# Attach. 6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

- - -

IN RE:                          : CIVIL ACTION NO. 06-689
                                :
                                :
                                :
                                :
                                :
                                :
                                : Philadelphia, Pennsylvania
W.R. GRACE & COMPANY,           : March 5, 2007
et al.                          : 4:02 p.m.

- - -

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE RONALD L. BUCKWALTER
UNITED STATES DISTRICT JUDGE

- - -

APPEARANCES:

For the Debtor:        DAVID M. BERNICK, ESQUIRE
W.R. Grace             Kirkland & Ellis LLP
& Co., et al:          Citigroup Center
                       153 East 53rd Street
                       New York, NY   10022


For the                EDWARD J. WESTBROOK, ESQUIRE
ZAI Claimants:         Richardson, Patrick,
                       Westbrook, Brinkman, LLC
                       1037 Chuck Dawley Boulevard
                       Building A
                       P.O. Box 1007
                       Mount Pleasant, SC   29464

With that exception, ZAI has not even been on the radar in the litigation that has consumed the Chapter 11 case.    Month after month we come in before Judge Fitzgerald with all kinds of contested matters.

It is a rarity that we have the benefit and pleasure of seeing Mr. Westbrook and hearing about ZAI, because the case is absolutely consumed with other matters.

Number three:    ZAI has not moved the needle for case resolution, nor can it, and what do I mean by that?

The big boys are the personal injury guys. ZAI has no control over those folks.    They assert that the liabilities in the case are enormous, that they own W.R. Grace.    They are the ones who are driving this negotiation, and they always will.    That is a fact of the matter in the case.

ZAI is a constituency, they're a constituency.    How important are they?    There is only one group that now believes that even before this opinion, believes that they're important and that's the ZAI people themselves.

But, objectively, are they important?    What are the indicators?    The indicators are that they're not important, and let me explain why, and it's not

just based on this opinion.

Look at all the hurdles that they have to sustain before they become important.   The cost of remediating a home is not -- taking the ZAI out is not a huge cost.   They know that the only way that they can move the needle of this case is to get their class certified.   So, they would have to do all of the following things before they count.

Number one, they would have to come forward to this judge, which they haven't done so far, to say that there really is a scientific case, and a scientific case that says that not just the contractors who are small in number, but all these different homeowners have risk and significant risk from this product.

I don't think they're ever going to get there, but that's what they have to do.   All they got is a bunch of contractors, it may add something to it, but it's not going to move the outcome of the case. So, they have to come up with a science.

Then they got to satisfy Rule 23, which as you know is a tough hurdle to clear.   Then they got to solve -- surmount the hurdles of the American Reserve case.

In bankruptcy, satisfying the requirements of

Rule 23 doesn't get you to class certification.    Under
American Reserve you then have to demonstrate that
certification of the class would also have the affect
of advancing the interest of the case.

So, they would have to convince Judge
Fitzgerald that they want to certify a class and have
class action litigation five or six years into the
Grace case.    They would have to that under American
Reserve.

They would then have to convince the Court of
Appeals, because that would become reviewable under the
new rules by the Third Circuit.    They would have to
convince the Court of Appeals, and then they would have
to come down and litigate the claim in order to show
that boy, that really is a robust claim.

They would have to go through all of those
hurdles to be able to belly up to the table as people
who really count, as folks who are going to actually
affect the outcome of the case.

Nobody believes that that is true.    Nobody
believed it was true even before this opinion came out,
because they have to do all of those different things
before they count.

Number four:    Let's take a look at the one
exceptional circumstance in this case, because that's

# Attach. 7

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                      .     Case No.  01-1139 (JKF)
                            .
W.R. GRACE & CO.,           .
et al.,                     .     USX Tower - 54th Floor
                            .     600 Grant Street
                            .     Pittsburgh, PA 15219
              Debtors.  .
                            .     September 17, 2009
. . . . . . . . . . . . ..         8:42 a.m.


TRANSCRIPT OF PLAN CONFIRMATION HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:            Kirkland & Ellis, LLP
                            By:  DAVID BERNICK, ESQ.
                                 LISA G. ESAYIAN, ESQ.
                                 JANET BAER, ESQ.
                            200 East Randolph Drive
                            Chicago, IL  60601

For the Asbestos            Caplin & Drysdale, Chartered
Creditors Committee:        By:  PETER LOCKWOOD, ESQ.
                            One Thomas Circle, NW
                            Washington, D.C. 20005

For the Future             Orrick, Herrington & Sutcliffe, LLP
Claimants                   By:  ROGER FRANKEL, ESQ.
Representatives:                 JONATHAN GUY, ESQ.
                            Washington Harbour
                            3050 K Street, N.W.
                            Washington, D.C.  20007

Audio Operator:             Janet Heller

Proceedings recorded by electronic sound recording, transcript
            produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311      Fax No. (609) 587-3599**

1    THE WITNESS:  Well, I don't know, if you could get me

2 the document I could answer the question.

3    THE COURT:  Do you want him to look at it?  He has

4 it.

5 Q   That's fine, sir.  We'll go ahead and read it.

6    MR. BROWN:  Michael Brown for OneBeacon and Seaton.

7                    CROSS EXAMINATION

8 BY MR. BROWN:

9 Q   Good morning, Mr. Austern.

10 A   Good morning, Mr. Brown.

11 Q   Just a couple of questions for you.  You were appointed

12 the FCR in this case after the Fresenius and Sealed Air

13 settlement agreements were reached, correct?

14 A   Yes.

15 Q   And you had no role at all in the negotiation of those

16 agreements, did you?

17 A   That's correct.

18    THE COURT:  Mr. Speights.

19                    CROSS EXAMINATION

20 BY MR. SPEIGHTS:

21 A   Good morning, Mr. Austern.

22 Q   Good morning, Mr. Speights.

23 A   I want to go back to the beginning of your testimony when

24 you talked about the negotiation process.  And I believe you

25 said it was an arm's length negotiation, is that correct?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Yes.

2  Q    And during that process when you negotiated the deal, the

3  Asbestos Personal Injury Committee was involved, correct?

4  A    Yes.

5  Q    And members of the Asbestos Personal Injury Committee,

6  such as Mr. Rice and others were involved in that process?

7  A    Yes.

8  Q    The debtors were involved in that process?

9  A    Yes.

10 Q    An equity was involved in that process?

11 A    Yes.

12 Q    Was a PD Committee involved in that process?

13 A    There were meetings with the PD Committee and Mr.

14 Westbrook and others.

15 Q    Well, let's back up a minute.  Are you telling me the

16 Official Property Damage Committee, through its counsel or

17 through its members, Mr. Baena and his group were involved in

18 the 2008 settlement negotiations?

19         MR. BERNICK:  When you talk about settlement

20 negotiations, is that face to face meetings, telephone calls

21 between -- I think there's a lack of foundation as well as

22 ambiguity.  The ambiguity is what particular context is he

23 talking about and the lack of foundation is the extent to which

24 Mr. Austern was aware of all aspects of the negotiation.

25         THE COURT:  Okay.  Well, with respect to all aspects,

1 Mr. Austern's testified that he had nearly daily conversations

2 with his counsel and participated in numerous meetings.    I

3 think the foundation has been laid.    To the extent that the

4 issue concerns some ambiguity in the time frame, that's

5 sustained.    Can you restate the question?

6 Q      During the 2008 settlement negotiations that you discussed

7 earlier which led to the deal, was a PD Committee's counsel,

8 let's start with the PD's Committee's counsel, Mr. Baena or

9 members of his firm, the Bilzin firm, involved in those

10 negotiations?

11 A      Mr. Speights, I can't tell you by date, by year even,

12 whether Mr. Baena or Mr. Westbrook or you or others were at

13 particular meetings.    I can tell you that at perhaps the last

14 five or six meetings, which by the way were very close upon

15 each other, I do not believe that any representative of the

16 property damage committees were present.    But they were

17 certainly present in what were seemingly endless numbers of

18 meetings that took place before the last four or five meetings

19 that led to the settlement.

20 Q      Well, let's go back then.    Because I think the record

21 needs to be clear on this, Mr. Austern.    In 2004, you put

22 together a group to try to negotiate a consensual plan and a

23 meeting of principals only, is that correct?

24 A      I think the group was put together by many others, but

25 yes.

Austern - Cross/Speights                79

1  Q     You participated in that?

2  A     Yes.

3  Q     And it was a session of principals only?

4  A     I think that's right, yes.

5  Q     And not only you participated, but the debtors

6  participated, the principals, correct?

7  A     Yes.

8  Q     The PI Committee's principals, Mr. Rice and others

9  participated?

10 A     Yes.

11 Q     And members of the PD Committee, Mr. Westbrook, Mr.

12 Speights, Mr. Dies, et cetera, also participated?

13 A     Yes.

14            MR. GUY:  Your Honor, I object to this -- sorry -- I

15 object to this line of -- I object to this line of questioning,

16 because it goes to settlement negotiations that took place in

17 2004 that are irrelevant to the plan that's before the Court.

18            THE COURT:  I don't know whether they're irrelevant.

19 Eventually we got to a settlement, and I'm not sure that any of

20 the negotiations that led to a settlement are irrelevant.  It

21 may not have led at that time to a settlement, but it got to

22 one.  So the objection's overruled.

23 Q     For whatever reason there was no settlement back in 2004,

24 correct?

25 A     Correct.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    And then later on, I believe 2006, there was a, there were

2  a series of meetings before Judge Horner I think, is that

3  correct?

4  A    Correct.

5  Q    And the PI Committee was involved in that, correct?

6  A    Yes.

7  Q    The PI principals were involved in that, correct?

8  A    Some of them.

9  Q    You were involved in that?

10  A    Yes.

11  Q    Your counsel was involved in that.

12  A    Yes.

13  Q    The PD Committee was involved in that.

14  A    Yes.

15  Q    Individual PD representatives, such as Mr. Westbrook and

16  Mr. Speights were involved in that.

17  A    Correct.

18  Q    And as a result of that, and I'm not trying to

19  characterize it at this point, there was a 8515 document

20  produced.  We call it an agreement.  You're not ready to call

21  it an agreement, but whatever it was that's what produced the

22  8515 split.

23  A    There were certainly discussions about that.  I don't

24  recall a document.

25  Q    Okay.  In any event, back in 2006, those discussions did

1  not lead to a settlement.

2  A     Correct.

3  Q     Now, you talked about 2008.  Can you point me to any

4  settlement meeting that involved the PD Committee, Mr. Baena or

5  lawyers in his firm, between the split discussions, the

6  mediation discussions, and 2008, Mr. Austern?

7  A     I'm sorry, did you say any meeting or any document?

8  Q     Any discussions, settlement discussions that involved the

9  PD Committee after we put aside the 2004 and after we've put

10 aside the split discussions, neither of which led to an

11 agreement, can you point to any session in which the PD

12 Committee participated, any settlement negotiations in which

13 they participated and you were there?

14 A     There was -- I do not recall any meeting that I attended

15 in which that happened.

16 Q     Thank you, sir.  Now, you clearly said that in 2008 the

17 last five or six sessions, which led to the deal, no PD

18 representatives were there, is that correct?

19 A     I believe that's correct, yes.

20 Q     And that's -- by PD representatives, I mean the PD

21 Committee or any PD lawyers, Mr. Westbrook and Mr. Speights or

22 Mr. Dies, none of those were present.

23 A     I do not believe any of them were present.

24 Q     And of course there was no PD Future Claimants

25 representative at that time?

1 A     I don't remember when Judge Sanders was appointed, but I

2 don't believe there was.

3 Q     And certainly Judge Sanders did not attend those meetings

4 or his counsel, correct?

5 A     He did not.

6 Q     So during those 2008 negotiation sessions, was PD

7 discussed?

8 A     I don't remember.

9           MR. SPEIGHTS:  Thank you, Mr. Austern.

10          THE COURT:  Anyone else?

11          MR. MONACO:  Can I ask two more questions?

12          THE COURT:  Mr. Monaco?  I'm sorry, I couldn't hear

13 you, sir.

14          MR. LOCKWOOD:  Your Honor, Mr. Monaco already asked

15 --

16          THE COURT:  I couldn't hear him.

17          MR. LOCKWOOD:  Mr. Monaco already questioned the

18 witness.

19          THE COURT:  I couldn't hear Mr. Monaco.  I'm sorry,

20 what did you say?

21          MR. MONACO:  Your Honor, I said I would like just to

22 ask one or two more questions  --

23          MR. GUY:  I have no objection.

24          MR. MONACO:  -- to follow up with Mr. Speights' --

25          THE COURT:  All right, that's fine.  Go ahead.

1          MR. MONACO:   I think it's relatively

2   non-controversial.

3                    FURTHER CROSS EXAMINATION

4   BY MR. MONACO:

5   Q    I apologize for acting like Columbo, Mr. Austern.   You've

6   been involved with the negotiations both with the original plan

7   and the current plan that's on the table throughout this case?

8   A    Well, since 2004, not throughout the case.

9   Q    Okay, fine.   And I think this is relatively

10  uncontroversial, but I want to make sure this is clear for the

11  record.   Has the State of Montana ever been a participant to

12  any of these settlement discussions that led up to the plan to

13  your knowledge?

14  A    I didn't see you or any other representative of the State

15  there.

16          MR. MONACO:   Thank you.   No further questions, Your

17  Honor.

18          THE COURT:   Any other cross examination?   Redirect?

19          MR. GUY:   Short redirect, Your Honor, honoring the

20  12:30 rule.

21                    REDIRECT EXAMINATION

22  BY MR. GUY:

23  A    Mr. Austern, if you could turn to the first document in

24  your binder, which is the term sheet that you refer to.

25          THE COURT:   Is this Exhibit PP-160?

**J&J COURT TRANSCRIBERS, INC.**

1           MR. GUY:  Yes, Your Honor.  If Chris could pull it up

2   on the screen?

3   Q    Mr. Austern, if you could look at the very opening

4   paragraph.  See the language there that says the co-proponents

5   providing for a resolution of all asbestos personal injury

6   claims and liabilities?

7   A    Yes.

8   Q    Does that refresh your recollection as to whether the

9   parties to this term sheet agreed for the resolution of all

10  asbestos personal injury claims and liabilities?

