# Attach. 11

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. Grace & Co., et al., | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | NOTICE OF CLASS CERTIFICATION |
| | ) | AND PROPOSED SETTLEMENT |
| | ) | WITH W. R. GRACE & CO. AND |
| | ) | AFFILIATED DEBTORS |

**TO:    ALL HOLDERS OF ZONOLITE ATTIC INSULATION CLAIMS IN THE UNITED STATES (US ZAI CLAIMS)**

This Notice is being issued pursuant to an Order of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and Rule 23 of the Federal Rules of Civil Procedure. The purpose of this Notice is to inform you of: (1) the certification of a class action (the "Class") of holders of US ZAI Claims (defined below); (2) a proposed settlement by the Class with W. R. Grace & Co. and its affiliated debtor companies (collectively, the "Debtors" or "W. R. Grace"); (3) your right to exclude yourself from the Class; (4) your right, if you do not exclude yourself from the Class, to comment on the proposed settlement, and (5) a hearing scheduled for _____, 2009 at _____ in the United States Bankruptcy Court in Wilmington, Delaware, to consider approval of the proposed settlement. You are being informed of these matters so that you may make appropriate decisions concerning the steps you may wish to take concerning your claim.

**PLEASE READ THIS NOTICE CAREFULLY IN ITS ENTIRETY. YOUR LEGAL RIGHTS MAY BE AFFECTED BY THESE LEGAL PROCEEDINGS AND THE PROPOSED SETTLEMENT WHICH IS DISCUSSED HEREIN.**

## I.   BRIEF SUMMARY OF THE LITIGATION

1.      On April 2, 2001, each of the Debtors commenced a chapter 11 case by filing a voluntary petition in the Bankruptcy Court.

2.      At the time the Debtors commenced their chapter 11 cases, there were pending a number of lawsuits asserting property damage and other injuries from Zonolite Attic Insulation ("ZAI") installed in homes and other structures.  The commencement of the chapter 11 cases stayed all such litigation.

3.      ZAI is expanded vermiculite formerly sold by W. R. Grace and predecessor companies under several trade names.  The claimants in the ZAI litigation allege that ZAI can release asbestos fibers into the home environment, contaminating the structure and endangering the health of those who may come in contact with ZAI.  The ZAI claimants assert that W. R. Grace should bear the costs of inspection, testing, identification, analysis, repair and remediation of the ZAI.  The ZAI legal claims include negligence, strict liability, breach of warranty, misrepresentation and equitable remedies.  W. R. Grace denies any liability for any ZAI claim and has asserted numerous defenses to those claims.

4.      Beginning in November 2001, counsel for certain ZAI claimants (the "ZAI Claimants") sought to have all claims relating to ZAI in the United States ("US ZAI Claims") treated in a class action.  On October 29, 2008, counsel for the ZAI Claimants filed a motion for class certification on behalf of US ZAI Claimants.

5.      The sending of this Notice is not to be construed as an expression of any Opinion by the Bankruptcy Court about the merits of any claim or defenses.  The foregoing is only a summary of the contentions of the ZAI Claimants and W. R. Grace.  The pleadings and other records of this litigation more fully reflect the respective contentions of the parties.  You or your

counsel may review the pleadings and other papers filed with the Office of the Clerk of Court,

United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, 3rd Floor,

Wilmington, Delaware 19801.

## II.   CLASS CERTIFICATION AND OPT-OUT RIGHTS

6.     This Court has appointed Class Counsel and certified a Class in the Debtors'

chapter 11 cases under Rule 23(b)(3) of the Federal Rules of Civil Procedure. The Class consists

of all holders of US ZAI Claims that were filed on or before the ZAI bar date established by the

Bankruptcy Court of October 31, 2008 (the "ZAI Bar Date").

7.     This class certification does not imply a conclusion that any entity within the

Class was injured as a result of ZAI. This class certification applies to all claims for damages

and equitable relief by members of the Class, whether now existing or which may arise in the

future concerning asbestos property damage from ZAI installed in any building owned or rented

by a Class member, or any alleged contamination ZAI may have created or will create. If you

properly filed a US ZAI Claim with the Bankruptcy Court on or before the ZAI Bar Date, you

are automatically a member of the Class unless you exclude yourself from the Class by following

the opt-out procedures in this Notice.

8.     Any member of the Class who does not wish to remain a Class member may be

excluded from the Class by requesting exclusion through the attached Request for Exclusion. If

you exclude yourself from the Class, you will not be a member of the Class and will not be

represented by Class Counsel. If you choose, you may enter an appearance in this matter

through an attorney of your choice, but you will be responsible for compensation to that attorney.

If you remain a Class member, you will not be responsible for any fees or costs of Class Counsel,

who will apply to the Bankruptcy Court for fees and costs out of the fund created for the class. If

you desire to exclude yourself from the Class, you must send the attached Request for Exclusion form to the Claims Agent appointed in the Debtors' chapter 11 cases on the address contained on the form by _____.

9.     IF YOU WISH TO REMAIN A MEMBER OF THE CLASS AND SHARE IN THE CLASS SETTLEMENT BENEFITS AS DISCUSSED HEREIN, YOU NEED DO NOTHING AT THIS TIME.  YOU WILL BE NOTIFIED WHEN THE CLASS SETTLEMENT HAS BEEN FINALLY APPROVED AND INCORPORATED INTO A CONFIRMED GRACE REORGANIZATION PLAN.

### III.    PROPOSED CLASS SETTLEMENT

10.    On November 21, 2008, counsel for the ZAI Claimants, acting on behalf of a proposed class of US ZAI claimants, entered into a Term Sheet for Resolution of U.S. Zonolite Attic Insulation Claims with W. R. Grace.  ZAI Claimants thereafter entered into a Class Settlement Agreement on December 15th, 2008 (the "Settlement"), which incorporates the provisions of the Term Sheet.  A copy of the Settlement is enclosed with this Notice.  The Settlement is designed to be incorporated into W. R. Grace's chapter 11 plan of reorganization (the "Plan"), which if approved by the Bankruptcy Court will provide benefits for all Class members including a monetary benefit to those Class members who undertake ZAI remedial action.

11.    In summary, the Settlement provides that, W. R. Grace will create a Trust under section 524(g) of the Bankruptcy Code with an expected life of at least twenty-five (25) years. The Trust will be funded by two non-contingent payments - an initial payment of $30 million on the effective date of the Plan, followed by an additional $30 million on the third anniversary of the Plan's effective date.  Depending on the pace at which this initial funding is used for Trust

claims and operations, W. R. Grace has agreed to make additional, contingent payments to the Trust beginning on the fifth anniversary of the Plan's effective date of up to $80 million over the following twenty (20) years. A ZAI Trustee will administer the Trust funds which will be used for: (1) a comprehensive ZAI educational program for homeowners and others who may encounter ZAI; (2) reimbursement for ZAI remedial action of 55% of a claimant's approved remediation costs up to a maximum reimbursement of $4,125 (55% of a $7,500 expenditure); and (3) Trust operation expenses and attorneys' fees and costs. To qualify for reimbursement from the Trust, a claimant will be required to document the existence of ZAI in the structure and the costs of remedial action undertaken. Under certain limited circumstances, the ZAI Trustee may reimburse a Claimant above the $7,500 expenditure ceiling.

12.     This is only a summary of the important provisions of the Settlement. If you have questions concerning the Class certification, the Settlement, or the effect of these developments on your claim, you should contact Class Counsel at the address listed in this Notice.

13.     By entering into this Settlement, W. R. Grace does not admit responsibility for any US ZAI Claim. W. R. Grace expressly denies liability to the ZAI Claimants and the Class for any US ZAI Claims. The proposed Settlement is not to be construed as an admission of liability on the part of W. R. Grace.

14.     The Court has certified the Class, granted preliminary approval to the Settlement and approved the sending of this Notice to the Class. This Notice is not an expression of any opinion by the Court about the merits of the Settlement or whether it will be finally approved as part of the Plan. The purpose of this Notice is to inform you that about the Class certification, the proposed Settlement and of the rights you have with respect to them.

15.     Each member of the Class who does not exclude itself is entitled to be heard with respect to the proposed Settlement described in this Notice.  Members of the Class will share the benefits of the Settlement described herein only if it is approved by the Court in connection with confirmation of the Plan and the Plan becomes effective.

16.     A hearing to determine the adequacy, fairness and reasonableness of the Settlement will be held as part of the confirmation hearing on the Plan on _____, 2009 at [    ] [ ].m. (prevailing Eastern time) in the United States Bankruptcy Court, Western District of Pennsylvania, 5414 U.S. Steel Tower, 600 Grant Street, Pittsburgh, PA 15219.  The approval hearing, once commenced may be adjourned from time to time by the Court, without further notice.

