UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In Re: | CHAPTER 11 |
| W.R. GRACE & CO., et al., | Case No. 01-01139 (KJC) |
| Reorganized Debtors. | Jointly Administered |

**Hearing Date: TBD**
**Reply Deadline: May 12, 2014 at 4:00 p.m. (ET)** [1]

**Relates to D.I. 31986, 32034, 32035, 32058, 32061, 32062, 32063, 32138**

**LUKINS & ANNIS, P.S.'s REPLY RE: MOTION FOR AN ALLOCATION OF THE ZAI CLASS ACTION COMMON FUND FEE AWARD**

Lukins & Annis, P.S., by and through its undersigned counsel, in reply with respect to its Motion for Allocation of ZAI Class Action Common Fund Fee Award, states as follows:

## I.    INTRODUCTION

In response to Lukins & Annis, P.S.'s ("L&A") Motion for an Allocation From the ZAI Class Action Common Fund Fee Award ("the Motion"), Class Counsel maintains its position that L&A should receive ***no allocation whatsoever*** from the Common Fund Fee Award. Because Class Counsel cannot rectify this position with an objectively reasonable analysis of the relative contributions of the six firms seeking an allocation – including L&A – Class Counsel makes no sincere attempt to do so.

Instead, Class Counsel makes a disingenuous and legally-flawed argument that L&A "abandoned" the ZAI claims and clients based on a decision that the ZAI claims were not worthy of pursuing and now wishes to take advantage of the successes of Class Counsel. This

---
[1] Extended to May 12, 2014 by agreement of the parties.

characterization of L&A's decision to transfer the ZAI litigation to Mr. Scott and his new firm, which was done in the best interests of the clients, is (at best) revisionist history.  L&A had good cause for doing so and has consistently maintained a reasonable expectation of remuneration from any fee recovery since that time.

Once Class Counsel's argument that L&A waived all right to payment of attorneys' fees is rejected, the remaining arguments do not support excluding L&A from a reasonable provision from the Common Fund Fee Award.  The relevant inquiry is the relative benefit to the Class and the contribution to the settlement made by each of the firms seeking such an allocation, based on the time and the type of work done.  As discussed at length in L&A's opening brief, L&A's work investigating and working on the Barbanti Litigation and the ZAI claims in the bankruptcy provided a benefit to the Class.  The most obvious and inescapable support for L&A's contribution to the Class and to the ultimate settlement is found in the representations by Class Counsel in the Class Settlement Agreement itself.  Class Counsel fails to provide the Court with any basis to disregard their prior representations to the Court and to the Class regarding the significance and value of the Barbanti Litigation and the years of work done – in no small part – by L&A.

Class Counsel steadfastly holds to its own closed-door allocation of fees and asks this Court to defer to that allocation but makes no real attempt to justify its seemingly arbitrary and self-serving allocation.  Specifically, Class Counsel makes no attempt to correlate forty-two per cent of the Common Fund Fee Award to the relevant time or work done by Scott or Westbrook, and more to the point, makes no attempt to distinguish Lieff's work (deemed worthy of a fifteen per cent, $2.4 million allocation) from the same type of work done by L&A.  Class Counsel

similarly makes no sincere effort to justify the allocations from the Common Fund Fee Award to Ness and McGarvey, neither of which has worked on the ZAI litigation since 2001.

L&A respectfully submits that, under the circumstances, the Court cannot simply defer to Class Counsel's arbitrary allocation of the Common Fund Fee Award, and should instead, make an allocation to the firms involved herein based upon the benefit conferred, which L&A respectfully submits, is consistent with L&A's proposed allocation.

## II.   RELEVANT FACTS ON REPLY

### A. L&A's Withdrawal From the ZAI Litigation Upon Mr. Scott's Departure With the ZAI Litigation, Files and Class Action Team.

As outlined by Class Counsel, Mr. Scott was an attorney and shareholder/partner at L&A for almost 15 years.  On or about December 1, 2004, Mr. Scott abruptly announced his almost immediate departure from L&A.  Contrary to Mr. Scott's assertions, from the beginning, it was Mr. Scott's clear position that he was taking certain cases to his new firm.  *More specifically, Mr. Scott always intended to take the ZAI litigation with him.*[2]  In fact, Mr. Scott now concedes that he had already contacted lead plaintiff, Marco Barbanti, regarding his departure and had presumably obtained Mr. Barbanti's consent to transfer the ZAI litigation to his new firm.[3]

L&A had limited knowledge regarding the status of Mr. Scott's cases – including all of the ZAI-related litigation – as it was being handled and directed by Mr. Scott.  Thus, when Mr. Scott announced his abrupt departure from L&A, it relied on Mr. Scott and his class action team to inform L&A as to the status of the cases.  Over the course of the following weeks, L&A worked with Mr. Scott to determine the status of L&A's cases being led by him and his class

---

[2] Declaration of Terence Whitten.
[3] Declaration of Darrell Scott.

action team.  Given Mr. Scott's intent to take certain cases, including the ZAI litigation, L&A

had to evaluate what course of action best served L&A's clients, while still preserving L&A's

right to recover on its substantial investment in these cases.  In the end, L&A decided that the

firm did not have the case-specific required background or attorney resources (absent Mr. Scott

and his class action team) to effectively jump-in with two weeks' notice and litigate this large

class action lawsuit, which Mr. Scott had been managing and directing for more than five years.

In L&A's estimation, it was in the best interests of the clients to remain with experienced

counsel.[4]

Contrary to Mr. Scott's assertions, L&A did not "abandon" the ZAI Litigation based

upon a risk/benefit analysis that the ZAI litigation was not going to be profitable.  In reality,

L&A had virtually no independent knowledge as to the status or profitability of the claims, and it

is clear from contemporaneous notes and memoranda, that L&A was getting all of its

information on the cases from Mr. Scott.[5]  Indeed, Mr. Scott intentionally left a large number of

ultimately costly class action and other litigation cases in various stages of disarray at L&A,

which L&A dealt with and managed after he left.[6]  Had L&A truly wished to "abandon" Mr.

