# APPENDIX A

EFiled: Feb 11 2005 4:50PM EST
Filing ID 5132028

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| HEINRICH BECK, individually and on behalf of a class of similarly situated individuals, | ) ) ) | |
| Plaintiff, | ) ) | C.A. No. 303-N |
| v. | ) ) ) | |
| ATLANTIC COAST PLC, a Foreign Corp.; DIGITAL MILLENNIUM, INC.; SALAMAN ZAFAR; and JOHN DOES A through L, | ) ) ) ) | |
| Defendants. | ) ) | |

## OPINION

Date Submitted: December 8, 2004
Date Decided: February 11, 2005

William D. Sullivan, Esquire, and David E. Wilks, Esquire, BUCHANAN INGERSOLL, P.C., Wilmington, Delaware; Darrell W. Scott, Esquire, THE SCOTT LAW GROUP, Spokane, Washington; Eric J. Roth, Esquire, LUKINS & ANNIS, P.S., Spokane, Washington, *Attorneys for Plaintiff.*

Kurt M. Heyman, Esquire, and Patricia L. Enerio, Esquire, THE BAYARD FIRM, Wilmington, Delaware, *Attorneys for Defendant Atlantic Coast, PLC.*

**STRINE, Vice Chancellor**

I regret having to write this opinion. But the plaintiffs' lawyers have given me no choice, having failed to acknowledge their own responsibility for wasting the time of this court and of a defendant in this purported class action by filing false pleadings and failing to produce documents clearly within the scope of a valid request for production. By their conduct, the plaintiff and his lawyers have made this litigation unduly expensive for the defendant, unnecessarily expended the limited resources of this court, and put this court in a position to potentially certify a class representative who was unfit to serve in that capacity.

In summary, this lawsuit was filed as a class action. The proposed plaintiff, Heinrich Beck, was, the complaint suggests, an unsophisticated computer user duped into buying a software product that he thought would improve the operational efficiency of his computer, but which, in reality, did not. Although Beck did not reside in Delaware, suit was filed here and the certification of a nationwide class of similarly situated consumers was sought.

After costly proceedings in the Superior Court, this case was transferred to this court. Beck filed a proposed amended complaint soon thereafter, dropping many of the original defendants, but continuing to assert claims against one particular defendant, Atlantic Coast, whose counsel had spent many hours demonstrating to Beck's counsel why Atlantic Coast was the least culpable of the parties originally named as defendants. In the proposed amended complaint, as well as in the original complaint, Beck was specifically alleged to have purchased the product in question.

Defendant Atlantic Coast then moved to dismiss the complaint and sought an award of attorneys fees on the grounds that Beck's prosecution of the action had been in bad faith and frivolous. Extensive briefing on these motions ensued.

In the course of discovery and briefing, it became clear that, contrary to representations in the original and proposed amended complaints, Beck had not been deceived and had never purchased the product in question, "Window Power Tools." In actuality, Beck observed an Internet popup ad for the product, believed the product did not work, and initiated a lengthy series of e-mail communications with the software developer in which he made numerous misrepresentations in order to elicit responses on, among other premises, the false basis that he could influence a school district's bulk purchase of the product. Beck waxed eloquent on his personal Internet web page about his triumph in duping the developer.

During this process, Beck learned of attorney Darrell W. Scott and his law firm Lukins & Annis because of their participation in a class action lawsuit against another software company. Beck eventually contacted Scott and discussed filing a lawsuit of his own against DMI. Eric J. Roth, another Lukins & Annis attorney who worked with Scott on this case, purchased a copy of Window Power Tools to test whether or not it worked. Beck himself never obtained the software and never reimbursed the law firm for its purchase, which was undertaken solely for purposes of filing this lawsuit.

The full course of this conduct was not voluntarily disclosed by Beck or by his counsel. Beck's counsel received discovery requests from the defendants that

2

clearly required them to produce the content of Beck's Internet web page in its entirety. Instead of producing that material, counsel consciously chose to withhold much of it from production. Absent a diligent Internet search by Atlantic Coast's counsel, the full content of Beck's web page — which was relevant to, among other material issues, Beck's fitness to be a class representative — would have gone unnoticed by both Atlantic Coast and this court.

Shortly before the argument on the various pending motions, Atlantic Coast's counsel — and not Beck's counsel — revealed to the court another fact that Beck's counsel had not revealed — that Beck's counsel had been unable to contact Beck himself for some nine or more weeks before the hearing date. At oral argument, Beck's counsel, Scott, admitted that the action should be dismissed but refused to agree that any of the costs of the proceedings should be borne by him, his law firm, or his Delaware correspondent counsel.

In this opinion, I conclude that Beck's counsel violated Court of Chancery Rules 11 and 37, and that Beck and his counsel prosecuted this action in bad faith. Beck and his counsel filed false and misleading complaints with this court that misrepresented factual circumstances at the core of this case, compounding this grave misjudgment by withholding material information that bore on a matter critical to the integrity of the class action mechanism — whether Beck (and indeed, given the origins of the suit, Beck's counsel themselves) were fit to represent in good faith the best interests of the absent class members.

This misconduct is not trifling. It resulted in the unnecessary incursion of costs not only by defendant Atlantic Coast, but also by this court, and denied the court's time to other litigants with pending cases. If ever candor cannot be compromised, it is when a plaintiff and his counsel undertake to act as fiduciaries for a wide array of persons not present before the court. Beck and his counsel here have created an example that can be cited by those who believe that class action suits should be curtailed because of the potential misuse that may be made of those suits. Without ensuring that Beck and his counsel bear appropriate responsibility for their inappropriate conduct by awarding a substantial, but fair, sanction of fees and costs against them, this court would do a disservice not only to Atlantic Coast and other litigants in this court, but also to those plaintiffs whose interests are well-served by the availability of class action suits to remedy harms that would otherwise go unredressed.

