UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In Re: | Chapter 11 |
| W.R. GRACE & CO., et al., | NO. 01-01139-KJC |
| Debtors. | (Jointly Administered) |

## DECLARATION OF TERENCE R. WHITTEN

TERENCE R. WHITTEN, under penalty of perjury of the laws of the States

of Washington and Delaware, hereby declares the following to be true and correct:

1.      I am over the age of 18 years, and I am otherwise competent to make

this declaration, which is made of my own personal knowledge and belief.

2.      I was an attorney at the Spokane, Washington law firm of Lukins &

Annis, P.S. ("L&A"), for more than 30 years, from 1976 through my official

retirement from the firm in December 2013. For the vast majority of that time, I

was a principal and shareholder with L&A.  I am now fully retired, my

DECLARATION OF TERENCE R.
WHITTEN: 1

Washington State Bar license is on "inactive" status, and I am no longer involved –
financially or otherwise – in L&A. I have no financial interest in any potential fee
recovery that may result from L&A's current Motion.

3.       During my years at L&A, I also served as Managing Partner/Firm
President on a number of separate occasions. I would estimate my total time in
that capacity as approximately eight years.

4.       I worked with attorney Darrell Scott during his approximately 15
years as an attorney and principal/shareholder at L&A, and I served as Managing
Partner/Firm President at various points in his employment with L&A. Relevant
here, I was Firm President at the time of Mr. Scott's withdrawal from L&A
(December 2004), and in the time period directly following his departure. I am
familiar with Mr. Scott's law practice and billing practices while at L&A.

5.       While employed at L&A, Mr. Scott was primarily involved in class
action litigation, multi-district litigation, and other complex contingency fee work.
As is usually necessary for this type of practice, Mr. Scott's cases involved
significant and substantial use of L&A resources – both in terms of attorney and
staff time and costs. Nonetheless, Mr. Scott worked his cases with very little
information being supplied to L&A. As a general rule, Mr. Scott kept L&A
relatively uninformed about his cases until and unless it was time to allocate an

DECLARATION OF TERENCE R.
WHITTEN: 2

attorneys' fee award among attorneys on a given case. To a point, L&A went along with Mr. Scott's preferred approach because he was a principal and his contingency practice was – at times – profitable to L&A.

6.    Mr. Scott was the only attorney at L&A supervising and directing the type of class-based and complex litigation that was involved with the ZAI litigation. While Mr. Scott's class action and litigation practice utilized a large amount of associate and partner time, it was my experience that no other attorney or staff member – other than Mr. Scott and his paralegal Kristy Bergland – really had a full picture of what was going on with Mr. Scott's cases or was very involved with the strategy or settlement of his cases. Primarily, he used other L&A attorneys to perform certain tasks and to do necessary leg-work on these large cases, like traveling to sites, performing legal research, drafting briefs, and working with experts. All of this work was done under the direction and supervision of Mr. Scott and Ms. Bergland.

7.    Mr. Scott acted as the supervising and billing attorney on the cases he worked on while at L&A. It is the responsibility of the supervising and billing attorney to ensure that all work done on a case – contingency or otherwise – is reasonable and appropriate. While Mr. Scott was here, it was L&A's policy that billing records must be reviewed on a monthly basis, and that any unreasonable or

DECLARATION OF TERENCE R.
WHITTEN: 3

inappropriate time is removed.  This policy is particularly important in contingency fee cases, given the possibility of "overbilling" a non-hourly file.

8.      Mr. Scott has testified in his declaration that he did not engage in this monthly review of the time records involved in L&A's fee request on a monthly basis as part of L&A's standard practice, and that he has taken issue with a number of time entries.  If he did fail to review and appropriately monitor the time spent on these cases, it was contrary to L&A's policy.  Because he was the billing and supervising attorney for these cases during that time, the accuracy and reasonableness of the time was his responsibility.  No one else at L&A had the responsibility or knowledge to review and monitor the time on the ZAI litigation.

9.      While it was almost ten years ago, I recall that around December 1, 2004, Mr. Scott came to me without prior notice and told me that he was immediately leaving L&A (within two weeks).  At the time, L&A did not have a good understanding of the status of Mr. Scott's cases, based on his standard mode of operation.  As a result, it was necessary to meet with Mr. Scott and Ms. Bergland to get a handle on his case load and to basically rely totally on them for information about Mr. Scott's cases.

10.     From the beginning, it was clear that Mr. Scott fully intended to take certain cases with him and leaving certain cases with L&A.  From our early

DECLARATION OF TERENCE R. WHITTEN: 4

discussions, I took it as a "given" that Mr. Scott planned to take the ZAI

bankruptcy litigation and a few other cases. Our discussions over the next few

weeks dealt with the status of these cases and what Mr. Scott thought should be

done. From these discussions, I went to L&A's Board of Directors for it to

consider Mr. Scott's intention to take cases, like the ZAI litigation to his new firm.

