## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., *et al.* | ) | Case No. 01-1139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | Relates to Document No. 31986 |
| | ) | |
| _____ | ) | |

## RULE 706 EXPERT REPORT OF JUDITH K. FITZGERALD

Judith K. Fitzgerald, Esquire
TUCKER ARENSBERG, P.C.
1500 One PPG Place
Pittsburgh, Pennsylvania 15222
Phone: (412) 594-3933
Email: jfitzgerald@tuckerlaw.com

## EXPERT REPORT OF JUDITH K. FITZGERALD

**Part I.  Qualifications and Background**

**A.  Qualifications**

My Curriculum Vitae is attached hereto and incorporated herein by reference as Exhibit 1.  I will confine this portion of my report to be a brief summary of my qualifications.

I was first admitted to the practice of law in 1973.  I took the oath of office as a United States Bankruptcy Judge on October 30, 1987.  I sat in the Western District of Pennsylvania for over 25 years and during that time, also sat by designation in the District of Delaware for 20 years, in the Eastern District of Pennsylvania for 8 years and in the United States Virgin Islands for 9 years.  My experience on the bench encompassed business and individual reorganization cases in chapter 11, individual and business cases in chapter 7, individual cases in chapter 13, and family farmer cases in chapter 12.  In chapter 11 cases, I dealt with pre-packaged and pre-negotiated plans as well as cases which did not utilize those techniques.  I adjudicated hundreds of chapter 11 cases through plan confirmation, including cases that involved certification of class actions and appointment of class counsel.  I also adjudicated thousands of fee applications and resolved disputes over fee allocations.

During my tenure as a United States Bankruptcy Judge, I adjudicated more asbestos mass tort bankruptcies than any other bankruptcy judge in the country, including several of the largest asbestos-driven bankruptcy cases in history.[1]  As a result, I am familiar with fee applications filed in those cases.  I presided over *W.R. Grace & Co., et al*, Jointly Administered at 01-1139 (KJC) ("*W.R. Grace*") and the ZAI litigation encompassed therein prior to my retirement on May 31, 2013.  The parties to the dispute pending before the court (the "Allocation Dispute") regarding whether fees and/or expenses should be allocated to the Lukins & Annis, P.S. law firm ("L&A") are aware of that fact, have requested my involvement as an expert witness in the pending

---

[1] I presided over the following mass tort asbestos bankruptcy cases (including hundreds of affiliated cases): A.P. Green Industries, Inc.; ABB Lummus Global Inc.; ACandS, Inc.; Armstrong World Industries, Inc.; Combustion Engineering, Inc.; DI Distributors, Inc.; DII Industries, LLC (Dresser Industries/Halliburton); Federal Mogul Corp.; The Flintkote Company; Flintkote Mines Limited; Global Industrial Technologies; H.K. Porter Company Inc. (post-confirmation); Harbison-Walker International Refractories, Inc.; Kaiser Aluminum Corporation; Mid-Valley, Inc.; North American Refractories Company (NARCO); Owens Corning; Pittsburgh Corning Corporation; Swan Transportation Co.; T&N Limited; United States Mineral Products; USG Corporation; and W.R. Grace & Co.

allocation issue and have waived any conflict based on my prior status as the presiding judge in the bankruptcy case.

Before I became a bankruptcy judge, I served as a law clerk and then accepted a position as an Assistant United States Attorney for the Western District of Pennsylvania. In that capacity, I actively litigated civil, criminal and bankruptcy cases and argued cases on appeal to the United States Court of Appeals for the Third Circuit. I resigned from that position after nearly 12 years, in order to take the oath of office.

I retired from my position as a United States Bankruptcy Judge on May 31, 2013. I accepted an offer as a tenured faculty member at Indiana Tech Law School, effective July 8, 2013. I teach Contracts, Commercial Transactions and Bankruptcy there. I also have been an Adjunct Professor at the University of Pittsburgh School of Law for many years, where I teach Bankruptcy and Advanced Bankruptcy classes. On December 1, 2013, I affiliated as Of Counsel with the Pittsburgh office of the law firm Tucker Arensberg, PC. I have accepted engagements as an expert witness in a bankruptcy malpractice dispute and in a re-insurance dispute. I have served as a court-appointed mediator and as the receiver *pendente lite* and liquidating receiver for a cultural center.

As a result of my experience handling bankruptcy cases and my tenure on the bench, my teaching law school classes and re-entering the practice of law, I am familiar with the chapter 11 bankruptcy process and with standards applicable to awarding fees.

## B.  Compensation

My compensation for this matter is $550 per hour, subject to periodic adjustments, plus expenses.

## C.  Material Reviewed

The factual premise on which my conclusions are based is found in the record of the chapter 11 bankruptcy proceedings of *W.R. Grace* and the submissions of the parties. A list of all documents I reviewed is attached hereto as Exhibit 2.

BANK_FIN:483739-2: 029711-164777

### D.  Scope of Engagement

I was appointed to serve as a Rule 706 expert regarding the Allocation Dispute by Order dated April 3, 2014 (the Honorable Kevin J. Carey). (D.I. 31986).[2]  My assignment is to "issue a report and recommendation, (the "Report"), with respect to the Lukins & Annis motion for fees and costs." *Id.* at paragraph 1.  I was provided with "sole discretion to determine the manner, timing and scope of the presentation of (i) evidence and any other submissions . . . with respect to the Allocation Dispute, or (ii) any discovery dispute among the parties." *Id.* at paragraph 6.  The Bankruptcy Court has already awarded a total fee of $16,000,000 as a common fund fee. *See* Order Granting Motion of ZAI Class Counsel for a Common Fund Fee Award, April 3, 2014. (D.I. 31985).  At issue is the allocation of that award.

### E.  Summary of Opinions

My opinions in this matter are summarized as follows:

1.      L&A did not withdraw from the case "voluntarily" as that term has been explained in applicable case law.

2.      L&A absorbed the risk of the state court *Barbanti* litigation, which indirectly led to the ZAI class settlement, and is entitled to a nominal fee but not to reimbursement of expenses.

3.      L&A's efforts contributed an indirect benefit to the ZAI class.

4.      Although Class Counsels' allocation of the $16,000,000 fee is entitled to great weight, L&A has established an entitlement to a nominal share and, accordingly, Class Counsels' proposed allocation should be adjusted to provide for such share.

5.      Alternatively, if the Court finds that L&A's services did not provide a benefit to the ZAI class sufficient to entitle L&A to an allocation of the Common Fund Fee then, similarly, this Court should find that neither McGarvey nor Ness provided a sufficient benefit to the ZAI class to be entitled to a fee.

6.      From the submissions of the parties and review of applicable law, the Court should award Lukins & Annis, P.S., ten percent (10%) of Darrell Scott's share of the Common Fund Fee, in the amount of $675,000.

---

[2] I will refer to pleadings filed in *W.R. Grace* by the appropriate Docket Index (D.I. number).

**Part II:  Overview of the Fee Allocation Dispute**

### A. The Major Participants

The major participants in this dispute are:

1.      The Movant, Lukins & Annis, P.S. ("L&A");

2.      The Reorganized Debtors, collectively referred to as W.R. Grace;

3.      Darrell W. Scott, formerly of the L&A firm and now of the Scott Law Group ("Scott"), one of the ZAI Class Counsel;

4.      Elizabeth Cabraser of Lieff, Cabraser, Heimann & Bernstein, L.L.P. ("Cabraser"), one of the ZAI Class Counsel;

5.      Edward J. Westbrook of Richardson, Patrick, Westbrook & Brickman, LLC ("Westbrook"), one of the ZAI Class Counsel;

6.      Ness Motley ("Ness");

7.      McGarvey Heberling ("McGarvey");

8.      Alan B. Rich, as counsel to Judge Alexander M. Sanders, Jr., the Legal Representative for Future Asbestos-Related Property Damage Claimants and Holders of Demands; and

9.      M. Dawes Cook, Jr., as counsel to Edward B. Cottingham, Jr., the ZAI (Class 7B) Trustee for the Asbestos Property Damage Trust.

In addition, declarations, affidavits and other information were provided by

1.      Terrence R. Whitten, formerly Managing Partner and Firm President of L&A;

2.      Jed W. Morris, an attorney at L&A;

3.      Kristy L. Bergland, lead paralegal at The Scott Law Group, P.S., formerly litigation paralegal at L&A;

4.      Darrell W. Scott, one of the ZAI Class Counsel and formerly a shareholder at L&A;

5.      David M. Fournier, Counsel for L&A;

6.      Edward J. Westbrook, one of the ZAI Class Counsel; and

7.      Laura J. Black, an attorney at L&A.

### B. Factual Background

Although the parties raise several legal issues, the primary factual background is not in dispute.  Prior to W.R. Grace filing its bankruptcy petition, Darrell Scott was a partner at L&A.

