<u>EXHIBIT D</u>

**Goulds Pumps Decision**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

SENECA MEADOWS, INC., et al.,

                          Plaintiffs,

                                        DECISION AND ORDER

                                        95-CV-6400L

              v.

ECI LIQUIDATING, INC., et al.,

                          Defendants.

---

## I. PROCEDURAL HISTORY

This is an action commenced by plaintiff, Seneca Meadows, Inc. ("SMI") and a related company, Macedon Homes, Inc., under the Comprehensive Environmental, Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 *et seq.,* originally against approximately two dozen corporate defendants.[1]  SMI sought to recover from those defendants some of the costs that it has incurred in cleaning up a contaminated landfill site that it owns. The contaminated site (sometimes "the Site" or the "Tantalo Site") formerly known as the Tantalo Landfill, consists of about 26 acres south of Black Brook and is part of a 533-acre parcel, parts of which SMI currently uses as the Seneca Meadows landfill near Seneca Falls, New York.[2]

---

[1]Because the issues and evidence in this case relate mostly to SMI rather than to Macedon Homes, Inc., and for the sale of convenience, this Decision and Order will generally use the singular "plaintiff."

[2]At trial, the present Seneca Meadows landfill was described as the largest in the state. Most of its refuse comes from New York State but about 20% comes from outside the state. It accepts about 1.9 million tons of refuse annually and the refuse depth ranges from170' to 200'.

The 26-acre site was classified by the New York State Department of Environmental Conservation ("DEC") in 1983 as a Class II Inactive Hazardous Waste Disposal Site. The Site was used by prior owners as an open dump and a landfill for decades, dating back to 1958. After a lessee, Wembley Construction, obtained a contract with the City of Rochester to dispose of municipal waste at the Site, it filled rather quickly and was closed in 1974.

In 1981, SMI obtained a permit to expand its operation and develop the landfill north of Black Brook. As part of that process, SMI was required to perform remediation at the Tantalo Site. To comply with DEC requirements, SMI entered into three different consent orders with the DEC (Exs. 1-3).[3]   The first order, Ex. 1, was executed in 1992, and the last, Ex. 3, in December 2004. Together these consent orders set out SMI's obligations to prepare a remediation plan for the contaminated Tantalo Site. These consent orders memorialized SMI's responsibilities.

As of March 2005, SMI had incurred approximately $8 million in costs to remediate the Site, and the project is not yet complete. Plaintiff expects that, over time, it will incur about twice that amount to complete the multi-year project.

By this action, SMI seeks to recover some of those costs from the industrial entities who deposited hazardous substances at the Site during its lifetime, that is, up to 1974. SMI does not contend that all of the costs should be assumed by others. It does not dispute that it is also responsible for much of the necessary remediation. During pretrial proceedings in the case, SMI appeared to concede its own responsibility for a substantial portion of the costs of remediation. Its principal expert at trial, Dr. Kirk W. Brown, as discussed in more detail below, testified that in his opinion SMI was responsible for 50% of the remediation costs.

The originally-named defendants consist of numerous industrial entities near Seneca Falls who regularly caused refuse to be deposited at the Site prior to its closure in 1974. Because the Site had been closed for 30 years at the time this trial commenced, the parties had the difficult task of

---

[3]"Ex." signifies the exhibits introduced in evidence at the trial of this action.

determining, with any type of precision, the identity of those depositing at the Site, the nature of the materials deposited, the nature of the hazardous substances, and the volume of refuse deposited by all generators.

By the time trial commenced, SMI's claims for contribution for response costs had been resolved through settlement or other disposition as to all defendants save one. The case proceeded to trial against a single defendant, Goulds Pumps, Inc. ("Goulds Pumps"), and the matter was tried to the Court for over ten days. The parties were granted leave to file post-trial briefs, and both sides have done so.

This Decision and Order constitutes my findings of fact and conclusions of law, as required by FED. R. CIV. P. 52. The principal issues are whether SMI does have a valid cause of action against Goulds Pumps under CERCLA and, if so, what percentage, if any, of the response costs should be allocated to Goulds Pumps.

## II. JURISDICTION UNDER CERCLA

SMI commenced this litigation to recoup money spent on remediation at and near the Site, which is allegedly contaminated with pollutants. Goulds Pumps suggests that this Court lacks jurisdiction since SMI fails to meet the requirements for such an action under CERCLA. The dispute centers on whether SMI may bring an action under § 107(a) or 113(b) of the Act. Goulds Pumps contends that plaintiff may not proceed under either section.

This Court has addressed this issue in prior decisions, most recently just prior to trial when Goulds Pumps moved to dismiss for lack of jurisdiction and SMI sought leave to amend its complaint to reinstate a previously-dismissed claim under §107(a). One would think that jurisdictional issues would have been resolved sooner rather than later, but there have been three recent, important court decisions concerning jurisdiction that were decided during the pendency of this action. One was the United States Supreme Court decision in *Cooper Industries, Inc. v. Aviall*

- 3 -

*Services, Inc.,* 543 U.S. 157 (2004). The second is *Bedford Affiliates v. Sills,* 156 F.3d 416 (2d Cir. 1998), and the third was decided by the Second Circuit *subsequent* to the trial in this case, *Consolidated Edison Co. v. UGI Utilities, Inc.,* 423 F.3d 90 (2d Cir. 2005) ("*Con Ed*"). *Cooper Industries* changed the landscape concerning contribution claims and the *Con Ed* case clarified, to some extent, the interplay between a § 107(a) action and an action for contribution under § 113(f), in the wake of *Cooper Industries* and *Bedford Affiliates.*

In my August 6, 1998 Decision and Order dismissing SMI's cause of action under CERCLA § 107, I stated that "[a]lthough the Second Circuit has not yet addressed this issue, every other circuit that has examined the issue has concluded that only an innocent party, who has undertaken a cleanup, may bring a § 107 cost recovery action to recover all of its response costs. A potentially responsible party ["PRP"], on the other hand, is limited to a § 113 contribution claim to recover only those response costs that exceed its equitable share." 16 F.Supp.2d 255, 258 (citing cases). I "agree[d] with the holding of these courts that a potentially responsible party, such as SMI, may not proceed against defendants under § 107, but that the nature of SMI's claim is for contribution under § 113." *Id.* The premise was that a party determined to be "responsible" could not recover *all* costs but only its fair share.

The following month, the Second Circuit joined those other circuits by holding that "an innocent party [may] sue for full recovery of its costs, *i.e.,* indemnity under § 107(a), while a party that is itself liable may recover only those costs exceeding its *pro rata* share of the entire cleanup expenditure, *i.e.,* contribution under § 113(f)(1)." *Bedford Affiliates,* 156 F.3d at 424. The court also stated that "a potentially responsible person under § 107(a) that is not entitled to any of the defenses enumerated under § 107(b) ... cannot maintain a § 107(a) action against another potentially responsible person," but "instead must rely on a claim for contribution provided for in CERCLA

§ 113(f)(1)."[4] That decision supported my prior ruling that SMI could only pursue a contribution claim under § 113.

In 2004, however, the Supreme Court held in *Cooper Industries,* that "to assert a contribution claim under § 113(f), a party must satisfy the conditions of either § 113(f)(1) or § 113(f)(3)(B)," *i.e.,* the party must either (1) have been sued under § 106 (which authorizes the federal government to compel responsible parties to clean up contaminated areas) or § 107, *see* 42 U.S.C. § 9613(f)(1), or (2) have "resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement." 42 U.S.C. § 9613(f)(3)(B). That decision, then, narrowed the circumstances in which a party may bring a contribution action under § 113. *Cf. Bedford Affiliates*, 156 F.3d at 425 (holding that party that had not been sued under § 106 or § 107 could seek contribution under § 113(f)(1)). The Court expressly declined, however, to decide whether a PRP that is foreclosed from bringing suit under § 113(f) may nonetheless seek some cost recovery or contribution under § 107. *Cooper Industries,* 543 U.S. at 170.

The following year, after trial of this case, the Second Circuit held in *Con Ed*, that § 113(f)(3)(B) "create[s] a contribution right only when liability for CERCLA claims, rather than some broader category of legal claims, is resolved." 423 F.3d at 95. In *Con Ed*, the Second Circuit held that although the plaintiff utility company, which had voluntarily taken measures to clean up certain hazardous waste sites, could not, under the Supreme Court's holding in *Cooper Industries*, seek contribution from another PRP pursuant to § 113(f), it could "pursue its suit under section 107(a) because, in light of *Cooper Industries*, Con Ed's costs to clean up the sites ... are 'costs of response' within the meaning of that section." 423 F.3d at 97. Specifically, the court held that "section 107(a) permits a party that has not been sued or made to participate in an administrative

---

[4]Section 107(b) provides that a party who would otherwise be liable under § 107(a) may escape liability by showing that the release of hazardous substances was caused by an act of God, act of war, or, under certain conditions, an act or omission of a third party.

proceeding, but that, if sued, would be held liable under section 107(a), to recover necessary response costs incurred voluntarily, not under a court or administrative order or judgment." *Id.* at 100.

