<u>**EXHIBIT F**</u>

**The Evans Chemetics Acquisition Agreement**

[CONFORMED COPY]

# AGREEMENT AND PLAN OF REORGANIZATION

## Among

## W. R. GRACE & CO.

### And

## EVANS CHEMETICS, INC.

### And

## ITS SHAREHOLDERS

AGREEMENT AND PLAN OF REORGANIZATION dated December 28, 1978, among W. R. Grace & Co., a Connecticut corporation having its executive offices at 1114 Avenue of the Americas, New York, New York 10036, Evans Chemetics, Inc., a New York corporation having its principal offices at 90 Tokeneke Road, Darien, Connecticut 06820, and the shareholders of Evans Chemetics, Inc.

In consideration of the mutual covenants and agreements herein contained, the parties hereto agree as follows:.

## 1. Definitions

For purposes of this Agreement and Plan of Reorganization, the following defined terms shall have the meanings set forth in this Article 1.

"Plan" means this Agreement and Plan of Reorganization. All Article and Section numbers used herein refer to Articles and Sections of this Plan unless otherwise specifically described.

"Grace" means W. R. Grace & Co., a Connecticut corporation.

"Grace Common Stock" means Common Stock, par value $1.00 per share, of Grace.

"Company" means Evans Chemetics, Inc., a New York corporation.

"Company Assets" means Company Assets as defined in Section 3.01.

"Balance Sheet" means the balance sheet of the Company as of April 30, 1978 referred to in Section 7.07 and the related notes thereto.

"Balance Sheet Date" means April 30, 1978.

"Income Statement" means the statement of income of the Company for the fiscal year ended April 30, 1978, referred to in Section 7.07.

"Closing" means the actions to be carried out pursuant to Sections 6.02, 6.03 and 6.04.

"Closing Date" means Closing Date as defined in Section 5.01.

"Shareholder" means one of the shareholders of the Company who has executed this Plan. "Shareholders" means more than one such shareholder.

"Pledge Agent" means the Pledge Agent referred to in the Pledge Agreement.

"Pledge Agreement" means the Pledge and Security Agreement in the form of Exhibit A to this Plan, to be dated the Closing Date, among the Pledge Agent, Grace, the Company and the Shareholders.



EXHIBIT

#53 8/23/55
KW

## 2. Plan of reorganization

2.01   The reorganization will comprise the acquisition by Grace of the business and substantially all of the assets of the Company in exchange solely for shares of Grace Common Stock and the assumption by Grace of certain of the liabilities and obligations of the Company, all upon and subject to the terms and conditions hereinafter set forth.

## 3. Sale of business and assets by the Company

3.01   On the terms and subject to the conditions of this Plan, at the Closing the Company shall sell, convey, transfer, assign and deliver to Grace the Company's business as a going concern and all of its assets, properties and rights of every type and description, real, personal and mixed, tangible and intangible, including, but not limited to, all cash on hand and in banks, certificates of deposit, stocks, bonds and other securities, good will, its corporate name and all variants thereof, patents, trademarks, servicemarks, trade names, brand names, copyrights, pending applications for patents, trademarks, servicemarks and copyrights, inventions, processes, know-how, formulae, patterns, designs and trade secrets and interests thereunder, real estate and interests therein (including, but not limited to, fee interests, reversions, leaseholds and all other interests), buildings, improvements, structures, construction in progress, machinery, equipment, fixtures and other operating properties, notes and accounts receivable, stock subscriptions receivable, work in process, inventories of raw materials, finished products and supplies, rights under contracts, agreements and leases, rights in funds of whatever nature (including, but not limited to, unemployment compensation, retirement, industrial accident and pension funds but excluding insurance proceeds covering liabilities referred to in Section 4.02(b)(A)), claims for refund of any federal, state or local income or franchise tax for any period prior to and including the Closing Date, books and records (other than its minute books and stock records) and all other properties and rights of every kind and nature owned or held by the Company at the time of the Closing or then used by it in its business whether or not specifically referred to in this Plan and whether or not under its control or under the control of others. The business, assets, properties and rights of the Company to be transferred to Grace hereunder are herein collectively called the "Company Assets". Without limiting the generality of the foregoing, the Company Assets shall include all of the assets, properties and rights of the Company reflected on the Balance Sheet, except such assets, properties and rights of the Company as may have been disposed of after the Balance Sheet Date and prior to the Closing (a) in the ordinary course of business without involving any misrepresentation or breach of warranty or covenant by the Company hereunder or (b) with the express written consent of Grace.

3.02   Section 3.01 notwithstanding, the Company shall retain at the Closing $200,000 in cash to pay as provided in Section 13.01 the expenses described in Section 13.01 as being permitted to be so paid (but excluding in any event expenses incurred to discharge the liabilities described in clauses (A), (B), (C), (D), (E) and (F) of subsection (b) of Section 4.02 which Grace is not assuming. If the amount of cash retained by the Company pursuant to this Section 3.02 is in excess of the amount required to pay such expenses, the excess shall be paid over by the Company to Grace promptly and in no event later than 90 days after the Closing.

## 4. Purchase of the Company Assets by Grace

4.01   In reliance on the representations and warranties of the Company and the Shareholders under this Plan, and on the terms and subject to the conditions of this Plan, Grace shall purchase the Company Assets at the Closing.

4.02   In full consideration of the purchase of the Company Assets provided for in Section 4.01 and in full payment therefor Grace shall in the manner herein provided:

(a) at the Closing issue to the Company 192,000 shares of Grace Common Stock;

(b) at the Closing assume, and agree to pay and discharge in due course, i  the liabilities of the Company existing at the time of the Closing to the extent set forth on or reserved against in the Balance Sheet, and ii  the normal and usual current liabilities of the Company existing at the time of

2

the Closing incurred subsequent to the Balance Sheet Date by the Company in the ordinary course of business and normal and usual long term liabilities of the Company existing at the time of the Closing incurred subsequent to the Balance Sheet Date by the Company in the ordinary course of business pursuant to lawful executory contracts, agreements, leases, licenses, commitments and undertakings of the Company duly and effectively assigned to Grace at the Closing, other than (X) those, if any, required to be listed or described, but not listed or described, in the schedules delivered to Grace pursuant to Sections 7.14, 7.17, 7.25 and 7.34 and (Y) those, if any, entered into by the Company in violation of any provisions of this Plan; provided that Grace shall not assume or agree to pay and discharge (A) liabilities of the Company against which the Company is insured or otherwise indemnified, (B) liabilities of the Company to its shareholders or former shareholders arising out of their relationship as such shareholders (except for a note dated September 1, 1966, payable to Nancy C. Evans in the principal outstanding amount of $60,000 which will be paid in accordance with its terms), (C) liabilities, if any, of the Company which involve misrepresentations or breaches of warranty by the Company under this Plan, (D) liabilities, if any, incurred by the Company as a result of any act performed, transaction entered into or state of facts suffered to exist in violation of any provision of this Plan, (E) liabilities for any income tax or tax based upon or measured by income or gain arising out of or resulting from the sale, conveyance, transfer, assignment or delivery of the Company Assets provided for in this Plan, (F) liabilities for any sales, excise, transfer or other tax on or arising out of such sale, conveyance, transfer, assignment or delivery, (G) liabilities, if any, arising out of any obligation, commitment or agreement of the Company to issue capital stock, or (H) liabilities of the Company referred to in Section 13.01; and

(c) at the Closing assume, and agree to perform and fulfill the obligations to be performed and fulfilled subsequent to the Closing by the Company under, all lawful executory contracts, agreements, leases, licenses, commitments and undertakings of the Company duly and effectively assigned to Grace at the Closing, other than (i) those, if any, required to be listed or described, but not listed or described, in the schedules delivered to Grace pursuant to Sections 7.14, 7.17, 7.25 and 7.34, (ii) those, if any, entered into by the Company in violation of any provision of this Plan, and (iii) those giving rise to liabilities of the Company which are not to be assumed by Grace pursuant to subsection (b) of this Section 4.02.

## 5. Closing Date

5.01   The Closing Date shall be December 28, 1978, or such other date as the Company and Grace shall agree.

## 6. Closing; actions of the Company, the Shareholders and Grace at the Closing; further assurances

6.01.   The Closing shall take place at the offices of Messrs. Cummings & Lockwood, One Atlantic Street, Stamford, Connecticut, at 10:00 a.m. local time on the Closing Date, or at such other place as the Company and Grace shall agree.

6.02·   At the Closing, the Company shall:

(a) execute, acknowledge and deliver to Grace such good and sufficient deeds, bills of sale, endorsements, assignments and other good and sufficient instruments of sale, conveyance, transfer and assignment, with all required federal, state and local documentary and transfer stamps, if any, affixed, in form and substance satisfactory to Grace's counsel, and containing warranties consistent with the representations and warranties contained in this Plan, as shall be required or as may be desirable in order effectively to vest in Grace title to the Company Assets;

(b) execute, acknowledge and deliver to Grace, the Shareholders and the Pledge Agent copies of the Pledge Agreement;

(c) deliver to the Pledge Agent a certificate representing the number of shares of Grace Common Stock provided for in the Pledge Agreement, duly endorsed in blank by the Company or with a stock power in the usual form executed in blank by the Company, with all required federal, state and local documentary and transfer stamps, if any, affixed, at the expense of Grace, to be held as provided in the Pledge Agreement; and

(d) deliver to Grace all files, documents, papers, agreements, formulae, books of account and other records pertaining to the business or businesses conducted by the Company other than its corporate seal, minute books and stock records.

3

6.03  At the Closing, Grace shall:

(a)  deliver to the Company certificates representing 192,000 shares of Grace Common Stock registered in the name of the Company;

(b)  execute and deliver to the Company an undertaking whereby Grace assumes and agrees to pay and discharge in due course the liabilities of the Company which, pursuant to subsection (b) of Section 4.02, Grace is to assume, pay and discharge;

(c)  execute and deliver to the Company an undertaking whereby Grace assumes, and agrees to perform and fulfill those obligations to be performed and fulfilled subsequent to the Closing by the Company under, the contracts, agreements, leases, licenses, commitments and undertakings of the Company which, pursuant to subsection (c) of Section 4.02, Grace is to assume; and

(d)  execute, acknowledge and deliver to the Company, the Shareholders and the Pledge Agent copies of the Pledge Agreement.

6.04  At the Closing, each Shareholder shall execute and deliver to Grace, the Pledge Agent and the Company copies of the Pledge Agreement.

6.05  At any time or from time to time on and after the Closing the Company and the Shareholders shall, at the request of Grace and (without hereby affecting the obligations of the Company and the Shareholders under Article 15) at its expense, execute and deliver or cause to be executed and delivered all such deeds, assignments, consents, documents and instruments, and take or cause to be taken all such other actions, as Grace may deem necessary or desirable in order to put Grace in actual possession and operating control of the Company Assets, or to more fully and effectively vest in Grace, or to confirm Grace's title to and possession of, the Company Assets, or to assist Grace in exercising rights with respect thereto, or otherwise to carry out the intents and purposes of this Plan.

6.06  If after the date of this Plan and prior to the issuance by Grace of any shares of Grace Common Stock to be issued pursuant to this Plan, (a) any dividend shall be declared upon Grace Common Stock payable in shares of Grace Common Stock, the number of shares of Grace Common Stock to be issued and delivered under the Plan shall be adjusted by adding to the 192,000 shares of Grace Common Stock referred to in Section 6.03(a) the number of shares of Grace Common Stock which would be distributable to the Company if the Company had been the record holder of said 192,000 shares of Grace Common Stock on the date fixed for determining the shareholders entitled to receive such stock dividend, or (b) the outstanding shares of Grace Common Stock shall be changed into or exchanged for a different number or kind of shares of stock or other securities of Grace or of another corporation, whether through reorganization, recapitalization, stock split-up, combination of shares, merger or consolidation, there shall be substituted for each share of said 192,000 shares of Grace Common Stock referred to in Section 6.03(a) the number and kind of shares of stock or other securities into which each outstanding share of Grace Common Stock shall be so exchanged or for which each such share shall be exchanged. In the event there shall be any change, other than as specified in this Section 6.06, in the kind of outstanding shares of Grace Common Stock or of any stock or other securities into which the Grace Common Stock shall have been changed or for which it shall have been exchanged, then, there shall be effected an equitable adjustment in the number of shares of Grace Common Stock to be issued and delivered by Grace to the Company and by the Company to the Pledge Agent hereunder and under the Pledge Agreement which may be necessary to carry out the intents and purposes of this Plan.

7.  Representations and warranties by the Company and the Shareholders

Each of the schedules described in this Article 7 is dated the date of this Plan, identified specifically as a schedule to a particular Section, and initialed for purposes of identification by the Managing Director of the Company, and has heretofore been delivered to Grace by the Company.

