15.02  Notwithstanding the Closing, and regardless of any investigation made at any time by or on behalf of Grace or any information Grace may have (other than information specifically related to a particular claim, which information has been specifically set forth in the relevant schedule to this Plan), the Company and each of the Shareholders hereby agrees to indemnify Grace and save and hold Grace harmless from and against any damage, liability, loss, cost or deficiency (including, but not limited to, reasonable attorneys' fees and other reasonable costs and expenses incident to proceedings or investigations or the defense of any claim) (hereinafter referred to as "Damages") arising out of, resulting from or related to, and to pay Grace on demand the full amount of any sum which Grace pays or becomes obligated to pay on account of, (a) any inaccuracy in any representation or the breach of any warranty of the Company or any of the Shareholders under this Plan, (b) any failure of the Company or any of the Shareholders duly to perform or observe any term, provision, covenant or agreement to be performed or observed by the Company or any of the Shareholders pursuant to this Plan or the Pledge Agreement, (c) any taxes of any kind whatever, or expenses, interest or penalties relating thereto, which arise out of or result from the transactions contemplated by this Plan, (d) the imposition upon or assessment against Grace or any of its properties or assets of any obligation or liability of the Company or any Shareholder except to the extent expressly assumed by Grace pursuant to this Plan or (e) the lack of possession by the Company of good, indefeasible and marketable title in fee simple absolute to all real property on which any facilities of the Company existing on the Closing Date are located or to all real property which is used or has been used within two years prior to the Closing Date in connection with the business and operations of the Company (other than such real property leased by the Company in Darien, Connecticut).  Grace shall be deemed to have suffered such damage, liability, loss or deficiency if the same shall have been suffered by any subsidiary of Grace, and the amount thereof deemed to have been suffered by Grace shall be the amount thereof suffered by such subsidiary.  Notwithstanding the foregoing provisions of this Section 15.02, with respect to all notes and accounts receivable included in the Company Assets, Grace will take all reasonable steps to collect said notes and accounts receivable at full value in a timely manner in accordance with customary practice and dealing in the trade with respect to collections and shall notify the Company and the Shareholders of any failure by, or inability of, Grace to collect any note or account receivable included in the Company Assets within 90 days after the date on which such note or account receivable shall have become due or payable in accordance with its terms (except that Grace shall not be required to take such steps or give such notice with respect to notes and accounts receivable which have become due and payable 90 days or more prior to the Closing Date).  If Grace shall fail to take such reasonable steps to collect any such note or account receivable, and because of such failure the full value of the note or account receivable is not collected from the obligor, neither the Company nor the Shareholders shall be liable to Grace for indemnification hereunder with respect to the uncollected amount thereof.  To the extent that any note or account receivable included in the Company Assets shall not be collected by Grace, and the failure to collect such note or account receivable shall result in a payment to Grace by the Company or any of the Shareholders by reason of a default in the representations and warranties contained in Section 7.21, upon payment to Grace of the full amount due by reason of such default, Grace shall promptly assign to the Company or the Shareholders, as the case may be, all of Grace's rights in any such note or account receivable.

15.03  Notwithstanding the Closing, and regardless of any investigation made at any time by or on behalf of the Company or the Shareholders or any information the Company or the Shareholders may have, Grace hereby agrees to indemnify the Company and the Shareholders and save and hold them harmless from and against any damage, liability, loss, cost or deficiency (including, but not limited to, reasonable attorneys' fees and other reasonable costs and expenses incident to proceedings or investigations or the defense of any claim) (hereinafter referred to as "Damages") arising out of, resulting from or related to, and to pay the Company or the Shareholders on demand the full amount of any sum which the Company or the Shareholders pay or become obligated to pay on account of, (a) any inaccuracy in any representation or the breach of any warranty of Grace under this Plan, (b) any failure of Grace duly to perform or observe any term, provision, covenant or agreement to be performed or observed by Grace pursuant to this Plan or the Pledge Agreement, or (c) the imposition upon or assessment against the Company or the Shareholders or any of its or their properties or assets of any obligation or liability of Grace.

15.04   (a) The aggregate liability of the Company and the Shareholders hereunder shall not be limited to the Grace Common Stock deposited with the Pledge Agent pursuant to this Plan and the Pledge Agreement, but in no event shall the aggregate of all liability of the Company and the Shareholders under this Plan exceed the aggregate value of the shares of Grace Common Stock which are issued to the Company at the Closing, valued at the closing price of Grace Common Stock on the New York Stock Exchange, Inc. on the Closing Date, nor shall the aggregate liability of Grace hereunder in any event exceed such aggregate value of the shares of Grace Common Stock.

(b) In no event shall the aggregate liability of any Shareholder under this Plan exceed an amount equal to the product derived by multiplying the aggregate value of the shares of Grace Common Stock which are issued to the Company at the Closing (determined as provided in subsection (a) of this Section 15.04) by a fraction, the numerator of which is the number of shares of the capital stock of the Company represented as owned by such Shareholder on the schedule to Section 7.01 and the denominator of which is the total number of shares of capital stock of the Company therein represented to be outstanding.

(c) There shall be deducted from the aggregate amount of Damages of the Company and/or the Shareholders with respect to the representations and warranties made in Sections 7.08 (with respect to taxes) and 7.12 an amount equal to the sum of (i), with respect to each taxable year of the Company to which such Damages relate, $25,000 (provided, that if the Damages with respect to any such year are in an amount less than $25,000, then, with respect to such year, only such lesser amount shall be taken into account for purposes of this subsection (c)), plus (ii) the excess (if any) of (A) the aggregate amount of all refunds of federal, state or local income or franchise taxes paid by the Company (except refunds with respect to taxes paid with funds provided by Grace) for any period prior to and including the Closing Date, which refunds have actually been received by Grace after the Closing Date and prior to the payment of such Damages to Grace, over (B) the aggregate of all amounts taken into account under clause (i) of this subsection (c).

(d) If the Company or the Shareholders indemnify Grace with respect to Damages prior to a final determination of the amount of such Damages, and the amount of such Damages is finally determined to be less than the related amount so indemnified by the Company or the Shareholders, Grace shall promptly refund the excess amount indemnified to the Company or the Shareholders, as the case may be.

15.05   As soon as reasonably practical after obtaining knowledge thereof, the indemnified party or parties shall notify the indemnifying party or parties of any claim or demand which the indemnified party or parties have determined has given or could give rise to a right of indemnification under this Plan.  Such notice shall specify the agreement, representation or warranty with respect to which the claim is made, the facts giving rise to the claim and the alleged basis for the claim, and the amount (to the extent then determinable) of liability for which indemnity is asserted.  In the event any action, suit or proceeding is brought with respect to which the Company and/or the Shareholders may be liable hereunder, the defense of the action, suit or proceeding (including all settlement negotiations and arbitration, trial, appeal, or other proceedings, which Grace's counsel shall deem appropriate) shall be at the discretion of and conducted by Grace, provided that, if Grace shall settle any such action, suit or proceeding without the written consent of the Company or, in the event the Transfer Notice, as defined in Article 1 of the Pledge Agreement, has been given, of the Representative (which consent shall not be unreasonably withheld), the right of Grace to make any claim against the Company and/or the Shareholders on account of such settlement shall neither be deemed conclusively established nor conclusively denied; provided further that the Company and/or the Shareholders shall have the right to be represented by advisory counsel and accountants, at their own expense, in any such action, suit or proceeding.  Notwithstanding the provisions of the immediately preceding sentence, in the event any action, suit or proceeding is brought with respect to which the Shareholders may be liable with respect to the representations and warranties made in Section 7.08 (with respect to taxes) or 7.12, the Shareholders shall have the right at their own expense to assume the defense thereof, with counsel satisfactory to Grace, provided that (i) the maximum potential liability with respect to such action, suit or proceeding is established to the satisfaction of Grace and (ii) there is Collateral (as defined in the Pledge Agreement) being held by the Pledge Agent (as so defined) under the Pledge Agreement which is not at the time to be transferred to Grace as provided in Article 4 thereof and is not being held with respect to a claim by Grace as provided in Section 4.03 thereof and

which is of a value sufficient to satisfy any such maximum potential liability and any potential related loss, damage, cost or deficiency (including, but not limited to, attorneys' fees and other costs and expenses)estimated by Grace. The parties hereto agree to make available to each other, their counsel and accountants all information and documents available to them which relate to such proceedings or litigation and the parties hereto agree to render to each other such assistance as they may reasonably require of each other in order to ensure the proper and adequate defense of any such action, suit or proceeding.

