IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case no. 01-01139 (KJC) |
| | ) | (Jointly Administered) |
| Reorganized Debtors. | ) | |
| | ) | Hearing Date: October 14, 2014, at 10:00 a.m. |
| | ) | |

**OBJECTION TO FEE ENHANCEMENT REQUESTED BY THE LAW FIRM OF
BILZIN SUMBERG BAENA PRICE & AXELROD LLP**

INTRODUCTION

In its *Fifty-Second Interim and Final Fee Application of Bilzin Sumberg Baena Price & Axelrod LLP for Approval and Allowance of Compensation for Services Rendered and Reimbursement of Expenses for the Period of April 9, 2001, through February 3, 2014*, dated May 12, 2014 [Docket no. 32190] (the "Bilzin Final Fee Application"),[2] the law firm of Bilzin Sumberg Baena Price & Axelrod LLP ("Bilzin") asks this Court to approve (among other things) an $875,000 "fee enhancement" for services performed in 2002 in the Sealed Air and Fresenius fraudulent transfer adversary proceedings (the "Adversary Proceedings")—services for which it has already been handsomely compensated in the amount of approximately $1.7 million.[3] Bilzin

---

[1] The Reorganized Debtors comprise the following 17 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., Darex Puerto Rico, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Gloucester New Communities Company, Inc., Grace Chemical Company of Cuba, Grace Energy Corporation, Grace Europe, Inc., Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace PAR Corporation, W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Guanica Caribe Land Development Corporation, Hanover Square Corporation, Kootenai Development Company, Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), and Water Street Corporation.

[2] Capitalized terms not defined herein shall have the meaning ascribed to them in, as the case may be, Bilzin's Final Fee Application, the Fee Auditor's Report or the *First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W. R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders as Modified Through December 23, 2010* [Docket no. 26368] (the "Plan").

[3] In addition to the $1.7 million paid on account of the Adversary Proceedings, Bilzin also received an additional approximately $10 million for other services the firm rendered as counsel to the Asbestos PD Committee. The

Final Fee Application ¶ 38. The Reorganized Debtors submit that Bilzin has not come close to satisfying its stringent burden of establishing why it should be entitled to any upward adjustment of its compensation in any amount. *In re Public Serv. Co.*, 160 B.R. 404, 420 (Bankr. D.N.H. 1993). Bilzin's fee enhancement request should therefore be denied in its entirety.

Courts rarely grant fee enhancements to retained professionals. As one bankruptcy court recently put it:

> [Fee] enhancements are the exception, not the rule … [But it] is not surprising that professionals have more regularly sought fee enhancements—after all, given the case law, it's worth a try when the outcome of the case is especially positive … In fact, it is not surprising that professionals might come to think that a court's refusal to grant an enhancement award is an indirect devaluation of the quality of their work—after all, having made the request and been denied, is not the implication that these professionals are not so special after all?

*In re Age Ref., Inc.*, 2012 Bankr. LEXIS 3210, at *20 (Bankr. W.D. Tex. 2012) (denying 30% fee enhancement).

Here, there is but one "special" aspect to Bilzin's request: The firm is the only retained professional in these chapter 11 cases to have deemed it "worth a try" to request a fee enhancement. None of the other approximately 80 retained professionals have done so. This is hardly surprising. The retained professionals have collectively requested final approval of more than $456 million in fees and expenses. If any of them were to seek upward adjustments of their fees, it would face the stringent burden of overcoming the very strong presumption that fee "enhancements are improper except in 'rare' and 'exceptional' cases." *In re UNR Indus.*, 986 F.2d 207, 210 (7th Cir. Ill. 1993) (internal citation omitted); *Public Serv. Co.*, 160 B.R. at 420. As the court in *Public Service* put it some 20 years ago, a "mere unsubstantiated claim of

---

Reorganized Debtors do not object to any of those fees. But they do object to the requested $875,000 fee enhancement on top of the approximately $11.8 million already approved and paid on an interim basis.

superior quality or extraordinary results obtained will not do." *Id.* at 415. An applicant such as Bilzin must instead provide, as that court put it, "not a smoking gun but a 'smoking silver platter' upon which the serving of the blessedly rare cut of economic nutrient for the estate is self-evident in all its steaming glory." *Public Serv. Co.*, 160 B.R. at 421.

