<u>EXHIBIT C-1</u>

**Hampshire Chemical Proof of Claim 13934**

# WR Grace

### Bankruptcy Form 10

### Index Sheet

SR00000683

| Claim Number: | 00013934 | | Receive Date: | 03/31/2003 |

## Multiple Claim Reference

| Claim Number | _____ | ☐ | MMPOC | Medical Monitoring Claim Form |
| | | ☐ | PDPOC | Property Damage |
| | | ☐ | NAPO | Non-Asbestos Claim Form |
| | | ☐ | | Amended |

| Claim Number | _____ | ☐ | MMPOC | Medical Monitoring Claim Form |
| | | ☐ | PDPOC | Property Damage |
| | | ☐ | NAPO | Non-Asbestos Claim Form |
| | | ☐ | | Amended |

## Attorney Information

| Firm Number: | 00285 | Firm Name: | Dilworth Paxson LLP |
| Attorney Number: | 00264 | Attorney Name: | Marie P Kelley |
| Zip Code: | 08034 | | |

Cover Letter Location Number:    SR00000683

| Attachments Medical Monitoring | Attachments Property Damage | Non-Asbestos |
|---|---|---|
| ☐ TBD | ☐ TBD | ☒ Other Attachments |
| ☐ TBD | ☐ TBD | |
| ☐ TBD | ☐ TBD | |
| ☐ TBD | ☐ TBD | |
| ☐ TBD | ☐ TBD | |
| | ☐ Other Attachments | |

| Other | |
|---|---|
| | ☐ Non-Standard Form |
| | ☐ Amended |
| | ☐ Post-Deadline Postmark Date |

| UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE | GRACE NON-ASBESTOS PROOF OF CLAIM FORM |
|---|---|

**Name of Debtor:**[1]  W. R. Grace & Co. – Conn. | **Case Number** 01-01179-(JKF)

NOTE: Do not use this form to assert an Asbestos Personal Injury Claim, a Settled Asbestos Claim or a Zonolite Attic Insulation Claim. Those claims will be subject to a separate claims submission process. This form should also not be used to file a claim for an Asbestos Property Damage Claim or Medical Monitoring Claim. A specialized proof of claim form for each of these claims should be filed.

**Name of Creditor** (The person or other entity to whom the Debtor owes money or property):

Hampshire Chemical Corp.

**Name and address where notices should be sent:**
Dilworth Paxson LLP
Libertyview – Suite 700
457 Haddonfield Road          ATTN:
P.O. Box 2570                      Anne Marie P. Kelley, Esquire
Cherry Hill, NJ 08034
Account or other number by which creditor identifies Debtor:

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.
☐ Check box if you have never received any notices from the bankruptcy court in this case.
☐ Check box if the address differs from the address on the envelope sent to you by the court.

THIS SPACE IS FOR COURT USE ONLY

Check here ☐ replaces
if this claim ☐ amends a previously filed claim, dated:_____

**Corporate Name, Common Name, and/or d/b/a name of specific Debtor against whom the claim is asserted:**

**1. Basis for Claim**
☐ Goods sold
☐ Services performed
☒ Environmental liability
☐ Money loaned
☐ Non-asbestos personal injury/wrongful death
☐ Taxes
☒ Other  Contract

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensation (fill out below)

Your SS #:_____
Unpaid compensation for services performed
from _____ to _____ (date)

**2. Date debt was incurred:** June 21, 1999 | **3. If court judgment, date obtained:**

**4. Total Amount of Claim at Time Case Filed:**
If all or part of your claim is secured or entitled to priority, also complete Item 5 below.
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

$ Approximately $6.5 million but not liquidated as of this date.

**5. Classification of Claim.** Under the Bankruptcy Code all claims are classified as one or more of the following: (1) Unsecured Nonpriority, (2) Unsecured Priority, (3) Secured. It is possible for part of a claim to be in one category and part in another. CHECK THE APPROPRIATE BOX OR BOXES that best describe your claim and STATE THE AMOUNT OF THE CLAIM AT TIME CASE FILED.

☐ SECURED CLAIM (check this box if your claim is secured by collateral, including a right of setoff.)

Brief Description of Collateral:

☐ Real Estate          ☐ Other (Describe briefly)

Amount of arrearage and other charges at time case filed included in secured claim above, if any: $_____

Attach evidence of perfection of security interest

☒ UNSECURED NONPRIORITY CLAIM

A claim is unsecured if there is no collateral or lien on property of the debtor securing the claim or to the extent that the value of such property is less than the amount of the claim.

☐ UNSECURED PRIORITY CLAIM - Specify the priority of the claim.

☐ Wages, salaries, or commissions (up to $4650), earned not more than 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(4).

☐ Taxes or penalties of governmental units - 11 U.S.C. § 507(a)(7).

☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a____).

**6. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim. | This Space is for Court Use Only

**7. Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.  See attached.

**8. Acknowledgement:** Upon receipt and processing of this Proof of Claim, you will receive an acknowledgement card indicating the date of filing and your unique claim number. If you want a file stamped copy of the Proof of Claim form itself, enclose a self addressed envelope and copy of this proof of claim form.

| Date 3/27/01 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): [signature] *Pennmark* | WR Grace   BF.46.181.9022  00013934  SR=683 |

REC'D MAR 31 2003

...al Instructions and Claims Bar Date Notice and its exhibits for names of all Debtors and "other names" used by the Debtors.

# SPECIFIC INSTRUCTIONS FOR COMPLETING
# GRACE NON-ASBESTOS PROOF OF CLAIM FORMS

*The instructions and definitions below are general explanations of the law. In particular types of cases or circumstances, there may be exceptions to these general rules.*

This Proof of Claim form is for Creditors who have **Non-Asbestos Claims** against any of the Debtors. Non-Asbestos Claims are any claims against the Debtors as of a time immediately preceding the commencement of the Chapter 11 cases on April 2, 2001 other than Asbestos Personal Injury Claims, Asbestos Property Damage Claims, Zonolite Attic Insulation Claims, Settled Asbestos Claims or Medical Monitoring Claims, as defined on the enclosed General Instructions. More specifically, **Non-Asbestos Claims** are those claims against one or more of the Debtors, whether in the nature of or sounding in tort, contract, warranty or any other theory of law or equity for, relating to or arising by reason of, directly or indirectly, any injury, damage or economic loss caused or allegedly caused directly or indirectly by any of the Debtors or any products or materials manufactured, sold, supplied, produced, specified, selected, distributed or in any way marketed by one or more of the Debtors and arising or allegedly arising directly or indirectly, from acts or omissions of one or more of the Debtors, including, but not limited to, all claims, debts, obligations or liabilities for compensatory and punitive damages.

**Administrative Expenses:** Those claims for, among other things, the actual, necessary costs and expenses of preserving the estate as defined in Section 503 of the Bankruptcy Code that arose after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to Section 503 of the Bankruptcy Code. This form should not be used to make a claim for an administrative expense.

**Secured Claim:** A claim is a secured claim to the extent that the creditor has a lien on property of the debtor (collateral) that gives the creditor the right to be paid from that property before creditors who do not have liens on the property. Examples of liens are a mortgage on real estate and a security interest in a car, truck, boat, television set, or other item of property. A lien may have been obtained through a court proceeding before the bankruptcy case began; in some states a court judgment is a lien. In addition, to the extent a creditor also owes money to the debtor (has a right to setoff), the creditor's claim may be a secured claim. (See also Unsecured Claim.)

**Unsecured Claim:** If a claim is not a secured claim, it is an unsecured claim. Unsecured claims are those claims for which a creditor has no lien on the debtor's property or the property on which a creditor has a lien is not worth enough to pay the creditor in full.

**Unsecured Nonpriority Claim:** Certain types of unsecured claims are given priority, so they are to be paid in bankruptcy cases before most other unsecured claims (if there is sufficient money or property available to pay these claims). The most common types of priority claims are listed on the proof of claim form. Unsecured claims that are not specifically given priority status by the bankruptcy laws are classified as Unsecured Nonpriority Claims.

**Information about Creditor:** Complete this section giving the name, address, and telephone number of the creditor to whom the debtor owes money or property, and the debtor's account number, if any. If anyone else has already filed a proof of claim relating to this debt, if you never received notices from the court which sent notice, or if this proof of claim replaces or amends a proof of claim that was already filed, check the appropriate box on the form.

1.  **Basis for Claim:** Check the type of debt for which the proof of claim is being filed. If the type of debt is not listed, check "Other" and briefly describe the type of debt. If you were an employee of the debtor, fill in your social security number and the dates of work for which you were not paid.

2.  **Date Debt Incurred:** Fill in the date the debt was first owed by the debtor.

3.  **Court Judgments:** If you have a court judgment for this debt, state the date the court entered the judgment.

4.  **Amount of Claim:** Insert the amount of claim at the time the case was filed in the appropriate box based on your selected Classification of Claim in item 5. If interest or other charges in addition to the principal amount of the claim are included, check the appropriate place on the form and attach an itemization of the interest and charges.

5.  **Classification of Claim:** Check either Secured, Unsecured Nonpriority or Unsecured Priority as appropriate. (See Definitions above.)

    **Unsecured Priority Claim:** Check the appropriate place if you have an unsecured priority claim, and state the amount entitled to priority. (See Definitions, above). A claim may be partly priority and partly nonpriority if, for example, the claim is for more than the amount given priority by the law. Check the appropriate place to specify the type of priority claim.

6.  **Credits:** By signing this proof of claim, you are stating under oath that in calculating the amount of your claim, you have given the debtor credit for all payments received from the debtor.

7.  **Supporting Documents:** You must attach to this proof of claim form, copies of documents that show the debtor owes the debt claimed or, if the documents are too lengthy, a summary of those documents. If documents are not available, you must attach an explanation of why they are not available.

*Be sure to date the claim and place original signature of claimant or person making claim for creditor where indicated at the bottom of the claim form. Please type or print name of individual under the signature. Be sure all items are answered on the claim form. If not applicable, insert "Not Applicable".*

RETURN CLAIM FORM (WITH ATTACHMENTS, IF ANY) TO THE FOLLOWING CLAIMS AGENT FOR THE DEBTORS:

> Claims Processing Agent
> Re: W. R. Grace & Co. Bankruptcy
> P.O. Box 1620
> Faribault, MN 55021-1620

**The Bar Date for filing all NON-ASBESTOS CLAIMS against the Debtors is March 31, 2003 at 4:00 p.m. Eastern Time.**

ATTACHMENT TO PROOF OF CLAIM

Pursuant to the terms and conditions of the Asset Purchase Agreement dated July 20, 2000, attached hereto as Exhibit A, and pursuant to the terms and conditions of the Owensboro Settlement Agreement entered into on June 21, 1999, the Debtor, W. R. Grace & Co. – Conn. is responsible to the Creditor, Hampshire Chemical Corp. for the environmental clean up and remediation of certain property located in Owensboro, Kentucky. The Owensboro Settlement Agreement is not attached hereto due to confidentiality provisions in that agreement. The agreed Order referred to in the Asset Purchase Agreement is attached hereto as Exhibit B.

## ASSET PURCHASE AGREEMENT

THIS AGREEMENT is made as of this 20 day of July, 2000 between **HAMPSHIRE Chemical Corp.**, of Lexington, Massachusetts ("HAMPSHIRE") and **W.R. GRACE & Co. Conn.**, of Columbia, Maryland ("GRACE").

WHEREAS, subject to the terms and conditions hereinafter set forth, HAMPSHIRE desires to sell to GRACE and GRACE desires to purchase from HAMPSHIRE, the business and assets of the HAMPSHIRE Polymers Business located in Owensboro, Kentucky as more fully described in Section 2.1 (the "Business");

NOW THEREFORE, in consideration of the agreements and covenants contained herein, the parties agree as follows:

## ARTICLE I
## PURCHASE OF ASSETS

Section 1.1    Assets to be Purchased from HAMPSHIRE.  At the Closing and subject to the provisions of this Agreement, HAMPSHIRE shall sell, assign, transfer, deliver and convey to GRACE, and GRACE shall purchase and acquire from HAMPSHIRE all of HAMPSHIRE's right, title and interest in and to all of the assets used in, or primarily relating to, the Business (the "Business Assets"), including, but not limited to the following, except as specifically excluded herein:

(a)    Real Property:  Certain real property (including all buildings, structures, fixtures and improvements thereon and HAMPSHIRE's interests therein) subject only to those matters described in Schedule 5.11 of this Agreement, located in Davies County, Kentucky (the "Real Property") all as more fully described in Schedule 5.11 hereto;

(b)    Inventory:  All inventories specifically including, but not limited to, all finished goods, raw materials, work in process, packaging material and sales literature owned by HAMPSHIRE as of the date hereof or hereafter acquired and used or acquired for use in the Business (collectively the "Inventories").  Inventories shall not include finished goods and work-in process for P-DAXAD dispersing agents, HYPOL hydrophilic prepolymer, and DMDNB as

well as raw material inventories designated for use in HYPOL* hydrophilic prepolymer, and DMDNB that GRACE will toll manufacture for DOW or HAMPSHIRE after the Closing Date under the certain contract manufacturing agreements between HAMPSHIRE and GRACE and DOW and GRACE executed simultaneously with this Agreement;

(c)     Customer Lists:  HAMPSHIRE 's customer, distributor, dealer, and supplier lists relevant to the Business;

(d)     Personal Property:  All machinery and equipment, appliances, motor vehicles, furniture, furnishings, fixtures, tools, parts, supplies and other tangible personal property owned, being purchased on contract or being leased by HAMPSHIRE as of the date hereof or hereafter acquired and used or acquired for use in the Business, including laboratory equipment, appliances and furniture located in Lexington, Massachusetts (collectively, the "Other Tangibles"), but does not include DOW workstations, which will remain the property of DOW. HAMPSHIRE has provided an electronic list of the Personal Property to GRACE.

