**E**XHIBIT **D-2**

**Weatherford Proof of Claim No. 1719**

# WR Grace

Bankruptcy Form 10

Index Sheet

SR00000088

Claim Number: __00001719__

Receive Date: __08 / 07 / 2002__

## Multiple Claim Reference

Claim Number _____

- [ ] MMPOC — Medical Monitoring Claim Form
- [ ] PDPOC — Property Damage
- [ ] NAPO — Non-Asbestos Claim Form
- [ ] Amended

Claim Number _____

- [ ] MMPOC — Medical Monitoring Claim Form
- [ ] PDPOC — Property Damage
- [ ] NAPO — Non-Asbestos Claim Form
- [ ] Amended

## Attorney Information

Firm Number: __00186__          Firm Name: __Andrews & Kurth LLP__

Attorney Number: __00059__          Attorney Name: __Helen  Ferguson__

Zip Code: __10022__

Cover Letter Location Number: __SR00000088__

| Attachments Medical Monitoring | Attachments Property Damage | Non-Asbestos |
|---|---|---|
| [ ] TBD | [ ] TBD | [ ] Other Attachments |
| [ ] TBD | [ ] TBD | |
| [ ] TBD | [ ] TBD | |
| [ ] TBD | [ ] TBD | |
| [ ] TBD | [ ] TBD | |
| | [ ] Other Attachments | |

| Other | |
|---|---|
| | [ ] Non-Standard Form |
| | [ ] Amended |
| | [ ] Post-Deadline Postmark Date |

| UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF Delaware | | GRACE NON-ASBESTOS PROOF OF CLAIM FORM |
|---|---|---|
| **Name of Debtor:** W. R. Grace & Co. | **Case Number** 01-01139 (JJF) Jointly Administered | |

NOTE: Do not use this form to assert an Asbestos Personal Injury Claim, a Settled Asbestos Claim or a Zonolite Attic Insulation Claim. Those claims will be subject to a separate claims submission process. This form should also not be used to file a claim for an Asbestos Property Damage Claim or Medical Monitoring Claim. A specialized claim form for each of these claims should be filed.

| Name of Creditor (The person or other entity to whom the Debtor owes money or property):<br><br>**Weatherford International, Inc.** | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. | THIS SPACE IS FOR COURT USE ONLY |
|---|---|---|
| Name and address where notices should be sent:<br>Mr. Burt Martin<br>Weatherford International, Inc.<br>515 Post Oak Boulevard, Suite 600<br>Houston, TX 77027<br>Telephone No.: 713-693-4000 | ☐ Check box if you have never received any notices from the bankruptcy court in this case.<br><br>☐ Check box if the address differs from the address on the envelope sent to you by the court. | |
| Account or other number by which creditor identifies Debtor: | Check here if this claim ☐ replaces ☐ amends a previously filed claim, date: _____ | |
| Corporate Name, Common Name, and/or d/b/a name of specific Debtor against whom the claim is asserted: | | |

| 1  **BASIS FOR CLAIM** | |
|---|---|
| ☐ Goods sold | ☐ Retiree benefits as defined in 11 U.S.C. §1114(a) |
| ☐ Services performed | ☐ Wages, salaries, and compensation (fill out below) |
| ☐ Environmental liability | Your SS # ____ ____ ____ |
| ☐ Money loaned | |
| ☐ Non-asbestos personal injury/wrongful death | Unpaid compensation for services performed |
| ☐ Taxes | from _____ to _____ (date) |
| ☒ Other  **Claim Under Agreement** | |

| 2  Date Debt Was Incurred: | 3.  If Court Judgment, Date Obtained: |
|---|---|

**4 Total Amount of Claim at Time Case filed:**  $  **351,758 plus interest, costs and attorneys' fees**

If all or part of your claim is secured or entitled to priority, also complete Item 5 below.
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5.** Classification of Claim: Under the Bankruptcy Code all claims are classified as one or more of the following (1) Unsecured Nonpriority, (2) Unsecured Priority, (3) Secured. It is possible for part of a claim to be in one category and part in another. CHECK THE APPROPRIATE BOX OR BOXES that best describe your claim and STATE THE AMOUNT OF THE CLAIM AT TIME CASE FILED.

☐ **SECURED CLAIM** (check this box if your claim is secured by collateral, including a right of setoff.)

Brief Description of Collateral:

☐ Real Estate      ☐ Other (Describe briefly)

_____

Amount of arrearage and other charges at time case filed included in secured claim above, if any: $ _____
Attach evidence of perfection of security interest

☐ **UNSECURED NONPRIORITY CLAIM**
A claim is unsecured if there is no collateral or lien on property of the debtor securing the claim or to the extent that the value of such property is less than the amount of the claim

☐ **UNSECURED PRIORITY CLAIM-** Specify the priority of the claim

☐ Wages, salaries, or commissions (up to $4,650) earned not more than 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier-11 U.S.C. § 507(a)(3)

☐ Contributions to an employee benefit plan-11 U.S.C. § 507(a)(4)

☐ Taxes or penalties of governmental units-11 U.S.C. §507(a)(8)

☐ Other-Specify applicable paragraph of 11 U.S.C. § 507 (a)( _____ )

| 6. Credits: The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim. | This Space is for Court Use Only |
|---|---|
| 7. Supporting documents: *Attach copies of supporting documents*, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary. | |
| 8. Acknowledgment: Upon receipt and processing of the Proof of Claim, you will receive an acknowledgment card indicating the date of filing and your unique claim number. If you want a file stamped copy of the Proof of Claim form itself, enclose a self-addressed envelope and copy of this proof of claim form. | **AUG 0 7 2002** |

| Date: 8/1/02 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach a copy of power of attorney, if any) *Burt M. Martin* | |
|---|---|---|

_____  *Bert M. Martin, Senior Vice President*

| | WR Grace | BF.9.33.1629 |
|---|---|---|
| | SR=88 | 00001719 |

¹See General Instructions and Claims Bar Date Notice and its exhibits for names of all Debtors and "other names" used by Debtors.

1.      On March 31, 1993, Weatherford U.S., Inc., n/k/a Weatherford International, Inc. ("Weatherford") entered into a lease agreement with Homco International, Inc. ("Homco"), pursuant to which Weatherford, as tenant, leased from Homco, as landlord, a certain premises located at Kalkaska, Michigan (the "Kalkaska Property").

2.      In 1994, Weatherford purchased the Kalkaska Property from Homco pursuant to a sales agreement by and among Homco, W.R. Grace & Co. ("Grace") and Weatherford dated March 1, 1994 (the "Purchase Agreement").  A copy of the Purchase Agreement is annexed hereto as Exhibit A.

3.      Pursuant to Section 4 of the Purchase Agreement, Homco and Grace agreed to indemnify Weatherford for, *inter alia*, all liabilities, responsibilities, claims, suits, losses, costs (including remediation, removal, response, abatement, clean up, investigative and/or monitoring cost) associated with environmental cleanup of contamination existing at the site prior to the date of the sale of the site.

4.      The Kalkaska Property has since become the subject of a Consent Decree with the State of Michigan, and Grace and Homco have agreed to undertake certain remediation efforts specified therein.  A copy of the Consent Decree is annexed hereto as Exhibit B.

5.      Grace/Homco has thus far conducted the remediation and taken the other actions required under the Consent Decree and has paid all costs and expenses associated with such actions.

6.      Weatherford estimates that in order to comply with the Consent Decree, Grace/Homco will need to spend an additional $351,758 for remediation, monitoring and other actions required by the Consent Decree.

7.      Accordingly, Weatherford asserts an unsecured claim against Grace and Homco without prejudice to Weatherford's right to seek an administrative claim for such amounts pursuant to Section 503(b)(1) of the Bankruptcy Code in the amount of $351,758, plus costs and attorneys' fees to the extent allowed under the Purchase Agreement or applicable law.

Exhibit A

## SALES AGREEMENT

THIS AGREEMENT dated as of March 1, 1994, by and among HOMCO INTERNATIONAL, INC. ("Homco"), a Delaware corporation, and W. R. GRACE & CO. ("Grace"), a New York corporation (collectively "Sellers"), and WEATHERFORD U.S., INC. ("Purchaser"), a Delaware corporation.

### WITNESSETH:

WHEREAS, Homco owns the real property described on Exhibit A attached hereto and made a part hereof (the "Real Property") together with those buildings and improvements located thereon, together with the furniture, fixtures, office equipment and supplies located thereon (the "Improvements"), the Real Property and Improvements being collectively referred to as the "Subject Premises"; and

WHEREAS, as of March 31, 1993, Homco sold to Purchaser the inventory for resale, rental tools, service equipment and other rights and interests located at Subject Premises pursuant to an Amended and Restated Assets Purchase Agreement dated as of January 28, 1993 (the "Purchase Agreement"); and

WHEREAS, pursuant to the Lease Agreement made as of March 31, 1993 between Homco and Purchaser (the "Lease"), Purchaser leased the Subject Premises from Homco; and

WHEREAS, Purchaser now wishes to purchase and Homco has agreed to convey to Purchaser the Subject Premises and to terminate the Lease in accordance with the terms and conditions set forth herein.

NOW THEREFORE, in consideration of the mutual agreements and covenants herein contained, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. <u>Purchase and Conveyance of the Subject Premises; Title Matters.</u>

(a)  Homco shall convey to Purchaser the Subject Premises, for the purchase price of $108,000 in immediately available funds, by a Special Warranty Deed and Bill of Sale in the forms attached hereto as Exhibits B and C and made a part hereof.

(b) Sellers shall furnish Purchaser with a commitment for title insurance for the Real Property from a real estate title insurance company licensed to do business in Michigan.

(c) Purchaser shall be responsible for obtaining title insurance for the Real Property.

2. <u>Closing</u>.

The closing shall occur on March 1, 1994 at 10 a.m. local time at the offices of Peter J. Zirnhelt, P.C. in Traverse City, Michigan or at such other time and place that the parties may designate.

-2-

3.   Tax Allocations.

Property taxes and special assessments with respect to the Subject Premises payable directly to taxing authorities shall be allocated between Homco and Purchaser on a per diem basis through the date of Closing, using as the basis for such allocation the amount of the most recent tax statements received from the taxing authorities for such taxes and assessments as of the Closing, whether or not such tax statements cover the tax period during which the Closing occurs.  There will be no further allocation of such property taxes as a result of any tax statements received by either of the parties after the Closing.

4.   Environmental Matters; Indemnification.

4.1   Definitions.  For purposes of this Agreement, the following terms shall have the following meanings:

(a)   "Environmental Matters" shall mean any and all liabilities, responsibilities, claims, suits, losses, costs (including remedial, removal, response, abatement, cleanup, investigative, and/or monitoring costs and any other related costs and expenses), other causes of action recognized now, damages, settlements, expenses, charges, assessments, liens, penalties, fines, prejudgment and post-judgment interest, attorneys' fees and other legal costs incurred or imposed: (i) pursuant to any agreement, order, notice of responsibility, directive (including requirements embodied in Environmental Laws), injunction, judgment or similar documents (including settlements) arising out of, in connection with or under Environmental Laws; (ii) pursuant to any claim by a Governmental Authority or other entity or person for personal injury, property damage, damage to natural resources, remediation, or payment or reimbursement of response costs incurred or expended by such Governmental Authority or other entity or pursuant to common law or statute; or (iii) as a result of any act, omission, event, circumstance or condition on or in connection with the Subject Premises prior to March 31, 1993 (the "Homco Closing"), including, but not limited to, any course of conduct or operating practice which existed or commenced prior to Closing and any pollution, contamination, degradation, damage or injury caused by, arising from or in connection with the generation, use, handling, treatment, storage, disposal, discharge, emission or release of contaminants of pollutants prior to the Homco Closing.

(c)   "Environmental Laws" shall mean all laws, ordinances, rules, regulations or official guidance of any Governmental Authority in effect at Closing, which relate to or otherwise impose liability, obligations, or standards with respect to: (a) the control of any potential pollutant or the protection of the environment; (b) solid waste, gaseous waste or liquid waste generation, handling, treatment, storage, disposal or transportation; and (c) exposure to hazardous, toxic or other substances alleged to be harmful, but in each case excluding the Occupational Safety and Health Act of 1970, as amended, and any regulation issued thereunder.

-3-

(d) "Excluded Environmental Matters" shall mean those Environmental Matters that relate to, arise out of or are in any way connected with Sellers' remediation and responsibility hereunder with respect to the Subject Premises in accordance with the reports and correspondence described in Exhibit D and made a part of this Agreement.

