## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re

W.R. Grace & Co., *et al.*,

Debtors.

_____/

Chapter 11

Case No. 01-01139 (KJC)
(Jointly Administered)
Re: Docket Nos.: 32190,
32382 & 32408

## DECLARATION OF SCOTT L. BAENA IN SUPPORT OF REQUEST FOR FEE ENHANCEMENT FOR SERVICES IN CONNECTION WITH FRAUDULENT TRANSFER LITIGATION AGAINST SEALED AIR CORPORATION, CRYOVAC, INC. AND FRESENIUS MEDICAL CARE HOLDINGS

I, Scott L. Baena, declare and state as follows pursuant to 28 U.S.C. § 1746:

1.     I was admitted to The Florida Bar in 1974 and have practiced bankruptcy law since then.  I am admitted to practice before the United States District Courts for the Southern, Middle, and Northern Districts of Florida, the United States Courts of Appeals for the First, Third, Fourth, and Eleventh Circuits, and the Supreme Court of the United States.  I have been a Senior Partner and Chair of the Business Finance & Restructuring Group in the law firm of Bilzin Sumberg Baena Price & Axelrod LLP ("Bilzin Sumberg") since September 2000.

2.     I have personal knowledge of the matters set forth herein and make this declaration in support of the *Fifty-Second Interim and Final Fee Application Request of Bilzin Sumberg Baena Price & Axelrod LLP for Approval and Allowance of Compensation for Services Rendered and Reimbursement of Expenses as Counsel to the Official Committee Of Asbestos Property Damage Claimants and Request for Fee Enhancement for Services in Connection with Fraudulent Transfer Litigation Against Sealed Air Corporation, Cryovac, Inc. and Fresenius Medical Care Holdings* [ECF No. 32190] (the "Application").

3.     On April 2, 2001, each of the Debtors (collectively, "Grace") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  On April 12, 2001, the United

States Trustee formed the Asbestos Property Damage Claimants Committee (the "PD Committee") in the Debtors' bankruptcy cases. In June, 2001, the Bankruptcy Court permitted the PD Committee to retain Bilzin Sumberg *nunc pro tunc* to April 9, 2001, pursuant to 11 U.S.C. §§ 328 and 1103, on a general retainer basis, to represent the PD Committee in these cases. Within Bilzin Sumberg, I have had principal responsibility for the representation of the PD Committee throughout the firm's retention.

4.    In June 2001, the PD Committee, represented by Bilzin Sumberg, and the Asbestos Personal Injury Claimants Committee (the "PI Committee" and, together with the PD Committee, the "Asbestos Committees"), represented by Caplin & Drysdale, filed their Joint Motion for Authority to Prosecute Fraudulent Transfer Claims with the Bankruptcy Court. By the Joint Motion, the PD Committee and the PI Committee sought authority to prosecute fraudulent transfer claims against Sealed Air[1] and Fresenius arising out of the spin-off of certain business segments by Grace in 1996 and 1998 (the "Fraudulent Transfer Claims"). The Asbestos Committees believed this spin-off was engineered by Grace to put those businesses and related assets out of the reach of asbestos claimants.

5.    Grace voraciously opposed this motion, decrying in its brief that the motion was "frivolous" and arguing that the Asbestos Committees were biased and unable to make a truly independent and objective evaluation of the merits of the claims. Grace argued the fraudulent transfer claims were "without merit and that pursuing these claims would be a waste of the estate's assets." The Debtors went so far as to object to any fees or costs being recovered by the Asbestos Committees and their counsel "in their unauthorized evaluation... as well as any fees and costs they incurred in bringing this frivolous motion." As a consequence, I was concerned that the fees we had incurred investigating the Fraudulent Transfer Claims, seeking leave for the

---

[1] Capitalized terms used and not defined herein shall have the meanings set forth in the Application.

Asbestos Committees to prosecute the Fraudulent Transfer Claims and in respect of any related activities might be challenged and go unpaid.

