**EXHIBIT A**

Roger Sullivan

Allan M. McGarvey

John F. Lacey

McGarvey, Heberling, Sullivan & Lacey, P.C.

345 First Avenue East

Kalispell, MT  59901

(406) 752-5566

Attorneys for Plaintiffs


MONTANA NINETEENTH JUDICIAL DISTRICT, LINCOLN COUNTY

| | |
|---|---|
| RALPH HUTTand CARL OSBORN,<br><br>          Plaintiffs,<br><br>v.<br><br>MARYLAND CASUALTY COMPANY,<br>a Maryland Corporation;<br><br>         Defendants. | **CAUSE NO. _____**<br><br><br>**COMPLAINT AND DEMAND<br>FOR JURY TRIAL** |

Come Now Plaintiffs, and for their causes of action against Defendant allege and pray as follows

## PARTIES

1.    Plaintiffs Ralph Hutt and Carl Osborn are residents of Lincoln County, Montana.

2.    Defendant Maryland Casualty Company (herein "Maryland Casualty") is a Maryland corporation with its principal place of business in Maryland.

3.    Venue in this action is proper in Lincoln County, Montana, because Maryland Casualty engaged in tortious conduct within Lincoln County.

## GENERAL ALLEGATIONS

4.    In 1963 W.R. Grace & Co. (Grace) purchased an existing vermiculite mine, mill and related facilities in and near Libby, Montana (the Mine) from the Zonolite Company (Zonolite).    Grace operated the Mine from 1963 until 1990. The vermiculite was intermixed with a highly toxic form of asbestos. The  extraction of vermiculite from the ground and processing of it generated substantial airborne dust containing asbestos, which dust was produced at the mine site, as well as in the town of Libby where expansion, bagging, storage and transport facilities were located.

5.    The Plaintiffs were mine, mill and/or processing workers at the Mine. Dates of work at the mine and mill, including events of injurious exposure during the period 1963-1973 for the Plaintiffs are:

      i.      Ralph Hutt        March 1968 to October 1969

     ii.      Carl Osborne     May 1960 to June 1965

6.    At all times Plaintiffs were ignorant of the nature and extent of the disabling and life threatening risks and injury involved, and would not have continued to work in such an environment if they had known the true facts.

7.     As a result of failure to control dust from the mining, milling, processing, and bagging, the vermiculite workers were exposed to the highly toxic asbestos.

8.     Without knowledge of the nature and extent of the asbestos hazard, Plaintiffs were denied, in the particular circumstances of their exposures, the options of avoiding exposure, demanding protective devices, demanding safer operations, changing jobs, presenting timely claims under the Montana Occupational Disease Act, or protecting their health.

### FIRST CLAIM

**Negligence in provision of industrial hygiene services
v. Maryland Casualty**

9.     Paragraphs 1-8 above are incorporated by this reference.

10.    Maryland Casualty provided professional industrial hygiene services to address the safety of the Mine work site through what were represented to be competent Safety Engineers and professionals from the Engineering Division and the Medical Division of Maryland Casualty, under the supervision of industrial hygienist L.E. Park.

11.    From its first undertaking at the Mine facility, Park and others in the Accident Prevention Department at Maryland Casualty knew that they "had an outstanding pneumoconiosis occupational disease exposure," and "soon learned that there were 30 employees who lacked normal lung function."  December 29, 1964 report of L.E. Park to V.W. Zanone.

12.    Maryland Casualty knew that the 1959 series of chest x-rays on the Mine workers showed a one-third incidence of abnormal chest x-rays.

13.    Maryland Casualty knew that the 1964-1973 annual series of chest x-rays on the Mine workers showed a 25% plus incidence of abnormal chest x-rays.

14.   Maryland Casualty knew that a 1965 study showed 20% incidence of asbestosis in the Mine workers, with a likely incidence of twice that upon thorough testing.

15.   An October 27, 1969 report, attached as Exhibit 1 to this Complaint, from L.E Park of Maryland Casualty Company reported results of worker chest x-rays. It includes handwritten comments specifically identifying Plaintiff Ralph Hutt as one of many workers with radiological evidence of respiratory disease process including "fibrotic changes, Emphysema, or other lung involvement," and who were in need of protection from further exposure to "high dust concentrations."

16.   Maryland Casualty knew or should have known that from 1961 forward, men were dying of asbestos disease, and that each year more became diseased.

17.   Maryland Casualty knew or should have known that there were no showers for workers, no coveralls for workers, and that workers went home covered with asbestos dust, which contaminated the home causing the workers to have 24 hour exposure to toxic asbestos fibers.

18.   As part of its industrial hygiene services, Maryland Casualty's Engineering Division and Medical Division undertook to design a "program for control and prevention" of asbestos dust and disease for the benefit of workers that would address dust control and personal protection from asbestos dust.

19.   In its provision of industrial hygiene services and its undertaking of industrial hygiene measures, Maryland Casualty had a duty of reasonable care to those (including the Plaintiffs and other workers) relying on the fulfilment of safe standards of industrial hygiene, and to those (including the Plaintiffs and other workers) who were in need of disclosure of the nature and degree of the asbestos hazard at the Mine known to Maryland Casualty.

