1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3   Case No. 01-01139(KJC)

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   W.R. GRACE & CO., ET AL.,

8

9           Reorganized Debtors.

10

11  - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12

13                              United States Bankruptcy Court

14                              824 North Market Street

15                              Wilmington, Delaware

16

17                              October 14, 2014

18                              10:01 AM

19

20

21  B E F O R E :

22  HON KEVIN J. CAREY

23  U.S. BANKRUPTCY JUDGE

24

25  ECR OPERATOR: AL LUGANO

1    HEARING re Amended Debtors' Twenty-Fifty Omnibus Objection

2    to Claims (Substantive and Non-Substantive)[Filed:

3    8/26/08](Docket No. 19378)

4

5    HEARING re Reorganized Debtors' Objection to the Remaining

6    Claims for the Internal Revenue Service (Substantive)[Filed:

7    4/22/14](Docket No. 32036)

8

9    HEARING re Motion of PricewaterhouseCoopers LLP, Auditors

10   and Tax Consultants for Debtors, to allow Amendment of Its

11   Final Application for Allowance of Compensation and

12   Reimbursement of Expenses for the Period January 10, 2002

13   Through February 3, 2014 to Be Deemed Timely Filed [Filed:

14   8/25/14](Docket No. 32386)

15

16   HEARING re Motion for Final Decree: (A) Closing Certain of

17   the Chapter 11 Cases; (B) Removing Such Cases From the Joint

18   Administration Order; and (C) Waiving the Requirements to

19   File a Final Report for Such Cases [Filed: 9/16/14](Docket

20   No. 32401)

21

22   HEARING re Final Fee Application of Counsel to the Debtors,

23   the Statutory Committees, and the Future Claimants'

24   Representative for Compensation for Service Rendered and

25   Reimbursement of Expenses

1   HEARING re Fifty-Second Interim and Final Fee Application

2   Request of Bilzin Sumberg Baena Price & Axelrod LLP for

3   Approval and Allowance of Compensation for Services Rendered

4   and Reimbursement of Expenses as Counsel to the Official

5   Committee of Asbestos Property Damages Claimants for the

6   Period of April 9, 2001 Through February 3, 2014 and Request

7   for Fee Enhancement for Services in Connection with

8   Fraudulent Transfer Litigation Against Sealed Air

9   Corporation, Cryovac, Inc. and Fesenius Medical Care

10  Holdings[Filed: 5/12/14](Docket No. 32190)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Dawn South

1    A P P E A R A N C E S :

2    PACHULSKI STANG ZIEHL & JONES LLP

3         Attorney for the Reorganized Debtors

4         919 N. Market Street

5         17th Floor

6         Wilmington, DE 19899

7

8    BY:  JAMES E. O'NEILL, ESQ.

9

10   THE LAW OFFICES OF ROGER HIGGINS, LLC

11        Attorney for the Reorganized Debtors

12        1 North Bishop Street

13        Suite 14

14        Chicago, IL 60607

15

16   BY:  ROGER J. HIGGINS, ESQ.

17

18   BILZIN SUMBERG

19        Attorneys for Bilzin Sumberg

20        1450 Brickell Avenue

21        23rd Floor

22        Miami, FL 33131

23

24   BY:  SCOTT L. BAENA, ESQ.

25        JAY M. SAKALO, ESQ.

```
                                              Page 5
 1   SAUL EWING
 2        Attorney for the Equity Committee
 3        222 Delaware Avenue
 4        Suite 1200
 5        Wilmington, DE 19801
 6
 7   BY:  TERESA K.D. CURRIER, ESQ.
 8
 9   SMITH KATZENSTEIN & JENKINS LLP
10        Attorney for PricewaterhouseCoopers
11        800 Delaware Avenue
12        Suite 1000
13        P.O. Box 410
14        Wilmington, DE 19899
15
16   BY:  CLARISSA R. CHENOWETH, ESQ.
17
18   FERRY, JOSEPH & PEARCE, P.A.
19        Attorney for FJP
20        824 Market Street
21        Suite 1000
22        P.O. Box 1351
23        Wilmington, DE 19899
24
25   BY:  LISA L. COGGINS, ESQ.
```

1    BUCHANAN INGERSOLL & ROONEY PC

2         1105 N. Market Street

3         Suite 1900

4         Wilmington, DE 19801

5

6    BY:  MARY F. CALOWAY, ESQ.

7

8    UNITED STATES DEPARTMENT OF JUSTICE

9         Attorney for the U.S. Trustee

10        844 King Street

11        Suite 2207

12        Wilmington, DE 19801

13

14   BY:  RICHARD L. SCHEPACARTER, ESQ.

15

16   ALSO PRESENT:

17   MARK T. HERFORD, ESQ.

18   ADAM PAUL, ESQ.

19   RICHARD FINK

20

21   ALSO PRESENT TELEPHONICALLY:

22   WARREN H. SMITH, ESQ.

23

24

25

1                    P R O C E E D I N G S

2            THE CLERK:  All rise.  Be seated, please.

3            THE COURT:  Good morning, all.

4            MR. O'NEILL:  Good morning, Your Honor.  James

5    O'Neill, Pachulski tang Ziehl & Jones appearing today on

6    behalf of the reorganized debtors, with my co-counsel, Roger

7    Higgins, and also Adam Paul who's in the courtroom, Your

8    Honor, from the Kirkland firm.  I

9             also wanted to note that our client, Richard

10   Fink, who's vice president and associate general counsel is

11   also joining us today in the courtroom.

12            Your Honor, thank you very much for hearing us

13   today.  Today is the final fee hearing, and we also have an

14   administrative matter and then a contested matter.

15            My proposal for handling the agenda would be to do

16   the uncontested final fee applications and a related motion

17   first, and then hopefully we could excuse the parties who

18   are appearing telephonically or in person just for the

19   uncontested fee applications, and then we'll move to the

20   balance of the agenda.

21            THE COURT:  All right, thank you.  Let me ask you

22   to pause for a moment, Mr. O'Neill.

23            I hear sounds coming from the telephone

24   connection.  Let me remind all participants please to keep

25   their phones on mute until it's time for them to be heard.

1    Thank you.

2              You may proceed.

3              MR. O'NEILL:  Thank you, Your Honor.

4              Just for purposes of the record, Your Honor, item

5    number 1 and 2 on our agenda are continued to our next

6    hearing date.

