<u>Exhibit D</u>

**Second Administrative Order for Removal Action, dated January 31, 1991**

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION I

SDMS DocID    264445

|  |  |  |
|---|---|---|
| In the Matter of: | ) | **U.S. EPA Region I** |
|  | ) | **CERCLA Docket No.** |
| **South Street Superfund Site** | ) | **I-92-1033** |
| **Walpole, Massachusetts** | ) |  |
|  | ) |  |
| Milton Shaffer, Irving Shaffer, and | ) |  |
| Burton Shaffer as Trustees of BIM | ) |  |
| Investment Trust; | ) |  |
|  | ) |  |
| Milton Shaffer, Irving Shaffer, and | ) |  |
| Burton Shaffer as Trustees of Shaffer | ) |  |
| Realty Nominee Trust; | ) |  |
|  | ) |  |
| W.R. Grace & Co. - Conn., | ) |  |
|  | ) | **SECOND** |
| Respondents | ) | **ADMINISTRATIVE ORDER** |
|  | ) | **FOR REMOVAL ACTION** |
|  | ) |  |
| Proceeding under section 106(a) | ) |  |
| of the Comprehensive Environmental | ) |  |
| Response, Compensation, and Liability | ) |  |
| Act, as amended, 42 U.S.C. § 9606(a) | ) |  |

## JURISDICTION

1.    This Administrative Order ("Order") is issued pursuant to the authority vested in the President of the United States by section 106(a) of the Comprehensive Environmental Response, Compensation, and Liability Act, as amended ("CERCLA"), 42 U.S.C. § 9606(a).  This authority was delegated to the Administrator of the United States Environmental Protection Agency ("EPA") on January 23, 1987, by Executive Order 12580, 52 Fed. Reg. 2926 (January 29, 1987), and further delegated to the Regional Administrator, EPA Region I by EPA Delegation No. 14-14-B (September 13, 1987).

## STATE COORDINATION

2.    Pursuant to section 106(a) of CERCLA, 42 U.S.C. § 9606(a), the State of Massachusetts has been notified in writing of the issuance of this Order.

South Street Site
Second Administrative Order for Removal Action
Page 2

---

### PURPOSE

3.   The purpose of this Order is to compel the Respondents
to perform removal activities at the South Street Superfund Site
in Walpole, Massachusetts, as set forth in the Action Memorandum
signed by the Regional Administrator on September 28, 1987, and
the Scope of Work appended to this Order as Appendix A.

### FINDINGS OF FACT

#### Respondents

4.   Respondents Milton Shaffer, Irving Shaffer, and Burton
Shaffer are the trustees of the Shaffer Realty Nominee Trust
("Shaffer Trust"), a trust created by declaration of trust dated
December 26, 1986.  The Shaffer Realty Nominee Trust has its
principal place of business in Boston, Massachusetts.

5.   Respondents Milton Shaffer, Irving Shaffer, and Burton
Shaffer are the trustees of the BIM Investment Trust ("BIM
Trust"), a trust created by declaration of trust dated February
28, 1966.  The BIM Investment Trust has its principal place of
business in Boston, Massachusetts.

6.   Respondent W.R. Grace & Co. - Conn. ("Grace") is a
Connecticut corporation with its principal place of business in
Boca Raton, Florida.

#### Site Description

7.   The South Street Superfund Site ("Site") consists of
approximately 21 acres of land in Walpole, Massachusetts.  The
Site is described as the following lots on the Town of Walpole
Tax Map D-12:  1232-1A, 1232-2, 1235-1, 1235-2A, 1235-2B, 1235-3
(erroneously designated on the Tax Map as lot 1275-3), 1235-4,
1235-5, 1235-6, 1235-7, 1235-8, 1240-13, 1240-14, 1245-8, 1245-9,
approximately 0.5 acres of lot 1249 which abuts lot 1235-4 and
the Neponset River, and lot 1275-5.

8.   The Site is located in a mixed commercial, industrial,
and residential area and is comprised of industrial buildings, a
railroad right of way, a portion of the Neponset River, wooded
areas, and residential properties.  Access to the Site is
partially restricted by a fence surrounding lots 1235-1, 1235-8,
1235-4, and an approximately one-half acre portion of lot 1249.
Access to the remainder of the Site is unrestricted.

South Street Site
Second Administrative Order for Removal Action
Page 3

---

## Site History

9.    Certain properties comprising the Site have been used
for industrial purposes since the early 1800s.  In 1915, the
Standard Woven Fabric Company acquired sixteen of those
properties and shortly thereafter began manufacturing multiple
woven asbestos brake linings and other asbestos products.
Operations involved in the manufacture of asbestos brake linings,
including the crushing of raw asbestos, the production of
finished goods, and the disposal of asbestos wastes, were
performed on portions of the Site property.  In 1920, Standard
Woven Fabric Company changed its name to the Multibestos Company.
From approximately 1920 to 1935, the Multibestos Company
continued the manufacture of asbestos brake linings and other
asbestos products at the Site.

10.    Historical data, visual evidence, and sampling data,
taken together, indicate that from approximately 1916 through
1936, Standard Woven Fabric Company and the Multibestos Company
disposed of raw asbestos waste, asbestos dust generated during
processing, and off-specification or otherwise unsold finished
goods on a portion of the Site.  Due to the flooding and erosion
of the Neponset River, other weather conditions, and human
activity, asbestos waste has been exposed in the soil surface and
has come to be located on other portions of the Site.

11.    Dewey & Almy Chemical Company acquired a majority of
the stock of Multibestos in 1930, and acquired all of the non-
realty assets of Multibestos in 1934.  As majority shareholder of
Multibestos, Dewey & Almy exerted control over operations and
decisions regarding Multibestos' facility at the Site.  W.R.
Grace & Co. and the Dewey and Almy Chemical Company merged in
1954, with W.R. Grace & Co. as the resulting corporation.  On May
25, 1988, W.R. Grace & Co. changed its name to W.R. Grace & Co. -
Conn.  Consequently, Respondent Grace is the successor-in-
interest to the operator of the Site (Multibestos) at the time of
disposal of asbestos waste at the Site.

12.    In 1937, a portion of the Site (lots 1235-1 and 1235-4)
was sold to the Kendall Company.  Kendall operated a non-woven
cotton fabric manufacturing business on the Site until 1985, when
it sold the aforementioned properties to Respondent BIM Trust.
Respondent BIM Trust is the current owner and operator of that
portion of the Site.

13.    Other entities, including the Massachusetts Chemical
Company, the Walpole Tire and Rubber Company, Industrial
Properties, Inc., General Fibre Company, Inc., and Holiday Coffee
Company, previously owned or operated on portions of the Site.

South Street Site
Second Administrative Order for Removal Action
Page 4

_____

The entities Cosmec, Inc. and Stop & Shop are currently tenants on lot 1235-2A at the Site.

14.  Between 1946 and 1967, Shaffer Realty Corp. purchased lots which constitute portions of the Site.  Legal title to these lots was conveyed to Shaffer Realty Nominee Trust on December 26, 1986.  Respondent Shaffer Trust is the current owner and operator of that portion of the Site.

15.  By letter dated November 23, 1987, EPA notified Shaffer Realty Corp. of its status as a potentially responsible party at the Site and afforded it the opportunity to perform or finance necessary removal activities.

16.  By letter dated December 15, 1987, EPA notified W.R. Grace & Co. - Conn. (f/k/a W.R. Grace & Co.) of its status as a potentially responsible party at the Site and afforded it the opportunity to perform or finance necessary removal activities.

### Environmental Status of Site

17.  On October 29, 1986, the Massachusetts Department of Environmental Quality Engineering[1] ("DEQE") received a telephone complaint that asbestos was present on lot 1235-8 along the banks of the Neponset River near South Street in Walpole, Massachusetts.  DEQE contacted EPA and requested assistance from EPA's New England Regional Laboratory in analyzing soil samples taken from the Site.  The analysis, completed on October 30, 1986, indicated that the soil samples contained 45 to 75 percent friable asbestos.  DEQE and EPA investigated the Site and found evidence of friable asbestos at or near the soil surface in certain areas of the Site.

18.  Asbestos bulk soil samples and river sediment samples were taken by EPA on October 30, 1986, November 14, 1986, November 20, 1986, November 21, 1987, July 2, 1987, and July 20, 1987.  Analysis of river sediment samples collected downstream of the Site indicated the presence of asbestos.  The percent of total asbestos present in soil samples taken at the Site ranged from zero to ninety percent.

19.  On December 15, 1988, EPA issued an Administrative Order for Removal Action (the "First Order") to Respondents BIM

_____

[1]  On July 1, 1989, the Massachusetts Department of Environmental Quality Engineering changed its name to the Massachusetts Department of Environmental Protection.

South Street Site
Second Administrative Order for Removal Action
Page 5

---

Trust and Shaffer Trust.  Pursuant to the First Order, the Respondents conducted a comprehensive site assessment to determine the horizontal and vertical extent of asbestos contamination at the Site.

