### EXHIBIT G

**Claim no. 13951 (The Sequa Claim)**

# WR Grace

SR00000669

## Bankruptcy Form 10

### Index Sheet

| Claim Number: | 00013951 | | Receive Date: | 03/31/2003 |
|---|---|---|---|---|

## Multiple Claim Reference

| Claim Number | _____ | ☐ | MMPOC | Medical Monitoring Claim Form |
|---|---|---|---|---|
| | | ☐ | PDPOC | Property Damage |
| | | ☐ | NAPO | Non-Asbestos Claim Form |
| | | ☐ | | Amended |
| Claim Number | _____ | ☐ | MMPOC | Medical Monitoring Claim Form |
| | | ☐ | PDPOC | Property Damage |
| | | ☐ | NAPO | Non-Asbestos Claim Form |
| | | ☐ | | Amended |

## Attorney Information

| Firm Number: | 00375 | Firm Name: | Von Briesen & Roper Sc |
|---|---|---|---|
| Attorney Number: | 00255 | Attorney Name: | Rebecca H Simonoi |

Zip Code: 53202

Cover Letter Location Number: SR00000669

| Attachments Medical Monitoring | Attachments Property Damage | Non-Asbestos |
|---|---|---|
| ☐ TBD | ☐ TBD | ☒ Other Attachments |
| ☐ TBD | ☐ TBD | |
| ☐ TBD | ☐ TBD | |
| ☐ TBD | ☐ TBD | |
| ☐ TBD | ☐ TBD | |
| | ☐ Other Attachments | |

| Other | ☐ Non-Standard Form |
|---|---|
| | ☐ Amended |
| | ☐ Post-Deadline Postmark Date |



| UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF Delaware | | **GRACE NON-ASBESTOS PROOF OF CLAIM FORM** |
|---|---|---|

Name of Debtor:[1]  W.R. Grace & Co. - Conn. | Case Number  01-01139 (JKF)

NOTE: Do not use this form to assert an Asbestos Personal Injury Claim, a Settled Asbestos Claim or a Zonolite Attic Insulation Claim. Those claims will be subject to a separate claims submission process. This form should also not be used to file a claim for an Asbestos Property Damage Claim or Medical Monitoring Claim. A specialized proof of claim form for each of these claims should be filed.

Name of Creditor (The person or other entity to whom the Debtor owes money or property):

Sequa Corporation

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☒ Check box if the address differs from the address on the envelope sent to you by the court.

THIS SPACE IS FOR COURT USE ONLY

Name and address where notices should be sent:

Rebecca H. Simoni, Esq.
von Briesen & Roper, s.c.
411 E. Wisconsin Avenue, Suite 700
Milwaukee, WI  53202

Account or other number by which creditor identifies Debtor:

Not Applicable

Check here ☐ replaces
if this claim ☐ amends a previously filed claim, dated:_____

Corporate Name, Common Name, and/or d/b/a name of specific Debtor against whom the claim is asserted:

W.R. Grace & Co. - Conn.

1. Basis for Claim
   ☐ Goods sold
   ☐ Services performed
   ☐ Environmental liability
   ☐ Money loaned
   ☐ Non-asbestos personal injury/wrongful death
   ☐ Taxes
   ☒ Other  Contingent claim arising under 6/18/97 TEC Systems Sales Agreement, based on Debtor's obligation to indemnify Creditor for liability and defense costs related to claims against Creditor in lawsuit filed in Circuit Court of Eau Claire County, Wisconsin, in Case No. 02-CV-495.

   ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
   ☐ Wages, salaries, and compensation (fill out below)
   Your SS #:_____
   Unpaid compensation for services performed
   from _____ to _____ (date)

2. Date debt was incurred:  Contract date 6/18/97;
   claim is contingent

3. If court judgment, date obtained: Not Applicable

4. Total Amount of Claim at Time Case Filed:  $ Unknown
   If all or part of your claim is secured or entitled to priority, also complete Item 5 below.
   ☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

5. Classification of Claim. Under the Bankruptcy Code all claims are classified as one or more of the following: (1) Unsecured Nonpriority, (2) Unsecured Priority, (3) Secured. It is possible for part of a claim to be in one category and part in another. CHECK THE APPROPRIATE BOX OR BOXES that best describe your claim and STATE THE AMOUNT OF THE CLAIM AT TIME CASE FILED.

   ☐ SECURED CLAIM (check this box if your claim is secured by collateral, including a right of setoff.)

   Brief Description of Collateral:

   ☐ Real Estate        ☐ Other (Describe briefly)

   Amount of arrearage and other charges at time case filed included in secured claim above, if any: $_____

   Attach evidence of perfection of security interest

   ☒ UNSECURED NONPRIORITY CLAIM
   A claim is unsecured if there is no collateral or lien on property of the debtor securing the claim or to the extent that the value of such property is less than the amount of the claim.

   ☐ UNSECURED PRIORITY CLAIM - Specify the priority of the claim.

   ☐ Wages, salaries, or commissions (up to $4650), earned not more than 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3).

   ☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(4).

   ☐ Taxes or penalties of governmental units - 11 U.S.C. § 507(a)(7).

   ☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a(____).

6. Credits: The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

This Space is for Court Use Only

7. Supporting Documents: *Attach copies of supporting documents*, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.  See documents attached as Exhibit A and Exhibit B.

8. Acknowledgement: Upon receipt and processing of this Proof of Claim, you will receive an acknowledgement card indicating the date of filing and your unique claim number. If you want a file stamped copy of the Proof of Claim form itself, enclose a self addressed envelope and copy of this proof of claim form.

Date  3/28/03 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): *Rebecca H. Simoni*  Rebecca H. Simoni, Esq.

WR Grace        BF.46.181.9039
00013951
SR=669

[1] See General Instructions and Claims Bar Date Notice and its exhibits for names of all Debtors and "other names" used by the Debtors.

# PURCHASE OF TEC SYSTEMS

# 6/18/97



**EXHIBIT**

A

# TEC SYSTEMS
# SALE AGREEMENT

**June 18, 1997**

C:\GRACE\SALEAGTG.618.wpd

## TABLE OF CONTENTS

Page

**ARTICLE 1**
**Definitions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
1.01  General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
1.02  Defined Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**ARTICLE 2**
**Sale of Subject Business, Price** . . . . . . . . . . . . . . . . . . . . . . . . . . 31
2.01  Sale of Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
2.02  Total Purchase Price . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
2.03  Local Purchase Prices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
2.04  Exchange Rates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
2.05  Swedish Indemnified Liabilities and Excluded Assets . . . . . . . . . 33

**ARTICLE 3**
**Closing** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
3.01  Scheduled Closing Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
3.02  Time and Place of Closing, Simultaneity . . . . . . . . . . . . . . . . . . 34
3.03  Transfers at the Closing; Payments . . . . . . . . . . . . . . . . . . . . . 35
3.04  Ancillary Agreements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
3.05  Method of Closing Payments . . . . . . . . . . . . . . . . . . . . . . . . . . 36
3.06  Further Assurances of Selling Companies . . . . . . . . . . . . . . . . . 37
3.07  Further Assurances of Buying Companies . . . . . . . . . . . . . . . . . 37

**ARTICLE 4**
**Purchase Prices, Post-Closing Adjustments** . . . . . . . . . . . . . . . . . 38
4.01  Closing of Books . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
4.02  Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
4.03  Computations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
4.04  Closing Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
4.05  Acceptance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
4.06  Non-Acceptance, Resolution of Disputes . . . . . . . . . . . . . . . . . . 39
4.07  Payment of Adjustments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

**ARTICLE 5**
**Grace's Representations and Warranties** . . . . . . . . . . . . . . . . . . . . 41
5.01  Corporate Status and Authority . . . . . . . . . . . . . . . . . . . . . . . . . 41
5.02  Authorization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
5.03  Execution and Delivery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

## TABLE OF CONTENTS

Page

5.04   No Conflict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   43
5.05   Real Property; Title . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   43
5.06   Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   44
5.07   Litigation; Investigations . . . . . . . . . . . . . . . . . . . . . . . . . . . .   44
5.08   Asset Disposition or Loss . . . . . . . . . . . . . . . . . . . . . . . . . . .   45
5.09   Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   45
5.10   Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   45
5.11   Labor and Employment . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   46
5.12   Employee Benefit Plans . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   47
5.13   Environmental . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   47
5.14   Intellectual Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   50
5.15   Compliance with Laws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   51
5.16   Permits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   51
5.17   Warranty Obligations; Receivables . . . . . . . . . . . . . . . . . . . . . .   52
5.18   Relations with Customers . . . . . . . . . . . . . . . . . . . . . . . . . . . .   53
5.19   Confidentiality Agreements . . . . . . . . . . . . . . . . . . . . . . . . . . .   53
5.20   Absence of Certain Changes and Events . . . . . . . . . . . . . . . . . .   53
5.21   Inventories . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   54
5.22   Owned Real Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   54
5.23   Real Property Leases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   55

ARTICLE 6
       Sequa Representations and Warranties . . . . . . . . . . . . . . . . . . . .   55
6.01   Corporate Status and Authority . . . . . . . . . . . . . . . . . . . . . . . .   55
6.02   Authorization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   56
6.04   No Conflict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   56
6.05   Sufficient Funds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   57
6.06   Phase I and Phase II Reports . . . . . . . . . . . . . . . . . . . . . . . . . .   57

ARTICLE 7
       Sequa's Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   57
7.01   Financial Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   57
7.02   No Additional Representations . . . . . . . . . . . . . . . . . . . . . . . . .   58
7.03   No Effect on Representations and Warranties . . . . . . . . . . . . . . .   58

ARTICLE 8
       Covenants of Grace and Sequa . . . . . . . . . . . . . . . . . . . . . . . . .   58
8.01   Access and Inquiry . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   59
8.02   Hart-Scott-Rodino Act, etc . . . . . . . . . . . . . . . . . . . . . . . . . . . .   59

## TABLE OF CONTENTS

Page

8.03    Licenses and Permits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    59
8.04    Notices to Third Parties; Consents to Assignment . . . . . . . . . . . .    60
8.05    Reasonable Efforts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    60
8.06    Title Insurance and Survey . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    60

**ARTICLE 9**
Conduct of Business Prior to the Closing . . . . . . . . . . . . . . . . . . .    61
9.01    Operation in Ordinary Course . . . . . . . . . . . . . . . . . . . . . . . . . . . .    61
9.02    Disposition of Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    61
9.03    Material Agreements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    61
9.04    Relations with Customers and Suppliers . . . . . . . . . . . . . . . . . . .    62
9.05    Maintenance of Transferred Assets . . . . . . . . . . . . . . . . . . . . . . .    62
9.06    Employees and Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . .    62
9.07    Labor Notifications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    63

**ARTICLE 10**  Conditions Precedent to Sequa's Obligations . . . . . . . . . . . . . . . .    64
10.01    Accuracy of Representations and Warranties . . . . . . . . . . . . . . .    64
10.02    Performance of Covenants and Agreements . . . . . . . . . . . . . . . .    64
10.03    HSR Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    64
10.04    Permits, Consents, etc . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    64
10.05    Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    65
10.06    Certificate of Grace . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    65
10.07    Opinion of Grace's Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    66
10.08    Receipt of Title Insurance, Survey . . . . . . . . . . . . . . . . . . . . . . . .    66
10.09    Union Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    67
10.10    Damages by Casualty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    67
10.11    Environmental . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    67
10.12    IDC/BABN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    68
10.13    Katec Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    68

**ARTICLE 11**
Conditions Precedent to Grace's Obligations . . . . . . . . . . . . . . . . . .    68
11.01    Accuracy of Representations and Warranties . . . . . . . . . . . . . . .    69
11.02    Performance of Covenants and Agreements . . . . . . . . . . . . . . . .    69
11.03    Hart-Scott-Rodino Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    69
11.04    Permits, Consents, etc . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    69
11.05    Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    70
11.06    Certificate of Sequa . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    70
11.07    Opinion of Sequa's Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    70

## TABLE OF CONTENTS

Page

Post-Closing Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   93
16.01 Information for Reports  . . . . . . . . . . . . . . . . . . . . . . .   93
16.02 Renewal of Agreements . . . . . . . . . . . . . . . . . . . . . . . . . . .   93
16.03 "Grace" Name . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   94
16.04 Intercompany Agreements . . . . . . . . . . . . . . . . . . . . .   94
16.05 Covenant Not to Compete . . . . . . . . . . . . . . . . . . . . . . .   95
16.06 Certain Tax Matters . . . . . . . . . . . . . . . . . . . . . . . . . . .   95
16.07 Value Added Taxes. . . . . . . . . . . . . . . . . . . . . . . . . . . . .   99
16.08 Consents to Assignment . . . . . . . . . . . . . . . . . . . . . . . .   99

ARTICLE 17
Expenses  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   99
17.01 Buying Companies' Expenses . . . . . . . . . . . . . . . . . . . .  100
17.02 Selling Companies' Expenses . . . . . . . . . . . . . . . . . . . .  100
17.03 Transfer Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  100

ARTICLE 18
Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  101
18.01 Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  101

ARTICLE 19 Product Warranty . . . . . . . . . . . . . . . . . . . . . . . . . . .  102
19.01 Accrued Warranty Obligations . . . . . . . . . . . . . . . . . . . .  102

ARTICLE 20
General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  103
20.01 Entire Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  103
20.02 Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  103
20.03 Submission to Jurisdiction . . . . . . . . . . . . . . . . . . . . . . .  103
20.04 Successors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  104
20.05 Amendments and Waivers . . . . . . . . . . . . . . . . . . . . . . .  104
20.06 Counterparts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  104
20.07 Captions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  104
20.08 Sequa Guaranty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  105

**TEC SYSTEMS
SALE AGREEMENT**

**Schedules and Exhibits**

<u>**Exhibits**</u>

| | |
|---|---|
| 1A | Selling Companies and Buying Companies |
| 3.04 (a) | Supply Agreement |
| (b) | Occupancy Agreement |
| (c) | License Agreement |
| (d) | Environmental Agreement |
| 10.07 | Opinion of Grace |
| 11.07 | Opinion of Sequa |

<u>**Schedules**</u>

| | |
|---|---|
| 1 | Machinery and Equipment |
| 1A | Additional Excluded Assets |
| 1B | Additional Swedish Excluded Assets |
| 2.03 | Local Purchase Prices |
| 4.01 | Inventory Taking Procedures |
| 4.03 | Special Accounting Rules |
| 5.04 | Conflicts |
| 5.05(a) | Owned and Leased Real Property |
| 5.05(b) | Title |
| 5.06 | Financial Statements |
| 5.07(a) | Litigation |
| 5.07(b) | Investigations |
| 5.08 | Asset Disposition or Loss |
| 5.09 | Insurance |
| 5.10(a)(1) | Personal Property Leases |
| 5.10(a)(2) | Real Estate Leases |
| 5.10(a)(3) | Supplier Goods Contracts |
| 5.10(a)(4) | Supplier Services Contracts |
| 5.10(a)(5) | Other Contracts |
| 5.10(a)(6) | Customer Contracts |
| 5.10(b) | Defaults |
| 5.11(a)(i) | Collective Bargaining Agreements |
| 5.11(a)(ii) | Shop Agreements |
| 5.11(a)(iii) | Employment and Consulting Agreements |
| 5.11(b) | Labor Disputes |

| 5.12 | Employee Benefit Plans |
| 5.13(a)(i) | Environmental Reports |
| 5.13(a)(ii) | Environmental Communications |
| 5.13(b) | Underground Storage Tanks |
| 5.13(c)(i) | Environmental Compliance |
| 5.13(c)(ii) | Spillage or Leaks |
| 5.13(c)(iii) | Hazardous Substances |
| 5.13(c)(iv) | Hazardous Substance Notices; Environmental Litigation |
| 5.13(c)(v) | PCBs, Asbestos |
| 5.14 | Intellectual Property |
| -- Part 1 | Patents, Trademarks and Applications |
| -- Part 2 | Licenses to Third Parties |
| -- Part 3 | Litigation |
| -- Part 4 | Licenses from Third Parties |
| -- Part 5 | Shared Intellectual Property |
| 5.15 | Compliance with Laws |
| 5.16(a) | Permits |
| 5.16(b) | Permit Exceptions and Notices |
| 5.17(a)(i) | Warranty Obligations |
| 5.17(a)(ii) | Post-Expiration Warranty Claims |
| 5.17(a)(iii) | Other Warranty Claims |
| 5.17(b) | Design Matters |
| 5.17(c) | Receivables |
| 5.18 | Customers |
| 5.19 | Confidentiality Agreements |
| 5.20 | Certain Changes and Events |
| 5.21 | Inventories |
| 5.22(a) | Owned Real Property Ownership |
| 5.22(b) | Land Use and Zoning Compliance |
| 5.22(c) | Easements and Encumbrances |
| 10.04(b) | Sequa's Closing Conditions: Third Party Consents |
| 10.08 | Title Exceptions |
| 11.04(b) | Grace's Closing Conditions: Third Party Consents |
| 12.01(a) | TEC Business Employees |
| 12.02 | Sequa Severance Program and Employee Benefits |
| 12.04 | Expatriate Employees and Agreements |
| 13.03 | Press Release |
| 16.02 | Certain Renewals |

## TEC SYSTEMS SALE AGREEMENT

**TEC SYSTEMS SALE AGREEMENT** ("Agreement") dated June 18, 1997, by and between W. R. Grace & Co.-Conn., a Connecticut corporation ("Grace"), and Sequa Corporation, a Delaware corporation ("Sequa").

### WITNESSETH:

**WHEREAS,** the Subject Business is conducted by the Selling Companies and TEC Systems AB; and

**WHEREAS,** the Selling Companies wish to sell, and the Buying Companies wish to purchase, the Subject Business by the transfer of certain assets and assumption of specified liabilities of the Selling Companies;

**NOW THEREFORE,** in consideration of the mutual covenants herein contained, the parties hereby agree as follows:

### ARTICLE 1

### Definitions

1.01    <u>General</u>.  All Article and Section numbers, and Exhibit and Schedule references, used in this Agreement refer to Articles and Sections of this Agreement, and Exhibits and Schedules attached hereto or delivered simultaneously herewith, unless otherwise specifically stated.  Any of the terms defined in this Agreement may be used in the singular or the plural. In this Agreement, unless otherwise specifically stated, "hereof," "herein," "hereto," "hereunder" and the like mean and refer to this Agreement as a whole and not merely to the specific

Section, paragraph or clause in which the word appears; and words importing any gender include the other genders.

    1.02   **Defined Terms**. For purposes of this Agreement, including the Exhibits and Schedules, the following defined terms have the meanings set forth in this Section.

    "Accrued Selling Company Warranty Obligations", "Accrued Swedish Warranty Obligations" and "Accrued Warranty Obligations" have the respective meanings given such terms in Article 19.

    "Ancillary Agreements" means the agreements described in Section 3.04.

    "Business Day" means a day that is not a Saturday or Sunday, nor a day on which banks are generally closed in New York City.

    "Buyer" means the Subsidiary of Sequa designated by Sequa to purchase the Transferred Assets located in the United States.

    "Buyer Entity" means a member of the Buyer Group.

    "Buyer Germany" has the meaning given such term in Section 12.10.

    "Buyer Group" means, collectively, Sequa and its Subsidiaries.

    "Buyer Union Contract" has the meaning given such term in Section 12.06.

    "Buying Companies" means, collectively, Buyer and each of the other Subsidiaries of Sequa listed on Exhibit 1A.

    "CBAs" has the meaning given such term in Section 12.01(b).

    "Claim" has the meaning given such term in Section 14.01.

    "Closing" means the actions to be taken by the Buying Companies and the Selling Companies described in Sections 3.03 through 3.05.

"Closing Asset Amount", "Closing Liability Amount" and "Closing Net Asset Amount" have the respective meanings given such terms in Section 4.02.

"Closing Assumption Agreements" means the assumption agreements with respect to the Transferred Liabilities to be executed and delivered by the Buying Companies at the Closing.

"Closing Date" means the date on which the Closing takes place.

"Closing Statement" has the meaning given such term in Section 4.04.

"Closing Transfer Documents" means the deeds, bills of sale, stock transfer instruments and other instruments of transfer and conveyance to be executed and delivered by the Selling Companies at the Closing

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidentiality Agreement" means the confidentiality letter agreement dated May 13, 1996, as amended by letter agreements dated August 28, 1996, and January 17, 1997, between Grace and Sequa.

"Continued Employees" has the meaning given such term in Section 12.01(b).

"Customer Contracts" has the meaning given such term in the definition of Transferred Assets.

"Damages" has the meaning given such term in Section 14.01.

"Direct Claims" has the meaning given such term in Section 14.01.

"DOJ" means the United States Department of Justice.

"Engelhard" means Engelhard Corporation, a Delaware corporation.

"Engelhard MC" means Engelhard MC Inc., a Delaware corporation and a wholly-owned Subsidiary of Engelhard.

"Environmental Law" means any law, regulation, rule, ordinance, by-law, or order of any Governmental Authority, which relates to or otherwise imposes liability, obligations, or standards with respect to pollution or contamination of air, soil or groundwater or the protection of the environment.

"Excluded Assets" means any of the Selling Companies' right, title and interest in (1) cash and cash items, other than petty cash and deposits with third parties, (2) except as provided in Section 16.07, Claims for refunds of Taxes, (3) other than Surviving Intercompany Accounts, amounts receivable from any non-Subject Business unit of any Selling Company, or from any other Grace Entity; (4) Claims with respect to insurance coverage obtained from, or in conjunction with, any Grace Entity, and refunds of amounts previously paid or prepaid amounts on account of such insurance, (5) employee benefit plans and funds maintained by, or in conjunction with, any Grace Entity, and refunds of amounts previously paid or prepaid amounts on account of such employee benefit plans and funds, (6) records to the extent relating to any of the Excluded Liabilities, (7) all assets of the Wash Coat Business, the Hiram Business and the Metreon Business, (8) the Noxso Shares and the Noxso Agreements, (9) proprietary information whose transfer or disclosure to the Buying Companies is not permitted under the agreements disclosed in Schedule 5.19, (10) Claims related to Excluded Liabilities, and (11) those assets listed in Schedule 1A.

