# Exhibit A

Roger Sullivan
Allan M. McGarvey
John F. Lacey
McGarvey, Heberling, Sullivan & Lacey, P.C.
345 First Avenue East
Kalispell, MT  59901
(406) 752-5566

Attorneys for Plaintiffs

120

CLERK OF DISTRICT COURT
FALLS COMMUNICATION

2014 OCT -3 PM 3: 41

FILED

BY_____
DEPUTY.

## MONTANA EIGHTH JUDICIAL DISTRICT, CASCADE COUNTY

| | |
|---|---|
| SHIRLEE A. BENNETT, JEREMY B. CARR, JULIE L. GIFFORD, GLORIA G. HARRIS, JOYCE I. LUNDVALL, EDWARD D. STEFANATZ,<br><br>          Plaintiffs,<br><br>     v.<br><br>STATE OF MONTANA, a governmental entity; BNSF RAILWAY COMPANY, a Delaware corporation; INTERNATIONAL PAPER COMPANY, a New York for profit corporation; ST. REGIS CORPORATION, a New York for profit corporation; J. NEILS LUMBER COMPANY, a Minnesota for profit corporation; MONTANA LIGHT & POWER COMPANY, a Montana for profit corporation; EVERETT NELSON; RALPH HEINERT; MARYLAND CASUALTY COMPANY, a Maryland Corporation; CNA INSURANCE COMPANIES, a corporation; CONTINENTAL CASUALTY COMPANY, a corporation; TRANSPORTATION INSURANCE COMPANY, a corporation; ROBINSON INSULATION COMPANY, a Montana Corporation for profit; JOHN SWING; and DOES A-Z,<br><br>          Defendants. | CAUSE NO. DDV-14-768<br><br>DIRK M. SANDEFUR<br><br><br><br>COMPLAINT AND DEMAND FOR JURY TRIAL |

## PARTIES

1.     Plaintiffs Julie L. Gifford, Gloria G. Harris, and Joyce I. Lundvall, are residents of Lincoln County, Libby, Montana.  Plaintiff Shirlee A. Bennett, is a resident

of Post Falls, Idaho.  Plaintiff Jeremy B. Carr, is a resident of Portland, Oregon.  Edward D. Stefanatz, is a resident of Kalispell, Montana.

2.     The State of Montana is a governmental entity.

3.     Defendant BNSF Railway Company (BNSF) is a corporation organized and existing under the laws of the State of Delaware and is engaged in interstate commerce with its headquarters in Fort Worth, Texas.

4.     Defendant John Swing was a managing agent for BNSF in Libby, Montana and is a resident of Lincoln County, Montana.

5.     Defendant International Paper Co. is a corporation organized and existing under the laws of New York with its principal place of business in the State of Connecticut.

6.     Defendant International Paper Co. is a successor corporation which is liable for the actions of Champion International Corp., St. Regis Corp. and J. Neils Corp. with respect to the claims and allegations of this Complaint.

7.     Defendant Champion International Corp. is or was a corporation organized and existing under the laws of New York with its principal place of business in the State of Connecticut.

8.     Defendant Champion International Corp. is a successor corporation which is liable for the actions of St. Regis Corp. with respect to the claims and allegations of this Complaint.

9.     Defendant St. Regis Corp. is or was a corporation organized and existing under the laws of New York with its principal place of business in the State of New York and is a successor corporation which is liable for the actions of J. Neils Corp. with respect to the claims and allegations of this Complaint.

10.     St. Regis Corporation is a New York corporation which was dissolved on or about September 18, 1984.  St. Regis Corp. is properly named as a defendant in this action pursuant to MCA § 35-1-935 and MCA § 35-1-937, because the dissolution of the corporation "does not take away or impair any remedy . . . against the corporation . . . for

any claim or right whether or not the claim or right existed or accrued prior to dissolution."

11.     Defendant Montana Light & Power, is a Montana Corporation currently inactive. At all times up to 1988, Montana Light & Power was doing business in Montana, including operating the powerhouse at the lumbermill in Libby.

12.     Montana Light & Power merged into Champion International Corporation (CIC) and CIC assumed all liabilities of Montana Light & Power as a successor corporation, including claims under this complaint.

13.     Defendants International Paper Co., Champion, St. Regis Corp., J. Neils Lumber Company, Everett Nelson, Ralph Heinert, and Does A-Q are referred to herein as "Wood Products Defendants."

14.     Defendants Everett Nelson and Ralph Heinert were managers of the corporate Wood Products Defendants.

15.     Defendants Does A-F are corporate entities operating facilities relating to the lumber mill in Libby, Montana.

16.     Defendants Does G-Q were managers of Wood Products Defendants International Paper Co., its predecessors in interest and/or its subsidiaries engaged in manufacturing operations of the forest products industry in Lincoln County, Montana, and whose true names are unknown at the present time.

17.     At all times relevant to this action, Wood Products Defendants, their predecessors in interests and/or their subsidiaries and associates, engaged in logging and manufacturing operations of the forest products industry in Lincoln County, Montana.

18.     Defendant Maryland Casualty Company is a Maryland corporation with its principal place of business in Maryland.

19.     Defendant CNA Insurance Companies (CNA) is a corporation doing business in the State of Montana. Continental Casualty Company and Transportation Insurance Company are companies owned or operated by CNA, and are included in references herein to "CNA".

20.    Robinson Insulation Company (Robinson Insulation) is or was a Montana business corporation for profit with its principal place of business in Great Falls, Cascade County, Montana where Robinson Insulation operated a vermiculite expansion plant. Robinson Insulation engaged in conduct that resulted in the accrual of this tort action in Montana.

21.    Does R - Z are corporations or persons, whose identities are unknown at this time, and whose negligence and wrongful acts caused asbestos related bodily injuries in the listed Plaintiffs.

22.    Plaintiffs will seek to amend their complaint when the true names and capacities of Does A - Z are ascertained.

23.    Venue in this action is proper in Cascade County, Montana, because at least one of the defendants, Robinson Insulation, engaged in tortious conduct within Cascade County and is a resident of Cascade County.

24.    This Complaint is filed to protect statutes of limitations.

## GENERAL ALLEGATIONS

25.    In 1963 W.R. Grace & Co. (Grace) purchased an existing vermiculite mine and mill in Libby, Montana (the Mine) from the Zonolite Company (Zonolite). Grace operated the Mine from 1963 until 1990. The vermiculite was intermixed with a highly toxic form of asbestos. The extraction of vermiculite from the ground and processing of it generated substantial airborne dust containing asbestos. The dust was produced at the mine site, as well as in the town of Libby where expansion, bagging, storage and transport facilities were located.

26.    The Plaintiffs were Grace and Zonolite mine, mill or processing workers, independent contractors, loggers, homeowners, gardeners, recreators, ball field players, lumber mill workers, railroad workers, housewives/children of Grace workers, or community members of Libby, Montana, or were otherwise distinctly exposed to asbestos in unique exposure events and in a wide variety of temporally separated, geographically distinct, and highly differentiated routes and circumstances. While many

Plaintiffs had repeated or continuous exposures, each of the Plaintiffs' individual exposure is unique in time, location, form, and degree of asbestos contact, and as a result of which Plaintiffs have been diagnosed with asbestos disease. Dates of residence in the Libby area and exposure, including events of injurious exposure between July 1, 1973, and July 1, 1975, are:

| | |
|---|---|
| Shirlee A. Bennett | 1954 - 1965 |
| Jeremy B. Carr | 1977 - 1995 and 2005 - 2007 |
| Julie L. Gifford | 1985 to date |
| Gloria G. Harris | 1957 to date |
| Joyce I. Lundvall | 1966 to date |
| Edward D. Stefanatz | Early 1960s to early 1980s |

27.    At all times Plaintiffs were ignorant of the nature and extent of the life threatening risks and injury involved, and would not have continued to be exposed to such an environment if they had known the true facts.

