# Exhibit D

Roger Sullivan
Allan M. McGarvey
John F. Lacey
McGarvey, Heberling, Sullivan & Lacey, P.C.
345 First Avenue East
Kalispell, MT 59901
(406) 752-5566

Attorneys for Plaintiffs

### MONTANA EIGHTH JUDICIAL DISTRICT, CASCADE COUNTY

| | |
|---|---|
| WILLIAM E. DeSHAZER, JOHN R. GARRISON, JOHNNY G. JELLESED, LORRAINE B. SICHTING, and TRUDY SIEFKE, as Personal Representative of the Estate of RAYMOND H. SIEFKE, deceased,<br><br>        Plaintiffs,<br><br>v.<br><br>INTERNATIONAL PAPER COMPANY, a New York for profit corporation; ST. REGIS CORPORATION, a New York for profit corporation; J. NEILS LUMBER COMPANY, a Minnesota for profit corporation; MONTANA LIGHT & POWER COMPANY, a Montana for profit corporation; EVERETT NELSON; RALPH HEINERT; BNSF RAILWAY COMPANY, a Delaware corporation; JOHN SWING; MARYLAND CASUALTY COMPANY, a Maryland Corporation; CNA INSURANCE COMPANIES, a corporation; CONTINENTAL CASUALTY COMPANY, a corporation; TRANSPORTATION INSURANCE COMPANY, a corporation; ROBINSON INSULATION COMPANY, a Montana Corporation for profit; and DOES A-Z,<br><br>        Defendants. | CAUSE NO. _DDV-14-___<br><br>DIRK M. SANDEFUR<br><br><br>**COMPLAINT AND DEMAND<br>FOR JURY TRIAL** |

### PARTIES

1.    Plaintiffs William E. DeShazer, John R. Garrison, Lorraine B. Sichting, and

Trudy Siefke, as Personal Representative of the Estate of Raymond H. Siefke, are residents of Libby, Montana. Plaintiff Johnny G. Jellesed, is a resident of Troy, Montana.

2.      Defendant International Paper Co. is a corporation organized and existing under the laws of New York with its principal place of business in the State of Connecticut.

3.      Defendant International Paper Co. is a successor corporation which is liable for the actions of Champion International Corp., St. Regis Corp. and J. Neils Corp. with respect to the claims and allegations of this Complaint.

4.      Defendant Champion International Corp. is or was a corporation organized and existing under the laws of New York with its principal place of business in the State of Connecticut.

5.      Defendant Champion International Corp. is a successor corporation which is liable for the actions of St. Regis Corp. with respect to the claims and allegations of this Complaint.

6.      Defendant St. Regis Corp. is or was a corporation organized and existing under the laws of New York with its principal place of business in the State of New York and is a successor corporation which is liable for the actions of J. Neils Corp. with respect to the claims and allegations of this Complaint.

7.      St. Regis Corporation is a New York corporation which was dissolved on or about September 18, 1984. St. Regis Corp. is properly named as a defendant in this action pursuant to MCA § 35-1-935 and MCA § 35-1-937, because the dissolution of the corporation "does not take away or impair any remedy . . . against the corporation . . . for any claim or right whether or not the claim or right existed or accrued prior to dissolution."

8.      Defendant Montana Light & Power, is a Montana Corporation currently inactive. At all times up to 1988, Montana Light & Power was doing business in Montana, including operating the powerhouse at the lumbermill in Libby.

9.      Montana Light & Power merged into Champion International Corporation

(CIC) and CIC assumed all liabilities of Montana Light & Power as a successor corporation, including claims under this complaint.

10.     Defendants International Paper Co., Champion, St. Regis Corp., J. Neils Lumber Company, Everett Nelson, Ralph Heinert, and Does A-Q are referred to herein as "Wood Products Defendants."

11.     Defendants Everett Nelson and Ralph Heinert were managers of the corporate Wood Products Defendants.

12.     Defendants Does A-F are corporate entities operating facilities relating to the lumber mill in Libby, Montana.

13.     Defendants Does G-Q were managers of Wood Products Defendants International Paper Co., its predecessors in interest and/or its subsidiaries engaged in manufacturing operations of the forest products industry in Lincoln County, Montana, and whose true names are unknown at the present time.

14.     At all times relevant to this action, Wood Products Defendants, their predecessors in interests and/or their subsidiaries and associates, engaged in logging and manufacturing operations of the forest products industry in Lincoln County, Montana.

15.     Defendant BNSF Railway Company (BNSF) is a corporation organized and existing under the laws of the State of Delaware and is engaged in interstate commerce with its headquarters in Fort Worth, Texas.

16.     Defendant John Swing was a managing agent for BNSF in Libby, Montana and is a resident of Lincoln County, Montana.

17.     Defendant Maryland Casualty Company is a Maryland corporation with its principal place of business in Maryland.

18.     Defendant  CNA Insurance Companies (CNA) is a corporation doing business in the State of Montana.  Continental Casualty Company and Transportation Insurance Company are companies owned or operated by CNA, and are included in references herein to "CNA".

