## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| W. R. GRACE & CO., et al.,[1] | ) Case No. 01-01139 (KJC) |
| | ) (Jointly Administered) |
| Reorganized Debtors. | ) |
| | ) **Hearing Date: September 23, 2015, at 2:00 p.m.** |
| | ) **Objection Deadline: September 4, 2015** |
| | ) |

## THIRTY-EIGHTH OMNIBUS OBJECTION TO CLAIMS FILED BY SGH ENTERPRISES, INC. (SUBSTANTIVE AND NON-SUBSTANTIVE OBJECTION)

SGH Enterprises, Inc. (f/k/a Samson Hydrocarbons, Inc., hereinafter "SGH" or "Claimant") has filed a total of nine claims (collectively, the "Claims") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), four against Grace-Conn. and five against GEC.[2] SGH asserts that the Claims all arise from certain indemnification provisions set forth in an agreement dated December 30, 1992 (the "1992 Stock Purchase Agreement"), whereby GEC sold the stock (the "GPC Stock Sale Transaction") of a subsidiary, Grace Petroleum Corporation ("GPC"), to Samson Investment Company ("Samson Investment"), as well as from three subsequent agreements. These latter three agreements comprise two "settlement and release agreements" resolving various post-closing issues arising from the GPC Stock Sale Transaction

---

[1]    The Reorganized Debtors comprise W. R. Grace & Co. ("Grace") and W. R. Grace & Co.-Conn. ("Grace-Conn."). Grace Energy Corporation ("GEC") is a former debtor, whose case was closed pursuant to this Court's *Final Decree: (A) Closing Certain of the Chapter 11 Cases; (B) Removing Such Cases From the Joint Administration Order; and (C) Waiving the Requirement to File a Final Report For Such Cases* [Docket no. 32429], dated October 14, 2014].

[2]    The facts and circumstances set forth in this Objection are supported by the *Declaration of Richard C. Finke in Support of the Reorganized Debtors' Thirty-Eighth Omnibus Objection to Claims Filed by SGH Enterprises, Inc. (Substantive and Non-Substantive Objection)* (the "Finke Declaration"), filed contemporaneously herewith and incorporated into this Objection by reference.

Capitalized terms not defined herein shall have the meaning ascribed to them in the Finke Declaration or the *First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W. R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders as Modified Through December 23, 2010* [Docket No. 26368] (as it may be amended or supplemented, the "Plan").

(respectively, the "1994 Settlement and Release Agreement" and the "1998 Settlement and Release Agreement"), and a joint defense agreement entered into by Grace and GEC on one hand and by SGH and Samson Investment on the other (the "Casmalia JDA," which together with the 1992 Stock Purchase Agreement, the 1994 Settlement and Release Agreement and the 1998 Settlement and Release Agreement, are the "Agreements").

In this *Thirty-Eighth Omnibus Objection to Claims Filed by SGH Enterprises, Inc. (Substantive and Non-Substantive Objection)* (the "38th Omnibus Objection" or "Claims Objection"), the above-captioned reorganized debtors (collectively, the "Reorganized Debtors" or "Grace") object to each of these claims on a number of substantive and non-substantive bases.

As a threshold matter, eight of the Claims should be disallowed pursuant to Del. Bankr. L. R. 3007-1. Seven of the nine Claims have been amended and superseded, and should be disallowed as such. Claim no. 18551 amends four claims filed against Grace-Conn. Claim no. 18552 amends three Claims filed against GEC. Claim no. 18552 should also be disallowed as a duplicative claim because it is identical to Claim no. 18851 in all respects, except that the former was filed against GEC and the latter against Grace-Conn.

The remaining Claim no. 18551 (the "SGH Claim," attached hereto as Exhibit A), seeks $94,232,954.99, based upon a purported right to indemnification for obligations arising from seven environmental litigation and clean-up matters. $77,071,785.32 of that amount is attributable to the "Otis Pipeline" matter, which was resolved in its entirety by a prior order of this Court. The total remaining amount of the SGH Claim is $17,161,169.67. The SGH Claim also sets forth certain contingent and unliquidated claims.

As a threshold matter, the SGH Claim does not comply with the requirements of Fed. R. Bankr. P. 3001(c). This failure means that Claimant should not receive the benefit of Fed. R.

Bankr. P. 3001(f), which states that a "proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." In particular, Claimant has not carried its burden of proof by complying with applicable Texas law in establishing a prima facie right to indemnification:

- Applicable Texas law requires SGH to establish proof that it actually paid the various amounts claimed in the SGH Claim. Any failure by SGH to produce documents substantiating payment of such amounts must result in the Claim being disallowed as to those amounts; and

- Applicable Texas law requires an indemnitee seeking reimbursement for litigation settlement payments such as those set forth in the SGH Claim (hereinafter, the "Settlement Payments") establish that such settlement payments are reasonable. The SGH Claim provides no proof that the Settlement Payments were reasonable. If SGH cannot carry its burden as to those payments, then the Claim should be disallowed as to those amounts.

The Reorganized Debtors intend to file a motion for summary judgment disallowing the SGH Claim as to any amounts as to which SGH fails to carry its burden of proof and production. Fed. R. Bankr. P. 3001; Fed. R. Bankr. P. 3007; Del. Bankr. L. R. 3007-1(f)(iv); *see also In re O'Brien*, 440 B.R. 654, 660-62 (Bankr. E.D. Pa. 2010); *In re Tribune Co.*, 2013 Bankr LEXIS 3716 *3-4 (Bankr. D. Del. 2013). To the extent that Claimant does satisfy its burden, the Reorganized Debtors reserve the right to supplement this Objection as necessary and to pursue further evidentiary proceedings as required.

Claimant has also not carried its burden pursuant to Fed. R. Bankr. P. 3001(c) and Del. Bankr. L. R. 3007-1(f)(iv) as to a number of other issues, including:

- Whether certain amounts claimed as "Litigation Expenses" (as the 1992 Stock Purchase Agreement defines that term) are reimbursable as such; and

- Whether certain other amounts claimed in the SGH Claim are indemnifiable under the 1992 Stock Purchase Agreement's limited environmental indemnification.

While in both instances, Claimant has produced documents or included assertions in the SGH

Claim as to these amounts, what has been produced is insufficient to establish a right to payment

without there being further evidentiary proceedings.

The Reorganized Debtors substantively object to the Claim on a number of other

grounds. In particular:

- Amounts claimed for the Casmalia Site and the Ellison Litigation (as those terms are defined herein) are not reimbursable because they do not fall within the 1992 Stock Purchase Agreement's limited environmental indemnification, for the following reasons:

  - Well-established Texas law, which governs the contract at issue, requires that, in order for an indemnification to be enforceable as to a particular claim, it must clearly and unequivocally provide for indemnification of that claim. *See Houston Lighting & Power Co. v. Atchison, T. & S.F. Ry.*, 890 S.W.2d 455, 457-58 (Tex. 1994) (indemnity clauses must be clear and unequivocal if they are to be enforceable);

  - Both the Casmalia Site and the site at issue in the Ellison Litigation were third-party-owned waste-disposal sites that were neither owned nor operated by GPC prior to the GPC Stock Sale Transaction;

  - SGH is not entitled to indemnification pursuant to the "Third Party Claims" (as the 1992 Stock Purchase Agreement defines that term) indemnification provision in the 1992 Stock Purchase Agreement, because that provision expired several years prior to SGH demanding indemnification for either matter;

  - The plain language of the remaining limited environmental indemnification expressly applies only to sites that were owned either at the time of the stock sale or which GPC had owned and then sold prior to the stock sale. The indemnification therefore does not include third-party-owned waste-disposal sites such as the Casmalia Site and the site at issue in the Ellison Litigation;

  - SGH thus may not recover any amounts arising from or related to the Casmalia Site or the Ellison Litigation;

- As a matter of well-established Texas law, Claimant is not entitled to indemnification as to certain sites in view of a subsequent 1993 transfer of assets from SGH to Samson Resources Corp. ("Samson Resources") and the 2011 sale of Samson Resources by Samson Investment to KKR & Co. L.P. ("KKR");

- The SGH Claim includes amounts that, to the extent that they were paid, such payments were made by entities other than SGH, including but not limited to Samson Investment and Samson Resources. As a matter of Texas law, SGH is not entitled to indemnification for amounts paid by other entities, even if those entities are related;

- Each of the contingent amounts claimed in the SGH Claim should be disallowed pursuant to Bankruptcy Code section 502(e)(1) because they are contingent claims for reimbursement, and to the extent that they are not so disallowed, such amounts should be estimated pursuant to Bankruptcy Code section 502(c); and

- The Plan and the Confirmation Order bar Claimant from asserting any post-bankruptcy indemnification claims against Grace under the 1992 Stock Purchase Agreement's limited environmental indemnification because the 1992 Stock Purchase Agreement was not an executory contract as of the Petition Date, and thus was not assumed pursuant to Plan Art. 9.1.1.

