## Exhibit A

**Claim No. 18551**

# WR Grace

SR0001186

Bankruptcy Form 10

Index Sheet

A 0 0 0 0 3 3 0 6 8

Claim Number: 00018551

Receive Date: 07/31/2012

## Multiple Claim Reference

Claim Number _____

| | | |
|---|---|---|
| ☐ | MMPOC | Medical Monitoring Claim Form |
| ☐ | PDPOC | Property Damage |
| ☐ | NAPO | Non-Asbestos Claim Form |
| ☐ | | Amended |

Claim Number _____

| | | |
|---|---|---|
| ☐ | MMPOC | Medical Monitoring Claim Form |
| ☐ | PDPOC | Property Damage |
| ☐ | NAPO | Non-Asbestos Claim Form |
| ☐ | | Amended |

## Attorney Information

Firm Number: 00465

Firm Name: Locke Lord Bissell & Liddell

Attorney Number: 00356

Attorney Name: Greg Lowry

Zip Code: 75201

Cover Letter Location Number: SR0001185

| Attachments Medical Monitoring | Attachments Property Damage | Non-Asbestos |
|---|---|---|
| ☐ TBD | ☐ TBD | ☐ Other Attachments |
| ☐ TBD | ☐ TBD | |
| ☐ TBD | ☐ TBD | |
| ☐ TBD | ☐ TBD | |
| ☐ TBD | ☐ TBD | |
| | ☐ Other Attachments | |

| Other | |
|---|---|
| | ☐ Non-Standard Form |
| | ☒ Amended    original 13947 |
| | ☐ Post-Deadline Postmark Date |

Box/Batch: WRBF0014/WRBF0056

Document Number: WRBF002753

B10 (Official Form 10) (4/98)

| UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE | | **GRACE NON-ASBESTOS PROOF OF CLAIM** |
|---|---|---|
| Name of Debtor **W.R. GRACE & CO.-CONN.** | Case Number:  01-01140 Per ECF<br>Docket; 01-1179 Per Bar Date Notice | |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| | | |
|---|---|---|
| Name of Creditor (The person or other entity to whom the debtor owes money or property) SGH Enterprises, Inc. (formerly known as **Samson Hydrocarbons Company**)(the creditor's name has been changed)<br><br>Name and address where notices should be sent:<br>c/o Greg Lowry<br>Locke Lord, LLP<br>2200 Ross Avenue<br>Suite 2200<br>Dallas, Texas 75201<br><br>Telephone number: (214) 740-8000 | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim.  Attach copy of statement giving particulars.<br>☐ Check box if you have never received any notices from the bankruptcy court in this case<br>☒ Check box if the address differs from the address on the envelope sent to you by the court. | THIS SPACE IS FOR COURT USE ONLY |

Corporate Name, Common Name, and d/b/a name of specific Debtor against whom the claim is asserted:

**W.R. GRACE & CO.-CONN.**

| | |
|---|---|
| Account or other number by which creditor identifies debtor: see Exhibit A | Check here ☐ replaces<br>if this claim ☒ amends a previously filed claim, dated on or about March 28, 2003<br>Claim number of the original proof of claim: 00013947<br>Amended by numbers: 18518, 18520 and 18526 |

| **1.  Basis for Claim** | |
|---|---|
| ☐ Goods sold | ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a) |
| ☐ Services performed | ☐ Wages, salaries, and compensation (fill our below) |
| ☐ Money loaned | Your SS #:___ _____ |
| ☐ Personal injury/wrongful death | Unpaid compensation for services performed |
| ☐ Taxes | From _____ to _____ |
| ☒ Other  Contractual Indemnity; see Exhibit A | (date)          (date) |

**2.  Date debt was incurred:  Various; see Exhibit A**  |  **3.  If court judgment, date obtained:**

**4.  Total Amount of Claim at Time Case Filed:**  see attached Exhibit A

If all or part of your claim is secured or entitled to priority, also complete Item 5 or 6 below.
☒ Check  this box if claim includes interest or other charges in addition to the principal amount of the claim.  Attach itemized statement of all interest or additional charges.

| **5.  Classification of Claim** | |
|---|---|
| ☐ SECURED CLAIM: (Check this box if your claim is secured by collateral, including a right of setoff)<br><br>Brief Description of Collateral:<br><br>☐ Real Estate    ☐ Other:<br><br>Amount of arrearage and other charges at time case field included  in secured claim, if any: $<br><br>☐ UNSECURED NONPRIORITY CLAIM<br>See Exhibit A | ☐ UNSECURED PRIORITY CLAIM - Specify the priority of the claim:<br><br>☐ Wages, Salaries, or commissions (up to $4,300), * earned within 90 days   before filing of the bankruptcy petition or cessation of the debtor's business,    whichever is earlier –11 U.S.C. § 507(a)(3).<br>☐ Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(4).<br>☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507(a)(8).<br><br>☐ Other Specify applicable paragraph of 11 U.S.C. § 507(a)(___). |

| | THIS SPACE IS FOR COURT USE ONLY |
|---|---|
| **6.  Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.<br>**7.  Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien.  DO NOT SEND ORIGINAL DOCUMENTS.  If documents are not available, explain.  If the documents are voluminous, attach a summary.<br>**8.  Date – Stamped Copy:** To receive an acknowledgement of the filing of your claim, enclose a stamped, self – addressed envelope and copy of this proof of claim. | |

| Date 7/__/2012 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): |
|---|---|
| | **SHG Enterprises, Inc., formerly known as Samson Hydrocarbons Company**<br><br>*Annabel M. Jones*<br>Name: Annabel M. Jones<br>Its: President |

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

B10 (Official Form 10) (4/98) Reverse

# INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In particular types of cases or circumstances, such as bankruptcy cases that are not filed voluntarily by a debtor; there may be exceptions to these general rules.*

## — DEFINITIONS —

**Debtor**
The person, corporation, or other entity that has filed a bankruptcy case is called the debtor.

**Creditor**
A creditor is any person, corporation, or other entity to whom the debtor owed a debt on the date that the bankruptcy case was filed.

**Proof of Claim**
A form telling the bankruptcy court how much the debtor owed a creditor at the time the bankruptcy case was filed (the amount of the creditor's claim). This form must be filed with the clerk of the bankruptcy court where the bankruptcy case was filed.

**Secured Claim**
A claim is a secured claim to the extent that the creditor has a lien on the property of the debtor (collateral) that gives the creditor the right to be paid from that property before creditors who do not have liens on the property.

Examples of liens are a mortgage on real estate and a security interest in a car, truck, boat, television set, or other item of property. A lien may have been obtained through a court proceeding before a bankruptcy case began; in some states a court judgment is a lien. In addition, to the extent a creditor also owes money to the debtor (has a right of setoff), the creditor's claim may be a secured claim. (See also *Unsecured Claim*)

**Unsecured Claim**
If a claim is not a secured claim it is an unsecured claim. A claim may be partly secured and partly unsecured if the property on which a creditor has a lien is not worth enough to pay the creditor in full.

