EXHIBIT 7

**E. Mack Letter to DOJ and EPA dated August 21, 2000 ("Mack 8/21/2000 Letter")**

# LOCKE LIDDELL & SAPP LLP

ATTORNEYS & COUNSELORS

2200 ROSS AVENUE
SUITE 2200
DALLAS, TEXAS 75201-6776

AUSTIN • DALLAS • HOUSTON • NEW ORLEANS

(214) 740-8000
Fax: (214) 740-8800
www.lockeliddell.com

DIRECT NUMBER: (214) 7~~~~~~
email: emack@lockeliddell.com

August 21, 2000

*Via Telecopy and U.S. Mail*

Bradley R. O'Brien
U.S. Department of Justice
301 Howard Street, Suite 870
San Francisco, CA 94105

Mark Chalfant
United States Environmental Protection Agency
Region IX
75 Hawthorne Street
San Francisco, CA 94105

Re:     Casmalia Superfund Site

Dear Messrs. O'Brien and Chalfant:

As you know, this firm represents Samson Hydrocarbons Corporation ("SHC"), as well as Samson Investment Corporation ("Samson"), which has been SHC's parent corporation since early 1993. Prior to early 1993, W.R.Grace & Co ("Grace's") subsidiary, Grace Energy Corporation, was the sole shareholder of the corporation named Grace Petroleum Corporation ("GPC"). GPC is now a corporation with no assets named SHC. The assets were transferred out of SHC in 1993.

We are responding to your request for information, as well as taking the opportunity to address several erroneous statements contained in the July 11, 2000 and August 14, 2000 letters to you from Holme Roberts & Owen on behalf of Grace. This letter is not intended to be an exhaustive response to Grace's position.

We understand from the Holme Roberts letter of August 14, 2000, that Grace has already provided you with a copy of the Agreement for Purchase and Sale of the Stock of GPC dated December 30, 1992 (the "Stock Purchase Agreement"). The parties closed the Stock Purchase Agreement in early 1993.

Bradley R. O'Brien
Mark Chalfant
August 21, 2000
Page 2

The Holme Roberts letters came as a surprise to Samson and SHC because pursuant to the same Stock Purchase Agreement, Grace recently acknowledged its responsibility for addressing another environmental claim that is similar to the Casmalia Site claim. That other claim was based on alleged contamination caused in the 1960's and 1970's by a pipeline owned at that time by GPC (or one of its predecessors) on Otis Air National Guard Base in Massachusetts. Like here, GPC had sold the Otis pipeline long before the sale of GPC to Samson, and Grace had not disclosed to Samson any potential for liability from that pipeline.

As to the Casmalia Site claim, we have substantial doubt that any potential liability arising from alleged disposal of materials from GPC's California oil and gas properties even remained with GPC after 1984. Publicly-available information shows that in September 1984, GPC conveyed those same California oil and gas properties to another Grace entity, Grace Geothermal Corporation. On the same day in September 1984, it appears that Grace Geothermal entered into some transaction with Shell California Production, Inc. ("Shell"), by which those properties were conveyed to Shell. Of course, we do not know the terms of GPC's transaction with Grace Geothermal or Grace Geothermal's transaction with Shell, and as a result, we do not know whether Grace Geothermal or Shell assumed liabilities.

We do know that when Samson purchased GPC years later in 1993, GPC owned *no* properties whatsoever in the State of California. We also know that Grace did not advise Samson of any properties, potential environmental liabilities or claims in the State of California, despite numerous representations and warranties in the Stock Purchase Agreement that Grace had disclosed all material liabilities, specifically including environmental liabilities, known to its or its subsidiaries' officers or reflected in its records. (*See, e.g.*, Stock Purchase Agreement ¶¶ 6.05, 6.09, 6.11, 11.01, 11.08).

That Grace knows that it remains responsible for any potential liability arising from GPC's use of the Casmalia Site (which was discontinued long before the sale to Samson in 1993) is further evidenced by the active role that Grace assumed in response to the EPA's notice letters regarding the Casmalia site. Indeed, Grace (acting through the Holme Roberts firm) entered into a tolling agreement, assumed responsibility for organizing and coordinating activities among all Tier 2 Parties, and apparently organized and attended several meetings with you long before it ever occurred to Grace to advise SHC of the existence of the Casmalia Site, any investigation occurring there, or to provide SHC with notice of the EPA's notice letter.

