## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| W. R. GRACE & CO., et al., | ) Case No. 01-01139 (KJC) |
|  | ) (Jointly Administered) |
| Reorganized Debtors. | ) |
|  | ) **Requested Hearing Date:  TBD** |
|  | ) **Objection Deadline: TBD** |
|  | ) |
|  | ) **Related to Docket No. 32600, 32601** |
|  | ) |

---

### SGH ENTERPRISES, INC.'S RESPONSE TO THIRTY-EIGHTH OMNIBUS
### OBJECTION TO CLAIMS FILED BY SGH ENTERPRISES, INC.
### (SUBSTANTIVE AND NON-SUBSTANTIVE OBJECTION)

---

SGH Enterprises, Inc. (f/k/a Samson Hydrocarbons Company.) ("SGH"), files this *Response* ("Response") to the *Thirty-Eighth Omnibus Objection to Claims filed by SGH Enterprises, Inc. (Substantive and Non- Substantive Objection*) [Docket No. 32600] (the "Objection") filed by the Reorganized Debtors[1] and SGH respectfully represents as follows:

### INTRODUCTION

1.    The Court should overrule the Objection because: (1) the Claim (defined below) satisfies the procedural requirements of the Federal Rules of Bankruptcy Practice and Procedure (the "Federal Rules" or Fed. R. Bankr. P.") and the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware ("Local Rules" or "Local Rule") (2) the Claim is covered by the indemnity provisions in the applicable agreement, or the agreement is ambiguous; and (3) the evidence at trial will establish that the amounts set forth in

---

[1] The Reorganized Debtors comprise W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.) and W. R. Grace & Co.-Conn. ("Grace-Conn."). Grace Energy Corporation was a Reorganized Debtor whose bankruptcy case has been closed.

the Claim have been paid by SGH, or on its behalf, all payments made were reasonable under the circumstances, and the Claim is due and owing from the Reorganized Debtors.

2.      In 1992, Grace Conn, Grace Energy Corporation ("Grace Energy" and with Grace-Conn, "Grace"), and Samson Investment Company ("Samson") executed an *Agreement for the Purchase and Sale of the Stock of Grace Petroleum Corporation* (the "1992 Purchase Agreement"), resulting in a sale by Grace Energy to Samson of all outstanding capital stock of Grace Petroleum Corporation ("Grace Petroleum").  The sale of any oil and gas or other energy-related asset raised environmental concerns, and Grace and Samson negotiated detailed mechanisms to address these concerns.  The 1992 Purchase Agreement covers environmental laws, properties, and facilities; requires Grace Energy to make extensive disclosures, representations, and warranties regarding environmental issues; and, contains an indemnity provision providing extensive protection for environmental damage caused by Grace Petroleum or its affiliated companies.  After the closing of the sale, Grace Petroleum was eventually renamed Samson Hydrocarbons Company and later changed its name to SGH, a claimant in the above-captioned bankruptcy cases (the "Bankruptcy Cases").

3.      In the years following the closing, SGH became embroiled in extensive litigation and regulatory actions related to Grace Petroleum's environmental liabilities, all of which undisputedly pre-dated Samson's acquisition of Grace Petroleum.  These claims included suits brought by private parties, enforcement actions brought by the EPA, and demands from state and other governmental entities.  Grace worked with Samson and SGH and, indemnified and defended many of these actions as documented in periodic settlements between Grace and Samson.

4.      When Grace filed bankruptcy, SGH had already filed suit to enforce its rights under the 1992 Purchase Agreement on the so-called Casmalia claim.  After the Grace Bankruptcy Cases

2

were filed, Grace abruptly changed course and balked on its indemnity obligations to SGH. Grace's failure to perform under the 1992 Purchase Agreement, pre- and post-petition, resulted in SGH having to address millions of dollars in Grace's environmental liabilities, which liabilities form the basis of the Claim. Now Grace makes a belated attempt to further avoid its obligations through the Objection. Neither the law nor the facts support the Objection, and SGH asks the Court to deny it.

## RELEVANT BACKGROUND

**A.    The Transaction and Indemnity Obligation**

5.    Grace and Samson entered into the 1992 Purchase Agreement whereby Samson Investment purchased all shares of Grace Petroleum's stock from Grace Energy.[2] In the 1992 Purchase Agreement, Grace Petroleum, and various subsidiaries, are referred to as the "Corporations."

6.    The 1992 Purchase Agreement contains the following indemnity provision:

13.03    <u>General Indemnification by Seller and Grace</u>.

(a)    Subject to the terms, conditions and limitations of this Article, Seller and Grace shall indemnify Purchaser and the Corporations and save and hold Purchaser and the Corporations harmless from and against any Damages caused by or arising out of [. . .] (iii) the environmental condition of any oil, gas and mineral leases and any other properties, including, but not limited to, gas plants and treatment facilities in which any of the Corporations or their respective predecessors previously owned an interest but in which the Corporation or any of their respective predecessors no longer own an interest as of the Closing Date, (iv) the environmental condition of any Leased Properties, Oil, Gas and Mineral Leases, Producing Properties, Properties, or Related Facilities as set forth in the schedule to Section 6.09 or as assumed by Seller pursuant to Section 11.04, but excluding form this indemnification claims for violations of any environmental laws that would not have been a violation of the Environmental Laws, as defined . . .

---

[2] SGH has produced the 1992 Purchase Agreement and the other agreements referenced herein. Because these documents are voluminous, SGH has not attached them here but can file them upon the Court's request or in connection with any dispositive motion filed in this case.

7.      Various components of the indemnity provisions contained expiration dates, but "Seller's and Grace's obligation to indemnify Purchaser under Section 13.03(a)(iii) and (iv) shall continue without limitation of time."[3]   The indemnities in favor of Corporations do not expire. After Purchaser or Corporations gives notice to Grace regarding Third Party Claims, Grace has a time period to take over the defense.[4] If Grace does not take over the defense, Samson may defend itself, and Grace must pay Litigation Expenses.[5]

8.      The indemnity provisions of the 1992 Purchase Agreement include detailed definitions.  "Damages" are defined as "any and all penalties, fines, damages, liabilities, interest, losses or costs . . ."[6]  "Litigation Expenses" are defined as "reasonable attorneys' fees and other costs and expenses (including actual cost of in-house counsel in a situation where Seller has allowed Purchaser to assume the defense of litigation and Purchaser's lead counsel is an employee of Purchaser) incident to proceedings or investigations respecting, or the prosecution or defense of, a claim."[7] "Third Party Claims" are defined as "any and all claims, demands, suits, actions or proceedings by any person or entity, other than Purchaser or Seller or their respective affiliates arising prior to the Closing Date."[8]

9.      Other definitions help to understanding the indemnity provision.  The 1992 Purchase Agreement defines "Environmental Law" as "any law, regulation, rule, ordinance, by-law, or order of any Governmental Authority, which relate to or otherwise imposes liability, obligations, or standards with respect to pollution or the protection of the environment in existence

---

[3] 1992 Purchase Agreement ¶ 13.03(e).
[4] *Id.* ¶ 13.05.
[5] *Id.*
[6] 1992 Purchase Agreement ¶ 13.01(b).
[7] *Id.* ¶ 13.01(e).
[8] *Id.* ¶ 13.01(h).

as of the date hereof."[9]

10.    "Properties" is defined as "real property owned and leased by the Corporations, other than real property interests created by Oil, Gas and Mineral Leases and the Producing Properties."[10]  "Related Facilities" are defined as follows:

> 1.30  "Related Facilities" means all real property (other than the Lease Properties, the Oil, Gas, and Mineral Leases, the Producing Properties and the Properties) and all personal property and other rights of any nature whatsoever owned by the Corporations and used in connection with the operations conducted at or incident or related to the Oil, Gas, and Mineral Leases, Leased Properties, Producing Properties, and Properties whether located on or off the Oil, Gas and Mineral Leases, Leased Properties, Producing Properties or Properties or on properties pooled and unitized therewith, including, but not limited to, all wells, fixtures casing and tubing, production, gathering, treating, processing, compression, dehydration, salt water disposal and pipeline equipment and facilities, office equipment, reference materials, lease, business and other records and files, and all licenses, leases easements, permits, actions and rights-of-way.

11.    In addition to the indemnity provision discussed above, the 1992 Purchase Agreement includes extensive representations and warranties regarding "substantial compliance with all Environmental Laws" and complete disclosure of statements of fact.[11]  The 1992 Purchase Agreement provides that it "shall be governed and construed and enforced in accordance with the laws of the State of Texas, excluding the conflict of laws provisions thereof that would otherwise require the application of the law of any other jurisdiction . . .".[12]

12.    Grace Energy and Samson entered into two subsequent agreements.  On March 31, 1994, Grace Energy and Samson entered the 1994 Agreement ("1994 Agreement") providing for certain purchase price adjustments to the 1992 Purchase Agreement and further preserved the

---

[9] 1992 Purchase Agreement ¶ 1.10.
[10] 1992 Purchase Agreement ¶ 1.27.
[11] 1992 Purchase Agreement ¶¶ 6.09, 6.11.
[12] *Id.* ¶ 18.04.

indemnity rights from the 1992 Purchase Agreement.[13]

13.     Grace Energy and Samson also entered into an agreement on November 30, 1998, to resolve certain outstanding indemnity claims (the "1998 Agreement").  Like the 1994 Agreement, the 1998 Agreement addressed a resolution of certain specific indemnity claims but left the overall indemnity rights from the 1992 Purchase Agreement intact and enforceable.

