```
 1   UNITED STATES BANKRUPTCY COURT
 2   DISTRICT OF DELAWARE
 3
 4
 5   In re:                        :
                                   :   Chapter 11
 6                                 :
     W.R. GRACE & CO., et al.,     :   Case No. 01-01139 (KJC)
 7                                 :
         Reorganized Debtors.      :   (Jointly Administered)
 8   _____    :
                                   :
 9   Ralph Hutt and Carl Osborn,   :
                                   :
10           Plaintiffs,           :
                                   :
11   v.                            :   Adv. Proc. No. 14-50867
                                   :   (KJC)
12   Maryland Casualty Company     :
                                   :
13           Defendants.           :
     _____  :
14                                 :
     Continental Casualty Company  :
15   Transportation Insurance      :
     Company                       :
16                                 :
             Plaintiffs,           :
17                                 :
     v.                            :   Adv. Proc. No. 15-50766
18                                 :   (KJC)
     Jeremy B. Carr, Juliet L.     :
19   Gifford, Gloria G. Harris,    :
     Joyce I. Lundvall, Edward     :
20   D. Stefanatz, Fred O. Bache   :
     Jack L. Jensen, Melba C.      :
21   Weston, Ruby R. Hagner, Kerry :
     L. Beasley, William G.        :
22   Corbett, Amanda K. Foss,      :
     Tammy Sue Lang, William E.    :
23   DeShazer, Johnny G. Jellesed, :
     Lorraine B. Sichting, Martin  :
24   H. Krebs, Kenneth B.          :
     Neubauer, Brenda L. Vinson,   :
25   Laurie A. Waller, Shirline E. :
```

Page 2

1    Almeida, Iganacio C. Almeida, :

     Thomas F. Erickson, Russell    :

2    S. Barnes, Sandra L. Barnes,   :

     Phyllis A. Haugen, and Dennis :

3    L. Welch,                      :

                                    :

4            Defendants.            :

     _____:

5

6

7

8

9    United States Bankruptcy Court

10                        824 North Market Street

11                        Wilmington, Delaware

12                        November 24, 2015

13                        1:15 PM – 3:03 PM

14

15

16

17

18

19

20

21    B E F O R E :

22    HON KEVIN J. CAREY

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO OPERATOR: AL LUGANO

1    HEARING re Debtors' Objection to the Proof of Claim Filed by

2    Norfolk Southern Railway Company [Filed: 7/20/09] (Docket

3    No. 22553)

4

5    HEARING re Notice of Completion of Briefing Regarding

6    Plaintiff's Motion for Summary Judgment [Filed: 10/25/15]

7    (Adv. Pro. No.: 14-50867, Docket No. 31) filed by Ralph Hutt

8    and Carl Osborn.

9

10   HEARING re Notice of Completion of Briefing Regarding

11   Defendants' Motion to Dismiss Adversary Proceeding [Filed:

12   11/4/15] (Adv. Pro. No.: 15-50766, Docket No. 26) filed by

13   Jeremy B. Carr, et al.,.

14

15   HEARING re Motion of the WRG Asbestos PI Trust for Leave to

16   File Amicus Curiae Brief in Support of Continental Casualty

17   Company and Transportation Insurance Company [Filed:

18   11/17/15] (Adv. Pro. No.: 15-50766, Docket No. 27)

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

Page 4

1    A P P E A R A N C E S :

2

3    ANDERSON KILL, P.C.

4        Attorney for Proposed WRG Asbestos PI Trust

5

6    BY:  ROBERT M. HORKOVICH

7

8    CONNOLLY GALLAGHER, LLP

9        Attorney for Maryland Casualty

10

11    BY:  JEFFREY C. WISLER

12

13    ECKERT SEAMANS

14        Attorney for Maryland Casualty

15

16    BY:  EDWARD J. LONGOSZ, II

17

18    PASCHULSKI STANG ZIEHL & JONES

19        Attorney for W.R. Grace & Co.

20

21    BY:  JAMES O'NEILL

22

23

24

25

1    GOODWIN PROCTER LLP

2         Attorney for CNA

3

4    BY:  MICHAEL S. GIANNOTTO

5

6    FORD MARRIN ESPOSITO WITMEYER & GLESER, L.L.P.

7         Attorney for CNA

8

9    BY:  ELIZABETH M. DECRISTOFARO

10

11   CAMPBELL & LEVINE

12        Attorney for WRG Asbestos PI Trust

13

14   BY:  MARK T. HURFORD

15

16   MURTHA CULLINA LLP

17        Attorney for Libby Claimants

18

19   BY:  DANIEL C. COHN

20

21   GELLERT SCALI BUSENKELL & BROWN

22        Attorney for Libby Claimants

23

24   BY:  MICHAEL BUSENKELL

25

1    BAYARD, PA

2          Attorney for CNA

3

4    BY:  SCOTT D. COUSINS

5

6    ALSO PRESENT TELEPHONICALLY:

7

8    RYAN M. HEHNER, KIRKLAND & ELLIS

9    ROGER HIGGINS, THE LAW OFFICES OF ROGER HIGGINS LLC

10   ALAN B. RICH, LAW OFFICE OF ALAN B. RICH

11   RICHARD WYRON, FRANKEL WYRON LLP

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2             THE COURT:  Good afternoon, everyone.

3             MR. COHN:  Good afternoon, Your Honor.

4             THE COURT:  Let's get this party started.

5             MR. COHN:  Good afternoon, Your Honor.  My name is

6    Daniel Cohn.  I represent the Montana plaintiffs in the

7    adversary proceedings that both concern CNA, which is seated

8    here at this table, Your Honor, and then Maryland Casualty

9    Company, which I'll sometimes call MCC, which is seated at

10   this table.

11            The agenda puts MCC, the MCC matter first and then

12   CNA and in order to avoid repetition because there's lots of

13   --

14            THE COURT:  I was hoping you were going to say

15   something like that.  Go ahead.

16            MR. COHN:  Counsel has agreed on a way to proceed,

17   which we hope that you all accept.  The first is that any

18   argument that anybody makes regarding CNA or MCC will apply

19   to both so that counsel don't need to reserve rights or

20   repeat arguments.

21            And then secondly, while the MCC matter will be

22   handled first, and I'll go first because it's my motion for

23   summary judgment, Mr. Giannotto for CNA will hold his fire

24   until we get to CNA, which will be the second matter on the

25   agenda and at that time he'll go first because I'll have had

Page 8

1   my say with MCC.  I'll have presented my argument.  Mr.

2   Longose will have replied.  I'll have had my rebuttal and

3   then at that point when we get to CNA it'll be up to Mr.

4   Giannotto to say whatever additional he feels needs to be

5   said on behalf of CNA and then I'll respond to him.

6           THE COURT:  All right.

7           MR. COHN:  So the other thing that we agreed, Your

8   Honor, between the Montana plaintiffs and CNA is for me to

9   just make it clear that the "only" objection that we have to

10  the declaratory judgment -- I put only in quotes -- the

11  "only" objection that we have to the declaratory judgment

12  sought by CNA is that it is substantively incorrect.  That

13  is to say that while they want a declaration saying that the

14  channeling injunction bars the Montana plaintiff's claims,

15  we want the opposite declaration.

16          But apart from that, we have no argument or are

17  making none that the declaratory judgment complaint is in

18  any way inadequately planned.

19          THE COURT:  All right.  Thank you.  Anything else

20  preliminarily?  I hear no response.  Okay.  How much time do

21  the parties expect that they will consume today?

22          MR. COHN:  Your Honor, it depends on how many

23  questions you have.  I've -- my estimate is that the two

24  hours that appear to be allocated on the agenda were

25  probably going to be just about right.

```
 1              THE COURT:  Let's move forward then.
 2              MR. COHN:  All right.  So we're starting off then
 3    with the MCC matter, and not -- the Montana plaintiffs are
 4    Ralph Hutt and Carl Osborn.  Each of them worked at Grace's
 5    Mine and Mill in the area of Libby, Montana, which the
 6    parties will tend to call the mine.  And they did so during
 7    a period when Maryland Casualty Company provided insurance
 8    to Grace and also provided industrial hygiene services at
 9    the mine and we're not just talking about an annual
10    walkthrough where you, you know, take a look at the plant,
11    go out for a nice lunch in Libby.  We're talking about as
12    alleged in the proposed complaint against MCC.  We're
13    talking about a pervasive involvement in industrial hygiene,
14    including designing a dust control system.  You'll see
15    documents attached to the complaint referring to specific x-
16    rays concerning specific workers, including Mr. Hutt, by the
17    way.
18              And so what we are alleging, Your Honor, is not
19    simply an occasional inspection but rather pervasive
20    involvement with the industrial hygiene system resulting in
21    a negligence claim because we assert that the industrial
22    hygiene system was inadequate, even under the standards of
23    the time, to protect the Montana plaintiffs from harm from
24    the asbestos dust that pervaded the mine.
25              And in addition, Your Honor, we accuse MCC of
```

1    knowing about and suppressing information concerning the

2    dangers of asbestos so that our clients were unable to take

3    steps to protect themselves.  That is the negligence claim.

4           And then in addition against MCC, we stated a

5    claim for bad faith.  One of the forms of insurance that MCC

6    provided was worker's comp insurance and the bad faith claim

7    says that in its capacity as worker's comp insurer, MCC

8    breached a duty to our clients by withholding information on

9    the dangers of asbestos so as to prevent them from filing a

10   claim for worker's compensation benefits at a time when such

11   a claim would be timely, so that's the bad faith claim,

12   which is the second of the two claims that we seek to bring

13   against MCC.

14          Now, Mr. Hutt and Mr. Osborn suffered terribly

15   from asbestos disease and of course they have claims against

16   Grace but these claims have been discharged under Grace's

17   Chapter 11 plan and they're not at issue -- the claims

18   against Grace are not at issue in this adversary proceeding.

19   Those claims will -- have been or will be filed against the

20   trust but the trust is paying claims in fractional dollars

21   and right now it's at about 25 percent.

22          So what's at issue here today, Your Honor, in

23   terms of both MCC and CNA is the claims against the

24   insurance under Montana law for the insurer's own alleged

25   wrongdoing.

1            Now, what I'd like to do, Your Honor, in case it

2    would be helpful, is to hand you up the statute, Section

3    524(g) with a couple of sections highlighted.

