# Exhibit 6

STATE OF SOUTH CAROLINA

COUNTY OF HAMPTON

| | | |
|---|---|---|
| ANDERSON MEMORIAL HOSPITAL, | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civ. Act. No. 92-CP-25-279 |
| - against - | ) | |
| | ) | |
| W.R. GRACE & CO., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**FILED**
11:15 Am
OCT 26 2000
~Linda D. Neals~
CLERK OF COURT
HAMPTON COUNTY

## CERTAIN DEFENDANTS' POST-HEARING
### BRIEF IN OPPOSITION TO CLASS CERTIFICATION .

Donald A. Cockrill
OGLETREE, DEAKINS, NASH
SMOAK & STEWART
P.O. Box 2757
Greenville, SC  29602
(864) 271-1300

P. Kevin Castel
Allen S. Joslyn
CAHILL GORDON & REINDEL
80 Pine St.
New York, NY  10005

ATTORNEYS FOR W.R. GRACE &
CO. and W.R. GRACE & CO. - CONN.

Timothy Bouch
LEATH BOUCH AND CRAWFORD
134 Meeting Street, 4th Floor
P.O. Box 59
Charleston, SC  29401
(843) 937-8811

Paul J. Hanly, Jr.
COBLENCE & WARNER
415 Madison Ave.
New York, NY 10019

ATTORNEYS FOR T&N plc

DATED:  October 23, 2000

Original

STATE OF SOUTH CAROLINA

COUNTY OF HAMPTON

| | | |
|---|---|---|
| ANDERSON MEMORIAL HOSPITAL, | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civ. Act. No. 92-CP-25-279 |
| - against - | ) | |
| | ) | |
| W.R. GRACE & CO., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## CERTAIN DEFENDANTS' POST-HEARING
## BRIEF IN OPPOSITION TO CLASS CERTIFICATION

This Memorandum of defendants W.R. Grace & Co. and T&N plc ("defendants") addresses the class certification requirements of numerosity and typicality, Rule 23, S.C.R.C.P. At the conclusion of the hearing on September 6, 2000, the Court directed that the parties may submit memoranda on issues other than adequacy of representation within 45 days from the conclusion of the hearing (and memoranda on adequacy of representation within 30 days from receipt of the hearing transcript).

### Preliminary Statement

Defendants respectfully submit that the issue of adequacy need never be reached by the Court. The individual claim of Anderson Memorial Hospital ("Anderson") should proceed to resolution in a prompt and efficient manner. Because the numerosity and

-2-

typicality requirements cannot be met, class certification should be denied.[1]  If there are any

remaining South Carolina building owners who wish to pursue damages claims against defen-

dants based on asbestos-containing surfacing materials — and, as shown below, there proba-

bly are not — they may readily proceed by individual actions — as they have been free to do

for many years.

The certification of a class in this case would create an endless judicial night-

mare where none need exist.  Building owners in South Carolina do not need a class action to

vindicate their rights.  Defendants are aware of only one other claim filed in South Carolina

by a building owner against any of the defendants since this suit was brought in 1992 (and

that case, filed in 1993, is no longer pending).  Thus, it has been over seven years since an as-

bestos building case has been brought in South Carolina.  Those who decided to sue, such as

colleges, universities, private building owners, school districts and the State itself, did so long

ago and their cases have long ago been tried or settled.

It is undisputed that the pendency of this action does not have the slightest

thing to do with the absence of any further filings in South Carolina over the last eight years.

In the 49 other states, where there are no class actions of the type which this one purports to

be, there have only been only eight new cases filed in the last four years against these defen-

---

[1]     Consistent with well-established precedent, this Court has ruled that the plaintiff bears the
burden of proof on class certification.  For the convenience of the Court, the filing parties
have restated in this post-hearing brief the arguments set forth in their prior memoranda on
the issues of numerosity and typicality.

-3-

dants. As of March 1998, when defendants first submitted an opposition to plaintiff's motion

for class certification, only <u>thirty-one</u> such cases remained pending against the four defendants

anywhere in the country. (<u>See</u> Affidavits of Robert H. Beber, Raymond T. Cullen, James P.

Verhalen and H. F. Baines, attached to defendants' March 3, 1998 class certification brief.)

Today, the number is far lower (<u>see</u> Supplemental Affidavits of Robert H. Beber, James P.

Verhalen and Charles Boulbol and the Affidavit of Richard C. Finke).[2]

Among those asbestos-in-buildings cases that remain on judicial dockets are

class actions which literally (so far) have no ending. <u>In re Schools Asbestos Class Action</u>,

Master File No. 83-0268 (E.D. Pa.), was filed in federal court in Philadelphia in January 1983.

It was "settled" eleven years after the order granting class certification but the claims and dis-

tribution process was continuing as of a year ago. The University class action pending before

the Honorable Sol Blatt in federal district court is in its thirteenth year and remains pending.

<u>Central Wesleyan College</u> v. <u>W. R. Grace & Co. et al.</u>, Civ. A. No. 2:87-1860-8 (D.S.C.).[3] A

class action was also filed thirteen years ago in Pennsylvania state court on behalf of owners

of buildings leased in whole or part to the federal government. <u>Prince George</u> v. <u>United States

Gypsum Co., et al.</u>, CA No. 5388 (Phila. Common Pleas, 1987 Term). While defendants have

settled, appellate proceedings as to which building owners were or were not in the class were

---

[2]    Mr. Finke's affidvit is attached as Exhibit A.

[3]    On March 21, 2000, a final judgment was entered as to Grace based upon a settlement. The
       claims process as to this settlement is only now beginning and the litigation continues as to
       certain other defendants.

-4-

only resolved with the denial of certiorari by the United States Supreme Court in 1999. Pru-

dential Insurance Company v. Prince George Center, Inc., 120 S. Ct. 41 (1999). Distribution

of the settlement funds was approved in April 2000 and all claims were to be filed by Sep-

tember 30, 2000.

Effect of Denial of Class Certification

If class certification is denied in this case, the effect is quite simple:  the claims

of the named plaintiff, Anderson, can proceed to trial at the conclusion of discovery.  Any

South Carolina building owner who wishes to file an individual suit may do so, as they have

been free to do all along, and have done.  Based upon the above-described record of filings,

the likelihood of there being any more than two or three new cases filed (if that) is highly re-

mote.

In contrast, class certification would drastically alter the focus of the case.

Rather than determining issues important to a disposition of individual claims, such litigation

predictably embarks on a search for some "classwide issue" to try, inevitably delaying resolu-

tion of individual claims.  Stated in Rule 23 terminology, there are insufficient "common

claims" to justify a class action, and plaintiff's individual claims are not "typical" of those of

other class members.  This case and the class actions cited above are living proof of this

proposition.  This case is itself a graphic demonstration.  If Anderson had brought an individ-

ual case in 1992, it would undoubtedly have been resolved years ago.  As we discuss herein,

there is a growing recognition among the judiciary that mass torts are ill-suited for class

-5-

treatment, and that class actions, far from the panacea they appeared to be in the past, only protract litigation and impose an unwarranted burden on the judiciary.

Absence of Evidence on Numerosity

The asbestos-in-buildings issue rose to a crescendo of litigation and regulatory pronouncements in the 1980s. The publicity was massive over such suits and the ensuing bankruptcies of companies such as Manville, H.K. Porter, Celotex, Keene and National Gypsum. Those who believed they had worthy claims have pursued them and won, lost or settled. As the affidavits previously submitted on this motion show, less than fifteen such cases remain pending nationwide against these defendants and only eight new cases have been filed in the last four years against them.

While such suits were still being filed in the 1980s, South Carolina had its share of such litigation, but by now the only such case left in the South Carolina state courts is this suit (and Central Wesleyan is the only such suit in federal court here). Indeed, with one exception in early 1993, this was the last asbestos-in-building case filed in South Carolina, almost eight years ago.

This plaintiff has utterly failed in its burden of showing the existence of claims so numerous that joinder is impracticable. We accept, arguendo, plaintiff's suggestion that there is a bright line demarcation for numerosity of 200 (Plaintiff's Brief, filed Jan. 2, 1998, or "P. Br.," pp. 17-18). But plaintiff cannot show that there are anything approaching that number remaining in the State. This is not surprising given (i) the limitations on the products in-

-6-

volved (for example, no thermal insulation), (ii) the entities excluded from the class defini-

tion[4] and (iii) the extensive litigation that occurred previously in this State. Any building in

South Carolina in which defendants' surface material could be identified has long since been

identified. Speights & Runyan, plaintiff's counsel, has had complete statewide discovery on

this issue since 1984 and whatever there is to be found has been found.

