## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | |
| | ) | Chapter 11 |
| **W. R. GRACE & CO., et al.** | ) | |
| | ) | Case No. 01-01139 |
| **Reorganized Debtors.** | ) | (Jointly Administered) |
| | ) | **Re: Docket Nos. 32648, 32669** |
| | ) | **Hearing Date:  TBD** |

## REORGANIZED DEBTORS' MOTION TO ENFORCE DISCHARGE AND INJUNCTION OF PLUM CREEK TIMBER CO.'S UNTIMELY CLAIM

Plum Creek Timber Co. ("Plum Creek") has owned thousands of acres of valuable timberland and logging operations in or near Libby, Montana since the 1980s and 1990s.  Plum Creek's land is located near a former W. R. Grace & Co. ("Grace") mine, from which asbestos dispersed near the former mine site and spawned one of the most highly publicized environmental controversies in U.S. history.  Plum Creek was acutely aware of both the potential and actual economic impact of Grace-related asbestos on its Libby-area timberland, well before the March 31, 2003 Bar Date ("Bar Date") for Grace Asbestos Property Damage Claims ("Asbestos PD Claims").  As shown below, by 2002 or early 2003 Plum Creek knew its timber was located within a Superfund site designated by the United States Environmental Protection Agency ("EPA") due to asbestos from the Grace mine.  Moreover, Plum Creek had undertaken a costly "Grace Risk Assessment" program, had been advised by EPA that it would be "prudent" to assume that Grace-related asbestos was physically incorporated into Plum Creek's tree bark, and reported in the local newspaper that a portion of its timber was already "losing its value."

Not only did Plum Creek have all this contemporaneous knowledge about its property damage claim against Grace:  Plum Creek also received *actual notice* of the Asbestos PD Bar Date from Grace, nine months before the Bar Date.  Although Plum Creek was only entitled to publication notice (because it was not a known creditor identifiable from Grace's books and

records), Grace chose to provide actual notice of the Bar Date to every resident and business at every postal address contained within six zip codes in and around Libby. This actual notice included mailing the Bar Date Notice package in June 2002 to Current Occupant, 126 Pipe Creek Road, Libby, MT 59923, which Plum Creek admits was its business address in Libby in 2002.

Despite receiving the Bar Date Notice — which apprised Plum Creek that its claims, including any contingent, unliquidated and unmatured claims, would be forever barred, precluded, discharged and enjoined unless a proof of claim was filed by the March 2003 Bar Date — Plum Creek did not file any claim by that date. Instead, it waited more than seven years, until June 2010, before filing its claim (the "Late Claim") and asserting, without justification, "excusable neglect."[1]

Grace's confirmed and consummated Plan of Reorganization (the "Plan") (Dkt. No. 26368) provides for a general discharge, a specific discharge of asbestos property damage liabilities of the Debtors and for a related discharge injunction, all as provided by the Bankruptcy Code as an essential element of the reorganization process. Plum Creek's Late Claim, which it now seeks to re-assert as a claim to the Asbestos PD Trust, is an attempt to circumvent these Plan provisions, the Bankruptcy Code, and the court-approved claims process by seeking to

---

[1]   As explained in further detail below, the parties entered into a tolling agreement applicable to the period *after* June 2010. In June 2010, Plum Creek submitted its claim to Grace's claims agent. On July 2, 2010, in Grace's Chapter 11 case, Plum Creek filed a *Motion to Allow Late Filing of Proofs of Claim* (Dkt. No. 25040) (the "July 2010 Motion"). In August 2010, Plum Creek withdrew the July 2010 Motion, without prejudice to refiling after the Effective Date. Plum Creek did not re-file the July 2010 Motion. Nonetheless, Grace responds herein to certain arguments set forth in that motion. Also, because the July 2010 Motion was withdrawn without prejudice, to provide comprehensive relief in the Proposed Order attached at Exhibit A, Grace requests that the July 2010 Motion be dismissed with prejudice. An August 3, 2010 order of this Court memorialized a tolling agreement that applied beginning on June 7, 2010. The Order further provided that "[t]he passage of time from and after June 7, 2010, until the Plum Creek Claims are resolved shall have no effect on and may not be used to the detriment of Plum Creek in pursuing the relief requested in the Motion, the Plum Creek Claims, or Plum Creek's rights to pursue the Plum Creek Claims, if any, pursuant to the Plan or the Bankruptcy Code and Rules, including without limitation with respect to the factors to be considered in determining excusable neglect." (Dkt. No. 25154 ¶ 3) Consistent with this provision, Grace makes no arguments concerning the approximately three and a half years from the August 2010 tolling agreement to the February 2014 Effective Date or the twenty months from the Effective Date to the submission of Plum Creek's claim to the Grace Asbestos Property Damage Trust (the "Asbestos PD Trust").

pursue a claim many years after the March 2003 claims Bar Date. Despite having timely received notice of the requirement to file proofs of claim by the Bar Date—even unliquidated, remote or contingent claims—Plum Creek elected to stick its head in the sand rather than file a claim. Now, apparently based on its mistaken view of the extent of knowledge required to assert a claim, Plum Creek seeks special treatment at the expense of the Reorganized Debtors and their stakeholders.

Based on the Bankruptcy Code, the Plan, the Bar Date Notice, and Plum Creek's actual knowledge, Plum Creek was required to file its claim by the Bar Date. In light of the extremely broad definitions of "claim" in the Bankruptcy Code and Bar Date Notice, Plum Creek cannot demonstrate that the tardiness of the Late Claim is the result of excusable neglect or of insufficient knowledge as to whether it actually had a claim.

Therefore, the above-captioned Debtors (collectively, the "Reorganized Debtors") file this motion to enforce the discharge and injunction provisions of their confirmed and consummated Plan with respect to the claim of Plum Creek. The Reorganized Debtors respectfully request that the Court enter an Order, substantially in the form of Exhibit A hereto, holding that Plum Creek's claim is discharged and enjoined, and that the July 2010 motion is dismissed with prejudice.

## FACTUAL BACKGROUND

### I.    LIBBY, MONTANA

From 1963 until 1990, Grace owned and operated a mine in Montana. The mine was located seven miles northeast of Libby, a small town situated in a narrow valley enclosed by tall mountains. Miners at the Libby mine extracted vermiculite, a natural, lightweight mineral which is fire-resistant and serves as a good insulator. Vermiculite itself is non-asbestos, but the ore at the Libby mine contained a number of impurities, including amphibole asbestos. Following

extraction, the vermiculite was processed using a procedure that generated a substantial amount of airborne dust.[2]

Since the early 2000s, Libby asbestos issues have been highly publicized, nationally and locally. Libby was the subject of a PBS documentary, reports by NBC Dateline, ABC 20/20, CBS 48 Hours, CNN and Time, among others. Grace's bankruptcy was heavily publicized in Libby, and multiple Libby-related lawsuits were filed in Montana and elsewhere relating to Grace's Libby operations and asbestos issues. Among these suits, in February 2000, a class-action lawsuit, *Tennison v. W. R. Grace & Co., et al.*, Case No. CV-00-035-M, was filed against certain of the Debtors in the United States District Court for the District of Montana on behalf of all owners of improved private real property situated within 12 miles of Libby — a class which, by definition, included Plum Creek. These claimants alleged that the class members suffered harm in the form of environmental contamination and loss of property rights resulting from the Debtors' former vermiculite mining and processing operations, and sought remediation and compensatory and punitive damages.

The EPA took a series of highly-publicized actions in Libby beginning in the late 1990s. Commencing in 1999, EPA sampled air and dust all around Libby and investigated asbestos levels. In March 2001, the EPA filed a lawsuit in Montana federal district court seeking recovery of costs incurred in response to Grace-related Libby asbestos issues. On February 26, 2002, EPA proposed to add a large area of land in Libby, including Plum Creek's property, to the National Priorities List, a list of national priority sites for known releases of hazardous substances, pollutants or contaminants, naming this site the "Libby Asbestos Site." 67 Fed. Reg.

