**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| W.R. GRACE & CO., *et al.*, | Case No. 01-01139 (KJC) |
| Reorganized Debtors. | **Re: Docket No. 32673** |

**OBJECTION OF PLUM CREEK TIMBER CO. TO THE REORGANIZED DEBTORS'**
**MOTION TO ENFORCE DISCHARGE AND INJUNCTION OF**
**PLUM CREEK TIMBER CO.'S CLAIM**

Plum Creek Timber Co. ("**Plum Creek**") objects to W.R. Grace & Co. and its affiliated reorganized debtors' (collectively, "**Grace**" or the "**Reorganized Debtors**") *Motion to Enforce Discharge and Injunction of Plum Creek Timber Co.'s Claim* [Docket No. 32673] (the "**Motion**"). In support of this Objection, Plum Creek respectfully states as follows:

<u>**Preliminary Statement**</u>

Asbestos contamination caused by Grace's vermiculite mining operations in Libby, Montana prompted the filing of the present confirmed Chapter 11 case in 2001. Claims bar dates for filing proofs of claims were established, and the bankruptcy process addressed all of the traditional asbestos injuries suffered by the townspeople of Libby as well as the businesses that dealt with asbestos-contaminated vermiculite.

Plum Creek was the largest owner of private commercial timberland near Libby.[1] In May 2010 – more than seven years after the claims bar date of March 31, 2003 (the "**Bar Date**") – the Environmental Protection Agency ("**EPA**") notified Plum Creek for the first time that some of

---

[1] Since the filing of the underlying 2010 Proof of Claim at issue here, Plum Creek merged into the Weyerhaeuser Company, based in Federal Way, Washington, but Plum Creek continues to maintain its separate corporate existence.

the trees on Plum Creek's property might have been contaminated with trace elements of asbestos. Within thirty days, Plum Creek filed a proof of claim.

More than four years later in December 2014, the EPA confirmed that 1,611 acres of Plum Creek's timberland (the "**Property**") were contaminated to the extent that the bark on the trees was hazardous to human health. Plum Creek therefore amended its original claim against the estate to a proof of claim against the § 524(g) asbestos channeling trust (the "**524(g) Trust**") specifically established by the Reorganized Debtors for late-filed property damage claimants. Plum Creek seeks $1.88 million for the replacement value of the timber on the Property (the "**Claim**").

Nonetheless, through the Motion, the Reorganized Debtors refuse to allow the 524(g) Trust to satisfy Plum Creek's Claim. The Reorganized Debtors argue that because Plum Creek technically received notice of the 2003 Bar Date, the Claim is wholly discharged. The Reorganized Debtors' argument ignores that for years after the Bar Date, Plum Creek did not know it had suffered contamination such that it should to file a valid claim.[2] Moreover, even if Plum Creek received technically-proper notice of the Bar Date, the Third Circuit's *en banc* asbestos decision of In re Grossman's, Inc., 607 F.3d 114 (3d Cir. 2010), controls and compels the conclusion that due process requires Plum Creek's Claim against the 524(g) Trust be allowed.

Because Plum Creek only acquired knowledge of actual hazardous contamination of its Property in 2014, its Claim should be allowed. The fact that a fully-funded § 524(g) trust has been established for property damage claims further supports the argument that Plum Creek's

---

[2] Indeed, if Plum Creek filed a false proof of claim, it could subject itself to criminal liability. See 18 U.S.C. § 152(4) (2016).

Claim must be paid.[3] See In re W.R. Grace & Co., 446 B.R. 96, 106, 144 n.84 (Bankr. D. Del. 2011). Moreover, in the entire time the 524(g) Trust has been operational, no one other than Plum Creek has ever applied for compensation.

In seeking to bar Plum Creek's Claim, Grace basically treats the 524(g) Trust as a public relations ploy. As Grace would have it, the 524(g) Trust exists to create the semblance of fairness for future asbestos claimants, but no one can actually recover from it. Grace's current refusal to allow Plum Creek to submit a claim contradicts its position at plan confirmation that the 524(g) Trust was necessary because "it enhances Grace's ability to reorganize." Grace, 446 B.R. at 144, n. 84. It begs the question: Why take the difficult steps necessary to establish a channeling trust for asbestos property damage claims if the 524(g) Trust is never to be used?

### Background

1.    The primary cause of Grace's bankruptcy filings was the harm that their ownership and operation of a vermiculite mine in Libby, Montana caused between 1963 and 1993.[4] The Ninth Circuit Court in 2005 described the asbestos contamination that has upended life in Libby:

> Vermiculite from the mine's waste piles was "commonly used by local residents in their yards and gardens as a soil conditioner." It was also used to create running tracks and baseball fields for nearby schools. The residents were particularly concerned because children regularly played in and around piles of vermiculite. … subsequent testing showed asbestos contamination to be pervasive. . . .
>
> [T]he EPA documented "complete human exposure pathways" through which asbestos particles were becoming airborne as a result of normal human activities, such as foot traffic and vacuuming, and natural forces,

---

[3] Section 5.3 of the Joint Plan, "Resolution of Asbestos PD Claims," provides that "Asbestos PD Claims shall be resolved in accordance with the Asbestos PD Trust Agreement and (a) in the case of Asbestos PD Claims in Class 7A, the Class 7A Case Management Order setting forth procedures for determining the allowance or disallowance of the Unresolved Asbestos PD Claims." Docket No. 24657 at 60, § 5.3.

