IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | |
| ) | Chapter 11 |
| **W. R. GRACE & CO., et al.** ) | |
| ) | Case No. 01-01139 |
| **Reorganized Debtors.** ) | (Jointly Administered) |
| ) | Re: Docket Nos. 32648, 32669, 32673, 32697 |
| ) | Hearing Date: TBD |

**REORGANIZED DEBTORS' REPLY IN SUPPORT OF
MOTION TO ENFORCE DISCHARGE AND INJUNCTION OF
PLUM CREEK TIMBER CO.'S UNTIMELY CLAIM**

In 2003, Plum Creek Timber Co. ("Plum Creek") had a claim against W. R. Grace, as amply demonstrated by Plum Creek's knowledge that:

- Its trees were near Grace's asbestos mine — some within 1 mile.
- The land was within a Superfund site.
- The EPA told Plum Creek to assume there was asbestos in the trees.
- The EPA was not sure if the trees could be safely harvested.
- The EPA had closed the access road due to asbestos exposure concerns.
- Plum Creek could not sell trees from the potentially-affected area.
- Plum Creek had incurred costs due to Grace asbestos.

And as Plum Creek admits, it received actual notice of the Bar Date. Well before the March 31, 2003 Bar Date ("Bar Date"), Plum Creek was, therefore, acutely aware of both the potential and actual economic impact of Grace-related asbestos on its Libby-area timberland, and the requirement to file a proof of claim.

Plum Creek's argument in its Objection (the "Objection") boils down to its assertion that it did not have a claim until it had "knowledge of actual hazardous contamination" in 2014. Objection at p. 2. This assertion flies in the face of the extremely broad definition of "claim" in

the Bankruptcy Code and Bar Date Notice, which required the filing of even unmatured, remote or contingent claims. The record demonstrates that Plum Creek was put on notice, again and again from multiple sources, that it had, at a minimum, a contingent claim against Grace for diminution in property value and economic loss. If that were not enough, by its own admission Plum Creek had incurred out-of-pocket costs before the Bar Date — for laboratory testing, formulation of a risk assessment plan, and dealing with the EPA — due to the presence of Grace asbestos on its property. Those actual, liquidated costs, coupled with economic loss due to not being able to access or harvest its trees, constituted more than enough for Plum Creek to file a proof of claim, particularly in light of the broad Bankruptcy Code definition which was expressly incorporated into the Bar Date notice.

Therefore, for the reasons stated in the Motion and in this Reply, the above-captioned Debtors (collectively, the "Reorganized Debtors") respectfully request that the Court enter an Order, substantially in the form of Exhibit A attached to the Motion, discharging and enjoining Plum Creek's late claim and dismissing Plum Creek's July 2010 motion with prejudice.[1]

## I. PLUM CREEK HAD EXTENSIVE PRE-BAR DATE KNOWLEDGE OF ITS CLAIM

By its own admission, before the March 2003 Bar Date, the U.S. EPA had told Plum Creek to assume the worst case scenario: that Grace-related asbestos may not only be present on Plum Creek's land, but may already be incorporated into its tree bark. Motion at 14-15, citing Exhibit N at PTCT 518. By 2002, Plum Creek had a precautionary zone of *more than 30,000 acres* of trees. Exhibit A to Objection, Ray Decl. at ¶ 12. In Plum Creek's own words and as attested to by its vice president, "because exposure to asbestos could have dire consequences,

---

[1] As Plum Creek states, it withdrew its July 2010 Motion. Objection at ¶ 25. However, that withdrawal was without prejudice. For the avoidance of doubt and in order for the record to be completely clear, Grace requests that the July 2010 Motion be denied with prejudice.

2

Plum Creek appropriately followed the federal government's lead, and erred on the side of caution by not harvesting timber on its Property." Objection at ¶ 16, citing Ray Decl. at ¶¶ 11-12; *see also* Exhibit B to Motion, Plum Creek 2/22/16 Responses at ¶ 7. According to Plum Creek, "choosing inaction" by not harvesting trees was a "prudent path until the government's slow-moving investigation finished" — a recognition that there was real risk that the trees were contaminated and could not safely be harvested. Objection at ¶ 16. And, Plum Creek knew that a portion of its timber was already "losing its value." Exhibit O to Motion.[2]

Against all of this, from a "Precautionary Zone" of more than 30,000 acres, Plum Creek relies on its testing of *eleven* samples in 1999 (only *four* of which were samples of tree bark[3]) showing that those samples did not contain asbestos. Exhibit E to Objection, Daszkiewicz Decl. at ¶¶ 6-9 and Exhibit 1 thereto. Out of 30,000 total acres, and 1611 acres that are covered by Plum Creek's proof of claim, these 11 "testing results" could not possibly have given Plum Creek any comfort that its trees did not contain asbestos — and in any event, were far outweighed by the overwhelming information suggesting risks as to asbestos in its timber that Plum Creek received from various sources between 1999 and the 2003 Bar Date. What this "testing" did do, however, was show Plum Creek, as early as 1999, that the bark in its trees could be tested for asbestos, belying Plum Creek's assertion that "testing for asbestos in timber did not even exist," prior to the EPA's 2010 report. Objection ¶ 36.[4]

---

[2] The mere location of Plum Creek's timberlands — 767 acres encompassed by Plum Creek's claim are within one mile of the edge of the former Grace vermiculite mine, and 844 acres are outside the one mile radius but can be accessed only by using roads that cross within 1 mile of the former mine (Exhibit J to Motion, 10/7/15 Plum Creek Claim, at 2) — was sufficient to put any landowner on notice that it needed to file a proof of claim.

