Page 1

1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3

4

5    In re:                    :

                               :   Chapter 11

6    W.R. GRACE & CO., et al.,  :

                               :   Case No. 01-01139 (KJC)

7                              :

          Debtors.            :   (Jointly Administered)

8    _____   :

9

10

11

12                              United States Bankruptcy Court

13                              824 North Market Street

14                              Wilmington, Delaware

15                              June 15, 2016

16                              1:01 p.m. - 3:20 p.m.

17

18

19

20

21   B E F O R E :

22   HON KEVIN J. CAREY

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO OPERATOR:  AL LUGANO

1    HEARING re Anderson Memorial Hospital's Motion to Alter or

2    Amend Order Denying Class Certification.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

1   A P P E A R A N C E S :

2

3   KIRKLAND & ELLIS LLP

4       Attorney for Reorganized Debtors

5

6   BY:  JOHN DONLEY

7

8   PACHULSKI STANG ZIEHL & JONES

9       Attorney for Reorganized Debtors

10

11  BY:  JAMES E. O'NEILL

12

13  FERRY JOSEPH PA

14      Attorney for Anderson Memorial Hospital

15

16  BY:  THEODORE J. TACCONELLI

17

18  SPEIGHTS & RUNYAN

19      Attorney for Anderson Memorial Hospital

20

21  BY:  DANIEL A. SPEIGHTS

22      A.G. SOLOMONS III

23

24

25

1   KOZYAK TROPIN & THROCKMORTON

2         Attorney for Anderson Memorial Hospital

3

4   BY:  DAVID L. ROSENDORF

5

6   THE SANDERS LAW FIRM LLC

7         Representative of Future Claimants (PD FCR)

8

9   BY:  ALEXANDER M. SANDERS, JR.

10

11  LAW OFFICE OF ALAN B. RICH

12        Attorney to PD FCR

13

14  BY:  ALAN B. RICH

15

16  ALSO PRESENT TELEPHONICALLY:

17

18  RYAN M. HEHNER

19  ROGER HIGGINS

20  ROBERT M. HORKOVICH

21  ADAM PAUL

22  RICHARD B. SCHIRO

23  DEBORAH WILLIAMSON

24

25

1                    P R O C E E D I N G S

2    THE CLERK:  All rise.

3              THE COURT:  Good afternoon, everyone.

4              GROUP:  Good afternoon, Your Honor.

5              MR. O'NEIL:  Good afternoon, Your Honor.  James

6    O'Neil, Pachulski, Stang, Ziehl & Jones appearing today with

7    my co-counsel, John Donley from the Kirkland & Ells firm, on

8    behalf of the reorganized debtors.  And, Your Honor, with us

9    in the courtroom today is Richard Fink, our client.

10             This is the time for the hearing on Anderson

11   Memorial Hospital's motion to alter or amend order denying

12   class certification.

13             Your Honor, I'll turn the podium over to the

14   movants; if that's acceptable.

15             THE COURT:  Very well.  Yes.  I mean, unless

16   there's anything preliminary, let's just jump right in.

17             MR. O'NEIL:  Okay.

18             MR. SPEIGHTS:  May it please the Court, I'm Dan

19   Speights.  I've represented Anderson since its initial

20   filing in South Carolina.  With me today is my bankruptcy

21   counsel, David Rosendorf, who is sitting next to me, of the

22   Kozyak Tropin Law Firm in Miami.  Next to him is Gibson

23   Solomon, he's my law partner.  And of course, next to him is

24   Ted Tacconelli, Delaware counsel.

25             I also note, for the record, that Judge Sanders,

1   property damage future claimants' representative and his

2   counsel, Adam Rich, are also present in the courtroom.

3          Your Honor, directed us to address class

4   certification, and that is what we have attempted to do.  I

5   am not one to simply read my briefs back into the record, I

6   would like to emphasize a few points on the class issues.

7          If bankruptcy issues arise I may ask Mr. Rosendorf

8   to address those, who is the bankruptcy counsel, I am an

9   asbestos lawyer and class action lawyer.  Although obviously

10  over the years, in this Court, I've become familiar with

11  many issues involving bankruptcy and asbestos cases.

12         Your Honor, I'd like to start with the ultimate

13  question, as I see it.  And the ultimate question is, why

14  should this Court certify class action.  And I believe there

15  are several reasons the court should do this.  They are set

16  forth in the brief, but I want to highlight exactly why we

17  believe the Court should do this.

18         And the first reason is, is in the interest of

19  this Court, the bankruptcy court, to certify a class action.

20  If this Court certifies the class action, you will avoid

21  repeated hearings where, they call them Section 2 claimants,

22  and I call them Category B claimants, they are one and the

23  same; and I may go back and forth on terminology, but where

24  the Section 2 or Category B claimants will be before you on

25  some regular basis, I --

1          THE COURT:  How many are there now; do you know?

2          MR. SPEIGHTS:  I don't know how many there are,

3   but the Murtaugh affidavit, which is in the record, shows

4   that there are thousands of buildings out there, how many of

5   them will choose to file individual cases is a great

6   unknown.  But, Grace has said there are a substantial

7   number, I can represent to you that we will file enough to

8   satisfy Judge Walrath's bottom line number, if the class is

9   not certified.

10          Super imposed upon all that issue is, when can

11   they be filed?  If you have a class, they were all filed as

12   of the bar date in March 2003, as members of the class as

13   Judge Walrath's holding, which is pretty standard class

14   action law.

15          If there is no class, then the issue is when do

16   these thousands of building owners accrue, because until

17   their claims accrue individually, they cannot bring a

18   lawsuit and would be subject to a motion by Grace to dismiss

19   the case, because they have not yet accrued.

20          I don't know, but I will say that the data we've

21   submitted in the Murtaugh affidavit, which is an exhibit,

22   shows that there are as many masonry fill claims out there

23   as there are ZAI claims.  Almost the exact amount of product

24   was sold over the years, and of course Judge Fitzgerald

25   certified a class for ZAI, finding that there was ample

1    support for numerosity, and there are at least that many

2    potential claims out there.

3            I'm going to discuss masonry fill a little later,

4    I don't want to get -- go down the road, but the bottom line

5    is I don't know, but I think there's ample evidence to find

6    that they are enough to meet numerosity.

7            THE COURT:  Well, Judge Fitzgerald found that

8    there was not.

9            MR. SPEIGHTS:  Judge Fitzgerald found that there

10   were none, because she thought, at the time, prior to the

11   filing of the plan, filing to her appointment of Judge

12   Sanders as the PD future claimants' representative, she

13   found, at that time there were none because all claims had

14   to be filed by the bar date, and there was no such thing as

15   a future PD claim.

16           Well, things change.  Grace asked Judge Fitzgerald

17   to appoint Judge Sanders as the future claimants'

18   representative and once that future claimants'

19   representative was appointed, there was an acknowledgement

20   that there are future claims out there, the bar date does

21   not control.  I disagree, respectfully, with Judge

22   Fitzgerald and her initial holding, but regardless, shortly

23   after she made that ruling things changed.

24           And the first thing was, and I think the most

25   important thing was the appointment of Judge Sanders as the

1    future claimants' representative.  The second important

2    thing was that the district court, Judge Buckwalter, ruled

3    that claims do not accrue when Judge Fitzgerald thought they

4    accrue.  Judge Fitzgerald granted summary judgment against

5    the State of California, found the statute had already run,

6    as part of her thinking about it with no few claims when

7    California recognized it had asbestos in buildings, and

8    actually did some work on that.  And Judge Buckwalter ruled,

9    and the appeal of that case, and Grace chose not to appeal

10   that ruling to the Third Circuit, that no, claims do not

11   accrue until there has been injury, defined as asbestos

12   contamination, which is almost a universal rule.  So that's

13   the second thing that changed after Judge Fitzgerald ruled.

14            You've got the appointment of a PD FCR, you've got

15   the California decision and then you have the troika of

16   cases, and this is a Rosendorf area of law, obviously

17   Frenville, Grossman's and Owens Corning, which changed the

18   law in the Third Circuit.  But in this case, in Frenville,

19   which recognized you did not have a claim to file until you

20   had injury.  So again, that is supportive of the district

21   court's opinion as well.  Those people were not required to

22   file proof of claims by March 31 of 2003, if they were not

23   injured, in accordance with state law.

24            And state law, as Judge Buckwalter has recognized,

25   almost universally, is that you cannot bring an asbestos

1   building case until there is contamination, a fact which

2   historically and consistently -- it's not the word I usually

3   choose for Grace, but it has been perfectly consistent since

4   the 1960's that their products do not contaminate prior to

5   major demolition activities.  So we have those changes.

6           And then finally, we have the plan itself.  This,

7   again, after Judge Fitzgerald denied certification, the plan

8   itself which Grace proposed was based upon expert testimony

9   that there would be a substantial number of PD claims.  And

10  certainly nobody believes that Grace was talking about 47

11  claims, which is Judge Walrath's number for certifying her

12  case, or 40, as Professor Miller says you need to justify a

13  class action.  Nobody believed that.  They were talking in

14  terms of thousands of claims in.

15          Grace says, well we didn't know exactly how many,

16  but they would be substantial.  And I'm not faulting Grace

17  for taking that position; I agree with Grace.  But Grace

18  took a calculated risk.  Grace decided on the appointment of

19  a PD FCR and decided to tell Judge Fitzgerald, Judge

20  Buckwalter and the Third Circuit that there was substantial

21  PD claims and ordered that it could get a 524(g) injunction.

22  And it needed the 524(g) injunction for property damage

23  claims so that it could get a billion dollars, actually a

24  little more than a billion dollars, from Sealed Air.  It was

25  a requirement of the Sealed Air settlement.

1           So when I say Grace took a calculated risk, I

2    think it was a smart risk, even if you want to certify as a

3    class, because they came out more than a billion dollars

4    ahead, by promoting the position that there were substantial

5    PD claims out there, and they got their 524(g) injunction.

6           THE COURT:  Okay.  So, let's just, for the moment,

7    assume that that's true, what about the position that Judge

8    Fitzgerald took saying, with the opt-out feature, you end up

9    really diluting any benefit, if there is one, to a class

10   action?  How do you respond to that?

11          MR. SPEIGHTS:  Well, if I understand what Judge

12   Fitzgerald is saying, and I believe my recollection is clear

13   on that, it may not be, Judge Fitzgerald was very protective

14   of the bar date order. It was an extensive bar date order,

15   it was publicized extensively, although for property damage

16   claimants, unlike ZAI claimants, she did not approve a

17   television component upon the representation by Grace that

18   the product was not in residences.  But in any event, she

19   was very protective of the bar date, of a PD bar date.

20          I have a couple of comments on that.  First of

21   all, I understand, having now dealt with a lot of bankruptcy

22   lawyers since 2001, that there is a tension between the

23   bankruptcy thinking on these issues, get a bar date, you

24   marshal the assets, you have the creditors there, you get

25   rid of it and you move on to more fertile cases.  And in

1    class action, which the idea is, starting with the cases of

2    In Re: American Reserve, and continuing almost until today,

3    that it's important, especially where you can't give actual

4    notice to people, but even when you can give actual notice,

5    that you have all the claimants before the Court, and

6    disperse justice to all the claimants and not to just those

7    who may not have ever heard of a bar date.  Another

8    statement that Judge Walrath talked about, the people who

9    don't even know about a bar date.

10            So I understand the tension, but I believe the

11   class action law, starting with In Re: American Reserve, and

12   going through all the circuits that have then considered it

13   and this Court, and other courts in the Third Circuit, that

14   Judge Fitzgerald did not appreciate what a class action

15   could provide.  But, having said that, and in defense of

16   Judge Fitzgerald, at that time there was no position put

17   forward by Grace, I tried to argue it, that there would be

18   additional claims out there.  That was -- and Judge

19   Fitzgerald says on the record at the 2007 certification

20   hearing, July 5, 2007, that she didn't believe there were

21   future claims out there.

22            So what she said in her order naturally follows

23   with the information that had been provided her at the time,

24   and what Grace's position was.  But I keep going back to

25   this.  Judge Fitzgerald changed her mind within months, when

1    at Grace's request, not my request, she appointed Mr. --

2    Judge Sanders to represent all these claimants who did not

3    file claims by the bar date.  If we were limited to the bar

4    date, why did the estate pay Judge Sanders and his counsel,

5    and rely upon Judge Sanders and his counsel throughout the

6    confirmation proceedings?  To support the fact that there

7    were -- would be substantial future claims, Judge.

8              It just seems to me Grace cannot have it both

9    ways, and I've said it over and over again in a brief, and I

10   can't add much to that, except if they are substantial

11   claims, then Judge Fitzgerald's statement, we don't have to

12   say it was wrong, it's inoperative.  Because now Judge

13   Fitzgerald, having approved the bankruptcy plan, recognized

14   herself that there would be substantial claims, contrary to

15   her certification order.

16             I hope I've addressed the question, Judge, but

17   that's -- I'm not here to argue so much that Judge

18   Fitzgerald was wrong, while I disagree with her, and while I

19   tried to appeal it.  I'm saying that the facts now that have

20   occurred since Judge Fitzgerald ruled, have completely

21   changed the landscape and have presented an entirely new

22   picture.  And I think it's important, and I will get to it

23   in a while, that Judge Sanders, who actively supported

24   Grace's confirmation, who actively supported the treatment

25   of property damage claims, and who was charged, by the

1   Court, not as an advocate for one claimant, charged by the

2   Court to represent all these future claimants, is sitting in

3   the courtroom now saying that to adequately represent all

4   these other people, Your Honor should certify a class

5   action.  And that certainly wasn't before Judge Fitzgerald

6   in 2007, because the plan had not even been filed at that

7   time.

8           Your Honor, if I could continue down my notes, but

9   I'm not, in any way, resistant to whatever questions the

10  Court as being important.  But --

11          THE COURT:  Well, I've noticed that.  You're free

12  to continue.

