# **<u>EXHIBIT A</u>**

# In Re:

*DELIVERY AGENT, INC., et al.*

*Case No. 16-12051 (LSS)*

---

*October 11, 2016*

---

*eScribers, LLC*

*(973) 406-2250*

*operations@escribers.net*

*www.escribers.net*

*To purchase copies of this transcript, please contact us by phone or email*

**Min-U-Script® with Word Index**

1

2  UNITED STATES BANKRUPTCY COURT

3  DISTRICT OF DELAWARE

4  - - - - - - - - - - - - - - - - - - - -x

5  In the Matter of:

6  DELIVERY AGENT, INC., et al.,           Case No.

7          Debtors.                        16-12051(LSS)

8  - - - - - - - - - - - - - - - - - - - -x

9

10

11                  United States Bankruptcy Court

12                  824 North Market Street

13                  Wilmington, Delaware

14

15                  October 11, 2016

16                  9:03 AM

17

18

19  B E F O R E:

20  HON. LAURIE SELBER SILVERSTEIN

21  U.S. BANKRUPTCY JUDGE

22

23  ECR OPERATOR:  MICHAEL MILLER

24

25

1  Motion for an Order Authorizing the Debtors to Pay Certain

2  Prepetition Taxes [Filed: 9/15/16] (Docket No. 8)

3

4  Motion for Interim and Final Orders Establishing Adequate

5  Assurance Procedures with Respect to the Debtors' Utility

6  Providers [Filed: 9/15/16] (Docket No. 9)

7

8  Debtors' Motion for Entry of an Order Authorizing the Debtors

9  to (I) File a Consolidated List of Creditors in Lieu of

10 Submitting a Separate Mailing Matrix for Each Debtor and (II)

11 Redact Certain Personal Identification Information for

12 Individuals Creditors [Filed: 9/15/16] (Docket No. 5)

13

14 Motion for an Order Authorizing the Debtors to Pay Prepetition

15 Employee Wages, Benefits, and Related Items [Filed: 9/15/16]

16 (Docket No. 11)

17

18 Debtors' Motion for Entry of Interim and Final Orders Pursuant

19 to Sections 105, 361, 362, 363(c), 363(m), 364(c)(1),

20 364(c)(2), 364(c)(3), 364(d)(1), 364(e), and 507 of the

21 Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6003, 6004,

22 and 9014 (I) Authorizing and Approving Debtors' Post-Petition

23 Financing; (II) Granting Liens and Security Interests and

24 Providing Superpriority Administrative Expense Status; (III)

25 Authorizing Use of Cash Collateral and Affording Adequate

1  Protection; (IV) Modifying Automatic Stay; and (V) Scheduling

2  Final Hearing [Filed: 9/15/16] (Docket No. 13)

3

4  Debtors' Motion for Orders (I)(A) Authorizing Debtors' Entry

5  Into the Asset Sale Agreement, (B) Authorizing and Approving

6  the Bidding Procedures, (C) Approving Procedures Related to the

7  Assumption of Certain Executory Contracts and Unexpired Leases;

8  (D) Authorizing and Approving a Break-Up Fee and Expense

9  Reimbursement, (E) Approving the Notice Procedures, and (F)

10  Setting a Date for the Sale Hearing, and (II) Authorizing and

11  Approving (A) the Sale of Certain Assets Free and Clear of All

12  Liens, Claims, Encumbrances and Interests and (B) the

13  Assumption and Assignment of Certain Contracts [Filed: 9/15/16]

14  (Docket No. 14)

15

16  Application for an Order Authorizing Debtors to Retain and

17  Employ Keller & Benvenutti LLP as Lead Bankruptcy Counsel, Nunc

18  Pro Tunc to the Petition Date [Filed: 9/20/16] (Docket No. 65)

19

20  Application for an Order Authorizing Debtors to Retain and

21  Employ Houlihan Lokey Capital, Inc. as Investment Banker, Nunc

22  Pro Tunc to the Petition Date [Filed: 9/20/16] (Docket No. 69)

23

24  Debtors' Motion for Orders (I)(A) Authorizing Debtors' Entry

25  Into the Asset Sale Agreement with Respect to the Sale of the

1  Clean Fun Business and Related Assets, (B) Authorizing and
2  Approving the Bidding Procedures, (C) Approving Procedures
3  Related to the Assumption of Certain Executory Contracts and
4  Unexpired Leases; (D) Authorizing and Approving a Break-Up Fee,
5  and (E) Approving the Sale Notice Procedures; (II) Authorizing
6  and Approving (A) the Sale of Certain Assets Free and Clear of
7  All Liens, Claims, Encumbrances and Interests and (B) the
8  Assumption and Assignment of Certain Contracts; and (III)
9  Granting Related Relief [Filed: 9/26/16] (Docket No. 86)

10

11 Motion for Entry of an Order Authorizing Rhino Entertainment
12 Company, a Warner Music Group Company, to File Under Seal
13 Exhibit 1 to Its Motion for the Expedited Entry of an Order
14 Granting Relief from the Automatic Stay Under 11 U.S.C. Section
15 362(d) or, in the Alternative, Motion for Adequate Protection
16 Under 11 U.S.C. Section 363(e) [Filed: 9/28/16] (Docket No.
17 101)

18

19 Motion of Rhino Entertainment Company, a Warner Music Group
20 Company, for the Expedited Entry of an Order Granting Relief
21 from the Automatic Stay Under 11 U.S.C. Section 362(d) or, in
22 the Alternative, Motion for Adequate Protection Under 11 U.S.C.
23 Section 363(e) [Filed: 9/28/16] (Docket Nos. 102 & 103)

24

25 Transcribed by:  Shoshana Ben Yaakov

1

2  A P P E A R A N C E S :

3

4  PACHULSHI STANG ZIEHL & JONES LLP

5       Attorneys for the Debtors

6  BY:   LAURA DAVIS JONES, ESQ.

7       PETER J. KEANE, ESQ.

8

9

10  KELLER & BENVENUTTI LLP

11       Attorneys for the Debtors

12  BY:   TOBIAS S. KELLER, ESQ.

13       JANE KIM, ESQ.

14

15

16  OFFICE OF THE UNITED STATES TRUSTEE

17       Attorneys for the United States Trustee

18  BY:   BENJAMIN HACKMAN, ESQ.

19

20

21  PEPPER HAMILTON LLP

22       Attorneys for Creditors' Committee

23  BY:   DAVID M. FOURNIER, ESQ.

24       DAVID B. STRATTON, ESQ.

25       MICHAEL J. CUSTER, ESQ.

```
 1   DUANE MORRIS LLP
 2         Attorneys for Chubb Companies
 3   BY:   RICHARD W. RILEY, ESQ.
 4
 5
 6   ASHBY & GEDDES, P.A.
 7         Attorneys for Rhino Entertainment
 8   BY:   GREGORY A. TAYLOR, ESQ.
 9
10
11   YOUNG CONAWAY STARGATT & TAYLOR, LLP
12         Attorneys for Hillair Capital
13   BY:   ROBERT S. BRADY, ESQ.
14
15
16   KLEHR HARRISON HARVEY BRANZBURG LLP
17         Attorneys for HALO Branded Solutions, Inc.
18   BY:   DOMENIC E. PACITTI, ESQ.
19         MORTON R. BRANZBURG, ESQ.
20
21
22   KIRKLAND & ELLIS LLP
23         Attorneys for HALO Branded Solutions, Inc.
24   BY:   GREGORY F. PESCE, ESQ. (TELEPHONICALLY)
25
```

1   STEVENS & LEE

2         Attorneys for Discovery Licensing, Inc.

3   BY:   JOHN D. DEMMY, ESQ.

4

5   CROSS & SIMON, LLC

6         Attorneys for Live Nation

7   BY:   CHRISTOPHER P. SIMON, ESQ.

8

9

10   SHAW FISHMAN GLANTZ & TOWBIN LLC

11         Attorneys for Universal Music Group, et al.

12   BY:   TERENCE G. BANICH, ESQ. (TELEPHONICALLY)

13

14

15   MORRIS, MANNING & MARTIN, LLP

16         Attorneys for Warner Music Group

17   BY:   FRANK DEBORDE, ESQ. (TELEPHONICALLY)

18

19

20   MANATT, PHELPS & PHILLIPS, LLP

21         Attorneys for Live Nation Merchandise, Inc.

22   BY:   IVAN L. KALLICK, ESQ. (TELEPHONICALLY)

23

24

25

1                    P R O C E E D I N G S

2            THE COURT:  Please be seated.

3            MR. KELLER:  Good morning, Your Honor.

4            THE COURT:  Good morning.

5            MR. KELLER:  I'm looking at the agenda and remembering

6    the Court's request that we keep the day light.  Hopefully, the

7    agenda is misleading in how thick it is by the number of things

8    that we've resolved.

9            What I would suggest is that we go through the motions

10   that we think we've -- we filed certificates of no objection or

11   certificates of counsel that are fully resolved first; make

12   sure that those are cleaned up.  Then there are three items, we

13   think, that can be resolved very quickly.  And then, I would

14   leave until -- we'll leave until the back part of the calendar

15   the debtor-in-possession bid procedures motion, which raised

16   this issue about the timing of the sale process.

17           THE COURT:  Okay.

18           MR. KELLER:  We have two witnesses; the committee has

19   one.  I think our direct testimony will last about twenty

20   minutes in total.  So we're still well within the window that

21   the Court offered us, I believe.

22           I noticed that the Court had entered orders on some of

23   the certificates of no objection, but just to go through the

24   agenda:  the tax motion, which was number 1 on the agenda, I

25   believe the Court has already signed the order on, but we have

1    extra copies if --

2             THE COURT:  No.  I have the tax order.  There's a

3    provision in several of the orders that make these orders

4    contingent upon the DIP order, indicating that the DIP order

5    controls.  And if I'm signing the order and permitting the

6    payment, I expect it to be made.  So is someone going to tell

7    me that these are all accounted for in the DIP budget?

8             MR. KELLER:  My understanding is that they are all in

9    the DIP budget.  I can go get positive confirmation of each

10   one, individually, but none of these -- as I go through, I know

11   that the tax is managed.  The utilities are managed.  Interim

12   comp, we have been -- the fees have been funded, as

13   anticipated.  The wages are not going to be funded, in light of

14   the sale to HALO, where HALO has agreed to assume those.  And I

15   think that addresses all of the funding obligations.

16            THE COURT:  Okay.  Well, I will sign the order.  I

17   have signed the order with respect to taxes.

18            With respect to utilities, paragraph 7, which says

19   that "to the extent that the procedures set forth herein are

20   not in technical compliance with certain time periods set forth

21   in Section 366 of the Bankruptcy Code, the debtors have

22   demonstrated good cause for the extension of the thirty-day and

23   twenty-day protected time periods under 366(c)(2) and 366(3)(b)

24   of the Bankruptcy Code, respectively", I'm striking that.  I

25   think it's more than technical compliance; you have to be in

1  compliance, and I don't have, as far as I know, the authority

2  to vary the statute, so that's coming out.

3         And then, paragraph 14, which makes it subject to the

4  DIP, is coming out because, again, by statute, you have to give

5  adequate assurance.  And if you don't, there are consequences

6  to that.  So with those changes, I will sign the order.

7         That order's signed.

8         Then I did sign 3, 4, 5, 6.

9         MR. KELLER:  And then we have to go out of order:

10  wages, number 8 on the list, did not make it into the CNO

11  section, but, in fact, is not opposed.

12         THE COURT:  Okay.  Do I have that?

13         MS. DAVIS:  It was submitted last night.

14         MR. KELLER:  It was submitted last night, or we can

15  also hand up a copy.

16         THE COURT:  Okay.  I see that.

17         That order's signed.

18         MR. KELLER:  Thank you.  Number 11 on the calendar is

19  the retention of my firm.  We had extended the objection

20  period, but resolved any questions.

21         THE COURT:  I've signed that order.

22         MR. KELLER:  Okay.  Then, the last item relates to

23  matters 14 and 15, the Rhino motion for relief from stay.

24         THE COURT:  Um-hum.

25         MR. KELLER:  We had executed a stipulation essentially

1   conceding their position under the UCC, and I think that's

2   prepared for signature as well.  If the Court would like, we

3   can -- we submitted a form of order, but we can also hand one

4   up.

5           THE COURT:  Why don't you hand that one to me?  I

6   don't see it.

7           MR. KELLER:  May I approach?

8           THE COURT:  Yes.  Thank you.

9           Counsel?

10          MR. TAYLOR:  Good morning, Your Honor.  Greg Taylor

11  from Ashby & Geddes, on behalf of Rhino.  Also on the agenda

12  was our related motion to seal an exhibit that was attached to

13  our motion.

14          THE COURT:  Um-hum.

15          MR. KELLER:  I have a -- there were no objections

16  filed to that.  I do have a copy I can hand up if you'd like.

17          THE COURT:  Thank you.

18          Thank you.  I will sign the stipulation with Rhino as

19  an agreed stipulation, and I did review the motion ahead of

20  time.  And I will approve the motion to file under seal, as

21  there is no objection.

22          Those orders are signed.

23          MR. KELLER:  Thank you, Your Honor.

24          With the Court's permission, just to give a preview,

25  what I'd like to do is introduce Ms. Jones to speak to the

1   consolidated creditor matrix issue, which is contested, but I

2   don't think will take much of the Court's time.

3            THE COURT:  Okay.

4            MR. KELLER:  Then give a brief update as to where we

5   stand with Houlihan, where there's still some things in flux,

6   and then we'd like to put Houlihan back to the end of the

7   calendar.

8            THE COURT:  Okay.

9            MR. KELLER:  After that, we'd like to get the -- to

10  present the sale of Clean Fun to HALO, which I believe will be

11  uncontested.  And then we can move on to the DIP and the

12  bidding procedures, where the vast majority of the issues have

13  been resolved.

14           THE COURT:  Um-hum.

15           MR. KELLER:  There's one issue now, which is timing.

16           THE COURT:  Okay.

17           MR. KELLER:  Ms. Jones?

18           MS. JONES:  Good morning, Your Honor.

19           THE COURT:  Ms. Jones.

20           MS. JONES:  For the record, Laura Davis Jones of

21  Pachulshi Stang Ziehl & Jones, on behalf of the debtors.

22           Your Honor, we had an issue, following up from the

23  last hearing --

24           THE COURT:  Um-hum.

25           MS. JONES:  -- with respect to our consolidated

1  matrix.  And we were down to the issue of whether we could

2  redact the home addresses for the former employees and whether

3  we could replace that on the matrix with their corporate

4  address, just for purposes of the matrix.  The noticing agent,

5  obviously, would have the home addresses for notice and service

6  purposes.  And Your Honor, we did file a supplemental response

7  in support of the motion.

8          Your Honor, bottom line, we submit it's unnecessary

9  and not prudent to disclose the personal home address

10  information when there is no reason to.  The case law instructs

11  us that a primary goal in a bankruptcy case is to make sure

12  that we're giving notice.  And that, Your Honor, we do, by the

13  noticing agent having the information, notice is being provided

14  to these former employees.

15          If there is a situation -- and I think Your Honor

16  raised this at the last hearing -- where a creditor may want

17  to, for some reason, either file their own motion or get in

18  touch with these other potential creditors about the former

19  employees, they could do so and coordinate through our noticing

20  agent.  And indeed, as part of practice, we've seen that when

21  committees move to dismiss a case or move to convert a case,

22  they use our noticing agent and do notices when it has to go to

23  a full matrix.

24          So Your Honor, we think, especially in this high-

25  technology environment, where there's been a lot of hacking and

1  everything else going on, that it's unnecessary to expose our

2  former employees to the risk that could result for them and to

3  the damage that could result by disclosing their personal

4  information.

5          THE COURT:  I'm sensitive to that, but what

6  distinguishes this case from any other case?  And what

7  distinguishes the former employees from any other individual

8  creditor who's on the creditor matrix?

9          MS. JONES:  A couple things, Your Honor.  First, with

10 respect to the first question, I don't think there has been

11 much distinguishment.  I think Your Honor has been practicing

12 long enough to watch the evolution, and what used to happen is

13 people just kept it off the matrix.  Then people started to do

14 under-seal motions, which were fairly routinely granted, to

15 keep the information off.

16          And then the issue started coming up well, should we

17 be doing that?  Let's talk more about commercial or sensitive

18 information.  And we had an agreement in some cases that we

19 would just use the corporate address.  In some cases, Your

20 Honor, there's still sealing going on, and in some cases,

21 there's still just redaction going on without, really, court

22 intervention.

23          So I don't think this case is so much distinguished

24 from other cases.  I think we respect to the personal

25 information of the former employees, Your Honor, though, I see

1   that as very different than the commercial address of a

2   creditor business.  And indeed, we're offering the commercial

3   creditor corporate address for these employees, and they can

4   be -- notice can be given at the corporate address for them.

5   But very different than someone's personal home address, Your

6   Honor.

7           THE COURT:  Right, but what if I had an individual

8   creditor, who, as we do in many cases -- I don't know if we

9   have them here or not, but we do in many cases -- and their

10  personal information is on the docket?  How is it

11  distinguishable from that?  And I don't know if we have that in

12  this situation.

13          MS. JONES:  Your Honor, I don't think I've seen that

14  too often with a -- I think I've seen it on an equityholder

15  list, where you've had equityholders, and oftentimes, their

16  individual beneficial holders are not listed.  Oftentimes,

17  there an agent or someone that's --

18          THE COURT:  Um-hum.

19          MS. JONES:  -- carrying that information for them.

20  For an individual creditor to not have a business, but just,

21  say, themselves having lent money to or provided services to a

22  debtor outside of some type of business, I think, would be

23  fairly unusual.

24          But if it does exist, Your Honor, then it would be in

25  the matrix, I would assume, if that's the address they gave and

1   if there wasn't an issue raised with the debtor to say hey,

2   this is a little too sensitive to me; I want you to keep it off

3   the matrix.  I think any debtor would or would try to, if some

4   of the -- if that request came, but I can't personally think of

5   a situation where I've had Joe Smith, who, in Joe's personal

6   capacity, has provided services or goods to a business outside

7   of Joe Smith LLC or some corporate entity, Your Honor -- or

8   some business entity, if you will.

9           THE COURT:  Thank you.

10          MS. JONES:  That's all I had on that, Your Honor, in

11  addition to our supplement that we filed.

12          THE COURT:  Thank you.

13          MS. JONES:  Thank you.

14          Mr. Hackman?

15          MR. HACKMAN:  Good morning, Your Honor, and may it

16  please the Court, Ben Hackman for the U.S. Trustee.

17          We submit that the debtors have not carried their

18  burden under Section 107(c) of showing that any risk of

19  identity theft or other unlawful injuries to individuals or

20  their property is undue in these cases.  Therefore, we submit

21  the employee addresses should not be redacted from the creditor

22  matrix.

23          This is an issue that came up on an interim basis at

24  the first-day hearing.  Our office objected to the redaction

25  for individual creditors and for former employees.  We did not

1   object to the redaction for current employees.  And the

2   debtors' reference in their memorandum in support that our

3   office did not object to the redaction of current employees,

4   and therefore, there's no reason to treat them differently from

5   former employees.

6          I would note on that, Your Honor, that our office had

7   very limited time to review the first-day papers in the cases.

8   We took a position that we thought it was appropriate at the

9   time.  I think, going forward, we may wish to look at this

10  issue again, whether there is a legitimate basis for redacting

11  both current and former employees.  So at the outset, I would

12  reserve our office's rights on that issue in future cases.

13         The debtors have not identified any actual instances

14  that they have suffered of identity theft, data breaches, or

15  hacking.  I haven't found anything in the first-day

16  declaration, the motion to redact, or the memorandum filed in

17  support that indicates there were particular instances of

18  identity theft.  And I don't think the debtors have identified

19  how this case differs from any other case in which there is a

20  general background risk of whatever identify theft may exist.

21  If a generic, unquantified risk of identity theft constituted

22  an undue risk, that information would be redactable in every

23  case, and we submit that that's not how the statute works.

24         The debtors, in their memorandum of support, cited a

25  few cases that I'd like to address briefly.  They cite the

1  Altegrity case, which was before Your Honor.  Your Honor

2  obviously knows that case much better than I do.  My

3  understanding is that Your Honor's opinion in that case was

4  under 107(b).

5          THE COURT:  Um-hum.

6          MS. JONES:  It dealt with confidential commercial

7  information, not undue risk of identity theft under 107(c).

8          Second, in Altegrity, the debtors had alleged, in

9  their first-day motion -- in their first-day declaration, that

10 they had been the victim of a state-sponsored data intrusion

11 attack on one of their businesses pre-petition.

12         THE COURT:  Um-hum.

13         MR. HACKMAN:  That that's what one of the factors

14 leading to their bankruptcy case had been.  So I think that

15 case is very distinguishable from what we have here.

16         The debtors also cite the Brunson case, which is a

17 state court case from New Jersey that also involved an actual

18 instance of identity theft.  It was a bit peculiar.  The person

19 who had been the victim of the identity theft was charged with

20 theft by deception, and the passage that the debtors cite in

21 the memorandum, I think, should be put into context.  The court

22 was looking -- was performing a negligence analysis and was

23 determining if a fraud investigator and a bank owed a duty of

24 care before opening criminal proceedings against an individual

25 who had been the victim of an identity thief -- of identity

1   theft.

2          Lastly, the Minshu (ph.) case which they cite is a

3   Nevada case that's not a bankruptcy case; it was not analyzed

4   under 107(c).  I don't believe the court made a finding as to

5   undue risk of identity theft.  The court only found that the

6   information may subject plaintiff to identity theft.  There was

7   no undue risk finding in the order that I can -- in that order

8   that I could find.  That's not the statutory standard under

9   Section 107(c), so we submit that that's not persuas -- that

10  should not be persuasive authority on the issue before the

11  Court.

12         In this case, where the debtors have not identified

13  any particular or specific or concrete risk or occurrence of

14  identity theft, the risk has not been shown to be undue.  If it

15  were, then any risk of identity theft could be undue.  The

16  information would be redactable in every case.

17         We worry that that's a slippery slope.  Other

18  information could be redacted; the motion gives us a preview of

19  that, where it originally contemplated redacting not just

20  addresses of employees, but also all individual creditors.  And

21  I would submit that the redaction of such information in the

22  schedules and statements would be next.

23         So in conclusion, Your Honor, we submit that the

24  debtors have not carried their burden of showing that redaction

25  is necessary here to prevent an undue risk, identity theft or

1  other unlawful injury.  Unless Your Honor has any questions,

2  that's all I have.

3            THE COURT:  I don't.  Thank you.

4            MR. HACKMAN:  Thank you.

5            MS. JONES:  Just a couple points, Your Honor.

6            THE COURT:  Um-hum.

7            MS. JONES:  First of all, counsel is correct; we have

8  not identified a specific instance where someone has taken our

9  employee information.  Obviously, we'd like to avoid that and

10 not be here in court after the fact and say this happened; now

11 what?  We'd obviously not like to have that injury to our

12 employees.

13           Secondly, Your Honor, with respect to the Altegrity

14 case, Your Honor, this actually did deal with employee

15 addresses.  But both Dow Jones and the U.S. Trustee's office,

16 in that case, decided not to object to the redaction of the

17 employee addresses, and that's why Your Honor did not have to

18 find on that issue.

19           Your Honor, the concept of a slippery slope -- again,

20 I think this Court is very good at looking at each case on its

21 own, as well as looking at broad concepts.  And I think it's a

22 little ridiculous for, now, to say we're going to go from

23 protecting individual home address to, all of a sudden,

24 deciding we're going to redact business addresses, which is

25 part of the discussion Your Honor and I just had.  Thank you,

 1    Your Honor.

 2              THE COURT:  Thank you.

 3              Well, on this record and in his case, I'm going to

 4    deny the relief.  Looking at the statute, it does require that

 5    I find cause, that disclosure of the information would create

 6    an undue risk of identity theft, and I don't think I've -- I

 7    have not had any type of evidence to suggest that there is an

 8    undue risk of identity theft.

 9              Rather, there's just a general assertion that there is

10    identity theft, unfortunately, in this day and age, and the

11    debtors, understandably, would like to avoid even the slightest

12    risk that filing information in this court could lead to

13    identity theft.  And while I certainly appreciate that

14    sentiment, given that there has been an objection by the Office

15    of the United States Trustee and given that this could lead to

16    a trend, which I'm not sure I'm prepared to endorse at this

17    point, I'm going to deny the request.

18              The agreement that had already been reached with the

19    Office of the United States Trustee will be honored, with

20    respect to current employees.

21              MS. JONES:  Thank you, Your Honor.  Your Honor, we'll

22    have to modify that form of order --

23              THE COURT:  Yes.

24              MS. JONES:  -- and propose it to Your Honor.

25              Your Honor, as Mr. Keller referenced earlier, the

1   Houlihan application -- I understand that there are a couple of
2   business issues that are still being discussed, as well as we
3   have a couple issues with the U.S. Trustee; I believe two out
4   of three have been resolved by proposed language, but we have
5   some other issues we're working through, so we'd like to just
6   push that to the end of the calendar, Your Honor.
7               THE COURT:  That's fine.
8               MS. JONES:  Thank you.
9               MR. KELLER:  On to the HALO sale.  Your Honor, I have
10  the pleasure of introducing my partner, Jane Kim, who's been
11  handling that sale and will present that motion.
12              THE COURT:  Ms. Kim?
13              MS. KIM:  Good morning, Your Honor.  For the record,
14  Jane Kim, from Keller & Benvenutti, on behalf of the debtors.
15              As Mr. Keller stated, I am here to present the motion
16  to sell the Clean Fun Promotional business.  The Clean Fun
17  Promotional business is a business that's operated out of Costa
18  Mesa, California.  It is a business -- it operates on a
19  business-to-business basis, so if a movie studio were to want
20  some promotional materials -- mugs, t-shirts, or the like -- to
21  give away at a movie premier, they would contact the Clean Fun
22  business, and the Clean Fun business would supply those and be
23  paid for it after the fact.
24              The debtors filed a motion to shorten --
25              THE COURT:  Um-hum.

1        MS. KIM:  -- which the Court granted, which permitted
2   the debtors to have both the bid procedures and the sale order
3   heard in a combined hearing today, based on the exigencies that
4   were stated in both the motion and the motion to shorten,
5   relating to the lack of working capital to be able to support
6   the Clean Fun business and the requirement that the Clean Fun
7   business, under the DIP financing, be either shuttered or sold
8   by October -- by thirty days after the petition date.

9        The proposed bid procedures had a bid deadline of
10  October 7th, this past Friday, at noon Pacific.  There was an
11  auction that was held yesterday.  A sale notice was served --
12  sale notices were served on the day that we filed the motion,
13  so September 26th, and true notices were served on October 1st.

14       The debtors followed the proposed bid procedures, and
15  I'll be proffering some testimony with respect to the bidding
16  procedures and the auction that was held yesterday.  The result
17  of that auction, which we did hold, is that HALO, the stalking
18  horse purchaser, is also the successful bidder, and the
19  stalking horse asset purchase agreement is the successful bid.
20  There's also a backup bidder, Bensussen Deutsch & Associates,
21  LLC -- BDA.

22       There was no objection received to the bid procedures
23  order, formal or informal.  We have not filed the sale order
24  with respect to the sale motion, largely because we had sent
25  the draft over -- and I know it was late -- on Friday to the

1  U.S. Trustee and we're waiting for comments.  So we didn't end

2  up being able to file the sale order last night with the rest

3  of the orders, but we received comments from the U.S. Trustee

4  this morning, which we are resolving through deletion of some

5  of certain provisions that were in the draft order, relating to

6  setoff and recoupment rights.  And the U.S. Trustee has also

7  asked that the debtors represent that the relief contained in

8  the sale order conforms substantively to the relief sought in

9  the motion, which I hereby represent.

10          There was one objection that was filed with respect to

11  the sale order by Oracle America's Inc. (sic).  That objection

12  was resolved through language that confirms that Oracle's

13  contracts are not being assumed and assigned through the sale

14  and there's no transfer of Oracle software under the sale.

15          We also received an informal objection from the Chubb

16  insurance companies, which is being resolved in the proposed

17  sale order through language confirming that Chubb's insurance

18  policies are not being sold through the sale.

19          At this time, I would like to proffer the testimony of

20  Ryan Sandahl, who is here in the courtroom and available to

21  testify.  Mr. Sandahl is the director at Houlihan Lokey, the

22  debtors' investment banker.  And if called upon to testify, Mr.

23  Sandahl would testify that Houlihan Lokey contacted thirty-five

24  parties specifically in connection with the Clean Fun business

25  and related assets.  Ten of those parties signed

1  confidentiality agreements so that they could conduct

2  diligence.  In addition, seventy-three other parties received

3  information from Houlihan about the sale of all of the debtors'

4  assets, which included the Clean Fun business.  Thirty-four of

5  those parties signed confidentiality agreements so that they

6  could conduct diligence.

7          That process of contacting the potentially interested

8  parties began during the pre-petition marketing process and

9  continued after the sale motion was filed under the proposed

10 bid procedures.

11         Mr. Sandahl would testify that, through the bidding

12 process, two bidders emerged with respect to the Clean Fun

13 business.  The first is HALO Branded Solutions, Inc., which was

14 the stalking horse purchaser, and pursuant to the proposed

15 bidding procedures, HALO's asset purchase agreement is a

16 qualified bid for all purposes in connection with the bidding

17 process, the auction, and the sale.

18         The second bidder that emerged is Bensussen Deutsch &

19 Associates, LLC or BDA.  Mr. Sandahl would testify that BDA

20 asked for wire instructions before the bid deadline on October

21 7th, but did not receive them from the debtors until after the

22 bid deadline expired, and that BDA sent, and the debtors

23 received, a good faith deposit at 1 o'clock p.m. Pacific time,

24 which was an hour after the bid deadline.

25         An offer letter from BDA was received at 1:35 p.m.

1    Pacific time.  The offer letter satisfied the substantive terms

2    of the bidding procedures, but was not accompanied by a marked

3    asset purchase agreement at the time.  The asset purchase

4    agreement was received later that evening.  There were some

5    inconsistencies between the offer letter and the asset purchase

6    agreement.  Those inconsistencies were -- it was confirmed over

7    the weekend that those inconsistencies were inadvertent and

8    that BDA would revise the APA to conform to the offer letter

9    and to the requirements under the proposed bidding procedures

10   for a qualified bid.

11        So BDA's bid -- the debtors, in consultation with the

12   creditors' committee, decided, in their business judgment, to

13   qualify BDA's bid as a qualified bid under the bid procedures,

14   notwithstanding the technical deficiencies in the bid.

15        The debtors opened an auction yesterday, Monday,

16   October 10th, at 11 a.m.  At the auction were representatives

17   of the debtors; the creditors' committee; Hillair, the DIP

18   lender; and the two bidders, HALO and BDA.  At the start of the

19   auction, the debtors announced that they, in consultation with

20   the committee, had determined that BDA's bid would be deemed a

21   qualified bid under the bid procedures.  At the start of the

22   auction, HALO confirmed that it had waived the diligence

23   contingency contained in Section 6.1(m) of the asset purchase

24   agreement and the condition that the debtors deliver signed,

25   independent contractor acknowledgements contained in Section

1  4.2(g) of the APA.

2          So at that point, the conditions to closing for --

3          THE COURT:  Um-hum.

4          MS. KIM:  -- the HALO sale, other than approval by

5  this Court of the sale, had been satisfied.

6          At that point, the auction was adjourned for what

7  turned out to be eight-and-a-half hours.  During that time, BDA

8  engaged in discussions with the debtors in order to determine

9  whether it was likely that BDA would be able to close its

10 transaction.  Eventually, the debtors and BDA concluded that it

11 was uncertain that certain closing conditions could be met.

12 BDA decided that it would not submit any further bids at the

13 auction.

14         And so at 8:40 p.m. yesterday, the auction was

15 reconvened.  The debtors announced that HALO's asset purchase

16 agreement was the starting bid and that, because BDA would not

17 be submitting any further bids, HALO's asset purchase agreement

18 was the successful bid.  The debtors further determined that

19 BDA would be the backup bidder.

20         Mr. Sandahl would testify that the debtors determined

21 to sell the Clean Fun business to HALO because the agreement

22 constitutes the highest and best offer for the assets, the

23 agreement and the closing of the agreement will present the

24 best opportunity to realize the value of the assets on a going-

25 concern basis and avoided declining the valuation of the assets

1    and any other transaction would not be -- would not have

2    yielded as favorable an economic result.

3              At this time, we would ask if the Court or anyone in

4    the courtroom would like to cross-examine Mr. Sandahl?

5              THE COURT:  I'll ask.  Does anyone wish to cross-

6    examine Mr. Sandahl?

7              I hear no one.

8              MS. KIM:  On that basis, I would request that the

9    proffer of Mr. Sandahl that I just read be entered into the

10   record.

11             THE COURT:  It will be accepted.

12             MS. KIM:  Thank you.  I have a revised form of bidding

13   procedures order, which I believe had been already filed

14   with -- now, I can't remember -- under certification of

15   counsel?

16             MS. JONES:  Yes.

17             MS. KIM:  And as well as a form of sale order, which,

18   as I mentioned, we had not yet filed.  There is one change,

19   which I'm going to hand mark, in the form of the sale order

20   that, because there was a definitional inconsistency, so

21   there's a use of "asset purchase agreement" instead of

22   "agreement", which is the way that it's defined in the sale

23   order, so I'm going to be hand marking that.  And then if Your

24   Honor would allow me to hand up these orders?

25             THE COURT:  Yes.

 1          MS. KIM:  Thank you.

 2          I believe that Mr. Fournier would like to speak.

 3          THE COURT:  Yes.

 4          MS. KIM:  So I will cede the podium.

 5          MR. FOURNIER:  Good morning, Your Honor.  For the

 6   record, David Fournier, on behalf of the creditors' committee.

 7          Your Honor, the creditors' committee was involved in

 8   the auction process yesterday, and we do appreciate the debtors

 9   having consulted with us actively as that process went forward,

10   as we expect that they will do in the sale processes to come.

11          Your Honor, this motion obviously came on

12   extraordinarily quickly for the Court, and certainly for the

13   creditors' committee.  We recognize the compulsion that the

14   debtor was under to move forward as quickly as it did, with

15   respect to this sale.  The committee, valuating the

16   circumstances, determined not to object to that.

17          We do appreciate BDA's having come to the auction,

18   having come to the process, as we understand it, very, very

19   late in the game, but it was a very fast process and we

20   appreciate their efforts to get up to speed with respect to the

21   sale.  And while, ultimately, they were unable to put

22   themselves in a position where they could actively bid and

23   raise the stalking horse bid above the level that was initially

24   filed with the Court, we do appreciate their involvement in the

25   process.

1          Your Honor, we'll have issues with respect to other

2    matters coming before the Court today with respect to sale

3    timing.  I would simply note, with respect to this, that the

4    rushed aspect of yesterday's auction is certainly one concern

5    we have with a rushed sale process, generally, with respect to

6    the overall assets.  But we are not objecting to this

7    particular sale and that we would support entry of the order.

8          THE COURT:  Thank you.

9          Does anyone else wish to be heard with respect to the

10   HALO sale?

11         MR. RILEY:  Good morning, Your Honor.  Richard Riley

12   from Duane Morris, on behalf of the Chubb companies.  I just

13   wanted to thank Ms. Kim for working with us on getting language

14   into the order, and I am the pain that was requesting the

15   interlineation on the definitional change because I have a

16   neurotic partner in Philadelphia.

17         So in paragraph 45, if the "asset purchase" would just

18   be stricken before the word "agreement"?  I think it's 45,

19   still.

20         THE COURT:  Mr. Hackman?

21         MR. HACKMAN:  Good morning, Your Honor.  Ben Hackman

22   for the U.S. Trustee.  We had filed a reservation of rights on

23   Friday --

24         THE COURT:  Um-hum.

25         MR. HACKMAN:  -- based on the sale order not having

1  been filed at that time.  Counsel circulated a form of order

2  Friday evening.  We had given them a few comments about it,

3  which the debtor and HALO accepted.  And based on that, and

4  counsel's representation that the relief in the order

5  materially conforms with the relief that we saw in the motion,

6  I believe our reservation of rights is resolved at this point

7  and we do not object to entry of the order.

8           THE COURT:  Thank you.

9           MR. HACKMAN:  Thank you, Your Honor.

10          THE COURT:  Anyone else?

11          MS. KIM:  All right.  And I would represent on the

12 record that we are not transferring any insurance policies --

13 not just Chubb's insurance policies, but any insurance

14 policies -- under this sale.

15          With that, Your Honor, I would request that Your Honor

16 enter the bidding procedures order and the sale order relating

17 to the Clean Fun business sale.

18          THE COURT:  Thank you.

19          Subject to reading the orders, which I will do during

20 some break, I will approve the sale and the bidding procedures

21 order.  Obviously, this sale proceeded very quickly.  There was

22 a basis for it, as recognized by the committee with respect to

23 this particular sale.  And given the committee's involvement

24 and the committee's lack of objection and, in fact, support

25 with respect to entry of this sale order, I will approve it,

1   based on the proffer of Mr. Sandahl with respect to the process

2   and the efforts made to bring parties into the auction process,

3   and based on the first-day declaration that was filed with

4   respect to these debtors.  So subject to reading it, I will

5   approve the sale.

6           MS. KIM:  Thank you, Your Honor.

7           MR. KELLER:  Your Honor, at this point, we'd like to

8   take on our debtor-in-possession financing motion.  It shares a

9   common issue with the bidding procedures motion, which we will

10  have trailed because I think the Court's ruling on the issue in

11  the debtor-in-possession financing motion will largely resolve

12  the only issue on the bid procedures motion.

13          Before we get into dispute, I do want to take a moment

14  to note that there were a number of issues that were raised and

15  there were extended negotiations between the debtor; Hillair,

16  our debtor-in-possession financier; and the committee, and

17  that's resulted in substantial to the form of the final DIP

18  order.  We submitted that revised form of order in a blackline

19  with our certificate of counsel last night.

20          THE COURT:  They're on my desk.

21          MR. KELLER:  If the Court would permit, I'd like to

22  introduce Mr. Brady, on behalf of Hillair, to simply walk

23  through what some of those changes were before we get to the

24  open issues.

25          THE COURT:  All right.

1          Mr. Brady?

2          MR. BRADY:  Good morning, Your Honor.  Robert Brady on

3    behalf of Hillair.  And I would echo Mr. Keller's comments that

4    we were pleased that the committee engaged immediately after

5    being formed and really focused on resolution of these issues,

6    rather than litigation.  And so we worked very hard and

7    cooperatively to try to resolve all the issues.  And as

8    indicated, other than the related timing issue, we resolved all

9    issues related specifically to the DIP financing.

10         So if I may, Your Honor, I'll walk through the

11   blackline that was filed last night.  I'll skip parts that deal

12   with just making this a final order and for the introduction of

13   the creditors' committee into the case.

14         But the first substantive change is on page 3, Your

15   Honor, related to excluding --

16         THE COURT:  Um-hum.

17         MR. BRADY:  -- from our DIP liens and our

18   superpriority claim avoidance actions and all commercial tort

19   claims not properly perfected pre-petition and all proceeds

20   thereof.  So we gave that a definition of excluded litigation

21   assets, and you'll see that pop up throughout the order, but

22   that is an exclusion from both the DIP liens, superpriority

23   claims, and adequate protection liens.

24         Your Honor, the next is informational, on page 7,

25   going on to 8; just confirmation that the Western Alliance

1   claim was paid in full.

2          THE COURT:  Um-hum.

3          MR. BRADY:  Which was authorized under the interim

4   order.

5          Next point I have, Your Honor, is in connection with

6   the DIP budget, and there is a new DIP budget attached to the

7   form of final order.  We've indicated that any nonmaterial

8   modifications to the budget can be agreed upon by the debtors

9   and the DIP lender with notice to the committee.  Obviously,

10  any material modifications would have to come before the Court.

11         Next page, 18, Your Honor, deals with the carryover

12  paragraph of superpriority claims, again, excluding any

13  superpriority claim on the proceeds of excluded litigation

14  assets; same in paragraph 7 with respect to the DIP facility

15  liens.

16         Your Honor, we reached a resolution on the rollup; you

17  may recall that that was reserved for the final order.  That

18  appears on paragraph -- on page 19, which is paragraph 7(d).

19  And we have agreed, for purposes of this final order, of a

20  rollup that will be comprised of 8 million of principal

21  advanced under the debenture and 1.425 million of principal

22  advanced under the emergency loan.  So for purposes of this

23  final order, that's the only amounts where the DIP loan may be

24  used to satisfy and roll up those amounts.

25         It's all subject to challenge, Your Honor, which is in

1 paragraph 11 of the order.  So while the Court approves the

2 rollup, it remains subject to the committee's challenge, and

3 there's some clarifying language on that.

4          Page 20, Your Honor, 8(a), just a clarification that

5 the diminution of value is of the post-petition diminution of

6 value of the pre-petition interest and pre-petition collateral.

7          Again, 21 picks up the concept of replacement liens

8 exclude the excluded litigation assets.  And one more time, for

9 good measure, in C, we make it clear that the excluded

10 litigation assets are just that:  excluded.

11          The investigation budget, Your Honor -- this is on

12 page 25 -- was increased from 25,000 dollars to 50,000 dollars.

13          THE COURT:  Um-hum.

14          MR. BRADY:  In connection with the professional fee

15 trust, we've confirmed that amounts held for the benefit of the

16 creditors' committee also includes creditors' committee member

17 expenses, but does not include third-party counsel that they

18 may hire individually.

19          Your Honor, in connection with that challenge period,

20 there's some clarifications throughout, but we also did agree

21 to consent to standing for the creditors' committee --

22          THE COURT:  Um-hum.

23          MR. BRADY:  -- to bring any such challenge so that we

24 can take that off the Court's calendar.  If the committee

25 chooses to bring a challenge, they don't need to first bring a

1  standing motion.

2         The right to credit bid, Your Honor, that is both set

3  forth in the proposed bidding procedures order and also an

4  exhibit -- an addendum to this order.  And there was fairly

5  negotiation over this, Your Honor, but as set forth on Schedule

6  A, we have reached agreement with the committee on what amounts

7  may be credit bid.

8         THE COURT:  Um-hum.

9         MR. BRADY:  This goes to another representation that

10 we indicated we'd make on the record as well, Your Honor, and

11 that is while we haven't thought through all the permutations

12 that the bidding process and the auction may take, with respect

13 to our APA, if it's the winning bid, it's the intent of Hillair

14 to either credit bid and/or waive all of its debts, such that

15 there's no deficiency claim.

16        And Your Honor, the final point I have that's

17 substantive -- and then I have two more representations to put

18 on the record -- but page 37, this was the issue with respect

19 to collateral rights in connection with real property --

20        THE COURT:  Um-hum.

21        MR. BRADY:  -- and/or leases.  It indicates that we

22 could take possession of real property leased by the debtors,

23 provided it's permitted under the terms of the lease, consented

24 to by the lessor, permitted by applicable nonbankruptcy law, or

25 authorized by Your Honor.

1          THE COURT:  Okay.

2          MR. BRADY:  And Your Honor, those are the substantive

3  changes.  Two other representations -- and I'll yield to Mr.

4  Fournier to make sure I got this right -- an issue was raised

5  with respect to how cash is treated under the APA --

6          THE COURT:  Um-hum.

7          MR. BRADY:  -- involving payment of accrued, but not

8  yet paid, administrative expenses.  We think that is an APA

9  issue, but we've agreed that the parties will work in good

10  faith if there is such an issue.  If there's something not

11  accounted for, we'll work that out between now and any auction,

12  under that APA.

13          And finally, Your Honor, to confirm, the DIP provides

14  a 250,000-dollar budget for wind-down expenses.  I think it may

15  have said "up to", but we've agreed it is 250,000 under the

16  DIP.  Under our APA also, there is a -- we leave behind 250,000

17  dollars, so the committee wanted us to confirm that's a total

18  of 500,000; those aren't the same amounts.  So under our APA

19  and the DIP, there would be a total of 500,000 remaining.

20          So with that, I'll yield to Mr. Fournier.

21          MR. FOURNIER:  Your Honor, again, for the record,

22  David Fournier on behalf of the committee.

23          Your Honor, that's a very thorough and, I think,

24  accurate recitation.  Your Honor will note when you see the DIP

25  budget that there also was an increase in the DIP budget for

1  the committee professional fees, largely to include an amount

2  for the committee's financial advisor, Carl Marks.

3          Your Honor, I would be remiss if I didn't note that

4  there were extensive and difficult negotiations with respect to

5  the DIP, and I would like to just note the professionalism of

6  the various people in the room.  Although the issues were hard

7  fought, it really was marked by a high degree of

8  professionalism, and we appreciate that.

9          Your Honor, with respect to the accrued-but-unpaid

10  expenses issues that Mr. Brady noted, I just wanted to speak a

11  little bit more about that so that the Court understands what

12  the issue is because it's very important, I think, to the

13  committee and to the process.

14          The debtor has worked on a budget the DIP loan that,

15  we understand, they believe incorporates all of the reasonably

16  anticipated administrative expenses that will accrue through

17  the process between now and approval of the sale, whatever sale

18  that may be.  And there are, as the Court would imagine, a

19  whole host of expenses in there, including things like

20  503(b)(9) claims, which may accrue -- and the debtors accrued

21  them in the budget -- but may not be payable until some point

22  after that sale closes.

23          The concern that we raised was that, under the asset

24  purchase agreement with Hillair, as currently drafted, they

25  would sweep cash -- they're buying cash; they would sweep cash

1   at the closing of that sale.  And we were concerned that,

2   although the debtor had accrued for expenses throughout in its

3   budget, that we could find ourselves in a situation where cash

4   is swept and there isn't actually cash left to pay those.

5          It's not, as we understand it, Hillair's intention to

6   do that, and we appreciate that.  I think it's just a

7   mechanical issue the parties need to work through to make sure

8   that we set up a mechanism so that budgeted expenses that

9   aren't yet payable at the time of closing can, in fact, be

10  paid.

11         THE COURT:  I understand the issue.

12         MR. FOURNIER:  Your Honor, the other point I would

13  note is that there is one very, very significant aspect of our

14  objection that is not resolved by this order, and it ties into

15  the DIP order, the budget for the DIP order, and the bidding

16  procedures.  And that is the sale timeline.

17         Your Honor, the debtors have set what we believe is a

18  very aggressive sale timeline for bids.  The deadline of

19  roughly -- no, exactly twenty days from today, October 31, and

20  then sale dates that follow from that.  Your Honor, the

21  committee had requested, in our objection, a four-week

22  extension of that.  So that is the remaining issue that's

23  before the Court.

24         And Your Honor, I'll save argument on it for closing,

25  but I would just note that, for the creditors' committee, if

1   the Court looks at what is left behind, a 250,000-dollar wind-
2   down budget to deal with post-closing administrative expenses,
3   and 250,000 dollars coming from the asset purchase agreement in
4   a case with 60 million dollars in unsecured debt.  It is a huge
5   concern to the creditors' committee that there be an
6   appropriate and adequate process for the sale of these assets
7   and that we not find ourselves in a position on October 30th
8   and 31st where we have people who have been made aware of the
9   process post-petition and are interested in the process finding
10  themselves, like BDA did yesterday, coming in at the last
11  moment, trying to get up to speed on diligence and not being in
12  the position to bid for the assets.  Thank you.
13          THE COURT:  Thank you.
14          MR. TAYLOR:  Your Honor, Greg Taylor for Rhino
15  Entertainment, again.  We had filed an omnibus objection both
16  to the DIP as well as the sale motion.
17          THE COURT:  Um-hum.
18          MR. TAYLOR:  That objection's been resolved by entry
19  of the stipulation this morning; we thank Your Honor for that.
20  I'd just like to ask if I may be excused?
21          THE COURT:  You may.
22          MR. TAYLOR:  Thank you, Your Honor.
23          THE COURT:  Before we start, can I make sure I have
24  the correct budget?  Is there an extra copy of the budget?
25          MR. KELLER:  Here.

1          MR. STRATTON:  Here's one.

2          MR. KELLER:  May I approach?

3          THE COURT:  Yes.  Thank you.

4      (Pause)

5          MR. KELLER:  Your Honor, I want to just echo the

6   statements of appreciation for the professionalism around the

7   courtroom.  I think the fact we are down to this issue is a

8   testament to how much we were able to cooperate.

9          This last issue is an issue where we've had extensive

10  discussions with the committees.  And the bottom line is that

11  the debtors really feel that pushing beyond the October 31st

12  deadline would be against the estate's and the creditors'

13  interests.  My proposal would be to waive opening argument and

14  go straight to putting on witnesses.

15         THE COURT:  Um-hum.

16         MR. KELLER:  And then I think we have about twenty to

17  thirty minutes of direct testimony.  Mr. Stratton may have

18  cross-examination.  I think we will be done well in advance of

19  Your Honor's deadline, subject to taking a short break to

20  understand where do we stand with the Houlihan Lokey questions.

21         If the Court would please, I would like to introduce

22  at this time Mr. Ryan Sandahl of Houlihan Lokey.

23         THE COURT:  Mr. Sandahl, can you take the stand,

24  please?

25     (Witness sworn)

1        THE CLERK:  And would you please state your full name

2   and spell your last name for the record?

3        THE WITNESS:  Sure.  It's Ryan Sandahl.  Last name is

4   S-A-N-D-A-H-L.

5        THE CLERK:  Thank you.  You may be seated.

6        THE WITNESS:  Thank you.

7   DIRECT EXAMINATION

8   BY MR. KELLER:

9   Q.   Good morning, Mr. Sandahl.

10  A.   Good morning.

11  Q.   Would you give us a quick summary of your professional

12  background?

13  A.   Sure.

14  Q.   I am a director at Houlihan Lokey in the financial

15  restructuring group.  I've been at Houlihan for eleven years,

16  always in the financial restructuring group.  Prior to that, I

17  was at PricewaterhouseCoopers in their broker-dealer, doing

18  financial restructuring.  And prior to that, I was at Bank of

19  America, doing capital markets work.

20  Q.   Okay.  And when you say financial restructuring, could you

21  explain what that means, effectively?

22  A.   Sure.  So traditionally, we represent companies,

23  creditors, and other constituents in financially distressed

24  situations, whether it be in bankruptcy, out of court -- and

25  that takes all sort of forms.  And probably the -- the focus or

1   one of the big parts of our practice in Chicago, where I'm at,

2   is on debtors and 363 sales and distressed M&A, as we call it.

3   Q.   Can you give the Court a sense of how many deals you've

4   done recently or over your career?  Just order of magnitude.

5   A.   You know, probably thirty or so, you know, cases and

6   others -- many others that we looked at that just -- that's

7   probably in the time at Houlihan.

8   Q.   Has Houlihan Lokey has been retained by Delivery Agent?

9   A.   They have.  Well, we've been proposed to be retained.

10  Q.   But prior to the bankruptcy?

11  A.   Yeah -- yes, we were retained prior to the bankruptcy.

12  Q.   Okay.  What was the date of that retention?

13  A.   May 18th.

14  Q.   And have you been working on this project consistently

15  since then?

16  A.   Yes, I have.

17  Q.   Okay.  Could you generally speak of the timeline of

18  activities that Houlihan Lokey engaged in during that pre-

19  petition process?

20  A.   Sure.  So on May 18th, we were retained by Delivery Agent.

21  On May -- May 19th, we had a team on site in San Francisco to

22  meet with the Delivery Agent team to get a better understanding

23  of the situation.  I think her, sort of, initial scope was to

24  look at strategic alternatives, likely to include a sale or

25  raising new capital.

1        It became apparent at that first meeting that it was
2    fairly urgent, given the liquidity situation, and we proceeded
3    very quickly into getting marketing materials prepared, working
4    on buyers' lists, and getting into the market as quickly as
5    possible to look at all alternatives:  sale, investment,
6    financing, et cetera.
7    Q.    Okay.  During that pre-petition period, did Houlihan
8    Lokey, as agent for the debtors, receive any indications of
9    interest on potential purchasers?
10   A.    We did.  We received, I believe, eight indications of
11   interest throughout that period.  You know, they were -- I
12   should probably clarify and say they were indications of
13   interest.  We did not receive what would be a letter of intent
14   or an asset purchase agreement or anything that was binding or
15   actionable to that extent, but we did receive indications prior
16   to --
17   Q.    Okay.
18   A.    -- the filing.
19   Q.    And can you give us a sense what the highest values that
20   were indicated in those indications of interest were?
21   A.    Yeah.  I'd say they were fairly low values and, in total,
22   there were no -- there were no indications that would have
23   exceeded the secured debt, which is sort of what led us to the
24   path of -- of Hillair.
25   Q.    This process that you describe, have you continued that

1  post-petition?

2  A.    Oh, we have.  Yes, we have continued in earnest since

3  post-petition and since the date of filing.

4  Q.    Okay.  Prior to today's hearing, you provided me with a

5  summary, I think, that helped explain that process.  I've

6  provided a copy to the parties here in the courtroom.  If I

7  may, I'd like to provide you with a copy and a copy to the

8  Court?

9  A.    Sure.

10  Q.    Mr. Sandahl, have you seen this document before?

11  A.    I have.

12  Q.    And could you explain what it is?

13  A.    Sure.  This is a -- I think it's updated as of

14  yesterday -- this is a summary of the number of parties we've

15  contacted, their status in the process, and the assets that

16  they've indicated that they're interested in.  And there's also

17  an indication of the pre-petition parties versus the post-

18  petition parties that we contacted.

19  Q.    Okay.  Looking at the row on the very top, the first box

20  says "Active".  Would you explain what that is?

21  A.    Sure.  That is the parties who, at this point in the post-

22  petition process, are actively looking at the assets.  Most --

23  I think nineteen of the twenty parties there have signed

24  confidentiality agreements.  And they are in either the data

25  room, active discussions, meetings with management, but -- but

1  we term them as active in the process and pursuing.

2  Q.   Okay.  The second column says "Executed CAs".  What's a

3  CA?

4  A.   A confidentiality agreement that we've provided to all

5  parties who've requested or been interested, so they can get

6  confidential information.

7  Q.   Okay.  Next row -- or next column is "Contacted, Not

8  Active".  What is that?

9  A.   That's parties who we've reached out to pre-petition,

10  post-petition; they have not been responsive; they've not

11  signed a confidentiality agreement.  They haven't officially

12  passed on the process, but -- but they've also not indicated an

13  interest in moving forward.

14  Q.   Okay.  The next column is "Passed"?

15  A.   Those are parties that have affirmatively said that they

16  are not interested in pursuing this opportunity.

17  Q.   And the last column, "Total", I guess, is self-

18  explanatory.

19  A.   Yeah.

20  Q.   In total, how many parties were contacted before the

21  petition was filed?

22  A.   152 parties.

23  Q.   Okay.  And how many new parties were contacted after the

24  petition was filed?

25  A.   Ninety-six parties have been contacted on a post-petition

1    basis.

2    Q.    And after the petition was filed, were parties that were

3    contacted pre-petition contacted again?

4    A.    They were.  There were -- the 152 were recontacted, yes.

5    Q.    Okay.  Could you explain how this chart was created?

6    A.    So we, in, I'd say, all of our processes, and certainly

7    all of the processes that I'm involved in, we keep a regular

8    tracking of all the parties we reach out to, their status,

9    who's -- who's tracking them, and sort of to make sure that

10   we're organized.  So this is a summary of that internal

11   tracking system that we use.

12   Q.    And are there business records that are regularly

13   maintained that underlie this summary?

14   A.    Absolutely.

15   Q.    Okay.  If the committee was so inclined, could the

16   committee review those underlying documents?

17   A.    They could.

18   Q.    Great, and those documents are maintained in the ordinary

19   course of business?

20   A.    They are.

21            MR. KELLER:  Your Honor, at this time, I would like to

22   move Debtors' Exhibit A into evidence.

23            THE COURT:  Any objection?

24            MR. FOURNIER:  No objection, Your Honor.

25            THE COURT:  It's admitted without objection.

1  (Houlihan Lokey summary of contacted parties was hereby
2  received into evidence as Debtors' Exhibit A, as of this date.)
3          MR. KELLER:   Okay.
4  Q.   Mr. Sandahl, specifically post-filing, after September
5  15th, could you explain what Houlihan Lokey has done to try and
6  get the market activated and get bids in by the proposed bid
7  deadline of October 31st?
8  A.    Sure.  So starting -- well, never stopping, but certainly,
9  you know, with the -- the filing date, we continued to pursue
10 all parties that we were active with prior to the date and
11 respond to anyone new who reached out or anyone new who was
12 identified to us.  And -- and that certainly continued.
13          And, frankly, parties who were interested on a pre-
14 petition basis, we notified them that we were going to file or
15 had filed so they could know that the process had shifted to
16 that stage and continue to maintain and, hopefully, generate
17 additional interest in pursuing the -- through the post-
18 petition process.
19 Q.   Since Houlihan Lokey's retention back in May of this year,
20 has there been any time at which Houlihan Lokey has stopped
21 exerting efforts to find potential purchasers for this
22 business?
23 A.    No, there has not.  And I think -- yeah, no.  No, there
24 has not.
25 Q.    Okay.  You're aware that the prospective bid deadline for

1  bids on what we've called the primary sale -- which is the sale

2  of the e-commerce business, the ShopTV and the analytics

3  business -- the proposed bid deadline is October 31st; you're

4  aware of that?

5  A.   I am aware of it.

6  Q.   Have any of the prospective bidders indicated that the

7  October date is too soon for them?

8  A.   They have not.

9  Q.   If the bid deadline were extended by four weeks, do you

10 believe that the results for the estates would be better?

11 A.   I do not.

12 Q.   Okay.  If it were extended at all, do you believe the

13 results would be better?

14 A.   I do not.

15        MR. KELLER:  Okay.  No further questions, Your Honor.

16        THE COURT:  Thank you.

17        Cross?

18 CROSS-EXAMINATION

19 BY MR. STRATTON:

20 Q.   Mr. Sandahl, we have not met.  My name's David Stratton.

21 I'm a partner at Pepper Hamilton and we represent the

22 committee.  How are you today?

23 A.   I'm good.  Nice to meet you.

24 Q.   Looking at your chart, a couple of things:  at the bottom,

25 it says -- boy, I'm getting old; I can't see anything

1    anymore -- "Memo Pre-Pet" --

2            MR. STRATTON:  And Ms. Jones laughs, just for the

3    record, Your Honor.

4    Q.    "Memo Pre-petition", "Memo Post-petition" -- what's that?

5    A.    That's to indicate that the -- the chart is on a sort of

6    current basis as of now, which is post-petition.  The pre-

7    petition are the parties that were contacted on a pre-petition

8    basis -- the 152 that Mr. Keller asked about.

9    Q.    Okay.  So out of the -- in the active column, out of the

10   total of twenty, thirteen were contacted pre?

11   A.    That's correct.

12   Q.    And seven were contacted post?

13   A.    That's correct.

14   Q.    Okay.  And so I'm going to go over and, under "Passed",

15   "Memo Post-Petition", thirty-one.  Is that right?

16   A.    That's correct.

17   Q.    Out of 103.  And you can't know -- and you can't

18   testify -- that, of those thirty-one, not a single one of them

19   passed because of the schedule?

20   A.    The answer is I cannot testify that I know their reasons

21   for passing, no.

22   Q.    Exactly.  And you can't testify that none of those thirty-

23   one passed because of the 19,864,000-dollar minimum purchase

24   price that's in your process letter; is that correct?

25   A.    I could not testify to that.  I could, you know, give

1   additional color, if needed, but I cannot testify to that.

2   Q.   Okay, we'll get back to that.  Including Clean Fun, as I

3   look at this chart, there's four businesses that really made up

4   the debtors' business; is that right?  When they --

5   A.   Predominantly three businesses, but there are --

6   Q.   Okay.

7   A.   -- permutations, yeah.

8   Q.   So you've broken it down by e-commerce?

9   A.   Yes.

10  Q.   ShopTV?

11  A.   Yes.

12  Q.   And Promo.  Is Promo --

13  A.   That's Clean Fun.

14  Q.   Is it Clean Fun?

15  A.   Yeah.

16  Q.   Okay.  Three businesses.  Thank you.  And am I correct:

17  when Houlihan Lokey was first hired, management put a value on

18  the business of 150 million dollars?

19  A.   That's an accurate statement.

20  Q.   Okay.  And that would necessarily be the entire business,

21  right?

22  A.   That -- that was the expectations that they were hoping to

23  achieve for the entire business, yes.

24  Q.   150 million dollars?

25  A.   That was the --

1    Q.    Thank you.

2    A.    -- expectations that they were -- and -- and maybe I

3    should clarify so it's -- so it's clear.  That was the

4    incentive they were driving us to get to in our engagement

5    letter.  So I wouldn't necessarily say that was their

6    expectations, but the, you know, the bound that they wanted us

7    to get to for a incentive fee.

8    Q.    Okay.  Thank you.

9          MR. STRATTON:  Excuse me, Your Honor.  Let me get my

10   exhibits.

11   Q.    All right.  So we had three businesses.  Management

12   thought that 150 million dollars was the value.  I think what I

13   heard, basically, is that there were no really interesting

14   offers pre-petition, and we'll talk a little bit about that in

15   a minute.  At some point, you got an offer from HALO for the

16   Clean Fun business?  Is that right?

17   A.    That's right.  I -- I do want to clarify in -- to -- you

18   said that I couldn't testify to something.  I -- I cannot

19   testify that management believed 150 was the -- was the

20   accurate amount.  I just clarify that.  That was in -- that was

21   from our engagement letter; I just want to clarify that --

22   Q.    Okay.

23   A.    -- for the Court.

24   Q.    But the number being discussed was a valuation in the 150-

25   million-dollar range?

1    A.    I don't -- I -- I -- no, I -- I don't think that's
2    accurate.  I -- I'd -- I --
3    Q.    Well, I'm sorry.  I asked you the question originally, and
4    you agreed with me, and -- are you changing your answer?
5    A.    I -- I -- no, I'm not -- I'm agreeing that in our
6    engagement letter, the incentive fee --
7    Q.    Ah.
8    A.    -- was set at 150 million.
9    Q.    Okay.
10   A.    So.
11   Q.    All right.  Three businesses marketed pre-petition.
12   Nothing -- I'm generalizing, but nothing worth pursuing.  Post-
13   petition, contract with HALO for the Clean Fun business?
14   A.    That -- that -- those discussions started on a pre-
15   petition basis, but the contract was not effe -- signed until
16   post-petition.
17   Q.    Okay.  And on Friday, a company with the initials BDA --
18   apparently, it's a German name that no one can get their tongue
19   and lips around -- they showed up with an offer?
20   A.    They did.
21   Q.    And there was an effort to get an auction started
22   yesterday?
23   A.    There was.
24   Q.    And at some point during these discussions, did BDA
25   complain that they were just learning about the opportunity

1  now?

2  A.   They -- they said that they were disappointed that they

3  hadn't -- it hadn't matriculated through their system

4  previously and that they got it late.  I don't know that they

5  complained that they hadn't gotten it --

6  Q.   Okay.

7  A.   -- until then.

8  Q.   But they didn't surface and get developed as a buyer

9  during any of the pre-petition process?

10  A.   They did not respond to outreach or express interest on

11  the pre- --

12  Q.   Okay.

13  A.   -- until late in the process.  That is accurate.

14  Q.   Thank you.  All right.  Back to your chart, if you would,

15  please?

16  A.   Yes.

17  Q.   As I look at this, nobody at this point in the active

18  column is interested in buying everything?

19  A.   Well, now that the promo business has been sold, I would

20  say that there are parties who are interested in e-commerce and

21  ShopTV together.

22  Q.   All right.

23  A.   Which is the balance of the business.

24  Q.   All right.  But you're --

25  A.   But -- but --

1  Q.    I'm sorry.  Go ahead.

2  A.    Yeah.

3  Q.    All right.

4  A.    So I just clarified that there are parties who may buy the

5  other two businesses together.  There was no one prior to now,

6  but -- yesterday or today that would have bought the entire

7  businesses together.

8  Q.    Thank you.  Again -- now, let's go back down to your

9  chart -- "Memo Post-Petition", seven active.

10  A.    Um-hum.

11  Q.    Those are names that were contacted after the filing?

12  A.    That's a combination of names that reached out to us or

13  were contacted after the filing.  There is some misnomer in

14  there in the sense of there are, probably, three of those seven

15  that I can think of that the company had had discussions with

16  prior to Houlihan Lokey, but that sort of have resurfaced.

17  Q.    Okay.  Carl Marks was hired on October 3rd by the

18  committee, if you'll accept that representation, and they've

19  given you some additional names to contact; is that right?

20  A.    They have provided us a list of additional names, yes.

21  Q.    And I think you accepted fifteen of those?

22  A.    That sounds accurate, yes.

23  Q.    Okay.  And am I also correct that two of those names

24  included in the fifteen are debtors' competitors?

25  A.    There -- there -- there are parties who are in a similar

1  industry.  It's a very -- as you probably appreciate or folks

2  in this room appreciate -- it's a very wide industry.  But yes,

3  there are people -- there are people who are involved in the

4  industry, yes.

5  Q.   Well, Mr. Sandahl, I confess to you that I have read the

6  papers in this case three or four times and I don't fully

7  understand the debtors' business.

8  A.   Fair.  Fair.

9  Q.   But for the record, I'm sixty-three, and I don't think I'm

10  expected to fully understand the debtors' business.  I'm told I

11  have a smart TV.

12      You said you wanted to get out, begin the marketing

13  process very, very quickly after May 18 or 19.  When did you

14  first start contacting prospects?

15  A.   I believe it's the first week of June.

16  Q.   Okay.  And I'm going to ask you to identify --

17         MR. STRATTON:  This is the part where I have to fumble

18  around with some papers, Your Honor.  I apologize.  Your Honor,

19  we have three exhibits on --

20         I apologize, Mr. Sandahl.  I'll get right back to you.

21         We have three exhibits.  Exhibit 1 is a pre-petition

22  process letter.  Exhibit 2 is a post-petition process letter.

23  And Exhibit 3 is the weekly budget variance reconciliation for

24  the week ending September 30.  The debtors have stipulated to

25  the admissibility of each of these, and I have provided, I

1  think, everyone in the courtroom up here, at least, with

2  copies.  Your clerk has a set.  If I may approach?

3          THE COURT:  You may.

4  (Pre-petition process letter was hereby received into evidence

5  as Committee's Exhibit 1, as of this date.)

6  (Post-petition process letter was hereby received into evidence

7  as Committee's Exhibit 2, as of this date.)

8  (Budget reconciliation was hereby received into evidence as

9  Committee's Exhibit 3, as of this date.)

10          MR. STRATTON:  I'll provide the witness with copies.

11  I actually want -- I want to ask him questions about them.

12  We'll get them up on the witness stand.  So -- Exhibit 1,

13  Exhibit 2 --

14  Q.   Mr. Sandahl, here is the Committee's Exhibit number 1.

15  Can I take one of those?

16          MR. STRATTON:  All right.  Can you hand me more copies

17  of these?  Thank you.

18  Q.   All right, so I think your testimony -- before I introduce

19  the exhibits -- was you started contacting prospects the first

20  week of June?

21  A.   That's accurate.

22  Q.   And then, at some point, you set out what your industry

23  calls a process letter.  Can you explain to the Court what a

24  process letter is?

25  A.   Typically, in a sale/financing/other process, you would

1   send out an official letter to folks, asking them for bids by a

2   date certain, with the information you'd like them to provide

3   in their bid.

4   Q.    Okay.  And when was that process letter sent out?

5   A.    I believe it was June 15th, if I have my dates right.

6   Q.    Do you recall a conference call with the committee, its

7   counsel, and Carl Marks last week?

8   A.    I do.

9   Q.    I will represent to you that, on that call, you told us it

10  was June 16th.

11  A.    That's --

12  Q.    Does that refresh your recollection?

13  A.    That refreshes my recollection.

14  Q.    Thank you.  And if you would look at the process letter,

15  please, Mr. Sandal?

16  A.    Yes.

17  Q.    Second paragraph, would you read that for the Court?

18  A.    The underlined statement?  I just -- make sure I have the

19  right paragraph.  Yes.

20  Q.    The -- exactly.  "We request"?

21  A.    "We request that all IOIs, defined as indications of

22  interest, be submitted no later than 5 p.m. Eastern time on

23  Friday, July 1st, 2016.  IOIs must be submitted in writing via

24  email to" my colleague.

25  Q.    Okay.  So that left anyone who was interested roughly two

1   weeks to provide you with an indication of interest?

2   A.    From the date that they received the letter.

3   Q.    Right.  And Friday was the beginning of the July 4th

4   weekend.

5           MR. STRATTON:  I think Your Honor can take judicial

6   notice of that.  Let me see, Your Honor.  I have some other

7   questions that -- don't want to jump around too much.

8   Q.    In this process, you did not contact any potential buyers

9   of the debtors' intellectual property?

10  A.    We did not contact -- I assume you're referring to -- I --

11  I don't want to -- I think the term is intellectual property

12  trolls.  But no, we didn't -- we did not contact those parties.

13  Q.    I think, actually, the PC way of referring to them is

14  nonpracticing entities, but I think we're agreed on that.

15  During the pre-petition process, the company's first lien

16  lender started sweeping the company's bank account?

17  A.    That's my understanding.

18  Q.    Resulting in an even more severe liquidity crisis?

19  A.    That's my understanding.

20  Q.    I assume that was not real helpful to the sale process?

21  A.    At the time it happened, there was significant liquidity

22  pressure already, but it did not help, no.  It did not -- maybe

23  I'll state it differently.  It did not help with the company's

24  ability to continue to operate outside of court.

25  Q.    Okay.  Company files September 15th?

1  A.    Yes.

2  Q.    Files a bid procedures and sale motion.  Houlihan Lokey

3  goes back out to the market to try to identify and develop

4  bidders.  New process letter goes out, correct?

5  A.    Following the -- yes, the bid procedures were distributed

6  first, but a new process letter to summarize those bid

7  procedures was distributed, yes.

8  Q.    Okay.  And that's Exhibit 2.  If you could look at that

9  and make sure I'm right, there?

10  A.    I've got two copies of Exhibit 1.

11  Q.    Okay.  Well --

12  A.    Nope.  No, hold on.  I got it.  Here you go.  Yes, I have

13  it.

14  Q.    All right.  And that's your post-petition process letter?

15  A.    This was our post-petition process letter, yes.

16  Q.    All right.  And in the first paragraph, you disclose that

17  the assets being sold are subject to an 18.9-million-dollar

18  credit bid; is that correct?

19  A.    We do disclose it with a footnote, but yes, we disclose

20  it.

21  Q.    Right.  And that credit bid number has now changed as a

22  result of negotiations with the committee and the secured

23  lender?

24  A.    That's my understanding.

25  Q.    It's now how much?

1  about it yesterday.  I believe it's approximately fifteen

2  million, but --

3

4  Q.    Okay.  If you don't know it, how would a bidder know it?

5  A.    Well, I don't know it because it hasn't been finalized to

6  my knowledge, but that was my discussion with Carl Marks

7  yesterday.

8  Q.    So no bidder would understand that the credit bid amount

9  has come down three million dollars?  Today?

10  A.    Well, unless they're listening to this court hearing, they

11  would not --

12  Q.    Okay.

13  A.    -- understand, no.

14  Q.    Thank you.  Exactly.  Paragraph 5 establishes the minimum

15  purchase price:  19,864,000 dollars.  That's the credit bid?

16  Correct?  I'm sorry.  Are you at paragraph 5?

17  A.    No.

18  Q.    All right.

19  A.    One, two, three, four, five.

20  Q.    It's numbered 5; it's on page 2.

21  A.    Oh.  I was counting five.  All right.

22  Q.    I'm sorry.

23  A.    Nineteen-eight-six-four; yes, I see it.

24  Q.    Okay.  And that's made up of the credit bid amount of

25  eighteen-nine, a breakup fee, expense reimbursement, and an

1  overbid, right?

2  A.    That is accurate.

3  Q.    And that number is no longer correct, correct?

4  A.    That's my understanding, yes.

5  Q.    All right.  And the way this reads, a bidder could have --

6  an interested party could have thought that to buy a company,

7  they'd have to come up with roughly twenty million dollars; is

8  that right?

9  A.    They -- they could have, yes.

10         MR. STRATTON:  Okay.  Just one more minute, Your

11  Honor.  I have nothing further.

12         Dave?

13         MR. FOURNIER:  No.

14  REDIRECT EXAMINATION

15  BY MR. KELLER:

16  Q.    Mr. Sandahl, going back to Debtors' Exhibit 1 (sic), the

17  fourth and fifth columns, "Contacted, Not Active" and "Passed"?

18  A.    Yes?

19  Q.    Does Houlihan Lokey reach out to these parties to

20  understand why they're not more actively engaged or have, in

21  fact, decided not to proceed?

22  A.    We do.

23  Q.    And what does Houlihan Lokey do when they reach out to

24  them?  What do they enquire of them?

25  A.    Typically, when someone passes, we would ask why they

1  passed, what the indication for the reason is, and frankly,

2  whether we can change their mind.

3  Q.    Okay.  Mr. Stratton had asked you whether you knew whether

4  a party had passed because of timing in the earlier -- in the

5  first process.  Do you recall that?

6  A.    I do.

7  Q.    In any of the conversations that you had with those

8  parties, did any communicate to you that they were withdrawing

9  because there was inadequate time?

10  A.    No, they did not.

11  Q.    All right.  It was left to innuendo, so I want to just ask

12  you some questions.  One of them, you said you needed to add

13  color to.  Mr. Stratton's questions suggested that maybe the

14  process wasn't sufficiently robust or hadn't been done

15  appropriately because the time period had been too short, made

16  the suggestion that the business was being marketed as a whole,

17  rather than different business segments, that the valuation

18  expectations were too high, or perhaps the credit bid amount

19  was chilling bidding.

20      I'm happy to take them one at a time, or I invite you to

21  respond to it globally, but do you believe that any of these

22  issues have, in fact, discouraged bidders, from your contact

23  with them?

24  A.    I do not.  I would, maybe, just state -- say to -- to your

25  comment, on a pre-petition basis, the evaluation expectations

1    that were indicated in our engagement letter, unfortunately,

2    were not -- you know, became unachievable.  We certainly never

3    indicated those to parties.  We never put a number out; there

4    wasn't a number in our process letter, nor one that we

5    communicated that we needed to hit.  In fact, we did receive

6    one indication of interest before the July 1st holiday from a

7    party that was for significantly less than -- than that number,

8    and we continued to receive indications of interest during the

9    month of July and in August, as we continued the process.  And

10   that was a continuous process.

11        On a post-petition basis, the -- I think it's worth noting

12   that Hillair, as the credit bidder -- stalking horse -- did not

13   restrict our ability to contact parties from the date that the

14   filing happened, which sometimes stalking horse bidders do.  So

15   there was no restriction from now until the bidding procedures,

16   for example.

17        So those conversations have continued throughout that

18   process and we have communicated to all parties that,

19   notwithstanding the official credit bid amount that's listed,

20   we have the ability to sell the business in lots and in pieces.

21   And it's our expectation, based on discussions, that lot bids

22   will be accepted that are below the credit bid amount and that

23   we encourage any and all of those bids which we've discussed

24   with -- with everyone.

25   Q.   Okay.  Can I take it from Debtors' Exhibit 1 -- this is

1   your process summary -- that, in fact, Houlihan Lokey is

2   actively inquiring as to whether a party's interested in all of

3   the business, one business, several businesses, and in this

4   regard, I point out each of the different rows that shows that

5   information?

6   A.   That's accurate.  We have -- we have inquired about it and

7   then tried to -- we actually have a data room that's divided by

8   business, for example, and if parties are interested in

9   e-commerce, but not ShopTV -- because they are different

10  underlying businesses -- we directed them to one or the other

11  as they have indicated that interest.

12  Q.   Houlihan Lokey -- let me ask the question.  Is Houlihan

13  Lokey aware that a party reading the bid proposal might be

14  concerned about the amount of the credit bid or that a whole

15  business might have to be purchased or something of that

16  nature, as Mr. Stratton was suggesting?  Is that something you

17  are aware of?

18  A.   We -- we are aware of it and we -- it's a -- it's in --

19  it's a discussion item when we talk to all of these parties

20  about the expectations and encouraging their bidding.

21  Q.   Okay.  So Houlihan Lokey is proactively addressing that in

22  their marketing?

23  A.   Absolutely, we are.

24         MR. KELLER:  Okay.  I have no further questions.

25         THE COURT:  Any recross?

1  RECROSS-EXAMINATION

2  BY MR. STRATTON:

3  Q.   I think the last question you were asked is that Houlihan

4  Lokey is aware of the concern over the credit bid and the

5  purchasing of the entire business, and you've been talking to

6  your prospects about it to reassure them that they can bid for

7  parts that are less than that whatever the number is today

8  number?

9  A.   We're aware that it could be a concern and that we're

10  proactively addressing it.  That's right.

11  Q.   Okay.  So it is a concern for -- you, as a professional,

12  sitting there, recognize the credit bid and the -- less than

13  the total are concerns for bidders?

14  A.   I recognize that it could be a concern, yes.

15  Q.   Right.

16  A.   We've proactively addressed it, yeah.

17  Q.   Under the bid procedures -- not what you tell buyers, but

18  under the bid procedures, until they were changed today -- a

19  bidder had to top 19,864,000 dollars; is that correct?

20  A.   They -- I -- I don't believe that they are required to top

21  18.9 million dollars to have a -- for us to have an auction.  I

22  believe that Hillair has to consent to sell for less than its

23  credit bid, but --

24  Q.   If they consented?

25  A.   Yes, my -- I will also -- I -- my understanding is, even

1  with the reduced amount of fifteen million -- or whatever it

2  is -- that that consent is still required.

3  Q.   So if you have bidders for eight for one and seven for the

4  other, Hillair could say sorry, no auction; we're not

5  consenting.

6  A.   That's my understanding, yes.

7       MR. STRATTON:  Okay.  No further questions, Your

8  Honor.

9       THE COURT:  I have one question.  Exhibit 2 --

10  Committee 2 -- the post-process letter, when did that go out?

11       THE WITNESS:  I believe that this went out -- so the

12  filing was September 15th.  The bidding procedures were sent --

13  the full bidding procedures were sent to parties who were

14  interested thereafter.  And I believe this went out -- not the

15  following -- it went out on the last week of September, so -- I

16  don't have my -- I have -- my calendar's back over there, but

17  the last week of September.

18       THE COURT:  The last week of September?

19       THE WITNESS:  Yes.

20       THE COURT:  Okay.

21  Q.   The week of Monday, the 26th?

22  A.   Yes.  Yeah.  My recollection is we finished this over that

23  weekend and sent it out that -- early that week.

24  Q.   And that would be roughly sixteen days ago or less,

25  depending on when --

1   A.    For --

2   Q.    -- in the week it went out?

3   A.    For -- for the -- just to be clear, for the process

4   letter.

5   Q.    Letter.  Right.

6   A.    The bidding procedure -- the full bidding procedures

7   and -- the -- the full bidding procedures were sent to people,

8   obviously, on the 15th or thereafter.  This was a summary to

9   ostensibly make it easier for people to read versus a court

10  document.  So this was sent out -- I guess, if it was the week

11  of the 26th, you know -- whenever that is -- ten to twelve days

12  later.

13  Q.    Okay.  So let's assume the week of the 26th, just give or

14  take a day, that they went out on Wednesday, the 28th.  That

15  was thirteen days ago, correct?

16  A.    That's accurate.

17          MR. STRATTON:  Thank you.

18          THE COURT:  Anything further?

19          Mr. Sandahl, you may step down.

20          THE WITNESS:  Thank you.

21          MR. KELLER:  Thank you.

22          The debtors would now like to call Mr. Jeff Hagan.

23          THE COURT:  Mr. Hagan?

24      (Witness sworn)

25          THE CLERK:  And would you please state your full name

1   for the record and spell your last name?

2              THE WITNESS:  James Jeffrey Hagan, H-A-G-A-N.

3              THE CLERK:  Thank you.  You may be seated.

4   DIRECT EXAMINATION

5   BY MR. KELLER:

6   Q.    Good morning, Mr. Hagan.

7   A.    Good morning.

8   Q.    Could you briefly describe for the Court your professional

9   background?

10  A.    Yes.  I was an investment banker for approximately twenty-

11  five years.  I started a company in the capacity of CFO.  I

12  joined another company thereafter, and was in that capacity

13  prior to joining Delivery Agent in October of 2014 in the

14  capacity of CFO.

15  Q.    Can you describe your duties as the CFO of Delivery Agent?

16  A.    Two general categories:  internal, meaning managing the

17  reporting and operations, finance, and accounting of the

18  business, supporting the overall operations and sales of the

19  business; externally, the external reporting to investors,

20  banks et cetera, as well as supporting functions of strategic

21  financing in mergers and acquisitions.

22  Q.    Have the debtors had positive cash flow during your tenure

23  at the company?

24  A.    We have not.

25  Q.    How have they financed themselves without positive cash

1    flow?

2    A.    Largely through the sale of equity and the raising of cash

3    through the sale of that equity.  Supplementally, but to a much

4    lesser degree, with debt as well.

5    Q.    During 2015, so last year, did you work with any

6    investment banks in your capacity as CFO?

7    A.    We did.  We worked with three.

8    Q.    And who are they?

9    A.    Barclays; Bank of Montreal, which we call BMO; and a --

10   a -- a firm called BTIG -- I don't know what that stands for.

11   Q.    And did any of them have the mandate to help sell the

12   company?

13   A.    They -- all three of them did, yes.

14   Q.    All right.

15   A.    Sell/finance, yes.

16   Q.    Okay.  When was Houlihan Lokey retained?

17   A.    Houlihan Lokey was retained in May of 2016.

18   Q.    And given your exposure to all these other investment

19   banks, why did you select Houlihan Lokey?

20   A.    We felt that Houlihan had the broadest capability to

21   continue some of the discussions that had been undertaken by

22   prior investment banks, but also the capability to take us

23   through a more distressed process, if that was what was

24   necessary, and it turned out that it was.

25   Q.    Okay.  Did you personally have a role in working with

 1    Houlihan Lokey --

 2    A.    I did.

 3    Q.    -- after they were retained?

 4    A.    I did.

 5    Q.    Okay.  Would you describe what that was?

 6    A.    Again, probably two general categories.  One, support of

 7    the process, creation of the necessary financials and

 8    information, provision of that information to Houlihan,

 9    provision of information for the data room, support of the due

10    diligence process.  And then externally, in some cases,

11    outreach to potential buyers and support of the CEO of Houlihan

12    in communicating with those potential buyers and investors.

13    Q.    Great.  Are the debtors' sales seasonal?

14    A.    They are.

15    Q.    Okay.  Would you explain how that seasonality works?

16    A.    We're on a calendar fiscal year.  Seasonality for us is

17    approximately twenty-twenty-twenty-forty with Q4, the December

18    31 ending quarter, being the forty percent of our year.

19    Q.    And within the fourth quarter, is there -- could you

20    explain how the revenues come in during that fourth quarter?

21    A.    Yes.  December's typically twenty-five percent of the

22    total year for us, so it's more than half.  And the -- the days

23    leading up to December, including Black Friday and the

24    Thanksgiving holiday, would be more than half of that quarter.

25    Q.    Okay.  I've heard the term Cyber Monday.  Are you familiar

1  with that?

2  A.    I am.  Yes.

3  Q.    What is Cyber Monday?

4  A.    Cyber Monday is -- is a, I guess, a somewhat recently

5  coined term to describe the e-commerce counterpart to Black

6  Friday, which is the day after Thanksgiving when retailers

7  supposedly create massive discounts, getting everyone to go to

8  the stores and create a lot of excitement.  Cyber Monday is

9  sort of the -- the e-commerce alternative to that.  Those are

10  two very big days for us in -- in our business as a retailer.

11  Q.    Okay.

12  A.    An e-tailer.

13  Q.    What does the seasonality that you've just described mean

14  in terms of workload for the debtors' workforce?

15  A.    It's the highest time of year for the team across all

16  functions.  It -- you know, it's -- in every aspect,

17  everyone -- it's kind of an all hands on deck, busiest time of

18  the year.  We know we need that time of year to be successful

19  and everyone's working hard to make that happen.  So everyone's

20  at capacity.

21  Q.    It seems fairly self-evident why that would be true of

22  people who do picking and shipping of a product.  Is that true

23  of the finance and administration services?

24  A.    It's true across the company.  In the picking and shipping

25  side of the business, we can, if necessary, create flex

1  capacity.  We don't have that ability in the other aspects of

2  the business.  So sales, sales operations, client management,

3  particularly finance and accounting, where we don't have the

4  ability to instantly add capacity and expertise, and we're --

5  we're, again, operating at full capacity through, really --

6  certainly, in finance and accounting through the first part of

7  the year, actually.

8  Q.   Okay.  What are the business implications if employees

9  can't keep up with their workload?

10  A.   Well, degradation, certainly, of business; potential for

11  missed orders, late orders; consumers cancelling their orders;

12  ultimately, clients -- or our partners being upset because

13  the -- the -- the goods, which we sell on their behalf, are not

14  reaching their customers.  And that reflects poorly, not just

15  on us, but on them as well.

16  Q.   Do those partners have alternatives to Delivery Agent?

17  A.   They -- I -- I guess in the larger picture, they probably

18  do in some fashion, but again, it's not a -- it's not a flex

19  capacity kind of thing.  So in an instance where a sale does

20  not take place, they do not have the capacity to backfill that

21  and it will immediately reflect poorly on them and on us.

22  Q.   Okay.  Setting aside the amount and quality of work that

23  they're doing, what's the effect of the seasonality on the --

24  seasonality on the workers themselves?

25  A.   It's a -- it's a stressful time.  Folks are -- are working

1   longer hours and putting in a lot more effort.  We -- we know

2   it and we expect it.  We're -- we're -- we're all signed up for

3   that and we -- we do our best to manage it, but it certainly is

4   a -- a -- a time of a lot harder work, a lot more time in the

5   office, a lot fewer lunches taken, a lot fewer breakfasts had

6   at home with kids, that kind of thing.

7   Q.    Okay.  So is it fair to say that that last quarter,

8   particularly late November and December, is stressful for

9   everybody?

10  A.    Absolutely, yes.

11  Q.    Okay.  Now, are extra demands placed on the staff during

12  the sale process?

13  A.    Yes, certainly.

14  Q.    Could you go ahead and explain what some of those extra

15  demands are?

16  A.    I -- from an informational and a due diligence

17  perspective, in particular, there's a lot of material and

18  information that is needed to be generated or has needed to be

19  generated, particularly in this process that we're

20  experiencing.  This is my first time going through a process

21  such as this.  And the volume of material and information is

22  even greater than in a normal -- normal sale process.  So yes,

23  there's a great deal of -- of extra demand placed upon the team

24  and the staff to answer questions quickly and efficiently.

25  Q.    Okay.  Does that influence your view of when a sale

1    process should ideally occur?

2    A.    It does.

3    Q.    Okay.  I think I used the term primary sale before.  When

4    I say primary sale, I mean a sale of the e-commerce, ShopTV,

5    and analytics businesses.  You're aware of the proposed October

6    31st bid deadline for the primary sale?

7    A.    I am, yes.

8    Q.    Okay.  And you're aware of the committee's request that it

9    be extended for four weeks?

10   A.    Yes.

11   Q.    Okay.  From a business perspective, do you agree that a

12   sale that closes in late November or early December is better

13   for buyers than a sale that would close in early to mid-

14   November?

15   A.    I do not.

16   Q.    Can you explain why that is?

17   A.    The increased risk created by the uncertainty and the

18   distraction to the business, I think, has a real risk to

19   degrading the business and, ultimately, the value of the

20   assets.

21   Q.    Um-hum.  Do you think that a sale in late November or

22   early December will attract more bidders than one that

23   commences on October 31st?

24   A.    I think it's highly unlikely.

25   Q.    Okay.  And why do you say that?

1   A.    Because we've been in contact with a very large group of

2   buyers, starting even prior to Houlihan's engagement.

3   Houlihan's been very active in their process.  I -- I think the

4   universe has largely been covered.  I think it's unlikely that

5   something will come out of the woodwork.

6   Q.    You've heard Mr. Sandahl's testimony a moment ago?

7   A.    I did.

8   Q.    Do you have any reason to believe that bidders have been

9   discouraged by any of the factors that we discussed with Mr.

10  Sandahl, namely the notion that they have to bid only on the

11  assets as a whole, that the credit bid will dissuade them from

12  bidding or anything of that nature?

13  A.    I can't testify to their reasoning, but I do not believe

14  any of those things to be a factor, no.

15  Q.    And why do you say that?

16  A.    Again, I think we've run a very fulsome process.  The

17  feedback has been -- when we've been able to solicit feed -- or

18  when, I should say, Houlihan has been able to solicit feedback,

19  it's been fairly specific, and none of that feedback has

20  indicated that timing is -- is or has been an issue.

21  Q.    Okay.  You just testified a moment ago about some of the

22  stresses that just going through the bankruptcy process has had

23  on you and your staff.

24  A.    Yes.

25  Q.    What are the operational risks of going for another four

1    weeks that would be tacked onto the sale process?

2    A.    We're, right now, running at about one employee a day that

3    we're losing.  So from an employee perspective, the -- the loss

4    of people is real.  We have to keep in mind that, in addition

5    to this being our busiest time, it's also people's busiest time

6    for the holidays and they need and want certainty, so I have

7    serious concerns that we're going to not only see that rate

8    continue, but perhaps accelerate in terms of the loss of -- of

9    employees as they look for their own certainty going into their

10   own holiday seasons.

11        On the client side, similarly, we've lost a major client

12   recently due, in large part -- we've been told by them -- to

13   the uncertainty that the process has created.  And we need to

14   provide -- because we're selling goods on their behalf through

15   this season -- we need to provide them certainty, not just now,

16   but -- but going forward.  So I have serious concerns that

17   we'll lose clients or -- and/or sales as well.

18   Q.    You referred to the one client that you've lost.  Are you

19   aware of other clients that are anxious at this time that have

20   communicated that to you?

21   A.    They're all anxious.  They've all communicated that to us.

22   Q.    Okay.  So let me ask you, the --

23   A.    I shouldn't say all, but -- there may be some who haven't,

24   but pretty much everyone, yes --

25   Q.    Okay.

1  A.   -- has communicated that.

2  Q.   So the critical question, then, is do you believe that the

3  debtors would benefit if the bid deadline were extended?

4  A.   I do not.

5        MR. KELLER:  Okay.  No further questions.

6        THE COURT:  Thank you.

7        Cross?

8  CROSS-EXAMINATION

9  BY MR. FOURNIER:

10  Q.   Good morning, Mr. Hagan.  For the record, David

11  Fournier --

12  A.   Good morning.

13  Q.   -- on behalf of the committee.  I want to take you back to

14  the sale process pre-filing.

15  A.   Okay.

16  Q.   So you had Barclays and BMO engaged in 2015, right?

17  A.   Correct, yes.

18  Q.   Okay.  And they were largely running the IPO process,

19  right?

20  A.   Correct.

21  Q.   Okay.

22  A.   But as part of that process, we had them speaking to

23  potential --

24  Q.   Okay.

25  A.   -- buyers as well.

1    Q.   Okay.  And during that time period, you were responsible,

2    as part of your duties, for the various capital raises for the

3    company that you mentioned in your direct?

4    A.   Partly responsible, yes.

5    Q.   Okay.  And can you walk the Court through the capital

6    raises that you engaged in in the latter part of 2015 and into

7    early 2016?

8    A.   Sure.  So we, again, had engaged Barclay's and BMO to look

9    at both financing and, in -- in particular instances, sales of

10   the company, in part to support and in part as a credible

11   alternative to that financing.  In addition, we undertook a

12   debt restructuring process, which began in the summer of 2015.

13   That concluded in December -- early December -- December 9th of

14   2015.  So those were those processes.

15   Q.   Okay, and did --

16   A.   And, I'm sorry, I should add -- there was one more; should

17   I continue?

18   Q.   Sure.

19   A.   So we also engaged BTIG with -- to undertake what has been

20   termed, although poorly, a private IPO, which is the sale of

21   the company's equity securities to historical buyers in the IPO

22   market, who, looking for yield in 2015, were coming down market

23   into the private market, buying unregistered securities.

24   Q.   Okay.  And so they assisted you with those capital raises?

25   A.   Correct.

1  Q.   Right?  And in fact, in early 2016, you placed additional

2  debentures, right?

3  A.   We raised, in mid-2015, from our insiders, a convertible

4  bridge note.  We did an extension of that note in early 2016;

5  that's correct.

6  Q.   Okay.  And that was -- to use the colloquial term -- a

7  bridge to an IPO?  That was the thinking at that point?

8  A.   It was a bridge to somehow -- kind of sale, an IPO, any --

9  any potential solution to raising the capital necessary to keep

10  the company going.

11  Q.   Right.  And those were equityholders putting money in,

12  right?  Existing equityholders?

13  A.   Exi -- in -- in the convertible bridge note --

14  Q.   Right.

15  A.   -- those were existing equityholders, correct.

16  Q.   And the expectation at that point was a transaction -- not

17  a transaction under 363 of the Code, a transaction that would

18  take out -- that would provide an exit for the equityholders in

19  the company, right?

20  A.   I -- again, I don't know -- but yes, I'd say that's

21  logical.

22  Q.   Okay.

23  A.   I -- I can't say what they each, individually, thought.

24  Q.   All right.  All right, so fast-forward, then, to May of

25  2016.

1  A.    Okay.

2  Q.    You change financial advisors, you change bankers, you

3  decide that a sale process now is appropriate, right?

4  A.    I'm not sure how to answer that question.

5  Q.    Okay, well --

6  A.    We didn't change the -- the --

7  Q.    You retained Houlihan Lokey in May of --

8  A.    We did --

9  Q.    -- of 2016?

10  A.    -- retain Houlihan Lokey --

11  Q.    Okay.

12  A.    -- in May of 2016; that's correct.

13  Q.    And Houlihan Lokey was going to do something different

14  than what Barclays was doing, right?  Houlihan Lokey wasn't

15  looking to place an initial public offering?

16  A.    That's correct.

17  Q.    Okay.  So Houlihan Lokey comes in, in mid-May -- I think

18  they testified May 18th?

19  A.    Correct.

20  Q.    A month later, they issue a process letter, right?

21  A.    I believe that's correct, yes.

22  Q.    Okay.  They give parties two weeks to submit indication of

23  interest?

24  A.    Um-hum.

25  Q.    Okay.  Would it be fair to say that the results of that

1   two-week process were disappointing?

2   A.    There were no -- there were a limited or no bidders that

3   came out of --

4   Q.    All right.

5   A.    -- that process.  I --

6   Q.    You weren't pleased with what you received on July 1,

7   right?

8   A.    We did not receive what we had hoped to receive on July 1;

9   that's correct.

10  Q.    Okay.  All right.  August 2016 -- at that point, you're

11  largely focused, as least towards the end of the month, on

12  trying to cobble together a stalking horse agreement with

13  Hillair, right?

14  A.    I wouldn't say largely.  I -- I think that's a

15  mischaracterization.

16  Q.    Okay.  Well, when did you --

17  A.    But we --

18  Q.    When did you begin negotiating the stalking horse

19  agreement with Hillair?

20  A.    Late August, early September -- I can't remember

21  specifically.

22  Q.    Okay.  And under that agreement, you're proposing to

23  transfer essentially the entirety of the company in exchange

24  for satisfaction of their claims, right?

25  A.    Barring some other outcome, if that is the only outcome,

1    then yes.

2    Q.    Okay.  And Hillair, just to put it in context, in December

3    of 2015 was your second lien lender, right?

4    A.    Correct.

5    Q.    Who had advanced eight million dollars to the company?

6    A.    Correct.

7    Q.    Okay.  And between original issue, a discount, and

8    prepayment premiums, another approximately three-and-a-half

9    million dollars, four million dollars loaded on top of that,

10   right?

11   A.    Including default premiums in the case of a default, yes.

12   Q.    Right.

13   A.    At the time, the total discount -- total amount was 9.2

14   million dollars.

15   Q.    Okay.  So the 150-million-dollar company that you're

16   looking to sell in summer of 2016 is, at that point, a 11, 12-

17   million-dollar sale?

18   A.    I'm not sure --

19   Q.    Okay.

20   A.    -- how your timing's working, and I didn't say 150 million

21   dollars.

22   Q.    Okay.  The valuation at which you raised capital in your

23   March 2016 raise was at 150-million-dollar valuation, right?

24   A.    The February 2016 bridge note extension was an extension

25   of the bridge notes that had been put in place the prior

1    July --

2    Q.    Right.

3    A.    -- and were a debt instrument convertible, but they

4    carried the -- the same valuation and same metrics that had

5    been in place --

6    Q.    Approximately --

7    A.    -- in July of 2015.

8    Q.    Approximately 150 million?

9    A.    Give or take.

10    Q.    Right.  Okay.  So as far as the market's concerned, then,

11    when you're running your process, whether you went out to the

12    market and said 115 million or not --

13    A.    Um-hum.

14    Q.    -- when you're running your process in June, right?  Late

15    June?  That's the valuation that's been out in the market,

16    right?

17    A.    Well --

18    Q.    Anybody who's conducting due diligence with respect to the

19    company is going to be aware of the valuations at which capital

20    was raised in March, right?

21    A.    Yes.

22    Q.    Okay.  All right.

23    A.    But I think -- I would answer that more completely, but

24    I'll -- I can wait to do that.

25    Q.    Great.  All right.  Bankruptcy filing, September 15th.

1   Would it be fair to say to you've been, sort of -- you've been

2   the primary point person for Houlihan in their communications

3   with the company?

4   A.    I wouldn't say that, no.

5   Q.    Okay.  And who would be the primary person?

6   A.    I think it's been a combination of myself, the CEO, and

7   other experts and advisors that we've brought on board.

8   Q.    Okay.  Who is the CEO?

9   A.    CEO is Mike Fitzsimmons.

10  Q.    And he is the founder of the company?

11  A.    He is the founder of the company, yes.

12  Q.    Okay.  So since the filing of the case, has Houlihan

13  communicated with you with respect to active indications of

14  interest with respect to the company?

15  A.    They have.

16  Q.    Okay.  And with those active indications, how many of

17  those would you characterize as strategic buyers?

18  A.    I don't have the numbers in front of me.  I'd have to look

19  at that?

20  Q.    Are you aware of any -- do you understand the -- you have

21  twenty-five years of experience as an investment banker, so you

22  understand what I'm talking about when I talk about a financial

23  buyer or a strategic buyer, okay?

24  A.    Absolutely.

25  Q.    Okay.  And so are you aware of any financial buyers who

1   are currently active in the process?

2   A.    Financial buyers or strategic buyers?

3   Q.    Are you aware of financial buyers who are active post-

4   petition in the process?

5   A.    Financial buyers, yes.

6   Q.    Okay.

7   A.    You had asked about strategic buyers before.  Sorry,

8   I'm --

9   Q.    I did.  And so of the, approximately -- I think it was

10  seven on your chart -- excuse me, on Houlihan's chart?

11  A.    I don't have that chart in front of me.

12  Q.    Okay.

13  A.    I'm sorry.

14  Q.    Well, Houlihan has represented to the Court that there are

15  seven active prospective purchasers --

16  A.    Um-hum.

17  Q.    -- for the assets.  Of those seven, how many are financial

18  buyers?

19  A.    I couldn't recall.  I --

20  Q.    In your --

21  A.    I'd be happy to look at that and give you a more specific

22  answer.

23          MR. FOURNIER:  Your Honor, if I may, I'd like to

24  provide the witness with --

25          THE COURT:  You may.

1        MR. FOURNIER:  -- a copy of -- thank you.

2        THE WITNESS:  Thank you.

3  Q.    And let me correct that.  There's seven who I understand

4  became involved post-petition.  There are thirteen who became

5  involved pre-petition, right?

6  A.    Um-hum.

7  Q.    And you don't know the division between strategic and

8  financial buyers on that?

9  A.    Not off the top of my head.

10  Q.    Okay.

11  A.    I'd say it's -- I don't know.  I -- I don't want to -- I'd

12  rather not wager a guess; I'd rather give you an accurate

13  answer.

14  Q.    Okay.  And post-petition, how many management

15  presentations have been given to -- post-petition, how many

16  management presentations have been given to prospective

17  purchasers?

18  A.    I don't know that number.  I'd say half-a-dozen.

19  Q.    Okay.  And did you participate in those?

20  A.    I did not.

21  Q.    Okay.  Who did participate in those for management?

22  A.    Mike Fitzsimmons, the CEO.

23  Q.    Okay.  Who else participated in those for management?

24  A.    Houlihan Lokey.

25  Q.    Did any other employees or executives of the company

1  participate in those presentations?

2  A.    I don't believe so.

3  Q.    Okay.  Do you believe -- you have experience as an

4  invest --

5  A.    Actually, that's not true.  Can I confirm that?

6  Q.    Sure.

7  A.    I believe there was a presentation last week, and Dave

8  Rudnick, who is the head of the ShopTV business, participated

9  in that.  So I can say that's one example of --

10  Q.    Okay.

11  A.    -- where someone else did participate.

12  Q.    All right.  And ShopTV is one of the lines of business

13  that is not dependent on the Cyber Monday sales, right?

14  A.    I wouldn't say it's not dependent.  It's a combination of

15  an interactive advertising technology and a -- what we would

16  call a t-commerce technology, so the sale of goods via the

17  television mechanism.  So it -- yes, some -- it's a nascent

18  business, so I -- I -- it's hard to put a statistic to it, but

19  certainly, Cyber Monday would have an impact on sales through

20  that mechanism, I believe.

21  Q.    Okay.  But when you're talking about your concerns about

22  timing for a sale, ShopTV isn't driving those concerns, is it?

23  A.    I would say we -- we look at that as a whole.  I --

24  what -- I --

25  Q.    All right.

1  A.   When I think of that, I'm not segregating ShopTV --

2  Q.   Okay.

3  A.   -- in my -- in my mind or in my answer, no.

4  Q.   Now, Houlihan has testified -- and I think that you have

5  as well -- that you think that all the bidders who may have an

6  interest in these assets have an adequate opportunity to

7  conduct diligence prior to October 31st, right?

8  A.   Yes.

9  Q.   Okay.  So is it your expectation, if the Court extends the

10  deadline, that those bidders would -- that any bidders would

11  need to conduct diligence into November?

12  A.   I do not believe they would need more time to conduct

13  diligence, no.

14  Q.   Okay.

15  A.   I'm not finished answering your question.

16  Q.   If bidders had had adequate time now to conduct diligence,

17  why would any bidders be conducting diligence into November?

18  A.   I -- I don't understand the question.

19  Q.   If the bidders that you've identified so far have adequate

20  time to complete their diligence, why would diligence be

21  continuing into November with respect to those bidders?  If the

22  Court extends the deadline?  If the Court extends the deadline

23  to submit a bid --

24  A.   I'm sorry.  I don't understand the question.

25  Q.   If the Court extends the deadline to submit a bid -- to

1    pick a date.

2    A.    Okay.

3    Q.    Yeah?  November 25th, November 28th, November 21st,

4    whatever the Court might set.

5    A.    Um-hum.

6    Q.    Why would any bidder who currently is looking at the

7    assets want to be engaged in diligence on November 5th?

8    A.    Well, I believe that they would be able to complete their

9    diligence by the 31st, so I don't think they have a need to

10   conduct diligence beyond that.  Would they continue to ask

11   questions?  Possibly.  But is there a need for those questions

12   to be asked?  No.  So that's why I'm -- I'm --

13   Q.    Okay.

14   A.    -- not sure, exactly, how to answer your question.  My

15   apologies.

16   Q.    Okay.  So a bidder comes in -- let's say one of the

17   bidders identified by the creditors' committee.

18   A.    Yes?

19   Q.    They come in tomorrow, right?  That bidder would have no

20   need for a diligence period of more than whatever that leaves

21   us -- nineteen days, right?  That's your testimony?

22   A.    I don't -- I can't testify to what their need would be,

23   but I don't believe they would have a need beyond that, no.

24   Q.    Okay.  And if they're identified by Carl Marks or Houlihan

25   next week, they wouldn't have a need for more than thirteen

1  days of diligence?

2  A.   I don't believe so, no.

3  Q.   Okay.  Let's just take it to the extreme.  They're

4  identified on the 29th.  Would they have a need for more than

5  two days of diligence?

6  A.   I couldn't say.

7  Q.   Okay.  Fair enough.  I think the Court can draw its own

8  conclusions on that.  Is Hillair a strategic or a financial

9  buyer, in your view, for these assets?

10  A.   Well, strat -- Hillair is our DIP lender.  I would -- I

11  would categorize them as a financial --

12  Q.   All right.

13  A.   -- investor or a financial party, rather than a strategic

14  party.

15  Q.   Okay.  They don't have their own management team set up to

16  run this business?

17  A.   That is correct.

18  Q.   Right?  And if the business is sold to Hillair, at least

19  for a transitional period, at a minimum, the existing

20  management team would have to stay in place?

21  A.   I don't know what they have in mind in that regard, if

22  they do end up with the assets.  But I would say that it would

23  probably be in their interest for existing management to stay

24  in place.

25  Q.   Okay.  And presumably, the existing employees would stay

1  in place, largely?

2  A.    Presumably.

3  Q.    In fact, your asset purchase agreement contemplates that?

4  A.    It does.

5  Q.    Right?  And there wouldn't be a need for operational

6  changes between now and Cyber Monday?  Or --

7  A.    Sorry.  There would or wouldn't --

8  Q.    -- the Christmas holidays?  There would not be a need for

9  operat -- there would not be an absolute need for operational

10  changes between now and Cyber Monday or the Christmas holidays,

11  right?

12  A.    Correct.

13        MR. FOURNIER:  Okay.  Nothing further.

14        THE COURT:  Thank you.

15        Any redirect?

16        MR. KELLER:  Just a couple questions, Your Honor.

17  REDIRECT EXAMINATION

18  BY MR. KELLER:

19  Q.    Mr. Hagan, when Mr. Stratton was asking you questions

20  about the debt raise that was done in March, and if you recall,

21  he was talking about 150-million-dollar valuation.  Do you

22  recall that?

23  A.    I do.

24  Q.    You seemed rather uncomfortable when you were answering.

25  Is that true?

1   A.    Yes.

2   Q.    Would you explain why that is?

3   A.    Well, I -- the -- the question was, was the 150 million

4   dollars the number that was in the market, and I can't say

5   whether it was the number that was in the market.  If a

6   buyer -- to the second part of his question of whether a buyer

7   would look and see that that was the previous valuation at

8   which money had been raised, the answer would be yes.  But to

9   say that that was the number in the market, I don't believe

10  that's the proper characterization.

11  Q.    Okay.  Mr. Stratton --

12          MR. STRATTON:  Your Honor, just for the record, I'm

13  the old one and he's the young one.  That's Mr. Fournier who

14  was asking the questions.

15          MR. KELLER:  Thank you for the clarification.

16  Q.    Mr. Fournier, by implication, was observing that it looks

17  like the value of the company had fallen precipitously.  Would

18  you accept that characterization?

19  A.    Yes, I would.

20  Q.    In your professional experience, can you explain how that

21  might happen?

22  A.    There were a number of factors that occurred.  One was we

23  had a -- a linear advertising business, which we

24  discontinued -- or forced to discontinue at the end of March

25  that, prior, had contributed about a third of the company's

1  revenue.  In addition, the -- the capital markets have a -- a

2  large impact -- the public markets have a large impact on

3  implied valuations for private companies.  And with a very

4  challenging public market, that trickled down to us, I guess is

5  the right way to put it, and was another factor in affecting

6  the -- the value of the -- of the company.

7  Q.   Okay.  Finally, anticipating both Mr. Fournier and Mr.

8  Stratton's arguments, there are a number of questions about

9  strategic versus financial buyers, so I just want to ask you

10  directly.  Do you think the company's done an adequate job of

11  reaching out to both financial and strategic partners?

12  A.   I do, with our advisors, Houlihan Lokey currently, but

13  prior advisors as well.  Yes, I do.

14  Q.   And are you aware of any attempt to keep out strategic

15  buyers from the process?

16  A.   Absolutely not.

17  Q.   Okay.  No further --

18  A.   The opposite.

19        MR. KELLER:  No further questions.

20        THE COURT:  Thank you.

21        You may step down.

22        THE WITNESS:  Thank you.

23        MR. STRATTON:  Your Honor, we have one witness.  Would

24  it make sense to take a ten-minute break or maybe even a five-

25  minute break, and we can resume at, say, a little after 10 --

1    ten after 11?

2             THE COURT:  Why don't we --

3             MR. STRATTON:  Or some set of numbers in Arabic or

4    Roman numerals?

5             THE COURT:  Why don't we do 11:15?

6             MR. STRATTON:  That's fine, Your Honor.  Thank you

7    very much.

8         (Recess from 11:04 a.m. until 11:18 a.m.)

9             THE COURT:  Please be seated.

10            MR. STRATTON:  Your Honor, we'd like to call Chris Wu

11   to the stand.

12            THE COURT:  Mr. Wu?

13        (Witness sworn)

14            THE CLERK:  And would you please state your full name

15   and spell your last name for the record?

16            THE WITNESS:  Christopher K. Wu, spelled W-U.

17            THE CLERK:  Thank you.  You may be seated.

18            THE WITNESS:  Thank you.

19   DIRECT EXAMINATION

20   BY MR. STRATTON:

21   Q.   Mr. Wu, by who are you employed?

22   A.   Carl Marks Advisors.

23   Q.   And how long have you been with Carl Marks?

24   A.   Fourteen years.

25   Q.   And what does Carl Marks do?

1  A.    We are a long-standing restructuring advisory firm, with a

2  focus on investment banking, financial advisory services, and

3  restructuring services.

4  Q.    Okay.  And your focus is in the distressed company,

5  bankruptcy arena?  Is that --

6  A.    That's my focus.  My focus is on distressed M&A, special

7  situations, and assisting companies in distress.

8  Q.    Okay, and what is your position with Carl Marks?

9  A.    I'm a partner and co-head of the investment banking group.

10 Q.    Okay.  How long -- I'm sorry.  Before you went to Carl

11 Marks, where did you work?

12 A.    I worked for JPMorgan.

13 Q.    And in what part of the JPMorgan empire?

14 A.    My last position was a vice president in the mergers and

15 acquisitions group.

16 Q.    Okay.  And how long were you there?

17 A.    I was there for seven years.

18 Q.    Okay.  So you've been in this industry for twenty years?

19 A.    Yes.

20 Q.    And how many deals, approximately, have you closed?

21 A.    I've closed over a hundred deals.

22 Q.    Okay.  And in this case, you're acting as financial

23 advisors to the creditors' committee; is that right?

24 A.    That's correct.

25 Q.    And when were you hired?

1   A.   About a week ago.

2   Q.   If I told you it was October 3rd, would you agree with me?

3   A.   That sounds about right.

4   Q.   All right.  Have you served in this capacity or similar

5   capacities in other Chapter 11 cases?

6   A.   Many times.

7   Q.   Have you advised debtors?

8   A.   Many times.

9   Q.   And committees?

10   A.   Many times.

11   Q.   Okay.  I'm getting the impression this isn't your first

12   rodeo.  How many times, approximately, have you been involved

13   in Chapter 11 cases?

14   A.   Chapter 11 cases -- over forty.

15   Q.   Can you give the Court some examples of debtor cases

16   you're been involved with?

17   A.   Here in Delaware:  Holley Performance, Monitor Consulting

18   (sic), Green Field Energy Services.  I was involved for the

19   lenders in -- in VeraSun.  I represented the committee --

20   committees in Sun-Times Media, PJ Finance, White Energy, to

21   name a few.

22   Q.   Okay.  In Monitor, you and I worked together, and as I

23   recall, the buyer and the debtors were insistent that a very

24   accelerated sale process be pursued; is that right?

25   A.   I do recall that.

1  Q.    So there's some parallels between those, just in that

2  little respect?

3  A.    Yes.

4  Q.    Let's talk -- before I begin, I want to take you through

5  the bid procedures, the pre-petition sale process, and the

6  post-petition sale process, and see if you can help the Court

7  understand some of our concerns.  But I want to go back to the

8  testimony that we just heard -- I apologize -- Mr. Hagan's

9  testimony about what a bidder would need to do.  Try to weave

10 into this a little some of the questions I'll ask you -- that I

11 was going to ask you later.

12       You've provided fifteen names to Houlihan Lokey that

13 they've accepted and have contacted to see if people are

14 interested in buying some or all of the assets here, right?

15 A.    Yes.  That -- that's a list that was longer, but

16 management and Houlihan have agreed that fifteen names were

17 additive to the process.

18 Q.    Okay.  And it's my understanding that Houlihan contacted

19 the people on that list yesterday?

20 A.    My understanding is they began contacting them yesterday,

21 which is consistent with us presenting them that list last

22 week.  They had some time internally to review them.

23 Q.    Okay.

24 A.    And -- and therefore, the outreach for those additional

25 names were -- was initiated yesterday.

1  Q.   Okay.  Let's suppose that one of those names -- or someone

2  just shows up today and says hm, I might be interested in one

3  of the businesses that's for sale.  Can you walk the Court

4  through the steps, from beginning to bid, that this

5  hypothetical entity would have to take along the way before it

6  could submit a written, binding commitment to purchase some or

7  all of the assets of these debtors?

8  A.   Sure.  So what's typical is an investment banker would

9  reach out to a strategic or financial party.  That party would

10  then be provided with a nondisclosure agreement.  They would

11  then need to negotiate and execute that.  If it's done on an

12  expedited basis, that could be as quick as one day.  What's

13  probably more typical is three or four days.  And of course,

14  some companies, particularly strategics, end up having a longer

15  process because they're not geared up, as financial investors

16  are, to move that along.  So that's -- that's the first stage.

17      They would then access the electronic data room and they

18  would need to assemble a team in order to evaluate that asset,

19  the information contained in the virtual data room.  Following

20  that, they would want to reach out to representatives of the

21  company or the company itself and either arrange a

22  teleconference and, likely, given the binding nature of the

23  post-petition process, arrange for an in-person meeting.

24      If they were a technology buyer, they would also have to

25  initiate a thorough evaluation of the intellectual property

1   assets that are contained in the company, which -- which

2   requires --

3   Q.   Let me interrupt you there.  That would be, in part, to

4   understand what it is and who owns it and how it's been

5   protected?  It's that sort of thing?

6   A.   Right.

7   Q.   Okay.

8   A.   The nature of the quality, whether it's a copyright,

9   whether it's a patent pending, whether -- whether the -- just

10  look at the intellectual property --

11  Q.   Okay.

12  A.   -- overall.  And -- and then once that evaluation has been

13  completed, which, you know, could take anywhere from -- you

14  know, who knows -- one to four weeks, depending on the buyer.

15  Obviously, we have time constraints, so anybody would need to

16  compress that accordingly.  And -- and certainly it can be

17  done, but it's certainly on the order of extreme difficulty.

18  Q.   Okay.  In add --

19  A.   And that's if they started today.

20  Q.   Okay.  In addition to the ten steps you identified, a

21  strategic buyer -- would they need counsel?

22  A.   Because it's in bankruptcy, they would need to retain

23  counsel.  They would want expert counsel to evaluate the bid

24  procedures, evaluate the existing purchase agreements.  They

25  would also want advice, certainly, probably, at the management

 1   level or the board, potentially.  If it was a financial, they'd
 2   want to do the same things, but have a -- convene an investment
 3   committee and -- and gain approval for that.
 4   Q.    Okay.  And at some point, they'd have to get -- am I
 5   correct that they'd have to get whatever corporate
 6   authorization is necessary to buy whatever they're buying?
 7   A.    Right.  And -- and that would be either through an
 8   investment committee approval or, you know, board of directors'
 9   approval or -- or, you know, executive management level.
10   Q.    Okay.  It's October 11; bids are due October 31.  Do you
11   think it's reasonable to expect that a bidder would show up
12   today and be able to get a binding commitment to buy an asset
13   in this case if they were just showing up today?
14   A.    Having done this a long time, I think that's
15   extraordinarily truncated and not -- not reasonable.
16   Q.    Okay.  I want to ask you another question to follow up on
17   the testimony of the two witnesses.  And then I'll get back to
18   what I promised to cover.  There was some discussion about
19   nobody's complained about the schedule and nobody's complained
20   about the bid procedures.  We do reach out to people -- this is
21   Mr. Sandahl -- we do reach out to people who say they're going
22   to pass to find out why.  This is what we haven't heard.
23        And so my first question to you is, when Carl Marks is in
24   that role, do you also reach out to bidders who have decided
25   not -- or contact, excuse me -- who decided not to participate,

1  to learn why?

2  A.    Yes.  We do that.

3  Q.    And can you tell the Court a little bit about your

4  experience in that regard and how it may shed light on whether

5  or not the issues we've identified -- the credit bid, the

6  timing -- were, in fact, reasons why companies decided to pass,

7  even if that wasn't what Houlihan Lokey was told?

8  A.    Sure.  You know, and any banker would likely testify to

9  the same, which is we reach out to people who pass in our

10  solicitation processes.  Some of the bidders would share

11  insights; some may not.  Some may provide all of their

12  rationale; some may provide part of their rationale.  Some of

13  the rationale may be provided by somebody who wasn't making the

14  decision, so it might not be, in the first instance, clear.

15  And obviously, the focus of bankers is to go ahead and move on

16  and focus on those who are interested.  So we don't spend an

17  inordinate amount of time on that, but we do spend sufficient

18  time.

19  Q.    Okay.  Now, let's talk about the bid procedures.  You've

20  reviewed them?

21  A.    Yes.

22  Q.    In the context of all the other things going on in this

23  case, do you have an opinion as to the bid procedures?

24  A.    The post-petition bid procedures?  Yes.

25  Q.    Yes.  Yes.  Let me ask a more direct question.  Do you

1   believe they're designed to maximize the value of these

2   debtors' estates?

3   A.    I think they're not optimal.  I think that --

4   Q.    And can you tell the Court why?

5   A.    I -- I think the time frame, given the nature of the pre-

6   petition process, is very accelerated.  I think the presence of

7   the initial credit bid at the levels that it was at --

8   Q.    When you talk about the initial credit bid, are you

9   talking about the minimum purchase price of 19,864,000 dollars?

10  A.    Yes.

11  Q.    Thank you.

12  A.    And -- and also, while -- while, if you read the bid --

13  bidding procedures and process letter, it allows for people to

14  bid less than the fact amount.  That's -- that's more implicit;

15  it's not explicit.  And it would be better for the process if

16  there were allocated amounts on the DIP for the various

17  business units.  That's my opinion.

18  Q.    Okay.  Based on your experience, if someone received the

19  post-petition process letter and saw the minimum purchase price

20  of 19,864,000 dollars, and that was the reason they said I'm

21  not going to waste my time with this, and they got a new

22  process letter tomorrow that said oh, wait, wait; the minimum

23  purchase price is now -- what's the right number -- it's two,

24  three, four million dollars less, is it possible that the lack

25  of interest could change to interest, in your experience?

1   A.   Well, I think the -- the amount in absolute value is
2   material, but not substantial.  However, as a percentage of the
3   purchase price, it's pretty significant.  So when you go down
4   from 19.8 to, you know, 17 or 16, that starts to become pretty
5   material.
6   Q.   Anything else in the -- no, I'm sorry.  I think you
7   covered my question there.
8        Have you reviewed the debtors' pre-petition marketing
9   process?
10  A.   I did.
11  Q.   And can you tell the Court whether you think that that was
12  designed to maximize the value of the debtors' assets?
13  A.   I think, in many respects, the process letter has elements
14  that are consistent with a lot of other process letters.  The
15  area that I looked at, which I think --
16  Q.   This is the pre-petition process letter?
17  A.   Pre-petition, yeah.  The area that I looked at, which I
18  think presents some problems, is just the truncated nature of
19  the bid deadline.  I think Houlihan testified that they began
20  reaching out to bidders as early -- early in the month.
21  Q.   Of June?
22  A.   Of June, quickly followed by a process letter, which
23  called for initial bids on July 1st.
24  Q.   Just, if I could stop you there?  As I understand the
25  testimony -- Mr. Sandahl's testimony said they started

1  contacting potential bidders the first week of June.  The

2  process letter went out June 16th and required IOIs --

3  indications of interest -- by July 1.  Is that what you're

4  focusing on?

5  A.   Yes.

6  Q.   Go ahead.

7  A.   So, you know, all things being equal, and -- and there are

8  circumstances that arise for every company, and I perfectly

9  understand that -- but that -- that is pretty accelerated and,

10  in my experience, bidders do two things:  am I busy now?  Do I

11  have time to look at this process, given the timelines?  And,

12  you know, what is the opportunity?

13      So I think time is particularly key, especially for

14  strategic buyers, who aren't otherwise in the business of being

15  organized to react to acquisition opportunities every day.  And

16  also, whether or not the opportunity was for -- for the whole

17  company or -- or parts of it.

18  Q.   During the pre-petition process, is it your understanding

19  that the sale process was aimed, in part -- not exclusively,

20  but in part -- at finding a buyer for the entire business?

21  A.   I believe it was.  I believe that there was, obviously, a

22  process even before Houlihan's process.  That process was

23  certainly designed to create a returned (sic) for all

24  stakeholders, and in particular, equity shareholders.

25      You know, the -- the strategics that were probably engaged

1   with the company at that point in time were evaluating, more

2   than likely, for the most part -- although this is just my

3   opinion; I can't -- I can't substan -- substantively testify to

4   what those buyers were looking at -- but they were likely

5   looking at a whole company.  Certainly, listening to Houlihan's

6   testimony, after they got retained, there certainly was a

7   persistence of that trend, even though the feedback from the

8   marketplace soon became that there really wasn't a whole-

9   company buyer, with the exception of one possible liquidating

10  bid.

11  Q.   Okay.  Pre-petition, process, any other issues?  They sent

12  out the process letter; IOI's disappointing.  Now we're in

13  July, moving into August.  Any other things that you think

14  could have been done differently that might have changed where

15  we are today?

16  A.   I think upon seeing the response from the marketplace,

17  additional focus on looking for not-whole-company buyers, but

18  looking at buyers for the -- for the assets, may have yielded

19  some results.  I -- I can certainly appreciate that a company

20  in an extreme liquidity crunch had to do what it had to do.

21      And, therefore, you know, my view is the pre-petition

22  process was insufficient.  It suffered from liquidity problems.

23  Companies in this situation experience that.  They have limited

24  degrees of freedom, which is why -- that's why I think the

25  post-petition process should have a little bit more

1  flexibility.

2  Q.    Okay.  We'll come back to that.  In the debtors' reply and

3  on the stand, they pointed to the 2015 process as being

4  relevant to how everybody knows the business is for sale.  I

5  guess the company that bid on -- BDA, on Friday, wasn't aware

6  of it.  And so, you know, we need to consider what happened in

7  2015 and we need to consider what happened pre-petition in 2016

8  and then all the great stuff we've done since then.

9        Can you talk about the 2015 process and whether it's

10  relevant at all to determining whether there's been a

11  reasonable effort to market these assets?

12  A.    Having advised many companies pre-petition and out of

13  court, I certainly appreciate companies go through many things

14  when they start to look for liquidity solutions or -- or

15  something that addresses the balance sheet.  In my opinion, the

16  work that was performed for the company by Barclays and BMO was

17  focused on investment.  It was focused on capital market

18  solutions.  It was focused on, likely, a dual-track M&A IPO

19  process, and very focused on valuation, which is certainly

20  natural for existing investors in the capital stack.

21  Q.    Okay.  And BMO is Bank of Montreal, Barclays is Barclays.

22  Neither of them work in the distressed restructuring business

23  the way Houlihan Lokey and Carl Marks do, correct?

24  A.    Not the way Houlihan and -- and Carl Marks do.  So I do

25  think it's not irrelevant in terms of what a company would

1  attempt to do prior to retaining a firm like Houlihan or Carl

2  Marks, for that matter.  But I think that the information, you

3  know, from the marketplace was that those -- those solutions

4  weren't viable and a more distressed solution was more likely.

5  Q.   Okay.

6  A.   And therefore, I don't think it's as relevant as the work

7  that Houlihan did.

8  Q.   Let's talk about the post-petition process.  You were

9  hired on October 3rd.  When did you first talk to Houlihan

10 Lokey?

11 A.   Likely, a couple days later.

12 Q.   Okay.  If I told you we had a conference call with the

13 committee, the committee professionals, and Houlihan Lokey on

14 October 4, would that refresh your recollection?

15 A.   It would.

16 Q.   That would be our first conversation with them?  And then,

17 following the 4th, did Carl Marks provide the debtors with

18 additional potential purchasers?

19 A.   We did.

20 Q.   The names of -- I'm sorry.

21 A.   We did, yes.

22 Q.   Okay.  And we've talked a little bit about that.  They

23 accepted fifteen names; is that right?

24 A.   Yes.

25 Q.   Can you give the Court an idea, either by name or by

1  category, of some of the names that you gave?  I asked Mr.

2  Sandahl whether the list included two of the company's

3  competitors.  There were competitors on your list?

4  A.   There were two parties that we identified that they hadn't

5  reached out to that were specific to the ShopTV segment that we

6  think should have been reached out, and I think the company

7  concurred and they are reaching out to them.

8      We identified a handful of venture capital firms for them

9  to reach out to.  Obviously, there were a number that the

10 company had already been engaged with or had covered in the

11 pre-petition, and certainly agree that those parties should be

12 reached out to post-petition.  And there were a number of IP-

13 focused buyers that the company hadn't previously reached out

14 to.

15     And it's our view that a lot of the pre-petition venture

16 capital first that invest in the company invested with a

17 premise of realizing value in the ShopTV, t-commerce asset,

18 and -- and therefore, while that technology is still nascent,

19 while the adoption is deferred, it's still the view that

20 t-commerce will be a significant sector in the future.  And

21 therefore, to the extent that the committee gets any recovery,

22 we think the possibilities are greater to realize value for

23 ShopTV.

24 Q.   Okay.

25 A.   Which is why we're focused on the IP and, you know, a

1   couple of competitors --

2   Q.   Okay.

3   A.   -- in that sector.

4   Q.   So some strategic buyers, some financial buyers, some

5   buyers of sort of what I'll call parts -- the IP buyers -- were

6   on the list?

7   A.   Yep.

8   Q.   As a result of negotiations between the bank, the debtor,

9   and the committee, the minimum purchase price has been reduced.

10  First of all, do you think that is a good thing or a bad thing

11  or neutral as far as the sale process goes?

12  A.   It's extremely encouraging.

13  Q.   Okay.  And when would a prospective bidder first learn of

14  that?  Do they -- unless they're here today?

15  A.   Well, we -- we would hope that they would learn about it

16  today and revised bidding procedures and the revised process

17  letter than Houlihan will ship out in due course.

18  Q.   So tomorrow, the day after?

19  A.   All -- all of that would be rational timing.

20  Q.   Okay.  So let's say it's tomorrow, that would leave them

21  nineteen days, if that got them back into the game, to put a

22  bid together?

23  A.   That would leave them that -- that much time, yes.

24  Q.   Thanks.  Do you think the forty-five days from the date of

25  filing is -- Mr. Hagan used the word adequate; I don't think

1  that's the right standard.  Do you think that's sufficient time

2  to maximize the value of the debtors' assets?

3  A.    Well, that's always a judgment call, and I certainly

4  understand the debtors' position.  In my experience, the post-

5  petition process is very related to the pre-petition process.

6  Pre-petition process was, as I -- as I testified, not optimal.

7  And I understand there's a variety of reasons why that would

8  happen.  And -- and sometimes you have no pre-petition

9  marketing and you show up in court with a stalking horse.  In

10 those cases, you would want otherwise longer post-petition

11 process.

12        In this particular case, working closely with the debtors

13 and with the DIP lender, we've made some very significant

14 changes, which we appreciate, and we think those features are

15 certainly worthy of drawing back in interest.  So I think the

16 time from bid procedures approval is where I'm probably more

17 focused on.

18 Q.    Today?

19 A.    Yeah.

20 Q.    And how much time?

21 A.    You know, we're on the record for asking for four weeks.

22 I think we've certainly heard from management that there are

23 operational issues and difficulties --

24 Q.    No, but --

25 A.    -- and -- and -- and up and down the organization,

1    stresses that are placed upon the company that closing too

2    close to Cyber Monday would present problems.  And having

3    worked for many debtors, you know, I certainly appreciate --

4    appreciate that.  That's -- that's always a concern and I share

5    those concerns.

6         Factoring those -- those concerns in, I would think that

7    two additional weeks might be a better balance in terms of

8    still being able to close pre-Thanksgiving, while affording

9    some new entrants, as well as old entrants, to reflect on

10   changes in the bidding procedure and -- and being able to draw

11   in more buyers.

12        Because where we stand, as a committee, if there's no

13   overbids, the estate is left with 500,000 dollars to wind up

14   the estate.  And -- and certainly, I appreciate the purpose of

15   Chapter 11.  The opportunity is there; we just want to make

16   that opportunity a practical one.

17   Q.   Okay.  Thank you.  You heard Mr. Hagan's testimony.

18   Actually, let me ask a question, which we did not discuss

19   beforehand.  Houlihan Lokey was hired May 19th.  They sent out

20   a process letter on June 16th.  IOIs two weeks later -- July 1.

21   My rudimentary arithmetic tells me that period is forty-two

22   days, so let's just say it's the same as the post-petition

23   period.  And I think we've already established that that was

24   disappointing, I think was the word the witness used, or a

25   failure.  Is there any reason to think that just forty-five

1   days is going to be enough here?

2   A.    Post-petition?

3   Q.    Right.

4   A.    You mean from the point of today?

5   Q.    No, September 1st.

6   A.    Oh, right.

7   Q.    Or September 15th.

8   A.    Right.  Well, as I've testified, bidders have to do a lot

9   of work.

10  Q.    Okay.

11  A.    So I -- I -- I think that, in this particular situation,

12  it's inadequate.

13  Q.    All right.  Mr. Hagan testified about his management

14  concerns and you were here to hear that testimony, correct?

15  A.    Yes.

16  Q.    Do you think that those concerns, as he explained them,

17  are sufficient to require, to insist on, to stick with the

18  October 31st bid deadline?  And if not, why not?

19  A.    I -- I heard them and I appreciate them.  And I often hear

20  that sentiment brought up for companies, especially, going

21  through a peak season.  And then those concerns need to be

22  balanced with providing a real opportunity for an auction to

23  transpire.  I cannot substitute my judgment for company

24  management.  They live and work and operate, so they know what

25  they know.  I know, as an advisor sitting in an advisor seat,

DELIVERY AGENT, INC., et al.                      114

1   those concerns need to be factored in.  There's no question

2   about it.

3        So all things being equal, not trying to substitute his

4   judgement for mine, I think the balance argues for slightly

5   more time.  And -- and -- and in our view, that should be at

6   least two weeks.

7            MR. STRATTON:  I have nothing further.

8            THE COURT:  Thank you.

9            Cross?

10            MR. KELLER:  Give me one minute?

11            THE COURT:  Um-hum.

12        (Pause)

13            MR. KELLER:  Mindful of the time, I'm going to keep

14   this quick.

15            THE COURT:  We're okay.

16   CROSS-EXAMINATION

17   BY MR. KELLER:

18   Q.   Mr. Wu, it was a pleasure to meet you yesterday.

19   A.   Likewise.

20   Q.   Hopefully, you can attest that the debtor was reasonably

21   forthcoming in the process last time?

22   A.   Without question.

23   Q.   Um-hum.  So I think you were very generous about the

24   management's concerns, and I just want to confirm.  Obviously,

25   you've never worked for Delivery Agent?

1  A.    Never.

2  Q.    And I don't think you purport to have particular e-

3  commerce or technology bonafides, do you?

4  A.    Members of my team do; I, personally, do not.

5  Q.    Okay.  You said you gave more than fifteen names to

6  Houlihan Lokey and that some of them weren't pursued.  Were you

7  in agreement with the decision not to pursue the names that

8  were not pursued?

9  A.    Yes, because in that case, I deferred to management.

10 Q.    Okay.  So I did the numbers.  Fifteen more names is about

11 six percent of the total number that have been recovered.  You

12 don't need to do the numbers yourself.

13 A.    Um-hum.

14 Q.    What is your sense, given your experience, of the

15 likelihood that one of these fifteen is going to turn out to be

16 one of the critical bidders?

17 A.    I think the key is you don't know.

18 Q.    Okay.

19 A.    I think that the debtors, obviously, know the business.

20 Houlihan has expertise.  So we're not saying that the debtors,

21 nor Houlihan, has the expertise, only that it's interesting

22 that, you know, there -- there always are additional names.

23 Q.    Sure.

24 A.    And having worked for creditors many times, you go through

25 an -- an arc of a process and -- and what you know later is

1    different from before; new facts emerge and buyer attitudes

2    also change.  And -- and obviously, you've run auctions before.

3    An unsuccessful auction is one in which another buyer doesn't

4    show up.  A successful action is where -- one where at least

5    one shows up.

6    Q.    Okay.

7    A.    So that -- you know, we just want the possibility for a

8    successful auction.

9    Q.    What is your understanding of how robust the debtors' IP

10   portfolio is?

11   A.    I think it's unclear.  I don't have a very clear picture

12   of what that is because we don't have views from the company

13   yet in terms of the IP.

14   Q.    Do you know how many patents have been issued to the

15   company?

16   A.    I don't.  I -- I believe none, but several are pending.

17   And -- and our opinion is that the copyright itself on -- on

18   the software could be worth something.  The URL is worth

19   something.  The name ShopTV is a good name.

20   Q.    Okay.

21   A.    That's worth something.  The ShopTV technology is embedded

22   in over forty million devices.  That's valuable.

23          MR. KELLER:  Okay.  I don't have any further

24   questions, Your Honor.

25          THE COURT:  Thank you.

1          MR. KELLER:  Thank you.

2          THE WITNESS:  Thank you.

3          MR. STRATTON:  No redirect, Your Honor.

4          THE COURT:  Mr. Wu, you may step down.

5          THE WITNESS:  Thank you.

6          THE COURT:  I take it that concludes the evidentiary

7   portion --

8          MR. KELLER:  We have no --

9          THE COURT:  -- of the hearing?

10          MR. KELLER:  -- further evidence, Your Honor.

11          THE COURT:  Okay.  Let's go to argument.

12          MR. KELLER:  Again, in light of the time, I will be

13   brief.  I don't think this is --

14          THE COURT:  We're okay on time.

15          MR. KELLER:  Okay.

16          THE COURT:  So I don't want to discourage fulsome

17   consideration.

18          MR. KELLER:  I don't think the matter is an incredibly

19   complex one and I want to assure the Court that we're all after

20   the same thing:  we want to maximize value.  And I will let

21   Hillair speak for itself if it wishes to, but my understanding

22   is even Hillair would much prefer to see overbidders and see

23   itself taken out as a lender, even with the strictures that

24   it's agreed to and the debtor-in-possession financing

25   agreement.  So what we have is a good-faith disagreement about

1    how to achieve that end.

2           With management, with our advisors, we've thoroughly

3    explored the company's ability to extend the sale deadline.

4    The efforts to find a compromise suitable to the committee kept

5    getting stalled on two points.  First, the debtors really don't

6    see a discernible benefit from extending the bid deadline.  The

7    evidence demonstrates that the debtors and their assets have

8    been already marketing broadly and for an extended time period.

9           We're mindful of the criticisms that were raised, but

10   I think the uncontroverted facts that -- is that Houlihan

11   Lokey, a firm with extensive credentials in the distressed

12   market, was involved for 120 days or so pre-petition and got

13   materials out about 90 pre-petition, started a process.  And

14   then it will have added another forty-six days or so post-

15   petition to the proposed October 31st deadline.

16          The testimony's also uncontroverted that it did

17   receive indications of interest.  They were very disappointing.

18   The first one was received before July 1st, but Houlihan Lokey

19   continued to solicit indications of interest and received

20   another seven -- that was the full eight indications of

21   interest that were received on a pre-petition basis, clearly

22   not limited by any valuation metrics, and, given the exhibit

23   that the debtors have introduced, clearly talking to

24   prospective purchasers in detail about segregating he

25   businesses in any number of ways.

1          So the criticisms are that the process was too slow,

2    but I think the evidence is uncontroverted, as Mr. Sandahl

3    said, that he began -- he was retained on May 18th.  He got his

4    materials out by June 16th and proceeded consistently to market

5    up until the post-petition -- or until the petition was filed,

6    and then consistently post-petition.

7          His testimony is also that the barriers that are being

8    raised by the committee are ones that we was aware of, that

9    they proactively addressed, and again, the evidence -- the very

10   fact that indications of interest came in at below the secured

11   debt and for different parts of the business, I think, is the

12   best evidence, the best attestation that the process really was

13   not confined to selling all the assets at 150 million dollars

14   or making sure that bids would only be accepted before July

15   1st.  The evidence is uncontroverted that Houlihan Lokey did

16   what it could to get interest at any level in any assets and

17   did so well.

18         The creditors' committee has testified that it's put

19   up another fifteen names; doesn't dispute that the other names

20   that were introduced didn't need to go forward.  That's six

21   percent against the 248 names that have been contacted.  It

22   doesn't make a particularly compelling case that we should be

23   pushing back the entire deadline.  And while I have absolute

24   respect for the committee and its professionals and the fact

25   that they're really -- they're very new to this, they're

1    drinking water from the proverbial firehose, at this time,

2    they're not aware of -- we're not aware of anybody who's

3    complaining about a lack of time, and Houlihan Lokey has been

4    proceeding vigorously on the assumption that we'd be on the

5    31st date that has been published widely to the community.  So

6    the lack of anyone coming forward and saying that that's

7    inadequate, we consider a very salient fact.

8            Then we have to look at the other aspect -- not the

9    marketing aspect, the investment banking aspect.  But if one

10   takes away this sort of grand generalization that more time is

11   better than less time, we have to look at the specifics of the

12   situation we're in.

13           The debtor didn't really choose the timing that it

14   would be thrown into this cash crisis.  It came and was in a

15   very rough state when it was put into the bankruptcy filing of

16   September 15th.  We are right up against that fourth quarter

17   rush that Mr. Hagan testified to.  And realistically, things

18   have become very disruptive very quickly, such that the next

19   reasonable sale date would be into 2017, and I don't think

20   anyone has the illusion that we'll be able to maintain the --

21   pay the cost, finance the cost, through 2017.

22           Mr. Hagan's testimony, as a person in the industry, is

23   that he's very concerned about forcing the sale process on

24   strategic buyers during their busiest season.  The same people

25   that the company has employed are being employed by their

1   competitors, who are trying to get their product out, now have

2   to come do diligence on the company.  It adds a new barrier to

3   their coming forward and being able to participate in a fulsome

4   process if they rely on a later date.

5           THE COURT:  I don't understand that.

6           MR. KELLER:  If, let's say, the date were set four

7   weeks later, so roughly November 28th -- which probably falls

8   on a weekend or Thanksgiving, but let's set it there -- the

9   parties set their closing deadlines, they're setting up the

10  schedules and the like, such that as a buyer, they have to buy

11  the company by Delivery Agent, its e-commerce platform,

12  whatever it is, integrate it into their business at the very

13  time that --

14          THE COURT:  Okay.

15          MR. KELLER:  -- they're dealing with their own.

16          THE COURT:  That, I understand.

17          MR. KELLER:  Yeah.

18          THE COURT:  Okay.

19          MR. KELLER:  We are going to be -- we have been

20  placing and are going to be placing extraordinary demands on

21  the debtors' personnel, risking, obviously, poor support and

22  execution for our partner clients, for whom we're doing

23  fulfillment on the one hand, and meaningfully reduced customer

24  service to the customers on the other, both of which could have

25  dire implications for the company over the long run.

1          And then, again, Mr. Hagan's uncontroverted testimony

2     is that, not surprisingly, the bankruptcy has caused some

3     operating degradation to the business.

4          THE COURT:  Um-hum.

5          MR. KELLER:  He's losing employees on a daily basis.

6     The partners who are using us are anxious about our ability to

7     perform, and perform through the Christmas season.  We do have

8     the attrition of the key employees and we do have some

9     financing risk.  We have operational covenants that we need to

10    continue to comply with.

11         We have found that Hillair has been very reasonable to

12    work with, but we worry about pushing beyond the November 15th

13    or 16th date.  They've been supportive, but we think that their

14    support, to take us well into the Christmas season, is not or

15    may not be there, and while that's not the core basis of our

16    opposition, it's really because we believe, at a business

17    level, October 31st is the latest date that we can go and get

18    this deal done in a reasonable way.  The financing risk is of

19    concern.

20         My last point would be that we don't know what will

21    come in the next few weeks.  It is possible that we will have a

22    fabulously well-qualified buyer who comes to us in two or three

23    weeks and say we're ready to proceed, but I'll tell you we

24    haven't had enough time; we're new to the process, we'd like

25    more time.  Mr. Wu testified that we were very forthcoming the

1  last process.  We absolutely intend to honor our consultation
2  rights obligation to the committee.

3       If we get chased with the extraordinary circumstance
4  that we think we can have a much more robust auction and
5  actually realize something in excess of the Hillair credit bid,
6  we may be coming before Your Honor and asking for an extension
7  in order to get that fulfilled.  I think Hillair would be
8  supportive of that, but we need bonafides and to know that
9  we're going to have a real auction.

10      Even if we didn't come before, we certainly aren't
11  proposed to prejudice the creditors' committee from coming
12  before Your Honor and saying you know that thing we said was
13  going to happen that the debtors said wasn't going to be a
14  problem, well guess what?  It's here.  And we'll deal with that
15  at that time, if we have to.

16      As you've heard from Mr. Sandahl, as you've heard from
17  Mr. Hagan, we don't think that's what we're going to see.  We
18  think this has been broadly exposed to the market.  We don't
19  think that taking a document out of a process without
20  understanding what Mr. Sandahl testified to, which is that our
21  advisors have been very forthcoming to bidders, saying come
22  one, come all, bid on something, bid on everything, give us
23  whatever prices you want; we want to see you in this process --
24  we think that that addresses the question of whether there's
25  been a fulsome process.  We had 90 or 120 days pre; we've got

DELIVERY AGENT, INC., et al.                    124

1   46 days post.

2          But if lightning strikes and we have a bidder or two

3   bidders who want to have an auction, we're more than prepared

4   to deal with that issue.  We would like to have -- that would

5   be a high-class problem and we'll deal with that then.

6          If I may take just a moment, I had noticed that there

7   was a note I want to check --

8          THE COURT:  Sure.

9          MR. KELLER:  -- to see if there's anything --

10          No?  All right.

11          Apparently, I covered it.  I have nothing further,

12   Your Honor.  Thank you.

13          THE COURT:  Thank you.

14          MR. BRADY:  Good afternoon, Your Honor.  Just quickly,

15   Robert Brady on behalf of Hillair.  Just a few points to echo

16   some of what Mr. Keller said.  I think the test here is the

17   debtors' business judgement.  Will this process maximize value

18   under the circumstances?  And the debtors have laid out its

19   case through two witnesses.

20          What you didn't hear in any of the testimony, Your

21   Honor, and I doubt you'll hear as part of any argument, is that

22   Hillair is somehow driving or demanded this process or this

23   timetable.  That is absolutely not the case.  This is not a

24   loan-to-own situation for Hillair.  It was not Hillair who

25   swept the cash; I want to make that clear.

1       THE COURT:  Um-hum.

2       MR. BRADY:  The first lien lender was Western

3  Alliance.  They started sweeping the cash.  It was Hillair that

4  came through with an emergency bridge loan to keep this company

5  going as a going concern and, really, to allow for this

6  process, allow for another opportunity to try to sell this

7  company and maximize value.

8       Hillair's timetable has been guided by the debtors'

9  business judgment.  And the DIP and the APA have all been

10  guided, again, by the business judgment that this business

11  needs to be sold prior to Thanksgiving.  That's why we've set

12  11/16 as the deadline for closing of the sale because that's a

13  week prior to Thanksgiving.  We think it positions the company

14  best to go into its most important season with a new owner.

15       I appreciate the committee's position here, Your

16  Honor.  They've given you a lot of hypotheticals of what could

17  happen, what might happen.  I think what Mr. Keller has

18  suggested is the right solution.  If something like that

19  happens, the parties can meet and confer.  If they can't agree,

20  we can come back before the Court, but then Your Honor is

21  dealing with real facts and a real potential bidder, as opposed

22  to hypotheticals of what might happen under the theory that

23  more is always better because I think what you've heard from

24  the debtors in this case, it's not.

25       And finally, Your Honor, just so there's no confusion

1   on Schedule A -- I know there were some questions by Mr.

2   Stratton of the Houlihan witness and the like -- we have agreed

3   to our credit bid rights that removes the OID amount and the

4   mandatory default amount, but we're still permitted to credit

5   bid those amounts.  That's the initial credit bid under the

6   scenario where someone can come in at fifteen-nine and become a

7   qualified bidder.  We still have the right, under Schedule A,

8   to then credit bid those what I'll call contested amounts.

9          And if the committee -- and we do credit bid those,

10  the committee later successfully challenges, we'd have to pay

11  cash.  We can also waive those amounts and increase our bid by

12  waiving those amounts.

13         There is no absolute consent right here by Hillair.

14  In other words, what this says is that other bids or a bid has

15  to beat our bid.  That's like any other auction.  If that bid

16  is less than our bid, we could consent to the debtor going with

17  the lower bid.

18         THE COURT:  Um-hum.

19         MR. BRADY:  But they still have to beat our bid.  We

20  don't have a veto right.  They have to beat our bid and

21  Schedule A lays this out very clearly.

22         THE COURT:  But the bid now is fifteen-nine, that they

23  have to beat?

24         MR. BRADY:  They have -- that gets them qualified.

25         THE COURT:  That gets them qualified.

1          MR. BRADY:  That gets them qualified, and then we

2    could go and credit bid those disputed amounts.  The risk there

3    is the committee can still challenge those.

4          THE COURT:  Um-hum.

5          MR. BRADY:  And we'd have to deal with that if they

6    successfully challenged those.  But all our rights and defenses

7    are preserved through this.  We're not waiving any of those as

8    part of this.

9          THE COURT:  Thank you.

10         MR. BRADY:  Thanks.

11         THE COURT:  Mr. Fournier?

12         MR. FOURNIER:  Just to keep the line consistent, I'll

13   just address that last point for the same area.  We did resolve

14   the credit bid issue --

15         THE COURT:  Um-hum.

16         MR. FOURNIER:  -- in the manner noted.  The minimum

17   bid is now approximately 15.9 million.  That's premised on a

18   full draw on the DIP.  The budget that the Court has in front

19   of it contemplates a two-million-dollar paydown on the DIP, so

20   that may adjust that.  So it would be whatever the ultimate DIP

21   amount is that would play into that minimum bid, but assuming a

22   full draw on the DIP, it would be that fifteen million and

23   change.

24         The other important change for the Court to note, and

25   this does tie into the timing issue, is if the Court looks at

1    the tail end of the language there, the parties have also

2    agreed that the debtors, Hillair, and creditors' committee will

3    jointly agree on minimum qualifying bid amounts for partial

4    bids; that is, a bid for ShopTV only or for e-commerce only.

5          THE COURT:  Um-hum.

6          MR. FOURNIER:  And the sum of those partial bids, at

7    least at this point of qualifying as a bidder, wouldn't have to

8    equal that total overbid amount.

9          THE COURT:  Okay.

10          MR. FOURNIER:  The objective being to get bidders in

11   the room to bid.  And Your Honor, so starting with that last

12   point, the committee has been consistent that, for us, the

13   adequacy of the process is critical.  And what we don't want to

14   find ourselves is in the same situation the debtor was in on

15   July 1 of 2016, where it set up an inadequate process to try to

16   solicit indications of interest, and it failed, Your Honor.  We

17   don't want to be in the position we were in yesterday with an

18   auction, where we have a rushed process and it failed.

19          Your Honor, what we really want is a process that

20   ensures that when Houlihan goes back out to bidders, when Carl

21   Marks is involved in assisting Houlihan in that process, and we

22   identify additional bidders who can come in or we reach out to

23   the bidders that are already in the process and say look, we

24   now have minimum overbids on ShopTV or on e-commerce, now, come

25   in and do due diligence, that they have adequate opportunity to

1   assess that new opportunity because the opportunity to acquire

2   the asset at materially less than nineteen million dollars is

3   something that may very well be relevant, as Mr. Wu's testimony

4   indicated.  We want to ensure that those parties have an

5   adequate opportunity to get in the room, to do the diligence

6   they need to show up at an auction and bid.

7           We don't want to be in a situation where we don't know

8   until the day after the auction that there is somebody who is

9   interested.  And this is a very -- this is a very rushed

10  process from today, in terms of what bidders are going to here.

11          Now, we don't discount the management's concerns.  And

12  Your Honor, we don't dismiss those at all, and frankly, we may

13  well have pushed for a much longer process, but for those

14  concerns.  And Mr. Stratton noted, in his questioning, that we

15  recognize that management has legitimate concerns, and those

16  need to be weighed in assessing how long we want to extend the

17  bid deadline.

18          But Your Honor, this case is not unique, in that it

19  comes before the Court wish stresses on the company and

20  stresses on management and stresses on the process.  And it's a

21  balancing for the parties and for the Court.  And respectfully,

22  Your Honor, when the debtor files the case and lays out its

23  timeline, it's not the only party-in-interest in the case.

24          When Hillair makes its credit bid, although they say

25  that it's not a loan-to-own and they don't want to own any

1  assets, we don't know that.  Ultimately, they have the right to

2  bid up to the full amount of their loan.  And they haven't

3  allocated their bid.  They haven't been willing to allocate

4  their bid; that's their right.  But we don't know that it's not

5  a loan-to-own.

6       And we're very concerned that we have a process that

7  ensures that we can go back out to the market, we can tell

8  people we have a bid procedures that will facilitate your

9  showing up and bidding for these assets.  I want to get as many

10  people in the room to do that diligence as we can.

11       With respect to Hillair's comment on a closing of

12  November 16th, we don't think that's really inconsistent -- or

13  something right around there -- with what Mr. Stratton had

14  suggested, Your Honor.  So respectfully, I think standing firm

15  and holding your breath on October 31 is certainly the debtors'

16  right, but just as we don't dismiss management's concern, we

17  don't think the committee's concerns should be dismissed

18  either, particularly in a case where we are looking at,

19  functionally, a zero recovery unless there is an adequate

20  process.

21       THE COURT:  Thank you.

22       Mr. Demmy?

23       MR. DEMMY:  Good afternoon, Your Honor.  John Demmy of

24  Stevens & Lee for Discovery Licensing, Inc., formerly known as

25  the Discovery Channel Store, Inc.  We did file a limited

1  objection to the motion and we do have a timing issue; it's not

2  the same timing issue that has been discussed, but we did raise

3  a timing issue.  And it may be a small issue in the context of

4  what you just heard, but it's important to --

5          THE COURT:  Um-hum.

6          MR. DEMMY:  -- Discovery.  And it's important to

7  Discovery, in effect, because of the nature of the agreement

8  that we have with Delivery Agent, Inc., and it's called an

9  e-commerce operation agreement.  And again, following Mr.

10  Stratton's comments, I'm not sure I fully understand everything

11  about the agreement, but it's, in part, a license agreement and

12  part a technology operation agreement.  And so therefore, it's

13  different than a lease of a warehouse.

14          THE COURT:  Um-hum.

15          MR. DEMMY:  And adequate assurance issues are

16  important to us.  If there's going to be an upset buyer, we

17  need to have some time to be able to understand who it is and

18  are they capable.

19          And originally, the process, as I understood it, had

20  an auction of November 4 and a sale hearing of November 8.

21          THE COURT:  Um-hum.

22          MR. DEMMY:  Now that gave us one business day, but

23  that also gave us a weekend to look at the situation, which we

24  felt was not sufficient, obviously, because we filed the

25  objection.  As I understand the procedures now, the auction's

1   been pushed back to November 2, with the sale hearing on
2   November 4th, so we actually have less --
3          THE COURT:  Um-hum.
4          MR. DEMMY:  -- time now than we did under the original
5   procedures.  So clearly, our objection has not been resolved.
6   And as I said, maybe a mole to the mountain of the overall
7   timing issue that the Court has heard, but it's an important
8   one to us and, presumably, to other countercontract parties.
9   We think there should be more time between the identification
10  of a winning bid and the sale hearing, so we can evaluate the
11  situation.
12         I would point out that, as part of the bid packages
13  that are being required to be a qualified bidder, the buyers
14  have to provide adequate assurance information.  So that's
15  going to be available to the committee and other part -- and
16  the debtor and other parties on October 31.  Now, we certainly
17  don't want to evaluate twelve of these things, but it could be
18  possible, if there are a limited amount of bidders, that we
19  could be given that information and at least start that
20  process.
21         So Your Honor, I don't want to take any more of your
22  time.  I think you understand our position --
23         THE COURT:  Um-hum.
24         MR. DEMMY:  -- and our situation.  Thank you.
25         THE COURT:  Thank you.

1           Anyone else?  Mr. Riley?

2           MR. RILEY:  Your Honor, Richard Riley from Duane

3   Morris, on behalf of the Chubb companies.  We just filed a

4   reservation of rights, but it does play into what Mr. Demmy was

5   saying.  We take the position that --

6           THE COURT:  Yeah.

7           MR. RILEY:  -- a buyer would need the consent of Chubb

8   to transfer the insurance policies, so we would want -- and

9   we're not saying we wouldn't consent, but we would need time to

10  work on consent with the buyer.  If it's Mr. Brady, we can

11  certainly work with him, but we don't know who the buyer will

12  be.

13          THE COURT:  Okay.

14          MR. RILEY:  So we would need some time.

15          THE COURT:  Thank you.

16          MR. KELLER:  So the reality of bankruptcy practice:

17  nobody has the illusion that this is a solvent debtor and we

18  take the committee's views very seriously.  They, if things go

19  well, represent the real economic party-in-interest.  If not,

20  Hillair, I guess, is.

21          The debtor has an independent fiduciary obligation to

22  do what it thinks is right for the estate.

23          THE COURT:  Um-hum.

24          MR. KELLER:  And it's a very hard decision when the

25  beneficiaries of your work are telling you they want you to do

DELIVERY AGENT, INC., et al.                     134

1   something else.  And I assure the Court that management has
2   taken that very seriously.  They think that putting this thing
3   past that October 31st date is going to hurt value, and that is
4   the sole that they haven't simply taken what the committee has
5   asked and done it.  I applaud my client for that; I think it's
6   the right decision.  And with that, we're submitted.
7           THE COURT:  Thank you.
8           I'm going to take fifteen minutes, then I'll be back.
9       (Recess from 12:18 p.m. until 12:45 p.m.)
10          THE COURT:  Please be seated.
11          I appreciated the testimony of all of the witnesses
12  and I found all of the witnesses credible.  I found Mr. Hagan's
13  testimony credible with respect to the seasonality of the
14  business and the need to close on any transaction before
15  Thanksgiving, as well as his testimony of the stresses on
16  employees during the holiday season.
17          But circumstances have changed since the bid
18  procedures went out, and the two things of particular
19  importance to me are the twenty percent decrease in what it
20  takes to become a qualifying bid from 19,864,000 to 15,943,857
21  dollars, as well as the fact that Clean Fun is now out of this
22  particular process.
23          So the question is trying to find the balance between
24  the need of the debtors to close prior to Thanksgiving, which
25  they believe maximizes the amount that will come to the estate,

 1  although I recognize that the debtor believes that October 31st

 2  will do that.  It's not clear to me from this record.

 3           So we're going to change the dates and put some

 4  pressure on the professionals to get things done.  The closing,

 5  unless parties decide to go longer, will be on the 18th -- and

 6  I'm working backwards, just because it was easier.  The sale

 7  hearing will be on the 17th.  We'll start at 9:30 in the

 8  morning.  If it's uncontested, that will give the professionals

 9  a very rushed twenty-four hours, but I have confidence they can

10  close it.  If it's contested, we'll be in a whole 'nother

11  situation.  Objections will be due on the 16th at noon.  The

12  auction will be on the 11th, with bids due on the 10th at noon.

13  That will give the parties --

14           MR. STRATTON:  Your Honor, I would never interrupt,

15  but --

16           THE COURT:  But you are.

17           MR. STRATTON:  -- for this one reason.  Could we make

18  that noon, California time, because I think that's what the

19  times, when they've been doing this, they've been using, and --

20           THE COURT:  That's --

21           MR. STRATTON:  -- debtors' counsel is in California.

22           THE COURT:  Okay.

23           MR. STRATTON:  Is that acceptable to the Court?

24           THE COURT:  Sure.

25           MR. STRATTON:  Thank you.  I apologize.

1          THE COURT:  That's okay.  And if the -- I don't know

2   where the auction's going to be, but it's all California

3   time -- whatever you all decide on that.

4          That gives the bidders an additional ten or so days,

5   and that gives parties, from today -- one, two -- a little more

6   than four weeks to get their bids in.  And I took seriously Mr.

7   Wu's testimony with respect to the time that parties would need

8   to make bids and realize that it's longer than that, but I

9   think that's the longest we can give them, under the

10  circumstances.

11         Mr. Demmy, I believe that's going to give you two-and-

12  a-half business days and two weekend days, and that's the best

13  we can do there.  But I recognize that concern, and that's not

14  a insignificant concern to me, that countercontract parties get

15  an opportunity to know who the winning bidder is.  I'm assuming

16  that information with respect to -- with respect to -- am I

17  blanking -- our stalking horse bid can be sent around earlier,

18  so that if there are any concerns about that, that doesn't

19  become an issue during crunch time, while you're trying to

20  evaluate other bids that may come in.

21         Did I leave out any -- the cure information should go

22  out at the same time.  There's no reason to delay the cure

23  information, again, so that countercontract parties have that

24  and can react to that.  If you want the cure information

25  objections earlier -- I actually didn't write anything down for

 1    that -- you can suggest a date for that, but give parties a

 2    sufficient time on the cure objection.

 3             Mr. Brady?

 4             MR. BRADY:  Your Honor, again, Robert Brady for

 5    Hillair.  I need to call my client on that, Your Honor, just

 6    because --

 7             THE COURT:  I recognize that.

 8             MR. BRADY:  -- I don't have any authority to consent.

 9    But I understand the Court's ruling and I'll pass it along to

10    them.  I'm hoping it won't be an issue -- two days -- but I do

11    need to call them.

12             THE COURT:  I understand that and I'm trusting it

13    won't be an issue, but I understand you need to call.

14             Any other concerns?  I think we have some.

15             MR. KELLER:  Your Honor, my suggestion is, between the

16    phone call that Mr. Brady has to make, we're just jiggering the

17    time, that maybe what we could do is take a couple minutes to

18    make sure we've got everything and then come back --

19             THE COURT:  Yes.

20             MR. KELLER:  -- before Your Honor.

21             THE COURT:  That's certainly acceptable.

22             MR. KELLER:  I would also -- just, I think on -- to

23    sort of set the ground, I think we've got a solution underway,

24    and so that won't take long.  And on the bid procedures, I

25    think this will help us get a stipulated bid procedures.  But I

1    think this is really the issue we need to work through, but if

2    we could have a couple of minutes, just to consult on this last

3    little thing?

4              THE COURT:  You can.

5              MS. JONES:  Thank you.

6              MR. KELLER:  Thank you.

7              MR. BRADY:  Thank you, Your Honor.

8        (Recess from 12:52 p.m. until 1:10 p.m.)

9              THE CLERK:  (Audio begins mid-sentence) -- rise.

10             THE COURT:  Please be seated.

11             Ms. Kim?

12             MS. KIM:  For the record, again, Jane Kim.  Your

13   Honor, we spent some time the last few minutes going over the

14   dates that Your Honor gave us.  One clarification and then some

15   commentary.

16             On the objection deadline that you have for November

17   16th, am I to understand that the objections that Your Honor

18   had in mind were those that were limited to if a successful

19   bidder were not the stalking horse purchaser and so there were

20   adequate assurance or cure amount issues or issue related to

21   the way that the sale process was run, that those would be --

22   that would be the objection deadline for those types of

23   objections?  And then the other objections to what was in the

24   sale motion originally would be under the existing objection

25   deadline?

1          THE COURT:  That is fine.  I don't remember the

2    existing deadline, so. don't remember the existing deadline,

3    so.

4          MS. KIM:  Yeah, I didn't look at it, myself, but it's

5    sometime between now and the (indiscernible) deadline.  I think

6    it's in a couple of weeks.

7          THE COURT:  Let the committee take a look.

8          MS. KIM:  Okay.

9          THE COURT:  And as long as there's sufficient time

10   between the notice that goes out of the cure amounts --

11         MS. KIM:  Um-hum.

12         THE COURT:  -- and the deadline that people need to

13   object, and now there is certainly sufficient time --

14         MS. KIM:  Okay.

15         THE COURT:  -- then that'll be acceptable.

16         MS. KIM:  Great.  Thank you, Your Honor.

17         The question that we had was Your Honor had the

18   auction as occurring on November 11th, the day after the bid

19   deadline, November 10th.  And the professionals here have been

20   discussing, practically, what that would mean because those of

21   us who have to come from the west coast will have to get on a

22   flight possibly before the bid deadline has passed, and

23   certainly before we've been able to qualify the bids.

24         And so I would have a suggestion for Your Honor to

25   consider.  We'd like to, once we qualify the bids, and in any

1    case, by no later than close of business Friday, November 11th,

2    have the evidence of adequate assurance that's going to be part

3    of those bidders' bid packages sent to any counterparties

4    who've requested it.  We'll send it by email.  And I hear

5    Discovery Licensing and Chubb as having requested it.  We'll

6    send it to them so that they have them by no later than

7    November 11th in order to be able to make their adequate

8    assurance objections by November 16th with respect to all of

9    the qualified bids.  But we would like to have the auction held

10   on November 14th and not move the sale hearing date.

11            MR. FOURNIER:  Your Honor, if I may?

12            THE COURT:  Mr. Fournier?

13            MR. FOURNIER:  David Fournier for the committee.  The

14   concern, Your Honor, is we were just working through just the

15   practical mechanics of qualifying, getting people onto

16   airplanes, and the like.  And so that was the -- sort of the

17   process that I think people thought would work to give adequate

18   time to make sure that we've got people where they need to be

19   for the start of the auction.

20            THE COURT:  I understand.  So the packages go out on

21   the 11th, but people won't know who the actual --

22            MS. KIM:  They won't --

23            THE COURT:  -- winner of the auction is until --

24            MS. KIM:  The --

25            THE COURT:  -- perhaps very late on the 14th.

1        MS. KIM:  Correct.  We'll be posting six hours after

2   the -- within six hours after the conclusion of the auction,

3   we'll be posting a notice of the successful bidder, but we will

4   have provided information to the counterparties as to all of

5   the qualified bidders and their adequate assurance packages so

6   they know who they might have an issue with by Friday, November

7   11th.

8        THE COURT:  Mr. Demmy, do you have a thought on that?

9        MR. DEMMY:  Your Honor, thank you.  John Demmy for

10  Discovery Licensing.  It's not optimal.  And we clearly don't

11  speak for other parties.  Begrudgingly, we're willing to live

12  with it to accommodate all the parties here, and on the

13  condition, of course, that we actually receive the information

14  that's provided by the close of business on Friday.  So at

15  least we'll have the weekend to start.  Hopefully, it's not too

16  many people.  Hopefully, it's one or zero.

17        THE COURT:  Well, hopefully, it would be a lot of

18  people.

19        MR. DEMMY:  Well --

20        MR. STRATTON:  Right.

21        MR. DEMMY:  For my personal --

22        MR. STRATTON:  But to say that out loud?

23        MR. DEMMY:  From my personal workload point of view --

24  obviously, from the estate's point of view, many -- but yes,

25  we've -- and Mr. Stratton played the old timer in the bar card

1   on me, so --

2           THE COURT:  Ah.

3           MR. DEMMY:  -- I had to grudgingly accept.

4           MR. STRATTON:  I did?

5           THE COURT:  Okay.  Okay.

6           MR. STRATTON:  I didn't --

7           MS. KIM:  So if that's acceptable to Your Honor, we

8   would propose to submit a revised form of bidding procedures

9   order under certification of counsel.

10          Actually, before I get to that, there were a couple of

11  clean up -- just a few other objections that I just wanted to,

12  for the sake of clarity of the record, make sure that I dealt

13  with.

14          THE COURT:  Um-hum.

15          MS. KIM:  Rhino -- we've already heard from their

16  counsel before --

17          THE COURT:  Yes.

18          MS. KIM:  -- he left.  Live Nation, we have a

19  stipulation that's been signed between the debtors and Live

20  Nation that we'll be submitting by motion, and we should be

21  doing that very shortly.

22          THE COURT:  Okay.

23          MS. KIM:  And then I think we've dealt with all of

24  Discovery Licensing's other objections or questions with

25  respect to how all of this would work through the revised

1   bidding procedures order.  And I believe with Chubb companies,
2   we've also -- the rest of their reservation of rights was
3   simply a reservation of rights.  And the we've also addressed
4   and resolved the informal comments that we received from the
5   U.S. Trustee.
6          So as I said, we'll submit a proposed form order --
7   revised proposed form of order under certification of counsel.
8   We'll also do so with respect to the final DIP order.  The
9   actual order itself, I understand wont' need to be changed, but
10  the budget that's attached to the order may need to be
11  adjusted, so we'll do that under certification of counsel as
12  well.
13         THE COURT:  Okay.
14         MS. KIM:  And with that, I believe Ms. Jones has one
15  last matter to deal with.
16         THE COURT:  Okay.  And with respect to those orders, I
17  will be out tomorrow.  I will be in Thursday.  I expect the
18  form of orders will be fine.  I would encourage Houlihan to
19  start contacting people immediately.  Please do not wait for
20  the order to be signed; let's go ahead and get that started.
21         MS. JONES:  Understood, Your Honor.  Your Honor, the
22  last item that was on the agenda was the Houlihan retention
23  application.  Your Honor may have heard reference earlier that
24  there was a business issue or two outstanding with that, as
25  well as a couple legal issues with the Office of the United

1   States Trustee.

2           THE COURT:  Um-hum.

3           MS. JONES:  Your Honor, I'm pleased to tell you that

4   those issues have been resolved.

5           THE COURT:  Wonderful.

6           MS. JONES:  We will need, though, to submit an order

7   under certification --

8           THE COURT:  That's fine.

9           MS. JONES:  -- of counsel with respect to that and I

10  probably won't say any more than that.  It'd probably be easier

11  for me to just leave it there.  But we do have a resolution

12  with the Trustee.  We took their language on two of the

13  matters, and on the third matter, we've agreed to agree with

14  him for now, but saving a right that Houlihan, in this case, if

15  later on they want to raise the issue and have Your Honor

16  decide, we'll come back to you, we'll talk about briefing, and

17  we'll do it.  And on the business issue, my understanding is

18  that language has to be scoped out in a form of order.

19          THE COURT:  That's fine.  I assume that I will sign

20  whatever order is agreed to.

21          MS. JONES:  Thank you, Your Honor.

22          Your Honor, the only last thing was with respect to

23  the HALO orders, I know --

24          THE COURT:  Yeah.

25          MS. JONES:  -- was going to take a look at those.  Mr.

1  Pacitti, I did promise him that if Your Honor was going to have

2  questions on those, that I would text him and give him a minute

3  to come back.

4         THE COURT:  I have, actually, tried to get that -- to

5  get this reviewed.  I haven't, so why don't I endeavor to take

6  a look at it?  And we will let you --

7         MS. JONES:  That's fine.

8         THE COURT:  If the only one that needs to be here are

9  you and Mr. Pacitti?

10        MS. JONES:  I think so, Your Honor.

11        THE COURT:  We'll let you know if we have any

12 questions, and if we do, why don't I say 2 o'clock, we'll take

13 that up?

14        MS. JONES:  That's great.

15        THE COURT:  Okay.

16        MS. JONES:  Thank you, Your Honor.  Appreciate that.

17        THE COURT:  Um-hum.

18        We're adjourned.

19        IN UNISON:  Thank you, Your Honor.

20     (Recess from 1:19 p.m. until 2:03 p.m.)

21        THE COURT:  Please be seated.

22        Okay.  Sorry to pull you back.

23        MS. JONES:  That's all right.

24        THE COURT:  I've signed the bid procedures order.  And

25 what I was just looking at for the sale order, I saw one

1    potential inconsistency:  paragraphs 15 and 16; it's on page
2    17.  And it talks about if there are any mechanic's liens, they
3    would attach to the sale proceeds in the same priority that
4    they currently enjoy.  But then the next paragraph says the
5    proceeds shall be used to pay the DIP lender.  This was a
6    relatively new DIP lender, and I know, at least with respect to
7    who we have earlier today, their UCC was filed five years in
8    advance.
9           MR. PACITTI:  Right.
10          THE COURT:  So I'll sign this, but just a recognition
11    that you really need to check on that and let the DIP lender
12    know that if, in fact, there's a mechanic's lien who took
13    prior --
14          MR. PACITTI:  Okay.
15          THE COURT:  -- that there needs to be a recognition.
16          MS. JONES:  That they stay in that
17          MS. KIM:  Well --
18          MS. JONES:  -- position?
19          THE COURT:  Right.
20          MS. KIM:  We'll definitely review it.  My
21    understanding, and I think I have confirmed this, is that there
22    are no mechanic's liens that relate to this business, so it
23    shouldn't be an issue, but we'll confirm that before the
24    proceeds are turned over to the DIP lender.
25          THE COURT:  Terrific.  The only other thing I was

1    looking at was the -- since there's obviously extensive

2    provisions with respect to contracts and this happened on such

3    a quick basis -- to make sure that notice, in fact, went out.

4    And it looked like there were only -- if I have the right

5    notice --

6              MS. KIM:  Yes.

7              THE COURT:  -- there's only six contracts?

8              MR. PACITTI:  Right.

9              MS. KIM:  Yes.  There were only six counterparties --

10             THE COURT:  Um-hum.

11             MS. KIM:  -- two potential assumption and assignment

12   contracts, and they all went out on October 1.

13             THE COURT:  Okay.  And the only ones you heard from

14   were Home Box Office?

15             MS. KIM:  Correct, yes.

16             THE COURT:  Okay.  Okay.  They're fairly sophisticated

17   parties, so I just wanted to confirm that.  That's what I saw

18   as well.  I trust --

19             MS. KIM:  And I --

20             THE COURT:  -- we won't have anybody coming back and

21   saying this happened too quickly for me.

22             MS. KIM:  I should mention we did receive a question

23   from another --

24             THE COURT:  That's good.

25             MS. KIM:  -- counterparty, just to clarify which

1  contracts were being assumed and assigned that were -- and so

2  we are hearing from them, so it does seem that the notices were

3  received and went to the right place.

4          THE COURT:  Good.  Okay.  That's great to hear.  Given

5  that, I will sign, and I am signing the sale order, and we will

6  get it docketed today.

7          IN UNISON:  Thank you very much, Your Honor.

8          MS. KIM:  Thank you.  I know that this was really

9  short notice, so I appreciate it.

10         THE COURT:  It was, but it seems to be documented, so

11 it's all good.  Thank you.

12         MR. PACITTI:  Thank you, Your Honor.

13         THE COURT:  Court adjourned.

14     (Whereupon these proceedings were concluded at 2:06 pm)

15

16

17

18

19

20

21

22

23

24

25

```
 1                       I N D E X
 2   WITNESS                EXAMINATION BY        PAGE
 3   Ryan Sandahl           Mr. Keller            42
 4   Ryan Sandahl           Mr. Stratton          49
 5   Ryan Sandahl           Mr. Keller            62
 6   Ryan Sandahl           Mr. Stratton          66
 7   James Jeffrey Hagan    Mr. Keller            69
 8   James Jeffrey Hagan    Mr. Fournier          78
 9   James Jeffrey Hagan    Mr. Keller            92
10   Christopher Wu         Mr. Stratton          95
11   Christopher Wu         Mr. Keller            114
12
13                       E X H I B I T S
14   COMMITTEE'S         DESCRIPTION              PAGE
15   1               Pre-petition process         57
16                   letter
17   2               Post-petition process        57
18                   letter
19   3               Budget reconciliation        57
20   DEBTORS'            DESCRIPTION              PAGE
21   A               Houlihan Lokey summary       48
22                   of contacted parties
23
24
25
```

1                          RULINGS

2                                      Page      Line

3    Tax motion granted.                9        16

4    Amended utilities motion granted.  10        6

5    Wages motion granted.              10        17

6    Rhino adequate protection motion   11        18

7    granted.

8    Rhino seal motion granted.         11        20

9    Consolidated creditor list motion  21        44

10   denied.

11   Proffer of Ryan Sandahl's testimony 28       11

12   accepted.

13   HALO bidding procedures and sale   31        20

14   motion granted.

15   Amended bidding and auction schedule 142     22

16   motion granted.

17   HALO sale motion granted.          148        5

18

19

20

21

22

23

24

25

1                  C E R T I F I C A T I O N

2

3    I, Shoshana Ben Yaakov, certify that the foregoing transcript

4    is a true and accurate record of the proceedings.

5

6

7    *[signature: Shoshana Ben Yaakov]*            October 18, 2016

8    _____        _____

9    SHOSHANA BEN YAAKOV                      DATE

10

11

12

13   eScribers, LLC

14   700 West 192nd Street, Suite #607

15   New York, NY 10040

16   (973)-406-2250

17   operations@escribers.net

18

19

20

21

22

23

24

25

**DELIVERY AGENT, INC., et al.**
**Case No. 16-12051 (LSS)**

October 11, 2016

## A

**ability (7)**
59:24;64:13,20;
73:1,4;118:3;122:6
**able (15)**
23:5;24:2;27:9;
41:8;76:17,18;90:8;
101:12;112:8,10;
120:20;121:3;
131:17;139:23;
140:7
**above (1)**
29:23
**absolute (4)**
92:9;104:1;
119:23;126:13
**Absolutely (7)**
47:14;65:23;
74:10;85:24;94:16;
123:1;124:23
**accelerate (1)**
77:8
**accelerated (3)**
97:24;103:6;105:9
**accept (3)**
55:18;93:18;142:3
**acceptable (4)**
135:23;137:21;
139:15;142:7
**accepted (7)**
28:11;31:3;55:21;
64:22;98:13;108:23;
119:14
**access (1)**
99:17
**accommodate (1)**
141:12
**accompanied (1)**
26:2
**accordingly (1)**
100:16
**account (1)**
59:16
**accounted (2)**
9:7;37:11
**accounting (3)**
69:17;73:3,6
**accrue (2)**
38:16,20
**accrued (3)**
37:7;38:20;39:2
**accrued-but-unpaid (1)**
38:9
**accurate (11)**
37:24;51:19;
52:20;53:2;54:13;
55:22;57:21;62:2;
65:6;68:16;87:12
**achieve (2)**
51:23;118:1
**acknowledgements (1)**

**26:25**
**acquire (1)**
129:1
**acquisition (1)**
105:15
**acquisitions (2)**
69:21;96:15
**across (2)**
72:15,24
**acting (1)**
96:22
**action (1)**
116:4
**actionable (1)**
44:15
**actions (1)**
33:18
**activated (1)**
48:6
**Active (15)**
45:20,25;46:1,8;
48:10;50:9;54:17;
55:9;62:17;76:3;
85:13,16;86:1,3,15
**actively (5)**
29:9,22;45:22;
62:20;65:2
**activities (1)**
43:18
**actual (4)**
17:13;18:17;
140:21;143:9
**actually (14)**
20:14;39:4;57:11;
59:13;65:7;73:7;
88:5;112:18;123:5;
132:2;136:25;
141:13;142:10;
145:4
**add (4)**
63:12;73:4;79:16;
100:18
**added (1)**
118:14
**addendum (1)**
36:4
**addition (6)**
16:11;25:2;77:4;
79:11;94:1;100:20
**additional (12)**
48:17;51:1;55:19,
20;80:1;98:24;
106:17;108:18;
112:7;115:22;
128:22;136:4
**additive (1)**
98:17
**address (11)**
13:4,9;14:19;15:1,
3,4,5,25;17:25;
20:23;127:13
**addressed (3)**
66:16;119:9;143:3

**addresses (10)**
9:15;13:2,5;16:21;
19:20;20:15,17,24;
107:15;123:24
**addressing (2)**
65:21;66:10
**adds (1)**
121:2
**adequacy (1)**
128:13
**adequate (18)**
10:5;33:23;40:6;
89:6,16,19;94:10;
110:25;128:25;
129:5;130:19;
131:15;132:14;
138:20;140:2,7,17;
141:5
**adjourned (3)**
27:6;145:18;
148:13
**adjust (1)**
127:20
**adjusted (1)**
143:11
**administration (1)**
72:23
**administrative (3)**
37:8;38:16;40:2
**admissibility (1)**
56:25
**admitted (1)**
47:25
**adoption (1)**
109:19
**advance (2)**
41:18;146:8
**advanced (3)**
34:21,22;83:5
**advertising (2)**
88:15;93:23
**advice (1)**
100:25
**advised (2)**
97:7;107:12
**advisor (3)**
38:2;113:25,25
**advisors (8)**
81:2;85:7;94:12,
13;95:22;96:23;
118:2;123:21
**advisory (2)**
96:1,2
**affecting (1)**
94:5
**affirmatively (1)**
46:15
**affording (1)**
112:8
**afternoon (2)**
124:14;130:23
**again (23)**
10:4;17:10;20:19;

**34:12;35:7;37:21;**
**40:15;47:3;55:8;**
**71:6;73:5,18;76:16;**
**79:8;80:20;117:12;**
**119:9;122:1;125:10;**
**131:9;136:23;137:4;**
**138:12**
**against (4)**
18:24;41:12;
119:21;120:16
**age (1)**
21:10
**agenda (6)**
8:5;7,24,24;11:11;
143:22
**agent (15)**
13:4,13,20,22;
15:17;43:8,20,22;
44:8;69:13,15;
73:16;114:25;
121:11;131:8
**aggressive (1)**
39:18
**ago (5)**
67:24;68:15;76:6,
21;97:1
**agree (7)**
35:20;75:11;97:2;
109:11;125:19;
128:3;144:13
**agreed (14)**
9:14;11:19;34:8,
19;37:9,15;53:4;
59:14;98:16;117:24;
126:2;128:2;144:13,
20
**agreeing (1)**
53:5
**agreement (34)**
14:18;21:18;
23:19;25:15;26:3,4,
6,24;27:16,17,21,23,
23;28:21,22;30:18;
36:6;38:24;40:3;
44:14;46:4,11;82:12,
19,22;92:3;99:10;
115:7;117:25;131:7,
9,11,11,12
**agreements (4)**
25:1,5;45:24;
100:24
**Ah (2)**
53:7;142:2
**a-half (1)**
136:12
**ahead (6)**
11:19;55:1;74:14;
102:15;105:6;
143:20
**aimed (1)**
105:19
**airplanes (1)**
140:16

**al (1)**
7:11
**alleged (1)**
18:8
**Alliance (2)**
33:25;125:3
**allocate (1)**
130:3
**allocated (2)**
103:16;130:3
**allow (3)**
28:24;125:5,6
**allows (1)**
103:13
**along (3)**
99:5,16;137:9
**Altegrity (3)**
18:1,8;20:13
**alternative (2)**
72:9;79:11
**alternatives (3)**
43:24;44:5;73:16
**Although (6)**
38:6;39:2;79:20;
106:2;129:24;135:1
**always (5)**
42:16;111:3;
112:4;115:22;
125:23
**America (1)**
42:19
**America's (1)**
24:11
**amount (22)**
38:1;52:20;61:8,
24;63:18;64:19,22;
65:14;67:1;73:22;
83:13;102:17;
103:14;104:1;126:3,
4;127:21;128:8;
130:2;132:18;
134:25;138:20
**amounts (13)**
34:23,24;35:15;
36:6;37:18;103:16;
126:5,8,11,12;127:2;
128:3;139:10
**analysis (1)**
18:22
**analytics (2)**
49:2;75:5
**analyzed (1)**
19:3
**and/or (3)**
36:14,21;77:17
**announced (2)**
26:19;27:15
**anticipated (2)**
9:13;38:16
**anticipating (1)**
94:7
**anxious (3)**
77:19,21;122:6

**anymore (1)**
50:1
**APA (9)**
26:8;27:1;36:13;
37:5,8,12,16,18;
125:9
**apologies (1)**
90:15
**apologize (4)**
56:18,20;98:8;
135:25
**apparent (1)**
44:1
**apparently (2)**
53:18;124:11
**appears (1)**
34:18
**applaud (1)**
134:5
**applicable (1)**
36:24
**application (2)**
22:1;143:23
**appreciate (19)**
21:13;29:8,17,20,
24;38:8;39:6;56:1,2;
106:19;107:13;
111:14;112:3,4,14;
113:19;125:15;
145:16;148:9
**appreciated (1)**
134:11
**appreciation (1)**
41:6
**approach (3)**
11:7;41:2;57:2
**appropriate (3)**
17:8;40:6;81:3
**appropriately (1)**
63:15
**approval (6)**
27:4;38:17;101:3,
8,9;111:16
**approve (4)**
11:20;31:20,25;
32:5
**approves (1)**
35:1
**approximately (10)**
61:1;69:10;71:17;
83:8;84:6,8;86:9;
96:20;97:12;127:17
**Arabic (1)**
95:3
**arc (1)**
115:25
**area (3)**
104:15,17;127:13
**arena (1)**
96:5
**argues (1)**
114:4
**argument (4)**

39:24;41:13;
117:11;124:21
**arguments (1)**
94:8
**arise (1)**
105:8
**arithmetic (1)**
112:21
**around (6)**
41:6;53:19;56:18;
59:7;130:13;136:17
**arrange (2)**
99:21,23
**ASHBY (2)**
6:6;11:11
**aside (1)**
73:22
**aspect (6)**
30:4;39:13;72:16;
120:8,9,9
**aspects (1)**
73:1
**assemble (1)**
99:18
**assertion (1)**
21:9
**assess (1)**
129:1
**assessing (1)**
129:16
**asset (18)**
23:19;25:15;26:3,
3,5,23;27:15,17;
28:21;30:17;38:23;
40:3;44:14;92:3;
99:18;101:12;
109:17;129:2
**assets (34)**
24:25;25:4;27:22,
24,25;30:6;33:21;
34:14;35:8,10;40:6,
12;45:15,22;60:17;
75:20;76:11;86:17;
89:6;90:7;91:9,22;
98:14;99:7;100:1;
104:12;106:18;
107:11;111:2;118:7;
119:13,16;130:1,9
**assigned (2)**
24:13;148:1
**assignment (1)**
147:11
**assisted (1)**
79:24
**assisting (2)**
96:7;128:21
**Associates (1)**
23:20;25:19
**assume (6)**
9:14;15:25;59:10,
20;68:13;144:19
**assumed (2)**
24:13;148:1

**assuming (2)**
127:21;136:15
**assumption (2)**
120:4;147:11
**assurance (7)**
10:5;131:15;
132:14;138:20;
140:2,8;141:5
**assure (2)**
117:19;134:1
**attach (1)**
146:3
**attached (3)**
11:12;34:6;143:10
**attack (1)**
18:11
**attempt (2)**
94:14;108:1
**attest (1)**
114:20
**attestation (1)**
119:12
**attitudes (1)**
116:1
**Attorneys (10)**
6:2,7,12,17,23;7:2,
6,11,16,21
**attract (1)**
75:22
**attrition (1)**
122:8
**auction (37)**
23:11,16,17;
25:17;26:15,16,19,
22;27:6,13,14;29:8,
17;30:4;32:2;36:12;
37:11;53:21;66:21;
67:4;113:22;116:3,
8;123:4,9;124:3;
126:15;128:18;
129:6,8;131:20;
135:12;139:18;
140:9,19,23;141:2
**auctions (1)**
116:2
**auction's (2)**
131:25;136:2
**Audio (1)**
138:9
**August (4)**
64:9;82:10,20;
106:13
**authority (3)**
10:1;19:10;137:8
**authorization (1)**
101:6
**authorized (2)**
34:3;36:25
**available (2)**
24:20;132:15
**avoid (2)**
20:9;21:11
**avoidance (1)**

33:18
**avoided (1)**
27:25
**aware (21)**
40:8;48:25;49:4,5;
65:13,17,18;66:4,9;
75:5,8;77:19;84:19;
85:20,25;86:3;
94:14;107:5;119:8;
120:2,2
**away (2)**
22:21;120:10

## B

**back (27)**
8:14;12:6;48:19;
51:2;54:14;55:8;
56:20;60:3;62:16;
67:16;78:13;98:7;
101:17;107:2;
110:21;111:15;
119:23;125:20;
128:20;130:7;132:1;
134:8;137:18;
144:16;145:3,22;
147:20
**backfill (1)**
73:20
**background (3)**
17:20;42:12;69:9
**backup (2)**
23:20;27:19
**backwards (1)**
135:6
**bad (1)**
110:10
**balance (3)**
54:23;107:15;
112:7;114:4;134:23
**balanced (1)**
113:22
**balancing (1)**
129:21
**BANICH (1)**
7:12
**bank (6)**
18:23;42:18;
59:16;70:9;107:21;
110:8
**banker (5)**
24:22;69:10;
85:21;99:8;102:8
**bankers (1)**
81:2;102:15
**banking (1)**
96:2,9;120:9
**Bankruptcy (15)**
9:21,24;13:11;
18:14;19:3;42:24;
43:10,11;76:22;
84:25;96:5;100:22;
120:15;122:2;

133:16
**banks (4)**
69:20;70:6,19,22
**bar (1)**
141:25
**Barclays (6)**
70:9;78:16;81:14;
107:16,21,21
**Barclay's (1)**
79:8
**barrier (1)**
121:2
**barriers (1)**
119:7
**Barring (1)**
82:25
**based (7)**
23:3;30:25;31:3;
32:1,3;64:21;103:18
**basically (1)**
52:13
**basis (18)**
16:23;17:10;
22:19;27:25;28:8;
31:22;47:1;48:14;
50:6,8;53:15;63:25;
64:11;99:12;118:21;
122:5,15;147:3
**BDA (17)**
23:21;25:19,19,22,
25;26:8,18;27:7,9,
10,12,16,19;40:10;
53:17,24;107:5
**BDA's (4)**
26:11,13,20;29:17
**beat (4)**
126:15,19,20,23
**became (5)**
44:1;64:2;87:4,4;
106:8
**become (5)**
104:4;120:18;
126:6;134:20;
136:19
**beforehand (1)**
112:19
**began (5)**
25:8;79:12;98:20;
104:19;119:3
**begin (3)**
56:12;82:18;98:4
**beginning (2)**
59:3;99:4
**begins (1)**
138:9
**Begrudgingly (1)**
141:11
**behalf (13)**
11:11;12:21;
22:14;29:6;30:12;
32:22;33:3;37:22;
73:13;77:14;78:13;
124:15;133:3

**DELIVERY AGENT, INC., et al.**
**Case No. 16-12051 (LSS)**                                                                 October 11, 2016

**behind (2)**
37:16;40:1
**believes (1)**
135:1
**below (2)**
64:22;119:10
**Ben (2)**
16:16;30:21
**beneficial (1)**
15:16
**beneficiaries (1)**
133:25
**benefit (3)**
35:15;78:3;118:6
**Bensussen (2)**
23:20;25:18
**Benvenutti (1)**
22:14
**best (7)**
27:22,24;74:3;
119:12,12;125:14;
136:12
**better (9)**
18:2;43:22;49:10,
13;75:12;103:15;
112:7;120:11;
125:23
**beyond (4)**
41:11;90:10,23;
122:12
**bid (122)**
8:15;23:2,9,9,14,
19,22;25:10,16,20,
22,24;26:10,11,13,
13,13,14,20,21,21;
27:16,18;29:22,23;
32:12;36:2,7,13,14;
40:12;48:6,25;49:3,
9;58:3;60:2,5,6,18,
21;61:8,15,24;63:18;
64:19,22;65:13,14;
66:4,6,12,17,18,23;
75:6;76:10,11;78:3;
89:23,25;98:5;99:4;
100:23;101:20;
102:5,19,23,24;
103:7,8,12,14;
104:19;106:10;
107:5;110:22;
111:16;113:18;
118:6;123:5,22,22;
126:3,5,5,8,9,11,14,
15,15,16,17,19,20,
22;127:2,14,17,21;
128:3,4,11;129:6,17,
24;130:2,3,4,8;
132:10,12;134:17,
20;136:17;137:24,
25;139:18,22;140:3;
145:24
**bidder (23)**
23:18,20;25:18;
27:19;61:4,8;62:5;

64:12;66:19;90:6,16,
19;98:9;101:11;
110:13;124:2;
125:21;126:7;128:7;
132:13;136:15;
138:19;141:3
**bidders (36)**
25:12;26:18;49:6;
60:4;63:22;64:14;
66:13;67:3;75:22;
76:8;82:2;89:5,10,
10,16,17,19,21;
90:17;101:24;
102:10;104:20;
105:1,10;113:8;
115:16;123:21;
124:3;128:10,20,22,
23;129:10;132:18;
136:4;141:5
**bidders' (1)**
140:3
**bidding (29)**
12:12;23:15;
25:11,15,16;26:2,9;
28:12;31:16,20;
32:9;36:3,12;39:15;
63:19;64:15;65:20;
67:12,13;68:6,6,7;
76:12;103:13;
110:16;112:10;
130:9;142:8;143:1
**bids (21)**
27:12,17;39:18;
48:6;49:1;58:1;
64:21,23;101:10;
104:23;119:14;
126:14;128:4,6;
135:12;136:6,8,20;
139:23,25;140:9
**big (2)**
43:1;72:10
**binding (4)**
44:14;99:6,22;
101:12
**bit (6)**
18:18;38:11;
52:14;102:3;106:25;
108:22
**Black (2)**
71:23;72:5
**blackline (2)**
32:18;33:11
**blanking (1)**
136:17
**BMO (5)**
70:9;78:16;79:8;
107:16,21
**board (3)**
85:7;101:1,8
**bonafides (2)**
115:3;123:8
**both (11)**
17:11;20:15;23:2,

4;33:22;36:2;40:15;
79:9;94:7,11;121:24
**bottom (3)**
13:8;41:10;49:24
**bought (1)**
55:6
**bound (1)**
52:6
**box (2)**
45:19;147:14
**boy (1)**
49:25
**BRADY (29)**
6:13;32:22;33:1,2,
2,17;34:3;35:14,23;
36:9,21;37:2,7;
38:10;124:14,15;
125:2;126:19,24;
127:1,5,10;133:10;
137:3,4,4,8,16;138:7
**Branded (3)**
6:17,23;25:13
**BRANZBURG (2)**
6:16,19
**breaches (1)**
17:14
**break (4)**
31:20;41:19;
94:24,25
**breakfasts (1)**
74:5
**breakup (1)**
61:25
**breath (1)**
130:15
**bridge (7)**
80:4,7,8,13;83:24,
25;125:4
**brief (2)**
12:4;117:13
**briefing (1)**
144:16
**briefly (2)**
17:25;69:8
**bring (4)**
32:2;35:23,25,25
**broad (1)**
20:21
**broadest (1)**
70:20
**broadly (2)**
118:8;123:18
**broken (1)**
51:8
**broker-dealer (1)**
42:17
**brought (2)**
85:7;113:20
**Brunson (1)**
18:16
**BTIG (2)**
70:10;79:19
**budget (20)**

9:7,9;34:6,6,8;
35:11;37:14,25,25;
38:14,21;39:3,15;
40:2,24,24;56:23;
57:8;127:18;143:10
**budgeted (1)**
39:8
**burden (2)**
16:18;19:24
**busiest (4)**
72:17;77:5,5;
120:24
**business (82)**
15:2,20,22;16:6,8;
20:24;22:2,16,17,17,
18,22,22;23:6,7;
24:24;25:4,13;
26:12;27:21;31:17;
47:12,19;48:22;49:2,
3;51:4,18,20,23;
52:16;53:13;54:19,
23;56:7,10;63:16,17;
64:20;65:3,3,8,15;
66:5;69:18,19;72:10,
25;73:2,8,10;75:11,
18,19;88:8,12,18;
91:16,18;93:23;
103:17;105:14,20;
107:4,22;115:19;
119:11;121:12;
122:3,16;124:17;
125:9,10,10;131:22;
134:14;136:12;
140:1;141:14;
143:24;144:17;
146:22
**businesses (13)**
18:11;51:3,5,16;
52:11;53:11;55:5,7;
65:3,10;75:5;99:3;
118:25
**business-to-business (1)**
22:19
**busy (1)**
105:10
**buy (5)**
55:4;62:6;101:6,
12;121:10
**buyer (20)**
54:8;85:23,23;
91:9;93:6,6;97:23;
99:24;100:14,21;
105:20;106:9;116:1,
3;121:10;122:22;
131:16;133:7,10,11
**buyers (31)**
59:8;66:17;71:11,
12;75:13;76:2;
78:25;79:21;85:17,
25;86:2,2,3,5,7,18;
87:8;94:9,15;
105:14;106:4,17,18;
109:13;110:4,4,5,5;

112:11;120:24;
132:13
**buyers' (1)**
44:4
**buying (5)**
38:25;54:18;
79:23;98:14;101:6

## C

**CA (1)**
46:3
**calendar (6)**
8:14;10:18;12:7;
22:6;35:24;71:16
**calendar's (1)**
67:16
**California (4)**
22:18;135:18,21;
136:2
**call (15)**
43:2;58:6,9;68:22;
70:9;88:16;95:10;
108:12;110:5;111:3;
126:8;137:5,11,13,
16
**called (5)**
24:22;49:1;70:10;
104:23;131:8
**calls (1)**
57:23
**came (7)**
16:4,23;29:11;
82:3;119:10;120:14;
125:4
**can (68)**
8:13;9:9;10:14;
11:3,3,16;12:11;
15:3,4;19:7;34:8;
35:24;39:9;40:23;
41:23;43:3;44:19;
46:5;53:18;55:15;
57:15,16,23;59:5;
63:2;64:25;66:6;
69:15;72:25;75:16;
79:5;84:24;88:5,9;
91:7;93:20;94:25;
97:15;98:6;99:3;
100:16;102:3;103:4;
104:11;106:19;
107:9;108:25;
114:20;122:17;
123:4;125:19,20;
126:6,11;127:3;
128:22;130:7,7,10;
132:10;133:10;
135:9;136:9,13,17,
24;137:1;138:4
**cancelling (1)**
73:11
**capability (2)**
70:20,22
**capable (1)**

Case 01-01139-AMC    Doc 32784-1    Filed 11/01/16    Page 157 of 178
DELIVERY AGENT, INC., et al.
Case No. 16-12051 (LSS)

October 11, 2016

131:18
**capacities (1)**
  97:5
**capacity (12)**
  16:6;69:11,12,14;
  70:6;72:20;73:1,4,5,
  19,20;97:4
**Capital (15)**
  6:12;23:5;42:19;
  43:25;79:2,5,24;
  80:9;83:22;84:19;
  94:1;107:17,20;
  109:8,16
**card (1)**
  141:25
**care (1)**
  18:24
**career (1)**
  43:4
**Carl (16)**
  38:2;55:17;58:7;
  61:6;90:24;95:22,23,
  25;96:8,10;101:23;
  107:23,24;108:1,17;
  128:20
**carried (3)**
  16:17;19:24;84:4
**carrying (1)**
  15:19
**carryover (1)**
  34:11
**CAs (1)**
  46:2
**case (46)**
  13:10,11,21,21;
  14:6,6,23;17:19,19,
  23;18:1,2,3,14,15,16,
  17;19:2,3,3,12,16;
  20:14,16,20;21:3;
  33:13;40:4;56:6;
  83:11;85:12;96:22;
  101:13;102:23;
  111:12;115:9;
  119:22;124:19,23;
  125:24;129:18,22,
  23;130:18;140:1;
  144:14
**cases (17)**
  14:18,19,20,24;
  15:8,9;16:20;17:7,
  12,25;43:5;71:10;
  97:5,13,14,15;
  111:10
**cash (13)**
  37:5;38:25,25,25;
  39:3,4;69:22,23;
  70:2;120:14;124:25;
  125:3;126:11
**categories (2)**
  69:16;71:6
**categorize (1)**
  91:11
**category (1)**

109:1
**cause (2)**
  9:22;21:5
**caused (1)**
  122:2
**cede (1)**
  29:4
**CEO (5)**
  71:11;85:6,8,9;
  87:22
**certain (4)**
  9:20;24:5;27:11;
  58:2
**certainly (34)**
  21:13;29:12;30:4;
  47:6;48:8,12;64:2;
  73:6,10;74:3,13;
  88:19;100:16,17,25;
  105:23;106:5,6,19;
  107:13,19;109:11;
  111:3,15,22;112:3,
  14;123:10;130:15;
  132:16;133:11;
  137:21;139:13,23
**certainty (3)**
  77:6,9,15
**certificate (1)**
  32:19
**certificates (3)**
  8:10,11,23
**certification (5)**
  28:14;142:9;
  143:7,11;144:7
**cetera (2)**
  44:6;69:20
**CFO (4)**
  69:11,14,15;70:6
**challenge (6)**
  34:25;35:2,19,23,
  25;127:3
**challenged (1)**
  127:6
**challenges (1)**
  126:10
**challenging (1)**
  94:4
**change (12)**
  28:18;30:15;
  33:14;63:2;81:2,2,6;
  103:25;116:2;
  127:23,24;135:3
**changed (5)**
  60:21;66:18;
  106:14;134:17;
  143:9
**changes (7)**
  10:6;32:23;37:3;
  92:6,10;111:14;
  112:10
**changing (1)**
  53:4
**Channel (1)**
  130:25

**Chapter (4)**
  97:5,13,14;112:15
**characterization (2)**
  93:10,18
**characterize (1)**
  85:17
**charged (1)**
  18:19
**chart (9)**
  47:5;49:24;50:5;
  51:3;54:14;55:9;
  86:10,10,11
**chased (1)**
  123:3
**check (2)**
  124:7;146:11
**Chicago (1)**
  43:1
**chilling (1)**
  63:19
**choose (1)**
  120:13
**chooses (1)**
  35:25
**Chris (1)**
  95:10
**Christmas (4)**
  92:8,10;122:7,14
**CHRISTOPHER (2)**
  7:7;95:16
**Chubb (7)**
  6:2;24:15;30:12;
  133:3,7;140:5;143:1
**Chubb's (2)**
  24:17;31:13
**circulated (1)**
  31:1
**circumstance (1)**
  123:3
**circumstances (5)**
  29:16;105:8;
  124:18;134:17;
  136:10
**cite (4)**
  17:25;18:16,20;
  19:2
**cited (1)**
  17:24
**claim (4)**
  33:18;34:1,13;
  36:15
**claims (5)**
  33:19,23;34:12;
  38:20;82:24
**clarification (3)**
  35:4;93:15;138:14
**clarifications (1)**
  35:20
**clarified (1)**
  55:4
**clarify (6)**
  44:12;52:3,17,20,
  21;147:25

**clarifying (1)**
  35:3
**clarity (1)**
  142:12
**Clean (19)**
  12:10;22:16,16,21,
  22;23:6,6;24:24;
  25:4,12;27:21;
  31:17;51:2,13,14;
  52:16;53:13;134:21;
  142:11
**cleaned (1)**
  8:12
**clear (7)**
  35:9;52:3;68:3;
  102:14;116:11;
  124:25;135:2
**clearly (5)**
  118:21,23;126:21;
  132:5;141:10
**CLERK (8)**
  42:1,5;57:2;68:25;
  69:3;95:14,17;138:9
**client (6)**
  73:2;77:11,11,18;
  134:5;137:5
**clients (4)**
  73:12;77:17,19;
  121:22
**close (9)**
  27:9;75:13;112:2,
  8;134:14,24;135:10;
  140:1;141:14
**closed (2)**
  96:20,21
**closely (1)**
  111:12
**closes (2)**
  38:22;75:12
**closing (11)**
  27:2,11,23;39:1,9,
  24;112:1;121:9;
  125:12;130:11;
  135:4
**CNO (1)**
  10:10
**coast (1)**
  139:21
**cobble (1)**
  82:12
**Code (3)**
  9:21,24;80:17
**co-head (1)**
  96:9
**coined (1)**
  72:5
**collateral (2)**
  35:6;36:19
**colleague (1)**
  58:24
**colloquial (1)**
  80:6
**color (2)**

51:1;63:13
**column (6)**
  46:2,7,14,17;50:9;
  54:18
**columns (1)**
  62:17
**combination (3)**
  55:12;85:6;88:14
**combined (1)**
  23:3
**coming (12)**
  10:2,4;14:16;30:2;
  40:3,10;79:22;
  120:6;121:3;123:6,
  11;147:20
**commences (1)**
  75:23
**comment (2)**
  63:25;130:11
**commentary (1)**
  138:15
**comments (6)**
  24:1,3;31:2;33:3;
  131:10;143:4
**commerce (1)**
  115:3
**commercial (5)**
  14:17;15:1,2;18:6;
  33:18
**commitment (2)**
  99:6;101:12
**committee (58)**
  8:18;26:12,17,20;
  29:6,7,13,15;31:22;
  32:16;33:4,13;34:9;
  35:16,16,21,24;36:6;
  37:17,22;38:1,13;
  39:21,25;40:5;47:15,
  16;49:22;55:18;
  58:6;60:22;67:10;
  78:13;90:17;96:23;
  97:19;101:3,8;
  108:13,13;109:21;
  110:9;112:12;118:4;
  119:8,18,24;123:2,
  11;126:9,10;127:3;
  128:2,12;132:15;
  134:4;139:7;140:13
**committees (4)**
  13:21;41:10;97:9,
  20
**committee's (12)**
  31:23,24;35:2;
  38:2;57:5,7,9,14;
  75:8;125:15;130:17;
  133:18
**common (1)**
  32:9
**communicate (1)**
  63:8
**communicated (6)**
  64:5,18;77:20,21;
  78:1;85:13

Case 01-01139-AMC    Doc 32784-1    Filed 11/01/16    Page 158 of 178

DELIVERY AGENT, INC., et al.
Case No. 16-12051 (LSS)

October 11, 2016

**communicating (1)**
71:12
**communications (1)**
85:2
**community (1)**
120:5
**comp (1)**
9:12
**Companies (14)**
6:2;24:16;30:12;
42:22;94:3;96:7;
99:14;102:6;106:23;
107:12,13;113:20;
133:3;143:1
**company (53)**
53:17;55:15;
59:25;62:6;69:11,12,
23;70:12;72:24;
79:3,10;80:10,19;
82:23;83:5,15;
84:19;85:3,10,11,14;
87:25;93:17;94:6;
96:4;99:21,21;
100:1;105:8,17;
106:1,5,9,19;107:5,
16,25;109:6,10,13,
16;112:1;113:23;
116:12,15;120:25;
121:2,11,25;125:4,7,
13;129:19
**company's (8)**
59:15,16,23;
79:21;93:25;94:10;
109:2;118:3
**compelling (1)**
119:22
**competitors (5)**
55:24;109:3,3;
110:1;121:1
**complain (1)**
53:25
**complained (3)**
54:5;101:19,19
**complaining (1)**
120:3
**complete (2)**
89:20;90:8
**completed (1)**
100:13
**completely (1)**
84:23
**complex (1)**
117:19
**compliance (3)**
9:20,25;10:1
**comply (1)**
122:10
**compress (1)**
100:16
**comprised (1)**
34:20
**compromise (1)**
118:4

**compulsion (1)**
29:13
**CONAWAY (1)**
6:11
**conceding (1)**
11:1
**concept (2)**
20:19;35:7
**concepts (1)**
20:21
**concern (15)**
27:25;30:4;38:23;
40:5;66:4,9,11,14;
112:4;122:19;125:5;
130:16;136:13,14;
140:14
**concerned (5)**
39:1;65:14;84:10;
120:23;130:6
**concerns (19)**
66:13;77:7,16;
88:21,22;98:7;112:5,
6;113:14,16,21;
114:1,24;129:11,14,
15;130:17;136:18;
137:14
**concluded (3)**
27:10;79:13;
148:14
**concludes (1)**
117:6
**conclusion (2)**
19:23;141:2
**conclusions (1)**
91:8
**concrete (1)**
19:13
**concurred (1)**
109:7
**condition (2)**
26:24;141:13
**conditions (2)**
27:2,11
**conduct (7)**
25:1,6;89:7,11,12,
16;90:10
**conducting (2)**
84:18;89:17
**confer (1)**
125:19
**conference (2)**
58:6;108:12
**confess (1)**
56:5
**confidence (1)**
135:9
**confidential (2)**
18:6;46:6
**confidentiality (5)**
25:1,5;45:24;46:4,
11
**confined (1)**
119:13

**confirm (6)**
37:13,17;88:5;
114:24;146:23;
147:17
**confirmation (2)**
9:9;33:25
**confirmed (4)**
26:6,22;35:15;
146:21
**confirming (1)**
24:17
**confirms (1)**
24:12
**conform (1)**
26:8
**conforms (2)**
24:8;31:5
**confusion (1)**
125:25
**connection (6)**
24:24;25:16;34:5;
35:14,19;36:19
**consent (9)**
35:21;66:22;67:2;
126:13,16;133:7,9,
10;137:8
**consented (2)**
36:23;66:24
**consenting (1)**
67:5
**consequences (1)**
10:5
**consider (4)**
107:6,7;120:7;
139:25
**consideration (1)**
117:17
**consistent (4)**
98:21;104:14;
127:12;128:12
**consistently (3)**
43:14;119:4,6
**consolidated (2)**
12:1,25
**constituents (1)**
42:23
**constituted (1)**
17:21
**constitutes (1)**
27:22
**constraints (1)**
100:15
**consult (1)**
138:2
**consultation (3)**
26:11,19;123:1
**consulted (1)**
29:9
**Consulting (1)**
97:17
**consumers (1)**
73:11
**contact (9)**

22:21;55:19;59:8,
10,12;63:22;64:13;
76:1;101:25
**contacted (19)**
24:23;45:15,18;
46:7,20,23,25;47:3,
3;48:1;50:7,10,12;
55:11,13;62:17;
98:13,18;119:21
**contacting (6)**
25:7;56:14;57:19;
98:20;105:1;143:19
**contained (5)**
24:7;26:23,25;
99:19;100:1
**contemplated (1)**
19:19
**contemplates (2)**
92:3;127:19
**contested (3)**
12:1;126:8;135:10
**context (4)**
18:21;83:2;
102:22;131:3
**contingency (1)**
26:23
**contingent (1)**
9:4
**continue (7)**
48:16;59:24;
70:21;77:8;79:17;
90:10;122:10
**continued (9)**
25:9;44:25;45:2;
48:9,12;64:8,9,17;
118:19
**continuing (1)**
89:21
**continuous (1)**
64:10
**contract (2)**
53:13,15
**contractor (1)**
26:25
**contracts (5)**
24:13;147:2,7,12;
148:1
**contributed (1)**
93:25
**controls (1)**
9:5
**convene (1)**
101:2
**conversation (1)**
108:16
**conversations (2)**
63:7;64:17
**convert (1)**
13:21
**convertible (3)**
80:3,13;84:3
**cooperate (1)**
41:8

**cooperatively (1)**
33:7
**coordinate (1)**
13:19
**copies (5)**
9:1;57:2,10,16;
60:10
**copy (7)**
10:15;11:16;
40:24;45:6,7,7;87:1
**copyright (2)**
100:8;116:17
**core (1)**
122:15
**corporate (6)**
13:3;14:19;15:3,4;
16:7;101:5
**cost (2)**
120:21,21
**Costa (1)**
22:17
**counsel (17)**
8:11;11:9;20:7;
28:15;31:1;32:19;
35:17;58:7;100:21,
23,23;135:21;142:9,
16;143:7,11;144:9
**counsel's (1)**
31:4
**countercontract (3)**
132:8;136:14,23
**counterpart (1)**
72:5
**counterparties (3)**
140:3;141:4;147:9
**counterparty (1)**
147:25
**counting (1)**
61:21
**couple (13)**
14:9;20:5;22:1,3;
49:24;92:16;108:11;
110:1;137:17;138:2;
139:6;142:10;
143:25
**course (4)**
47:19;99:13;
110:17;141:13
**COURT (240)**
8:2,4,17,21,22,25;
9:2,16;10:12,16,21,
24;11:2,5,8,14,17;
12:3,8,14,16,19,24;
14:5,21;15:7,18;
16:9,12,16;18:5,12,
17,21;19:4,5,11;
20:3,6,10,20;21:2,
12,23;22:7,12,25;
23:1;27:3,5;28:3,5,
11,25;29:3,12,24;
30:2,8,20,24;31:8,
10,18;32:20,21,25;
33:16;34:2,10;35:1,

13,22;36:8,20;37:1,
6;38:11,18;39:11,23;
40:1,13,17,21,23;
41:3,15,21,23;42:24;
43:3;45:8;47:23,25;
49:16;52:23;57:3,
23;58:17;59:24;
61:10;65:25;67:9,18,
20;68:9,18,23;69:8;
78:6;79:5;86:14,25;
89:9,22,22,25;90:4;
91:7;92:14;94:20;
95:2,5,9,12;97:15;
98:6;99:3;102:3;
103:4;104:11;
107:13;108:25;
111:9;114:8,11,15;
116:25;117:4,6,9,11,
14,16,19;121:5,14,
16,18;122:4;124:8,
13;125:1,20;126:18,
22,25;127:4,9,11,15,
18,24,25;128:5,9;
129:19,21;130:21;
131:5,14,21;132:3,7,
23,25;133:6,13,15,
23;134:1,7,10;
135:16,20,22,23,24;
136:1;137:7,12,19,
21;138:4,10;139:1,7,
9,12,15;140:12,20,
23,25;141:8,17;
142:2,5,14,17,22;
143:13,16;144:2,5,8,
19,24;145:4,8,11,15,
17,21,24;146:10,15,
19,25;147:7,10,13,
16,20,24;148:4,10,
13,13
**courtroom (5)**
24:20;28:4;41:7;
45:6;57:1
**Court's (6)**
8:6;11:24;12:2;
32:10;35:24;137:9
**covenants (1)**
122:9
**cover (1)**
101:18
**covered (4)**
76:4;104:7;
109:10;124:11
**create (5)**
21:5;72:7,8,25;
105:23
**created (3)**
47:5;75:17;77:13
**creation (1)**
71:7
**credentials (1)**
118:11
**credible (3)**
79:10;134:12,13

**credit (29)**
36:2,7,14;60:18,
21;61:8,15,24;63:18;
64:12,19,22;65:14;
66:4,12,23;76:11;
102:5;103:7,8;
123:5;126:3,4,5,8,9;
99:17,19
**creditor (9)**
12:1;13:16;14:8,8;
15:2,3,8,20;16:21
**creditors (5)**
13:18;16:25;
19:20;42:23;115:24
**creditors' (17)**
26:12,17;29:6,7,
13;33:13;35:16,16,
21;39:25;40:5;
41:12;90:17;96:23;
119:18;123:11;
128:2
**criminal (1)**
18:24
**crisis (2)**
59:18;120:14
**critical (3)**
78:2;115:16;
128:13
**criticisms (2)**
118:9;119:1
**CROSS (4)**
7:5;49:17;78:7;
114:9
**cross- (1)**
28:5
**cross-examination (4)**
41:18;49:18;78:8;
114:16
**cross-examine (1)**
28:4
**crunch (2)**
106:20;136:19
**cure (6)**
136:21,22,24;
137:2;138:20;
139:10
**current (5)**
17:1,3,11;21:20;
50:6
**currently (5)**
38:24;86:1;90:6;
94:12;146:4
**customer (1)**
121:23
**customers (2)**
73:14;121:24
**Cyber (9)**
71:25;72:3,4,8;
88:13,19;92:6,10;
112:2

**D**

**daily (1)**
122:5
**damage (1)**
14:3
**data (7)**
17:14;18:10;
45:24;65:7;71:9;
99:17,19
**date (24)**
23:8;43:12;45:3;
48:2,9,10;49:7;57:5,
7,9;58:2;59:2;64:13;
90:1;110:24;120:5,
19;121:4,6;122:13,
17;134:3;137:1;
140:10
**dates (4)**
39:20;58:5;135:3;
138:14
**Dave (2)**
62:12;88:7
**David (5)**
29:6;37:22;49:20;
78:10;140:13
**DAVIS (2)**
10:13;12:20
**day (12)**
8:6;21:10;23:12;
68:14;72:6;77:2;
99:12;105:15;
110:18;129:8;
131:22;139:18
**days (24)**
23:8;39:19;67:24;
68:11,15;71:22;
72:10;90:21;91:1,5;
99:13;108:11;
110:21,24;112:22;
113:1;118:12,14;
123:25;124:1;136:4,
12,12;137:10
**deadline (34)**
23:9;25:20,22,24;
39:18;41:12,19;48:7,
25;49:3,9;75:6;78:3;
89:10,22,22,25;
104:19;113:18;
118:3,6,15;119:23;
125:12;129:17;
138:16,22,25;139:2,
2,5,12,19,22
**deadlines (1)**
121:9
**deal (10)**
20:14;33:11;40:2;
74:23;122:18;
123:14;124:4,5;
127:5;143:15
**dealing (2)**
121:15;125:21
**deals (4)**
34:11;43:3;96:20,
21

**dealt (3)**
18:6;142:12,23
**debenture (1)**
34:21
**debentures (1)**
80:2
**DEBORDE (1)**
7:17
**debt (7)**
40:4;44:23;70:4;
79:12;84:3;92:20;
119:11
**debtor (19)**
15:22;16:1,3;
29:14;31:3;32:15;
38:14;39:2;97:15;
110:8;114:20;
120:13;126:16;
128:14;129:22;
132:16;133:17,21;
135:1
**debtor-in-possession (5)**
8:15;32:8,11,16;
117:24
**debtors (59)**
9:21;12:21;16:17;
17:13,18,24;18:8,16,
20;19:12,24;21:11;
22:14,24;23:2,14;
24:7;25:21,22;26:11,
15,17,19,24;27:8,10,
15,18,20;29:8;32:4;
34:8;36:22;38:20;
39:17;41:11;43:2;
44:8;56:24;68:22;
69:22;78:3;97:7,23;
99:7;108:17;111:12;
112:3;115:19,20;
118:5,7,23;123:13;
124:18;125:24;
128:2;134:24;
142:19
**debtors' (26)**
17:2;24:22;25:3;
47:22;48:2;51:4;
55:24;56:7,10;59:9;
62:16;64:25;71:13;
72:14;103:2;104:8,
12;107:2;111:2,4;
116:9;121:21;
124:17;125:8;
130:15;135:21
**debts (1)**
36:14
**December (9)**
71:17,23;74:8;
75:12,22;79:13,13,
13;83:2
**December's (1)**
71:21
**deception (1)**
18:20
**decide (4)**

**dealt (3)** → column 5:

81:3;135:5;136:3;
144:16
**decided (7)**
20:16;26:12;
27:12;62:21;101:24,
25;102:6
**deciding (1)**
20:24
**decision (4)**
102:14;115:7;
123:4;134:6
**deck (1)**
72:17
**declaration (3)**
17:16;18:9;32:3
**declining (1)**
27:25
**decrease (1)**
134:19
**deemed (1)**
26:20
**default (3)**
83:11,11;126:4
**defenses (1)**
127:6
**deferred (2)**
109:19;115:9
**deficiencies (1)**
26:14
**deficiency (1)**
36:15
**defined (2)**
28:22;58:21
**definitely (1)**
146:20
**definition (1)**
33:20
**definitional (2)**
28:20;30:15
**degradation (2)**
73:10;122:3
**degrading (1)**
75:19
**degree (2)**
38:7;70:4
**degrees (1)**
106:24
**Delaware (1)**
97:17
**delay (1)**
136:22
**deletion (1)**
24:4
**deliver (1)**
26:24
**Delivery (9)**
43:8,20,22;69:13,
15;73:16;114:25;
121:11;131:8
**demand (1)**
74:23
**demanded (1)**
124:22

DELIVERY AGENT, INC., et al.
Case No. 16-12051 (LSS)

October 11, 2016

**demands (3)**
74:11,15;121:20
**DEMMY (18)**
7:3;130:22,23,23;
131:6,15,22;132:4,
24;133:4;136:11;
141:8,9,9,19,21,23;
142:3
**demonstrated (1)**
9:22
**demonstrates (1)**
118:7
**deny (2)**
21:4,17
**dependent (2)**
88:13,14
**depending (2)**
67:25;100:14
**deposit (1)**
25:23
**describe (5)**
44:25;69:8,15;
71:5;72:5
**described (1)**
72:13
**designed (3)**
103:1;104:12;
105:23
**desk (1)**
32:20
**detail (1)**
118:24
**determine (1)**
27:8
**determined (4)**
26:20;27:18,20;
29:16
**determining (2)**
18:23;107:10
**Deutsch (2)**
23:20;25:18
**develop (1)**
60:3
**developed (1)**
54:8
**devices (1)**
116:22
**different (9)**
15:1,5;63:17;65:4,
9;81:13;116:1;
119:11;131:13
**differently (3)**
17:4;59:23;106:14
**differs (1)**
17:19
**difficult (1)**
38:4
**difficulties (1)**
111:23
**difficulty (1)**
100:17
**diligence (24)**
25:2,6;26:22;

40:11;71:10;74:16;
84:18;89:7,11,13,16,
17,20,20;90:7,9,10,
20;91:1,5;121:2;
128:25;129:5;
130:10
**diminution (2)**
35:5,5
**DIP (40)**
9:4,4,7,9;10:4;
12:11;23:7;26:17;
32:17;33:9,17,22;
34:6,6,9,14,23;
37:13,16,19,24,25;
38:5,14;39:15,15;
40:16;91:10;103:16;
111:13;125:9;
127:18,19,20,22;
143:8;146:5,6,11,24
**dire (1)**
121:25
**direct (7)**
8:19;41:17;42:7;
69:4;79:3;95:19;
102:25
**directed (1)**
65:10
**directly (1)**
94:10
**director (2)**
24:21;42:14
**directors' (1)**
101:8
**disagreement (1)**
117:25
**disappointed (1)**
54:2
**disappointing (4)**
82:1;106:12;
112:24;118:17
**discernible (1)**
118:6
**disclose (4)**
13:9;60:16,19,19
**disclosing (1)**
14:3
**disclosure (1)**
21:5
**discontinue (1)**
93:24
**discontinued (1)**
93:24
**discount (3)**
83:7,13;129:11
**discounts (1)**
72:7
**discourage (1)**
117:16
**discouraged (2)**
63:22;76:9
**Discovery (8)**
7:2;130:24,25;
131:6,7;140:5;

141:10;142:24
**discuss (1)**
112:18
**discussed (5)**
22:2;52:24;64:23;
76:9;131:2
**discussing (1)**
139:20
**discussion (4)**
20:25;61:6;65:19;
101:18
**discussions (8)**
27:8;41:10;45:25;
53:14,24;55:15;
64:21;70:21
**dismiss (3)**
13:21;129:12;
130:16
**dismissed (1)**
130:17
**dispute (2)**
32:13;119:19
**disputed (1)**
127:2
**disruptive (1)**
120:18
**dissuade (1)**
76:11
**distinguishable (2)**
15:11;18:15
**distinguished (1)**
14:23
**distinguishes (2)**
14:6,7
**distinguishment (1)**
14:11
**distraction (1)**
75:18
**distress (1)**
96:7
**distressed (8)**
42:23;43:2;70:23;
96:4,6;107:22;
108:4;118:11
**distributed (2)**
60:5,7
**divided (1)**
65:7
**division (1)**
87:7
**docket (1)**
15:10
**docketed (1)**
148:6
**document (3)**
45:10;68:10;
123:19
**documented (1)**
148:10
**documents (2)**
47:16,18
**dollars (26)**
35:12,12;37:17;

40:3,4;51:18,24;
52:12;61:9,15;62:7;
66:19,21;83:5,9,9,
14,21;93:4;103:9,20,
24;112:13;119:13;
129:2;134:21
**DOMENIC (1)**
6:18
**done (14)**
41:18;43:4;48:5;
63:14;92:20;94:10;
99:11;100:17;
101:14;106:14;
107:8;122:18;134:5;
135:4
**doubt (1)**
124:21
**Dow (1)**
20:15
**down (14)**
13:1;40:2;41:7;
51:8;55:8;61:9;
68:19;79:22;94:4,
21;104:3;111:25;
117:4;136:25
**draft (2)**
23:25;24:5
**drafted (1)**
38:24
**draw (4)**
91:7;112:10;
127:18,22
**drawing (1)**
111:15
**drinking (1)**
120:1
**driving (3)**
52:4;88:22;124:22
**dual-track (1)**
107:18
**DUANE (3)**
6:1;30:12;133:2
**due (9)**
71:9;74:16;77:12;
84:18;101:10;
110:17;128:25;
135:11,12
**during (18)**
25:8;27:7;31:19;
43:18;44:7;53:24;
54:9;59:15;64:8;
69:22;70:5;71:20;
74:11;79:1;105:18;
120:24;134:16;
136:19
**duties (2)**
69:15;79:2
**duty (1)**
18:23

**E**

**e- (1)**

115:2
**earlier (6)**
21:25;63:4;
136:17,25;143:23;
146:7
**early (11)**
67:23;75:12,13,
22;79:7,13;80:1,4;
82:20;104:20,20
**earnest (1)**
45:2
**easier (3)**
68:9;135:6;144:10
**Eastern (1)**
58:22
**echo (2)**
33:3;41:5;124:15
**e-commerce (11)**
49:2;51:8;54:20;
65:9;72:5,9;75:4;
121:11;128:4,24;
131:9
**economic (2)**
28:2;133:19
**effe (1)**
53:15
**effect (2)**
73:23;131:7
**effectively (1)**
42:21
**efficiently (1)**
74:24
**effort (3)**
53:21;74:1;107:11
**efforts (4)**
29:20;32:2;48:21;
118:4
**eight (4)**
44:10;67:3;83:5;
118:20
**eight-and-a-half (1)**
27:7
**eighteen-nine (1)**
61:25
**either (8)**
13:17;23:7;36:14;
45:24;99:21;101:7;
108:25;130:18
**electronic (1)**
99:17
**elements (1)**
104:13
**eleven (1)**
42:15
**ELLIS (1)**
6:22
**else (8)**
14:1;30:9;31:10;
87:23;88:11;104:6;
133:1;134:1
**email (2)**
58:24;140:4
**embedded (1)**

Case 01-01139-AMC    Doc 32784-1    Filed 11/01/16    Page 161 of 178
DELIVERY AGENT, INC., et al.
Case No. 16-12051 (LSS)

October 11, 2016

116:21

**emerge (1)**
116:1

**emerged (2)**
25:12,18

**emergency (2)**
34:22;125:4

**empire (1)**
96:13

**employed (3)**
95:21;120:25,25

**employee (6)**
16:21;20:9,14,17;
77:2,3

**employees (22)**
13:2,14,19;14:2,7,
25;15:3;16:25;17:1,
3,5,11;19:20;20:12;
21:20;73:8;77:9;
87:25;91:25;122:5,
8;134:16

**encourage (2)**
64:23;143:18

**encouraging (2)**
65:20;110:12

**end (9)**
12:6;22:6;24:1;
82:11;91:22;93:24;
99:14;118:1;128:1

**endeavor (1)**
145:5

**ending (2)**
56:24;71:18

**endorse (1)**
21:16

**Energy (2)**
97:18,20

**engaged (11)**
27:8;33:4;43:18;
62:20;78:16;79:6,8,
19;90:7;105:25;
109:10

**engagement (5)**
52:4,21;53:6;64:1;
76:2

**enjoy (1)**
146:4

**enough (4)**
14:12;91:7;113:1;
122:24

**enquire (1)**
62:24

**ensure (1)**
129:4

**ensures (2)**
128:20;130:7

**enter (1)**
31:16

**entered (2)**
8:22;28:9

**Entertainment (2)**
6:7;40:15

**entire (6)**

51:20,23;55:6;
66:5;105:20;119:23

**entirety (1)**
82:23

**entities (1)**
59:14

**entity (3)**
16:7,8;99:5

**entrants (2)**
112:9,9

**entry (4)**
30:7;31:7,25;
40:18

**environment (1)**
13:25

**equal (3)**
105:7;114:3;128:8

**equity (4)**
70:2,3;79:21;
105:24

**equityholder (1)**
15:14

**equityholders (5)**
15:15;80:11,12,15,
18

**especially (3)**
13:24;105:13;
113:20

**ESQ (11)**
6:3,8,13,18,19,24;
7:3,7,12,17,22

**essentially (2)**
10:25;82:23

**established (1)**
112:23

**establishes (1)**
61:14

**estate (4)**
112:13,14;133:22;
134:25

**estates (2)**
49:10;103:2

**estate's (2)**
41:12;141:24

**et (3)**
7:11;44:6;69:20

**e-tailer (1)**
72:12

**evaluate (6)**
99:18;100:23,24;
132:10,17;136:20

**evaluating (1)**
106:1

**evaluation (3)**
63:25;99:25;
100:12

**even (12)**
21:11;59:18;
66:25;74:22;76:2;
94:24;102:7;105:22;
106:7;117:22,23;
123:10

**evening (2)**

26:4;31:2

**Eventually (1)**
27:10

**everybody (2)**
74:9;107:4

**everyone (5)**
57:1;64:24;72:7,
17;77:24

**everyone's (2)**
72:19,19

**evidence (13)**
21:7;47:22;48:2;
57:4,6,8;117:10;
118:7;119:2,9,12,15;
140:2

**evidentiary (1)**
117:6

**evolution (1)**
14:12

**exactly (5)**
39:19;50:22;
58:20;61:14;90:14

**EXAMINATION (5)**
42:7;62:14;69:4;
92:17;95:19

**examine (1)**
28:6

**example (3)**
64:16;65:8;88:9

**examples (1)**
97:15

**exceeded (1)**
44:23

**exception (1)**
106:9

**excess (1)**
123:5

**exchange (1)**
82:23

**excitement (1)**
72:8

**exclude (1)**
35:8

**excluded (5)**
33:20;34:13;35:8,
9,10

**excluding (2)**
33:15;34:12

**exclusion (1)**
33:22

**exclusively (1)**
105:19

**Excuse (3)**
52:9;86:10;101:25

**excused (1)**
40:20

**execute (1)**
99:11

**executed (2)**
10:25;46:2

**execution (1)**
121:22

**executive (1)**

101:9

**executives (1)**
87:25

**exerting (1)**
48:21

**exhibit (19)**
11:12;36:4;47:22;
48:2;56:21,22,23;
57:5,7,9,12,13,14;
60:8;10;62:16;
64:25;67:9;118:22

**exhibits (4)**
52:10;56:19,21;
57:19

**Exi (1)**
80:13

**exigencies (1)**
23:3

**exist (2)**
15:24;17:20

**Existing (10)**
80:12,15;91:19,23,
25;100:24;107:20;
138:24;139:2,2

**exit (1)**
80:18

**expect (5)**
9:6;29:10;74:2;
101:11;143:17

**expectation (3)**
64:21;80:16;89:9

**expectations (6)**
51:22;52:2,6;
63:18,25;65:20

**expected (1)**
56:10

**expedited (1)**
99:12

**expense (1)**
61:25

**expenses (9)**
35:17;37:8,14;
38:10,16,19;39:2,8;
40:2

**experience (10)**
85:21;88:3;93:20;
102:4;103:18,25;
105:10;106:23;
111:4;115:14

**experiencing (1)**
74:20

**expert (1)**
100:23

**expertise (3)**
73:4;115:20,21

**experts (1)**
85:7

**expired (1)**
25:22

**explain (13)**
42:21;45:5,12,20;
47:5;48:5;57:23;
71:15,20;74:14;

75:16;93:2,20

**explained (1)**
113:16

**explanatory (1)**
46:18

**explicit (1)**
103:15

**explored (1)**
118:3

**expose (1)**
14:1

**exposed (1)**
123:18

**exposure (1)**
70:18

**express (1)**
54:10

**extend (2)**
118:3;129:16

**extended (7)**
10:19;32:15;49:9,
12;75:9;78:3;118:8

**extending (1)**
118:6

**extends (4)**
89:9,22,22,25

**extension (6)**
9:22;39:22;80:4;
83:24,24;123:6

**extensive (4)**
38:4;41:9;118:11;
147:1

**extent (2)**
9:19;44:15;109:21

**external (1)**
69:19

**externally (2)**
69:19;71:10

**extra (5)**
9:1;40:24;74:11,
14,23

**extraordinarily (2)**
29:12;101:15

**extraordinary (1)**
121:20;123:3

**extreme (3)**
91:3;100:17;
106:20

**extremely (1)**
110:12

## F

**fabulously (1)**
122:22

**facilitate (1)**
130:8

**facility (1)**
34:14

**fact (20)**
10:11;20:10;
22:23;31:24;39:9;
41:7;62:21;63:22;

**DELIVERY AGENT, INC., et al.**
Case No. 16-12051 (LSS)                                                    October 11, 2016

64:5;65:1;80:1;92:3;
102:6;103:14;
119:10,24;120:7;
134:21;146:12;
147:3
**factor (2)**
76:14;94:5
**factored (1)**
114:1
**Factoring (1)**
112:6
**factors (3)**
18:13;76:9;93:22
**facts (3)**
116:1;118:10;
125:21
**failed (2)**
128:16,18
**failure (1)**
112:25
**Fair (6)**
56:8,8;74:7;81:25;
85:1;91:7
**fairly (8)**
14:14;15:23;36:4;
44:2,21;72:21;
76:19;147:16
**faith (2)**
25:23;37:10
**fallen (1)**
93:17
**falls (1)**
121:7
**familiar (1)**
71:25
**far (4)**
10:1;84:10;89:19;
110:11
**fashion (1)**
73:18
**fast (1)**
29:19
**fast-forward (1)**
80:24
**favorable (1)**
28:2
**features (1)**
111:14
**February (1)**
83:24
**fee (4)**
35:14;52:7;53:6;
61:25
**feed (1)**
76:17
**feedback (4)**
76:17,18,19;106:7
**feel (1)**
41:11
**fees (2)**
9:12;38:1
**felt (2)**
70:20;131:24

**few (7)**
17:25;31:2;97:21;
122:21;124:15;
138:13;142:11
**fewer (2)**
74:5,5
**fiduciary (1)**
133:21
**Field (1)**
97:18
**fifteen (13)**
55:21,24;61:1;
67:1;98:12,16;
108:23;115:5,10,15;
119:19;127:22;
134:8
**fifteen-nine (2)**
126:6,22
**fifth (1)**
62:17
**file (6)**
11:20;13:6,17;
24:2;48:14;130:25
**filed (25)**
8:10;11:16;16:11;
17:16;22:24;23:12,
23;24:10;25:9;
28:13,18;29:24;
30:22;31:1;32:3;
33:11;40:15;46:21,
24;47:2;48:15;
119:5;131:24;133:3;
146:7
**files (3)**
59:25;60:2;129:22
**filing (12)**
21:12;44:18;45:3;
48:9;55:11,13;
64:14;67:12;84:25;
85:12;110:25;
120:15
**final (8)**
32:17;33:12;34:7,
17,19,23;36:16;
143:8
**finalized (1)**
61:5
**finally (3)**
37:13;94:7;125:25
**finance (6)**
69:17;72:23;73:3,
6;97:20;120:21
**financed (1)**
69:25
**financial (24)**
38:2;42:14,16,18,
20;81:2;85:22,25;
86:2,3,5,17;87:8;
91:8,11,13;94:9,11;
96:2,22;99:9,15;
101:1;110:4
**financially (1)**
42:23

**financials (1)**
71:7
**financier (1)**
32:16
**financing (11)**
23:7;32:8,11;33:9;
44:6;69:21;79:9,11;
117:24;122:9,18
**find (10)**
19:8;20:18;21:5;
39:3;40:7;48:21;
101:22;118:4;
128:14;134:23
**finding (4)**
19:4,7;40:9;
105:20
**fine (7)**
22:7;95:6;139:1;
143:18;144:8,19;
145:7
**finished (2)**
67:22;89:15
**firehose (1)**
120:1
**firm (6)**
10:19;70:10;96:1;
108:1;118:11;
130:14
**firms (1)**
109:8
**first (32)**
8:11;14:9,10;20:7;
25:13;33:14;35:25;
44:1;45:19;51:17;
56:14,15;57:19;
59:15;60:6,16;63:5;
73:6;74:20;97:11;
99:16;101:23;
102:14;105:1;108:9,
16;109:16;110:10,
13;118:5,18;125:2
**first-day (6)**
16:24;17:7,15;
18:9,9;32:3
**fiscal (1)**
71:16
**FISHMAN (1)**
7:10
**Fitzsimmons (2)**
85:9;87:22
**five (4)**
61:19,21;69:11;
146:7
**five- (1)**
94:24
**flex (2)**
72:25;73:18
**flexibility (1)**
107:1
**flight (1)**
139:22
**flow (2)**
69:22;70:1

**flux (1)**
12:5
**focus (8)**
42:25;96:2,4,6,6;
102:15,16;106:17
**focused (9)**
33:5;82:11;
107:17,17,18,19;
109:13,25;111:17
**focusing (1)**
105:4
**folks (3)**
56:1;58:1;73:25
**follow (2)**
39:20;101:16
**followed (2)**
23:14;104:22
**following (6)**
12:22;60:5;67:15;
99:19;108:17;131:9
**footnote (1)**
60:19
**forced (1)**
93:24
**forcing (1)**
120:23
**form (14)**
11:3;21:22;28:12,
17,19;31:1;32:17,18;
34:7;142:8;143:6,7,
18;144:18
**formal (1)**
23:23
**formed (1)**
33:5
**former (9)**
13:2,14,18;14:2,7,
25;16:25;17:5,11
**formerly (1)**
130:24
**forms (1)**
42:25
**forth (4)**
9:19,20;36:3,5
**forthcoming (3)**
114:21;122:25;
123:21
**forty (3)**
71:18;97:14;
116:22
**forty-five (2)**
110:24;112:25
**forty-six (1)**
118:14
**forty-two (1)**
112:21
**forward (8)**
17:9;29:9,14;
46:13;77:16;119:20;
120:6;121:3
**fought (1)**
38:7
**found (5)**

**17:15;19:5;**
122:11;134:12,12
**founder (2)**
85:10,11
**four (13)**
49:9;51:3;56:6;
61:19;75:9;76:25;
83:9;99:13;100:14;
103:24;111:21;
121:6;136:6
**Fournier (27)**
29:2,5,6;37:4,20,
21,22;39:12;47:24;
62:13;78:9,11;
86:23;87:1;92:13;
93:13,16;94:7;
127:11,12,16;128:6,
10;140:11,12,13,13
**Fourteen (1)**
95:24
**fourth (4)**
62:17;71:19,20;
120:16
**four-week (1)**
39:21
**frame (1)**
103:5
**Francisco (1)**
43:21
**FRANK (1)**
7:17
**frankly (3)**
48:13;63:1;129:12
**fraud (1)**
18:23
**freedom (1)**
106:24
**Friday (13)**
23:10,25;30:23;
31:2;53:17;58:23;
59:3;71:23;72:6;
107:5;140:1;141:6,
14
**front (3)**
85:18;86:11;
127:18
**fulfilled (1)**
123:7
**fulfillment (1)**
121:23
**full (15)**
13:23;34:1;42:1;
67:13;68:6,7,25;
73:5;95:14;118:20;
127:18,22;130:2
**fully (4)**
8:11;56:6,10;
131:10
**fulsome (4)**
76:16;117:16;
121:3;123:25
**fumble (1)**
56:17

Case 01-01139-AMC    Doc 32784-1    Filed 11/01/16    Page 163 of 178

DELIVERY AGENT, INC., et al.
Case No. 16-12051 (LSS)

October 11, 2016

**Fun (18)**
12:10;22:16,16,21,
22;23:6,6;24:24;
25:4,12;27:21;
31:17;51:2,13,14;
52:16;53:13;134:21

**functionally (1)**
130:19

**functions (2)**
69:20;72:16

**funded (2)**
9:12,13

**funding (1)**
9:15

**further (16)**
27:12,17,18;
49:15;62:11;65:24;
67:7;68:18;78:5;
92:13;94:17,19;
114:7;116:23;
117:10;124:11

**future (2)**
17:12;109:20

## G

**gain (1)**
101:3

**game (2)**
29:19;110:21

**gave (7)**
15:25;33:20;
109:1;115:5;131:22,
23;138:14

**geared (1)**
99:15

**GEDDES (2)**
6:6;11:11

**general (4)**
17:20;21:9;69:16;
71:6

**generalization (1)**
120:10

**generalizing (1)**
53:12

**generally (2)**
30:5;43:17

**generate (1)**
48:16

**generated (2)**
74:18,19

**generic (1)**
17:21

**generous (1)**
114:23

**German (1)**
53:18

**gets (4)**
109:21;126:24,25;
127:1

**given (18)**
15:4;21:14,15;
31:2,23;44:2;55:19;

70:18;87:15,16;
99:22;103:5;105:11;
115:14;118:22;
125:16;132:19;
148:4

**gives (3)**
19:18;136:4,5

**giving (1)**
13:12

**GLANTZ (1)**
7:10

**globally (1)**
63:21

**goal (1)**
13:11

**goes (6)**
36:9;60:3,4;
110:11;128:20;
139:10

**going- (1)**
27:24

**Good (29)**
8:3,4;9:22;11:10;
12:18;16:15;20:20;
22:13;25:23;29:5;
30:11,21;33:2;35:9;
37:9;42:9,10;49:23;
69:6,7;78:10,12;
110:10;116:19;
124:14;130:23;
147:24;148:4,11

**good-faith (1)**
117:25

**goods (4)**
16:6;73:13;77:14;
88:16

**grand (1)**
120:10

**granted (2)**
14:14;23:1

**Great (8)**
47:18;71:13;
74:23;84:25;107:8;
139:16;145:14;
148:4

**greater (2)**
74:22;109:22

**Green (1)**
97:18

**Greg (2)**
11:10;40:14

**GREGORY (2)**
6:8,24

**ground (1)**
137:23

**Group (7)**
7:11,16;42:15,16;
76:1;96:9,15

**grudgingly (1)**
142:3

**guess (9)**
46:17;68:10;72:4;
73:17;87:12;94:4;

107:5;123:14;
133:20

**guided (2)**
125:8,10

## H

**hacking (1)**
13:25;17:15

**Hackman (10)**
16:14,15,16;
18:13;20:4;30:20,21,
21,25;31:9

**Hagan (7)**
68:22,23;69:2,6;
78:10;92:19;110:25;
113:13;120:17;
123:17

**H-A-G-A-N (1)**
69:2

**Hagan's (5)**
98:8;112:17;
120:22;122:1;
134:12

**half (2)**
71:22,24

**half-a-dozen (1)**
87:18

**HALO (17)**
6:17,23;9:14,14;
12:10;22:9;23:17;
25:13;26:18,22;27:4,
21;30:10;31:3;
52:15;53:13;144:23

**HALO's (3)**
25:15;27:15,17

**Hamilton (1)**
49:21

**hand (9)**
10:15;11:3,5,16;
28:19,23,24;57:16;
121:23

**handful (1)**
109:8

**handling (1)**
22:11

**hands (1)**
72:17

**happen (8)**
14:12;72:19;
93:21;111:8;123:13;
125:17,17,22

**happened (7)**
20:10;59:21;
64:14;107:6,7;147:2,
21

**happens (1)**
125:19

**happy (2)**
63:20;86:21

**hard (5)**
33:6;38:6;72:19;
88:18;133:24

**harder (1)**
74:4

**HARRISON (1)**
6:16

**HARVEY (1)**
6:16

**head (2)**
87:9;88:8

**hear (7)**
28:7;113:14,19;
124:20,21;140:4;
148:4

**heard (18)**
23:3;30:9;52:13;
71:25;76:6;98:8;
101:22;111:22;
112:17;113:19;
123:16,16;125:23;
131:4;132:7;142:15;
143:23;147:13

**hearing (13)**
12:23;13:16;
16:24;23:3;45:4;
61:10;117:9;131:20;
132:1,10;135:7;
140:10;148:2

**held (4)**
23:11,16;35:15;
140:9

**help (5)**
59:22,23;70:11;
98:6;137:25

**helped (1)**
45:5

**helpful (1)**
59:20

**hereby (5)**
24:9;48:1;57:4,6,8

**herein (1)**
9:19

**Here's (1)**
41:1

**hey (1)**
16:1

**high (2)**
38:7;63:18

**high- (1)**
13:24

**high-class (1)**
124:5

**highest (3)**
27:22;44:19;72:15

**highly (1)**
75:24

**Hillair (32)**
6:12;26:17;32:15,
22;33:3;36:13;
38:24;44:24;64:12;
66:22;67:4;82:13,
19;83:2;91:8,10,18;
117:21,22;122:11;
123:5,7;124:15,22,
24,24;125:3;126:13;

128:2;129:24;
133:20;137:5

**Hillair's (3)**
39:5;125:8;130:11

**hire (1)**
35:18

**hired (5)**
51:17;55:17;
96:25;108:9;112:19

**historical (1)**
79:21

**hit (1)**
64:5

**hm (1)**
99:2

**hold (2)**
23:17;60:12

**holders (1)**
15:16

**holding (1)**
130:15

**holiday (4)**
64:6;71:24;77:10;
134:16

**holidays (3)**
77:6;92:8,10

**Holley (1)**
97:17

**home (7)**
13:2,5,9;15:5;
20:23;74:6;147:14

**Honor (150)**
8:3;11:10,23;
12:18,22;13:6,8,12,
15,24;14:9,11,20,25;
15:6,13,24;16:7,10,
15;17:6;18:1,1;
19:23;20:1,5,13,14,
17,19,25;21:1,21,21,
24,25;22:6,9,13;
28:24;29:5,7,11;
30:1,11,21;31:9,15,
15;32:6,7;33:2,10,
15,24;34:5,11,16,25;
35:4,11,19;36:2,5,
10,16,25;37:2,13,21,
23,24;38:3,9;39:12,
17,20,24;40:14,19,
22;41:5;47:21,24;
49:15;50:3;52:9;
56:18,18;59:5,6;
62:11;67:8;86:23;
92:16;93:12;94:23;
95:6,10;116:24;
117:3,10;123:1,6,12;
124:12,14,21;
125:16,20,25;
128:11,16,19;
129:12,18,22;
130:14,23;132:21;
133:2;135:14;137:4,
5,15,20;138:7,13,14,
17;139:16,17,24;

140:11,14;141:9;
142:7;143:21,21,23;
144:3,15,21,22;
145:1,10,16,19;
148:7,12
**honored (1)**
21:19
**Honor's (2)**
18:3;41:19
**hope (1)**
110:15
**hoped (1)**
82:8
**Hopefully (6)**
8:6;48:16;114:20;
141:15,16,17
**hoping (2)**
51:22;137:10
**horse (11)**
23:18,19;25:14;
29:23;64:12,14;
82:12,18;111:9;
136:17;138:19
**host (1)**
38:19
**Houlihan (74)**
12:5,6;22:1;24:21,
23;25:3;41:20,22;
42:14,15;43:7,8,18;
44:7;48:1,5,19,20;
51:17;55:16;60:2;
62:19,23;65:1,12,12,
21;66:3;70:16,17,19,
20;71:1,8,11;76:18;
81:7,10,13,14,17;
85:2,12;86:14;
87:24;89:4;90:24;
94:12;98:12,16,18;
102:7;104:19;
107:23,24;108:1,7,9,
13;110:17;112:19;
115:6,20,21;118:10,
18;119:15;120:3;
126:2;128:20,21;
143:18,22;144:14
**Houlihan's (5)**
76:2,3;86:10;
105:22;106:5
**hour (1)**
25:24
**hours (5)**
27:7;74:1;135:9;
141:1,2
**huge (1)**
40:4
**hundred (1)**
96:21
**hurt (1)**
134:3
**hypothetical (1)**
99:5
**hypotheticals (2)**
125:16,22

## I

**idea (1)**
108:25
**ideally (1)**
75:1
**identification (1)**
132:9
**identified (13)**
17:13,18;19:12;
20:8;48:12;89:19;
90:17,24;91:4;
100:20;102:5;109:4,
8
**identify (4)**
17:20;56:16;60:3;
128:22
**identity (18)**
16:19;17:14,18,
21;18:7,18,19,25,25;
19:5,6,14,15,25;
21:6,8,10,13
**illusion (1)**
120:20;133:17
**imagine (1)**
38:18
**immediately (3)**
33:4;73:21;143:19
**impact (3)**
88:19;94:2,2
**implication (1)**
93:16
**implications (2)**
73:8;121:25
**implicit (1)**
103:14
**implied (1)**
94:3
**importance (1)**
134:19
**important (7)**
38:12;125:14;
127:24;131:4,6,16;
132:7
**impression (1)**
97:11
**inadequate (4)**
63:9;113:12;
120:7;128:15
**inadvertent (1)**
26:7
**Inc (9)**
6:17,23;7:2,21;
24:11;25:13;130:24,
25;131:8
**incentive (3)**
52:4,7;53:6
**inclined (1)**
47:15
**include (3)**
35:17;38:1;43:24
**included (3)**

25:4;55:24;109:2
**includes (1)**
35:16
**including (4)**
38:19;51:2;71:23;
83:11
**inconsistencies (3)**
26:5,6,7
**inconsistency (2)**
28:20;146:1
**inconsistent (1)**
130:12
**incorporates (1)**
38:15
**increase (2)**
37:25;126:11
**increased (2)**
35:12;75:17
**incredibly (1)**
117:18
**indeed (2)**
13:20;15:2
**independent (2)**
26:25;133:21
**indicate (1)**
50:5
**indicated (12)**
33:8;34:7;36:10;
44:20;45:16;46:12;
49:6;64:1,3;65:11;
76:20;129:4
**indicates (2)**
17:17;36:21
**indicating (1)**
9:4
**indication (5)**
45:17;59:1;63:1;
64:6;81:22
**indications (16)**
44:8,10,12,15,20,
22;58:21;64:8;
85:13,16;105:3;
118:17,19,20;
119:10;128:16
**indiscernible (1)**
139:5
**individual (8)**
14:7;15:7,16,20;
16:25;18:24;19:20;
20:23
**individually (3)**
9:10;35:18;80:23
**individuals (1)**
16:19
**industry (6)**
56:1,2,4;57:22;
96:18;120:22
**influence (1)**
74:25
**informal (3)**
23:23;24:15;143:4
**information (36)**
13:10,13;14:4,15,

18,25;15:10,19;
17:22;18:7;19:6,16,
18,21;20:9;21:5,12;
25:3;46:6;58:2;65:5;
71:8,8,9;74:18,21;
99:19;108:2;132:14,
19;136:16,21,23,24;
141:4,13
**informational (2)**
33:24;74:16
**initial (6)**
43:23;81:15;
103:7,8;104:23;
126:5
**initially (1)**
29:23
**initials (1)**
53:17
**initiate (1)**
99:25
**initiated (1)**
98:25
**injuries (1)**
16:19
**injury (2)**
20:1,11
**innuendo (1)**
63:11
**inordinate (1)**
102:17
**in-person (1)**
99:23
**inquired (1)**
65:6
**inquiring (1)**
65:2
**insiders (1)**
80:3
**insights (1)**
102:11
**insignificant (1)**
136:14
**insist (1)**
113:17
**insistent (1)**
97:23
**instance (4)**
18:18;20:8;73:19;
102:14
**instances (3)**
17:13,17;79:9
**instantly (1)**
73:4
**instead (1)**
28:21
**instructions (1)**
25:20
**instructs (1)**
13:10
**instrument (1)**
84:3
**insufficient (1)**
106:22

18,25;15:10,19;
17:22;18:7;19:6,16,
18,21;20:9;21:5,12;
25:3;46:6;58:2;65:5;
71:8,8,9;74:18,21;
99:19;108:2;132:14,
19;136:16,21,23,24;
141:4,13
**insurance (6)**
24:16,17;31:12,13,
13;133:8
**integrate (1)**
121:12
**intellectual (4)**
59:9,11;99:25;
100:10
**intend (1)**
123:1
**intent (2)**
36:13;44:13
**intention (1)**
39:5
**interactive (1)**
88:15
**interest (27)**
35:6;44:9,11,13,
20;46:13;48:17;
54:10;58:22;59:1;
64:6,8;65:11;81:23;
85:14;89:6;91:23;
103:25,25;105:3;
111:15;118:17,19,
21;119:10,16;128:16
**interested (17)**
25:7;40:9;45:16;
46:5,16;48:13;54:18,
20;58:25;62:6;65:2,
8;67:14;98:14;99:2;
102:16;129:9
**interesting (2)**
52:13;115:21
**interests (3)**
41:13
**Interim (3)**
9:11;16:23;34:3
**interlineation (1)**
30:15
**internal (2)**
47:10;69:16
**internally (1)**
98:22
**interrupt (2)**
100:3;135:14
**intervention (1)**
14:22
**into (33)**
10:10;18:21;28:9;
30:14;32:2,13;
33:13;39:14;44:3,4;
47:22;48:2;57:4,6,8;
77:9;79:6,23;89:11,
17,21;98:10;106:13;
110:21;120:14,15,
19;121:12;122:14;
125:14;127:21,25;
133:4
**introduce (4)**
11:25;32:22;
41:21;57:18
**introduced (2)**
118:23;119:20

**DELIVERY AGENT, INC., et al.**
**Case No. 16-12051 (LSS)**

October 11, 2016

**introducing (1)**
22:10
**introduction (1)**
33:12
**intrusion (1)**
18:10
**invest (2)**
88:4;109:16
**invested (1)**
109:16
**investigation (1)**
35:11
**investigator (1)**
18:23
**investment (14)**
24:22;44:5;69:10;
70:6,18,22;85:21;
96:2,9;99:8;101:2,8;
107:17;120:9
**investor (1)**
91:13
**investors (4)**
69:19;71:12;
99:15;107:20
**invite (1)**
63:20
**involved (11)**
18:17;29:7;47:7;
56:3;87:4,5;97:12,
16,18;118:12;128:21
**involvement (2)**
29:24;31:23
**involving (1)**
37:7
**IOIs (4)**
58:21,23;105:2;
112:20
**IOI's (1)**
106:12
**IP (4)**
109:25;110:5;
116:9,13
**IP- (1)**
109:12
**IPO (6)**
78:18;79:20,21;
80:7,8;107:18
**irrelevant (1)**
107:25
**issue (48)**
8:16;12:1,15,22;
13:1;14:16;16:1,23;
17:10,12;19:10;
20:18;32:9,10,12;
33:8;36:18;37:4,9,
10;38:12;39:7,11,22;
41:7,9,9;76:20;
81:20;83:7;124:4;
127:14,25;131:1,2,3,
3;132:7;136:19;
137:10,13;138:1,20;
141:6;143:24;
144:15,17;146:23

**issued (1)**
116:14
**issues (20)**
12:12;22:2,3,5;
30:1;32:14,24;33:5,
7,9;38:6,10;63:22;
102:5;106:11;
111:23;131:15;
138:20;143:25;
144:4
**item (3)**
10:22;65:19;
143:22
**items (1)**
8:12
**IVAN (1)**
7:22

**J**

**James (1)**
69:2
**Jane (1)**
22:10,14;138:12
**Jeff (1)**
68:22
**Jeffrey (1)**
69:2
**Jersey (1)**
18:17
**jiggering (1)**
137:16
**job (1)**
94:10
**Joe (2)**
16:5,7
**Joe's (1)**
16:5
**JOHN (3)**
7:3;130:23;141:9
**joined (1)**
69:12
**joining (1)**
69:13
**jointly (1)**
128:3
**Jones (37)**
11:25;12:17,18,19,
20,20,21,25;14:9;
15:13,19;16:10,13;
18:6;20:5,7,15;
21:21,24;22:8;
28:16;50:2;138:5;
143:14,21;144:3,6,9,
21,25;145:7,10,14,
16,23;146:16,18
**JPMorgan (2)**
96:12,13
**judgement (2)**
114:4;124:17
**judgment (2)**
26:12;111:3;
113:23;125:9,10

**judicial (1)**
59:5
**July (15)**
58:23;59:3;64:6,9;
82:6,8;84:1,7;
104:23;105:3;
106:13;112:20;
118:18;119:14;
128:15
**jump (1)**
59:7
**June (12)**
56:15;57:20;58:5,
10;84:14,15;104:21,
22;105:1,2;112:20;
119:4

**K**

**KALLICK (1)**
7:22
**keep (11)**
8:6;14:15;16:2;
47:7;73:9;77:4;80:9;
94:14;114:13;125:4;
127:12
**KELLER (64)**
8:3,5,18;9:8;10:9,
14,18,22,25;11:7,15,
23;12:4,9,15,17;
21:25;22:9,14,15;
32:7,21;40:25;41:2,
5,16;42:8;47:21;
48:3;49:15;50:8;
62:15;65:24;68:21;
69:5;78:5;92:16,18;
93:15;94:19;114:10,
13,17;116:23;117:1,
15,17,19;122:5;
124:9,16;125:17;
133:16,24;137:15,
20,22;138:6
**Keller's (1)**
33:3
**kept (2)**
14:13;118:4
**key (3)**
105:13;115:17;
122:8
**kids (1)**
74:6
**Kim (40)**
22:10,12,13,14;
23:1;27:4;28:8,12,
17;29:1,4;30:13;
31:11;32:6;138:11,
12,12;139:4,8,11,14,
16;140:22,24;141:1;
142:7,15,18,23;
143:14;146:17,20;
147:6,9,11,15,19,22,
25;148:8

**kind (4)**
72:17;73:19;74:6;
80:8
**KIRKLAND (1)**
6:22
**KLEHR (1)**
6:16
**knew (1)**
63:3
**knowledge (1)**
61:6
**known (1)**
130:24
**knows (3)**
18:2;100:14;107:4

**L**

**lack (5)**
23:5;31:24;
103:24;120:3,6
**laid (1)**
124:18
**language (8)**
22:4;24:12,17;
30:13;35:3;128:1;
144:12,18
**large (4)**
76:1;77:12;94:2,2
**largely (9)**
23:24;32:11;38:1;
70:2;76:4;78:18;
82:11,14;92:1
**larger (1)**
73:17
**last (36)**
8:19;10:13,14,22;
12:23;13:16;24:2;
32:19;33:11;40:10;
41:9;42:2,3;46:17;
58:7;66:3;67:15,17,
18;69:1;70:5;74:7;
88:7;95:15;96:14;
98:21;114:21;
122:20;123:1;
127:13;128:11;
138:2,13;143:15,22;
144:22
**Lastly (1)**
19:2
**late (11)**
23:25;29:19;54:4,
13;73:11;74:8;
75:12,21;82:20;
84:14;140:25
**later (14)**
26:4;58:22;68:12;
81:20;98:11;108:11;
112:20;115:25;
121:4,7;126:10;
140:1,6;144:15
**latest (1)**
122:17

**latter (1)**
79:6
**laughs (1)**
50:2
**Laura (1)**
12:20
**law (2)**
13:10;36:24
**lays (2)**
126:21;129:22
**lead (2)**
21:12,15
**leading (2)**
18:14;71:23
**learn (3)**
102:1;110:13,15
**learning (1)**
53:25
**lease (2)**
36:23;131:13
**leased (1)**
36:22
**leases (1)**
36:21
**least (9)**
57:1;82:11;91:18;
114:6;116:4;128:7;
132:19;141:15;
146:6
**leave (7)**
8:14,14;37:16;
110:20,23;136:21;
144:11
**leaves (1)**
90:20
**led (1)**
44:23
**LEE (2)**
7:1;130:24
**left (6)**
39:4;40:1;58:25;
63:11;112:13;
142:18
**legal (1)**
143:25
**legitimate (2)**
17:10;129:15
**lender (13)**
26:18;34:9;59:16;
60:23;83:3;91:10;
111:13;117:23;
125:2;146:5,6,11,24
**lenders (1)**
97:19
**lent (1)**
15:21
**less (11)**
64:7;66:7,12,22;
67:24;103:14,24;
120:11;126:16;
129:2;132:2
**lesser (1)**
70:4

Case 01-01139-AMC   Doc 32784-1   Filed 11/01/16   Page 166 of 178

DELIVERY AGENT, INC., et al.
Case No. 16-12051 (LSS)

October 11, 2016

**lessor (1)**
36:24
**letter (39)**
25:25;26:1,5,8;
44:13;50:24;52:5,
21;53:6;56:22,22;
57:4,6,23,24;58:1,4,
14;59:2;60:4,6,14,
15;64:1,4;67:10;
68:4;5;81:20;103:13,
19,22;104:13,16,22;
105:2;106:12;
110:17;112:20
**letters (1)**
104:14
**level (5)**
29:23;101:1,9;
119:16;122:17
**levels (1)**
103:7
**license (1)**
131:11
**Licensing (4)**
7:2;130:24;140:5;
141:10
**Licensing's (1)**
142:24
**lien (4)**
59:15;83:3;125:2;
146:12
**liens (7)**
33:17,22,23;
34:15;35:7;146:2,22
**light (4)**
8:6;9:13;102:4;
117:12
**lightning (1)**
124:2
**likelihood (1)**
115:15
**likely (9)**
27:9;43:24;99:22;
102:8;106:2,4;
107:18;108:4,11
**Likewise (1)**
114:19
**limited (7)**
17:7;82:2;106:23;
118:22;130:25;
132:18;138:18
**line (1)**
13:8;41:10;127:12
**linear (1)**
93:23
**lines (1)**
88:12
**lips (1)**
53:19
**liquidating (1)**
106:9
**liquidity (6)**
44:2;59:18,21;
106:20,22;107:14

**list (9)**
10:10;15:15;
55:20;98:15,19,21;
109:2,3;110:6
**listed (2)**
15:16;64:19
**listening (2)**
61:10;106:5
**lists (1)**
44:4
**litigation (5)**
33:6,20;34:13;
35:8,10
**little (12)**
16:2;20:22;38:11;
52:14;94:25;98:2,
10;102:3;106:25;
108:22;136:5;138:3
**Live (6)**
7:6,21;113:24;
141:11;142:18,19
**LLC (5)**
7:5,10;16:7;23:21;
25:19
**LLP (6)**
6:1,11,16,22;7:15,
20
**loaded (1)**
83:9
**loan (5)**
34:22,23;38:14;
125:4;130:2
**loan-to-own (3)**
124:24;129:25;
130:5
**logical (1)**
80:21
**Lokey (43)**
24:21,23;41:20,
22;42:14;43:8,18;
44:8;48:1,5,20;
51:17;55:16;60:2;
62:19,23;65:1,12,13,
21;66:4;70:16,17,19;
71:1;81:7,10,13,14,
17;87:24;94:12;
98:12;102:7;107:23;
108:10,13;112:19;
115:6;118:11,18;
119:15;120:3
**Lokey's (1)**
48:19
**long (9)**
14:12;95:23;
96:10,16;101:14;
121:25;129:16;
137:24;139:9
**longer (8)**
62:3;74:1;98:15;
99:14;111:10;
129:13;135:5;136:8
**longest (1)**
136:9

**long-standing (1)**
96:1
**look (24)**
17:9;43:24;44:5;
51:3;54:17;58:14;
60:8;77:9;79:8;
85:18;86:21;88:23;
93:7;100:10;105:11;
107:14;120:8,11;
128:23;131:23;
139:4,7;144:25;
145:6
**looked (4)**
43:6;104:15,17;
147:4
**looking (19)**
8:5;18:22;20:20,
21;21:4;45:19,22;
49:24;79:22;81:15;
83:16;90:6;106:4,5,
17,18;130:18;
145:25;147:1
**looks (3)**
40:1;93:16;127:25
**lose (1)**
77:17
**losing (2)**
77:3;122:5
**loss (2)**
77:3,8
**lost (2)**
77:11,18
**lot (14)**
13:25;64:21;72:8;
74:1,4,4,5,5,17;
104:14;109:15;
113:8;125:16;
141:17
**lots (1)**
64:20
**loud (1)**
141:22
**low (1)**
44:21
**lower (1)**
126:17
**lunches (1)**
74:5

**M**

**M&A (3)**
43:2;96:6;107:18
**magnitude (1)**
43:4
**maintain (2)**
48:16;120:20
**maintained (2)**
47:13,18
**major (1)**
77:11
**majority (1)**
12:12

**makes (2)**
10:3;129:24
**making (3)**
33:12;102:13;
119:14
**manage (1)**
74:3
**managed (2)**
9:11,11
**management (23)**
45:25;51:17;
52:11,19;73:2;87:14,
16,21,23;91:15,20,
23;98:16;100:25;
101:9;111:22;
113:13,24;115:9;
118:2;129:15,20;
134:1
**management's (3)**
114:24;129:11;
130:16
**managing (1)**
69:16
**MANATT (1)**
7:20
**mandate (1)**
70:11
**mandatory (1)**
126:4
**manner (1)**
127:16
**MANNING (1)**
7:15
**many (24)**
15:8;9;43:3,6;
46:20,23;85:16;
86:17;87:14,15;
96:20;97:6,8,10,12;
104:13;107:12,13;
112:3;115:24;
116:14;130:9;
141:16,24
**March (4)**
83:23;84:20;
92:20;93:24
**mark (1)**
28:19
**marked (2)**
26:2;38:7
**market (18)**
44:4;48:6;60:3;
79:22,22,23;84:12,
15;93:4,5,9;94:4;
107:11,17;118:12;
119:4;123:18;130:7
**marketed (2)**
53:11;63:16
**marketing (8)**
25:8;44:3;56:12;
65:22;104:8;111:9;
118:8;120:9
**marketplace (3)**
106:8,16;108:3

**markets (3)**
42:19;94:1,2
**market's (1)**
84:10
**marking (1)**
28:23
**Marks (16)**
38:2;55:17;58:7;
61:6;90:24;95:22,23,
25;96:8,11;101:23;
107:23,24;108:2,17;
128:21
**MARTIN (1)**
7:15
**massive (1)**
72:7
**material (5)**
34:10;74:17,21;
104:2,5
**materially (2)**
31:5;129:2
**materials (4)**
22:20;44:3;
118:13;119:4
**matriculated (1)**
54:3
**matrix (10)**
12:1;13:1,3,4,23;
14:8,13;15:25;16:3,
22
**matter (2)**
108:2;117:18;
143:15;144:13
**matters (3)**
10:23;30:2;144:13
**maximize (6)**
103:1;104:12;
111:2;117:20;
124:17;125:7
**maximizes (1)**
134:25
**May (64)**
11:7;13:16;16:15;
17:9,20;19:6;33:10;
34:17,23;35:18;36:7,
12;37:14;38:18,20,
21;40:20,21;41:2,17;
42:5;43:13,20,21,21;
45:7;48:19;55:4;
56:13;57:2,3;68:19;
69:3;70:17;77:23;
80:24;81:7,12,18;
86:23,25;89:5;
94:21;95:17;102:4,
11,11,12,13;106:18;
112:19;117:4;119:3;
122:15;123:6;124:6;
127:20;129:3,12;
131:3;136:20;
140:11;143:10,23
**maybe (7)**
52:2;59:22;63:13,
24;94:24;132:6;

Case 01-01139-AMC    Doc 32784-1    Filed 11/01/16    Page 167 of 178

DELIVERY AGENT, INC., et al.
Case No. 16-12051 (LSS)

October 11, 2016

137:17

**mean (4)**
72:13;75:4;113:4;
139:20

**meaning (1)**
69:16

**meaningfully (1)**
121:23

**means (1)**
42:21

**measure (1)**
35:9

**mechanical (1)**
39:7

**mechanics (1)**
140:15

**mechanic's (3)**
146:2,12,22

**mechanism (3)**
39:8;88:17,20

**Media (1)**
97:20

**meet (4)**
43:22;49:23;
114:18;125:19

**meeting (2)**
44:1;99:23

**meetings (1)**
45:25

**member (1)**
35:16

**Members (1)**
115:4

**Memo (5)**
50:1,4,4,15;55:9

**memorandum (4)**
17:2,16,24;18:21

**mention (1)**
147:22

**mentioned (2)**
28:18;79:3

**Merchandise (1)**
7:21

**mergers (2)**
69:21;96:14

**Mesa (1)**
22:18

**met (2)**
27:11;49:20

**metrics (2)**
84:4;118:22

**mid- (1)**
75:13

**mid-2015 (1)**
80:3

**mid-May (1)**
81:17

**mid-sentence (1)**
138:9

**might (11)**
65:13,15;90:4;
93:21;99:2;102:14;
106:14;112:7;

125:17,22;141:6

**Mike (2)**
85:9;87:22

**million (26)**
34:20,21;40:4;
51:18,24;52:12;
53:8;61:2,9;62:7;
66:21;67:1;83:5,9,9,
14,20;84:8,12;93:3;
103:24;116:22;
119:13;127:17,22;
129:2

**million-dollar (2)**
52:25;83:17

**mind (5)**
63:2;77:4;89:3;
91:21;138:18

**Mindful (2)**
114:13;118:9

**mine (1)**
114:4

**minimum (11)**
50:23;61:14;
91:19;103:9,19,22;
110:9;127:16,21;
128:3,24

**Minshu (1)**
19:2

**minute (5)**
52:15;62:10;
94:25;114:10;145:2

**minutes (6)**
8:20;41:17;134:8;
137:17;138:2,13

**mischaracterization (1)**
82:15

**misleading (1)**
8:7

**misnomer (1)**
55:13

**missed (1)**
73:11

**modifications (2)**
34:8,10

**modify (1)**
21:22

**mole (1)**
132:6

**moment (5)**
32:13;40:11;76:6,
21;124:6

**Monday (11)**
26:15;67:21;
71:25;72:3,4,8;
88:13,19;92:6,10;
112:2

**money (3)**
15:21;80:11;93:8

**Monitor (2)**
97:17,22

**month (4)**
64:9;81:20;82:11;
104:20

**Montreal (2)**
70:9;107:21

**more (43)**
9:25;14:17;35:8;
36:17;38:11;57:16;
59:18;62:10,20;
70:23;71:22,24;74:1,
4;75:22;79:16;
84:23;86:21;89:12;
90:20,25;91:4;
99:13;102:25;
103:14;106:1,25;
108:4,4;111:16;
112:11;114:5;115:5,
10;120:10;122:25;
123:4;124:3;125:23;
132:9,21;136:5;
144:10

**morning (19)**
8:3,4;11:10;12:18;
16:15;22:13;24:4;
29:5;30:11,21;33:2;
40:19;42:9,10;69:6,
7;78:10,12;135:8

**MORRIS (4)**
6:1;7:15;30:12;
133:3

**MORTON (1)**
6:19

**Most (3)**
45:22;106:2;
125:14

**motion (33)**
8:15,24;10:23;
11:12,13,19,20;13:7,
17;17:16;18:9;
19:18;22:11,15,24;
23:4,4,12,24;24:9;
25:9;29:11;31:5;
32:8,9,11,12;36:1;
40:16;60:2;131:1;
138:24;142:20

**motions (2)**
8:9;14:14

**mountain (1)**
132:6

**move (8)**
12:11;13:21,21;
29:14;47:22;99:16;
102:15;140:10

**movie (2)**
22:19,21

**moving (2)**
46:13;106:13

**much (16)**
12:2;14:11,23;
18:2;41:8;59:7;
60:25;70:3;77:24;
95:7;110:23;111:20;
117:22;123:4;
129:13;148:7

**mugs (1)**
22:20

**Music (2)**
7:11,16

**must (1)**
58:23

**myself (2)**
85:6;139:4

# N

**name (12)**
42:1,2,3;53:18;
68:25;69:1;95:14,
15;97:21;108:25;
116:19,19

**namely (1)**
76:10

**names (19)**
55:11,12,19,20,23;
98:12,16,25;99:1;
108:20,23;109:1;
115:5,7,10,22;
119:19,19,21

**name's (1)**
49:20

**nascent (2)**
88:17;109:18

**Nation (4)**
7:6,21;142:18,20

**natural (1)**
107:20

**nature (7)**
65:16;76:12;
99:22;100:8;103:5;
104:18;131:7

**necessarily (2)**
51:20;52:5

**necessary (6)**
19:25;70:24;71:7;
72:25;80:9;101:6

**need (51)**
35:25;39:7;72:18;
77:6,13,15;89:11,12;
90:9,11,20,22,23,25;
91:4;92:5,8,9;98:9;
99:11,18;100:15,21,
22;107:6,7;113:21;
114:1;115:12;
119:20;122:9;123:8;
129:6,16;131:17;
133:7,9,14;134:14,
24;136:7;137:5,11,
13;138:1;139:12;
140:18;143:9,10;
144:6;146:11

**needed (5)**
51:1;63:12;64:5;
74:18,18

**needs (3)**
125:11;145:8;
146:15

**negligence (1)**
18:22

**negotiate (1)**

99:11

**negotiating (1)**
82:18

**negotiation (1)**
36:5

**negotiations (4)**
32:15;38:4;60:22;
110:8

**Neither (1)**
107:22

**neurotic (1)**
30:16

**neutral (1)**
110:11

**Nevada (1)**
19:3

**New (17)**
18:17;34:6;43:25;
46:23;48:11,11;60:4,
6;103:21;112:9;
116:1;119:25;121:2;
122:24;125:14;
129:1;146:6

**next (11)**
19:22;33:24;34:5,
11;46:7,7,14;90:25;
120:18;122:21;
146:4

**Nice (1)**
49:23

**night (5)**
10:13,14;24:2;
32:19;33:11

**nineteen (4)**
45:23;90:21;
110:21;129:2

**Nineteen-eight-six-four (1)**
61:23

**Ninety-six (1)**
46:25

**nobody (2)**
54:17;133:17

**nobody's (2)**
101:19,19

**nonbankruptcy (1)**
36:24

**nondisclosure (1)**
99:10

**none (4)**
9:10;50:22;76:19;
116:16

**nonmaterial (1)**
34:7

**nonpracticing (1)**
59:14

**noon (3)**
23:10;135:11,12,
18

**Nope (1)**
60:12

**nor (2)**
64:4;115:21

**normal (2)**

74:22,22
**note (14)**
17:6;30:3;32:14;
37:24;38:3,5;39:13,
25;80:4,4,13;83:24;
124:7;127:24
**noted (3)**
38:10;127:16;
129:14
**notes (1)**
83:25
**nother (1)**
135:10
**notice (12)**
13:5,12,13;15:4;
23:11;34:9;59:6;
139:10;141:3;147:3,
5;148:9
**noticed (2)**
8:22;124:6
**notices (4)**
13:22;23:12,13;
148:2
**noticing (4)**
13:4,13,19,22
**notified (1)**
48:14
**noting (1)**
64:11
**notion (1)**
76:10
**not-whole-company (1)**
106:17
**notwithstanding (2)**
26:14;64:19
**November (26)**
74:8;75:12,14,21;
89:11,17,21;90:3,3,
3,7;121:7;122:12;
130:12;131:20,20;
132:1,2;138:16;
139:18,19;140:1,7,8,
10;141:6
**number (26)**
8:7,24;10:10,18;
32:14;45:14;52:24;
57:14;60:21;62:3;
64:3,4,7;66:7,8;
87:18;93:4,5,9,22;
94:8;103:23;109:9,
12;115:11;118:25
**numbered (1)**
61:20
**numbers (4)**
85:18;95:3;
115:10,12
**numerals (1)**
95:4

## O

**object (6)**
17:1,3;20:16;

29:16;31:7;139:13
**objected (1)**
16:24
**objecting (1)**
30:6
**objection (23)**
8:10,23;10:19;
11:21;21:14;23:22;
24:10,11,15;31:24;
39:14,21;40:15;
47:23,24,25;131:1,
25;132:5;137:2;
138:16,22,24
**objections (9)**
11:15;135:11;
136:25;138:17,23,
23;140:8;142:11,24
**objection's (1)**
40:18
**objective (1)**
128:10
**obligation (2)**
123:2;133:21
**obligations (1)**
9:15
**observing (1)**
93:16
**obviously (19)**
13:5;18:2;20:9,11;
29:11;31:21;34:9;
68:8;100:15;102:15;
105:21;109:9;
114:24;115:19;
116:2;121:21;
131:24;141:24;
147:1
**occur (1)**
75:1
**occurred (1)**
93:22
**occurrence (1)**
19:13
**occurring (1)**
139:18
**o'clock (2)**
25:23;145:12
**October (29)**
23:8,10,13;25:20;
26:16;39:19;40:7;
41:11;48:7;49:3,7;
55:17;69:13;75:5,
23;89:7;97:2;
101:10,10;108:9,14;
113:18;118:15;
122:17;130:15;
132:16;134:3;135:1;
147:12
**off (5)**
14:13,15;16:2;
35:24;87:9
**offer (7)**
25:25;26:1,5,8;
27:22;52:15;53:19

offered (1)
8:21
**offering (2)**
15:2;81:15
**offers (1)**
52:14
**office (9)**
16:24;17:3,6;
20:15;21:14,19;
74:5;143:25;147:14
**office's (1)**
17:12
**official (2)**
58:1;64:19
**officially (1)**
46:11
**often (2)**
15:14;113:19
**oftentimes (2)**
15:15,16
**OID (1)**
126:3
**old (4)**
49:25;93:13;
112:9;141:25
**omnibus (1)**
40:15
**once (2)**
100:12;139:25
**one (68)**
8:19;9:10;11:3,5;
12:15;18:11,13;
24:10;28:7,18;30:4;
35:8;39:13;41:1;
43:1;50:18,23;
53:18;55:5;57:15;
61:19;62:10;63:12,
20;64:4,6;65:3,10;
67:3,9;71:6;75:22;
77:2,18;79:16;88:9,
12;90:16;93:13,13,
22;94:23;99:1,2,12;
100:14;106:9;
112:16;114:10;
115:15,16;116:3,4,5;
117:19;118:18;
120:9;121:23;
123:22;131:22;
132:8;135:17;136:5;
138:14;141:16;
143:14;145:8,25
**ones (2)**
119:8;147:13
**only (18)**
19:5;32:12;34:23;
76:10;77:7;82:25;
115:21;119:14;
128:4,4;129:23;
144:22;145:8;
146:25;147:4,7,9,13
**onto (2)**
77:1;140:15
**open (1)**

32:24
**opened (1)**
26:15
**opening (2)**
18:24;41:13
**operat (1)**
92:9
**operate (2)**
59:24;113:24
**operated (1)**
22:17
**operates (1)**
22:18
**operating (2)**
73:5;122:3
**operation (2)**
131:9,12
**operational (5)**
76:25;92:5,9;
111:23;122:9
**operations (3)**
69:17,18;73:2
**opinion (6)**
18:3;102:23;
103:17;106:3;
107:15;116:17
**opportunities (1)**
105:15
**opportunity (15)**
27:24;46:16;
53:25;89:6;105:12,
16;112:15,16;
113:22;125:6;
128:25;129:1,1,5;
136:15
**opposed (2)**
10:11;125:21
**opposite (1)**
94:18
**opposition (1)**
122:16
**optimal (3)**
103:3;111:6;
141:10
**Oracle (2)**
24:11,14
**Oracle's (1)**
24:12
**order (71)**
8:25;9:2,4,4,5,16,
17;10:6,9,21;11:3;
19:7,7;21:22;23:2,
23,23;24:2,5,8,11,
17;27:8;28:13,17,19,
23;30:7,14,25;31:1,
4,7,16,16,21,25;
32:18,18;33:12,21;
34:4,7,17,19,23;
35:1;36:3,4;39:14,
15,15;43:4;99:18;
100:17;123:7;140:7;
142:9;143:1,6,7,8,9,
10,20;144:6,18,20;

145:24,25;148:5
**orders (13)**
8:22;9:3,3;11:22;
24:3;28:24;31:19;
73:11,11,11;143:16,
18;144:23
**order's (2)**
10:7,17
**ordinary (1)**
47:18
**organization (1)**
111:25
**organized (2)**
47:10;105:15
**original (2)**
83:7;132:4
**originally (4)**
19:19;53:3;
131:19;138:24
**ostensibly (1)**
68:9
**others (2)**
43:6,6
**otherwise (2)**
105:14;111:10
**ourselves (2)**
39:3;40:7;128:14
**out (84)**
10:2,4,9;22:3,17;
27:7;37:11;42:24;
46:9;47:8;48:11;
50:9,9,17;55:12;
56:12;57:22;58:1,4;
60:3,4;62:19,23;
64:3;65:4;67:10,11,
14,15,23;68:2,10,14;
70:24;76:5;80:18;
82:3;84:11,15;94:11,
14;99:9,20;101:20,
21,22,24;102:9;
104:20;105:2;
106:12;107:12;
109:5,6,7,9,12,13;
110:17;112:19;
115:15;117:23;
118:13;119:4;121:1;
123:19;124:18;
126:21;128:20,22;
129:22;130:7;
132:12;134:18,21;
136:21,22;139:10;
140:20;141:22;
143:17;144:18;
147:3,12
**outcome (2)**
82:25,25
**outreach (3)**
54:10;71:11;98:24
**outset (1)**
17:11
**outside (3)**
15:22;16:6;59:24
**outstanding (1)**

143:24

**over (14)**
23:25;26:6;36:5;
43:4;50:14;66:4;
67:16,22;96:21;
97:14;116:22;
121:25;138:13;
146:24

**overall (4)**
30:6;69:18;
100:12;132:6

**overbid (2)**
62:1;128:8

**overbidders (1)**
117:22

**overbids (2)**
112:13;128:24

**owed (1)**
18:23

**own (8)**
13:17;20:21;77:9,
10;91:7,15;121:15;
129:25

**owner (1)**
125:14

**owns (1)**
100:4

**P**

**PA (1)**
6:6

**Pachulshi (1)**
12:21

**Pacific (3)**
23:10;25:23;26:1

**PACITTI (7)**
6:18;145:1,9;
146:9,14;147:8;
148:12

**packages (4)**
132:12;140:3,20;
141:5

**page (9)**
33:14,24;34:11,
18;35:4,12;36:18;
61:20;146:1

**paid (4)**
22:23;34:1;37:8;
39:10

**pain (1)**
30:14

**papers (3)**
17:7;56:6,18

**paragraph (14)**
9:18;10:3;30:17;
34:12,14,18,18;35:1;
58:17,19;60:16;
61:14,16;146:4

**paragraphs (1)**
146:1

**parallels (1)**
98:1

**part (25)**
8:14;13:20;20:25;
56:17;73:6;77:12;
78:22;79:2,6,10,10;
93:6;96:13;100:3;
102:12;105:19,20;
106:2;124:21;127:8;
131:11,12;132:12,
15;140:2

**partial (2)**
128:3,6

**participate (6)**
87:19,21;88:1,11;
101:25;121:3

**participated (2)**
87:23;88:8

**particular (12)**
17:17;19:13;30:7;
31:23;74:17;79:9;
105:24;111:12;
113:11;115:2;
134:18,22

**particularly (7)**
73:3;74:8,19;
99:14;105:13;
119:22;130:18

**parties (59)**
24:24,25;25:2,5,8;
32:2;37:9;39:7;45:6,
14,17,18,21,23;46:5,
9,15,20,22,23,25;
47:2,8;48:1,10,13;
50:7;54:20;55:4,25;
59:12;62:19;63:8;
64:3,13,18;65:8,19;
67:13;81:22;109:4,
11;121:9;125:19;
128:1;129:4,21;
132:8,16;135:5,13;
136:5,7,14,23;137:1;
141:11,12;147:17

**Partly (1)**
79:4

**partner (5)**
22:10;30:16;
49:21;96:9;121:22

**partners (4)**
73:12,16;94:11;
122:6

**parts (6)**
33:11;43:1;66:7;
105:17;110:5;
119:11

**party (8)**
62:6;63:4;64:7;
65:13;91:13,14;99:9,
9

**party-in-interest (2)**
129:23;133:19

**party's (1)**
65:2

**pass (4)**
101:22;102:6,9;

137:9

**passage (1)**
18:20

**passed (9)**
46:12,14;50:14,19,
23;62:17;63:1,4;
139:22

**passes (1)**
62:25

**passing (1)**
50:21

**past (2)**
23:10;134:3

**patent (1)**
100:9

**patents (1)**
116:14

**path (1)**
44:24

**Pause (2)**
41:4;114:12

**pay (4)**
39:4;120:21;
126:10;146:5

**payable (2)**
38:21;39:9

**paydown (1)**
127:19

**payment (2)**
9:6;37:7

**PC (1)**
59:13

**peak (1)**
113:21

**peculiar (1)**
18:18

**pending (2)**
100:9;116:16

**people (27)**
14:13,13;38:6;
40:8;56:3,3;68:7,9;
72:22;77:4;98:13,
19;101:20,21;102:9;
103:13;120:24;
130:8,10;139:12;
140:15,17,18,21;
141:16,18;143:19

**people's (1)**
77:5

**Pepper (1)**
49:21

**percent (5)**
71:18,21;115:11;
119:21;134:19

**percentage (1)**
104:2

**perfected (1)**
33:19

**perfectly (1)**
105:8

**perform (2)**
122:7,7

**Performance (1)**

97:17

**performed (1)**
107:16

**performing (1)**
18:22

**perhaps (3)**
63:18;77:8;140:25

**period (11)**
10:20;35:19;44:7,
11;63:15;79:1;
90:20;91:19;112:21,
23;118:8

**periods (2)**
9:20,23

**permission (1)**
11:24

**permit (1)**
32:21

**permitted (4)**
23:1;36:23,24;
126:4

**permitting (1)**
9:5

**permutations (2)**
36:11;51:7

**persistence (1)**
106:7

**person (4)**
18:18;85:2,5;
120:22

**personal (8)**
13:9;14:3,24;15:5,
10;16:5;141:21,23

**personally (3)**
16:4;70:25;115:4

**personnel (1)**
121:21

**perspective (3)**
74:17;75:11;77:3

**persuas (1)**
19:9

**persuasive (1)**
19:10

**PESCE (1)**
6:24

**petition (17)**
23:8;43:19;45:18,
22;46:21,24;47:2;
48:14,18;50:7;53:13,
15;86:4;103:6;
111:5;118:15;119:5

**ph (1)**
19:2

**PHELPS (1)**
7:20

**Philadelphia (1)**
30:16

**PHILLIPS (1)**
7:20

**phone (1)**
137:16

**pick (1)**
90:1

**picking (2)**
72:22,24

**picks (1)**
35:7

**picture (2)**
73:17;116:11

**pieces (1)**
64:20

**PJ (1)**
97:20

**place (8)**
73:20;81:15;
83:25;84:5;91:20,
24;92:1;148:3

**placed (4)**
74:11,23;80:1;
112:1

**placing (2)**
121:20,20

**plaintiff (1)**
19:6

**platform (1)**
121:11

**play (2)**
127:21;133:4

**played (1)**
141:25

**Please (14)**
8:2;16:16;41:21,
24;42:1;54:15;
58:15;68:25;95:9,
14;134:10;138:10;
143:19;145:21

**pleased (5)**
33:4;82:6;144:3

**pleasure (2)**
22:10;114:18

**pm (11)**
55:23,25;27:14;
58:22;134:9,9;138:8,
8;145:20,20;148:14

**podium (1)**
29:4

**point (30)**
21:17;27:2,6;31:6;
32:7;34:5;36:16;
38:21;39:12;45:21;
52:15;53:24;54:17;
57:22;65:4;80:7,16;
82:10;83:16;85:2;
101:4;106:1;113:4;
122:20;127:13;
128:7,12;132:12;
141:23,24

**pointed (1)**
107:3

**points (3)**
20:5;118:5;124:15

**policies (5)**
24:18;31:12,13,
14;133:8

**poor (1)**
121:21

Case 01-01139-AMC   Doc 32784-1   Filed 11/01/16   Page 170 of 178

DELIVERY AGENT, INC., et al.
Case No. 16-12051 (LSS)

October 11, 2016

**poorly (3)**
73:14,21;79:20
**pop (1)**
33:21
**portfolio (1)**
116:10
**portion (1)**
117:7
**position (13)**
11:1;17:8;29:22;
40:7,12;96:8,14;
111:4;125:15;
128:17;132:22;
133:5;146:18
**positions (1)**
125:13
**positive (3)**
9:9;69:22,25
**possession (1)**
36:22
**possibilities (1)**
109:22
**possibility (1)**
116:7
**possible (5)**
44:5;103:24;
106:9;122:21;
132:18
**Possibly (2)**
90:11;139:22
**post (2)**
50:12;124:1
**post- (7)**
45:17,21;48:17;
53:12;86:3;111:4;
118:14
**post-closing (1)**
40:2
**post-filing (1)**
48:4
**posting (2)**
141:1,3
**post-petition (31)**
35:5;40:9;45:1,3;
46:10,25;50:4,6,15;
53:16;55:9;56:22;
57:6;60:14,15;
64:11;87:4,14,15;
98:6;99:23;102:24;
103:19;106:25;
108:8;109:12;
111:10;112:22;
113:2;119:5,6
**post-process (1)**
67:10
**potential (14)**
13:18;44:9;48:21;
59:8;71:11,12;
73:10;78:23;80:9;
105:1;108:18;
125:21;146:1;
147:11
**potentially (2)**

25:7;101:1
**practical (2)**
112:16;140:15
**practically (1)**
139:20
**practice (3)**
13:20;43:1;133:16
**practicing (1)**
14:11
**pre (2)**
50:10;123:25
**pre- (6)**
43:18;48:13;50:6;
53:14;54:11;103:5
**precipitously (1)**
93:17
**Predominantly (1)**
51:5
**prefer (1)**
117:22
**pre-filing (1)**
78:14
**prejudice (1)**
123:11
**premier (1)**
22:21
**premise (1)**
109:17
**premised (1)**
127:17
**premiums (2)**
83:8,11
**prepared (4)**
11:2;21:16;44:3;
124:3
**prepayment (1)**
83:8
**Pre-Pet (1)**
50:1
**pre-petition (36)**
18:11;25:8;33:19;
35:6,6;44:7;45:17;
46:9;47:3;50:4,7;
52:14;53:11;54:9;
56:21;57:4;59:15;
63:25;87:5;98:5;
104:8,16,17;105:18;
106:11,21;107:7,12;
109:11,15;111:5,6,8;
118:12,13,21
**presence (1)**
103:6
**present (5)**
12:10;22:11,15;
27:23;112:2
**presentation (1)**
88:7
**presentations (3)**
87:15,16;88:1
**presenting (1)**
98:21
**presents (1)**
104:18

**preserved (1)**
127:7
**president (1)**
96:14
**pressure (2)**
59:22;135:4
**presumably (3)**
91:25;92:2;132:8
**pre-Thanksgiving (1)**
112:8
**pretty (4)**
77:24;104:3,4;
105:9
**prevent (1)**
19:25
**preview (2)**
11:24;19:18
**previous (1)**
93:7
**previously (2)**
54:4;109:13
**price (7)**
50:24;61:15;
103:9,19,23;104:3;
110:9
**prices (1)**
123:23
**PricewaterhouseCoopers (1)**
42:17
**primary (7)**
13:11;49:1;75:3,4,
6;85:2,5
**principal (2)**
34:20,21
**Prior (21)**
42:16,18;43:10,
11;44:15;45:4;
48:10;55:5,16;
69:13;70:22;76:2;
83:25;89:7;93:25;
94:13;108:1;125:11,
13;134:24;146:13
**priority (1)**
146:3
**private (3)**
79:20,23;94:3
**proactively (4)**
65:21;66:10,16;
119:9
**probably (16)**
42:25;43:5,7;
44:12;55:14;56:1;
71:6;73:17;91:23;
99:13;100:25;
105:25;111:16;
121:7;144:10,10
**problem (2)**
123:14;124:5
**problems (3)**
104:18;106:22;
112:2
**procedure (2)**
68:6;112:10

**procedures (49)**
8:15;9:19;12:12;
23:2,9,14,16,22;
25:10,15;26:2,9,13,
21;28:13;31:16,20;
32:9,12;36:3;39:16;
60:2,5,7;64:15;
66:17,18;67:12,13;
68:6,7;98:5;100:24;
101:20;102:19,23,
24;103:13;110:16;
111:16;130:8;
131:25;132:5;
134:18;137:24,25;
142:8;143:1;145:24
**proceed (2)**
62:21;122:23
**proceeded (3)**
31:21;44:2;119:4
**proceeding (1)**
120:4
**proceedings (2)**
18:24;148:14
**proceeds (5)**
33:19;34:13;
146:3,5,24
**process (151)**
8:16;25:7,8,12,17;
29:8,9,18,19,25;
30:5;32:1,2;36:12;
38:13,17;40:6,9,9;
43:19;44:25;45:5,15,
22;46:1,12;48:15,18;
50:24;54:9,13;56:13,
22,22;57:4,6,23,24,
25;58:4,14;59:8,15,
20;60:4,6,14,15;
63:5,14;64:4,9,10,
18;65:1;68:3;70:23;
71:7,10;74:12,19,20,
22;75:1;76:3,16,22;
77:1,13;78:14,18,22;
79:12;81:3,20;82:1,
5;84:11,14;86:1,4;
94:15;97:24;98:5,6,
17;99:15,23;103:6,
13,15,19,22;104:9,
13,14,16,22;105:2,
11,18,19,22,22,22;
106:11,12,22,25;
107:3,9,19;108:8;
110:11,16;111:5,5,6,
11;112:20;114:21;
115:25;118:13;
119:1,12;120:23;
121:4;122:24;123:1,
19,23,25;124:17,22;
125:6;128:13,15,18,
19,21,23;129:10,13,
20;130:6,20;131:19;
132:20;134:22;
138:21;140:17
**processes (5)**

29:10;47:6,7;
79:14;102:10
**product (2)**
72:22;121:1
**professional (6)**
35:14;38:1;42:11;
66:11;69:8;93:20
**professionalism (3)**
38:5,8;41:6
**professionals (5)**
108:13;119:24;
135:4,8;139:19
**proffer (3)**
24:19;28:9;32:1
**proffering (1)**
23:15
**project (1)**
43:14
**promise (1)**
145:1
**promised (1)**
101:18
**Promo (3)**
51:12,12;54:19
**Promotional (3)**
22:16,17,20
**proper (1)**
93:10
**properly (1)**
33:19
**property (7)**
16:20;36:19,22;
59:9,11;99:25;
100:10
**proposal (2)**
41:13;65:13
**propose (2)**
21:24;142:8
**proposed (16)**
22:4;23:9,14;
24:16;25:9,14;26:9;
36:3;43:9;48:6;49:3;
75:5;118:15;123:11;
143:6,7
**proposing (1)**
82:22
**prospective (6)**
48:25;49:6;86:15;
87:16;110:13;
118:24
**prospects (3)**
56:14;57:19;66:6
**protected (2)**
9:23;100:5
**protecting (1)**
20:23
**protection (1)**
33:23
**proverbial (1)**
120:1
**provide (12)**
45:7;57:10;58:2;
59:1;77:14,15;

80:18;86:24;102:11,
12;108:17;132:14
**provided (14)**
13:13;15:21;16:6;
36:23;45:4,6;46:4;
55:20;56:25;98:12;
99:10;102:13;141:4,
14
**provides (1)**
37:13
**providing (1)**
113:22
**provision (3)**
9:3;71:8,9
**provisions (2)**
24:5;147:2
**prudent (1)**
13:9
**public (3)**
81:15;94:2,4
**published (1)**
120:5
**pull (1)**
145:22
**purchase (23)**
23:19;25:15;26:3,
3,5,23;27:15,17;
28:21;30:17;38:24;
40:3;44:14;50:23;
61:15;92:3;99:6;
100:24;103:9,19,23;
104:3;110:9
**purchased (1)**
65:15
**purchaser (3)**
23:18;25:14;
138:19
**purchasers (6)**
44:9;48:21;86:15;
87:17;108:18;
118:24
**purchasing (1)**
66:5
**purport (1)**
115:2
**purpose (1)**
112:14
**purposes (5)**
13:4,6;25:16;
34:19,22
**pursuant (1)**
25:14
**pursue (2)**
48:9;115:7
**pursued (3)**
97:24;115:6,8
**pursuing (4)**
46:1,16;48:17;
53:12
**push (1)**
22:6
**pushed (2)**
129:13;132:1

**pushing (3)**
41:11;119:23;
122:12
**put (14)**
12:6;18:21;29:21;
36:17;51:17;64:3;
83:2,25;88:18;94:5;
110:21;119:18;
120:15;135:3
**putting (4)**
41:14;74:1;80:11;
134:2

## Q

**Q4 (1)**
71:17
**qualified (11)**
25:16;26:10,13,
21;126:7,24,25;
127:1;132:13;140:9;
141:5
**qualify (3)**
26:13;139:23,25
**qualifying (4)**
128:3,7;134:20;
140:15
**quality (2)**
73:22;100:8
**quarter (6)**
71:18,19,20,24;
74:7;120:16
**quick (4)**
42:11;99:12;
114:14;147:3
**quickly (12)**
8:13;29:12,14;
31:21;44:3,4;56:13;
74:24;104:22;
120:18;124:14;
147:21

## R

**raise (5)**
29:23;83:23;
92:20;131:2;144:15
**raised (12)**
8:15;13:16;16:1;
32:14;37:4;38:23;
80:3;83:22;84:20;
93:8;118:9;119:8
**raises (3)**
79:2,6,24
**raising (3)**
43:25;70:2;80:9
**range (1)**
52:25
**rate (1)**
77:7
**Rather (7)**
21:9;33:6;63:17;
87:12,12;91:13;

92:24
**rational (1)**
110:19
**rationale (3)**
102:12,12,13
**reach (11)**
47:8;62:19,23;
99:9,20;101:20,21,
24;102:9;109:9;
128:22
**reached (10)**
21:18;34:16;36:6;
46:9;48:11;55:12;
109:5,6,12,13
**reaching (4)**
73:14;94:11;
104:20;109:7
**react (2)**
105:15;136:24
**read (5)**
28:9;56:5;58:17;
68:9;103:12
**reading (3)**
31:19;32:4;65:13
**reads (1)**
62:5
**ready (1)**
122:23
**real (10)**
36:19,22;59:20;
75:18;77:4;113:22;
123:9;125:21,21;
133:19
**realistically (1)**
120:17
**reality (1)**
133:16
**realize (4)**
27:24;109:22;
123:5;136:8
**realizing (1)**
109:17
**really (19)**
14:21;33:5;38:7;
41:11;51:3;52:13;
73:5;106:8;118:5;
119:12,25;120:13;
122:16;125:5;
128:19;130:12;
138:1;146:11;148:8
**reason (9)**
13:10,17;17:4;
63:1;76:8;103:20;
112:25;135:17;
136:22
**reasonable (6)**
101:11,15;107:11;
120:19;122:11,18
**reasonably (2)**
38:15;114:20
**reasoning (1)**
76:13
**reasons (3)**

50:20;102:6;111:7
**reassure (1)**
66:6
**recall (8)**
34:17;58:6;63:5;
86:19;92:20,22;
97:23,25
**receive (11)**
25:21;44:8,13,15;
64:5,8;82:8,8;
118:17;141:13;
147:22
**received (20)**
23:22;24:3,15;
25:2,23,25;26:4;
44:10;48:2;57:4,6,8;
59:2;82:6;103:18;
118:18,19,21;143:4;
148:3
**recently (3)**
43:4;72:4;77:12
**Recess (4)**
95:8;134:9;138:8;
145:20
**recitation (1)**
37:24
**recognition (2)**
146:10,15
**recognize (7)**
29:13;66:12,14;
129:15;135:1;
136:13;137:7
**recognized (1)**
31:22
**recollection (4)**
58:12,13;67:22;
108:14
**reconciliation (2)**
56:23;57:8
**recontacted (1)**
47:4
**reconvened (1)**
27:15
**record (20)**
12:20;21:3;22:13;
28:10;29:6;31:12;
36:10,18;37:21;
42:2;50:3;56:9;69:1;
78:10;93:12;95:15;
111:21;135:2;
138:12;142:12
**records (1)**
47:12
**recoupment (1)**
24:6
**recovered (1)**
115:11
**recovery (2)**
109:21;130:19
**recross (1)**
65:25
**RECROSS-EXAMINATION (1)**
66:1

**redact (3)**
13:2;17:16;20:24
**redactable (2)**
17:22;19:16
**redacted (2)**
16:21;19:18
**redacting (2)**
17:10;19:19
**redaction (7)**
14:21;16:24;17:1,
3;19:21,24;20:16
**REDIRECT (4)**
62:14;92:15,17;
117:3
**reduced (3)**
67:1;110:9;121:23
**reference (2)**
17:2;143:23
**referenced (1)**
21:25
**referred (1)**
77:18
**referring (2)**
59:10,13
**reflect (2)**
73:21;112:9
**reflects (1)**
73:14
**refresh (2)**
58:12;108:14
**refreshes (1)**
58:13
**regard (3)**
65:4;91:21;102:4
**regular (1)**
47:7
**regularly (1)**
47:12
**reimbursement (1)**
61:25
**relate (1)**
146:22
**related (7)**
11:12;24:25;33:8,
9,15;111:5;138:20
**relates (1)**
10:22
**relating (3)**
23:5;24:5;31:16
**relatively (1)**
146:6
**relevant (4)**
107:4,10;108:6;
129:3
**relief (6)**
10:23;21:4;24:7,8;
31:4,5
**rely (1)**
121:4
**remaining (2)**
37:19;39:22
**remains (1)**
35:2

Case 01-01139-AMC    Doc 32784-1    Filed 11/01/16    Page 172 of 178

DELIVERY AGENT, INC., et al.
Case No. 16-12051 (LSS)

October 11, 2016

**remember (4)**
28:14;82:20;
139:1,2
**remembering (1)**
8:5
**remiss (1)**
38:3
**removes (1)**
126:3
**replace (1)**
13:3
**replacement (1)**
35:7
**reply (1)**
107:2
**reporting (2)**
69:17,19
**represent (7)**
24:7,9;31:11;
42:22;49:21;58:9;
133:19
**representation (3)**
31:4;36:9;55:18
**representations (2)**
36:17;37:3
**representatives (2)**
26:16;99:20
**represented (2)**
86:14;97:19
**request (8)**
8:6;16:4;21:17;
28:8;31:15;58:20,
21;75:8
**requested (4)**
39:21;46:5;140:4,
5
**requesting (1)**
30:14
**require (2)**
21:4;113:17
**required (4)**
66:20;67:2;105:2;
132:13
**requirement (1)**
23:6
**requirements (1)**
26:9
**requires (1)**
100:2
**reservation (5)**
30:22;31:6;133:4;
143:2,3
**reserve (1)**
17:12
**reserved (1)**
34:17
**resolution (3)**
33:5;34:16;144:11
**resolve (3)**
32:11;33:7;127:13
**resolved (15)**
8:8,11,13;10:20;
12:13;22:4;24:12,

16;31:6;33:8;39:14;
40:18;132:5;143:4;
144:4
**resolving (1)**
24:4
**respect (47)**
9:17,18;12:25;
14:10,24;20:13;
21:20;23:15,24;
24:10;25:12;29:15,
20;30:1,2,3,5,9;
31:22,25;32:1,4;
34:14;36:12,18;
37:5;38:4,9;84:18;
85:13,14;89:21;
98:2;119:24;130:11;
134:13;136:7,16,16;
140:8;142:25;143:8,
16;144:9,22;146:6;
147:2
**respectfully (2)**
129:21;130:14
**respectively (1)**
9:24
**respects (1)**
104:13
**respond (3)**
48:11;54:10;63:21
**response (2)**
13:6;106:16
**responsible (2)**
79:1,4
**responsive (1)**
46:10
**rest (2)**
24:2;143:2
**restrict (1)**
64:13
**restriction (1)**
64:15
**restructuring (8)**
42:15,16,18,20;
79:12;96:1,3;107:22
**result (6)**
14:2,3;23:16;28:2;
60:22;110:8
**resulted (1)**
32:17
**Resulting (1)**
59:18
**results (4)**
49:10,13;81:25;
106:19
**resume (1)**
94:25
**resurfaced (1)**
55:16
**retailer (1)**
72:10
**retailers (1)**
72:6
**retain (2)**
81:10;100:22

**retained (10)**
43:8;9,11,20;
70:16,17;71:3;81:7;
106:6;119:3
**retaining (1)**
108:1
**retention (4)**
10:19;43:12;
48:19;143:22
**returned (1)**
105:23
**revenue (1)**
94:1
**revenues (1)**
71:20
**review (5)**
11:19;17:7;47:16;
98:22;146:20
**reviewed (3)**
102:20;104:8;
145:5
**revise (1)**
26:8
**revised (7)**
28:12;32:18;
110:16,16;142:8,25;
143:7
**Rhino (6)**
6:7;10:23;11:11,
18;40:14;142:15
**RICHARD (3)**
6:3;30:11;133:2
**ridiculous (1)**
20:22
**Right (113)**
15:7;31:11;32:25;
36:2;37:4;50:15;
51:4,21;52:11,16,17;
53:11;54:14,22,24;
55:3,19;56:20;57:16,
18;58:5,19;59:3;
60:9,14,16,21;61:18,
21;62:1,5,8;63:11;
66:10,15;68:5;
70:14;77:2;78:16,
19;80:1,2,11,12,14,
19,24,24;81:3,14,20;
82:4,7,10,13,24;
83:3,10,12,23;84:2,
10,14,16,20,22,25;
87:5;88:12,13,25;
89:7;90:19,21;91:12,
18;92:5,11;94:5;
96:23;97:3,4,24;
98:14;100:6;101:7;
103:23;108:23;
111:1;113:3,6,8,13;
120:16;124:10;
125:18;126:7,13,20;
130:1,4,13,16;
133:22;134:6;
141:20;144:14;
145:23;146:9,19;

147:4,8;148:3
**rights (11)**
17:12;24:6;30:22;
31:6;36:19;123:2;
126:3;127:6;133:4;
143:2,3
**RILEY (8)**
6:3;30:11,11;
133:1,2,2,7,14
**rise (1)**
138:9
**risk (20)**
14:2;16:18;17:20,
21,22;18:7;19:5,7,
13,14,15,25;21:6,8,
12;75:17,18;122:9,
18;127:2
**risking (1)**
121:21
**risks (1)**
76:25
**ROBERT (4)**
6:13;33:2;124:15;
137:4
**robust (3)**
63:14;116:9;123:4
**rodeo (1)**
97:12
**role (2)**
70:25;101:24
**roll (1)**
34:24
**rollup (3)**
34:16,20;35:2
**Roman (1)**
95:4
**room (10)**
38:6;45:25;56:2;
65:7;71:9;99:17,19;
128:11;129:5;
130:10
**rough (1)**
120:15
**roughly (5)**
39:19;58:25;62:7;
67:24;121:7
**routinely (1)**
14:14
**row (2)**
45:19;46:7
**rows (1)**
65:4
**rudimentary (1)**
112:21
**Rudnick (1)**
88:8
**ruling (2)**
32:10;137:9
**run (5)**
76:16;91:16;
116:2;121:25;
138:21
**running (4)**

77:2;78:18;84:11,
14
**rush (1)**
120:17
**rushed (5)**
30:4,5;128:18;
129:9;135:9
**Ryan (3)**
24:20;41:22;42:3

**S**

**sake (1)**
142:12
**sale (98)**
8:16;9:14;12:10;
22:9,11;23:2,11,12,
23,24;24:2,8,11,13,
14,17,18;25:3,9,17;
27:4,5;28:17,19,22;
29:10,15,21;30:2,5,
7,10,25;31:4,16,17,
20,21,23,25;32:5;
38:17,17,22;39:1,16,
18,20;40:6,16;43:24;
44:5;49:1,1;59:20;
60:2;70:2,3;73:19;
74:12,22,25;75:3,4,
4,6,12,13,21;77:1;
78:14;79:20;80:8;
81:3;83:17;88:16,
22;97:24;98:5,6;
99:3;105:19;107:4;
110:11;118:3;
120:19,23;125:12;
131:20;132:1,10;
135:6;138:21,24;
140:10;145:25;
146:3;148:5
**sale/financing/other (1)**
57:25
**sales (9)**
43:2;69:18;71:13;
73:2,2;77:17;79:9;
88:13,19
**salient (1)**
120:7
**same (14)**
34:14;37:18;84:4,
4;101:2;102:9;
112:22;117:20;
120:24;127:13;
128:14;131:2;
136:22;146:3
**San (1)**
43:21
**Sandahl (28)**
24:20,21,23;25:11,
19;27:20;28:4,6,9;
32:1;41:22,23;42:3,
9;45:10;48:4;49:20;
56:5,20;57:14;
62:16;68:19;76:10;

101:21;109:2;119:2;
123:16,20
**S-A-N-D-A-H-L (1)**
42:4
**Sandahl's (2)**
76:6;104:25
**Sandal (1)**
58:15
**satisfaction (1)**
82:24
**satisfied (2)**
26:1;27:5
**satisfy (1)**
34:24
**save (1)**
39:24
**saving (1)**
144:14
**saw (4)**
31:5;103:19;
145:25;147:17
**saying (7)**
115:20;120:6;
123:12,21;133:5,9;
147:21
**scenario (1)**
126:6
**Schedule (6)**
36:5;50:19;
101:19;126:1,7,21
**schedules (2)**
19:22;121:10
**scope (1)**
43:23
**scoped (1)**
144:18
**seal (2)**
11:12,20
**sealing (1)**
14:20
**season (7)**
77:15;113:21;
120:24;122:7,14;
125:14;134:16
**seasonal (1)**
71:13
**seasonality (6)**
71:15,16;72:13;
73:23,24;134:13
**seasons (1)**
77:10
**seat (1)**
113:25
**seated (8)**
8:2;42:5;69:3;
95:9,17;134:10;
138:10;145:21
**Second (6)**
18:8;25:18;46:2;
58:17;83:3;93:6
**Secondly (1)**
20:13
**Section (6)**

9:21;10:11;16:18;
19:9;26:23,25
**sector (2)**
109:20;110:3
**secured (3)**
44:23;60:22;
119:10
**securities (2)**
79:21,23
**seeing (1)**
106:16
**seem (1)**
148:2
**seemed (1)**
92:24
**seems (2)**
72:21;148:10
**segment (1)**
109:5
**segments (1)**
63:17
**segregating (2)**
89:1;118:24
**select (1)**
70:19
**self- (1)**
46:17
**self-evident (1)**
72:21
**sell (8)**
22:16;27:21;
64:20;66:22;70:11;
73:13;83:16;125:6
**Sell/finance (1)**
70:15
**selling (2)**
77:14;119:13
**send (3)**
58:1;140:4,6
**sense (5)**
43:3;44:19;55:14;
94:24;115:14
**sensitive (3)**
14:5,17;16:2
**sent (12)**
23:24;25:22;58:4;
67:12,13,23;68:7,10;
106:11;112:19;
136:17;140:3
**sentiment (2)**
21:14;113:20
**September (13)**
23:13;48:4;56:24;
59:25;67:12,15,17,
18;82:20;84:25;
113:5,7;120:16
**serious (2)**
77:7,16
**seriously (3)**
133:18;134:2;
136:6
**served (4)**
23:11,12,13;97:4

**service (2)**
13:5;121:24
**services (6)**
15:21;16:6;72:23;
96:2,3;97:18
**set (18)**
9:19,20;36:2,5;
39:8,17;53:8;57:2,
22;90:4;91:15;95:3;
121:6,8,9;125:11;
128:15;137:23
**setoff (1)**
24:6
**Setting (2)**
73:22;121:9
**seven (10)**
50:12;55:9,14;
67:3;86:10,15,17;
87:3;96:17;118:20
**seventy-three (1)**
25:2
**several (3)**
9:3;65:3;116:16
**severe (1)**
59:18
**shall (1)**
146:5
**share (2)**
102:10;112:4
**shareholders (1)**
105:24
**shares (1)**
32:8
**SHAW (1)**
7:10
**shed (1)**
102:4
**sheet (1)**
107:15
**shifted (1)**
48:15
**ship (1)**
110:17
**shipping (2)**
72:22,24
**ShopTV (16)**
49:2;51:10;54:21;
65:9;75:4;88:8,12,
22;89:1;109:5,17,23;
116:19,21;128:4,24
**short (3)**
41:19;63:15;148:9
**shorten (2)**
22:24;23:4
**shortly (1)**
142:21
**show (4)**
101:11;111:9;
116:4;129:6
**showed (1)**
53:19
**showing (4)**
16:18;19:24;

101:13;130:9
**shown (1)**
19:14
**shows (3)**
65:4;99:2;116:5
**shuttered (1)**
23:7
**sic (4)**
24:11;62:16;
97:18;105:23
**side (2)**
72:25;77:11
**sign (7)**
9:16;10:6,8;11:18;
144:19;146:10;
148:5
**signature (1)**
11:2
**signed (16)**
8:25;9:17;10:7,17,
21;11:22;24:25;
25:5;26:24;45:23;
46:11;53:15;74:2;
142:19;143:20;
145:24
**significant (5)**
39:13;59:21;
104:3;109:20;
111:13
**significantly (1)**
64:7
**signing (2)**
9:5;148:5
**similar (2)**
55:25;97:4
**similarly (1)**
77:11
**SIMON (2)**
7:5,7
**simply (4)**
30:3;32:22;134:4;
143:3
**single (1)**
50:18
**site (1)**
43:21
**sitting (2)**
66:12;113:25
**situation (16)**
13:15;15:12;16:5;
39:3;43:23;44:2;
106:23;113:11;
120:12;124:24;
128:14;129:7;
131:23;132:11,24;
135:11
**situations (2)**
42:24;96:7
**six (6)**
115:11;119:20;
141:1,2;147:7,9
**sixteen (1)**
67:24

101:13;130:9
**sixty-three (1)**
56:9
**skip (1)**
33:11
**slightest (1)**
21:11
**slightly (1)**
114:4
**slippery (2)**
19:17;20:19
**slope (2)**
19:17;20:19
**slow (1)**
119:1
**small (1)**
131:3
**smart (1)**
56:11
**Smith (2)**
16:5,7
**software (2)**
24:14;116:18
**sold (6)**
23:7;24:18;54:19;
60:17;91:18;125:11
**sole (1)**
134:4
**solicit (4)**
76:17,18;118:19;
128:16
**solicitation (1)**
102:10
**solution (4)**
80:9;108:4;
125:18;137:23
**Solutions (6)**
6:17,23;25:13;
107:14,18;108:3
**solvent (1)**
133:17
**somebody (2)**
102:13;129:8
**somehow (2)**
80:8;124:22
**someone (8)**
9:6;15:17;20:8;
62:25;88:11;99:1;
103:18;126:6
**someone's (1)**
15:5
**sometime (1)**
139:5
**sometimes (2)**
64:14;111:8
**somewhat (2)**
72:4
**soon (2)**
49:7;106:8
**sophisticated (2)**
147:16
**sorry (14)**
53:3;55:1;61:16,
22;67:4;79:16;86:7,

13;89:24;92:7;
96:10;104:6;108:20;
145:22
**sort (13)**
42:25;43:23;
44:23;47:9;50:5;
55:16;72:9;85:1;
100:5;110:5;120:10;
137:23;140:16
**sought (1)**
24:8
**sounds (2)**
55:22;97:3
**speak (6)**
11:25;29:2;38:10;
43:17;117:21;
141:11
**speaking (1)**
78:22
**special (1)**
96:6
**specific (5)**
19:13;20:8;76:19;
86:21;109:5
**specifically (4)**
24:24;33:9;48:4;
82:21
**specifics (1)**
120:11
**speed (2)**
29:20;40:11
**spell (3)**
42:2;69:1;95:15
**spelled (1)**
95:16
**spend (2)**
102:16,17
**spent (1)**
138:13
**stack (1)**
107:20
**staff (3)**
74:11,24;76:23
**stage (2)**
48:16;99:16
**stakeholders (1)**
105:24
**stalking (11)**
23:17,19;25:14;
29:23;64:12,14;
82:12,18;111:9;
136:17;138:19
**stalled (1)**
118:5
**stand (7)**
12:5;41:20,23;
57:12;95:11;107:3;
112:12
**standard (2)**
19:8;111:1
**standing (3)**
35:21;36:1;130:14
**stands (1)**

70:10
**Stang (1)**
12:21
**STARGATT (1)**
6:11
**start (10)**
26:18,21;40:23;
56:14;107:14;
132:19;135:7;
140:19;141:15;
143:19
**started (12)**
14:13,16;53:14,
21;57:19;59:16;
69:11;100:19;
104:25;118:13;
125:3;143:20
**starting (4)**
27:16;48:8;76:2;
128:11
**starts (1)**
104:4
**state (7)**
18:17;42:1;59:23;
63:24;68:25;95:14;
120:15
**stated (2)**
22:15;23:4
**statement (2)**
51:19;58:18
**statements (2)**
19:22;41:6
**States (3)**
21:15,19;144:1
**state-sponsored (1)**
18:10
**statistic (1)**
88:18
**status (2)**
45:15;47:8
**statute (4)**
10:2,4;17:23;21:4
**statutory (1)**
19:8
**stay (5)**
10:23;91:20,23,
25;146:16
**step (3)**
68:19;94:21;117:4
**steps (2)**
99:4;100:20
**STEVENS (2)**
7:1;130:24
**stick (1)**
113:17
**still (14)**
8:20;12:5;14:20,
21;22:2;30:19;67:2;
109:18,19;112:8;
126:4,7,19;127:3
**stipulated (2)**
56:24;137:25
**stipulation (5)**

10:25;11:18,19;
40:19;142:19
**stop (1)**
104:24
**stopped (1)**
48:20
**stopping (1)**
48:8
**Store (1)**
130:25
**stores (1)**
72:8
**straight (1)**
41:14
**strat (1)**
91:10
**strategic (17)**
43:24;69:20;
85:17,23;86:2,7;
87:7;91:8,13;94:9,
11,14;99:9;100:21;
105:14;110:4;
120:24
**strategics (2)**
99:14;105:25
**STRATTON (39)**
41:1,17;49:19,20;
50:2;52:9;56:17;
57:10,16;59:5;
62:10;63:3;65:16;
66:2;67:7;68:17;
92:19;93:11,12;
94:23;95:3,6,10,20;
114:7;117:3;126:2;
129:14;130:13;
135:14,17,21,23,25;
141:20,22,25;142:4,
6
**Stratton's (3)**
63:13;94:8;131:10
**stresses (6)**
76:22;112:1;
129:19,20,20;134:15
**stressful (2)**
73:25;74:8
**stricken (1)**
30:18
**strictures (1)**
117:23
**strikes (1)**
124:2
**striking (1)**
9:24
**studio (1)**
22:19
**stuff (1)**
107:8
**subject (8)**
10:3;19:6;31:19;
32:4;34:25;35:2;
41:19;60:17
**submit (15)**
13:8;16:17,20;

17:23;19:9,21,23;
27:12;81:22;89:23,
25;99:6;142:8;
143:6;144:6
**submitted (7)**
10:13,14;11:3;
32:18;58:22,23;
134:6
**submitting (2)**
27:17;142:20
**substan (1)**
106:3
**substantial (2)**
32:17;104:2
**substantive (4)**
26:1;33:14;36:17;
37:2
**substantively (2)**
24:8;106:3
**substitute (2)**
113:23;114:3
**successful (8)**
23:18,19;27:18;
72:18;116:4,8;
138:18;141:3
**successfully (2)**
126:10;127:6
**sudden (1)**
20:23
**suffered (2)**
17:14;106:22
**sufficient (7)**
102:17;111:1;
113:17;131:24;
137:2;139:9,13
**sufficiently (1)**
63:14
**suggest (3)**
8:9;21:7;137:1
**suggested (3)**
63:13;125:18;
130:14
**suggesting (1)**
65:16
**suggestion (3)**
63:16;137:15;
139:24
**suitable (1)**
118:4
**sum (1)**
128:6
**summarize (1)**
60:6
**summary (8)**
42:11;45:5,14;
47:10,13;48:1;65:1;
68:8
**summer (2)**
79:12;83:16
**Sun-Times (1)**
97:20
**superpriority (4)**
33:18,22;34:12,13

**supplement (1)**
16:11
**supplemental (1)**
13:6
**Supplementally (1)**
70:3
**supply (1)**
22:22
**support (13)**
13:7;17:2,17,24;
23:5;30:7;31:24;
71:6,9,11;79:10;
121:21;122:14
**supporting (2)**
69:18,20
**supportive (2)**
122:13;123:8
**suppose (1)**
99:1
**supposedly (1)**
72:7
**sure (34)**
8:12;13:11;21:16;
37:4;39:7;40:23;
42:3,13,22;43:20;
45:9,13,21;47:9;
48:8;58:18;60:9;
79:8,18;81:4;83:18;
88:6;90:14;99:8;
102:8;115:23;
119:14;124:8;
131:10;135:24;
137:18;140:18;
142:12;147:3
**surface (1)**
54:8
**surprisingly (1)**
122:2
**sweep (2)**
38:25,25
**sweeping (2)**
59:16;125:3
**swept (2)**
39:4;124:25
**sworn (3)**
41:25;68:24;95:13
**system (2)**
47:11;54:3

---

**T**

**tacked (1)**
77:1
**tail (1)**
128:1
**talk (11)**
14:17;52:14;
65:19;85:22;98:4;
102:19;103:8;107:9;
108:8,9;144:16
**talked (1)**
108:22
**talking (6)**

**DELIVERY AGENT, INC., et al.**
**Case No. 16-12051 (LSS)**                                                  October 11, 2016

66:5;85:22;88:21;
92:21;103:9;118:23
**talks (1)**
146:2
**tax (3)**
8:24;9:2,11
**taxes (1)**
9:17
**TAYLOR (8)**
6:8,11;11:10,10;
40:14,14,18,22
**t-commerce (3)**
88:16;109:17,20
**team (8)**
43:21,22;72:15;
74:23;91:15,20;
99:18;115:4
**technical (3)**
9:20,25;26:14
**technology (8)**
13:25;88:15,16;
99:24;109:18;115:3;
116:21;131:12
**teleconference (1)**
99:22
**TELEPHONICALLY (4)**
6:24;7:12,17,22
**television (1)**
88:17
**telling (1)**
133:25
**tells (1)**
112:21
**Ten (5)**
24:25;68:11;95:1;
100:20;136:4
**ten-minute (1)**
94:24
**tenure (1)**
69:22
**TERENCE (1)**
7:12
**term (6)**
46:1;59:11;71:25;
72:5;75:3;80:6
**termed (1)**
79:20
**terms (8)**
26:1;36:23;72:14;
77:8;107:25;112:7;
116:13;129:10
**Terrific (1)**
146:25
**test (1)**
124:16
**testament (1)**
41:8
**testified (11)**
76:21;81:18;89:4;
104:19;111:6;113:8,
13;119:18;120:17;
122:25;123:20
**testify (17)**

24:21,22,23;25:11,
19;27:20;50:18,20,
22,25;51:1;52:18,19;
76:13;90:22;102:8;
106:3
**testimony (24)**
8:19;23:15;24:19;
41:17;57:18;76:6;
90:21;98:8,9;
101:17;104:25,25;
106:6;112:17;
113:14;119:7;
120:22;122:1;
124:20;129:3;
134:11,13,15;136:7
**testimony's (1)**
118:16
**Thanks (2)**
110:24;127:10
**Thanksgiving (7)**
71:24;72:6;121:8;
125:11,13;134:15,24
**that'll (1)**
139:15
**theft (19)**
16:19;17:14,18,20,
21;18:7,18,19,20;
19:1,5,6,14,15,25;
21:6,8,10,13
**theory (1)**
125:22
**thereafter (3)**
67:14;68:8;69:12
**Therefore (8)**
16:20;17:4;98:24;
106:21;108:6;
109:18,21;131:12
**thereof (1)**
33:20
**thick (1)**
8:7
**thief (1)**
18:25
**thinking (1)**
80:7
**third (2)**
93:25;144:13
**third-party (1)**
35:17
**thirteen (4)**
50:10;68:15;87:4;
90:25
**thirty (3)**
23:8;41:17;43:5
**thirty- (1)**
50:22
**thirty-day (1)**
9:22
**thirty-five (1)**
24:23
**Thirty-four (1)**
25:4
**thirty-one (2)**

50:15,18
**thorough (2)**
37:23;99:25
**thoroughly (1)**
118:2
**though (3)**
14:25;106:7;144:6
**thought (7)**
17:8;36:11;52:12;
62:6;80:23;140:17;
141:8
**three (17)**
8:12;22:4;51:5,16;
52:11;53:11;55:14;
56:6,19,21;61:9,19;
70:7,13;99:13;
103:24;122:22
**three-and-a-half (1)**
83:8
**throughout (5)**
33:21;35:20;39:2;
44:11;64:17
**thrown (1)**
120:14
**Thursday (1)**
143:17
**tie (1)**
127:25
**ties (1)**
39:14
**timeline (4)**
39:16,18;43:17;
129:23
**timelines (1)**
105:11
**timer (1)**
141:25
**times (7)**
56:6;97:6,8,10,12;
115:24;135:19
**timetable (2)**
124:23;125:8
**timing (15)**
8:16;12:15;30:3;
33:8;63:4;76:20;
88:22;102:6;110:19;
120:13;127:25;
131:1,2,3;132:7
**timing's (1)**
83:20
**today (21)**
23:3;30:2;39:19;
49:22;55:6;61:9;
66:7,18;99:2;
100:19;101:12,13;
106:15;110:14,16;
111:18;113:4;
129:10;136:5;146:7;
148:6
**today's (1)**
45:4
**together (6)**
54:21;55:5,7;

82:12;97:22;110:22
**told (6)**
56:10;58:9;77:12;
97:2;102:7;108:12
**tomorrow (5)**
90:19;103:22;
110:18,20;143:17
**tongue (1)**
53:18
**took (4)**
17:8;136:6;
144:12;146:12
**top (5)**
45:19;66:19,20;
83:9;87:9
**tort (1)**
33:18
**total (13)**
8:20;37:17,19;
44:21;46:17,20;
50:10;66:13;71:22;
83:13,13;115:11;
128:8
**touch (1)**
13:18
**towards (1)**
82:11
**TOWBIN (1)**
7:10
**tracking (3)**
47:8,9,11
**traditionally (1)**
42:22
**trailed (1)**
32:10
**transaction (6)**
27:10;28:1;80:16,
17,17;134:14
**transfer (3)**
24:14;82:23;133:8
**transferring (1)**
31:12
**transitional (1)**
91:19
**transpire (1)**
113:23
**treat (1)**
17:4
**treated (1)**
37:5
**trend (2)**
21:16;106:7
**trickled (1)**
94:4
**tried (2)**
65:7;145:4
**trolls (1)**
59:12
**true (6)**
23:13;72:21,22,
24;88:5;92:25
**truncated (2)**
101:15;104:18

**trust (2)**
35:15;147:18
**Trustee (11)**
16:16;21:15,19;
22:3;24:1,3,6;30:22;
143:5;144:1,12
**Trustee's (1)**
20:15
**trusting (1)**
137:12
**try (7)**
16:3;33:7;48:5;
60:3;98:9;125:6;
128:15
**trying (6)**
40:11;82:12;
114:3;121:1;134:23;
136:19
**t-shirts (1)**
22:20
**turn (1)**
115:15
**turned (3)**
27:7;70:24;146:24
**TV (1)**
56:11
**twelve (2)**
68:11;132:17
**twenty (8)**
8:19;39:19;41:16;
45:23;50:10;62:7;
96:18;134:19
**twenty- (1)**
69:10
**twenty-day (1)**
9:23
**twenty-five (2)**
71:21;85:21
**twenty-four (1)**
135:9
twenty-twenty-twenty-forty (1)
71:17
**two (35)**
8:18;22:3;25:12;
26:18;36:17;37:3;
55:5,23;58:25;
60:10;61:19;69:16;
71:6;72:10;81:22;
91:5;101:17;103:23;
105:10;109:2,4;
112:7,20;114:6;
118:5;122:22;124:2,
19;134:18;136:5,12;
137:10;143:24;
144:12;147:11
**two-and- (1)**
136:11
**two-million-dollar (1)**
127:19
**two-week (1)**
82:1
**type (2)**
15:22;21:7

DELIVERY AGENT, INC., et al.
Case No. 16-12051 (LSS)

October 11, 2016

**types (1)**
138:22
**typical (2)**
99:8,13
**Typically (3)**
57:25;62:25;71:21

**U**

**UCC (2)**
11:1;146:7
**ultimate (1)**
127:20
**ultimately (4)**
29:21;73:12;
75:19;130:1
**Um-hum (47)**
10:24;11:14;
12:14,24;15:18;18:5,
12;20:6;22:25;27:3;
30:24;33:16;34:2;
35:13,22;36:8,20;
37:6;40:17;41:15;
55:10;75:21;81:24;
84:13;86:16;87:6;
90:5;114:11,23;
115:13;122:4;125:1;
126:18;127:4,15;
128:5;131:5,14,21;
132:3,23;133:23;
139:11;142:14;
144:2;145:17;
147:10
**unable (1)**
29:21
**unachievable (1)**
64:2
**uncertain (1)**
27:11
**uncertainty (2)**
75:17;77:13
**unclear (1)**
116:11
**uncomfortable (1)**
92:24
**uncontested (2)**
12:11;135:8
**uncontroverted (5)**
118:10,16;119:2,
15;122:1
**under (43)**
9:23;11:1,20;
16:18;18:4,7;19:4,8;
23:7;24:14;25:9;
26:9,13,21;28:14;
29:14;31:14;34:3,21,
22;36:23;37:5,12,15,
16,18;38:23;50:14;
66:17,18;80:17;
82:22;124:18;
125:22;126:5,7;
132:4;136:9;138:24;
142:9;143:7,11;

144:7
**underlie (1)**
47:13
**underlined (1)**
58:18
**underlying (2)**
47:16;65:10
**under-seal (1)**
14:14
**understandably (1)**
21:11
**understands (1)**
38:11
**understood (2)**
131:19;143:21
**undertake (1)**
79:19
**undertaken (1)**
70:21
**undertook (1)**
79:11
**underway (1)**
137:23
**undue (10)**
16:20;17:22;18:7;
19:5,7,14,15,25;
21:6,8
**unfortunately (2)**
21:10;64:1
**unique (1)**
129:18
**UNISON (2)**
145:19;148:7
**United (3)**
21:15,19;143:25
**units (1)**
103:17
**Universal (1)**
7:11
**universe (1)**
76:4
**unlawful (2)**
16:19;20:1
**Unless (5)**
20:1;61:10;
110:14;130:19;
135:5
**unlikely (2)**
75:24;76:4
**unnecessary (2)**
13:8;14:1
**unquantified (1)**
17:21
**unregistered (1)**
79:23
**unsecured (1)**
40:4
**unsuccessful (1)**
116:3
**unusual (1)**
15:23
**up (49)**
8:12;10:15;11:4,

16;12:22;14:16;
16:23;24:2;28:24;
29:20;33:21;34:24;
35:7;37:15;39:8;
40:11;51:3;53:19;
57:1,12;61:24;62:7;
71:23;73:9;74:2;
91:15,22;99:2,14,15;
101:11,13,16;111:9,
25;112:13;113:20;
116:4,5;119:5,19;
120:16;121:9;
128:15;129:6;130:2,
9;142:11;145:13
**update (1)**
12:4
**updated (1)**
45:13
**upon (6)**
9:4;24:22;34:8;
74:23;106:16;112:1
**upset (2)**
73:12;131:16
**urgent (1)**
44:2
**URL (1)**
116:18
**use (5)**
13:22;14:19;
28:21;47:11;80:6
**used (6)**
14:12;34:24;75:3;
110:25;112:24;
146:5
**using (2)**
122:6;135:19
**utilities (2)**
9:11,18

**V**

**valuable (1)**
116:22
**valuating (1)**
29:15
**valuation (11)**
27:25;52:24;
63:17;83:22,23;84:4,
15;92:21;93:7;
107:19;118:22
**valuations (2)**
84:19;94:3
**value (18)**
27:24;35:5,6;
51:17;52:12;75:19;
93:17;94:6;103:1;
104:1,12;109:17,22;
111:2;117:20;
124:17;125:7;134:3
**values (2)**
44:19,21
**variance (1)**
56:23

**variety (1)**
111:7
**various (3)**
38:6;79:2;103:16
**vary (1)**
10:2
**vast (1)**
12:12
**venture (2)**
109:8,15
**VeraSun (1)**
97:19
**versus (3)**
45:17;68:9;94:9
**veto (1)**
126:20
**via (2)**
58:23;88:16
**viable (1)**
108:4
**vice (1)**
96:14
**victim (3)**
18:10,19,25
**view (8)**
74:25;91:9;
106:21;109:15,19;
114:5;141:23,24
**views (2)**
116:12;133:18
**vigorously (1)**
120:4
**virtual (1)**
99:19
**volume (1)**
74:21

**W**

**wager (1)**
87:12
**wages (2)**
9:13;10:10
**wait (4)**
84:24;103:22,22;
143:19
**waiting (1)**
24:1
**waive (3)**
36:14;41:13;
126:11
**waived (1)**
26:22
**waiving (2)**
126:12;127:7
**walk (3)**
32:22;33:10;79:5;
99:3
**warehouse (1)**
131:13
**Warner (1)**
7:16
**waste (1)**

103:21
**watch (1)**
14:12
**water (1)**
120:1
**way (9)**
28:22;59:13;62:5;
94:5;99:5;107:23,
24;122:18;138:21
**ways (1)**
118:25
**weave (1)**
98:9
**Wednesday (1)**
68:14
**week (18)**
56:15,24;57:20;
58:7;67:15,17,18,21,
23;68:2,10,13;88:7;
90:25;97:1;98:22;
105:1;125:13
**weekend (7)**
26:7;59:4;67:23;
121:8;131:23;
136:12;141:15
**weekly (1)**
56:23
**weeks (15)**
49:9;59:1;75:9;
77:1;81:22;100:14;
111:21;112:7,20;
114:6;121:7;122:21,
23;136:6;139:6
**weighed (1)**
129:16
**well-qualified (1)**
122:22
**weren't (3)**
82:6;108:4;115:6
**west (1)**
139:21
**Western (2)**
33:25;125:2
**What's (6)**
46:2;50:4;73:23;
99:8,12;103:23
**whenever (1)**
68:11
**Whereupon (1)**
148:14
**White (1)**
97:20
**whole (8)**
38:19;63:16;
65:14;76:11;88:23;
105:16;106:5;
135:10
**whole- (1)**
106:8
**who's (6)**
14:8;22:10;47:9,9;
84:18;120:2
**who've (2)**

Case 01-01139-AMC    Doc 32784-1    Filed 11/01/16    Page 177 of 178

DELIVERY AGENT, INC., et al.
Case No. 16-12051 (LSS)

October 11, 2016

46:5;140:4
**wide (1)**
  56:2
**widely (1)**
  120:5
**willing (2)**
  130:3;141:11
**wind (1)**
  112:13
**wind- (1)**
  40:1
**wind-down (1)**
  37:14
**window (1)**
  8:20
**winner (1)**
  140:23
**winning (2)**
  36:13;132:10;
  136:15
**wire (1)**
  25:20
**wish (4)**
  17:9;28:5;30:9;
  129:19
**wishes (1)**
  117:21
**withdrawing (1)**
  63:8
**within (3)**
  8:20;71:19;141:2
**without (5)**
  14:21;47:25;
  69:25;114:22;
  123:19
**Witness (21)**
  41:25;42:3,6;
  57:10,12;67:11,19;
  68:20,24;69:2;
  86:24;87:2;94:22,
  23;95:13,16,18;
  112:24;117:2,5;
  126:2
**witnesses (6)**
  8:18;41:14;
  101:17;124:19;
  134:11,12
**Wonderful (1)**
  144:5
**wont' (1)**
  143:9
**woodwork (1)**
  76:5
**word (3)**
  30:18;110:25;
  112:24
**words (1)**
  126:14
**work (20)**
  37:9,11;39:7;
  42:19;70:5;73:22;
  74:4;96:11;107:16,
  22;108:6;113:9,24;

122:12;133:10,11,
25;138:1;140:17;
142:25
**worked (8)**
  33:6;38:14;70:7;
  96:12;97:22;112:3;
  114:25;115:24
**workers (1)**
  73:24
**workforce (1)**
  72:14
**working (12)**
  22:5;23:5;30:13;
  43:14;44:3;70:25;
  72:19;73:25;83:20;
  111:12;135:6;
  140:14
**workload (3)**
  72:14;73:9;141:23
**works (2)**
  17:23;71:15
**worry (2)**
  19:17;122:12
**worth (5)**
  53:12;64:11;
  116:18,18,21
**worthy (1)**
  111:15
**write (1)**
  136:25
**writing (1)**
  58:23
**written (1)**
  99:6
**Wu (7)**
  95:10,12,16,21;
  114:18;117:4;
  122:25
**W-U (1)**
  95:16
**Wu's (2)**
  129:3;136:7

**Y**

**year (9)**
  48:19;70:5;71:16,
  18,22;72:15,18,18;
  73:7
**years (7)**
  42:15;69:11;
  85:21;95:24;96:17,
  18;146:7
**Yep (1)**
  110:7
**yesterday (16)**
  23:11,16;26:15;
  27:14;29:8;40:10;
  45:14;53:22;55:6;
  61:1,7;98:19,20,25;
  114:18;128:17
**yesterday's (1)**
  30:4

**yield (3)**
  37:3,20;79:22
**yielded (2)**
  28:2;106:18
**YOUNG (2)**
  6:11;93:13

**Z**

**zero (2)**
  130:19;141:16
**Ziehl (1)**
  12:21

**1**

**1 (15)**
  8:24;25:23;56:21;
  57:5,12,14;60:10;
  62:16;64:25;82:6,8;
  105:3;112:20;
  128:15;147:12
**1.425 (1)**
  34:21
**1:10 (1)**
  138:8
**1:19 (1)**
  145:20
**1:35 (1)**
  25:25
**10 (1)**
  94:25
**103 (1)**
  50:17
**107b (1)**
  18:4
**107c (4)**
  16:18;18:7;19:4,9
**10th (3)**
  26:16;135:12;
  139:19
**11 (10)**
  10:18;26:16;35:1;
  83:16;95:1;97:5,13,
  14;101:10;112:15
**11/16 (1)**
  125:12
**11:04 (1)**
  95:8
**11:15 (1)**
  95:5
**11:18 (1)**
  95:8
**115 (1)**
  84:12
**11th (6)**
  135:12;139:18;
  140:1,7,21;141:7
**12- (1)**
  83:16
**12:18 (1)**
  134:9
**12:45 (1)**

134:9
**12:52 (1)**
  138:8
**120 (2)**
  118:12;123:25
**14 (2)**
  10:3,23
**14th (2)**
  140:10,25
**15 (2)**
  10:23;146:1
**15,943,857 (1)**
  134:20
**15.9 (1)**
  127:17
**150 (9)**
  51:18,24;52:12,
  19;53:8;83:20;84:8;
  93:3;119:13
**150- (1)**
  52:24
**150-million-dollar (3)**
  83:15,23;92:21
**152 (3)**
  46:22;47:4;50:8
**15th (9)**
  48:5;58:5;59:25;
  67:12;68:8;84:25;
  113:7;120:16;
  122:12
**16 (2)**
  104:4;146:1
**16th (9)**
  58:10;105:2;
  112:20;119:4;
  122:13;130:12;
  135:11;138:17;
  140:8
**17 (2)**
  104:4;146:2
**17th (1)**
  135:7
**18 (2)**
  34:11;56:13
**18.9 (1)**
  66:21
**18.9-million-dollar (1)**
  60:17
**18th (5)**
  43:13,20;81:18;
  119:3;135:5
**19 (2)**
  34:18;56:13
**19,864,000 (5)**
  61:15;66:19;
  103:9,20;134:20
**19,864,000-dollar (1)**
  50:23
**19.8 (1)**
  104:4
**19th (2)**
  43:21;112:19
**1st (7)**

134:9

23:13;58:23;64:6;
104:23;113:5;
118:18;119:15

**2**

**2 (9)**
  56:22;57:7,13;
  60:8;61:20;67:9,10;
  132:1;145:12
**2:03 (1)**
  145:20
**2:06 (1)**
  148:14
**20 (1)**
  35:4
**2014 (1)**
  69:13
**2015 (11)**
  70:5;78:16;79:6,
  12,14,22;83:3;84:7;
  107:3,7,9
**2016 (14)**
  58:23;70:17;79:7;
  80:1,4,25;81:9,12;
  82:10;83:16,23,24;
  107:7;128:15
**2017 (2)**
  120:19,21
**21 (1)**
  35:7
**21st (1)**
  90:3
**248 (1)**
  119:21
**25 (1)**
  35:12
**25,000 (1)**
  35:12
**250,000 (3)**
  37:15,16;40:3
**250,000-dollar (2)**
  37:14;40:1
**25th (1)**
  90:3
**26th (4)**
  23:13;67:21;
  68:11,13
**28th (3)**
  68:14;90:3;121:7
**29th (1)**
  91:4

**3**

**3 (4)**
  10:8;33:14;56:23;
  57:9
**30 (1)**
  56:24
**30th (1)**
  40:7
**31 (5)**

**DELIVERY AGENT, INC., et al.**
Case No. 16-12051 (LSS)

October 11, 2016

39:19;71:18;
101:10;130:15;
132:16
**31st (14)**
40:8;41:11;48:7;
49:3;75:6,23;89:7;
90:9;113:18;118:15;
120:5;122:17;134:3;
135:1
**363 (2)**
43:2;80:17
**366 (1)**
9:21
**3663b (1)**
9:23
**366c2 (1)**
9:23
**37 (1)**
36:18
**3rd (3)**
55:17;97:2;108:9

**4**

**4 (3)**
10:8;108:14;
131:20
**4.2g (1)**
27:1
**45 (2)**
30:17,18
**46 (1)**
124:1
**4th (3)**
59:3;108:17;132:2

**5**

**5 (5)**
10:8;58:22;61:14,
16,20
**50,000 (1)**
35:12
**500,000 (3)**
37:18,19;112:13
**503b9 (1)**
38:20
**5th (1)**
90:7

**6**

**6 (1)**
10:8
**6.1m (1)**
26:23
**60 (1)**
40:4

**7**

**7 (3)**
9:18;33:24;34:14

**7d (1)**
34:18
**7th (2)**
23:10;25:21

**8**

**8 (4)**
10:10;33:25;
34:20;131:20
**8:40 (1)**
27:14
**8a (1)**
35:4

**9**

**9.2 (1)**
83:13
**9:30 (1)**
135:7
**90 (2)**
118:13;123:25
**9th (1)**
79:13