# **<u>EXHIBIT B</u>**

```
 1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2

 3    IN RE:                          .  Chapter 11
                                      .
 4    MAXUS ENERGY CORPORATION,       .
      et al.,                         .  Case No. 16-11501 (CSS)
 5                                     .
                                      .  Courtroom No. 6
 6                                     .  824 Market Street
                                      .  Wilmington, Delaware 19801
 7                                     .
                   Debtors.           .  October 19, 2016
 8    . . . . . . . . . . . . . . . .  11:00 A.M.

 9                      TRANSCRIPT OF HEARING
              BEFORE HONORABLE CHRISTOPHER S. SONTCHI
10                UNITED STATES BANKRUPTCY JUDGE

11    APPEARANCES:

12    For the Debtors:          Joseph Barry, Esquire
                                YOUNG CONAWAY STARGATT & TAYLOR LLP
13                              1000 North King Street
                                Wilmington, Delaware 19801
14
                                James Peck, Esquire
15                              Jordan Wishnew, Esquire
                                J. Alexander Lawrence, Esquire
16                              MORRISON & FOERSTER LLP
                                250 West 55th Street
17                              New York, New York 10019

18    ECRO:                     LESLIE MURIN

19    Transcription Service:    Reliable
                                1007 N. Orange Street
20                              Wilmington, Delaware 19801
                                Telephone:  (302) 654-8080
21                              E-Mail:  gmatthews@reliable-co.com

22    Proceedings recorded by electronic sound recording:
      transcript produced by transcription service.
23

24

25
```

```
 1  APPEARNACES (Continued):

 2  For U.S. Trustee:        Linda Casey, Esquire
                             UNITED STATES DEPARTMENT OF JUSTICE
 3                           Office of the United States Trustee
                             844 King Street, Suite 2207
 4                           Wilmington, Delaware 19801

 5  For YPF SA Entities:     Howard Seife, Esquire
                             CHADBOURNE & PARKE LLP
 6                           1301 Avenue of the Americas
                             New York, New York 10019-6022
 7
     For the Committee:      Adam Harris, Esquire
 8                           SCHULTE ROTH & ZABEL LLP
                             919 Third Avenue
 9                           New York, New York 10022

10  For Occidental Chemical Corporation:
                             Christopher Shore, Esquire
11                           WHITE & CASE LLP
                             1155 6th Avenue
12                           New York, New York 10036

13                           Kathy Patrick, Esquire
                             GIBBS & BRUNS LLP
14                           1100 Louisiana, Suite 5300
                             Houston, Texas 77002
15
     For Ashland Entities:   Natasha Songonuga, Esquire
16                           William Hatfield, Esquire
                             GIBBONS P.C.
17                           300 Delaware Avenue, Suite 1015
                             Wilmington, Delaware 19801-1058
18
     For Lower Passaic River Study Area:
19                           Charles Dale, III, Esquire
                             K&L GATES LLP
20                           State Street Financial Center
                             One Lincoln Street
21                           Boston, Massachusetts 02111-2950

22

23

24

25
```

1                              <u>INDEX</u>

2                                                              <u>Page</u>

3  <u>NOTICE OF AGENDA MATTERS:</u>

   For the Debtors, by Mr. Barry                              4
4  For the U.S. Trustee, by Ms. Casey                         7
   For the Debtors, by Mr. Peck                              20
5  For YPF SA Entities, by Mr. Seife                         24
   For the Committee, by Mr. Harris                          26
6  For Occidental Chemical, by Mr. Shore                     30
   For the Debtors, by Mr. Wishnew                           48
7  For Occidental Chemical, by Ms. Patrick                   51
   For Ashland Entities, by Ms. Songonuga                    52
8  For Ashland Entities, by Mr. Hatfield                     53
   For Lower Passaic River Study, by Mr. Dale                55
9  For the Debtors, by Mr. Alexander                         56

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings commence at 11:00 a.m.)

2          (Call to order of the Court)

3               THE COURT:  Please be seated.

4               MR. BARRY:  Good morning, Your Honor.

5               THE COURT:  Good morning.

6               MR. BARRY:  Joseph Barry of Young Conaway Stargatt

7     & Taylor on behalf of the Debtors.

8               Your Honor, this is our regularly scheduled

9     omnibus hearing.  We have a pretty hefty agenda today, Your

10    Honor.  So unless you have any thoughts to the contrary I'd

11    like to dive right in.

12              THE COURT:  That's fine.

13              MR. BARRY:  We do have some -- there is some

14    movement on some of these items, but we'll get to those as we

15    move through the agenda, Your Honor.

16              Items 1 and 2 Your Honor has entered orders on and

17    we thank you for that.  Item 3 is our KEIP motion.  Your

18    Honor, we just wanted to thank the Committee and the U.S.

19    Trustee for working through all of their issues on that

20    motion such that it could be approved under certification of

21    counsel yesterday and we thank Your Honor for entering that

22    without the need for a hearing.

23              Your Honor, the next item is the Debtors' motion

24    seeking to approve the sealing of certain of private home

25    addresses of its employees and retirees.  So, Your Honor,

1    this came up in the context of the Debtors' 341 meeting when

2    the Debtor had filed its schedules and sofas.  We redacted

3    the private home addresses of their employees and retirees;

4    citing, in the global notes, privacy concerns.  We also noted

5    that --

6              THE COURT:  We used to have these things call

7    phonebooks that your address was in and it was publicly

8    available to the world and all you had to do was look up the

9    name, you could find out where people lived and nobody died

10   as a result of phonebooks.

11             MR. BARRY:  Understood, Your Honor, but this is

12   exactly the kind of information that Section 107(c) covers.

13   107(c) --

14             THE COURT:  Addresses?

15             MR. BARRY:  It does, actually, Your Honor.  107(c)

16   allows the Court to protect a means of identification if it

17   would pose a threat to identify theft; and means of

18   identification is defined by:

19             "Any name or number that may be used alone or in

20             conjunction with any other information."

21             And here any other information is actually two

22   things; it's their home address and it's their identification

23   as an employee or as a retiree.

24             To your point, Your Honor, with respect to the

25   white pages we actually did a couple of small research

1  projects and spot check to see how easy it would be to locate

2  the home addresses for these people using just their names

3  and it was actually quite difficult.  We took one step

4  further and did a secondary research project to determine,

5  using just the state in which you could glean that these

6  employees resided.  So New Jersey, for example, or Texas, for

7  example.  Again, given the vast amount of information that's

8  out there it's not as freely or exceedingly available as one

9  would think.

10          So, Your Honor, our view is similar to that of

11  Judge Gross.  He has a recent decision, oral ruling if you

12  will --

13          THE COURT:  Yeah, Judge Silverstein went the other

14  way though just last week I believe.

15          MR. BARRY:  Fair enough.  So we have at least one

16  Judge on either side of this, but one point we did make in

17  our papers, Your Honor, is the situation you faced in the Wet

18  Seal case.  As you may remember this is a situation where a

19  third party filed fraudulent notices of change of address for

20  two creditors.  Your Honor called that fraudulent.  You

21  referred it to the U.S. Attorney's office.

22          So we actually did a little digging in connection

23  with this motion and found out that this person is actually

24  still at it.  So in connection with -- since your ruling in

25  August of 2015 that party has filed similar papers in 16

1   bankruptcy cases around the country  including eight in this

2   jurisdiction.  The reason I raise that, Your Honor, is

3   because it seems to me that that is a real identifiable

4   threat of identity theft that's ongoing and occurring in this

5   Court.  And weigh it against the relative importance of this

6   information these are employee and retiree home addresses.

7            They have little to no significance to the overall

8   restructuring effort.  We will give them notice as required

9   to their home addresses.  Again, we just don't want to expose

10  them to any undue risk of identity theft.  And we think that

11  given what Your Honor dealt with in <u>Wet Seal</u> and the fact

12  that that is still occurring in this jurisdiction even after

13  a referral was made to the U.S. Attorney that that militates

14  in favor of confidentiality.

15            THE COURT:  Okay.

16            MR. BARRY:  Thank you, Your Honor.

17            THE COURT:  You're welcome.

18            MS. CASEY:  Good morning, Your Honor, Linda Casey

19  on behalf of the U.S. Trustee.

20            Your Honor, the U.S. Trustee has seen a larger

21  number of creditors coming in and either filing their

22  schedules and statements with redacted information or seeking

23  to seal this information.  The code and the rules require the

24  identity and the addresses of the creditors to be disclosed.

25  We start with the principle that the Courts are an open

1  process that the public should have the right to information

2  for.  Section 107 provides that certain information can be

3  redacted for cause.

4         There are two issues with the present motion.  The

5  first is, as Your Honor pointed out, addresses are not the

6  kind of information that are means of identification that

7  107(c) seeks to protect.  The means of identification that

8  107(c) seeks to protect are those laid out in 18 U.S.C.

9  Section 1028(d) which does not include the physical address;

10 it does include IP address, it does include account numbers,

11 social security numbers, it includes names, but it does not

12 include the physical address.

13        In fact, as Your Honor pointed out, it is easy to

14 get the white pages, whitepages.com, now.  If there are

15 physical white pages list addresses, deed records list

16 addresses.  And, although, we heard from counsel that it was

17 difficult we don't have a declaration or any facts.  I looked

18 myself up and I was able to find my address very easily.

