## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., *et al.*,[1] | ) | Case No. 01-01139 (KG) |
| | ) | Jointly Administered |
| Reorganized Debtors. | ) | |
| | ) | **Re: Docket No. 32825** |

**NORFOLK SOUTHERN RAILWAY COMPANY'S (I) ANSWERING BRIEF IN OPPOSITION TO REORGANIZED DEBTORS' MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. BANKR. P. 7056 FOR PARTIAL ALLOWANCE AND PARTIAL DISALLOWANCE OF CLAIM NO. 7021 AND (II) OPENING BRIEF IN SUPPORT OF NORFOLK SOUTHERN'S CROSS-MOTION FOR SUMMARY JUDGMENT**

POTTER ANDERSON & CORROON LLP
David J. Baldwin (DE Bar No. 1010)
R. Stephen McNeill (DE Bar No. 5210)
D. Ryan Slaugh (DE Bar No. 6325)
1313 North Market Street, Sixth Floor
Wilmington, DE 19899-0951
Telephone: (302) 984-6000
Facsimile: (302) 658-1192

*Counsel to Norfolk Southern Railway Company*

Dated: January 27, 2017

---

[1]      The Reorganized Debtors are W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc., or "Grace") and W. R. Grace & Co.-Conn. ("Grace-Conn.")

# TABLE OF CONTENTS

**Page(s)**

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS.................. 1

SUMMARY OF THE ARGUMENTS ............................................................... 2

STATEMENT OF FACTS ........................................................................... 3

    A.   The Parties' Contractual Relationship ................................................3

    B.   The Operation of the Debtors' Facility ..............................................5

    C.   The January 23, 1998 Accident ........................................................6

    D.   The January 26, 1998 Accident ........................................................6

    E.   The Georgia Litigation and Communications Between the Parties............7

ARGUMENT ............................................................................................ 8

I.    THE DEBTORS' MOTION FOR SUMMARY JUDGMENT MUST
    BE DENIED..............................................................................................8

    A.   Standard on Summary Judgment ......................................................8

    B.   The Material Facts Are Disputed ......................................................9

           1.   The Debtors Deny any Involvement with the
                January 23 Accident.........................................................9

           2.   The Debtors Ignore Their Involvement with the
                January 26 Accident.......................................................10

           3.   The Debtors Fail to Acknowledge Norfolk Southern's
                Attempts to Involve Them in the Georgia Litigation....................11

    C.   The Debtors Are Not Entitled to Judgment as a Matter of Law ...............13

           1.   Norfolk Southern's Claim is *Prima Facie* Valid ...........................13

           2.   The Debtors Have Not Shown That Norfolk Southern Cannot
                Provide Admissible Evidence .......................................................14

i

II.    THE TRIAL RECORD IS ADMISSIBLE IN THIS PROCEEDING..................17

       A.    Mr. Kirkland's Testimony is Admissible Under Rule 804(b)(1) of
             the Federal Rules of Evidence ...................................................................17

       B.    The Doctrine of Voucher Establishes Privity Between the Parties............19

       C.    Mr. Kirkland's Testimony, and the Entire Trial Record Are
             Admissible ...................................................................................................23

III.   SUMMARY JUDGMENT ALLOWING NORFOLK SOUTHERN'S
       CLAIM IS APPROPRIATE .................................................................................24

       A.    The Relevant Indemnification Provisions Establish the Debtors'
             Liability to Norfolk Southern.....................................................................25

       B.    The Evidence Establishes the Debtors' Negligence in Connection with
             the January 26 Accident..............................................................................28

       C.    Applying the Language of the Agreements to the Uncontested Facts
             Establishes Norfolk Southern's Right to Indemnification.........................30

             1.    The Debtors' Negligent Use of the Loading Spout Requires
                   Them to fully Indemnify Norfolk Southern in Connection with
                   the January 26 Accident................................................................31

             2.    Even if the Debtors Are Not Strictly Liable for Negligent Use of
                   the Loading Spout, They Must Fully Indemnify Norfolk Southern
                   Based on Their Failure to Comply with the Agreements ..............31

             3.    If the Debtors Are Neither Strictly Liable Nor Required to Fully
                   Indemnify Norfolk Southern for Breaching the Agreements,
                   They Must Still Indemnify Norfolk Southern for Half of the
                   Indemnification Claim ..................................................................32

       D.    The Debtors Have Failed to Refute the Applicability of the
             Indemnification Provisions .........................................................................33

             1.    The Location of the Accidents is Irrelevant to the
                   Indemnification Analysis ..............................................................33

             2.    The Debtors Are Liable, Notwithstanding Norfolk Southern's
                   Liability.........................................................................................35

CONCLUSION............................................................................................................ 38

## TABLE OF AUTHORITIES

**Cases**                                                              **Pages(s)**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986).................................................................................9

*Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co.*,
    180 F.3d 518 (3d Cir. 1999)....................................................................30

*Bruszewski v. U.S.*,
    181 F.2d 419 (3d Cir. 1950)....................................................................20

*Cecil's, Inc. v. Morris Mech. Enter., Inc.*,
    735 F.2d 437 (11th Cir. 1984) ................................................................12

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)................................................................................9

*Crawford v. Pope & Talbot, Inc.*,
    206 F.2d 784 (3d Cir. 1953)....................................................................20

*Ga. Ports Auth. v. Cent. of Ga. Ry. Co.*,
    219 S.E.2d 467 (Ga. Ct. App. 1975)........................................................36

*Haas v. 3M Co.*,
    613 Fed. App'x 191 (3d Cir. 2015)..........................................................19

*Humble Oil & Ref. Co. v. Phila. Ship Maint. Co.*,
    444 F.2d 727 (3d Cir. 1971)................................................................20-22

*In re Allegheny Int'l, Inc.*,
    954 F.2d 167 (3d Cir. 1992)....................................................................13

*In re Hartman*,
    2009 WL 4043096 (Bankr. D.N.J. Nov. 20, 2009)................................14-15

*In re Rudd*,
    104 B.R. 8 (Bankr. N.D. Ind. 1987).........................................................20

*Lloyd v. American Export Lines, Inc.*,
    580 F.2d 1179 (3d Cir. 1978)..................................................................18

*Master Blaster, Inc. v. Dammann*,
    781 N.W.2d 19 (Minn. Ct. App. 2010)..................................................22-23

*Master of Ross*,
    602 F.2d 604 (3d Cir. 1979)....................................................................24

*Molly Pitcher Canning Co. v. Cent. of Ga. Ry. Co.*,
    253 S.E.2d 392 (Ga. Ct. App. 1979) ............................................................34

*Richie v. Ingle*,
    2004 WL 6251539 (S.C. Ct. App. Apr. 13, 2004) ......................................28

*S. Ry. Co. v. Brunswick Pulp & Paper Co.*,
    376 F. Supp. 96 (S.D. Ga. 1974) ................................................................34

*S. Ry. Co. v. Ins. Co. of N. Am.*,
    183 S.E.2d 912 (Ga. 1971) ..........................................................................34

*S. Ry. Co. v. Springs Mills, Inc.*,
    625 F.2d 496 (4th Cir. 1980) ......................................................................35

*Steed v. Cent. of Ga. Ry. Co.*,
    529 F.2d 833 (5th Cir. 1976) ................................................................35, 37

*Town of Winnsboro v. Wiedeman-Singleton, Inc.*,
    398 S.E.2d 500 (S.C. Ct. App. 1990) ..........................................................12

*Transcraft, Inc. v. Galvin, Stalmack, Kirschner & Clark*,
    39 F.3d 812 (7th Cir. 1994) ........................................................................28

*Union Camp Corp. v. Louisville & Nashville R.R. Co.*,
    202 S.E.2d 508 (Ga. Ct. App. 1973) ....................................................19, 36

*United N.Y. Sandy Hook Pilots Assoc. v. Rodermond Indus., Inc.*,
    394 F.2d 65 (3d Cir. 1968) ..........................................................................22

*United States v. Pelullo*,
    964 F.2d 193 (3d Cir. 1992) ........................................................................16

*Wash. Gas Light Co. v. District of Columbia*,
    161 U.S. 316 (1896) ....................................................................................20

**STATUTES**

Federal Employers Liability Act,
45 U.S.C. §§ 51 *et seq.* ............................................................................ *passim*

**OTHER AUTHORITIES**

18A Charles Alan Wright & Arthur R. Miller,
    *Federal Practice and Procedure* §4449 (2d ed. 1981) ..............................20

19 A.L.R.3d 928 §3 ............................................................................................36

iv

47 Am. Jur. 2d *Judgments* § 606,
    Westlaw (database updated Dec. 2016) ........................................................20

59 Am. Jur. 2d *Parties* § 241,
    Westlaw (database updated Nov. 2016) ........................................................20

*Black's Law Dictionary* 10th ed. (2014) ..........................................................19

Dennis J. Turner, *Federal Rule of Evidence 804:*
    *Will the Real Predecessor-in-Interest Please Stand Up*,
    19 Akron L. Rev. 251 (1986) ........................................................................18

Fed. R. Bankr. P. 7056 ...............................................................................8, 15

Fed. R. Civ. P. 56(c) .........................................................................................8

Fed. R. Evid. 803(6) ........................................................................................16

Fed. R. Evid. 804 .............................................................................................18

Fed. R. Evid. 804(b)(1) ................................................................................*passim*

Fed. R. Evid. 902 .............................................................................................18

Fed. R. Evid. 902(4) ........................................................................................18

Restatement (Second) of Judgments § 57 (Am. Law Inst. 1982) ......................23

Restatement (Second) of Contacts § 202 (Am. Law Inst. 1981) ........................12

Norfolk Southern Railway Company ("Norfolk Southern," and together with the above-captioned Reorganized Debtors, the "Parties"), hereby respectfully submits its brief (the "NS Brief") (I) in opposition to the Reorganized Debtors' Motion for Summary Judgment Pursuant to Federal Rule of Bankruptcy Procedure 7056 for Partial Allowance and Partial Disallowance of Claim Co. 7021 [D.I. 929575] and (II) in support of its Cross-Motion for Summary Judgment (the "Cross-Motion"), which was filed contemporaneously herewith.

### STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

On March 27, 2003, Norfolk Southern filed proof of claim 7021 (the "NS POC"), asserting, among other things, a right to indemnification from the Debtors under several agreements between a predecessor-in-interest of Norfolk Southern and the Debtors (the "Indemnification Claim") resulting from personal injuries to Mr. Lester E. Kirkland, a former Norfolk Southern employee who sued Norfolk Southern in Georgia state court, as a result of injuries he suffered when he slipped on kaolin clay on a railcar that had been dangerously overfilled by the Debtors' employees.[2]

Over six years later, on July 20, 2009, the Debtors filed their *Objection to the Proof of Claim Filed by Norfolk Southern Railway Company* [D.I. 22553] (the "Objection").

On August 26, 2009, Norfolk Southern filed its *Preliminary Response of Norfolk Southern Railway to Debtors' Objection to the Proof of Claim Filed by Norfolk Southern Railway* [D.I. 22975] (the "NS Response").

---

[2]    The NS POC consists of the $1,500,000.00 settlement with Mr. Kirkland, $61,664.66 in fees and expenses, and $20,415.52 in transportation services. Norfolk Southern agrees that the transportation services portion of the NS POC should be allowed in the amount of $6,995.35.

Another seven years later, the Reorganized Debtors filed their *Motion for Summary Judgment Pursuant to Fed. R. Bankr. P. 7056 for Partial Allowance and Partial Disallowance of Claim No. 7021, Filed by Norfolk Southern Railway Company* [D.I. 929575] (the "Motion"), along with their memorandum in support of the Motion (the "Debtors' Op. Br.") and their proposed findings of uncontested facts (the "Debtors' Proposed Facts"). This is Norfolk Southern's brief in opposition to the Motion and in support of its Cross-Motion.

## SUMMARY OF THE ARGUMENTS

1.    The Motion must be denied because the Reorganized Debtors[3] have not come forward with any evidence to rebut the *prima facie* validity of the Indemnification Claim.

2.    Even if the Court finds that the Reorganized Debtors have rebutted the *prima facie* validity of the NS POC, the Motion must still be denied because the Reorganized Debtors have failed to establish undisputed facts concerning the January 23 Accident, have completely ignored credible evidence related to the January 26 Accident, and cannot establish, as a matter of law, that the Indemnification Provisions do not apply.

3.    The Reorganized Debtors' entire basis for the Motion is that Norfolk Southern has failed to offer "admissible" evidence to establish its Indemnification Claim, yet the Reorganized Debtors offer no evidence of their own, choosing instead to rely on selected excerpts from the evidence provided by Norfolk Southern in the context of settlement discussions between the Parties. But Norfolk Southern's evidence is not

---

[3]    Capitalized terms used in this section and not defined previously shall have the meaning ascribed to them *infra*.

inadmissible simply because the Reorganized Debtors say so. Indeed, contemporaneously with the filing of the NS Brief, Norfolk Southern has lodged sworn declarations from two witnesses who were present when one or both of the Accidents occurred. Moreover, Mr. Kirkland's trial testimony, and indeed the entire Trial Record from the Georgia Litigation, are admissible under both Federal Rule of Evidence 804(b)(1) and the doctrine of voucher.

4.      Given the Reorganized Debtors' failure to provide any of their own evidence in support of the Objection or the Motion, Norfolk Southern is entitled to summary judgment on its Indemnification Claim based on the uncontroverted evidence underlying the January 26 Accident that is contained in the declarations, the Accident Reports, and the Trial Record.

## STATEMENT OF FACTS

### A.      The Parties' Contractual Relationship

The relationship between the parties is governed by two contracts, the second of which has been amended twice. On December 15, 1980, Grace, a predecessor-in-interest to Grace-Conn (together with Grace the "Debtors"), and Southern Railway Company ("Southern"), a predecessor-in-interest to Norfolk Southern, entered into a license agreement (the "License Agreement"),[4] which authorized the Debtors to occupy and use certain Norfolk Southern-owned property in Natka, South Carolina in connection with the Debtors' kaolin mining and manufacturing operations. Ex. A, License Agreement ¶2.[5] The

---

[4]      The Reorganized Debtors refer to this agreement as the Right-of-Way Agreement.

[5]      All references to "Ex. __" are references to the exhibits attached to the Declaration of R. Stephen McNeill in Support of Norfolk Southern Railway Company's (I) Answering Brief In Opposition To Reorganized Debtors' Motion for Summary Judgment Pursuant to Fed. R. Bankr. P. 7056 for Partial Allowance and Partial Disallowance of Claim No. 7021 and (II) Opening Brief in Support of Norfolk Southern's Cross-Motion for Summary Judgment, which was filed contemporaneously herewith.

License Agreement contemplated that the Debtors' would use and maintain a warehouse building, two overhead canopies, a shed, a fence and two double swing gates (collectively, the "Facility"). Id. ¶1.

Also on December 15, 1980, Grace and Southern entered into an agreement (the "Side-Track Agreement")[6] by which Norfolk Southern would have full right and authority to use the double-ended side-track running through the Facility. Ex. B, Side-Track Agreement ¶A. The Debtors were responsible for maintaining this track in good condition and repair and agreed to observe and be bound by the rules of the railroad for standard clearances, except with respect to specified existing structures. Id. ¶¶3-4. The Side-Track Agreement was amended by Grace and Southern on November 7, 1983 (the "1983 Supplement") to account for an additional 477 feet of track. Ex. C, 1983 Supplement ¶1. Through the 1983 Supplement, this additional track was made subject to the Side-Track Agreement. Id. ¶4.

On October 3, 1990, Grace and Southern further amended the Side-Track Agreement (the "1990 Amendment," and with the License Agreement, the Side-Track Agreement and the 1983 Supplement, the "Agreements"), effective as of September 17, 1990, by permitting the Debtors to construct an "overhead loading structure with retractable loading spout" over a portion of the side-track. Ex. D, 1990 Amendment ¶1. This retractable loading spout (the "Loading Spout") was referred to as the "Facility" in the 1990 Amendment. Id. ¶1. The Debtors were responsible for all costs of constructing the Loading Spout and agreed to maintain it in such condition that it would not interfere with railroad operations on the track. Id. ¶¶2-3.

---

[6]    The Reorganized Debtors refer to this agreement as the Operating Agreement.

### B.     The Operation of the Debtors' Facility.

Consistent with the intent of the Agreements, the Debtors operated the Facility in connection with their kaolin mining and manufacturing operations.  Norfolk Southern provided the Debtors with empty covered hopper[7] railcars, which the Debtors filled with kaolin. Conley Declaration ¶5.[8]  The Debtors typically used the Loading Spout to load the railcars because it was covered and provided some protection from the elements.  Conley Declaration ¶6.  After the Debtors filled the railcars, Norfolk Southern personnel would pick them up, transport them to the switching station and switch them onto the main line for transport to their ultimate destination.  Conley Declaration ¶5.

Under the Agreements, the Debtors had an obligation to maintain and use the Facility, and specifically the Loading Spout, in such a manner as to ensure safe and proper operation of the track.  Ex. A, License Agreement ¶18; Ex. B, Side-Track Agreement ¶14. Unfortunately, the Debtors' use of the Facility, and especially the Loading Spout, was not safe, as they repeatedly overfilled the railcars with kaolin, causing it to cover and accumulate on the railcars.  Conley Declaration ¶8.  Norfolk Southern personnel constantly complained about the condition of the Debtors' railcars, and the Debtors were aware of those complaints.  Conley Declaration ¶9.

---

[7]     A hopper car is used to transport loose bulk commodities, including kaolin.  As its name implies, a covered hopper car is equipped with a roof, which provides protection from exposure to weather.  Conley Declaration ¶7.

[8]     Citations to the "Conley Declaration" are citations to the Declaration of Thomas Wesley Conley in Support of Norfolk Southern Railway Company's (I) Answering Brief In Opposition To Reorganized Debtors' Motion for Summary Judgment Pursuant to Fed. R. Bankr. P. 7056 for Partial Allowance and Partial Disallowance of Claim No. 7021 and (II) Opening Brief in Support of Norfolk Southern's Cross-Motion for Summary Judgment, which was filed contemporaneously herewith.

PAC 1238776v.8

### C.    The January 23, 1998 Accident

On January 23, 1998, Norfolk Southern train conductor, Lester E. Kirkland, was injured while attempting to release a handbrake on a railcar (the "January 23 Accident"). Ex. E, Kirkland Complaint ¶5.  In doing so, he "slipped in a slick and dangerous substance which had been allowed to cover the rail car on which the handbrake was located." Id. ¶5. That "slick and dangerous substance" was kaolin, which had become wet from the rainfall that day, making it even more slippery than usual.  Sharpe Declaration ¶4, 7.[9]  Indeed, the Personal Injury Report completed by Mr. Kirkland that afternoon (the "January 23 Personal Injury Report") specifically stated that he "slipped on clay on hopper and fell to ground." Ex. F, January 23 Personal Injury Report.

