# EXHIBIT X

IN THE STATE COURT OF BIBB COUNTY
STATE OF GEORGIA

LESTER E. KIRKLAND, JR.,
     PLAINTIFF

VS

NORFOLK SOUTHERN
RAILWAY COMPANY,
     DEFENDANT

"
"
"
"

Civil Action No.

45273

COPY

TRIAL

held before

HON. WILLIAM P. ADAMS

and a JURY

VOLUME I of III

March 19, 2001
2:00 p.m.
Bibb County Courthouse
Macon, Georgia

REPORTED BY:  Julia J. Scarborough

HAWTHORNE & WEBB COURT REPORTING
P.O. Box 539
Macon, Georgia 31202-0539
(478) 746-2295 & (478) 477-9356

1    APPEARANCES:

2    FOR PLAINTIFF:              JAMES H. WETTERMARK, of
                                 Burge & Wettermark
3                                2300 SouthTrust Tower
                                 420 North 20th Street
4                                Birmingham, Alabama  35203

5                                FRANK H. CHILDS, JR., of
                                 Groover & Childs
6                                165 First Street
                                 Macon, Georgia  31201

7

     FOR DEFENDANT:             BENJAMIN M. GARLAND, of
8                                Hall, Bloch, Garland & Meyer
                                 Suite 1500, 577 Mulberry Street
9                                Macon, Georgia  31201

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                                INDEX

3                             -----------

4                          VOLUME I of III

5

6     **OPENING STATEMENT** for the Plaintiff. . . . . . .      7

7                         for the Defendant. . . . . . .     25

8     **WITNESSES FOR THE PLAINTIFF:**

9          Lee Gene Williamson. . . . .  Direct/Wettermark     39

10                                        Cross/Garland         61

11                                        Redirect/Wettermark   63

12                                        Recross/Garland       65

13         Thomas Leon Joy. . . . . . .  Direct/Wettermark     66

14                                        Cross/Garland         74

15         Lester Kirkland. . . . . . .  Direct/Wettermark     77

16

17

18

19

20

21

22

23

24

25

```
 1

 2                              EXHIBITS

 3

 4       Plaintiff's Ex. Nos. 1 - 4   (Tendered and admitted). .  43

 5       Plaintiff's Ex. Nos. 6 - 13  (Tendered and admitted)..  43

 6       Plaintiff's Ex. Nos. 14 - 24 (Tendered and admitted). . 116

 7       Plaintiff's Ex. Nos. 25 - 27 (Tendered and admitted). .  92

 8       Plaintiff's Ex. No.  28      (Tendered and admitted). . 102

 9       Plaintiff's Ex. No.  29      (Tendered and admitted). . 122

10       Plaintiff's Ex. Nos. 30 - 34 (Tendered and admitted). .  53

11       Plaintiff's Ex. No.  44      (Tendered and admitted). . 145

12       Plaintiff's Ex. No.  47      (Tendered and admitted). . 146

13       Plaintiff's Ex. No.  48      (Tendered and admitted). . 135

14       Plaintiff's Ex. No.  50      (Tendered and admitted). . 136

15       Plaintiff's Ex. No.  52      (Tendered and admitted). . 137

16       Plaintiff's Ex. No.  54      (Tendered and admitted). . 139

17       Plaintiff's Ex. No.  61      (Tendered and admitted). . 141

18       Plaintiff's Ex. No.  62      (Tendered and admitted). . 142

19       Plaintiff's Ex. No.  65      (Tendered and admitted). . 139

20       Plaintiff's Ex. No.  66      (Tendered and admitted). . 138

21       Plaintiff's Ex. No.  67      (Tendered and admitted). . 132

22       Plaintiff's Ex. No.  68      (Tendered and admitted). . 146

23

24

25
```

4

1          THE COURT:      Please be seated.  Ladies and

2     gentlemen, thank you for being back on time.  We are now

3     ready to proceed.  As I mentioned earlier, we would start

4     at 2:00 o'clock with the opening statements by the

5     attorneys.  You will recall my explanation this morning,

6     I hope, about generally how a trial will proceed.  The

7     Plaintiff gets to go first.  But let me first mention to

8     you that you have been given these pads and pencils, and

9     the rules do permit jurors to take notes if they want to.

10    But let me just give you these brief instructions.  You

11    are not required to take notes.  If you prefer not to,

12    that's okay, if you want to take a few notes and not

13    many, that's okay, it's just up to you how you do that.

14    The main -- one of the main points I want to make though

15    is, don't let note-taking divert your attention away from

16    paying close attention to what is being said by the

17    lawyers and then by the witnesses as they testify.  The

18    notes that you take, of course, are just memory aids,

19    they are not evidence in themselves, and you should not

20    let somebody who has taken a lot of notes influence later

21    your recollection of the evidence, you should rely on

22    what you remember with or without your notes as you

23    choose to take them or not.  Your notes will be

24    confidential, they should not be reviewed by anyone else

25    except you until you are in the deliberation stage when

1    the case is submitted to you, at that point you can share

2    from your notes, but until then, they are your notes,

3    your notes only, don't share them with anybody.   After

4    the trial is over, we will take them up and they will be

5    destroyed.   But just, again, the main thing I want you to

6    do is pay close attention to what is said, and taking

7    notes is just up to you as to whether it will be helpful

8    to you in this process of being a juror.

9         All right, Mr. Wettermark, you get to go first in

10    the opening statements.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  OPENING STATEMENT FOR THE PLAINTIFF

2       MR. WETTERMARK:       Thank you, Your Honor.  Members

3  of the Jury.  This is a case about safety in the work

4  place.  It's a case about what happens when a company

5  fails to uphold its responsibility to provide its

6  employees with a safe place to work.  But more important

7  than that, this is a case about a man who went to work

8  for a railroad when he was 19 years old, spent his whole

9  life working for that company, and now, at the age of 45,

10  finds himself disabled, all because his employer

11  repeatedly refused to provide him a safe place to work.

12  What I would like to do, is tell you about that man

13  first.  He is Lester Kirkland.  I would like to tell you

14  about Lester Kirkland.  I want to tell you what happened

15  to Lester, and then I am going to tell you why we are

16  here.  Lester went to work for the railroad when he was

17  19 years old.  He came from a railroad family.  His

18  father worked for the railroad for 45 years, all he ever

19  wanted to do.  He hired on as a trainman, got promoted to

20  a conductor, and for the next 25 or so years he worked

21  these jobs in his home state, home town area, near Aiken,

22  South Carolina.  He worked for the Norfolk Southern

23  Railroad Company.  They have three big hubs up there, in

24  Columbia, in Greenville/Spartanburg, and Augusta.  And he

25  worked in that triangle that was formed by those three

1  railroad hubs.  He was a trainman, a conductor; these are

2  the men that do all the groundwork associated with moving

3  trains.  They throw the railroad switches, they climb up

4  on the cars and tie up hand brakes, they couple, they

5  uncouple cars, they ride on the side of cars, sometimes

6  for many miles.  A trainman's safety on the railroad is

7  tied up in two things:  His hand holds and his foot

8  holds.  Those are all that stand between him coming home

9  safe at night and falling down and being a casualty.  In

10  Lester's job, starting about 1992, he started working a

11  job that was known as the Aiken local.  This is a local

12  switching job that would switch various industries in the

13  Aiken area, pick up cars and deliver cars, and then put

14  them together and leave them for trains to pick up and

15  take to various cities.  It's not a very large area that

16  he worked in, in miles, maybe 20 or 30 miles all total.

17  We have this diagram just to get you kind of oriented.

18  But the Aiken Depot was right in the middle of this area,

19  and he travels in his train, he and his train crew would

20  get their locomotive engine, and they would go and work

21  all these industries.  And by work, I mean, they would go

22  pick up cars and leave cars at all these industries up

23  and down these tracks.  Several of these industries are

24  kaolin loading facilities, clay loading facilities.  One

25  of them is called the W. R. Grace Clay-Loading Facility,

1    and this is what this case is about, this facility right
2    here.  When Mr. Kirkland went on the job in 1992, he
3    would take empty cars every day down to the W. R. Grace
4    facility, and you will see photographs of the facility,
5    but it's a railroad car loading facility where empty cars
6    are pushed into the facility.  They go under these
7    loading platforms and clay is poured down into the top of
8    these hopper cars, and then the cars are pushed through
9    and picked up and take -- the loaded cars are taken out
10   the other side.  Well, what was supposed to happen at
11   this facility was, after they loaded the cars, the grab
12   irons, the foot sets, the areas where these men worked,
13   were supposed to be blown off, cleaned off, get the clay
14   off of these ladders and grab irons these men rely upon
15   to do their job.  It was not being done.  And starting
16   back as far back as 1992, for sure, and I am going to
17   bring to you in this courtroom just about every man who
18   has worked this job from 1992 up until the day he got
19   hurt, they wouldn't clean these things off.  This is what
20   one of these cars looks like up close.  You see the
21   ladders, you see the hand brakes, this is where the men
22   work, they are up and down these ladders, going across
23   these platforms.  When they would go pick up these loaded
24   cars, all of these grab irons, all these platforms would
25   be covered with kaolin.  You will hear these men tell you

1    about kaolin, it's slick, it's a very, very fine powdery

2    substance, and it's very, very slick, even in its dry

3    state it's very slick, but when it gets wet, it is about

4    as slippery a substance as you can ever encounter.  And

5    so Mr. Kirkland is trying to do his job and encountering

6    these cars on a daily basis.  And he, and every crew

7    member who was there, tried to get something done about

8    it.  You will hear testimony from each of these men, how

9    they started calling the officials, saying, you all need

10   to do something about this.  They called over and over

11   and over, and could never get anything done.  Oh, sure,

12   they would come out there and maybe for one or two days

13   they would start blowing them off, and then it would go

14   right back to where it was.  By 1996, he and his engineer

15   -- actually it was his engineer, had said, I have had

16   enough, I am going to do something about this.  And so

17   the engineer started on a daily basis calling the

18   railroad, whatever official he could get, saying, do

19   something about this; this is a safety hazard; someone is

20   going to get hurt.  They kept a calendar to keep track of

21   this, put a calendar up on the depot wall, and every day

22   they put down who they called.  And this went on for nine

23   months, and it was never corrected.  Finally, after nine

24   months, the official who was in charge of this area comes

25   into the depot, sees this calendar with all the

1    complaints on it, tears it down, does not fix the

2    situation.  And that brings us to January 23rd of 1998.

3    Lester was working, as he had been for years, the job.

4    It was a rainy day.  He and his crew, as they always did,

5    went down to the W. R. Grace facility to pick up the

6    cars.  When they got in there, as it always was, the cars

7    were just coated with kaolin, coated with the stuff, and

8    it was wet.  They did not have -- when they got there

9    they did not have to get on the cars, they were able just

10   to couple up to them and pull them out when they got in

11   the facility.  So when they first got there, he avoided

12   having to go up and climb up on these cars.  And then

13   they proceeded to do the rest of their work, pulling

14   these loaded cars with them.  They picked up the cars

15   early in the morning they continued to work the rest of

16   their job, not having to deal with these cars, pulling

17   them around behind them, but not having to deal with

18   them, they were working with the other cars.  And

19   finally, in the afternoon, one of the last things they

20   were going to have to do was to take the cars down to the

21   main line, put them in a siding where they were going to

22   be picked up by trains to be taken to either Augusta or

23   to Columbia.  Well, in the course of switching down here

24   Mr. Kirkland had to get on these cars, and had to get on

25   it for the purpose of tying up hand brakes and knocking

```
 1      off the hand brake.  When he got on it the first time,

 2      they will tell you, there is no way you can keep from

 3      slipping.  I mean, it's just a slippy, slidy experience.

 4      They have learned how to try to brace their feet to

 5      minimize the slip.  He was able to get the hand brake on

 6      the first time he was up on the car okay.  A little while

 7      later, though, he had to get back on the car to release

 8      the hand brake.  And when he got up there to release the

 9      hand brake, it is a wheel like this, there is a little

10      lever, it's hard to see, but there's a lever you can pull

11      that releases it, or you can turn this wheel to release

12      it.  Well, the hand brake was gummed up, probably from

13      all the clay, we don't know.  But it's something they

14      encountered all the time, they found if you kept giving

15      it a little pressure, eventually you could get it loose.

16      And so he was up there in the proper stance brace, trying

17      to get this thing loose, and just like that, his feet --

18      he thinks it was his foot that went first, but in an

19      instant, he couldn't hold on with his hand because his

20      leather gloves were caked with kaolin, and down he went,

21      landed on his back.  And he went -- it happened so fast,

22      and because his feet went -- his hands just came off, he

23      went over backwards and landed on the -- fell to the

24      ground and landed on his back, he put his hand out to try

25      to catch himself.  Injured pretty severely his right
```

```
 1    thumb, it was immediately swelling up, and terrible pain,
 2    immediately had significant back pain.  Picked himself
 3    up, managed to get up to his crew members, told them, I
 4    have fallen, I have hurt myself.  And they say, well, we
 5    are almost finished, let's get back to the depot and we
 6    will report the injury.  Well, he goes back to the
 7    depot.  They report the injury, five officials for the
 8    railroad come down to the depot.  For the next four and
 9    five hours they interrogate the men, these men keep
10    telling them, this is the situation we have been telling
11    you about for five years.  They go down to the scene
12    where they observe the kaolin on the cars.  One of the
13    officials tells Mr. Chapman, the gentleman sitting over
14    there, you get out there on Monday morning with these men
15    and let's get this situation squared away.  And they send
16    Lester home after five or six hours.  They ask him if he
17    would not go to the doctor because if he goes to the
18    doctor, if he gets medication, that makes it a reportable
19    injury and hurts their safety record.  And they said,
20    will you work with us to protect the safety record.  And
21    he said, yes, I will be glad to.  So he went home that
22    night, he was in -- didn't sleep at all that night,
23    pretty bad pain.  Saturday was putting ice on his back.
24    The officials -- they gave him ice packs, and said, here,
25    use these ice packs, they will help.  And so he used ice
```

1    packs on his hand and his back all weekend.  Monday, he

2    did feel some better, he was still in pain, but he wanted

3    to try to protect the safety record, so he goes to work,

4    same place, back to the depot.  They are waiting for Mr.

5    Chapman, he doesn't show up, so the crew says, let's go

6    on to work.  They get in their engines, start heading

7    back to the same place, W. R. Grace.  They have some

8    engine trouble, so they have to wait a while for some

9    repair work, and while they are waiting, Chapman comes

10   up.  Lester says, look, while we are stuck here, why

11   don't you and I go down to the facility.  So he says

12   fine.  Well, they go down to the W. R. Grace facility,

13   but Mr. Chapman stops way up here at the empty side where

14   all the cars are clean coming in, and doesn't go down to

15   the area where all the problems are.  And Lester says,

16   why don't we go down there, and I'm going to show you

17   this problem.  He says, I have seen enough, and leaves.

18   So Lester goes back to his crew, they get in the train

19   and they go to switch this same place.  They get down

20   there, they go shove in to where the loads are and they

21   are covered with kaolin.  And he and his crew had had

22   enough.  They said, we ain't doing it.  They called Mr.

23   Chapman.  He comes down there, and they said, you come

24   look at this.  And they get Mr. Chapman, they get the

25   official from the W. R. Grace place.  The W. R. Grace

1    official says, well, I haven't seen it this bad in a

2    while.  And Lester turns to Mr. Chapman, and says, what

3    are we going to do, what do you want us to do about it.

4    He tells them, switch them, this is a good customer.

5    They sat there and looked at each other in disbelief.  He

6    says, I have got to go, went to a derailment somewhere,

7    and left them there.  So they did what good employees do,

8    they tried to switch the cars.  They got them out of the

9    W. R. Grace facility safely, got them up here as far as

10   the Aiken depot where they were going to do a maneuver

11   where they wanted to get the locomotive engine from one

12   side of the cars to the other, and to do that, they are

13   required to go and tie up hand brakes.  He went up on the

14   car, and again, it was coated with this kaolin, on there

15   doing his best, and again his feet slid out from under

16   him, he goes halfway down but catches himself.  Mr.

17   Sharpe, his trainman, was standing there and saw him

18   fall, saw him with tears in his eyes afterwards, had to

19   help him down off the car and takes him into the depot,

20   and they again call the officials. Mr. Chapman comes out

21   there, sees Mr. Kirkland hurt, says he will call him

22   relief.  Asks him, can you all go and place these cars

23   that you just pulled down here on the Warrenville site.

24   Mr. Kirkland said, Mr. Chapman, if we put them down here

25   a train crew is going to come through here tonight, pick

1    these cars up, and they are going to have to get on them

2    with all this kaolin on them.  He said, I will worry

3    about that, sent them down there to put the cars down

4    there.  Lester was -- he was angry.  And he turned to his

5    crew, and says, I am going over his head.  Got on the

6    phone, started calling whoever he could; tried the

7    terminal superintendent, he was in meetings; tried the

8    assistant superintendent, he was busy.  Hung up the

9    phone, tried to call the agent there -- you will hear

10   from the agent.  He'll tell you about what a problem this

11   was.  When he couldn't get anybody, couldn't think what

12   to do, so he called his wife, and asked his wife, said,

13   do we have a camera, if you do, get down here, I want you

14   to take pictures of this, and she did.  This is just one

15   of the pictures you will see that shows these cars.  This

16   white stuff -- this is the platform he walked on.  When

17   you look at this, you can see there is a quarter of an

18   inch of raised kaolin on top of these little tiny

19   surfaces, probably three or four or five inches worth of

20   it has piled up in here.  You can see on the grab irons

21   where there is still kaolin coating the grab irons.  This

22   is how much kaolin was left on these surfaces after these

23   cars had been pulled for three or four miles.  This is

24   after they have been jiggled, and after it had blown off

25   in the wind, this is how much was left then.  And you

1   will see the other pictures.  The locomotive engines

2   these men worked on, the walkways, were covered with the

3   kaolin.  That's why I told you just a few seconds ago,

4   that this is a case about a company that failed in its

5   obligation to provide its employees a safe place to work.

6        Now, let me tell you what has happened to Lester.

7   He went to a company doctor the next day; he went to his

8   family doctor; he was referred to specialist; and he has

9   two significant injuries.  And I would like to tell you

10  what you are going to hear about those injuries.  You

11  will hear the doctors -- I already know what the

12  testimony is from the doctors, because we have already

13  taken their testimony.  They testify by videotape

14  depositions, and so we'll play a video tape of what the

15  doctor's testimony is about his injuries.  His back

16  injury, the diagnosis by the doctor is that he had a

17  traumatic injury to his lower back, he damaged the disk

18  at both the L4-5 level and the L3-4 level.  The damage to

19  the disk has been confirmed by MRIs, L4-5 disk is bulging

20  and it has a partial tear of the annulus.  The doctor

21  will explain to you that in our back we all have these

22  intervertebral disks, they are like the shock absorbers

23  between the individual bones of the spine.  When these

24  are overloaded or subjected to trauma, like falling, it

25  damages them, and it tears this outer surface of these

1    disks, and that's what the MRI scan showed on the L4-5

2    disk, which is this one, and it causes the disk to bulge

3    out as is depicted, and it puts pressure on the nerves

4    and the spine that go down the leg.  He has an injury to

5    both the L4 disk and the one above it, the L3-4 disk.  He

6    has some reflex loss in his right patella reflex, which

7    is from the nerve damage, and this has been confirmed on

8    four MRIs and two EMGs, it's been confirmed.  The other

9    injury was, which he has, is that he, like all of us, as

10   we get older, we have degenerative changes, wear and

11   tear, our backs are not what they were when we were

12   younger.  It's something we all have, but what happens

13   is, when you have these normal degenerative changes, and

14   you subject your spine to trauma, these wear and tear

15   changes, which everybody -- we all get it to some degree

16   and it's not a problem until you have trauma or an

17   injury.  And the doctor will tell you that this trauma

18   adds years and years to the spine.  So he has this

19   condition going on.  The reason this is so important, and

20   you will see in a second, as he went through his

21   treatment, one of the things that he considered was to go

22   in and have surgery to see if they could repair the

23   damage.  But surgery doesn't work very well when you have

24   all of these things together.  His right hand, which he

25   fell, he -- the diagnosis is ligamentous laxity of his

1    right thumb joint, he stretched the ligaments to the

2    point that it was loose in his joint.  And the doctor

3    will tell you the only thing that can be done for that --

4    surgery won't repair it.  The only thing that can be done

5    is simply to fuse the joint; by that, just make it fuse

6    where it doesn't move at all.  It's kind of a catch-22

7    type decision.  They fuse the joint, you lose your

8    movement in your thumb joint, but you get rid of your

9    pain.  If you don't fuse it, well, you can keep more

10   mobility but you have pain.  The treatment he has had for

11   his back, the doctors have been very, very methodical

12   about how they have treated his back.  They started off

13   for the first month saying, let's just rest, medication,

14   see if it doesn't get better on its own; it didn't.  They

15   then put him in a physical therapy program for the next

16   two months to see if that would help; it didn't.  They

17   then started a series of lumbar epidural injections,

18   which is where they actually put steroids into the spinal

19   canal hoping to help the situation; it didn't.  Finally

20   sent him to a neurosurgeon to see if surgery could help;

21   it won't.  Finally, they put him in, what is the last

22   resort for people like this, they put him in a pain

23   control program.  The doctors of the pain control program

24   will tell you that this is only for people who have

25   significant and life style limiting pain with no

1    treatment or cure identifiable.  And that's where he is

2    now.  He undergoes a regime of treatment for his spine.