11  A    Yes.

12  Q    Do the indemnities provided under the prepetition

13  settlement agreements with insurers give rise to liabilities?

14  A    Yes.

15  Q    So to satisfy this condition, those indemnities would have

16  to be addressed and claims would have to be enjoined under the

17  plan?

18          MR. KOVACICH:  Objection, leading.

19          THE COURT:  Sustained.

20          MR. GUY:  I'll withdraw it, Your Honor.  I think it's

21  a given.

22  Q    If you could turn to Page 4, Mr. Austern.  Paragraph 2

23  there, sir.

24  A    Yes.

25  Q    If you could highlight for the Court and the courtroom,

**J&J COURT TRANSCRIBERS, INC.**

1 the first paragraph of Paragraph 2 on Page 4.  The first

2 sentence in the first paragraph.

3            MR. GUY:  Just the first sentence, Chris.

4 Q    Mr. Austern, could you take a moment to read that?.

5 A    Yes, I've read it.

6 Q    Do you see the language there that says the plan shall

7 contain injunctions under 524(g) for various parties including

8 insurers?

9 A    Yes.

10 Q    Does that refresh your recollection, sir, as to whether

11 the term sheet addressed the provision of 524(g) protection for

12 insurers?

13 A    It does and it did.

14            MR. GUY:  No further questions, Your Honor.

15                    RECROSS EXAMINATION

16 BY MR. BERNICK:

17 Q    Good morning, Mr. Austern.

18 A    Good morning, Mr. Bernick.

19 Q    I want to revisit, just very briefly, the history that Mr.

20 Speights covered with you briefly on his cross examination.  Do

21 you recall -- I'm assuming that you got regular updates on what

22 was happening of consequence in the case?

23 A    Yes.

24 Q    Do you recall that in connection with the mediation

25 process, as Mr. Speights indicated, was that mediation process

1 focused on doing a settlement piece by piece through the case

2 or was it focused on a global or overall deal?

3 A    It was a global or overall deal.

4 Q    Was that mediation process successful?

5 A    It was not.

6 Q    After the mediation process was done, could you tell us

7 whether or not there were any further efforts to essentially

8 put together a global deal that its efforts involving PD, PI --

9 PD and PI together?

10 A    Specific timing is difficult for me, but I certainly did

11 have discussions and I know my counsel did with Mr. Westbrook,

12 perhaps Mr. Speights, I don't remember, but these tended to be

13 piecemeal meetings and I do not recall a global meeting that

14 took place.

15 Q    Well, let me be more specific.  Did a time come, I think

16 Mr. Speights referred to an 85/15 split, remember that?

17 A    Yes.

18 Q    And that was an effort that was undertaken, as I recall at

19 least as it was reported to the Court and to us, that was

20 undertaken by the PD and PI people working as a group.

21 A    Yes, that's correct.

22 Q    Remember that they then reached out to try to also include

23 the unsecured creditors at one point?

24 A    I do.

25 Q    And the only folks that were left out of that dialogue

1  were the debtor and equity.

2  A     That's correct.

3  Q     Did those efforts come to fruition, that is, did they

4  produce an overall deal?

5  A     They did not.

6  Q     Could you tell us whether or not after that time, the

7  focal point of the negotiation and settlement process turned

8  from overall packages to kind of a piece by piece approach.

9            MR. SPEIGHTS:  Objection, as leading, Your Honor.

10 He's a plan proponent, that's one of their witnesses.

11           THE COURT:  He said whether or not, it's not leading.

12 Overruled.

13 A     It was piecemeal, including visits to various constituents

14 by me and counsel.

15 Q     Okay.  Now, when you sat down in the discussions and the

16 ACC was present as well, in discussions with the debtor and

17 equity, tell us what the subject matter focus, what was the

18 principal focus of those negotiations in terms of reaching a

19 deal?

20 A     How much money the trust was going to get.

21 Q     But in terms of which constituency you all were

22 negotiating for resolution, which constituency was it?

23 A     It was just equity and the debtor.

24 Q     Do you recall whether during the same period of time, do

25 you remember that during the course of the case, much was made

Recross - Austern/Bernick                                88

1  by Mr. Speights, in particular, pointing out that on certain

2  matters, the PD Committee could speak for PD Claimants, and on

3  other matters, PD Claimants were the only ones through their

4  counsel who could speak to those issues.  Do you recall that

5  distinction being made?

6  A    Yes, and it was reinforced to me by counsel on several

7  occasions.

8  Q    Right.  Now when it came to the settlement of PD Claims,

9  can you tell the Court whether or not, while the debtor and

10 equity on the one hand and the PI constituency on the other

11 were trying to resolve their issues, could you tell us whether

12 you had any awareness, whether it was ever reported to you that

13 settlement discussions were taking place between the debtor on

14 the one hand and representatives of individual PD claimants on

15 the other?

16        MR. SPEIGHTS:  I object, Your Honor.  That's patently

17 hearsay.

18        THE COURT:  Sustained.

19        MR. BERNICK:  Well, no.  I'll rephrase the question.

20 Q    Mr. Speights asked you without regard to your personal

21 knowledge, he asked you, were you aware.  So I'm not asking for

22 the truth of the matter, I'm asking in terms of your awareness,

23 was it reported to you that there were discussions that were

24 unfolding between the debtor and representatives of individual

25 PD claimants?

1            MR. SPEIGHTS:   Same objection, Your Honor.

2            THE COURT:  It's a yes or no answer, Mr. Austern, you

3   may answer yes or no.

4   A    Yes.

5   Q    During the course of this case as the process again

6   continued to unfold between the PI folks and the debtor and

7   equity over their issues, could you tell -- were you made aware

8   of reports that Mr. Restivo made on a regular basis to the

9   Court with his little chart about PD settlements that were

10  being reached?

11  A    Yes.

12  Q    Okay.  Are you aware of any effort by the PD Committee as

13  a committee to participate in the discussions that you've

14  discussed between the debtor and the bodily injury constituency

15  about settling bodily injury?

16  A    Not to me.

17  Q    At the end of the day, with the exception of Anderson

18  Memorial, and I believe the State of California, which has

19  pursued an appeal, are there any outstanding, unsettled,

20  current PD claims?

21  A    Not that I know of.

22  Q    After the term sheet was done and there was the light

23  shown, there was happiness in the courtroom.  I remember the

24  Court expressing a certain degree of satisfaction with the

25  process, did the discussions then turn to the next pieces,

1 which were ZAI and PD futures?

2 A    Yes.

3 Q    And again, just as all of the other elements of the plan

4 that's now before the table, were those handled on a piecemeal

5 basis?

6 A    As far as I know they were.

7         MR. BERNICK:  I have nothing further, Your Honor.

8         THE COURT:  Any recross?

9         MR. SPEIGHTS:  None from Anderson, Your Honor.

10        THE COURT:  All right, you're excused, Mr. Austern,

11 thank you.  Why don't we take a five-minute recess since we've

12 been going since 8:30, and then we'll reconvene with the next

13 witness.

14                    (Recess)

15        THE COURT:  All right, whose next?

16        MR. SPEIGHTS:  Your Honor, excuse me, are we supposed

17 to have the monitors working?

18        THE COURT:  She's turning it on.  They're turned on,

19 but there's no presentation at the moment.

20        MR. SPEIGHTS:  The people on the telephone have been

21 disconnected.

22        MR. BERNICK:  We call Judge Sanders, the Future

23 Claimants representative for PD.

24     JUDGE ALEXANDER SANDERS, DEBTOR'S WITNESS, SWORN

25        MR. RICH:  May it please the Court, Alan Rich for the

# Attach. 8

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| W. R. GRACE & CO., et al. | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |

Hearing Date: April 9, 2007
Pittsburgh, PA
Response Deadline: March 19, 2007
Related Docket No. 9315

## DEBTORS' MOTION AND MEMORANDUM FOR AN ORDER PURSUANT TO F.R.B.P. 7056 DISALLOWING AND EXPUNGING SIXTEEN (16) TIME-BARRED ASBESTOS PROPERTY DAMAGE CLAIMS

This motion seeks to expunge nine (9) asbestos property damages claims that are barred by the statute of limitations of the states in which the properties subject to the claims are located and seven (7) additional claims that are barred by Delaware's three-year statute of limitations.

**I.     SIXTEEN CLAIMS ARE BARRED BY EITHER THE STATUTES OF LIMITATIONS IN THE STATES WHERE THE PROPERTIES ARE LOCATED OR DELAWARE'S THREE-YEAR STATUTE OF LIMITATIONS.**

As set forth in Debtors' "Road Map" of Summary Judgment Motions To Expunge Various Asbestos Property Damage Claims ("Debtors' 'Road Map'"), Delaware's borrowing statute requires the Court to apply the shorter of Delaware's three-year statute of limitations or the statute of limitations of the state in which the property subject to the claim is located. *See* Debtors' "Road Map" at 13-14.

The following claims are barred by the statute of limitations in the states where the properties are located:  (1) the Texas claims relating to (a) the Woodbury Apartments (No. 2763), (b) EPEC Realty (No. 5672), (c) the 600 Building (No. 5690), and (d) BNC Forum Lp (No. 5688); (2) the Arkansas claims of KARK-TV (Nos. 9912 and 9913); (3) the Georgia claims of Dodge County Hospital (No. 11550) and Virginia L. Thrasher (No. 2636); and (4) the

Wisconsin claim of Ronald Skarie (No. 6582).

The following claims are barred by Delaware's three-year statute of limitations: (1) Manor Oak (No. 10789); (2) Allegheny Center Associates (No. 9778); (3) Children's Hospital (No. 10962); (4) St. Luke's Hospital (No. 11106); (5) Titusville Hospital (No. 11144); (6) Ferrell Hospital (No. 11144); and (7) Investment Tower (No. 11179).

Each of these claimants was required to complete a property damage claim form (the "Claim Form") in connection with this proceeding. The Claim Form required the claimants to state when they first knew that asbestos was in their building and to list any remediation efforts and asbestos test results. Based on the admissions contained on the foregoing claimants' Claim Forms, their claims are barred by the statute of limitations of the state in which their properties are located and/or Delaware's three-year statute of limitations.

## II.    THE APPLICABLE STATES' STATUTES OF LIMITATIONS BAR NINE CLAIMANTS' PROPERTY DAMAGE CLAIMS.

### A.    THE TEXAS CLAIMANTS' CLAIMS ARE BARRED BY TEXAS' TWO-YEAR STATUTE OF LIMITATIONS.

Texas applies a two (2) year statute of limitations that begins to run when the claimant knew or should have known of an injury caused by another. *See S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex. 1996).

Woodbury Apartments (No. 2763) admitted in its Claim Form that it knew of the presence of asbestos in its building when it purchased the building in 1989. *Exhibit A.* At that time, a September 23, 1988 report was disclosed that found 2-5% chrysotile asbestos in building materials in the building. *Id.* Woodbury Apartments' claims accordingly were barred by Texas' two-year statute of limitations by 1991.[1]

---

[1]    Woodbury Apartments' claim (No. 2763) is also barred because it involves a product with a component not found in Debtors' asbestos-containing surfacing products, namely
Continued on following page

EPEC Realty (No. 5672) admitted in its Claim Form that it knew asbestos was in its building in 1996 when it purchased the property. *Id.* EPEC Realty further indicated in its Claim Form that asbestos testing was conducted on the property in 1987, 1988 and 1989. *Id.* Asbestos was abated from the property in 1998. *Id.* EPEC Realty's admissions that it incurred expenses in 1998 to abate or remove ACMs from its building establish sufficient knowledge of its alleged injury at that time to commence the running of Texas' two-year statute of limitations. Accordingly, EPEC Realty's claims were barred by Texas' two-year limitations period by no later than 2000.

The 600 Building (No. 5690) admitted in its Claim Form that it knew of the presence of asbestos in its building in 1985. *Id.* Asbestos testing in 1988 reported 10-15% asbestos in the building. *Id.* Asbestos was abated from the building in 1988, 1991, 1992 and 1997. *Id.* The 600 Building knew of its injuries at that time. The 600 Building's claims accordingly expired pursuant to Texas' two-year limitations period no later than 1990.

BNC Forum Lp (No. 5688) admitted in its Claim Form that it knew of the presence of asbestos in its building in 1998 when it purchased the property. *Id.* At the time of purchase, a July 17, 1991 Comprehensive Asbestos Survey was supplied which identified asbestos in the fireproofing in the building. *Id.* BNC Forum Lp's claims accordingly were barred by Texas' two-year statute of limitations no later than 2000.

## B.   ARKANSAS' THREE-YEAR STATUTE OF LIMITATIONS BARS KARK-TV'S CLAIMS.

Arkansas has a three-year statute of limitations that runs from when the claimant knew of the nature of their injury and the causal connection of that injury to the product.

---

Continued from previous page
    cellulose. *See* Debtors' Motion for An Order Pursuant To F.R.B.P. 7056 Disallowing and Expunging Eleven (11) Asbestos Property Damage Claims Involving Products Not Made By The Debtor.

*Adkison v. G.D. Searle & Co.*, 971 F.2d 132, 134 (8th Cir. 1992).

KARK-TV (Nos. 9912 and 9913) admitted in its Claim Forms that in 1988 it began an asbestos monitoring and maintenance program for the building that is the subject to its claims. *Exhibit A*. The program included extensive employee training on the hazards of asbestos-containing materials ("ACMs"). *Id*. On February 10, 1988, a survey for ACMs was completed in KARK-TV's building. *Id*. The survey found friable, asbestos-containing sprayed-on fireproofing and sprayed-on acoustical surfacing materials throughout the building. *Id*. Test results dated February 24, 1988 showed that the sprayed-on fireproofing contained between 6-21% chrysotile asbestos and the sprayed-on acoustical surfacing material contained between 7-21% chrysotile asbestos. *Id*.

In April and May of 1988, ACMs were removed from several different locations within KARK-TV's buildings. Asbestos abatement records indicate that 23,312 square feet of friable acoustical plaster were to be removed from the KARK-TV Channel 4 Building starting on April 7, 1988. *Id*. Test results dated April 7, 1988 detected 8% chrysotile in acoustical ceiling material in KARK-TV's building and 10% chrysotile in sprayed-on duct insulation in the building's control room. *Id*. In a second project on June 20, 1988, 1000 square feet of acoustical spray ceiling material was removed from KARK-TV's Transmitter Tower.