17.     At the approval hearing, any member of the Class may appear in person or by counsel and be heard to the extent allowed by the Court in support of or in opposition to the fairness, reasonableness and adequacy of the settlement.  However, no class member will be heard in support of or in opposition to the settlement, and no paper or briefs submitted by any such party will be accepted or considered by the Court unless, at least _____ days before the settlement hearing, such class member: (1) files with the Clerk of Court, United States Bankruptcy Court, 824 N. Market Street, 3rd Floor, Wilmington Delaware  19801, notice of its intention to appear, together with a statement that indicates the basis for its support or opposition; and (2) serves copies thereof, and copies of any other papers or briefs it files with the Court, upon Class Counsel who have been appointed by the Court:

| | | |
|---|---|---|
| Edward J. Westbrook, Esq.<br>Richardson Patrick Westbrook<br>& Brickman<br>P. O. Box 1007<br>Mount Pleasant, SC  29465 | Darrell W. Scott, Esq.<br>The Scott Law Group, PS<br>926 W. Sprague Avenue<br>Chronicle Building, Ste. 583<br>Spokane, WA  99201 | Elizabeth Cabraser, Esq.<br>Lieff, Cabraser, Heimann<br>& Bernstein, L.L.P.<br>Embarcadero Center West<br>275 Battery Street, 30th Floor<br>San Francisco, CA 94111 |

and on counsel for W.R. Grace:

Kirkland & Ellis LLP
David M. Bernick, P.C.
Janet S. Baer
200 East Randolph Drive
Chicago, Illinois 60601
Telephone: (312) 861-2000

Kirkland & Ellis LLP
Theodore L. Freedman
Deanna D. Boll
Craig A. Bruens
153 East 53rd Street
New York, New York 10022
Telephone: (212) 446-4800

18.    Class Counsel recommend final approval of the Settlement described herein as fair and reasonable and in the best interests of the members of the Class, in view of: (1) the risks and costs of continuing litigation involving US ZAI Claims against W. R. Grace; (2) the substantial and valuable benefits that will accrue under the terms of the Settlement to the Class; and (3) the favorable sum of the Settlement in light of the risks and uncertainties facing the ZAI Claimants and W. R. Grace.

19.    If the Settlement is approved as part of W. R. Grace's Plan, the settlement funds will be paid pursuant to the Plan to a Trust created in compliance with § 524(g) of the Bankruptcy Code. The funds will be maintained in full, subject only to such deductions or expenditures as are expressly provided for in the Plan and trust agreement, or otherwise as ordered by the Bankruptcy Court. The Settlement contemplates that the ZAI Trustee who will administer the settlement funds will operate under a trust agreement and trust distribution procedures that will carry out the purpose and intent of the Settlement to provide a fair and efficient program for education concerning ZAI in homes and financial assistance for ZAI remedial action.

20.    Notice is expressly given that, subject to judicial approval, the settlement funds may be disbursed in part to Class Counsel for their efforts in creating the settlement fund in an amount of up to 25% of the non-contingent payment by W. R. Grace to the Trust. Subject to

Bankruptcy Court approval, Class Counsel may also be paid from the settlement fund for their unreimbursed out-of-pocket ZAI litigation costs.

21.    The Plan and its incorporation of the Settlement provides that all members of the Class will be forever barred from instituting, maintaining, or prosecuting against W. R. Grace or any other Asbestos Protected Party (as defined in the Plan) any of the claims asserted or which could have been asserted in the ZAI litigation.  Class members shall be deemed to have forever released, relieved and discharged W. R. Grace, its predecessors and successors, past and present assigns, representatives, subsidiaries, divisions, affiliates, receivers, parents, shareholders, partnerships and partners, and all of their officers, directors, agents, employees, insurers and attorneys, both past, present and future from any and all manner of claims, demands, rights, or causes of action, past, present or future, known or unknown arising from ZAI property damage, that the members of the Class, individually and collectively, had, now have, or hereinafter can, shall, or may have against W. R. Grace.

22.    This summary of certain aspects of the litigation, the Class certification and the proposed Settlement is not intended, and should not be construed, as a complete statement on these matters.  The pleadings and orders regarding the US ZAI Claims, the Class certification and the proposed Settlement are on file with the Clerk of Court and are also available for inspection and copying of the offices of Class Counsel.

**IF YOU HAVE QUESTIONS CONCERNING ANYTHING IN THIS NOTICE, YOU SHOULD CONTACT YOUR LEGAL COUNSEL OR CLASS COUNSEL.  DO NOT CONTACT THE COURT OR THE CLERK'S OFFICE FOR INFORMATION.**

Dated: _____

By Order: _____
                The United States Bankruptcy Court
                District of Delaware

# Attach. 12

*In Re: The State of Florida, et al.*
*v. The American Tobacco Company, et al.*
CL-95-1466-AH (Palm Beach Cty. Cir. Ct.)
Report of Attorneys' Fee Arbitration Findings Pursuant to the
Florida Fee Payment Agreement Dated September 11, 1998

## I. INTRODUCTION

The undersigned panel of arbitrators ("panel") were designated to determine the amount of attorneys' fees that certain tobacco companies[1] must pay to the premier team of private counsel representing the State of Florida in its landmark litigation against the tobacco industry, *The State of Florida, et al. v. The American Tobacco Company, et al.*, CL-95-1466-AH (Palm Beach Cty. Cir. Ct.) ("tobacco lawsuit"). In connection with its fee award of December 10, 1998, the panel makes the following findings and conclusions.

The obligation of the tobacco companies to pay to the State of Florida's private counsel full, reasonable attorneys' fees arises out of this settlement and is contractual in nature. See Florida Fee Payment Agreement, § 1. The Florida Fee Payment Agreement thus provides an alternative, non-exclusive mechanism to the February 1995 25% contingency fee contract between the State of Florida and its team of private counsel by which the private counsel may be paid. See Florida Contingent Fee Contract, Attachment 1, p. 2 ("The State will ask the court to require the tobacco companies to pay all the attorneys' fees and costs.")

The term "private counsel" is defined in Schedule B of the Florida Fee Payment Agreement as those who "...are appropriate, legal and authorized parties to the contingent fee agreement titled 'Standard Contract - State of Florida, Agency for Health Care Administration'

---

[1] These certain tobacco companies are: Philip Morris Incorporated; R.J. Reynolds Tobacco Company; Brown & Williamson Tobacco Corporation; Lorillard Tobacco Company and United States Tobacco Company.

and executed in February 1995..." The rules governing this arbitration are contained in the September 11, 1998 Florida Fee Payment Agreement.

The members of this team of private counsel eligible for payment of attorneys' fees have been identified by the Governor of the State of Florida. See Florida Fee Payment Agreement, §§ 1 & 24 and Schedule B, the "Designation of Florida Counsel by the Governor" appended thereto. Pursuant to the Florida Fee Payment Agreement, these private counsel provided a detailed submission in support of an attorneys' fee award for the panel's consideration. The award we make today will not be paid today or in a lump sum; rather it will be paid out piece meal, over what is likely to be decades, from a $500 million a year attorneys' fee fund that the industry has committed to provide until all attorneys' fees in all the Attorney General tobacco cases are paid.

## II. ANALYSIS OF FULL, REASONABLE FEES

A.    The Benefits of the Florida Settlement.

1.    Economic Recovery.

On August 25, 1997 the State of Florida settled its historic tobacco lawsuit which was at that time the largest settlement in the history of American civil litigation. Under the Settlement Agreement and its amendments, the tobacco companies agreed to pay the State of Florida a *minimum* of $13.197 billion over the course of the next 25 years, *without* taking into account the guaranteed minimum growth factor of 3%. Press accounts contemporaneous with Florida's announcement of the settlement used the figure of $11.3 billion[2], but that reflects the State officials' quick calculation of merely adding up the scheduled yearly payouts without increasing

---

[2] This amount did not include the supplemental payments under the Most Favored Nations provision that aggregate to the total $13.197 billion

2

them at the guaranteed rate of the *greater* of 3% or the CPI. The initial reports of the "$11.3 billion settlement" also failed to calculate the payment stream beyond 25 years when in fact the industry has committed to make its yearly payments indefinitely, i.e. as long as cigarettes are sold. Thus, the real value of Florida's settlement can and should be considered to be significantly greater than the initially reported amounts. In fact, the minimum value of the recovery is $17.480 billion when the minimum annual increase is considered. When future trends in inflation, the life-span of the obligations under the settlement, "most-favored-nation" provisions and other factors are taken into account, the more realistic monetary payment to the State of Florida will likely exceed $79 billion.

 2.     Non-Economic Benefits.

Counsel was employed by the State to achieve the Governor's goals of vigorously pursuing a speedy and successful recoupment of the State's Medicaid monies spent on treating tobacco related illnesses, as well as to resolve non-monetary/public health objectives such as eliminating sales and advertising to minors. The concessions made by the tobacco industry defendants in settlement of this case were unprecedented, both financially and otherwise. In addition to the record-breaking monetary payments of somewhere between $17 and $79 billion, counsel for the State accomplished the removal of billboards and transit advertisements by the defendant companies, as well as support for proposed legislation to (i) limit childrens' access to tobacco products; (ii) strengthen civil penalties for the sale of tobacco products to minors; (iii) strengthen penalties for minors who possess tobacco products; (iv) provide funding for the State's pilot program aimed at discouraging youth smoking. Moreover, in addition to negotiating the extraordinary amount of money to be paid to the State for Medicaid recoupment costs, counsel

also negotiated for the defendants to pay the Attorney General's costs and expenses in connection with this litigation. The valuation of these non-economic benefits have been conservatively computed by a well-qualified economist to be approximately $30.1 billion. While the attorneys do not seek to apply their 25% contingency fee contract to the non-economic value of Florida's recovery, it is nevertheless very relevant to our considerations in determining a full, fair and reasonable fee under these unprecedented circumstances.