Scott's unprofitable cases, it would not have agreed to keep the cases it did.  In reality, Mr. Scott

chose the cases he wished to take, and L&A ultimately consented in favor of Mr. Scott's

intentions and what L&A believed was in the best interests of the clients.[7]

---

[4] Declaration of Terence Whitten.
[5] Declaration of Darrell Scott at Exs. F and G.
[6] *See* Scott Declaration at Ex. G.  As mere examples, L&A paid the entirety of the fine in the
Beck case after Mr. Scott refused to do so, and dealt with dismissing claims in a Nevada multi-
district litigation case where Mr. Scott had lost contact with the client for months.  Declaration of
Terence Whitten; Supplemental Declaration of Jed W. Morris.
[7] With reference to the December 6, 2004 memorandum prepared by Terence Whitten, it is clear
that Darrell took numerous positions on which cases he was taking and leaving with L&A.  *See*

The notices to the Class certainly reflect L&A's transfer of the cases to Mr. Scott and his new law firm on the basis of Mr. Scott's departure and desire for continuity for the clients:

> Darrell W. Scott, who is a principal with Lukins & Annis, P.S. and the lead attorney in the above referenced cases announced that he was leaving Lukins & Annis effective December 15, 2004.  He has started a new firm….

> Darrell Scott has been the attorney primarily responsible for doing legal work for you on behalf of Lukins & Annis.  The firm of Lukins & Annis is not going to handle any aspect of this case and will be withdrawing as counsel of record.  Darrell Scott will continue his legal work in the W.R. Bankruptcy Zonolite Attic Insulation cases on your behalf….[8]

Mr. Scott's new firm drafted the notices of withdrawal and pushed L&A to have the notices executed and filed quickly.[9]

Moreover, L&A's willingness to transfer the ZAI Litigation to Mr. Scott was based upon his affirmative representations and L&A's resulting understanding that L&A would receive a portion of any attorney fee recovery from cases it transferred to Mr. Scott for its substantial financial investment.  This is represented in contemporaneous board meeting notes from L&A, which reflect that L&A was attempting to work out a financial arrangement with Mr. Scott – both before and after his departure.[10]  At no point during these ongoing discussions did Mr. Scott indicate that L&A had "abandoned" its right to a fee recovery through its transfer of the case.  To the contrary, Mr. Scott and L&A engaged in numerous follow-up discussions, wherein the fact of L&A's right to a recovery from any attorney fee award was always a given, and the only variable

---

Darrell Scott Declaration at Ex. G. (General Cable…**Darrell presumes he is taking that case**…."; "NOS Telemarketing Fraud…**I think he indicated that this case should stay here.**"; There is a Martha Stewart Case…**Darrell says he will take that case**.")
[8] Declaration of Darrell Scott at Exhibits H and I.  Contrary to Mr. Scott's Declaration, Mr. Whitten strenuously denies making any of the handwritten notes on Exhibit H, which Mr. Scott argues evidences L&A's abandonment intentions.  Declaration of Terence Whitten.
[9] Declaration of Terence Whitten.
[10] *Id.*

#26241211 v1

was *the amount* of L&A's allocation from any future award.[11]  L&A reasonably relied on Mr.

Scott's representations and expectations of continued good faith in transferring the ZAI

Litigation and the ZAI clients to Mr. Scott.[12]

However, L&A's relationship with Mr. Scott soon deteriorated, based on a number of

subsequent issues and disagreements.  For example, after Mr. Scott's departure, L&A received

an order indicating that Mr. Scott's actions were the subject of, and indirectly implicated L&A

in, class-action related misconduct and sanction proceedings in *Beck v. Atlantic Coast PLC,* 868

A.2d 840 (2004) ("Beck"), which immediately preceded his departure announcement.[13]  *See*

Appendix A.  L&A paid the sanction in full.  Later, L&A successfully moved to have the

remaining sanctions removed with respect to L&A.  *See* Appendix B.  Since his departure, Mr.

Scott and L&A have been involved in at least one other contentious fee dispute, disagreements

over cases Mr. Scott left at L&A, and other issues related to his departure over the last 10

years.[14]

Needless to say, while L&A would have preferred to come to an agreement with Mr.

Scott and Class Counsel on the allocation of fees, the parties' history and deteriorated trust made

it impossible to agree on an appropriate fee allocation to L&A.  Given this history, no particular

deference should be given to Class Counsel's proposed allocation.

---

[11]*Id.*  Some point closer in time to the settlement with W.R. Grace, Mr. Scott did begin to imply
that L&A had abandoned its right to attorneys' fees.  However, that was never part of the
discussion when the clients were being transferred to Mr. Scott's new firm.
[12] *Id.*
[13] According to the Order entered by the trial court, Mr. Scott filed false and misleading
pleadings in violation of Civil Rules 11 and 37, and engaged in associated discovery violations
while employed at L&A. The Court ordered the plaintiff, Mr. Scott, and L&A to pay a $25,000
sanction on a joint and several basis and also ordered the parties to submit a copy of the
sanctions order with any subsequent application for pro hac vice admission.  *See* Exhibit A.
[14] *Declaration of Terence Whitten; Supplemental Declaration of Jed W. Morris.*

**B. There is No Admissible Evidence In the Record that Ness and McGarvey Remained Involved – In Any Way – In the ZAI Litigation After 2001.**

Because (for a number of reasons) Class Counsel cannot rectify their treatment of Ness and McGarvey and allocation of fees to them with its position that L&A should be denied any right to an allocation of fees, they instead resort to bald, unsubstantiated, and vague assertions that Ness and McGarvey were integrally involved in the settlement and, in fact, remain heavily involved in the ZAI litigation to date. *There is not one piece of admissible evidence to support such assertions.* In fact, all evidence in the record (*i.e.,* Ness and McGarvey's time records) effectively dispute any such characterization.

Without citation to billing records, testimony from attorneys at Ness or McGarvey, or even testimony from Mr. Scott, Class Counsel repeatedly asserts that Ness and McGarvey contributed to the settlement. Purportedly, Ness and McGarvey:

"remained engaged in ZAI litigation…."[15]

"continuously engaged in representing ZAI interests, [and] …directly assisted Class Counsel in securing the U.S. ZAI Class Settlement."[16]

"[offered] critical assistance to Class Counsel in securing the U.S. ZAI Class Settlement."[17]

"ha[ve] been engaged in ZAI representation from its earliest initiation in 2000 to date."[18]

These statements are used to justify Class Counsel's proposed disparate treatment of L&A in comparison to Ness and McGarvey.