## I. Factual Background

The plaintiff, Heinrich Beck, proposed himself as the class representative in a proposed class action lawsuit brought on behalf of certain Internet users against defendants Digital Millennium, Inc., Salaman Zafar, and Atlantic Coast, PLC seeking injunctive relief and damages in connection with Internet-based marketing and sale of software. Although he is a resident of the state of New York, Beck filed his suit in Delaware.

Because the role of Beck's counsel in this action is critically important, a review of the individuals and the entities involved is useful. Darrell Scott of the

Spokane, Washington law firm of Lukins & Annis, is Beck's lead counsel. Eric J. Roth of Lukins & Annis assisted Scott, and is listed as one of Beck's attorneys on all of the pleadings filed with this court on his behalf. Beck's Delaware counsel throughout these proceedings has been William D. Sullivan initially with the Wilmington, Delaware law firm of Elzufon, Austin, Reardon, Tarlov & Mondell, but now with the Wilmington, Delaware office of Buchanan Ingersoll.[1] On November 5, 2004, Sullivan filed a motion for the admission pro hac vice of Scott, which this court granted on November 8, 2004. Roth did not seek admission pro hac vice.[2] Sullivan and Scott appeared before the court on Beck's behalf for oral argument on this motion.

Before describing the differences between the two complaints filed on behalf of Beck, it is efficient to describe their common elements.

As set forth in the complaints filed by Beck, Digital Millennium Inc. ("DMI") is a developer of software products for personal computers, supposedly having its principal place of business in Karachi, Pakistan. The founder and chief executive officer of DMI is Salaman Zafar, a citizen of Pakistan. DMI's software products are advertised on the Internet as performance-enhancing utilities, capable of improving computer speed and memory.

---

[1] Other Delaware attorneys worked with Sullivan at different stages of this case.
[2] Although Roth apparently never sought admission pro hac vice, he clearly acted as a litigator in this case, for example, by writing a letter to the court on August 12, 2004 seeking a telephone conference on the issue of bad faith raised by Atlantic Coast in response to Beck's interrogatory answers.

Defendant Atlantic Coast — the moving party here — conducts online sales services for software publishers who do not wish to maintain proprietary online payment systems. DMI and Atlantic Coast were involved in a business relationship by which online sales initiated on DMI's website were routed to Atlantic Coast's website for completion.

A. Allegations Made In The Original Complaint

The original complaint was filed in the Superior Court and named Atlantic Coast, DMI, and Zafar as defendants, alleging a conspiracy of fraud and misrepresentation under which all conduct in furtherance of the conspiracy is attributable to each of the defendants. Paragraphs 4.1-4.7 of the complaint allege a general scheme under which the defendants jointly marketed and solicited the purchase of Window Power Tools software using web pages and popup windows that were likely to be viewed by Internet users. These advertisements included a button marked "Buy Now" which, when clicked, would direct Internet users to a web page offering Window Power Tools for sale. This web page provided access to Atlantic Coast's online payment system, where interested consumers could purchase Window Power Tools.

The original complaint further alleges that popup ads used in marketing Window Power Tools were designed to resemble computer error messages characteristically generated by the Microsoft Windows operating system or computer performance evaluations that reported computer failures, memory errors, and Internet security vulnerabilities. The fake error messages were accompanied

by advertisements claiming that the reported errors could be fixed with Window

Power Tools software and claiming the product could "Optimize Internet and

Boost your Internet Speed up to 300%" and "Make your PC Faster and Increase

Windows Speed up to 200%." Presumably, unsophisticated computer users could

mistakenly believe these messages reported actual problems with their own

computer systems, and, hoping to fix the reported problems, would purchase

Window Power Tools. In reality, the computer problems reported by the fake

performance evaluations and error messages did not exist, and the purchase of

Window Power Tools to solve these nonexistent problems was unnecessary.

Paragraph 4.8 of the original complaint states that the "[n]amed plaintiff

and members of the Class encountered defendants' deceptive Internet

communications and purchased Window Power Tools from defendants."

Paragraph 5.1 of the original complaint states that the named plaintiff "brings this

case as a class action . . . on behalf of himself and a Class of all others similarly

situated," and defines the proposed class as follows:

> All persons residing in the United States who encountered, while
> operating their computer, an advertising banner issued by defendants
> stylized to resemble a Microsoft system or software error message or
> alert promoting Window Power Tools . . . . A subcomponent of this
> same class population are those who responded by purchasing
> Window Power Tools over the Internet through web pages
> maintained by defendants.

Paragraph 5.6 of the original complaint describes the typicality of the named

plaintiff as follows:

> The claims of the named plaintiff arise from the same events and courses of conduct that give rise to the claims of other Class Members. Plaintiff is a member of the Class, possesses the same legal interests, and has suffered the same injury as other Class Members. Plaintiff's claims are typical of the claims of the Class generally.

Paragraph 5.7 of the original complaint states that the named plaintiff "will fairly and adequately represent and protect the interests of the Class."

Beck sought injunctive relief in the form of "a final order enjoining defendants from deceptive, misleading, unfair, untrue, immoral, false, and unethical business practices." As a result, Atlantic Coast brought a motion alleging that the Superior Court lacked subject matter jurisdiction and that the case should be dismissed subject to the plaintiff's right to transfer the case to this court. Atlantic Coast also challenged the complaint, arguing that it was inappropriate to certify a nationwide class action in a consumer fraud case that would involve the application of various state laws to a myriad of differently situated consumers. As a condition of agreeing to a voluntary transfer of the suit to this court, Beck agreed that neither party would take any steps to defeat the jurisdiction of the Court of Chancery. Upon transfer, Atlantic Coast filed motions attacking the viability of the complaint, and Beck responded by proposing an amended complaint, the allegations of which I describe next.