11.    Before Mr. Scott left, L&A determined that without Mr. Scott and Ms.

Bergland, L&A did not have enough background and knowledge about the status

of the complex claims involved with the ZAI litigation to get up to speed on the

cases within two weeks, when Mr. Scott was leaving. If L&A had decided not to

transfer the cases, it would have had to very quickly jump in to litigation in which

it did not have any real involvement, absent Mr. Scott and his team. In the end,

L&A determined that it was in the clients' best interests to remain with its

experienced class action counsel and team.

12.    I can say that I do not recall ever being involved in any discussions

with the Board, nor do I recall ever telling Mr. Scott, that L&A believed the ZAI

litigation was too risky, was financially or legally unsound, was somehow

worthless, or that L&A did not want to invest any more time or money in to the

litigation. In fact, neither I nor L&A had the independent knowledge to make such

DECLARATION OF TERENCE R.
WHITTEN: 5

an assessment, and could only assess cases based on Mr. Scott's representations and the substantial amount of time that L&A had invested.

13.    The bottom line is that L&A's decision to transfer the ZAI litigation to Mr. Scott was made in accordance with what I believe was his desire and intent, and based upon what L&A believed was in the best interests of the clients at the time.

14.    It is my recollection that Mr. Scott stated that compensation to L&A for its time and costs on cases he was taking could not be decided at the time he was leaving, but that financial remuneration to L&A would be dealt with at a later time. Because L&A believed Mr. Scott, and because Mr. Scott's transition was initially cordial and professional under the circumstances, L&A consented to the informal arrangement. At no time did Mr. Scott indicate to me that L&A was abandoning any claim of recovering its fees by transferring the case to him. To the contrary, we continued to try to work out the specific financial details of any fee split prior to his departure and after he left. Attached hereto as **Exhibit A** are (redacted) L&A Board Meeting notes reflecting the fact that L&A was engaging in ongoing discussions with Mr. Scott regarding the allocation of any eventual attorney fee recovery in the cases he took with him.

DECLARATION OF TERENCE R.
WHITTEN: 6

15.    L&A had no intention of "abandoning" its right to recover for the substantial hours and costs invested in these cases and, instead, was attempting to do what was best for the clients while still protecting its interests with hopes of an agreement on a fair allocation.

16.    After Mr. Scott left L&A, in February 2005, L&A received a copy of an order indicating that Mr. Scott had been sanctioned (and subjected L&A to sanctions) in one of his class action lawsuits, and that the hearing had occurred immediately prior to Mr. Scott's announcement of his departure to start a new firm. Mr. Scott had mentioned the sanctions issue in passing when he notified me of his departure, but did not provide L&A with any details. As part of the sanctions against Mr. Scott, he and L&A were made jointly liable for a $25,000.00 award to the Defendants. I am aware that L&A ultimately paid the fine. Although I was not directly involved, I am also aware that L&A was able to have the remaining sanctions removed as to L&A.

17.    Although Mr. Scott appears to make it look like L&A dumped the cases that L&A did not want to keep for financial reasons on Mr. Scott that simply is not true. He desired to take cases he deemed financially viable (at least one of which turned out successfully and resulted in a different fee dispute with L&A) and left a number of financially unviable cases with L&A, which L&A was forced

DECLARATION OF TERENCE R.
WHITTEN:  7

to "clean up." Had Mr. Scott truly believed that the ZAI litigation was not a sound financial investment, I firmly believe that he would have left it for L&A to deal with.

18.    I did not draft the notices that went out to the class regarding Mr. Scott's departure from L&A. Also, contrary to Mr. Scott's statements, I did not make the handwritten notes on Exhibit H to his Declaration, which is a draft of those notices. I have not written in cursive handwriting since the 1970s, and those are not my notes. My handwriting (which is distinctly different) can be see in Exhibit F to his Declaration. While I did not draft the notices, I know that L&A's intent with the notices to the class was to convey that Mr. Scott, who had been their attorney all along, would continue to be their attorney at his new firm. To my knowledge, all clients elected to go with Mr. Scott.

19.    L&A similarly did not prepare the Notice of Withdrawal at Exhibit J to Mr. Scott's Declaration. Someone at Mr. Scott's new firm prepared it. I recall that there was a push by Mr. Scott to get L&A to sign the withdrawal. Ms. Bergland called and followed-up with me on a number of occasions in order to make sure that the transfer occurred quickly.

DECLARATION OF TERENCE R.
WHITTEN: 8

Dated at Spokane, Washington this /2 day of May, 2014.

Terence R. Whitten

DECLARATION OF TERENCE R.
WHITTEN: 9