BANK_FIN:483739-2: 029711-164777

During that time, and before W.R. Grace filed its bankruptcy, Darrell Scott was lead counsel at L&A working on litigation that was on-going in the State of Washington, known as the Barbanti case. The law suit involved a request to certify a state court class in a case styled "*Barbanti v. W.R. Grace & Co.,* Case No. 00-2-01756-6 (Super. Ct. Wash.) ("*Barbanti*"), and sought primarily equitable relief for all owners or occupiers of real property located in the state of Washington in which Zonolite Attic Insulation ("ZAI")[3] has been installed." *See Barbanti* (Dec. 20, 2000), quoted in the Reorganized Debtors' Response to the Motion of Lukins & Annis, P.S. for an Allocation of the ZAI Class Action Common Fund Fee Award (D.I. 32058 at Paragraph 6.) The class was certified in December, 2000, four months prior to W.R. Grace's bankruptcy filing. Upon the bankruptcy filing, further state court action was stayed by operation of the automatic stay. 11 U.S.C. § 362.

Litigation over the potential disease-causing potency of ZAI also began in the bankruptcy case and consumed substantial time and resources from 2002 through a hearing on cross motions for summary judgment in October, 2004. The same Barbanti who was a named plaintiff in the state court action was a named party in the bankruptcy law suit.[4] In December, 2004, Scott left L&A and began his own firm, the Scott Law Group. A Notice of Withdrawal was filed for L&A substituting the Scott Law Group as counsel for the ZAI bankruptcy litigation (D.I. 7641).[5] L&A continued to be involved in the bankruptcy, essentially monitoring the case, but not as class counsel for the ZAI claimants. After the December 14, 2006 decision ruling against the ZAI

---

[3] Zonolite Attic Insulation ("ZAI") is expanded vermiculite formerly sold by W.R. Grace and predecessor companies under several trade names. The ZAI claimants alleged that ZAI can release asbestos fibers into the home environment, contaminating the structure and posing a health risk to occupants. *See* Notice of Class Certification and Proposed Settlement with W.R. Grace & Co. and Affiliated Debtors, D.I. 31718-5, paragraph 3.

[4] The process utilized was opposing motions for summary judgment regarding the threshold issue of whether the presence of ZAI in the home created an unreasonable risk of harm. *See* D.I. 4007, 4009 and 4018.

[5] Although not in dispute, it appears from the record that Scott complied with the Washington Rule of Professional Conduct 1.16(c) which requires a lawyer to provide notice when terminating a representation and to take steps to the extent reasonably practicable to protect a client's interest. Moreover, although not directly applicable here, Scott complied with Rule 71 of the Washington State Rules of Civil Procedure which requires an attorney who is withdrawing to be substituted by a new attorney and to file a Notice of Withdrawal and Substitution. The Rule indicates that the notice should include a statement of the date on which the withdrawal and substitution are effective and the name, address, Washington State Bar Association membership number and signature of both attorneys.

parties was announced[6] the parties continued to negotiate a consensual resolution of the ZAI claims.[7]

Scott, Westbrook and Cabraser were appointed as class counsel (collectively, "Class Counsel")(D.I. 20535; 31718-6, Attachment 17). Class Counsel ultimately achieved a settlement for the ZAI class ("Settlement") and participated in the negotiation and crafting of all of the relevant documents necessary to carry out the Settlement, including distribution procedures (the "ZAI TDP"), certain inter-creditor trust agreements and guarantee agreements.[8] The parties agree that only Class Counsel were involved directly in achieving the Settlement although, according to Westbrook, Joe Rice of Ness (a representative of the asbestos personal injury committee) was instrumental in setting up the meetings that ultimately led to the Settlement.[9] Neither McGarvey nor L&A directly participated in the Settlement.

On December 15, 2008, a Motion to Approve Class Settlement and Certification of the ZAI class was filed seeking court approval of the Settlement between the Debtors and the ZAI parties (the "Motion to Approve Settlement")(D.I. 20275). The ZAI parties consisted of a nation-wide opt-out settlement class of homeowners in the U.S. who had filed proofs of claim regarding ZAI in their homes. The motion was preliminarily granted on January 16, 2009 (D.I. 20535; 31718-6, Attachment 17) and finally approved on April 1, 2009. (D.I. 21174; 31718-6, Attachment 18).

The Settlement related to property damage and not to personal injury claims and was contingent on confirmation of a plan that contained a trust (the "ZAI Trust") with distribution procedures (that is, the ZAI TDP) that would effectuate the Settlement. The ZAI Trust would be

---

[6] *See* Memorandum Opinion, D.I. 14014.
[7] During the bankruptcy, on March 18, 2008, a motion was filed to recognize and permit the filing of a class proof of claim (D.I. 18323, 31718-6, Attachment 21), but that motion was never adjudicated. However, the Court set a bar date for individual ZAI claims of October 31, 2008, by Order dated June 17, 2008. (D.I. 18934).
[8] There will be additional legal work to be done on behalf of the ZAI Trust and class counsel has agreed to undertake that work until January, 2015, without additional fees. (D.I. 31718, P. 11). Nothing in the papers submitted by the parties indicates what fee, if any, will be sought after January, 2015.
[9] According to paragraph 7 of Edward J. Westbrook's Declaration in Support of the Class' Motion for Preliminary Approval of the Settlement (D.I. 20276), a representative of the personal injury interests arranged the initial meeting and other representatives of those interests also participated in meetings. None of the representatives are identified in the Declaration. However, by letter dated May 28, 2014, which was emailed to me to address questions that I asked during a status conference call, Mr. Westbrook identified Mr. Rice as the representative who initially contacted Mr. Westbrook to arrange the discussions that led to the Settlement.

implemented through a U.S. ZAI claims facility. The Settlement involved creation of a Common Class Fund for the benefit of class members.

On April 1, 2009, the Court approved the Settlement (D.I. 21174).[10]  Debtor's Plan took effect on February 3, 2014.  On February 7, 2014, Class Counsel filed a motion seeking a Common Fund Fee Award of 25 percent of the first two payments[11] in the class settlement.  The fee totaled approximately $16,000,000 (the "Fee Award")(D.I. 31718).  On February 28, 2014, L&A filed a partial joinder to the Motion of ZAI Class Counsel for a Common Fund Fee Award, and Counter-Motion to Stay Disbursement of any Common Fund Fee Award Pending Resolution of All Common Fund Fee Allocation Disputes (the "Joinder and Counter-Motion")(D.I. 31794).  The Joinder and Counter-Motion stated L&A's consent to the Motion approving Fee Award but noted an objection to the disbursement of attorney's fees pending resolution of the fee allocation among those claiming an interest therein.  On April 3, 2014, the Court entered an Order approving the Fee Award and reimbursement of Class Counsels' expenses from the fund created by the Settlement (the "Order Approving the Fee Award")(D.I. 31985).  On the same date, the Court entered an Order (the "Rule 706 Order"), appointing me as a Rule 706 Expert to issue a report and recommendation (the "Report") with respect to a request by L&A to recover fees and costs from the Fee Award.

The Order Approving the Fee Award provides that pending further order regarding the L&A claim for a fee allocation and award of costs, the Common Fund Fee Award will be held in trust by the ZAI Trustee, with any interest earned credited to the fee award.  Class Counsel propose to pay the three law firms involved in achieving the Settlement.[12]  Class Counsels' proposed allocation of the Fee Award is as follows:

---

[10]L&A filed a Limited Objection to the Motion to Approve Settlement (the "Limited Objection")(D.I. 20383), in which L&A supported the Settlement while reserving its right to claim a fair allocation from the Common Class Fund.  L&A objected on a limited basis to the extent that the Motion to Approve Settlement (1) could be seen as seeking preliminary approval of entitlement to fees and costs for legal work benefitting the class of ZAI claimants, (2) to the extent L&A and Scott had an agreement to share fees for L&A's work during Scott's employment with L&A, and (3) L&A's subsequent and continued representation of members of the ZAI class).

[11]Twelve payments could potentially be made, depending on the extent to which funds from the first two payments are insufficient to deal with the claims addressed by the Settlement.

[12] Additional fee sharing arrangements have been reached.  Despite the requirement in Federal Rule of Bankruptcy Procedure 2016(a) that fee sharing arrangements must be set forth in an application for compensation, a search of the docket did not disclose such an application regarding either the law firm of McGarvey Heberling ("McGarvey") or Ness Motley ("Ness").  Nonetheless, Class Counsel have stated that

(1)     Scott will receive 42.5 percent of the Fee Award (approximately $6,675,000);

(2)     Westbrook will receive 42.5 percent of the Fee Award (approximately $6,675,000);

(3)     Cabraser will receive 15 percent of the Fee Award (approximately $2,400,000);

(4)     McGarvey will receive $250,000 from the Fee Award;

(5)     Ness will receive 10 percent of Westbrook's allocation of the Fee Award (approximately $667,500); and

(6)     L&A will receive nothing.