*Con Ed* did address the interplay between §§ 107(a) and 113(f) in the wake of *Cooper Industries*, *see Con Ed*, 423 F.3d at 94-95, but the waters in this area still remain somewhat murky.[5] Applying the principles set forth in these recent cases to the facts before me, however, I adhere to my prior ruling that SMI may seek contribution under § 113(f)(3)(B). Alternatively, I believe it has a remedy under § 107(a).

As stated, § 113(f)(3)(B) permits a contribution action to be brought by a party that has "resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement." Here, SMI did enter into consent orders that resolved its liability to New York State. The third, most recent such order provided that

> [t]o the extent authorized under 42 U.S.C. Section 9613, ... [SMI] shall be deemed to have resolved its liability to the State for purposes of contribution protection provided by CERCLA Section 113(f)(2) for "matters addressed" pursuant to and in accordance with this Order. ... Furthermore, to the extent authorized under 42 U.S.C. Section 9613(f)(3)(B), by entering into this administrative settlement of liability, if any, for some or all of the response action and/or for some or all of the costs of such action, [SMI] is entitled to seek contribution from any person except those who are entitled to contribution protection under 42 U.S.C. Section 9613(f)(2).

Plaintiff's Ex. 3 at 19.  The order also provided that upon the DEC's acceptance of a final report evidencing that no further remedial action (other than monitoring) is needed, "such acceptance shall constitute a release and covenant not to sue for each and every claim ... which the Department has or may have pursuant to Article 27, Title 13 of the ECL or pursuant to *any other provision of*

---

[5]That is hardly new or unusual where CERCLA is concerned.  *See, e.g., Commander Oil Corp. v. Barlo Equipment Corp.*, 215 F.3d 321, 326 (2d Cir. 2000) ("We are called upon in this case to resolve yet another ambiguity within CERCLA's miasmatic provisions"); *Cadlerock Properties Joint Venture, L.P. v. Schilberg*, No. 3:01CV896, 2005 WL 1683494, at *5 (D.Conn. 2005) (July 19, 2005) ("wading through CERCLA's morass of statutory provisions can often seem as daunting as cleaning up one of the sites the statute is designed to cover").

*statutory or common law ...*" relating to the disposal of hazardous wastes at the Site. Plaintiff's Ex. 3 at 6. Thus, SMI and the DEC clearly viewed the consent order as a settlement of SMI's liability to the State for purposes of CERCLA, and they agreed that upon completion of the remediation, the DEC would release SMI from all liability under the ECL or "any other provision of statutory ... law," which obviously includes CERCLA.

Goulds Pumps contends that the DEC lacked authority to settle SMI's liability under CERCLA because the Environmental Protection Agency ("EPA") never "delegated" its CERCLA authority to the DEC. In support of that contention, Goulds Pumps relies upon case law stating that "[a]bsent an express delegation by the EPA, a state has no CERCLA authority." *W.R. Grace & Co.-Conn. v. Zotos Int'l, Inc.*, No. 98-CV-838, 2005 WL 1076117, at *4 (W.D.N.Y. May 3, 2005) (citing 42 U.S.C. § 9604(d)); *see also Con Ed*, 423 F.3d at 96 ("section 113(f)(3)(B) does not permit contribution actions based on the resolution of liability for state law–but not CERCLA–claims") (citing *W.R. Grace*, 2005 WL 1076117, at *7).

*W.R. Grace* is distinguishable from the case at bar, however. In support of the quoted proposition, the *W.R. Grace* court cited CERCLA § 104(d)(1)(A), which permits a state to "apply to the [EPA] to carry out actions authorized in this section. If the [EPA] determines that the State ... has the capability to carry out any or all of such actions in accordance with the criteria and priorities established pursuant to section 9605(a)(8) of this title and to carry out related enforcement actions, the [EPA] may enter into a contract or cooperative agreement with the State ... to carry out such actions." "[W]here a state receives such delegation, its actions taken pursuant to the cooperative agreement are on behalf of the Federal government." *W.R. Grace*, 2005 WL 1076117, at *4 (citing 42 U.S.C. § 9604(d)(3)). Cooperative agreements and the delegation of CERCLA authority are specific to one or more facilities. *Id.* (citing 42 U.S.C. § 9604(d)(1)(B)).

The court in *W.R. Grace* did hold that the consent order between the plaintiff and the DEC in that case did not constitute a settlement of the plaintiff's CERCLA liability, in part because there was no indication that the DEC was operating pursuant to a cooperative agreement or contract with

-7-

the EPA. In addition, though, the consent order "d[id] not state that the DEC was exercising any authority under CERCLA, d[id] not indicate that the EPA concurred with the remedy selected and d[id] not provide a release as to any CERCLA claims. In fact, the 1988 Consent Order ma[de] *no mention of CERCLA at all.*" 2005 WL 1076117, at *7 (emphasis added).

In contrast, the consent orders here expressly state that the parties agreed that SMI had resolved its liability to the state for purposes of CERCLA. In addition, while there is no evidence before me that the DEC was operating pursuant to a cooperative agreement with the EPA, that does not mean that SMI could not have "resolved its liability to [the] State" by means of the consent orders. 42 U.S.C. § 9613(f)(3)(B). Although a state may not be able to act on behalf of the federal government absent a delegation of authority from the EPA, or to *completely* resolve a party's CERCLA liability, § 107(a)(4)(A) "contains no requirement that a state obtain authorization from the federal government prior to engaging in response actions. States need not obtain EPA authorization to clean up hazardous waste sites and recover costs from potentially responsible parties." *Washington State Dep't of Transp. v. Natural Gas Co., Pacificorp*, 59 F.3d 793, 801 (9th Cir. 1995) (citing *State of New York v. Shore Realty Corp.*, 759 F.2d 1032, 1047 (2d Cir. 1985) ("*Shore* apparently is arguing that EPA has ruled that the State cannot act on its own and seek liability under CERCLA. We disagree. Congress envisioned states' using their own resources for cleanup and recovering those costs from polluters under section 9607(a)(4)(A)").

As *Pacificorp* and *Shore Realty* explain, then, the DEC could have taken steps on its own to remediate the Site, and then sought recovery of its response costs from SMI under CERCLA. In addition, the December 2004 consent order provided that SMI "shall pay to the Department a sum of money which shall represent reimbursement for State Costs for work performed at or in connection with the Site pursuant to this Order." Plaintiff's Ex. 3 at 9. In my view, therefore, the consent orders amount to a settlement of SMI's liability to the State not just under state law, but under CERCLA as well. SMI may therefore seek contribution from Goulds Pumps under § 113(f)(3)(B). *See Benderson Dev. Co. v. Neumade Products Corp.*, No. 98-CV-0241, 2005 WL

1397013, at *12 (W.D.N.Y. June 13, 2005) (plaintiff who had entered into consent order with DEC providing that "the provisions of 42 U.S.C. Section 9613(f)(3) shall apply" to the plaintiff could seek contribution from third party); *Fireman's Fund Ins. Co. v. City of Lodi, California*, 296 F.Supp.2d 1197, 1212 (E.D.Cal. 2003) (cooperative agreement between state agency and city was "administrative settlement" within meaning of CERCLA § 113(f)(3)(B), since agreement partially resolved city's liability to state for past and future response costs based upon design, construction, and operation of city's sewers).[6]

Even if the consent orders here could not be deemed a settlement of SMI's CERCLA liability to the State, thus foreclosing a § 113(f) claim under *Cooper Industries*, I find that SMI could seek relief under § 107. The law on this subject has changed since I ruled previously that no such action would lie.

The one overarching principle that remains as clear today as before *Con Ed* and *Cooper Industries* is that CERCLA should be interpreted in a way that will further "one of CERCLA's main goals, 'encourag[ing] private parties to assume the financial responsibility of cleanup by allowing them to seek recovery from others.'" *Con Ed*, 423 F.3d at 100 (quoting *Key Tronic Corp. v. United States*, 511 U.S. 809, 819 n. 13 (1994)). In *Con Ed*, for example, the Court of Appeals stated that the court "would be impermissibly discouraging voluntary cleanup were we to read section 107(a) to preclude parties that, if sued, would be held liable under section 107(a) from recovering necessary response costs," because, "[w]ere this economic disincentive in place, such parties would likely wait until they are sued to commence cleaning up any site for which they are not exclusively responsible because of their inability to be reimbursed for cleanup expenditures in the absence of a suit." *Id.* *See also Syms v. Olin Corp.*, 408 F.3d 93, 106 n. 8 (2d Cir. 2005) (noting "CERCLA's stated

---

[6]The other case principally relied upon by Goulds Pumps, *Cadlerock Properties Joint Venture, L.P. v. Schilberg*, No. 3:01CV896, 2005 WL 1683494 (D.Conn. July 19, 2005), is also distinguishable. The plaintiff in *Cadlerock* "conceded that it had not ... administratively or judicially settled its liability with the United States or Connecticut," and in fact was "vigorously litigating and resisting its state obligations and responsibilities." 2005 WL 1683494, at *4 and n. 3.

purpose of 'induc[ing] such persons voluntarily to pursue appropriate environmental response actions with respect to inactive hazardous waste sites'") (quoting H.R.Rep. No. 96-1016(I), at 17 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6119, 6120).[7]

It is true, of course, that *Bedford Affiliates* held that, in general, a PRP cannot maintain a § 107(a) action against another potentially responsible person. 156 F.3d at 425. As several courts–including the Second Circuit–have recognized, however, *Bedford Affiliates* is of questionable validity following the Supreme Court's decision in *Cooper Industries*. In *Syms*, for instance, the court observed that "[the combination of *Cooper Industries* and *Bedford Affiliates*, if the latter remains unaltered, would create a perverse incentive for PRP to wait until they are sued before incurring response costs." 408 F.3d at 106 n. 8. Because *Cooper Industries* was decided after oral argument was held in *Syms*, and the parties had not fully briefed or argued its impact on *Bedford Affiliates*, the Second Circuit remanded the case "to allow the district court to address in the first instance the issue of [the plaintiff's] eligibility to sue under § 107(a)." *Id.* at 107.