The Company and the Shareholders represent and warrant to Grace as follows:

7.01  The information set forth in the schedule to this Section concerning the name and jurisdiction of incorporation of the Company, the authorized, issued and outstanding capital stock of the Company, the

ownership of the capital stock of the Company by each Shareholder, and the incumbent officers and directors of the Company, is true and complete. Except for the ownership described in the schedule to this Section, there exists no ownership interest whatever in capital stock of the Company.

7.02    The Company is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation set forth in the schedule to Section 7.01. The Company is duly licensed, qualified or domesticated to do business and is in good standing under the laws of the jurisdictions specified in the schedule to this Section, and neither the character or location of the properties owned by it nor the nature of the business conducted by it makes license or qualification under the laws of any other jurisdiction necessary. The Company has full power and lawful authority to carry on its business as presently conducted and to own and operate its assets, properties and business. The copies of the charter documents of the Company and all amendments thereto (certified by the Secretary of State of its jurisdiction of incorporation) and of its By-Laws as amended to date (certified by its Secretary) which have heretofore been delivered to Grace are true and complete.

7.03    All of the issued and outstanding shares of the capital stock of the Company are validly issued and outstanding, fully paid and non-assessable. There are no outstanding subscriptions, options, rights, warrants, calls, commitments or agreements relating to shares of the Company, except as specifically set forth on the schedule to this Section.

7.04    Except as specifically set forth on the schedule to this Section, the ownership of the capital stock of the Company set forth in the schedule to Section 7.01 consists of good, valid and indefeasible title, free and clear of all security interests, liens, encumbrances, options, calls, pledges, trusts, voting trusts and other stockholder agreements, covenants, restrictions, reservations and other burdens.

7.05    Except as specifically set forth on the schedule to this Section, the Company does not own or control ( directly or indirectly) any capital stock, bonds or other securities of, and does not have any proprietary interest in, any corporation, partnership, firm, association or business organization, entity or enterprise, and the Company does not control (directly or indirectly) the management or policies of any corporation, partnership, firm, association or business organization, entity or enterprise.

7.06    Except as specifically set forth on the schedule to this Section, (a) no director, officer or principal executive of the Company and no Shareholder owns, directly or indirectly, any interest in, or is a director, officer or employee of, or consultant to, any corporation, partnership, firm, association or business organization, entity or enterprise which is a competitor, potential competitor, supplier or customer of the Company, is in any way associated with or involved in the business conducted by the Company, or is a substantial competitor, supplier or customer of Grace or any of its subsidiaries, provided that ownership of not more than 2% of the capital stock of any corporation listed on a national securities exchange shall not be deemed to be ownership of an interest in such corporation for purposes of this Section; (b) no director, officer or principal executive of the Company and no Shareholder is an official or employee of or is otherwise affiliated with, any labor organization having dealings with the Company or Grace or any of its subsidiaries; (c) no director, officer or principal executive of, or any salaried employee earning over $25,000 a year of, the Company and no Shareholder owns, directly or indirectly, in whole or in part, any property, asset or right, tangible or intangible (including, but not limited to, any patent, trademark, servicemark, trade name, brand name, copyright, pending application for any patent, trademark, servicemark, or copyright, invention, process, know-how, formula, design or trade secret), which is associated with any property, asset or right owned by the Company or which the Company is presently operating or using or the use of which is necessary for its business; and (d) since December 31, 1974, no director, officer of, or salaried employee earning over $25,000 a year of, the Company and no Shareholder has, directly or indirectly, engaged in any transaction with the Company except transactions inherent in the capacities of director, officer or employee or Shareholder.

7.07    The Company has heretofore delivered to Grace copies of the following described financial statements: the balance sheets of the Company as of April 30, 1978, April 30, 1977, April 30, 1976, April 30, 1975 and April 30, 1974, and the related statements of income, retained earnings and changes in financial position of the Company for the years then ended. Each of the balance sheets described in this Section together with the respective notes thereto presents fairly the financial position of the Company as

at the date thereof and each statement of income, retained earnings and changes in financial position described in this Section presents fairly the results of operations and changes in financial position of the Company for the year which it purports to cover, all in conformity with generally accepted accounting principles applied on a basis consistent with that of prior years, except as otherwise specifically disclosed in the related notes thereto and the related reports of Price Waterhouse & Co. thereon.

7.08   The Company has no debts, liabilities or obligations of any nature whether accrued, absolute, contingent or other, and whether due or to become due, including, but not limited to, liabilities or obligations on account of taxes, other governmental charges, duties, penalties, interest or fines, and there is no basis for the assertion against the Company of any debt, liability or obligation, except:

(a) to the extent set forth on or reserved against in the Balance Sheet;

(b) normal and usual current liabilities incurred, and normal and usual obligations under agreements, undertakings and commitments entered into, in the ordinary course of business since the Balance Sheet Date; and

(c) debts, liabilities or obligations specifically set forth on the schedule to this Section.

7.09   Except as specifically set forth on the schedule to this Section there has not been since the Balance Sheet Date:

(a) any change in the condition (financial or other), properties, assets, liabilities or business of the Company except normal and usual changes in the ordinary course of business which have not in any one case or in the aggregate been materially adverse;

(b) any damage, destruction or loss (whether or not covered by insurance) materially and adversely affecting the properties, assets or business of the Company;

(c) any change in the accounting methods or practices followed by the Company or any change in depreciation, amortization or inventory valuation policies or rates theretofore adopted;

(d) any sale, lease, abandonment or other disposition by the Company of any interest in real property, or, other than in the ordinary course of business, of any machinery, equipment or other operating property, or any sale, assignment, transfer, license or other disposition by the Company of any patent, trademark, servicemark, trade name, brand name, copyright (or pending application for any patent, trademark, servicemark or copyright), invention, process, know-how, formula, pattern, design, trade secret or interest thereunder or other intangible asset;

(e) any declaration, setting aside or payment of any dividend or other distribution on or in respect of shares of the capital stock of the Company, or any direct or indirect redemption, retirement, purchase or other acquisition by the Company of any such shares; or

(f) any other occurrence, event or condition which materially adversely affects or, to the best of the knowledge of the Company and the Shareholders, may materially adversely affect the properties, assets or business of the Company.

7.10   Except as specifically set forth on the schedule to this Section, the Company does not have any liability or obligation for accounting, consulting, investment banking or legal fees, or fees, expenses or charges (including, but not limited to, brokerage or finder's fees) in connection with the negotiation, preparation, execution or performance of this Plan or the transactions contemplated hereby, and the Company has not made any payment on account of any such liability or obligation since May 1, 1976.

7.11   The Company has cooperated fully with the New York office of Price Waterhouse & Co. in the review of the financial statements of the Company made by Price Waterhouse & Co. prior to the date hereof in connection with the transactions contemplated by this Plan.

7.12   Except as specifically set forth on the schedule to this Section, (a) the Company has, with respect to each of its fiscal years of 1970 through 1978, duly and timely filed all tax returns required to be filed by it or for which it may be held responsible, has paid all taxes shown to be due and payable on such returns, has paid all deficiencies and assessments with respect to any years or periods notice of which has

6

been received by the Company and has paid all other taxes, governmental charges, duties, penalties, interest and fines due and payable by it on or before the date of this Plan, including, without limitation, those with respect to years or periods prior to the Company's fiscal year of 1970; (b) all income and franchise tax returns of the Company for its fiscal years of 1970 through 1976 have been audited by the taxing authorities and all taxes, deficiencies and assessments affecting the Company for any year covered by any such return have been finally determined and paid; (c) there are no agreements, waivers or other arrangements providing for an extension of time with respect to the filing of any tax returns by the Company or the payment by, or assessment against, the Company of any tax, governmental charge, duty or deficiency; (d) there are no suits, actions, claims, investigations, inquiries or proceedings pending or, to the best of the knowledge of the Company and each of the Shareholders, threatened against the Company in respect of taxes, deficiencies, governmental charges, duties or assessments, or any matters under discussion with any governmental authority relating to taxes, deficiencies, governmental charges, duties or assessments, or any claims for additional taxes, deficiencies, governmental charges, duties or assessments asserted by any such authority; and (e) the accruals made for taxes, governmental charges and duties on the Balance Sheet are sufficient for the payment of all unpaid taxes, governmental charges and duties payable by the Company attributable to all periods ended on or before the Balance Sheet Date. Since the Balance Sheet Date, the Company has not incurred, nor are there accruable, any debts, liabilities or obligations (whether absolute, contingent or otherwise, whether due or to become due and whether or not presently outstanding) on account of taxes other than on account of the kinds of taxes in respect of which accruals have been made on the Balance Sheet and there is no basis for the assertion of a claim for any such debts, liabilities or obligations against it except for the kinds of taxes in respect of which such accruals have been made and at rates not in excess of the rates of taxation reflected in such accruals. Since the Balance Sheet Date, the Company has made adequate provisions in its books for all taxes accruable by it with respect to its operations for such period, which provisions, except as specifically set forth on the schedule to this Section, are not in excess of an amount in the same proportion to the income before income taxes of the Company since the Balance Sheet Date as the amount of all taxes applicable to the period ended on the Balance Sheet Date bears to the income before income taxes of the Company reflected in the Income Statement. The Company has withheld or collected from each payment made to each of its employees the amount of all taxes (including, but not limited to, federal income taxes, Federal Insurance Contribution Act taxes and state and local income, payroll and wage taxes) required to be withheld or collected therefrom and has paid the same to the proper tax receiving officers. The Company has not filed a consent with the Internal Revenue Service pursuant to Section 341(f) of the Internal Revenue Code of 1954, as amended.

7.13    The schedule to this Section sets forth a complete description by metes and bounds or lot, block and section of each parcel of real property owned by the Company, together with a summary description of the buildings, structures and improvements thereon. The Company has good, indefeasible and marketable title in fee simple absolute to all real property which it purports to own (including, but not limited to, that reflected on the Balance Sheet) and to the buildings, structures and improvements thereon, in each case free and clear of all security interests, liens, encumbrances, mortgages, pledges, equities, charges, assessments, easements, covenants, restrictions, reservations, defects in title, encroachments and other burdens, whether or not the same render the title to such real property unmarketable, except as specifically set forth on the schedule to this Section.

7.14    The schedule to this Section sets forth a description of the premises, buildings, structures and improvements covered by each lease of real property to which the Company is a party, a description of all other interests of the Company in real property, and a list of all contracts, agreements, concessions, leases, licenses, commitments and undertakings relating to or affecting real estate or any interests therein to which the Company is a party or by which the Company or any property of the Company is in any way bound or affected, together with all amendments and supplements thereto and modifications thereof. The Company has heretofore delivered or made available to Grace true and complete copies of all such contracts, agreements, concessions, leases, licenses, commitments, undertakings, amendments, supplements and modifications. All such contracts, agreements, concessions, leases, licenses, commitments, undertakings, amendments, supplements and modifications are legally valid and binding upon the Company (and neither the Company nor any of the Shareholders has any knowledge or reason to believe that such are not

7

legally valid and binding on the other party or parties thereto) and in full force and effect, and there are no defaults thereunder of the Company or, to the best of the knowledge of the Company and each of the Shareholders, of other parties thereto.  The Company does not purport to have any leasehold or other interest in real property except as reflected on the schedule to this Section and the schedule to Section 7.13. The Company has the right to quiet enjoyment of all real property leased to it for the full term of each lease and any renewal option related thereto, and no leasehold or other interest of the Company in real property is subject or subordinate to any security interest, lien, encumbrance, mortgage, pledge, equity, charge, assessment, easement, covenant, restriction, reservation, defect in title, encroachment or other burden, whether or not the same constitutes a lien or renders the title to such real property unmarketable, except as specifically set forth on the schedule to this Section or the schedule to Section 7.13.  None of the rights of the Company under any such leasehold or other interest in real property will be impaired by the consummation of the transactions contemplated by this Plan, and all of such rights will be enforceable by Grace after the Closing without the consent or agreement of any other party, except such consents or agreements as are specifically set forth on the schedule to this Section.

7.15.  Except as specifically set forth on the schedule to this Section, the Company has all easements and rights of ingress and egress and for utilities and services necessary for all operations conducted by it. Neither the whole nor any portion of any real property owned, leased or occupied by the Company has been condemned, requisitioned or otherwise taken by any public authority, and, to the best of the knowledge of the Company and each of the Shareholders, no such condemnation, requisition or taking is threatened or contemplated.

7.16  The Company has good, indefeasible and marketable title to all personal property which is reflected on the Balance Sheet (except as disposed of since the Balance Sheet Date in the ordinary course of business and without involving any misrepresentation or breach of warranty or covenant under this Plan by the Company or any Shareholder) or which the Company otherwise purports, pursuant to this Plan or the schedules hereto, to own, free and clear of all security interests, liens, encumbrances, restrictions and other burdens, except as specifically set forth on the schedule to this Section.