### 16. Appointment of Representative; service of process and submission to jurisdiction

16.01   Each of the Shareholders hereby appoints Mr. Lawrence W. Evans as the representative and agent of such Shareholder (herein called the "Representative") through whom all actions of the Shareholders relating to this Plan, the Pledge Agreement and the transactions contemplated by this Plan and the Pledge Agreement are to be taken by the Shareholders, and to whom all communications to the Shareholders (by Grace or the Pledge Agent or any party connected with or succeeding to either of them) may be directed. The appointment of the Representative shall be irrevocable, except that a successor to the Representative, having an address in the United States of America, may be appointed by a written instrument signed and acknowledged by all of the Shareholders or their legal representatives, in form and substance reasonably satisfactory to Grace, delivered to Grace and the Pledge Agent, provided that such successor is simultaneously appointed pursuant to Section 8.01 of the Pledge Agreement. The Representative or any successor shall have full power and authority to act in the name and on behalf of each of the Shareholders in all matters relating to this Plan, the Pledge Agreement and the transactions contemplated by this Plan and the Pledge Agreement, as though such Representative or successor were such Shareholder, and all such actions taken by the Representative or successor shall be binding on such Shareholder.

16.02   Any process against any Shareholder in, or in connection with, any suit, action or proceeding arising out of or relating to this Plan, the Pledge Agreement or any of the transactions contemplated by either thereof may be served on the Representative personally or by mail at the address set forth in Section 17.01 with the same effect in either case as though served upon such Shareholder personally.

16.03   The Company and each of the Shareholders hereby irrevocably submits in any suit, action or proceeding arising out of or relating to this Plan, the Pledge Agreement or any of the transactions contemplated by either thereof to the jurisdiction of the United States District Court for the District of Connecticut and the jurisdiction of any court of the State of Connecticut located in Fairfield County.

### 17. Notices

17.01   All notices, requests, demands and other communications required or permitted to be given hereunder shall be deemed to have been duly given if in writing and delivered personally, given by prepaid telegram, or mailed first-class, postage prepaid, registered or certified mail, as follows:

If to Grace—

W. R. Grace & Co.
1114 Avenue of the Americas
New York, New York 10036
*Attention:* Secretary

If to the Company, the Representative or any of the Shareholders—

Lawrence W. Evans, as representative of ECI Liquidating Corporation, et al.
100 Tokeneke Road
Darien, Connecticut 06820

17.02   Grace or the Representative or the Company may change the address to which such communications are to be directed to it by giving written notice to the other in the manner provided in Section 17.01.

33

## 18. General

18.01  This Plan and the performance of the transactions contemplated hereby shall be governed by and construed and enforced in accordance with the laws of the State of New York.

18.02  This Plan and the exhibits and schedules hereto and the agreements referred to herein set forth the entire agreement and understanding of the parties in respect of the transactions contemplated hereby and supersede all prior agreements, arrangements and understandings relating to the subject matter hereof. No representation, promise, inducement or statement of intention has been made by the Company or any Shareholder or Grace which is not embodied in this Plan or in the documents referred to herein, and neither the Company nor any Shareholder nor Grace shall be bound by or liable for any alleged representation, promise, inducement or statement of intention not so set forth.

18.03  All of the terms, covenants, representations, warranties and conditions of this Plan shall be binding upon, and inure to the benefit of and be enforceable by, the parties hereto and their respective successors, assigns, heirs at law, legatees, distributees, executors, administrators and other legal representatives, but this Plan and the rights and obligations hereunder shall not be assigned, except as provided in the Pledge Agreement. All representations, warranties, covenants and agreements of the Company and the Shareholders or any one or more of them hereunder are made by the Company and the Shareholders jointly and severally.

18.04  This Plan may be amended, modified, superseded or cancelled, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by Grace, the Company and the Shareholders or, in the case of a waiver, by or on behalf of the party or parties waiving compliance. The failure of any party at any time or times to require performance of any provision hereof shall in no manner affect the right at a later time to enforce the same. No waiver by any party of any conditions, or of any breach of any term, covenant, representation or warranty contained in this Plan, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such condition or breach or a waiver of any other condition or of any breach of any other term, covenant, representation or warranty.

18.05  The article headings contained in this Plan are for convenient reference only, and shall not in any way affect the meaning or interpretation of this Plan. This Plan may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have duly executed this instrument on the date first above written.

[CORPORATE SEAL]

W. R. GRACE & CO.

By...........  /s/  CARL W. LORENTZEN  ...........

ATTEST:

.......  /s/  G. N. McNAIR  .......
Assistant Secretary

[CORPORATE SEAL]

EVANS CHEMETICS, INC.

By...........  /s/  R. L. EVANS JR.  ...........
Managing Director

ATTEST:

.......  /s/  JOSEPH S. KENDY  .......
Secretary

SIGNATURE GUARANTEED
THE STATE NATIONAL BANK OF CONNECTICUT
STAMFORD, CONN.,

.......  /s/  THOMAS F. MAURATH  .......
Authorized Signature
Thomas F. Maurath
Assistant Vice President

34

GUARANTORS OF SIGNATURE:                          SHAREHOLDERS:
   Signature Guaranteed

SIGNATURE GUARANTEED
THE STATE NATIONAL BANK OF CONNECTICUT
STAMFORD, CONN.
          /s/   THOMAS F. MAURATH               /s/   RALPH L. EVANS, JR.
Authorized Signature                            Ralph L. Evans, Jr.
Thomas F. Maurath
Assistant Vice President

By          /s/   JOSEPH S. KENDY               /s/   LAWRENCE W. EVANS
                                                Lawrence W. Evans

By          /s/   JOSEPH S. KENDY               /s/   RALPH LAWRENCE EVANS
                                                Ralph Lawrence Evans

By                                              /s/   NANCY C. EVANS
                                                Nancy Evans, as trustee for Nancy E. Burden,
                                                   under Agreement dated July 3, 1958, and
                                                   as co-trustee for Nancy E. Burden under
                                                   Trust Agreement dated December 1, 1969

SIGNATURE GUARANTEED
THE STATE NATIONAL BANK OF CONNECTICUT
STAMFORD, CONN.
     /s/   THOMAS F. MAURATH                    /s/   RALPH L. EVANS, JR. TTEE
Authorized Signature                            Ralph L. Evans, Jr., as co-trustee for
Thomas F. Maurath                                  Nancy E. Burden under Trust Agreement
Assistant Vice President                           dated December 1, 1969

EXHIBIT A

# EVANS CHEMETICS, INC.

## PLEDGE AND SECURITY AGREEMENT

AGREEMENT dated              , 1978, among MARINE MIDLAND BANK, a New York banking corporation (the "Pledge Agent"), W. R. GRACE & Co., a Connecticut corporation ("Grace"), EVANS CHEMETICS, INC., a New York corporation (the "Company") and the undersigned stockholders of the Company.

In consideration of the mutual covenants and agreements herein contained, and in order to induce Grace to proceed with the closing under an Agreement and Plan of Reorganization dated              , 1978 among Grace, the Company and the stockholders of the Company, the parties hereto agree as follows:

### 1. Definitions

As used in this agreement the following terms have the meanings set forth in this Article 1.

1.01  "Pledge Agent" means Marine Midland Bank, a New York banking corporation.

1.02  "Grace" means W. R. Grace & Co., a Connecticut corporation.

1.03  "Company" means Evans Chemetics, Inc., a New York corporation, and its assigns as provided in Section 2.02.

1.04  "Shareholder" means one of the individuals who have executed this agreement. "Shareholders" means any and all of such individuals.

1.05  "Allocation Factor" means the number identified as such opposite the name of each Shareholder.

1.06  "Plan" means the Agreement and Plan of Reorganization dated              , 1978 among Grace, the Company and the Shareholders.

1.07  "Pledge Period" means the period commencing on the date hereof and ending on the date fifteen (15) months after the date of expiration of the periods for assessment against the Company (as such periods may from time to time be extended) of all United States federal income taxes of the Company for any period ended on or prior to the date hereof. (Grace will notify the Pledge Agent when the Pledge Period has ended.)