Bilzin has not furnished any such "smoking silver platter," nor can the firm claim that it alone was responsible for the economic nutrient arising from settlement of the Adversary Proceedings. *Asarco*, 751 F.3d at 298 (applicant entitled to fee enhancement only if success can be ascribed to it alone). Indeed, the Bilzin Final Fee Application itself makes it abundantly clear that Bilzin was but one of an entire team of retained professionals that prosecuted the Adversary Proceedings. (The New York law firm of Milberg Weiss Bershad Hynes & Lerach LLP ("Milberg Weiss") was retained as special litigation counsel to lead that effort.) Additionally, there were a number of other retained professionals that also played significant roles in settling that litigation. Thus, success in the Adversary Proceedings cannot be ascribed—as it must—solely to Bilzin.

It follows then, that all Bilzin has done—and can do—is to compare its blended hourly rate of $316.24 with Milberg Weiss's $475 hourly rate. This hourly rate differential—without more—is not by itself a basis for a fee enhancement. *See, e.g., In re Bank of New Eng. Corp.*, 484 B.R. 252, 281 (Bankr. D. Mass. 2012) (Rate differential between fee enhancement applicant and litigation opponent does not demonstrate that applicant's hourly rates were "so below market value as to warrant an upward adjustment"). What's more, Milberg was retained as special litigation counsel in the Adversary Proceedings in no small part because, as Bilzin admits, it was not qualified to assume the role. *See, e.g.*, Bilzin Final Fee Application ¶¶ 16, 22 & 24. Bilzin's admission, combined with its failure to substantiate any "rare and exceptional circumstances"

3

regarding its services in the Adversary Proceedings, demonstrates very clearly that it has done nothing to overcome the strong presumption that payment at the lodestar—here, $1.7 million—is proper and should not be disturbed. *Asarco*, 751 F.3d at 295 (adjustments upward from the lodestar are appropriate only in "rare and exceptional circumstances").

Finally, it is worth noting that the Reorganized Debtors do not object to any other aspect of the Fee Auditor's recommendations regarding Bilzin's final fee request. The Reorganized Debtors also have no objections to the fees and expense recommendations made by the Fee Auditor (totaling more than $456 million) regarding the other approximately 80 retained professionals who rendered valuable services in these highly successful chapter 11 cases—efforts that the Reorganized Debtors recognize and appreciate.

## BACKGROUND

- *Bilzin's Retention.*

1. On May 22, 2001, Bilzin filed its retention application [Docket no. 298], and on June 21, 2001, the Court entered its *Order Granting Application by the Official Committee of Property Damage Claimants for Approval of Employment of Bilzin Sumberg Dunn Baena Price & Axelrod LLP as its Counsel, Nunc Pro Tunc to April 9, 2001* [Docket no. 551] (the "<u>Bilzin Retention Order</u>"). The Bilzin Retention Order states in relevant part that:

> [T]he Firm shall be compensated in accordance with the procedures set forth in 11 U.S.C. §§ 330 and 331, applicable Federal Rules of Bankruptcy Procedure, the Local Rules of this Court, and such other procedures which may be fixed by Order of this Court.

- *The Adversary Proceedings.*

2. On March 18, 2002, the Adversary Proceedings commenced. They were captioned, *Official Committee of Asbestos Personal Injury Claimants, et al. v. Sealed Air Corporation and Cryovac, Inc., et al.*, and *Official Committee of Asbestos Personal Injury*

4

*Claimants, et al., v. Fresenius Medical Care Holdings, Inc., et al.* Adversary no. 02-2210, Docket no. 1; Adversary no. 02-2211, Docket no. 1.

3. On May 9, 2002, the Asbestos PI and PD Committees jointly filed an application [Adversary no. 02-2210, Docket no. 22] requesting among other relief:

- Approval of Milberg Weiss's employment; and
- Withdrawal of the reference for review and approval of professionals' fees and expenses arising in the Adversary Proceedings.

On July 10, 2002, District Judge Wolin entered an order granting the above-requested relief, with the proviso that Milberg Weiss's retention was conditioned upon all parties agreeing to a protocol attached thereto (the "Protocol") governing the division of responsibilities for prosecuting the Adversary Proceedings. *Order re: Fraudulent Conveyance Proceedings* [Adversary no. 02-2210, Docket no. 87] (the "Adversary Fee Order").

4. The Protocol provided, among other things, that "Milberg Weiss will have overall supervisory responsibility for the entire matter" as to the prosecution of the Adversary Proceedings. Milberg was also to "coordinate the work of other plaintiff counsel." In addition, the Protocol established that Milberg Weiss was to be compensated at an hourly rate of $475 per hour for its attorneys, "regardless of the hourly billing rate for each such professional."