(e)     Intellectual Property:   Patents and manufacturing know-how and licenses pertaining thereto; product recipes; operating manuals and operating disciplines; manufacturing process technology; the trademarks DARAN, DARATAK, VERSAFLEX and EVERFLEX all set forth in Schedule 5.16 and all of which are primarily associated with the Business.  A license to print, copy, publish, distribute, prepare derivative works and otherwise use copyrighted material (except for computer programs) presently used by Seller in the conduct of the Business presently conducted.

(f)     Intangible Personal Property:   All notes and accounts receivable from unaffiliated parties, prepaid expenses, the goodwill relating to the Business and any open sales orders, sales contracts, supply contracts, unfilled purchase orders and purchase commitments, other contracts and agreements as of the date hereof or hereafter acquired and used or acquired for use in the Business.  HAMPSHIRE has previously provided a preliminary list of such agreements to GRACE which is attached to the Agreement as Schedule 1.1(f). HAMPSHIRE will identify to, and will cooperate with, GRACE concerning sales orders and sales contracts and other contracts and commitments that are not assignable without permission of the other party to that order or contract.  HAMPSHIRE will  cooperate with GRACE to identify tc  GRACE any supply or purchase orders and purchase commitments that are part of larger agreements of the Seller Group where the supplier declines to continue the agreement with GRACE so that GRACE may negotiate a separate arrangement with the

supplier or another party; HAMPSHIRE assumes no obligation that the terms negotiated by GRACE shall be equivalent to those enjoyed by the Seller Group.

(g)    Owensboro Support Agreement:  All rights, entitlements and services provided to HAMPSHIRE by the Owensboro Support Agreement as amended.

Section 1.2    Liabilities Assumed by GRACE:  As further consideration for the transfer of the Business Assets by HAMPSHIRE to GRACE, GRACE shall assume all debts, liabilities and obligations (a) arising out of or relating to the ownership and operation of  the Business after the Closing Date or (b) to be performed or discharged under any contract or other obligation assigned or otherwise transferred to GRACE by HAMPSHIRE, but only to the extent that such debt, liability or obligations is for, or relates to, actions or performance incurred after the Closing Date (the "Assumed Obligations").  Notwithstanding anything, expressed or implied, to the contrary contained in the previous sentence or in this Agreement, it is expressly understood that GRACE will assume as part of the Assumed Obligations all existing environmental remedial obligations and liabilities and all expenditures associated with future environmental related compliance and remediation issues, including, but not limited to, all obligations and liabilities associated with the March 14, 1997 Agreed Order issued to HAMPSHIRE, the March 14, 1997 Site-Wide Order issued to HAMPSHIRE and GRACE, the liabilities and obligations of the Owensboro Support Agreement dated November 25, 1992 as amended and all liabilities and obligations of HAMPSHIRE with respect to the contamination of soils or groundwater on, under or at the Real Property or adjacent property caused by the disposal, release or escape of any liquid, solid or gaseous substances generated, stored, treated or disposed of at the Real Property by or on behalf of HAMPSHIRE on or prior to the Closing Date.  The Assumed Obligation shall also include environmental remedial obligations for off-site disposal of waste by HAMPSHIRE during the Ownership Period where the total volume of waste disposed by GRACE at the facility in question exceeds the volume diposed by HAMPSHIRE at the facility.

Section 1.3    Liabilities Not Assumed by GRACE.  Except as otherwise provided in this Agreement, HAMPSHIRE will retain all debts, liabilities and obligations arising out of HAMPSHIRE's ownership and operation of the Business, from December 29, 1992 to and on the Closing Date (the "Ownership Period" ), including without limitation  :

(a)    all fines and penalties arising from the operation of the Business during the Ownership Period; fines and penalties shall not include the cost, if any, to upgrade equipment or technology, or to make other capital improvements;

(b)    accounts payable or other instruments of debt including any liability or obligation of HAMPSHIRE under any mortgage or deed of trust or any note, bond or other instrument secured thereby;

(c) any liability or obligation of HAMPSHIRE arising from claims for personal injury (including death) or damage to property with respect to Products sold by HAMPSHIRE during the Ownership Period

(d)    any liability or obligation with respect to employee benefit plans and funds, employee claims, and for compensation and/or benefits by HAMPSHIRE's employees, for or relating to such employees' service during the Ownership Period;

(d)    any liability or obligation for or relating to any termination or other action regarding the terms and conditions of any of HAMPSHIRE's employees (including, but not limited to, liabilities under the Federal Civil Rights Act of 1964, as amended, the National Labor Relations Act, and the Collective Bargaining Contract) that occurred during the Ownership Period;

(e)    any liability or obligation with respect to intercompany payables within the Seller Group.

Section 1.3 bis  No modification.  Except as expressly provided in Section 1.2, Section 1.3 and Section 3.3, nothing in this Agreement shall be construed to modify, terminate or supersede any rights or obligations of GRACE or HAMPSHIRE under any of the following agreements between the parties:  the Owensboro Settlement Agreement and the Owensboro Support Agreement as amended and nothing herein impacts any agreements between the parties involving other sites or properties.

Section 1.4    Definitions.  For purposes of this Agreement, including the Schedules, the following defined terms have the meanings set forth in this Section.

"Agreed Order" has the meaning given such term in Section 7.3.

"Assumed Obligations" has the meaning given such term in Section 1.2.

"Balance Sheet Items" has the meaning given such term in Section 5.9.

"Bargaining Unit Employee" has the meaning given such term in Section 7.4(a).

"Benefit Plans" has the meaning given such term in Section 5.21.

"Business" has the meaning given such term in Section 2.1.

"Business Assets" has the meaning given such term in Section 1.1.

"Cause" has the meaning given such term in Section 7.7(a).

"Claims" has the meaning given such term in Section 10.1.

"Closing" means the actions to be taken by HAMPSHIRE and GRACE decribed in Article IV

"Closing Date" means the date specified in Section 4.1.

"Collective Bargaining Contract" has the meaning given such term in Section 5.22.

"Consent Agreement" has the meaning given such term in Section 2.2 and is attached to this Agreement as Exhibit 2.2.

"Continued Bargaining Unit Employee" has the meaning given such term in Section 7.4(a).

"Continued Subject Business Employee" has the meaning given such term in Section 7.4(a).

"Contracts" has the meaning given such term in Section 5.7.

"Covenant Not to Compete" has the meaning given such term in Section 7.1(d).

"DMDNB" means 2, 3-dimethyl-2, 3-dinitrobutane also called dimethyldinitrobutane [CAS #3964-18-9]

"DOW" means The Dow Chemical Company, a Delaware corporation.

"Employee Leasing Period" has the meaning given such term in Section 7.4(a).

"Employee Leasing Termination Date" has the meaning given such term in Section 7.4(a).

"Facility" means the manufacturing plant and related buildings on the Real Property.

"Governmental Authority" means an entity exercising executive, legislative, regulatory or administrative functions of government, including, but not limited to agencies, departments, boards, commissions, or other instrumentalities.

"Governmental Licenses" means any license, permit or other authorization granted by a Governmental Authority.

"GRACE" means W.R. Grace & Co.-Conn, a Connecticut corporation.

"GRACE Employment Date" has the meaning given such term in Section 7.4(a).

"HAMPSHIRE" means Hampshire Chemical Corp., a Delaware corporation.

"HAMPSHIRE Executives" means the knowledge of: James F. Cunningham, Mike James, James D. McIlvenny and Ron J. Pingel after reasonable inquiry of knowledgeable employees of DOW and Hampshire.

"HAMPSHIRE Logo Design" means the trademark as set forth in Schedule 2.2.

"Inventories" has the meaning given such term in Section 1.1(b).

"Knowledge" of HAMPSHIRE means the actual knowledge of the HAMPSHIRE Executives after reasonable inquiry.

"Liens" means any mortgage, pledge, security interest, agreement to sell, option to buy, right of first refusal, title retention device or other lien or encumbrance, including any of the foregoing arising under a deed of trust or indenture.

"Other Tangibles" has the meaning given such term in Section 1.1(d).

"Ownership Period" has the meaning given such term in Section 1.3.

"Permitted Encumbrances" means (i) Liens for taxes not yet due or which are being contested in good faith and by appropriate proceedings; (ii) carriers' warehousemen's, repairmen's or other similar possessory Liens arising in the ordinary course of business with respect to obligations that are not overdue or are being contested in good faith and by appropriate proceedings; and (iii) matters identified in Schedule 5.11 as permitted exceptions to title.

"Permitted Real Estate Encumbrances" means (i) Liens for taxes not yet due and payable; (ii) standard exceptions to an ALTA Title Insurance Policy; (iii) easements and interests of record (other than a UCC Financing Statement which secured a debt of HAMPSHIRE to Chemical Bank and which is still of record) and (iv) matters identified in Schedule 5.11 as permitted exceptions to title.

"Real Property" has the meaning given such term in Section 1.1(a).

"Revenue/Margin Statement" has the meaning given such term in Section 5.9.

"Seller Group" means DOW, HAMPSHIRE, and any person or entity controlled, directly or indirectly, by DOW.

"Site Wide Order" has the meaning given such term in Section 7.3.

"Subject Business Employee" has the meaning given such term in Section 7.4(a).

"Substitution Agreement" has the meaning given such term in Section 7.4(a).

## ARTICLE II
## DEFINITION OF BUSINESS; EXCLUDED ASSETS

Section 2.1    Definition of Business.    The parties agree that for purposes of this Agreement the Business shall mean the development, manufacturing, marketing and sale of: (1) DARAN vinylidene chloride homo and copolymer latex products; (2) vinyl acetate emulsion homo and copolymer latex products; and (3) custom or specialty copolymers, all as currently manufactured at the HAMPSHIRE site in Owensboro, KY. The current list of products sold by such business is set forth in Schedule 2.1.

Section 2.2    Excluded Assets.    Notwithstanding anything expressed or implied to the contrary contained in this Agreement, it is expressly understood by the parties that the following assets and properties are not being sold or transferred to GRACE: (a) cash, (b) insurance policies, (c) corporate and accounting journals and books of account which comprise HAMPSHIRE's accounting and tax records, (d) the DOW work stations; (e) except as provided in the Consent Agreement, attached hereto as Exhibit 2.2, all rights or rights of use in or to the trade name HAMPSHIRE; the trademarks of HAMPSHIRE and HAMPSHIRE and Logo Design (attached hereto as part of Schedule 2.2); the trade name DOW and the trademarks of DOW and DOW Diamond; internet domain names that include such trade names or trademarks; and any right by succession or otherwise to any licenses from DOW to HAMPSHIRE or from HAMPSHIRE to any other person or entity pertaining to the right to use such trade names or trademarks; (f) except as provided in Schedule 5.16, any copyrights, trademarks, trade names, domain names, or trading style designs, and (g) except as provided in Schedule 5.16, any licenses or other rights of use pertaining to any copyright, trademarks, trade names, domain names or trading style designs; (h) Assets located off the Owensboro, KY or Lexington, MA sites are excluded unless they are primarily related to the Business.

Section 2.3    No Guarantee.    While HAMPSHIRE is a wholly owned subsidiary of DOW, DOW neither makes nor shall DOW provide GRACE with any guarantee, representation or warranty regarding the Business or the Business Assets.

## ARTICLE III
## PAYMENT OF PURCHASE PRICE AT CLOSING

Section 3.1    Purchase Price.  In consideration of the transfer to GRACE of the Business and Business Assets, the assumption of the Assumed Obligations and the Covenant Not to Compete contained in Section 7.1(d) of this Agreement, GRACE shall pay to HAMPSHIRE an aggregate purchase price (the "Purchase Price") of $1.00 (One Dollar) plus the aggregate value of the accounts receivables as of the close of business on the Closing Date. HAMPSHIRE will estimate, and GRACE will pay to HAMPSHIRE at Closing, the aggregate value of the outstanding receivables based on the average balance for the two full calendar months preceeding the Closing less 1% as an allowance for bad debt. Accounts receivable for P-DAXAD dispersing agents, HYPOL hydrophilic polymer and DMDNB products will be excluded as they are not being transferred to GRACE as part of the Business. The parties will perform a post Closing reconciliation within 120 days of the Closing Date based on the actual outstanding receivables. Any receivables oustanding for more than 120 Days as of the date of such reconciliation shall be deemed uncollectible and subtracted from the total. HAMPSHIRE shall retain ownership of and the right to collect against those receivables.  The party performing the reconciliation shall notify the party of the amount of any over or underpayment. Within thirty (30) days of such notice, HAMPSHIRE shall pay GRACE such amount if there were an overpayment and GRACE shall pay HAMPSHIRE any shortcoming.