(e) "Environmental Equipment" shall mean all wells, piping systems, equipment, buildings, tanks, tools and machinery specifically required by Seller to remediate the Excluded Environmental Matters.

(f) "Governmental Authority" shall mean the Government of the United States, the State of Michigan, County of Kalkaska and Village of Kalkaska and any of their agencies, boards, bureaus, courts, departments or commissions.

(g) "Hazardous Substance" shall mean any substance, the presence of which may require any investigation, regulation or remediation under any Environmental Laws.

(h) "Damages" shall mean any and all claims, actions, liabilities, losses, expenses, costs, judgments, penalties and fines, damages, including any and all expenses, costs and fees of attorneys and professionals related thereto arising from a potential liability to a third party (but excluding consequential damages and damages for lost profits).

(i) "NL Litigation" means the action entitled Homco International, Inc. vs. NL Industries, Inc. and NL Acme Tool, Inc., Case No. H-89-3112 (S.D. Texas filed September 13, 1989)

4.2 Affirmative Covenants of Purchaser; Paving. In order to insure the integrity of Sellers' remediation of the Excluded Environmental Matters, Purchaser shall:

(a) as soon as possible after weather conditions permit, (but no later than May 31, 1994) pave the surface of Lot 11 of the Subject Premises at its sole expense in accordance with specifications of, and by contractors approved by, Sellers;

(b) notify Sellers of any and all construction or maintenance activities on the Subject Premises and conduct such activities in a manner that will not disrupt or adversely affect Sellers' remediation of the Excluded Environmental Matters until such time as Sellers receive a "full implementation letter" or similar correspondence from the Michigan Department of Natural Resources or other Governmental Authority requiring no further remediation of the Excluded Environmental Matters with respect to the Subject Premises;

(c) use Lot 12 of the Subject Premises only for the purpose of storing tubular goods and equipment; and

-4-

(d) inspect and steam clean all tools, threads and drill collars only in the designated roofed area of Lot 11 of the Subject Premises as shown on the map attached as Exhibit E and made a part hereof using procedures that capture outfall.

4.3 Negative Covenants of Purchaser. In order to insure the integrity of Sellers' remediation of the Excluded Environmental Matters, Purchaser shall not:

(a) store any equipment, supplies or materials that contain any Hazardous Substance on Lot 12 of the Subject Premises; or

(b) clean or inspect any tubular goods on the Subject Premises, except as provided in Section 4.2(d) above.

4.4 Environmental Equipment of Sellers; Access. Purchaser shall allow Sellers and their employees, agents, licensees, subcontractors, consultants and representatives access to the Subject Premises 24 hours a day, seven days a week, at no charge or rental for purposes of installing, maintaining, repairing or constructing the Environmental Equipment; provided, however, that Sellers shall at all times coordinate such actions with Purchaser so as not to unreasonably interfere with the business of Purchaser. Purchaser shall not remove, modify, alter, or destroy the Environmental Equipment without Sellers' written consent.

4.5 Sellers' Indemnification.

(a) Sellers shall defend, indemnify and hold harmless Purchaser and its affiliates, controlling persons, officers, directors and employees from and against and in respect of any and all Damages imposed upon, asserted against or incurred by Purchaser relating to the performance of Sellers' obligations under this Agreement or that arise out of, or in connection with, the personal injury or death of any employee, agent, licensee, subcontractor, representative or invitee, or the employee of any agent licensee, subcontractor, representative or invitee, of Sellers to or on the Subject Premises that is caused by Sellers' negligence (direct, indirect, sole or concurrent).

(b) Sellers shall defend, indemnify and hold harmless Purchaser and its affiliates, controlling persons, officers, directors and employees from and against and in respect of any and all Environmental Liabilities that may be imposed upon, asserted against or incurred by Purchaser arising out of the Excluded Environmental Matters at the Subject Premises.

4.6 Purchaser's Indemnification.

(a) Purchaser shall defend, indemnify and hold harmless Sellers and their affiliates, controlling persons, officers, directors and employees from and against and in respect of any and all Damages imposed upon, asserted against or incurred by either or both Sellers relating to the performance of Purchaser's obligations under this Agreement or that arise out of, or in connection with, the personal injury or death of any

-5-

employee, agent, licensee, subcontractor, representative or
invitee, or the employee of any agent, licensee, subcontractor,
representative or invitee, of Purchaser to or on the Subject
Premises that is caused by Purchaser's negligence (direct,
indirect, sole or concurrent).

(b)    Purchaser shall defend, indemnify and hold
harmless Sellers and their affiliates, controlling persons,
officers, directors and employees from and against and in respect
of any and all Environmental Liabilities that may be imposed
upon, asserted against or incurred by Sellers not arising out of
the Excluded Environmental Matters at the Subject Premises.

4.7    <u>NL Litigation Evidence</u>.    Purchaser shall
maintain and not remove any and all materials that are located on
the Subject Premises until a final resolution of the NL
Litigation. Sellers shall remove all such materials from the
Subject Premises at their sole expense within a reasonable time
after such resolution.  Such materials are being used as evidence
in the NL Litigation.

4.8    <u>Environmental Documents and Test Results.</u>
Sellers shall provide Purchaser with copies of all reports, tests
and correspondence submitted to Governmental Agencies relating to
remediation of Subject Premises including test results for
Monitor Well Number 5 ("MW-5").    Sellers shall test MW-5 on a
quarterly basis in accordance with the "ENSR Interim
Environmental Report" dated September, 1993. Such testing shall
be for the account of and at the sole expense of Purchaser.

## 5.   Disclaimer of Warranties

PURCHASER ACKNOWLEDGES THAT IT HAS INSPECTED THE
SUBJECT PREMISES AND THAT, EXCEPT FOR WARRANTIES CONCERNING
TITLE, PURCHASER AGREES AND UNDERSTANDS THAT SELLERS ARE NOT
MAKING ANY EXPRESS OR IMPLIED WARRANTIES CONCERNING THE SUBJECT
PREMISES INCLUDING SUITABILITY, HABITABILITY, OPERATION,
SALABILITY, CONDITION, MERCHANTABILITY, OR FITNESS FOR A
PARTICULAR PURPOSE. PURCHASER ACCEPTS THE SUBJECT PREMISES ON AN
"AS IS," "WHERE IS," "WITH ALL FAULTS" BASIS.

## 6.   Asbestos

Purchaser acknowledges that asbestos-containing
materials were in frequent use in the construction and/or
renovation of Subject Premises and are or may be present at the
Subject Premises. Purchaser represents that it has inspected, or
has been given the opportunity to inspect, the Subject Premises
for same to the extent it has deemed appropriate.

## 7.   Notice

Any and all notices, requests, demands or
communications permitted or required to be given pursuant to this
Agreement shall be deemed to have been duly given if in writing
and delivered personally or delivered by facsimile transmission
or delivered by courier service as follows:

-6-

| | |
|---|---|
| To Sellers: | Homco International, Inc.<br>c/o Grace Energy Corporation<br>13455 Noel Road - Suite 1500<br>Dallas, TX  75240<br>ATTN: Secretary<br>Telephone:  (214) 770-0234<br>Fax:      (214) 770-0215 |
| | W. R. Grace & Co.<br>100 North Main - 17th Floor<br>Memphis, TN  38103<br>ATTN:  Manager, Remediation<br>             Management Dept.<br>Telephone: (901) 522-2138<br>Fax:      (901) 522-2350 |
| with copies to: | W. R. Grace & Co.-Conn.<br>One Town Center Road<br>Boca Raton, FL 33486-1010<br>ATTN:  Secretary<br>Telephone: (407) 362-1959<br>Fax:      (407) 362-1970 |
| To Purchaser: | Weatherford U.S., Inc.<br>4710 Bellaire Blvd., Suite 200<br>Bellaire, TX  77401<br>ATTN:  Environmental Manager<br>Telephone:  (713) 663-6444<br>Fax:      (713) 295-6106 |
| with copies to: | Weatherford International<br> Incorporated<br>1360 Post Oak Blvd.<br>Suite 1000<br>Houston, TX  77056<br>ATTN:  General Counsel<br>Telephone:  (713) 439-9400<br>Fax:      (713) 622-0913 |

8.  Termination of Lease

    At Closing Purchaser and Sellers shall terminate the
Lease by execution of a Termination Agreement in the form
attached hereto as Exhibit F and made a part hereof.  Such
Termination Agreement shall acknowledge, among other things, that
Purchaser shall have complied to Sellers' reasonable satisfaction
with Section 25 of the Lease.  Execution of the Termination
Agreement shall be a condition to Closing.

9.  General Terms

    9.1  Governing Law.  This Agreement shall be governed
by and construed in accordance with the laws of the State of
Michigan, excluding the conflict of law provisions thereof that
would otherwise require the application of the law of any other
jurisdiction.

-7-

**9.2    Entire Agreement.**  This Agreement contains the entire agreement between the parties concerning its subject matter, and supersedes and replaces all prior oral and written agreements and understandings with respect to the Subject Premises.

**9.3    Amendment.**  No agent, employee, or other representative of either party is empowered to alter or amend any of the terms of this Agreement, unless such alteration and/or amendment is in writing and has been signed by an authorized representative of each of the parties.  This provision cannot be orally waived.

**9.4    Successors, Assigns, etc.**  The terms and conditions of this Agreement, and the rights and obligations created as a result thereof, shall be binding upon, and/or inure to the benefit of the successors, assigns and subsequent purchasers of the parties.  This Agreement and the terms and provisions specified herein shall survive Closing and the passing of title to the Subject Premises.

**9.5    Paragraph Headings.**  The paragraph headings appearing herein are for the convenience of the parties and are not to be used or construed so as to modify the terms and conditions of this Agreement in any fashion.

**9.6    Counterparts.**  This Agreement may be executed in multiple counterparts, each of which shall constitute an original.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first indicated above.

HOMCO INTERNATIONAL, INC.          WEATHERFORD U.S., INC.

By: _Frank L. Ryan_                By: _Suzanne Thomas_

Title: _President_                 Title: _Sr. Vice President_


W. R. GRACE & CO.

By: _BJ Smith_

Title: _Executive Vice President_

## EXHIBIT A

### LEGAL DESCRIPTION

Land located in the Village of Kalkaska, County of Kalkaska, State of Michigan, described as:

Lots 11 and 12, Industrial Subdivision, as recorded in Liber D of Plats, Page 76, Kalkaska County Records

EXHIBIT 3

## DEED

Homco International, Inc., a Delaware corporation hereinafter "Grantor", with an office at Suite 200, 4710 Bellaire Blvd., Bellaire, Texas 77401 for and in consideration of the sum of $10.00, and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does hereby grant and convey unto Weatherford U.S., Inc., a Delaware corporation, hereinafter "Grantee", with an office at Suite 200, 4710 Bellaire Blvd., Bellaire, Texas 77401, all of Grantor's right, title and interest in those certain lands located in the Village and County of Kalkaska, State of Michigan, to wit:

Lots 11 and 12 of Industrial Subdivision, according to the plat thereof recorded in Liber D of Plats at page 76,

together with all fixtures and appurtenances located thereon, except Environmental Equipment, as that term is defined in that certain Sales Agreement between the parties hereto dated _____, and further excepting from this conveyance all mineral, coal, oil and gas, the same having heretofore been reserved by the State of Michigan as cited below.

This conveyance is subject to the terms and conditions of said Sales Agreement and in particular, but not by way of limitation, is subject to the rights retained by the Grantor for continued access to the subject premises and the limitation on use of said premises pending remediation of Known Environmental Liabilities, as more particularly set forth in said Sales Agreement. The rights so retained and the limitation on use, as well as the remaining terms and conditions of Sales Agreement, shall be binding upon Grantee, its successors and assigns in title.

Until the Michigan Department of Natural Resources, or other governmental authority, having jurisdiction, authorizes discontinuance of further remediation of Known Environmental Liabilities, Grantee and its successors and assigns in title shall, each and everyone of them, include the following provision in each future conveyance of all or any portion of the subject premises:

"Notice is hereby given that the lands which are the subject of this conveyance are subject to the rights of Homco International, Inc, a Delaware corporation, and W.R. Grace & Co., a New York corporation, or either of them or any of their successors or assigns, to enter upon the subject premises for the purpose of remediating certain environmental contamination from said premises. Notice is further given that pending authorization by the Michigan Department of Natural Resources, or other governmental authority having jurisdiction, to discontinue such remediation, certain restrictions apply to the utilization of the subject premises; for the specifics by which you are directed to the Sales Agreement dated _____ between the above named corporations and Weatherford U.S., Inc., a Delaware corporation. This conveyance is made subject to such rights and limitations."