6.      The Unsecured Creditors Committee also filed an opposition, arguing — in unison with the Debtors — that the motion was "premature," and that "[b]efore these estates are burdened with the costs of litigation, a prompt but thorough investigation of the facts and circumstances underlying the transactions at issue should be pursued to determine whether the Fraudulent Transfer claims should be prosecuted at all."

7.      I considered these oppositions to be the result of the mutual concern of the Debtors and the Unsecured Creditors Committee that litigation of the Fraudulent Transfer Claims (the "Fraudulent Transfer Litigation") would establish the validity of pre and post-petition asbestos claims asserted against the Debtors, as well as the resulting conclusion that the Debtors were insolvent based on their liability for such asbestos claims.   Thus, it was clear to me that the Fraudulent Transfer Litigation would be "high stakes" and hard fought and thus would require substantial time, attention and resources to prosecute.

8.      The District Court withdrew the bankruptcy court reference over the Fraudulent Transfer Claims and offered first the Debtors, and then the Unsecured Creditors Committee, the right to bring the Fraudulent Transfer Claims.  Both declined.  The District Court thereupon granted the Asbestos Committees' request that they be permitted to prosecute the claims.

9.      My law firm did not contemplate that it would prosecute the Fraudulent Transfer Litigation.  I welcomed the Asbestos Committees' joint determination to retain special litigation counsel to handle the Fraudulent Transfer Litigation because (a) the limited bankruptcy resources and other professional demands upon Bilzin Sumberg, (b) the fact that Sealed Air and Fresenius had engaged two of the largest law firms in the world to represent them and otherwise had vast

resources with which to wage their defenses, and (c) concern that the Debtors (and conceivably, the Unsecured Creditors Committee) might oppose payment of our fees prosecuting the Fraudulent Transfer Litigation.

10.     To this end, the Asbestos Committees jointly, as well as separately, interviewed numerous law firms with the requisite experience in this sort of litigation and the size and stature to litigate against the law firms chosen by Sealed Air and Fresenius.  I personally participated in such interviews.  We met with numerous law firm candidates in New York City and Dallas in a fairly compressed time span.  Among others, we interviewed Leiff Cabresser, Holland & Knight, McKool Smith, and Cozen & O'Connor.  Each candidate interviewed was asked to describe the fee basis under which it would be willing to undertake this representation.

11.     The Asbestos Committees ultimately selected the pre-eminent trial law firms of Cozen & O'Connor and McKool Smith to jointly prosecute the Fraudulent Transfer Claims. Among the factors considered in the selection were the facts that McKool Smith had commenced pre-petition litigation against Grace for the Fraudulent Transfer Claims, Cozen & O'Connor was regularly involved with fraudulent transfer litigation in the Third Circuit and, the negotiated alternative fee arrangement the firms were willing to accept for this engagement.

12.     The fact that the Asbestos Committees reached agreement on the choice of counsel was itself remarkable. Generally speaking, during the course of decades of asbestos litigation in the United States, distinguished and distinguishable bars of counsel emerged in asbestos property damage and asbestos personal injury litigation against asbestos containing product manufacturers like Grace.  While professionally respectful of one another, suffice it to say, those bars did not always work in tandem.

Case 01-01139-AMC   Doc 32420   Filed 10/07/14   Page 5 of 16

Case 01-01139-AMC   Doc 32420   Filed 10/07/14   Page 5 of 16

13. Thus, it was particularly unfortunate that Cozen & O'Connor developed a conflict that precluded it from accepting the engagement and that a disagreement ensued between the Asbestos Committees as to the retention of McKool Smith as lone counsel in the matter. However, we were gratified that McKool Smith was willing to accept the engagement on a flat 10% contingent fee basis, which clearly was the then best and lowest fee proposal of any of the firms we had interviewed.[2]