20.   Maryland Casualty was negligent in their design of the industrial hygiene program, and in failing to disclose and disseminate to the workers, the nature and degree of the asbestos hazard Maryland Casualty had acquired and analyzed by its

industrial hygiene professionals.   In connection with the industrial hygiene program, Maryland Casualty was negligent:

(a)    in failing to include sufficient measures for education of workers in the hazards of asbestos exposure;

(b)    in failing to warn workers of the hazards of asbestos exposure;

(c)    in failing to include sufficient measures and standards for dust control through housekeeping, ventilation and exhaust air cleaning;

(d)    in failing to include sufficient measures and standards for maintenance of equipment and premises;

(e)    in failing to include a sufficient medical monitoring program;

(f)    in failing to disclose the nature and degree of the immediate and extreme asbestos hazard known to the professionals at Maryland Casualty;

(g)    in failing to sufficiently test and monitor the effectiveness of dust control at all locations where there was dust;

(h)    in failing to obtain available medical information on the incidence of disease and deaths at the Mine, including from public agencies; and

(i)    in failing to sufficiently study and use the information on dust control and asbestos disease that it did have.

21.    Maryland Casualty undertook to address industrial hygiene concerns including prescription of warnings and worker education of the asbestos hazard for the Mine workers.

22.    Maryland Casualty had a duty of care to the Mine workers to assure that warnings were designed to reasonably inform those at risk:

(a)    of the level of asbestos in the workplace;

(b)    of the hazards of asbestos carried home on workers' clothes;

(c)    of the toxicity of the asbestos and nature and degree of the health hazard and deadly health effects of asbestos inhalation;

(d)    of the hidden nature of the hazard, that its deadly effects operated invisibly and without obvious signs of irritation or harm, and that its latent deadly effects would first manifest many years after what would, to the uneducated layman, be an apparent innocuous exposure to harmless dust; and

(e)    of the means to limit exposure in the workplace and at home, such as changing and washing procedures that kept work clothes out of the home, and training on where, when and what type of respirator devices needed to be worn to keep the worker safe.

23.    As part of its industrial hygiene services and the creation of a program for control and prevention of asbestos disease, Maryland Casualty failed to design and prescribe the necessary warnings.

24.    Maryland Casualty was negligent in their design of the warning and education aspects of the safety program in that it failed:

(a)    to include sufficient measures for education of workers, in the hazards of asbestos exposure;

(b)    to include sufficient measures for apprising the workers of the high levels of asbestos dust at the worksite;

(c)    to include sufficient warnings and measures to apprise workers of consequences of unprotected exposure to asbestos dust at levels regularly encountered in the workplace;

(d)    to include sufficient measures to warn and apprise workers of the dangers of transporting work clothes to their homes; and

(e)    to include warnings and measures to warn workers of the hazards of asbestos exposure in a manner that met industrial hygiene standards for warnings of a hidden and deadly hazard.

25.    Maryland Casualty's representatives with expertise in industrial hygiene inspected the Mine operations.

26.    In so doing, Maryland Casualty had a duty of reasonable care to the Mine workers.

27.    Maryland Casualty was negligent in inspection of the Mine operations, in failing to disclose to workers the nature and degree of the hazard and in failing to act upon known hazardous conditions due to insufficient worker education, insufficient warnings to workers, insufficient dust control (including housekeeping, ventilation, exhaust air cleaning and maintenance), and insufficient medical monitoring.

28.    Plaintiffs worked at the Mine, where they were exposed to and inhaled asbestos.

29.    Workers had no coveralls and no showers at the Mine.  As a result, workers including Plaintiffs went home with asbestos dust on their clothing and in their cars, thereby contaminating their homes with asbestos dust, causing the workers to have 24 hour exposure to toxic asbestos fibers.

30.    At all times each of the Plaintiffs was ignorant of the nature and extent of the life threatening risks and injury involved, and would not have continued to work in such an environment if he had known the true facts.

31.    Without knowledge of the nature and extent of the asbestos hazard at the Mine, each of the Plaintiffs was denied the options of avoiding exposure, demanding protective devices, demanding a safer work environment, changing jobs, and protecting his home.

32.    As a direct and proximate result of Maryland Casualty's negligence in performance of industrial hygiene professional services for the protection of

Plaintiffs (among others), including inadequate warnings, inspections, safety program and disclosure of known hazards, Plaintiffs suffer from asbestos disease, asbestos related bodily injuries and have incurred the damages alleged herein.

## SECOND CLAIM

**Bad Faith Treatment of Workers with Rights to Occupational Disease Benefits (Breach of Fiduciary Duty, Deceit, Bad Faith Negligent Misrepresentation and Constructive Fraud, Malice) v. Maryland Casualty**

33.    Paragraphs 1-32 above are incorporated by this reference.

34.    Beginning upon Grace's acquisition of the Mine in 1963 through at least June 30, 1973, Maryland Casualty provided for the Mine workers, under Policies R-00590, R-00591, R-00592, et. seq., the disability insurance prescribed by Montana's Workers' Compensation and Occupational Disease laws.

35.    Maryland Casualty owed duties with respect to workers' rights to occupational disease benefits under Montana's Occupational Disease Act, including the duties to adjust and pay occupational disease claims for benefits promptly and in good faith, and the duty not to hide or mislead workers about the facts of their exposure to asbestos, the course of latent asbestos disease process, or other facts relating to their entitlement to occupational disease benefits.

36.    Maryland Casualty contracted to provide workers' compensation/occupational disease coverage to employees under statutorily defined "compensation plan No. 2," which required that Maryland Casualty "shall be directly and primarily liable to and will pay directly to the employee" the medical and disability compensation owed under the Montana Occupational Disease Act (herein MODA).