7              Moving to the uncontested fee applications, Your

8    Honor.  As a preliminary matter I will note on agenda

9    number 3, PricewaterhouseCoopers, who served as a auditors

10   and tax accountants for the debtors, filed a motion to amend

11   their final fee application.  There were no objections filed

12   to that.  And PricewaterhouseCoopers filed a certificate of

13   no objection.  There have been no objections filed on the

14   docket or ways that I'm aware of, Your Honor.  I'm not sure

15   whether the Court has had an opportunity to review that

16   order yet.

17             THE COURT:  I have, and I signed it yesterday.

18             MR. O'NEILL:  Thank you very much, Your Honor.

19             Moving then to item number 5 on the agenda, which

20   is the uncontested final fee applications.  Your Honor,

21   these fee applications include the last quarterly fee appeal

22   and the final fee applications for the entire case.

23             Your Honor, in this case Warren Smith has been

24   appointed the fee auditor and has served as fee auditor

25   throughout.  Mr. Smith and his colleagues have reviewed the

1    final fee applications and submitted reports with respect to

2    each of the final fee applications, and it is my

3    understanding that with respect to the final fee

4    applications, which are before Your Honor on this particular

5    matter, all professionals have agreed to accept the

6    recommendation of the fee auditor, and the fee auditor has

7    prepared a schedule, which we have incorporated into a final

8    form of order.

9             We did file the form of order under certification

10   of counsel yesterday, Your Honor, but we received one

11   correction and then a change, and so I have a slightly

12   revised schedule.

13            I will note that the change that we made relates

14   to the members of the property damage committee expenses.

15   There were certain expenses which the fee auditor had

16   questioned, and the property damage committee members have

17   not had an opportunity to fully respond.

18            So with respect to the property damage committee

19   expenses that application is going to be adjourned to the

20   next hearing date to provide additional time for the

21   committee to review the expenses and speak with the fee

22   auditor.  And the fee auditor was okay with that as were the

23   reorganized debtors, Your Honor.

24            Your Honor, I do have a revised schedule and a

25   proposed form of final order approving the fifty-second

1    interim fee applications and the final fee applications, and

2    I'm happy to approach with that order.

3              THE COURT:  If you would.  Thank you.

4              Let me ask for the record does anyone wish to be

5    heard in connection with the fee applications?  I don't have

6    any questions.  I hear no response.

7              This is Judge Carey, I still hear a noise coming

8    from the telephone connection.  If I hear anymore I'll

9    direct the CourtCall operator to terminate that line.  This

10   is your last warning.

11             That order has been signed.

12             MR. O'NEILL:  Thank you very much, Your Honor.

13             I would like to step back for a moment then to an

14   administrative matter at agenda matter number 4, which is

15   the motion for entry of final decree closing certain of the

16   Chapter 11 cases, removing such cases from the joint

17   administration order, and waiving requirements to file final

18   or the for such cases.

19             THE COURT:  I'm sorry, Mr. O'Neill.  Is the

20   CourtCall operator on the line.

21             OPERATOR:  Yes, Your Honor, this is the CourtCall

22   operator.

23             THE COURT:  Can you identify the line that the

24   noise is coming from?

25             OPERATOR:  Yes, we have had -- we have had

1    multiple lines that have been having noise from them.  One

2    of them was Robert Murphy's line, and then one of them was

3    Mr. Kaplan line, which has just disconnected.

4              THE COURT:  What was the most recent static off

5    them?

6              OPERATOR:  The most recently one was John Kaplan's

7    line, which has since disconnected, Your Honor.

8              THE COURT:  Thank you.

9              OPERATOR:  You're welcome.

10             THE COURT:  Let's try again, Mr. O'Neill.

11             MR. O'NEILL:  Okay, Your Honor.  Thank you.

12             Moving to item number 4 on the agenda is the

13   motion for entry of final decree closing certain of the

14   Chapter 11 cases.

15             Your Honor, as we have progressed through the case

16   we have filed motions to enter final decree closing certain

17   of the cases.  This is -- the current pending motion would

18   allow us to close all but two of the cases.  The two

19   remaining cases would be W. R. Grace & Co. and W. R. Grace &

20   Co.-Conn.  Those are 01-01139 and 01-01140.  Those two cases

21   would remain open.

22             Your Honor, we filed the motion seeking authority

23   to close these cases and received comments from a creditor

24   and also from the Office of the United States Trustee.

25             Your Honor, the creditor was SGH Enterprises,

1    Inc., formally known as Samson Hydrocarbons Company, and we

2    have revised the order pursuant to their request so that

3    certain open claims held by that creditor were transferred

4    to the Grace Conn case, and that -- those changes are

5    reflected in the order.

6            We also received comments from the United States

7    Trustee, and we appreciate their cooperation in working with

8    us on the final reporting for the cases, and we've

9    accordingly entered certain language in the order which will

10   allow us to file the post-confirmation reports current as of

11   today's date.  And we did file a certification of counsel

12   reflecting those changes.

13           There have been no changes since we filed the

14   certification of counsel, but I have a copy of the order

15   here that I'm happy to hand up.

16           THE COURT:  The order was signed yesterday.

17           MR. O'NEILL:  Very good, Your Honor.  Thank you

18   very much.  We certainly appreciate that.

19           Moving then, Your Honor, to the only item

20   remaining on the agenda for today, this is the fifty-second

21   and final fee application request of the Bilzin Sumberg

22   Baena Price & Axelrod case.  This firm served as counsel for

23   the official committee of asbestos property damage claimants

24   during the case.

25           I will note just as a preliminary matter that in

1    the final fee order, which the Court just approved, all of

2    the uncontested fees of the Bilzin firm were approved.  The

3    only element which is contested is the request for a fee

4    enhancement, and that's as we have noted in our agenda.

5              And with that, Your Honor, I'll turn it over to

6    the Bilzin firm to make their presentation.

7              THE COURT:  Thank you.

8              MR. O'NEILL:  Thank you.

9              MR. SMITH:  Your Honor, excuse me, this is Warren

10   Smith, the auditor.

11             THE COURT:  Good morning.

12             MR. SMITH:  Your Honor, we had filed a final

13   report regarding the fifty-second interim and final fee

14   application of Bilzin Sumberg, but we took no position, Your

15   Honor, regarding the fee enhancement issue.

16             THE COURT:  I saw that.

17             MR. SMITH:  In light of that, Your Honor -- in

18   light of that I was wondering if Your Honor would mind if we

19   dropped off the line.

20             THE COURT:  You're free to do so, Mr. Smith, and

21   anyone else who's on the line who is no longer interested in

22   what remains today on the agenda is free to be excused as

23   well.