20.  Sampling results in the Respondents' report dated August 18, 1989, indicated the need for additional sampling and analysis and the inclusion of additional properties in the Site description.  Results of the additional sampling and analysis were submitted to EPA in a report dated August 30, 1990.  In late 1990, the Respondents recommended sampling and analysis on yet additional properties and supplemental sampling on several properties which had previously been investigated.

21.  The two diagrams attached to this Order as Appendix B identify soil sample locations at which actionable levels of asbestos were found.  Asbestos-containing soils ("ACS") exhibiting more than one percent asbestos were deemed by EPA to be actionable.  In addition, visual examination of the soil surface at the Site revealed the presence of discarded brake linings and other asbestos-containing materials in significantly higher concentrations.

22.  Based upon the results of the site assessment, in January 1991, the Respondents to the First Order submitted a plan to EPA entitled "Short Term Measure Response Plan - Engineering Evaluation and Cost Analysis - Asbestos Removal Action - South Street Site" ("Response Plan") which examined various alternative cleanup options.  Of the proposed alternatives, the Response Plan recommended a cleanup approach consisting of:

-- construction of an aluminum corrugated plate arch culvert for a length of approximately 400 feet in the portion of the Neponset River (and corresponding banks) where ACS is present.

-- excavation of ACS from on-site residential and non-residential properties and containment of such ACS in the area above the culvert.

-- excavation of ACS from certain on-site locations, transfer of such ACS to other Site areas, and containment of such ACS with cover materials.

23.  In a letter to the Respondents dated September 6, 1991, EPA approved the concept of the removal plan outlined above.

South Street Site
Second Administrative Order for Removal Action
Page 6

## Endangerment and Response

24. The Site is located in an industrialized area surrounded by residential neighborhoods. Three operating businesses and numerous private residences are located within the Site boundaries. An estimated 3,500 people reside within a 500 meter radius of the Site.

25. For some portions of the Site there are no barriers, or inadequate barriers, to prevent access to the Site. In addition, friable asbestos when exposed to the elements may become airborne. Consequently, the potential exists for exposure to humans, including nearby residents and employees of area businesses.

26. Approximately 30 percent of the Site falls within the 100-year flood plain. This 30 percent includes portions of the river banks which contain high concentrations of asbestos-containing materials. A flood of this area may cause the waterborne migration of asbestos from the Site and thus the potential for exposure to nearby residents and workers.

27. Friable asbestos, when exposed to the elements, provides a direct means by which asbestos fibers may enter the environment in an uncontrolled manner, become airborne, and potentially expose humans. Asbestos fibers may enter the body through inhalation or ingestion.

28. On December 18, 1986, the Agency for Toxic Substances and Disease Registry issued a health assessment which concluded that, "In so far as the South Street Asbestos Site, Walpole, MA has been documented to be contaminated with asbestos waste that could be dispersed into the air or water via natural means or by human activity, the Site poses an increased risk of cancer to human populations that become exposed and, therefore, presents a substantial public health threat which should be remediated."

29. The actual or threatened release of asbestos from the Site may pose an imminent threat to public health or welfare. The dangers posed include, without limitation: (i) Asbestosis - a chronic pneumoconiosis which results from the inhalation of asbestos fibers. Asbestosis is a progressive and irreversible disease which leads to respiratory failure; (ii) Mesothelioma - diffuse cancers that rapidly spread over the surface of the lung, abdominal organs, and heart. Mesothelioma results in rapid physiological deterioration and death within one to two years of diagnosis; and (iii) Cancers of the larynx, esophagus, stomach, colon, and rectum. As there is no safe exposure level

South Street Site
Second Administrative Order for Removal Action
Page 7

---

established for asbestos, any human exposure to asbestos fibers
should be minimized.

30.   The removal action specified in the Action Memorandum
signed by the Regional Administrator, EPA Region I, on September
28, 1987, and as detailed in the Scope of Work appended to this
Order, will consist of incorporating the results of Respondents'
investigative and assessment efforts into a comprehensive removal
action plan (the "Removal Action Plan") designed to eliminate the
actual or threatened release of asbestos into the soil, air, and
water and, upon approval, implementing that Removal Action Plan.
By eliminating and controlling the source of exposure to nearby
human populations, this removal action will prevent, minimize,
and/or mitigate the imminent and substantial endangerment to the
public health or welfare or the environment posed by the actual
or potential releases of asbestos from the surface soils and
river banks at the Site.

## CONCLUSIONS OF LAW AND DETERMINATIONS

On the basis of the findings of fact, EPA makes the following
Conclusions of Law and Determinations:

31.   The South Street Site is a "facility" as that term is
defined in section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

32.   Each Respondent is a "person" as that term is defined
in section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

33.   Each Respondent is a liable party within the meaning of
section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

34.   The substance listed in paragraph 17 above is a
"hazardous substance" as that term is defined in section 101(14)
of CERCLA, 42 U.S.C. § 9601(14).  The hazardous substance listed
above is present at the Site.

35.   The conditions described in paragraphs 9 to 26 above
constitute an actual or threatened "release" into the
"environment" within the meaning of section 101(8), (22) of
CERCLA, 42 U.S.C. § 9601(8), (22).

36.   The actual or threatened releases of hazardous
substances at or from the Site may pose "an imminent and
substantial endangerment to the public health or welfare or the
environment" within the meaning of section 106(a) of CERCLA, 42
U.S.C. § 9606(a).

South Street Site
Second Administrative Order for Removal Action
Page 8

_____

37.    In order to protect public health and welfare and the
environment, and prevent further release or threat of release of
hazardous substances at or from the Site, a Removal Action is
necessary and appropriate.  The Removal Action will consist of
implementation of the Scope of Work appended to this Order.  The
Scope of Work is designed to prevent, minimize, and/or mitigate
damage to the public health or welfare or the environment which
may otherwise result from the release or threat of release of
hazardous substances and was developed in accordance with the
criteria set forth at section 300.415 of the National Contingency
Plan ("NCP"), 40 C.F.R. § 300.415.

38.    The removal actions specified in this Order will be
done promptly and properly by the Respondents, and will be
consistent with the NCP, if performed in accordance with the
terms of this Order and Scope of Work.


                              ORDER

     Based upon EPA's jurisdiction, and the findings of fact and
determinations set forth above, the Respondents are ORDERED to
perform all work required under this Order.  The Respondents
shall comply with the following provisions and perform all
actions required by the terms and conditions of this Order.


                         PARTIES BOUND

39.    This Order shall apply to and be binding upon the
Respondents and upon their receivers, trustees, successors, and
assigns.  No change in ownership or corporate status shall in any
way alter the Respondents' responsibilities under this Order.
Respondents are jointly and severally responsible for carrying
out all activities required of them by this Order.  The failure
of one or more Respondent to comply with all or any part of this
Order shall not in any way excuse or justify noncompliance by any
other Respondent including, but not limited to, the failure to
perform all obligations of any defaulting Respondent.


DESIGNATION OF SUPERVISING CONTRACTOR AND PROJECT COORDINATOR

40.    Within seven (7) days after the effective date of this
Order, the Respondents shall retain the services of a qualified
and experienced Supervising Contractor for the purpose of
performing the work required by this Order in accordance with the
terms and conditions of the Scope of Work.  Within the same seven

South Street Site
Second Administrative Order for Removal Action
Page 9

(7) day period, the Respondents shall notify EPA in writing of
the name, address, and qualifications of the proposed supervising
contractor and the name and telephone number of the supervising
contractor's primary contact person.  The Respondents shall also
notify EPA of the identity and qualifications of any other
contractor(s) or subcontractor(s) to be used at the Site at least
seven (7) days in advance of their performing any work under this
Order.

41.  The supervising contractor shall be a qualified
professional with substantial expertise and experience in the
cleanup of hazardous waste sites.  EPA reserves the right to
disapprove, based on professional qualifications, conflicts of
interest, and/or deficiencies in previous similar work, any
contractor or subcontractor or other person engaged directly or
indirectly by the Respondents to conduct work activities under
this Order.  If EPA disapproves the selection of any proposed
contractor, the Respondents shall notify EPA in writing of the
name, address, and qualifications of another contractor within
fourteen (14) days after receipt of the notice of disapproval.

42.  The Respondents shall provide a copy of this Order to
all contractors, subcontractors, laboratories, and consultants
retained in connection with this Order within seven (7) days
after the Order's effective date or of such retention, whichever
is later.  The Respondents shall ensure that all such
contractors, subcontractors, laboratories, and consultants will
perform all work in conformity with CERCLA, the NCP, and the
terms and conditions of this Order and Scope of Work.

43.  Within seven (7) days after the effective date of this
Order, the Respondents shall designate a Project Coordinator who
shall be responsible for administration of all of the
Respondents' actions called for by this Order and shall submit
the designated coordinator's name, address, and telephone number
to EPA.  EPA will deem the project coordinator's receipt of any
notice or communication from EPA relating to this Order as
receipt by the Respondents.