"Excluded Liabilities" means, other than the Transferred Liabilities, any and all other debts, liabilities and obligations of any of the Selling Companies of any nature whatsoever

and whether or not arising out of, or relating directly or indirectly to the Subject Business, and of any other Grace Entity relating to the Subject Business (including known, unknown, absolute, contingent or otherwise) and regardless of whether such is made, claimed or asserted prior to or after the Closing Date, including without limitation (1) obligations with respect to checks outstanding as of the Closing, (2) Income Taxes, (3) all amounts payable to any non-Subject Business unit of any Selling Company, or to any other Grace Entity, except for Surviving Intercompany Accounts to the extent and in the amounts included in the final Closing Statement, (4) obligations with respect to insurance coverage obtained from, or in conjunction with, any Grace Entity, (5) except as otherwise expressly provided in Article 12 of this Agreement, obligations with respect to employee benefit plans maintained by, or in conjunction with, any Grace Entity, including without limitation, the Grace Severance Program and any other Grace severance entitlement, (6) liabilities of the Wash Coat Business, the Hiram Business and the Metreon Business, and Noxso, (7) liabilities under all contracts, agreements and commitments which are part of or relate to the Excluded Assets, (8) all debts, liabilities, obligations and indebtedness for money borrowed by any Grace Entity, (9) except for Taxes relating to currently applicable reporting periods and included as Accrued Expenses in the Closing Statement, all liabilities and obligations for foreign, federal, state and local taxes, including deficiencies, interest and penalties and including, without limitation, those relating to or arising out of either the operation of the Subject Business prior to the Closing or the transfer, conveyance and assignment of the Transferred Assets contemplated by this Agreement, including, without limitation, sales, use, property, franchise, gross receipts, withholding, payroll, social security, unemployment, disability, estimated, occupation and

excise taxes, (10) all liabilities and obligations for consequential, incidental and liquidated damages as well as lost profits and other monetary amounts due to customers of the Subject Business with respect or related to shortages and/or defects in goods and equipment delivered to customers or services provided to customers, or goods and equipment in transit to customers, in any such case, prior to the Closing in connection with the return, replacement and/or repair or rework of goods and equipment and/or services, whether pursuant to (i) product warranties extended by the Grace Group or (ii) product warranties or obligations implied or provided by applicable law including by operation of law, and whether or not such involve any misrepresentation or breach of warranty by the Grace Group of this Agreement, (11) the liabilities and obligations of the Grace Group arising under this Agreement, including those arising or incurred in connection with the negotiation, preparation and execution of this Agreement and the transactions contemplated hereby and fees and expenses of counsel, accountants and other experts, (12) all liabilities and obligations, including costs, expenses, damages, fines, awards and penalties and settlements with respect to litigation, lawsuits, claims, labor disputes, demands or federal, state or local governmental proceedings or investigations arising from events occurring prior to or conditions existing at the Closing and whether or not disclosed in the Schedules to this Agreement and whether asserted prior to or after the Closing, (13) all obligations and liabilities of the Grace Group arising out of or resulting from any Grace Entity's noncompliance with any federal, state, local or foreign law, regulation, order or administrative or judicial determination, including without limitation, those relating to the environment and Environmental Matters at the Owned Real Property and otherwise, the Occupational Health and Safety Act ("OSHA"), the Employee Retirement

Income Security Act of 1974 ("ERISA"), employment practices of the Subject Business, including the health and safety standards applicable to employees of the Grace Group, employee discrimination and claims under the Americans with Disabilities Act, arising out of an occurrence, condition, facts or circumstances existing prior to the Closing and whether asserted before or after the Closing, (14) acts or omissions by employees, representatives, officers, directors, agents, contractors, transporters or any person for whose acts or omissions the Grace Group is responsible in connection with the production, generation, storage, treatment, transportation, disposal, emission or other handling or disposition of any waste or materials of any kind including any of the foregoing at the Owned Real Property and the Leased Real Property; (15) emission, discharge, dispersal, disposal, seepage, release or escape of any liquid, solid or gaseous substance produced, generated, stored, treated, utilized, transported or disposed of by or on behalf of the Grace Group, including its employees, representatives, officers, directors, agents, contractors, transporters or any person for whose acts or omissions the Grace Group is responsible and including any of the foregoing at the Owned Real Property and the Leased Real Property; (16) contamination of air, surface water, groundwater, soil, real or personal property by any of the foregoing and whether at the Owned Real Property and the Leased Real Property or elsewhere, (17) all claims, demands, liabilities and obligations of any nature whatsoever and regardless of when such claim is asserted which arise out of or which are based on events occurring or conditions existing prior to the Closing or which relate to goods and equipment sold or services performed by



the Grace Group prior to the Closing whether founded upon negligence, breach of warranty, strict liability in tort and/or any and all other legal, equitable or other theory, seeking compensation or recovery for, or relating to, injury to person or damage to property, (18) all claims, demands, obligations and liabilities including cost and expense of defense regardless of when such claim is asserted, whether arising out of, based upon or related to workers' compensation or employer's liability claims, negligence, strict liability in tort and/or any and all other legal, equitable or other theory seeking compensation and/or recovery and arising out of or relating to injuries and occupational diseases sustained by employees of the Grace Group prior to the Closing, and exposure to workplace chemicals, substances and conditions prior to Closing, (19) all liabilities and obligations of the Grace Group accruing through the Closing including those relating to breaches or defaults by the Selling Companies pursuant to the terms and conditions of the Customer Contracts, the Supplier Contracts, the Other Contracts, the Real Property Leases and the Personal Property Leases assigned to Buyer at the Closing, (20) all claims, demands, liabilities and obligations of whatever kind or nature in connection with the conduct of any and all businesses of the Grace Group other than the Subject Business, (21) all claims, demands, liabilities and obligations for claims for severance and termination and for payments in lieu of notice of termination made by any employee of the Grace Group (i) as a consequence of the termination of employment by the Grace Group of such employee prior to the Closing Date or (ii) who is offered employment by Buyer in accordance with Section 12.02, (22) all liabilities, debts, obligations and claims of employees and former employees of the Grace Group and their beneficiaries, heirs and representatives on account of the employee plans and entitlements, and any and all employee

profit sharing plans and savings and stock ownership/option plans and other pension or retirement plans, 401(k) plans, disability (long term and short-term), dental, life insurance, health, medical, welfare and any and all other remuneration, employee compensation and entitlement plans of the Grace Group of any kind whatsoever, (23) any liabilities imposed under law owing to employees at the Closing relating to health or safety arising out of any act or event occurring prior to the Closing, and (24) those claims, demands, debts, obligations and liabilities arising out of or related to those matters specifically designated as "Excluded Liabilities" in the Schedules and Exhibits to this Agreement; provided, however, that the matters described in the foregoing numbered items are enumerations for the avoidance of doubt on specific matters and are not intended either to broaden or narrow the scope of the definition of "Excluded Liabilities". Notwithstanding the foregoing, "Excluded Liabilities" shall not be deemed to include the obligations and liabilities of Sequa and the Buying Companies under this Agreement and the Ancillary Agreements. The disclosure of any Excluded Liability in the Exhibits or Schedules to this Agreement shall not adversely affect its status as an Excluded Liability.

"Expatriate Employee" and "Expatriate Agreement" have the respective meanings given such terms in Section 12.04.

"Financial Statements" has the meaning given such term in Section 5.06.

"Fixed Assets" means the Owned Real Property, the Machinery and Equipment and the Swedish Machinery and Equipment.

"FTC" means the United States Federal Trade Commission.

"German Employees" has the meaning given such term in Section 12.10.

"German Pension Arrangement" has the meaning given such term in Section 12.10.

"Governmental Authority" means an entity, whether domestic or foreign, exercising executive, legislative, judicial, regulatory or administrative functions of government, including, but not limited to, agencies, departments, boards, commissions, or other instrumentalities.

"Grace" means W. R. Grace & Co.-Conn., a Connecticut corporation.

"Grace Entity" means a member of the Grace Group.

"Grace Executives" means James R. Hyde, Michael Evans and Steven E. Zelac.

"Grace Group" means, collectively, Grace, Grace's Subsidiaries, and WRG, but excluding the Swedish Companies.

"Grace JVH" means Grace JVH, Inc., a Delaware corporation and a wholly-owned Subsidiary of Grace.

"Grace German Pension Arrangement" has the meaning given such term in Section 12.10.

"Grace Severance Program" has the meaning given such term in Section 5.12.

"Hazardous Substances" has the meaning given such term in Section 5.13(c)(iii)

"Hiram Business" means the metal monolith business based in Hiram, Ohio, which was carried on as part of Grace's TEC Systems unit until its sale to Engelhard on February 19, 1997.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations thereunder.

"IDC Guaranty" shall have the meaning given such terms in Section 10.12.

"Income Tax" means any federal, state, local or foreign governmental tax or assessment measured (in whole or in part) or imposed upon income, and any interest and penalties assessed on any such tax or assessment.

"Knowledge" of a Grace Executive, Subject Business Executive or other individual means the actual knowledge of such individual on the date of this Agreement or on the date of the Closing, as applicable.

"Leased Real Property" means those parcels of leased real property used in the Subject Business as identified by location on <u>Schedule 5.05(a)</u>.

"Lien" means any mortgage, pledge, security interest, agreement to sell, option to buy, right of first refusal, title retention device or other lien or encumbrance, including any of the foregoing arising under a deed of trust or indenture.

"Litigation Expenses" has the meaning given such term in Section 14.01.

"Local Purchase Prices" has the meaning given such term in Section 2.03.

"Machinery and Equipment" has the meaning given such term in the definition of Transferred Assets.

"Metreon" means Metreon, a Delaware general partnership that is owned 50% by Grace JVH and 50% by Engelhard MC, and which is currently in dissolution.

"Metreon Business" means the business of Metreon.

"Noxso" means Noxso Corporation, a Virginia corporation.

"Noxso Agreements" means the Research Agreement and the License and Supply Agreement, each effective September 11, 1987, by and between Noxso and Grace (then

named W. R. Grace & Co.), the Option Agreement dated as of September 11, 1987, by and between Noxso and Grace, and the Option to Purchase Shares of Common Stock dated as of September 11, 1987, from Noxso to Grace.

"Noxso Shares" means the shares of capital stock of Noxso owned by Grace.

"Other Contracts" has the meaning given such term in the definition of Transferred Assets.

"Owned Real Property" has the meaning given such term in clause (iii) of the definition of "Transferred Assets" contained in this Article.

"Permitted Liens" means (i) Liens for Taxes or other governmental charges not yet due and payable; (ii) carriers', warehousemen's, mechanics', materialmen's, vendors' and landlords' and similar Liens arising, under applicable law or the Customer Contracts, Swedish Customer Contracts, Supplier Contracts and Swedish Supplier Contracts included in the Transferred Assets or the Swedish Continuing Assets, with respect to obligations not required to be performed until after the Closing.

"Person" means any individual, partnership, firm, trust, association, corporation, joint venture, unincorporated organization, other business entity or Governmental Authority.

"Personal Property Leases" has the meaning given such term in the definition of Transferred Assets.

"Real Property Leases" has the meaning given such term in the definition of Transferred Assets.

"Scheduled Closing Date" has the meaning given such term in Section 3.01.

"Sequa" means Sequa Corporation, a Delaware corporation.

C:\GRACE\SALEAGTG.618.wpd                                12

"Selling Companies" means, collectively, Grace and its Subsidiaries listed in <u>Exhibit 1A</u>.

"Specific Allocation" has the meaning given such term in Section 2.03.

"Subject Business" means (a) the manufacture, sale and service by the Selling Companies of (i) drying systems for the printing, industrial coating, and paper industries, (ii) non-contact web turning devices, chill roll stands, and web decurling devices for the same industries, whether sold separately or as part of drying systems, and (iii) catalytic and thermal (both recuperative and regenerative) oxidation equipment for stationary air emission control applications, and (b) the Swedish Business, but shall not include the Wash Coat Business, the Hiram Business, performance of Grace's service and warranty obligations regarding equipment sold by the Hiram Business when it was owned by Grace, and the Metreon Business.

"Subject Business Employees" has the meaning given such term in Section 12.01.

"Subject Business Executives" means Alan D. Fiers, Donald B. Harrison III, Lawrence M. Miller and William A. Smith.

"Subsidiary" of a Person means any other Person in which the first Person directly or through one or more intermediaries owns securities or other interests representing more than 50% of the voting power of all such securities or other interests.

"Supplier Contracts", "Supplier Goods Contracts" and "Supplier Services Contracts" have the respective meanings given such terms in the definition of Transferred Assets.

"Surviving Intercompany Accounts" means amounts payable or amounts receivable as of the Closing that are (a) related to the Subject Business <u>and</u> (b) payable to or receivable

from a unit of Grace (including but not limited to another unit of the same Selling Company, a unit of another Grace Entity that is not a Subject Business unit, or a Subject Business unit of another Selling Company) for (i) goods and equipment supplied in the ordinary course of the Subject Business or the business of the Grace Group (which shall be deemed to include, but shall not be limited to, supplies purchased from the Grace Davison business unit of Grace), (ii) reimbursement of research expenses related to the development of Subject Business goods and equipment, (iii) reimbursement of selling expenses, or (iv) reimbursement of personnel costs.

"Swedish Business" means the business of the Swedish Companies.

"Swedish Companies" means TEC Systems AB and its wholly-owned Subsidiaries Adtec AB, a Swedish company, and Götaverken Emission Technology AB, a Swedish company.

"Swedish Continuing Assets" means all the assets of any of the Swedish Companies (other than the Swedish Excluded Assets), including without limitation all of the Swedish Companies' right, title and interest in and to the following:

    (i)    all machinery, equipment, vehicles, rolling stock, laboratory equipment, furniture, computers, fixtures, leasehold improvements, dies, jigs, prototypes, samples, and all other items of personal property, including spare parts and tools, and factory maintenance, operating, and shipping and packaging supplies, all wherever located, including but not limited to, those items listed and described on Schedule 1 (collectively, the "Swedish Machinery and Equipment");

    (ii)    all inventories of raw materials and component parts, work-in-process, and finished goods, all wherever located (collectively, the "Swedish Inventories");

(iii)   all trade receivables, employee receivables and advances, and royalty receivables (collectively, the "Swedish Receivables");

(iv)   prepaid rent, prepaid freight and storage costs billable to customers, and other prepaid expenses relating to the Subject Business, and all other deposits and advances made in connection with the Subject Business, but in each case with respect to the foregoing, only those for which the Swedish Companies will receive an economic benefit after the Closing (collectively, the "Swedish Prepaids");

(v)   all intellectual property, including domestic and foreign trademarks, service marks, trade names and applications relating thereto, common law and registered copyright applications, domestic and foreign patents, patent applications, discoveries, improvements and all other licenses, processes, formulas, inventions (whether patentable or unpatentable), invention disclosures, new products and product developments, trade secrets, product formulations and associated manufacturing and process know-how, including product testing and quality control procedures, product applications and associated know-how, unpatented inventions, research developments and know-how technology, customer and supplier lists, mailing lists, product literature, brochures, blueprints, specifications, equipment plans, manuals, engineering data, design and specifications, drawings, know-how, sales records, marketing and production information, computer programs and software, as well as all books, documents and records relating to the foregoing and including but not limited to (i) any of the foregoing

under development and (ii) those items listed and described on Part 1 to Schedule 5.14 (collectively, the "Swedish Intellectual Property");

(vi)    the Swedish Companies' leases of personal property relating solely to the Subject Business (A) involving outstanding financial commitments of less than $10,000 each or (B) listed in Schedule 5.10(a)(1) (collectively, the "Swedish Personal Property Leases");

(vii)    those of the Swedish Companies' leases of real property from third parties relating to the Subject Business which are listed and described in Schedule 5.10(a)(2) (collectively, the "Swedish Real Property Lease");

(viii)    those agreements or contracts in existence as of the Closing with customers of the Swedish Companies (other than the Grace Group), for goods and equipment that have not been shipped to the customer as of the Closing (collectively, the "Swedish Customer Contracts");

(ix)    those agreements, contracts or purchase orders in existence as of the Closing with suppliers of the Swedish Companies (other than the Grace Group) for the supply of goods that have not been received as of the Closing and either (A) involve outstanding financial commitments of less than $25,000 each or (B) are listed on Schedule 5.10(a)(3) (collectively, the "Swedish Goods Supplier Contracts");

(x)    those agreements, contracts or purchase orders in existence as of the Closing with or to suppliers of the Swedish Companies (other than the Grace Group) for the supply of services that have not been performed as of the Closing (other

16

than sales agent, sales representative, commission agent, distribution, confidentiality, secrecy, dealer, employee and similar agreements) and either (A) involve outstanding financial commitments of less than $10,000 each or (B) are listed on Schedule 5.10(a)(4) (collectively, the "Swedish Services Supplier Contracts" and collectively with the Swedish Goods Supplier Contracts, the "Swedish Supplier Contracts");

(xi)    those pending or executory contracts (excluding the Swedish Personal Property Leases, Swedish Real Property Lease, Swedish Customer Contracts, Swedish Supplier Contracts and employee benefit plans) of the Swedish Companies or directly relating to the Swedish Continuing Assets in either instance other than with respect to the Grace Group, that either are listed in Schedule 5.11(a) and relate to non-U.S. Subject Business Employees, or either (A) are terminable without cost, expense or penalty, under the terms thereof or applicable law, on notice of no more than sixty (60) days or (B) are listed in Schedule 5.10(a)(5) (collectively, the "Swedish Other Contracts");

(xii)   to the extent transferable, all permits and approvals, qualifications, authorizations, consents, licenses, orders, and franchises of all customers and Governmental Authorities, owned, held or utilized by the Swedish Companies in connection with the Subject Business;

(xiii)  all other property, assets and rights, whether tangible or intangible, including, without limitation, the full benefit, including causes of action and rights of enforcement, of all representations, warranties, guaranties, indemnities,

undertakings, certificates, covenants, agreements and the like made by any vendor, manufacturer or contractor and all security therefor received by the Swedish Companies in connection with the purchase or other acquisition of any part of the Swedish Continuing Assets or conduct of the Subject Business, but excluding any of the foregoing to the extent related to or arising from or out of the Swedish Excluded Assets or the Swedish Indemnified Liabilities;

(xvi)    files and accounting records; and

(xvii)   assets reflected in the Closing Net Asset Amount;

provided, however, that the matters described in the foregoing numbered items are enumerations for the avoidance of doubt on specific matters and are not intended to limit or broaden the scope of the definition of "Swedish Continuing Assets".

"Swedish Continuing Liabilities" means the following debts, liabilities and obligations of the Swedish Companies pertaining directly and exclusively to the Subject Business, and no others:  (a)(i) trade accounts payable, customer deposits and Surviving Intercompany Accounts, but in the case of Surviving Intercompany Accounts and customer deposits, only to the extent and in those amounts which are reflected and included in the Closing Statement (collectively, the "Swedish Accounts Payable"), (ii) accrued expenses of the Subject Business with respect to Taxes, payroll, commissions, and bonuses (if any), but only for the respectively applicable current reporting periods and vacation and other compensated absences (collectively, the "Swedish Accrued Expenses"); (b) liabilities and obligations of the Subject Business for performance after the Closing Date under the Swedish Real Property Lease, Swedish Personal Property Leases, Swedish Customer Contracts, Swedish Supplier Contracts,

and Swedish Other Contracts; (c) Accrued Swedish Warranty Obligations; and (d) with respect to goods and equipment that have not been shipped to the customer prior to the Closing, all warranty obligations under the Swedish Customer Contracts covering such goods and equipment, and all liabilities and obligations for product defects in and damage to person or property relating to such goods and equipment.

"Swedish Contracts" means the Swedish Real Property Lease, the Swedish Personal Property Leases, the Swedish Customer Contracts, the Swedish Supplier Contracts, and the Swedish Other Contracts.

"Swedish Customer Contracts" has the meaning given such term in the definition of Swedish Continuing Assets.

"Swedish Excluded Assets" means any of the Swedish Companies' right, title and interest in (1) cash and cash items, other than petty cash and deposits with third parties, (2) Claims for refunds of Taxes other than for periods included in the Swedish Continuing Liabilities and refunds resulting from carry back of post-Closing losses, (3) other than Surviving Intercompany Accounts, amounts receivable from any Grace Entity; (4) Claims with respect to insurance coverage obtained from, or in conjunction with, any Grace Entity, and refunds of amounts previously paid or prepaid amounts on account of such insurance, (5) employee benefit plans and funds maintained by, or in conjunction with, any Grace Entity, and refunds of amounts previously paid or prepaid amounts on account of such employee benefit plans and funds, (6) records to the extent relating to any of the Swedish Indemnified Liabilities, (7) Claims related to Swedish Indemnified Liabilities, and (8) those assets listed in Schedule 1B.

"Swedish Indemnified Liabilities" means, other than the Swedish Continuing Liabilities and the Tax Claims, any and all other debts, liabilities and obligations of any of the Swedish Companies of any nature whatsoever and whether or not arising out of, or relating directly or indirectly to the Subject Business (including known, unknown, absolute, contingent or otherwise) and regardless of whether such is made, claimed or asserted prior to or after the Closing Date, including without limitation (1) obligations with respect to checks outstanding as of the Closing, (2) Income Taxes other than those for the year beginning January 1, 1997, (3) all amounts payable to any Grace Entity, except for Surviving Intercompany Accounts to the extent and in those amounts included in the final Closing Statement, (4) obligations with respect to insurance coverage obtained from, or in conjunction with, any Grace Entity, (5) except as otherwise expressly provided in Article 12 of this Agreement, obligations with respect to employee benefit plans maintained by, or in conjunction with, any Grace Entity, including without limitation, the Grace Severance Program and any other Grace severance entitlements, (6) liabilities under all contracts, agreements and commitments which are part of the Swedish Excluded Assets, (7) all debts, liabilities, obligations and indebtedness for money borrowed by any Grace Entity and the Swedish Companies, (8) except for Taxes included in Swedish Accrued Expenses in the Closing Statement, all liabilities and obligations for Taxes, including deficiencies, interest and penalties and including, without limitation, those relating to or arising out of either the operation of the Subject Business prior to the Closing or the transfer, conveyance and assignment of the Swedish Excluded Assets contemplated by this Agreement, including, without limitation, sales, use, property, franchise, gross receipts, withholding, payroll, social security, unemployment, disability, estimated,

C:\GRACE\SALEAGTG.618.wpd                    20

occupation and excise taxes, (9) all liabilities and obligations for consequential, incidental and liquidated damages as well as lost profits and other monetary amounts due to customers of the Swedish Companies with respect to the Subject Business with respect or related to shortages and/or defects in goods and equipment delivered to customers or services provided to customers, or goods and equipment in transit to customers, in any such case, prior to the Closing in connection with the return, replacement and/or repair or rework of goods and equipment and/or services, whether pursuant to (i) product warranties extended by any of the Swedish Companies, or (ii) product warranties or obligations implied or provided by applicable law including by operation of law, and whether or not such involve any misrepresentation or breach of warranty by Grace of this Agreement, (10) the liabilities and obligations of any of the Selling Companies arising under this Agreement, including those arising or incurred in connection with the negotiation, preparation and execution of this Agreement and the transactions contemplated hereby and fees and expenses of counsel, accountants and other experts, (11) all liabilities and obligations, including costs, expenses, damages, fines, awards and penalties and settlements with respect to litigation, lawsuits, claims, labor disputes, demands or federal, state or local governmental proceedings or investigations arising from events occurring prior to or conditions existing at the Closing and whether or not disclosed in the Schedules to this Agreement and whether asserted prior to or after the Closing, (12) all obligations and liabilities arising out of or resulting from any of the Swedish Companies' noncompliance with any federal, state, local or foreign law, regulation, order or administrative or judicial determination, including without limitation, those relating to the environment and Environmental Matters at the property covered by the Swedish

C:\GRACE\SALEAGTG.618.wpd                    21

Real Property Lease and otherwise, occupational health and safety and pension laws, employment practices of the Subject Business, including the health and safety standards applicable to employees of the Swedish Companies, employee discrimination claims arising out of occurrences, conditions, facts or circumstances existing prior to the Closing and whether asserted before or after the Closing, (13) acts or omissions by employees, representatives, officers, directors, agents, contractors, transporters or any person for whose acts or omissions the Swedish Companies are responsible in connection with the production, generation, storage, treatment, transportation, disposal, emission or other handling or disposition of any waste or materials of any kind including any of the foregoing at the Swedish Leased Real Property; (14) emission, discharge, dispersal, disposal, seepage, release or escape of any liquid, solid or gaseous substance produced, generated, stored, treated, utilized, transported or disposed of by or on behalf of any Swedish Company, including its employees, representatives, officers, directors, agents, contractors, transporters or any person for whose acts or omissions such Swedish Company is responsible and including any of the foregoing at the Swedish Leased Real Property; (15) contamination of air, surface water, groundwater, soil, real or personal property by any of the foregoing and whether at the Swedish Leased Real Property or elsewhere, (16) all claims, demands, liabilities and obligations of any nature whatsoever and regardless of when such claim is asserted which arise out of or which are based on events occurring or conditions existing prior to the Closing or which relate to goods and equipment sold or services performed by the Grace Group and/or Swedish Companies prior to the Closing whether founded upon negligence, breach of warranty, strict liability in tort and/or any and all other legal, equitable or other theory, seeking compensation

or recovery for, or relating to, injury to person or damage to property, (17) all claims, demands,

obligations and liabilities including cost and expense of defense regardless of when such

claim is asserted, whether arising out of, based upon or related to workers' compensation

or employer's liability claims, negligence, strict liability in tort and/or any and all other legal,

equitable or other theory seeking compensation and/or recovery and arising out of or relating

to injuries and occupational diseases sustained by employees of the Swedish Companies

prior to the Closing, and exposure to workplace chemicals, substances and conditions prior

to Closing, (18) all liabilities and obligations of the Swedish Companies accruing through

the Closing including those relating to breaches or defaults by the Swedish Companies

of the terms and conditions of the Swedish Real Property Lease, Swedish Personal Property

Leases, Swedish Customer Contracts, Swedish Supplier Contracts and Swedish Other

Contracts assigned to Buyer at the Closing, (19) all claims, demands, liabilities and obligations

of whatever kind or nature in connection with the conduct of any and all businesses of the

Swedish Companies other than those that are part of the Subject Business, (20) all claims,

demands, liabilities and obligations for claims for severance and termination and for payments

in lieu of notice of termination made by any employee of the Swedish Companies as a

consequence of the termination of employment of such employee prior to the Closing Date,

(21) all liabilities, debts, obligations and claims of employees and former employees of the

Swedish Companies and their beneficiaries, heirs and representatives on account of the

employee plans and entitlements, and any and all employee profit sharing plans and savings

and stock ownership/option plans and other pension or retirement plans, disability (long

term and short-term), dental, life insurance, health, medical, welfare and any and all other

remuneration, employee compensation and entitlement plans of the Swedish Companies of any kind whatsoever, (22) any liabilities imposed under law owing to employees at the Closing relating to health or safety arising out of any act or event occurring prior to the Closing, and (23) those claims, demands, debts, obligations and liabilities arising out of or related to those matters specifically designated as "Excluded Liabilities" in the Schedules and Exhibits to this Agreement; provided, however, that the matters described in the foregoing numbered items are enumerations for the avoidance of doubt on specific matters and are not intended either to broaden or narrow the scope of the definition of "Swedish Indemnified Liabilities". Notwithstanding the foregoing, "Swedish Indemnified Liabilities" shall not be deemed to include the obligations and liabilities of Sequa and the Buying Companies under this Agreement and the Ancillary Agreements. The disclosure of any Swedish Indemnified Liability in the Exhibits or Schedules to this Agreement shall not adversely affect its status as a Swedish Indemnified Liability.