28.    The workers were not provided with coveralls or showers. As a result workers went home and into the community with asbestos dust on their clothing and in their cars, thereby extending the asbestos exposure. Similarly, invisible asbestos fibers from the mining operations infiltrated a broad variety of Libby area work sites, forests, recreation areas, homes, gardens, and numerous other distinct locations, resulting in hundreds of distinct routes and circumstances of exposure.

29.    As a result of failing to control dust from the mining, milling, processing, bagging, transport and a variety of uses of the vermiculite, workers, family members, members of the community, and others were exposed to the highly toxic asbestos.

30.    Without knowledge of the nature and extent of the asbestos hazard, Plaintiffs were denied, in the unique circumstances of their exposures, the options of avoiding exposure, demanding protective devices, demanding safer operations, changing jobs, or protecting themselves and their families.

### FIRST CLAIM
### Negligence v. State of Montana (All Plaintiffs except Bennett and Carr)

31.     All paragraphs above are incorporated by this reference.

32.     The Montana State Board of Health ("BOH" or "Board") was created in 1907 under § 1474, RCM (1907). The BOH was responsible for the "general supervision of the interests and health and life of the citizens of the state." § 2448, RCM (1921); § 69-105, RCM (1947).

33.     The Montana legislature mandated that as a part of the BOH's "functions, powers and duties" that the Board "shall make sanitary investigations and inquiries regarding the causes of disease; . . . causes of mortality, and the effects of localities, employments, conditions . . . and circumstances affecting the health of the people." The BOH was further charged to "gather such information in respect to all these matters as it may deem proper for diffusion among and use by the people. . . ." § 2448, RCM (1921); § 69-105, RCM (1947) (as revised in 1961, Replacement, Vol. 4).

34.     The Montana Industrial Hygiene Act of 1939 Sections 2(1), (3) and (5), Ch. 127, L. 1939 (renumbered and codified at § 69-201-208, RCM (1947)) created within the BOH, an Industrial Hygiene Division (the Division) granting to the Division the powers to:

> (1) make studies of industrial hygiene and occupational disease problems in Montana industries; . . .
>
> (3) make investigations of the sanitary conditions under which men and women work in the various industries of the State; . . .
>
> (5) report to the industries concerned the findings of such investigations and to work with such industries to remedy unsanitary conditions.

35.     In 1955, the Industrial Hygiene Division was effectively eliminated by the legislative decree of § 69-201, RCM (1947)(1961, Replacement, Vol. 4) providing that the BOH "shall possess, exercise and administer all of the powers, functions and authority, and shall carry out, discharge and execute all of the duties, in the field of industrial hygiene" set forth in § 69-201-208, RCM (1947). Thus, the BOH became exclusively responsible for the State's programs for general public health and safety as well as occupational/industrial health and safety.

36.    § 69-105, RCM (1947) (1961, Replacement, Vol. 4) (effective 1955 to 1967) provided that the State Board of Health shall ". . . have general supervision of the interests of health and life of the citizens of the state," . . . "gather such information . . . as it may deem proper for diffusion," . . . and " . . . make sanitary investigations and inquiries regarding . . . employments . . . ."

37.    In 1967, the Montana legislature revised the public health and industrial hygiene statues, creating the Department of Health (DOH). § 1, Ch. 197, L. 1967. The creation of the DOH resulted in the functions and duties of the BOH being divided between the BOH and the new DOH.

38.    The DOH assumed the responsibility to "make investigations, disseminate information, and make recommendations for control of diseases and improvement of public health to persons, groups, or the public." § 69-4110(3), RCM (1947) (1969, 2d Replacement, Vol.4).

39.    The DOH also became responsible for administering the industrial hygiene program (§ 69-4105(1), RCM (1947) (1969, 2d Replacement, Vol. 4)), requiring it to "investigate the conditions of work at any place of employment at any time," and to "report the findings of investigations to the industry concerned and co-operate with the industry in preventing or correcting  conditions which are hazardous to health." § 69-4203(3) and (4), RCM (1947) (1969, 2d Replacement, Vol.4) .

40.    The Montana Industrial Hygiene Act (1967),  § 20 *et seq.* Ch. 197, L. 1967, provided:

> The state board of health shall adopt rules and approve orders to correct or prevent conditions which are hazardous to health at any place of employment.

§ 69-4202, RCM (1947) ( 1969, Replacement, Vol. 4).

> The State Department of Health shall:
>
> (1) make studies, make recommendations, and issue orders approved by the State Board on industrial hygiene and on occupational diseases; ...
>
> (4) report the findings of investigations to the industry concerned and cooperate with the industry in preventing or correcting conditions which are

hazardous to health;

(5) enforce provisions of this chapter, and rules adopted by the State Board.
§ 69-4203, RCM (1947) ( 1961, Replacement, Vol. 4).

41.    § 69-4106, RCM (1947) (effective 1967 to 1971) provided that "The state
Board shall . . . (d) . . . enforce rules and standards . . . for the preservation of public
health and prevention of disease."

42.    § 69-4203, RCM (1947) ( 1961, Replacement, Vol. 4) (effective 1967 to
1971) provided that the Board of Health: "shall . . . (3) . . . investigate the conditions of
work . . . (4) . . . cooperate with the industry in preventing or correcting conditions which
are hazardous to health."

43.    The Montana Clean Air Act, § 69-3905, RCM (1967), provided as follows:

It is hereby declared to be the public policy of this state and the purpose of
this act to achieve and maintain such levels of air quality as will protect
human health and safety.

§ 69-3909, RCM (1967) provided:

In addition to any other powers conferred on it by law the [State Board of
Health] shall:  . . .

(3) Issue such orders as may be necessary to effectuate the purposes of this
act and enforce them by all appropriate administrative and judicial
proceedings.

(4) Require access to records relating to emissions.

§ 69-3914, RCM (1967) further provided:

(1) Whenever the board has reason to believe that a violation of any
provision of this act or rule made pursuant thereto has occurred, it may
cause written notice to be served upon the alleged violator or violators.  The
notice . . . may include an order to take necessary corrective action within a
reasonable period of time stated in the order.

44.    In 1971, the industrial hygiene statues were further revised by the
Occupational Health Act, (OHA) of Montana. § 1, Ch. 316, L. 1971; § 69-4206, RCM
(1947) (Supp. 1977).  The policy and purpose of the OHA was:

(1) ... to achieve and maintain such conditions as will protect human health
and safety, and to the greatest degree practicable, foster the comfort and

convenience of the workers at any workplace of this state and enhance their productivity and well-being.

(2) To these ends it is the purpose of this act to provide for a co-ordinated statewide program of abatement and control of occupational diseases ....