19.     Robinson Insulation Company (Robinson Insulation) is or was a Montana

business corporation for profit with its principal place of business in Great Falls, Cascade County, Montana where Robinson Insulation operated a vermiculite expansion plant. Robinson Insulation engaged in conduct that resulted in the accrual of this tort action in Montana.

20.    Does R - Z are corporations or persons, whose identities are unknown at this time, and whose negligence and wrongful acts caused asbestos related bodily injuries in the listed Plaintiffs.

21.    Plaintiffs will seek to amend their complaint when the true names and capacities of Does A - Z are ascertained.

22.    Venue in this action is proper in Cascade County, Montana, because at least one of the defendants, Robinson Insulation, engaged in tortious conduct within Cascade County and is a resident of Cascade County.

23.    This Complaint is filed to protect statutes of limitations.

### GENERAL ALLEGATIONS

24.    In 1963 W.R. Grace & Co. (Grace) purchased an existing vermiculite mine and mill in Libby, Montana (the Mine) from the Zonolite Company (Zonolite). Grace operated the Mine from 1963 until 1990. The vermiculite was intermixed with a highly toxic form of asbestos. The extraction of vermiculite from the ground and processing of it generated substantial airborne dust containing asbestos. The dust was produced at the mine site, as well as in the town of Libby where expansion, bagging, storage and transport facilities were located.

25.    The Plaintiffs were Grace and Zonolite mine, mill or processing workers, independent contractors, loggers, homeowners, gardeners, recreators, ball field players, lumber mill workers, railroad workers, housewives/children of Grace workers, or community members of Libby, Montana, or were otherwise distinctly exposed to asbestos in unique exposure events and in a wide variety of temporally separated, geographically distinct, and highly differentiated routes and circumstances. While many Plaintiffs had repeated or continuous exposures, each of the Plaintiffs' individual

exposure is unique in time, location, form, and degree of asbestos contact, and as a result of which Plaintiffs have been diagnosed with asbestos disease. Dates of residence in the Libby area and exposure, including events of injurious exposure between July 1, 1973, and July 1, 1975, are:

| | |
|---|---|
| William E. DeShazer | 1940 to date |
| John R. Garrison | 1949 - 1966 and 1968 to date |
| Johnny G. Jellesed | 1954 - 1965 and 1975 to date |
| Lorraine B. Sichting | 1935 to date |
| Raymond H. Siefke | 1922 to 2002 |

26.     At all times Plaintiffs were ignorant of the nature and extent of the life threatening risks and injury involved, and would not have continued to be exposed to such an environment if they had known the true facts.

27.     The workers were not provided with coveralls or showers. As a result workers went home and into the community with asbestos dust on their clothing and in their cars, thereby extending the asbestos exposure. Similarly, invisible asbestos fibers from the mining operations infiltrated a broad variety of Libby area work sites, forests, recreation areas, homes, gardens, and numerous other distinct locations, resulting in hundreds of distinct routes and circumstances of exposure.

28.     As a result of failing to control dust from the mining, milling, processing, bagging, transport and a variety of uses of the vermiculite, workers, family members, members of the community, and others were exposed to the highly toxic asbestos.

29.     Without knowledge of the nature and extent of the asbestos hazard, Plaintiffs were denied, in the unique circumstances of their exposures, the options of avoiding exposure, demanding protective devices, demanding safer operations, changing jobs, or protecting themselves and their families.

## FIRST CLAIM
**Strict Products Liability (John Garrison) v. Wood Products Defendants**

30.     All paragraphs above are incorporated by this reference.

31.     At all times relevant to this action, Plaintiff lived in or around the town of

Libby. He shopped, visited and enjoyed recreation in the town of Libby and its vicinity as indicated above.

32.     At times relevant to this action, the Wood Products Defendants were engaged in the business of manufacturing, fabricating, modifying, expanding, labeling, distributing, supplying, selling, marketing, packaging, and/or advertising products containing vermiculite. Said vermiculite was laced with deadly asbestos.

33.     The Wood Products Defendants knew and intended that the above referenced vermiculite and asbestos contaminated products would be used without inspection for defects therein or in any of their component parts and without knowledge of the hazards involved in such use.

34.     The Wood Products Defendants distributed and/or sold said asbestos-laced vermiculite products to the public, to the Plaintiff, and to one or more of Plaintiff's employers.

35.     Said asbestos-laced vermiculite products were defective and unreasonably dangerous for their intended purpose in that the inhalation of asbestos fibers causes serious disease and/or death to humans. The defect existed in the said products at the time they left the possession of the Wood Products Defendants. Said products did, in fact, cause injury and damage to Plaintiff, while being used in a reasonably foreseeable manner, thereby rendering the same defective, unsafe, and unreasonably dangerous for use.