Certain of these issues are ripe for summary judgment, while others will require further evidentiary proceedings. The Reorganized Debtors therefore respectfully request the Court enter an order, substantially in the form attached hereto as <u>Exhibit B</u> (the "Order"):

(a)     Disallowing, pursuant to Del. Bankr. L. R. 3007-1, all claims other than Claim no. 18551 as either duplicative or otherwise amended and superseded; and

(b)     Setting for disposition by summary judgment the following issues:

    (i)     Whether the Court should disallow the SGH Claim to the extent that it arises from or relates to the Casmalia Site and the Ellison Litigation, because such indemnification claims are not within the scope of the 1992 Stock Purchase Agreement's indemnification provisions;

    (ii)    Whether the 1992 Stock Purchase Agreement is an executory contract assumed by the Reorganized Debtors pursuant to Plan Art. 9.1.1;

    (iii)   Whether the Limited Environmental Indemnification (as defined herein) was terminated as to the Then Currently Owned Sites (as defined herein) when SGH sold, assigned or otherwise conveyed those sites subsequent to the Closing Date;

    (iv)    Whether contingent amounts asserted by Claimant for indemnification under the 1992 Stock Purchase Agreement should be disallowed pursuant to Bankruptcy Code section 502(e)(1); and

    (v)     Such other issues relating to the allowance or disallowance of the SGH Claim that are ripe for summary judgment;

(c)     Setting the following issues for further evidentiary proceedings:

    (i)     Whether, to the extent that payments of claimed amounts were made, SGH made those payments or whether other entities made those payments;

(ii)    Whether the settlement payments made in the Youpee and Placerita Litigations (and made pursuant to the Casmalia Site and in the Ellison Litigation, to the extent not otherwise disallowed) were reasonable as a matter of Texas law;

(iii)    Determining the properly allowable amount of SGH's asserted "Litigation Expenses" (as that term is discussed herein and defined in the 1992 Stock Purchase Agreement) and other costs asserted in the SGH Claim;

(iv)    To the extent that contingent or unliquidated claims are not disallowed pursuant to Bankruptcy Code section 502(e)(1)(B), estimation of the allowable amount of any such contingent or unliquidated claims pursuant to section 502(c)(1); and

(v)    The allowable amount of remaining claimed amounts, if any, not otherwise adjudicated by summary judgment; and

(d)    Giving the Reorganized Debtors leave to supplement or amend this Objection as necessary during the claim resolution process.

In support of this Motion, the Reorganized Debtors respectfully state as follows:

<u>JURISDICTION</u>

1.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.[3] This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409.

2.    The predicates for this Claims Objection are section 502 of the Bankruptcy Code, Fed. R. Bankr. P. 3001, 3007 and 7055 and Del. Bankr. L.R. 3007-1 and 7055-1.

<u>Background</u>

I.    THE PROOFS OF CLAIM

3.    Claimant has filed the following nine proofs of claim:

---

[3]    The Reorganized Debtors confirm their consent pursuant to Del. Bankr. L. R. 9013-1(f) to the entry of a final order by the Court in connection with this Claims Objection to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

| Claim No. | Date Filed | Debtor | Amount | Comments |
|---|---|---|---|---|
| 13946 | 3/31/03 | GEC | $7,958,774.60 | |
| 13947 | 3/31/01 | Grace-Conn. | $7,958,774.60 | Duplicates Claim no. 13946 |
| 18518 | 4/10/09 | Grace-Conn. | $9,289,309.10 | Amends and supersedes Claim no. 13497 |
| 18520 | 5/1/09 | Grace-Conn. | $9,289,309.10 | Amends and supersedes Claim no. 18518 |
| 18521 | 5/1/09 | GEC | $9,289,309.10 | Amends and supersedes Claim no. 13946 |
| 18526 | 8/7/09 | Grace-Conn. | $92,717,705.03 | Amends and supersedes Claims nos. 18520, 18518 and 13947 |
| 18527 | 8/7/09 | GEC | $92,717,705.03 | Amends and supersedes Claims nos. 18521 and 13946 |
| 18551 | 7/31/12 | Grace-Conn. | $94,232,954.99 | Amends and supersedes Claims nos. 18526, 18520, 18518 and 13947 |
| 18552 | 7/31/12 | GEC | $94,232,954.99 | Amends and supersedes Claims nos. 18527, 18521 and 13946 |

4.      As set forth above, Claim no. 18551, filed against Grace-Conn., amends and supersedes Claims nos. 18526, 18520, 18518 and 13947.  Claim no. 18552, filed against GEC, amends and supersedes Claims nos. 18527, 18521 and 13946.  Claims nos. 18551 and 18552 are identical in all respects, and document the same claim:  a series of indemnification demands arising from the 1992 Stock Purchase Agreement, two follow-on settlement and release agreements and the Casmalia JDA, which are described below.

## II.    THE AGREEMENTS

### A.    1992 Stock Purchase Agreement

5.      The 1992 Stock Purchase Agreement, dated as of December 30, 1992, documents the sale by GEC to Samson Investment of all the outstanding shares of GPC in exchange for payment of the "Purchase Price" of approximately $125,000,000.   1992 Stock Purchase Agreement at Art. 2.  The "Closing Date" for the transactions contemplated by the 1992 Stock Purchase Agreement was January 21, 1993.  *See Settlement and Release Agreement* at Preamble. A copy of the 1992 Stock Purchase Agreement is attached to the Finke Declaration as Exhibit 1.

6.      Article 5 of the 1992 Stock Purchase Agreement provided for post-Closing Date purchase price adjustments.    Other sections of the Purchase Agreement provided for post-Closing Date tax adjustments and other post-closing matters.

7.      The 1992 Stock Purchase Agreement further provided that:

> This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Texas, excluding the conflict of laws provisions thereof that would otherwise require the application of the law of any other jurisdiction, except that with respect to matters regarding title to real property, the same shall be governed by the laws of the state in which such property is located.

1992 Stock Purchase Agreement § 18.04.

8.      The 1992 Stock Purchase Agreement sets forth highly detailed and limited mutual indemnifications by both Seller and Purchaser.    By their terms, Purchaser's indemnification obligations expired prior to the Petition Date. 1992 Stock Purchase Agreement § 13.02(e).

9.      Seller's Indemnification in 1992 Stock Purchase Agreement section 13.03(a) provided for a variety of indemnifications.    All such indemnifications set forth in section 13.03 expired on the third anniversary of the Closing Date except for the limited environmental indemnifications set forth in subsections 13.03(a)(iii) and (iv) (which together are the "Limited Environmental Indemnification").    1992 Stock Purchase Agreement § 13.03(b); *cf. Id.* at § 13.03(e) ("Seller's and Grace's obligation to indemnify Purchaser under subsection 13.03(a)(iii) and (iv) shall continue without limitation of time").  The Limited Environmental Indemnification provides:

> Subject to the terms, conditions and limitations of this Article, Seller and Grace shall indemnify Purchaser and the Corporations and save and hold Purchaser and the Corporations harmless from and against any Damages caused by or arising out of ... (iii) *the environmental condition of any oil, gas and mineral leases* and *any other properties*, including, but not limited to, gas plants and treatment facilities *in which any of the Corporations or their respective predecessors previously owned an interest* but in which

the Corporations or any of their respective predecessors no longer own an interest as of the Closing Date, (iv) *the environmental condition of any Leased Properties, Oil, Gas and Mineral Leases, Producing Properties, Properties or Related Facilities* as set forth in the schedule to Section 6.09 or as assumed by Seller pursuant to Section 11.04, but excluding from this indemnification claims for violations of any environmental laws that would not have been a violation of the Environmental Laws, as defined.

1992 Stock Purchase Agreement § 13.03(a) (emphasis added).

10.    In other words, SGH can only assert indemnification claims for "Damages caused by or arising out of" properties described in subsection (iii) as having been formerly owned by GPC (which are referred to herein as the "Formerly Owned Sites") and certain properties enumerated in subsection (iv) as being owned by GPC on the Closing Date (hereinafter referred to as the "Then Currently Owned Sites," which together with the Formerly Owned Sites are the "Owned Sites"). The Limited Environmental Indemnification does not provide for any other indemnification.

11.    Other provisions relevant to the Limited Environmental Indemnification include:

"Damages" means any and all penalties, fines, damages, liabilities, interest, losses or costs (including, without limitation, Litigation Expenses incident to Indemnified Claims but in any event excluding consequential damages and damages for lost profits which may be awarded to Purchaser or the Corporations).

1992 Stock Purchase Agreement § 13.01(b).

"Litigation Expenses" means reasonable attorneys' fees and other costs and expenses (including actual cost of in-house counsel in a situation where Seller has allowed Purchaser to assume the defense of litigation and Purchaser's lead counsel is an employee of Purchaser) incident to proceedings or investigations respecting, or the prosecution or defense of, a claim.

1992 Stock Purchase Agreement § 13.01(e).

12.    Among the expired indemnification provisions were those enumerated in 1992 Stock Purchase Agreement subsections 13.03(v) and (vi), which provided in relevant part that:

Subject to the terms, conditions and limitations of this Article, Seller and Grace shall indemnify Purchaser and the Corporations and save and hold Purchaser and the Corporations harmless from and against any Damages caused by or arising out of ... (v) all Third Party Claims for unpaid royalties, revenue payments or tax payments attributable to periods or transactions which occurred prior to the Closing Date and including, but not limited to, such claims by mineral owners, working interest owners, or taxing authorities arising out of gas plant assessments, contractual settlements of take-or-pay claims, gas purchase contract buy-downs, government pricing regulations or like occurrences, (vi) all other Third Party Claims, except those arising out of the litigation listed in the schedule to Section 6.05 and not listed in Section 13.06 and except as otherwise provided in this Section and except for such as are assumed by Purchaser hereunder

13.    Section 13.01 defines "Third Party Claim" to mean "any and all claims, demands, suits, actions or proceedings by any person or entity, other than Purchaser or Seller or their respective affiliates, arising prior to the Closing Date."