**Unsecured Priority Claim**
Certain types of unsecured claims are given priority, so they are to be paid in bankruptcy cases before most other unsecured claims (if there is sufficient money or property available to pay these claims). The most common types of priority claims are listed on the proof of claim form. Unsecured claims that are not specifically given priority status by the bankruptcy laws are classified as *Unsecured Nonpriority Claims.*

## — ITEMS TO BE COMPLETED IN PROOF OF CLAIM FORM (IF NOT ALREADY FILLED IN) —

**Court, Name of Debtor, and Case Number:**
Fill in the name of the federal judicial district where the bankruptcy case was filed (for example, Central District of California), the name of the debtor in the bankruptcy case, and the bankruptcy case number. If you received a notice of the case from the court, all of this information is near the top of the notice.

**Information about Creditor:**
Complete the section giving the name, address, and telephone number of the creditor to whom the debtor owes money or property, and the debtor's account number, if any. If anyone else has already filed a proof of claim relating to this debt, if you never received notices from the bankruptcy court about this case, if your address differs from that to which the court sent notice, or it this proof of claim replaces or changes a proof of claim that was already filed, check the appropriate box on the form.

**1. Basis for Claim:**
Check the type of debt for which the proof of claim is being filed. If the type of debt is not listed, check "Other" and briefly describe the type of debt. If you were an employee of the debtor, fill in your social security number and the dates of work for which you were not paid.

**2. Date Debt Incurred:**
Fill in the date when the debt first was owed by the debtor.

**3. Court Judgments:**
If you have a court judgment for this debt, state the date the court entered the judgment.

**4. Total Amount of Claim at Time Case Filed:**
Fill in the total amount of the entire claim. If interest or other charges in addition to the principal amount of the claim are included, check the appropriate place on the form and attach an itemization of the interest and charges.

**5. Secured Claim:**
Check the appropriate place if the claim is a secured claim. You must state the type and value of property that is collateral for the claim, attach copies of the documentation of your lien, and state the amount past due on the claim as of the date the bankruptcy case was filed. A claim may be partly secured and partly unsecured. (See DEFINITIONS, above.)

**6. Unsecured Priority Claim:**
Check the appropriate place if you have an unsecured priority claim, and state the amount entitled to priority. (See DEFINITIONS, above). A claim may be partly priority and partly nonpriority, if, for example, the claim is for more than the amount given priority by the law. Check the appropriate place to specify the type of priority claim.

**7. Credits:**
By signing this proof of claim, you are stating under oath that in calculating the amount of your claim you have given the debtor credit for all payments received from the debtor.

**8. Supporting Documents:**
You must attach to this proof of claim form copies of documents that show the debtor owes the debt claimed or, if the documents are too lengthy, a summary of those documents. If documents are not available, you must attach an explanation of why they are not available.

## CLAIM ATTACHMENT FOR W.R. GRACE & CO. - CONN.
## EXHIBIT A

Samson Hydrocarbons Company, now known as SGH Enterprises, Inc. (but for convenience only, still referred to herein as "Samson Hydrocarbons"), timely filed a Proof of Claim against the debtor W. R. Grace & Co.- Conn, as well as Grace Energy Corporation. Samson Hydrocarbons further amends its original Proof of Claim (and any prior amendments) to, without limitation, provide updated information and to describe its claims and the basis of its claims with further particularity, including information regarding and clarifying amounts that comprise portions of its claims against W. R. Grace & Co.- Conn. Portions of the claim amounts identified herein may be entitled to and constitute administrative priority claims. This amendment to the Proof of Claim is without prejudice to any contention that any portion of Samson Hydrocarbons' claims, described below, are entitled to administrative priority status.

On March 15, 2012, the United States Bankruptcy Court entered its "Order Approving Compromise and Settlement" that, among other things: (i) approved a "Private Parties Settlement Agreement" between, *inter alia*, Samson Hydrocarbons, W. R. Grace & Co.- Conn and Grace Energy Corporation, and (ii) authorized W.R. Grace & Co., W. R. Grace & Co.- Conn, and Grace Energy Corporation to perform under a "Consent Decree." This amended proof of claim does not in any manner affect the Consent Decree, the Private Parties Settlement Agreement, the "Samson Hydrocarbons Otis Pipeline Related Claims" or the "Samson Hydrocarbons Allowed Otis Claim" (as those terms are defined in the Private Parties Settlement Agreement). Pursuant to the Consent Decree and Private Parties Settlement Agreement, the Samson Hydrocarbons Allowed Otis Claim has been assigned to the United States. Additionally, in accordance with the Consent Decree and the Private Parties Settlement Agreement, the description of the Samson Hydrocarbons Otis Pipeline Related Claims in the amended proof of claim filed by Samson Hydrocarbons dated August 3 2009, is not intended to be affected, including in Article II A and Article III below.

## I.
## THE AGREEMENTS

The relationship between Grace Energy Corporation, a Delaware Corporation and its parent corporation, W.R. Grace & Co. - Conn. (collectively, "Grace") on one side and Samson Investment Company ("Samson Investment"), a Nevada Corporation and its wholly-owned subsidiary Samson Hydrocarbons (collectively, "Samson") on the other side with respect to the claims described herein is governed by, inter alia, four contracts between Samson and Grace: (i) the December 30, 1992 Grace Petroleum Stock Purchase Agreement (the "Purchase Agreement"); (ii) the March 31, 1994 Settlement and Release Agreement (the "1994 Agreement"); (iii) the November 30, 1998 Second Settlement and Release Agreement (the "1998 Agreement") (collectively, the "Agreements"); and (iv) the "Payment of Settlement, Joint Defense and Confidentiality Agreement" entered into with respect to the Casmalia Disposal Site (the "Casmalia Defense Agreement"). The Agreements and the Casmalia Defense Agreement are voluminous and are instead summarized; however copies will be provided upon request to Samson's counsel.

1

## A.   The Purchase Agreement.

On December 30, 1992, Grace and Samson Investment entered into the Purchase Agreement. Pursuant to the Purchase Agreement, Samson Investment purchased all of the outstanding shares of Grace Petroleum Corporation ("Grace Petroleum") from Grace, including all shares of all of Grace Petroleum's wholly owned subsidiaries.

Article XIII of the Purchase Agreement contains an indemnity. Specifically, Grace is obligated to indemnify Samson for

> (iii) the environmental condition of any gas, oil and mineral leases and any other properties, including, but not limited to, gas plants and treatment facilities in which any of the Corporations or their respective predecessors previously owned an interest but in which the Corporations or any of their respective predecessors no longer own an interest as of the Closing Date, (iv) the environmental condition of any Leased Properties, Oil, Gas and Mineral Leases, Producing Properties, Properties or Related Facilities as set forth in the schedule to Section 6.09 or as assumed by Seller pursuant to Section 11.04...