As noted above, there are repeated representations and warranties by Grace Energy in the Stock Purchase Agreement that no known or knowable undisclosed material claims or potential claims (such as this one) existed against GPC at the end of 1992. In addition, Grace's insurance program remains applicable for occurrences prior to the Closing Date of the purchase. (Stock Purchase Agreement ¶ 6.07). The Stock Purchase Agreement provided a mechanism for Samson to inspect the "Producing Properties and Related Facilities" that GPC owned at the time of the sale and obtain a downward adjustment of the purchase price for remediation costs. (Stock Purchase Agreement ¶ 11.04). For other matters, specifically including environmental claims, Grace and

Bradley R. O'Brien
Mark Chalfant
August 21, 2000
Page 3

Grace Energy, as the former owners of GPC, agreed to indemnify Samson and SHC, and hold them harmless. (Stock Purchase Agreement ¶ 13.03). The indemnities pertaining to environmental matters are unlimited in time. (Stock Purchase Agreement ¶ 13.03(e)).

Grace claims that under Texas law, the indemnities to which Grace agreed in the Stock Purchase Agreement do not cover CERCLA claims arising before Grace's sale of GPC to Samson because, according to Grace, the indemnities do not specifically contain the words "strict liability." Grace is mistaken in its analysis of Texas law for at least two reasons:

*First*, this is not the type of situation in which the Texas courts apply their "express negligence" (or as here their "express strict liability") rule. The rule is that courts do not presume, absent clear language, that one party will agree to assume responsibility for another party's *future* acts (or omissions) that might give rise to liability in negligence or strict liability. *See, e.g., Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 386-87 (Tex. 1997). Here, there are no future acts or omissions involved. If in 1993, GPC had CERCLA liability for disposing of allegedly hazardous substances at the Casmalia Site in prior years, that liability had been created *on Grace's watch*; Grace represented and warranted to Samson that such liability did not exist; and the purchase price for GPC was negotiated assuming the absence of such liability. We do not think the Texas courts would hesitate to enforce Grace's indemnification of Samson and SHC against such claims.

*Second*, it is quite clear that Grace and Grace Energy knew what they were doing, i.e., the "express strict liability rule" would be met, even if it were applicable (which it is not). The parties specifically defined the term "Environmental Law" in paragraph 1.10 of the Stock Purchase Agreement to include "any law . . . which relates to or otherwise imposes liability . . . with respect to pollution or the protection of the environment in existence as of [December 30, 1992]," and then used that term throughout their contract. *See, e.g.,* ¶¶ 6.09, 6.13(a). We seriously doubt that *W. R. Grace & Co.* can claim that it did not know in 1992 and 1993 that CERCLA imposed a form of strict liability. That Grace knew what it was doing is also illustrated by its accepting responsibility for the environmental claim on Otis Air National Guard Base, as discussed above. The "express liability rule" is, after all, merely a "fair notice" presumption. It disappears in the face of proof that the indemnitor had actual notice or knowledge of the terms of its indemnity. *E.g., Dresser Industries, Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 508 n.2 (Tex. 1993).

We also note from our limited review of certain records that we recently received that at least some of what GPC purportedly shipped to Casmalia prior to September 1984 was non-hazardous, or if hazardous, does not appear to be associated with a contaminant of concern at Casmalia. In addition, any shipments attributed to GPC after September 1984 were not, in fact, made by GPC. In fact, it is clear from these records that Grace, itself, or another Grace entity shipped hazardous materials to Casmalia both before and after 1984. On top of that, neither you nor we know what role, if any, Grace, itself, or Grace Energy, GPC's immediate parent, took in the operations of GPC's California oil and gas properties, or in the choices made regarding disposal of allegedly hazardous substances from those properties, during the years the Casmalia Site was in operation. It is absolutely clear that neither Samson nor anyone associated in any way with SHC

Bradley R. O'Brien
Mark Chalfant
August 21, 2000
Page 4

since the closing of the Stock Purchase Agreement in 1993 had any role whatsoever in those operations.

Thank you in advance for your consideration. We look forward to meeting with you tomorrow in San Francisco.

Sincerely,

Elizabeth E. Mack

EEM:caw

cc: Kenneth W. Lund