**B.     The Claims**

14.     Following the 1998 Agreement, SGH incurred significant liabilities and Litigation Expenses attributable to Grace under the indemnity provisions in the 1992 Purchase Agreement. SGH itself did not, at all times, maintain an operating account.  Instead, some amounts set forth below were paid by SGH, and some from checks issued through a Samson Investment or a Samson Resources operating account.  Samson accounted for those transactions in its books and records through an account code tying distributions and allocating the expenses to the SGH cost center. Thus, while some checks may have been issued from a Samson Investment or Samson Resources account, SGH either paid, or is obligated to repay, the obligations for which it seeks indemnity.

15.     The specific claims at issue are detailed below.

**i.     The Casmalia Site**

16.     SGH was listed by the EPA as a potentially responsible party ("PRP") with respect to Casmalia Resources Hazardous Waste Disposal Site (the "Casmalia Site"), a disposal site in California for certain types of waste. In March 2000, Grace, which the EPA had listed as a PRP at Casmalia, alleged in a letter to SGH that SGH, rather than Grace, was the correct PRP for alleged disposal of oil field waste allegedly deposited at Casmalia in earlier years from wells partially owned at the time by Grace Petroleum.  The EPA pursued the action in support of alleged

---

[13] 1994 Agreement at 9.

remediation efforts, seeking $75.5 million from a tier of PRPs that included SGH and Grace.

17.    On April 26, 2000, and again on November 15, 2000, SGH sent Notices of Claim to Grace seeking indemnification under the 1992 Purchase Agreement. SGH also filed a lawsuit against Grace to compel Grace to indemnify SGH and Samson for its costs incurred in connection with the Casmalia Superfund Site and further asserting claims related to Grace Energy's failure to disclose the Casmalia liabilities in breach of the representations and warranties in the 1992 Purchase Agreement. The litigation, *Samson Investment Co. & Samson Hydrocarbons Co. v. WR Grace & Co.—Conn. & Grace Energy Corporation*, Case No. 01-769, in the 95th Judicial District Court for Dallas County, Texas, was administratively closed due to the Grace bankruptcy cases.[14]

18.    Samson and Grace (collectively, here, the "Parties") entered into the Casmalia Defense Agreement effective January 31, 2001. The Casmalia Defense Agreement allowed the Parties to participate, along with other potentially responsible parties, in the defense of claims made by the EPA, the State of California and the "Casmalia Resources Site Steering Committee" (the "CRSSC") with respect to the Casmalia Site. In the Casmalia Defense Agreement, Grace and SGH agreed to participate in the defense of the Casmalia matter as part of the "Tier II PRP Group." The Casmalia Defense Agreement provided that Samson and Grace would pay their own legal expenses, but specifically reserved any right either of them may have to seek recovery of its legal expenses from any or all other Parties. SGH and Grace each agreed to pay one half of SGH's "expenses or assessments" to remain part of the Tier II PRP Group. SGH and Grace each also agreed to pay one-half of SGH's share of any settlement entered into by the Tier II PRP Group

---

[14] Attached to this Response as Exhibit "A" is a true and correct copy of the Texas state court petition.

with the United States, the State of California or the CRSSC.[15]

19.     On or about June 29, 2001, SGH, along with certain other entities that the EPA alleged are liable at Casmalia, conditionally agreed, without admission of liability, to resolve the claims made against them, subject to negotiating a mutually acceptable Consent Decree. Grace participated in the negotiations through mid-June 2001, when it abruptly—and contrary to the Casmalia Defense Agreement—notified SGH that it would not participate in any settlement. SGH gave Grace additional notice about the conditional agreement in late June 2001.

20.     Meanwhile, SGH and other PRPs began negotiating a Consent Decree with the Department of Justice. During the negotiation of the Consent Decree, on January 28, 2002, SGH again gave notice to Grace of the negotiations and sought Grace's approval of the settlement. In early September 2002, SGH sent a copy of the proposed final Consent Decree to Grace, seeking approval of the settlement. Grace did not respond. On or about September 20, 2002, SGH, the EPA and others entered into a Consent Decree resolving the environmental issues at the Casmalia Site.

21.     Pursuant to the Consent Decree entered into by SGH, the EPA and others, Samson Hydrocarbons wired $6,067,323.00 to be used towards the remediation of the pollution at the Casmalia Site.  SGH has also paid or incurred attorneys' fees and costs totaling $832,229.90 through July 31, 2009, in its efforts to negotiate the Consent Decree, evaluate the claims, pursue indemnification rights, and otherwise address issues presented by the EPA's action.

22.     In addition, the State of California has made demands on SGH and other members on the Casmalia Negotiating Committee ("CNC") for the imposition of a separate assessment

---

[15] The Casmalia Defense Agreement also contains a reservation of rights permitting any of the Parties to seek relief against the other Parties for claims related to the Casmalia Site and a denial of liability specifically acknowledging a disagreement among the Parties as to the ultimate liability for any claim arising from the Casmalia Site (although each Party denies any liability for the Casmalia Site).

against said parties for the State's past costs, estimate of future costs, and natural resources damages associated with the Casmalia Site.  The State of California made a settlement offer to certain *de minimis* members of the CNC, but not to SGH, stating that the State was still calculating its demand.  The parties offered a settlement accepted the settlement, and an insurance policy paid 88% of the settlement.  SGH is still waiting on its settlement offer.  SGH's estimates that Grace will owe SGH $250,000.00 as an indemnified obligation in connection with the State's demand. The $250,000 estimate assumes that an existing insurance policy pays at the same rate it has paid the other settlements. That insurance policy will expire in 2017 and, without the insurance, the out of pocket costs to SGH to defend such a claim will be substantially higher.

23.     Including both actual costs paid in resolution and settlement of the EPA's action and estimated costs from the threatened action from the State of California, Grace's indemnity obligation to SGH associated with the Casmalia Site is $7,149,552.90, through the date of SGH's amended proof of claim.   SGH also asserts a claim for all attorneys' fees and costs, other costs and expenses that it has or may incur in connection with the State's claims, and all costs, expenses, damages, judgments, or other liabilities that may arise related to the Casmalia Site in the future.

### ii.        The Fort Peck/ East Poplar Oil Field Matters

24.     SGH's Fort Peck/ East Poplar Claims arise out of a series of Emergency Administrative Orders ("EAOs") issued by the EPA.  The EAO issued November 30, 2000 initiated an EPA enforcement action against SGH, and others, alleging violation of the Safe Drinking Water Act, purportedly resulting from salt water disposal operations in the East Poplar Unit, Roosevelt County, Montana.  Grace Petroleum or its predecessors owned as many as seven salt water disposal wells in the East Poplar Field.  Grace Petroleum ceased its operations between 1973 and 1984 and sold its interest in 1986, many years before the 1992 Purchase Agreement.

Grace indemnified and defended the November 30, 2000 EAO related to the Fort Peck, Montana, properties and began prosecuting an appeal of the EAO, until June 2001 when it indicated that it would no longer defend the EAO.

25.     The EPA issued a second EAO on or about September 20, 2001, naming SGH, among others, which relates to the same issues raised in the first EAO.  Grace declined to accept its indemnity obligations, which forced SGH to defend the matter, conduct environmental studies, and undertake evaluation, monitoring, and eventually plugging and abandonment of two wells previously operated by Grace Petroleum in the East Poplar Unit.  SGH also appealed the Order by filing a Petition for Review to the United States Court of Appeals for the Tenth Circuit.

26.     Following briefing and Tenth Circuit-monitored settlement negotiations, on July 20, 2004, SGH and others entered into an Administrative Order on Consent ("2004 AOC") to resolve the issues in the second EAO.  The 2004 AOC required SGH and the other respondents to, among other things, pay for construction of a water pipeline, pay certain homeowners compensation for issues with the pipes in their homes, supply bottled water to homeowners, conduct monitoring, and prepare an annual study.  SGH fully complied with the 2004 AOC.

27.     On or about December 16, 2010, the EPA issued another EAO, which required among other things, SGH and the other respondents to conduct additional sampling, supply clean water, and prepare studies for remediation.  SGH timely filed a petition for review.  Following extensive negotiations and numerous mediation sessions jointly conducted by the Third and Tenth Circuit mediators,, on March 26, 2012, the parties entered into a separate Administrative Order on Consent ("2012 AOC") to resolve the 2010 EAO.  The 2012 AOC required SGH and the other Respondents to sample the City of Poplar wells monthly, supply fresh drinking water to the entire City in the event the monthly sampling demonstrates (after confirmation sampling) that certain

compounds exceed certain concentrations, and pay the City of Poplar $320,000.  The 2012 AOC does not resolve EPA's allegations regarding rural water users or remediation.  SGH and the other respondents have fully complied with the obligations of the 2012 AOC.

28.    In addition to issues brought by the EPA, on April 18, 2012, the Town of Poplar sent SGH and the other parties a 60-day notice under the Clean Water Act, contending that SGH and others are responsible for contamination from a point source into waters of the United States. The letter is a jurisdictional prerequisite to filing suit, and therefore, because the 60 days elapsed, the Town of Poplar may file suit on this issue at any time.  The Town of Poplar, through counsel, has indicated that it is considering bringing tort claims against SGH and the other Respondents on behalf of the Town of Poplar and other potential plaintiffs, alleging property damage, negligence, and trespass, among other claims.  On July 11, 2012, the Town of Poplar sent SGH a separate 60-day notice letter, this one purportedly under CERCLA, contending that SGH and the other Respondents are responsible for contamination that is compensable under CERCLA.

29.    Given the actual expenses in addressing the EPA's actions and estimated costs of future litigation, SGH asserts claims related to Fort Peck and the East Poplar Oil Fields in the amount of not less than $9,245,960.64.  This amount includes: costs and expenses in participating in the studies and the other requirements of the EAOs; constructing and operating the pipeline and plugging the Huber Wells; professional service fees, construction costs, attorneys' fees and other costs in connection with (and in defending against and complying with) the EAOs in the amount of $2,045,960.64 through June 20, 2012; the share of the monthly sampling and $320,000 required to be paid to the Town of Poplar under the Administrative Order on Consent; future costs incurred related to the East Poplar Unit and any remediation associated therewith, which may exceed $6.2 million; and, future attorneys' fees and expenses that SGH incurs in defending itself in connection

with the EAOs, Clean Water Act claims, and tort claims, which SGH estimates to be at least $1,000,000.  SGH also asserts claims for any future attorneys' fees, costs, judgments, settlements, or other amounts SGH may become liable to pay under applicable environmental laws or other claims.