4            THE COURT:  Okay.

5            MR. COHN:  Thank you.  Oh, and other counsel in

6    the courtroom already have this.

7            THE COURT:  I assume given the nature of the

8    dispute that they would.

9            MR. COHN:  Well, not only have they read the

10   statute many times but they have this specific handout, Your

11   Honor, the one with the highlighted.

12           So under the statutory language, Your Honor -- and

13   this really appears down at the bottom of the second page.

14   In order to be barred by the chair of the injunction, a

15   claim would have to meet two expressed requirements under

16   the statute.

17           The first of them, down at the bottom under

18   4(a)(2) is that the third party -- that would be the insurer

19   - must be alleged to be directly or indirectly liable for

20   the conduct of claims against or demands on the debtor.  In

21   that little separator thing, that black mark, that's mine.

22   That's not in the statute.  But then that leads to the

23   second of the requirements which is that the alleged

24   liability of the insurer must arise by reason of the third

25   party's provision of insurance to the debtor.  So those are

1    the two separate and distinct statutory requirements for a

2    third party to be eligible for protection under the Grace

3    channeling injunction.

4          And at the outset I should say, Your Honor, as I

5    know you know from our briefs, that the Grace channeling

6    injunction expressly incorporates the terms of the statute

7    so that to the extent that a claim cannot be adjoined under

8    the statute, it is not adjoined and Grace does not purport

9    to have adjoined it under the Grace plan.  So for that

10   reason, we start off, Your Honor, with the two statutory

11   requirements.

12         I'm first, Your Honor, going to deal with the

13   provision of insurance because that's the one where there

14   actually seems to be some authority in the form of a couple

15   of Second Circuit decisions that have actually considered

16   the issue.

17         And the first of these was Manville, the branch of

18   Manville that will be called Manville 3.

19         THE COURT:  Mr. Cohn, you'll have to forgive me.

20   I've kind of a family situation going on at the same time,

21   so I have to take a break for a phone call.

22         MR. COHN:  Of course.

23         THE COURT:  But I hope to be back shortly.  Stand

24   in recess.

25         (Recess)

1          CLERK:  All rise.  Be seated, please.

2          THE COURT:  Okay.  Sorry to interrupt your mojo.

3          MR. COHN:  No, no, of course not, Your Honor.

4   This is for your benefit, so I hope you will feel free to

5   interrupt.

6          THE COURT:  You have my full attention.

7          MR. COHN:  Okay.  That's cool.  All right.  So,

8   Your Honor, you'll recall we were just starting on the

9   statutes.

10          THE COURT:  Two requirements, got them both.

11          MR. COHN:  Yep, two requirements.  One is that it

12   be for the liability of the third party would have to be for

13   the conduct to offer claims against Grace and the other one,

14   which I'm going to deal with first, is that it has to be by

15   reason of the provision of insurance.

16          So on that issue of by reason of the provision of

17   insurance, there are actually two Second Circuit cases that

18   shed important light on this issue.  The first of them --

19          THE COURT:  Of course, we're in the Third Circuit,

20   right?

21          MR. COHN:  Well, yes, Your Honor.  We can, of

22   course, completely ignore the Second Circuit but, in fact,

23   the decisions are so well-reasoned, Your Honor, that I'm

24   sure you will decide that they should be adopted in an

25   honorary sort of way as Third Circuit law.

1           So in the case of Manville 3, Your Honor, that was

2    a grant obviously in the Johns-Manville bankruptcy.  What

3    happened was that there were various plaintiffs who were

4    bringing suit against one of the insurance companies for

5    what they, as the Montana plaintiffs sit here, what they

6    said was that the insurer's own wrongdoing, not its

7    insurance liability to Manville, which had been settled

8    under the Manville plan and claims based on the insurance

9    policies had been adjoined.

10          So the insurer, of course, responded no, no, no, I

11   think that the injunction that was issued in connection with

12   the plan harbors everything, including my own wrongdoing, if

13   there is such.

14          So that issue was considered by the Second Circuit

15   and the Second Circuit said that, no, these claims, even

16   though factually related to the Manville bankruptcy -- I

17   mean, they were claims such as you didn't disclose the

18   dangers of asbestos and Travelers, the insurance company,

19   said, well, yeah.  Everything we learned about asbestos we

20   learned from Manville.

21          Despite that pervasive factual connection which

22   was the subject of a very extensive factual findings by

23   Judge Lifland in the bankruptcy court, despite that, the

24   Second Circuit said, no, it's not the factual nexus that

25   counts.  What counts is legal nexus. The fact that you, the

1    basis of liability asserted against the insurer is the

2    insurer's own misconduct.  And, by the way, I hope Your

3    Honor will insert the word alleged whenever I say this

4    because I'm really not presuming that either Travelers or

5    MCC or CNA are to be judged liable on claims in this court.

6    But so at this point, all liability is alleged.

7            So having said that, Your Honor, the claims were

8    that Travelers breached its own legal duties to the

9    plaintiffs and the Second Circuit said that is what matters.

10   What matters is that the -- if it's a separate basis for

11   legal liability against the insurers, then the bankruptcy

12   court does not have jurisdiction to adjoin those claims or,

13   rather, bankruptcy court didn't have jurisdiction and we

14   would construe its injunction if we look at it now to have

15   been intended to be in the court's jurisdiction.  And so

16   they said that the claims against Travelers could proceed.

17           And that's the case that got reversed by the

18   Supreme Court in the Travelers against Bailey decision on

19   res judicata counts where the Second Circuit said no, no,

20   no, the time to have challenged the scope of injunction was

21   back when it was entered.  But that holding as to res

22   judicata did not apply to anyone who hadn't been given

23   notice of the original injunction proceeding and there were

24   such parties and they went back to the Second Circuit and

25   that's Manville 4.

1              In Manville 4, the Second Circuit, yeah -- said,

2    yeah, we really meant it in Manville 3.  As to anybody who's

3    not bound by res judicata there is an issue in this case of

4    a bankruptcy court jurisdiction -- it would be beyond the

5    bankruptcy court's jurisdiction to simply say that because

6    it has to do with Manville's asbestos, that, therefore,

7    third parties can be protected from liability.

8              You can protect them for their liability under

9    Manville's insurance policies and it should and did.  But to

10   the extent they have their own independent liability, we

11   don't have jurisdiction to adjoin.  And then the court said,

12   this is in dictum because Section 544(g) had been acted but

13   was not applicable to Manville.  The court in dictum said

14   and the result will be the same under section 524(g) where

15   the issue is not jurisdiction but rather construction of the

16   statute and the court said the proper construction of that

17   statute would be that you would need to have -- that factual

18   nexus is insufficient to bring it within the scope of an

19   injunction.  If there is a separate ground for legal

20   liability on the insurer's part, then it's not adjoined.

21             So then you have the Quigley case and Quigley was

22   a Section 524(g) case.  It didn't involve provision of

23   insurance.  It involved one of those other -- the other

24   three statutory relationships that is in the same block of

25   type, if you will, of statute.  And so it's equally

1    applicable to the provision of insurance.

2            And so here, the court in an actually holding, not

3    dictum, said the same thing, said the standard is whether

4    there is legal liability.  If there is a separate basis for

5    legal liability of the insurer other than, excuse me in that

6    case, of the corporate parent, then the claim cannot be

7    adjoined and it doesn't matter how factually or latent it

8    is, it doesn't matter that it was the debtor's asbestos that

9    gave rise to the injuries for which the plaintiffs were

10   seeking recovery.  If there's a separate, legal basis for

11   them to recovery from, in that case, the corporate parent,

12   then they can do so.

13           And what happened in Quigley was that Pfizer had

14   bought Quigley and marketed as Quigley's Asbestos under

15   Pfizer's name and there was a statute.  I think it was

16   Pennsylvania but applicable state law was that if you mark

17   that product under your own name then you're liable for it.

18   And the judge, the Second Circuit said, well, yeah, that's

19   the basis of your liability.  The basis of your liability is

20   not that you're the corporate parent of the debtor.  And so

21   this would not be a claim that rose against you, Pfizer, by

22   reason of your being  the corporate parent of the debtor.

23           And that was despite the fact that it was obvious

24   and nobody was contesting the fact that it was a factual

25   matter.  Pfizer marketed the asbestos the way that it did

1    solely because it was the corporate parent of the debtor and

2    it was the debtor's asbestos.  Pfizer had nothing to do with

3    the, you know, with the manufacturer of the product.

4         And so here the application of this principle is

5    obvious.  The fact that it's Grace's asbestos is not what's

6    important.  What's important is that there's a separate

7    basis for the liability of the insurers other than their

8    provision of insurance to Grace.  So, yes, the injunction in

9    the most complete possible way protects the insurers from

10   any future liability under their insurance policies.

11        But to the extent that they engaged in conduct

12   which was tortious as to the Montana plaintiffs, they are

13   outside the permissible scope of the second 524(g)

14   injunction.  So that's -- and that's the provision of

15   insurance branch of the statute.

16        Separately, Your Honor, we argue that just based

17   on the statutory structure and language the application of

18   this injunction to our claims would also flunk the other

19   statutory test, which is that the liability of the insurers

20   would have to be for the conduct of or claims against Grace.

21        And to understand that claim, Your Honor, the

22   starting point is the structure of the statute itself.  All

23   that I've talked about so far is Section 524(g)(4) because

24   that's the part of the statute that pertains to the

25   protection the channeling injunction may afford to third

1    parties, such as the insurers.

2              Section 524(g)(2) pertains to the protection that

3    a channeling injunction affords the debtor and that standard

4    is much broader than the standard that we have in Section

5    524(g)(4).

6              If you look at the language I highlighted in the

7    chalk that I've handed up, Your Honor, the -- Grace can be

8    protected, can and is protected under the channeling

9    injunction.  From personal injury, wrongful death or

10   property damage actions, seeking recovery for damages

11   allegedly caused by the presence of or exposure to asbestos

12   or asbestos-containing products, okay.  That's Grace's

13   protection.  It's totally in relation to asbestos.

14             By contrast, Your Honor, Section 524(g)(4)

15   contains a narrow standard which is that is a third party

16   liable for the conduct of or claims against Grace?  So the

17   very language of the statute we seem to distinguish between

18   conduct of Grace versus conduct of the insurer, liability of

19   Grace versus liability of the insurer.

20             So the other -- excuse me just a second.  All

21   right.  So the other thing that we should focus on with

22   respect to 524(g)(4) are the words of the statute itself.