Recognizing that it is unable to demonstrate the requisite number of potential

class members to justify a class action, plaintiff presently is attempting an end-run around the

numerosity requirements. Plaintiff is attempting to shoe-horn additional products into the

category of "surfacing materials," the products that have been at issue since the action was

commenced eight years ago in 1992. However, plaintiff's latest gambit also is unavailing.

The additional products, attic insulation and masonry fill, are _not_ "surfacing materials." They

were excluded from the Complaint in plaintiff's counsel's representations to this Court in

1996 and have never been considered by those working in the field and by the applicable

regulatory definitions to be "surfacing material." The inescapable conclusion remains. Plain-

tiff cannot identify sufficient potential members of the class to satisfy the Rule 23 numerosity

requirement for a class action. For this reason alone, plaintiff's motion to certify a class

should be denied.

---

4    Excluded from the claim definition are (i) all public and private elementary and secondary
     schools in South Carolina, (ii) all public and private colleges in South Carolina, (iii) all com-
     mercial buildings in South Carolina leased in any part to the United States government on or
     after May 30, 1986, (iv) any building owned by the State of South Carolina, and (v) any

Footnote continued on next page.

-7-

## I.

### ANDERSON HAS NOT SHOWN THAT THE PURPORTED CLASS IS "SO NUMEROUS THAT JOINDER OF ALL MEMBERS IS IMPRACTICABLE"

The South Carolina Supreme Court has ruled that "[p]roponents of the class certification have the burden of proving these prerequisites of class certification have been met." Waller v. Seabrook Island Property Owners Ass'n, 300 S.C. 465, 467, 388 S.E.2d 799, 801 (1990), citing Windham v. American Brands, Inc., 565 F.2d 59 (4th Cir. 1977), cert. denied, 435 U.S. 968 (1978). Furthermore, in deciding whether to certify a class, this Court must apply a "rigorous analysis to assure the prerequisites of Rule 23(a) have been satisfied." Id. "The failure of the proponents to satisfy any one of the prerequisites is fatal to class certification." Id. at 467-68, 388 S.E.2d at 801, citing Tolbert v. Daniel Construction Co., 332 F. Supp. 772 (D.S.C. 1971).

This burden cannot be satisfied by unsupported assertions or speculation. Marcial v. Coronet Insurance Co., 880 F.2d 954, 957 (7th Cir. 1989) (Plaintiff "cannot rely on conclusory allegations that joinder is impractical or on speculation as to the size of the class in order to prove numerosity."); Fleming v. Travenol Laboratories Inc., 707 F.2d 829, 833 (5th Cir. 1983).

---

Footnote continued from previous page.

building in South Carolina owned by the federal government. Moreover, any entity which

Footnote continued on next page.

-8-

Plaintiff has utterly failed in its burden of showing the existence of a class so numerous that joinder is impracticable.

A.      There Are Few Potential Class Members in South Carolina

The class defined in the complaint is subject to very extensive exceptions which drastically reduce the number of possible class members.  The exceptions are:

- all public and private elementary and secondary schools in South Carolina (which were covered by the Asbestos School Litigation)

- all public and private colleges in South Carolina (which are covered by Central Wesleyan)

- all commercial buildings leased in any part to the United States government on or after May 30, 1986 in South Carolina (covered by the Prince George suit)

- any building owned by the State of South Carolina

- any building owned by the federal government in South Carolina, including the armed forces

_____

Footnote continued from previous page.

has resolved its claims against the defendants is not a member of the class.

-9-

The class would, of course, also exclude any entity which has resolved its claims against the defendants, either by settlement or by judgment.

In its initial Memorandum in support of its motion for class certification, Anderson claimed that:

> common sense establishes that the number of private residences, commercial buildings, and buildings owned by county and municipal governments that contain or used to contain the defendants' asbestos materials more than exceeds the bright line number of 200 members . . . .

P. Br., p. 17. Plaintiff's invocation of "common sense" in an effort to establish the numerosity necessary for class certification is squarely refuted by the historical facts of asbestos-in-buildings litigation in this State.

The extent of litigation involving South Carolina entities over a decade demonstrates that, by now, there are no more chickens left in the coop. Cases were filed in South Carolina as early as 1982 (Greenville County, Lexington County and Richland County School Districts), and the second and third asbestos-in-buildings cases to go to verdict in the United States were in South Carolina in 1985 (Spartanburg County School District and City of Greenville). A total of at least twenty-seven suits (other than this case) were filed in South Carolina, and at least two other South Carolina plaintiffs filed suit in other States. (Affidavits of Robert H. Beber and Raymond T. Cullen) Messrs. Speights & Runyon were in the forefront in representing South Carolina plaintiffs.

-10-

In 1984, Judge Hamilton Smith ordered defendants to produce to plaintiffs' lawyers (including Mr. Speights) copies of <u>all</u> their invoices showing sales in South Carolina (Orders of 4/10/84 and 5/26/86) (Affidavit of Don Cockrill, submitted in support of Defendants' opposition to class certification ("Cockrill Aff't") Ex. 6). Grace began producing documents to Mr. Speights in June of 1983, and since 1990 he and his personnel have been regular visitors to Grace's document depository in Cambridge, Massachusetts. (Affidavit of Robert Murphy attached to defendants' May 22, 1998 response brief as Tab 1.) Mr. Speights has copied the entire contents of that depository.[5] Mr. Speights has long had, for over a decade and a half, all the information that defendants have concerning sales of their products in South Carolina.

As of December 31, 1997, there were only 18 asbestos-in-building cases against Grace pending anywhere in the United States. Two of these cases were pending in South Carolina, the instant case and <u>Central Wesleyan</u> (in federal court). Twenty-two other asbestos-in-building cases that previously had been filed against Grace in South Carolina (in state and federal courts) had been resolved by that date. (<u>See</u> Beber Aff't, ¶¶ 4-5.)

Two years later, as of January 18, 2000, the 18 pending cases had been sliced in half. Only nine of those cases remained pending against Grace, and, in that two-year period, only one new asbestos-in-building case was filed against Grace anywhere in the United

---

5    <u>See</u> Speights' Reply Memorandum in Support of Motion for Sanctions and to Compel, dated May 3, 1994, p. 6, n.5 ("Plaintiff's counsel has copied the entire documents depository . . .").

-11-

States (in California). (See Supp. Beber Aff't.)[6] Since January 2000, the pending asbestos

property damage cases against Grace have been reduced to seven, and no new case has been

filed in any state or federal court. (See Finke Aff't.)

Nor are asbestos-in-building claims so small that they could not be litigated

except in a class action, if there were any such claims left and if those owners had any interest

in litigating. As the Supreme Court noted in Benjamin v. South Carolina National Bank, 269

S.C. 250, 252, 237 S.E.2d 72, 74 (1977), among the practical reasons for denying class certi-

fication is that where "'there is obviously going to be a substantial amount of money in most

cases,'"

> "'[i]t would be practical for any claimant to bring his own suit, and in fact, it
> may be preferable in the case of substantial interests like this since the claim-
> ants would be able to choose their own attorneys and their own time and forum
> in bringing their suits.'"

Anderson proposes a "bright line" test of 200 class members as constituting a

number large enough that "joinder is . . . impracticable" (P. Br., pp. 16-17), citing Stemmer-

man v. Lilienthal, 54 S.C. 440, 32 S.E. 535 (1899). We agree, and many federal cases are in

---

6   Grace's settlement of the Central Wesleyan case, noted in the Supplemental Beber Affidavit,
    received final approval by the court in March 2000. Similarly, this is the only asbestos-in-
    building case that T&N has left, and U.S. Minerals has dropped from eighteen to eleven
    cases. See Affidavits of James P. Verhalen and Charles Boulbol.

-12-

accord. See, e.g., Aiello v. City of Wilmington, 426 F. Supp. 1272, 1282-83 (D. Del. 1976)

(250 potential class members not too numerous for joinder); Barcelo v. Brown, 78 F.R.D. 531,

535 (D. P.R. 1978) (class action certification unnecessary where there were approximately

150 potential class members); United Steelworkers, Local 8024 v. Jarl Extrusions, Inc., 405

F. Supp. 302, 303 (E.D. Tenn. 1974), aff'd, 527 F.2d 648 (6th Cir. 1975) (joinder of 85 po-

tential class members practicable); Van Allen v. Circle K Corp., 58 F.R.D. 562, 564 (C.D.