---

[2]    These background facts concerning Grace's Libby operations are drawn from the District Court's opinion affirming confirmation of Grace's Plan, *In re W. R. Grace*, 475 B.R. 34 (D. Del. 2012); 5/25/11 Appellees' Main Brief to the District Court (Dist. Ct. Dkt. No. 86, Case No. 11-199); 2/27/09 Grace Disclosure Statement (Dkt. No. 20873); and 4/2/01 Grace Informational Brief (Dkt. No. 6).

8836 (Feb. 26, 2002).  On October 24, 2002, EPA published its Final Federal Register Notice

designating Libby as a Superfund site.  67 Fed. Reg. 65315 (Oct. 24, 2002); *see also* July 2010

Motion, ¶ 10 ("More than six (6) months before expiration of the Bar Date, the EPA listed the

Libby Asbestos Site on the National Priorities List.")  Indeed, Plum Creek admits that, within a

year of the designation, Plum Creek knew its land was within the boundaries of EPA's

designated Superfund site.  Exhibit B, Plum Creek's 2/22/16 Responses to Grace's Information

Requests ("Plum Creek 2/22/16 Responses"), ¶ 9; July 2010 Motion at ¶ 10.  By its own

admission, Plum Creek knew that it was one of only a few major property owners within the

Superfund site's Operable Unit No. 3, which is comprised of thousands of acres surrounding the

former mine. *Id.*

The EPA's activities and the widespread concerns of Libby residents were heavily

publicized in the media in Seattle, where Plum Creek is headquartered, in Libby (principally in

the *Western News*, a Libby newspaper that has the largest paid circulation newspaper in the

region), and in the national press. *See, e.g.*, "*Grace to Pick Up Medical Bills in Tainted Town*,"

Seattle Post-Intelligencer, Jan. 22, 2000; "*Possible Asbestos Contamination Shakes a Tiny

Town*," Los Angeles Times, Jan. 7, 2000; "*EPA Plans Asbestos Removal from Homes in Libby,

Mont.*," Wall Street Journal, May 13, 2002; all attached hereto at Exhibit C.  In May 2000, the

New York Times chronicled the closure of a family-owned nursery business in Libby due to

asbestos. "*Montana Town Grapples With Asbestos Ills*," New York Times, May 10, 2000,

attached hereto at Exhibit D.  Before the Bar Date, the owners of the nursery business filed an

Asbestos PD proof of claim for damages due to asbestos. Exhibit E, Claim No. 9658.  And in

January 2003, the Los Angeles Times described how a Libby lumber mill, Stimson Lumber, was

forced to shut down because its insurer raised the mill's premium by $600,000 due to asbestos in

its lumber. "*A Mountain of Trouble Pulls A Town Together: A mine's legacy of asbestosis leaves a community ailing but determined.*" Exhibit D, Los Angeles Times, Jan. 19, 2003. All of the above-described events and publications took place well before the March 2003 Bar Date.

## II.   THE BAR DATE FOR ASBESTOS PROPERTY DAMAGE CLAIMS

On April 2, 2001, each of the Debtors commenced these Chapter 11 cases (the "Chapter 11 Cases") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). Shortly thereafter, Grace filed a motion seeking an Asbestos PD Claims bar date. For the following ten months, Grace worked with various constituencies and the Bankruptcy Court to craft the Bar Date Notice, notice package, and a comprehensive publication system (collectively, the "Notice Program"), resulting in the April 12, 2002 Revised Bar Date Notice Plan, Proof of Claim Forms and Related Materials. Exhibit F, Dkt. No. 1926)  Throughout this process, a consistent element of the Notice Program was that Grace would provide actual notice to "all residents of the Libby, Montana area." *See, e.g.*, 2/12/02 Debtors' Revised Bar Date Motion at ¶7 (Dkt. No. 1665); Exhibit F, 4/12/02 Revised Bar Date Notice Plan at 11 (Dkt. No. 1926-1 at 11 of 28)

On April 22, 2002, the Court approved and entered the Bar Date Notice and Bar Date Order, establishing the Bar Date in the Chapter 11 Cases for all prepetition claims relating to asbestos property damage, non-asbestos claims, and medical monitoring claims. (Dkt. Nos. 1960 and 1963)  The definition of Asbestos PD Claims in the Revised Bar Date Notice (Exhibit F, Dkt. No. 1926-2) was extremely broad, encompassing not only claims for costs for removing asbestos-containing material but also direct and indirect claims for diminution in property value and economic loss. (Dkt. No. 1926-2, reprinted in Appendix A hereto)  The Notice made clear the severe consequences of failing to file a claim:  the claimant would be forever barred, estopped and enjoined from asserting a claim against Grace. (*Id.* at p. 7, ¶9, "Effect of Not

Filing a Claim")  The Notice also provided the Bankruptcy Code's full definition of "claim," in bold typeface, informing all putative claimants that even "contingent," "unliquidated" and "unmatured" claims must be filed or be forever forfeited.  (*Id.* at pp. 2-3, ¶1, reprinted in Appendix B hereto)  This language is extremely broad, and does not draw distinctions based upon the extent of knowledge of a claim or the extent of knowledge of the amount of damages.

The Notice informed recipients, including Plum Creek, that they must file a proof of claim if they have a claim, even if the claim is remote and contingent:

> **1. WHO MUST FILE A PROOF OF CLAIM.**
>
> You MUST file a Proof of Claim if you have a **CLAIM** against the Debtors including but not limited to any **pre-petition** Non-Asbestos Claim or any **present** Asbestos Property Damage Claim . . .
>
> \* \* \*
>
> **Therefore, any creditor having a claim against the Debtors, no matter how remote or contingent, must file a proof of claim before the Bar Date.**

(Capitalization and bold in original).  And the Notice made clear the consequences for not filing a claim by the Bar Date:

> **9. EFFECT OF NOT FILING A CLAIM**
>
> ANY HOLDER OF A . . . ASBESTOS PROPERTY DAMAGE CLAIM . . . WHO FAILS TO FILE A PROOF OF CLAIM ON OR BEFORE THE BAR DATE FOR ANY CLAIMS SUCH CLAIMANT HOLDS AGAINST ANY OF THE DEBTORS. . . **SHALL BE FOREVER BARRED, ESTOPPED AND ENJOINED** FROM ASSERTING ANY SUCH CLAIMS. . .

Exhibit F at 1926-2, p. 7, ¶9.  (Capitalization and bold in original).

The $4 million Notice Program was extremely comprehensive.  It included, among many features, actual notice to all known Asbestos PD claimants (Exhibit F, 4/12/02 Revised Notice Plan at 11 of 28) and actual notice to all addresses in Libby, Montana, even if the recipients were

not known to Debtors and did not appear in Debtors' books and records. (*Id.*) It also included

an extensive, multi-million dollar publication notice program, *see* Affidavit of Katherine

Kinsella (Dkt. No. 12206), the breadth and adequacy of which this Court and the Third Circuit

have recognized, approved and affirmed, as discussed below. In May and June 2002, the Bar

Date Notice was published in: (1) national newspaper supplements, which were carried in more

than 900 local newspapers; (2) consumer magazines; (3) national newspapers; (4) local

newspapers; (5) newspapers in the U.S. Commonwealths and Territories; (6) thirty-five trade

publications; and (7) Canadian newspapers. *Id.* ¶¶ 7-13. The media program was estimated to

reach 90.1% of U.S. executives, managers and administrators with an estimated frequency of 4.0

opportunities to see the Notice, and 83% of U.S. adults with an estimated frequency of 3.3

opportunities to see the Notice. *Id.* ¶ 16. Plum Creek has admitted that in 2002 and 2003, it

subscribed to at least seven of the periodicals in which Grace's Bar Date notice was published,

including USA Today, The Wall Street Journal, The Missoulian, Business Week, Forbes

Magazine, Fortune and Money. <u>Exhibit G</u>, 12/10/15 Letter from Plum Creek's counsel B.