[4] Disclosure Statement [Docket No. 20667] § 2.6.

such as wind — especially during the dry summer months. This migration transformed the latent threat of undisturbed asbestos into a current hazard to anyone breathing the airborne particles. For example, residents described halting baseball games when large dust clouds swept over the field carrying particles from exposed piles of vermiculite. A study of Libby residents conducted in 2000 by the Agency for Toxic Substances and Disease Registry . . . found that most participants reported multiple routes of exposure. . . .[5]

**I.     The Hazard to Human Health Posed by Airborne Asbestos Prior to the 2003 Bar Date Did Not Place Plum Creek on Notice that the Timber on its Property was also Contaminated.**

2.      The town of Libby has been contaminated for a long time. By contrast, Plum Creek is a landowner seven miles from the town of Libby. Plum Creek acquired some of the Property from a predecessor entity in 1989, and acquired the balance of the Property in 1993. The Property is currently a commercial forest. See Declaration of Tom Ray ("**Ray Decl.**"), ¶¶ 5-7, attached hereto and incorporated herein by reference as Exhibit A. An illustrative map of the Plum Creek Property at issue is attached hereto as Exhibit B.

3.      The Motion's chronology of facts sets forth most of the relevant events that relate to this dispute, but the following key dates merit repeated consideration:

- On March 30, 2001, the EPA first brought suit against Grace in Montana Federal District Court for Libby CERCLA clean-up.[6]
- Three days later, on April 2, 2001, the Debtors filed Chapter 11 bankruptcy in Delaware.
- Plum Creek was never identified as a creditor in Grace's bankruptcy schedules.
- On October 24, 2002, the EPA declared the Libby mine facility and adjacent lands a Superfund site.
- March 31, 2003 was set as the Bar Date.
- On February 27, 2009, Grace filed their Disclosure Statement, but nowhere indicated that they believed Libby operations had caused environmental contamination to anything other than people or man-made structures.
- On May 6, 2010, the EPA issued its Draft Report entitled "Remedial Investigation for Operable Unit 3, Libby Asbestos Superfund Site, Phase IV Sampling and Analysis Plan,

---

[5] United States v. W.R. Grace, 429 F.3d 1224, 1230 (9th Cir. 2005).

[6] United States v. W.R. Grace et al., Case No. 01-72-M-DWM (D. Mont. 2001).

Part A, Data to Support Human Health Risk Assessment" ("**2010 Report**"). A copy of the 2010 Report is attached hereto as <u>Exhibit C</u>.

- In June, 2010, Plum Creek filed a contingent and unliquidated claim.
- On July 2, 2010, Plum Creek then filed a motion to allow the late filing of its proof of claim. The proof of claim issue was subsequently tolled by agreement with Grace. [Docket No. 25154]
- On January 31, 2011, Grace's Amended Plan of Reorganization was confirmed. [Docket No. 26368]
- On December 8, 2014, the EPA issued its Draft Report entitled "*Site-Wide Human Health Risk Assessment*" ("**2014 Report**"). A copy of the 2014 Report is attached hereto as <u>Exhibit D</u>.
- On October 7, 2015, Plum Creek filed an amended claim with the 524(g) Trust.

4.      Despite the general consensus that the town of Libby had an asbestos contamination problem, to what extent this was also a problem for the trees owned by Plum Creek outside of Libby (or any other timberland owner in Montana) remained unanswered for a very long time. In fact, Plum Creek had good reason to believe it might not have an asbestos contamination problem at all.

5.      In 1999, a contract logger harvesting timber on Plum Creek land near Libby alerted Plum Creek that something strange might be on the bark of its trees and he was concerned it might be asbestos. On December 3, 1999, Plum Creek had samples of the material evaluated by a third-party laboratory, which concluded that the substance was not asbestos or vermiculite, but rather, benign cellulose, and in some cases, spider webs. <u>See</u> Declaration of Rosemary Daszkiewicz (the "**Daszkiewicz Decl**."), ¶¶ 5-8, attached hereto and incorporated herein by reference as <u>Exhibit E</u>. The formal laboratory results are attached to the Daszkiewicz Declaration, at Ex. 1. Thus, the only specific scientific testing for asbestos on Plum Creek's trees prior to the Bar Date (or prior to 2010), in fact, came back negative.

**II.    In 2010 – Seven Years after the Bar Date – Plum Creek was First Put on Notice that the Timber on its Property Could also be Contaminated.**

6.      After 1999, speculation about potential tree contamination circulated, yet scientific inquiry into the issue did not occur until 2010.[7] See 2010 Report.[8] The 2010 Report is when the EPA first disclosed that asbestos had become embedded in tree bark of some Libby trees. At that time, however, the EPA lacked any metrics to establish whether levels of contamination were in fact hazardous.

7.      The 2010 Report was prepared as a joint remedial effort between EPA and Grace. Ultimately, the 2010 Report recommended further testing and analysis because the commercial harvest of trees was found to be potentially hazardous to human health. 2010 Report § 2.1, at 5-6. The 2010 Report identified the need to "monitor air levels during authentic commercial logging activities near the site." Id. § 3.1, at 10. The 2010 Report stated that it was not currently known whether the Libby amphibole asbestos presented an unacceptable risk to human health. Id. § 4.1, at 12. Notably, nothing in the 2010 Report suggested that there was any evidence of asbestos contamination of trees on Plum Creek's Property.

8.      Even though Plum Creek still had no knowledge of whether its trees actually contained asbestos or if they did, whether tree harvesting would cause asbestos injury to humans, Plum Creek filed its proof of claim in 2010 based on the information available in the 2010 Report. Not until 2014 did the federal government conclude that areas within one mile of the

---

[7] In its Motion, Grace claims that Plum Creek spent $100,000 to undertake subsequent testing. Id. at 13. This is false. Ray Decl. ¶ 15. Plum Creek opted not to fund government science to establish whether contamination committed by another private citizen – Grace – was hazardous or not. Clearly, Grace, rather than Plum Creek, would have been the appropriate party to fund that research.