[3] Seven samples were of pine needles, soil, and animal droppings. Exhibit E to Objection, at Exhibit 1 thereto.

[4] Meanwhile, by 2005, the University of Montana had notified the Libby community of a study that confirmed asbestos contamination in bark in trees near Grace's mine, as described in the newspaper with the local area's largest paid circulation. Exhibit R hereto, "*Study shows trees contaminated*," Libby Western News, May 18, 2005. The EPA responded that "[t]he bark contamination is not a surprise," because "[w]e expect those trees up around the mine to have some asbestos contamination," and "[t]he findings aren't good." *Id.*

Plum Creek's statements about the 2002 closure of the access road to its timber lands are particularly telling. Plum Creek says that "without access to Rainy Creek Road, it was cost-prohibitive to resume normal forestry operations on the Property." Objection at ¶ 16. This statement alone proves that Plum Creek had incurred, and knew of, injury and damages by 2002. Regardless of whether the road was closed so that EPA could transport hazardous materials, or because EPA thought that the trees and the area were contaminated, the road to Plum Creek's timberlands was closed as a direct result of Grace asbestos.

Plum Creek incorrectly asserts that the October 18, 2002 Libby Western News article, titled "Risks Worry Plum Creek and USFS," a copy of which Plum Creek produced from its own files, contains "a profound lack of information" about whether Plum Creek's trees contained asbestos, Objection at ¶¶ 12-13,[5] but the article chronicles the EPA's and Forest Service's concerns about asbestos exposure and timber harvests. As discussed in the Motion, additional local newspaper articles from this period leading up to the Bar Date are replete with concerns expressed by EPA and others as to whether the trees could safely be harvested and reports of planned timber sales that were stalled or had been written off entirely because the EPA had not provided a "clean bill of health." Exhibit L to Motion, at PTCT 435 and 438. These facts further demonstrate that Plum Creek incurred harm and damages (or at least had strong notice of same) sufficient to trigger a pre-Bar Date claim filing. Plum Creek attests that it decided not to complete its own risk assessment, for which it had undertaken a preliminary analysis and cost estimate of $100,000. Objection at p. 6 n.7. Its documents, however, reflect that Plum Creek incurred out-of-pocket costs in creating charts and blueprints, whether through in-house

---

[5] In the article, Plum Creek's own forester stated that "his company's beetle-killed timber in the Rainy Creek drainage is deteriorating rapidly and losing its value," Exhibit O to the Motion, which flies in the face of Plum Creek's sweeping assertion that "timber is a non-perishable asset." Exhibit A to Objection, Ray Decl. at ¶ 12.

resources, preliminary discussions with outside consultants, or both. *See* Exhibit M to Motion, Plum Creek charts and blueprints.

While the 2010 EPA Report may have stated that "asbestos had become embedded in tree bark of some Libby trees," Objection at ¶ 6, to call this the "first notification" of such a problem is wrong. In February 2003, EPA informed Plum Creek that "[g]iven the established toxicity of Libby asbestos and the lack of any sampling data for the areas in question, *it is prudent to assume*" a "worst case scenario," in which "high levels of *[Libby Amphibole asbestos]* may have been deposited under a very wide area (including the areas in question) and still remain today. Such contamination could be present . . . on surfaces of vegetation and trees, and even *incorporated into . . . timber (e.g. bark)*." Exhibit N to Motion, at PTCT 518 (emphasis added).

Plum Creek's assertion that its "level of awareness of the threat of asbestos contamination" substantially changed upon receipt of the December 2014 EPA Report is a self-serving over-statement. Objection at ¶ 9. According to Plum Creek, the 2014 Report confirmed that "specific timber on [Plum Creek's] Property had been contaminated to an extent that precluded commercial forestry." *Id.* But the report does not actually state or conclude that "it will be impossible to safely conduct commercial forestry" within one mile of Grace's site. *Id.* at ¶ 35. By Plum Creek's own description, "[t]he 2014 Report left for the future any determination of whether and how commercial forestry operations could be conducted safely" on timber lands within one and four miles of the mine, such as the lands at issue in Plum Creek's Late Claim. *Id.* at ¶ 10. Thus, while the report may have provided incremental information, fundamentally it did not change what Plum Creek knew in 2003: As a result of Grace asbestos, Plum Creek may not be able to safely harvest its timber, or, may need substantial safety precautions.[6]

---

[6] As noted in the Motion, Plum Creek also asserts the right to file another, future Asbestos PD Claim regarding other parcels of property near the former mine. Exhibit J to Motion, 10/7/15 Plum Creek letter at 6 n.22.