13          MR. SPEIGHTS:  Your Honor, I was saying I believe

14  it's in the interest of the Court.  If there are a

15  substantial number of claims, whether they are 40 or whether

16  they are hundreds, and I might can put a little more meat on

17  the bone about how there are -- how many there could be in a

18  while, but if there are substantial claims, I believe it's

19  in the Court's interest to try the Anderson claims

20  objections under Section 1 or Category A, and deal with all

21  of these in one proceeding, as opposed to having claimants

22  discover that they have asbestos materials and Grace

23  manufactured it, and that those materials have contaminated

24  buildings and begin a series of filing claims, which will

25  come before this Court, if Grace objects to them, and I

1    suspect everybody here believes that Grace will object to

2    claims.  It has consistently said, for years, that their

3    claims do not contaminate.  And Your Honor will have to go

4    through a proceeding that we affectionately call running the

5    gauntlet.

6              A claimant will come in here, let's say it's a

7    masonry fill claim for $3,000.  He files a claim, Grace

8    objects.  And you have to conduct proceedings on that.  I've

9    outlined it on the brief as to what all that could consist

10   of, and all of the issues that the Court might have to face

11   going from Owens Corning to accrual standards, as bar date

12   issues, et cetera, et cetera.

13             And then if Your Honor releases those, and they go

14   back to district court, in the wings will be another

15   claimant come through and in the absence of a class,

16   whatever you find as to claimant one will not be binding on

17   claimant two.  And there is no deadline for this procedure

18   running out, theoretically, this could go for 50 years. I

19   don't expect it to go for 50 years, but theoretically it

20   could.  There are a lot of buildings, thousands and

21   thousands of buildings, as their own expert testified, with

22   Grace's product, and those claims could continue to come

23   along.

24             So if Your Honor -- in contrast, if Your Honor

25   certifies the class, what will happen then?  Well, the first

1    thing Your Honor will do, I believe, if Your Honor follows

2    what is normally done in these situations, you will issue an

3    opt-out notice.  By the way, when you certify the class,

4    it's subject to additional review.  Grace can ask you later

5    to decertify that class.  And once you've certified a class,

6    you have wedded yourself to that class for the rest of the

7    time on the bench, Your Honor.

8              Under Rule 23, a trial court has great flexibility

9    to deal with class actions, as they should be, through

10   managed class action suit, modify certification orders.

11   It's an essential ingredient of class action law that is

12   used every day in the class action world.

13             But if you certify a class, you will issue an opt-

14   out notice.  The opt-out notice will go out, it'll be

15   published, maybe some direct notice as well, and it will say

16   to all these claimants, Category A, Category B, Section 1,

17   Section 2, if you don't opt-out by a certain date, a date

18   Your Honor will decide, 60 days, 90 days, whatever, then

19   your claim will be forever barred.

20             And unlike a bar date order, the class, which I

21   will be prepared to argue in a few minutes, includes both

22   accrued and unaccrued claims.  It includes all claimants.

23   It includes masonry fill and (indiscernible) and all

24   products.  So if you issue a bar date order -- excuse me, if

25   you certify a class and issue an opt-out order, if they

1    don't opt-out of this class, that's the end of it; they

2    don't have another day in court.  They can't come before you

3    and run the gauntlet.  Everybody's in the class, except

4    those who opt-out.

5            Now, how many will opt-out?  If we follow Grace's

6    logic that not really anybody out there wants to pursue an

7    individual litigation, under that logic, there will be no

8    opt-outs.  I don't buy that logic completely; there will

9    probably be a few opt-outs who would rather proceed

10   individually, file a motion and try to head to Spokane,

11   Washington or Phoenix, Arizona or somewhere and litigate

12   their case in a district court.

13           My point is, Your Honor, the best argument that

14   this is in the interest of the Court is, that it brings

15   closer.  It takes a proceeding with no deadline on how to

16   resolve it, and says, once that opt-out period is, we'll

17   know exactly, exactly how many individual claims there are

18   who will proceed individually and go to the gauntlet,

19   because they will be the opt-outs, be there three or 48 or

20   whatever.  We will get rid of all the uncertainty on that.

21           And of course, the converse is, if there were too

22   many opt-outs, Your Honor can say there are too many opt-

23   outs, I'm going to decertify this class that I certified.

24   I've decided, in light of those circumstances, that doesn't

25   make sense.  That's -- that happens occasionally in the

1    class action world that there are too many opt-outs. I don't

2    think that's going to be the case.  Your Honor, that will be

3    closure.

4           Then what happens next?  We have a defined

5    universe of what this class represents.  Unless we settle, a

6    word which I do not dislike, unless we settle, there will be

7    a trial.  If Your Honor, and I almost don't want to say

8    this, Your Honor, but if Your Honor rules against them, you

9    find in favor of W.R. Grace on the merits, subject to

10   whatever appeal we might take, that's the end of it.  You've

11   decided against all of the property damage claims, less opt-

12   outs, in one trial, a trial which will not take an

13   inordinate amount of time.

14          Suppose Your Honor rules, well, Grace is

15   responsible and we have a pot of money to deal with.  Or

16   better yet, suppose the parties all of a sudden agree, in

17   light of the certification, to have settlement discussions

18   and resolve it.

19          That's exactly what happened in the ZAI case.

20   Grace vigorously opposed class certification for years,

21   vigorously.  But at the end of the day, they worked out an

22   agreement, and they agreed to a certification and moved on.

23          Well, what happens then?  I'm trying to make sure

24   -- and I think it's important Your Honor knows where we're

25   headed.  If we settle or there's a verdict, there are

1    recognized, well accepted, often used procedures to divvy up

2    the pot.  In the world of asbestos litigation, there's

3    school class, which we certified and affirm on the Third

4    Circuit, the colleges class, which was certified and

5    affirmed by the Fourth Circuit, and a multitude of state

6    class actions, which are referred to in our initial

7    (indiscernible) process those claims, sometimes by

8    appointing an independent claims evaluator.

9           The judge doesn't do that, the class action judge

10   does not sit down and then evaluate 50 or 500 claims.

11   There's a claims administrator, there's a process and there

12   they are processed.  Some of these cases provide an appeal

13   to the district court, some of those provide a processing

14   agent's evaluation as final.  That's -- Your Honor could

15   decide if we go down that track.

16          Let me also say there is ample experience in the

17   bankruptcy world for how you process claims once you have

18   determined a pot of money.  In the -- in just those cases

19   I've been involved, in the Manville bankruptcy there was a

20   processing -- there was a PD trust created for this amount

21   of money and the Court appointed someone to process those

22   claims, a claims evaluator.  The same was done in the

23   Celotex bankruptcy down in Tampa, Florida.

24          Judge Fitzgerald had three other debtors that

25   Anderson had claims against, Mogul -- Federal Mogul, United

1    States Gypsum and U.S. Mineral.  And the Mogul and the

2    U.S.G. cases there was a settlement, we agreed upon a pot of

3    money.  Judge Fitzgerald actually sent those cases back to

4    South Carolina for the state court judge to process those

5    claims.  The state court judge in turn appointed somebody to

6    assist him in that endeavor.

7           And the U.S. Mineral bankruptcy, which is

8    currently pending before Judge Gross, Judge Fitzgerald

9    appointed a claims administrator, Mr. Hilton out of Texas.

10   Mr. Hilton processed those claims.  Anderson actually had a

11   dispute with Mr. Hilton over the amount that he awarded

12   Anderson.  That matter came to be heard before Judge Gross.

13   Judge Gross ordered us to mediation before Chief Judge

14   Magner of the New Orleans Bankruptcy Court.  She got us to

15   knock some heads and got us to resolve it.  And now Judge

16   Gross has approved that settlement.

17          That's sort of a long, winding story to tell Your

18   Honor that I'm not asking you to do anything that has not

19   been done multiple times in the past, both in the sense of

20   class action litigation, and class action settlements and

21   class action settlements within bankruptcies and plans which

22   provide for the payment of property damage claims.

23          So I believe it's undisputable, frankly, Your

24   Honor, that the class action will bring closure and will

25   bring closure far sooner, years earlier, then the Court --

1   this Court will ever have closure on having all these

2   individual claims out there which, again, there's no

3   deadline for bringing them.

4           THE COURT:  So what makes you so confident that if

5   a class were to be certified, that any notice that would go

6   out, by publication or otherwise, would be sufficient or any

7   better than what Grace did in the first place?

8           MR. SPEIGHTS:  Well, Your Honor, I have two

9   answers to that question.  The Third Circuit has ruled that

10  Grace's notice was sufficient to provide minimum due process

11  under the standard of the Supreme Court.  And I understand

12  that.  Kirkland & Ellis, representing Grace, at the time

13  said the purpose of a bar date notice is to define the

14  universe.  And Grace wanted to provide minimum due process

15  to define the universe, they didn't want to expand the

16  universe.  And I understand, from a Debtor's standpoint why

17  that was its attitude.  And the Third Circuit has said that

18  was sufficient.  And I'm not challenging the bar date order.

19          But a class action lawyer would support going out

20  with two notices.  First of all, we could go out with the

21  same notice that Grace went out with, but in class action

22  that applies both to accrued and unaccrued claims.  We could

23  go out with the same notice, and presumably under the same

24  Supreme Court authority, that would be binding, but it would

25  be binding on a much larger group than the bar date notice,

1   because under Frenville and under everything that's happened

2   since, that bar date notice does not bind those whose claims

3   had not accrued and those future claims, which were the

4   subject of the confirmation order.

5          So it may be.  I'm not saying I wouldn't try to do

6   a better job than Grace, and I don't think they would care

7   if I tried to do a better job.  For example, with residences

8   involved in this case, particularly masonry fill and

9   textures on ceilings of churches and buildings and other, I

10  believe there should be a television component.  I think

11  that it should be brought.

12         Again, that may not be constitutionally

13  requirement, but I'm a fiduciary for the class, I want to

14  get the best notice I can to the class.  I would also

15  attempt to get -- I would probably ask you to revisit, see

16  if there are any more records available to give more direct

17  notice.

18         It's really undisputed, despite their contrary

19  arguments in the record, I think it's undisputed now, the

20  only people that have got direct notice of the bar date

21  order were the lawyers who had represented asbestos PD

22  claimants in the past.

23         But leaving that aside --

24         THE COURT:  With the notion that they would be the

25  ones best able to convey the notice to those who should get

1    it, right?

2           MR. SPEIGHTS:  I think that was the thinking at

3    the time, although there is much confusion on that issue

4    that I had talked about for a long time.  I don't think Your

5    Honor wants me to do that.  But certainly, there's a --

6    there was a belief by some, including Judge Buckwalter, that

7    they had noticed hundreds of thousands of people, that never

8    happened.  The PD bar, at the time, the lawyers -- it was a

9    very narrow group of lawyers.  I was one of them, and I got

10   direct notice on behalf of Anderson.  I still believe that I

11   filed a proof of claim for Anderson, a class proof of claim

12   that covered everybody.

13          Mr. Diaz down in Texas, a prominent property

14   damage lawyer, and Mr. Westbrook down in Charleston, South

15   Carolina, another property damage lawyer, our three law

16   firms probably had represented, in conjunction with co-

17   counsel, have probably represented, I don't think I'm

18   overstating it, 90 percent of the property damage claimants

19   over the years.

20          It's not like asbestos PI case where now you can't

21   turn on the TV at night without discovering another law firm

22   wanting a PI case.  They're not -- PD lawyers are not

23   ubiquitous.  Okay?  But as these cases arise, and they have

24   a right to bring these cases, and people go to a lawyer in

25   Dubuque, Iowa or Hampton, South Carolina, they may or may

1    not associate one of the lawyers I mentioned, or somebody

2    else with experience.  But there's no question that was a

3    theory that we'll serve the -- at least the prominent three,

4    or four, or five PD lawyers and see what happens.  And those

5    -- all of us filed cases.  All of us filed claims, including

6    Anderson.

7           But, I said it was a two-part answer to your

8    question.  How would you do notice?  I would do notice at

9    least as good as Grace, which under the Third Circuit

10   authority would probably be sufficient under due process to

11   bind the class.  And the class consists not only of those

12   who file notices before the bar date, but includes all

13   future claimants as well.  But I tell you, Your Honor, that

14   would be the first step in my attempting to communicate with

15   the class.  Because once we get the opt-out notice done, I

16   will take every step imaginable, every step reasonable, to

17   identify, specifically, all those claimants to actually have

18   a specific identification.

19          And there are other ways beside publishing a

20   notice in the New York Times and The Wall Street Journal to

21   try to get those notices.  And for example, we have the

22   sales records for many of their products.  I tried to get

23   some more, that's another issue for another day, but we have

24   sales records where we can continue to push and try to get

25   those identified.

1         And some of these buildings are large buildings.

2     And I think I said it in the initial motion, in the Celotex

3     bankruptcy Anderson filed 50 -- they filed more than 52,

4     Anderson had 52 claims allowed with Celotex's fireproofing

5     product in 52 buildings, that's all.  Grace had, as the

6     largest manufacturer of fireproofing in the world, sold a

7     lot more than Celotex, in my belief it'll be more than 52.

8     But in any event, 52 claimants.  And the process there that

9     was proceeded in the bankruptcy court down there, and the

10    claims administrator, there's an order, which I think is in

11    the record, Judge Glenn, of the Tampa bankruptcy court,

12    approved a settlement, approved any allowance, which was

13    around $250 million.  I didn't get -- my clients didn't get

14    $250 million, we got 12 cent on the dollar.  I wish that had

15    been a hundred cent plan like this is a hundred cent plan.

16    But in any event, it doesn't take a whole lot of big

17    buildings to produce a whole lot of money.  And those can be

18    more easily identified through some notice program.

19         And the fellow who owns a house with masonry fill

20    and the concrete blocks, who will not know about it, much

21    less what it is, or who made it, or has asbestos or anything

22    else, until he starts some demolition activities and a good

23    contractor will say, wait a minute, I'm not going in that

24    wall until this thing is tested.  I'm not going to expose

25    myself to asbestos.  Where if when he realizes he's got to

1   spend some money for that, not a huge amount of money, a few

2   thousand dollars to deal with that problem.  How do you

3   notify all of the homeowners?  And I suggest that it's done

4   very much like the ZAI class counsel are doing.  They have

5   set up a program, in conjunction with Judge Sanders and his

6   lawyer being a part of that, to try to have an education

7   program for people.  We will have a website and we will do

8   all the things that class action lawyers do.  But

9   particularly on masonry fill there needs to be an education

10   program, there needs to be a fund set aside, and so when,

11   over the years there is a claim, when people discover it,

12   they have somebody to make a claim against.  And that's the

13   class action fund; that's not coming to run a gauntlet

14   before Judge Carey in Wilmington, Delaware.  You're done

15   with it if we have a class action resolution of it.