19        The second important part is what's the cause?

20 The cause here is this amorphous generic threat of identity

21 theft.  And when you weight it against what the purpose is,

22 the purpose is there needs to be transparency and disclosure.

23 And there are a lot of people who might want the addresses.

24 It's not just for service.  The press might be interested in

25 contacting these people, attorneys might be interested in

1    contacting these people and the employees might have an

2    interest in having the attorneys contact these people, other

3    creditors may be interested in contacting them, there may be

4    a desire to put together an Ad Hoc Committee, there may be a

5    desire to find out what's happening with your claim and these

6    addresses are important for many people.

7         On the flipside they're saying, but there's this

8    amorphous generic threat of identity threat.  That's in every

9    case for every individual for every corporation.  The example

10   they use, the Wet Seal case, this individual, who's only one

11   individual, was not targeting individual creditors, they were

12   targeting corporate creditors.  There is certainly -- I think

13   it would be hard-pressed for a Debtor to come in and say we

14   should be able to redact the addresses of our corporate

15   creditors because this one individual is going around and

16   putting in notices of change of address, and that's the only

17   alleged fact they have here.

18        When you weight the interest in the public and

19   disclosure versus this amorphous threat they have not

20   established cause to reject home addresses which are A) not

21   the kind that Congress intended to protect and B) they

22   haven't established cause.  The U.S. Trustee does acknowledge

23   that if it were put on the claims agent website then perhaps

24   it's open to everybody who has an interest address worldwide.

25   And I don't see there's any reason why they couldn't not put

1  them or put a redacted version on the claims agent website,

2  but putting it on the Court docket, where its required, and

3  serving it to the creditors and other parties in interest who

4  require it there needs to be a greater showing of cause then

5  just someone might use this.

6         The schedules requires the names and addresses to

7  be disclosed.  The bankruptcy code does not provide that

8  addresses are the types of information that can be redacted.

9  They haven't shown cause and here we do have a high level of

10 public disclosure in the Bankruptcy Courts.  So, therefore,

11 we would ask that the motion be denied.

12         THE COURT:  Thank you.

13         MR. BARRY:  Your Honor, just three points.  First,

14 I think every harm is generic and amorphous until it occurs.

15 What 107(c) is intended to do is to actually prevent that

16 from occurring.  As a dovetail to that, Your Honor --

17         THE COURT:  Yeah, but how do you deal with the

18 fact that, you know, it's specifically required that the

19 addresses be provided.  So you've got, perhaps, a conflict

20 here, but, you know, you've got a specific requirement in the

21 code that says that the schedules should contain this

22 information.  107(c) doesn't specifically -- I mean its broad

23 language, but it doesn't specifically address what's,

24 otherwise, specifically required in another section of the

25 code.  So you've got a conflict where you've got a specific

1  requirement and a general exception and doesn't the specific

2  govern over the general.  In that situation it's a question

3  of statutory interpretation.

4          MR. BARRY:  Your Honor, on that point the Third

5  Circuit Court of Appeals has, in a non-presidential opinion,

6  actually identified address as one of the items that is

7  included in other information for purposes of this statute.

8  So 18 U.S.C. 1028(d) is what we are talking about here.  It

9  provides that:

10          "A means of identification is any name that may be

11          used alone or in conjunction with any other

12          information to identify a specific individual

13          including, in sub-section 7(c), address."

14          The Third Circuit Court of Appeals, again, in an

15  un-presidential opinion, said that address means mailing

16  address.  In this specific case it was used to convict a

17  criminal who used the name of an actual person and that

18  actual person's home address in a counterfeit check scheme.

19  The Third Circuit Court of Appeals -- again, I want to make

20  sure I'm clear.  This is a non-presidential opinion, but it

21  goes into deal.  It says:

22          "A mailing address can constitute means of

23          identification for purposes of 18 U.S.C. 1028(d)."

24          So that may or may not resolve it for purposes of

25  the perceived conflict, but the actual language of the

1  statute, I think, permits this.  Its two things.  It's not

2  just address.  It's also their identification as an employee

3  or as a retiree which may or may not make them more

4  susceptible to identify theft as an individual.

5        The second point is the difference between a

6  corporate creditor and an individual creditor.  We think that

7  that militates in favor of protecting the individual.  It's

8  certainly not true of every instance, but I would think

9  generally the financial burden that would be imposed on an

10 individual, particularly here rank and file employees, having

11 their identity stolen as a result of a bankruptcy case that

12 they didn't consent to the disclosure of their information

13 would be more impactful then that on a corporate creditor.

14        The final point, Your Honor, with respect to the

15 formation of a Committee we would let the Trustee know that

16 we were in any instance of a formation of an Ad Hoc or other

17 committee work with them to get this information provided.

18 It was kept confidential in accordance with what we hope Your

19 Honor will do, which is to enter a seal order.

20        Your Honor, the case that I was referring to is

21 called US vs. Graham 46 Fed. Rep. 265.  So with that, Your

22 Honor, again, we actually -- this wasn't cited in our papers,

23 it was something we just found, but the Third Circuit Court

24 of Appeals, again, has specifically found in a non-

25 presidential opinion that home mailing address does

1  constitute the type of information that's a means of

2  identification for purposes of 18 U.S.C. 1028(d).

3          THE COURT:  Well, I mean there's no question that,

4  you know, name plus address is more valuable for identity

5  theft purposes then name.  There is a line drawing problem

6  here.  Identity theft is a very serious and important issue.

7  Actually, as a victim of it last year when someone filed a

8  fraudulent tax return and I still don't have my refund

9  because the IRS is still working through this nine months

10  later I take it very seriously.

11          The problem I'm having is if we're talking about

12  social security numbers or, you know, birthdays your, sort

13  of, a step further.  But the problem I'm having is there's

14  nothing in the statute that says you have to disclose that

15  information; whereas, it says you have to disclose addresses.

16  So I'm struggling between this fact where I've got something

17  that specifically says I have to do addresses even though

18  putting the name in the address clearly makes it more likely

19  than just the name in order to allow people to perform

20  identity theft on these people; albeit, perhaps, not much

21  because as Ms. Casey said I dare say if everybody in this

22  room got on whitepages.com and put their name, in

23  whitepages.com they would get a whole list of people with

24  that name.  If Your Sontchi there aren't many and they would

25  have addresses and telephone numbers.  I mean it is publicly

1  available information.  You're not seeking to redact the

2  names of the employees and the retirees, right, just the

3  address or have I got that wrong?

4         MR. BARRY:  Well, that's right and that's why this

5  falls under 107(c) because what 107(c) requires is name and

6  any other information.  Again, I think it's important to

7  note, Your Honor, that it's not just their addresses.  It's

8  actually name, address and the name of their employer.

9         Now, I don't know much about identity theft, but I

10 imagine that having someone's name and home address is

11 meaningful to someone that would attempt to steal someone's

12 identity, but I think knowing their employer is probably more

13 meaningful and probably better information which is disclosed

14 on our schedules.  We have the name, we have the fact that

15 they're an employee or retiree of one of the Maxus Energy by

16 Debtor.  All we're asking to do is holdback that one piece of

17 information that could ostensibly link the two together to

18 make it greater information.

19        So, again, we think that that's really the

20 critical piece.  It's not just the addresses.  It's the fact

21 that we get two critical pieces of information; the fact that

22 they're employees of Maxus and their names.  We just don't

23 want that one link that's in the middle that will,

24 potentially, give away critical information.

25        I think the last thing is, Your Honor, the Trustee

1    accused us of being cavalier about our disclosure

2    obligations.  Again, saying that its only one person that's

3    perpetuating an ongoing fraud in this Court by stealing

4    identities of corporate Debtors seems a tad cavalier to me.

5    I mean, this presents a real risk to folks.  Again, it's

6    ongoing; notwithstanding a referral to the U.S. Attorney.  I

7    think, in my mind, that takes this from what Ms. Casey called

8    the amorphous threat to the actual threat.

9          THE COURT:  All right.  Well, while I'm aware of

10   that situation, not to put too fine a point on it, I don't

11   actually have any evidence that that's occurring.  I don't

12   have any evidence to back up the statements that you've made.

13   I don't have any evidence to back up the statements I've

14   made.

15          MR. BARRY:  You asked for it, Your Honor.

16          THE COURT:  Okay.  Well, if you've got evidence

17   now's the time.  It's a contested motion.

18          MR. BARRY:  What I would say, Your Honor, is,

19   obviously, I don't have a witness.  These are documents that

20   have been filed on the dockets of cases in Delaware and

21   around the country.  Your Honor was presented with some of

22   these in the context of the hearing in the Wet Seal case.

23          THE COURT:  Yeah, was that Wet Seal?

24          MR. BARRY:  Seal 123, I think, it was subsequently

25   called.

1          THE COURT:  Yeah.

2          MR. BARRY:  And what we have here is, that stack

3   including, the some 16 additional filings that we found since

4   your ruling in August of 2015.  I don't think we need a

5   witness to admit these into evidence.  I think Your Honor can

6   simply take judicial notice that these have been filed,

7   they're stamped by each of the respective Courts, simply as

8   proof that the person that you had referred to the U.S.