Following the January 23 Accident, Norfolk Southern prepared a "non-reportable injury" report (as supplemented on January 29, 1998, the "January 23 Accident Report"). Although no one personally witnessed Mr. Kirkland's fall from the railcar, Mr. Sharpe was present at the scene.  Ex. G, January 23 Accident Report; Sharpe Declaration ¶7.  Mr. Kirkland did not request any medical attention in connection with the January 23 Accident. Id. Ex. G, January 23 Accident Report

### D.    The January 26, 1998 Accident

Following a weekend to recover, Mr. Kirkland returned to work on his next scheduled work day, Monday, January 26, 1998. Id. As evidenced by the Personal Injury Report completed by Mr. Kirkland later that day (the "January 26 Personal Injury Report,"

---

[9]    All references to the "Sharpe Declaration" are references to the Declaration of Christopher John Sharpe in Support of Norfolk Southern Railway Company's (I) Answering Brief In Opposition To Reorganized Debtors' Motion for Summary Judgment Pursuant to Fed. R. Bankr. P. 7056 for Partial Allowance and Partial Disallowance of Claim No. 7021 and (II) Opening Brief in Support of Norfolk Southern's Cross-Motion for Summary Judgment, which was filed contemporaneously herewith.

and collectively with the January 23 Accident Report and the January 23 Personal Injury Report, the "Accident Reports"), Mr. Kirkland was injured once more when he again slipped on a clay covered railcar while attempting to apply a handbrake (the "January 26 Accident," and together with the January 23 Accident, the "Accidents"). Ex. H, January 26 Personal Injury Report. The January 26 Personal Injury Report notes that the railcars at issue were pulled from the Debtors' plant. Once again, the railcar was "covered with a clay like slick and dangerous substance." Ex. E, Kirkland Complaint ¶6. When he fell, Mr. Kirkland "reinjured his back" and aggravated the previous injury which he had suffered to his back." Id. Mr. Sharpe witnessed the January 26 Accident. Ex. H, January 26 Personal Injury Report; Sharpe Declaration ¶8.

E.    **The Georgia Litigation and Communications Between the Parties**

On July 3, 1998, Mr. Kirkland filed a complaint (the "Kirkland Complaint") against Norfolk Southern in Georgia state court in Bibb County, Georgia. That action was later captioned *Lester E. Kirkland Jr. v. Norfolk Southern Railway Co.*, C.A. No. 45273 (the "Georgia Litigation"). The Georgia Litigation was brought pursuant to the provisions of the Federal Employers Liability Act ("FELA"). Ex. E, Kirkland Complaint ¶4.

Although none of the Debtors were parties to the Georgia Litigation, they were intimately aware that Norfolk Southern believed it was entitled to indemnification from the Debtors based on a series of letters the parties exchanged back and forth (as attached to the McNeill Declaration as Exhibits I-S, the "Voucher Letters"). Indeed, by letter dated September 15, 1999, Norfolk Southern's counsel informed the Debtors' Plant Manager that it believed the Debtors were obligated to indemnify Norfolk Southern for any damages arising out of the Accidents based on the Agreements and asked the Debtors to assume the defense of Norfolk Southern in the Georgia Litigation. Ex. I, September 15, 1999 Letter

7

from Benjamin M. Garland, Esq. to Harry Fishel, Plant Manager. Two weeks later, the Debtors' Division Counsel, Lynne M. Durbin, responded to Mr. Garland's letter declining to assume the defense on Norfolk Southern in the Georgia Litigation. Ex. J, September 29 Letter from Lynne M. Durbin, Division Counsel, to Benjamin M. Garland, Esq. After another round of back and forth where Mr. Garland expressly indicated Norfolk Southern's intent to seek indemnification from the Debtors —and the Debtors' denial of any such responsibility—Mr. Garland continued to keep the Debtors' counsel informed regarding the developments in the case through the eventual entry of the judgment and the Debtors' bankruptcy filing. Exs. I-S, Voucher Letters.

Ultimately, the Debtors declined to intervene in the Georgia Litigation or assume the defense of Norfolk Southern. On March 21, 2001, the jury awarded Mr. Kirkland $1,924,500 in the Georgia Litigation. Ex. T, Kirkland Judgment. A few months later, Norfolk Southern negotiated a settlement with Mr. Kirkland for $1,500,000 and the Georgia Litigation was dismissed following Norfolk Southern's satisfaction of the judgment. Ex. U, Plaintiff's Satisfaction of Judgment and Dismissal of Action. As part of the settlement, Norfolk Southern negotiated a release of all claims that Mr. Kirkland may have been able to assert against the Debtors. Ex.V, Kirkland Release. Mr. Kirkland died on October 22, 2009. Ex. W, Kirkland Obituary.

## ARGUMENT

## I.    THE DEBTORS' MOTION FOR SUMMARY JUDGMENT MUST BE DENIED.

### A.    Standard on Summary Judgment

Federal Rule of Civil Procedure 56(c), incorporated by Federal Rule of Bankruptcy 7056, authorizes summary judgment only if the moving party establishes by admissible

8

evidence that "there is no genuine dispute as to any material fact" to be tried and the moving party "is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).    This Court may not "weigh the evidence or make credibility determinations," and must resolve all inferences in the light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Applying this standard, the Motion should be denied.

### B.    The Material Facts Are Disputed

As the Supreme Court has indicated, a genuine dispute as to material facts exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." Id. at 248. Such disputes "properly preclude the entry of summary judgment." Id. The Debtors wrongly allege that there are no disputes as to any material fact, and yet ignore or deny a number of factual allegations made by Norfolk Southern.

### 1.    The Debtors Deny any Involvement with the January 23 Accident

The Debtors claim that they were not involved with the January 23 Accident. However, the trial record from the Georgia Litigation, which is attached as Exhibit X to the McNeill Declaration (the "Trial Record"), including, inter alia, Mr. Kirkland's testimony, and the January 23 Accident Report render that assertion in dispute at a minimum.    The testimony given in the Georgia Litigation clearly indicates that Mr. Kirkland fell as a result of slipping on the Debtors' kaolin.  In reference to the January 23 Accident, Mr. Kirkland testified that the railcar that he fell on was a hopper car from the Debtors. Ex. X, Trial Tr. vol. I, 91:12-19.

Although the January 23 Accident Report indicates that the railcar in question was in service for J.M. Huber, Mr. Kirkland's trial testimony noted that while J.M. Huber was

a stop on their route on the day of the January 23 Accident, the railcar that he slipped on was from the Debtors. Ex. X, Trial Tr. vol. I, 88:18-20, 91:12-19. The assertion that the Debtors were responsible for the January 23 Accident is further substantiated by the fact that Mr. Kirkland had his supervisor accompany him to the Facility on January 26, *prior* to the January 26 Accident in an attempt to address the kaolin problem that they had been experiencing. Ex. X, Trial Tr. vol. I, 109:7-9. The Debtors' involvement with the January 23 Accident is most likely what prompted Mr. Kirkland to ask his supervisor to check on the situation at the Debtors' plant first thing on his next working day.[10] Because the resolution of the Motion requires the Court to resolve all inferences in the light most favorable to Norfolk Southern, the Court must infer that the Debtors' kaolin contributed to the January 23 Accident. At a minimum, this creates a conflicting narrative that cannot be resolved against Norfolk Southern on summary judgment.

    2.  <u>The Debtors Ignore Their Involvement with the January 26 Accident</u>

While the Debtors highlight the January 23 Accident Report in an attempt to exculpate themselves, they completely ignore the January 26 Personal Injury Report that states "pulled 7 loads from W.R. Grace plant in Aiken, S.C. Brought all 7 loads which were covered in clay back to Aiken and ran around cars in house track to take to Warrenville, S.C. to be set off. While applying handbrakes on cars, conductor slipped on NS245061 and twisted or tore or pulled something in lower back." Ex. H, January 26 Personal Injury Report. Just like the January 23 Personal Injury Report and the January 23

---

[10]    Mr. Kirkland asked his supervisor twice on the day of the January 26 Accident to check on the kaolin situation at the Debtors' plant. Mr. Kirkland made the first request prior to even arriving at the Facility on that day, and made the second request after seeing the condition of the railcars. Ex. V, Trial Tr. vol. I, 109:3-112:18.

Accident Report, the January 26 Personal Injury Report is a Norfolk Southern business record as discussed more fully herein.[11]

The Debtors again attempt to escape liability regarding the January 26 Accident by focusing solely on the 1990 Amendment governing the use of the Loading Spout and alleging that Norfolk Southern has not established that the Loading Spout was used to fill the railcars at issue.   Not only does this allegation ignore the numerous other indemnification provisions that are applicable here, but it also is refuted by declarations from two witnesses that were on site during the January 26 Accident and Mr. Kirkland's extensive trial testimony.   Mr. Conley, in particular, has indicated in his declaration that the Debtors typically used the Loading Spout, especially when the weather conditions were poor, as they were on the day of the January 26 Accident.   The Debtors have offered no evidence to dispute Mr. Conley's testimony establishing the likelihood that the Debtors used the Loading Spout to load the railcar on which Mr. Kirkland slipped.   Here, again, the Court is required to resolve this question in favor of Norfolk Southern as the non-moving party.   Doing so requires this Court to deny the Motion.