3    He gets injections in his back about once a month.  He

4    takes four different types of medication, Oxycontin,

5    which is a very powerful pain killer; Neurontin, which

6    helps with the nerve damage; he takes Celebrex, which is

7    an antiinflammatory to help with the inflammation of the

8    spine; and he takes an antidepressant, which brings me to

9    the next part about this case.  What the doctor is going

10   to tell you is that, especially in the spring time, Mr.

11   Kirkland develops severe depression.  And the reason is,

12   is because his activities are so limited.  Before this

13   accident, he led a very full and active life, played

14   golf, tennis -- I have got some pictures of him before

15   the accident.  He can't do any of that now.  He is

16   dependent on his medications, and he can't do any of

17   that, and as a result he gets terribly depressed, and so

18   they give him antidepressant medication.  His hand was in

19   a cast for a month and then a splint.  The doctors

20   recommended a fusion surgery.  Lester has elected not to

21   have it yet, because he says, you know what, right now I

22   have pain, but I can live with it, and I would rather

23   keep that extra motion I get without a fusion.  Whether

24   he has it down the road, we don't know.  When he was

25   first off, and undergoing all this medical treatment, he

1    was in contact with -- the railroad has a Rehabilitation

2    Program, and he was in contact with them, and you will

3    see all the letters he wrote to them.  He told them --

4    they were saying, you want us to help you find another

5    job.  He said, I want your help, but not right now, I am

6    trying to get back to my old job.  And so for the first

7    year he did everything the doctors asked of him trying to

8    get back to work.  By a year after the accident, March of

9    '99, his doctor told him, you ain't ever going back to

10   work on the railroad, you won't ever do anything in your

11   life except sedentary type work.  And so Lester wrote to

12   the railroad at that point, and said, well, you know, I

13   can't go back to work, I want your help.  Well, the only

14   thing that he asked the railroad to do -- he told them,

15   and you will see the letter -- he told the railroad, I

16   will do anything, but I have got -- you know, my family

17   is here, and I don't want to move outside of the state of

18   South Carolina.  You have got three big hubs here, I will

19   do anything you can find for me.  But my daughter is

20   here, I promised her I wouldn't be an absentee father,

21   and so find me a job near here.  Well, the first job

22   offer they find for him, they offer him a clerk's job in

23   Dearborn, Michigan.  He writes back, says, I can't do

24   that.  They offer him jobs in Atlanta, Georgia.  He says,

25   can't you find me something closer to home.  Finally,

1    they find him a dispatcher's job in Greenville.  And he

2    says great, I am ready.  Goes to Greenville, which is a

3    good distance from where he lives now, but he was fine

4    with it.  Goes to Greenville, they say, you are medically

5    disqualified. You can't do the dispatcher's job because

6    of the medications you take.  They hired a company called

7    GENEX, which is a rehabilitation company, to see if they

8    could help find him a job.  They haven't been able to.

9    But I took the testimony of the lady from this company

10   who has been working with him, and she told us under oath

11   that he has done everything that she has asked him to do

12   trying to find work, and in fact, has gone above and

13   beyond the call of duty trying to find work.  He has

14   found work.  He went to a friend of his who has a title

15   type company and he allows him to work on his own

16   schedule, pays him $7 an hour, which in his situation is

17   great; it allows him to go work for two or three hours,

18   and if he needs to go home and lie down with his back, he

19   can.  And so he has been doing that sort of work.  He has

20   worked his way up from, I think, 15 hours a week to 20

21   hours a week, and now he is working about 25 hours a

22   week, the best he can do right now.  That's what happened

23   to Lester Kirkland.

24        Now why are we here?  We are here because, like Mr.

25   Garland told you, there is no workers' compensation for

1    railroad workers.  They are covered by a federal law,

2    called the Federal Employers Liability Act.  And if he

3    wants to get compensation, it can only be awarded by you.

4    And you have to ask two questions, you'll have to answer

5    two questions.  One, is he entitled to receive

6    compensation; in other words, was he injured as a result

7    of the railroad's negligence.  And if you find that he

8    was injured because of the railroad's negligence, then he

9    is entitled to receive full compensation.  Well, I am

10    confident that by the time you hear all the evidence in

11    this case there is not going to be any question about how

12    negligent this railroad was.  The elements of

13    compensation that the law says he is entitled to, if this

14    was the railroad's fault -- there's three types of

15    compensation that you all can award.  One is his past

16    lost wages, that's how much money he has lost to date out

17    of pocket.  Two, is the present value of his future lost

18    wages and benefits, that's his wages and also includes

19    his health insurance, which is going to run out at the

20    end of this year.  He is entitled to recover that.  And

21    you will hear an economist come testify to tell you how

22    to calculate this; you will hear a vocational

23    rehabilitation expert to come here and tell you what his

24    prospects are in the work force.  And then finally, you

25    are entitled to award him a sum to compensate him for his

1    pain and suffering, including his permanent physical

2    disability and his loss of enjoyment of life. I can't

3    bring an economist to help you on this. The law asks you

4    to use your common sense and the law asks you to be fair

5    and reasonable. And I mean that truly, fair to him and

6    fair to the railroad. But you need to, if you feel like

7    he is entitled to compensation, to try to find a sum of

8    money that would be fair to him for what has happened to

9    him. That's what this case is about. I will look

10   forward to letting you hear the evidence. I think, by

11   the end of this case, you will be impressed with two

12   things. One, you are going to be impressed with how

13   negligent this railroad was, and how pointless this

14   accident was, how it didn't need to happen. And two, I

15   think you are going to be impressed by the type of man

16   this is. Thank you.

17

18

19

20

21

22

23

24

25

OPENING STATEMENT FOR THE DEFENDANT

1

2          THE COURT:     Mr. Garland, you may proceed.

3          MR. GARLAND:   May it please the Court?

4          THE COURT:     Yes, sir.

5          MR. GARLAND:   Ladies and gentlemen of the Jury, as

6    I have mentioned this morning, my name is Ben Garland.  I

7    practice law here in Macon in the firm of Hall, Bloch,

8    Garland and Meyer.  We represent Norfolk Southern

9    Railroad in this case.  And with me is Mr. John Chapman,

10   who lives in Forest Park, Georgia.  He is a trainmaster

11   there in the Atlanta depot.  During the year 1998, which

12   is the year in question here, he was a trainmaster in

13   Columbia, South Carolina.  He was in charge of this area,

14   and he will testify as a witness in this case.  Now,

15   members of the Jury, as Judge Adams told you earlier

16   today, the opening statement by the lawyers is not

17   evidence.  Now, Mr. Wettermark has made, what I guess is,

18   kind of a closing argument about what he perceives the

19   evidence to be, but the evidence is not what he says, or

20   not what I say, it's what the witnesses say, and doctors

21   -- it's what the doctors say in their video depositions.

22   Members of the Jury, there are a lot of things in this

23   case that are not in dispute at all, and then of course

24   there are some things that are going to be in dispute,

25   and that's what you will be called upon to decide the

1    disputed issues in the case.  Now, first of all the

2    evidence is not in dispute that Mr. Kirkland was a

3    railroad employee, has been with the railroad, like the

4    mid-70s.  You will hear the history of his progression of

5    the steps, and he finally became the conductor.  And you

6    will hear what duties a conductor has, what he does and

7    what his responsibilities are.  And he held that job

8    until January of 1999, and that's what we are here about

9    today.  Now, the evidence will show, I guess, and common

10   sense tells you, that railroading, out on the road, is a

11   physically demanding job.  You are out there in all sorts

12   of weather, hot in summer and cold in the winter, and

13   then when it rains, that you are there in the rain,

14   that's just a fact of it.  Of course, those may be some

15   of the bad things.  The good things about it is you are

16   out there in the nature, you are outdoors, and your --

17   Norfolk Southern, you are working for a very good

18   company.  And I think you will feel that when you hear

19   all the evidence in this case.  And the way the evidence

20   progresses, the Plaintiff will put in their's first, and

21   then we will put in the evidence afterwards.  Now,

22   Norfolk Southern, like all railroads, has certain rules,

23   there are rule books, operating rules and safety rules.

24   These are these little books right here that will be in

25   evidence, they have certain rules that the railroaders

1    must follow.  Each employee gets these rules when he

2    signs on, he keeps them, they have seminars on them and

3    meetings on them and so forth.  And in these rules, each

4    member of the crew has some specific responsibilities.  I

5    guess the easy one is the engineer.  Now, his

6    responsibility is, he drives the train, and has things to

7    do with carrying the train down the road, but then, and

8    this may surprise some people, the engineer, though, is

9    not in charge of the train.  The person in charge of the

10   train, as these rules will say, is the conductor.  Now,

11   one specific rule, that I think is relevant and important

12   in this case is Rule 586, and that provides several

13   things the conductor must do, and this is Mr. Kirkland in

14   this case.  And one the conductor is charged with, his

15   responsibility, he must remedy any defects of equipment,

16   and this is important, must remove from the consist, and

17   the consist is the train, any cars that are unsafe to

18   run.  Any cars that are unsafe to run is the conductor's

19   job, and it just makes sense.  The conductor is right

20   there on the scene, he can make a decision and does make

21   decisions, you will hear evidence of that, if a car is

22   defective to a degree that endangers his safety or the

23   other people in the train, or anybody else, it is his job

24   to just leave that particular car off and set it aside.

25   Now there are other general safety rules that you will

1    hear about.  And one that you will hear about is Rule M,

2    and that provides generally that employees should not,

3    and shall not do any work that they feel is hazardous.

4    Those are rules in the book, and they are the guidelines

5    that the industry runs by.  And I invite your attention

6    to the discussion about these railroad rules, and how

7    they apply to the facts that you hear in this case.

8    Another undisputed fact, members of the Jury, is going to

9    be that the railroad delivers these empty cars to the W.

10    R. Grace and Company, which is a kaolin company, I guess

11    like some of the kaolin companies in the Middle Georgia

12    area, and the fill these cars with kaolin, and then they

13    -- the railroad then pulls the full cars away for

14    further shipment.  Now, I think the evidence is going to

15    be undisputed that the W. R. Grace and Company employees

16    that fill these cars, they fill them through these big

17    filters on top.  They dump the kaolin in and kaolin, the

18    evidence will be, is like dust powder.  It's like dust

19    and powder, and it does spread into the air, wherever --

20    whatever is there is going to catch some of that dust.

21    Now, I believe the evidence is going to show that they

22    have installed there a big blower at the end of this --

23    they come in to get the kaolin dumped in them, and as

24    they are pulling out, they have a big, kind of an air

25    dryer or air blower, I guess it's kind of like you see in

1   a car wash when your car goes through and at the end it

2   gets blown off, and that is to blow away the kaolin dust

3   that is all scattered around.  And I kind of think it's

4   like the situation, if any of you drive up Highway 87, up

5   towards Jackson, and you pass by the big rock quarry

6   there, well, the trucks are coming out and the dust is

7   kind of flying off, and when it's real dry, most of that

8   whole area is going to be covered in kind of a white

9   substance.  When it rains it kind of washes it all off.

10  But I think that's probably kind of what the testimony is

11  going to be, what the evidence is going to show.  Around

12  that kaolin plant, it's going to be dust in the air,

13  that's a fact of life.  It's almost like, when they pick

14  it up at a paper mill, there's going to be a paper

15  smell.  There are just some things that are going to be

16  there, and this is going to be, I think, one of them you

17  are going to see.  I believe the evidence is also going

18  to be undisputed that when kaolin gets wet, it's

19  slippery.  I think anybody that's ever been around a

20  kaolin plant, or worked on a railroad that goes in there,

21  knows that.  And they know that they have to be extra

22  cautious and careful, because on a rainy day when that

23  truck, or when that car of kaolin goes through the big

24  blower, if it's wet, it's not going to really blow it

25  off.  Now there will be some evidence that maybe if it

1  goes down the road a while, it just kind of blows it off,

2  and sometimes -- I think evidence is going to be that

3  sometimes the Grace and Company employees would not blow

4  it off right or wouldn't do a good job, and sometimes Mr.

5  Kirkland said, he just would stop and make them blow it

6  again, and they would do that again, and maybe that would

7  be better.  And then sometimes if it goes down the road,

8  kind of like driving down the road in your car with the

9  pollen on it, and some of it kind of blows off.  But

10  there again, when it's wet, it will either wash off, or

11  if it doesn't wash off, it will just kind of stay there

12  until it's dry enough to blow off.  Now, the evidence, I

13  think, is going to show that Mr. Kirkland has been

14  working that very job for about eight years before then.

15  And I think the evidence is going to show that he

16  respects the fact that he's dealing with a substance

17  there that when it is wet you have to be very cautious.

18  He has testified that he would instruct the new people

19  that come on board with the railroad that, you know, you

20  have to watch out for that.  You will hear about some

21  complaints, and I think some of the evidence will be that

22  there were some walkways around there seven or eight

23  years ago that weren't paved, and they just had kaolin

24  around, so when the railroad employees would get out and

25  kind of walk around there, their shoes would get in

1    there.  Now, after that situation, the kaolin company

2    paved some of those areas there.  Now, this is some of

3    the history, I don't know what, they say it's going back

4    and talking about six or seven years ago, that'll -- you

5    will hear some evidence about that.  But the evidence is

6    going to show that on that date, on Friday, February the

7    23rd of 1998, it was raining.  Mr. Kirkland and his crew,

8    he was the conductor, went out to make a pick up from the

9    kaolin company.  They picked up the cars there, and they

10   took them about eight or ten miles up to Warrenville,

11   South Carolina, and at that point, they were cut off from

12   the train and left there.  And when the cars got to

13   Warrenton [sic], Mr. Kirkland was disengaging the brake,

14   and I think they call it throwing the brake switch, and

15   he testified that either his hand slipped, he has on a

16   glove there, on the wheel, or his foot slipped, he wasn't

17   sure, but he fell.  There were no witnesses there, but

18   that's -- he says he fell, he hurt his hand, he said his

19   back hurt.  And he got up and brushed himself off, and I

20   think some people came around.  He said, well, I -- you

21   know, I think I'm pretty -- all right, kind of shook up a

22   little bit, and he finished out the day's work.  The

23   evidence then will show that he did what he was supposed

24   to do.  There is another rule in this book that every one

25   of them know, and that is, if you ever encounter any sort

1    of injury, even though, maybe at the time, you don't

2    think it's anything, you make a report, that's what you

3    should do.  He goes back and he makes a handwritten

4    report, that you will have in evidence, describing what

5    happened.  And then the evidence will show that if

6    there's ever any question about any equipment, he was on

7    equipment, then there is an investigation in to see if

8    anything is wrong with that, and that's exactly what

9    happened here.  You will have the notes of the

10   investigation that says, you know, there is nothing wrong

11   with the railroad equipment, and does say that there was

12   some of that Kaolin stuff on there, and you will have

13   those documents in evidence.  Now, the evidence will show

14   Mr. Kirkland went with them and showed them exactly what

15   happened and that sort of thing, and Mr. Chapman and the

16   other officials that make up this team were there.  Now,

17   that was on Friday.  The evidence will show, contrary I

18   suggest, to what Mr. Wettermark is saying -- and of

19   course, neither of us were there, you will have to hear

20   the witnesses, but Mr. Kirkland's own testimony on

21   deposition was that Mr. Chapman said, do you need to go

22   to a doctor.  And he said, no, I think I will be all

23   right.  And he said, I will put some ice on here, and

24   take some Tylenol, and all this sort of stuff, he said, I

25   think I will be all right.  And they said, well, we will

1    check.  It's a weekend, I'll rest up over the weekend,
2    see if I am able to come back to work.  I will -- if not,
3    then we will go to a doctor.  That was the way the thing
4    was left.  I invite your close attention to that
5    testimony.  The evidence, I think, is going to be that on
6    Monday morning Mr. Kirkland returns to work, he has met
7    there with the people.  He says, yes, I am feeling
8    better, I am going to try to, you know, make this thing.
9    Said, I took the Tylenol, and what have you.  I rested
10   over the weekend.  My hand is still hurting some, and
11   that sort of thing, you will hear about it.  And I think
12   the evidence will show that that was another rainy day,
13   that they went to the Grace and Company plant, and here
14   is a -- definitely a dispute in the evidence, if the
15   evidence is what Mr. Wettermark said, because you will
16   hear Mr. Chapman's testimony about this, and Mr. Chapman
17   will say he never had a conversation with this conductor
18   when that conductor said, what do I do with the cars, and
19   that would be highly irregular.  Under the rules, the
20   conductor is the man charged with making these decisions.
21   But in any event, later that Monday, Mr. Kirkland is
22   there on a car, and he doesn't -- I think, as he
23   described it, he kind of slid, but he slid and he hurt
24   his back again.  And he had some people there watching,
25   and he said, you know, you saw that, I slid on this

1    stuff, it's slippery.  And I submit to you if you do

2    that, then you will probably slide.  But he did that, and

3    he jammed his back again, hurt his back again he says.

4    Fills out another injury complaint, again, on the 26th,

5    that would be on Monday.  I think the evidence is going

6    to be that Mr. Chapman and the other people there said,

7    well, do we need to go to the doctor, now.  And he said,

8    well, let's give it maybe until in the morning and just

9    see how I feel in the morning.  He felt no better, so he

10   said, yes, and they went the doctor.  I think, actually

11   Tuesday morning, instead of Monday afternoon. I think the

12   doctor x-rayed a hand, back, gave him some medication,

13   saw that there was nothing broken on that -- those

14   x-rays, and said, if you need further medical service get

15   transferred to an orthopedic doctor, or hand doctor,

16   something like that, and that is exactly what happened.

17   In this case, members of the Jury, you will have the

18   video depositions of these doctors that were involved in

19   treating Mr. Kirkland.  You will have the deposition of a

20   Dr. Duncan over in Augusta, who was a hand specialist,

21   who testified about treating the hand, which at the first

22   was the main complaint.  Then you will have the testimony

23   of a Dr. Eisenberg, who was a neurologist in Aiken, South

24   Carolina, and then you will have the testimony of Dr.

25   Epstein.  Dr. Epstein is a neurosurgeon.  He is the one

1    that they refer things to when it's really complicated,

2    when nobody else can find anything that shows up on the

3    x-rays or anything like that.  And of course, I invite

4    your close attention to all of that testimony, but

5    particularly to Dr. Epstein's testimony, and to his

6    reports to the arthritic condition that he found on first

7    examination in Mr. Kirkland's back, and when he testified

8    that that condition occurred.  Now, that will be in his

9    testimony and what he related it to.  There is another

10   doctor in Augusta, Dr. Downey, who testified, and he is

11   the pain doctor that prescribes the medication and so

12   forth, you will hear his testimony.

13        Now, members of the jury, what I have discussed, up

14   until this point, has been evidence of liability.  And as

15   the Judge says, I think will charge you, and as Mr.

16   Wettermark has referred to, there are two elements in

17   this case.  The first is the issue of liability, and the

18   burden the Plaintiff has, he has to show that these

19   injuries were -- happened because of the negligence of

20   the railroad, the negligence of the railroad.  Now, there

21   will be another issue in the case that Judge Adams will

22   charge you about, will be the Plaintiff's own

23   contributory negligence.  What, if anything, did the

24   Plaintiff -- was the Plaintiff negligent, that will be

25   another issue that you will wrestle with during that

1  trial.  Now, with respect, though, to the second element,

2  that is, the element of damages, I believe Judge Adams

3  will charge you that the law of Georgia is that when

4  someone is injured by someone else's fault and is

5  claiming money damages, that there is the duty and the

6  law of Georgia imposes the duty, to do what they call

7  mitigate, that's the term they use, which means lessen

8  the damages.  And that would be in the case of if you are

9  claiming damages in terms of lost wages, you would

10  mitigate that taking employment that was offered, that

11  sort of thing.  Now, I invite your close attention again,

12  members of the Jury, to what each of the doctors say when

13  they are asked the question, can Mr. Kirkland return to

14  work, and if so, what kind of work.  Now, it will be

15  undisputed that the doctors will say, well, not if it's

16  that kind of work he was doing, climbing up and all that,

17  that's out the window.  If he hurts as bad as he says,

18  then he should not be doing that.  And they will say

19  that, and that's accepted.  But they will also go one

20  step further, and they will say, it would even be good

21  for him -- you know, nothing to do with mitigation of

22  damages, but good for him, if he would go ahead and

23  accept employment; and the doctor even uses the term, in

24  a clerk position, in a clerk position.  Now, in this

25  regard, Norfolk Southern does have a Vocational

1   Rehabilitation Program for its employees. You will hear

2   testimony from Mr. Michael Maher from Virginia, who is

3   the head of that department, and he will testify, and

4   have the correspondence and the evidence about what

5   efforts the railroad has gone to to try to place Mr.