Given these undisputed facts, KARK-TV's claims were barred by Arkansas' three-year statute of limitations by the summer of 1991.

## C.    THE GEORGIA CLAIMANTS' CLAIMS ARE BARRED BY GEORGIA'S FOUR-YEAR STATUTE OF LIMITATIONS.

Georgia applies a four-year statute of limitations to asbestos property damage claims that runs from substantial completion of the building. *Corporation of Mercer*

*University v. National Gypsum Co.*, 368 S.E.2d 732 (Ga. 1988).

Dodge County Hospital (No. 11550) admitted in its Claim Form that the building

for which it is making a claim was built between 1968-1973. *Exhibit A.* Dodge County

Hospital purchased the property in 1970 and stated that it did not install the Debtors'

products on the property. *Id.* Dodge County Hospital further attaches a December 9,

1970 invoice for the Debtors' product in support of its claim. *Id.* Dodge County

Hospital's claims accordingly were barred by Georgia's four-year statute of limitations

no later than 1974.

Virginia L. Thrasher (No. 2636) admitted in her Claim Form that the property for

which she is making a claim was built before 1969. *Id.* Ms. Thrasher inherited the

property in 1973 and states that she did not install any asbestos-containing products on

the property. *Id.* Ms. Thrasher's claims accordingly were time barred under Georgia's

four-year statute of limitations no later than 1977.[2]

### D.    THE WISCONSIN CLAIMANT'S CLAIM IS BARRED BY WISCONSIN'S SIX YEAR STATUTE OF LIMITATIONS.

Wisconsin has a six-year statute of limitations applicable to asbestos property

damage claims that begins to run from the date upon which the plaintiff knew of the

presence of asbestos in their building. *Banc One Building Management Corp. v. W. R.

Grace Co. – Conn.*, 565 N.W.2d 154, 159 (Ct. App. Wisc. 1997).

Ronald Skarie (No. 6582) admitted in his Claim Form that he knew of the

presence of asbestos in the building for which he is making his claim in 1992. *Exhibit A.*

His claims accordingly were time barred by 1998.[3]

---

2    Ms. Thrasher's claim (No 2626) is also barred because it involves a product not
     manufactured or sold by Debtors, namely asbestos siding. *See* Debtors' Motion for An
     Order Pursuant To F.R.B.P, 7056 Disallowing and Expunging Eleven (11) Asbestos
     Property Damage Claims Involving Products Not Made By The Debtor.

3    Mr. Skarie's claim (No. 6582) is also barred because it involves a product not

Continued on following page

III.    **DELAWARE'S THREE-YEAR STATUTE OF LIMITATIONS BARS SEVEN ADDITIONAL CLAIMS.**

Delaware's three-year limitations period begins to run at the time a claimant knew or should have known of its alleged injury. *See Becker v. Hamada, Inc.*, 455 A.2d 353 (Del. 1982); *Nardo v. Guido DeAscanis & Sons, Inc.*, 254 A.2d 254 (Del. Super. 1969).  A claim is barred if a claimant knew or should have known of its injury prior to April 1998, three years before the bankruptcy was filed.

The following claimants submitted information in connection with their claims establishing that, not only did they know that asbestos was in their buildings by April 1998, but they also incurred costs to abate or remove ACMs in their buildings before that time:

| Claimant | Claim No. | Abatement/Removal |
|---|---|---|
| Manor Oak | 10789 | **1997** |
| Allegheny Center Associates | 9778 | **1980s** |
| Children's Hospital | 10962 | **1991/1992** |
| St. Luke's Hospital | 10998 | **1992-1997** |
| Titusville Hospital | 11106 | **1991/1992** |
| Ferrell Hospital | 11144 | **1991/1992** |
| Investment Tower | 11179 | **1987, 1989-1991** |

Because these claimants abated and/or removed ACMs in their buildings due to the hazards associated with those materials more than three years before the bankruptcy was filed, their claims are barred by Delaware's three-year statute of limitations.

---

Continued from previous page
    manufactured or sold by Debtors, namely asbestos wrapping. *See* Debtors' Motion for An Order Pursuant To F.R.B.P, 7056 Disallowing and Expunging Eleven (11) Asbestos Property Damage Claims Involving Products Not Made By The Debtor.

## CONCLUSION

The Court should disallow and expunge the foregoing sixteen (16) property damage

claims that are barred by applicable statutes of limitations by entering the attached proposed

order.

Dated: February 16, 2007

REED SMITH LLP
James J. Restivo, Jr., Esq. (#10113)
Lawrence Flatley, Esq. (#21871)
Douglas E. Cameron, Esq. (#41644)
Traci S. Rea, Esq. (#72658)
435 Sixth Avenue
Pittsburgh, PA  15219
Telephone:  (412) 288-3131
Facsimile:  (412) 288-3063

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Janet S. Baer
Lisa Esayian
Samuel Blatnick
200 East Randolph Drive
Chicago, Illinois 60601
Telephone:  (312) 861-2000
Facsimile:  (312) 861-2200

And

PACHULSKI STANG ZIEHL YOUNG JONES &
WEINTRAUB LLP
Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
(Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

By: _____
Co-Counsel for the Debtors and Debtors in
Possession

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| W. R. GRACE & CO., et al. | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| | ) | |

Hearing Date: April 9, 2007
Pittsburgh, PA
Response Date: March 19, 2007
Related Docket No. 9315

### DEBTORS' MOTION AND MEMORANDUM FOR AN ORDER PURSUANT TO F.R.B.P. 7056 DISALLOWING AND EXPUNGING ELEVEN (11) PROPERTY DAMAGE CLAIMS BARRED BY STATUTES OF REPOSE IN MINNESOTA, NORTH CAROLINA, IOWA AND TENNESSEE

This motion seeks to expunge eleven (11) asbestos property damages claims that are barred by the statutes of repose of the states in which the properties are located.

Certain states have enacted statutes of repose that apply to Debtors' asbestos-containing surfacing products. These statutes of repose bar any claim relating to those products after a certain number of years from the manufacture, sale or installation of the products. Specifically: (1) Minnesota has a 10-year statute of repose that runs from completion of the building; (2) North Carolina has a 6-year statute of repose that runs from the last act of the defendant; (3) Iowa has a 15-year statute of repose that runs from the act or omission of the defendant that allegedly caused the damage; and (4) Tennessee has a 10-year statute of repose that runs from the sale of the product. Because claimants in these states allege that Debtors' products were sold to them and installed in their buildings more than 30 years ago, the claims subject to this motion are barred by the applicable statutes of repose.

## I.  DEBTORS' PRODUCTS ALLEGEDLY WERE SOLD TO CLAIMANTS AND INSTALLED IN THEIR BUILDINGS OVER THIRTY YEARS AGO.

The following claims are subject to this motion:  (1) the Minnesota claims of (a) the Church of St. Helena (No. 3512), (b) the Church of Holy Redeemer (No. 6933), (c) the City of Barnesville (No. 6936), (d) Bethesda Hospital (10523), and (e) First Presbyterian Church (No. 12780); (2) the North Carolina claims of (a) New Hanover Medical Center (No. 10672) and (b) Montgomery Memorial Hospital (No. 10673); (3) the Iowa claims of (a) the YMCA (No. 11153) and (b) St. Anthony's Hospital (No. 11151); and (4) the Tennessee claims of the National Bank Building (No. 11722) and First National Bank (No. 10533).

Each of these claimants was required to complete a property damage claim form (the "Claim Form") in connection with this proceeding.  The Claim Form required claimants to state when the building subject to their claim was built and when the Debtors' product was installed in that building.   The responses to those questions for the foregoing claimants were as follows:

| Claimant | State | Date Property Built | Date Product Installed |
|---|---|---|---|
| Church of St. Helena | MN | Pre-1969 | 1954 |
| Church of Holy Redeemer | MN | Pre-1969 | 1954 |
| City of Barnesville | MN | Pre-1969 | 1950 |
| Bethesda Hospital | MN | Pre-1969 | 1966 |
| First Presbyterian Church | MN | Pre-1969 | 1960 |
| New Hanover Med. Center | NC | Pre-1969 | 1954 |
| Montgomery Med. Hosp. | NC | 1969-1973 | 1970 |
| YMCA | IA | 1969-1973 | 1971 |
| St. Anthony's Hospital | IA | 1969-1973 | 1970 |
| National Bank Building | TN | 1969-1973 | 1970 |
| First National Building | TN | 1969-1973 | 1970 |

*See* Exhibit A (Rule 1006 Summary of Voluminous Writings).

As established by the admissions contained in these Claim Forms, the Debtors' products for which the claims are being made are alleged to have been sold and installed in the claimants'

buildings more than three decades ago.

## II.   THE APPLICABLE STATES' STATUTES OF REPOSE BAR CLAIMANTS' ASBESTOS PROPERTY DAMAGE CLAIMS.

### A.   MINNESOTA'S TEN-YEAR STATUTE OF REPOSE BARS THE MINNESOTA CLAIMANTS' CLAIMS.

Minnesota's statute of repose precludes any action arising out of an improvement to real property if not brought within ten (10) years after substantial completion of construction. *See* Minn. Stat. § 541.051. This statute applies to manufacturers of asbestos-containing products such as the Debtors. *See Appletree Square 1 Ltd. Partnership v. W. R. Grace & Co.*, 815 F. Supp. 1266, 1272 (D. Minn. 1993).

The Minnesota claimants admitted in their Claim Forms that the Debtors' products allegedly were installed in their buildings from 1950-1966. These claimants' claims accordingly were barred by Minnesota's 10-year statute of repose by 1970.

### B.   NORTH CAROLINA'S SIX-YEAR STATUTE OF REPOSE BARS THE NORTH CAROLINA CLAIMANTS' CLAIMS.

North Carolina has a six-year statute of repose that applies to remote manufacturers of asbestos-containing materials such as the Debtors. *See Forsyth Memorial Hospital v. Armstrong World Indus., Inc.*, 444 S.E.2d 423 (N.C. 1994). That statute runs six years from the sale of the product. *See* N.C. Gen. Stat. § 1-50(6).

New Hanover Medical Center ("New Hanover") admitted in its Claim Form that the Debtors' product was installed in its North Carolina building in 1954. New Hanover's claim accordingly was barred by North Carolina's six-year statute of repose by 1960. Montgomery Medical Hospital ("Montgomery") similarly admitted in its Claim Form that the Debtors' product was installed in its buildings in 1970. Montgomery's claims were barred by North Carolina's six-year statute of repose by 1976.

**C.    IOWA'S FIFTEEN-YEAR STATUTE OF REPOSE BARS THE
        IOWA CLAIMANTS' CLAIMS.**

Iowa has enacted a statute of repose that precludes actions arising out of defective

conditions in improvements to real property that are filed more than fifteen years after the act or

omission of the defendant that allegedly caused the damage. *See* Iowa Code § 614.1 (11) (1993).

Iowa's statute of repose bars actions against asbestos manufacturers unless commenced within

fifteen years from when the product was manufactured. *See Tallman v. W.R. Grace & Co. –

Conn.*, 558 N.W.2d 208 (Iowa 1997); *see also Eastern Iowa Propane, Ltd v. Honeywell, Inc.*,

652 N.W.2d 462 (Iowa 2002) (15-year statute of repose runs against manufacturers from the date

of manufacture of the product).

Two Iowa claimants, the YMCA and St. Anthony's Hospital, admitted in their Claim

Forms that Debtors' products were installed in their buildings in 1971 and 1970 respectively.

Their claims accordingly were barred by Iowa's 15-year statute of repose by 1986 and 1985.

**D.    TENNESSEE'S TEN-YEAR STATUTE OF REPOSE BARS THE
        TENNESSEE CLAIMANTS' CLAIMS.**

Tennessee has a ten-year statute of repose that applies to asbestos property damage

claims. *Wyatt v. A-Best Products Co., Inc.*, 924 S.W.2d 98 (Ct. App. Tenn. 1996); *see also*

T.C.A. § 29-28-103(a). That ten-year period begins to run from the date of the sale of the

asbestos-containing product. *Id.*

The National Bank and the First National Bank admitted in their Claim Forms that their

buildings were built between 1969 and 1973 and that Debtors' asbestos-containing product

allegedly was installed in 1970. Their claims accordingly were barred by Tennessee's 10-year

statute of repose by 1980.

## CONCLUSION

The Court should disallow and expunge the foregoing eleven property damage claims

that are barred by applicable statutes of repose by entering the attached proposed order.

Dated:  February 16, 2007

REED SMITH LLP
James J. Restivo, Jr., Esq. (#10113)
Lawrence Flatley, Esq. (#21871)
Douglas E. Cameron, Esq. (#41644)
Traci S. Rea, Esq. (#76258)
435 Sixth Avenue
Pittsburgh, PA  15219
Telephone:  (412) 288-3131
Facsimile:  (412) 288-3063

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Janet S. Baer
Lisa Esayian
Samuel Blatnick
200 East Randolph Drive
Chicago, Illinois 60601
Telephone:  (312) 861-2000
Facsimile:  (312) 861-2200

And

PACHULSKI STANG ZIEHL YOUNG JONES
& WEINTRAUB LLP
Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
(Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

By: _____
     Co-Counsel for the Debtors and Debtors in
     Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| W. R. GRACE & CO., et al. | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |

Hearing Date: April 9, 2007 at 9:00 a.m.
Pittsburgh, PA
Response Deadline: March 19, 2007
Related Docket No. 9315

**DEBTORS' MOTION AND MEMORANDUM IN SUPPORT
OF AN ORDER PURSUANT TO F.R.B.P. 7056 DISALLOWING AND
EXPUNGING ONE HUNDRED TWENTY (120) TIME-BARRED
LOUISIANA ASBESTOS PROPERTY DAMAGE CLAIMS**

This motion seeks to expunge 120 Louisiana property damage claims that are barred by Louisiana's one-year statute of limitations or "prescription period."