Another major, but unquantified benefit conferred by private counsel upon the State of Florida, indeed the nation, is based upon the role they played in what has become known as "Liggett I" and the "June 20th Proposed Global Resolution." Private counsel were at the forefront in driving, negotiating and achieving the March 1996 Liggett I settlement and the proposed June 20, 1997 resolution. The Liggett I settlement, of which Florida was one of the five participating states, was a turning point in the tobacco litigation. The defection by Liggett encouraged other states to file, and brought about the critical mass of lawsuits ultimately necessary to bring the tobacco industry to the negotiating table. The June 20, 1997 resolution was further driven by the August 1997 Florida trial date. Without the pressures of the potentially bankrupting Florida case, the incentive for the tobacco industry to reach a timely nationwide resolution of these lawsuits would not have existed. In evaluating the fair and reasonable attorneys' fees to be awarded to Florida's private counsel, we have taken these two very important events into consideration, but have made no attempt to quantify them. This is yet another reason why we are well satisfied and convinced that the attorneys' fee we award is reasonable, even conservative, under the circumstances.

B.    Other Factors Considered in Making the Attorneys Fee Award.

1.    The Contingent Fee Contract.

No one disputes that at the time the State of Florida contracted with its private counsel, the 25% contingency fee contract was fair and reasonable. The State acknowledged it could not bring the case without the assistance of private counsel, having neither the manpower, expertise or resources to take on the most powerful and successful litigant in the history of civil litigation.

Although the contract is not controlling on the Florida Fee Payment Agreement (indeed the tobacco companies have neither assumed the 25% contingency fee contract nor agreed to be bound by its terms), it is not in the least unreasonable, however, to consider the 25% contingency fee in seeking to determine what the appropriate fee should be. The following provision of the contingency fee contract is particularly noteworthy and persuasive.

> The State of Florida cannot handle this lawsuit on its own. If the State had handled it, the suit would take literally 100's of lawyers and expend most of the State's legal resources. By having a private Trial Team, the State can continue to maintain the protection of Floridians and take on the Tobacco Industry. In order to obtain taxpayer dollars without having the risk of taxpayer dollars, the State of Florida located the top lawyers in the State with experience in pursuing similar actions and who would agree to aggressively pursue this cause using their own money. The listed providers were hired by the State of Florida at no cost, with these lawyers taking the full risk. *See* Attachment 1 to the Florida Contingency Fee Contract.

This case was the largest, most important and most difficult in the history of the State of Florida. Indeed from a national perspective, only the parallel litigation instituted by the Attorneys General in Mississippi, Texas and Minnesota against the tobacco industry is comparable. Florida's private counsel bore the *entire* risk of this lawsuit - a risk that was personal, professional

5

and financial. Through a combination of hard work, creativity, innovation, dedication, diligence, persistence and extraordinary legal acumen, they achieved a truly remarkable result.

Although the contract is a significant factor, the panel has also considered all other relevant factors in determining a full, fair and reasonable fee to be paid by the Tobacco Industry under the Settlement Agreement.

A careful review of the submissions leaves us no doubt that this case required immense amounts of time and labor. This fact is perhaps best reflected by the following statistics:

1.    Florida responded to more than 600 discovery requests, producing more than 500 million pages of documents from more than 40 state agencies.

2.    Florida served more than 4300 discovery requests.

3.    Florida developed the novel "deemed produced" procedure, whereby nearly 13,000 key tobacco industry documents were, through operation of the Sunshine in Litigation Act, stripped of secretive protective orders. This procedure -- in stark contrast to documents produced in the other states - which were encumbered by onerous protective orders -- made key tobacco industry documents instantly accessible to litigants across the country.

4.    There were more than 70 discovery hearings before the Special Master, resulting in nearly 60 reports and some 10 appeals to the trial court.

5.    There were more than 80 days of hearings before the trial court.

6.    There were 8 interlocutory appeals to the Fourth District Court of Appeals.

7.    Florida secured the first favorable trial court and appellate court "crime-fraud" rulings against the tobacco industry. In fact, these early crime-fraud rulings can fairly be said to have provided the springboard for the later Minnesota crime-fraud rulings.

8.    From millions of pages of tobacco industry documents, Florida identified and designated some 9000 trial exhibits.

9.    There were over 4000 docket entries.

10.    Over 300 depositions were taken in the case and hundreds more collected and prepared for use at trial.

These few facts clearly illustrate the enormity of the time, labor and effort required in this case.

### 3.    The Difficulty of the Case and Risks Involved.

The novelty and difficulty of the complex and untested legal theories on which this case was based is no doubt a major reason why the State sought out the services of some of its most preeminent lawyers and law firms. Indeed, it even went outside its borders to obtain the services of two firms possessing a national, if not international reputation for handling highly complex, multi-defendant litigation. This Florida lawsuit, along with the parallel lawsuits by the Attorneys General in Mississippi and Texas against the tobacco industry, can fairly be said to be "cases of first impression" and as such, they were the vanguard states in pursuing, developing and perfecting this extremely high risk litigation.

It must be remembered that at the time the Florida tobacco lawsuit was filed in 1995, the tobacco industry had previously been sued more than 800 times -- but yet had never paid a cent in damages. Moreover, the tobacco industry has long had a reputation in legal circles as being a tenacious litigator second to none. Illustrative of this reputation is the now infamous RJR internal memo from its counsel which states in part:

> ...the aggressive posture we have taken regarding depositions and discovery in general continues to make these cases extremely burdensome and expensive for plaintiffs' lawyers, particularly sole practitioners. To paraphrase General Patton, the way we won these cases was not by spending all of Reynolds' money, but by making that other son of a bitch spend all his.

> *See* Memo from Mike Jordan to Smoking & Health Attorneys dated April 29, 1988

7

Couple these facts with the additional fact that Florida was proceeding on untested legal theories and what opponents claimed was a constitutionally-suspect Medicaid recoupment act, and it is not an overstatement to say that private counsel were in the legal fight of their lives. It is also clear that if they had not succeeded - and the likelihood of success at the outset appeared bleak at best - the lawyers could have well been bankrupted by taking on the state's case.

4.    The Extraordinary Demands on Private Counsel.

Private counsel worked under extreme time limitations. They imposed upon themselves a "No Delays" policy due to concerns that the tobacco industry would try to overwhelm them with discovery and objections to their discovery in order to indefinitely put off the trial date. Aware that if they, private counsel, objected to basically anything the defendants requested that could be used as an excuse for obtaining a continuance, private counsel was assiduous in timely responding to the industry's barrage of pleadings, motions and discovery. The stakes were enormously high. If there was a continuance, private counsel would run the risk of losing the momentum of the case. They risked that trial would be put over into the next political administration with its attendant uncertainties. They also ran the risk that the Governor's veto would ultimately be overridden or the law stricken from the books (which it was the next legislative session).

Over the course of the year and one-half after surviving the Tobacco Industry's constitutional assault on the Medicaid Amendments in the Florida Supreme Court, private counsel repeatedly prevailed over the tobacco industry in key, complex and difficult legal battles. To mention a few, these battles included abrogation of the tobacco industry's affirmative defenses, use of market share to allocate liability, use of statistical evidence to prove causation and damages, restrictions on individual Medicaid recipient discovery, defending against the tobacco

8

industry's counter-claims, limiting the scope of the Industry's pre-emption defense, addition of a punitive damages claim, resisting a motion for partial summary judgment on proximate cause and upholding the state-law RICO causes of action. A loss on any one of these issues would have seriously weakened Florida's lawsuit. Imaginative, intelligent and skillful lawyering on the part of Florida's private lawyers is the only explanation for this extraordinary string of legal victories.

To those who might contend that, in light of the recently announced Global Resolution of all the Attorney General tobacco litigation, there was no real risk in undertaking the Florida tobacco lawsuit, one need look no further than the Indiana and Idaho Attorney General tobacco lawsuits. Both these cases – nearly a year after the Florida settlement – were dismissed in their entirety at the trial court level. Similarly, the tobacco industry has had considerable success against the *Castano*-type state class actions, overcoming certification or achieving decertification in Pennsylvania, Missouri, New York, Puerto Rico, the District of Columbia and other venues, as well as against the health care fund cases, which have been thrown out in Pennsylvania, California, Florida, Maryland and other venues. The simple lesson is that there was and is no such thing as a low risk case against the tobacco industry and no one knew that better than pioneering lawyers for Florida.