---

[15] Response at p. 4.
[16] *Id.*
[17] *Id.* at p. 5.
[18] *Id.* at p. 6.

Again, there is no admissible evidence in the record to support these assertions or that would, in turn, support the idea that Ness and McGarvey remained involved in the ZAI litigation in any capacity after 2001, three years *before* L&A transferred the litigation to Mr. Scott's new firm.[19]  Had Ness and McGarvey remained ensconced in the ZAI litigation and provided the critical assistance asserted by Class Counsel, it defies logic and credibility that both firms happened not to bill a single hour for this "critical" and "continued" involvement.

Under the circumstances, the Court has no admissible evidence from which to conclude that Ness and McGarvey remained involved with the ZAI litigation or made any additional contributions after their virtual (if not actual) withdrawals in 2001.  There is no basis in the record to treat Ness and McGarvey more favorably than L&A with respect to the lack of involvement in the later stages of ZAI litigation.

## III.    REPLY ARGUMENT

### A.  Class Counsel's "Good Cause for Withdrawal" Standard Does not Apply Under These Circumstances.

Class Counsel's primary argument against awarding L&A any portion of the Common Fund Fee Award, despite the previously admitted value of L&A's services, is the assertion that L&A withdrew its representation of ZAI claimants because of a calculated business decision that the claims were too risky in light of recovery, and thus, L&A forfeited any right to recovery.

Class Counsel's version of events is patently false.  L&A agreed with Mr. Scott's intent to transfer the ZAI litigation and clients to his new firm when he left L&A: (1) based on Mr. Scott's departure, along with his class action team; (2) based on L&A's belief that allowing Mr. Scott to continue to represent the Class was in the best interests of the clients; and (3) in reliance

---

[19] *See* Time Records Submitted by Ness and McGarvey.

on Mr. Scott's representations that L&A would share in any subsequent fee recovery in an amount to be determined.  L&A's transfer of the case under these circumstances does not preclude it from obtaining an allocation of the Common Fund Fee Award.

1. **The "Good Cause" For Withdrawal Standard Does Not Apply to Circumstances Where the Clients' Primary Attorney Leaves the Withdrawing Law Firm and Takes His Clients.**

As cited by Class Counsel, there is a general proposition that an attorney retained on a contingent fee arrangement who withdraws from a case for "good cause" is entitled to compensation for the reasonable value of his services.  *See e.g., Ecclestone, Moffett & Humphrey, P.C. v. Ogne, Jinks, Alberts & Stuart, P.C.,* 441 N.W.2d 74, 75 (Mich. 1989). Whether good cause for withdrawal exists depends on the facts and circumstances of each case. *Augustson v. Linea Aerea Nacional-Chile,*76 F.3d 658, 663 (5th Cir. 1996).

It is evident from the representative cases cited by Class Counsel that the general rule prohibiting recovery of a contingent fee under this standard is applied in fee disputes involving a former client, where an attorney withdraws over disagreements with the client or co-counsel about case strategy or value, and then subsequently tries to take advantage of a successful outcome achieved by other attorneys.  *See Ausler v. Ramsey*, 73 Wn. App. 231, 868 P.2d 877 (1994) (dispute between attorney and former client after attorney withdrew over disagreements with client); *Ryan v. State,* 112 Wn. App. 896, 51 P.3d 175 (2002) (dispute between attorney and former client where attorney withdrew based on conflict with co-counsel); *Estate of Falco,* 188 Cal.App.3d 233 (Cal.App. 2 Dist. 1987) (dispute between attorney and former client after attorney withdrew based on disagreements with client); *B. Dahlenburg Bonar, P.S.C. v. Waite, Schneider, Bayless & Chesley Co., L.P.A.,* 373 S.W.3d 419 (2012) (dispute over attorneys' fee

award in class action litigation, where attorney withdrew because the case jeopardized

professional relationships). The reasoning for the rule in this context is clear: "an attorney should

not be permitted to withdraw from a 'bad case' … thereby eliminating his or her exposure to

risk, and still recover fees for that case." *See Ausler,* 73 Wn. App. at 738; *Ryan,* 112 Wn. App. at

901.

However, this reasoning does not apply to fee disputes between successive law firms,

where a lead attorney simply leaves his firm, taking his cases and clients with him and

subsequently benefits from the prior work done by the original firm.  The "good faith" basis for

withdrawal is inherent when a law firm withdraws to allow continuity of representations for

clients under these circumstances.  *See L-Tryptophan Cases v. Showa Danka, K.K.,* 518 N.W.2d

616 (1994) (expressly recognizing the important differences in fee disputes between successive

law firms and "cases in which a discharged attorney sues a client, or to cases in which a client

wants to discharge an attorney, with or without cause"); *see also La Mantia v. Durst,* 234 N.J.

Super. 534, 561 A.2d 275 (1989)*.  La Mantia* is directly on-point and has repeatedly served as

guidance to courts deciding fee disputes between successive law firms with a departing attorney.

In *La Mantia,* a client entered in to a contingency fee agreement with a firm, wherein the

originating partner spent a considerable amount of time litigating the case.  The partner left and

took the case with him.  The former law firm withdrew and allowed the partner to take the case

to his new firm.  The Court did not reject the original firm's ability to obtain an allocation of the

contingency fee based on its decision to allow the partner's continuous representation of the

clients.  Instead, in analyzing how to allocate the resulting contingency fee obtained by the

departing attorney, the Court found that special considerations apply when the fee dispute is

between successive law firms:

> [W]here the fee disputes are between successive lawyers, other considerations
> must weigh heavily in making fee allocation determinations….Every firm faces
> the possibility that one of the individual attorneys assigned to a matter could leave
> with a substantially prepared case.  This risk is unavoidable since clients have
> unfettered discretion to obtain or release counsel.  When a lawyer leaves a law
> firm, a litigation client may understandably elect to "follow" the person who was
> most heavily involved with that litigation.  This fact of professional life, however,
> should not deprive the firm whose services the client initially sought from
> equitably realizing fruits of its reasonable expectancy of the contingent fee….The
> courts should not foster such behavior in the bar by permitting the defecting
> attorney to obtain a windfall.  Such windfalls are created where, as here, the trial
> court fails to recognize the value of the initial firm's willingness to risk the time
> and money to develop the claim….It is also necessary to examine any pre-existing
> partnership agreements between the members of the firms who now compete for a
> percentage of the contingency fee….Where one attorney "jumps ship" and takes
> the client with him, his relationship with the former firm will impact on the
> distribution of the fee.