### B. Allegations Made In The Proposed Amended Complaint

The proposed amended complaint differs from the original complaint in several ways. Initially, the proposed complaint dropped DMI and Zafar as

8

defendants, even though they were alleged to have been the parties most directly involved in the supposed fraud on Beck and the class, apparently due to an inability to obtain personal jurisdiction over Pakistani residents in Delaware. Given this problem and other vulnerabilities in Beck's case, Atlantic Coast invested a great deal of energy in trying to convince Beck's counsel not to prosecute the case, arguing particularly that its role in the case was limited to, at most, being simply a fulfillment house that processed transactions between software retailers (such as DMI) and consumers. Atlantic Coast's efforts did not result in it being omitted from the proposed amended complaint; to its chagrin, it was left as the sole defendant.

Beck also deleted prior allegations relating to the use of popup ads and fake error messages in marketing Window Power Tools software. Atlantic Coast's activities are described in ¶ 1.1 as calculated "to deceive Internet consumers into buying a software product by falsely warranting that the product would drastically increase a computer user's computer speed and Internet speed." Where the original complaint emphasized the deceptive appearance of popup ads resembling computer error messages while promoting Window Power Tools as capable of fixing those same errors, by contrast, the proposed amended complaint alleges that Atlantic Coast made warranties that the software could increase computer speed and Internet speed by 300%.[3] These warranties were alleged to be false.

---

[3] Atlantic Coast argues that it made no representations at all to Beck or other purchasers of Window Power Tools and that any representations were made by DMI as the retailer.

With respect to Heinrich Beck, ¶ 2.1 of the proposed amended complaint states that he "is a victim of defendants' breach of warranty and deceptive business scheme." Paragraph 5.1 suggests that class members are similarly situated to Beck, and defines the proposed class as "[a]ll persons residing in the United States who encountered, while operating their computer, representations that Window Power Tools increases computer speed and Internet speed by 300% and who *subsequently purchased* Window Power Tools through a web site maintained by Defendant Atlantic Coast."[4] Paragraphs 5.4 and 5.5 of the proposed amended complaint retain the language of the original complaint, stating in relevant part that Beck "possesses the same legal interests, and has suffered the same injury as other Class Members," and that Beck "will fairly and adequately represent and protect the interests of the Class."

## C. Facts Actually Underlying This Lawsuit

Both the original and the proposed amended complaints portray Beck as both a deceived consumer and a purchaser of Window Power Tools software, explicitly stating and implicitly suggesting factual matters that distort both the relationship between Beck (as a consumer) and Atlantic Coast, and the resemblance of Beck (as a proposed class representative) to the proposed class of similarly situated individuals. From the complaints, one would infer that Beck was an unsophisticated consumer who was duped into buying a product that he

---

[4] Emphasis added.

thought would improve his computer's operating performance but that, upon purchase, did not work.

In reality, Heinrich Beck is quite a different character. Beck is actually a software engineer who maintains his own Internet web site,[5] seemingly as a hobby. Far from a naïve consumer, Beck is a skilled user of information technology who can easily recognize dubious claims of computer performance-enhancing software. How do I know this?: From the volume of Internet communications and commentary that Beck himself posted on his personal web site that, as I will discuss, was concealed from Atlantic Coast in the discovery process. For present purposes, I focus on the content of these communications rather than on the circumstances of their non-production.

When confronted with a popup advertisement for Window Power Tools, Beck, who uses the Macintosh operating system, was not misled by the proclamation that his "Windows Core Matrix [was] Unoptimized," nor was he misled by the resemblance of the ad to error alert messages characteristically generated by the Windows operating system.[6] Although not personally deceived, Beck was irritated by the deceptive nature of the ad, surmising that it might persuade less sophisticated Internet users that their computers were defective or

---

[5] *See* http://iheinrich.com/optimizer/. This web page, including the portions cited in this opinion, is reproduced in Exhibit E of the Defendant's Motion for Summary Judgment.
[6] The Macintosh operating system (Mac OS) and Microsoft Windows, while capable of performing similar functions, are structurally distinct, and do not incorporate the same structural elements. Thus, a message referring to a "Windows Core Matrix" on a computer running Mac OS would be cause for immediate skepticism.

damaged in some way.  Beck clicked on the popup ad, not to purchase the
software, but to discover its source.  He was led to DMI's web site.

After having grown "bored" with his e-mail bating scheme, Beck revealed

Beck then launched his own campaign against the offensive software
developer — which he described on his web site as a "weasel hunt," and which
can only reasonably be characterized by an objective observer as a sustained
course of mockery.[7]  In early October, 2002, using a false name and various false
e-mail addresses,[8] Beck initiated a series of phony e-mail exchanges with
personnel at DMI, clearly intending to ridicule the company.  In one e-mail, for
example, Beck, posing as a school district representative, wrote to DMI proposing
the purchase of $6000 worth of Window Power Tools software licenses.  At the
same time, Beck began a narrative journal on a web page he named "Optimizer"
(referred to in this opinion as the "Optimizer Page"), posting his e-mail
correspondence with DMI and recounting his distaste for its advertising.[9]

After having grown "bored" with his e-mail bating scheme, Beck revealed
the final step of his campaign: "Round #3: Did someone say, 'Class Action

---

[7] Beck's motivation for contacting and corresponding with DMI is suggested by
statements that he posted on his web page, such as: "If I screw with them . . . THAT is
comedy!" and "I know my weasel.  I must draw my weasel out."