L&A proposes an entirely different allocation, as follows:

(1) Scott will receive $4,000,000 of the Fee Award;

(2) Westbrook will receive $4,000,000 of the Fee Award;

(3) Cabraser will receive $2,720,000 of the Fee Award;

(4) McGarvey will receive $480,000 of the Fee Award;

---

they reached such an agreement with McGarvey, which would be paid $250,000 from the $16,000,000 and with Ness, which would receive 10% ($667,500) of Westbrook's allocation. In the event that the Court determines that L&A is entitled to a fee, Class Counsel have agreed that it would be paid from Scott's proposed 42.5% share of the total fee award.  Neither McGarvey nor Ness have filed fee applications but they have submitted time records.  L&A filed its Final Application as ZAI Additional Special Counsel for the period July 21, 2002 to December 14, 2004 on May 5, 2014 at D.I. 32139.  A hearing is scheduled for October 14, 2014 with objections due July 7, 2014.  L&A has not filed any other fee applications but has submitted cost sheets (D.I. 31794, Exhibit A1-A3), and requested an allocation from the total pool.  (D.I 31794)  Moreover, 11 U.S.C.§ 330 provides in relevant part that after notice to parties in interest and the United States Trustee and a hearing, the court may award a professional person reasonable compensation for actual, necessary services rendered and reimbursement for actual, necessary expenses. Section 330 is to be read in conjunction with Federal Rule of Bankruptcy Procedure  2016 that requires an entity seeking interim or final compensation for services, or reimbursement of necessary expenses, from the estate file an application.  With the exception of Class Counsel, none of the other parties requesting an allocation (or proposed by Class Counsel or by L&A to receive an allocation) have submitted fee applications or articulated to this Court (other than identifying "a representative of the personal injury interests" who assisted in commencing the initial settlement discussions, now identified as Mr. Rice of Ness) the benefit provided to the Class that would entitle said party to an allocation.  The Court could direct the parties to file fee applications, if needed, to assist in identifying the specific benefit each party provided to the Class. At this point in the bankruptcy case, Class Counsel have articulated the benefit, in essence, as follows: regarding Ness as encompassing the service Mr. Rice provided in moving the process toward settlement and regarding McGarvey as having not abandoned clients during the bankruptcy and having aided in the early stages of the bankruptcy.

BANK_FIN:483739-2: 029711-164777

(5) Ness will receive $800,000 of the Fee Award; and

(6) L&A will receive $4,000,000 of the Fee Award.

L&A filed a motion for an allocation of the Common Fund Fee (D.I. 32034). Responses to L&A's motion for an allocation were filed by ZAI Class Counsel (D.I. 32063), the Reorganized Debtor (D.I. 32058)(objecting to any reimbursement of expenses), the ZAI Class 7B Trustee (D.I. 32061)(objecting to any payment from the Common Fee Fund because L&A did not help create the Fund or from the Trust corpus so as to preserve those assets for the beneficiaries of the Trust), and the Property Damage Future Claims Representative ("FCR")(D.I. 32062)(objecting to any payment based on L&A's lack of involvement in the bankruptcy on behalf of ZAI claimants after the science trial). L&A filed a reply brief (D.I. 32181). In addition to the docketed pleadings and briefs, at my request, supplemental information was sent to me by David M. Fournier, L&A's Counsel (letter dated June 3, 2014), the Scott Law Group (Declaration of Kristy L. Bergland dated June 2, 2014), and Edward J. Westbrook (letter dated May 28, 2014). Copies of the three supplements are attached to this Report.

The amount of the Fee Award is not in dispute and, accordingly, this Report will focus only on its allocation. In particular, the Report will address whether Class Counsels' proposal is appropriate although it provides no allocation to L&A, whether L&A's proposal is appropriate in substantially modifying Class Counsels' proposal, and whether a modified allocation of Class Counsels' proposal should be considered and approved by the Court. The recommendation will suggest that the Court utilize the proposal of Class Counsel with a modification as more fully addressed, *infra.*

BANK_FIN:483739-2: 029711-164777

**Standards Applicable to the Allocation of the Fee Award Among Counsel:**

The common fund doctrine has been called "equitable and flexible." *In re Enron Corp. Securities, Derivative & "ERISA" Litigation,* 2008 WL 2714176 at *9 (S.D.Tex., July 10, 2008)(not published in the Federal Reporters). Federal law permits courts to apply the percentage-of-recovery method in class actions where attorney's fees flow from a "common fund" shared by plaintiffs. *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 732 (3d Cir.2001)(percentage-of-recovery method is generally favored in cases involving a common fund, and is designed to allow courts to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure *(quoting In re Prudential*, 148 F.3d 283, 333 (3d Cir.1998))). Although a court may consider the lodestar method rather than the percentage of recovery method, the ultimate choice of methodology rests with the court's discretion. *See Dewey v. Volkswagen Aktiengesellschaft,* --- F.App'x. ----, 2014 WL 542224 at *3 (3d. Cir. 2014) (not published in the Federal Reporters)(affirming application of percentage of recovery method rather than lodestar under both federal and New Jersey law when approving settlement of class action involving automobiles with sun roofs that allegedly leaked).

In this case, the parties suggest application of the percentage of recovery method to the allocation. Given the long history of this litigation and the prior Order of this Court setting the total amount of the allowed fee, that method is appropriate.

Class Counsels' allocation of a common fund fee award to non-class counsel is entitled to judicial deference. *See, Milliron v. T-Mobile USA, Inc.,* 423 F.App'x 131, 134 (3d Cir. 2011).  To overcome Class Counsels' allocation, non-class counsel must show that "their work conferred a benefit on the class beyond that conferred by class counsel." *In re Cendant Corp. Securities Lit.*, 404 F.3d 173, 191 (3d Cir. 2005)("*Cendant*").  The focus of the inquiry is the benefit that non-class counsel's independent work provided the class.[13]

In a class action settlement, under Federal Rule of Civil Procedure 23, the court has an independent duty to the class and the public to ensure that attorney's fees are reasonable and

---

[13]  The Third Circuit opined: "If a hundred lawyers each perform admirable but identical work on behalf of a class before the appointment of the lead plaintiff, the court should not award fees to each of the lawyers, as this would overincentivize [*sic*] duplicative work. Instead, while all of lead counsel's work will likely be compensable, ... other attorneys who merely duplicated that work—however noble their intentions, however diligent their efforts, and however outstanding their product—will not be entitled to compensation. Only those who confer an independent benefit upon the class will merit compensation." *Cendant,* 404 F.3d at 197.

BANK_FIN:483739-2: 029711-164777

divided fairly among plaintiffs' counsel. *Drazin v. Horizon Blue Cross Blue Shield of New Jersey, Inc.*, 528 Fed.Appx. 211, 214 (3d Cir. 2014).   A proper allocation should reflect the relative contribution that the various plaintiffs' firms made to the successful outcome of the litigation. *Id.*

The common fund doctrine on which the Fee Award is based reflects the traditional practice in courts of equity and rests on the perception that those who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense. "Jurisdiction over the fund involved in the litigation allows a court to prevent this inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionately among those benefited by the suit." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S. Ct. 745, 749 (1980).

In dispute is not how large a fee to award or whether the totality of the awarded fee is reasonable, but which counsel have properly earned fees for their efforts in reaching the ultimate class settlement. Courts generally prefer to leave the allocation of a common fund fee award to class counsel, *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 357 (N.D.Ga.1993), as class counsel are generally in a better position to evaluate the weight and merit of each other's contribution to the case.   However, the Court has a responsibility to closely scrutinize the attorneys' fee allocation. *Evans v. TIN, Inc.*, 2013 WL 4501061, at *16 (E.D.La. Aug. 21, 2013). *See also*; *Rossi v. Proctor & Gamble Co.*, 2013 WL 5523098 at * 9 (D.N.J., Oct. 3, 2013)(not published in the Federal Reporters)("If money paid to the attorneys comes from a common fund, and is therefore money taken from the class, then the Court must carefully review the award to protect the interests of the absent class members. *See, e.g., In re Rite Aid Corp. Secs. Litig.*, 396 F.3d 294, 301 (3d Cir.2005)(articulating seven factors a district court should consider when analyzing a fee award in a common fund case and noting that 'notwithstanding our deferential standard of review of fee determinations, we have required district courts to clearly set forth their reasoning for fee awards so that we will have a sufficient basis to review for abuse of discretion.')").

In that same vein, the Court has discretion to award reasonable expenses to class counsel whose efforts benefit the class in common fund cases. *See Serrano v. Sterling Testing Sys. Inc.*, 711 F.Supp. 2d 402, 423-24 (E.D. Pa 2010).   Under the Federal Rules of Civil Procedure,

BANK_FIN:483739-2: 029711-164777

incorporated into bankruptcy as Federal Rule of Bankruptcy Procedure 7023[14]"[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h).  However, any claim for an award of attorney's fees and nontaxable costs must be made by motion. Fed. R. Civ. P. 23(h)(1); 54(d)(2)(A).