In *Con Ed*, the Second Circuit likewise stated that "*Cooper Industries* may call into question the rationale of *Bedford Affiliates*'s section 107(a) holding," and that "it might be argued that, in the wake of *Cooper Industries*, *Bedford Affiliates*'s section 107(a) holding can no longer stand." 423 F.3d at 101 n. 12. The court found it unnecessary to decide whether *Bedford Affiliates* remains good

---

[7]Although the Court in *Cooper Industries* admonished that courts should be guided by "the provisions of our laws rather than the principal concerns of our legislators," 543 U.S. at 167 (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 79 (1998)), the Court also found "no need ... to consult the purpose of CERCLA" in that case because of what it viewed as "the clear meaning of the text" of § 113(f) insofar as it related to the issue before the Court. *Id.* As demonstrated by the varying results reached by courts considering the exact nature, availability and extent of post-*Cooper Industries* contribution claims under CERCLA § 107, there is no "clear meaning" for courts to rely upon on that score. Certainly the Court in *Cooper Industries* did not overturn the well-established principle that it is proper for courts to consider the purposes of a statute in deciding how best to interpret it, particularly where the statute's meaning is not apparent on its face. *See, e.g., Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, ___ U.S. ___, 126 S.Ct. 1503, 1513 (2006) (construing the Securities Litigation Uniform Standards Act ("SLUSA") in light of "the particular concerns that culminated in SLUSA's enactment," and rejecting a "narrow reading of the statute [because it] would ... run contrary to SLUSA's stated purpose").

law, however, because of certain factual distinctions between *Bedford Affiliates* and *Con Ed*. *Id.* at 100-02.

I recognize, then, that the Second Circuit has not expressly overruled *Bedford Affiliates*, and that the *Cooper Industries* Court also declined to decide whether *Bedford Affiliates* and similar cases from other circuits were correctly decided with respect to whether a PRP may pursue other PRPs under § 107(a). 543 U.S. at 169-70. *See Benderson Dev. Co.*, 2005 WL 1397013, at *11 ("It is this Court's opinion that *Bedford Affiliates* remains controlling precedent in this circuit"). Nevertheless, under the facts of the case before me, in light of CERCLA's purpose to encourage prompt cleanup of hazardous waste sites, and keeping in mind the concerns enunciated by the Second Circuit in *Syms* and *Con Ed*, I do not believe that *Bedford Affiliates'* holding should be applied here in a simplistic, mechanical fashion.

A key factor to consider here is the distinction between a cost recovery action seeking *indemnity–i.e.*, full recovery of *all* the plaintiff's response costs, and an action seeking *contribution–i.e.*, recoupment of the portion of costs exceeding the plaintiff's equitable share of the total costs. In *Con Ed*, the court, discussing the holding of *Bedford Affiliates*, stated that "importantly, [the plaintiff in *Bedford Affiliates*] argued that it should be able to recover *one hundred percent* of its costs" under § 107. *Con Ed*, 423 F.3d at 98 (emphasis added). The court later explained why that was "important[]":

> the *Bedford Affiliates* plaintiff, having agreed to the consent order, put the extent of its liability at issue by proceeding to seek recovery under both sections 107(a) and 113(f)(1). As noted, under section 113(f), the district court found that the plaintiff was partially [five percent] liable for the costs of response. To rule that in those circumstances Bedford could have proceeded under section 107(a) to seek recovery of one hundred percent of the costs, this court would have had to hold in substance that a party already adjudicated liable for a portion of the costs of response under section 113(f)(1) could circumvent that section by recovering under section 107(a) that portion of the costs attributed to it by the adjudication.

*Id.* at 102. In other words, it would make no sense to find that the plaintiff was liable for five percent of the response costs, and then to hold that the plaintiff could seek to recover that very five-percent share of the costs. That is not the situation here. SMI is not seeking to recoup *all* of its response

- 11 -

costs from Goulds Pumps, but only the portion of those costs that it alleges is allocable to Goulds Pumps.

The *Con Ed* court also noted that though the Court in *Cooper Affiliates* cited (and declined to consider the correctness of) a long list of circuit court cases stating that PRPs could not pursue a section 107(a) action, "[all but one of those cases are inapposite [because] they considered plaintiffs that had either been held liable–or, because they had been sued, might imminently be held liable–under an administrative or court order or judgment." *Con Ed*, 423 F.3d at 102 (citing cases). The court contrasted that with the situation before it, involving a party that had incurred response costs voluntarily. The court reasoned that funds expended voluntarily for cleanup might more properly be characterized as "response costs" than would funds spent "solely due to the imposition of liability through a final administrative order." *Id.* at 101.

In the case at bar, SMI was operating under consent orders issued by the DEC, but it would not be entirely accurate to characterize its response costs as "involuntary." For one thing, the consent orders expressly provided that SMI admitted no liability or fault. *See* Plaintiff's Ex. 1 at 3; Ex. 2 at 2; Ex. 3 at 2. In addition, SMI had not been sued, and there was no threat that SMI "might imminently be held liable ... under an administrative or court order or judgment." The impetus behind the process leading to the consent orders was SMI's desire to expand the landfill, and the conditions that the DEC placed on SMI in order to obtain the necessary authorization to do so. SMI may not have acted entirely out of altruistic motives, but neither had it been found liable, or even sued at that point.

It should also be pointed out that 113(f) itself expressly provides that it does not necessarily provide the *only* avenue by which a PRP can seek contribution. Section 113(f)(1) states, in part, that: "Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 of this title or section 9607 of this title." This sentence, which the *Cooper Industries* Court described as a "saving clause," 543 U.S. at 166, "rebuts any presumption that the express right of contribution provided by the enabling clause is the

- 12 -

exclusive cause of action for contribution available to a PRP." *Id.* at 166-67. *See Viacom, Inc. v. United States*, 404 F.Supp.2d 3, 7 (D.D.C. 2005) (stating that *Cooper Affiliates* "clarified ... that § 113(f) does not bar other types of response cost recovery actions," and holding that PRP that cannot sue for contribution due to the absence of a preexisting civil action, may still seek indemnification from another PRP under § 113(f)); *see also McDonald v. Sun Oil Co.*, ___ F.Supp.2d ___, 2006 WL 696316, at \*16 (D.Or. 2006) (concluding that "[w]hen a plaintiff falls outside the technical requirements of § 113, the contribution claim is allowed under § 107, and the mechanics of apportionment are governed by the factors established in § 113").

Finally, I note that SMI and the DEC entered into the consent orders prior to the issuance of the Supreme Court's decision in *Cooper Industries*.[8] They clearly intended SMI to enjoy both protection from contribution claims under CERCLA § 113(f)(2), and the right to seek contribution from others pursuant to § 113(f)(3)(B).[9] It would be inequitable, and inconsistent with the purposes of CERCLA as it has been interpreted and applied by the Second Circuit both before and after *Cooper Industries*, to hold that what was at worst a technical omission–and one that took on potential significance only after *Cooper Industries* was decided–now bars SMI from seeking any CERCLA contribution at all.

---

[8]The third consent order is dated December 14, 2004, one day after *Cooper Industries* was decided.

[9]Even after *Cooper Industries*, the consent agreements here would seem to be sufficient to satisfy the requirements of § 113(f), as I have already found them to be. In that regard, I note that one commentator has suggested that

> until Congress directly addresses this issue [of when a private party can assert a contribution claim under CERCLA in a purely private party cost recovery action] through an amendment to CERCLA, or the Supreme Court resolves the issues that it left open in *Cooper Industries* ... , practitioners prosecuting private party cost recovery actions would be wise to enhance the viability of contribution claims by making sure that settlements with EPA or a state *clearly reference that CERCLA liability is being resolved ... .*

Robert C. Goodman, *CERCLA Contribution Actions after* Cooper/Aviall, 19 No. 3 Cal. Envtl. Insider 4 (July 18, 2005) (emphasis added). SMI and the DEC, of course, did exactly that.