7.17  The schedule to this Section sets forth a list of all machinery, equipment, vehicles, vessels, aircraft and other tangible personal property covered by each lease of personal property to which the Company is a party, a description of all other interests (except ownership interests) of the Company in tangible personal property, and a list of all contracts, agreements, leases, licenses, commitments and undertakings relating to or affecting any interest in tangible personal property to which the Company is a party or by which the Company or any property of the Company is in any way bound or affected, together with all amendments and supplements thereto and modifications thereof (each such list setting forth general categories rather than specific items in the case of routing and immaterial matters). The Company has heretofore delivered or made available to Grace true and complete copies of all such contracts, agreements, leases, licenses, commitments, undertakings, amendments, supplements and modifications. All such contracts, agreements, leases, licenses, commitments, undertakings, amendments, supplements and modifications are legally valid and binding upon the Company (and neither the Company nor any of the Shareholders has any knowledge or reason to believe that such are not legally valid and binding on the other party or parties thereto) and in full force and effect, and there are no defaults thereunder of the Company or, to the best of the knowledge of the Company and each of the Shareholders, of other parties thereto.  The Company does not purport to have any leasehold or other such interest in tangible personal property except as reflected on the schedule to this Section.  No leasehold or other interest of the Company in tangible personal property is subject or subordinate to any security interest, lien, encumbrance, mortgage, pledge, equity, defect in title or other burden except as specifically set forth on the schedule to this Section or the schedule to Section 7.16.  None of the rights of the Company under any such leasehold or other interest in tangible personal property will be impaired by the consummation of the transactions contemplated by this Plan, and all of such rights will be enforceable by Grace after the Closing without the consent or agreement of any other party, except such consents or agreements as are specifically set forth on the schedule to this Section.

7.18  Except as specifically set forth on the schedule to this Section, all buildings, offices, shops and other structures and all machinery, equipment, tools, dies, fixtures, vehicles, vessels, aircraft, spare parts

8

and other properties owned, leased or used by the Company (whether under its control or the control of others) are in generally good operating condition and repair and are adequate and sufficient for all operations conducted by it, or can be restored to such condition at an aggregate cost of $25,000 or less.

7.19   Except as specifically set forth on the schedule to this Section, none of the real or personal properties owned, leased, occupied or operated by the Company, or the ownership, leasing, occupancy or operation thereof, is in violation of any law or any building, zoning or other ordinance, code, rule or regulation (except such thereof as relate to environmental matters or occupational safety and health, which matters are referred to in Section 7.35), and no notice from any governmental body or other person has been served upon the Company or upon any property owned, leased, occupied or operated by the Company claiming any violation of any such law, ordinance, code, rule or regulation or requiring, or calling attention to the need for, any work, repairs, construction, alterations or installation on or in connection with such property which has not been complied with. The Company has the right to use its properties for all operations conducted by it, except as specifically set forth on the schedule to this Section or on the schedule to Section 7.28 and 7.35.

7.20   The inventories of the Company shown on the Balance Sheet consist of items of a quality and quantity usable and salable in the normal course of its business, and the values of items which are below standard quality or are obsolete or otherwise unmarketable have been written down on the Balance Sheet to net realizable value, or adequate reserves have been provided therefor. The inventories of the Company acquired subsequent to the Balance Sheet Date have been acquired in the ordinary course of business and the values of items which are below standard quality have been written down on its books of account to net realizable value, or adequate reserves have been provided therefor. The values at which the inventories of the Company are carried reflect the customary inventory valuation policy consistently applied by it of stating inventory at the lower of cost or market, on the last-in first-out method, all in accordance with generally accepted accounting principles.

7.21   All notes and accounts receivable of the Company have arisen in the ordinary course of business and have been collected or, except as set forth on the schedule to this Section, as of the date hereof are, and as of the Closing Date will be, collectible in due course in the aggregate recorded amounts thereof less (a) with respect to notes and accounts receivable shown on the Balance Sheet, the applicable reserves in respect thereof shown on the Balance Sheet, and (b) with respect to notes and accounts receivable acquired subsequent to the Balance Sheet Date, the applicable reserves set up on its books in respect thereof, which reserves are not in excess of an amount in the same proportion to the notes and accounts receivable acquired by it subsequent to the Balance Sheet Date as the applicable reserves shown on the Balance Sheet bear to the aggregate recorded amounts of the notes and accounts receivable shown on the Balance Sheet.

7.22   (a) The schedule to this subsection (a) of this Section sets forth:

(i) in Part I a complete list of all U. S. and foreign patents and patent applications which are owned by the Company;

(ii) in Part II a complete list of all U. S. and foreign patents and patent applications under which the Company holds any right, license or interest apart from the patent property set forth in Part I of the schedule to this subsection (a) and an indication of the nature of such right, license or interest in each instance; and

(iii) in Part III a complete list of all agreements, commitments, contracts, understandings, licenses, assignments, indemnities and the like (whether written or oral, express or implied) which relate or in any way refer or pertain to:

(A) any of the U. S. or foreign patents and patent applications referred to in Part I and Part II of the schedule to this subsection (a) or to

9

(B) any inventions, processes, know-how, formulae, designs, trade secrets, proprietary or confidential information or the like which are:

(1) owned or controlled (in the sense of having the right to grant licenses to others) by the Company, or

(2) licensed to or otherwise made available to the Company, or

(3) now utilized or have previously been utilized in conjunction with the business of the Company.

All patents set forth in Part I of the schedule to this subsection (a) are valid and in force and all patent applications set forth therein are pending and in good standing, all without challenge of any kind, and the Company owns the entire right, title and interest in and to such patents and patent applications without qualification, limitation, burden or encumbrance of any kind.

A true and complete copy has heretofore been furnished to Grace of all of the aforesaid patents, patent applications, agreements, commitments, contracts, understandings, licenses, assignments, indemnities and the like as are in writing, and a detailed and complete written description has heretofore been furnished to Grace with respect to all such agreements, commitments, contracts, understandings, licenses, assignments, indemnities and the like (whether express or implied) as are not entirely in writing. To the best of the knowledge of the Company and each of the Shareholders, for the conduct of the business of the Company as now conducted and the continuation of such business hereafter, no right, license, consent or permission or the like is or will be required with respect to any patent or patent application in any country other than the patent property referred to in Part II of the schedule to this subsection (a); nor is any right, license, consent or permission or the like now or hereafter required for such purposes in respect of any inventions, processes, know-how, formulae, designs, trade secrets, proprietary or confidential information, or the like other than as set forth in Part III of the schedule to this subsection (a). To the best of the knowledge of the Company and each of the Shareholders, no infringement of any U.S. or foreign patent or patent right has occurred or results from or is in any way involved in connection with the operations of the Company, the use by the Company of its raw materials, equipment and manufacturing processes, the manufacture, performance, sale and/or use by the Company of its products and services, the receipt or use of the Company's products and services by its customers for the purposes for which sold, or the promotion and advertising by the Company of its products and services. No claim or threat of patent infringement has been made or implied in respect of any of the foregoing matters and neither any of the Shareholders nor the Company is aware of the existence of any patent or patent application anywhere which poses or may pose an infringement question or issue in any such regard. None of the patents or patent applications referred to in Part I and Part II of the schedule to this subsection (a) is involved in an interference, conflict or opposition proceeding and there has been no threat or other indication that any such proceeding will hereafter be declared or commenced. Neither any of the Shareholders nor the Company has any information or other reason to know or suspect that any such proceeding will hereafter be declared or commenced or that the Company has or will have any basis for provoking or initiating a patent interference, conflict or opposition proceeding with respect to patent property held by others anywhere. Neither any of the Shareholders nor the Company has any information or other reason to know or suspect that any of the patents or patent applications listed in Part I and Part II of the schedule to this subsection (a) has been, is being, or will be infringed by others; nor does any Shareholder or the Company have any information or other reason to know or suspect that any person, firm, or corporation has sought, is seeking, or will seek to obtain patent coverage on any invention or development used in the conduct of the business of the Company or which is the subject of any of the patents and patent applications listed in Part I and Part II of the schedule to this subsection (a) apart from the patentee(s) and applicant(s) currently referred to in such patents and patent applications. "To the best of the knowledge of the Company and each of the Shareholders" for purposes of this paragraph means present, actual, and existing knowledge only, and does not include nor in any way imply knowledge which the Company or Shareholders might have had or reasonably should have had if detailed searches or investigations had been made.

(b) The schedule to this subsection (b) sets forth:

(i) in Part I a complete list of all Proprietary Names and all copyright applications and registrations which are owned by the Company together with a complete list of all registrations and applications for registration of such Proprietary Names in all countries of the world;

(ii) in Part II a complete list of all Proprietary Names, both registered and unregistered, and copyright registrations and applications which the Company uses in the conduct of its business or under which the Company holds any right, license or interest apart from the Proprietary Names and copyright registrations set forth in Part I of the schedule to this subsection (b) and a description of the nature of such right, license or interest in each instance; and

(iii) in Part III a complete list of all agreements, commitments, contracts, understandings, licenses, assignments, indemnities and the like (whether written or oral, express or implied) which relate or in any way refer or pertain to any of the Proprietary Names, copyrights, registrations, and applications referred to in Part I and Part II of the schedule to this subsection (b).

As used in this subsection (b), the term "Proprietary Names" means and includes any and all trademarks, servicemarks, trade names, brand names, and the like, whether registered or unregistered.

All registrations for the Proprietary Names and copyrights listed in Part I of the schedule to this subsection (b) are valid and in force and all applications for such registrations are pending and in good standing, all without challenge of any kind, and the Company owns the entire right, title, and interest in and to such Proprietary Names and all registrations and applications for registration of such Proprietary Names and copyright registrations and applications without qualification, limitation, burden or encumbrance of any kind.

A true and complete copy has heretofore been furnished to Grace of all the aforesaid Proprietary Names and copyright applications, registrations, agreements, contracts, commitments, understandings, licenses, assignments, indemnities and the like as are in writing, and a detailed and complete written description has heretofore been furnished to Grace with respect to all such agreements, commitments, contracts, understandings, licenses, assignments, indemnities and the like (whether express or implied) as are not entirely in writing. To the best of the knowledge of the Company and each of the Shareholders, for the conduct of the business of the Company as now conducted and the continuation of such business hereafter, no right, license, consent, permission or the like is or will be required with respect to any Proprietary Names or copyright in any country other than the Proprietary Names and copyrights referred to in Part II of the schedule to this subsection (b). To the best of the knowledge of the Company and each of the Shareholders, no infringement of any Proprietary Names or registrations thereof or copyrights has occurred or results from or is in any way involved in connection with the operations of the Company, the manufacture, labelling and sale by the Company of its products, the performance and designation by the Company of its services, the receipt or use of the Company's products and services by its customers for the purposes for which sold, the promotion and advertising by the Company of its products and services, or any publication of the Company. No claim or threat of Proprietary Names or copyright infringement has been made or implied in respect of any of the foregoing matters and neither any of the Shareholders nor the Company is aware of the existence of any Proprietary Name or copyright anywhere which poses or may pose an infringement question or issue in any such regard. None of the Proprietary Names or registrations or applications to register such Proprietary Names referred to in Part I or Part II of the schedule to this subsection (b) is involved in any opposition, cancellation, nullification, interference, conflict, or concurrent use proceeding and there has been no threat or other indication that any such proceeding will hereafter be declared or commenced. Neither any of the Shareholders nor the Company has any information or other reason to know or suspect that any such proceeding will hereafter be declared or commenced or that the Company has or will have any basis for provoking or initiating a trademark cancellation, nullification, interference, conflict, or concurrent use proceeding with respect to Proprietary Names held or used by others anywhere. Neither any of the Shareholders nor the Company has any information or other reason to know or suspect that any of the Proprietary Names or copyrights listed in Part I and Part II of the schedule to this subsection (b) has been, is being, or will be infringed by others; nor does any of the Shareholders or the Company have any information or other reason to know or suspect that any person, firm or corporation has used or registered, or is seeking to use or register, or will seek to use or register any of the Proprietary Names or copyrights listed in Part I and Part II of the schedule to this subsection (b). "To the best of the knowledge of the Company and each of the Shareholders" for purposes of this paragraph means present, actual, and existing knowledge only, and does not include nor

in any way imply knowledge which the Company or Shareholders might have had or reasonably should have had if detailed searches or investigations had been made.

7.23  To the best of the knowledge of the Company and each of the Shareholders, there are no new developments in any business conducted by the Company, nor any new or improved materials, products, processes or services useful in connection with the business of the Company or its customers or suppliers as presently conducted, which may have a material adverse effect on the properties, assets or business of the Company.

7.24  No officer or director of, or salaried employee earning over $25,000 a year of, the Company has entered into any agreement which is now in effect with any person, corporation, partnership, firm, association or business organization, entity or enterprise (other than the Company) requiring such person to assign any interest in any inventions or trade secrets or to keep confidential any trade secrets or containing any prohibition or restriction of competition or solicitation of customers.

7.25  The schedule to this Section lists specifically each of the following contracts, agreements, commitments and other documents to which the Company is a party or by which the Company or any of the properties or assets of the Company is in any way affected or bound:

(a)  Each contract, agreement or commitment in respect of the sale of products or the performance of services, or for the purchase of inventories, equipment, raw materials, supplies, services or utilities, other than any contract, agreement or commitment which involves payments or receipts by the Company of less than $15,000 and (except in the case of any immaterial agreement covering routine services or supplies provided to the Company) is either terminable by the Company without penalty or to be fully performed within six months from the date of this Plan.