1.08  "Grace Common Stock" means common stock, par value $1.00 per share, of Grace.

1.09  "Pledge Share" means any one of the shares of Grace Common Stock to be delivered by the Company to the Pledge Agent pursuant to Section 2.01 of this agreement, and all shares or other securities into which such share of Grace Common Stock is changed, subdivided or combined and all shares or other securities, if any, received by the Pledge Agent as dividends or distributions paid on or in respect of such share of Grace Common Stock or on or in respect of any other such shares or securities so received by the Pledge Agent as a result of holding such share of Grace Common Stock.

1.10  "Collateral" means all Pledge Shares, all securities and property into which the same may be changed, and any other property held by the Pledge Agent from time to time pursuant to this agreement, and the proceeds of any and all thereof.

1.11  "Representative" means the person referred to in Section 8.01 of this agreement or his successor appointed pursuant to such Section.

1.12  "Transfer Notice" means the notice, accompanied by payment of applicable documentary and stock transfer taxes (which shall be payable by Grace) given to the Pledge Agent in accordance with Section 2.02.

*Exhibit A*

**2. Delivery of Pledge Shares; assignment; holding of Collateral**

2.01   Simultaneously with the execution of this agreement, the Company is delivering to the Pledge Agent a certificate representing 41,757 shares of Grace Common Stock pursuant to subsection (c) of Section 6.02 of the Plan, duly endorsed in blank by the Company, or with a stock power in the usual form executed in blank by the Company, with signature guaranteed in a customary form. The Pledge Agent shall promptly transfer the registration of all Pledge Shares into its own name or that of a nominee.

2.02   The Company may assign, subject to the terms and conditions of this agreement, all, but not less than all, of the Company's right, title and interest in and to the Collateral, to the Shareholders, in amounts proportional to each Shareholder's Allocation Factor. In such event, the Company shall furnish to the Pledge Agent a notice of such assignment accompanied by payment of applicable documentary and stock transfer taxes (which shall be payable by Grace). Thereupon, the Shareholders shall succeed to all of the rights and obligations of the Company under this agreement in proportion to their respective Allocation Factors. Following the furnishing of the Transfer Notice in accordance with this Section, all references in this agreement to the Company shall be deemed to refer to the Shareholders in accordance with their respective Allocation Factors, and Grace and the Pledge Agent shall be entitled to rely thereon and for all purposes to treat the Shareholders as owners of the Collateral in the amounts proportional to their respective Allocation Factors.

2.03   The Pledge Agent, acting as agent of Grace, shall accept and hold on behalf of Grace all Collateral until released, delivered, paid or applied as provided in this agreement and shall have and may exercise on behalf of Grace all of the rights and remedies of a pledgee in respect of the Collateral.

**3. Dividends and other distributions; voting**

3.01   The Pledge Agent shall, promptly upon receipt of the same, pay over or transfer or cause to be paid over or transferred to the Company, (or, in the event the Transfer Notice has been given, to each Shareholder in an amount proportional to such Shareholder's Allocation Factor), all cash dividends and other distributions of property (not including distributions of shares or other securities) paid or distributed on or in respect of Pledge Shares or other Collateral held by the Pledge Agent.

3.02   So long as the Pledge Agent continues to hold Pledge Shares under this agreement the Pledge Agent shall, in connection with all meetings of shareholders of Grace, designate a suitable proxy or proxies (who may be the proxies designated by the management of Grace in connection with a general solicitation of proxies from shareholders) to vote such Pledge Shares entitled to vote at each such meeting and shall instruct such proxy or proxies to vote such Pledge Shares proportionately in such manner as the Company shall direct in written instructions delivered to the Pledge Agent, or, in the event the Transfer Notice has been given, proportionately in such manner as the Shareholders shall direct in written instructions delivered to the Pledge Agent. In any such case the Pledge Agent shall mail to the Company (or, in the event the Transfer Notice has been given, to the Shareholders) a copy of each annual report, notice of meeting of shareholders, proxy statement or other solicitation material distributed generally to shareholders of Grace in connection with each meeting of shareholders of Grace, not later than the last day upon which Grace mails to its shareholders of record notice of the meeting to which the same relates.

**4. Grant of security interest; rights of secured party; satisfaction of claims**

4.01   (a)  The Company and the Shareholders hereby grant to Grace a present security interest in and assign and pledge to Grace the Collateral to secure payment and satisfaction of all liabilities of the Company and/or the Shareholders, and fulfillment of all obligations of the Company and/or the Shareholders, under the Plan.

(b)  Grace, acting by itself or through the Pledge Agent, shall have and may exercise, with respect to the Collateral, at any time after the delivery of any instruction under Section 4.02 of this agreement, all rights and remedies of a secured party under Article 9 of the Uniform Commercial Code as then in force in the State of New York, or corresponding provisions of successor legislation (the "Code"). In conjunction

*Exhibit A*

2

with such rights and remedies, subject to compliance with any applicable mandatory provisions of the Code, Grace may, in its discretion,

(i) sell all or any part of the Collateral at one or more public or private sales, without public or private notice or advertisement (except ten calendar days' prior written notice to the Representative, which notice the parties hereto agree to be reasonable), at such price or prices and on such terms as Grace may deem best, and assign and deliver any Collateral so sold,

(ii) itself be a purchaser at any such sale, and

(iii) apply the net proceeds of any disposition of the Collateral to the payment of obligations secured thereby in any order of preference which Grace may choose.

(c) The Company and the Shareholders each consents and acknowledges that the Pledge Agent's duty in respect of custody of the Collateral shall be solely to use reasonable care.

(d) The Company represents and warrants to Grace and the Pledge Agent that the Company is the sole owner of the Pledge Shares, has good and marketable title thereto, free and clear of all liens, claims and encumbrances, except as provided in the Plan, and has the right to pledge the Pledge Shares under this agreement. The Company (or, in the event the Transfer Notice has been given, the Shareholders) shall defend the Collateral against all claims of third parties.

4.02  At any time or from time to time while the Pledge Agent continues to hold Collateral, Grace may instruct the Pledge Agent in writing (signed by an officer of Grace) to transfer to Grace all or any part of the Collateral then held by the Pledge Agent on account of a claim or claims under the Plan, specifying whether and to what extent any securities are to be converted into cash before such transfer is made. Such instruction shall state that the Company and/or the Shareholders are liable to Grace in a specified amount under the Plan, and the amount of funds and/or securities which are to be transferred to Grace in satisfaction or partial satisfaction of such liability. Such instruction shall be accompanied by either (a) an agreement executed by Grace and the Company (or, in the event the Transfer Notice has been given, by the Representative) providing for the transfer of such Collateral to Grace, or (b) a copy of a final judgment entered by a court of competent jurisdiction in favor of Grace ordering such transfer or assessing damages in an amount which together with the reasonable attorneys' fees and other reasonable costs and expenses incurred by Grace in connection with the claim or claims giving rise to such judgment (as certified by an officer of Grace in a written certificate delivered to the Pledge Agent) equals or exceeds the amount of the liability stated in such instruction and equals or exceeds the sum of the amount of funds and the market value of securities to be transferred pursuant to such instruction. ("Market value" of any securities traded on a national securities exchange, for purposes of the immediately preceding sentence, shall be deemed to be equal to the average (arithmetic mean) of the daily closing price of such securities on such exchange for the last 15 trading days on which such securities were traded on such exchange prior to the date of such instruction, provided, however, that "market value" with respect to the Common Stock, par value $1.00 per share, of Grace shall for such purposes be deemed to be the greater of (i) the market value determined as hereinbefore in this sentence provided, or (ii) $30.50.) Upon receipt of such instruction the Pledge Agent shall transfer to Grace the Collateral specified therein to be transferred.