5. Bilzin, by contrast, was limited by the Protocol to having "primary responsibility for the property damage aspect of the case." The Protocol further provided for two other firms with significant experience in asbestos property damage law, Speights Runyan and Dies & Hile, to assist Bilzin in "preparing the property damage aspect of the case." The team also included Caplin Drysdale, which had "primary responsibility for the personal injury damage aspect of the case." Bilzin Sumberg was clearly just one of a much larger team of firms serving as plaintiffs' counsel in the Adversary Proceedings—none of which are requesting any fee enhancement.

6.      Thereafter, pursuant to the Adversary Fee Order and this Court's *Amended Administrative Order Under U.S.C. §§ 105(a) and 331 Establishing Revised Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and Official Committee Members*, dated April 17, 2002 [Docket no. 1949] (the "Interim Compensation Order"), professionals involved in the Adversary Proceedings, including Bilzin, filed monthly fee applications and were paid interim compensation in the amount of 80% of their requested compensation and 100% of their fees. These professionals subsequently filed quarterly fee applications in accordance with the Interim Compensation Order for review of those fees and expenses and interim payment of the 20% fee holdbacks. *See Motion for Entry of Order Approving Fee Applications and Allowing the Payment of Holdbacks*, dated February 15, 2005 [Adversary no. 02-2210, Docket no. 720] (the "2005 Holdback Payment Motion"). Judge Wolin entered various orders approving the relevant quarterly fee applications on an interim basis, and the Debtors paid the holdbacks. *See* Adversary no. 02-2210, Docket no. *passim.*

7.      In November 2002, the Adversary Proceedings were settled in principle. Due to the complex nature of the settlements, however, Judge Wolin did not approve the Fresenius Adversary Proceeding settlement until June 25, 2003. Adversary 02-2210, Docket no. 522; Disclosure Statement ¶ 2.8.4. Shortly after Judge Wolin's recusal, the Adversary Proceedings, including consideration of outstanding fee applications, were referred back to this Court. *See* Disclosure Statement ¶ 3.2.12. On June 27, 2005, Judge Fitzgerald approved the Sealed Air Adversary Proceeding settlement. Adversary no. 02-2210, Docket no. 751; Disclosure Statement ¶ 2.8.4.

8.      On April 11, 2005, pursuant to the 2005 Holdback Payment Motion and after having reviewed the fee applications at issue therein, the Court entered its *Order Approving*

*Quarterly Fee Applications and Allowing Payment of Holdbacks for Services Rendered* [Adversary no. 02-2210, Docket no. 731], and the Debtors paid the relevant holdbacks. All fees and expenses remained subject to a final fee order pursuant to the Interim Compensation Order. *Id.* On December 20, 2010, after an audit by the Debtors revealed that several quarterly holdbacks relating to the Adversary Proceedings had never been paid, the Court entered its *Order Approving Remaining Fee Applications Relating to Fraudulent Conveyance Adversary Proceedings and Allowing the Payment of Remaining Holdbacks for Services Rendered* [Adversary no. 773]. The remaining holdbacks were paid shortly thereafter.

### The Bilzin Final Fee Application & Request for Fee Enhancement

9. On May 12, 2014, Bilzin filed its Final Fee Application. On July 29, 2014, pursuant to the Plan, the Interim Compensation Order and the *Order Appointing Fee Auditor in Accordance with the Court's Direction*, dated March 18, 2002 [Docket no. 1852], the Fee Auditor filed its *Final Report Regarding the Fifty-Second Interim and Final Fee Application of Bilzin Sumberg Baena Price & Axelrod LLP for Approval and Allowance of Compensation for Services Rendered and Reimbursement of Expenses for the Period of April 9, 2001, Through February 3, 2014* [Docket no. 32352] (the "Final Fee Report"). The Final Fee Report states in relevant part:

> We note that in addition to its final fee and expense request, Bilzin has requested a fee enhancement of $875,000.00 for its work on the Sealed Air Adversary Proceedings. As the enhancement sought relates to the Sealed Air Adversary Proceedings, it appears to us that it is outside the scope of our review. Therefore, we make no recommendation, and take no position, concerning Bilzin's request for fee enhancement in this report. However, we will be glad to provide an opinion concerning Bilzin's request for fee enhancement if the Court directs us to do so.

Final Fee Report at 21.

## ANALYSIS

- *Fee Enhancements Permitted Only in Rare Cases*.