Section 3.2    Adjustments.  With respect to the Real Property, Inventory, and Personal Property, the following adjustments shall be made:

(a)    Real estate taxes payable for the tax year in which Closing occurs shall be apportioned as of the Closing Date. If Closing shall occur before the tax rate for the said tax year is fixed, the apportionment of taxes at Closing shall be upon the basis of the tax rate for the previous year, applied to the latest assessment, with an adjustment, if necessary, to be made when GRACE receives the tax bill. Upon GRACE's receipt of the tax bill for the tax year in which Closing occurs, GRACE shall promptly notify HAMPSHIRE of any additional amount due by HAMPSHIRE or refund due HAMPSHIRE for the period of such tax year prior to Closing. Within thirty (30) days of such notice, HAMPSHIRE shall pay GRACE such amount if additional tax is due and GRACE shall pay HAMPSHIRE any refund. Taxes on Inventory and on Personal Property that are payable for the tax year in which Closing occurs will be shared by GRACE and HAMPSHIRE on a pro rata basis, with each of GRACE and HAMPSHIRE

paying its pro rata share of the amount of the tax bill that relates to the assessment date of January 1, 2000.

(b)     GRACE shall pay for the Title Insurance policy, which shall be issued by Chicago Title Insurance Company and providing coverage in a dollar amount acceptable to Grace.  HAMPSHIRE shall pay any additional premium to insure over title objections or encumbrances requested by HAMPSHIRE, or any other additional title insurance coverage requested by HAMPSHIRE.

(c)     The parties mutually acknowledge that the real estate transfer tax for this transaction will be based on the fair market value of the Real Property and the assessed value will be considered the fair market value for this purpose.

(d)     Water, sewer and utility charges, if any, affecting the Real Property, and any other costs or expenses necessary for the transfer of the Real Property, shall be apportioned according to local custom at Closing as of the Closing Date.

(e)     Promptly after execution of this Agreement, GRACE and HAMPSHIRE shall select a mutually acceptable third party, such as (but not limited to) a title company or real estate brokerage firm, to prepare a Closing Statement quantifying each and every Adjustment as herein provided, and specifying the net dollar adjustment to be made in order to address all Adjustments. Alternatively, either GRACE or HAMPSHIRE may, at its option, elect to assume the responsibility of preparing the Closing Statement.   The Closing Statement shall be available to GRACE and HAMPSHIRE for review.

Section 3.3     Additional Consideration.  As additional consideration for GRACE's purchase of the Business Assets from HAMPSHIRE, GRACE hereby releases HAMPSHIRE from any and all liabilities and obligations, including, but not limited to any cost sharing obligations, under the Owensboro Settlement Agreement as of the Closing Date and as such the Owensboro Settlement Agreement is hereby modified by the parties as provided for under Section 39 of the Owensboro Settlement Agreement. GRACE further releases and waives any claims it may have under the Owensboro Support Agreement against HAMPSHIRE.  HAMPSHIRE hereby releases GRACE from GRACE's obligation to transfer Lot 2 of Tract 1 to HAMPSHIRE as provided for under the Owensboro Settlement Agreement.

## ARTICLE IV
## CLOSING

Section 4.1    The Closing.  Closing of the purchase and sale of the Business Assets shall take place on the date and at such place as the parties agree.  Operation of the Business after the close of business on the Closing Date shall be for GRACE's account.

Section 4.2    Instruments of Conveyance.  In order to effectuate the sale, assignment, transfer and conveyance contemplated by this Agreement, HAMPSHIRE shall, or shall cause other members of the Seller Group to, where appropriate, execute and deliver to GRACE at the Closing all such deeds, bills of sale and other documents or instruments of assignment, transfer and conveyance as are necessary or appropriate to complete the transaction contemplated by this Agreement.  With respect to the Real Property, the Deed shall be a Special Warranty Deed in a form mutually reasonably acceptable to the parties, said form to be approved by the parties prior to Closing.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF HAMPSHIRE

HAMPSHIRE hereby represents and warrants to GRACE as follows:

Section 5.1    Organization and Qualification of HAMPSHIRE.  HAMPSHIRE is a corporation duly organized, validly existing and in good standing under the laws of the State of Massachusetts, with full power and authority to own and operate the Business Assets and to carry on the Business as now conducted.

Section 5.2    Authority.  HAMPSHIRE has full legal right, corporate power and authority to execute and deliver this Agreement and to consummate all of the transactions hereby. HAMPSHIRE has taken all necessary corporate action to authorize the execution, delivery and performance of this Agreement and the transactions hereby.  This Agreement has been duly executed and delivered by HAMPSHIRE and constitutes a legal, valid and binding obligation of HAMPSHIRE enforceable against HAMPSHIRE in accordance with its terms.

Section 5.3    No Conflict.  The parties mutually acknowledge that notifications, approvals or consents may be required by documents, laws or regulations referenced in subsection 5.3(d)

or subsection 5.3(e).  Such requirements shall not be construed as failure by HAMPSHIRE to fulfill the representations and warranties in those subsections.

The execution, delivery and performance of this Agreement by HAMPSHIRE will not:

(a)    violate any provision of the certificate of incorporation or by-laws of HAMPSHIRE;

(b)    conflict with, result in any violation of, constitute a default under any mortgage, bond, indenture, agreement, franchise, or other instrument or obligation to which HAMPSHIRE is a party or by which HAMPSHIRE or any of its assets (including, without limitation, the Business Assets) may be bound or affected, except as provided in Schedules 5.11 and 5.12;

(c)    result in the creation of any lien, charge or encumbrance upon any asset of HAMPSHIRE (including, without limitation, the Business Assets) pursuant to the terms of any such mortgage, bond, indenture, agreement, franchise, or other instrument or obligation;

(d)    violate any judgment, order, injunction, decree or award of any court, administrative agency or governmental body against, or binding upon, HAMPSHIRE or upon the securities, property or business of HAMPSHIRE; or

(e)    constitute a violation by HAMPSHIRE of any law or regulation of any jurisdiction as such law or regulation relates to such or to the securities, property, business or assets (including, without limitation, the Business Assets) of HAMPSHIRE.

Section 5.4    Ownership of Assets.  Except as otherwise provided in this Agreement HAMPSHIRE is the owner of and has good title to the Business Assets, but GRACE will take such Business Assets subject to all claims and encumbrances except those listed on Schedule 5.4. Except as otherwise provided in the Agreement, HAMPSHIRE does not hold or use any of such Business Assets pursuant to any conditional sales contract, franchise or license.

Section 5.5  No Defaults Under Loan Agreements.  HAMPSHIRE is not in default under any contract or other agreement relating to borrowed money which could have a material adverse effect upon the Business Assets nor does any condition exist which with notice or lapse of time or both would constitute such a default and each such contract or other agreement relating to borrowed money is in full force and effect.

Section 5.6 <u>Litigation.</u>    Except as otherwise disclosed in Schedule 5.6, as of the date of execution of this Agreement:

     (a)    HAMPSHIRE is not a party to any litigation or judicial, administrative or arbitration proceeding relating to the Business Assets, the Business or the Assumed Obligations.

     (b)    To the Knowledge of HAMPSHIRE, there is no litigation or judicial, administrative or arbitration proceeding threatened against HAMPSHIRE or any of the Business Assets which if brought would have a material affect on the Business..

     (c)    Schedule 5.6 lists all warranty claims against the Business by customers of the Business in excess of ten thousand dollars ($10,000). which have not been remedied to the satisfaction of such customers.

Section 5.7 <u>Other Contracts.</u>    Schedule 5.7 lists of the following contracts relating to the Business and which will be assumed by GRACE:

     (i)    all contracts for lease or sublease of personal property from or to any third party in excess of $20,000;

     (ii)    all existing contracts and blanket purchase orders for the sale of Products or services which involve more than the sum of $20,000;

     (iii)    all broker, distributor, dealer, sales, agency, consulting or advertising contracts which involve more than the sum of $10,000; and

     (iv)    other contracts which by their terms extend beyond December 31, 2001.

The foregoing contracts provided in this Section 5.7 are referred to collectively as the "Contracts". Except as noted in Schedule 5.7, each Contract listed therein is valid and binding and in full force and effect and is assignable to GRACE without the consent of any other party thereto without breach, penalty, termination or other adverse consequences.    To the Knowledge of HAMPSHIRE no unremedied breaches or defaults exist under any other Contract. HAMPSHIRE has delivered to GRACE complete copies of all Contracts. Schedule 5.7 also includes a description of any such Contract that is not in writing.

Section 5.8 <u>Governmental Approval.</u>  Except as otherwise disclosed, no consent, approval, waiver, order or authorization of, or registration, declaration or filing with, any governmental authority is required in connection with the execution and delivery of this Agreement by HAMPSHIRE or the consummation by HAMPSHIRE of the transactions contemplated hereby.

Section 5.9 <u>Financials.</u>

(a)    Schedule 5.9 contains an unaudited presentation of Trade Volumes, Trade Revenues, Trade NUR, Trade Cost of Goods, Trade Gross Margin ($), and Trade Gross Margin (%) of the Business for 1997, 1998 and 1999.  (the "Revenue/Margin Statement").  Schedule 5.9 also contains an unaudited presentation of Balance Sheet Items for 1997, 1998 and 1999 (the "Balance Sheet Items").  Schedule 5.9 further provides the basis upon which the Revenue/Margin Statement and the Balance Sheet Items were prepared.

(b)    The information provided in the Revenue/Margin Statement and in the Balance Sheet Items was prepared and is presented in good faith.  The information is derived from HAMPSHIRE'S records and includes estimates and allocations regarding costs and balance sheet items relating to the Business.  HAMPSHIRE MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESSED OR IMPLIED THAT THE INFORMATION IN SCHEDULE 5.9 CONFORMS TO OR WAS PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRACTICES.

Section 5.10   <u>Liabilities.</u>  Except as set forth in Schedule 5.10, to the Knowledge of HAMPSHIRE, the Business has no debts, liabilities or obligations (other than Permitted Encumbrances) of a nature that would have an adverse material impact on the Business except:

(a)    to the extent set forth on the financials provided in Section 5.9 of this Agreement,

(b)    normal current liabilities incurred in the ordinary course of business since January 1, 2000, and

(c)     obligations under Contract listed or discribed in the schedules of this Article, and under Contracts entered into in the ordinary course of business and not required to be so listed or described.

Section 5.11  Real Estate.  HAMPSHIRE or the selected Title Company has delivered to GRACE a copy of instruments creating Permitted Real Estate Encumbrances.  To the Knowledge of HAMPSHIRE, except as set forth in Schedule 5.11, HAMPSHIRE has good and marketable title in fee, simple absolute to Real Property used by the Business, free and clear of all Liens, encroachments and other burdens (other than Permitted Encumbrances); the Real Property has all utility services necessary for the operation of the Business (or contracts have been executed providing for such services) on the Real Property and has all easements and rights of ingress and egress necessary for utilities and services presently utilized at the Real Property and for all operations presently conducted by the Business at the Real Property; and there are no options, contracts, agreements or understandings for the sale of all or any portions of the Real Property  To the Knowledge of HAMPSHIRE, there are no threatened or pending condemnation proceedings relating to all or any portion of the Real Property

Section 5.12  Personal Property.  Except as set forth in  Schedule 5.12, HAMPSHIRE has good title to all equipment, Inventories and other personal property used by the Business, free and clear of all Liens (other than Permitted Encumbrances).

Section 5.13  Use of Business Assets.  The Business has the rights to use of the Business Assets for all operations conducted by it.  To the Knowledge of HAMPSHIRE, except as set forth in Schedule 5.13, there are no known defects in the Business Assets that would have a material adverse effect on operations.

Section 5.14  Accounts Receivable.  Except as set forth in Schedule 5.14 the accounts receivable are unpaid actual billings for sales made in the ordinary course of business and represent legal and valid assets of the Business.

Section 5.15  Inventories.  Except as set forth in Schedule 5.15, the inventory of the Business is of a quality and quantity useable and saleable in the ordinary course of business, without material price mark-down.  The Inventories are sufficient for the operation of the Business in the normal course.  The book value of the Inventories at Closing is not less than $2,100,000 as determined in accordance with Dow's practices

and policies. In the event the inventory is less than $2,100,000 then an appropriate adjustment will be made in GRACE's favor, but will not be counted towards the aggregate limits of liability in Section 11.12.

Section 5.16    Patents, Technology.

(a)    To the Knowledge of HAMPSHIRE there are no patents or patent applications owned or controlled by the Seller Group which are used by, or under development for use by, the Business.

(b)    To the Knowledge of HAMPSHIRE, for the conduct of the Business as now conducted, no right, license, consent or other agreement is required with respect to any patent, invention, know-how, technology or the like, other than those listed or described in the Schedule 5.16. and all of the licenses and other contracts listed or described in Schedule 5.16 are legally valid and binding and in full force and effect and there are no defaults thereunder.

(c)    Except as set forth in Schedule 5.16, to the Knowledge of HAMPSHIRE, no infringement (whether by HAMPSHIRE or any other member of the Seller Group) of any U.S. or foreign patent rights or other intellectual property rights has occurred or is involved in connection with the operations of the Business, and no claim of any such infringement has been made or implied that would have a material adverse affect on the Business.

Section 5.17    Governmental Licenses.  To the Knowledge of HAMPSHIRE and except as disclosed in Schedule 5.17.

(a)    HAMPSHIRE has all Governmental Licenses necessary to conduct the Business and to own and operate the Business Assets, and such Governmental Licenses are valid and in full force and effect.

(b)    HAMPSHIRE is operating the Business in conformance with such Governmental Licenses in all material respects.

(c)    There is no circumstance which indicates that any such Governmental License is likely to be revoked or modified to limit current operations of the Business.