This Deed is given by Grantor, and accepted by Grantee, subject to all easements, rights-of-way, reservations and restrictions of record or which would be apparent upon an inspection of the premises including, but not limited to, the following:

1. Reservation by The State of Michigan of all mineral, coal, oil and gas and all rights incidental thereto, as recited in Deed dated November 6, 1970 and recorded in Liber 116 at page 636, Kalkaska County Register of Deeds records.

2. Easements to Consumers Power Company as dated May 13, 1968

and recorded in Liber 115 at pages 69 and 69A of said records
(electric distribution line) and dated October 13, 1972 and recorded
in Liber 131 at page 150 of said records (guy wire & anchor).

3. Restriction on use of subject lands "for industrial purposes
only" in Warranty Deed dated April 27, 1972 and recorded in Liber 128
at page 49 of said records .

4. Utility easements and any other easements as shown on plat,
recorded May 10, 1974 in Liber D at page 76 of said records.

5. Declaration of Restrictions on Use and Occupancy dated
September 14, 1974 and recorded in Liber 145 at pages 48 through 54
of said records.

Grantor warrants to Grantee, and to Grantee's successors and
assigns in title, that it has not created or permitted to be created
any lien, charge or encumbrance against the subject premises which is
not of record in the office of the Register of Deeds of said County,
except for Known Environmental Liabilities referenced above, and
Grantor covenants to defend, the title to the subject premise to the
extent of said warranty as against any and all lawful claims or
demands arising by, through or under Grantor, but no other; however,
Grantor grants to Grantee the benefit of all previous warranties in
Grantor's chain of title.

Dated this _____day of_____,1993

Witnesses:                              Homco International, Inc.,
                                        a Delaware corporation

_____               by:_____


_____               its:_____


State of_____)
                             )ss
County of_____)


The foregoing instrument was acknowledged before me

this_____day of _____, 1993,

by_____:
of Homco International, Inc., a Delaware corporation,
on behalf of the  Corporation.

                                    _____

                                    _____, Notary Public

                                    _____County_____

                                    My commission expires:_____

PREPARED BY:

Peter J. Zirnhelt, Esq.
400 East Eighth Street
P.O. Box 1067
Traverse City, MI  49685-1067
(616) 946-8630
p/f/90385ded

EXHIBIT C

BILL OF SALE

KNOW ALL MEN BY THESE PRESENTS that Homco International, Inc., a Delaware corporation (hereinafter "Seller"), with an office at Suite 200, 4710 Bellaire Blvd., Bellaire, Texas 77401, in consideration of the sum of $10.00 and other valuable consideration, to it in hand paid by Weatherford U.S., Inc., a Delaware corporation (hereinafter "Purchaser"), with an office at Suite 200, 4710 Bellaire Blvd., Bellaire, Texas  77401, the receipt and sufficiency of which are hereby acknowledged, has granted, bargained, sold, conveyed, transferred and delivered, and by these presents does grant, bargain, sell, convey, transfer and deliver unto Purchaser, all of Seller's right, title and interest in and to all the equipment, machinery, furniture, furnishings and other personal property (collectively "Personalty") located on those lands located in the Village and County of Kalkaska and State of Michigan more particulary described as:

> Lots 11 and 12 of Industrial Subdivision, according to the plat thereof recorded in Liber D of Plats of page 76, of the office of the Register of Deeds for said county,

and commonly known as 424 East Dresden Street in said Village, which Personalty is the subject of that certain Lease Agreement between the parties hereto dated March 31, 1993; provided that "Personalty" does not include "Tenant's

1 of 2

Personal Property", as that term is defined in said Lease Agreement, which was heretofore acquired by Purchaser under the terms of that certain Amended and Restated Assets Purchase Agreement between the parties hereto dated January 28, 1993; and provided further that Personalty does not include Environmental Equipment, as that term is defined in that certain Sales Agreement between the parties hereto dated_____. This Bill of Sale is pursuant to and subject to the terms and conditions of said Sales Agreement. Personalty is sold, conveyed, transferred and delivered to Purchaser in as is and where is condition. This sale of Personalty is without warranty of any kind except that Seller warrants to Purchaser that title to Personalty has not been incumbered as between Seller and any third party.

IN WITNESS WHEREOF Seller has caused this Bill of Sale to be executed on its behalf this _____day of_____,1993.

WITNESSES:                          Homco International, Inc.,
                                    a Delaware corporation


_____             by:_____


_____             its:_____


2 of 2

p/r90385bil

EXHIBIT D

**Harding Lawson Associates**

DOCUMENT SUMMARY

**FILE LETTERS UP TO 1992**
**HOMCO INTERNATIONAL, INC.**
**SITE NO. 166**
**424, EAST DRESDEN, KALKASKA, MICHIGAN**

<u>October 21, 1982: DNR to NL</u> - Requested control of spray paint, wastewater discharge, and spillage of oil. No permit to discharge. Overspray of paint and runoff of paint/solvents is a concern. Conducted outside on concrete pad. Spillage of fuel oil used for soaking parts in yard. Questioned floor drain system and pretreatment necessary to discharge to sanitary system.

<u>November 5, 1982: NL Response to DNR</u> - Steam cleaning and painting operations moved inside. Drums used for soaking parts in oil also moved inside. Evaluated feasibility of hooking up to city sewer.

Note in file that hook-up to sanitary sewer being completed <u>(11-9-82)</u>.

<u>October 15, 1985: DNR to NL</u> - Connection to sanitary sewer not completed. Floor drains still connected to holding tanks. Corrective actions not to DNR satisfaction. Requested that a determination be made concerning outlet of tanks! Appeared that steam cleaning still conducted outside. No paint booth, DNR still concerned for overspray.

<u>December 19, 1985: DNR to NL</u> - Summary of inspection. Floor drains in two areas drain to suspected seepage tanks or dry wells. Replaced with sealed holding tanks. Plan was to seal floor drain in east room and hook floor drain in mechanical shop to City POTW after connecting to an oil/water separator. Appears that one floor drain was abandoned.

<u>October 15, 1990</u> - Letter from Coding Products, adjacent property owner, reporting contamination. Upgradient source, i.e., Acme/Maxco/Well Tech/Craft House/Michigan Diesel Power.

Requested meeting on 10/19 with Environmental Solutions Inc. (Coding Products consultant).

<u>October 26, 1990: ENSR to HOMCO</u> - Proposal to conduct groundwater characterization in three phases.

(1)    Field screen plume with Photovac unit, i.e., soil gas survey with a 50' grid. Collect composite soil samples.

10689059.1
2/21/94                                          1

FEB 24 '94  07:56AM ...

Harding Lawson Associates

## DOCUMENT SUMMARY

### FILE LETTERS UP TO 1992
### HOMCO INTERNATIONAL,, INC.
### SITE NO. 166
### 424, EAST DRESDEN, KALKASKA, MICHIGAN
#### (Continued)

(2)     Develop strategy for installing wells based on Task 1.

(3)     Address remediation if on-site source identified.

Composite soil samples along grid if no visible contamination identified (Task 1).

October 26, 1990: Letter from Vinson & Elkins to ENSR - Requested assistance due to potential groundwater contamination and litigation.  Assistance to include:

- Soil gas survey;
- Surface soil sampling; and
- Meeting with DNR and split samples.

November 11, 1990:  ENSR to HOMCO - Completed Task 1, no results presented.  Referenced Nov. 5, 1990 discussion.  Initially recommended three wells and sampling water from hand auger borings.  Settled on six monitor wells.  Location: three wells in path of plume and three wells laterally upgradient.  Four feet of screen, bottom of screen to depth of 12', with 3' extended into the saturated zone.  Installed wells by advancing to 12' and pushing screen and casing to depth! BETX and BETX-semi-volatiles along plume.

November 30, 1990:  HOMCO to ENSR - Authorization to act on behalf of HOMCO during negotiations with State.

December 5, 1990: ENSR to HOMCO and Vinson & Elkins - Draft letter to DNR on plans for characterization and remediation.  Concern of DNR is to sample areas with extensive surface contamination that could extend to groundwater i.e., source.  Sources include:

(1)     BOP pad;

(2)     South side of building (previous cleaning activities);

Harding Lawson Associates

## DOCUMENT SUMMARY

### FILE LETTERS UP TO 1992
### HOMCO INTERNATIONAL, INC.
### SITE NO. 166
### 424, EAST DRESDEN, KALKASKA, MICHIGAN
(Continued)

(3)     Diesel tank; and

(4)     Sump (abandoned).

Soil sampling to *3'*, *i.e.*, 1.5/3.0 feet depths.  Analysis includes BETX, PNAs, and TOX.

December 7, 1990:  Summary from ENSR to Vinson & Elkins and HOMCO - Similar to 12-5-90 letter to DNR.

Issues:        (1)     Xylene plume in Coding Products upgradient well;

               (2)     Removal of source; and

               (3)     Disposal of sludge (sump).

Three apparent upgradient wells, *i.e.*, south and east property lines were clean, *i.e.*, no BETX. No data on development procedures after installation, well installation techniques which could have caused problems!  Cited EPA and statistical data using three data points.  Rest of data pending.  Plan to sample soils at 3', 6', 8' depths in areas with suspected contamination.

Characterizing sump sludge for disposal.  Recommended dye test for sump piping and tanks.

No map provided with well locations.  No analytical data on groundwater.  No report on soil vapor survey which was used to select well locations.

January 25, 1991:  ENSR to HOMCO - Approval from DNR to have sump/oil water separator sludges disposed as a non-hazardous waste.  Provided list of qualified, permitted companies. Passed TCLP, recommended no charge in operations.

Harding Lawson Associates

DOCUMENT SUMMARY

FILE LETTERS UP TO 1992
HOMCO INTERNATIONAL, INC.
SITE NO. 166
424, EAST DRESDEN, KALKASKA, MICHIGAN
(Continued)

May 23, 1991: ENSR to DNR - Supplemental Soils Investigation Work Plan for Pipe Inspection Area - May 1991.

June 4, 1991: ENSR to DNR - Soil Remediation Work Plan - May 24, 1991.

Both of the above documents basically repeat previous information.

October 3, 1991: HOMCO to Coding Products - Response to Coding Products letter. Attempt to share in costs for remediation and characterization!

November 11, 1991: Joe Batiste to file - Spill of 65-85 gallons of diesel fuel. Spilled November 9, 1991, accidental rupture of tank during loading. Tried to contact DNR. Contacted ENSR, ENSR remediated 140 cubic yards of soil. Collected verification samples. Not clear if DNR contacted.

January 7, 1992: HOMCO to Coding Products - Proposed to share costs of existing wells and sampling.

January 20, 1992: Coding Products to HOMCO - Response to cost sharing.

January 29, 1992: ENSR to DNR - Summary of diesel fuel response. Location of spill was just east of machine shop.

April 27, 1992: Letter from HOMCO to GRACE on pipeline incident - Line apparently not correctly marked by MichCon Gas Utility. Gas line was PVC. No spark and no injuries.

May 26, 1992  Newspaper article, gas leak in natural gas line, struck by Terra Tech (CPT firm) of Houston during environmental work. Did not mention HOMCO. April 29, 1992 incident during off-site work.

Harding Lawson Associates

## DOCUMENT SUMMARY

### FILE LETTERS UP TO 1992
### HOMCO INTERNATIONAL, INC.
### SITE NO. 166
### 424, EAST DRESDEN, KALKASKA, MICHIGAN
(Continued)

June 8, 1992:  ENSR to DNR on  Groundwater Plume Delineation - Statement that HOMCO is not sole contributor to plume due to nature of businesses upgradient.

DNR requested further delineation of xylene plume.  DNR anticipates a Type A closure for the diesel plume.  No mention of TPH data not being run.

June 17, 1992:  HOMCO to DNR - Letter objecting to issuance of a permit to reinject treated groundwater by Coding Products.  HOMCO has five objections that basically involve future liability.  Mounding and redirecting the plume is a concern.

June 19, 1992:  ENSR to HOMCO - Previous pipe inspection activities.  Probably a source of the contamination due to use of solvents spilling onto ground surface.  Referenced use of pipe dope.  Generally contain high lead which is why site has not been characterized for metals!

Reference to a disposal pit used by Maxco (to south) to dispose chemicals, etc.

According to Jim Rowell, Kal Con Construction and former NI. employee, NI. routinely buried waste on-site at location approximately 25 feet from back fence.

June 25, 1992:  Coding Products to HOMCO - Historical costs for groundwater controls.

July 24, 1992:  HOMCO to Coding Products - Groundwater cost sharing proposal.

July 30, 1992:  ENSR to Village Superintendent, Village of Kalkaska - Village requested information on groundwater contamination.  Summary of investigation.