14. The dispute was "resolved" by Judge Wolin who determined, in Solomon-like fashion, that Bilzin Sumberg and Caplin & Drysdale would represent the plaintiffs in the Fraudulent Transfer Litigation and that, in view of the historical differences in case positions between the Asbestos Committees, the law firm of Milberg Weiss Bershad Hynes & Lerach LLP ("Milberg") would also represent the Asbestos Committees as plaintiffs in the Fraudulent Transfer Litigation. Judge Wolin directed the Asbestos Committees to file an application for the retention of Milberg. While I understand that Milberg also sought a contingent fee, Judge Wolin, by negotiation, set Milberg's compensation at a blended hourly rate of $475/hour for attorney time and $125/hour for non-attorney time. Moreover, in the face of the Debtors' insistence that prosecution of the Fraudulent Transfer Litigation was doomed to failure and thus, a waste of estate assets, and the District Court's interest in regulating the fees of professionals in a matter pending before it and not the Bankruptcy Court, the District Court's withdrawal of the reference in respect of the Fraudulent Transfer Claims was expanded to also encompass the allowance of

---

[2] Thus, had McKool Smith been engaged to prosecute and obtained the same result in the Fraudulent Transfer Litigation, it would have been entitled to more than $100 million in fees based on a settlement value of approximately $1.6 billion.

MIAMI 4340009.2 73190/14066                    5

fees and costs for all estate counsel serving in the Fraudulent Transfer Litigation, commencing April 2, 2002.[3]

15.    To be clear, Bilzin Sumberg neither solicited this engagement nor proposed to undertake it at its usual hourly rates.  To the contrary, the law firm was enjoined to handle the Fraudulent Transfer Litigation by Judge Wolin.   To the best of my recollection, not a single law firm we interviewed proposed to undertake the Fraudulent Transfer Litigation at their standard hourly rates. Not even Milberg was willing to do so.

16.    Moreover, had I been offered the opportunity to handle this litigation, I would not have accepted if all I was to be paid was my law firm's standard hourly rates.  Indeed, in the very same time period, we were engaged as special bankruptcy litigation counsel, first by the Creditors Committee and then by the Debtor, to prosecute significant fraudulent transfer litigation against the pre-petition lenders in *In re Helig-Meyers Company*, Case Nos. 00-34533 through 00-34538 (Bankr. E.D. Va.).[4]   In that matter, our fees were based on our standard hourly rates, <u>plus</u> a contingent success fee of 10% or 15% depending on the amount of we recovered.  Likewise, in October 2004, the Litigation Trust emanating from the chapter 11 case of *Lernout & Hauspie Speech Products, N.V.*, Case No. 00-4398(JHW) (Bankr. D. Del.), retained Bilzin Sumberg to prosecute estate causes of action on a contingent fee basis that scaled as high as 30% depending on the amount recovered.

17.    While Bilzin Sumberg had neither sought nor anticipated serving as plaintiffs' counsel in the Fraudulent Transfer Litigation, the law firm nonetheless accepted the responsibility reposed in it by the District Court with the requisite enthusiasm that applicable

---

[3]   Ultimately, District Judge Wolin retired from the District Court and his responsibilities in connection with the Debtors' bankruptcy cases were re-assigned to District Judge Buchwalter who subsequently referred the Fraudulent Transfer Litigation and the related authority over counsel fees back to the Bankruptcy Court.

[4]   The seminal issue in that litigation just happened to be whether the debtors were insolvent at the time of the transfers.

rules of professional responsibility dictate.  I was especially pleased when Judge Wolin subsequently wrote, "Anyone experienced with litigation of this scale will appreciate the case management challenge that [a September trial date] represented. *** The Court is pleased to say that counsel rose admirably to the task before it. Their professionalism is only highlighted by the fact that the parties' positions are strongly held and the stakes high."[5]

18.     At the time this matter was first undertaken, I anticipated that the primary issues in the case would involve an analysis of Grace's enterprise value versus its asbestos liabilities (including associated insurance issues).  I also anticipated that all of the relevant Grace documents already had been, or shortly would be, made available in a document depository in Florida, so that discovery disputes would be minimal.  Indeed, we understood from Caplin & Drysdale that in another asbestos bankruptcy case, in which that firm served as counsel to the official asbestos claimants' committee and debtor's counsel was also Kirkland & Ellis, such an indispensable document depository was created without significant incident.