37.    There was a special relationship between Maryland Casualty and the workers that arose out of its contractual and statutory duty to be directly liable for occupational disease benefits. This special relationship arises from (a) inherently unequal positions of control and knowledge over disease-causing asbestos dust problem,

and knowledge of the workers' "disease" and "injurious exposure" within the meaning of MODA; (b) the workers' special vulnerability because of the harm they may suffer to their right to benefits for disability and/or medical expenses; (c) the workers' need to place trust in Maryland Casualty in its communication of asbestos disease hazards, injurious exposures to asbestos, and incidence and likelihood of asbestos-related disease, all known to Maryland Casualty, especially because of the hidden, insidious, and latent nature of asbestos injury; (d) Maryland Casualty's awareness of this vulnerability, need and trust; (e) the workers' loss of their right to pursue their employer for tort liability as the statutory *quid pro quo* for entitlement to benefits under MODA; and (f) the time limitations to which workers were subject for presenting claims for occupational disease benefits following injurious exposure.

38. Because of the above-described special relationship, Maryland Casualty had a fiduciary duty to disclose and not to suppress information necessary to the insured employees' rights as injured workers with injurious exposures and, therefore, their rights to occupational disease benefits for latent disease.

39. This fiduciary duty is further defined and heightened by Maryland Casualty's industrial hygiene control over the design of the safety program and the absence of reasonable warning therein, its conduct of workplace inspections, and its control of information that should be communicated to the workers.

40. This fiduciary duty is further defined and heightened by Maryland Casualty's actual knowledge of a serious dust, health problem, and the occupational disease "claims" problem at the Mine facility, and the effect thereof on the workers' health and their health and disability benefit needs, including the knowledge that Plaintiffs had exhibited signs and/or symptoms of occupational disease, including "fibrotic changes, Emphysema, or other lung involvement" (See Exhibit 1 attached to this Complaint).

41.    From its first undertaking at the Mine facility, Park and others in the Accident Prevention Department at Maryland Casualty knew that they "had an outstanding pneumoconiosis occupational disease exposure," and "soon learned that there were 30 employees who lacked normal lung function."  December 29, 1964 report of L.E. Park to V.W. Zanone.

42.    Maryland Casualty knew that the 1959 series of chest x-rays on the Mine workers showed a one-third incidence of abnormal chest x-rays.

43.    Maryland Casualty knew that the 1964-1973 annual series of chest x-rays on the Mine workers showed a 25% plus incidence of abnormal chest x-rays.

44.    Maryland Casualty knew that a 1965 study showed 20% incidence of asbestosis in the Mine workers, with a likely incidence of twice that upon thorough testing.

45.    Maryland Casualty knew or should have known that from 1961 forward, workers were dying of asbestos disease, and that each year more became diseased.

46.    Maryland Casualty suppressed, and failed to disclose the knowledge of the fact, degree and expected consequences of the asbestos hazard. Its safety program failed to provide for worker education and warnings, and it failed to report to the workers known and ongoing hazardous conditions. Maryland Casualty concealed the expected course of latent disease process in workers. Further, Maryland Casualty knew that workers were being advised that the dust was not dangerous, and that workers were not aware of the extreme asbestos dust concerns raised in reports of periodic inspections by the Montana State Board of Health.

47.    Maryland Casualty knew that the workers would not be alerted to the occupational disease hazard of asbestos or the resulting occupational disease benefit entitlement because (a) the workers were not apprised of the presence of asbestos toxin in the apparently benign workplace dust; (b) the workers were not apprised that asbestos levels at the Mine far exceeded standards of danger for workplace exposure; and (c) asbestos hazard is hidden and insidious, has no irritant or odor signal of health

hazard, has no immediate symptomological manifestation, and has a lengthy period of latency.

48.  Maryland Casualty's non-disclosure and suppression of facts was done in order to hide from the workers the nature and degree of the hazard and the fact that workers had rights to occupational disease benefits for their injurious exposures under MODA which Maryland Casualty would owe a direct duty to pay. With asbestosis experienced at a rate of 41.5% of Mine workers with over 10 years of service, and lung disease at a rate of 92% of Mine workers with 21-25 years of service, Maryland Casualty faced enormous cost of medical and/or disability benefit claims under MODA.

49.  Maryland Casualty's knowledge of, and motive with respect to, the impact of the suppressed facts on occupational disease claims included a November 25, 1967 letter to Maryland Casualty from the attorney it retained to defend the MODA claim of Zonolite worker Lilas D. Welch. (Attached as Exhibit 2.)

50.  Suppressed and undisclosed facts included that "a great many of [Maryland Casualty's] insured's employees suffer from lung abnormalities" (see attached Exhibit 2 at p.5); the fact that asbestos fibers in "the dust in the mill did far exceed what were considered to be allowable concentrations" (see attached Exhibit 2 at p.1); the fact that not only the mill but "the entire yard area may subject workmen to what might be termed to be 'injurious exposure'" under MODA (see attached Exhibit 2 at p.7).

51.  The suppression and nondisclosure of facts was motivated by Maryland Casualty's realization that it had "a severe problem, and that [it] might expect a good many [MODA] claims involving asbestosis" (see attached Exhibit 2 at p.3).

52.  Actions to conceal these facts include the suppression of radiologist studies where revelation of the studies "would reveal the extent and severity of the problem." (see attached Exhibit 2 at p.3).

53. Knowledge of the hidden nature of the facts is reflected in the rationale of, and formed the basis of, a plan to keep Montana State Board of Health reports "out of the hands of the Industrial Accident Board" (see attached Exhibit 2 at p.2), and "avoiding the necessity of exposure of all the more damaging aspects of our own situation" (Exhibit 2 at p.5).

54. Maryland Casualty sought to avoid disclosure to the Montana Industrial Accident Board, the entity charged with addressing compensability of occupational disease claims, the facts of the degree of disease-causing asbestos-laden dust in order to avoid Maryland Casualty's liability on existing claims, the expected "good many claims involving asbestosis" (see attached Exhibit 2 at p.3), as well as the future liability for benefits for workers with latent disease.