24             MR. O'NEILL:  Thank you for that, Your Honor.  I

25   did --

1          MR. SMITH:  Thank you, Your Honor.

2          MR. O'NEILL:  -- I neglected to ask for that, but

3    I do appreciate it.  There were a number of parties who were

4    appearing just today for the uncontested portion, so we do

5    appreciate them being excused at this time.

6          THE COURT:  All right.

7          MR. BAENA:  May it please the Court.  Good

8    morning, Your Honor, my name is Scott Baena, I am with the

9    law firm of Bilzin Sumberg Baena Price & Axelrod.  I'm here

10   today with my partner, Mr. Jay Sakalo.  And as counsel

11   indicated we have represented the official committee of

12   asbestos property damage claimants since April of 2001 in

13   the W. R. Grace matter.

14         THE COURT:  Okay.  Mr. Baena, just a couple things

15   preliminarily.

16         One, I want you and the others to know I did read

17   the written submissions, and I'll simply say to all sides

18   that use of hyperbole will not enhance your chances of

19   getting an enhancement.  So let's keep the discussion on

20   that level.  But I have a couple preliminary questions.

21         MR. BAENA:  Yes, sir.

22         THE COURT:  Are fee enhancements permitted in this

23   circuit?

24         MR. BAENA:  Your Honor, there is no circuit law

25   that I'm aware of that either permits it or doesn't permit

1    it.

2              THE COURT:  Okay.  Am I applying in connection

3    with the determination on the relief that you've requested a

4    standard under Section 328 or 330 of the Bankruptcy Code?

5              MR. BAENA:  It would be 330.  And if I could be

6    more specific, Your Honor?

7              THE COURT:  Certainly.

8              MR. BAENA:  I believe that more recent case law

9    views the analysis as being one that is informed by both

10   330(a) as well as the Johnson factors.  And --

11             THE COURT:  All right.  You may proceed.

12             MR. BAENA:  Thank you, Your Honor.

13             Just preliminarily, Your Honor, for the record our

14   application is found within -- our application for an

15   enhancement is found within our fee application at docket

16   32190.  Objections to our application were filed by both the

17   debtor -- or the reorganized debtor I should say -- at

18   docket 32382, and by the U.S. Trustee at docket numbers

19   32408 and 32409.  In an attempt at efficiency we also filed

20   my declaration at docket number 32420.  I say it in an

21   effort of efficiency, it would be my proffer of testimony in

22   this regard.

23             THE COURT:  It parallels with the motion alleges.

24             MR. BAENA:  It does.  Yes, Your Honor.

25             Assuredly, Your Honor, I do appreciate that the

1    enhancements are the exception and not the norm.  After 40

2    years of bankruptcy practice I can honestly say I've only

3    been involved in fee enhancements twice on my own behalf.

4    This being the second.  So I do indeed approach this

5    advisedly, but nonetheless with the conviction that

6    enhancement is warranted and entirely consistent with

7    decision of law, particularly recent decision of law in this

8    particular instance, given the extreme circumstances under

9    which our law firm was enjoined to represent the estate in

10   the Sealed Air fraudulent transfer litigation based upon the

11   exceptional results that were achieved in the face of

12   daunting opposition.  And as a -- and those results were in

13   large part a direct result of the substantial contribution

14   that our firm made.

15          We seek an enhancement as well with all due

16   deference to our co-counsel in the Sealed Air litigation.

17   And let me pause to make sure the Court understands, we are

18   not seeking some holistic form of a fee enhancement for all

19   of our services in this case.  These -- this request is

20   strictly limited to the services that we provided in respect

21   to the foregoing transfer litigation against Sealed Air and

22   Fresenius back in 2002.

23          We were one of three law firms that were engaged

24   by the district court, Judge Roland was then presiding, to

25   handle that litigation.

1           And in fact all we're seeking here, Your Honor, is

2      to be afforded the same treatment, if you will, that was

3      afforded to our co-counsel in that matter, Milberg Weiss.

4           THE COURT:  But it's true, is it not, that you

5      knew the economic terms of your engagement at the outset?

6           MR. BAENA:  Your Honor, the reality is we

7      certainly understood that we were engaged by the asbestos

8      property damage claimants committee at a standard hourly

9      rate, and we had been continuously paid on that basic,

10     subject to revisions to those rates that occurred

11     periodically throughout the case.

12          We came to the fraudulent transfer litigation in a

13     very, very different way though.  We actually --

14          THE COURT:  But you knew at the time at which you

15     were authorized to pursue the litigation what the economic

16     terms of your engagement were to be in connection with that

17     litigation did you not?

18          MR. BAENA:  I cannot concede that, Your Honor.  We

19     actually were before Judge Roland on a joint motion between

20     the asbestos property damage committee and the asbestos

21     personal injury claimants committee in an effort to engage

22     special counsel to litigate the matter.

23          We had done an extensive search for counsel that

24     was both experienced in litigation and this sort of

25     litigation, and we intervened --

1           THE COURT:  Mr. Baena, I'm going to continue to

2    press you.  I read the papers, I knew what happened, you won

3    the lottery unexpectedly, you can consider that good or bad,

4    but you did.

5           But at the time when you began to pursue once you

6    got permission to pursue the actions over the vociferous

7    objection of the debtors and others, you knew what the

8    economic terms of your engagement were did you not?

9           MR. BAENA:  Your Honor, we understood at that

10   moment that our standard hourly rate what was we would be

11   billing.

12          THE COURT:  Okay.  Thank you.

13          MR. BAENA:  Yes.

14          THE COURT:  I knew I could get you there

15   eventually.

16          MR. BAENA:  And I'm not trying to be evasive,

17   Judge.

18          THE COURT:  All right.

19          MR. BAENA:  I will tell you though in absolute

20   candor with the Court, that the issue of our fees as opposed

21   to the fees of proposed counsel or the fees of counsel

22   selected by the judge in the latter, Milberg Weiss, were

23   indeed discussed subject to objections and fully vetted.