## EPA ON-SCENE COORDINATOR

44.  The EPA On-Scene Coordinator ("OSC") will administer
EPA's responsibilities and receive all written notices, reports,
plans, and other documents required by this Order.  All
submissions required by this Order shall be sent to EPA's OSC at
the following address:

South Street Site
Second Administrative Order for Removal Action
Page 10

---

Thomas C. Condon
U.S. Environmental Protection Agency
60 Westview Street
Lexington, MA  02173
(617) 860-4305
FAX (617) 860-4397

45.  EPA's OSC shall have the authority vested in him by the NCP including, but not limited to, the authority to stop work being performed pursuant to this Order and the authority to modify the Scope of Work.  Absence of the OSC from the Site shall not be cause for stoppage of work by the Respondents unless specifically directed by the OSC.

## REMOVAL WORK TO BE PERFORMED; COMPLETION OF WORK

46.  Within seven (7) days after retention of the supervising contractor, the Respondents shall commence the work detailed in the Scope of Work.  Activities involved shall include performance of pre-removal inspection and maintenance activities; summarizing all available sampling and analysis results and specifically delineating the scope and extent of asbestos contamination; providing detailed engineering plans for the placement of the aluminum plate arch culvert; proposing comprehensive plans for addressing all remaining contamination on-site; compiling these elements into a detailed Removal Action Plan; and, upon approval, implementing all activities outlined in the approved Removal Action Plan.  All work performed by the Respondents shall be conducted in accordance with CERCLA, the NCP, applicable guidance documents provided by EPA, and the provisions of this Order including any standards, specifications, and time schedules contained in the Scope of Work or specified by the OSC.

47.  Within sixty (60) days after completing all work required under this Order, the Respondents shall submit for EPA approval a Completion of Work Report summarizing the activities conducted pursuant to the Scope of Work.  The Completion of Work Report shall include the categories of information and conform to the requirements specified in section VII. of the Scope of Work. The Completion of Work Report shall be certified by the supervising contractor to the effect that all removal activities have been completed in full satisfaction of the requirements of this Order.

48.  When EPA determines that all work has been fully performed in accordance with this Order (with the exception of

South Street Site
Second Administrative Order for Removal Action
Page 11

all continuing obligations required by this Order) and that all
goals and objectives of this Order and the Scope of Work have
been satisfied, EPA will provide written notice to the
Respondents. If EPA determines that all removal activities have
not been completed in accordance with the provisions of this
Order, it will so notify the Respondents and provide a list of
the tasks remaining and a schedule for their completion. The
Respondents shall perform all remaining tasks and shall submit an
amended Completion of Work Report in accordance with the EPA
notice. If EPA determines that the remaining tasks have not been
completed in accordance with the provisions of the EPA notice and
this Order, the Respondents shall be in violation of this Order.

    49.  EPA's issuance of the notice referred to in paragraph
48 shall not preclude it from later determining, based upon new
information or otherwise, that the Respondents have not completed
all removal activities in accordance with the provisions of this
Order.


                    PROGRESS REPORTS

    50.  The Respondents shall submit a written progress report
to EPA concerning activities undertaken pursuant to this Order by
the fifth day of each calendar month until issuance of the EPA
notice referred to in paragraph 48 above. These reports shall
describe all significant developments during the preceding month,
including the work performed and any problems encountered, and
the developments anticipated during the next calendar month,
including the work to be performed, anticipated problems, and
planned resolutions of past or anticipated problems.


          SUBMISSIONS REQUIRING AGENCY APPROVAL;
           RESPONDENTS' OBLIGATION TO PROCEED

    51.  After review of any deliverable, plan, report, or
other item ("submission") which the Respondents are required to
submit for review and approval pursuant to this Order and Scope
of Work, EPA may: (i) approve the submission; (ii) conditionally
approve the submission with required modifications; (iii)
disapprove the submission and notify the Respondents of
deficiencies; or (iv) disapprove the submission and modify the
deliverable, plan, report, or other item itself to cure any
deficiencies. In the event EPA approves or conditionally
approves the submission, or disapproves and modifies the
submission itself, the Respondents shall perform all actions
required by the submission, as approved, conditionally approved,
or modified by EPA.

South Street Site
Second Administrative Order for Removal Action
Page 12

---

52.  Upon receipt of a notice of disapproval with deficiencies ((iii) above), the Respondents shall correct the deficiencies and resubmit the submission within **seven (7) days** or such other time period specified in the notice of disapproval. Notwithstanding a notice of disapproval, the Respondents shall proceed to take any action required by any non-deficient portion of the submission.  If EPA does not approve the submission as resubmitted, Respondents shall be in violation of the Order.

53.  For each submission provided to EPA, the Respondents shall submit such copies as specified by the OSC.  Any deliverable, plan, or report submitted to EPA pursuant to this Order shall be dated and shall include, in a prominent location in the document, the following disclaimer: "Disclaimer:  This document has been prepared pursuant to a government administrative order (U.S. EPA Region I CERCLA Docket No. I-92-1033) and is subject to approval by the U.S. Environmental Protection Agency.  The opinions, findings, and conclusions expressed are those of the authors and not those of the U.S. Environmental Protection Agency."  In addition, any such deliverable, plan, or report which has not received final approval from EPA shall be marked "Draft" on each page.

## INCORPORATION AND ENFORCEABILITY OF DOCUMENTS

54.  The Scope of Work and all other appendices or attachments to this Order shall be deemed incorporated into, and made an enforceable part of, this Order.  Upon approval by EPA pursuant to the procedures of paragraphs 51 and 52, all deliverables, plans, reports, specifications, schedules, or other items required by or developed under this Order shall be deemed incorporated into, and made an enforceable part of, this Order. In the event of conflict between this Order and any document attached to, incorporated into, or enforceable hereunder, the provisions of this Order shall control.

## SITE ACCESS

55.  All Respondents that own, occupy, or control property at the Site, or property other than the Site to which access is required in order to properly carry out the terms of this Order, shall grant access to the other Respondents, the other Respondents' authorized representatives, and EPA and its officers, employees, agents, contractors, consultants, and other authorized representatives for purposes of implementing and monitoring work to be performed under this Order.

South Street Site
Second Administrative Order for Removal Action
Page 13

---

56. To the extent access to, use or ownership of, or
easements over property other than the Site is required for the
proper and complete implementation of this Order, the Respondents
shall use their best efforts to obtain access agreements or other
interests in the property, in writing, sufficient to allow
implementation of this Order within twenty-eight (28) days after
the Order's effective date. For purposes of this paragraph,
"best efforts" include, but are not limited to, the payment of
money in consideration of access to property.

57. Such written access agreements or other interests
obtained pursuant to the preceding paragraph shall provide the
Respondents, the Respondents' authorized representatives, EPA
and their officers, employees, agents, contractors, consultants,
and other authorized representatives access to the Site at all
times for purposes of implementing and monitoring work under this
Order. Such written access agreements or other interests shall
specify that the Respondents are not EPA's representatives or
agents with respect to liability associated with the Site.

58. In the event that site access agreements or other
interests sufficient for implementation and monitoring of work
under this Order are not obtained within the time period
specified above, the Respondents shall notify EPA, in writing,
within three (3) days thereafter regarding the lack of such
agreements and the efforts made by the Respondents to obtain
them. Lack of access shall not excuse or justify failure to
perform any activity or to meet any deadline not requiring or
directly dependent upon such access.


## QUALITY ASSURANCE/SAMPLING

59. The Respondents shall submit to EPA, upon receipt, the
results of all sampling or tests and all other data generated by
the Respondents, their contractor(s), or on the Respondents'
behalf in the course of implementing this Order. The Respondents
shall also provide the quality assurance/quality control
procedures followed by all sampling teams and laboratories
performing data collection and/or analysis.

60. Upon request, the Respondents shall allow EPA or its
authorized representatives to take split and/or duplicate samples
of any samples collected by the Respondents while performing work
under this Order. The Respondents shall notify EPA not less than
seven (7) days in advance of any sample collection activity. In
addition, EPA shall have the right to take any additional samples
that it deems necessary.

South Street Site
Second Administrative Order for Removal Action
Page 14

61.  The Respondents shall assure that EPA and its
authorized representatives are allowed access to any laboratory
utilized by the Respondents in implementing this Order.  Upon
request, the Respondents shall have a designated laboratory
analyze samples submitted by EPA for quality assurance
monitoring.

### ACCESS TO INFORMATION; RECORD PRESERVATION; CONFIDENTIALITY CLAIMS

62.  Upon request, the Respondents shall provide EPA with
copies of all records, documents, and other information generated
by the Respondents and their contractor(s) which relate in any
way to the conditions at the Site or to the implementation of
this Order including, but not limited to, sampling and analysis
records, field sheets and field notes, engineering logs, chain of
custody records, contracts, bills of lading, trucking logs,
manifests, receipts, reports, and correspondence.  In addition,
the Respondents' employees, agents, or representatives with
knowledge of facts concerning the conditions at the Site or
performance of work under this Order shall be made available to
EPA to provide such information at reasonable times and after
reasonable notice.