"Swedish Machinery and Equipment", "Swedish Other Contracts", "Swedish Personal Property Leases", "Swedish Real Property Lease", "Swedish Supplier Contracts", "Swedish Supplier Goods Contracts" and "Swedish Supplier Services Contracts" have the respective meanings given such terms in the definition of Swedish Continuing Assets.

"Tax Claims" means any claims, demands, suits, actions or proceedings by any Taxing Authority involving any of the Swedish Companies that could give rise to a liability for Income Taxes attributable to tax periods ending on or prior to the Closing Date.



"Taxes" means any United States or foreign Income Tax, any payroll or other similar employment tax, any sales, use, excise, gross receipts or value added tax, or any tax on real or personal property.

"Taxing Authority" means any Governmental Authority responsible for the imposition of Taxes.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"TEC Systems AB" means Grace TEC Systems AB, a Swedish company and a wholly-owned Subsidiary of Grace.

"TEC Systems AB Shares" mean all of the outstanding shares of the capital stock of TEC Systems AB.

"Third Party Claims" has the meaning given such term in Section 14.01.

"Total Purchase Price" has the meaning given such term in Section 2.02.

"Transaction Documents" means the Ancillary Agreements, the transfer and assumption documents to be executed at the Closing pursuant to Section 3.03, and the Buyer Union Contract.

"Transferred Assets" means, except only for the Excluded Assets, all right, title and interest of any of the Selling Companies, free and clear of all Liens except for Permitted Liens, in and to all of the assets, properties and rights

(A)    located at the Owned Real Property or the Leased Real Property,



(B)    with respect to items not located at the Owned Real Property or the Leased Real Property, used or pertaining directly and exclusively to the conduct of the Subject Business, or

(C)    reflected in the Closing Net Asset Amount,

including without limitation the following:

(i)    all machinery, equipment, vehicles, rolling stock, laboratory equipment, furniture, computers, fixtures, leasehold improvements, dies, jigs, prototypes, samples and all other items of personal property, including spare parts and tools, and factory maintenance, operating, and shipping and packaging supplies, all wherever located, including, but not limited to, those items listed and described on Schedule 1 (collectively, the "Machinery and Equipment");

(ii)    all inventories of raw materials and component parts, work-in-process, and finished goods, all wherever located (collectively, the "Inventories");

(iii)    all of the owned real property utilized in the Subject Business, including buildings, improvements and fixtures thereon, located in De Pere, Wisconsin (the "Owned Real Property");

(iv)    all trade receivables, employee receivables and advances and royalty receivables (collectively, the "Receivables");

(v)    all intellectual property, including domestic and foreign trademarks, service marks, trade names and applications relating thereto, common law and registered copyright applications, domestic and foreign patents,

patent applications, discoveries, improvements and all other licenses, processes, formulas, inventions (whether patentable or unpatentable), invention disclosures, new products and product developments, trade secrets, product formulations and associated manufacturing and process know-how, including product testing and quality control procedures, product applications and associated know-how, unpatented inventions, research developments and know-how technology, customer and supplier lists, mailing lists, product literature, brochures, blueprints, specifications, equipment plans, manuals, engineering data, design and specifications, drawings, know-how, sales records, marketing and production information, computer programs and software, as well as all books, documents and records relating to the foregoing, and including but not limited to (i) any of the foregoing under development and (ii) those items listed and described on Part 1 to Schedule 5.14 (collectively, the "Intellectual Property");

(vi)   the name "TEC Systems";

(vii)  the Selling Companies' leases of personal property relating solely to the Subject Business (A) involving outstanding financial commitments of less than $10,000 each or (B) listed in Schedule 5.10(a)(1) (collectively, the "Personal Property Leases");

(viii)   those of the Selling Companies' leases of real property from third parties relating to the Subject Business which are listed and described in Schedule 5.10(a)(2) (collectively, the "Real Property Leases");

(ix)   those agreements or contracts in existence as of the Closing with customers of the Subject Business (other than the Grace Group) for goods and equipment of the Subject Business that have not been shipped to the customer as of the Closing (collectively, the "Customer Contracts");

(x)   those agreements, contracts or purchase orders in existence as of the Closing with suppliers of the Subject Business (other than the Grace Group) for goods that have not been received as of the Closing that either (A) involve outstanding financial commitments of less than $25,000 each or (B) are listed on Schedule 5.10(a)(3) (collectively, the "Goods Supplier Contracts");

(xi)   those agreements, contracts or purchase orders in existence as of the Closing with or to suppliers of the Subject Business (other than the Grace Group) for the supply of services which services have not been performed as of the Closing (other than sales agent, sales representative, commission agent, distribution, confidentiality, secrecy, dealer, employee and similar agreements) that either (A) involve outstanding financial commitments of less than $10,000 each or (B) are listed on Schedule 5.10(a)(4) (collectively, the "Services Supplier Contracts" and collectively with the Goods Supplier Contracts, the "Supplier Contracts");

(xii)    those pending or executory contracts (excluding the Personal Property Leases, Real Property Leases, Customer Contracts, Supplier Contracts and employee benefit plans) of the Subject Business or directly relating to the Transferred Assets, in either instance other than with respect to the Grace Group, that either are listed in Schedule 5.11(a) and relate to non-U.S. Subject Business Employees, or either (A) are terminable without cost, expense or penalty under the terms thereof or applicable law, on notice of no more than sixty (60) days or (B) are listed in Schedule 5.10(a)(5) (collectively, the "Other Contracts");

(xiii)    prepaid rent, prepaid freight and storage costs billable to customers and other prepaid expenses relating to the Subject Business, and all other deposits and advances made in connection with the Subject Business, but in each case with respect to the foregoing, only those for which Sequa or the Buying Companies will receive an economic benefit after the Closing (collectively, the "Prepaids");

(xiv)    to the extent transferable, all permits, approvals, qualifications, authorizations, consents, licenses, orders and franchises of all customers and Governmental Authority, owned, held or utilized by the Selling Companies in connection with the Subject Business;

(xv)    all other property, assets and rights, whether tangible or intangible, including, without limitation, the full benefit, including causes of action and rights of enforcement, of all representations, warranties, guaranties,

indemnities, undertakings, certificates, covenants, agreements and the like made by any vendor, manufacturer or contractor and all security therefor received by the Selling Companies in connection with the purchase or other acquisition of any part of the Transferred Assets or conduct of the Subject Business, but excluding any of the foregoing to the extent related to or arising from or out of the Excluded Assets or the Excluded Liabilities;

(xvi)   files and accounting records; and

(xvii)   the TEC Systems AB Shares;

provided, however, that the matters described in the foregoing numbered items are enumerations for the avoidance of doubt on specific matters and are not intended to limit or broaden the scope of the definition of "Transferred Assets".

"Transferred Liabilities" means the following debts, liabilities and obligations of the Selling Companies pertaining directly and exclusively to the Subject Business, and no others: (a)(i) trade accounts payable, customer deposits and Surviving Intercompany Accounts, but in the case of Surviving Intercompany Accounts and customer deposits, only to the extent and in those amounts which are reflected and included in the Closing Statement (collectively, the "Accounts Payable"), and (ii) accrued expenses of the Subject Business with respect to payroll, commissions, and bonuses (if any), real estate and personal property taxes, but only for the respectively applicable current reporting periods and in the case of employee obligations, only with respect to those employees who accept employment with the Buyer Group or otherwise become employees of the Buyer Group, and vacation and other compen-

sated absences, but only with respect to those employees who accept employment with the Buyer Group or otherwise become employees of the Buyer Group (collectively, the "Accrued Expenses"); (b) liabilities and obligations of the Subject Business for performance after the Closing Date under all Real Property Leases, Personal Property Leases, Customer Contracts, Supplier Contracts, and Other Contracts (as such terms are defined in the definition of "Transferred Assets" in this Article), (d) Accrued Selling Company Warranty Obligations, and (e) with respect to goods and equipment that have not been shipped to the customer prior to the Closing, all warranty obligations under the Customer Contracts covering such goods and equipment, and all liabilities and obligations for product defects in and damage to person or property relating to such goods and equipment.

"Union" means the Sheet Metal Workers International Association, Local 18, AFL-CIO.

"U.S. Subject Business Employees" has the meaning given such term in Section 12.01(b).

"Valuation Time" means 11:59 pm local time on the day immediately preceding the Closing Date.

"Wash Coat Business" means the Grace Group's business of manufacturing alumina based wash coats that are used as base coats on catalyst substrates (ceramic or metal) to support the platinum metal catalysts.

"WRG" means W. R. Grace & Co., a Delaware corporation, of which Grace is the wholly-owned Subsidiary.

## ARTICLE 2

### Sale of Subject Business, Price

2.01    Sale of Business. On the terms and subject to the conditions of this Agreement, Grace shall sell, and shall cause the other Selling Companies to sell, and Sequa shall cause Buyer and the other Buying Companies to purchase, the Subject Business as follows: each of the Selling Companies shall transfer its right, title and interest in and to the Transferred Assets to the Buying Company listed next to such Selling Company on Exhibit 1A, and in exchange therefor, such Buying Company shall assume the Transferred Liabilities of such Selling Company and shall pay the Local Purchase Price therefor. The Selling Companies shall retain the Excluded Assets and shall retain and be solely responsible for payment, performance and discharge, as the case may be, of the Excluded Liabilities.

2.02    Total Purchase Price. "Total Purchase Price" means the Closing Net Asset Amount less Twelve Million Dollars ($12,000,000). The Total Purchase Price shall be allocated among the Local Purchase Prices as provided in Section 2.03. The aggregate of the Local Purchase Prices shall equal the Total Purchase Price.

2.03    Local Purchase Prices. The "Local Purchase Price" for each country in which assets of the Subject Business are sold and liabilities transferred by one of the Selling Companies to one of the Buying Companies shall mean the portion of the Total Purchase Price allocated to the sale in such country as provided in this Section. Grace and Sequa have agreed to the Local Purchase Price for each such country as set forth in Schedule 2.03 (the "Allocation"). Prior to the Closing Date, Grace and Sequa shall negotiate in good faith a specific allocation, in accordance with the Allocation, that complies with the requirements of Section 1060 of the Code and any other applicable provision of Tax law (the "Specific Allocation"). Each Grace Entity and Buyer Entity shall, except for allocations relating to

expenses incurred in the transactions contemplated herein which are included in the purchase price for Buyer, be bound by the Allocation and the Specific Allocation for all Tax purposes including the preparation and filing of Tax Returns. If the Allocation or the Specific Allocation is disputed by any Taxing Authority, the party receiving notice of the dispute shall promptly notify the other party concerning the resolution of such dispute. Sequa and Grace each agrees to file Internal Revenue Service Form 8594, and Tax Returns, using consistent allocations (except for allocations relating to expenses incurred in the transactions contemplated herein that are included in the purchase price for Buyer) in accordance with the Specific Allocation. Sequa and Grace agree to provide each other promptly with any other information required to complete Form 8594. Sequa and Grace may make material modifications to the Allocation and the Specific Allocation only by mutual consent. If there is an adjustment to the Total Purchase Price pursuant to this Agreement, Sequa and Grace shall modify the Allocation and the Specific Allocation so that the adjustment is allocated in the country where it relates or as Sequa and Grace otherwise mutually agree.

    2.04 **Exchange Rates.** Each Local Purchase Price shall be expressed in U.S. dollars using the foreign currency exchange rate for the applicable local currency for the Valuation Time as reported in the Eastern Edition of *The Wall Street Journal*; provided that the aggregate of all Local Purchase Prices shall equal the Total Purchase Price.

    2.05 **Swedish Indemnified Liabilities and Excluded Assets.**

    (a) Prior to the Closing, Grace shall execute and deliver an assumption agreement by which it shall assume the Swedish Indemnified Liabilities. Any payment by Grace or

its designee of a Swedish Indemnified Liability shall be treated by Grace and Sequa for purposes of this Article 2 as a reduction of the Local Purchase Price for Sweden.

(b) If after the Closing, any of the Swedish Companies shall receive any amount that is attributable to a Swedish Excluded Asset, Sequa shall cause such Swedish Company to pay such amount to Grace or its designee promptly after receipt thereof. Any amount received by Grace or its designee shall be treated by Grace and Sequa for purposes of this Article as an increase of the Local Purchase Price for Sweden.

## ARTICLE 3

### Closing

3.01    **Scheduled Closing Date**. The "Scheduled Closing Date" shall be the first Tuesday that falls at least five Business Days after the fulfillment or waiver, provided a waiver is permissible in a jurisdiction applicable hereto, of the conditions set forth in Sections 10.03 and 11.03; or such other day as Grace and Sequa may agree to in an amendment to this Agreement executed and delivered in accordance with Section 20.05.

3.02    **Time and Place of Closing, Simultaneity**. Subject to fulfillment or waiver of the conditions set forth in Articles 10 and 11, the Closing shall take place at 10:00 a.m. local time on the Scheduled Closing Date at the offices of Grace, located at One Town Center Road, Boca Raton, Florida 33486-1010, U.S.A. and at such other time and place as may be applicable under the laws of any other country or as Grace and Sequa mutually agree. All of the actions to be taken and documents to be executed and delivered at the Closing shall be deemed to be taken, executed and delivered simultaneously, and no such action,

execution or delivery shall be effective until all actions to be taken and executions and deliveries to be effected at the Closing are complete.

3.03    **Transfers at the Closing; Payments**.    At the Closing:

(a)    Grace shall, and shall cause the other Selling Companies to, execute, acknowledge and deliver to the Buying Companies special warranty or equivalent deeds, bills of sale, assignments and other instruments of sale, conveyance, transfer and assignment in order to effectively transfer to the Buying Companies all right, title and interest of the Selling Companies in the Transferred Assets.

(b)    Sequa shall cause Buyer and the other Buying Companies to pay to the Selling Companies, on account of the Total Purchase Price, the parties' best estimate of the Total Purchase Price; provided that if the parties have not reached agreement with respect to such estimate, then Sequa shall pay to the Selling Companies, on account of the Total Purchase Price, Eighteen Million Four Hundred Twenty-Two Thousand Dollars ($18,422,000).

(c)    Sequa shall cause Buyer and the other Buying Companies to execute, acknowledge and deliver to the appropriate Selling Companies assumption agreements in order to effectively assume the Transferred Liabilities.

In addition, Sequa shall, and shall cause the Buying Companies to, and Grace shall, and shall cause the other Selling Companies to, execute and deliver such other agreements, instruments and documents to effect, confirm or evidence the transactions contemplated by this Agreement as any other party hereto shall reasonably request consistent with the terms and conditions of this Agreement. Each document of transfer or assumption executed

and delivered pursuant to this Agreement shall be in customary form for the country to which it pertains, shall be reasonably satisfactory in form and substance to the parties thereto, but shall contain no terms, conditions, representations, warranties, covenants, agreements or indemnities either (i) not provided by or (ii) inconsistent with the terms, conditions, representations, warranties, covenants, agreements or indemnities contained in this Agreement. Sequa may request that, in lieu of instruments of transfer, a Selling Company convey specified assets by delivering possession thereof, where they are then located, to the appropriate Buying Company.

3.04 **Ancillary Agreements**. At the Closing, each of the following agreements shall be executed and delivered by the parties thereto or, if executed and delivered simultaneously with this Agreement, shall become effective:

(a) Agreement for supply of miniliths and alumina beads, and technical assistance respecting manufacture of noble metal catalyst, substantially in the form of Exhibit 3.04(a).

(b) Occupancy arrangements with respect to certain sales personnel substantially in the form of Exhibit 3.04(b).

(c) License Agreement substantially in the form of Exhibit 3.04(c).

(d) Environmental Administration, Remediation and Indemnity Agreement substantially in the form of Exhibit 3.04(d).

3.05 **Method of Closing Payments**. All payments at the Closing by the Buying Companies to the Selling Companies shall be made by means of a single payment by Buyer, for itself and as agent for the other Buying Companies, to Grace, for itself and as agent for

the other Selling Companies, by means of a wire transfer to Grace's account # 016-001257, ABA # 021000021, at Chase Manhattan Bank.

3.06  **Further Assurances of Selling Companies**.  At any time and from time to time after the Closing, at the request and expense of Buyer or any of the other Buying Companies, the Selling Companies shall, and shall cause the other members of the Grace Group to, execute and deliver, or cause to be executed and delivered, all such deeds, assignments, and other documents, and take or cause to be taken all such other actions, as Buyer or any of the other Buying Companies reasonably deem necessary or desirable in order to put the Buying Companies in actual possession or operating control of the Transferred Assets, or to more fully and effectively vest in the Buying Companies, or to confirm their title to and possession of, the Transferred Assets, and to confirm to third parties responsibility of the Selling Companies with respect to the Excluded Liabilities and Swedish Indemnified Liabilities.

3.07  **Further Assurances of Buying Companies**.  At any time and from time to time after the Closing, at the request and expense of Grace or any of the other Selling Companies, Sequa shall, and shall cause the other members of the Buyer Group to, execute and deliver, or cause to be executed and delivered, all such documents, and take or cause to be taken all such other actions, as Grace or any of the other Selling Companies reasonably deems necessary or desirable in order to more fully and effectively divest Grace or any of the other Selling Companies of responsibility for the Transferred Liabilities and incidents of ownership of the Transferred Assets.

Accounts Payable, Swedish Accrued Expenses and Swedish Accrued Warranty Obligations, all computed in accordance with Section 4.03.

(c) "Closing Net Asset Amount" means, as of the Valuation Time, the Closing Asset Amount less the Closing Liability Amount.

4.03  **Computations**.  The Closing Net Asset Amount shall be determined in U.S. dollars in accordance with the valuation methods and accounting practices and procedures as set forth in Schedule 5.06, as modified by the Special Accounting Rules set forth in Schedule 4.03.  All foreign currency amounts in the Closing Net Asset Amount shall be translated into U.S. dollars using the exchange rates for such currencies as in effect at the Valuation Time as reported by the Eastern Edition of *The Wall Street Journal*.

4.04  **Closing Statement**.  Not later than 60 days after the Closing, Grace shall deliver to Buyer a statement setting forth Grace's determination of the Closing Net Asset Amount (the "Closing Statement"), which shall describe in reasonable detail the basis for such determination.

4.05  **Acceptance**.  If Sequa does not object to the Closing Net Asset Amount shown on the Closing Statement delivered by Grace, by written notice of objection delivered to Grace within 60 calendar days after Sequa's receipt of such Closing Statement, describing in reasonable detail each of its proposed adjustments to Grace's determination thereof, then the Closing Net Asset Amount shown on the Closing Statement shall be final and binding on the Selling Companies and the Buying Companies.

4.06  **Non-Acceptance, Resolution of Disputes**.

(a) If Sequa does object to the Closing Net Asset Amount shown on the Closing Statement, then Sequa and Grace shall promptly endeavor to agree upon the proper amount of the items in dispute. If a written agreement settling any disputed item has not been reached within 30 calendar days after the date of receipt by Grace from Sequa of Sequa's notice of objection thereto, then either Grace or Sequa may, by notice to the other, submit for determination by arbitration in accordance with this Section 4.06 the question of what adjustments, if any, must be made to Grace's determination of such amount in order for it to be determined in accordance with the provisions of this Agreement.

(b) Any such determination by arbitration shall be made by Ernst & Young, L.L.P. (the "Arbitrator") and shall be final and binding on all parties to this Agreement.

(c) The fees and expenses of the Arbitrator for any determination under this Article 4 shall be borne by Grace and Sequa in inverse proportion to the total of the amount(s) of such disputed item(s) determined in favor of such party.

(d) Nothing herein shall be construed to authorize or permit the Arbitrator to determine (i) any question or matter whatsoever under or in connection with this Agreement or any Transaction Document except the determination of what adjustments, if any, must be made to one or more of the items reflected in the Closing Net Asset Amount as shown on the Closing Statement delivered by Grace in order for the Closing Net Asset Amount to be determined in accordance with the provisions of this Agreement and (ii) a Closing Net Asset Amount that is not in the range between and including the final proposals of Grace and Sequa. Nothing herein shall be construed to require the Arbitrator to follow any rules or procedures of any arbitration association.

4.07   **Payment of Adjustments**.    Promptly after the Closing Net Asset Amount has been finally determined, Grace shall deliver to Sequa a statement of the Total Purchase Price and of the Local Purchase Prices (the aggregate of which shall equal the Total Purchase Price) determined in conformity with the final Closing Net Asset Amount and the terms of this Agreement.   All local Purchase Price adjustments shall be settled simultaneously based on such statement not later than 15 calendar days after delivery thereof.  If any Local Purchase Price exceeds the amount paid at the Closing with respect thereto, Sequa shall cause the appropriate Buying Company to pay, or shall pay as its agent, the amount of the excess to the appropriate Selling Company or to Grace as its agent; if any Local Purchase Price is less than the amount paid at the Closing with respect thereto, the appropriate Selling Company shall, or shall cause Grace as its agent to, refund the amount of the overpayment to the appropriate Buying Company or to Sequa as its agent.  If the net amount of the total adjustment payments is in excess of $100,000, interest shall be paid on the net amount of the total adjustment payments, from the Closing Date to the date of payment, at a floating rate equal to the U.S. prime rate, as reported by the Eastern Edition of *The Wall Street Journal*, in effect from time to time during the period from the date of the Closing until the date of payment.

### ARTICLE 5

### Grace's Representations and Warranties

Grace represents and warrants to Sequa as follows:

5.01   **Corporate Status and Authority**.

(a) Each of Grace and the other Selling Companies is a corporation duly organized and validly existing under the laws of its jurisdiction of incorporation as set forth on Exhibit 1A. Grace is duly qualified to do business as a foreign corporation in the State of Wisconsin. Grace and each other Selling Company has full corporate power and authority to enter into this Agreement and the Transaction Documents to which it is or will be a party and perform its obligations thereunder.

(b) Each of the Swedish Companies is a corporation duly organized and validly existing under the laws of its jurisdiction of incorporation. Grace is the owner of all the outstanding capital stock of TEC Systems AB, free and clear of all Liens. TEC Systems AB is the owner of all the outstanding capital stock of the other Swedish Companies, free and clear of all Liens. Except as provided in their charter documents or under applicable law, there are no outstanding subscriptions, warrants, options or other rights to purchase or otherwise acquire any of the capital stock (whether or not currently outstanding) of any of the Swedish Companies.

5.02  **Authorization**. The execution and delivery by Grace and each other Selling Company of this Agreement and the Transaction Documents to which it is or will be a party and its performance of its obligations hereunder and thereunder have been duly authorized by all required corporate action (including any required shareholder action).

5.03  **Execution and Delivery**. Grace and each other Selling Company has duly and validly executed and delivered this Agreement and the Transaction Documents to which it is a party and which are being executed and delivered simultaneously with this Agreement and this Agreement and such Transaction Documents are valid and binding obligations of

C:\GRACE\SALEAGTG.618.wpd

42

such Selling Company. The remaining Transaction Documents to which each Selling Company will be a party, when executed and delivered at the Closing, will be duly and validly executed and delivered by such Selling Company, and upon such execution and delivery, will be valid and binding obligations of such Selling Company.

5.04    **No Conflict**. Except as otherwise disclosed in Schedule 5.04, the execution and delivery by each of Grace and the other Selling Companies of this Agreement and the Transaction Documents to which it is or will be a party, and its performance of its obligations hereunder and thereunder, do not (a) conflict with its charter documents or by-laws; or (b) result in any breach of any of the provisions of, or constitute a default under, any judgment, order, decree, or agreement to which any such entity is bound, which breach or default would prevent such entity from executing and delivering this Agreement or any Transaction Document to which it is or will be a party or performing its obligations hereunder or thereunder.

5.05    **Real Property; Title**. (a) Schedule 5.05(a) sets forth a true and complete legal description of the Owned Real Property and list of the Leased Real Property and the property covered by the Swedish Real Property Lease, and any rights of third parties to occupy space at these facilities.