45.     The OHA act mandated that the BOH (re-named the "Board of Health and Environmental Sciences" by the OHA) adopt rules implementing the Act, establish threshold limit values of airborne contaminants, and issue orders necessary to carry out the Act. The OHA granted the Department powers that included a requirement that the DOH enforce orders issued by the Board, prepare and develop a comprehensive plan for the prevention, abatement and control of occupational diseases, determine "the degree of health hazard at any workplace" and "collect and disseminate information and conduct educational and training programs relating to the prevention and control of occupational diseases." § 69-4211.1(1), (3), (6) and (7), RCM (1947) (Supp.1977).

46.     Under the OHA, the Department also had the power to take enforcement actions and impose monetary penalties on violators of the OHA. §§ 69-4215 and 69-4221, RCM (1947) (Supp. 1977). Additionally, the OHA set forth a specific "emergency procedure" to be implemented by the Department upon discovering "a generalized hazard at a workplace" that "creates an emergency requiring immediate action to protect human health." § 69-4216(1), RCM (1947) (Supp. 1977). In such circumstances, the Department was required to order the persons causing or contributing to the hazard to "reduce or discontinue immediately the emissions creating the hazard." § 69-4216(1), RCM (1947) (Supp. 1977). In the absence of a general condition creating an emergency, the Department was granted the power to order the persons responsible for the "emissions from an operation ... causing imminent danger to human health" to reduce or discontinue such emissions immediately. § 69-4216(2), RCM (1947) (Supp. 1977).

47.     In 1978, the OHA was renumbered and became § 50-70-101, *et seq.* MCA. The public polices of the former state department of public health were extended through the department of public health and human services' charge to "(1) . . . protect and promote the public health, . . . [in that it]" shall: "(a) make inspections for conditions of

public health importance and issue written orders for correction, destruction, or removal of the condition; (b) disseminate information and make recommendations for control of diseases and other conditions of public health importance; . . . ." § 50-70-102, MCA.

48.     The 1972 Montana Constitution provides in Article II § 3 that all persons have the inalienable right "to a clean and healthful environment" and provides in Article IX § 1(1) that "the State and each person shall maintain and improve a clean and healthful environment in Montana . . . ."

49.     In 1956 the State Board of Health, Division of Disease Control, undertook an industrial hygiene study of the Zonolite mine and mill operation at Libby, Montana "to determine if any of the components of this company were detrimental to the health of the employees." The 1956 report, p. 3, found high dust levels, that the dust contained asbestos, and that "the asbestos dust and the dust in the air is of considerable toxicity." It cited medical literature. The 1956 report found dust levels greatly exceeding the asbestos limit, and recommended dust control measures. The 1956 report, p. 6, states:

> Full recognition should be given to the fact that direct control measures alone are usually not enough to insure safe working conditions. The method of operations, proper maintenance of equipment and of housekeeping are equally essential to maintain healthful conditions.
>
> That until such time as the repair and maintenance of both the exhaust and ore conveying systems have been complete, all the men in the dry mill be provided with and required to wear an adequate respirator.

No further action was taken in 1956 and 1957.

50.     In 1958, the State Board of Health, Division of Disease Control, undertook another industrial hygiene study of the Zonolite mine and mill operation "to determine if any of the components of this company found to be detrimental to the health of the employees during the last study in August, 1956 had been reduced or alleviated since that time." The report again found dust levels greatly exceeding the asbestos limit, and recommended dust control measures. The report, at p. 8, cites medical literature showing that asbestosis is "a progressive disease with a bad prognosis," often fatal. The report, at p. 8, finds that asbestos dust "concentrations had, as yet, not been reduced to a

satisfactory level over all . . . The dry mill still required a considerable amount of work to reduce the dust in this area to an acceptable level." No further action was taken by the State Board of Health, Division of Disease Control in 1958, 1959, 1960, or 1961.

51.    In 1959, the State of Montana, State Tuberculosis Sanitarium treated Glenn Taylor, a Libby Zonolite mine worker, for shortness of breath and asbestosis.

52.    In 1961, the State of Montana, through formal death certificate reporting procedures, had notice that Glenn Taylor died of asbestosis, and that Charles Wagner, a mechanic at Zonolite in Libby, died of pulmonary fibrosis.

53.  .  In 1962, the State Board of Health, Division of Disease Control, undertook an industrial hygiene study of the Zonolite mine and mill operation "to determine if any of the components of the operations continued to be a threat to the health of the employees." The report again found dust levels far in excess of the asbestos limit, and recommended dust control measures. The report, at p. 4, concludes "as indicated in the findings of this study, it appeared that no progress had been made in reducing dust concentrations in the dry mill to an acceptable level and that, indeed, the dust concentrations had been increased, substantially, over those in the past." No further action was taken in 1962.

54.    In 1963, the State Board of Health, Division of Disease Control, undertook an industrial hygiene study of the Grace/Zonolite mine and mill. The report again found dust levels greatly exceeding the asbestos limit, and recommended dust control measures. The report, at p. 3, found a "hazardous condition existing at this plant." No further action was taken in 1963.

55.    In April of 1964, the State Board of Health, Division of Disease Control, undertook an industrial hygiene study of the Grace/Zonolite mine and mill "to determine if compliance with previous recommendations for the control of dust had been achieved." The report again found dust levels greatly exceeding the asbestos limit, and recommended dust control measures. The report cited an article by Dr. Irving Selikoff (1964), finding dangerous levels of asbestos disease in asbestos insulation workers with

"light intermittent exposure to asbestos." The State knew that the Libby workers had heavy and frequent exposure to asbestos. The 1964 report states at p. 3, "the asbestos content of the material with which you are working appears to provide some serious potential for the development of disease if not properly controlled. In addition, the discharge of large volumes of asbestos-laden dust at ground levels sets up a condition where all members of the plant can be exposed in addition to those who work in the dry mill."

56.    In September, 1964, the State Board of Health, Division of Disease Control, undertook an industrial hygiene study of the Grace/Zonolite mine and mill "to determine if the concentrations were excessive as has been found in many previous studies." The report again found dust levels greatly exceeding the asbestos limit, and recommended dust control measures. The report states at p. 3 "the dust discharged at ground level from the main dust collection fan was continuously contaminating the whole plant work area and needs to be either raised substantially so the dust-laden air discharges substantially above the plant area or that cleaning be provided. There was much reentry of this dust into the working environment." The report concludes at p. 3 with the "hope that continued work to reduce dust concentrations will be done and that a continuous operation at acceptable levels will be achieved soon."

57.    In 1964, the State of Montana, through formal death certificate procedures, had notice that Albert Barney, a millworker at Zonolite in Libby died of cor-pulmonale.

58.    In 1966, the State of Montana, through formal death certificate reporting procedures, had notice that Walter McQueen, a miner from Libby, died of asbestosis.

59.    In 1967, the State Board of Health, Division of Disease Control, undertook an industrial hygiene study of the Grace/Zonolite mine and mill "to determine compliance with previous recommendations." The report, at p. 2, concluded "as in the past, the need for particularly close attention to the functioning of the dust control system, condition of duct work, . . . was apparent. It was also apparent that a strict housekeeping program must be maintained." No further action was taken by the State Board of Health,

Division of Disease Control in 1967, 1968, 1969, 1970 and 1971.