36.     Plaintiff did not know of the substantial danger of using said asbestos-laced vermiculite products, nor was said danger readily recognizable by him. The Wood Products Defendants further failed to adequately warn of the risk of contamination to which Plaintiff was exposed.

37.     As a direct and proximate result of the unlawful actions of the wood products defendants, and as a direct and proximate result of exposure to the wood products defendants' unreasonably dangerous asbestos vermiculite products, Plaintiff suffered from asbestos related bodily injuries, and has incurred damages as alleged

herein.

## SECOND CLAIM
## Common Law Strict Liability (John Garrison) v. Wood Products Defendants

38.    All paragraphs above are incorporated by this reference.

39.    The Wood Products Defendants failed to control asbestos contaminated vermiculite used in the operation of their business thereby causing Plaintiff to be exposed to asbestos, an extra hazardous and abnormally dangerous substance.

40.    The Wood Products Defendants engaged in abnormally dangerous activities thereby causing the release of asbestos contamination and exposure of Plaintiff to deadly asbestos. The Wood Products Defendants' business activities in handling, storing, transporting, loading, and using asbestos were abnormally dangerous in that:

(a)    said business activities created a high degree of prior, present, and continuing contamination in the form of exceedingly toxic asbestos, which created a high degree of risk of harm to Plaintiff and others;

(b)    there was and is a strong likelihood that the harm resulting from said business activities and exposure to asbestos is great;

(c)    the risk of harm caused by the Wood Products Defendants storing, handling, transporting, loading, and using asbestos contaminated vermiculite cannot be reasonably eliminated for those humans living and working in proximity to the Wood Products Defendants abnormally dangerous business activity;

(d)    said business activities are not a matter of common usage;

(e)    the Wood Products Defendants' abnormally dangerous business activities were carried on within the town of Libby and adjacent areas, which were places that were inappropriate for the release of asbestos contamination; and

(f)    The dangerous attributes of the Wood Products Defendants' business activities completely outweigh the value of those activities to the community.

41.    The dangers of the Wood Products Defendants' business activities for the locality where Plaintiff resided, worked, or remained were so great that despite any usefulness of their activities and of the asbestos contaminated vermiculite under its control, the Wood Products Defendants should be required as a matter of law to pay for

any harm caused.

42.    The Wood Products Defendants are strictly liable to the Plaintiff for damages caused by Plaintiff's exposure to deadly asbestos caused by the Wood Products Defendants' abnormally dangerous business activities.

43.    As a direct and proximate result of the Wood Products Defendants' abnormally dangerous business activities, Plaintiff was exposed to unreasonably dangerous and hazardous materials, Plaintiff suffered asbestos related bodily injuries, and has incurred damages as alleged herein.

### THIRD CLAIM
### Negligence (all Plaintiffs except Raymond Siefke) v. BNSF

44.    Paragraphs 1-29 above are incorporated by this reference.

45.    During the dates above stated, Plaintiffs resided or remained in proximity to the real property of BNSF and were thereby exposed to asbestos dust from BNSF's property and operations. John Swing was a managing agent for BNSF in Libby, Montana, and as such is separately responsible for acts wrongful in this nature. Allegations herein as to BNSF's conduct and knowledge by this reference specifically include defendant John Swing.

46.    Throughout the years of exposure above stated, the Plaintiffs lived in an environment that caused them to be exposed to and to inhale asbestos dust.

47.    At all times Plaintiffs were ignorant of the nature and extent of the life threatening risks and injury involved, and would not have continued to remain in such an environment if they had known the true facts.

48.    Without knowledge of the nature and extent of the asbestos hazard, Plaintiffs were denied the options of avoiding exposure, demanding dust control or changing residence.

49.    At all times BNSF knew or should have known of the asbestos in the vermiculite, and knew or should have known of the hazards to human health of asbestos exposure and had a continuing duty to gather information, to prevent toxic dust from collecting upon and escaping from its property, and to warn Plaintiffs and others who

would be harmed by said dust.

50.     BNSF was negligent, as follows:

(a)     in failing to inquire, study and evaluate the dust hazard to human health;

(b)     in failing to take measures to prevent toxic dust from collecting upon and escaping from its property;

(c)     in failing to warn Plaintiffs of the true nature of the hazardous effects of the dust; and

(d)     by acting in concert with Zonolite/Grace.

51.     As a direct and proximate result of the conduct of BNSF as described above, Plaintiffs suffered from asbestos related bodily injuries and have incurred the damages alleged herein.

## FOURTH CLAIM
### Common Law Strict Liability (all Plaintiffs except Raymond Siefke ) v. BNSF

52.     Paragraphs 44 - 51 above are incorporated by this reference.

53.     Defendant BNSF failed to control asbestos contaminated vermiculite used in the operation of their business thereby causing Plaintiffs to be exposed to asbestos, an extra hazardous and abnormally dangerous substance.