14.    Upon information and belief, substantially all of the transactions and obligations contemplated by the 1992 Stock Purchase Agreement have been performed.  As of the Petition Date:

- Samson Investment had no remaining obligations to perform under the 1992 Stock Purchase Agreement; and

- Except as to subsection 13.03(a)(iii) of the Limited Environmental Indemnification, GEC had no remaining obligations to perform under the 1992 Stock Purchase Agreement.[4]

**B.    1994 Settlement and Release Agreement**

15.    Effective as of March 31, 1994, GEC and Samson Investment entered into the 1994 Settlement and Release Agreement, which purported to settle all price adjustment issues,

---

[4]    As discussed below, in 1993 the GPC entity, which was renamed Samson Hydrocarbons Company, transferred substantially all of its assets, including the Then Currently Owned Sites, to another Samson entity called Samson Resources. As further discussed below, the Reorganized Debtors believe that as a matter of relevant Texas law, the Limited Environmental Indemnification became unenforceable as to the Then Currently Owned Sites upon their transfer out of the GPC entity.

except as to certain specified matters not relevant here.  None of the matters addressed in the 1994 Settlement and Release Agreement affected or changed the obligations, benefits and indemnities arising from the 1992 Stock Purchase Agreement.  1994 Settlement and Release Agreement ¶ 10.  A copy of the 1994 Settlement and Release Agreement is attached to the Finke Declaration as Exhibit 2.

16.    On information and belief, there are no remaining obligations arising from the 1994 Settlement and Release Agreement to be performed by either GEC or Samson Investment.

**C.    1998 Settlement and Release Agreement**

17.    The 1998 Settlement and Release Agreement provided for Grace to make a $1.8 million settlement payment in settlement of 51 additional claims for indemnification made by SGH against Grace after the date of the 1994 Settlement and Release Agreement (the "1998 SGH Claims").

18.    SGH released Grace from further liability for the 1998 SGH Claims and also indemnified Grace against further liability or other costs relating thereto. 1998 Settlement and Release Agreement ¶ 1.B.  On information and belief, Grace has never made an indemnification demand against SGH relating to the 1998 SGH Claims.

19.    Paragraph 1.C of the agreement provides (emphasis added):

> Notwithstanding the foregoing, nothing contained herein shall prevent Samson from submitting additional claims to Grace pursuant to the terms and conditions of the [1992 Stock Purchase] Agreement to the extent such claims arise from and after the date hereof … provided, however, *any such additional claims shall not be of a category of claims for which Grace's indemnification obligations have expired pursuant to the terms of the* [1992 Stock Purchase] *Agreement or by operation of law*, or otherwise excluded by the terms hereof.

In other words, SGH may make further indemnification claims against Grace only insofar as the 1992 Stock Purchase Agreement's indemnification provisions permit.

20.     The 1998 Settlement and Release Agreement provides for an indemnification by Grace of SGH relating to certain specified claims and litigation matters.  SGH has asserted that three of the matters for which it is seeking recovery here were included among the indemnified matters: the "Youpee Litigation," the "Fort Peck/East Poplar Unit Emergency Administrative Orders" and the "Exxon Litigation" (each as discussed below in more detail).  *See* 1998 Settlement and Release Agreement, ¶ 1.A.(e) and Exhibits C and E-4 (relating to the Exxon Litigation), and ¶¶ 1.E and 2, and Exhibit F (relating to the "Murphy Oil Claim," which encompasses the Youpee Litigation and the Fort Peck/East Poplar Unit Emergency Administrative Orders), attached to the Finke Declaration as Exhibit 3.

21.     Paragraph 3 of the 1998 Settlement and Release Agreement provides:

> Except for the specific matters which are the subject hereof, all of the terms, conditions and limitations contained within the [1992 Stock Purchase] Agreement and the [1994] Settlement and Release Agreement shall remain in full force and effect as originally written.

22.     On information and belief, there are no other remaining obligations arising from the 1998 Settlement and Release Agreement to be performed by either GEC or Samson Investment.

**D.     Casmalia Joint Defense Agreement**

23.     On or about February 7, 2000, the EPA named Grace as a potentially responsible party ("PRP") under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601 et seq. ("CERCLA"), and the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq. ("RCRA"), regarding the Casmalia Disposal Site, formerly the Casmalia Resources Hazardous Waste Management Facility (the "Casmalia Site").  *See General Notice Letter and Tolling Agreement, Casmalia Disposal Site, Santa Barbara County, CA*, at 2 (enclosed with the K. W. Lund letter to C. P. Tholen, dated

March 31, 2000 (the "Lund Letter"), which is attached to the Finke Declaration as Exhibit 4). The Casmalia Site is an approximately 252-acre, inactive commercial hazardous waste treatment, storage, and disposal facility located in Santa Barbara County, California. Extract of *Casmalia Resources Superfund Site Final Remedial Investigation Report*, dated January 25, 2011, at 2-2 (accessed on May 27, 2015 at http://yosemite.epa.gov/), attached to the Finke Declaration as Exhibit 5.

24.    On information and belief, GPC sent waste to the Casmalia Site prior to 1984. GPC ceased such shipments when it sold the relevant assets to Shell Oil Company and ceased all its operations in California. Grace may have also sent relatively small quantities of waste to the Casmalia Site that were "far below the de minimis cutoff EPA has established for the Site." *See* K. W. Lund letter to M. Chalfont and B. O'Brien, dated July 11, 2000, attached to the Finke Declaration as Exhibit 6. The Casmalia Site's operator, Casmalia Resources, ceased accepting off-site liquid wastes in July 1987 and stopped accepting off-site solid waste in November 1989. All of these events occurred prior to the GPC Stock Sale Transaction. At no time did any of GPC, its subsidiaries, GEC, Grace or any of their affiliates hold an ownership interest in the Casmalia Site.

25.    On March 24, 2000, the EPA communicated the 3/24/00 EPA Settlement Offer to Grace. *See* Lund Letter. In the Lund Letter, Grace took the position that any and all of GPC's remediation liability for the Casmalia Site was SGH's obligation because they were one and the same entity. In addition, Grace asserted that SGH's obligations arising from the Casmalia Site and any settlement thereof were not indemnifiable under the 1992 Stock Purchase Agreement. SGH disputed Grace's position in its entirety. *See* E. Mack letter to DOJ and EPA dated 8-21-2000, attached to the Finke Declaration as Exhibit 7 (the "Mack 8/21/2000 Letter").

26.     In late 2000, the EPA conditioned its settlement offer in part on SGH and Grace resolving their differences over who was liable for GPC's share of the remediation liability. In an attempt to resolve or at least suspend their disputes, effective as of January 31, 2001, Grace-Conn. and GEC entered into a *Payment of Settlement, Joint Defense, and Confidentiality Agreement* (the "Casmalia JDA," attached to the Finke Declaration as Exhibit 8) with Samson Investment and SGH to defend and settle claims asserted by the EPA regarding the Casmalia Site. Under the Casmalia JDA, both Grace and SGH specifically reserved their positions regarding who was liable for GPC's Casmalia Site liabilities, which the JDA defined as the "SHC Share." The Casmalia JDA provided that each party would pay 50% of the SHC Share with certain adjustments as summarized below:

| Provision | Description |
|---|---|
| Preamble: | Defined "SHC Share" to mean "the Samson Hydrocarbons Company share of alleged liability for materials disposed of at the Casmalia Disposal Site in Santa Barbara, California" |
| | The Tier II PRP Group comprised the Casmalia Resources Site Steering committee and its individual members (collectively, the "CRSSC") and "certain other large quantity generators." |
| 1. | Grace agreed to "rejoin and SHC shall join the Tier II PRP Group" |
| 5. | Grace and SGH agreed to pay their own respective legal expenses going forward |
| 6. | Grace and Samson "shall each pay 50% of the SHC Share" |
| 7. | Subject to an $87,500 offset, Grace agreed to pay 50% of the SHC Share "of any Tier II PRP Group settlement," which the parties acknowledged could include certain potential "Interim 50% Payments." |
| 11. | Grace and SGH each denied their respective liability for the SHC Share, whether based upon the 1992 Stock Purchase Agreement or otherwise. |
| 12. | Each side reserved its rights to pursue each other for claims relating to Casmalia (including but not limited to the SHC Share) |
| 13. | Each side agreed to toll for two years any statutes of limitations for claims arising out of the 1992 Stock Purchase Agreement. |
| 14. & 15. | Each side waived claims regarding negotiations occurring after January 31, 2001. |
| 17. | The Agreement may not be terminated until Grace and SGH have each paid their respective payments. |

### III.   POST-CLOSING—GPC RENAMED AND STRIPPED OF ASSETS

27.   On information and belief, in early 1993, almost immediately after Samson Investment purchased the stock of GPC from GEC, Samson Investment caused all of the assets of GPC to be transferred to other Samson companies, contemporaneous with changing GPC's name to Samson Natural Gas Company. Subsequently in that same year, Samson Natural Gas Company changed its name to SNG Production Company. In 1994, SNG Production Company changed its name to Samson Hydrocarbons Company. On August 21, 2000, in response to an EPA request for information regarding the Casmalia Site, Samson Hydrocarbons Company's counsel asserted to the EPA and the Department of Justice that "GPC is now a corporation with no assets named SHC. The assets were transferred out of SHC in 1993." *See* Mack 8/21/2000 Letter. On July 23, 2009, Samson Hydrocarbons Company changed its name to SGH Enterprises, Inc.[5] Del. Sec'y of State Certification, dated July 23, 2009, attached to the Finke Declaration as Exhibit 9.