Section 13.03(e) of the Purchase Agreement provides that Grace's indemnity obligation under Sections 13.03(a)(3) and (4) is not limited in time.   Section 13.05 of the Purchase Agreement provides that upon proper notice, Grace will defend Samson against any Third Party Claims.[1] The Purchase Agreement provides that Grace should notify Samson that it will undertake such defense within ten (10) days after it receives notice that it is obligated to undertake such defense. *See* Purchase Agreement, § 13.05. If Grace does not undertake such defense, Samson may defend itself and Grace must pay all Litigation Expenses, as that term is defined in the Purchase Agreement. *Id.*

## B.   The 1994 Agreement.

On March 31, 1994, Grace and Samson Investment entered into the 1994 Agreement. The 1994 Agreement referenced Sections 5.01 through 5.05 of the Purchase Agreement, which provided for future adjustments to the Purchase Price for Net Realizable Assets as further set forth in the Purchase Agreement. Among other things in the 1994 Agreement, Grace agreed to indemnify and defend Samson Investment in certain actions specified in paragraph 5 of the 1994 Agreement. The 1994 Agreement, at 9, provides that:

> nothing contained herein shall prevent Samson from submitting additional claims to Grace pursuant to the terms and conditions of the Agreement to the extent such claims either (i) arise from and after the date hereof, or (ii) were outside the scope of the personal knowledge of the above-named individuals on the date hereof. Subject to the terms and conditions of the Agreement, Grace will indemnify Samson for any such claims.

---

[1] "Third Party Claims" is defined in paragraph 13.01(h) of the Purchase Agreement as "any and all claims, demands, suits, actions or proceedings by any person or entity, other than Purchaser or Seller or their respective affiliates arising prior to the Closing Date."

DAL:0579037/00008:2027903v7

C.    **The 1998 Agreement.**

On November 30, 1998, Grace and Samson Investment entered into the 1998 Agreement. In the 1998 Agreement, Grace acknowledged that there were other outstanding claims for which Samson was entitled to indemnification from Grace.

The 1998 Agreement states that part of the consideration for the 1998 Agreement is Grace's indemnification of Samson "with respect to those certain environmental claims relating to the Otis Pipeline as more fully set forth in paragraph 1.A.(k) hereof...". The 1998 Agreement also provided that "Grace and Samson desire to fully and finally settle, compromise and resolve as between themselves the responsibility for defending and providing indemnification for the Samson Claims." 1998 Agreement at 4.  A portion of the Samson Claims are set forth in paragraph 1.A. and include, among others:,

\* \* \*

(e) That certain claim made by Samson pursuant to letter dated May 4, 1994, attached hereto as Exhibit E(4) ('Ella Glimp v Exxon Company, USA, Case No. C-92-449, filed in the District Court of Creek County, Oklahoma").

\* \* \*

(k) That certain claim made by Samson pursuant to letters dated September 6, 1994 and December 15, 1995, jointly attached hereto as Exhibit 'E(7)' ('The Massachusetts Department of Environmental Protection and the U.S. Department of Justice, acting on behalf of the U.S. Department of Defense, investigation of, and inquiry into, the Otis Pipeline running from Cape Cod Canal to Otis Air National Guard Base near the town of Sandwich, Massachusetts').

(l) Any additional future claims that may be made by Samson from and after the date hereof as hereinafter provided in paragraph 1.C

Paragraph 1.C referenced above provides, in relevant part, "Notwithstanding the foregoing, nothing contained herein shall prevent Samson from submitting additional claims to Grace pursuant to the terms and conditions of the Agreement to the extent such claims arise from and after the date hereof...."[2]

---

[2] Also of significance is paragraph 2 of the 1998 Agreement whereby Samson, based on the knowledge of certain of its officers, provided a warranty as to "no known additional claims" except as set forth in the 1998 Agreement and except for: "... that certain additional claim set forth in Samson's letter to Grace dated July 31, 1998 ('Murphy Oil Claim'), a copy of which is attached hereto as Exhibit 'F'. Grace has agreed to indemnify Samson for said Murphy Oil Claim in accordance with the terms and conditions contained herein pertaining to Grace's indemnification of Samson for the Grace Indemnities, provided however, that Samson hereby agrees to initially defend said Murphy Oil Claim on behalf of Grace in accordance with the terms of the Agreement, with Grace reserving the right to take over such defense at its option. Should it subsequently be determined that Grace has no liability pursuant to the Murphy Oil Claim, Grace's indemnity obligation will be limited to costs of defense incurred by Samson."

3

### D.    The Casmalia Defense Agreement

Samson and Grace (collectively, the "Parties") entered into the Casmalia Defense Agreement effective January 31, 2001. The Casmalia Defense Agreement allowed the Parties to participate, along with other potentially responsible parties, in the defense of claims made by the EPA, the State of California and the "Casmalia Resources Site Steering Committee" (the "CRSSC") with respect to the Casmalia Resources Hazardous Waste Disposal Site (the "Casmalia Site"). In the Casmalia Defense Agreement, Grace and Samson Hydrocarbons agreed to participate in the defense of the Casmalia matter as part of the "Tier II PRP Group." *See* Casmalia Defense Agreement, at 1, ¶ 1. The Casmalia Defense Agreement provided that Samson and Grace would pay their own legal expenses, but specifically reserved any rights either of them may have to seek recovery of its legal expenses from any or all of the other Parties. Id. at 2, ¶ 5. Samson and Grace each agreed to pay one half of Samson Hydrocarbons' "expenses or assessments" to remain part of the Tier II PRP Group. *Id.*, ¶ 6. Samson and Grace each also agreed to pay one-half of Samson Hydrocarbons' share of any settlement entered into by the Tier II PRP Group with the United States, the State of California or the CRSSC. Id. at 2-3, ¶ 7. The Casmalia Defense Agreement also contains a reservation of rights permitting any of the Parties to seek relief against the other Parties for claims related to the Casmalia Site (*Id*, at 4, ¶ 12) and a denial of liability specifically acknowledging a disagreement among the Parties as to the ultimate liability for any claims arising from the Casmalia Site (although each Party denies any liability for the Casmalia Site). Id. 3-4, ¶ 12.

## II.
## SAMSON HYDROCARBONS' CLAIMS

### A.    Otis Pipeline

The Commonwealth of Massachusetts and the United States Department of Justice have each asserted claims against Samson Hydrocarbons related to a jet fuel pipeline connecting a port terminal near the Town of Sandwich, Massachusetts to a storage terminal located within the former Otis Air Force Base (the "Otis Pipeline"). On March 4, 1994, Samson Hydrocarbons received a Notice Terminating Consent to Easement, in which the United States Department of the Army alleged that there had been leakage from the Otis Pipeline. On November 28, 1995, the Massachusetts Department of Environmental Protection (the "MADEP") issued a Notice of Responsibility to SNG Production Company (now Samson Hydrocarbons) stating that the site described therein required "the performance of response actions to prevent harm to the health, safety, public welfare and the environment which may result from this threat of release..." pursuant to the Massachusetts Oil and Hazardous Material and Release Prevention and Response Act. The Notice of Responsibility further stated that the site represented "a clear threat of release of oil and hazardous materials and threats to health, safety, public welfare, and the environment."

On September 6, 1994, and again on December 15, 1995, Samson Hydrocarbons served Notices of Claim on Grace seeking indemnity for costs related to the Otis Pipeline. Grace assumed

---

The "Murphy Oil Claim" is the same claim as the Youpee Litigation and the claim giving rise to the Fort Peck Administrative Orders and the CERCLA, Clean Water Act and/or tort claims addressed herein.

4

responsibility for the matters covered by the Notices pursuant to the Purchase Agreement. Grace accepted its indemnity obligations and performed work required by the MADEP.