### iii.    The Youpee Litigation

30.    In the Youpee Litigation, Plaintiffs sought damages for alleged contamination of certain real property purportedly resulting from certain salt-water disposal operations in the East Poplar Unit, Roosevelt County, Montana. This private-party lawsuit involves many of the same issues as the Fort Peck Administrative Orders described above.  Plaintiffs asserted they had been damaged in the amount of $8,500,000.00.  SGH demanded indemnity from Grace with respect to the Youpee Litigation. Grace accepted the indemnity demand under the 1998 Agreement.  When Grace originally assumed the defense of the Fort Peck Administrative Orders, Grace also assumed the defense of the Youpee Litigation.  Grace subsequently withdrew its defense after it filed for bankruptcy protection, requiring SGH to pay attorneys' fees to defend itself and to incur expenses in resolving the Youpee Litigation. On May 9, 2002, pursuant to a Settlement Agreement and General Release (the "Youpee Settlement Agreement"), the Youpee Litigation was dismissed with prejudice.

31.    Pursuant to the Youpee Settlement Agreement, SGH paid $210,000.00 for the remediation of the property that was the subject of the Youpee Litigation. In addition to the $210,000.00 paid under the Youpee Settlement Agreement, SGH paid attorneys' fees and costs totaling $128,025.90. Therefore, SGH asserts an indemnity claim arising from the Youpee Litigation of $338,025.90.

####     iv.    **The Exxon Litigation**

32.    On May 28, 1999, Exxon Corporation filed suit against SGH, seeking indemnification for environmental response costs associated with oil and gas properties sold by SGH to Exxon Corporation.  Grace is also obligated to defend SGH in the Exxon Litigation pursuant to the 1992 Purchase Agreement.  SGH served a written Notice of Claim upon Grace seeking indemnification in the Exxon Litigation, and Grace undertook the defense of the Exxon Litigation in accordance with the 1992 Purchase Agreement and the 1998 Agreement. Just before the trial in the Exxon Litigation, Grace stopped defending SGH.

33.    In connection with the Exxon Litigation, SGH has paid or incurred attorneys' fees and costs totaling $180,995.34. SGH also asserts claims for all other damages, costs, and attorneys' fees that may arise as a result of the Exxon Litigation as set forth in SGH's Proof of Claim.

####     v.    **The Ellison Litigation**

34.    On November 21, 2000, Jackie Eugene Ellison and Marcia Ellison filed their Second Amended Petition seeking damages for alleged groundwater contamination, against, *inter alia*, SGH.  On January 3, 2001, SGH sent its notice of claim to Grace seeking indemnification for its attorneys' fees and costs and for environmental response costs associated with the Ellison Litigation.  SGH ultimately settled the litigation by making a settlement payment of $25,000 after SGH incurred after incurring attorneys' fees and costs in the amount of $182,509.38.

####     vi.    **The Placerita Litigation**

35.    NY Hillside, Inc., a defendant and third-party plaintiff in the above-described action, asserted a third-party claim against SGH, claiming that SGH should assist in certain environmental clean-up to be performed at the Placerita Field. SGH demanded indemnity, but Grace declined.  NY Hillside asserted that SGH was liable for equitable contribution and equitable

indemnity based on Grace Petroleum's former working interest and net revenue interest in five oil and gas leases in the Placerita Field.

36.     SGH was able to settle the Placerita Litigation by making a $25,000.00 settlement payment after incurring attorneys' fees and costs totaling $14,125.51.  SGH seeks indemnification for these amounts along with all future damages or other attorneys' fees and liabilities incurred with respect to the Placerita leases.

**vii.    SGH Claim Summary**

37.     The following table summarizes the asserted claim amounts, amounts paid by SGH, amounts associated with settlement payments, and the amounts associated with attorneys' fees and other costs incurred for each Claim:

| Claim | Claim Amount | Total Amounts Paid by SGH | Settlement Amount (if applicable) | Attorneys' fees and other costs |
|---|---|---|---|---|
| Casmalia | $7,149,552.90 | $6,899,552.90 | $6,067,323.00 | $1,082,229.90 |
| Fort Peck | $9,245,960.64 | $2,045,960.64 | | $2,045,960.64 |
| Youpee Litigation | $338,025.90 | $338,025.90 | $210,000.00 | $128,025.90 |
| Exxon Litigation | $180,995.34 | $180,995.34 | | $180,995.34 |
| Ellison Litigation | $207,509.38 | $207,509.38 | $25,000.00 | 182,509.38 |
| Placerita Litigation | $39,125.51 | $39,125.51 | $25,000.00 | $14,125.51 |

**C.     The Bankruptcy Cases**

38.     These chapter 11 proceedings were commenced on April 2, 2001 (the "Petition Date").

39.     SGH filed proofs of claim, as amended (SGH will refer to its operative current amended proofs of claim and all amounts identified, reserved, or otherwise described therein as the "Claim" or "Claims"), in the Bankruptcy Cases of Grace-Conn and Grace Energy Corporation based, in part, on the above-described contractual indemnity provisions and claims.  The original

proofs of claim were timely filed over 12 years ago. Following resolution of a significant claim related to Otis Pipeline, the remaining Claims exceed $17 million.

40.    SGH and Reorganized Debtors have discussed the Claim in an effort to resolve it. A joint defense and confidentiality agreement was approved by this Court's *Protective Order Pursuant to Fed. R. Evid. 502*, dated March 3, 2015 [Docket No. 32514].  In March 2015, SGH provided Reorganized Debtors with several thousand pages of documents, including invoices, supporting the Claim, with an expectation of further discussions to resolve the Claim.

41.    Instead of attempting to resolve the Claim through negotiations, after a period of relative silence following the production of extensive documents, on August 18, 2015, the Reorganized Debtors instead filed the Objection.

42.    The Objection asserts a number of purported grounds for denying the Claim.[16] Reorganized Debtors assert the Casmalia and Ellison Claims are not covered by the indemnification, but do not dispute that the remaining Claims are covered.  The issues raised by the Objection include: whether SGH actually paid claims to trigger an indemnity obligation; whether the Claims are properly asserted under the language of the indemnity provision and Texas indemnity law, including the express negligence doctrine; and, whether the Claim amounts are reasonable under Texas law.    Reorganized Debtors object to the components of SGH's Claim under § 502(e) of the Bankruptcy Code.  Reorganized Debtors also assert that SGH is precluded from recovering any future cost or expense because the 1992 Purchase Agreement is not executory and the injunction arising from Reorganized Debtors confirmed chapter 11 plan precludes assertion of the claims.

---

[16] The Objection incorporates a declaration of Richard Finke ("Finke Declaration"), which contains inadmissible hearsay and legal conclusions.  SGH reserves the right to object to the Finke

**RESPONSE TO THE REQUEST FOR RELIEF**

43.     The Objection requests, in summary, the following relief: (i) disallowance of superseded or amended claims;[17] (ii) that this Court set a schedule for summary judgment motions on a set of specific issues; and, (iii) that this Court set the objections and a set of specific issues for trial, after allowing for discovery and other pre-trial matters.[18]

44.     SGH requests that the Court deny the Objection and allow its Claims.  SGH objects to entry of the order proposed by Reorganized Debtors in its current form.  SGH concurs that a reasonable schedule and related scheduling order makes sense for discovery, compliance with the joint defense agreement, a dispositive motion deadline following discovery, other pre- trial matters, and ultimately an evidentiary hearing or trial.  On the other hand, SGH objects, at this stage of the process, to Reorganized Debtors' proposed parsing and designation of a specific set of issues to be determined by summary judgment and others to be determined at an evidentiary hearing.  These issues—such as whether summary judgment on an issue is appropriate—should not be pre-determined at this stage.  For example, there may be genuine issues of material fact on

---

Declaration, and otherwise address the arguments and alleged evidence therein, at the appropriate juncture.

[17] In response to Reorganized Debtors' request for relief and objection seeking disallowance of amended or superseded proof of claims, SGH responds:  SGH filed proofs of claim and amended proofs of claim against Grace-Conn and Grace Energy.  When Grace Energy's case was closed, the claims filed against Grace Energy were, in part, deemed to also be claims against Grace-Conn.; provided that, such claims were preserved "as-is" and without prejudice to any right.  *See Doc. No.* 32429.  According to the Reorganized Debtors, the current claim numbers are 13946, 13947, 18518, 18521, 18521, 18526, 18527, 18551, and 18552.  SGH does not seek a double recovery on the same substantive claims.  But, on the other hand, the requested "disallowance" of superseded or amended proofs of claim should not prejudice the validity of the filed proofs of claim and the amendments, and should leave pending the amended proofs of claim against Grace Energy and Grace-Conn in the event a difference between the rights and claims should be asserted or develop.  SGH will work with Reorganized Debtors to develop an appropriate order to address this aspect of the Objection using the appropriate amended proofs of claim going forward, all without prejudicing rights.

[18] Objection at p. 37 and attached proposed order.

every part of the Objection.  All rights, defenses, and responses should be preserved, including that summary judgment may not be granted because discovery has not concluded and because there are genuine issues of material fact.  And there may be other issues or objections that require an evidentiary hearing.  Rather than address each possible point of disagreement, SGH will work with counsel to agree to a scheduling order so that, at the scheduling conference the parties may present an agreed order or set forth for the Court any specific disagreement.  SGH also objects to an open-ended scheduling order allowing unlimited further claim objections.