23   And so when you see those words that you have to be -- the

24   third party has to be liable for the claims against -- I'm

25   sorry, the conduct offer claims against Grace, it's worth

1    asking, well, what would it -- what would it mean if Grace

2    were not liable?

3          So that when you look at each of the four

4    categories of the -- of liability and you say, you know, can

5    there be a claim against the person without there being a

6    claim against -- I'm sorry, let me just go back and reset,

7    if I may, Your Honor.

8          All right.  So the conduct offer claims against

9    debtor applies to all four of the categories of the

10   statutory relationship, so it's provision of insurance but

11   it's also the corporate parent.  It's also being a manager

12   of a corporation.  It's also having to do with corporate

13   financing.  Those are the statutory relationships.

14         And if you consider -- if you now consider those

15   other statutory relationships, they shed some light on what

16   provision of insurance means so that, for example, as a

17   corporate parent you can be -- a channeling injunction can

18   protect you from claims for piercing the corporate veil, for

19   example.

20         And so when you think about a corporate veil

21   claim, no matter how sloppy the parties were about observing

22   the corporate formalities, about keeping them operating

23   separately and so on, there can still be no claim against

24   the corporate parent unless there's a claim against the

25   debtor subsidiary.  If a claim against the debtor subsidiary

1    were to go away, there's no veil piercing claim against the

2    corporate parent.  And so that's -- that, as the statutory

3    language indicates, there'd be no claim against the

4    corporate parent for the conduct offer claims against Grace

5    if it were Grace's corporate parent unless Grace has

6    liability.  That's just a prerequisite for the statute to

7    work.

8            And the same would be for let's say you're a

9    manager of the debtor and you go out and you incur liability

10   on the debtor's behalf and somebody says you're personally

11   liable.  Okay.

12           So now what happens if it turns out there isn't a

13   claim against Grace?  Well, the answer is you're not liable.

14   There can't be a claim against you for tortious conduct on

15   behalf of the corporation unless there's a claim against the

16   corporation.  Totally different in the case of our claims

17   against these insurers.

18           There is no act of conduct -- there is no conduct

19   offer claim against Grace on which our claim depends.  If

20   there's no conduct offer or claims against Grace, we still

21   have a claim against these insurers for their own misconduct

22   because we're stating a separate basis of tort liability

23   against these insurers.

24           And so just under the language of the statute

25   itself, it is clear that the statute cannot apply to this

1   kind of separate liability which is for the conduct of the

2   insurers and claims against the insurers rather than the

3   conduct offer claims against Grace.

4           Now, in addition to the arguments related to pure

5   construction of the statutes, Your Honor, there are several

6   alternative arguments that we advance.

7           Based on not the concession, as my brother likes

8   to actually call it, but suppose we were to assume that he's

9   right that these claims of the Montana plaintiffs against

10  the insurers do arise by reason of the provision of worker's

11  compensation insurance, so let's just say they were right on

12  that because you accepted that the factual (indiscernible)

13  was sufficient even though as argued just a few minutes ago

14  the -- being Grace's insurer was not a legal element of the

15  claim.

16          So let's say you accepted that position.  The

17  result would be the same, which is that this channeling

18  injunction is not going to bar the Montana plaintiff's

19  claims against the insurers.  And there are three arguments

20  in this regard, Your Honor.

21          The first is that in the 3rd Circuit -- but really

22  it's based on Supreme Court law, so it just happens that the

23  3rd Circuit referred to this recently in the (indiscernible)

24  case -- but there is a presumption against redemption of

25  state laws pertaining to police powers regarding health and

1    safety.  And the worker's compensation scheme is just such a

2    state exercise of police power regarding health and safety.

3            And in federal and local, by the way, Your Honor,

4    you know, the section that was being referred to as being

5    not capable of preempting a state statutory scheme was

6    Section 1123(a)(3) which has to do with what -- I'm sorry,

7    1123(a) which has to do with what provisions shall be

8    included in a plan, what a plan can do, and that section

9    starts off with "Notwithstanding any contrary law".

10           So but despite that, the 3rd Circuit said, no, no,

11   no, no.  If it's Section 1123(a) versus a state statutory

12   scheme concerning for the regulation of health and safety,

13   there is a presumption that the bankruptcy code does not

14   preempt that statutory scheme.  So the way they want to have

15   it is that these claims are so closely related to worker's

16   compensation and worker's compensation insurance that they

17   have, therefore, provision of insurance within the meaning

18   of the statute.  Then, fine.  The statute, however, cannot

19   be construed to preempt the state statutory scheme regarding

20   worker's compensation.

21           And there's an actual 1st Circuit bankruptcy

22   appellate panel case that deals specifically with worker's

23   compensation and holds that worker's compensation is a type

24   of state statutory scheme regarding health and safety that

25   cannot be preempted by the bankruptcy code.

1           Now, there are two ways to get there, Your Honor.

2    One would just be the sledgehammer approach where you just

3    say, okay, therefore, I'm just going to graft an exception

4    onto Section 524(g)(4) which says that worker's compensation

5    is excluded from all of this.  And I want to point out that

6    that would do no harm whatsoever to the purpose the statute

7    is meant to serve, which is to promote settlements with at

8    least the (indiscernible) provision.  It's designed to

9    insure that.  We promote settlements of insurance policies

10   in Chapter 11 cases and the reason is because worker's

11   compensation policies cannot be settled.

12          There's a statutory obligation for any debtor to -

13   - in fact, for any company -- to have worker's compensation

14   coverage.  If you settle one policy you just have to buy

15   another.  The claims have to be covered and it's very clear

16   that the Grace plan and every other one that I'm familiar

17   with just carves those out and doesn't try to -- doesn't try

18   to settle worker's compensation coverage and, indeed,

19   expressly reserves it so as to -- well, essentially because

20   there's nothing to be gained by going through the exercise

21   that you go through with liability insurers where you go to

22   the insurer and say if you wanted an injunction that

23   protects you from any future plans under these policies,

24   write us a check for, you know, the estimated risk adjusted

25   value of the policy.

1        So since that -- since worker's compensation

2    insurance doesn't -- would add nothing to the pot available

3    for claimants in any event, then there's really no harm if

4    you simply apply the presumption against preemption so as to

5    take worker's compensation insurance out of the statutory

6    scheme.

7        I would point out, however, that there is a way to

8    construe the statute itself or (indiscernible) the statute

9    to accomplish that same result.  Worker's compensation

10   insurance, although it's called, you know, insurance and

11   it's bought by -- in this case it was bought by Grace --

12   what it insures are claims that are for state mandated

13   benefits as opposed to Grace's liability.  In fact, the

14   whole purpose of the statutory scheme is that instead of --

15   is that you take away the liability of the employer and you

16   say we're going to substitute this worker's compensation

17   scheme, which pays fixed amounts to workers for various

18   types of injuries so that on that basis one could say that

19   what is not -- that worker's compensation does not pertain

20   to conduct of or liability of Grace.  That's one way to get

21   there.

22       Another way to get there is to say that it doesn't

23   fall within the warrants of the statute that say it has to

24   be by reason of the provision of insurance to Grace.  Under

25   the Montana Statutory Scheme -- the language is in our brief

1   -- under the Montana Statutory Scheme, the insurer is

2   directly and primarily liable to the claimant, the worker's

3   compensation claimant.

4          So one way of viewing worker's compensation

5   insurance is that it is not insurance to Grace, not

6   insurance to the debtor even in the words of the statute but

7   rather is insurance to the workers for their state mandated

8   benefits.  So that's another way of getting to the same

9   result.  It's a -- I'll acknowledge, Your Honor, it's not

10  the strongest statutory construction argument that one could

11  make but when you match that up with the mandate of the 3rd

12  Circuit to enforce this presumption against preemption, it

13  is a way to get there that's perhaps gentler than simply

14  saying we're going to just overrule the words of the

15  statute.

16         All right.  Then, Your Honor, we come to the words

17  of the plan itself and the plan itself, as you know in a

18  gigantic case like that, the People labored over the

19  language of the plan and we can presume that they said what

20  they meant to say in regard to the plan.

21         And so when you track through the definitions,

22  Your Honor, and, once again, I -- rather than walk through

23  it definition by definition right now, what I'm just going

24  to do is to read you the language of the definitions with

25  ellipses put in to take away irrelevant material and what

1    you have is an expressed exclusion from the injunction for

2    rights or obligations that pertain solely to coverage for

3    benefits under worker's compensation system, rights or

4    obligations that pertain to coverage -- pertain to worker's

5    compensation coverage.  That's what's excluded.

6            So there's a certain paradox to I would say, or

7    the inconsistency, really, in the insurer's argument where

8    they say on one hand these claims should be adjoined within

9    the statute because they have to do with provision of

10   worker's compensation insurance but then they turn the Grace

11   plan and say but they're not picked up by the language that

12   says they pertain to worker's compensation coverage?  If

13   it's a right or an obligation that pertains to worker's

14   compensation coverage, then it is excluded by the expressed

15   terms of the Grace plan.

16           So whether you get there under the statute where

17   it isn't provisioned insurance at all or whether you get

18   there because there's an expressed exclusion for rights or

19   obligations pertaining to worker's compensation insurance in

20   the plan, it all reaches the same place, which is that --

21           THE COURT:  Is it logical or rational to assume

22   that the plan drafters and -- while I wasn't involved, I

23   would presume that you were correct there were many hands in

24   it.

25           MR. COHN:  Yeah.

1           THE COURT:  Expected that claims arising out of I

2   guess to put the rabbit in the hat, asbestos-related claims

3   were to be carved out of any protection that the insurers

4   were otherwise provided?  Do you think anybody would have

5   intended that really?

6           MR. COHN:  Oh yes.  Oh yes.  Absolutely, Your

7   Honor, because even the insurers acknowledge that if you're

8   talking about claims that are statutory, worker's

9   compensation benefits, four people who were injured by

10  asbestos, by Grace's asbestos, that is carved out.  And the

11  sole debate is -- that we have under the language of the

12  plan -- is whether it -- well, whether the words mean what

13  they say when they don't just talk about excluding worker's

14  compensation claims but it talks about excluding rights or

15  obligations that pertain to worker's compensation coverage.