Cal. 1972) (149 potential class members would not create an unmanageable piece of litiga-

tion); Minersville Coal Co. v. Anthracite Export Ass'n, 55 F.R.D. 426, 428 (M.D. Pa. 1971)

(330 potential class members are not so numerous as to make joinder impracticable); Utah v.

American Pipe and Construction Co., 49 F.R.D. 17, 21 (C.D. Cal. 1969) (joinder of 350 class

members practicable). See also Maltagliati v. Wilson, No. CV 970575612, 1999 WL 971116

(Conn. Super. Ct. Oct. 7, 1999) (118 property owners not sufficiently numerous to justify

class certification).

Joinder is also clearly more feasible when the class members are all in one

State, as will have to be the case here, rather than spread about the country. Independent

School District v. Bolain Equipment, Inc., 90 F.R.D. 245 (W.D. Okla. 1980); Christiania

Mortgage Corp. v. Delaware Mortgage Bankers Ass'n, 136 F.R.D. 372, 377-78 (D. Del.

1991). "Joinder is generally considered more practicable when all members of the class are

from the same geographic area." Hum v. Dericks, 162 F.R.D. 628, 634 (D. Haw. 1995).

-13-

Based on the historical evidence described above, any potential class could not come anywhere near this bright line test of 200. Indeed, as discussed below, plaintiff has been able to identify only 14 potential class members.

B.      Anderson Has Identified Only Fourteen
        Possible Claimants Who May Proceed
        Individually, If They Wish

For the first time in its April, 1998 Reply Brief, Anderson belatedly attempted to meet its burden, under Rule 23, of making a factual showing that its purported class is too numerous for joinder. This effort is demonstrably flawed. The "evidence" which Anderson offered to identify members of the class is riddled with errors and gaps which renders it worthless. Anderson's various claims were dealt with, on a document-by-document basis, in Defendants' Analysis of Exhibits Regarding Numerosity which was attached to Defendants' Reply Memorandum and to the Memorandum of Certain Defendants, filed on May 3, 2000, and which is attached hereto as Exhibit B, for the convenience of the Court. As is shown in Exhibit B, most of plaintiff's supposed class members cannot meet the basic requirements of a building in South Carolina in which one of the asbestos-containing surfacing materials manufactured by a defendant has been installed, a building that is not a member of the Central Wesleyan, Schools Asbestos or the Prince George class, and a building that is not owned by the State of South Carolina or the Federal Government. Entities which have litigated to settlement or verdict against defendants obviously cannot be counted.

-14-

As Exhibit B demonstrates, only 14 apparent potential class members remain.[7]
Despite having ample opportunity to do so (Exhibit B was filed initially on May 3, 2000 and a
substantially identical analysis was filed on May 22, 1998), plaintiff has not seriously chal-
lenged or disputed the accuracy of this analysis.[8]  Even if the Court were to give Anderson the
benefit of the doubt on some of the supposed class members excluded by Exhibit B, it could
not conceivably approach the numbers which are required to meet the "bright line" test in
South Carolina.

Plaintiff's latest attempt to inflate the potential members of the class is simi-
larly unavailing.  In his affidavit, Mr. Fairey refers to "billing registers" of Grace in an effort
to show shipments by Grace into South Carolina.  Yet, the billing records and shipments to
building contractors and wholesalers do not identify any building owners where the products
were installed.  As the Fairey affidavit recognizes:  "Grace shipped asbestos-containing prod-
ucts directly to contractors who may have used the shipment on numerous jobs, or who may
have used multiple shipments on one job" (¶ 7).  Plaintiff here recognizes the obvious fact that

---

[7]    These are:  St. Francis Hospital, Charleston; John Knox Church, Greenville; SC National
Bank, Columbia; General Electric Plant, Greenville; Lamb, Young, Jones Office Building,
Charleston; Roper Hospital, Charleston; Richland County Hospital, Columbia; Mary Black
Hospital, Spartanburg; Landmark job, Myrtle Beach; State Farm Bureau, Cayce; Aldersgate
Methodist Church, Sumpter; Community Center for the Congregation of Beth Israel,
Greenville; Clinic for Drs. Price & Hart, Florence; and the Colonial Court Motel, Greenville.

[8]    North Bros. was not counted as a potential class member, not because it is on Columbia Col-
lege Drive and is therefore an excluded college as claimed in the Fairey Affidavit (¶ 18), but
because it is a wholesaler and not a building where a product at issue was installed.  The only
entity excluded because it was a college is the Lutheran Seminary in Columbia.  (Ex. B at
p. 2)

-15-

records of <u>shipments</u> to wholesalers or middlemen do not provide identification of any building which could be in the class.

Plaintiff also points to shipments of products manufactured by National Gypsum Company, which is not now and never has been a defendant in this action, as part of its proof of shipments into South Carolina (Fairey Aff't, ¶¶ 11-12). This inclusion is despite the fact that Anderson previously told this Court that products manufactured by non-defendants were not at issue in this case. During the oral argument on December 3, 1996 on plaintiff's motion to amend its complaint,[9] the following colloquy took place:

| | |
|---|---|
| Mr. Cockrill (Grace Counsel) | In the actual proposed Second Amended Complaint there is a phrase in describing the materials in the class action which defendants are otherwise liable and [the defendants are] not sure what that means, and maybe the simplest and most expedient way to resolve that issue is for Mr. Speights to tell us what it means. <u>Is he trying to bring in products of non-defendants</u> for example, such as Keane Corporation, the bankrupt defendant? |
| Mr. Speights | I'll be glad to delete that language whatever the existing allegations be. |

(Ex. C, p. 101, emphasis supplied)  The complaint alleges a conspiracy only among defendants and Mr. Speights conceded that is all he is claiming. (<u>See</u> Second Amended Complaint, Count X.)

---

[9]    A copy of the transcript of the December 3, 1996 oral argument is attached hereto as Exhibit C.

-16-

Anderson also refers to asserted gaps in defendants' records. It is, however, Anderson's burden to affirmatively show numerosity. This burden is especially appropriate because the members of at least three other class actions are excluded from this class by its very definition, because all State or federal buildings are excluded and because over the last two decades numerous South Carolina entities have already conducted extensive independent litigation. Indeed, there have been at least 31 independent lawsuits filed against one or more defendants in South Carolina.[10] Obviously the state of defendants' records has not prevented suits by others in South Carolina. Claimants interested in litigating against these defendants have long since filed suit and those disputes have been resolved.

Plaintiff relies on <u>Littlefield</u> v. <u>South Carolina Forestry Commission</u>, Op. No. 25036 (S.C. Sup. Ct., Dec. 20, 1999) (Pl. Mem. at 2-3 and Ex. 1), where the Supreme Court reversed the denial of certification in a class action. That case involved a class of all "termi-nated, deceased, and retiring State employees" of "all agencies" of the State. There was no issue of lack of numerosity raised there and the Court can take judicial notice that such a class would comprise far more than 200, or even 2,000 members — as compared to the less than 20 members who are at issue here.[11]

---

[10]  <u>See</u> affidavit of Robert H. Beber (listing 24 suits); affidavit of Ray T. Cullen (list includes 5 suits not listed by Mr. Beber) and Sur-Reply affidavit of James P. Verhalen (list includes two more suits not in other affidavits).

[11]  In various Memoranda, plaintiff relies on several cases for the proposition that even "one family" has been found sufficient in this State for certification of a class. (Pl. Mem. at 9) In South Carolina, however, families can be very large indeed For example, in <u>Caine</u> v. <u>Griffin</u>,

Footnote continued on next page.

-17-

C.    Attic Insulation and Masonry Fill
      Are Not Surfacing Materials

        From its inception, this lawsuit has been about "surfacing materials" — asbes-

tos-containing materials which are sprayed or troweled onto walls and ceilings for acoustical

or fireproofing purposes.  Recognizing that it cannot establish numerosity based on such

products as set forth in its Complaint, Anderson seeks to torture the definition of "surfacing

materials."  Anderson now claims that surfacing materials include attic insulation and  ma-

sonry fill.  Simply put, attic insulation and masonry fill are not surfacing materials.  They

were not included in the products at issue as represented by plaintiff's counsel to the Court

during the December 3, 1996 oral argument on plaintiff's motion to file a second amended

complaint.  Nor are they considered to be surfacing materials by those in the field (see the ac-

companying Affidavit of Morton Corn, Ph.D., attached as Exhibit D) or by the applicable

regulatory definitions of surfacing materials.