Ellison.

The program of providing actual notice to known and potential claimants had two parts.

The first part—the typical process of providing the Bar Date Notice to all known claimants who

were reasonably ascertainable from a debtor's books and records, in accord with the standard set

forth in *Chemetron Corp. v. Jones*, 72 F.3d 341, 346 (3d Cir. 1995)—was mailed to more than

200,000 creditors and potential claimants on June 21, 2002. *See* Declaration of Service of Craig

Zink of R. R. Donnelley and attachments thereto. (Dkt. Nos. 2382-2393, the "<u>Donnelley</u>

<u>Declaration</u>" and the attachments thereto, listing creditors and potential claimants who received

actual notice by mail).

The second prong of the actual notice program was even broader. To saturate the Libby area with as much notice as was feasible to all businesses and individuals who potentially might have Asbestos PD claims or other claims subject to the Bar Date, Grace and its service agents served the Bar Date Notice package to "all current residents of the Libby, Montana area" (Exhibit F, 4/12/02 Revised Notice Plan at 11 of 28) by obtaining every mailing address within six zip codes in and around Libby, and mailing the Bar Date Notice package to the Current Occupant at every such address. The notice and mailing were effected by Grace's claims agent R. R. Donnelley, which mailed the Bar Date Notice to the mailing list of all current residents of the Libby, Montana, area on June 21, 2002, as attested in the June 27, 2002 sworn Declaration of Service of its employee, Craig Zink. (Dkt. No. 2382, Donnelley Declaration ¶¶ 2-3)

Critically for purposes of this motion, one of the recipients to whom Debtors' agent mailed the Bar Date Notice package on June 27, 2002 was: Current Occupant, 126 Pipe Creek Road, Libby, MT 59923. Exhibit H, 4/21/16 Affidavit of James O'Neill, ¶ 4 (attaching Donnelley Declaration, page 5756 from within Exhibit 7 of the Donnelley Declaration, and complete copy of Exhibit 7 to Donnelley Declaration). On February 22, 2016, Plum Creek admitted that in 2002 and 2003 — prior to and as of the Bar Date — its physical and mailing address was this exact address: 126 Pipe Creek Road, Libby, MT 59923. Exhibit B, Plum Creek 2/22/16 Responses at 1. The Current Occupant of 126 Pipe Creek Road was among the more than 10,000 residents of the Libby area who received direct notice by mail via R. R. Donnelley's mailing, as shown by the listing of such addresses on Exhibit 1 to the O'Neill Declaration.

While investigating the history of notice to Plum Creek after Plum Creek presented its Late Claim in October 2015, Grace discovered that a number of pages attached to the Donnelley Declaration, including page 5756 which documents the mailing to Plum Creek's Libby address,

were inadvertently omitted from the July 16, 2002, court filing of the Donnelley Declaration and

its exhibits made by Debtors' counsel, Pachulski Stang Ziehl & Jones.[3]  As Pachulski Stang

partner James O'Neill recently has confirmed, however, the complete original of the Donnelley

Declaration and Exhibit 7 thereto in fact reflect on page 5756 that Debtors effected service on

Plum Creek's Libby address — Current Occupant, 126 Pipe Creek Road, Libby, MT 59923 —

on or around June 21, 2002, nine months before the Bar Date.  Exhibit H, O'Neill Aff. ¶¶ 5-7.

The voluminous original of the Donnelley Declaration remains on file at the Pachulski

Stang firm, and counsel is happy to make it available for review or to re-file in complete form on

the Court docket if requested.  *Id.* ¶ 8.  But, the key fact established by the contemporaneous

Donnelley Declaration is both unaffected by the inadvertent July 2002 filing error and

undisputable:  Grace's agent mailed the Bar Date Notice package to Plum Creek's Libby address

nine months before the Bar Date, thus providing actual notice to Plum Creek.

The Bankruptcy Court and the United States District Court for the District of Delaware

(the "District Court") have repeatedly recognized that the notice program was extensive, *see In*

*re W. R. Grace*, 389 B.R. 373, 379 (Bankr. D. Del. 2008); *see also Mission Towers v. Grace*,

2007 WL 4333817, *1, *7 (D. Del. Dec. 6, 2007), and that the Notice Program was "designed to

cover the universe of plaintiffs who could be out there with property damage."  (Bankr. Ct.

4/22/02 Transcript at 97 (Dkt. No. 2057))  The Bankruptcy and District Courts and Third Circuit

have also repeatedly recognized that the Bar Date and the sufficiency of its notice program are

---

[3]    As shown in the affidavit of Pachulski Stang partner James O'Neill, the clerical error occurred after Pachulski
Stang received the June 27, 2002 Donnelley Declaration and full exhibits thereto (including Exhibit 7, with
page 5756 with Plum Creek's address) and filed them electronically via Pacer in July 2002 in Grace's Chapter
11 case.  Exhibit H hereto, 4/21/16 O'Neill Affidavit ¶ 5.  Due to the extremely large size of the filing—more
than 6,000 pages— and the multiplicity of the docket numbers at which the materials were filed, an error
occurred with respect to the uploading of certain pages to the Pacer system.  Specifically, (i) duplicate portions
of Exhibit 6 were uploaded; and (ii) Exhibit 7 — the list of all addresses in Libby, Montana — was not filed.
*Id.* ¶ 5.  After receiving Plum Creek's October 2015 renewed proof of claim and investigating Grace's Bar Date
notice to Plum Creek, Debtors' counsel discovered these errors.  *Id.*

law of the case. *Mission Towers*, 2007 WL 4333817 at *1; *In re W. R. Grace & Co.*, 398 B.R. 368, 374 (D. Del. 2008); *In re W. R. Grace & Co.*, 316 F. App'x 134, 137 (3d Cir. 2009).[4]

## III.   THE TREATMENT OF ASBESTOS PD CLAIMS UNDER GRACE'S PLAN

Among numerous categories of asbestos and non-asbestos claims addressed by the Plan, Asbestos PD Claims are defined to include claims that relate to "diminution of property value, environmental damage, economic loss and property damage" caused by asbestos in products manufactured by the Debtors or from vermiculite mined, milled, or processed by the Debtors. Plan § 1.1(19) (Dkt. No. 26368 at p. 8)  Approximately 4,000 Asbestos PD Claims were filed at the Bar Date.  The Plan provides that all Asbestos PD Claims are channeled to a trust created by the Plan and funded by Grace, the Asbestos PD Trust.