[8] The 2010 Report constitutes the EPA's recommended scope of testing and analysis to assess the human health impact from asbestos around the Libby area and specifically as to tree bark. The 2010 Report was prepared pursuant to 40 C.F.R. 300.430, which provides a step by step process to study/assess a release, followed by a phase to determine the viable options to clean up the release, and finally a phase to make a determination on a cleanup.

mine were contaminated to the extent that they constituted a hazard to human health.[9] See 2014 Report.

9.    Plum Creek's level of awareness of the threat of asbestos contamination increased substantially by the end of 2014 when it received confirmation that specific timber on its Property had been contaminated to an extent that precluded commercial forestry. See 2014 Report. The 2014 Report made numerous findings about the risk to human health at various distances from the Libby Mine:[10]

> [D]ata show[s] that [Libby asbestos] structures are present on the outer bark surface of trees at the Site.[11] If [Libby asbestos]-containing trees or wood-related materials (e.g., woodchips, mulch) are disturbed, people may be exposed to [Libby asbestos] that is released to air from the wood. If [Libby asbestos]-containing trees are used as a source of firewood (e.g., in a residential woodstove), studies have shown that [Libby asbestos] fibers can become concentrated in the resulting ash, which itself can become a source of potential [Libby asbestos] exposure.
>
> When commercial logging activities were conducted in an area located near the mine with higher concentrations of [Libby asbestos] in tree bark and duff, estimated [recommended maximum exposure] cancer risks for all commercial logging activities were below 1E-04,[12] but [the] non-cancer [hazard quotients] were at or above 1 during timber skidding and site restoration activities. . . .
>
> Estimated [recommended maximum exposure] non-cancer [hazard quotients] for activities associated with the removal of ash from a woodstove differed depending on the source of the firewood that was burned. The estimated [hazard quotient] was 1 when firewood was collected from a location near the mine (where tree bark [Libby asbestos] levels are highest), but [hazard quotients] were below 1 when firewood was collected from a location intermediate or far from the mine. . . .[13]

---

[9] Grace even concedes that the 2014 Report was relatively inconclusive: "[t]he report provided Plum Creek with incremental information but did not pinpoint with certainty the scope of the affected area." Id. at 16.

[10] 2014 Report, at Figure ES-7.

[11] The 2014 Report defines "Site" as the Libby Superfund site. 2014 Report, at ES 1.

[12] This is the threshold at which cumulative cancer risks arise. 2014 Report at ES 4. Numbers "lower" than 1E-04 (i.e., 1E-03, 1E-02, 1E-01) are more carcinogenic.

[13] Non-cancer health risks are measured differently from the 1E-04 scale for cancer risks, noted immediately above. If the cumulative hazard quotient is below 1, generally no remedial action is required. By contrast, measurements of 1 or above are consistent with cumulative non-cancer health risks. Id.

These risk estimates demonstrate that exposures to [Libby amphibole asbestos] in ash may contribute significantly to cumulative exposures, especially if the ash is derived from a wood source in close proximity to the mine.[14]

(footnotes added).

10.    The 2014 Report defines "near the mine" or "in close proximity to the mine" as within one mile and concludes that safe commercial forestry operations within that area will be impossible. It concludes that commercial forestry operations can be safely conducted four or more miles from the mine.[15] The 2014 Report left for the future any determination of whether and how commercial forestry operations could be conducted safely between one and four miles of the mine.

III.    **Grace's Characterization of the Facts concerning Plum Creek's Level of Knowledge is Misleading.**

11.    Even though the only applicable scientific findings about the risks of asbestos in bark were issued well after the Bar Date, the Reorganized Debtors characterize Plum Creek as always having known that its trees were contaminated with asbestos: "Plum Creek was aware well before the Bar Date that asbestos in Libby was a serious issue and could affect forested areas, as was everyone else in the Libby area, but particularly because it owned substantial timberlands." Mot. at 12. The Reorganized Debtors rely on a series of newspaper articles, see Mot., Ex. L, as support for this premise. Yet Exhibit L actually favors Plum Creek's position, and undermines Grace's argument.

12.    Exhibit L begins with an October 18, 2002 article in the *Libby Western News*. That article highlights a profound lack of information about whether a landowner like Plum Creek would have asbestos contamination on its Property: "While the proposed timber sales are

---

[14] 2014 Report at ES 7-ES 8.

[15] Id.

within a couple of miles of the mine site, they are upwind and geologically separate from the asbestos-contaminated vermiculate deposits that were mined from the 1920s until 1990." PTCT__00435. An EPA on-site coordinator is then quoted in the same article as saying: "**No one knows if asbestos sticks to trees, or even how to test for it**." PTCT__00436 (emphasis added).[16] The coordinator further acknowledged that this tree contamination issue was not a priority for the EPA, nor could it be immediately funded.[17]

13.    This article – on which Grace places great weight – illustrates the true state of what the federal government, Plum Creek, and everyone else really knew prior to 2014: *no one knew* whether tree bark was even contaminated with asbestos, let alone contaminated to the extent that it was hazardous to human health. Without any scientific information, Plum Creek had no certain answers. Furthermore, there were realistic geological and biological reasons to expect there would be no contamination. See PTCT__00435. While the questions might eventually be answered, the EPA's limited funding, higher priority contamination problems, and the scientific complexity of determining whether bark was contaminated and hazardous postponed answering the questions for well over a decade.

14.    Several other factual assertions in the Motion suffer from significant omissions. First, Grace argues that because the EPA "closed" Rainy Creek Road to the public around 2001, Plum Creek must have known that its Property was contaminated. See Mot. at 13. This is an incorrect presumption. Rainy Creek Road is a Forest Service road generally used to access the Grace mine as well as Plum Creek's Property. See Ray Decl. ¶ 8. In 2001, the EPA began to use

---

[16] This same article (also cited in the Motion at page 14) goes on to quote another EPA official, Jim Christiansen, local superfund manager, that "[i]f you're looking . . . for EPA to come in and say it's OK for people to be . . . chopping up trees . . . even if I find the money I can't answer that in the short term." PTCT__00435.