5

II. **UNDER THE BANKRUPTCY CODE'S DEFINITION OF A "CLAIM" AND CONTROLLING CASE LAW, BASED ON ITS KNOWLEDGE, PLUM CREEK HAD A CLAIM AT THE BAR DATE.**

   A. **The Broad Bankruptcy Code and Bar Date Notice Claims Definition Does Not Require Knowledge to a High Degree of Scientific Certainty.**

Plum Creek repeatedly insists it cannot be held to the Bar Date because of professed ignorance of its claim. Plum Creek implies or suggests a number of standards for when the requirement to file a proof of claim is triggered—a claimant must have "knowledge of actual hazardous contamination" and must not have "good reason to believe it might not have an asbestos contamination problem;" a claimant's knowledge of its claim must be based on "certain answers," "scientific answers," "scientific information," "scientific understanding" or "scientific confirmation;" or, perhaps, a claimant must have only a "reasonable knowledge of harm" or possibly must "[know] with confidence" that it has a claim. Objection at p. 2 and ¶¶ 4, 13, 17, 19, 29, 32, 47, 49, 53. Plum Creek in effect asserts that a bankruptcy claim cannot arise unless and until the claimant accrues "some reasonable quantum of scientific evidence that a harmful outcome is likely." *Id.* at ¶ 32.

But the test is not whether a potential claimant has scientific evidence of near-definitive proof of exposure to asbestos that cause injury. If that were the test, virtually no one would have filed by the Bar Date. Nor is the test whether there were "realistic geological and biological reasons to expect there would be no contamination,"[7] or whether the EPA had postponed further investigation because of other more pressing Libby issues. *See* Objection at ¶ 13.[8]

---

[7] The article cited by Plum Creek as evidence of such "realistic geological and biological reasons" states that the trees for which timber sales were planned were "upwind and geologically separate from the asbestos-contaminated vermiculite deposits" mined by Grace but that EPA perceived risks in logging these trees. *See* Exhibit L to Motion, at PTCT 435. The articles also states that "[r]ecent health screenings have revealed asbestos-related disease among loggers who worked in the area when the mine was in operation . . ." *Id.*

[8] Plum Creek also asserts that it could have been subject to criminal liability for filing a false proof of claim. Objection at 2 n.2. Of course, a claim cannot be criminally fraudulent merely because it is partially contingent or unmatured.

6

The Bankruptcy Code's definition of "claim" in no way can be read — and has not been read in this circuit or others — to require such a heightened level of scientific proof or perfect knowledge. To the contrary, the Code explicitly sweeps into the definition of "claim" rights to payment that are "unliquidated," "contingent," "unmatured," and "disputed." 11 U.S.C. § 101(5)(A). Grace's Bar Date Notice made this statutory definition of "claim" explicitly clear, in bold typeface, informing putative claimants that claims for "diminution in value or economic loss" were included and that even "contingent," "unliquidated" and "unmatured" claims — and "no matter how remote or contingent" — must be filed or be forever forfeited. Exhibit F to Motion, Dkt. No. 1926-2, p. 3, ¶ 1. As if this were not clear enough, the Notice also stated: "Because of this broad definition, acts or omissions of the Debtors that occurred before the Debtors filed their Chapter 11 cases on April 2, 2001 may give rise to claims against them notwithstanding that such claims may not have matured or become fixed or liquidated prior to such date." *Id.*

Plum Creek can point to no case, whether in the asbestos context or otherwise, requiring the high degree of scientific certainty of contamination and harm that it has postulated. *In re Grossman's, Inc.*, 607 F.3d 114 (3d Cir. 2010), holding that a bar date applies to asbestos claims that did not manifest until nearly ten years following the effective date of a bankruptcy plan, demonstrates that Plum Creek is wrong. *Grossman's* does not refer to actual knowledge of or scientific certainty as to asbestos injury, damage or contamination. Rather, *Grossman's* holds "that a 'claim' arises when an individual is exposed pre-petition to a product or other conduct giving rise to an injury, which underlies a 'right to payment' under the Bankruptcy Code." *Id.* at 125, citing 11 U.S.C. § 101(5). Yet despite offering over a dozen different standards for

determining whether its level of knowledge of its claim was sufficient, Plum Creek never addresses the applicable standard under *Grossman's*.[9]

This Court previously rejected an argument that a claimant's failure to recognize that it had a claim prior to the bar date excuses a failure to file its claim. *See In re New Century TRS Holdings, Inc.*, 465 B.R. 38 (Bankr. D. Del. 2012). In *New Century*, the claimant alleged she was unaware of any claim for fraud against the debtor until after the bar date. *Id.* at 46. After summarizing the definition of a claim under the bankruptcy code, this Court then examined *Grossman's* and concluded that Third Circuit law was clear that a claim was a prepetition claim (and thus subject to the bar date) if it arose out of prepetition conduct toward the claimant. *Id.* at 45. Explicitly holding that the claimant's claim was subject to the bar date, the Court applied the excusable neglect standard with which Plum Creek refuses to engage. *Id.* at 51-53.