16        Again, you will approve these procedures and I'm

17   sure Mr. Donley and I will disagree about some of them, and

18   we'll figure out how to do it, but if two parties ever want

19   to settle they'll do it, as they did in ZAI.  But even if it

20   goes to trial, and we get a verdict there, we can get

21   closure on it by proposing a set of procedures and hopefully

22   deal with it.

23        Let me say something else.  This is far ahead of

24   the argument I will make later.  There's an extra set there,

25   Judge, that I've never had in a class action before.  I've

1   got somebody looking over my shoulder.  And that's good,

2   it's good for the class.  Judge Sanders is sitting back

3   there, who's one of the most distinguished jurists in my

4   part of the country.  He's got an obligation to make sure

5   everything is on the up and up, it's fair to his future

6   claimants.  He has his responsibilities as I have a

7   fiduciary responsibility as a lawyer, and I take them

8   seriously.  And they have not challenged my adequacy in this

9   case.  As Anderson has its fiduciary duties.

10          We've also got a court-appointed, retired judge to

11  make sure that everything is on the up and up.  Judge

12  Sanders was instrumental in bringing the parties together in

13  the ZAI resolution, and is instrumental today.  I mean, he

14  continues to be involved in that process today to make sure

15  claimants are properly taken care of.

16          That's a very long answer to your question how do

17  you give notice.  Well, we had the initial notice, which

18  will be Grace plus something.  And then we have all sorts of

19  ideas of how to gain a great deal more notice so we can

20  fairly represent the class.

21          My next point, Judge, and I'll be brief on this

22  one, is in the interest of the district court that this

23  Court certify a class.  Now, again we go back to how many

24  are there.  It's sort of a chicken and an egg thing, with

25  how many are there.  But I don't take a position, as I stand

1    before you today, on whether someone can bring a case for

2    less than a jurisdictional amount in a district court.

3    That's what the plan provides.

4            And suppose it's a masonry fill claim and it's a

5    $7,500 claim.  The plan says, if that claimant effectively

6    runs the gauntlet before Your Honor and gets released, he

7    can go back and file a case for that $7,500 in a district

8    court.  I see both sides of the argument.  It's not my

9    argument; I don't have a dog in that fight, unless I don't

10   have a class action, then I'll have to deal with it.  But I

11   can tell you, having practiced for a fair number of years, I

12   can foresee some district court judges looking down and

13   saying to me, Mr. Speights, you want to litigate a $7,500

14   case in the district court of South Carolina?  How many more

15   are there?  Can I could -- I'm not sure what I will say, but

16   I'll say, Your Honor, there are hundreds of thousands of

17   these claims out there, I don't know how many.

18           And he might turn to me and say, well why don't

19   you just bring a class action, Mr. Speights?  I mean, that's

20   the way we deal with all these claims.  Can't do it, Judge.

21   The plan says, according to Grace, you can't bring a class

22   action in a district court.  Anderson is the last best hope

23   of these claimants to have class treatment.  So when I say

24   it's in the interest of the district court I'm not sure that

25   a district court wants to be having to face these cases.

1          And this is an unusual case, a hundred cent plan

2     which Grace says, go back home and bring your lawsuit.  I'm

3     not sure that the district court is going to be excited that

4     these hadn't been wrapped up, except for the opt-outs.

5          Lastly, Your Honor, on this point, I really

6     believe it's in the interest of the claimants.  And I

7     believe Judge Sanders has said the same in his joinder in

8     the motion.  Here you have all these claimants out there

9     with claims, not everybody wants to bring a lawsuit, that

10    doesn't mean they're not entitled to be members of a class.

11    Not everybody knows they have a lawsuit.  Not everybody has

12    a claim that's wroth enough money.  Not everybody has enough

13    money to pay a lawyer to bring a lawsuit.  Not everybody

14    wants to bring two actions, hire somebody like Mr.

15    Tacconelli and their own lawyer, and get involved in this

16    Courtroom, to get a -- what I call it, to get a slip of

17    paper saying, you can go back and bring your own lawsuit,

18    and then go litigate for two to three years, and all the

19    appeals and motions, et cetera, et cetera.  And maybe that

20    case is reversed and you come back again and retry the case.

21    I've had cases, individual cases that have gone on, not as

22    long as Anderson, but for a number of years.

23          I think it would be very appealing to claimants to

24    participate in a class action.  And that's not just based

25    upon my representation in this Court, but it's based upon

1    some history of class action litigation where we wrap up the

2    claims of a lot of people.  And I think that, I'll argue the

3    law in a little while, but I think that affords people a

4    superior method of proceeding.  And it gives them a choice,

5    and again, I believe Judge Sanders will say that he believes

6    it's in the interest of claimants to have that option.

7           So, I've dealt with my first question, Your Honor.

8    I don't want to be accused of filibuster, but I have several

9    other points and -- that I think are important.  Obviously

10   this is an important case to my law firm and obviously an

11   important case to Anderson Hospital which has been involved

12   in this for years, and I want to make sure that the Court

13   understands where we're headed and not only what we're

14   asking the Court to do, but what we are not asking the Court

15   to do.

16          Let me talk about class action law, very briefly.

17   I know this may sound like hyperbole, but I have never

18   argued a class action with stronger grounds for

19   certification than this.  And I'll tell you why.  I first

20   got involved in class actions in 1984, after trying an

21   individual asbestos case.  I probably had never mentioned

22   the word asbestos before then.  When the Berger Law Firm in

23   Philadelphia, which had filed an asbestos class action,

24   asked me to bring a South Carolina school district to

25   Philadelphia and be a named plaintiff so that it could get

1   complete diversity in a federal class action.  And I did so,

2   along with co-counsel.  That school district was Barnwell

3   School District, 32 miles from where I live.  And it was the

4   lead plaintiff in what we call the schools litigation, the

5   national schools class action.

6           I cannot imagine having a stronger precedent for a

7   class action certification, than the schools class action,

8   which is a Third Circuit case.  The Third Circuit is known

9   as the best class action circuit court in the nation,

10  although some people argue the Eleventh Circuit.  But it

11  essentially has been historic in its class action decisions

12  going way back.  And here you have the Third Circuit

13  certifying a class action on behalf of all the school

14  districts in the country, an asbestos property damage class

15  action.

16          And Your Honor, leaving aside the plan, which I

17  think even makes this a better certification. The facts just

18  of Anderson versus the schools' class action show that

19  Anderson is much more a candidate for class certification.

20  The schools class action not only involved Grace, but it

21  involved 71 defendants with hundreds of products.  This case

22  involves one defendant, with essentially what it calls

23  vermiculite products.  That other cases was far more

24  difficult, far more difficult to deal with than the Anderson

25  case.  And it was certified, and it lead to a number of

1    other asbestos property damage classes certified around the

2    country, including the Fourth Circuit certifying a

3    nationwide class action, including the Common Pleas Court

4    certifying a nationwide class action on behalf of lessors,

5    people who leased building to -- buildings to the federal

6    government, and state class actions in Michigan and Texas.

7    All of these cases are cited in our initial motion.

8            So not only do I have all this precedent, but I've

9    got a Third Circuit case directly on point, but even better.

10   And then to top all that off, Grace, which for reasons

11   apparent to me, waited to way back towards the end of its

12   response, to deal with the class action issues.  It did that

13   for reasons unknown to me, but Grace consented to that class

14   action in Philadelphia.  Grace was the one that went to the

15   court, with Mr. Berger on April 9, 1984, and got Judge Kelly

16   to conditionally certify a class action, Grace and two of

17   its codefendants.

18           So I can't imagine having stronger law.  I'm not

19   going to read all -- refer to all the cases, but I will tell

20   you that in case distinguished adversary comes up and say --

21   says something like, well that was a long time ago, 1984, it

22   might seem like yesterday to me, but I can understand if the

23   Court thinks that was a long time ago.

24           THE COURT:  Not to me.

25           MR. SPEIGHTS:  But it's not what just happened in

1    '84, two other things.  The ZAI certification was not long

2    ago, and grace consented to the ZAI certification as well.

3            And then among all the cases we've cited, I would

4    invite Your Honor to a 2015 case.  Neale versus Volvo, it's

5    in the briefs but it's 794 F.3d 353, and which is just one

6    of the latest Third Circuit cases reaffirming class action

7    law, and citing Judge Posner, a very famous case out of the

8    Seventh Circuit, for the proposition that a class will often

9    include persons who have not been injured by the defendant's

10   conduct.  Indeed, this is almost inevitable because at the

11   outset of the case many of the members of the class may be

12   unknown, or if they are known, still the facts varying on

13   their claims may be unknown. I mean that case, which was

14   decided actually on my birthday last year, reaffirms that in

15   class action represents accrued and unaccrued, known and

16   unknown claimants.

17           So I tell Your Honor that the Third Circuit has

18   not backed off.  Actually, I think in April the Third

19   Circuit decided the NFL case, got a lot of publicity, and

20   they restated all the general principles of class action law

21   that are perfectly consistent.

22           But then I get to the plan, not the planned

23   defenses, the technical defenses which I assume in reply we

24   will have to address, because I assume that Grace has some

25   statements to make in light of our reply brief about our

1    defenses to its technical arguments; and we'll be prepared

2    to address those in reply.  But, the plan itself, on the

3    merits, makes this case even more certifiable.  I mean, I'd

4    be happy to argue certification if were standing in the

5    district court with no bankruptcy ever having taken place,

6    in light of the school asbestos case and all the precedent.

7    But in this case we have a plan, and forgetting whatever

8    barriers which Grace says there are to our proceeding this

9    way, and I don't think there are, Mr. Rosendorf will address

10   that.  But just the plan itself greatly simplifies, greatly

11   simplifies this whole procedure.

12            For example, Your Honor, under the plan, under

13   Section A, Section 1, we have essentially a claims objection

14   proceeding; that's what it essentially is.  They objected,

15   they filed their omnibus objection to claims, their 15th

16   omnibus objection, and they objected to Anderson's

17   individual claim and Anderson's class action claims.  And

18   therefore, under the BDCMO, they are set down for Your Honor

19   to decide.  And --

20            THE COURT:  I'm glad you referred to the CMO, was

21   that order ever signed by anybody?

22            MR. SPEIGHTS:  Not to my knowledge, Your Honor.

23            THE COURT:  Why not?  Do you know?

24            MR. SPEIGHTS:  That's a Grace question, Your

25   Honor.  I do not know.  We've raised that issue, and we

1   think it has implications, which Mr. Rosendorf will be

2   prepared to address.  But I don't know.  It has blanks for

3   you to decide.  It has some changes, since the, you know,

4   original one was attached to the plan, et cetera.  But I

5   don't know that.  And I think that might be significant, but

6   I'm out of my area when I talk bankruptcy.

7            In any event, what we do know is under track A, we

8   have a very limited trial.  You know, they raised the hazard

9   defense, for example, and that's a big issue in these cases.

10  Is the product unreasonably dangerous, was it defective, or

11  is it unsafe, or does it contaminate?  We all have our

12  definitions of that, but essentially -- and I believe they

13  call it the hazard defense that they have, that is an issue

14  which will be tried before Your Honor, for Anderson, whether

15  it's a class or an individual case.  And that's a case that

16  will be tried if there is no class and people have to

17  proceed to their district courts.  That's one of the issues.

18  We have to try that.

19           But there are a whole lot of other issues that

20  these individual claimants will have to get tried if they go

21  back to district court, that are not in the CMO for what we

22  have to try.  There's no requirement in that CMO that we

23  have to try liability, for example, that is what did Grace

24  know and when did they know it.  All those thousands of

25  documents I have in the office will sit there, representing

1    Anderson, because Anderson, at least alone and hopefully as

2    a class, is going to be litigating under Section 1 or Track

3    A where that's not an issue.

4           We've got the hazard issue, they may say we have

5    something else, but we have a much more confined trial or

6    claims objections proceeding than those who have to be

7    released to the tort system start doing what I started doing

8    many years ago.

9           So in my opinion, Your Honor, and I would urge the

10   Court to say -- to find that the issues, such as

11   commonality, are much easier in this case.  There's

12   commonality anyway under the school asbestos case, but there

13   are clearly less problems in litigating it under the CMO

14   than going back elsewhere.

15          Your Honor, the other thing is, I don't think

16   Grace disputes this, although its brief is, I'm going to say

17   ambiguous to me.  And there's a point I said -- made

18   earlier, and I want to keep making.  If we go back and try

19   the class action, we will eliminate so many issues, because

20   all of the claims will be part of Anderson, which filed its

21   case in 1992, for statute of limitation purposes in 1992.

22   Grace is going to be hard pressed to say Anderson missed the

23   statute of limitations, or people should have been filing

24   cases before 1992, when it still says there's no problem

25   with their product.

1           And all of the members of the class will have

2     filed claims in this Court before March 31, 2003.  We have

3     just eliminated a host of issues and simplified the trial.

4     So Your Honor, I would say despite the Third Circuit cases

5     and all the other cases, et cetera, this is clearer -- a

6     more clear and direct way to go.

7           Let me comment briefly on what Grace says on the

8     merits, and then I'll sit down.  John Adams said that facts

9     are stubborn things, and there are some very stubborn facts

10    here that Grace does not address or it does not directly

11    address.  The first I mentioned a while ago.  First two,

12    Grace consented to a nationwide class, it consented to a ZAI

13    class.  The third fact, which Grace glosses over, the site

14    that the PD FCR now supports this motion.

15          The PD FCR and I disagreed during confirmation.

16    The PD FCR was sitting on that side helping Grace, because

17    it wanted a plan of reorganization and it thought that

18    futures were being treated as well as present claimants.

19          THE COURT:  He says so in his joinder and says,

20    but now it seems like a good idea.