9   Attorney continues to file papers and bankruptcy cases around

10  the country.  I don't think that we need a foundation for

11  that because I don't think those are adjudicative facts.  I

12  think you're just taking judicial notice of the fact that a

13  Court accepted a filing by what seems to be that same person.

14         THE COURT:  All right.  Well, you can certainly

15  approach.

16         MR. BARRY:  Your Honor, I'll admit, this is just a

17  stack of the filings.  If Your Honor wants them organized in

18  some way we are happy to submit supplemental briefing.

19         THE COURT:  This person's central European

20  distribution.  Good lord.  This person is very busy and I

21  think it's because he's currently incarcerated and needs

22  something to do in his free time.

23         MR. BARRY:  He must have quite a hand cramp, Your

24  Honor, because these are all handwritten.

25         THE COURT:  All right.  Ms. Casey.

1          MS. CASEY:  Your Honor, first this is not a proper

2    request for judicial notice.  I'm not going to stress that

3    too much.  The question of this individual -- first of all,

4    its one individual filing handwritten notes and mostly with

5    corporate entities.  So if this is sufficient information to

6    redact the addresses of the individual employees it's also

7    sufficient to redact the addresses of all of the creditors in

8    every case in Delaware because of this gentleman.  I don't

9    think that's sufficient.

10         The question regarding the Third Circuit case, I

11   just want to briefly go over that.  It's non-presidential.  I

12   haven't read it, but 1028(d)(c), and I don't have the exact

13   words here, talks about electronic and IP addresses.  It does

14   have a comma in between IP and electronic; so addresses is on

15   its own, but it is a section that's discussing IP and

16   electronic addresses.  That makes sense because those are not

17   publicly filed information such as your social security

18   number, your account number, your IP address, your electronic

19   address, something like that that's not publicly available;

20   your addresses are.

21         The fact is that there already is two pieces of

22   information; the name and the employer that is disclosed.

23   It's the address that they're seeking to redact.  The address

24   is important for notice purposes.  It's important for people

25   to determine whether notices be sent and certificate of

1   services.  It's important for parties who wish to contact

2   these employees.  There has been no record made today of a

3   real risk to go beyond what 1028(d) does and protect

4   addresses which are A) publicly available and B) mandated to

5   be discloses in these cases.

6           THE COURT:  All right.  Thank you.

7           All right.  I'm going to deny the motion to

8   sustain the U.S. Trustee's objection.  I do take this matter

9   very seriously, but I think that it's a line drawing

10  question.  The reality is there is a specific requirement to

11  list name and address of the creditors.  While 107 exists to

12  protect against, among other things, identity theft and the

13  confidentiality what we don't have is that next step that

14  isn't specifically required by the statute where were dealing

15  with social security numbers which, of course, would not

16  happen.

17          We're not revealing bank account numbers.  We're

18  not revealing email addresses.  We're not revealing other

19  information, credit card numbers, etc., that would very much

20  result in a high risk of identity theft which is a very

21  serious concern for the Court to protect innocent creditors

22  from that occurring; however, I believe that while there is

23  some marginal additional risk by associating the Debtors'

24  name, the name of the person and their address as opposed to

25  simply the name of the person and their affiliation with the

1  Debtors, I think that that marginal additional risk is not

2  sufficient to trigger 107 over riding the specific

3  requirement elsewhere in the code that that information be

4  disclosed.

5      While I appreciate the presentation of these

6  notices of both, it looks like, 2002 notices, but also

7  notices of changes of address by Mr. Bassley (sp) who has

8  continued to make a career out of this, I would note that I'm

9  not sure that's sufficient evidence, but his focus has been

10 on corporate creditors not individual creditors.  While there

11 is a general concern about corporate creditors versus

12 employees or retirees, there is no specific evidence that

13 would indicate there's an additional risk here that would

14 give rise to a reason to overturn the specific requirement in

15 the statutes.

16      So I appreciate and would follow-up with the U.S.

17 Trustees comment which is that this not be disclosed on the

18 claim agent website.  Did I hear that correctly?

19      MS. CASEY:  That's correct.

20      THE COURT:  All right.

21      MR. BARRY:  We will do that and work with them on

22 a form of order, Your Honor.

23      THE COURT:  Yeah, put that in a form of order.

24      Just so we're clear, I really am following, I

25 think, what my colleague Judge Silverstein ruled last week in

1    a different case.  I don't have the case name off the top of

2    my head, but I did actually have a conversation with her

3    about it.  So I'm aware of the issue.  I think she took the

4    same approach and same ruling as I'm doing today. I think

5    that's the appropriate way to go forward.

6             MR. BARRY:  Thank you, Your Honor.

7             THE COURT:  You're welcome.

8             MR. PECK:  Good morning, Your Honor, James Peck of

9    Morrison & Foerster for the Debtors.

10            The next item on today's calendar is the contested

11   motion for an order extending the exclusive periods.  I am

12   pleased to report that an agreement, in principle, has been

13   reached to resolve the motion.  I want to provide a brief

14   overview of status as to how we got here and also to, at some

15   point before I sit down, introduce Howard Seife of Chadbourne

16   who represents YPF and who has certain statements to make to

17   the Court regarding the issue of corporate governance.

18            The motion to extent exclusivity was originally

19   filed requesting 135 day extension consistent with a

20   milestone date that is contained in the Debtor-In-Possession

21   financing provided by YPF.  We still think that is a

22   reasonable extension for this case, but would note that

23   issues surrounding the governance issues that I'll be

24   describing in a moment have been difficult to resolve, time

25   consuming, extremely sensitive and they are still an open

1  issue; although, one that I think is closer to final

2  resolution as of today.

3         The agreement that has been reached, actually, is

4  the product of extensive discussions that have occurred on

5  several occasions between counsel for the Creditors

6  Committee, Adam Harris who's here in the room, and myself.

7  Shortly after the motion to extend exclusivity was served Mr.

8  Harris contacted us and said that there would be consent to a

9  60 day extension, but no more, and also raised some issues

10 concerning the accelerated time table for developing a plan

11 of reorganization.

12        We rejected, at the time, the 60 day extension,

13 but stated that we were actively interested in pursuing plan

14 discussions with the Committee and, in fact, general

15 discussions along those lines have taken place including a

16 meeting that took place on September 8th in our offices.

17 That meeting was generally referenced during the last status

18 conference that took place on September 7th.  It was an all-

19 day meeting.  It involved individual members of the Creditors

20 Committee and their counsel. And in the afternoon we had

21 some, I'll call them, brainstorming sessions that were more

22 informal with professionals for the Creditors Committee.

23        I can report, and I don't think this is

24 controversial, that we have a very productive professional

25 relationship between the Debtors' professionals and

1   professionals for the Committee.  That's true of the

2   financial advisors as well as counsel.

3          The issue which has been identified in the

4   opposition papers filed by counsel for the Committee in a

5   limited objection and by counsel for Occidental Chemical

6   primarily relate to the fact that governance surrounding the

7   Maxus board of directors remains an open issue.  In the reply

8   that was filed this week by counsel for YPF a representation

9   was made that certain bylaws and corporate resolutions in a

10  form acceptable to YPF in its capacity as equity holder would

11  be distributed before today's hearing.  In fact, those were

12  distributed yesterday afternoon; regrettably too late for

13  members of the board of directors of Maxus to consider those

14  resolutions and to react to them.

15         The construct here is for the board of directors

16  of Maxus, which includes three directors who are affiliated

17  with or appointed by YPF, and two independent directors to

18  establish bylaws that are more robust than those that are

19  currently in place and that would delegate certain

20  authorities within the bankruptcy case solely to the

21  independent directors.  We think we are making progress and

22  based upon conversations immediately before today's hearing

23  I'm not sure that the objectors agree that the progress is

24  substantial enough, but we have managed to develop what I

25  consider to be a workable reformulation of a proposed

1 resolution that appeared in the reply papers submitted by

2 Maxus on Monday of this week.

3         In that original proposal we had suggested that an

4 order be entered extending exclusivity for 90 days with the

5 understanding that it would be shortened to 60 days if we

6 were unable to resolve the governance issues that are still

7 outstanding in a manner acceptable to all parties by November

8 15th.  In conversations immediately before today's hearing we

9 have worked out, what I believe to be, an acceptable

10 resolution that's a different version of what I've just said.

11 Exclusivity would be extended by agreement for 60 days from

12 the date of an order that you would be entering and there

13 would be an ability to extend exclusivity for an additional

14 30 days.  So it would be a total of 90 days provided that

15 parties in interest including counsel for the Debtor, counsel

16 for the Committee and counsel for YPF were to stipulate to

17 that extension.

18         Unstated in this is that there would be active

19 negotiations and structuring discussions in reference to a

20 plan of reorganization, and also active efforts on the part

21 of all parties in interest to develop acceptable governance

22 resolutions acceptable to the Maxus board.  We're hoping that

23 can take place within the very same timeframe originally

24 announced; basically, between now and November 15th.

25 Hopefully, it would happen sooner, but my understanding is

1  that the stipulation to extent for an additional 30 days is

2  not directly tied to governance; although, an acceptable

3  resolution of governance is assumed to be part of that

4  stipulation.

5          It's also understood that this form of order would

6  be without prejudice to the ability to the Debtors to file to

7  a motion to extent exclusivity beyond 60 days even if the

8  parties I've identified have not consented to the 30

9  additional days and that the right to extend exclusivity

10 would be beyond 90 days, consistent with our original request

11 for 135 days.  That is the basic understanding that we have.