     3.   The Debtors Fail to Acknowledge Norfolk Southern's Attempts to Involve them in the Georgia Litigation

The Debtors repeatedly refer to the Kirkland Complaint to support their allegation that they cannot be held liable for indemnification because they were not named as a party to the Georgia Litigation.   This assertion misinterprets the Agreements and fails to properly apply the indemnification provisions found therein (the "Indemnification Provisions").   Indemnification provisions are contract provisions and are thus governed by their plain

---

[11]     The Debtors attached the January 26 Accident Report as an exhibit to their Debtors' Proposed Facts but failed to mention it therein.

language. <u>Town of Winnsboro v. Wiedeman-Singleton, Inc.</u>, 398 S.E.2d 500, 502 (S.C. Ct. App. 1990), <u>aff'd,</u> 414 S.E.2d 118 (S.C. 1992); Restatement (Second) of Contracts § 202 (Am. Law Inst. 1981). Additionally, courts have held that indemnification provisions that bind a party based on proceedings to which it was not a named party are not unfair or unreasonable. <u>See, e.g., Cecil's, Inc. v. Morris Mech. Enter., Inc.</u>, 735 F.2d 437, 439 (11th Cir. 1984) (finding the indemnification provision of a contract to bind the indemnitor to an arbitration judgment in which it was not a named party).

Nothing in the language of the Agreements suggests that Norfolk Southern is limited to recovery from actions in which the Debtors are a named party. Furthermore, Norfolk Southern repeatedly requested that the Debtors participate in the Georgia Litigation. <u>See</u> Exs. I-S, Voucher Letters. The Debtors were aware of their potential liability and voluntarily chose to refrain from participation. The Debtors have consistently denied liability based on claims that the Indemnification Provisions are not applicable despite the absence of any legal support for that position.

Simply put, the Debtors' Proposed Facts, even if taken as true, are insufficient to establish a right to summary judgment. These "facts" completely ignore the January 26 Personal Injury Report, which links the Debtors' activities to the damages suffered. While this single piece of paper, standing alone, is sufficient to defeat the Motion, Norfolk Southern has also provided declarations from two witnesses who identify the Debtors' overfilling of railcars as the proximate cause of the Accidents. The Debtors have offered no evidence of their own to refute these statements, but even if they do, they can only establish, at best, a disputed fact.

C.    **The Debtors are Not Entitled to Judgment as a Matter of Law**

In addition to the factual issues that defeat the Motion, the Debtors also fail to demonstrate that they are entitled to summary judgment as a matter of law. The Debtors allege that Norfolk Southern has not met its burden of proof to support its Indemnification Claim and that Norfolk Southern has not adduced relevant admissible evidence in support thereof. Not only are both of these allegations wrong and premature, but neither is sufficient to entitle the Debtors to summary judgment.

1.    Norfolk Southern's Claim is *Prima Facie* Valid

The NS POC is *prima facie* valid. See In re Allegheny Int'l., Inc., 954 F.2d 167, 173 (3d Cir. 1992). Therefore, the burden shifts to the Debtors "to *produce evidence* sufficient to negate the prima facie validity of the filed claim." Id. (emphasis added). The Debtors have yet to produce any evidence of their own. They have merely questioned the admissibility and the authenticity of Norfolk Southern's evidence. This simple denial of liability is not sufficient to rebut the *prima facie* validity of Norfolk Southern's claim.

Notwithstanding the Debtors' complete lack of evidence, Norfolk Southern recognizes that the ultimate burden of proof will likely revert back to Norfolk Southern to demonstrate the validity of its Indemnification Claim by a preponderance of the evidence, and that it ultimately carries the burden of persuasion. See Id. at 174. Before those questions can be addressed, however, the Debtors must offer some evidence, not just legal argument, to rebut the *prima facie* validity of the Indemnification Claim. The Debtors have not even attempted to meet this minimal burden.

The only evidence that the Debtors have offered thus far is evidence that was provided to them by Norfolk Southern by way of the NS POC, the NS Response, and in

settlement discussions. Indeed, the Trial Record was offered to the Debtors and they claim it is inadmissible for Norfolk Southern to carry its burden of proof but admissible for the Debtors as to any aspect of the record based on the doctrine of collateral estoppel. See Debtors' Op. Br. 17-18. While Norfolk Southern acknowledges that it cannot re-litigate any of the issues already decided in the Georgia Litigation, the Debtors' assertion that they can use portions of the Trial Record but that Norfolk Southern cannot use that same document is clearly wrong. Equity, and the Federal Rules of Evidence, demand that documents are admissible or they are not. Admissibility generally is not determined on a party by party basis.

### 2. The Debtors Have Not Shown That Norfolk Southern Cannot Provide Admissible Evidence

Even if the Debtors' legal arguments are sufficient to rebut the *prima facie* validity of the Indemnification Claim, they are insufficient to support summary judgment. For example, the Debtors allege that Norfolk Southern has failed to carry its burden of proof as to its Indemnification Claim because it has not adduced admissible evidence. This allegation is both wrong and premature. Norfolk Southern is not required to *produce* admissible evidence at the proof of claim or response stage. The Debtors attempts to support their allegation by citing to In re Hartman, 2009 WL 4043096, (Bankr. D.N.J. Nov. 20, 2009). However, in Hartman, the creditor's claim had been denied because the creditor had failed to respond to the debtor's objection and failed to attend the hearing on the motion and the court had therefore entered judgment in the debtor's favor. Id. at *1. Additionally, the court determined that the creditor's contentions as to how it would supplement its claim were at best misleading and at worst fraud. Id. at *3. Such an analysis is clearly distinguishable from the circumstances here, where Norfolk Southern timely responded to

the Objection and no hearing has been held. Moreover, <u>Hartman</u> is contrary to the Debtors' position because the court explained that the failure to attach supporting documents to a proof of claim is not a sufficient basis to disallow a claim. <u>Id.</u>

If a party were required to have all of the admissible evidence necessary to prove its case at the outset of a proceeding, then there would be no need for Federal Rule of Bankruptcy Procedure 9014.[12] Therefore, for the Debtors to prevail on such a theory, they would have to show that Norfolk Southern *cannot* produce any admissible evidence to support its claim, not that it *has not* produced any admissible evidence, to prevail on summary judgment. <u>See</u> Fed. R. Bankr. P. 7056. The Debtors have clearly failed in this regard because Norfolk Southern can and has produced abundant evidence to substantiate its Indemnification Claim, including the declarations of Mr. Conley and Mr. Sharpe, the Accident Reports, and the Trial Record.

a.  The Witness Declarations are Admissible

First, Norfolk Southern retirees Thomas Conley and C.J. Sharpe each witnessed one or both Accidents. Conley Declaration ¶10; Sharpe Declaration ¶7-8. While Mr. Conley did not see Mr. Kirkland fall, he was working with him when the January 26 Accident occurred and can attest to the events that took place, including the Debtors' negligence in overfilling the railcars with kaolin. Conley Declaration ¶10. Mr. Sharpe was working with Mr. Kirkland when the January 23 Accident occurred and was also an eye witness to the January 26 Accident and helped Mr. Kirkland down from the railcar after he

---

[12]    Bankruptcy Rule 9014(a) provides an opportunity for a hearing on a contested matter. Bankruptcy Rule 9014(c) also imports the discovery rules into a contested matter. Accordingly, the Bankruptcy rules contemplate an opportunity for the parties to take discovery and argue their positions before the Court in connection with any contested matter, including claims objections.

slipped. Sharpe Declaration ¶7-8. Both Mr. Conley and Mr. Sharpe remember the slick

and dangerous conditions caused by the Debtors' negligence and can attest to the events

that transpired on the days of the Accidents. Conley Declaration ¶10; Sharpe Declaration

¶7-8. Their unrefuted testimony alone is sufficient to defeat the Motion.

          b.  The Accident Reports are Admissible as Business Records

The Accident Reports are admissible evidence as business records under Federal

Rule of Evidence 803(6).

Rule 803(6) allows for the admission of business records under the following

circumstances:

> (1) [T]he declarant in the records had personal knowledge to
> make accurate statements; (2) the declarant recorded the
> statements contemporaneously with the actions that were the
> subject of the reports; (3) the declarant made the record in
> the regular course of the business activity; and (4) such
> records were regularly kept by the business.

United States v. Pelullo, 964 F.2d 193, 200 (3d Cir. 1992) (citing United States v. Furst,

886 F.2d 558, 571 (3d Cir. 1989); Fed. R. Evid. 803(6)).  Furthermore, there must be no

indication of a lack of trustworthiness of the information contained in the document. Fed.

R. Evid. 803(6).

By the Debtors' own admission, the Accident Reports qualify as business records.[13]

The Debtors admit repeatedly and rely on the authenticity of the January 23 Personal Injury

Report and January 23 Accident Report as business records to support their assertion that

they were not involved with the January 23 Accident. The Debtors identify these reports

as business records and state that they are "properly authenticated by virtue of Norfolk

---

[13]     Even without the Debtors' admission, the Accident Reports qualify as business records under the
foregoing test.

PAC 1238776v.8

Southern having produced them to the Reorganized Debtors." Debtors' Op. Br. 5 & n.3. This same statement holds true for the January 26 Accident Report as well.