6   Kirkland in another position. And what you will hear, in

7   addition to several different propositions about

8   employment, maybe some way off, but also some in Atlanta,

9   Georgia. There will be papers that will show that there

10  were 11 clerical vacancies in the centralized yard in

11  Atlanta. And what the -- I think the evidence will show

12  the centralized yard meant that they took some positions

13  from Macon, from Augusta, from wherever, centralized

14  those clerk functions in Atlanta, I guess computers and

15  whatever makes good sense -- I guess it may be like the

16  lady this morning talking about the bank centralizing

17  some thing up in McDonough. It's the same sort of

18  proposition. They had 11 vacancies. He says, well, I'm

19  taking all this medication. He submits it to the medical

20  director, I think the evidence is going to be that the

21  medical director says that's fine, he can hold any of

22  those. Now, you will hear the evidence, and of course,

23  Mr. Kirkland will give his reasons as to why he couldn't

24  or wouldn't take those jobs. You will further hear

25  testimony from a Ms. Bookman, who is a vocational

1    rehabilitation counselor with GENEX, that's a company --
2    a private company in South Carolina, it's not related at
3    all to the railroad, but they are in the business of
4    finding positions for people who are either displaced in
5    their job or looking to change careers and so forth.  The
6    evidence will be that the railroad, then, when they
7    couldn't find where they don't have any clerkship jobs
8    right there, that or the nearest, wouldn't take that,
9    well, let's try to get something outside of the railroad.
10    He has had monthly meetings with her and you will hear
11    her testimony and you will see her records, and it will
12    be almost in every monthly record, the statement, I am
13    having a difficult time locating employment, here are
14    these five or six jobs, but Mr. Kirkland says he can only
15    work part time.  Now, I invite your attention to the
16    medical testimony, and I submit no doctor in this case is
17    going to make that statement, that he has got to be on a
18    part-time basis.  They are talking about lighter work,
19    but not lighter hours.  And she says, for that reason,
20    it's very hard to make these placements.  Now, you will
21    have all that evidence before you, and of course, Mr.
22    Kirkland will explain why it is that he said that, why he
23    couldn't take these jobs for various reasons, and there
24    were some other reasons he gave other than just that that
25    he will tell you about.  But now, there is one other

1   fact, I think, that is undisputed, but I think relevant

2   in this case is; although Mr. Kirkland has seen many

3   doctors on many occasions, there has never been any sort

4   of surgery procedure performed, and I invite your close

5   attention as to why the doctors say that there has been

6   no surgery performed.

7        So members of the Jury, I thank you very much for

8   your attention, and I invite your attention to the

9   evidence as it unfolds and I say, the Plaintiff now goes

10  first with his case, when he finishes the Defense will

11  offer their case.  Thank you so much.

12              ==============================

13       THE COURT:    Mr. Wettermark, call your first

14  witness.

15       MR. WETTERMARK:    Mr. Williamson.

16              LEE GENE WILLIAMSON

17              Witness having been first

18              duly sworn, testified on

19              DIRECT EXAMINATION

20  BY MR. WETTERMARK:

21       Q    Can you tell us your name, please?

22       A    Lee Gene Williamson.

23       Q    Mr. Williamson, where do you live, sir?

24       A    Live at 1119 Dunbar Road, West Columbia, South

25  Carolina.

1      Q      And who do you work for?

2      A      Norfolk Southern Railroad.

3      Q      How long have you worked for the railroad?

4      A      Twenty-eight years.

5      Q      Tell this jury a little bit about your railroad

6  background.  Are you the first generation railroader in your

7  family?

8      A      Yes, sir, I am.  No, sir, I am not.  No, sir.

9      Q      Who, before you, worked for the railroad in your

10  family?

11     A      My father, my father-in-law, and his father.

12     Q      How far back does that go?

13     A      Back to 1917.

14     Q      Tell us a little bit about your background.  First

15  of all, when did you go to work for the railroad?

16     A      I went to work with the railroad in 1973.

17     Q      What did you do before that?

18     A      I was in the Air Force.

19     Q      For how many years?

20     A      Twelve years.

21     Q      What did you do in the Air Force?

22     A      I was a flight engineer on 141s and 130s.

23     Q      When you hired on with the railroad what job did you

24  hire on as?  What did you start off as?

25     A      I started off as a trainman.

1    Q    And did you receive any promotions from that

2  position?

3    A    Yes, sir.  I went from a trainman to a conductor,

4  and then to an engineer.

5    Q    So you have worked all three jobs --

6    A    Yes, sir, I have.

7    Q    -- during your career?

8    A    Yes, sir.

9    Q    Where have you worked?

10    A    I worked out of Andrews Yard in Columbia, South

11  Carolina.  I worked out of Spartanburg/Greenville Hane Yard,

12  and worked out of Augusta, Georgia.

13    Q    Is that called the Piedmont Division, Columbia

14  District of the Railroad?

15    A    Yes, sir.  Piedmont Division, Columbia.

16    Q    Is that -- Columbia, Greenville/Spartanburg,

17  Augusta, that forms like a little triangle there in South

18  Carolina?

19    A    Yes, sir.  That's correct.

20    Q    Spent your whole career working in that triangle

21  area?

22    A    Yes, sir.

23    Q    The railroad has hubs at each of these places?

24    A    Yes, sir.  Switching yards.

25    Q    Switching yards, that's a technical term.  Can you

1   explain to the members of the jury what a railroad man does, a

2   trainman, a conductor?

3       A   Trainman, conductor is responsible for getting the

4   train together at these hubs, putting the train together,

5   going out on a line of road, placing the cars, satisfying the

6   customer.

7       Q   Let me take it this way.   There's three men on a

8   crew?

9       A   Yes, sir, that's correct.

10      Q   The engineer, what does he do?

11      A   Engineer operates the engine.

12      Q   Kind of like drives the engine?

13      A   Drives the engine.

14      Q   The conductor, what does he do?

15      A   The conductor is responsible for satisfying the

16  customers, placing cars and keeping them happy.

17      Q   How about the trainman?

18      A   The trainman is assistant to the conductor.

19      Q   What type of work do they do?  You told us about

20  their overall responsibilities.  Tell us a little bit about

21  the jobs and the actual work they do during the course of a

22  shift.

23      A   The trainman and conductor is responsible for lining

24  the switches, getting the train together, lining the air hose,

25  putting the air on the trains so you have air brakes, seeing

1    that the cars are inspected when they go to the industry.

2    They have got to pick up the cars and inspect them, make sure

3    all the safety compliances are on the cars, are not broke or

4    anything.

5        Q    Now, before you got in the Courtroom to testify, did

6    you have a chance to look through these photographs,

7    Plaintiff's Exhibits Numbers 1 through 13?

8        A    Yes, sir.  I did.

9        Q    And do these photographs, Exhibits 1 through 13, do

10   they fairly and accurately depict the everyday duties of a

11   railroad trainman and a railroad conductor?

12       A    Yes, sir, they do.

13       Q    This is stuff you all do every day?

14       A    Every day.

15       MR. WETTERMARK:    Your Honor, at this time, we

16   will offer Exhibits 1 through 13.

17       MR. GARLAND:   No objection.

18       THE COURT:    They are admitted without objection.

19       MR. WETTERMARK:    May I ask the witness to come

20   out of the box, Your Honor?

21       THE COURT:    Yes, sir.  Just as long as he will

22   speak up loudly enough so the Court Reporter and the

23   Jurors can hear what you have to say.

24       Q    Mr. Wettermark:    I want you to help me with these

25   first three, but if you will hold that one kind of over there,

43

1    I will put this one here, and we will put the last one over

2    here.  Now, you can step over to the side now, see if we can

3    do this.  Tell us, what do these three photographs depict?

4          A    This depicts a conductor, or a brakeman getting

5    ready to throw the switch.

6          Q    Explain what he is doing.

7          A    The first switch, he is in the proper position of

8    lining up the switch.  The next position, he is lifting the

9    ball of the switch up to change the direction of the cars or

10   the engine to travel.  The other one, he is swapping his --

11   changing weight, to get over to the other side, and pushing

12   the switch down to a complete -- the switchboard is lining up.

13         Q    In like a local freight job, a local switching job,

14   how many times a day does a trainman have to do that?

15         A    I would say on a local day where you stay out,

16   between 75 and 100 times a day.

17         Q    Plaintiff's Exhibit Number 4, tell us what is

18   depicted in this photograph.

19         A    This is a brakeman, or a trainman, tying the car

20   down, applying brakes on the car.

21         Q    This is the hand brake?

22         A    Yes, sir, this is the hand brake.

23         Q    How many times do you have to do that, say, in the

24   course of a day on a local switching job?

25         A    I would say, if you are on a local that's got a lot

1    of stops, you are going to do it from 75 to 100 times a day.

2        Q    Exhibit Number 5, is this what is known as a high

3    hand brake?

4        A    Yes, sir.  This is a high hand brake.  He is in a

5    position to put the high hand brake -- to put the brake on the

6    car, so while they're sitting they won't move.

7        Q    Exhibit Number 6, explain to us what this gentleman

8    is doing in this photograph.

9        A    When you cover your cars up, you always line your

10   air hose, you have got to turn this, that's what supplies air

11   to each one of the cars from the engine, that puts air brakes

12   on the cars.

13       Q    Why do you need -- the brakes on trains are air

14   operated?

15       A    Yes, sir.

16       Q    Where is the source of the air for the brakes?

17       A    It comes from a reservoir on the engine.

18       Q    And then it goes down through these hoses all the

19   way through the train?

20       A    Right.

21       Q    Do you have to make this connection between every --

22   every car?

23       A    Yes, sir.

24       Q    Exhibit Number 7, can you tell us what is depicted

25   in that, sir?

1      A    These couplings they're holding between the cars,

2   he's turning the air in, put the air to the cars.

3      Q    Can you tell us what is depicted in Exhibit Number

4   8?  What is he showing us there?

5      A    This is called the cut lever, and when he pulls this

6   cut lever it opens the knuckle here, and the knuckle has got

7   to be open to make a coupling.  If there was a car coupled up

8   to this, he's opening this knuckle to separate the cars.

9      Q    In railroad terminology, what do you call these

10  grips around here to hold on to?

11     A    Ladder lungs.

12     Q    Same thing that we do in regular life?

13     A    Right.

14     Q    When you all talk about grab irons, what does that

15  mean?

16     A    The grab irons is this, this is grab irons on the

17  side.

18     Q    Exhibit Number 9, can you tell us what is depicted

19  in that?

20     A    The brakeman and the conductor is in position and he

21  is pulling the cut lever to pull the knuckle open.

22     Q    Exhibit Number 10, explain what he is doing in this

23  photograph.

24     A    He is opening the knuckle, but he appears to be

25  closing the knuckle.

1    Q    Are there times when you have to adjust draw heads,

2    the movement of them from side to side?

3    A    Yes, sir.  At times when you are going to make a

4    coupling in a curve you have got to shift this draw head over

5    so the knuckle is going to be open and they will couple up and

6    the pin drops.

7    Q    That's called adjusting the draw head?

8    A    Yes, sir.

9    Q    Let me take a few of these off here.  And then let

10   me take you through the last few.  Exhibit Number 11?

11   A    The conductor, trainman is mounting the car.

12   Q    Again, you all typically wear gloves out there?

13   A    Yes, sir.  Yes, sir.

14   Q    Exhibit Number 12, what does that depict?

15   A    The trainman and conductor is on the side ladder

16   riding the car out of the track.

17   Q    Do you all have to ride on the side of moving cars?

18   A    Yes, sir, we do.

19   Q    For how great a distance?

20   A    Sometimes it could be as much as a car length to

21   make a coupling, sometimes it could be as much a as half a

22   mile or mile.

23   Q    And then finally, Exhibit Number 13?

24   A    This shows a man dismounting a moving boxcar.

25   Q    Now, you all don't have to do that anymore, though,

1    do you?

2        A    No, sir.  We do not.

3        Q    That is something that they have stopped?

4        A    Yes, sir.

5        Q    But for years you all did that?

6        A    Yes, sir.

7        Q    Pretty physical work?

8        A    Yes, sir.

9        Q    You can go back to the witness stand.  In all these

10   things you have just showed us, all these duties that you just

11   showed us that are done on a daily basis, can you explain to

12   us how important is it to a railroad man, a trainman, a

13   conductor, how important is it to you to have good hand holds,

14   to have good foot holds?

15       A    It's very important that you have good hand holds,

16   it could mean life or death or loss of limb.

17       Q    Why is that, sir?

18       A    Because you could catch up on a car, if the grab

19   irons was not -- hadn't been inspected, was rusted or going to

20   break off, you could fall back over, your legs could fall

21   across the track, you could be run over, it could cause your

22   death.

23       Q    You men rely upon these grab irons for your safety?

24       A    Yes, sir.

25       Q    Are you familiar with the W. R. Grace plant near

1    Aiken?

2         A    Yes, sir, I am.

3         Q    How long have you had opportunities to work at that

4    facility?

5         A    Out of my 28 years, probably 20 years.

6         Q    I want to bring you forward in time and talk just

7    about the 1990s.  Did you work that job on a regular basis in

8    the 1990s?

9         A    Yes, sir.  From about '92 to '97 I worked it every

10   six months.

11        Q    You would work it six months out of the year?

12        A    Yes, sir.

13        Q    Why did you not work it the full 12 months?

14        A    They was two divisions that had the job and the

15   Piedmont Division had it for six months, from December to May;

16   and the Carolina Division had it from May to December.

17        Q    You are on the Piedmont Division?

18        A    I am on the Piedmont division.

19        Q    So you only got to work it for six months a year?

20        A    That's right.

21        Q    But you worked it continuously from '92 up through

22   '96 or '97?

23        A    Yes, sir, that's correct.

24        Q    The -- I want you to describe to us just a little

25   bit what work is done and how this job works, this Aiken local

1    job, how it works.

2         MR. WETTERMARK:    And again, may I have him come

3    down here and use the diagram?

4         THE COURT:    Yes, sir.

5    A    The Witness:    The Aiken local goes on duty every

6    morning five days a week, Monday through Friday, at Aiken

7    South Carolina.  The first thing we do when we go on duty at

8    7:00 o'clock, we will go to what they call a swap track and

9    switch out empty hoppers that go to W. R. Grace.  Most of the

10   time we would go work W. R. Grace first thing in the morning,

11   and once in a while -- this clay mine here is closed, but this

12   here, we will go to Southeast -- maybe once or twice a month,

13   but most times it's W. R. Grace every day.

14        Q    Now, at W. R. Grace, what type of cars do you

15   deliver there, and what type do you take out?

16        A    We take empty hoppers to W. R. Grace and pull the

17   load out of W. R. Grace, which is hoppers.

18        Q    And that's always the first job in the morning?

19        A    Yes, sir.

20        Q    After you have finished working -- this is called

21   the AB line?

22        A    Yes, sir, that's correct.

23        Q    After you finish working the AB line, take us

24   through the rest of the course of the day's work.

25        A    After we go work W. R. Grace we will get around the

1    cars and go back to Aiken.  And then we got a house track

2    here, we will pull up here and leave the cars on the main

3    line.  A lot of times we would have cars up in the rock track,

4    we will get them out, we will go out and work Florida steel,

5    Owens-Corning, Metal Services, go out there and load them on

6    the run around track.  We will run around the train and get

7    all the cars solid, we will come back to Aiken, usually it's

8    lunch time, we'll take our lunch break.  And then after that,

9    we will go down the hill -- this is the SA side, we take all

10   these cars down the hill, which is about six miles downhill,

11   we go to Warrenville, which is a side.  We will go down there

12   and classify these cars, you will classify all your north cars

13   with your south cars, because there will be a train coming by

14   that night to stop and pick these cars up.  One goes -- the

15   south cars go to Augusta, north cars go to Columbia.

16        Q    How long -- in a typical day, how long do you do

17   this job?

18        A    Nine to 12 hours.

19        Q    You used a term, you said, we run around the train.

20   Explain what you are talking about when you run --

21        A    When I say run around the train, that means getting

22   the engine from one end to the other end, it's changing

23   directions.  You have got to get the engine on the other end

24   to take them downhill, because you couldn't shove them

25   downhill backwards.

1    Q    You prefer to pull trains instead of push them?

2    A    That's right.

3    Q    And so you always try to move the engine around to

4    the front of the train?

5    A    That's right.

6    Q    All right, you can go back to your witness chair,

7    sir.

8    (Witness complies.)

9    Q    Well, I lied.  I need you down one more time.

10   THE COURT:    You may step down.

11   Q    Mr. Wettermark:    I'm just going to use this thing

12   again one more time.  I'll take this down.  You have had a

13   chance to review these photographs before?

14   A    Yes, sir, I have.

15   Q    These are all photographs of the W. R. Grace

16   facility?

17   A    That's right.

18   Q    Has this facility -- has it looked just like this

19   the entire time we are talking about?

20   A    Yes, sir, it has.

21   Q    And so these photographs, they are a fair and

22   accurate depiction of that facility?

23   A    Yes, sir.  That's right.

24   Q    Tell us what we are looking at, Exhibit Number 30?

25   A    This photo was taken looking back up the main line

1   back towards Aiken, South Carolina.   This here shows -- if I

2   look at it right like this, -- it shows this plant has just

3   been completed, because all these that sit up here and the

4   train crew that's done left the facility.

5       Q    The cars that we see on this end of the facility,

6   these are the empties?

7       A    Yes, sir, that's right.

8       Q    Now, what goes on at these -- underneath these

9   things?

10      A    This is a loading station where they load cars and

11  they drop the cars down this way and there's some more loading

12  facilities down here in the plant which has got a shed on it.

13      Q    The clay goes in the top of the cars?

14      A    Yes, sir.   There's doors that open up, and six foot

15  and eight foot doors that fold back, and the pipes come down

16  and fill these cars up.

17          MR. WETTERMARK:    We will offer Exhibit Number 30,

18      Your Honor.

19          THE COURT:    Is there a series you have there, so

20      we can go ahead and just --

21          MR. WETTERMARK:    Let me offer them all, Exhibit

22      Number 30, 31, 32, 33, and 34, we will offer them at this

23      time.

24          THE COURT:    Any objection?

25          MR. GARLAND:   No objection.

1              THE COURT:     Those are admitted.

2        Q    Mr. Wettermark:     All right, tell us about 33;

3   what are we seeing there?

4        A    This is the same -- approximately same position, but

5   you are looking toward Greenville here, Aiken side is back

6   this way.  This shows the loading facility, down here they are

7   loading a truck right here, here, they got the hoppers over

8   here, loading the hoppers, that's their little track mobile

9   that they move the cars around with.

10       Q    And really, it's not a good match, but basically, if

11  we put these together, that kind of gives you the --

12       A    Right, this track here goes right back into this

13  track here, that's the main line.

14       Q    Exhibit Number 32, tell us what we are looking at.

15       A    This is a -- the lower end of the plant looking

16  back towards Aiken; this way would be towards Greenville.

17  This is loaded cars that the plant has loaded up under its

18  shed here and dropped down, there are two tracks right here,

19  and they have put them on each side.  They put loads here and

20  loads here.

21       Q    Exhibit Number 31?

22       A    This is the same thing, this is the switch right

23  here, and this is the loading -- that is the truck up there,

24  this is -- the hopper has been loaded, and this car is coming

25  down in this track right here.

1      Q    And then finally, Exhibit Number 34?

2      A    This is still the bottom of the track where the

3    loading facilities -- where they load cars, this car is going

4    down into the plant.

5      Q    Is this basically just a loading facility for clay?

6      A    That's correct.

7      Q    Is it kaolin clay?

8      A    Kaolin clay.

9         MR. WETTERMARK:    You can go back and have your

10    seat.

11      Q    Mr. Wettermark:    When you were working this job

12    from '92 up until '97, going into W. R. Grace, how often --

13    how many days a week would you go into W. R. Grace?

14      A    Five days a week.

15      Q    Did you become aware of any safety problems with

16    regard to kaolin being on the cars during this time?

17      A    Yes, sir.  Almost every day you would go in there,

18    the cars would be coated with kaolin, the grab irons, the

19    brake handles, the walkways, the top of the cars.

20      Q    Did they have -- did they have any facilities there

21    at Grace to get this stuff off, to blow it off?

22      A    Yes, sir.  They had an air system down the side of

23    the building, which they could hook an air hose to and blow

24    the kaolin off.

25      Q    Would they use it?

1        A    Once in a while they would.

2        Q    But day in, day out?

3        A    No, sir.  Not day in and day out.

4        Q    What did you try to do about it?  Did you try to

5    correct the situation?

6        A    Yes, sir.  We tried to correct the situation.

7        Q    Tell us how.

8        A    We would go complain to the plant manager, which

9    was David Woods, would tell him about it, and he -- that's

10    about as far as it would go.  We would complain to the train

11    master, the terminal superintendent, we would call an agent

12    and tell him, he would call the trainmaster, and every day you

13    would go back.  It would be just almost the same situation

14    every day.