The facts are undisputed. On January 17, 1983, a nationwide class action (the "Class Action") was filed in which each of the Louisiana School Boards that are subject to this motion were putative class members. All of the Louisiana School Boards opted out of the Class Action in 1988 to file a new action. Under Louisiana law, while the filing of the Class Action initially tolled the one-year prescription period, once the Louisiana School Boards opted-out of the Class Action, that tolling is deemed never to have occurred. Accordingly, the Louisiana School Boards' claims are barred if, by 1987 (one year prior to the filing of the new action), they knew or should have known of their claims.

All but three of the Louisiana School Boards admitted that they knew of their claims by 1984. In fact, several of the Louisiana School Boards knew of their claims in 1981, more than a year before even the Class Action was filed. Had the remaining Louisiana School Boards acted

diligently and in accordance with government mandates, they also would have known of their

claims in 1981.  For the foregoing reasons, all of the Louisiana School Boards' claims are barred

by Louisiana's one-year prescription period.


## BACKGROUND

**I.      Louisiana's One-Year Prescription Period Applies To The Louisiana School
         Boards' Claims.**

To determine which state's statute of limitations to apply, the Court must apply

Delaware's choice of law rules.  Under Delaware's choice of law rules, Louisiana's one-year

prescription period applies to the Louisiana School Boards' claims.[1]

As set forth in more detail below, Louisiana's prescription period for asbestos property

damage claims is one year.  Because this period is shorter than Delaware's three-year statute of

limitation and because the Louisiana School Boards' claims arose in Louisiana, Delaware's

borrowing statute compels application of the one-year Louisiana prescription period to those

claims.  10 Del. C. § 8121 (2005).[2]

**II.     The Louisiana Prescription Period Is One Year From The Date When The
         Claimants Knew Or Should Have Known Of Their Claims.**

Louisiana's prescription period for asbestos property damage claims is one year.  La. Civ.

Code art. 3492.  The one-year period begins to run when the plaintiff knew or should have

known of his cause of action.  *Orleans Parish Sch. Bd. v. United States Gypsum Co.*, 892 F.

---

[1]  *See* Debtors' "Road Map" of Summary Judgment Motions to Expunge Various Asbestos Property Damage
     Claims at 13-14.

[2]  If Delaware's three-year statute of limitations is deemed to be shorter than Louisiana's one-year prescription
     period for any reason, it would apply under Delaware's borrowing statute.  The Court need not reach that issue
     to decide this motion because the Louisiana School Boards' claims clearly are barred under Louisiana's one-
     year prescription period.  Since the shorter of the two periods applies, if the claims are barred by Louisiana's
     one-year period, Debtor is entitled to have the claims expunged regardless of which period applies under
     Delaware's borrowing statute.

Supp. 794, 798 (E.D. La. 1995). A person knows or should know of the existence of his cause of action once he has received sufficient notice to prompt a reasonable person to investigate further. *Id.*

For asbestos property damage claims, the one-year prescription period begins to run when the plaintiff becomes aware that asbestos is present in some of its buildings posing a health risk to employees, and that it must be dealt with at a considerable expense. *Orleans Parish School Board v. United States Gypsum Co.*, 114 F.3d 66, 68 (5th Cir. 1997); *Cameron Parish School Board v. AC and S, Inc.*, 687 So.2d 84 (La. 1997); *see also Trizec Properties, Inc. v. United States Mineral Prods. Co.*, 974 F.2d 602, 607-608 (5th Cir. 1992) (period ran where plaintiff knew of the presence of asbestos in its buildings more than one year before filing suit). Accordingly, under Louisiana law, where a school board has been warned of the dangers of asbestos and discovers that some of its buildings contain asbestos which may require expensive removal, the prescriptive period on their claims against the asbestos manufacturer begins to run. *Id.*

## III.    The Class Action Was Commenced In 1983 And The Louisiana School Boards Opted Out in 1988.

On January 17, 1983, various school boards filed the Class Action against numerous manufacturers of asbestos containing materials ("ACMs"), including the Debtor. The Class Action was brought on behalf of all primary and secondary schools in the United States, including the Louisiana School Boards, and, eventually, the class was certified. *See In Re Asbestos School Litig.*, 104 F.R.D. 422 (E.D. Pa. 1984), *modified*, 107 F.R.D. 215 (E.D. Pa. 1985), *aff'd in part and vacated in part*, 789 F.2d 996 (3d Cir. 1986), *cert. denied*, 479 U.S. 852 (1986). The Class Action was the first action by the Louisiana School Boards against the Debtors for property damage resulting from the inclusion of ACMs in their respective school buildings. *Id.*

On March 16, 1988, each of the Louisiana School Boards opted out of the Class Action. On August 31, 1988, the Louisiana School Boards and others sued the Debtor and other ACMs manufacturers in Louisiana in an action captioned *Jefferson Parish School Board v. W.R. Grace & Co.*, Civ. A. No. 88-3844F (D. La. filed Aug. 31, 1988) (the "Louisiana Action"). *See Exhibit A (Rule 1006 Summary of Voluminous Writings)* ("Ex. A."). The Louisiana Action sought to recover alleged damages related to the detection, management, removal, and abatement of ACMs used in the construction of the Louisiana School Boards' schools. *Id.*

Under Louisiana law, once the Louisiana School Boards opted out of the Class Action, any tolling of the applicable prescription period was rendered null and void. Accordingly, the claims of all of the Louisiana School Boards are barred by Louisiana's one-year prescription period if they knew or should have known of their claims by August 31, 1987, one year before the Louisiana Action was filed.

## IV.  All of the Louisiana School Boards Knew Or Should Have Known Of Their Claims By 1984.

Each of the Louisiana School Boards that are subject to this motion were required to submit a proof of claim form (the "Claim Form") to support their asbestos property damage claims in this bankruptcy proceeding.[3]  The Claim Form required the claimants to state when they first knew of the presence of asbestos in the property for which they are making their claims.

---

[3]  The claims that are the subject of this motion are:  Jefferson Parish School Board ("Jefferson") claim numbers 008164 -008186; Acadia Parish School Board ("Acadia") claim numbers 008029-008030; East Baton Rouge Parish School Board ("East Baton Rouge") claim numbers 012651-012669; Natchitoches Parish School Board ("Natchitoches") claim numbers; 011326-011330); Lafourche Parish School Board ("Lafourche") claim numbers 008018-008023 (Laforche); Caddo Parish School Board ("Caddo") claim numbers 010631-010647; Jefferson Davis Parish School Board ("Jefferson Davis") claim numbers 008025-008026 (Jefferson Davis); Lafayette Parish School Board ("Lafayette") claim numbers 011285-011297; St. Martin Parish School Board ("St. Martin") claim numbers 008024 and 008031; Calcasieu Parish School Board ("Calcasieu") claim numbers 008032-008039; LaSalle Parish School Board ("LaSalle") claim numbers 008027 and 008028; and The Archdiocese of New Orleans ("The Archdiocese") claim numbers 008357-008377.  These claimants are collectively referred to herein as the "Louisiana School Boards."

All but three of the Louisiana School Boards admitted that, between the period 1979 and 1984, they had actual knowledge that asbestos was in their buildings. Those same Louisiana School Boards also undertook remediation efforts with respect to the ACMs in their buildings and/or knew of the significant costs associated with those efforts by 1984. In addition, in light of an extensive federal asbestos notification program and widespread publicity regarding the asbestos problems in Louisiana schools, all of the Louisiana School Boards knew or should have known of the hazards associated with ACMs in their buildings and the substantial costs of dealing with asbestos in the early 1980s.

**V.     In 1979, The Federal Government Began Notifying School Boards Throughout The United States About The Hazards Of ACMs In Their Schools.**

In the late 1970s and early 1980s, school boards across the nation, including the Louisiana School Boards, learned of the potential dangers of asbestos, the possibility of its presence in school buildings, and the expense of its removal. *Orleans Parish*, 114 F.3d at 66.

Specifically, in 1979, the Environmental Protection Agency (the "EPA") issued a report entitled *Asbestos-Containing Materials in School Buildings: A Guidance Document* ("EPA Guidance Document") which warned school districts of the presence of ACMs in school buildings and described potential health risks caused by exposure to ACMs. *Ex. A.*[4] The EPA Guidance Document also provided detailed procedures for school officials to follow for identifying ACMs in school buildings. In addition, the EPA Guidance Document notified school systems that ACMs were likely to have been used in "[s]chools built or renovated during the period following World War II to 1978 [and that such schools] should be inspected," because ACMs use was not widely prohibited until 1978. *Id.*

---

[4]   The documents referenced in this section were produced by certain of the Louisiana School Boards in discovery in the Louisiana Action. All of the Louisiana School Boards were parties to the Louisiana Action.

Also in 1979, the EPA sent a publication related to the EPA Guidance Document to every school district in the United States entitled School Asbestos Program Questions and Answers ("School Asbestos Questions"). *Ex. A*; *see also Orleans Parish* at 68-69. The School Asbestos Questions explained that asbestos in school buildings was of great concern because "[e]xposure to asbestos fibers [could] cause debilitating or fatal diseases." *Id.* The EPA also characterized asbestos as hazardous, warning that:

> [e]pidemiological studies of asbestos workers have shown that exposure to asbestos increases the risks of developing lung cancer, mesothelioma ... and asbestosis . . . . EPA believes that any exposure to asbestos involves some increase of risk. No safe level of exposure or "threshold" level has ever been established . . . .

*Id.*

The School Asbestos Questions repeated the EPA Guidance Document's recommendation that each school should:

> (1) visually inspect the building for material which might contain asbestos, (2) take bulk samples of suspect material, (3) have the bulk samples analyzed, (4) if there is asbestos-containing material, perform exposure assessment . . . and (5) perform corrective action if necessary.

*Id.*

In 1980 and 1981, the EPA promulgated proposed regulations and Congress passed the Asbestos School Hazard Detection and Control Act of 1980 ("ASHDCA"), 20 U.S.C. § 3601 *et seq.* ASHDCA required state educational agencies to prepare plans for inspecting school buildings for ACMs and for abating ACMs in school buildings. *Id.*

On April 7, 1980, Louisiana's Office of Health Services and Environmental Quality sent a letter to parish school superintendents informing them that the EPA's regulations regarding asbestos in schools:

> will become <u>mandatory</u> near the end of May 1980, as follows:
>
> 1. A survey of all schools for asbestos hazards will have to be completed in 120 days after publication of the rule....

2.   A report that the surveys were made and that samples, if any, were
sent for testing will have to be sent to the EPA within 180 days after
publication of the rule....

*See Exhibit B.*  In 1981, the Louisiana legislature codified the Louisiana Educational Facilities

Asbestos Detection Program which established a program whereby all schools could obtain free

testing of building materials suspected of containing asbestos. *See* La.R.S. § 17:3701 *et. seq.* at

§§17:3707, 17:3709.

Also in 1981, following the promulgation of the ASHDCA, the Attorney General of the

United States issued a report entitled "The Attorney General's Asbestos Liability Report to

Congress" (1981) ("Attorney General's Report"). *Ex. A.* The Attorney General's Report advised

school systems to file legal actions before state statutes of limitations expired. *Id.* In particular,

the Attorney General warned that:

> School authorities faced with substantial expenditures in removing or
> containing friable asbestos should, as a matter of the utmost urgency,
> consult with qualified counsel to determine whether they should file
> litigation on their own, as at least three school districts already have done.
> **Urgency is necessary because of statutes of limitation.**

*Id.* (emphasis supplied). On May 27, 1982, the EPA issued a final rule requiring the Louisiana

School Boards to inspect and test for ACMs in their schools. *See* 47 Fed. Reg. 23360 (codified

at 40 C.F.R. § 763).

## VI.   Asbestos Problems in Louisiana Schools Were Widely Publicized Beginning In 1979.

At least as early as January of 1979, Louisiana newspapers began reporting on the

extensive asbestos problems in Louisiana schools.  On January 18, 1979, the New Orleans

Times-Picayne (the "New Orleans Times") reported that Jefferson Parish School Board

("Jefferson) ordered its staff to being investigating ACMs in its schools.[5]  Jefferson viewed

---

[5]   *See Exhibit C,* Molly Moore, *Jeff To Probe School Asbestos,* New Orleans Times-Picayune, Jan. 18, 1979, at 1.

Continued on following page

ACMs as a potentially "massive problem" that would be very expensive to remediate. *Id.* On June 29, 1979, the newspaper reported that both Jefferson and the Orleans Parish School Board had begun to gather samples for asbestos testing.[6] On November 29, 1979, the New Orleans Times further reported that ACMs had been detected in 23 Jefferson schools and that costs to remediate those ACMs could be nearly $1 million.[7] In that same article, a Jefferson official was quoted as stating that the other Louisiana school boards were "just burying their heads and acting like the problem doesn't exist." *Id.*

On January 24, 1980, it was reported that ACMs had been discovered in two thirds of the public schools surveyed in New Orleans and that remediation costs would be $1 million.[8] On July 22, 1983, the New Orleans Times reported that the $2 million project to remove ACMs in Louisiana schools that had begun two years earlier was expected to be completed by the summer of 1984.[9] That same article reported that ACMs had been removed from the Egard Elementary School in St. John the Baptist Parish about three years earlier. *Id.*

---

Continued from previous page

Copies of the articles referenced in this section were produced by certain of the Louisiana School Boards in connection with the Louisiana Action.

[6]  *Id.*, Rhonda McKendall, *N.O., Jeff Schools Tested for Asbestos*, June 29, 1979 at AS-2A.

[7]  *Id.*, Molly Moore, *Asbestos Found In 23 Jeff Schools*, New Orleans Times-Picayune, Nov. 29, 1979, at 18.

[8]  *Id.*, Rhonda McKendall, *Asbestos Discovered In Many City Schools*, New Orleans Times-Picayune, January 24, 1980, at 6.

[9]  *Id.*, Rhonda McKendall, *Jefferson, Orleans Lead Race To Clean Up School Asbestos*, New Orleans Times-Picayune, July 22, 1983, § 1 at 13-14.