It is not an exaggeration to say that when these lawyers signed on to represent the State of Florida and to commit the necessary economic resources to do so, each of these firms faced the very real prospect of financial ruin. Indeed, private counsel expended approximately $10 million in behalf of the State. Their acceptance of this case required them to commit themselves and substantial portions of their staff to the preclusion of other employment. The minimum financial commitment which they pledged was ultimately dramatically exceeded. Given the factors

evidencing the undesirability of accepting this case, the panel is even more convinced that its award of attorneys' fees is reasonable under these unique circumstances.

The panel recognizes that the amount of fee it is awarding is very large and notes that while it cannot be said to be "customary", such a standard would be problematic to apply given the uniqueness and enormity of this lawsuit. This was not a "customary" lawsuit. Therefore, this panel has concentrated its deliberations on the question of what is a "full, fair and reasonable fee" under these unprecedented circumstances. Finally, we would note that the fee we award is a reasonable percentage of the State's recovery.

## III.  CONCLUSION

No other case in the history of America has brought forth this magnitude of economic recovery or conferred such an extraordinary benefit.  Through the Florida tobacco lawsuit, private counsel were charged with attacking head on what amounts to two of the greatest public health crises of our day:  underage smoking and the millions of dollars of excess health care costs attributable to smoking-related disease.  It has been estimated by Elizabeth King, Ph.D., that the anticipated reduction in smoking will save at least 200,000 lives over the course of the next 50 years and $30.1 billion in savings from societal smoking-attributable costs.  It is difficult to imagine litigation with higher stakes, more important objectives or a better end result.

Applying the factors generally recognized for assessing attorneys fees and considering the unprecedented and unique circumstances of this case, we have determined to award Florida's contract counsel, as defined by the Florida Fee Payment Agreement, the sum of $3,431,220,000 plus an annual increase on the unpaid balance calculated as of January 1 of each year equal to any increase in the CPI for the previous calendar year. The panel finds the fee award to be not only

fair and reasonable under the circumstances, but further observes that to award a reduced fee because the result was so great and so publicly beneficial would be unfair and counterproductive to the public interest.

Although not a consideration in our decision, for those who may question the size of the award, we would point out that it is to be paid out over an extended period of time. Florida's counsel's fees are subject to payment from the capped $500 million per year attorneys' fee fund established in connection with the settlement of these Attorney General cases. As a result, this fee will be paid out over many years and on a pro-rata basis. Presently, the fees to Florida's private counsel as well as those fees awarded to Mississippi and Texas counsel must share the annual $500 million fund. There has been announced a recent settlement with some 40 other states and other states' attorneys fees may also be assessed against the $500 million fund. While we do not take that into consideration in making this award, these events underscore the fact that while the amount of the fee award is undoubtably large, the actual present value of the award is obviously much less.

One of the significant accomplishments of this settlement was the requirement that the losing party pay attorneys fees. Florida's private counsel have agreed to accept this award and the long-term payment of their fees by the Industry in lieu of seeking fees from the State of Florida. As a result, the State of Florida will reap the full and complete benefit of these lawyers extraordinary work and its landmark settlement will not be reduced in any respect. The award to Florida's counsel is in recognition of their extraordinary commitment to their public client and is a testament to the public good that can be achieved when individuals are willing to risk themselves to serve the public interest. It also reinforces basic principles of our society that exceptional work

11

should be commensurately rewarded and hopefully will serve as incentive to others to lend their

time and skills to the public interest and to not be afraid to take on important causes, even if the

risk is great and the course daunting.

_____
JOHN CALHOUN WELLS

_____
HARRY HUGE

DISSENT:                              _____
                                     CHARLES B. RENFREW

Dated:  December 11, 1998

12

# Attach. 13



## States v. Big Tobacco

# Tobacco Arbitration Panel Awards $8.2 Billion

***Fee awards outstrip fees for attorneys in states that opted out of arbitration.***

Law Journal Extra
December 11, 1998

By **Melissa J. Kozlowski**

1. Dwarfing the $221 million fee attorneys in eight states who shunned arbitration will receive, attorneys in the Florida, Texas and Mississippi tobacco cases were awarded a $8.2 billion settlement today.

2. In its first round of awards, the Tobacco Fee Arbitration Panel announced a 10 percent contingency fee award plus a "success" multiplier that took into account individual circumstances, according to the panel.

3. "The panel recognizes that the fee awards being announced today are very substantial," said John Calhoun Wells, panel chairman, in a written statement. "However, notwithstanding all th e efforts by individuals who committed years of their lives to achieving progress on this issue, without these outside counsel, there would be no multi-billion dollar settlements for the states to reimburse tobacco-related health expenses and provide fund s for educational efforts to reduce youth smoking."

### Documents

Tobacco Settlement

### Related Sites

National Association of Attorneys General home page

### See Also...

*That $10 Billion Fee*

*Tobacco Arbitration Panel Goes to Work*

Product Liability Law Practice Area

Return to LJX Files Main Page

5. Calling the awards "obscene," Brown & Williamson Tobacco Corp vowed to "vigorously assert" its position in the remaining state cases.

6. A provision of the settlement in the Florida, Texas and Mississippi cases prevented the tobacco companies from appearing before the fee panel.

7. Using the Mississippi case as an example, Brown & Williamson estimated that it would take 70,000 Mississippi households working an entire year to earn what the state's 29 lawyer legal team earned with this settlement.

8. "We believe that such mind-boggling fee awards have a corrupting effect on the entire legal system," Brown & Williamson said.

9. Florida's lawyers received an award of $3.4 billion, assuming a success multiplier of 2.6, given that state's $13.2 billion in recoveries.

10. Attorneys for Texas received an award of $3.3 billion, assuming a success multiplier of 1.9, given that state's award of $16.4 billion.

11. Mississippi's outside counsel received an award of $1.4 billion, assuming a success multiplier of 3.5, given that state's award of $4.1 billion.

12. Each award will be paid by the tobacco companies over at least a 10-year period, beginning immediately. The total fees to be awarded by this panel are subject to an annual aggregate cap of $500 million, which could alter the time-frame for payment once e the fees in other states are decided.

13. Attorneys for Alaska, Arizona, Idaho, Montana, Nevada, Oregon and Washington opted out of the arbitration proceedings and reached a settlement yesterday.

14. Charles B. Renfrew who was the tobacco interests' choice for the panel, condemned the fee decision in a written statement, shortly after fees were announced.

15. "[T]here are limits, even in these cases, as to the amount the attorneys should be paid," Renfrew said. "Each of three state awards rendered by the majority is clearly excessive and to me incomprehensible."

16. Renfrew criticized the exclusion of tobacco companies from supplying arguments against the fee applications; the failure of counsel in the three states to keep time records or estimate the time spent; and the limited time the panel had to review the c ases.

17. In particular, Renfrew questioned the panel majority's decision to go above-and-beyond contracted contingency fees.

18. Florida lawyers originally asked for 25 percent of their state settlement--and got 26 percent. Renfrew recommended a 7 percent or $801 million award.

19. Texas had originally contracted for a 15 percent contingency fee. And while the state asked for 25 percent in oral arguments, they got 19 percent. Renfrew recommended 7 percent or a $1.1 billion.

20. Mississippi counsel, who had no written contract with the state, got a 35 percent contingency fee.

21. "While their risks were high, the percentage awarded here is vastly larger than they ever could have negotiated with the state in the first place," Refrew said of the Mississippi fee award. "I do not believe that a contingent fee of this amount could have been politically acceptable. He recommended a 10 percent or $1.2 billion award.

22. Other panelists include:

    ○ Harry Huge, a Washington D.C. based attorney, selected by Florida

- ○ Texas Law School Dean W. Frank Newton, selected by Texas
- ○ Jack F. Dunbar, an Oxford, Mississippi-based attorney chosen by Mississippi

Home|Contents|Marketplace|< /b>News|Employment|Practice Areas|Resources< b>|Law Tech.|Law Firms

Copyright 1998, The New York Law Publishing Company. All Rights Reserved.
Access to Law Journal EXTRA! is governed by its Rules of Use. Send comments to feedback@ljextra.com

This Web page is in a section entitled Lawyers Make Billions at Expense of Sick and Dying Smokers in the Web site entitled Legal Reform through Transforming the Discipline of Law into a Science.

# Attach. 14

**FILED**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

DEC 2 1 2001

LARRY W. PROPES, CLERK
CHARLESTON, SC

CENTRAL WESLEYAN COLLEGE,  )        C. A. No. 2:87-1860-8
on behalf of itself and all      )
others similarly situated,        )
                                  )
                Plaintiff,         )
                                  )        **ORDER**
        v.                         )
                                  )
W.R. GRACE & CO., et al.,         )
                                  )
                Defendants.        )
_____ )

Class counsel have applied for a contingency fee award of 28.75% of the cash

recovery in this action and for reimbursement of litigation expenses currently totaling

$1,014,431.35. This application is a follow-up to counsel's September 21, 2001, motion

for approval of a contingency fee not to exceed 30%. Pursuant to court order, counsel sent

individual notice to over 3,400 colleges on September 25, 2001, stating that: "[c]lass

counsel have informed the Court that they will apply for a contingency fee not to exceed

30% of the current and future cash recoveries in the case." Class Notice, ¶ E. This notice

was also carried in a leading college newspaper, "The Chronicle of Higher Education,"

which reaches over 90,000 college subscribers. The notice required any college with an

objection to the motion to respond by November 9, 2001.