*Id.* at 540-41.

Numerous cases follow the reasoning outlined in *La Mantia*, where the case involves fee

disputes between successive law firms.  These cases find inherent good cause in the withdrawing

firm's decision to allow a case to follow primary counsel.  *See Ecclestone,* 177 Mich. App. at 75

("good cause" for withdrawal found without discussion and law firm held entitled to fees after it

withdrew because attorney primarily responsible for the case left and took the case to a new

firm); *Barth v. Fieger,* 2013 WL 2399532 (January 22, 2013) (same); *L-Tryptophan Cases,* 518

N.W.2d at 626 (same); *Kopelman & Associates, L.C. v. Collins,* 473 S.E.2d 910 (W. Va. 1996)

(same); *Plunkett & Cooney v. Capitol Bancorp Ltd.,* 536 N.W.2d 886 (1995) (same).

Similarly here, inherent good cause existed for L&A to transfer the cases to Mr. Scott

when he left with his class action team and ultimately benefitted from the work done by L&A.

L&A's decision was not (as Mr. Scott characterizes it) a risk/benefit analysis, nor a calculated

business decision, and there is nothing – other than Mr. Scott's disputed and self-interested testimony – that indicates otherwise.  The decision was instead made in accordance with Mr. Scott's intent to take the ZAI litigation, and L&A's belief that such was in the best interests of the clients; without Mr. Scott and his team directing and supervising the litigation, L&A did not believe it had the knowledge, background, or ability to effectively represent the clients.  And, in agreeing to allow the transfer, L&A attempted to protect its substantial investment in the ZAI litigation and relied on Mr. Scott's representations that it would share in any eventual fee recovery.  L&A's reasonable decision in the clients' best interest is the very definition of "good cause."  Class Counsel has not provided the Court with a single case denying fees to a withdrawing law firm under these or analogous circumstances.

Moreover, Class Counsel has made no attempt to square their argument with the decision to allocate fees to Ness and McGarvey, both of whom actually or effectively withdrew from the ZAI litigation in 2001, long before L&A.[20]  Class Counsel's argument that a withdrawal under these circumstances strictly precludes an allocation of attorneys' fees from the Common Fund Fee Award is not only legally and factually-flawed, but also disingenuous in light of their position as to Ness and McGarvey.

In sum, L&A's withdrawal in the best interests of the clients does not preclude L&A from receiving an allocation from the Common Fund Fee Award.  Thus, L&A is entitled to an attorneys' fee based on a quantum meruit analysis of L&A's respective benefit to the litigation.[21]

---

[20] Ness has no hours after March 2001, and McGarvey has no hours after September 2001.
[21] Quantum meruit is the same theory underlying the provision for and allocation from a common fund fee award.  *See In Re Teletronics Pacing Sys., Inc.,* 137 F.Supp.2d 1029, 1035 (2001) (citing *Central R.R. & Banking Co. v. Pettus,* 113 U.S. 116 (1885)).  L&A's Motion and the current response outline at length the basis for L&A's award under quantum meruit theory (*i.e.,* L&A's benefit to the Class).

*See Barth,* 2013 WL 2399532; *L-Tryptophan Cases,* 518 N.W.2d at 626; *Kopelman & Associates, L.C.,* 473 S.E.2d 910; *Plunkett & Cooney,* 536 N.W.2d 886.

### B.  L&A is Entitled to an Allocation From the Common Fund Fee Award for Providing a Benefit to the Class and To the Settlement.

In its Motion, L&A analyzed at length both the qualitative and quantitative contributions to the Class and to the settlement made by L&A and has provided the  Court with a proposed allocation that is based on this analysis.  Class Counsel makes no such effort.  Instead, Class Counsel requests that that Court defer to its seemingly arbitrary allocation, without any sincere attempt to correlate the allocation to the relative contributions by the various counsel (*e.g.,* L&A) to the Class.

"Likely because of perceived practical necessity, courts have shown an eagerness to defer to counsel's views in allocating attorneys' fees." *In re Diet Drugs Prods. Liab. Litig.,* 401 F.3d 143, 173 (3d Cir. 2005) (Ambro, J. concurring).  While "ideally," allocation of a common fund fee award is handled among class counsel, the Court nonetheless has a "responsibility to closely scrutinize the attorneys' fee allocation." *Evans v. TIN, Inc.,* 2013 WL 4501061 (August 21, 2013).  Certainly, "[i]t is one thing for all attorneys to come to an agreement about dividing up fees, and quite another for five attorneys to declare how an award will cover themselves and … other attorneys with no meaningful judicial supervision or review." *In re High Sulfur Content Gasoline Products Liability Litigation,* 517 F.3d 220 (5th Cir. 2008).

The necessity for judicial oversight is in no small part because "counsel have inherent conflicts." *In re Diet Drugs Products Liab. Litig.,* 401 F.3d at 173.  "They [counsel] make recommendations on their own fees and thus have a financial interest in the outcome.  How

much deference is due the fox who recommends how to divvy up the chickens?" *Id.* Class

Counsel has a conflict of interest when they are "suggesting to the District Court how to proceed

on matters near and dear – dividing a limited fund among themselves and other firms. Such a

direct conflict suggests that substantial deference is inappropriate." *Id.* at 173-74. Class Counsel

advocates that the Court simply defer to its proposed allocation of fees because everyone but

L&A is in agreement. While L&A would have preferred to avoid litigation over the current fee

dispute, L&A's strained relationship with Mr. Scott prohibited the possibility of a fair allocation

to L&A.