[8] Beck corresponded with personnel at DMI using the pseudonym "Jack Zilla" and a set
of what he described as "disposable e-mail accounts," including moron@piratemail.com,
stupid@money.com, stupid@cash.com, afool@hismoney.com, and bwhaha@evil.com.

[9] Each of Beck's e-mails to DMI was posted on his Optimizer Page, followed by
commentary.  As an example, Beck commented on DMI's reply to an e-mail in which he
asked support personnel to explain what a Windows Core Matrix was, writing:

> AHA!  So that's what the Windows Core Matrix is!  I thought Lawrence
> Fishburne would come to my house with a blue bill and a red pill!  If you
> believe that, I have a bridge in Brooklyn, been in the family for years…
> hate to sell it, but… but I digress.  Wanna catch a BIG WEASEL?  You
> need BIG WEASEL BAIT!

Lawsuit?'" To this end, on December 5, 2002, Beck contacted Lukins & Annis, whose web site advertises it as specializing in the prosecution of class action lawsuits "to protect consumers from deceptive business practices." On engaging Lukins & Annis in filing a class action lawsuit against DMI, Beck wrote: "Want to join the lawsuit? . . . You could get nothing, or you could get $500 smackaroos! Did I already contact these lawyers and tell them about DMI Software? Hahahaha... what do you think!??"

On June 2, 2003, allegedly at Beck's behest, attorney Roth of Lukins & Annis purchased Window Power Tools software through an online transaction. Roth's purchase was initiated on DMI's website and then routed to a website owned by Atlantic Coast and concluded using the online payment system operated by Atlantic Coast. Following the conclusion of the online transaction, DMI e-mailed confirmation of the sale to Roth. Atlantic Coast was named as a defendant in this action on the basis of its business relationship with DMI. The connection between the two companies was evidently discovered in connection with this purchase, however, the full extent of Atlantic Coast's involvement in this transaction remains unclear.[10]

On June 3, 2002, a CD-ROM copy of the software was shipped to Roth in Spokane, Washington. Upon arrival, the software was forwarded to a consultant who concluded that Window Power Tools was incapable of increasing computer

---

[10] It appears that several companies are involved in providing online sales services for DMI of and in manufacturing and shipping Window Power Tools in CD-ROM format.

speed or Internet speed as advertised. The original complaint flatly stated that Beck purchased the Window Power Tools product. That statement is false. In reality, Roth, in conjunction with his law firm, Lukins & Annis, purchased Window Power Tools. Roth and his firm paid the purchase price and took possession of the software. *Beck never received, used, or paid for the product.*

### D. Atlantic Coast's Document Request

On June 29, 2004, Atlantic Coast submitted a document request seeking production of "all documents reflecting any correspondence, communications or transactions between Plaintiff and any of the Defendants." One of Beck's counsel, Scott, learned of the Optimizer Page in June 2003, one year before receiving that document request. Although Beck's counsel did produce Beck's "Jack Zilla" e-mail exchange with DMI in response to the discovery request, Scott consciously chose not produce the Optimizer Page in its entirety.

By late summer 2004, Beck and Atlantic Coast were dueling over a variety of motions. As of that time period, Beck had moved to amend the complaint with the proposed complaint I have described. Atlantic Coast opposed that motion on the grounds of a lack of subject matter jurisdiction and failure to state a claim against Atlantic Coast. In addition, Atlantic Coast had moved for summary judgment as on all of Beck's claims, based on, among other things, learning in discovery that Beck was, contrary to his pleadings, not in fact a purchaser of the product at issue in the case.

In the midst of this briefing, Atlantic Coast's counsel came upon Beck's Optimizer Page, which contained correspondence between Beck and DMI and commentary written by Beck that cast grave doubt on his maturity and fitness to be a class representative. Perplexed by the string of e-mails from "Jack Zilla" that was included in Beck's response to interrogatories submitted on August 6, 2004, Atlantic Coast's counsel conducted an independent web search in an effort to discover the identity of "Jack Zilla" and ultimately came upon the Optimizer Page.

The materials contained on Beck's Optimizer Page were clearly subject to prior document requests but had not been produced. It is important to note that, absent the efforts of Atlantic Coast's counsel to discover the identity of "Jack Zilla," neither Atlantic Coast nor this court would have ever known the full scope of Beck's communications with DMI. More important still is the fact that, had it not been for this discovery by Atlantic Coast's counsel, this court would have, at the instance of Beck's counsel, addressed the question of Beck's fitness as a class representative ignorant of probative evidence bearing importantly on the question of his fitness to serve in that important capacity.

Atlantic Coast's motion for summary judgment also sought an award of attorneys' fees. Given that Beck had been revealed to be neither a purchaser nor an unsophisticated victim of fraud, but, at best, a well-intentioned yet immature prankster who amused himself by confronting possible fraud with lies of his own, and who believed that filing a class action suit falsely stating the facts, as opposed to referring the case to consumer protection enforcement authorities in his home

state, was the best way to protect consumers who might actually be duped, Atlantic Coast argued that Beck's case should be dismissed. Atlantic Coast further contended that Beck and his counsel had, through their deceptive litigation practices, acted in bad faith, and that fee-shifting was therefore warranted.

Oral argument on the various motions was set for November 9, 2004. In advance of oral argument, the court invested a good deal of time preparing to address the wide-ranging issues to be presented. The court was therefore surprised when, on November 2, one week before oral arguments, it received, not from Beck's counsel, but from counsel for Atlantic Coast, a letter informing the court that Beck's counsel had been, since at least some time in September, unable to get in touch with him. Beck's counsel therefore had no idea at that time whether Beck wished to proceed with the case in the face of the pending motions, because Beck had refused to respond to their communications.