Courts make a distinction in their review of fees between the allocation of the common fund to class counsel and to non-lead counsel, reviewing the latter with a presumption of correctness afforded to lead plaintiff's decision.  As noted, class counsel's allocation of common fund fee awards to non-class counsel is generally entitled to judicial deference.[15] *See, Milliron v. T-Mobile USA, Inc., supra,* 423 F.App'x at 134 ("Generally, a district court may rely on lead counsel to distribute attorneys' fees among those involved, but we have recognized that the court may take a greater role when separate counsel requests fees for work performed prior to the appointment of the lead plaintiff.)(citation omitted). In deciding how to allocate fees, '[w]hat is important is that the district court evaluate what class counsel actually did and how it benefited the class. *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 342 (3d Cir.1998). When awarding fees to non-lead counsel, [o]nly work that actually confers a benefit on the class will be compensable.'" *Cendant, supra,* 404 F.3d at 197.

---

[14] Federal Rule of Bankruptcy Procedure 7023 incorporates Federal Rule of Civil Procedure 23 into adversary proceedings.  The ZAI Class was certified pursuant to a contested matter, rather than an adversary proceeding.  Without bankruptcy rules that specifically address the procedure that was employed in this case, I am of the view that following the applicable Rules of Civil Procedure is the appropriate path.

[15] *See also In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products Liability Litigation: BROWN v. AMERICAN HOME PRODUCTS CORPORATION,* 2002 WL 32154197 at *22-23 (E.D.Pa., Oct. 3, 2002)("There is ample authority for a court making an award of attorneys' fees out of a common fund to permit lead counsel to allocate fees among all counsel entitled to share in the award. *Bowling v. Pfizer, Inc.,* 102 F.3d 777, 781 (6th Cir. 1996); *Longden v. Sunderman,* 979 F.2d 1095, 1101 (5th Cir. 1992); *In re Conley Pharm., Inc.,* 50 F. Supp. 2d 1141, 1148 (D. Wyo. 1999); *In re Indigo Sec. Litig.,* 995 F. Supp. 233, 235 (D. Mass. 1998).   Such a procedure makes sense because it relieves the court of the "difficult task of assessing counsels' relative contributions," *In re Prudential Ins. Co.* of *Am. Sales Practices Litig.,* 148 F.3d 283, 329 n.96 (3d Cir. 1988).   Moreover, lead/class counsel are generally "better able to decide the weight and merit of each other's contributions." (citation omitted).   As one court pointed out when dealing with a situation similar to the one before the Court: "[I]t is recognized that the allocation among counsel must depend at least in part upon the more subjective factors of the relative contributions of the attorneys to the group effort. In the context of this litigation, which has extended over an eight-year period, it is virtually impossible for the Court to determine as accurately as can the attorneys themselves the internal distribution of work, responsibility and risk."*In re Ampicillin Antitrust Litig.,* 81 F.R.D. 395, 400 (D.D.C, 1978).")

The Court of Appeals has recognized that non-class counsel may be entitled to fees.  "The [common-fund] doctrine provides that a private plaintiff, or plaintiff's attorney, whose efforts create, discover, increase, or preserve a fund to which others also have a claim, is entitled to recover from the fund the costs of his litigation, including attorneys' fees. *Cendant*, supra, 404 F.3d at 187.  *Cf.  Boyd v. Coventry Health Care Inc.*, --- F.R.D. ----, 2014 WL 359567 at *16  (D.Md. Jan. 31, 2014)(awarding incentive payments to class plaintiffs for the considerable time spent over four years reviewing the relevant documents, providing extensive information and materials to class counsel, responding to document requests, staying apprised of developments in the case and reviewing and ultimately approving the terms of the settlement).

 However, to overcome class counsel's allocation, "non-class counsel must demonstrate a benefit to the class *beyond* that conferred by lead counsel." *Cendant*, *supra,* 404 F.3d at 191.[16]  As the Court of Appeals noted:

> [t]he mere fact that a non-designated counsel worked diligently and competently with the goal of benefiting the class is *not* sufficient to merit compensation. Instead, only attorneys 'whose efforts create, discover, increase, or preserve' the class's ultimate recovery will merit compensation from that recovery. (*citation omitted*). To the extent that the Tenth Circuit's pre-PSLRA decision in *Gottlieb v. Barry*, 43 F.3d 474 (10th Cir.1994), is in tension with this holding, we reject Gottlieb's suggestion that duplicative but useful work will always be compensable, and that 'the quality of the attorneys' legal services' will be somehow dispositive. . . .

*Cendant*, *supra,* 404 F.3d at 197.

Thus the focus of the inquiry is on the benefit that non-class counsel's independent work provided the class, not merely the hours that attorney or firm expended. *Milliron, supra,* 423 F.App'x at 135.  In essence, there is a deference to the allocation suggested by class counsel when the issue is who to pay and how much to pay for work performed after the class has been certified. However, where the fee request is for work performed *before* the appointment of lead plaintiff, the court's involvement in a fee decision will be at its highest:

---

[16] *Cendant* involved a Private Securities Litigation Reform Act ("PSLRA") claim.  The  PSLRA vests authority over counsel selection and compensation in the lead plaintiff, not in the court,  and  the analysis of the type of work done by a law firm that was not selected to be lead counsel must be considered in light of the securities fraud nature of the action.  Nonetheless, the analysis of what attributes may constitute a benefit to the class is useful in the context of the instant dispute.

> [T]he common fund doctrine survives most robustly in the period running from the accrual of the cause of action to the appointment of lead plaintiff. This period can be of significant importance: before lead plaintiff is appointed, counsel may discover possible fraud at the issuer, investigate that possible fraud, determine whether it warrants filing of a complaint, make strategic decisions about the form and content of the complaint, draft the complaint, file it, issue notice to class members, and navigate the PSLRA's lead-plaintiff selection procedures. These actions will often constitute a considerable fraction of the work that goes into the litigation.

*Cendant*, *supra,* at 193-94.

Here, the allocation proposed by Class Counsel is divided among five firms, with a sixth firm, L&A, now requesting a portion of that allocation for work primarily performed prior to appointment of class counsel. After a review of the case law and all the materials and documents provided by the parties, I am of the opinion that L&A has established that its work, pre-petition, provided a benefit to the eventual class through the Settlement, and thus, L&A has rebutted the deference to be accorded to Class Counsels' decision not to compensate L&A for work performed prior to the appointment of Class Counsel. However, L&A's suggested allocation is out of proportion to the actual benefit conferred on the ZAI Class by L&A and L&A has not rebutted the deference to be accorded Class Counsels' proposed allocation as to anyone other than L&A. Thus, I recommend that the Court accord the proposal of Class Counsel deference but modify it to provide a share of Scott's proposed distribution to L&A.

L&A has established that the proposed allocation is inequitable in that it allocates fees to law firms which had little or nothing to do with the Settlement *per se*, yet fails to reflect the relative contribution that the L&A firm made to the successful resolution of the ZAI claims. In that respect, the proposed allocation is not in accord with equity principles that govern common fund fee allocations. Although merely accepting a client and filing a lawsuit, without more, is not sufficient to confer a benefit, L&A was more involved with the ZAI claims. L&A was counsel for over five years, --from the time Barbanti came to the firm until Scott left. A material factor weighing in favor of an allocation to L&A is the benefit L&A's legal services had on the ultimate momentum of the case through advancing costs, investigating the case, instituting the state court action, and assuming the risk of the outcome of the *Barbanti* litigation prior to the appointment of Class Counsel

All counsel have recognized that there existed meaningful risk of non-recovery here.  L&A accepted ZAI clients on a contingency basis and retained them for the first years of the bankruptcy, until Scott left the firm in December, 2004, which was after the science trial and before the decision was rendered.   After the science trial, the Bankruptcy Court ruled against the ZAI claimants' position regarding the risk posed by ZAI due to its presence in homes without action that would make the particles airborne.  With that state of affairs, Class Counsel recognized that the ZAI claims may have achieved no recovery in the bankruptcy case, with the result that there also would have been no contingent fee, given that counsel took the claims on a contingency basis and faced substantial difficulties in proving Debtors' liability for those claims.   But for L&A's willingness to institute the state court proceedings and pursue them through discovery and class certification, and then continue representation into the bankruptcy and through the science trial, the class as recognized would not have existed at all and would have received no benefit.   Thus, although L&A did not participate directly in the settlement process and is not entitled to a large share of the fee for the benefit it provided in instituting the investigation, discovery and action that led to the class certification, it has provided a benefit at least equivalent to that provided by Ness in setting up the meetings that eventually led to the Settlement.

Several matters must be addressed to explain my recommendation.

**The crux of the problem:**

1)   ***Did L&A withdraw from the representation of the clients and thereby relinquish any right to fees?***

ZAI Class Counsel base their proposal to provide no allocation to L&A on the basis that L&A voluntarily withdrew from representing the ZAI clients, some of whose claims in the bankruptcy led to the ZAI Settlement.  L&A disputes the contention, asserting that it had no choice other than to withdraw as counsel, given the circumstances under which Scott left the firm to start his own law practice.

This contention focuses on whether there was good cause for the withdrawal of counsel and looks to the relevant facts to determine whether the withdrawal was voluntary.   Voluntary withdrawal from representing a client, without good cause, will not permit the withdrawing firm to collect a fee. There are several sets of circumstances that occasion the issue of whether a fee is appropriate after a firm withdraws as counsel.  When faced with a contingent fee arrangement such

as that involved with representation of the ZAI clients of L&A and Scott, the *quantum meruit* theory of recovery applies.