- 13 -

### III. FACTORS UTILIZED TO ALLOCATE RESPONSE COSTS

SMI seeks recovery of response costs from Goulds Pumps as a person who deposited hazardous waste at the Site. To establish liability under CERCLA, plaintiff must establish: that the defendant is a "covered person" under the Act; that the site is a "facility"; that there was a release of hazardous substances; and that, as a result, the plaintiff incurred response costs that conformed to the National Contingency Plan as administered by the EPA. *United States v. Alcan,* 990 F.2d 711, 719-20 (2d Cir. 1993). CERCLA imposes strict liability on "any person" who deposits such material. *Id.* at 721.

In determining liability, plaintiff is not required to show causation, that is, that the pollutants deposited by the defendant were what necessitated the remediation. *Prisco v. A & D Carting Corporation,* 168 F.3d 593, 606 (2d Cir. 1999); *B. F. Goodrich v. Betkowski,* 99 F.3d 505, 517 (2d Cir. 1976).

In the instant case, I believe that SMI has established a *prima facie* case of the general liability of Goulds Pumps under CERCLA. It is certainly not disputed that some response costs consistent with the National Contingency Plan were incurred by SMI, that the Site is a defined "facility," and that Goulds Pumps, a "person" who arranged for disposal of hazardous substances, *see* 42 U.S.C. § 9607(a)(3), is a person within one of the four categories of responsible persons. I find that the proof is sufficient to support a finding that from 1968 to 1974, Goulds Pumps did cause refuse to be deposited at the Site that, by definition, constituted a hazardous substance.

At trial, and in its post-trial brief (Dkt. # 279), Goulds Pumps did not claim that plaintiff had failed to make out a *prima facie* case under CERCLA's strict liability provisions. Instead, Goulds Pumps argues that the proof establishes the complete affirmative defense of divisibility, under § 107(b), that is, that the acts of another caused the release of hazardous waste and the resulting damages. Evidence and concepts relating to an affirmative defense on the one hand, and allocation of response costs in a contribution case, are sometimes discussed interchangeably. But, a defendant,

- 14 -

in order to prevail on this affirmative defense, must establish that the harm was caused by a third party and that the defendant's pollution constituted no more than background contamination. *Alcan,* 990 F.2d at 722.

The focus of this trial, though, has been about allocation of the response costs, and not on any affirmative defense. The factors advanced by Goulds Pumps to minimize its exposure are, of course, germane to the allocation inquiry. The focus, then, must be on the appropriate allocation of costs.

Section § 113(f)(1) directs courts to allocate cleanup costs between responsible parties "using such equitable factors as the court determines are appropriate," and does not limit courts to any particular list of factors. "The statute's expansive language instead affords a district court broad discretion to balance the equities in the interests of justice." *Bedford Affiliates,* 156 F.3d at 429. In a given case, "a court may consider several factors or a few, depending on the totality of the circumstances and equitable considerations." *New Jersey Turnpike Auth. v. PPG Indus., Inc.,* 197 F.3d 96, 104 (3d Cir. 1999) (citation omitted). *See also Environmental Transp. Systems, Inc. v. ENSCO, Inc.,* 969 F.2d 503, 509 (7th Cir. 1992) ("[T]he language of [CERCLA § 113(f)] clearly indicates Congress's intent to allow courts to determine what factors should be considered in their own discretion without requiring a court to consider any particular list of factors"); *United States v. R.W. Meyer, Inc.,* 932 F.2d 568, 571 (6th Cir. 1991) ("The trial judge was well within the broad discretion afforded by the statute in making the apportionment he did"). In addition, "in an appropriate case, the court might properly exercise its discretion under § 113(f)(1) to allocate a smaller portion or even no portion of the cleanup cost to a non-polluting PRP landowner ... ." *Western Properties Service Corp. v. Shell Oil Co.,* 358 F.3d 678, 690 (9th Cir. 2004).

"Courts have considered a potpourri of factors in equitably allocating CERCLA response costs among liable parties." *United States v. Davis,* 31 F.Supp.2d 45, 63 (D.R.I. 1998), *aff'd,* 261 F.3d 1 (1st Cir. 2001). Many courts, for instance, have applied the six so-called "Gore factors": (1) the ability of the parties to demonstrate that their contribution to the site can be distinguished; (2) the amount of hazardous waste involved; (3) the degree of toxicity of the hazardous waste involved;

(4) the degree of involvement by the parties in the generation, transportation, treatment, storage or disposal of the hazardous waste; (5) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristic of such waste; and (6) the degree of cooperation by the parties with federal, state or local officials to prevent any harm to the public health or the environment. *See, e.g., United States v. Hercules, Inc.*, 247 F.3d 706, 718 (8th Cir. 2001); *Acushnet Co. v. Mohasco Corp.*, 191 F.3d 69, 74 (1st Cir. 1999); *Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp.*, 153 F.3d 344, 354 (6th Cir. 1998).[10]  Other factors that have been taken into account are: the financial resources of the liable parties; the extent of the benefit that the parties received from the hazardous waste disposal practices; the extent of the parties' knowledge and awareness of the environmental contamination of the site; the efforts made, if any, to prevent environmental harm; and the efforts made to settle the case. *Davis*, 31 F.Supp.2d at 63 (citing cases).

Among these myriad factors, courts frequently look in particular at the four "critical factors" identified by Judge Ernest C. Torres in *Davis*: (1) the extent to which cleanup costs are attributable to wastes for which a party is responsible; (2) the party's level of culpability; (3) the degree to which the party benefitted from disposal of the waste; and (4) the party's ability to pay its share of the cost. *See, e.g., United States v. Consolidation Coal Co.*, 184 F.Supp.2d 723, 744 (S.D.Ohio 2002), *aff'd in part, vacated on other grounds in part*, 345 F.3d 409 (6th Cir. 2003).  *See also* Robert P. Dahlquist, *Making Sense of Superfund Allocation Decisions: The Rough Justice of Negotiated and Litigated Allocations*, 31 Envtl. L. Rep. 11098, 11099 (2001) ("The Gore factors are most relevant in academic and theoretical analysis of the way Superfund liabilities should be allocated.  But in the real world Judge Torres' list of four critical factors often provides the basis upon which Superfund allocations are made").

---

[10]The "Gore factors," named after then-Congressman Albert Gore, Jr., were part of a proposed amendment to CERCLA (which was rejected by Congress) that would have listed the Gore factors as the basis for allocating liability. *Boeing Co. v. Cascade Corp.*, 207 F.3d 1177, 1187 (9th Cir. 2000).

## IV. EVIDENCE AT TRIAL RELATING TO ALLOCATION ISSUES

SMI seeks to recover from Goulds Pumps a portion of sums that it has expended at the Site for what it describes as necessary remediation costs. It also seeks a declaratory judgment that Goulds Pumps is responsible for its *pro rata* share of future necessary costs.

Owners of a contaminated landfill site, entities who generated or caused hazardous materials to be deposited, and haulers who actively transported the offending substances, are all liable under CERCLA. Where multiple entities contributed to the contamination at the Site, they share a responsibility for response costs, which should be allocated equitably. In an action involving multiple parties, all of whom are responsible to a degree, the Court, proceeding in equity, may consider many factors in deciding who should ultimately bear the burden of the response costs and in what amount.

In this case, I have considered the testimony of the numerous witnesses who testified, as well as the hundreds of exhibits received at the trial, in resolving the allocation issue. The following trial evidence speaks to the allocation issues before the Court.

In the instant case, there are some matters that are not truly in dispute. The subject Site consists of a portion of SMI's present landfill operation. The Site was formerly used as a dump and landfill for approximately 20 years until it closed in 1974. Thomas Hasek, SMI's environmental manager, testified that the present permit for the existing Seneca Meadows site (Ex. 190) was issued in 1999, allows expansion of the Site, and expires in 2009. The permit authorizes plaintiff to accept up to 6,000 tons of refuse a day. This permit does require certain requirements for closure of part of the Site north of Black Brook Road and another site east of the Tantalo Site.

All agree that numerous industrial companies, municipalities and haulers used the Site. It is not disputed that to some extent, Goulds Pumps deposited material at the Site during some of the time prior to 1974. The municipalities deposited municipal solid waste (sometimes "MSW") and the industrial entities deposited what is termed industrial solid waste (sometimes "ISW").

- 17 -

The parties stipulated that commencing in 1958, both the Village of Seneca Falls and the Village of Waterloo, New York entered into a contract with owners of the Site for the disposal of all residential and commercial refuse generated within their municipalities. It was also stipulated that other municipalities arranged for the disposal of MSW at the Site up until it closed in 1974. In 1973, a lessee of the Site obtained a significant contract with the City of Rochester, New York, a large municipality, to accept its refuse. This contract caused a significant increase in volume at the Site, so much so that the Site filled rather quickly and was closed in 1974.

It was also stipulated that some of the entities who deposited waste at the Site included haulers of septic tank waste and haulers of sludge from a municipal waste-water treatment plant. (Document # 258). It was also stipulated that other companies, including Evans Chemetics, Inc., GTE, Sylvania, Zotos International, General Motors Corporation, Borden Foods, Comstock Foods and Libby Foods, all deposited waste at the Site. Expert witnesses on both sides generally agreed that about 75% of the volume of refuse at the Site consists of municipal solid waste. Industrial solid waste constitutes the balance.