(b)  Each sales agency, distributorship or brokerage agreement or franchise.

(c)  Each collective bargaining, union, employment, noncompetition or secrecy agreement.

(d)  Each loan or credit agreement, security agreement, guaranty, indenture, mortgage, pledge, conditional sale or title retention agreement, equipment obligation, lease purchase agreement or instrument evidencing indebtedness.

(e)  Each partnership, joint venture, joint operating or similar agreement.

(f)  Each contract, agreement or commitment other than those of the types covered by subsections (a) through (e), inclusive, of this Section which (i) involves payments or receipts by the Company of $15,000 or more, or (ii) is not terminable by the Company without penalty or not to be fully performed within six months from the date hereof (except in the case of any immaterial agreement covering routine services or supplies provided to the Company), or (iii) otherwise materially affects the condition (financial or other), properties, assets or businesses of the Company.

All of such contracts, agreements and commitments are legally valid and binding upon the Company (and neither the Company nor any of the Shareholders has any knowledge or reason to believe that such are not legally valid and binding on the other party or parties thereto) and in full force and effect, and there are no defaults thereunder of the Company or, to the best of the knowledge of the Company and each of the Shareholders, of other parties thereto. None of the rights of the Company thereunder (except as specified on the schedule to this Section) will be impaired by the consummation of the transactions contemplated by this Plan, and all of the rights of the Company thereunder (except as specified on the schedule to this Section) will be enforceable by Grace after the Closing (subject to applicable bankruptcy, insolvency, moratorium and other laws affecting creditors' rights generally, neither the Company nor any of the Shareholders being presently aware of any facts indicating that any of such other parties are bankrupt or insolvent) without the consent or agreement of any other party except consents and agreements specifically listed in the schedule to this Section. Copies of all documents described in the schedule to this Section have heretofore been delivered or made available to Grace by the Company and are true and complete and include all amendments and supplements thereto and modifications thereof.

7.26  The schedule to this Section lists specifically each of the following described documents, and the copies thereof heretofore delivered or made available by the Company to Grace are true and complete and include all amendments and supplements thereto and modifications thereof:

(a) Each contract, agreement, arrangement or commitment entered into after April 30, 1973, whether or not fully performed, in respect of the issuance of capital stock, bonds or other securities of the Company.

(b) Each contract, agreement, arrangement or commitment entered into after April 30, 1973, whether or not fully performed, pursuant to which the Company has acquired or disposed of any substantial portion of its business or assets.

(c) Each inspection report, questionnaire, inquiry, demand or request for information received after April 30, 1973, by the Company from (and each response of the Company thereto), and each statement, report or other document filed after April 30, 1973, by the Company with, any federal, state or local governmental body or administrative agency (including, but not limited to, the Securities and Exchange Commission, Federal Trade Commission, Department of Justice, Department of Labor, National Labor Relations Board, Interstate Commerce Commission and health and environmental agencies), and any stock exchange, other than any request for information received from the Internal Revenue Service in connection with its audit of federal income tax returns and routine questionnaires and requests for information received by members of the industry generally.

(d) The federal, state and local income, and other income and franchise tax returns of the Company (including, but not limited to, foreign tax returns of the Company) for the five years ended April 30, 1977.

(e) Each audit report or other formal report submitted to the Company after April 30, 1973, by independent accountants in connection with any annual or interim audit of the books of the Company or by the Internal Revenue Service in connection with the audit of any federal income tax return of the Company or by any state or local tax authorities in connection with the audit of any state or local tax return of the Company.

(f) Each market survey, management study, engineering report or other special report or study concerning the business or assets of the Company submitted to the Company after April 30, 1973, by any independent business, marketing, engineering or other consultant.

(g) Each statement (including, but not limited to, completed questionnaires) concerning conflicts of interest, commercial bribery or improper payments received after April 30, 1973, by the Company from any of its directors, officers or employees.

(h) Each formal report of the Company submitted to its stockholders after April 30, 1973.

7.27  Except as specifically set forth on the schedule to this Section, the Company is not, and is not alleged to be, in default under, or in breach of any term or provision of, any contract, agreement, lease, license, commitment, instrument or fiduciary or other obligation, except defaults or breaches, if any, which would not result in damages to the Company in any individual case in excess of $500 or in the aggregate in excess of $10,000 and which would not in any individual case or in the aggregate have a material adverse effect on the Company's properties, assets or business.  No other party to any contract, agreement, lease, license, commitment, instrument or fiduciary or other obligation to which the Company is a party is in default thereunder or in breach of any term or provision thereof, except defaults or breaches, if any, which would not result in damages to the Company in any individual case in excess of $500 or in the aggregate in excess of $10,000 and which would not in any individual case or in the aggregate have a material adverse effect on the Company's properties, assets or business.  To the best of the knowledge of the Company and each of the Shareholders, there exists no condition or event which, after notice or lapse of time or both, would constitute a default by any party to any such contract, agreement, lease, license, commitment, instrument or fiduciary or other obligation.

7.28  There is (i) no suit, action or claim, (ii) no investigation or inquiry, known to the Company or any of the Shareholders, by any administrative agency or governmental body, and (iii) no legal, administrative or arbitration proceeding pending or, to the best of the knowledge of the Company and

13

each of the Shareholders, threatened against any Shareholder or the Company or any of the properties, assets or business of the Company or to which the Company is or might become a party, and there is, to the best of the knowledge of the Company and each of the Shareholders, no basis or grounds for any such suit, action, claim, investigation, inquiry or proceeding, except as specifically set forth on the schedule to this Section, which schedule also specifies each suit, action, claim, investigation, inquiry or proceeding of a type referred to in this Section pending at any time since April 30, 1973. There is no outstanding order, writ, injunction or decree of any court, administrative agency or governmental body or arbitration tribunal against or, to the best of the knowledge of the Company and each of the Shareholders, affecting any Shareholder or the Company or any of the capital stock, properties, assets or business of the Company except as specified in the schedule to this Section.

7.29   The Company has all governmental leases, licenses and permits (except such thereof as relate to environmental matters or occupational safety and health, which matters are referred to in Section 7.35) necessary to conduct its business and to operate its properties and assets, and such leases, licenses and permits are in full force and effect. No violations (except such thereof as relate to environmental matters or occupational safety and health, which matters are referred to in Section 7.35) exist or have been recorded in respect of any governmental lease, license or permit of the Company. No proceeding is pending or to the best of the knowledge of the Company and each of the Shareholders, threatened looking toward the revocation or limitation of any such governmental lease, license or permit and there is to the best of the knowledge of the Company and each of the Shareholders, no basis or grounds for any such revocation or limitation except as specifically set forth on the schedule to Section 7.28. Except as set forth on the schedule to this Section, the Company has complied with all laws, rules, regulations, ordinances, codes, orders, licenses and permits (except such thereof as relate to environmental matters or occupational safety and health, which matters are referred to in Section 7.35) relating to any of its properties or applicable to its business including, but not limited to, the labor and antitrust laws, except for such non-compliance as would not result in the case of any individual instance of non-compliance in damages to the Company in excess of $500 and in the case of all instances of non-compliance in excess of an aggregate of $10,000 and would not in any individual case or in the aggregate have a material adverse effect on the Company's properties, assets or business.

7.30   Since April 30, 1973, there has not been any written correspondence with, and since January 1, 1976, there has not been any matter under discussion with, any labor union, and since April 30, 1973, there has not been any strike, work stoppage or labor trouble relating to employees of the Company, except as specified on the schedule to this Section. Since April 30, 1973, there has not been any change in the relationship or course of dealing between the Company and any of its suppliers or customers which has had or could have a material adverse effect on the present or future business of the Company, except as specifically set forth on the schedule to this Section.

7.31   The schedule to this Section sets forth (a) the name and the current annual salary and other compensation or the rate of compensation payable by the Company to each employee whose current total annual compensation or estimated compensation from the Company (including, but not limited to, normal bonus, profit sharing and other extra compensation) is $30,000 or more, and each director and each officer, (b) the profit sharing, bonus or other form of extra compensation paid or payable by the Company to or for the benefit of each such person for the fiscal years ended April 30, 1976, April 30, 1977 and April 30, 1978, (c) any increase, since April 30, 1978, in the total compensation or in the rate of total compensation payable or to become payable by the Company to each such person, (d) any general increase, since April 30, 1978, in the total compensation or rate of total compensation payable or to become payable by the Company to salaried employees other than those specified in clause (a) of this Section or to hourly employees ("general increase" for purposes of this Section means any increase generally applicable to a class or group of employees and not including increases granted to individual employees for merit, length of service, change in position or responsibility or other reasons applicable to specific employees and not generally to a class or group thereof), (e) each loan or advance (other than routine travel advances repaid or formally accounted for within 60 days and routine vacation advances) made by the Company to any director, officer or employee or shareholder of the Company since April 30, 1975, and the current status thereof, whether or not presently outstanding and (f) each consultant who has been engaged by or consulted with the Company at any time since April 30, 1976.

14

7.32   The schedule to this Section sets forth (a) the name of each bank in which the Company has an account or safe deposit box and the names of all persons authorized to draw thereon or to have access thereto, and (b) the name of each person, corporation, firm, association or business organization, entity or enterprise holding a general or special power of attorney from the Company and a summary of the terms thereof.

7.33   The schedule to this Section sets forth each insurance policy (specifying the insurer, the amount of the coverage, the type of insurance, the policy number, the expiration date, the annual premium and any pending claims thereunder) maintained by the Company on its properties, assets, business or personnel, and true and complete copies of the most recent inspection reports, if any, received from insurance underwriters as to the conditions of the properties and assets owned, leased, occupied or operated by it or the conduct of its business. The Company is not in default with respect to any provision contained in any insurance policy, and the Company has not failed to give any notice or present any claim under any insurance policy in due and timely fashion. The insurance maintained by the Company on its properties, assets, business and personnel is adequate in accordance with the standards of businesses of comparable size in the industries in which the Company operates.

7.34   (a)   Part I of the schedule to this Section lists each "employee welfare benefit plan" (as defined in Section 3(1) of the Employee Retirement Income Security Act of 1974 ("ERISA")) maintained by the Company or to which the Company contributes or is required to contribute, including any multiemployer plan, ("Welfare Benefit Plan") and sets forth as of the Balance Sheet Date (i) the amount of any liability of the Company for payments due with respect to any Welfare Benefit Plan and (ii) the amount of any payment made and to be made, stated separately, by the Company with respect to any Welfare Benefit Plan for the plan year during which the Closing is to occur.

(b)   Part II of the schedule to this Section lists each "employee pension benefit plan" (as defined in Section 3(2) of ERISA) maintained by the Company or to which the Company contributes or is required to contribute, including any multiemployer plan, ("Pension Benefit Plan"). With respect to each Pension Benefit Plan which is subject to Title I, Part 3 of ERISA (concerning "Funding"), the funding method used in connection with such Pension Benefit Plan is acceptable under Section 3(31) of ERISA, and Part II of the schedule to this Section sets forth as of the Balance Sheet Date (i) the unfunded liability for all accrued benefits (at projected final average salaries, if applicable) under such Pension Benefit Plan, (ii) the funding method used in connection with such Pension Benefit Plan, (iii) the actuarially computed value of vested benefits (at projected final average salaries, if applicable) under such Pension Benefit Plan, (iv) the fair market value of the assets held to fund such Pension Benefit Plan, (v) the amount and plan year of any "accumulated funding deficiency" as defined in Section 302(a)(2) of ERISA (whether arising on account of inadequate Company contributions, improper amortization of charges or credits in any funding standard account, improper determination of any such charge or credit, or any other reason) which exists with respect to any plan year of such Pension Benefit Plan, (vi) the amount of any contribution by the Company paid and to be paid, stated separately, to any entity through which such Pension Benefit Plan is funded for the plan year during which the Closing is to occur and (vii) the actuarial assumptions used in connection with funding such Pension Benefit Plan. With respect to each Pension Benefit Plan which is an "individual account plan" (as defined in Section 3(34) of ERISA), Part II of the schedule to this Section sets forth as of the Balance Sheet Date (A) the amount of any liability of the Company for any contributions due with respect to such Pension Benefit Plan and (B) the amount of any contribution paid and to be paid, stated separately, by the Company with respect to such Pension Benefit Plan for the plan year during which the Closing is to occur.

(c)   All of the Pension Benefit Plans and any related trust agreements or annuity contracts (or any other funding instruments) comply with the provisions of ERISA and the Internal Revenue Code of 1954, as amended, ("Code"), where required, and all other applicable laws, rules and regulations, except that the only representations made under this subparagraph (c) with respect to compliance with Part 2 of Subtitle B of Title I of ERISA and the corresponding provisions of the Code are that a favorable determination as to the qualification under the Code of each of the Pension Benefit Plans and each amendment thereto, has been made by the Internal Revenue Service, and each such Pension Benefit Plan

15

has been administered in accordance with the terms thereof (including each amendment thereto); and all necessary governmental approvals for the Pension Benefit Plans have been obtained.