4.03  If a corporate officer of Grace, at any time or from time to time while the Pledge Agent continues to hold Collateral, certifies to the Pledge Agent that there is pending a claim under the Plan that may give rise to a right to have Collateral transferred to Grace pursuant to this Article 4, setting forth a brief description of the nature of such pending claim and the amount of Collateral which Grace desires the Pledge Agent to continue to hold with respect to such claim, then the Pledge Agent shall promptly forward to the Company (or, in the event the Transfer Notice has been given, to the Representative) a copy of such certificate and shall, notwithstanding the expiration of the Pledge Period, continue to hold for disposition as provided in this Article 4 the amount of Collateral specified by Grace in such certificate. Any such Collateral not subsequently required to be transferred to Grace in satisfaction or partial satisfaction of

*Exhibit A*

3

a liability arising out of such claim or other claims hereunder shall be transferred to the Company (or, in the event the Transfer Notice has been given, to the Shareholders) in a manner consistent with the provisions of Article 5 of this agreement.

## 5. Release of Pledged Collateral

5.01 (a) Upon written request to the Pledge Agent by the Company (or, in the event the Transfer Notice has been given, by the Representative) given at any time after February 28, 1979, the Pledge Agent shall promptly mail to the Company (or, in the event the Transfer Notice has been given, to the Shareholders at the addresses set forth under their signatures in this agreement, or such other address as any Shareholder shall have specified by notice to the Pledge Agent) certificates representing that portion of the Collateral (rounded downward in the case of each such recipient to avoid fractional securities) computed by subtracting (i) the sum of (x) Collateral theretofore-transferred or to be transferred to Grace as provided in Article 4 of this agreement, plus (y) Collateral being held with respect to a claim by Grace as provided in Section 4.03 of this. agreement, from (ii) 46 percent (46%) of the Collateral initially received by the Pledge Agent.

(b) Upon written instruction to the Pledge Agent signed by an officer of Grace and an officer of the Company (or, in the event the Transfer Notice has been given, by the Representative) given at any time prior to June 30, 1981, to release an amount of Collateral equal to 15.4% of the Collateral initially received by the Pledge Agent, the Pledge Agent shall mail to the Company (or, in the event the Transfer Notice has been given, to the Shareholders at the addresses set forth under their respective signatures in this agreement, or such other address as any Shareholder shall have specified by notice to the Pledge Agent) certificates representing 15.4% (rounded downward in the case of each Shareholder to avoid fractional securities) of the Collateral initially received by the Pledge Agent. If the Pledge Agent shall not receive such a written instruction prior to June 30, 1981, the Pledge Agent shall on June 30, 1981, or as soon thereafter as practicable, transfer to Grace Collateral equal to 15.4% of the Collateral initially received by the Pledge Agent.

(c) Upon written request to the Pledge Agent by the Company (or, in the event the Transfer Notice has been given, by the Representative) given at any time after the end of each of the first, second and third limitation periods (as hereinafter defined), respectively, the Pledge Agent shall mail to the Company (or, in the event the Transfer Notice has been given, to the Shareholders at the addresses set forth under their respective signatures in this agreement, or such other address as any Shareholder shall have specified by notice to the Pledge Agent) certificates representing that percentage (rounded downward in the case of each Shareholder to avoid fractional securities) of the Collateral initially received by the Pledge Agent necessary to reduce the Collateral then held to not more than (i) 31.1%, 12% and 0%, respectively, of the Collateral initially received by the Pledge Agent, plus (ii) in each case Collateral being held with respect to a claim by Grace as provided in Section 4.03 of this agreement, plus (iii) in each case 15.4% of the Collateral initially received by the Pledge Agent if such amount of Collateral has not been delivered to the Company, the Shareholders or Grace under Section 5.01(b) of this agreement. For purposes of this subsection (c), the "first, second and third limitation periods" shall mean, respectively, the periods commencing on the date hereof and ending fifteen months after the date of expiration of the period for assessment against the Company of all United States federal income taxes of the Company (as such periods may from time to time be extended) for the Company's taxable years ending, respectively, April 30, 1977 and April 30, 1978 and for the Company's taxable period ending the date hereof. Grace will notify the Pledge Agent when each limitation period has ended. For purposes hereof, "the date of expiration of the period for assessment against the Company of all United States federal income taxes of the Company" means the date thirty-six months after the due date for filing of the Company's United States federal income tax return for its taxable year in question.

5.02 Certificates representing Collateral mailed to the Company or the Shareholders pursuant to Section 5.01 of this agreement shall be registered in the name of the Company, or the Shareholders, as the

*Exhibit A*

4

case may be. The amount of Collateral to be so mailed to each Shareholder shall be computed by multiplying such Shareholder's Allocation Factor by the total amount of Collateral to be so mailed to all of the Shareholders. The Pledge Agent shall not in any event distribute any fractional securities, but shall instead sell all fractional interests for the account of the Company or the Shareholders, as the case may be, and mail the proceeds (less costs) of such sales to the Company or the Shareholders, as the case may be, by check or checks drawn to the order of the Company or the Shareholders, as the case may be. In making any distribution of proceeds from the sale of fractional interests, the Pledge Agent may use any rounding method which does not result in receipt by the Company or the Shareholders, as the case may be, of $1.00 more or less than the amount which the Company or the Shareholders, as the case may be, would have received if such rounding method had not been used.

5.03    In the event that the Pledge Agent has not received from the Company (or, in the event the Transfer Notice has been given, from the Representative) a request for release of the appropriate amount of Collateral within 30 days after any date for the release of Collateral referred to in subsection (a) or subsection (c) of Section 5.01, or the end of the Pledge Period, the Pledge Agent may deliver Collateral to the Company (or, in the event the Transfer Notice has been given, to the Shareholders) by any reasonable means after five days' written notice to the Company (or, in the event the Transfer Notice has been given, to the Shareholders).

## 6. Fees and expenses

6.01    Grace shall pay all out-of-pocket expenses of the Pledge Agent incurred in connection with this agreement and in addition shall pay to the Pledge Agent for its services hereunder a fee of $750 per annum for the first year the Pledge Agent holds Collateral under this agreement and $650 per annum thereafter, the first such payment to be made as of the date of this agreement and subsequent payments to be made as of each anniversary date thereof so long as the Pledge Agent shall be obligated hereunder to hold Collateral.

6.02    Grace shall be liable for the payment of all documentary and stock transfer taxes payable in connection with the transfer of Collateral or any interest therein by the Company or by the Pledge Agent hereunder and shall pay to the Pledge Agent promptly upon demand the amount thereof, except that if any such amount is payable or to become payable in connection with the transfer or contemplated transfer of Collateral pursuant to Section 4.02, then the Company (or in the event the Transfer Notice has been given, the Shareholders) shall be so liable for the payment of such taxes, and if any such amount so payable by the Company or the Shareholders shall not be paid by the Company (or, in the event the Transfer Notice has been given, by the Shareholders), the Pledge Agent may withhold such amount from any cash dividends payable to the Company (or, in the event the Transfer Notice has been given, to the Shareholders) received by the Pledge Agent.

## 7. Liability of the Pledge Agent

Acceptance by the Pledge Agent of its duties under this agreement is subject to the following terms and conditions, which shall govern and control the rights, duties and immunities of the Pledge Agent.

7.01  The Pledge Agent shall not be responsible in any manner whatsoever for any failure or inability of Grace, the Company or the Shareholders or any one of them, or of any one else, to deliver Collateral to the Pledge Agent or otherwise to honor any of the provisions of this agreement.

7.02  Grace and the Company (or, in the event the Transfer Notice has been given, the Shareholders), jointly and severally, will reimburse and indemnify the Pledge Agent for, and hold it harmless against, any loss, liability or expense, including but not limited to counsel fees, incurred without bad faith, willful misconduct or gross negligence on the part of the Pledge Agent arising out of or in connection with its acceptance of, or the performance of, its duties and obligations under this agreement as well as the costs and expenses of defending against any claim or liability arising out of or relating to this agreement.

*Exhibit A*

5

7.03  The Pledge Agent shall be fully protected in acting on and relying upon the Transfer Notice or any written notice, direction, request, waiver, consent, receipt or other paper or document which the Pledge Agent in good faith believes to be genuine and to have been signed or presented by the proper party or parties.

7.04  The Pledge Agent shall not be liable for any error of judgment, or for any act done or step taken or omitted by it in good faith, or for any mistake in fact or law, or for anything which it may do or refrain from doing in connection herewith, except its own bad faith, willful misconduct or gross negligence.

7.05  The Pledge Agent may seek the advice of legal counsel in the event of any dispute or question as to the construction of any of the provisions of this agreement or its duties hereunder, and it shall incur no liability and shall be fully protected in respect of any action taken, omitted or suffered by it in good faith in accordance with the opinion of such counsel.