10. When a law firm is retained under section 327(a) and compensated pursuant to section 330(a), then all retrospective fee requests are to be evaluated under section 330(a). *Zolfo, Cooper & Co. v. Sunbeam-Oster Co.*, 50 F.3d 253, 261-62 (3d Cir. 1995). As the Bilzin Retention Order specifically provides for review of the firm's fees and expenses under section 330, then any requested fee enhancement must also be evaluated under section 330(a). *UNR Indus.*, 986 F.2d 207; *Asarco*, 751 F.3d 291.

11. The Court of Appeals for the Third Circuit does not appear to have directly addressed the issue of fee enhancements under section 330—whether they are to be permitted at all, and if so, under what standards. Most courts considering the issue have held that a fee enhancement may be permitted "only in the rare case where the counsel offers specific evidence that the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was exceptional." *UNR*, 986 F.2d at 210 (internal quotation marks and citation omitted); *see also Asarco*, 751 F.3d 291.

12. The Court of Appeals for the Fifth Circuit recently considered whether to award to debtor's counsel a fee enhancement of 20% of all fees earned during a chapter 11 case. *Asarco*, 751 F.3d 291. In so doing, it held that the process involves two steps. First, a bankruptcy court should "use the lodestar method, multiplying the number of hours of work performed by attorneys and paraprofessionals by the hourly rates of each. The total yields a lodestar amount." *Id.* at 295 (internal citations omitted). Second, "after calculating the lodestar, bankruptcy courts retain the discretion to adjust the lodestar upwards or downwards to reflect their consideration of the ... factors" found in the Fifth Circuit's *Johnson* case. *Id.* at 295 (internal citations omitted). The twelve *Johnson* factors are:

> (1) The time and labor required; (2) The novelty and difficulty of the questions; (3) The skill requisite to perform the legal service properly; (4) The preclusion of other employment by the attorney due to acceptance of the case; (5) The customary fee; (6) Whether the fee is fixed or contingent; (7) Time limitations imposed by the client or other circumstances; (8) The amount involved and the results obtained; (9) The experience, reputation, and ability of the attorneys; (10) The "undesirability" of the case; (11) The nature and length of the professional relationship with the client; [and] (12) Awards in similar cases.

*In re Pilgrim's Pride Corp.*, 690 F.3d 650, 654 (5th Cir. 2012) (internal citations omitted). The *Asarco* court further held that:

> Because the four Johnson factors related to attorney skill and legal complexity are presumably fully reflected in the lodestar, those four factors can only form the basis for a fee enhancement in "rare and exceptional circumstances."

*Asarco*, 751 F.3d at 295 (internal citation omitted).

13. In the *Bank of New England Corporation* case, the court elucidated two more factors to be taken into account: "whether the party paying for the fee agreed to it, and whether all creditors have been paid in full." *Bank of New England*, 484 B.R. at 280-81 (internal citations omitted).

14. The Court of Appeals for the Seventh Circuit articulated the standard of review for fee enhancement requests slightly differently:

> The Supreme Court, in construing fee-shifting statutes, has stated that fee enhancements may be available for quality of representation, but only in the "rare" case where the counsel offers specific evidence that "the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was 'exceptional.'" *Blum v. Stenson*, 465 U.S. 886, 899 (1984). Normally, however, the lodestar fee—the number of billable hours times reasonable hourly rates—reflects the novelty and complexity of the case, the experience and special skill of counsel, the quality of the representation and the results obtained. *Id.* at 898-900. Two years after *Blum*, in *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546 (1986), the Court reiterated the "strong presumption"

> that factors demonstrating superior representation are accounted for in the lodestar figure and cannot serve as independent bases for increasing the fee award. *Id.* at 565. As a result, enhancements are improper except in "rare" and "exceptional" cases. *Id.*

*UNR*, 986 F.2d at 210.

15. By any standard, the applicant's burden to show that there should be an upward adjustment from the lodestar is a heavy one, and:

> It cannot be overcome by generalized rhetoric of "success" and "value[,]" but only by a specific showing of exceptional activity *without which* the estate likely would not have achieved the results obtained by other specialists of like background and rates, or exceptional activity *beyond that* reasonably contemplated at the time of the original retention.

*Public Serv. Co.*, 160 B.R. at 421 (emphasis in original). As discussed below, Bilzin has not carried this stringent burden in its fee enhancement request. *Id.* at 420. That this is so is illustrated by two cases—*UNR* decided by the Court of Appeals for the Seventh Circuit about 20 years ago, and *Asarco*, recently decided by the Court of Appeals for the Fifth Circuit. Both cases involved debtor's counsel requesting fee enhancements at the conclusion of a highly successful chapter 11 case. One was approved (at a much smaller amount than originally requested), and one was not. When compared to the fact patterns of either, Bilzin's fee enhancement request falls far short—and should thus be denied.