Schedule 5.17 lists all Governmental Licenses possessed by the Business and any pending application for Governmental Licenses relating to the Business. [Under Review]

Section 5.18   Compliance with Laws.   Except as set forth in Schedule 5.18, to the Knowledge of HAMPSHIRE:

     (a)    HAMPSHIRE is in substantial compliance with all laws and governmental regulations and orders relating to (i) any of the property owned, leased or used by the Business, or (ii) the products and materials used, stored or sold by the Business or otherwise applicable to the Business.

     (b)    As of the date of this Agreement, there are no outstanding notices from any Governmental Authority or other person or entity which have been served upon HAMPSHIRE claiming any violation of any law or any governmental regulation, permit or order or requiring, or calling attention to the need for, any work, repairs, alterations or installations on or in connection with any of the property owned, leased or used by the Business.

     (c)    During the Ownership Period, there have been no spills or releases of hazardous substances at the Facility that have had or will have a material impact on increasing the costs of any environmental remediation obligation at the Facility.

Schedule 5.18 also sets forth the names and addresses of all off site locations where HAMPSHIRE has disposed of hazardous waste during the Ownership Period.

Section 5.19   Employee Compensation.   Schedule 5.19 sets forth (a) the name of and current annual salary (or rate of pay) payable to Subject Business Employee, (b) any increase, including any "general increase," to become effective after the date of this Agreement in the rate of compensation payable by HAMPSHIRE to each Subject Business Employee, (c) any general increase since January 1, 1999 in the total compensation or rate of compensation payable, including any increase to become payable after the date of this Agreement, by HAMPSHIRE to salaried employees other than those specified in clause (a) of this Section or to hourly employees, and (d) the names of any Subject Business Employees on short-term disability leave, layoff or any other leave of absence.  For purposes of this Section "general increase" means any

increase generally applicable to a class or group of employees and not including increases granted to individual employees for merit, change in position or responsibility or other reasons applicable to specific employees and not generally to a class or group thereof.

Section 5.20   Labor and Employment Matters.  Schedule 5.19 to this Section lists those Subject Business Employees who are member of the International Brotherhood of Boilermakers, Ironship Builders, Blacksmiths, Forgers and Helpers Union, Local 727 (the "Union").   Seller has delivered to GRACE a complete copy of the collective bargaining contract between HAMPSHIRE and the Union (the "Collective Bargaining Contract").  The Collective Bargaining Contract is legally and binding and in full force and effect; and to HAMPSHIRE's Knowledge there are no defaults thereunder.  To the Knowledge of HAMPSHIRE, there are no pending material labor disputes, grievances or controversies with respect to the Business or any of the Subject Business Employees except as listed in Schedule 5.20.

Section 5.21   Employee Benefits.  Schedule 5.21 sets forth a list of all "employee benefit plans" (as defined in Section 3(3) of ERISA) and other profit sharing, deferred compensation, bonus, stock option, stock purchase, severance pay, and employee benefit plans and arrangements maintained or contributed to by HAMPSHIRE or another member of the Seller Group for the benefit of the Subject Business Employees (the "Benefit Plans").  HAMPSHIRE has delivered to GRACE a complete copy of each Benefit Plan and any related funding agreements, including all amendments, supplements thereto and modifications thereof (or Schedule 5.21 includes a description of any such item that is not in writing), all of which are valid and binding and in full force and effect; and there are no defaults thereunder.

Section 5.22   Transactions with Related Parties.   (a) Schedule 5.7 sets forth a complete list (i) all Contracts between HAMPSHIRE and another member of the Seller Group relating to the Business, and (ii) any material arrangements or services provided by HAMPSHIRE or another member of the Seller Group to the Business or provided by HAMPSHIRE in respect of the Business to another member of the Seller Group.

Section 5.23   Disclaimer of Representations and Warranties.  Other than as expressly set forth in this Agreement: a) HAMPSHIRE makes no representations, warranties or promises regarding the Real Property or Other Tangible Property including, but not limited to,

representations, warranties or promises as to the physical or environmental condition, layout, footage, leases, rents, incomes and revenue, expenses, zoning, presence of hazardous substances or any other matter or thing affecting or relating to the Real Property or the Other Tangible Property, and b) GRACE agrees to take Real Property and the Other Tangible Property "AS IS" "WHERE IS" AND WITH ALL FAULTS. THIS DISCLAIMER INCLUDES BUT IS NOT LIMITED TO ANY ITEMS OF PERSONAL PROPERTY CONTAINED WITHIN THE REAL PROPERTY OR THE BUSINESS ASSETS.

HAMPSHIRE HAS NOT MADE AND DOES NOT MAKE ANY REPRESENTATIONS, PROMISES OR WARRANTIES (EXPRESS OR IMPLIED AND WHETHER DEALING WITH MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE EXCEPT AS ARE SET FORTH IN THIS AGREEMENT).

Section 5.24   FIRPTA.  HAMPSHIRE is not a "foreign person" as defined under the Foreign Investment in Real Property Tax Act (FIRPTA).

Section 5.25   Absence of Certain Events.   Since January 1, 2000, HAMPSHIRE has conducted the Business and the operations of the Business only in the ordinary course, consistent with HAMPSHIRE 's past practices and there has not been any sale or disposition of any Business Assets or any damage, destruction or loss materially affecting the Business Assets, whether or not covered by insurance, or any other material adverse change (financial or otherwise) in the Business or the Business Assets; it being acknowledged that sales downturns or loss of sales of less than five percent (5%) shall not be deemed to constitute a material adverse change for the purposes of this Section 5.25. Except as set forth in Schedule 5.25 none of Mobil, BP, Henkel, American Packaging or Graphic Packaging has served written notice of its intention to cancel its purchase agreement or arrangement with HAMPSHIRE.

Section 5.26   Trademarks.  To the Knowledge of HAMPSHIRE:

(a)      HAMPSHIRE is the owner of the trademarks set forth in Schedule 5.16 free and clear of all liens (other than permitted encumbrances) and has the right to assign said trademarks to GRACE.

(b)      The use of the trademarks set forth in Schedule 5.16 does not infringe the intellectual property rights of others, and HAMPSHIRE has not received any notice or claim of such infringement.

(c)     Except as otherwise noted in Schedule 5.16, the trademarks set forth in said Schedule are not involved in any opposition, cancellation, invalidation, interference, or concurrent use proceeding.

(d)     Except as otherwise noted in Schedule 5.16, the trademarks set forth in said Schedule are not licensed to any third party.

Section 5.27  Copyrights and Computer Software.  To the Knowledge of HAMPSHIRE:

(a)     Schedule 5.16 sets forth a list of computer software programs presently used by the Seller in the conduct of the Business as presently conducted by the Seller that are owned or controlled (in the sense of having the right to license to others) by a member of the Seller Group

(b)     The use of the computer programs set forth in Schedule 5.16 presently used by the Seller in the conduct of the Business as presently conducted by the Seller does not infringe the intellectual property rights of others, and Seller has not received any notice of claim of such infringement.

(c)     The use of copyrighted material (except for computer software programs) presently used by the Seller in the conduct of the Business as presently conducted by the Seller does not infringe the intellectual property rights of others, and Seller has not received any notice or claim of infringement.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF GRACE

GRACE hereby represents and warrants to HAMPSHIRE as follows:

Section 6.1 Organization and Qualification.  GRACE is a corporation duly organized and validly existing under the laws of the State of Connecticut.

Section 6.2 Authority.  GRACE has full legal right, corporate power and authority to execute and deliver this Agreement and to consummate all of the transactions hereby.  The execution

and delivery of this Agreement have been duly authorized by all necessary corporate action of GRACE. This Agreement has been duly executed and delivered by GRACE and constitutes the legal, valid, and binding obligation of GRACE enforceable against GRACE in accordance with its terms. The execution, delivery and performance of this Agreement will not violate, conflict with or result in a breach of the terms, conditions or provisions of, or constitute a default under, the organizational documents of GRACE, or any material contract, indenture, agreement or commitment to which GRACE is a party or by which GRACE is otherwise bound or any law applicable to GRACE or any of its properties.

**ARTICLE VII**
**COVENANTS**

Section 7.1    Covenants of HAMPSHIRE. HAMPSHIRE hereby covenants and agrees that:

(a)    Continuity of Business: From the date of this Agreement until the Closing Date, HAMPSHIRE shall maintain its corporate existence in good standing, and shall use its best efforts to keep the Business intact and to preserve for GRACE the goodwill of the suppliers, distributors, customers and others having business relations with HAMPSHIRE relating to the Business. During such period, HAMPSHIRE shall conduct the Business in a manner consistent with its past practices and procedures. HAMPSHIRE shall obtain the consent of GRACE regarding all major purchases or dispositions of capital assets major changes in pricing which consent shall not be unreasonably withheld or delayed.

(b)    Access to Assets: Between the date of this Agreement and the Closing Date, HAMPSHIRE shall give GRACE and its authorized representatives access to all of the Business Assets, will permit GRACE to make such inspections during business hours as it may reasonably require and will cause its officers and senior managers to furnish GRACE with such financial and operating data and other information with respect to the Business and the Business Assets as GRACE may from time to time reasonably request.

(c)    Obtaining Consents: HAMPSHIRE will cooperate and use its best efforts to make promptly all registrations, filings and applications, to give all notices and to obtain all consents, transfers of approvals, orders, qualifications and waivers necessary or desirable (i) for the consummation of the transactions (including, but not limited to, consents to the assumption by GRACE of HAMPSHIRE's rights and obligations under the Assumed Obligations), (ii) to effect the transfer or renewal of any approvals, licenses, or authorizations

from HAMPSHIRE to GRACE, including without limitation consents to transfer of computer software licenses where permitted by the license or (iii) to permit GRACE to continue to conduct the Business and operations of Business after the Closing Date in a manner consistent with the manner in which they are presently conducted.

(d)   Covenant Not to Compete.  HAMPSHIRE agrees that it shall not, for a period of two (2) years from the Closing Date solicit for employment any Subject Business Employee (which, for the avoidance of doubt, shall not include general advertising for job vacancies) without the prior written consent of GRACE.

Section 7.2   Covenants of GRACE.

Section 7.3   Agreed Order and Site Wide Order.  GRACE will cooperate with HAMPSHIRE and seek to have the Agreed Order and the Site-Wide Order modified by the State of Kentucky to reflect the agreement of the parties such that GRACE assumes all obligations, responsibilities and liabilities of HAMPSHIRE under the Agreed Order and the Site-Wide Order and that the Agreed Order and the Site-Wide Order no longer provide that HAMPSHIRE is a party to either order.

Section 7.4   Employee Matters.

(a)   Additional Definitions.  The following terms shall have the meaning assigned to them below:

"Bargaining Unit Employee" means a Subject Business Employee who is represented by the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, and its Local Lodge No. 727 (the "Union").

"Continued Bargaining Unit Employee" means a Continued Subject Business Employee who is a Bargaining Unit Employee.

"Continued Salaried Employee" means a Continued Subject Business Employee who is not a Bargaining Unit Employee.

"Continued Subject Business Employee" means a Subject Business Employee who commences employment with GRACE as of the GRACE Employment Date, in accordance with this Section 7.2.

"Employee Leasing Period" means the period commencing on the Closing Date and ending on the Employee Leasing Termination Date.

"Employee Leasing Termination Date" means August 15, 2000, or a later date agreed to by the parties.

"GRACE Employment Date" means the date next after the Employee Leasing Termination Date.

"Guarantee Period" means the period that commences on the GRACE Employment Date and ends on the one-year anniversary of that Date.

"Subject Business Employee" means an employee of HAMPSHIRE who is employed exclusively in the Business, and who is listed on Schedule 5.19.

"Substitution Agreement" means the written agreement between GRACE and the Union, with respect to Continued Bargaining Unit Employees, entitled "Substitution Agreement", which was agreed to by Grace and the union representing certain employees of the Business, in July 2000.

(b)    Hiring Of Subject Business Employees.

(i)    Effective as of the GRACE Employment Date, each Subject Business Employee, who accepts an offer of employment made by GRACE, or who is deemed to accept such an offer, in accordance with the provisions of this Section shall cease to be an employee of HAMPSHIRE and shall become an employee of GRACE.

(ii)    On a date no later than the Employee Leasing Termination Date, GRACE shall offer employment to each Subject Business Employee, to commence on the GRACE Employment Date. GRACE may communicate such offer (or offers) in any manner. Any Subject Business Employee who does not affirmatively decline an offer of employment

with GRACE prior to the GRACE Employment Date shall be deemed to have accepted such offer.

(c)    Disabled and Other Individuals.  Notwithstanding the foregoing:  (i) GRACE shall have no obligation to any Subject Business Employee on short-term or long-term disability, or other leave of absence, as of the GRACE Employment Date, provided that any such Employee may request to return to work for the Business after that Date by requesting employment with GRACE and shall be treated by GRACE in the same manner as GRACE treats its employees who become authorized to work after a period of disability or who return to work after a family or medical leave; (ii) such an Employee who does return to work with GRACE after that Date shall be regarded as a "Continued Subject Business Employee" as of the date he or she returns to work, and (iii) GRACE shall have no obligation to employ individuals who are on layoff or on other leave of absence from HAMPSHIRE as of the GRACE Employment Date, provided that such individuals shall continue in such status with GRACE after the GRACE Employment Date.  Notwithstanding anything in this Agreement to the contrary:  (i) GRACE shall employ any person that is required to be reinstated in his or her position with the Business pursuant to an order of the NLRB or an arbitrator and such person shall be regarded as a "Continued Subject Business Employee" as of the date he or she returns to work and (ii) Bargaining Unit Employees who are disabled, laid-off or otherwise inactive as of the GRACE Employment Date shall retain seniority and reemloyment rights in accordance in the Substitution Agreement.