September 2, 1992:  Coding Products to HOMCO - Cost sharing.

September 9, 1992: ENSR to HOMCO - DNR concerned about drinking water wells (private and city) in Village of Kalkaska.

Harding Lawson Associates

# DOCUMENT SUMMARY

## FILE LETTERS UP TO 1992
### HOMCO INTERNATIONAL, INC.
### SITE NO. 166
### 424, EAST DRESDEN, KALKASKA, MICHIGAN
### (Continued)

<u>September 15, 1992:  DNR to HOMCO</u> - Not satisfied with progress on TCE plume delineation.

<u>September 22, 1992:  DNR Memo</u> - Stated no further action requried on diesel spill.

October 9, 1992:  ENSR to HOMCO - Recommendation to locate downgradient end of TCE plume.  DNR has allocated $200,000 to locate all potential water wells downgradient.  Cost recovery would be sought from HOMCO and others.

<u>October 14, 1992:  ENSR to B&L Trucking</u> - Seeking cost recovery for clean-up of diesel spill caused by B&L Trucking.

<u>November 16, 1992/November 18, 1992</u>  Letters to off-site property owners seeking approval to conduct investigative work.

Harding Lawson Associates

## DOCUMENT SUMMARY

### WORK PLANS AND REPORTS
### HOMCO INTERNATIONAL, INC.
### SITE NO. 166
### 424 EAST DRESDEN, KALKASKA, MICHIGAN

**Documents Submitted by ENSR Consulting and Engineering and others (1990-1993):**

| DATE | DOCUMENT TITLE |
|------|----------------|
| June 1990 | Coding Products Hydrogeological Investigation, Kalkaska, Michigan (Environmental Solutions, Inc. Document). |
| October 1990 | Phase I Site Investigation, Kalkaska, Michigan. HOMCO Site No. 166. |
| February 1991 | Supplemental Soils Investigation Work Plan for the Former Pipe Inspection Area - HOMCO Site No. 166, Kalkaska, Michigan. |
| May 1991 | Supplemental Soils Investigation Work Plan for Pipe Inspection Area. |
| May 1991 | Summary of Groundwater Investigations Conducted as of March 1991. |
| November 1991 | Hydrogeologic Investigation and Work Plan, HOMCO Site No. 166, Kalkaska, Michigan. |
| January 1992 | Phase III Report, Soil Remediation, Verification Sampling and Capital Improvements, HOMCO Site No. 166. |
| October 1992 | Interim Report I, Subsurface Investigation of TCE Plume Area, HOMCO Site No. 166, 424 East Dresden, Kalkaska, Michigan. |
| October 1992 | Interim Report I, Subsurface Investigation of Northwest Plume Area, HOMCO Site No. 166, 424 East Dresden, Kalkaska, Michigan. |
| October 1992 | Closure Report, Diesel Storage Tank Area, HOMCO Site No. 166, 424 East Dresden, Kalkaska, Michigan. |
| November 1992 | Work Plan - Downgradient TCE Plume Delineation, HOMCO Site No. 166, 424 East Dresden, Kalkaska, Michigan. |

Harding Lawson Associates

### DOCUMENT SUMMARY

**WORK PLANS AND REPORTS**
**HOMCO INTERNATIONAL, INC.**
**SITE NO. 166**
**424 EAST DRESDEN, KALKASKA, MICHIGAN**
**(Continued)**

| | |
|---|---|
| March 1993 | Interim Corrective Action Plan for On-Site Plumes. |
| March 1993 | Groundwater Re-injection Permit Exemption. |
| September 1993 | Quarterly Report - TCE Plume Remediation, July 1993, HOMCO Site 166, Kalkaska, Michigan. |
| September 1993 | Quarterly Report - NW Plume Remediation, July 1993, HOMCO Site 166, Kalkaska, Michigan. |
| September 1993 | Interim Report II, Subsurface Investigation of TCE Plume Area, HOMCO Site No. 166, 424 East Dresden, Kalkaska, Michigan. |
| November 1993 | Quarterly Report - TCE Plume Remediation, October 1993, HOMCO Site 166, Kalkaska, Michigan. |
| November 1993 | Quarterly Report - NW Plume Remediation, October 1993, HOMCO Suite 166, Kalkaska, Michigan. |



FIGURE 1-2
CLOSE-UP OF
SITE LOCATION MAP
HOMCO INTERNATIONAL SITE #166
KALKASKA, MICHIGAN

EXHIBIT F

## LEASE TERMINATION AGREEMENT

THIS LEASE TERMINATION AGREEMENT dated February _____, 1994, between WEATHERFORD U.S., INC., a Delaware corporation ("Tenant"), and HOMCO INTERNATIONAL, INC., a Delaware corporation ("Landlord").      WITNESSETH:

WHEREAS, Landlord and Tenant entered into a Lease Agreement dated as of March 31, 1993 (the "Lease Agreement") for the Premises as that term is defined in the Lease Agreement; and

WHEREAS, the parties hereto desire to terminate and cancel all rights and obligations with respect to the Lease Agreement and waive any and all claims they have or may have against each other arising out of or in connection with the Lease Agreement or occupancy and use of the Premises, except as provided in a Sales Agreement between the parties executed on _____ __, 1993 ("Sales Agreement");

NOW, THEREFORE, in consideration of this Lease Termination Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby respectively acknowledged by the parties hereto, the parties agree as follows:

1.   Except as provided in the Sales Agreement, the Lease Agreement is hereby canceled and is of no further force or effect. Tenant agrees that all obligations and duties of the Landlord under the Lease Agreement are terminated, and that Landlord shall be under no obligation to remove any particular structures, equipment or fixtures located on the Premises, it being Tenant's intention to accept the return of the Premises in whatever condition they are left at the time Landlord vacates the same and Tenant expressly waives any obligation on the part of Landlord to restore the Premises to their condition as of the date of the signing of the

-2-

Sales Agreement.

2.    Tenant, for itself, its successors and assigns, hereby expressly releases and discharges Landlord and its successors and assigns, from any and all claims, demands, damages and causes of action, known or unknown, which the Tenant has or may have against the Landlord or its successors or assigns arising out of or in any way connected with the Lease Agreement or Landlord's occupancy and use of the Premises, except as provided in the Sales Agreement.

3.    Landlord, for itself, its successors and assigns, hereby expressly releases and discharges Tenant and its successors and assigns, from any and all claims, demands, damages and causes of action, known or unknown, which the Landlord has or may have against the Tenant or its successors or assigns arising out of or in any way connected with the Tenant's occupancy and use of the Premises, except as provided in the Sales Agreement.

IN WITNESS WHEREOF, Tenant and Landlord have caused this Lease Termination Agreement to be executed by their duly authorized officers as of the day and year first above written.

HOMCO INTERNATIONAL, INC.

By: _Frank L. Gye_____

Title: _President_____

WEATHERFORD U.S., INC.

By: _____

Title:_____

-2-

Sales Agreement.

2.    Tenant, for itself, its successors and assigns, hereby expressly releases and discharges Landlord and its successors and assigns, from any and all claims, demands, damages and causes of action, known or unknown, which the Tenant has or may have against the Landlord or its successors or assigns arising out of or in any way connected with the Lease Agreement or Landlord's occupancy and use of the Premises, except as provided in the Sales Agreement.

3.    Landlord, for itself, its successors and assigns, hereby expressly releases and discharges Tenant and its successors and assigns, from any and all claims, demands, damages and causes of action, known or unknown, which the Landlord has or may have against the Tenant or its successors or assigns arising out of or in any way connected with the Tenant's occupancy and use of the Premises, except as provided in the Sales Agreement.

IN WITNESS WHEREOF, Tenant and Landlord have caused this Lease Termination Agreement to be executed by their duly authorized officers as of the day and year first above written.

HOMCO INTERNATIONAL, INC.

By: _____

Title: _____

Attest:

~ongeligue~ ]. Yaracero

WEATHERFORD U.S., INC.

By: _Dwayne Thomas_____

Title: _Sr Vice Pres + Sec___

-3-

STATE OF TEXAS     )
COUNTY OF DALLAS   )

     On this ___*1st*___ day of ___*March*___, 1994, before me, appeared Frank L. Ryan, II, to me personally known, who being by me duly sworn, did say that he is ___*President*___ of Homco International, Inc., a Delaware corporation, and that said instrument was signed on behalf of said corporation, and said Frank acknowledged to me that he/she executed the same for the purposes therein stated as the free act and deed of said corporation.

     IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal at my office in said County and State the date and year last above written.

*Marcy L. Rose*
               Notary Public

My commission expires: *3/9/06*



MARCY L. ROSE
Notary Public, State of Texas
My Commission Expires 3-09-96

STATE OF TEXAS     )
COUNTY OF HARRIS   )

     On this _____ day of _____, 1994, before me, appeared _____, to me personally known, who being by me duly sworn, did say that he/she is _____, of Weatherford U.S., Inc., a Delaware corporation, and that said instrument was signed on behalf of said corporation, and said _____ acknowledged to me that he/she executed the same for the purposes therein stated as the free act and deed of said corporation.

     IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal at my office in said County and State the date and year last above written.

               _____
               Notary Public

My commission expires:

-3-

STATE OF TEXAS    )
COUNTY OF DALLAS  )

        On this _____ day of _____, 1994, before me, appeared Frank L. Ryan, II, to me personally known, who being by me duly sworn, did say that he is _____ of Homco International, Inc., a Delaware corporation, and that said instrument was signed on behalf of said corporation, and said Frank acknowledged to me that he/she executed the same for the purposes therein stated as the free act and deed of said corporation.

        IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal at my office in said County and State the date and year last above written.

                                _____
                                  Notary Public

My commission expires:


STATE OF TEXAS    )
COUNTY OF HARRIS  )

        On this _1st_ day of _March_____, 1994, before me, appeared _H. Suzanne Thomas_____, to me personally known, who being by me duly sworn, did say that he/she is _Sr. Vice President and Secretary_, of Weatherford U.S., Inc., a Delaware corporation, and that said instrument was signed on behalf of said corporation, and said _H. Suzanne Thomas_____ acknowledged to me that he/she executed the same for the purposes therein stated as the free act and deed of said corporation.

        IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal at my office in said County and State the date and year last above written.

                         Judy Kimbley_____
                         Notary Public

My commission expires: 5-2-96



```
JUDY KIMBLEY
Notary Public
STATE OF TEXAS
My Comm. Exp. May 2, 1996
```

ALL-STATE® LEGAL  800-222-0510   ©D11   RECYCLED

Exhibit B

STATE OF MICHIGAN
CIRCUIT COURT FOR THE 30TH JUDICIAL CIRCUIT
INGHAM COUNTY

FRANK J. KELLEY, Attorney General
of the State of Michigan, ex rel,
MICHIGAN DEPARTMENT OF NATURAL
RESOURCES,

        Plaintiffs,

v

W. R. GRACE & CO. - CONN.,
HOMCO INTERNATIONAL, INC.,
N. L. INDUSTRIES, WEATHERFORD
U.S. INC., AND WEATHERFORD
INTERNATIONAL, INCORPORATED,

        Defendants.

_____/

File No. _Michael Harrison_

HON. _94-78818-CE_

### CONSENT DECREE

The Plaintiffs are Frank J. Kelley, Attorney General of the State of Michigan, and Michigan Department of Natural Resources ("MDNR").

The Defendants are W.R. Grace & Co. - Conn. ("Grace"), HOMCO International, Inc. ("HOMCO"), NL Industries, Inc. ("NL"), Weatherford U.S. Inc. ("Weatherford U.S.") and Weatherford International Incorporated ("Weatherford International").

The Consent Decree requires the preparation and performance of the Remedial Action for contamination at or emanating from the HOMCO site, Kalkaska, Michigan (hereafter "Facility", as the term is defined in the Michigan Environmental Response Act ("MERA")). Defendants agree not to contest: (a) the authority or jurisdic-

- 1 -

tion of the Court to enter this Consent Decree; or (b) any terms
or conditions set forth herein.

The entry of this Decree by Defendants is neither an admis-
sion of liability with respect to any issue dealt with in this
Decree nor is it an admission or denial of any factual allega-
tions or legal conclusions stated or implied herein.

The Parties agree, and the Court by entering this Decree
finds that the Remedial Actions set forth herein are necessary to
abate Releases of Hazardous Substances into the environment to
control future Releases and to protect public health, welfare,
safety and the environment.