19.     Based upon these understandings concerning the relevant issues and availability of discovery, we were compelled to pursue this still extremely complex litigation on an almost unbelievably compressed time schedule; a schedule that called for a trial on highly sophisticated financial and asbestos liability and asbestos insurance coverage issues involving billions of dollars in just over six months.  Even under the best of circumstances this schedule presented a significant challenge.  Judge Wolin made it abundantly clear that the resolution of the Debtors' bankruptcy cases depended on the outcome of the Fraudulent Transfer Litigation and that he would proceed expeditiously with the litigation.   Even the United States Trustee eventually conceded that "it is likely that a Chapter 11 Plan could not be negotiated and confirmed while the

---

[5] *In re W. R. Grace & Co.*, 285 B.R. 148, 153 (D.Del. 2002).

outcome of [the Fraudulent Transfer Litigation] remained a question mark."[6]    As things developed, however, the case became even more vast, complex and difficult than I originally anticipated — without any relief in the trial schedule.

20.    The first unpredicted twist to occur was that on April 1, 2002, the Debtors actually sought and ultimately were granted leave to intervene in the Fraudulent Transfer Litigation and to align themselves with the defendants!    Not only was it "an out of body experience" to be representing the Debtors' estates while the Debtors themselves opposed the recovery that ultimately permitted them to exit bankruptcy,  Debtors' counsel served as architects of the defense that was mounted and it was nothing less than "scorched earth."    Indeed, Judge Wolin observed that "the debtor as an intervenor-defendant has been vigorously litigating in concert with Sealed Air to defeat" the Fraudulent Transfer Litigation and had "taken the laboring oar on significant parts of this litigation…."[7]

21.    Moreover, the combined intellectual capital and human resources of Kirkland & Ellis, Skadden Arps and McDermott Will, augmented by the support they received from Stroock & Stroock & Lavan, counsel for the Unsecured Creditors Committee, and Kramer Levin Naftalis & Frankel, counsel for the Equity Committee, substantially changed the intensity of the Fraudulent Transfer Litigation and the demands that it imposed on Bilzin Sumberg (which had approximately 65 lawyers resident in a single office in Miami, Florida) and our co-counsel. Bilzin Sumberg was required to expend more human resources on this matter than I originally anticipated, including senior lawyers from other practice groups to augment me and the then-associate who assisted me in this representation.    Attorneys who were deployed by Bilzin Sumberg to the Fraudulent Transfer Litigation, including senior litigation partner Robert Turken,

---

[6] *Id.*
[7] *Id.*

were compelled to put aside virtually everything else they were handling and to devote their full time and attention to the Fraudulent Transfer Litigation.

22.     As for discovery, Grace established a document depository in its former headquarters located in Boca Raton, Florida, a relatively short distance from Bilzin Sumberg's office in Miami, as a result of which Bilzin Sumberg accepted primary responsibility for the review of the enormous number of documents that were maintained in the depository. However, despite the enormity of the documents produced and reviewed, the depository failed to include back-up documents supporting the spin-off transactions at issue and also failed to include any post-spin-off transaction documents. All of this resulted in substantial, unanticipated, and time-consuming motion practice to get the documents that I believed would be available from the beginning. More importantly, given the compressed time frame under which plaintiffs' counsel were operating, it meant a hugely difficult squeeze in preparing for a relatively fixed trial date which plaintiffs' counsel did not wish to postpone — particularly with respect to the post-transaction documents, which were not ordered produced for some time.

23.     The discovery disputes that ensued with Grace and Sealed Air were massive. As Judge Wolin subsequently remarked, the parties' resort to the Special Master he appointed and to him as a result of discovery disputes was "frequent and contentious."[8] For example, at the outset of the litigation, the Debtors and the Unsecured Creditors Committee (which was merely monitoring the litigation from the sidelines) insisted upon a protocol whereby there would be no unnecessary duplication of effort among plaintiffs' counsel. More specifically, to avoid such duplication, Grace and the Unsecured Creditors Committee insisted that each firm be responsible for separate areas of the case, with little or no overlap. Accordingly, and logically, Bilzin

---

[8] *Id.*

Sumberg agreed to take responsibility for the property damage liability portion of the case,[9] Caplin & Drysdale agreed to take responsibility for the personal injury liability portion of the case, and Milberg agreed to take responsibility for all other issues. But, when discovery commenced, Grace insisted upon producing virtually all of its significant personal injury and property damage documents "for attorneys' eyes only," meaning that only Milberg could view them; Bilzin Sumberg was forced to fight tooth and nail to see unredacted copies of the property damage documents.