55. Plaintiffs' rights to occupational disease medical and disability benefits for their injurious exposure were lost after the expiration of the prescribed period for presentation of a claim for benefits and before they had knowledge that they had sustained injurious exposures to occupational disease qualifying them for benefits under MODA.

56. Maryland Casualty's conduct constituted a breach of its fiduciary duties as a workers' compensation and occupational disease insurer of workers including Plaintiffs.

57. Maryland Casualty's conduct constituted deceit within the meaning of 27-1-712, M.C.A. and Plaintiffs were misled thereby.

58. Maryland Casualty's conduct constituted bad faith and a breach of the duty of good faith and fair dealing.

59. Maryland Casualty's conduct constituted constructive fraud within the meaning of 28-2-406, M.C.A., and negligent misrepresentation.

60.   As a proximate result of Maryland Casualty's breach of duties described above, Plaintiffs lost the opportunity to timely present claims for occupational disease benefits, lost the opportunity to receive payment for asbestos-related medical expenses and disability benefits, and, as a result, sustained and will sustain economic loss of hundreds of thousands of dollars.

61.   Maryland Casualty's conduct described in this count constituted malice such that an assessment of punitive damages sufficient to punish, deter and make example of such malicious conduct is appropriate.

62.   As a direct and proximate result of the acts of Maryland Casualty Company, the Plaintiffs have suffered and will suffer:

   a.    Loss of enjoyment of established course of life;

   b.    Loss of services which can no longer be performed;

   c.    Loss of earnings and/or earning capacity;

   d.    Physical, mental and emotional pain and suffering;

   e.    Medical expenses, rehabilitation expenses and related expenses;

   f.    Loss of insurability for medical coverage; and

   g.    Loss of medical and disability benefits under MODA.

### PRAYER FOR RELIEF

1.    Reasonable damages for lost enjoyment of established course of life, past and future;

2.    Reasonable damages for loss of services which can no longer be performed;

3.    Reasonable damages for physical, mental and emotional pain and suffering, past and future;

4.      Reasonable damages for medical expenses, rehabilitation expenses, and related expenses incurred to date and reasonably certain to be incurred in the future;

5.      Advance payment of past and present medical expenses and special damages not reasonably in dispute;

6.      Reasonable damages for loss of earnings and/or earning capacity;

7.      Reasonable damages for grief and sorrow;

8.      Reasonable damages for loss of medical and disability benefits under MODA;

9.      An assessment of punitive damages in an amount sufficient to punish, deter and make example of Maryland Casualty's malicious conduct;

9.      For costs of suit; and

10.     For such further relief as is just and equitable under the circumstances.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

DATED this _____ day of October, 2014.

McGARVEY, HEBERLING, SULLIVAN
& LACEY, P.C.


By: _____
JOHN F. LACEY
ROGER SULLIVAN
ALLAN M. McGARVEY
Attorneys for Plaintiffs

**Exhibit 1**

Mr. H. G. Gieksy, Coordinator, Engineering Services
Drs. Blazek and Chenoweth

October 27, 1969

Mr. E. D. Lovick, Manager
Zonolite Libby Operation
Division of W. R. Grace & Co
P. O. Box 607
Libby, Montana 59923

Dear Earl:

### Radiological Interpretation of X-Rays - Annual Follow Up

Thank you so much for the copies of these radiological interpretations. It is most encouraging to see that for the most part there have been no changes since the previous x-ray.

I do note that some of the men apparently have not heeded the need for protecting themselves and have shown some changes since the last x-ray examination. There is one man, Mr. Edwin Schnaskenberg, who apparently has a tumor mass which I am sure requires special attention. I would assume that all these men have been advised of their physical examination findings and will therefore be prudent and wear their respirators conscientiously when ever exposed to a dusty atmosphere.

It would be my suggestion that the following men be given a follow up x-ray no longer than six months from the past x-ray examination:

Arthur Bundrock
Frank Hoehn
Norman Hoen
Loren Perry
Ernie Hamilton
Orville Thom

I would also suggest that each one of these men be given specific job study to determine if they are being negligent in wearing respirator protection or if they have unusual exposures to dust.

I note that Gerald Vachen has apparently had heart surgery and should therefore be particularly cautious to protect against overloading his heart in any way. I would therefore assume that

EXHIBIT 1

10047592

October 77, 1

... wears a resp...
... ...
More frequent x-ra)   ... all times when in a dusty atmosphere...
named individuals:    ... and ... ... safely in this operation,
                      are certainly in order for the following

Charles Garrell
Willis D. Fields
Kenneth Frederick
Robert Graham
Max Hardin
Francis Hutt
Donald Hutton
Ronald Johnson
Dean Stletsttoser
Edgar Warner
Harold Wilburn
Ralph Hutt
Louis Leader
Carlos Maynard
Glen Mitchel
Arnold Smith
Earl Lovick
Jim D. Lyle
William Melcher
Duane Monroe
Derwood Preston
Richard Rayone
Lyle Snoke (spelling ... be incorrect)
Bud D. Snyder
Ivan Boyce, Sr.
Albert Urdahl, Sr.
Rex Smith
William Hostetler
Harold Day
George Alford

*[Handwritten note:]* Peter, all of these men have fibrotic changes, Emphysema, or other lung involvement. All can continue safely provided they protect themselves against high dust concentrations. 5,000,000 particle per cubic foot or ... are our criteria for control by respiratory protection.

10047593

John E. Anderson

Walter Baker

Raymond Selangie

Lewis Biszant

Robert Cohenour

Floyd Cole

Thomas Craver

Tom DeShafer

James Gidley

Edmund Hendrickson

Robert Holiday

Donald Johnson

Morris Kair

Fred Koehler

Miguel McNair Sr.