24          Our fees and the fees of Caplin & Drysdale, the

25   counsel for the personal injury committee, were, I presume,

```
1    assumed to be our standard hourly rates, but they were not

2    actively discussed.

3              We (indiscernible - 10:21:48) of course, Your

4    Honor, when we were enjoined to handle this litigation.  I

5    don't -- didn't regard to that at that point in time as

6    winning the lottery.  We had a small law firm, we were up

7    against a host of law firms, including Skadden, Arps, the --

8              THE COURT:  You know when I was in practice I

9    enjoyed that kind of challenge myself.

10             MR. BAENA:  Well, I suppose it opened -- it became

11   enjoyable, Your Honor, but it did -- it did bring on great

12   hardship to our law firm at that point.

13             THE COURT:  So let me -- let me ask this.  The

14   parties have cited lots of law which offers a menu of

15   factors which the Court can or should or may consider in

16   connection with such a request, but one of the factors -- I

17   think the U.S. Trustee brought it up in her objection -- was

18   -- and I didn't see anything in the motion or in your

19   declaration about this -- and that is, were there other

20   representations that you were forced to turn down as a

21   result of the -- my words, not yours -- but overwhelming

22   strain that it put on your firm's resources to pursue this

23   litigation?

24             MR. BAENA:  Your Honor, and again, I hope that my

25   -- neither my affidavit nor what I'm about to tell you is
```

1    deemed to be evasive.

2            We were forced to devote all of our time and

3    attention to this litigation.  We were forced to redeploy

4    senior people in our firm, litigation people, and they were

5    compelled to work on this exclusively.  We had 5,000 hours

6    expended in a period of 7 months on this matter.  For a law

7    firm of 60 lawyers that's an incredible amount of time and

8    energy.

9            Can I point Your Honor to a single case that

10    walked in the door that we turned away as a result of this?

11    No, I cannot, Your Honor.  But I can tell you we weren't

12    soliciting that work either.  And in a small law firm that's

13    what you do.  And we did not, because we could not undertake

14    that.

15            Indeed I refer in my affidavit to two other

16    matters that we were engaged to handle during the same time

17    period and we had to delay getting revved up for one of

18    those matters as a result of the fact that the team that had

19    been assign to do that matter was now being redeployed to

20    this matter.

21            So in honesty, Judge, I cannot say to you we lost

22    the representation of Mrs. Jones, but I can tell you we were

23    unable to solicit Mrs. Jones for that work.

24            THE COURT:  At presumably a higher hourly rate.

25            MR. BAENA:  At -- Judge, no.

1           THE COURT:  Because you see for me the dynamic is

2     if you turn down work that you could have billed more for at

3     a higher rate then -- then maybe you've got a little bit of

4     my ear any way, but again, it's not a criticism, and I

5     appreciate your candor, but that doesn't seem to be the case

6     here.

7           MR. BAENA:  Well, Judge, we --

8           THE COURT:  You have a law firm that fully

9     occupied -- and by the way these days I don't hear a lot of

10     that.

11           MR. BAENA:  Well a lot of years later, you're

12     right.

13           THE COURT:  Yeah.

14           MR. BAENA:  But back then it was the salad days,

15     Your Honor, and we were all very busy.

16           THE COURT:  Yeah, and you know, generally law

17     firms see that as a good thing if they're being paid their

18     standard rates.  So what's the beef here?

19           MR. BAENA:  Well the beef is that we wouldn't have

20     undertaken this on just our standard hourly rate if we were

21     amongst those firms that were soliciting this work as

22     perfected counsel.  Nobody that we interviewed was going to

23     undertake this litigation on a standard hourly basis.  No

24     one.  Indeed at the last moment there was retreating with

25     the law firm that was selected, and it came down on its rate

1    from a substantially higher rate, which also had an hourly

2    component as well as a contingent fee component.  And our

3    view was that that was the same way we were doing.  The two

4    other cases that I was engaged in during that same period of

5    time, the one that we had to delay and the one that came

6    subsequent to the conclusion of this case, those were also

7    engagements that were not on our standard hourly rate basis.

8              THE COURT:  Okay.

9              MR. BAENA:  Now they were the same sort of

10   litigations.

11             THE COURT:  So let me ask this.  Understanding,

12   without having been there, but just assuming for a moment in

13   the chaos of what to do in pursuit of litigation and who

14   should pursue it, if you had it to do over again at that

15   point would you have stuck up your hand and said, you know,

16   judge, thank you for the privilege of ordering us to take --

17   undertake this litigation, but can we talk about our hourly

18   rate?  If you had it to do over again do I think that might

19   have been a good thing to do?

20             MR. BAENA:  If I had Mulligan again, Judge, I

21   would like to think I would have -- I would go back and do

22   it better.  But, Judge, as we sit here and now --

23             THE COURT:  In the calm environment of Delaware

24   bankruptcy court.

25             MR. BAENA:  -- in the calm of all this --

1              THE COURT:  Yes.

2              MR. BAENA:  -- I can assure you it wasn't that

3      way.

4              I grew to have tremendous represent for Judge

5      Roland as a result of this matter.  I had never appeared

6      before him before, didn't know anything about him before.

7      Judge Roland had his own (indiscernible - 10:27:21) but a

8      very effective way of managing matters in front of him.  He

9      was not a bankruptcy specialist before or during his term on

10     the bench, so this was --

11             THE COURT:  Although the Supreme Court in Stern

12     has said the Article 3 court is -- are experts in

13     everything, so.

14         (Laughter)

15             MR. BAENA:  They have.  They have, Your Honor.

16             THE COURT:  So there you are.

17             MR. BAENA:  They have.  But we know otherwise.

18             And Judge Roland was -- made it very clear to us

19     at that moment in time, that very moment in time that our

20     role in this was not debatable, and it certainly didn't

21     appear to us to be an opportune time to talk to him about

22     how much we were going to get paid.

23             THE COURT:  But --

24             MR. BAENA:  But I will assure you, Your Honor --

25             THE COURT:  -- I will accept that as true.

1          MR. BAENA:  I assure you I never -- I never

2   considered it a foregone conclusion that that was the end of

3   the day.

4          THE COURT:  Okay.

5          MR. BAENA:  One of the things I might add, Judge,

6   in that regard is that it's never happened to me before or

7   since, early in the W. R. Grace case, I understand that

8   Judge Roland was handed a whole package of asbestos cases,

9   and to the large extent the players in each case were very

10  much the same, represented by the same people, and so he was

11  -- he was moving all of these to the starting line -- not to

12  the finish line -- but to the starting line at the same

13  time.  He would convene group meetings regularly.

14          At the very, very outset of his involvement after

15  the Third Circuit appointed him to supervise these cases, he

16  actually asked all of us to agree that he could meet with

17  everybody on an ex parte basis.

18          THE COURT:  I know.

19          MR. BAENA:  And he did.  And he did all the time.

20  And I had the benefit of meetings like that too, sometimes

21  by myself, he sometimes would invite folks from across the

22  aisle, depending upon what it was that he was focused on

23  that particular day.