63.  For a period of at least six (6) years following
completion of all work conducted by the Respondents pursuant to
this Order, the Respondents shall preserve all documents,
records, and information of whatever kind, nature, or description
in their possession and/or control or that of their officers,
employees, agents, accountants, contractors, attorneys,
successors, and assigns that relate in any way to the performance
of work under this Order or relate in any way to releases or
threatened releases of hazardous substances which are the subject
of the removal action addressed by this Order.  After this nine
(9) year period has expired, the Respondents shall provide EPA
with thirty (30) days advance written notice prior to the
destruction of any such records, documents, or information.  The
Respondents shall send such notice, accompanied by a copy of this
Order, to:

Regional Counsel
Office of Regional Counsel
U.S. Environmental Protection Agency
J.F.K. Federal Building
Boston, Massachusetts  02203-2211
Re: Removal Action at South Street Superfund Site,
CERCLA Docket No.I-92-1033

South Street Site
Second Administrative Order for Removal Action
Page 15

---

Upon request, the Respondents shall provide to EPA copies of all such records, documents, or information.

64.    The Respondents may assert a confidentiality claim, if appropriate, covering part or all of the information required by or requested under this Order, pursuant to section 104(e)(7) of CERCLA, 42 U.S.C. § 9604(e)(7), and 40 C.F.R. § 2.203(b) (1989). The Respondents shall adequately substantiate all such assertions.    Analytical and other data specified in section 104(e)(7)(F) of CERCLA shall not be claimed as confidential by the Respondents.    Information determined to be confidential by EPA will be afforded the protection required by section 104(e)(7) of CERCLA and by 40 C.F.R. Part 2, Subpart B.    If no confidentiality claim accompanies the information when submitted to EPA, EPA may make it available to the public without further notice to the Respondents.

### CREATION OF DANGER; EMERGENCY RESPONSE

65.    Upon the occurrence of any incident or change of conditions during the activities conducted pursuant to this Order that causes or threatens a release of hazardous substances from the Site or an endangerment to the public health or welfare or the environment, the Respondents shall immediately take all appropriate action to prevent, abate, or minimize such release or endangerment.    The Respondents shall also immediately notify the OSC or, in the event of his unavailability, shall notify the Regional Duty Officer of the Emergency Planning and Response Branch, EPA Region I, telephone (617) 223-7265.    In taking any actions under this paragraph, the Respondents shall act in accordance with all applicable provisions of the Health and Safety Plan prepared pursuant to the Scope of Work.

66.    The Respondents shall submit a written report to EPA within seven (7) days after each incident specified above, setting forth the events that occurred and the measures taken and to be taken to mitigate any release or endangerment caused or threatened by the incident and to prevent the recurrence of such an incident.

67.    Nothing herein shall limit the power and authority of EPA or the United States to take, direct, or order all actions necessary to protect public health, welfare, or the environment or to prevent, abate, or minimize an actual or threatened release of hazardous substances, pollutants or contaminants, or hazardous or solid waste on, at, or from the Site.

South Street Site
Second Administrative Order for Removal Action
Page 16

---

## INSTITUTIONAL CONTROLS

68.  Respondents shall implement all institutional controls
and/or deed restrictions as specified in the Scope of Work.

## OFF-SITE POLICY

69.  All hazardous substances, pollutants or contaminants
removed off-site pursuant to this Order for treatment, storage,
or disposal shall be treated, stored, or disposed of at a
facility in compliance with the EPA Revised Off-Site Policy
(OSWER Dir. No. 9834.11, promulgated pursuant to 42 U.S.C. §
9621(d)(3)), as determined by EPA.

## AMENDMENTS

70.  This Order, other than the Scope of Work, may only be
amended in writing by signature of the Regional Administrator of
EPA Region I.  Amendments to the Scope of Work may be made in
writing by the OSC or at the OSC's oral direction.  Where the OSC
makes an oral modification, he will memorialize the modification
in writing to the Respondents within three (3) days; provided,
however, that the effective date of the modification shall be the
date of the OSC's oral direction.

71.  No informal advice, guidance, suggestion, or comment by
EPA regarding reports, plans, specifications, schedules, and any
other writing submitted by the Respondents shall be construed as
relieving the Respondents of their obligation to obtain such
formal approval as may be required by this Order.

## OTHER APPLICABLE LAWS

72.  Except as otherwise provided pursuant to paragraph 73
herein and Section 121(e) of CERCLA, all on-site and off-site
actions required pursuant to this Order shall be performed in
accordance with all applicable local, state, and federal laws and
regulations.  Such laws shall include, but not be limited to, the
laws relating to occupational health and safety and worker's
compensation.

73.  In accordance with 40 C.F.R. § 300.415(i), all on-site
actions required pursuant to this Order shall, to the extent
practicable, as determined by EPA, considering the exigencies of

South Street Site
Second Administrative Order for Removal Action
Page 17

the situation, attain applicable or relevant and appropriate requirements under federal environmental, state environmental, or facility siting laws.

INSURANCE

74.  At least seven (7) days prior to commencing any on-site work under this Order, the Respondents shall secure, and shall maintain for the duration of this Order, comprehensive general liability and automobile insurance with limits of five million dollars ($5,000,000), combined single limit.  The United States shall be named as an insured for all such insurance policies. Within the same time period, the Respondents shall provide EPA with certificates of such insurance and a copy of each insurance policy.  If the Respondents demonstrate to EPA that any contractor or subcontractor maintains insurance equivalent to that described above or insurance covering the same risks but in a lesser amount, then the Respondents need provide only that portion of the insurance described above which is not maintained by such contractor or subcontractor.

REIMBURSEMENT OF EPA COSTS

75.  The Respondents shall reimburse EPA, upon written demand, for all response costs (including interest) incurred by the United States in connection with this Order.  Response costs shall include all direct costs related to overseeing the removal activities performed under this Order and all indirect costs calculated in accordance with EPA policy.  On a periodic basis, EPA will submit to the Respondents a bill for response costs incurred by the United States with respect to this Order.  Such bill will consist of: (1) a line-item summary of costs incurred during the preceding period with a breakdown of costs by category (including without limitation, payroll, travel, indirect costs, and contracts); and (2) a brief narrative summarizing the oversight activities performed by EPA and EPA's contractors during the billing period.

76.  The Respondents shall, within thirty (30) days after receipt of each bill, remit payment by certified or cashier's check, payable to the "Environmental Protection Agency, Hazardous Substance Superfund".  Each such check shall reference the South Street Superfund Site and the EPA docket number of the Order. The transmittal letter accompanying each such payment shall reference the purpose of the payment -- reimbursement of response costs -- and shall be mailed to the following address:

South Street Site
Second Administrative Order for Removal Action
Page 18

---

Region I
U.S. Environmental Protection Agency
Attn:  Hazardous Substance Superfund Accounting
P.O. Box 360197M
Pittsburgh, Pennsylvania  15251

Respondents shall simultaneously send a copy of the transmittal letter and check to:

Lee Mac Michael
U.S. Environmental Protection Agency
Site Evaluation and Response Section I
60 Westview Street
Lexington, Massachusetts  02173

### ENFORCEMENT; PENALTIES FOR NONCOMPLIANCE

77.  Violation of this Order may subject the Respondents to civil penalties of up to twenty-five thousand dollars ($25,000) for each day the violation occurs, as provided in section 106(b)(1) of CERCLA, 42 U.S.C. § 9606(b)(1).  The Respondents may also be subject to punitive damages in an amount up to three (3) times the amount of any costs incurred by the United States as a result of such violation, as provided in section 107(c)(3) of CERCLA, 42 U.S.C. § 9607(c)(3).

### DISCLAIMER OF LIABILITY BY EPA

78.  By issuance of this Order, the United States and EPA assume no liability for injuries or damages to persons or property resulting from acts or omissions by the Respondents, their officers, employees, agents, representatives, successors, assigns, contractors, or consultants in carrying out activities pursuant to this Order.  Neither the United States nor EPA shall be held as a party to any contract entered into by the Respondents or their directors, officers, employees, agents, representatives, successors, assigns, contractors, or consultants in carrying out activities pursuant to this Order.

### NO RELEASE FROM LIABILITY

79.  Nothing in this Order shall constitute or be construed as a satisfaction or release from any claim, cause of action, or demand in law or equity against the Respondents or any other person, whether or not a party to this Order, for any liability such person may have for any conditions or claims arising out of

South Street Site
Second Administrative Order for Removal Action
Page 19

---

or relating in any way to the generation, storage, treatment, handling, transportation, release, or disposal of any hazardous substances, hazardous wastes, pollutants, or contaminants found at, taken to, or taken from the Site including, but not limited to, any and all claims of the United States for money damages and interest under section 107(a) of CERCLA, 42 U.S.C. § 9607(a), or under any other applicable statute or the common law.