(b) Except as specified in Schedule 5.05(b) , (i) the Transferred Assets and Swedish Continuing Assets, including the Owned Real Property, are not subject to any Lien, except Permitted Liens; and (ii) the Selling Companies and the Swedish Companies at March 31, 1997, severally had title to the assets reflected on the statement of net assets as of that date included in the Financial Statements, and at the Closing, the Selling Companies and the Swedish Companies severally will have title to  the assets reflected as owned on the

Closing Statement, in each case free and clear of all Liens, except Permitted Liens, as well as any other title defects or restrictions that would interfere with the continued use or operation thereof in the manner heretofore used or operated by Grace in its conduct of the Subject Business.

5.06    **Financial Statements**. Schedule 5.06 contains unaudited statements of the net assets of the Subject Business as of December 31, 1996 and March 31, 1997 and of the operating results of the Subject Business for the year and quarterly period then ended (collectively, the "Financial Statements"). Such schedule also presents the basis upon which the Financial Statements have been prepared and describes the accounting practices that have been applied. The Financial Statements fairly present, in all material respects, the financial condition and results of operations of the Subject Business as of and for the year ended December 31, 1996, and as of and for the three months ended March 31, 1997, in accordance with such accounting practices. Except for Excluded Liabilities and liabilities reflected on the Financial Statements, there are no liabilities of the Subject Business which are recorded on the books and records of any Grace Entity.

5.07    **Litigation; Investigations**. (a) Except as set forth in Schedule 5.07(a), there are no actions, suits or proceedings, including condemnation or eminent domain actions, suits or proceedings, as to which any Grace Entity has received service of process , or insofar as the Grace Executives and the Subject Business Executives have Knowledge, is otherwise pending or threatened against any Selling Company or Swedish Company which relate to or arise out of the Subject Business, the Transferred Assets, the Swedish Continuing Assets, the Transferred Liabilities or the Swedish Continuing Liabilities.

(b) Except as set forth in Schedule 5.07(b) there are no governmental investigations as to which the Grace Group has received service of process or, insofar as the Grace Executives and the Subject Business Executives have Knowledge, are otherwise pending or threatened against any Selling Company or Swedish Company which relate to or arise out of the Subject Business, the Transferred Assets, the Swedish Continuing Assets, the Transferred Liabilities or the Swedish Continuing Liabilities.

5.08   **Asset Disposition or Loss**. Except as set forth in Schedule 5.08, since March 31, 1997, the Subject Business has not disposed of (other than by sales of inventory in the ordinary course of business), any of its assets whose aggregate net book value from and after March 31, 1997, exceeds $100,000.

5.09   **Insurance**. Schedule 5.09 describes the insurance coverage maintained by or on behalf of the Subject Business in the United States, Germany, Sweden, and the United Kingdom.

5.10   **Contracts**. (a) Schedule 5.10(a)(1) lists each of the Personal Property Leases and the Swedish Personal Property Leases whose outstanding financial commitments are more than $10,000. Schedule 5.10(a)(2) lists each of the Real Property Leases and the Swedish Real Property Lease. Schedule 5.10(a)(3) lists each of the Supplier Goods Contracts and Swedish Supplier Goods Contracts whose outstanding financial commitments are more than $25,000. Schedule 5.10(a)(4) lists each of the Supplier Services Contracts and Swedish Supplier Services Contracts whose outstanding financial commitments are more than $10,000. Schedule 5.10(a)(5) lists each of the Other Contracts and Swedish Other Contracts that are not terminable without cost, expense or penalty under the terms thereof or applicable

law, on notice of no more than 60 days.  Schedule 5.10(a)(6) lists each of the Customer

Contracts and the Swedish Customer Contracts whose outstanding commitments are more

than $25,000 and also specifically indicates (i) each of such contracts in which the Selling

Companies or the Swedish Companies has agreed to consequential, incidental or liquidated

damages, damages for lost profits, or other monetary damages, and (ii) each of such contracts

in which the Selling Companies or the Swedish Companies have not explicitly excluded

such damages. Grace has heretofore delivered or made available to Sequa true and complete

copies of all such contracts that are currently in effect.

(b)  Except as set forth in Schedule 5.10(b), there is no material breach or default

of any of the Selling Companies or any of the Swedish Companies with respect to any of

the Customer Contracts, Swedish Customer Contracts, Supplier Contracts and Swedish

Supplier Contracts , and insofar as the Grace Executives and the Subject Business Executives

have Knowledge, there is no material breach or default by any other party to the Customer

Contracts, Swedish Customer Contracts, Supplier Contracts, Swedish Supplier Contracts,

Other Contracts or Swedish Other Contracts described in (a) of this Section 5.10.

5.11    Labor and Employment. (a) Schedule 5.11(a) lists (i) each collective bargaining

or other similar agreement with a labor union or similar organization covering any Subject

Business Employee, (ii) each shop agreement with workers' and employees' representatives,

and (iii) each individual written employment or consulting agreement (other than standard

form confidentiality and/or noncompete agreements) covering any Subject Business Employee.

Grace has heretofore delivered or made available to Sequa true and complete copies of

all such agreements as currently in effect.

(b) Except as set forth in Schedule 5.11(b), insofar as the Grace Executives and the Subject Business Executives and Amy M. Gillis have Knowledge, there are no pending material labor disputes, grievances or controversies respecting the Subject Business or any of the Subject Business Employees.

5.12  **Employee Benefit Plans**. Schedule 5.12 lists each employee benefit plan (as defined in Section 3(3) of the Employee Retirement Income Security Act), excluding governmental plans, which as of the date hereof covers any Subject Business Employee in the United States, and each employee benefit plan or contract currently maintained by any of the Selling Companies or the Swedish Companies covering Subject Business Employees in Germany, Sweden, the United Kingdom and France that provides benefit coverages in addition to those required by applicable law. Except for those listed on Schedule 5.12 as not administered by the Selling Companies, Grace has heretofore delivered or made available to Sequa true and complete copies of all such plans, and all such contracts to which any of the Selling Companies or the Swedish Companies is a party, as currently in effect. Attached to Schedule 5.12 is a true and complete copy of Grace's severance policy applicable to U.S. employees of the Subject Business in connection with the sale thereof (the "Grace Severance Program").

5.13  **Environmental**.

(a) Schedule 5.13(a) sets forth (i) a listing of each material written report prepared by or for the Grace Group concerning the environmental condition of the Owned Real Property prepared by or for the Grace Group in the last five (5) years, including such reports as pertain to conditions existing or resulting from activities associated with the Selling Companies,

the Swedish Companies and their respective predecessor's activities, including, if any, but without limitation, matters relating to air, soil contamination and water pollution, solid wastes, toxic substances, matters relating to waste disposal practices, groundwater and soil monitoring ("Environmental Matters"), and (ii) a listing of all of the Grace Group's material written communications to and from federal, state and local environmental agencies during the past five (5) years regarding any claims and all existing, past, pending, threatened or anticipated violations, citations, claims, and complaints relating to or resulting from activities associated with the Subject Business or conditions existing at the Owned Real Property.

(b) The disclosure set forth in Schedule 5.13(b) identifies the location and current status of use, if applicable, contents, capacity and age of each underground storage tank located on the Owned Real Property.

(c) Except as set forth on Schedule 5.13(c) with respect to the Owned Real Property:

(i)      the use and operations thereon (a) are, insofar as the Grace Executives and the Subject Business Executives have Knowledge, currently in material compliance with all Environmental Laws, and (b) are in material compliance with all permits required thereby;

(ii)     insofar as the Grace Executives and the Subject Business Executives have Knowledge, there has been no spillage or leaks associated with the filling, draining, or use of any underground storage tanks of any Hazardous Substances;

(iii)    insofar as the Grace Executives and the Subject Business Executives have Knowledge, (x) the Selling Companies have never generated, transported, treated, stored or disposed of, nor, in any manner, arranged for disposal or treatment of any Hazardous

Substances on the Owned Real Property other than in compliance with applicable law and (y) there is no Hazardous Substance present on, in or under the Owned Real Property. "Hazardous Substances" for purposes of this Agreement shall include, without limitation: (A) hazardous substances or hazardous wastes, as those terms are defined by the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 6901 et seq., and/or any other applicable federal, state, or local law, regulation, ordinance or requirement, all as amended or hereafter amended; (B) petroleum, including but not limited to crude oil or any fraction thereof; and (C) any radioactive material, including, but not limited to, any source, special nuclear or by-product material as defined at 42 U.S.C. §§ 2011 et seq., as amended or hereafter amended or hereafter amended;

(iv)    the Grace Group is not and has not been subject to, or received any written notice of, any private, administrative or judicial action, relating to the presence or alleged presence of Hazardous Substances in, under, upon or emanating from the Owned Real Property; and insofar as the Grace Executives and the Subject Business Executives have Knowledge, there are no pending or threatened actions or proceedings regarding the Owned Real Property from any governmental agency or any other person or entity regarding any matter relating to health, safety, or protection of the environment; and

(v)    insofar as the Grace Executives and the Subject Business Executives have Knowledge, in connection with its use, ownership and operation of the Owned Real Property, (A) the Selling Companies do not own, lease, possess, or control any polychlorinated biphenyls (PCB) or PCB contaminated fluids or equipment, and (B) the Owned Real Property

does not contain material or substance containing asbestos in violation of any federal or state standard in existence on the date hereof.

5.14  **Intellectual Property**. Part 1 of Schedule 5.14 sets forth a list of all patents and patent applications and registered trademarks and trademark applications owned by any of the Selling Companies and the Swedish Companies and used directly and primarily in the Subject Business. Except as set forth in Part 2 of Schedule 5.14, none of the Selling Companies or Swedish Companies have granted any third party any license to use any of such items. Except as set forth in Part 3 of Schedule 5.14, there is no action, suit or proceeding as to which the Grace Group has received service of process or, insofar as the Grace Executives and the Subject Business Executives have Knowledge, is otherwise pending or threatened with respect to any Intellectual Property or Swedish Intellectual Property including any of the foregoing contesting the right of any of the Selling Companies or Swedish Companies to use or the validity of any Intellectual Property or Swedish Intellectual Property (as defined in the definitions of Transferred Assets and Swedish Continuing Assets, respectively). Part 4 of Schedule 5.14 lists any contracts under which any Selling Company or any of the Swedish Companies have a license from an unaffiliated person to use any patent or trademark that is used in the Subject Business. Except as set forth in Part 5 of Schedule 5.14, insofar as the Grace Executives and the Subject Business Executives have Knowledge, there is no intellectual property used in the Subject Business that is not either part of the Transferred Assets or the Swedish Continuing Assets or covered by the license agreement referred to in Section 3.04(c).

C:\GRACE\SALEAGTG.618.wpd

50

5.15   **Compliance with Laws**.  Except as set forth in <u>Schedule 5.15</u>, insofar as the Grace Executives and the Subject Business Executives and Todd M. Kreuser have Knowledge, the Subject Business and the Transferred Assets and Swedish Continuing Assets are in compliance, in all material respects, with all federal, state, county, local or foreign laws, statutes, ordinances, rules and regulations.  The Selling Companies and the Swedish Companies have not received any written notice of default or violation, nor insofar as the Grace Executives and the Subject Business Executives have Knowledge, are any of the Selling Companies or the Swedish Companies in default of violation, with respect to any judgment, order, writ, injunction, decree, demand or assessment issued by any Governmental Authority, relating to any aspect of the Subject Business or the Transferred Liabilities, the Swedish Continuing Liabilities, the Transferred Assets or the Swedish Continuing Assets.

5.16   **Permits**.  (a) <u>Schedule 5.16(a)</u> sets forth a list of the material permits, licenses or other governmental authorizations held by the Selling Companies and the Swedish Companies in connection with their operation of the Subject Business, including the operation, use and occupancy of, and construction of improvements on the Owned Real Property (collectively, "Seller Permits").

(b) Except as set forth in <u>Schedule 5.16(b)</u>, insofar as the Grace Executives and the Subject Business Executives have Knowledge, (i) the Seller Permits are all the material permits, licenses or other governmental authorizations required in the conduct by the Selling Companies and the Swedish Companies of the Subject Business, including for the operation, use and occupancy of, and construction of improvements on the Owned Real Property (collectively, "Required Permits"), and (ii) no Selling Company or Swedish Company has

received any written warning notice, notice of violation or probable violation, or notice of revocation from or on behalf of any Governmental Authority, alleging (x) any violation of any Seller Permit, which violation has not been corrected or otherwise settled, or (y) that any Selling Company or Swedish Company requires any Required Permit not currently held by it.

    5.17    **Warranty Obligations; Receivables**.  (a) Schedule 5.17(a)(i) sets forth a true, complete and accurate description of all currently effective warranty obligations granted by the Subject Business with respect to goods and equipment sold by the Subject Business (other than warranty obligations (A) contained in customer purchase orders, customer terms and conditions, order acknowledgments, acceptance forms and the like, as well as warranty obligations under applicable law, all of which obligations Grace acknowledges to be Excluded Liabilities (except to the extent that such obligations are identical with the warranty obligations set forth in Schedule 5.17(a)(i)), (B) for replacement parts sold individually, and (C) for components of equipment whose system warranty has expired).  Schedule 5.17(a)(ii) lists all claims with respect to such goods and equipment established as open rework matters as of May 30, 1997 on which work was commenced or continuing after the expiration of the relevant warranty period.  Schedule 5.17(a)(iii) lists all warranty claims with respect to such goods and equipment established as open rework matters as of May 30, 1997 other than those listed on Schedule 5.17(a)(ii).

    (b) Insofar as the Grace Executives, the Subject Business Executives, Michael Loos (with respect to dryers) and Rodney Schwartz (with respect to oxidizers) have Knowledge,

<u>Schedule 5.17(b)</u> contains a list of all material design defects in the significant product lines of the Subject Business.

(c)  Except as set forth in <u>Schedule 5.17(c)</u>, there is no pending or, insofar as the Grace Executives and the Subject Business Executives have Knowledge, threatened dispute, offset or other claim by any account debtor with respect to any of the Receivables and the Swedish Receivables (as defined in the definitions of Transferred Assets and Swedish Continuing Assets, respectively), which dispute, offset or other claim has not been satisfied or otherwise settled.

5.18  **Relations with Customers**.  Except as set forth in <u>Schedule 5.18</u>, for the last twelve months prior to the date hereof, insofar as the Grace Executives and the Subject Business Executives have Knowledge, no Selling Company, none of the Swedish Companies or other Grace Entity has received written notice or other written communication that any customer is refusing to do business with the Subject Business, has removed the Subject Business from its bid list, or is canceling any contract with the Subject Business.

5.19  **Confidentiality Agreements**. <u>Schedule 5.19</u> lists all confidentiality, secrecy and similar agreements that currently bind any Selling Company or any of the Swedish Companies  to keep confidential or not to disclose any information disclosed to it by the other party or parties to such agreements.  Grace has heretofore delivered or made available to Sequa true and complete copies of such contracts as currently in effect.

5.20  **Absence of Certain Changes and Events.**  Since March 31, 1997, except as otherwise disclosed in <u>Schedule 5.20</u>, insofar as the Grace Executives and the Subject Business Executives have Knowledge, there has not been:

(a)    any material adverse change in the Transferred Assets, the Swedish Continuing Assets, the Transferred Liabilities, the Swedish Continuing Liabilities or the Subject Business; and

(b)    any increase in the compensation payable or to become payable by any of the Selling Companies or Swedish Companies to any officers or employees of the Subject Business, other than customary compensation adjustments consistent with the past practice of the Selling Companies or the Swedish Companies in the conduct of the Subject Business.

5.21    <u>Inventories</u>. Except as set forth on <u>Schedule 5.21</u>, (i) the Selling Companies and the Swedish Companies, in the conduct of the Subject Business, do not hold and will not as of the Closing hold, any Inventories on consignment; and (ii) other than Inventories shipped but not yet delivered to the Subject Business, no Inventories of the Subject Business are on the date hereof in the possession of others, and no Inventories existing as of the Closing Date will be in the possession of others.

5.22    <u>Owned Real Property</u>. Except as disclosed on <u>Schedule 5.22</u>:

(a)    Grace is the sole record owner in fee simple absolute of all of the Owned Real Property;

(b)    insofar as the Grace Executives and the Subject Business Executives have Knowledge, the Owned Real Property is in material compliance with all applicable land use requirements and zoning ordinances; and

(c)    no Selling Company is a party to any agreements, contracts or commitments (including those relating to ingress and egress) which are not of record relating to

any of the Owned Real Property, and insofar as the Grace Executives and the Subject Business Executives have Knowledge, there are no easements, encumbrances, restrictions or rights of way not currently of record which could interfere with the conduct of the Subject Business on any of the Owned Real Property or diminish the value of any of the Owned Real Property for use as it is currently used.

5.23    **Real Property Leases**. Each of the Real Property Leases and the Swedish Real Property Lease is in full force and effect and constitutes a valid and binding obligation of the respective lessors and lessees. None of the Selling Companies and the Swedish Companies has received any notice of default with respect to any term or condition of any of the Real Property Leases or the Swedish Real Property Lease, nor is any Selling Company or Swedish Company in default or arrears in the performance or satisfaction of any agreement or condition on its part to be performed or satisfied thereunder.

## ARTICLE 6

### Sequa Representations and Warranties

Sequa represents and warrants to Grace as follows:

6.01    **Corporate Status and Authority**. Each of Sequa and the Buying Companies is a corporation duly organized and validly existing under the laws of its jurisdiction of organization as set forth on Exhibit 1A. Each Buying Company is a direct or indirect Subsidiary of Sequa. Each of Sequa and the Buying Companies has full corporate power to enter into this Agreement and the Transaction Documents to which it is or will be a party and perform its obligations hereunder and thereunder.

6.02  **Authorization**. The execution and delivery by each of Sequa and the Buying Companies of this Agreement and the Transaction Documents to which it is or will be a party, and its performance of its obligations hereunder and thereunder, have been duly authorized by all required corporate action (including stockholder action).

6.03  **Execution and Delivery**. Sequa and each Buying Company has duly and validly executed and delivered this Agreement and the Transaction Documents to which it is a party and which are being executed and delivered simultaneously with this Agreement and this Agreement and such Transaction Documents are valid and binding obligations of Sequa and such Buying Company. The remaining Transaction Documents to which Sequa and each Buying Company will be a party, when executed and delivered at the Closing, will be duly and validly executed and delivered by Sequa or such Buying Company, and upon such execution and delivery, will be valid and binding obligations of Sequa or such Buying Company.

6.04  **No Conflict**. The execution and delivery by each of Sequa and the Buying Companies of this Agreement and the Transaction Documents to which it is or will be a party, and its performance of its obligations hereunder and thereunder, do not (a) conflict with its charter documents or by-laws; or (b) result in any breach of any of the provisions of, or constitute a default under, any judgment, order, decree, or agreement to which any such entity is bound, which breach or default would prevent such entity from executing and delivering this Agreement or any Transaction Document to which it is or will be a party or performing its obligations hereunder or thereunder.

6.05  **Sufficient Funds**.  Sequa and the Buying Companies have on the date hereof and will have on the Scheduled Closing Date sufficient funds to consummate the transactions contemplated by this Agreement.

6.06  **Phase I and Phase II Reports**.  Sequa has delivered to Grace true and complete copies of the Phase I and Phase II reports prepared for Sequa respecting the Owned Real Property (the "Reports"). The Selling Companies have and will take responsibility for evaluating the Reports with respect to the Owned Real Property.  There are uncertainties inherent in such reports, and the Selling Companies are aware of such uncertainties, and have taken such uncertainties into account in their reliance on the Reports.  Neither Sequa nor any Buying Company shall have any liability of any kind to any Grace Entity with respect to the Reports.

### ARTICLE 7

### Sequa's Investigation

Sequa hereby acknowledges the following:

7.01  **Financial Information**.  As part of their investigation, Sequa and the Buying Companies are being given certain forecasts, projections and opinions prepared or furnished by the Grace Group or their representatives with respect to the Subject Business (the "Additional Financial Information"). Sequa and the Buying Companies have taken responsibility for evaluating the adequacy, of the Additional Financial Information.  There are uncertainties inherent in attempting to make projections and forecasts and formulate opinions; Sequa and the Buying Companies are familiar with such uncertainties, and have taken such

uncertainties into account in their reliance on any of the Additional Financial Information. Except for the representations and warranties contained in Article 5 and Sections 12.01(a), 12.04 and 12.10 of this Agreement and the Schedules referred to therein or in the Transaction Documents for the conveyance or transfer of the Transferred Assets, neither Grace nor any other member of the Grace Group shall have any liability of any kind to Sequa, the Buying Companies, or any other Buyer Entity, with respect to any of the Additional Financial Information.

7.02   **No Additional Representations**. Except for the representations and warranties contained in Article 5 and Sections 12.01(a), 12.04 and 12.10 of this Agreement and the Schedules referred to therein or in the Transaction Documents for the conveyance or transfer of the Transferred Assets, none of the Selling Companies (nor any other Grace Entity) is making any representation or warranty, express or implied, of any nature whatsoever with respect to the Subject Business, the Transferred Assets or the Transferred Liabilities.

7.03   **No Effect on Representations and Warranties**.  No provision of this Article 7 shall amend, modify, limit, or abridge in any way the representations and warranties set forth in Article 5 of this Agreement and the Schedules referred to therein or in the Transaction Documents for the conveyance or transfer of the Transferred Assets and retention of the Swedish Continuing Assets.

### ARTICLE 8

### Covenants of Grace and Sequa

8.01  **Access and Inquiry**. Between the date of this Agreement and the Closing, Grace shall give the Buying Companies reasonable access to the facilities of the Subject Business and the Buying Companies will be permitted to contact and make reasonable inquiry of employees and customers of the Selling Companies and Swedish Companies regarding the Subject Business and its assets and liabilities. Except for the details of any trade secrets and non-public intellectual property, access to which shall be subject to such additional restrictions and limitations as Grace may reasonably require, Grace shall make available to the Buying Companies all books, records, and other financial data and files of the Selling Companies and Swedish Companies to the extent relating to the Subject Business. Sequa acknowledges that the terms of the Confidentiality Agreement shall apply to information obtained by any Buying Company pursuant to this Section.

8.02  **Hart-Scott-Rodino Act, etc**. As soon as practicable after the date hereof, Grace and Sequa will file or cause to be filed (i) appropriate Notification and Report Forms under the HSR Act and (ii) appropriate filings in Germany and Sweden with respect to this Agreement and the transactions contemplated hereby. Grace and Sequa shall cooperate to coordinate such filings, and to make reasonable efforts to respond to any governmental request or inquiry with respect thereto.

8.03  **Licenses and Permits**. As soon as reasonably practicable after the date hereof, the Buying Companies shall prepare and file or cause to be prepared and filed with the appropriate licensing and permitting authorities applications for the issuance to the Buyer Group of all governmental licenses and permits required for the Buyer Group to operate the Subject Business after the Closing. The Buying Companies shall use all reasonable

efforts to secure such licenses and permits. The Selling Companies shall use all reasonable efforts to assist the Buyer Group to the extent reasonably requested in the preparation of such applications and the securing of such licenses and permits.

8.04   **Notices to Third Parties; Consents to Assignment**. The Buying Companies and the Selling Companies shall cooperate to make all other filings and to give notice to all third parties that may reasonably be required to consummate the transactions contemplated by this Agreement.

8.05   **Reasonable Efforts**. In making reasonable efforts under Sections 8.02, 8.03 and 8.04, no Grace Entity or Buyer Entity shall be required to make any payment (other than for reasonable legal fees) that it is not presently contractually required to make, divest any assets (including but not limited to assets of the Subject Business), make any change in the conduct of its business or that of the Subject Business, accept any limitation on the future conduct of its business or that of the Subject Business, enter into any other agreement or arrangement with any person that it is not presently contractually required to enter into, accept any significant modification in any existing agreement or arrangement, or agree to any of the foregoing.

8.06   **Title Insurance and Survey**. Sequa shall, at its expense, order the title insurance policy and survey described in Section 10.08.

## ARTICLE 9

### Conduct of Business Prior to the Closing

Grace agrees that except as otherwise consented to by Sequa, from the date of this Agreement until the Closing:

9.01  **Operation in Ordinary Course**.  The Selling Companies and the Swedish Companies shall conduct the Subject Business only in the ordinary course of business and consistent with prior practice.

9.02  **Disposition of Assets**.  The Selling Companies and the Swedish Companies shall not sell, lease (as lessor), transfer, license (as licensor), or otherwise dispose of, any asset of the Subject Business other than sales of inventory in the ordinary course of business and Excluded Assets or Swedish Excluded Assets.