60.    In November 1967, evidence was presented to the Chairman of the State Industrial Accident Board that another worker at the Grace/Zonolite mine and mill had been diagnosed with asbestosis from work in the warehouse.

61.    In 1974 the Montana State Department of Health performed an investigation of the airborne asbestos exposure at the Grace mine and mill.  No action was taken.

62.    From 1967 to about 1974, Grace regularly reported on the status of dust control at its operations in Libby to the State of Montana.

63.    All the above described reports of the State of Montana, Division of Disease Control, were delivered to Grace, or its predecessor, Zonolite.  None of the reports were made public, nor were the Grace workers or their families warned of what the State had found.

64.    In 1971-1976, a number of federal agency inspections of the Grace mine and mill showed violations of asbestos dust control requirements.  The State of Montana was either a participant in said inspections or was copied in on the reports of said inspections.  Federal inspections in 1971, 1972, 1973, 1974 and 1975 found dangerous levels of asbestos dust at the Grace mine and mill.  Again the State of Montana did nothing to warn the workers, their families, or the community of the dangers of asbestos disease.

65.    From 1976 to a date after 1990, the State of Montana continued to inspect the Grace mine and mill for occupational health hazards.

66.    By 1971, 14 workers at the Grace mine and mill had died of asbestos disease.

67.    The State of Montana acquired insurance or undertook a comprehensive plan of insurance thereby waiving sovereign immunity.

68.    The cause of action in this case arose after July 1, 1973, and there is no sovereign immunity.  (Art. II §18, 1972 Montana Constitution.)

69.     At all times pertinent herein, the State of Montana had a continuing duty to gather information, to protect and to warn Plaintiffs.

70.     The State Board of Health, Division of Disease Control, undertook specific action to cause corrective measures to be taken to protect Plaintiffs and others similarly situated.

71.     The State of Montana negligently failed to take sufficient action to protect Plaintiffs from known hazards of asbestos exposure.

72.     The State of Montana negligently failed to gather sufficient information as to the extent of disease in workers at the Grace/Zonolite mine and mill operation.

73.     The State of Montana negligently failed to inform and warn Plaintiffs of the hazards of asbestos exposure.

74.     As a direct, proximate and legal result of the State of Montana's negligence and unlawful conduct, and that of its agencies and agents as described above: Plaintiffs suffered from asbestos disease and asbestos related bodily injuries and have incurred the damages alleged herein.  The event and occurrence of the different Plaintiffs' exposures to asbestos happened in a wide variety of temporally separated, geographically distinct, and highly differentiated routes and circumstances.  While many Plaintiffs had repeated or continuous exposures, each of the Plaintiffs' individual exposure history is unique in time, location, form, and degree of asbestos contact.  The occasion when asbestos fibers caused injury to each Plaintiff occurred in unique circumstances of an event of injurious exposure to asbestos fibers, and the causal event of each person's bodily injury is unique.

### SECOND CLAIM
### Violation of the Montana Constitution
### (All Plaintiffs except Bennett and Carr)

75.     All paragraphs above are incorporated by this reference.

76.     Plaintiffs have the following inalienable rights, pursuant to the Montana Constitution, Article II, § 3:

> All persons are born free and have certain inalienable rights.  They include the right to a clean and healthful environment and the rights of pursuing life's basic necessities, enjoying and defending their lives and liberties, acquiring, possessing

and protecting property, and seeking their safety, health and happiness in all lawful ways.

77.     Plaintiffs have the further constitutional rights pursuant to the Montana Constitution, Article IX, § 1:

> The state and each person shall maintain and improve a clean and healthful environment in Montana for present and future generations.

78.     The past, present and continuing asbestos exposures caused and allowed by the State on multiple occasions violate the inalienable right of Plaintiffs to a clean and healthful environment and breach the Defendants' duty to maintain and improve a clean and healthful environment for Plaintiffs.

79.     As a direct, proximate and legal result of the Defendants' violation of the enumerated rights of Plaintiffs under the Montana Constitution: Plaintiffs have been exposed to asbestos, suffered from asbestos disease and asbestos related bodily injuries, and incurred the damages alleged herein. The event and occurrence of the different Plaintiffs' exposures to asbestos happened in a wide variety of temporally separated, geographically distinct, and highly differentiated routes and circumstances. While many Plaintiffs had repeated or continuous exposures, each of the Plaintiffs' individual exposure history is unique in time, location, form, and degree of asbestos contact. The occasion when asbestos fibers caused injury to each Plaintiff occurred in unique circumstances of an event of injurious exposure to asbestos fibers, and the causal event of each person's bodily injury is unique.

### THIRD CLAIM
### Breach of Statutory Duties v.
### State of Montana (All Plaintiffs except Bennett and Carr)

80.     All paragraphs above are incorporated by this reference.

81.     At times relevant herein, the State owed statutory duties to Plaintiffs, as set forth herein, regarding the hazardous conditions at Grace's and Zonolite's Lincoln County facilities.

82.     Among other things, the State was statutorily required to investigate and to determine hazards in Montana workplaces, to remedy unsanitary or hazardous conditions

in the workplaces, to disseminate information regarding hazardous conditions in the workplaces, and to enforce the laws, regulations and orders intended to protect Montana workers, their families, and the public from hazardous work conditions.

83.     The State breached its statutory duties by, among other things, failing to disseminate asbestos health hazard information to the Plaintiffs; failing to warn Plaintiffs of the hazards associated with exposure to Grace's and Zonolite's mining operations and asbestos contaminated vermiculite; failing to inform Plaintiffs of the extreme asbestosis and cancer risk associated with exposure to Grace's asbestos; and failing to enforce its rules and orders against Grace.

84.     The State failed to take any reasonable action to protect the Plaintiffs from the grave danger the State discovered and observed over a period of many years at Grace's facilities.

85.     As a direct, proximate and legal result of the State's breach of its statutory duties and its unlawful conduct as alleged in this Third Claim, Plaintiffs have been exposed to asbestos, suffered from asbestos related bodily injuries and incurred the damages alleged herein. The event and occurrence of the different Plaintiffs' exposures to asbestos happened in a wide variety of temporally separated, geographically distinct, and highly differentiated routes and circumstances. While many Plaintiffs had repeated or continuous exposures, each of the Plaintiffs' individual exposure history is unique in time, location, form, and degree of asbestos contact. The occasion when asbestos fibers caused injury to each Plaintiff occurred in unique circumstances of an event of injurious exposure to asbestos fibers, and the causal event of each person's bodily injury is unique.

### FOURTH CLAIM
### Civil Aiding and Abetting v.
### State of Montana (All Plaintiffs except Bennett and Carr)

86.     All paragraphs above are incorporated by this reference.

87.     The State knew for many years that Grace and Zonolite were not disclosing to the public the unreasonable nature of their business activities and the grave human health hazards associated with the asbestos contaminated vermiculite they were

producing.

88.    The State generated multiple secret and confidential documents concerning the contamination. The State communicated the contents of those documents only to Grace and Zonolite in a concerted effort that insured that the public could not discover the enormous health hazard in Libby.

89.    The State provided substantial assistance and encouragement to Zonolite's and Grace's misconduct by allowing them to continue operating their hazardous facilities for decades and by allowing and assisting with the concealment of the dangerous nature of the operation.