54.     Defendant BNSF engaged in abnormally dangerous activities thereby causing the release of asbestos contamination and exposure of Plaintiffs to deadly asbestos. BNSF's business activities in handling, storing, transporting, loading, and using asbestos and asbestos contaminated products were abnormally dangerous in that:

(a)     said business activities created a high degree of prior, present, and continuing contamination in the form of exceedingly toxic asbestos, which created a high degree of risk of harm to Plaintiffs and others;

(b)     there was and is a strong likelihood that the harm resulting from said business activities and exposure to asbestos is great;

(c)     the risk of harm caused by BNSF's storing, handling, transporting, loading, and using asbestos contaminated vermiculite cannot be reasonably eliminated for those humans living and working in proximity to BNSF's abnormally dangerous business activity;

(d)     said business activities are not a matter of common usage;

(e)    BNSF's abnormally dangerous business activities were carried on within the town of Libby and adjacent areas, which were places that were inappropriate for the release of asbestos contamination; and

(f)    the dangerous attributes of the BNSF's business activities completely outweigh the value of those activities to the community.

55.    The dangers of the BNSF's business activities for the locality where Plaintiffs resided, worked, or remained were so great that despite any usefulness of their activities and of the asbestos contaminated vermiculite under its control, BNSF should be required as a matter of law to pay for any harm caused.

56.    BNSF is strictly liable to the Plaintiffs for damages caused by Plaintiffs' exposure to deadly asbestos caused by BNSF's abnormally dangerous business activities.

57.    As a direct and proximate result of the BNSF's abnormally dangerous business activities, Plaintiffs were exposed to unreasonably dangerous and hazardous materials, contracted asbestos related disease, suffered asbestos related bodily injuries and sustained damages as alleged herein.

**FIFTH CLAIM**
**Negligence in provision of industrial hygiene services**
**(All Plaintiffs) v. Maryland Casualty**

58.    Paragraphs 1-29 above are incorporated by this reference.

59.    Maryland Casualty provided professional industrial hygiene services to address the safety of the mine and mill work site through what were represented to be competent Safety Engineers and professionals from the Engineering Division and the Medical Division of Maryland Casualty, under the supervision of industrial hygienist L.E. Park.

60.    Maryland Casualty knew that the 1959 series of chest x-rays on the Libby workers showed a one-third incidence of abnormal chest x-rays.

61.    Maryland Casualty knew that the 1964-1973 annual series of chest x-rays on the Libby workers showed a 25% plus incidence of abnormal chest x-rays.

62.    Maryland Casualty knew that a 1965 study showed 20% incidence of asbestosis in the Libby workers, with a likely incidence of twice that upon thorough

testing.

63.    Maryland Casualty knew or should have known that from 1961 forward, men were dying of asbestos disease, and that each year more became diseased.

64.    Maryland Casualty knew or should have known that there were no showers for workers, no coveralls for workers, and that workers went home and into the community covered with asbestos dust, which was hazardous to all those who might come into contact with it.

65.    As part of its industrial hygiene services, Maryland Casualty's Engineering Division and Medical Division undertook to "engineer this risk," and undertook to design a "program for control and prevention" of asbestos dust and disease for the benefit of workers, their families and the community that would address dust control and personal protection from asbestos dust.

66.    In its provision of industrial hygiene services and its undertaking of industrial hygiene measures, Maryland Casualty had a duty of reasonable care to those (including workers, their families and the community) relying on the fulfillment of safe standards of industrial hygiene, and to those who were in need of disclosure of the nature and degree of the asbestos hazard known to Maryland Casualty.

67.    Maryland Casualty was negligent in their design of the industrial hygiene program, and in failing to disclose and disseminate, to the workers and individuals at risk, the nature and degree of the asbestos hazard Maryland casualty had acquired and analyzed by its industrial hygiene professionals. Maryland Casualty was negligent:

(a)    in failing to include sufficient measures for education of workers, in the hazards of asbestos exposure;

(b)    in failing to include measures to warn workers, their families, and the community of the hazards of asbestos exposure;

(c)    in failing to include sufficient measures and standards for dust control through housekeeping, ventilation and exhaust air cleaning;

(d)    in failing to include sufficient measures and standards for maintenance of equipment and premises;

(e)    in failing to include a sufficient medical monitoring program;

(f)     in failing to disclose the nature and degree of the immediate and extreme asbestos hazard known to the professionals at Maryland Casualty;

(g)     in failing to sufficiently test and monitor the effectiveness of dust control at all locations where there was dust;

(h)     in failing to obtain available medical information on the incidence of disease and deaths at the Grace operations including from public agencies; and

(i)     in failing to sufficiently study and use the information on dust control and asbestos disease that it did have.

68.     Maryland Casualty undertook to address industrial hygiene concerns including prescription of warnings and worker education of the asbestos hazard for the mine and mill workers, their families and the community.