28.   On information and belief, in November 2011, Samson Resources sold substantially all of its assets to KKR for $7.2 billion. *See KKR-Led Group has deal to buy Samson*, dated November 24, 2011 (accessed on July 9, 2015, at http://www.reuters.com/article/2011/11/24/us-kkr-samson-idUSTRE7), attached to the Finke Declaration as Exhibit 10 (the "KKR Purchase Article"). KKR has since sold some or all of the assets acquired from Samson Resources. *Exclusive: KKR Prepares More Samson Asset Sales as Oil Prices Plunge*, Reuters, dated November 10, 2014 (accessed on July 9, 2015, at

---

[5]   Despite the name-change in July 2009, Claim nos. 18526 and 18527 were nonetheless filed on August 7, 2009, identifying the claimant as "Samson Hydrocarbons Company." On July 31, 2012, Claims nos. 18551 and 18552 were filed with the claimant identified as SGH.

http://www.reuters.com/article/2014/11/10/us-samsonresources-kkr-idUSKCN0IU0DR2014111

0), attached to the Finke Declaration as Exhibit 11 (the "KKR Sale Article").

29.     As discussed in this Objection, this admitted lack of assets within the SGH corporate entity calls into question whether SGH made the payments sought to be recovered in the SGH Claim or whether a separate entity, such as Samson Resources or Samson Investment, made those payments.  For example, if SGH did not make the payments, then it is not entitled to recover on Claim no. 18551 under relevant Texas law.   Moreover, Samson Resources, the apparent beneficial holder of the former SGH/GPC assets from 1993 through 2011, is not entitled to indemnification under the 1992 Stock Purchase Agreement's Limited Environmental Indemnification, as it is not a party to that Agreement.   Therefore, to the extent that either Samson Investment or Samson Resources paid amounts set forth in Claim no. 18551, the claim should be disallowed as to those amounts.

## IV.   THE ASSERTED CLAIMS

30.     Schedule 1 to the SGH Claim lists an array of amounts to be recovered for each of the six matters (other than Otis Pipeline) for which it seeks indemnification.   Some of these amounts are estimates of future costs, and should either be disallowed pursuant to Bankruptcy Code section 502(e)(1) as contingent, unliquidated claims or estimated at $0 pursuant to Bankruptcy Code section 502(c)(1) because the SGH Claim does not substantiate these amounts. Still other amounts are identified as payments in settlement of litigation.

31.     The remaining amounts appear to be either Litigation Expenses or a potpourri of other costs.  The SGH Claim does not provide a total for its asserted Litigation Expenses, but the Reorganized Debtors estimate that SGH is asserting approximately $2,251,493.39 in Litigation Expenses, with other costs estimated at $1,201,510.70, in each case exclusive of amounts relating to the Otis Pipeline.

### A.    Otis Pipeline

32.    Claimant asserted a claim as to the Otis Pipeline in the amount of $77,071,785.32 in Claim no. 18551, which was filed on July 31, 2012.  On March 15, 2012, the Court entered its *Order Approving Compromise and Settlement* [Docket no. 28668] (the "Otis Pipeline Order"), which allowed a claim as to the Otis Pipeline in the amount of $7,440,000 (the "Allowed Otis Pipeline Claim").  SGH thereafter transferred its right to that payment to the EPA.  On February 5, 2014, the EPA was paid in full satisfaction of the Allowed Otis Pipeline Claim.  Therefore, the Otis Pipeline part of the SGH Claim has been fully resolved and the total amount claimed by SGH after accounting for the Otis Pipeline Claim is $17,161,169.67.

### B.    Fort Peck/East Poplar Unit

33.    Claimant has asserted a claim for approximately $9,245,960.64 allegedly caused by a well in the East Poplar Unit, located in Roosevelt County, MT, in which GPC owned a working interest from approximately 1978 to 1986.  *See Concise Summary of the Case*, *SGH Enterprises, Inc. v. United States Environmental Protection Agency*, Case no. 11-1027 (3rd Cir.) (Docket no. 003110410559), filed January 14, 2011 (the "SGH Ft. Peck Case Summary"), at 1 (attached to the Finke Declaration as Exhibit 12).    The SGH Claim bases its assertions on several emergency administrative orders and consent decrees filed by the EPA over the years, and on certain "60-day notices" issued by the City of Poplar.  SGH did not attach copies of these notices to its proof of claim.  On information and belief, SGH has no remaining obligations under any of these administrative orders, consent decrees and notices.  The East Poplar Unit working interest formerly owned by GPC is not known to have any further liabilities.

34.    Notwithstanding the lack of known, potential future exposure, the major component of the amount claimed by SGH in connection with the East Poplar Unit working

interest is contingent and unliquidated, while a smaller portion of the claimed amount is liquidated (the "Fort Peck Claimed Amount"), as follows:

| Component of Fort Peck Claimed Amount | Amount |
|---|---|
| Asserted Litigation Expenses | $896,315.80 |
| Settlement Payments | $0.00 |
| Non-Legal (exclusive of settlement payments) | $1,149,644.84 |
| Liquidated Component (subtotal) | $2,045,960.64 |
| Contingent/Unliquidated Component | $7,200,000.00 |
| Fort Peck Claimed Amount | $9,245,960.64 |

35.    The Reorganized Debtors object to the Fort Peck Claimed Amount on the following bases:

- SGH has failed to provide proof of payment to support the liquidated components;

- SGH has failed to establish that: (i) the asserted Litigation Expenses fall within the 1992 Stock Purchase Agreement's definition of that term, as discussed later herein; and (ii) such amounts are reasonable under relevant Texas law;

- SGH has failed to carry its burden to establish that its expenditure of the liquidated claimed amounts was either reasonable or necessary, as required by Texas law; and

- The contingent portions of the Fort Peck Claimed Amount are subject to disallowance pursuant to Bankruptcy Code section 502(e)(1), or should otherwise be estimated pursuant to Bankruptcy Code section 502(c)(1) at $0.00, because SGH has no known remaining obligations arising from the East Poplar Unit working interest.

**C.    Youpee Litigation**

36.    The Youpee Litigation (as that term is defined in the SGH Claim) was also allegedly caused by East Poplar Unit well.  The litigation was settled.  Claimant has asserted a claim for reimbursement as follows:

| Component of Youpee Claimed Amount | Amount |
|---|---|
| Asserted Litigation Expenses | $81,230.76 |
| Settlement Payments | $210,000.00 |
| Non-Legal (exclusive of settlement payments) | $46,795.14 |

| Component of Youpee Claimed Amount | Amount |
|---|---|
| Liquidated Component (subtotal) | $338,025.90 |
| Contingent/Unliquidated Component | $0.00 |
| Youpee Claimed Amount | $338,025.90 |

37.    The Reorganized Debtors object to the Youpee Litigation indemnification claim on the following bases:

- SGH has failed to provide proof of payment of the various claimed amounts;

- SGH has failed to establish that: (i) the asserted Litigation Expenses fall within the 1992 Stock Purchase Agreement's definition of that term; and (ii) such amounts are reasonable and necessary under relevant Texas law;

- SGH has failed to carry its burden to establish that its expenditure of other liquidated claimed amounts was either reasonable or necessary, as required by Texas law; and

- SGH has failed to establish that the Youpee Litigation settlement payment was reasonable, as required by Texas law.

**D.    Casmalia Site**

38.    Claimant asserts that it is entitled to be indemnified under the Limited Environmental Indemnification for obligations arising from or otherwise relating to the Casmalia Site. Claimant therefore seeks to recover for a settlement payment it made, certain related legal and non-legal expenses, and a contingent, unliquidated claim for an alleged potential future obligation to the State of California.

| Component of Casmalia Claimed Amount | Amount |
|---|---|
| Asserted Litigation Expenses | $896,316.60 |
| Settlement Payments | $6,067,323.00 |
| Non-Legal (exclusive of settlement payments) | $5,070.72 |
| Liquidated Component (subtotal) | $6,968,710.32 |
| Contingent/Unliquidated Component | $250,000.00 |
| Casmalia Claimed Amount | $7,149,552.90 |

Claimant has also asserted a contingent claim of unspecified amount for future indemnification relating to or otherwise arising from the Casmalia Site.

39.    The Reorganized Debtors object to the Casmalia Site indemnification claim on the following bases:

- SGH has no right to indemnification for the Casmalia Site indemnification claim, because:

  - The plain language of the Limited Environmental Indemnification does not include claims made by third parties for environmental clean-up obligations that arise from sites that were neither owned nor operated by GPC prior to the GPC Stock Sale Transaction; and

  - SGH is not entitled to indemnification based upon its settlement of "Third Party Claims," as the 1992 Stock Purchase Agreement defines that term, because the indemnification provision applicable to such Third Party Claims expired prior to SGH's demand for indemnification for the Casmalia Site;

- SGH has failed to establish that the Casmalia Site Settlement Payment was reasonable, as required by Texas law;

- SGH has failed to provide proof of payment of the various claimed amounts;

- SGH has failed to establish that: (i) the asserted Litigation Expenses fall within the 1992 Stock Purchase Agreement's definition of that term; and (ii) such amounts are reasonable under relevant Texas law; and

- To the extent that the claimed amounts include non-legal expenses, SGH has failed to carry its burden to establish that its expenditure of such amounts was either reasonable or necessary, as required by Texas law.

### E.    Exxon Litigation

40.    Claimant has asserted a claim for Litigation Expenses relating to litigation involving certain oil and gas development rights that GPC held from 1979 through 1985 at the Cushing Field in Creek County, Oklahoma. *W. R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*, 2004 Bankr. LEXIS 579, *2 (Bankr. D. Del. Apr. 29, 2004). For reasons set forth in the *Chakarian* opinion, the Reorganized Debtors do not contest their liability for properly documented Litigation Expenses. But as discussed below, insufficient documentation has been

provided to the Reorganized Debtors by Claimant to evaluate whether the legal and non-legal expenses qualify for reimbursement under the 1992 Stock Purchase Agreement and the 1998 Settlement and Release Agreement.