In a letter dated August 27, 2001, at about the time a status report was due to the MADEP, Grace notified Samson Hydrocarbons that due to Grace's bankruptcy, it would no longer perform the remedial actions associated with the Otis Pipeline. Based on Grace's withdrawal, the MADEP required Samson Hydrocarbons to complete the response activities related to the Otis Pipeline.

Since the filing of the original Proof of Claim by Samson Hydrocarbons, the United States Department of Justice has further asserted that Samson Hydrocarbons is responsible for the remediation costs. On April 30, 2002, the United States Department of Justice asserted claims against Samson Hydrocarbons for remediation costs of the Otis Pipeline site in the amount of $62,000,000.00 (the Department of Justice asserts that it has spent approximately $42 million and expected to spend another $20 million remediating the site). On May 14, 2002, Samson Hydrocarbons served another Notice of Claim on Grace seeking to be indemnified for costs related to the Otis Pipeline. Grace is aware of the Department of Justice's claims.

By letter dated October 30, 2008, the Department of Justice reasserted its requests against Samson Hydrocarbons for remediation costs of the Otis Pipeline site. On the same date, the Department of Justice sent a similar letter to Kaneb Pipe Line Operating Partnership, L.P. and Support Terminal Services Inc., and/or their successors (collectively, "Kaneb"). The Department of Justice asserts claims against Kaneb similar to those asserted against Samson Hydrocarbons.

By Partial Summary Judgment dated July 2, 1999, and by Amended Final Judgment dated August 20, 2000 entered after a jury trial (the "Texas Litigation"), it was affirmatively established that all liabilities pertaining to the Otis Pipeline were transferred from Grace to Kaneb. While both Grace and Kaneb appealed the Texas Litigation, upon information and belief, Kaneb has not filed a proof of claim with respect to its potential liability for the Otis Pipeline in this bankruptcy proceeding involving Grace. On or about January 16, 2009, Kaneb filed a motion seeking to modify the automatic stay, to which Grace submitted its objection on February 10, 2009. The Court denied in part Kaneb's motion.

As of July 15, 2009, the Department of Justice asserts that the costs are at least $71,747,297 associated with FS-12, an alleged 70,000 gallon release of JP-4 in the early 1970s, including alleged past costs through December 31, 2007 of $54,183,219, plus estimated alleged future costs (calendar year 2008 to completion) of $17,563,078. Additionally, upon information and belief, the Department of Justice alleges that Samson Hydrocarbons is liable for cleanup costs associated with FS-13, an alleged 1,000 gallon release of JP-4, which are approximately $1 million. In 2009, at the request of the Department of Energy, the Department of Justice, Samson Hydrocarbons, Kaneb, and Grace have commenced participation in mediation (upon information and belief, in advance of and as a required predicate to a potential lawsuit by the Department of Justice). The Department of Justice has also stated that, notwithstanding the Judgment against Kaneb in the Texas Litigation, it will bring suit against Samson Hydrocarbons for the full amount plus attorneys fees and costs (an amount of approximately $75 million), in the event that the matter is not resolved/ mediation is unsuccessful.

DAL:0579037/00008:2027903v7

Through July 31, 2009, in defending itself in matters involving the Otis Pipeline, Samson Hydrocarbons has paid or incurred attorneys' fees and other costs totaling $325,488.32. All of these fees and costs were paid after Grace filed for bankruptcy protection. A detailed breakdown of attorneys' fees and costs is reflected on Schedule 1 attached to this Exhibit "A".

Samson does not admit through this Proof of Claim or otherwise (and expressly disputes and denies) any liability, responsibility or obligation for any such remediation costs or any claims asserted or that may be asserted by the Department of Justice, the Commonwealth of Massachusetts or any other party related to the Otis Pipeline. Samson reserves all rights, defenses and claims. Nonetheless, whether through settlement or defense and disposition of any lawsuit or claim that the Department of Justice, the Commonwealth of Massachusetts or any other party may file or assert, Grace agreed to, and is obligated to, indemnify Samson for the full amount of such claims and costs, including attorneys' fees and costs.

Accordingly, pursuant to Article XIII of the Purchase Agreement and Paragraph 1.D. of the 1998 Agreement and based upon Grace's agreement to indemnify, Samson Hydrocarbons asserts a claim (and claim for indemnification) for matters related to the Otis Pipeline in the approximate amount of Seventy Seven Million, Seventy One Thousand and Seven Hundred Eighty- Five Dollars ($77,071,785)(see Schedule 1 attached to this Exhibit A for a summary of the amounts included in this sum), plus the additional amounts described below in this paragraph. Included in such approximate amount are: (i) as described above, an amount up to approximately $75,000,000 for past and future remediation costs demanded by the Department of Justice (plus its litigation expenses), plus (ii) estimated future attorneys' fees and costs that Samson Hydrocarbon's will incur in defending itself in matters related to the Otis Pipeline, which can reasonably estimated to be $2 million, Plus (iii) Samson Hydrocarbon's costs and expenses already incurred of $325,488.32 as described above.    Additionally, Samson Hydrocarbons asserts a claim (and claim for indemnification) for: (i) all other future attorneys' fees and costs that it will incur in defending itself in matters related to the Otis Pipeline; (ii) all other remediation costs, if any, that it becomes obligated to pay in connection with the Otis Pipeline, (iii) amounts reimbursed to the Commonwealth of Massachusetts and or the United States for response and/or remediation costs incurred as a result of alleged leaks from the Otis Pipeline, and (iv) any other amounts required to be paid to any governmental or private party as a result of alleged leaks from the Otis Pipeline.

6

**B.**   **Fort Peck/East Poplar Oil Field Matters**

1.   **Administrative Orders**

Three Emergency Administrative Orders ("EAOs") issued by the Environmental Protection Agency ("EPA") with respect to Fort Peck, Montana are the subject of this portion of the Proof of Claim.[3]    The first EAO issued against Samson, called the Second Amended Emergency Administrative Order, SWDA-8-99-68, issued November 30, 2000 (the "First EAO") initiated an EPA enforcement action against Samson and others, alleging violations of the Safe Drinking Water Act, purportedly resulting from salt water disposal operations conducted in the East Poplar Unit Roosevelt County, Montana.[4]  Grace Petroleum (now Samson Hydrocarbons) at one time owned a working interest in the East Poplar Unit. According to the First EAO, the conditions at the East Poplar Unit threaten imminent and substantial endangerment.

Grace accepted Samson's indemnity demand, began prosecuting an appeal of the First EAO in the United States Court of Appeals for the Tenth Circuit (Case No. 01-9500) and continued defending Samson after the filing of Grace's bankruptcy petition. On June 27, 2001, Grace notified Samson that it would no longer defend Samson with respect to the First EAO.

The second EAO of interest (issued September 20, 2001) named Samson Hydrocarbons (but not Samson Investment), among others, as a respondent. The second EAO arises out of the same facts and circumstances as the First EAO and required that Samson Hydrocarbons and others perform several studies of the area and build a pipeline to provide drinking water. Samson Hydrocarbons sent a Notice of Claim to Grace and demanded indemnity. Grace declined to accept its indemnity obligation, forcing Samson Hydrocarbons to defend the matter as well as conduct the mandated studies and pipeline construction.  In addition, Samson Hydrocarbons was forced to undertake the evaluation, monitoring and ultimate plugging and abandonment of the Huber No. 1W and Huber No. 4 wells ("Huber Wells") previously operated and abandoned by Grace Petroleum in the East Poplar Unit.