45.     Further, Reorganized Debtors refer repeatedly to summary judgment motions they intend to file.  There are no motions for summary judgment filed or pending.  If and when the Reorganized Debtors file a motion for summary judgment, SGH will respond.  There is no rule requiring SGH to preemptively respond to an as-yet-unfiled motion, or to speculate upon the basis upon which the Reorganized Debtors may rely.

## ARGUMENTS AND AUTHORITIES

**A.     SGH's Claim is Valid and constitutes *Prima Facie* evidence.**

46.     The Court should overrule the Reorganized Debtors' Objection that SGH's Claim does not comply with the Federal Rules and the Local Rules, and is not entitled to prima facie validity, because the Objection is without merit, and misstates and misapplies the rules.

47.     SGH's amended proofs of claim include a 17-page attachment that:

(i) identifies the 1992 Purchase Agreement, the 1994 Agreement, the 1998 Agreement, and the Casmalia Defense Agreement (collectively, the "Agreements") and discusses various provisions of the Agreements;

(ii) describes the facts and circumstances underlying various components of the Claim;

(iii) states a claim amount for various components of the Claim; and

(iv) includes a list itemizing the third-party expenses that are a component of the Claim, by amount and vendor, and identifies the settlement payments that comprise a component of the Claim.

48.    The Agreements and the invoices were not attached to SGH's Claim.  Instead, as proof of claim Form 10 contemplates, SGH attached a summary.  The proof of claim also states that "The Agreements and the Casmalia Defense Agreement are voluminous…. however, copies will be provided upon request to Samson's counsel."[19]  Likewise, the proof of claim provides that the invoices supporting the fees, costs and expenses set forth are voluminous, but can be obtained upon request to SGH's attorneys, subject to any applicable privilege.[20]

49.    Reorganized Debtors possess copies of the above-described Agreements. Moreover, in March 2015 pursuant to this Court's Protective Order Pursuant to Fed. R. Evid. 502 dated March 3, 2015 [Docket No. 32514],  SGH produced to the Reorganized Debtors a significant number of the third-party invoices summarized in the SGH Claim.[21]

50.    In their Objection, the Reorganized Debtors erroneously assert SGH's Claim does not comply with Fed. R. Bankr. P. 3001(c) and that the Claim is not entitled to prima facie validity because documents showing actual payment of expenses and the reasonableness of such expenses are not attached.  Reorganized Debtors state they intend to file a motion for summary judgment disallowing any amount as to which SGH fails to carry its burden of proof and production, citing Fed. R. Bankr. P. 3001, Fed. R. Bankr. P. 3007, and Local Rule 3007-1(f)(iv).[22]  But, there is no motion for summary judgment filed or pending.  If, and when, the Reorganized Debtors file a

---

[19] *See* SGH proof of claim attachment, p. 1.
[20] *See* SGH proof of claim at attachment, p. 14.
[21] Declaration of Amber N. Sladovnik attached hereto as Exhibit "B."

motion, SGH will respond.

51.     Reorganized Debtors also contend SGH has not carried its burden as to "other" issues, such as a right to indemnification for "certain" other amounts, citing Fed. R. Bankr. P. 3001(c) and Local Rule 3007-1(f)(iv),[23] but they do not further substantively discuss these assertions under Federal Rules 3001(c) and 3007-(1)(f)(iv).  Although some of the Reorganized Debtors' contentions are tangentially related to the objections actually asserted, and are addressed to that extent below, SGH reserves its right to fully respond to any argument or objection on these grounds, if and when made. Further, and subject to SGH's responses to these arguments, SGH's Claim is valid, provides more than adequate information to evidence the Claim, and constitute prima facie evidence of the validity and amount of the Claim.  The Federal Rules do not require every document that might bear on the reasonableness of an attorney's fee to be attached and, in any case, the failure to attach the referenced documents is not a basis to disallow the Claim.  SGH is permitted to present evidence at any hearing or trial or respond to a summary judgment motion. Ultimately, SGH will meet its burden.

52.     Under section 502(b) of the Bankruptcy Code, even when a party objects to a claim, the claim is allowed "except to the extent" the claim implicates any exception to allowance set forth in section 502(b).[24]  An alleged failure to comply with Bankruptcy Rule 3001(c), which SGH denies, is not listed as an independent basis for disallowance of a claim.   This is in accord with the purpose of the Federal Rules and related forms--to govern procedure, but not abridge substantive rights.[25]

---

[22] *See* Objection p. 3.
[23] *See* Objection p. 3.
[24] 11 U.S.C. 502(b).  *See Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co.,* 549 US 443, 449; 127 S. Ct. 1199 (2007).
[25] *See* 28 U.S.C. 2075.

53.     The Local Rules cited by Reorganized Debtors do not support their argument. Local Rule 3007-1(f)(iv) incorporates Fed. R. Bankr. P. 7015 and addresses when a party objecting to a claim may amend such objection without leave of court.  Accordingly, this rule does not create any burden on SGH.  Asserting that this Local Rule creates a burden on SGH with respect to the SGH Claim and that the SGH Claim may be disallowed on this basis is, at best, a misstatement of the Local Rule.

54.     The Reorganized Debtors further erroneously contend that the Claim should be disallowed by citing to Local Rule 3007-1(f)(vi).  There is no current Local Rule 3007-1(f)(vi). Subsection (f) of Local Rule 3007-1 ends at subparagraph (v).  For purposes of its Response, SGH will assume that the Reorganized Debtors meant to refer to Local Rule 3007-1(d)(vi).

55.     Local Rule 3007-1(d)(vi) has similar language to that cited by the Reorganized Debtors, which provides, in pertinent part:

Substantive v. Non-Substantive Objections.  An Objection is deemed to be on a substantive basis unless it is based on one or more of the following:

…

(vi) A claim that does not have a basis in the debtor's books and records and does not include or attach sufficient information or documentation to constitute prima facie evidence of the validity and amount of the claim, as contemplated by Fed. R. Bankr. P. 3001(f); provided, however, that if the Court determines that the claim attaches or includes sufficient information or documentation and is otherwise in compliance with applicable rules, then the Objection shall be deemed substantive….[26]

56.     The Reorganized Debtors improperly quote and cite this rule, and assign a substantive effect to the rule that simply does not exist.  The Reorganized Debtors assert:

Local Rule 3007-1(f)(vi) states in the relevant part that such claim **may be disallowed** if it:

does not include or attach sufficient information or documentation to constitute prima facie evidence of the validity and amount of the claim, as contemplated by Fed. R. Bankr. P. 3001(f).

---

[26] Local Rule 3007-1(d)(vi).

57.     Due to the similarity in language, SGH concludes that the Reorganized Debtors may have intended to cite to Local Rule 3007-1(d)(vi).[27]   The Debtors' citation materially misstates the Local Rule.   Significantly, nowhere does this rule provide that the claim may be disallowed or afford any type of substantive relief.   The rule merely specifies the types of objections that are classified as "Substantive" and those that are "Non-Substantive."   The rule provides that if a claim fails to include sufficient information to constitute prima facie evidence of the validity of the claim under Fed. R. Bankr. P. 3001(f), it will result in the objection being considered a non-substantive objection.

58.     This Local Rule is used to determine whether a claim objection is substantive or non-substantive.   Substantive objections are subject to certain requirements that are inapplicable to non-substantive objections.[28]   The requirements contain restrictions such as:  limiting the amount of claims under each objection to 150; permitting no more than two substantive objections to be filed each month; requiring that all substantive bases for objection be included in the same objection; limiting the objectors ability to amend the objection; and, clarifying that the court will not consider substantive objections to personal injury claims for which it does not have jurisdiction.[29]   Each of these restrictions are to protect claimants.   None contemplate, in any way, disallowing a claim.   And the rule requires that all substantive bases for an objection be included. Because the Reorganized Debtors are asserting substantive objections to SGH's Claim, they are precluded from asserting any additional substantive objection to SGH's Claim.

59.     Further, Local Rule 3007-1(d)(vi) references Fed. R. Bankr. P. 3001(f), which is a

---

[27] *See* Objection ¶57 (emphasis added).
[28] Local Rule 3007-1(f).  Local Rule 3007-1(e)(i)(A) requires that an omnibus objection be filed as either substantive or non-substantive, but not both.  The objection was filed as both a substantive and non-substantive objection and is therefore improper under the Local Rules.

rule that relates to the evidentiary effect of a proof of claim. Fed. R. Bankr. P. 3001(f) states, "Evidentiary Effect. A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." This Federal Rule does not state a basis to disallow a claim.

60.    The Third Circuit has examined this burden shifting and the impact of the Federal Rule in the *In re Allegheny Int'l, Inc.* case, in which it stated:

> The burden of proof for claims brought in the bankruptcy court under 11 U.S.C.A. § 502(a) rests on different parties at different times. Initially, the claimant must allege facts sufficient to support the claim. If the averments in his filed claim meet this standard of sufficiency, it is "prima facie " valid. In re Holm, 931 F.2d 620, 623 (9th Cir.1991) (quoting 3 L. King, Collier on Bankruptcy § 502.02, at 502-22 (15th ed. 1991)). In other words, a claim that alleges facts sufficient to support a legal liability to the claimant satisfies the claimant's initial obligation to go forward. The burden of going forward then shifts to the objector to produce evidence sufficient to negate the prima facie validity of the filed claim. It is often said that the objector must produce evidence equal in force to the prima facie case. Id.; see In re Windsor Communications Group, Inc., 45 B.R. 770, 773 (Bankr.E.D.Pa.1985). In practice, the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency.[30]

This authority removes any doubt with respect to the effect of Federal Rule 3001(f); specifically, that Federal Rule 3001(f) may not be used to disallow a claim and only relates to the evidentiary burden of the parties to a claim objection.