16          When I see that language and I say that the plan

17  carves that out, too.  And Grace, by the way, remembering

18  that Grace -- well, first of all, the insurers objected to

19  the plan.  So the insurers, whoever had a hand in drafting

20  it -- and I'm not speaking, by the way, from knowledge.  I

21  have no idea whether their input was solicited but they were

22  adversaries in terms of the plan process.  And so, in fact,

23  they may not have been consulted.

24          But the real point here is that from Grace's

25  perspective -- remember, this is all about what Grace, the

1   protection that Grace wants for itself and to accomplish its

2   goal in the Chapter 11 of maximizing the insurance proceeds

3   that are available to pay asbestos claims.

4          In terms of serving Grace's goals, Grace had

5   absolutely no reason to care whether we had these claims,

6   you know, on the side, if you will, based on worker's

7   compensation coverage or, for that matter, you know, claims

8   on the side, as it were, you know, for insurer's own

9   liability not related to worker's compensation coverage.

10  That would not diminish the amount that Grace could get or

11  that ultimately the asbestos PI trust would get.

12         And so, therefore, you know, therefore, Grace had

13  no reason to care other than, as we'll get to when we talk

14  about CNA, remember, there was that CNA -- the settlement

15  with CNA which contained a kind of funky provision whereby

16  CNA tried to make it cost the trust something if it walked

17  on this issue of independent liability.  But that was

18  something that the parties sort of -- that the parties

19  invented as part of their settlement to create financial

20  incentive that they could then kind of argue to this court.

21  But we'll talk about that some more, Your Honor, in the CNA

22  branch of the argument.  I'm really trying to respect our

23  attempt to go in sequence here.

24         So I've been talking about thus far -- I've been

25  making my argument in respect of the negligence claim, and I

1    wanted to just say that everything I said about the

2    negligence claim also applies to the bad faith claim the

3    Montana plaintiffs are bringing, except for there are two

4    important distinction, okay.

5           One of those is it does have to do with provision

6    of insurance.  I mean, in other words, when you say somebody

7    is negligent in providing industrial hygiene services and

8    industrial hygiene services is not insurance, it's something

9    anybody could provide.  They don't have to be an insurance

10   company to do it and it involved a whole separate realm of

11   activity and liability, a whole separate basis for liability

12   and that's the negligence claim.

13          But the bad faith claim, Your Honor, is clearly a

14   premise on being an insurer.  You can't be in bad faith

15   unless you're in bad faith under your role as a provider of

16   insurance.  And so I just wanted to make sure that that was

17   understood that one thing that's not going to help in

18   respect to the bad faith claim is the provision -- is that

19   we do not take the position that the bad faith claim was not

20   -- it didn't have to do with provision of insurance.

21          THE COURT:  Okay, but --

22          MR. COHN:  It's still a question --

23          THE COURT:  -- depending upon the side of the

24   prism through which I choose to view the two different

25   issues, you would agree that I could reach different results

1      on the motion with respect to the two claims, right?

2              MR. COHN:  Yes, you could.  Yes, you could.  And

3      but -- and one important aspect of that that I wanted to

4      point out is that while the bad faith claim is weaker, you

5      might say, on the provision of insurance argument, it's

6      stronger than the negligence claim on the plan construction

7      arguments because the bad faith claim does have to do with

8      the provision of worker's compensation in terms and when you

9      look at the bad faith claim and you say, well, wait a

10     second.  How can that be?  If it rises from the provision of

11     insurance, how can it now be within that language that I

12     just read to you of that it pertains to worker's

13     compensation coverage?

14              And if it pertains to worker's compensation

15     coverage, it is excluded from the injunction.  So that's

16     really the only point I wanted to make there.

17              So in sum, Your Honor, I don't know if you were

18     counting, but basically I gave you five arguments and it's

19     important for you to understand that if the Montana

20     plaintiffs prevail on any of the five arguments that the

21     negligence claim and then of course they also apply to the

22     bad faith claim, you know, any of those arguments, then the

23     claims are excluded from the injunction.  In other words,

24     we've given you a number of tasks to get to a result.

25     They're not cumulative.  They're (indiscernible) and if you

1    decide that any of them is persuasive, then first of all,

2    you may or may not decide to rule on the others.  You could

3    just stop there.  But also the point is that from the result

4    standpoint, in terms of issuing the declaration that we

5    would see, which is that the Grace channeling injunction

6    does not bar the Montana plaintiffs from bringing the

7    negligence claim and the bad faith claim.  If we prevail in

8    any of the five arguments, then we are entitled to that

9    declaration.

10            THE COURT:  I take it -- and I ask the question

11   now so others may respond but I take it from the submissions

12   that there's no dispute that this court can enter a final

13   order on the motions that are now before me.

14            MR. COHN:  That is correct.  There is no dispute

15   about that, Your Honor.

16            THE COURT:  All right.

17            MR. COHN:  And also, by the way, since these are

18   cross motions for summary judgment effectively, they're

19   issues of law anyway and so I don't see -- while it makes a

20   whole bunch of, you know -- while it makes a difference in

21   what label you put on the order whether it's proposed by

22   (indiscernible) rulings or just rulings, the standards that

23   we view are all the same.  And so it really just -- I don't

24   think it matters to anybody and we would all I think want

25   you to issue a final order.  And while we might differ on

1    what the content would be, I'm sure we would all like to

2    have it issued, you know, issued sooner rather than later

3    because it is just -- it's inevitable given the amounts that

4    are at stake here, Your Honor, that it's going to take it up

5    to at least the level of the 3rd Supreme.

6           THE COURT:  Well, I'm often not the last stop

7    along the line.

8           MR. COHN:  Yeah.  Well, I always -- I don't know.

9    I always -- it just seems nicer to say it.

10          THE COURT:  And I take no offense at that.

11   There's a reason there are three levels of appeal above me.

12          MR. COHN:  All right.  Well, thank you very much,

13   Your Honor.

14          THE COURT:  Thank you.

15          MR. LONGOSE:  Good afternoon, Your Honor.  May it

16   please the court, Ed Longose on behalf of Maryland Casualty.

17   I'd start the argument by talking to some of the points made

18   by counsel and then perhaps highlighting some of the other

19   arguments.  Obviously this matter's been well-briefed by the

20   parties and I don't intend to spend the next few minutes

21   rereading or regurgitating our brief.

22          However, I don't know if it was a Freudian slip or

23   it is truly what is occurring here and that is when counsel

24   started his argument he said this case "all arising out of

25   insurer's wrongdoing", insurer's wrongdoing.

1          Here in this case, it does in fact, everything,

2     arises out of Grace who is the insurer's wrongdoing.  And in

3     fact, throughout this case, there's been a lot of discussion

4     about asbestos, whose asbestos, who has control of the

5     asbestos.  And, in fact, there was a discussion and there

6     has been a discussion about the fact that Maryland Casualty,

7     never mind manufacturer, supplied or otherwise was involved

8     in production or distribution of asbestos or asbestos-

9     containing products or marketing of the product.

10          The plaintiffs' injuries are caused solely by

11     exposure to asbestos mine mill being distributed by Grace.

12     That's the claims in this case.  At least, that's their

13     allegation.  Plaintiffs' injuries are caused solely by the

14     fact that Grace was in charge of the mine, was in charge of

15     what happened in the mine, was in charge of any decisions to

16     be made in the mine, was in charge of the safety of the mine

17     workers.

18          There's no evidence or record evidence that the

19     plaintiffs in this case have brought forward to show this

20     court that Maryland Casualty had some separate agreement

21     outside the worker's comp policy or this general liability

22     policy that they were conducting special services, whether

23     it be industrial hygiene or engineering or other type of

24     service.

25          All those service emanated out of the contractual

1   relationship, the delivery of insurance to W. R. Grace.  In

2   fact, the plaintiffs attach two very illustrative exhibits

3   to their motion.  Both exhibits are the policies.  One's the

4   worker's comp policy.  One's a CGL policy.  And under both

5   of those policies there's language in there that says that

6   Maryland Casualty has -- can/has the right to take a look

7   at, survey, inspect and do all sorts of things relative to

8   the risk that they're insuring.

9           Those are embedded in the policy and unless

10  plaintiff comes forward with some type of agreement, special

11  agreement, side agreement, unbundled agreement or

12  contractual relationship that says, yes, Maryland Casualty,

13  we want you to do these services for us and we're going to

14  pay you to do these services for us, Plaintiff cannot stand

15  before this court and suggest that these are independent

16  activities, independent torts or torts unrelated to both the

17  delivery of insurance and unrelated to Grace's asbestos.

18          Grace always had total control over all aspects of

19  the mine, mill and processing facilities and Maryland

20  Casualty could take no actions unless directed to by Grace.

21  It's plaintiffs' burden to some forward to this court and

22  provide record evidence in order to get over the hurtle,

23  which they did talk about and that's the derivative hurtle

24  which was discussed by Judge Fitzgerald, Judge Buckwalter

25  and everybody else and we discussed it in our briefs, to

1   show that the activity or the actions by Maryland Casualty

2   were not derivative of Grace's asbestos or Grace's operation

3   of the mine or Grace's processing of the mine or Grace's

4   marketing.

5            Maryland Casualty didn't market, manufacture,

6   possess or transport Grace's asbestos or anybody else's

7   asbestos.  That, if they did, that would be an independent

8   tort.

9            As Mr. Lockwood said during the confirmation

10  hearing, which we cited in our brief, and he represents a

11  constituency here from which counsel and plaintiffs are

12  arising from, and that is he was asked what's an example of

13  an independent tort?  And you saw it in our briefs.  An

14  example of an independent tort is something outside of

15  Grace's asbestos.  He gave an example of an automobile

16  accident where Maryland Casualty or somebody's else's

17  vehicle as you wish was driving down the street and hits a

18  pedestrian in a crosswalk.  That's something outside of

19  Grace's asbestos and outside of the statutory construct

20  here.

21            The other interesting component relative to the

22  argument and there was a big, long discussion about worker's

23  comp.  And to point, Your Honor, you're right.  There are

24  two counts in this draft complaint that the plaintiffs are

25  suggesting that this court approve being or that this court

1    suggests is not channeled or not covered by channel

2    injunction.

3          And the second count, for example, talks about

4    worker's comp.  And the plaintiffs have a whole long

5    discussion about worker's comp and worker's comp being

6    carved out, so to speak.  However you look at it, the

7    plaintiffs in this case had every opportunity and should

8    have maintained the worker's comp case at some point in

9    time.  They were never precluded from doing it.  They're not

10   precluded from doing it now and they would never be

11   precluded from doing it.