---

Footnote continued from previous page.

    232 S.C. 562, 103 S.E.2d 37 (1958) (Pl. Mem. at 1), the "one family" certified as a class con-
    sisted of all present relatives of the testator.  Thirty-seven of the known living nieces and
    nephews of the testator, all his first cousins and some great nieces, great nephews and cousins
    once removed were joined as defendants, individually and as representatives of a class of the
    "nearest relatives" of a deceased individual whose will was the subject of the lawsuit.  The
    court in Caine noted that a class was appropriate and necessary because "the joining of all the
    present relatives of the testator is impracticable since the testimony shows that they are very
    numerous."  (103 S.E.2d at 47)

-18-

1.    Plaintiff's Representations to the Court as to
      the Products at Issue Did Not Include Attic
      Insulation or Masonry Fill

The initial Complaint filed in December 1992 defined (in paragraph 3) a class of claimants that own buildings that contain "asbestos material manufactured, sold and/or distributed by the above-named defendants." "Asbestos material" is defined (in paragraph 2) as "friable spray or trowel applied asbestos-containing building materials." Thus, by the express terms of the initial Complaint, the products at issue were restricted to spray or trowel applied asbestos-containing building materials which, by definition, does not include attic or masonry fill. Attic insulation and masonry fill are not spray applied or trowel applied. They are "poured" from bags. See Affidavit of Morton Corn, Ph.D., Exs. 2 and 3.

Within a few weeks, plaintiff filed an Amended Complaint in January 1993 which further narrowed the scope of the products at issue to fireproofing and acoustical plaster. In 1996, plaintiff moved to file a Second Amended Complaint after Judge William Howard had narrowed the geographical scope of the lawsuit to South Carolina buildings based upon the South Carolina door closing statute. Oral argument on plaintiff's motion was heard by this Court on December 3, 1996, and the representations made to the Court by Anderson's counsel are instructive and revealing.

At that hearing, plaintiff's counsel, Mr. Speights, noted that in the initial December 1992 Complaint plaintiff was pursuing "spray applied asbestos-containing [materials]." (Ex. C, p. 98) Mr. Speights further explained that, because at the time (December 1992) he was pursuing a worldwide class, he immediately filed an Amended Complaint lim-

-19-

iting the lawsuit to two spray/trowel applied products:  acoustical plaster and fireproofing

materials.  (Ex. C, p. 95, 96, 98)  Once Judge Howard limited the lawsuit to South Carolina

buildings, Mr. Speights no longer had, he said, the same manageability concerns and, thus,

sought in the Second Amended Complaint to encompass products other than acoustical plaster

and fireproofing materials.

     During the December 3, 1996 oral argument on plaintiff's motion to file a Sec-

ond Amended Complaint, the sole example that plaintiff cited to the Court of a spray applied

asbestos-containing material other than acoustical plaster or fireproofing material that would

be added to the lawsuit was "texture products, acoustical plasters applied to ceilings, typically

spray." (Ex. C, p. 98) (emphasis added).  These products were only used in large buildings

such as office buildings, schools and hospitals.  There was no mention whatsoever of any as-

bestos-containing product that was not spray or trowel applied.  Similarly, the only example

cited to the Court of an asbestos product in a residence that would be included in the proposed

Second Amended Complaint was a church parsonage where the same spray-applied material

might be applied to the ceilings in both the church and the parsonage.  (Ex. C, p. 97)  Again,

no mention of attic insulation or masonry fill or similar types of products.

     Perhaps most compelling were the repeated assurances of Anderson's counsel

to the Court (and to the Defendants) that in filing a Second Amended Complaint Anderson

was merely trying to return to the definition of products used in the original December 1992

Complaint — i.e., trowel or spray applied asbestos-containing materials.  Thus, Mr. Speights

stated that "I want to go back to the first complaint" (Ex. C, p. 95), "essentially I want to go

-20-

back to the same thing that was in the first complaint" (Ex. C, p. 98), "I want to take this

amended complaint . . . move back to the first complaint that was filed in December" (id.) and

"the bottom line, Your Honor, is we would be happy with the definition in the original com-

plaint" (Ex. C, p. 100).

Anderson did not deviate from this position.  When T&N's counsel (Tim

Bouch) expressed concern that Anderson might try to expand the lawsuit to "every conceiv-

able asbestos product that could be found in a structure" (Ex. C, p. 105), Mr. Speights replied

that "I don't want every piece of asbestos in the building" (Ex. C, p. 106), and once again reit-

erated that the products covered in the Second Amended Complaint were simply those en-

compassed by the initial December 1992 Complaint:  "In the old complaint, the first com-

plaint it's a little more generic than that; I'll be happy to keep that definition, and I don't think

either definition covers as broadly as Mr. Bouch has complained about."  (Ex. C, p. 107) (em-

phasis supplied).

Now, having belatedly realized the lack of numerosity in its proposed class,

plaintiff repudiates the representations made to this Court on December 3, 1996 and now

seeks to include residential attic insulation and masonry fill in the "surfacing materials" at is-

-21-

sue in this lawsuit. (Affidavit of Marion Fairey, August 31, 2000, ¶ 3)[12] This attempt to

manufacture numerosity fails for three simple reasons.

First, neither attic insulation nor masonry fill is spray or trowel applied, but are

rather poured into cavities. As shown in the accompanying affidavit of Dr. Morton Corn (Ex-

hibit D), attic insulation and masonry fill have never been considered to be "surfacing materi-

als." It is particularly inappropriate to attempt to include masonry fill as a "surfacing mate-

rial" since it is poured into the cores or cavities of concrete blocks and is enclosed in such

blocks. (See Corn Aff't Ex. 3.) It is not on any "surface," is not spray or trowel applied and

is not friable.

Second, accepting plaintiff's position on this issue would lead to the ludicrous

result of mixing apples and oranges — i.e., a class composed of owners of large buildings

joined with homeowners who have nothing in common with one another. The products

(spray/trowel applied surfacing materials and attic insulation and masonry fill) are vastly dif-

ferent in composition, application, as well as the degree of government regulation. Grace's

vermiculite attic fill is primarily used in residences, not large buildings such as schools or of-

fice buildings. Anderson Hospital, which does not claim to have attic insulation (or masonry

fill) in its buildings, would be representing a class of homeowners with whom it has abso-

---

[12] The Fairey affidavit was submitted to the Court and served on the Defendants at the class
certification hearing on September 5, 2000.

-22-

lutely nothing in common.  As a result, plaintiff would be unable to satisfy the typicality re-

quirement for a class action (see Point II, below).

Third, there are already four nationwide class actions pending against W.R.

Grace regarding residential attic insulation.  Mr. Fairey (¶ 10) refers to two of these actions:

Price v. W.R. Grace & Co., Civil Action No. CV-00-71-M-DWM (M.D. Mont. Apr. 14,

2000) (nationwide class for those properties containing Grace vermiculite attic insulation) and

Lindholm v. W.R. Grace & Co., Civil Action No. 00-CV-1-10323 (D. Mass. Feb. 24, 2000)

(nationwide class for attic insulation).  The Lindholm case actually is a consolidation of two

nationwide attic insulation class actions filed in federal court in Massachusetts and there is a

fourth such class action, Hunter v. W.R. Grace & Co., Civil Action No. 00-569-GPM (S.D.

Ill. July 19, 2000).  These actions were filed in the Spring and Summer of 2000.  The belated

inclusion of Grace attic insulation in this lawsuit would be duplicative and a waste of the time

and resources of the Court and parties.

Courts have recognized that there is no point in certifying a class action where

another similar or identical class action is already pending in another jurisdiction.  Thus, a

Louisiana district court refused to certify a national class action of property owners whose

structures incorporated hardboard siding because of the differences among products manu-

factured at the defendant's three plants.  In re Masonite Hardboard Siding Products Liability

Litigation, 170 F.R.D. 417, 424-25 (E.D. La. 1997).  In so holding, the court recognized that

certification was not proper because another national class action was already pending:

-23-

> Today plaintiffs' counsel seeks to create one more national litigation class ac-
> tion in the name of the same set of plaintiffs.  One wonders how judicial econ-
> omy (or any other policy) is thereby served.