The Plan's Case Management Order for Class 7A Asbestos PD Claims (the "Class 7A CMO" or "CMO") provides a full procedure for any claimant who wishes to try to assert that a post-Effective Date Class 7A PD Claim can be maintained and was not discharged.  First, a claimant files with the PD Trust a detailed proof of claim that addresses 17 separate factors relating to discharge, including when asbestos was installed, when the claimant learned of asbestos in the property, and whether and when the claimant received actual notice of Grace's bankruptcy.  Exhibit I, CMO ¶ II.A.1.  Then, the claimant must provide information if requested

---

[4]   In the context of arguments asserted by another property damage claimant, Anderson Memorial Hospital ("AMH"), the District Court has summarized the long-settled nature of the Bar Date Notice: "In 2002, Grace attempted to organize all the property damage claims brought against it, and sought a centralized way to provide notice to all potential claimants.  The result was the Summary Bar Date Notice Program ("Bar Notice"), which was published in thousands of newspapers and periodicals, and was estimated to reach 83% of adults nationwide.  Over the years, AMH has repeatedly challenged the sufficiency of the Bar Notice, alleging that the notice procedures used did not reach a sufficient number of potential claimants and thereby violated due process.  AMH repeats that argument here.  The adequacy of the Bar Notice, however, has long been settled.  In 2007, the Bankruptcy Court found that it comports with due process.  *See In re W. R. Grace & Co.*, 366 B.R. 302, 304 (Bankr. D. Del. 2007).  This finding was affirmed by both this Court and the Third Circuit.  *See Mission Towers v. W. R. Grace*, No. Civ. A. 07-287, 2007 WL 4333817, at *1 (D. Del. Dec. 6, 2007); *aff'd* 316 Fed.Appx. 134, 136 (3d Cir. 2009)."  *In re W. R. Grace*, 475 B.R. 34, 118 n.76 (D. Del. 2012) (District Court amended opinion affirming Plan confirmation).

by Grace to evaluate the claim. *Id.* ¶ II.B.1. If Grace believes the claim was discharged, it must

file a motion with this Court "seeking to enjoin or otherwise terminate the prosecution of such

claim on the ground that the claim is barred by the discharge granted to Grace pursuant to

confirmation of the Plan and the March 2003 Bar Date." *Id.* ¶ II.B.3. If this Court finds that the

claim was not discharged, the claimant may prosecute the claim against the PD Trust in the

United States District Court for the District of Delaware or any other federal District Court with

jurisdiction, and the PD Trust shall pay any allowed claims. *Id.* at ¶ II.C.1, C.4.

The Bankruptcy Court confirmed Grace's First Amended Joint Plan of Reorganization on

January 31, 2011 (Dkt. No. 26155) (the "Confirmation Order"). The Plan, including its property

damage provisions, became effective on February 3, 2014. (Dkt. No. 31700)

## IV.   PLUM CREEK AND ITS KNOWLEDGE

Plum Creek is one of the largest private landowners in the United States, managing more

than 6 million acres in 19 states. Exhibit J, 10/7/15 Plum Creek Ltr. at 1. At all relevant times,

Plum Creek was headquartered in Seattle. *Id.* It was recently acquired by Weyerhaeuser; the

combined company owns 13 million acres of timberland. Exhibit K, 2/19/16 PR Newswire

release) Among other properties, Plum Creek owns 771,000 acres in Montana, including 2,639

acres in the Libby area, of which 1,611 acres are the subject of its proof of claim. Exhibit J at 2.

Plum Creek acquired this acreage on 1989 and 1993. *Id.*

Plum Creek was aware well before the Bar Date that asbestos in Libby was a serious

issue and could affect forested areas, as was everyone else in the Libby area, but particularly

because it owned substantial timberlands. Libby newspaper articles and letters to the editor from

this period discussed asbestos in logging areas. *See, e.g.*, Exhibit L, PTCT 431-36, 438. Some

of these articles were written by a local activist and were sent directly to Plum Creek in an urgent

attempt to convince it not to log in the affected area due to asbestos. *Id.* at PTCT 432.

By 2001 or at the latest 2002, Plum Creek not only had highly specific knowledge about the impact of Grace-related asbestos on timberlands, but also had incurred substantial investigation costs and discussed possible solutions with the EPA. And in 2001 or 2002, the EPA closed Rainy Creek Road, a Forest Service access road to Plum Creek's property, such that Plum Creek could no longer reach its timberland. Exhibit B, Plum Creek 2/22/16 Responses ¶7. Not surprisingly, in light of all of the publicity, the EPA's activities, and the closure of Rainy Creek Road, by 2002 Plum Creek had adopted a "precautionary approach" to its commercial activities in an area potentially affected by the Debtors' operations in Libby, Montana. *See id.* at p. 3 ("With the closure of Rainy Creek Road, Plum Creek had a generalized understanding of Libby Amphibole contamination in the area, but the Company did not know its geographical scope or the extent of hazard. Accordingly, the Company adopted a precautionary approach, and did not conduct commercial forestry activities on certain portions of its land in the area").

But Plum Creek did far more than just take a "precautionary approach" — it took expensive, extensive affirmative steps to assess and act on its knowledge that Grace-related asbestos posed what Plum Creek called a "Risk" to its valuable timberlands. For example, by November 2002, Plum Creek produced a series of documents titled "Grace Risk Assessment" that included mapping and planned sampling. Exhibit M, PTCT 402-430. Plum Creek later reported that it spent $100,000 on this survey. *Id.* at PTCT 410.

In the year preceding the Bar Date, Plum Creek's concerns were public knowledge. On October 18, 2002, the Western News in Libby published an article titled "Risks Worry Plum Creek and USFS." The article quotes Plum Creek forester Dave Friedman stating that "his company's beetle-killed timber in the Rainy Creek drainage is deteriorating rapidly and *losing its value*." (Emphasis added) Thus, by October 2002, Plum Creek was not only aware of a risk to

the value of its Libby timberland, it was already "losing . . . value," and the timber was

"deteriorating rapidly." The article also quotes Jim Christiansen of the EPA as stating at a

Lincoln County Commissioners meeting that "'[i]f you're looking for a clean bill of health, for

EPA to come in and say it's OK for people to be working here [in the Rainy Creek area near the

Debtors' former vermiculite mine] and chopping up trees and spending a lot of time...I can't

answer that in the short term.'" Exhibit L at PTCT 435.[5] Another article from approximately the

same period mentions that a substantial quantity of timber was still awaiting sale after two years

because the EPA had not provided a "clean bill of health." Id. at PTCT 438.

Plum Creek approached the EPA in late 2002 to determine if it was dangerous from a

human health perspective to log in the area, or if there were any recommended asbestos sampling

strategies. Exhibit N at PTCT 517. On February 18, 2003, the EPA's Jim Christiansen emailed

Plum Creek's forester in Libby, Jerry Wolcott, noting that Plum Creek had recently proposed

logging in areas near Grace's former mine that "may have been subject to aerial deposition of

contaminants from the mine and milling operations in the past." Id. EPA also advised Plum

Creek that it was prudent to assume that Grace-related asbestos could be incorporated into tree

bark on Plum Creek's land, stating: "[g]iven the established toxicity of Libby asbestos and the

lack of any sampling data for the areas in question, *it is prudent to assume*" a "worst case

scenario," in which "high levels of *[Libby Amphibole asbestos]* may have been deposited under

a very wide area (including the areas in question) and still remain today. Such contamination

---

[5]    Plum Creek produced an undated copy of this article. Grace has obtained the complete, dated copy, which is
       attached hereto as Exhibit O.

could be present . . . on surfaces of vegetation and trees, and even *incorporated into . . . timber (e.g. bark)*." *Id.* at PTCT 518. (Emphasis added)[6]

A few weeks before the Bar Date, a March 7, 2003 Western News article confirmed EPA's work with Plum Creek: "The Environmental Protection Agency is providing the U.S. Forest Service and Plum Creek Timber Co. with guidance on how to determine if it's safe to log timber stands near the former W.R. Grace vermiculite mine." Exhibit L at PTCT 431. This article also states that not only had a 1.5 million board-foot timber sale been postponed indefinitely, but that a beetle-killed trees harvest had been written off due to uncertainty about potential risk from asbestos. *Id.*

## V.    **PLUM CREEK'S LATE CLAIM**

In July 2010, in Grace's Chapter 11 case, Plum Creek filed a *Motion to Allow Late Filing of Proofs of Claim.* (Dkt. No. 25040) Grace and Plum Creek later agreed that Plum Creek would withdraw the motion without prejudice, and the matter would be tolled until after the effective date of the Plan. The tolling agreement did not excuse Plum Creek's failure to file a claim by the March 31, 2003, Bar Date or indeed at any time before 2010, but only provided for tolling beginning on June 7, 2010, when Plum Creek first submitted its proof of claim. Plum Creek was permitted to re-file its motion with this Court (which Plum Creek did not do) and to reassert the Late Claim upon the Debtors' emergence from chapter 11. The Court entered an order to this effect on August 3, 2010. (Dkt. No. 25154) On October 7, 2015, Plum Creek submitted its claim to the Asbestos PD Trust (Exhibit J), which in turn forwarded it to Grace.[7]

---

[6]    An April, 8, 2003 internal, follow-up Plum Creek email suggested that Plum Creek would try to convince the EPA to do such sampling and, alternatively, that Plum Creek would do the sampling. Exhibit P, PTCT 521. A May 29, 2003 email describes EPA and Plum Creek's agreement to do the sampling. Exhibit Q, PTCT 522.