[17] "'It's just a problem that we put off in terms of priority,' he said. Residential cleanups have been given a higher priority than work near the mine site, where no one lives … Nothing has been budgeted for the current or upcoming fiscal year for work in the Rainy Creek area . . .  [i.e., an area that includes the Property]." PTCT__00436.

Rainy Creek Road to transport contaminated soils and materials to the Libby mine where such hazardous materials could be stored. Id. ¶ 10. The EPA closed Rainy Creek Road to minimize possible accidents or secondary contamination between the transportation of hazardous material and the public. Id. Rainy Creek Road's closure cannot be construed as notice that Grace had contaminated Plum Creek's Property.[18]

15.    Second, while Plum Creek's Property was physically located within the EPA's Superfund site in 2002, it does not mean that Plum Creek was "acutely aware" of contamination.[19] See Mot. at 1. Grace fails to disclose that boundary demarcations for the EPA Superfund site were intentionally vague and the naming of a site is only to point out general site location.[20] Moreover, having property designated within a Superfund site does not mean that all such property inside the designated boundary would be toxic: "the site name is merely used to help identify the geographic location of the contamination." 67 FED. REG. at 65,316. Merely because the EPA chose to locate its hazardous waste transportation corridor near Plum Creek's Property, which brought Plum Creek within the boundary of the Superfund site, did not put Plum Creek on notice that Grace had contaminated its Property.

16.    Third, the Company's decision to not cut or sell timber from its Property after 2002 does not demonstrate Plum Creek's knowledge or belief that its land was contaminated. First, at a practical level, without access to Rainy Creek Road, it was cost-prohibitive to resume normal forestry operations on the Property. Ray Decl. ¶ 11. Second, because exposure to asbestos could have dire consequences, Plum Creek appropriately followed the federal

---

[18] Mot., Ex. B, Plum Creek Discovery Response No. 7, dated January 22, 2016.

[19] Environmental Protection Agency, Final Rule: Nat'l Priorities List for Uncontrolled Hazardous Waste Sites, FRL–7399–6, 67 FED. REG. 65,315 (October 24, 2002).

[20] The Final Federal Register notice for designating Libby as a superfund site specifically provided that: "The [National Priorities List] does not describe releases in precise geographical terms. . . ." 67 FED. REG. at 65,316.

government's lead, and erred on the side of caution by not harvesting timber on its Property. Ray Decl. ¶¶11-2. As one of the articles cited by the Reorganized Debtors noted, at the time, even the EPA could not concur that there was not a contamination risk associated with the timber in the area. See PTCT__00436. Therefore, choosing inaction was a prudent path until the government's slow-moving investigation finished. Regardless, before 2014, there was never an appreciation that hazardous contamination of Plum Creek's trees had occurred or even was likely.

17.    Finally, Grace misleadingly suggests that the EPA communicated to Plum Creek that the trees on its Property were contaminated in February 2003. See Mot. at 13-15; see also Mot., Ex. N, PTCT__00517-19. A careful review of the EPA's correspondence shows that the purported guidance suffered from a complete lack of any scientific analysis,[21] and instead merely highlighted the range of potential risk to Plum Creek: "Under a worst case scenario, high levels of [asbestos] may have been deposited under a very wide area . . . Under a best case scenario, very little [asbestos] was deposited away from the point of release or was greatly dispersed, and any that was deposited has been transported away by runoff." PTCT__00518. In short, the EPA simply pointed out the obvious: that all sorts of outcomes were possible. In 2003, the EPA had no scientific answers as to whether there was contamination or not, and lacked the resources to conduct sampling.

18.    Instead of supporting Grace's proposition that the EPA communicated the existence of contamination to Plum Creek in 2003, the EPA's communication actually shows the EPA encouraging Plum Creek to be the party to fund and administer testing to determine the existence of contamination - as if Plum Creek were the regulator.

---

[21]  Agency determinations are only entitled to deference to the extent they are based on scientific analysis. See Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 103 (1983).

19.     The EPA's lack of any concrete scientific understanding of the situation is conceded by the quotation it provided to the *Libby Western News* in March 2003, "**It's probably OK**, but . . . [t]here's too much at stake and the stuff is just too nasty." (emphasis added) PTCT__00431. Until 2010, the federal government only advised caution because they simply did not know enough to impart knowledge to Plum Creek.

**IV.    Grace created the 7A Trust to provide for property damage claimants such as Plum Creek.**

20.     Grace filed an Amended Disclosure Statement [Docket No. 20873], and an Amended Plan of Reorganization [Docket No. 20872] on February 27, 2009. Sections 2.7.2 to 2.8.1.3 of the Amended Disclosure Statement discuss asbestos-related litigation and property damage claims including those in the Libby area. Yet these sections do not disclose that Grace caused contamination to trees. For example, Section 2.8.1.1 discusses remediation for "cleaning and/or demolition of contaminated buildings, excavation and removal of contaminated soil, health screening of Libby residents and of former mine workers, and investigation and monitoring costs."

21.     Because Grace knew that it could not foresee all of the potential damages that had or would occur due to their asbestos contamination, the Amended Plan provided that upon confirmation, a trust would be established and funded to assume all liabilities and responsibility for asbestos-related property damage claims. Asbestos PD Trust Agmt. § 1.2. The Amended Plan allowed proofs of claim to be filed with the 7A Asbestos Property Damage Trust after confirmation of the Amended Plan. Id. § II.A.

22.     At the 2011 Plan confirmation hearing, Anderson Memorial Hospital ("**AMH**"), a property damage creditor, strenuously objected to the creation of the 524(g) Trust. [Docket No. 21782]. Grace summarized AMH's argument as follows: "The [524(g) Trust] is not a genuine

trust for members of Class 7A. It is simply a conduit for payment of funds by the Reorganized

Debtors. The structure of the Plan and Trust actually make it harder for claimants to recover than

if Reorganized Grace assumed liability for unresolved PD claims." [Docket No. 24549-1 at 56].