Here, Plum Creek does not even allege the type of total ignorance of legal rights apparently at issue in *New Century*. Plum Creek acknowledges that it understood there was a "range of potential risk to Plum Creek" as early as 2003 (*i.e.*, before the Bar Date), and that "all sorts of outcomes were possible." Objection at ¶ 17. By its own admission, at the Bar Date, Plum Creek was aware of a degree of risk—easily within the Bankruptcy Code's broad definition of a claim, as incorporated into the Bar Date notice—but chose not to act, ostensibly based on a mistaken belief that it needed to be certain of the level of harm. *Id.* at ¶ 16.

**B.    *Fogel v. Zell* Shows Precisely Why Plum Creek Had A Claim At The Bar Date.**

Plum Creek's characterization of *Fogel v. Zell*, 221 F.3d 955, 960 (7th Cir. 2000), is inapposite for at least three reasons. *First*, unlike the *Fogel* claimants, Plum Creek had actual

---

[9]   Plum Creek does bizarrely rely in principal part on *Grossman's* discussion of factors to consider in determining whether discharge comports with due process, *see* Objection at ¶ 28, even though the Objection itself admits that *Grossman's* noted that due process could be satisfied by implementation of a Section 524(g) trust such as the one under the Debtors' Plan, as discussed below at Section IV.

damages before the Bar Date. *Second*, Fogel is not governing law; under *Grossman's*, "a 'claim' arises when an individual is exposed pre-petition to a product or other conduct giving rise to an injury, which underlies a 'right to payment' under the Bankruptcy Code." 607 F.3d at 125.

*Third*, the Seventh Circuit expressly distinguished between asbestos claims and the claims that were at issue in *Fogel*. While purchasers of defective concrete piping did not have a "claim" within the meaning of the Bankruptcy Code until the occurrence of actual harm (i.e., pipes bursting), claims based upon asbestos exposure present unique circumstances; thus, "it might be a price worth paying" to permit asbestos claims to be treated as having arisen before the injury has manifested, in order to "eliminate an arbitrary difference in treatment" among claimants who had all been exposed to asbestos prior to the bankruptcy. *Fogel*, 221 F.3d at 960-61. Plum Creek does not acknowledge this explicit distinction of asbestos claims from more customary tort cases.

More specifically, Judge Posner wrote that "before, perhaps long before, any harm giving rise to a matured tort claim has occurred, the bankruptcy court can bring those [asbestos] claimants into the bankruptcy proceeding and make provision for them in the final decree." *Id.* at 962. *Fogel's* suggested treatment of asbestos claims, perhaps unsurprisingly, mirrors the Third Circuit's treatment under the standard articulated in *Grossman's* as well as the philosophy embodied in Section 524(g) of the Bankruptcy Code, which *Fogel* mentions as a mechanism for administering claims based on un-manifested harm. *Grossman's*, 607 F.3d at 126; *Fogel*, 221 F.3d at 961. Consequently, Plum Creek's reliance on *Fogel* fails.

### III.  PLUM CREEK RECEIVED MORE THAN ADEQUATE NOTICE

While Plum Creek makes much of the fact that the Debtors delivered notice of the Bar Date to Plum Creek's Libby branch office, it nevertheless concedes that it received actual notice as well as publication notice. *See* Objection at ¶¶ 38, 43. As discussed in the Motion, the

9

Debtors' robust notice program went above and beyond what the Bankruptcy Code and relevant case law requires. *See In re W.R. Grace & Co.*, 389 B.R. 373, 379 (Bankr. D. Del. 2008) (recognizing that the notice program was "extensive"). Judge Fitzgerald previously approved these forms of notice as "fair and reasonable" and found that they would "provide good, sufficient and proper notice to all creditors of their rights and obligations." *See* Exhibit S hereto, 4/22/02 Bar Date Order, Dkt. 1963 at p. 2. Although any argument of insufficient notice should begin and end with the admission that it received not one but two forms of the sanctioned notice, Plum Creek's assertions of inadequate notice are meritless for a number of other reasons.

As a preliminary matter, the Debtors were under no legal obligation to provide anything other than publication notice to unknown creditors such as Plum Creek. Plum Creek concedes that it was such an unknown creditor. *See* Objection at p. 19 ("Plum Creek is an Unknown Creditor"); p. 20 ("Because Plum Creek Was an Unknown Future Creditor . . ."). Case law is unambiguous—as was the Motion—that such creditors are entitled to only publication notice. *See, e.g.*, Motion, p. 17; *see also Chemetron Corp. v. Jones*, 72 F.3d 341, 345-46 (3d Cir. 1995).