21          MR. SPEIGHTS:  Well, and that -- it's apples and

22    oranges, Judge.  In the confirmation proceeding, the

23    question was, we challenged there's really -- we challenged

24    the fact that Anderson was the only property damage claimant

25    that had to try its case in bankruptcy court without a jury

1    rather than returning to the tort system.  Grace argued the

2    opposite, Judge Sanders supported them.  It's a question of

3    -- almost a question of venue.  Well, I lost.  The Third

4    Circuit said, you're getting the same amount of money on the

5    dollar, if you win, wherever you win.  And that's the

6    essence of a quality of treatment, so purposes of 524(g),

7    there's equality of treatment here and we agree with Grace

8    and Judge Sanders.  In effect, they said we're all the same,

9    Anderson claimants and other claimants, we're all getting

10   the same amount of money.

11            Now it's an entirely different issue.  Now we've

12   got all these claims, we've got the Anderson claim and we've

13   got all these claims that are under Judge Sanders umbrella

14   and some that have probably moved, in the ensuing years,

15   from Judge Sander's umbrella to the present claims umbrella.

16   The question is, how do you try them.  Do you try them

17   individually, one by one or you try them in a class?

18   There's nothing in the plan, there's no position I've taken

19   that's inconsistent with the position I've taken before the

20   Third Circuit saying I'd rather be in South Carolina.  And

21   that's with all due respect to Judge Fitzgerald, who was the

22   judge then, I'd rather be back in South Carolina trying my

23   case before a jury. But if I was in South Carolina I would

24   still be arguing in favor of a class.  And I would still try

25   to get a class notice sent so that people could not -- so

1   that people would have the option, all claimants would have

2   the option.

3           It's just a question now, I'm in the bankruptcy

4   court, which is fine, we're happy to be here.  It's the same

5   issue that I would have had if we were in South Carolina.

6   Can we send -- can we -- is the trial -- is the -- will a

7   claimant receive superior treatment, or a bulk of defendants

8   receive superior treatment by being a part of the class

9   action.  That issue has not been decided and there's nothing

10  in the history of this bankruptcy litigation which affects

11  that decision.  It is your decision to make.

12          And it's just -- I would say it's a simple

13  question, but it is a pretty direct question, at least, of

14  is there superiority here.  And all we need to do is read

15  the words of Rule 23 to say, is this a superior way of

16  providing relief for many claimants.

17          THE COURT:  Well Judge Fitzgerald found that it

18  wasn't.

19          MR. SPEIGHTS:  She did.  Judge Fitzgerald found

20  that it wasn't, based upon the fact that she thought that

21  all the claimants were before her, there would never be any

22  more claimants, and those claimants could be disposed of

23  them.  And she disposed of a lot of claims, a lot of

24  individual claims.  But again, and I won't repeat my laundry

25  list of reasons why things have changed since Judge

1   Fitzgerald ruled, but it's clear that her ruling was based

2   on numerosity.  I mean that's almost her exact words.

3            THE COURT:  Was the thrust of it, I agree.

4            MR. SPEIGHTS:  It's -- and let me say to you, more

5   accurately, it's not superior because of the numerosity

6   problems.  So she ruled on numerosity and superiority, but

7   superiority was a derivative of numerosity.  And I believe

8   there's a quote in Judge Walrath's case, I've got it

9   highlighted over there, numerosity is a practical decision.

10  And I agree with Judge Walrath, and I agree that we have to

11  show numerosity.

12           And I don't know how -- I believe we've, frankly,

13  done it better than most people would have in an early

14  stage.  Normally you file a class action and these days you

15  get a hearing pretty soon and numerosity is essentially

16  self-evident, as I think it is in this case.  And if it's

17  not numerosity, you certainly can decide later there should

18  not be a class.

19           Fact number four, it's undisputed that Grace told

20  all the PD cases could be tried in one bench trial at the

21  beginning of this case.  It's a fact that Grace admitted

22  numerosity in South Carolina, on the worldwide class, not

23  the state class.  It's a fact that it told the district

24  court and Third Circuit there was substantial claims. And

25  it's an undisputed fact that Grace has always contended that

1    it's products do not contaminate.

2            I can't imagine going more than an hour, so let me

3    close on one thing, Your Honor.  I'll be happy to go as long

4    as you like.  Sometimes, as a famous author of our -- one of

5    our presidents who in studying that president said he used

6    to have a saying, what is important is not what a man says,

7    but what he doesn't say.  There are many examples of this

8    that I could point out, but I think there's one particular

9    example I want to point out, that it's not what Grace says

10   in its brief, but it's what it doesn't say in its brief.

11           And the particular instance, again, I want to

12   refer to is the masonry fill claims.  Masonry fill was not

13   listed in the bar date order.  If you read the bar date

14   order, the words masonry fill do not appear.  And more

15   importantly, whether it was or wasn't, masonry fill is in as

16   many buildings as ZAI was in.

17           Throughout our brief, Your Honor, I constantly,

18   repeatedly -- I was looking for the numbers, was why my head

19   went down, refer to masonry fill.  What does Grace say?  The

20   words masonry fill do not appear in its responsive brief.

21   It simply ignores the problem of how to deal with masonry

22   fill claims, the forgotten class of claimants within the

23   umbrella of Anderson's class action.

24           For that, and other reasons, Your Honor, I would

25   urge the Court to certify a class action.

1            THE COURT:  Thank you.  Does the future claims

2      representative wish to be heard?

3            MR. RICH:  Very briefly, Your Honor.

4            THE COURT:  All right.

5            MR. RICH:  I'd like to say a couple things.  And

6      Judge Sanders, himself, has a couple words he wanted to

7      speak.  Alan Rich, from Dallas, on behalf of the future

8      claimants' representative.

9            Judge Sanders just wanted to make a couple things

10     clear.  First of all, he agrees that factually and legally

11     the circumstances are much different today than they were at

12     the time that Judge Fitzgerald made her initial decision on

13     class certification.  Those changes have been discussed

14     extensively by Mr. Speights, in his papers and at the podium

15     today, so I don't intend to actually go through the litany

16     myself.

17           The other thing that he'd like to say is that

18     there has been a flavor, at least I perceived it, that maybe

19     Judge Sanders has changed his mind in one way or another,

20     from plan confirmation to today, and that's just not at all

21     the case.  As Mr. Speights said, the issues really are very

22     different.  Before the Court, at the time of confirmation,

23     the issue was essentially whether the type of treatment

24     Anderson was receiving, versus the type of treatment in the

25     second tier of claims, or Class 2, were they substantially

1   similar under the applicable provisions of the bankruptcy

2   code.  We thought they were, we -- Judge tested that they

3   were, and we still believe that they are today.

4           Notably, one -- there was no third category that

5   we could testify about, and that would have been a class

6   action.  Because at the time, obviously there was no class

7   action, it was denied, appeals were not permitted and that

8   was simply not one of the choices.  But I think it's self-

9   evident, frankly, that a class action would be vastly

10  superior to either Class 1 or Class 2 in the PD-CMO and

11  under the plan.

12          We are very concerned about a punitive class

13  member's ability to come to the PD trust and prove, in

14  opposition to what will be vigorous defense, that the bar

15  date, for instance, isn't a problem for a lot of claimants.

16          The interaction between Frenville and Owens

17  Corning, and its progeny, and the bar date notice and the

18  bankruptcy code provisions about the bar date are very

19  complex and we don't know how that's going to come out.  But

20  what we do know is that having a class certified would

21  eliminate any bar date problem for the future claimants.  It

22  would eliminate any statute of limitations problems, which

23  could possibly otherwise exist for unknown claimants.  Of

24  course, we don't know that, because we don't know their

25  circumstances, because they're unknown, but certainly it

1    takes that whole thing off the table.

2             So, you know, we think that all in all, given the

3    vast savings of judicial time and resources and the parties'

4    times and resources and the possible effect on defenses out

5    there that a class action, would be certainly in the best

6    interest of the future claimants that Judge Sanders

7    represents.  We've said that in the papers and I wanted to

8    make sure the Court understood that there was no

9    inconsistency between that position and the position we took

10   at trial.

11            Judge Sanders wanted to say a couple things, very

12   briefly to the Court.

13            THE COURT:  Briefly.  That's fine.

14            MR. RICH:  Thank you, Your Honor.

15            MR. SANDERS:  Good afternoon, Your Honor.  Let me

16   get one matter aside, briefly.  It's not appropriate to call

17   me Judge.  I'm not a judge, and I haven't been a judge in so

18   long ago I can barely remember it.  Judge Fitzgerald taught

19   me, in this very room, that this Courtroom is not big enough

20   for but one judge, and I'm not the one.

21            THE COURT:  The Judicial Conference on Codes of

22   Conduct has so advised us.

23            MR. SANDERS:  I have no blinding insights into

24   this matter to deliver.  My lawyer has addressed the matter

25   quite competently.  If you would permit me, I would like to

1   sit quietly and listen to Grace's position on the matter,

2   and then I might have a word or two to give you, by way of

3   observation.

4           THE COURT:  We'll have a time for a word or two,

5   certainly.  Thank you.

6           MR. DONLEY:  Good afternoon, Your Honor.  John

7   Donley on behalf of Reorganized Debtors.  I know I'm

8   probably as complicit as counsel on both sides with

9   burdening the Court with very lengthy briefs, and for my

10  argument, the key points I wanted to highlight.  I tried to

11  winnow them and to pull the points on a PowerPoint, which

12  I'll refer to and have up on the screen.

13          THE COURT:  The only regret I have, Mr. Donley, is

14  that Judge Fitzgerald decided to retire.  You may proceed.

15          MR. DONLEY:  I understand she's had a big smile on

16  her face, though, for a couple of years.  Thank you, Your

17  Honor.

18          Let me start with the text of the case management

19  order, which is Exhibit 25 to the plan.  And the important

20  point I wanted to start with there is that in the very first

21  line of the PD, property damage CMO, it makes clear that it

22  applies to all, it's exclusive, all class 7-A property

23  damage claims, other than the ones that were previously

24  allowed.  It's in the very first line.  This case management

25  order provides procedures for the resolution of all Class 7-

1    A asbestos PD claims.

2            And then all claims breaks down into two

3    categories that cover the entire waterfront.  You're either

4    in Section 1, you have a Section 1 claim, or Section 2

5    claim.  There's nothing else, there's no third category or

6    something you fall out of.

7            THE COURT:  But apparently this is a form of order

8    that has never been signed.

9            MR. DONLEY:  Yes, sir.  And I get --

10           THE COURT:  Tell me what that means.

11           MR. DONLEY:  So, I have a -- I don't want to steal

12   my thunder completely, because I have a slide with cites on

13   that later, and I'll pick up then.

14           THE COURT:  All right.

15           MR. DONLEY:  But the order -- there are 35 plan

16   documents that are exhibits, none of them -- or many of

17   them, a majority of them are unsigned, to my knowledge.  And

18   they were simply tendered to the Court and when the

19   confirmation order was entered, both the language of the

20   plan and the language of the confirmation order made clear

21   that these exhibits are part of the plan, they're an

22   integral part of the plan.  It's not just the document that

23   says joint plan, these plan exhibits are also part of the

24   plan.  And the order said, I am entering, in this -- it's I

25   believe page 9 of the confirmation order, I do have a cite

1    I'll come to later on this, where Judge Fitzgerald says, I

2    am entering this order.

3            So the question comes up, well why is it still

4    left in a form where there's a signature line for the judge

5    and it's never signed.  And I wasn't involved at the time, I

6    don't know.  But I think we can sit here today and look at

7    the record, and it would have been redundant, in a sense,

8    because it was entered by the Court, in the confirmation

9    order, in that exact form.

10           And I know there have been exhibits to the briefs,

11   with a couple of different versions.  Exhibit A-1 to their

12   brief was the February 21st, 2011 version, there was a

13   version submitted to the Court on December 8th that's cited

14   in our briefs of 2010 that's identical.  We attached our

15   brief, Exhibit 1, a conforming order.  It didn't have

16   changes in it at all, it's just we conformed to the current

17   times and we put in Judge Carey, because -- instead of Judge

18   Fitzgerald.  The content didn't change; it was -- the

19   provisions were the same at all times.

20           So that order was entered as part of the

21   confirmation order, is the short answer.  So in terms of --

22   and I'll have the cites on those, which I'll go through very

23   briefly, because I've kind of discussed it already, when I

24   get to them.

25           So, you're either in Section 1 or Section 2.

1    Anderson agrees its claims are not covered by Section 2.

2    That's for claims filed after the bar date; no dispute about

3    that.  Anderson's -- both the class claims and its

4    individual claims are all in Section 1.  And I know there's

5    a little confusion in their brief, because their opening

6    brief called it Track A, but we're talking about the same

7    thing, Section 1.  Those are claims filed before the bar

8    date, but not resolved as of the effective date.

9            And when you then drill down into Section 1(b)(2),

10   the first bullet point, Anderson's class claims, 9911,

11   that's the so called worldwide claim, 9914 is the South

12   Carolina state claim, shall remain inactive.  They're

13   pending, but inactive.  I'll come to the word "pending" a

14   little later.  Unless and until there is a final appealable

15   order with respect to Anderson's individual claim.

16           And then 1(b)(3) further clarifies, provides a

17   sequence and a procedure that says if the appeal of the

18   denial of class certification is reactivated, and is

19   successful, it ultimately is remanded to this Court for

20   determination.  And the last bullet point of 1(b)(3)

21   continues to say, just to be clear, for the avoidance of

22   doubt, Section 2 of the PD-CMO does not apply to the

23   proceedings, the appeal, the remand of the class action

24   certification.  So all of that's making clear all of

25   Anderson's claims are in Section 1.

1          And I did this chart, on page -- the next page,

2    which just basically breaks down Section 1 claims, Section 2

3    claims.  Mutually exclusive, you've got to be in one or the

4    other.  Reading across the top row, Section 1 claims, those

5    are claims filed before the bar date.  Are individual claims

6    permitted?  Yes, of course.  Are class claims permitted?

7    Yes.  But Anderson's class claim, under the plan, has to

8    remain inactive, pending but inactive, at least for the time

9    being, until certain steps are taken.