12          I'd like to, with the Court's permission, simply

13 turn the podium over to Howard Seife so that he can make some

14 comments in reference to YPF's position on governance.  Then

15 I expect other parties who are involved in this will want to

16 be heard.

17          THE COURT:  Okay.

18          MR. PECK:  Thank you.

19          MR. SEIFE:  Good morning, Your Honor, Howard Seife

20 from Chadbourne & Parke counsel for YPF SA.

21          I think Mr. Peck has done a good job of outlining

22 the situation of where we are today.  YPF acknowledges that

23 governance changes need to be made and reflected in the

24 bylaws.  We have met with the Committee and we have discussed

25 what those changes might be.  That was some time ago and we

1   know the parties are frustrated that, perhaps, YPF hasn't

2   responded in a concrete way as expeditiously as they would

3   have hoped.

4           As Mr. Peck noted we did circulate, last night,

5   propose amendments to the bylaws.  They provide for greater

6   powers to the independent directors and it provides three

7   different buckets for dealing with corporate governance;

8   items which are in the exclusive control of the independent

9   directors, items that the independent directors would take

10  the lead on, subject to ultimate full board consent and

11  resolution, and the third items would be those in the bucket

12  which the full board, ultimately, would have responsibility

13  to approve.

14          We understand Committee counsel has some comments

15  and reservations about the drafts.  We have told them that we

16  are prepared to meet with them and discuss them.  We heard

17  their concerns when we met with them and we're hopeful

18  consensual resolution can be met.  So we're pleased to report

19  that.

20          There has been nothing nefarious here in the delay

21  that has occurred in resolving this issue.  YPF is a

22  government instrumentality with the elections in Argentina.

23  At the end of the year there were massive changes at YPF.

24  There was a new board of directors, new CEO, new general

25  counsel.  So it's a process to educate new people at YPF as

1   to our Chapter 11 processes here and how we deal with issues

2   like corporate governance, which we have frequently in

3   complex Chapter 11 cases.

4           So I think the delivery last night of the revised

5   bylaws was a big step forward.  We look forward to further

6   discussions with Committee counsel, Mr. Harris, and we're

7   hopeful that we will be able to reach a resolution.

8           MR. HARRIS:  Good morning, Your Honor, Adam Harris

9   from Schulte Roth & Zabel on behalf of the Creditors

10  Committee.

11          I to want to put this discussion into context,

12  albeit from a slightly different perspective then what you've

13  heard so far.  Your Honor, you put basically this case into

14  buckets of principle issues that need to be addressed.  There

15  is the settlement agreement which is, obviously, the

16  centerpiece of the strategy here from the company's

17  perspective and YPF's perspective and then there is

18  everything else.

19          There are a series of other issues that have

20  nothing to do with the settlement agreement which, frankly,

21  were the subject of the meeting on September 8th.  We wanted

22  to understand what the other assets were, what the sale

23  ability are, what the potential value there is, what the

24  status of various litigations are that might result in

25  affirmative recoveries for the benefit of the estate.  We

1  needed to understand the company's pension liabilities and

2  how those might be treated in part of a plan of

3  reorganization.  We, obviously, were very concerned about the

4  ultimate transition of remediation projects for which Tierra

5  is currently responsible; from Tierra to, whether it's, OCC

6  or any other potentially responsible party under CIRCLA as

7  part of the resolution of the case.

8         Frankly, Your Honor, when we looked at the key

9  employee incentive plan that was first proposed by the

10 Debtors in light of those other items we suggested to the

11 company, in which they were very receptive to as it turns

12 out, that they milestones for earning incentive payments

13 under the KEIP should be very much directed towards

14 resolution of all the other issues in this case over which

15 they have responsibility.

16         So when you look at the KEIP, Your Honor, there

17 are milestones tied to developing and implementing transition

18 plans for remediation for those people within management who

19 are responsible for dealing with those issues.  There are

20 milestones for earning incentive payments that are directed

21 to completion of the pre-marketing sale process and ultimate

22 sale of the Debtors' few remaining assets; whether it's the

23 Neptune investments or whether it's the overriding royalty

24 interests.  There are incentive payments that are tied to

25 developing a plan for dealing with the contaminated real

1  estate that Tierra still owns; whether it's through a sale

2  process, an abandonment process or something else.

3       All of this, Your Honor, was dictated by the

4  Committees' desire to move this case along because, frankly,

5  when you cut right through it this case isn't that

6  complicated.  There are very few assets here.  There are

7  significant contingent liabilities.  There is some litigation

8  claims against third parties and in numerous other cases that

9  Your Honor has overseen, the parties here have been involved

10  with, you'd walk into Court and say this is what we got,

11  we're going to put together a plan that creates some kind of,

12  you know, liquidating trust or litigation trust, and dump the

13  assets into that and we'll make distributions as and when

14  money becomes available.

15       The only complicating factor in this case, Your

16  Honor, is that it came either burdened by or benefited by

17  this settlement agreement which, frankly, the company has

18  agreed is going to be baked into and made a part of its plan

19  of reorganization.  The creditors aren't so sure that they

20  want that.  How we slot that in is really the only open issue

21  here.  The timing of it, whether it gets done independently

22  as a 9019, whether it gets incorporated into the plan itself

23  and becomes subject to voting requirements of a plan, whether

24  we have a toggle plan that says if the settlement gets

25  approved we go one way in terms of distributions, if it

1    doesn't those claims go to a litigation trust and we come out

2    in a different form.  Those are the issues that need to get

3    dealt with, Your Honor, but they're not that complicated,

4    frankly, at the end of the day.

5              The ability to move forward with them is dependent

6    on having a receptive and unbiased counterparty to negotiate

7    with which is why the corporate governance issues have been

8    so important to us dating back to July 13th when we were

9    here, Your Honor, and they first got raised, and the

10   Committee took the position, frankly, in front of Your Honor

11   that all case administration issues should be exclusively

12   within the problems of the special committee and that anybody

13   who sits on the board who is there at the behest of or at the

14   request of YPF, other than the special committee members,

15   shouldn't be involved.  They just shouldn't be involved

16   because, frankly, I can't see any circumstance under which

17   any plan that gets done here isn't adverse in some way shape

18   or form to YPF; even if it's a simple thing as cancelling

19   their equity interest at the end of the day, but it's going

20   to go deeper than that and I think its obvious to everybody.

21             That is what we have tried to clarify in these

22   resolutions in the forms that, frankly, we revised and sent

23   back to YPF and the Debtors in mid to late August.  Despite

24   numerous conversations that have been held, the first

25   response we really got to that came through last night.  So,

1  Your Honor, we said in our papers and we continue to believe

2  this case needs to move along.  We need to know sooner rather

3  than later whether we've got somebody we can work with here

4  or whether we need to go it our own way here.

5          We understand the implications of that, Your

6  Honor, but if we can work through the structuring issues on

7  the plan and get something that's approved by the company and

8  we can all move forward on together that would be great, but

9  I would like to know that sooner rather than later, as I

10 said.  We think that the 60 days will afford us that

11 opportunity.

12          Your Honor, if you would like, I know it's been

13 raised in the papers, I'm happy to give Your Honor an update

14 on kind of where the Committees' investigation is relative to

15 the settlement agreement, but I also want to give other

16 parties the opportunity to speak to the exclusivity issue

17 itself.

18          THE COURT:  Yeah, I don't need that at this point.

19          MR. SEIFE:  Okay.  Thank you, Your Honor.

20          THE COURT:  Thank you.

21          All right.  Mr. Shore, good morning.

22          MR. SHORE:  Good morning, Your Honor, Chris Shore

23 from White & Case on behalf of OCC.

24          I have said to the Court before I have always,

25 kind of, looked at exclusivity hearings as the opportunity to

1  educate the Court on what's going on in the plan process.

2  What are people thinking?  Are we going to get there in any

3  time and what are the challenges facing us?  I think the

4  short answer to report to the Court now and the reason we

5  asked for 60 days, and I think the reason the Committee asked

6  60 days, we need another 60 days to kind of figure out are we

7  really going to be heading towards a plan process, are these

8  cases going to be forced into a conversion or is this just

9  some kind of expensive theater that's going on, but isn't

10 going to lead to any process in the Bankruptcy Court at all.

11      This case, I don't think anybody is going to

12 dispute, started from a three party dispute.  YPF, Maxus and

13 OCC were involved in litigation in New Jersey.  The Court

14 needs to understand, be real about what people's real

15 interests are here because there is a lot of rhetoric going

16 back and forth about, you heard today, don't see this as

17 nefarious; people are trying to get out in front of what

18 people think their strategies are, but the strategies, I

19 think, Your Honor probably already knows right what people's

20 strategies are.

21      Let me lay out our view of it.  YPF, it had its

22 chance to settle bilaterally with OCC.  That litigation was

23 going on.  There was a mediation.  They chose not to go that

24 route.  YPF had its opportunity to litigate the claims in New

25 Jersey.  It decided it didn't want to litigate the claims and

1  cause the Debtors to file the bankruptcy proceeding on the

2  eve of trial.  YPF, clearly seeking an advantage in the

3  bankruptcy process.  There's nothing wrong with that;

4  everybody is entitled to use the bankruptcy process to their

5  advantage.  They put independents in place.  The independents

6  were given the authority to analyze the claims and propose a

7  settlement.  The independents negotiated with YPF and YPF

8  came in to an opening offer in that litigation.