Despite relying on the January 23 Accident Reports, the Debtors are conspicuously silent as to the January 26 Personal Injury Report, which clearly implicates the Debtors' involvement in the January 26 Accident. The January 26 Personal Injury Report was completed by Mr. Kirkland on the same form document that he used to report the January 23 Accident. No basis exists to distinguish the January 26 Personal Injury Report from the other Accident Reports, which the Debtors admit are business records. Accordingly, all of the Accident Reports are admissible as business records. Because the January 26 Personal Injury Report implicates the Debtors' negligence as the proximate cause of Mr. Kirkland's injuries, it demonstrates that the Indemnification Provisions are triggered, and establishes Norfolk Southern's Indemnification Claim against the Debtors. This evidence alone also is sufficient to justify denial of the Motion.

## II.    THE TRIAL RECORD IS ADMISSIBLE IN THIS PROCEEDING.

### A.    Mr. Kirkland's Testimony is Admissible Under Rule 804(b)(1) of the Federal Rules of Evidence

In addition to the foregoing evidence, which is unquestionably admissible, Norfolk Southern has also provided the Debtors and this Court with the Trial Record as further support of the Indemnification Claim. Under applicable law, the Trial Record is also admissible, yet the Debtors allege that the entirety of the Trial Record is inadmissible in this proceeding. Debtors' Op. Br. 17. At a minimum, however, Mr. Kirkland's testimony is admissible as former testimony of an unavailable witness. The Debtors have additionally called into question the authenticity of the Trial Record. Debtors' Op. Br. 3. Norfolk Southern can resolve any authenticity issue by obtaining a certified copy of the Trial

Record from the state of Georgia. Such a copy is self-authenticating under Rule 902 of the Federal Rules of Evidence. Fed. R. Evid. 902(4).

Under Rule 804(b)(1) of the Federal Rules of Evidence, former testimony may be admitted as an exception to the rule against hearsay when the declarant is unavailable as a witness. Fed. Rule Evid. 804(b)(1).  The rule defines former testimony as follows:

> Testimony that: (A) was given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one; and (B) is now offered against a party who had—or, in a civil case, whose predecessor in interest had—an opportunity and similar motive to develop it by direct, cross-, or redirect examination.

Id. The Debtors attempt to limit this rule to apply only to parties who are named in a prior proceeding by omitting the language regarding a "predecessor in interest."  Debtors' Op. Br. 4. Such an interpretation controverts the intended meaning of the rule.

As it relates to Rule 804, the Third Circuit has applied the term predecessor-in-interest broadly.  See Dennis J. Turner, Federal Rule of Evidence 804: Will the Real Predecessor-in-Interest Please Stand Up, 19 Akron L. Rev. 251, 253 (1986) (citing Lloyd v. Am. Export Lines, Inc., 580 F.2d 1179 (3d Cir. 1978)).  As the court explained in Lloyd, the requirements of Rule 804 are met when there is "sufficient community of interest shared" among the parties.  Lloyd, 580 F.2d at 1185-86.  The court stated that it prefers a definition of predecessor-in-interest that is "realistically generous over one that is formalistically grudging." Id. at 1187.

The Third Circuit has also clarified that the "similar motive" requirement does not call for "identical motive." Haas v. 3M Co., 613 Fed. App'x 191, 196 (3d Cir. 2015) (citing United States v. Salerno, 505 U.S. 317, 326 (1992) (Blackmun, J., concurring)).  Rather, the requirement is designed to ensure that "the earlier treatment of the witness is the rough

18

equivalent of what the party against whom the statement is offered would do . . . if the witness were available to be examined by that party. Haas, 613 App'x, at 196 (citing Kirk v. Raymark Indus., Inc., 61 F.3d 147, 166 (3d Cir. 1995)).

Mr. Kirkland is deceased and therefore unavailable. Ex. W, Kirkland Obituary. His testimony was given under oath in the Georgia Litigation. While Norfolk Southern and the Debtors clearly have different motives in this bankruptcy proceeding, their motives to examine Mr. Kirkland in the Georgia Litigation were sufficiently similar to now warrant the application of Rule 804(b)(1). Because, under FELA, Norfolk Southern owed Mr. Kirkland a nondelegable duty[14] to provide a safe work environment, Norfolk Southern and the Debtors shared a motive to disprove any negligence on the Debtors' part so as to exculpate themselves.[15] This common interest is sufficient to consider Norfolk Southern a predecessor-in-interest of the Debtors for purposes of Rule 804(b)(1) given the Third Circuit's broad application of the rule.

## B.   The Doctrine of Voucher Establishes Privity Between the Parties

A related, and more narrow, doctrine to that of predecessor-in-interest is the concept of privity. Privity concerns the "connection or relationship between two parties, each having a legally recognized interest in the same subject matter." Black's Law Dictionary 10th ed. (2014). Parties that are brought into privity with one another are

---

[14]   Nondelegable does not mean non-indemnifiable, however, as discussed infra. See, e.g., Union Camp Corp. v. Louisville & Nashville R. Co., 202 S.E.2d 508, 510 (Ga. Ct. App. 1973).

[15]   Indeed the Trial Record is replete with examples of Norfolk Southern's attempts to argue that Mr. Kirkland's own negligence was the proximate cause of his injuries. See, e.g., Ex. V, Trial Tr. vol. II 11:17-13:16 (reviewing employee safety guidelines, including conductor's obligation to leave an unsafe car); Id. at 23:21-24:2 (demonstrating that the Debtors had blown kaolin off the cars when asked to do so); Id. at 25:3-5 (asking if Mr. Kirkland did anything to remove the kaolin); Id. at 174:1-15 (explaining that Mr. Kirkland's supervisor reviewed with him his obligation to not pull an unsafe car); Trial Tr. vol. III 36:9-15 (questioning the condition of Mr. Kirkland's shoes).

PAC 1238776v.8

precluded from re-litigating issues that have already been adjudicated with relation to each other. In re Rudd, 104 B.R. 8 (Bankr. N.D. Ind. 1987). The term privity, in the context of preclusion, has become merely a label attached to the conclusion that the relationship between a party and the person who is sought to be precluded warrants the preclusion. Bruszewski v. U.S., 181 F.2d 419, 423 (3d Cir. 1950). In analyzing whether parties are in privity, the court searches directly for circumstances that justify preclusion. 18A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 4449 (2d ed. 1981).

Two parties can be brought into privity with each other through the doctrine of voucher. Voucher is a doctrine by which a defendant can request that a potential indemnitor assume the defense of an action. 59 Am. Jur. 2d Parties § 241, Westlaw (database updated Nov. 2016) (citing West Indian Co. v. S. S. Empress of Canada, 277 F. Supp. 1 (S.D. N.Y. 1967)). If after receiving proper notice and opportunity, the indemnitor fails to defend the action, the indemnitor "may be precluded from relitigating issues decided in an action against its indemnitee if the indemnitee defended the action with due diligence and reasonable prudence." 47 Am. Jur. 2d Judgments § 606 Westlaw (database updated Dec. 2016) (citing Universal American Barge Corp. v. J-Chem, Inc., 946 F.2d 1131 (5th Cir. 1991)).

When the indemnitor is vouched in an action, it is treated as though it was a party to that action even if it refused to take part in the defense. Wash. Gas Light Co. v. District of Columbia, 161 U.S. 316, 330 (1896). Voucher applies when an indemnitor has a duty to defend and was given adequate notice that the duty to defend had arisen. See Humble Oil & Ref. Co. v. Phila. Ship Maint. Co., 444 F.2d 727, 734 (3d Cir. 1971) (quoting Crawford v. Pope & Talbot, Inc., 206 F.2d 784, 795 ("Where . . . the indemnitor, with notice of the

20

action and of the indemnitee's request that he defend it, does not participate in the defense but leaves it to the reasonable efforts of the indemnitee, then in subsequent litigation between them both indemnitor and indemnitee are bound by the findings necessary to the judgment in the action.")). [16]

When, as here, the duty to defend is not explicitly incorporated into a written agreement, the duty to defend may still arise constructively when "the facts actually or constructively known to the indemnitor at the time the defense of the action is proffered to it, demonstrate that liability will eventually fall on the indemnitor." Humble Oil, 444 F.2d at 734. In determining whether a duty to defend arose constructively, courts in the Third Circuit have focused on two factors: (1) whether the existence and viability of multiple theories of recovery, one or more of which does not support indemnitor liability, creates ambiguity about where liability will eventually fall; and (2), whether the breadth of the legal relationship giving rise to the indemnification claim makes the indemnitor's duty to defend more or less concrete. Id. The broader the basis of the indemnitor's duty to defend, the less information is needed to provide adequate notice. Id. (giving extra consideration to the sufficiency of notice where indemnification claim was based on implied warranty rather than an indemnification agreement).

As set forth in greater detail in Section III below, based on unrefuted evidence surrounding the January 26 Accident, either Norfolk Southern and the Debtors are jointly liable for Mr. Kirkland's injuries, or the Debtors are solely liable for them. There does not appear to be any theory under which the Debtors would be entirely relieved of their liability

---

[16]    While the Third Circuit ultimately determined in Humble Oil that the indemnitor did not owe a duty to defend, the court endorsed the rule but found fault in the application of the rule to the specific facts of the case. Humble Oil, 444 F.2d at 734-35.

on these facts. Accordingly, the Debtors' duty to defend Norfolk Southern in the Georgia Litigation was not obscured by alternate theories of liability. In addition, the breadth and clarity of the Indemnification Provisions provided the Debtors with ample notice of their duty to defend. Even if the Agreements were not clear—and they are—Norfolk Southern, through the Voucher Letters, specifically identified the relevant indemnification language for the Debtors and even provided the Debtors with case law refuting the Debtors' purported reason not to defend. Exs. I-S, Voucher Letters. The Voucher Letters also make it clear that Norfolk Southern provided the Debtors with notice of its duty to defend under the Agreements.[17] Thus, the Debtors had no legitimate argument to dispute their duty to defend Norfolk Southern in the Georgia Litigation, and the doctrine of voucher places the Debtors in privity with Norfolk Southern.