15        Q    Give us some names.  What trainmasters?

16        A    Trainmaster Mass, Mr. Roberson, Jimmy King, we've

17    also -- Mr. Chapman.

18        Q    Talking -- during this period, '92, '93, '94, '95,

19    how -- give me your best judgment, how often were you

20    contacting officials of the Norfolk Southern trying to get

21    something done about the kaolin situation on the cars?

22        A    I would say we would call them sometimes every --

23    twice, three times a week.

24        Q    That much?

25        A    Yes, sir.

1       Q    Did there come a time when you -- you worked with

2    Mr. Kirkland on this job, didn't you?

3       A    Yes, sir, I did.

4       Q    Did there come a time, sir, that you and he decided

5    you all were going to start making a record of this and do

6    something about it?

7       A    Yes, sir.

8       Q    Tell us what you all decided to do.

9       A    We came back to the job in December and the clay was

10   real bad, so we decided we was going to start keeping a

11   record, we was going to report it every day and keep a

12   record.  So every day, we would call and report to an

13   official, or call Mr. Jimmy King, he would call, we would

14   write it down on a calendar.

15      Q    Where did you keep this calendar?

16      A    In the depot at Aiken.

17      Q    You started keeping it when you first came on the

18   job in December?

19      A    Yes, sir.

20      Q    And did you keep it all the way through -- when did

21   you leave, in June?

22      A    Yes, sir.  I left it six months later.

23      Q    And you had kept this calendar the entire six

24   months?

25      A    Yes, sir, sure did.

1          Q     And how many -- if you know, how many notations had

2     you all put on this calendar by the time you left the job?

3          A     Oh, it was too many to name.

4          Q     Anybody ever do anything about it?

5          A     No, sir.

6          Q     Mr. Williamson, I have got to ask you this question,

7     why didn't you just say I ain't going to do it?

8          A     We tried that -- tried to not work the plant, and we

9     were told that they were a good customer, we had to move the

10    cars.

11         Q     Who told you that?

12         A     Mr. Mass, Mr. Roberson told us that, and Mr. Chapman

13    told us that.

14         Q     Did you go so far as to say we are not going to do

15    it?

16         A     Yes, sir, I did.

17         Q     These are your bosses?

18         A     Yes, sir, I did.

19         Q     And they told you to do it anyway?

20         A     Right.

21         Q     Did you ever have a chance to actually get with

22    them, take them out there, or be with them at the plant, say,

23    here it is, here is the problem?

24         A     Yes, sir.  I have had a chance -- Mr. Roberson was

25    there one time they had a derailment, we showed him the

1    situation.  And he said, this plant sure is a mess, said I

2    wouldn't even work it.  Mr. Mass has been there several times,

3    we told him about the situation.  He would come to Aiken, we

4    would tell him to go out there and look at the situation, it

5    was still bad, and it would never see nothing get done.

6         Q    Tell us what it's like to try to work on a car

7    that's covered with kaolin.

8         A    Well, the kaolin is so slick it's just -- it's like

9    it's got grease in it.  And when you are out there working, if

10   you don't be real careful you are going to slide, or slip, or

11   fall.

12        Q    When you are working a car that's got the kaolin on

13   it, have you all learned little techniques, methods, that you

14   try to use to try to make it safer?

15        A    Yes, sir, we have.

16        Q    Tell the jury some of the things that you have to do

17   to cope.

18        A    Most of the men that's working to ground, or say

19   regular men that's been on the job, has learned how to place

20   the foot in corners to keep them from slipping, or getting on

21   the steps or anything, and place them so the feet won't slip.

22   But there's always -- you know, I have seen the clay on the

23   cars from two to three inches, I've seen it on top as much as

24   18 inches.

25        Q    When it's covered with clay like that is there any

1    way you can do the job without slipping?

2         A    No, sir.

3         Q    Have you slipped?

4         A    Yes, sir.

5         Q    You said that the people at W. R. Grace, do they

6    have to get up on these cars to do their job?

7         A    They have to get on top of them.

8         Q    Well, how do they do their job if it's so slick?

9         A    They have got to put a restraining belt on it, and

10   they have got a cable running over top of them.  They have to

11   hook up before they ever get on top of them.

12        Q    Safety harnesses?

13        A    Safety harnesses.

14        Q    You were -- what was your -- were you the engineer

15   on the job during all this time?

16        A    Yes, sir, I was the engineer.

17        Q    Was Mr. Kirkland doing all these same things that

18   you have just told us about, trying to get the situation

19   fixed?

20        A    Yes, sir, he was.

21        Q    You have worked with him for years, haven't you?

22        A    Yes, sir, I have.

23        Q    Tell this Jury what sort of trainman he was.

24        A    In my opinion, Lester was one of the best

25   conductors on the job.  He was real self-conscious of his

1    job.  He performed his job in a timely manner, and there

2    wasn't a better conductor, or better person to work for.

3         Q    You know what happened to the calendar, don't you?

4         A    Yes, sir.

5         Q    But you weren't there when it happened?

6         A    That's right.

7         Q    Well, I can't ask you about it then.

8              MR. WETTERMARK:    That's all I have.  I think this

9    gentleman has some questions.

10             THE COURT:    All right, Mr. Garland.

11                       CROSS EXAMINATION

12   BY MR. GARLAND:

13        Q    Mr. Williamson, let me ask you a few questions.

14   Now, you said you left that Grace job in '97?

15        A    Yes, sir.

16        Q    When did Mr. Chapman come to be trainmaster; do you

17   remember that?  What year was that?

18        A    I can't exactly remember exactly what year it was,

19   but --

20        Q    Was it '97 or '98 or was -- or do you remember?

21        A    Let me think.  I believe it was the latter part of

22   '97, I am not sure.

23        Q    Now, Mr. Roberson is who?  Who is he?

24        A    The terminal superintendent.

25        Q    All right.  Now tell me this, you are familiar with

1    the operating rule book, are you?

2         A    Yes, sir.

3         Q    These are the Bibles, I guess, of your employees?

4         A    That's right.

5         Q    You have had yours since you went on duty?

6         A    That's right.

7         Q    And you have safety classes and talk about these

8    various rules?

9         A    That's right.

10        Q    Do you know -- look at Rule 586 --

11             MR. GARLAND:    May I approach the witness, Your

12        Honor?

13             THE COURT:    Yes, sir, you may.

14        Q    Mr. Garland:    Are you familiar with Rule 586?  Are

15   you familiar with that?  Would you read that rule, please,

16   sir?

17        A    "It says, conductors must if possible remedy defects

18   in their equipment and must remove from the consist any cars

19   that are unsafe to run.  They must report all defective

20   brakes, hot box or other defects as well as repairs made

21   between terminals.  They must comply with instructions for

22   reporting materials applied to cars and disposition of

23   defective parts."

24        Q    Let me ask you this question, Mr. Williamson, if a

25   car is encountered at an industry, or anywhere, to be pulled,

1    whose responsibility is it, the engineer, the trainman or the

2    conductor, to not -- to not move that car if it is an unsafe

3    car?  Whose responsibility would that be under?

4         A    The conductor and the brakeman is jointly

5    responsible for the cars.

6         Q    Not the engineer?

7        ·A    No, sir.

8         Q    And under this rule, it says conductor, doesn't it?

9         A    That's right, exactly right.

10             MR. GARLAND:   I think that's all I have of this

11        witness.

12             THE COURT:    Any redirect?

13             MR. WETTERMARK:    Yes, sir.

14                      REDIRECT EXAMINATION

15   BY MR. WETTERMARK:

16        Q    Lester Kirkland, all these years you were working

17   with him did he do everything in his power that you were able

18   to observe to try to correct the situation with those cars?

19        A    Yes, sir, he did.

20             MR. GARLAND:   I object to the leading form of that

21        question.

22             MR. WETTERMARK:    Let me withdraw the question, it

23        was leading.

24             THE COURT:    It was just a trifle.

25        Q    Mr. Wettermark:    Did Mr. Kirkland -- were you

1    able to observe Mr. Kirkland trying to correct the situation

2    with these cars?

3         A    Yes, sir.

4         Q    Can you tell this jury anything that you can think

5    of that he could have done more than what you saw him do?

6              MR. GARLAND:   Your Honor, I object to these leading

7         questions of his own witness.

8              THE COURT:     Restate your question.

9         Q    Mr. Wettermark:     Can you tell us anything else

10   that Mr. Kirkland could have done to try to correct the

11   situation with these cars?

12        A    As far as Mr. Lester -- Mr. Kirkland correcting the

13   clay that was on the cars, that wasn't his responsibility to

14   correct that.  What the rule is reading is mechanical defects,

15   safety effects.  Just like I stated before, when he pulled

16   cars from an industry he inspected these cars for mechanical

17   defects, and if the cars were bad he would tell me, and I

18   would call somebody, or we would set the car off and not move

19   it.

20        Q    You told us about this time when you told Mr. Mass

21   that you all weren't going to move them, and he told you to go

22   ahead and do it because, I think you said, it was a good

23   customer?

24        A    It was a good customer.

25        Q    Was Mr. Kirkland there then?

1      A    Yes, sir, he was.

2      Q    If an official tells you -- gives you specific

3   orders to move a car after you reported it as being a safety

4   hazard do you have any choice in that?

5      A    No, sir, we do not.

6      Q    What would happen if you said, no, I ain't going to

7   do it?

8      A    Well, chances are, they would take some action

9   against you saying you failed to follow instructions and you

10  would be taken out of service.

11     Q    They would fire you?

12     A    That's exactly right.

13          MR. WETTERMARK:    That's all.

14          THE COURT:    Any recross?

15                    RECROSS EXAMINATION

16  BY MR. GARLAND:

17     Q    Mr. Williamson, you were not working that run in

18  January of '98, were you?

19     A    No, sir, I was not.

20     Q    And you never heard Mr. Chapman say anything about,

21  you have to move a car like that during that time, did you?

22     A    Not in '98, no, sir.

23          MR. GARLAND:    That's all.

24          THE COURT:    Is that all of this witness?

25          MR. WETTERMARK:    That's all.

1          THE COURT:   You may step down.

2          MR. WETTERMARK:   May he be released to go home?

3          MR. GARLAND:  Sure.

4          THE COURT:   Why don't we take a short break, it's

5      getting close to that time, rather than -- as I mentioned

6      to you earlier, we will try to do it between witnesses or

7      between examinations, so we are going to take just our

8      short mid-afternoon break.  Remember, and I will remind

9      you each time, or try to, don't talk about the case yet.

10     I know that's what brings you all here together, and it

11     would be natural to go back and do it, but resist that

12     urge, don't talk about the case yet.  And we will be in a

13     short recess for our mid-afternoon break.

14  (RECESS)

15         THE COURT:   Please be seated.  All right, Mr.

16  Wettermark, you may proceed.

17         MR. WETTERMARK:   Your Honor, we would call Mr.

18  Leon Joyce.

19                  THOMAS LEON JOY

20             Witness having been first

21              duly sworn, testified on

22            DIRECT EXAMINATION

23  BY MR. WETTERMARK:

24      Q   Can you tell us your name, sir?

25      A   Thomas Leon Joy.

1    Q    Mr. Joy, where do you live, sir?

2    A    I live in North Augusta.

3    Q    Who do you work for?

4    A    Norfolk Southern Railroad.

5    Q    How long have you worked for the railroad?

6    A    Almost 28 years.

7    Q    What is your job at the railroad?

8    A    Conductor.

9    Q    That's something I want you to explain to us.  Do

10   you also hold trainman seniority?

11   A    Yes.

12   Q    How can you be both a trainman and the conductor;

13   how does that work?

14   A    Well, usually, when we started, you started off as a

15   trainman, and you retain that seniority forever.  You just get

16   promoted to a conductor after years of experience as a

17   trainman.

18   Q    Even when you have been promoted to conductor, are

19   there sometimes when you will have to go back and work as a

20   trainman?

21   A    Not have to, but by choice.

22   Q    Oh, okay.  So you have a choice; if you want to you

23   can work as either a trainman or a conductor?

24   A    Correct.

25   Q    Why do you want to work as a conductor?

1       A    It's more money.

2       Q    Pretty good reason.  Has a little bit more

3    responsibility?

4       A    Yes.

5       Q    Is the work, though, the physical work basically the

6    same?

7       A    Yes.

8       Q    In your career, have you worked the Aiken local?

9       A    Yes.

10      Q    Have you ever worked it on a regular basis?

11      A    Yes.

12      Q    When was that?

13      A    Regular, early '90s.

14      Q    Can you give us your best judgement of what years it

15   was?

16      A    '91, 2, 3, 4.

17      Q    When you worked it, did you work it at half a year

18   at a time or did you work it the full year at a time?

19      A    I worked it the full year.

20      Q    Would you have the same engineer for the whole year?

21      A    No.

22      Q    Do you remember who your engineers were back at that

23   time?

24      A    Six months, I would have Lee Gene Williamson; and I

25   think six months, I would have David Hall.

1     Q     When you worked the Aiken local job did you all

2     switch W. R. Grace?

3     A     Yes.

4     Q     How often?

5     A     Usually every day.

6     Q     Can you tell us during that period of time, that

7     three or four year period of time when you worked the job

8     regular, what the situation was with the cars coming out of W.

9     R. Grace with regards to clay on them?

10    A     It always had some clay on them.

11    Q     Tell us what you are talking about when you say it

12    had some clay on them.

13    A     Sometimes it would be piled up a foot high,

14    sometimes just an inch.

15    Q     How could it -- where would it pile up a foot high?

16    A     On top.

17    Q     How about the grab irons and the ladders would it

18    accumulate on those?

19    A     Yes.

20    Q     Would that create a safety problem for you as a

21    trainman or conductor?

22    A     Yes.

23    Q     How so?

24    A     It's -- gets slippery, slick.

25    Q     I know it's hard to put things like slippery and

1    slick into words, but can you describe for the members of the

2    Jury, just to the best of your ability, what it was like to

3    try to work on a car where the grab irons and the footholds

4    and walkways were coated with the kaolin?

5         A    It would be slick, like maybe pouring oil on them,

6    and trying to step on them.

7         Q    Is it slick even when it's dry?

8         A    Yes.

9         Q    How about when it's wet?

10        A    It's worse, more slick when it's wet.

11        Q    I asked you if you considered it a safety problem;

12   did you consider it a safety problem?

13        A    Yes.

14        Q    Did you try to get something done about it?

15        A    Yes.

16        Q    What?

17        A    Usually we would tell the agent, the local agent.

18        Q    Who was that?

19        A    That would have been Mr. Jimmy King.

20        Q    He was the agent at the Aiken depot?

21        A    Aiken depot, that's our local agent.

22        Q    Who else did you talk with?

23        A    Would talk with Trainmaster John Mass.

24        Q    He was the trainmaster at that time?

25        A    Right.

1     Q    Is he a company official?

2     A    Yes.

3     Q    Is he over you?

4     A    Yes.

5     Q    Anybody else that you can remember talking to?

6     A    And the supervisor at the plant.

7     Q    You actually talked to the people at Grace?

8     A    Yes.

9     Q    Was anything ever done about the clay being on the

10    cars?

11    A    Once in a while.

12    Q    Explain what you mean by that.

13    A    If you got on them and -- or told your boss to get

14    them to clean the cars off, they would clean them off, or try

15    to, as much as they could.

16    Q    For how long?

17    A    A day or two.

18    Q    And then what would happen?

19    A    Then it would go back to the same piling up, not

20    cleaning them off.

21    Q    Can you give us your best judgement, how often did

22    you personally talk with someone from the railroad about the

23    situation down there at Grace with the clay on the cars?

24    A    How often?

25    Q    Yes.  Were you doing it once a day, once a week,

1    once a month, once a year?

2        A    Probably at least with an official, probably at

3    least once a month.

4        Q    Throughout the entire time that you were there did

5    they ever fix the problem?

6        A    Not fix.

7        Q    I have got to ask you this question, if having this

8    clay on these grab irons was such a -- was a safety problem

9    why didn't you just refuse to do it?

10       A    Probably scared for my job.

11       Q    Were you ever given specific instructions by an

12   official to switch them, even after you told them about the

13   problem?

14       A    Yes.

15       Q    When you gentlemen work out there what do you wear

16   on your hands?

17       A    Gloves.

18       Q    When you get this kaolin on your gloves, tell us

19   what effect that has.

20       A    It's -- the clay stays on your gloves, you never get

21   it off, and it causes you to -- a grip problem.

22       Q    Frank just mentioned this to me.  Explain -- you

23   used the term, when we switch cars, what do you mean when you

24   talk about when we switch cars?

25       A    You either take loads out of an industry or put

1    loads in the industry.  This particular industry, you would

2    take loads out and put empties in.

3        Q    And in the process of doing the switching the cars,

4    pulling the loads out, putting the empties in, do you and the

5    other groundmen, the conductor and the trainman, do you have

6    to climb up and down on the cars?

7        A    Yes.

8        Q    Up and down the ladders?

9        A    Yes.

10       Q    Across walkways?

11       A    Yes.

12       Q    Let me show you what I will identify as Exhibit 37.

13   Do you know what this is?  Is this kaolin?

14       A    Looks like it.

15       Q    I will wait and let someone else put that into

16   evidence.  You worked with Lester Kirkland, didn't you?

17       A    Yes.

18       Q    Would you tell the Jury what type of trainman he

19   was, what type of conductor he was?

20       A    He was a good conductor.

21            MR. WETTERMARK:    I think that's all I have, Mr.

22       Joy.  Thank you for your time.

23            THE COURT:    Mr. Garland?

24            MR. GARLAND:    May it please the Court?

25            THE COURT:    Yes, sir.

CROSS EXAMINATION

BY MR. GARLAND:

Q    Mr. Joy, let me you ask you just a few questions now.  You say you worked that job from '91 to '94?

A    Yes.

Q    Do you know Mr. John Chapman?

A    Yes.

Q    When you were working the job whose responsibility was it for trying to blow off the kaolin, was it the railroad's or W. R. Grace and Company employees?

A    W. R. Grace.

Q    And you say, when you would -- who would you talk to -- you mentioned you would talk to somebody there at W. R. Grace, and then for a few days it would get a little better; who was that gentleman?

A    Been a supervisor --

Q    Mr. Woods?

A    David Wood.

Q    Was he kind of the man in charge of the place there, the supervisor?

A    That's correct.

Q    Did you see him almost every time you went?

A    Yes.

Q    Did you have occasion to have them come back and blow some off?  Did you have occasion to point out to them,

74

1    look, they didn't blow that car good enough, do it again?  Did

2    you ever do that?

3         A    I didn't understand the question.

4         Q    Was it ever an occasion when you would go to Mr.

5    Woods and say they didn't blow these cars off at all, and he

6    would say, well, just leave them there a minute and let us get

7    somebody out there to do it?  Did that ever happen?

8         A    No.

9         Q    Would he not be there, or why wouldn't you report it

10   to him, if there was some clay left on the cars?

11        A    I would.

12        Q    Oh, you would.  But would he just say he wasn't

13   going to blow it anymore?

14        A    Right.

15        Q    Had it already gone through the little blower?

16        A    If at all.

17        Q    Has the blower always been there?

18        A    Not always.

19        Q    Do you remember when they installed the blowing

20   mechanism?

21        A    No, I don't.

22        Q    Did they have any way to blow it off before then, or

23   do you know?

24        A    They used to wash it off with water.

25        Q    Did they decide blowing was better?

1  A Yes.

2  Q Now, is it true that if they don't blow it, or don't

3 do a good job in blowing it, if you are going down the road,

4 does some of it blow off into the fields along side?

5  A Yes.

6  Q Do you recall back when they didn't have the paving

7 out at Grace and Company on the walkways?

8  A Yes.

9  Q Now, you all complained about that, did you not?

10  A Yes.

11  Q Did you complain to Mr. Roberson about that?

12  A I don't think Mr. Roberson.

13  Q Did you complain to Mr. Roberson at all about any of

14 this; do you remember?

15  A I don't think I did, personally.

16  Q I am just asking what you did.  And when did they do

17 the paving?  Do you remember a point in time when that was

18 accomplished?

19  A I can't recall that time.

20  Q Did that help some as far as sloshing around in the

21 kaolin on the ground?

22  A Some.

23  Q Were they supposed to blow off the walkway, too?

24  A Yes.  They were -- would try to scrape it with a

25 little --

1          Q     That was the railroad employees or the Grace and

2     Company employees?

3          A     Grace.

4                MR. GARLAND:    That's all we have.

5                THE COURT:    Any redirect?

6                MR. WETTERMARK:    No, sir.  Thank you, Mr. Joy.

7                THE COURT:    May he be excused?

8                MR. GARLAND:    He may.

9                MR. WETTERMARK:    Mr. Kirkland, Lester.

10                          **LESTER KIRKLAND**

11                     Witness having been first

12                     duly sworn, testified on

13                     DIRECT EXAMINATION

14     BY MR. WETTERMARK:

15          Q     Could you tell us your name?

16          A     Lester Eugene Kirkland, Jr.

17          Q     Mr. Kirkland, where do you live?

18          A     In Cross Hills, South Carolina.

19          Q     How old are you?

20          A     45.

21          Q     Can you tell us your date of birth just for the

22     record?