## VII.    All Of The Louisiana School Boards Knew Or Should Have Known Of Their Claims By 1984.

### A.    Caddo Began An Asbestos Program By 1980.

Caddo admitted in its Claim Forms that, in 1979 or 1980, it began its asbestos control program. 10631-007.[10] On December 11, 1981, Caddo submitted bulk samples for cost-free testing through the state asbestos program. 10631-067. The results of that testing established that ACMs in Caddo Middle Magnet School contained between 15-25% chrysotile asbestos. 10631-062-067. Caddo encapsulated ACMs in that school in 1982 and removed them in 1986. 10631-062-064. In 1983, Caddo encapsulated and removed ACMs in its Captain Shreve High School. 10632-005. Caddo did not file suit before the Class Action and opted out of the Class Action in 1988.

### B.    Natchitoches Knew Of Its Claims In 1981.

Natchitoches admitted in its Claim Form that it learned that ACMs were present in North Natchitoches Elementary School in 1981. 11326-006. In 1983, Natchitoches encapsulated ACMs in the school. 11326-004. Natchitoches also removed ACMs from its Provencal Elementary School in 1983 at a cost of in excess of $85,000.[11] Natchitoches similarly failed to file suit before the Class Action was initiated and opted out of the Class Action along with the other Louisiana School Boards in 1988.

---

[10]  The information in this section comes from the Claims Forms and supporting documentation submitted by the Louisiana School Boards in this proceeding. Page references are to the claim number followed by the page number of the Claim Form or supporting documents submitted with the claim. *See Ex. A.*

[11]  This information is found in the supplemental material submitted in support of Natchitoches' claim 11328 on September 18, 2006. There are no page numbers on these supplemental documents. *See Ex. A.*

**C.**     <u>East Baton Rouge Began An Asbestos Program in 1979.</u>

East Baton Rouge admitted in its Claim Forms that it began an asbestos control program in 1979. 12651-006. Despite the initiation of this program and the availability of cost-free testing in 1981, East Baton Rouge purportedly first submitted samples for testing in 1983. 12651-037-040. The results of that testing showed the presence of 9-33% chrysotile asbestos in East Baton Rouge schools. *Id.* East Baton Rouge admits that it knew of asbestos in its schools by 1983. 12651-006. By June of 1983, East Baton Rouge had taken corrective actions to remedy ACMs in several of its schools.[12] From June through August of 1984, East Baton Rouge had ACMs removed from its Capital Middle School. 12654-006. By 1985, East Baton Rouge estimated ACMs remedial costs to be $425,000.[13] Like the other Louisiana School Boards, East Baton Rouge failed to file suit prior to the Class Action and opted out of the Class Action in 1988.

**D.**     <u>Jefferson Davis Knew Of Its Claims In 1982.</u>

Jefferson Davis admitted in its Claim Forms that it knew of the presence of ACMs in its schools in 1982. 8025-006.[14] Jefferson Davis obtained a bulk sample report dated August 2, 1982 showing that Jennings High School had ACMs that contained between 5% and 35% chrysotile asbestos. 8025-019-020. Jefferson Davis encapsulated ACMs in the school in 1982. 8025-004, 008, 022. Jefferson Davis opted out of the Class Action and did not bring suit against the Debtor until August 31, 1988, more than six years after it knew of its claims.

---

[12] This information is found in the supplemental material submitted in support of East Baton Rouge's claims on September 18, 2006. There are no page numbers on these supplemental documents. *See Ex. A.*

[13] This information is found in the supplemental material submitted in support of East Baton Rouge's claims on September 18, 2006. There are no page numbers on these supplemental documents.

[14] *See Ex. A.*

### E.    Acadia Knew Of Its Claims In 1983.

Acadia admitted in its Claim Form that it learned that ACMs were present in South Crowley Elementary School in 1983.  8029-006.[15]  On March 11, 1983 Acadia learned that the ACMs in the school contained 35% chrysotile asbestos.  8029-019.  Arcadia encapsulated ACMs in its schools in 1984.  8029-021.  Acadia opted out of the Class Action and did not file the Louisiana Action until 1988.

### F.    Lafourche Knew of Its Claims In 1983.

In 1983, Lafourche learned that it had asbestos in its schools.  8023-006, 8019-006, 8018-006.[16]  On July 14, 1982, Lafourche engaged an asbestos testing contractor to test Central Lafourche High School (8018-006) and Cut Off Elementary School (8019-006) for ACMs.  Lafourche conducted inspections for friable ACMs, took bulk samples of the materials at its schools and, on or about March 1, 1983, learned that the ACMs contained 25% chrysotile asbestos.  8019-006, 8019-051, 8018-006, 8018-061-65.  Thereafter, on May 20, 1983, Lafourche sent notices to school employees (8019-052) and letters to parents (8019-054) informing them that ACMs had been found in its buildings and noting the health hazards associated with asbestos.  Lafourche encapsulated ACMs in 1983.  8022-004.  As of January 7, 1985, Lafourche had removed some ACMs in its schools and planned to remove more at a cost of over $550,000.  8018-066, 8019-055, 8022-050, 8023-182.  Despite its knowledge of its claims in 1983, Lafourche opted out of the Class Action and did not file suit prior to the Louisiana Action in 1988.

---

[15]  *See Ex. A.*

[16]  *See Ex. A.*

### G.   Lafayette Knew Of Its Claims By 1984.

Lafayette admitted in its Claim Forms that it knew its schools contained asbestos by 1984. 11285-006.[17] A December 11, 1984 report to Lafayette showed that nine of its schools contained ACMs with 11% to 15% asbestos, and 13 schools contained ACMs with 50% to 65% asbestos. 11285-092-093. Lafayette had encapsulated ACMs in its schools' reading labs by December 11, 1984. *Id.* By March 30, 1987, some ACMs in Lafayette's schools had been encapsulated and a recommendation had been made to remove remaining ACMs at a cost of $895,400. 11285-042. Lafayette did not file suit against the Debtor prior to the Class Action and, along with the other Louisiana School Boards, opted out of the Class Action in 1988.

### H.   Jefferson Knew Of Its Claims By 1980.

In its Claim Forms, Jefferson admitted that it knew of the presence of asbestos in its schools by 1980. 8165-006.[18] Jefferson encapsulated ACMs in its schools in 1981. 8164-004, 8181-004, 8184-004, 8186-004. In addition, Jefferson removed ACMs from its SJ Barbre Jr. High School in 1985. 8165-004, 006. Jefferson opted out of the Class Action in 1988 along with the other Louisiana School Boards.

### I.   St. Martin Should Have Known Of Its Claims By 1984.

Despites the extensive government notices and media coverage of the asbestos problems in Louisiana schools, St. Martin stated in its Claim Forms that it did not know that asbestos was in its buildings until 1988. 8024-006.[19] At that time, St. Martin abated ACMs in its schools in order to bring the schools into compliance with existing federal law. 8024-004, 008, 020. Given the extensive government notifications and publications detailing the problems with asbestos,

---

[17] *See Ex. A.*

[18] *See Ex. A.*

[19] *See Ex. A.*

had St. Martin exercised reasonable diligence, it would have known of its claims, like most of the other Louisiana School Boards did, by 1984.

### J.    Calcasieu Should Have Known Of Its Claims By 1984.

Calcasieu similarly asserted in its Claim Forms that it did not know about asbestos in its buildings until 1988. 8034-006.[20] Calcasieu encapsulated ACMs in its schools at that time. 8034-004, 008. Had Calcasieu acted responsibly in light of the extensive information published in legislation, government bulletins and the media, Calcasieu also would have known of its claims by 1984.

### K.    LaSalle Should Have Known Of Its Claims By 1984.

LaSalle stated in its Claim Forms that it did not know about asbestos in its buildings until it opted-out of the Class Action and joined the Louisiana Action in 1988. 8027-006.[21] Had LaSalle headed EPA mandates and begun testing in 1981, it would have known of its claims by 1984 like other Louisiana School Boards did.

### L.    The Archdiocese Knew Of Its Claims In 1981.

The Archdiocese began testing for ACMs in 1981. In July 1981, St. Louise de Marillac tested for ACMs and found that certain spray-on ceiling material in the building contained 15% chrysotile asbestos.[22] At Chinchuba Institute samples were taken at the school for asbestos testing in January, 1982.[23] On April 26, 1982, the Archdiocese sent a letter to school principals

---

20  *See Ex. A.*

21  *See Ex. A.*

22  *See Ex. A,* September 4, 1990 Rule 30(B)(6) Deposition of Donald B. Pfefferle ("Pfefferle Deposition") at 134. The depositions and documents referenced in this section were taken and produced in connection with the Louisiana Action.

23  *Id.* at 135-136.

indicating that an asbestos problem existed with regard to buildings constructed before 1972.[24]

The Archdiocese finally instituted a mandatory testing program in October, 1982, even though it

knew that at least some schools had ACMs in 1981.[25]  The Archdiocese admitted in its Claim

Forms that it knew of the presence of asbestos in its some of its buildings in 1983.  8359-007,

8365-011.[26]

## ARGUMENT

I.    **Debtors' Motion Should Be Granted Because The Louisiana School Boards' Claims
Are Prescribed By Louisiana Civil Code Article 3492.**

Summary judgment should be granted if "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c); *Orleans Parish*, 114 F.3d at 68.  "When the record -- taken

as a whole -- could not lead a rational trier of fact to find for the nonmoving party, then there is

no genuine issue for trial." *Davis v. Chevron USA, Inc.*, 14 F.3d 1082, 1084 (5th Cir. 1994).

A.    **The Louisiana School Boards' Claims Are Barred By Louisiana's One Year
Prescription Period.**

Louisiana Civil Code article 3492 states that "Delictual [tort] actions are subject to a

liberative prescription of one year.  This prescription commences to run from the day injury or

damage is sustained . . . ." La. Civ. Code art. 3492.  The Louisiana Supreme Court has held that

prescription begins to run in asbestos property damage cases "once [the plaintiff] has received

sufficient notice to prompt a reasonable person to investigate further." *Orleans Parish*, 892 F.

Supp. at 798 (citing *Jordan v. Employee Transfer Corp.*, 509 So. 2d 420, 423-424 (La. 1987)).

---

24    *See Ex. A.*, November 15, 1990 Deposition of John C. Rice, Jr. at 26, 32.  According to Rice's April 5, 1982
letter to superintendents, Rice indicated that he had distributed copies of Act 268 of the Louisiana Legislature to
the superintendents in the summer of 1981.  *Id.* at page 31.

25    *See Ex. A.*, October 7, 1982 Howard Jenkins and Leonard J. Fine letter to all pastors and principals.

26    *See Ex. A.*

Similarly, federal courts have held that Louisiana's one year period begins to run in asbestos property damage cases "when the person in whose favor a cause of action exists knows or should have known of the existence of his cause of action." *Orleans Parish*, 892 F. Supp. at 798. The Fifth Circuit and Louisiana Supreme Court have consistently held that:

> at the latest, prescription begins to run against a school board in a suit against an asbestos manufacturer when the school board becomes aware that asbestos is present in 'at least some of its buildings' posing a health risk to employees, and that it must be removed at a considerable expense.

*Orleans Parish*, 114 F.3d at 68 (citing *Cameron Parish*, 687 So. 2d at 89).

In *Cameron Parish*, the Louisiana Supreme Court held that prescription began to run against the Cameron Parish School Board ("CPSB") not later than November 1981 when, after having received EPA warnings, it determined that ACMs were present in the Grand Lake High School and it adopted a resolution to seek bids for a contract to remove the ACMs from that school. *Cameron Parish*, 687 So. 2d at 89. Accordingly, the Supreme Court held that the filing of the Class Action in January 1983 was too late to interrupt prescription for the benefit of the CPSB and affirmed the dismissal of the school board's action. *Id.* at 93.

In *Orleans Parish*, the district court held that the Orleans Parish School Board ("OPSB") had sufficient notice to prompt investigation and filing of its claim against the Debtor by 1980, or 1981 at the very latest. *Orleans Parish*, 892 F. Supp at 801. The court referred to the texts of the 1979 EPA School ACM Guidance Document and the School Asbestos Questions, both of which the school board received in the summer of 1979. The court also noted that the School Asbestos Questions booklet

> emphasized the likelihood that many public school buildings contained ACMs. It recommended that schools check building records, conduct a visual inspection of buildings, gather and test bulk samples of suspected ACMs, and take any necessary corrective action.

*Orleans Parish*, 892 F. Supp. at 798. The record showed that OPSB inspected and sampled its buildings for ACMs in 1979 and by the summer of 1980 began to undertake asbestos encapsulation and other abatement procedures. The court determined that prescription on the OPSB claims against the Debtor began to run by at least 1981 and that the claims prescribed in 1982 before the Class Action was filed in January 1983. *Id.* at 801-802

The Fifth Circuit, in affirming the decision, found the 1981 date to be an "expansive reading of the facts" and held that by sometime in 1980 OPSB knew or should have known of its claims. *Orleans Parish*, 114 F.3d at 69 n.10. The Fifth Circuit found that "[i]n the late 1970s and early 1980s, school boards across the nation learned of the potential dangers of asbestos, the possibility of its presence in school buildings, and the expense of its removal." *Id.* at 67. The court further held that the 1979 EPA Guidance Documents should have been enough to prompt a reasonable school board to investigate whether their buildings contained ACMs, and to test sample building materials from its schools as the OPSB did in 1979. *Id.* at 68.

The district court and the Fifth Circuit both held that pinpointing an exact date upon which the prescriptive period began to run was not a material fact for purposes of resolving the issue. As the Fifth Circuit stated:

> Although from the record we cannot pinpoint the exact day that prescription began to run against the School Board, it is not necessary that such be done. The record reflects beyond peradventure that the School Board knew by sometime in 1980 that asbestos was a serious problem and that it necessitated an extensive and expensive removal process. The one year liberative prescription for delictual actions began to accrue against the School Board at that time. The School Board's claims were thus prescribed by the time the national class action lawsuit was filed in 1983.

*Id.* at 69.

The district court in *Orleans Parish* also held that even if the OPSB had non-prescribed claims on January 17, 1983, which were preserved by the filing of the Class Action, those claims

later prescribed because of OPSB's decision to opt out of the Class Action on March 16, 1988.[27]

That action, the court held, was in effect a voluntary dismissal of its claims in the Class Action.