        After this extensive notice campaign, no college registered a timely objection.

Only one class member, Medaille College, voiced any objection at all. In a letter received

on November 15, 2001, Medaille stated that class counsel should be paid solely on their

hours. Class counsel subsequently sent Medaille their 42 page fee application containing

426 pages of time records and a 59 page expense summary. After receiving those

materials, Medaille informed class counsel it had no further objection to the fee request.

For the reasons set forth hereinafter, the Court applies the "percentage of the

fund method" that is used overwhelmingly for common fund class action fee awards and

finds that a percentage award of 28.75% is eminently reasonable under the circumstances.

The Court also finds that the application for expense reimbursement is fair and reasonable.

## I.    FACTUAL BACKGROUND

This case was filed in July 1987 as a companion to the original college and

university asbestos class action, Clemson University, et al. v. W.R. Grace & Co., et al., No.

2: 86-2055-2 (D.S.C. 1986). When Clemson was dismissed on jurisdictional grounds, this

case became the college standard-bearer for recovery of asbestos property damage costs.

The history of the litigation through affirmance of class certification on appeal is set forth

in the opinions of this Court and the Fourth Circuit Court of Appeals.[1] As summarized in

those opinions, this case is one of the most ambitious undertakings ever attempted in this

district, or, for that matter, the country. It successfully brought together for resolution in one

forum the asbestos property damage claims of over 3,400 colleges spread throughout the

50 states. This case remains one of the few nationwide diversity class actions to have

survived appellate scrutiny and resulted in substantial benefits to class members.



As expected in a case where over 3,000 institutions were suing 50 companies

in the asbestos products distribution chain, this case was hard fought, raising numerous

---

[1]    Central Wesleyan College v. W.R. Grace & Co., 143 F.R.D. 628 (D.S.C. 1992);
Central Wesleyan College v. W.R. Grace & Co., 6 F.3d 177 (4th Cir. 1993).

novel issues and requiring expert legal ability on both sides. Without unduly belaboring this order, the Court will review briefly the history and progress of the litigation to date.

The college asbestos property damage litigation began in the mid-1980's in a period of enormous uncertainty. Asbestos property damage litigation was then in its infancy. Defendants had won two of the first three asbestos property damage trials.[2] From the outset class counsel faced a well-organized and aggressive defense. Shortly after the complaint was filed, defendants launched a preemptive strike with a "Motion to Dismiss and Deny Certification." Class counsel successfully countered that attack. They also defused defendants' attacks on the initial class representatives, Clemson and the College of Charleston, by effectively substituting Central Wesleyan as the class representative. Class counsel turned back other defense assaults on the class such as: (1) the class claims should be dismissed under the "local action" doctrine; (2) the class sought only "economic loss" not recoverable in tort; (3) discovery against certain Canadian defendants should be prohibited under the "Quebec Business Records Concern Act"; and (4) the claims of all non-South Carolina colleges should be dismissed under the "door closing" statute. Had any of these defense arguments prevailed, they could have crippled the class.

In seeking class certification, class counsel marshaled extensive evidence that convinced both this Court and the Fourth Circuit that the class should be certified and given a chance to resolve college asbestos claims. Class counsel successfully argued: (1) that the defendants' manageability concerns could be met by dividing the action into

---

[2] Anderson County Bd. of Educ. v. U.S. Gypsum Co., Civ. No. 3-83-511 (E.D. Tenn.) [defense verdict, March 1985]; Spartanburg County Sch. Dist. 7 v. National Gypsum Co., No. 83-1744-14 (D.S.C.) [defense verdict July 1985]; City of Greenville v. W.R. Grace & Co., Civ. No. 85-1693-3 (D.S.C.) [plaintiff's verdict January 1986].

3

phases and initially addressing a set of common issues; (2) that concerns over Central Wesleyan's adequacy should be deferred pending completion of sales records discovery that defendants had withheld; and (3) that the class action was superior to a morass of individual actions that could quickly bankrupt the defendants. Again, a loss on any of these points could have doomed the class.

Following affirmance of class certification in 1993, class counsel undertook extensive post-certification discovery under the Court's discovery orders. Those orders separated discovery into three phases: (1) product identification; (2) conspiracy; and (3) class representative adequacy. Class counsel took approximately 200 depositions, served over 320 sets of discovery, reviewed over 4,000 discovery responses, and responded to numerous discovery requests from defendants. Discovery extended to the United Kingdom where certain English asbestos companies kept their records.

In addition to pursuing their discovery, class counsel successfully derailed defendants' motions to decertify the class in late 1998 and early 1999. Class counsel filed an extensive opposition to these motions pointing out the numerous events since certification that argued in favor of continuing with the class. Before the Court had to address the motions, class counsel settled with one of the main defendants seeking decertification. Bankruptcies of the other defendants eventually mooted the issue.

While vigorously litigating against the defendants, class counsel had taken note of the views of this Court and the Fourth Circuit that settlement was an important consideration in the class certification decision. See, e.g., Central Wesleyan College, 6 F.3d at 185-86 ["Here the prospects for encouraging settlement weigh in favor of certification"]. Taking this to heart, class counsel continuously offered the "carrot" of

4

settlement to receptive defendants, while wielding the "stick" of discovery and an eventual trial against recalcitrant defendants.  Using this approach, class counsel were ultimately able to negotiate 34 individual settlements that created a settlement fund of over $71.5 million cash and $26.4 million in cash rebates.

The case has now reached a stage where it is appropriate to begin preparation for distribution of the settlement fund.  All active defendants except one have settled.[3] Several other original defendants are in bankruptcy.  It will take time to develop suitable distribution guidelines.  But the settlement fund is now sufficiently established to warrant moving ahead with the process.

It is also appropriate to consider an award of counsel fees and expenses.  It is well-settled that a court can make an attorneys' fee award before the conclusion of all work.  Edmonds v. United States, 658 F.Supp. 1126, 1151 (D.S.C. 1987).  Nevertheless, it is important to note that there is still much work to be done in this case.  The Court has recently appointed a class settlement fund advisory committee that will be working with counsel to draft settlement fund guidelines.   The process of distributing the class settlement fund may take several years.  Class counsel must also continue to prosecute class claims in the various bankruptcies where those claims are pending.  It will likely be several years  before the bankruptcy process is concluded.  The college class sits on a creditors' committee in the United States Gypsum bankruptcy which is in its formative stages, as is the U. S. Mineral bankruptcy.  Class counsel have also been attempting to resolve the class claims against H.K. Porter which recently emerged from bankruptcy.  If

---

[3] The exception is H.K. Porter which is discussed hereinafter.

5

those efforts are unsuccessful, class counsel may yet have to litigate against H.K. Porter in this Court. Class counsel and the court-appointed CPA must also monitor the status of the W.R. Grace rebate coupons for the remaining 8 years of that 10 year program. Tracking the $25 million in face value coupons is an important, ongoing responsibility.

Class counsel recognize that their responsibilities to the class are of a continuing nature and will no doubt represent the class as vigorously in the future as they have in the past. The Court is retaining jurisdiction over this matter to supervise its future progress. It is against this background that the Court considers class counsel's fee request.

II.    **LEGAL ANALYSIS**

In 1987, this Court concluded in another class action that "the preferred method of computation of fees in this common fund case is the percentage of the fund method." Edmonds v. United States, 658 F.Supp. 1126, 1143 (D.S.C. 1987). The Court's statement at the time was based on the Supreme Court opinion in Blum v. Stenson, 465 U.S. 886, 900 n.16 (1984). Blum stated that in a common fund case "a reasonable fee is based on a percentage of the fund bestowed on the class." Id.

Since this Court's decision in Edmonds, there have been numerous appellate decisions agreeing that the percentage of the fund method is the accepted method in common fund cases.[4] In addition, several district courts in this circuit have concluded that



---

[4] See, e.g., In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litigation, 56 F.3d 295, 307 (1st Cir. 1995); In re General Motors Corp. Pick-Up Truck Fuel-Tank Prods. Liability Litig., 55 F.3d 768, 821-22 (3d Cir. 1995), cert. denied, 516 U.S. 824 (1995); Rawlings v. Prudential-Bache Properties, Inc., 9 F.3d 513, 515-17 (6th Cir. 1993); Montgomery v. Aetna Plywood, Inc., 231 F.3d 339, 408-09 (7th Cir. 2000); Six (6) Mexican Workers v. Arizona Citrus Growers, 904 F.2d 1301, 1311 (9th Cir. 1990); Gottlieb v. Barry, 43 F.3d 474, 487 (10th Cir. 1994); Waters v. International Precious Metals Corp., 190 F.3d 1291, 1294 (11th Cir. 1999); and Swedish Hosp. Corp. v. Shalala, 1 F.3d 1261, 1271 (D.C.

the percentage of the fund method is preferable in common fund cases. <u>See, e.g.</u>, <u>Strang v. JHM Mortgage Sec. Ltd. Part.</u>, 890 F.Supp. 499, 502 (E.D. Va. 1995) ["[T]he current trend among the courts of appeal favors the use of a percentage method to calculate an award of attorneys' fees in common fund cases."]; <u>Goldenberg v. Marriott PLP Corp.</u>, 33 F.Supp.2d 434, 438 (D.Md. 1998) [holding that the percentage method was "simpler, more efficient, and more accurate in terms of approximating a 'fair' award"]; <u>Kidrick v. ABC Television & Appliance Rental, Inc.</u>, 1999 WL 1027050 (N.D. W. Va. 1999) ["Where there is a common fund in a class settlement, application of a percentage method to calculate an attorney's fee award is now favored"].