Respectfully, Class Counsel's bias is reflected in the disparate treatment of L&A with

respect to the other counsel involved. There is *no legitimate basis* to treat L&A's right to an

allocation from the Common Fund Fee award as any less appropriate than the nearly identical

type hours, albeit lesser in number, devoted by Lieff (whose proposed allocation is

approximately $2.4 million), and certainly not any less than Ness and McGarvey, both of whom

have less and more distant time than L&A, less involvement than L&A, less demonstrated

contribution than L&A, neither of whom was included in the notice of proposed settlement to the

Class, and both of whom effectively withdrew from the ZAI litigation as of 2001.

The circumstances surrounding the proposed allocation require judicial oversight and

negate the appropriateness of any particular deference to Class Counsel's proposed allocation.

> **1. In Making the Allocation of Attorneys' Fees From the Common Fund Fee Award, the Court Must Decide What Allocation Reflects the "Relative Benefit" to the Class.**

Class Counsel argues that the relevant standard for dividing up an attorney fee award from a common fund is an analysis under the *Gunter*[22] factors, and that this analysis appropriately results in no fee allocation to L&A.  Class Counsel's attempt to persuade the Court to look solely and critically at L&A's hours is not only contrary to the Court's obligation to review the relative contributions of *all counsel*, but is motivated by a desire to avoid the implications of a critical comparison between L&A and the other five firms seeking an allocation of the Common Fund Fee Award.

In any case, as recognized by the Court in *In re Cendant Corporate Securities Litigation,* 404 F.3d 173, 189 (3d Cir. 2005), a court's analysis of the *Günter* factors in order to determine whether and how large of a common fund fee to award is a "***different problem***" than a court's decision as to who has properly earned part of that common fund fee.  *See also Sullivan v. DB Invest., Inc.,* 667 F.3d 273 (3d Cir. 2011 ("***In determining the appropriate percentage fee award***, the District Court then devoted detailed consideration to each of the ten factors that we identified in *Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190 (3d Cir.2000), and *Prudential,* 148 F.3d 283").  Contrary to Class Counsel's assertion, the *Gunter* factors do not govern the actual allocation of a common fund fee award, *once a common fund fee award has been made*. This Court has already applied the *Gunter* factors herein, in the context of a motion in which L&A joined, and determined that it was appropriate to award twenty-five per cent of the Common Fund as attorneys' fees.  The only issue remaining is the allocation of the resulting Common Fund Fee Award.

---

[22] *Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190 (3d Cir. 2000).

#26241211 v1

The appropriate allocation analysis is whether the work done by an attorney seeking an allocation of the common fund fee award  "actually benefit[ted]" the class.  *Id.* at 190; *Drazin v. Horizon Blue Cross Blue Shield of New Jersey, Inc.,* 528 Fed. Appx. 211, 214 (3d Cir. 2013) ("a proper allocation should reflect the relative contribution that the various plaintiffs' firms made to the successful outcome of the litigation."); *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,* 148 F.3d 283, 342 (3d Cir. 1998) (holding that the Court must look to what the attorneys "actually did and how it benefitted the class," as well as "whether the allocation is reflective of the relative work performed (*i.e.,* lodestars).").  That is the precise analysis that has been performed by L&A.

L&A's opening brief outlines, at length, L&A's benefit to the Class and to settlement, relative to that of the five other firms seeking an allocation.  In addition to thousands of hours investigating W.R. Grace & Co. and potential ZAI claims, L&A drafted numerous legal briefs, took and defended relevant fact and expert depositions, conducted discovery, argued motions, and managed the administrative aspects of the Barbanti Litigation.  In addition, L&A spent thousands of hours litigating ZAI claims and issues in the bankruptcy proceeding and hundreds of hours working on the Property Damage Creditors' Committee.  In all, approximately 5,602 of the 8,181 total hours of L&A's time was directly expended on investigating, developing, and litigating the Barbanti Litigation and in litigating the ZAI property damage claims in the Bankruptcy Proceedings – the same type of hours Class Counsel has deemed worthy of compensation in its own fee allocation.[23]

## 2.  Class Counsel is Estopped From Taking the Position That L&A's Work Did Not Provide a Benefit to the Class or Contribute to Settlement.

---

[23] Declaration of Laura J. Black, Exhibits 1, 2.

In order to justify an allocation that excludes L&A and minimizes the thousands of hours

L&A expended toward ZAI property damage claims, Class Counsel characterizes this work and

L&A's more than 5,600 hours of Barbanti Litigation and ZAI litigation time as essentially

worthless after the outcome of the Science Trial.  So the argument goes, Class Counsel was able

to negotiate a $140 million settlement with Grace seemingly out of thin air and without any

perceivable benefit from the eight years of investigation, discovery, and litigation of the ZAI

property damage claims that preceded the settlement, and based solely on the innovation and

negotiating skills of Class Counsel.

L&A does not dispute the importance, significance, and ingenuity of the settlement

negotiated by Class Counsel, particularly after the Science Trial setback.  However, Class

Counsel's argument that (i) Grace agreed to settle a worthless lawsuit for a value of up to $140

million, and (ii) the Court approved a settlement of a worthless class action lawsuit for a value of

up to $140 million, is not credible.  Had the ZAI Class claims been essentially worthless after the

Science Trial decision, no amount of skilled negotiation would have netted a $140 million

settlement with Grace nor survived this Court's scrutiny and responsibility to Grace's other

numerous creditors.[24]

The other glaring defect with Class Counsel's argument is that when it has benefitted

their position with the Court or the Class, Class Counsel has repeatedly taken the position that

the Barbanti Litigation and the significant amount of investigation, discovery and litigation on

---

[24] Bankruptcy Rule 9019 governed this Court's approval of the Class Settlement Agreement and compelled the Court to make a "full and fair assessment" of the settlement, including the "probability of success in the litigation, the difficulties in collection, the complexity of the litigation, and the paramount interest to the creditors."  *Will v. Northwestern University,* 434 F.3d 639, 644-45 (3d Cir. 2006).

#26241211 v1

the ZAI litigation was integrally important to the Class and justified the significant settlement of the claims, *particularly* after the Court's decision on the Science Trial.