Beck's counsel, however, did not move for dismissal. Rather, they called the court and requested, at the last minute, that the court's technical support personnel work with them so that they could present a computerized, multimedia presentation at oral argument. Beck's counsel did not properly consult with counsel for Atlantic Coast about this. After being permitted to correct that oversight, Beck's counsel had a last-minute change of heart and decided to abandon its plans for a technology-enhanced presentation, but failed to inform the court's staff. Consequently, the court's staff needlessly continued preparing the

courtroom for this presentation up until the time when oral arguments were scheduled to begin, in a wasteful expenditure of taxpayer dollars.

On the day of oral argument, attorney Scott of Lukins & Annis argued on Beck's behalf. Scott readily conceded that Beck's refusal to cooperate in the prosecution of the action justified the dismissal of this case. Moreover, Scott conceded, as shall be discussed further, that Beck's prior conduct made him at best a compromised, and at worst, a clearly unfit class representative. Scott confessed that he had offered to dismiss this case but that Atlantic Coast had insisted on receiving some award of fees and costs as a result of the improper manner in which the litigation proceeded. Scott would not agree to such an award, and pressed on — without a client he could reach.

At oral argument, therefore, the bulk of the extensive hearing was spent on the propriety of Beck's and his counsel's conduct, it being conceded that the case should be dismissed. In this regard, the issue of whether Atlantic Coast should receive an award of fees and costs on account of the behavior of Beck and his counsel was squarely presented by Atlantic Coast itself.

At the court's instance, the question of whether Atlantic Coast's request for an award of fees should also be considered under the specific requirements of Court of Chancery Rules 11 and 37 was raised. The court raised that question so that it could consider Atlantic Coast's request for fee shifting under all of the appropriate procedural rubrics. In order to ensure that the due process rights of Beck's counsel were adhered to scrupulously, and that the procedural

17

requirements of Rule 11 were honored, I gave Beck's counsel yet an additional opportunity to address the propriety of their conduct. In so doing, I considered it obvious and plain that I was invoking Rules 11 and 37, not simply in order to address any possible harm that Beck and his counsel had done to the court's own efficient operations, but in order to permit Atlantic Coast to seek redress for itself under both the bad faith exception to the American Rule, and under the procedural rules of this court. To that end, Atlantic Coast was expressly given an opportunity to address the submission of Beck's counsel and to argue why their conduct violated Rules 11 and 37.

With this background in mind, I now explain why Beck's counsel have engaged in conduct that is inexcusable and that justifies fee-shifting and sanctions under the bad faith exception to the American Rule, Rule 11, and Rule 37.

## II. The Relevant Legal And Procedural Standards

The question of whether Beck and his counsel engaged in conduct that justifies fee shifting or other sanctions raises issues under three rubrics, each of which is in large measure designed to ensure that litigation is prosecuted in a candid and non-frivolous manner that does not inexcusably add to the substantial costs that almost always result when a complex case is filed.

Atlantic Coast initially raised the most general of these rubrics, which is the bad faith exception to what is known as the "American Rule" against fee-shifting. Under the American Rule, litigants are expected to bear their own costs of litigation absent some special circumstances that warrant a shifting of attorneys'

fees, which, in equity, may be awarded at the discretion of the court.[11] The bad

faith exception to the American Rule applies in cases where the court finds

litigation to have been brought in bad faith or finds that a party conducted the

litigation process itself in bad faith, thereby unjustifiably increasing the costs of

litigation.[12] There is no single standard of bad faith that warrants an award of

attorneys' fees in such situations; rather, bad faith is assessed on the basis of the

facts presented in the case.[13] Courts have found bad faith conduct where parties

have unnecessarily prolonged or delayed litigation, falsified records, or knowingly

asserted frivolous claims.[14] Specific behavior that has been found to constitute

bad faith in litigation includes misleading the court, altering testimony, or

changing position on an issue.[15] The bad faith exception is not lightly invoked.

The party seeking a fee award bears the stringent evidentiary burden[16] of

producing "clear evidence" of bad-faith conduct.[17]

   As noted, at oral argument, it became clear that Atlantic Coast had also

fairly put in contention the question of whether the conduct of Beck and his

counsel justified fee shifting under the bad faith exception, but also whether that

---

[11] *See Barrows v. Bowen*, 1994 WL 514868, at *1 (Del. Ch. Sept. 7, 1994).

[12] *See Arbitrium (Cayman Islands) Handels v. Johnston*, 705 A.2d 225, 231 (Del. Ch. 1997).

[13] *Jacobson v. Dryson Acceptance Corp.*, 2002 WL 31521109, at *16 (Del. Ch. Nov. 1, 2002) (citations omitted).

[14] *Johnston v. Arbitrium (Cayman Islands) Handels*, 720 A.2d 542 (Del. 1998) (citations omitted).

[15] *Jacobson*, 2002 WL 31521109, at *16.

[16] *See Shapiro v. Healthcare Acquisition, Inc.*, 2004 WL 878018, at *1 (Del. Ch. Apr. 20, 2004).

[17] *Arbitrium*, 705 A.2d at 232.

19

conduct violated two express procedural rules of this court. Thus, Beck's counsel was invited to justify that conduct under those Rules and Atlantic Coast was invited to argue why those Rules also justified an award of fees and costs in its favor.

The first of the Rules in issue is Delaware Court of Chancery Rule 11, which requires that an attorney sign all papers submitted to the court. In signing, filing, or otherwise submitting such papers, an attorney certifies that, to the best of his knowledge, and based on reasonable inquiry, such papers are factually accurate and presented for a proper purpose. Specifically, an attorney certifies under Rule 11(b)(2) that "claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law," and under Rule 11(b)(3) that "the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." Rule 11(c) permits the court to impose appropriate sanctions for violations of 11(b).