Courts distinguish those matters where an attorney withdraws from representation but remains at the initial law firm and then requests a fee award from those in which an the attorney leaves his current firm, taking the client with him to the new firm, and then the predecessor law firm requests a fee award. The good cause standard that is applied to the first scenario has been found not applicable to the second scenario for purposes of determining whether the predecessor firm is entitled to fees. *See, In re L-Tryptophan Cases v. Showa Danka, K.K.,* 518 N.W.2d 616 (1994); *La Mantia v. Durst,* 234 N.J. Super. 534 (1989), as discussed, *infra,* in more detail.

The good cause standard is applied in the former situations, that is, where the issue is whether an attorney retains the right to compensation notwithstanding the fact that he voluntarily withdrew from the case. Whether just cause exists depends on the facts and circumstances of each case. *Kopelman & Associates, L.C. v. Collins*, 473 S.E.2d 910, 917 (1996); *Matheny v. Farley*, 66 W.Va. 680, 682-83, 66 S.E. 1060, 1061 (1910).

The "good faith" or "good cause" standard, or a similar basis for withdrawing as counsel under the Code of Professional Responsibility, does not translate into a comparable justification or "good cause" for an attorney to be entitled to *quantum meruit* compensation for past services; they are two entirely different standards, with a much lower threshold to simply withdraw from the case than to withdraw, claiming entitlement to *quantum meruit* compensation. *See, generally,* 7A C.J.S. Attorney & Client § 360 (database updated June 2014);[17] *Lofton v. Fairmont Specialty Ins. Managers, Inc.*, 367 S.W.3d 593 (Ky. 2012) (referring to Kentucky Sup.Ct.Rules, Rule 3.130 and Rules of Prof. Conduct, Rule 1.16(b)).

---

[17]An attorney who withdraws from a case may be entitled to compensation for his or her services. "An attorney who withdraws from representing his or her client for good cause retains a right to compensation for services rendered based on *quantum meruit*. Whether just cause exists for an attorney's abandonment of a client's case depends on the facts and circumstances of each case. On the other hand, an attorney who voluntarily withdraws from a case without good cause forfeits recovery of compensation for services performed, and he or she may not recover either on the contract or on *quantum meruit*. It has, nevertheless, been held that a lawyer who withdraws from a case without good cause or justification may receive compensation if the withdrawal results in no prejudice to the client; compensation for the good faith work of the withdrawing lawyer should be assessed in relation to the time and effort required by both lawyers towards completing the litigation process and assessed from the perspective of the result ultimately obtained compared with the intermediate accomplishments by the withdrawing counsel. (footnotes omitted)."

BANK_FIN:483739-2: 029711-164777

The first example is not applicable to the facts here, where Scott left L&A to form a new firm, and thus the "good cause" standard does not apply for purposes of determining whether L&A, as the predecessor firm, is entitled to fees when Scott, the departing attorney took the former client with him.  *See, In re L-Tryptophan, supra,* 518 N.W.2d 616; *La Mantia, supra, 234 N.J. Super. 534.*

In *L-Tryptophan, supra,* 518 N.W.2d 616, the Minnesota Court of Appeals discussed an allocation of attorney's fees in a contingency fee matter. The court noted that after attorneys leave a law firm and take clients with them, courts should consider several factors in determining whether the predecessor firm is entitled to fees. The factors include the length of time each firm spent on the case, the proportion of funds invested by each firm, the quality of representation, the result of each firm's efforts, the reason the client changed firms, the viability of the claim at transfer, the amount of recovery realized and any preexisting partnership agreements.[18]  The *L-Tryptophan* court was of the opinion that the first factor, the length of time each firm spent on the case[19] is the most important consideration in the determination. *Id.* at 621.

Likewise, in *La Mantia, supra,* 234 N.J. Super. 534, the New Jersey Superior Court recognized that where there is a fee dispute with successive law firms based on the departure of an attorney, the predecessor firm may be entitled to compensation.  In *La Mantia,* the client entered into a contingency fee arrangement with the Evans firm.  Thereafter, the case was assigned to one of the partners, attorney Monte, who spent a considerable amount of time on the case while at the firm. Later, the partner left to create a new firm and took the client's case with him. The case went to trial, resulting in a $2.1 million verdict in favor of the plaintiff.  In analyzing how to allocate the

---

[18] Neither L&A nor Scott could produce a partnership agreement that would govern the situation here.

[19] In his letter to me dated June 3, 2014, David M. Fournier, L&A's Counsel, represented that L&A spent 2,424 hours on the Barbanti litigation pre-petition and another 3,177 hours post-petition on "legal research, litigation strategy, maintaining a class claimant database, attended hearings, attending creditors' meetings, responding to objections to proofs of claim, and moving to allow a class-wide proof of claim on behalf of Washington residents."  None of those services directly benefited the ZAI Class and none related directly to the Settlement. The number of hours L&A spent on the ZAI claims pre-petition is disputed.  However, under the circumstances here, where Scott was primarily responsible for managing the case while he was a partner at L&A, that factor seems less significant that it would under a different set of facts.  The documents establish  that L&A took on the risk of the litigation, fronted the costs, including paying the salary of Scott's paralegal and other lawyers, paralegals and assistants working with him (and, presumably, Scott – although how Scott was compensated while at L&A is not a matter of record), undertook all of the discovery and pleading preparation and in-court work necessary to pursue the ZAI claims until the day Scott left the firm. Then, when Scott and his paralegal left L&A, the parties agreed to negotiate a shared fee but were unable to finalize the arrangement.

resulting contingency fee obtained by the departing attorney, the court found that special considerations apply when the fee dispute is between successive law firms. *Id.* at 539. Accordingly, while agreeing that the proper measure of a former's firm compensation involves principles of *quantum merit*, the court also considered the value of the contributions of the respective firms and examined the factors as set forth in *L-Tryptophan*. *Id.* at 540.  The court recognized that where an attorney jumps ship and takes the client with him, his relationship with the former firm will impact upon the distribution.[20] *Id.* at 541.  In conclusion, the court held that the fact that an attorney leaves a firm and his litigation client follows should not deprive the firm whose services the client initially sought from equitably realizing fruits of its reasonable expectancy in the contingent fee. *Id.* at 543.

Each case is unique. This is a dispute between a predecessor and a successor firm occasioned by Scott's departure from L&A.  In this case, the operative facts lead me to conclude, to a reasonable degree of professional certainty, that L&A's withdrawal should not be subjected to consideration under the good cause standard. Rather, the appropriate balance is to ascertain whether L&A provided any benefit to the ZAI class, and, if so, to provide a measure of compensation comparable to that benefit.

Scott was the attorney who brought Barbanti into the L&A firm and was the attorney who managed and directed the case for more than five years while he was employed at L&A.  Scott announced to L&A on or about December 1, 2004 that he was leaving the firm on December 15. It appears from the record that the practice at the firm was such that counsel who managed a case did not share detailed information with other members of the firm.  When Scott announced his imminent departure, L&A had to determine what was in the best interests of the firm's clients: could L&A retain the representation or should the client remain with experienced counsel?[21] This

---

[20] L&A and Scott's relationship deteriorated significantly after Scott left the firm due to disputes regarding fees and select matters where L&A was sanctioned for Scott's alleged misconduct in several proceedings as further set forth in L&A's Reply to Motion for An Allocation of the Fee Award (D.I. 32181).  Other than to provide a possible explanation of why a consensual resolution of the pending dispute did not occur, there is no relevance to the sanctions matter and the instant dispute over allocation of fees.

[21] *See,* Whitten Declaration, paragraph 11: "Mr. Scott was the only attorney at L&A supervising and directing the type of class-based and complex litigation that was involved with the ZAI litigation.  While Mr. Scott's class action and litigation practice utilized a large amount of associate and partner time, it was my experience that no other attorney or staff member - other than Mr. Scott and his paralegal Kristy Bergland - really had a full picture of what was going on with Mr. Scott's cases or was very involved with the strategy or settlement of his cases."

situation is different from that where a good cause analysis should be undertaken. Here, L&A did not abandon clients based on risk which L&A had already absorbed while Scott was a partner in the firm. Rather, when Scott advised L&A he was leaving the firm, he met with Terence R. Whitten, the Managing Partner/Firm President and discussed pending cases, including the cases he wanted to take with him to the Scott Law Group. L&A agreed with Scott's analysis, relying on Scott's discretion and what was perceived to be in the best interests of the clients.[22] *See* Declaration of Whitten (D.I. 32182).