Although the municipalities deposited the bulk of the refuse, SMI elected not to sue *any* of them and also declined to sue any hauler. Instead, SMI focused only on the industrial entities that utilized the Site. As mentioned, now only Goulds Pumps remains as a defendant, all the others having settled or been dismissed from the action.

It is also agreed that the principal negative environmental impact is the presence of trichloroethylene ("TCE") in the bedrock and ground water near the southern end of the Site. There is a knob of bedrock that rises very close to the surface, and it is in this area that the contamination occurred and spread in a plume in a southwesterly direction.

In approximately 1983, about 10 years after this Site ceased accepting refuse, it was designated as a Class II Inactive Hazardous Waste Disposal Site, which posed a threat to the environment. A site so denominated is deemed to present a "significant threat to the public health or environment -- action required." Environmental Conservation Law ("ECL") § 27-1305(4)(b).

- 18 -

Witnesses for SMI testified that it incurred expenses during the mid-1980s to investigate the site to effect remediation. Eventually, in 1992, SMI entered into its first Consent Order ("Consent Order No. 1") (Ex. 1). SMI agreed to conduct an investigation and feasibility study which comported with CERCLA's National Contingency Plan (40 C.F.R., Pt. 300). Pursuant to this Consent Order No. 1, SMI incurred costs in examining the Site and also was required to reimburse the State for its monitoring costs in the amount of $50,000 the first year (1992 to March 31, 1993) and in a sum not to exceed $25,000 per annum thereafter.

SMI agreed to conduct the investigation and issue a report with a work plan to commence remediation. SMI submitted several lengthy, detailed reports to the DEC relating to its preliminary investigation. The initial report, entitled "Tantalo Landfill Site: Preliminary Remedial Investigation Report" including tables, graphs and drawings, etc., consisted of seven, thick looseleaf binders (Ex. 9). This study was concluded in 1994, twenty years after the Site closed.

SMI and its consultants made four general recommendations (Ex. 9, p. 6-6). These included:

- Evaluate bedrock ground water contamination at the southern portion of the Site;

- Characterize the waste in the landfill in terms of volume and chemical composition;

- Characterize the chemical components relative to potential contaminant migration;

- Evaluate whether there is a source of contamination which could be removed with a reasonable level of effort.

Thomas Hasek conceded on cross-examination that the first report prepared by plaintiff (Ex. 9) pursuant to the 1998 Consent Order, identified significant problems at the Site. There were ten areas of leachate seepage; ponded water was found on the Site and there were cracks in the landfill cover as well as bubbling of gas up through the Site, and migration of waste oil. He conceded that the soil cover was inadequate. It ranged from only 6 inches to 2.8 feet to the north. In fact, a table attached to the report (Ex. 9), Table 2-32, listed forty areas of concern in and around the Site.

- 19 -

After years of investigation and study, the DEC eventually issued a "Record of Decision" ("ROD") in March 1998 (Ex. 4). This decision dealt only with remediation at the Tantalo Site itself and did not deal with any offsite bedrock water contamination. The ROD imposed several requirements on SMI. These included: (1) consolidation of waste along the northern boundary away from Black Brook; (2) installation of a leachate collection system within the landfill and along its borders; (3) construction of a ground water barrier to prevent migration of ground water and leachate into Black Brook; (4) achievement of acceptable slopes of waste on the south site to permit proper drainage; (5) installation of a single-layer synthetic membrane cap over the refuse; and (6) maintenance of a long-term monitoring program. (Ex. 4, p. 26).

Remediation of the possible contamination of bedrock was left for a later project. The ROD described the past disposal practices at the Tantalo landfill, which began as early as 1952 and continued up to 1974. The Site initially served as a rubbish dump for the Villages of Seneca Falls and Waterloo and accepted municipal and industrial waste. "During the early years of operation, wastes were typically not separated and were frequently set afire. Leaking drums, open dumping, and land spreading of waste was recorded. Industrial wastes, reported to have been disposed at the Site include sludges, foundry sand, surfactants, liquid waste containing chlorinated solvents, characteristic corrosive liquid wastes and canning waste." (Ex. 4, p. 5).

During investigation of the Site, it was determined that municipal solid waste was mixed throughout the landfill with industrial solid waste and construction debris. The landfill expanded over time from the south to the north, and the depth of waste ranged from 10 feet in the southern portion to 25 feet in the north. The Site also contained a quantity of ashes, which was consistent with the former practice of burning refuse.

Hasek also testified that SMI's first report (Ex. 9) after the ROD was issued listed the principal waste generators at the Site. It described Goulds Pumps as depositing only 1,750 tons a year (Ex. 9, Table 1-1; 1-2). The witness conceded that the same report noted that both septic tank sludge and sewage treatment plant sludge were accepted at the Site.

- 20 -

After issuance of the ROD in 1998, there was a multi-year period when design activities occurred. Once the DEC accepted those designs in 2003, (Ex. 23), almost *thirty* years after the Site closed, the work commenced. This work included using comparable structural fill to grade the landfill, covering it with both a foot of compacted impermeable clay soil, as well as a plastic liner. Pipes were installed for drainage as was a leachate collection system. Waste near the creek was also moved and consolidated (Ex. 197), a final layer of soil covered the Site, and vegetation was added.

By the time of trial, much of the remediation work had been completed. The waste had been pulled back from Black Brook and a barrier constructed there. Sedimentation basins had been prepared and 98% of the leachate collection system was in place.

SMI received a substantial amount of fill for disposal, called comparable structural fill, which it was able to use in grading and covering the site. This material, much of which was received from the Onondaga Resource Recovery Facility, generated approximately $2 million in revenue for SMI, which offset some of the remediation costs.

A second phase of remediation related to bedrock ground water contamination. The investigation report concerning this was issued in January 2001 (Ex. 18). The report concluded that there was a plume of contamination to the south containing chlorinated, volatile organic compounds. The DEC issued its decision in March 2001 (Ex. 16) and selected a remedy involving what was described as "enhanced monitoring with natural attenuation." The cost for this was estimated to be $500,000 in capital costs with about $1.5 million in monitoring costs over time.

Although it is not contested that there is contamination of the bedrock ground water, by all accounts, it is not expanding but is attenuating. The method of remediation chosen by the DEC involved natural attenuation, which entails simply letting the compounds in the soil filter and, therefore, alleviate the contamination over time.

In analyzing the Site, the DEC was required to hold public hearings, and a record of that hearing was attached to the ROD (Ex. 4, Appx. A). At that hearing, a representative of the DEC testified that the contamination plume is "drying up or abating in the knob area." ( Ex. 20, p. 12).

- 21 -

SMI's investigation of the ground water problem concluded that there was a "generally stable plume," which was "not expanding but decreasing over time." (Ex. 18, p. 6-1).

At the hearing, a DEC representative stated that the Site did not have the double composite liner required under current regulations nor did it have a leachate collection system or an adequate soil cap. He also concluded that it appeared that bedrock contamination was caused in part by disposal of waste outside the footprint of the Tantalo Site. (Ex. 4, p. 35). In the DEC's report, after analyzing the hydrogeological conditions at the southern portion of the Site, the DEC concluded that the waste mass was *not* the sole source of chlorinated solvents in the bedrock ground water (Ex. 4, p. 13). Although the DEC later apparently changed its view as to off-site pollution, this was its first determination.

After reviewing all of the evidence, I find -- and there is no dispute -- that there is some bedrock ground water contamination to the south of the Tantalo Site. It appears now to be contained, is not growing, and the remedy approved by the DEC is a conservative one, and, therefore, less costly. Natural attenuation and monitoring is all that is required.

The ground water contamination is caused principally by TCE. Both sides seem to agree on that. Robert Schick, the DEC Director of the Division of Environmental Remediation, testified that in his view the "problem" at the Site is the amount of TCE in the bedrock. (Tr. 392).[11] In the witness's view, such high concentrations of TCE suggest that liquid waste had been deposited, which is often contained in large drums.

It is also apparent that no witness, lay or expert, has been able to identify a single source of this contamination. They all seem to agree that municipal solid waste, which comprises the bulk of the fill (approximately 75%) does contain some TCE. SMI's experts, though, as explained below, believe that only about 1% of the municipal solid waste would contain TCE. Goulds Pumps suggests

---

[11]"Tr." signifies the trial transcript.

that this figure should be much higher. Goulds Pumps also contends that because of the large volume of municipal waste, it had a significant deleterious effect on the Site.

The parties are at odds as to whether Goulds Pumps introduced any TCE at the Site. Goulds Pumps claims that there is no evidence that it ever deposited liquid TCE there. SMI's theory that Goulds Pumps did so is based largely on circumstantial evidence. It has no direct evidence of such deposits by Goulds Pumps.

Goulds Pumps suggests that its proportionate share should be zero or very minimal in light of the evidence at trial. In many respects, that evidence does support Goulds Pumps' position. Charles Bauman, for instance, testified that he worked for Klionsky Scrap and that during the relevant period, he serviced both Sylvania and Goulds Pumps. He recalled transporting material from Sylvania about once a day. When he deposited refuse, he just dumped the refuse on the ground. He recalled that Sylvania deposited drums of material and although he had no specific recollection concerning volumes, he recalled that when Sylvania had a cleanup, he would take 200 to 300 large drums to the Site. (Tr. 462). He had no idea what they contained. He remembered one time getting some liquid from the top of a barrel on his hands and it burned him.