(d) To the best of the knowledge of the Company and each of the Shareholders, each Welfare Benefit Plan and each Pension Benefit Plan has been administered to date in compliance with the requirements of ERISA. Future compliance with the requirements of ERISA as in effect on the date of Closing or any collective bargaining agreements to which the Company is a party will not result in any increase in the rate of benefit accrual under any Pension Benefit Plan except as otherwise stated in Part III of the schedule to this Section.

(e) On and after January 1, 1975, no plan fiduciary of any Welfare Benefit Plan or Pension Benefit Plan has engaged in any transaction in violation of Section 406(a) or (b) of ERISA or any "prohibited transaction" (as defined in Section 4975(c)(1) of the Code) for which no exemption exists under Section 4975(d) of the Code.

(f) On and after September 2, 1974, there has been no "reportable event" (as defined in Section 4043(b) of ERISA and the regulations of the Pension Benefit Guaranty Corporation ("PBGC") under such Section) with respect to any Pension Benefit Plan subject to Title IV of ERISA. No liability to the PBGC has been incurred by the Company or any member of the controlled group of corporations (as defined in Section 414(b) of the Code) of which the Company is a member on account of any termination of an employee pension benefit plan subject to Title IV of ERISA. On and after September 2, 1974 no proceeding has been commenced to terminate any employee pension benefit plan subject to Title IV of ERISA maintained, or wholly or partially funded, by the Company (or any member of such controlled group of corporations). Neither the Company nor any member of such controlled group of corporations has (i) ceased operations at a facility so as to become subject to the provisions of Section 4062(e) of ERISA, (ii) withdrawn as a substantial employer so as to become subject to the provisions of Section 4063 of ERISA, or (iii) ceased making contributions as of the date of the Closing to any employee pension benefit plan subject to Section 4064(a) of ERISA to which the Company (or such member of such controlled group of corporations) made contributions during the five years prior to the date of the Closing.

(g) Part IV of the schedule to this Section lists each deferred compensation plan, bonus plan, stock option plan, employee stock purchase plan and any other employee benefit plan, agreement, arrangement or commitment not previously listed (other than normal policies concerning holidays, vacations and salary continuation during short absences for illness or other reasons) maintained by the Company.

(h) True and complete copies of each Welfare Benefit Plan and each Pension Benefit Plan, related trust agreements or annuity contracts (or any other funding instruments), each plan, agreement, arrangement, and commitment referred to in subsection (g) of this Section, Annual Reports on Form 5500 Series required to be filed with any governmental agency for each Welfare Benefit Plan and each Pension Benefit Plan since December 31, 1974 and all actuarial reports prepared for the last three plan years of each Pension Benefit Plan, other than an "individual account plan", have heretofore been delivered by the Company to Grace.

·(i) All Welfare Benefit Plans, Pension Benefit Plans, related trust agreements or annuity contracts (or any other funding instruments), and all plans, agreements, arrangements and commitments referred to in subsection (g) of this Section are legally valid and binding and in full force and effect, and there are no defaults thereunder. None of the rights of the Company thereunder (except as specified in Part V of the schedule to this Section) will be impaired by the consummation of the transactions contemplated by this Plan, and all of the rights of the Company thereunder (except as specified in Part V of the schedule to this Section) will be enforceable by Grace after the Closing without the consent or agreement of any other party except consents and agreements specifically listed in Part V of the schedule to this Section.

7.35  (a) The schedule to this Section sets forth:

(i) The description of each waste material, effluent or atmospheric or other discharge, including raw materials, products and known by-products, regulated under any applicable law, ordinance, code, rule or regulation having for its purpose the safety of persons or the protection of health or the

environment which is generated incident to the manufacture of each product manufactured by the Company.

(ii) A description or summary of all data (including, but not limited to, reports of laboratory work, animal studies, statistical analysis, epidemiological studies, morbidity studies, literature reference or other document) in the Company's or any of the Shareholders' possession or of which the Company or any of the Shareholders has knowledge relating to or describing the effect or possible effect on man or other life forms or the environment of exposure to each material, effluent or discharge, including raw materials, products and known by-products, listed pursuant to subsection (a) of this Section provided that the schedule to this Section does not describe information which has been published in the English language, is widely available in the United States, and is corroborative of well-established adverse effects already documented and published of exposure to any such material, effluent or discharge; and

(iii) A description or summary by reference to the Company's employee medical records of the effect on the Company's past or present employees of exposure to each material, effluent or discharge, including raw materials, products and known by-products, listed pursuant to subsection (a) of this Section.

The Company has heretofore delivered to Grace true and complete copies of all data listed in the schedule to this Section.

(b) The extent to which the Company's real and personal property is in compliance with, or in violation of, any existing law, ordinance, code, rule or regulation relating to the environment or occupational safety and health in any manner which would have a material adverse effect on the properties, assets or business of the Company or would have a material effect on the conduct of the business of the Company as it is presently being conducted, and all notices served upon the Company claiming any violation of any such law, ordinance, rule or regulation or requiring or calling attention to the need for any work, repair, construction, alterations or installation on or in connection with such property, which the Company might not have complied with, are set forth in the schedule to this Section and in the items of the schedules to Sections 7.26 and 7.28 which are specifically listed in the schedule to this Section.

(c) The extent, status and effect of all governmental leases, licenses and permits relating to the environment or occupational safety and health necessary for the Company to conduct its business and to operate its properties and assets, except such leases, licenses and permits the absence of which would not have a material adverse effect on the properties, assets or business of the Company and would not have a material effect on the conduct of the business of the Company as it is presently being conducted, possible violations thereof, proceedings pending or threatened looking toward the revocation or limitation of any such governmental lease, license or permit and the bases or grounds for any such revocation or limitation are set forth in the schedule to this Section and in the items of the schedules to Sections 7.26 and 7.28 which are specifically listed in the schedule to this Section.

(d) The extent and status of the Company's compliance with all existing laws, rules, regulations, ordinances, codes, orders, licenses and permits relating to any of its properties or applicable to its business and concerning the environment or occupational safety and health, except for such non-compliance therewith as would not have a material effect on the conduct of the business of the Company as it is presently being conducted, are set forth in the schedule to this Section and in the items of the schedules to Sections 7.26 and 7.28 which are specifically listed in the schedule to this Section.

(e) Except as set forth in the schedule to this Section and in the items of the schedules to Sections 7.26 and 7.28 which are specifically listed in the schedule to this Section, neither the Company nor any of the Shareholders has actual knowledge (i) of any violation of any laws, rules, regulations, ordinances, codes, orders, governmental leases, licenses or permits relating to occupational safety and health and the environment, or the absence of any such governmental lease, license or permit, which would have a material adverse effect on the properties, assets or business of the Company or on the conduct of the business of the Company as it is presently being conducted, (ii) of any proceedings pending or threatened

17

looking toward revocation or limitation of any such governmental lease, license or permit, or (iii) of the bases or grounds for any such revocations or limitations.

7.36    The schedule to this Section sets forth for calendar years 1978 through and including 1982 the anticipated expenditures for capital additions to the Company's facilities (and for the continuing operation and maintenance thereof), deemed by the Company's management to be reasonably necessary or appropriate for the continuation of the business of the Company as presently conducted, in respect of compliance with federal, state and local laws, regulations, ordinances or standards in effect, as of the date of this Plan, or which have been adopted and are presently scheduled to become effective after the date of this Plan, relating to (a) employee occupational safety and health, (b) effluent or air emission treatment or control, or (c) otherwise related to preservation or protection of health or the environment. The anticipated expenditures in respect of effluent treatment and control are based, in part, on estimates provided by the Company's engineering consultants, O'Brien and Gere Engineers, Inc., and on the assumption that the effluent limitations, treatment system and compliance schedule requested by the Company, as set forth in Schedules 7.26 and 7.28 are granted by the U. S. Environmental Protection Agency and the New York Department of Environmental Conservation.

7.37    Neither the Company, nor any officer or director of the Company nor any Shareholder is aware of, nor have they made or authorized, directly or indirectly on behalf of the Company, any payment, contribution or gift of money, property or services as a kickback or bribe to any person, political organization, or the holder of or any aspirant to any elective or appointive office of any nation, state, county, city or other political subdivision or governmental instrumentality, in contravention of any applicable law.

7.38    The execution and delivery of this Plan and the Pledge Agreement and the consummation of the transactions contemplated by this Plan and the Pledge Agreement will not (a) result in the breach of any of the terms or conditions of, or constitute a default under, the charter documents or the By-Laws of the Company, or any contract, agreement, commitment, indenture, mortgage, pledge agreement, note, bond, license or other instrument or obligation to which the Company is now a party or by which the Company or any of the properties or assets of the Company are bound or affected, or (b) violate any law by which the Company or any of the properties or assets of the Company are bound or affected, or any rule or regulation of any administrative agency or governmental body having jurisdiction over the Company or any of its properties or assets, or any order, writ, injunction or decree of any court, administrative agency or governmental body having jurisdiction over the Company or any of its properties or assets.

7.39    The execution and delivery of this Plan and the Pledge Agreement by the Company and the consummation of the transactions contemplated hereby have been duly and validly authorized by the Board of Directors and by the unanimous consent of the shareholders of the Company. This Plan and the Pledge Agreement have been duly and validly authorized by all necessary corporate action of the Company, and have been duly executed and delivered by the Company and each of the Shareholders and are legally binding on the Company and each of the Shareholders in accordance with their respective terms. Each Shareholder has full capacity, power and authority to enter into this Plan and the Pledge Agreement and to carry out the transactions contemplated hereby and thereby.

7.40    No representation or warranty of the Company or any Shareholder under this Plan contains any untrue statement of a material fact or omits any fact necessary to make the statements herein not materially misleading.

7.41    The employment, consulting and noncompetition agreements, in the forms attached to this Plan as Exhibit 7.41 A, B and C, respectively, which have been executed and delivered on the date of this Plan by each of the persons specified therein, are, as to the individual persons who are parties thereto, in full force and effect and such persons are not in default thereunder.

8.    Representations, warranties and covenants by Grace

Grace represents and warrants to the Company as follows:

8.01    Grace is a corporation duly organized, validly existing and in good standing under the laws of the State of Connecticut.

18

8.02   The shares of Grace Common Stock to be delivered pursuant to this Plan will, when issued and delivered as herein provided, be duly and validly issued, fully paid and non-assessable and duly authorized for listing on the New York Stock Exchange, Inc. and the Midwest Stock Exchange upon official notice of issuance.

8.03   The financial statements included in the documents delivered to the Company and the Shareholders by Grace pursuant to Section 14.01(d)(1) and (2) have been prepared in accordance with generally accepted accounting principles on a basis consistent with prior periods (except as noted therein) and fairly present Grace's consolidated financial position and results of operations as of the dates and for the periods which they purport to cover. Except as disclosed in the documents referred to in subsection (d) of Section 14.01, since June 30, 1978, there has not been any material adverse change in the financial condition, properties or business of Grace and its subsidiaries taken as a whole. None of the documents delivered to the Company and the Shareholders by Grace pursuant to Section 14.01(d)(1), (2), (3), (4), (5) and (6) contains any untrue statement of a material fact or omits any fact necessary to make the statements therein not materially misleading.

8.04   Grace has filed and intends to , and will use its best efforts to, file all reports under the Securities Exchange Act of 1934 required to be filed as a condition to the use of Rule 144 of the Securities and Exchange Commission.

8.05   Grace will retain all financial books, tax returns, and official corporate records of the Company for a period of not less than six years from the Closing and shall give the Shareholders and their duly authorized agents or representatives access to such books, returns and records during normal business hours, and the right at their expense to make copies thereof at any time during normal business hours. Thereafter Grace shall not dispose of any thereof without giving at least sixty (60) days' prior written notice to the Representative of its intention to dispose of same, specifying the items to be disposed of. The Representative may, within a period of thirty (30) days after the receipt of any such notice, notify Grace in writing of his or the Shareholders' desire to retain one or more of the items to be disposed of. Grace shall upon receipt of such notice from the Representative deliver to the Representative at the Shareholders' expense the items specified in the Representative's notice to be retained.

8.06   The execution and delivery of this Plan and the Pledge Agreement by Grace and the consummation of the transactions contemplated hereby have been duly and validly authorized by the Board of Directors of Grace. This Plan and the Pledge Agreement have been duly and validly authorized by all necessary corporate action of Grace, and have been duly executed and delivered by Grace and are legally binding on Grace in accordance with their respective terms.

8.07   The employment and consulting agreements, in the forms attached to this Plan as Exhibits 7.41 A and B, respectively, which have been executed and delivered on the date of this Plan by each of the persons specified therein and Grace, are, as to Grace, in full force and effect and Grace is not in default thereunder.