7.06  If a controversy arises between one or more of the parties hereto, or between any of the parties hereto and any person not a party hereto, as to whether or not or to whom the Pledge Agent shall deliver the Collateral or any portion thereof or as to any other matter arising out of or relating to this agreement or the Collateral, the Pledge Agent shall not be required to determine same and need not make any delivery of the Collateral or any portion thereof but may retain the same until the rights of the parties to the dispute shall have finally been determined by agreement or by final order of a court of competent jurisdiction, provided, however, that the time for appeal of any such final order has expired without an appeal having been made.  The Pledge Agent shall deliver the Collateral or any portion thereof within 30 days after the Pledge Agent has received written notice of any such agreement or final order (accompanied by an affidavit that the time for appeal has expired without an appeal having been made).  The Pledge Agent shall be entitled to assume that no such controversy has arisen unless it has received a written notice that such a controversy has arisen which refers specifically to this agreement and identifies the adverse claimants to the controversy.

**8.  Appointment of Representative, service of process and submission to jurisdiction**

8.01  Each Shareholder hereby appoints Lawrence W. Evans as the representative and agent of such Shareholder (herein called the "Representative") through whom all actions by the Shareholders relating to the Plan and this agreement and the transactions contemplated by the Plan and this agreement are to be taken by the Shareholders, and to whom all communications to the Shareholders (by Grace or the Pledge Agent or any party connected with or succeeding to any of them) may be directed.  The appointment of the Representative shall be irrevocable, except that a successor to the Representative, having an address in the United States of America, may be appointed by a written instrument signed and acknowledged by a majority in interest (determined by reference to the Allocation Factor) of the Shareholders or their legal representatives, in form and substance reasonably satisfactory to Grace, delivered to Grace and the Pledge Agent, provided that such successor is simultaneously appointed pursuant to Section 16.01 of the Plan. The Representative or any successor shall have full power and authority to act in the name and on behalf of each Shareholder in all matters relating to the Plan and this agreement and the transactions contemplated by the Plan and this agreement, as though such Representative or successor were such Shareholder, and all such actions taken by the Representative or successor shall be binding on such Shareholder.

8.02  Any process against any Shareholder in, or in connection with, any suit, action or proceeding arising out of or relating to the Plan or this agreement or any of the transactions contemplated by either thereof may be served on the Representative personally or by mail at the address set forth in Section 9.01 of this agreement with the same effect in either case as though served upon such Shareholder personally. Any such process with respect to the Company may be served on the Company personally or by mail at the address set forth in Section 9.01 of this Agreement with the same effect as though served upon the Company personally.

8.03  The Company and each Shareholder and Grace hereby irrevocably submit in any suit, action or proceeding arising out of or relating to the Plan or this agreement or any of the transactions contemplated

*Exhibit A*

by either thereof to the jurisdiction of the United States District Court for the District of Connecticut and the jurisdiction of any court of the State of Connecticut located in Fairfield County.

## 9. Notices

9.01  All notices, instructions and other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given if delivered personally, given by prepaid telegram or mailed first-class, postage prepaid, registered or certified mail, as follows:

> If to the Pledge Agent—
> MARINE MIDLAND BANK
> 250 Park Avenue
> New York, New York 10017
> *Attention:* Corporate Trust Administration

> If to Grace—
> W. R. GRACE & Co.
> 1114 Avenue of the Americas
> New York, N. Y. 10036
> *Attention:* Secretary

> If to the Company or to the Shareholders—
> E.C.I. LIQUIDATING CORP.
> 100 Tokeneke Road
> Darien, Connecticut 06820
> *Attention:* Lawrence W. Evans

9.02  Any party to this agreement or the Representative may change the address to which such communications are to be directed to it by giving written notice to the other parties hereto and the Representative in the manner provided in Section 9.01 of this agreement.

## 10. General

10.01  This agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York.

10.02  This agreement may be amended, modified, superseded or cancelled, and any of the terms or covenants hereof may be waived, only by a written instrument executed on behalf of the parties hereto or, if the same does not affect the rights and obligations of the Pledge Agent, by Grace, the Company, the Shareholders or the Representative or, in the case of a waiver, by the party or parties waiving compliance. The failure of any party at any time or times to require performance of any provision hereof shall in no manner affect the right at a later time to enforce the same. No waiver by any party of any breach of any term or covenant contained in this agreement, whether by conduct or otherwise, in any one or more instances shall be deemed to be or construed as a further or continuing waiver of any such breach or a waiver of any breach of any other term or covenant of this agreement.

10.03  The article headings contained in this agreement are for convenient reference only, and shall not in any way affect the meaning or interpretation of this agreement. This agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

*Exhibit A*

7

IN WITNESS WHEREOF, the parties have duly executed this instrument on the date first above written.

MARINE MIDLAND BANK

By.............................................................

W. R. GRACE & CO.

By.............................................................

By.............................................................

EVANS CHEMETICS, INC.

By.............................................................
                                                President

By.............................................................
                                         Managing Director

| GUARANTORS OF SIGNATURE: Signature Guaranteed | SHAREHOLDERS: | ALLOCATION FACTORS: |
|---|---|---|
| By ............................... | ............................................... Ralph L. Evans, Jr. | ............................... |
| By ............................... | ............................................... Lawrence W. Evans | ............................... |
| By ............................... | ............................................... Ralph Lawrence Evans | ............................... |
| By ............................... | ............................................... Nancy Evans, Trustee for Nancy E. Burden | ............................... |
| By ............................... | ............................................... Ralph L. Evans, Jr. Trustee for Nancy E. Burden | ............................... |

*Exhibit A*

8

12/28/78
RLR, WO, KDL

## SCHEDULE 7.13

(1)  <u>Descriptions of Real Property Owned by Company</u> -

See description attached to this Schedule 7.13

Lease dated 7-1-74 between Evans Chemetics, Inc. and
The Seneca County Industrial Development Agency (purchase
option to Company).

Buildings on Waterloo, N.Y. property, devoted to follow-
ing functions (area in square feet): Production 24,721;
Waste Treatment 9,180; Warehouse and Maintenance 125,501;
Boiler Room 4,218.  Property also contains storage tanks,
parking lot.  Plot plan previously delivered to Grace.

2)  <u>Liens, Charges and Encumbrances to Which Real Property
Described in Paragraph 1 Hereof is Subject</u> -

Liens, charges and encumbrances referred to in the follow-
ing documents, copies of which are in Exhibit 7.13 to
this Schedule 7.13:

1) Indenture dated 6-23-50 between Julius
   Jahna and Emilie Jahna and Evans Chemetics,
   Inc.

2)  Indenture dated 7-30-54 between Sales
   Affiliates, Inc. and Evans Chemetics, Inc.

3) Indenture dated 9-14-64 between the Village
   of Waterloo and Evans Chemetics, Inc. and
   Indenture dated 9-14-64 between Evans
   Chemetics, Inc. and Marshall L. Somerville.

4) Indenture dated 3-24-76 between Dawn V.
   Tarca and Kenneth Corneles and Evans
   Chemetics, Inc.

and also the following liens, charges and encumbrances:

(a) Rights of others in, over and upon Brewer Road.

(b) Exceptions, easements, reservations and rights
   contained in deed from Sales Affiliates, Inc.

12/20/76
RLR, WO, KDL

SCHEDULE 7.13 (continued)

to Evans Chemetics, Inc., recorded in the office
of the Clerk of the County of Seneca in Liber 260
at Page 50.

(c) Any effect of a certain deed from Evans Chemetics,
Inc. to Seneca County Industrial Development Agency
recorded in the said Clerk's office in Liber 366,
Page 787.

(d) Rights and easements granted by Evans Chemetics,
Inc. to New York State Electric & Gas Corporation
by instrument recorded in said Clerk's office in
Liber 267 Page 16.

(e) Conditions, rights and covenants set forth in
instruments recorded in said Clerk's office in
Liber 317 Page 322 and in Liber 326 Page 445.

(f) Rights and easements granted to Socony-Vacuum Oil
Company, Incorporated, by instrument recorded in
said Clerk's office in Liber 177 Page 558.