- ***The UNR Court Denied a 25% Fee Enhancement Request by Debtor's Counsel.***

16. In *UNR*, debtor's counsel (the law firm of Schwartz, Cooper, Kolb and Gaynor ("Schwartz Cooper")) requested a fee enhancement of 25% of the total fees awarded. Schwartz Cooper cited its "creative means of handling [the UNR] mass tort case," which ultimately allowed the debtor to reorganize while, at the same time, providing a fund of 92% of the debtor's stock for the benefit of its creditors. The bankruptcy court characterized Schwartz Cooper's

"performance as 'downright ingenious' at times." *Id.* at 208. But the court still denied the firm's fee enhancement request, stating that:

> [A]lthough the firm provided services of an extraordinarily high quality, that superior service was accounted for in the compensation it received at highly adequate hourly rates. The analysis does not flatly prohibit fee enhancements for quality; it merely presumes, in accord with the Supreme Court cases, that such enhancements are not proper when the compensation awarded is reasonable.

*Id.* at 210-11.

- ***The* Asarco *Court Reduced Debtor's Counsel's Fee Enhancement Request*.**

17. In *Asarco*, debtor's counsel, Baker Botts, requested a fee enhancement equal to 20% of all its fees approved in the chapter 11 case. By all accounts, including the bankruptcy court's own personal observation and those of witnesses called by the firm, Baker Botts was the single driving force behind a chapter 11 restructuring for which the "prospects were slim" at the case's outset. Mem. Op. at 7, *In re Asarco, LLC*, Case no. 16249 (S.D. Tex. July 20, 2011). Debtor's counsel faced myriad challenges—including a highly unstable management and corporate governance situation, a major employees' strike, and little operating cash and no DIP financing. *Id.* Yet the bankruptcy court refused to award Baker Botts a fee enhancement for surmounting these hurdles, finding that it had been well compensated for these efforts, herculean as they may have been. *Id.* at 66-67. Instead:

> The court singled out the firms' prosecution of the SCC Litigation for fee enhancement precisely because it *ascribed success to their efforts alone*. The court described the [fraudulent transfer] SCC Litigation as ASARCO's "crown jewel." "Baker Botts was able to quickly and efficiently" prevail "[t]hrough its creativity, tenacity, and legal talent." The court found the results "were due to Baker Botts's performance and not to inferior performance by opposing counsel, unanticipated defense concessions, unexpectedly favorable rulings, a sympathetic fact-finder, or simple luck." Most impressive, Baker Botts won the trial "by deciphering millions of pages of documents and using those documents to tell a compelling

> story primarily out of the mouths of adverse witnesses." The result was a judgment "valued in excess of $6 billion" that was "most likely the largest fraudulent transfer verdict in United States history." That judgment "promised a far more meaningful recovery for creditors than originally anticipated" because of results achieved by Baker Botts that were "without question, rare and extraordinary by any possible measure." The bankruptcy court could hardly have been more specific and detailed as to Baker Botts's "rare and exceptional" performance than it was while placing this description in the context of its 85-page opinion on fees.

*Asarco*, 751 F.3d at 298 (emphasis added). It was for these reasons that the *Asarco* court awarded a fee enhancement of 20% of the fees relating to the fraudulent transfer "SCC Litigation"—a much smaller amount than was originally requested.

- ***The Bilzin Final Fee Application Does Not Support Its Fee Enhancement Request.***

18. As a threshold matter, the fact that the Reorganized Debtors do not agree with Bilzin's fee enhancement request should weigh heavily in this Court's decision. *Bank of New England*, 484 B.R. at 281 (denying fee enhancement request in part because creditors paying for it opposed the request). The source of the Reorganized Debtors' opposition is neatly captured by comparing *Asarco* with Bilzin's request, both for their similarities—the gravamen of the respective fee enhancements arising in the context of fraudulent transfer litigation—and their differences. The first distinction is noteworthy in that the *Asarco* fee award was (in percentage terms) much smaller—20% of fees relating to the fraudulent transfer litigation. Bilzin, by comparison, has requested an $875,000 fee enhancement, which is approximately 51% of the lodestar fees ($1.7 million) awarded and paid on an interim basis for services rendered in the Adversary Proceedings.