(d)    Compensation And Certain Other Terms Of Employment.  As of the GRACE Employment Date, each Continued Subject Business Employee (i) shall be paid base salary or hourly wages (as applicable) that are no less than such salary or wages that are effective as of the Employee Leasing Termination Date; (ii) and shall have substantially the same job responsibilities with the Business as immediately before that Date; and (iii) shall be employed in the same municipal work location as he or she was employed immediately before that Date. The base salary or hourly wages of each Subject Business Employee, as of the date of this Agreement, is listed on the schedule to Section 5.19.

(e)    Continuation Of Subject Business Employees. Effective during the Employee Leasing Period, each Subject Business Employee shall continue to be employed by HAMPSHIRE, and shall be leased to GRACE, in accordance with the terms of the Payroll and Benefits Continuation Agreement that is attached hereto as an Exhibit.

(f)     Benefit Plans.

(i)     Except as otherwise expressly provided in this agreement:  (a) as of the day before the GRACE Employment Date, the Continued Subject Business Employees shall cease to be active participants in, and to be covered by, the employee benefit plans, policies and arrangements of HAMPSHIRE, and (b) as of the GRACE Employment Date, the Continued Subject Business Employees shall commence participation in, and to be covered by, employee benefit plans, policies and arrangements of GRACE that GRACE deems reasonable and appropriate, and such plans, policies and arrangements shall be administered with respect to Continued Subject Business Employees in the same manner as such plans, policies and arrangements are administered for similarly situated employees of GRACE, including (but not limited to) with respect to employee contributions required under such plans, policies and arrangements; provided that, with respect to Continued Bargaining Unit Employees on and after the GRACE Employment Date, the Substitution Agreement shall govern with respect to benefit plan, policy and arrangement issues covered therein.

(ii)     DOW's Pension Plan.  Effective as of the day before the GRACE Employment Date, the Continued Subject Business Employees who are active participants in the DOW Pension Plan shall cease active participation in that Plan.  No assets  or liabilities from the DOW Pension Plan shall be transferred to any pension plan sponsored by GRACE.

(iii)     GRACE Retirement Plans.  As of the GRACE Employment Date, each Continued Subject Business Employee shall be given credit by GRACE for prior service with HAMPSHIRE (and any predecessor employers) for purposes of any "years of service" eligibility requirement and any vesting requirement, under any defined benefit or defined contribution retirement plan offered by GRACE to such employees; provided that credit for such prior service shall not be granted for benefit accrual purposes under any GRACE retirement plan.  With respect to each Continued Salaried Employee who participated in the GRACE Salaried Retirement Plan at any time prior to the GRACE Employment Date, such Employee shall recommence participation in such Plan as of that Date, in accordance with the terms of that Plan, which means that such Employee shall cease receiving any retirement benefit payments he or she is receiving from the Plan, and he or she shall accrue additional service for benefit calculation purposes

under such Plan for service with GRACE after the GRACE Employment Date; provided that he or she shall not be credited with service for that purpose for any period that he or she was not an employee of GRACE.

(iv)    Long Term Disability Plan.    With respect to each Continued Subject Business Employee who elects to participate in the Grace Long Term Disability Income Plan (the "LTD Plan") as of the Grace Employment Date, Grace shall arrange that the LTD Plan waive any waiting period for eligibility for coverage, and any preexisting condition exclusion.

(v)    Benefits for Salaried Employees.    As of the GRACE Employment Date, salaried Continued Subject Business Employees shall participate in, and be covered by, employee benefit plans, policies and arrangements that are the same or substantially similar in all material respects to such plans, policies and arrangements that  GRACE provides to other similiarly situated salaried employees of GRACE. As of the GRACE Employment Date, each salaried Continued Subject Business Employee shall be given credit by GRACE for prior service with HAMPSHIRE (including predecessor employers to the extent such service is recognized by HAMPSHIRE) for purposes of any "years of service" eligibility requirement with respect to such employee benefit plans, policies and arrangements.

(vi)    Medical Plan.    With respect to each Continued Subject Business Employee, GRACE shall arrange that any medical coverage provided by GRACE on and after the GRACE Employment Date shall grant credit for deductibles and waive preexisting condition provisions and waiting periods already incurred or satisfied under DOW's health and welfare plans, for the calendar year in which the GRACE Employment Date occurs.

Section 7.5    Vacation.

(a)    Effective as of the GRACE Employment Date, Dow shall pay directly to each Continued Subject Business Employee an amount attributable to accrued but unused vacation for the 2000 calendar year, and an amount attributable to accrued vacation for 2001, calculated under HAMPSHIRE's vacation policy.

(b)      As of the Grace Employment Date, each Continued Subject Business Employee shall be eligible to vacation under GRACE's vacation policy and practices; provided that GRACE shall credit each such Employee with prior service with HAMPSHIRE (including any predecessor employers) for purposes of such policy.

(c)      Any other provision of the Agreement to the contrary notwithstanding, with respect to Continued Bargaining Unit Employees on and after the GRACE Employment Date, the Substitution Agreement shall govern all vacation issues addressed therein.

Section 7.6    Post-Retirement Welfare Benefits.

(a)      Effective as of the GRACE Employment Date, in accordance with this Section 7.6(a), GRACE agrees to offer to the Continued Subject Business Employees post-retirement health and life insurance benefits upon their retirement or separation from service under the same terms and conditions as applicable to similarly situated employees of GRACE (the "GRACE Post-Retirement Benefits"). GRACE shall credit each Continued Subject Business Employee with the Employee's prior service with HAMPSHIRE (and service with any predecessor employer) for purposes of any "years of service" eligibility requirement for GRACE Post-Retirement Benefits, but not for purposes of detemining the cost that a retiree must pay in order to be covered by such Benefits. Such retiree cost shall be determined by treating the GRACE Employment Date as the Employee's initial GRACE hire date, regardless of whether the Employee had any prior service with GRACE.

(b)      GRACE expressly reserves the right to amend, modify or terminate the terms of any post-retirement health and life insurance benefits at any time and to interpret the provisions of those benefits with respect to the Continued Subject Business Employees and all of its other employees; provided that such amendment, modification, determination or interpretation applies to all similarly situated Employees of the GRACE Group.

Section 7.7    Severance Pay.

(a)      In the event that a Continued Salaried Employee is involuntarily terminated by GRACE without "Cause" (as defined below) during the the 24 month period following the Grace Employment Date, GRACE shall provide a severance payment to such Continued Subject Business Employee in an amount equal to the greater of (a) the amount such Employee would have received under the terms of The Dow Chemical Company U.S.

Severance Plan (USSP) if he or she were employed by HAMPSHIRE at the time of his or her termination and his or her employment with HAMPSHIRE had been terminated under similar circumstances, or (b) the amount such Transferred Employee would receive under GRACE'S applicable severance plan. In addition to the above severance payment, GRACE will provide medical benefits and outplacement services substantially similar to those benefits GRACE provides to former employees receiving severance under its severance plan. As used herein with respect to any Continued Subject Business Employee, the term "Cause" shall mean termination of a Continued Subject Business Employee because of absenteeism, unsatisfactory performance which is deliberate or the result of dishonesty, unethical conduct, insubordination or violation of company work rules as established by GRACE.

(b)    With respect to Continued Bargaining Unit Employees on and after the GRACE Employment Date, the Substitution Agreement shall govern issues regarding severance pay.

(c)    If GRACE announces the closing of the Owensboro Site within one year of the Closing Date, HAMPSHIRE shall assume 50% of the first $3,000,000 in severance payments and outplacement service expenses provided to Continued Subject Business Employees that are incurred by GRACE after that announcement, which HAMPSHIRE will pay within 30 days of the calendar quarter after such costs are properly documented and submitted to HAMPSHIRE by GRACE.

Section 7.8    Post-Closing WARN and COBRA Obligations.

GRACE shall indemnify and hold HAMPSHIRE harmless in any suit or claim of violation brought against HAMPSHIRE or its Affiliates (i) under the Worker Adjustment and Retraining Act ("WARN"), or any comparable state law, for any actions taken by GRACE after the Closing Date with respect to the Owensboro site or the Continued Subject Business Employees and (ii) under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), or any comparable state law, for any suit or claim of violation arising after the Closing Date under health plans sponsored by GRACE.

Section 7.9    Additional Provisions Regarding Continued Bargaining Unit Employees.

(a)    GRACE will not assume any collective bargaining agreement or any other labor agreement in effect or binding upon HAMPSHIRE, or which HAMPSHIRE may have followed

as a matter of practice regarding Subject Business Employees. The terms and conditions of employment, inclusive of compensation and benefits, pertaining to Continued Bargaining Unit Employees, shall be governed by the terms set forth in the Substitution Agreement.

(b)    In the event there is a conflict between the terms of this Agreement and the terms of the Substitution Agreement, the terms of the Substitution Agreeement shall prevail with respect to Continued Bargaining Unit Employees.

Section 7.10   Other Provisions.

(a)    GRACE shall not assume the sponsorship of, or any liability with respect to, any employee benefit or compensation plan maintained by HAMPSHIRE for employees, former employees, independent contractors or others, and HAMPSHIRE shall indemnify GRACE with respect to any such liability or Damages related to any such plan (including, but not limited to, any liabilities associated with the provisions of the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, with respect to any such plan). HAMPSHIRE shall not assume the sponsorship of, or any liability with respect to, any employee benefit or compensation plan maintained by GRACE for employees (including Continued Subject Business Employees), former employees (including former Continued Subject Business Employees), independent contractors or others, and GRACE shall indemnify HAMPSHIRE with respect to any such liability or Damages related to any such plan (including, but not limited to, any liabilities associated with the provisions of the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, with respect to any such plan).

(b)    Nothing in this Agreement shall give any employee the right to be retained in the service of any of the parties hereto or to interfere with each party's rights to discharge or terminate the service of any of its employees at any time without regard to the effect such discharge or termination may have on the employee's ability to participate in any employee benefit plan.

(c)    Recognition Of Seniority For Salaried Employees. As of the GRACE Employment Date, except as specifically provided herein, each Continued Salaried Employee shall be given credit by GRACE for prior service with HAMPSHIRE (including service with predecessor employers to the extent such service is recognized by HAMPSHIRE) for purposes of each of GRACE's seniority-based human resources policies and practices (including service awards and short-term disability salary continuance).

(d)      Except as otherwise expressly provided in this Agreement, no provision of this Agreement shall be interpreted or construed in a manner which would prevent the parties hereto, in their sole discretion, from discontinuing, suspending or amending, at any time, any employee benefit plan, severance pay plan, or any other employee benefit plan, policy or arrangement, which covers employees or former employees.

(e)      No Third Party Beneficiaries.  This Agreement shall not confer any rights or remedies upon any person (including, but not limited to, any employee of either HAMPSHIRE or GRACE), other than the parties hereto and their respective successors and permitted assigns.

Section 7.11  <u>Mutual Covenants of GRACE and HAMPSHIRE.</u>

GRACE and HAMPSHIRE hereby covenant and agree that in the event that, after the Closing Date, HAMPSHIRE or GRACE shall require the participation of officers and employees employed by each other to aid in the defense or prosecution of litigation or claims relating to the Business or the Business Assets, and so long as there exists no conflict of interest between the parties, each of HAMPSHIRE and GRACE shall use all reasonable efforts to make such officers and employees available to participate in such defense or prosecution, provided that, except as required pursuant to the provisions of Article 10, the party requiring the participation of such officers or employees shall pay all reasonable out-of-pocket costs, charges and expenses arising from such participation.  Further, should HAMPSHIRE require access to the Business Assets sold to GRACE in the event of litigation or threat of litigation relating to the Business or the Business Assets, GRACE shall permit HAMPSHIRE reasonable access to the Business Assets.

**ARTICLE VIII**
**Left Blank**


**ARTICLE IX**
<u>**TRANSITIONAL MATTERS**</u>

Section 9.1 <u>Further Assurances.</u>  From time to time after the Closing, at the reasonable request of GRACE and without further consideration, HAMPSHIRE shall execute and deliver further instruments of transfer and assignment (in addition to those delivered under Section 4.2) and take such other action as GRACE reasonably may require to more effectively transfer, assign to, and vest in GRACE each of the Business Assets.  To the extent that the assignment of any contract, commitment or right in respect of which GRACE is assuming any liabilities under Section 1.2 shall require the consent of other parties thereto, this Agreement shall not constitute an assignment thereof.

Section 9.2 <u>Competition.</u>  For a period of four (4) years after the Closing Date, HAMPSHIRE will not, directly or indirectly, sell, or offer to sell, or solicit for the purpose of selling, products in competition with any product identified in column (2) of any numbered line of Schedule 9.2 to the company at the location and for the application identified, respectively, in columns (1), (3) and (4) of the same numbered line of such Schedule.  In the event that a company listed in such Schedule moves its manufacturing process for the application listed in such Schedule to a different location in North America within the aforesaid four-year period, Schedule 9.2 shall be deemed automatically amended to substitute the new location for the location listed in such Schedule.  References to companies in column (1) of the Schedule includes their successors and assigns.