NOW, THEREFORE, before the taking of any testimony, and with-
out this Consent Decree constituting an admission of any of the
allegations in the Complaint or as evidence of the same, and upon
the consent of the Parties, by their attorneys, it is hereby
ORDERED, ADJUDGED AND DECREED:

## I.    JURISDICTION

1.1.    This Court has jurisdiction over the subject matter of
this action pursuant to MCL 299.616.  This Court also has per-
sonal jurisdiction over the Defendants.  Defendants waive all
objections and defenses that they may have to jurisdiction of the
Court or to venue in this District.

1.2.   The Court determines that the terms and conditions of
this Consent Decree are reasonable, adequately resolve the envi-
ronmental issues raised and properly protect the interests of the
people of the State of Michigan.

1.3.   The Court shall retain jurisdiction over the Parties
and subject matter of this action to enforce this Consent Decree
and to resolve disputes arising under this Consent Decree,
including those that may be necessary for its construction, exe-
cution or implementation, subject to Section XX (Dispute
Resolution).

## II.  PARTIES BOUND

2.1.   This Consent Decree shall apply to and be binding upon
Plaintiffs and Defendants and their successors and assigns.  No
change or changes in the ownership or corporate status of
Defendants shall in any way alter Defendants' responsibilities
under this Consent Decree.  Defendant Weatherford shall provide
the MDNR with written notice prior to the transfer of ownership
of part or all of the Facility in Kalkaska, Michigan and shall
also provide a copy of this Consent Decree to any subsequent own-
ers or successors prior to the transfer of any ownership rights.
Defendants shall comply with the requirements of Section 10(c) of
the Michigan Environmental Response Act ("MERA"), MCL 299.610(c).
Defendants shall provide a copy of this Consent Decree to all
contractors, subcontractors, laboratories, and consultants
retained to conduct any portion of the Response Activities per-

formed pursuant to this Consent Decree, within fourteen (14) days
after the effective date of this Consent Decree or after the date
of such retention.   Notwithstanding the terms of any contract,
Defendants are responsible for compliance with this Consent
Decree and for ensuring that their contractors, subcontractors,
laboratories, and consultants perform all work in conformance
with the terms and conditions of this Consent Decree.

2.2.   The signatories to this Consent Decree certify that
they are authorized to execute and legally bind the parties they
represent.

### III.   STATEMENT OF PURPOSE

3.1.   The mutual objectives of Plaintiffs and Defendants in
entering into the Consent Decree are to: (a) reimburse the MDNR
for past response costs incurred for Response Activities relating
to the Facility; (b) provide for payment of the MDNR's future
response costs in verifying or overseeing the conduct of Response
Activities concerning the Facility; (c) remediate releases or·
threatened releases of hazardous substances, pollutants, or con-
taminants·or any discharge of injurious substances attributable
to Defendants' activities at the Facility, or emanating from the
Facility, through the implementation of the selected remedial
action; and (d) provide contribution protection, as provided in
Section XXV.

3.2.   The activities conducted under this Consent Decree are
subject to approval by the MDNR and Defendants shall provide all
appropriate necessary information that is consistent with MERA,
1982 PA 307, as amended, MCL 299.601 et seq; MSA 13.32(1) et seq;
the MERA Rules, MAC R 299.5101 et seq; and other applicable or
relevant and appropriate federal and state laws and regulations.

## IV.   DEFINITIONS

4.1.   "Consent Decree" means this Consent Decree and the
Statement of Work attached hereto, including any future modifica-
tions pursuant to Section XVIII (Modifications/Incorporation by
Reference), and any reports, plans, specifications and schedules
required by the Consent Decree which, upon approval of the MDNR,
shall be incorporated into and are enforceable under this Consent
Decree.

4.2.   "Defendants" means Grace, HOMCO, NL, Weatherford, U.S.
and Weatherford International.

4.3.   "Plaintiffs" means Frank J. Kelley, Attorney General,
of the State of Michigan, ex rel. Michigan Natural Resources
Commission and MDNR.

4.4.   "Parties" means the Plaintiffs and Defendants.

4.5.   All other terms used in this Consent Decree which are
defined in MERA and/or the MERA Rules shall have the same meaning

- 5 -

in the Consent Decree as in MERA and the MERA Rules or as set
forth in other provisions of this Consent Decree.


V.   IMPLEMENTATION


5.1.  Defendants shall prepare and perform all Response
Activities in accordance with the time schedule set forth in this
Section.  The Response Activities conducted pursuant to this
Consent Decree are subject to approval by the MDNR in accordance
with Section XVI (Progress Reports), and shall be consistent with
and in compliance with MERA and the MERA Rules.


5.2.  Defendants shall deliver to the MDNR for approval the
following submittals or commence or complete the following
actions, as appropriate, in accordance with the following time
schedule:


SCHEDULE


| SUBMITTAL/RESPONSE ACTIVITY | DUE DATE |
|---|---|
| Statement of Work ("SOW") | Attached to Consent Decree |
| Plume Delineation/Investigation | 90 days after entry of Consent Decree |
| Plume Delineation Report | 60 days after completion of all plume investigation efforts |
| MDNR Comments to Plume Delineation Report | 30 days after submission of Plume Delineation Report |
| Corrective Action Plan for end-of-plume treatment system at Old M-72 road location | 60 days after MDNR approval of Plume Delineation Report |
| Implementation of Corrective Action Plan for end-of-plume | 60 days after MDNR approval of Corrective Action Plan |

treatment system at Old M-72
road location

| Closure Reports for | When levels of chemical of |
|---|---|
| Corrective Action | concern are at or below |
| | Type B levels for a period |
| | of 12 consecutive months |

5.3. The Parties acknowledge and agree that this Consent
Decree does not constitute a warranty or representation of any
kind by the MDNR that the work performed in accordance by
Defendants herein will result in the achievement of the remedial
criteria as established by law.

5.4. Any report or plan submitted pursuant to this Section
shall include, but not be limited to, an overview of the work
conducted, a description of the methodologies employed, and docu-
mentation and analysis of data collected pursuant to this Consent
Decree and the subject submission, report, plan, or other
document.

VI.  ADDITIONAL RESPONSE ACTIVITY

6.1. As used in this Section, "Additional Response Activity"
shall mean all activities not specifically set forth in the
approved remedial action, SOW, or Work Plan that the MDNR deter-
mines are necessary to meet the Performance and Cleanup Standards
described in the administrative rules pursuant to MERA, MAC R
299.5101 et seq., and all applicable state and federal
requirements, that do not fundamentally change the overall reme-
dial approach outlined in the approved remedial action, SOW, and
Work Plan.  These activities may include modifications to the

- 7 -

components of the remedial action and to the type and cost of
materials, equipment, facilities, services and supplies used to
implement the remedial action.

6.2.  In the event that the MDNR determines that Additional
Response Activity is necessary, notification of such Additional
Response Activity will be provided to the Parties' project
coordinators.  Any Additional Response Activities agreed to by
the Parties, shall be completed by Defendants in accordance with
the standards, specifications, and schedules approved by the
MDNR.

6.3.  Defendants shall submit a plan for the Additional
Response Activities to the MDNR for approval within sixty (60)
days of agreement.  The plan shall be developed in conformance
with the requirements of this Consent Decree.  Upon approval, the
plan shall be incorporated herein and made an enforceable part of
this Consent Decree.  Defendants shall implement the plan for
Additional Response Activities in accordance with the schedule
contained therein.

6.4.  Nothing in this Section shall limit the power and
authority of MDNR, the State of Michigan, or this Court, to take,
direct, or order all appropriate action to protect public health,
welfare, and safety, or the environment or to prevent, abate, or
minimize an actual or threatened release of hazardous substances,

pollutants or contaminants on, at, or from the Facility in accord
with Section XI (Creation of Danger).

## VII.   ENGAGEMENT OF A CONTRACTOR

7.1.   ENSR Consulting and Engineering has been designated by
Defendants to be their contractor to perform the technical activ-
ities required under this Consent Decree.   All work performed by
said contractor pursuant to this Consent Decree shall be under
the general direction and supervision of a qualified individual.
Defendants' contractor shall also employ project personnel who
shall have direct experience in the investigation and cleanup of
sites of environmental contamination.   In the event Defendants
desire to replace said contractor, Defendants shall notify MDNR
regarding the identity and qualifications of the new contractor
as soon as the contractor is engaged or at least two weeks prior
to the contractor's commencement of Facility work, whichever
comes first.   Defendants shall notify MDNR regarding the identity
and qualifications of all subcontractors as soon as each subcon-
tractor is engaged or at least two (2) weeks prior to the
subcontractor's commencement of facility work, whichever occurs
first.   MDNR shall have the right to disapprove, within ten (10)
days of notification of a subcontractor, or project personnel,
based on professional qualifications, conflicts of interest,
and/or deficiencies in previous similar work, any such
subcontractor, or project personnel.   If MDNR disapproves any
such person(s), MDNR will provide Defendants written notice

thereof, and Defendants shall have thirty (30) days to identify
any replacement(s).

## VIII.   QUALITY ASSURANCE/SAMPLING

8.1.  Defendants shall assure that MDNR and its authorized
representatives are allowed access to any laboratory utilized by
Defendants in implementing this Consent Decree for quality assur-
ance monitoring.

8.2.  Defendants shall submit to the MDNR the verified
results of all sampling or tests and all other verified data gen-
erated by Defendants or their contractor(s), or on Defendants'
behalf, in the course of implementing this Consent Decree upon
receipt of such information by Defendants.  Verified sampling
data generated under this Consent Decree shall be admissible in
evidence without waiving any objection as to weight or relevance.

8.3.  At the request of MDNR, Defendants shall allow MDNR or
its authorized representatives to take split and/or duplicate
samples of any samples collected by Defendants pursuant to the
implementation of this Consent Decree.  Except as may be neces-
sary for sampling required pursuant to Section XI (Creation of
Danger), Defendants shall notify MDNR not less than seven (7)
days in advance of any sample collection activity.  In addition,
MDNR shall have the right to take any additional samples that it

deems necessary providing Defendants reciprocal notice and rights
to take split and/or duplicate samples.

8.4.  Notwithstanding any provision of this Consent Decree,
MDNR shall retain all of its information gathering, inspection,
and enforcement authorities under MERA and other applicable stat-
ute or regulation.

## IX.  PROJECT COORDINATORS

9.1.  Defendants' project coordinator shall be J.D. Tucker,
Senior Project Engineer for Grace.  Defendants' project coordina-
tor shall have primary responsibility for implementation of the
Response Activities at the Facility.  The MDNR's project coordi-
nator shall be Brian Maturen, Environmental Quality Analyst,
Environmental Response Division, MDNR.  The MDNR's project coor-
dinator will be the primary designated representative for the
MDNR at the Facility.  All communication between the parties and
all documents, reports, approvals, and other submissions and cor-
respondence concerning the activities performed pursuant to the
terms and conditions of this Consent Decree shall be directed
through the project coordinators.  If any party decides to change
its designated project coordinator, the name, address, and tele-
phone number of the successor shall be provided, in writing, to
the other party seven (7) days prior to the date on which the
change is to be effective.  This subsection does not relieve
Defendants from other reporting obligations under the law.

9.2.  Subject to Section X (Access), the MDNR may designate other authorized representatives, employees, contractors, and consultants to observe and monitor the progress of any activity undertaken under this Consent Decree.

## X.  ACCESS

10.1.  To the extent access to the Facility is owned, controlled by, or available to Defendants from the effective date of this Consent Decree, the MDNR, its authorized employees and representatives, upon presentation of proper credentials, shall have access at all reasonable times to the Facility for the implementation of the response activities under the Consent Decree, and for dealing with contamination migrating onto or under the Facility from an off-site source, including, but not limited to:

(a)  Monitoring the response activities or any other activities taking place under this Consent Decree on the Facility;

(b)  Verifying any data or information submitted to MDNR;

(c)  Conducting investigations relating to contamination at the Facility;

(d)  Obtaining samples;

(e)  Assessing the need for or planning and implementing response actions at the Facility; and

(f)  Inspecting and copying non-privileged records, operating logs, contracts, or other documents upon reasonable notice required to assess compliance with this Consent Decree.

10.2. To the extent that the Facility or any other area
where the Response Activities are to be performed by Defendants
under this Consent Decree is owned or controlled by persons other
than Defendants, Defendants shall use their best efforts to
secure from such persons access for the Parties and their author-
ized employees and representatives. Each access agreement shall
be embodied in a written document and Defendants shall provide
the MDNR with a copy of each access agreement secured pursuant to
this subsection. For purposes of this subsection, "best effort"
includes, but is not limited to, reasonable compensation to the
owner to secure such access. If, after using best efforts,
Defendants are unable to obtain access within forty-five (45)
days of the entry of this Consent Decree, Defendants shall
promptly notify the MDNR. Plaintiffs may thereafter assist
Defendants in obtaining access. Defendants shall, within thirty
(30) days of a receipt of a written request from Plaintiffs,
reimburse the Plaintiffs for all costs not inconsistent with law
incurred by the Plaintiffs in obtaining access in the manner pro-
vided in Paragraph 21.3.