24. By any standard, the Fraudulent Transfer Litigation was hotly contested. The discovery was extensive and highly adversarial, prompting the need for numerous — almost daily — appearances before a Special Master. Millions of pages of documents were produced and needed to be reviewed; 58 depositions were taken; 17 sets of expert reports were issued including 5 from the plaintiffs, certain of which concerned the extent of asbestos property damage liability and thus, were the responsibility of Bilzin Sumberg.

25. Throughout, the seminal issue remained whether the Debtors were insolvent in 1996 and 1998 when the spin-offs to Sealed Air and Fresenius occurred. That, in turn, depended on the validity and amount of asbestos claims against the Debtors and to what extent post-transfer asbestos claims should be considered in calculating the Debtors' solvency on the dates of the transfers.

26. Existing decisional law was not particularly helpful as it did not deal with unasserted toxic tort claims and it was also not clear which section of the Uniform Fraudulent Transfer Act was applicable or the standard to be applied for proving insolvency under

---

[9] Pursuant to the protocol, the law firms of Speights & Runyan and Dies & Hile, L.L.P. --- two of the premier asbestos property damage law firms in the United States --- were permitted to assist Bilzin Sumberg. In particular, those law firms assisted in the formulation of models for property damage estimation based on anecdotal pre-petition asbestos litigation experience they had with the Debtors and other manufacturers of asbestos containing products.

whichever provision of the Act was applicable.  In the Summer of 2002, the Bilzin Sumberg team became proponents and strategists among plaintiffs' counsel for clarifying the so-called "standards" for determining whether the Debtors were insolvent at the time of or as a result of the transfers to Sealed Air and Fresenius.  This involved both the relevance of post-spin-off asbestos liability information, and the relevance of the "reasonableness" of any belief Grace may have had at the time of the transactions with respect to the future cost of its asbestos liabilities.  The Bilzin Sumberg team undertook initial drafting of a motion to tee up these issues before Judge Wolin.  After multiple rounds of briefing on what became the "signature issue" in the Fraudulent Transfer Litigation, Mr. Turken and Mr. Friedman of Milberg argued the motion before Judge Wolin on July 25, 2002.  On July 29, 2002, Judge Wolin issued his precedent-setting *in limine* opinion on the standards issue — an opinion with nationwide ramifications for virtually every asbestos-related bankruptcy and virtually every asset sale for less than reasonably equivalent value from a company with asbestos liabilities.  Sealed Air thereafter sought permission for an interlocutory appeal pursuant to 28 U.S.C. § 1292(b) — an application that plaintiffs' counsel opposed in two different briefs but that <u>every other constituency</u> in this bankruptcy supported. The District Court denied that application.

27.     Needless to say, Bilzin Sumberg's contributions in the pursuit of the standards issue — an issue that Grace, Sealed Air and others loudly ridiculed and vehemently opposed — lead to what was perhaps the single most significant event in this litigation.  It most definitely appeared to me that the standards opinion issued by the District Court was an enormous impetus for Sealed Air and Fresenius to settle the Fraudulent Transfer Litigation.  After all, immediately

after the Court's issuance of the opinion, the market price of Sealed Air's stock plummeted by 42%.[10]

28.    The Fraudulent Transfer Litigation against Sealed Air was scheduled for trial on September 30, 2002. The District Court announced it would bifurcate the "intent" and "constructive fraud" portions of the cases, with constructive fraud to be litigated and tried first, and granted plaintiffs' counsels' request to stay the Fresenius action pending resolution of the Sealed Air action.  The latter proved to be a huge strategic victory for the Debtors' estates that ultimately paid a $115 million dividend, the settlement payment paid by Fresenius.  As a result of the decision to seek a stay of the Fresenius action, plaintiffs' counsel were able to leverage their result in the much stronger Sealed Air case, and avoid the not insignificant potential that, if litigated, the weaker case against Fresenius might have been dismissed prior to trial.