Lloyd Miller

Harvey Noble

Virgil Priest

Harold Shrewsbury

Lionel Van Horn

Perley Vatland

Joyn Vinion

Del Rawdon

Gladys Boggess

It would be my suggestion that the above named have a chest x-ray within six months after the last x-ray and in any special instance where the doctor recommends biotic view to be taken, encourage this additional picture. It is encouraging among the above names to see that there has been no change since the previous x-ray in most instances and it is essential that emphasis be maintained upon the control of dust and the wearing of respiratory protection when dust count in the atmosphere is above 5 million particles per cubic foot of air.

Even with the above list and findings revealed by these studies we should still be encouraged by the progress to date. If I had any one suggestion to offer to the individual, it would be to refrain from smoking cigarettes as well as be habitual in the wearing of respiratory protection while in the dusty environment.

10047594

My sincere        ...es for your continued successes.

Very truly yours,

L. E. Park
Engineering Analyst
Loss Control Dept.

10047595

**EXHIBIT 92a, p.2**

-8-

Many recommendations were presented by the State Board, and it would appear insured gradually attempted to correct the situation. It must however further be considered that it might appear to others that the action taken by insured to correct the situation which was presented, might not to the unbiased observer, appear to have been either extremely effective, or quickly performed.

State Board records reveal that additional recommendations were made in 1959, and at that time actual dust samples in the dry mill had revealed an asbestos content, which, while not extremely severe, was, in the words of the Board report "significant".

In 1962, dust samples revealed a high asbestos content, and the Board's conclusion at that time were that "no progress had been made in reducing dust concentrations in the dry mill to an acceptable level, and that indeed the dust concentrations had been increased substantially....." Further recommendations were made relative to alleviation of the problem.

In 1963, concentrations again were determined to be well in excess of "acceptable levels" and at that time the State Board recommended that "considerable effort should be made immediately to improve the dust control procedures at the plant to reduce dustiness to an acceptable level".

A study of the information furnished by the State Board would therefore make it appear that the asbestos problem has existed certainly since 1956, and generally with increasing severity. It does however now appear that preventive measures have at least commenced having effect, and according to Mr. Lovick, it would seem that considerable strides have been made within the last couple of years.

Nevertheless, as I informed you, I would hesitate to allow in evidence the State Board reports if it is possible to keep them out of the hands of the Industrial Accident Board, and through it, the general public.

While I have not researched the problem, it has even occurred to me that insured's inability to curb the problem at the State Board's recommendations through the years, might be alleged at least to have constituted willful and wanton conduct on its part, with whatever complications that particular charge might carry with it.

> . . . the asbestos problem has existed certainly since 1956, and generally with increasing severity.
>
> Nevertheless, as I informed you, I would hesitate to allow in evidence the State Board reports if it is possible to keep them out of the hands of the Industrial Accident Board, and through it, the general public.

O-32



EXHIBIT

2

-3-

Further, Mr. Lovick, for the first time, thought to advise me of certain studies which have been conducted by a local Radiologist since around 1963 or 1964, which apparently have involved obtaining annual x-rays of all employees for study. The information furnished by Mr. Lovick was to the effect that the Radiologist was convinced that a good many of the employees suffered from lung abnormalities which could be the result of encroaching asbestosis.

**EXHIBIT 92a, Page 3**

This information of course appeared to me to be of extreme importance, and we made arrangements to travel to Whitefish, Montana immediately to interview the Radiologist. The party involved, Dr. William Little, informed me that his studies most certainly did indicate there to be present a great deal of lung abnormalities among the insured's employees far in excess of the percentage one would find in examining the ordinary population, and he did in addition point out that the situation was even more severe, when considering that he was in general examining young, hearty male workmen.

Dr. Little stated that we did indeed have a severe problem, and that we might expect a good many claims involving asbestosis.

He did further indicate however that in his view, the more recent steps taken by the insured to alleviate the problem were having their effect, in that it appeared to him from his most recent studies, that a lesser percentage existed of new or previously non-discovered abnormalities, as well as some decrease in the speed of the progress of the disease in those workers suffering from it throughout the course of his studies.

We might point out that apparently the only persons aware of the studies are the insured's officials, and Dr. Little. I would as for you may well recognize, would much like to avoid having evidence presented by the opposing party which would reveal the extent and severity of the problem with which we are concerned.

> "... The only persons aware of the studies are the insured's officials, and Dr. Little. ... I would much like to avoid having evidence presented ... which would reveal the extent and severity of the problem."

Claimant Neigh had been employed in the warehouse situate in the yard at the mill site since 1956, or from a time three years prior to Montana's adoption of the Industrial Disease Act. In addition, "asbestosis" was not added as a compensable industrial disease until 1965.

**EXHIBIT 92a, Page 5**

At any rate, the problem now presented is that claimant Welsh may well have suffered an injurious exposure as that term may be defined in the Occupational Disease Act, at most every point he was employed, including the warehouse. The fact also now must be considered that a great many of insured's employees suffer from lung abnormalities and a good many of them have probably never been in the mill, which, of course simply means that they are contracting the disease in the yard or in fact at any point where a dust condition may exist.

I had explained to Dr. Oscar Sander, of Milwaukee, Wisconsin, in a recent conference, my own theory of defense concerning exposure at the warehouse, however in reviewing the radiologist's report, and report of Dr. Thomas Power, retained by the Industrial Accident Board to perform a biopsy on claimant Welsh, Dr. Sander felt that Mr. Welsh must have suffered injurious exposure even while employed in the warehouse.