24          I assure you, Judge, that I did have a

25  conversation him, an ex parte conversation about addressing

1    the fee issue, particularly after the settlement with Sealed

2    Air was reached.  And I did reach -- I did receive

3    assurances that we would address it.  But he made a point

4    which frankly resonated with me, and even after his

5    departure made entirely good sense to me, and that was we're

6    not going to talk about that until the settlement is

7    actually executed upon by Grace.  Under the settlement the

8    defendants were entitled to a 524(g) injunction, they can

9    only get that through a plan, and so the execution of the

10   settlement was, you know, inextricably intertwined with a

11   confirmed plan.

12            THE COURT:  Well, as you say, you call it is

13   centerpiece of the plan.

14            MR. BAENA:  And it was the centerpiece of the

15   plan, but I can assure you, Judge, at that moment in time

16   when he -- when he said we need to wait 'til it's actually

17   -- the debtor actually avails itself of it, it never

18   occurred to me it would be 11 years before that occurred.

19   It didn't occur to me that he would be gone in that period

20   of time, that the bankruptcy judge that approved the

21   settlement would be gone during that period of time.

22            We were reminiscing before Your Honor walked in

23   the room, there are only a few of us that were here in 2002

24   that continue to be involved in the case today.  And so --

25            THE COURT:  Well lasting some time is its own

1    reward.

2             MR. BAENA:  Sometimes.  I don't consider that an

3    advantage in this particular context.  Indeed I apologize

4    for dropping this on your desk, given that you don't have

5    that corporate memory.

6             THE COURT:  Look, when I first came to the bench

7    here in Delaware my first job was to take back all the cases

8    that the many visiting judges had here at that time, so I'm

9    a -- I'm a veteran at taking things that I didn't start but

10   am required to finish.

11            MR. BAENA:  Well, look, I'm leading with my own

12   chin, Judge, but you know, the case law makes it very clear

13   that a record is important in all of this, and those records

14   have generally resulted from the corporate memory of the

15   courts that presided over the matters.

16            I'm not going to sit here and tell you about, you

17   know, seven months of litigation so as to impart that

18   corporate memory on you, I couldn't conceivably do it, and I

19   do understand that I therefore suffer this disadvantage.

20            THE COURT:  You know, I -- well, you're free to

21   hold your own opinion, but I will tell you the story you

22   told in you motion, jumped off the page, and frankly, I'm

23   willing to assume, without deciding, but -- that your

24   description of what it was like to begin and then to end up

25   where you ended up is all true, and I don't know whether the

1    objectors here today would concede that or not, and their

2    objections in part, at least the debtors' for sure, does not

3    wholly because you had help they say and were part of a team

4    effort they say, but I'm willing to believe that the effort

5    that you undertook was every bit as difficult as you

6    describe it in your motion, but I'm not sure that in and of

7    itself answers the question.

8              MR. BAENA:  I appreciate that.  It isn't just the

9    effort, it is the result as well.  And I do believe, Judge,

10   that the defining moment in that litigation was the

11   Standards opinion that was issued by Judge Roland, which

12   essentially required the inclusion of post-transfer asbestos

13   claims in the analysis of solvency.

14             For the (indiscernible - 10:33:14) judge this

15   attempt at prosecuting these claims was described variously

16   as a fool's errand and a sure loser, and it was because of

17   the debtors' view that (a), they had been subjected to

18   claims that were not valid and there was a spike in those

19   claims just before they filed, they alleged, and that we

20   would not be able to demonstrate insolvency based upon valid

21   claims.

22             The Standards opinion changed that calculus

23   dramatically.  Indeed the day the Standards opinion came out

24   they -- the value of Sealed Air stock plummeted by 42

25   percent.  It clearly had a profound affect on the outcome of

1    the litigation.

2            THE COURT:  Well then maybe Judge Roland should

3    get an enhancement?  What do you think?

4            MR. BAENA:  I won't even --

5            THE COURT:  No need to respond.

6            MR. BAENA:  -- I won't even say what I was about

7    to say.

8            THE COURT:  No need to respond.

9            MR. BAENA:  Maybe he should, but I'd like to think

10   that it was good lawyering that brought him to that

11   position.

12           THE COURT:  I knew you'd say that.

13           MR. BAENA:  And we do believe we have some

14   bragging rights in that regard, Judge.  It was -- we

15   promoted the idea of moving forward the in limine, we

16   drafted the first round of briefs, we socialized that with

17   our co-counsel, my partner argued it to Judge Roland, and

18   indeed it was a successful conclusion, and it did open the

19   gate to settlement discussions, which were concluded in

20   November of 2002 on a very, very favorable basis.

21           Indeed while it's taken us 11 years to get here,

22   Judge, I should point out that during that same period of

23   time under this settlement agreement Grace was earning 5 and

24   a half percent interest compounded annually on about

25   $512 million which was a cash component of this settlement.

1    So in that same period of time they earned $600 million

2    while we were unable to prosecute our claim.

3              Any notion of windfall here, Judge, any suspicion

4    of windfall I think is really unfounded.  I'm not seeking a

5    windfall.

6              And to cut to the chase, Judge, the motion that

7    one cannot seek an enhancement because they weren't solely

8    responsible I think was laid to rest by the very authorities

9    that the objectors rely on.  Asarco -- in Asarco Baker &

10   Boch (ph) was of course lead counsel, The Hayden (ph) firm

11   was local counsel, both of them were awarded an enhancement

12   for their role in that case.  And the Hayden firm by the way

13   was merely local counsel, which in the litigation that gave

14   rise to the enhancement, their sole job was purely an

15   administrative one.  So the courts are recognizing that

16   there is the opportunity for enhancement where there is a

17   joint effort.

18             But even more importantly here we're not trying to

19   gore anyone's ox.  We're just asking to be treated the same

20   way our co-counsel was treated.  Judge Roland no less

21   unilaterally negotiated a $475 blended hourly rate with

22   Milberg Weiss.  None of us participated in those

23   discussions, although he did direct us to move for their

24   appointment on that basis and we did.  We defended their

25   application as well although we asked them to take the

1    laboring oar in that regard.

2            In their -- in their defense of their retention

3    they made the point that they wouldn't have ordinarily taken

4    this except on a contingent fee basis, but I gather Judge

5    Roland was able to prevail upon them to do otherwise.

6            And we take the view that what we're really asking

7    you to do, Your Honor is to recalibrate our loadstar in

8    respect of this particular engagement and to -- and

9    consistent with 330(a) treat us fairly and provide us a

10   reasonable fee which is based upon what the district court

11   judge presiding over this matter valued these services at.