80. Nothing in this Order shall be deemed to constitute any decision on preauthorization of a claim within the meaning of section 111 of CERCLA, 42 U.S.C. § 9611.

## RESERVATION OF RIGHTS BY EPA

81. The United States reserves all rights against the Respondents and all other persons to take any further civil, criminal, or administrative enforcement action pursuant to CERCLA and/or any other available legal authority including the right to seek injunctive relief; the recovery of money expended or to be expended (plus interest); monetary penalties; criminal sanctions; and/or punitive damages regarding: (i) any violation of this Order; or (ii) any actual or potential threat to human health or welfare or the environment, or any release or threat of release of hazardous substances on, at, in, or near the Site.

82. EPA further expressly reserves the right both to disapprove work performed by the Respondents and to request or order the Respondents to perform tasks in addition to those detailed in the Order. In addition, EPA reserves the right to undertake response actions at any time and to perform any and all portions of the work activities which the Respondents have failed or refused to perform properly or promptly.

83. Notwithstanding any other provision of this Order, EPA shall retain all of its information gathering, entry, inspection, and enforcement authorities and rights under CERCLA and under any other applicable law, regulation, or permit.

## OPPORTUNITY TO CONFER

84. On December 23, 1991, EPA transmitted a draft of this Order to the Respondents. The Respondents were given twenty-one (21) calendar days to submit comments on the terms of the Order and the attached Scope of Work. EPA has reviewed and considered all such comments prior to issuing the final Order.

South Street Site
Second Administrative Order for Removal Action
Page 20

---

85.   Within **four (4) days** after receipt of this Order, the Respondents may request a conference with EPA to be held no later than **two (2) days** before the effective date.   Requests for a conference should be submitted to:

Andrew Raubvogel
Office of Regional Counsel
U.S. Environmental Protection Agency
JFK Federal Building -- RCV-23
Boston, Massachusetts  02203-2211
(617) 565-3169
FAX (617) 565-1141

86.   The purpose and scope of the conference shall be limited to issues involving the implementation of the response actions required by this Order and the extent to which the Respondents intend to comply with this Order.   The conference is not an evidentiary or adversarial hearing and is not part of any proceeding to enforce or challenge the Order.   The conference does not give the Respondents a right to seek review of this Order or to seek resolution of potential liability and no official stenographic record of the conference will be made.   At any conference held pursuant to this section, the Respondents may appear in person or by attorney or other representative.

### EFFECTIVE DATE; COMPUTATION OF TIME

87.   This Order shall be effective **fourteen (14) days** after the Order is signed by the Regional Administrator.   All times for performance of obligations under this Order shall be calculated from the effective date.   For purposes of this Order, the term "day" shall mean a calendar day unless otherwise noted herein. When computing any period of time under this Order, if the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the next working day.

**IT IS SO ORDERED.**   Issued at Boston, Massachusetts this 31st day of _January_, 1997.

Julie Belaga
Regional Administrator, Region I
U.S. Environmental Protection Agency

APPENDIX A

SCOPE OF WORK

SOUTH STREET SUPERFUND SITE – WALPOLE, MASSACHUSETTS

Pursuant to the

Administrative Order for Removal Action

Docket No. I-92-1033 CERCLA

I.   INTRODUCTION

This scope of work ("SOW") identifies the components of work required pursuant to the Unilateral Administrative Order for Removal Action (CERCLA Docket No. I-92-1033). Under this SOW, Respondents shall prepare and submit to EPA a Removal Action Plan and other plans and reports as identified below. Upon EPA approval, Respondents shall implement the Removal Action Plan. The Removal Action Plan will provide a detailed outline of the work to be performed to abate the potential danger to public health or welfare or the environment which may otherwise result from the actual or threatened release of asbestos at or from the South Street Superfund Site in Walpole, Massachusetts ("Site"). The Removal Action Plan and all other plans and reports shall be developed in accordance with the criteria set forth in the National Contingency Plan (NCP), 40 C.F.R. Part 300 and any amendments thereto.

Pursuant to the first Unilateral Administrative Order (CERCLA Docket No. I-89-1000) ("First Order"), the respondents to that order performed an assessment of the horizontal and vertical extent of asbestos contamination at the Site. Based upon the results of the site assessment, the respondents to the First Order prepared a plan entitled "Short Term Measure Response Plan - Engineering Evaluation and Cost Analysis - Asbestos Removal Action - South Street Site" (the "Response Plan") which examined various alternative cleanup options. The Response Plan recommended a cleanup approach consisting of:

    -- construction of an aluminum corrugated plate arch culvert for a length of approximately 400 feet in the portion of the Neponset River (and corresponding banks) where asbestos-contaminated soil ("ACS") is present.

    -- excavation of ACS from off-facility properties and containment of such ACS in the area above the culvert.

    -- excavation of ACS from on-facility locations and containment of such ACS in the area above the culvert.

    -- excavation of ACS from on-facility locations, transfer of such ACS to other Site areas, and containment of such ACS with cover materials.

EPA approved this cleanup approach in a letter to the Respondents dated September 6, 1991.

A - 1

## II.   WORK TASKS

Respondents shall perform the following activities pursuant to the schedule provided in Section VIII of this SOW:

A.   Conduct a Pre-Removal Inspection and Maintenance Program;

B.   Develop and Implement a Removal Action Plan consisting of:

    1.   Removal Action Work Plan.

    2.   Quality Assurance Project Plan.

    3.   Health and Safety and Air Monitoring Plan.

    4.   Design Drawings, Calculations, and Specifications.

        a.   Plate Arch Culvert Design.

        b.   Hydraulic and Hydrologic Analysis.

        c.   Site Preparation.

        d.   Containment Cell Design.

        e.   Cap design.

After EPA approval of the Health and Safety Plan and Quality Assurance Project Plan, Respondents shall comply with such plans in conducting all removal activities under this SOW.

C.   Develop and Implement a Post-Removal Inspection and Maintenance Plan;

D.   Develop and Implement Institutional Controls;

E.   Prepare a Completion of Work Report; and

F.   Attain the Applicable or Relevant and Appropriate Requirements identified in Appendix C.

## III.   PRE-REMOVAL INSPECTION AND MAINTENANCE

From the effective date of this order until on-site removal activities commence, Respondents shall implement an ongoing inspection and maintenance program which will include the following: i) the entire fence line; ii) all warning signs; iii) the asbestos pile located on Lot 1235-2A; iv) all areas where a temporary asbestos cover is in place; and v) a

general reconnaissance of the entire Site.  Where an
inspection reveals damage or deterioration of any such area,
Respondents shall immediately notify the OSC of the
conditions, and undertake repairs and/or replacement as soon
as possible, but no later than **seven (7) days** from the
inspection.  Inspections shall occur every month, and shall
be conducted by an individual familiar with the Site and the
conditions present at the Site.  Within **ten (10) days** of
each inspection, Respondents shall submit a written report
to the OSC summarizing the results of the inspection.


IV.  <u>REMOVAL ACTION PLAN</u>

Respondents shall prepare a Removal Action Plan which will
contain the following components:

A.   <u>Removal Action Work Plan</u>

The Removal Action Plan shall contain a Work Plan based
upon the prior site assessment work and the Response
Plan approved by EPA under the First Order.  The Work
Plan shall identify the objectives for implementation
and completion of all removal activities, including a
description of all removal activities and proposed
methods for the implementation of each such activity.

The Work Plan shall contain a proposed schedule which
at a minimum identifies the sequence of removal
activities and the start and completion dates for each
activity.  The plan shall define a critical path which
identifies those activities dependent on the completion
of other activities, and those activities which can be
implemented concurrently.

Under the First Order, the approved Response Plan
consisted of several distinct removal activities
tailored towards particular areas of the Site.
Consistent with that approach, the Work Plan shall
depict Site boundaries, and further delineate specific
zones based upon the proposed removal activity to be
utilized for each such zone.

The Work Plan shall also provide for sampling and
analysis to confirm the effective removal of Asbestos
Contaminated Soil from those zones where ACS is to be
excavated.

B.   <u>Quality Assurance Project Plan (QAPjP)</u>

The Quality Assurance Project Plan shall ensure that
all analytical results generated during removal

A - 3

activities are of known quality. The Respondents shall
develop the QAPjP in conjunction with the chosen
laboratory. The QAPjP shall be developed in accordance
with EPA's "Interim Guidance and Specifications for
Preparing Quality Assurance Project Plans" (QAM-005/80,
EPA-600/4-83-004; NTIS PB 83-170514). The QAPjP shall
address both field and laboratory analytical work and
include at a minimum: laboratory certification, chain
of custody, sample receipt, sample storage and
handling, analytical methods, calibration procedures
and frequency for the analytical equipment that will be
used, QA/QC Standard Operating Procedures (SOPs for
ms/msd, method blanks, duplicate surrogate recoveries
and instrument performance criteria), data validation,
and a listing of the laboratory personnel and their
qualifications. In addition, the QAPjP shall specify
the elapsed time between sample submission and receipt
of analytical results.