9.03  **Material Agreements**.  The Selling Companies and the Swedish Companies shall not, in the course of the Subject Business:

(a)  enter into any Customer Contract or Swedish Customer Contract that has a term of more than six (6) months and cannot be canceled by the Selling Companies or the Swedish Companies without penalty under the terms thereof or applicable law, upon notice of thirty (30) days or less, and either (i) under which it is reasonably expected that the Subject Business will make expenditures or obtain receipts of more than $500,000; or (ii) which has terms and conditions different from the Subject Business's standard terms and conditions;

(b)  either: (i) materially amend, cancel or modify any of the Customer Contracts or Swedish Customer Contracts involving a change in commitment of more than $25,000;

(ii) materially amend, cancel or modify any other contract involving a change in commitment of more than $25,000; (iii) enter into or undertake any unusual or long-term purchase or supply commitments for the Subject Business involving a commitment in excess of $100,000; or (iv) enter into any lease of capital assets or other new agreement, commitment or transaction (other than a Customer Contract) which by its terms extends beyond the Closing Date and involves a commitment in excess of $100,000;

        (c)    make or commit to make any capital expenditure in excess of $100,000;

        (d)    accelerate or otherwise effect any material change in the method of collection of its trade accounts receivables, accelerate or delay the existing method of payment of trade accounts payable or accrued expenses;

        (e)    change the existing accounting practices or policies of the Subject Business; or

        (f)    agree to do, or take any action in furtherance of, any of the foregoing acts.

    9.04   **Relations with Customers and Suppliers**.  Grace shall use all reasonable efforts to preserve the Subject Business's relations with customers and suppliers.

    9.05   **Maintenance of Transferred Assets.** The Grace Group will maintain the tangible personal property included in the Transferred Assets and the Swedish Continuing Assets in its existing state of repair and condition, ordinary wear and tear excepted, and will not defer or delay any regularly scheduled maintenance of any material part of the foregoing.

    9.06   **Employees and Compensation.**  The Grace Group will not do any of the following acts, to the extent relating to the Subject Business:

(a)    pay, grant or authorize any salary increases or bonuses, other than customary compensation adjustments consistent with the past practice of the Selling Companies and the Swedish Companies in the conduct of the Subject Business;

(b)    enter into any employment agreement (other than standard form confidentiality and/or non-compete agreements, or oral employment contracts terminable at will without cost, expense or penalty under the terms thereof and applicable law), consulting agreement involving payments in excess of $25,000, management agreement or collective bargaining agreement, or modify any such agreement;

(c)    reassign or make any material changes in the nature or terms of employment of any of the present employees of the Subject Business;

(d)    grant any discretionary increases in salary or historical bonus arrangements to any executive or other supervisory personnel of the Subject Business who are offered employment with the Buying Companies;

(e)    make any change in management personnel; or

(f)    agree to do, or take any action in furtherance of, any of the foregoing acts.

9.07    **Labor Notifications**.    Grace will notify the workers' and employees' representatives in non-U.S. jurisdictions of the Selling Companies and will take any other action with respect thereto, including notification of Governmental Authorities, to the extent required by local applicable law.

## ARTICLE 10

### Conditions Precedent to Sequa's Obligations

All obligations of Sequa under this Agreement are subject, at Sequa's option, to the fulfillment prior to or at the Closing, of each of the following conditions:

10.01 <u>Accuracy of Representations and Warranties</u>. Each and every representation and warranty of Grace under this Agreement shall be true and accurate in all material respects.

10.02 <u>Performance of Covenants and Agreements</u>. Grace shall have performed, in all material respects, all of the covenants and agreements required to be performed by Grace at or prior to the Closing pursuant to this Agreement.

10.03 <u>HSR Act</u>. All waiting periods under the HSR Act and the analogous German and Swedish statutes applicable to the transactions contemplated by this Agreement shall have expired, by passage of time or by valid termination by the FTC or the DOJ or the analogous German or Swedish agencies; no representative of either the FTC or the DOJ or such German or Swedish agencies shall be taking the position that any of such waiting periods has not commenced to run or has not expired for any reason; and no representative of either the FTC or the DOJ or such German or Swedish agencies shall have requested a delay of the Closing for a period which has not expired, which request has not been withdrawn.

10.04 <u>Permits, Consents, etc.</u>

(a) There shall be no material permits, consents, approvals or authorization of, or declarations to or filing with, any Governmental Authority required in connection with the transactions contemplated by this Agreement and the Transaction Documents that have not been accomplished or obtained and which may not be accomplished or obtained after

64

the Closing without penalty or other material consequences to the Subject Business or the Buyer Group.

(b) The non-governmental third party consents set forth on Schedule 10.04(b) shall have been obtained at or prior to the Closing.

10.05 **Litigation**. No action, suit or proceeding by any third person (including but not limited to any Governmental Authority) shall have been instituted (and remain pending on the date of the Closing) against any Grace Entity or Buyer Entity that questions, or reasonably could be expected to lead to subsequent questioning of, the validity or legality of this Agreement, the Ancillary Agreements or the transactions contemplated by this Agreement.

10.06 **Certificate of Grace**. (a) Grace shall have delivered to Sequa a certificate of Grace, dated the Closing Date, signed by the President or any Vice President of Grace certifying that: (i) each and every representation and warranty of Grace under this Agreement is true and accurate in all material respects as of the Closing; and (ii) Grace has performed, in all material respects, at or prior to the Closing all of the covenants and agreements required to be performed by Grace at or prior to the Closing pursuant to this Agreement.

(b) On or before the Closing Date, Grace may deliver to Sequa one or more proposed amendments to the Schedules to reflect any information not included in the original Schedules (other than Schedules 1A, 1 B, 2.03, 4.01, 4.03, 5.06, 5.12, (Grace Severance Program), 5.17(a)(ii), 10.04(b), 11.04(b), 12.02, 13.03 and 16.02, which may not be changed). Such proposed amendments shall not be deemed amendments to the Schedules delivered on the date hereof, and shall not be deemed to modify any representation or warranty made

by Grace in this Agreement, unless accepted by Sequa in its sole discretion. If such proposed amendments contain any items that show that any representation and warranty of Grace under this Agreement (without giving effect to the proposed amendments) is not true and accurate in all material respects, then Sequa shall have the right to terminate this Agreement in accordance with Section 13.01(d). If Sequa accepts such amendments to the Schedules containing exceptions and/or the certificate described in clause (a) containing exceptions, and proceeds with the Closing, then Sequa shall be deemed to have waived any rights against Seller only with respect to any misrepresentation or breach of warranty described in such exceptions and no others. Any such acceptance of any such amendments and/or certificate shall be at Sequa's sole and absolute discretion. None of the foregoing provisions of this Section 10.06(b) shall apply to amendments to any Schedule expressly permitted by the terms of such Schedule, which amendments shall not be deemed a breach of the representations and warranties to which such Schedule refers; provided, however, that such amendments shall not limit Grace's obligations under Article 9 of this Agreement.

10.07 <u>Opinion of Grace's Counsel</u>. Grace shall have delivered to Sequa an opinion of its General Counsel, dated the Closing Date, in the form of <u>Exhibit 10.07</u>.

10.08 <u>Receipt of Title Insurance, Survey</u>.

(a) Sequa shall have obtained at Sequa's expense a commitment for title insurance policy issued by the title company engaged pursuant to Section 8.06 as Owner's Policy, Form B, insuring, in an amount not greater than the fair market value thereof, the Owned Real Property, showing the title to such real estate is in Grace, and containing only the exceptions listed in <u>Schedule 10.08</u>.

C:\GRACE\SALEAGTG.618.wpd

66

(b) Sequa shall have obtained at Sequa's expense a survey of the Owned Real Property, prepared after the date hereof by a Wisconsin Registered Land Surveyor and certified to the abovementioned title company. The survey shall identify all recorded easements and shall not show any encroachments of improvements on or from the property, or any violations of building setback lines, that would adversely affect the value of such real estate or Buyer's ability to use the improvements on such real estate in the manner in which they are currently used.

10.09 **Union Agreement**. Buyer and the Union shall have executed and delivered the Buyer Union Contract.

10.10 **Damages by Casualty**. The Transferred Assets and the Swedish Continuing Assets shall not have been adversely affected on or prior to the Closing by any damage or destruction by casualty (whether or not adequately covered by insurance) occurring on or after the date hereof and prior to the Closing Date; provided that if such damage or destruction may be repaired or the damaged or destroyed assets replaced at a cost of less than $500,000, and Grace shall agree on terms reasonably satisfactory to Sequa to effect or defray the expenses of such repair or replacement within a reasonable period of time, then this condition shall be deemed satisfied with respect to such damage or destruction. If such damage or destruction may be repaired or the damaged or destroyed assets repaired only at a cost of more than $500,000, then either Sequa or Grace may terminate this Agreement.

10.11 **Environmental**. On or before June 30, 1997, Grace shall have provided written notice to the appropriate Governmental Authority for the State of Wisconsin with respect to the potential soil and groundwater contamination of the Owned Real Property as identified

by Rust Environment & Infrastructure, Inc. ("REI") in its June 11, 1997 Phase II Report. Such notice shall include copies of the analytical data contained in the REI report. A copy of such notice will be provided to Sequa when filed.

10.12 **IDC/BABN**. Either (a) Sequa shall have received from IDC written confirmation, reasonably satisfactory in form and substance to Sequa, that Grace is not in default under the contract between Grace and IDC for Job Nos. 106632 (Dryer) and 105360 (Oxidizer) (collectively, the "IDC Contract"), or (b) Grace shall have delivered a written guaranty, reasonably satisfactory in form and substance to Sequa, of the collectibility of the receivable with respect to the IDC Contract in the face amount of such receivable as of the Valuation Time (the "IDC Guaranty"). If Grace shall deliver the IDC Guaranty, Grace shall retain all rights against third parties in connection with any default or alleged default by Grace under the IDC Contract.

10.13 **Katec Matters**.    Grace shall have sent a letter to all purchasers of KATEC and Shadow recuperative oxidizers in the form and substance set forth in Schedule 10.13 and shall have provided Sequa with written evidence of such purchasers' receipt of such letter or refusal to accept such letter.

## ARTICLE 11

### Conditions Precedent to Grace's Obligations

All obligations of Grace under this Agreement are subject, at Grace's option, to the fulfillment prior to or at the Closing, of each of the following conditions:

11.01 <u>Accuracy of Representations and Warranties</u>. Each and every representation and warranty of Sequa under this Agreement shall be true and accurate in all material respects as of the Closing.

11.02 <u>Performance of Covenants and Agreements</u>. Sequa shall have performed, in all material respects, at or prior to the Closing all of the covenants and agreements required to be performed by Sequa at or prior to the Closing pursuant to this Agreement.

11.03 <u>Hart-Scott-Rodino Act</u>. All waiting periods under the HSR Act applicable to the transactions contemplated by this Agreement shall have expired, by passage of time or by valid early termination by the FTC or the DOJ; no representative of either the FTC or the DOJ shall be taking the position that any of such waiting periods has not commenced to run or has not expired for any reason and no representative of either the FTC or the DOJ shall have requested a delay of the Closing for a period which has not expired, which request has not been withdrawn.

11.04 <u>Permits, Consents, etc.</u>

(a)  There shall be no material permits, consent, approval or authorization of, or declaration to or filing with, any Governmental Authority required in connection with the transactions contemplated by this Agreement which has not been accomplished or obtained and which may not be accomplished or obtained after the Closing without material penalty or other material adverse consequences to the Seller Group.

(b)  The non-governmental third party consents set forth on <u>Schedule 11.04(b)</u> shall have been obtained at or prior to the Closing.

11.05 <u>Litigation</u>. No action, suit or proceeding by any third person (including but not limited to any Governmental Authority) shall have been instituted (and remain pending on the date of the Closing) against any Grace Entity or Buyer Entity that questions, or reasonably could be expected to lead to subsequent questioning of, the validity or legality of this Agreement, the Ancillary Agreements or the transactions contemplated by this Agreement.

11.06 <u>Certificate of Sequa</u>. Sequa shall have delivered to Seller a certificate of Sequa, dated the Closing Date, signed by the President or a Vice President of Sequa, certifying that: (a) each and every representation and warranty of Sequa under this Agreement is true and accurate in all material respects as of the Closing; and (b) Sequa has performed, in all material respects, at or prior to the Closing all of the covenants and agreements required to be performed by Sequa at or prior to the Closing pursuant to this Agreement.

11.07 <u>Opinion of Sequa's Counsel</u>. Sequa shall have delivered to Seller an opinion of John J. Dowling III, the Senior Associate General Counsel of Sequa, dated the Closing Date, in the form of <u>Exhibit 11.07</u>.

11.08 <u>Union Agreement</u>. Buyer and the Union shall have executed and delivered the Buyer Union Contract, and Buyer shall have delivered to Grace a true and complete copy thereof, certified by an officer of Buyer.

11.09 <u>IDC/BABN</u>. Either (a) Sequa shall have received from IDC written confirmation, reasonably satisfactory in form and substance to Sequa, that Grace is not in default under the contract between Grace and IDC for Job Nos. 106632 (Dryer) and 105360 (Oxidizer) (collectively, the "IDC Contract"), or (b) Grace shall have delivered a written guaranty,

reasonably satisfactory in form and substance to Sequa, of the collectibility of the receivable with respect to the IDC Contract in the face amount of such receivable as of the Valuation Time (the "IDC Guaranty").  If Grace shall deliver the IDC Guaranty, Grace shall retain all rights against third parties in connection with any default or alleged default by Grace under the IDC Contract.

### ARTICLE 12

### Employee Matters

12.01 <u>Employment</u>.

(a) Effective on the Closing Date, each employee of any Grace Entity who is employed exclusively in the Subject Business, excluding those employees described in Section 12.03 (collectively, the "Subject Business Employees"), shall cease to be an employee of the Grace Group.  <u>Schedule 12.01(a)</u> lists all employees described in the preceding sentence as of the date specified therein.

(b) (i) Sequa shall cause the Buying Companies to offer employment to such U.S. Subject Business Employees that are employed in the United States ("U.S. Subject Business Employees") as Sequa shall determine in Sequa's sole and absolute discretion.  With respect to each U.S. Subject Business Employees to whom Sequa determines not to offer employment, Sequa shall indemnify and hold harmless the Selling Companies for any and all payments to which such Subject Business Employee is entitled in accordance with the Grace Severance Program applicable to U.S. Subject Business Employees.  Sequa shall have no obligation to indemnify Grace, and Grace shall indemnify and hold harmless Sequa, for any payments under the Grace Severance Program or any other Grace employee benefit or entitlement

to any U.S. Subject Business Employee to whom Sequa shall have offered employment in accordance with Section 12.02 or 12.03 and who does not accept such employment. To the extent reasonably practicable, (A) Sequa shall give Grace notice of those U.S. Subject Business Employees to whom it does not intend to offer employment, (B) Grace shall provide information to enable Sequa to verify the amount of severance owed to such employees, and (C) Sequa shall pay the amount of such severance to Grace at the Closing and Grace shall remit said amount to the U.S. Subject Business Employees to whom a Buying Company has not made an offer of employment in accordance with the Grace Severance Program. With respect to any U. S. Subject Business Employee as to whom Sequa does not give sufficient notice to Grace of the intent not to hire to enable payment of the amount of such severance as of the Closing, the parties shall verify and Sequa shall pay to Grace the amount of severance as soon as practicable thereafter; provided that any such delay shall not affect the calculation as of the Closing of such amount. The foregoing payments shall not include vacation pay or other compensated absences due any such U.S. Subject Business Employee, all of which amounts are an Excluded Liability and, as such, are the responsibility of Grace.

(b)(ii) Sequa shall offer employment to or retain, as applicable, all non-U.S. Subject Business Employees in accordance with applicable law and the provisions of any of the applicable collective bargaining agreements listed in Schedule 5.11(a)(i) (the "CBAs"). Sequa does not have to indemnify and/or hold harmless Grace but Grace has to indemnify and hold harmless Sequa for any payments due to non-U.S. Subject Business Employees who object to becoming and/or refuse to become Continued Employees as permissible under applicable law.

(b)(iii) Each Subject Business Employee who accepts an offer of employment from one of the Buying Companies in accordance with Section 12.02 shall become an employee of such company effective on the Closing Date; and all such employees, and all non-U.S. Subject Business Employees retained as provided above, are referred to collectively as "Continued Employees". The Selling Companies are making no representation or warranty as to which, if any, U. S. Subject Business Employees will accept offers of employment with the Buying Companies, and which non-U.S. Subject Business Employees will become employees of the Buying Companies. The Buying Companies are making no representation or warranty as to which, if any, Subject Business Employees will be offered employment with the Buying Companies.

(c) Sequa shall indemnify and hold harmless the Selling Companies from and against any Damages (including without limitation, severance benefits, separation pay or similar entitlement under applicable law) arising from the discharge (but not from the objections raised by any non-U.S. Subject Business Employee against his or her commencement of employment with any Buying Company) or the constructive discharge (but not from the objection raised by any non- U.S. Subject Employee against his or her commencement of employment with any Buying Company) of any non-U.S. Subject Business Employee that occurs after the Closing.

(d) Grace shall indemnify and hold harmless the Buying Companies from and against (i) any failure of Grace to bargain the effects of the transactions contemplated by this Agreement with the Union to the extent required by applicable law and (ii) any failure of the Selling Companies or the Swedish Companies to give notice of the transactions contemplated by

this Agreement to Governmental Authorities, if applicable, for non-U.S. Subject Business Employees or works councils to the extent required of the Selling Companies or the Swedish Companies under applicable law, .

12.02 **Positions Offered to Subject Business Employees**. Those Subject Business Employees who are offered and who accept employment with the Buying Companies shall commence employment with the Buying Companies on the Closing Date. With respect to such Subject Business Employees, the position offered by the Buying Companies (i) shall be for a job that is substantially equivalent with respect to work assignments, level of responsibility and authority, to the Subject Business Employee's job with the Subject Business as of the Closing, (ii) shall be at no reduction in base salary, wages, or commission or sales incentive award levels, (iii) shall not during the first six months following the Closing Date change the location of the Subject Business Employee's principal place of work to one that is an unreasonable commuting distance from the employee's residence, and (iv) shall provide in the U.S. employee benefit plan coverages, including a severance program, for a period of at least six (6) months following the Closing Date, as described in Schedule 12.02 (collectively, the "Buyer's U.S. Benefit Plans") and, in the case of non-US employees, only in accordance with applicable law, the provisions of the CBAs and their respective employment agreements as set forth in the Schedules to this Agreement. Nothing in the immediately preceding sentence shall prevent Buyer, after the expiration of any applicable time periods, from effecting from time to time such changes in the matters referred to therein as it considers appropriate in the operation of the Subject Business.

12.03 <u>Inactive Subject Business Employees</u>. Grace acknowledges that Sequa has advised Grace that the Buying Companies do not intend to offer employment to or to employ any employee of the Subject Business who is classified by the Grace Group as being on long-term disability leave, layoff, leave of absence (whether paid or unpaid) or furlough or worker's compensation as of the Closing.  With respect to those employees on short-term disability leave as of Closing, if they have received medical clearance to return to work, and have communicated to the Buying Companies their willingness to return to work, within one year after the Closing Date, the Buying Companies will either offer them employment on the terms set forth in Section 12.02 or indemnify and hold harmless Grace from any obligation to such employees under the Grace Severance Program.

12.04 <u>Expatriate Employees</u>.  The Subject Business Employees listed on <u>Schedule 12.04</u> are referred to as the "Expatriate Employees." Each Expatriate Employee has relocated from the country where he was a citizen or resident, and is a party to one of the written agreements listed in <u>Schedule 12.04</u> regarding relocation payments, home leave, repatriation rights and other matters (the "Expatriate Agreements"). Grace has delivered to Sequa complete copies of the Expatriate Agreements as currently in effect and listed in <u>Schedule 12.04</u>. Without limiting the generality of Section 12.02, from and after the Closing, the Buying Companies shall assume all obligations of the Grace Group under the Expatriate Agreements but only to extent arising from and after the Closing with respect to those Expatriate Employees who are offered employment by the Buying Companies and who accept employment with the Buyer Group; provided, however, that Sequa shall indemnify and hold harmless the Selling Companies against any and all Damages arising from and after the Closing (i) under the

Expatriate Agreements of Expatriate Employees who are not offered employment by the Buying Companies or (ii) otherwise from the termination and repatriation of such Expatriate Employees.

12.05 **Employment Related Indemnities**.  Sequa shall, and shall cause the other members of the Buyer Group to, indemnify the Selling Companies and the other members of the Seller Group against any Damages resulting from: (a) any breach by the Buyer Group of Section 12.02 or Section 12.03, (b) hiring practices by the Buyer Group that violate applicable law, (c) the employment by the Buyer Group after the Closing or termination of employment by the Buyer Group after the Closing of any Subject Business Employee, except for any Damages constituting an Excluded Liability, or (d) any change in the terms and conditions of employment or any change in the collective organization or joint committees, applicable to any non-U.S. Subject Business Employee, that occurs after the Closing.

12.06 **De Pere Collective Bargaining Agreement**. As soon as practicable after the execution of this Agreement, Sequa shall cause Buyer to commence discussions with the Union and use its reasonably diligent efforts to enter into a collective bargaining agreement with the Union (the "Buyer Union Contract") that (except as otherwise provided below) shall contain terms and conditions substantially the same as those of the 1996-1999 collective bargaining agreement dated March 14, 1996, between Grace and the Union (the "Grace Union Contract"), under which Buyer shall recognize the Union as the exclusive bargaining representative of those employees covered by the Grace Union Contract ("Union Employees"), and which shall also provide that the Grace Union Contract and Grace's obligations thereunder shall terminate as of the Closing Date except with respect to obligations arising from or out

C:\GRACE\SALEAGTG.618.wpd                    76

of the terms of the Grace Union Contract as in effect prior to its termination. Buyer shall offer employment only to those Union Employees who are actively employed on the Closing Date. At Buyer's sole and absolute discretion and election, the Buyer Union Contract shall provide for elimination of the Retirement Plan of W. R. Grace & Co.-Conn. Chemical Group (De Pere Plant) plan number 139 (the "Union Pension Plan"), 401(k) program and retiree medical coverage, and substitution of a Buyer Group pension plan for the Union Pension Plan; provided, however, that in its negotiations with the Union, Buyer shall be prepared to offer basic wage rates at least equivalent to those in effect on the date hereof and such other benefits as shall reasonably compensate those covered by the Buyer Union Contract for the benefits eliminated or substituted for; and provided further, however, that Buyer shall not be required to offer any compensation or remuneration whatsoever for obtaining the Grace Union Contract termination provision described above.

12.07 **Employment Tax Reporting Responsibility**. Grace and Sequa shall follow the alternative procedure for employment tax withholding as provided in section 5 of Rev. Proc. 96-60, I.R.B. 1996-53, for Continued Employees in the United States, under which Buyer shall assume all of Grace's obligations to furnish IRS Forms W-2 to the Continued Employees for the 1997 calendar year. Grace and Buyer shall provide each other with such assistance and information as may be required to enable Buyer and Grace to comply with their obligations under this Section.

12.08 **Employee Information Sharing**. After the Closing, the Buying Companies shall provide to the Grace Group, and the Selling Companies shall provide to the Buyer Group, on a continuing basis at no cost to the recipient, such information regarding employees

of the Subject Business under the ownership of the Grace Group, as may be reasonably requested. This Section shall not compel any Person to maintain records beyond the periods specified in Sections 15.02 and 15.03.

12.09 **Certifying Employees**. The parties acknowledge that in connection with the execution and delivery of this Agreement, certain employees of the Subject Business (the "Certifying Employees") are delivering to Grace certificates, based on their individual actual knowledge, respecting the accuracy of certain representations that are given by Grace in Article 5 hereof as to their Knowledge (the "Employee Certificates"). Sequa agrees that if, in connection with any Claim for indemnification by any Buyer Entity against any Grace Entity, it is judicially determined that any Certifying Employee then employed by any Buyer Entity knowingly and willfully misrepresented any material matter in his Employee Certificate, Sequa at Grace's written request will promptly discharge such Certifying Employee. Sequa may make discharge for such cause a basis for refusing severance to such employee under the Sequa severance program described in Section 12.02.

12.10 **German Pension Plan**.