90.    The State aided and abetted Zonolite's and Grace's misconduct and is therefore liable for the misconduct and responsible for Plaintiffs' resulting injuries and damages which include all of the injuries and damages referred to herein.

91.    As a direct result of the State's aiding and abetting the unlawful conduct of Grace and Zonolite, Plaintiffs were exposed to asbestos contaminated vermiculite dust. Had the State acted properly and timely conveyed truthful information to the Plaintiffs and the public, Plaintiffs could have avoided the direct and substantial asbestos exposure which caused their asbestos related lung disease.

92.    The unlawful conduct of the State of Montana, as alleged in this cause of action, was a direct, proximate and legal cause of Plaintiffs having been exposed to asbestos, suffered from asbestos disease and asbestos related bodily injuries, and incurring the damages alleged herein.  The event and occurrence of the different Plaintiffs' exposures to asbestos happened in a wide variety of temporally separated, geographically distinct, and highly differentiated routes and circumstances.  While many Plaintiffs had repeated or continuous exposures, each of the Plaintiffs' individual exposure history is unique in time, location, form, and degree of asbestos contact.  The occasion when asbestos fibers caused injury to each Plaintiff occurred in unique circumstances of an event of injurious exposure to asbestos fibers, and the causal event of each person's bodily injury is unique.

FIFTH CLAIM
Breach of Nondelegable Duty
by Permitting Tortious Conduct v.
State of Montana (All Plaintiffs except Bennett and Carr)

93.     All paragraphs above are incorporated by this reference.

94.     By virtue of the statutes and actions of the State referenced above, the State had a non-delegable duty to investigate and determine hazards at Grace's and Zonolite's workplaces, to remedy unsanitary or hazardous conditions at Graces' and Zonolite's workplaces, to disseminate information regarding hazardous conditions at Grace's and Zonolite's workplaces, and to enforce the laws, regulations and orders intended to protect the Grace and Zonolite workers, their families, and the public from hazardous work conditions. Given the conditions that were hazardous to human health that the State observed at the Grace and Zonolite workplaces for many years, it was likely that Zonolite and Grace would harm the Plaintiffs and others if not properly controlled.

95.     The State failed to exercise reasonable care relating to its control of Zonolite and Grace by allowing them to continue operating the hazardous facilities for decades and by allowing and assisting with the concealment of the dangerous nature of the operation.

96.     The State had a nondelegable duty to protect the Plaintiffs, other mine and mill workers, and their family members from abnormally dangerous workplace hazards and emissions at the Zonolite and Grace mine in Lincoln County. The State breached its duty and allowed Zonolite and Grace to avoid health and safety responsibilities the State had detected and observed for decades. The State acquiesced in the companies' consistently exposing their workers and others to deadly asbestos.

97.     As a direct and proximate result of the State's breach of its non-delegable duty to investigate and determine hazards in Grace's and Zonolite's workplaces, to remedy unsanitary or hazardous conditions in the Grace and Zonolite workplaces, to disseminate information regarding hazardous conditions in the Grace and Zonolite workplaces, and to enforce the laws, regulations and orders intended to protect the Grace

and Zonolite workers, their families, and the public from hazardous work conditions, the State effectively left these non-delegable health and safety duties entirely in the hands and under the authority of Zonolite and Grace, rendering the State liable for the resulting unlawful conduct that caused the asbestos human health hazard and Plaintiffs' asbestos related diseases.

98.    The State is therefore responsible for Plaintiffs' resulting injuries and damages which include all of the injuries and damages described herein.

99.    The State's unlawful conduct, as alleged in this cause of action, was a direct, proximate and legal cause of Plaintiffs having been exposed to asbestos, suffering from asbestos disease, asbestos related bodily injuries, and suffering the damages alleged herein. The event and occurrence of the different Plaintiffs' exposures to asbestos happened in a wide variety of temporally separated, geographically distinct, and highly differentiated routes and circumstances. While many Plaintiffs had repeated or continuous exposures, each of the Plaintiffs' individual exposure history is unique in time, location, form, and degree of asbestos contact. The occasion when asbestos fibers caused injury to each Plaintiff occurred in unique circumstances of an event of injurious exposure to asbestos fibers, and the causal event of each person's bodily injury is unique.

**SIXTH CLAIM**
**Acting in Concert with Grace and Zonolite v.**
**State of Montana (All Plaintiffs except Bennett and Carr)**

100.    All paragraphs above are incorporated by this reference.

101.    The State acted in concert with the unlawful conduct of Grace and Zonolite concerning the asbestos human health hazard in Libby and Lincoln County, thereby causing the public, workers, their families, and Plaintiffs to be exposed to dangerous asbestos.

102.    By virtue of said concerted action with Zonolite and Grace, the State is liable for the conduct of said companies in bringing about Plaintiffs' asbestos disease and damages.

103.    As a direct, proximate and legal result of said concerted action, Plaintiffs

have been exposed to asbestos, suffered from asbestos disease and asbestos related bodily injuries and incurred the damages alleged herein. The event and occurrence of the different Plaintiffs' exposures to asbestos happened in a wide variety of temporally separated, geographically distinct, and highly differentiated routes and circumstances. While many Plaintiffs had repeated or continuous exposures, each of the Plaintiffs' individual exposure history is unique in time, location, form, and degree of asbestos contact. The occasion when asbestos fibers caused injury to each Plaintiff occurred in unique circumstances of an event of injurious exposure to asbestos fibers, and the causal event of each person's bodily injury is unique.

**SEVENTH CLAIM**
**Negligence v. BNSF (All Plaintiffs)**

104.    Paragraphs 1-30 above are incorporated by this reference.

105.    During the dates above stated, Plaintiffs resided or remained in proximity to the real property of BNSF and were thereby exposed to asbestos dust from BNSF's property and operations. John Swing was a managing agent for BNSF in Libby, Montana, and as such is separately responsible for acts wrongful in this nature. Allegations herein as to BNSF's conduct and knowledge by this reference specifically include defendant John Swing.

106.    Throughout the years of exposure above stated, the Plaintiffs lived in an environment that caused them to be exposed to and to inhale asbestos dust.

107.    At all times Plaintiffs were ignorant of the nature and extent of the life threatening risks and injury involved, and would not have continued to remain in such an environment if they had known the true facts.

108.    Without knowledge of the nature and extent of the asbestos hazard, Plaintiffs were denied the options of avoiding exposure, demanding dust control or changing residence.

109.    At all times BNSF knew or should have known of the asbestos in the vermiculite, and knew or should have known of the hazards to human health of asbestos exposure and had a continuing duty to gather information, to prevent toxic dust from

collecting upon and escaping from its property, and to warn Plaintiffs and others who would be harmed by said dust.

110.   BNSF was negligent, as follows:

(a)   in failing to inquire, study and evaluate the dust hazard to human health;

(b)    in failing to take measures to prevent toxic dust from collecting upon and escaping from its property;

(c)   in failing to warn Plaintiffs of the true nature of the hazardous effects of the dust; and

(d)   by acting in concert with Zonolite/Grace.

111.   As a direct and proximate result of the conduct of BNSF as described above, Plaintiffs suffered from asbestos related bodily injuries and have incurred the damages alleged herein.