69.     Maryland Casualty had a duty of care to the mine and mill workers, their families and to the members of the Libby community to assure that warnings were designed to reasonably inform those at risk:

(a)     of the level of asbestos in the workplace;

(b)     of the hazards of asbestos carried home on workers clothes;

(c)     of the toxicity of the asbestos and nature and degree of the health hazard and deadly health effects of asbestos inhalation;

(d)     of the hidden nature of the hazard, that its deadly effects operated invisibly and without obvious signs of irritation or harm, and that its latent deadly effects would first manifest many years after what would, to the uneducated layman, would be an apparent innocuous exposure to harmless dust; and

(e)     of the means to limit exposure in the workplace and at home, such as changing and washing procedures that kept work clothes out of the home, and training on where, when and what type of respirator devices needed to be worn to keep the worker safe.

70.     As part of its industrial hygiene services and the creation of a program for control and prevention of asbestos disease, Maryland Casualty failed to design and prescribe the necessary warnings.

71.     Maryland Casualty was negligent in their design of the warning and

education aspects of the safety program in that it failed:

    (a)    to include sufficient measures for education of workers, in the hazards of asbestos exposure;

    (b)    to include sufficient measures for apprising the workers of the high levels of asbestos dust at the worksite;

    (c)    to include sufficient warnings and measures to apprise workers of consequences of unprotected exposure to asbestos dust at levels regularly encountered in the workplace;

    (d)    to include sufficient measures to warn and apprise workers of the dangers of transporting work clothes to their homes; and

    (e)    to include warnings and measures to warn workers, their families and the community of the hazards of asbestos exposure in a manner that met industrial hygiene standards for warnings of a hidden and deadly hazard.

    72.    Maryland Casualty's representatives with expertise in industrial hygiene inspected the Grace Libby operations.

    73.    In so doing, Maryland Casualty had a duty of reasonable care to the Libby workers, their families and to the community.

    74.    Maryland Casualty was negligent in inspection of the Grace Libby operations, in failing to disclose to workers the nature and degree of the hazard and in failing to act upon known hazardous conditions due to insufficient worker education, insufficient warnings to workers, their families and to the community, insufficient dust control (including housekeeping, ventilation, exhaust air cleaning and maintenance), and insufficient medical monitoring.

    75.    Plaintiffs worked at the vermiculite mine and Mill in the Libby are and/or lived or recreated in the Libby area and was exposed to and inhaled asbestos dust from the mill operations.

    76.    Workers had no coveralls and no showers. As a result, workers including plaintiff went home with asbestos dust on their clothing and in their cars, thereby contaminating their homes with asbestos dust.

    77.    At all times Plaintiffs were ignorant of the nature and extent of the life

threatening risks and injury involved, and would not have continued to live and work in such an environment if they had known the true facts.

78.     Without knowledge of the nature and extent of the asbestos hazard, Plaintiffs were denied the options of avoiding exposure, demanding protective devices, demanding safer operations, changing jobs, and protecting their homes and families.

79.     As a direct and proximate result of Maryland Casualty's negligence in performance of industrial hygiene professional services for the protection of workers and others, including inadequate warnings, inspections and disclosure of known hazards, Plaintiffs suffered from asbestos disease, asbestos related bodily injuries incurred the damages alleged herein.

## SIXTH CLAIM
### Bad Faith Treatment of Workers with Rights to Occupational Disease Benefits (Breach of Fiduciary Duty, Deceit, Bad Faith Negligent Misrepresentation and Constructive Fraud, Malice) (Garrison only) v. Maryland Casualty

80.     Paragraphs 1-29 and 58-79 are incorporated by this reference.

81.     Maryland Casualty owed duties with respect to workers' rights to occupational disease benefits, including the duties to adjust and pay occupational disease claims for benefits promptly and in good faith, and the duty not to hide or mislead workers about the facts of their exposure to asbestos, the course of latent asbestos disease process, or other facts relating to their entitlement to occupational disease benefits.

82.     Apart and distinct from any liability insurance for conduct of W.R. Grace, during the period 1962-1973, Maryland Casualty contracted to provide workers compensation/occupational disease coverage to employees under statutorily defined "compensation plan No. 2," which required that Maryland Casualty "shall be directly and primarily liable to and will pay directly to the employee" the compensation owed under the Montana Occupational Disease Act (herein MODA).

83.     There was a special relationship between Maryland Casualty and the workers that arose out of its contractual and statutory duty to be directly liable for occupational disease benefits. This special relationship arises from:

(a)    inherently unequal positions of control and knowledge over disease-causing asbestos dust problem, and knowledge of the workers' "disease" and "injurious exposure" within the meaning of MODA;

(b)    the workers' special vulnerability because of the harm they may suffer to their right to benefits for disability and/or medical expenses;

(c)    the workers need to place trust in Maryland Casualty in its communication of asbestos disease hazards, injurious exposures to asbestos, and incidence and likelihood of asbestos-related disease, all known to Maryland Casualty, especially because of the hidden, insidious, and latent nature of asbestos injury;

(d)    Maryland Casualty's awareness of this vulnerability, need and trust;

(e)    the workers losing their right to pursue their employer for tort liability as a quid pro quo for the protection of benefits under MODA; and

(f)    the workers being subject to time limitations for presenting claims for occupational disease benefits following injurious exposure.