**F.    Ellison Litigation**

41.    Claimant asserts that the Reorganized Debtors are liable for $182,509.38 in attorneys' fees and a settlement payment of $25,000 relating to certain litigation captioned, *Ellison v. FPC Disposal, Inc.*, Case No. CV-99-151-1 (OK. Dist. Ct., Canadian County) (the "Ellison Litigation").

| Component of Ellison Claimed Amount | Amount |
|---|---|
| Asserted Litigation Expenses | $182,509.38 |
| Settlement Payments | $25,000.00 |
| Non-Legal (exclusive of settlement payments) | $0.00 |
| Liquidated Component (subtotal) | $207,509.38 |
| Contingent/Unliquidated Component | $0.00 |
| Ellison Claimed Amount | $207,509.38 |

42.    Claimant asserts that, on November 21, 2000, Jackie Eugene Ellison and Marcia Ellison "filed their Second Amended Petition seeking damages for alleged groundwater contamination" on their property. Claimant further asserts that, on January 3, 2001, it sent "its notice of claim to Grace seeking indemnification for its attorneys' fees and costs and for environmental response costs associated with the Ellison Claim." The SGH Claim does not assert that the Ellison Litigation concerns any Owned Site. According to pleadings filed by Claimant's own counsel, the alleged source of contamination of plaintiffs' property was chlorides and other substances leaking from a third-party commercial disposal facility—*which GPC never owned*. *See Defendants' Joint Motion for Partial Summary Judgment and Brief in Support*, attached to the Finke Declaration as Exhibit 13, and *Defendants' Reply to Plaintiffs'*

*Response to Defendants' Joint Motion for Partial Summary Judgment and Brief in Support*, "Undisputed Fact No. 4," attached to the Finke Declaration as <u>Exhibit 14</u>. On further information and belief, SGH (f/k/a GPC) and Samson Resources were both named defendants in the Ellison Litigation. *See* Finke Declaration <u>Exhibit 15</u> (Ellison Litigation docket sheet). The Ellison Litigation docket sheet further states that Samson Resources was dismissed with prejudice from the litigation pursuant to summary judgment and SGH was separately dismissed with prejudice by reason of a settlement.

43. The Reorganized Debtors object to the Ellison Litigation indemnification claim on the following bases:

- SGH has no right to indemnification for the Ellison Litigation indemnification claim, because:

  - The plain language of the Limited Environmental Indemnification does not include claims made by third parties for environmental clean-up obligations that arise from third-party-owned waste-disposal sites such as that at issue in the Ellison Litigation that were neither owned nor operated by GPC prior to the GPC Stock Sale Transaction; and

  - SGH is not entitled to indemnification based upon its settlement of "Third Party Claims," as the 1992 Stock Purchase Agreement defines that term, because the indemnification provision applicable to such Third Party Claims expired prior to SGH's demand for indemnification for the Ellison Litigation;

- SGH has failed to establish that the Ellison Litigation Settlement Payment was reasonable, as required by Texas law;

- SGH has failed to provide proof of payment of the various claimed amounts;

- SGH has failed to establish that: (i) the asserted Litigation Expenses fall within the 1992 Stock Purchase Agreement's definition of that term; and (ii) such amounts are reasonable under relevant Texas law; and

- To the extent that the claimed amounts include non-legal expenses, SGH has failed to carry its burden to establish that its expenditure of such amounts was either reasonable or necessary, as required by Texas law.

G.    **Placerita Litigation**

44.    SGH has claimed the following amounts relating to certain litigation captioned, *Petro Resources, Inc., v. N.Y. Hillside, Inc., et al.,* Case no. BC 222456 (Cal. Sup. Ct.) (the "Placerita Litigation"):

| Component of Placerita Claimed Amount | Amount |
|---|---|
| Asserted Litigation Expenses | $14,125.51 |
| Settlement Payments | $25,000.00 |
| Non-Legal (exclusive of settlement payments) | $0.00 |
| Liquidated Component (subtotal) | $39,125.51 |
| Contingent/Unliquidated Component | $0.00 |
| Placerita Claimed Amount | $39,125.51 |

45.    The Placerita Oil Field is located in Newhall, CA.  On information and belief, GPC had a working interest and net revenue interest in five leases in the Placerita Oil Field that were disposed of prior to the sale of GPC's stock to Samson Investment.  In July 2001, NY Hillside, Inc., a defendant and third-party plaintiff in the Placerita Litigation, asserted a third-party claim against SGH based upon GPC's former working interest.

46.    According to Claim no. 18551, subsequent to the Petition Date, SGH presented a demand to the Debtors for indemnification.  The Debtors were unable to comply in view of the then-ongoing Chapter 11 cases.

47.    In December 2001, according to the SGH Claim, SGH entered into a Settlement Agreement and Mutual Release, which settled the Placerita Litigation.  Claimant seeks recovery of a $25,000 settlement amount (the "Placerita Settlement Amount") and $14,125.51 in attorneys' fees and costs (the "Placerita Legal Fees").

48.    The Reorganized Debtors object to the Placerita Litigation indemnification claim on the following bases:

- SGH has failed to establish that: (i) the asserted Litigation Expenses fall within the 1992 Stock Purchase Agreement's definition of that term; and (ii) such amounts are reasonable under relevant Texas law;

- To the extent that the claimed amounts include non-legal expenses, SGH has failed to carry its burden to establish that its expenditures of such amounts was either reasonable or necessary, as required by Texas law;

- SGH has failed to establish that the Placerita Litigation settlement payment was reasonable, as required by Texas law; and

- SGH has failed to provide proof of payment of the various claimed amounts.

## The Objection

49.    As discussed above, the SGH Claim contains many components, each of which will have to be addressed separately, whether through summary judgment or further evidentiary proceedings.

## I.    THE CASMALIA SITE AND ELLISON LITIGATION CLAIMS SHOULD BE DISALLOWED

50.    Simply put, the Reorganized Debtors are not liable to SGH for any amounts relating to the Casmalia Site or the Ellison Litigation—which together comprise approximately $7,357,062.28 of the $17,161,169.67 claimed by SGH (exclusive of the Otis Pipeline amounts). There are only two indemnification provisions in the 1992 Stock Purchase Agreement upon which SGH could base its Casmalia and Ellison indemnification claims. SGH is precluded from recovery under either provision by the "fair notice" doctrine adopted by the Texas Supreme Court, which requires that an indemnification clause meet two criteria: the express negligence doctrine and the conspicuousness requirement. *Enron Corp. Sav. Plan v. Hewitt Associates, LLC*, 611 F. Supp. 2d 654, 663-64 (S.D. Tex. 2009) (citations omitted). Whether the requirements of conspicuousness and express negligence are satisfied is a question of law for the court to decide. *Am. Home Shield Corp. v. Lahorgue*, 201 S.W.3d 181, 184-85 (Tex. App.— Dallas 2006).

51.     The express negligence doctrine, which the Texas Supreme Court also applies to strict liability indemnity clauses, *Houston Lighting & Power Co. v. Atchison, T. & S.F. Ry.*, 890 S.W.2d 455, 456 (Tex. 1994), states in relevant part that "an enforceable indemnity clause must contain three elements: (1) the intent of the parties must be clear; (2) it must be set forth within the four corners of the agreement; and (3) the specific intent of the parties must be expressed." *Delta Air Lines, Inc. v. ARC Security, Inc.*, 164 S.W.3d 666, 671 (Tex. App.--Fort Worth 2005, pet. denied); *see also Enron Corp. Sav. Plan*, 611 F. Supp. 2d at 664.  "The doctrine is not an affirmative defense but a rule of contract interpretation." *Van Voris v. Team Chop Shop, LLC*, 402 S. W. 3d 915, 919 (Tex. App.—Dallas 2013, no pet.).

52.     Here, the intent of the parties to provide different indemnification for "Third Party Claims" and Owned Sites is clearly expressed within the four corners of the 1992 Stock Purchase Agreement.  Section 13.03(b) of the 1992 Stock Purchase Agreement, which expressly limited GEC and Grace-Conn.'s indemnification liability for "Third Party Claims" to claims asserted by SGH and Samson Investment during the three-year period after the Closing Date, expired on January 21, 1996.  Neither SGH nor Samson Investment asserted an indemnification claim as to either the Casmalia Site or the third-party disposal site at issue in the Ellison Litigation until long after that date.  Indeed, SGH admits in the SGH Claim that it gave notice of its indemnification demand for the Ellison Litigation to Grace on January 3, 2001, *see* SGH Claim at 12, and gave notice of its indemnification demand for the Casmalia Site on April 26, 2000.  *Id.* at 10; *see also* J. A. Canon letter to Grace Energy Corp., dated April 26, 2000, attached to the Finke Declaration as Exhibit 16.  Therefore, SGH cannot look to that provision to support its Casmalia and Ellison indemnification claims.

53.    The Limited Environmental Indemnification does not provide a basis for SGH's recovery, either.  It expressly applies only to Owned Sites, and simply cannot be read to include third-party disposal sites.  Moreover, the express negligence doctrine precludes any argument that the Limited Environmental Indemnification should be more broadly construed.  *Houston Lighting*, 890 S.W.2d at 458 (Tex. 1994) ("fairness [which] dictates against imposing liability on an indemnitor unless the agreement clearly and specifically expresses the intent to encompass strict liability claims."); *Van Voris*, 402 S. W. 3d at 919.