Since the filing of the original Proof of Claim, on July 20, 2004, an Administrative Order on Consent became effective, which required Samson Hydrocarbons to, among other things, pay for construction of a water pipeline, pay certain homeowners amounts to compensate them for issues with the pipes in their homes, supply bottled water to homeowners, conduct monitoring and an annual study.

On December 16, 2010, the EPA issued another EAO, which required among other things, Samson Hydrocarbons to conduct additional sampling, supply clean water, and prepare studies for remediation.  Samson Hydrocarbons timely filed a petition for review, and has been engaged in mediation with the EPA.   On March 26, 2012, the parties entered into an Administrative Order on Consent, requiring Samson Hydrocarbons and the other Respondents to sample the City of Poplar wells monthly, supply fresh drinking water to the entire City in the event the monthly sampling demonstrates (after confirmation sampling) that certain compounds

---

[3] The EAOs arise out of and relate to the "Murphy Oil Claim" for which Grace assumed responsibility and agreed to indemnify Samson in the 1998 Agreement.

[4] The predecessor EAO to the First EAO named Grace.  The EPA substituted Samson Hydrocarbons for Grace on or about November 30, 2000, after learning of the Purchase Agreement.

7

exceed certain concentrations, and pay the City of Poplar $320,000. This Administrative Order on Consent does not resolve EPA's allegations regarding rural water users or remediation. Therefore, a very real possibility exists that even if the parties settle, the EPA will issue another EAO.

Through June 20, 2012, in defending itself in matters involving the EAOs, participating in the studies and the other requirements of the EAOs, constructing and operating the pipeline and plugging the Huber Wells, Samson Hydrocarbons has paid or incurred costs professional service fees, construction costs, attorneys' fees and other costs totaling $2,045,960.64. The great majority of these costs and fees were paid after Grace filed for bankruptcy protection. A detailed breakdown of such attorneys' fees and costs is reflected on Schedule 1 attached to this Exhibit "A".

As mentioned above, the EPA has indicated that it may require Samson Hydrocarbons to conduct additional studies and engage in remediation associated with the Huber Wells and property to the North.

## 2.    Clean Water Act, CERCLA, and/or Tort Claims

On April 18, 2012, the City of Poplar sent Samson Hydrocarbons and the other Respondents a 60-day notice under the Clean Water Act, contending that Samson Hydrocarbons and the other Respondents are responsible for contamination from a point source into waters of the United States. The letter is a jurisdictional prerequisite to filing suit and therefore, because the 60 days have elapsed, the City of Poplar may file suit on this issue at any time. Counsel for Samson Hydrocarbons and counsel for the other Respondents conferred with counsel for the City of Poplar who indicated that he is considering bringing tort claims against Samson Hydrocarbons and the other Respondents on behalf of the City of Poplar and other potential plaintiffs, alleging property damage, negligence, trespass, among other claims. Counsel for the City of Poplar referenced two recent Montana Supreme Court cases, both of which he contends support tort claims: *Sunburst v. Texaco*, regarding property damage, and *Burley v. Burlington Northern & Santa Fe Railway*, regarding statute of limitations and continuing torts.

On July 11, 2012, the City of Poplar sent Samson Hydrocarbons a separate 60-day notice letter, this one purportedly under CERCLA, contending that Samson Hydrocarbons and the other Respondents are responsible for contamination that is compensable under CERCLA.

Given the 60-day notice letters and the conversation with counsel for the City, Samson Hydrocarbons reasonably expects that the City of Poplar and/or others may bring suit.

**Summary**: Future costs associated with further EPA requirements, including Samson Hydrocarbons' share of the $320,000 payment to the City of Poplar, and continued sampling of the City of Poplar wells, and/or defending itself against Clean Water Act, CERCLA, and tort claims, are expected to exceed $7.2 million.

Samson does not admit through this Proof of Claim or otherwise (and expressly disputes and denies) any liability, responsibility or obligation for any such remediation costs or any claims asserted or that may be asserted by the EPA, the City of Poplar, the Fort Peck tribe or any other party, including any private citizens, related to these matters. Samson reserves all rights,

8

defenses and claims. Nonetheless, Grace agreed to (and is obligated to) indemnify Samson for the full amount of such claims and costs, and defense thereof, including attorneys' fees and costs.

Pursuant to the 1998 Agreement and Article XIII of the Purchase Agreement, Samson Hydrocarbons asserts a claim (and a claim for indemnification) related to the matters described in B this section in the amount of not less than $9,245,960.64 (see Schedule 1 attached to this Exhibit A for a summary of the amounts included in this sum). Included in such amount are: (i) the attorneys' fees and expenses that Samson Hydrocarbons has paid in defending itself in connection with (and in complying with) the EAOs, in the amount of $2,045,960.64 through June 20, 2012; (ii) its share of the monthly sampling and $320,000 required to be paid to the City of Poplar under the Administrative Order on Consent; (iii) costs incurred related to the East Poplar Unit and any remediation associated therewith, which costs for (ii) and (iii) may exceed $6.2 million; and (iv) future attorneys' fees and expenses that it incurs in defending itself in connection with the EAOs, Clean Water Act claims, and tort claims, which may be estimated as at least $1,000,000. Additionally, Samson Hydrocarbons asserts a claim (and a claim for indemnification) for: (a) all other future attorneys' fees and costs that it will incur in defending itself in matters related to the EAOs, future orders, Clean Water Act claims, CERCLA claims, and/or tort claims, (b) any remediation costs, judgment or settlements it incurs or becomes obligated to pay in connection with the EAOs, future orders, Clean Water Act claims, CERCLA claims, and/or tort claims; and (c) any other amounts Samson Hydrocarbons is required to pay to any governmental or private party in connection with the EAOs, the Clean Water Act, CERCLA, and/or any other tort or other claims.

**C.** ***Youpee, et.al. v. Murphy Exploration & Production, et.al.;* Case No. CV-98-108BLG-JDS (U.S. D. C. - MT) (the "Youpee Litigation")**

In the Youpee Litigation, the Plaintiffs sought damages for alleged contamination of certain real property, purportedly resulting from certain salt water disposal operations in the East Poplar Unit, Roosevelt County, Montana. This is a private party lawsuit involving many of the same issues as, and gave rise to, the Fort Peck Administrative Orders described above. Samson Hydrocarbons demanded indemnity from Grace with respect to the Youpee Litigation. Grace accepted the indemnity demand under the 1998 Agreement in which it was originally agreed between the parties that Samson Hydrocarbons would defend the case "with Grace reserving the right to take over such defense at its option." When Grace originally assumed the defense of the Fort Peck Administrative Orders, Grace exercised its option and assumed the defense of the Youpee Litigation. Grace subsequently withdrew its defense after it filed for bankruptcy protection, requiring Samson Hydrocarbons to pay attorneys' fees to defend itself and to incur expenses in resolving the Youpee Litigation. On May 9, 2002, pursuant to a Settlement Agreement and General Release (the "Youpee Settlement Agreement"), the court entered an Order of Dismissal with Prejudice.