61.    As discussed, SGH submitted proofs of claim that identify the applicable Agreements, makes them available upon request, describes facts and circumstances related to the claims, and identifies the component claim amounts, with a list of expense items. The Reorganized Debtors have the Agreements and were provided extensive documentation, including a number of invoices.

---

[29] Local Rule 3007-1(f).
[30] *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173-74 (3d Cir. 1992).

62.     SGH's proofs of claim are sufficient to constitute prima facie evidence of the validity and amount of the Claim. The standard for sufficiency of allegations in a proof of claim that entitles it to prima facie validity is below the federal notice pleading standards.  Courts in this district have explained the difference between the sufficiency standard under *Allegheny* and the notice pleading standard by stating that although many courts analogize proofs of claim to civil complaints and apply federal pleading standards, other courts, including the U.S. Court of Appeals for the Third Circuit, have not imposed the federal pleading standards on those seeking to file proofs of claim, "requiring simply that a proof of claim 'allege facts sufficient to support the claim' without mentioning notice or any other standard by which sufficiency might be determined."  *In re Nortel Networks, Inc.*, 469 B.R. 478, 497 (Bankr. D. Del. 2012, J. Gross) (citing *In re marchFirst, Inc.*, 431 B.R. 436, 443 (Bankr. N.D.Ill. 2010), citing *In re Allegheny Int'l, Inc.*, 954 F.2d 167 (3d Cir. 1992).

63.     Accordingly, the amount of information that must be included in a proof of claim is less than what would be required to survive a motion to dismiss a complaint.  In this district, a claimant must only make averments of fact, not proof, sufficient to support a legal liability to claimant to satisfy Federal Rule 3001, which is measured as a low threshold under section 502(a) of the Bankruptcy Code.[31]  If the claimant's averments in the claim meet that standard, the claim is considered prima facie valid. [32]  Accordingly, SGH need only provide allegations of a legal claim-- SGH need not fully prove and attach every document proving its claim in the proof of claim.  The information and allegations in SGH's proofs of claim far exceed that standard.

64.     Similarly, the Third Circuit has indicated that Federal Rule 3001(c)(1) is applicable only when a writing creates an obligation, not merely "because a document might play some role

---

[31] *See In re Jackson*, 2008 WL 1700415, *2 (Bankr. D. Del., April 9, 2008) (J. Shannon).

in establishing the claim."[33]   The Court further clarified that "[t]he rule is meant to 'provide the debtor with fair notice of the conduct, transaction, and occurrences that form the basis of the claim.'"[34]   Here, the allegations, information and documents in the proofs of claim provide the Reorganized Debtors with notice of the conduct, transaction, and occurrences that form the basis of the Claim.  The proofs of claim should be accorded prima facie validity.

65.     In the Objection, the Reorganized Debtors improperly contend that SGH needs to fully prove every aspect of its claims (including apparently every document bearing on whether a claim is reasonable) in the proof of claim.   This assertion equates to requiring SGH to attach to the proof of claim every document that might play a role in establishing the claim—an interpretation rejected by the Third Circuit in *Lampe*—and turns the construct of the Federal Rules regarding proofs of claim on its head.  This assertion is not supported by section 502 of the Bankruptcy Code or Federal Rule 3001.

66.     Ultimately, the full support for the components of the Claim will require the analysis of thousands of pages of documents relating to vouchers and payments incurred over several years and many years ago.  Producing and analyzing these previously-produced, and to-be-produced, documents is appropriate under a discovery and trial process, but there is no obligation on SGH to produce all such documents with its proofs of claim.

67.     Finally, to avoid further unnecessary use of resources and to focus the parties on substantive issues, SGH requests permission, if needed, to amend its proof of claim.

**B.     SGH Made Payments Triggering Grace's Indemnity Obligation.**

68.     An indemnity provision can be classified as indemnifying against liabilities or as

---

[32] *See In re Jackson*, 2008 WL 1700415, *2 (Bankr. D. Del., April 9, 2008) (J. Shannon).
[33] *In re Lampe*, 665 F.3d 506, 514 (3d Cir. 2011) (citations omitted).

indemnifying against damages. *See Marathon E.G. Holding Ltd. v. CMS Enters. Co.*, 597 F.3d

311, 316 (5th Cir. 2010); *Smith Int'l, Inc. v. Egle Group, LLC*, 490 F.3d 380, 388 (5th Cir. 2007)

(both applying Texas law).  Liability agreements are broader and indemnify against "all claims"

and "liabilities." *Marathon*, 597 F.3d at 316.  Under those provisions, a right to enforce the

indemnity arises once liability is "'fixed and certain, as by rendition of a judgment, whether or not

the indemnitee has yet suffered actual damages as by payment of a judgment.'"[35]  Damage

indemnity agreements require actual payment of the judgment or debt.[36]

69.     While the indemnity provision in the 1992 Purchase Agreement refers to

indemnification for "Damages," the defined term "Damages" includes "liabilities."[37]  If the

provision is construed as a liability indemnity, SGH need not even make payment for liability to

accrue.  However, as discussed above, SGH paid, or amounts were paid on its behalf and for which

it remains liable, for the vast majority of the amounts constituting SGH's Claim.  These payments

were made from an operating account in the name of Samson Investment or Samson Resources

with payment then booked through accounting entries to SGH.  Reorganized Debtors argue this

payment mechanism somehow means SGH made no "payment" to trigger a claim under a damage

indemnity provision theory.[38]  This argument fails.

70.     Reorganized Debtors rely primarily on *Conoco, Inc. v. Republic Ins. Co.*, 819 F.2d

120 (5th Cir. 1987) for the proposition that issuing a check in the name of one entity precludes an

indemnification claim by another entity.  However, the *Conoco* opinion cannot be stretched so far.

The "payment" at issue in the *Conoco* case was whether "the use of a promissory note worthless

---

[34] *Id.* At 514-15, quoting *In re Obrien*, 440 B.R. 654, 662 (E.D. Pa. 2010) (quoting *In re Sandifer*, 318 B.R. 609, 611 (Bankr. M.D. Fla. 2004).
[35] *Smith Int'l*, 49 F.3d at 388. (internal citation omitted).
[36] *Id.*
[37] 1992 Purchase Agreement ¶¶ 13.01(b); 13.03(a).

from the day it was executed" could constitute a loss triggering indemnity obligations.[39]  Relying on cases associated with Texas' *Stowers* Doctrine, the Fifth Circuit determined "a worthless promissory note does not constitute payment under Texas law."[40]  Here, actual funds were paid to the third-party claimant, to lawyers, and other vendors.  The payments are not fiction.

71.     Reorganized Debtors also rely on cases from a completely separate legal context— the doctrine of equitable subordination—to argue a check issued by Samson Investment or Samson Resources would be a payment by a "volunteer."  *See Drilltec Technologies, Inc. v. Remp*, 64 S.W.3d 212, 217 (Tex. App.—Houston [14th Dist.], no pet.).  However, SGH does not assert a Claim based on equitable subordination to another entity's rights—rather, SGH asserts direct indemnification on its own behalf under the 1992 Purchase Agreement.  Reorganized Debtors' equitable subordination theory is inapposite.

72.     SGH's payment of damages, attorneys' fees, and costs associated with its Claim was tied to SGH's accounting records as costs of SGH.  In some instances, while checks may have been issued from another source for some payments, SGH bore responsibility for the costs and has produced thousands of pages of documents identifying these costs.  SGH is continuing to collect and produce documents supporting the payments made, and, at the time of trial or summary judgment, SGH can demonstrate these payments were paid and SGH is responsible for them.  For example, the Casmalia settlement payment was paid by a wire from an SGH account.  Moreover, in each case, actual funds were advanced—not an unsecured promissory note issued by an

---

[38] *See* Objection ¶¶ 57-63.

[39] *Id*. at 123.

[40] *Id*.  The case distinguished by *Conoco*, *Liman v. Am. Steamship Owners Mutual Protection & Indemn. Assoc.*, 299 F. Supp. 106 (S.D.N.Y. 1969), bears more relation to the facts of SGH's payment, noting that "the insurer may not escape its obligation to indemnify by showing that the payment made by the assured was advanced to it by a third party or financed in some other

institution with no assets or intention to pay, as was the case in *Conoco*. Reorganized Debtors'

theory that SGH did not "pay" any obligation to trigger indemnity rights is incorrect.

**C.    Grace Must Indemnify SGH for the Casmalia Site, the Ellison Litigation, and for Properties Subsequently Transferred by SGH to Other Entities.**

73.    Reorganized Debtors' arguments to avoid indemnifying SGH on these sites are

without merit, contrary to the unambiguous language in the 1992 Purchase Agreement, predicated

on self-defined terms that are not in the 1992 Purchase Agreement, and unsupported by Texas law.

Specifically, Reorganized Debtors must indemnify SGH for the Casmalia Site and Ellison claims

because: (1) the environmental indemnity clearly and unequivocally covers them and neither the

environmental indemnity, nor any other indemnity, in favor of SGH has expired; (2) the

environmental indemnity is not limited to sites owned or operated by GPC; and (3) the fair notice

doctrine is either inapplicable or satisfied.

74.    Reorganized Debtors admit GPC could have caused or contributed to alleged

environmental contamination by disposing of its allegedly hazardous wastes and hazardous

substances at the Casmalia disposal site,[41] and did so well prior to the 1992 Purchase Agreement.[42]

In fact, the Casmalia facility was closed in 1989, several years before the 1992 Purchase

Agreement.    Notwithstanding these facts, Reorganized Debtors argue that their "Limited

Environmental Indemnity"[43] does not cover this site.    Limited Environmental Indemnity is not a

term in the 1992 Purchase Agreement.

---

fashion." Here, the payments at issue were not even financed or advanced but rather accounted for directly to SGH.