12          Relative to that, if there was a denial of the

13   worker's comp benefits, then plaintiffs could make their

14   case statutorily and follow that process.  That's all the

15   claims here are attempting to do relative to count two of

16   the complaint.

17          With respect to count one of the complaint, that

18   count, while they disguise it, is still part of the worker's

19   comp construct and they're still attempting to have it arise

20   out of the delivery of worker's comp, which would be an

21   action, statutory action before the appropriate worker's

22   comp commission.

23          But if you look at that count one, what it does is

24   it's -- it goes to actions or activities that very well

25   would be or could be considered under the CGL policy, which

1    is protected, excluded and part of Schedule 5.  So

2    plaintiffs have attempted to draft a complaint that really

3    is creating a pleading and it's to avoid the application of

4    the injunction.

5            And I know plaintiffs' reply talks about the fact

6    that defendants, whether it be Maryland Casualty or CNA

7    suggest that this issue was decided earlier when the

8    preliminary injunction was, 12 years ago, 14 years ago, was

9    put in place.  The reason we put that in our brief is

10   because Judge Fitzgerald -- when Judge Fitzgerald was asked

11   to extend the preliminary injunction to include insurers and

12   to include Maryland Casualty, the plaintiffs came up with

13   the same argument before Judge Fitzgerald.  And we recognize

14   that there's varying standards and the standard in which he

15   was looking at this -- the court was looking at this is a

16   more broad-based standard.

17           But plaintiffs came forward -- and I talk about

18   the constituency, the living plaintiffs, of which Mr. Hutt,

19   Mr. Osborn are no different.  They try to suggest there

20   weren't around or they weren't making a claim then but it's

21   the same claim.

22           They came before the court and they suggested or

23   they opposed the preliminary injunction.  And they came

24   before the court with the same arguments, the same evidence

25   to suggest that these claims should be separate and apart

1    and should be carved out.  They shouldn't be given any type

2    of injunctive relief and the plaintiffs should be able to go

3    forward and maintain their cause of action.

4           Judge Fitzgerald did not agree with that and well-

5    reasoned that and she said based on what was in front of her

6    and they presented all that evidence and more evidence than

7    is being presented to this court for the preliminary

8    junction, said you just don't get there.  And fast forward

9    12 years later, 14 years later, we're standing here not even

10   with that same body of evidence before this court and

11   plaintiffs are suggesting that these claims are not

12   channeled and cannot be channeled because they don't arise

13   out of Grace's asbestos or Grace's activities at the plant.

14   They have not, in this case, sustained any type of burden

15   with respect to the court.

16          Your Honor, just going back to who -- just so it's

17   clear who Mr. Hutt and Mr. Osborn are, and just for a brief

18   timeline and I know you have it in the papers but I'll just

19   briefly talk about that, Maryland Casualty provided

20   insurance for the facility between 1963 and essentially

21   1973.  But before that time, Royal was providing the

22   insurance.

23          The plant or the mine and the facility was owned

24   by (indiscernible).  That was purchased by Grace in '63, so

25   that's why Maryland Casualty assumed the insurance

1    obligations.  In '73, CNA came in and took over the

2    insurance obligations to approximately 1990 or so.  The

3    plant I think was shut down, the mine was shut down

4    somewhere between '90 and 1993.

5         Mr. Osborn apparently worked in the facility from

6    19 -- according to the papers, 1960 to 1965 and, just so

7    this court knows that in -- it wasn't until 1965 that

8    Montana even recognized asbestos as a compensable disease.

9         Mr. Hutt worked in the facility 1968 to '69 for a

10   year or so, a little over a year and any of these -- the

11   suggestion -- it's interesting.  One of the exhibits says

12   Mr. Hutt had a chest x-ray that needed to be looked at and

13   he needed to be x-rayed thereafter if he remained at the

14   facility.  He didn't remain at the facility, so there wasn't

15   anything to do with respect to him.

16        But just to give some context to the time period

17   and what we're talking about, certainly if there was a

18   disease that manifested itself where there was a workers'

19   compensation claim to be made by either one of those

20   gentlemen, they certainly could and should have made it and

21   there's no evidence that there was any impediment to their

22   making that claim.  That would be under the worker's comp

23   portion.

24        So we talked about the preliminary injunction and

25   we talked about the fact that this -- the preliminary

1     injunction was looked at and we look at the history of that

2     discussion.

3            We get to the point where we go through the

4     confirmation hearing.  Sure, there were objections to the

5     plan.  The living constituents failed to tell the court that

6     they tried to get or obtain a nice carve out or try to

7     inject within the plan this whole notion that they could

8     proceed with these independent torts and try to make that

9     part of the plan.  And, of course, you know, insurers,

10    particularly Maryland Casualty is going to object to that

11    because it arose out of Grace's asbestos.

12           But Judge Fitzgerald and Judge Buckwalter both

13    talked about the fact that if, if the plaintiffs at some

14    point in the future can show that their claims are not

15    derivative of Grace's asbestos then they can come back to

16    the court and prove to the court or show the court how their

17    independent claims are not derivative of Grace's asbestos.

18    And both -- their draft complaint, everything in it is about

19    Grace's asbestos.  And you can't play around it or suggest

20    to this court that it's not when, in fact, that's the very -

21    - we wouldn't be here but for Grace's asbestos.  The

22    plaintiffs can't have it both ways in that regard.

23           So these arguments have been rejected and it is --

24    it's curious that in a motion for summary judgment in their

25    argument that they didn't come to the court and read off of

1    the argument and tell the court how their claims are not

2    derivative of Grace's asbestos.  They didn't do that because

3    they can't.  And I would suggest to the court -- we've cited

4    in our briefs.  The court's probably well -- is

5    knowledgeable and has read it 100 times and that's that this

6    is the Pittsburgh Corning case.

7            If there's any case to look at -- that and

8    Combustion Engineering -- but Pittsburgh Corning, Judge

9    Fitzgerald, you know, talked about derivative and what's

10   derivative.  And the fact of the matter here is that

11   Maryland Casualty didn't have anything to do with Grace's

12   asbestos or delivering that.

13           In those cases, what has happened is you have

14   somebody who is either manufacturing their own product so

15   that they may be a joint tortfeasor somewhere along the way

16   because it's one person's asbestos, another person's

17   asbestos.  You put it together and you've got asbestosis.

18   We don't have that here and Judge Fitzgerald is very clear

19   and that case was affirmed.  But plaintiff doesn't want to

20   talk about, you know, this recording, doesn't want to talk

21   about combustion engineering because they know if they have

22   to get into a discussion about and sustain their burden --

23   and that's what they have to do here on summary judgment is

24   sustain their burden -- that these cases are not derivative

25   of Grace's asbestos, they can't do that and they haven't

1    done that here.

2              Your Honor, I would just -- you asked an

3    interesting question and I had looked at the -- and I

4    focused on the complaint for the most -- in large part

5    because that's what the plaintiffs are asking this court to

6    do, to essentially bless, to allow them to go forward.  And

7    it's interesting that first of all the complaint that they

8    have is very narrow, very focused and to the extent that if

9    it were ever to be allowed to go forward in any way, shape

10   or form, it relates to, you know, two employees, you know,

11   situated as these two employees are.  This isn't a complaint

12   and that's the only thing before the court is that complaint

13   and this side of the facts relative to that complaint.

14             But I suggest that -- and we suggested that that

15   complaint can never go forward as constituted.  It's

16   interesting because another complaint, no doubt not very

17   different, was -- and several of them -- and if you go back

18   and read Judge Fitzgerald's orders with respect to the

19   preliminary injunction and the other proceedings, you have

20   the Gerard complaint, you have Schull, you have Pennock.

21   These are very similar, very similar.

22             And in that similarity, the plaintiffs for 12

23   years or 14 years were trying to suggest that they had this

24   carve out for this independent tort.  They never got

25   traction during the entire 12 to 14 years.  They tried once,

1    twice, three times here.  They tried to reconstitute the

2    complaint.  They tried to suggest that it was worker's comp,

3    it was a carve out, there's this.  But in no way does this

4    complaint differ from anything that's been before the court

5    and where they have not been able to develop any record

6    evidence to allow this complaint or whatever form of it is

7    to be non-derivative.

8               One of the complaint, as they talked about,

9    clearly every count or clearly this complaint in terms of it

10   is derivative of Grace asbestos and it must be channeled.  I

11   mean, there's no -- I believe there's no discussion with

12   respect to that.

13              Going back to, as I talked about this recording,

14   Mr. Lockwood and any other example you could make, the

15   plaintiffs have not come up with anything independent of

16   Grace's asbestos.  The activities followed here were exudent

17   of Grace's asbestos.

18              Count two, as I've talked about is -- clearly

19   deals with worker's comp and they even admitted it deals

20   with worker's comp and there's no way around worker's comp

21   being part of this.  And to that end, that's a statutory

22   claim that they could make and what they want to do is

23   backdoor count two and have this judge and have you, Your

24   Honor, bless that count two and suggest that that lives

25   outside of the worker's comp statutory scheme to which we

1    heard is preemptive anyway.

2           So the plaintiffs -- I don't know if they made a

3    worker's comp claim or if they haven't made a worker's comp

4    claim.  They should have and they can and they have been

5    able to for the last 12 years.  And we've seen no evidence

6    with respect to that or that it was rejected or that it was

7    rejected on the grounds that allows them to suggest that it

8    somehow should be included within our discussion today.

9           Maryland Casualty is an asbestos-protected party

10   covered by the asbestos channeling injunction.  This was so

11   despite Libby's objection to the plan confirmation.  Judge

12   Fitzgerald rejected the creative pleading by Libby and its

13   prior efforts to avoid the application and preliminary

14   injunction.  And we sit here and this is where we are today.

15          In terms of where do we go from here, it's

16   plaintiff's burden on the declaratory judgment act.  If, in

17   fact, and this court if it denies plaintiff's motion, it's

18   game over as far as the -- as far as we're concerned.

19          In terms of are there other things the court can

20   do or other things the court may need to see, it's

21   plaintiff's time for them to come forward with evidence to

22   show that these are not derivative of Grace's asbestos.