Id. at 426.  See also Inda v. United Airlines, Inc., 83 F.R.D. 1, 6 (N.D. Cal. 1979) (the court

refused to certify the class until the parties addressed the issue of pending litigation in Illinois

that was entirely inclusive of the putative class before the court); Garcia-Mir v. Civiletti,

No. 81-4007, 1981 U.S. Dist. LEXIS 18607 at *21 (D. Kan. May 12, 1981) (the court de-

clined to certify a class action because of the pendency of a virtually identical class action in

another federal court); Mitchell v. Texas Gulf Sulfur Co., 446 F.2d 90, 107 (10th Cir. 1971)

(holding that trial court properly denied certification when two similar class actions in another

district had been allowed to proceed); Becker v. Schenley Industries, Inc., 557 F.2d 346 (2d

Cir. 1977) (holding that the district court properly denied class action certification in order to

avoid duplicative class actions, to avoid undue burdens on the parties and on judicial re-

sources and to eliminate the possibility of inconsistent results.  See also Moore's Federal

Practice 3d, § 23.49[3] ("if any similar class actions are already pending, it is more difficult to

justify the certification of yet another such action"); Charles A. Wright & Arthur R. Miller,

Federal Practice & Procedure, § 1780.

> 2.   Surfacing Materials Are Not Understood by
>      Those in the Field to Include Attic Insulation
>      and Masonry Fill

Morton Corn, Ph.D., a Professor Emeritus of Environmental Health Engineer-

ing at Johns Hopkins University, who has served as a governmental official and provided con-

sultation services to many private and governmental organizations, has submitted an affidavit

-24-

in which he states that, based on his many years of teaching, governmental and consulting work, "the term 'surfacing materials' does not include attic insulation and masonry fill products" (Affidavit of Morton Corn, Ph.D., ¶ 10). Dr. Corn further stated:

> "Throughout my teaching, government and consulting work, I have always understood, used and referred to the term 'surfacing materials' to mean materials such as fireproofing, acoustical plaster and ceiling textures that are sprayed on, troweled-on or otherwise applied to the structural members of a building. I have never used or understood the term 'surfacing materials' to include products such as attic insulation or masonry fill which are poured into attics or into concrete blocks. Attic insulation and masonry fill are commonly referred to and described as 'loose fill' products to distinguish them from products that are affixed to or applied to the structural members of a building such as fireproofing and acoustical plastic." Id. at ¶ 11.

> 3.    The Applicable Regulatory Definitions of
>        Surfacing Materials Confirm Dr. Corn's
>        Understanding

Dr. Corn stated that his understanding and use of the term "surfacing materials" is confirmed by a review of applicable regulatory definitions of this term. (See Corn Affidavit, ¶¶ 12-16.) The definition of "surfacing material" used in the Occupational Health and Safety Administration ("OSHA") regulations, 29 C.F.R. § 1910.1001(b), states:

> Surfacing material means material that is sprayed, troweled-on or otherwise applied to surfaces (such as acoustical plaster on ceilings and fireproofing materials on structural members, or other materials on surfaces for acoustical, fireproofing and other purposes).

Corn Aff't, Ex. 5.

While Mr. Fairey in his affidavit attempts to rely on this definition to justify his contention that the term "surfacing materials" includes attic insulation and masonry fill,

-25-

the text of this definition compels the opposite conclusion. The specific language relied on by

Mr. Fairey, "other materials on surfaces for acoustical, fireproofing and other purposes" (¶ 3)

is part of a parenthetical clause in the definition that begins with the words "such as," and

provides examples of "material that is sprayed, troweled-on or otherwise applied to surfaces."

It is not meant to refer to a separate or additional type of surfacing material. Vermiculite

products such as attic insulation and masonry fill are not products that are "sprayed, troweled-

on or otherwise applied to surfaces." Grace's attic insulation product is poured into portions

of the attic of a private home and its masonry fill product is poured into concrete blocks.

　　　　　Further support for the conclusion that attic insulation and masonry fill are not

"surfacing materials" can be gained from an examination of the definition of "surfacing mate-

rials" found in the federal regulations pertaining to asbestos-containing materials in schools.

The definition of the term "surfacing materials" in 40 C.F.R. § 763.83 contains essentially the

same language found in the OSHA definition:

> "Surfacing material" means material in a school building that is sprayed-on,
> troweled-on, or otherwise applied on surfaces, such as acoustical plaster on
> ceilings and fireproofing materials on structural members, or other materials on
> surfaces for acoustical, fireproofing or other purposes.

(Corn Aff't, Ex. 5) In a December 1990 United States document prepared by the Office of

Air Quality Planning and Standards of the U.S. Environmental Protection Agency ("EPA")

and entitled "Asbestos/NESHAP Adequately Wet Guidance," the definition of "surfacing

material" used in 40 C.F.R. § 763 is referred to and is said "to mean any wall or ceiling mate-

rial that is sprayed-on or troweled-on, such as acoustical plaster or fireproofing." (Corn Aff't,

-26-

Ex. 6)  This also confirms that the asbestos-containing products intended to be included

within the term "surfacing materials" do not include products that are not sprayed on or trow-

eled on the structural members of a building.

Similarly, in the Third Draft, dated March 1992, of the EPA's Office of Ad-

ministration's "Policy and Standard Operating Practice Manual for the Management of As-

bestos-containing Building Material at EPA Facilities," examples of "surfacing material" are

provided.  (Corn Aff't, Ex. 7)  They are "ACM [asbestos-containing materials] sprayed or

troweled onto surfaces, such as decorative plaster on ceilings or acoustical ACM on the un-

derside of concrete slabs or decking, or fireproofing materials on structural members."  This

document also contains two categories of asbestos-containing materials other than "surfacing

materials":  "thermal system insulation" and "miscellaneous ACM."  Thermal insulation is

defined as "ACM applied to pipes, boilers, tanks, and ducts to prevent heat loss or gain, or

condensation" and miscellaneous ACM is "asbestos-containing ceiling or floor tiles, textiles,

and other components such as asbestos cement panels, asbestos siding and roofing materials."

In other words, the "miscellaneous ACM" category includes all ACM products other than sur-

facing materials and thermal insulation.

D.    The Evident Lack of Interest by Putative
      Class Members Justifies Denial of Class
      Certification

One of the primary purposes of Rule 23 is to prevent the clogging of a court's

docket with numerous individual cases when those individual lawsuits can be handled more

expeditiously and efficiently as a class action.  But where, as here, there is no large group of

-27-

potential litigants interested in or likely to bring individual actions, the basis for the use of the class action device evaporates. As shown above (at pp. 8-12), there simply are not enough South Carolina buildings with asbestos-containing surfacing materials to satisfy Rule 23's numerosity requirement.

But it is important to bear in mind that numbers alone do not establish numerosity. That is, even assuming *arguendo* that the Plaintiff could identify a sufficiently large number of South Carolina buildings, it must go one step further and demonstrate that those South Carolina building owners would likely file individual lawsuits in the event certification is denied. To the extent that people in South Carolina were interested in filing claims, they have done so long ago and those claims have long since been resolved. At the present time, the lack of individual actions demonstrates a lack of possible claimants and/or a lack of interest on the part of such claimants. Courts have repeatedly declined to certify class actions where there is little or no interest on behalf of the individual putative class members in pursuing claims against the entities made defendants in a case.

Thus, in Berley v. Dreyfus & Co., 43 F.R.D. 397 (S.D.N.Y. 1967), the district court cautioned against certifying a class action lawsuit made up of class members who are not interested in litigating their claims. Finding that only the present plaintiffs purporting to represent the class elected to pursue their claims against Dreyfus in court, the court refused to certify a class action pursuant to Fed. R. Civ. P. 23(b)(3) which requires, inter alia, that the class action device be superior to other available methods for adjudication of the controversy.

-28-

The Court recognized that "if a class of interested litigants is not already in existence, the court should not go out of its way to create one without good reason." Id. at 397-98.

Given the lack of interest demonstrated here by possible individual litigants as manifested by the fact that no lawsuits have been filed in over seven years, class certification should be denied. In re Three-Mile Island Litigation, 95 F.R.D. 164 (M.D. Penn. 1982), involved a putative class of tourist-related businesses outside a 25-mile radius of the infamous Three-Mile Island nuclear reactor following its catastrophic meltdown. In passing upon class certification, the Court looked at the actual docket activity in the geographic area and concluded that the class was not so numerous as to justify utilization of the class action mechanism. The court reviewed the actual cases filed and found that although the courts had been inundated with lawsuits arising out of the nuclear accident, no lawsuits had been filed on behalf of tourist-related businesses outside a 25-mile area until the class action before the court was instituted some two years after the accident. Given the massive amount of publicity surrounding this incident, the court declined to certify the class, stating that a class should have manifested itself in the form of a large number of plaintiffs heading to the courthouse to file lawsuits. Id. at 167. In reality, there were no such suits and, therefore, the putative class representatives were able to do nothing more than establish a class of potential plaintiffs:

> In sum, though the Lancaster County plaintiffs have established that there exists in the designated area several hundred businesses deriving part of their income from tourism, they failed to establish anything more than that these are possible plaintiffs. Under these circumstances, the court believes its docket is a more reliable indication of the number of tourist-related businesses interested in pursuing claims for economic harm.