[7]    The Asbestos PD Trust is the proper recipient for Grace Asbestos PD claims. However, the Class 7A CMO provides that in "[i]ts sole discretion, Grace shall be authorized to prosecute an Asbestos PD Claim Discharge Motion on behalf of the Asbestos PD Trust." Exhibit I, ¶ II.B.4.

In its claim, Plum Creek alleges it can no longer conduct commercial forestry on 1,611 acres that are either within one mile of the former Libby mine site (767 acres) or which can only be accessed by using roads that cross within one mile of the mine site (844 acres).  Exhibit J, 10/7/15 Ltr. at 2.  Plum Creek seeks approximately $1.9 million in damages, which it says is based on the value of the property and the merchantable timber on the property.  *Id.* at 6.  Plum Creek also asserts the right to file an additional Asbestos PD Claim in the future regarding other parcels of property near the former mine site.  *Id.* at 6 n. 22.

Plum Creek argues that its claim is not barred since it did not receive "individualized notice of the Grace bankruptcy or the bar date for filing claims" and that publication notice was insufficient because Plum Creek was entitled to actual notice.  *Id.* at 3.  Plum Creek further asserts that it "first learned that specific timber on its Property had been contaminated" from a December 2014 draft EPA Human Health Risk Assessment ("2014 EPA Report").  According to Plum Creek, the EPA concluded "that it will be impossible to safely conduct commercial forestry within" one mile of Grace's former mine.  *Id.* at 5, citing 2014 EPA report at pp. ES7-ES8.  Plum Creek admits that "[a]sbestos contamination at Libby was presumed to exist since before the Grace bankruptcy claims bar date," Exhibit J, 10/7/15 Ltr. at 3 n.8, but suggests that "there has always been uncertainty as to the scope of the contamination." *Id.*

Notably, the 2014 EPA Report does not actually contain the words or conclusion that "it will be impossible to safely conduct commercial forestry" within one mile of Grace's site.  As a Human Health Risk Assessment, the report describes the risks of exposures of forestry activities at various locations.  2014 EPA Report at ES-7-ES-8.  The report provided Plum Creek with incremental information but did not pinpoint with certainty the scope of the affected area.  Nor did it provide Plum Creek with its first awareness of a potentially costly asbestos problem on its

Libby-area timberland — as documented above, *that* information was well known to Plum Creek by 2002. Nonetheless, Plum Creek says that the 2014 EPA Report caused its "level of awareness" to change. Exhibit J, 10/7/15 Ltr. at 4.

## ARGUMENT

## I.  PLUM CREEK WAS ENTITLED ONLY TO PUBLICATION NOTICE

The constitutionally required notice that chapter 11 debtors must provide to potential claimants "is dependent upon whether the creditor is known or unknown. If a creditor is known, the debtor must provide actual notice of the bankruptcy proceedings, whereas if the creditor is unknown, notice by publication is sufficient." *In re In re Smidth & Co.,* 413 B.R. 161, 165 (Bankr. D. Del. 2009), citing *Chemetron,* 72 F.3d at 345-46. In the Third Circuit, a creditor must be reasonably ascertainable in order to be entitled to actual notice. *Chemetron,* 72 F.3d at 346 (internal citations omitted). A creditor is reasonably ascertainable if it can be "identified through 'reasonably diligent efforts.'" *Id.* Such diligent efforts do not require "impracticable and extended searches." *Id.*

The Supreme Court of the United States has stated that a "known" creditor is one whose identity is either "known or reasonably ascertainable" by the debtor. *Tulsa Prof'l Collection Servs., Inc. v. Pope,* 485 U.S. 478, 490 (1988). An "unknown" creditor is one whose "interests are either conjectural or future, or, although they could be discovered upon investigation, do not in due course of business come to knowledge [of the debtors]." *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 317 (1950).[8]

In considering the same Bar Date at issue here, the District Court rejected attempts by current and former owners of a former Grace vermiculite processing site in Salt Lake City to file

---

[8]  *See also In re Bicoastal Corp.,* 147 B.R. 807, 808-09 (Bankr. M.D. Fla. 1992) (owner of property downstream from debtor's contaminated property was an "unknown" creditor); *In re Texaco Inc.,* 182 B.R. 937, 954-55 (Bankr. S.D.N.Y. 1995) (owner of land adjacent to debtor was an "unknown" creditor).

late claims less than two years after the Bar Date. *See Pacificorp v. W. R. Grace*, 2006 WL

2375371 (D. Del. Aug. 16, 2006). The District Court found that, under *Chemetron*, the Debtors

had no obligation to look beyond their books and records to determine the existence of creditors

with whom they had no direct relationship, noting that "in the context of environmental liability,

a debtor is not required to search out all possible parties that may have been affected by its

actions." *Id.* at *10. This was true even though the *Pacificorp* claimants were current and

former owners of a property to which Grace had shipped vermiculite for processing. *Id.* at *5;

*see also Chemetron*, 72 F.3d at 346-47 (debtor who operated nuclear waste landfill had no

obligation to provide actual notice to nearby residents).

Such is the case here. Plum Creek was not on any list of known creditors of Grace.[9] The

Debtors did not conduct any business transactions or have any contractual dealings with Plum

Creek. It is also uncontested that the Debtors never owned, leased or operated or had any

connection to Plum Creek's property. Thus, Plum Creek's relationship to Grace is even more

attenuated than that of the *Pacificorp* claimants. Consequently, Plum Creek, as an unknown

creditor, stands in no better position than the claimants in *Pacificorp* and, therefore was entitled

to only the publication notice that the Debtors provided via their extensive notice program that

found favor in *Pacificorp*.[10] *Id.* at *14 (noting that the publication notice program was "more

than adequate.")

---

[9]  W. R. Grace & Co. and each of the sixty other Debtors filed Statements of Financial Affairs which included schedules of all creditors in multiple categories, none of which identified Plum Creek. *See* Dkt. Nos. 355-425, 427-467, 1451-1459.

[10]  In *Chemetron*, the Third Circuit also noted that it is not even clear that the "excusable neglect" standard (which, as discussed below, may permit the filing of a late proof of claim under certain narrow circumstances) is applicable in the case of a claimant entitled only to publication notice. *Chemetron*, 72 F.3d at 349 n.3. At least one other court has noted in the context of a potential asbestos personal injury claim that recognizing an excusable neglect defense on the part of such a claimant entitled only to publication notice would be "problematic." *In re Trump Taj Mahal Assoc's.*, 1993 WL 534494, at *6 n.7 (D.N.J. Dec. 13, 1993).

As Plum Creek has admitted, in 2002-2003 it subscribed to at least seven of the periodicals which published Grace's Bar Date notice, including USA Today, The Wall Street Journal, The Missoulian, Business Week, Forbes, Fortune and Money. Exhibit G, 12/10/15 Plum Creek Ltr. Therefore, Plum Creek received adequate and proper publication notice via the notice program.