23.    The Court considered testimony on the issue at confirmation, overruled AMH's

objection, and rendered a written opinion that credited the Grace's expert witness testimony

about the need for the 524(g) Trust:

> Debtors' witness, Dr. Denise Martin, testified that, based on historical [property
> damage] claims against Debtors and what occurred postpetition up to the bar date,
> there is a substantial likelihood that Asbestos [property damage] Demands will be
> made. The postpetition events include the influx of [property damage] claims that
> were filed right before the bar date (approximately 4,000), the fact that the
> amount of product that was sold is unknown as is how much product was used per
> building, the number of buildings that would have been affected, how many of
> those buildings have removed the product, the degree of owner awareness or
> concern regarding the presence of the product in their buildings, when awareness
> might occur and whether, once aware of the presence of the product, there would
> be concern about it. Thus, depending on these factors and a host of others, it is
> unknown whether such claims will be filed but she expects [property damage]
> claims to be filed in the future.

Grace, 446 B.R. at 144 (emphasis added).   Since Grace overcame AMH's objection that the

524(g) Trust served no purpose, its doors should reasonably be open to the sole applicant that has

ever appeared before it: Plum Creek.

### Argument

**I.    Grace's Excusable Neglect Discussion is a Misapplication of the Current Law.**

24.    In the Motion, Grace relies upon several irrelevant non-asbestos environmental

cases, such as Chemetron Corp. v. Jones, 72 F.3d 341 (3d Cir. 1995), to disallow Plum Creek's

Claim under the excusable neglect standard. See Mot. at 8, 17, 18, 19, 23. The *en banc* Third

Circuit decision In re Grossman's Inc., 607 F.3d 114 (3d Cir. 2010), however, controls and

requires denial of the Motion.

25.     As stated herein, Plum Creek filed a motion in July 2010 to allow the late filing of its proof of claim, arguing the excusable neglect standard. [Docket No. 25040]. That motion, however, was withdrawn pursuant to a tolling agreement that allowed Plum Creek to "re-file the Motion in the Bankruptcy Court or seek other appropriate relief." *Order Approving Tolling Agmt. Regarding Plum Creek's Mot. to Allow Late Filing of Proofs of Claim* [Docket No. 25154]. Grace's Motion largely responds to the arguments raised in Plum Creek's withdrawn pleading. Those arguments simply are no longer applicable. The Third Circuit's <u>Grossman's</u> analysis applies to the Motion and Plum Creek's Claim.

26.     In <u>Grossman's</u>, Mary Van Brunt remodeled her home using products allegedly containing asbestos that she purchased from a home improvement and lumber retailer. 607 F.3d at 117. Twenty years later, the retailer filed for bankruptcy, published notice of the bankruptcy and bar date, and confirmed a plan of reorganization. <u>Id.</u> Van Brunt did not file a proof of claim before confirmation. Nearly nine years after that, Van Brunt was diagnosed with cancer. <u>Id.</u>

27.     While <u>Grossman's</u> is best known for redefining when a claim arises, the Third Circuit also ruled that, with latent manifesting injuries like asbestos exposure, the inquiry does not end once the bankruptcy court finds the claim arose prepetition. <u>Id.</u> at 125. Accordingly, even though Van Brunts' claims arose in the late 1970s when she was exposed to the asbestos, "That does not necessarily mean that the Van Brunts' claims were discharged by the Plan of Reorganization. Any application of the test to be applied cannot be divorced from fundamental principles of due process." <u>Id.</u>

28.     The *en banc* Third Circuit then noted that due process could have been afforded if a § 524(g) asbestos channeling trust had been created. <u>Id.</u> at 126-27. Unlike in our case where

such a trust was established, none was created in Grossman's, so the Third Circuit remanded the

case back to the bankruptcy court to conduct the following multi-factoral due process analysis:

> Whether a particular claim has been discharged by a plan of reorganization depends on factors applicable to the particular case and is best determined by the appropriate bankruptcy court or the district court. In determining whether an asbestos claim has been discharged, the court may wish to consider, inter alia, [1] the circumstances of the initial exposure to asbestos, [2] whether and/or when the claimants were aware of their vulnerability to asbestos, [3] whether the notice of the claims bar date came to their attention, [4] whether the claimants were known or unknown creditors, [5] whether the claimants had a colorable claim at the time of the bar date, and other circumstances specific to the parties, including [6] whether it was reasonable or possible for the debtor to establish a trust for future claimants as provided by § 524(g).

Grossman's, 607 F.3d at 127-28.

29.    Based on the foregoing, the central issue in this case is not whether Plum Creek

read a newspaper or whether its corporate headquarters in Seattle, Washington was informed by

its branch office in Libby, Montana of a generic mailing addressed to "Current Occupant." The

question is whether a bankruptcy discharge affecting future claimants like Plum Creek (or Mary

Van Brunt), satisfies Grossman's due process test when, at the time of the bar date, the claimant

has no reasonable knowledge of harm.

## II.    Discharging Plum Creek's Claim under Grossman's Violates Due Process.

30.    The circumstances of this case satisfy all of the due process factors in the

Grossman's test, but the most striking factor is the sixth factor, the presence of a § 524(g)

asbestos channeling trust. For the existence of Grace's 524(g) Trust to be meaningful, a future

claimant must be able to recover more easily from the trust than from the post-bankruptcy estate.

As the Third Circuit has explained:

> Congress enacted § 524(g) in part because of the long latency period of [] asbestos-related [damage], which, in cases like this, typically creates a large pool of future claimants whose disease has not yet manifested. Congress was concerned about those [claimants because] they lack the ability to protect their

> own interests during the bankruptcy proceeding . . . Section 524(g) addresses those concerns by imposing requirements to protect the rights of future claimants, and then, if those requirements are met, channeling all present and future asbestos-related liability to a trust funded by the debtor. Congress wanted to cover the whole set, and it did.