Although Plum Creek provides no legal support for an argument that it was entitled to actual notice despite its admitted status as an unknown creditor, it asks this Court to find that the *additional* notice it received on top of the sufficient publication notice was inadequate because it didn't comply with Plum Creek's apparent preference to be served in a location 450 miles away from Libby (at an address which was unknown to the Debtors, given that Plum Creek was an unknown creditor) rather than an office in the immediate vicinity of the Debtors' mine. Plum Creek's citation to Federal Rule of Bankruptcy Procedure 7004(b) in support of this argument is irrelevant for, at minimum, two reasons. *See* Objection at p. 21, n.22.

*First*, Fed. R. Bankr. P. 7004(b) applies to adversary proceedings; the establishment of a bar date is not an adversary proceeding. *See* Fed. R. Bankr. P. 7001 (outlining the scope of what proceedings are adversary proceedings). *Second*, as noted above, Judge Fitzgerald has already ruled on the adequacy of the notice, and Plum Creek has offered no evidence supporting a finding that her conclusion as to all Libby occupants ought not to apply to Plum Creek, who received the same notice as every other similarly-situated party in Libby. If Plum Creek believes its apparent practice of not opening, or reading, or forwarding its mail at branch offices or some other mitigating factor excused its performance, such an argument is relevant not to the adequacy of notice (which the courts have already settled), but rather only to the excusable neglect analysis with which Plum Creek has refused to engage (as discussed in more detail below). *See, e.g., In re Seivers*, 378 B.R. 473 (Bankr. W.D. Pa. 2007) (Internal Revenue Service late claim was not excused by failure to establish internal processes to forward claims bar date notices to departments that may have knowledge of claims against the debtor).

Plum Creek also suggests that if asbestos contamination in its trees was obvious to the Debtors, they should have known that Plum Creek was a potential creditor and identified it as such. Objection at ¶ 43. The Third Circuit has specifically rejected such a "foreseeability" test. *See Chemetron*, 72 F.3d at 347 (bankruptcy court applied an "incorrect rule of law" in finding that the debtor "'knew or should have known that it was reasonably foreseeable that it could suffer claims from individuals living near the [environmental damage site]'") (internal citation omitted). That Plum Creek was a major Libby landowner does not change this standard. *Id.* at 347[10]; *see also In re Texaco Inc.*, 182 B.R. 937, 954-55 (Bankr. S.D.N.Y. 1995) (claim was

---

[10] In *Chemetron*, the Third Circuit specifically rejected the same contention that Plum Creek makes here — that because asbestos contamination near Libby was "obvious," Grace should have listed Plum Creek as a creditor and provided "personalized notice." Objection at ¶ 43. *See Chemetron*, 72 F.3d at 347 ("It has been suggested that Chemetron could have conducted a title search on all properties surrounding the sites to determine all

11

unknown where adjacent landowner did not file environmental action against debtor until after bar date). *Pacificorp* provides clear guidance on identifying creditors in the environmental context, and rejects the existence of a duty for a debtor to seek out and provide notice to every party in Plum Creek's situation. *See Pacificorp v. W. R. Grace*, 2006 WL 2375371, *10 (D. Del. Aug. 16, 2006) ("in the context of environmental liability, a debtor is not required to search out all possible parties that may have been affected by its actions").

Perhaps unsurprisingly given that it cites no law in support of its argument, Plum Creek focuses on the irrelevant question of whether the Debtors should have anticipated that claims might be asserted by Plum Creek or sought out further information about Plum Creek, rather than the legally dispositive question of whether a careful examination of the Debtors' books and records would have revealed Plum Creek as a creditor. *Id.* As set forth in the Motion, it would not and in fact did not. *See* Motion at p. 18.

In summary, to the extent that Plum Creek believes it *should* have been a known creditor even under the applicable standard — despite its own statement that it was unknown — that argument is defeated by *Pacificorp*. To the extent Plum Creek believes the extensive notice program did not provide adequate publication notice to unknown creditors such as itself, Judge Fitzgerald long ago decided emphatically to the contrary. *See* Exhibit S, Bar Date Order, Dkt. 1963 at p. 5 (ordering that notice in accordance with the notice program to unknown creditors "shall be deemed good, adequate and sufficient notice of the Bar Date"). To the extent that Plum Creek would like to have it both ways and call itself an unknown creditor but insist on actual notice, Plum Creek by its own admission in fact received such notice. *See* Objection at ¶ 43. To the extent Plum Creek believes that the Bankruptcy Code or due process required a

---

persons who might have lived in the area during the twenty years between Chemetron's operation of the sites and the Chapter 11 proceeding. We decline to chart a jurisprudential course through a Scylla of causational difficulties and a Charybdis of practical concerns.")

different form of actual notice than it received, such a claim is meritless; it is settled that the Bankruptcy Code and due process do not require that Plum Creek receive *any* such actual notice. Plum Creek's attempt to obtain a ruling that the Debtors should have gone "above and beyond going above and beyond" in providing actual notice should be rejected.