10          After the effective date, the second to last

11   column to the right, what's the litigation sequence for

12   Section 1 claims, like Anderson's?  Well, first of all,

13   you've got to litigate Anderson's individual claim until --

14   if -- there's a final judgment.  Number two, you then appeal

15   -- then they reactivate and appeal the order denying class

16   certification.  And third, if that appeal succeeds,

17   Anderson's class claims are remanded to this Court for

18   further dealings, all litigated in this Court.

19          Big distinction for Section 2, and this is the

20   distinction that was fully endorsed and unequivocally signed

21   off by future's rep, Mr. -- I won't call him Judge Sanders,

22   because we've always called him Mr. Sanders at the

23   confirmation hearing.  This rubric, this breakdown, this

24   treatment of Section 2 was unequivocally endorsed by him,

25   and I'll come to the citations for that later.

1          Section 2, where are those claims filed?  That's

2     claims filed after the bar date.  So it's a really bright-

3     line test, Your Honor, it's not -- doesn't get into

4     Grossman's issues or Frenville issues, or notice, or due

5     process.  It's when was the claim form filed; before or

6     after the bar date.  Very simple.

7          Are individual claims permitted under Section 2?

8     Yes.  Are class claims permitted?  No.  Section 2(a)(4)

9     says, no class action treatment for Section 2 claims.

10    Unequivocal.

11         What's the procedure after the effective dates for

12    litigating Section 2 claims, the ones filed after the bar

13    date?  Number 1, you have this discharge motion, where 17

14    factors are looking at.  It's basically the excusable

15    neglect test, looking at when asbestos was installed, when

16    they got notice and a whole series of factors.  And if the

17    claimant defeats that discharge motion, or if Grace doesn't

18    bring one, the claim is tried in district court.  Where?  It

19    can be here; it can be in any other jurisdiction.  And that

20    is federal question jurisdiction under Section 1331 and

21    Section 1334(b).  Diversity has nothing to do with it, the

22    $75,000 argument in their brief was a red herring.

23         So, Anderson's -- what about Anderson's appeal to

24    the class cert -- the order denying class cert?

25         THE COURT:  Well, it doesn't mean I still

1    shouldn't have sympathy for the district court.

2            MR. DONLEY:  Understood.  Understood.  Any court.

3    But if that -- if there are claims that are worth $3,000, we

4    haven't seen them yet, but if they are, they'll be dealt

5    with.

6            Anderson really smudges and blurs the line between

7    its interlocutory appeal and its regular appeal.  We know

8    that the interlocutory appeal of the -- of Judge

9    Fitzgerald's order denying class cert was denied.  It was

10   denied in the district court, and then in 2009 the Third

11   Circuit said it's interlocutory, it can't appeal.

12           But their regular, non-interlocutory appeal has

13   been pending ever since.  It was pending as to the February

14   2014 effective date.  It's required, under the plan, to be

15   inactive currently.  We just looked at those provisions

16   where it's reactivated and can be pursued only after the

17   correct sequence is followed the individual claims is

18   litigated to judgment.  And that's 1(b)(3) that we looked at

19   before.

20           And the irony of all of this, Your Honor, is that

21   Anderson has owned the keys to this process all along.  They

22   could have fully litigated their individual claim, starting

23   in February 2014.  They said it could be done quickly, even

24   if there was discovery, it probably could have been

25   discovered and tried in two years and be done now, and their

1    appeal of the class cert denial could be running.  They

2    chose not to; they chose to proceed by motion practice.

3           Now what about this word "pending"?  They say,

4    well those provisions of Section 1 don't apply to us because

5    our claim -- our class -- appeal of our class, of the order

6    denying class cert was not, quote/unquote, "pending" as to

7    the effective date, so we fall into some nether world,

8    neither Section 1, nor Section 2.  It's an absurd argument.

9           If it's true that their claim wasn't -- their

10   appeal wasn't pending as of the effective date, it would

11   mean their claims aren't in Section 1 or Section 2.  We saw

12   that the order says this covers everything.  We know they're

13   not in Section 2.  And of course, this is the problem with

14   them blurring the interlocutory appeal and a regular appeal.

15   We know their --

16           THE COURT:  All right.  So let's explore the

17   procedural niceties for a moment.

18           MR. DONLEY:  Sure.

19           THE COURT:  If Anderson were to have proceeded as

20   Grace says it should have, and I guess still says it should,

21   once that's disposed of, procedurally, how does the, what

22   was then the appeal of denial and certification, how does

23   that spring up?

24           MR. DONLEY:  They file a notice of appeal with the

25   district court.  It's been stayed, under the plan, for a

1    certain amount of time.  When a final, appealable judgment

2    of their individual claim is entered, and that will be

3    entered in an order of this Court, the procedure for notice

4    of appeal kicks in.  And they'll file a notice of appeal

5    with the district court.

6              THE COURT:  And I assume that you're correct about

7    that, as a matter of process.  So, if a new notice has to be

8    filed, how can it be said that the earlier appeal is still

9    pending?

10             MR. DONLEY:  Because the definition of -- it's

11   basic, plain language in black letter law.  Black's Law

12   Dictionary I have two slides down, the definition of pending

13   -- pending doesn't mean actively under prosecution.  It

14   means, in this definition, the Sixth Edition, begun but not

15   yet completed, during, before the conclusion of.  Certainly

16   the appeal -- the regular appeal, not the interlocutory

17   appeal of the denial of class cert is still before its

18   conclusion.  It's prior to the completion of.  It's

19   unsettled and undetermined.

20             A waiting and occurrence or conclusion of action.

21   A waiting, held in suspense, held inactive, as the plan

22   says, that means pending.

23             In a period of continuance or indeterminacy.

24   Again, that also applies.  It's not actively being

25   prosecuted, but pending means in a period of continuance or

1    indeterminacy.  That appeal has been held in abeyance.

2           Finally, the last line of Black's Law Dictionary,

3    an action or suit is pending from its inception until the

4    rendition of final judgment.  There's been no final judgment

5    on their motion for class certification, only orders entered

6    in interlocutory appeals.

7           So yeah, we normally think of pending as, you

8    know, actively proceeding, and there are motions being

9    argued, but pending also includes unsettled, undetermined,

10   awaiting a continuance, in effect stayed, but pending.  And

11   that's where they have been since 2008, 2009, on their

12   regular appeal.  That's where they were, as of the effective

13   date.  And that's just straight black letter law in plain

14   language reading.

15          And then beyond that, it is -- if we were to

16   accept their interpretation, it's pretty absurd to look at

17   the prior slide, I pulled out the language of Section (1)(b)

18   of the PD-CMO. (1)(b)(2), (1)(b)(3) talk in detail, in name,

19   naming the claim number of Anderson's claim and saying,

20   these claims are treated under the section, in the following

21   way.  How would it make any sense to have them not covered

22   by that section?  Really, it would be an absurd reading, but

23   you don't even need to get to the absurdity, you just deal

24   with, I think the plain language of the meaning of the word

25   pending.

1           Now, the next point I'd like to address, Your

2     Honor, is the property damage case management order.  They

3     say, piece of cake, you can amend it.  It's like a briefing

4     schedule that the judge enters, you can amend it at any

5     time, no impediment to that whatsoever, it's a mere

6     scheduling order.  Absolutely false.  It is an integral part

7     of the plan.  And you don't need to take my word for it,

8     Section 1.4 of the plan says, quote, each of the plan

9     documents is an integral part of this plan, and that

10    includes, I believe there are 37 exhibits, Exhibit 25 is the

11    PD-CMO, and is hereby incorporated by reference and made a

12    part of this plan."

13          The plan further says, in the next bullet point,

14    and this is definition 170 in the plan, quote, plan means

15    the first amended joint plan of reorganization, et cetera,

16    et cetera, and the exhibits, in the bold second to last

17    line, and schedules to the foregoing.

18          So the plan is not just, you know, the document

19    that says plan of reorganization.  It also has, as integral

20    parts, all of -- and I've got the mini version,

21    (indiscernible) if you print out the big ones, it also

22    includes all of the 37, or so, exhibits as parts of the

23    plan.  And the last bullet point on this page says the same

24    thing in Plan Definition 172, plan documents, quote/unquote,

25    are defined as not just the joint plan, but also the exhibit

1    book and all exhibits in the exhibit book.  Very standard,

2    and that's true in many plans, of course, as Your Honor well

3    knows.

4          And here's Judge Fitzgerald's confirmation order I

5    referred to before, January 31st, 2011.  She entered this

6    order, absolutely correct that the Exhibit 25 wasn't

7    separate tendered for signature, but she entered this

8    confirmation order that said the plan, and all exhibits, and

9    schedules thereto are amended, as amended to the date hereof

10   are confirmed in each and every respect.  That includes the

11   PDCMO plan, Exhibit 25, the version -- the language we're

12   talking about was identical on the version filed with the

13   Court on December 8th, 2010.  The cite is there, I mentioned

14   that before.  The language is the same on the version that's

15   Exhibit A-1 to Anderson's September 2015 brief.

16         The district court and Third Circuit then affirmed

17   the PDCMO and the plan, including the PDCMO, as an integral

18   part, went effective and was substantially consummated in

19   February of 2014.

20         AMH very actively contested the PDCMO.  They

21   briefed it, they argued it, I vividly remember long

22   arguments and long briefs against these esteemed counsel, at

23   the district court and Third Circuit, in addition to the

24   confirmation hearing.  And they aggressively objected to, in

25   particular, the CMO regarding jurisdiction, venue, procedure

1    and sequencing of claims under Section 1 as compared to

2    Section 2; that was the heart of their argument.  Tons of

3    pages of briefing and argument on that point.  They've

4    changed their objection to it over time, they're arguing

5    something different now, but that subject matter was the

6    subject of their objection.

7              Interestingly, they did not challenge or contest,

8    as part of the confirmation hearing and appeal the placement

9    of the provisions governing the appeal of -- denial of their

10   class certification motion in Section 1 of the CMO; that's

11   what they're challenging now.  They say, we're not even part

12   of Section 1 because of our contorted reading of the word

13   "pending".  Never raised that issue or said it at all, in

14   fact, just the opposite.

15             What they did was they complained mightily, during

16   the confirmation process and appeal how unfair it was for

17   Anderson's claim to be singled out for this terrible

18   draconian treatment in Section 1 of the CMO whereby the

19   individual claim has to be litigated before the class --

20   appeal of the denial of class cert can be reactivated and

21   litigated.

22             I quote from page 16 of their June 6th, 2013 Third

23   Circuit brief, where they say, in the highlighted text that

24   the Class 7-A CMO contains procedures that control how

25   unresolved PD claims will be resolved, including provisions

1    that are directed exclusively to AMH.  That was their

2    objections, it's really singling us out; it's unfair

3    treatment in paragraph 1(b) of the CMO.  Never said one word

4    one that Section 1 doesn't apply to us, it was unfair to put

5    us in.  That's a completely new, opposite argument they've

6    brought out during this procedure before Your Honor.

7            THE COURT:  So let me ask you this question.  If I

8    were to deny the motion for this reason and then after

9    whatever other Court Anderson might ask to opine on the same

10   issue, gets finished, but the result's the same, and then

11   they try their individual claim, would it not then also be

12   appropriate -- well, let me ask you this.

13           Would they be foreclosed from bringing this motion

14   again, based on the fact that circumstances have changed?

15   Or are they required to pursue the appeal instead, or first?

16   What's your position on that?

17           MR. DONLEY:  I don't know if they're foreclose --

18   I think it would be completely lacking in merit.  Of course,

19   I think their current motion is completely lacking merit --

20           THE COURT:  Not --

21           MR. DONLEY:  -- doesn't mean they're foreclosed.

22           THE COURT:  -- the question that I asked.

23           MR. DONLEY:  Are they foreclosed from bringing a

24   motion for reconsideration?  I think they are, because

25   they're raised -- they've really -- I don't see what new,

Page 59

1    germane in material has happened in the meantime.

2              THE COURT:  No, you're dealing with the merits.

3    I'm just talking process.  It's not, would you win.  It's,

4    could they bring it under the terms of the plan and the CMO?

5              MR. DONLEY:  So, let me make sure I'm following,

6    maybe I didn't follow your question, Your Honor.

7              THE COURT:  Could be I didn't ask it clearly

8    enough.

9              MR. DONLEY:  Well, so the situation is --

10             THE COURT:  So, I deny the motion today.

11             MR. DONLEY:  Yes.

12             THE COURT:  And I'm not going to rule from the

13   bench today.  But I deny the motion today, the individual

14   claim gets resolved, one way or the other and under Grace's

15   version of what should happen, the appeal gets reinstated

16   and they proceed.  But after determination of the individual

17   claim, is there anything that would present -- prevent

18   Anderson from renewing this motion, saying that things have

19   changed and we should certify a class?

20             MR. DONLEY:  I don't believe that is a proper

21   motion --

22             THE COURT:  Okay.

23             MR. DONLEY:  -- in direct answer to the question.

24   The reason is, that possibility that their individual claim

25   could either be granted or denied or have a ruling where

1    maybe they appeal part of it and don't, that's already baked

2    into the plan in this procedure, so that eventuality

3    happening in, you know, one of the possibilities for having

4    their individual claim is resolved, is already baked in.

5    And whichever way it comes out, their next step just has to

6    follow the plan, that they have to reactivate, file their

7    notice of appeal and pursue the appeal of denial of class

8    cert.

9              THE COURT:  Yeah, that question isn't before me

10   today, but I'm not so convinced that you're correct.

11             Okay.  You may proceed.

12             MR. DONLEY:  All right.  We think what they're

13   doing is --

14             THE COURT:  And by the way, I don't mean by that

15   question to extend any invitations.

16             MR. DONLEY:  All right.  Changing to a related --

17   new but related topic, Your Honor.  We think what they're

18   doing is attempting a back door, maybe not even so back

19   door, pretty direct, plan modification.  And I don't need to

20   educate Your Honor on what Section 1127(b) of the code says,

21   just briefly --

22             THE COURT:  No, because I don't know if -- we may

23   have had this discussion before, but I write that section

24   for the treaties.

25             MR. DONLEY:  Yeah.  So we're now not only after

1    confirmation, that window when plan proponents of the Debtor

2    can revise, we're after substantial consummation and the

3    door is foreclosed to plan amendments at this point.  Plan

4    Section 4.1.1 basically mimics 1127(b), it's baked into the

5    plan.  Maybe that's redundant and unnecessary, but it's in

6    there as well.