9        This litigation, and this is important for why we

10  care about the bylaws, this litigation was not over every

11  issue.  It was over a very discreet issue; whether between

12  the time that YPF took control of the company in 2011, which

13  was the discovery cutoff, whether or not YPF used its

14  position on Maxus's board to adversely dominate the company

15  in violation of the -- or in a manner that allowed for a

16  piercing of the corporate veil.  In other words, what were

17  those YPF board members doing during that period that caused

18  injury to the corporation?

19        YPF and the independents reached a settlement

20  agreement and with that agreement in hand YPF had one goal.

21  Mr. Seife has one goal; one for the barn and get that

22  agreement done without OCC's input.  They already know what

23  OCC's view is of the likelihood that $130 million dollar

24  settlement is sufficient.  So that's got to be their

25  strategy; how do we get the settlement agreement with the

1  Debtors' approved without OCC's input.

2          What do the Debtors want?  For us that raises the

3  question of who the Debtors are which is why the bylaws

4  matter to us.  Each of the Debtors has a board of directors

5  with six members; the two independents who were appointed to

6  the boards the day of the filing except for Maxus when they

7  came in months earlier and four YPF designees.

8          Two of the YPF designees, including the chairman,

9  were involved in the actions complained of; that is that they

10 assisted in the domination of the Debtors' board or in that

11 case Maxus's boards when these transactions took place.

12 Those boards now, all six members, have two jobs in this.

13 One, stay out of Chapter 7 because if in the event of a

14 Chapter 7 the decision as to whether or not to settle goes

15 away from the boards and is handed to a Chapter 7 Trustee.

16 Two, make sure that Occidental or any creditor as opposed to

17 the settlement doesn't get a chance to vote on the settlement

18 of YPF's claims because they already know that will not end

19 well.

20          When you take those two considerations into mind,

21 the Debtors' strategy don't convert to a 7 and don't let this

22 go to a vote, you see what's happening in the case.  Why is

23 the 9019 filed outside of a context of a plan because it

24 can't afford to put it in a plan.  Why has the transition

25 been so rocky?  Why are we going in fits and starts?  Why

1   isn't it all done now?  Well, when everything is transitioned

2   off there is not going to be an operational business that

3   deserves to stay in 11.  Why do we have tranche B loans?  Why

4   did the DIP lender agree to subordinate to everybody?  That

5   is purely to keep the EPA out of the case because if the EPA

6   ordered Tierra to perform and YPF, as its owner, to see that

7   performance was done it would be out of their hands.

8           Why do we have to keep coming back into Court to

9   get information?  I think this is just part of a strategy. I

10  think they think that if YPF -- sorry, if OCC has to keep

11  coming back in and filing things like Rule 2004 motions and

12  asking for status conferences the Court is going to perceive

13  us as the aggressor in the process and give them the benefit

14  of the doubt. I don't know why they're running that strategy.

15          Why no plan negotiations with OCC?  You'll note

16  from their response they say they've been talking to the

17  Committee.  They have not talked to OCC.  They already know

18  that that's going nowhere, at least to the extent that what

19  they want to do is seek OCC's support for a plan that

20  includes the current YPF settlement.  The biggest part, in

21  our view, of the YPF dominated board strategy is to never,

22  never let the creditors put a plan forward before that

23  settlement gets up or down by the Court.  They will not let

24  that happen.  They can't let that happen because the moment

25  they let the creditors vote and the creditors say no that

1  strategy, that whole strategy that's been set up to run this

2  through bankruptcy falls apart.  That is why we have the

3  current exclusivity dispute.  The Debtors can't tolerate

4  creditor suffrage on the settlement agreement that they put

5  forward.

6       Now what do we want? I don't mean that to say in

7  saying it's a three party dispute minimize all the other

8  creditors, but the fact is, is that all the other scores of

9  creditors who are here represented by the Committee including

10  the Federal Government are collateral damage from the

11  strategy that YPF put in place to try to isolate the

12  environmental indemnification liability that Maxus had and

13  the problem that's going on at Tierra with all of the cites

14  for which they were a YPF derivative owner of.

15       So what do we want?  I said at the beginning and

16  I'm still clear first and foremost, and I hope Your Honor

17  understands this, OCC's primary interest is in making sure

18  that there is an efficient and effective handoff of the

19  remediation cites.  You can't overestimate the chaos that the

20  Debtors have caused with their strategy of heading into

21  bankruptcy without advising anybody of what was going on.

22  That was critical to this process of trying to stop the

23  litigation, would not tell anybody, not us, not the state

24  regulators, not the federal regulators, not any of the trade

25  that this thing was going to be going into bankruptcy.  So we

1  spent the bulk of this case leading up to the services

2  agreement, which is up this afternoon, in trying to stabilize

3  the process and make sure that at the end of the day nothing

4  is dropped.  We can't, nobody, not us, not any of the other

5  creditors, not the Court, and not the Debtors and not YPF can

6  tolerate a cite falling through the cracks.

7          As I said OCC has even gone so far as to offer to

8  pay just to get it done.  We've had to actually pay to get

9  information which was created under the assumption of defense

10 that Maxus had under its prepetition agreement.  Second, OCC

11 wants a rational resolution of the YPF Legacy litigation.

12 We've got very definitive views as a party who's been

13 litigating as to a piece of that settlement.

14          What happened between 1996 and 2011, right,

15 because we've been litigating that?  We're in the process of

16 looking at what happened between 2011 and 2016.  In fact,

17 nobody has looked at that.  I think the Debtors will tell you

18 they did not look, in their investigation, at a single

19 document created after 2011 nor did they interview anybody

20 about what happened from 2011 forward.  So we're in the

21 process, and that's what we're using the next 60 days for, of

22 trying to figure out that in addition to the claims that

23 existed what else exists out there.

24          Two, given that it is the target of the bankruptcy

25 and is the largest creditor OCC wants a voice in the

1  resolution of the case.  We're just going to fight to make

2  sure that this gets run in a plan process subject to 1129.

3  That is not wrong.  We've got a lot of heat in the two

4  replies about somehow that's bad that we want to voice in

5  this, but recognize YPF's strategy was designed to isolate

6  OCC.  All of the other creditors during those years were paid

7  off, including the funded debt claims, to make sure that

8  there was never a creditor that went unpaid who could force

9  this thing into bankruptcy.  It's a little rich for the

10 Debtors to be complaining that OCC's voice is loud in the

11 case when they were the ones who made sure that OCC's voice

12 would be the loudest voice in the case.

13       So what's the problem with just limiting to 60

14 days a requested?  I think they had offered two reasons.  One

15 is that we're a disgruntled litigant and you shouldn't listen

16 to us at all.  Here is the problem with the bylaws and why we

17 make such a point about it.  The claims being settled are

18 that YPF, through its control, engaged in unjust behavior

19 that's sufficient to pierce the corporate veil in Delaware.

20 As I said, the current directors were engaged in the activity

21 that leads to the conclusion of unjust activity.  In fact,

22 YPF thought the behavior was egregious enough that its

23 opening offer to settle those claims was over $100 million

24 dollars.

25       So the notion that the YPF directors who are

1   sitting on those boards are going to have their hand in the

2   plan process as to which the settlement agreement is the

3   centerpiece, according to the Debtors, is just not tolerable

4   to us.  Now as a matter of history we were the ones who

5   raised the bylaw issue the first time.  Since that time we've

6   only had two interactions with the Debtors.  The Debtors'

7   strategy has been let's just not deal with OCC, they're just

8   going to be loudly protesting what we're doing, we'll deal

9   with the Committee, but we raised the issue.

10          Since that time, the first time that we discussed

11  this at that September meeting and made very clear to

12  Morrison & Foerster if you don't have this issue resolved as

13  of the time of the exclusivity hearing, they didn't file

14  their motion for exclusivity yet to extend exclusivity, it's

15  going to be an issue for us. We got no engagement all the way

16  up to the time of the filing of the objection and only got a

17  call afterwards at which point I was informed that the YPF

18  board members were stepping down; that was going to be the

19  resolution.  The next thing we got were the bylaws that came

20  across last night.

21          Now they don't fix the problem.  I raise this

22  because there's this notion that there's going to be an

23  additional 30 day extension if these bylaws get fixed.  I

24  just predict that they're not going to get fixed here.  This

25  is why.  The way this is set up right now, as Mr. Seife laid

1  out, is that the independents can come up with all their plan

2  processes, but they have to propose it and it has to be

3  resolved by the entire board.  In other words, if we got into

4  a situation in the next 60 days when the creditors Committee,

5  all of the creditors and the independents came to the view

6  that the best plan out there is a liquidating plan that just

7  pushes off, outside of bankruptcy, the resolution of the

8  claims.  Under the bylaws that would still have to be

9  presented to the YPF board, dominated board, to authorize the

10  filing and solicitation of that plan.

11        So all the YPF board members have to do at that

12  time is say it took us eight week, twelve weeks to get the

13  bylaws done.  It's very difficult to figure out how to do

14  things in Argentina.  We just can't really get to the issue

15  of whether or not we should solicit a plan that is supported

16  by the Creditors Committee, the independents and everybody

17  else.  So that's just kicking the can down the road to

18  another exclusivity fight.