This Court also should apply the doctrine of voucher here because it "helps to avoid duplicative litigation and the risk of inconsistent results in adjudicating indemnification claims." Master Blaster, Inc. v. Dammann, 781 N.W.2d 19, 26 (Minn. Ct. App. 2010). In Master Blaster, the indemnitee sought indemnification from a subcontractor after the indemnitee had been adjudged vicariously liable for the subcontractor's negligence in a South Dakota state action, to which the subcontractor was not a party. Id. at 23. The court held that the doctrine of voucher precluded the subcontractor from relitigating the matters

---

[17] The Third Circuit requires that the indemnitor be given notice, whether written or oral, which: (1) contains "full and fair information" concerning the pending action; (2) contains an unequivocal, certain and explicit demand to undertake the defense thereof; (3) contains an offer to surrender control of the action to the indemnitor at least to that portion of the claim for which the indemnitee seeks ultimately to hold the indemnitor liable; (4) be given so shortly after the institution of suit as to permit complete control of pretrial proceedings by the indemnitor; and (5) generally provides notice that if the indemnitor refuses to defend, it will be bound in any subsequent litigation between them to the factual determinations necessary to the original judgment. See e.g., Humble Oil & Ref. Co., 444 F.2d 727; United N.Y. Sandy Hook Pilots Assoc. v. Rodermond Indus., Inc., 394 F.2d 65 (3d Cir. 1968). Each of these factors is easily satisfied by the Voucher Letters.

decided in the South Dakota action because the matters presented no conflict of interest between the indemnitee and the indemnitor and because the indemnitee acted with due diligence and reasonable prudence in the South Dakota litigation. Id. at 29-33; See also, Restatement (Second) of Judgments § 57. As in Master Blaster, and as more fully set forth herein, Norfolk Southern, because of its non-delegable duty under FELA, "could not have avoided liability by shifting the blame to [the Debtors]." Master Blaster, 781 N.W.2d at 31. Therefore there was no conflict of interest, and the Debtors have failed to demonstrate that Norfolk Southern was neither diligent nor prudent in its defense of the Georgia Litigation. Therefore, the doctrine of voucher applies.

### C.    Mr. Kirkland's Testimony, and the Entire Trial Record Are Admissible

Because the Debtors were in privity with Norfolk Southern and privity is narrower than Rule 804's predecessor-in-interest construct, the Debtors will be hard-pressed to argue that Norfolk Southern was not a predecessor-in-interest to them in the Georgia Litigation for purposes of Rule 804(b)(1). Accordingly, Mr. Kirkland's testimony is therefore admissible as former testimony under Rule 804(b)(1).

Furthermore, the Debtors are estopped from relitigating issues determined in the Georgia Litigation because they failed to assume or participate in its defense after receiving notice of their obligation to do so. See Restatement (Second) of Judgments § 57 (Am. Law Inst. 1982). The Debtors voluntarily chose to refrain from participating in the Georgia Litigation despite Norfolk Southern's repeated attempts to inform them of their obligation to defend. Additionally, after Norfolk Southern filed the NS POC, the Debtors waited six years to file their Objection and another seven years to file the Motion. Had the Debtors objected promptly and efficiently prosecuted their Objection, Mr. Kirkland's testimony

23

may have been available by other means. The Debtors' attempt to now deny Norfolk Southern of use of Mr. Kirkland's testimony is prejudicial to Norfolk Southern.

Moreover, for practical purposes, the privity between the Debtors and Norfolk Southern means that the Debtors should be treated as though they too were a party to the Georgia Litigation. To the extent that the Debtors' argument that they can use any aspect of the Trial Record to carry their burden under the doctrine of non-mutual issue preclusion is correct, see Debtors' Op. Br. 18 (citing Peloro v. United States, 488 F.3d 163, 174-75 (3d Cir. 2007)), Norfolk Southern can rely on the same doctrine to carry its burden. This Court may review the entire Trial Record to determine the extent to which issues should be precluded. See Matter of Ross, 602 F.2d 604, 608 (3d Cir. 1979). Because both Parties' ability to rely upon the Trial Record is co-extensive, neither Party will be prejudiced by the admission of the entire Trial Record as evidence in this proceeding. Accordingly, the Court should admit the entire Trial Record, including Mr. Kirkland's testimony, to avoid any prejudice to Norfolk Southern as a result of the Debtors' delay in raising and prosecuting the Objection.

## III.    SUMMARY JUDGMENT ALLOWING NORFOLK SOUTHERN'S CLAIM IS APPROPRIATE.

Unlike the Debtors' Motion, which is not well founded for the reasons stated above, Norfolk Southern's Cross-Motion should be granted. While Norfolk Southern disputes material facts offered by the Debtors, thereby causing the Motion to fail, accepting such facts as offered by the Debtors does not bar summary judgment in Norfolk Southern's favor. Indeed, based solely on the January 26 Accident, which the Debtors fail to discuss, the Debtors are liable for the injuries suffered by Mr. Kirkland because the Debtors' negligence proximately caused those injuries, and a tortfeasor must take his victim as he

finds him. The unrefuted evidence from the Trial Record, along with the Declarations of

Mr. Conley and Mr. Sharpe, establish that under the Agreements, the Debtors are required

to indemnify Norfolk Southern for Mr. Kirkland's injuries. As discussed below, the only

question that remains is whether the Debtors are responsible for 100% of Norfolk

Southern's claim or whether they are liable for 50% of it, in either case together with

interest contemplated by the Debtors' Plan of Reorganization and any other costs and

expenses as may be determined appropriate by the Court.

A.     **The Relevant Indemnification Provisions Establish the Debtors'
       Liability to Norfolk Southern**

The Agreements require the Debtors to indemnify Norfolk Southern pursuant to the

Indemnification Provisions. Although Norfolk Southern believes that it is entitled to 100%

indemnification from the Debtors under these provisions, the unrefuted facts establish that

the Debtors are required to indemnify Norfolk Southern for at least half of the

Indemnification Claim.

The License Agreement and the Side-Track Agreement contain substantially

identical general indemnification provisions that allocate liability between the parties in

most circumstances. The License Agreement provides, in relevant part:

> The liability of the parties to this agreement, as between
> themselves, for death, personal injury and property loss and
> damage, which occurs by reason of, or arises out of, or is
> incidental to, the use or occupancy by Licensee [Grace] of
> the property covered by this agreement, shall be determined
> in accordance with the following provisions:
> * * * *
> (b) Licensee shall be solely responsible for, and shall bear
> all cost, expense and liability resulting from death, personal
> injury, and loss and damage to property, caused solely by the
> negligence of Licensee, or of the agents or employees of
> Licensee, or by the violation by Licensee or its agents or
> employees of the terms of this agreement, or by the

negligence of Licensee concurring with the negligence of a third party;

(c) Except for [damages from fire], Company [Norfolk Southern] shall be solely responsible for and shall bear all cost, expense and liability resulting from death, personal injury, and property loss and damage, caused solely by the negligence of the Company, or of the agents or employees of Company, or by the negligence of Company concurring with the negligence of a third party;

(d) Except for [damages from fire], Company and Licensee shall be jointly responsible for and bear equally all cost, expense and liability resulting from death, personal injury and property loss and damage caused by their joint and concurring negligence;

(e) Each of the parties hereto, for the liability imposed upon such party by this agreement, shall indemnify and hold entirely harmless the other party hereto;

(f) Knowledge on the part of Company of a continuing violation of the terms of this agreement by Licensee shall constitute neither negligence nor acquiescence on the part of the Company, and shall in no event relieve the Licensee of any of the responsibilities imposed upon Licensee hereunder.

Ex. A, License Agreement ¶10.    The Side-Track Agreement retains the same indemnification structure as the License Agreement, but it is triggered by "the construction, operation, maintenance, use, presence or removal of the track covered by this agreement and the right of way thereto. . . ." Ex. B, Side-Track Agreement ¶5.

In addition to these general indemnification provisions, the License Agreement and the Side-Track Agreement also contain separate provisions that require the Debtors to indemnify Norfolk Southern in certain circumstances, regardless of any negligence on the part of Norfolk Southern.  These provisions can be regarded as "strict liability" provisions that apply when the Debtors take certain actions.   The strict liability provision of the License Agreement reads as follows:

Licensee proposes to construct, maintain and use said Facility with full cognizance of the risk of loss of life, personal injury and property loss or damage which may be

26

> caused by or result from railroad operations on said
> industrial track at the location of said Facility, or which may
> accrue from or by reason of the construction, installation,
> maintenance, presence or use of said Facility by Licensee;
> and Licensee covenants that said Facility shall be
> constructed, maintained and used solely at the risk of
> Licensee, and the [sic] neither Company nor any associated
> controlled or affiliated corporation, shall assume any
> responsibility in the premises; Licensee hereby specifically
> agreeing, notwithstanding any other provision of this
> agreement, to indemnify and save harmless Company and
> any associated, controlled or affiliated corporation, from and
> against the consequences of any and all such loss, injury or
> damage, whether or not negligence of Company may have
> caused or contributed to such loss, injury or damage.

Ex. A, License Agreement ¶20.    The Side-Track Agreement contains an identical

provision, with the exception of the distinct defined terms for the Parties. Ex. B, Side-Track

Agreement ¶16.