23          A     May 19th, 1955.

24          Q     Were you born and raised there in South Carolina?

25          A     Yes, sir.

1     Q    Ever lived anywhere else in your life?

2     A    No, sir.

3     Q    Your family live there?

4     A    Yes, sir.

5     Q    Who all -- tell me who all lives there.

6     A    My dad, my brother, my sister, and their families,

7 naturally, my nephews, my uncle and his wife, my aunt, and

8 then my ex-wife -- you know, we got divorced, but -- and my

9 stepdaughter that I am real close to.  So really all my

10 family.

11     Q    I want to find out just a little bit about your

12 education.  How far did you go in school?

13     A    Just high school, 12th grade.

14     Q    Did you graduate?

15     A    Yes, sir.

16     Q    From which high school?

17     A    Southside High School.

18     Q    In which town?

19     A    Greenville.

20     Q    When was that, when did you graduate?

21     A    1974.

22     Q    Well, then tell me about your work background; how

23 old were you when you started working?

24     A    I was probably 14 or 15 when I first started

25 working.

1    Q    What type of work did you do then?

2    A    Like pumping gas at a Union 76 Truck Stop and

3    working at a Scrub-Dub Car Wash most of the time.  I think I

4    started with the Scrub-Dub Car Wash, like washing the cars

5    before they went through the line first.

6    Q    When would you do this type of work?

7    A    After school and on the weekends.

8    Q    Did you pretty much work throughout your high school

9    years?

10    A    Yes, sir.

11    Q    What about when you got out of high school, what was

12    your first full-time job?

13    A    Bi-Lo Warehouse Food Stores.

14    Q    What did you do there?

15    A    Pulled orders that they loaded the trucks, like for

16    a store, what they ordered.  I would go and get it and put it

17    on little carts and then they would send it to the store.  And

18    then I was trying to learn to drive a forklift, you know, and

19    start driving a forklift for them.

20    Q    How long did you work at the Bi-Lo Warehouse?

21    A    Less than a year -- I think six months to a year.

22    Q    Why did you leave them?

23    A    I got hired by Norfolk Southern, by Southern

24    Railway.

25    Q    How long had you wanted to work for the railroad?

1       A    Since I was four or five.  My dad, he was a

2   conductor, and --

3       Q    How long did your father work out there?

4       A    About 43, 44 years.

5       Q    For Norfolk Southern?

6       A    Yes, sir.

7       Q    I guess back then it was called Southern?

8       A    It was Southern Railway and Norfolk and Western.  We

9   were the old Southern Railway, and they merged in 1982, I

10  think it was '82, and called it Norfolk Southern.

11      Q    What was the year -- what year did you hire on the

12  railroad?

13      A    1975.

14      Q    Was your father still working there when you hired

15  on?

16      A    Yes, sir.

17      Q    What job did you hire on as?

18      A    As a trainman.

19      Q    Were you promoted to conductor?

20      A    Yes, sir.

21      Q    When?

22      A    1978.

23      Q    In which division of the railroad did you hire on?

24      A    In Columbia, Columbia district.

25      Q    Have you -- ever since you hired on in '75 and got

1    promoted to conductor in '77, have you held the trainman and

2    seniority -- trainman and conductor seniority ever since?

3        A   I gave the conductor's up one time in -- like in

4    '78, right at the end of '78, and then took it right back

5    like the next day.  They had a test the next day, and my dad

6    said, you messed up, you should keep that conductor's, because

7    everybody else was giving up their trainman, so I took it

8    right back and I never really lost the position or anything.

9    So I -- yes, sir, I have held a trainman and conductor the

10   whole time.

11       Q   I don't want to get into all the details of the

12   railroad seniority system, but am I correct that basically you

13   all work under a seniority system?

14       A   Yes, sir, that's correct.

15       Q   The longer you have been there the better choice of

16   jobs you have?

17       A   That's right.  You could pull whoever is younger

18   than you.

19       Q   During your railroad career did you also for a time

20   work as a dispatcher?

21       A   Yes, sir, from 1986 to 1992.

22       Q   Why did you work as a dispatcher?

23       A   Trying to -- I wrote a letter, you know, to try to

24   move up with the company, and I was trying to learn different

25   aspects, and trying to better myself.

1    Q    When you worked as a dispatcher, did you give up

2  your trainman and conductor's work?

3    A    No, sir.

4    Q    How could you do both?

5    A    It was hard, but I worked a train during the week,

6  and then I was just like an on-call dispatcher working the

7  weekends, on like second or third shift or something on the

8  weekends.

9    Q    Did there come a time though when you gave up that

10  dispatcher's work?

11    A    Yes, sir, in '92.

12    Q    Why?

13    A    It got too hard.  I got married, and it was a long

14  way, it was like two and a half hours, almost three hour drive

15  one way.  And I really love the outdoor work.  I loved my

16  conductor's job, and that was -- I had to -- it was getting

17  too hard to do both, and so I had to make a decision.

18    Q    Tell me, on the Piedmont division, Columbia

19  district, where are the major hubs, major yards?

20    A    Columbia, South Carolina; Greenville/Spartanburg

21  area; and Augusta, Georgia.

22    Q    Have you worked in that area your whole career?

23    A    Yes, sir.

24    Q    You told me that when your dad -- you say your dad

25  was still working for the railroad when you hired on.  Did you

1    ever have a chance to work with him?

2        A    Yes, sir.

3        Q    For how long?

4        A    Twelve years.

5        Q    You worked the same job with your father for 12

6    years?

7        A    Yes, sir.

8        Q    How was that?

9        A    It was tough.  It was a little harder on me than --

10   he said you are going to usually learn to do it right, so --

11   but I enjoyed it, I love -- you know, he was good and I loved

12   it and --

13       Q    I want you to tell us about January the 23rd of

14   1998.  What job were you working that day?

15       A    Aiken local.

16       Q    How long had you been on that job?

17       A    Since probably the middle of '91, right close to

18   '92, '91.

19       Q    Who was on your crew on January 23rd?

20       A    Engineer Bruce McFarland, J. B. McFarland, and

21   brakeman/trainman was Chris Shaw.

22       Q    What was the weather like?

23       A    It was about 45 degrees and raining, 50 degrees and

24   raining.

25       Q    What time did you all go on duty?

1    A    At 7:00 o'clock a.m.

2    Q    Where?

3    A    At the Aiken depot.

4    Q    Can you tell us when you first got to work that

5    morning what you did?

6    A    My normal duties are to get the paperwork together,

7    the train orders, what we need to actually get out -- we can't

8    get the engine out on the track without, you know, permission

9    from the dispatchers and all.  And then, I gather up all the

10   paperwork from what industries need switching, you know, who

11   needs what that day.  I'm in charge of what cars to take

12   where, I get all that from the agent.  And then, we have our

13   little talk about what we are going to do and what sequence we

14   are going to do it, and then we gather our supplies that we

15   need that day and then we go to work.

16   Q    And did you do all of that that morning?

17   A    Yes, sir.

18   Q    What was your first stop that morning?

19   A    At W. R. Grace plant.

20   Q    Do you recall how many empty cars were you bringing

21   to W. R. Grace?

22   A    Approximately seven or eight.

23   Q    And do you recall how many loaded cars were you

24   picking up from W. R. Grace?

25   A    I think three, three loads.

1      Q    What was the condition of the loaded cars, as far as

2  clay on them?

3      A    Just covered in clay, just all over.

4      Q    How much?  Tell us what you mean when you say it's

5  covered in clay.

6      A    Well, on the top it might be six or eight inches, on

7  the grab irons and the platforms where we stand and stuff, it

8  might be an inch, inch -- you know, on the little grab irons,

9  that are real thin like this, you know, it won't pile up high,

10  it will fall off, but it will get up like that.  But then on

11  the inside of the car where there is a base for it to pile up,

12  it would pile up a foot high.

13      Q    Was this unusual to have this much clay on the cars?

14      A    It was -- that was a bad time, but it was like that

15  all the time.

16      Q    How long had it been going on like that?

17      A    Ever since I had been there in '91.

18      Q    Can you tell us a little bit -- you were the

19  conductor on the job, weren't you?

20      A    Yes, sir.

21      Q    Aren't you responsible for the job?

22      A    Yes, sir, I am.

23      Q    Well, did you consider this clay on the cars to be a

24  safety hazard?

25      A    Yes, sir, I did.

1      Q    What had you done to get rid of this safety hazard?

2      A    Over the years, I had complained hundreds of times

3  to every officer that I could find, whether it would be the

4  superintendent, the trainmaster, the track people that work on

5  the track.  I went in the plant and complained to all the

6  different managers.  I talked to David Wood many times and

7  tried my best not to switch the place.  I got into fights with

8  the trainmaster on several occasions, Mr. Mass.

9      Q    What do you mean?  Tell us what you are talking

10  about, got in a fight with a trainmaster over it.

11      A    We came back from Aiken -- he would never come to

12  the plant, none of the trainmasters like to come to the plant.

13  They would always catch you when you got back to the depot,

14  and then we would complain that, you really need to go to the

15  plant.  Well, this particular day, we came back, rolling into

16  Aiken with the cars behind us, and they are just covered.  And

17  when you stop, the clay just blows, you know, and it got all

18  over the -- all of our personal cars sitting there, Lee Gene's

19  Mark VIII, you know.  It -- so I went in and Trainmaster Mass

20  just happened to be there, and we all get in there, and we are

21  gathering up our paperwork to go switch the other industries

22  that day.  And I was telling Mr. Mass, I said, Mr. Mass, you

23  need to look at these cars; I said, this is just the same old

24  stuff, it's just covered.  And he kicks back, you know, and

25  he's trying to act cocky.  And he says, I have seen the cars

1    -- just go on and get your work done, Lester.  So I decided I

2    was going to get cocky back.  And I said, well, I am not going

3    in the plant anymore, Mr. Mass.  I said, I have asked you and

4    asked you and asked you.  I said, I am not going in the plant

5    anymore.  He gets up, turns beet red in his face, embarrasses

6    me in front of the crew and gets right in my face, and he

7    says, don't tell me what you won't do, he says, I will fire

8    you right now.  And I shut up, I got embarrassed and walked

9    off, my engineer walked off with me.

10       Q    Let's go back to the day you got hurt.  You said the

11   cars were covered in clay?

12       A    Yes, sir.

13       Q    When you first got the cars, you said it was raining

14   that day when you first got the cars.  Were all of them

15   covered with wet clay, or were some of them still dry?

16       A    Some of them are dry -- they have a -- if you have

17   seen the pictures of the plant, the back end of the plant is

18   empty -- I mean, you know, no covering, and the front where

19   you put the empties in, but in the middle where they load

20   them, it's still -- there's a cover, so it keeps their

21   employees dry.  And most of the time, the loads will be under

22   that, and then sometimes they will be rolled on down.  And

23   then they roll them down -- they may not roll every load down,

24   they may want to load a certain car, because they don't want

25   to clean a car out that's like dirty, so they may roll a

1    couple of empties back, if you know what I mean, to get to a

2    certain car.  So all the -- but they would be wet -- the

3    answer would be they would be wet or dry.

4         Q    Do you recall that morning, the 23rd, did you have

5    to get on the cars while they were still there at Grace?

6         A    No, sir.

7         Q    Just able to couple up to them and pull them?

8         A    Right.  They were hooked to a big cut.  And the way

9    I switched the place, I just sat them out on my empties and

10   put the cars -- the cars that were already there back in.  And

11   then I coupled up and put our empties in and we left.  I never

12   had to get on the car -- you try to stay off of the loaded

13   cars as much as you can.  I mean, you try to avoid it.

14        Q    After you got the loaded cars did you continue on

15   with your work that day?

16        A    Yes, sir.

17        Q    Tell us where you went.

18        A    Well, we went back to Aiken depot, and then we got

19   our orders, and we went on out toward Florida Steel and Huber

20   Clay.

21        Q    Let us look at this diagram while you are telling us

22   about it real quick.

23        A    Right.

24        Q    So, what you are saying is --

25        A    We came off of this little AB line where W. R. Grace

1    is, back to the depot, and then we went up to the top, we went

2    up here to the --

3         Q    So you came up here?

4         A    Right.  Went out that way, and went on out and

5    switched those places, we go to Oakwood.  And see we are

6    pulling the cars behind us, so when we get to Oakwood, it's a

7    little run around track, and we take the engine and put it on

8    the other side, and then we start working our way back.  And

9    we work some of the places going out, and then some of the

10   places coming back, it's according to which way your switch

11   opens.  And then we come back to Aiken depot, and we get our

12   orders about how to line the cars up, because at this time, we

13   have got like 20 cars and they are going everywhere, they are

14   going to Charlotte, they are going to Lynwood, Columbia, they

15   are going up in Indiana, or they are going south to like

16   Augusta or Nixon or -- and I don't ever know where they go.

17   So the agent will fax a list and he will give it to me.  And

18   then I go down there and I have to that -- back on the main

19   line, and you have to get -- you go down the hill -- down that

20   hill --

21        Q    So you take all these cars down here to --

22        A    And right there, you have to get permission to get

23   out on that big main line, that's were all the big long trains

24   run, and we are just a little switch engine car -- you know,

25   gathering up the stuff, and then we put it in that side track

1    at Warrenville, and those big trains come through at night and

2    pick all the cars up and then they will drop off cars that I

3    need for my work, so --

4         Q    And at this little side track here at Warrenville,

5    do you all try -- how many groups of cars do you leave there?

6         A    Two groups.  We switch them up to what goes north

7    and we switch them up to what goes south.

8         Q    About what time did you all arrive at Warrenville

9    that day?

10        A    Probably about 1:00 o'clock, 1:15.

11        Q    Still raining?

12        A    Yes, sir.

13        Q    How hard was the rain that day?

14        A    Off and on, it would get a little bit, and -- mostly

15   misty, you know, just a steady little misty.

16        Q    Tell us what happened when you got to Warrenville.

17        A    We got to Warrenville, and I dismounted like halfway

18   the length of the track.  I got off the engine.  I dismounted

19   the engine, and -- so I would be in place when we pulled down

20   to start making a cut, if you know what I mean.  We have to

21   hold so many of the cars and put them in first, and then we

22   will reach back out with the engine and get other cars and put

23   them in -- to put them in the right order.

24        Q    I am going to stop you.  You have explained -- and I

25   know it gets complicated, but when you got ready to switch

1    those cars, basically what you are going to do, is you're

2    going to get your locomotive engine and then start going in

3    one track, out, in the next one, out?

4        A    Yes, sir.

5        Q    And putting the cars in whichever track it belongs

6    in?

7        A    Right.  So I got down to where the rear of the train

8    would have come to a stop, because you can't cut the cars off

9    without brakes on them.  So when he stopped, I got up -- I

10   mounted the two rear cars and put the brakes on, because we

11   were leaving them on the track.

12       Q    What type of cars did you get on?

13       A    The hopper cars.

14       Q    From where?

15       A    From W. R. Grace.

16       Q    Were they wet by this time?

17       A    Yes, sir, slick.

18       Q    Were they still coated with the --

19       A    Yes, sir, slippery, coated.

20       Q    Tell us what it was like.  When you went up on them

21   the first time tell us what it's like to try to walk on those

22   cars and move around those cars when they are covered with the

23   kaolin?

24       A    It's just slick, you just be as very careful as you

25   can and try to find -- you go one foot at a time and try to

1   find a corner to put your foot in, so it won't slide, you

2   know, and then you get up in your little stance so that you

3   can -- and try to make sure that you keep a good handhold,

4   because if you lose your handhold, you are going -- you know.

5       Q       Were you able to safely put the brakes on the two

6   cars?

7       A       Yes, sir.

8       Q       And then did you all go and do the switching work we

9   were talking about?

10      A       Yes, sir, that's correct.

11      Q       Later on, did you have to go back and take brakes

12  off those cars?

13      A       Yes, sir.

14      Q       And is that when you got hurt?

15      A       Yes, sir.

16      Q       Let me show you -- I am going to show you Exhibits

17  numbers 27, 26 -- 25, 26, and 27.

18      A       All right, sir.

19      Q       You have seen these photographs, haven't you?

20      A       Yes, sir.

21      Q       And this isn't the car you got hurt on, but is it

22  identical?

23      A       Yes, sir.  That's a clean hopper car.

24          MR. WETTERMARK:      I'll offer Exhibits 25, 26, and

25      27.

1          MR. GARLAND:   No objection.

2          THE COURT:    They're admitted.

3     Q   Mr. Wettermark:    Exhibit 27, that simply shows

4 what these cars look like from the side; is that correct?

5     A   Yes, sir, that's correct.

6     Q   And then this is -- Exhibit Number 26; is that a

7 picture of the brake end of the car?

8     A   Yes, sir, that's called the brake end, the "B" end

9 of the car.

10     Q   And let me just show you 25, likewise, is that

11 another picture of the "B" end, the brake end?

12     A   That's right, yes, sir.

13     Q   Let me ask you to come down here --

14          MR. WETTERMARK:  If he may, Your Honor?

15          THE COURT:    Yes, sir, you may.

16     Q   Mr. Wettermark:    Can you show us how you got on

17 the car and then tell us what happened?

18     A   How you mount a railroad car is, you go to the side

19 here, there is a step, and you come up the step here, you

20 know, these are the hand holds, the grab irons, and you work

21 your way up to this position on a short ladder.  This is what

22 you call a short brake, the high brake would be here.  You get

23 here, my feet -- your feet are here, and your hands are here,

24 and then you come around, you cross over to this, and then you

25 cross up to here.

93

1    Q    So at one point in time you are actually kind of on

2  the corner of the car as you are going around?

3    A    Yes, sir, that's real slippery on those -- because

4  you are twisting and -- you know, you are trying to go from

5  here to here, and from here around to here without slipping in

6  the clay.

7    Q    Is that hard?

8    A    Yes, sir.

9    Q    Did you make it around the corner of the car?

10    A    Yes, sir.

11    Q    What did you do next?

12    A    I got up here trying to get the brake off -- you put

13  the brake on, I had put it on turning it clockwise, and so you

14  get it off reversing.  Like, I got up here and got in my

15  position, you have to have one foot here and one foot on the

16  platform and then you have your left hand here, and then you

17  can take the -- they have that quick release, and you can pull

18  the quick release, some of the quick releases are push type,

19  you can push or pull and it pops that brake loose.  Usually

20  you just get up there and pull the quick release and it's off,

21  and you come around and come back down, you are on the car

22  three seconds.  A lot of times it won't come off.

23    Q    And on this afternoon did it come off right away?

24    A    No, sir.

25    Q    Is that unusual for it not to come off?

1      A    No, sir.

2      Q    So what did you do then?

3      A    Usually, the clay and stuff gets up in there and

4  gums it up, and so you can wiggle it and play with it, and try

5  to get it loosened.  You can turn it with your hand, you try

6  the quick release a couple of times, if it won't let the chain

7  down, which releases the brake, then you can try to turn the

8  wheel.  So I tried to pull the wheel off, and I couldn't move

9  it.  So then I tried to pull it back on, you know, wiggle it,

10  try to put some more on it, and I couldn't move it that way,

11  either, it was just stuck.

12      Q    You were trying to -- you thought if you could move

13  it back and forth that would get it free?

14      A    Right.  And break whatever was gummed up in there

15  loose.

16      Q    Is that something you have done before?

17      A    Yes, sir.

18      Q    Tell us what happened.

19      A    I couldn't get it either way.  I couldn't move it,

20  it was just like stuck.  And so I pulled the quick release

21  again, you know, couldn't get it to do anything, so I grabbed

22  the brake wheel, and I was pulling it toward me again, to see

23  if I could manually pull it off, and when I did I slipped off

24  the car.  I mean, just like that, I mean, my hand -- my foot

25  went that way, my hand went this way, and the next thing you

1    know I was laying on my back in the rocks.

2        Q    Do you know what came loose first, your hand or your

3    foot?

4        A    Not exactly.  I think my foot shot out, and when it

5    did, you know, my hand was coming down like this, and then

6    this hand came loose, it was like instantly.

7        Q    Go back to your chair.

8    (Witness complies.)

9        Q    Were you wearing anything on your hands?

10       A    Yes, sir, my work gloves.

11       Q    What type of work gloves do you use?

12       A    The Wells-Lamont work gloves.

13       Q    Do you wear work boots?

14       A    Yes, sir.

15       Q    What type of work boots do you wear?

16       A    Wolverine, mostly Wolverine steel toe, regular good

17   work boots.

18       Q    How long had you had this pair of boots?

19       A    About a month.

20       Q    When you fell off the car what part of your body hit

21   the ground first?

22       A    My buttocks and lower back and my hand, I was

23   falling back and trying to put my hand down and catch myself,

24   like reflex, and kind of landed on the tailbone area.

25       Q    And you said which hand?

1     A    This right hand.

2     Q    What was your -- when you -- what was your initial

3 reaction when you hit the ground?