*Orleans Parish*, 892 F. Supp. at 802-05. The court reasoned that:

> By opting out of the national class action, the School Board lost any benefit it gained by being in the class, because opting out of a class action lawsuit, like voluntarily dismissing a suit without the consent of the defendant, is a unilateral, voluntary action by the plaintiff that allows the plaintiff to forum-shop. By opting out of the national class action in 1988, the School Board voluntarily and unilaterally chose to cease being a part of litigation that had been ongoing for five years so that it could bring suit in a court of its own choosing. ***Under Louisiana law, the class action is considered as if it was never filed.***

*Id.* at 804 (emphasis added).

The rationales supporting the dismissals of the *Orleans Parish* and *Cameron Parish* cases apply with equal force to the claims of the Louisiana School Boards. All of the Louisiana School Boards opted out of the Class Action in 1988 negating any tolling effect of that action. All but three of the Louisiana School Boards admitted on their Claim Forms that they knew that ACMs were in their schools by 1984. Some of the Louisiana School Boards admitted to instituting asbestos control programs by 1980. All but three of the Louisiana School Boards took steps to abate ACMs in their buildings by 1984.

All of the Louisiana School Boards were informed of the hazards of ACMs by the EPA in 1979 and 1980 and were required to begin testing for ACMs in their schools by 1982. In addition, the well-publicized asbestos detection and abatement activities in Jefferson and OPSB schools in 1979 and 1980 emphasized the importance of the EPA's notices and informed the Louisiana School Boards of the substantial expenses associated with abatement activities.

---

27   While La. Civ. Code art. 3462 provides that prescription is interrupted by the timely filing of an action (in a court of competent jurisdiction and proper venue) and that the filing of a class action interrupts prescription on behalf of all class members, *Williams v. State of La.*, 350 So. 2d 131, 137 (La. 1977), La. Civ. Code art. 3463 provides that interruption of prescription "is considered never to have occurred if the plaintiff abandons [or] voluntarily dismisses the action at any time . . . ." *Id.*

As the Supreme Court of Louisiana held under strikingly similar circumstances:

> the Board clearly was aware it had asbestos in at least some of its buildings, the asbestos posed a serious health problem to its employees and students, the problem was severe enough to warrant immediate removal of the material, and the removal . . . would cost the Board a significant amount of money.

*Cameron Parish*, 687 So.2d at 89.  The identical conclusion is warranted in the present case.  In short, because all of the Louisiana School Boards knew or should have known of their claims by 1984 and because the Louisiana School Boards failed to file suit until 1988, all of their claims are barred by Louisiana's one year prescription period.

In addition, Caddo, Natchitoches, Jefferson and the Archdiocese knew of their claims more than a year before the Class Action was filed in 1983.  Those Louisiana School Boards knew of the presence of ACMs in their schools in 1981.  Had the remaining Louisiana School Boards acted diligently and availed themselves of cost-free testing for ACMs in their schools in 1981 -- as recommended by government agencies -- they also would have known of their claims at that time.  The Louisiana School Boards' failure to do so does not prevent Louisiana's one year prescription period from running.  *See Orleans Parish*, 892 F. Supp. at 799-802.  Accordingly, all of the Louisiana School Boards knew or should have known of their claims in 1981, more than one year before the Class Action was filed.

Given these undisputed facts, the claims of all of the Louisiana School Boards are barred by Louisiana's one-year prescription period as a matter of law.  *Orleans Parish,* 892 F. Supp at 801-802, *Cameron Parish*, 687 So.2d at 89.

## II.    Knowledge Of The Identity Of The Manufacturer Of ACMs Is Not Necessary To Begin Tolling Of Louisiana's One Year Prescriptive Period.

Under Louisiana law, knowledge of the identity of the manufacturer of ACMs is not necessary to begin the tolling of Louisiana's one-year prescription period.  *Orleans Parish*, 892 F. Supp. at 800-801.  Specifically, once the Louisiana School Boards knew of the presence of

ACMs in at least some of their buildings, they were charged with exercising reasonable diligence to discovery the identity of the manufacturers of those ACMs. *Id.* Because the Louisiana School Boards undisputedly knew or should have known of the presence and hazards of ACMs in their buildings by no later than 1984, any alleged failure on their part to identify the Debtor in the intervening four years before the Louisiana Action was filed does not toll Louisiana's one-year prescription period. *Id.*

**III.    Louisiana's R.S. 9:5644 Does Not Apply Retroactively To Revive The Louisiana School Boards' Claims.**

In *Cameron Parish* and *Orleans Parish*, the school boards unsuccessfully argued that La. R.S. 9:5644 applied retroactively to revive their claims against asbestos products manufacturers. *Cameron Parish*, 687 So. 2d at 89-93; *Orleans Parish*, 114 F.3d at 69. On September 6, 1985, Louisiana enacted La. R.S. 9:5644 which in relevant part provides:

> **Prescription of actions involving asbestos abatement.**....
>
> B.    Notwithstanding any other provision of law to the contrary, any time limitation or prescriptive period which may be applicable to any action to recover for asbestos abatement work shall not apply or expire until five years after the date on which the party seeking to recover has completed the abatement work or discovered the identity of the manufacturer of the materials which require abatement, whichever is later.
>
> C.    Any person who has an action to recover for asbestos abatement work under the provisions of this Section but whose action is barred by the prescriptive period provided in R.S. 9:5644 shall have one year from the effective date of this Act within which to bring an action or be forever barred.

The Louisiana Supreme Court meticulously analyzed R.S. 9:5644 and concluded that "[s]ubsections B and C clearly apply retroactively to causes of action which arose prior to the date of its enactment and as to which the applicable prescriptive period had not yet accrued . . . ." *Cameron Parish*, 687 So. 2d at 90. Under circumstances nearly identical to the Louisiana School Boards' claims which, as shown above, were prescribed more than one year before the revival

statute, the *Cameron Parish* court held that "the Board's claims are not simply prescribed by the prescriptive period provided in La. R.S. 9:5644 but, instead, were prescribed for nearly three years before the enactment of La. R.S. 9:5644, and nothing in the statute evidences a 'clear and unequivocal intent' on the part of the legislature to revive such prescribed claims." *Id.* at 92.

The Fifth Circuit, when faced with the same issue in *Orleans Parish,* held that "[t]his issue was decided conclusively in *Cameron Parish* in which the Louisiana court held that La. R.S. 9:5644(c) could not be retroactively applied to 'claims as to which prescription has already accrued.'" *Orleans Parish*, 114 F.3d at 69. In light of the foregoing, it is clear that La. R.S. 9:5644 does not retroactively apply to, and did not revive, the Louisiana School Boards' untimely claims.

## CONCLUSION

The Court should disallow and expunge the Louisiana School Boards' 120 property

damage claims that are prescribed by Louisiana Civil Code article 3492.

Dated: February 16, 2007

REED SMITH LLP
James J. Restivo, Jr., Esq. (#10113)
Lawrence Flatley, Esq. (#21871)
Douglas E. Cameron, Esq. (#41644)
Traci S. Rea, Esq. (#76258)
435 Sixth Avenue
Pittsburgh, PA  15219
Telephone:  (412) 288-3131
Facsimile:  (412) 288-3063

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Janet S. Baer
Salvatore F. Bianca
200 East Randolph Drive
Chicago, Illinois 60601
Telephone:  (312) 861-2000
Facsimile:  (312) 861-2200

And

PACHULSKI STANG ZIEHL YOUNG JONES &
WEINTRAUB LLP

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
(Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

Co-Counsel for the Debtors and Debtors in
Possession

# Attach. 9

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

IN RE:

W.R. Grace & Co., *et al.*                     Chapter 11

           Debtors.                      Bankruptcy No. 01-1139-JKF
                           (Jointly Administered)

                           **Related to Doc. No. 14584, Motion for Summary Judgment With Respect to the Debtors' Fifteenth Omnibus Objection (Substantive) to Asbestos Property Damage Claims on Bases of Statute of Limitations, Laches and Assumption of Risk filed on behalf of Macerich Fresno Limited Partnership**

## ORDER GRANTING SUMMARY JUDGMENT IN FAVOR OF DEBTORS

**AND NOW**, this 10th day of October, 2008, it is **ORDERED** that the Motion for Summary Judgment With Respect to the Debtors' Fifteenth Omnibus Objection (Substantive) to Asbestos Property Damage Claims on Bases of Statute of Limitations, Laches and Assumption of Risk filed on behalf of Macerich Fresno Limited Partnership is **DENIED.**

It is **FURTHER ORDERED** that Debtors' objection to the claim of Macerich Fresno Limited Partnership is **SUSTAINED.**

1

DKT 19473

It is **FURTHER ORDERED** that Debtors shall serve a copy of this Order and the accompanying Memorandum Opinion on all parties in interest who do not receive electronic notice and shall file a certificate of service forthwith.

*Judith K. Fitzgerald*
jmd

Judith K. Fitzgerald
United States Bankruptcy Judge

2

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR DISTRICT OF DELAWARE

IN RE:

W.R. GRACE & CO., et al.            Bankruptcy No. 01-01139
      Debtor(s)                  Chapter 11

                        **Related to Dkt. No. 14597** Debtors' Motion and
                        Memorandum for an Order Pursuant to F.R.B.P. 7056
                        Disallowing and Expunging Eighty-Eight (88) Time-Barred
                        Canadian Asbestos Property Damage Claims

## MEMORANDUM OPINION[1]

The matter before the court is Debtors' Motion and Memorandum for an Order Pursuant to F.R.B.P. 7056 Disallowing and Expunging Eighty-Eight Time-Barred Canadian Asbestos Property Damage Claims, docketed as a Motion for Summary Judgment.[2] Since the filing of the motion, the eighty-eight claims have been reduced to thirty-five due to withdrawal, expungement, or settlement of claims. Debtors assert that these remaining thirty-five claims are time-barred by the applicable Canadian ultimate limitations periods,[3] similar to American statutes of repose, and move for summary judgment. Anderson Memorial Hospital filed a response[4] to Debtors' motion on its own behalf and on behalf of the Canadian Claimants. The

---

[1] The court's jurisdiction was not at issue. This Memorandum Opinion constitutes our findings of fact and conclusions of law.

[2] Doc. No. 14597.

[3] The "ultimate" limitations periods are sometimes referred to as the "absolute" limitations periods. We use the terms interchangeably in this Memorandum Opinion and Order.

[4] Anderson Memorial Hospital's Response to Debtor's Motion for Summary Judgment Directed to 88 Claims from Canada Based upon the Statute of Limitations, Doc. No. 14898. To the extent the response is filed by Anderson Memorial Hospital as the representative of a worldwide class action, no such class has been recognized and Anderson Memorial Hospital is
(continued...)

1

DKT NO. 21270

Canadian Claimants dispute the dates upon which the ultimate limitations periods would begin to run and contend that the limitations periods were tolled.[5]

Background

The Canadian Claimants seek to recover the costs associated with management and removal of asbestos-containing surfacing materials sold by Debtors and installed in the Claimants' buildings.  The thirty-five remaining Canadian Claims involve buildings in three different Canadian provinces.  Thirty-three of the claims arise from properties located in Alberta and the remaining two arise from properties located in Manitoba and British Columbia.  It is undisputed that Debtors ceased selling asbestos-containing products in Canada by 1976, at the latest.[6]  Based upon this date, Debtors argue that the thirty-three Alberta claims are time-barred.  With regard to the Manitoba claim, the parties have stipulated to the fact that the asbestos-containing material was installed in 1956.[7]  The British Columbia claim involves an installation date in the 1960s at the latest.[8]  Based upon these dates, the Debtors argue that the applicable

_____

[4](...continued)
not a Canadian Claimant. The court will proceed to address the substance of the Debtors' summary judgment motion.

[5] The Canadian Claimants also argued that the issue of ultimate limitations periods was not properly raised in Debtors' Fifteenth Omnibus Objection (Substantive) to Asbestos Property Damage Claims. *See* Anderson Memorial Hospital's Response to Debtors' Motion for Summary Judgment Directed to 88 Claims from Canada Based upon the Statute of Limitations, Doc. No. 14898, at 3-4.  The court previously ruled that the language of the objection was broad enough to raise the ultimate limitations periods.  Transcript of 9/10/07, Doc. No. 16930, at 95-96.

[6] Affidavit of James Cintani, Exhibit D to Doc. No. 14597, at 2.

[7] Transcript of 12/15/08, Doc. No. 20371, at 16-17.

[8] Rule 1006 Summary of Voluminous Writings 44 Claims Barred By Canadian Ultimate Limitations Periods, Exhibit C to Doc. No. 14597, Debtors' Motion and Memorandum for an
(continued...)

Canadian ultimate limitations periods expired with respect to each of the remaining claims prior to April 2, 2001, the Bankruptcy Petition Date.

Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(c), the moving party is entitled to summary judgment where the evidence shows that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." The non-moving party can defeat summary judgment if it produces evidence in the record creating a genuine issue of material fact.[9] However, where the moving party has satisfied its burden under Rule 56(c), "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."[10] The non-moving party cannot "rely merely on allegations or denials in its own pleading; rather, its response must...set out specific facts showing a genuine issue for trial."[11] Only evidence which is "ultimately reducible to admissible evidence" will be considered.[12]

Causes of Action

Analysis of ultimate limitations periods requires identification of the cause of action being pursued. Debtors assert that, under Canadian law, "any asbestos-in-building tort claims

---

[8](...continued)
Order Pursuant to F.R.B.P. 7056 Disallowing and Expunging Eighty-Eight (88) Time-Barred Canadian Asbestos Property Damage Claims, at 2. The source of the installation date is identified as Report of Monenco Consultants Limited.

[9] *El v. SEPTA*, 479 F.3d 232, 238 (3d Cir. 2007).

[10] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

[11] Fed. R. Civ. Pro. 56(e)(2).

[12] *Lexington Insurance Co. v. Western Pennsylvania Hospital*, 423 F.3d 318, 329 n. 6 (3d Cir. 2005)(internal quotations omitted).