Although class counsel notified the class that they might request a fee of up to 30% of the settlement fund, they have limited their request to 28.75%. While there is no steadfast rule on what percentage of a common fund is reasonable, a review of the cases indicates that counsel's request falls well within the range of reasonableness. Last year a federal court surveyed the law and concluded:

> [B]ased on the opinions of other courts and the available studies of class action attorneys' fees awards (such as the NERA study), this Court concludes that attorneys' fees in the range from twenty-five percent (25%) to thirty-three and thirty-four one-hundredths percent (33.34%) have been routinely awarded in class actions.

<u>Shaw v. Toshiba America Info. Sys., Inc.</u>, 91 F.Supp.2d 942, 972 (E.D.Tex. 2000).



Other courts have concluded that the fee range may go as low as 20% and as high as 50%. <u>See, e.g.</u>, <u>In re Warner Communications Sec. Litig.</u>, 618 F.Supp. 735, 749 (S.D.N.Y. 1985) ["Traditionally, courts in this Circuit and elsewhere have awarded fees in

Cir. 1993).

the 20%-50% range in class actions."], aff'd, 798 F.2d 35 (2d Cir. 1986); Maywalt v. Parker & Parsley Petroleum Co., 963 F.Supp. 310, 313 (S.D.N.Y. 1997) ["Traditionally, federal courts have awarded fees in the 20% to 50% range in class actions."].  While the cases differ somewhat in their identification of the lower and upper bounds of a reasonable percentage, they all include class counsel's 28.75% request within their range.  For the reasons set forth below, the Court concludes that class counsel's requested percentage is fair and reasonable.

Our circuit court has instructed trial courts addressing fee requests to make specific findings regarding the 12 factors set forth in Barber v. Kimbrell's, Inc., 577 F.2d 216, 226 (4th Cir. 1978).  While Barber was a statutory fee shifting case, not a common fund case, the Court believes it is nevertheless helpful to analyze these factors in reaching its determination.

### 1.    Time and Labor Required

This case is one of the longest running cases in this district.  It was a gargantuan undertaking at the outset and remains a formidable project today.  Over the last 15 years, the Ness, Motley firm has called upon the services of 28 of its attorneys and 42 of its paralegals to work on some aspect of this case.  Ness, Motley has submitted a 426 page time report reflecting the expenditure of over 32,000 hours for gathering liability evidence, developing expert testimony, directly prosecuting this case and protecting class interests in various other forums where the class claims are being pursued.  The Court's docket sheet for the college asbestos property damage litigation reflects over 1,250 entries.

During the past 15 years, class counsel attended many hearings, filed numerous briefs, and reviewed thousands of discovery responses.  As discussed previously, class

8

counsel's work is far from over. The class settlement fund guidelines must be created and the settlement fund distribution administered. The detailed class claims already filed in some bankruptcies must be prosecuted. Class counsel will need to defend the class right to recover in other bankruptcies that are just getting underway. They must protect the W.R. Grace rebate program in Grace's bankruptcy and monitor that program for another eight years. They must still deal with the H.K. Porter Trust situation. They must continue to be responsive to numerous requests for information from class members. If the ongoing proceedings in this Court and the bankruptcy courts do not produce any further recovery to the class, counsel will be performing all these future activities for free because they have agreed to limit their percentage fee request to 28.75%. They cannot seek any further fees from the existing fund.

2.    **Novelty and Difficulty of the Questions Involved**

As a groundbreaking action, this case faced enormous difficulties from the outset that have continued throughout its prosecution. Class counsel achieved a rare victory in having this case certified as a national class action and then getting it upheld by the Fourth Circuit Court of Appeals. A similar attempt at national class action status for the nation's hospitals failed completely, leaving counsel in that case with nothing to show for their years of effort. Sisters of St. Mary v. AAER Sprayed Insulation, 445 N.W.2d 723 (Wis. Ct. App. 1989) [affirming refusal to certify class]. Other counsel have similarly come up empty-handed after spending years attempting to have nationwide product liability class actions certified. See, e.g., Amchem Products, Inc. v. Windsor, 521 U.S. 591 (1997) [affirming decertification of national asbestos personal injury class action]; Castano v. American Tobacco Co, 84 F.3d 735 (5th Cir. 1996) [decertifying national tobacco class action]; In re

9

Rhone-Poulenc Rorer, Inc., 51 F.3d 1293 (7th Cir. 1995), cert denied, 516 U.S. 867 (1995) [decertification of national hemophiliac class action].

The class certification difficulties did not end with the Fourth Circuit's affirmance. As other appellate opinions began to reject nationwide class actions, defendants renewed their attack on certification here through motions to decertify in late 1998 and early 1999. Those motions raised difficult questions about the action which class counsel had to confront in extensive responses.

Class counsel also faced difficult questions of tort law, such as the application of the laws of the 50 states to this action. They had to convince this Court and the Fourth Circuit Court of Appeals that the South Carolina "door closing" statute did not bar the claims of non-South Carolina colleges. They had to prevail on the issue of whether certain Canadian "blocking statutes" could prevent discovery in this Court. They were faced with difficult arguments that the "local action" doctrine prevented class treatment of claims outside South Carolina. They confronted the argument that the Foreign Sovereign Immunities Act prevented certain defendants from being included in this action. Virtually every cutting edge legal issue in the field of tort and class action jurisprudence was presented in this case.

Going beyond the difficult issues inherent in the national class action aspect of this case, there were the difficult issues of substantive law underlying the case. While class counsel are among the leading attorneys trying asbestos property damage cases, they readily acknowledge that the defendants have won approximately 50% of the cases taken to trial. Class counsel have themselves occasionally suffered defeat in asbestos property damage trials. See Clarksville-Montgomery County Schl Sys. v. U.S. Gypsum

10

Company, 925 F.2d 993 (6th Cir. 1991).  This was not a situation where getting class certification assured class counsel of a recovery.

### 3.    The Skill Required to Perform the Legal Services Properly

The nature of this case required counsel of the highest caliber.  Few firms have the expertise in both asbestos property damage litigation and national class action procedure that was required for this daunting task.  Unlike some other areas of class action litigation, such as securities law, where numerous counsel have acquired the skills to prosecute those cases and vie for class counsel appointment, there was no such rush to represent the class here.  Throughout the 15 years of this litigation, no counsel sought to intervene to assist in representing the class.  Over 3,000 colleges, most represented by a general counsel, and hundreds of state institutions, represented by their respective Attorneys General, relied on the  expertise of class counsel.

Class counsel were opposed by virtually every major defense firm in South Carolina and many national defense firms.  Two of the leading defense lawyers in this case went on to become federal judges.  Class counsel's skill was evident in their dealings with the numerous defendants.  Through their professionalism, many disputed matters were worked out among counsel.  This prevented the case from degenerating into an endless series of contentious motions hearings.  This was a critically important skill in the context of this case.  The Fourth Circuit had noted that this class certification was "fraught with potential problems that may well offset the advantages that the class mechanism might afford."  Central Wesleyan College, 6 F.3d at 186.  The court further  cautioned:

> As this litigation proceeds, the district court must make
> certain that manageability and other types of problems do not
> overwhelm the advantages of conditional certification. Should

> such concerns render the class mechanism ineffective, the district court must be prepared to use its considerable discretion to decertify the class . . . .
>
> Id. at 189.

Class counsel skillfully avoided repeated disputes before the Court that could portray unmanageability and give the defense an argument for decertification.

### 4.    Preclusion of Other Employment

A 15 year effort on behalf of thousands of plaintiffs against an entire industry necessarily consumes enormous amounts of time and attention. The Ness, Motley firm is one of the most highly regarded litigation firms in the country. If this case had not consumed such significant attention, counsel would have been free to engage in other litigation. Class counsel also spent over $1 million of their own money to finance this case, money that was not available to be invested in other cases. Class counsel committed to this effort in 1986 and have steadfastly maintained loyalty to the class through the ups and downs of the past 15 years.