The elements of judicial estoppel are: (1) the party to be estopped is taking to irreconcilably inconsistent positions; (2) the party to be estopped has changed his or her position in bad faith; and (3) the use of judicial estoppel is tailored to address the harm identified and no lesser sanction would adequately remedy the damage done. *Montrose Med. Group Participating Savings Plan v. Bulger,* 243 F.3d 773, 777-78 (3d Cir. 2001). Class Counsel has repeatedly represented to the Court the importance and significance of the Barbanti Litigation and defended the continued value of the ZAI Class claims, even after the Science Trial decision. As examples:

- Counsel for ZAI claimants represented the importance of the Barbanti Litigation to the Court, as follows: "Recognition of the certified Washington class action and the proof of claim field on behalf of that class is not only appropriate, it serves an important purpose in these bankruptcy proceedings….The Washington class claim, further provides a blueprint for resolution of ZAI claims in other jurisdictions and for securing finality in a context where litigation would otherwise persist for years, both inside and outside of bankruptcy."[25]

- Counsel for ZAI claimants again represented to the Court that the work done by L&A in the Barbanti Litigation was worthy of recognition in moving for nationwide class certification: "This Court, following the lead of the Washington court, may certify a class pursuant to Rule 23(b)(2)…."[26]

---

[25] ECF No. 18526.
[26] ECF No. 19991.

- Counsel represented that, despite the Court's summary judgment ruling in the Science Trial, "the next logical and important stage in the Science Trial proceedings is to determine the impact of the Court's order on the underlying ZAI claims."[27]

- "In order to keep the ZAI ball rolling despite the Science Trial setback, ZAI Class counsel …. filed a motion requesting that the Court recognize the pre-existing *Barbanti* Washington state court ZAI class action and use that case as a potential proving ground for resolving ZAI claims.  ZAI Class counsel were well aware that without a class certification, ZAI claims would be almost impossible to prosecute."[28]

- Counsel for ZAI claimants continued to argue in favor of class certification for the putative class, despite the outcome of the Science Trial.  Counsel represented to the Court that the putative class continued to maintain class-wide property damage claims under theories of strict liability, a risk/utility analysis, the consumer expectations test, negligent manufacture and sale, unfair and deceptive business practices, and state strict liability law.[29]

- The Barbanti Litigation is referenced at least four separate times in the Class Settlement Agreement as justifying the settlement amount to the putative class and to the Court; overwhelmingly, it serves as the justification for the settlement.  As one example:

> WHEREAS Class Counsel in the course of this and similar litigation, including the Barbanti case, have conducted exhaustive discovery and investigations into the facts underlying the U.S. ZAI Claims, have made a thorough examination of the legal principles applicable to the holders of U.S. ZAI Claims within the Class, have litigated certain of those issues with W.R. Grace, both prior to and during the Chapter 11 Cases, and have concluded, based on their extensive and now mature experience with ZAI, that a class settlement with W.R.

---

[27] Reply to Debtors' Opposition to ZAI Claimants' Motion for Order Recognizing and Permitting Filing a Washington Proof of Claim. (ECF No. 18526).
[28] ZAI Class Counsel's Motion for Common Fund Fee Award.  (ECF No. 31718).
[29] ZAI Claimants' Memorandum of Points and Authorities in Support of United States Zonolite Claimants' Motion for Class Certification (ECF No. 19911).

#26241211 v1

Grace in the amount and terms hereinafter set forth is fair, reasonable, and adequate, and is in the best interest of the Class.[30]

Under the circumstances, Class Counsel is judicially estopped from taking the divergent position it attempts to take herein – that the Barbanti Litigation and L&A's other contributions made to the early stages of developing the ZAI claims were rendered worthless by the outcome of the Science Trial. This Court should hold Class Counsel to its positions to the Class and to this Court and not allow them to pick and choose when to rely on the significant work of L&A on behalf of the Class.

### 3. In Any Case, L&A Would Be Entitled to an Award of Fees From the Common fund Fee Award Under the *Gunter* Factors.

Even if the Court determined that it was required to (again) engage in the *Gunter* analysis already utilized by the Court to determine the size and appropriateness of the Common Fund Fee Award in the first place, L&A's right to a significant allocation remains. Overwhelmingly, the same analysis done by Class Counsel to justify a Common Fund Fee Award applies equally to L&A.[31] The *Gunter* factors include:

> (1) The size of the fund and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

*Gunter,* 223 F.3d at 195. Under this analysis, L&A is entitled to an allocation.

### a. *The Size of the Fund Created and the Number of Beneficiaries.*

---

[30] Class Settlement Agreement. ECF No. 20275-3. (emphasis added).
[31] If this analysis is truly required before any allocation may be made to the parties seeking an allocation, it must militate against any award to Ness and McGarvey, because no one, including Class Counsel, has made any attempt to apply these factors to those two firms.

The size of the Common Fund created herein has a potential value of $140 million. Counsel has characterized this amount as weighing "heavily in favor" of a requested attorney fee award.[32]

While Class Counsel now attempts to limit L&A to the portion of the fund that could arguably be traced to the Barbanti Class that is not the inquiry.  Rather, the size of the total "fund" is the inquiry; here, $140 million.  L&A has already provided the Court with significant evidence and admissions by Class Counsel that L&A's impact on the settlement and contribution to obtaining this amount goes beyond the specific plaintiffs in the Washington Barbanti class and contributed to the settlement as a whole.  As it does with Class Counsel, this factor "weighs heavily" in favor of a significant allocation to L&A.

### b. The Presence or Absence of Substantial Objections by Members of the Class to the Settlement Terms or the Fees Requested by Counsel.

Notice sent to the Class advised them of the terms of the settlement and the intent to seek a contingency fee of twenty-five per cent of the first two payments to the ZAI Trust.[33]  None of the 16,000 Class members objected.[34]  The fact that no Class member objected to the settlement or the possibility of a twenty-five per cent award weighs in favor of an allocation of a portion of this amount to L&A, who does not seek an increase in the amount of attorneys' fees approved by the Class.