The second of the Rules is Delaware Court of Chancery Rule 37, in particular, that aspect of Rule 37 stating that failure to produce documents in response to a discovery request constitutes sanctionable misconduct.[18] Rule 37(d) provides that, if a party fails to honor a legitimate discovery request, then it may be required to pay the reasonable expenses, including attorneys' fees, caused by

---

[18] *See* Del. Ct. Ch. R. 37(a)(3).

the failure. An award of expenses and fees is mandatory under Rule 37 where a party is found to have failed to honor a discovery request "unless the Court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust."[19] A party found to have violated Rule 37 has the burden to show that his actions were justified or that other circumstances make the award unjust.[20]

Under each of these rubrics, I conclude that the behavior of Beck and his counsel cannot be excused and that an appropriate remedy for Atlantic Coast must supplement the dismissal of this case. In so concluding, I move from a general observation about how this case might have been more appropriately litigated to a discussion focusing on the key particulars of misconduct that cannot be tolerated.

My general observation begins with an acknowledgement that Beck came across, and his counsel acted upon, conduct that very well might have constituted tortious conduct. There is no doubt that a variety of shady characters are using the Internet to mislead and dupe consumers, a phenomenon that does not reflect any new defect in human character, but simply represents the use by the current generation of confidence men (and women) of the newest means of communication available to them. Although Beck has proposed that the worst of the alleged wrongdoers — DMI and its controller, Zafar — be dismissed from the case it appears true that Atlantic Coast, at the very least, probably acted as a

---

[19] Del. Ct. Ch. R. 37(a)(4)(A)-(B); *see also* Del Ct. Ch. R. 37(d).
[20] *See Bader v. Fisher*, 504 A.2d 1091, 1096 (Del. 1986).

fulfillment house for a retailer selling a bogus product.  Put bluntly, I do not write

this opinion under the impression that the fulfillment house for a reputable

software company has been wrongly maligned.

That said, there are proper and improper ways of addressing disreputable

conduct.  Beck and his counsel would not be in the pickle they are in now had they

acted with candor.  Imagine a complaint that (distilled down) read as follows:

> Plaintiff Heinrich Beck was working on his computer one day.  A
> popup advertisement emerged on his screen in the guise of a warning
> that his computer system was vulnerable and his operating system
> might crash.  The advertisement mentioned a product that could, in a
> very substantial and specific way, increase the operational efficiency
> of a personal computer.  Beck, a software engineer by training,
> suspected that the product was bogus and that the representations
> were fraudulent.  He therefore undertook, through artifice, to
> communicate with the manufacturer in order to learn more about the
> product and to confirm his suspicions.  Ultimately, in order to
> protect other consumers inconvenienced by these practices, and to
> prevent less sophisticated consumers from actually purchasing the
> product, Beck contacted counsel and authorized them to file suit on
> his behalf.  To confirm Beck's belief that the product could not
> perform as advertised, counsel for Beck purchased the product so
> that the product could be tested.  Upon testing, counsel for Beck
> determined that Beck was correct and that the product did not work
> as represented and warranted.

Assume further that, when asked in discovery for all communications between

Beck and the defendants, Beck and his counsel had promptly produced all of the

information on Beck's Optimizer Page.

In those circumstances, non-frivolous questions about the viability of

Beck's complaint might have existed.  Can someone like Beck, who was not

duped and who used misrepresentations himself in order to explore his concerns,

act as a class representative?  Can a non-purchaser represent purchasers in a class-wide warranty claim?  Should a nationwide class action be certified when the class is dispersed and the fairness and efficiency of a class action, for a variety of obvious reasons (e.g., multiple sources of applicable law, the lack of common circumstances involving the class, etc.), are by no means obvious?

Although such issues might ultimately have precluded a purported class action, what is clear is that litigating in this manner would not have raised any substantial questions under the bad faith exception to the American Rule, or Rules 11 and 37.

But that, of course, is not what happened here.

A.  Analysis Under The Bad Faith Exception To The American Rule

Beck and his counsel conducted themselves in a less-than-forthright manner.  Beck's complaints paint a fundamentally deceptive picture.  Beck is represented to be typical of the proposed plaintiff classes, but he seems obviously "unique."  In stark contrast to the picture of the innocent rube duped into purchasing a defective product by fraud, the real portrait of Beck is that of an Internet vigilante, who supplements the proper authorities in policing misconduct on the web.

Even if the essentially deceptive image of Beck created by the complaints is put to the side, I am still faced with, and cannot ignore, what is, at bottom, the plainest of false allegations — that Beck was a purchaser of Window Power Tools software.  He was not a purchaser.  His counsel purchased the software.  The

23

statements in the complaint to the contrary were known by Beck, Scott, and Roth to have been false. Had the complaint pled the real truth, Atlantic Coast would not have wasted time in discovery ferreting out the real facts. There is simply no justification for this misrepresentation, and it plainly constitutes bad faith conduct justifying fee shifting under the American Rule.[21]

The complaint is also false because it alleges that Beck is typical of members of two proposed plaintiff classes when he is not typical. It is not (or so I hope and trust) typical for people to create web pages that discuss their plans to induce transactions and then turn around and file a class action lawsuit. It is not typical for a law firm to purchase software and then file a complaint stating that the plaintiff purchased it. In and of itself, the characterization of Beck as typical would not support a finding of bad faith. But the purposeful false identification of Beck as a purchaser and the concealment of the Optimizer Page demonstrate a mindset to mislead Atlantic Coast and this court as to Beck's satisfaction of the requirements to be a class representative.