Moreover, L&A did not voluntarily abandon its right to seek compensation. To the contrary, the Board Meeting Executive Committee Notes show Scott made affirmative representations that L&A would receive a fee and an agreement in principle would be reached as to pending contingent cases, including the W.R. Grace bankruptcy litigation, as a result of his departure. *See, e.g.,* Minutes of the Meeting of the Board of Directors of Lukins & Annis, P.S. 2.15.2005, attached to Exhibit A, D.I. 32182, reflecting: "JWM updated the Board on the negotiations with DWS [Scott] as to the division of future fees and costs on matters where L&A has invested time and costs. DWS has presented a proposal outlining his position to such an agreement." All of the board minutes referenced in Exhibit A refer to ongoing discussions, but no final conclusion, regarding a proposed agreement to share fees.

Applying this general rule to the matter at hand, the record establishes that L&A should not be penalized by Scott's leaving L&A, taking the ZAI clients with him and promising to reach a fee arrangement with L&A at a later date. L&A's actions pre-petition, while not directly related to the Settlement, assisted in the eventual resolution of ZAI claims, by way of the Settlement.

It is also significant that two of the firms that are to be allocated a percentage of the Fee Award (Ness and McGarvey) have not established that they directly benefited the class. Neither firm submitted fee details documenting hours on ZAI matters after the conclusion of the science

---

[22] The documents of record support L&A's position that it was in the best interests of the client to retain Scott as counsel. The circumstances do not support the assertion that L&A voluntarily withdrew from representation. *See*, Whitten Declaration, D.I. 32182, Paragraph 11 ("Before Mr. Scott left, L&A determined that without Mr. Scott and Ms. Bergland [a paralegal moving to the Scott Law Group], L&A did not have enough background and knowledge about the status of the complex claims involved with the ZAI litigation to get up to speed on the cases within two weeks, when Mr. Scott was leaving. If L&A had decided not to transfer the cases, it would have had to very quickly jump in to litigation in which it did not have any real involvement, absent Mr. Scott and his team. In the end, L&A determined that it was in the clients' best interests to remain with its experienced class action counsel and team."

trial.  Westbrook has now identified Joe Rice of Ness as the person who assisted in setting up the initial settlement negotiations. Ness represented the personal injury ("PI") interests and, as such, had a stake in the resolution of ZAI claims.  At that stage of the bankruptcy, any subsequent settlement of the ZAI property damage claims could potentially reduce the total funding available for the PI trust, as part of a global settlement directed to achieving a consensual plan. If Ness, which was compensated for its work for the PI claimants, is to share in an allocation of Westbrook's fees for the indirect benefit provided by initiating settlement meetings on behalf of the ZAI property damage claimants, it is inequitable that L&A should not be provided an allocation from Scott's share for its actions in investigating, developing and otherwise providing the foundation and class certification that would provide the basis for the ZAI Class Claims and eventual settlement of same.  Both Ness and L&A provided an indirect benefit to the ZAI Class.

Further, there appears to be no basis, related to participation in the settlement process, for the grant of the proposed allocation to McGarvey, as the fee detail submitted shows no activities related to the Settlement and nothing more than the assertion that McGarvey did not withdraw from representation has been alleged to support the allocation.  Yet Class Counsel (and, separately, L&A) endorse a distribution of $250,000 ($480,000 if L&A's allocation were accepted) from the common fund to McGarvey for early participation in the bankruptcy. L&A like McGarvey actively participated in the early stages of the bankruptcy and until Scott left the firm in December, 2004.

Based on the legal services provided by L&A -  which, like McGarvey, represented ZAI claimants, and which, like Ness, provided strategic services that led to the Class Settlement -  I conclude that equity requires either that L&A receive a share or the Court refuse to order an allocation to McGarvey and Ness.  Because Ness's assistance started the settlement process and because L&A's accepting the ZAI claimants as clients early on facilitated the implementation of the ZAI class itself, I conclude to a reasonable degree of professional certainty that a share of the fees is appropriate.

Alternatively, if the Court determines that the indirect benefits provided to the ZAI Class by Ness and L&A do not warrant an allocation and only Class Counsel are awarded percentages of the total Fee Award, those parties are then free to gift from their shares as they see fit.  However, after thorough review of the materials and case law, my opinion is that it would be inequitable for

the allocation as proposed by Class Counsel, which excludes L&A, to be ordered by the Court under the facts as presented here.

**Conclusion Regarding Withdrawal:**

L&A's withdrawal from representing the ZAI claimants in the bankruptcy proceedings was not voluntary in the sense that would deprive L&A from sharing in the Fee Award. L&A's willingness to transfer the ZAI litigation and clients to Scott, and Scott's willingness to accept that transfer, were based on the view that the clients would be best served by remaining with the lawyer who had been handling their cases. The withdrawal of L&A from representation was also based upon Scott's affirmative representations and L&A's understanding that L&A would receive a portion of any attorney's fee recovery from ZAI clients it transferred to Scott, as compensation for its substantial financial investment in the Barbanti and related actions that were brought into the bankruptcy and that served as the basis for the actions that led to the ZAI Class Settlement. *See* Whitten Declaration Paragraph 15 ("L&A had no intention of 'abandoning' its right to recover for the substantial hours and costs invested in these cases and, instead, was attempting to do what was best for the clients while still protecting its interest with hopes of an agreement on fair allocation."). L&A reasonably relied on Scott's representations and expectations of continued good faith when it transferred the ZAI Litigation and the ZAI clients to Scott.

L&A's participation pre-petition and as counsel during the bankruptcy and through the ZAI science trial served to set the stage for class certification and the attendant need for negotiations to resolve the ZAI claims in the effort to arrive at a consensual plan. L&A's services benefited the class as much as did Mr. Rice's actions in communicating the willingness of Grace's owners to begin the actual Settlement process.

In my opinion, both L&A and Mr. Rice (*i.e.,* Ness) indirectly contributed to the ultimate Settlement such that an allocation of the Fee Award is fair and equitable. Although the record is scant regarding McGarvey's contributions, inasmuch as no party has objected to a share for McGarvey, and L&A's proposal actually allocates more to McGarvey than Class Counsels' proposal, I will assume that the deference typically accorded to Class Counsel in allocating fees is applicable and recommend that the Court grant each counsel a share of the Fee Award.

**2)** **_Has L&A shown a direct causal link – or a sufficient indirect link - between services performed and a benefit to the class so as to be entitled to an allocation of the Common Fund Fee?_**

To overcome class counsel's allocation and receive an allocation of fees, non-class counsel must show that their work conferred a benefit on the class beyond that conferred by class counsel. As discussed *supra*, the court's involvement in a fee decision will be at its height when the fee request is for work performed before the appointment of counsel for the lead plaintiff. The facts here are analogous to the situation in *Cendant* where the Court of Appeals for the Third Circuit considered an allocation of fees to non-lead counsel:

> If an attorney creates a substantial benefit for the class in this period - by, for example, discovering wrongdoing through his or her own investigation, or by developing legal theories that are ultimately used by lead counsel in prosecuting the class action - then he or she will be entitled to compensation whether or not chosen by lead counsel. The court, not the lead plaintiff, must decide for itself what firms deserve compensation for work done on behalf of the class prior to the appointment of the lead plaintiff. This is not to say that the court may not give substantial deference to the lead plaintiff's decision about what work conferred such benefits. Lead plaintiff will presumably have reviewed the fee requests of all attorneys who worked on behalf of the class, and may well have a better sense of what early work was useful than will the court. The court may place significant weight on plaintiff's findings, but must also consider any objections proffered by those counsel left out in the cold.

*Cendant , supra,* at 95.

In securities litigation, an award of attorney's fees will be granted to those attorneys who served the common weal by providing services benefiting all prospective class representatives with the expectation that they would be compensated, whether out of any recovery or from plaintiffs collectively, for their services that attended the designations of the lead plaintiffs and of the class. *See e.g., In re Bank One Shareholders Class Action*, 96 F.Supp.2d 789, 790 n. 13 (N.D. Ill. 2000). That approach applies equally in other class action cases where a common fund is established.

To recover a portion of the allocation of the Fee Award, L&A must show how its specific services benefited the class. *See e.g., supra,* 528 F.App'x. at 214*)*(appropriate allocation analysis looks at whether work done by an attorney seeking an allocation of the common fund fee award actually benefited the class). The Court of Appeals for the Third Circuit recognizes that an attorney, whose efforts create, discover, increase or preserve a fund to which others have a claim,

is entitled to recover attorneys' fees from the fund. *See, e.g., Cendant, supra,* at 187.  L&A contributed a benefit by its investigation, development and prosecution of the Barbanti litigation that was ultimately used by Class Counsel in presenting the ZAI issues to the Court and in settling the class claims.

The ruling of the Court of Appeals for the Tenth Circuit in *Gottlieb v. Barry,* 43 F.3d 474, 489 (10th Cir. 1994), similarly found that non-lead counsel were entitled to fees for their work prior to the designation of class counsel. In *Gottlieb*, the appellate court ruled that the trial court erred in denying fees to non-designated counsel because their work had indeed conferred a benefit to the class through pursuit and litigation of the various cases for sixteen months before class counsel was designated.  The Court recognized that "it seems implausible that all of sixteen months of work, pursued on multiple fronts by multiple counsel, suddenly becomes worthless upon the selection of a few counsel to serve as class counsel." *Id.* at 489

However, simply doing work on behalf of the class does not create a right to compensation; the focus is on whether that work provided a benefit to the class:

> Non-lead counsel will have to demonstrate that their work conferred a benefit on the class beyond that conferred by lead counsel.  Work that is duplicative of the efforts of lead counsel - *e.g.,* where non-lead counsel is merely monitoring appointed lead counsel's representations of the class, or where multiple firms, in their efforts to become lead counsel, filed complaints and otherwise prosecuted the early stages of litigation - will not normally be compensated.