The refuse from Goulds Pumps consisted of cafeteria material, cardboard, wood, sand and some plastic. Bauman gave no testimony that Goulds Pumps deposited any liquids. He also recalled that companies that cleaned septic tanks did deposit their material at the Site.

Marvin Lay, Assistant Plant Engineer at Goulds Pumps from 1971 to 1975, testified about some of the refuse practices at Goulds Pumps. In sum, he had no information that Goulds Pumps disposed of liquid waste prior to 1973. He could not recall the presence of any liquid waste other than coolants and waste oil. The witness insisted that he was not aware of any liquid waste deposited by Goulds Pumps at the Tantalo Site. To his knowledge, no liquid waste was deposited in containers that were provided by the refuse hauler, Klionsky.

- 23 -

SMI relies to a great extent on expert testimony to support its claim against Goulds Pumps. As happens all too often, distinguished experts in the field of environmental engineering and landfill remediation have come to opposite conclusions on the critical issues before the Court.

Dr. Kirk W. Brown was one of the experts, probably the most important, retained by SMI. He was a professor for 30 years at Texas A&M and has written numerous articles on landfill remediation, disposal of wastes and other matters relating to environmental issues. He presented several opinions concerning allocation. He concluded that there was no single source of contamination at the Site. He acknowledged that municipal solid waste contains TCE, a man-made compound, but his opinion was that this Site had a much higher concentration of TCE than would normally be expected from a municipal waste facility. He determined this after his review of other landfills which demonstrated a 1:1 ratio between TCE and BTEX contaminants.[12] The Site at issue had TCE levels fifty times higher than he would expect to find at a municipal waste site.

His opinion was that municipal solid waste did not cause the off-site contamination, and, therefore, it must have been industrial solid waste that caused the problem. He believed that only 1.25% of the TCE contamination originated from municipal solid waste.

Brown's opinion was that ground water contamination was the problem at the Site, not leachate migration or the burning of refuse. He also did not believe that septic tank sludge was the source of the TCE plume.

He claimed that the foundry industry does create hazardous substances and that some cleaning solvents utilized by some in the foundry industry contained TCE. In sum, he believed that Goulds Pumps contributed to the hazardous material at the Site and based on his view of the volume deposited by Goulds Pumps and other industrial generators, he believed that Goulds Pumps, because it had the highest volume, should be responsible for 31% of the cost of remediation. He did find plaintiff, SMI, at fault for 50% of the cost.

_____

[12]"BTEX" is an acronym for benzene, toluene, ethylbenzene and xzylene, which are volatile organic compounds commonly found in petroleum products. (Tr. 684).

Several experts testified for Goulds Pumps and came to the opposite conclusion, disagreeing with many of Brown's opinions and conclusions.  William A. Stone, a principal of Environ International Corporation, has practiced for 30 years as a civil engineer and focuses on civil and environmental engineering.  He specializes in the investigation and remediation of contaminated soil and ground water.  He has worked both on landfills and industrial sites, and he has authored approximately 100 investigation reports. He is familiar with both New York and federal regulations concerning landfills.

Stone concluded that 75% to 80% of the waste at the site was contributed by municipalities. Based on his examination of the material and the volume deposited by Goulds Pumps, he concluded that Goulds Pumps was responsible for only 1.3% of the total volume.

Stone also concluded that the great majority of waste deposited by Goulds Pumps was foundry sand, and in his view, this sand would *not* contain TCE.  The other substances collected, such as floor sweepings, wood, and office trash, would have only very minute quantities of TCE.

Municipal solid waste does contain hazardous substances, albeit in a low concentration. But, if one-half to one percent of it contained hazardous substances, based on the large volume deposited at the Site, this would equal 1,500 to 3,000 tons of hazardous substances over time.

Stone believed that the better way to measure refuse's effect on a landfill is by volume, not weight.  He based his analysis on 18,000 tons deposited per year and converted that to cubic yards. Using this analysis, he determined that using weight as the parameter, Goulds Pumps accounted for 3% of the refuse but under his volume analysis, it was only 1.3%.

Dr. Robert Harris also testified on behalf of Goulds Pumps.  He is also a principal with Environ International Corporation and has been so employed since the 1980s.  Dr. Harris has extensive credentials.  He received a Masters of Science degree from the California Institute of Technology and a Ph.D. from Harvard in 1971 in Environmental Science and Engineering.  He taught at Princeton University and has worked extensively in the environmental field for several different entities, including the Environmental Defense Fund. He was appointed by President Jimmy

Carter to the Council on Environmental Quality, where he did a nationwide study of ground water quality. He has investigated several hundred landfills throughout the country. In his work for the Council on Environmental Quality, he also studied septic materials and septic tank cleaners. In his view, such cleaners used for septic tanks constitute pure phase liquid TCE.

Concerning the Tantalo Site, his opinion was that the contamination was caused by the disposal of significant amounts of liquid TCE. In his view, the overwhelming evidence was that the contamination came from the southern part of the landfill or a portion off-site immediately adjacent to it. In his view, the waste materials from Goulds Pumps did not contribute to the TCE contamination.

Harris based this opinion on several reasons: first, there was no evidence of any significant liquid waste deposited by Goulds Pumps and, second, Goulds Pumps began depositing at the Site in approximately 1968, at a time when about 20% of the Site at the southern end of the landfill had already been filled. Goulds Pumps deposits, therefore, would not have been deposited near the south end but at the north, a good distance from the area where the pollution was found.

He believed that the material deposited by Goulds Pumps is divisible and, therefore, Goulds Pumps should not be responsible for remediation costs and there should be no allocation to it.

As mentioned, he did not find any evidence that Goulds Pumps deposited liquid TCE. The highest level was 32,000 parts per billion, which must have involved a substantial deposit, and this was at the south end of the Site near the office. Samples of ground water near the shallow bedrock to the south shows a high level of TCE. (Ex. 930, Map 4-3).

In Harris's view, liquid waste or leachate at the north would *not* flow south toward the contaminated bedrock. He has studied hydrology extensively and saw no evidence that leachate would flow south to that extent. The leachate data at the Site recorded low levels of TCE which suggested TCE in amounts consistent with normal municipal solid waste.

In conclusion, Harris's opinion was that the contamination was caused by septic tank sludge that was deposited close to bedrock near the southern end of the Site. He also believed that septic

tank cleaners, which were extensively used during the early stages of the landfill's development, did contain TCE. These were the leading candidates for contamination of the bedrock.

It was also his opinion that it would not take much liquid TCE to cause high readings. It could involve only one or two gallons. In his view, neither standard municipal solid waste nor industrial solid waste would cause such high readings.

He believed that because Goulds Pumps deposited material at the landfill many years after it opened, and because over several hundred feet of landfill had been filled before it began to deposit material in 1968, (Tr. 1017-18), Goulds Pumps would not be responsible for any contamination occurring near that southern area.

Based on his studies concerning landfills in both Nassau and Suffolk Counties, Harris was positive that in the '60s and '70s there was a high level of TCE in septage. He believed that at the Tantalo Site, there was ample evidence that such a septic tank site did exist near the southern end of the Site.

## V. FINDINGS OF FACT AND CONCLUSIONS OF LAW

I am not convinced that SMI has established that Goulds Pumps should be responsible for 31% of the remediation at the Site. I find, furthermore, that plaintiff has failed to convince me that Goulds Pumps should bear any portion of the remediation costs. I find that the evidence concerning Goulds Pumps' disposal of TCE is not persuasive and I also disagree with SMI's conclusions concerning the volume of refuse deposited by Goulds Pumps.

I find the testimony of Dr. Harris and Mr. Stone to be credible and persuasive. I believe that they have exemplary credentials and practical experience and, after observing them testify, I credit their testimony and accept their conclusions.

I cannot say the same for SMI's principal expert, Dr. Brown. I find that many of the facts relied on by Brown are not clearly established. I find Brown's conclusions to involve little more than

speculation, and I also question Brown's methodology, which seems unique, in some respects, to this case. In sum, I find substantial reasons to discount the testimony and conclusions reached by Dr. Brown.

The focus concerning a need for remediation has been the presence of TCE. Plaintiff's environmental manager, Hasek, testified that the primary area of concern to the DEC and others concerning ground water pollution was the presence of TCE. As mentioned, Robert Schick, the DEC's director of the division of environmental remediation, testified at trial that "the problem" at the Site was the amount of TCE in the bedrock.

There is no credible evidence that it deposited liquid TCE, which the experts, even SMI's experts, seem to agree is the compound that has required the ground water remediation. To the extent that the allocation is based on the volume of refuse deposited, the trial evidence does not support the volume attributed to it by SMI. The evidence is stronger that other entities were the source of the liquid TCE and also that septic waste disposal and waste water sludge were a more likely cause of the contamination than Goulds Pumps' waste stream.