8.08   An officer of Grace shall sign the written instruction referred to in Section 5.01(b) of the Pledge Agreement prior to June 30, 1981, if prior to June 30, 1981, (a) good, indefeasible and marketable title in fee simple absolute (and the title to which may be insured as such) to all properties on which any facilities of the Company existing on the Closing Date are located and to all properties which are used in connection with the business or operations of the Company on the Closing Date or have been so used within two years prior to the Closing Date (other than such real property leased by the Company in Darien, Connecticut) has been conveyed to Grace, or (b) a perpetual and unconditional right, license or easement permitting Grace to use such properties without charge in the conduct of the business of the Company as continued by Grace has been conveyed to Grace.

## 8A.   Provisions relating to benefit plans

8A.01   (a) Grace shall adopt and put into effect, as of the date of the Closing (the "Valuation Date"), a pension plan (the "New Pension Plan") for those employees of the Company who participate in the Retirement Assistance Plan for Employees of Sales Affiliates, Inc. et al. (the "Sales Affiliates Plan") and who are transferred to the employ of Grace. The benefit provisions of the New Pension Plan shall be

substantially similar to the terms of the Sales Affiliates Plan, a copy of which has heretofore been delivered to Grace. Grace shall also establish a trust fund or utilize its existing trust fund (the "New Pension Trust Fund") to hold all assets of the New Pension Plan.

(b) The Company shall cause the trust fund of the Sales Affiliates Plan (the "Sale Affiliates Trust Fund") to transfer to the New Pension Trust Fund an amount in cash equal to the amount necessary to fund all benefits under the Sales Affiliates Plan (whether or not vested) accrued until the Valuation Date by those employees who are participants in the Sales Affiliates Plan and who are transferring from the employ of the Company to the employ of Grace. Such transfer to the New Pension Trust Fund shall be made on or before the later of (i) 120 calendar days after the Closing, or (ii) 40 calendar days after Grace obtains and presents to the Company Internal Revenue Service determinations, or other evidence satisfactory to the Company, demonstrating qualification of the New Pension Trust Fund and the New Pension Plan under the applicable provisions of the Code. All required actuarial valuations shall be made by William M. Mercer, Incorporated using the same actuarial assumptions and methods as those heretofore used by it in its valuation of the Sales Affiliates Plan as of September 1, 1976, which are set forth in the schedule to this Section. Such actuarial valuations shall be subject to the review and approval of Alexander & Alexander, Inc.

(c) During the period prior to the transfer referred to in subsection (b) of this Section, the Sales Affiliates Trust Fund may pay to, or in respect of, participants in the Sales Affiliates Plan who are transferred to the employ of Grace and whose employment with Grace terminates prior to the transfer of funds pursuant to subsection (b) of this Section any benefits to which such persons may then be entitled based on service prior to the Valuation Date. The amount to be transferred from the Sales Affiliates Trust Fund to the New Pension Trust Fund under such subsection (b) shall be reduced by the amount of any such payments.

(d) The Company shall cause the Sales Affiliates Trust Fund to pay the New Pension Trust Fund on the date of the transfer of funds pursuant to subsection (b) of this Section, interest on the amount of funds so transferred at the rate of 6% per annum from the Valuation Date to the date of the transfer.

8A.02 (a) Grace shall adopt, as of the date of the Closing, the Profit-Sharing Plan of Evans Chemetics, Inc. (the "Evans Plan"), except with respect to those persons employed by Zotos International, Inc. on the date of the Closing. Prior to the date of the Closing, the Company shall amend the Evans Plan to substitute W. R. Grace & Co. and its Board of Directors as the "Company" and "Board" under the Evans Plan, respectively. Grace shall also establish a trust fund or utilize its existing trust fund (the "New Profit Sharing Trust Fund") to hold all assets of the Evans Plan transferred to it as hereinafter provided.

(b) The Company and the parties hereto shall cause the trust fund of the Evans Plan (the "Evans Trust Fund") to transfer to the New Profit Sharing Trust Fund an amount in cash equal to the value on the date of transfer of the accounts of all persons under the Evans Plan (except those persons employed by Zotos International, Inc. on the date of the Closing) and unallocated forfeitures under the Evans Plan (as determined below) allocable to the accounts of such persons. The Company and the parties hereto shall cause the trust fund (the "Zotos Trust Fund") of the Profit Sharing Plan of Zotos International, Inc. (the "Zotos Plan") to transfer to the New Profit Sharing Trust Fund an amount in cash equal to the value on the date of transfer of the accounts in the Zotos Trust Fund of all employees of the Company who are transferred to the employ of Grace and unallocated forfeitures under the Zotos Plan (as determined below) allocable to the accounts of such employees. Unallocated forfeitures under the Evans Plan and the Zotos Plan to be transferred as provided above shall be determined as of the date of the Closing as if such date were a date under the Evans Plan and the Zotos Plan for the reallocation of forfeitures to the accounts of participants. The amount to be transferred from the Evans Trust Fund shall not be less than the value on the date of transfer of all the assets in the Evans Trust Fund reduced by the value of the accounts (including forfeitures allocable thereto) on the date of transfer of those persons employed by Zotos International, Inc. on the date of the Closing. Such transfers to the New Profit Sharing Trust Fund shall be made on or before 90 calendar days after the Closing. After such transfers, amounts remaining in the Evans Trust Fund shall be maintained in trust or otherwise disposed of in accordance with the directions of the Company.

(c) During the period prior to the transfers referred to in subsection (b) of this Section, the Evans Trust Fund and the Zotos Trust Fund may pay, to, or in respect of, employees of the Company who are transferred to the employ of Grace and whose employment with Grace terminates prior to the transfer of

20

funds pursuant to subsection (b) of this Section any benefits to which such persons may then be entitled under the Evans Plan or the Zotos Plan, and the Evans Trust Fund may pay to any other person in respect of whom an account is maintained under the Evans Plan any benefits to which such persons may then be entitled under the Evans Plan. The amount to be transferred from the Evans Trust Fund and the Zotos Trust Fund to the New Profit Sharing Trust Fund under subsection (b) of this Section shall not include the amount of any such payments.

9.  **Conduct of the Company's business prior to the Closing; additional covenants of the Company and the Shareholders**

The Company and the Shareholders covenant and agree with Grace that, except as otherwise consented to in writing by Grace or provided in this Plan, pending the Closing:

9.01  The business of the Company will be conducted only in the ordinary course and consistent with its prior practice.

9.02  No change will be made in the Certificate of Incorporation, By-Laws or other constituent documents of the Company.

9.03  No change will be made in the authorized, issued or outstanding capital stock of the Company, no additional shares of capital stock thereof will be issued and no subscriptions, options, rights, warrants, calls, commitments or agreements relating to, or security interests, pledges, liens or other burdens on, or relating to, the authorized, issued or outstanding capital stock of the Company will be issued, granted, created, entered into or suffered to exist.

9.04  No dividend or other distribution or payment will be declared, set aside, paid or made on or in respect of shares of the capital stock of the Company, nor will the Company, directly or indirectly, redeem, retire, purchase or otherwise acquire any of such capital stock.

9.05  The Company will not merge, amalgamate or consolidate with any other corporation or acquire all or substantially all of the business or assets of any other person, corporation, partnership, firm, association or business organization, entity or enterprise, or acquire (directly or indirectly) ownership or control of any capital stock, bonds or other securities of, or any proprietary interest in, any corporation, partnership, firm, association or business organization, entity or enterprise, or acquire (directly or indirectly) control of the management or policies thereof.

9.06  No change will be made in the accounting methods and practices followed by the Company or in the depreciation, amortization or inventory valuation policies, rates or methods heretofore used or adopted. No change will be made affecting the banking and safe deposit arrangements and powers of attorney of the Company, no new bank accounts or safe deposit boxes will be opened and no new powers of attorney will be granted by the Company.

9.07  The Company will not (a) enter into, create or assume any obligation for borrowed money or any security agreement, lien, encumbrance, mortgage, deed of trust, pledge, conditional sale or other title retention agreement, easement, covenant, restriction or other burden upon any of its properties or assets whether now owned or hereafter acquired, nor (b) assume, guarantee, endorse or otherwise become liable with respect to the obligations of any person, corporation, partnership, firm, association, or business organization, entity or enterprise (except that the Company may endorse checks or other instruments payable to it for purposes of collection), nor (c) make any loan or advance to, or assume, guarantee, endorse or otherwise become liable with respect to the capital stock or dividends of, any person, corporation, partnership, firm, association or business organization, entity or enterprise (other than routine travel and vacation advances to employees).

9.08  The Company will not sell, lease, abandon, assign, transfer, license or otherwise dispose of (a) any real property, patent, trademark, servicemark, trade name, brand name or copyright (or pending application for any patent, trademark, servicemark or copyright), invention, process, know-how, formula, pattern, design, trade secret or interest thereunder or other intangible asset, or (b), other than in the ordinary course of business, any machinery, equipment or other operating property.

9.09   The Company will not enter into or assume any contract, agreement or commitment except for any normal and ordinary contract, agreement or commitment for the sale of products, the performance of services, or the purchase or lease of tools, machinery or equipment, or the purchase of raw materials, supplies, services or utilities, which is entered into in the normal course of business, which does not involve payments or receipts by the Company materially in excess of payments or receipts involved in similar contracts heretofore entered into in the ordinary course of the Company's business, and which is either terminable by the Company without penalty or to be fully performed within six (6) months from the date of this Plan.

9.10   The Company will not default under, or become in breach of any term or provision of, or suffer or permit to exist any condition or event which is reasonably within its ability to control which, after notice or lapse of time or both, would constitute a default under, any contract, agreement, lease, license, commitment, instrument or obligation.

9.11   No increase will be made in the total compensation (including, but not limited to, normal bonus, profit-sharing and other extra compensation) or the rate of total compensation payable or to become payable by the Company to any employee whose current total annual compensation or estimated compensation from the Company is $30,000 or more, or to any director or officer; no general increase will be made in the total compensation or rate of total compensation payable or to become payable by the Company to any other salaried employees or to hourly employees ("general increase" having the meaning specified in Section 7.31); no employee will be hired by the Company at a total annual compensation payable by the Company of $30,000 or more; no extraordinary or special extra compensation or bonus will be paid by the Company except as contemplated by Note 9 to the Balance Sheet; no employee benefit arrangements of any kind, including, but not limited to, the types specified in Section 7.34, will be adopted or entered into, or be amended, modified or changed in any respect; and the Company will not enter into any transaction with any stockholder, officer, director or employee except payment of directors' fees and compensation for services rendered as employees.

9.12   The Company will, consistent with normal good business judgment and practices, use its best efforts to preserve the business organization of the Company intact, to keep available to Grace or the Company the services of the present employees, distributors, brokers and agents of the Company and to preserve for Grace and the Company the good will of customers, suppliers, unions and others having business relations with the Company.

9.13   All buildings, offices, warehouses, shops and other structures and all machinery, equipment, tools, dies, fixtures, vehicles, vessels, aircraft, spare parts and other properties owned, leased or used by the Company (whether under its control or the control of others) will be kept and maintained in good operating condition and repair.

9.14   The Company will continue to maintain in full force and effect all insurance policies now in effect or renewals thereof or substitutions therefor, will take out such additional insurance as may be reasonably requested by Grace and will not default with respect to, and will give all notices and present all claims under, all insurance policies in due and timely fashion, provided, however, that if any of the Company's insurance policies now in effect is cancelled due to events outside the control of the Company and cannot be replaced at reasonable cost, the Company need not replace such policy but shall give Grace immediate written notice of such cancellation.

9.15   The Company will duly and timely file all reports required to be filed with governmental authorities and will duly observe and conform to all laws, rules, regulations, ordinances, codes, orders, licenses and permits relating to any of its properties or applicable to its business.

9.16   The Company will duly and timely file all tax returns required to be filed by it and will promptly pay, before becoming delinquent, all taxes, assessments, governmental charges, duties, penalties, interest and fines which shall be due and payable; the Company will not, without the prior written consent of Grace's Director of Taxes, enter into any agreement, waiver or other arrangement providing for an extension of time with respect to the filing of any tax return or the payment or assessment of any tax, governmental charge, duty or deficiency, provided that the Company may contest in appropriate proceedings any tax, governmental charge, duty or assessment which may be contested in good faith and for which adequate provision has been made on the books of the Company or otherwise disclosed in

writing to Grace; and the Company will withhold from each payment made to each of its employees the amount of all taxes (including, but not limited to, federal income taxes and Federal Insurance Contribution Act taxes and state and local income and wage taxes and any similar taxes payable under the laws of foreign countries) required to be withheld therefrom and will pay the same, before becoming delinquent, to the proper tax receiving officers.

9.17   The Company will give to Grace, and to Grace's counsel, accountants, engineers and other representatives, full access during normal business hours throughout the period prior to the Closing to all of its offices, properties, books, contracts, commitments, records and affairs, and the Company will promptly furnish to Grace, at its expense, copies (certified, if requested) of all documents and information concerning the properties and affairs of the Company as Grace may request.