(g) Rights and easements set forth in instrument
recorded in said Clerk's office in Liber 162
Page 161.

(h) Any rights of others to drain through creeks or
streams, if any, which cross the premises, and
the natural flow thereof.

(i) Any and all taxes becoming due subsequent to
the date hereof, which may constitute a lien on
the premises, which taxes the grantee assumes and
agrees to pay as part of the consideration hereof.



'illage of
ed as follows:

ice at the
north
nt No. 457;
to the
south
east,
north
ly Blue
rth 23
minutes,
89 feet

) the
sioners

& Seneca
.44 feet
00 feet
reet);
ne of
$ Seneca
59
'.12

lue

t

those tracts or parcels of land situate in the Town and Village of Waterloo,
ity, State of New York bounded and described as follows:

PARCEL I

DRAFT
12/27/78
RLR, WO

SCHEDULE 7.28

(1)  Suits, Actions, Claims – The following is a true and
complete list of all suits, actions, or claims pending
or threatened at this time or pending at any time
since April 30, 1973 against any Shareholder or the
Company or any of the Company's properties, assets
or business or to which the Company is or might become
a party:

A.  Evans Chemetics, Inc. v. Allendale Mutual Insurance
Company.  Action in New York Supreme Court, Seneca
County, seeking damages of $150,000, together with
interest, costs and disbursements, for damage cov-
ered by insurance policy issued by defendant.  The
Company has served a summons and filed a complaint.
Defendant has made an appearance and filed an answer.

B. · As to environmental matters, see Schedule 7.28(3).

(2)  Investigations – The following is a true and complete
list of all investigations or inquiries of any adminis-
trative agency or governmental body pending or threat-
ened at this time or pending at any time since April
30, 1973 against any Shareholder or the Company or any
of its properties, assets or business or to which the
Company is or might become a party:

DRAFT
12/27/78    2
RLR, WO

SCHEDULE 7.28 - (Continued)

    A.  See Schedule 7.26(3)

    B.  As to environmental matters, see Schedule 7.28(3).

(3)  Legal Proceedings - The following is a true and com-
plete list of all legal, administrative or arbitra-
tion proceedings pending or threatened at this time
or pending at any time after April 30, 1973 against
any Shareholder or the Company or any of its proper-
ties, assets or business or to which the Company is
or might become a party:

    A.  In the matter of the Arbitration between Evans
Chemetics, Inc. and United Steelworkers of America
Local No. 7110 Case No. 15-30-0292-78, Grievance
dated 5-1-78.  Pending.

    B.  The Company is opposing, in the U.S. Patent and
Trademark Office, the attempt of Chemetics Inter-
national Ltd., a Canadian corporation, to register
a mark consisting of the word "Chemetics".  Testi-
mony has been taken of both parties.  Opposer's
brief has been filed.  Applicant's brief is due
1/11/79.  Opposer's reply brief is due 1/26/79.
Oral argument is still pending.

    C.  Arbitration No. SA 76-131.  Award dated 8-26-76.
See Schedule 7.30.

    D.  Proceedings by the New York State Department of En-
vironmental Conservation ("DEC"):

Pursuant to a proceeding against the Company
commenced on May 19, 1969 by the New York Depart-
ment of Health, the Company agreed to the entry of
an Order ("the Order") by the New York State Com-
missioner of Health dated October 14, 1969, which
required the Company to abate the discharge of
untreated industrial wastes from its Waterloo, New
York, plant into the Seneca River and Barge Canal



DRAFT
12/27/78     3
RLR, WO

SCHEDULE 7.28 - (Continued)

in contravention of State water quality standards
by the construction of waste treatment facilities
("the treatment facilities") within the schedule
set forth in the Order ("the compliance schedule").
The Order was subsequently modified to extend the
compliance schedule by a consent order of the New
York State Commissioner of Environmental Consera-
tion, successor to the Commissioner of Health, on
April 28, 1971 ("the Modified Order").

Pursuant to a proceeding commenced by the DEC on
February 23, 1973, arising from the Company's
alleged failure to comply with the compliance
schedule of the Modified Order, the Company agreed
to the entry of a Second Modified Order on Consent
dated May 16, 1973 ("the Second Modified Order").
The Second Modified Order extended the compliance
schedule, required the Company to post a surety
bond with the DEC in the amount of $25,000.00 and
expressly provided that the Company ". . . shall
suffer no penalty under any of the provisions of
[the] Order if it cannot comply with any require-
ment of the Order because of an act of God, war,
strike, riot, castastrophe, or other condition as
to which negligence or willful misconduct on the
part of the [Company] was not the proximate cause
. . ." provided the Company shall have notified the
Commissioner in writing within a reasonable time
after it obtains knowledge of the fact and requests
the appropriate extension or modification of the
Order.

On September 7, 1973, the Company requested a
modification of the compliance schedule of the
Second Modified Order due to delays in equipment
delivery.  This request was denied by the DEC
Regional Attorney on November 26, 1973.  In
response to the Company's request on December 14,
1973 for a reconsideration of its request for
modification of the Second Modified Order, the
Regional Attorney on January 15, 1974 proposed a
Third Modified Order on Consent which was unac-
ceptable to the Company.  The proposed Third
Modified Order on Consent would have omitted the
force majeure clause of the Second Modified Order
and would have assessed a penalty of $5,000 against
the Company.

DRAFT
12/27/78    4
RLR, WO

## SCHEDULE 7.28 - (Continued)

Additional requests for modifications of the Second
Modified Order to extend the compliance schedule
were made by the Company on February 4, 1974, April
4, 1974, June 10, 1974 and July 1, 1974.

On September 9, 1974, the DEC commenced a proceeding
against the Company and sought an order denying the
Company's request for a modification of the Second
Modified Order and assessing civil penalties
against the Company.  In its answer to the com-
plaint, the Company requested a further modifi-
cation of the Second Modified Order to extend the
compliance schedule due to further delays in the
delivery of equipment.

The proceeding was settled by the entry of an Order
on Stipulation dated December 23, 1974 ("the Order
on Stipulation") which modified the Second Modified
Order to increase the surety bond from $25,000 to
$30,000 and to extend the compliance schedule as
requested by the Company.

Pursuant to the Company's request on March 17, 1975
for modification of the compliance schedule in the
Order on Stipulation due to further delays in
delivery of equipment, an Order Modifying Order on
Stipulation was made by the Commissioner of the DEC
on April 2, 1975 to modify the compliance schedule
as requested by the Company.

At an informal pre-hearing conference in the adju-
dicatory hearing proceeding on the NPDES permit held
on June 13, 1975 (see discussion of NPDES permit
proceeding in subparagraph E below), a further modi-
fication of the compliance schedule was agreed to
by the DEC and Region II of the U.S. Environmental
Protection Agency ("EPA").  Thereafter, on July 2,
1975 the Company informed the DEC that construction
of Phase I facilities was completed on June 30,
1975, in accordance with the compliance schedule
contained in the Order Modifying Order on Stipula-
tion and requested a modification of the Order
Modifying Order on Stipulation to extend the com-
pliance schedule in accordance with the agreement
reached with the DEC and Region II of the EPA at
the informal pre-hearing conference.



DRAFT
12/27/78    5
RLR, WO

SCHEDULE 7.28 – (Continued)

On February 9, 1976 the DEC proposed a Second Order
Modifying the Order on Stipulation to revise the
compliance schedule as requested by the Company.
On March 25, 1976 the Company requested a further
extension of the compliance schedule contained
in the proposed Second Order Modifying Order on
Stipulation, and on March 29, 1976 submitted to
the DEC a revised Second Order Modifying Order
on Stipulation executed by the Company.  The ex-
ecution of the proposed Second Order Modifying
Order on Stipulation by the Commissioner was de-
layed pending negotiations between the Company,
Region II of the EPA and the DEC regarding modi-
fications of the NPDES final permit.

On July 13, 1976, the DEC proposed a revised Second
Order Modifying Order on Stipulation with a revised
compliance schedule upon which the Company, Region
II of the EPA and the DEC had reached agreement in
a proposed stipulation in settlement of the adjudi-
catory hearing proceeding.  The revised Second
Order Modifying Order on Stipulation was executed
by the Company on July 19, 1976 and forwarded to
the DEC on August 2, 1976 for execution by the
Commissioner concurrently with the execution of
the stipulation in settlement of the adjudicatory
hearing proceeding on the NPDES final permit.