19. More important is the distinction between the role of Baker Botts in the SCC Litigation in *Asarco* and Bilzin's role in the Adversary Proceedings—a comparison leading inexorably to the conclusion that Bilzin's fee enhancement request should be denied. The

*Asarco* court "ascribed success" in the SCC Litigation solely to Baker Botts (and its co-counsel, to a lesser degree). *Asarco*, 751 F.3d at 298. By contrast and by Bilzin's own account, it—Bilzin—was just one of three law firms responsible for its particular aspect of the Adversary Proceedings (asbestos property damage), and only one of several retained professionals—with Milberg Weiss responsible as lead counsel for prosecuting the Adversary Proceedings in their entirety. Final Fee Application ¶¶ 34-35, 41 ("By no means does Bilzin Sumberg claim sole or principal credit for the results achieved in the Fraudulent Transfer Litigation"); *see also* Protocol ("Milberg Weiss will have overall supervisory responsibility for the entire matter"). Moreover, Bilzin has admitted that its own "limited bankruptcy resources and other professional demands" were in part why the Asbestos PI and PD Committees sought to retain Milberg Weiss as lead special litigation counsel. Bilzin Final Fee Application ¶ 22. In a nutshell, this is not a case where Bilzin was solely responsible for the outcome. *Compare Public Serv. Co.*, 160 B.R. at 423 (fee enhancements denied to two investment bankers where many parties—under the court's direct supervision—were responsible for a successful outcome).

20. Bilzin has also suggested that it is entitled to its requested fee enhancement at least in part because "the threat existed from the outset that the law firm would go unpaid if it did not successfully conclude the litigation." Bilzin Final Fee Application ¶ 37. That argument is also without merit. *See, e.g., Bank of New England*, 484 B.R. at 281 (dismissing the risk of nonpayment as a significant factor). As the Court of Appeals for the Ninth Circuit noted, "[t]he Supreme Court … has determined that basing an enhancement on the risk of loss … is not permitted." *See Arter & Hadden LLP v. Meronk (In re Meronk)*, 24 Fed. Appx. 737, 738 (9th Cir. Cal. 2001) (denying fee enhancement in addition to lodestar fee award based upon full

hourly rate, where firm failed to provide specific evidence why lodestar alone was not reasonable) (internal citation omitted).

21.   In any event, Bilzin has presented no facts to indicate "that without risk enhancement ... [the Asbestos PD Committee] would have faced substantial difficulties in finding counsel in the local or other relevant market." *Pa. v. Del. Valley Citizens' Council for Clean Air*, 483 U.S. 711, 731 (U.S. 1987). Indeed, no less than three separate law firms represented the Asbestos PD Committee in the Adversary Proceedings—and they and every other retained professional rendering services in the Adversary Proceedings was paid in full after their fees were reviewed and approved by the District Court. Adversary Fee Order; *see also* Adversary no. 02-2210, Docket no. *passim*; *see also Bank of New England*, 484 B.R. at 281. Bilzin has thus—at most—alluded to the risk of non-payment that every professional retained pursuant to section 330 faces during a bankruptcy court's interim and final fee application review. *In re Busy Beaver Bldg. Centers, Inc.*, 19 F.3d 833, 843 (3d Cir. 1994) ("bankruptcy courts have an independent duty to review fee applications even absent objections").

## CONCLUSION

22.   Bilzin has not—and cannot—carry its stringent burden. The outcome of the Adversary Proceedings was the work of several law firms—not just Bilzin. And none of the other firms has requested any fee enhancement. Moreover, Bilzin has already been handsomely compensated approximately $1.7 million for its work. Finally, the party that would pay for the fee enhancement—the Reorganized Debtors—does not support the request. In short, there is no basis for any upward adjustment of Bilzin's fees. The Reorganized Debtors thus respectfully request the Court deny Bilzin's fee enhancement request in its entirety—while they at the same time acknowledge the efforts of all the retained professionals in these chapter 11 cases and consent to the fees and expenses of each as recommended by the Fee Auditor.

WHEREFORE, the Reorganized Debtors request the Court deny Bilzin's fee enhancement request and grant such other relief as may be appropriate.

Dated August 15, 2014

THE LAW OFFICES OF ROGER HIGGINS, LLC
Roger J. Higgins
1 North Bishop Street
Suite 14
Chicago, IL 60607-1823
(312) 666-0431

and

PACHULSKI STANG ZIEHL & JONES LLP

_/s/ James E. O'Neill_

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705
(302) 652-4100
(302) 652-4400

Co-counsel for the Reorganized Debtors