Section 9.3 <u>Title Report.</u>  Upon execution to this Agreement, GRACE shall order a title report as to the Real Property from a Title Insurer.  At GRACE's option and expense, GRACE may also order a survey of the Real Property.  Within five days of receipt of the Title Report and, if applicable, the survey, GRACE shall advise HAMPSHIRE in writing of any title or survey objections.  Objection shall be made only to conditions which would materially impair the value of the Business Assets, which are  set forth in the title report or survey, and which  are not set forth in this Agreement and not otherwise accepted by GRACE.  Any matters of title or survey to which GRACE does not object, in writing, during said five-day period are deemed waived by GRACE.  If at the Closing Date (or such date as the parties may adjourn the Closing).  If HAMPSHIRE is unwilling or unable to remove any such material title and survey objections, GRACE may (a) terminate this Agreement by written notice to HAMPSHIRE, in which event this Agreement shall have no further effect except for provisions that expressly survive termination, or (b) accept such title as HAMPSHIRE can convey without any reduction or

abatement of the consideration due to HAMPSHIRE under this Agreement and without any present or future claim against HAMPSHIRE for such reduction or abatement by reason of the condition of title or matters disclosed in the survey.

Section 9.4 Taxes.  GRACE shall pay when due all sales, use, transfer and documentary taxes, if any, payable in conjunction with the sale and delivery of the Business Assets (excluding the Real Property) to GRACE pursuant to this Agreement and HAMPSHIRE shall pay when due all income, sales, use, transfer and documentary taxes, if any, payable in connection with the operation of the Business by HAMPSHIRE before the Closing Date. Real estate transfer taxes and recording fees will be shared by GRACE and HAMPSHIRE on a 50/50 basis.

# ARTICLE X
# INDEMNIFICATION

Section10.1 Indemnification by GRACE.  GRACE agrees to indemnify, defend and hold HAMPSHIRE harmless from and against any and all losses, claims, demands, damages, costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) of every kind, nature and description (collectively, "Claims") based upon, arising out of or otherwise in respect of (i) any inaccuracy in or any breach of any representation, warranty, covenant or agreement of GRACE contained in this Agreement or in any of the collateral agreements executed in connection with the transactions contemplated hereby, to the extent such inaccuracy or breach has not been specifically waived in writing by HAMPSHIRE, (ii) any Assumed Liability or (iii) any breach of any covenant or agreement to be performed by GRACE hereunder after the Closing Date,or (iv) any occurrence or anything done, suffered to be done, or omitted to be done by GRACE in relation to the Business or the Business Assets subsequent to the Closing Date except to the extent a Claim arises out of or relates to the Business for which HAMPSHIRE has retained liability under this Agreement.

Section 10.2  Indemnification by HAMPSHIRE.  HAMPSHIRE agrees to indemnify, defend and hold GRACE harmless from and against any and all Claims based upon, arising out of or otherwise in respect of (i) any inaccuracy in or any breach of any representation, warranty, covenant or agreement of HAMPSHIRE contained in this Agreement or in any certificate delivered at the Closing or in any of the collateral agreements executed in connection with the transactions contemplated hereby, to the extent such inaccuracy or breach has not been

specifically waived in writing by GRACE, (ii) liabilities related to the Business as conducted by HAMPSHIRE on or prior to the Closing Date that HAMPSHIRE has retained under Section 1.3 of this Agreement, (iii) any breach of any covenant or agreement to be performed by HAMPSHIRE after the Closing, or (iv) any liability or obligation with respect to employee benefit plans and funds, employee claims, and for compensation and/or benefits by HAMPSHIRE'S employees, for or relating to such employees' service prior to the Closing; (iv) any liability or obligation for or relating to any termination or other action regarding the terms and conditions of any of HAMPSHIRE's employees (including, but not limited to, liabilities under the Federal Civil Rights Act of 1964, as amended, the National Labor Relations Act, and the Collective Bargaining Contract) that occurred before the Closing.

Section 10.3   <u>Claims.</u>  GRACE and HAMPSHIRE shall give one another prompt written notice of any Claims of one ("Indemnitee") against the other ("Indemnitor") under this Agreement, which may give rise to a claim for indemnification of Indemnitee by Indemnitor under this Agreement.  In the case of any third party Claims, Indemnitor shall undertake the defense of such Claim, by representatives of its own choosing, at its own cost and expense; provided, however, that in the event Indemnitor, within a reasonable time (not less than sixty (60) days) after notice of any Claim shall fail to undertake the defense thereof, then Indemnitee shall have the right to undertake the defense, compromise or settlement thereof at the risk of Indemnitor. During the course of any third party Claim, Indemnitor shall keep Indemnitee fully informed and shall use all reasonable efforts to defend such Claims and present any defense reasonably suggested by Indemnitee or its counsel.  Indemnitee shall have the right to be represented in any such third party Claim by counsel and accountants, at its own expense and, upon notice to Indemnitor, to assume, at its own expense and without liability to Indemnitor with respect to such Claim, the defense or prosecution thereof, as the case may be.  However, in the event that Indemnitor proposes to settle a claim and Indemnitee desires to assume the defense and prosecution thereof, Indemnitor shall be liable for, and will pay Indemnitee, the amount for which the Indemnitor proposed to pay the claimant to settle the Claim.  Indemnitor shall not make or offer to make any settlement of any third party Claim obligation without giving Indemnitee advance notice thereof and the opportunity to assume the defense of the matter at its own expense and risk.

**ARTICLE XI**

**<u>MISCELLANEOUS</u>**

Section 11.1    <u>Fees and Expenses.</u>  HAMPSHIRE and GRACE shall bear their own expenses in connection with the negotiation and the consummation of the transactions contemplated by this Agreement, and no expense of either party hereto relating in any way to the purchase and sale of the Business Assets hereunder shall be charged to or paid by the other or included in any account of the other.

Section 11.2    <u>Brokers.</u>  HAMPSHIRE and GRACE each represent and warrant to the other that the warranting party has not engaged or dealt with or through any broker, finder or any other person who would be entitled to any brokerage fee or commission in respect of the execution of this Agreement or the consummation of the transactions contemplated hereby. Each party shall indemnify and hold the other party harmless for or from any claims for such fee or commission against such other party by any broker, finder or other person, on the basis of any arrangement or agreement made by that party.

Section 11.3    <u>Notices.</u>  All notices, requests, demands and other communications hereunder shall be effective when actually delivered and shall be given by mail, postage prepaid, return receipt requested, or sent by courier guaranteeing overnight delivery to the following addresses:


To GRACE:                    _Richard Williams, Vice-President ,General Manager
                             _Grace Container Products
                             __62 Whittemore Avenue.
                             Cambridge, MA 02140

with a copy to:              _____General Counsel_____.
                             _____W. R. Grace & Co._____.
                             _____7500 Grace Drive_____.
                             _____Columbia, MD  21044_____.

To HAMPSHIRE:    James D. McIlvenny, President and CEO
                 Hampshire  Chemical Corp
                 45 Hayden Ave.
                 Suite 2500
                 Lexington, MA 02474
                 Attention: _____.

                 _____.

_____

with a copy to:         General Counsel
                        The Dow Chemical Company
                        2030 Dow Center
                        Midland, Michigan 48674

_____

Any addresses to which a notice must be sent may be changed by written notice to the other party. Notice shall be deemed to have been given upon its receipt.

Section 11.4   Governing Law.   This Agreement shall be construed under and governed by the laws of the State of Kentucky, excluding (a) any conflict-of-laws provisions thereof that would otherwise require the application of the law of any other jurisdiction, and (b) if applicable, the United Nations Convention on Contracts for the International Sale of Goods.

Section 11.5   Entire Agreement.   This Agreement, including the schedules, exhibits, and memoranda attached hereto or delivered hereunder, represents the complete and entire agreement between the parties and all promises, representations, understandings, warranties and agreements with reference to the subject matter hereof, and all inducements to the making of this Agreement relied upon by any party hereto, have been expressed herein. Additions or amendments to this Agreement may be made only by written agreement signed by or on behalf of all parties hereto.

Section 11.6   Publicity.   No press release or any public disclosure of the transactions contemplated by the Agreement, either written or oral, shall be made by either party without the prior knowledge, consent and approval of the other except as may be required by law.

Section 11.7   Assignment.   GRACE shall have the right to assign this Agreement, in whole or in part, to any affiliate of GRACE; provided, however, that no such assignment shall relieve GRACE from any of its obligations under this Agreement.   No other assignment of this Agreement is permitted without the written consent of all parties hereto.

Section 11.8   No Waiver.   No failure on the part of HAMPSHIRE or GRACE at any time to require the performance by the other party of any term of this Agreement shall be taken or held to be a waiver of such term or in any way affect such party's right to enforce such term,

and no waiver on the part of HAMPSHIRE or GRACE of any term of this Agreement shall be taken or held to be a waiver of any other term hereof or the breach thereof.

Section 11.9   Severability.  The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision had not been contained herein or, if necessary to avoid hardship, a reasonable substitute provision that does not suffer from the invalidity or unenforceability of the original provision shall be inferred.

Section 11.10  Uniform Commercial Code-Bulk Transfers.  HAMPSHIRE and GRACE agree to waive compliance with the provisions of the Uniform Commercial Code-Bulk Transfers of any jurisdiction in connection with this transaction and HAMPSHIRE hereby agrees to indemnify and save GRACE harmless against any and all claims or losses arising from or in connection with such non-compliance.

Section 11.11  Survival of Representations and Warranties.  All representations and warranties made in Articles V and VI of this Agreement, including the schedules referred therein (collectively, the "Representations and Warranties") shall survive the execution of this Agreement and the consummation of the transaction for a period of 24 months from the Closing Date, except Section 5.23, "Disclaimer of Representations and Warranties" which shall survive indefinitely, and no party to this agreement may bring any action against the other party on account of breach of warranty or misrepresentation relating to the Representations and Warranties more than 36 months after the Closing Date .

Section 11.12  Limitation of Liabilities.  HAMPSHIRE's liability to GRACE, its officers, directors and employees under this Agreement in respect of any and all claims, causes of action, damages and liability on account of breach of warranty or misrepresentation relating to the Representations and Warranties shall be limited to an aggregate of $2,000,000 and if such amount is reached, GRACE shall give releases to that effect to HAMPSHIRE, its officers, directors, and employees, and to DOW.

Section 11.13  Raw Material and Supply Agreements.  In support of this Agreement, GRACE and HAMPSHIRE and GRACE and DOW are entering into Contract Manufacturing Agreements under which the products P-DAXAD dispersing agents DMDNBand HYPOL will be manufactured by GRACE for HAMPSHIRE and by GRACE for DOW, respectively.  GRACE and HAMPSHIRE and GRACE and DOW will also agree to enter into appropriate Raw Material

Supply Agreements for the supply of 2-SEM and VDC from HAMPSHIRE to GRACE, and from DOW to GRACE, respectively.  Executed copies of the agreements as proposed and to be executed concurrently with this Agreement are attached hereto as Schedule 11.13

Section 11.14 <u>Successors.</u>  This Agreement shall be binding upon and inure to benefit of the parties hereto and their respective successors and assigns.

Section 11.15 <u>Captions.</u>  The captions in this Agreement are for convenience and identification purposes only, are not an integral part of this Agreement, and are not to be considered in the interpretation of any part hereof.

Section 11.16 <u>Counterparts.</u>  This Agreement may be executed in separate counterparts, each of which when so executed shall be an original, but all of such counterparts shall together or separately constitute but one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective authorized representatives as of the date set forth above.

Hampshire

By: _____
Its: _____

WR. Grace & Co. - Conn.

By: _____
Its: _____

FILED

MAR 1 4 1997

Office of Administrative Hearings

COMMONWEALTH OF KENTUCKY
NATURAL RESOURCES AND
ENVIRONMENTAL PROTECTION CABINET
FILE NO. DWM-30270-029

COMMONWEALTH OF KENTUCKY
NATURAL RESOURCES AND
ENVIRONMENTAL PROTECTION CABINET                    PLAINTIFF

VS

W.R. GRACE & CO. - CONN. AND
HAMPSHIRE CHEMICAL CORPORATION                      DEFENDANTS

***********************
## AGREED ORDER

1.      Whereas, the Natural Resources and Environmental Protection Cabinet (hereinafter "Cabinet") is charged with the statutory duty of enforcing the laws of the Commonwealth relating to water resources and waste management under KRS Chapters 151 and 224.

2.      Whereas, W.R. Grace & Co. - Conn. (hereinafter "Grace") operates a waste-water treatment plant and previously had manufacturing facilities at the 5525 U.S. Highway 60 East facility (the "Site") near Owensboro, Kentucky.

3.      Whereas, Hampshire Chemical Corporation (hereinafter "Hampshire") purchased a portion of the Site from Grace, and further, initiated remediation of a release of 1, 1-DCE which occurred at the DCE raw material underground storage tank ("the UST"). The remediation was being performed pursuant to a Corrective Action Plan submitted and approved by the Underground Storage Tank Branch of the Cabinet.

1

4.     Whereas, the Cabinet, by letter dated March 10 ,1994 informed Hampshire that it was revoking its approved Corrective Action Plan relating to the release and  remediation of the underground storage tank in question; and demanded that Hampshire submit a Part A Application under RCRA  for closure of the UST as a waste disposal unit.

5.     Whereas, Hampshire filed a petition for hearing pursuant to KRS 224.10-420 to contest the aforementioned revocation and closure demand.

6.     Whereas, Hampshire, Grace and the Cabinet have voluntarily entered into negotiations to resolve various notices of violations ("NOVs") issued by the Cabinet to the companies relating to the Site; and the execution of this Agreed Order and the Agreed Orders regarding those NOVs, which are being executed simultaneously, is intended to resolve these  outstanding notices of violation and the remediation of the release of 1, 1-DCE from the UST.