10.3. All parties granted access to the Facility pursuant to
this Consent Decree shall comply with all applicable health and
safety laws and regulations.

10.4. Notwithstanding any provision of this Consent Decree,
the MDNR shall retain all of its inspection and access authori-
ties under any applicable statute or regulation.

XI.  CREATION OF DANGER

11.1.  Upon obtaining information concerning the occurrence
of any event during performance of Response Activities conducted
pursuant to this Consent Decree that causes or threatens a
release of a hazardous substance from the facility or that may
present an imminent and substantial endangerment to on-site per-
sonnel or to the public health, safety, welfare, or the
environment, Defendants shall immediately undertake all appropri-
ate action to prevent, abate, or minimize such release or endan-
germent and shall immediately notify the MDNR's project
coordinator or, in the event of his or her unavailability, shall
notify the Pollution Emergency Alerting System (PEAS,
1-800-292-4706).  In such an event, any action undertaken by
Defendants shall be in accordance with all applicable health and
safety laws and regulations, and with the provisions of the
Health and Safety Plan, as prepared by the Defendants'
contractor.  Defendants shall submit a written report setting
forth the events that occurred and the measures taken and to be
taken to mitigate any release or endangerment caused or threat-
ened by the incident and to prevent recurrence of such an
incident.  Regardless of whether Defendants notify the MDNR under
this subsection, if Response Activities undertaken under this
Consent Decree cause or threaten a release or may present an
imminent and substantial endangerment to on-site personnel or to
public health, safety, welfare, or to the environment, MDNR may:
(a) require Defendants to stop Response Activities at the
Facility for such period of time as may be needed to prevent or

- 14 -

abate any such release, threat, or endangerment; (b) require
Defendants to undertake any such activities that MDNR determines
are necessary to prevent or abate any such release, threat, or
endangerment; and/or (c) undertake any actions that MDNR deter-
mines are necessary to prevent or abate such release, threat, or
endangerment.  In the event that Defendants fail to take appro-
priate Response action as required by this Section and the MDNR
undertakes any action to abate such a release, threat, or
endangerment, Defendants shall reimburse the MDNR for all costs
incurred by the MDNR that are not inconsistent with law.  Payment
of such costs shall be made in the manner provided in Paragraph
21.3.


11.2  Nothing in the preceding subsection shall limit the
power and authority of the MDNR, the State of Michigan, or this
Court to take, direct, or order all appropriate action to protect
the public health, welfare, and safety, or the environment, or to
prevent, abate, or minimize an actual or threatened release of
hazardous substances, pollutants, or contaminants on, at, or from
the Facility in accord with Section XI (Creation of Danger).


XII.  COMPLIANCE WITH OTHER LAWS


12.1.  All actions required to be taken pursuant to this
Consent Decree shall be undertaken in accordance with the
requirements of all applicable or relevant and appropriate state
and federal laws and regulations, including MERA, the MERA Rules,
laws relating to occupational safety and health, and other State

- 15 -

environmental laws.  Other agencies may also be called upon to review the conduct of Response Activities under this Consent Decree.  Further, Defendants must designate, in a report to the MDNR, any facilities that Defendants propose to use for such off-site transfer, storage, treatment, or disposal of materials.

## XIII.  RECORD RETENTION/ACCESS TO INFORMATION

13.1.  Defendants and their representatives, consultants, and contractors shall preserve and retain, during the pendency of this Consent Decree and for a period of seven (7) years after its termination, all records, sampling or test results, charts, and other documents relating to historical hazardous substance disposal, treatment or handling activities at the facility or that are maintained or generated pursuant to any requirement of this Consent Decree.  After the seven (7) year period of document retention, Defendants and their successors shall obtain the written permission of the MDNR prior to the destruction of such documents and, upon request, Defendants and/or their successors shall relinquish custody of all documents to the MDNR.  Defendants'. request shall be accompanied by a copy of this Consent Decree and sent to the following address:

Chief
Environmental Response Division
Michigan Department of Natural Resources
P.O. Box 30426
Lansing, MI 48909

13.2.  Defendants shall, upon request, provide to the MDNR
all documents and information within its possession or control or
that of its employees or authorized representatives relating to
the Response Activities at the Facility or to the implementation
of this Consent Decree, including, but not limited to, verified
sampling, analysis, chain of custody records, manifests, trucking
logs, receipts, reports, correspondence, or other documents or
information related to the Response Activities.  Defendants shall
also, upon request, make available to the MDNR, upon reasonable
notice, Defendants' employees, contractors, agents, or represen-
tatives with knowledge of relevant facts concerning the perform-
ance of the Response Activities.


13.3.  Defendants may assert a confidentiality or privilege
claim, if appropriate, covering all or part of the information
requested under this Consent Decree.  Such an assertion shall be
adequately substantiated when it is made.  If no such claim
accompanies the information when it is submitted to the MDNR, it
may be made available to the public by the MDNR without further
notice to Defendants.  Analytical data shall not be claimed as
confidential or privileged by Defendants.

XIV.  NOTICES

14.1.  Whenever, under the terms of this Consent Decree,
notice is required to be given or a report, sampling data,
analysis, or other document is required to be forwarded by one
party to the other, such correspondence shall be directed to the
following individuals at the specified addresses or at such other
address as may subsequently be designated in writing:

As to MDNR:                          As to Defendants:

Brian Maturen                        R. J. Medler
Environmental Response Division      W.R. Grace & Co. - Conn.
Michigan Department of               Homco International, Inc.
  Natural Resources                   100 N. Main. Ste. 1700
Route#1                              Memphis, TN  38103
8015 S. Mackinaw Trail                (901) 522-2051
Cadillac, MI  49601
(616) 775-9777

                                     Barry Sams
                                     NL Industries, Inc.
                                     Corporate Environmental
                                       Services
                                     P.O. Box 1090
                                     Wyckoffs Mill Road
                                     Hightstown, NJ  08520
                                     (609) 443-2410

                                     Robin C. Palmer, Esq.
                                     Weatherford U.S. Inc. and
                                     Weatherford International
                                       Incorporated
                                     1360 Post Oak, Ste. 1000
                                     Houston, TX  77056
                                     (713) 439-9416

XV.  SUBMISSIONS AND APPROVALS

15.1.  All plans, reports or other submissions
("submissions") shall be delivered to the MDNR in accordance with
the schedule set forth in this Consent Decree.  Prior to receipt
of the approval, any report submitted to the MDNR for approval
shall be marked "Draft" and shall include, in a prominent loca-
tion in the document, the following disclaimer:  "Disclaimer:
This document is a DRAFT document prepared by Defendants pursuant
to a Court Order, which has not received final acceptance from
the Michigan Department of Natural Resources ("MDNR").  The
opinions, findings, and conclusions expressed are those of the
authors and not those of MDNR."

15.2.  Upon receipt of any submission relating to the
Response Activities that is required to be submitted for approval
under this Consent Decree, the MDNR project coordinator will in
writing:  (a) approve the submission; (b) disapprove the
submission, notifying Defendants of deficiencies; or (c) approve
the submission with modifications to cure a deficiency.  In the
case of a MDNR disapproval or modification, a written explanation
shall be appended.  Upon receipt of a notice of approval or modi-
fication from the MDNR, Defendants shall proceed to take any
action required by the plan, report, or other submission as
approved or as modified, and shall submit a new cover page marked
"Final."

- 19 -

15.3. Notice of any disapproval will specify the reason(s) for the disapproval. Unless a notice of disapproval specifies a longer time period, upon receipt of a notice of disapproval from the MDNR, Defendants shall, within thirty (30) days thereafter, correct the deficiencies and resubmit the submission for approval. Notwithstanding a notice of disapproval, Defendants shall proceed to take any response action not directly related to the deficient portion of the submission. If, upon resubmission, the submission is not approved, the MDNR shall so advise Defendants and will consider Defendants to have failed to complete the submittal in a timely manner or failed to have provided a submission of acceptable quality.

15.4. A finding of approval or an approval with modifications shall not be construed to mean that the MDNR concurs with all conclusions, methods, or statements in the submissions or warrants that the submission comports with law.

15.5. No informal advice, guidance, suggestions, or comments by the MDNR regarding any submissions by Defendants shall be construed as relieving Defendants of their obligation to obtain such formal approval as may be required by this Consent Decree.

## XVI.   PROGRESS REPORTS

16.1.   Defendants shall provide to the MDNR written progress reports relating to response action that shall: (a) describe the actions that have been taken toward achieving compliance with this Consent Decree during the previous year; (b) describe data collection and activities scheduled for the next year; and (c) include all results of sampling and tests and other data received by Defendants, their employees or authorized representatives during the previous year relating to the Response Activities performed pursuant to this Consent Decree. Annual reports shall be submitted to the MDNR sixty (60) days following the entry date of this Consent Decree by the Court and thereafter on the anniversary date of such submission until issuance of the Certificate of Completion as provided in Section XXVI (Certification).

16.2.   Defendants shall provide quarterly reports in accordance with the SOW. The current schedule for conducting quarterly sampling is the third week of January, April, July and October. Quarterly reports will be submitted to the MDNR within 60 days of receiving analytical data. All comments received from the MDNR will be addressed in writing within 30 day after receipt.

XVII.   INDEMNIFICATION

17.1.   Defendants shall indemnify and save and hold harmless
the State of Michigan and its departments, agencies, officials,
agents, employees, contractors, and representatives for any and
all claims or causes of action arising from or on account of acts
or omissions of Defendants, their officers, employees, agents,
and any persons acting on its behalf or under its control in car-
rying out response activities pursuant to this Consent Decree.
Plaintiffs shall notify Defendants of any such claims or actions
promptly after receipt of notice.  Neither the State of Michigan
nor its departments, agencies, officials, agents, employees,
contractors, and representatives shall be held out as a party to
any contract entered into by or on behalf of Defendants in carry-
ing out actions pursuant to this Consent Decree.  Neither
Defendants nor any contractor shall be considered an agent of the
State.

17.2.   Defendants waive any and all claims or causes of
action against the State of Michigan and its departments,
agencies, officials, agents, employees, and representatives for
damages, reimbursement, or set-off of any payments made or to be
made to the State that arise from or on account of any contract,
agreement, or arrangement between Defendants and any person for
performance of Response Activities at the Facility or any other
property where Response Activities are performed under this

- 22 -

Consent Decree, including claims on account of construction
delays.

17.3.   Defendants shall indemnify and hold harmless the State
of Michigan and its departments, agencies, officials, agents,
employees, contractors, and representatives for any and all
claims or causes of action for damages or reimbursement from the
State arising from or on account of any contract, agreement, or
arrangement between Defendants and any person for performance of
Response Activities at the Facility or any other property where
Response Activities are performed under this Consent Decree,
including claims on account of construction delays.

17.4.   Prior to commencing Response Activities, Defendants
shall secure, and shall maintain for the duration of this Consent
Decree, comprehensive general liability insurance with limits of
not less than $1 million per claim/$3 million aggregate, combined
single limit, naming the MDNR and the State of Michigan as addi-
tional insureds.   If Defendants demonstrate by evidence satisfac-
tory to the MDNR that any contractor or subcontractor maintains
insurance equivalent to that described above, or insurance cover-
ing the same risks but in a lesser amount, then with respect to
that contractor or subcontractor, Defendants need to provide only
that portion, if any, of the insurance described above that is
not maintained by the contractor or subcontractor.   Regardless of
the method used to insure, Defendants shall provide the MDNR with
certificates evidencing said insurance and the MDNR's and the
State of Michigan's status as additional insureds.   In addition,

- 23 -

for the duration of this Consent Decree, Defendants shall satisfy, all applicable laws and regulations regarding the provision of Workers' Disability Compensation Insurance for all persons performing response action on behalf of Defendants in furtherance of this Consent Decree. Prior to commencement of the Response Activity under this Consent Decree, Defendants shall provide to the MDNR satisfactory proof of such insurance.

XVIII.   MODIFICATIONS/INCORPORATION BY REFERENCE

18.1.  This Consent Decree may only be modified upon the written agreement of the MDNR by signature of the Director and Defendants' authorized representatives.

18.2.  Any submission and attachments to submissions required by this Consent Decree which have been approved by the MDNR are incorporated into this Consent Decree. Any delay or noncompliance with such submissions or attachments to a submission shall be considered delay or noncompliance with the requirements of this Consent Decree and shall subject Defendants to penalties pursuant to Section XXII (Stipulated Penalties).