29.    However, as luck would have it, in September 2002, the Third Circuit issued its opinion in *In re Cybergenics*, 310 F.3d 785 (3d. Cir. 2002) and that spawned yet another side-show over the legal authority of the Asbestos Committees to prosecute the Fraudulent Transfer Litigation on the eve of trial.  The issue resulted in yet more unanticipated research, motion practice and brief and letter writing, including but not limited to applications to the Third Circuit for permission to take interlocutory appeals pursuant to 28 U.S.C. § 1292(b) and applications to expedite, and multiple hearings before the District Court.  As a consequence, the trial date was adjourned indefinitely as the District Court weighed the options.  Throughout the debate, Bilzin Sumberg lawyers were active and effective advocates and ultimately, Bilzin Sumberg parted company with Milberg and Caplin & Drysdale as to how to proceed in the face of the

---

[10]  Conversely, the market price of Sealed Air shares went up 50% upon the announcement of the settlement of the Fraudulent Transfer Litigation.  By the time of the Effective Date of the Debtors' Plan of Reorganization, after giving effect to a 2 for 1 stock split, the market price of the Sealed Air shares was double their price on the date the settlement was reached.

*Cybergenics* decision. Indeed, it was the relief sought in Bilzin Sumberg's motion on behalf of the PD Committee that was granted by the District Court resulting in the case being rescheduled for trial in December 2002, yet another blow to the defendants.

30.     With the standards opinion in hand and a new trial date locked in, I thought it predictable that settlement discussions would ensue. Judge Wolin enlisted Duke University Professor Francis McGovern and New Jersey attorney David Gross to assist with settlement negotiations. The Asbestos Committees were heavily engaged in that on-going process and, as a consequence, I and our colleagues at Caplin & Drysdale were likewise meaningfully involved at the very same time preparations for the December trial were underway. Then, Judge Wolin, with input from the parties — who were continuing their lengthy, difficult, brass knuckles behind-the-scenes negotiations — organized a marathon settlement negotiating session involving both the Fresenius and Sealed Air matters in the Newark Federal Courthouse on the Wednesday before Thanksgiving, November 27, 2002. Lawyers from throughout the country traveled to Newark to be present for this session, and were "asked" by the Court not to leave the Courthouse early notwithstanding the impossibility of rescheduling flights on one of the heaviest travel nights of the year. Negotiations continued until well into the evening, and while many parties stayed late that evening, the undersigned, Mr. Turken and other of our Bilzin Sumberg colleagues were literally the last lawyers to leave the room after settlements were finally reached with both Sealed Air and Fresenius, well after 9 pm that evening.[11] Indeed, I issued the very last settlement demand on behalf of the plaintiffs that was acceded to by Sealed Air and Fresenius.

31.     While there is no question that Bilzin Sumberg was paid its standard hourly rates for its role in the Fraudulent Transfer Litigation, our search for counsel to prosecute the

---

[11] With leave of the District Court, Debtors' counsel left early to return to Chicago, long before the settlements were reached. The Bilzin Sumberg lawyers missed the last flight to Miami that evening but jubilantly returned to their homes just as Thanksgiving dinners were being served.

Fraudulent Transfer Litigation, as well as the terms of the retention of Milberg made it apparent that Bilzin Sumberg's then hourly rates did not measure the market's view of the value of fees chargeable for prosecution of the Fraudulent Transfer Litigation.   Moreover, I believed that the threat existed from the outset that the law firm would go unpaid if we did not successfully conclude the litigation since, from the outset, counsel for the Debtors objected to Bilzin Sumberg being paid for what they characterized as a fool's errand.