He advised that he did not feel he could assist us in any way at the Hearing, in that all information available to him would indicate that the claim might well be compensable. He has now provided me with his written report in this respect, copy of which I am attaching, and you will notice that he feels claimant must have suffered a considerable exposure not only in the mill in 1949, but also in the warehouse since 1956.

When all of the above developed so rapidly, it occurred to me that discretion might be the better part of valor in the instant case, and that **you might wish to seriously consider a compromise settlement in hopes of, in this manner, avoiding the necessity of exposure of all the more damaging aspects of our own situation at the Hearings**, feeling that when considering the studies made by insured's own radiologist, that the problem of asbestosis among insured's employees might better be met through a continued attempt by the employer to alleviate the dust problem prior to facing either the Industrial Accident Board, or a competent claimant's attorney.

As you are aware of course, this matter has been set down for Hearing in Kalispell on November 29, 1967. I attempted to obtain a stay through counsel representing claimant. He advised however that his own client was becoming so impatient that he simply could not agree to a delay at this time, and accordingly if there is any hope of avoiding a Hearing, it must necessarily involve attempting to obtain some authority and disposing of the matter prior to that date.

> " . . . you might wish to seriously consider a compromise settlement in hopes of, in this manner, avoiding the necessity of exposure of all the more damaging aspects of our own situation at the Hearings . . . "

~7~

It is my feeling that we may attribute our present situation primarily to the fact that it appears that no one has ever quite realized the extent of the problem which exists. Certainly Mr. Lovick, who has been extremely cooperative and helpful, felt that there was not a contamination problem present at any point other than at the dry mill itself, and possibly at the loading and unloading hoppers. Now however, we find that dust from the mill itself may from time to time permeate the entire yard, and of course it may well be argued, and perhaps with some validity due to the incorrectly placed exhaust, that the entire yard area may subject workmen to what might be termed to be "injurious exposure". Mr. Lovick does inform that funds are now available which will allow moving the exhaust, and correcting that particular problem.

I might point out that the Radiologist involved, Dr. Little did mention his amazement at the percentage of workers presenting lung abnormalities at the insured's plant, as compared to a problem such as silicosis at a typical mine. His own explanation was that generally in a mine, the only persons directly exposed are the hard-rock miners themselves, and then only on these occasions when silican dioxide is existent in the ore, and he differentiates that situation from our own where the entire area may from time to time be permeated with injurious dust.

I believe it should be further pointed out that we have no genuine guidelines to assist us in approaching this problem. As I understand from information furnished by Mr. Lovick, the Libby, Montana Vermiculite mine and plant may well be the only one in the world where an identical situation exists, and while the problem of asbestosis has been subject to considerable study, it has generally involved either asbestos miners, or persons working with asbestos in some commercial form. In our case, we are concerned primarily with Tremolite, an extremely short fiber asbestos which cannot be used for commercial purposes, and which accordingly has not figured in previous studies.

As I informed you in our telephone conversation, it may be that I can obtain a favorable decision in the instant case on technicalities alone, however it would appear that it will be necessary to expose the entire situation to the Industrial Accident Board, whose records may well be available to unions and the general public. Most certainly claimant's counsel around the area are going to be well aware of the existence of the problem if all information is placed in evidence.

**EXHIBIT 92a, p.7**

. . . it would appear that it will be necessary to expose the entire situation to the Industrial Accident Board, whose records may well be available to unions and the general public.

---

Attachments
| | |
|---|---|
| D0058.jpg | 1.7 MB |
| D0060.jpg | 621 KB |
| D0064.jpg | 550 KB |
| D0068.jpg | 1.7 MB |
| $0110.pdf | 359 KB |

**Exhibit 2**

November 25, 1967

<u>AIR MAIL</u>

Maryland Casualty Company
1415 East Ankey Street
Portland, Oregon

ATTENTION: John Hopkins

> Re: Your Claim No: 750 C 890
> Insured: W. R. Grace & Co.
> (Zonolite Division)
> Claimant: LILAS D. WELCH
> Policy: R 001598

Dear Mr. Hopkins:

This will confirm our recent telephone conversation concerning the above matter. As I informed you at that time, very recent developments in the case seem to me to require that we re-assess our own position, and as Mr. Robert Conley, of American Adjustment Company, was not available, we contacted you direct, and in accordance with your suggestions, I am forwarding this report to you, with copy to Mr. Conley.

At the time I contacted you, I was conferring with Mr. Earl Lovick, of the insured's Libby, Montana offices, and we had thoroughly reviewed all phases of the case. In addition, we had gone over all material provided by the Montana State Board of Health, and had discussed the entire situation with Mr. Benjamin F. Wake, the State Board's Chief Industrial Hygiene Engineer with the Division of Disease Control.

As we were of course earlier aware through reports furnished insured by the State Board of Health, the original plant inspection conducted in 1956 revealed a dust problem in the dry mill. At that time however, the asbestos content of the dust had not been determined.

Through the years however, the plant inspections did reveal asbestos content, and of course the percentage of such fibers found to exist in the dust in the mill did far exceed what were considered to be allowable concentrations.



EXHIBIT

92a

-2-

Many recommendations were presented by the State Board, and it would appear insured gradually attempted to correct the situation.  It must however further be considered that it might appear to others that the action taken by insured to correct the situation which was presented, might not to the unbiased observer, appear to have been either extremely effective, or quickly performed.

State Board records reveal that additional recommendations were made in 1959, and at that time actual dust samples in the dry mill had revealed an asbestos content, which, while not extremely severe, was, in the words of the Board report "significant".