12   And we would argue that that became market for this case.  A

13   district court judge decided that's the value that should be

14   paid for these services, and we just ask to be treated the

15   same way.

16            Indeed part of me says I'm not even asking for an

17   enhancement, I'm asking for the first time, as you point

18   out, I am asking for the very first time that somebody

19   address my loadstar in this case.  We billed at a standard

20   hourly rate.  None of the cases -- none of the cases suggest

21   that that's what your strapped with.  They talk about

22   prevailing market rates.  And I think we've determined what

23   the prevailing market rate was in 2002 by the exhaustive

24   search we did for counsel, and by Judge Roland's own

25   agreement with Milberg Weiss.

1            I was -- I would argue respectfully, Your Honor,

2    that is the lower end of the market that existed at that

3    point in time based upon the comments of Mr. Friedman and

4    his filed papers on behalf of Milberg Weiss.  And if that's

5    the case I think 330(a) does -- does warrant that the Court

6    revisit not what we billed, but how we get paid, and that it

7    would be appropriate and fair and reasonable for us to be

8    paid on the same basis.

9            It would be a lot better I suppose optically if

10   Caplin & Drysdale wished to step up here and say we think we

11   should be paid that way too, but --

12           THE COURT:  Well that's one of the fears the

13   debtor expresses.

14           MR. BAENA:  Well they missed the opportunity, they

15   have assured me they're not going to do so, and I'm not here

16   to explain to you why and I don't need to.

17           I don't think though that the fact that someone

18   who might have been entitled to an enhancement, for lack of

19   a better word, decided to forego it means that everybody

20   else is prejudiced by that.

21           THE COURT:  All right, I understand.  Mr. Baena,

22   I'd like to get to the others shortly.  Is there anything --

23           MR. BAENA:  Thank --

24           THE COURT:  -- you'd like to --

25           MR. BAENA:  Thank you very much, Your Honor.

1                    THE COURT:  Thank you.

2              Let me hear from the reorganized debtors first.

3                    MR. HIGGINS:  Again, Your Honor, Roger Higgins for

4       the reorganized debtors.

5                    I think it's fairly simple from our perspective.

6       When you look at the standards that other courts have used,

7       and I'm thinking of the Public Service Company, said words

8       to the effect that the burden can't be overcome by

9       generalized rhetoric of success and value but only by a

10      specific showing of exceptional activity without

11      (indiscernible - 10:40:32), that the achievements wouldn't

12      have -- would have happened.

13                   THE COURT:  Well let me ask you this, Mr. Higgins,

14      do you in any way disagree with the circumstances that

15      Mr. Baena describes around which these arrangements were

16      made?

17                   MR. HIGGINS:  Your Honor --

18                   THE COURT:  Obviously if they were ex parte

19      contacts there's nothing you can say about that, but just

20      generally, did he give me a fair description of the way

21      things were at the time?

22                   MR. HIGGINS:  Your Honor, in talking to my client

23      and to others who were involved there is, to put it bluntly,

24      a fair amount of hyperbole there.  If we want to get into

25      specifics quite frankly we'd have to, you know, go in an

1   evidentiary direction.  We don't think that that's

2   necessary.  We do think it's overblown.  The rhetoric in the

3   -- in both the motion and in the application and in the

4   declaration speaks for itself.

5           THE COURT:  I'm talking about the description

6   Mr. Baena gave me today.

7           MR. HIGGINS:  Your Honor, they were one, and you

8   pointed it out yourself, they were one of several firms.

9   The lead firm was Milberg Weiss, they were co-counsel with

10  Milberg and with Caplin.  They had two other firms, the

11  Speights firm and the Dyce (ph) firm that were helping them

12  specifically with aspect -- the property damage aspects of

13  the case.

14          When you listen to what counsel said today and

15  when you read what is in the -- his declaration and in the

16  motion they were part of a team, and they were a smaller

17  part of the team, and very much in contrast to say in the

18  Asarco case.

19          THE COURT:  Well let me -- let me switch gears for

20  a moment and just give you an impression.

21          In light of the fact that the debtor and others

22  fought so hard against bringing these actions, which turned

23  out to be wildly successful, it seems to me that on one

24  level the reorganized debtors' objection here could be

25  viewed as just sour grapes.  I mean, I -- to put the final

1  argument I guess on an argument that had been ongoing.  How

2  do you respond to that?

3          MR. HIGGINS:  Your Honor, I think that -- I think

4  that's an unfair characterization.

5          THE COURT:  Tell me why.

6          MR. HIGGINS:  The reorganized debtors spent 12

7  years -- almost 13 years in bankruptcy.  This was hard

8  fought all the way around.  The Bilzin firm was the only one

9  of 80 professionals to ask for a fee enhancement or any kind

10  of increase over their loadstar rate.

11          THE COURT:  But in a way your objection seems

12  ungrateful for what the efforts, at least in part, brought

13  for the debtor.

14          MR. HIGGINS:  We took a view, Your Honor, when you

15  look at that in the context of all the other professionals.

16  One does note, as Mr. Baena did, that nobody else asked for

17  one of the -- for a fee enhancement, and I think that that

18  goes a long way to speaking for itself --

19          THE COURT:  Well, you know sometimes --

20          MR. HIGGINS:  -- and it was the fact that they

21  asked.

22          THE COURT:  -- in bankruptcy cases there's only

23  one party asking for relief which everyone else in the world

24  opposes, and I will tell you most of the time that shouldn't

25  matter.

1           MR. HIGGINS:  It shouldn't matter, but they -- you

2    know, they made the bargain they did in April of '01, May of

3    '01 when they were retained.

4           THE COURT:  It sounds to me as if they didn't have

5    much of a choice.

6           MR. HIGGINS:  At the rates they set when they were

7    retained in 2001?  I would beg to differ, Your Honor.

8           THE COURT:  Well, no, at the point at which they

9    were required to pursue this litigation.

10          MR. HIGGINS:  I mean, I think that if what counsel

11   said uncontroverted, yes, but I would suspect that if the

12   carpet were to be rolled back and events looked at more

13   closely that that would turn out to be I think a best case

14   scenario, a best case look at what -- that the roll that PD

15   counsel took at the time.  We can't know standing here

16   today, and I would be loathe to say that I do.

17          THE COURT:  Thank you.

18          MR. HIGGINS:  All right.

19          MR. SCHEPACARTER:  Good morning, Your Honor.

20   Richard Schepacarter for the United States Trustee.

21          THE COURT:  Good morning.  Mr. Schepacarter, let

22   me ask you a question that I asked the movant here.