It is strongly recommended that Respondents request the
supervising contractor to work with the selected
laboratory(ies) when developing the entire QAPjP, since
much of the required material will already have been
developed by such laboratory(ies). The analytical
methods used will also be dictated in part by the data
requirements specified by the selected treatment and
disposal facility, where applicable.

C.   Health and Safety and Air Monitoring Plan (HSAMP)

In conducting all on-site activities, Respondents shall
comply with Section 300.150 of the NCP, 40 C.F.R. §
300.150, which references standards promulgated by the
Occupational Safety and Health Administration
(Hazardous Waste Operations and Emergency Response, 29
C.F.R. § 1910.120), including development and
implementation of a health and safety program.
Respondents shall also comply with applicable
contaminant-specific standards for asbestos (29 CFR §
1926.58 - Asbestos Standards for the Construction
Industry).

Respondents shall submit the HSAMP for EPA review and
comment. After incorporation of EPA's comments,
Respondents shall ensure that all persons entering the
Site during this removal action comply with the HASMP.

The HSAMP shall, at a minimum:

1.   Designate an on-site safety and health supervisor,
     define his/her role and authority, and list any

A - 4

other critical personnel (including the alternate supervisor) who will assist the supervisor;

2.  Characterize the safety and health risk or hazard analysis for each of the tasks and/or operations identified in this SOW;

3.  Specify the site security measures and/or security guard duties. This description shall include the security measures to be taken to ensure that no unauthorized persons enter the Site and that all persons conducting work at the Site will comply with the security measures. A Site entry/exit log shall be maintained and the HSAMP shall specify the person responsible for maintaining this log. If a security guard is hired, the on-site safety and health supervisor shall ensure that the guard conducts his/her duties outside the areas of contamination;

4.  Specify the personnel training requirements necessary to comply with tasks and/or operations identified in this SOW;

5.  Specify the appropriate levels of personnel protective equipment that will be worn to conduct the tasks and/or operations identified in this SOW;

6.  Specify the medical surveillance requirements. Based upon the anticipated season when work will be performed and the required level of personnel protective equipment, the potential site-specific health hazards (including physical stress due to temperature) shall be included;

7.  Specify an air monitoring program designed to provide information on the exposure of persons at the Site to friable asbestos, as well as the release of friable asbestos from the Site. Specify the frequency and types of personnel and ambient air monitoring methods, and the monitoring instrumentation that will be utilized.

8.  Specify the decontamination procedures for personnel and equipment. A flow chart identifying the specific decontamination stations shall be included;

A - 5

9.   Specify the site control measures.  The HSAMP
     shall include a Site map with initial delineation
     of work zones.  As zones change, the map shall be
     amended;

10.  Specify a plan for site communications, including
     the means by which all employees will be notified
     in an emergency, and the identification of the
     nearest medical assistance;

11.  Specify an emergency response plan.  This plan
     shall describe the appropriate response to various
     contingencies that may reasonably be anticipated
     to arise during the course of implementing work
     required under this SOW.  A list of emergency
     phone numbers and a map which identifies the
     location and the route to the nearest hospital
     that will accept injured personnel shall be
     included.  Material Safety Data Sheets (MSDS) for
     all hazardous substances, pollutants, or
     contaminants known or suspected to be on-site
     shall be available for inspection by all employees
     and in the event of an emergency; and

12.  Specify the precautions to be taken to ensure the
     safety of local residents, including but not
     limited to, conducting air monitoring and
     implementing procedures to minimize the migration
     of asbestos while conducting removal operations.

D.  Design Drawings, Calculations, and Specifications

    1.  Plate Arch Culvert Design

        The Removal Action Plan shall include a detailed
        design plan for the plate arch culvert which will
        be utilized to contain asbestos and stabilize the
        banks of a portion of the Neponset River.  The
        detailed design plan shall be accompanied by the
        performance specifications for the culvert, and
        the calculations which demonstrate that the
        culvert design meets those specifications.

        The Response Plan under the First Order included a
        proposal that the area above the culvert be
        utilized as a containment cell for ACS.  The
        culvert shall be designed to minimize the
        likelihood of any failure of or damage to this
        containment cell.  In addition, the culvert shall
        be designed so as to allow for repairs to be
        conducted from within the culvert.

                        A - 6

2.   Hydraulic and Hydrologic Analysis

The Removal Action Plan shall include the results
of hydraulic and hydrologic analyses to ensure
that the proposed culverting of the Neponset River
does not significantly increase the level of the
existing 100-year floodplain.  The hydrologic
analysis shall include a definition of the 100
year-floodplain for the Neponset River and the
projected flows if a 100 year flood occurred.
Existing information such as the Federal Emergency
Management Agency, Flood Insurance Study of the
Neponset River should be utilized.  A United
States Geological Survey Stream Gauge located just
downstream of the site should be used to develop
flow rates.

The hydraulic analysis shall be performed to
determine if the proposed culvert can handle the
100 year flow without significantly increasing the
100 year floodplain elevation upstream or
downstream of the site.  Water Surface Profiles
(i.e. Energy Grade Lines, Hydraulic Grade Lines,
etc.) of pre-construction conditions and projected
post-construction conditions shall be incorporated
into the analysis.  In addition, the plan shall
include an analysis of potential erosion effects
caused by the proposed culvert at the inlet and
outlet areas of the structure.

3.   Site Preparation

Prior to actual on-site commencement of removal
activities, a number of preliminary tasks must be
accomplished (e.g., the relocation of sanitary
sewer and storm water discharge drains, and
clearing vegetation from certain areas of the
Site).  The Removal Action Plan shall include a
site preparation plan for all foreseeable
preparatory activities, based upon the Response
Plan.

4.   Containment Cell Design

The areas known as lagoons #1 and #2 and the area
above the proposed culvert have been designated as
potential locations for on-site containment of
asbestos-contaminated soil transferred from other
portions of the Site.  The Removal Action Plan
shall include a design plan for these containment
cells.

A - 7

The proposed containment cell above the culvert shall be designed so as to minimize the potential for release of ACS into the Neponset River (and its banks) in the event of failure of or damage to the culvert.

5.   Cap Design

The Removal Action Plan shall include a design plan for the cap which will be utilized to contain asbestos on certain portions of the Site. The cap should be designed to prevent the penetration of frost into the asbestos containing soils. Respondents shall refer to "EPA Asbestos Abatement Work, New England Division, Engineering Division, Position Paper" as guidance in preparing the cap design. The cap design plan shall include calculations which demonstrate that the proposed cap thickness is justified.

A Site Drainage Plan should also be developed due to the length of the proposed culvert and the size of the area to be filled. The Plan should outline how drainage will be handled for the area above and around the diversion structure. All assumptions and calculations necessary to perform the analyses should be submitted.

V.   POST-REMOVAL INSPECTION AND MAINTENANCE PLAN

Respondents shall submit a Post-Removal Inspection and Maintenance Plan, and corresponding schedules, which shall address the following post-removal tasks:

A.   An evaluation of the need for and development (as appropriate) of post-removal inspection and maintenance for the cap and culvert; and

B.   An evaluation of the need for institutional controls and/or deed restrictions and a description of such controls and/or restrictions.

In the event that analysis performed during implementation of the Removal Action Plan indicates that the action levels for residual contamination have not been achieved, Respondents shall propose additional response actions to achieve those levels. Upon EPA approval, Respondents shall undertake those additional response activities.

A - 8

VI.  <u>INSTITUTIONAL CONTROLS</u>

Respondents shall provide institutional controls as set
forth in the Federal Clean Air Act National Emission
Standards for Hazardous Pollutants (NESHAPS), 40 CFR §
61.151(e), and as may be additionally required by EPA.


VII. <u>COMPLETION OF WORK REPORT</u>

The Completion of Work Report shall by modeled after the OSC
Report required by Section 300.165 of the NCP.  The Report
shall include but not be limited to:

A.  An overview of all removal work conducted, including a
    brief summary which explains how Respondents
    accomplished the objectives of the removal action;

B.  A chronology of the removal activities.  Daily field
    activity summary reports shall be maintained during the
    cleanup and should be referred to when developing this
    chronology.  The actual daily reports shall be provided
    as attachments;

C.  A discussion of the removal activities.  Include "as-
    built" drawings as appropriate.  The removal shall be
    photo-documented and copies of those photographs shall
    also be provided as attachments to this report;

D.  A description of the physical location of residual
    asbestos at the Site, including:

    1.  Tabular summary of all the data generated;

    2.  Site map(s) that delineate the residual lateral
        and vertical contaminant concentration and show
        the depth and type of clean fill used to restore
        the Site to its original contour;

    3.  All analytical reports generated from samples
        taken during the implementation of the Removal
        Action Work Plan shall be provided as attachments;
        and

    4.  An evaluation of the effectiveness of the cleanup
        in mitigating the threat and actual release of
        hazardous substances from the Site.