(a) As of the Closing Date, in accordance with applicable law, the Buyer Entity ("Buyer Germany") that becomes the employer of non-U.S. Subject Business Employees who are employed by Grace GmbH (the "German Employees") will commence maintaining the Grace GmbH pension arrangement (*Pensionsordnung* of December 1, 1975) with respect to the German Employees (the "German Pension Arrangement").



(b) As of the Closing Date, in accordance with applicable law, Buyer Germany shall be responsible for all liabilities associated with the benefits accrued (whether before or after the Closing) for each German Employee under the German Pension Arrangement.

(c) No later than fifteen (15) business days after the date of this Agreement, Grace GmbH and Buyer Germany will inform the German Employees in writing of the intention of Grace GmbH to transfer, and the intention of Buyer Germany to accept, as of the Closing Date, the liabilities associated with the benefits accrued for each German Employee under the German Pension Arrangement; and upon the Closing, Buyer Germany will pledge in writing to each German Employee that he or she will receive a benefit from Buyer Germany (or any successor thereto), for service before and after the Closing Date, in accordance with applicable law.

(d) Sequa shall, and shall cause the other members of the Buyer Group to, indemnify each member of the Grace Group (including, but not limited to, Grace GmbH) for all Damages related to the benefits accrued for each German Employee under the German Pension Arrangement.

(e) Except for the German Pension Arrangement and social security, savings plan and business travel accident insurance coverage, no Grace Entity currently contributes towards benefits on retirement, leaving service or death for or in respect of any of the German Employees.

(f) Grace represents and warrants that it has given Sequa true and complete copies of the following:

(i)     all documents governing the Grace GmbH pension arrangement (*Pensionsordnung* of December 1, 1975) (the "Grace German Pension Arrangement") including the arrangement under which each of the relevant German Employees is included in the Grace German Pension Arrangement, and

(ii)    the current explanatory booklet issued to the beneficiaries or prospective beneficiaries from the Grace German Pension Arrangement.

All the benefits that the Grace German Pension Arrangement provides are described in full in these documents.

(g)   Grace represents and warrants that the Grace German Pension Arrangement does not fail to qualify for the accrual of reserves in the balance sheet for tax purposes (*Steuerbilanz*) pursuant to Art. 6, Para. 1 EStG ("German Income Tax Act"). Grace will indemnify and hold harmless the Buyer Group if and to the extent a Grace Entity has implemented such pension scheme(s) that the Grace German Pension Arrangement does not comply with this Section 12.10(g).

(h)   Grace represents and warrants that with respect to German Employees, Grace GmbH has accrued all reserves in its balance sheet for tax purposes in accordance with German Income Tax Act for pension scheme(s) and will indemnify and hold the Buyer Group harmless if and to the extent reserves in the final Closing Statement are not calculated under applicable German income tax law and the standards of actuarial mathematics generally accepted under that law.

(i)   Grace represents and warrants that Grace GmbH is not, with respect to the German Employees, in arrears with employer's required contributions (*Arbeitgeberbeitragen*) to the

Social Security Pension Scheme(s) for blue collar and white collar workers (*Gesetzliche Rentenversicherung der Arbeiter und Angestellten*), to the compulsory Health Insurance (*Gesetzliche Krankenversicherung*), the applicable Employers' Liability Insurance Association(s) (*Berufsgenossenschaft*), to direct insurances or employers' pension liability insurance(s) (*Ruckdeckungsversicherungen*) or to the superannuation security scheme (*Pensionsicherungsverein A.G.*), and will not be in arrears with required contributions to an employee's or officer's voluntary health insurance as of the Closing Date and will reimburse the Buyer Group with respect to all those contributions to the above-mentioned schemes and insurances that were due to be paid to or on account of the German Employees as of the Closing Date but have not been paid by Grace GmbH, unless and to the extent that an adequate reserve therefor has been accrued on the Closing Statement.  Grace also will indemnify and hold harmless the Buyer Group with respect to any and all charges, fines, payments of interest or other payments due to the late payment of such contributions.

12.11  **End of Grace Benefit Plan Participation**.  Sequa acknowledges that Grace has informed Sequa that all of the Continued Employees shall cease to actively participate in the Grace employee benefit plans as of the Closing Date; provided that the foregoing shall not affect any vested benefits under such plans.

### ARTICLE 13

### Termination

13.01  **Rights to Terminate**.

(a)  This Agreement may be terminated at any time prior to the Closing by written agreement of Grace and Sequa.

(b)  If for any reason the Closing shall not take place on the earlier of (i) the Scheduled Closing Date or within five Business Days thereafter or (ii) sixty days after the date of this Agreement (or any later date agreed to as the Scheduled Closing Date in an amendment to this Agreement executed in accordance with Section 19.06), then either Grace or Sequa may terminate this Agreement at any time thereafter.

(c)  If on or after the date hereof and prior to the Closing Date there is damage or destruction to the Transferred Assets or the Swedish Continued Assets and such damage or destruction may be repaired or the damaged or destroyed assets repaired only at a cost of more than $500,000, then either Grace or Sequa may terminate this Agreement.

(d)  If prior to the Closing Sequa receives an amendment to the Schedules that either (i) shows that any representation or warranty of Grace in this Agreement is not accurate in all material respects(such amendment not being considered part of the Schedules for these purposes) and either (A) such representation or warranty was inaccurate at the date of this Agreement or (B) Grace could not reasonably be expected to cure the inaccuracy of such representation or warranty before the Closing, or (ii) is either material or adverse, then Sequa may terminate this Agreement.

(e)  A party terminating this Agreement pursuant to (b), (c) or (d) above shall do so by giving notice of such termination to the other in the manner provided in Section 18.01.

13.02  **Consequences of Termination**.

(a) The termination of this Agreement, whether in accordance with any of the provisions of Section 13.01 or otherwise, shall not affect the rights of Sequa or Grace for any prior breach of any covenant or agreement contained in this Agreement, except as provided in Section 14.04(c) and except that upon termination in accordance with any of the provisions of Section 13.01, the parties (and all related persons) shall be released from any and all liability for breach of any of the representations and warranties contained in Articles 5 and 6 of this Agreement.

(b) The obligations of the parties under Sections 17.01 and 17.02 shall survive any termination of this Agreement.

13.03 **Press Release**. If the parties shall not have issued a press release in the form attached hereto as <u>Schedule 13.03</u> by Friday, June 20, 1997, then either Grace or Sequa may terminate this Agreement by notice to the other. In the event of such termination, this Agreement shall be deemed void *ab initio*.

## ARTICLE 14

### Indemnification

14.01 <u>Definitions</u>.

(a) "Claim" means any claim, demand, suit, action or proceeding.

(b) "Damages" means any and all penalties, fines, damages, liabilities, losses, costs or expenses (including reasonable Litigation Expenses incident to Third Party Claims, but excluding, with respect to Direct Claims, incidental, indirect or consequential damages, damages

for lost profits, and Litigation Expenses); provided that Damages arising from any Tax Claim or any Excluded Liability for any Income Taxes shall be reduced by any Tax attributes of the Swedish Companies as of the Valuation Time.  For purposes of the proviso of the immediately preceding sentence, (i)  the term "Tax attribute" shall include any net operating loss, Tax credit or similar Tax attribute of the relevant Swedish Company as of the Closing Date; (ii) Tax attributes shall include any increases or decreases that may be the result of an agreed upon or adjudicated adjustment by any Tax Authority; and (iii) Tax attributes shall be calculated without  regard to any events or transactions caused or initiated by the Buyer Group after the Valuation Time.

(c)  "Direct Claims" means Claims other than Third Party Claims.

(d)  "Litigation Expenses" means attorneys' fees and other costs and expenses incident to proceedings or investigations respecting, or the prosecution or defense of, a Claim. For purposes of this Article, a Tax Claim shall be deemed a Third Party Claim.

(e)  "Third Party Claims" means any and all Claims by any Person, other than Grace Entities or Buyer Entities, which could give rise to a right of indemnification under this Article.

14.02  Grace's Indemnification.

(a)  Subject to the terms and limitations of this Article, Grace shall indemnify the Buying Companies and the other Buyer Entities against any Damages which are caused by or arise out of (i) the failure of any Selling Company to perform and fulfill any provision or agreement to be performed or fulfilled by it under this Agreement or any of the Transaction Documents, (ii) any inaccuracy in any representation or breach of any warranty of Grace set forth in Article 5 and Sections 12.01(a), 12.04 and 12.10 of this Agreement or any Schedule referred to

therein or in any Transaction Document for the conveyance or transfer of any of the Transferred Assets, (iii) all of the Excluded Liabilities, (iv) any Tax Claim, and (v) all of the Swedish Indemnified Liabilities.

(b) The representations and warranties of Grace set forth in Article 5 and Sections 12.01 (a), 12.04 and 12.10 shall survive the Closing; provided, however, that those representations and warranties set forth in Sections 5.06 and subsequent Sections of Article 5 and Section 12.01(a), 12.04 and 12.10 shall expire and be of no further force and effect eighteen months after the date of the Closing, except with respect to Claims which Sequa has previously asserted against Grace in writing setting forth and describing the nature of such Claims.

(c) There shall be no time limitation whatsoever with respect to Grace's indemnification of Buyer Entities with respect to the matters referred to in Section 14.02(a)(iii) and Section 14.02(a)(v).

14.03 <u>Sequa's Indemnification</u>.

(a) Subject to the terms and limitations of this Article, Sequa shall indemnify the Selling Companies and the other Grace Entities against any Damages which are caused by or arise out of (i) the failure of any Buying Company to perform or fulfill any provision or agreement to be performed or fulfilled by it under this Agreement or any of the Transaction Documents, (ii) any inaccuracy in any representation or breach of any warranty of Sequa set forth in Article 6, (iii) the failure of any Buyer Entity subsequent to the Closing to perform or fulfill its obligations under any contract, agreement or obligation included in the Transferred Liabilities and Swedish Continuing Liabilities for which any Grace Entity is or may be liable, as original obligor, guarantor or otherwise, or (iv) any of the Transferred Liabilities and the Swedish Continuing Liabilities.

(b) The representations and warranties of Sequa set forth in Article 6 shall survive the Closing.

14.04 **Limitations**. (a) No Buyer Entity may assert any Claim for indemnification under this Article (collectively, "Buyers' Claims") with respect to the breach of any representation in Section 5.03 or subsequent Sections of Article 5, Section 12.01(a), Section 12.04 or Section 12.10 unless and until the aggregate amount of all such Buyers' Claims assertable shall exceed US $500,000, and then only with respect to the excess of such aggregate Buyers' Claims over said US $500,000. In no event shall the aggregate amount of Grace's indemnification with respect to all such Buyers' Claims exceed the Total Purchase Price; and in no event whatsoever shall the limitations set forth in the preceding two sentences apply to either the Excluded Liabilities or the Swedish Indemnified Liabilities.

(b) The dollar thresholds set forth in this Section have been negotiated for the special purpose of the provision to which they relate, and are not to be taken as evidence of the level of "materiality" for purposes of any statutory or common law which may be applicable to the transactions contemplated by this Agreement under which a level of materiality might be an issue.

(c) The effect of any nonperformance of any provision of Article 9 shall be limited to nonfulfillment of the conditions set forth in Section 10.02, and no Grace Entity shall have any liability therefor or in connection therewith; provided that if the Closing takes place, the foregoing shall not apply unless prior to the Closing, (i) Grace advises Sequa in writing of such nonperformance and (ii) Sequa proceeds with the Closing..

86

(d) If any Buyer Entity makes material performance of any personal property lease or supply arrangement (goods or services) related to the Subject Business, the obligations of the Grace Group under which are not Transferred Liabilities or Swedish Continuing Liabilities, then (i) the Grace Group shall have no indemnity obligations to the Buyer Group for failure to disclose the existence of such personal property lease or supply arrangement (goods or services), and (ii) all rights and obligations arising under such personal property lease or supply arrangement (goods or services) from and after such material performance shall be respectively assigned to and assumed by such Buyer Entity, and (iii) from and after such material performance, such personal property lease or supply arrangement (goods or services) shall for all other purposes of this Agreement be deemed a Personal Property Lease, a Swedish Personal Property Lease, a Supplier Contract, or a Swedish Supplier Contract, if and as applicable.

14.05  **Defense of Third Party Claims**.

(a) Sequa shall notify Grace in writing as soon as reasonably practicable after learning of any Third Party Claim for which any Buyer Entity intends to seek indemnification from Grace under this Agreement, or to have taken into account for purposes of the dollar thresholds in Section 14.04. Grace shall notify Sequa in writing promptly after learning of any Third Party Claim for which any Grace Entity intends to seek indemnification from Sequa under this Agreement. It shall be a necessary condition of any claim by any entity for indemnification under this Agreement with respect to any Third Party Claim, or for such Third Party Claim to be taken into account for purposes of the dollar thresholds under Section 14.04, that the entity seeking indemnification or to have such claim taken into account (the "Claimant") notify

Grace on behalf of the Grace Group, if the Claimant is a Buyer Entity, or Sequa on behalf of the Buyer Group, if the Claimant is a Grace Entity, prior to the time when the notice of recipient's ability to contest the Third Party Claim would be materially impaired by lack of notice. If no Buyer Group Claimant gives such notice of a Third Party Claim, all Buyer Entities shall be deemed to have waived all rights to indemnification or payment with respect to such Third Party Claim if, and only if, the Grace Group is prejudiced by such lack of notice. If no Grace Group Claimant gives such notice of a Third Party Claim, all Grace Entities shall be deemed to have waived all rights to indemnification with respect to such Third Party Claim if, and only if, the Buyer Group is prejudiced by such lack of notice.

(b) Except as otherwise provided in subsection (d) of this Section, Grace or any other Grace Entity may undertake the defense of a Third Party Claim of which Sequa has notified Grace, by notice to Sequa not later than 60 calendar days after receipt by Grace of Sequa's notice of the claim. Failure on the part of the Grace Group to so notify Sequa that it will undertake such defense shall be deemed to be a waiver of the Grace Group's right to undertake such defense. If the Grace Group undertakes the defense of any Third Party Claim, it shall control the investigation and defense thereof, except that the Grace Group shall not require any Buyer Entity, without its prior written consent, to take or refrain from taking any action in connection with such Third Party Claim, or make any public statement, which it reasonably considers to be against its interest, nor shall the Grace Group, without the prior written consent of Sequa, consent to any settlement that requires any Buyer Entity to make any payment that is not fully indemnified under this Agreement or taken into account under Section 14.04; and subject to the Grace Group's control rights, the Buyer Group may participate in such

88

investigation and defense, at its own expense. If the Grace Group does not undertake the defense of a Third Party Claim, then except as otherwise provided in subsection (d) of this Section, the Buyer Group shall control such investigation and defense, except that the Buyer Group shall not require a Grace Entity, without its prior written consent, to take or refrain from taking any action in connection with such Third Party Claim, or make any public statement, which such entity reasonably considers to be against its interest, nor shall the Buyer Group, without the prior written consent of Grace, consent to any settlement; and subject to the Buyer Group's control rights, the Grace Group may participate in such investigation and defense, at its own expense.

(c) Except as otherwise provided in subsection (d) of this Section, Sequa or any other Buyer Entity may undertake the defense of a Third Party Claim of which Grace has notified Sequa of, by notice to Grace not later than 60 calendar days after receipt by Sequa of Grace's notice of the claim. Failure on the part of the Buyer Group to so notify Grace that it will undertake such defense shall be deemed to be a waiver of the Buyer Group's right to undertake such defense. If the Buyer Group undertakes the defense of any Third Party Claim, it shall control such investigation and defense, except that the Buyer Group shall not require any Grace Entity, without its prior written consent, to take or refrain from taking any action in connection with such Third Party Claim, or make any public statement, which it reasonably considers to be against its interest, nor shall the Buyer Group, without the prior written consent of Grace, consent to any settlement that requires any Grace Entity to make any payment that is not fully indemnified under this Agreement; and subject to the Buyer Group's control rights, the Grace Group may participate in such investigation and defense, at its own expense. If the

Buyer Group does not undertake the defense of a tendered Third Party Claim, then except as otherwise provided in subsection (d) of this Section, the Grace Group shall control such investigation and defense, except that the Grace Group shall not require a member of the Buyer Group, without its prior written consent, to take or refrain from taking any action in connection with such Third Party Claim, or make any public statement, which such entity reasonably considers to be against its interest, nor shall the Grace Group, without the prior written consent of Sequa, consent to any settlement; and subject to the Grace Group's control rights, the Buyer Group may participate in such investigation and defense, at its own expense.

(d)  If there is a conflict of interest between the Grace Group and the Buyer Group with respect to a Third Party Claim, neither group shall be entitled to assume the defense thereof.  In that event the Buyer Group and the Grace Group each shall  be entitled to conduct its own investigation and defense, but the parties shall cooperate to conduct such investigation and defense as efficiently as possible.  If Grace is required to indemnify the Buyer Group with respect to such Third Party Claim, it shall pay the reasonable attorneys' fees and expenses of one individual or firm representing the Buyer Group with respect thereto.  If Sequa is required to indemnify the Grace Group with respect to such Third Party Claim, it shall pay the reasonable attorneys' fees and expenses of one individual or firm representing the Grace Group with respect thereto.

(e)  The Buying Companies and the Selling Companies shall make available to each other, their counsel and other representatives, all information and documents reasonably available to them which relate to any Third Party Claim, and otherwise cooperate as may reasonably be required in connection with the investigation and defense thereof.

C:\GRACE\SALEAGTG.518.wpd                         90

14.06 <u>Consequential or Lost Profit Damages, etc</u>.

(a)  Neither party to this Agreement, nor any other Grace Entity or Buyer Entity, shall seek or be entitled to incidental, indirect or consequential damages or damages for lost profits in any claim for indemnification under this Article, nor shall it accept payment of any award or judgment for such indemnification to the extent that such award or judgment includes such party's incidental, indirect or consequential damages or damages for lost profits.

(b)  Any provision of this Article 14 to the contrary notwithstanding, (i) none of the limitations contained in this Article 14 on recovery of incidental, indirect or consequential damages, damages for lost profits, or Litigation Expenses shall apply to Excluded Liabilities or Swedish Indemnified Liabilities unless such Excluded Liabilities or Swedish Indemnified Liabilities are Direct Claims; and (ii) no Claim asserted between the parties seeking indemnification of any Third Party Claim shall be deemed a Direct Claim with respect to the limitations set forth in Article 14.

## ARTICLE 15

## Cooperation in Various Matters

15.01 <u>Mutual Cooperation</u>.  (a)  After the Closing, each party to this Agreement shall, and shall cause its respective subsidiaries to, cooperate with each other party and its subsidiaries as reasonably requested by such other party in connection with the prosecution or defense of any claims or other matters relating to the Subject Business, including without limitation the collection of receivables.  At Sequa's reasonable request, such cooperation shall include filing of lawsuits at Sequa's expense for collection of receivables in the Selling Companies' names provided that Sequa shall indemnify and hold harmless the Selling Companies against

any Damages arising from or out of acts or omissions of the Buyer Group in connection with such lawsuit. Such cooperation shall also include the furnishing of testimony and other evidence, permitting access to employees and providing information regarding the whereabouts of former employees.

(b) Grace and Sequa shall use all reasonable efforts to obtain any certificate or other document from any Governmental Authority or other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed (including, but not limited to, with respect to the transactions contemplated hereby).

15.02 **Preservation of Buying Companies' Files and Records**. For a period of six years after the Closing, Sequa shall, and shall cause the other Buyer Entities to, preserve all files and records in their possession relating to the Subject Business prior to the Closing, allow the Grace Group access to such files and records and the right to make copies and extracts therefrom at any time during normal business hours, and not dispose of any thereof, except that at any time after the Closing, any Buyer Entity may give Grace written notice of its intention to dispose of any records that are more than six years old, specifying the items to be disposed of in reasonable detail. Any Grace Entity may, within a period of sixty days after Grace's receipt of any such notice, notify Sequa of the Grace Group's desire to retain one or more of the items to be disposed of. Sequa shall, upon receipt of such a notice from a member of the Grace Group, deliver to such Grace Entity, at the Grace Group's expense, the items that the Grace Group has elected to retain.

15.03 **Preservation of Selling Companies' Files and Records**. For a period of six years after the Closing, Grace shall, and shall cause the other Grace Entities to, preserve

all files and records in their possession relating directly and primarily to the Subject Business,

allow the Buyer Group access to such files and records and the right to make copies and

extracts therefrom at any time during normal business hours, and not dispose of any thereof,

except that at any time after the Closing, any Grace Entity may give Sequa written notice

of its intention to dispose of any records that are more than six years old, specifying the items

to be disposed of in reasonable detail. Any Buyer Entity may, within a period of sixty days

after receipt of any such notice, notify Grace of the Buyer Group's desire to retain one or

more of the items to be disposed of. Grace shall, upon receipt of such a notice from the Buyer

Group, deliver to such Buyer Entity, at the Buyer Group's expense, the items that the Buyer

Group has elected to retain.

## ARTICLE 16

### Post-Closing Matters

16.01 **Information for Reports**. At the reasonable request of Grace, Sequa shall

provide to Grace on a timely basis, in such form as Grace may reasonably request,  such

information relating to the Subject Business for periods prior to the Closing as Grace may

require in order to enable it  to prepare financial, tax and other reports and statements for

such periods.

16.02 **Renewal of Agreements**. Without prior written consent of the Treasurer or

any Assistant Treasurer of Grace, Sequa shall not, and shall not permit any other Buyer Entity

to,  renew or extend the term of, increase its obligations under, or transfer to a third party,

any lease, contract or other obligation for which Grace or any other Grace Entity is or may

C:\GRACE\SALEAGTG.618.wpd                          93

be liable, as guarantor, original tenant, primary obligor, or otherwise, all of which are listed in Schedule 16.02, unless all obligations of the Grace Group with respect thereto are thereupon terminated by documentation satisfactory in form and substance to Grace.

16.03 "Grace" Name. After the Closing, the Buying Companies shall have no right to use the "Grace" name, and the Buying Companies shall not, nor permit any other Buyer Entity to, refer (other than in response to unsolicited inquiries or in announcements of the occurrence of the Closing) to their respective businesses as formerly being owned by or associated with any Grace Entity, except that for a period of 90 days after the Closing, the Buying Companies shall have the right to use any catalogues, sales and promotional materials and printed forms that use such name and are included in the Transferred Assets as of the Closing, or have been ordered prior to the Closing for use in the Subject Business, but only to the extent that it is not practicable to remove or cover up the "Grace" name. The Buying Companies shall use reasonable efforts to minimize such usage and to discontinue it as soon as practicable after the Closing.

16.04 Intercompany Agreements. All contracts, licenses, agreements, commitments or other arrangements between Grace or any other Grace Entity and the Subject Business unit of any Selling Company, whether written or oral, and whether express or implied, pursuant to which Grace or any other Grace Entity provides management, administrative, legal, financial, accounting, data processing, insurance, technical support, or other services to the Subject Business, or the use of any assets of any Grace Entity, or pursuant to which rights, privileges or benefits are accorded to the Subject Business as a unit of the Grace Group shall terminate as of the Closing. After the Closing, none of the Buying Companies shall have any rights

under any similar contract, license, agreement, commitment or arrangement with Grace or any other Grace Entity, except as otherwise provided pursuant to the terms and conditions of the Ancillary Agreements.

16.05 **Covenant Not to Compete**. For a period of seven (7) years after the Closing Date, no Grace Entity shall engage, directly or indirectly, in the manufacture or sale anywhere in the world of products manufactured by the Subject Business on the Closing Date; provided that the foregoing shall not apply to (i) ownership of the Noxso Shares or engaging in the business of Noxso, or engaging in the Wash Coat Business or the Metreon Business, (ii) manufacture or sale of such products by a business acquired by a Grace Entity after the Closing Date if, in the year prior to such acquisition, its net sales of such products were less than 17.5% of the net sales of the entire acquired business. A Grace Entity may also acquire a business that exceeds the threshold set forth in clause (ii) of the immediately preceding sentence; provided that the Grace Entity divests the unit of such business manufacturing or selling such products within one year after its acquisition; and provided further that if the Grace Entity shall not have effected such divestment within one year after acquisition despite its reasonably diligent efforts, Sequa shall grant the Grace Entity reasonable extension of the divestment period not to exceed six months. If the Grace Entity proposes to sell the unit of the acquired business that manufactures or sells such products, it shall notify Sequa and give Sequa the opportunity to participate in the bidding or other process for the sale of such unit on a basis substantially equal to other interested parties.

16.06 **Certain Tax Matters**.