## EIGHTH CLAIM
### Common Law Strict Liability v. BNSF (All Plaintiffs)

112.   Paragraphs 104-111 above are incorporated by this reference.

113.   Defendant BNSF failed to control asbestos contaminated vermiculite used in the operation of their business thereby causing Plaintiffs to be exposed to asbestos, an extra hazardous and abnormally dangerous substance.

114.   Defendant BNSF engaged in abnormally dangerous activities thereby causing the release of asbestos contamination and exposure of Plaintiffs to deadly asbestos.  BNSF's business activities in handling, storing, transporting, loading, and using asbestos and asbestos contaminated products were abnormally dangerous in that:

(a)   said business activities created a high degree of prior, present, and continuing contamination in the form of exceedingly toxic asbestos, which created a high degree of risk of harm to Plaintiffs and others;

(b)   there was and is a strong likelihood that the harm resulting from said business activities and exposure to asbestos is great;

(c)   the risk of harm caused by BNSF's storing, handling, transporting, loading, and using asbestos contaminated vermiculite cannot be reasonably eliminated for those humans living and working in proximity to BNSF's abnormally dangerous business activity;

(d)    said business activities are not a matter of common usage;

(e)    BNSF's abnormally dangerous business activities were carried on within the town of Libby and adjacent areas, which were places that were inappropriate for the release of asbestos contamination; and

(f)    the dangerous attributes of the BNSF's business activities completely outweigh the value of those activities to the community.

115.    The dangers of the BNSF's business activities for the locality where Plaintiffs resided, worked, or remained were so great that despite any usefulness of their activities and of the asbestos contaminated vermiculite under its control, BNSF should be required as a matter of law to pay for any harm caused.

116.    BNSF is strictly liable to the Plaintiffs for damages caused by Plaintiffs' exposure to deadly asbestos caused by BNSF's abnormally dangerous business activities.

117.    As a direct and proximate result of the BNSF's abnormally dangerous business activities, Plaintiffs were exposed to unreasonably dangerous and hazardous materials, contracted asbestos related disease, suffered asbestos related bodily injuries and sustained damages as alleged herein.

## NINTH CLAIM
### Strict Products Liability v.
### Wood Products Defendants (All Plaintiffs except Bennett and Carr)

118.    All paragraphs above are incorporated by this reference.

119.    At all times relevant to this action, Plaintiffs lived in or around the town of Libby. They shopped, visited and enjoyed recreation in the town of Libby and its vicinity as indicated above.

120.    At times relevant to this action, the Wood Products Defendants were engaged in the business of manufacturing, fabricating, modifying, expanding, labeling, distributing, supplying, selling, marketing, packaging, and/or advertising products containing vermiculite. Said vermiculite was laced with deadly asbestos.

121.    The Wood Products Defendants knew and intended that the above referenced vermiculite and asbestos contaminated products would be used without inspection for defects therein or in any of their component parts and without knowledge

of the hazards involved in such use.

122.    The Wood Products Defendants distributed and/or sold said asbestos-laced vermiculite products to the public, to the Plaintiffs, and to one or more of Plaintiffs' employers.

123.    Said asbestos-laced vermiculite products were defective and unreasonably dangerous for their intended purpose in that the inhalation of asbestos fibers causes serious disease and/or death to humans. The defect existed in the said products at the time they left the possession of the Wood Products Defendants. Said products did, in fact, cause injury and damage to Plaintiffs, while being used in a reasonably foreseeable manner, thereby rendering the same defective, unsafe, and unreasonably dangerous for use.

124.    Plaintiffs did not know of the substantial danger of using said asbestos-laced vermiculite products, nor was said danger readily recognizable by them. The Wood Products Defendants further failed to adequately warn of the risk of contamination to which Plaintiffs were exposed.

125.    As a direct and proximate result of the unlawful actions of the wood products defendants, and as a direct and proximate result of exposure to the wood products defendants' unreasonably dangerous asbestos vermiculite products, Plaintiffs suffer from asbestos related bodily injuries and have incurred damages as alleged herein.

### TENTH CLAIM
### Common Law Strict Liability v.
### Wood Products Defendants (All Plaintiffs except Bennett and Carr)

126.    All paragraphs above are incorporated by this reference.

127.    The Wood Products Defendants failed to control asbestos contaminated vermiculite used in the operation of their business thereby causing Plaintiffs to be exposed to asbestos, an extra hazardous and abnormally dangerous substance.

128.    The Wood Products Defendants engaged in abnormally dangerous activities thereby causing the release of asbestos contamination and exposure of Plaintiffs to deadly asbestos. The Wood Products Defendants' business activities in handling, storing,

transporting, loading, and using asbestos were abnormally dangerous in that:

    (a)    said business activities created a high degree of prior, present, and continuing contamination in the form of exceedingly toxic asbestos, which created a high degree of risk of harm to Plaintiffs and others;

    (b)    there was and is a strong likelihood that the harm resulting from said business activities and exposure to asbestos is great;

    (c)    the risk of harm caused by the Wood Products Defendants storing, handling, transporting, loading, and using asbestos contaminated vermiculite cannot be reasonably eliminated for those humans living and working in proximity to the Wood Products Defendants abnormally dangerous business activity;

    (d)    said business activities are not a matter of common usage;

    (e)    the Wood Products Defendants' abnormally dangerous business activities were carried on within the town of Libby and adjacent areas, which were places that were inappropriate for the release of asbestos contamination; and

    (f)    The dangerous attributes of the Wood Products Defendants' business activities completely outweigh the value of those activities to the community.

129.    The dangers of the Wood Products Defendants' business activities for the locality where Plaintiffs resided, worked, or remained were so great that despite any usefulness of their activities and of the asbestos contaminated vermiculite under its control, the Wood Products Defendants should be required as a matter of law to pay for any harm caused.

130.    The Wood Products Defendants are strictly liable to the Plaintiffs for damages caused by Plaintiffs' exposure to deadly asbestos caused by the Wood Products Defendants' abnormally dangerous business activities.

131.    As a direct and proximate result of the Wood Products Defendants' abnormally dangerous business activities, Plaintiffs were exposed to unreasonably dangerous and hazardous materials, Plaintiffs suffered asbestos related bodily injuries and have incurred damages as alleged herein.

/

/

## ELEVENTH CLAIM
### Negligence in provision of industrial hygiene services v.
### Maryland Casualty (All Plaintiffs except Carr and Gifford)

132.   Paragraphs 1-30 above are incorporated by this reference.

133.   Maryland Casualty provided professional industrial hygiene services to address the safety of the mine and mill work site through what were represented to be competent Safety Engineers and professionals from the Engineering Division and the Medical Division of Maryland Casualty, under the supervision of industrial hygienist L.E. Park.

134.   Maryland Casualty knew that the 1959 series of chest x-rays on the Libby workers showed a one-third incidence of abnormal chest x-rays.

135.   Maryland Casualty knew that the 1964-1973 annual series of chest x-rays on the Libby workers showed a 25% plus incidence of abnormal chest x-rays.

136.   Maryland Casualty knew that a 1965 study showed 20% incidence of asbestosis in the Libby workers, with a likely incidence of twice that upon thorough testing.

137.   Maryland Casualty knew or should have known that from 1961 forward, men were dying of asbestos disease, and that each year more became diseased.