84.    Because of the above-described special relationship, Maryland Casualty had a fiduciary duty to disclose and not to suppress information necessary to the insured employees' rights as injured workers with injurious exposures and, therefore, their rights to occupational disease benefits for latent disease.

85.    This fiduciary duty is further defined and heightened by Maryland Casualty's industrial hygiene control over the design of the safety program and the absence of reasonable warning therein, its conduct of workplace inspections, and by its control of information that should be communicated to the workers.

86.    This fiduciary duty is further defined and heightened by MCC's actual knowledge of a serious dust, health and occupational disease "claim" problem at the Libby facility, and the effect thereof on the workers' health and their health and disability benefit needs.

87.    Maryland Casualty knew that the 1959 series of chest x-rays on the Libby workers showed a one-third incidence of abnormal chest x-rays.

88.    Maryland Casualty knew that the 1964-1973 annual series of chest x-rays on the Libby workers showed a 25% plus incidence of abnormal chest x-rays.

89.    Maryland Casualty knew that a 1965 study showed 20% incidence of

asbestosis in the Libby workers, with a likely incidence of twice that upon thorough testing.

90.    Maryland Casualty knew or should have known that from 1961 forward, men were dying of asbestos disease, and that each year more became diseased.

91.    Maryland Casualty failed to disclose and suppressed the knowledge of the fact, degree and expected consequences of the asbestos hazard. Its safety program failed to provide for worker education and warnings, and it failed to report to the workers known and ongoing hazardous conditions. Maryland Casualty concealed the expected course of latent disease process in workers. Further, Maryland Casualty knew that workers were being advised that the dust was not dangerous, and that workers were not aware of the extreme asbestos dust concerns raised in reports of periodic inspections by the Montana State Board of Health.

92.    Maryland Casualty knew that the workers would not be alerted to the occupational disease hazard of asbestos or the resulting occupational disease benefit entitlement because (a) the workers were not apprised of the presence of asbestos toxin in the apparently benign workplace dust; (b) the workers were not apprised that asbestos levels at the mine and mill far exceeded standards of danger for workplace exposure; and (c) asbestos hazard is hidden and insidious, has no irritant or odor signal of health hazard, has no immediate symptomological manifestation, and has a lengthy period of latency.

93.    Maryland Casualty's non-disclosure and suppression of facts was done in order to hide from the workers the nature and degree of the hazard and the fact that workers had rights to occupational disease benefits for their injurious exposures under MODA which Maryland Casualty would owe a direct duty to pay. With asbestosis experienced at a rate of 41.5% of workers with over 10 years of service, and lung disease at a rate of 92% of workers with 21-25 years of service, Maryland Casualty faced enormous cost of medical and/or disability benefit claims.

94.    Suppressed and undisclosed facts included that "a great many of [MCC] insured's employees suffer from lung abnormalities"; the fact that asbestos fibers in "the

dust in the mill did far exceed what were considered to be allowable concentrations"; the fact that not only the mill but "the entire yard area may subject workmen to what might be termed to be 'injurious exposure'" under MODA.

95.     The suppression and nondisclosure of facts was motivated by Maryland Casualty's realization that it had "a severe problem, and that [it] might expect a good many claims involving asbestosis."

96.     Actions to conceal these facts include the suppression of radiologist studies where revelation of the studies "would reveal the extent and severity of the problem."

97.     Knowledge of the hidden nature of the facts is reflected in the rationale of, and formed the basis of, a plan to keep Montana State Board of Health reports" out of the hands of the Industrial Accident Board."

98.     Maryland Casualty sought to avoid disclosure to the Montana Industrial Accident Board, the entity charged with addressing compensability of occupational disease claims, the facts of the degree of disease-causing asbestos-laden dust in order to avoid Maryland Casualty's liability on existing claims, the expected "good many claims involving asbestosis," as well as the future liability for benefits for workers with latent disease.

99.     Plaintiff's right to occupational disease benefits for his injurious exposure was lost after the expiration of the prescribed period for presentation of a claim for benefits and before he had knowledge that he had sustained an injurious exposure to occupational disease qualifying him for benefits under MODA.

100.    Maryland Casualty's conduct constituted a breach of its fiduciary duties as a workers compensation and occupational disease insurer of workers including plaintiff.

101.    Maryland Casualty's conduct constituted deceit within the meaning of 27-1-712, M.C.A. and plaintiff was misled thereby.

102.    Maryland Casualty's conduct constituted bad faith and a breach of the duty of good faith and fair dealing.

103.    Maryland Casualty's conduct constituted constructive fraud within the

meaning of 28-2-406, M.C.A., and negligent misrepresentation.