54.    Finally, the express negligence doctrine precludes SGH from looking to the 1994 and 1998 Settlement and Release Agreements or the Casmalia JDA. *Enron Corp. Sav. Plan*, 611 F. Supp. 2d at 664.  But even if those agreements were to be consulted, they would not provide SGH with any succor, for they each expressly refer back to the 1992 Stock Purchase Agreement as the sole agreement setting forth the scope of indemnification.  Thus, SGH is precluded from recovery as to either matter as a matter of well-established Texas law.  *Houston Lighting*, 890 S.W.2d at 458 (Tex. 1994); *see also  Ethyl Corp. v. Daniel Constr. Co.*, 725 S.W.2d 705, 707-08 (Tex. 1987) (the rule "cut[s] through the ambiguity of provisions where the 'intent of the scriveners is to indemnify the indemnitee for its negligence, yet just be ambiguous enough to conceal that intent from the indemnitor'.").

55.    The Reorganized Debtors intend to file a motion for summary judgment on these issues.

## II.    NO PROOF THAT SGH MADE THE PAYMENTS FOR WHICH IT SEEKS RECOVERY

56.    SGH has failed to substantiate that it paid the amounts for which it is demanding indemnification, which raises two separate grounds for objection.  In the first instance, SGH has simply not carried its burden to provide sufficient documentation demonstrating that the alleged payments were made.  Second, to the extent that such payments were made, there is evidence to

indicate that SGH was not the party making at least some of those payments. Indeed, it appears that separate entities, such as Samson Investment and Samson Resources, made those payments. If that indeed turns out to be the case, then SGH may not recover for amounts paid by other entities.

### A.     Claimant Has Not Established a Right to Recovery Under Texas Law

57.     Del. Bankr. L. R. 3007-1(f)(vi) states in relevant part that a claim may be disallowed if it:

> does not include or attach sufficient information or documentation to constitute prima facie evidence of the validity and amount of the claim, as contemplated by Fed. R. Bankr. P. 3001(f).

Such proof must establish a right to payment under state law—in this case Texas state law. *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 245 n.66 (3d Cir. 2005), citing *United States v. Sanford*, 979 F.2d 1511, 1513 (11th Cir. 1992) (A claim "will not be allowed in a bankruptcy proceeding if the same claim would not be enforceable against the debtor outside of bankruptcy"). Relevant Texas law provides that a claimant seeking recovery under a "damages" indemnity provision such as the Limited Environmental Indemnification must establish that actual payment is made. Indeed, under such a provision, "the indemnitee's right to sue does not accrue 'until the indemnitee has suffered damage or injury by being compelled to pay the judgment or debt'." *Smith Int'l, Inc. v. Egle Group LLC*, 490 F.3d 380, 389 (5th Cir. 2007) (quoting *Tubb v. Bartlett*, 862 S.W.2d 740, 750 (Tex. App.—El Paso 1993, writ denied); *see also Marathon E.G. Holding Ltd. v. CMS Enters. Co.*, 597 F.3d 311, 321 (5th Cir. Tex. 2010). The Reorganized Debtors therefore object to the SGH Claim for indemnification as to amounts for which SGH has not established that the payment was actually made.

**B.    SGH May Be the Improper Claimant as to Certain Amounts**

58.    SGH's failure to provide proof of payment raises a second, related issue, which is whether some or all of the payments were made by a party other than SGH.  If that is the case, then the SGH Claim must be disallowed as both a matter of Texas and bankruptcy law to the extent that such payments were made by a third party.

59.    It is a matter of well-established Texas law that only an indemnitee may recover from an indemnitor.  *Conoco, Inc. v. Republic Ins. Co.*, 819 F.2d 120, 121-124 (5th Cir. 1987) (applying Texas law, an indemnity only covers expenses actually incurred by the indemnitee, not money that the indemnitee may have promised to repay to another who paid the expense without a legal obligation to do so).  In other words, a volunteer stepping into the shoes of the indemnitee to make a payment on the indemnitee's behalf may not recover that payment from the indemnitor—even when the volunteer and the indemnitee are affiliates or otherwise related.  *Drilltec Techs. v. Remp*, 64 S.W.3d 212, 217 (Tex. App.—Houston [14th Dist.] 2001, no pet.) ("equitable subrogation is unavailable to a 'mere stranger or volunteer who has paid the debt of another, without any assignment or agreement for subrogation, without being under any legal obligation to make payment, and without being compelled to do so for the preservation of any rights or property of his own'.")

60.    Here, SGH and Samson Investment have made it abundantly clear that SGH has had no assets of its own since 1993.  *See* Mack 8/21/2000 Letter.  This raises the question of whether SGH could have made any of the payments for which it is claiming an indemnity—and whether because of that apparent lack of capacity, Samson Investment or Samson Resources or some other volunteer made those payments.

61.    The Reorganized Debtors do not make this objection in a vacuum, for the limited amount of information in their possession strongly suggests that one or more entities other than

SGH made at least some of the payments for which SGH seeks recovery.  For example, the Reorganized Debtors note that at least one wire transfer to the law firm of Locke Lord in payment for services rendered as to the Casmalia Site appears to have been made from a Samson Resources operating account.  *See* Finke Declaration Exhibit 17.  Other checks, including one dated October 21, 2002 for legal services rendered by the law firm of Watkins & Eager, and a second check dated August 25, 2004 in payment for non-legal services, both relating to the East Poplar Unit, are embossed "Samson," which leaves open the question of which entity was making the payments from what bank account.  *See* Finke Declaration Exhibits 18 and 19.  Yet another "disbursement voucher," also for services relating to the East Poplar Unit, directs the issuance of a check from the Samson Resources operating account.  *See* Finke Declaration Exhibit 20, at p. 4 (entitled "Disbursement Voucher").[6]

62.    These admittedly incomplete and anecdotal examples do not provide the Reorganized Debtors with sufficient information to systematically determine which entities were making what payments of amounts at issue in the SGH Claim.  Samson Resources apparently made at least some payments, but it is not an indemnitee under the 1992 Stock Purchase Agreement.  It also did not make a claim in these Chapter 11 Cases.  Therefore, it cannot recover any such amounts, both as a matter of relevant Texas and bankruptcy law.  *Conoco, Inc. v. Republic Ins. Co.*, 819 F.2d at 121-124; Del. Bankr. L. R. 3007-1(d)(iv).[7]  Samson Investment is

---

[6]  The Reorganized Debtors note that they cannot with certainty tie these checks back to specific items listed in the SGH Claim, but that only further buttresses the Reorganized Debtors' objection as to SGH's failure to carry its burden of proof that all amounts it seeks to recover were payments that were actually made.

[7]  To the extent that SGH asserts that its rights under the 1992 Stock Purchase Agreement were assigned to Samson Resources, such an assignment would have been improper and of no legal effect, as the agreement states in relevant part, "this Agreement shall not be assignable by either party without the prior written consent of the other party."  1992 Stock Purchase Agreement at § 18.06.  On information and belief, no such assignment was requested, nor was it consented to by Grace, whether in writing or otherwise.

an indemnitee, but it too chose not to file a claim in these Chapter 11 Cases. It is now time-barred from doing so. Samson Investments therefore may not recover any amounts that it may have paid. Del. Bankr. L. R. 3007-1(d)(iv).

63.    SGH likewise cannot be permitted an allowed claim for amounts paid by Samson Resources and Samson Investment. First, SGH cannot recover under the Limited Environmental Indemnification for amounts that it did not pay. *Smith Int'l, Inc. v. Egle Group LLC*, 490 F.3d at 389. Second, SGH cannot recover on behalf of entities who may have made such payments on its behalf, because those entities were mere volunteers who "paid the debt of another," without there being an assignment or any "legal obligation to make" those payments. *Drilltec Techs. v. Remp*, 64 S.W.3d at 217.

III.    **THE 1993 ASSET TRANSFER TO SAMSON RESOURCES AND THE 2011 SALE OF SAMSON RESOURCES HAVE INVALIDATED THE LIMITED ENVIRONMENTAL INDEMNIFICATION AS TO THEN CURRENTLY OWNED SITES**

64.    The SGH Claim does not assert any specific Limited Environmental Indemnification claims for any of the Then Currently Owned Sites. But the SGH Claim seems to leave open the possibility that SGH may assert indemnification claims for Then Currently Owned Sites, whether through an amended proof of claim or (to the extent that the Court finds that the 1992 Stock Purchase Agreement was executory—which the Reorganized Debtors assert is not the case—and thus assumed under Plan Art. 9.1.1) at some point in the future.[8] For reasons set forth below, the Reorganized Debtors respectfully submit that subsection 13.03(a)(iv)

---

[8]    In ¶¶ 78-79, the Reorganized Debtors request the Court make a finding that the 1992 Stock Purchase Agreement was not executory as of the Petition Date (because the only remaining obligation—indemnification—is not executory in nature). Such a finding will preclude SGH from asserting further claims for indemnification in the future.

is no longer effective, because SGH (which was formerly GPC) no longer owns the Then Currently Owned Sites.

65.     As discussed above, the Then Currently Owned Sites were transferred in 1993 from the GPC entity to Samson Resources.  *See* Mack 8/21/2000 Letter.  According to news reports, Samson in 2011 apparently sold the Samson Resources entity and the Then Currently Owned Sites to KKR, which subsequently sold the sites and other former Samson assets in November 2014.  *See* KKR Purchase Article; KKR Sale Article.