Pursuant to the Youpee Settlement Agreement, Samson Hydrocarbons paid $210,000.00 for the remediation of the property that was the subject of the Youpee Litigation. In addition to the $210,000.00 paid under the Youpee Settlement Agreement, Samson Hydrocarbons paid substantial attorneys' fees and costs totaling $128,025.90. All of these fees and costs were paid after Grace filed for bankruptcy protection. A detailed breakdown of the settlement payment, attorneys' fees and costs is reflected on Schedule 1 attached to this Exhibit "A".

9

Pursuant to the 1998 Agreement and Article XIII of the Purchase Agreement, Samson Hydrocarbons asserts a claim for (and an indemnity claim for) the $210,000.00 Samson Hydrocarbons paid pursuant to the Youpee Settlement Agreement. Samson Hydrocarbons also asserts a claim for attorney fees' and costs paid or incurred in the amount of $128,025.90. Grace's indemnity obligation to Samson Hydrocarbons arising from the Youpee Litigation is $338, 025.90 through July 31, 2009.

**D.    Casmalia Site**

Samson Hydrocarbons was listed by the EPA as a potentially responsible party ("PRP") with respect to the Casmalia Site. On or about March 11, 2000, Grace, which the EPA had listed as a PRP at Casmalia, alleged in a letter to Samson Hydrocarbons that it, rather than Grace, was the correct PRP for alleged disposal of oil field waste allegedly made at Casmalia in earlier years from wells partially owned at the time by Grace Petroleum.

On April 26, 2000, and again on November 15, 2000, Samson Hydrocarbons sent Notices of Claim to Grace seeking indemnification under the Purchase Agreement. Samson Hydrocarbons also filed a lawsuit against Grace to compel Grace to indemnify Samson Hydrocarbons for its costs incurred in connection with the Casmalia Superfund Site. This litigation was temporarily mooted by the Casmalia Defense Agreement (described in Section I, above) and is subject to the automatic stay.

The Casmalia Site was allegedly appropriate for the waste when the waste was delivered, but has (allegedly) subsequently degraded. The EPA sought to hold Samson Hydrocarbons, among others, liable for the costs of remediation.    On June 29, 2001, Samson Hydrocarbons, along with certain other entities that the EPA alleged are liable at Casmalia, conditionally agreed, without admission of liability, to resolve the claims made against them, subject to negotiating a mutually acceptable Consent Decree. Grace participated in the negotiations up through June 14, 2001, when it notified Samson Hydrocarbons that it would not participate in any settlement. Samson Hydrocarbons gave Grace additional notice about the conditional agreement on June 27, 2001. Samson Hydrocarbons, among others, began negotiating a Consent Decree with the Department of Justice. During the negotiation of the Consent Decree, on January 28, 2002, Samson Hydrocarbons again gave notice to Grace of the negotiations and sought Grace's approval on the settlement. On or about September 7, 2002, Samson sent a copy of the final Consent Decree to Grace, which Samson had not yet agreed to enter into, seeking approval of the settlement. Grace did not respond. On or about September 20, 2002, Samson Hydrocarbons, the EPA and others entered into a Consent Decree resolving the environmental issues at the Casmalia Site.

Pursuant to the Consent Decree entered into by Samson Hydrocarbons, the EPA and others, Samson Hydrocarbons paid (post-petition) $6,067,323.00 to be used towards the remediation of the pollution at the Casmalia Site.    Samson Hydrocarbons has also paid or incurred attorneys' fees and costs totaling $832,229.90 through July 31, 2009. The breakdown of all such assessments, costs and fees is reflected on Schedule 1 attached to this Exhibit "A" and are in the amount of $6,899,552.90 as of July 31, 2009.    The majority of these fees and costs were paid after Grace filed for bankruptcy protection.

10

In addition, the State of California has made demands of other members of the Casmalia Negotiating Committee, of which Samson Hydrocarbons is a member, for the imposition of a separate assessment against said parties for the State's past costs, estimate of future costs, and natural resources damages associated with the Casmalia Site. Samson Hydrocarbons' best current estimate of the amount for which Grace would owe it an indemnity in connection with the State demand is $250,000. Including this estimated $250,000, Grace's indemnity obligation to Samson Hydrocarbons associated with the Casmalia Site is currently $7,149,552.90 through June 20, 2012. Samson Hydrocarbons also asserts a claim for all attorneys' fees and costs and other costs and expenses which it incurs in connection with the State's claims.

Pursuant to the Casmalia Defense Agreement and Article XIII of the Purchase Agreement, Grace agreed to and is obligated to indemnify Samson Hydrocarbons for, among other things, both the costs of remediation and all of its attorneys' fees and other costs associated with the Casmalia Site. Samson Hydrocarbon's asserts a claim related to Grace's indemnity obligation to Samson Hydrocarbons associated with the Casmalia Site of $7,149,552.90 through June 20, 2012, plus Samson Hydrocarbon's attorneys' fees and costs and other costs and expenses which it incurs in connection with the State's claims. If, for any other reason Samson Hydrocarbons is forced to pay additional amounts to resolve any of the issues related to the Casmalia Site, its claim will increase considerably.

E.     **Exxon Corp. v. Samson Hydrocarbons Co., Case No. CJ-99-390(Ok. Dist. Ct.) (the "Exxon Litigation")**

On May 28, 1999, the Exxon Corporation filed suit against Samson Hydrocarbons, seeking indemnification for environmental response costs associated with oil and gas properties sold by Samson Hydrocarbons to Exxon Corporation. The Exxon Litigation is the same claim as the *Ella Glimp v Exxon Corporation* matter that Grace expressly agreed to be responsible for, and agreed to indemnify Samson with respect to the same, under the 1998 Agreement. Grace is also obligated to defend Samson Hydrocarbons in the Exxon Litigation pursuant to the Purchase Agreement. Samson Hydrocarbons served a written Notice of Claim upon Grace seeking indemnification in the Exxon Litigation, and Grace undertook the defense of the Exxon Litigation in accordance with the Purchase Agreement and the 1998 Agreement. Just before the trial in the Exxon Litigation, Grace stopped defending Samson Hydrocarbons in the Exxon Litigation.

In connection with the Exxon Litigation, Samson Hydrocarbons has paid or incurred substantial attorneys' fees and costs totaling $180,995.34 through June 20, 2012. Most of these fees and costs were paid after Grace filed for bankruptcy protection. A detailed breakdown of the attorneys' fees and costs is as reflected on Schedule 1 attached to this Exhibit "A".

Pursuant to the 1998 Agreement and Article XIII of the Purchase Agreement, Samson Hydrocarbons asserts a claim for attorneys' fees and costs incurred in defending itself in the Exxon Litigation in the amount of $180,995.34 through June 20, 2012. Samson Hydrocarbons also asserts a claim for (i) all future attorneys' fees and costs which it incurs in defending itself from any matters arising from the Exxon Litigation; (ii) for any remediation costs, judgments or settlements it becomes obligated to pay in connection with the Exxon Litigation; and (iii) any other amounts Samson Hydrocarbons is required to pay to any governmental or private party in connection with the Exxon Litigation.