[41] Objection at ¶ 24.

[42] *Id.*

i.      **The Indemnity Provision Covers SGH's Claim related to the Casmalia Site and the Ellison Litigation.**

75.     The indemnities at issue are in section 13 in the 1992 Purchase Agreement.  Section 13.03(a) reads, in part:

> Subject to the terms, conditions and limitations of this Article, Seller and Grace shall indemnify Purchaser and the Corporations and save and hold Purchaser and the Corporations harmless from and against any Damages caused by or arising out of [. . .] (iii) **the environmental condition of** any oil, gas and mineral leases and **any other properties**, including, but not limited to, gas plants and treatment facilities in which any of the Corporations or their respective predecessors previously owned an interest but in which the Corporation or any of their respective predecessors no longer own an interest as of the Closing Date,. . .(emphasis added)

76.     The indemnity provided by section 13.03(a)(iii) covers the environmental condition of "properties," and is not limited to the defined "Properties," which are those "owned or leased by Corporations, other than real property interests created by Oil, Gas and Mineral Leasing and the Producing Properties."   There is no dispute that the environmental indemnity covers Properties.   Had the parties intended to limit the environmental indemnity solely to  the defined term "Properties," they could have done so.  They did not.  Instead, the parties agreed the environmental indemnity covers properties, "including but not limited to" the Properties.  The construction of the indemnity Reorganized Debtors ask the Court to adopt would make the "including, but not limited to" language superfluous and meaningless.  Texas law requires that every term in an agreement be given meaning so as to avoid any being read as meaningless or a nullity. Under the plain language indemnity, Grace agreed to indemnify SGH for the environmental condition of any property, including Casmalia.[44]

---

[43] Objection at ¶ 9.

[44] Terms are given their "plain, ordinary, and generally accepted meaning unless the contract shows them to be used in a technical or different sense."  *Marathon EG Holding Ltd. v. CMS Enters. Co.*, 597 F.3d 311, 316 (5th Cir. 2010).  If the indemnity agreement is unambiguous it may be construed

77.     Section 13.03(a)(iv) also provides Purchaser and SGH with indemnification for the Casmalia Site and Ellison Litigation.    This provision provides indemnification for "the environmental condition of . . . Related Facilities."    Related Facilities is defined to include "other rights of whatever nature," which would include rights to dispose solid waste.    Grace admits it disposed of waste at the Casmalia Site "prior to 1984."[45]    Similarly, SGH"s claims based on the Ellison Litigation relate to Grace's disposing material that affected groundwater and, therefore, also fit within the section 13.03(a)(iv) indemnity.

78.     The 1992 Purchase Agreement further provides the indemnities in 13.03(iii) and (iv) "shall continue without limitation of time."[46]    Although there are expirations for indemnities to Purchaser (Samson Investment Company), there is no such limitation for indemnities in favor of Corporations (Grace Petroleum, now SGH).[47]    Section 13.03 contains no limitation or expiration based on SGH's subsequent transfer of any asset whatsoever.    Section 13.03 covers the EPA's claims and SGH's damages and Litigation Expenses associated with the Casmalia Site and the Ellison Litigation.

79.     Reorganized Debtors contend that there can be no indemnity claim based on "Third Party Claims" under section 13.03(a)(v) because they contend the provision expired. But the expiration in section 13.03(c) applies to the "Purchaser" and not to "Corporations."

80.     The Casmalia and Ellison components of SGH's Claim are covered by the indemnity.    SGH's environmental indemnity rights have not expired, are not limited in the fashion urged by Reorganized Debtors, and those rights have not expired.

---

as a matter of law.  *E.I. Du Pont De Nemours & Co. v. Shell Oil Co.*, 259 S.W.3d 800, 805 (Tex. App.—Houston [1st Dist.] 2007, pet. denied).
[45] *See* Objection ¶ 24.
[46] 1992 Purchase Agreement ¶ 13.03(e).
[47] 1992 Purchase Agreement ¶¶ 1.04, 1.29.

### ii.    The Indemnity Provision Provides No Limitation for Subsequently Transferred Properties.

81.    Grace improperly attempts to limit SGH's indemnity rights by arguing SGH may not seek indemnity for properties that SGH owned at one time, but now no longer owns.  This limitation is not in the 1992 Purchase Agreement, and is inconsistent with the express language in the indemnity that Seller's obligations "shall continue without limitation of time."[48] The lack of an expiration or limitation on environmental liability makes sense given the nature of environmental liabilities.  SGH's ownership of a property subsequent to Grace, even briefly, can subject SGH to potential liability.

82.    The Reorganized Debtors' argument, to the extent it is a request for declaratory relief, is procedurally improper. If Reorganized Debtors are asking for an advisory declaration that SGH cannot assert a claim against Grace related to SGH properties subsequently transferred, the Court should overrule the objection because the Reorganized Debtors are not entitled, in this contested matter, to such a declaration.

### iii.    The Express Negligence Doctrine, or Fair Notice Doctrine, does not Apply, and, even if it did, the Indemnity Provision Satisfies the Requirements.

83.    Reorganized Debtors contend that Texas law prevents SGH's Claim, to the extent predicated on CERCLA claims arising before Grace's sale of GPC to Samson, because the indemnity does not contain the words "strict liability."  Grace is mistaken.

84.    This is not the type of situation in which the Texas courts apply their "express negligence" (or as here their "express strict liability") rule.  The rule is that courts do not presume, absent clear language, that one party will agree to assume responsibility for another party's *future* acts (or omissions) that might give rise to liability in negligence or strict liability.  *See*, *e.g.*, *Green*

---

[48] 1992 Purchase Agreement ¶ 13.03(e).

*Int'l, Inc. v. Solis*, 951 S.W.2d 384, 386-87 (Tex. 1997). Here, there are no future acts or omissions involved. Grace Petroleum's CERCLA liability for disposing of allegedly hazardous substances and wastes at the Casmalia Site occurred prior to 1992 on Grace's watch; Grace represented and warranted to Samson that such liability did not exist; and the purchase price for GPC was negotiated assuming the absence of such liability.

85.    Grace knew what they were doing, *i.e.*, the "express strict liability rule" would be met, even if it were applicable (which it is not). The parties specifically defined the term "Environmental Law" in paragraph 1.10 of the 1992 Purchase Agreement to include "any law . . . which relates to or otherwise imposes liability . . . with respect to pollution or the protection of the environment in existence as of [December 30, 1992]," and then used that term throughout their contract.[49] It is not credible for Reorganized Debtors to claim that Grace did not know in 1992 and 1993 that CERCLA imposed a form of strict liability. The "express liability rule" is, after all, merely a "fair notice" presumption. It disappears in the face of proof that the indemnitor had actual notice or knowledge of the terms of the indemnity. *E.g.*, *Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 508 n.2 (Tex. 1993).

86.    Even if the fair notice or express negligence doctrine applied, the doctrine is satisfied. The Casmalia and Ellison claims fall within the plain language of the 1992 Purchase Agreement and were entered into by Grace with a full understanding of applicable "Environmental Laws."

87.    Finally, even if the Court somehow construes the Casmalia Site claims to be outside the scope of the indemnity, they are Third Party Claims that are not time-barred -- as referenced in SGH's proofs of claim, pre- petition, SGH filed a lawsuit against Grace related to breach of

---

[49] *See*, *e.g.*, 1992 Purchase Agreement at ¶¶ 6.09, 6.13(a).

representations and warranties associated with the Casmalia Site issue.  Grace has breached the

Casmalia Defense Agreement by failing to pay half of SGH's settlement and associated costs.

Therefore, even without the environmental indemnity claim, Grace remains liable to SGH under

alternate theories based on the 1992 Purchase Agreement set forth in the litigation between SGH

and Grace, which is currently stayed in Dallas County, Texas.

**D.     SGH's Claim for Settlement Amounts and Litigation Expenses is Reasonable.**

88.     SGH's Claim for indemnification include claims that must be "reasonable" under

Texas law.  These include claims associated with settlements and claims associated with attorneys'

fees and costs of litigation.[50]

89.     "Under Texas law, where an indemnitee enters into a settlement with a third party,

it may recover from the indemnitor only upon a showing that potential liability existed, and that

the settlement was reasonable, prudent, and in good faith under the circumstances." *Ins. Co. of

North Am. v. Aberdeen Ins. Servs., Inc.*, 253 F.3d 878, 888 (5th Cir. 2001); *Gulf Co. & Santa Fe

Ry. Co. v. McBride*, 322 S.W.2d 492, 495 (Tex. 1958); *see also Du Pont*, 259 S.W.3d at 810.  The

settling party "need not prove actual liability to the third party" to recover the cost of the

settlement.  *Id.*  Courts may also consider the costs of continued defense in evaluating a settlement

subject to indemnity rights and the potential exposure to liability if the case were to be tried.  *Du

Pont*, 259 S.W.3d at 810; *Sieber & Calicutt, Inc. v. La Gloria Oil & Gas Co.*, 66 S.W.3d 340, 350

(Tex. App.—Tyler 2001, pet. denied).

90.     Attorneys' fees and costs under Texas law must also be reasonable and within the

scope of the indemnity provision.  Indeed, the definition of Litigation Expenses in the 1992

---

[50] The remaining claims arise from environmental testing, monitoring, and remediation mandated
by the EPA or other regulatory agency.  These amounts are "Damages" under the 1992 Purchase
Agreement, not "Litigation Expenses."