23   They haven't done that.  They haven't suggested that there

24   is evidence out there they need to obtain.  They've not

25   suggested that there needs to be an evidentiary hearing

1    before the court.  And if the court is satisfied that it has

2    what it needs in front of it absent some additional

3    evidence, discovery, hearing of some sort, in terms of --

4    because it's a declaratory judgment action, what we're

5    asking for is a denial of motion and entry of judgment in

6    favor of Maryland Casualty.  That way we can put to rest

7    this whole issue regarding whose asbestos it was.  It

8    certainly was not Maryland Casualty's.  Thank you.

9              THE COURT:  Thank you.

10             MR. COHN:  Your Honor, if I may, I'll briefly

11   reply to those arguments and then it'll be Mr. Giannotto's

12   turn to go forward on behalf of CNA.

13             THE COURT:  Okay.

14             MR. COHN:  But I will be brief because much of

15   what was said had already been really addressed in my

16   principle argument.

17             What you heard several times over, Your Honor, is

18   the idea that it's Grace's asbestos and that what it means

19   to be -- for a claim to be derivative, derivative means

20   arising from Grace's asbestos.  But Mr. Longose didn't say a

21   word about the actual language of the statute and you'll

22   recall, Your Honor, that Section 544(g)(2) says the standard

23   for the debtor to be protected is, if it has anything to do

24   with asbestos, but that's not the standard under G4.  G4

25   refers to the conduct of or liability of Grace.  And that's

1    the standard to be applied.  And if someone else has

2    liability on an independent basis, then the fact that it was

3    Grace's liability that has caused the injury does not make

4    that claim adjoinable.

5            So it's -- and, again, just to make it clear on

6    the issue of, you know, we are talking about cross motions

7    for summary judgment.  We do restipulate, Your Honor, that

8    the injuries were caused by Grace's asbestos.  That's not in

9    dispute.  What is very much in dispute is that that's the

10   standard of the statute.  The statutory language says

11   otherwise.

12           You also heard again a couple of different times

13   the notion that we should make a worker's compensation claim

14   in Montana.  Our understanding is that we are barred from

15   doing so and that the reason that we ended up not being able

16   to timely -- and when I say we, I'm talking about the

17   clients at a period when well before they were represented

18   by counsel -- but the reason they did not timely make a

19   claim is because they didn't know they had a claim.  And the

20   reason they didn't know they had a claim was because the

21   dangers of asbestos were suppressed by Maryland Casualty,

22   which had a duty as their worker's compensation carrier to

23   have let them know about this kind of harm.

24           Now, if it is the case, Your Honor, that a

25   worker's compensation claim would still be timely in

1   Montana, that sounds like a pretty good defense to any claim

2   we might bring for bad faith.  But it doesn't have anything

3   to do with whether this -- with the issue of whether this

4   was the type of claim that's within or not within the

5   injunction.  This type of claim is not within the injunction

6   and if we're still entitled to bring a worker's compensation

7   claim, you know, I mean, which just isn't the case, Your

8   Honor, but if it were the case, I'm sure that we would hear

9   from Maryland Casualty in Montana saying what's this bad

10  faith claim?  Just go file your worker's compensation case

11  and that will lead to the dismissal of the complaint.

12          Excuse me one second.  Yeah, and finally, Your

13  Honor, I just wanted to add that there was an argument that

14  I actually, under the Grace plan, that I neglected to

15  mention as to Maryland Casualty, which is a very simple one,

16  which is that their worker's compensation policies were not

17  listed in Exhibit 5 of the plan.

18          You asked a good question of what Grace's

19  intentions were.  Well, certainly the failure -- the non-

20  listing of the worker's compensation policies of Maryland

21  Casualty in the schedule that listed all of the settlement

22  asbestos insurance policies not only shows Grace's intent

23  but also when you track it through the language of the plan,

24  if it's not listen in Exhibit 5, then the insurer as issuer

25  of that policy is not protected by the injunction.  Thank

1    you.

2              THE COURT:  Thank you.

3              MR. GIANNOTTO:  Your Honor, may it please the

4    court, I'm Michael Giannotto.  I'm counsel for Continental

5    Casualty Company and Transportation Insurance Company.

6    Those companies are referred to as CNA in the briefs and all

7    the arguments.

8              We have a separate adversary proceeding that's

9    against 27, what I'll refer to as Libby claimants or Montana

10   plaintiffs as counsel for these people say.

11             It's a different type of action in some ways but

12   in a lot of ways very similar to the first case you've heard

13   about.  There were complaints filed on behalf of 27 people

14   exposed in Libby, Montana to Grace's asbestos and they filed

15   complaints against the CNA.  It's really just the tip of the

16   iceberg.

17             We've been told by the Libby, Montana counsel that

18   he has over 700 other claims he's getting ready to file

19   depending in large part on how this court rules.

20             And by way of background, and some background that

21   wasn't stated in the earlier argument, CNA, like MCC, issued

22   several liability policies, excess policies, worker's comp

23   and employer's liability policies to Grace over the years.

24   And disputes arose over the years as to the extent to which

25   CNA would be responsible or liable to cover injuries cost to

1    people by exposure to Grace asbestos.

2           And CNA, during the bankruptcy, entered into a

3    comprehensive settlement with Grace.  And pursuant to that

4    settlement, CNA will be paying $84 million, or had to pay

5    $84 million into the asbestos PI trust.  The asbestos PI

6    trust is the mechanism that's set up by the bankruptcy to

7    compensate people like the Libby claimants who claim to be

8    exposed to Grace's asbestos.  And we contributed this money.

9    We settled a lot of defenses on our policies.  We paid early

10   on a lot of excess policies that might never have come due

11   and we did that because we wanted closure on asbestos

12   claims.  And the way that we got that closure was through

13   the asbestos PI channeling injunction.

14          And just to make a couple of things clear, in

15   their papers, the Libby claimants claim a couple of times

16   that, well, you don't really have to contribute money to the

17   trust in order to be protected by that channeling

18   injunction.  That is incorrect.  You do.  CNA has

19   contributed $84 million as part of their settlement.  MCC,

20   Judge (indiscernible) found, contributed indirectly through

21   prior settlements with Grace but you have to contribute on

22   it.

23          And Libby has sort of implied that we're asking

24   for some sort of special channeling injunction.  We got the

25   same channeling injunction everyone else got.  And it's

1    geared to 524(g), as Mr. Cohn stated.

2          Now, these 27 claims -- and it's important, Your

3    Honor, when you review this case to review these complaints.

4    These 27 complaints allege -- and when we say that the MCC

5    complaints in this respect only exposure to Grace's

6    asbestos.  The plaintiffs -- and to step back a second,

7    these claimants aren't necessarily workers or former

8    workers.  These are what are called community exposure

9    claims.  Most, if not all of these people -- because the

10   complaint's a little garbled -- lived in Libby, Montana.

11   They're not making worker's compensation claims.  They're

12   not even eligible to make worker's compensation claims since

13   they never worked at the mine or the mill.  They're making

14   what we've called community exposure claims.

15          And what they're alleging is that basically by

16   living, recreating, whatever in the environs of Libby,

17   Montana they were exposed to Grace's asbestos that was

18   emitted by Grace from Grace's facilities and they're --

19   again, they're not making worker's comp claims but now

20   they're suing CNA and MCC as part of these 27 claims that

21   are part of our case as well in tort.

22          And what they're alleging is -- if you really read

23   the complaint closely, they say, we, CNA, inspected the

24   Grace facilities.  We knew that some workers were sick from

25   asbestos.  And then they don't allege that we actually did

1   anything.  They allege we failed to do certain things.  We

2   failed to warn the workers.  We failed to educate the

3   workers.  We failed to fix the dust control equipment.  So

4   basically they are suing us because they're sick from what

5   Grace did and we didn't step in and stop it.  And that's

6   essentially relevant here for two reasons.

7          Commonsense reading of the statute is they are

8   suing, they are seeking to hold us liable, whether you want

9   to call it directly or indirectly -- the statute uses both -

10  - for the conduct of Grace and for the claims against Grace.

11  That's what they're trying to do.  Grace did misconduct.

12  Grace made these people sick.  We issued insurance.  We

13  didn't do anything and now we're liable.  They're seeking to

14  hold us liable for Grace's conduct.

15         The second part of it is that by reason of

16  provision of insurance, Judge, this is a summary judgment

17  motion on our behalf and we put in evidence on this.  The

18  Libby claimants did not rebut that evidence.  They didn't

19  ask for discovery.  They didn't put in any evidence of their

20  own.

21         And one of the things we put in were our insurance

22  policies.  And those insurance policies, whether they're

23  worker's comp policies or they're general liability

24  policies, give us the right to inspect the Grace facilities,

25  to make reports and to make recommendations and that's

1    exactly what they're saying the basis of our liability is.

2    It rises right out of the provision of insurance, right out

3    of the actual terms of the insurance policy.

4         But there's more than that.  We put in scholarly

5    commentary.  Plaintiffs lawyers, defense lawyers, experts in

6    insurance, federal government studies that say this is what

7    insurers do.  Insurers don't just take premiums and pay out

8    when someone gets sick.  Insurers try to help the

9    policyholder.  Insurers are ultimately going to be legally

10   liable under their policies if claims are made against the

11   policyholders.  And as part of the provision of insurance

12   they do inspect.  They do make recommendations.  That's what

13   they do.  This clearly arises by reason of the provision of

14   insurance.

15        And in their paper and today, Mr. Cohn emphasizes

16   the Quigley decision.  A couple things, just a footnote,

17   Quigley did not involve 524(g).  It involved a preliminary

18   injunction but it did involve a preliminary injunction that

19   used the language of 524(g), so I acknowledge it is relevant

20   to this hearing today.

21        But whether Quigley was rightly or wrongly decided

22   it's nothing like this case.  In this case, this is what

23   insurers do.  It's part of the insurance relationship.  It's

24   to avoid liability down the road under their policies.  It's

25   totally different from Quigley.  Quigley there was no

1    discussion or evidence that parents typically put their

2    logos on their subs products.  A lot of people do that.

3    When you go to CVS, they put their log on somebody else's

4    product that's made.  It doesn't establish a parent-sub

5    relationship and that's not necessary.

6              There was nothing to show that parents

7    overwhelmingly do this in Quigley.  But here, this is what

8    insurers do and it's part of their policies and they do it

9    because of the potential legal liabilities to pay claims.