-29-

Id. at 167.

Bogus v. American Speech and Hearing Ass'n, 582 F.2d 277, 290 (3d Cir. 1978), affirmed the denial of class certification because, inter alia, of the lack of existing individual lawsuits . . . which would give some indication of a large class of interested litigants. In so holding, the court "note[d] that the existence [or lack thereof] of other litigation . . . weigh[ed] against class certification to the extent that such actions betoken an interest in individual litigation." Also, in Castano v. American Tobacco Co., 84 F.3d 734 (5th Cir. 1996), the Fifth Circuit reversed the district court's certification of a class by noting that the lower court failed to consider "the very real possibility that the judicial crisis [presented by numerous individual lawsuits filed on behalf of cigarette smokers] may fail to materialize." Id. at 747. The Fifth Circuit refused to create a class action where no interest apparently existed in pursuing claims in the first place.

Similarly, a Colorado district court failed to find numerosity in the face of limited interest on the part of putative class members in regard to personal injury and property damage allegedly caused by the cleanup activity of a private company and the United States Army at a toxic waste disposal pond located in a government arsenal. Daigle v. Shell Oil Company, 133 F.R.D. 600, 603 (D. Colo. 1990). And, in Lloyd's Leasing Ltd., 697 F. Supp. 289 (S.D. Tex. 1988), the district court declined to certify a putative class action brought on behalf of shrimpers who allegedly suffered economic injury as the result of an oil spill off the coast of Galveston, Texas where no shrimpers other than the six purported class representatives had filed claims despite a tremendous amount of publicity surrounding the spill:

-30-

> No credible attempt has been made by [the six class representatives] to demon-
> strate that the six claimants are representatives of a vastly larger "hidden" class
> of shrimpers who have failed to file actions as claimants. The publicity sur-
> rounding the Alvenus oil spill and the necessary prerequisites, including re-
> peated notices in local papers, to the petition for limitation of liability would
> seem to have brought forth those shrimpers who (a) [sic] interest in pursuing
> their claims.

Id. at 292.  In Amajac Ltd. v. North Lake Mall, 59 F.R.D. 169 (N.D. Ga. 1973), the court de-

clined to certify a putative class of shopping mall tenants because of a total lack of interest.

While 90 stores had leases containing allegedly restrictive provisions, no tenant other than the

putative class representative expressed any interest in pursuing class claims and the court de-

clined to "go out of its way to create a class where a class of interested litigants is not already

in existence." Id. at 174.[13]

The putative class representative can take no issue with the simple fact that as-

bestos litigation has been pervasive for the last twenty years.  Any party wishing to pursue a

claim against the asbestos manufacturers has had ample opportunity to do so and, as the dock-

ets have indicated over the years, there was a wave of asbestos litigation involving asbestos-

containing surfacing materials, but it has long since passed.  Moreover, it remains undisputed

---

[13]   See also Ansari v. New York University, 179 F.R.D. 112, 115 (S.D.N.Y. 1998) (refusing to
certify a class of 35 dental school students on numerosity grounds, finding a total lack of in-
terest); Davis v. Roadway Express, Inc., 621 F.2d 775, 776 (5th Cir. 1980) (finding that puta-
tive class action against employer alleging racial and sexual discrimination lacked required
numerosity where only one of 23 prospective class members indicated the desire to be part of
the class); Remington Arms Co., Inc. v. Luna, 996 S.W.2d 641, 644 (Tex. Ct. App. 1998)
(declining to certify a putative class action consisting of purchasers of defective rifles, finding
a lack of interest beyond the four named plaintiffs).

-31-

that plaintiff is unable to identify a single building owner who is refraining from bringing an individual action in reliance upon the pendency of this class action.

Nor would it be proper or necessary to notify members of the putative class if class certification is denied. Rule 23 only provides for notice to the class of the grant of class certification. Far from being the norm, notice of the denial of class certification is rarely given to the putative class. See, e.g., Laventhall v. General Dynamics Corp., 91 F.R.D. 208 (E.D. Mo. 1981); Robinson v. First National City Bank, 482 F. Supp. 92 (S.D.N.Y. 1979); Bantolina v. Aloha Motors, Inc., 75 F.R.D. 26 (D. Haw. 1977); Booth v. Prince George's County, 66 F.R.D. 466 (D. Md. 1975); Seligson v. Plum Tree, Inc., 61 F.R.D. 343 (E.D. Pa. 1973); Beaver Associates v. Cannon, 59 F.R.D. 508 (S.D.N.Y. 1973); Polakoff v. Delaware Steeplechase and Race Association, 264 F. Supp. 915 (D. Del. 1966); Berger v. Purolator Products, Inc., 41 F.R.D. 542 (S.D.N.Y. 1966); Newberg, Class Action § 11.65; Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure, § 1797.

The Fifth Circuit has recognized that notice of the denial of class certification is not proper without a showing that the absent class members relied on the class representative to protect their interests or would otherwise be prejudiced if notice were not given. Bernard v. Gulf Oil Corp., 890 F.2d 735, 746 (5th Cir. 1989); Roper v. Consurve, Inc., 578 F.2d 1106, 1110 (5th Cir. 1978). Other courts have agreed that notice is not mandatory and is left to the sound discretion of the Court, to be exercised only in those instances where the absent class members would be prejudiced by a lack of notice. Gunn v. World Omni Financial Corp., 184 F.R.D. 417, 419 (M.D. Ala. 1999); Austin v. Pennsylvania Department of Correc-

-32-

tions, 876 F. Supp. 1437, 1455 (E.D. Pa. 1995); Sheinberg v. Fluor Corp., 91 F.R.D. 74, 75

(S.D.N.Y. 1981); Smith v. Jostens American Yearbook Co., 78 F.R.D. 154, 175 (D. Kan.

1978); Bantalina v. Aloha Motors, Inc., 75 F.R.D. 26, 31 (D. Haw. 1977); Polakoff v. Dela-

ware Steeplechase and Race Association, 264 F. Supp. 915, 917 (D. Del. 1966).

        As the foregoing authorities make clear, this Court is not bound to, and should

not, notify absent putative class members in the event that this Court determines that the case

at bar is not maintainable as a class action.  There can be no showing that the absentee mem-

bers are relying on Anderson to pursue their claims or would otherwise be prejudiced by the

lack of notice.  As noted, Anderson cannot point to a single building owner staying his or her

hand because of this class action.  There is no evidence whatsoever of the existence of a large

group of building owners interested in pursuing individual lawsuits.  Anderson cannot estab-

lish a sufficient number of ready, willing and interested litigants to make joinder impractica-

ble.

E.      Plaintiff's Other Contentions Pertaining to
         Numerosity Are Without Merit

        Anderson claims that the class includes single family residences in South

Carolina (they were added in 1997 when the Second Amended Complaint was filed).  (Pl.

Mem. at 7)  That may be so, but it does not help establish numerosity.  Plaintiff has not identi-

fied a single residence in South Carolina which could be in the class.  Fireproofing is used to

protect structural steel beams in high-rise buildings and acoustical plaster was rarely, if ever,

installed in single family homes.  See Affidavits of Robert H. Beber, James P. Verhalen and

-33-

H. F. Baines.  In seeking to add residences into the class, Mr. Speights said he was doing so to pick up the occasional parsonage that may have had an product installed at the same time as the church, and conceded that generally single family residences were not a "huge market for asbestos products." (Ex. 2, p. 97)  Interestingly enough, even in this hypothetical, there would still be only one class member, the owner of the church complex.  Clearly, inclusion of single family residences will do nothing to establish numerosity.

Plaintiff claims that the composition of the class "fluctuates" each time a building is sold.  (Pl. Mem. at 7)  Buildings do not, however, move, divide or multiply.  The fact that, on occasion, their owners may change would not render joinder of their owners impracticable.  Anderson cites one case involving residents of a subdivision where the Court of Appeals of South Carolina found that defining the class as residents of a particular residential subdivision was proper, even though the class had a "fluid, changing membership," McGann v. Mungo, 287 S.C. 561, 570, 340 S.E.2d 154, 159 (Ct. App. 1986).  The case turned on the adequacy of the class definition, not whether the class was sufficiently numerous that joinder was impracticable.  Here, Anderson has not shown that the entities within its class definition are sufficiently numerous.  Moreover, unlike private residences (which are not, practically speaking, involved in this case), there would be virtually no turnover in the ownership of city or county buildings, and the turnover of commercial buildings is infrequent.