## II.    PLUM CREEK WAS SERVED WITH ACTUAL NOTICE OF THE BAR DATE

Although they had no "duty to search out each conceivable or possible creditor," *see Chemetron*, 72 F.3d at 346, out of an abundance of caution, the Debtors provided wide notice of the Bar Date throughout Libby. Indeed, the Debtors mailed the Bar Date notice to every occupant of a property in Libby. *See, e.g.*, 2/12/02 Debtors' Revised Bar Date Motion at ¶7 (Dkt. No. 1665); Exhibit F, 4/12/02 Revised Bar Date Notice Plan at 11 (Dkt. No. 1926). This included mailing the Notice to the Current Occupant at Plum Creek's address in Libby. Donnelley Declaration at 2 (Dkt. No. 2382); Exhibit H, O'Neill Affidavit ¶7. Thus, although Grace had no obligation to provide Plum Creek with actual notice, it did so.

There is a "long recognized" presumption that an item properly addressed and mailed in a mailbox approved by the United States Postal Service is timely received at the intended address. *See In re Cendant Corp. Prides Litig.*, 311 F.3d 298, 304 (3d Cir. 2002). Therefore, when a debtor's notice agent certifies that the employee "supervised the mailing of the notices"— as was the case here — a creditor's "assertion denying receipt of the notice is insufficient to rebut the presumption that . . . properly mailed notice was delivered." *In re Worldcom, Inc.*, 2005 WL 3875192, at *4 (Bankr. S.D.N.Y. Oct. 27, 2005).[11]

---

[11] And in any event, Plum Creek has not denied that it received the June 2002 Bar Date Notice package mailing.

### III.   THE LATE CLAIM WAS DISCHARGED AND CANNOT BE ASSERTED

#### A.   Discharge Provisions of the Bankruptcy Code and Grace's Plan

Section 1141(d) of the Bankruptcy Code provides that confirmation of a chapter 11 plan of reorganization "discharges the debtor from any debt that arose before the date of such confirmation." 11 U.S.C. § 1141(d)(1)(A). Section 8.1.1 of the Plan implements the Bankruptcy Code's discharge, and section 8.1.3 of the Plan confirms that this discharge extends to asbestos property damage claims. Section VI.A of the Confirmation Order (Dkt. No. 26155) expressly approved these provisions.

In addition, section 524(a) of the Bankruptcy Code provides that the discharge provided by a chapter 11 plan of reorganization operates as a permanent injunction against the commencement or continuation of any action to collect, recover, or offset any debt that is discharged by such plan. 11 U.S.C. § 524(a)(2) ("A discharge in a case under this title operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor."). Section 8.1.1 of the Plan, which was expressly approved by section VI.A of the Confirmation Order, also effectuates the Bankruptcy Code's permanent injunction.

The debtor is discharged for all "claims" as defined in the Bankruptcy Code. The Code defines "claim" broadly to include any:

> right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured.

11 U.S.C. § 101(5)(A). This definition is "designed to ensure that 'all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case.'" *Cal. Dep't of Health Servs. v. Jensen (In re Jensen)*, 995 F.2d 925, 929-30 (9th Cir. 1993) (inner citation omitted). This broad definition:

performs a vital role in the reorganization process by requiring, in conjunction
with the bar date, that all those with a potential call on the debtor's assets,
provided the call in at least some circumstances could give rise to a suit for
payment, come before the reorganization court so that those demands can be
allowed or disallowed and their priority and dischargeability determined.

*Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 580 (S.D.N.Y. 2001) (citation

omitted). This broad definition also helps fulfill Congress' intent to provide debtors a fresh start

"by maximizing the scope of a discharge." *U.S. v. LTV Corp. (In re Chateaugay Corp.)*, 944

F.2d 997, 1002 (2d Cir. 1991).

**B.      Effect of Grace's Bar Date**

A claims bar date operates as a strict "drop-dead date" that prevents a creditor from

asserting prepetition claims when service of a bar date notice is proper. *See, e.g., In re New*

*Century TRS Holdings, Inc.*, 465 B.R. 38, 46 (Bankr. D. Del. 2012) ("For creditors who receive

the required notice, the bar date is a 'drop dead date' that prevents a creditor from asserting

prepetition claims unless he can demonstrate excusable neglect.") (internal citation omitted).

The purpose of establishing a strict deadline for filing proofs of claim is "to provide the debtor

and its creditors with finality," and "courts look upon the bar date as being [in] the nature of a

statute of limitations [which] must be strictly observed." *In re Norris Grain Co.*, 131 B.R. 747,

749 (M.D. Fla. 1990) (internal citations omitted). In fact, the bar date is "essential" to the

chapter 11 process because it lays the foundation upon which a debtor may begin to formulate a

reorganization plan. *See In re Trump Taj Mahal Assocs.*, 156 B.R. 928, 938 (Bankr. D.N.J.

1993), *aff'd*, 1993 WL 534494 (D. Del. Dec. 13, 1993) ("Without a final claims deadline,

participants in the reorganization process would be hindered by undue caution in their

negotiations and in voting on the plan."). The Third Circuit is no exception, where it is the

"well-established law. . . that bar dates for filing Proofs of Claim are strictly construed." *Id.*

at 936.

Well before March 2003, Plum Creek had more than enough knowledge to assert a claim. It knew that asbestos had been deposited on its property, and it had already taken precautionary steps and undertaken a "Grace Risk Assessment" program involving substantial out-of-pocket costs. It was working with EPA on sampling, and EPA had told Plum Creek to assume the worst case scenario: that Grace-related asbestos could not only be present on its land, but could already be incorporated into Plum Creek's tree bark. Five months before the Bar Date, Plum Creek forester Dave Friedman publicly acknowledged that the economic loss to Plum Creek was not just potential, but that the beetle-killed timber was already "losing its value." All of this came on the heels of Plum Creek's property falling within a designated Superfund site, and extensive national and local publicity about Libby asbestos issues and Grace.

Therefore, failure to file the Late Claim by the Bar Date, despite having received proper notice of such Bar Date, prevented Plum Creek from having a timely claim on which it could seek to collect under the terms of the Plan. The Bankruptcy Code, the Plan, and the Confirmation Order enjoin Plum Creek's attempt to assert such a claim unless, as described below, Plum Creek can meet the high burden of demonstrating excusable neglect.

**IV.    PLUM CREEK HAS NOT MET AND CANNOT MEET ITS BURDEN OF DEMONSTRATING THAT ITS FAILURE TO TIMELY FILE ITS LATE CLAIM WAS THE RESULT OF EXCUSABLE NEGLECT**

Federal Rule of Bankruptcy Procedure 3003(c)(3) provides that "[t]he court shall fix and for cause shown may extend the time within which proofs of claim or interest may be filed." Courts generally read Rule 3003(c)(3) in conjunction with Federal Rule of Bankruptcy Procedure 9006(b)(1), which provides "when an act is required or allowed to be done at or within a specified period by these rules . . . the court for cause shown may at any time in its discretion . . . on motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect." The party seeking enlargement of time bears

the burden of showing excusable neglect. *See, e.g., Jones v. Chemetron Corp.*, 212 F.3d 199, 205 (3d Cir. 2000); *see also Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 382-83 (1993) (excusable neglect required for late proofs of claim). The decision to permit or deny an untimely proof of claim lies within the sound discretion of the bankruptcy court. *See In re Vertientes, Ltd.*, 845 F.2d 57, 59 (3d Cir. 1988). Having been properly served with notice of the Bar Date at its Libby address but having failed to timely file a proof of claim, Plum Creek carries the burden of demonstrating that its failure was the result of excusable neglect.