In re W.R. Grace & Co., 729 F.3d 311, 323 (3d Cir. 2013). Ignoring the very purpose of the 524(g) Trust, Grace argues that because one thing happened – Plum Creek did not timely file its Claim – another thing automatically follows – there can be no recovery from the 524(g) Trust. Grace's argument conflates the existence of the 524(g) Trust with the passage of time. Grace wants this Court to adopt the illogical and unfair position that an untimely claim negates the rights of a future claimant to recover from the 524(g) Trust. This position contradicts the very reason Grace established the 524(g) Trust and is contrary to applicable law.

a. The Circumstances of Plum Creek's Claim Favor Allowing the Claim against the Trust.

31.      The first factor, circumstances of exposure, favors finding that Grace's insistence on the inviolability of the Bar Date violates due process. The damage for which Plum Creek seeks compensation is a wholly non-intuitive form of asbestos harm – the contamination of trees in a forest.

b. Plum Creek had no Knowledge of its Claim Until Well after the Bar Date and Plan Confirmation.

32.      The second factor, knowledge of asbestos injury, clearly favors allowance of Plum Creek's Claim. Grace has yet to demonstrate that Plum Creek had knowledge of a claim before the Bar Date. None of the exhibits introduced by Grace demonstrates that anyone knew with confidence that trees in Libby were contaminated. The parties merely proceeded cautiously based solely on the magnitude of the risk if it turned out contamination existed. In a case such as this, there must be some reasonable quantum of scientific evidence that a harmful outcome is likely.

53269108.5

33.    As a counter example to the facts in this case, the Seventh Circuit found an environmental claim existed, and was therefore discharged, because the claimant's pre-confirmation "preliminary" negative testing of the debtor's contamination indicated a health hazard. See In re Chicago, Milwaukee, St. Paul & Pacific R. Co., 974 F.2d 775, 787 (7th Cir. 1992). In this case, testing never indicated asbestos contamination until well after the Bar Date. In fact, tree testing done in 1999 expressly yielded a negative finding. Thus, if constitutional due process is to have any meaning in the context of filing proofs of claim, it must not be determined simply on how grave the theoretical downside might be to a claimant.

34.    Fundamentally, Grace's factual arguments concerning Plum Creek's knowledge of its asbestos contaminated timber clash. Grace cites the following facts as evidence that Plum Creek knew its timber was contaminated with asbestos prior to the Bar Date: (i) the location of some of Plum Creek's timber, (ii) newspaper articles concerning asbestos damage to the residents of Libby, (iii) litigation instituted by other parties, (iv) articles on beetle (not asbestos) damage to Plum Creek's lumber, and (v) the assertion of claims in the Reorganized Debtors' cases by other parties. See Mot. at 4-6, 12-15.

35.    Later in the Motion, however, Grace seems to downplay the viability of Plum Creek's Claim by arguing that the 2014 Report "does not actually contain the words or conclusion that 'it will be impossible to safely conduct commercial forestry.'" Id. at 16. Grace continues its criticism by noting, "The report provided Plum Creek with incremental information but did not pinpoint with certainty the scope of the affected area." Id.

36.    But if Plum Creek cannot trust the EPA to impart it with knowledge of its asbestos contamination to sufficiently assert a claim, then how can Plum Creek's knowledge be founded on third party articles, beetle damage, and litigation during a time when testing for

17

asbestos in timber did not even exist? As Judge Posner of the Seventh Circuit explains, a bankruptcy claim based on a tort cannot arise until the harm is known (occurred):

> A claim implies a legal right, however, and before a tort occurs the potential victim has no legal right, "contingent" or otherwise . . . A right that can be made the basis of a claim in bankruptcy may be contingent on something happening, such as the signing of a contract, but if the contingency can be the tort itself, this spells trouble, both practical and conceptual. Suppose a manufacturer goes bankrupt after a rash of products-liability suits. And suppose that ten million people own automobiles manufactured by it that may have the same defect that gave rise to those suits but, so far, only a thousand have had an accident caused by the defect. Would it make any sense to hold that all ten million are tort creditors of the manufacturer and are therefore required, on pain of having their claims subordinated to early filers, to file a claim in the bankruptcy proceeding? Does a pedestrian have a contingent claim against the driver of every automobile that might hit him? We are not alone in thinking that the answer to these questions is "no." Driving carelessly is not a tort and neither is the sale of a defective product. The products-liability tort occurs when the defect in the design or manufacture of the product causes a harm, and this didn't happen to Denver until the defective pipes burst. It is a fundamental principle of tort law that there is no tort without a harm, and so until the harm occurs, the tort hasn't occurred.

Fogel v. Zell, 221 F.3d 955, 960 (7th Cir. 2000).

37.     In Plum Creek's situation, it was not aware of the harm of asbestos damage prior to the Bar Date because neither Plum Creek nor the scientific community had any definitive testing results regarding the harm of asbestos damage to timber.

   c.   Notice was Not Sufficient to Warrant Barring Plum Creek's Claim.

38.     As set forth above, Plum Creek knew that Grace was in bankruptcy relating to its operations in Libby. Plum Creek received notice through publication or a generic mailing to a branch office. Nonetheless, at the time it received notice, Plum Creek was unaware it had a claim to file because it did not know the existence of its injury.

d.  Plum Creek is an Unknown Creditor.

39.    Grace concedes that Plum Creek was an "unknown" creditor. See Mot. at 18.
Plum Creek is nowhere identified in Grace's original or amended bankruptcy schedules as a
creditor.

e.  Plum Creek would not have had a Viable Claim at the Bar Date.