## IV. <u>DISCHARGE OF PLUM CREEK'S CLAIM COMPORTS WITH DUE PROCESS</u>

As the Third Circuit noted in *Grossman's*, due process is satisfied by implementation of a Section 524(g) trust such as the one under the Debtors' Plan. Section 524(g) was enacted to "[take] account of the due process implications" inherent in discharging asbestos liabilities. *Grossman's*, 607 F.3d at 127; *see also In re Combustion Engineering, Inc.*, 391 F.3d 190, 234 and n.45 (3d Cir. 2004) (Section 524(g)'s entire purpose is to provide for resolution of asbestos claims "in a manner consistent with due process," and "[m]any of [section 524(g)'s] requirements are specifically tailored to protect the due process rights of future claimants)."

It was only after opining on the innovative manner in which Section 524(g) balances rehabilitation concerns with due process considerations, and then noting that a Section 524(g) trust did *not* exist in the case before it, that the *Grossman's* court moved on to a consideration of the factors relied on in the Objection. *See Grossman's*, 607 F.3d at 127. Plum Creek apparently reads *Grossman's* to have completely abrogated Section 524(g) in favor of a totality of the circumstances due process test in all cases (even after noting that Section 524(g) was enacted specifically to provide a consistent mechanism for affording appropriate process), which certainly would be news to Congress and the many debtors who have successfully relied on Section 524(g) since its enactment.

While Plum Creek may wish to cherry pick various factors in analyzing due process, the Bankruptcy Court has already done this work for it in a much more straightforward manner. In her order confirming the Plan, Judge Fitzgerald noted that Section 524(g) "provides due process

13

to the 'unknown future claimant,'" as a general matter, and in the specific context of the Debtors' Plan, "those due process rights are protected." *In re W. R. Grace & Co.*, 446 B.R. 96, 130 n.58 (Bankr. D. Del. 2011). As discussed throughout this reply, Plum Creek had a claim at the Bar Date, and is not the type of future claimant whose due process rights were at stake in Judge Fitzgerald's analysis.[11] However, even accepting Plum Creek's incorrect assertion that the necessary inquiry is "whether a bankruptcy discharge affecting future claimants like Plum Creek . . . satisfies *Grossman's* due process test," Plum Creek has offered nothing to upset the considered judgment of Congress and the courts that affirmed the Debtors' Plan that a Section 524(g) trust protects those due process rights. Objection at ¶ 29. Even on its own erroneous terms, Plum Creek's argument must fail.

## V. THE PD TRUST, NO MATTER HOW FUNDED, DOES NOT EXIST TO PAY CLAIMS SUCH AS PLUM CREEK'S

Plum Creek also implies that its neglect ought to be irrelevant because it believes that Grace's Section 524(g) property damage trust is illusory, painting the entire trust process as "a public relations ploy" from which "no one can actually recover." Objection at p. 3.[12]

But it is incorrect to assert that if Plum Creek cannot recover from the PD Trust, no one can recover from the trust. Rather, what is true is that a claimant whose claim existed at the Bar Date and received adequate notice cannot recover from the Trust if such claimant chose not to comply with the Bar Date procedures. The PD Trust is for future claimants, not for those who

---

[11] Plum Creek was informed of its rights with respect to its claim by the Bar Date notice program, which Judge Fitzgerald explicitly found provided "proper notice to all creditors of their rights and obligations in connection with the claims they may have against the Debtors in these chapter 11 cases *in satisfaction of due process*." Exhibit S, Bar Date Order, at p. 6 (emphasis added).

[12] Plum Creek also asserts that "Grace's current refusal to allow Plum Creek to submit a claim" contradicts Grace's position at confirmation that the Asbestos PD Trust was necessary. Objection at 3. Grace has not refused to allow Plum Creek to submit a claim, and Plum Creek did submit its claim to the Asbestos PD Trust on October 7, 2015. Grace has, however, required Plum Creek to comply with the procedures of the Class 7A Asbestos PD Case Management Order, which requires claimants to provide information relevant to evaluating whether the claim has been discharged and affords Grace the opportunity to file a discharge motion. *See* Exhibit I to Motion, PD CMO at Sections II.A and II.B.

had pre-petition claims and neglected to file. That is precisely why the Class 7A Asbestos PD Case Management Order contains detailed procedures for the evaluation and adjudication of discharge issues related to post-effective date claims. The purposes of the Trust do not include processing prepetition claims held by parties who knowingly elected not to comply with the Bar Date. The establishment of the PD Trust does not invalidate the Bar Date, and the Bar Date would have no purpose if, merely because funds remain in the trust, any creditor could later be entitled to recovery without establishing excusable neglect. No principle of bankruptcy law or precedent supports such an outcome.