7            The PDCMO itself, if you just look at that, is

8    there some way that that can be modified now?  And the

9    answer is, no.  The plan says that after the effective date,

10   plan documents, they are an integral part of the plan, but

11   if you look at just the plan documents, the exhibits, such

12   as the PDCMO, they may be modified -- and maybe the time's

13   run, because this says only after the effective date, or

14   beyond that, we're past substantial consummation now.  But

15   even just after the effective date, plan documents, such as

16   the PDCMO may be modified only as provided in the plan

17   documents themselves.  It's Section 4.1.2 of the plan I have

18   cited there, and plan definition 172 says basically the same

19   thing.

20           And I'm happy to supply hardcopies or electronic

21   version of the PowerPoint slides, if the references are

22   helpful, Your Honor.

23           And the PDCMO itself contains no provision for its

24   modification.  So modification by AMH, or urged by AMH, at

25   this stage, is not permitted.

1          What about this final judgment issue, very

2     prominently mentioned in the briefs, wasn't mentioned in

3     argument?  They say, well Grace, you're wrong when you say

4     that confirmation of the plan is a final judgment on the

5     merits of Anderson's class claim.  That's not what we said;

6     that's not what we're saying.  But confirmation of the plan

7     is a final judgment on the treatment sequence, jurisdiction,

8     venue and procedures governing the Class 7-A PD claims that

9     are set out in the CMO.  And those are really I mean

10    procedures.  Those are not just like dates for a oral

11    argument on a motion that can be changed by any judge in

12    managing your courtroom, those provisions were integral to

13    confirming a 524(g) plan.

14          I cite, just as one piece of testimony, Mr. Fink

15    is here, deputy general counsel of Grace, he gave testimony

16    at Docket 23475 during the confirmation hearing, of how

17    integral those procedures in the PDCMO were.  They ensure

18    that the future PD asbestos claims would be subject to

19    substantially and equivalent and fair procedures, as

20    compared to two groups of people.  Number one, the current

21    claimants; it didn't have to be identical, but had to be

22    substantially equivalent and fair.  And number two, as

23    between one future claimant and another future claimant.

24    You couldn't have a situation where the plan was confirmable

25    if one future claimant would be treated substantially

1    differently.

2          And these procedures and the sequencing were

3    absolutely integral to achieving that equality and fairness

4    and to getting the plan confirmed.  So they were really

5    integral to the plan and confirmation of the plan was entry

6    of a final judgment, as to those issues.  It didn't say

7    anything about the merits of their class claim, which of

8    course actually the plan expressly preserved their ability

9    to keep litigating that.

10          These provisions were all very heavily negotiated,

11    negotiated with the PD committee that Mr. Speights served

12    on.  They were actively litigated.  They were confirmed.

13    They were appealed.  And the plan has now been substantially

14    consummated.

15          Let me turn to the future claimants'

16    representative's brief where he now says -- and Mr. Rich and

17    Mr. Sanders have said they believe it's in the best interest

18    of future claimants as they sit here today, to certify a

19    class of traditional property damage claimants.  That

20    completely ignores, I believe it's a complete 180, Your

21    Honor, in change of position.  The future representative

22    ignores the express language of the plan provisions that he

23    endorsed, without equivocation, which said, and I quote,

24    class action claims shall not be permitted, closed quote,

25    for claims in Section 2 of the property damage CMO.  That

1    includes all future Class 7-A PD claims, because Section 1

2    was for claims filed prior to the March 2003 bar date,

3    Section 2 encompasses all future PMOs -- all future PD

4    claims.  And it's Section II(a)(4) of the CMO that says, and

5    was -- there wasn't a line item endorsement by Mr. Sanders,

6    I endorsed some provisions of the CMO and not others, he

7    endorsed it straight out, and that included Provision

8    2(a)(4) saying class action claims shall not be permitted.

9    Couldn't be clearer, the expressed language couldn't be

10   clearer.

11          The future claim representative's testimony at the

12   confirmation hearing established that he extensively

13   negotiated that document, the PDCMO, and he unequivocally

14   supported the plan's treatment of future claims in that

15   document, which includes Section 2, which we just read,

16   saying no class treatment for future claims.  Period.  And

17   two pieces of testimony in particular, he testified quote, I

18   participated in extensive negotiations with the Debtors with

19   respect to the joint plan as treatment of future traditional

20   asbestos PD claims, and I had a significant role in drafting

21   the operative legal documents that established that

22   treatment.  These include the Class A -- 7-A case management

23   order with respect to future claims.

24          Never a peep, nothing in the record, no suggestion

25   before today or his brief, that we want to -- or think it's

1    better to have a class treatment for Section 2 claims.  Just

2    never occurred.

3              Further testimony from Mr. Sanders.  The plan,

4    quote, treats future holders of traditional PD claims or

5    demands -- again, I put it in brackets, those are Section 2

6    claims -- fairly and equitably.  Fairly and equitably, and

7    on terms substantially similar to the current traditional PD

8    claims, those are the Section 1 claims filed by the bar

9    date, by providing mechanisms by which all valid, current

10   and future claims shall be treated and paid on substantially

11   similar terms.

12             So the record is the record.  We can quibble about

13   whether it's a change of position now or not, I think it is,

14   I think it's pretty clear that it is, but it's really beside

15   the point.  It's of no legal relevance if he's urging a

16   different position now.  This is what the testimony was,

17   this is when it went into the confirmed plan, the terms have

18   been confirmed, upheld on appeal and substantially

19   consummates.  And there's zero legal relevance to the FCR

20   advocating different treatment now after the fact.

21             I'll be very brief on this next point.  In fact,

22   I'll take 20 seconds or less, because he didn't mention it

23   in his oral argument, but they mention it in their reply,

24   and I didn't have a surreply, Your Honor.  We pointed out

25   that there's never been a case -- this seems -- the relief

```
1    they're asking for is unprecedented when -- where there's a
2    class certification denial, in a bankruptcy case, pre-
3    confirmation, and then a motion for reconsideration post-
4    confirmation.  And they came back and said, no, no there's
5    the (indiscernible) in the Southern District of New York and
6    there's the F-Squared case here, that's exactly what
7    happened there.
8              That's not true at all.  There was no -- pre-
9    confirmation there was no hearing on a motion to certify a
10   class in either of those cases.  Yes, after confirmation
11   there was agreement by all the parties, by the Court, prior
12   to confirmation, that there would be a hearing.  In fact, it
13   was even scheduled for two months after confirmation in
14   (indiscernible) 2:34:45.  And then it took place because
15   they were expedited Chapter 11's.  Everybody agreed,
16   basically that these can pass through and the hearing can
17   take place later.
18             So we're not saying -- we didn't say that a motion
19   to certify a class can never take place after confirmation.
20   It was agreed to and understood in these two cases.  But it
21   is -- we've looked for a case, and they haven't pointed one
22   to us, it is at least unprecedented, certainly unusual, to
23   have an order six years before the effective date, denying
24   class cert and then after confirmation, the matter brought
25   up on a motion for reconsideration, certainly very unusual.
```

1          On the merits.  The four factors that weren't

2     addressed by Judge Fitzgerald, they suggested or said in

3     their brief that she went their way on these factors.  No,

4     they just weren't addressed because she didn't have to get

5     to them.

6               THE COURT:  I agree.

7               MR. DONLEY:  And so -- but these were addressed in

8     the original round of briefing back in 2014 and '15.  So let

9     me just respond briefly.  Commonality, we believe, is absent

10    here.  The 17 highly individualized factors including

11    installation, removal, damages, also statute of limitations,

12    all very, very individualized.  We don't see the commonality

13    among the claims, at all.  And that's very different from

14    some of the cases they've cited.

15              Predominance.  They ignored the showing entirely,

16    didn't make it, didn't support it.

17              Typicality.  This is, in our view, a classic,

18    intricate class conflict.  Anderson, in our judgment, just

19    is not in a position.  They have a built-in conflict in

20    representing many claimants.  You know, maybe the opt-out is

21    a partial relief valve for that, but they filed their claim

22    on time and they're really in a -- as we said in our brief,

23    I won't belabor it, they're in a very different position,

24    not equipped to represent others.

25              The two cases on typicality they cited, by the

1    way, Whirlpool, this it was remanded to the Sixth Circuit,

2    but in their opening brief they should have noted that it

3    was vacated.  It's not good law; it's not a precedent.

4            And Pella, which is another Seventh Circuit case,

5    there were two classes in Pella.  One was a 23(b)(2)

6    declaratory judgment class, that's not germane here.  Then

7    there was -- the germane class was the 23(b)(3) class that

8    was certified for consumers who bought Pella windows.

9    Totally different fact situation.  These were all claimants

10   who had not only manifested injuries but wood rot in their

11   windows had all been manifested, known, and they replaced

12   them with replacement windows already.  All manifested.

13           Very different from here where you have a whole

14   range of class members, or potential class members, some of

15   whom may not know they have asbestos in their building,

16   maybe some 7-A claimant finds out tomorrow, during a repair,

17   that he or she has asbestos found knocking out a wall,

18   brings a claim and says, I'm not subject to the bar date.

19           You have other people who found out maybe at some

20   interim point in time and maybe it raises an Owens Corning

21   versus Wright issue of a so called gap claim.  There's a

22   whole range of people.  Pella, everybody was the same,

23   everybody had a very mature, manifest claim, so not

24   relevant.

25           On fair and adequate reputation, that's similar,

1    related to typicality.  Here, you know, the district court

2    and the Third Circuit both found that AMH lacked standing to

3    argue Grossman's type issues, due process issues on behalf

4    of post-bar date claimants, the claimants we believe are in

5    Section 2.  And they really didn't distinguish or mention

6    Anderson in its individual capacity or its capacity as a

7    class rep, just lacked stand, period, without making that

8    distinction, is what the Third Circuit said.

9            On superiority.  I kind of flinched when I heard

10   it said that superiority was not decided because it may not

11   have been the main point, but it was certainly in Judge

12   Fitzgerald's opinion, as Your Honor knows, and Judge

13   Buckwalter.  They say it's dicta, maybe it is maybe it

14   isn't.  But Judge Buckwalter also addressed that and agreed.

15           But their main argument for superiority, which

16   they repeat many, many, many times in their brief, is they

17   say, geez, the fundamental question is whether class

18   litigation under Section 1 is superior to individual

19   litigation under Section 2.  I lost count of how many times,

20   over a dozen times in their brief, that's the question they

21   say.  And of course, Mr. Speights believes that it is.

22           But it's an academic question, it's a false

23   question because the plan expressly forecloses that option.

24   We looked at that plan language before in Section 2(a)(4).

25   The class approach is available under Section 1, yes, but

1    only if the steps are taken to litigate the individual claim

2    and then follow the other steps set forth with the appeal,

3    and if they're successful, the remand.  Those are provisions

4    that Anderson's bound to follow.

5            It may be an interesting academic exercise, it may

6    be an interesting exercise on class actions -- it is a

7    fascinating, interesting topic.  But it's not available

8    here.  So that basis for superiority is foreclosed and it's

9    binding because the plan is binding on creditors such as

10   AMH, at this point.

11           Numerosity.  In Anderson's September 2015 brief,

12   at page 62, they made a very interesting statement,

13   admission.  Quote, there is no evidence that any building

14   owners even, quote, know they have accrued claims against

15   Grace or right to file claims.  It's different from a quote

16   in their reply brief that I'm going to cite in just a

17   minute.  But I mean, if that's true that really undermines

18   them on numerosity and takes us back -- we've been a long

19   way, so if I can inject a little levity.

20           My old friend, the Maytag repairman is on my next

21   slide.  And we look at, he's still waiting.  The total

22   number of claims that have been filed since emergence over 2

23   1/2 years, there's one claim, it's not a building owner or a

24   putative number of Anderson's class, so I said total number

25   of claims within Anderson's class, zero.  It's a Timberland

1    owner that's the subject of separate briefing under Section

2    2 that's -- I believe the briefing is going to be completed

3    before Your Honor next week, by a company called Plumb

4    Creek, a timber company out in Libby, Montana.  So, there's

5    not been much action; there still could be.

6            Here's the other statement on numerosity they

7    made, I wanted to point out, which seemed different from

8    their first statement.  This is from their reply brief on

9    April 11th of this year Anderson filed at page 27.  They

10   said, quote, each class member can produce invoices and/or

11   asbestos-containing product to be sampled and tested, to

12   establish members -- membership, meaning in Anderson's

13   putative class, once a claim process is established.

14           My question is, Your Honor, is if that's true,

15   they've got the invoices, they've got the asbestos

16   materials, they're at their fingertips as Anderson's

17   represents here, or suggests.  Why haven't -- hasn't anyone

18   filed them?  Especially when class certification is very

19   much in peril, we think in great peril, because we don't

20   think it's merited and it's already been denied once.  And

21   that's pretty thin ice to be grounding a claim on.

22           It's real simple to file your claim and preserve

23   your rights, why hasn't another, even one person in 2 1/2

24   years done that?  We just think it shows a lack of

25   credibility to the assertion that there is -- that

1    numerosity has been satisfied.

2          I'll finish just by addressing a couple of Mr.

3    Speights's points from his argument.  On numerosity, he said

4    we admitted it in the South Carolina amended complaint.  I

5    won't repeat our briefs.  We gave four cites at page 24 --

6          THE COURT:  I know you dispute it.

7          MR. DONLEY:  -- where we disputed that. Dr.

8    Martin, the expert's testimony at the trial, again, I won't

9    repeat the quotes in our brief, there's a lengthy

10   discussion.  There are two prongs under 524(g), you have to

11   make a showing that future demands, as it's called, meaning

12   future claims, basically -- substantial future demands, it's

13   likely they will occur and the amount, number and timing are

14   indeterminate.  That's what she testified, she said, I've

15   look at the record, I believe it's likely.  I'm predicting

16   the future, so I can't say for sure, and there's no estoppel

17   here at all, as they say in their briefs, because that's a

18   good faith estimate by an expert in 2009 about what is

19   likely to happen in the future.