19        I get it, they agreed to 60 days now and maybe

20  another 30 day consensual Evergreen adjournment, but unless

21  they pull the YPF directors out of the process of the plan

22  that is let the independents be truly independent, then we're

23  just going to be back here in 60 days.  Just want to manage

24  expectations on that.

25        To go back to my analogy, what YPF is saying right

1   now is that they want to tout that they put the independent

2   referees into watch the game, but they are reserving the

3   right that if they disagree with the decision made by the

4   referees on an issue even as important as the plan they

5   reserve the right to cancel the game at any time; that is

6   they can pocket veto a plan and run the entire process into a

7   Chapter 7 because if they're being told that the creditors

8   don't support the solution their next best attempt is going

9   to be with a Chapter 7 trustee to try to get a Trustee to

10  bite on a number that the creditors won't support.

11          If they want to stay in an 11 creditors are

12  entitled to their day and 60 days is about as long as we can

13  wait to get a plan, get it on file, get the disclosure

14  statement approved, get the solicitation done, get the

15  confirmation done and then go effective which requires

16  transitioning off all those cites before the money runs out.

17          THE COURT:  Thank you, Mr. Shore.

18          Let me just, before I hear a response, say I

19  haven't seen the bylaws; no one sent them to me.  I don't

20  want to see them.  They are, obviously, in negotiation and I

21  don't want to get into the weeds about what they say or don't

22  say, but I will say this which is something, I think, the

23  lawyers who appear in front of me would agree.  I have

24  consistently been a vigorous advocate for independent robust

25  authority for independent directors when they are facing

1   inter-company or any other kind of conflict and ended up

2   costing the estate about $80 million dollars at the end of

3   the day, but it was the right thing to do and it ultimately

4   led or has led to a settlement in that case and ultimately,

5   at least one of the estates being or one side of the estates

6   being confirmed.

7         I'm not jumping in.  I don't know what the bylaws

8   say, don't say.  I don't want to get into a conflict over how

9   Mr. Shore is interpreting them and whether that's right or

10  not right, but I just want to say what I think everybody

11  already knows which is that when you have a conflict

12  situation you need vigorous robust procedures that allow

13  independent decision makers to control how the Debtor

14  proceeds.  That is certainly something that I will support

15  and even fight for in my cases.  So I just thought I would

16  put that on the record.

17        Mr. Peck, if you would like to -- we have a lot to

18  do today so I don't want to spend too much more time on this

19  because I have to be somewhere at three p.m.  So we have a

20  lot to do.

21        MR. PECK:  Consistent with the time constraints

22  and also with the comments just made I want to say a couple

23  of things.  First, the Debtors are as concerned about the

24  governance issues that have been expressed by, at least,

25  counsel for the Committee.  I'm not going to endorse pretty

1  much anything that Mr. Shore just said, but the issues

2  presented raise serious issues of case administration for us

3  as professionals representing this estate.  In a manner that

4  has been personally uncomfortable for me I have, effectively,

5  put myself in the middle of that and I have taken the

6  position with the company that I'm only listening to the

7  independent directors.  That takes me only so far.

8          We need effective governance that leads to,

9  effectively, that outcome, but up to this point, and I've

10  said this to YPF, I've said this to the Committee and I said

11  it in the September 8th meeting that was attended by Mr.

12  Shore in our offices when he asked a very direct question.

13  So who's going to decide the question of how the settlement

14  agreement is going to be prosecuted.  Who is going to decide

15  questions relating to plan structure?  I answered very

16  directly, the independent directors.

17          Now what was my basis for saying that, because

18  that's the only way that we can effectively represent the

19  Debtors in this case?  We can't be subjected to domination by

20  YPF.  We can't be in a situation in which there is a conflict

21  that implicates the integrity of the Chapter 11 process.  As

22  Debtors' counsel we believe we owe that to this Court and to

23  all stakeholders.  We're doing the best we can in a difficult

24  situation.

25          Now as far as what Mr. Harris said in reference to

1   how simple this plan is, actually not so simple.  It's an

2   oversimplification what he said.  There are structuring

3   issues.  There are issues relating to governmental claims.

4   The governmental bar date is mid-December.  Sixty days only

5   gets us to the point that we know what our claims are.  So to

6   suggest that this is something we've all done before is not

7   quite right.

8           It is true that the settlement agreement

9   represents a critical keystone in the plan process.  Mr.

10  Harris has talked about a toggle.  We've talked about that

11  with him.  The fact that OCC, itself, is not sitting in a

12  room with Mr. Harris is meaningless.  OCC is the most vocal

13  member of a three member Creditors Committee represented by

14  competent professionals.  I am confident their voice is being

15  heard and expressed by the Committee.

16          So in short we hear you, we're part of the process

17  of solving this, we think we're going to get there and if we

18  don't there will be obvious consequences to the case.

19          THE COURT:  Okay.

20          MR. PECK:  The 60 days is a start.  We hope we

21  extend it beyond that by consent because governance is

22  resolved in a manner that's satisfactory to parties and if

23  it's not we reserve our rights to do what we have to do in

24  Court to get the time that we need.

25          With that, I think I should turn it over to other

1  items on a compressed agenda including the services agreement

2  that was referenced.

3          MR. SEIFE:  If I may, Your Honor.  Howard Seife

4  again for YPF.

5          I feel like I do need to respond to some of the

6  comments made because there's been a lot of mud thrown on YPF

7  and a lot of it is based on incorrect facts and assertions.

8  I think a little background, and I'll be brief, Your Honor.

9          THE COURT:  I didn't hear any mud, I have to say.

10         MR. SEIFE:  Allegations; in any event, I would

11 like to address some of the background to the case that

12 hasn't been expressed so far.

13         First of all, YPF has owned Maxus for over 20

14 years.  And during that 20 years, it has pumped $1.4 billion

15 dollars into the company so it can meet its obligations.  Now

16 Mr. Shore suggested that was a big thing enabling Maxus to

17 pay its creditors including OXY throughout that period, but I

18 think that's what a responsible parent does and did in this

19 case.

20         During that period of time, Maxus performed over

21 $700 million dollars of remediation work for the benefit of

22 OXY.  It's not surprising that they were disappointed and

23 concerned about the filing of the bankruptcy, because that

24 support is coming to an end.  But it's an end which YPF

25 provided $34 million dollars of subordinated financing for a

1   transition, which would be successful and without any blips

2   in the road.  Because these are OXY's obligation to

3   remediate.  They're the ones that acquired and merged with a

4   company that had these environmental obligations and they're

5   the ones that have been noted by the environmental

6   authorities as being the primary party that needs to clean up

7   the sites.

8          It's not Maxus.  Maxus has a contractual

9   indemnification, which until the date of its bankruptcy

10  filing, it fully met and provided substantial support for

11  remediation for the benefit of OXY.  So it's not surprising

12  that all of this support, which YPF provided for its

13  subsidiary over the years must come to an end during the

14  course of the litigation.  The magistrate even commented why

15  YPF was continuing to support its bankrupt and insolvent

16  company while it was doing what it thought was the

17  responsible thing.

18         The litigation, which was for the sole benefit of

19  OXY, is now for the benefit of all the creditors to the

20  estate.  And the settlement will be for all creditors and not

21  for OXY.  And I'm sure that is something which OXY finds hard

22  to swallow.

23         Some of the factual assertions by Mr. Shore are

24  just incorrect.  There are no directors on the Maxus or

25  Jared's boards that date back to the alleged events that were

1    the subject of the litigation and piercing the corporate

2    veil.  That is absolutely not true.  There are not four YPF

3    directors.  There are three YPF designated directors.

4              In their papers, they allege that YPF selected

5    counsel for the independent directors.  Again, totally false.

6    It was completely the choice of the independent directors.

7    There was no persuasion or pointing in any direction by YPF

8    in that decision.  There's suggestion that one of the

9    independent directors was a colleague of mine at Chadbourne

10   some years back.  Again, absolutely not true.  Mr. Nicholas,

11   one of the independent directors, was an associate at

12   Chadbourne, left 26 years ago, six years before I joined the

13   firm.

14             So there are two sides to the story, Your Honor.

15   There is an investigation being conducted by the Committee.

16   The Committee will investigate whether the appointment to the

17   independent directors was proper, whether their process was

18   proper, whether their hiring of professionals was proper,

19   whether they fully considered the merits of the lawsuit,

20   whether they had a fully engaged counsel and experts to

21   negotiate the settlement, and whether the settlement is an

22   appropriate range.

23             All of those things, the Committee is looking at,

24   and I'm sure they'll do a full and thorough job.  The

25   suggestion that discovery ended in 2011, again totally wrong.

1  The depositions continued into 2016, so there's no issue of

2  stale information or productions here.  So just want to

3  highlight some of the factual inaccuracies in the

4  presentation.

5           The fact that YPF has acted responsibly here in

6  supporting Maxus and continues to do so.  And we look forward

7  to engaging with the parties to a consensual resolution of

8  governance issues.

9           THE COURT:  Okay.  Thank you.

10          So I'll get an order under certification of

11  counsel on exclusivity?

12          UNIDENTIFIED:  Yes, Your Honor.

13          THE COURT:  Okay.  We're going to take a short

14  recess, then we'll turn to the next item on the agenda.

15      (Recess taken at 12:15 p.m.)