Finally, to alleviate any doubt that the Debtors would be strictly liable for any

damages resulting from the use of the Loading Spout, the 1990 Amendment included a

similar strict liability provision, which provides:

> Industry [Grace] proposes to construct, maintain and use
> said Facility [the Loading Spout] with full cognizance of the
> risk of loss of life, personal injury and property loss or
> damage which may be caused by or result from railroad
> operations on said industrial track at the location of said
> Facility, or which may accrue from or by reason of the
> construction, installation, maintenance, presence or use of
> said Facility by Industry; and Industry covenants that said
> Facility shall be constructed, maintained and used solely at
> the risk of Industry, and that neither Railroad nor any
> associated controlled or affiliated corporation, shall assume
> any responsibility in the premises; Industry hereby
> specifically agreeing, notwithstanding any other provision of
> said Agreement, to indemnify and save harmless Railroad
> and any associated, controlled or affiliated corporation, from
> and against the consequences of any and all such loss, injury
> or damage, whether or not negligence of Company may have
> caused or contributed to such loss, injury or damage.

27

Ex. D, 1990 Amendment ¶5.

**B.      The Evidence Establishes the Debtors' Negligence in Connection with the January 26 Accident**

The Debtors allege that they were not involved with the January 23 Accident and therefore they cannot be held liable for Mr. Kirkland's injuries.  Norfolk Southern denies this allegation. Assuming for purposes of this Cross-Motion that this statement is true, however, it is of little importance considering that Mr. Kirkland went back to work after the January 23 Accident and was then involved in a subsequent accident.

Commonly referred to as the eggshell skull rule, a tortfeasor must take his victim as he finds him. <u>Transcraft, Inc. v. Galvin, Stalmack, Kirschner & Clark</u>, 39 F.3d 812, 816 (7th Cir. 1994).  This means that a tortfeasor cannot escape liability due to the fact that his victim suffered from a preexisting injury.  The law of South Carolina entitles a plaintiff who suffers from a preexisting condition "to be compensated for the aggravation of the preexisting injury . . . as well as any new or additional injuries sustained in [a] subsequent accident." <u>Richie v. Ingle</u>, 2004 WL 6251539, at *6 (S.C. Ct. App. Apr. 13, 2004).

Mr. Kirkland testified that he started to feel a bit better on both Saturday and Sunday after the January 23 Accident, and that he felt up to and returned to work his regular shift on Monday, January 26. Ex. X, Trial Tr. Vol. I, 106:7-24. It was not until after the January 26 Accident that Mr. Kirkland felt the need to see a doctor or take time off work. <u>Id.</u> at 122:8-12; Ex. G, January 23 Accident Report.

Therefore, notwithstanding any injuries that Mr. Kirkland may have suffered as a result of the January 23 Accident, the new injuries he suffered from the January 26 Accident gave rise to the damages Norfolk Southern was required to pay in the Georgia Litigation. The Debtors have offered only conjecture—not evidence—that its negligence

did not cause the January 26 Accident. Therefore, this issue is ripe for summary judgment for purposes of the Cross-Motion.

In contrast to the Debtors' bald and unsupported assertion that the January 26 Accident was the result of Norfolk Southern "sen[ding] an injured employee back to work,"[18] Norfolk Southern has offered overwhelming testimonial and documentary evidence to support its Indemnification Claim. Both Mr. Conley and Mr. Sharpe attest that the Debtors consistently overfilled the railcars with kaolin, creating a slick and therefore dangerous working environment. Conley Declaration ¶8; Sharpe Declaration ¶5. Mr. Conley confirmed that the Debtors typically used the Loading Spout to fill the railcars with kaolin, especially in poor weather conditions such as those present on the day of the January 26 Accident. Conley Declaration ¶6. Mr. Thomas Leon Joy, another Conductor for Norfolk Southern, testified in the Georgia Litigation that it was the Debtors' responsibility to blow the kaolin off of the railcars. Ex. X, Trial Tr. vol. I, 74:8-11. Mr. Kirkland testified in the Georgia Litigation that he repeatedly had to ask the Debtors' employees to blow the excess kaolin off of the railcars and that sometimes they complied and other times they refused. Ex. X, Trial Tr. vol. II, 24:3-10.

Mr. Kirkland testified that on the day of the January 26 Accident, the Debtors again overfilled the railcars with kaolin.[19] Ex. X, Trial Tr. vol. I, 110:11-15. The condition was so bad that he called his supervisor to examine the condition of the railcars. Id. at 110:18-25. His supervisor spoke with the plant manager for the Debtors, admonishing him to "make an effort" to better clean the railcars. Id. at 111:24-112:2. The plant manager said

---

[18]    Debtors' Op. Br. 19.

[19]    Mr. Conley and Mr. Sharpe confirmed that the Debtors indeed overfilled the railcars on the day of the January 26 Accident. Conley Declaration ¶10; Sharpe Declaration ¶8.

29

he would "look into it." Id. at 112:6-7. Following that exchange, Mr. Kirkland was instructed to switch the railcars. Id. at 112:14-18. Shortly thereafter, Mr. Kirkland, while attempting to apply the brake to one of the railcars filled by the Debtors, "slipped again." Id. at 113:5-8. His exact words were "My foot – my right foot slipped on that clay and pulled down and I almost fell off the car, but I didn't." Id. at 113:8-10. The January 26 Personal Injury Report substantiates Mr. Kirkland's testimony. Ex. H, January 26 Personal Injury Report. In further support of his testimony, Mr. Kirkland offered photographs of the kaolin accumulation on the car that he slipped on. See Ex. Y.

C.   **Applying the Language of the Agreements to the Uncontested Facts Establishes Norfolk Southern's Right to Indemnification**

Accepting the facts as presented above distills this case to an issue of whether the Indemnification Provisions apply to require the Debtors to indemnify Norfolk Southern for the settlement it paid to Mr. Kirkland. Such a question is simply a matter of contract interpretation, which is appropriate for summary judgment so long as the "contract language is unambiguous and the moving party is entitled to judgment as a matter of law." Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co., 180 F.3d 518, 521 (3d Cir. 1999).

The unchallenged facts above demonstrate that the Debtors' negligence in overfilling the railcars with kaolin was the proximate cause of the January 26 Accident. The potential for such negligence was contemplated by the Parties in the Agreements, which expressly required the Debtors to indemnify Norfolk Southern in situations such as the one present here. Accordingly, the Debtors are liable to Norfolk Southern under the Indemnification Provisions, and the Court should require the Debtors to honor the Agreements and satisfy the Indemnification Claim in full.

1. The Debtors' Negligent Use of the Loading Spout Requires Them to Fully Indemnify Norfolk Southern in Connection with the January 26 Accident

The 1990 Amendment contemplated the construction and use of the Loading Spout by the Debtors. Ex D, 1990 Amendment ¶5. That provision provided that the Debtors would "construct, maintain and use" the Loading Spout with full knowledge of the risk of injury that could occur from the use of the Loading Spout at the Facility. Id. As the sole purpose of the Loading Spout was to load kaolin into railcars, the Debtors cannot plausibly argue that personal injury resulting from a railroad worker slipping on kaolin that had accumulated on the railcars was not foreseeable at the time the 1990 Amendment was executed. Moreover, because the Debtors were required to indemnify Norfolk Southern for such injuries regardless of any negligence on the part of Norfolk Southern, the Debtors cannot escape liability by pointing to any negligence of Norfolk Southern. Id.

With respect to the January 26 Accident, the facts above overwhelmingly establish that (a) the Debtors used the Loading Spout to load kaolin into the railcars, (b) the Debtors overfilled those railcars, and (c) the railcar that Mr. Kirkland slipped on was covered with kaolin. The Debtors have not—and cannot—offer any evidence to dispute these facts. Even assuming Norfolk Southern was also negligent in some fashion, the fact that the kaolin was a proximate cause of the January 26 Accident is sufficient to establish the Debtors' obligation to indemnify Norfolk Southern in full.

2. Even if the Debtors Are Not Strictly Liable for Negligent Use of the Loading Spout, They Must Fully Indemnify Norfolk Southern Based on Their Failure to Comply with the Agreements

If the Court finds that the Debtors should not be held strictly liable for overfilling the railcars using the Loading Spout or the Facility, the Debtors still bear sole responsibility for Mr. Kirkland's injuries under the general indemnification provisions of the

31

Agreements. These provisions apportion liability between the Parties based on the underlying facts. Critically, the License Agreement establishes that the Debtors "shall be solely responsible for, and shall bear all cost, expense and liability resulting from death, personal injury, and loss and damage to property, caused . . . by the violation by Licensee or its agents or employees of the terms of this agreement . . . ." Ex. A, License Agreement ¶10(b). The License Agreement requires the Debtors to "maintain said Facility at all times during the life of this agreement in such condition that said Facility *or the use thereof* by Licensee shall not be or become an obstruction to, or interfere with, the safe and proper maintenance of said industrial track, or railroad operations upon said track, or *endanger life or limb of employees of the Company* or other persons on or about said track." Id. (emphasis added)

By using the Facility and the Loading Spout in a way that clearly endangered Mr. Kirkland's "life or limb," the Debtors, or at least one or more of their employees, were in direct violation of paragraph 18 of the License Agreement (as well as the substantially identical paragraph 14 of the Right-of-Way Agreement). The Debtors cannot disprove Norfolk Southern's overwhelming evidence that the railcars were overfilled immediately prior to the January 26 Accident. Because the presence of kaolin on the railcars posed a danger to Mr. Kirkland, the Debtors were in violation of paragraph 18 of the License Agreement and are solely responsible for indemnifying Norfolk Southern under the general indemnification provision of paragraph 10 of the License Agreement.