4     A    Fear.  You know, I haven't fallen like that, and it

5 was like a shock.  You know, I hit the ground.  I didn't stay

6 there long, and I popped back up.  And I'm like, I'm all

7 right, I'm okay.  You know, I was assessing, looking around,

8 it's like, you know, it scared me to death.

9     Q    Prior to this day on the cars with the kaolin on

10 them have you slipped on them before?

11    A    Yes, sir.

12    Q    Have you ever fallen, I mean, where you have

13 actually lost your footing or handhold?

14    A    I have lost it and caught myself, you know, a bunch

15 of us have, about, you know, maybe catch yourself and bang

16 your elbow or bruise your knee, or bruise your -- but I had

17 never fallen like that and lost it completely.

18    Q    Where did you -- what did you do, where did you go?

19    A    I got up, and -- I think Chris called me and asked

20 me was I in the clear, because I was on the off side from

21 him.  And I told him yes, and -- so I walked on over toward

22 the north end, he was pulling that and shoving that in the

23 south end, and I kind of walked over here to where the cars

24 are on the north end.

25    Q    When you fell how far were you from the rest of your

1    crew?

2        A    The engineer was probably 15 -- no, he was further

3    than that, he was probably 25 car lengths, which is a 50-foot

4    car usually.  He was a pretty good ways up the track.

5        Q    Twelve hun -- quarter of a mile?

6        A    And then the brakeman would have been at the --

7    Chris would have been around there at the coupling, which

8    would have been six car lengths, because we had three tanks,

9    and I think like three hoppers, which is like 300 feet, but he

10   was -- and he was on the other side.

11       Q    Did you -- eventually they come to you with the

12   engine?

13       A    Yes, sir, that's correct.

14       Q    When you got back with your crew did you tell them

15   what had happened?

16       A    I told Chris on the ground, when we were making our

17   brake test to go to Aiken, I told Chris, and then we got up on

18   the engine, and I told Bruce, the engineer.

19       Q    Tell us, when you got on the engine, did you -- what

20   did you do with your crew as far as checking you out?

21       A    I was still scared and I didn't know how bad I was

22   hurt.  I was looking at my hand, it was swelling up.  And

23   Chris was going, I think you broke your thumb.  And I was

24   saying, how bad is my back.  And he was pulling up my shirt,

25   and he said, you know, you need to -- we got -- you hurt

98

1    yourself bad, or whatever.  So then we went to the -- when we

2    rode up to Aiken depot.

3        Q    How did you feel at that point in time?

4        A    It was starting to hurt worse.  You know, the back

5    was, you know, a lot of pain in the back, my hand was swelling

6    up and bruising up, and everything.  I couldn't see my back,

7    but they said it was bruising up, too.  But my hand hurt

8    pretty bad and I was getting a headache.  I couldn't bend

9    over, I was tightening up bad.

10       Q    When you got to the Aiken depot did you keep on

11   working, or did you get off?

12       A    I got off.

13       Q    What did your crew do?

14       A    They went on up and finished the work, put the cars

15   away.  Chris did that for me while I called the supervisors

16   and reported it.  They put the cars away, and then came back

17   and put the engine away, and that was the end of our day.

18       Q    Which supervisor were you able to get in touch with?

19       A    Superintendent of terminals, Mr. Roberson, in

20   Columbia.

21       Q    What instructions did he give you?

22       A    He told me to stay right there, and he would call me

23   back in five or ten minutes.

24       Q    And did he call you back?

25       A    Yes, sir.

1    Q    And what instructions did he give you then?

2    A    He said they were on the way, and for me to instruct

3    the train crew for nobody to leave, nobody to change clothes

4    or anything for -- the other crew couldn't go home.  I told

5    them I was sorry, you know, that they couldn't go home, and

6    that we had to wait until they got there.  He said, stay right

7    there until we get there.

8    Q    What time was this?

9    A    About 2:00 o'clock then.

10    Q    How long before the officials got there?

11    A    The first one got there at a quarter to 5:00, 2

12    hours and 45 minutes.

13    Q    So you all stayed there the whole time?

14    A    Yes, sir.

15    Q    How was your back and hand doing?

16    A    Getting worse, hurting bad.

17    Q    Who were the first officials to arrive?

18    A    Trainmaster Chapman arrived first.

19    Q    Who came next?

20    A    Superintendent of Terminals, Mr. Roberson, and a

21    road foreman, Mr. Marcum, he's like over the engineers.

22    Q    Who came next?

23    A    Then came Assistant Superintendent, Mr. Burgess, out

24    of Greenville, he is way up the ladder; and then division road

25    foreman, I didn't ever get his name.  There were five of them

1    that came.

2         Q    Tell us what happened when they got there.

3         A    Mr. Chapman got there first, and he came in and kind

4    of ignored me first, you know, went over there and started

5    getting the bulletin books updated and everything, and just

6    kind of non -- you know, asking me what happened and going

7    over little stuff like that.  And I told him I was hurting

8    pretty bad, and this took -- went on for like 10 or 15

9    minutes, and Mr. Roberson walked in the door.

10        Q    Did they -- was there a discussion about medical

11   attention for you?

12        A    Yes, sir.  All during the four or five hours that

13   they kept me there, you know, there was a lot of talk about,

14   you know, would you -- will you work with you us, you know --

15   there was --

16        Q    The officials got there at what, 4:45, 5:00 o'clock?

17        A    4:45.

18        Q    What time did you finally get home?

19        A    I didn't get home until probably at least 7:30.  I

20   mean, it might have been -- probably 7:30, 8:00 o'clock.

21        Q    So tell us what -- I mean, did you ask to go to a

22   doctor, did they offer to take you to the doctor?  What

23   happened in that regard?

24        A    I told them I was hurt bad.  And Chris -- everybody

25   was telling them I was hurt pretty bad.  And they were just

1    putting the pressure on about, will you work with us and keep

2    this a non-reportable, will you try to hang in there.  And

3    there was things, you know, like they were putting ice on it,

4    They went and got ice and put on it.  And they said they knew

5    what to do.  Mr. Burgess got there, and he said, I know what

6    to do, trust me.  And they went and got ice bags and put on my

7    back, had me sit in a chair.  They put ice packs on top of my

8    hand and gave me Tylenol.

9        Q    I mean, were you willing to, as they say, try to

10   work with them, try to keep this from being reportable?

11       A    Yes, sir.  I was trying, I was trying.

12       Q    Did you tell them how you got hurt?

13       A    Yes, sir.

14       Q    Did you actually fill out an accident report?

15       A    Yes, sir.  I couldn't write very much, but --

16       Q    Are you required to fill out one of these things?

17       A    Yes, sir.

18       Q    Let me show you what has been identified as

19   Plaintiff's Exhibit Number 28.  Is this the accident report

20   that you filled out that evening?

21       A    Yes, sir.  That's right.

22            MR. WETTERMARK:    We'll offer Exhibit 28.

23            MR. GARLAND:   No objections.

24            THE COURT:    That's admitted.

25       Q    Mr. Wettermark:    Would you read for us what the

102

1    description is that was written here?

2        A    It says, "while releasing hand brake on covered

3    hopper, loaded with clay, slipped on clay on hopper and fell

4    to ground."

5            MR. WETTERMARK:      May I submit this to the jury?

6            THE COURT:      Yes, sir.  You may.

7        Q    Mr. Wettermark:      Did you tell them about the clay

8    on the cars?

9        A    Yes, sir, I did.

10       Q    Was there a discussion about that?

11       A    Yes, sir, there was.

12       Q    Tell me what the discussion was about the clay on

13   the cars.

14       A    Can I talk about -- can I talk about when -- you

15   want me to go as far as when we were down at the car and they

16   actually got to see the cars?

17       Q    Well, you actually -- that sounds good.  Did you and

18   the officials actually go back down to Warrenville to see the

19   car that night?

20       A    Yes, sir.  At 6:20, after they had interviewed

21   everybody and took them all outside and asked them what

22   happened, and did all this stuff, then they let the crew go at

23   6:20.  And then they took me to Warrenville in the company car

24   to show them where I fell and show them the car.

25       Q    Who went to Warrenville with you?

1        A      Mr. Burgess, Mr. Chapman.  And I don't know if Mr.

2    Roberson or Mr. Marcum went, they might have stayed up there

3    at the depot.  I don't remember seeing them down there at

4    Warrenville.

5        Q      Tell us what happened.  Did you go show them the

6    car?

7        A      Yes, sir.  I went and showed them the place I fell,

8    I showed them the car.

9        Q      Was the car still covered with clay?

10       A      Yes, sir.  Had clay on the car.

11       Q      What response did you get from the officials?

12       A      Mr. Burgess asked Mr. Chapman why is the clay -- why

13   does the clay have to be on these cars?  And Mr. Chapman said

14   something like, you know, I really don't know why it has to be

15   on cars.  And he instructed Mr. Chapman to be with me -- he

16   asked me, well, when do you work this plant again.  And I

17   said, first thing on Monday, we are off on Saturday and

18   Sunday.  And he said, well -- do you -- will you try to hang

19   in there over the weekend.  And he says, I'm going to have Mr.

20   Chapman meet you at 7:00 o'clock Monday, and go out there and

21   get this problem fixed.  And I said, yes, sir, I will try.

22       Q      There was something you told me about.  Did you all

23   see some paw prints, animal prints out there?

24       A      There had been a cat -- it had stopped raining, and

25   there was a bunch of people down there, shop people and all,

1    and there had been a cat that had got up on the clay car, and

2    he got this clay on his feet, and then he had jumped down off

3    the clay car, and he was walking the track, the rail, and he

4    was making little clay foot prints.  And Mr. Burgess saw that

5    and laughed, and he said, well, that cat won't last very long

6    walking that track -- walking that main line.  So he thought

7    it was funny.

8        Q    At any point when you were there with the officials,

9    did they inspect your gloves?

10       A    Yes, sir.  I think they looked at my gloves.

11       Q    Check out your boots?

12       A    Yes, sir.  They looked at my boots, my clothes.

13       Q    Did anybody take any exception to any of your

14   equipment?

15       A    No, sir.

16       Q    Who took you home that night?

17       A    One of the officers.  I think Mr. Chapman or Mr.

18   Burgess, or whatever, took me home.  Well, I didn't live but

19   like three or four miles from the depot at that time, well, I

20   didn't live there, but that's where I stayed at night.

21       Q    You just can't remember which one for sure?

22       A    No, sir.

23       Q    When you got home that night what was your

24   condition?

25       A    It was stiff and hurting pretty bad.  And I got ice

1    and put on it and sat on it and everything.  And then I called

2    the agent, Jimmy King, he lived pretty close by, and got him

3    to go get me something to eat, because I hadn't had anything

4    to eat.

5        Q    Did you sleep any that night?

6        A    No, sir.  Not much.

7        Q    How about Saturday; how did you do on Saturday?

8        A    I kept icing it up and taking Ibuprofen and Aleve,

9    and it was starting to feel a little bit better.  I was --

10   kept it numb and iced up and everything, and I was feeling,

11   you know, a little bit better.

12       Q    How about Sunday?

13       A    Just progressing a little bit better.  I said, you

14   know, I think I am going to be okay.  I said -- you know, I

15   said, it's easing off and I am keeping it iced up, and I just

16   rested and didn't do much of anything.  And I was, you know,

17   ready to go Monday.  I mean, I was sore, I was hurting pretty

18   good, and it was bruising up and everything, it looked pretty

19   bad but I thought it would go down.

20       Q    Well, come Monday morning, did you feel up to trying

21   to work?

22       A    Yes, sir.

23       Q    And did you go to work that morning?

24       A    Yes, sir.

25       Q    That would have been Monday the 26th?

1      A   That's right.

2      Q   Well, when you got to work at the Aiken depot that

3  morning tell us what happened.

4      A   I got there at 7:00 o'clock, and we got our

5  paperwork and everything, and Mr. Chapman wasn't there yet.

6  And so we did our usual thing, I got my paperwork, my switch

7  list and everything from the -- called Jimmy King in Augusta.

8  We got our supplies and everything and --

9      Q   You said that Mr. Chapman wasn't there yet, you were

10  expecting him based on the conversation --

11      A   I was thinking -- I told Chris.  And Chris asked me,

12  said, well, are we going to wait on Mr. Chapman.  And I said,

13  well, let's go out here to the rock track since it's right

14  there right at the depot and go ahead and get our cars that we

15  are going to take for the W. R. Grace plant, because that's

16  our first move anyway.  I didn't want to be just sitting there

17  doing nothing, so I said, let's go ahead and get our empties

18  together.  So we got out there and was getting our empties,

19  and he called on the radio and said, where are you at.  And I

20  said, we are getting ready to leave Aiken to go to the plant,

21  the Grace plant.  And he said, well, I will just meet you at

22  the W. R. Grace plant.  He was running a few minutes late, I

23  reckon.

24      Q   So you all started heading to the Grace plant?

25      A   Yes, sir.  We started out toward the W. R.  Grace

1    plant with our engine and four empties.

2        Q    Then what happened?

3        A    It's about four miles out there, and so we started

4    out there, and we started developing engine trouble, the

5    engine wouldn't move.  We call it loading up, or you could

6    give it throttle.  And the engineer, it wasn't loading up.

7    And we were just coasting.  It's downhill to the plant, but

8    it's uphill back.  So we are just kind of coasting, he can't

9    get it to move, and he says, we have lost power.  So I got on

10   the radio and called the big dispatcher in Greenville, told

11   him he needed to get the Augusta shop truck to come to us that

12   our engine was quitting, we couldn't move.  And we coasted

13   down to this crossing.  I told Engineer -- Tommy Connolly was

14   our engineer Monday, I said you better stop the train short of

15   that crossing there, that's a big bypass, so we don't block

16   cars.  So we stopped.

17       Q    And then what happened?

18       A    Then Trainmaster Chapman heard me calling for the

19   help, you know, for the engine, so he called and said, where

20   are you at.  And I said, we are stopping at this big 118

21   bypass.  And he said, okay, I will come around there to you.

22       Q    And did he?

23       A    Yes, sir.  He did.

24       Q    And when he got there did you all have a

25   conversation about going to W. R. Grace?

1    A    Yes, sir, we did.  He got up on the engine.  I said

2    -- talked a few minutes.  And I said, the shop truck might be

3    an hour or two, why don't you and I just run around there in

4    your car and I will show you the problem.

5    Q    And did he agree to?

6    A    Yes, sir.  He did.

7    Q    So did you all go to W. R. Grace?

8    A    We hopped in his car and we went around to W. R.

9    Grace, and he pulls in there and pulls down to the top end,

10    where you put the empties in, and there are no cars there.

11    And he gets out, looks around, there is some clay piled up and

12    everything.  And one of the guys, Mark comes out, and I

13    introduce him to Mr. Chapman and they talked a few minutes.

14    And he said something about the clay on the ground to this

15    Mark guy.  And Mark said, yes, we will get the -- we got a

16    little backhoe type thing that we will pick that up with.  And

17    he asks me, he says, where's the train.  And I said, it's

18    broke down around the curve about a mile, I said we will be

19    here as quick as we can.  And then Mark went back in the

20    building.  So I looked at Mr. Chapman, and I said, Mr.

21    Chapman, the problem is down in the plant where the loads are.

22    I said, let's you and I walk down in there and I will show

23    you where the problem is.  He said, I have seen enough, let's

24    go back to the train.  We got back in the car, went back to

25    the train.

1       Q    Did you all get your train fixed?

2       A    Yes, sir, about -- probably took a couple of hours,

3   and shop truck got there and fixed the engine.

4       Q    When Mr. Chapman -- when you finally had him down

5   there at the plant, and you said, let's go down and see where

6   the problem is, and he said, I have seen enough, I mean, was

7   that anything new?

8       A    No, sir.

9       Q    When you got your engine fixed did you all go ahead

10  to W. R. Grace?

11      A    Yes, sir.  We went down to the plant and got ready

12  to start switching.  We put our empties out on the main line

13  like I always do, and then we started in with the engine.  And

14  when we started coupling these loads -- there were seven loads

15  to come out, and they were just covered.  I mean, they -- it

16  was just bad, covered.  And I stopped Chris, I said, hold up,

17  hold up, I said.  I told Tommy -- I said, just stop, Tommy.  I

18  said, take your break, Tommy.  I said, Tommy, call Trainmaster

19  Chapman on the radio and tell him to come back around here.

20  Well, he called two or three times and he couldn't get him.

21  He had gone to the depot, and I guess he was in the depot

22  making phone calls.  So I went in there and called on the

23  phone and got the dispatcher to call him on the phone at Aiken

24  depot and told him to come back around to Grace, that we had a

25  problem.

1          Q     And did he come?

2          A     Yes, sir.  He did.

3          Q     Tell us what happened when he got there the second

4     time.

5          A     He got there the second time about 20 minutes later,

6     and we -- all this time, the engine had been sitting there for

7     30 or 40 minutes, so he drives up in a car -- now, he drives

8     to the lower end this time, he drives down there to where the

9     cars are, because he sees us standing there, me -- myself and

10    my brakeman, Chris Sharpe.  And about this time, David Wood,

11    the plant manager comes out because we have got his plant tied

12    up because we are not switching.  He comes out and says, what

13    is going on.  He gets out of the car.  And I said, Mr. Chapman

14    and take a pic -- I said, come around here and let me show you

15    this problem and take a picture for Mr. Burgess.  He said,

16    something -- either said, I don't have a camera, or he said, I

17    am not getting the camera right now.  He says, let -- he says,

18    show me what you have got.  So I introduced him to Mr. Wood.

19    They walked all around the cars, it was just covered, Chris

20    and I were with them.  Mr. Wood said, plant manager at Grace

21    said, I hadn't seen it quite this bad lately.  I said, Mr.

22    Wood, it's like this every day, it's like this every other

23    day.  You will blow it off, you try to blow it off and then

24    you will pile it right back up.  So then Mr. Chapman told Mr.

25    Wood, he said, you know, you need to try to make an effort to

1    blow a couple of the grab irons off and a steel step where

2    they can get -- at least get up on the car. Chris looked at

3    Mr. Chapman, he said, what about all this clay piled up in

4    there that's a foot deep. He says, it's blows right off --

5    right on us, gets in our faces and everything, and then it

6    covers the grab irons again. So Mr. Wood says, well, you

7    know, I will look into it. So he walks off, goes back into

8    the plant. You want me to continue?

9         Q    Yes, sir.

10        A    Then I look at Mr. Chapman, and I said, well, what

11   do I do now, Mr. Chapman, I says, here's the cars, here's the

12   problem, I said, it's covered in clay. I said, best thing we

13   can do is just leave the cars sitting right here until they

14   clean them up. He said, this is a good customer, you are

15   going to switch this place. I said, you want me to switch

16   this place. He said, yes, you have got to switch them, got in

17   his car drove off. Me and Chris sat there going, what can you

18   do, I mean, what could I do.

19        Q    Did you switch them?

20        A    Yes, sir.

21        Q    Get them out of there okay?

22        A    Yes, sir.

23        Q    Where did you take them?

24        A    Went back to Aiken depot with them.

25        Q    And what did you do when you got to Aiken depot?

1      A   We were getting ready to take them down to

2  Warrenville, so we had to get our engine around them, so we

3  have to get down and tie some brakes.  So Chris got down, I

4  got down, and then we got up and started mounting the cars.

5  And Chris got the first brake and I walked back there and got

6  the second brake, about that time Chris was coming back.  I

7  mounted the car, got up on the platform, and was putting the

8  brake on and slipped again.  My foot -- my right foot slipped

9  on that clay and pulled down and I almost fell off the car,

10  but I didn't.  I grabbed myself and I was about to cry.  And

11  Chris come walking up, and I said, Chris, I hurt myself bad, I

12  said, something ain't right.  I said, something in my back is

13  not right.  And I eased around, and he helped me down off the

14  car.  And I told him, I said, get Tommy Connolly off the

15  engine and come on in the depot, and we will call Mr. Chapman

16  again.

17      Q   And did you all call him again?

18      A   Yes, sir.

19      Q   Did he come?

20      A   Yes, sir.

21      Q   And tell us what happened when he got there.

22      A   He walks in the depot and Tommy and Chris and I are

23  standing there, and he says, what now.

24      A   And I said, Mr. Chapman, I have hurt myself on this

25  second load out here.  I said these cars are covered with

1   clay.  I said -- you know, and I have re-injured myself.  He

2   said, this is a bunch of crap.  And I said, I'm going -- you

3   know, do I need to fill out another form, or something.  He

4   says, no, no.  I said, Mr. Chapman, I have hurt myself bad.  I

5   said, I don't know how much I can go.  So he says, well, I

6   will get a relief crew to come relieve you all, he said, how

7   about that, and let you go home and get some rest this

8   afternoon.  He says, how about you and Chris take the cars

9   down to Warrenville and set them off, and I will get a relief

10  crew to come down there and meet you all, and relieve us for

11  that day, and finish the work.

12       Q    What did you say when he asked you to take -- I

13  mean, these are the cars you had just finished falling on

14  again?