3

fall under the rubric of 'pure economic loss.'"[13]  Therefore, the Debtors addressed only how the

ultimate limitations periods would bar economic loss claims.  However, the Claimants contend

that the Debtors failed to show that claims based on certain other "asbestos-property damage

causes of action," such as nuisance, warranty, conspiracy, restitution, fraud, and

misrepresentation, would be barred.[14]  In addition, the Claimants assert that, due to a

manufacturer's continuing duty to warn, the ultimate limitations periods cannot bar these claims

as "a new cause would accrue for every breach of the continuing duty to warn."[15]

   Both parties' Canadian law experts reached the same conclusion with regard to the cause

of action being pursued by the Claimants.  That is, in Canada, the claims are cognizable only as

negligence claims for pure economic loss.[16]  The Supreme Court of Canada in *Winnipeg*

*Condominium Corp. No. 36 v. Bird Construction Co. Ltd.*, addressed whether the cost of

repairing a defect in the construction of a building is the type of economic loss recoverable in

---

[13] Debtors' Reply in Support of their Motion for an Order Pursuant to F.R.B.P. 7056 Disallowing and Expunging Eighty-Eight (88) Time-Barred Canadian Asbestos Property Damage Claims, Doc. No. 14965, at 4.

[14] Anderson Memorial Hospital's Response to Debtors' Motion for Summary Judgment Directed to 88 Claims from Canada Based upon the Statute of Limitations, Doc. No. 14898, at 11-12.

[15] *Id.* at 11.

[16] *See* Affidavit of Graeme Mew, Debtors' Expert, Exhibit B to Doc. 14965, Debtors' Reply in Support of their Motion for an Order Pursuant to F.R.B.P. 7056 Disallowing and Expunging Eighty-Eight (88) Time-Barred Canadian Asbestos Property Damage Claims, at ¶ 13, stating "regardless of the nominate tort alleged, the claimants' allegations fall in line with what the leading author on Canadian tort law describes as recovery for pure economic loss." *See also* Deposition of John C. Irvine, Claimants' Expert, (Aug. 22, 2007), Tab E to Doc. No. 16757, Appendix to Debtors' Supplemental Submission in Support of Their Motion and Memorandum for an Order Pursuant to F.R.B.P. Disallowing and Expunging What is Now Fifty-Five (55) Time-Barred Canadian Asbestos Property Damage Claims, at 142-44, affirming his belief that all of the claims would be considered negligence claims for pure economic loss.

4

tort.[17] Pure economic loss claims are those which do not arise from injury to persons or damage

to property apart from the defective product itself.[18] The *Winnipeg Condo* court recognized and

outlined five categories in which these claims arise. The relevant category in both *Winnipeg*

*Condo* and under the facts of this case is "negligent supply of shoddy goods or structures."[19]

Prior to *Winnipeg Condo*, the claims asserted by the Canadian Claimants in this case "would

have been regarded as speculative if not entirely unarguable in Canadian courts[.]"[20]

Furthermore, Canadian courts are skeptical of attempts to recharacterize causes of action and are

unwilling to permit the purpose of the ultimate limitations periods to be undermined.[21] Based on

---

[17] [1995] 1 S.C.R. 85, 90, 1995 S.C.R. LEXIS 373, at *10.

[18] *Id.* at 97, 1995 S.C.R. LEXIS 373, at *21-22.

[19] *Id.,* 1995 S.C.R. LEXIS 373, at *21. "[T]ort law serves to encourage the repair of dangerous defects and thereby to protect the bodily integrity of inhabitants of buildings." *Id.* at 120, 1995 S.C.R. LEXIS 373, at *60. Despite the use of the term "shoddy," the court distinguished poor quality workmanship from dangerous defects and restricted itself to the facts presented in ruling that, if negligence was found, the plaintiff was entitled "to recover the reasonable cost of putting the building into a non-dangerous state." *Id.* at 120-21, 1995 S.C.R. LEXIS 373, at *60.

[20] Expert Report of Professor John Irvine, Doc. No. 16754, at 4.

[21] *See Edwards Estate v. Beckmann*, No. S060723, 2008 BC.C. LEXIS 581, at *26 (B.C. S.C. Mar. 17. 2008) ("These amendments, then, seek to avoid the ultimate limitation period by alleging the breach of continuing duties during the relevant period. The plaintiffs seek to accomplish indirectly what they cannot achieve directly, that is, to extract damages for the time barred torts"); *Bowes v. Edmonton (City),* [2007] 425 A.R. 123, at ¶ 173, 2007 AB.C. LEXIS 1877, at *77 (Alta. C.A. Dec. 28, 2007) ("To regard every ancient failure to warn as occurring every day would be a fiction destroying all limitations periods. If the above were not the law, then most cases of delayed harm from a tort could be dressed up as failures to warn, with no limitation period"); *Bowes v. Edmonton (City),* [2005] 49 Alta. L.R. (4th) 100, at ¶ 210, 2005 AB.C. LEXIS 1114, at *105-06 (Alta. Q.B. July 7, 2005) ("It seems to me that categorization of non-action in this context as either nuisance or recurring negligence has the potential to substantially undermine limitations law in this province and to return us to the unacceptable uncertainty which marked litigation prior to proclamation of the Limitations Act").

reported cases construing Canadian law and the consensus in opinion of the parties' experts, which is unrefuted on this record, the court will proceed to analyze the claims as negligence claims for pure economic loss.

Canadian Limitations Acts

As the Claimants' buildings are located in Alberta, Manitoba, and British Columbia, the laws of each of those Canadian provinces must be considered in determining whether the claims are barred by the applicable limitations period.

### Alberta's Limitations Act, R.S.A., ch. L-12

Pursuant to §3(1)(b) of Alberta's Limitations Act, a claimant must seek a remedial order within the ten-year ultimate limitations period.[22]  Section 3(3)(b) of the Act states that, for purposes of the ultimate limitations period, "a claim based on a breach of a duty arises when the conduct, act or omission occurs."[23]  The Claimants contend, however, that this latter provision does not apply to economic loss cases, but only to those cases involving a generalized breach of duty.  The Claimants base their argument on the general definition section of the Act which defines "injury" in five separate categories, one of which is "economic loss" and another for breach of duty where the injury does not fall into one of the other five categories.[24]  However, a

---

[22] "[I]f a claimant does not seek a remedial order within . . . (b)10 years after the claim arose . . .the defendant, on pleading this Act as a defence, is entitled to immunity from liability in respect of the claim." R.S.A., ch. L-12 §3(1)(b).

[23] [2007] 425 A.R. 123, at ¶ 151, 2007 AB.C. LEXIS 1877, at *69, interpreting and applying the language of the R.S.A., ch. L-12 §3(3)(b). "That paragraph is plain.  It says that the time under the alternative absolute period starts to run from the negligent or wrongful act or omission itself.  Therefore, one should not wait until the harm occurs."

[24] Anderson Memorial Hospital's Supplemental Post-Hearing Memorandum Re: Canadian Statute of Limitations, Doc. No. 17059, at 17.

similar argument was rejected by the Alberta Court of Appeal in *Bowes v. Edmonton*.[25]  In *Bowes*, counsel for the plaintiffs attempted to avoid the result of the language of § 3(3)(b) by relying on the definition of "claim" in §1(a), the general definition section of the Act.[26]  The court rejected the argument, stating "the Legislature does not confine itself to the vague general s. 1(a) [definition],....Section 3(1)(b), the unconditional limitation period, has its own express interpretation section."[27]  Therefore, Claimants cannot avoid the result that the Alberta ultimate limitations period commences to run upon the act, omission, or conduct that constituted the breach.

As previously stated, these claims fall under the *Winnipeg Condo* category of "negligent supply of shoddy goods or structures,"[28] and the Debtors ceased selling asbestos-containing products in Canada by 1976.[29]  Therefore, the Debtors could not have committed an act constituting the negligent supply of these products after that date. Consequently, the ten-year ultimate limitations period for the Alberta claims would have expired by 1986.  Absent suspension of the ultimate limitations period, the thirty-three Alberta claims are time-barred.

Manitoba's Limitation of Actions Act, R.S.M., ch. L150[30]

---

[25] *Bowes*, [2007] 425 A.R. 123, at ¶¶ 148-51, 2007 AB.C. LEXIS 1877, at *67-69.

[26] *Id.* at ¶ 148, 2007 AB.C. LEXIS 1877, at *68-69 (citing R.S.A., ch. L-12 § 1(a), which provides that "'claim' means a matter giving rise to a civil proceeding in which a claimant seeks a remedial order").

[27] *Id.* at ¶¶ 149-50, 2007 AB.C. LEXIS 1877, at *68-69.

[28] *Winnipeg Condo*, 1 S.C.R. at 97, 1995 S.C.R. LEXIS 373, at * 21.

[29] Affidavit of James Cintani, Exhibit D to Doc. No. 14597, at 2.

[30] The Claimants assert that the Manitoba ultimate limitations period has no application

(continued...)

7

Pursuant to Manitoba's statute, the ultimate limitations period within which to bring an

action is thirty years after the occurrence of the acts or omissions that gave rise to the cause of

action.[31]  The language of the statute is clear.  As in Alberta, the date for commencement of the

ultimate limitations period is the date of the relevant act or omission.[32]  With regard to the single

Manitoba claim, the parties stipulated to a 1956 installation date of the Debtors' product.[33]

Therefore, the limitations period expired with respect to this claim no later than 1986 unless the

period was otherwise tolled.[34]

### British Columbia's Limitation Act, R.S.B.C., ch. 266

British Columbia's Limitation Act provides a thirty-year ultimate limitations period to

bring an action which begins to run from "the date on which the right to do so arose."[35]  The

---

[30](...continued)
in this bankruptcy proceeding and only applies to special proceedings brought in Manitoba.  *See*
Anderson Memorial Hospital's Supplemental Post-Hearing Memorandum Re: Canadian Statute
of Limitations, Doc. No. 17059, at 15, n.12.  The Claimants cite no authority for this assertion.
The special proceedings described are the only mechanism by which a plaintiff can bring a claim
after the normal limitations period has expired.  R.S.M., ch. L150 § 14(1).

[31] In Manitoba, a plaintiff must apply to the court for an extension of time to begin or
continue a cause of action beyond the normal limitations period.  R.S.M., ch. L150 § 14(1).
However, "[t]he court shall not grant leave (a) to begin an action; or (b) to continue an action
that has been begun; more than 30 years after the occurrence of the acts or omissions that gave
rise to the cause of action." § 14(4).

[32] *Cf.* R.S.A., ch. L-12 §§ 3(1)(b), (3)(b) (interpreted in *Bowes*, [2007] 425 A.R. 123, at ¶
151, 2007 AB.C. LEXIS 1877, at *69,  to mean the "absolute period starts to run from the
negligent or wrongful act or omission itself").

[33] Transcript of 12/15/08, Doc. No. 20371, at 16-17.

[34] *See* discussion of "tolling," *infra.*

[35] "[N]o action to which this Act applies may be brought . . . (c) . . . after the expiration of
30 years from the date on which the right to do so arose."  R.S.B.C., ch. 266 § 8(1)(c).

8

British Columbia Act, unlike the Alberta statute, does not define when a cause of action arises, but British Columbia case law provides guidance. The most factually relevant case is *Privest Properties Ltd. v. Foundation Co. of Canada*, where the plaintiffs sought compensation for the removal costs of the asbestos-containing material MK-3.[36]  Claimants attempt to argue that the *Privest* decision is not applicable because it does not address the "ultimate" limitations period but rather interprets the "normal" limitations period.[37]  The normal limitations period provided that an action "shall not be brought after the expiration of 6 years after the *date on which the right to do so arose.*"[38]  Therefore, the court was interpreting identical language found in both the normal and ultimate limitations provisions and its analysis focused on the identical issue: that is, when time begins to run under the Act.[39]  The court concluded that "a cause of action accrues when all of the constituent elements exist, whether or not the plaintiff is then aware of them."[40]  The court then applied its ruling to the facts of the case and held that it was "clear that all of the elements necessary to the plaintiff's cause of action came into existence...when the MK-3 was installed in the Building.  Accordingly, the limitation period began to run...when the installation was completed."[41]

The Claimants argue that the *Privest* court's holding is incorrect and is not based on any

---

[36] [1995] 11 B.C.L.R. (3d) 1, at ¶ 1 (B.C. S.C.).

[37] Anderson Memorial Hospital's Supplemental Post-Hearing Memorandum Re: Canadian Statute of Limitations, Doc. No. 17059, at 18, n.13.

[38] *See Privest*, 11 B.C.L.R. (3d) 1, at ¶ 164 (emphasis added).

[39] *Id.* at ¶¶ 163-71.

[40] *Id.* at ¶ 171.

[41] *Id.* at ¶ 172.

Canadian legal authority.[42]  However, there is no British Columbia case law contrary to *Privest*

and we decline to create a different interpretation of the statute where a British Columbia court

has already spoken directly on the issue.  The single British Columbia claim at issue herein

involved an installation date in the 1960s.   Therefore, the thirty-year ultimate limitations period

expired prior to the April 2, 2001, Bankruptcy Petition Date.

Tolling of Limitations Periods

The Claimants assert that, even if the limitations periods would have commenced at a

date such as to potentially bar their claims, the running of the ultimate limitations periods was

suspended.

Fraudulent Concealment

First, the Claimants contend that the limitations periods were postponed by Debtors'

fraudulent concealment of the injury for which the remedial order is sought.  British Columbia's

ultimate limitations period continues to run despite fraudulent concealment.[43]  Therefore, this

---

[42] Anderson Memorial Hospital's Supplemental Post-Hearing Memorandum Re:
Canadian Statute of Limitations, Doc. No. 17059, at 7, n.6.

[43] *Edwards Estate*, 2008 BC.C. LEXIS 581, at *16 ("On the face of the legislation, it
seems clear that the 30 year period runs despite a postponement under s. 6 of the running of time
in an action '(d) based on fraud or deceit;' and '(e) in which the material facts relating to the
cause of action have been willfully concealed'").

10

argument could only apply with respect to the Alberta[44] and Manitoba[45] claims.  While the

Claimants have produced numerous exhibits[46] in an attempt to support a claim of fraudulent

concealment, the miscellaneous exhibits are not identified in any way or supported by an

affidavit.  Because the Claimants have not satisfied the basic evidentiary standards, the court will

not consider these exhibits.[47]  Despite the fact that the Claimants' pleadings contain allegations

---

[44] "(1) The operation of the limitation period provided by section 3(1)(b) is suspended during any period of time that the defendant fraudulently conceals the fact that the injury for which a remedial order is sought has occurred.  (2) Under this section, the claimant has the burden of proving that the operation of the limitation period provided by section 3(1)(b) was suspended."  Limitations Act, R.S.A., ch. L-12, § 4.  Section 3(1)(b) provides the ultimate limitations period.