### 5.    Customary Fee

As set forth previously, courts appear to have settled upon a customary contingent fee in complex class actions of between 20% and 50%. Class counsel's requested fee of 28.75% is at the lower end of this range. An additional factor supports its reasonableness here. Class counsel have limited their fee request to be computed only on the cash component of the settlements. Class counsel are not seeking any percentage recovery on the $26.4 million in cash rebates that are available to the class. These rebates, which provide class members with a 25% discount on certain W.R. Grace non-asbestos replacement products and a cash discount on GAF roofing products, are

12

potentially a significant source of value to the class. Class counsel are traditionally entitled to a fee based on the total value of a settlement, not just the cash. In re Domestic Air Transp. Antitrust Litig., 148 F.R.D. 297 (N.D.Ga. 1993). Nevertheless, class counsel have not sought to have their fee percentage apply to the class recovery as a whole, but only the cash portion of the recovery.

Class counsel point out that in a similar asbestos class action for the nation's elementary schools, In re Asbestos School Litigation, No. 83-0268 (E.D. Pa. 1995), the court awarded nearly 64% of the cash in the settlement fund to counsel ($44.3 million out of a $69.5 million cash recovery). Class counsel here seek less than half of that percentage of the cash. The reason the Asbestos School Litigation cash percentage was so high was that the court awarded a percentage fee based on both the cash and the rebate component of that settlement. Class counsel have conferred a significant benefit on the class by disclaiming any fee based on the rebate component of this settlement.

### 6.    The Contingent Nature of the Matter

Class counsel understood at the outset that if there were no recovery there would be no significant attorney's fee. Forty colleges advanced $15,000 each to create a "seed money" fund of $600,000 at the outset of litigation. This was exhausted early on. Class counsel have agreed to deduct from their contingency fee award the amount they were paid for fees out of the "seed money" fund. This amount, along with the amount advanced out of the "seed money" fund for expenses, will be returned to the sponsoring colleges with an appropriate recognition for their early support. In addition to working many years without payment, class counsel spent over $1 million of their own money for case expenses not covered by the "seed money."



13

The contingent nature of recovery in this case was great at the outset and continued throughout most of the litigation.  As late as 1999, defendants were filing motions to decertify the class. The contingency continues in part today.  Class counsel are still prosecuting claims in several bankruptcies which undoubtedly will be highly contested.

## 7.    The Time Limitations Imposed by the Circumstances

While it was important for this case to be filed as quickly as possible in the mid-1980's because of the statute of limitations concerns, all parties recognized that this was not a case that would be completed overnight or on a "fast track." The nature of the case made it inevitable that there would be enormous discovery, extensive class certification motion papers, an involved appeal, protracted settlement negotiations, and, due to the bankruptcies, proceedings in many forums. Accordingly, the importance of the time factor in this case is class counsel's ability to persevere for over 15 years and continue to spend their own money while they worked through the litigation maze that this case presented.

## 8.    The Amount Involved and Results Obtained

Considering all of the roadblocks to recovery and the numerous complications injected by the bankruptcies, counsel have achieved a very significant result.  While each class action is different, it is useful to compare the cash recovered so far on behalf of the nation's 3,000 colleges here ($71.5 million) with the cash recovered for 14,000 school districts in the Asbestos School class action at the time of that fee petition ($69.5 million). In re Asbestos School Litigation, No. 83-0268 (E.D. Pa. 1995).  Not only is the amount recovered per institution much higher in this case, but the aggregate amount is higher as well.  In addition, class counsel are still pursuing several major defendants in bankruptcy.

14

While there is no guarantee, the class settlement fund may be increased by these additional efforts.

This Court has previously noted the degree of responsibility that must be assumed by counsel litigating a case of this magnitude:

> [A]n attorney who handles a matter involving tens of millions of dollars is assuming much greater responsibility than an attorney who undertakes representation in a matter involving tens of thousand of dollars, and substantial compensation for that responsibility is common in the marketplace.

Edmonds, 358 F.Supp. at 1137.

Class counsel undertook enormous responsibility here and produced a significant result. Without the efforts of counsel, the class could well have recovered nothing. This is not a theoretical concern. The Court is aware that at least one college asbestos property damage case handled by other counsel resulted in a defense verdict. Corporation of Mercer Univ. v. National Gypsum Co., 877 F.2d 35 (11th Cir. 1989).

### 9.    The Experience, Reputation, and Ability of Counsel

Ness, Motley, Loadholt, Richardson & Poole is one of the premier class action and mass tort litigation firms in the nation. Its expertise has been recognized in numerous areas. The firm is best known for its nationwide asbestos litigation practice where the firm has been representing asbestos victims for 25 years. Ness, Motley has been involved in virtually every major asbestos-related development in the country. Its lawyers have tried major consolidated asbestos class actions as well as numerous asbestos property damage cases. In addition to representing this class, Ness, Motley has represented numerous other building owners including schools, banks, counties, municipalities, and state governments in their asbestos property damage litigation.

15

Class counsel have tried more cases and established more precedents in the field of asbestos property damage litigation than any other group. Class counsel won the first plaintiff's verdict in an asbestos property damage case and prevailed on appeal. City of Greenville v. W.R. Grace & Co., 640 F.Supp. 559 (D.S.C. 1986), aff'd, 827 F.2d 975 (4th Cir. 1987), reh'g denied, 840 F.2d 219 (4th Cir. 1988). They also achieved significant victories in numerous other asbestos property damage cases. See, e.g., Kershaw County Bd. of Educ. v. U.S. Gypsum Co., 302 S.C. 390, 396 S.E.2d 369 (S.C. 1990); Rowan County Bd. of Educ. v. U.S. Gypsum Co., 407 S.E.2d 860 (N.C. Ct. App. 1991), aff'd, 418 S.E.2d 648 (N.C. 1992); State Farm Mut. Auto. Ins. Co. v. W.R. Grace & Co., 834 F.Supp. 1052 (C.D. Ill. 1993), aff'd, 24 F.3d 955 (7th Cir. 1994), cert. denied, 513 U.S. 919 (1994); Spartanburg County Sch. Dist. Seven v. National Gypsum Co., 805 F.2d 1148 (4th Cir. 1986).

Ness, Motley's determination in taking on the asbestos industry here was no aberration, as reflected by its recent effort against the tobacco industry. In the 1990's, Ness, Motley represented over 20 states in their efforts to recover tobacco-related costs. The tobacco industry had never paid a penny in any settlement or verdict until Ness, Motley became involved. After several years of the most contentious and well-publicized litigation this country has ever seen, the states achieved a significant settlement largely through Ness, Motley's efforts. The industry will pay over $250 billion to the states over the next 25 years. As part of that settlement, an independent panel of arbitrators was appointed to evaluate the caliber of counsel's work and set a reasonable fee. A sampling of the opinions of the arbitration panel confirms Ness, Motley's excellent reputation. For example, in In re Florida v. The American Tobacco Co., No. CL-95-1466-AH (Palm Beach

16

Co. Circuit Court), the arbitration panel awarded $3.4 billion in fees, which was 26% of Florida's $13.2 billion recovery.[5] The panel noted that the fee award was a reasonable percentage of the state's recovery which was achieved through "a combination of hard work, creativity, innovation, dedication, diligence, persistence and extraordinary legal acumen . . ." Panel Decision at 6.[6] In the Mississippi arbitration, the panel awarded $1.43 billion in fees which amounted to 35% of the state's $4.1 billion recovery.[7] Ness, Motley played a crucial role in both cases.

Ness, Motley is also active in other areas of complex mass tort litigation including the Ford/Firestone defect cases, international pesticide injury cases, toxic dump cases, and numerous defective drug and medical device cases. It continues to be on the cutting edge of complex litigation.

Speights & Runyan, the other class counsel firm, is well-known to this Court as an excellent plaintiff's law firm that handles complex matters. It has also been active since the early 1980's in asbestos property damage litigation. See, e.g. Blue Cross and Blue Shield v. W.R. Grace & Co., 781 F.Supp. 420 (D.S.C. 1991) [$5.5 million verdict]; San Francisco Unified Sch. Dist. v. W.R. Grace & Co.-Conn., 37 Cal. App. 4th 1318, 44 Cal. Rptr. 2d 305 (Cal. Ct. App. 1995) [reversing defense summary judgment].

_____

[5] See "Multi-billion dollar lawyers' windfall in tobacco cases," CNN.com, December 12, 1998 (available on CNN website).

[6] The Court has been supplied with this decision which is a matter of public record from the arbitration panel.

[7] See note 5.

17

The ability of class counsel to prosecute a complex action such as this is further demonstrated by the fact that, unlike many large class actions, this case did not require "litigation by committee." In many complex class actions, numerous firms are involved because of the various types of expertise needed to prosecute the case. Here, class counsel possessed all the toxic tort, federal procedure, and class action expertise needed to handle the matter. The reputation and experience of class counsel clearly signaled to the defendants that if they did not settle they would be facing an expertly presented trial on behalf of the class. Class counsel's reputation and ability undoubtedly played a significant role in convincing the defendants to settle.

### 10.    "Undesirability" of the Case

To the extent this factor encompasses concern about whether undertaking a particular case will discourage other potential clients from employing counsel, it has no application here. However, on the more general issue of whether this case was "desirable" to the legal community, the Court reiterates that during the 15 years of this litigation, no other attorneys attempted to intervene to represent the class. This was likely due to a combination of factors, including the time and resources necessary to see the case through to conclusion, the complexity of the issues involved, the novelty of this undertaking, and the specialization required to prosecute an asbestos property damage case. As class counsel noted in their application, there was certainly "easier money" to be made over the last 15 years than by pursuing this action against an entrenched group of defendants.