Class Counsel places much emphasis on the fact that notice of a fee allocation to L&A was not included in the information provided to the Class.  In so doing, Class Counsel conveniently ignores that no notice whatsoever was provided to the Class regarding an allocation

---

[32] Motion of ZAI Counsel for Common Fund Fee Award. (ECF No. 31718).
[33] *Id.*
[34] *Id.*

#26241211 v1

to Ness or McGarvey, but that has not stopped Class Counsel from advocating for an allocation to them.[35]  Again, Class Counsel's bias is in play.  Because the actual allocation of the approved award has no impact on the Class, this is a non-issue.

### c.  The Skill and Efficiency of the Attorneys Involved.

Mr. Scott has previously detailed for the Court his experience, skill, and abilities, as justifying an attorney fee award.  Five of the eight cases relied upon by Mr. Scott as representative of his significant class action experience are cases he worked while he was at L&A.[36]

Without recognizing the irony, Mr. Scott appears to argue that this factor does not favor an allocation to L&A.  As the lead and primary attorney working on the Barbanti Litigation and ZAI claims at L&A, Mr. Scott's experience, skill, and ability is the relevant measure of L&A's skill and efficiency.[37]  Mr. Scott's experience and skill was similarly in play during the time-frame in which he led the litigation at L&A.  It is difficult, to say the least, for Class Counsel to argue that Mr. Scott's skills qualified him to earn an award of attorneys' fees only after he departed L&A to start his own law firm.  This factor supports an award to L&A.

---

[35] "Notice is expressly given that…the settlement funds may be disbursed in part to Class Counsel for their efforts in creating the settlement fund in an amount of up to 25% of the non-contingent payment by W.R. Grace to the Trust."  Notice of Class Certification and Proposed Settlement with W.R. Grace & Co.  (ECF No. 20842).
[36] ECF No. 31718.
[37] Class Counsel has only detailed the skill and efficiency of the lead attorney for each firm in requesting a fee award.  *See id.*  L&A has taken Class Counsel's lead and done the same by relying on the skill and efficiency of its lead attorney on the ZAI litigation, Mr. Scott.

#26241211 v1

#### d.  The Complexity and Duration of Litigation.

As argued by Class Counsel, the ZAI litigation was complex, in large part because of the relative infancy of these types of claims when they were first brought as class actions.[38]  That is no less true than for the work done by L&A, which was involved in this litigation at its earliest stages and – despite the lack of legal precedent – achieved the first class certification in any ZAI property damage litigation.  The vast majority of L&A's work on the case is indistinguishable from the type of work being done by the other counsel during those time-frames; if it was complex for Class Counsel, it was no less complex for L&A.

L&A's work was of substantial duration and continued for approximately five years, when the case was transferred to Mr. Scott's new firm.

#### e.  The Risk of Non-Payment.

L&A outlined the "risk factor" at length in its opening brief, as it weighs heavily in favor of L&A's early work on this litigation.  As discussed, L&A took a considerable risk in investing money, firm resources, and attorney time in the ZAI Litigation at a time when ZAI litigation was relatively unexplored territory and when, cases have recognized, the risk of non-payment is the highest.  While Class Counsel now discounts this factor, it has repeatedly taken the position that these claims were risky from the outset.[39]

In contrast, Mr. Scott essentially eliminated his risk of non-payment on the 5,600 hours of time expended by December 2004, when he left L&A and began working on the ZAI litigation with a zero-balance ledger.  Mr. Westbrook made a similar move in 2001, when he left Ness.  Given L&A's lack of direct involvement in the post-settlement aspect of the ZAI litigation, it is

---

[38] *Id.*
[39] *See e.g., id.*

#26241211 v1

difficult to analyze Class Counsel's assertions that the risk of non-payment was at its zenith *after the settlement had been approved in 2008*, but it does not ring true, given that a $140 million settlement had already been secured and is not supported by cases analyzing the relative risk after a settlement has been achieved.  *See e.g., Jorstad v. IDS Realty Trust,* 643 F.2d 1305, 1315 (8th Cir. 1981).

### *f.  The Amount of Time Devoted.*

L&A's opening brief analyzes at length the amount and quality of time spent by each of the firms seeking an allocation from the Common Fund Fee Award.   As discussed, 5,602 of L&A's total 8,181 hours were spent directly on the Barbanti Litigation and the ZAI litigation. These hours do not include the thousands of hours spent by L&A on the Dorrington Litigation or related medical monitoring and personal injury cases.  L&A included this time for reference in its Motion in recognition that Class Counsel similarly included hundreds of hours spent by Lieff on the Dorrington Litigation and related cases in its fee application to this Court, implicitly representing to the Court that the hours were valuable and worthy of compensation.[40]

However, even after eliminating time spent on the Dorrington Litigation and related cases, L&A's 5,602 hours spent on the Barbanti Litigation and ZAI litigation exceed that of Lieff (**which includes Barbanti and personal injury time**), Ness, and McGarvey (**both of which also include personal injury and other related time**).

In contrast, Westbrook and Scott's hours exceed L&A's, only in consideration of post-settlement hours spent by these firms; approximately one-third of Scott's total time and approximately one-half of Westbrook's total time is post-settlement.  Class Counsel places

---

[40] Declaration of Laura J. Black at Exs. 1, 2.

extreme emphasis on these particular hours and the tasks purportedly accomplished by Class Counsel after the settlement.  However, L&A's third-party review of Class Counsel's post-settlement time records reveals a collective *thousands of hours* of simply "monitoring" the bankruptcy proceedings and "reviewing" filed pleadings.  Given the exceedingly large amount of post-settlement hours spent by Scott and Westbrook and Class Counsel's heavy reliance on these hours, L&A respectfully submits that the true importance of these hours warrants special scrutiny from the Court.

### g.  *Awards in Similar Cases.*

Because the Court has already determined that a twenty-five per cent allocation from the Common Fund is appropriate, and L&A is not seeking an increase in this amount, this is a non-factor herein.

To the extent that the Court is inclined to rely on the *Gunter* factors in evaluating L&A's right to an allocation from the Common Fund Fee Award, L&A continues to be entitled to its requested allocation.