Thus, Atlantic Coast has satisfied its burden of showing clear evidence of bad faith conduct. In truth, because Beck and his counsel have not refuted any of

---

[21] *See Rice v. Herrigan-Ferro*, 2004 WL 1587563, at *1 (Del. Ch. July 12, 2004) (awarding fees principally for filing a complaint that falsely alleged statements of fact); *Arbitrium*, 705 A.2d at 235 (noting the exceptional nature of an award under the bad faith exception, the court nevertheless found an award of attorneys' fees justified, citing "a highly disturbing pattern of deceitful, bad faith conduct" that included alteration of testimony, repeated change of position, falsification of evidence, and finally disavowal of previous litigation positions in an effort to justify other misrepresentations).

their challenged behaviors, choosing instead to cast them as well-intentioned oversights, Atlantic Coast has little to prove.[22]

## B. Analysis Under Rule 11

Although it seems clear that the intentional filing of factually inaccurate pleadings violates the spirit of Rule 11, there is case law suggesting that non-material misrepresentations to the court may not be sanctionable under Rule 11.[23] Here, however, Beck's misrepresentations are of a nature that tend to taint this proceeding and obstruct the orderly administration of justice.[24] Whether or not Beck was a purchaser of Window Power Tools software is plainly material, given that he is proposed to be a fit representative of a class of other purchasers pressing, among other claims, breach of warranty claims. To mislead the court and Atlantic Coast about so fundamental a question as Beck's purchaser status through plainly false pleadings is a clear violation of Rule 11.

## C. Analysis Under Rule 37

Beck and his counsel's failure to produce the Optimizer Page in its entirety is equally, if not more disturbing, than the misrepresentative nature of the

---

[22] The court could not help observing that Scott holds a Ph.D. in Rhetorical Theory. This fact underscores the irony that Scott seems to have no idea that he has acted improperly in litigating this case. For example, in ¶ 47 of his affidavit responding to the court's order to show cause, Scott attempts to explain away the serious misrepresentations made in the proposed amended complaint, noting that it was "proposed, unsigned, and now abandoned." That is sophistry of the plainest kind. By filing and signing a motion to amend the complaint, Scott and his colleagues were representing that the complaint they were proposing to become operative satisfied Rule 11. Scott's resort to nonsensical arguments of this kind is indicative of a failure to appreciate his professional obligations.

[23] *See Sanders v. Wang*, 2001 WL 1000725, at *1 (Del. Ch. Aug. 22, 2001).

[24] *Id.*

pleadings. This material was clearly called for by Atlantic Coast's request for "all documents reflecting any correspondence, communications or transactions between Plaintiff and any of the Defendants," yet Beck's counsel responded to that request on August 6, 2004 by producing only *some* documents reflecting such communication. At oral argument, Scott confessed that he made a conscious decision not to produce certain portions of the Optimizer Page even though he had known about it for a year. This is behavior of an entirely calculated, tactical, and inexcusable kind. Scott had to have known that this information clearly bore on the fitness of Beck to be a class representative as well as on the viability of Beck's own personal claims against Atlantic Coast.

In fact, during oral arguments, Scott stated that, when he first discovered Beck's Optimizer Page in June 2003, he regarded it as a "troubling misfortune" which created "substantial doubt about . . . the appropriateness . . . of [Beck] ultimately being a class representative."[25] At the same time, Scott also contradictorily argued that Beck's commentary was not probative. Although it is difficult to reconcile Scott's description of the Optimizer Page as a "troubling misfortune" that created "substantial doubt" with his stated belief that Beck's commentary was not probative, Atlantic Coast's document request explicitly sought "all documents reflecting," not "some documents reflecting." The contents of the Optimizer Page were not privileged materials, they were plainly relevant within the meaning of Rule 26(b)(1), and they should have been produced.

---

[25] Transcript at 17.

Most inexcusably of all, Beck's counsel knew that they were, on Beck's behalf, asking this court to certify Beck as an appropriate fiduciary for a class of persons who would have to depend on his fidelity, and that of his counsel, for appropriate representation. By their own conduct, Beck's counsel acted to deny this court extremely probative information relevant to an exceedingly important determination in violation of Rule 37.

As discussed previously, that outrageous behavior clearly rises to the level of subjective bad faith justifying invocation of the exception to the American Rule.[26] Likewise, that behavior also plainly implicates the text and evident purpose of Rule 37. When a client and counsel are revealed to have hidden obviously non-privileged and relevant information plainly requested by their opponent, Rule 37 provides for relief. Although Rule 37 will not be invoked where a party provides reasonable justification for non-production of documents, Beck has provided no such justification.

In *Iotex Communications, Inc. v. Iota, Inc.*, this court held that sanctions under Rule 37(d) are ordinarily warranted only where an aggrieved party has first moved for an order compelling discovery under Rule 37(a).[27] The facts of this case are exceptional for two reasons. First, because Beck and his counsel's

---

[26] *See Arbitrium*, 705 A.2d at 237 (justifying an award of attorneys' fees citing *Batson v. Neal Spelce Associates Inc.*, 805 F.2d 546, 551 (5th Cir. 1986) (plaintiff's withholding of documents necessary to defend against a claim for damages created a presumption that the damage claim was unfounded)).

[27] 1999 WL 66527 (Del. Ch. Jan. 19, 1999) (citing *Fitzgerald v. Cantor*, 1998 WL 409158 (Del. Ch. June 22, 1998) and *Andreson v. Bucalo*, 1982 WL 17824 (Del. Ch. Dec. 2, 1982)).

27

concealment of responsive documents was discovered by Atlantic Coast after all relevant documents had supposedly been produced, Atlantic Coast had no prior reason to move for compulsion. It is not as if Atlantic Coast was attempting to overcome an improper, but candidly raised objection to production. Second, because Atlantic Coast was clearly seeking an award of fees under the bad faith exception, it put the question of whether Beck and his counsel had honored their responsibilities to this court squarely before the court, citing the failure to produce the Optimizer Page as an example. For completeness, Atlantic Coast was given an opportunity to avail itself of Rule 37 to address this aspect of the bad faith conduct and Beck's counsel was given an opportunity to respond specifically. The use of Rule 37 is therefore entirely appropriate, especially given the strong policy interests protected by that rule.