*Cendant, supra,* 404 F.3d at 191.

In this case, the factual history and supporting documents establish that L&A provided a benefit to the class by taking on the initial litigation in Barbanti and continuing that representation and role in the bankruptcy.  L&A is not seeking compensation for duplicate efforts but rather for the benefit it provided to all members of the class by advancing the litigation prior to the appointment of Class Counsel.  Case law does not readily define what constitutes "benefit" to a class.  As noted by Judge Becker in his concurring opinion in *In re Fine Paper Antitrust Litig.*, 751 F.2d 562, 602 (3d. Cir. 1984), the notion of a "benefit" to a class may be quite flexible.[23]  Thus, a

---

[23] In discussing a Supreme Court ruling, *Cowdrey v. Galveston Railroad Co.*, 93 U.S. 352, 3 Otto 352, 23 L.Ed. 950 (1876), Judge Becker noted:  "In *Cowdrey,* the Court allowed the payment of fees to an attorney from a fund in court despite the fact that the attorney had not actually been involved in the specific litigation that had established the fund. *Id.* 93 U.S. at 354. Rather, the attorney had earlier brought a similar suit that was disrupted by the outbreak of the civil war. *Id.* I believe that it is difficult to read the Court's

range of indirect benefits may be compensable from a common fund, even to counsel who provided no services in the specific litigation that led to the creation of the fund.

By submission of their proposed allocation, Class Counsel clearly determined that Ness and McGarvey provided services that were within the compensable range of indirect benefits. Thus, Class Counsels' proposal applied a "flexible" standard to the benefits provided by other non-lead counsel so that they can be awarded a share of the Fee Award.[24]

L&A's exclusion from that allocation is allegedly based on its "voluntary" withdrawal from representing ZAI clients and its lack of direct involvement in the settlement. Nothing more has been alleged. Yet, Class Counsel cites to the benefits provided by McGarvey, for its "early and minor involvement"[25] but provides no concrete facts to show how counsel specifically benefited the class. While I do not downplay other counsel's efforts, I do not see a material distinction between Ness's role or McGarvey's role and L&A's on the ultimate question of benefit to the class.

When an attorney discovers grounds for a suit, based on his own investigation, and pursues the action until it eventually leads to a class settlement, the legal work produced a benefit for the class. *See, e.g., Cendant, supra,* at 197. The *Cendant* Court recognized the inherent unfairness of denying such counsel its fees, stating: "…expect that lead plaintiffs who make use of earlier attorneys; legal or investigative work will request compensation for such attorneys. In the unlikely case that lead plaintiffs appropriate that work and attempt to deny compensation, we expect that the court will nonetheless reward the earlier attorney's work on behalf of the class." *Id.*

A similar view was expressed in the *La Mantia* case in which the fee dispute was between successive lawyers. In *La Mantia, supra*, 234 N.J. Super. at 542-43, the New Jersey appeals court noted that the trial court had failed to consider that attorney Monte, the principal lawyer who had

---

endorsement of *Cowdrey* as anything but a suggestion that the notion of a "benefit" to a class may be far more flexible than Judge Gibbons' opinion now allows."
*In re Fine Paper Antitrust Litig.*,751 F.2d 562, 602 (3d. Cir. 1984).
[24] L&A's proposed allocation follows this same approach, although the suggested amounts to be paid to the various counsel differ substantially from the proposal of Class Counsel.
[25] *See,* ZAI Motion to Approve Fund [D.I. 31718] "In March 2008, ZAI Class Counsel filed their motion asking that the Court recognize the Barbanti statewide class certification in this bankruptcy. Grace vigorously opposed the motion during argument in July 2008. While this and other ZAI matters were under consideration in the summer of 2008, ZAI Class Counsel met with the Equity Committee representatives and other and began to discuss negotiation. Parties worked toward creative resolution embodied in Class Settlement Agreement.

worked on and developed the matter, was being paid by the Evans firm and also that the Evans' firm resources were used to enable attorney Monte to pursue the claim. The court further opined that the fact that a lawyer leaves a firm and takes a client:

> should not deprive the firm whose services the client initially sought from equitably realizing fruits of its reasonable expectancy in the contingent fee. These include, in addition to recognition of the factor of initial attraction of the client, the quality of the firm's initial investment of time, skill and funds in investigation, construction of pleadings, discovery, choice of experts, research and those other foundational services which shape the ultimate result, good or bad, of every lawsuit.

*La Mantia, supra*, 234 N.J. Super at 542-43.

The court went on to caution that "courts should not foster such behavior in the bar by permitting the defecting attorney to obtain a windfall. Such windfalls are created where, as here, the trial court fails to recognize the value of the initial firm's willingness to risk the time and money to develop the claim." *Id.*

In the instant action, Class Counsel and other parties referred numerous times to the significance of the *Barbanti* litigation, including the science trail, and its ultimate role in the resolution of the litigation.[26] This fact further points out that L&A provided a benefit to the class through its representation over a period of approximately five years with 5,602 hours of time[27] and

---

[26] *See, e.g.*, Motion of ZAI Class Counsel for a Common Fund Fee Award (D.I. 31718, p. 23)( "Darrell Scott was appointed as Class Counsel in the vanguard ZAI action, Barbanti v. W.R. Grace[.]");Motion to Approve Class Settlement and Certification of the U.S. ZAI Claims ( D.I. 31718, p. 23); Statement of Alan Rich, Counsel for the Property Damage Future Claims Representative in support of plan confirmation, Trans. Feb. 7, 2014, p. 259 l. 11 - 15 (D.I. 31718-6)(crediting Class Counsel and special counsel for snatching victory from the jaws of defeat. "The Science trial was a devastating loss for ZAI claimants.") *Id.*, l. 16-17.

[27] This is the total number of hours L&A spent on Barbanti litigation and ZAI property damage claims as provided by David Fournier in his letter to me dated June 3, 2014. The exact number of hours L&A spent is contested by Scott. However, all parties agree that the number of hours is not the appropriate benchmark in determining entitlement to a fee allocation. It is not disputed that while Scott was a partner at L&A, all of the actions taken in the Barbanti/ZAI actions were through the auspices of the law firm of L&A, under the direction of Scott. *See, e.g.* Declaration of Jed W. Morris (D.I. 31794-1, paragraph 9)("Darrell W. Scott directed, managed and supervised over 30 Lukins & Annis lawyers, associates, paralegals, and litigation assistants to work on the matters at various times during his employment with Lukins & Annis."). It is primarily those actions and the risk associated with them that led to the bankruptcy litigation and settlement that benefited the entire class. *See* Declaration of Darrell W. Scott in Support of ZAI Class Counsels' Opposition to Motion of Lukins & Annis, P.S. for an Allocation of the ZAI Class Action Common fund Fee Award (D.I. 32063)(summarizing L&A's work regarding the ZAI claims while Scott was a partner at L&A).

more than $184,097 of L&A's funds devoted to develop, initiate, finance, and advance the ZAI litigation. L&A tested materials, investigated contaminated homes, located and worked with experts, investigated W.R. Grace, identified and located possible class representatives (including Barbanti), and filed the Barbanti action in the State of Washington. Motion of Lukins & Annis, P.S. For An Allocation of the ZAI Class Action Common Fund Fee Award (D.I. 32034 at 5).

Not only did L&A engage in extensive discovery and investigation into the factual and legal basis for the ZAI claims, file the Barbanti suit and achieve and defend class certification of the Washington Class of ZAI claimants, L&A continued to have a role in the bankruptcy process, first through the ZAI science trial and later, primarily, monitoring the case. L&A did not participate in the settlement negotiations as it had withdrawn as ZAI counsel years earlier. Significantly, however, throughout this entire period, L&A believed it would be compensated for its efforts on behalf of the ZAI constituents by Scott from any recovery he obtained.

L&A alleges it continued to work directly on behalf of the ZAI property damage claimants after Scott's departure in December 2004, asserting that post bankruptcy, L&A spent approximately 3,177 hours[28] directly on behalf of the ZAI claims. For example, L&A indicates that it played a role in the creation of the committee for property damage creditors, on which Mr. Barbanti held a seat. Additionally, in furtherance of the ZAI claims in the bankruptcy, L&A contends that it performed extensive legal and factual research, worked on proofs of claim issues, monitored and participated in the proceedings as it related to the ZAI claims, and developed damage theories, among other things.[29]

Although Scott disputes L&A's self-assessment, Scott agrees that the "largely qualitative award factors set forth in *Gunter v. Ridgewood Energy Corporation.,* 223 F. 3d 190, 195 (3d Cir. 2000), apply to the percentage-of-recovery analysis." ZAI Class Counsels' Opposition to Motion of Lukins & Annis, P.S. for an Allocation of the ZAI Class Action Common Fund Fee Award (D.I.