In my view, there is no direct evidence that Goulds Pumps ever deposited liquid TCE at the Site. There appears to be pretty substantial evidence that other entities did deposit TCE. Moreover, even plaintiff appears to concede (Plaintiff's Post-Trial Brief, p. 22) that it bases its claim of TCE contamination by Goulds Pumps on purely circumstantial evidence.

A party may, of course, rely on circumstantial evidence in presenting its case. Here though, what plaintiff describes as circumstantial evidence is vague, inconclusive and speculative. The so-called circumstantial evidence appears to be nothing more than a guess, especially since there is persuasive evidence in the record which suggests that the inference plaintiff seeks to make is unwarranted. The heart of plaintiff's case is based on Dr. Brown's opinions and conclusions. In my view, there are numerous reasons why his conclusions and opinions are suspect and should be given little weight.

- 28 -

First, there is significant doubt as to the extent to which Goulds Pumps deposited any TCE at the Site at all. Absent such proof, it is difficult to see why any costs of remediation should be allocated to Goulds Pumps. As stated, several witnesses testified that the contaminant TCE was "driving" the need for remediation. Brown himself testified that TCE was the "driving force" behind the remediation and that it was the "harm" that needed remediation. (Tr. 392).

Sand used in the foundry at Goulds Pumps was one of the substances deposited at the Site. There are no existing records as to how much of this sand was deposited there. Furthermore, there is a lack of persuasive evidence that the sand that was transported contained TCE, especially liquid TCE. It was dry waste.

Brown claimed to be familiar with the foundry industry in general. He claimed that the sand became "contaminated" by metals during the manufacturing process and that it would then constitute a hazardous substance. He never claimed, however, that the residue from the sand contained TCE. Brown claimed that those in the industry used inorganic solvents for cleaning and that those solvents *could* contain TCE. Rags used in the cleaning process could contain some as well. The discussion of what *generally* occurs in the foundry industry is of little help here, however, since there is no evidence that *Goulds Pumps* used compounds laced with TCE and deposited them at the Site. In fact, a Goulds Pumps employee, Marvin Lay, testified that Goulds Pumps' cleaning rags were sent out for cleaning to an industrial laundry.

Furthermore, even if there were some hazardous substances, such as metal, in the foundry sand, that does not equate to TCE pollution. There is a marked difference between hazardous substances and hazardous waste. (*See* Tr. 379-82). The latter may not be deposited at the landfill. Foundry sand is *not* in that category. Foundry sand is not objectionable and continues to be accepted by SMI at the Seneca Meadows landfill today. SMI's own environmental engineer, Hasek, so testified. (Tr. 164). If it constituted hazardous waste, it could not be accepted at Seneca Meadows.

After reviewing all the evidence, I believe it is clear that the focus on TCE was on *liquid* TCE. Sylvania did produce TCE, and several other industrial users had waste streams that included

TCE, but there is no evidence that Goulds Pumps deposited liquid TCE at the Site at any time, and certainly not before 1974.

The presence (or lack) of liquid TCE is important. One of plaintiff's experts, Robert D. Mutch, testified as an expert in water hydrology. He received an advanced degree at Columbia University in the subject and has participated for over three decades in hydrology, involving landfill investigation and design.

Mutch began work at the Site in 1997, 23 years after it had been closed. His opinion was that there was a zone of contaminated ground water (a plume) to the south and west of the Site. This plume was in balance and was not moving. In his view, the presence of liquid TCE is indicated by the high concentration of that contaminant in the tests. He also could not find any single industrial source for the contamination, but he believed it to be pure phase, that is, liquid TCE.

As mentioned, Bauman, who worked with his father in the waste disposal business, recalled transporting 200-300 drums of liquid material to the Site from Sylvania, not Goulds Pumps. Thomas Hasek, the environmental manager for SMI since 1996, testified that during SMI's investigation and excavation, it found 26 drums at the Site, but did not determine their contents, or their source.

Robert Schick, the DEC's Director of Environmental Remediation, testified that there is a range of TCE in a septic system. He opined that where there are high concentrations of TCE, it suggests deposits of liquid waste. He acknowledged that in its ROD in March 2001, in response to community concerns, the DEC concluded that there were drums found at the Site and that there might be additional ones buried there. It was also possible that the contents of the drums had been emptied directly into the landfill. (Ex. 16, App. A, Response 5, p. 3).

Marvin Lay was an employee of Goulds Pumps and its Assistant Plant Manager from 1968 to 1975. He had no information as to the volume of waste deposited at the Tantalo Site by Goulds Pumps. Waste coolants were kept in containers, but he had no information as to how they were disposed of prior to the 1970s and '80s when the material went to waste haulers for recycling. He could not recall any liquid waste other than coolants and waste oil. In fact, he testified that he was

- 30 -

not aware of *any* liquid waste being deposited at the Tantalo site by Goulds Pumps. To his knowledge, no liquid waste was placed in containers provided by Klionsky Scrap & Metal, a refuse hauler. Brown conceded that other depositors, including Sylvania, General Motors, and Zotos, all produced waste containing TCE. Another depositor, Evans Chemetics, is in bankruptcy and it is unclear what they produced. He testified that because there was insufficient data as to how much TCE was sent by each industrial customer, he determined that they all should be responsible in proportion to the gross volume that they deposited at the Site.

In sum, the evidence concerning Goulds Pumps' disposal of liquid TCE is virtually non-existent. In my view, the evidence does not support an inference that Goulds Pumps was responsible for any liquid TCE contamination.

The next problem is Brown's conclusion as to the volume of waste deposited by Goulds Pumps during the relevant time period. There is, to say the least, conflicting evidence on that score. Brown's ultimate conclusion concerning allocation depends on accurate information concerning volume (or weight). In my view, Brown's determination of volume is flawed.

As mentioned, GTE and Sylvania had records concerning waste volumes, but neither SMI nor Goulds Pumps did. Brown relied on several documents. First, he relied on a 1980 Engineer's Report (Ex. 184) submitted as part of an application for construction of a new landfill by a private refuse hauler, Klionsky. This report, of course, had nothing to do with the Tantalo Site. In that report, Klionsky represented that it accepted for transport 70 tons daily from Goulds Pumps, consisting of foundry sand, paper, wood, dirt, etc. (P. 3). No liquid refuse is referenced at all. More to the point, this volume, if it is accurate, relates to the year 1980, *six years* after the Tantalo Site had been closed.

Anthony Dellefave was employed by Goulds Pumps in a variety of positions. During the early 1970s he was employed in the foundry operation and in 1973, he was the Assistant Superintendent of the foundry. He testified that in about April 1978, the company began using a different type of sand and that it increased production as well. He believed there probably was 8

times the amount of waste sand used in this process as compared with what occurred previously in the 1970s. He scoffed at the suggestion that Goulds Pumps was generating 50 tons of refuse a day to the Tantalo Site up to 1974.

Furthermore, Brown's figure concerning volume does not seem consistent with another document (Ex. 184A) prepared at about the same time by another Goulds Pumps employee, Marvin Lay. Lay estimated that the yearly volume from Goulds Pumps was 13,000 tons per year, which is far less than the amount contained in the Klionsky application for its own landfill. Again, both these figures related to activity in 1980, *six years* after the relevant time period.

Brown also claimed to rely on the trial testimony of Charles Bauman, Jr. This witness's testimony was very vague though. He recalled there being twelve refuse containers at Goulds Pumps. Some were emptied daily but others were not. He had no information as to what was in the containers, the weight of the containers or how many of them were deposited at the site each day. He did opine that Klionsky made ten trips a day from Goulds Pumps to the Tantalo Site, but was vague as to whether that was before 1974 or later. In spite of these testimonial conflicts, Brown used Bauman's figure, about 50 tons a day, as a basis for his calculation concerning volume for his allocation theory.

There are other documents and reports that contain much lower estimates of volume, which Brown chose not to consider. For example, there was a 1979 Questionnaire completed by Goulds Pumps employees that referenced only 1,875 tons a year. (Ex. 138A). On cross-examination, Brown acknowledged reviewing a 1996 memo concerning expansion of the Seneca Meadows Site. (Ex. 195, p. 4). That memorandum calculated the total industrial solid waste deposited by *all* industrial users as 87,210 tons. That number for all industrial users was far less than the total volume (105,000 tons) that Brown now attributes *solely* to Goulds Pumps. During cross-examination, Brown conceded that there were several other documents from engineering firms and others that listed volumes for Goulds Pumps in amounts much lower than the one Brown used. Brown's explanation

- 32 -

was that although he respected the firms, he did not believe those particular reports could be accurate.

There are several other matters concerning Brown's methodology that are also troubling and lead me to question his ultimate conclusions. For example, Brown claimed that he used the so-called Gore factors[13] in determining the relative responsibility between the owner and those who used the Site. His conclusion was that the owner (SMI) should be accountable for 50% of the response costs. From his testimony, though, this allocation to SMI seems quite arbitrary. In answer to a question from the Court, he conceded that the ratio could have been different. Brown never established why he attributed 50% to SMI and not some other figure. He admitted that this determination was his alone and that there was no "science" involved. (Tr. 727-28). Based on this testimony, it is clear to me that using Brown's methodology, the percentage could have varied greatly. In fact, it seems totally arbitrary.