9.18   Consistent with normal good business judgment and practices, the Company will not do any act or thing, or suffer any act or thing to be done or to exist, which would result in (a) an inaccuracy in any representation or breach of any warranty of the Company under this Plan if such representation or warranty were deemed to be made again at the time of doing or suffering such act or thing or (b) any failure of the Company duly to perform or observe any term, provision, covenant, agreement or condition set forth or provided for in this Plan.

9.19   The Company will use its best efforts to obtain all consents, approvals and agreements of other parties or governmental authorities which are necessary to the consummation of the transactions contemplated by this Plan. If requested by Grace, the Company shall take or cause to be taken such actions as Grace may deem necessary or desirable to comply with any applicable bulk sales law.

9.20   The Company will make such arrangements as Grace may request so that the indebtedness of the Company specified by Grace can be repaid, and the related evidences of indebtedness be cancelled.

9.21   With respect to each leasehold interest in real property held by the Company as to which there exists a mortgage of the fee which mortgage is superior to the leasehold, the Company shall use its best efforts to obtain a document in recordable form executed by the holder of such mortgage stating that in the event of a foreclosure, either judicial or non-judicial, of such mortgage, the Company's possession of such leasehold interest shall not be disturbed or terminated as a result of such foreclosure, provided that the Company is not in default under terms of its lease.

9.22   With respect to each leasehold interest in real property held by the Company, the Company shall use its best efforts to obtain and furnish to Grace a certificate of the lessor with respect to each such leasehold interest in form satisfactory to Grace; and in the case of each leasehold interest in real property as to which the consent or agreement of any other party is required in order that the consummation of the transactions contemplated by this Plan shall not cause the rights of the Company under such leasehold interest to be impaired nor affect the enforceability of such leasehold interest by the Company after the Closing, the Company shall obtain and furnish to Grace the consent of such other party in form satisfactory to Grace.

**10.   Conditions precedent to the obligations of Grace**

All obligations of Grace under this Plan are subject, at Grace's option, to the fulfillment, prior to or at the Closing, of each of the following conditions:

10.01   Each and every representation and warranty of the Company and the Shareholders under this Plan shall be true and accurate in all respects as of the date when made and shall be deemed to be made again at and as of the time of the Closing and shall be true and accurate in all respects as of the time of Closing.

10.02   The Company and the Shareholders shall have performed and complied with each and every covenant, agreement and condition required by this Plan to be performed or complied with by any of them prior to or at the Closing.

10.03   The Company shall have delivered to Grace a certificate of the Managing Director of the Company, dated the Closing Date, certifying on behalf of the Company the fulfillment of the conditions set forth in Sections 10.01 and 10.02.

10.04    The Company shall have delivered to Grace an opinion of Cummings & Lockwood, counsel for the Company, dated the Closing Date, in form and substance satisfactory to Grace, to the effect that:

(a) The corporate existence and good standing in its jurisdiction of incorporation, the need for qualification and good standing in other jurisdictions and the corporate power and authority of the Company are as represented and warranted in Sections 7.01 and 7.02.

(b) The authorized, issued and outstanding capital stock of the Company is as represented and warranted in Sections 7.01 and 7.03.

(c) This Plan and the Pledge Agreement and the transactions contemplated by this Plan and the Pledge Agreement have been duly and validly adopted and approved by the Board of Directors and the stockholders of the Company, all legal and corporate proceedings necessary to be taken by the Company and its stockholders in connection with the adoption and approval of this Plan and the Pledge Agreement have been duly and validly taken, and this Plan and the Pledge Agreement have been duly executed and delivered by the Company and are legally binding upon the Company and the Shareholders.

(d) Such counsel does not know or have any reason to believe that any representation or warranty by the Company or the Shareholders in this Plan, or in any statement, deed, certificate, schedule or other document delivered pursuant hereto or in connection with the transactions contemplated hereby, is false or inaccurate in any respect, or that any statement of fact made by the Company or the Shareholders herein or therein contains any untrue statement of fact or omits to state any fact necessary in order to make the statements herein or therein not misleading;

(e) Such counsel does not know or have any reason to believe that the Company or any Shareholder has not performed and complied with all covenants, agreements and conditions required by this Plan to be performed or complied with by the Company or any Shareholder prior to the Closing; and

(f) Except as specified in said opinion, such counsel does not know or have any reason to believe that the Company or any Shareholder is a party to or affected by any pending suit, action, investigation by any governmental body, or legal, administrative or arbitration proceeding or that any such suit, action, investigation or proceeding is threatened to which the Company or any Shareholder might become a party or which might affect its properties, assets, business or prospects.

Such opinion shall also opine on such other matters incident to the transactions contemplated hereby as Grace may reasonably request.

10.05    Grace shall have received such legal opinions of its General Counsel or other counsel selected by it, such title insurance (or commitments therefor), and such other evidence, in form and substance satisfactory to it, as it may deem necessary to establish:

(a) The fulfillment of the conditions set forth in Sections 10.1, 10.02, 10.04, 10.06, 10.09, 10.10, 10.11, 10.12, 10.16, 10.17 and 10.18, including, but not limited to the fact that, as of the Closing the interests of the Company in the real and personal property referred to in Sections 7.13, 7.14, 7.15, 7.16 and 7.17 are as represented in such Sections; and,

(b) That the instruments of sale, conveyance, transfer, assignment and consent delivered to Grace at the Closing are valid and enforceable in accordance with their terms, proper in form and substance to accomplish their intended purpose and effectively vest in Grace good, indefeasible and marketable title to the Company Assets as represented and warranted in this Plan, including, but not limited to, all of the Company's rights under all contracts, agreements, leases, licenses and permits.

10.06    Grace shall have received a written legal opinion of its General Counsel substantially to the effect that the transfer of the Company Assets to Grace in exchange for shares of Grace Common Stock and the assumption of certain of the Company's liabilities as contemplated by this Plan will constitute a reorganization as defined in Section 368(a)(1)(C) of the Internal Revenue Code of 1954, as amended, and will not result in recognition of gain or loss to Grace or the Company for federal income tax purposes, and that Grace's tax basis for the Company Assets will be the same as the Company's tax basis therefor immediately prior to the Closing.

10.07   Grace shall have received from its Chief Patent Counsel an opinion to the effect that:

(a)  The Company owns or is validly licensed under all patents, trademarks, servicemarks, trade names, brand names, copyrights, applications for patents, trademarks, servicemarks and copyrights, inventions, processes, know-how, formulae, patterns, designs and trade secrets which are necessary for the conduct of its business as presently conducted, and all such rights and all rights listed on the schedule to Section 7.22 are valid and in good standing and free and clear of all security interests, liens, encumbrances and other burdens, are not currently being challenged in any way and are not involved in any pending or threatened interference proceeding; and

(b)  The operations of the Company, the production, use and sale by it of its raw materials, products and services, the use by it and its agents and licensees of its machinery, equipment and processes, the use of its products and services by its customers for the purpose for which sold, and the use of its patents, trademarks, servicemarks, licenses, trade names, brand names, patterns, designs and advertising, technical or other literature does not involve infringement or claimed infringement of any patent, trademark, servicemark or copyright.

10.08   Grace shall, at its expense, have received the following:

(a)  Written confirmation from Price Waterhouse & Co. that treatment of the transaction contemplated by this Plan as a pooling of interests would be in accordance with generally accepted accounting principles.

(b)  A report from Price Waterhouse & Co. based on its examination of the financial statements of the Company as of April 30, 1977, and April 30, 1978, respectively.

(c)  A letter signed by Price Waterhouse & Co. and a letter signed by the Company, each satisfactory in form and substance to Grace, stating that, based on procedures specified in such letter, during the period commencing with April 30, 1978, and ending with a date not more than five (5) business days prior to the Closing, there have not been any changes in such items of the Balance Sheet or such aspects of the results of operations of the Company since such date as have been specified in a letter from Grace to Price Waterhouse & Co. delivered to them and to the Company prior to the date hereof.

10.09   The shares of Grace Common Stock to be issued pursuant to this Plan shall have been duly authorized for listing on the New York Stock Exchange, Inc. and the Midwest Stock Exchange upon official notice of issuance, and all Blue Sky filings and permits necessary in the opinion of Grace to carry out the transactions contemplated by this Plan shall have been made and received.

10.10   All consents, approvals and agreements of other parties or governmental authorities, including, without limitation, the obtaining or transfer of all permits and licenses which Grace shall deem necessary or appropriate to the effective consummation of the transactions contemplated by this Plan and for the effective continuation by Grace of the business heretofore conducted by the Company and the effective succession by Grace to all the rights, privileges, powers, immunities, franchises, properties, interests and choses in action of the Company, shall have been obtained.

10.11   All statutory and other legal requirements for the valid consummation of the transactions contemplated by this Plan shall have been fulfilled.  If required by Grace, the Company shall have complied with any applicable bulk sales law.

10.12   No suit or action, no investigation, inquiry or request for information by any administrative agency, governmental body or private party, and no legal or administrative proceeding shall have been instituted or threatened which questions or reasonably appears to portend subsequent questioning of the validity or legality of this Plan or the transactions contemplated by this Plan or the viability of the Company's business as presently conducted.

10.13   The Company and the Shareholders shall have delivered to Grace one or more copies of the Pledge Agreement signed by the Pledge Agent, the Company and the Shareholders.

10.14  Grace shall have received written confirmation from the Company and, at Grace's expense, an opinion of counsel satisfactory to Grace to the effect that a supply agreement, and a sales agreement, in the forms attached to this Plan as Exhibit 10.14A and B, respectively, between the Company and Zotos International, Inc., have been entered into and are legally binding on the parties thereto.

10.15  Grace shall, at its expense, have received satisfactory assurances from such qualified individuals selected by it as it deems necessary to establish that the matters disclosed by the Company pursuant to Sections 7.35 and 7.36 will not materially adversely affect the business of the Company as continued by Grace.

10.16  The employment, consulting and noncompetition agreements referred to in Section 7.41 shall as of the time of the Closing be in full force and effect and no defaults thereunder shall be then threatened or contemplated.

10.17  All amendments and modification to the outstanding loan and financing agreements and leases and related mortgage or security agreements and arrangements of the Company shall have been made which are necessary in accordance with the policies of Grace to permit consistency with the loan and financing agreements and arrangements of Grace.

10.18  The execution and delivery of this Plan by Grace and the consummation of the transactions contemplated hereby shall have been duly and validly authorized by the Board of Directors of Grace. All actions, proceedings, instruments and documents required to carry out this Plan or incidental thereto, and all other related matters, shall have been approved as to legal form, content and sufficiency by the General Counsel of Grace.

10.19  The Company shall have delivered letters, in form and substance satisfactory to Grace, from each consultant who has been engaged by or consulted with the Company at any time since April 30, 1976, to the same effect as the representations and warranties of the Company and the Shareholders in Sections 7.06(a), (b) and (c) and 7.24.

## 11. Conditions precedent to the obligations of the Company

All obligations of the Company under this Plan are subject, at the Company's option, to the fulfillment, prior to or at the Closing, of each of the following conditions:

11.01  The conditions set forth in Section 10.18 shall have been fulfilled.

11.02  Grace shall have delivered to the Company an opinion of the General Counsel of Grace, dated the date of the Closing, in form and substance satisfactory to the Company, to the effect that:

(a)  Grace's corporate existence and good standing are as represented and warranted in Section 8.01,

(b)  The execution and delivery of this Plan and the Pledge Agreement by Grace and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by the Board of Directors of Grace, and this Plan and the Pledge Agreement have been duly and validly authorized by all necessary corporate action, duly executed and delivered by Grace and are legally binding upon Grace.  The issuance of shares of Grace Common Stock by Grace as contemplated by this Plan has been duly and validly authorized by the Board of Directors of Grace and by all other necessary corporate action of Grace.

11.03  Each and every representation and warranty of Grace under this Plan shall be true and accurate in all respects as of the date when made and shall be deemed to be made again at and as of the time of the Closing and shall be true and accurate in all respects as of the time of Closing.

11.04  Grace shall have performed and complied with each and every covenant, agreement and condition required by this Plan to be performed or complied with by it prior to or at the Closing.

11.05  Grace shall have delivered to the Company a certificate of an officer of Grace, dated the Closing Date, certifying on behalf of Grace the fulfillment of the conditions set forth in Sections 11.03 and 11.04.

11.06  All consents, approvals and agreements of other parties of governmental authorities, including, without limitation, the obtaining or transfer of all permits and licenses which the Company shall deem necessary or appropriate to the effective consummation of the transactions contemplated by this Plan, shall have been obtained.

11.07  All statutory and other legal requirements for the valid consummation of the transactions contemplated by this Plan shall have been fulfilled.

11.08  The Company shall have received written confirmation from Grace and, at the Company's expense, an opinion of counsel satisfactory to the Company to the effect that a supply agreement, and a sales agreement, in the forms attached to this Plan as Exhibit 10.14A and B, respectively, between the Company and Zotos International, Inc., have been assumed by Grace.