On October 1, 1976, the Company advised the DEC
and Region II of the EPA that it was unable to
submit final plans and specifications on October
1, 1976, or to commence construction of Phase II
treatment facilities on November 1, 1976, as con-
templated in the proposed Second Order Modifying
Order on Stipulation.  The delay was occasioned
by problems encountered in the pilot plant testing
by Zimpro, Inc., the proposed vendor for the wet
air oxidation system to be included in the Com-
pany's Phase II treatment facilities, and ongoing
studies and testing by the Company's consultants,
O'Brien & Gere, Engineers, Inc.  The Company re-
quested an appropriate modification of the compli-
ance schedule and a meeting with representatives
of the DEC and Region II of the EPA.



DRAFT
12/27/78    6
RLR, WO

SCHEDULE 7.28 - (Continued)

At an informal pre-hearing conference with the DEC and Region II of the EPA held on February 8, 1977, the need for additional time to design a less capital intensive Phase II treatment system was discussed, including a redesigned wet air oxida-tion system and the alternative of an activated carbon treatment and controlled release system.

On April 5, 1977, the Company submitted to both the DEC and Region II of the EPA an analysis of the economic impact of Phase II pollution abatement costs and requested additional time to develop a less capital intensive Phase II treatment system.

On July 1, 1977, the Company submitted to the DEC a preliminary plan for a modified Phase II treatment system, consisting of activated carbon treatment and controlled release.

On July 19, 1977, the Company submitted to the DEC a proposed compliance schedule to achieve the mod-ified Phase II treatment system and a preliminary capital cost estimate.

On August 10, 1977, at a meeting between Company and DEC representatives, the DEC representative reported that the proposed activated carbon treat-ment and controlled release system was acceptable to the DEC.  The DEC also submitted proposed efflu-ent limitations.  See the memorandum of the Com-pany's engineering consultants, O'Brien & Gere Engineers, Inc., on their meeting with the DEC on August 10, 1977, and related data attached to this Schedule as Exhibit 7.28(3)(D)(1).

On November 14, 1977, the DEC submitted to Region II of the ERA a draft NPDES final permit, which included the controlled release system and the schedule of 30 months requested by the Company for implementation of the Phase II program.

At an informal pre-hearing conference with repre-sentatives of the DEC and Region II of the EPA held on August 7, 1978, the Company requested further modifications of the effluent limitations



DRAFT
12/27/78    7
RLR, WO

SCHEDULE 7.28 - (Continued)

previously proposed by the DEC on August 10, 1977,
in respect of iron, zinc, sulfides, and suspended
solids.

The Company proposes to submit to the DEC and Region
II of the EPA in the form of a letter the following
statement and exhibits attached thereto:

"Pursuant to our meeting of August 7, 1978,
we are enclosing, in the form of exhibits,
the information and data requested and
available at this time.  In our efforts to
obtain complete and representative data
regarding the hotwell discharges, further
sampling and evaluation became necessary
and is underway.  We should have all of the
hotwell data and related analyses available
for submission to you by January 31, 1979.

"The exhibits enclosed are as follows:

"Exhibit 1.  Total capital expenditures to
date on the Company's pollution
abatement program.

"Exhibit 2.  Capital and operating costs
for Phase I and Phase II
effluent treatment system and
comparison of Phase I costs to
organic chemical industries.

"Exhibit 3.  Description of in-plant
modifications and improve-
ments.

"Exhibit 4.  Removal efficiencies of the
Phase I effluent treatment
system.

"Exhibit 5.  Analysis of application of BPT
and BAT by Phase I and Phase
II systems.

"Exhibit 6.  Statement of Company's posi-
tion relative to Phase II
and permit conditions.

DRAFT
12/27/78    8
RLR, WO

SCHEDULE 7.28 - (Continued)

"The exhibits were prepared with the
assistance of our engineering consult-
ants, O'Brien & Gere.

"The Phase I treatment system is currently
achieving greater than 90% reductions in
TSS, iron, zinc, and sulfides, is approach-
ing 90% reductions in TKN and is achieving
significant reductions in $BOD_5$ and UOD.
The removal efficiency will be further
increased after the correction of certain
mechanical problems encountered in the
operation of the Phase I system equipment.
Further details of the process waste
characteristics, removal efficiency and
applicable technology are set forth in
Exhibits 4, 5 and 6.

"The primary function of the Phase II
system is the secondary removal of organic
substances by the application of powdered
activated carbon together with improved
phase separation and a controlled release
system.  In addition, a polishing filter
system for the removal of particulates
will further reduce the TSS iron, zinc and
sulfide levels in the effluent.  Further
details of the Phase II system, including
the applicable technology, are set forth in
Exhibits 5 and 6.

"The overall abatement program of the
Company will achieve the application of
treatment technology well in excess of
that presently defined as BCT, and for
certain components the application of BAT.

"Even with the additional reductions to be
achieved upon implementation of the Phase
II system, the discharge limitations
proposed for certain parameters in the
Company's NPDES permit cannot be met.
The effluent limitations most recently
proposed for iron, zinc and sulfides would
require a reduction greater than 98.5% for



DRAFT
12/27/78    9
RLR, WO

SCHEDULE 7.28 - (Continued)

these parameters.  The attainment of this level of reduction on a consistent basis is both technically impractical and uneconomical in terms of the additional benefit which might be derived.

"We respectfully request your approval of the effluent limitations, treatment program and implementation schedule proposed in Exhibit 6.

"As shown in Exhibits 1 and 2, our Company has to date incurred, and will incur, very substantial costs in the construction and operation of effluent treatment and related facilities at Waterloo, New York.  The Phase I treatment costs alone far exceed the chemical processing industry averages.

"As we have indicated in our prior meetings, and as the hotwell data will show, the hotwell discharges represent a very small percentage of the total plant pollutant load.  The minimal benefits to be derived from the replacement of the contact condensers would not justify the incremental capital investment which is estimated to be several million dollars.

"The reports and information we have submitted to you demonstrate the unique nature of many of our waste water problems and their proposed solution.  We trust that these factors will be given appropriate consideration in the determination of the final permit.  We wish to conclude the present adjudicatory hearing and initiate and implement the proposed Phase II system at the earliest possible date."

The pleadings, stipulations, orders, requests for modifications of the orders and each statement, report and other document filed with the DEC in this proceeding after April 30, 1973 are attached to this Schedule as Exhibit 7.28(3)(D)(2).

DRAFT
12/27/78    10
RLR, WO

SCHEDULE 7.28 - (Continued)

E.  EPA NPDES Permit Proceeding:

On or about June 28, 1971, the Company made appli-
cation under the Federal Refuse Act for a permit to
discharge industrial wastes from its Waterloo, New
York plant into the Seneca River and Barge Canal.
Pursuant to the Federal Water Pollution Control Act
("FWPCA") Amendments of 1972, the Company's appli-
cation for a permit under the Refuse Act became an
application for an NPDES permit.

On August 7, 1974, Region II of the EPA tentatively
determined to issue a NPDES permit to the Company.
On September 13, 1974 the Company submitted its
comments to Region II of the EPA on the tentative
determinations in the draft permit and requested
certain modifications of the terms and conditins
of the draft permit.

On November 6, 1974, Region II of the EPA informed
the Company that it had made a final determination
to issue a NPDES permit for the Company's facility
at Waterloo, New York.  The NPDES permit was signed
on November 1, 1974, to become effective on December
31, 1974 and to expire on December 31, 1979.

On November 27, 1974, the Company requested an
adjudicatory hearing pursuant to the provisions of
Title 40, Section 125 of the Code of Federal Reg-
ulations, as amended, 39 Federal Register 143, to
reconsider certain of the terms and conditions con-
tained in the final determination of Region II of
the EPA to issue a NPDES permit for the Company's
Waterloo, New York, facility.  The Company contested
the monitoring requirements, certain effluent lim-
itations and the compliance schedule of the NPDES
permit as more particularly set forth in the Com-
pany's request for an adjudicatory hearing.

Pursuant to a public notice dated January 3, 1975,
Region II of the EPA granted the Company's request
for an adjudicatory hearing on the NPDES permit.