NOW THEREFORE, to settle the aforementioned pending petition for an administrative hearing and the  remediation of the release of 1, 1-DCE from the UST  the parties to this Agreed Order, Grace, Hampshire and the Cabinet agree as follows:

## I. SITE WIDE CHARACTERIZATION AND REMEDIATION

1.     Grace shall perform a Site-wide investigation of all properties shown on Attachment 1 , irrespective of current ownership,  pursuant to KRS 224.01-400 and the regulations promulgated pursuant thereto,  of potential releases or threatened releases of hazardous substances, pollutants or contaminants, and shall characterize all  identified releases or threatened releases originating at the facility, including, but not limited to,  the characterization of  1,1-DCE contained in the groundwater. The procedures for such investigation and characterization shall be specified in a work plan submitted to the Cabinet for its approval.  This site -wide investigation will not include the 1, 1-DCE Soil Characterization for the UST release addressed in Part II of this Agreed Order.   It is agreed that, although the the site-wide  investigation and characterization will include the area on Attachment 1 shown as the area of PCB contamination, the investigation, characterization  and remediation of this

2

area will be addressed in a separate agreed order between Grace and the cabinet. It is agreed that the landfarm will be characterized and remediated pursuant to the terms of this agreed order, in lieu of closing the landfarm area in accordance with the former landfarm permit.

2.    Within sixty (60) days of the entry of this Agreed Order, Grace shall submit a Site-wide Characterization Work Plan (hereinafter referred to in Part I as "characterization plan") to include contingency sampling to fully characterize the vertical and horizonal extent of the releases or threatened releases of hazardous substances, pollutants or contaminants as provided by KRS 224.01-400 and the regulations promulgated pursuant thereto.

3.    The cabinet's Division of Waste Management (DWM) will review the characterization plan and provide Grace with notice of all deficiencies, if any. Grace shall be allowed the opportunity to correct deficiencies in the characterization plan. If during the review of Grace's submittals, DWM identifies deficiencies, such deficiences shall be subject to a performance penalty after Grace has two (2) opportunities to respond to the deficiency. If the third submittal regarding a deficiency is not corrected and approvable, Grace shall pay a performance penalty as follows for each day until submittal of a corrected, approvable characterization plan:

|  |  |
| --- | --- |
| 1-10 | $200.00 |
| 11-30 | $300.00 |
| over 30 | $500.00 |

4.    Grace acknowledges that time is of the essence and shall begin implementation of the plan as soon as possible, but no later than thirty (30) days after the Cabinet's "Notice of Approval for the Site Characterization Plan." Grace shall include a timetable for implementation and completion of the approved plan in the characterization plan. The design and implementation of the plan shall comply with the requirements of KRS 224.01-400 and the regulations promulgated pursuant thereto.

3

5.    Sampling shall be conducted in accordance with the following requirements:

a.    The characterization plan shall include protocols for the sampling and analysis of surface and subsurface soils , and sediments and groundwater to characterize the horizontal and vertical extent of any hazardous substances, pollutants or contaminants suspected by the Cabinet or Grace to have been released or threatened to be released into the environment.

b.    A sampling schedule, subject to cabinet approval, shall be set forth in the characterization plan .

c.    All sampling shall be conducted in rounds. The first round of sampling shall be conducted for all hazardous substances listed in the attachment 2, incorporated herein by reference. Subsequent rounds shall be conducted based on the findings obtained from the previous round. The cabinet reserves its right to require additional sampling at other areas within the site for other constituents.

d.    All soil sampling and analysis protocols shall follow methodology as established in the latest edition of *Test Methods for Evaluating Solid Waste, Physical/Chemical Methods* (US EPA Publication SW 846) in conducting sampling and analyses for the site characterization. Grace may use the latest edition of 40 CFR Part 136 for surface water or groundwater analyses.

e.    Grace shall notify the Superfund Branch of the DWM before conducting any sampling. A minimum of twenty-four (24) hours hours notice shall be given for samples to be taken following a rainfall or snowmelt event. Grace shall give a minimum notice of seven (7) days to the Superfund Branch before all other sampling events.

f.    The DWM may elect to split samples with Grace and to analyze all or some of them.

6.    Grace may submit samples analyses performed by qualified laboratories for Grace in partial satisfaction of its obligation to conduct its site-wide characterization. The Cabinet agrees

to evaluate those analyses and, if the samples comply with the sampling and analytical protocols referenced in this Agreed Order, the Cabinet will accept those analyses as partial satisfaction of Grace's obligation to conduct soil sampling as part of the characterization plan. Sampling by soil gas analysis shall also be accepted by DWM as partial satisfaction of the responsible parties' obligations to conduct sampling to characterize the site.

7.    No later than ninety (90) days after completing each round of sampling, Grace shall submit to the DWM's Enforcement Branch Manager a Site Characterization Report describing the status of the site characterization and appending laboratory test results or analyses to the report. The DWM shall evaluate the Site Characterization Report(s) after receiving confirmation sampling results, including any pertinent split sampling results. Grace shall incorporate the DWM's comments, if any, within thirty (30)  days of receipt of same, by amending and resubmitting the site characterization report including a time schedule for any additional sampling required by the DWM.

8.    No later than thirty (30) days after submitting each Site Characterization Report, Grace shall submit to the DWM's Enforcement Branch Manager, if necessary, a sampling plan that includes a schedule for the next round of sampling. The DWM shall evaluate the sampling plan(s). Grace shall incorporate the DWM's comments, if any, within thirty (30) days of receipt of same, by amending and resubmitting the sampling plan.

9.    Grace shall be allowed the opportunity to correct deficiencies in the Site Characterization Report(s). If during the review of Grace's submittals, DWM identifies deficiencies, such deficiencies shall be subject to a performance penalty after Grace has two (2) opportunities to respond to the deficiency. If the third submittal regarding a deficiency is not corrected and approvable, Grace shall pay a performance penalty as follows for each day until submittal of a corrected, approvable Site Characterization Report:

|       |          |
|-------|----------|
| 1-10  | $200.00  |
| 11-30 | $300.00  |

5

|          |          |
|----------|----------|
| over 30  | $500.00  |

10.    Within 60 days of an approved Site Characterization Report, Grace shall submit a corrective action plan for the restoration or remediation of areas affected by the release or threatened release of hazardous substances, pollutants or contaminants in accordance with KRS 224.01-400 and the regulations promulgated pur.nant thereto.  The corrective action plan shall demonstrate, if restoration of the environment by removal of the hazardous substances, pollutants or contaminant is not employed, that the remedy selected by Grace shall be protective of human health and the environment in accordance with KRS 224.01-400 (21).  The corrective action plan shall contain a proposal for monitoring if the environment is not fully restored in accordance with KRS 224.01-400 to ensure that the remedy remains protective of human health and the environment. Grace shall include a timetable for implementation and completion of the corrective action plan.

11.    The cabinet will review the corrective action plan and provide Grace with notice of any deficiencies.  Grace shall be allowed the opportunity to correct deficiencies in the corrective action plan.  If during the review of Grace's submittals, DWM identifies deficiencies, such deficences shall be subject to a performance penalty after Grace has two (2) opportunities to respond to the deficiency.  If the third submittal regarding a deficiency is not corrected and approvable, Grace shall pay a performance penalty as follows for each day until submittal of a corrected, approvable corrective action plan:

|          |          |
|----------|----------|
| 1-10     | $200.00  |
| 11-30    | $300.00  |
| over 30  | $500.00  |

12.    The cabinet may periodically review the progress of the work and may require Grace to modify the work to require the performance of additional measures that are reasonably necessary to protect human health and safety and the environment in accordance with KRS 224.01-400 and the regulations promulgated pursuant thereto.  Within ninety (90) days of completion of the corrective action plan, Grace shall submit to the cabinet an approvable corrective action final report

6

which shall describe in detail how Grace has corrected the effect of the release or threatened release of hazardous substances, pollutants and contaminants on the environment.

13.     Grace shall, within three years from the cabinet's approval of Grace's corrective action plan, attain a target groundwater concentration of 7 parts per billion of 1, 1-DCE released from the UST area. The level of 1, 1-DCE in the groundwater shall be established by sampling the groundwater from each monitoring well, using established EPA sampling protocols, on a quarterly basis. The results from each well shall be averaged over three consecutive quarters to determine the average 1, 1-DCE levels at each well for comparison against the target groundwater concentration. It is acknowledged by the parties that this target concentration may be higher or lower than the standard established by the risk assessment made by Grace in its characterization and remediation of the groundwater. Grace may use data obtained during the site characterization to attempt to affirmatively demonstrate to the Cabinet that the 1, 1-DCE release from the UST area did not contribute to 1, 1-DCE in the groundwater in another area of the site or that a source other than the UST area caused the 1, 1-DCE contamination in the groundwater, consistent with the applicable provisions of 401 KAR 34:060, Section 9(7)(f). If Grace can make this affirmative demonstration to the satisfaction of the cabinet, then the provisions of paragraph 23, with respect to groundwater, shall only apply to groundwater contamination caused by the 1, 1-DCE release from the UST area. In any event, the 1, 1-DCE contamination in the groundwater shall be remediated pursuant to KRS 224.01-400 and the regulations promulgated pursuant thereto; and, Grace shall continue its remediation of the groundwater for all hazardous substances, pollutants and contaminants pursuant to its approved corrective action plan and KRS 224.01-400 and the regulations promulgated pursuant thereto.

## II. CLOSURE OF THE AREAS AFFECTED BY 1, 1-DCE

14.     Within sixty (60) days of the entry of this Agreed Order, Hampshire shall submit a 1, 1-DCE Soil Characterization Work Plan (hereinafter referred to in Part II as "soil characterization plan") to include contingency sampling to fully characterize the vertical and horizontal extent of the release of 1, 1-DCE from the UST, in the soil, utilizing the protocol outlined in KRS 224.01-400

7

and the regulations promulgated pursuant thereto.

15.    The cabinet's Division of Waste Management (DWM) will review the soil characterization plan and provide Hampshire with notice of all deficiencies, if any. Within fourteen (14) days of receipt of the notice of deficiencies, Hampshire shall resubmit to the DWM a corrected soil characterization plan.

16.    Hampshire acknowledges that time is of the essence and shall begin implementation of the approved soil characterization plan as soon as possible, but no later than thirty (30) days after the Cabinet's notice of approval. Hampshire shall include a timetable for implementation and completion of the approved plan in the soil characterization plan. The design and implementation of the plan shall comply with the requirements of KRS 224.01-400 and the regulations promulgated pursuant thereto.

17.    Sampling shall be conducted in accordance with the following requirements:

    a.    The soil characterization plan shall include protocols for the sampling and analysis of surface and subsurface soils , and sediments to characterize the vertical and horizontal extent of 1, 1-DCE to have been released into the environment.

    b.    A sampling schedule, subject to cabinet approval, shall be set forth in the soil characterization plan.

    c.    All soil sampling and analysis protocols shall follow methodology as established in the latest edition of *Test Methods for Evaluating Solid Waste, Physical/Chemical Methods* (US EPA Publication SW 846) in conducting sampling and analyses for the site characterization.

    d.    Hampshire shall notify the Superfund Branch of the DWM before conducting any sampling. A minimum of twenty-four (24) hours notice shall be given for samples to be taken following a rainfall or snowmelt event. Hampshire shall give a minimum notice of seven (7) days to the Superfund Branch before all

8

other sampling events.

e.    The DWM may elect to split samples with Hampshire and to analyze all or some of them.

18.    No later than ninety (90) days after completion of the soil characterization plan, Hampshire shall submit to the DWM's Enforcement Branch Manager a 1, 1-DCE Soil Characterization Report describing the status of the soil characterization and appending laboratory test results or analyses to the report. The DWM shall evaluate the 1,1-DCE Soil Characterization Report(s) after receiving confirmation sampling results, including any pertinent split sampling results. Hampshire shall incorporate the DWM's comments, if any, within thirty (30) days of receipt of same, by amending and resubmitting the 1,1-DCE Soil Characterization Report including a time schedule for any additional sampling required by the DWM.

19.    Within 60 days of an approved 1,1-DCE Soil Characterization Report, Hampshire shall submit a corrective action plan for the restoration or remediation of the soils affected by the release of 1, 1-DCE from the UST in accordance with KRS 224.01-400 and the regulations promulgated pursuant thereto. Hampshire shall complete implementation of the corrective action plan within two (2) years of its approval. The corrective action plan shall demonstrate, if restoration of the environment by removal of the 1,1-DCE is not employed, that the remedy selected by Hampshire shall be protective of human health and the environment in accordance with KRS 224.01-400 (21) and the regulations promulgated pursuant thereto. The corrective action plan shall contain a proposal for monitoring if the environment is not fully restored in accordance with KRS 224.01-400 and the regulations promulgated pursuant thereto to ensure that the remedy remains protective of human health and the environment. Hampshire shall include a timetable for implementation and completion of the corrective action plan.

20.    The cabinet will review the corrective action plan and provide Hampshire with notice of any deficiencies. Within fourteen (14) days of receipt of the notice of deficiencies, Hampshire shall resubmit to the cabinet a corrected, approvable corrective action plan.