XIX.   DELAYS IN PERFORMANCE

19.1.  Any delay attributable to a Force Majeure shall not be deemed a violation of Defendants' obligations under this Consent Decree in accordance with this Section.

- 24 -

19.2.  Defendants shall perform the requirements of this Consent Decree within the time limits established herein, unless performance is prevented or delayed by events which constitute a "Force Majeure."  "Force Majeure" is defined, for the purpose of this Consent Decree, as an occurrence or nonoccurrence arising from causes entirely beyond the control of and without the fault of the Defendants.  "Force Majeure" does not include unanticipated or increased costs, changed financial circumstances, commencement of a proceeding in bankruptcy, contractual disputes, or failure to obtain a permit or license as a result of Defendants' actions or omissions.

19.3.  When circumstances occur that Defendants believe constitute a Force Majeure, Defendants shall notify the MDNR by telephone or telefax of the circumstances within twenty-four (24) hours after it first becomes aware of those circumstances. Within five (5) working days after Defendants first become aware of such circumstances, Defendants shall supply the MDNR, in writing, an explanation of the cause(s) of any actual or expected delay, the anticipated duration of the delay, the measures taken, and to be taken, by Defendants to avoid, minimize, or overcome the delay, and the timetable for implementation of such measures. Failure of Defendants to comply with the written notice provision of this subsection shall constitute a waiver of Defendants' right to assert a claim of Force Majeure with respect to the circumstances in question.

19.4.   If the MDNR agrees that a delay is or was caused by Force Majeure, Defendants' delay shall be excused and the MDNR shall provide Defendants such additional time as may be necessary to compensate for the Force Majeure event.  Defendants shall have the burden of demonstrating (i) that the delay is or was caused by a Force Majeure event; and (ii) that the amount of additional time requested is necessary to compensate for that event.

19.5.   An extension of one compliance date based upon a particular Force Majeure incident does not mean that Defendants qualify for an extension of a subsequent compliance date without meeting their burden of proof for each incremental step or other requirement for which an extension is sought.

## XX.   DISPUTE RESOLUTION

20.1.   The dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under this Consent Decree and shall apply to all provisions of this Consent Decree, excluding Section XI (Creation of Danger). Any dispute that arises under this Consent Decree shall in the first instance be the subject of informal negotiations between the Parties.  The period of negotiations shall not exceed ten (10) days from the date of written notice by any party that a dispute has arisen, but it may be extended by agreement between the Parties.  The period for informal negotiations shall end when MDNR provides a written statement setting forth its proposed res-

tion in accordance with and in the manner provided in Section
XXII (Stipulated Penalties), as appropriate.

20.5.   In proceedings on any dispute relating to the
selection, extent, or adequacy of any aspect of the work,
Defendants shall have the burden of demonstrating on the adminis-
trative record that the position of MDNR is arbitrary and capri-
cious or otherwise not in accordance with law.  For purposes of
this subsection, the adequacy of the work includes:  (1) the ade-
quacy or appropriateness of permits, licenses, and plans, and
procedures to implement such permits, licenses, or plans, or any
other item requiring approval by MDNR under this Consent Decree;
and (2) the adequacy of construction and remedial action per-
formed pursuant to this Consent Decree.  In proceedings on any
dispute, Defendants shall bear the burden of persuasion on fac-
tual issues.  Nothing herein shall prevent MDNR from arguing that
the Court should apply the arbitrary and capricious standard of
review to all disputes under this Consent Decree.

## XXI.   REIMBURSEMENT OF COSTS

21.1.  On the entry date of this Consent Decree, Defendants
shall pay MDNR Twenty Three Thousand Two Hundred and 18/100
Dollars ($23,200.18) in reimbursement of response costs incurred
by MDNR from July 1, 1991, through June 30, 1994, for Response
Activities relating to the Facility.  For the purposes of this
Decree, the term "costs incurred" is defined as costs that have

been dispersed or paid out by the State.  It does not include
costs that are due or owed by the State.

21.2.  As soon as possible after each anniversary of the
entry date of this Consent Decree, MDNR will provide Defendants
with a written demand of response costs incurred by the State in
overseeing or verifying the conduct of the Response Activities
concerning the Facility, including, but not limited to,
reviewing, developing, or modifying submissions; split sampling;
undertaking an action to prevent or abate a release, threat, or
endangerment; overseeing field work; entering into a contract
with a contractor to oversee or verify any or all portions of the
Response Activities at the Facility; and enforcing, monitoring
and documenting compliance with this Consent Decree.  Any such
demand will set forth with reasonable specificity the nature of
the costs incurred.

21.3.  All costs recovered pursuant to this Section shall be
deposited in the Environmental Response Fund in accordance with
the provisions of Section 9(3) of MERA, MCL 299.509(3).
Defendants shall have the right to request a full and complete
accounting of all demands hereunder.  Defendants shall reimburse
MDNR for such costs within sixty (60) days of receipt of a writ-
ten demand and  complete accounting, if requested, from MDNR.  In
any challenge by Defendants to a demand for recovery of costs by
MDNR, Defendants shall have the burden of establishing that the
costs were not lawfully incurred, in accordance with Section
12(2)(a) of MERA, MCL 299.612(2)(a), and are inconsistent with

the National Contingency Plan (40 CFR Part 300). All payments
made pursuant to this Consent Decree shall be by check payable to
the "State of Michigan," and shall be sent by first-class mail to
the following address:

> Assistant Attorney General In Charge
> Natural Resources Division
> P.O. Box 30028
> Lansing, MI 48909

The Facility name and Court Docket number shall be identified on
each check. A copy of the transmittal letter and the check shall
be provided simultaneously to the MDNR Project Coordinator.


## XXII.  STIPULATED PENALTIES


22.1.  Except as provided by Sections XIX (Delays in
Performance) and XX (Dispute Resolution), if Defendants fail or
refuse to comply with any term or condition in Sections V
(Implementation), VI (Additional Response Activity), XI (Creation
of Danger), XVI  (Progress Reports), and XXI (Reimbursement of
Costs), Defendants may be required to pay the MDNR stipulated
penalties in the following amounts for each day for every failure
or refusal to comply or conform:

| Period of Delay | Penalty Per Violation Per Day |
|---|---|
| 1st through 15th Day | $   500.00 |
| 15th through 30th | $1,000.00 |
| Beyond 30 Days | $1,500.00 |

22.2.  Except as provided in Section XX and XXI, if
Defendants fail or refuse to comply with any other term or condi-
tion of this Consent Decree, Defendants may be required to pay
the MDNR stipulated penalties of $500.00 a day for each and every
failure or refusal to comply.

22.3.  Defendants shall notify the MDNR, in writing, of any
violation of this Consent Decree no later than five (5) days
after becoming aware of such violation and shall describe the
violation.

22.4.  Stipulated penalties may begin to accrue on the day
performance was due. or other failure or refusal to comply
occurred, and may continue to accrue until the final day of cor-
rection of the noncompliance.  Separate penalties may accrue for
each separate failure or refusal to comply with the terms and
conditions of this Consent Decree.

22.5.  Except as provided in Section XX (Dispute Resolution),
stipulated penalties owed to the MDNR shall be paid no later than
thirty (30) days after receiving a written demand from the MDNR.
Payment shall be made in the manner provided in Paragraph 21.3.
Interest may accrue on the unpaid balance at the end of the
thirty (30) day period at the rate provided for in Section 12(4)
of MERA, MCL 299.612(4).  Failure to pay the stipulated penalties

within thirty (30) days after receipt of a written demand constitutes an independent violation of the terms and conditions of this Consent Decree.

22.6.  Liability for or payment of stipulated penalties are not MDNR's exclusive remedy in the event Defendants violate this Consent Decree.  MDNR reserves the right to pursue any other remedy or remedies that it is entitled to under this Consent Decree or any applicable law for any failure or refusal of Defendants to comply with the requirements of this Consent Decree, including, but not limited to, seeking civil penalties, injunctive relief, specific performance, reimbursement, exemplary damages in the amount of three (3) times the costs incurred by the State of Michigan, and sanctions for contempt of court, provided that the stipulated penalties set forth above shall be credited against any such civil penalties.

### XXIII.    COVENANT NOT TO SUE BY PLAINTIFFS AND RESERVATION OF RIGHTS

23.1.  In consideration of the actions that will be performed and the payments that will be made by Defendants under the terms of the Consent Decree, and except as specifically provided in this Section, Plaintiffs covenant not to sue or to take administrative action against Defendants for Covered Matters.

23.2.  "Covered Matters" shall include any liability to the State of Michigan of the Defendants herein under applicable state

and federal law relating to the Facility (including MERA and CERCLA) for the following:

    (a)  Performance of the agreed upon Work by Defendants under the Consent Decree;

    (b)  Payment of past response costs and future oversight costs incurred by the State as set forth in Paragraphs 21.1 and 21.3 of this Consent Decree;

    (c)  Performance of Response Activities related to releases of Methyl Ethyl Ketone or any of its constituents and breakdown products at or emanating from the Facility.

23.3. The covenant not to sue set forth in this Section does not pertain to any matters other than those expressly specified in "Covered Matters" in Paragraph 23.2. Plaintiffs reserve, and this Consent Decree is without prejudice to, all rights against Defendants with respect to all other matters, including but not limited to, the following:

    (a)  Liability arising from a violation by Defendants of a requirement of this Consent Decree, including conditions of approved submissions required herein;

    (b)  Liability for any Additional Response Activities required at the Facility;

    (c)  Liability for any response costs incurred by the MDNR other than those referred to in Section XXI;

    (d)  Liability arising from the past, present, or future treatment, handling, disposal, release, or threat of release of hazardous substance(s) taken from the Facility;

    (e)  Liability for damages for injury to, destruction of, or loss of natural resources;

    (f)  Liability for criminal acts,

    (g)  Any matters for which the State is owed indemnification under Section XVII (Indemnification) of this Consent Decree; and

- 33 -

(h)  Liability for violations of federal or state law which
occur during or after implementation of the Remedial
Action.

23.4.  With respect to liability for Facility response costs
incurred prior to the effective date of this Consent Decree, this
covenant not to sue shall take effect upon receipt by the MDNR of
the payments required by Paragraph 21.1.  With respect to liabil-
ity for performance of response activities required to be per-
formed under this Consent Decree, and response activity costs
incurred by the State after the effective date of this Consent
Decree and reimbursement of those costs by Defendants pursuant to
Paragraph 21.2 of this Decree, the covenant not to sue shall take
effect upon issuance by MDNR of the Certification of Completion
in accordance with with Section XXVI.  The covenant not to sue is
conditioned upon the complete and satisfactory performance by
Defendants of their obligations under this Consent Decree.  The
covenant not to sue extends only to the Defendants and does not
extend to any other person.

23.5.  Plaintiffs' Pre-Certification of Completion
Reservations: Notwithstanding any other provision of this Consent
Decree, the Plaintiffs reserve, and this Consent Decree is with-
out prejudice to, the right to institute proceedings in this
action or in a new action, or to issue an administrative order
seeking to compel Defendants (1) to perform further response
activities relating to the Facility or (2) to reimburse the State

of Michigan for additional costs of response if, prior to
Certification of Completion of the Remedial Action:

> (a)   Conditions at the Facility, previously unknown to the
>        MDNR, are discovered after the entry of this Consent
>        Decree; or
>
> (b)   New information is received regarding conditions at the
>        Facility after the entry of this Consent Decree;

and these previously unknown conditions or this information

together with any other relevant information indicates that the

Remedial Action is not protective of the public health, safety,

or welfare, or the environment.


23.6.   Plaintiffs' Post-Certification of Completion

Reservations: Notwithstanding any other provision of this Consent

Decree, the Plaintiffs reserve, and this Consent Decree is with-

out prejudice to, the right to institute proceedings in this

action or in a new action, or to issue and administrative order

seeking to compel Defendants (1) to perform further response

activities relating to the Facility or (2) to reimburse the State

of Michigan for additional costs of response if, subsequent to

Certification of Completion of the Remedial Action:

> (a)   Conditions at the Facility, previously unknown to the
>        MDNR, are discovered after the Certification of
>        Completion; or
>
> (b)   New information is received regarding conditions at the
>        Facility  after the Certification of Completion;

and these previously unknown conditions or this information

together with other relevant information indicate that the

Remedial Action is not protective of the public health, safety, or welfare, or the environment.