32.     From the time Bilzin Sumberg was impressed into service, up until the Settlement Agreements were reached, the District Court offered no assurances — nor could it — that, despite the Debtors' protestations, Bilzin Sumberg's fees, even if reasonable, would in any circumstance, be finally allowed.  However, after the Settlement Agreement was reached, I did raise with Judge Wolin *ex parte* that I wished to address the amount of fees paid to Bilzin Sumberg for its service in the Fraudulent Transfer Litigation.[12]   Judge Wolin indicated his willingness to do so but only after the Debtors' estate actually received the consideration due it under the Settlement Agreement.   Under the Settlement Agreement, the defendants were not obligated to the estate unless they received the benefits of a Section 524(g) injunction.  Thus, I understood Judge Wolin to mean that a plan of reorganization with the requisite injunctive relief for the defendants had to be confirmed and consummated before Judge Wolin would revisit our fees.  Little did I know at the time that it would be more than eleven years until that would occur. Nonetheless, and despite Judge Wolin's retirement from the bench in 2004, I deferred seeking an enhancement of the fees paid to Bilzin Sumberg for its efforts in the Fraudulent Transfer Litigation.

---

[12]  Soon after the Third Circuit appointed Judge Wolin to preside over most (but not all of the then pending asbestos bankruptcy cases, Judge Wolin withdrew the reference over all matters concerning the Debtors' asbestos liabilities and he asked all counsel involved in such matters to consent to the Court conducting *ex parte* communications with any of the other parties and their counsel.  I gave such consent, as did the PD Committee, and I believe that every other party and their counsel who was asked did so as well.

33.    In the course of its service as litigation counsel in connection with the Fraudulent Transfer Litigation, Bilzin Sumberg expended 5,503.2 hours of attorney time and collected approximately $1.7 million in fees.  Our blended hourly <u>attorney</u> rate for such service was $316.24. All we seek is that our blended hourly <u>attorney</u> rate be enhanced so that it is not less than the $475 per hour blended rate that the District Court authorized Milberg to charge in the Fraudulent Transfer Litigation.  Such an enhancement would result in additional fees payable to Bilzin Sumberg for its services in the Fraudulent Transfer Litigation in the amount of approximately $875,000.

34.    By no means does Bilzin Sumberg claim sole or principal credit for the results achieved in the Fraudulent Transfer Litigation.  What we do seek is that plaintiff's counsel's fees are uniformly calculated.  Any other result, in the circumstances, would not be fair or reasonable. As previously stated, this representation was a collaborative effort.  Each of the three law firms serving as plaintiffs' counsel acquitted itself with distinction. Both time and circumstance required that each of plaintiffs' counsel function efficiently and timely and without duplication but that their efforts nonetheless be seamless. Given the results obtained, such efficiency is appropriately rewarded by an enhancement.

35.    Moreover, the results obtained went beyond the stated expectations of every constituency of the Debtors' estates other than the Asbestos Committees.   Indeed, the expectations were so low that all of those constituencies sought to prevent the prosecution of the Fraudulent Transfer Litigation in the first instance.   I do not think there is any basis to contradict my view that the results obtained in the Fraudulent Transfer Litigation were a direct and proximate consequence of the "standards opinion" issued by Judge Wolin or that Bilzin Sumberg was a driving force in formulating and prosecuting the motion resulting in that decision.

36.     To dispel any misapprehensions, as suggested by footnote 3 of the United States Trustee's objection, Bilzin Sumberg's fees in the Fraudulent Transfer Litigation are shown on two different exhibits to our final fee application. First, the fees for the time period prior to the withdrawal of the reference by Judge Wolin on April 2, 2002 are reflected on page 18 of 43 of ECF No. 32190 under the project category "Fraudulent Transfer Litigation." That amount is $396,191.50, representing 1,374.8 hours. Second, the fees for the time period after the withdrawal of the reference by Judge Wolin are reflected on page 21 of 43 of ECF No. 32190 under the project category "Fraudulent Transfer Litigation." That amount is $1,392,044.50, representing 4,651.2 hours.

37.     On a combined basis, the total fees related to the Fraudulent Transfer Litigation were $1,788,236. That amount includes both attorney fees and paraprofessional fees. Bilzin Sumberg expended $1,740,346 of attorney-only fees, over 5,503.2 hours, for a blended rate of $316.24 for attorney-only fees.

FURTHER DECLARANT SAYETH NAUGHT.

28 U.S.C. § 1746 Declaration

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 7, 2014.

_____
Scott L. Baena, Esq.