In 1962, dust samples revealed a high asbestos content, and the Board's conclusions at that time were that "no progress had been made in reducing dust concentrations in the dry mill to an acceptable level, and that indeed the dust concentrations had been increased substantially...." Further recommendations were made relative to alleviation of the problem.

In 1963, concentrations again were determined to be well in excess of "acceptable levels" and at that time the State Board recommended that "considerable effort should be made immediately to improve the dust control procedures at the plant to reduce dustiness to an acceptable level".

A study of the information furnished by the State Board would therefore make it appear that the asbestos problem has existed certainly since 1956, and generally with increasing severity.  It does however now appear that preventive measures have at least commenced having effect, and according to Mr. Lovick, it would seem that considerable strides have been made within the last couple of years.

Nevertheless, as I informed you, I would hesitate to allow in evidence the State Board reports if it is possible to keep them out of the hands of the Industrial Accident Board, and through it, the general public.

While I have not researched the problem, it has even occurred to me that insured's inability to curb the problem at the State Board's recommendations through the years, might be alleged at least to have constituted willful and wanton conduct on its part, with whatever complications that particular charge might carry with it.

-3-

Further, Mr. Lovick, for the first time, thought to advise me of certain studies which have been conducted by a local Radiologist since around 1963 or 1964, which apparently have involved obtaining annual x-rays of all employees for study. The information furnished by Mr. Lovick was to the effect that the Radiologist was convinced that a good many of the employees suffered from lung abnormalities which could be the result of encroaching asbestosis.

This information of course appeared to me to be of extreme importance, and we made arrangements to travel to Whitefish, Montana immediately to interview the Radiologist. The party involved, Dr. William Little, informed me that his studies most certainly did indicate there to be present a great deal of lung abnormalities among the insured's employees, far in excess of the percentage one would find in examining the ordinary population, and he did in addition point out that the situation was even more severe, when considering that he was in general examining young, hearty male work-men.

Dr. Little stated that we did indeed have a severe problem, and that we might expect a good many claims involving asbestosis.

He did further indicate however that in his view, the more recent steps taken by the insured to alleviate the problem were having their effect, in that it appeared to him from his most recent studies, that a lesser percentage existed of new or previously non-discovered abnormalities, as well as some decrease in the speed of the progress of the dis-ease in those workers suffering from it throughout the course of his studies.

We might point out that apparently the only persons aware of the studies are the insured's officials, and Dr. Little. Again, as you may well realize, I would much like to avoid having evidence presented by the opposing party which would reveal the extent and severity of the problem with which we are concerned.

Claimant Welch had been employed in the warehouse situate in the yard at the mill site since 1956, or from a time three years prior to Montana's adoption of the Industrial Disease Act. In addition, "asbestosis" was not added as a compensable industrial disease until 1965.

No dust counts had been obtained in the warehouse or yard area by the State Board, and it appeared that no information with respect to contamination of those areas was available.

I understood that insured's own engineers were never able to find a measurable amount of dust in the yard area, and accordingly it was my thought that our primary defense would rest upon the fact that claimant's last injurious exposure must have been prior to the effective date of the Act, and the inclusion of asbestosis.

As you know however, I have felt that the Industrial Accident Board would require us to provide all available relevant information obtained by the State Board of Health, and while we were willing to admit the existence of asbestos fibers in the dust in the dry mill, it was not felt that tests there conducted were truly relevant to the issues in this case involving employment in the warehouse.

In a letter to me of June 28, 1967, Mr. Robert Swanberg, Chairman of the Industrial Accident Board, had urged a "full disclosure of all pertinent material on this question to avoid controversies that will merely prolong the litigation without materially effecting its outcome", and further discussions with him made it appear that he agreed that a total disclosure of all information in the State Board's hands might well not be justified in the instant case.

Now however, I am informed by Mr. Wake, of the State Board of Health, that while he had limited his own dust counts to the dry mill, he did believe that a problem would exist with respect to the drillers in the mine itself, as well as with respect to truck drivers loading and unloading under and into hoppers. Further, while this information did not appear in any of his reports, he stated that the exhaust at the mill was so placed as to create a dust problem in the yard itself. The warehouse is located in the yard, and accordingly it would now appear that the entire area may be considered to be possibly permeated with concentrations of asbestos fiber in excess of allowable percentages.

Mr. Lovick has now advised that the company did receive a request from union officials to change the mill exhaust around a year ago, and my recollection is that Mr. Wake had made such a recommendation, however apparently on an oral basis.

-5-

At any rate, the problem now presented is that claimant
Welch may well have suffered "an injurious exposure" as
that term may be defined in the Occupational Disease Act,
at most every point he was employed, including the ware-
house.  The fact also now must be considered that a great
many of insured's employees suffer from lung abnormalities
and a good many of them have probably never been in the
mill, which of course simply means that they are contracting
the disease in the yard or in fact at any point where a dust
condition may exist.

I had explained to Dr. Oscar Sander, of Milwaukee, Wisconsin,
in a recent conference, my own theory of defense concerning
exposure at the warehouse, however in reviewing the Patholo-
gist's report, and report of Dr. Thomas Power, retained by
the Industrial Accident Board to perform a biopsy on claim-
ant Welch, Dr. Sander felt that Mr. Welch must have suffered
injurious exposure even while employed in the warehouse.

He advised that he did not feel he could assist us in any
way at the Hearing, in that all information available to
him would indicate that the claim might well be compensable.
He has now provided me with his written report in this
respect, copy of which I am attaching, and you will notice
that he feels claimant must have suffered a considerable
exposure not only in the mill in 1949, but also in the
warehouse since 1956.