23          Are fee enhancements permitted in the Third

24   Circuit?

25          MR. SCHEPACARTER:  I don't think there's anything

1    on point Third Circuit law wise.

2              THE COURT:  Are they precluded in the Third

3    Circuit?

4              MR. SCHEPACARTER:  I don't think they're precluded

5    in the Third Circuit.  The way I -- I analyzed the law was

6    that there's a loadstar and I think we cited to

7    (indiscernible - 10:46:59) so I guess that's a Third Circuit

8    case, and we could --

9              THE COURT:  It sure is.

10             MR. SCHEPACARTER:  -- kind of start there, and I

11   think that that talked about the loadstar of how to

12   calculate fees.  And I think that the Third Circuit hasn't

13   discussed this of course, at least there's not a case that

14   I've been able to find, but I think that that amount can be

15   either lowered, and I think there's situations where it can

16   be lowered for a number of reasons, and I don't have to go

17   into detail with that, but I think Your Honor understands

18   what those reasons might be, or it could be higher based on

19   certain other factors.

20             And as I said, I don't think there's any Third

21   Circuit wise that's there, but I think we did cite to a

22   couple other cases, one of which was a Ninth Circuit case

23   and also to a Supreme Court case which talked about how the

24   -- and I think we laid it out in your papers -- how the

25   possibility of an upward adjustment of the loadstar might be

1    -- might be handled.

2          THE COURT:  Well if I read your objection

3    correctly you say the Court should look at three things, and

4    that the movant here hasn't met its burden in demonstrating

5    one, that the hourly rates paid were not market rates; two,

6    that they didn't incur either extraordinary expenses and

7    there wasn't other employment from which they were precluded

8    as a result of this reputation; and third, there was no

9    substantial risk of non-payment here.  Did I correctly read

10   your objection?

11         MR. SCHEPACARTER:  That's our opening statement

12   part of it, I think we go into more detail as the objection

13   goes on, but I think that's sort of --

14         THE COURT:  Well there's lots of detail in all the

15   pleadings.  I think I said it's a menu of factors that the

16   Court can select from --

17         MR. SCHEPACARTER:  Right.

18         THE COURT:  -- but I'm trying to distill them as

19   best I can.

20         MR. SCHEPACARTER:  Understood.

21         THE COURT:  And I will tell you, I've said this

22   before, when I'm not bound by controlling law I limit myself

23   to five factors.  If you can't figure something out in five

24   factors something is wrong.  Now, I know there are others

25   that may disagree with this and when I'm bound by

1    controlling law I follow it.

2              MR. SCHEPACARTER:  Uh-huh.

3              THE COURT:  But the parties seem to agree there is

4    no controlling law here.

5              MR. SCHEPACARTER:  Understood.  And just sort of I

6    guess to highlight a couple things is that with respect to

7    the loadstar, and I think we cited some cases later on as we

8    stated, the Court needs to look and see if there was

9    something that sort of precluded that the loadstar factors

10   didn't already take into account, and I think that all of

11   that -- none of that has been established through what

12   Mr. Baena has indicated.  He cites to -- and parties have

13   also cited -- that there are other parties involved in the

14   case.  There was Caplin & Drysdale, the PI firm I guess you

15   want to call them, the ones that were handle thing personal

16   injury aspect of it, there was a lead counsel that was

17   involved.  And also with respect to the property damage

18   aspect there were two other law firms involved that have

19   been cited.  The Speights firm and I think it was Dyce firm,

20   I'm not sure if I'm saying that right.

21              Also Mr. Baena, and I think Your Honor pointed --

22   sort of boiled this down, is that perhaps he could have made

23   a better deal somewhere along the line, and I think he cites

24   to a case which I don't think is very reliable, it's a case

25   that happened two years later, I don't know what the facts

1    of that case were, Mr. Lernow Hosby (ph) I guess post-

2    confirmation litigation trustee was involved, and again,

3    maybe at that point there was some other deal to be made,

4    but I don't think we can sort of rely on that.

5            I think what we can rely on is what Mr. -- what

6    the Bilzin firm put into its application, which was the

7    hourly rates that were set forth therein, the work that was

8    done, there was no adjustment during the period of the time

9    during the case as to the hourly.  Although the hourly rate

10   grew, I haven't been able to sort of figure that out, but

11   just didn't have enough time to go through it.  But I'm sure

12   the hourly rate increased over time.

13           And I think it would also appear that -- a couple

14   other points I want to make before I get there.  One of

15   which is, I know there was some discussion as to the sort of

16   ex parte discussions that went on, and I don't know that the

17   Court can rely on that, because even though there's no

18   evidence to the fact, even if we had that evidence it might

19   also be hearsay.  So, I don't think that that's probative of

20   anything.

21           What also is an indication is that there's no

22   evidence of the fact that any other work that could have

23   been brought in -- I think we pointed it out in our papers,

24   I think Your Honor highlighted that -- that there was no

25   other work that was foregone that they can say that there

```
1    was actually a loss there.  So that those partners or
2    whomever were doing the work were still employed, they were
3    working on this case.  The result was sort of I guess the
4    lynchpin, if you want to call it, for the plan, I wasn't
5    involved in this case.
6              Like Your Honor some things sort of reassigned,
7    and I think -- I think I handled the first days of this
8    case, and I don't think I was involved until one of our
9    trial attorneys left a few years ago and then I've been
10   assigned to all of the asbestos cases in the office.
11             THE COURT:  Oh, lucky you.
12             MR. SCHEPACARTER:  Oh, I am lucky, I am blessed.
13   But --
14             THE COURT:  That's why we decided when Judge
15   Fitzgerald was done to randomly reassign them so not one of
16   us had them all.
17             MR. SCHEPACARTER:  Yeah.  Well, I didn't have -- I
18   wasn't that lucky.
19             So -- but again, I don't -- there are aspects of
20   -- of sort of -- I mean, I can understand why somebody may
21   want a fee enhancement, but during the time of the case I
22   think all the work that was done has been compensated for, I
23   don't know that any of the factors that we point out either
24   on the first page of our objection or in the latter stages
25   with respect to the citation to the Supreme Court case,
```

1   which basically states that, you know, a lawyer takes on a

2   case, he is sworn oath that he'll be the best or she'll do

3   the best that she can do, and that the hourly rates that

4   they charge are commensurate with that.