E.  Legible copies of hazardous waste manifests containing
    all signatures including the receiving facility
    signature or any similar shipping documents, and

A - 9

documentation which certifies the final disposition of any material shipped off-site shall be provided as attachments.

VIII.    SCHEDULE

Respondents shall submit deliverables in accordance with paragraphs 51-53 of the Order, and plan and conduct the removal activities pursuant to the following schedule:

A.    Within **thirty (30) days** after the effective date of this Order and continuing until on-site removal activities under the Removal Action Plan commence, Respondents shall implement an ongoing inspection and maintenance program under section III of this SOW.

B.    Within **twenty-one (21) days** after the effective date of this Order, Respondent shall submit for EPA approval the Removal Action Plan;

C.    Within **fourteen (14) days** after EPA approves the Removal Action Plan, Respondents shall commence on-site removal activities and shall complete such activities within the time schedule provided in the approved Removal Action Plan. Respondents shall notify EPA in writing of the date on which on-site removal activities are completed;

D.    No later than **fourteen (14) days** prior to the scheduled date for completion of work in the approved Removal Action Plan, Respondent shall submit for EPA approval a Post-Removal Inspection and Maintenance Plan.

E.    Within **seven (7) days** after EPA approval of the Post-Removal Inspection and Maintenance Plan, Respondents shall commence post-removal activities and shall complete such activities within the time schedule provided in the approved Post-Removal Plan; and

F.    Within **sixty (60) days** after completing all on-site removal activities other than ongoing post-removal inspection and maintenance, Respondents shall submit for EPA approval the Completion of Work Report.

IX.    NOTIFICATION, STATUS REPORTS, AND STATE COMMUNICATION

A.    Respondents shall provide advance notification to EPA of any planned field activities related to this Order including but not limited to the following:

A - 10

1.  **Seven (7) days** advance notice of any sampling
    activities.  This will ensure sufficient lead time
    for EPA to schedule sample analysis slots for any
    confirmatory sampling required.  Should an
    unanticipated occurrence require collection of
    samples (e.g. an emergency), Respondents shall
    notify EPA of the sampling event as soon as
    practicable;

2.  **Three (3) days** advance notice of other field work,
    e.g., commencement of actual cleanup activities.

B.  Within **ten (10) days** after receiving a verbal or
    written request from the OSC, Respondents shall provide
    EPA with a written status report of work identified by
    the OSC.  This report shall include specific
    photographs, tables and diagrams, as required, in
    addition to a brief chronological summary of milestone
    activities which positively or negatively impact on the
    Respondents' ability to fulfill their obligations under
    the Order and this SOW in a timely manner.

C.  In addition to any provisions of the Order or SOW
    requiring submission of deliverables, plans, or other
    documents to EPA, Respondent shall also submit any or
    all such documents, as specified by the OSC, to the
    State of Massachusetts Department of Environmental
    Protection at the following address:

                    Patricia Donahue
    Massachusetts Department of Environmental Protection
                    10 Commerce Way
              Woburn, Massachusetts  01801

                          A - 11

APPENDIX B

SOIL SAMPLE LOCATIONS FOR WHICH RESPONDENTS' FOUND ACTIONABLE
LEVELS OF ASBESTOS

SOUTH STREET SUPERFUND SITE - WALPOLE, MASSACHUSETTS

Pursuant to the

Administrative Order for Removal Action

Docket No. I-92-1033 CERCLA



ASBESTOS SAMPLING RESULTS
EASTERN AND WESTERN
ON-FACILITY AREA PLAN
SOUTH STREET SITE, WALPOLE, MA

SOUTH STREET SITE
PRPs

Canonie Environmental

FIGURE 3



ASBESTOS SAMPLING RESULTS
OFF-FACTORY AREA PLAN
SOUTH STREET SITE, WALPOL, MA
PREPARED FOR
SOUTH STREET SITE
PRPs

FIGURE 4

APPENDIX C

APPLICABLE OR RELEVANT AND APPROPRIATE REQUIREMENTS

SOUTH STREET SUPERFUND SITE - WALPOLE, MASSACHUSETTS

Pursuant to the

Administrative Order for Removal Action

Docket No. I-92-1033 CERCLA

SOUTH STREET SITE, WALPOLE MASSACHUSETTS:

ARARS DETERMINATION FOR REMOVAL ACTION
CONDUCTED UNDER CERCLA § 106

Introduction

The purpose of a removal action is to respond to a release
or threat of release of hazardous substances, pollutants, or
contaminants in order to abate near term dangers to human health
and the environment.  Pursuant to the National Contingency Plan
(NCP), removal actions shall, "to the extent practicable
considering the exigencies of the situation, attain applicable or
relevant and appropriate requirements [ARARs] under federal
environmental or state environmental or facility siting laws."
40 C.F.R. § 300.415(i).  To assess the practicability of
attaining ARARs, EPA examines the urgency of the situation, the
scope of the removal action, and other appropriate factors.  Id.

An ARARs analysis relating to a removal action conducted
under Sections 104 or 106 of CERCLA requires EPA to identify any
"standard, requirement, criteria, or limitations under any
Federal environmental law."  42 U.S.C. § 9621(d)(2)(A)(i).  State
ARARs include any "promulgated standard, requirement, criteria or
limitation ... that is more stringent than the federal standard."
42 U.S.C. § 9621(d)(2)(A)(ii).  However, with respect to removal
actions conducted entirely on-site, local, state and federal
permits are not required.  42 U.S.C. 9622(e).  EPA interprets
this provision to mean that removal actions conducted on-site
only need to comply with the substantive components of ARARs, and
not with the corresponding administrative requirements.  CERCLA
Compliance with Other Laws Manual (OSWER Directive 9234.1, p.
XVI) ("ARARs Manual").  Further, the permit exemption applies to
all administrative requirements, whether or not they are actually
styled as "permits."  ARARs Manual at pp. 1-11.

In order to determine the universe of ARARs pertaining to
the removal action at the South Street Site, EPA evaluated
information from the following sources: (i) communications from
the Commonwealth of Massachusetts on state ARARs in letters dated
July 11, 1990, May 29, 1991, and July 29, 1991; (ii) the Removal
Plan submitted by the PRPs in January 1991 which included a
discussion on state and federal ARARs; and (iii) EPA guidance and
regulations and discussions with EPA personnel on federal ARARs.
Based upon the criteria established by Section 121 of CERCLA and
the guidelines in the ARARs Manual, EPA has determined that the
ARARs listed below are practicable to attain and protective of
human health and the environment.

-2-

The ARARs listed below shall be attained both during implementation of the removal action, and with respect to the hazardous substances, pollutants and contaminants remaining at the Site after the removal action is complete.  The PRPs shall therefore consider these ARARs in preparing the detailed design plans for the removal action.  Subsequent to this ARARs determination, EPA may make changes to the list of ARARs to be attained based upon changed conditions, information presented by the PRPs in the detailed design plans, or other relevant information, e.g., results of an ecological assessment.

## I.  AIR AND TOXICS STANDARDS

### Federal Clean Air Act

Under the authority of Section 112 of the Clean Air Act, 42 U.S.C. § 7412, EPA promulgated new National Emission Standards for Hazardous Air Pollutants (NESHAPs) on November 20, 1990, codified at 40 C.F.R. Part 61.  Subpart M of the regulations governs asbestos emissions to the air; listed below are the regulations that are applicable or relevant and appropriate.

| FEDERAL NESHAPS REGULATIONS | TOPIC |
|---|---|
| 40 C.F.R. § 61.145(c)(2), (6)-(8) | Standard for demolition and renovation - procedures for asbestos emission control. |
| 40 C.F.R. § 61.150 (except § 61.150(d)) | Standard for waste disposal for manufacturing, fabricating, demolition, renovation, and spraying operations (subsection (d) is a procedural requirement). |
| 40 C.F.R. § 61.151 (except § 61.151(d) & (e)) | Standard for inactive waste disposal sites for asbestos mills and manufacturing and fabricating operations (subsections (d) and (e) are procedural requirements). |
| 40 C.F.R. § 61.154 (except § 61.154(e)-(j)) | Standard for active waste disposal sites (subsections (e)-(j) are procedural requirements). |

### Massachusetts Clean Air Act

The state regulations for asbestos emissions to the air are codified at 310 C.M.R. § 7.15.  This entire subpart is applicable or relevant and appropriate.  The PRPs shall develop the detailed design so as to attain those standards that are more stringent than the federal NESHAPs requirements.

### Federal Toxic Substances Control Act (TSCA)

Under TSCA, 15 U.S.C. § 2601 et seq., EPA has promulgated regulations on the performance of asbestos abatement projects conducted by state and local governments whose employees are not

-3-

covered under OSHA workplace standards.[1]  40 C.F.R. Part 763, Subpart G (763.120 - 763.121).  As no state or local government is conducting the removal action, the TSCA standards are not directly applicable; the standards are, however, relevant and appropriate for the health and safety of all on-site personnel during implementation of removal activities at the Site.  As the detailed design plan (including the Health and Safety Plan) is developed and reviewed by EPA, the OSC may need to make case-specific determinations on the practicability or impracticability of attaining particular portions of these regulations.