(a) <u>Tax Periods Ending on or before the Closing Date</u>. Grace shall prepare or cause to be prepared and file or cause to be filed all Tax Returns and pay all Taxes related to the Swedish Companies for all periods ending on or prior to the Closing Date. Sequa shall and shall cause the Swedish Companies, as reasonably requested by the Selling Companies, to provide the Selling Companies with all information and documents in their possession and control necessary and appropriate to enable Grace to perform its obligations under this Section.

(b) <u>Tax Periods Beginning Before and Ending After the Closing Date</u>. Sequa shall cause the Swedish Companies to prepare and file all Tax Returns and pay all Taxes of the Swedish Companies for all periods that begin before the Closing Date and end after the Closing Date. Grace, as reasonably requested by the Swedish Companies, shall provide the Swedish Companies with all information and documents in the Grace Group's possession or control necessary and appropriate to enable the Swedish Companies to perform their obligations under this Section. Without Grace's prior written consent, Sequa agrees that the Swedish Companies shall not amend or otherwise modify any Tax Return for Taxes of the Swedish Companies where any portion of the Taxes, interest and penalties that are reported in such return are subject to indemnification by Grace under Article 14.

(c) <u>Cooperation on Tax Matters</u>. Grace shall and shall cause the Selling Companies, and Sequa shall and shall cause the Buying Companies and the Swedish Companies, to cooperate fully, as and to the extent reasonably requested by the other party, in connection with the filing of Tax Returns pursuant to this Section and any audit, litigation or other proceeding with respect to Taxes. Such cooperation shall include the retention and (upon the other party's

request) the provision of records and information which are reasonably relevant to any such audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided under this Section. To the extent that they are in possession of such books and records after the Closing Date, Grace shall and shall cause the Selling Companies, and Sequa shall cause the Buying Companies and the Swedish Companies, to (I) retain all books and records with respect to Tax matters pertinent to the Subject Business relating to any taxable period beginning before the Closing Date until the expiration of the statute of limitations (and, to the extent notified by the other parties, any extensions thereof) of the respective taxable periods, and to abide by all record retention agreements entered into with any Taxing Authority, and (ii) to give the other parties reasonable written notice prior to transferring, destroying or discarding any such books and records and, if the other parties so request, the discarding parties shall allow the other parties to take possession of such books and records.

(d) Section 338 Election. If the Buying Companies make or cause to be made a Code Section 338 election for TEC Systems AB , Sequa agrees that simultaneously it shall make or cause to be made an election under Section 338 of the Code for the other Swedish Companies. If the Buying Companies make or cause to be made a Section 338 election for TEC Systems AB but do not simultaneously make a Section 338 election for the other Swedish Companies, the Buying Companies shall indemnify the Selling Companies and the other members of the Grace Group for the additional U.S. Tax cost that the Selling Companies and other members of the Grace Group may incur, including by reason of any reduction of

foreign tax credits, as a result of such election under Section 338 of the Code for TEC Systems AB.

(e) Section 1248. Unless the Buying Companies make or cause to be made an election under Section 338 of the Code for the Swedish Companies, Sequa shall not and shall cause the Buying Companies not to cause or permit the Swedish Companies to make any distributions that would be classified as a dividend under Section 301 of the Code on or before December 31, 1997 (a "Prohibited Distribution"). For purposes of the preceding sentence, the term "Swedish Companies" shall include, without limitation, any successor in interest to any of the Swedish Companies through merger, reorganization, consolidation, amalgamation, or otherwise. Sequa shall indemnify Grace and the other Grace Entities against any and all additional U.S. Taxes that may be caused by or arise out of any Prohibited Distribution by the Swedish Companies.

(f) Refunds. If any Tax Claim results in a refund of any amount previously paid by TEC Systems AB, if TEC Systems AB directly or indirectly receives a refund for previously paid Taxes, interest and penalties that relates to Taxes attributable to Tax periods ending on or before the Closing Date (whether as the result of a Tax Claim or otherwise) other than as a result of the carry back of post-closing losses, then Grace or another designated member of the Grace Group shall be entitled to such refund and Sequa shall, or shall cause TEC Systems AB to, pay such refund to Grace or its designee promptly after receipt thereof; provided, however, that any adjustment by a Taxing Authority for any pre-Closing period which would have the effect of reducing the Tax liability of the relevant Swedish Company shall be treated as taking place prior to the carryback of any post-Closing losses.

16.07 <u>Value Added Taxes</u>. With respect to the portion of any Receivables representing value added taxes that the Buyer Group does not collect after the Closing, the appropriate Selling Company will at Sequa's request complete and file the necessary information to obtain a refund of such value added taxes and upon receipt of such value added taxes shall promptly remit such amount to Sequa.

16.08 <u>Consents to Assignment</u>. The parties shall use all commercially reasonable efforts both before and after the Closing Date to obtain any consents required for transfer of contracts and agreements included in the Transferred Assets. An "Unconsented Contract" means any such contract or agreement as to which such consent has not been obtained before the Closing. This Agreement and the Transaction Documents shall not constitute an assignment or transfer or attempted assignment or transfer of any Unconsented Contract unless and until the consent required for its transfer shall have been obtained. Unless and until such consent shall have been obtained, the Buying Companies shall perform the Selling Companies' obligations under such Unconsented Contract and the parties shall cooperate in all reasonable actions in order to obtain for the Buying Companies the benefit and to relieve the Selling Companies of the burden of such Unconsented Contract. Without limiting the generality of the foregoing, the parties at the reasonable request of either party will enter into one or more subcontracting agreements with respect to the Unconsented Contracts.

**ARTICLE 17**

**Expenses**

17.01 **Buying Companies' Expenses**.  Sequa shall pay and indemnify the Selling Companies against all expenses incurred by or on behalf of the Buying Companies in connection with the preparation, authorization, execution and performance of this Agreement and the transactions contemplated hereby, including, but not limited to, all fees and expenses of brokers, finders, agents, representatives, counsel and accountants.

17.02 **Selling Companies' Expenses**.  Grace shall pay and indemnify the Buying Companies against all expenses incurred by or on behalf of the Selling Companies in connection with the preparation, authorization, execution and performance of this Agreement and the transactions contemplated hereby, including, but not limited to, all fees and expenses of brokers, finders, agents, representatives, counsel and accountants.

17.03 **Transfer Taxes**.  With respect to any stamp duty, sales, transfer, value added, (except as provided in Section 16.07) excise, recording, registration or similar Taxes applicable to the transfer to the Buying Companies of the Transferred Assets pursuant to this Agreement, and any other document or transaction contemplated by this Agreement: (i) if either party or its Subsidiaries is solely or primarily responsible for any such Taxes under applicable law, then such party shall pay or cause to be paid and hold harmless the other party and its Subsidiaries from and against such Taxes; and (ii)  if the responsibility for payment of any such Taxes is not specified under applicable law, then each party shall pay fifty percent (50%) of such Taxes.



## ARTICLE 18

### Notices

18.01 <u>Notices</u>. All notices, requests, demands and other communications required or permitted to be given under this Agreement or any of the Transaction Documents shall be deemed to have been duly given if in writing and delivered personally, delivered by facsimile transmission, or delivered by first-class, postage prepaid, registered or certified mail, addressed as follows:

If to any of the Selling Companies:

> c/o W.R. Grace & Co.-Conn.
> One Town Center Road
> Boca Raton, Florida 33486-1010
> Attention: Corporate Secretary
> Fax:          (561) 362-1635
> Confirmation: (561) 362-1645

If to any of the Buying Companies:

> c/o Sequa Corporation
> 200 Park Avenue
> New York, New York 10166
> Attention: Secretary
> Fax:          (212) 370-1969
> Confirmation:  (212) 986-5500

Any Buying Company may change the address to which such communications are to be directed to it by giving written notice to Grace in the manner provided above. Any Selling Company may change the address to which such communications are to be directed to it by giving written notice to Sequa in the manner provided above.

### ARTICLE 19

**Product Warranty**

19.01 <u>Accrued Warranty Obligations</u>.  From and after the Closing, the Buying

Companies shall, in accordance with the provisions of this Section, be responsible for the

repair and/or replacement of certain goods and equipment shipped prior to the Closing by

the Selling Companies (the "Accrued Selling Company Warranty Obligations") and the Swedish

Companies (the "Accrued Swedish Company Warranty Obligations," and collectively with

the Accrued Selling Company Warranty Obligations, the "Accrued Warranty Obligations").

With respect to such goods and equipment other than (i) replacement  parts sold individually

and (ii) Components of Equipment (which for purposes of this Agreement, shall mean the

following: 936 Catalysts, Magnum Heat Exchangers, Heat Exchange Media for Enterprise

2, Monoblock Bearings and Katec Heat Exchangers) whose system warranties have expired,

the Accrued Warranty Obligations shall be limited to include only (A) the obligations for repair

and/or replacement set forth on <u>Schedule 5.17(a)(i)</u> and <u>Schedule 5.17(a)(ii)</u> and (B) obligations

for repair and/or replacement of goods and equipment shipped between the date hereof and

the Closing pursuant to Customer Contracts. With respect to replacement parts sold individually

and Components of Equipment whose system warranties have expired, the Accrued Warranty

Obligations shall be limited to include only obligations for repair and/or replacement under

Grace's written warranty terms and conditions (excluding obligations contained in customer's

purchase orders, terms and conditions, order acknowledgments, acceptance and the like,

as well as warranty obligations under applicable law); provided, however such warranties

shall not exceed the following time periods: 936 Catalysts (four years), Magnum Heat

Exchangers (four years), Heat Exchange Media for Enterprise 2 (four years), Monoblock

Bearings (five years) and Katec Heat Exchangers (four years). Notwithstanding the foregoing, the Buying Companies shall not be responsible for (i) any liabilities or obligations for consequential, incidental and liquidated damages as well as lost profits and other monetary amounts due to customers of the Subject Business whether imposed by contract, law or otherwise, for goods and equipment shipped prior to the Closing, or (ii) any extension by the Selling Companies or the Swedish Companies of the warranty periods set forth in Schedule 5.17(a)(i).

### ARTICLE 20

### General

20.01 **Entire Agreement**. This Agreement sets forth the entire agreement and understanding of the parties and related persons with respect to the subject matter hereof and supersedes all prior agreements, arrangements and understandings relating thereto. No representation, promise, inducement or statement of intention relating to the transactions contemplated by this Agreement has been made by any party or any related person which is not set forth in this Agreement or the agreements referred to herein.

20.02 **Governing Law**. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, excluding (a) any conflict-of-laws provisions thereof that would otherwise require the application of the law of any other jurisdiction, and (b) if applicable, the United Nations Convention on Contracts for the International Sale of Goods.

20.03 **Submission to Jurisdiction**. Each party to this Agreement hereby irrevocably submits in any suit, action or proceeding arising out of or relating to this Agreement or any

C:\GRACE\SALEAGTG.618.wpd                    103

of the Transaction Documents to which it is or will be a party, or any of its obligations hereunder or thereunder, to the jurisdiction of the United States District Court for the Southern District of New York and the jurisdiction of any court of the State of New York located in New York County, and waives any and all objections to such jurisdiction that it may have under the laws of the State of New York or any other jurisdiction.

20.04 **Successors**. This Agreement shall be assignable by Sequa only with the prior written consent of Grace, and by Grace only with the written prior consent of Sequa. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

20.05 **Amendments and Waivers**. This Agreement may be amended, superseded or canceled, and any of the terms hereof may be waived, only by a written instrument specifically referring to this Agreement and specifically stating that it amends, supersedes or cancels this Agreement or waives any of its terms, executed by Grace and Sequa. Failure of any party to insist upon strict compliance with any of the terms of this Agreement in one or more instances shall not be deemed to be a waiver of its rights to insist upon such compliance in the future, or upon compliance with other terms hereof.

20.06 **Counterparts**. This Agreement may be executed in two or more counterparts, each of which counterparts may be signed by one or more parties. Each such counterpart shall be an original, but all such counterparts shall constitute but one agreement.

20.07 **Captions**. The captions used in this Agreement are for convenience of reference only and shall not be considered in the interpretation of the provisions hereof.

20.08 **Sequa Guaranty**.  Sequa hereby agrees to cause the Buying Companies to perform all the obligations that this Agreement describes as being performed by the Buying Companies, and hereby guarantees the accuracy, performance and satisfaction of all the representations, warranties, covenants, agreements and obligations of the Buying Companies under the Transaction Documents.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date

first above written.

**W. R. GRACE & CO.-CONN.**

**SEQUA CORPORATION**


By: _Bd Schult_
     Name: Bernd A. Schulte
     Title:  Vice President

By: _____
     Name: John J. Dowling III
     Title:  Senior Associate General
              Counsel


Sworn to and subscribed before me this _____ _18th_

day of _____ JUNE _____ , 19 _97_

_Rochelle L. Kaye_
(Signature of Officer Administering Oath or of Notary Public - State of Florida)

_ROCHELLE  L.  KAYE_
(Print, Type, or Stamp Commissioned Name of Notary Public)

*Both* Personally Known ☑ or  Produced Identification ☐
Type of Identification Produced _____



Rochelle L. Kaye
Notary Public, State of Florida
Commission No. CC 536733
My Commission Expires 05/22/00
1-800-3-NOTARY - Fla. Notary Service & Bonding Co.



STATE OF WISCONSIN      CIRCUIT COURT      EAU CLAIRE COUNTY

---

ESTATE OF JEFFREY CHWALA,
by its Personal Representative,
Dale A. Chwala,
12295 312th Street
Boyd, Wisconsin 54726,

                              Case No. 02 CV 495

SAMANTHA J. KITTL,
541 – 3rd Street, Apt 4
Rib Lake, WI 54470,
minor daughter of Jeffrey Chwala,
by her Guardian Ad Litem,
Ann W. Johnson,
Wachowski & Johnson, S.C.
P.O. Box 145
Eau Claire, WI  54702-0145,

                              Wrongful Death
                              Code No. 30105

                              Amount Claimed Greater
                              Than $5,000.00

                Plaintiffs,

ROYAL& SUN ALLIANCE PERSONAL
INSURANCE CO.
P.O. Box 1000
Charlotte, NC  28201,

                Subrogated Plaintiff,
v.

TEC (THERMAL EMISSION CONTROL)
SYSTEMS, INC., a/k/a
TEC SYSTEMS AB, a/k/a
GRACE TEC SYSTEMS AB,
DePere, WI  54115

ABC INSURANCE COMPANY,

MEGTEC SYSTEMS, INC.
830 Prosper Rd.
De Pere, WI  54115,

DEF INSURANCE COMPANY,

W.R. GRACE & CO.
799 Main St.
Hartford, CT  06103,

**FILED**
CIRCUIT COURT
EAU CLAIRE COUNTY

OCT 0 4 2002

DIANA J. MILLER
CLERK OF CIRCUIT COURT

OCT 2 1 2002

**EXHIBIT**
B

CONTINENTAL CASUALTY COMPANY a/k/a
CNA INSURANCE COMPANY,
CNA Plaza
Chicago, IL 60685,

SEQUA CORPORATION
229 S. State Street
Dover, DE 19901,

GHI INSURANCE COMPANY,

VAN ERT ELECTRIC CO., INC.
7019 Stewart Ave.
Wausau, WI 54401,

JKL INSURANCE COMPANY,

MURPHY ELECTRIC, INC.,
a/k/a Murphy Brothers
1025 N. Lane St.
Kaukauna, WI 54130,

MNO INSURANCE COMPANY,

LUNDA CONSTRUCTION
620 Gebhardt Rd.
P.O. Box 669
Black River Falls, WI 54615,

PQR INSURANCE COMPANY,

AMERICAN AUTOGARD CORPORATION
5173 – 26th Avenue
Rockford, IL 61109, and

STU INSURANCE COMPANY,

                Defendants.

---

## AMENDED COMPLAINT

---

COME NOW the plaintiffs, Estate of Jeffrey Chwala, by its personal representative, Dale Chwala and Samantha Kittl, minor daughter of Jeffrey Chwala, by her Guardian Ad Litem, Ann W. Johnson, by their attorneys, as and for their Complaint against the defendants, allege as follows:

1. The personal representative of the Estate of Jeffrey Chwala is Dale Chwala with a mailing address of 12295 312th Street, Boyd, WI 54726.

2. The guardian ad litem for Samantha Kittl, the minor daughter of Jeffrey Chwala, is Ann W. Johnson with a mailing address of 320 South Barstow Street, Eau Claire, Wisconsin 54701.

3. The subrogated plaintiff, Royal & Sun Alliance Personal Insurance Company, is an insurance company licenses to sell insurance within the State of Wisconsin with its registered agent and address for service being: Roger L. Gierhart, CT Corporation System, 44 E. Mifflin Street, Madison, WI 53703.

4. Defendant TEC (Thermal Emission Control) Systems, Inc., a/k/a TEC Systems AB, a/k/a Grace TEC Systems AB, and formerly a division of W.R. Grace & Company (hereinafter "TEC Systems") is a foreign corporation doing business in the State of Wisconsin with last known address in De Pere, WI 54115.

5. At all times material hereto, TEC Systems, Inc. had in effect a policy of liability insurance covering them. By terms of this policy, ABC Insurance Company insured TEC Systems, Inc. against loss by reason of liability imposed upon it arising out of the manufacture and sale of its products.

ABC Insurance Company is a proper party to this claim under the provisions of Wisconsin Stat. § 803.04(2).

6.  MEGTEC Systems, Inc., a division of Sequa Corporation, is a domestic corporation doing business in Wisconsin with its principal offices located in the State of Wisconsin, with its registered agent and address for service being: CT Corporation System, 44 E. Mifflin Street, Madison, WI 53703.

7.  At all times material hereto, MEGTEC Systems, Inc. had in effect a policy of liability insurance covering them.  By terms of this policy, DEF Insurance Company insured MEGTEC Systems, Inc. against loss by reason of liability imposed upon it arising out of the manufacture and sale of its products.  DEF Insurance Company is a proper party to this action under the provisions of Wisconsin Stat. § 803.04(2).

8.  Defendant W.R. Grace & Company (hereinafter "W.R. Grace") is a foreign corporation doing business in the State of Wisconsin with its registered agent and address for service being:   The Prentice-Hall Corporation System, Inc., 25 W Main Street, Madison, WI 53703.

9.  At all times material hereto, W.R. Grace & Company had in effect a policy of liability insurance covering them. By terms of this policy, CNA Insurance Company insured W.R. Grace & Company against loss by reason of liability imposed upon it arising out of the manufacture and sale of its products. CNA Insurance Company is a proper party to this action under the provisions of Wis. Stat. § 803.04(2).

10.   Defendant Sequa Corporation is a foreign corporation doing business within the State of Wisconsin, with its registered agent and address for service being: CT Corporation System, 44 E. Mifflin St., Madison, WI 53703.

11.   At all times material hereto, Sequa Corporation had in effect a policy of liability insurance covering them. By terms of this policy, GHI Insurance Company insured Sequa Corporation against loss by reason of liability imposed upon it arising out of the manufacture and sale of its products. GHI Insurance Company is a proper party to this action under the provisions of Wis. Stat. § 803.04(2).

12.   Defendant Van Ert Electric Company, Inc., is a corporation doing business in the State of Wisconsin with its registered agent and address for service being: Robert Van Ert, 7019 Stewart Avenue, Wausau, WI 54401.

13.   At all times material hereto, Van Ert Electric Company, Inc. had in effect a policy of liability insurance covering them. By terms of this policy, JKL Insurance Company insured Van Ert Electric Company against loss by reason of liability imposed upon it arising out of the manufacture and sale of its products. JKL Insurance Company is a proper party to this action under the provisions of Wis. Stat. § 803.04(2).

14.   Defendant Murphy Electric, Inc., a/k/a Murphy Brothers, is a corporation doing business in the State of Wisconsin with its registered agent and address for service being: Thomas J. Murphy, 1025 N. Lane St., Kaukauna, WI 54130.

15.   At all times material hereto, Murphy Electric, Inc. had in effect a policy of liability insurance covering them. By terms of this policy, MNO Insurance Company insured Murphy Electric, Inc. against loss by reason of liability imposed upon it arising out of the manufacture and sale of its products. MNO Insurance Company is a proper party to this action under the provisions of Wis. Stat. § 803.04(2).

16.   Defendant Lunda Construction is a corporation doing business in the State of Wisconsin with its registered agent and address for service being: Larry Lunda, 620 Gebhardt Road, Black River Falls, WI 54615.

17.   At all times material hereto, Lunda Construction had in effect a policy of liability insurance covering them. By terms of this policy, PQR Insurance Company insured Lunda Construction against loss by reason of liability imposed upon it arising out of the manufacture and sale of its products. PQR Insurance Company is a proper party to this action under the provisions of Wis. Stat. § 803.04(2).

18.   American Autogard Corporation is a foreign corporation doing business within the State of Wisconsin with its last known address in Rockford, Illinois.

19.   At all times material hereto, American Autogard Corporation had in effect a policy of liability insurance covering them. By terms of this policy, STU Insurance Company insured American Autogard Corporation against loss by reason of liability imposed upon it arising out of the manufacture and sale of

its products. STU Insurance Company is a proper party to this action under the provisions of Wis. Stat. § 803.04(2).

20. At all times material hereto Jeffrey Chwala, deceased, was employed by American Coating Technologies, Inc. as a general laborer.

21. At all times material hereto, American Coating Technologies, Inc., was insured through a policy of worker's compensation liability insurance issued by Royal & Sun Alliance Insurance Company, which said company made workers' compensation payments herein.

22. Defendants were, at all times material hereto, in the business of manufacturing, selling and/or installing conveyor belt ovens and component parts which were used by manufacturers for the purpose of drying paper.

23. Defendants sold and/or installed conveyor belt ovens and component parts to American Coating Technologies prior to October 6, 1999, and those ovens had been used by American Coating Technologies prior to October 6, 1999 and at all times material hereto.

24. On or about October 6, 1999, Jeffrey Chwala, while in the course of his employment at American Coating Technologies, was cleaning one of the ovens manufactured by TEC Systems and W.R. Grace. Mr. Chwala was required to climb into the oven itself in order to clean the oven.

25. While Mr. Chwala was inside the oven cleaning said oven, the closing mechanism on the oven was activated and Mr. Chwala was crushed by the

oven and its attendant closing mechanisms, causing severe bodily injuries and death.

## FIRST CAUSE OF ACTION AGAINST
## DEFENDANT'S SOUNDING IN NEGLIGENCE

26.    Reallege and incorporate all of the above as is fully set forth herein.

27.    At all times material hereto, Defendants transacted business within the State of Wisconsin, including the use in the State of Wisconsin of salesmen, advancement, agents, servants or employees to display, sell, take orders, and enter into contracts for the sale and/or installation of industrial equipment within the State of Wisconsin by advertisement and promotion of said products.

28.    That at all times material hereto, Defendants have engaged in activities as set forth in this Complaint that gives this court personal jurisdiction over these defendants after service of process.

29.    That Defendants were, at all times material hereto, engaged in the business of manufacturing, distributing, installing and promoting the sale and installation of industrial equipment including the oven product material to this suit.

30.    That no material changes or alterations were made to the product material to this suit prior to the subject accident.

31.    That Defendants owed a duty of care in the design, testing, manufacturing, marketing, selling and installation of the aforesaid oven to avoid an unreasonable risk of death or injury to purchasers or foreseeable users of

said product. Said duty was owed to Jeffrey Chwala as a foreseeable user of said product.

32. That Defendants owed a duty to adequately warn and instruct Jeffrey Chwala of all defects either known by said defendants, or which should have been known by them relative to the unreasonably dangerous nature of this product to avoid an unreasonable risk of death or injury to Jeffrey Chwala.

33. That Defendants breached the aforesaid duties of care owed to Jeffrey Chwala and were careless and negligent in the design, manufacturing, sale, distribution' installation and failure to warn of defects of the oven which caused Mr. Chwala's death.

34. As a direct and proximate result of the negligence of defendants, their agents, employees and assigns, Jeffrey Chwala was injured and suffered grievous bodily injury, conscious pain, suffering and death.

35. As a direct and proximate result of the negligence of defendants, plaintiff Samantha Kittl has suffered the loss of the aid, assistance and society of her father, Jeffrey Chwala, all to her great damage in an amount to be adduced at the time of trial.

## SECOND CAUSE OF ACTION AGAINST DEFENDANTS SOUNDING IN STRICT LIABILITY

36. Reallege and incorporate the above as is fully set forth herein.

37. That the oven and attendant devices material to this suit were in a defective condition and were unreasonably dangerous at the time they were manufactured, distributed, sold and installed by defendants.

38. The defendants had an obligation to refrain from placing into the stream of commerce products which were in a defective condition and unreasonably dangerous to foreseeable purchasers and users of said products, which conditions created risk of death or injury to such purchasers or users.