138.   Maryland Casualty knew or should have known that there were no showers for workers, no coveralls for workers, and that workers went home and into the community covered with asbestos dust, which was hazardous to all those who might come into contact with it.

139.   As part of its industrial hygiene services, Maryland Casualty's Engineering Division and Medical Division undertook to "engineer this risk," and undertook to design a "program for control and prevention" of asbestos dust and disease for the benefit of workers, their families and the community that would address dust control and personal protection from asbestos dust.

140.   In its provision of industrial hygiene services and its undertaking of industrial hygiene measures, Maryland Casualty had a duty of reasonable care to those

(including workers, their families and the community) relying on the fulfillment of safe standards of industrial hygiene, and to those who were in need of disclosure of the nature and degree of the asbestos hazard known to Maryland Casualty.

141.    Maryland Casualty was negligent in their design of the industrial hygiene program, and in failing to disclose and disseminate, to the workers and individuals at risk, the nature and degree of the asbestos hazard Maryland casualty had acquired and analyzed by its industrial hygiene professionals. Maryland Casualty was negligent:

(a)    in failing to include sufficient measures for education of workers, in the hazards of asbestos exposure;

(b)    in failing to include measures to warn workers, their families, and the community of the hazards of asbestos exposure;

(c)    in failing to include sufficient measures and standards for dust control through housekeeping, ventilation and exhaust air cleaning;

(d)    in failing to include sufficient measures and standards for maintenance of equipment and premises;

(e)    in failing to include a sufficient medical monitoring program;

(f)    in failing to disclose the nature and degree of the immediate and extreme asbestos hazard known to the professionals at Maryland Casualty;

(g)    in failing to sufficiently test and monitor the effectiveness of dust control at all locations where there was dust;

(h)    in failing to obtain available medical information on the incidence of disease and deaths at the Grace operations including from public agencies; and

(i)    in failing to sufficiently study and use the information on dust control and asbestos disease that it did have.

142.    Maryland Casualty undertook to address industrial hygiene concerns including prescription of warnings and worker education of the asbestos hazard for the mine and mill workers, their families and the community.

143.    Maryland Casualty had a duty of care to the mine and mill workers, their families and to the members of the Libby community to assure that warnings were designed to reasonably inform those at risk:

(a)    of the level of asbestos in the workplace;

(b)    of the hazards of asbestos carried home on workers' clothes;

(c)    of the toxicity of the asbestos and nature and degree of the health hazard and deadly health effects of asbestos inhalation;

(d)    of the hidden nature of the hazard, that its deadly effects operated invisibly and without obvious signs of irritation or harm, and that its latent deadly effects would first manifest many years after what would, to the uneducated layman, would be an apparent innocuous exposure to harmless dust; and

(e)    of the means to limit exposure in the workplace and at home, such as changing and washing procedures that kept work clothes out of the home, and training on where, when and what type of respirator devices needed to be worn to keep the worker safe.

144.    As part of its industrial hygiene services and the creation of a program for control and prevention of asbestos disease, Maryland Casualty failed to design and prescribe the necessary warnings.

145.    Maryland Casualty was negligent in their design of the warning and education aspects of the safety program in that it failed:

(a)    to include sufficient measures for education of workers, in the hazards of asbestos exposure;

(b)    to include sufficient measures for apprising the workers of the high levels of asbestos dust at the worksite;

(c)    to include sufficient warnings and measures to apprise workers of consequences of unprotected exposure to asbestos dust at levels regularly encountered in the workplace;

(d)    to include sufficient measures to warn and apprise workers of the dangers of transporting work clothes to their homes; and

(e)    to include warnings and measures to warn workers, their families and the community of the hazards of asbestos exposure in a manner that met industrial hygiene standards for warnings of a hidden and deadly hazard.

146.    Maryland Casualty's representatives with expertise in industrial hygiene inspected the Grace Libby operations.

147.   In so doing, Maryland Casualty had a duty of reasonable care to the Libby workers, their families and to the community.

148.   Maryland Casualty was negligent in inspection of the Grace Libby operations, in failing to disclose to workers the nature and degree of the hazard and in failing to act upon known hazardous conditions due to insufficient worker education, insufficient warnings to workers, their families and to the community, insufficient dust control (including housekeeping, ventilation, exhaust air cleaning and maintenance), and insufficient medical monitoring.

149.   Plaintiffs worked at the vermiculite mine and Mill in the Libby area and/or lived or recreated in the Libby area and were exposed to and inhaled asbestos dust from the mill operations.

150.   Workers had no coveralls and no showers.  As a result, workers including Plaintiffs went home with asbestos dust on their clothing and in their cars, thereby contaminating their homes with asbestos dust.

151.   At all times Plaintiffs were ignorant of the nature and extent of the life threatening risks and injury involved, and would not have continued to live and work in such an environment if they had known the true facts.

152.   Without knowledge of the nature and extent of the asbestos hazard, Plaintiffs were denied the options of avoiding exposure, demanding protective devices, demanding safer operations, changing jobs, and protecting their homes and families.

153.   As a direct and proximate result of Maryland Casualty's negligence in performance of industrial hygiene professional services for the protection of workers and others, including inadequate warnings, inspections and disclosure of known hazards, Plaintiffs suffered from asbestos disease, asbestos related bodily injuries and have incurred the damages alleged herein.

## TWELFTH CLAIM
### Negligence v. CNA (All Plaintiffs except Bennett)

154.   All paragraphs above are incorporated by this reference.

155.    CNA, through Continental Casualty Co., was the workers' compensation carrier for W.R. Grace from July 1, 1973 to July 1, 1976. CNA, through Transportation Ins. Co. or Continental Casualty Co., was the workers' compensation carrier for W.R. Grace from July 1, 1976 to 1996.

156.    CNA's professional staff included industrial hygienists and medical doctors with expertise in occupational disease. At all times CNA was well aware of the hazards of asbestos exposure.

157.    At all times, CNA knew of the asbestos exposure at the Grace Libby operations, and that workers were diseased and dying from asbestos exposure, and that a hazardous condition existed.

158.    CNA knew or should have known that there were no showers for workers, no coveralls for workers, and that workers went home and into the community covered with asbestos dust, which was hazardous to all those who might come into contact with it.

159.    CNA undertook to provide industrial hygiene services for the benefit of Grace employees, their families and the community.

160.    In so doing, CNA had a duty of care to the Libby workers, their families and to the community.

161.    CNA was negligent in this undertaking to provide services:

(a)     in failing to recommend or require sufficient measures and standards for employee education, warning the workers, their families and the community, protection against asbestos dust going into workers' homes and into the community, dust control (including housekeeping, ventilation, exhaust air cleaning and maintenance) and medical monitoring;

(b)     in failing to sufficiently test and monitor the effectiveness of dust control at all locations where there was dust;

(c)     in failing to obtain medical information on the incidence of disease and deaths at the Grace operations from Grace and from public agencies; and

(d)     in failing to sufficiently study and use the information on dust control and asbestos disease that it did have.

162.    CNA's representatives with expertise in industrial hygiene inspected the Grace Libby operations.

163.    In so doing, CNA had a duty of reasonable care to the Libby workers, their families and to the community.

164.    CNA was negligent in inspection of the Grace Libby operations, in failing to report and act upon known hazardous conditions due to insufficient worker education, insufficient warnings to workers, their families and to the community, insufficient dust control (including housekeeping, ventilation, exhaust air cleaning and maintenance), and insufficient medical monitoring.