104.    As a proximate result of Maryland Casualty's breach of duties described above, Plaintiff lost the opportunity to timely present a claim for occupational disease benefits, lost the opportunity to receive payment for asbestos-related medical expenses and disability benefits, and, as a result, sustained and will sustain economic loss of hundreds of thousands of dollars.

105.    Maryland Casualty's conduct described in this count constituted malice such that Plaintiff is entitled to an assessment of punitive damages sufficient to punish, deter and make example of such malicious conduct.

**SEVENTH CLAIM**
**Negligence (DeShazer, Jellesed, and Sichting) v. CNA**

106.    All paragraphs above are incorporated by this reference.

107.    CNA, through Continental Casualty Co., was the workers' compensation carrier for W.R. Grace from July 1, 1973 to July 1, 1976. CNA, through Transportation Ins. Co. or Continental Casualty Co., was the workers' compensation carrier for W.R. Grace from July 1, 1976 to 1996.

108.    CNA's professional staff included industrial hygienists and medical doctors with expertise in occupational disease. At all times CNA was well aware of the hazards of asbestos exposure.

109.    At all times, CNA knew of the asbestos exposure at the Grace Libby operations, and that workers were diseased and dying from asbestos exposure, and that a hazardous condition existed.

110.    CNA knew or should have known that there were no showers for workers, no coveralls for workers, and that workers went home and into the community covered with asbestos dust, which was hazardous to all those who might come into contact with it.

111.    CNA undertook to provide industrial hygiene services for the benefit of Grace employees, their families and the community.

112.    In so doing, CNA had a duty of care to the Libby workers, their families and to the community.

113.   CNA was negligent in this undertaking to provide services:

(a)    in failing to recommend or require sufficient measures and standards for employee education, warning the workers, their families and the community, protection against asbestos dust going into workers' homes and into the community, dust control (including housekeeping, ventilation, exhaust air cleaning and maintenance) and medical monitoring;

(b)    in failing to sufficiently test and monitor the effectiveness of dust control at all locations where there was dust;

(c)    in failing to obtain medical information on the incidence of disease and deaths at the Grace operations from Grace and from public agencies; and

(d)    in failing to sufficiently study and use the information on dust control and asbestos disease that it did have.

114.   CNA's representatives with expertise in industrial hygiene inspected the Grace Libby operations.

115.   In so doing, CNA had a duty of reasonable care to the Libby workers, their families and to the community.

116.   CNA was negligent in inspection of the Grace Libby operations, in failing to report and act upon known hazardous conditions due to insufficient worker education, insufficient warnings to workers, their families and to the community, insufficient dust control (including housekeeping, ventilation, exhaust air cleaning and maintenance), and insufficient medical monitoring.

117.   As a direct and proximate result of the negligence of CNA, Plaintiffs have suffered from asbestos related bodily injuries and incurred the damages alleged herein.

## EIGHTH CLAIM
### Negligence (All Plaintiffs) v. Robinson Insulation

118.   All paragraphs above are incorporated by this reference.

119.   For many years, defendant Robinson Insulation obtained asbestos contaminated vermiculite from Libby, Lincoln County, Montana. Said asbestos contaminated vermiculite was transported by rail from Lincoln County to Great Falls, Cascade County, Montana, where defendant Robinson Insulation expanded the asbestos

contaminated vermiculite and processed it into various manufactured products.

120.    After expanding the deadly asbestos contaminated vermiculite and
processing it into manufactured products, Robinson Insulation sold said vermiculite and
vermiculite products to the J. Neils/St. Regis Champion lumber mill in Libby and to
others for use and for resale in Libby, Montana.  Said expanded vermiculite and
vermiculite products were transported from Great Falls back to Libby and delivered to
the said lumber mill and to other sites in Libby.

121.    Plaintiffs were exposed to defendant Robinson Insulation's unreasonably
dangerous asbestos contaminated products, which Robinson Insulation wrongfully placed
in the stream of commerce for use and consumption by the general public.

122.    During Plaintiffs' period of exposure to asbestos and contaminated
vermiculite, which was generated and released by Robinson Insulation's business
activities, Robinson Insulation knew that extended exposure to asbestos was
unreasonably dangerous and hazardous to an individual's health.  Nevertheless, Robinson
Insulation concealed and failed to disclose such knowledge to their employees, the
public, and the Plaintiffs.  Robinson Insulation gave no indication that it was unsafe and
in fact a serious health hazard for Plaintiffs to be exposed to asbestos generated and
released by Robinson Insulation's business activities.  Plaintiffs were at all times ignorant
of the nature and extent of the life threatening risk involved in exposure to the asbestos
generated and released by defendant's business activities.

123.    Robinson Insulation owed the Plaintiffs a duty to act with reasonable care
concerning their business operations, so as not to jeopardize their health and welfare from
exposure to its asbestos contamination and asbestos products.