66.     The Limited Environmental Indemnification does not include any right to indemnification once SGH is no longer the beneficial owner of the Then Currently Owned Sites (nor does any other part of the 1992 Stock Purchase Agreement).  As discussed above, it is a matter of well-established Texas law that indemnification clauses are strictly construed and thus enforceable only to the extent of their express terms.  *See, e.g.*, *Houston Lighting & Power Co. v. Atchison, T. & S.F. Ry.*, 890 S.W.2d 455, 459 (Tex. 1994).  Here, the Limited Environmental Indemnification is silent as to the effect of a post-Closing Date sale or transfer of the Then Currently Owned Sites on the subsection 13.03(a)(iv) component of the Limited Environmental Indemnification.

67.     As the Texas Supreme Court held in *Houston Lighting*, "fairness dictates against imposing liability on an indemnitor unless the agreement clearly and specifically expresses the intent to encompass" the claim for which indemnification is sought.  890 S.W.2d at 458.  Here, fairness dictates that GEC and Grace-Conn. cannot be held liable for indemnification claims as to Then Currently Owned Sites when GPC/SGH no longer owns those sites.  To enforce such liability would be to impose upon GEC and Grace-Conn. a liability that they did not bargain for

in the 1992 Stock Purchase Agreement. The 1992 Stock Purchase Agreement, at section 18.06

("Binding Agreement; Assignment"), confirms the point, stating in relevant part:

> This Agreement shall be binding upon and inure to the benefit of
> the parties hereto and their respective successors and permitted
> assigns, but ***this Agreement shall not be assignable by either party
> without the prior written consent*** of the other party.

1992 Stock Purchase Agreement § 18.06 (emphasis added).

68.     SGH never obtained the written consent of GEC and Grace-Conn. to any such

assignment. Samson Resources thus never became the assignee of the 1992 Stock Purchase

Agreement or the Limited Environmental Indemnification contained therein, even though in

1993, it became the transferee of the Then Currently Owned Sites.

69.     Therefore, the silence in the Limited Environmental Indemnification can lead to

only one conclusion—that once SGH transferred a Then Currently Owned Site to another entity

(whether Samson Resources or otherwise), the indemnification is no longer operative as to that

site. Thus, even if this Court were to find that the 1992 Stock Purchase Agreement was executory

and thus assumed on the Effective Date pursuant to Plan Art. 9.1.1, SGH is precluded from both

amending the SGH Claim to seek recovery as to any Then Currently Owned Sites arising on or

before the Plan Effective Date or from making any post-bankruptcy claims for recovery.

70.     The Reorganized Debtors intend to address this aspect of the Objection in a

summary judgment motion.

## IV.    SAMSON HAS NOT CARRIED ITS BURDEN TO ESTABLISH THAT CLAIMED AMOUNTS ARE "REASONABLE" AND "NECESSARY"

71.     Samson has the burden of establishing that each of the amounts for which it is

claiming indemnification fall within the scope of the Limited Environmental Indemnification.

Del. Bankr. L. R. 3007-1(f)(vi). These amounts fall into three broad categories, "Litigation

Expenses," settlement payments negotiated to resolve various litigation matters, and other amounts, the nature of which are not readily identifiable in most instances.

72.    The SGH Claim merely lists line items without establishing whether these amounts are reasonable and necessary under applicable Texas law. The Reorganized Debtors have no information in their books and records upon which to determine whether these amounts are reasonable and necessary under applicable Texas law. Such amounts must therefore be disallowed under Del. Bankr. L. R. 3007-1(f)(vi).

A.    **Litigation Expenses**

73.    On March 14, 2015, pursuant to the *Joint Defense and Confidentiality Agreement* (the "SGH Legal Invoice JDA") which was approved by this Court's *Protective Order Pursuant to Fed. R. Evid. 502*, dated March 3, 2015 [Docket no. 32514], Claimant produced law firm time records and certain other invoices to the Reorganized Debtors for review. The Reorganized Debtors have completed a preliminary review of these time records. Based upon that review, the Reorganized Debtors believe that substantial portions of the amount requested for Litigation Expenses, which as discussed above are "***reasonable*** attorneys' fees and other costs and expenses," 1992 Stock Purchase Agreement at ¶ 13.01(e) (emphasis added), may not be reasonable or necessary under relevant Texas law for one or more of the following reasons:

- Fees were expended on matters that were not "incident to proceedings or investigations respecting, or the prosecution or defense of, a claim," as required by the Limited Environmental Indemnification. For example:

  - Certain invoices provided to the Reorganized Debtors name an entity other than SGH as the client; others are unclear as to whether SGH was the party incurring the legal fees, and whether the legal services were rendered not to SGH but to other legal entities, including Samson Resources and Samson Investment, which are not claimants under the SGH Claim;

  - Some of the time set forth in the invoices reviewed by the Reorganized Debtors seems to be related to SGH's monitoring and participation in these Chapter 11 Cases, which clearly is not contemplated by the Limited

Environmental Indemnification, and which associated costs are therefore not recoverable by SGH; and

- Other time, particularly as to the East Poplar Unit, may have been spent on behalf of clients other than SGH or on activities that otherwise do not fall within the meaning of "Litigation Expenses;"[9]

- Invoices seem to contain instances of duplicative billing by more than one attorney for what appear to be the same tasks;

- Block-billed and vague time entries make it impossible to determine whether a particular time entry is for legal services reimbursable under the Limited Environmental Indemnification;

- Invoices seem to include non-reimbursable items such as travel time and overhead.

74.    The Reorganized Debtors respectfully submit that determining the properly allowable amount of Litigation Expenses will require further evidentiary proceedings, which the SGH Legal Invoice JDA refers to as a "Claim Allowance Proceeding:"

> In the event of a Claim Allowance Proceeding, the Parties shall seek prompt entry by the Bankruptcy Court of a further stipulated protective order (the "Seal Order") through filing of an agreed motion and/or a joint certification of counsel between Grace and SGH, which Seal Order sets forth procedures to protect the Confidential Information, including without limitation, authorizing and directing filing or submission of all Confidential Information under seal, sealing the portion of the record (including transcripts) containing Confidential Information and providing that, to the extent necessary to protect the Confidential Information, the Court shall clear the courtroom at any hearing in which Confidential Information is at issue, disclosed, or will otherwise be placed of record.

SGH Legal Invoice JDA at ¶ 2.2.  The Reorganized Debtors intend to work with SGH to submit a "Seal Order" to this Court under certificate of counsel before undertaking any further action as to the legal expense components of the SGH Claim.

---

[9]    The Reorganized Debtors have refrained from attaching any of the documents supporting these assertions to the Finke Declaration in order to comply with the SGH Legal Invoice JDA.  They will produce them in compliance with that JDA, as discussed below in ¶ 74.

**B.    Settlement Payments May Not Be Reasonable Under Texas Law**

75.    SGH asserts in its Claim that it entered into a total of four settlements during the course of the Chapter 11 Cases: (a) the Youpee Litigation, for $210,000; (b) the Placerita Litigation, for $25,000; (c) the Casmalia Site, for $6,067,323; and (d) the Ellison Litigation, for $25,000. As the SGH Claim also makes clear, the Reorganized Debtors did not participate in any of these settlements.   Under prevailing Texas law, such settlements are indemnifiable only to the extent that they are "reasonable." *See, e.g., Fireman's Fund Ins. Co. v. Commercial Standard Ins. Co.*, 490 S.W.2d 818, 824 (Tex. 1972), overruled on other grounds, *Ethyl Corp. v. Daniel Constr. Co.*, 725 S.W.2d 705, 708 (Tex. 1987); *Mitchell's, Inc.,* 303 S.W.2d 775, 779 (Tex. 1957); *H.S.M. Acquisitions, Inc. v. West*, 917 S.W.2d 872, 879 (Tex. App.—Corpus Christi 1996, no writ). The SGH Claim does not establish the reasonableness of any of these settlement amounts, which it must do as a matter of relevant Texas law. The Reorganized Debtors therefore do not have sufficient information on hand to determine whether these settlements are reasonable.

76.    The Reorganized Debtors submit that discovery will be required in order for them to determine whether to object to one or more of these settlements in an evidentiary proceeding.

**C.    Other Claimed Amounts**

77.    The Reorganized Debtors do not possess sufficient information in their books and records to determine whether amounts claimed for expenditures other than Settlement Payments and Litigation Expenses are indemnifiable pursuant to the 1992 Stock Purchase Agreement. In most cases, the SGH Claim has little more than a one-line reference in Schedule 1 thereto. SGH has, to date, chosen not to produce any documentation in support of the SGH Claim beyond the

limited production pursuant to the SGH Legal Invoice JDA.[10]  The Reorganized Debtors intend

to engage in discovery to determine if Claimant can meet its burden of proof as to which, if any,

of these claimed amounts are within the Limited Environmental Indemnification and which are

not.  Based upon such discovery, the Reorganized Debtors request leave to supplement or

otherwise amend this Objection.

**V.    THE SGH CLAIM SHOULD BE LIQUIDATED IN ITS ENTIRETY—AND THE PLAN AND BANKRUPTCY DISCHARGE INJUNCTIONS BAR CLAIMANT FROM MAKING FURTHER CLAIMS UNDER THE 1992 STOCK PURCHASE AGREEMENT'S LIMITED ENVIRONMENTAL INDEMNIFICATION**

78.    Although it is not entirely clear from the face of the SGH Claim, it appears that

Claimant is requesting that the Court allow the liquidated portions of the SGH Claim and then

permit Claimant to continue to make further, post-bankruptcy indemnification claims against the

Reorganized Debtors under the 1992 Indemnification Agreement's Limited Environmental

Indemnification, as if these Chapter 11 Cases had never happened.  This is contrary to both the

law and the facts and circumstances relevant to resolving the SGH Claim.