11

F.   **Ellison v. FPC Disposal, Inc., Case No. CV-99-151-01, (Ok. Dist. Ct.) (the "Ellison Litigation")**

On November 21, 2000, Jackie Eugene Ellison and Marcia Ellison filed their Second Amended Petition seeking damages for alleged groundwater contamination, against, *inter alia*, Samson Hydrocarbons. On January 3, 2001, Samson Hydrocarbons sent its notice of claim to Grace seeking indemnification for its attorneys' fees and costs and for environmental response costs associated with the Ellison Litigation. The Ellison Litigation as it relates to Samson Hydrocarbons has been settled.

Pursuant to Article XIII of the Purchase Agreement, Samson Hydrocarbons asserts a claim for attorneys' fees and costs in connection with the Ellison Litigation. Samson Hydrocarbons has paid attorneys' fees and costs in the amount of $207,509.38 through July 31, 2009, which includes a settlement payment of $25,000. Most of these fees and costs were paid after Grace filed for bankruptcy protection. A detailed breakdown of the settlement payment, attorneys' fees and costs is reflected on Schedule 1 attached to this Exhibit "A." Samson Hydrocarbons also asserts a claim for (i) all future attorneys' fees and costs which it incurs in defending itself from any matters arising from the Ellison Litigation; (ii) any remediation costs, judgments or settlements it becomes obligated to pay in connection with the Ellison Litigation; and (iii) any other amounts Samson Hydrocarbons is required to pay to any governmental or private party in connection with the Ellison Litigation.

G.   **Petro Resources, Inc. v. N.Y. Hillside, Inc., et al., Case No. BC 222456, (California Sup. Ct.) (the "Placerita Litigation")**

In July 2001, NY Hillside, Inc., a defendant and third-party plaintiff in the above described action, asserted a third party claim against Samson Hydrocarbons, claiming that Samson Hydrocarbons should assist in certain environmental clean-up to be performed at the Placerita Field. Samson Hydrocarbons demanded indemnity, but Grace declined to accept it. NY Hillside asserted that Samson Hydrocarbons was liable for equitable contribution and equitable indemnity based on Grace Petroleum's former working interest and net revenue interest in 5 leases in the Placerita Field. The Placerita Litigation as it relates to Samson Hydrocarbons has been settled.

In December 2001, Samson Hydrocarbons entered into a Settlement Agreement and Mutual Release settling the Placerita Litigation. Pursuant to the Settlement Agreement and Mutual Release, Samson Hydrocarbons paid $25,000.00 to N.Y. Hillside, Inc. in full satisfaction of the claims against it. In addition to the $25,000.00 paid as part of the Settlement Agreement and Mutual Release, Samson Hydrocarbons paid attorneys' fees and costs totaling $14,125.51, nearly all post-petition. A detailed breakdown of the settlement payment, attorneys' fees and costs is reflected on Schedule 1 attached to this Exhibit "A".

Pursuant to Article XIII of the Purchase Agreement, Samson Hydrocarbons has an indemnity claim against Grace based upon the costs its paid in the Placerita Litigation in the amount of $39,125.51 through July 31, 2009. Samson Hydrocarbons also asserts a claim for (i) all future attorneys' fees and costs which it incurs in defending itself from any matters arising from the Placerita Litigation; (ii) for any remediation costs, judgments or settlements it becomes

12

obligated to pay in connection with the Placerita Litigation; and (iii) any other amounts Samson Hydrocarbons is required to pay to any governmental or private party in connection with the Placerita Litigation.

## III.
## CONCLUSION

Samson Hydrocarbons has incurred substantial liability and paid significant sums in defending, and in some cases paying, claims for which Grace is obligated to indemnify Samson Hydrocarbons. Pursuant to the Agreements, without admission of any liability by Samson Hydrocarbons, Samson Hydrocarbons asserts a claim against Grace based upon Grace's agreement and obligation to indemnify Samson (and based upon and including Grace's breach of that agreement and obligation) in the current estimated amount of $94,232,954.99[5], as described in this Proof of Claim and summarized as follows:

| | |
|---|---|
| Otis Pipeline | $77,071,785.32 |
| Fort Peck | $9,245,960.64 |
| Youpee Litigation | $338,025.90 |
| Casmalia | $7,149,552.90 |
| Exxon Litigation | $180,995.34 |
| Ellison Litigation | $207,509.38 |
| Placerita Litigation | $39,125.51 |
| Total: | $94,232,954.99 |

---

[5] In accordance with the Consent Decree and the Private Parties Settlement Agreement, the description of the Samson Hydrocarbons Otis Pipeline Related Claims in the amended proof of claim filed by Samson Hydrocarbons dated August 3, 2009, is not intended to be affected by this amendment, including the various claim amounts listed in Article III related to the Otis Pipeline. This amended proof of claim does not in any manner affect the Consent Decree, the Private Parties Settlement Agreement, the Samson Hydrocarbons Otis Pipeline Related Claims or the Samson Hydrocarbons Allowed Otis Claim. Pursuant to the Consent Decree and the Private Parties Settlement Agreement, the Samson Hydrocarbons Allowed Otis Claim has been assigned to the United States.

13

Included in this sum are the following costs, expenses and fees that Samson Hydrocarbons has already incurred and/or paid as described in this Proof of Claim,[6] for which Grace is required to indemnify Samson Hydrocarbons:

| | |
|---|---|
| Otis Pipeline | $325,488.32 |
| Fort Peck | $2,045,960.64 |
| Youpee Litigation | $338,025.90 |
| Casmalia | $6,899,552.90 |
| Exxon Litigation | $180,995.34 |
| Ellison Litigation | $207,509.38 |
| Placerita Litigation | $39,125.51 |
| Total: | $10,036,657.99 |

The claim amounts described above do not include pre- petition or post-petition interest. Samson Hydrocarbons is entitled to such interest on and as part of its claim. To the extent required to do so, Samson Hydrocarbons asserts a claim for interest on its claim for the period after April 2, 2001, at the interest rate applicable to such claim in this case, including without limitation, interest calculated at the rate of 4.19 percent per annum, compounded annually, in accordance with the amended plan of reorganization confirmed in this case if such plan becomes effective. This paragraph does not affect the Consent Decree, the Private Parties Settlement Agreement, the Samson Hydrocarbons Otis Pipeline Related Claims or the Samson Hydrocarbons Allowed Otis Claim.

Samson Hydrocarbons also asserts a claim for (i) all other future attorneys' fees and costs which will be incurred in connection with the matters described above; (ii) for any other remediation, operating or maintenance costs, judgments or settlements Samson Hydrocarbons may become obligated to pay in connection with the matters described above; (iii) any other amounts Samson Hydrocarbons is required to pay to any governmental or private party in connection with the above-described matters; and (iv) for any defense costs, attorneys' fees, remediation costs, judgments or settlements Samson Hydrocarbons incurs for any others matters that may arise for which Grace is obligated to indemnify Samson Hydrocarbons. Samson reserves the right to amend this claim in the event any of the subject agreements are determined to be executory contracts that are rejected.

This Proof of Claim is without prejudice to any assertion by Samson Hydrocarbons that any of its claims are entitled to administrative priority.

---

[6] Copies of invoices supporting the claims, fees, costs and expenses set forth herein are located in the offices of Samson Hydrocarbons, but are voluminous to attach and instead are summarized. Copies can be obtained by requesting the same from Samson Hydrocarbons' attorneys, subject to any applicable privilege.