Purchase Agreement specifically refers to "reasonable" attorneys' fees and costs and other expenses "incident to proceedings or investigations respecting, or the prosecution or defense of, a claim."[51] Texas law also provides for the recovery of attorneys' fees associated with pursuing an indemnity claim.[52]

91.    In determining the reasonableness of attorneys' fees for an indemnity claim under Texas law, courts will consider the following factors:

1) the time and labor required, the novelty and difficulty of the question involved, and the skill required to perform the legal service properly;

2) the likelihood . . . that the acceptance of the particular employment will preclude other employment by the lawyer;

3) the fee customarily charged in the locality for similar legal services;

4) the amount involved and the results obtained;

5) the time limitations imposed by the client or by the circumstances;

6) the nature and length of the professional relationship with the client;

7) the experience, reputation, and ability of the lawyer or lawyers performing services; and

8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

*La Gloria Oil & Gas*, 66 S.W.3d at 351 (*citing Arthur Anderson & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997)).

92.    While Reorganized Debtors challenge the reasonableness of the settlements, legal expenses, and litigation costs associated with SGH's Claims, any determination of reasonableness under the above standards will be fact-intensive.  With respect to settlements, the Court will consider factors like overall potential exposure, potential costs of continuing litigation, and amount

---

[51] 1992 Purchase Agreement ¶ 13.01(e).
[52] *See Du Pont*, 259 S.W.3d at 810-811.

of settlement in light of that potential exposure.  Similarly, the Court will have to analyze the legal expenses, applicable local rates, and other fact-intensive factors to determine reasonableness of attorneys' fees associated with the litigation and EPA actions subject to SGH's Claims.  The Court will also have to address whether any specific cost fits within the definition of "Litigation Expenses" set forth in the 1992 Purchase Agreement.

93.     SGH has produced thousands of pages of invoices to support the attorneys' fees and other costs associated with its Claims.  SGH will continue to produce responsive documents and information through discovery and believes the settlements, attorneys' fees, and costs are reasonable under applicable Texas law.  Ultimately, however, reasonableness will be determined at trial.

**E.     The Reorganized Debtors' Request to Bar all Future Claims Must be Denied.**

94.     The Reorganized Debtors assert the 1992 Purchase Agreement is not executory and, therefore, requests that all future, unliquidated or contingent claims under the agreement be liquidated and then barred by the discharge injunction in the Bankruptcy Code and the Reorganized Debtors confirmed chapter 11 plan ("Plan").  The Reorganized Debtors assert that Grace's only remaining obligation is payment of monies and this issue is ripe for summary judgment.  SGH disputes the request for relief and the related assertions.  In this  Response, SGH will not provide an extended executory-contract analysis, and instead will respond to the Reorganized Debtors' summary judgment motion if and when filed.  Further, this argument does not establish that the future, unliquidated components of SGH's Claim are barred, or should be estimated at $0.00, or disallowed on that basis alone.[53]

95.     SGH notes that the Objection neither cites *In re Exide Technologies*, 607 F.3d 957,

---

[53] *See* Objection, ¶ 79.

962 (3d Cir. 2010), which is the controlling case on this issue in this jurisdiction, nor does it apply Texas law (which would govern here) to examine the parties' unperformed obligations under the 1992 Purchase Agreement. 607 F.3d 957 at 962 (examining New York contract law to determine whether a contract governed by New York law was executory); *see also Foothills Tex., Inc. v. MTGLQ Investors, L.P. (In re Foothills Tex., Inc.)*, 476 B.R. 143, 151-52 (Bankr. D. Del. 2012) (applying *Exide*'s executory contract definition); *In re SuperMedia, Inc.*, 2013 WL 5567838, Case No. 13-10545 (KG), at *3 (Bankr. D. Del. Oct. 9, 2013) ("Courts look to the principles of contract interpretation under relevant non-bankruptcy law to determine the existence of an obligation that would constitute a material breach.").

96.    To establish that the 1992 Purchase Agreement was executory or non-executory, the Reorganized Debtors must consider *Exide* and its progeny and must examine the parties' unperformed obligations as of the Petition Date to determine whether they were material under Texas law. *Exide Techs.*, 607 F.3d 957 at 962. The Objection does not do this. Instead, it cites *In re Chateaugay Corporation*, 102 B.R. 335, 347 (Bankr. S.D.N.Y. 1989), for the proposition that a contract cannot be executory where no obligation remains under it except promises to pay money. *Id.* But, *Chateaugay* was not analyzing the facts of this case or Texas law, and its holding is therefore inapplicable to the 1992 Purchase Agreement.[54]  *Chateaugay*, 102 B.R. at 347-48. Further, SGH disputes Grace's summary and characterization of the facts.

97.    In any case, the executory (or non-executory) nature of the 1992 Purchase Agreement is not a reason to disallow the future, unliquidated components of SGH's Claim. If the 1992 Purchase Agreement was executory under section 365 of the Bankruptcy Code as of the Petition Date, then (as the Reorganized Debtors concede), that agreement was assumed as of the

---

[54] 1992 Purchase Agreement ¶ 18.04, p. 69 (providing that Texas law governs the agreement).

Plan's Effective Date pursuant to Plan § 9.1.1.[55]  The Reorganized Debtors must perform all their obligations under this assumed agreement—including their future indemnification obligations—as if the Bankruptcy Cases had never been filed. *Elliot v. Four Seasons Props. (In re Frontier Props., Inc.)*, 979 F.2d 1358, 1367 (9th Cir. 1992) (holding that a debtor must perform an assumed executory contract "in full, just as if the bankruptcy had not intervened"); *see also In re Juvennelliano*, 464 B.R. 651, 653 (Bankr. D. Del. 2011) (holding that assumption creates a post-petition obligation of the debtor's estate "legally distinct from the obligations that existed prior to an assumption of the contract") (quoting *In re Multech Corp.*, 47 B.R. 747, 750-51 (Bankr. N.D. Iowa 1985).  The future claims should not be disallowed or prejudiced by any claim objection—rather Grace must perform its obligations.

98.    On the other hand, if the 1992 Purchase Agreement was *non*-executory as of the Petition Date, SGH still has a right to indemnification and the Reorganized Debtors are still obligated to perform the indemnification obligations.  SGH's rights against Grace are not secured by collateral of Reorganized Debtors.  SGH has asserted a General Unsecured Claim, including for Grace's future indemnification obligations under the agreement.  Section 3.1.9 of the Plan states that "[t]he Plan leaves unaltered the legal, equitable, and contractual rights to which each such General Unsecured Claim entitles the Holder of each such General Unsecured Claim subject to the preemptory effect of bankruptcy law."[56]  This class of Claims was expressly treated as unimpaired."[57]  Thus, all of SGH's rights and unsecured claims under the 1992 Purchase Agreement should be treated as unimpaired and unaltered.  Surely, the statement "subject to the preemptory effect of the bankruptcy law" was not intended to expressly contradict the provision

---

[55] Plan, § 9.1.1, p. 114 (assuming all executory contracts except for certain agreements expressly designated for rejection). (Doc No. 26368)
[56] Plan, § 3.1.9(b), p. 52.

leaving those rights unimpaired and unaltered.    Given the terms of the Plan, the Reorganized Debtors should not be permitted to obtain disallowance of these claim components, based solely on their status as future unliquidated claims, and at the same time, rely on the discharge and Plan injunctions to permanently bar and preclude assertion of the right to indemnification and those future unliquidated components.  SGH either has valid indemnification rights and claims, which are not altered under the Plan, or it does not, and this Court should not disallow or estimate them- or bar their future assertion-notwithstanding their future or unliquidated status.

99.    For these reasons, the Reorganized Debtors may not impair Samson's future, unliquidated indemnification claims on this basis alone.  The Court should reject the Reorganized Debtors' request to disallow or estimate the future, unliquidated components of SGH's Claim.

**F.    The Court Should Neither Disallow Nor Estimate the Unliquidated Components of SGH's Claim.**

100.    The Court should deny the Reorganized Debtors' request that the Court either disallow the allegedly "contingent and unliquidated" components of the Claim entirely or estimate the Claim at a $0.00 allowed amount because the Reorganized Debtors have not shown they are entitled to such relief.[58]

**i.    The Reorganized Debtors May Not Disallow SGH's Claim under the 1992 Purchase Agreement Because They Have Not Satisfied All Elements of 11 U.S.C. § 502(e)(1).**

101.    First, the Reorganized Debtors seek to disallow under Section 502(e)(1) of the Bankruptcy Code certain portions of the Claim related to the Fort Peck Site, the Casmalia Site, the Exxon Litigation, the Ellison Litigation and the Placerita Litigation-specifically those portions that

---

[57] Plan, § 3.1.9(f).
[58] *See* Objection ¶¶ 78-82.

relate to future costs, payments and expenses.[59]   This argument fails because the Reorganized

Debtors have not met their burden to establish all elements required by § 502(e)(1).

102.    Bankruptcy Code § 502(e) provides in part as follows:

(1)    Notwithstanding subsections (a), (b), and (c) of this section and paragraph (2) of this subsection, the court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on or has secured the claim of a creditor, to the extent that—

…

(B)    such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution.[60]

To disallow a claim under section 502(e)(1) of the Bankruptcy Code, the party objecting to the

claim must prove three (3) elements: "(i) the claim must be contingent, (ii) the claim must be for

reimbursement or contribution, and (iii) the debtor and the claimant must be co-liable on the

claim." *In re Touch Am. Holdings, Inc.*, 409 B.R. 712, 715-16 (Bankr. D. Del. 2009); *see also In re*

*RNI Wind Down Corp.*, 369 B.R. 174, 181 (Bankr. D. Del. 2007) (applying the same three-part test

for section 502(e)(1)(B). The burden of proving all three (3) elements falls on the objecting party

(i.e., the Reorganized Debtors) and not, as the Reorganized Debtors assert, on the party making the

claim. *RNI Wind Down,* 369 B.R. at 181 ("[T]he Plan Administrator has the burden of proof on

each element.") (citing *Juniper Dev. Group v. Kahn (In re Hemingway Trans., Inc.)*, 993 F.2d 915,

925 (1st Cir. 1993)).