10   This clearly arises out of insurance.

11             And Mr. Cohn points out the Manville case.  Okay.

12   Manville, if you want to construe it very broadly and squint

13   your eyes and, you know, give them every benefit of the

14   doubt, yes, Manville could be deemed to support them, but a

15   bunch of things about Manville.  Manville was not a 524(g)

16   case.  It was an injunction issued before 524(g) ever

17   existed and it was not governed by 524(g).

18             Manville decided the case on non-52(g) grounds and

19   then said something about 524(g) at the end.  But we went

20   back.  Judge, I went back and looked at the briefs both

21   times before the 2nd Circuit and while there was mention of

22   524(g) a couple of times in the briefs just to say, you

23   know, there's a new standard, you know, that doesn't govern

24   here, there was no extensive briefing or argument about

25   whether 524(g) applied in that case.

1            And but what's really important is that Manville

2     did not involve just liability arising out of Manville's

3     products, out of the debtor's products.  People were seeking

4     to hold Travelers liable because of their exposure to other

5     companies' products.  And, of course, that doesn't derive

6     from Manville.  It's not derivative from Manville.

7            So this is a different case from Manville.  And as

8     Mr. Longose pointed out, and my view, if you want to read

9     one case, Judge, you should read the Pittsburgh Corning

10    cases by Judge Fitzgerald.  If anyone's handled asbestos

11    cases, if anyone knows 524(g), it's Judge Fitzgerald.

12            THE COURT:  I know.  And in my view she retired

13    too darn soon.

14            MR. GIANNOTTO:  And, Judge, the second of the

15    Pittsburgh Corning decisions was decided after Manville,

16    after both Manville 3 and 4.  It was decided after the lower

17    court case in Quigley which held the same way that the 2nd

18    Circuit did and that -- and Judge Fitzgerald still held that

19    if they're seeking to hold you liable on any theory due to

20    exposure to the debtor's product, then that is seeking to

21    hold you derivatively liable.  That is liable for the

22    conduct or claims against the debtor.

23            And Mr. Cohn made an argument today that I don't

24    think he made in his briefs which is that if you look at the

25    other categories of people protected under 524(g), it's

1   always the case that the parent can only be liable if the

2   sub is liable or something like that.  But in Pittsburgh

3   Corning, PPG, the parent or one of the parents of Pittsburgh

4   Corning, Judge Fitzgerald made this clear.  They were sought

5   to be held liable, not because of piercing the corporate

6   veil but in some cases they were sought to be held liable

7   because they failed to correct the deficiencies in the

8   debtor's product to make it safer.  They failed to protect

9   other people from the debtor's product and that is exactly

10  what they're alleging here as to us, not that we did

11  anything but that we didn't do certain things to protect

12  them from the debtor's asbestos.

13          And, Your Honor, at bottom, what their argument is

14  is that we are only protected from seeking policy proceeds.

15  And if that were the case, we wouldn't need the channeling

16  injunction and we wouldn't need 524(g).  We entered into a

17  settlement with Grace that was approved by the bankruptcy

18  court and the district court.  And once that settlement was

19  approved we had settled the policies.  No one can come after

20  us for proceeds.

21          The injunction gave us something more than that.

22  The injunction gave us -- if you look at the legislative

23  history that we've cited, the injunction was modeled on the

24  Manville injunction which adjoined all claims related to or

25  arising out of the policies, not just policy proceeds.  And

1    even before 524(g), courts, bankruptcy courts always had

2    jurisdiction over the proceeds of policies.  They could

3    adjoin suits against the proceeds of policies.  They're the

4    property of the debtor.  524(g) would, therefore, be a

5    nullity if that's all it protected here.

6              I want to talk a little bit about their theory of

7    there's an independent tort claim they can make against us.

8    Again, the only reason we need protection from the

9    channeling injunction is if they can cobble together an

10   independent tort claim.  If they can't then we win under

11   state law and it wouldn't matter.  And 524(g), again, would

12   be a nullity.  The only time we need this protection is if

13   they can actually put together a claim.  We don't think they

14   can.  We think we can win under state law.  There's no

15   negligence here.  There's no duty here.  There's no nothing

16   here.

17             But by making us go to Montana and defend 700

18   cases, you know, that's what the channeling injunction is

19   supposed to preclude.  On its face, this complaint -- it

20   only alleges that we give things that derive from Grace

21   misconduct and that is due to the provision of insurance.

22   And we should have to go and defend those claims and it

23   doesn't matter if they can assert and independent cause of

24   action.

25             Talk a little bit about worker's comp very

1    briefly.  Again, most, if not any of these people are

2    workers in our case.  They don't have any basis for a

3    worker's comp claim.  But if they did -- if one of them

4    happens to be a worker -- and I may be speaking a little out

5    of school here, but we do have outside in this case some

6    information given by the Montana counsel on some of these

7    plaintiffs.  At most it appears that one out of these 27 may

8    have been a former worker.  But in any event, they're not

9    all or most of them aren't.

10          But if any of these people can make a worker's

11   compensation claim, they can go make it.  This claim doesn't

12   stop worker's compensation claims.  Mr. Cohn's arguments

13   about preemption, they're just irrelevant.  The plan divides

14   claims into two kinds, the kind that's compensable by the

15   trust, which are tort claims, which are what these people

16   are making, and worker's -- statutory worker's comp claims.

17   That's what the plan defines as a worker's comp claim, a

18   statutory worker's comp claim and those aren't precluded.

19          And so tort claims that are payable by the trust,

20   you're precluded if you're a protected settled asbestos

21   insurance company.  And worker's comp claims, you're not

22   because those claims are not payable by the trust and you

23   need the insurance to pay it.

24          And by the way, I'll just throw in Mr. Cohn

25   mentioned in his rebuttal to the MCC case that their

1    worker's comp policies aren't listed as settled policies and

2    we put in our brief -- I'm not going to go through the whole

3    rigmarole -- ours are.  If you look at the brief you'll see

4    that our worker's comp policies are there.

5              And I just want to end with a couple of points

6    that they raise in their briefs.  These people have remedies

7    for their injuries.  As I mentioned, if they truly have a

8    worker's comp claim, they can make it.  If they truly are

9    injured, they can go and collect from the trust.  And, you

10   know, the trust was set up and we put the trust distribution

11   procedures in our papers.  Libby claimants who don't -- if

12   they have no one else to sue but Grace are entitled to an

13   eight times recovery over the values that other asbestos

14   claimants are.

15             And the trust also sets up a disease that pays

16   more than regular plural disease called severe asbestos

17   plural disease just for the Libby claimants because they

18   claim that's some disease they have that pays more.  So they

19   can go to the trust and they can get money.

20             And as you can see from the face of the underlying

21   complaints from CNA and MCC that we've attached to our

22   complaints, there are other defendants out there that

23   they're suing and can sue, the State of Montana for failure

24   to do things at the mine mill and the state supreme court in

25   Montana has ruled that those cases can proceed against

1    Montana.

2         They allege claims against BNSF Railway for

3    handling asbestos.  They allege against Robinson Insulation

4    Company.  They allege claims against International Paper

5    Company.  There are other defendants out there, so they have

6    remedies.  And there is nothing unfair, Your Honor, about

7    barring these claims against us.  We paid a lot of money, a

8    lot of money to get out of the Grace asbestos problem.  And

9    if you let them bring us back in, that would be what is

10   unfair.

11        And, in fact, Mr. Cohn alluded to the fact, and

12   I'm sure he'll mention this, that we have a partial

13   indemnity from the asbestos PI trust if we're held liable

14   for these claims.  And, true, it's only a partial indemnity.

15   When we were negotiating that indemnity we knew that the

16   Libby claimants were considering bringing these claims post

17   confirmation.  We didn't know how many there would be.  We

18   didn't know what they were worth.  We did know, however, how

19   much we thought was relevant to pay off all legitimate

20   asbestos claims and we agreed on $13 million as a partial

21   indemnity.

22        But Mr. Cohn says this doesn't affect Grace.  This

23   doesn't affect the trust.  It affects it a lot more than

24   this partial indemnity because, Your Honor, their theory

25   taken to its end would mean that any insurer, whether a CGL

1   insurer or a worker's comp insurer could be sued

2   notwithstanding their settlement with the trust because

3   insurers know there are dangers at different places.  That's

4   why people buy insurance.

5          And you could claim a general liability insurer

6   didn't warn somebody as to something or didn't step in to do

7   anything.  There's no logical conclusion.  And what's going

8   to happen -- and I think one of the reasons the trust has

9   moved to file an amicus brief is that in the future, not

10  only in other asbestos bankruptcies but even in this one

11  because there's still unsettled insurance in this

12  bankruptcy.  Insurers are going to insist on indemnities or

13  they're going to pay less than they would have otherwise

14  paid to settle with the debtor.  And that's going to mean

15  less money for people injured by asbestos.  It's going to

16  mean less money in that trust.  And that's why this is not -

17  - that's why it is not unfair to preclude these suits.  They

18  have their avenue of recovery from the trust.  This is what

19  524(g) was aimed at doing.

20         And so with that, I will sit down, unless you have

21  any questions.

22         THE COURT:  I do not.  Thank you.

23         MR. GIANNOTTO:  Thank you.

24         MR. HORKOVICH:  May it please the court, Your

25  Honor, Bob Horkovich.  I represent the WRG asbestos PI

1    trust.  We have filed a motion to submit an amicus brief.

2    Your Honor was kind enough to admit me pro hac vice.

3            Libby has opposed our solution of our amicus brief

4    basically on two grounds.  One is that we have no interest

5    in the institutes that were impartial.

6            THE COURT:  Although they say maybe you do.  Maybe

7    there's some argument that you do.

8            MR. HORKOVICH:  The --

9            THE COURT:  It's the other factors they say just

10   don't apply.

11           MR. HORKOVICH:  Well, the claims come to the

12   trust.  If the channeling injunction's enforced then the

13   Libby claims would be fought with the trust.  And then as

14   Mr. Giannotto just pointed out, there is $4.5 million in the

15   settlement proceeds that CNA is holding back depending upon

16   what happens with potential settlements with other

17   outstanding claimants and settlements for judgments and if

18   they have to pay that in other outstanding judgments it

19   doesn't come to the trust, otherwise it does.

20           But Mr. Giannotto said -- was perfectly correct

21   was that the settlements -- insurance is very, very

22   important to the trust.  It's in essence of the $600 million

23   asset settlements with scores of insurance companies and

24   every one of them look for indemnities here.  And I echo Mr.