Anderson also asserts that the supposed existence of a "conspiracy" among defendants is sufficient to demonstrate numerosity.  (Pl. Mem. at 7)  Such a theory would not increase the number of potential class members.  Since the class includes anyone who bought

-34-

from defendants, adding a claim of conspiracy among the defendants does not increase the number of class members. It would only expand the number of defendants who may be liable to a particular class member.[14]

Anderson has, in short, the burden of showing that the proposed class is so numerous that joinder would be impracticable. Its attempt to do so is demonstrably insufficient, despite its counsel's access to all of defendants' records on sales in South Carolina. Given the fact that only buildings built before July 1, 1973 could be in the class, the extensive exceptions to the class definition (e.g., all schools, colleges and State or federal buildings), and the two decades of such litigation in South Carolina, it is not surprising that Anderson has failed to demonstrate that the number of potential class members is anywhere close to its "bright line" test of 200.

II.

ANDERSON HAS NOT SHOWN THAT
"THE CLAIMS OR DEFENSES OF THE
REPRESENTATIVE PARTIES ARE TYPICAL
OF THE CLAIMS OR DEFENSES OF THE CLASS"

Plaintiff posits that the legal standard for "typicality" in South Carolina renders "typicality" indistinguishable from the "commonality" requirement of Rule 23. (See Pl. Mem. at 5.) It would be convenient to assume that there is no distinct "typicality" requirement under Rule 23, but such an assumption cannot be squared with the plain language of the

---

14    In any event, the "conspiracy" claim is a red herring.



FILED
10:30 AM
NOV 21 2000
MW
CLERK OF COURT
HAMPTON COUNTY

-34-

from defendants, adding a claim of conspiracy among the defendants does not increase the number of class members.  It would only expand the number of defendants who may be liable to a particular class member.[14]

Anderson has, in short, the burden of showing that the proposed class is so numerous that joinder would be impracticable.  Its attempt to do so is demonstrably insufficient, despite its counsel's access to all of defendants' records on sales in South Carolina. Given the fact that only buildings built before July 1, 1973 could be in the class, the extensive exceptions to the class definition (e.g., all schools, colleges and State or federal buildings), and the two decades of such litigation in South Carolina, it is not surprising that Anderson has failed to demonstrate that the number of potential class members is anywhere close to its "bright line" test of 200.

## II.

### ANDERSON HAS NOT SHOWN THAT "THE CLAIMS OR DEFENSES OF THE REPRESENTATIVE PARTIES ARE TYPICAL OF THE CLAIMS OR DEFENSES OF THE CLASS"

Plaintiff posits that the legal standard for "typicality" in South Carolina renders "typicality" indistinguishable from the "commonality" requirement of Rule 23.  (See Pl. Mem. at 5.)  It would be convenient to assume that there is no distinct "typicality" requirement under Rule 23, but such an assumption cannot be squared with the plain language of the

---

14    In any event, the "conspiracy" claim is a red herring.  No plaintiff has ever successfully gone

-34A-

**FILED**
10:30am
NOV 21 2000
mon
CLERK OF COURT
HAMPTON COUNTY

Footnote Continued

to trial on such claims against any of these defendants. A number of courts have held that there is insufficient evidence to permit such claims to go to a jury, see, e.g., Methodist Health Systems Inc. v. W. R. Grace & Co., No. 85-2553 GA (W.D. Tenn. 4/17/89) (Cockrill Aff't, Ex. 7); City of Detroit v. Celotex, No. 84-429634 N.P. (Mich. Cir. Ct. Wayne Co., 10/20/89) (Cockrill Aff't, Ex. 8); see also Maryland v. United States Gypsum Co., Civ. Act. No. 1108600 (Md. Cir. Ct. Anne Arundel Co. Nov. 7, 1990) (plaintiff withdrew conspiracy claims after U.S. Gypsum moved in limine to exclude "conspiracy" documents) (Cockrill Aff't, Ex. 9). Indeed, Mr. Speights has dismissed such claims rather than let them go to a jury, see, e.g., Blue Cross and Blue Shield of South Carolina v. W. R. Grace & Co., C/A No. 6:89-1287-17 (D.S.C. May 23, 1991) (Cockrill Aff't, Ex. 10).

-35-

Rule. If the Rule is to have meaning, "typicality" must have some meaning apart from a reiteration of "commonality."

Plaintiff fails to come to grips with the essence of the typicality requirement. "[C]ommonality" tests the sufficiency of the class itself by focusing on the class claims, while "typicality" tests the sufficiency of the named plaintiff by focusing on the relation between the named plaintiff and the class as a whole. Hassine v. Jeffes, 846 F.2d 169, 176 n.4 (3d Cir. 1988). The central question posed by the typicality criterion of Rule 23 is whether, in proving or attempting to prove its own case, the representative plaintiff would significantly advance other potential plaintiffs' claims by demonstrating facts that such other plaintiffs would also be required to demonstrate. "'A necessary consequence of the typicality requirement is that . . . in pursuing his own claims, the named plaintiff will also advance the interests of class members.'" Sprague v. General Motors Corp., 133 F.3d 388, 399 (6th Cir. 1998) (quoting In re American Medical Systems, Inc., 75 F.3d 1069, 1082 (6th Cir. 1996)). "The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." 133 F.3d at 399.

By this standard, Anderson cannot establish that it presents claims that are typical of claims class members would assert. Even as to the oft-invoked "conspiracy" claim, Anderson's interest is necessarily limited to alleged conspiracies involving the manufacturer or manufacturers of any asbestos-containing building materials actually found in its buildings, and, practically speaking, only if that manufacturer cannot satisfy an adverse judgment. It has no legal interest in any concerted action not alleged to involve such manufacturer, although

-36-

other potential plaintiffs might have such an interest.  As to the non-conspiracy claims against

companies that did <u>not</u> manufacture the products present in its buildings, plaintiff has no legal

interest whatsoever in whether such other manufacturers did or did not test or warn, when

such other manufacturers might have learned anything relevant about asbestos generally or

asbestos in buildings in particular, or whether such other manufacturers' products are defec-

tive.  In short, as to products not present in its buildings, Anderson simply cannot be said to

present any "typical" claim; indeed, it cannot be said to present any non-conspiracy claim

against such manufacturers.

      Of course, the inclusion of attic insulation to the products at issue in the instant

complaint would further destroy any vestiges of typicality.  Attic insulation is not located in

plaintiff's building.  Plaintiff cannot be said to present a "typical" claim insofar as attic insu-

lation is concerned.  In other words, if plaintiff is successful in including attic insulation in the

"surfacing materials" which plaintiff seeks to do to establish numerosity, it will, as a result, be

unable to establish the required element of "typicality."

      This Court has encountered similar problems in the past, in the context of al-

leged injuries that had much more in common than the alleged injuries of class members here.

In <u>Mulcahey</u> v. <u>Columbia Organic Chemicals Co.</u>, Richland Co., Court of Common Pleas,

No. 91-CP-40-3491, the putative class representative sought joinder of all persons who lived

or worked within 1.5 miles of a chemical facility in Columbia.  <u>See</u> Order dated March 31,

1995 (Cockrill Aff't, Ex. 30), at 2.  The claims asserted included alleged property damage and

-37-

were framed in terms of, <u>inter alia</u>, negligence and nuisance. <u>Id</u>. at 1.  In analyzing the request

for class certification, the Court noted the following:

> In the proposed class, each Plaintiff will have been injured, if at all, in different
> ways and to different degrees.  Each plaintiff must prove his own claim.  These
> proof issues permeate Plaintiff's other claims as well as prevent any claim for
> being "typical."  (<u>Id</u>. at 8)

This determination, coupled with others (notably the Court's conclusions concerning com-

monality)[15] prompted the denial of class certification.