As noted above, Plum Creek was entitled to merely publication notice — which it received, by virtue of its subscription to seven publications in which Grace published the Bar Date Notice — and therefore its failure to file a proof of claim cannot be defended under an "excusable neglect" standard. However, even if excusable neglect were a valid defense for claimants entitled only to publication notice, or even if Plum Creek were entitled to actual notice, Plum Creek is unable to satisfy its burden of proving excusable neglect, as evidenced by an evaluation of the four relevant factors: (a) the danger of prejudice to the debtor; (b) the length of the delay and its potential effect on judicial proceedings; (c) the reason for the delay, including whether it was within the reasonable control of Plum Creek; and (d) whether Plum Creek acted in good faith. *See Pioneer Inv. Servs.*, 507 U.S. at 395; Fed. R. Bankr. P. 3003(c)(3), 9006(b)(1). These four elements are discussed in turn below.

A.    **Prejudice to the Debtor**

Allowing the Late Claim would prejudice the Reorganized Debtors as well as their many stakeholders who timely filed proofs of claim and relied "on a fixed financial position of the debtor[s]" as of the Bar Date. *In re W. R. Grace & Co.*, 366 B.R. at 307 (internal citation omitted). To permit the filing of a late claim here on the basis of Plum Creek's professed ignorance of its claim would establish precedent that could open the floodgates to other claims.

*See In re Am. Classic Voyages Co.*, 405 F.3d 127, 133 (3d Cir. 2005) ("[A] strict bar date . . .

facilitate[s] the equitable and orderly intake of those claims.")  Grace's Plan and the funding of

the PD Trust were premised on claims such as Plum Creek's not being permitted after the

Effective Date.  Although the Reorganized Debtors received a discharge from all asbestos

property damage claims and such claims were transferred to the Asbestos PD Trust, the Plan

obligates Grace to "true up" to the Trust for allowed claims.  Plan § 7.3.2(e); Plan Exhibit 27,

Deferred Payment Agreement (Class 7A PD), § 2(a)(i) (Dkt. No. 31657-15).[12]  As a result, the

amounts sought by the Late Claim would be paid by Reorganized Debtors.  To pay out additional

funds on account of Plum Creek's alleged property damage is prejudicial for a company that has

charted its post-bankruptcy course based on an understanding that it would be free from pre-

petition asbestos claims, unless the claim holder can truly make a legitimate showing of

excusable neglect.  Moreover, opening the door to a claim as flimsy as Plum Creek's could

further prejudice Grace by inviting additional claims from other claim holders evincing the same

level of disregard for the Bar Date as Plum Creek did.  Indeed, if Plum Creek's Late Claim is

allowed to proceed, notwithstanding the numerous alerts it received that it had a possible claim,

it is difficult to imagine the discharge and injunction provisions ever being enforced against a

claimant who hereafter asserts an Asbestos PD Claim.  The framework Congress has put in place

to permit full and final resolution of asbestos liabilities would be entirely undermined if untimely

asbestos claims like the Late Claim are allowed.

### B.    Length of the Delay

Plum Creek's delay of more than seven years in seeking to file the Late Claim, from the

2003 Bar Date until 2010, far exceeds what courts consider acceptable.  *See, e.g., In re AMF*

---

[12]    The Plan required certain contributing parties other than Grace to provide the initial funding for the Asbestos
PD Trust, which covered Effective Date payments and the first six months of expenses.  Grace is required to
provide all subsequent funding for allowed PD Claims.  *Id.*

*Bowling Worldwide, Inc.*, 520 B.R. 185, 196-97 (Bankr. E.D. Va. 2014) (one year delay stood in "stark contrast" to cases in which the delay was acceptable); *In re G-I Holdings, Inc.*, 514 B.R. 720, 760-61 (Bankr. D.N.J. 2014) (three year delay did not militate in favor of a finding of excusable neglect); *In re DPH Holdings Corp.*, 434 B.R. 77, 84 (S.D.N.Y. 2010) (three year delay was "significant"); *In re Enron Creditors Recovery Corp.*, 370 B.R. 90, 103 (Bankr. S.D.N.Y. 2007) (fifteen month delay is "substantial"); *In re Cable & Wireless USA, Inc.*, 338 B.R. 609, 616 (Bankr. D. Del. 2006) (one year delay is "substantial" and weighs against a finding of excusable neglect); *In re Enron Corp.*, 298 B.R. 513, 526 (Bankr. S.D.N.Y. 2003) (six month delay is "substantial"). The length of the delay in this case does not support a finding of excusable neglect.

### C.    Reason for the Delay

"Fault in the delay [is] . . . perhaps the most important single factor [ ] in determining whether neglect is excusable." *Kanoff v. Better Life Renting Corp.*, 2008 WL 4755343, at *2 (D.N.J. 2008). In this case, Plum Creek's delay in filing the untimely Late Claim was "entirely avoidable and within [Plum Creek's] control." *In re Am. Classic Voyages*, 405 F.3d at 134 (citing *Pioneer Inv. Servs.*, 507 U.S. at 397). The most charitable explanation for Plum Creek's inaction is that it simply misapprehended (and continues to misapprehend) when a claim arises under the Bankruptcy Code and with respect to the Bar Date. Such misapprehension is no excuse. It is black letter law that "'[i]gnorance of one's own claim does not constitute excusable neglect.'" *Chemetron*, 212 F.3d at 205 (inner citation omitted).

The Bar Date notice stated in no uncertain terms that creditors with claims against the Reorganized Debtors, "no matter how remote or contingent," were required to file proofs of claim. Exhibit F, Bar Date Notice, ¶ 1. Plum Creek had the ability to preserve its claim simply by filing a timely proof of claim in March 2003, at minimal effort and cost. Even if Plum Creek

was unsure about the validity of its claim prior to the Bar Date, it was on notice that a failure to file a proof of claim would foreclose any ability to recover for claims in the future. However, Plum Creek "sat on its hands and did nothing." *In re Nat'l Steel Corp.*, 316 B.R. 510, 519 (Bankr. N.D. Ill. 2004) (denying motion to file late proof of claim sixteenth months late where, like here, the Reorganized Debtors' plan had gone effective). It is also of no consequence if Plum Creek was unsure at the time of the Bar Date about the full scope of any damages it might ultimately be entitled to. *See, e.g., In re Glob. Aviation Holdings Inc.*, 495 B.R. 60, 65-66 (Bankr. E.D.N.Y. 2013) ("If [the claimant] was unable to ascertain the amount or extent of its claim, it had the option to file a claim in an unliquidated amount. Instead, [it] made the assumption that the Debtor would undertake to expend the funds to put the equipment in working order. The fact that this assumption turned out to be unwarranted does not constitute a basis for extending the bar date.") It is indisputable that Plum Creek had incurred actual economic loss before the Bar Date, including costs to create the "Grace Risk Assessment" and to work with the EPA on investigating the possibility and extent of contamination. That alone was more than enough to require Plum Creek to tender its claim by the Bar Date.

Plum Creek cannot credibly profess ignorance of the validity of its claim, either prior to the Bar Date or in the intervening years before it untimely filed the Late Claim. Like the would-be claimants in *Pacificorp*, who claimed ignorance of their claim until they were spoon fed their rights by the EPA, Plum Creek cannot rely on such ignorance as an excuse. *See Pacificorp*, 2006 WL 2375371 at *13. Plum Creek had more than enough information to ascertain its rights and to determine that it had a claim, ahead of the Bar Date. By 2002, it had taken a "precautionary approach" to its commercial activities in the area potentially affected by asbestos. Exhibit B, Plum Creek 2/22/16 Responses at p.3. The Libby community was aware of the risk as evidenced

by the newspaper articles and letters published in 2002, certain of which were sent directly to Plum Creek. The EPA even contacted Plum Creek to study the risk associated with cutting timber that might be contaminated with asbestos. Exhibit L at PTCT 431. And approximately one and one-half months before the Bar Date, Jim Christiansen of the EPA expressly stated in an email to Plum Creek that the Debtors' former mine "may have been subject to aerial deposition of contaminants from the mine and milling operations." Exhibit N at PTCT 517. In the same email, Mr. Christiansen also stated it would be prudent for Plum Creek to assume that asbestos had been "incorporated into . . . timber (e.g. bark)." Exhibit N at PTCT 518. This statement alone is sufficient to demonstrate that Plum Creek was on notice that it had a claim against Grace for property damage to its timber. As reported in the local newspaper from approximately 2002, Dave Friedman of Plum Creek confirmed his company's awareness of property damage in that Plum Creek's beetle-killed timber in the Rainy Creek drainage was "deteriorating rapidly and losing its value." Exhibit L at PTCT 436.