40.    Plum Creek would not have been able to assert its Claim against Grace outside of
bankruptcy at the time of the Bar Date. As the scientific community could not determine that the
timber was contaminated at that time, Plum Creek could not have proven the elements required
for a cause of action, such as causation or damages. Indeed, Plum Creek's testing in 1999
undercuts any argument to the contrary because the testing did not show asbestos damage
existed.

41.    Moreover, as illustrated in the following table based on key language drawn from
Grace's own exhibits, the state of knowledge before the Bar Date was wholly inconclusive:

| Statement | Speaker | Agency | Date | Exhibit | Number |
|---|---|---|---|---|---|
| "No one knows if asbestos sticks to trees, or even how to test for it." | Paul Peronard | EPA | October 18, 2002 | L | PTCT__00436 |
| "It's probably OK, but …" | Jim Christiansen | EPA | March 17, 2003 | L | PTCT__00431 |
| "I can't answer that in the short term." | Jim Christiansen | EPA | October 18, 2002 | L | PTCT__00435 |
| "proposed timber sales … are upwind and geologically separate from the asbestos-contaminated vermiculate deposits that were mined" | Brent Shrum | Libby Western News | October 18, 2002 | L | PTCT__00435 |
| "Residential cleanups have been given a | Paul Peronard | EPA | October 18, 2002 | | PTCT__00436 |

| | | | | |
|---|---|---|---|---|
| higher priority than work near the mine site, where no one lives … Nothing has been budgeted for the current or upcoming fiscal year" | | | | |

It would have been imprudent for Plum Creek to assert a claim based on inconclusive third-party commentary, much like it is imprudent to object to Plum Creek's Claim now based on the same inconclusive third-party commentary. The lack of viability of Plum Creek's Claim prior to the Bar Date indicates that due process should allow for it to assert its Claim now.

### III.   Because Plum Creek was an Unknown Future Creditor, Grace's Efforts at Service in 2002 Failed to Satisfy any Notice or Due Process Requirements.

42.     That Plum Creek did not file a claim by the Bar Date is not at all the issue in this case. The only relevant issue is the due process inquiry: when did Plum Creek have sufficient knowledge to file a proof of claim?

43.     The Motion suggests it is self-evident that the largest private landowner near Libby would know of the asbestos-contaminated trees on its Property. See, e.g., Mot. at 1. If asbestos contamination of Plum Creek's timber near Libby were as obvious as Grace now asserts, then Grace should have listed Plum Creek as a creditor in its bankruptcy schedules and provided personalized notice to Plum Creek of the Bar Date. Instead, in mid-2002 there was publication of the Bar Date in various newspapers, and a packet was delivered to Plum Creek's local branch office in Libby, addressed to "Current Occupant," and only as part of a non-targeted mass mailing. See Mot. at 6-11. It was not delivered to the headquarters of the well-known, publicly-traded company, in Seattle, Washington.

44.     In short, because Grace dropped off a generic package about asbestos on the door-step of a branch office, to no particular person, concerning an unspecified risk of harms that were

20

then not yet scientifically known, Grace now contends this can fully immunize it from liability to

Plum Creek.[22] The argument fails.

**IV.    The <u>PacifiCorp v. Grace</u> Decision Does Not Compel the Conclusion that Plum Creek Should have Filed a Claim Before it had any Scientific Basis to Know its Property was Contaminated.**

45.    The Reorganized Debtors extensively cite to <u>PacifiCorp v. Grace</u>, No. 05–764, 2006 WL 2375371 (D. Del. Aug. 16, 2006) in support of their Motion. *See* Mot. at 17-18. That decision involved a property damage claimant in Utah who was the successor-in-interest to a licensee who had previously processed vermiculite shipped by Grace. As a result of the Libby mine asbestos contamination, the claimant's industrial space in Salt Lake City was contaminated.

46.    PacifiCorp was subject to the Bar Date. Unlike Plum Creek, however, PacifiCorp received a notice from the EPA in 2004 that its property in Utah was likely contaminated. Despite receiving this notice from the EPA, PacifiCorp delayed in filing its proof of claim until 2005. While the district court acknowledged that PacifiCorp had no knowledge of its claim at the time of the Bar Date, the court analyzed whether notice by publication was sufficient and whether excusable neglect tolled PacifiCorp's late filing. For various reasons, the court denied PacifiCorp's late claim.

47.    <u>PacifiCorp</u> is analogous to the present situation on the sole fact that both claimants received scientific confirmation of asbestos contamination of their property after the Bar Date. Beyond this singular similarity, <u>PacifiCorp</u> should not apply to Plum Creek for three reasons.

48.    First, because the Third Circuit's 2010 <u>Grossman's</u> decision occurred four years after <u>PacifiCorp</u>, the district court in <u>PacifiCorp</u> did not have the benefit of the detailed multi-

---

[22] Such service of process to a large commercial business does not meet the requirements of Fed. R. Bankr. P. 7004(b), which requires that a specific corporate officer be named in order to provide effective service.

factor test on whether due process had been satisfied for claimants with only future awareness of their injuries. In Grossman's, the Third Circuit determined that the multi-factor due process test it articulated applied to situations like PacifiCorp and Plum Creek's Claim here, not an excusable neglect analysis. Indeed, the Third Circuit's Grossman's decision has upended certain prior asbestos decisions. See Wright v. Corning, 679 F.3d 101, 108-09 (3d Cir. 2012) (analyzing the impact of Grossman's on how to analyze when claim arises). Thus, if the court in PacifiCorp were called to decide that case today, it would apply Grossman's due process analysis.