Indeed, Plum Creek's argument is a flavor of an argument the Debtors faced in seeking confirmation of their Plan, and one with which the Third Circuit notably disagrees. In 2013, the Third Circuit specifically held that future property damage claims *can* exist, even if it is possible that they may never be allowed. *In re W. R. Grace & Co.*, 729 F.3d 332, 340-42 (3d Cir. 2013). Prior to the appeal to the Third Circuit, the Bankruptcy Court explicitly rejected the argument that the trust was illusory because no property damage Demands could be asserted against it. *See In re W. R. Grace*, 446 B.R. at 144. Plum Creek quotes at length from this Bankruptcy Court decision, Objection at ¶ 23, but fails to recognize its importance.

## VI. PLUM CREEK HAS NOT MET AND CANNOT MEET ITS BURDEN OF DEMONSTRATING EXCUSABLE NEGLECT

Because Plum Creek had a claim at the Bar Date, it is simply incorrect that it need not demonstrate excusable neglect. Just as this Court did in *New Century*, once it is determined that Plum Creek's claim was subject to the Bar Date, the excusable neglect standard must be applied. *New Century*, 465 B.R at 51-53. Here, not only can Plum Creek not demonstrate excusable neglect for the reasons set forth in Grace's Motion at pp. 22-27; Plum Creek's Objection

15

provides additional reasons that demonstrate that its late filing would be prejudicial to Grace, was entirely within Plum Creek's control, and was not in good faith.[13]

### A. Prejudice to the Reorganized Debtors

To permit the filing of a late claim on the basis of Plum Creek's professed ignorance of its claim would establish precedent that could open the floodgates to other claims. *See In re Am. Classic Voyages Co.*, 405 F.3d 127, 133 (3d Cir. 2005) ("[A] strict bar date . . . facilitate[s] the equitable and orderly intake of those claims.") Grace's Plan and the funding of the PD Trust were premised on the fact and understanding that Asbestos PD Claims such as Plum Creek's would not be permitted after the Effective Date. Opening the door to a pre-Bar Date claim such as Plum Creek's could further prejudice Grace by inviting additional claims from other parties with the same level of pre-Bar Date knowledge. Moreover, as this Court is well aware, another property damage claimant — Anderson Memorial Hospital — has asserted that there are droves of unasserted property damage claims that will eventually inundate the PD Trust.

### B. Reason for the Delay

Plum Creek's delay, which occurred apparently based on a flat-out misunderstanding of the Bankruptcy Code and the Bar Date, was "entirely avoidable and within [Plum Creek's] control." *See Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 397 (1993)). It is black letter law that "'[i]gnorance of one's own claim does not constitute excusable neglect.'" *Jones v. Chemetron Corp.*, 212 F.3d 199, 205 (3d Cir. 2000) (inner citation omitted), and that legal mistakes do not constitute excusable neglect. *Pioneer*, 507 U.S. at 392. In a case involving a similar mistaken belief, *In re DPH Holdings Corp.*, 434 B.R. 77 (S.D.N.Y. 2010), the court found that the state workers compensation fund held a contingent claim which it should

---

[13] The fourth *Pioneer* factor with respect to excusable neglect — length of delay — remains perhaps the most difficult hurdle for Plum Creek, for the reasons stated in the Motion at pp. 24-25.

have filed at the bar date because the bankruptcy court had authorized, but not required, the debtor to make workers compensation payments. *Id.* at 84-85. Thus, there was a risk that based upon changed circumstances or the exercise of their business judgment, the debtors would not make payments, and the fund was obligated to file a proof of claim based on this contingency. *Id.* at 85. Here, Plum Creek held, and should have asserted, just such a contingent claim.

Not only is Plum Creek's "scientifically certain claim" the wrong standard for whether a claim arose prior to the petition date, but the belief that this was the standard also does not establish excusable neglect. *See, e.g., In re Flintkote Co.*, 486 B.R. 99, 114 (Bankr. D. Del. 2012), *aff'd sub nom. In re Flintkote Co.*, 526 B.R. 515 (D. Del. 2014) (noting, with respect to a contingent claim, that "a belief that filing a proof of claim would be futile, or a belief that the law does not allow the filing of a proof of claim does not constitute excusable neglect.").

It is also of no consequence if Plum Creek was unsure at the time of the Bar Date about the full scope of any damages it might ultimately be entitled to. *See, e.g., In re Glob. Aviation Holdings Inc.*, 495 B.R. 60, 65-66 (Bankr. E.D.N.Y. 2013) ("If [the claimant] was unable to ascertain the amount or extent of its claim, it had the option to file a claim in an unliquidated amount.") It is indisputable that Plum Creek had incurred actual economic loss before the Bar Date, including costs to sample a small number of trees in 1999, to consider and develop (if not complete) the "Grace Risk Assessment," and to work with the EPA on investigating the possibility and extent of contamination. That alone was more than enough to require Plum Creek to assert its claim.