20         She said, yeah, it's likely there will be

21   substantial claims.  She didn't say more than 47.  She

22   didn't say more than five.  She didn't say 20.  In fact, to

23   the contrary, she said they can't be quantified, we don't

24   know enough.  It's indeterminate.  And so there was no

25   concession of numerosity there, even if 40 was a bright-line

1    test, with all deference to Professor Miller, very engaging

2    professor.  You know, he doesn't sit on any court, there's

3    no bright-line test of 40.  There were 47 in United

4    Companies, there were 291, I think, in Kaiser, those two

5    case before Judge Walrath that they cited, but those weren't

6    dispositive of numerosity.

7              In United Companies, Judge Walrath also denied

8    certification of a class of I think it was home repair

9    owners, more on superiality (sic) and commonality issues

10   than on numerosity so much, but those were factors in those

11   decisions to certify a class in her discretion there,

12   looking at all the factors of numerosity, superiority.

13   There was no per se rule that if you have 47 claimants it's

14   automatically in.  There's no law that says that.

15             Masonry fill was only briefly mentioned at all in

16   -- it was mentioned in the first round of briefing a year

17   and a half ago, only very briefly mentioned -- I don't

18   recall where it was at all, in the most recent briefing.

19   That's why we didn't address it.

20             And as we said in our first round of briefs,

21   because it's almost two years ago, on masonry fill, the

22   company never even got sued once pre-petition, on masonry

23   fill.  They just weren't litigating claims.  We've seen no

24   proofs of claim for them.  There were lots and lots of ZAI

25   attic fill proofs of claim filed, so people who were

1    homeowners, who had an issue or had relatively low dollar

2    amounts.

3              And by -- just as an aside, Your Honor, when he

4    says the dollar amount in claims the site very low, the

5    majority are below $75,000, I think if there are class

6    members out there, there's quite a few who would dispute

7    that, I believe.  If you just look at the average allowed

8    claim that we paid in this case, there were 407 allowed

9    Class 7-A PD claims that were paid for approximately 150 --

10   I think it was $150.8 million.  And that's about, I think

11   $375,000 per claim, on average, some of them worth multi-

12   millions.  So there's a real range here, many of the claims

13   highly valuable, if the claims are valid and they can

14   survive the legal and factual showings they have to make.

15             But on masonry fill, in contrast, we know people

16   with attic fill filed lots, and lots, and lots of claims.

17   There was a trial, there was a settlement class.  Settlement

18   class totally distinct from the class we're talking about

19   for ZAI.  Masonry fill nobody's ever shown up.  So is it

20   possible that those claims may be filed later?  Sure, it is,

21   but it's completely speculative.  There's no evidence in the

22   record, and the record suggests, pretty strongly to the

23   contrary, that there will be few, if any masonry fill

24   claims.

25             If I could just have one moment to look at my

1    notes, Your Honor?

2            THE COURT:  Certainly.

3            MR. DONLEY:  Just a couple last response points.

4    Yeah, the 1984 schools case, that sure was an old case, and

5    that's not new law that justifies and supports a motion for

6    reconsideration.

7            The Neale versus Volvo case that they mentioned

8    just briefly in their reply, it was a sunroof design defect

9    that was common, same exact defect, same facts, expert,

10   legal issues applicable to everybody who bought the Volvo

11   cars.  Just totally distinct, doesn't justify class

12   certification in this situation, where a wide variety of

13   fact patterns, exposure, histories, damages, statute of

14   limitations for a wide variety of building owners and uses

15   of asbestos.

16           Richard, anything else?  Your Honor, happy to

17   answer any questions, and I thank you for your time and

18   indulging me going on so long, but that finishes my

19   argument, unless you have questions.

20           THE COURT:  I have no questions.  Thank you.

21           MR. DONLEY:  Thank you, sir.

22           THE COURT:  Mr. Speights?  Oh.

23           MR. DONLEY:  Yeah, let me take down my --

24           MR. ROSENDORF:  Your Honor --

25           MR. DONLEY:  -- get this out of your way.

1          MR. ROSENDORF:  Dismantle there?

2          MR. SPEIGHTS:  Yeah.

3          MR. ROSENDORF:  Your Honor, with the Court's

4    permission, I would like to address the procedural issues

5    that have been raised by Grace and Mr. Speights will close

6    on the class issues and reply; if that's okay.

7          THE COURT:  That's fine.

8          MR. ROSENDORF:  Thank you, Your Honor.  Your

9    Honor, my purpose here is primarily to respond to the

10   arguments raised by Grace asserting, in effect, that the

11   plan is a barrier to this Court's even entertaining of this

12   motion for reconsideration, even after this Court entered an

13   order directing the parties to brief the issues of class

14   certification.

15          And we have, in substance, I think four responses

16   to that.  First, the order, the PDCMO on which Grace relies,

17   has not even been entered by this Court.  Secondly, even if

18   it had been entered, it is not a final judgment on anything,

19   certainly not Rule 23 class certification or the underlying

20   merits of the AMH claim, either individual or class claim.

21   It is, as it describes itself, a case management order, that

22   addresses issues of scheduling and sequencing.

23          Third, even if this order had been entered, its

24   terms, by the expressed language of the PDCMO itself, at

25   least those that Grace seeks to rely upon here, do not apply

1    to the Anderson class claim.

2          And finally, Your Honor, as Mr. Speights has

3    already started to argue, and as we can demonstrate,

4    circumstances have so changed since the original class

5    certification order was entered, that in any event there is

6    no reason for this Court not entertain reconsideration of

7    class certification at this time.

8          So let me turn to the first issue, which this

9    Court raised, which is the same question that we have been

10   asking, which is why was this order never submitted for

11   entry?  Why has it never been entered?  And what does that

12   mean?  We would submit that what it means is that if Grace

13   seeks to rely upon this order, it should seek the Court's

14   entry of the order, it should file a certification or motion

15   for entry of order, at which point issues with respect to

16   the scheduling and sequencing order, as they now exist, as

17   known to the Court, could be addressed.  But the reality is,

18   that never happened.  That didn't happen.

19         And for Grace to suggest now that because the

20   order was a plan exhibit that it is so set in stone that it

21   can't be modified or altered, is frankly somewhat absurd if

22   you just look at the order itself.  Because if you review

23   the order as it is included in Grace's submissions in

24   connection with this briefing, it's full of blanks.  The

25   scheduling order doesn't even have a schedule in it, it has

1   no dates for the things that are supposed to happen in that

2   order.  So if you just look at the exhibit that they have

3   provided themselves, it is clear that this order cannot be

4   operative, cannot be so set in stone that it is incapable of

5   being altered.  It is nothing of the sort.

6           So we would submit, in the first place, that

7   Grace's reliance upon this order is entirely misplaced,

8   because in fact no PDCMO has been entered.

9           But Your Honor, if you then actually look at the

10  order, its language does not apply to the AMH claim.  In

11  particular, Your Honor, what Grace is relying upon are the

12  provisions in Section 1(b) 1, 2 and 3 of this order, which

13  appear on pages 1 and 2 of the order.

14          But in order to figure out what 1, 2 and 3 apply

15  to, you actually have to read Section 1(b) in the first

16  place.  And 1(b) refers to claims which have been disallowed

17  or expunged by the bankruptcy court and for which the

18  holders of such claims have filed appeals, which appeals are

19  pending as of the effective date.  Or, two, as to which

20  class certification has been denied, and an appeal from such

21  certification is pending as of the effective date.

22          AMH did file a class certification motion, that

23  motion was denied by Judge Fitzgerald.  AMH did file an

24  appeal of that denial, that appeal was taken through the

25  district court and to the Third Circuit of Appeal, which

1    dismissed the appeal on December 24th, 2009.  As of, and

2    after that date, there was no appeal pending of class

3    certification in this case.  Now, in the demonstrative that

4    counsel provided here, the sort of sub rosa surreply that we

5    got as we walked into court today.

6            They have argued that Anderson's, what they call,

7    regular, non-interlocutory appeal is pending and is still

8    pending as of this moment.  I, frankly, have no idea what

9    appeal Grace is talking about.  What court is that appeal

10   pending in?  What is the docket number of that appeal?

11   There is no such appeal, there is no case pending.

12           And indeed, after an extensive citation to Black's

13   Law Dictionary, as to the definition of "pending," there's

14   an interesting slip of the tongue on page 7 of these slides

15   here, when they say, there is no final judgment on AMH's

16   class claim, or denial of a motion to certify its class.

17           Therefore, it's class claims remain pending.  This

18   is not about Anderson's class claims, that is not the

19   language that was used in the PDCMO.  The PDCMO referred to

20   pending appeals and there is no such thing.

21           So by the plain language of the PDCMO, Section

22   1(b) does not include the AMH class claim, because there was

23   no appeal pending as of the effective date in 2014.  What

24   that means is that all of these provisions that they seek to

25   apply as procedural bars to consideration of a motion to

Page 80

1    reconsider on Anderson, simply do not apply.

2            Now, the other subcomponent of their argument here

3    --

4            THE COURT:  So let me ask you this question.  What

5    do you -- if it doesn't apply, what do you think the

6    provisions that you're discussing were intended to do?

7            MR. ROSENDORF:  I was not their drafter.  And

8    while counsel said that the PD committee was consulted on

9    their drafting, and that Mr. Speights was a member of the

10   Committee, Mr. Speights obviously does not control that

11   Committee, and Anderson was never consulted on these

12   procedures.  I cannot speak to their intent; I can speak to

13   their application.  And their application as to pending

14   appeals very well may make sense, because while there is an

15   appeal pending, there is a certain logic to holding, in

16   abeyance, the underlying claim.

17           But when there is no such appeal pending, that

18   logic, to the extent there is any, no longer applies.  So I

19   can't read into the intent, I won't speculate on the intent.

20   But as to the application, if there is no appeal pending,

21   these provisions do not apply.

22           THE COURT:  So let's say I agree with you.  Do I

23   have the discretion to require the process that the Debtor

24   says should be followed, in any event?

25           MR. ROSENDORF:  I think this Court always retains

Page 81

```
1     discretion over the managing of its docket.  And I think
2     that what we would welcome the Court to do is to manage its
3     docket in a way that makes for an efficient use of both this
4     Court's resources and the potential resources of appellate
5     courts that are going to hear this.  And indeed, as reasons
6     that I'm sure Mr. Speights can tell you in a lot more
7     detail, we believe that the efficient use of this Court's
8     docket is to address the issue of class conference first
9     before going down the road of trying the individual claim,
10    and apparently, as the Debtor now argues, not only trying
11    that claim, but apparently taking appeals from that as well.
12            Now the Court brought up an interesting question
13    to the Debtor, which I don't understand their answer to,
14    which is that the Debtor seems to say that even after the
15    AMH individual claim has been trialed -- tried, that this
16    Court still lacks authority, it is barred by the plan, from
17    even considering, reconsideration of the AMH class claim.  I
18    don't see that anywhere in the PDCMO.
19            It's certainly not in one.  It's not in two, the
20    provision that Grace relies upon, says the Anderson class
21    claims shall remain inactive unless and until there is a
22    final appealable order with respect to the Anderson
23    individual claim.
24            THE COURT:  Look, the issues not before me today.
25    I tend to agree with you, but if there comes a time when I
```

1    should face the question, I'll address it after appropriate

2    pleadings and arguments.

3                MR. ROSENDORF:  Fair enough, Your Honor.  But from

4    our perspective, it simply highlights what I think is the

5    absurdity of the notion that this Court lacks the discretion

6    to manage its own docket because of the language in a

7    proposed case management order that was originally drafted

8    more than seven years ago, 2009.  And we would submit that

9    for purposes of procedure, of sequencing, that this Court

10   always retains the discretion, under an interlocutory order

11   that it has entered, to revisit those issues of scheduling

12   and sequencing.

13                And on that point, I want to address further the

14   notion that the Debtor has advanced, that Grace has

15   advanced, that the plan constitutes a final judgment.  And

16   in their briefs they argue this by saying that Rule 23

17   prohibits reconsideration after a final --

18                THE COURT:  Look, I tend to agree with you --

19                MR. ROSENDORF:  -- judgment's been entered.

20                THE COURT:  -- as you just articulated that

21   proposition.  The plan deals, in final ways, with any number

22   of things, but I don't think with respect to this issue.

23                MR. ROSENDORF:  Very well, Your Honor, then I

24   won't belabor the point because again, we believe this is a

25   sequencing issue, it's not a final judgment on any issues of

1     the merits.

2           So Your Honor, let me turn to some of the comments

3     that were made in Grace's argument.  They suggested, for

4     instance, that we did not challenge the appeal provisions of

5     the PDCMO when we took this up on appeal.  I think for

6     reasons that we have just discussed and explained, that was

7     not the concern of the appeal, the appeal addressed other

8     issues of unequal treatment.

9           THE COURT:  Well, I'm not sure it's relevant

10    either way, because the plan and the order say what they

11    say.

12          MR. ROSENDORF:  Thank you, Your Honor.  Again,

13    with respect to the whole issue of plan modification, I am

14    certainly not going to try to educate somebody who knows a

15    lot more than me on that subject, but I would submit that

16    treating the updating of a case management order entered in

17    conjunction with the plan is simply not nearly the same

18    thing, first of all, as modifying the plan itself.

19          And secondly, as Grace noted, the plan itself does

20    say that the plan exhibits can be modified according to

21    their terms.  Well, the case management order is an

22    interlocutory order, it is a scheduling order, and any such

23    scheduling order of this Court, by its terms, is susceptible

24    to modification.  So --

25          THE COURT:  But I will say, while I did not sit on

1   the confirmation of this case -- of the plan in this case, I

2   have had cases in which there have been individual claims

3   which were corralled into, I purposely didn't use the word

4   "channeled" into either an ADR type of process or a claims

5   disposition type of process.  So the fact that -- and they

6   are all, in my experience, fairly important to how part of

7   the plan is to be carried out.

8           So I -- you know, this is not -- I don't think

9   this is quote, just a scheduling order.