16      (Proceedings resume at 12:25 p.m.)

17      (Call to order of the Court)

18          THE COURT:  Please be seated.  Let's give everyone

19  just a moment to get situated.

20          Okay.

21          MR. WISHNEW:  Good afternoon, Your Honor, Jordan

22  Wishnew, Morris & Foerster, for the Debtors.  Next matter on

23  today's agenda is item six, the Debtors' motion for entry of

24  an order approving a services agreement by and between Tierra

25  Solutions and Occidental.

1           Your Honor, I'm pleased to report that using the

2   break just now, we resolved the last limited objection.  So,

3   at this point, there are no objections going forward.  Let me

4   just make a brief presentation to point on the record how

5   we've come to this point.

6           THE COURT:  Okay.

7           MR. WISHNEW:  So, Your Honor, the limited

8   objections that were filed dealt with the objections concerns

9   regarding Section 10 of the services agreement, which dealt

10  with a limited exclusive royalty free license to use any and

11  all site information.

12          To make clear to the parties that their rights to

13  this information was not being limited, the Debtors and

14  Occidental agree to two additions to the services agreement

15  and two additional provisions to the order of approval.

16          The first agreement or the first change to the

17  services agreement is in Section 9.1.2, subpart (3), which

18  will read,

19              "The receiving party shall not be prevented,

20              however, from using or disclosing information:

21              sub (1) which already is or becomes published

22              or, otherwise, publicly available through no

23              breach of this agreement; subpart (2) which is

24              already known to the receiving party at the time

25              of disclosure as evidenced in writing; subpart (3)

1          which the receiving party is required by any

2          applicable provision of any contract, law,

3          regulation, administrative order or Court order to

4          disclose; subpart (4) which the receiving party

5          roughly learns from some source other than

6          directly or indirectly from the disclosing party;

7          or subpart (5) which was not, otherwise,

8          confidential prior to the date of this agreement."

9          In addition, the following sentence will be added

10    to Section 10 on the services agreement,

11          "The exclusive license granted in this paragraph

12          does not prohibit the parties from complying with

13          any existing legal obligation to disclose site

14          information to any other person or entity pursuant

15          to any applicable provision of any agreement, any

16          regulation, any administrative or judicial order

17          or applicable law."

18          Finally, Your Honor, two additional paragraphs

19    will be added to the order approving the motion.

20          "First, nothing in the services agreement or,

21          otherwise, herein shall impair the ability of any

22          party in interest to invoke its own rights, if

23          any, to obtain site information, as that term is

24          defined in the services agreement, or to seek

25          discovery of other documents, information, or

1          materials as allowed by law.  Any applicable

2          provision of any agreement, regulation,

3          administrative order, or Court order and all such

4          rights are preserved."

5          Finally, Your Honor, the additional -- the second

6  paragraph should be added to the order would be:

7          "All site information shall be preserved during

8          dependency of these bankruptcy proceedings,

9          notwithstanding any party in interest, document

10          retention policies, or similar policies."

11          Finally, Your Honor, with regards to the limited

12  objection filed by the Ashland Group, both the Debtors and

13  Occidental will endeavor in the coming days to reach a

14  consensual order, which we would present under certification

15  to the Courts providing for a sharing of information sought

16  by those parties related to operating unit three on the

17  Passaic River.

18          And with that, I will turn the podium over to Ms.

19  Patrick on behalf of Occidental, to the extent she has

20  anything more to add.

21          THE COURT:  Thank you.

22          MS. PATRICK:  Good morning, Your Honor, Kathy

23  Patrick for Occidental.

24          Occidental's position is twofold.  First, that

25  while the services agreement should not have been necessary

1  because all of the information subject to it is information

2  Occidental was already entitled to receive by virtue of

3  Debtors' admitted obligations to defend, indemnify and hold

4  OXY harmless, we are pleased that as a result of the

5  consistent and diligent effort of the Debtors' environmental

6  professionals that we have reached this place.

7          Occidental is, obviously, not happy to have to pay

8  for information it is entitled to receive by virtue of an

9  obligation Debtors already owe.  But having access to this

10 information will help to effectuate the smooth transition of

11 site; although, there are, as the Court knows from our

12 pleading, ongoing issues.

13         As it pertains to the resolution with the Ashland

14 Group, the resolution is essentially as follows.  The consent

15 order will provide that they can request the information that

16 they have sought.  And if they are entitled to receive it, it

17 will be produced.  If there is a dispute about the question

18 whether the information sought is privileged or whether they

19 are entitled to it, we will come back to the Court on short

20 notice to resolve that so that this will not be prolonged.

21         It has taken considerable time to get here, but

22 this agreement is beneficial to the estates.  It brings in

23 revenue that, frankly, we think the estates are not entitled

24 to have to pay for data that we were supposed to get for

25 free.  But we're here, and we urge the Court, therefore, to

1   approve the agreement and to accept the settlement of a

2   consent order.

3           Obviously, if other parties claim the same rights

4   that the Ashland entities claim, there is no preference for

5   Ashland, just as there is no preference for OXY.  Everybody's

6   rights are preserved.  Our privileges are preserved.  Their

7   contractual rights, if any, are preserved.  And we should now

8   move forward and get this entered so we can go on and get it

9   done.  Thank you, Your Honor.

10          THE COURT:  Thank you.

11          MS. SONGONUGA:  For the record, Your Honor, good

12  afternoon, Natasha Songonuga of Gibbons PC on behalf of what

13  is now being termed the Ashland entities.

14          For purposes of identifying the entities, Your

15  Honor, they're Ashland, Inc., ISP Chemical LLC, Mallinckrodt

16  LLC, National-Standard LLC, Harris Corporation, Givaudan

17  Fragrance Corporation, Hoffmann-La Roch Inc., and Tiffany and

18  Company.

19          Your Honor, with me today is my collogue William

20  Hatfield, and Bill's going to address, Your Honor, the need

21  for the information.  And we do agree with, as stated on the

22  record by OCC, in terms of the fact that we have agreed to

23  work out a consent agreement, Your Honor.  I think what needs

24  to be clarified is that that request for the information is

25  simply whether it be an email or a letter to the Debtor

1   requesting -- that the data that we're requesting be produced

2   and not a motion practice before this Court.

3           THE COURT:  Okay.  Thank you.

4           MR. HATFIELD:  Good afternoon, Your Honor, William

5   Hatfield.

6           I thank that Debtors' counsel and also Occidental

7   for working out this issue with us.  We look forward to this

8   consent order.  And I want to give you a little background on

9   why this is necessary.

10          The Transition Services Agreement is designed to

11  move all of the environmental obligations of the Debtors over

12  to Occidental, but there's a hole in it.  And there's a hole

13  with respect to the Diamond Alkali site, which has four

14  operable units.

15          Now each unit is a piece of the Diamond Alkali

16  site.  The first unit is the Upland site at 80-120 Lister

17  Avenue.  The second unit is the lower 8 miles, which you've

18  heard about, the focus feasibility study, which Occidental

19  has chosen to step up and to conduct a remedial design.  That

20  was just announced a couple of weeks ago, Your Honor.

21          The third unit is the lower 17 miles.  There is a

22  separate operable unit for the lower 17 miles.  There is an

23  agreement with the EPA called an Administrative Order on

24  Consent that about 73 parties entered into in 2007. That is

25  the subject of the cooperating parties groups.  It's AROA,

1  which is a group agreement that bound those 73 parties

2  together to conduct this comprehensive study, which has cost

3  well over a $100 million dollars and still continues today.

4         However, in 2012, Your Honor, the Debtors, Maxus

5  and Tierra, as well as Occidental pulled out of the CPG group

6  and stopped performing this Administrative Order on Consent,

7  this 17 mile study.  So there's a hole in the transition

8  services agreement.  The conduct of the study is no longer

9  being continued by the Debtors or Occidental.  But there's

10 data that's been gathered by the Debtors on behalf of

11 Occidental in Operable unit 4, Your Honor, which is the

12 Newark Bay site.  The Newark Bay study areas to the south of

13 the Passaic River. It's the water body that receives the flow

14 from the river on a daily basis.

15        So we've been looking for two things that are not

16 privileged, Your Honor; just the data, the raw data that's

17 gathered by the Debtors on behalf of Occidental that's

18 necessary to conduct the modeling for Operable Unit 3 and 4.

19 And this is all encompassed inside of another Administrative

20 Order on Consent with the EPA that Occidental entered into in

21 2004 for Newark Bay, which was amended in 2010.

22        So I just want to give the Court some background

23 that the Transition Services Agreement, hopefully, amended by

24 this consent order will allow for the orderly transition of

25 information from the Debtors to the other parties that are

1   conducting the cleanups, both to OXY and to the cooperating

2   parties group, as well as the Ashland Group.

3           If we have a dispute, Your Honor, about whether

4   there's a right to this data or other public information that

5   we're seeking in our papers, we hope to be before you whether

6   it's in person or by a conference call, because it's very

7   important that this data be provided, both to Occidental and

8   to the extent that we're seeking data that's not privileged

9   or not confidential to our group and to the cooperating

10  parties group.

11          Thank you, Your Honor.

12          MR. WISHNEW:  Your Honor, so unless you -- I

13  apologize, Your Honor.

14          MR. DALE:  Good afternoon, Your Honor, I'll be

15  very brief.  Charles Dale, K&L Gates; I represent the

16  cooperating parties group.