     3. If the Debtors Are Neither Strictly Liable Nor Required to Fully Indemnify Norfolk Southern for Breaching the Agreements, They Must Still Indemnify Norfolk Southern for Half of the Indemnification Claim

If the Court determines that, notwithstanding the Indemnification Provisions discussed above, equity demands that Norfolk Southern share responsibility for the

Accidents with the Debtors, the general indemnification provision requires that the Parties "bear equally all cost, expense and liability" arising out of their joint and concurring negligence.   Ex. A, License Agreement ¶10(d).   This straightforward indemnification provision establishes that when both Parties are negligent, they will split the damages evenly.   As discussed throughout the NS Brief, the Debtors have offered no argument, much less evidence, to refute Norfolk Southern's assertions that the Debtors negligently overfilled the railcars involved in the January 26 Accident.   Accordingly, Norfolk Southern, at a minimum, is entitled to indemnification from the Debtors in an amount equal to half of the Indemnification Claim.

### D.    The Debtors Have Failed to Refute the Applicability of the Indemnification Provisions

Recognizing the outcome mandated by the foregoing contractual analysis, the Debtors do not attempt to assert that the language of the Agreements is unambiguous. Rather, they attempt to evade liability by claiming that (1) the Accidents did not occur on their property; and (2) because Norfolk Southern was held liable in the Georgia Litigation, that it cannot now seek to confer that liability on the Debtors.  Both of these allegations are insufficient to exculpate the Debtors from their indemnification obligations in connection with the January 26 Accident.

#### 1.  The Location of the Accidents is Irrelevant to the Indemnification Analysis

The Debtors intensely emphasize that the kaolin-covered railcars involved in the Accidents were not located on the Facility when the Accidents occurred.  However, the Debtors do not point to any language in the Indemnification Provisions that would limit their liability to injuries occurring only on its property.

PAC 1238776v.8

Under similar indemnification provisions, several of which were entered into by Southern, Norfolk Southern's predecessor and an original party to the Agreements, courts have determined that the indemnification provisions were not limited to accidents occurring at the facility that was the subject of the respective contract. See, e.g., Molly Pitcher Canning Co. v. Cent. of Ga. Ry. Co., 253 S.E.2d 392, 395 (Ga. Ct. App. 1979) (recognizing indemnification provisions may apply to damages occurring beyond "the premises specifically described in the indemnification agreement, so long as the damages in fact accrued as a result of or in connection with the use or operation of the described premises"); S. Ry. Co. v. Brunswick Pulp & Paper Co., 376 F. Supp. 96, 99 n.3 (S.D. Ga. 1974) (finding that the indemnification obligations reached "beyond the industrial track" at issue); S. Ry. Co. v. Ins. Co. of N. Am., 183 S.E.2d 912, 916 (Ga. 1971) (ruling that damage that occurred more than 1600 feet from the facility where the negligence occurred was covered by the indemnification covenant because it "was an occurrence accruing from the maintenance and operation of the facilities, or the use of the facilities").

A good analysis of the applicable rule is found in Brunswick Pulp & Paper, where the court noted in reference to its prior order in the same case:

> [T]he sensible and proper construction of the indemnity clause here is that the obligation to indemnify is effective as to damage resulting beyond the industrial track if the causal act of negligence took place "in and about" the spur. The cardinal rule of construction is, as stated, the intention of the parties. I hardly think Southern would intend to limit its indemnification to such damage as occurred in and about the industrial track when negligence of the industry in loading pulpwood could result in heavy loss or injury elsewhere on the system.

Brunswick Pulp & Paper, 376 F. Supp. at n.3.

PAC 1238776v.8

Consistent with the foregoing cases, the language of the Indemnification Provisions clearly indicates that the Debtors must indemnify Norfolk Southern for personal injury that occurs as a result of the Debtors' use or occupancy of the track, or use of the Loading Spout. Nothing in the Agreements indicates that the Debtors' liability is limited to incidents occurring within the Facility.

2.    The Debtors Are Liable, Notwithstanding Norfolk Southern's Liability

The Debtors also try to escape liability by focusing on Norfolk Southern's liability as determined in the Georgia Litigation. This reasoning is flawed because it controverts the very purpose of the Indemnification Provisions. Additionally, the Debtors attempt to assert that they are not liable because Mr. Kirkland did not name the Debtors in the Georgia Litigation. This reasoning is similarly flawed because it misunderstands the application of FELA.

Mr. Kirkland was able to recover against Norfolk Southern because Norfolk Southern is required under FELA to provide railroad employees with a safe place to work. This duty is nondelegable and therefore Norfolk Southern can be found liable even if it simply fails to correct the mistakes of other parties. Accordingly, under FELA, Norfolk Southern was liable for the Debtors' negligence in the Georgia litigation. However, nondelegable does not equate to nonindemnifiable, and nothing prevents Norfolk Southern from contracting for indemnification from its liability under FELA. See Steed v. Cent. of Ga. Ry. Co., 529 F.2d 833, 838 (5th Cir. 1976).

Such indemnification provisions can even contemplate indemnification for a railway's own negligence. See S. Ry. Co. v. Springs Mills, Inc., 625 F.2d 496, 498 (4th Cir. 1980) (finding that the parties had agreed that the industry would indemnify against

PAC 1238776v.8

loss caused by the railroad's negligence, and that such an agreement was not prohibited by public policy.)

Likewise, the settlement of a FELA claim does not mitigate a railway's right to indemnification. See Union Camp Corp. v. Louisville & Nashville R.R. Co., 202 S.E.2d 508, 510 (Ga. Ct. App. 1973). Union Camp involved a railroad employee who sought recovery from his employer under FELA for injuries he sustained during the course of his employment as the result of the negligent conduct of an industry with which the railroad had contracted. Id. at 114. The railroad notified the industry of the claim and gave it an opportunity to defend. Id. After the industry's denial of liability, the railroad settled the claim with the employee and sought indemnification from the industry. Id. The court determined that the railroad did not forfeit its right of indemnity because it was justified in its conclusion that while the industry's active and primary negligence caused the employee's injuries, the railroad would likely still be liable under FELA. Id. at 115. The court held that the railroad was entitled to proceed with the settlement without forfeiting its right to indemnity because the industry, after receiving notice of the facts surrounding the settlement, "denied any responsibility or liability in the matter." Id.

There is also no requirement that the Indemnification Provisions reference FELA for a right to indemnification for a FELA claim to exist. See Ga. Ports Auth. v. Cent. of Ga. Ry. Co., 219 S.E.2d 467, 470 (Ga. Ct. App. 1975) (stating that it is not necessary for an indemnity agreement to reference FELA because the parties are held to have known of its existence at the time of contracting). Rather, courts have generally imposed liability on the active negligent actor rather than the passive railway whose only liability arose out of

a failure to correct the misconduct of a party with whom it had contracted. 19 A.L.R.3d 928 § 3; see also Steed, 529 F.2d at 837-38.

For example, in Steed, a railway employee was injured as a result of the negligence of the industry with whom the railroad had contracted. Steed, 529 F.2d at 834. The employee sued the railroad in state court for FELA violations, and the railroad sought indemnification from the industry, which it pursued in an action that was removed to federal court. Id. at 834-35. After the employee obtained judgment in the state court action, the railroad introduced the entire record from that action into evidence in federal court in support of its claim for indemnification against the industry and received a directed verdict in its favor. Id. at 835. On appeal, the 5th Circuit explained that the directed verdict was appropriate because the railroad's liability was based only on its nondelegable duty and that because the industry chose not to defend the charges, it was bound by the result. Id. at 837. The court further explained that the industry's "reliance on the mere fact that [the railroad] was liable to [the employee] cannot bring the 'equal shares' provision of the agreement into play. [The railroad's] liability to [the employee] . . . was based on its nondelegable duty to provide its employee with a safe place to work." Id. at 838.

This line of cases demonstrates the courts' willingness to enforce contract provisions that require an industry to indemnify a railroad for injuries that arise out of the industry's use of the railroad. The evidence here clearly establishes that the Debtors acted negligently by failing to remove the slick kaolin from the railcars after they overfilled them. The Debtors were in the best position to perform this task, and as a result of their failure, Mr. Kirkland suffered his injuries. The Debtors have not offered any evidence to rebut this

37

assertion and this Court should therefore grant Norfolk Southern's Cross-Motion and allow

the Indemnification Claim in the full amount asserted.

## CONCLUSION

For the foregoing reasons, Norfolk Southern respectfully requests that the court (i)

deny the Debtors' Motion, (ii) grant Norfolk Southern's Cross-Motion for Summary

Judgment, (iii) allow the Indemnification Claim in the full amount asserted, and (iv) grant

Norfolk Southern any further relief to which it is otherwise entitled.

Respectfully submitted,

Dated: January 27, 2017                     **POTTER ANDERSON & CORROON LLP**
      Wilmington, Delaware

David J. Baldwin (DE Bar No. 1010)
R. Stephen McNeill (DE Bar No. 5210)
D. Ryan Slaugh (DE Bar No. 6325)
1313 North Market Street, Sixth Floor
Wilmington, DE  19899-0951
Telephone:  (302) 984-6000
Facsimile:  (302) 658-1192

*Counsel to Norfolk Southern Railway Company*

38