15       A    I said, Mr. Chapman, the cars are covered with clay.

16   I said, the engine out there, the walkway is covered with

17  clay.  I said, we are going to slip and slide on that, you

18  want Tommy to get up there and fall.  I said, if I take these

19  seven cars to Warrenville and set them off, Leon or some of

20  these other people is going to come through at night with this

21  clay on them and they are going to have to get up on these

22  cars and knock these brakes off, and I said, they are going to

23  slip and fall.  He said, you let me worry about that.  You

24  take the cars to Warrenville.

25       Q    What was your reaction to that?

1    A    I got mad.  He said he had a crossing accident at

2    the W line on another main line and he left, for like the

3    third or fourth time that day.  And I got mad.  I said, I am

4    going over his head.  I said, this is --

5    Q    Did you try to go over his head?

6    A    Yes, sir.

7    Q    Who did you call?

8    A    I picked up the phone and called up to Mr. Wagner,

9    who is the superintendent in Greenville, and he's over Mr.

10   Burgess.  And I couldn't find him, he was gone.  So then I

11   asked for Assistant Superintendent Burgess, well, they put me

12   to his secretary, or whatever.  And she said that he was up in

13   Lynwood, North Carolina, in meetings all day.  So then I

14   didn't know what to do, so I said, well, I can't find

15   anybody.  So I called Jimmy King, the agent in Augusta over

16   there and told him what all happened, and told -- you know, I

17   can't order a relief crew, because that costs them a lot of

18   money to send a crew.  I had to tell him why we were getting a

19   crew and whose permission I had to get the crew and

20   everything.

21   Q    You never could get an official, though?

22   A    Never could get anybody to --

23   Q    So what did you decide to do then?

24   A    I thought for a minute, and thought for a minute,

25   and then I said, man, I am going to call my wife two blocks up

1    the street working and ask her if she has got a camera, come

2    down here and take pictures of these cars.

3         Q    And did she come down and take pictures?

4         A    Yes, she did.

5         Q    We have got those pictures here, don't we?

6         A    Yes, sir.

7         Q    Are these the pictures that -- well, they are

8    blowups, obviously, but are these the pictures that your wife

9    took that day?

10        A    Yes, sir, they are.

11        Q    Let me get my numbers right, Lester, before we put

12   them in evidence.

13        A    All right, sir.

14             MR. WETTERMARK:    These are exhibits 14 through

15        24, photographs of the rail cars taken that day, we will

16        offer them into evidence.

17             MR. GARLAND:   No objection.

18             THE COURT:    They are admitted.

19        Q   Mr. Wettermark:    Lester, if you would --

20             MR. WETTERMARK:    May I have him come down here, Your

21   Honor?

22             THE COURT:    Yes, sir, you may.  Just be sure to

23        speak up loudly so the Court Reporter and all the Jurors

24        can hear you.

25        Q   Mr. Wettermark:    I don't have these in any

116

1    particular order, so you will have to explain them to me, to

2    us.  Let me show you Exhibit Number 15, show us where the --

3         A    This is just a car, a hopper car, and it's supposed

4    to be clean, but the commodity -- the stuff is supposed to be

5    in the car, not on the car, and it gets all over the knuckles,

6    the couplers --

7         Q    That's all this white stuff?

8         A    All this white stuff, this is clay.  All this stuff

9    in here is clay, all this build up, like six or eight inches.

10   All this is clay, clay on these grab irons, that's where you

11   would come across from this side and step, this is where you

12   would step, covered in clay.  This is the type of clay that

13   was building up on the cars and blowing all over us, and all

14   in our faces and all over the stuff that we were climbing on.

15        Q    What we are seeing here, this is after you all have

16   pulled these cars for how far, how many miles?

17        A    Four miles, bouncing and pulling them with the wind

18   blowing, and that's what is left after four miles.

19        Q    Was it worse than this when you first picked them

20   up?

21        A    Yes, sir.

22        Q    Exhibit Number 18, again, is that a view of --

23        A    That's a different car, it's just pictures of the

24   seven cars, and it's all up in here, caked up in there, and it

25   blows off and it would get all in the walkway -- see all this

1    clay is in the walkways.   And this is what you walk across

2    the car -- like if I had to cross over, you can't just run and

3    jump over the knuckle, you have to -- I don't mean to use

4    railroad lingo, but you have to climb up and then cross over,

5    and you go across this thing to get to the other side of the

6    car, and it's covered in clay.

7         Q    Exhibit 19.

8         A    Same type -- this is a -- one photo, top photo of

9    the car that I got injured on, I believe, and this is all the

10   clay that's built up.  This is the brake that I was putting

11   on.  This is the platform that I was on.  That's all the clay

12   that was on that car.

13        Q    You actually -- let me find the two photos.  Looking

14   at Exhibit 18 and Exhibit 19, a kind of cross-referencing; can

15   you tell if this is the same platform as this?

16        A    Yes, sir, that's the same car.

17        Q    And this is the car you were hurt on?

18        A    Right.

19        Q    Can you see in these photographs?  Can you see where

20   your foot slipped?

21        A    Yes, sir.  I got her to try to get where my feet

22   were.

23        Q    Show us where your -- what you are talking about.

24        A    If you can see the clay buildup, and my left foot

25   was here, my right foot was in here, if you can see that

1  imprint.  And then when I slipped, my foot turned out this way

2  and pushed this clay -- this is gone, the clay, and it's

3  pushed over to here.  And I slipped -- I just slipped out that

4  way while I was pulling the brake.

5       Q    And you are pointing right here where the clay has

6  been kind of knocked out of that crevice, that corner there?

7       A    I was trying to apply the brake onto the car.

8       Q    In this other view, is that where you are talking

9  about, where your boot hit it and knocked the clay --

10      A    Yes, sir.  If you can see it good enough, there's

11  clay all built in here, clay all built in here, and then it's

12  knocked loose right there, where my toe drug across.

13      Q    Let's just go show all the rest of these

14  photographs.  Again, these are more photos showing the

15  accumulation of the clay.

16      A    Just different cars, there were seven cars -- I

17  said, get as many pictures as she could of -- it's just

18  everywhere, it just -- it piles up everywhere, and they say,

19  well, we don't see where it can get.  And I said, it gets

20  everywhere.

21      Q    Let me show you Exhibit Number 16.  How thick has it

22  -- how thick would have been your best judgement is this in

23  here?

24      A    That's probably six to eight inches, maybe ten

25  inches, you know, that is a flat base, and here is like the

1    bottom.  So you can see where the bottom would be, and it's

2    piled up in there.  And when it blows, it blows out and covers

3    all this other stuff, and if you are riding right in here, and

4    the wind is blowing across, it just blows all in your face.

5         Q    Again, here is a closer up photograph of the

6    accumulation.  Again, how -- well, you can see here how many

7    inches that is.  What is your judgment, how many inches

8    accumulated?

9         A    Probably a foot, 10 to 12 inches, it looks like,

10   close.

11        Q    Exhibit Number 20.

12        A    Same thing, that's just like a bleed right where --

13   where you would bleed air off the car, but this is all taped

14   up, it's just another view of the clay caked up on the cars.

15   That's like a -- yes, that's like the draw head, and the

16   walkway.  See the walkway with the clay dripping off of it,

17   and --

18        Q    Hard to see it from there.

19        A    Right.  It was sun shining on Monday, it was pretty

20   on Monday.

21        Q    Let me show you the next exhibit.

22        A    This is the engine, this is our engine.  This is our

23   walkway, this is our engine, and of course, on one end is

24   where we ride and then the other end is the long one where you

25   can see us coming down the tracks.  So this is our walkway,

1    which is supposed -- it's black, this engine is black, and

2    this is black.  This is clay, this is a light buildup, and

3    then it gets heavier, and then, here is how heavy it is.  And

4    it's just slick, you go walking down through there, holding

5    onto the rail.  All of that is supposed to be black.  See,

6    that's the white clay on the side of the engine.  And I said

7    -- I said, you want us to work on an engine like that.

8         Q    There's one last photograph.  Your wife actually

9    took a photograph of you out there that day.  Is that you?

10        A    Unfortunately.  That's a picture of me.

11        Q    What is all this white stuff?

12        A    This is the clay.  This is clay on my coat, clay

13   piled up -- you know, stuck on the side of the engine.  This

14   is clay all in my hat, clay all on my safety glasses, all in

15   my jacket, on my shirt.  My wife, every day -- you know, I

16   would wash this jacket twice a week, it would just be

17   covered.

18        Q    You can go back to your chair, Lester.

19   (Witness complies.)

20        Q    Did you fill out an accident report for that second

21   day?

22        A    Yes, sir.  Two officials said I didn't need to, but

23   I filled one out anyway.

24        Q    Let me show you Exhibit 29.  Is this the accident

25   report you filled out on January 26th?

1       A    Yes, sir.  It is.

2            MR. WETTERMARK:    We'll offer Exhibit Number 29.

3            MR. GARLAND:   Is that the same as number 2?

4            MR. WETTERMARK:    Yes.

5            THE COURT:    That's admitted.

6            MR. WETTERMARK:    May I submit it to the Jury?

7            THE COURT:    Yes, sir.

8       Q    Mr. Wettermark:    When did you go see a doctor the

9    first time?

10      A    Tuesday.

11      Q    The next morning?

12      A    Tuesday, January 27th.

13      Q    And where did you go first?

14      A    First, they took me to a company railroad doctor in

15   Columbia, South Carolina.

16      Q    Who went with you to the doctor?

17      A    Trainmaster Chapman and Superintendent of Terminals,

18   Mr. Roberson.

19      Q    After you saw the railroad doctor in Columbia did

20   you go see another doctor?

21      A    Yes, sir, I did.

22      Q    Who?

23      A    I finally got them to let me go see my doctor in

24   Aiken the next day.

25      Q    And did he make a -- did he refer you to two more

1    doctors, instead, two more doctors?

2         A    Yes, sir.  He treated me a couple of weeks, and he

3    referred me to -- finally referred me to two more doctors.

4         Q    What doctors did he refer you to?

5         A    Dr. Hill, orthopedic doctor for my thumb; and Dr.

6    Eisenberg, a neurologist for my back.

7         Q    If you don't mind, let me take you through your

8    thumb, and the treatment on your thumb, and then I am going to

9    go back and talk about your back.

10        A    All right, sir.

11        Q    Before I do that, Lester, let me just ask you this.

12    Which of your two injuries, your hand, your thumb, or your

13    back, gives you the most trouble?

14        A    My back.

15        Q    By a small margin or a wide margin.

16        A    No, by a large margin.

17        Q    Let's talk about your thumb first.  You went to see

18    Dr. Hill, what did he do for you?

19        A    He immediately put me in a cast, a hard cast.

20        Q    How long did you stay in the cast?

21        A    Five weeks.

22        Q    And after you got out of the cast what did he put

23    your arm in?

24        A    He put my hand in -- thumb in like a little splint,

25    a removal splint, so I could work with it some.

1      Q    And then after the splint -- well, how long were you

2    in the split?

3      A    I think two to three weeks.

4      Q    And then what sort of treatment did you get for your

5    hand?

6      A    Thumb therapy.  I went to Hitchcock Rehabilitation

7    for hand therapy.

8      Q    Did that get you as well as you wanted to be?

9      A    No, sir.

10     Q    Did you get a referral to yet another specialist?

11     A    Yes, sir.

12     Q    Who was that?

13     A    Dr. Wendell Duncan, in Augusta, Orthopedic.

14     Q    Dr. Hill was just a local doctor in Aiken?

15     A    Yes, sir, he was a local.

16     Q    And then Dr. Duncan, was he a specialist in --

17     A    He was like a specialist -- we heard about, you

18   know, like he operated on ball players and stuff, you know.

19   He could --

20     Q    And you went to see him in Augusta?

21     A    Yes, sir.

22     Q    And he recommended surgery for you, hadn't he?

23     A    Yes, sir.

24     Q    Well, tell us why haven't you had the surgery,

25   what's your thoughts on the surgery?

1      A    Well, he said the only thing he could do was --

2   would be to fuse it.  And if he fused it, then nothing would

3   move but the little tip end, and this would not move, it would

4   just be stationary, he said.  And then you -- I think he said,

5   like you cut the nerves so that you don't have pain, but you

6   don't have the movement.  And he said, or I can leave it like

7   it is, you know, but you have to live with the pain.

8      Q    So what have you chosen?

9      A    I told him, I said, right now, I would like to try

10   to keep the movement, if I can, and try to deal with the pain.

11      Q    How bad is the pain in your hand?

12      A    It's not too bad if I don't -- you know, if I don't

13   just grab and squeeze something, or you know, if I don't do

14   the wrong thing, it's not that bad.

15      Q    Can you look at your hand and see the injury?

16      A    Oh, yes, sir.  Yes, sir.

17         MR. WETTERMARK:    May I have him come down and

18      show the Jury?

19         THE COURT:    Yes, sir.

20      Q    Mr. Wettermark:    Mr. Kirkland, if you would,

21   come down here.  Maybe hold your hands up like this, first.

22   And this is the thumb, injured thumb, and that's your good

23   thumb?

24      A    Yes, sir.

25      Q    Now, maybe show them like this, can you do it like

                                                              125

1    that?

2        A    Yes, sir.  If I can open it --

3            THE COURT:    Speak up a little bit, please, sir.

4    I want to be sure the Court Reporter --

5            THE WITNESS:    I'm sorry.

6            THE COURT:    That's fine, just speak up a little.

7        A    The Witness:    I can open this one wide, I can't get

8    this one open, and I can't get it closed.  I can get it about

9    right there.  They worked with it and worked with it in

10   therapy, but I couldn't get it to go anymore.  It's got a big

11   knot on it.

12       Q    Maybe show -- show them like this.

13       A    I don't know if they -- can everybody see it?  Can

14   you see the knot?

15       Q    Has it been like that since the day of the accident?

16       A    Yes, sir, since the day of the accident.

17       Q    You told us that Mr. Sharpe was afraid it was

18   broken; is that --

19       A    Mr. King said, oh, you broke your thumb.

20       Q    That's fine, Lester, you can go on back to the

21   witness stand.

22   (Witness complies.)

23       Q    Let's talk about your back.  Who was the specialist

24   you went to for your back?

25       A    Dr. Eisenberg, a neurologist.

1     Q    I don't know how to get you -- to take you through

2  all the treatment you have had with him.  How many MRI scans

3  have you had?

4     A    Four MRIs.

5     Q    How many EMG scans -- EMG tests have you had?

6     A    Two or three on my leg.

7     Q    Let me try it this way.  When you first started

8  going to see Dr. Eisenberg in January and February, how did he

9  start off by treating you?  What was his first type of

10  treatment for you?

11     A    First, he started for a month with medication and

12  rest, just try -- do nothing, he said, don't pick up anything,

13  don't twist, don't turn, just rest it, and pain medication.

14     Q    And how did you do?

15     A    It just stayed the same.

16     Q    And so then what type of treatment did he go into

17  after that first month or so?

18     A    He went into physical therapy at Hitchcock

19  Rehabilitation.

20     Q    And how often and how long did you go to physical

21  therapy at Hitchcock?

22     A    I went to physical therapy for two months, three

23  times a week.

24     Q    Was there anything in the physical therapy that

25  seemed to help?

1          A    Yes, sir.

2          Q    What helped the most?

3          A    I don't know what you call it when they hook you up

4     to your hips and your shoulders and they stretch your body

5     apart?

6          Q    Traction.

7          A    Traction.  And when they let you go back, and I

8     would lay there for a minute, and it would start hurting.  And

9     they would pull me, and I would tell the therapist, I would

10    say, keep me pulled apart, because it's not hurting when I am

11    pulled apart.  But it would -- they hook you to a machine and

12    it does it a minute and then a minute and then a minute and

13    then a minute.  And ice -- and they ice you up, they lay you

14    down and they massage it with ice, and that numbed it up and

15    helped it.

16         Q    But overall, what was the overall results of the two

17    months of therapy?

18         A    It just stayed the same, it wasn't -- it was

19    aggravating it.  Dr. Eisenberg said riding the bikes and

20    stuff--

21         Q    You can't tell us what the doctor said.

22         A    I'm sorry.

23         Q    That's okay.  After you finished the therapy, what

24    was the next phase of your treatment, Lester?

25         A    He went back to rest for a few months and changed my

1    medications.  He kept changing my medications trying to find a

2    medicine that would work.

3        Q    And then by the fall of 1998, I guess, about seven

4    or eight months after the accident --

5        A    Right.

6        Q    -- tell us about the treatment then.

7        A    Then he went to, he says, let's do the epidural

8    steroid injections.

9        Q    Now, can you explain to us what are epidural steroid

10   injections and how those are done?

11       A    They take you to -- they don't do it at his office,

12   they take you to the hospital as an outpatient, and they take

13   you and hook you to an IV.  And an anesthesiologist, the

14   person that puts you to sleep, I guess, Dr. Durette was his

15   name, he's the one that give you those shots.  And they hook

16   you to an IV, and put it in your arm and everything, lay you

17   on a gurney, and then they take you back there to where he is.

18   And then they make you sit up and lean over the bed and put

19   your feet in a chair, and then they -- they do you like this,

20   and they lay you forward, push your head down, and they have

21   two nurses, one on this side and one on this side, and then

22   they hold you down, and they tell you you can yell but you

23   can't move.  If you move, you know, it will go in the wrong

24   place and you will get paralyzed, or something for like, you

25   know, weeks or something, not bad, but it hurts really bad.

1    Then they go -- he comes in and goes in right in the middle --

2    in the lower back right close to the buttocks in the lower

3    back, he goes in with a little needle first and puts a little

4    numbing stuff, and then he goes in with a really big needle

5    and shoots that steroid in there, it hurts pretty bad.

6         Q    How many of those did you have?

7         A    Three.

8         Q    Did you get -- did any of them give you any relief?

9         A    Yes, sir.  The middle one that -- you couldn't have

10   them but every two weeks apart, and the middle one helped for

11   four or five days.

12        Q    Was that -- did you get encouraged by that?

13        A    Yes, sir.  I thought, he is on to some -- I said,

14   they are on to something, they know what is wrong with it, or

15   something.  And it went right back to the same.

16        Q    What came next?

17        A    More rest, kept changing the pain medications.  And

18   he said, I am going to refer you to a surgeon, Dr. Epstein.

19        Q    And you went and got an evaluation to see if surgery

20   would help?

21        A    That's right, yes, sir.

22        Q    Anybody recommend any surgery that would help?

23        A    No, sir.

24        Q    For the last year or so, you have been in the last

25   kind of phase of your treatment?

1    A    That's right.

2    Q    That's with what doctor?

3    A    Dr. Downey, a chronic pain management.

4    Q    And tell us what Dr. Downey is doing for you.

5    A    He increased my pain medicine, put me on some really

6    strong stuff, and he gives me trigger point injections once a

7    month.  Like February 20th, he gave me three shots in the

8    back, and like March 13th, he gave me two shots in the back.

9    And I think I go back April 24th, or something.  But he gives

10    me injections.

11    Q    Do those help?

12    A    Yes, sir.  Yes, sir.  I do pretty good on those for

13    four or five days, and then it starts hurting bad again.

14    Q    What type of medications is he giving you?

15    A    I take Celebrex, 200 milligrams, for inflammation.

16    I take Neurontin 300 milligrams three times a day for nerve

17    pain in the leg.  I take Oxycontin, that's the strong pain

18    pill, I take that two to three times a day for the pain.

19    Q    Does that help?

20    A    Yes, sir, that helps.  And then I take Zoloft,

21    that's for depression, 50 milligrams once a day.

22    Q    Let me show you what's -- Exhibit 67.  Did you go by

23    your pharmacy and get a printout of all your medications you

24    have been taking?

25    A    Yes, sir.  That's a printout of all my medicine for

131

1   the last three years.

2          MR. WETTERMARK:     And this -- we'll offer Exhibit

3      67.

4          MR. GARLAND:   No objection.

5          THE COURT:     It's admitted.

6   A   The Witness:   That's all at Aiken Drug.

7          MR. WETTERMARK:     May I submit this to the jury?

8          THE COURT:     Yes, sir.  You may.

9   Q   Mr. Wettermark:     Lester, you said that you were

10  on anti-depression medication; when did your depression start

11  that you -- I should say, when did you become aware of the

12  depression?

13  A   Well, I was a little disgusted the first summer --

14  you know, I got hurt in January, and when summer hit, April,

15  May, June, all my friends are, you know, playing golf, and

16  doing this and that, and tennis and I was a little disgusted.

17  And then I got through the winter okay, because nobody really

18  does much.  And then the next year, '99, when summer time hit

19  and everybody is having their fun, and you know, my

20  brother-in-law is playing tennis and bowling, and --

21  Q   Can you do any of that stuff?

22  A   Can't do any of that.  They are out riding boats and

23  jet skis and --

24  Q   What did you like to do before this accident?  Tell

25  us some of the things you used to do for recreational

1    activities before.