[45] "Where the existence of a cause of action has been concealed by fraud of the person setting up this Part or Part II as a defence, the cause of action shall be deemed to have arisen when the fraud was first known or discovered."  Limitation of Actions Act, R.S.M., ch. L150, § 5. Part II of the Act contains §14(4), which is the ultimate limitation provision.

[46] In Anderson Memorial Hospital's Supplemental Post-Hearing Memorandum Re: Canadian Statute of Limitations, Doc. No. 17059, at 12-15, Claimants made various allegations of Debtors' fraudulent concealment.  In support of these allegations, Claimants state that "[e]vidence of Grace's concealment is demonstrated in Exhibits 1-145 submitted in the Court's binder prior to the September 10, 2007 hearing." *Id.* at 12, n.11. There is no indication that these exhibits were admitted into evidence, and they were submitted with no accompanying affidavit, exhibit list, certificate of authenticity, or any description of what the documents purport to be or how, if at all, they have any bearing on the matters at bench.

[47] The following is a partial, illustrative list of the documents submitted: unnumbered page one of Exhibit 2 appears to be a patent for "light weight moulded articles and methods of making the same," Exhibit 3 appears to be an undated advertisement for Monokote without any identification as to its circulation, and Exhibit 7 is titled "Information Kits/Booklets Distribution Breakdown" and is also undated.  Claimants have not shown how the documents are related to this Motion.  The exhibits were submitted without a document list, description, or affidavit, or identification of any kind.  We have not even a proffer as to what the documents purport to be and, apparently are left to our own devices to figure that out.  Claimants should produce a competent witness for that purpose and have not.  Despite their burden in opposing summary judgment, Claimants failed to satisfy the most basic standards for admission of these documents into evidence.  We have no evidence or proffer of authenticity, relevance, or exceptions to hearsay.  In short, we have no principled way to relate these exhibits to the matter at bench.  We
(continued...)

11

of fraudulent concealment, Claimants, as the non-moving parties, cannot "rely merely on

allegations or denials in [their] own pleading."[48]  In addition, while the fraudulent concealment

alleged does not have to rise to the level of deceit or common law fraud, in order to argue

equitable fraud under Canadian law, a special relationship must exist between the parties.[49]  The

Canadian Claimants have not shown that a special relationship exists between them and Debtors

to support a fraudulent concealment argument based on equitable fraud.  Therefore, the court has

no evidence to conclude that the ultimate limitations periods were suspended by fraudulent

concealment.[50]

---

[47](...continued)
do not know the source of these documents or how they came into the possession of Canadian
Claimants' counsel.  We have no foundation to consider these exhibits as evidence and we do not
consider them.  Cf. *Lexington Insurance Co. v. Western Pennsylvania Hospital*, 423 F.3d 318,
329 n. 6 (3d Cir. 2005) ("Our Court has not precluded reliance on unauthenticated documents to
oppose a motion for summary judgment, so long as they are ultimately 'reducible to admissible
evidence'").  In *Lexington*, the court had both testimony and circumstantial evidence of
authenticity of the document, which the court found to provide a sufficient foundation.  *Id.*  We
do not.

[48] Fed. R. Civ. Pro. 56(e).

[49] In order to toll the limitations period, the fraudulent concealment alleged "need not
amount to deceit or common law fraud."  *Guerin v. Canada,* [1984] 2 S.C.R. 335, 390, 1984
S.C.R. LEXIS 492, at *94.  However, in order to demonstrate equitable fraud, there must have
been "conduct which, having regard to some special relationship between the two parties
concerned, is an unconscionable thing for the one to do towards the other."  *Id.*

[50] Notwithstanding the failure of the Claimants to produce evidence in support of
fraudulent concealment, it is unlikely that a fraudulent concealment argument could succeed
given the facts.  According to *Ambrozic v. Burcevski*, "[t]he limitation period will not be
suspended if the plaintiff could have uncovered the fraud but did not make reasonable inquiries."
[2008] 90 Alta. L.R. (4th) 247, at ¶ 25, 2008 AB.C. LEXIS 633, at *15-16 (Alta. C.A. May 22,
2008).  Similarly, the Supreme Court of Canada, stated that "[i]t is well established that where
there has been a fraudulent concealment of the existence of a cause of action, the limitation
period will not start to run until the plaintiff discovers the fraud, or until the time when, with
reasonable diligence, he ought to have discovered it."  *Guerin,* 2 S.C.R. at 390, 1984 S.C.R.
(continued...)

12

Anderson Memorial Hospital's Class Action Complaint

The Claimants' second argument for tolling of the limitations periods is based upon

Anderson Memorial Hospital's Class Action Complaint, which was filed in a South Carolina

Court of Common Pleas in 1992.[51]  Given the date the complaint was filed, the class action

tolling argument would not affect the expiration of the ultimate limitations periods with regard to

the Alberta and Manitoba claims, which expired by 1986.  Therefore, the only issue is whether

the filing of the South Carolina complaint suspended the ultimate limitations period with respect

to the single British Columbia claim.  British Columbia has a statute governing when the filing

of a class action suspends a limitations period.[52]  Based on the language of the British Columbia

Class Proceedings Act, it is clear that it does not apply to suspend the limitations period in these

---

[50](...continued)
LEXIS 492, at *94.  In *Canadian Indemnity Co. v. Canadian Johns-Manville Co.*, the Supreme
Court of Canada addressed the awareness of the risks of asbestos within the insurance industry.
[1990] 2 S.C.R. 549, 596, 1990 S.C.R. LEXIS 36, at *84.  The court recognized that "asbestos-
related health risks had spread well beyond the boundaries of industry knowledge and were in
wide public circulation " in 1970.  *Id.* at 597, 1990 S.C.R. LEXIS 36, at *86.  There can be no
fraudulent concealment of that which is public knowledge.  Therefore, even if the limitations
periods were tolled until 1970, both Alberta's ten-year limitations period and Manitoba's thirty-
year limitations period would have expired by the Bankruptcy Petition Date, April 2, 2001.

[51] In its response to Debtors' Motion, Anderson Memorial Hospital states that "these
Canadian claimants have filed claim forms...referencing the Anderson Memorial Hospital class
litigation....That litigation was ongoing at the time the Debtors' bankruptcy petition was filed,
and the Canadian claimants filing under that class action are entitled to have the statute of
limitations tolled....Because these claims were subject to class proceedings, the statutes of
limitations have been suspended since 1992." Doc. No. 14898, at 6.  We note that the proofs of
claim forms were actually filed by Speights & Runyan, the same firm attempting to be class
counsel.  However, in this Circuit, it is clear that Anderson Memorial Hospital does not have
authority to represent the Canadian Claimants.  *In re W.R. Grace & Co.,* 2009 U.S. App. LEXIS
5281, at *4-5 (3d Cir. Mar. 11, 2009) (holding that the role of class counsel in a South Carolina
class action does not provide authority to file proofs of claim in bankruptcy proceedings).

[52] Class Proceedings Act, R.S.B.C., ch. 50.

13

circumstances.

First, the Class Proceedings Act provides for suspension of a limitations period where it would be reasonable for a person to assume that he would be included as a member of the class.[53] Due to South Carolina's "door closing statute,"[54] it would be unreasonable for any of the Canadian Claimants to believe that they would be included as class members. The door closing statute prohibits those who are not residents of South Carolina from suing foreign corporations in that State unless the claims arose or the property was situated in South Carolina. The statute "controls the eligibility of class members in a class action where the defendant is a foreign corporation."[55] The Debtors are corporations created by or under the laws of states other than South Carolina and are "foreign" corporations within the meaning of the South Carolina statute.[56] The claims asserted by the Canadian Claimants did not arise in South Carolina or

---

[53] "If a person has a cause of action, a limitation period applicable to that cause of action is suspended . . . in the event that . . . (b) when the proceeding . . . is commenced, it is reasonable to assume that, if the proceeding were to be certified...(ii) the person would be included as a member of the class on whose behalf the cause of action would be asserted . . . . " R.S.B.C., ch. 50, § 38.1.

[54] S.C. Code Ann. §15-5-150.

[55] *Farmer v. Monsanto*, 579 S.E.2d 325, 328 (S.C. 2003). In the Anderson Memorial action, the South Carolina court found that the door closing statute would not permit the court to "assert jurisdiction over the claims of non-resident potential class members...whose claims do not arise in South Carolina or whose property at issue is not situated within this state." *Anderson Memorial Hospital v. W.R. Grace & Co.*, No. CIV. A. 92-CP-25-279, 1994 WL 1744074 at *1 (S.C.Com.Pl. Aug. 8, 1994). Although the South Carolina Supreme Court in *Monsanto* found that §15-5-150 did not determine subject matter jurisdiction but rather dealt with capacity to sue, the Canadian Claimants would nonetheless have been excluded from the class by the door closing statute. "Limiting the class to members who qualify under § 15-5-150 simply excludes class members who would otherwise have no access to [South Carolina] courts via individual lawsuits." *Monsanto*, 579 S.E.2d at 328.

[56] *Anderson Memorial Hospital,* 1994 WL 1744074 at *2 (S.C.Com.Pl.) ("It is undisputed (continued...)

14

involve property located in South Carolina.[57]  Based on the door closing statute, the tolling

provision does not apply here.

Second, the tolling argument must fail because the Class Proceedings Act does not apply

to proceedings that may be brought in a representative capacity under another statute.[58]  Clearly,

Anderson Memorial Hospital did not file under British Columbia's Class Proceedings Act.  In

addition, the Act does not apply to representative proceedings commenced before the Act came

into force.[59]  The British Columbia Legislature did not pass the Act until 1995, well after the

filing of the 1992 Anderson Memorial South Carolina Complaint.  Therefore, the Act does not

apply to the South Carolina action.

Conclusion

For the foregoing reasons, the court concludes that there is no genuine issue of material

fact in dispute and as a matter of law summary judgment in favor of Debtors is appropriate.  The

---

[56](...continued)
that the defendants in this action are corporations created by or under the laws of states other
than South Carolina").

[57] *Id.* at *1 ("Anderson's proposed class would include claims by purported class
members who are not residents of South Carolina and whose buildings at issue are not located in
South Carolina").

[58] R.S.B.C., ch. 50, § 41(a). In support of their class action tolling argument, the
Canadian Claimants rely upon the Class Proceedings Act and *Currie v. McDonald's Restaurants
of Canada Ltd.*, [2005] 74 O.R.3d 321, 2005 Ont. Rep. LEXIS 22 (Ont. C.A. Feb. 16, 2005).
Anderson Memorial Hospital's Response to Debtors' Motion for Summary Judgment Directed to
88 Claims From Canada Based upon the Statute of Limitations, Doc. No. 14898, at 6-8. The
Canadian Claimants cited no other statute in support of the proposition that a foreign class action
could toll the British Columbia limitations period. With respect to the *Currie* case, the case was
not decided in British Columbia, did not apply British Columbia law, and did not address tolling
of limitations periods.

[59] *Id.* at § 41(c).

15

applicable ultimate limitations periods have expired and no evidence has been produced to show that the limitations periods were tolled.  Therefore, the remaining thirty-five Canadian Asbestos Property Damage Claims are disallowed and expunged.

Counsel for Debtors shall serve a copy of this Memorandum Opinion and accompanying Order on all parties in interest who do not receive electronic notice and shall file a certificate of service forthwith.

DATE: Dated: 4/14/2009
14:52:01

Judith K. Fitzgerald
United States Bankruptcy Judge

cjs

16

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR DISTRICT OF DELAWARE

IN RE:

W.R. GRACE & CO., et al.       Bankruptcy No. 01-01139
    Debtor(s)             Chapter 11
                            **Related to Dkt. No. 14597** Debtors' Motion and
                            Memorandum for an Order Pursuant to F.R.B.P.
                            7056 Disallowing and Expunging Eighty-Eight (88)
                            Time-Barred Canadian Asbestos Property Damage
                            Claims

### ORDER

    **AND NOW**, this 14th day of ___April___, 2009, for the reasons expressed in the

foregoing Memorandum Opinion, it is **ORDERED, ADJUDGED, and DECREED** that claim

numbers 011620, 011632, 012377, 012388, 012394, 012410, 012412, 012421, 012422, 012423,

012438, 012439, 012442, 012443, 012454, 012457, 012489, 012496, 012498, 012500, 012501,

012503, 012537, 012541, 012542, 012546, 012548, 012549, 012554, 012557, 012570, 012576,

012590, 012591, and 014885 are hereby disallowed and expunged as barred by the applicable

Canadian ultimate limitations periods.

    **IT IS FURTHER ORDERED THAT** counsel for Debtors shall serve a copy of this

Memorandum Opinion and accompanying Order on all parties in interest who do not receive

electronic notice and shall file a certificate of service forthwith.

Dated: 4/14/2009
14:50:53

                            *Judith K. Fitzgerald*
                            Judith K. Fitzgerald      **cjs**
                            United States Bankruptcy Judge

1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| W. R. GRACE & CO., et al. | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket Nos. 23724, 23866, 24249** |
| | ) | **4/19/10 Agenda No. 15** |

### ORDER DISALLOWING AND EXPUNGING ASBESTOS PROPERTY DAMAGE CLAIM NUMBERS 011627 AND 012476 AS BARRED BY BRITISH COLUMBIA'S ULTIMATE LIMITATIONS PERIOD

**AND NOW**, this _4th_ day of _May_, 2010, upon the record established at the

trial held before this Court on April 19, 2010 and for the reasons set forth in the Court's April 14,

2009 Memorandum Opinion [Docket No. 21270], it is hereby **ORDERED, ADJUDGED**, and

**DECREED** that claim numbers 011627 and 012476 are hereby disallowed and expunged as

barred by British Columbia's 30-year ultimate limitations period.

_Judith K. Fitzgerald_

The Honorable Judith K. Fitzgerald
United. States Bankruptcy Judge

DKT No. 24735

# Attach. 10



EXHIBIT
PP CL040