## 11.    Nature and Length of the Professional Relationship

While this class action is a one-time arrangement, it has extended far longer than many continuing representation agreements between a lawyer and client.  During the 15 years this case has been pending, the record discloses no complaint by any of the 3,400 colleges about class counsel's performance or attention to the class.  Class counsel report that they have had individual contact with over 500 colleges during the course of this case.  They have kept the class informed through class notices, periodic mailings, and news articles.  They have answered numerous inquiries from class members and provided scientific testing at counsel's expense of suspected asbestos-containing products in class member's buildings.  They have given advice on many  asbestos-related issues.  The colleges appear totally satisfied with the representation they have received.

## 12.    Awards in Similar Cases

In their fee application class counsel provided a listing of representative common fund percentage fee awards from around the country.  These awards confirm what the Court has set forth in this Order -- percentage fee awards in complex class actions commonly range from approximately 20% to over 33.3%.

As the Court has previously mentioned, the fee award in the most similar class action – the <u>Asbestos School</u> class action -- amounted to almost 64% of the cash portion of the settlement fund ($44.375 million of the $69.5 million cash fund).  In contrast, class counsel seek only 28.75% of the cash portion of the college settlement fund ($20.565 million of the $71.5 million fund).  This is less than one-half of the award in the <u>Asbestos School</u> case.  The fee percentage requested here is approximately the same as the percentage awarded Ness, Motley  in the Florida tobacco litigation (26% vs. 28.75%), and

19

substantially less than Ness, Motley received in the Mississippi tobacco litigation (35% vs. 28.75%).

The fee request is made even more reasonable by the fact that this litigation has been ongoing for 15 years. Counsel have waited a very long time for any substantial payday. Many of the cases cited in class counsel's application, as well as the tobacco cases, concluded within a much shorter time frame. Class counsel had to deal with recalcitrant defendants who had been involved in asbestos litigation for decades. Many of them were also facing the onslaught of tens of thousands of asbestos personal injury claims which made negotiations long and difficult. The percentage award here is well within the range of awards in similar cases.

For all of the foregoing reasons, the Court finds that a fee of 28.75% of the cash component of the settlements or other recoveries in this case is fair and reasonable.[8]

---

[8] This is a common fund case and not a statutory fee shifting case where the "lodestar" analysis would be appropriate. Nevertheless, the Court notes that a lodestar calculation here would likely produce a similar result. Ness, Motley has reported approximately 32,000 hours attributable to various aspects of prosecuting this action and developing the evidence necessary for success. In 1987, this Court noted that calculating an effective hourly rate for a complex class action "would require utilizing an hourly rate of $400-$450 per professional hour." Edmonds v. United States, 658 F.Supp. 1126, 1141 n.30 (D.S.C. 1987). Even if that effective hourly rate has only doubled in the last 14 years (a conservative assumption), it would require utilization of an effective hourly rate of $800-$900 per professional hour. At that hourly rate, the expenditure of just over 24,000 hours would equal the 28.75% percentage fee (24,194.6 hours x $850 per hour = $20,565,427, which is 28.75% of the current fund balance of $71,531,920). By one recent measure, $850 per hour would be low for Ness, Motley. In the Louisiana tobacco case, for instance, Ness, Motley was awarded a fee amounting to $6,700 per hour. See In re Attorneys' Fee Application by Louisiana Private Outside Counsel, (Nov. 9, 1999) [Renfew, J., Dissenting at 6]. (Opinion available on the Internet at http://www.fairlaws.org.)

20

III.     **EXPENSES**

The class notice informed the colleges that "class counsel have incurred expenses of approximately $1.2 million for which they will seek reimbursement from the class settlement fund." <u>Class Notice</u>, ¶ E. Ness, Motley has provided a 59 page accounting of expenses totaling $1,004,431.35. The other class counsel, Speights & Runyan, has represented that its expenses are approximately $10,000. No college objected to class counsel's notice that they would seek expense reimbursement of up to $1.2 million. The actual request for expense reimbursement is less than that.

The expense listing from Ness, Motley contains a detailed breakdown of the expenses by category, date, and amount, including expenses for class notices, court reporters, expert witnesses, investigators, document storage, federal express, photocopies, computerized research, service of process, travel, and witness fees. These are all proper categories of expenses. Moreover, the reasonableness of the expense request is further supported by the fact that Ness, Motley is asking for reimbursement without interest for expenses which have been incurred as long as a decade ago. This is an additional benefit to the class. Accordingly, the Court finds the request for expense reimbursement to be fair and reasonable.

IV.     **CONCLUSION**

For all the reasons set forth previously, the Court hereby orders that:

1.       Class counsel are awarded a fee of 28.75% of all cash recoveries in this case;

2.       Class counsel are awarded reimbursement of their current out-of-pocket expenses in the amount of $1,014,431.35;

21

3.      Class counsel will deduct from their percentage fee award all amounts paid to them as fees out of the initial college fund.  Such amounts shall remain part of the settlement fund for return to the sponsoring colleges in connection with the class settlement fund distribution process.

**IT IS SO ORDERED.**

Done this _21st_ day of _December_ 2001.

HONORABLE SOL BLATT, JR.
Senior United States District Judge

Charleston, South Carolina.



22

**Attach. 15**

# JusticeinMotion

## Lawyers Receive Top Honors

**A** FEW OF AAJ'S outstanding trial lawyers were honored for their achievements at the Annual Convention in July. This year's honorees included Elizabeth Cabraser, Wayne Hogan, Peter Perlman, and Fred Baron (1947–2008).

The Lifetime Achievement Award is AAJ's most prestigious award. It recognizes a body of work over a lifetime demonstrating a profound commitment to the pursuit of justice. Recipients have been responsible for saving countless lives by challenging and changing corporate wrongdoing through their perseverance, creativity, and trailblazing work. This year's award was presented to **Elizabeth Cabraser** of San Francisco. A leading practitioner in civil litigation devoted to the core mission of pursuing justice for her clients, Cabraser is well known for saying, "Justice is a bone-deep urge toward fairness in things large and small. It's the human journey toward a better world."

**Wayne Hogan**, of Jacksonville, Fla., received the Harry M. Philo Award, presented annually to the trial lawyer who has made an outstanding contribution to the safety and protection of American consumers and our civil justice system. In Philo's words, the award is for a "lawyer on the side of the people." Hogan's tremendous work on behalf of civil justice is evident not only through his law practice but also through his commitment to the future of civil trial law. He and his wife, Patricia, endow a summer program for college students interested in pursuing careers in the law. Each year, about 60 students participate for free in the Summer for Undergraduates Program at the Florida State University College of Law. Hogan returns to the classroom every year to talk to the students about working as a civil justice lawyer.

The Leonard M. Ring Champion of Justice Award, given this year to **Peter Perlman** of Lexington, Ky., honors those who demonstrate Ring's devotion to civil justice and whose careers epitomize a true champion of justice. Among Perlman's many accolades over decades of work, he is known for his recent efforts to ensure that auto manufacturers assume liability for all vehicles involved in collisions after the bankruptcy bailout.

AAJ also posthumously inducted **Fred Baron** of Dallas into the AAJ Hall of Fame. A former AAJ president, Baron was a trailblazer in toxic tort litigation and a visionary on behalf of AAJ. He had the idea of founding the Center for Constitutional Litigation, a law firm with an outstanding record of working with AAJ members to successfully overturn laws and decisions that impede access to justice. Baron also started AAJ's Leaders Forum program to encourage additional support for AAJ's mission to preserve the Seventh Amendment. Baron believed that Leaders Forum would attract 100 firms nationwide, but that number has swelled to more than 450. He was an advocate for the environment, consumers, and workers, and he was a true believer in civil justice.

## Medicare Issues Proposed MSP Rulemaking

**T**HE CENTERS FOR Medicare and Medicaid Services (CMS) issued an advance notice of proposed rulemaking (ANPRM) on June 14 seeking comments and asserting its authority to ensure that Medicare beneficiaries (and potentially some non-beneficiaries) fund future medical care related to their settlement from their settlement, so those costs are not shifted to Medicare.

Until the ANPRM, CMS had not provided any guidance regarding "future medicals," and this area had become a major point of contention among all parties attempting to settle claims. The comment period closed on August 14.

Under the Medicare Secondary Payer (MSP) Act, when a Medicare beneficiary receives a settlement, the beneficiary is responsible for reimbursing Medicare for any medical care Medicare provided that is related to the accident, injury, or illness that resulted in the settlement. Medical care from the date of injury or illness until the settlement date must be reimbursed.

In workers' compensation cases only, CMS has issued guidance that requires the Medicare beneficiary to pay out of pocket for any medical treatment related to the settlement that is needed after the settlement date until the full settlement has been exhausted. Alternatively, the beneficiary can implement a Medicare set-aside account.

Reimbursement of future medical