### 4.  **L&A's Proposed Allocation From the Common Fund Fee Award Remains Reasonable, Based on the Relative Benefit to the Class.**

As demonstrated above, L&A has benefitted the Class under any standard.  Even if, as Class Counsel advocates, only L&A's hours spent on the Barbanti Litigation and ZAI litigation are relevant (despite the fact that Lieff included hundreds of Dorrington and personal injury-related hours in its fee application) L&A's proposed allocation adequately accounted for a significant discount for the Dorrington and related litigation.  Even when those hours are

discounted in total (unlike those of Lieff, Ness, or McGarvey), L&A's 5,602 hours have a lodestar yield of $3,610,807.00.[41]

This remains consistent with L&A's proposed allocation of 25 per cent of the common fund fee award ($4,000,000.00) and survives the lodestar cross-check.  These hours were spent on investigating, developing and litigating class-wide ZAI property damage claims and have an established link to the settlement with Grace.  Class Counsel has not and cannot meaningfully distinguish L&A's contribution from that provided by Lieff, whose hours are remarkably similar (albeit less) to L&A's in quality and time-frame, and for which Class Counsel believes Lieff deserves approximately $2.4 million.

In sum, L&A respectfully submits that it is entitled to a twenty-five per cent allocation from the Common Fund Fee Award.

**C.  <u>The Court Should Not be Influenced by the Remaining Third-Party Objections.</u>**

In addition to Class Counsel's objection, Grace, the Future Claims Representative, and the Trustee of the Trust have filed overlapping and related objections to L&A's Motion.  L&A urges the Court not to be swayed by these third-party joinders, despite the appearance created by the "piling on" of objections by .

First, these parties likely lack any legal standing to weigh in on L&A's Motion because, as they must each concede, any allocation to L&A would have no impact on any of them or the funds they administer.  L&A is not seeking an increase in the Common Fund Fee Award or a separate award from the Common Fund and is, instead, simply seeking an allocation from the

---

[41] Supplemental Declaration of Jed W. Morris.

fund that has already been approved.  Given that, it is unclear what, if any, basis exists for them to object to L&A's Motion.[42]

Second, a serious lack of personal knowledge is at issue.  To L&A's knowledge, neither the Future Claims Representative nor the Trustee were involved, in any capacity, with these proceedings during the time-frame in which L&A represented ZAI class members and worked on behalf of the Class.  Thus, neither have any personal knowledge from which to comment on the value of L&A's contributions to the Class, which admittedly took place prior to settlement.  Similarly, none of these parties have – to L&A's knowledge – reviewed any of the time records of the six firms seeking a common fund fee allocation.  Thus, they lack the knowledge to thoughtfully comment on the relative contributions of the parties involved.

Third, to the extent the Court is inclined to consider the arguments of these third parties, they overwhelmingly overlap with those made by Class Counsel and are addressed in L&A's reply argument.  For example, the arguments that L&A's contributions were rendered useless by the outcome of the Science Trial and, thus,  had no impact on the settlement,[43] and that L&A cannot recover from the Common Fund Fee Award because (like Ness and McGarvey), L&A was not mentioned in Class Counsel's notice to the Class, are addressed above and incorporated herein.

---

[42] Standing requires an "injury in fact," which is: concrete and particularized, actual or imminent, and not speculative.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

[43] Like Class Counsel, Grace signed the Class Settlement Agreement and expressly agreed that L&A's work on the Barbanti Litigation and ZAI litigation formed the basis for the settlement.

#26241211 v1

While the motivations of these third-parties, at least one of which apparently owes his position to Class Counsel,[44] are not entirely clear, they nonetheless do not provide the Court with any persuasive basis to deny L&A's Motion.

**D.  The Court Retains the Discretion to Reimburse L&A's Costs.**

This Court has the discretion to award costs to those attorneys whose efforts benefit the class in common fund cases.  *See Serrano v. Sterling Testing Sys., Inc*., 711 F.Supp.2d 402, 423-24 (E.D. Pa. 2010).  As part of its Motion, L&A requested that $184,097.00 in out-of-pocket expenses be reimbursed from the Common Fund Fee Award.

Class Counsel and the third-parties have strenuously objected to the payment of L&A's costs, particularly pre-bankruptcy petition costs because the other five firms involved came to an agreement regarding the withdrawal of any claim for pre-petition costs, which was made without L&A's involvement.

Certainly, that was an easy deal for Scott and Westbrook to make – all of their pre-petition costs and expenses were shouldered by their former law firms (L&A and Ness).  Further, unlike L&A, the other firms making that agreement have been allocated a substantial amount of money from the Common Fund Fee Award for their time.  Class Counsel proposes that L&A get nothing for its time, and also forego all of its out-of-pocket costs.  L&A requests that the Court exercise its discretion and approve reimbursement $184,097.00 in costs, which were reasonably incurred on behalf of the Barbanti Litigation and in prosecuting the ZAI claims in the bankruptcy proceedings, from the Common Fund Fee Award already approved by the Court.

---

[44] Class Counsel is apparently responsible for the appointment of the Future Claims Representative.

#26241211 v1

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, L&A respectfully requests: (i) the Federal Rule of Evidence 706 expert recommend an allocation of the Common Fund Fee Award consistent with this Motion; (ii) the Court grant L&A's Motion for an award and allocation to L&A of 25 percent of the Common Fund Fee Award, as compensation for L&A's benefit provided to the Class and contribution to creation of the Common Fund, and for reimbursement to L&A of $184,097.00 in costs from the Common Fund Fee Award; and (iii) that the Court grant L&A such other and further relief as may be just.

Dated: May 12, 2014                     Respectfully submitted,
Wilmington, Delaware

                                        **PEPPER HAMILTON LLP**


                                        By:  /s/ Michael J. Custer
                                        David M. Fournier (DE No. 2812)
                                        Michael J. Custer (DE No. 4843)
                                        Hercules Plaza, Suite 5100
                                        1313 N. Market Street
                                        P.O. Box 1709
                                        Wilmington, DE 19801
                                        Phone: (302) 777-6500
                                        Fax:    (302) 421-8390
                                        fournierd@pepperlaw.com
                                        custerm@pepperlaw.com

                                        *Attorneys for Lukins & Annis, P.S.*