Our Supreme Court in *Holt v. Holt* stressed the obligation of trial courts to diligently sanction discovery abuse, stating that "Discovery abuse has no place in our courts, and the protection of litigants, the public, and the bar demands nothing less than that our trial courts be diligent in promptly and effectively taking corrective action to 'secure the just, speedy and inexpensive determination of *every* proceeding' before them."[28] Here, both Beck and his counsel would have been content to allow Atlantic Coast and this court to proceed in ignorance of the plainly material information disclosed on Beck's Optimizer Page, working a stealthy spoliation of evidence and fraud by concealment. Such conduct is clearly

---

[28] 472 A.2d 820, 824 (Del. 1984) (citation omitted) (emphasis in original).

inappropriate, and must be remedied in a manner that will deter future misbehavior of this kind. Every reasonable effort must be made to ensure that conduct of this kind will not be repeated by this plaintiff or by any other. Rule 37 recognizes that the record before a court will only be adequate if clients and counsel responding to discovery requests produce all probative, non-privileged information that is subject to legitimate discovery requests.[29] That is, the integrity of the civil litigation process depends largely on a client and counsel living by an "honor code." As such, a strong sanction is warranted here.

### D. The Precise Remedy And Sanctions

By this conduct, and by other inexcusable behavior,[30] Beck and his counsel have taxed the resources of this court and plainly made this litigation excessively expensive for Atlantic Coast to defend. Under the bad faith exception to the American Rule, and under Rules 11 and 37, I will therefore enter an order requiring Beck and his lead counsel, Scott and Roth, and their law firm, Lukins & Annis, to pay $25,000 to Atlantic Coast. In order to be as fair as possible, I have set an amount that understates the excess cost incurred by Atlantic Coast as a result of Beck and his counsel's lack of candor. As of November 9, 2004, Atlantic Coast had expended more than $60,000 in fees and costs in litigating this case. I

---

[29] Del. Ch. Ct. R. 37(a)(3).

[30] To wit, 1) not informing the court promptly of Beck's refusal to communicate with them and of the evident need for the case to be dismissed; 2) dropping their request for injunctive relief in their proposed amended complaint after promising to do nothing that would divest this court of jurisdiction; and 3) wasting the time of court staff to equip a courtroom with specific audio-visual equipment.

have set the amount awarded on the charitable assumption that Atlantic Coast would have had to expend over half that amount trying to dismiss this case had Beck and his counsel acted candidly. I have also ignored the additional expenses Atlantic Coast has incurred since November 9, 2004.

Relatedly, I have decided not to hold Beck's Delaware counsel, William Sullivan, responsible for paying the award. Although I believe that Sullivan's performance as local counsel was far less than optimal, I cannot conclude from the record that he knew that Beck had not actually purchased Window Power Tools software or that he was aware of Beck's Optimizer Page or that it had not been produced. I trust that Sullivan will be more scrupulous in reviewing with lead counsel the factual background of pleadings and discovery responses in the future to ensure that they are accurate and complete.

Fee shifting towards Atlantic Coast is not, however, a sufficient remedy. The final judgment shall also dismiss this case against Atlantic Coast with prejudice as to Beck. Furthermore, Scott, Roth, and the law firm of Lukins & Annis shall be enjoined from filing, on behalf of any client, litigation against Atlantic Coast related to the Window Power Tools product, DMI, or Zafar. In this regard, it is troubling to note that after the supplemental submissions in this case, Scott left the firm of Lukins & Annis. He did not so inform the court, which once again learned of something it should have heard from Scott or his Delaware colleague, Sullivan, from counsel for Atlantic Coast instead. Equally troubling is the fact that the firm of Lukins & Annis still had a reference to this case soliciting

class members to come forward on its website as recently as January 18, 2005. Given the behavior of the lawyers at the Lukins & Annis firm, and my decision to err on the side of modest fee-shifting, it is reasonable that Atlantic Coast not have to suffer further suits brought at their instance. Individual plaintiffs are, of course, free to sue, just through other lawyers, of which there are many in this nation.

Finally, given the needless burden that the conduct of Beck, Scott, Roth, and the firm of Lukins & Annis have imposed on the court, it is appropriate that they should pay an award to the court of $2500. This award represents the cost of one day of the court's mediation services.[31] In reality, the conduct here resulted in several days of judicial and staff time that could have been devoted to handling other matters before the court. Because this payment is not enough to protect the interests of justice, in the future, any application by Scott or Roth, or by any lawyer at the firm of Lukins & Annis, for admission pro hac vice shall be accompanied by a copy of this decision.

## III. Conclusion

For the foregoing reasons, a final judgment shall be entered:  1) dismissing this action with prejudice as to plaintiff Beck; 2) enjoining Darrell W. Scott and Eric J. Roth, and the law firm of Lukins & Annis from participating as counsel or plaintiff in any suit against defendant Atlantic Coast relating to the Window Power Tools product, DMI, or Zafar; 3) requiring plaintiff Beck, Scott, Roth, and Lukins & Annis to be jointly and severally liable to pay Atlantic Coast and the Register In

---

[31] Del. Ch. Ct. R. 174.

Chancery the sums of $25,000 and $2500 respectively; and 4) requiring Scott, Roth, and any attorney Lukins & Annis to submit a copy of this decision with any motion for pro hac vice filed by any of them.  Counsel for Atlantic Coast shall prepare an implementing final judgment and submit it within ten days, upon notice as to form to Beck's counsel.  Beck shall bear each side's costs.