---

[28] Again, the precise hours are in dispute but the dispute is not material to the recommendation herein.

[29] L&A's counsel maintains in his letter to me dated June 3, 2014 that "L&A remained active and involved counsel for ZAI property damage claimants through 2004, by providing an additional 3,177 hours of time directly spent on legal research, litigation strategy, maintaining a class claimant database, attending hearings, attending creditors' meetings, responding to objections to proofs of claim, and moving to allow a class-wide proof of claim on behalf of Washington residents." However, the Declaration of Jed W. Morris (D.I. 31794-1, paragraph 10, recognizes that after December 31, 2004, L&A was essentially monitoring the bankruptcy proceedings. Nothing has been submitted to show that L&A's actions after that date were intended to or did benefit the ZAI class.

32063, p. 16). Of the *Gunter* factors, Scott opposes L&A's contention that the entire ZAI class benefited from its work, based on Scott's analysis that L&A represented only 9 percent of the total ZAI class.  Regardless of the percentage of the total ZAI class that L&A represented prior to Scott's departure from that firm, the record supports the proposition that L&A secured the ZAI plaintiffs who would and did pursue the class aspects of litigation, with the ultimate benefit provided to the entire class.

Thus, while I conclude from the record that L&A did not provide the same level of benefit to the class that Scott provided through his negotiating and securing the Settlement, L&A provided a benefit.  After all, Scott was the lawyer at L&A who undertook the ZAI representation at the outset and but for the firm's support of the contingent aspects of the cases, would have had no opportunity to devote the time and resources necessary to achieve the result obtained. While I agree with Scott that some of the time reported by L&A as related to the ZAI claims is not, in fact so related,[30] I also agree with L&A that the responsibility to have accounted for the time in a fashion that could be understood by all was Scott's responsibility while he was at the firm. Nonetheless, the proposed share of Scott's award compensates L&A for its nominal contribution to the benefit accorded to the ZAI Class.  The over-arching, primary benefit to the ZAI Class was the Settlement, which L&A had no part in achieving.

Scott's explanation of the fee time sheets is acceptable; however, even Scott's recitation shows that L&A satisfies the *Gunter* factors as follows: the size of the ZAI Settlement fund was not something that L&A accomplished but the 9 percent of the claimants who benefited from it and who were represented by L&A plus the other 91 percent that ultimately benefited weighs in favor of a share of the fee; similarly, there were no objections by class members to the overall fee; there is no contest related to the skill and efficiency of the attorneys involved (who, for the majority of time, were led by Scott); the litigation (first in state court and then in the bankruptcy court) was quite complex and lasted for many years; and L&A had the risk of non-payment from the outset and devoted sufficient time to the case that an award in similar cases would be likely.

In addition, although Class Counsels' efforts outweighed L&A's in accomplishing the Settlement, L&A participated at least to the same extent as Ness and McGarvey.  Moreover, this was a contingent fee case and L&A will not receive the full benefit of the contingency as its work

---

[30] L&A put together the fee detail without the benefit of Scott's assistance.  Scott was the partner in charge of the litigation and it was his responsibility to keep track of time.

ended before the Settlement was achieved. While substantial work took place after L&A withdrew, that fact does not mean that L&A's services should be entirely disregarded. Like McGarvey, L&A played an early role even though it was not directly involved in the Settlement.

Accordingly, I recommend that the Court award L&A $667,500 from Scott's share of the Fee Award.

*3)      Whether L&A is entitled to the reimbursement of costs advanced?*

The Court has discretion to award costs to attorneys who benefit the class in common fund cases. However, several inadequacies weigh against that award for L&A. First, none of the other non-lead counsel (Ness or McGarvey) are seeking reimbursement for costs. More importantly, there was no notice to the class that non-lead counsel may seek reimbursement for costs from the Fund.[31] Costs cannot be recovered from the Common Fund without proper notice to the class, providing its members with an opportunity to object. An award of costs to L&A would diminish the pool of funds available to the ZAI claimants without providing them the chance to oppose the award. Parties objecting to L&A's request assert, and I recommend that the Court agree, that L&A cannot stand in a better position than the other parties and recover prepetition costs where no other parties are seeking to do so, including Class Counsel.

**Conclusion Regarding Allocation:**

The Court of Appeals for the Third Circuit has written:

It is true that, "[i]n a class action settlement, the district court has an independent duty ... to the class and the public to ensure that attorneys' fees are reasonable and divided up fairly among plaintiffs' counsel." *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 227 (5th Cir.2008). And a proper allocation should reflect the relative contribution that the various plaintiffs' firms made to the successful outcome of the litigation. *See In re Thirteen Appeals Arising out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 308 (1st Cir.1995)(approving a district court's allocation of fees paid out of a settlement fund based on an analysis "emphasizing the attorneys' relative contribution to the creation of the Fund" (internal quotation marks omitted))*; Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–18 (5th Cir.1974) (listing "[t]he time and labor required" and "the results obtained" as factors in determining a fee award).

*Drazin, supra,* 528 Fed.Appx. at 214.

---

[20]The Notice specifically provides: "Subject to Bankruptcy Court approval, class counsel may also be paid form the settlement fund for their unreimbursed out-of-pocket ZAI litigation costs."

BANK_FIN:483739-2: 029711-164777

Applying *Drazin* to this case, I am of the opinion that L&A contributed a benefit to the ZAI class that enabled Class Counsel to obtain a highly favorable Settlement.  A fair allocation of the $16,000,000 this Court has already approved as the Fee Award requires that L&A receive a share.

Like the court's ruling in *Gottlieb*, due in large part to equitable considerations, this Court should determine that L&A is entitled to a fee commensurate with the nominal benefit that its services, albeit largely prepetition, conferred on the ZAI class. It would be inequitable that the work of counsel later designated as Class Counsel should be fully compensated while the work of counsel who were not later designated class counsel but on whose shoulders Class Counsel admittedly stood, should be wholly uncompensated.  Moreover, review of the time records submitted by Ness and McGarvey substantiate that neither spent substantial, if any, time on the ZAI Settlement and did not directly contribute to the benefit of the ZAI class.  This is not to trivialize the significance of Mr. Rice's assistance in setting up the initial meeting that led to the ZAI Class Settlement, merely to point out that both are proposed recipients of fees.

I recommend that the Court give some deference to and consider the allocation requested by Class Counsel and determine whether it is reasonable in light of the benefits conferred by all counsel.  I recommend that the Court rule that, with one modification, the allocation is fair and reasonable.  That modification is to award L&A a 10 percent share of Scott's portion of the Fee Award.

I further recommend that the Court consider the effort expended by L&A pre-petition, which effort enabled the ZAI claimants to have a role on the ZAI Property Damage Committee, which fostered Mr. Barbanti attaining a seat on that Committee, and which began the process through which the benefit to the ZAI Class in the form of the ZAI Class Settlement ultimately came to be.  I further recommend that the Court consider the roles of Ness and McGarvey as compared to L&A, the benefits they contributed to the ZAI class, and the allocation proposed for them.  I recommend that the Court find that L&A's services provided a sufficient benefit to entitle L&A to an award of 10 percent of Scott's share of the fee.

I further recommend that the Court find that awarding L&A a 10 percent share of Scott's fee is equitable and a fair division of the total Fee Award, based upon the relative contributions to and for the benefit of the ZAI class by Ness, McGarvey and L&A.  Thus, for that additional reason, I recommend that the Court award L&A the same fee as that proposed by Class Counsel

for Ness- that is, $667,500.  Moreover, I recommend that L&A's allocation be deducted from Scott's share of the Fee Award as principles of equity would so dictate.  Scott was a partner at L&A, which fronted the costs and assumed the risk of the Barbanti litigation until Scott left the firm, taking Barbanti and the ZAI claimants with him.

I further recommend that L&A be denied any reimbursement of its costs as no notice was provided to the ZAI class that such a request would be made and no other non-class counsel will receive a disbursement based on costs.

The final fee allocation that I recommend to the Court is as follows:

(1)     Scott - 42.5 percent of the Fee Award (approximately $6,675,000 less $675,000 to be awarded to Lukins & Annis, P.S.);

(2)     Westbrook - 42.5 percent of the Fee Award (approximately $6,675,000 less $675,000 to be awarded to Ness);

(3)     Cabraser - 15 percent of the Fee Award (approximately $2,400,000);

(4)     McGarvey -  $250,000 from the Fee Award;

(5)     Ness - 10 percent of Westbrook's allocation of the Fee Award ($667,500); and

(6)     Lukins & Annis - 10 percent of Scott's allocation of the Fee Award ($667,500).


I am available to answer any questions or to submit further analyses upon request.


Respectfully submitted,

Judith K. Fitzgerald

Judith K. Fitzgerald

Dated:  June 24, 2014

BANK_FIN:483739-2: 029711-164777