Brown admitted on cross-examination that prior to this case, he had *never* done an allocation analysis between an operator and generators of refuse. He testified that he was familiar with the "divisibility of harm" concept, which places responsibility on the party causing the harm. In this case, though, because it was not possible to trace the harm to any one entity, he determined to place responsibility on all the industrial solid waste distributors (at least those who had been sued) in proportion to the amount of waste generated by each. This procedure, of course, assumes that the refuse figures utilized are accurate. Brown conceded that if those figures were not accurate, it would affect his allocation.

Brown's formula also did not seem to account for the type of waste deposited. His assumption was that all industrial solid waste entities deposited some type of hazardous substance and, therefore, all are equally responsible in proportion to the volume deposited. He did not attempt to determine whether some entities deposited more TCE than others. Even though 75% of the refuse

---

[13](Ex. 922).

came from municipal solid waste generators -- who were not sued -- he believed that because municipal solid waste "typically" contains little TCE, their responsibility should be only about 2%. He seems to have ignored the effect that the substantial volume of such waste would have had on potential TCE contamination. Furthermore, it does not appear that Brown ever did any examination or made any inquiry of the municipalities to determine whether there had been a time when waste involving TCE had been deposited by the municipalities.

There are other problems with Brown's testimony. In arriving at his conclusions concerning "typical" municipal solid waste deposits, he used a ratio of BTEX compounds to TCE. He concluded that the ratio of BTEX to TCE at a facility where multiple solid waste was deposited should be approximately 1:1. Because the ratio at this site contained a much higher concentration of TCE to BTEX, he "assumed" that it must have come from the industrial solid waste generators. Of course, this assumed that the substantial municipal solid waste generated at the Site was "typical." There was virtually no exploration as to whether over the years, a municipal generator *did* deposit TCE, however.

In addition, Brown conceded on cross-examination that although he had written hundreds of articles and papers on related topics, he had never written anything about this BTEX-to-TCE ratio as an indicator of the nature of industrial waste, and he had never testified about such a ratio. (Tr. 715-16). He also conceded that this indicator of waste contamination was *not* used by his peers. (Tr. 716). For that reason alone, I believe his opinion on this "ratio" concept is not persuasive. Although peer review, or general acceptance in the relevant scientific community, is not always a *sine qua non* for admissibility of an expert's theory, *see Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151 (1999), the absence of such review or acceptance is often indicative of the unreliability of an expert's opinion. *See, e.g., Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 537 (7th Cir. 2005) (district court erred in admitting expert's opinion testimony, where expert's theory had not been published or otherwise subjected to peer review, and there was no evidence that his theory had gained general acceptance in the scientific community; noting that expert's "untested and unpublished theory ... has not

remediation activities are not designed to provide operators with a financial windfall. *See, e.g., G.J. Leasing Co. v. Union Electric Co.*, 54 F.3d 379, 386 (7th Cir. 1995) (CERCLA's "limitation to 'necessary' costs of cleaning up is important. Without it there would be no check on the temptation to improve one's property and charge the expense of improvement to someone else"); *see also Atlantic Richfield Co. v. Current Controls, Inc.*, No. 93-CV-0950, 1996 WL 528601, at *9 (W.D.N.Y. Sept. 6, 1996) (stating that plaintiff ARCO could "press for [defendant's] fair share of response costs through its contribution claim," and that "[a]nything else would be a windfall to ARCO").

The evidence here supports the conclusion that much of the work at this Site was done to facilitate SMI's application to obtain a permit to greatly expand its operation. A 10-year permit from the DEC to expand its Site was granted in 1981. This permit, and the ability to expand, was extremely valuable to SMI. Seneca Meadows is now the largest landfill in New York State. This is an ongoing business and SMI continues to receive, on a daily basis, tipping fees for wastes deposited at the Site. Furthermore, a former owner of SMI testified that the value of SMI, based on stock transfers, increased from approximately $2 million in 1983 to over $180 million in 2003. (Ex. 933 at pp. 48, 88; Tr. 697). Although this increase in value was one of the Gore factors, Brown never considered it in making his determinations. (Tr. 696-98).

I also agree with defendant's experts, Dr. Harris and Mr. Stone, that much of the cost of remediation is for matters that should have been addressed by SMI and its predecessors decades earlier, when the landfill closed in 1974. I agree with these witnesses that had SMI's predecessors done what should have been done to properly close this Site, many of the problems discovered at the Site would not have needed remediation in the first place. The Site closed in 1974, and it was not until 1994, 20 years later, that SMI finally made four recommendations to remediate the Site. The first consent order was not entered until 1998, the same year the DEC issued its ROD. (Ex. 4). I agree that this two-decade lapse between closure of the Site and the first serious efforts to remediate the Site was detrimental.

Stone reviewed the regulations and the permits obtained by plaintiff to operate the Site. In his view, the 1981 permit for the Seneca Meadows site required that certain steps be taken to close that part of plaintiff's operation consisting of the Tantalo Site. The permit authorized plaintiff to conduct a landfill operation adjacent to the Site north of Black Brook, but it also required closure of the existing Site. That permit had several conditions, described as "special conditions." One of the conditions required plaintiff to obtain a written evaluation from an engineer concerning the soil, its composition, and remedial work. The condition required that "said remedial work shall include any measures required for final closure as specified in Part 360." (Ex. 759). In addition, another condition required that remedial work be performed at the completed landfill south of Black Brook, including establishment of permanent vegetative cover and fill-in with compacted clay. There also had to be ground water monitoring wells from October 1981 to April 1982.

In Stone's view, these conditions were not met. The remedial work was not completed, no soil cap was placed on the Site and although the wells were eventually installed, it did not appear that they were installed in a timely manner. Stone analyzed the DEC's ROD in 1998. He believed that much of what was required in that decision should have been completed a decade or so earlier in conformity with the 1981 permit.

Dr. Harris also testified that when considering equitable factors in determining whether there should be an allocation, he believed that the New York State Regulations, at Part 360, had not been complied with and that there was a consistent pattern of substandard care by the prior owners. In his view, the evidence showed inadequate cover, leachate seeps, ponding of water and visible waste. The cost relating to remediation of the landfill should have been incurred many years earlier to properly close the Site. The Site was not properly closed according to the Part 360 Regulations or according to good practice concerning the design and maintenance of landfills.

- 37 -

## VI. CONCLUSION

Based on all the evidence, I conclude that Goulds Pumps should bear no responsibility for any portion of the response costs incurred by SMI at the Site.[14]

I believe the evidence supports the conclusion that the presence of TCE is what necessitates the ground water monitoring off the Site. I agree with defendant's experts that the depositing of liquid TCE caused the contamination. I believe that SMI has failed to establish by a preponderance of the evidence that Goulds Pumps did deposit liquid TCE. I further find that SMI has failed to prove that Goulds Pumps deposited any material containing TCE at the Site during 1968-1974. The evidence is stronger, albeit not conclusive, that other industrial users of the Site had TCE in their waste stream.

I find defendant's experts, Dr. Robert Harris and Mr. William Stone, to be credible; I accept their testimony and find it persuasive. I am not persuaded by the testimony of SMI's expert, Dr. Kirk Brown. I find that the facts he utilized were not sufficiently established. I also find his methodology suspect, especially his utilization of the TCE:BTEX ratio which has never been used previously and has not been subject to any peer review.

I also determine that Dr. Brown failed to properly consider the substantial volume of refuse deposited by municipalities and the substantial economic benefit to SMI from the remediation. He also failed to consider the long-term neglect of the Site by SMI and its predecessors. I also conclude that the Dr. Brown's determination that SMI should be responsible for only 50% of the response costs is unpersuasive, is not supported by the evidence and is arbitrary.

---

[14]I also believe that many of the costs listed by SMI as response costs are not proper. They are not necessary to accomplish the remediation. For example, the $2 million cost to construct a new road to service the new Seneca Meadows Landfill is not a reasonable, necessary charge of remediation. Since I have determined that Goulds Pumps should bear no responsibility for costs, no purpose would be served by resolving the several issues relating to the costs that SMI seeks to recover.

I find that much of the so-called response costs should be attributed to SMI. I find that the work at the Site has been of great economic benefit to SMI. I also find that much of the remediation at the Site involves procedures and expenditures that should have been performed at least 20 years earlier when the Site closed. Abandonment of the Site in 1974 without utilizing proper procedures to close the Site, as required by New York States Regulations and good practice, caused harm. I conclude that SMI seeks to extract funds from one class of depositors at the Site for work that it could have, and should have, performed itself, at its own expense, to properly conclude operations in 1974. There were problems at the Site in the 1970s, and SMI's failure to deal with those problems to the extent necessary, exacerbated the situation and caused the Site to deteriorate.

I find in favor of defendant Goulds Pumps on the plaintiffs' third amended complaint, and the complaint is dismissed, with prejudice as to Goulds Pumps. All claims by plaintiffs for contribution or allocation of plaintiffs' response costs are dismissed.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
       April 20, 2006.