11.09  The employment and consulting agreements referred to in Section 7.41 shall as of the time of the Closing be in full force and effect and no defaults thereunder shall be then threatened or contemplated.

11.10  All actions, proceedings, instruments and documents required to carry out this Plan or incidental thereto, and all other related matters, shall have been approved as to legal form, content and sufficiency by Messrs. Cummings & Lockwood.

## 12.  Change of name; final tax returns of the Company

12.01  Immediately after the Closing, the Company shall take all action necessary to change its corporate name to "ECI Liquidating Corporation" or such other name as is approved by Grace.

12.02  After the Closing, the Company shall promptly prepare, submit to Grace's Director of Taxes for review and approval, sign and duly file all tax returns required to be filed by it and shall promptly pay all taxes shown to be due thereon. Grace shall furnish to the Company, at its request, funds for the payment of such income, sales and other excise taxes arising out of the conduct of the Company's business through and including the Closing Date to the extent that Grace shall have assumed the obligation to pay the same hereunder. The Company shall not, without the prior written consent of Grace's Director of Taxes, enter into any agreement, waiver or other arrangement providing for an extension of time with respect to the filing of any such return by, or payment or assessment of any tax or deficiency against, the Company.

## 13.  Expenses

13.01  The Shareholders shall pay and discharge all liabilities and expenses incurred by or on behalf of the Company in connection with the preparation, authorization, execution and performance of this Plan and the Pledge Agreement, including, but not limited to, the following: (a) all fees and expenses of agents, representatives, counsel and accountants, (b) all taxes and expenses arising out of the sale, conveyance, transfer, assignment and delivery of the Company Assets to Grace, (c) all fees, taxes, charges and expenses required to be paid by the Company upon its liquidation and dissolution and on its withdrawal from states in which it is qualified to do business, and (d) all amounts payable with respect to any claim for brokerage or finder's fees or other commissions in respect of the transactions contemplated by this Plan based in any way on any agreement, arrangement or understanding made by or on behalf of the Company or any of the Shareholders; except as otherwise provided in the Pledge Agreement and except that such fees and expenses of counsel and accountants and the amounts referred to in clause (d) of this Section 13.01 may be paid from the funds permitted to be retained by the Company pursuant to Section 3.02, and if such funds shall not be sufficient to pay and discharge all such fees, expenses and amounts, any additional funds which shall be required to pay and discharge the same shall be provided by the Shareholders and each of them shall be jointly and severally liable therefor.

13.02  Grace shall pay and discharge all liabilities and expenses incurred by or on behalf of Grace and approved by it in writing in connection with the preparation, authorization, execution and performance of this Plan and the Pledge Agreement.

27

**14. Provisions relating to Securities Laws and Pooling of Interests**

14.01  The Company and each of the Shareholders represents and warrants to Grace as follows ("he" as used in this Section includes the feminine and, in referring to the Company, the neuter):

(a) He knows that the shares of Grace Common Stock which are to be issued by Grace pursuant to this Plan ("Shares") have not been registered under the Securities Act of 1933, as amended ("Act"), and that Grace is relying on the private offering exemption from the registration requirements of the Act afforded by Section 4(2) thereof and on Rule 146 of the Securities and Exchange Commission ("SEC") thereunder.

(b) He has selected Mr. Don Sutherland ("Offeree Representative") to act as his offeree representative in connection with evaluating the merits and risks of the proposed investment in the Shares pursuant to paragraph (a) of said Rule 146 and the Offeree Representative is qualified to act as offeree representative for him under said Rule 146. He, together with the Offeree Representative, have such knowledge and experience in financial and business matters that they are capable of evaluating the merits and risks of said prospective investment. He has delivered to Grace a statement signed by the Offeree Representative confirming the foregoing representations with respect to the Offeree Representative.

(c) He is able to bear the economic risk of said prospective investment and he understands that he must bear such risk for an indefinite period of time unless the Shares are registered under the Act, as hereinafter provided, or an exemption from registration thereunder is available, because the Shares have not been registered under the Act and may not be offered, sold, pledged, transferred or otherwise disposed of except in the circumstances described in Sections 14.02 through 14.07, inclusive. The information which he has delivered to Grace concerning his personal financial condition is true and correct.

(d) He and the Offeree Representative have reviewed and analyzed the following documents, copies of which have heretofore been delivered to the Company and the Shareholders by Grace:

(1) Grace's Annual Report on Form 10-K pursuant to the Securities Exchange Act of 1934 for the fiscal year ended December 31, 1977.

(2) Grace's Quarterly Report on Form 10-Q pursuant to said Act for the first, second and third quarters of 1978.

(3) Grace's Proxy Statement for its Annual Meeting of Shareholders held on May 10, 1978.

(4) A description of the Shares and of material changes, if any, in Grace's affairs not disclosed in the documents referred to in clauses (1) through (3) of this subsection (d), as provided in paragraph (e) of said Rule 146.

(5) A description of any arrangements between Grace and any Shareholder as provided in paragraph (f)(4) of said Rule 146.

(6) A statement concerning any relationships between Grace and the Offeree Representative as provided in paragraph (e)(3)(i) of said Rule 146.

(e) He and the Offeree Representative have had the opportunity to ask questions of, and receive answers from, Grace concerning the terms and conditions of the transactions contemplated hereby and to obtain any additional information necessary to verify the accuracy of the information referred to in subsection (d) above.

(f) Each question concerning Grace which he or the Offeree Representative has so asked has been answered and each document concerning Grace which he or the Offeree Representative has so requested has been furnished and there is no further information on Grace which he or the Offeree Representative desires to have.

(g) He does not have any reason to believe that any of the Shareholders is acting other than solely for his or her own account (or as trustee as indicated on the signature page of this Plan) or that the number of direct or indirect recipients of the Shares will exceed 5.

14.02  (a) The Company covenants and agrees and represents and warrants to Grace that (except in connection with the distribution of the Shares to the Shareholders in the event of the liquidation of the Company) it intends to take and hold and that it will take and hold the Shares for investment for its own account and not with a view to the resale or distribution thereof, and that it will not at any time or times, directly or indirectly, offer, sell, pledge, transfer or otherwise dispose of all or any portion of the Shares (or of its rights to receive any of the Shares pursuant to this Agreement or the Pledge Agreement) or solicit any offer to buy, purchase or otherwise acquire all or any portion of the Shares (or of such rights), otherwise than in conformity with the Act and the terms of any applicable prospectus meeting the requirements of the Act covering the Shares.

(b) Each of the Shareholders covenants and agrees and represents and warrants to Grace that he intends to take and hold and that he will take and hold the Shares which he may receive in the event of the liquidation of the Company for investment for his own account (or as trustee as indicated on the signature page of this Plan) and not with a view to the resale or distribution thereof, and that he will not at any time or times, directly or indirectly, offer, sell, pledge, transfer or otherwise dispose of all or any portion of the Shares (or of his rights, if any, to receive any of the Shares pursuant to the Pledge Agreement) or solicit any offer to buy, purchase or otherwise acquire all or any portion of the Shares (or of such rights), otherwise than in conformity with the Act and the terms of any applicable prospectus meeting the requirements of the Act covering the Shares.

14.03  In the event that, at any time prior to December 31, 1982, any one or more of the Shareholders shall determine that he or they wish to sell not less than 10,000 Shares owned by them on national securities exchanges in normal brokerage transactions (such method of sale being herein called "Stock Exchange Sales") and wish to have such Shares registered under the Act for such purpose, the Representative, as hereinafter defined in Section 16.01, shall deliver to Grace a written notice to that effect. (The Shares covered by such notice are herein called "Registrable Shares".)

Upon receipt of such a notice Grace will use its best efforts (a) to cause the Registrable Shares to be registered under the Act for the purpose of Stock Exchange Sales, (b) to cause the prospectus covering the Registrable Shares (herein called "Prospectus") to be up to date and meet the requirements of the Act for a period of one year from the date the Registrable Shares become registered, and (c) to furnish or cause to be furnished to each of the Shareholders owning Registrable Shares, at Grace's expense, such number of copies of the Prospectus as such Shareholder may from time to time reasonably request.  Grace may delay the filing of the registration statement with respect thereto for up to 180 days from the date of receipt of a notice under the first paragraph of this Section 14.03 for the purpose of including the Registrable Shares in a prospectus which also covers shares of Grace Common Stock issued in other business combinations.

The Shareholders shall cooperate with Grace in the registration of the Registrable Shares and promptly provide Grace with all information which Grace or the SEC may request in connection therewith, including, but not limited to, information as to the number of shares owned and sold by the Shareholders from time to time.

14.04  Grace's obligation under Section 14.03 to use its best efforts to cause Registrable Shares to become registered under the Act is subject to the following conditions and exceptions:

(a) If registration of the Registrable Shares under the Act is not required in connection with a Stock Exchange Sale thereof by or for the account of the Shareholders, and Grace shall deliver to the Representative an opinion of the General Counsel of Grace to such effect, or a letter from the Division of Corporation Finance of the SEC to the effect that such Division would not recommend any action to the SEC if a Stock Exchange Sale were so effected without the Registrable Shares being registered, Grace shall not be obligated to register any of the Registrable Shares.

(b) Grace shall not be obligated to register any Registrable Shares unless the representations of the Shareholders and the Offeree Representative set forth in Section 14.01 shall be true and correct and unless the Company and the Shareholders shall have fully performed and observed the obligations provided for in Sections 14.02, 14.03 and 14.05.

29

(c) Grace shall not be obligated to register any Registrable Shares except by means of an SEC form of registration statement which would be appropriate for the registration of the Registrable Shares for sale in Stock Exchange Sales and is a Form S-16 or similar abbreviated form of registration statement.

(d) Grace shall not in any event be obligated to file more than one registration statement which includes any of the Shares in each of the first four fiscal years of Grace after the Closing.

14.05  The Shareholders will pay all fees and expenses incurred by the Shareholders related to the registration of the Registrable Shares or to any offer or sale of Shares by the Company or the Shareholders, including, but not limited to, fees of counsel retained by the Company or the Shareholders, brokerage fees, transfer taxes and any fees of the Offeree Representative, but shall not be obligated to pay related printing costs, S.E.C. registration fees or costs or fees related to "blue sky" filing or qualification matters.

14.06  The certificates representing the Shares may, at Grace's option, bear the following legend:

"The shares represented by this certificate have been issued pursuant to an Agreement and Plan of Reorganization with respect to Evans Chemetics, Inc., and have not been registered under the Securities Act of 1933, as amended. Such shares may not be offered or sold, and no transfer will be made, except under one of the following circumstances: (a) if there shall be available a prospectus covering such shares meeting the requirements of said Act, (b) if there shall have been delivered to W. R. Grace & Co. or its Transfer Agent (i) the written opinion of legal counsel satisfactory to W. R. Grace & Co. to the effect that such a prospectus is not required in connection with the proposed offer, sale or transfer, or (ii) a letter from the Division of Corporation Finance of the Securities and Exchange Commission to the effect that such Division would not recommend any action to such Commission if such offer, sale or transfer were effected without such a prospectus being available, or (c) with the written consent of W. R. Grace & Co."

In the event of a public sale of Shares under the circumstances specified in clause (a) or (b) of the aforesaid legend, Grace will, upon surrender for exchange of certificates representing such Shares, cause to be issued to the record holder thereof (or, if Grace deems appropriate, to his transferee) a new certificate representing the number of Shares represented by such certificate which new certificate will not bear the aforesaid legend.

14.07  The Company and the Shareholders covenant and agree that neither the Company nor any of the Shareholders will sell or otherwise dispose of any Shares in a manner which would cause the transactions contemplated by this Plan to cease to be treated as a pooling of interests by reason of the considerations set forth in SEC Accounting Series Release No. 130, as amended by Release No. 135.

## 15.  Survival of representations and warranties; indemnification

15.01  All covenants, agreements, representations and warranties of the Company and any of the Shareholders and of Grace under this Plan shall survive the Closing and the delivery of instruments of conveyance and assignment hereunder, shall survive the liquidation and dissolution of the Company, and shall remain effective regardless of any investigation at any time made by or on behalf of any of them or of any information any of them may have with respect thereto, provided however, that:

(a) unless a claim has been asserted with respect thereto on or before February 28, 1979, the representations and warranties set forth in Article 7, other than those set forth in Sections 7.08 (with respect to taxes) and 7.12, shall expire and be of no further force and effect after said date; and

(b) the representations and warranties set forth in Sections 7.08 (with respect to taxes) and 7.12 shall expire and be of no further force and effect fifteen (15) months after the date of expiration of the periods for assessment against the Company (as such periods may from time to time be extended) of all United States federal income taxes of the Company for any period ended on or prior to the Closing Date, unless a claim has been asserted with respect thereto prior to such date of expiration; and

(c) unless a claim has been asserted with respect thereto on or before February 28, 1979, the representations and warranties set forth in Sections 8.03 and 8.07 shall expire and be of no further force or effect after said date.