The DEC issued its certification of the NPDES
permit under Section 401 of the FWPCA on September
24, 1974 and an amended certification on February
26, 1975.

DRAFT
12/27/78  11
RLR, WO

SCHEDULE 7.28 - (Continued)

On March 11, 1975, Region II of the EPA granted
the DEC's request to be admitted as a party to
the adjudicatory hearing proceeding on the NPDES
permit.

On April 9, 1975, the Company forwarded the DEC
Order on Stipulation dated December 23, 1974 and
the Order Modifying Order on Stipulation dated
April 2, 1975 to Region II of the EPA with the
request that the compliance schedule contained
in the Order Modifying Order on Stipulation be
included in the NPDES permit.

Informal prehearing conferences in the adjudicatory
hearing proceeding have been held at the offices of
Region II of the EPA on June 13, 1975, May 20, 1976,
February 8, 1977 and August 7, 1978.

At the informal prehearing conference held on June
13, 1975, a further modification of the compliance
schedule was agreed to by the DEC and Region II of
the EPA.

At the informal prehearing conference held on May
20, 1976, agreement was reached on the terms and
conditions of the NPDES permit, including a revised
compliance schedule.

On or about June 22, 1976, Region II of the EPA
prepared a proposed stipulation for execution by
the Company, the EPA and the DEC as the final
administrative disposition of the adjudicatory
hearing proceeding, which included the agreement
reached at the May 20, 1976 conference ("the
proposed permit stipulation").  The proposed
permit stipulation was forwarded by Region II of
the EPA to the Washington office of the EPA for
approval and execution.

On August 26, 1976, the Company's engineering
consultant was informed by Mr. Phil Greco, the
engineer with Region II of the EPA responsible for
the technical aspects of the NPDES permit, of the
status of the proposed permit stipulation.  The
alleged response of the Washington office to the
proposed stipulation was that it appeared to be too



DRAFT
12/27/78   12
RLR, WO

SCHEDULE 7.28 - (Continued)

liberal in the allocation of effluent limitations.
Mr. Greco was furnished the basis for the effluent
limitations proposed in the permit stipulation,
which he believed would be satisfactory.   On
September 2, 1976, the Company's consultant pro-
vided additional data to Mr. Greco in support of
the permit stipulation.   Mr. Greco believed that
the additional information was more than adequate
and that resolution of the stiuplation internally
within the EPA would be completed within the
following week.

As stated in subparagraph (D) above, the Company
advised the DEC and Region II of the EPA on October
1, 1976 that it was unable to submit final plans
and specifications for Phase II treatment facilities
on October 1, 1976 or to commence constuction of
Phase II treatment facilities on November 1, 1976,
as contemplated in the proposed permit stipulation.
Subsequent proceedings on the NPDES permit are set
forth in subparagraph (D) above.

Refer to the following items in Exhibit 7.28(3)(E):

1.   The Company's application to the U.S. Army
     Corps of Engineers for a discharge permit

2.   Draft NPDES permit

3.   The Company's comments to Region II of the
     EPA on the draft NPDES permit

4.   Final NPDES permit

5.   Section 401 certification of NPDES permit by

6.   The Company's request for an adjudicatory
     hearing on the NPDES permit

7.   The granting by Region II of the EPA of the
     Company's request for an adjudicatory hearing

8.   Proposed permit stipulation

9.   Draft permit limitations and conditions pro-
     posed by the DEC to Region II of the EPA on
     November 14, 1977



12/27/78   13
RLR, WO

### SCHEDULE 7.28 - (Continued)

10. Each statement, report or other document filed
by the Company with Region II of the EPA after
April 30, 1973

(4) Basis for Proceedings - There is no basis or ground for
any suit, action, claim, investigation, inquiry or pro-
ceeding of the type referred to in this Schedule, except
as follows:

A. The Company is withdrawing water from the Seneca Barge
Canal in excess of the amount authorized by permit from
New York Department of Transportation.

B. A former Swedish customer has, at various times be-
tween 1961 and 1975, threatened action against the
Company for an alleged breach of contract.

C. Such further proceedings which may arise from the
environmental matters discussed in Schedule 7.28(3).

(5) Orders or Decrees - There is presently no outstanding
order, writ, injunction or decree of any court, admin-
istrative agency, governmental body or arbitration
tribunal against or affecting any Shareholder or the
Company or any of the capital stock, properties,
assets, business or prospects of the Company, except
as follows:

A. The orders described in Schedule 7.28(3).

and deeded rights and permit from New
York State Electric & Gas Corporation pursuant
to agreement dated December 30, 1966.

he information listed below in this Schedule 7.35 represents the 78
resent, actual and existing knowledge and belief of the Company D, KDL
rd each of the Shareholders; however, this information does not
lude and should not be construed to imply knowledge which the
ompany or any of the Shareholders might have had or reasonably
hould have had if detailed searches or investigations had been
ade.

## SCHEDULE 7.35

(a)(i)      Regulated Wastes and Discharges – The following is a
            true and complete list of each waste material, effluent,
            atmospheric or other discharge regulated under any ap-
            plicable law, ordinance, code, rule or regulation having
            for its purpose the safety of persons or the protection
            of health or the environment which is generated incident
            to the manufacture of each product manufactured by the
            Company:

            See Exhibit 7.35.


(a)(ii)     Environmental Data – The following is a true and
            complete list of all data in the Company's posses-
            sion or of which the Shareholders have knowledge
            relating to the possible effect on man or the en-
            vironment of each substance listed in (a)(i) above:

            See Exhibit 7.35.


(a)(iii)    Summary or Description of Effects on Past or Present
            Employees of the Company of Substances listed in
            (a)(i) above –

            See Exhibit 7.35.


(b)         Violations Relating to the Environment or Occupa-
            tional Safety and Health –

            The following is a true and complete list of the Com-
            pany's real and personal property which is in violation

DRAFT
12/27/78
RLR, WO, KDL

## SCHEDULE 7.35 - (Continued)

of any existing law, ordinance, code, rule or regulation
relating to the environment or occupational safety and
health, which violation would have a material adverse
affect on the properties, assets or business of the
Company or would have a material affect on the conduct
of the business of the Company as it is presently being
conducted:

See Exhibit 7.35, Schedule 7.26 and Schedule 7.28.

(c)     Leases, Licenses and Permits Relating to the En-
vironment or Occupational Safety and Health -

The following sets forth the extent, status and effect of
all govenmental leases, licenses and permits relating to
the environment or occupational safety and health neces-
sary for the Company to conduct its business and to
operate its properties and assets, except such leases,
licenses and permits the absence of which would not have
a material adverse effect on the properties, assets or
business of the Company and would not have a material
effect on the conduct of the business of the Company as
it is presently being conducted, possible violations
thereof, proceedings pending or threatened looking toward
the revocation or limitation of any such governmental
lease, license or permit and the bases or grounds for any
such revocation or limitation:
None.



DRAFT
12/27/78
RLR, WO, KDL

## SCHEDULE 7.35 - (Continued)

(d)    Compliance with Laws Relating to the Company's Property
or Applicable to the Company's Business and Concerning
the Environment or Occupational Health and Safety -

The following sets forth the extent and status of the
Company's compliance with all existing laws, rules,
regulations, ordinances, codes, orders, licenses and
permits relating to any of its properties or applicable
to its business and concerning the environment or occupa-
tional safety and health, except for such non-compliance
therewith as would not have a material effect on the
conduct of the business of the Company as it is pre-
sently being conducted:

See Exhibit 7.35, Schedule 7.26 and Schedule 7.28.

(e)    Knowledge of the Company or Any of the Shareholders of
Violations, Pending or Threatened Proceedings, or
Grounds for Proceedings -

The following sets forth the actual knowledge of the
Company or any of the Shareholders (i) of any violation
of any laws, rules, regulations, ordinances, codes,
orders, governmental leases, licenses or permits relating
to occupational safety and health and the environment,
or the absence of any such governmental lease, license
or permit, which would have a material adverse effect on
the properties, assets or business of the Company or on
the conduct of the business of the Company as it is
presently being conducted, (ii) of any proceedings
pending or threatened looking toward revocation or
limitation of any such governmental lease, license or
permit, or (iii) of the bases or grounds for any such
revocations or limitations.

See Exhibit 7.35, Schedule 7.26 and Schedule 7.28.