9

21.    The cabinet may periodically review the progress of the  work and may require Hampshire  to modify the work to require the performance of additional measures that are reasonably necessary to protect human health and safety and the environment  in accordance with KRS 224.01- 400 and the regulations promulgated pursuant thereto.   Within  sixty  (60) days of completion of the corrective action plan,  Hampshire  shall submit to the cabinet an approvable corrective action final report which shall describe  in detail how Hampshire  has corrected the effect of the release or threatened release  of hazardous substances, pollutants and  contaminants on the environment.

## MISCELLANEOUS PROVISIONS

22.    Grace and Hamphire  shall keep all records, documents and information relating to the performance of work conducted pursuant to the  characterization and remediation, including analytical bench sheets and laboratory reports, chain of custody records, manifests, contracts, trucking logs, bill of lading, receipts, records pertaining to volumes, constituents, destination of hazardous substances, pollutants and contaminants and other documents produced pursuant to the characterization and remediation for five (5) years after completion of the restoration or remediation of the site or in accordance with any applicable statute or regulations in effect at the time Grace or Hamphire  seeks to dispose or disregard the record, document or information, whichever is longer in time.

23.    If  Grace fails to achieve the target groundwater concentration as set forth in paragraph 13, or if Hampshire fails to implement the approved  corrective action plan  as set forth in paragraph 19, then Hampshire shall, within 45 days of Grace's failure to meet the deadline in paragraph 13 or Hampshire's failure to meet the deadline in paragraph 19,  submit to the Cabinet a Part A Application, a revised closure plan for closure with waste in place and a Part B postclosure permit application,  under KRS 224.46-520 and 401 KAR Chapters 30 through 38  for closure of the areas affected by the release of 1, 1-DCE.   Upon receipt of  these documents, the DWM will review the  document(s) and respond to Hampshire  in writing with an approval or list of deficiencies  with respect to the submitted  document(s).   Should any deficiencies be noted, Hampshire  shall respond with corrections in the document(s) within thirty (30) days from receipt

10

of notice of deficiencies, and resubmit the document(s) addressing the deficiencies noted by the DWM. Hampshire shall be allowed the opportunity to correct any deficiencies. If during the review of Hampshire's submittals, DWM identifies deficiencies, such deficiences shall be subject to a performance penalty after Hampshire has two (2) opportunities to respond to the deficiency. If the third submittal regarding a deficiency is not corrected and approvable, Hampshire shall pay a performance penalty as follows for each day until submittal of a corrected, approvable document:

| | |
|---|---|
| 1-10 | $200.00 |
| 11-30 | $300.00 |
| over 30 | $500.00 |

24.    Nothing herein shall be construed as requiring Hampshire, as a responsible party, to perform obligations directed to Grace, as responsible party; and nothing herein shall be construed as requiring Grace, as a responsible party, to perform obligations directed to Hampshire, as responsible party. Similarly, neither Hampshire nor Grace shall be deemed a guarantor for obligations directed to the other responsible party. Failure by either Hampshire or Grace to comply with any of the terms of this Agreed Order shall not excuse the other responsible party from performing its respective obligations as set forth herein.

25.    When this Agreed Order requires the cabinet or DWM to provide notice of a plan or report approval or deficiency to one responsible party, a copy of such notice shall also be provided to the other responsible party.

26.    Nothing herein shall prevent or preclude the responsible parties from implementing interim remedial measures at any time to remediate any confirmed release of hazardous substances, pollutants or contaminants, provided that such actions comply with all applicable laws and regulations.

27.    This Agreed Order constitutes a final order and Grace and Hampshire waive their

11

right to any hearing on the matters pertaining to the release of 1, 1-DCE from the UST area, in issue herein. Failure by Grace or Hampshire to comply with the terms of this Agreed Order shall be grounds for the Cabinet to seek enforcement of this Agreed Order in Franklin Circuit Court and to pursue any other administrative or judicial action under KRS Chapter 224 that it deems appropriate. It is agreed that entry of this Agreed Order constitutes a satisfactory resolution of the matters contained in the administrative petition filed by Hampshire to contest the revocation of the corrective action plan and the cabinet's demand for a Part A application under RCRA.

28.    A final determination by the Cabinet to disapprove Grace or Hampshire's third submittal of a characterization plan, site characterization report, closure plan, corrective action plan, or other final determinations required to be made by the terms of this agreed order, may be appealed as provided by KRS 224.10-420(2). Any performance penalties required by paragraphs 3, 9 or 11 will run from the date the final determination is made until the deficiency(ies) is corrected to the satisfaction of the Cabinet, unless a final order is entered in accordance with KRS 224.10-440 which excuses payment. The performance penalty is due and payable within ten (10) days of written notice from the cabinet. A notice of penalty due is not appealable. The cabinet will refund the performance penalty if the Cabinet issues an order pursuant to KRS 224.10-440 which excuses payment, or if a court of competent jurisdiction enters an unappealable judgment reversing an order entered pursuant to KRS 224.10-440 thereby excusing payment.

29.    This Agreed Order addresses only the characterization and remediation outlined in Parts I and II of this agreed order, and nothing contained herein shall be construed to waive or limit any remedy or cause of action, including issuance, reissuance, modification, suspension, revocation, reopening or denial of permits by the cabinet based on statutes or regulations under its jurisdiction. Furthermore, the cabinet expressly reserves its right at any time to issue administrative orders or to take any other action, including judicial, administrative or permitting, it deems necessary, including the right to order all necessary remedial measures, assess penalties for violations or recover any response costs that may be incurred.

30.     Each separate provision, condition or duty contained in this Agreed Order may be the basis for an enforcement action for a separate violation and penalty pursuant to KRS Chapter 224, upon the failure to comply with the terms of this Agreed Order.

31.     This AGREED ORDER or any of its provisions, conditions or dates contained herein may be amended, modified, deleted, or extended only upon a written request stating the reasons therefor; and by the approval and written Order of the Secretary or his designee. Any such amendment, modification, deletion, or extension shall not affect any other provision, condition or date within the AGREED ORDER unless specifically and expressly so provided by the written Order.

32.     The Cabinet does not, by its consent to the entry of this AGREED ORDER, warrant or aver in any manner that Grace's or Hampshire's complete compliance with this AGREED ORDER will result in compliance with the provision of KRS Chapter 224 and the regulations promulgated pursuant thereto. Notwithstanding the Cabinet's review and approval of any plans formulated pursuant to this AGREED ORDER, Grace and Hampshire shall remain solely responsible for compliance with the terms of KRS Chapter 224 and the regulations promulgated pursuant thereto, this AGREED ORDER and any permit requirements.

33.     Until termination pursuant to paragaraph 37, the provisions of this AGREED ORDER shall apply to and be binding upon the parties to this action, their successors, assigns, and all persons, firms and corporations in active concert or participation with them. Grace and Hampshire shall be responsible for ensuring that officers, directors, agents, servants, and employees of Grace or Hampshire, will comply with the terms of this agreed order. The act of, or failure to act by, an officer, director, agent, servant or employee of Grace or Hampshire shall not be a defense to Grace or Hampshire's failure to comply with the terms of this Agreed Order. Grace and Hampshire shall give notice of this AGREED ORDER to any successors in interest prior to the transfer of ownership and/or operation of any part of its now existing facility and shall follow all statutory and regulatory requirements for such a transfer. After such a transfer, Grace and Hampshire shall notify the Cabinet that the required notice was given to any successor in interest prior to the transfer of ownership

13

and/or operation. Regardless of whether or not any transfer takes place, Grace and Hampshire shall continue to be bound by all the terms and conditions of this Agreed Order and remain fully responsible for all penalties and remedial measures, except as the cabinet, Grace and/or Hampshire and transferee/successor may agree otherwise and modify this Agreed Order in writing accordingly, pursuant to paragraph 31. Grace, Hampshire and the cabinet agree to act in good faith in the event the Agreed Order is modified in regard to the transfer of responsibility for penalties, remedial measures or other terms and conditions of this Agreed Order.

34.     The Cabinet and Grace and Hampshire acknowledge and agree that the terms and conditions of this Agreed Order are facility specific and are designed specifically for the unique characteristics of this facility and the factual circumstances of this enforcement case. The language of this Agreed Order is specifically tailored for the Grace and Hampshire facility. This Agreed Order is therefore expressly inapplicable to any other site or facility in the Commonwealth of Kentucky.

35.     a. The responsible parties shall perform their obligations under this Agreed Order within the time limits set herein, unless performance is delayed solely by events which constitute a force majeure, in which event the delay in performance shall be excused. For purposes of this Agreed Order, a force majeure is defined as any event arising from causes beyond the control of the responsible parties, or their consultants and contractors, which could not have been reasonably anticipated or overcome by due diligence and which delays or prevents performance by a date required by the Agreed Order. Force majeure events do not include unanticipated or increased costs of performance, changed economic or financial circumstances, normal precipitation events, or the failure by a contractor to perform or the failure by a supplier to deliver unless such failure to perform or to deliver is itself due to a force majeure event beyond the control of the contractor or supplier. Similarly, the failure by one of the responsible parties herein to comply with any of the terms or conditions of this Agreed Order does not constitute a force majeure event which will excuse delay or nonperformance by the other responsible party of its obligations herein.

b. The responsible parties shall notify the cabinet orally within three (3) business days, and in writing within ten (10) days, after learning of any event which the responsible parties believe

14

may be a force majeure. The notice shall estimate the anticipated length of delay, including necessary demobilization and remobilization, its cause, measures taken or to be taken to minimize delay and an estimated timetable for implementation of these measures. Failure to comply with the notice provisions of this paragraph shall be grounds for the cabinet to deny an extension of time for performance. If the responsible parties demonstrate to the cabinet that the delay has been or will be caused by a force majeure event. the cabinet may extend the time for performance pursuant to paragraph 32 herein.

36.    This Agreed Order shall be no force and effect unless and until it is entered by the Secretary of the Cabinet or his designee as evidence by his signature thereon. Should this Agreed Order contain any date by which Grace or Hampshire is to take any action, and should the Secretary enter the Agreed Order after that date, then Grace or Hampshire is nonetheless obligated to have taken the action by the date contained in this Agreed Order.

37.    This Agreed Order shall terminate upon Grace and Hampshire's completion of the requirements described in the Agreed Order. Grace and Hampshire may submit written notice to the Cabinet when it believes all requirements have been performed. The cabinet will notify Grace and Hampshire in writing of whether it intends to agree with or object to termination. The Cabinet reserves its right to enforce this Agreed Order, and Grace and Hampshire reserve their right to seek a hearing pursuant to KRS 224.10-420(2) contesting the Cabinet's determination as to a cabinet determination objecting to the termination.

**HAVE SEEN, READ AND AGREED TO BY:**

**W.R. Grace & Co. -- Conn.**
Legally Authorized Agent

By: _Pamela Hamilton_                    01/13/97
   NAME  Pamela Hamilton         Date
Senior Vice President of HR
 and EHS & Government Relations
TITLE

**Hampshire Chemical Corp.**
Legally Authorized Agent

By: _____           10/25/96
   NAME                          Date
Timothy J. Zappala
Vice President and General Manager
TITLE

**HAVE SEEN:**

_____               2-10-97
Martin J. Cunningham, Esq.              Date
Breeding McIntyre & Cunningham
Attorney for W.R. Grace & Co. -- Conn.

_John C. Bender_ _____        10/23/96
John C. Bender, Esq.                    Date
Greenbaum Doll & McDonald
Attorney for Hampshire Chemical Corp.

**APPROVAL RECOMMENDED BY:**

~~Caroline P. Haight~~, Director
Division of Waste Management

2-14-97
Date

Robert W. Logan, Commissioner
Department for Environmental
Protection

2/14/97
Date

Kathryn M. Hargraves, Director
Department of Law

Date

Glenna Jo (Jody) Curry
General Counsel

10-21-96
Date

**HAVE SEEN:**

James L. Dickinson
Hearing Officer

Date

17

## ORDER OF THE CABINET SECRETARY

Upon agreement of the parties and being otherwise sufficiently  informed, the foregoing

AGREED ORDER is hereby executed as a final Order of the Natural Resources and Environmental

Protection Cabinet this the 14ᵗʰ day of r r ʼlaue r ɭ , 199?.

NATURAL RESOURCES AND
ENVIRONMENTAL PROTECTION CABINET

JAMES E. BICKFORD, SECRETARY

## CERTIFICATE OF SERVICE

I hereby certify that a true and
accurate copy of the foregoing A.JREED
ORDER was mailed, postage prepaid
to the following this 14ᵗʰ day of
r r ʼlaue r ɭ , 199?:

W.R. Grace & Co. -- Conn., Inc.
David M. Cleary, Esq.
Senior Environmental Counsel
One Town Center Road
Boca Raton, FL 33486-1010

Hon. Martin J. Cunningham
Breeding McIntyre & Cunningham
Suite 900
333 West Vine Street
Lexington, KY 40507-1632

18

Hampshire Chemical Corp.
5525 U.S. 60
Owensboro, KY 42303

John C. Bender, Esq.
Greenbaum Doll & McDonald
1400 Vine Center Tower
P.O. Box 1808
Lexington, KY 40593-1637

**and hand-delivered to:**

Glenna Jo (Jody) Curry
Office of Legal Services
Natural Resources and
 Environmental Protection Cabinet
Fifth Floor, Capital Plaza Tower
Frankfort, Kentucky  40601

and by messenger mail to:

DOW Enforcement Branch
DWM Enforcement Branch


_____
DOCKET COORDINATOR

Distribution:

JK
JLD
Order file
DOW
DWM
LTS
KB
DWM - 21437-042

19