13.7.  For purposes of Paragraph 13.5, the information previ-ously received by and the conditions known to the MDNR shall include only that information and those conditions set forth in the administrative record supporting the Remedial Action.  For purposes of Paragraph 13.5, the information previously received by and the conditions known to the MDNR shall include only that information and those conditions set forth in the administrative record supporting the Remedial Action, and any information received by MDNR pursuant to the requirements of this Consent Decree prior to Certification of Completion of the Remedial Action.

13.8.  In the event MDNR determines that Defendants have failed to implement any provisions of the Consent Decree in an adequate or timely manner, MDNR may, after ten (10) days written notice to Defendants and an opportunity to confer with the MDNR, perform, or contract to have performed, any and all portions of the Response Activities as MDNR determines necessary and obtain reimbursement for such activities.

13.9.  Notwithstanding any other provision of this Consent Decree, MDNR retains all authority and reserves all rights to take any and all Response Activities authorized by Section XI (Creation of Danger).

- 36 -

XXIV.   COVENANT NOT TO SUE BY DEFENDANTS

24.1.   Defendants hereby covenant not to sue and agree not to assert any claim or cause of action against the State of Michigan with respect to the Facility or response activities relating to the Facility arising from this Consent Decree, including, but not limited to, any direct or indirect claim for reimbursement from the Environmental Response Fund pursuant to Section 10f(5) of MERA, MCL 299.610f(5) or any other provision of law.

24.2.   In any subsequent administrative or judicial proceeding initiated by the Attorney General for injunctive relief, recovery of Response Activity costs, or other appropriate relief relating to the Facility, Defendants agree not to assert, and may not and shall not maintain any defense or claim based upon principles of waiver, res judicata, collateral estoppel, issue preclusion, claim splitting, or other defenses based upon any contention that the claims raised by the MDNR or the Attorney General in the subsequent proceeding were or should have been brought in this case; provided, however, that nothing in this Paragraph affects the enforceability of the covenant not to sue set forth in Section XXIII (Covenant Not to Sue by Plaintiffs and Reservation of Rights) or the Contribution Protection set forth in Section XXV.

XXV.    CONTRIBUTION PROTECTION

25.1.    Pursuant to Section 12c(5) of MERA, MCL 299.612c(5), Section 13 of CERCLA, 42 USC 9613 and any other state or federal law and consistent with Section XXIII (Covenant Not to Sue by Plaintiffs and Reservation of Rights), Defendants shall not be liable for claims for contribution under Section 12 of MERA, MCL 299.612; 42 USC 9607 and 9613; or any other state or federal cause of action regarding matters addressed in this Consent Decree, which include without limitation any past, ongoing or future investigation, remedial, or other response activities and costs due to an actual or threatened release of hazardous sub-stances at or emanating from the Facility. Entry of the Consent Decree does not discharge the liability of any other person(s) liable under Section 12 of MERA, MCL 299.612.  In any action by Defendants for contribution from any person not a party to this Consent Decree, Defendants' cause of action shall be subordinate to the rights of the State of Michigan if the State files an action pursuant to MERA or other applicable federal or state law, in accordance with Section 12c(8) of MERA, MCL 299.612c(8).

XXVI.    CERTIFICATION

26.1.    When Defendants determine that they have completed all the Response Activities required by this Consent Decree, they shall submit to the MDNR a Notification of Completion and a draft final report.  The draft final report shall summarize all response activities performed under this Consent Decree.  The

- 38 -

draft final report shall include or reference any supporting documentation.

26.2.   Upon receipt of the Notification of Completion, the MDNR will review the Notification of Completion, the draft final report, any supporting documentation, and the actual response activities performed pursuant to this Consent Decree.  Within ninety (90) days of receipt of the Notification of Completion, the MDNR will determine whether Defendants have satisfactorily completed all requirements of this Consent Decree, including, but not limited to, completing the Response Activities required by this Consent Decree, complying with all terms and conditions of this Consent Decree, and paying any and all cost reimbursement and stipulated penalties owed to the MDNR.  If the MDNR determines that all requirements have been satisfied, the MDNR will so notify Defendants, and upon receipt of a "Final" final report in accordance with Section XV, shall issue a Certificate of Completion.

## XXVII.   SEPARATE DOCUMENTS

27.1.   This Consent Decree may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

XXVIII.    EFFECTIVE DATE

28.1.    This Consent Decree shall be effective upon the date
that the Court enters this Consent Decree.  All times for per-
formance of activities under this Order shall be calculated from
that date.


IT IS SO AGREED BY:

_____
Gary L. Finkbeiner (P25363)
Assistant Attorney General
Natural Resources Division
530 Allegan Street
8th Floor, Mason Building
Lansing, MI  48909
(517) 383-7540

DATE: _Oct 14 1994_____


IT IS SO AGREED BY:

W. R. GRACE & CO.-CONN.


By:   _____
Its:  _____
Date: _____


IT IS SO AGREED BY:

HOMCO INTERNATIONAL, INC.


By:   _____
Its:  _____
Date: _____


- 40 -

IT IS SO AGREED BY:

NL INDUSTRIES, INC.

By: _____

Its: _____

Date: _____

IT IS SO AGREED BY:

WEATHERFORD U.S., INC.


By: _Hourne Themae_
Its: _Senior Vice President_
Date: _October 3 1994_


IT IS SO AGREED BY:

WEATHERFORD INTERNATIONAL INCORPORATED


By: _Hourne Themae_
Its: _Senior Vice President_
Date: _October 3, 1994_

IT IS SO AGREED BY:

HOMCO INTERNATIONAL, INC.

By: _Frank L. Caso_
Its: _President_
Date: _10/5/94_

IT IS SO AGREED BY:

W. R. GRACE & CO.-CONN.


By: _7P Boer_

Its: _Executive Vice President_

Date: _Oct 9, 1997_

IT IS SO AGREED BY:

NL INDUSTRIES, INC.


By: _____
Its: _____
Date: _____


IT IS SO AGREED BY:

WEATHERFORD U.S., INC.


By: _____
Its: _____
Date: _____


IT IS SO AGREED BY:

WEATHERFORD INTERNATIONAL INCORPORATED


By: _____
Its: _____
Date: _____


IT IS SO ORDERED, ADJUDGED AND DECREED
THIS _____ day of _____, 1994.


_____
Honorable
Circuit Court Judge


ATTEST:  A TRUE COPY


_____
Deputy Court Clerk

rwd/cases/9400066 grace.9-23

- 41 -

Scope of Work (SOW)
Kalkaska Site

The investigative and corrective action process as outlined in this Scope of Work (SOW) provides a guide that will be followed for characterizing the nature and extent of impacted groundwater, for evaluating potential remedial options, for implementing the selected remedial option (treatment system) and operation of all treatment systems. This SOW is a flexible process that must be tailored to specific characteristics and needs as they arise. This SOW provided a continuous process to investigate and remediate impacted groundwater in a time-efficient and cost-effective manner.

The objectives of the SOW are as follows:

1.  Delineate the extent (horizontal and vertical) of the impacted groundwater in a timely and cost-effective manner.

2.  Gather a sufficient amount of data to develop a list (minimum of two) of interim corrective action alternatives to be evaluated for the untreated portion of the plume.

3.  Evaluate the effectiveness and cost of at least two (2) alternatives and to evaluate a "no action" alternative.

4.  Prepare and submit "Corrective Action Plans" as needed, to the MDNR, which recommend and justify a specific corrective action.

5.  Install a treatment system as described in the "Corrective Action Plans".

6.  Operate, maintain, monitor and report to MDNR the effectiveness of all treatment systems.

7.  Prepare and submit to MDNR closure reports after achieving Type B levels for each specific corrective action taken.

Specifically the Scope of Work includes:

1.  <u>Plume Delineation/Investigation</u> - Installation of temporary monitor wells by the Casing Pull Back (CPB) or other MDNR approved method to determine the vertical and horizontal extent of the impacted groundwater. Temporary CPB wells may be installed in the right of way of public roads or on private land if access can be arranged with the property owner. The exact location of each well will be determined in part by the availability of appropriate drilling locations.

1

Scope of Work (SOW)
Kalkaska Site

Groundwater samples will be analyzed by an acceptable laboratory (currently S.O.S. Analytical in Traverse City). Quality assurance will be maintained and will provide for quality control, sampling protocol, chain of custody procedures and quality assurance (duplicates).

Permanent monitor wells will be installed to provide permanent delineation and migration monitoring points along the plume. The well will be installed to delineate the vertical and horizontal extent of the impacted area. It is understood that as the plume migrates additional monitor wells may be required and that original delineation wells may lose their usefulness and no longer require sampling. All wells may lose their usefulness and no longer require sampling. All wells will be installed at agreed upon locations and sampled in accordance with the current MDNR guidelines. Monitor wells will be installed and sampled within 90 days of entry of the Consent Decree.

2.  Delineation/Investigation Report - A plume delineation report will be prepared describing the additional plume delineation effort and results since submittal of the previous delineation report entitled "Interim Report 11, Subsurface Investigation of the TCE Plume Area" and will focus on the area downgradient of the UVB treatment system located at Coral and Norway Streets.

The report will be sufficiently detailed to provide delineation of the TCE plume from the source area to the last documented downgradient point of existence. The report will be prepared upon completion of all delineation efforts and submitted to the MDNR within 60 days thereafter. Comments from the MDNR will be addressed in writing within 30 days. If necessary, the report will be modified or amended to provide sufficient data and information to satisfy MDNR comments or requests.

The report will include the following:

- Outline of work accomplished to date,
- Explanation of any deviations from the work plan,
- Summary of analytical results in table form,
- Laboratory data,
- Discussion of data gaps,
- Boring and well logs,

2

Scope of Work (SOW)
Kalkaska Site

- Site maps with applicable data (surveyed boring locations, well locations and CPB locations with/without analytical results and other appropriate data), and
- Recommendations for further investigations.

3. <u>Corrective Action Plan</u> - A corrective action plan which addresses the untreated portion of the TCE plume, downgradient of the UVB system, will be prepared and submitted to the MDNR for approval. The Plan will evaluate at least two remedial alternatives and make a specific recommendation for an additional treatment system to be installed downgradient of the UVB treatment system at Coral and Norway Streets. <u>Any additional treatment systems shall include additional performance monitoring wells both laterally and downgradient of the new treatment systems.</u> Upon MDNR approval of the Plan and obtaining property access and appropriate permits, HOMCO and Grace will proceed within 60 days with installation of the approved systems.

4. <u>Corrective Action</u> - HOMCO and Grace will continue to operate the Granular Activated Carbon (GAC) treatment system located at 424 East Dresden, the UVB *in-situ* remedial system located at Coral and Norway Streets in Kalkaska, along with an additional system to be installed at the end of the TCE plume. Each system will be operated until chemical analysis of the groundwater indicates that Type B levels of the chemical of concern have been achieved.

During excavation to remove TPH impacted under the machine shop building floor in June 1991, one area could not be excavated further because it was directly beneath the building supporting wall. Samples from borings on the opposite side of the wall showed that TPH impacts did not extend east of the building foundation. The amount of soil above groundwater level is estimated to be 8 to 12 feet below grade, five feet in width and 10 feet in length. Groundwater beneath the area will be treated by the on-site GAC treatment system to Type B levels. HOMCO and Grace will reexamine the area of the impacted soil beneath the building supporting wall to determine closure requirement.

Quarterly Reports of TCE plume monitoring data will be expanded to include appropriate monitor wells along the plume up to the location of the UVB systems at Coral and Norway. The Quarterly Reports will be expanded as needed to include additional plume area and additional treatment systems as required. Quarterly reporting for both the Northwest Plume

3

Scope of Work (SOW)
Kalkaska Site

and the TCE plume will continue until operation of the treatment system or systems is terminated.

The current schedule for conducting quarterly sampling is the third week of January, April, July and October. Quarterly Reports will be submitted to the MDNR within 60 days of receiving analytical data. All comments received from the MDNR will be addressed in writing within 30 days after receipt.

5.  Closure Reports - Upon MDNR approval of closure, the associated system will be shutdown, dismantled and removed, and all associated monitor wells will be plugged and abandoned.

   - After reaching target cleanup levels, the purge wells and all monitoring wells within the defined plume must show target Type A or Type B standards with the system running for six consecutive months. The purge well is to be sampled quarterly for all constituents of concern; the monitoring wells are to be sampled for two quarters (i.e., six months) for all constituents of concern prior to purge well shut down.

   - After purge system shutdown, all wells within the defined plume shall be sampled quarterly for one year for all constituents of concern.

   - Sample results from all wells must show the target levels or below--Type A or Type B--for 12 consecutive months to demonstrate cleanup.

   - Levels exceeding the target levels--Type A or Type B--at any monitoring point during the post closure monitoring triggers purge system start-up.

4