When all of the above developed so rapidly, it occurred to
me that discretion might be the better part of valor in the
instant case, and that you might wish to seriously consider
a compromise settlement in hopes of, in this manner, avoiding
the necessity of exposure of all of the more damaging aspects
of our own situation at the Hearings rooms.  It was my
feeling that when considering the studies made by insured's
own Radiologist, that the problem of asbestosis among
insured's employees might better be met through a continued
attempt by the employer to alleviate the dust problem prior
to facing either the Industrial Accident Board, or a
competent claimant's attorney.

As you are aware of course, this matter has been set down
for Hearing in Kalispell on November 29, 1967.  I attempted
to obtain a stay through counsel representing claimant.  He
advised however that his own client was becoming so impatient
that he simply could not agreed to a delay at this time, and
accordingly if there is any hope of avoiding a Hearing, it
must necessarily involve attempting to obtain some authority
and disposing of the matter prior to that date.

-5-

As you explained to me in our telephone conversation of
November 22, 1967, you did not feel we would be in a
position to obtain such authority without this written
report, and I am accordingly forwarding it to you at the
first opportunity.

I may say that it now appears that counsel intends at the
Hearing of November 29, to establish his record through
claimant himself, as well as other employees who may be
expected to testify in general terms as to the dust problem
at the mill, and most probably at other points around the
premises.

In addition, it appears that counsel has subpoenaed insured's
Safety Engineer, who we would assume, is well aware of the
major aspects of our problem, and a good bit of damaging
testimony may get into the record at that time.

On the other hand however, I do not believe counsel intends
to attempt at that time to obtain reports of the State Board
of Health, and in fact, Mr. Swanberg of the Industrial Accident
Board has indicated to me that he may well continue the Hearing,
resetting it in Helena at a later date to pick up this
information.

In this latter regard, I am now convinced that we have a
good argument with respect to the privileged character of
State Board reports, through a provision included in the
Session Laws of 1967 relating to State Board of Health
records and information.

As indicated on previous occasions however, I simply do not
feel when considering the extent of the problem here
presented, that we can afford to antagonize the Industrial
Accident Board by refusing to be at least somewhat candid
in making information available upon which it may make a
reasonable decision.

The question of relevancy now of course presents difficulty,
in that if dust from the mill is being exhausted in the
yard area where the warehouse is situate, the content of
the dust at the dry mill may well be considered to relate
directly to Mr. Welch's condition. Even our own expert,
Dr. Oscar Sander, would be forced to hold to this view,
were he in fact examined.

-7-

It is my feeling that we may attribute our present situation primarily to the fact that it appears that no one has ever quite realized the extent of the problem which exists. Certainly Mr. Lovick, who has been extremely cooperative and helpful, felt that there was not a contamination problem present at any point other than at the dry mill itself, and possibly at the loading and unloading hoppers. Now however, we find that dust from the mill itself may from time to time permeate the entire yard, and of course it may well be argued, and perhaps with some validity due to the incorrectly placed exhaust, that the entire yard area may subject workmen to what might be termed to be "injurious exposure". Mr. Lovick does inform that funds are now available which will allow moving the exhaust, and correcting that particular problem.

I might point out that the Radiologist involved, Dr. Little did mention his amazement at the percentage of workers presenting lung abnormalities at the insured's plant, as compared to a problem such as silicosis at a typical mine. His own explanation was that generally in a mine, the only persons directly exposed are the hard-rock miners themselves, and then only on those occasions when silican dioxide is existent in the ore, and he differentiates that situation from our own where the entire area may from time to time be permeated with injurious dust.

I believe it should be further pointed out that we have no genuine guidelines to assist us in approaching this problem. As I understand from information furnished by Mr. Lovick, the Libby, Montana Vermiculite mine and plant may well be the only one in the world where an identical situation exists, and while the problem of asbestosis has been subject to considerable study, it has generally involved either asbestos miners, or persons working with asbestos in some commercial form. In our case, we are concerned primarily with Tremolite, an extremely short fiber asbestos which cannot be used for commercial purposes, and which accordingly has not figured in previous studies.

As I informed you in our telephone conversation, it may be that I can obtain a favorable decision in the instant case on technicalities alone, however it would appear that it will be necessary to expose the entire situation to the Industrial Accident Board, whose records may well be available to unions and the general public. Most certainly claimant's counsel around the area are going to be well aware of the existence of the problem if all information is placed in evidence.

-8-

Additionally, when considering the most recent develop-
ments, it would appear to me that the Industrial Accident
Board might well ignore technicalities and determine the
instant claim to be compensable, allowing us to test its
decision at the District or Supreme Court level.

At the time I contacted counsel relative to a possible
stay of the proceedings, I informed him that we might be
willing to consider some sort of compromise in order to
avoid the expense of proceeding further. I asked if he
had a figure of his own in mind, and was informed that
he did not, and I am accordingly unable to provide you
with any information to pass along concerning possible
compromise and settlement.

We will of course advise you of all developments as they
occur, and should you wish to discuss the matter further
personally, I would appreciate your contacting me by
telephone. In this regard, I will be in other industrial
accident Hearings on Monday and Tuesday, November 17 and
18, however arrangements for such discussion can be made
through my personal secretary, Mrs. Klehm, should it be
necessary.

I am at this time attaching statement submitted by Dr.
Oscar Sander in the sum of $50.00, and request that draft
in payment be issued and forwarded to this office, in order
that we may personally thank the Doctor for his assistance.

Sincerely,


S. Y. Larrick

SYL/nk

Enclosures:   Dr. Sander's Report
              Dr. Sander's Statement


CC:   Mr. Robert Conley
      American Adjustment Company
      Great Falls, Montana 59401
      (With Enclosures as Listed Above)
      Your File:  1 C 34-016160