5           There were no other -- there were no other parties

6   that have asked for a fee enhancement.  The Bilzin firm's

7   fees fall somewhere in between I think the Milberg fees and

8   the Caplin & Drysdale fees, if I got the numbers right, I

9   think I set them forth in our papers, I think Milberg was

10  somewhere in the range of $3 million or so, and I think

11  Caplin & Drysdale billed almost $1 million for this

12  litigation, at least that's the way I read the applications.

13  I could be wrong on that, but -- but that's at least the way

14  I read them.  And this firm's fees sort of fall in between

15  those.  I wasn't able to figure out what the other Speights

16  or the Dyce firm had billed for this.  I tried to go back

17  and look for it but I just wasn't able to get there.

18          So, I would maintain that based on the facts that

19  have been presented that with respect to the application of

20  the law, as we cited in our papers, that the fee enhancement

21  just doesn't come up and meet those tests.

22          THE COURT:  All right, thank you.

23          MR. SCHEPACARTER:  Thank you, Your Honor.

24          THE COURT:  Mr. Baena, I've heard enough.

25  Normally I'd give the movements another shot at it, but

1    really I think I've heard enough, and that's not a criticism

2    by the way.

3              MR. BAENA:  I appreciate that.  There were some

4    statements made without conclusive responses and I thought I

5    could provide that to you if you wanted.

6              THE COURT:  All right.  Mr. O'Neill, this was the

7    last item we had to address today?

8              MR. O'NEILL:  Yes, Your Honor.

9              THE COURT:  All right.  I'd like to take a recess

10   and see counsel in chambers.

11             UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

12             UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

13        (Recess at 10:54 a.m.)

14             THE CLERK:  All rise.  Please be seated.

15             THE COURT:  Good afternoon all.

16             During the recess I met with counsel and

17   encouraged them to see if they couldn't talk some more and

18   reach an amicable resolution of the Bilzin application.

19             The parties did have discussions, consulted with

20   their respective clients, and I am advised that a resolution

21   has been reached, and I'm pleased about that.

22             I know that this is not an easy issue for any of

23   the parties, and an agreement does not come easily to

24   anyone, but I am advised that the resolution consists of an

25   agreement among the parties, without opposition from the

1    U.S. Trustee, for an additional payment of $300,000 to the

2    Bilzin firm in complete resolution of this application.

3           I will note for the record that the time for

4    having filed fee applications and an application of the

5    nature that Bilzin filed here has long since passed in May

6    of this year earlier, so I don't expect to see further

7    applications of this nature since the time has indeed

8    passed.

9           And I'm willing to approve this resolution due to

10   the unique circumstances that apply with respect to Bilzin.

11          As all the parties have pointed out, such relief

12   is to be granted only under extraordinary circumstances, and

13   I'm satisfied, particularly in light of the agreed amount,

14   that that burden has been reached and satisfied.

15          So for these reasons I'll consider submission of

16   an amended fee order under certification, which will include

17   this resolution.

18          I'll pause now and ask if any of the parties wish

19   to be heard.

20          MR. O'NEILL:  James O'Neill for the debtor, Your

21   Honor.

22          We appreciate the Court's assistance and we will

23   submit the order as requested.

24          THE COURT:  All right.

25          MR. SCHEPACARTER:  Richard Schepacarter for the

Page 44

1    United States Trustee, Your Honor.

2              Although we're not party to the agreement the U.S.

3    Trustee has no opposition to the resolution that's been

4    reached.

5              THE COURT:  All right, thank you.

6              Mr. Baena, do you wish to be heard?

7              MR. BAENA:  Only to thank the Court for its

8    assistance in this matter and for allowing me to appear

9    before you on this application.

10             THE COURT:  A delight to have you, sir.

11             All right.  I'll await submission of a revised

12   order under certification.

13             Mr. O'Neill, is there anything further for today?

14             MR. O'NEILL:  No, Your Honor, that includes our

15   hearing for today, we certainly appreciate Your Honor's

16   assistance.

17             THE COURT:  All right.  Thank you all very much,

18   that concludes this hearing.  Court will stand in recess.

19        (A chorus of thank you)

20        (Whereupon these proceedings were concluded at 12:07

21   PM)

22

23

24

25

Page 45

1                         I N D E X

2

3                           RULINGS

4                                        Page       Line

5    Motion of PricewaterhouseCoopers LLP,

6    Auditors and Tax Consultants for Debtors, to

7    allow Amendment of Its Final Application for

8    Allowance of Compensation and Reimbursement

9    of Expenses for the Period January 10, 2002

10   Through February 3, 2014 to Be Deemed Timely

11   Filed [Filed: 8/25/14](Docket No. 32386)      8          17

12

13   Final Fee Application of Counsel to the

14   Debtors, the Statutory Committees, and the

15   Future Claimants' Representative for

16   Compensation for Service Rendered and

17   Reimbursement of Expenses                      10         11

18

19   Motion for Final Decree: (A) Closing Certain

20   of the Chapter 11 Cases; (B) Removing Such

21   Cases From the Joint Administration Order;

22   and (C) Waiving the Requirements to File a

23   Final Report for Such Cases [Filed: 9/16/14]

24   (Docket No. 32401)                             12         16

25

Page 46

1    Fifty-Second Interim and Final Fee

2    Application Request of Bilzin Sumberg Baena

3    Price & Axelrod LLP for Approval and

4    Allowance of Compensation for Services

5    Rendered and Reimbursement of Expenses as

6    Counsel to the Official Committee of

7    Asbestos Property Damages Claimants for the

8    Period of April 9, 2001 Through February 3,

9    2014 and Request for Fee Enhancement for

10   Services in Connection with Fraudulent

11   Transfer Litigation Against Sealed Air

12   Corporation, Cryovac, Inc. and Fesenius

13   Medical Care Holdings[Filed: 5/12/14]

14   (Docket No. 32190)                    42        16

15

16

17

18

19

20

21

22

23

24

25

Page 47

1                    C E R T I F I C A T I O N

2

3    I, Dawn South, certify that the foregoing transcript is a

4    true and accurate record of the proceedings.

5        Dawn        Digitally signed by Dawn South
                     DN: cn=Dawn South, o, ou,
                     email=digital1@veritext.com,
6        South       c=US
                     Date: 2014.10.17 13:01:33
                     -04'00'
     _____

7    Dawn South

     AAERT Certified Electronic Transcriber CET**D-408

8

9    Veritext

10   330 Old Country Road

11   Suite 300

12   Mineola, NY 11501

13   Date:  October 17, 2014

14

15

16

17

18

19

20

21

22

23

24

25