## II.  WASTE DISPOSAL STANDARDS

### Federal Resource Conservation and Recovery Act (RCRA)

The removal action will involve the placement of clean fill on areas contaminated with asbestos.  Pursuant to RCRA, such activity will constitute the disposal of solid waste.  EPA has promulgated general guidelines under RCRA for the classification of solid waste disposal facilities and practices, codified at 40 C.F.R. Part 257.  EPA applies these criteria to determine whether a waste disposal facility will pose an adverse effect on human health or the environment.  EPA has determined that the removal action will attain the RCRA siting criteria if the detailed design plans are developed consistent with the Removal Response Plan; that is, implementation of the proposed action will not present any adverse effects on human health or the environment.

### Massachusetts Solid Waste Facility Site Assignment

Section 40 of 310 CMR establishes site suitability criteria for solid waste disposal.  In a July 11, 1990 letter from the Massachusetts Department of Environmental Protection (DEP) to counsel for the PRPs, DEP acknowledged that the procedural requirements of the site assignment regulations do not apply.  DEP further informed the PRPs and EPA that in order to abate the public health threats associated with asbestos emissions at the Site, DEP would use its statutory authority under M.G.L. c 21H to exempt the South Street Site from the site suitability criteria.

### Massachusetts Solid Waste Management

The state regulations for managing a solid waste facility are codified at 310 CMR Part 19.  The table below lists those solid waste management regulations applicable or relevant and

---

[1]Pursuant to 40 C.F.R. § 300.150, all removal actions conducted under the NCP must comply with OSHA standards in 29 C.F.R. § 1910.120.  OSHA standards are thus always applicable and are not considered under an ARARs analysis.

-4-

appropriate for the removal action.  As the detailed design plan is developed and reviewed by EPA, the OSC may need to make case-specific determinations on the practicability or impracticability of attaining particular portions of these regulations.

| MASSACHUSETTS SOLID WASTE MANAGEMENT REGULATIONS | TOPIC |
|---|---|
| 310 CMR § 19.038(2)(a)(4)-(10); 19.038(2)(c)(2), (3) | General Criteria and Landfill Criteria for review of applications for a permit or permit modification. |
| 310 CMR § 19.061 | Regulations governing Special Wastes (Section 19.061(3) lists asbestos as a special waste). |
| 310 CMR § 19.080(2)(c) | Variances.  EPA has determined that the variance standard is met for the other applicable portions of 19.038 which are not listed above. |
| 310 CMR § 19.112 | Landfill Final Cover Systems. |
| 310 CMR §19.115 | Storm Water Controls. |
| 310 CMR § 19.130 (except §§ 19.130(30)-(31), (34)-(35). | Operation and Maintenance Requirements (subsections 19.130(34)-(35) are procedural requirements). |

## III.  WATER AND WETLANDS STANDARDS

## Federal Clean Water Act

Pursuant to Section 404 of the Clean Water Act, 33 U.S.C. § 1344, EPA regulates dredge or fill activities in waters of the United States.  EPA has issued guidelines, codified at 40 C.F.R. Part 230, to regulate dredge and fill activities.  These guidelines are applicable or relevant and appropriate, and shall be considered in the development of the detailed design plans.

| EPA SECTION 404(b)(1) GUIDELINES FOR DISPOSAL OF DREDGE/FILL MATERIAL | TOPIC |
|---|---|
| Subpart A (40 C.F.R. §§ 230.1 - 230.7) | General. |
| Subpart B (40 C.F.R. §§ 230.10 - 230.11) (except § 230.12) | Compliance with the Guidelines (Section 230.12 is a procedural requirement).  Under 230.10(a), dredge or fill activity may only occur if there is no practicable alternative.  EPA has determined, based upon the Removal Response Plan, that there is no practicable alternative. |
| Subparts C and D (40 C.F.R. §§ 230.20 - 230.32) | Potential Impacts on Physical, Chemical, and Biological Characteristics of the Aquatic Ecosystem.  These Subparts shall be considered by the PRPs when performing an ecological evaluation of the Site. |
| Subpart E (40 C.F.R. §§ 230.40 - 230.45) | Potential Impacts on Special Aquatic Sites.  This Subpart shall be considered by the PRPs when performing an ecological evaluation of the Site. |

-5-

| Subpart F (40 C.F.R. §§ 230.50 - 230.54) | Potential Impacts on Human Use Characteristics. This Subpart shall be considered by the PRPs when performing an ecological evaluation of the Site. |
|---|---|
| Subpart H (40 C.F.R. §§ 230.70 - 230.77) | Actions to Minimize Adverse Effects. The PRPs shall consider the results of the ecological evaluation in meeting these standards. |

Under the Clean Water Act, the U.S. Army Corps of Engineers is authorized to issue permits for discharges into waters of the United States. The Army Corps guidelines for issuance of such permits are relevant and appropriate and shall be considered in the development of the detailed design plan.

| ARMY CORP OF ENGINEERS - NATIONWIDE PERMITS | TOPICS |
|---|---|
| 33 C.F.R. § 330.5(b) | Conditions to consider when dredge or fill activity occurs. |
| 33 C.F.R. § 330.6 | Management practices to minimize adverse effects of dredge or fill activity. |
| 33 C.F.R. § 325.3(c) | In addition to the 404(b)(1) guidelines, EPA evaluates the probable (and cumulative) impacts of the proposed activity on the public interest. This public interest analysis involves an evaluation of factors enumerated in this provision. EPA has determined that the removal action is in the public interest. |

## Massachusetts Wetlands Protection Act

The state regulations for activities conducted in wetlands are codified at 310 CMR §§ 10.00 - 10.60. Part III of 310 CMR 10 establishes standards to ensure that activities in wetlands are conducted in a manner protective of the affected resources. At this time, EPA does not have sufficient information to determine if the removal will create an endangerment to the resource areas identified below, or if the attainment of the particular standards is practicable or impracticable. EPA will reassess the attainment of these standards at the detailed design phase after the PRPs perform an ecological evaluation of the Site.

| MASSACHUSETTS WETLANDS PROTECTION REGULATIONS | TOPIC |
|---|---|
| 310 CMR § 10.54(4)(a)(1), (3), (5) | Banks. The PRPs shall consider the results of the ecological evaluation in meeting standard (5). |
| 310 CMR § 10.55(4)(b) | Bordering Vegetated Wetlands |
| 310 CMR § 10.56(4)(a)(2), (4) | Land Under Water Bodies and Waterways. The PRPs shall consider the results of the ecological evaluation in meeting standard (4). |

—6—

| 310 CMR § 10.60 | Wildlife Habitat Evaluations. The PRPs shall consider the results of the ecological evaluation in meeting these standards. |

## Massachusetts Waterways Statute

Under the authority of M.G.L. c 91, Massachusetts DEP promulgated regulations to protect and promote the public interest in waterways, including tidal and non-tidal rivers. 310 CMR 9. While these regulations may not be directly applicable to the proposed removal activities in the Neponset River, certain standards enumerated below are relevant and appropriate.

| MASSACHUSETTS WATERWAYS REGULATIONS | TOPIC |
|---|---|
| 310 CMR § 9.32 | Categorical Restrictions on Fill and Structures |
| 310 CMR § 9.35 | Standards to Preserve Water-Related Public Rights |
| 310 CMR § 9.37 | Engineering and Construction Standards |
| 310 CMR § 9.40 | Standards for Dredging and Dredged Material Disposal |

## IV.   TO BE CONSIDERED

EPA may, as appropriate, identify other advisories, criteria, or guidances as additional guidelines when analyzing the risk assessment or setting protective cleanup levels at a CERCLA site. 40 C.F.R. § 300.400(g)(3). These additional guidelines are not legally binding but provide useful information or recommended procedures. The PRPs should consult the following guidelines when developing the detailed design plans for the removal action.

| DOCUMENTS TO BE CONSIDERED | TOPIC |
|---|---|
| U.S. Army Corp of Engineers, "EPA Asbestos Abatement Work - Position Paper" (New England Division, Engineering Division, Dec. 1987) (prepared for EPA). | Contains guidelines developed by the Army Corps of Engineers for the cleanup of asbestos-contaminated sites in southern New Hampshire. |
| Massachusetts Department of Environmental Quality Engineering, "Policy for the Handling and Disposal of Non-friable Asbestos Waste" (June 20, 1979). | This policy seeks to encourage techniques which render non-friable asbestos waste from demolition sites, and establishes two methods for the disposal of such wastes. |
| Memorandum of Agreement Between EPA and the Department of the Army Concerning the Determination of Mitigation Under the Clean Water Act Section 401(b)(1) Guidelines (55 Fed. Reg. 9210, March 12, 1990). | Provides policy and procedures to be used in determining the type and level of mitigation techniques for work done under Section 404(b)(1) of the Clean Water Act. |