39. That in violation of the aforesaid duty, defendants placed into the stream of commerce the oven and attendant devices material to this suit.

40. As a direct and proximate result of the negligence of defendants, their agents, employees and assigns, Jeffrey Chwala was injured and suffered grievous bodily injury, conscious pain, suffering and death.

41. As a direct and proximate result of the negligence of defendants, plaintiff Samantha Kittl has suffered the loss of the aid, assistance and society of her father, Jeffrey Chwala, all to her great damage in an amount to be adduced at the time of trial.

## PUNITIVE DAMAGE CLAIM AGAINST DEFENDANTS

42. Reallege and incorporate by reference all of the allegations contained above in the Complaint herein.

43. The defendants conduct, including their failure to warn or otherwise advise Mr. Chwala and/or his employer that certain sensors and/or parts were missing or not functional at the time of the accident which caused his death, constituted a willful, wanton, intentional and reckless disregard of

the plaintiff's safety and rights so as to entitle the Estate of Jeffrey Chwala and Samantha Kittl, the minor child of Jeffrey Chwala, to punitive damages.

WHEREFORE the plaintiffs, the Estate of Jeffrey Chwala, Samantha Kittl, the minor child of Jeffrey Chwala, and Royal & Sun Alliance Insurance Company, pray for judgment against the defendants as follows:

a.    For a sum of compensatory damages against defendants TEC Systems Inc., Megtec Systems, Inc., W.R. Grace, Van Ert Electric Company, Inc., Lunda Construction, Murphy Electric, Inc., Sequa Corporation, AND American Autogard Corporation commensurate with the facts of this case as adduced at the time of trial.

b.    For a sum of punitive damages against defendants TEC Systems Inc., Megtec Systems, Inc., W.R. Grace, Van Ert Electric Company, Inc., Lunda Construction, Murphy Electric, Inc., Sequa Corporation, and American Autogard Corporation commensurate with the facts of this case as adduced at the time of trial.

c.    For a determination as to the entitlement of the subrogated plaintiff, Royal & Sun Alliance Insurance Company's rights to any benefits pursuant to Wis. Stats. § 102.29.

d.    For the costs and disbursements in this matter, together with reasonable attorney's fees.

e.    That the Court award the plaintiff the opportunity to amend and modify the provisions of this Complaint, if necessary or appropriate, after

additional or further discovery is completed in this matter and after all parties

have been served.

    f.       For such other further relief as the Court deems just and proper.

    g.      For a twelve person jury trial.

Dated this _4 th_ day of _Oct._ , 2002.


DOAR, DRILL & SKOW, S.C.
Attorneys for the Plaintiffs

By:_____
    Michael J. Brose
    State Bar No. 1000827

**Mailing Address:**
P. O. Box 69
New Richmond, WI 54017-0069
(715) 246-2211


NIKOLAY LAW OFFICES
Attorneys for the Plaintiffs

By:_____
    Paul A. Nikolay
    State Bar No.: 1015223

**Mailing Address:**
P.O. Box 469
Abbotsford, WI 54405
(715) 223-4151



STATE OF WISCONSIN          CIRCUIT COURT          EAU CLAIRE COUNTY
                                Branch ___5___

ESTATE OF JEFFREY B. CHWALA,
by its Personal Representative,
Dale A. Chwala,                        **FILED**
12295 312th Street                  CIRCUIT COURT
Boyd, Wisconsin 54726,            EAU CLAIRE COUNTY

                                     JUL 2 5 2002
SAMANTHA J. KITTL,
minor daughter of Jeffrey Chwala,  DIANA J. MILLER      Case No. 02 CV __495__
by her Guardian Ad Litem,         CLERK OF CIRCUIT COURT
Ann W. Johnson,
              Plaintiff,                                Wrongful Death
                                                        Code No. 30105
ROYAL & SUN ALLIANCE PERSONAL
INSURANCE CO.                                           Amount Claimed Greater
P.O. Box 1000                                              Than $5,000
Charlotte, NC 28201,

        Subrogated Plaintiff,

    v.

TEC (THERMAL EMISSION CONTROL)
SYSTEMS, INC.
n/k/a MEGTEC SYSTEMS, INC.
830 Prosper Rd.
De Pere, WI 54115,

W.R. GRACE & CO.
799 Main St.
Hartford, CT, 06103,

SEQUA CORPORATION
229 S. State Street
Dover, DE 19901,

VAN ERT ELECTRIC CO., INC.
7019 Stewart Ave.
Wausau, WI 54401,

LUNDA CONSTRUCTION
620 Gebhardt Rd.
P.O. Box 669
Black River Falls, WI 54615,

MURPHY CO., now a division of
LUNDA CONSTRUCTION,
620 Gebhardt Rd.
P.O. Box 669
Black River Falls, WI 54615,

               Defendants.

---

## COMPLAINT

---

COME NOW the plaintiffs, Estate of Jeffrey Chwala, by its personal representative, Dale Chwala and Samantha Kittl, minor daughter of Jeffrey Chwala, by her Guardian Ad Litem, Ann W. Johnson, by their attorneys, as and for their Complaint against the defendants, allege as follows:

1.  The personal representative of the Estate of Jeffrey Chwala is Dale Chwala with a mailing address of 12295 312th Street, Boyd, WI 54726.

2.  The guardian ad litem for Samantha Kittl, the minor daughter of Jeffrey Chwala, is Ann W. Johnson with a mailing address of 320 South Barstow Street, Eau Claire, Wisconsin 54701.

3.  The subrogated plaintiff, Royal & Sun Alliance Personal Insurance Company, is an insurance company licensed to sell insurance within the State of Wisconsin with its registered agent and address for service being: Roger L. Gierhart, CT Corporation System, 44 E. Mifflin Street, Madison, WI 53703.

4.  Defendant TEC (Thermal Emission Control) Systems, Inc, formerly a division of W.R. Grace & Company (hereinafter "TEC Systems"), n/k/a MEGTEC

Systems, Inc., a division of Sequa Corporation, is a domestic corporation doing business in Wisconsin with its principal offices located in the State of Wisconsin, with its registered agent and address for service being: CT Corporation System, 44 E. Mifflin Street, Madison, WI 53703.

5.  Defendant W.R. Grace & Company (hereinafter "W.R. Grace") is a foreign corporation doing business in the State of Wisconsin with its registered agent and address for service being: The Prentice-Hall Corporation System, Inc., 25 W Main Street, Madison, WI 53703.

6.  Defendant Sequa Corporation is a foreign corporation doing business within the State of Wisconsin, with its registered agent and address for service being: CT Corporation System, 44 E. Mifflin St., Madison, WI 53703.

7.  Defendant Van Ert Electric Company, Inc., is a corporation doing business in the State of Wisconsin with its registered agent and address for service being: Robert Van Ert, 7019 Stewart Avenue, Wausau, WI 54401.

8.  Defendant Murphy Company, now a division of Lunda Construction, is a corporation doing business in the State of Wisconsin with its registered agent and address for service being: Larry Lunda, 620 Gebhardt Road, Black River Falls, WI 54615.

9.  Defendant Lunda Construction is a corporation doing business in the State of Wisconsin with its registered agent and address for service being: Larry Lunda, 620 Gebhardt Road, Black River Falls, WI 54615.

10. At all times material hereto Jeffrey Chwala, deceased, was employed by American Coating Technologies, Inc. as a general laborer.

3

11. At all times material hereto, American Coating Technologies, Inc., was insured through a policy of worker's compensation liability insurance issued by Royal & Sun Alliance Insurance Company, which said company made workers' compensation payments herein.

12. Defendants were, at all times material hereto, in the business of manufacturing and selling and installing conveyor belt ovens which were used by manufacturers for the purpose of drying paper.

13. Defendants installed and sold conveyor belt ovens to American Coating Technologies prior to October 6, 1999, and those ovens had been used by American Coating Technologies prior to October 6, 1999 and at all times material hereto.

14. On or about October 6, 1999, Jeffrey Chwala, while in the course of his employment at American Coating Technologies, was cleaning one of the ovens manufactured by TEC Systems and W.R. Grace. Mr. Chwala was required to climb into the oven itself in order to clean the oven.

15. While Mr. Chwala was inside the oven cleaning said oven, the closing mechanism on the oven was activated and Mr. Chwala was crushed by the oven and its attendant closing mechanisms, causing severe bodily injuries and death.

## FIRST CAUSE OF ACTION AGAINST
## DEFENDANTS SOUNDING IN NEGLIGENCE

16. Reallege and incorporate all of the above as is fully set forth herein.

4

17. At all times material hereto, Defendants transacted business within the State of Wisconsin, including the use in the State of Wisconsin of salesmen, advancemen, agents, servants or employees to display, sell, take orders, and enter into contracts for the sale and installation of industrial equipment within the State of Wisconsin by advertisement and promotion of said products.

18. That at all times material hereto, Defendants have engaged in activities as set forth in this Complaint that gives this court personal jurisdiction over these defendants after service of process.

19. That Defendants were, at all times material hereto, engaged in the business of manufacturing, distributing, installing and promoting the sale and installation of industrial equipment including the oven product material to this suit.

20. That no material changes or alterations were made to the product material to this suit prior to the subject accident.

21. That Defendants owed a duty of care in the design, testing, manufacturing, marketing, selling and installation of the aforesaid oven to avoid an unreasonable risk of death or injury to purchasers or foreseeable users of said product. Said duty was owed to Jeffrey Chwala as a foreseeable user of said product.

22. That Defendants owed a duty to adequately warn and instruct Jeffrey Chwala of all defects either known by said defendants, or which should have been

known by them relative to the unreasonably dangerous nature of this product to avoid an unreasonable risk of death or injury to Jeffrey Chwala.

23. That Defendants breached the aforesaid duties of care owed to Jeffrey Chwala and were careless and negligent in the design, manufacturing, sale, distribution' installation and failure to warn of defects of the oven which caused Mr. Chwala's death.

24. As a direct and proximate result of the negligence of defendants, their agents, employees and assigns, Jeffrey Chwala was injured and suffered grievous bodily injury, conscious pain, suffering and death.

25. As a direct and proximate result of the negligence of defendants, plaintiff Samantha Kittl has suffered the loss of the aid, assistance and society of her father, Jeffrey Chwala, all to her great damage in an amount to be adduced at the time of trial.

## SECOND CAUSE OF ACTION AGAINST DEFENDANTS SOUNDING IN STRICT LIABILITY

26. Reallege and incorporate the above as is fully set forth herein.

27. That the oven and attendant devices material to this suit were in a defective condition and were unreasonably dangerous at the time they were manufactured, distributed, sold and installed by defendants.

28. The defendants had an obligation to refrain from placing into the stream of commerce products which were in a defective condition and unreasonably dangerous to foreseeable purchasers and users of said products, which conditions created risk of death or injury to such purchasers or users.

6

29. That in violation of the aforesaid duty, defendants placed into the stream of commerce the oven and attendant devices material to this suit.

30. As a direct and proximate result of the negligence of defendants, their agents, employees and assigns, Jeffrey Chwala was injured and suffered grievous bodily injury, conscious pain, suffering and death.

31. As a direct and proximate result of the negligence of defendants, plaintiff Samantha Kittl has suffered the loss of the aid, assistance and society of her father, Jeffrey Chwala, all to her great damage in an amount to be adduced at the time of trial.

## PUNITIVE DAMAGE CLAIM AGAINST DEFENDANTS

32. Reallege and incorporate by reference all of the allegations contained above in the Complaint herein.

33. The defendants conduct, including their failure to warn or otherwise advise Mr. Chwala and/or his employer that certain sensors and/or parts were missing or not functional at the time of the accident which caused his death, constituted a willful, wanton, intentional and reckless disregard of the plaintiff's safety and rights so as to entitle the Estate of Jeffrey Chwala and Samantha Kittl, the minor child of Jeffrey Chwala, to punitive damages.

WHEREFORE the plaintiffs, the Estate of Jeffrey Chwala, Samantha Kittl, the minor child of Jeffrey Chwala, and Royal & Sun Alliance Insurance Company, pray for judgment against the defendants as follows:

7

a.    For a sum of compensatory damages against defendants TEC Systems Inc., n/k/a Megtec Systems, Inc.,  W.R. Grace, Van Ert Electric Company, Inc., Lunda Construction, Murphy Co., and Sequa Corporation commensurate with the facts of this case as adduced at the time of trial.

b.    For a sum of punitive damages against defendants TEC Systems Inc., n/k/a Megtec Systems, Inc.,  W.R. Grace, Van Ert Electric Company, Inc., Lunda Construction, Murphy Co., and Sequa Corporation, commensurate with the facts of this case as adduced at the time of trial.

c.    For a determination as to the entitlement of the subrogated plaintiff, Royal & Sun Alliance Insurance Company's rights to any benefits pursuant to Wis. Stats. § 102.29.

d.    For the costs and disbursements in this matter, together with reasonable attorney's fees.

e.    That the Court award the plaintiff the opportunity to amend and modify the provisions of this Complaint, if necessary or appropriate, after additional or further discovery is completed in this matter and after all parties have been served.

f.    For such other further relief as the Court deems just and proper.

g.    For a twelve person jury trial.

Dated this ___2⁴___ day of ___7.1_____, 2002.

RICHIE, WICKSTROM & WACHS, LLC
Attorneys for the Plaintiffs

By:_____
Dana J. Wachs
State Bar No.:1009908

8

Mailing Address:
101 Putnam Street
P. O. Box 390
Eau Claire, WI 54702-0390
(715) 839-9500

                                    NIKOLAY, JENSEN, SCOTT, GRUNEWALD &
                                    SCHMIEGE, S.C.
                                     Attorneys for the Plaintiffs


                                    By:
                                        Paul A. Nikolay
                                        State Bar No.:
Mailing Address:
111 North First Street
P.O. Box 469
Abbotsford, WI  54405
(715) 223-4151

9

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the date first above written.

**W. R. GRACE & CO.-CONN.**                **SEQUA CORPORATION**

By: _Bernd Schulte_                          By: _John Dowling_

Name:  Bernd A. Schulte                       Name:  John J. Dowling III
Title:   Vice President                       Title:   Senior Associate General
                                                       Counsel

Sworn to and subscribed before me this ___18th___

day of ___JUNE___, 19 _97_

_Rochelle L. Kaye_
(Signature of Officer Administering Oath or of Notary Public - State of Florida)

_ROCHELLE  L.  KAYE_
(Print, Type, or Stamp Commissioned Name of Notary Public)

BoTh  Personally Known ☑ or Produced Identification ☐

Type of Identification Produced _____



Rochelle L. Kaye
Notary Public, State of Florida
Commission No. CC 536733
My Commission Expires 05/22/00
1-800-3-NOTARY - Fla. Notary Service & Bonding Co.

C:\GRACE\SALEAGTG.618.wpd

W. R. GRACE & CO.        Fax:561-362-1584        Sep  5  02  11:27        P.02

William J. A. Sparks
Senior Litigation Counsel

**GRACE**

W. R. Grace & Co.
919 North Market Street
Suite 460
Wilmington, DE 19801

Tel.:    (302)652-5340
Fax:    (302)652-5338

E-mail: William.Sparks@grace.com

September 5, 2002

<u>VIA U.S. MAIL & FAX TRANSMISSION</u>

Steven R. Lowson, Esq.
Sequa Corporation
200 Park Avenue
New York, NY 10166

Re:  Estate of Jeffrey B. Chwala, et. al. v. TEC Systems, Inc., et. al.

Dear Mr. Lowson:

This will respond to your letter of August 13, 2002. As you may know, W. R. Grace & Co. and related entities filed for protection under Chapter 11 of the Bankruptcy Code in Wilmington Delaware on April 2, 2001. As a result and notwithstanding the provisions of the TEC Systems Sale Agreement dated June 18, 1997 between Sequa and Grace, Grace is prohibited from accepting your tender of defense and providing indemnification for this matter. However, your rights under the Sale Agreement may constitute pre-petition claims against Grace. Any such claims must be made in the form of a proof of claim filed in the Grace Bankruptcy cases.

You should be aware that Grace contacted counsel for plaintiff in the above matter in early August. Grace advised him that pursuant to Section 362 of the Bankruptcy Code he is prohibited from proceeding with his action against Grace. Grace did not accept service of the pleading, nor is Grace bound to make an appearance in the lawsuit. Grace informed counsel that if he believes his client has a claim against Grace, it must bring any such claim in the Delaware court in which the Grace Chapter 11 cases are proceeding.

Finally, please be advised that a Bar Date of March 31, 2003 has been set for the filing of all non-asbestos claims and asbestos property damage claims against Grace. No such Bar Date has been set regarding claims constituting asbestos personal injury claims.

Please do not hesitate to call if you have any questions.

Sincerely,

*William Sparks*

William J. A. Sparks

cc:    Jay W. Hughes, Esq.
       John McFarland, Esq.
       John Dowling, Esq.
       Greg Linn

**Sequa Corporation**

200 Park Avenue
New York, New York 10166
212 986-5500
212 661-2189 (fax)
Steven_Lowson@sequa.com

Steven R. Lowson
*Vice President and*
*Senior Associate General Counsel*



August 13, 2002

*Via Facsimile – 50 Pages / (561) 362-1583*
*And Via Certified Mail – Return Receipt Requested*

William J.A. Sparks, Esq.
W.R. Grace & Co.-Conn.
One Town Center Road
Boca Raton, FL 33486-1010

561·362-2800 &n
Jim Hughes
561·362-1532

Re:    Estate of Jeffrey B. Chwala, et al. v. TEC Systems, Inc., et al.

Dear Mr. Sparks:

I attach the Summons and Complaint (and related discovery) received last week in the above-referenced action. This is an action brought in state court in Eau Claire County, Wisconsin by the estate of a former employee (now deceased) of American Coating Technologies, who apparently was crushed by the closing mechanism on a "conveyor belt oven used for the purpose of drying paper" ("Dryer"), causing him severe bodily injuries and ultimately death. Plaintiffs allege that the defendants, which include TEC Systems, MEGTEC Systems, Inc. ("MEGTEC"), Sequa Corporation ("Sequa") and W.R. Grace & Co.-Conn ("W.R. Grace"), installed and sold conveyor belt ovens to American Coating Technologies some time prior to the date of the incident on October 6, 1999, and that these ovens were somehow defective.

MEGTEC has determined, from a review of its records, that it has not sold American Coating Technologies any Dryers (or any other product) since Sequa purchased TEC Systems on June 18, 1997 from W.R. Grace.

As a result, this matter concerns equipment sold by TEC Systems prior to the sale and relates to an excluded liability, as that term is defined in the document entitled "TEC Systems Sale Agreement," dated June 18, 1997 by and between W.R. Grace and Sequa (the "Sale Agreement"). Please consider this letter as formal notice under Articles 14 and 18 of the Sale Agreement. As such, this letter is intended to tender the defense and indemnification of this matter to

**Sequa Corporation**

William J.A. Sparks, Esq.
W.R. Grace & Co.-Conn.
August 13, 2002
Page 2

W.R. Grace under the Sale Agreement, including but not limited to, under Article 14.02 relating to W.R. Grace's indemnification of Sequa.

As W.R. Grace is also a named defendant in this action, I would suggest that it does not make sense for W.R. Grace to hire two sets of counsel to represent itself on the other hand, and MEGTEC and Sequa on the other. Therefore, I would suggest that we jointly approach plaintiff's counsel in this matter and explain that, to the extent there is any responsibility in this matter (and, of course, I am not suggesting there is), it would not be the responsibility of MEGTEC or Sequa, given the date of manufacture of this equipment.

As you are aware, you were orally advised of this incident in a telephone conversation with Greg Linn and John Dowling on February 9, 2000. This was followed up in a more formal notice dated February 25, 2000 from John Dowling, which I attach for your convenience. Moreover, Mr. Dowling sent you a letter on February 29, 2000 in response to your inquiry for additional information, and I attach that for your convenience as well.

Please feel free to call with any questions.

Very truly yours,

Steven R. Lowson

SRL/hm

Enclosures

cc:    Corporate Secretary       (w/ encl.)
       W.R. Grace & Co.-Conn
       (via telefax - 410-531-4783)

*Sequa Corporation*
William J.A. Sparks, Esq.
W.R. Grace & Co.-Conn.
August 13, 2002
Page 3

bcc:    Stuart Krinsly        (w/o encl.)
        John Quicke          (w/o encl.)
        John Dowling         (w/o encl.)
        Michael Gurrieri     (w/o encl.)
        Alan Fiers           (w/o encl.)
        Greg Linn            (w/o encl.)

*Sequa Corporation*

William J.A. Sparks, Esq.
W.R. Grace & Co.-Conn.
August 13, 2002
Page 3

bcc:    Stuart Krinsly      (w/o encl.)
        John Quicke      (w/o encl.)
        John Dowling     (w/o encl.)
        Michael Gurrieri   (w/o encl.)
        Alan Fiers       (w/o encl.)
        Greg Linn       (w/o encl.)

AUG-13-02  06:57  FROM:SEQUA ST LOUIS                    ID:3142411027              PAGE   8/9

*Mertec / Grace P.C.*
*American Coating Technology*

**Sequa Corporation**

1310 Papin Street
St. Louis, Missouri 63103          John J. Dowling III
314 241-1000                      *Senior Associate General Counsel*
314 241-1027 (fax)

**SEQUA**

February 25, 2000

<u>Via Telefax 410-531-4783</u>

W. R. Grace & Co. – Conn.
7500 Grace Drive
Columbia, MD 21044

Attention: Corporate Secretary

Dear Sir:

Reference is hereby made to the TEC Systems Sale Agreement ("Sale Agreement") dated June 12, 1997 by and between W. R. Grace & Co.-Conn. ("Grace") and Sequa Corporation ("Sequa"). Terms used herein and not otherwise defined shall have the meanings given to them in the Sale Agreement.

In accordance with Articles 14 and 18 of the Sale Agreement, Sequa would like to formally advise Grace of an incident involving equipment shipped by Grace prior to August 29, 1997. Mr. Will Sparks, in-house litigation counsel for Grace, was orally advised of this incident on February 9, 2000 in a telephone conversation with Mr. Linn and myself. On January 26, 2000, MEGTEC Systems, Inc. ("MEGTEC") by telephone contact, was orally informed of an industrial accident at American Coating Technology. Apparently, during October 1999, an employee of American Coating Technology was inside a dryer cleaning and cleaning such dryer. A second employee of American Coating Technology allegedly closed the access door to the equipment and the employee inside the equipment was injured. The injured employee died five days later.

At this point, Sequa is not aware of any formal claim being asserted against either Sequa or MEGTEC.

If you have any questions concerning the foregoing, please do not hesitate to contact Greg Linn, Vice President Finance at MEGTEC in DePere, Wisconsin (telephone number 920-337-1568).

Very truly yours,

John J. Dowling III
Senior Associate General Counsel

JJD:leb

cc:   Jack McFarland (W. R. Grace) (Via Telefax: 410-531-4783)
      Alan Fiers
      Stuart Krinsly
      Greg Linn
      John Quicke
      Will Sparks (Via Telefax: 561-362-1583)

AUG-13-02 06:56 FROM:SEQUA ST LOUIS                ID:3142411027                PAGE    7/9

*Sequa Corporation*

1310 Papin Street
St. Louis, Missouri 63103
314 241-1000
314 241-1027 (fax)

John J. Dowling III
*Senior Associate General Counsel*



February 29, 2000

**Via Telefax 561/362-1583**
William J. A. Sparks, Esq.
W.R. Grace & Co.
5400 Broken Sound Blvd., N.W.
Boca Raton, Florida 33487

                    RE: TEC Systems Equipment – Dryer Incident reported through
                    MEGTEC Systems, Inc.

Dear Will:

        Further to my letter to W. R. Grace & Co. dated February 25, 2000 and your
subsequent inquiry made to Gregg Linn of MEGTEC Systems, Inc. regarding the
incident referenced above, I have obtained the following information:

|  |  |
|---|---|
| Customer: | American Coatings Technology, Inc.<br>3431 Hogarth Street<br>Eau Claire, Wisconsin 54702<br>715/839-8060 |
| Owner: | Nabil Nasser |
| Nature of Business: | American Coatings applies clay-based latex<br>coatings on to paper |

        I understand you may need this information for insurance purposes. If I can
be of further assistance, please advise.

                            Very truly yours,

                            John J. Dowling III
                            Senior Associate General Counsel

cc:    Stuart Krinsly
       Gregg Linn
       Jack McFarland(W.R. Grace)(Via Telefax 410/531-4783)
       John Quicke