165.    As a direct and proximate result of the negligence of CNA, Plaintiffs have suffered from asbestos related bodily injuries and incurred the damages alleged herein.

## THIRTEENTH CLAIM
### Negligence v. Robinson Insulation (All Plaintiffs)

166.    All paragraphs above are incorporated by this reference.

167.    For many years, defendant Robinson Insulation obtained asbestos contaminated vermiculite from Libby, Lincoln County, Montana.  Said asbestos contaminated vermiculite was transported by rail from Lincoln County to Great Falls, Cascade County, Montana, where defendant Robinson Insulation expanded the asbestos contaminated vermiculite and processed it into various manufactured products.

168.    After expanding the deadly asbestos contaminated vermiculite and processing it into manufactured products, Robinson Insulation sold said vermiculite and vermiculite products to the J. Neils/St. Regis Champion lumber mill in Libby and to others for use and for resale in Libby, Montana.  Said expanded vermiculite and vermiculite products were transported from Great Falls back to Libby and delivered to the said lumber mill and to other sites in Libby.

169.    Plaintiffs were exposed to defendant Robinson Insulation's unreasonably dangerous asbestos contaminated products, which Robinson Insulation wrongfully placed in the stream of commerce for use and consumption by the general public.

170.    During Plaintiffs' period of exposure to asbestos and contaminated

vermiculite, which was generated and released by Robinson Insulation's business activities, Robinson Insulation knew that extended exposure to asbestos was unreasonably dangerous and hazardous to an individual's health. Nevertheless, Robinson Insulation concealed and failed to disclose such knowledge to their employees, the public, and the Plaintiffs. Robinson Insulation gave no indication that it was unsafe and in fact a serious health hazard for Plaintiffs to be exposed to asbestos generated and released by Robinson Insulation's business activities. Plaintiffs were at all times ignorant of the nature and extent of the life threatening risk involved in exposure to the asbestos generated and released by defendant's business activities.

171.    Robinson Insulation owed the Plaintiffs a duty to act with reasonable care concerning their business operations, so as not to jeopardize their health and welfare from exposure to its asbestos contamination and asbestos products.

172.    Robinson Insulation breached its duty of care by negligently, carelessly, and recklessly generating, handling, storing, releasing, disposing of, and failing to control and contain unreasonably dangerous and hazardous asbestos created by and/or resulting from its for profit business operations.

173.    Although Robinson Insulation knew or had ample reason to know that its acts or omissions created a high degree of harm to the Plaintiffs, it nevertheless deliberately acted in conscious disregard of and indifference to the risk imposed upon the Plaintiffs by their continued exposure to asbestos.

174.    As a direct and proximate result of Plaintiffs' exposure to asbestos-laced vermiculite generated and released by Robinson Insulation's business activities, all Plaintiffs suffered asbestos related bodily injuries, and have incurred damages as alleged herein.

### FOURTEENTH CLAIM
### Strict Products Liability v. Robinson Insulation (All Plaintiffs)

175.    All paragraphs above are incorporated by this reference.

176.    At times relevant to this action, defendants Robinson Insulation and wood products defendants were engaged in the business of manufacturing, fabricating,

modifying, expanding, labeling, distributing, supplying, selling, marketing, packaging, and/or advertising multiple products containing vermiculite. Said vermiculite was laced with deadly asbestos.

177.    After expanding the deadly asbestos contaminated vermiculite and processing it into manufactured products, Robinson Insulation sold said vermiculite and vermiculite products to the wood product company defendants for use and for resale at their lumber mill in Libby, Montana. Said expanded vermiculite and vermiculite products were transported from Great Falls back to Libby where the products were sold by the wood product defendants to various parties for use on construction and other projects in Lincoln County.

178.    Defendants Robinson Insulation and wood products defendants knew and intended that the above referenced vermiculite and asbestos contaminated products would be used without inspection for defects therein or in any of their component parts and without knowledge of the hazards involved in such use.

179.    Defendants Robinson Insulation and wood products defendants distributed and/or sold said asbestos-laced vermiculite products to the public, to the Plaintiffs, and to one or more of Plaintiffs' employers.

180.    Said asbestos-laced vermiculite products were defective and unreasonably dangerous for their intended purpose in that the inhalation of asbestos fibers causes serious disease and/or death to humans. The defect existed in the said products at the time they left the possession of defendant Robinson Insulation and wood products defendants. Said products did, in fact, cause injury and damage to Plaintiffs, while being used in a reasonably foreseeable manner, thereby rendering the same defective, unsafe, and unreasonably dangerous for use.

181.    Plaintiffs did not know of the substantial danger of using said asbestos-laced vermiculite products, nor was said danger readily recognizable by them. Defendants Robinson Insulation and wood products defendants further failed to adequately warn of the risk of contamination to which Plaintiffs were exposed.

182.    As a direct and proximate result of the unlawful actions of defendants Robinson Insulation and wood products defendants and as a direct and proximate result of exposure to Robinson Insulation's and the wood products defendants' unreasonably dangerous asbestos contaminated vermiculite products, Plaintiffs suffered asbestos related bodily injuries, and have incurred damages as alleged.

## FIFTEENTH CLAIM
### Does A-Z

183.    All paragraphs above are incorporated by this reference.

184.    Does A-Z are corporations or persons unknown at this time whose negligence and wrongful acts caused asbestos disease in the Plaintiffs. Plaintiffs will seek to amend their complaint when the true names and capacities of Does A-Z are ascertained.

## DAMAGES

185.    All paragraphs above are incorporated by this reference.

186.    As a direct and proximate result of the acts of the defendants, the Plaintiffs have suffered and will suffer:

a.    Loss of enjoyment of established course of life;

b.    Loss of services which can no longer be performed;

c.    Loss of earnings and/or earning capacity;

d.    Physical, mental and emotional pain and suffering;

e.    Medical expenses, rehabilitation expenses and related expenses;

f.    Loss of insurability for medical coverage;

g.    Loss of care, comfort, society and support; and

h.    Great grief and sorrow.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray for damages against the State of Montana in an amount subject to the limitations provided by law for each claim and for damages against other Defendants as follows:

1.    Reasonable damages for lost enjoyment of established course of life, past and future;

2.    Reasonable damages for loss of services which can no longer be

performed;

3.  Reasonable damages for physical, mental and emotional pain and suffering, past and future;

4.  Reasonable damages for medical expenses, rehabilitation expenses, and related expenses incurred to date and reasonably certain to be incurred in the future;

5.  Reasonable damages for loss of the care, comfort, society and support;

6.  Advance payment of past and present medical expenses and special damages not reasonably in dispute;

7.  Reasonable damages for loss of earnings and/or earning capacity;

8.  Reasonable damages for grief and sorrow;

9.  For costs of suit;

10.  For such further relief as is just and equitable under the circumstances.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

DATED this ___ day of October, 2014.

McGARVEY, HEBERLING, SULLIVAN
& LACEY, P.C.

By: _____
ROGER SULLIVAN
ALLAN McGARVEY
JOHN F. LACEY
Attorneys for Plaintiffs