124.    Robinson Insulation breached its duty of care by negligently, carelessly,
and recklessly generating, handling, storing, releasing, disposing of, and failing to control
and contain unreasonably dangerous and hazardous asbestos created by and/or resulting
from its for profit business operations.

125.    Although Robinson Insulation knew or had ample reason to know that its

acts or omissions created a high degree of harm to the Plaintiffs, it nevertheless deliberately acted in conscious disregard of and indifference to the risk imposed upon the Plaintiffs by their continued exposure to asbestos.

126.    As a direct and proximate result of Plaintiffs' exposure to asbestos-laced vermiculite generated and released by Robinson Insulation's business activities, all Plaintiffs suffered asbestos related bodily injuries, and have incurred damages as alleged herein, including asbestos related deaths.

**NINTH CLAIM**
**Strict Products Liability v. Robinson Insulation (all Plaintiffs)**

127.    All paragraphs above are incorporated by this reference.

128.    At times relevant to this action, defendants Robinson Insulation and wood products defendants were engaged in the business of manufacturing, fabricating, modifying, expanding, labeling, distributing, supplying, selling, marketing, packaging, and/or advertising multiple products containing vermiculite.  Said vermiculite was laced with deadly asbestos.

129.    After expanding the deadly asbestos contaminated vermiculite and processing it into manufactured products, Robinson Insulation sold said vermiculite and vermiculite products to the wood product company defendants for use and for resale at their lumber mill in Libby, Montana.  Said expanded vermiculite and vermiculite products were transported from Great Falls back to Libby where the products were sold by the wood product defendants to various parties for use on construction and other projects in Lincoln County.

130.    Defendants Robinson Insulation and wood products defendants knew and intended that the above referenced vermiculite and asbestos contaminated products would be used without inspection for defects therein or in any of their component parts and without knowledge of the hazards involved in such use.

131.    Defendants Robinson Insulation and wood products defendants distributed and/or sold said asbestos-laced vermiculite products to the public, to the Plaintiffs, and to one or more of Plaintiffs' employers.

132.    Said asbestos-laced vermiculite products were defective and unreasonably dangerous for their intended purpose in that the inhalation of asbestos fibers causes serious disease and/or death to humans. The defect existed in the said products at the time they left the possession of defendant Robinson Insulation and wood products defendants. Said products did, in fact, cause injury and damage to Plaintiffs, while being used in a reasonably foreseeable manner, thereby rendering the same defective, unsafe, and unreasonably dangerous for use.

133.    Plaintiffs did not know of the substantial danger of using said asbestos-laced vermiculite products, nor was said danger readily recognizable by them. Defendants Robinson Insulation and wood products defendants further failed to adequately warn of the risk of contamination to which Plaintiffs were exposed.

134.    As a direct and proximate result of the unlawful actions of defendants Robinson Insulation and wood products defendants and as a direct and proximate result of exposure to Robinson Insulation's and the wood products defendants' unreasonably dangerous asbestos contaminated vermiculite products, Plaintiffs suffered asbestos related bodily injuries, and have incurred damages as alleged, including asbestos related deaths.

### TENTH CLAIM
#### Does A-Z

135.    All paragraphs above are incorporated by this reference.

136.    Does A-Z are corporations or persons unknown at this time whose negligence and wrongful acts caused asbestos disease in the Plaintiffs. Plaintiffs will seek to amend their complaint when the true names and capacities of Does A-Z are ascertained.

### DAMAGES

137.    All paragraphs above are incorporated by this reference.

138.    As a direct and proximate result of the acts of the defendants, the Plaintiffs have suffered and will suffer:

a.    Loss of enjoyment of established course of life;

b.    Loss of services which can no longer be performed;

c.    Loss of earnings and/or carning capacity;

d.    Physical, mental and emotional pain and suffering;

e.    Medical expenses, rehabilitation expenses and related expenses;

f.    Loss of insurability for medical coverage;

g.    Loss of care, comfort, society and support; and

h.    Great grief and sorrow.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray for damages against the Defendants as follows:

1.    Reasonable damages for lost enjoyment of established course of life, past and future;

2.    Reasonable damages for loss of services which can no longer be performed;

3.    Reasonable damages for physical, mental and emotional pain and suffering, past and future;

4.    Reasonable damages for medical expenses, rehabilitation expenses, and related expenses incurred to date and reasonably certain to be incurred in the future;

5.    Reasonable damages for loss of the care, comfort, society and support;

6.    Advance payment of past and present medical expenses and special damages not reasonably in dispute;

7.    Reasonable damages for loss of earnings and/or earning capacity;

8.    Reasonable damages for grief and sorrow;

9.    For costs of suit;

10.    For punitive damages; and

11.    For such further relief as is just and equitable under the circumstances.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

DATED this ___ day of July, 2014.

McGARVEY, HEBERLING, SULLIVAN
& LACEY, P.C.

By: _____
ROGER SULLIVAN
ALLAN McGARVEY
JOHN F. LACEY
Attorneys for Plaintiffs