79.    First and foremost, the 1992 Stock Purchase Agreement was not an executory

contract as of the Petition Date.  The only remaining obligation thereunder was pursuant to the

Limited Environmental Indemnification—which required only the payment of monies.  *See, e.g.*,

*In re Chateaugay Corp.*, 102 B.R. 335 (Bankr. S.D.N.Y. 1989) (contract requiring only the

payment of money by the debtor is not executory).  The agreement was therefore not assumed

pursuant to Plan Art. 9.1.1.  SGH's claims, which are based upon the Limited Environmental

Indemnification, are therefore prepetition claims to be allowed or disallowed in their entirety

---

[10]    What other documents the Reorganized Debtors do have on hand (some of which are referred to in this Objection) have been accumulated by the Reorganized Debtors and their counsel and were not produced by SGH in support of its Claim.

prior to the closing of these Chapter 11 Cases. Once those claims have been resolved, the Plan's and Bankruptcy Code's discharge injunctions apply to bar Claimant from making further claims against the Reorganized Debtors pursuant to the Limited Environmental Indemnification.

80.    Second, Bankruptcy Code section 502(e)(1) provides for the disallowance of claims for reimbursement that are contingent as of the time of the claim's allowance or disallowance. *In re APCO Liquidating Trust*, 370 B.R. 625, 631 (Bankr. D. Del. 2007). Claimant has asserted contingent and unliquidated claims for: (a) Fort Peck, in the amount of $7,200,000 or more ($1 million in estimated future legal fees and $6,200,000 in future "estimated vendor and consultant costs associated with third-party claims"); and (b) Casmalia Site, in the amount of $250,000 for a hypothetical future claim by the State of California. The SGH Claim also asserts additional, unspecified contingent amounts as to the Exxon Litigation, Ellison Litigation and Placerita Litigation. SGH has not substantiated—as is its burden—that these amounts remain anything other than contingent and unliquidated. The Court should therefore disallow them as such pursuant to Bankruptcy Code section 502(e)(1).

81.    To the extent that the Court does not disallow the contingent and unliquidated components in their entirety, the Reorganized Debtors will request the Court set a further evidentiary hearing to estimate the allowable amount of the SGH Claim's contingent and unliquidated components. On information and belief, there are no such allowable amounts and the Court should estimate them to be $0.00.

82.    The Reorganized Debtors intend to file a motion for summary judgment requesting that the Court enter an order requesting the foregoing relief.

### RELIEF REQUESTED

83.    The Reorganized Debtors request that the Court enter the Order substantially in the form attached hereto as Exhibit B:

(a)　Disallowing, pursuant to Del. Bankr. L. R. 3007-1, all claims other than Claim no. 18551 as either duplicative or otherwise amended and superseded; and

(b)　Setting for disposition by summary judgment the following issues:

　(i)　Whether the Court should disallow the SGH Claim to the extent that it arises from or relates to the Casmalia Site and the Ellison Litigation, because such indemnification claims are not within the scope of the 1992 Stock Purchase Agreement's indemnification provisions;

　(ii)　Whether the 1992 Stock Purchase Agreement is an executory contract assumed by the Reorganized Debtors pursuant to Plan Art. 9.1.1;

　(iii)　Whether the Limited Environmental Indemnification (as defined herein) was terminated as to the Then Currently Owned Sites (as defined herein) when SGH sold, assigned or otherwise conveyed those sites subsequent to the Closing Date;

　(iv)　Whether contingent amounts asserted by Claimant for indemnification under the 1992 Stock Purchase Agreement should be disallowed pursuant to Bankruptcy Code section 502(e)(1); and

　(v)　Such other issues relating to the allowance or disallowance of the SGH Claim that are ripe for summary judgment); and

(c)　Setting for trial the issues of:

　(i)　Whether, to the extent that payments of claimed amounts were made, SGH made those payments or whether other entities made those payments;

　(ii)　Whether the settlement payments made in the Youpee and Placerita Litigations (and made pursuant to the Casmalia Site and in the Ellison Litigation, to the extent not otherwise disallowed) were reasonable as a matter of Texas law;

　(iii)　Determining the properly allowable amount of SGH's asserted "Litigation Expenses" (as that term is discussed herein and defined in the 1992 Stock Purchase Agreement) and other costs asserted in the SGH Claim;

　(iv)　To the extent that contingent or unliquidated claims are not disallowed pursuant to Bankruptcy Code section 502(e)(1)(B), estimation of the allowable amount of any such contingent or unliquidated claims pursuant to section 502(c)(1); and

　(v)　The allowable amount of remaining claimed amounts, if any, not otherwise adjudicated by summary judgment; and

(d)   Permitting the Reorganized Debtors to supplement this Claims Objection as necessary to adjudicate the Claims and to file further claims objections to the extent that Claimant files one or more amended claims.

### PROCEDURES FOR RESPONDING TO THE CLAIMS OBJECTION

84.   To contest any of the objections set forth in this Claims Objection, Claimants must file and serve a written response to this Claims Objection (a "Response") so that it is received no later than 4:00 p.m. ET, on September 17, 2015 (the "Response Deadline").   The Response (or each Response, if more than one is filed) must be filed with the Office of the Clerk of the United States Bankruptcy Court for the District of Delaware (the "Clerk") at the following address:

> 824 Market Street
> Wilmington, Delaware 19801

85.   Each such Response must also be served upon the following co-counsel to the Reorganized Debtors on or before the Response Deadline:

> THE LAW OFFICES OF ROGER HIGGINS, LLC
> Roger J. Higgins
> 1 North Bishop Street
> Suite 14
> Chicago, IL 60607-1823
>
> PACHULSKI STANG ZIEHL & JONES LLP
> Laura Davis Jones (Bar No. 2436)
> James E. O'Neill (Bar No. 4042)
> 919 North Market Street, 17th Floor
> P.O. Box 8705
> Wilmington, DE  19899-8705

86.   Every Response to this Claims Objection must contain, at a minimum, the following:

a.   A caption setting forth the name of the Court, the name of the Reorganized Debtors, the case number, and the title of the Claims Objection to which the Response is directed;

b. The name of the Claimant, its claim number, and a description of the basis for the amount of the claim;

c. The specific factual basis and supporting legal argument upon which the party will rely in opposing the Claims Objection;

d. Any supporting documentation, to the extent it was not included with the proof of claim previously filed with the Clerk or Claims Agent, upon which the party will rely to support the basis for and amounts asserted in the proof of claim;

e. The name, address, telephone number, and fax number of the person(s) (which may be the Claimant or the Claimant's legal representative) with whom counsel for the Reorganized Debtors should communicate with respect to the claim or the objection thereto, and who possesses authority to reconcile, settle, or otherwise resolve the objection to the Disputed Claim on behalf of the Claimant.

87. If a Claimant fails to file and serve a timely Response (or Responses), the Reorganized Debtors may present to the Court an appropriate order disallowing and expunging that Claimant's claim or claims without further notice to the Claimant or a hearing.

## REPLY TO RESPONSE

88. The Reorganized Debtors reserve the right to, at their option, file and serve one or more replies to Claimants' Responses, if any.

## SEPARATE CONTESTED MATTER

89. If a Claimant files a Response to this Objection, and the Claimant and the Reorganized Debtors are unable to resolve that Response, the corresponding claim and the objection by the Reorganized Debtors thereto asserted in this Claims Objection shall constitute a separate contested matter as contemplated by Fed. R. Bankr. P. 9014. Any order entered by the Court regarding an objection asserted in the Claims Objection shall be deemed a separate order with respect to each such claim.

## RESERVATION OF RIGHTS

90. The Reorganized Debtors hereby reserve the right to object in the future to any of the Claims. The Reorganized Debtors further reserve the right to amend, modify, and/or

supplement this Objection, including, without limitation, to object to amended claims and newly-filed claims. Separate notice and hearing will be scheduled for any such objection.

## NO PREVIOUS OBJECTION

91.    No previous objection to these Claims has been filed, nor has any other motion for the relief sought herein been made to this or any other court.

## NOTICE

92.    Notice of this Motion has been given to:  (i) the Office of the United States Trustee; (ii) Counsel for the WRG Asbestos PI Trust; (iii) Counsel for the Asbestos PI Future Claimants Representative; (iv) Counsel for the Asbestos PD Future Claimants Representative; (v) Counsel for the WRG Asbestos PD Trust (7A); (vi) Counsel for the WRG Asbestos PD Trust (7B); (vii) Counsel for the CDN ZAI PD Claims Fund; (viii) those parties that requested service and notice of papers in accordance with Fed. R. Bankr. P. 2002; and (ix) Claimant.  In light of the nature of the relief requested, the Reorganized Debtors submit that no further notice is required.

**[remainder of this page is intentionally left blank]**

WHEREFORE, the Reorganized Debtors request the Court enter the Order in substantially the form attached hereto as Exhibit B:  (i) disallowing the Claims other than the SGH Claim as either duplicative or as otherwise amended and superseded; (ii) setting for summary judgment certain matters enumerated herein; (iii) setting further evidentiary hearings certain other matters herein; and (iv) granting such other relief as may be appropriate.

Dated:  August 18, 2015

THE LAW OFFICES OF ROGER HIGGINS, LLC
Roger J. Higgins
1 North Bishop Street
Suite 14
Chicago, IL 60607-1823
(312) 666-0431

and

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705
(302) 652-4100
(302) 652-4400

Co-Counsel for the Reorganized Debtors