DAL:0579037/00008:2027903v7

Schedule 1

DAL:0579037/00008:2027903v7

# SCHEDULE 1
## TO PROOF OF CLAIM

| Otis Pipeline (Otis Air Force Base) | |
|---|---|
| Vendor | Claim Amount ($) |
| Susan W. Gable | 68.50 |
| Locke Liddell/Locke Lord | 216,076.91 |
| Goulston & Storrs | 35,042.69 |
| GZA Geoenvironmental, Inc. | 58,884.91 |
| International Legal Imprint | 75.54 |
| Ridgway's | 224.36 |
| RGP Enterprises LLC | 11,600.00 |
| JAMS | 3,515.41 |
| DOJ Asserted Claim for FS-12 Past Costs | 54,183,219.00 |
| DOJ Asserted Claim for FS-12 Future Costs | 17,563,078.00 |
| DOJ Asserted Claim for FS-13 Costs | 1,000,000.00 |
| DOJ MGL 21E Lawsuit Est'd Fees and Expenses | 2,000,000.00 |
| Samson Hydrocarbons Est'd Attys Fees Associated with DOJ Lawsuit | 2,000,000.00 |
| **Total Otis Pipeline** | **77,071,785.32** |

| Fort Peck Administrative Orders (East Poplar) | |
|---|---|
| Vendor | Claim Amount ($) |
| Blank Rome Comisky & McCauley, LLP | 2,123.00 |
| Locke Liddell/Locke Lord | 894,192.80 |
| Atkins Benham | 57,448.65 |
| Copy-Scan & More LLC | 112.32 |
| Daniel, Michael G | 1,156.81 |
| Land & Water Consulting, Inc. | 186,380.01 |
| Lonewolf Energy, Inc. | 6,263.57 |
| Murphy Exploration & Production Co. | 110,781.65 |
| Southern International, Incorporated | 5,478.40 |
| Eby, Art | 9,408.48 |
| Astro-Chem Lab, Inc. | 80.00 |
| Bob's Oilfield Service/ND | 3,798.01 |
| Dalton, Mark | 4,380.38 |
| DC&B Hotshot | 418.70 |
| Dowell Schlumberger, Inc. | 11,278.82 |
| Franz Construction, Inc. | 253,269.92 |
| G L Trucking & Rental, Inc. | 5,458.50 |
| H & L Rental, Inc | 1,310.00 |
| Halliburton Energy Services | 361.83 |
| High Plains, Inc. | 3,270.00 |
| Lustre Salt Water Disposal | 175.00 |
| Richard's Roustabout Service | 1,408.00 |
| S K & S Oilfield Services | 1,677.00 |
| Sanjel | 6,507.01 |
| Spec-Tech Threading, Inc. | 1,351.50 |
| Sun Well Service, Inc. | 33,599.00 |
| Watkins & Eager | 1,670.29 |
| Weatherford International | 15,537.07 |
| Williston Industrial Supply | 1,107.50 |
| Wilson Supply Co. | 1,220.77 |
| Archdale Enterprises | 2,000.00 |
| Atkins Americas | 16,767.73 |
| Benham Companies | 149,566.30 |
| Canon, Jack | 1,003.05 |
| First Energy Services Company | 618.75 |
| Hi Dezert Trucking | 8,189.00 |
| PBS&J Engineering | 27,230.69 |
| Pioneer Natural Resources | 106,879.76 |
| RGP Enterprises | 13,645.00 |
| Sierra Engineering | 14,722.96 |
| Well Pro, Inc. | 1,009.75 |
| SAIC Energy, Evironment | 82,345.73 |

| Tholen, CP | 756.93 |
| Estimated Attorneys Fees Associated with Third Party Claims | 1,000,000.00 |
| Estimated Vendor & Consultant Costs Associated with Third Party Claims | 6,200,000.00 |
| **Total Fort Peck Administrative Orders** | **9,245,960.64** |

| Youpee, Et.Al. V. Murphy Exploration & Production, Et.Al. (Youpee Litigation) | |
| --- | --- |
| **Vendor** | **Claim Amount ($)** |
| Dorsey & Whitney LLP | 78,489.23 |
| Lonewolf Energy, Inc. | 13,545.66 |
| MNG, Inc. | 3,601.42 |
| Petersen, Jones | 4,473.27 |
| Ridgway's | 924.41 |
| Sam J. Cerny | 21,292.00 |
| Wold Law Firm, P.C. | 2,741.53 |
| Daniel, Michael G. | 2,958.38 |
| Settlement Payment | 210,000.00 |
| **Total Youpee, Et.Al. V. Murphy Exploration & Production, Et.Al.** | **338,025.90** |

| Casmalia Site (Casmalia Litigation) | |
| --- | --- |
| **Vendor** | **Claim Amount ($)** |
| Chubb | 387,875.73 |
| Locke Liddell/Locke Lord | 433,132.22 |
| Maverick Petroleum, Inc. | 4,138.40 |
| Primark Disclosure | 80.50 |
| Ridgway's | 47.27 |
| Smiland & Khachigian | 1,000.00 |
| I H S Energy Group | 1,111.55 |
| Tholen, C P | 4,844.23 |
| State of CA Claim | 250,000.00 |
| Settlement Payment | 6,067,323.00 |
| **Total Casmalia Site** | **7,149,552.90** |

| Exxon Corp. V. Samson Hydrocarbons Co. (Exxon Litigation) | |
| --- | --- |
| **Vendor** | **Claim Amount ($)** |
| Ballard Productions, Inc. | 1,200.00 |
| Conner & Winters LLP | 1,435.00 |
| Daniel B. Stephens & Associates | 30,982.88 |
| Dauphin & Rodgers | 4,218.14 |
| Huffman & Robinson, Inc. | 1,205.50 |
| IKON Office Solutions | 14,149.41 |
| Legal Graphics, Inc. | 2,808.84 |
| McKinney & Stringer | 92,187.89 |
| Monzack Mersky Mclaughlin | 1,123.68 |
| Sam Cerny | 25,400.00 |
| Susan R. Rogers, C.S.R. | 90.60 |
| Taylor, Burrage, Foster, et.al. | 3,363.59 |
| Tulsa Freelance Reporters | 45.00 |
| Ryan Whaley Coldrin & Shandy, P.C. | 2,784.81 |
| **Total Exxon Corp. V. Samson Hydrocarbons Co.** | **180,995.34** |

| Ellison V. FPC Disposal, Inc. (Ellison Litigation) | |
| --- | --- |
| **Vendor** | **Claim Amount ($)** |
| Hall Estill Hardwick Gable Golden & Nelson, P.C. | 182,509.38 |
| Settlement Payment | 25,000.00 |
| **Total Ellison V. FPC Disposal, Inc.** | **207,509.38** |

| Petro Resources, Inc. V. N.Y. Hillside, Inc., Et Al. (Placerita Litigation) | |
| --- | --- |
| **Vendor** | **Claim Amount ($)** |
| Locke Liddell/Locke Lord | 14,125.51 |
| Settlement Payment | 25,000.00 |
| **Total Petro Resources, Inc. C. N.Y. Hillside, Inc., Et Al.** | **39,125.51** |

| **Total All Claims** | **94,232,954.99** |