103.    The Objection fails because Reorganized Debtors have not shown (nor even alleged

in the Objection) that they are co-liable with SGH to any third party for these claims.   The

requirement that the Reorganized Debtors establish co-liability is critical because section 502(e)(1)

of the Bankruptcy Code is intended to prevent "redundant recoveries" and is therefore focused on

---

[59] Objection ¶ 80.

"claims by those who *may* become liable to a third party because the debtor fails to satisfy a primary liability to that third party." *Worldwide Distrs. v. Wells Fargo Retail Fin., LLC (In re G.I. Joe's Holding Corp.)*, 420 B.R. 208, 214 (Bankr. D. Del. 2009) (emphasis in original). As one court has explained, "'[t]he co-liability element of § 502(e)(1)(B) requires a 'finding that the causes of action in the underlying lawsuit assert claims upon which, if proven, the debtor could be liable but for the automatic stay.'" *Touch Am.*, 409 B.R. at 718 (quoting *In re Wedtech Corp.*, 85 B.R. 285, 290 (Bankr. S.D.N.Y. 1988)). The Reorganized Debtors have not met (or even tried to meet) their burden on this element.

104.    For example, with regard to Fort Peck, the Reorganized Debtors assert that $7,200,000 of this claim ($1,000,000 in future legal fees and $6,200,000 in remediation and other costs) should be disallowed under § 502(e)(1)(B).[61] Yet, while the 1992 Purchase Agreement gives SGH indemnification claims against the Reorganized Debtors for these amounts, the Reorganized Debtors have not alleged they are  co-liable with SGH to any other party for them. Nowhere in the Claim does SGH suggest that the Reorganized Debtors have separate, independent liability for this $7,200,000 to anyone other than SGH.

105.    Moreover, in any event, the Reorganized Debtors cannot assert co-liability to a third party for the future legal expenses and costs incurred by SGH. *E.g., RNI Wind Down, 369 B.R. at 186-87* (advancement of an indemnitee's attorneys' fees and expenses is not a co- liability or contingent for purposes of section 502(e)(1)(B)); *but see Touch Am.*, 409 B.R. at 717 (holding that future advancement costs for attorneys' fees and expenses were contingent under § 502(e)(1)(B)).

106.    The Reorganized Debtors also cannot prove that the portion of these claims seeking reimbursement for SGH's attorneys' fees and costs are contingent on ultimate liability for the

---

[60] 11 U.S.C. § 502(e)(1)(B).

underlying claim for purposes of section 502(e)(1) of the Bankruptcy Code.  Section 13.05 of the

1992 Purchase Agreement states that:

> If Seller does not undertake the defense of any Third Party Claims or claim under Section 13.06, Purchaser may undertake such defense and Seller shall cooperate with Purchaser and its counsel in the investigation and defense thereof and Seller and Grace shall assume responsibility for payment of all related Litigation Expenses.[62]

Nothing in this language states that the Reorganized Debtors' obligation to pay "Litigation

Expenses" (which include reasonable attorneys' fees and other costs and expenses) depends on the

outcome of the underlying litigation for which the Litigation Expenses are incurred.[63]  For this

additional reason, the portion of the future claims should not be disallowed under section

502(e)(1)(B) of the Bankruptcy Code.

107.    The Reorganized Debtors have also failed to show or allege that the State of

California intends to hold them co-liable with SGH for the potential future costs and damage

associated with the Casmalia Site.  Here again, the Reorganized Debtors' failure to establish (or

even allege) co-liability for these Casmalia claims means that section 502(e)(1)(B) of the

Bankruptcy Code does not apply.

108.    Likewise, the Reorganized Debtors cannot disallow Samson's claims for future

expenses related to the Exxon Litigation, the Ellison Litigation, and the Placerita Litigation.  As

with Fort Peck and Casmalia, the Reorganized Debtors have not shown (or even alleged) co-

liability for these amounts.  As SGH's Claim makes clear, the Exxon Litigation, the Ellison

Litigation and the Placerita Litigation have now all settled.[64]  SGH has not suggested that the

Reorganized Debtors will be separately liable for any amount to anyone other than Samson.

---

[61] Objection ¶ 80.
[62] 1992 Purchase Agreement ¶ 13.05, p. 57.
[63] *See id.*
[64] SGH's Claim, at 11-13.

109.    Because Reorganized Debtors have not (and cannot) meet their burden to prove every element of section 502(e)(1)(B) of the Bankruptcy Code as to the future and unliquidated components of SGH's Claim, the Court should reject this argument.[65]

     **ii.    This Court Should Not Estimate SGH's Claims Under the 1992 Purchase Agreement.**

110.    Second, the Court should also reject the Reorganized Debtors' request to estimate SGH's unliquidated claims at $0.00, presumably in an abbreviated process, to the extent that section 502(e)(1)(B) of Bankruptcy Code does not provide for their disallowance.

111.    Section 502(c) of the Bankruptcy Code provides, in part, for the estimation of "(1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case; or (2) any right to payment arising from a right to an equitable remedy for breach of performance."   11 U.S.C. § 502(c).  Avoiding undue delay in the administration of the case is a prerequisite to estimating a claim under section 502(c).  *O'Neill v. Continental Airlines, Inc. (In re Continental Airlines),* 981 F.2d 1450, 1461 (5th Cir. 1993) ("In order for the estimation process of § 502(c) to apply, a claim must be contingent or unliquidated and fixing the claim must entail undue delay in the administration of justice.").  As one court has explained, "[a] court must only perform an estimation proceeding where the fixing of the claim 'would unduly delay' the administration of the bankruptcy case.'"  *In re Stone & Webster, Inc.,* 279 B.R. 748, 809 (Bankr. D. Del. 2002) (quoting *Continental Airlines,* 981 F.2d at 1461).  In other words, the estimation proceeding is available to bankruptcy courts to ensure that a debtor can

---

[65] By arguing that the Reorganized Debtors cannot satisfy the elements of co-liability and (with respect to the "advancement" expenses, contingency), Samson does not concede that the Debtors have proved the other elements of section 502(e)(1)(B) with respect to any component of SGH's Claim. Samson reserves its right to argue that the Reorganized Debtors have not met the other elements of section 502(e)(1)(B) in response to any motion for summary judgment filed by the Reorganized Debtors and/or at any hearing on the Objection.

complete its reorganization without any unnecessary delay.  *Stone & Webster*, 279 B.R. at 810.  In particular, estimating a claim is often appropriate to enable a debtor to "prepare a plan of reorganization within a reasonable time."  *In re Bellucci*, 119 B.R. 763, 779 (Bankr. E.D. Cal. 1990).

112.    The Reorganized Debtors have not shown (and cannot show) that estimating SGH's unliquidated and/or contingent claims under the 1992 Purchase Agreement will prevent undue delay in the administration of these Bankruptcy Cases.  The Reorganized Debtors' Plan became effective on February 3, 2014 and, upon information and belief, is substantially consummated. That Plan provides for payment in full (plus post-petition interest) of General Unsecured Claims like those asserted in SGH's Claim.[66]  The Reorganized Debtors also, upon information and belief, have more than enough money to pay SGH's claims (and all other General Unsecured Claims) as provided in the Plan.   Under these circumstances, declining to estimate SGH's claims in an abbreviated process under section 502(c)(1) of the Bankruptcy Code would not cause any further undue delay in the administration of the Reorganized Debtors' estates. The Reorganized Debtors can pay any other allowed General Unsecured Claims whether or not the SGH Claim is ever paid. By contrast, estimating SGH's  claims now under the truncated procedure of section 502(c)(1) of the Bankruptcy Code would deprive SGH of its rights to a full, evidentiary hearing on the allowance of the amounts owed to it.  Thus, the Court should not estimate the Claim under section 502(c)(1) of the Bankruptcy Code and should instead hold a full and untrammeled evidentiary hearing to determine whether the Claim is allowed or disallowed.  *See Stone & Webster*, 279 B.R. at 809-10.

113.    Even if an estimation proceeding were appropriate with respect to any unliquidated

---

[66] Plan, § 3.1.9, pp. 52-53.

portion of the Claim, the Court should still not estimate that part of the Claim at $0.00.  If given the opportunity to present evidence on this matter, SGH will demonstrate that the future and unliquidated portions of the Claim are worth considerably more than $0.00.  SGH intends to submit evidence in support of this position at any evidentiary hearing on this matter and/or in response to any motion for summary judgment brought by the Reorganized Debtors.  Ultimately, SGH believes that the Court will conclude that the Reorganized Debtors' request to estimate SGH's future, unliquidated claims at $0.00 should be denied.

## CONCLUSION

**WHEREFORE**, SGH respectfully requests that this Court deny the Claim Objection and grant such other and further relief as the Court deems appropriate.

**[remainder of this page is intentionally left blank]**

Dated: October 19, 2015
Wilmington, Delaware

/s/ Domenic E. Pacitti

Domenic E. Pacitti (DE Bar No. 3989)
**KLEHR HARRISON HARVEY
BRANZBURG LLP**
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:     (302) 426-1189
Facsimile:      (302) 426-9193

- and -

Morton Branzburg (admitted *pro hac vice)*
**KLEHR HARRISON HARVEY
BRANZBURG LLP**
1835 Market Street, Suite 1400
Philadelphia, Pennsylvania 19103
Telephone:     (215) 569-3007
Facsimile:      (215) 568-6603

- and -

David L. Swanson (admitted *pro hac vice*)
Gregory Lowry (admitted *pro hac vice*)
  Texas Bar No. 12641360
**LOCKE LORD, LLP**
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201-6776
Telephone: (214) 740-8000
Facsimile: (214) 740-8800

**ATTORNEYS FOR SGH ENTERPRISES, INC. (F/K/A
SAMSON HYDROCARBONS COMPANY)**