25   Giannotto's points.

1        It's late in the day.  Your Honor has a very full

2    calendar still yet ahead of him.  I don't want to repeat

3    what's in my brief except to echo what Mr. Giannotto said.

4    I do agree that the relevant case law would be the 3rd

5    Circuit decision in Combustion Engineering, the 3rd Circuit

6    decision in Pittsburgh Corning.  I also would like to note

7    another 3rd Circuit decision which has not been mentioned

8    today and that's the 3rd Circuit's earlier affirmance of a

9    preliminary injunction adjoining claims by other earlier

10   Libby claimants against Maryland Casualty for negligently

11   undertaking to develop a dust control system and found to

12   warn of the dangers of Grace asbestos.  In Re: W. R. Grace

13   and Company 115F appellate 565 3rd Circuit 2004, the 3rd

14   Circuit asserted that the claims were based on the insurance

15   company's role in working with Grace on a dust control

16   system in the Libby mine, which it did so as Grace's

17   worker's compensation carrier therefore arose out of

18   insurance.

19        With that, Your Honor, if Your Honor has any

20   questions about my amicus brief or participation, I stand

21   ready to answer them.

22        THE COURT:  Okay.  I don't.  Thank you.

23        MR. HORKOVICH:  Thank you, Your Honor.

24        MR. COHN:  Your Honor, I am not going to argue

25   about the amicus brief but will rest on our papers in that

1    regard.  But Mr. Giannotto said some important and incorrect

2    things.

3            The first, Your Honor, is he did explain what it

4    was that CNA settled.  In fact, that's pretty typical of

5    what insurers settle when they do a settlement with an

6    asbestos debtor.  Namely, they waive -- they settle defenses

7    under their policies, so they're presumably not going to

8    write a check for the fully amount of the policy but they're

9    going to write a check for the policy minus the, you know,

10   the risk rewarded value, if you will, of the defenses that

11   they have.

12           And then also, there's the issue of when you pay

13   because especially with the excess policies that CNA

14   settled, they might not have to get paid for a while and,

15   therefore, you settle on the basis that money now is worth

16   more than money later.  That's what insurers do, Your Honor,

17   and that's what the statute is designed to have them do and

18   the statute protects them from any further liability under

19   their insurance if they do make that kind of settlement.

20           What Mr. Giannotto is looking for -- I'm sorry, I

21   shouldn't personalize it.  What CNA is looking for is a

22   bonus.  What they want is not only to settle their insurance

23   policies on the same basis that insurers do, you know,

24   namely the risk adjusted value of the policy, what they want

25   is a throw-in to be protected from any of the liability for

1    their own independent wrongdoing.

2            The fact that you've had thousands, Your Honor,

3    insurance settlements in major asbestos cases that seem to

4    have gone through without any particular difficulty where

5    insurers settled on the traditional basis of their policies

6    and have gone off on their merry way, it would seem to

7    indicate that the system's working just fine as it now

8    operates.

9            Insurers settle their policies and they're going

10   to continue to settle their policies.  They have no

11   intention not to settle their policies in any future

12   asbestos cases.  And that's whether or not the particular

13   insurer has engaged in a tortious conduct in relation to any

14   -- in relation to any particular plaintiff.

15           They -- why as an insurer would you sit out there

16   and subject yourself to suit by the debtor or by the

17   insurance trust of the debtor on your insurance policies

18   when you can make a rational settlement and walk off with an

19   injunction?  The answer is of course insurers will continue

20   to settle.  They'll walk off with that injunction

21   protection.  They just won't get the bonus, which is not as

22   earlier argued, permitted under the statutory language

23   anyway of being protected from specific claims by specific

24   plaintiffs who have -- who allege tortious conduct on their

25   party.

1        And I'm not going to respond, by the way, to Mr.

2    Giannotto's assertions about what CNA did or didn't do.

3    That's up to us to prove in state court.  And we acknowledge

4    we have to prove they did something.  If they didn't do

5    anything, as Mr. Giannotto said, then I guess we don't have

6    claims.  But that's not our view of it and that's not before

7    this court.  It's property before the state court if and

8    when we're permitted to bring those to state court.

9        But the statute refers to alleged liability and

10   this court must follow the allegations of our complaint

11   against CNA, assume those allegations to be true at least

12   just for purposes of deciding whether it's the type of claim

13   that may be adjoined or not.

14       There was mention of CNA's policies being listed

15   in Exhibit 5 and we're not sure on that, Your Honor, but it

16   doesn't matter.  And the reason it doesn't matter is because

17   under the language of the plan, in order to be within the

18   scope of the injunction by the terms of the plan, the policy

19   must be an asbestos insurance policy, which his listed in

20   Exhibit 5.  The definition of asbestos insurance policy

21   excludes worker's comp policies.  So even if by mistake or

22   intentionally because it wouldn't matter, a worker's

23   compensation policy or maybe a larger policy that contained

24   worker's compensation provisions, were included in Exhibit

25   5, the insurer is still not a settled asbestos insurance

1   company with a respect to its worker's compensation coverage

2   obligations.

3           Excuse me one moment, Your Honor.  Your Honor, I

4   will, you know, I will simply conclude on going back to the

5   fundamental disconnect in the argument that's being made by

6   both of the insurers, which is that on the one hand they're

7   arguing that their claims are by reason of worker's

8   compensation insurance, and then on the other hand saying

9   that they do not pertain to worker's compensation coverage

10  within the language of the plan because that takes them out

11  of the injunction.  They can't have it both ways.  And on

12  that, I will thank you very much, Your Honor.

13          THE COURT:  Thank you.

14          MR. GIANNOTTO:  Your Honor, Michael Giannotto

15  again.  I will be very brief because Mr. Cohn was so kind to

16  be very brief.

17          Mr. Cohn says and I emphasize too, read the

18  complaint.  They say the complaint says what it says and the

19  complaint doesn't say that CNA did anything other than

20  inspect the facility and know there were injuries there.

21  The complaint alleges that we then didn't do things.  We

22  didn't warn them.  We didn't recommend a better dust control

23  system.  We didn't have more medical monitoring.  That's

24  what the complaints say, all seven of them that have the 27

25  claimants that are attached to our adversary complaint here.

1        You know, the thing about Exhibit 5, I agree in

2    one sense with Mr. Cohn that whether the policies are

3    identified on Exhibit 5 is irrelevant.  What's relevant here

4    is whether they're making worker's compensation claims or

5    claims in the tort system.  The tort system claims go to the

6    trust and were protected from them.  The worker's

7    compensation claims are not payable by the trust and are

8    payable by insurance.

9        But his point that there was some sort of mistake

10    or something by identifying these policies is incorrect.

11    What the statute says -- I'm sorry, not the statute.  What

12    the plan says is that worker's -- policies or portions of

13    policies aren't covered but solely to the extent they

14    pertain to rights and obligations or that solely pertain to

15    coverage for worker's comp claims and worker's comp claims

16    are defined as statutory worker's comp claims under the

17    plan.  We go through this in our brief.

18        Our what we've referred to as worker's comp

19    policies don't only provide for statutory -- compensational

20    coverage for statutory worker's comp claims.  They also

21    provide employer liability coverage, if the employer is

22    suiting tort because of some injury to the employee.  They

23    also provide for inspections and recommendations and things

24    we've said.  And these claims are not for worker's

25    compensation as defined in the plan, which is statutory

1   worker's compensation benefits.  They are for tort damages

2   in the tort system.

3          As to the bonus argument that Mr. Cohn made, you

4   know, before these Libby claims, as far as I'm aware, no one

5   has ever tried to do what they're doing, that is to go

6   around to the channeling injunction, whether issuing

7   pursuant to 524(g) or otherwise and to create claims in tort

8   against settled insurers for failing to have done something

9   in their role as insurers.  So it is not surprising that

10  people have settled because they didn't think that these

11  claims would ever go forward.

12         Manville was a different kind of case where there

13  were different insurers and it was way after the injunction

14  was issued but it wasn't the debtor's product.  So people

15  did not believe that these kinds of claims would be there.

16  That's why they are not decisions exactly like this one out

17  there.  And, yes, we did ask for an indemnity as part of

18  ours because we knew that the Libby claimants here were

19  making noises that they were trying to do this, so we got a

20  partial indemnity.

21         But if you decide in their favor here, Your Honor,

22  I predict that insurers are going to be much less willing to

23  settle because if they settle at coverage they're still

24  going to be liable for the whole shebang.  So why not fight

25  out -- why not not pay on the excess policies until 20 years

1    from now when they come due?

2              You know, but one of the reasons they do and

3    they'll settle more extensively than they otherwise would,

4    is to get closure and then won't get closure here.  Thank

5    you, Your Honor.

6              THE COURT:  Thank you.

7              MR. LONGOSE:  Your Honor, if I may make one last

8    comment.

9              THE COURT:  If it's one, yes.

10             MR. LONGOSE:  It is.  It's not a long run-on

11   sentence either.  I just want to -- I just wanted to add

12   that -- and I felt just being in the argument that this

13   consolidated argument and we adopt and incorporate the

14   arguments from CNA, we had obviously taken some different

15   arguments, including the discussion of Bailey in that.

16             In that although -- just so the court realizes --

17   MCC paid large sums of money as well to settle prior to the

18   bankruptcy and our protection of the plan is the same and we

19   obtained the indemnity as well.  I think that was a short

20   enough sentence.  Thank you, Your Honor.

21             THE COURT:  It was.  Thank you.  Is there anything

22   further for today?

23             MR. COHN:  No, Your Honor.

24             THE COURT:  All right.  I'll decide the competing

25   motions in due course and we'll decide the amicus motion at

1    the same time.  Thank you all very much.  I will say the

2    presentation both in writing and orally have been extremely

3    efficient and very helpful to me.  So I thank you for that.

4              MR. COHN:  Thank you, Your Honor.

5              THE COURT:  Court will stand in recess.

6              MR. COHN:  Thank you, Your Honor.

7

8

9

10                        * * * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 72

1                    C E R T I F I C A T I O N

2

3     I, Sonya Ledanski Hyde, certified that the foregoing

4     transcript is a true and accurate record of the proceedings.

5

6     Sonya Ledanski          Digitally signed by Sonya Ledanski Hyde
                              DN: cn=Sonya Ledanski Hyde,
                              o=Veritext, ou,
7     Hyde                    email=digital@veritext.com, c=US
                              Date: 2015.11.30 17:36:51 -05'00'

8     Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  November 30, 2015