　　　　In <u>Mulcahey</u>, the alleged injuries at least had a single source.  In this case, the

class would be pursuing claims based on different purchases of different products by different

people from different manufacturers at different points in time, which products are now lo-

cated in vastly different kinds of buildings in varying conditions and subject to different

maintenance regimes.  The degree of risk, if any, posed by asbestos-containing materials in a

particular building, and the appropriate response thereto — key questions in asbestos-in-

buildings litigation — vary with the product involved, the location and condition of each

product, and the uses of the areas of the building where they are installed.  Deciding those

questions as to Anderson Memorial Hospital will not decide them as to any other purported

class member — and certainly not as to any private homeowner class member.  Other signifi-

---

15　　As to commonality, the Court noted that "[i]t is clear . . . that each individual or party who
alleges damage will present unique issues with regard to proximate cause:  the property dam-
age cases will involve individualized questions concerning the type of damage, the amount of
damage, . . . and the general condition of the property subsequent to any alleged damage." <u>Id</u>.
at 5.

-38-

cant issues will also vary among class members — such as the date of installation, which importantly impacts issues such as the state of the art defense. Issues such as the statute of limitations will depend on when the particular claimant's building was allegedly "contaminated" and when the class member became aware of it. Another important issue as to which Anderson cannot claim to be "typical" of the purported class is identification of the manufacturer(s) of the particular product(s) in Anderson's buildings. On all these issues, it cannot be said that Anderson's proof, or lack thereof, will dispose of the claims of everyone else in the class. The difficulties present in Mulcahey are substantially exacerbated here, and would be exacerbated even if private residences are excluded from the class.

In a recent class action brought by a doctor against HMO organizations, a federal court noted that the questions in the case "involve highly specific and individual factors that vary by defendant, advertisement, geographical location, sophistication of the target audience, familiarity of the audience with the HMOs, and the particular physician's particular medical specialty. . . . Because of the existence of these individual questions, there is an absence in typicality between the proposed class members claims." Ford v. Nylcare Health Plans, Inc., 190 F.R.D. 422, 426 (S.D. Tex. 1999).[16]

This Court's decision in Mulcahey is completely in line with the current trend in class action jurisprudence. After more than a decade of unsuccessful experimentation with

---

[16]    See also Askins v. Albright & Wilson Americas, Inc., No. 93-CP-10-1178 (Court of Common Pleas, Charleston Co., S.C., May 17, 1994) (Cockrill Aff't, Ex. 31).

-39-

mass tort class actions, the federal courts have recently begun to question whether such cases could actually be tried efficiently — or tried at all. See, e.g., Castano v. American Tobacco Co., 84 F.3d 734 (5th Cir. 1996) (reversing certification of class of cigarette smokers); In re American Medical Systems, Inc., 75 F.3d 1069 (6th Cir. 1996) (reversing class certification in products liability case where different products were purchased by different plaintiffs); In re Rhone-Poulenc Rorer Inc., 51 F.3d 1293 (7th Cir.), cert. denied, 516 U.S. 867 (1995) (reversing class certification in products liability case); Valentino v. Carter-Wallace, Inc., 97 F.3d 1227 (9th Cir. 1996) (same). Although different decisions point to different reasons for rejecting class certification in products liability cases, the common message is clear: class certification in such cases serves no useful purpose. See also the discussion above (at pp. 3-4) of In re Schools Asbestos Class Action, Central Wesleyan and Prince George.

Plaintiff relies heavily on the decision of the Fourth Circuit granting class certification in another asbestos-in-building litigation, Central Wesleyan College v. W.R. Grace & Co., 6 F.3d 177 (4th Cir. 1993). (Pl. Mem. at 5) Yet, five years after it decided Central Wesleyan, the Fourth Circuit denied class certification in a lawsuit in which franchisees were suing a franchisor, after a trial on the merits and a jury verdict in favor of the plaintiff class. In Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331 (4th Cir. 1998), the Fourth Circuit said:

> "Meineke directed different representations to different franchisees; franchisees relied on these representations . . . to a different degree; each franchisee's entitlement to toll the statute of limitations is fact-dependent; and the profits lost by franchisees also differed according to their individual business circumstances. Plaintiffs do not 'advance the same factual and legal arguments' as the class they are supposed to represent. And frankly, in these circumstances,

-40-

we doubt that any set of claims is common to or typical of this class." Id. at
343 (emphasis added) (citation omitted).

See also In re Stucco Litigation, 175 F.R.D. 210, 213 (E.D.N.C. 1997) ("Rather than reading

Central Wesleyan as a ringing endorsement of class certification, this court reads the case as a

cautious affirmance of the trial court's decision under the abuse of discretion standard . . . .

Significantly, the Fourth Circuit repeatedly noted that the class certification 'may have to be

reconsidered' by the district court . . . .") (citation omitted).

    In the final analysis, the question is whether plaintiff's request for class certifi-

cation meets the requirements of the South Carolina Rules of Civil Procedure.  Just as plain-

tiff's request fails to meet the numerosity requirement of S.C.R.C.P. 23, it also fails to meet

the typicality requirement of the Rule.

## CONCLUSION

    The motion to certify a class in this case offers an unworkable "solution" to a

non-existent problem.  Asbestos-in-buildings litigation in this State has run its course.  Those

who have wanted to sue have done so, and their cases have been won, lost or settled.  There

has been no evidentiary showing by plaintiff that this purported class is so numerous that

joinder is impracticable and defendants' refutation of plaintiff's limited attempt at an eviden-

tiary showing remains unopposed.

    Also, there is a lack of typicality between the claims of the would-be class and

those of Anderson who bought certain products (but not others), at certain points of time (but

-41-

not at other times), based upon advice from particular architects and contractors and followed

its own plan of action in managing and/or removing the material in recent years.

For these reasons, class certification should be denied and the Court should

proceed at the close of discovery with the trial of the individual claim of Anderson.

Dated:  October 23, 2000                Respectfully submitted,

By:_____*DA Cockrill*_____

Donald A. Cockrill
Phillip A. Kilgore
OGLETREE, DEAKINS, NASH, SMOAK &
    STEWART
P.O. Box 2757
Greenville, SC  29602
(864) 271-1300

and

P. Kevin Castel
Allen S. Joslyn
CAHILL GORDON & REINDEL
80 Pine Street
New York, NY  10005
        ATTORNEYS FOR W.R. GRACE &
            CO. and W.R. GRACE & CO. - CONN.

By:_____*T. Bouch*_____ *w/permission DK*

Timothy Bouch
LEATH BOUCH AND CRAWFORD
134 Meeting Street, 4th Floor
P.O. Box 59
Charleston, SC  29401
(843) 937-8811

and

-42-

Paul J. Hanly, Jr.
COBLENCE & WARNER
415 Madison Ave.
New York, NY 10019
      ATTORNEYS FOR T&N plc

STATE OF SOUTH CAROLINA

COUNTY OF HAMPTON


| | | |
|---|---|---|
| Anderson Memorial Hospital, | ) | |
| | ) | |
| | ) | IN THE COURT OF COMMON PLEAS |
| Plaintiff, | ) | |
| | ) | |
| -against- | ) | Civ. Act. No. 92-CP-25-279 |
| | ) | |
| W. R. GRACE & Co., et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Certain Defendants' Consolidated Brief in Opposition to Class Certification has been served upon the following individual on the date below by placing a copy of same in the United States Mail, First Class, with proper postage affixed thereto:

Daniel A. Speights, Esquire
SPEIGHTS & RUNYAN
Post Office Box 685
Hampton, South Carolina 29924

Timothy W. Bouch, Esquire
Leath Bouch & Crawford, LLP
134 Meeting Street
P.O. Box 59
Charleston, SC   29402

Steven W. Ouzts, Esquire
Timothy D. St. Clair, Esquire
TURNER, PADGET, GRAHAM, & LANEY, P.A.
Post Office Box 1473
Columbia, South Carolina 29202

Raymond T. Cullen, Esquire
MORGAN, LEWIS & BOCKIUS
1701 Market Street
Philadelphia, Pennsylvania  19103

Bruce E. Miller, Esquire
Moore & Van Allen, PLLC
40 Calhoun Street, Suite 300
P.O. Box 22828
Charleston, SC   29413-2828

Calum B. Anderson, Esquire
Paul F. Slater, Esquire
DANAHAR, TEDFORD, LAGNESE & NEAL, P.C.
Capitol Place
21 Oak Street, Suite 700
Hartford, Connecticut  06106

Allen S. Joslyn, Esquire
Kevin Castel, Esquire
CAHILL, GORDON & REINDEL
80 Pine Street
New York, New York   10005

Paul J. Hanly, Jr., Esquire
Coblence & Warner
415 Madison Avenue, 17th Floor
New York, New York   10017

Dated this 23rd day of October, 2000.