If Plum Creek remained unconvinced, despite ample evidence, that its legal rights could be implicated by the Bar Date, this lack of certainty and the resultant failure to act is a "self-inflicted wound" and the fault of Plum Creek and Plum Creek alone. *In re Nat'l Steel Corp.*, 316 B.R. at 518 ("It is not the duty of the Debtors to make [the claimant] or any of its creditors aware of every potential claim they may have against the Debtors. To the contrary, it was [the claimant's] responsibility to explore, investigate and file a proof of claim against the Debtors, not the other way around"). To the extent that any legal misinterpretation on the part of Plum Creek's counsel is to blame for Plum Creek's delay, the delay must be imputed to Plum Creek; neither the Reorganized Debtors nor other stakeholders should be disadvantaged as a result. *See, e.g., In re Lehman Bros. Holdings Inc.*, 433 B.R. 113, 122 (Bankr. S.D.N.Y. 2010) (mistakes by

a creditor's agents, attorneys, or advisors which results in the filing of late claims do not meet the requirements of excusable neglect).  The Debtors went above and beyond the notice required by the Bankruptcy Code to put Plum Creek in a position to be apprised of and move to protect its rights.  Its failure to do so is not excusable.

**D.     Good Faith**

Plum Creek has not and cannot meet its burden of proving that it has acted in good faith, in large part because of the contradiction in its failure to timely file a claim due to professed uncertainty about its legal rights and its later decision to file the Late Claim despite continuing uncertainty.  After all, Plum Creek has admitted that it was "uncertain" of the potential for property damages even at the time it first attempted to file a claim in 2010, and only fully understood that its trees were contaminated in 2014.  Exhibit B, Plum Creek Responses, at ¶12.

It is emphatically not the right of Plum Creek to decide when the underlying basis for a claim is concrete enough to file a proof of claim.  Such is the province of this Court and the Bankruptcy Code—with its expansive definition of a "claim," which was accurately and boldly reflected on the Bar Date Notice.  *See, e.g., In re Bennett*, 175 B.R. 181, 183 (Bankr. E.D. Pa. 1994) ("Cases interpreting § 101(5) have uniformly held that the definition of 'claim' is to be interpreted broadly.").  Plum Creek's decision to file its June 2010 proof of claim and the July 2010 Motion "was a change of mind, not circumstances." *In re Nortel Networks, Inc.*, 531 B.R. 53, 66 (Bankr. D. Del. 2015) (denying motion to file late proof of claim).  Plum Creek simply made a bad bet on determining whether timely filing a proof of claim was worthwhile, and when incremental evidence finally convinced it seven years later that the bet was a bad one, Plum Creek decided to attempt to circumvent the court-approved claims process.  This attempt should be rejected by this Court.

## CONCLUSION

For the reasons set forth in this Motion, the Reorganized Debtors respectfully request that the Court enter an Order, substantially in the form of the Proposed Order at Exhibit A hereto, holding that Plum Creek's claim is discharged and enjoined and that the July 2010 motion is dismissed with prejudice.

Dated:  April 21, 2016

KIRKLAND & ELLIS LLP
John Donley, P.C.
Lisa Esayian
Ryan Matthew Hehner
Bryan Vincent Uelk
300 North LaSalle
Chicago, IL 60654
(312) 862-2000

And

THE LAW OFFICES OF ROGER HIGGINS
Roger J. Higgins
111 East Wacker Drive
Suite 2800
Chicago, IL 60601
(312) 836-4047

And

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ James E. O'Neill*
Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705
(302) 652-4100
(302) 652-4400

***Co-Counsel for the Reorganized Debtors***

## APPENDIX A

## W. R. Grace Bar Date Notice Definition of "Asbestos Property Damage Claims"
### (Dkt. No. 1926-2, Exhibit 1 to Exhibit B, Definitions of Claims Subject to Bar Date)

"**Asbestos Property Damage Claim**:  Asbestos Property Damage Claims are claims **as of the time immediately preceding the Bar Date** that relate, for example, to the cost of removal, diminution of property value or economic loss caused by asbestos in products manufactured by the Debtors or from vermiculite mined, milled, or processed by the Debtors.  More specifically, Asbestos Property Damage Claims are those claims against, or any debt, obligation or liability of, one or more of the Debtors, whether in the nature of or sounding in tort, contract, warranty or any other theory of law or equity for, relating to or arising by reason of, directly or indirectly, property damage, including, but not limited to, diminution in the value thereof, or environmental damage or economic loss caused or allegedly caused, directly or indirectly, by asbestos in products or materials, manufactured, sold, supplied, produced, specified, selected, distributed or in any way marketed by one or more of the Debtors or from vermiculite mined, milled, or processed by the Debtors and arising or allegedly arising, directly or indirectly, from acts or omissions of one or more of the Debtors, including, but not limited to, all claims, debts, obligations or liabilities for compensatory and punitive damages."

### [bold in original]

**APPENDIX B**

**W. R. Grace Bar Date Notice Definition of "Claim"**
**(Dkt. No. 1926, Exhibit 1 to Exhibit B)**

**Under Section 101(5) of the Bankruptcy Code and as used in this notice, the word "claim" means (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.  Because of this broad definition, acts or omissions of the Debtors that occurred before the Debtors filed their Chapter 11 cases on April 2, 2001 may give rise to claims against them notwithstanding that such claims may not have matured or become fixed or liquidated prior to such date.  Therefore, any creditor having a claim against the Debtors, no matter how remote or contingent, must file a proof of claim before the Bar Date.**

**[All bold in original]**

**EXHIBITS**

| Exhibit | Date | Description |
|---------|------|-------------|
| A | Undated | Proposed Order |
| B | 2/22/16 | Plum Creek Responses to Grace Information Requests |
| C | Various dates 2000-2002 | Seattle Post-Intelligencer and national newspaper articles about Libby |
| D | 5/10/00 and 1/19/03 | New York Times and Los Angeles Times articles |
| E | 3/28/03 | Proof of Claim No. 9658 from The Parkers (nursery owners) |
| F | 4/12/02 and 4/22/02 | Revised Bar Date Notice Plan, with Claims Bar Date Notice (Dkt. Nos. 1926-1 and 1926-2); Claims Bar Date Notice signed and entered by Judge Fitzgerald (Dkt. No. 1960) |
| G | 12/10/15 | Letter from Plum Creek's Counsel B. Ellison |
| H | 4/21/16 | Affidavit of James O'Neill |
| I | 1/28/14 | Class 7A CMO (Plan Exhibit 25) |
| J | 10/7/15 | Letter from Plum Creek's Counsel B. Ellison and Proof of Claim to Asbestos PD Trust |
| K | 2/19/16 | Weyerhaeuser PR Newswire News Release |
| L | 2002-2003 | Newspaper articles from Plum Creek's files (PTCT 431-436, 438) |
| M | Various dates in 2002, 2003, 2004 | Plum Creek's "Grace Risk Assessment" (PTCT 402-430) |
| N | 2/18/03 | Emails between Jerry Wolcott of Plum Creek and Jim Christiansen of EPA (PTCT 517-520) |
| O | 10/18/02 | Western News article, "Risks Worry Plum Creek and USFS" |
| P | 4/8/03 | Plum Creek email (PTCT 521) |
| Q | 5/29/03 | EPA/Plum Creek email (PTCT 522) |