49.    Second, Plum Creek did not delay in asserting its claim once the asbestos contamination became known. In PacifiCorp, after PacifiCorp received scientific confirmation from the EPA sufficient to inform it of its claim, it waited six additional months before filing its proof of claim. Although sympathetic to the fact that PacifiCorp was unaware of its claim at the time of the bar date, the court substantially discounted this excuse based on the ensuing delay:

> After Appellants did learn of their environmental liability, Appellants did not file with the Bankruptcy Court for over six months. Appellants have not presented the Court with compelling arguments for this delay. The Court points out that in other cases, late claimants have filed much sooner after claims have come to their attention.

2006 WL 2375371, at * 14.

50.    Unlike PacifiCorp, Plum Creek was not tardy in its response to the disclosure that its Property was contaminated. PacificCorp had knowledge of its contamination in June 2004. In Plum Creek's present case, it had no definitive knowledge until December 2014. Yet by that time, Plum Creek had already filed its claim four years earlier in 2010, when it first understood that asbestos traces had been detected in tree bark, but before it was aware of whether asbestos contamination was on its Property and was harmful.

51.     Third, the existence of an untapped and earmarked trust further distinguishes the present claim from PacifiCorp. The PacifiCorp district court implied throughout its decision that the underlying bankruptcy court decision was primarily motivated by the concern that allowing additional claims (in 2005) would make the case administratively unmanageable. In fact, there were thirty-six other similarly-situated licensed vermiculite "exfoliators" waiting in the wings if PacifiCorp's late-filed claim theory succeeded. And this single claimant was seeking damages totaling approximately one percent of Grace's total obligations. See 2006 WL 2375371, at *12. Accordingly, the bankruptcy court was unsurprisingly wary of this invitation to open a Pandora's box: "This debtor is well on the road toward trying to get a confirmable plan together. Having filed these claims at this point in time will jeopardize that process. It will certainly change distributions to other creditors within certain classes." Id.

52.     Such fear of disruption was real in 2005. However, once a plan of reorganization was filed and confirmed in 2011, it is clear that (1) distributions to creditors will not change if late-filed property damage claims are permitted, i.e., they are paid 100 cents on the dollar out of Grace's post-2011 earnings, and (2) there is a specific trust established to deal precisely with these claims. Plum Creek's Claim implicates neither of the bankruptcy court's twin concerns in 2005 that allowance would either jeopardize the plan confirmation process or prejudice other creditors.[23]

53.     Because the PacifiCorp court's motivating considerations prior to plan confirmation have been superseded by events that would cause no prejudice to Grace other than having to write the check it expected it would have to write, a proof of claim for future harm is timely filed upon scientific confirmation of asbestos contamination. The earlier Bar Date here is

_____

[23] Plum Creek alone owns large-scale private forestry operations in the Libby area. In short, there is a distinct cap to the impact of any ruling here in favor of Plum Creek's Claim.

53269108.5

largely irrelevant. To require that all creditors with contingent claims – not matter how remote – file proofs of claim before possible damages are firmly established will administratively disrupt a complex Chapter 11 reorganization more than allowing a single creditor to come forward, after the harm is evidenced, to recover from a § 524(g) trust established expressly for that purpose.

### Conclusion

54.    Grace has profoundly benefited from its constitutional right to file bankruptcy and reorganize in Chapter 11. Its shareholders were able to retain their equity position in the Reorganized Debtors, and the value of the company's stock has climbed more than 50-fold since the bankruptcy petition date. In return for this benefit, Grace committed to use its bankruptcy filing "to define the debtors' true liability to Asbestos Claimants." See Docket No. 6,899 at 2.

55.    Nonetheless, in its Motion, Grace does everything to prevent being held accountable for its true liability for asbestos harms that were both known and unknown at the Bar Date. Grace contaminated broad swathes of Montana timber country, but it has never taken responsibility for the contamination caused to the timber itself. Scientific uncertainty as to whether the trees near Libby were contaminated – in addition to the town and the mine – lasted from the time a Superfund site was declared in 2002 until late 2014, when the EPA finally confirmed hazardous contamination of tree bark within one mile of the mine.

56.    Plum Creek's only relevant knowledge during this twelve-year period involved the potential cost of remediation, not evidence of contamination. If there were a contamination issue with its trees, resolving it would be very expensive, and potentially Plum Creek's logging and forestry employees could have their health imperiled. Other than this awareness of the potential costs if they proceeded with remediation, Plum Creek's only other knowledge about

asbestos on its Property was the result of the only test for asbestos contamination that Plum

Creek itself conducted - the 1999 test that showed no asbestos contamination of its trees.

57.     It is against this backdrop that Grace established the 524(g) Trust for future

property damage claimants, a trust that is fully funded and from which payments will not disrupt

Grace's further reorganization process. Despite the years it has been open, no one has ever

applied to the trust for compensation until Plum Creek. For Grace to shut the door now conflicts

with its stated desire to be held accountable for its "true liability." This Court should deny the

Motion and order Plum Creek's Claim to be satisfied.[24]

Dated: June 6, 2016
       Wilmington, Delaware

**POLSINELLI PC**

*/s/ Shanti M. Katona*
Shanti M. Katona (Del. Bar No. 5352)
Jarrett Vine (Del. Bar No. 5400)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921
skatona@polsinelli.com
jvine@polsinelli.com

-and-

Benjamin A. Ellison (*admitted pro hac vice*)
**CAIRNCROSS & HEMPELMANN**
524 Second Avenue, Suite 500
Seattle, Washington 98104-2323
bellison@cairncross.com

*Counsel for Plum Creek Timber Co.*

---

[24] Complete remediation by the EPA of asbestos contamination in Libby still has no fixed deadline and could take decades. Ongoing weather, forest fires, and bio-accumulation in the forest ecosystem may also lead to further asbestos contamination of Plum Creek's timber. The existing asbestos on Plum Creek's Property therefore is not necessarily static, and may be getting incrementally worse. Accordingly, Plum Creek expressly reserves its rights to assert any claims it may have against the Reorganized Debtors to remediate the Property aside and apart from its pending Claim.

53269108.5