Plum Creek cannot credibly profess ignorance of the validity of its claim, either prior to the Bar Date or in the intervening years before it untimely filed the Late Claim. Like the would-be claimants in *Pacificorp*, who professed ignorance of their claim until they were spoon fed

have filed at the bar date because the bankruptcy court had authorized, but not required, the debtor to make workers compensation payments. *Id.* at 84-85. Thus, there was a risk that based upon changed circumstances or the exercise of their business judgment, the debtors would not make payments, and the fund was obligated to file a proof of claim based on this contingency. *Id.* at 85. Here, Plum Creek held, and should have asserted, just such a contingent claim.

Not only is Plum Creek's "scientifically certain claim" the wrong standard for whether a claim arose prior to the petition date, but the belief that this was the standard also does not establish excusable neglect. *See, e.g., In re Flintkote Co.*, 486 B.R. 99, 114 (Bankr. D. Del. 2012), *aff'd sub nom. In re Flintkote Co.*, 526 B.R. 515 (D. Del. 2014) (noting, with respect to a contingent claim, that "a belief that filing a proof of claim would be futile, or a belief that the law does not allow the filing of a proof of claim does not constitute excusable neglect.").

It is also of no consequence if Plum Creek was unsure at the time of the Bar Date about the full scope of any damages it might ultimately be entitled to. *See, e.g., In re Glob. Aviation Holdings Inc.*, 495 B.R. 60, 65-66 (Bankr. E.D.N.Y. 2013) ("If [the claimant] was unable to ascertain the amount or extent of its claim, it had the option to file a claim in an unliquidated amount.") It is indisputable that Plum Creek had incurred actual economic loss before the Bar Date, including costs to sample a small number of trees in 1999, to consider and develop (if not complete) the "Grace Risk Assessment," and to work with the EPA on investigating the possibility and extent of contamination. That alone was more than enough to require Plum Creek to assert its claim.

Plum Creek cannot credibly profess ignorance of the validity of its claim, either prior to the Bar Date or in the intervening years before it untimely filed the Late Claim. Like the would-be claimants in *Pacificorp*, who professed ignorance of their claim until they were spoon fed

their rights by the EPA, Plum Creek cannot rely on such ignorance as an excuse. *See Pacificorp*, 2006 WL 2375371 at *13. To the extent that any legal misinterpretation on the part of Plum Creek's counsel is to blame for Plum Creek's delay, the delay must be imputed to Plum Creek; neither the Reorganized Debtors nor other stakeholders should be disadvantaged as a result. *See, e.g., In re Lehman Bros. Holdings Inc.*, 433 B.R. 113, 122 (Bankr. S.D.N.Y. 2010) (mistakes by a creditor's attorneys or advisors which result in the filing of late claims do not meet the requirements of excusable neglect). The Debtors went above and beyond the notice required by the Bankruptcy Code to put Plum Creek in a position to be apprised of and move to protect its rights. Its failure to do so is not excusable.

### C. Good Faith

Plum Creek has not met and cannot meet its burden of proving that it has acted in good faith, in large part because of the contradiction in its failure to timely file a claim due to professed uncertainty about its legal rights and its later decision to file a claim despite continuing uncertainty. Plum Creek has admitted that it was "uncertain" of the potential for property damages even when filing its 2010 claim, and only fully understood that its trees were contaminated in 2014. Objection at ¶¶ 8, 55. Nothing in the Objection alters the inescapable conclusion that Plum Creek's decision to file its proof of claim "was a change of mind, not circumstances." *In re Nortel Networks, Inc.*, 531 B.R. 53, 66 (Bankr. D. Del. 2015).[14]

---

[14] As the Reorganized Debtors were filing this Reply, counsel received the brief filed this afternoon by the Property Damage Future Claimants' Representative. The Reorganized Debtors believe no response is necessary, but are at the Court's pleasure and happy to file a response if the Court believes any new issue has been raised that it would like Grace to address.

## **CONCLUSION**

For the reasons set forth in its Motion and this Reply, the Reorganized Debtors respectfully request that the Court enter an Order, substantially in the form of the Proposed Order at <u>Exhibit A</u> to the Motion, holding that Plum Creek's claim is discharged and enjoined and that the July 2010 motion is dismissed with prejudice.

Dated: June 20, 2016

KIRKLAND & ELLIS LLP
John Donley, P.C.
Lisa Esayian
Ryan Matthew Hehner
Bryan Vincent Uelk
300 North LaSalle
Chicago, IL 60654
(312) 862-2000

And

THE LAW OFFICES OF ROGER HIGGINS
Roger J. Higgins
111 East Wacker Drive
Suite 2800
Chicago, IL 60601
(312) 836-4047

And

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ James E. O'Neill*
Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705
(302) 652-4100
(302) 652-4400

*Co-Counsel for the Reorganized Debtors*