10          MR. ROSENDORF:  I understand that, Your Honor.

11  But I think that we have to focus in particular on what's at

12  issue here, which really is, at the heart, just a matter of

13  sequencing.  Do you address issues of reconsideration of

14  class certification now, when you have the opportunity to do

15  so, or do you go down the path suggested by Grace of trying

16  the individual Anderson Memorial claim, forcing an appeal,

17  going through that whole route, before even addressing the

18  question --

19          THE COURT:  Wait, maybe you'll win.

20          MR. ROSENDORF:  -- of whether --

21          THE COURT:  Maybe you'll wain.

22          MR. ROSENDORF:  Right.  But then winning means it

23  just comes back to you after -- you know, on a record before

24  the Third Circuit of a class certification order that was

25  entered eight years ago before, Frenville was reserved,

1   before Grossman and Owens Corning, before all of those

2   things, before the Debtor proposed a hundred cent plan,

3   before the Debtor agreed to the appointment of a future

4   claims representative.

5            THE COURT:  Look, I'll just say I appreciate

6   everyone's concern about my caseload.  Thank you so much.

7            MR. ROSENDORF:  You know, or do we deal with those

8   issues now?  And what's interesting, Your Honor, is -- and I

9   understand what you've just described which is that there

10  are some processes that are very integral to the plan.  What

11  you have not heard from Grace, for a moment, is how this

12  particular process and the order of consideration of either

13  class certification or trial of the individual claims has

14  any impact whatsoever on Grace, or how it is harmed.  How

15  the process of the plan or the trust are in any way impaired

16  by that; you've not even heard a suggestion of it.

17           THE COURT:  Look, it -- you know, that may not be

18  relevant.  It's either required by the plan and the order,

19  or it's not.

20           MR. ROSENDORF:  Your Honor, the -- a couple of

21  other additional points that I would just like to address.

22  One of the things that was argued, and this was more

23  directed to the future claims representative's joinder, is

24  the provisions of the PDCMO, purporting to prohibit what

25  Grace describes as Section 2 claimants from filing class

1    action claims.  What is notably omitted from Grace's

2    discussion of that, in which they effectively try to argue

3    that because of that provision Anderson is prohibited from

4    pursuing a class claim that would include otherwise Section

5    2 claimants, what they don't mention is what appears

6    immediately after Section -- within Section 2(a)(4) where

7    the provision itself says that this provision shall not be

8    construed to require the dismissal of or require any

9    particular ruling with respect to class certification, in

10   any subsequent proceedings on remand, if any, from any such

11   pending appeals with respect to Anderson.

12            They are now arguing exactly what their own PDCMO

13   says it would not do.  And so we would submit that that, as

14   well, is no bar to this Court's consideration of Anderson's

15   motion.

16            THE COURT:  Thank you.

17            Mr. Speights, I encourage you to be brief, if you

18   are able.

19            MR. SPEIGHTS:  I'll try to talk faster, Your

20   Honor, but it's not the way we speak --

21            THE COURT:  Talking fast --

22            MR. SPEIGHTS:  -- where I'm from.

23            THE COURT:  -- is not your style, sir.  I

24   understand this.

25            MR. SPEIGHTS:  Quickly.  Maytag defense, we've

1   cited in the brief, and you've read it.  The absence of

2   claims support certification, big point.  Mr. Donley

3   complete -- continues to argue this, he's arguing against

4   commonality and predominance, et cetera, because of the 17

5   individual factors that a claimant must go through when he's

6   running the gauntlet.  All members of the class, if

7   certified, are in Category A/Section 1.  None of them have

8   to run the gauntlet, there is no commonality or predominance

9   issue, all are in here.  Even though who are future

10  claimants, represented by Mr. Sanders, are in Section 1.

11          Mr. Donley mentioned there's a conflict between

12  Anderson and the rest of the class, because Anderson is a

13  superior claimant.  Well, thank you for the compliment of

14  Anderson, but the reality is, the law says that's the type

15  of claimant you want.  I cite Judge Posner being quoted by

16  the Third Circuit's case in Neale, July 2015, talking about

17  adequacy, there is nothing wrong with the class claimant

18  being strong, what you don't want is a weak class claimant.

19          Post-bankruptcy consideration.  I don't know

20  whether there's any case out there or not, but I do know in

21  this case it was not until the plan was affirmed and went

22  active, that the basis of the reconsideration, their motion

23  to alter or amend, existed, because it was the plan that was

24  confirmed that provided for 100 cents on the dollar, and all

25  this different treatment that triggered the filing of the

1    motion to alter or amend in this case.

2           PD committee.  I don't think this is a big issue,

3    Your Honor.  I was co-chair of the PD committee.  I'll admit

4    that my memory is not what it used to be, I don't think

5    there's anything in the records saying the PD committee

6    participated in the drafting of this document, nor do I have

7    any recollection of that.

8           Two more points, Your Honor.  I always return to

9    masonry fill.  You know, I started as class representative,

10   as class counsel, think about it as people who have no idea

11   (indiscernible) have a claim.  And there's been no dispute

12   of what I said.  But what is important is, while counsel

13   says he didn't remember masonry fill being discussed in our

14   brief, we discuss masonry fill 14 different times in our

15   brief.  Never mention?  We discuss masonry fill or mention

16   it 44 times in our briefing before Your Honor.  And in their

17   brief, they don't say anything, and I understand why they

18   don't say anything, they don't have an answer to masonry

19   fill.  It's not in the bar date notice, it's sitting out

20   there, these people.

21          Judge Sanders and I are both concerned about these

22   people having an opportunity.  We representative truth and

23   justice, we want these people to have their day.  We will

24   actively try to do that, and to give them an opportunity to

25   make a claim.  This is not a gotcha game; this is an

1    opportunity for these people to participate in the class,

2    and particularly for those people who had the exact same

3    product of ZAI and not going to get a penny out of this

4    because they have no idea until they knock down that wall

5    and then they're faced with this problem.

6           Lastly, Your Honor, you talked about discretion,

7    you asked Mr. Rosendorf if you had discretion.  And he, of

8    course, answered that question.  This is the situation I

9    find myself in, in representing Anderson.  If Your Honor

10   says to Anderson and its counsel, well you've got to first

11   come and try this case before me, individually.  And we'll

12   all run out and do a bunch of discovery, you know, some of

13   the witnesses will be changed.  Mr. Donley will run down to

14   South Carolina and visit the hospital, I'm sure.  I'll run

15   to Tampa where his leading expert is now retired, but ready

16   to testify again, I'm sure.

17          We'll do all this work.  And we'll come here and

18   try the case.  And you'll rule one way or the other, and

19   then, according to them, we'd have to appeal to the district

20   court on the Third Circuit, eventually.  If I win in the

21   district court, he'll appeal to the Third Circuit.  If he

22   wins in the district court, I'll appeal it to the Third

23   Circuit.  Again, that's assuming you can't just decide right

24   then and trigger the filing of it, which I understand you

25   will require briefing on that, if you want that issue

1    addressed.

2           But we go through all of that and then I'm

3    standing up in the Third Circuit arguing against Judge

4    Fitzgerald's denial of class certification, which is

5    completely irrelevant to reality.  Whatever Judge Fitzgerald

6    decided is not the existence of what is now before Your

7    Honor, because of the plan.  The plan changed everything,

8    and everything has changed.

9           So if I win in the Third Circuit, all I do is to

10   come back before you and argue again, well -- you know,

11   certify again.  They'll move to reconsider everything.  If I

12   lose in the Third Circuit -- I mean, it -- this is just a

13   never ending thing.  I'm worried about the time, as class

14   counsel, that all of this is going to take.

15          And to the extent that you have discretion, I

16   would urge you to exercise the discretion and let's decide

17   this one way or the other.  If Your Honor declines to

18   certify -- to consider class certification, and declines to

19   certify, then the individual claims will start coming on and

20   we'll deal with it.  But to require us to appeal, after we

21   go through a trial, we're just buying several years of

22   litigation that's unnecessary.  Thank you, Your Honor.

23          THE COURT:  Thank you.  Mr. Sanders, would you

24   like a few words at this point?

25          MR. RICH:  Yes.  Between Judge Sanders and I,

1    we'll be done before 3:15, we'll make this very quick.  I

2    just wanted to make one comment about counsel's assertion

3    that, again, we have somehow -- we are somehow precluded, or

4    our Class 2 claimants are somehow precluded from

5    participating in the Anderson class action.

6              Now I was certainly involved in drafting the

7    documents and Mr. Rosendorf was certainly to correct to

8    point out that Mr. Donley omitted 90 percent of the clause

9    that he quoted.  That clause that says, class action shall

10   not be permitted, was qualified in its entirely by what says

11   essentially -- but whatever happens in Anderson, whatever

12   the Court orders in Anderson controls.

13             And that's -- we're not arguing anything different

14   from that, and we think that's a very important point of the

15   provision.  So if the Third Circuit, or if this Court,

16   eventually or the Third Circuit, eventually, decides that

17   there should be a class action, and that definition happens

18   to include people who are in the second track, well then

19   that controls, over the provision that says no class

20   actions.

21             What that no class action provision is meant to do

22   was to make sure that there were none others, other than

23   Anderson, that there won't be any new class actions brought.

24   And of course that's not what's happening here today, no

25   one's arguing that somebody else is going to come in and

1    file a new class action, nor would we endorse such a thing.

2    So that's what I wanted to clarify for the Court.

3              And Judge Sanders had wanted to comment.

4              MR. SANDERS:  Your Honor, this matter in the name

5    of Anderson Memorial has been pending, to my knowledge, for

6    almost a quarter of a century.  These are good lawyers and

7    men of good will on both sides.  They do everything except

8    talk to each other.

9              If an experienced mediator could be brought to

10   bear on this matter, it wouldn't take up much time, it's

11   altogether possible that this thing might be resolved in my

12   lifetime, otherwise I don't believe I'm going to be able to

13   outlive it.

14             THE COURT:  And I'll probably be off the bench.

15             MR. SANDERS:  Give us a mediator.  See if he can

16   put them together.

17             THE COURT:  All right.  Thank you.

18             MR. DONLEY:  May I respond to just one point,

19   briefly, Your Honor.

20             THE COURT:  Yeah, once you tell me whether you

21   think you should go to mediation or not, yes.

22             MR. DONLEY:  Okay.  On mediation, I'd certainly

23   like to confer with my client on that. There -- I can report

24   to Your Honor, because I've been involved in even a small

25   fraction of them, there have been very extensive settlement

1    discussions for years and years on this claim, with Mr.

2    Speights, Mr. Fink having dialogue.  I've sat in or

3    participated, briefly, in a couple of them.  So candidly, I

4    don't think mediation would be effective at this point.  I

5    think the experience from those settlement discussions is

6    the gap is so big and my client corral me if I'm talking out

7    of school here.  And I would like to have a chance to caucus

8    with the client before giving a final answer, but that's my

9    just candid first impression, that it probably wouldn't be

10   effective.

11            THE COURT:  All right.  Well --

12            MR. DONLEY:  We're always happy to talk.  But the

13   one point I wanted to respond to was the point in Mr.

14   Speights's reply brief and argument about the -- on

15   numerosity and the paucity of claims supporting numerosity.

16            Very briefly, Your Honor, the case they rely on is

17   the Community Bank of Northern Virginia case, a 2005 Third

18   Circuit case, fairly old case, so around before the first

19   class cert hearing, in fact.  But that was a very different

20   situation.  It was a settlement class, there were more than

21   40,000 claims for a home mortgage forum alleged fraud.  The

22   claims were very low value, 200 to $950.  And the 44,000

23   people had -- in the settlement class had been told, ten

24   years before, that the case had been settled on their behalf

25   and they didn't need to file a proof of claim, and that's

1    why they didn't file.  So just the facts just don't really

2    match up.  I don't think it's really germane or helpful to

3    our sit.

4              THE COURT:  Thank you.

5              MR. DONLEY:  Thank you, Your Honor.  Oh, just a

6    point of Your Honor's practice, I'm not urging it.  I did

7    cite from the PowerPoint with many citations.  Is it Your

8    Honor's preference that I mark this as an exhibit to the

9    hearing record?  I'd be happy to, if Your Honor prefers

10   that, but I -- however Your Honor would like me to proceed.

11             THE COURT:  I'll take it as a demonstrative.

12             MR. DONLEY:  All right. Should I hand that to --

13             THE COURT:  Just give it to me.  Thank you.

14             And Mr. Speights, for your benefit, it is only a

15   demonstrative.

16             MR. SPEIGHTS:  Thank you, Your Honor.  And I do

17   not wish to -- well, I might wish to, but I'm going to argue

18   anymore.  But I do want to respond to your question about

19   mediation.

20             THE COURT:  Yes.

21             MR. SPEIGHTS:  And I'm sure Mr. Donley is not

22   aware of the history of this, having inherited this case,

23   but I'm aware of no settlement discussions that have taken

24   place since we -- since the effective date and we filed this

25   motion shortly thereafter.

1          I have, over the years, settled individual cases

2    with Grace and I did have some, I wouldn't call it an

3    extensive, settlement discussions with Grace prior to the

4    Third Circuit ruling on the confirmation.  But from my

5    standpoint, I can tell you that my client would be delighted

6    to participate in mediation, having just done so -- Anderson

7    just participated in a successful mediation with the U.S.

8    Mineral Trust.  So I always think it's worth a try.  Thank

9    you, Your Honor.

10          THE COURT:  All right. Thank you.  I tell my law

11   clerks that all the easy and moderately hard stuff gets

12   settled, but the really hard stuff comes here.  And that's

13   okay.  Is there anything further for today, Mr. O'Neil?

14          MR. SPEIGHTS:  No, Your Honor.

15          THE COURT:  Thank you all very much.  That

16   concludes this hearing.  I will take the matter under

17   advisement and issue a decision in due course.

18          Court will stand adjourned.

19          MR. SPEIGHTS:  Thank you, Your Honor.

20          MR. RICH:  Thank you, Your Honor.

21

22                    * * * * *

23

24

25

Page 96

1                    C E R T I F I C A T I O N

2

3     I, Sonya Ledanski Hyde, certified that the foregoing

4     transcript is a true and accurate record of the proceedings.

5     Sonya                    Digitally signed by Sonya Ledanski Hyde
                                DN: cn=Sonya Ledanski Hyde,
6     Ledanski Hyde            o=Veritext, ou,
                                email=digital@veritext.com, c=US
7                               Date: 2016.06.22 15:46:59 -04'00'

8     Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  June 22, 2016