17          I think Debtors' counsel has correctly recited the

18  agreement that resolves our limited objection.  We thank the

19  Debtors and Occidental for working with us.  And we too will

20  work with the Ashland Group and the parties to resolve site

21  information access.  Thank you, Judge.

22          THE COURT:  Thank you.

23          MR. WISHNEW:  Your Honor, unless you have any

24  additional questions, we will prepare an order and send under

25  certification to the Court.

1                THE COURT:  I have no questions.

2                The Court will approve the order when it receives

3     it.

4                MR. WISHNEW:  Thank you very much, Your Honor.

5     I'd like to turn the podium over to my colleague, Alex

6     Lawrence, to address the next matter on the agenda.

7                MR. LAWRENCE:  Good afternoon, Your Honor, Alex

8     Lawrence, counsel to the Debtors.

9                I'm here in connection with the last conference we

10    had before the Court.  The Court asked that we give a status

11    update on environmental matters so that everybody would know

12    where things stand with Maxus and Tierra's work in that area.

13               And we submitted a letter to the Court so that

14    would be on the docket, so everyone would have access to it

15    and could read it, and could give Your Honor a preview as

16    well.

17               Today -- on the line, we have environmental

18    counsel from Morrison & Foerster, Bob Falk and Bill

19    Tarantino, but we also have Dave Rabbe who is the president

20    of Tierra Solutions.  Tierra is the affiliate of Maxus that

21    does all the environmental remediation work.  Occidental has

22    its own affiliate, Glenn Springs, which does environmental

23    work for Occidental.

24               And what we found, what we're trying to achieve

25    here, Your Honor, is to have a system in place where the

1  engineers, the professionals from Tierra Solutions and from

2  Glenn Springs can work together preferably without

3  interference by counsel.  It seems to work best when the

4  professionals work together.  And the first step in that,

5  Your Honor, was to put the services agreement in place and

6  we're pleased that that agreement is being put in place.

7          Even before that, though, Your Honor, we entered

8  into on September 13th and there's already been four work

9  orders under that services agreement and the parties are

10  working collaboratively and understand well with those

11  projects.  In addition to that, Your Honor, we had a meeting

12  with the creditors committee on September 8th.  And at that

13  meeting, the idea of having a transition working group where

14  Occidental and Maxus and Glenn Springs and Tierra could meet

15  and come up with a plan to transition projects from Tierra to

16  Occidental.

17          We put in a place a plan to put that together.

18  There's already been one meeting, a formation meeting between

19  Mr. Rabbe and counterparts at Glenn Springs in Houston where

20  they have put together certain proposals to move forward with

21  that transition working group.  And I understand their first

22  meeting is going to be next week in which they're going to

23  discuss transition, a transition agreement, how to move these

24  projects, ultimately, from Tierra to OXY.

25          And my understanding and we've asked counsel from

1 OCC to let us know if they have any issues with how this is

2 progressing.  Our understanding is that it is progressing

3 well.  We've heard nothing about any disputes between Glenn

4 Springs and Tierra or any issues in that regard.  That things

5 are progressing well with respect to these collaborative

6 relationships.

7          There have also been some information requests,

8 Your Honor.  First off, on September 21, I believe it was,

9 the Committee asked that the Debtors provide periodic reports

10 on these remediation projects.  They sent us a matrix that we

11 were to complete for each of the sites.  We've done that.  We

12 delivered them yesterday.  It's hundreds of pages of

13 materials.  There's a matrix for each site.  And then there's

14 supporting material behind those matrices and those have been

15 provided to the creditors committee.  We also provided them

16 to OCC and to the EPA, as well, Your Honor.

17          And the last point is the 2004 request.  It was on

18 Tuesday, October 4 that we received that request to provide

19 certain information.  We turned it around on October 14th, we

20 provided a response.  We also supplemented that yesterday

21 with some additional information.  And I understand that

22 there was issue with respect to our estimate of future costs

23 that remained outstanding.  But my understanding from

24 discussions with counsel from OCC is that they are going to

25 adjourn their 2004 motion.  So, hopefully, we'll be able to

1  work collaboratively with respect to getting whatever

2  information they need.

3           I've offered Mr. Rabbe to speak to counterparts at

4  Glenn Springs if they have any questions about our response

5  and, hopefully, that will work itself out as well, Your

6  Honor.

7           THE COURT:  Thank you.

8           MR. LAWRENCE:  Thank you.

9           THE COURT:  Ms. Patrick.

10           MS. PATRICK:  Your Honor, the concerns that we've

11  had and that we continue to have are that, in general, it

12  seems to require that Occidental invoke the processes of the

13  Court in order to get access to information.  And let me

14  explain what I mean by that.

15           And as I explain what I mean by that, let me draw

16  a distinction between the Debtors' environmental

17  professionals, Mr. Rabbe, Mr. Tarantino.  They have worked

18  very diligently when they are permitted to do so to provide

19  us with information.  But it is balkanized information.  It

20  comes through piecemeal and haltingly.  And at the level of

21  the information that we need in order to plan for the

22  transition of these sites and, importantly, resolve this

23  case, it is halting.

24           The Court will remember on September 7th that we

25  asked for and obtained a telephonic status conference to

1  request information on the environmental sites in general

2  and, specifically, on the spend and what was being done under

3  Tranche B.  And as a result of that conference, the Court

4  directed the Debtors to provide a report to the Court

5  concerning the status of those sites because they are

6  critical and of critical importance to the ongoing progress

7  of these cases.

8          On September 21st, the committee sent a proposed

9  reporting matrix to the Debtors to which the Debtors did not

10 respond until last night at 7:00 p.m.  In the meantime, the

11 Debtors filed their motion to extend exclusivity in which

12 they disclosed for the first time that they had "over 100

13 remediation projects" under way.

14         The list, the budgets for Tranche B of the DIP,

15 the list of sites were in the couple dozen range, not over

16 100.  And so Occidental filed a Rule 2004 request and asked

17 for somebody to sit down under oath and say, yes, these are

18 the sites.  This is what it is.

19         And in response to that, the Debtors did not

20 respond to that until October 14th when they sent some

21 information, but still not a catalog of their liabilities.

22 The liabilities that they purported to settle with YPF, the

23 liabilities that are the most important liabilities in this

24 case, and we didn't get that information until they

25 supplemented it, again, late last night.

1      We have not had a chance to review it.  But in

2  view of the fact that they are providing it, we are going to

3  adjourn the Rule 2004 request.  But at a more fundamental

4  level, Your Honor, the concern that Occidental continues to

5  have is that the Debtors' approach to this issue has been

6  don't worry, I got this.  But they will not tell the Court

7  what this is.  Even as of last night, we do not know what

8  those 100 remediation projects are.  And we don't know what

9  they're doing.

10      Now, there's a meeting scheduled for next week at

11  which the technical people will meet and at which we hope to

12  get further information.  But the services agreement doesn't

13  solve this issue.  The services agreement doesn't permit us,

14  in fact, to request information about the Tranche B funding.

15  And so without just standing here complaining about it, Your

16  Honor, the solution, I think, is this.

17      Let's have that meeting next week.  Let's find out

18  what the Debtors have in mind to facilitate the transition of

19  these sites.  If it resolves it, then we will inform the

20  Court of that at the next omnibus hearing and, hopefully, we

21  will have made considerable progress.  But if it doesn't, we

22  may need to come back to the Court because the concern that

23  we have is that it has only been when Occidental has

24  precipitated a hearing or request for a status conference

25  that the Debtors have been forthcoming.  And that is

1 regrettable and it is not a means by which you can ultimately

2 effectuate an orderly transition.

3          So we are where we are, but as it pertains to the

4 environmental status report that is the status.  It has been

5 pulling teeth, but we have got some teeth now.  We don't have

6 all of them.  And we may need to come back to the Court as a

7 consequence.  Thank you, Your Honor.

8          THE COURT:  Okay.  Thank you.

9          Okay.  So we'll continue the 2004 motion to the

10 next hearing, which I believe is November 17th.  Let's have

11 an updated status report as well.  I don't know if you

12 necessarily would need to bring the principles of the Debtor

13 for that hearing, but something in advance along the lines of

14 Mr. Peck's letter would probably be very helpful for the

15 Court.

16          And I continue to urge -- I know the Debtors have

17 a lot of fires to put out, but this is an issue of public

18 safety and is very important that it be resolved as smoothly

19 as possible.  And I fully expect -- and it sounds like many

20 of the professionals are working very hard to make sure that

21 happens, and I applaud them on all sides on those efforts.

22          Anything else?

23          UNIDENTIFIED:  Your Honor, that concludes this

24 morning's agenda.  Thank you.

25          THE COURT:  Very good.  Thank you

1           UNIDENTIFIED:  Now this afternoons.

2           THE COURT:  Now this afternoon, yes.  Thank you

3    very much.  We're adjourned.

4        (Proceedings conclude at 12:48 p.m.)

5

6

7

8                         CERTIFICATE

9

10   I certify that the foregoing is a correct transcript from the

11   electronic sound recording of the proceedings in the above-

12   entitled matter.

13
     /s/Mary Zajaczkowski                  October 21, 2016
14   Mary Zajaczkowski, CET**D-531

15

16

17

18

19

20

21

22

23

24

25