2         A    I have got a boat.  I water skied.  I tubed.  I

3    played golf.  I bowled.  I played tennis, basketball.  I mean,

4    I loved the outdoor stuff.

5         Q    Well, actually -- I mean, you were a pretty good

6    bowler, weren't you?

7         A    Yes, sir.  I --

8         Q    What is your -- you told me that you had some --

9    what was your best series?

10        A    A 712.  I had like a 298 game, you know -- this was

11   in leagues and stuff.  And I tried to find the patch, but I

12   couldn't.  But I had like a 298 game and a 712.

13        Q    Is that pretty good?

14        A    Yes, it's pretty good.  I averaged like a 185, was

15   my average.

16        Q    Were you a pretty good golfer?

17        A    Decent, mid-70s

18        Q    Where I come from, that's pretty good.

19        A    I love sports and I loved outdoors, you know.

20   Anything with sports and outdoor, I loved it.

21        Q    Have you played golf at all since this accident?

22        A    I tried a couple of times.  I went out there, you

23   know, and they were playing.  And I said, let me see what I

24   can do, and I couldn't do it, you know.  And then I hit some

25   balls, and I couldn't do that.  And I went out there, and I

1    said, you know, let me see if I can play.  And I played two

2    holes and almost threw up.  And I said, I can't play, I can't

3    do it.  That was like in the middle of '98, and I haven't

4    tried since.

5         Q    Let me talk to you a little bit about finding work.

6         A    Okay.

7         Q    After this accident first happened, when you were

8    first treating with Dr. Eisenberg, did you think and feel that

9    you were going to be able to get back to work?

10        A    Oh, yes, sir.  I wanted -- I knew I would get back

11   to work, I said, you know, I wanted to be -- I loved it.

12        Q    What do you mean you loved it, you like your job?

13        A    Oh, yes, sir.  I love it.  It's fun switching cars

14   and riding trains, and I love the outdoor stuff, you know.

15        Q    Well, shortly after you got injured, were you in

16   contact with the Rehabilitation Department of the railroad?

17        A    Yes, sir, I was.

18        Q    And did you write them letters telling them your

19   interest?

20        A    Yes, sir.  We kept writing back and forth.

21        Q    Let me show you what I will identify as Exhibit 48.

22   Is this a letter that you wrote to the railroad's

23   Rehabilitation Department --

24        A    Yes, sir.  It is.

25        Q    -- in May 11th of 1998?

1    A   Yes, sir, that's right.

2    MR. WETTERMARK:   We will offer Exhibit 48.

3    MR. GARLAND:  No objection.

4    THE COURT:   It's admitted.

5    Q  Mr. Wettermark:   Would you just read that for the

6 Jury, real quick?

7    A   Can I put these reading glasses on?

8    Q   Yes, sir.

9    A   It says, "Dear Ms. Wilson, thank you for letter for

10 May 4th, 1998.  I appreciate your offer for rehabilitation

11 services.  At the present time, however, I am still under the

12 care of my doctors, and I am very hopeful that I will recover

13 from my injuries to the extent that I can return to my former

14 employment with the railroad.  I have invested much of my life

15 in railroad work and I do not want to give up my job or my

16 seniority without having done everything I can from a medical

17 standpoint to recover from my injuries.  If at some future

18 date it appears that I won't be able to return to my former

19 employment, then I would like to avail myself to whatever help

20 you, or anyone else, can find and give me productive

21 employment.  Thank you again for your consideration, Lester E.

22 Kirkland, Jr.."

23    Q   Then, let me show you.  This is May of 1998 -- let

24 me show you what I will identify as Exhibit Number 50, dated

25 August 24th, 1998; is that, again, another letter you wrote to

1    the Norfolk Southern people?

2         A    Yes, sir.

3              MR. WETTERMARK:    We will offer Exhibit 50.

4              MR. GARLAND:   No objection.

5              THE COURT:    It's admitted.

6         Q    Mr. Wettermark:    And in this --

7         A    That's to Mr. Maher.

8         Q    I won't ask you to read the whole letter.  But if

9    you will, just read that sentence.

10        A    Okay.  If the worst happens, and I am permanently

11   disabled as a trainman, then I would very much like any

12   assistance that Norfolk Southern could give me in trying to

13   find alternative employment.

14        Q    I'm not going to go through all these letters, but

15   eventually, did your doctor tell you that you could not go

16   back to railroad work?

17        A    Yes, sir, he did.

18        Q    And when was that?

19        A    Shortly after I saw Dr. Epstein I met with Eisenberg

20   again, and -- like in February or March of '99, and he said I

21   could not -- he said I could not go back.

22        Q    Let me show you Exhibit 52.  Is this the first

23   letter you wrote to the railroad after you were told you

24   couldn't go back to railroad work?

25        A    Yes, it is.

1          MR. WETTERMARK:      We will offer Exhibit 52.

2          THE COURT:      What's the date of that one, now?

3          MR. WETTERMARK:      March 31st, 1999.

4          MR. GARLAND:    No objection.

5          THE COURT:      That's admitted.

6     Q    Mr. Wettermark:      Will you just read, if you

7     would, just read this portion of the letter, start right

8     there, and go all the way through that paragraph, because I

9     want to ask you about that.

10         A    "I have just finished receiving an evaluation by Dr.

11    Eisenberg.  He has advised me that I will never be able to

12    return to my former work as a trainman for the railroad.

13    Obviously, this is very disturbing news to me, nevertheless, I

14    am willing to accept this fact, and I am trying to move

15    forward with my life.  Obviously getting some sort of gainful

16    employment is highest on my list.  Any help you can give me in

17    this regard would be greatly appreciated.  As you may know, I

18    have worked out of, and lived in the Aiken, South Carolina

19    area for the past nine years.  I have made a commitment to my

20    daughter that I will not be an absentee father.  My friends

21    and roots are now here.  The reason I tell you this is because

22    I very much want to find a job in this area.  I realize that

23    when you are unemployed and disabled you can not be choosy,

24    but at the same time, however, moving out of this area would

25    be a last resort.  I would greatly appreciate it if you could

1    help me find a job in this area.  I'm willing" -- oh, you want

2    me to stop?

3        Q    That's fine.  Is that the only request you made out

4    of them, that they try to find you a job close to your home?

5        A    Yes, sir.

6        Q    In your letter, you talk about your daughter; are

7    you very close with your daughter?

8        A    Yes, sir.  It's really a stepdaughter.

9        Q    You are divorced from your wife now?

10        A    Yes, sir, we are divorced.

11        Q    But you still retain that relationship?

12        A    Oh, yes, sir, it was a friendly divorce.

13        Q    Let me show you Exhibit 66.  Are these photographs

14    of you before the accident, with your daughter?

15        A    Yes, sir.  It is.

16            MR. WETTERMARK:    We will offer Exhibit 66.

17        A    The Witness:    I think that's like the beach, and

18    the Grand Canyon.

19            MR. GARLAND:    No objection.

20            THE COURT:    It's admitted.

21        Q    Mr. Wettermark:    And let me show you Exhibit 65.

22    Are these the photographs I have asked you to find, just that

23    show you, some of the activities that you enjoyed doing before

24    this accident?

25        A    Right.  That's me skiing up top, my wife and I

1    playing her mom and dad in tennis, and that's my daughter,

2    Jenna, and I, riding a waterfall.

3                MR. WETTERMARK:    We will offer 65.

4                MR. GARLAND:    No objection.

5                THE COURT:    They are admitted.

6                MR. WETTERMARK:    May I submit these to the jury?

7                THE COURT:    Yes, sir.  You may.

8          Q    Mr. Wettermark:    Mr. Kirkland, the first job

9    offer the railroad gave to you for a railroad job, where was

10   it?

11         A    Like Dearborn, Michigan.

12         Q    Have you written to them additional times asking

13   them to try to find you work near your home?

14         A    Yes, sir, I have.

15         Q    Let me show you Exhibit 54.  Is this a letter I

16   wrote on your behalf to the railroad?

17         A    Yes, sir.  It is.

18         Q    It's dated September 8th, 1999.  Exhibit 54.

19                THE COURT:    I'm sorry, what was the date again?

20                MR. WETTERMARK:    September 8th 1999.  We will

21         offer 54.

22                MR. GARLAND:    No objection.

23                THE COURT:    It's admitted.

24         Q    Mr. Wettermark:    Read that to us.

25         A    "Dear Mr. Maher, thank you for your letter of August

1   31st, 1999.  I have discussed with Mr. Kirkland the offer of

2   the dispatcher jobs in Dearborn, Michigan and/or Atlanta,

3   Georgia.  As Mr. Kirkland has indicated to you in the past,

4   his personal situation is such that he needs to seek

5   employment in his locality.  Does Norfolk Southern have any

6   sedentary or light-duty type jobs in Mr. Kirkland's part of

7   South Carolina?  If so, he would certainly be interested in

8   them.   In the meantime, I am trying to get a functional

9   capacities evaluation for Mr. Kirkland so we can see what he

10  is able to do.  I will forward the results to you. Sincerely,

11  James Wettermark."

12      Q     And you actually went and got a functional

13  capacities evaluation, didn't you?

14      A     Yes, sir, I did.

15      Q     To see what you could do?

16      A     To see what I could do.

17      Q     Did there come a time when the railroad found you a

18  job in your locality?

19      A     Yes, sir, they did.

20      Q     What type of job was it?

21      A     As a dispatcher.

22      Q     Did you go apply for that job?

23      A     Yes, sir, I did.

24      Q     Where did you go to apply for it?

25      A     To the Superintendent's office in Greenville, South

1    Carolina.

2         Q    Let me show you Exhibit Number 61, dated March 20th,

3    2000, to you from Mr. Maher's disability support services.

4         A    Right.

5         Q    This is Exhibit 61.

6              MR. WETTERMARK:    We will offer 61.

7              MR. GARLAND:   No objection.

8              THE COURT:    Admitted.

9         Q    Mr. Wettermark:    Will you read the first

10   paragraph, what happened to that job?

11        A    "Dear Mr. Kirkland.  I understand you met with Mr.

12   Alley to discuss aspects of a dispatcher position.  It is my

13   further understanding you do not medically qualify for a

14   dispatcher position at the present time."

15        Q    Is that the only job that you have been offered in

16   South Carolina?

17        A    Yes, sir.  It is.

18        Q    They have offered you jobs in Atlanta as a clerk?

19        A    Yes, sir.

20        Q    How many times have you asked them or told them that

21   you don't feel in a position to move there because of personal

22   reasons?

23        A    Lots of time.  I said, let me be a clerk in

24   Columbia, or something like that.

25        Q    Let me show you Exhibit Number 62, dated March 24,

1    2000, to Mr. Maher from you.

2        A    Right.

3        Q    Is this a letter you wrote?

4        A    Yes, sir.

5             MR. WETTERMARK:    We'll offer Exhibit 62.

6             MR. GARLAND:    No objection.

7             THE COURT:    Admitted.

8        Q    Mr. Wettermark:    Read that second paragraph to

9    us?

10       A    "Dear Mr. Maher.  As I have indicated to you in my

11   prior conversations and correspondence, I have very strong

12   personal reasons which prevent me from moving from South

13   Carolina to Atlanta, Georgia.  Obviously, the clerk jobs in

14   Atlanta are not much good to me.  As I have indicated, I would

15   be interested in trying to find some work outside the

16   railroad.  Please have your vocational counselors contact me

17   at their earliest convenience.  Thank you, Lester Kirkland."

18       Q    Well, did you -- did you work with some vocational

19   counselors?

20       A    Yes, sir, I do.

21       Q    Who are you working with?

22       A    Ms. Geneva Bookman.

23       Q    Has she been able to find you a job?

24       A    No, sir, not yet.

25       Q    Has she found you -- has she gotten you a list of

1    jobs and places to go apply?

2         A    Yes, sir, she's --

3         Q    Tell us how many places that you can think of that

4    you have gone to apply for work.

5         A    About 14 places, so far.

6         Q    Have any of them hired you?

7         A    No, sir.

8         Q    At some point in time did you go out and find work

9    on your own?

10        A    Yes, sir.  I started, you know, putting out word to

11   my friends and all that I needed a job, that they couldn't

12   find me anything to do.  And I talked to people that run

13   stores in the area and stuff like that, and I finally found a

14   job.

15        Q    What type of job did you find?

16        A    It's with a mortgage company that does refinancing,

17   and I do like, looking up stuff at Courthouses for them, to

18   help them get people's homes refinanced.

19        Q    How much do they pay you?

20        A    $7 an hour.

21        Q    Tell me how much you are working.

22        A    I have got it up now to -- I can get about 25 hours

23   a week.

24        Q    Why can't you do more?

25        A    My back hurts.  I get up and go and I will go to the

1    courthouse -- I live in an area where there is three counties

2    real close to me and I will go and work at one courthouse for

3    a couple or three hours, and my back will start hurting really

4    bad, and so I have to go home and take the Oxycontin and lay

5    down a little bit.  And if it eases off, then I get up, I go

6    back to a different courthouse and get leads for them at that

7    courthouse.

8          Q    Does your boss man allow you to do this?

9          A    Yes, sir.  He's -- it's like an honor system.  He

10    lets me work at my own pace, and -- I mean, he wants me to

11    work as many hours as I can, he needs me to get all I can do

12    for him, but he allows me to try to build up to it.

13          Q    What do you think?  Do you think you can ever make

14    it into a full-time job doing that?

15          A    Yes, sir, I am trying, yes, sir, I think I can.

16          Q    Are you getting any insurance with that job?

17          A    No -- not unless -- I have got to get it up to 40

18    hours to get insurance.  I am trying, because I mean, my

19    insurance will run out this year.

20          Q    Well, do you even know, does the job have insurance,

21    do you know?

22          A    I am not sure.  I don't know if they do the people

23    like me or not, because the other people are like commission,

24    so I don't really know if they --

25          Q    Let me show you, Mr. Kirkland, Plaintiff's Exhibit

1    Number 44.   Are these your W-2 forms that show your earnings

2    while you were still working for the railroad from 1994

3    through 1999?

4         A    Yes, sir.   That's correct, that's right.

5              MR. WETTERMARK:     We will offer Exhibit 44.

6              MR. GARLAND:   No objection.

7              THE COURT:      They're admitted.

8         Q    Mr. Wettermark:      The one thing I wanted to ask

9    you, this 1997, does that represent -- in 1997, did you work a

10   full year or was there a time when you weren't working?

11        A    Yes, sir, there was a 45-day period -- there was a

12   month and a half in '97 that I was not working.

13        Q    So the '97 earnings are based on 10 and a half

14   months?

15        A    That's right.

16        Q    Looks like in 1993 you made $53,000?

17        A    Yes, sir.   That's right.

18        Q    Pretty good money on the railroad?

19        A    Yes, sir, real good.   It's a good career, good

20   insurance.

21        Q    Mr. Kirkland, let me show you Exhibit Number 47.

22   Are these your tax returns from calendar years 1997?

23        A    Yes, sir.

24        Q    Looks like it's '93 through '97?

25        A    Right, joint with Kathy, that's right.

1      Q    Your wife worked as well?

2      A    Yes, sir, she did.

3      Q    So this has both her earnings and your earnings?

4      A    Yes, sir, that's right.

5      MR. WETTERMARK:    We'll offer 47.

6      MR. GARLAND:  No objection.

7      THE COURT:    Admitted.

8      Q   Mr. Wettermark:    Mr. Kirkland --

9      A    That's a bag of clay from W. R. Grace.

10     Q    You got one of the witnesses to stop by there and

11 pick it up?

12     A    Yes, sir.  Got two bags, really, he did.

13     MR. WETTERMARK:    We'll offer this as Exhibit

14 Number 68.

15     MR. GARLAND:  No objection.

16     THE COURT:    It's admitted.

17     Q   Mr. Wettermark:    Mr. Kirkland, when Mr.

18 Williamson was testifying he told us about how you and he kept

19 a calendar, writing down on the calendar all the times that

20 you all had contacted officials trying to get something done

21 about the clay?

22     A    Yes, sir, that's correct.

23     Q    He told us he knows what happened to that calendar,

24 but he wasn't there.  Were you there?

25     A    Yes, sir, I was there.

1       Q.   What happened to the calendar?

2       A   Trainmaster -- Mr. Mass came in one day later, I

3  think Lee left the job on his six months in June, and it was

4  -- got to be like August or September and in walks Mr. Mass,

5  the Trainmaster, and he walks around talking to the crew and

6  stuff.  He looks up on the wall and he sees this calendar

7  where we have been writing -- I took over when Lee quit, and

8  we was writing the officer's names in the little boxes of the

9  dates.  And he turned beet red, he walked over to the calendar

10  and he flipped three or four pages.  And he looked at me, he

11  was red, and he grabbed that calendar off the wall and went

12  out to the car, and got in the car and took off, took the

13  calendar.

14       Q   You have told us that the railroad operates on a

15  seniority system; is that right?

16       A   Yes, sir.  That's correct.

17       Q   The more seniority you have, the more job choices

18  you have?

19       A   That's right.

20       Q   If you were still able to work on the railroad

21  today, what job would you be working?

22       A   Right now I would be working the job closest --

23       MR. GARLAND:  Your Honor, I am going to object to

24      this.  I think this is getting a little far afield asking

25      him to speculate and that sort of thing.  I just don't

1          think that's appropriate.

2               THE COURT:     What do you say, Mr. Wettermark?

3               MR. WETTERMARK:     Let me try to rephrase it just

4          to make sure.

5               Q    Mr. Wettermark:     Are you familiar with the jobs

6          that are available to you with your seniority now?

7               A    Yes, sir, that's correct.

8               Q    And which job, that's available to you, with your

9          seniority, is the closest to your home?

10              A    The Greenwood/Newberry switcher, the job that I was

11         working when I lived in Greenwood before I met Kathy.  And now

12         we're divorced, and it's the closest job to my house, it's

13         like 20 miles to that job.

14              Q    If you were able to work and you had a choice of

15         jobs, which job would you choose?

16              A    I would choose --

17              MR. GARLAND:     Your Honor, I object to that.  I just

18         don't think it's appropriate to let him choose and pick

19         and that sort of thing.  I just don't think that's

20         proper.

21              THE COURT:     What do you say?

22              MR. WETTERMARK:     I mean, I certainly think he is

23         entitled to say which job he would be working if he was

24         able to.

25              THE COURT:     I will overrule the objection.

1        Q    Mr. Wettermark:      Which job would you work?

2        A    If my seniority would let me, I would work the

3   Newberry switcher.

4        Q    Do you know who is working that job now?

5        A    Yes, sir, I do.

6        Q    Who?

7        A    Gary Walls.

8        Q    And does he have more or less seniority than you?

9        A    He has less.

10       Q    If we wanted to find out how much that job pays, is

11   Mr. Walls the person who would know?

12            MR. GARLAND:   Your Honor, I am going to object to

13       that.  I think that's highly inappropriate.

14            MR. WETTERMARK:     I will withdraw the question.

15       That's all I have, Mr. Kirkland.  I think --

16            THE COURT:     Is that all the direct examination?

17            MR. WETTERMARK:    Yes, sir.

18            THE COURT:    Given the time, rather than running

19       the risk of making it a longer day than it already has

20       been, and Mr. Garland feeling rushed, I think it makes

21       more sense for us to take our break for the evening.  And

22       we will resume in the morning at 9:00 o'clock with Mr.

23       Kirkland here on the stand, at which time Mr. Garland

24       will have his opportunity to cross examine Mr. Kirkland.

25       As we break for the day, though -- you know what I'm

1       going to tell you, right?  Don't talk about the case

2       among yourselves as you leave or with anybody at home,

3       your spouse, or any family member.  They are going to

4       want to know what you have been doing today, maybe, you

5       can tell them you have been down here on Jury duty, but

6       don't talk about the case.  We don't want you getting

7       into discussions with somebody else that's not hearing

8       the evidence and not a part of this process, so don't

9       talk about it with anyone as you leave, nor allow anybody

10      that you might see as you leave to talk about it around

11      you this evening, or in the morning as you return.  But

12      if you can be here at 9:00 o'clock in the morning, we

13      will resume with the trial, and we will try to keep

14      things moving along.  And if everyone else will just stay

15      where you are as these Jurors are excused for the evening

16      to be back here in the morning ready to go at 9:00

17      o'clock.

18  HEARING CONCLUDED:  5:10 p.m.

19

20

21

22

23

24

25

```
 1                       CERTIFICATE OF REPORTER

 2    GEORGIA, JONES COUNTY:

 3              I, Julia J. Scarborough, CCR, B-908, CERTIFY that

 4    acting in such capacity on March 19, 2001, I reported the

 5    trial in the above captioned case held before Hon. William

 6    Adams, and on the foregoing pages, numbered 5 through 150,

 7    both inclusive, have transcribed a true and accurate

 8    transcript of the same.

 9              I FURTHER CERTIFY that I am not counsel for nor

10    related to any of the parties; nor am I interested in the

11    event or the outcome thereof.

12              WITNESS my hand and official seal this 30th day of

13    April 2001.

14

15                         _____ CCR
                           Certificate No. B-908
16

17

18

19

20

21

22

23

24

25
```