IN THE STATE COURT OF BIBB COUNTY
STATE OF GEORGIA

LESTER E. KIRKLAND, JR.,            "
        PLAINTIFF
                                    "
VS                                      Civil Action No.
                                    "
NORFOLK SOUTHERN
RAILWAY COMPANY,                    "        45273
        DEFENDANT

COPY

---

TRIAL

held before

HON. WILLIAM P. ADAMS

and a JURY

VOLUME II of III

March 20, 2001
9:00 a.m.
Bibb County Courthouse
Macon, Georgia

REPORTED BY:  Julia J. Scarborough

---

HAWTHORNE & WEBB COURT REPORTING
P.O. Box 539
Macon, Georgia 31202-0539
(478) 746-2295 & (478) 477-9356

1    APPEARANCES:

2    FOR PLAINTIFF:              JAMES H. WETTERMARK, of
                                Burge & Wettermark
3                               2300 SouthTrust Tower
                                420 North 20th Street
4                               Birmingham, Alabama  35203

5                               FRANK H. CHILDS, JR., of
                                Groover & Childs
6                               165 First Street
                                Macon, Georgia  31201
7

     FOR DEFENDANT:             BENJAMIN M. GARLAND, of
8                               Hall, Bloch, Garland & Meyer
                                Suite 1500, 577 Mulberry Street
9                               Macon, Georgia  31201

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                                    INDEX

3                                ------------

4                            VOLUME II of III

5

6      **WITNESSES FOR THE PLAINTIFF:**

7          Lester Kirkland. . . . . . Cross/Garland          6

8                                    Redirect/Wettermark     45

9                                    Recross/Garland         47

10         Dr. Richard Eisenberg. . . (VIDEO DEPOSITION)     48

11         Christopher Sharpe . . . . Direct/Wettermark      49

12                                    Cross/Garland          64

13                                    Redirect/Wettermark    68

14         Dr. Richard Eisenberg. . . (VIDEO DEPOSITION)     70

15         Thomas Conley. . . . . . . Direct/Wettermark      71

16                                    Cross/Garland          80

17         Dr. John Martin Downey . . (VIDEO DEPOSITION)     92

18         James Edward King. . . . . Direct/Wettermark      92

19                                    Cross/Garland          98

20                                    Redirect/Wettermark    101

21         Dr. Franklin Epstein . . . (VIDEO DEPOSITION)     102

22         Gary Walls . . . . . . . . Direct/Wettermark      102

23                                    Cross/Garland          105

24                                    Redirect/Wettermark    106

25                                    Recross/Garland        107

1       Dr. Wendell Duncan . . . . . Direct/Wettermark     109

2                                        Cross/Garland     118

3                                        Redirect/Wettermark     121

4       Dr. Fred Johnson . . . . . . Direct/Wettermark     121

5                                        Cross/Garland     138

6                                        Redirect/Wettermark     148

7                                        Recross/Garland     150

8   **WITNESSES FOR THE DEFENDANT:**

9       John Chapman . . . . . . . . Direct/Garland     152

10                                      Cross/Wettermark     176

11      Michael Maher. . . . . . . . Direct/Garland     201

12                                      Cross/Wettermark     211

13                                      Redirect/Garland     220

14                                      Recross/Wettermark     221

15                                      Redirect/Garland     221

16

17

18

19

20

21

22

23

24

25

1

2                                     **EXHIBITS**

3

4        Defendant's Ex. Nos. 3 - 5     (Tendered and admitted). . 13

5        Defendant's Ex. No.   12       (Tendered and admitted). . 83

6        Defendant's Ex. No.   14       (Tendered and admitted). . 83

7        Defendant's Ex. No.   20       (Tendered and admitted). . 83

8        Defendant's Ex. No    24       (Tendered and admitted). . 83

9        Defendant's Ex. No.   26       (Tendered and admitted). . 83

10       Defendant's Ex. No.   29       (Tendered and admitted). . 83

11

12

13

14       Plaintiff's Ex. Nos. 36 - 40 (Tendered and admitted). . 48

15

16

17

18

19

20

21

22

23

24

25

1                           LESTER KIRKLAND

2                        Witness having been first

3                        duly sworn, testified on

4                           CROSS EXAMINATION

5        BY MR. GARLAND:

6            Q    Good morning, Mr. Kirkland.

7            A    Good morning, Mr. Garland.

8            Q    Let me ask you a few questions, please.  You

9        testified you live in -- is it Cross Hill, South Carolina?

10           A    Yes, sir.

11           Q    Is there a lake there?

12           A    Yes, sir, there is a lake there.

13           Q    You live on the lake?

14           A    Yes, sir.

15           Q    What is the name of that lake?

16           A    Lake Greenwood.

17           Q    How far is it from Columbia?

18           A    About 60 -- 60 miles, 65 miles.

19           Q    Now, I understand you live there by yourself?

20           A    Yes, sir.

21           Q    You mentioned yesterday that you are divorced?

22           A    Yes, sir.

23           Q    The ex-wife that took the pictures; is that right?

24           A    Yes, sir.

25           Q    What is her occupation?

1       MR. WETTERMARK:     Objection, Your Honor, what

2   relevance does that have?

3       THE COURT:     I don't know.  Does it have any

4   relevance?

5       MR. GARLAND:    I don't know.  I am asking him what

6   his occupation is, I think that's a --

7       MR. WETTERMARK:     I object.  His ex-wife's

8   occupation is irrelevant.

9       MR. GARLAND:    I don't know if she is a photographer

10  or what she is, but I --

11      THE COURT:     You can ask if she is a photographer.

12      MR. GARLAND:    I think I have got him on cross

13  examination, Your Honor, and I feel like that's an issue

14  that -- they have got evidences of tax returns that they

15  put in, I don't think it makes much sense without talking

16  about that.  They are their exhibits, they are not mine.

17      THE COURT:     Does that reflect the ex-wife's

18  income?  I don't know, I haven't looked at the tax

19  returns.

20      MR. WETTERMARK:     His ex-wife's job is irrelevant

21  to this case.  It's about this gentleman.

22      THE COURT:     Does the jury already have

23  information in effect through those tax returns about her

24  income?

25      MR. GARLAND:    I imagine they will, Your Honor, he

1          suggested --

2                   THE COURT:     They were admitted.

3                   MR. WETTERMARK:     Yes, sir.  The tax returns are

4          in.

5                   THE COURT:     I will overrule this objection, but I

6          don't think much inquiry beyond that would be

7          appropriate.

8                   MR. GARLAND:   Yes, sir.

9          Q    Mr. Garland:    What is and was her occupation,

10         please, sir?

11         A    She is an investment broker.

12         Q    Where is her office?

13         A    In Aiken, South Carolina.

14         Q    How far is Aiken from the lake there where you

15         live?

16         A    About 52 miles.

17         Q    Now, she had a daughter; is that correct, when you

18         got married?

19         A    Yes, sir, that's right.

20         Q    The daughter lived with her?

21         A    Yes, sir.

22         Q    Now, was that your first marriage?

23         A    No, sir.

24         Q    You had been married in fact twice before; is that

25         correct?

1          MR. WETTERMARK:    Again, Judge, what relevance

2    does that have to this case?  I'm sorry, objection,

3    that's irrelevant.

4          MR. GARLAND:    Your Honor, I think -- we can explore

5    this man's background, where he lives, that sort of

6    thing.  I think that's just a question that I have got a

7    right on cross examination to ask.

8          THE COURT:    Well, I mean, you inquired about his

9    education, his employment history, I think his marital

10    back -- I will overrule the objection.

11     A   The Witness:  I'm sorry, what was the question?

12     Q   So you have been married and divorced three times;

13   is that correct?

14     A   Yes, sir.

15     Q   Now, you graduated from Greenville High School; is

16   that right?

17     A   Southside.

18     Q   What year was that?

19     A   '73, '74, somewhere in there.

20     Q   Now, you mentioned your father worked for Norfolk

21   Southern Railroad; is that correct?

22     A   Yes, sir.

23     Q   Is he retired?

24     A   Yes, sir.

25     Q   What is the nature of his retirement?

1       A    I don't understand the question.  He is 71.

2       Q    Well, did he -- what age was he when he retired?

3       A    56.

4       Q    What was the nature of the retirement?

5            MR. WETTERMARK:    Objection, Your Honor,

6       irrelevant.

7            MR. GARLAND:   Well, I don't know until he answers,

8       Your Honor, but I think it's relevant to the case.

9            THE COURT:    Well, I will sustain that objection.

10       Q   Mr. Garland:   Now, what was your first job

11      assignment with the railroad?

12       A    As a trainman.

13       Q    First job assignment with the railroad?

14       A    It was an Air Wood local in Charlotte, North

15      Carolina.

16       Q    Did you then move up to Charlotte, North Carolina?

17       A    Yes, sir.  I rented an apartment.

18       Q    How long were you in that position in Charlotte,

19      North Carolina?

20       A    A little over a year.  My dad came up there and

21      worked with me.

22       Q    And then did you move back down to where?

23       A    Back to Greenville.

24       Q    Now, you were then -- you worked a while and were

25      promoted to conductor; is that correct?

 1        A    Yes, sir, that's correct.

 2        Q    And for a while, I believe, you testified you worked

 3    in the office as a dispatcher; is that right?

 4        A    Yes, sir.  That's correct.

 5        Q    What office was that where you were the dispatcher?

 6        A    In Greenville.

 7        Q    Now, it's true, isn't it, that the conductor really

 8    supervises the switching of the cars at the industry; is that

 9    one of the functions of a conductor?

10        A    Yes, sir, that's correct.

11        Q    You are familiar, are you not, with the safety

12    rules, the little booklets?

13        A    Yes, sir.

14        Q    Are you familiar with the specific rules that apply

15    to conductors?

16        A    Yes, sir.

17        Q    Are there certain rules that apply to everyone,

18    certain safety rules?

19        A    Yes, sir.

20        Q    Look at Exhibit 4.

21             MR. GARLAND:    May I approach the witness?

22             THE COURT:    Yes, sir.

23        Q    **Mr. Garland:**    Does that appear to be a copy of

24    Safety Rule "M" from the Safety Rule Book?

25        A    Yes, sir.

1      Q      Read, if you will, please, the second paragraph of

2    that rule.

3      A      It says, "employees must not do any work in a manner

4    that will jeopardize their own safety or the safety of others.

5      They must know that appliances, tools, supplies, and

6    facilities used in performing their duties are in proper

7    condition.  If not, they must have them put in order before

8    using them.  It is the duty of every employee to examine them

9    to determine their condition."

10     Q      Thank you.  And did you understand that that's a

11   rule that applies to all railroad employees, safety rule; is

12   that correct?

13     A      Yes, sir.

14     Q      Conductors and everybody?

15     A      Yes, sir.  Everyone.

16     Q      Now, look, if you will, please, at Rule 581, Exhibit

17   5?  Are you familiar with Rule 581?

18     A      Yes, sir.

19     Q      Would you please read the rule as to what it says

20   about conductors?

21     A      "Conductors have charge of trains to which they are

22   signed, and of all employees thereon.  They are responsible

23   for safe and proper management of their trains for protection

24   and care of passengers and property for performance of duty by

25   train employees, and for observance and enforcement of all

1    rules and instructions."

2        Q    And that rule connects with the evidence you have

3    already testified to, that the conductor is the person on that

4    train with that crew in charge of the train?

5        A    Yes, sir, I am in charge of the train.

6        Q    Now, look, please, if you will, at Exhibit 3, which

7    is Rule 586, are you familiar with 586?

8        A    Yes, sir.

9        Q    And please read that rule.

10       A    "Conductors must, if possible, remedy defects in

11   their equipment and must remove from the consist any cars that

12   are unsafe to run.  They must report all defective brakes,

13   hotboxes or other defects, as well as repairs made between

14   terminals.  They must comply with instructions for reporting

15   materials applied to cars and disposition of defective parts."

16       Q    Thank you.

17           MR. GARLAND:    I move for admission of Defendant's

18       Exhibits 3, 4, and 5.

19           MR. WETTERMARK:       No objection.

20           THE COURT:      They're admitted.

21       Q    Mr. Garland:    Mr. Kirkland, prior to this injury in

22   '98, had you ever been in any automobile accidents or

23   collisions or anything like that prior to that time?

24       A    Yes, sir.

25       Q    And was one an automobile accident around 1990

1   involving really three cars?

2        A    Yes, sir.

3        Q    And were you, as a result of that accident, admitted

4   to the emergency room at Greenwood Hospital?

5        A    Yes, sir.

6        Q    And you were treated for injuries, neck injuries; is

7   that correct?

8        A    Yes, sir, whiplash type.

9        Q    And had to wear a collar and so forth for a while?

10       A    Yes, sir.

11       Q    Now, there was another accident automobile at about

12  that same time; is that right, shortly after that?

13       A    Before.

14       Q    Before that, all right.  Was that where a lady ran

15  into your car at an intersection?

16       A    Yes, sir.  She hit me in the side door.

17       Q    Driver's side door; is that correct?

18       A    Right.

19       Q    Now, the job as conductor you had in January of

20  1998; is that the same job and the same route that you had

21  been working for eight or nine years before that time?

22       A    Yes, sir, most of time, yes, sir.

23       Q    Did you ever request during that eight or nine year

24  period to be transferred to another route or another conductor

25  job?

1          A    I didn't request, but you would periodically get
2     pulled, you know, that's what your senior -- you could get
3     pulled any time, and then you would have to go somewhere
4     else.
5          Q    Did you pull anybody else during those seven or
6     eight years, eight or nine?
7          A    Yes, sir.  I was pulled off the Aiken local myself.
8          Q    Didn't you pull somebody else somewhere else?
9          A    I went back to Newberry job.
10         Q    And how long did you work there?
11         A    About six months.
12         Q    And then you pulled somebody else to get back to
13    Aiken; is that right?
14         A    Right, to get back to my wife; that's right.
15         Q    So as I understand what you just said, you were
16    pulled and you went to the Newberry job for six or eight
17    months?
18         A    Yes, sir.  There's always a lot of moving around.
19         Q    And then you pulled somebody else to get back to
20    the Aiken job where you were in January of '98; is that
21    correct?
22         A    Yes, sir, when somebody younger than me got on it.
23         Q    What other industries does the Aiken run pick up
24    from and leave off of, other than the Grace and Company?
25         A    A bunch.  About 14 industries, I think it is, that

1   Aiken local switches.

2        Q    Can you tell us what they are?

3        A    Yes, sir.  Out at the three clay mines are W. R.

4   Grace, Kentucky-Tennessee, Southeastern Clay, then you go in

5   the other direction, and it's Florida Steel, Owens-Corning, a

6   fiberglass company.

7        Q    What do you pick up there at Owens?

8        A    Owens Corning, you take them loads, it's a reverse

9   of W. R. Grace.  You take Owens Corning loads of material that

10  they use to make fiberglass, and then you pull out their empty

11  cars.

12       Q    Okay.

13       A    So Owens-Corning and Florida Steel; and then there's

14  a metal service place that gets metal; there's another clay

15  mine, J. M. Huber, that gets tank cars, they load clay; then

16  there's a fiberglass place in Trenton, I can't think of the

17  name of it, but there's another fiberglass place, a small one;

18  then there's Graniteville Company.

19       Q    What do you move out of or into Graniteville?

20       A    You move coal cars from -- they must still run off

21  of coal, and then caustic soda tanks that I think they use to

22  dye, to color blue jeans and stuff.  And then we have two more

23  clay mines down there.  We have Dixie Clay at Bath and then we

24  have Langley, it used to be called J. M. Huber-Langley, and I

25  don't know what it's called now.  And since I have gotten hurt

1    there's a big Bridgestone tire plant been added down there, I

2    think.  That's all I can think of from memory.

3            Q    Does the kaolin belt kind of run from South Carolina

4    on down into Georgia where the kaolin is mined from; do you

5    know that?

6            A    Yes, sir, there is a lot of clay mines.

7            Q    Have you ever been out to those clay mines?

8            A    I don't understand the question.

9            Q    Have you ever been to a clay mine?

10           A    No, sir, just the loading facilities on the train.

11           Q    Do you know how the kaolin gets from the kaolin mine

12   into the loading facility?

13           A    No, sir.

14           Q    Do you know if it is on your train or trucks, or do

15   you have any idea how it comes in?

16           A    It's not on my train.  I don't know -- I don't know

17   if the other plants have it trucked in or trained in or if

18   they actually mine it right there.  I don't really understand

19   the mining part of it.

20           Q    Have you ever been behind those trucks loaded with

21   kaolin as they are coming down the road?

22           A    I haven't.  I mean, I have never seen them.  That's

23   what we were talking about, I have never seen them coming into

24   the plant.

25           Q    Now, is it correct that when it rains and the kaolin

17

1    is wet it's slippery; is that correct?

2         A    Yes, sir.

3         Q    Have you had occasion when new people come to work

4    that job to tell them anything about the kaolin, and if so,

5    what do you tell them?

6         A    I tell the new people that come, you know, we are

7    having a lot of trouble with the Grace plant, and it's real

8    dangerous.  And I tell them to be -- you know, be careful, and

9    I try to let them stay up at the switch.  And I have more

10   experience, so I go down there and try to mess with it.

11        Q    The walkway; is it a solid face or is it kind of

12   like that egg carton effect, that walkway that you are on when

13   you turn the wheel?

14        A    It has little perforations in it.

15        Q    Is that where the water and all drips through?

16        A    Yes, sir.  I guess that's what it's for.

17        Q    Is it also where you are more stable on that than

18   just a solid surface?

19        A    You are stable when it's dry, and you know, and

20   clean, but you are not stable when it's got the clay on it.

21        Q    The little eggshell carton things kind of stick up;

22   is that right?

23        A    Yes, sir.

24        Q    Do you know what a car handling report is?

25        A    Yes, sir.

1      Q    Tell the jury what that is.

2      A    If I have got the right one, it's like a -- you

3   know, what cars you have handled that day and stuff and --

4   used to call it like a train and handle delay, and --

5      Q    Is it also -- is there a procedure within the

6   company where if you encounter an unsafe condition you fill

7   out a report or a form about it?

8      A    Yes, sir, they have had those.

9      Q    Is that the same form or is that another form?

10     A    I am not really sure.

11     Q    You have filled those out, have you not, from time

12   to time?

13     A    Oh, yes, sir.  Like a -- for switches, and stuff

14   like that that need repair.

15     Q    How about for cars?

16     A    For cars --

17     Q    I am asking you now about the car handling report.

18   Have you filled some of those out that relate to cars?

19     A    No, sir.  Usually I just report them to the

20   officers, you know, and -- now if it's a bad order brake or

21   something, you know, I will call Augusta shop and talk to them

22   and find out where to actually set the car so they can come

23   and repair that car.

24     Q    If you encounter an unsafe condition, you fill out

25   one of those forms to make a report of that, do you not, sir?

1        A    Yes, sir.

2        Q    And is that the same form we are talking about, or

3    is that another form?

4        A    I think it's the same form.

5        Q    And you have done that before, haven't you?

6        A    Yes, sir.

7        Q    Now, to your knowledge, Mr. Kirkland, before you

8    slipped in January of '98 and was injured, to your knowledge,

9    has anyone else, any other railroad employee, ever gotten hurt

10   slipping off a car at the Grace place before?

11       A    Yes, sir.

12       Q    When did you -- do you recall giving a deposition in

13   this case?

14       A    Yes, sir.

15       Q    Where you were under oath?

16       A    Yes, sir.

17       Q    Do you recall asking -- let me just show you.

18            MR. GARLAND:    May I approach the witness?

19            THE COURT:    Yes, sir, you may.

20       Q    Mr. Garland:    Specifically, Mr. Kirkland, do you

21   recall back in January of '99, two years ago, January 13,

22   '99 --

23       A    Yes, sir.

24       Q    -- giving a deposition here in Macon, Georgia?

25       A    Right.

1     Q    Before a court reporter?

2     A    Yes, sir.

3     Q    Sworn to tell the truth?

4     A    Yes, sir.

5     Q    Do you remember that question that I asked you --

6 and let me read the question, it's page 58, line 20.  The

7 question was:  "To your knowledge, has anybody ever gotten

8 hurt before January 23rd".  And what was your answer?

9     A    I said, "I think, I am just not sure".

10    Q    All right.  Is that correct?  Are you not sure or --

11 what is the correct answer to that?

12    A    Well, if I am understanding it correctly, you know,

13 I can name names of people that have fallen there, and I can

14 name names of people that have been injured, you know, on

15 those cars.

16    Q    And how did that knowledge come to you now that you

17 didn't have two years ago, because that's -- two years ago,

18 when you were asked the question, you said you didn't know of

19 any.

20    A    I said I wasn't -- I said, I think, I am not sure.

21 I just was nervous, that was my first ever deposition.

22    Q    Now, how exactly do the employees at W. R. Grace and

23 Company blow this excess dust and powder kaolin off of the

24 cars?  What do they use to do that with?

25    A    Well, you had it wrong.  You were explaining that it

1    was like a car wash type --

2         Q    You tell us how it is.

3         A         -- to where -- that it was like the cars would go

4    under, like a car wash, and it would just blow it off, and the

5    car would come out clean, but that's not how it's done.  It's

6    -- there is like a thing -- they have to hook up the little

7    air hoses, and they have a wand, and they will get up on the

8    car and they will hook up their safety harnesses, and it takes

9    a good deal of time, and they have to manually blow it off,

10   and then you get it off the top, it gets -- and then they have

11   to get down and get it all off the grab irons, and then they

12   go to the next car.  It's not just like a car wash part where

13   you follow through there.

14        Q    You say they, who is this that is doing this?

15        A    That's W. R. Grace's job.

16        Q    Those are the Grace employees that do it, those are

17   not the railroad employees, are they?

18        A    No, sir, that's the Grace employees.

19        Q    Is there a certain employee that has that as his

20   job, or do you know, or is it a different one every time?

21        A    It's different ones, and different -- they always

22   put it on a different shift.  They always say, that's third

23   shift, that's second shift.

24        Q    Now, Mr. David Woods is who?

25        A    He was -- we kind of called him the plant manager, I

1   didn't know his exact title.  But there were little shift

2   managers like Mark and Ricky and Charles, and then David Wood

3   sat in a big office and he was over them.

4        Q    Is Mr. David Wood; he is a Grace and Company

5   manager; is that right?

6        A    Yes, sir.

7        Q    Now, is he the main man you complain to about the

8   kaolin situation?

9        A    Yes, sir, I would complain to the little ones --

10       Q    Mark and -- yes.

11       A    -- and then I would go -- the main one was David

12  Wood.

13       Q    And when you complained to him did it get better for

14  a period of time after you had had one of those meetings with

15  him?

16       A    Sometime it would, yes, sir.  He would talk to them

17  and get them to blow it off, or I would go in there mad and

18  tell him I wasn't pulling the cars.  And then he would make a

19  phone call to Mr. Mass, and say Mr. Mass wants to talk to you.

20       Q    Have there been occasions when you felt they didn't

21  blow the kaolin off properly and you called it to their

22  attention and they came out and blew it off some more before

23  you left; had that happened?

24       A    Yes, sir.  There were days that I would pitch a fit,

25  and I guess he couldn't find Mr. Mass to make me pull the

1    cars, and he would come out there, and if it was one or two,

2    you know, he would blow it off a little bit.

3         Q    And it's never been a case, has it, when you went to

4    Mr. David Woods and said, you know, they didn't do a very good

5    job on this car, I need them to blow it a little more that he

6    refused to let them blow it a little more, did he?

7         A    Yes, sir, there was cases of that.

8         Q    What would he say?

9         A    He would say, I will take care of it, and he would

10   walk off, like he did on Monday the 26th.

11        Q    I'm asking, you know, about Mr. David Wood, the

12   manager at Grace and Company?

13        A    Yes, sir.

14        Q    You testified sometimes you would complain to him

15   before you pulled the cars off and he would send a fellow back

16   and let him blow it some more; is that right?

17        A    Yes, sir.

18        Q    But then you are saying now sometimes you would

19   complain and he wouldn't do that?

20        A    Yes, sir.  Sometimes I would complain and he

21   wouldn't blow the cars off.

22        Q    Did he give you any reason?

23        A    No, sir.

24        Q    When it was raining did it do any good to blow it

25   off again?

1        A     I don't know about that.  I mean, I am sure it would

2    get some of it.  It might help to sweep it.

3        Q     Did you ever yourself get up there and kind of sweep

4    it off yourself; you ever do that?

5        A     No, sir.

6        Q     Did you ever ask the Grace and Company employees

7    that it's now blowing off good, it's wet, to come with a

8    little broom and sweep it?  Did you ever ask them to do that?

9        A     I didn't know how they could get it off.  I did tell

10   them, I said, it needs to get off.

11       Q     If you don't know how they could get it off, how do

12   you think they could if it was raining and wet?  Is it any way

13   that you know of?

14       A     Well, I'm sure they could get it off some kind of

15   way, it's just not my job to -- I didn't work for W. R. Grace

16   plant.

17       Q     Did you ever meet with Mr. Wood and say, Mr. Wood,

18   why don't you get a little broom up there?  Did you ever ask

19   him to do that?

20       A     Yes, sir.  We made several -- lots of suggestions.

21       Q     Did he follow up with a broom?

22       A     We never did make the suggestion with the broom.  I

23   said we made plant suggestions.  I didn't ever make a broom

24   suggestion.

25       Q     Is it true that when it wasn't wet, and when they

1    didn't do a very good job of blowing it off, when you left the

2    plant it would blow off as it travelled down the track?

3        A    A lot of it would blow off, some of it -- and it

4    would be a big cloud.  We would come around a curve and cars

5    would back up, they would roll their windows up, see us

6    coming, and it would be just a big cloud.

7        Q    You have never been behind a truck, though, with

8    kaolin, you talked about, and seen the -- blow off of that

9    truck, have you?

10       A    No, sir, not like that.  I think -- I don't know if

11   they are enclosed or how the clay gets there.  I have never

12   ridden down the road and seen it like that, I mean, from

13   following us.

14       Q    You testified yesterday that when you go in to pick

15   the full cars up you didn't have to get up on them, you just

16   pull them off; is that right, and then you get up on them to

17   release the break when you get wherever they are going; is

18   that right?

19       A    Right.  You know, sometimes you would have to get

20   up, it's according to -- like if every car was loaded -- see

21   there might be 15 cars in the plant, and if they were

22   shipping them all, then you might have to get up on some of

23   them.  They wouldn't have -- lot of times they wouldn't have

24   brakes on any.

25       Q    And what you were talking about yesterday --

1     A     But you would have to couple them and couple the

2 hoses.

3     Q     Well, specifically on the 23rd and the 26th is when

4 you made that statement yesterday; isn't that right?

5     A     Right.  On the 26th I had to get up on those cars.

6     Q     When you got to the other end, isn't that what you

7 said?

8     A     If I understand the question, the seven loads that I

9 pulled on Monday, the 26th, that I asked Mr. Chapman could I

10 leave and I asked Mr. Woods could I leave, when they told me I

11 had to switch those cars I had to get up on those cars to get

12 the brakes off.  I didn't want to, but I had to.

13     Q     Was that -- when you made that little slip, was that

14 there at Grace and Company or was that at Warren?

15     A     No, sir.  It was back at Aiken -- at Aiken Depot.

16     Q     But you didn't testify yesterday that you didn't

17 have to get up, you were able to just couple them and take

18 off; do you remember that testimony yesterday?

19     A     Yes, sir.  I remembered it as the three cars on

20 Friday.

21     Q     But it's different you say on Monday?

22     A     Yes, sir, because there was -- like a bunch of loads

23 on Friday, and I don't remember getting up on the cars on

24 Friday.  I may have, but they might have been in the middle of

25 the cut.

1     Q   So when you were talking to us yesterday about just

2    being able to couple it up and not having to get on it until

3    you got down the road, you were just talking about Friday; is

4    that what you are telling us, or do you remember which day it

5    was?

6     A   I know I had to get on the cars on Monday because

7    they were shipping like all of the loads, so I had to get on

8    those loads.  They had loaded all weekend, and they were out

9    of empties and we took them more empties.  On Fridays they

10   will have a lot of cars out there, and I may or may not have

11   had to get on those cars.  I don't remember -- we try not to

12   get on them if we don't have to.

13    Q   So you are really not sure whether you got on them

14   or not; is that what you are telling us now?

15    A   Well, I'm pretty sure I didn't get on them because

16   the way I worked the plant.  I try to keep them set up next to

17   my empties, and I don't get on them unless I have to.

18    Q   And you can't really remember one way or the other

19   now; is that correct?

20    A   No, I really can't.

21    Q   You will recall what you testified to yesterday, and

22   the jury will.  But let me ask you something else, the report

23   that you wrote yesterday, which is already in evidence, where

24   was that written?  Was it written back at the Aiken depot or

25   where did you write that report on Friday the 23rd?

1       A    They had me write that report that Friday night, I

2   believe, when Mr. Burgess, the superintendent, assistant

3   superintendent got down here.  And he said just do the best

4   you could.

5       Q    Mr. Kirkland, on either Friday the 23rd -- well, let

6   me ask you about Friday the 23 before the first question.  Did

7   you ever ask Mr. Chapman or any of the other railroad people

8   to take you to a doctor that day?

9       A    No, sir, I didn't ask them.

10      Q    On Monday, the 26th, did you ever ask Mr. Chapman or

11  any of the railroad people to take you to a doctor that day

12  and they refused?

13      A    Can I answer --

14      Q    No, sir.  I would like for you to answer, and then

15  of course you can explain.  But my question is, did you ever

16  on Monday ask Mr. Chapman to take you to the doctor, yes or

17  no?

18      A    No, sir.  I didn't.

19      Q    Now, when did you see a doctor for the first time;

20  was it on Tuesday morning, the 27th?

21      A    Yes, sir.  Can I explain or you don't want me to?

22      Q    Who took you to the doctor on Tuesday?

23      A    Mr. Roberson, the Superintendent of Terminals and

24  Trainmaster, Mr. Chapman.

25      Q    Was Mr. Roberson there as part of the group that

1    came out on Friday and did the investigation?

2         A    Yes, sir.

3         Q    Was he there again on Monday?

4         A    No, sir, he was not there on Monday.

5         Q    He was there Tuesday?

6         A    He was in Columbia, and Mr. Chapman came and got me.

7         Q    And Mr. Roberson's title is what?

8         A    Superintendent of Terminals.

9         Q    Who is Mr. Michael Maher with the Norfolk Southern

10   Railroad?

11        A    I have never met him.  He is the -- like Roanoke, or

12   he is in Virginia.  He is like head of the Rehabilitation

13   Department.

14        Q    Now, he is the same gentleman that yesterday

15   afternoon you read us parts of letters that you had written to

16   him; is that correct?

17        A    Yes, sir.  He writes back and forth.

18        Q    Oh, he would write you as well; is that correct?

19        A    Yes, sir.

20        Q    Do you know what -- he is the fellow, isn't he, that

21   tries to get you back to work with the railroad?

22        A    Yes, sir.

23             MR. GARLAND:   May I approach the witness, Your

24        Honor?

25             THE COURT:   Yes, sir.

1        Q   Mr. Garland:   Let me show you now some letters that

2    -- let me see if you can identify these.  Do you recall

3    getting a letter -- Defendant's Exhibit 12, addressed to you

4    from Mr. Maher dated March 19 of 1999?

5        A    Yes, sir.

6        Q    Now, does it say in the second paragraph, "although

7    we have not heard from you, I want to again offer you the

8    opportunity to enter Norfolk Southern's Rehabilitation Program

9    as related to you in prior correspondence.  There are numerous

10   services we can offer you, the Medical Management Services,

11   and the assignment of a registered nurse to work with you

12   could be especially helpful."  Do you remember that?

13       A    Yes, sir.

14       Q    Do you recall -- did you respond to that letter or

15   do you know?

16       A    Yes, sir.  I remember talking to him on the phone

17   initially, and then I got into the program.  I don't remember

18   the exact dates of entry.

19       Q    Those railroad letters that you introduced

20   yesterday, those are the letters that you wrote to him; is

21   that right, Mr. Maher?

22       A    Yes, sir.

23       Q    Look at this letter, this is dated April 22, '99,

24   Defendant's Exhibit 14, a letter addressed to you by -- or

25   from Mr. Maher; is that right?

1     A    Right.  Yes, sir.  I remember now.

2     Q    Now, look at the last paragraph on that first page

3 of that letter, and does it say, "if there are no railway

4 company jobs available with any reasonable distance from your

5 home, I will gladly provide you with the services of an

6 outside vocational counselor"; is that what that says?

7     A    Yes, sir.

8     Q    Did you request that they provide you at some point

9 with an outside vocational counselor?

10    A    Yes, sir.

11    Q    Did they do that?

12    A    Yes, sir.

13    Q    Who was the outside vocational counselor?

14    A    Ms. Geneva Bookman with GENEX.

15    Q    She is not a railroad employee; is she?

16    A    No, sir.

17    Q    And you met with her on a monthly basis; is that

18 right?

19    A    Yes, lots of time.

20    Q    Would she write letters to you and you would write

21 letters back to her?

22    A    Yes, sir.  Mostly she would call me on the phone.

23 It was not a lot of mail.

24    Q    Now, let me show you Defendant's Exhibit 24, a

25 letter of March 20th, 2000, about a year ago.  Do you remember

1    getting that letter from Mr. Michael Maher?

2         A    Yes, sir.

3         Q    Let me ask you to refer, please, to the second

4    paragraph of that letter.  Is this what it says to you,

5     "Norfolk Southern's Medical Department informed me that you

6    are medically qualified to return to an alternative clerical

7    position within the company"; is that what that says?

8         A    Yes, sir.

9         Q    And it says, "there are currently 11 clerical

10   vacancies in the centralized yard office in Atlanta, Georgia;

11   is that what it says?

12        A    Yes, sir.

13        Q    Did you write back four days later, on March 24th,

14   this letter to Mr. Maher, which is Defendant's Exhibit 25, is

15   that your response to that letter?

16        A    Yes, sir.

17        Q    And you thanked him for the letter; is that right?

18        A    Right.  I didn't put in there about the typing,

19   but --

20        Q    These are your letters that we are looking at now,

21   Number 20?

22        A    Right.

23        Q    What does the second paragraph of your letter say?

24        A    It says, "as I have indicated to you in my prior

25   conversation and correspondence, I have very strong personal

1   reasons which prevent me from moving from South Carolina to

2   Atlanta, Georgia.  Obviously the clerk jobs in Atlanta are not

3   much good to me."

4        Q    And you got -- do you recall his letter as dated

5   March 20th, do you remember when you got it, the next day or

6   so after that, you suspect?

7        A    The mail -- I don't remember exactly.

8        Q    It takes a few days, I guess, to get down there?

9        A    Yes, sir.  Down where I'm at.

10       Q    Then your letter is dated March 24th, so you wrote

11   him back pretty quickly on that, didn't you?

12       A    Yes, sir.

13       Q    Now, look at this letter --

14       A    It says certified mail, I guess that might have came

15   quick, I don't know.

16       Q    Look at Defendant's Exhibit 26, please, sir.  Now,

17   is that a letter to your attorney copied to you from Mr. Maher

18   dated April 6, 2000?

19       A    Right.

20       Q    And does that say that you had requested the

21   services of a vocational counselor, and that you are going to

22   engage the GENEX Company to provide vocational assistance to

23   you; is that right?

24       A    Yes, sir.

25       Q    That was the notice that you received?

1     A    Right.

2     Q    When, after April 6 -- was it just a month or so

3  after April 6, 2000 that you started working with Ms. Bookman

4  from GENEX?

5     A    It wasn't long.  I mean, I called the numbers and

6  everything that they gave me, and I got in touch with her as

7  soon as I could.

8     Q    Now look at Exhibit 29, which appears to be a letter

9  of January of 2001, just a couple of months ago, written to

10  you by Mr. Maher; do you recall that letter?

11     A    Yes, sir.  I didn't understand some of it.

12     Q    Does the third paragraph say that it is his

13  understanding that you indicated to Ms. Bookman that you were

14  unable to return to a full-time job; is that right?

15     A    I never said that.

16     Q    Did you ever tell Ms. Bookman that you could only do

17  about 20 hours a week, and that was about all you could --

18     A    I told -- I was always honest with Ms. Bookman.  I

19  told her all my treatments, the shots that I was taking and

20  the medicine that I was having to take.  And I said, you know,

21  right now I am working like 20 hours a week.  And she said,

22  well, do you think you are going to be able to get it up to

23  full time.  And I said, I think so, I'm trying hard.

24     Q    When did you make that statement to her, it's been

25  since January of 2001, hasn't it?

1      A     I have been honest with her up front.

2      Q     I understand.  When did you make the statement to

3  her that you would be willing to accept full time employment,

4  Mr. Kirkland?

5      A     I told -- I have applied for full time.  I have

6  applied for every job that she has sent me to apply for.

7      Q     But when did you tell her that you would be willing

8  to accept full time employment; when was that?  When did you

9  make that statement to Ms. Bookman?

10     A     I don't understand the question.  I never told her I

11 wouldn't.  I don't understand the question.

12     Q     Is it your testimony that you have never told Ms.

13 Bookman that you could only do about 20 hours a week and you

14 couldn't accept the other jobs because they were full-time

15 jobs, you never told her that at all, anytime?

16     A     No, sir, I have been applying.  I have 13 in my

17 pocket that I have applied for.

18     Q     All right.  Look at Defendant's Exhibit 34; is that

19 a letter from January 18th, 2001, from Ms. Bookman to you?

20     A     Yes, sir.

21     Q     Does it list certain job openings that are

22 available?

23     A     Yes, sir.

24     Q     Did you respond to Ms. Bookman after receiving this

25 letter?

1      A    Yes, sir.

2      Q    How did you respond?

3      A    By letter.

4      Q    Do you have that letter?

5      A    Yes, sir.  I have got two more letters from her

6    since then, and have them in my --

7      Q    You have them with you in your pocket?

8      A    Let me see your letter responding to her --

9          THE COURT:     What's the number of that one?

10          MR. GARLAND:    This is 34.

11      A    The Witness:    I might have -- I have got two here,

12    but I got one after that.  I think this one is responding to

13    jobs -- okay, this one is responding to the three most recent

14    jobs that she gave me.  She met me at my doctor's office on

15    February 20th, when I got -- it's in my room, the little

16    sticky -- she met me at my doctor's office when I was getting

17    the shots.  This is the one that she sent me -- and a lot of

18    these jobs --

19      Q    Oh, that's from you -- may I see that?

20      A    Yes, sir.  She sent me a list of eight more jobs,

21    and half of them, when I applied, they said I had to have a

22    college -- it said master's degree and marketing degree, and

23    so I wrote her back, and I said, I don't have any degrees.

24      Q    So this was written just a week or so ago; is that

25    right?

1        A     I can't see the date, I'm sorry.

2        Q     March 7th?

3        A     That's March 7th to reply -- because see, she wrote

4    me a letter -- see, my first paragraph, if I can read it, it

5    says, "I just wanted to bring you up to date concerning the

6    eight most recent job leads that you sent me in your letter

7    dated February 22.  I would like to point out that your letter

8    was not postmarked until March 2nd, and I didn't receive it

9    until Saturday, March 3rd", so it took 10 days for me to get

10   the letter.

11       Q     Did you -- one of the leads was to Time Warner; is

12   that right?

13       A     Yes, sir, I applied for that job.

14       Q     Did you write her anything about that job?

15       A     Yes, sir.

16       Q     Where is that?

17       A     If it's not here, I have it in my other notes.  It

18   may be in this one.

19       Q     Do you remember --

20       A     Do you have a copy of --

21       Q     What was the reason you weren't interested in the

22   Time Warner job?

23       A     I was interested.  I applied for that job, yes, sir.

24    I applied for that job.  If I could go to my room, I have

25   all copies of the letters.

1       Q     But you remember a specific letter you wrote to Ms.

2     Bookman?

3       A     Yes, sir.  I have been to Time Warner, it's on

4     Graystone Boulevard in South Carolina, in Columbia, and

5     applied for the job.  It was a job of a bill collector for

6     people that weren't paying their cable bill, that's it.

7       Q     What reasons, if any, did you give her for not

8     wanting to be interested in that job?

9       A     I applied for the job.  I said, I didn't know if I

10    would like the job, because, you know, I know what it's like

11    being behind on bills and stuff, and I didn't know if -- how I

12    would feel about calling people and saying, you know, you owe

13    me for your cable bill.

14      Q     You told that to Ms. Bookman?

15      A     I put in the letter -- but I applied for the job and

16    told them I would take -- they said they had other jobs.  And

17    I said, well, you know, I was waiting on them to call me for

18    an interview.

19      Q     And when you made the statement, you just meant

20    about knowing people behind, were you making that from a

21    personal observation?

22      A     I just know it gets tough, you know, it gets tough.

23            MR. GARLAND:    May I approach the bench, Your Honor?

24            THE COURT:    Yes, sir.

25    (BENCH CONFERENCE OFF THE RECORD)

1      Q    Mr. Garland:   Mr. Kirkland, has the railroad done

2   everything that you would have suspected them to do to try to

3   place you in some sort of employment?

4      A    Yes, sir, they are trying to work with me about

5   getting employment.

6      Q    Do you know the wage rate of the clerkship positions

7   in Atlanta that were offered?

8      A    No, sir.

9      Q    Did you inquire?

10     A    No, sir.  I mean, I have got friends that are

11  clerks.  I guess -- I never thought about, you know, how much

12  a clerk made.

13     Q    There has been no surgery on your back; is that

14  correct?

15     A    No, sir.  Not yet.

16     Q    No surgery on your hand; is that correct?

17     A    No, sir.

18     Q    You have undergone other types of surgery, have you

19  -- did you last year undergo some type of surgery?  Colon

20  surgery?

21     A    Not last year.

22     Q    When was that?

23     A    Just recently, I started developing worser problems.

24  And Dr. Downey, the pain doctor, did like a rectal exam.  And

25  I am having a lot of trouble and he thought it was from all

1    this other stuff with the back.  And so they have sent me for

2    a colonoscopy, that was a Dr. Keesler.

3         Q    What did Dr. Epstein say about that last question?

4    Do you know what he said about it to you?

5              MR. WETTERMARK:    Objection, Your Honor, that's

6         hearsay.  Dr. Epstein can testify.

7              MR. GARLAND:   Your Honor, but he has said what some

8         other doctor -- a hearsay statement from some other

9         doctor, and I think he is entitled to give me an answer

10        if he knows.

11             THE COURT:    Just now?

12             MR. GARLAND:   He just did.

13             MR. WETTERMARK:    I mean --

14             THE COURT:    Normally, what the doctor's tell

15        folks would be hearsay.  Normally.

16             MR. GARLAND:   He just, I think, opened that one up,

17        Your Honor, he just said what Dr. --

18        Q    Mr. Garland:   And let me ask you this question,

19   maybe it -- did he then refer you to Dr. Epstein for an

20   examination?

21        A    Yes, sir.

22        Q    What did Dr. Epstein say the cause of that was?

23             MR. WETTERMARK:    Objection, that's hearsay.

24             THE COURT:    Well, yes, sir, that would be

25        hearsay.

1           MR. GARLAND:   It's in his deposition.

2      Q   Mr. Garland:   Are you telling the jury that the

3 colon problem is related somehow to the back problem?

4      A   I don't know.

5      Q   Now, did you have any inner ear surgery?

6      A   I have a tube in my ear.

7      Q   When was that done?

8      A   It's been in there about a year.

9      Q   Have you ever been, Mr. Kirkland, admitted to the

10 hospital for any sort of chest pains or anything?

11      A   Yes, sir, back in -- was it '95, '94, '95?

12      Q   Was that in -- where was that?

13      A   It was in Myrtle Beach, South Carolina.

14      Q   The railroad has told you, have they not, in

15 correspondence and otherwise, that they would pay for any

16 additional educational training that you wanted; is that

17 correct?

18      A   Yes, sir.

19      Q   Have you requested any from them?

20      A   Not at this time, no.

21      Q   Has the railroad also told you if you wanted to

22 enroll in any college courses they would pay for that?

23      A   Yes, sir.  I have been looking into that with Ms.

24 Bookman.

25      Q   You haven't done that at this point; is that

1    correct?

2         A    No, sir.  It would be hard working that job and

3    getting the shots and stuff.  But we have been talking about

4    that.

5         Q    What job is that now?

6         A    The job that I am working.

7         Q    Now that's a part-time job; is that right?

8         A    No.  It's a full-time job, I just work it at my own

9    pace.

10        Q    You limit yourself to about 20 hours a week; is that

11   right?

12        A    I don't want to.  I just --

13        Q    You just have to?

14        A     -- I just have to.

15        Q    Is there any other reason that you limit yourself to

16   the 20 hours?

17        A    Just the back pain and the trouble I'm having.

18        Q    No other reason other than the pain trouble; is that

19   correct?

20        A    That's right.

21        Q    Now, I believe you said earlier the railroad before

22   the job offered in Atlanta in March of last year, even before

23   then, the first job was some job in Michigan; is that correct?

24        A    Yes, sir, I think Dearborn, Michigan.

25        Q    Right.  And you said you didn't want to move way up

1    there; is that right?

2        A    Right.  That's right.  I would like to stay in my

3    area.

4        Q    Let me make sure I understand your current

5    situation.  Are you now working full time or part time with

6    the title checking company?

7        A    Well, I don't know how to explain it.  The

8    supervisor, Mr. Brannon, he wants me to work as many hours as

9    I can, and I am trying to get it up to a full week.

10       Q    What are you up to now?

11       A    About 25 hours a week.

12       Q    Did you come up from about 20 to about 25?

13       A    It was starting like 12 or 15, and then -- and I am

14   just gradually getting to working more.

15       Q    And as I understand your testimony, there is no

16   other reason, other than the pain in your back, that would

17   keep you from working a full-time job at that place; is that

18   right?

19       A    That's correct.  If I understand it correctly.  I

20   mean, would he hire me full time, yes.  He's -- you know --

21       Q    He has offered that, hasn't he?

22       A    I have the position, that's what I keep telling Ms.

23   Bookman.  I said, you know, I'm applying for jobs that I need

24   a college education and I have got a job.

25       Q    And if you could double your work from 20 to 40, I

44

1    guess, would your salary double, or what would happen?

2         A    Well, yes, I guess that's true.  You know, I am on

3    an hourly rate.

4         Q    Do you anticipate doing that within the next few

5    months?  What is your --

6         A    Yes, sir.  I am trying.  Yes, I feel pretty good

7    about it.

8              MR. GARLAND:    That's all I have, Your Honor.

9              THE COURT:     Any redirect?

10             MR. WETTERMARK:    Yes, sir.  I just had a few

11        follow-up questions.

12                        REDIRECT EXAMINATION

13   BY MR. WETTERMARK:

14        Q    Mr. Kirkland, the gentleman asked you about the

15   various railroad safety rules, can you think of anything else

16   that you could have done to try to get the situation with

17   these cars correct?

18        A    No, I -- on the --

19             THE COURT:     Hold on.  We might have an objection

20        here.

21             MR. GARLAND:    Your Honor, I object to him leading

22        this witness.

23             THE COURT:     Overruled.

24        A    The Witness:   The rules say that, you know, I must

25   do everything I can.  And I didn't want to move the cars.  I

1    tried not to move the cars.  I reported it to everybody I

2    could report it to, and when they threaten me with my job and

3    get in my face, they overrule that rule.  And I said, well,

4    how can I comply with the rule if I am telling you the cars

5    are unsafe and you're tell me I have to pull the cars, so in

6    my mind I didn't break that rule, I am going by that rule.

7        Q    Sure.  Just out of curiosity, did the safety rules,

8    did they apply to railroad management as well as the people

9    who are out there working every day?

10       A    My understanding is they are supposed to, they can't

11   -- they can't mount the cars or step on a rail, you know.

12   They are setting examples -- that would be a bad example if

13   they tell us don't step on a rail.

14       Q    The only other thing I want to -- the gentleman

15   asked you about -- like, you have had tubes in your ears, and

16   I think you said you went and had your heart checked out when

17   you had to go to the emergency room with your chest pains did

18   that turn out to be anything?

19       A    No, sir.  It was fine.  Came back and Dr. Jackson

20   did a stress test and that was fine.

21       Q    I got you.  Tube in your ears, does that keep you

22   from doing anything?

23       A    No, sir.

24       Q    I think he asked you about ten years ago you were in

25   these car wrecks; did that amount to anything?

1    A    No, sir.

2         MR. WETTERMARK:    That's all I have, Mr. Kirkland,

3    thank you, sir.

4         MR. GARLAND:   Let me ask one follow-up question,

5    Your Honor.

6         THE COURT:   Yes, sir.

7                        RECROSS EXAMINATION

8    BY MR. GARLAND:

9    Q    You testified earlier in your tax returns one of the

10   years you were off about a month; what was the reason for that

11   absence?

12   A    It was a disciplinary action.

13   Q    It didn't have anything to do with these problems,

14   health problems, is that what you are saying?

15   A    No, sir, I don't think so.

16   Q    You don't think so?  Are you sure of that or who

17   would know if you didn't know?

18   A    You are talking for '97?

19   Q    I am talking for the time you testified you --

20   A    For '97, that was for disciplinary.

21        THE COURT:    Is that it?

22        MR. WETTERMARK:    Yes, sir.

23        THE COURT:   Call your next witness.

24        MR. WETTERMARK:    Your Honor, at this time we

25   would call Dr. Eisenberg by video tape deposition.

1          THE COURT:    What's his first name?  Well, it

2     doesn't matter, I will hear it.  Ladies and Gentlemen,

3     you have heard the lawyers, I think, mention in opening

4     perhaps that there would be some testimony from doctors

5     presented by video tape.  Just so you will understand,

6     the Rules of Evidence and Procedure do allow a party to a

7     lawsuit to take a deposition, take testimony, from a

8     medical doctor, it can be video tape, this apparently is

9     the case here.  The doctor is placed under oath at the

10    time.  And the rules allow this to be done, probably for

11    the obvious reason, and not make a doctor come some

12    distance away to Court, so the rules do permit this to be

13    done.  You should listen to this testimony just like as

14    if the doctor were sitting here on the witness stand

15    testifying.  You may proceed.

16    (AT THIS TIME THE VIDEO DEPOSITION OF DR. RICHARD EISENBERG

17    WAS PLAYED FOR THE JURY)

18         MR. WETTERMARK:    Your Honor, at this time

19    Plaintiff would call Mr. Chris Sharpe.  We might as well,

20    while they are getting him, we would also at this time

21    offer into evidence Plaintiff's Exhibits Numbers 36, 37,

22    38, 39 and 40, which were the depositions referred to in

23    Dr. Eisenberg's deposition.

24         MR. GARLAND:    No objection.

25         THE COURT:    They are admitted.

                    **CHRISTOPHER JOHN SHARPE**

1                   **CHRISTOPHER JOHN SHARPE**

2                   Witness having been first

3                   duly sworn, testified on

4                   DIRECT EXAMINATION

5   BY MR. WETTERMARK:

6        Q    Can you tell us your name, please?

7        A    Christopher John Sharpe.

8        Q    Where do you live, Mr. Sharpe?

9        A    1224 Blackville Court, Gaston, South Carolina.

10       Q    Who do you work for?

11       A    Norfolk Southern Corporation.

12       Q    Mr. Sharpe, are you getting tired of sitting out in

13   the hallway?

14       A    Yes, sir.

15       Q    How long have you worked for the Norfolk Southern

16   Railroad Company?

17       A    This is my 25th year.

18       Q    And what is your position with the railroad?

19       A    I am currently the 10UPB Utility Man, Columbia,

20   South Carolina.

21       Q    What job classification is that?  Is that considered

22   a trainman's job, a conductor's job?

23       A    That is a trainman's job being paid a conductor rate

24   of pay.

25       Q    Have you been either a trainman or a conductor, or

1    in that job classification, your entire career?

2        A   I have been both.  I am currently a conductor.

3        Q   Mr. Sharpe, were you working on the crew with Mr.

4    Kirkland on January 23rd, 1998?

5        A   Yes, sir.

6        Q   What was the job number that day?

7        A   P22PO.

8        Q   Is that what is referred to as the Aiken local?

9        A   Yes, sir, the Aiken local.

10        Q   Who was on your crew?

11        A   There was Conductor Lester Kirkland and Mr. Bruce

12    McFarland and myself.

13        Q   How long had you been working the Aiken local as a

14    regular job prior to January 23rd?

15        A   Six weeks.

16        Q   Prior to -- I am not going to ask you to go through

17    this testimony, back at that time was this job something that

18    was available six months of the year to one division and six

19    months of the year to another division?

20        A   Yes, sir.

21        Q   And when you got on the job six months prior, was

22    that when it first became available to your division?

23        A   Yes, sir.

24        Q   Prior to this month and a half or so when you worked

25    it regular, had you periodically worked it in the past?

1     A   Yes, sir, like all extra employees do, we catch it

2   once in a while.   I have been doing it over 20 years.

3     Q   Filling in vacancies here and there?

4     A   Yes, sir, vacations, off days.

5     Q   Do you recall what the weather was like that day?

6     A   It was raining.

7     Q   What time did y'all get to work?

8     A   7:00 a.m..

9     Q   Did you pick up cars from W. R. Grace that day?

10    A   Yes, sir.

11    Q   Did you see the condition of the cars?

12    A   Yes, sir.

13    Q   What was the condition of the cars?

14    A   They were covered with clay.

15    Q   Was that unusual?

16    A   No, sir.

17    Q   Tell the jury about what percentage of the time that

18  you would get cars out of W. R. Grace that the grab irons and

19  walkways and handholds would be covered with the clay.

20        MR. GARLAND:   I object to the form of the question,

21    Your Honor.

22        THE COURT:     Overruled.

23    Q   MR. WETTERMARK:     You can answer it.

24    A   Every time we handle the cars they are covered.

25    Q   Were you aware of the efforts that had been made to

1    try to get that situation corrected?

2         A    Yes, sir.

3         Q    Let me ask you just about that month and a half

4    before Mr. Kirkland got injured, what is your best judgment as

5    to how many -- well, let me ask you this.  Did you hear him

6    talk to any officials at Norfolk Southern during that period

7    of time trying to get the situation corrected?

8         A    The agent, which is an official for us, our

9    immediate supervisor, he reported it to him constantly.

10        Q    You heard him do this?

11        A    Yes, sir.

12        Q    Take us through, generally, and I don't want to go

13   through -- you have not been here, but we have heard a lot of

14   the testimony.  W. R. Grace was the first place you switched?

15        A    Yes, sir.

16        Q    And you got these loaded cars at W. R. Grace?

17        A    Yes, sir.

18        Q    And then you were able to continue the rest of your

19   switching operations that day?

20        A    Yes, sir.

21        Q    Eventually where did you and your crew have to take

22   these clay cars that you got from W. R. Grace?

23        A    Warrenville, South Carolina.

24        Q    And that is a siding off the main line?

25        A    Yes, sir.

1    Q    What do you do with the cars when you take them to
2    Warrenville?
3    A    That is where we classify them.
4    Q    How do you classify them?
5    A    By switching them.
6    Q    In the course of classifying those cars would it be
7    necessary for Mr. Kirkland to have to get on the cars, to tie
8    up handbrakes or knock off handbrakes?
9    A    Yes, sir.
10    Q    And did you all switch these cars at Warrenville
11    that night or that afternoon?
12    A    Yes, sir.
13    Q    On that Friday did you see Mr. Kirkland when he fell
14    off the car?
15    A    No, sir.
16    Q    Were you in a position where you could see him?
17    A    No, sir.
18    Q    How did you first learn that he was injured?
19    A    We were starting back up the hill going back to
20    Aiken and we had lined up the switches and everything to
21    leave, he informed me that he had fallen off the car and hurt
22    himself.
23    Q    Did you, I say inspect him, that is not the word,
24    did you check him out or did he ask you to check him out?
25    A    Not at that time, no, sir.

1    Q    Did he a little bit later?

2    A    Yes, sir, on the engine I did.

3    Q    Tell us what you saw.

4    A    He was gripping his hand like this, you know, like

5    when you hit your hand and it goes numb, or whatever, he was

6    going like this.  He said my hand hurts, my back hurts, you

7    know, but he kept doing that.  And you could see his hand was

8    getting big, and it looked like the thumb had moved backwards,

9    you know, and that is when I knew he was hurt.

10   Q    Did you actually look at his back?

11   A    Yes, sir.  He pulled his shirt up and showed me his

12   back.

13   Q    What did you see when you looked at the back?

14   A    Just like any time you fall and you get red marks.

15   He had fallen across the rocks and stuff and you could see the

16   little dents from the rocks and everything, it had started

17   discoloring a lot.

18   Q    After he got on the engine, and told you he was

19   hurt, where did you all go next?

20   A    Went straight to the depot to let him off.

21   Q    Did he get off at the depot?

22   A    Yes, sir, we helped him.  We got him off the engine,

23   he went into the depot.

24   Q    And what did you and the engineer do?

25   A    We went and put the train up.

1      Q    Finished up your work?

2      A    Yes, sir.

3      Q    When you got to the depot can you tell us basically

4  what happened when you got to the depot?

5      A    Come in the depot, Mr. McFarland and myself.  Mr.

6  Kirkland informed us that he had called and reported the

7  injury, and we were told to stay there until the officials

8  arrived.

9      Q    Did you do that?

10     A    Yes, sir.

11     Q    How long did it take before the officials arrived?

12     A    I would say around two hours we sat there.

13     Q    And tell us who arrived first and then tell us the

14  order that they arrived, to the best of your recollection.

15     A    I believe Mr. Chapman was the first one there; and

16  then came Mr. Roberson, and somebody with him; and then Mr.

17  Burgess; Mr. Marcum.  It was -- it was a room full of

18  officials.

19     Q    What happened when they all got there?

20     A    Well, when they got there they kind of stood around

21  a little but until Mr. Burgess got there.

22     Q    He was the big boss?

23     A    He is the boss.  He is the Assistant Division

24  Superintendent.  And a couple of them asked how are you doing,

25  Lester, like that.  He says I am hurting.  And so they just

1    stood there.  And Mr. Burgess came in and he told Mr.

2    Kirkland, you know, to trust him, that he knew about bruises

3    and that he had bruised himself badly and that is when he

4    instructed one of the officials to get a bag of ice to put on

5    his back.  Got him a chair and put the bag of ice behind his

6    back and put a bag to his hand.  And Mr. Kirkland said my head

7    and neck are hurting too, you know, and they went and got him

8    Tylenol.  And then that time, that is when I got a little -- I

9    took exception to the when they started calling each other

10   doctor.  Dr. Burgess, Dr. Roberson, stuff like that.  And I

11   felt -- I took exception to that.

12        Q    Was there discussion by the officials to Mr.

13   Kirkland concerning the reportability of the injury and going

14   to doctors?

15        A    They wanted to wait.  They wanted him to wait.

16        Q    Why?  Did they say why?

17        A    Well, they just don't want reported injuries.  They

18   call them FRA, reportable injuries.

19        Q    Did Mr. Kirkland, was he agreeable to working with

20   them?

21        A    Yes, sir.

22        Q    How long were you all there?

23        A    Well, we are only allowed to work 12 hours, so it

24   was getting close to 7:00 o'clock.  I guess we were there a

25   good five or six hours before they had to release us and tell

1    us to go on home.

2         Q    They sent you and the crew home?

3         A    They sent Mr. McFarland and myself, we left.

4         Q    Was Lester still there when you left?

5         A    Yes, sir, he was still there.

6         Q    Any discussions about the condition of the cars?

7         A    He -- Mr. Burgess told one of the officials, I am

8    not sure which one, to go to Warrenville and look at the cars.

9         Q    Was there any discussion about checking out the

10   situation at W. R. Grace?

11        A    I was taken outside by Road Foreman Marcum and asked

12   a few questions, so I don't recall what was said inside.   I

13   don't know that.

14        Q    Fair enough.  When was your next work day?

15        A    Monday morning.

16        Q    And did you go to work Monday morning?

17        A    Yes, sir, 7:00 a.m..

18        Q    Mr. Kirkland come to work?

19        A    Yes, sir.

20        Q    How was he doing that early morning?

21        A    He was hurting.

22        Q    When you all first got to work did you all wait?

23   Were you looking for someone to join you there?

24        A    When I showed up Mr. Kirkland told me we were

25   supposed to meet Mr. Chapman at 7:00 a.m. to go to the clay

1    mines.

2        Q    Did he arrive at the depot before you all started

3    working?

4        A    No.

5        Q    What happened after you all -- Monday when you all

6    took off and started working, tell us what happened after

7    that.

8        A    We got the cars for the clay mines, and we developed

9    engine problems.  So we broke down prior to getting to them at

10    a main crossing.  We were waiting for the shop people out of

11    Augusta, Georgia to come and work on the engine.  Well, Mr.

12    Chapman came on the radio and told Lester, Mr. Kirkland, that

13    he would meet us at the crossing.  He met the engine and him

14    and Mr. Kirkland got out and left.

15        Q    Where were they going?

16        A    They were going to W. R. Grace.

17        Q    How long were they gone?

18        A    I would say at least an hour or two, maybe.  Some --

19    it was a long time, because they had to wait on the shop man

20    to come from Augusta, to get there and fix the engine.

21        Q    When you say it was an hour or two, were they gone

22    an hour or two or does it just take an hour or two to fix the

23    engine?

24        A    It was about an hour or two to fix the engine plus

25    start moving again.  You know, I don't really know how long

1      they were gone, because just sitting there waiting on

2      everything to take place.

3           Q    Well, that's fine.  Just tell us if you are not

4      sure.  Eventually were you able to get your engine fixed?

5           A    Yes, they fixed the engine.

6           Q    And where did you go after the engine was fixed?

7           A    Went straight to W. R. Grace.

8           Q    Tell us what happened when you got to W. R. Grace.

9           A    At W. R. Grace we went into -- we rode a train to

10     begin our switching, went in there, and there it was again,

11     they were covered.

12          Q    How badly were they covered?

13          A    They were covered bad.

14          Q    I mean

15          A    There was almost a half inch of clay on the grab

16     irons, at least a inch of clay on the crosswalks, handbrakes

17     had it all in the spokes and on top of them.  There was almost

18     a foot inside the cars and at least two to three feet of it on

19     top of the cars.

20          Q    It was covered --

21          A    They were covered.

22          Q    What happened?  What did Mr. Kirkland do when he

23     saw them?

24          A    Well, he got upset and said we are not going to

25     switch this way, because somebody -- you know, somebody is

1    going to get hurt there, doing this.  He called Mr. Chapman

2    again on the radio.  He did not get a response, so he called

3    dispatch to get Mr. Chapman.  And they got in touch with him,

4    and then Mr. Chapman come over the radio and said for us to

5    wait there, he would meet us at W. R. Grace.

6        Q    Did Mr. Chapman come out and meet you at W. R.

7    Grace?

8        A    Yes, he did.

9        Q    And tell us what happened when he got there.

10       A    Well, him, Lester, the plant supervisor, David

11   Woods, and myself were standing there and we were discussing

12   about the dirtiness of the cars and everything.  And he looked

13   at -- they went on, you know, because I am not -- I am just a

14   brakeman on the job, so I don't really pay attention to the

15   argument about the cleanliness of the cars.  I just stepped

16   aside a little bit, but I did -- you know, I am standing there

17   and then all of a sudden Mr. Chapman tells Lester, he says,

18   Lester they are a good customer, we have got to switch them.

19   Switch them, so we switched it.

20       Q    After he told you all to switch them what did he do?

21       A    He left.

22       Q    You took the cars with all the clay on them?

23       A    Oh, you -- we left, yeah.  We left with the cars.

24   We went to Aiken.

25       Q    When you got to Aiken what move did you have to

1  make?

2      A    We were going to run around a train, so we stopped,

3  got down and tied the cars off.  To tie them down you have to

4  -- according to the rules you have to tie your cars down

5  before you cut the engine off.  We were tying the cars down.

6  I got my brake on first and I was walking up and Mr. Kirkland

7  was putting his on.

8      Q    What type of car was he putting his brake on?

9      A    On a covered hopper, like in that picture right

10 there.

11     Q    One of the W. R. Grace cars?

12     A    Yeah, it came out of W. R. Grace, yes.

13     Q    Tell us what you saw when Mr. Kirkland was up there

14 trying to put the handbrake on.

15     A    Well, he was putting the brake on and when he cut

16 that last little bit he slipped, and when he slipped he

17 twisted real hard.  And I saw that tear come out of the corner

18 of his eye.  I knew then that this was no joke, this boy was

19 hurting.

20     Q    Was he able to get off the car?

21     A    No, sir.  I helped him off that car.

22     Q    And where did you take him?

23     A    Straight to the depot.

24     Q    Did you all call somebody?

25     A    Yes, sir.  We called Mr. -- I called the dispatcher

1    and they got in touch with Mr. Chapman.

2        Q    Did he come?

3        A    Yes, sir, he did.

4        Q    Tell us what happened when he got there.

5        A    Well, when he got there he came to the door and he

6    said -- well, do you want me to tell you the exact words he

7    said?

8        Q    Say the exact words.

9        A    He said this is a bunch of shit, like that you

10   know.  And he didn't say it softly, he was upset, because this

11   is his third time he done seen us today on the same thing.

12       Q    So what happened then?

13       A    Well, he told me to go out there and finish the

14   switching, him and Lester did some talking.  I got a train

15   ready to go down the hill.  Mr. Kirkland informed me that he

16   was instructed to line up a relief crew for us when we went

17   down the hill.  And then I got on the engine and waited for

18   Mr. Kirkland.

19       Q    Now, these cars that Mr. Kirkland got hurt on on

20   this day, were they part of the cars that you all were taking

21   down the hill?

22       A    They were the cars we were to take down the hill.

23       Q    To do what with?

24       A    Put them off on the side for somebody else to pick

25   them up.

1      Q     And were they still in the same clay covered

2   condition?

3      A     Yes, sir, they were.

4      Q     And I can't remember, were you there during the

5   conversation between Mr. Kirkland and Mr. Chapman about the

6   advisability of putting those cars on another train?

7      A     Yes, sir.

8      Q     Tell us what you heard.

9      A     Lester told them what about, you know, somebody

10  slipping and falling, and all this good stuff, and he said let

11  me worry about that.

12     Q     And he instructed you all to take the cars anyway?

13     A     Yes, sir.

14     Q     How much after that was Mr. Kirkland able to stay on

15  the job?  How long did he stay on the job?

16     A     Well, we finished up that day, which with a relief

17  crew, they came and relieved us, and that was the last day Mr.

18  Kirkland worked.

19     Q     Was he able to any further work?

20     A     Because I didn't let him work, I didn't let him do

21  anything.  You know, I didn't want him to do anything.  I

22  could handle the rest of the day.  He just did paperwork and

23  that was it.

24          MR. WETTERMARK:     Mr. Sharpe, that is all I have.

25     This gentleman may have some questions.

1     THE COURT:  Mr. Garland?

2     MR. GARLAND:  May it please the Court?

3     THE COURT:  Yes, sir.

4         CROSS EXAMINATION

5 BY MR. GARLAND:

6   Q Mr. Sharpe, on the Monday you have just been talking

7 about, where was the slipping that you observed, was it at W.

8 R. Grace and Company, this slipping by Mr. Kirkland, or was it

9 down at near the Aiken Depot?

10   A It was at the Aiken Depot, sir.

11   Q Did you see him?  Did anybody climb up on the car at

12 the Grace Company or did you just couple them together?

13   A We just coupled them together.

14   Q You saw him earlier Monday morning?

15   A Yes.

16   Q Did he seem to be okay or in pain or what?

17   A He was in pain.

18   Q Did you volunteer to take the brakes off for him

19 that day?

20   A Yes, sir.

21   Q Could you tell me why he was up there, then, if you

22 volunteered to do that?   Were you just down looking at him?

23   A No, sir.  I don't quite understand your question.

24   Q Well, you tell me that he says he is in pain.

25   A Yes.

1      Q    There's a brake to be taken off, but he is up there

2  taking it off; is that right?

3      A    No, sir.  I didn't say he was taking off any brakes.

4      Q    What was he doing up there?

5      A    He was applying the brakes.

6      Q    Applying the brakes.  Okay, why was he up there to

7  begin with, in other words, why didn't you go up there?

8      A    Because Mr. Kirkland is a conscientious employee,

9  that is part of his duties and he was there.

10     Q    And you were standing there watching him?

11     A    No, sir.  I said I was tying on mine, my brake

12  first, and I walked up and he was tying his on.

13     Q    Was it raining on Monday?

14     A    No, sir.

15     Q    Do you recall, Mr. Sharpe --

16          MR. GARLAND:   May I approach the witness, Your

17     Honor?

18          THE COURT:    Yes, sir.

19     Q    MR. GARLAND:     -- Giving a statement to Mr. J. D.

20  Hollis, Claims Agent for Southern Railway?

21     A    I remember having a meeting with him.

22     Q    On February 13th or 8th?

23     A    I guess, if that is the date it says, yes.

24     Q    That was just about a couple of weeks after the

25  event?

1      A     I guess.  You have got the dates there, I don't

2  know.

3      Q     Let me ask you if you remember telling him --

4            MR. WETTERMARK:     May I look over your shoulder?

5            MR. GARLAND:    Yes.

6      Q     MR. GARLAND:    Asking about -- let me ask you this,

7  you talked about Trainmaster Chapman being out there and

8  having these conversations on Monday of that week; is that

9  right, Monday the 26th?

10     A     Yes, sir.  Three conversations.

11     Q     Look at this question and answer, please sir.

12 Talking about page five here, you are going through talking

13 about on Monday the 26th, right, about how you watched him

14 slide?

15     A     Slip and slide.

16     Q     And then you recall the question, "so Mr. Chapman,

17 the trainmaster, was he out there that day looking, wasn't

18 he"?  And what did you say?

19     A     "I don't know."  Are you talking about was he out

20 there when he slid, I don't know if he slid or not.

21     Q     Was he out there on the 26th?

22     A     Out there where?

23     Q     I don't know.  And then you said -- "what was the

24 weather like on the 26th, that was a Monday?".  And what did

25 you say?

1     A    "It was raining a little bit."

2     Q    Well, was it raining or was it clear?

3     A    I don't know.  Tell you the truth, I don't remember

4  that well.

5     Q    And how about, was Mr. Chapman out there or was he

6  not out there?

7     A    He was there, sir.

8     Q    And why did you not tell Mr. Hollis what you have

9  just said, why did you say you didn't know whether he was even

10  there or not if he was there and you heard --

11     A    I don't know what you are asking here, sir.  I mean,

12  you are saying if I made these statements.  I don't recall

13  making these statements.

14     Q    There is a tape of this here, would you like for me

15  to play it for you?

16     A    Yes, sir, play the beginning of it.

17     Q    Are you saying to me that you didn't make the

18  statement when he asked you if Mr. Chapman came out there --

19     A    If it's in that tape and you have a tape of it then

20  I must have said it.

21     Q    Now, were you telling the truth then or did you know

22  whether he came out there or not, or are you telling the truth

23  today?

24     A    I just swore to God that I would tell the truth now.

25     Q    So can you give us an explanation why you didn't say

1    this to Mr. Hollis?

2         A    I have not -- well, now I see why I said I didn't

3    want to record it, I would make a mistake like that.

4         Q    You and Mr. Kirkland have been there for a long

5    time; is that right?

6         A    I have known Mr. Kirkland for a long time, yes, sir.

7         Q    And have you ever held a conductor's job on a train?

8         A    Yes, sir.  I am currently a conductor.

9         Q    Did you, at that time, take exception and say we are

10   not going to move these cars, on the 26th?

11        A    I am not -- I wasn't the conductor on the job, no.

12        Q    Had you been the conductor would that have been

13   something that you could have done if you had wanted to?

14        A    I would have acted just the same as Mr. Kirkland

15   did.

16             MR. GARLAND:    That's all.

17             THE COURT:    Any redirect?

18             MR. WETTERMARK:    Hang on one second, please.

19                      REDIRECT EXAMINATION

20   BY MR. WETTERMARK:

21        Q    Have you ever seen this before?

22        A    No, sir.

23        Q    The questions right before he asked you if Mr.

24   Chapman was out there, let's just start here, will you read

25   those questions, please?

```
 1              THE COURT:  Read them out loud?

 2              MR. WETTERMARK:      Yes, sir.

 3      A    The Witness:  Which ones, sir?

 4      Q    Let's start right here.  This is talking about

 5  Monday the 26th is that right?  Read that for us.

 6      A    All right.  "He almost fell and caught himself and

 7  wrenched himself real good, I mean twisted himself real good."

 8      Q    And read the next question.

 9      A    "Was he trying to take off take the brake off, put a

10  brake on or what?  You know, I believe he was just trying to

11  cross over to get down, I am not sure about the brake.  You

12  are not sure about that?  No, I just saw him fall, slip.

13  Slip, fall, whatever you want to say, however you want to say

14  it."

15      Q    The next question.

16      A    "He didn't fall off the car, did he?  No, he didn't

17  fall all the way off the car on that day."

18      Q    Keep going.

19      A    "Did you help him off the car?  No.  By the time I

20  got to him he done got down and he complained about really

21  jerking."

22      Q    And then the next question.

23      A    "So Mr. Chapman, the trainmaster, was out there that

24  day, wasn't he?  I don't know.  Okay, you don't know about

25  that?  Uh-uh. (Negative)."
```

1      Q      When he asked you that question was Mr. Chapman out

2  there, what was your --

3      A      My understanding --

4          THE COURT:      Wait, wait, wait.  One at a time.

5      One at a time.

6      Q    MR. WETTERMARK:      Let me ask this.  When Mr.

7  Kirkland fell off the car was Mr. Chapman out there?

8      A      No, sir.

9      Q      Fair enough, thank you, sir.

10          THE COURT:      Is that it for this witness?

11          MR. WETTERMARK:      Yes.

12          THE COURT:      May he be excused?

13          MR. WETTERMARK:      Yes, sir.

14          THE COURT:      You may be excused.

15          MR. WETTERMARK:      At this time we took a follow-up

16      deposition of Dr. Eisenberg, and I would like to play it

17      now, Your Honor, it's just a 15-minute deposition.  Dr.

18      Eisenberg's first deposition, which was just played a

19      minute ago, was taken in March of 2000 and then nine

20      months later, in November of 2000, we took his follow-up

21      deposition.

22  (AT THIS TIME THE FOLLOW-UP VIDEO DEPOSITION OF DR. RICHARD

23  EISENBERG WAS PLAYED FOR THE JURY)

24          MR. WETTERMARK:      The Plaintiff calls Mr. Tommy

25      Conley.

1                    THOMAS WESLEY CONLEY

2                    Witness having been first

3                    duly sworn, testified on

4                       DIRECT EXAMINATION

5    BY MR. WETTERMARK:

6         Q    Tell us your name, please.

7         A    Thomas Wesley Conley.

8         Q    Where do you live?

9         A    Wrightsville, South Carolina.

10        Q    Who do you work for?

11        A    Norfolk Southern Railway.

12        Q    What is your job with the railroad?

13        A    A locomotive engineer.

14        Q    How long have you worked with the railroad?

15        A    Almost 24 years.

16        Q    Were you working with Lester Kirkland and Tommy

17   (sic) Sharpe on Monday, January 26th, 1998?

18        A    Yes, sir, I was.

19        Q    And what was your position on that crew?

20        A    Locomotive engineer.

21        Q    Was that your regular job?

22        A    No, sir, it was not.

23        Q    Why were you on that job that day?

24        A    The regular engineer was off on vacation and I was

25   working his vacation.

1      Q    Now, we have heard testimony here about on Friday

2   the 23rd an incident involving Mr. Kirkland, you were not on

3   the job that day?

4      A    No, sir, I was not.

5      Q    You came to work that Monday morning for the first

6   time on this particular job at that time?

7      A    Yes, sir.

8      Q    Tell me what you recall when you first got to work

9   that morning.  What do you recall about Mr. Kirkland's

10  situation?

11     A    When I got there they told me Mr. Kirkland had

12  gotten hurt on Friday before, and that is all I knew about it,

13  that he had gotten hurt.

14     Q    So you heard some conversations about what had

15  happened the previous Friday?

16     A    Yes, sir, I have.

17     Q    When you all first got to work tell us what

18  happened.   If you would, take us through what you remember

19  that day.

20     A    When we got to work we went out and cranked the

21  engine and went to get straight to go.  And you could tell, I

22  talked with the conductor, and he -- you know, you could tell

23  he was -- looked like he was a little stoved up and sore.  And

24  he told us what all we were going to do.  And we went out and

25  got the engine and come out to do our normal work, switching

1   cars out to go to work some industries.

2        Q    Where was your first scheduled stop for that day?

3        A    First scheduled stop was W. R. Grace.

4        Q    And as you all went from the Aiken Depot towards W.

5   R. Grace tell us what happened with your engine.

6        A    Well, I had some engine trouble and I couldn't get

7   the engine to load.  And we had to get the shop to come to

8   work on the engine.

9        Q    Where did you stop?

10       A    It was a crossing just before you got to W. R. Grace

11  on the bypass, I believe it was.

12       Q    Do you recall how long you were stuck there waiting

13  on the engine to be fixed?

14       A    Probably about an hour, or better.

15       Q    Tell us what you remember happening while you were

16  there waiting for the engine to be fixed.

17       A    The trainmaster was in the area and had called us on

18  the radio.  And he came to the engine and talked with us, and

19  him and -- he and Mr. Kirkland got in his car and went -- and

20  left while we were waiting.

21       Q    How long were they gone?

22       A    Probably -- to my recollection it was probably a

23  half hour or so.

24       Q    And after Mr. Kirkland got back and after your

25  engines were fixed where did you and your crew go?

1           A    We left and went to W. R. Grace.

2           Q    Can you tell us what you remember happening at W. R.

3    Grace that morning?

4           A    We went to W. R. Grace and we rolled the cars by, as

5    was normal for us to do at that point, and we got everything

6    together and then went into the plant.

7           Q    And then what happened after you went into the

8    plant?

9           A    We got everything coupled together and the conductor

10   and all was in the plant and said that -- just to sit where we

11   were, that he wanted me to call the trainmaster on the radio,

12   that we were not going to move the cars and he wanted to talk

13   with the trainmaster.

14          Q    Let me figure out, let me -- if I could, I would

15   like for you to try to explain where you were located and

16   where Mr. Kirkland was located.  First of all, were you still

17   on the locomotive engine?

18          A    Yes, sir, I was.

19          Q    How far would you have been, when you were on the

20   locomotive engine, to where Mr. Kirkland was down in the

21   plant?

22          A    Probably seven or eight car lengths.

23          Q    And how much in feet is that?  Translate that to

24   feet.

25          A    Probably 5, 600 feet, maybe.

1     Q     When you were on the locomotive engine you could not
2  see what was going on where Mr. Kirkland was?
3     A     No, sir, I could not.
4     Q     I think you said that he called you and asked you to
5  contact the trainmaster?
6     A     Yes, sir.
7     Q     He called you on his radio?
8     A     Yes, sir, he did.
9     Q     Did you try to contact the trainmaster?
10    A     Yes, sir, I did.
11    Q     How?
12    A     By radio.
13    Q     And were you able to get in touch with him?
14    A     No, sir, I was not.
15    Q     Tell us what you did then.
16    A     I called Mr. Kirkland back on the radio and told him
17 I was not able to get the trainmaster, did not hear him on the
18 radio at all.
19    Q     And what did he do?
20    A     He told me he would go and call the dispatcher.
21    Q     Call the dispatcher?
22    A     Yes, sir.
23    Q     Could you have called the dispatcher on your radio?
24    A     Yes, sir, I could have.
25    Q     Can you also reach these people by land -- I call

1    them land lines, but by old fashioned telephone?

2        A    Yes, sir, you can.

3        Q    After Mr. Kirkland told you he was going to contact

4    the dispatcher tell us what happened after that.

5        A    We just -- I sat on the engine to wait and I heard

6    the radio, the dispatcher calling the trainmaster on the

7    radio.

8        Q    And did the trainmaster eventually get there?

9        A    Yes, sir, to my knowledge he did.

10       Q    Which trainmaster?

11       A    Trainmaster Chapman.

12       Q    You are still sitting on the engine?

13       A    Yes, sir.

14       Q    Did you ever get off the engine and go back?

15       A    No, sir.

16       Q    You don't have any knowledge about what was said or

17   happened back inside the plant while Mr. Chapman was there?

18       A    No, sir.

19       Q    What was the next thing that happened as far as

20   communications from Mr. Kirkland on the ground end?

21       A    The next thing that happened was I was told to

22   switch the cars, to pull the cars out.

23       Q    And did you all pull those cars out?

24       A    Yes, sir.

25       Q    Did you ever see those cars that day?

1      A    Yes, sir, I did.

2      Q    Tell us what their condition was.

3      A    They had clay on them.

4      Q    Where did you take those cars?

5      A    To the depot at Aiken.

6      Q    What move were you all going to make at the Aiken

7   Depot?

8      A    We were going to get other cars to go work the other

9   plants and run around the cars there.

10     Q    Did you see Mr. Kirkland when he slipped on the car

11  there at the Aiken Depot?

12     A    No, sir, I did not.

13     Q    When did you first see him after that happened?

14     A    When I -- after he had the cars already tied -- he

15  was down on the ground already with the brakeman, and I came

16  down there and he told me to come to, you know, the office.

17  And I got off the engine, got the engine tied down and went to

18  the office where he was at.

19     Q    I am sorry, you went to where?

20     A    To the depot.

21     Q    With Mr. Kirkland?

22     A    Yes, sir.

23     Q    When you got to the depot what happened?

24     A    He was on the telephone trying to call -- I think he

25  called the trainmaster, I am not sure.  Called the dispatcher

1    to call the trainmaster, I am not sure exactly, but he was on

2    the telephone.

3         Q    Did anybody come to the depot?

4         A    Yes, sir, they did.

5         Q    Who?

6         A    Trainmaster.

7         Q    Trainmaster who?

8         A    Chapman.

9         Q    And what happened when he got there?

10        A    When he got there we told him what had transpired,

11   Mr. Kirkland getting hurt, slipping.  And we were told to take

12   the cars, to move the cars to Warrenville.

13        Q    Did Mr. Kirkland take exception to that?

14        A    Yes, sir, he did.

15        Q    How so?

16        A    He said that the clay was all over everything, you

17   know, that we needed to do something about it before somebody

18   else got hurt.

19        Q    And what was Mr. Chapman's response?

20        A    He said don't worry about that, that he would take

21   care of that.

22        Q    And did you and your crew take these cars?

23        A    Yes, sir, we did.

24        Q    Put them on the siding at Warrenville?

25        A    Yes, sir, we did.

1          Q      Were they cleaned up before they were put on the

2     siding?

3          A      No, sir, they were not.

4          Q      Before you -- let me back you up, I got out of

5     order.   When Mr. Chapman said that he would handle that did he

6     stay around after that or did he leave?

7          A      No, sir, he did not, he left.

8          Q      After he left what did Mr. Kirkland do?

9          A      He called on the telephone.   He got on the telephone

10    and made a telephone call.

11         Q      Do you know who he was calling?

12         A      I think he called the agent that takes care of

13    Aiken, Augusta.

14         Q      At some point in time did he -- did his wife come

15    out there?

16         A      Yes, sir, they did.

17         Q      And what did she do when she was there?

18         A      They took some pictures of the cars that he slipped

19    on and I think the engine and also his clothes and stuff as

20    well.

21              MR. WETTERMARK:     That is all I have, thank you.

22              THE COURT:    Mr. Garland?

23              MR. GARLAND:   Your Honor, I just have a couple of

24         questions.   May I ask from right here?

25              THE COURT:    Yes, sir.

1                        CROSS EXAMINATION

2    BY MR. GARLAND:

3        Q    Mr. Conley, do you recall there was a derailment

4    that day, Mr. Chapman left for a derailment?

5        A    No, sir.  I don't recall whether it was a

6    derailment.  I think they said something about a crossing

7    accident, I am not sure.

8        Q    Do you know where that was?

9        A    No, sir, I do not.

10       Q    And do you recall that was why he left?

11       A    Yes, sir.  I said he was leaving, that is what -- I

12   think I said that.

13       Q    Back at the Grace plant, do they Grace employees,

14   are they the ones that blow the kaolin off of the cars?

15       A    I think so, yes, sir.

16       Q    So you are up in the engine when all that is going

17   on, right?

18       A    Yes, sir.

19       Q    Do you know, of your own knowledge, whether or not

20   that is usually done by the Grace employees or done by the

21   railroad crew?

22       A    To my knowledge it is done by the Grace people.  I

23   don't --

24       Q    Have you ever had occasion to talk with either Mr.

25   Woods -- do you know Mr. Woods, the plant manager there?

1        A    No, sir, I do not.

2        Q    Have you ever talked to anybody at Grace and Company

3    about any problem with the Kaolin on the cars?

4        A    No, sir, I have not.

5        Q    You have never talked to Mr. Chapman about it, have

6    you?

7        A    No, sir, I did not.

8             MR. GARLAND:    That is all I have.

9             THE COURT:     Is that it?

10            MR. WETTERMARK:    Thank you, Mr. Conley.  May we

11       approach for a second?

12            THE COURT:    Yes, sir.  Excuse us just a moment.

13   (BENCH CONFERENCE OFF THE RECORD).

14   (JURY LEAVES COURTROOM).

15            THE COURT:   Okay, the Jurors are out.  Mr. Garland,

16       you and --

17            MR. GARLAND:   Your Honor, let me tender -- I think

18       I tendered Defendant's Exhibits 3, 4 and 5, but also the

19       ones identified by Mr. Kirkland, Defendant's Exhibit 34,

20       29, 30 --

21            THE COURT:    Wait a minute.  Those numbers don't

22       correspond to my notes, how about yours?

23            THE REPORTER:  I have got 34, 29, 25, 12 and 14 that

24       have been --

25            MR. GARLAND:   26?

1          THE REPORTER:  And 26.

2          THE COURT:    I have 12, 14, 20, 25, 26, 34.

3          MR. WETTERMARK:     Exhibit 25?

4          THE REPORTER:  25.

5          MR. GARLAND:   24, 14?

6          THE REPORTER:  I don't have 24.

7          THE COURT:    I did not have 24.  You didn't use

8     them all, I don't think, that you had in your hand.  But

9     which ones do you have?

10          THE REPORTER:  I have 12, 14, 25, 26, 29 and 34.

11          MR. GARLAND:   You are right.  I think this is --

12     that's right, 28 was not used.  34 you have?

13          THE REPORTER:  Right.

14          MR. GARLAND:   25?

15          THE REPORTER:  Right.

16          MR. GARLAND:   24?

17          THE REPORTER:  No.

18          THE COURT:    I didn't have a 24.

19          MR. GARLAND:   24 was the one that he identified

20     about the letter --

21          THE REPORTER:  So put it in?

22          THE COURT:    Sometimes I was not clear if you said

23     an exhibit number to take a letter --

24          MR. GARLAND:   It was the March 20th, 2000 letter is

25     the exhibit.  There might have been another that you --

1        THE COURT:    I had that Exhibit 20 was March the

2    20th, but I might have written it down wrong.

3        MR. GARLAND:    I might have misstated, but it is the

4    March 20th, 2000, letter is the Exhibit 24 letter from

5    Mr. Maher to Mr. Kirkland.

6        THE COURT:    That was 24.  I had the March 20th

7    letter was shown to me.  But that's Exhibit 24?

8        MR. GARLAND:    That is Exhibit 24.

9        THE COURT:    All right, well it is 12, 14, 24, 25,

10   26, 29, 34.

11       MR. WETTERMARK:    Show me the ones that you are

12   offering.

13       MR. GARLAND:    25, that was one of them.  26, 34,

14   29, 30 --

15       THE COURT:    I did not have 30.

16       MR. GARLAND:    I will identify that with another

17   witness.  14, 26 and 12.

18       MR. WETTERMARK:    I do not have any objections,

19   except for 26 is highlighted, we need to --

20       MR. GARLAND:    Oh, yes.  Let me get another copy of

21   that.

22       MR. WETTERMARK:    We need to get an unhighlighted

23   copy.  But subject to that I do not have any objections

24   to those exhibits.

25       THE COURT:    Admitted with the understanding that

1   that one exhibit that is highlighted will be substituted

2   with one that is not highlighted.

3         MR. GARLAND:   Got you.  We will do that.  Can I

4   also perfect the record on our side bar?

5         THE COURT:      Yes, sir, you may.

6         MR. GARLAND:   I had asked -- I was in the process

7   of cross examining the Plaintiff and he had indicated

8   that the had written a response to Ms. Bookman concerning

9   a job at Tiwana Company.  It was a letter that he had

10  written her dated February 6th, 2001.  He testified about

11  this letter, and then said that -- when asked why he did

12  not pursue that job he said that was a bill collecting

13  job.  He read from this letter, it said, since I have

14  been out of work I remember first hand some of the

15  difficulties people encounter in paying their bills on a

16  timely basis.  Understanding that was a job of collecting

17  debts.  I then, because of the earlier ruling by Your

18  Honor on the Motion in Limine, instructed me not to

19  mention the fact that this Plaintiff is drawing 1900 and

20  some odd dollars a month railroad disability payment.  We

21  approached the bench for a side bar and said that in my

22  opinion this was a different issue, he had opened the

23  door now to his financial condition in that he had put it

24  into evidence by making a statement like that to the

25  jury.  And I then -- I would have proffered the evidence,

1    I would have then asked him, well, isn't it true, though,

2    Mr. Kirkland, that you are receiving monthly, and have

3    been now for well over a year, $1,973 a month in railroad

4    disability payment.  And he would have said yes.  And I

5    would have said, is it further conditioned that if you

6    work in excess or make in excess of $400 that that

7    payment will be reduced by the amount over that that you

8    make, if you agree that those were the conditions.  And I

9    think also that would be relevant for impeachment

10   purpose, because I specifically asked him if there was

11   any other reason, other than his back pain, that he

12   couldn't work any more hours or earn any more.  So I make

13   that proffer of evidence if it please the court.

14        THE COURT:     Okay.  Anything, Mr. Wettermark, you

15   want to add to that perfecting of the record by Mr.

16   Garland?

17        MR. WETTERMARK:     No, sir.  Thank you, Your Honor.

18        THE COURT:     Okay.  And I, at the side bar, ruled

19   that, in my judgment, he had not opened the door, that

20   all he had said was he had some reluctance to being a

21   bill collector.  He did not say, as I heard his

22   testimony, that he was having financial problems that

23   prevented him from paying his own bills, in which case we

24   would have had something different in my view.  I

25   understand where you were coming from on the law you

1   wanted to make reference to.  I mean, the concept is

2   probably straight forward.  I just did not feel like what

3   he testified to was in that category, so I declined to

4   let you go into that.  And that is my ruling and that

5   will stand.

6        MR. WETTERMARK:    One other matter of

7   housekeeping.  Is it okay for all the witnesses who have

8   testified so far, are they all released to go back home?

9        MR. GARLAND:   They are all released to go.

10       THE COURT:    As long as you all are comfortable

11  with that, that is fine with me.  We will resume at 1:15.

12  Are there any other matters you anticipate coming up this

13  afternoon?  It has been going very smoothly, but just to

14  look ahead.  I think the only issue I had made a note

15  about was perhaps on your getting into Mr. Walls's W-2.

16  I don't know if --

17       MR. WETTERMARK:    That is this afternoon.

18       MR. GARLAND:   That will be an issue, Judge.

19       THE COURT:   Well, you plan to call Mr. Walls as a

20  witness, I take it?

21       MR. WETTERMARK:    I do.

22       THE COURT:    And Mr. Garland is going to object

23  and so we have already talked about it.  Anything more to

24  clarify that matter?

25       MR. WETTERMARK:    No.  I mean, I have double

1    checked with Mr. Walls and I will have him testify to

2    what the Newberry switcher job pays. I am going to try

3    to do it two ways, have him tell us what the biweekly pay

4    of that job is and then show what he was able to make on

5    that job working a whole year.

6         MR. GARLAND: Your Honor, my objection is not to

7    what the job pays, but as to his W-2, what he made. I

8    think those are two different things.

9         THE COURT: That is true, isn't it? I mean, that

10    is two different things.

11         MR. WETTERMARK: Well, I mean, maybe we can

12    resolve it by, I will just have him refresh his

13    recollection with his W-2 and tell us what the annual

14    salary for that job was in 1999. I am not tied to having

15    his W-2 in evidence. I just want to prove what the job

16    makes.

17         MR. GARLAND: I think that is -- he can testify, I

18    guess, as to an hourly or daily rate, but what his W-2

19    has to do with it, I don't think that would refresh him,

20    because that would then give that evidence in another

21    form. So that is my objection.

22         THE COURT: I mean, you laid some foundation with

23    Mr. Kirkland's testimony about his eligibility, according

24    to his understanding of things, for that position.

25         MR. WETTERMARK: Right.

1    THE COURT: This is the fellow that holds that

2 position.

3    MR. WETTERMARK: Right.

4    THE COURT: I think Mr. Garland's point is a good

5 one on his W-2 as to how much he actually -- because

6 apparently you told me the other day there is a

7 complicated salary or compensation scheme used by the

8 railroad --

9    MR. WETTERMARK: It is, it's very complicated.

10    THE COURT: Which I don't know that you intend

11 to try to explain to this jury, or me for that matter,

12 but --

13    MR. WETTERMARK: It is too complicated to do it

14 that way in all honesty.  I mean, they get paid a basic

15 day, plus they have arbitrary, plus they have over time--

16    THE COURT: There is a number of variables that

17 affect what a given employee is ultimately paid?

18    MR. WETTERMARK: Correct.

19    THE COURT: So what Mr. Walls is ultimately paid

20 may or may not be entirely the point that you are trying

21 to get at for the sake of -- I guess your economist

22 eventually is going to use some figure to --

23    MR. WETTERMARK: Sure.  What Mr. Walls's

24 testimony is -- he can provide us testimony as to what

25 the pay for that job would be on an annual basis.  And

1    because he is working he knows what that job pays.  And I

2    don't know how else to establish the annual pay for the

3    alternative job.

4         THE COURT:    All right.  Do you object to what he

5    just described?

6         MR. GARLAND:    But that's not doing that, he is

7    telling us his W-2, what his wages are, and I object to

8    that, because I think that would not be if somebody else

9    was working the job, just because all those same

10   variables he just described.

11        THE COURT:    Well --

12        MR. GARLAND:    There is a base on it, but he just

13   said you go into all this other stuff, over time and so

14   forth.

15        MR. WETTERMARK:    The variables are the same for

16   whoever is working -- whoever is working that job gets

17   paid the exact same amount of money with one exception,

18   Mr. Kirkland would actually receive an additional payment

19   above and beyond what everybody else would.

20        THE COURT:    Productivity thing?

21        MR. WETTERMARK:    Right.  But what I am going to

22   prove is, whoever works that job gets -- would get paid

23   what Mr. Walls gets paid.  It does not matter if it is

24   Mr. Kirkland or Mr. Walls, or whoever else, that is what

25   that job pays.

1    THE COURT:    Mr. Walls's W-2 for that particular

2    year is not necessary to be admitted to getting the

3    testimony you just described, is it?

4    MR. WETTERMARK:    Sure.  I mean, I -- that is what

5    I was saying earlier.  I mean, I can get Mr. Walls to

6    testify what an annual salary for the job was in 1999

7    without putting his W-2 into evidence.

8    THE COURT:    Or without using his W-2 figure

9    necessarily?

10    MR. WETTERMARK:    Sure.  I mean --

11    THE COURT:    I don't want us being hypertechnical,

12    but I think Mr. Garland has a point there.  And I --

13    okay, does that clarify the way we are going to handle

14    the way you are going to handle Mr. Walls --

15    MR. WETTERMARK:    Sure.

16    THE COURT:    Is there anything else this afternoon

17    that may come up?

18    MR. GARLAND:    When do you anticipate finishing this

19    afternoon?  I need to know that where I can have somebody

20    on --

21    MR. WETTERMARK:    I am trying to think.

22    MR. GARLAND:    Who else have you got?

23    MR. WETTERMARK:    I have got a couple of agents.

24    I have got one other -- I have got the engineer, who

25    worked the other six months of the year besides Mr.

1    Williamson.  I have 23 minutes on Epstein, 48 minutes on

2    Downey, so I have got --

3         MR. GARLAND:   Is Downey --

4         MR. WETTERMARK:      -- an hour and a half worth of

5    medical depositions and I have got some short witnesses.

6    I am doing

7         THE COURT:    No, I think we are doing fine.  Well,

8    you all can talk after I step out.  But your sense is

9    that you will rest this afternoon, subject to the calling

10   of your other expert first thing in the morning?

11        MR. WETTERMARK:      Correct.

12        THE COURT:    It is reasonable to anticipate the

13   evidence will be concluded by lunch tomorrow?

14        MR. GARLAND:   Probably, depending on -- I am not

15   sure how long he is going to be with this woman he is

16   running in on me tomorrow.  I can finish it -- if I start

17   at 9:00 I can finish by 12:00 on my evidence tomorrow.

18        THE COURT:    Particularly if we get some in today?

19        MR. GARLAND:   That is right.

20        THE COURT:    Some of your defense evidence today.

21   Okay.  Anything else before we take a break?

22        MR. WETTERMARK:      No, sir.

23        THE COURT:    All right, we will be in recess until

24   1:15.

25   (LUNCH RECESS 12:15 p.m. To 1:15 p.m.)

1          THE COURT:    Please be seated.  I assume by that

2      signal from the bailiff we have another tape.  You may

3      proceed.

4  (AT THIS TIME THE VIDEO DEPOSITION OF DR. JOHN MARTIN DOWNEY

5  WAS PLAYED FOR THE JURY).

6          MR. WETTERMARK:  We will call James Edward King.

7                      **JAMES EDWARD KING**

8                  Witness having been first

9                  duly sworn, testified on

10                   DIRECT EXAMINATION

11  BY MR. WETTERMARK:

12      Q    Would you tell us your name, please?

13      A    James Edward King.

14      Q    Where do you live, Mr. King?

15      A    102 The Bunkers in Aiken, South Carolina.

16      Q    Are you nervous about being here in the courtroom?

17      A    Yes, sir.

18      Q    Who do you work for, Mr. King?

19      A    Norfolk Southern Railroad.

20      Q    How long have you worked for the railroad?

21      A    It will be 34 years this October.

22      Q    What is your position with the railroad?

23      A    I am an operator/clerk now.

24      Q    Where are you working now?

25      A    Augusta, Georgia.

1        Q    From 1990 up until about 1999 what was your position

2   at that time with the railroad?

3        A    I was an agent for Aiken, South Carolina.

4        Q    And what does an agent's job involve?

5        A    Basically you work with the train crews, whether it

6   be the -- you know, the Aiken local or either through freights

7   that come through the valley and coordinate with the customers

8   on what they need as far as the car orders and inbound

9   shipments and make sure they give you the correct paperwork

10  for, say Hazmet materials and just basically you are a go

11  between between the trainmen and the customers.

12       Q    If the trainmen, who were working the Aiken local

13  job, have a safety related problem concerning cars they are

14  picking up at an industry are you one of the persons they are

15  supposed to report that to?

16       A    Yes, sir.

17       Q    Could you tell us, sir, in that period between 1990

18  and 1999 did you receive any safety related complaints

19  concerning clay on the cars coming out of W. R. Grace?

20       A    Yes, sir, numerous complaints.

21       Q    You say numerous, tell us what you mean.

22       A    Well, I don't -- one week you might get two -- they

23  go in there three days and all three days they see that they

24  have not blown the cars off, there is clay all over the ground

25  that needs cleaning up, you know, call them and tell them to

1    clean it up.  And I would call and maybe talk to Mr. Woods out

2    there and tell him to clean it up, or something like that, and

3    then the next week maybe I would not get maybe for a couple of

4    weeks I would not get a complaint, and then it would go back

5    to being the same thing again.  It varies at different times.

6        Q    Within the range of that variance did you continue

7    to receive reports all the way -- from 1990 all the way up

8    until 1999?

9        A    Yes, sir.

10       Q    Did you speak with your superior officials at the

11   railroad about this situation?

12       A    Yes.  My immediate supervisor when I first went to

13   Aiken was Trainmaster John Mask.  And he was there until, I am

14   guessing about '95, '96 and then Mr. Chapman came in as the

15   trainmaster then, Trainmaster Chapman.  And I dealt closer

16   with Mr. Mask as far as reporting, because it was a district

17   set up then, we had not consolidated so much.  But I did

18   report it to him, yes, sir.

19       Q    How often?  Can you give us an idea how often or how

20   many times you and Mr. Mask you reported this situation to Mr.

21   Mask?

22       A    He knew it was on ongoing problems, I mean he was

23   trainmaster, he knew it was a problem.  And I mean, I don't

24   know.  I just don't know.  I mean a bunch of times.  It was

25   just like we still have a problem out at W. R. Grace or in a

1    normal conversation when we were talking about other parts of

2    working the railroad.  But I can not give you no idea.  I

3    mean, I don't know.

4         Q    A lot?

5         A    A lot, yes, sir.

6         Q    As an agent there at Aiken, did you have the power

7    to go ahead and order that they don't handle cars anymore that

8    are unsafe out of W. R. Grace?

9         A    No, sir.  I am a contract employee.  I am not a

10   company official.  The only thing I can do to the crews, I

11   would tell them they would have to do certain things and if

12   they did not do it then I would report it on up, but I don't

13   have the authority to tell a customer we will not switch them,

14   no, sir.

15        Q    Do you recall after Mr. Chapman got there, did you

16   ever have occasion to discuss the situation with him?

17        A    I remember one occasion, but I don't remember the

18   conversation.  It was something about we are having problems

19   with clay again, it is a standard problem.  And I just did not

20   keep up with how many times I talked to him.  I mean, I don't

21   know -- I know for sure of one, but I don't know if there were

22   several others, I just don't know.  Because by that time they

23   had moved me down to Augusta.

24        Q    Now, when they moved you down to Augusta would you

25   still have to come up to Aiken periodically?

1     A    Yes, sir.  I would come up there a lot of times with

2  supplies and stuff the men would need for printers and fax

3  machines and as an agent you do it all.  You had to sweep and

4  mop the floors and that -- so I would come a couple of times a

5  week I would come back to the depot.

6     Q    On the night of Friday, January 23rd, which was the

7  first night that Mr. Kirkland was injured, were you at Aiken

8  on that evening or that afternoon?

9     A    Yes, sir.  I came by Aiken that evening after the

10  Greenville dispatcher, I would say it is Greenville, I am

11  guessing now, somebody told me that Lester had got hurt.  And

12  I said, well, I have to go by the depot anyway.  I said, I

13  will see what is going on, because nobody really knew.

14     Q    Did you go by the depot?

15     A    Yes, sir, I did.

16     Q    And did you see Mr. Kirkland there?

17     A    Yes, sir, I did.

18     Q    Tell us what you were able to observe about his

19  condition.

20     A    I walked in.  He was hunched over and he was real

21  nervous.  He was tensed up.  And then I looked at his left

22  hand --  Well, first off, when I walked in I saw him, I said,

23  Lester, what happened.   And then I don't even remember what

24  he told me other than he said my feet came up from under me,

25  just boom, and I was on my back.  And then I looked at his

1   hand and it looked to me like his thumb was either broke in

2   two places or either jammed in his wrist.  I mean, I am no

3   doctor, but that is what it looked like.

4        Q    You could see it was abnormal, it looked wrong?

5        A    Oh, yeah.  Yes, sir, it sure did.

6        Q    So what did you do?

7        A    I said, Lester, do you want me to take you to the

8   doctor.  And he was talking on about what had happened to

9   him.  He says, no, he says Assistant Division Superintendent

10  Burgess and Trainmaster Chapman and, I believe, he said the

11  superintendent from Columbia were coming down and going to

12  take him to the doctor.  So, I said when.  And he said -- I

13  said, how long -- Columbia is about 70 miles away and

14  Greenville, I guess, I don't know how far it is, 120, 130 and

15  that is where the assistant division superintendent is.  And I

16  said, well, when are they going to be here.  And he said,

17  well, we have been here an hour or so, I don't remember how

18  long it was, he said but I have to stay here and wait on them.

19       Q    What about you said he was -- I think you said he

20  was hunched over with his back?

21       A    Yes.  He said that I asked him about his back, and

22  he said it felt like it was freezing up or just swelling or

23  something.

24       Q    Was he able to sit down?

25       A    No, sir.

1          Q     What was he doing?

2          A     He was pacing, he was walking in circles, more or

3     less.

4                MR. WETTERMARK:     Mr. King, that is all I have,

5          thank you, sir.

6                THE COURT:    Mr. Garland?

7                MR. GARLAND:    Mr. King, let me just ask you a few

8          questions.

9                              CROSS EXAMINATION

10    BY MR. GARLAND:

11         Q     You said the one time you recall talking to Mr.

12    Chapman, was that the occasion in January of '98 about any

13    problems with Grace?

14         A     No, it was before then.  I am sure I talked to him

15    about it then also, but I was thinking of sometime earlier.  I

16    can't -- what I can't get in my mind, fixed in my mind,

17    exactly when Mr. Marcum came down there on that job.

18         Q     But you remember talking to him one time, that was

19    one time you talked to him in January of '98, isn't that

20    right?

21         A     I don't remember

22         Q     Do you remember talking to him in January of '98

23    about the Grace Company?

24         A     Yes, I do.  Yeah, I think -- yeah, okay.

25         Q     Let me ask you this, another question.  You had

1   mentioned something about cleaning up the ground at the Grace

2   and Company, are you talking about the ground at the plant out

3   there, the Grace and Company plant?

4       A    Well, yes, sir.  Where the crew said it was unsafe

5   for them to walk.

6       Q    Do you remember, that was back in the -- was that

7   about the mid 90s before they paved out there?

8       A    I never even knew they paved it out there.

9       Q    Do you know Mr. Roberson?

10      A    Pardon me?

11      Q    Mr. Roberson, do you know him?

12      A    Yes, I know him well.

13      Q    Do you remember if he had anything to do with

14  getting the walkways paved out there or not?  Do you know one

15  way or another?

16      A    I know -- no, sir.

17      Q    What was his official rank, Mr. Roberson, do you

18  remember?

19      A    He was Terminal Superintendent of Columbia, South

20  Carolina.

21      Q    You mentioned cleaning up the grounds, do you

22  remember anything else other than the walkways that you were

23  talking about about the W. R. Grace and Company grounds?

24      A    Well, the cars were not getting blown off.  I mean,

25  the ground and the cars were not getting blown off.  They

1    would come around the curve and it would look like a car on a

2    dirt road, you know, a dry dirt road, instead of the dust

3    coming up it would be coming off the cars.

4         Q    Whose job was it to blow off -- was it the

5    railroad's job or was it W. R. Grace and Company's job to blow

6    off those cars, do you know?

7         A    W. R. -- we did not blow the cars off.

8         Q    And you all did not go out and clean up the grounds

9    out there, I don't guess, did you, W. R. Grace?

10        A    No, sir, we did not.

11        Q    That was the W. R. Grace people?

12        A    Yes, sir.

13        Q    And you remember this talking to the man out there

14   who would you talk to at Grace and Company?

15        A    It varied.  David Wood, I believe, was the plant

16   manager.  He was some type of manager.  He ordered the

17   cars and furnished me the documents to ship them and all

18   that.  And--

19        Q    He was your contact, wasn't he, out there?

20        A    Basically him and Sherry and then there was a couple

21   of others that I would talk to, but he was he was the main

22   man, yes, sir.

23        Q    And is it correct when you would talk to him about

24   the problem there it would seem to get better for a while and

25   then -- is that right?

1      A    Yes, sir, sometimes it would and sometimes it would

2  not.

3      Q    How many times you reckon you talked to Mr. Wood?

4      A    A bunch.  I -- a lot.

5           MR. GARLAND:   That is all I have.

6                      REDIRECT EXAMINATION

7  BY MR. WETTERMARK:

8      Q    Mr. King, you don't know anything about running a

9  kaolin loading facility, do you?

10     A    No, sir.

11     Q    And, I guess, the people at W. R. Grace, they don't

12  really know anything about what trainmen do on the trains

13  after they leave there?

14     A    No, sir.

15     Q    The responsibility for making sure that the trainmen

16  have safe coupler or safe grab irons and safe platforms to

17  stand on, that is the railroad's responsibility --

18          MR. GARLAND:   I object to him leading his own

19      witness, Your Honor.  Object to that.

20          THE COURT:    Rephrase your question.

21     Q    MR. WETTERMARK:    Who is responsible between --

22  who is responsible for making sure that trainmen have safe

23  equipment to work on?

24     A    Norfolk Southern Corporation.

25     Q    Sure.

1          MR. WETTERMARK:     That is all.

2          THE COURT:     Is that all for this witness?

3          MR. WETTERMARK:     Yes.

4          THE COURT:     May he be excused?

5          MR. WETTERMARK:     Yes, sir.

6          THE COURT:     You may step down and be excused.

7     Mr. Wettermark?

8          MR. WETTERMARK:  This is the video deposition of Dr.

9     Epstein.

10    **(AT THIS TIME THE VIDEO DEPOSITION OF DR. FRANKLIN EPSTEIN WAS**

11    **PLAYED FOR THE JURY).**

12         MR. WETTERMARK:  We will call Gary Walls.

13                        **GARY WALLS**

14                   Witness having been first

15                   duly sworn, testified on

16                     DIRECT EXAMINATION

17    BY MR. WETTERMARK:

18         Q    What is your name, sir?

19         A    Gary Walls.

20         Q    Where do you live?

21         A    In Columbia, South Carolina.

22         Q    And who do you work for?

23         A    Norfolk Southern Railway.

24         Q    How long have you worked for the railroad?

25         A    Since '79, 1979.

1      Q    As an employee of Norfolk Southern do you hold a

2    union position with the railroad union?

3      A    Yes.  I am a local representative for the UTU,

4    Engineers and Conductors.

5      Q    And when you say you are the local representative,

6    what does your job involve?

7      A    I am more or less a mediator between the employees

8    and the management.

9      Q    Are you aware of -- in your job as local chairman

10   are you aware of the various ways employees get to choose jobs

11   and what they get paid for various jobs?

12     A    Yes.

13     Q    Are you familiar with the Newberry switcher job?

14     A    Yes, I am.

15     Q    Do you know how much that job pays?

16     A    Yes, sir.

17     Q    How do you know?

18     A    I am currently the conductor on that job.

19     Q    Do you know what the Newberry switcher job paid the

20   conductor on that job during calendar year 1998?

21     A    Yes, sir.

22     Q    How much did it pay the conductor?

23     A    $77,000.

24     Q    How about calendar year 1999, what did that job pay

25   for its conductor?

1    A    $73,069.

2    Q    You will have to explain this a little bit, do some

3    employees on the railroad get an additional -- here is what I

4    am trying to ask you, if Mr. Kirkland was to work that job

5    would he get yet another payment on top of the numbers you

6    just gave us?

7    A    Yes, sir.  We have what they call a productivity

8    fund, and he Mr. Kirkland is one of the few that did not sell

9    his fund, so he would get an additional amount.

10    Q    Some years down the road you all had an option for

11    taking cash money for it or taking the productivity fund paid

12    over time?

13    A    Right.

14    Q    How much would the productivity fund pay now per

15    day?

16    A    It is averaging $30.50 per day.

17            MR. WETTERMARK:    Is my five minutes used up yet?

18            THE COURT:    You may have another minute.

19            MR. WETTERMARK:    I tell you what, I will give

20        that minute to Mr. Garland.

21            MR. GARLAND:    Thank you.

22            MR. WETTERMARK:    Let me ask you this.

23        Q    MR. WETTERMARK:    Does Mr. Kirkland have the

24    seniority to hold the Newberry switcher job?

25    A    Yes, he does.

1          THE COURT:    Mr. Garland?

2                      CROSS EXAMINATION

3     BY MR. GARLAND:

4          Q    Mr. Walls, when did this productivity pay that you

5     have just mentioned come into effect?

6          A    It was approximately five years ago.  I am not real

7     exact but approximately five years ago.

8          Q    1995, '96, somewhere like that?

9          A    Yes, sir.

10         Q    It has been in effect from then forward?

11         A    Yes, sir.

12         Q    Do you know whether at some point way back Mr.

13    Kirkland held the Newberry job?

14         A    Yes, sir.  Mr. Kirkland has worked the Newberry job

15    before.

16         Q    And do you know whether or not he then decided to go

17    back into the Aiken job, or how did he get back?  Do you have

18    any idea?

19         A    Seniority out there, when jobs are changed or

20    conditions, we pull back and forth depending on who wants what

21    job.  The oldest man gets choice.

22         Q    Do you know whether or not he chose to go back to

23    Aiken, or do you know?

24         A    I am not sure what the reasoning was behind that.

25         Q    What would you suspect?

1          THE COURT:     Hold on.  If he doesn't know, he

2      doesn't know.  I mean, I don't think his suspicion would

3      be proper.

4          Q   MR. GARLAND:    Seniority controls in those cases, is

5  that what you are saying?

6          A   Yes.

7          Q   So that productivity pay, whatever you call it, has

8  been in effect at least during the last five years; is that

9  correct?

10         A   Yes, sir.

11         Q   Do you think it might even have been back longer, or

12 do you really know a date on that?

13         A   I would have to look back in my files to know the

14 exact date.

15             MR. GARLAND:    That is all.

16             MR. WETTERMARK:     I have one question.

17                  REDIRECT EXAMINATION

18 BY MR. WETTERMARK:

19         Q   You said, though, you had a choice between this

20 productivity fund, you could either take the productivity

21 fund, which pays you and extra $30.50 a day now or you could

22 take a cash payment?

23         A   Yes, sir.

24         Q   You took the cash payment?

25         A   Yes, sir.

1      Q    Just out of curiosity, how much was the cash

2  payment?

3      A    70,000.

4      Q    And Mr. Kirkland was one of the people who opted for

5  the $30 a day in the future?

6      A    Yes, sir.

7      Q    Does that go -- if he were still working out there,

8  that $30 a day, is that something that he would continue to

9  have gotten until the end of his career?

10     A    It is looking that way, yes, sir, every day he

11  worked.

12          MR. WETTERMARK:    Thank you, sir.

13                    RECROSS EXAMINATION

14  BY MR. GARLAND:

15     Q    And by the same token, Mr. Walls, every day he

16  worked after the productivity pay went into effect, that would

17  be true too, wouldn't it?

18     A    Yes, sir, since this buy-out was in effect.

19          THE COURT:    Does that conclude his testimony?

20          MR. WETTERMARK:    Yes.  Mr. Walls, I think you

21      just won the award for the shortest witness in history.

22          THE COURT:    You may be excused, thank you.  What

23      are you going to have next, Mr. Wettermark?

24          MR. WETTERMARK:    We are going to read the last

25      medical deposition.

1          THE COURT:     Okay.   Why don't we take a break

2     before we do that?

3          MR. WETTERMARK:     Sure.

4          THE COURT:     Let's take our mid afternoon break.

5     When we come back we will have, I think, a medical

6     deposition to be read to you as opposed to the video, and

7     I will talk about that when we come back.   Remember, no

8     talking about the case yet.   We will be in recess for our

9     mid-afternoon break.

10    (COURT IN RECESS)

11         THE COURT:     Mr. Wettermark, what do you have

12    next?

13         MR. WETTERMARK:     I am going to call Dr. Childs.

14    We are going to read the deposition of Dr. Wendell

15    Duncan.

16         THE COURT:     Ladies and Gentlemen, I explained to

17    you about the rules permitting depositions to be taken of

18    doctors and then presented to you during the trial and

19    you have seen some video tape depositions and it can also

20    be done by the taking of testimony that is then

21    transcribed, that is typed up and brought into Court to

22    be read to you, in which someone -- in this case Mr.

23    Childs will play the role of the witness and read the

24    answers, Mr. Wettermark will be reading the questions

25    that were actually posed to the doctor at the deposition.

1        Mr. Childs will be reading the answers.  I guess Mr.

2     Garland when cross examination comes will get up and read

3     the questions that he asked of the doctor on cross.  Just

4     as with the video tape testimony you should view this

5     testimony just as if the doctor were here testifying to

6     the words that you will hear Mr. Childs read as the

7     answers to the questions posed to the doctor on that

8     occasion.  Go ahead, Mr. Wettermark.

9        MR. WETTERMARK:     This deposition was taken at Dr.

10     Duncan's office on February the 28th, 2000.

11                        **DR. WENDELL DUNCAN**

12                      Witness having been first

13                      duly sworn, testified on

14                        DIRECT EXAMINATION

15     BY MR. WETTERMARK:

16        Q     Could you tell us your name, please?

17        A     James Wendell Duncan.

18        Q     What is your profession?

19        A     Orthopedic hand surgery.

20        Q     Dr. Duncan, could you explain to us what the

21     practice of orthopedic surgery involves?

22        A     Orthopedics is a practice that involves injuries and

23     abnormalities involving the musculoskeletal system, which

24     involves the skeleton, muscles, nerves, everything involved in

25     the extremities and the spine.

1    Q    As I understand it, you have a subspecialty within

2    orthopedic surgery in the field of hands?

3    A    Correct.

4    Q    And the treatment of traumatic injuries to a hand,

5    is that something that falls within your field of expertise?

6    A    Right.

7    Q    Doctor, could you briefly tell us your medical

8    education and training that you have had to be an orthopedic

9    surgeon?

10    A    Okay.  My undergraduate education was at Mercer

11    University in Macon, Georgia; and I got my medical degree from

12    Medical College of Georgia; and then did my internship and

13    residency in the Greenville Hospital system in South Carolina;

14    and then did my hand surgery fellowship with the hand center

15    in Charleston.

16    Q    Do you now practice here in Augusta, Georgia?

17    A    Right.  I have been with this group for almost 12

18    years.

19    Q    Doctor, in your professional capacity have you had

20    occasion to see and evaluate Mr. Lester Kirkland?

21    A    Yes, I did on July 16th, 1998.

22    Q    Did you obtain a history from Mr. Kirkland?

23    A    Yes, sir.

24    Q    Could you tell us what that history was, please?

25    A    The history I obtained found that he had worked for

1    Norfolk Southern Railway since 1974, and at the time was

2    living in Greenwood.   And told me of an injury to his right

3    thumb, he stated was January 23rd of 1998 when he fell off a

4    railroad car that he was conducting.   And in that fall not

5    only injured his thumb but said also his back and was being

6    treated elsewhere for that.

7        Q    Did you obtain a past medical history with respect

8    to the thumb from Mr. Kirkland?

9        A    Right.   For this particular injury he had been

10    treated by an orthopedic surgeon in Aiken conservatively with

11    casting and then therapy, but stated that about 18 years

12    earlier in 1980 had injured a ligament to this thumb that

13    required surgical repair in Greenville, South Carolina

14        Q    According to the history you took had he had a good

15    recovery from the injury 18 years ago?

16        A    Yes.   He said that he had been, you know, working

17    full time for the railroad and played golf and really denied

18    having any problems with the thumb.

19        Q    Until the most recent injury?

20        A    Right.

21        Q    Now, I think you mentioned this, as far as the

22    injury that happened on January 23rd of '98, he had been

23    seeing other doctors before he came to you?

24        A    Right.

25        Q    And tell us, again, what treatment he had had before

1 he actually saw you --

2   A It was -- he said he was casted about five weeks and

3 then wore a removable splint for a period of time and had some

4 therapy as well for the thumb.

5   Q And what complaints or problems did Mr. Kirkland

6 have that he reported to you when he first saw you?

7   A He said it continued to hurt chronically, hurt with

8 most any use of the thumb, that it would continue to swell and

9 had stiffness.

10   Q Did you perform an examination on him?

11   A Yes.

12   Q Could you tell us the results of your exam?

13   A Well, I found that on that joint he lacked about 55

14 degrees getting the joint up completely straight.  What we

15 call extension.  So he was -- it would sit in a flexed posture

16 and then when he went to flex it further he could only go

17 another 10 degrees or only had about 10 degrees of active

18 movement of that one joint of his thumb.

19   Q If I could stop you at that point, what is the

20 medical term to describe the joint in his thumb that was

21 injured?

22   A It is the metacarpageal joint.

23   Q And because the jury can't see what you are doing,

24 am I correct that that's the joint where the thumb basically

25 is attached to the hand?

1          A      Correct.

2          Q      And what range of motion does that joint normally

3      have?  What range of active motion would the joint normally

4      have?

5          A      It will be normal for most people to have at least

6      60 to 70 degrees.

7          Q      And Mr. Kirkland only had 10 degrees?

8          A      Ten degrees of active motion.  He could flex to 65,

9      but it started at 55 degrees because he would sit at a

10     posture of 55 degrees and could not get it any straighter than

11     that.

12         Q      You will have to try to explain it a little bit to

13     us, if you can, using words.

14         A      Okay.

15         Q      When he came to you, what was the position that his

16     thumb was in when you saw him?

17         A      That joint, just resting, was flexed about 55

18     degrees and he could not straighten it up any further than

19     that.

20         Q      And when you say it was flexed, you mean that --

21         A      Bent down.

22         Q      -- the thumb was bent toward the palm of the hand?

23         A      Correct.

24         Q      And he was unable to straighten it out to a straight

25     position?

                                                                    113

1       A      Right.

2       Q      Did you test the joint for laxity of motion?

3       A      Yes.  There are ligaments on the side of the joint

4  that keep it from opening up side to side and on one side of

5  the thumb it was loose.  And just manipulating it with my

6  fingers it would easily open up about 30 degrees, which is

7  excessive.

8       Q      What is the significance of that, the lack of

9  motion?

10      A      It is a sign that the ligament is not as tight as it

11 is supposed to be, so there is abnormal looseness of the

12 joint.

13      Q      Did you perform x-rays on the hand?

14      A      Yes, I did.

15      Q      And could you tell us what those revealed?

16      A      It showed that there was some spurring from some

17 degenerative changes, which is just a word for, you know, it

18 is wear and tear and some -- what I refer to as roughness of

19 the head of that bone from wear and tear.

20      Q      Doctor, based upon your exam and history and, of

21 course, the radiographic findings what was your impression at

22 this time?

23      A      That with all of the problems with the joint, being

24 the abnormal wear that had developed, the looseness of the

25 joint, that it would -- the best treatment would be a fusion

1     of that joint rather than any other type of attempt at soft

2     tissue reconstruction.

3         Q    If you would, tell us, when you say a fusion of the

4     joint, what does that mean?

5         A    Well, a fusion is just a term for where we take out

6     a diseased joint, putting raw bone surfaces together in a good

7     position to allow the bones to heal together.  So it is like

8     when a broken bone is put back together and it heals solid as

9     one bone.

10         Q    After a joint is fused does it have any motion?

11         A    Not at that one joint, it doesn't.

12         Q    So basically when you say fuse the joint it takes

13     away all the motion from that one joint?

14         A    Correct.

15         Q    You mentioned that you did not recommend or did not

16     think that it was advisable to try soft tissue reconstruction

17     of the thumb, why?

18         A    Primarily because of the wear that he already has of

19     the joint.  I would be very concerned that soft tissue

20     reconstruction would just give him a tighter, but still

21     painful, joint.

22         Q    Now, you did not do this fusion surgery on Mr.

23     Kirkland; is that correct?

24         A    No.

25         Q    If he decided to undergo this surgery what sort of

1    functionality will he be left with after he has the surgery?

2        A    Most people get back to doing about anything they

3    ever did before, because not only is it now a painless joint,

4    but a very strong joint because the bone is fused together.

5    There is no looseness or abnormal movement.  And if the other

6    joints adjacent to this are working well, like his are, it is

7    usually a very strong, painless, functional joint.

8        Q    I was going to ask you, the fusing of the joint,

9    what is the primary reason to fuse the joint?  What are you

10   looking to do by fusing it?

11       A    Primarily to stop the pain.

12       Q    And then on this particular joint of the thumb, as I

13   understand it, even after you fuse it and he loses all the

14   movement in that joint he still can maintain a fairly good

15   functionality with his hand?

16       A    Right.

17       Q    When this joint is fused do you have to pick an

18   angle for it to be permanently fixed in?

19       A    Yes.  We just found traditionally through experience

20   that a position of 5 or 10 degrees of flexion is the most

21   functional.

22       Q    And just so we can understand what that is, if you

23   open your hand up, I guess, and bend all your fingers and your

24   thumb fully backwards, is that considered full extension?

25       A    Correct.

1      Q     And so you are saying that you take from that full

2  extension and you go forward just 10 degrees and that is where

3  you try to leave the thumb?

4      A     Right.

5      Q     Even after this fusion is done, will he end up with

6  a permanent medical impairment secondary to the fusion?

7      A     Yes.

8      Q     How much permanent medical impairment will he have?

9      A     According to the AMA guides to the evaluation of

10  permanent impairment it says it is 6 percent impairment of the

11  thumb.

12      Q     I did not ask you this the formal way, Doctor, but

13  let me ask you this, when you say he would be left with a 6

14  percent impairment, is that an opinion that you would hold to

15  a reasonable degree of medical probability?

16      A     Yes.

17      Q     Doctor, do you have an opinion, again, to a

18  reasonable degree of medical probability as to whether or not

19  this fall that he described to you as having occurred on

20  January 23rd, '98, do you have an opinion as to whether or not

21  that caused or contributed to the problems he was having with

22  his thumb that led to your recommendation for a fusion?

23      A     Yes.  Just going by his history he did not develop

24  these specific problems with the thumb until after this

25  injury.

1      Q    The impairment that you said he would have, if he

2  undergoes this fusion, is that a permanent impairment?

3      A    Yes.

4      Q    Now as I understand it, at the time you saw him for

5  his thumb he was also being treated separately for a back

6  problem?

7      A    That is right.

8      Q    And you did not undertake to deal with his back

9  problem at all?

10     A    No, I did not address that.

11          MR. WETTERMARK:    Thank you, Doctor.

12                    CROSS EXAMINATION

13  BY MR. GARLAND:

14     Q    Doctor, let me ask you a few questions now.  You

15  made a report in your records of this visit, did you not?

16     A    Yes.

17     Q    I would like to ask you to refer to that while I ask

18  you a few other questions.  Did you explain to Mr. Kirkland

19  that a fused MP joint would be very, very functional?

20     A    Yes, I did.

21     Q    In fact, those are the words, were those words that

22  you used in your report?

23     A    That is right.

24     Q    All right.  Did you explain that this was in your

25  opinion his best option?

1       A    Yes, I did.

2       Q    And, in fact, did you see any reason not to go ahead

3    and have the fusion of that joint?

4       A    No, I did not.

5       Q    And did you think that you could get him back to

6    work with a fused thumb joint?

7       A    Oh, definitely.

8       Q    And in your specialty, as a hand surgeon, I guess

9    you treat lots of thumb cases, don't you?

10      A    Right.

11      Q    And the fusion we are talking about, a MP joint

12   fusion of the thumb, is that a fairly routine and common

13   operation that you perform?

14      A    Yes, it is fairly common.

15      Q    All right.  And in most cases do the people who are

16   in their early 40s return to work and to activities after such

17   an operation?

18      A    Yes, they do.

19      Q    If someone was a golfer, would you still be able to

20   hold and swing a golf club with a fused thumb?

21      A    Yes.

22      Q    In fact, can you -- in most occupations with the use

23   of your hand, could you still perform most occupations after a

24   fused thumb joint?

25      A    Yes, you can.  In fact, I am not sure if I can come

1    up with any occupation that would be a problem except,

2    perhaps, a professional baseball pitcher.

3        Q    I see, can you still shake hands?

4        A    Oh, yeah.

5        Q    Doctor, you mentioned 6 percent, is that a

6    disability of just the thumb joint?

7        A    That is considered an impairment of the whole thumb

8    itself, which they would calculate out to 2 percent impairment

9    of the whole hand.

10        Q    And that would be the whole body, how does that

11    translate into impairment, a 6 percent of the thumb?

12        A    It would be 1 percent.

13        Q    Your don't got for 1 percent whole body ratings, do

14    you?

15        A    Right.

16        Q    In your opinion, could he have returned, after

17    pursuing a normal period of recovery, to the job of being a

18    conductor on a railroad?

19        A    Oh, yes.  It would probably be at least 8 to 10

20    weeks.

21        Q    8 to 10 weeks of recovery?

22        A    Yes.

23        Q    Okay.  Have you seen Mr. Kirkland since the

24    evaluation of July 1998?

25        A    No, sir.

1              MR. GARLAND:    Thank you, Doctor.

2                    REDIRECT EXAMINATION

3    BY MR. WETTERMARK:

4        Q    I gather if he undergoes the surgery then

5    fortunately the thumb injury will not be disabling to him as

6    far as his railroad job; is that right?

7        A    I am sorry, rephrase that.

8        Q    It was probably a bad question.  Let me withdraw it.

9     When you say that he can get back to work on the railroad

10   you are talking about with respect to his thumb?

11       A    Right.

12       Q    You are not drawing any opinions about what may have

13   happened with his back?

14       A    Oh, no, not at all.

15             MR. WETTERMARK:     Thank you, Doctor.

16             THE COURT:     Is that it?

17             MR. WETTERMARK:     Yes, sir.

18                      DR. FRED JOHNSON

19                   Witness having been first

20                   duly sworn, testified on

21                     DIRECT EXAMINATION

22   BY MR. WETTERMARK:

23       Q    Could you tell us your name, please?

24       A    Fred Johnson.

25       Q    What is your profession?

1          A     Retired profession of economics, University of

2     Alabama at Birmingham.

3          Q     Where do you live, Dr. Johnson?

4          A     Birmingham, Alabama.

5          Q     I say, Dr. Johnson, do you have a doctorate degree?

6          A     I have a Ph.D. in economics.

7          Q     Could you tell us the education and training that

8     you have had to be an economist?

9          A     Yes.  I have a BS and MS degrees in statistics, a

10    Ph.D. in economics.

11         Q     Where are your degrees in statistics from?

12         A     Alabama.

13         Q     University of Alabama?

14         A     Yes, sir.

15         Q     In both undergraduate and your Master's?

16         A     Yes, sir.

17         Q     And where do you have your doctorate degree in

18    economics?

19         A     University of Alabama.

20         Q     You told us that you used to teach at the University

21    of Alabama in Birmingham?

22         A     Yes, sir.

23         Q     How many years?

24         A     I taught there for 20 years and retired in 1989.

25         Q     Dr. Johnson, does one area or one part of the field

1    of economics deal with making calculations to determine the

2    present value of an injured worker's future lost wages?

3         A    Yes, sir.

4         Q    Is that something that you have experience doing?

5         A    Yes, sir.

6         Q    Tell us what your experiences in doing these sort of

7    calculations are.

8         A    I think I started around 1970, so it would be a

9    period of almost 31 years.  I have probably been in 20, 22

10   states in the country, in Federal and State courts in most of

11   those states.

12        Q    You have made these sort of calculations hundreds of

13   times?

14        A    Yes, sir.

15        Q    Can you tell us -- what we are trying to find, why I

16   hired you, is we want you to determine how much money would

17   have to be awarded today to compensate someone for his lost

18   wages and fringe benefits in the future.  Can you start us off

19   and tell us what are the criteria, what sort of information do

20   you have to have to start this process?

21        A    You need to know the person's date of birth for the

22   purpose of establishing something we call work life

23   expectancy.

24        Q    In Mr. Kirkland's case have I provided that to you?

25        A    Yes, sir.  His date of birth is 5/19/55.  His work

1  life expectancy is 15.94 years.  Incidentally, his life

2  expectancy is 30.6 years.

3       Q    And how do you make those determinations?

4       A    The U.S. Department of Labor is the source for the

5  work life.  The U.S. Department of Health and Human Services

6  is the source for the life expectancy.

7       Q    Okay.  Now, let me talk to you a little bit about

8  his work life expectancy.  Why do you need to have that?

9       A    So you can project income over the remaining number

10  of years that he would have expected to be employed.  And,

11  incidentally, I use the word employed intentionally because

12  work life expectancy is not the number of years until you --

13  he would retire, but the number of years that he would remain

14  in the work force.  So, for example, his age is currently just

15  under 46, if you add 46 and 15 that will take you to 61, that

16  does not mean that he would retire at 61.  It means that if he

17  retired at 65 there would be a four-year period that he would

18  be out of the work force.  It could be illness, layoffs,

19  injury --

20       Q    So things like that, the fact that he could get laid

21  off or get sick, those are built into your work life

22  expectancy calculation?

23       A    Yes, sir.

24       Q    Now, we know what, statistically, his work life

25  expectancy is, what is the next step you need to take?

1      A      Because the measure of damages is the contrast

2    between the pre-injury capacity to earn and the post-injury

3    capacity you have to know both.  The best evidence of what he

4    could earn prior to his injury would be his tax returns, or if

5    he has not worked in a while, and I do not think Mr. Kirkland

6    has worked since '98 on the railroad job, early '98 in fact,

7    that is a period of a little over three years, you can use

8    something that we call comparable worker pay to establish what

9    he would be earning today.  So that -- one of the two of

10   those, or both, could be used to establish his pre-injury

11   capacity and then I will have to rely upon someone else's

12   opinion as to his post-injury capacity.  For example, if

13   someone says that maybe he can make $8 an hour then I will

14   have to go with that.  I am not an expert in the area of what

15   he can earn now.

16      Q      Well, let's talk about his earning capacity before

17   his injury.  You said that we can look at his actual earning

18   experience?

19      A      Yes, sir.

20      Q      Or we can go -- when he has been out of work for

21   several years like this we can go and look and see what the

22   job he would be working now would be paying?

23      A      Exactly.

24      Q      All right.  Well, let's do both of those.

25      A      All right.

1          Q     With respect to his earnings, what information did

2     you have to have to determine that?

3          A     Remember that he was injured January 26th, '98, so

4     his last full year of work was '97.  I averaged his '96 and

5     '97 earnings and came up with $55,116.

6          Q     Now, once we have his earnings, the average earnings

7     of $55,000, is it simply a matter of taking that and

8     multiplying it by his work life expectancy?

9          A     No, sir.

10         Q     Why not and what do we have to do?

11         A     Certain things have to be removed.  For example, he

12    should not collect on the taxes he would have to pay out of

13    this income, so I am taking Federal and State taxes out;

14    neither should he be expected to collect on the expenses that

15    would be related to his employment, employer related expenses

16    are taken out, those total 30.1 percent.  So I am taking out

17    from the $58,115 or $16 an amount equal to 30.7, I believe I

18    said 30.1, it is 30.7, leaving a net income of $38,195.

19         Q     So that number, $38,000, that is what he would have

20    taken home after he paid his taxes and after he paid all his

21    employer related expenses?

22         A     Yes, sir.

23         Q     So this number you are going to calculate is just

24    going to replace his after tax income?

25         A     That is correct.

1       Q    Why is that?

2       A    Because it is defined as contribution, how much the

3    family would benefit from him working after he has paid his

4    taxes and his expenses.

5       Q    All right.

6       A    Now, next -- we have talked about two of the

7    variables, how long he is going to work, how much he could be

8    making net.  Now we have to ask what would that income do in

9    the future.  We can anticipate that a worker is going to get a

10   pay raise.

11      Q    Sure.

12      A    Rather than speculate about whether it will be 6

13   percent a year or 4 percent a year, we use what we call real

14   values. Where a real value is defined as inflation adjusted.

15   So, for example, if I get a 5 percent raise and inflation is 4

16   percent, 5 minus 4, 1 percent real wage gain.

17      Q    In other words, you really have not gotten a 5

18   percent wage increase?

19      A    The hardest thing to project in our economy is

20   inflation.  So, therefore, you can get a more precise

21   determination of future values if you just take inflation out,

22   which is what I have done.  I am using a 1.22 percent average

23   annual real wage gain for this gentleman over his remaining

24   work life.

25      Q    And an average annual real wage gain, that means

1    that his pay raises will exceed inflation by that much?

2         A    Barely.  1.22 percent.

3         Q    Okay.

4         A    Lastly, because you are providing this future income

5    stream today, instead of him having to wait 10 years to get

6    this 10th year pay you are giving it to him today, you have to

7    discount that future value to its present value, so we have to

8    use a discount rate.  It is the same thing as saying what can

9    I earn if I take my money down to the bank or if I buy a CD,

10   or something like that.  You remember that I took inflammation

11   out of his wage increases, I am going to take inflation out of

12   his discount rate, so we have apples and apples when we

13   compare them.  I am using the three-year U.S. Government bond

14   to approximate the average yield on a market basket of

15   instruments that can go anywhere from cash, which pays

16   nothing, to government bonds to CDs, if you really want to be

17   foolish you put some in the stock market.  And I have been

18   recently.

19        Q    You and a lot of other people.

20        A    Yes, sir.  And a lot of other people, like me, got

21   hurt.  But, anyway, I would not ask that someone untrained,

22   even someone trained, theoretically, would mess with the stock

23   market if you have to live on that income, okay?

24        Q    It is a determinant risk, right?

25        A    Certainly.  You know there are risks, trade-offs,

1    and yield trade-offs and liquidity trade-offs.  When you

2    compare all of those, analyze all of those, then the

3    three-year government bond probably best approximates the

4    yield that you could get on his market basket.  Now, I take

5    inflation out of that.  Because this award must be invested,

6    if you have already taken income taxes out, so you don't want

7    to cheat him by taxing him twice, you take taxes, out of that

8    interest earned to give him credit for that and what we are

9    left with is called a tax adjusted real discount rate.  It is

10   the yield you get, less inflation, less the taxes you pay on

11   it.

12       Q    Can you give us an example; plug in some numbers

13   maybe and give us an example?

14       A    Yeah, I think I can.  You know, I am so used to this

15   that it is hard to do it in your head anymore.  Let's suppose

16   that I can get a yield of 6 percent and suppose I pay 20

17   percent taxes, that leaves 4.8, correct?  And suppose

18   inflation is 4, that leaves .8.  So here I go, 6 percent by

19   subtracting inflation and taxes from it is leaving a tax

20   adjusted real yield of .8 percent.  As a matter of fact, given

21   this gentleman's tax bracket the yield rate that I used for

22   him is .69 percent.

23       Q    Okay.  Let me just -- let me try it this way.  Let

24   me just pick a good round number and get you to explain how

25   that works.  Let's just say you invested $100,000 at 6

1    percent, like you said, you get $6,000 back from that

2    investment in the course of one year; is that right?

3        A    Yes, sir.

4        Q    But then you would have to pay taxes on that 6,000?

5        A    Yes, sir, $1,200 worth.

6        Q    And then inflation would eat away at some more of

7    it?

8        A    4 percent, using my example.

9        Q    And so really you are not getting as much as --

10       A    You have made $800 in real terms, that is what we

11   mean by the tax adjusted real interest rate.

12       Q    And so that is why you use it this way?

13       A    Yes, sir.

14       Q    To take all those factors into account?

15       A    Yes, sir.

16       Q    Okay.  Anything else that you need in your

17   calculation?

18       A    I think I have covered all of them with the

19   exception, I think I covered it too but not explicitly, what

20   he can earn now.

21       Q    And we will talk about that in just a second.

22       A    Okay.

23       Q    But I guess the first calculation I want from you,

24   and let me go ahead and tell you what -- I will make sure that

25   my understanding of what you have done is the same as yours.

1    Have you made a calculation to determine the sum of money that

2    would have to be awarded now and invested by Mr. Kirkland to

3    replace his future railroad lost earnings based upon what he

4    was making before the injury?

5        A    Yes, sir.

6        Q    But made that calculation so that at the end of his

7    work life expectancy everything would be gone, all the

8    principal, all the interest would be used up replacing his

9    future income.  Have you made that calculation?

10       A    Yes, sir.

11       Q    And could you tell us, how much would have to be

12   awarded today to replace his future railroad income?

13       A    633,324.

14       Q    Tell me again.

15       A    633,324.

16       Q    And at the end of his work life expectancy, however

17   many years it is, all this money would be gone?

18       A    Assuming he can not work.

19       Q    Correct.  Can not do anything?

20       A    That's right.

21       Q    I got you.  And this number is based upon what he

22   was making three, four years ago on the railroad?

23       A    '96 and '97, which was quite a long time ago.

24       Q    Have you also done this calculation based upon the

25   earnings of a job that he could be working now?

1      A    I used a 75 percent impairment rating, now whether

2   that has changed since we talked I don't know.

3      Q    I am going to ask you about that in a second.   I

4   guess I am kind of flip-flopping on you, Dr. Johnson.   You

5   have not been here, but we have heard testimony in here from

6   Mr. Gary Walls about what the job of the Newberry switcher

7   pays.

8      A    Uh-huh (affirmative).

9      Q    Have I provided you with the information concerning

10  what that job pays?

11     A    No, sir, you have not, but I can do it in a brief

12  moment if you will tell me.

13     Q    Actually I have somewhere, Dr. Johnson.

14     A    Well, I am using a 75 percent impairment rating.

15  Now, whether that is reflective of that job, I don't know.

16     Q    Okay.   We will come back to that.   Let's go back and

17  let's work again on his -- based on his 1996, 1997 earnings,

18  okay?   You said the second thing that you could do is assume

19  his post-injury earnings?

20     A    Yes, sir.

21     Q    Now, I am going to have to ask you to assume

22  something based upon what a witness who is going to testify

23  tomorrow morning is going to testify to and get you to make a

24  brief calculation.   I didn't mean to fuss at you.

25     A    Yes, you did.   What is the evidence going to show?

1      Q    I will ask you to assume that he has been evaluated

2   by Dr. Kessler, a Vocational Rehabilitation Specialist, and

3   that Dr. Kessler has calculated that Mr. Kirkland in his job

4   will be able to obtain in his injured condition now, which is

5   based upon -- is that he will lose 79 percent of his access to

6   his former wages has been loss, that you will lose

7   approximately 79 percent.

8      A    Okay.

9      Q    I will take that back, Dr. Johnson.  Let me just

10  double check these numbers.  I want to make sure -- you can

11  fuss at me now.  He has lost access to 79 percent of the type

12  of jobs he used to be able to work --

13     A    Uh-huh (affirmative).

14     Q    -- but he has lost access to 75 percent of his

15  former wages.

16     A    Well, that is exactly what I said earlier, 75

17  percent, do you remember that?

18     Q    I can not remember, Dr. Johnson, but I -- really, I

19  apologize.

20     A    Now, that is all right.  Now, let's assume that

21  instead of losing all of that 633,000 he is only going to lose

22  25 percent of it, I mean 75 percent of it, which means that he

23  can make 25 percent, so now the present value of the

24  difference between the net earnings would be 474,993.

25     Q    Okay.  Tell me that again.

1      A      474,993.

2      Q      474 --

3      A      993.

4      Q      Now, this 474,993, am I correct that this is the

5  number that is assuming he goes to work tomorrow at a job that

6  pays roughly 25 percent of what he was making on the railroad

7  and works it until the end of his career --

8      A      With the same kind of pay raise that I gave him in

9  the railroad job.

10     Q      So he would start a job paying 25 percent and then

11 would get raises from that?

12     A      That is correct.

13     Q      That it would take 474,993 invested to make up the

14 difference?

15     A      Yes, sir.

16     Q      To get him back to where he would have been?

17     A      That is correct.

18     Q      Dr. Johnson, I will also ask you to assume that Mr.

19 Kirkland's health insurance expires at the end of this year.

20 Have you made a calculation to determine the sum of money that

21 would be necessary to provide him with the money to pay the

22 premiums for health insurance for the rest of his work life?

23     A      I made a calculation based upon it having already

24 expired.  If it expires at the end of this year that would be

25 rounded off .75 years from now.  So what I am going to do is

1   revise the calculation based upon a work life of 15.94, less

2   .75, correct?  121,763 $+ 474993 = 596,756$

3      Q   121,763?

4      A   Yes, sir.

5      Q   That is the amount of money that he would have to

6   invest and then use the return to pay the premiums?

7      A   Over his work life, that is correct.

8      Q   Okay.  Now, the other thing I wanted to ask you

9   about is, in his case, we have determined that there is a job,

10  the Newberry switcher, that he was now -- he would stand to

11  work at the present time.  And is it possible to do this same

12  sort of calculation to determine what his future losses are

13  based upon the income he would have earned in that job?

14      MR. GARLAND:   I am going to object to calculations

15     made on a speculative question like that as to what he

16     may have done, could have done, might have done and that

17     sort of thing.  I just think that is -- that is just

18     improper to speculate like that.  I think the way he has

19     already characterized this is the normal and customary

20     formula.  But then to go and say what he might have done,

21     might have taken another job somewhere else is just

22     improper.

23      MR. WETTERMARK:   Well, I mean, there is no might

24     about it.  The job is there, he has the seniority for it,

25     he is entitled to work it.  He would be working it if he

1    had not have gotten hurt.

2         THE COURT:    I overrule the objection.

3    Q    MR. WETTERMARK:    Do you have those calculations?

4    A    Yes, sir.

5    Q    Tell us, is the process that you go through to make

6    those calculations the same.

7    A    Yes, sir.  The only thing that would change is the

8    base-year difference in the two incomes.  Obviously, if this

9    job would be paying more then the present value is going to be

10   greater just based upon that single fact.

11   Q    Did I provide you with the amounts that that

12   Newberry switcher job paid in 1998 --

13   A    Yes, sir, it would be --

14   Q    -- '99?

15   A    Yes, sir, it would be $80,334, gross.

16   Q    Did you get that by combining the two?

17   A    I combined the 72,482, which was the average --

18   there is a $30.20 per day amount bonus, or whatever you call

19   it

20   Q    Productivity fund.

21   A    Productivity added to that, that is how it got from

22   72,5 up to 80.

23   Q    Okay.  Great.  Can you tell us, sir, based upon the

24   earnings of that job what the present value of his future loss

25   railroad earnings are?

1        A      The equivalent number to the -- to the 633 that I

2    gave you earlier, that would be the, quote, railroad

3    earnings--

4        Q      Correct.

5        A      -- would be 938,823.

6        Q      Okay.

7        A      The equivalent number to the difference, you

8    remember I said that if he works this job then the present

9    value of the difference would be 474,993?

10        Q      Correct.

11        A      The equivalent number to that, given the higher

12    income level, would be 775,476.  $+ 121,763 = 897,539$

13        Q      I have got it.  And the insurance would stay the

14    same?

15        A      Insurance would stay the same.

16        Q      All these numbers you have been giving us, are those

17    projections from today forward?

18        A      Yes, sir.

19        Q      Have you calculated how much he has lost in past

20    lost wages from the date of his accident up until the present

21    time?

22        A      Yes, sir, I have.

23        Q      Can you tell us how much is that?

24        A      The first scenario, assuming he would be making 55

25    plus, he has already lost $111,924.  The second scenario based

137

1    upon the $80,000 per year current pay --

2        Q    Yes, sir.

3        A    -- he has already lost 157,915.

4        Q    These numbers you have given us, these are after tax

5    numbers?

6        A    Yes, sir.

7        Q    So you have already taken out the income tax?

8        A    And expenses.

9        Q    And, again, with respect to these future numbers,

10   they have been calculated so that if they are invested, if he

11   uses the money to replace his lost income at the end of his

12   work life expectancy when he is 61 years old, all this money

13   will be gone?

14       A    Yes, sir.

15            MR. WETTERMARK:    Thank you, Dr. Johnson.

16            THE WITNESS:    Thank you, sir.

17            THE COURT:    Mr. Garland?

18            MR. GARLAND:    May it please the Court?

19            THE COURT:    Yes, sir.

20                        CROSS EXAMINATION

21   BY MR. GARLAND:

22       Q    Dr. Johnson, we have not met.  I am Ben Garland and

23   I have some questions I would like to ask you now.

24       A    How do you do, sir.

25       Q    I take it from your exchange with Mr. Wettermark

1    that you have known Mr. Wettermark for some time?

2         A    Since he was a brand new lawyer.

3         Q    And is it true that Burge and Wettermark, their

4    firm there, is the largest, by volume, of any client that you

5    have?

6         A    Any single client?

7         Q    Yes, sir.

8         A    That is correct.

9         Q    What percentage of -- first of all, how many of

10   these cases, either in depositions or in court testimony, do

11   you do a year, on average?

12        A    Between 25 and 40 probably, that is based upon -- I

13   just put together my 2000 experience, and that is what --

14   somewhere between 25 and 40 last year.

15        Q    Do you recall testifying for a defendant in a

16   personal injury case like this?

17        A    I am sorry, sir.  Do I recall testifying for a

18   defendant?

19        Q    Yes.

20        A    A deposition, yes, but not in live testimony.

21        Q    Now, of these cases --

22        A    And, by the way, that would be -- I guess you are

23   talking about railroad cases?  I also do commercial cases

24   where somebody has lost profits, or something like that.

25   About half of my work in there is for the defendant.

1    Q    Now, of your FELA cases, what percentage of those

2    would be for the firm of Burge and Wettermark?

3    A    I have never calculated that, sir.  I do work for --

4    by FELA you mean railroad cases --

5    Q    Railroad cases.

6    A    -- of course, and I do work for about six or seven

7    firms that specialize in railroad cases, so I have never

8    broken it down.

9    Q    Would it be as much as half, you think?

10   A    It is possible but not likely.

11   Q    More like 40 percent, would that be -- does that

12   sound --

13   A    Anything I tell you would be just a wild guess, but

14   40 percent sounds reasonable.

15   Q    Dr. Johnson, you are an attorney as well as a Ph.D.?

16   A    I have a degree in law.  I have a license to

17   practice law, but I have never found any reason to do so.

18   Q    What is your fee as an expert?

19   A    $150 an hour for consultation.

20   Q    What about testimony?

21   A    Testimony is obviously -- if I come to Macon and it

22   takes me 12 hours, let's say, before I get back home I don't

23   charge but 8.  I have a fee that cuts off after 8 hours.  I

24   don't believe anybody is worth more than 8 hours work.

25   Q    Do you fly over or do you drive over?

1  A Today I flew to Jacksonville and drove up.

2  Q Is that Mr. Wettermark's plane or is it commercial?

3  A No, it is commercial.  And the auto was too.

4  Q You have never spoken, I don't guess, with Mr.

5 Kirkland, have you?

6  A I don't remember having done so, no.

7  Q Am I correct that the documents that you reviewed

8 were the documents given to you by Mr. Wettermark?

9  A Yes, sir.

10  Q Now, the tables, the work life expectancy tables

11 that you calculated, is that for the public as a whole or is

12 that for railroad specific?

13  A It is for private sector workers in the United

14 States overall.

15  Q overall?

16  A Yes, sir.

17  Q All right.  Do you know, is there a difference in

18 the work expectancy life for railroad workers as opposed to

19 industry overall?

20  A I don't know, because in my opinion there is no such

21 thing as a realistic, reliable railroad work life table.

22 There are things that purport to be, but if you ask them how

23 they put it together they will not tell you.

24  Q You have never tried to put one together, have you?

25  A No, sir, I would not be capable.

1      Q      This is, of course, not the first railroad case you

2   have testified in.  Have you testified in any cases involving

3   clerks, wages lost by clerks?

4      A      Sir, I am sure I have.

5      Q      Do you recall wage rates of the office clerks in the

6   cases that you have testified in --

7      A      No, sir.

8      Q       -- do you recall that?

9      A      No, sir.

10     Q      If I told you that wage was probably $40,000 a year,

11  does that sound in line or --

12     A      I would not have an opinion one way or the other.

13     Q      Were you aware that the railroad has made offers of

14  clerk positions to Mr. Kirkland?

15     A      That is something that I do not get into.  I respond

16  to the hypotheticals of the attorney.

17     Q      And the hypotheticals given assumes no railroad job,

18  isn't that what it assumes?

19     A      I think it assumes some kind of job that would pay

20  about 25 percent of his former wages, but what that job is I

21  don't know.

22     Q      What would that figure be, 25 percent of his normal

23  wages?  Can you calculate that for us?

24     A      Well, it was 55,116, it would be about 13,779

25  divided by 2080 would be about $6.62 an hour.

1     Q    That is the information you have that you have based

2  everything on that, correct?

3     A    That is correct.

4     Q    Now, in this second calculation you did were you

5  using somebody's W-2 form to come up with that number you gave

6  us, that number on the second calculation?  How did you arrive

7  at that?

8     A    That information was provided by attorney.

9     Q    And what was the nature of that?

10    A    The nature of it was how much a Mr. Walls made in

11  '98 and '99.

12    Q    What are you looking at, his W-2 form?

13    A    No, sir, just what I was told.

14    Q    Did you understand where that came from or do you

15  know?  Is that just what he said or did it come from some

16  document?

17    A    I would assume it came from some document, railroad

18  earnings document.

19    Q    Now, under the calculation you just gave, too, you

20  said that the future of the past loss, you recall, under the

21  first scenario you gave us, was something like an average of

22  $55,000 a year, is that what you said?

23    A    It was after taxes about 39 a year.

24    Q    And that was based on averaging two years of

25  earnings; is that correct?

1   A    That's correct.

2   Q    Did you have access to the four or five year earning

3   history?

4   A    You know, I don't recall, but if I did I did not use

5   it.

6   Q    Any reason not to use it or just --

7   A    Well, typically since the charges to compare

8   pre-injury capacity with post-injury capacity it is typical

9   that the last year is because people get wage increases, would

10  be the better years, and that would establish his capacity.

11  In this case I am not positive, but that would be what is

12  typical.

13  Q    Now, the past loss wage you gave us in the second

14  calculation using Mr. Walls's figures --

15  A    That is correct.

16  Q    -- what date did you assume he would leave his job

17  and take over Mr. Walls's job to get that past earning

18  calculation that you gave us?

19  A    I established a loss for '98, for '99 and for 2000.

20  Q    So does that assume that instead of does that

21  assume, then, the loss began January the 23rd of 1998; is that

22  right?

23  A    That is what is implied.  And if started later I

24  need to take some out.

25  Q    Well, I guess under that scenario you assume that on

1    January 23rd, 1998, he would leave his job and replace Mr.

2    Walls, is that the assumption to get --

3        A    Not especially, but that would be implied when I

4    made that calculation.  And like I said, if it would have come

5    later that needs to be adjusted.

6        Q    Can you run an average or can you run an estimate of

7    loss if, in fact, you make these assumptions?   If you will,

8    assume that the clerk job pays $40,000.

9        A    All right, sir.

10       Q    Assume he started filling that job in the year 2000.

11       A    January 1, 2000?

12       Q    January 1.

13       A    All right.

14       Q    Now, how does that change or would it change at all

15   these numbers that you have given us?

16       A    Well, it would reduce his past losses, obviously, in

17   both instances, because I would assume he has not worked.

18       Q    But if you make that assumption then what would

19   those numbers that you just gave us change to?

20       A    The first number was 120,314, right?  120,314?  If

21   you take the 40,000 and multiply that by .693 --

22       Q    What we are doing now is we are using this number

23   instead of using 75 percent of the formula?

24       A    No, understand something, please.  That 75 percent

25   does not figure into any past losses.  That just --

1      Q    I am talking about future losses now.

2      A    No.   Right now I am just asking -- I am answering

3   your question about what would have happened to his past

4   losses.   That is the only thing I know right now.

5      Q    Well, wouldn't they be the same up until --

6      A    No, no.   You said you wanted me to assume that he

7   would have done this January 1 of 2000, so obviously if he's

8   working in 2000 his past losses are going to be less than I

9   have calculated, correct?

10     Q    Correct.

11     A    That is what I am going to do first, for you.

12     Q    Do that first.

13     A    That 120 would go to 92,594, that was under scenario

14   A.

15     Q    Well, let's stick with scenario A while we are

16   working on that.

17     A    Okay.

18     Q    What would that future wages be if you used that

19   amount instead of the 25 percent?

20     A    All right, sir.   The 39 -- well, the 38,195 would be

21   contrasted with 27,720.

22     Q    And what numbers are those representative of,

23   please, sir?

24     A    It would be the after tax incomes for the two jobs.

25     Q    Would be what?

146

1     A    $10,475 difference.

2     Q    I am sorry, how much?

3     A    10,475.

4     Q    Between the --

5     A    The net incomes of the two jobs that you asked me to

6  assume.

7     Q    The two jobs being the railroad clerk job and the

8  railroad conductor job, correct?

9     A    That is correct.  173,694.

10    Q    That is 173,694?

11    A    That is correct, sir.

12    Q    Now, is it correct the insurance would be a wash

13  because if you are a railroad employee you have railroad

14  insurance?

15    A    Under your hypothetical, that is correct.

16    Q    Were you aware of any other -- were you aware of any

17  actual employment that Mr. Kirkland had?

18    A    Since his injury?

19    Q    Since his injury.

20    A    I have not been made aware of any at this point.

21    Q    So your assumptions were made on the fact that he

22  had had no income, but that a lady, Ms. Kessler, said he might

23  be able to earn about 25 percent of what he earned before; is

24  that right?

25    A    In the future, that is correct.

1          Q    And so I guess it stands to reason if the underlying

2     assumptions change with reference to employment or injury

3     capacity then the numbers change, is that fair?

4          A    Certainly.

5               MR. GARLAND:    That is all.

6               THE COURT:    Any redirect?

7               MR. WETTERMARK:    Yes, sir, a few questions.

8                         REDIRECT EXAMINATION

9     BY MR. WETTERMARK:

10         Q    Dr. Johnson, the gentleman asked you about the times

11    you have testified for my firm and other firms, when you made

12    these economic calculations does it make a difference who

13    provides the numbers to you?

14         A    No, sir.

15         Q    Whether they come from me or Mr. Childs or Mr.

16    Garland, they always come out the same?

17         A    Yes, sir.

18         Q    The --

19         A    It depends upon the assumptions, obviously, that I

20    am asked to use.

21         Q    Sure.  When you said that you -- when you made the

22    calculations where you assumed that he would -- the

23    calculations assumed that he would be able to find a job but

24    it would not pay as much as the railroad job would by, it

25    would pay roughly 25 percent of what the railroad job was --

1     A   Yes, sir.

2     Q   -- and you said that would calculate out to a

3 present starting salary of $6.62 an hour.  Are you saying that

4 in this other job he would make $6.62 an hour for the rest of

5 his life?

6     A   No, sir.  You remember that I said that in both jobs

7 I provided wage increases.

8     Q   So basically what you are saying is if he had to

9 start over again at the bottom, at 6.62, that you provided for

10 him to start getting wage increases?

11     A   Certainly.  By 10 years from now if he got, as an

12 example, a 6 percent annual wage he would be making 10

13 something an hour, almost 12 an hour.

14     Q   I guess if he started at $6.62 and hour and worked

15 at that job for 25 years, like he worked at his railroad job,

16 he might eventually get up to where he -- about what he is

17 making now?

18     A   Certainly.

19     Q   About 25 years from now?

20     A   That is probable, yes.

21     Q   And the calculations that you have made, the numbers

22 you have made, those are the numbers that would make up for

23 that difference?

24     A   Yes, sir.

25     Q   Fair enough, thank you sir.

RECROSS EXAMINATION

BY MR. GARLAND:

    Q    Dr. Johnson, let me ask you one other thing.  In trying to make a calculation of this nature do you try to find, when you can, actual job opportunities available at certain rates, is that a better indication of an actual job offer at a certain rate, or is it a better indication of what Ms. Kessler, or somebody, might do a percentage of what she thinks he may be able to earn, which of those two is the better one in your opinion, which one makes the most sense?

    A    Well, that 75 percent came from her actual hourly or weekly wage rate as I recall.  So, you know, they should be the same in the final analysis.

    Q    Well, I do not think they are, in the final analysis, because of what we have just shown.  If he has a job offer and accepts it at $40,000 a year --

    A    Oh, I am sorry, I misunderstood your question.

    Q    Which do you think -- is there a common sense way to figure this thing out, if you don't have a Ph.D., or anything else, if you have a job at $40,000 available or you have Ms. Kessler to say you might be able to go out somewhere and earn $6 an hour, no more than that, which of those would be the more reliable?

    A    Assuming he can get it.  Obviously, assuming he can

1    get it, assuming he doesn't have to travel all over the world

2    to get it, assuming that he can work it without hurting,

3    assuming he can work the same 16 years that he could prior to

4    his injury, then obviously he would be better off to work the

5    40,000, but that is something that I am not capable of

6    determining.

7         Q    I got you.

8         A    All those other factors.

9         Q    I got you.

10        A    Thank you.

11             THE COURT:    Thank you, Dr. Johnson.

12             THE WITNESS:    Thank you, sir.  May I be excused?

13             THE COURT:    Yes, sir.  You may be excused.  Mr.

14    Wettermark, what do you have next?

15             MR. WETTERMARK:    May I have one second to talk to

16    Mr. Childs?

17             THE COURT:    Yes, sir, you may.

18             MR. WETTERMARK:    Your Honor, with the exception

19    of Dr. Kessler who, I think we informed the Court, will

20    be here at 9:00 tomorrow, we will rest with the exception

21    of her testimony.

22             THE COURT:    Okay.  Ladies and Gentlemen, the

23    attorneys informed me earlier that this one witness for

24    the Plaintiff that is scheduled to be here in the morning

25    at 9:00 o'clock, in the event we finished earlier enough

1      today to continue, Mr. Garland is agreeable to proceeding

2      with the defense case so we could use this time today and

3      then take Dr. Kessler, in effect, out of order, out of

4      turn in the morning first thing.  So with that

5      observation, Mr. Garland, are you ready to proceed?

6                MR. GARLAND:   Ready, Your Honor.

7           THE COURT:     You may do so.

8                MR. GARLAND:   Call Mr. John Chapman to the stand.

9                         JOHN L. CHAPMAN

10                    Witness having been first

11                    duly sworn, testified on

12                    DIRECT EXAMINATION

13     BY MR. GARLAND:

14        Q    Give us your name, please.

15        A    John L. Chapman.

16        Q    Mr. Chapman, where do you live?

17        A    I live at Forest Park, Georgia, 5097 Maple Street.

18        Q    And by whom are you employed?

19        A    Norfolk Southern Corporation.

20        Q    What is your title there in the Atlanta area?

21        A    I am a general yard master, Terminal Trainmaster.

22        Q    Is that in Atlanta?

23        A    Yes, sir, in Atlanta, Georgia.

24        Q    How long have you been with the railroad?

25        A    I have been a supervisor since '85, but I worked for

1    the railroad in '73, for Maintenance Away Department and was

2    laid off and had to get other employment and then later I came

3    back to the railroad.

4        Q    Where were you born and raised?

5        A    Mullens, West Virginia.

6        Q    Did you graduate from high school there?

7        A    1970, yes, sir.

8        Q    Kind of give us a thumbnail sketch after high school

9    what you did until you got to the railroad and then let's stop

10    there and then we will take the same scenario on the railroad

11    jobs.

12        A    Okay, just my railroad career?

13        Q    Well, before that what did you do, were you in

14    service or --

15        A    Oh, I worked in the coal mines.

16        Q    West Virginia?

17        A    Yes, sir.

18        Q    How many years did you do that?

19        A    Done that two years.

20        Q    And then what?

21        A    I had the -- I had a short stint with the railroad.

22        Q    That's right, the one you just told us about?

23        A    Yes, sir.

24        Q    In Maintenance Away?

25        A    Right.

1      Q    What is Maintenance Away?

2      A    The guys that drive the spikes and handle the ties

3  and the labor work.

4      Q    What after that?

5      A    After that I had several, driving a truck, or

6  whatever job I could get to make money.

7      Q    Then you went back on the railroad?

8      A    No, sir.  No, then I went to -- then I got a civil

9  service job with the Sheriff in the county where I lived.

10      Q    All right.

11      A    And later I attended West Virginia State Police

12  Academy.  And shortly after that I got a job with the railroad

13  in their Property Protection Department, that is how I got

14  back on the railroad after the Maintenance --

15      Q    What year would that have been when you got back in

16  the railroad on property protection?

17      A    1984, I think.

18      Q    Where was that job located?

19      A    Bluefield, West Virginia.

20      Q    Go on and continue, then, on with your railroad

21  career as to what you did, where you worked and that sort of

22  thing?

23      A    Well, I worked a couple of years in that capacity as

24  a property protection agent for Norfolk Southern.  Shortly

25  after that a superintendent offered me a job as a yard master.

1      Q    Where was this?

2      A    The offer on the job was in Grundy, Virginia, but it

3  was a considerably more attractive job.

4      Q    Did you move, then, from West Virginia over to

5  Virginia?

6      A    Yes, sir.

7      Q    And how long were you in Virginia?

8      A    I was there for six years.

9      Q    Where next?

10     A    As best I remember it, I was transferred to an

11  outpost called Yeager, West Virginia.  It is in the coal

12  fields, they deal primarily with coal.

13     Q    Moved back from Virginia to West Virginia?

14     A    Yes, sir.  Not back home, but back into the state.

15     Q    Right.

16     A    After that I was -- after a couple of years at

17  Yeager I was made an Assistant Trainmaster, and my job was in

18  Williamson, West Virginia, which is the hub of the coal

19  fields.

20     Q    All right.

21     A    After that I was -- this would have been in

22  September of '97, I was transferred to Columbia, South

23  Carolina.

24     Q    In September of '97?

25     A    Yes, sir.

1     Q    And what was your job in Columbia, South Carolina?

2     A    Trainmaster.

3     Q    Did you actually live in Columbia, South Carolina?

4     A    Yes, sir.

5     Q    What period of time were you a trainmaster in South

6  Carolina?

7     A    I was Trainmaster there until July the 15th the

8  following year.

9     Q    '98?

10     A    Yes, sir, '98.

11     Q    And where after that?

12     A    Atlanta, Georgia.

13     Q    I got you.  What geographic area was served out of

14  your office in Columbia?  What part of South Carolina did you

15  serve as Trainmaster?

16     A    It is a huge geographical area, Columbia being the

17  center I have -- there are four main lines.  I was

18  responsible for the trains and the crews that operated between

19  Columbia and Charleston, South Carolina, down to the Port

20  Authority.

21     Q    How many miles of trackage were under your

22  jurisdiction?

23     A    Nearly 500 miles of main line track.

24     Q    Do you know Mr. Lester Kirkland, the Plaintiff, in

25  this case?

1      A   Yes, sir.  But the area you asked me about earlier

2  is considerably large than just Columbia to Charleston.

3      Q   So where would it go?

4      A   Well, I also had responsibility on the line that Mr.

5  Kirkland worked between Augusta and Columbia.  We also worked

6  and serviced people, of course, in the Columbia area.  We also

7  worked up to near the North Carolina line up toward Columbia.

8  I am sorry, up toward Charlotte.  Anyway, that is pretty much

9  the geographical area.

10     Q   How many industries did you serve in that territory,

11  do you have any idea?

12     A   In excess of 150.

13     Q   You do know Mr. Kirkland, who was a conductor there

14  out of Aiken?

15     A   Yes, sir.

16     Q   Are you familiar with Operating Rule 581 that we

17  have talked about in this case?

18     A   Yes, sir.

19     Q   Have you always had the rulebooks with you in your

20  railroad career?

21     A   Yes, sir.

22     Q   In your railroad career have there been meetings and

23  so forth emphasizing the rules and that sort of thing?

24     A   Yes, sir.  Yeah, we have an annual rules meeting

25  that all the people, all the employees are tested on, as are

1    the supervisors on the scene, set of rules.  And we have --

2    we talk -- we have safety conferences and huddles, talks as

3    we go.

4         Q    How about Safety Rule M, are you familiar with that?

5         A    Yes, sir.

6         Q    Let me show you, Mr. Chapman, Defendant's Exhibit 4,

7    and is that a correct copy of Safety Rule M?

8         A    Yes, sir, it is.

9         Q    And what does Safety Rule M provide with reference

10   to employee safety?  What does it say?

11        A    That the employee is expected not to do anything

12   that would jeopardize his own safety.

13        Q    Or the safety of anybody else?

14        A    Yes, sir, or the safety of anybody.

15        Q    Now, how about Rule 851, are you familiar with Rule

16   851?

17        A    I can not -- yeah, the 500 Conductor Rules?

18        Q    Right.

19        A    Yes, sir.

20        Q    What does that rule state?  Does it state who is in

21   charge of trains?

22        A    Yes, sir, that must be understood, because that

23   becomes -- occasionally we have a problem with that, but the

24   conductor is in charge of the train and he is responsible for

25   the safe operation and movement and that the train will not

1    move until it is safe to do so.

2        Q    And, finally, Rule 586, is that another rule in the

3    conductor area?

4        A    Yes, sir.

5        Q    What does that provide with reference to the

6    conductor's duties concerning the cars in the consist.

7        A    That if a car is found on the line of road, an

8    industry, it will not be moved until it is safe to do so.

9    That if the car is found unsafe that it will not be moved.

10        Q    And that language, consist, what does that mean?

11        A    The train.  We make a train -- we have a marker on

12    the rear and an engine on the head end of a cut of cars and it

13    consists of a train.

14        Q    Can you give us some approximation of how often in

15    your career as trainmaster a conductor would, under that rule,

16    make a decision not to pull a car or take a car out of a

17    consist?

18        A    Yes, sir.  In my experience weekly under this rule.

19    For one reason or another, either a mechanical problem, a

20    problem with the customer, who is loading the car, like in

21    this case, or mechanical brake defect.

22        Q    I got you.

23        A    That happens fairly routine.  Now, the problem with

24    the customer is not as routine as the mechanical failures, but

25    they both happen.

1      Q    Mr. Chapman, prior to Friday, January 23rd of 1998,

2   were you ever notified in your capacity as Trainmaster there

3   by anyone of any problems at the Grace and Company with

4   reference to kaolin not being blown off properly from the

5   cars?

6      A    Well, no, sir.  No, not before this incident with

7   Mr. Kirkland.

8      Q    Now, do you know prior to this incident with Mr.

9   Kirkland on January 23rd, 1998 if there had been any railroad

10  injuries occasioned by the cars there at the Grace plant, do

11  you know?

12     A    No, sir, I am not aware of any.

13     Q    Now, with reference to Friday, January 23rd -- let

14  me first --

15          MR. GARLAND:    May I approach the witness, Your

16     Honor?

17          THE COURT:    Yes, sir.

18     Q    MR. GARLAND:    -- show you a document, that

19  document is Defendant's Exhibit 1.  What is that?

20     A    This is Form 22 that is -- when any type of injury

21  is sustained by an employee will be filled out, if possible,

22  by the employee.

23     Q    And that was filled out and signed by what employee?

24     A    L. E. Kirkland, Jr.

25     Q    And is that the report that Mr. Kirkland has talked

1    about and others have talked about, the report of his injury,

2    on Friday, the 23rd of January?

3        A    Yes, sir.

4        Q    Now, let me show you a document identified as

5    Defendant's Exhibit 6, what is that, please?

6        A    This is a required piece of information, a report,

7    that is inspection of a freight car in connection with a

8    personal injury.

9        Q    Was this the inspection of the freight car involved

10   in the incident on January 23rd?

11       A    Yes, sir.

12       Q    Does it describe a condition found by the inspection

13   there, on the form itself, of the car?

14       A    Yes, sir, it shows no exception.  It shows the

15   condition of the car is good with no exceptions.

16       Q    Now, when there is an injury reported that involves

17   a car, tell us whether or not there is any sort of

18   investigation that is carried out and, if so, explain that to

19   the jury, please.

20       A    Okay.  It is a standard, we only do the same -- we

21   are going to do the same routine every time we have an injury,

22   and I have been involved in maybe a dozen of them.  The first

23   thing you do is, like you do in any first aid situation, you

24   offer assistance.  You first want to know if the guy is in a

25   position where he needs immediate attention.  After you

1    resolve that fact and either go to the doctor or sit down and

2    start talking about what happened, I will get from the

3    employee, whoever it was, what the facts, as best as he

4    remembers since it has just -- it is new, because we do not

5    tarry on these things, we get right at them.

6        Q    You investigate the incident, is that what it is

7    called?

8        A    Yes, sir.  You interview the crew and then you will

9    go to the scene if possible and check the equipment, have a

10   mechanical expert come or one of our mechanical people that

11   does this every day, I don't know expert or not, but he will

12   come and do his inspection.

13       Q    As part of that do you ask the employee what

14   happened and that sort of thing?

15       A    Oh, yes, sir.  Yes, sir.

16       Q    Let me show you Defendant's Exhibit 7 and do you

17   recognize that document?

18       A    Yes, sir.

19       Q    Is that a summary of the findings of the

20   investigation into the incident of the 23rd of January?

21       A    Yes, sir.  On the Piedmont Division we had a team of

22   officers and when anybody was -- when anything of a serious

23   nature like this would happen then you would have -- you would

24   not be there by yourself, you would have other people to

25   assist with several aspects of the investigation.

1      Q    Who was the team in this case, do their names appear

2   there on the second page?

3      A    Yes, sir.  It was Assistant Superintendent Burgess,

4   Division Road Foreman of Engines Goznell, Superintendent of

5   Terminal Roberson, Trainmaster Chapman and Road Foreman of

6   Engines Marcum.

7      Q    Now, did the inspection of the car 99418, what did

8   it reveal, if anything?

9           MR. WETTERMARK:    Your Honor, if I could object.

10          I object, it calls for hearsay.  He can ask him what he

11          saw, what he observed.  I object to him asking about what

12          other people may have observed or seen.

13     Q    MR. GARLAND:   Well, what you saw.  Let's limit that

14   to what you saw and did you prepare this report?

15     A    I assisted in preparing the report.

16     Q    What, if anything, did you see or report on

17   concerning the condition of the railroad?  What --

18          MR. WETTERMARK:    I object to the form of the

19          question. It is a compound question, it says what did you

20          see or report on, and I object.  I do not mind this man

21          testifying about things he saw, but the question was

22          broader than that.

23          THE COURT:    Rephrase your question.

24     Q    MR. GARLAND:   What, if anything, did you see with

25   reference to the equipment in question?

1          A    We did go by the equipment that evening.   Mr.

2    Kirkland and I, and I am not sure who else, but I do remember

3    -- I do remember being with him, because that is the point

4    that we left and went to his home.   I went out when I

5    delivered him home that night.

6          Q    What did you observe about the equipment, what

7    was --

8          A    The -- to be honest, I may have been sent to pull

9    the tape from the engine and then met the team with Mr.

10   Kirkland.   I don't think I carried Mr. Kirkland out to the

11   scene, but I took him away from it.   I did notice there was

12   residue on the car.

13         Q    What about the handbrake, was it --

14         A    I didn't, myself, touch the car.   I was told by some

15   of the team members that --

16              MR. WETTERMARK:    Well, again, Your Honor, I

17         object to that, hearsay.

18              THE COURT:    Sustained.

19         Q    MR. GARLAND:   Can you tell us what you -- what was

20   the report of the investigative team as identified in Exhibit

21   7 with reference to the handbrake?

22              MR. WETTERMARK:    Again, I object.   That contains

23         hearsay.

24              MR. GARLAND:   He is the man that wrote the report.

25         I think he can testify --

1          THE COURT:     I don't believe that would cure a

2     hearsay problem.

3          MR. WETTERMARK:     That is right.  Object to

4     hearsay.

5          Q    MR. GARLAND:    Well, let me ask you this, did you

6     personally have any part in observation of the handbrake on

7     this car?

8          A    No, sir.

9          Q    That's far enough.  Let me ask you this, look at

10    Exhibit Defendant's Exhibit 8 and tell us what this is, if you

11    know.

12         A    It is just a follow-up from Mr. Roberson.

13         Q    Whose name is there at the bottom, Roberson and who

14    else?

15         A    Roberson and Chapman.

16         Q    And is this a document that you and Mr. Roberson

17    prepared?

18         A    Some of this information came from -- we were in two

19    different places.  Some of the information came from me and

20    then he compiled this information for the superintendent.

21         Q    Tell us about document D-9.   Tell us, number one,

22    what it is and for what reason it was prepared.

23         A    The Form 22 is filled out by Mr. Kirkland, is

24    accompanied by another form that is filled out by the

25    supervisors.  And the form is filled out by the supervisor is

1    condensed and entered into the computer, and this is a

2    condensed version or a computerized version of a handwritten,

3    copied report.

4        Q    That is Exhibit 9?

5        A    Yeah.

6        Q    What about Exhibit 10, what is this?

7        A    It is the same as the -- this report is -- I don't

8    know if it is identical, but it is very close to the initial

9    injury report and when the -- when the fellow changed from a

10   -- when the status of the injury changed we re-submitted a

11   report with a different heading.

12       Q    You prepared this partially; is that correct?

13       A    Yes, sir.

14       Q    Who does this go to?

15       A    It goes to the superintendent of the division.

16       Q    Who is that?

17       A    J. O. Wagner.

18       Q    Now, these reports you just identified, are those

19   reports that are routinely prepared when there is an injury?

20       A    Yes, sir.

21       Q    How did Mr. Kirkland explain to you, if you recall,

22   how he fell off the car there?  Do you recall his

23   explanation?

24       A    Yes, sir.  He had described his working condition as

25   best I remember.  I know that his gloves -- he had made

1    comment of his gloves being wet.  And I think that he made

2    reference to the clay on the car.  But when he started

3    describing his injury I asked him -- I tried to figure out the

4    dynamics of how you fall.  I was the first responding officer.

5    I found out that he was not requiring -- I offered medical

6    assistance, he did not require it.  He declined.

7        Q    What did you really say with reference to offering

8    medical assistance?  What that night -- this is Friday the

9    23rd.

10       A    Yeah.

11       Q    Tell us about any conversations you had with Mr.

12   Kirkland --

13       A    Well, I will tell you, it is three years ago and I

14   have moved from that area and to another area with another 200

15   customers and I do not remember a lot of these conversations

16   word for words.  But I do know that the first thing I would

17   have done after I found out that he was okay and that he did

18   not need any medical assistance at the time, the first thing

19   we would have done is started talking about how he got to

20   where he is right now.

21       Q    Did you ask him that night if he needed to go see a

22   doctor?

23       A    Yes, sir.

24       Q    Do you remember what he said?

25       A    He said he did not need a doctor.

1  Q Now, did you talk to him during the weekend of the

2 24th and 25th, Friday and Saturday, so you recall?

3  A No, sir, I do not recall, but I do not think I did.

4  Q When did you next see Mr. Kirkland?

5  A I saw him mid morning on Monday.

6  Q That is the 26th?

7  A Yes, sir.

8  Q Tell us just, if you will, where he was, what you

9 did, what you said, you know.  Give us just a recap of what

10 happened that Monday morning.

11  A I had -- I had picked him up off of his engine, as

12 we described earlier, where the engine failed, so I -- when I

13 heard he was there I went -- I left the plant and went to

14 him.  And picked him up, we went back to the plant, we

15 talked about the operation a little bit and looked around the

16 plant.

17  Q That is the Grace and Company plant?

18  A Yes, sir.

19  Q Did you talk to anybody from Grace and Company

20 there, do you recall?

21  A Well, my first move Monday, of course, is to go to

22 -- my first move was, since I was in the area I went

23 straight to the plant, because that was my next -- that was

24 my next place I needed to see.  Mr. Kirkland is going to be

25 at work and he thought he was going to be all right and time

1    would tell.  And we went to -- well, I went out to the plant

2    and --

3        Q    Monday morning?

4        A    Monday morning.  -- and took a little walk and

5    looked around.

6        Q    All right.  Did you talk to anybody there at Grace

7    and Company then, or do you recall?

8        A    The only person I ever talked to at Grace and

9    Company was the load out man, the guy -- and I am not familiar

10   with all the names of these fellow that worked outside.  But

11   the man I talked to, I was just explaining to him that we had

12   had an incident and that these cars could not be pulled unless

13   the and I didn't say the car to be cleaned, I told him that

14   the walking area and the ladders had to be clean to where we

15   could work on them without slip sliding.

16       Q    And what did he say?

17       A    He said that they did the best they could do and

18   they worked on these cars every day before we pulled them.

19       Q    It was raining on Friday; is that right, the 23rd?

20       A    It was raining when I caught up with Mr. Kirkland,

21   yes, sir.

22       Q    Do you remember was it raining or not on Monday, the

23   26th?

24       A    No, it was not.

25       Q    Tell us, back now, you caught up with Mr. Kirkland,

1    and what, did the two of you have a conversation?

2         A    Well, I heard testimony that I got up on the engine

3    and talked to him, which is probably what happened.  I don't

4    remember getting up on the engine but I get up on a lot of

5    engines, is what I do, and talk to crews.  But me and Mr.

6    Kirkland did take a ride over to the property where Grace is.

7    And during that conversation I am sure the topics were his

8    health, first of all, when we were not talking railroad we

9    would maybe talk a little bit of golf or --

10         Q    How did he describe his health that Monday morning

11    when you saw him?

12         A    Well, my observation was I saw -- I did not see

13    anything, but -- I mean, I did not see a limp.  And when I

14    asked him about his hand he would show me one of these, but he

15    is going to tell me that he is reliable for service, because

16    if I think he is not I am going to send him home.

17         Q    And he was back on service that Monday morning?

18         A    He was back at work, yes, sir.

19         Q    Go ahead.

20         A    The conversation would have been about his

21    well-being.  And, of course, he is talking about -- at this

22    point he is talking about Grace, I am asking the questions

23    about the service.  He knows at this time I have only been on

24    the property maybe four or five months.  I spread myself as

25    thin as I could learning 75 crew members in Charleston and 100

1    crew members in Columbia.  I had not had -- maybe one time

2    that I had went by myself just hunting out all the little back

3    roads and where these industries are located to figure out

4    where I was at myself.  So I was getting my information from

5    Mr. Kirkland, because he is -- he is the authority on that

6    particular location.

7         Q    Tell us what else was, if anything, was said between

8    you and Mr. Kirkland and then what next happened that Monday

9    as you recall?

10        A    Well, I remember taking him back, I take him back

11   and put him with his crew.  I don't remember if it is at the

12   road crossing or not, but I put him with the crew.

13        Q    Where did you then go from there, do you recall?

14        A    Well, there is -- yeah, I went down down in the

15   valley, down on the river -- oh, I started that morning

16   pretty early.  I went to get something to eat, I do remember

17   that.  And I -- looking at industries, I suppose.  I mean,

18   just normal course of duties.  I did not have another crew

19   working, but I had a lot of areas that I was not real sure

20   about between there and Augusta, so between there and the

21   river.

22        Q    When did you next see or hear from Mr. Kirkland on

23   Monday the 26th?

24        A    I was called back to the -- I was called back to the

25   depot to meet with the crew.

1      Q    This is the Aiken Depot?

2      A    Yes, sir, in Aiken.

3      Q    Had they left Aiken and gone to Grace and come back

4  or --

5      A    Yes, sir.

6      Q    Okay.

7      A    Yeah, they were almost at Grace that morning when I

8  talked to Mr. Kirkland about -- whatever time that was.

9      Q    Did you have any telephone conversations with him

10  between the time you were telling me about seeing him and

11  talking to him and the time you were called back to the depot

12  in Aiken?

13      A    No, sir.

14      Q    Any radio, two-way radio conversations?

15      A    No, sir.

16      Q    So what, then, the next encounter with him, was that

17  your meeting at the depot there in Aiken?

18      A    Yes, sir.

19      Q    What was the nature of the call or did you know?

20      A    Well, no, I did not know -- I did not know until I

21  walked in the office.  And he explained to me that -- well, he

22  said that -- I can not remember the term about his back.  He

23  said his back was tightening up.  He told me it was tightening

24  up.  And I asked him, do you need to go to the doctor, are you

25  able to go.  And he said, well -- at that time he refused

1   medical attention.  He did not want to go to the doctor.

2       Q   Did he remain on duty, or what happened?

3       A   The day was shortened.  I don't remember if he done

4   it -- I don't remember if he performed in on service after our

5   conversation or if he -- if he just told the brakeman to put

6   the train away.  I don't remember that myself.

7       Q   Did he tell you at that time he had slipped on the

8   car?

9       A   Yeah.  He told me that he had gotten up on a car,

10   which the first thing I -- well, he said he had gotten up on a

11   car that had this residue on it and his foot slipped and his

12   back was tightening up on him.  And he had told me at that

13   time if the tightening persisted or pain, I can not remember

14   which way he said it, it is in the report, but he said if it

15   persisted he did not know if he was going to be able to work.

16       Q   And what did you do then?

17       A   I would say I sent the crew home.  I mean, I am just

18   we can look at the records -- you can look at the record and

19   see how much time they made that day -- but it was probably

20   getting up near the five, six hour on duty, and being the

21   situation I was in I felt I was better off letting Mr.

22   Kirkland go home.

23       Q   Did Mr. Kirkland call you or tell you, ask your

24   advice about whether he could leave a car at the Grace and

25   Company that day?

1      A   No, sir, he did not.  We had covered that the

2   night-- on Friday, the night he got hurt, the initial 23rd

3   deal, we covered, not verbatim like we did here with these

4   rules, but it is understood and has always been understood the

5   conductor has the authority and the right, the ability, the

6   obligation to leave a car that is not fit to run at the plant.

7   And the reason being, we are not set up to clean up

8   everybody's cars and make everybody's cars mechanically sound.

9    If they are our cars we are going to repair them

10   mechanically. But if a man has scrap hanging over the side of

11   a car and we let it go down the road and somebody on another

12   track gets sideswiped or -- in this case if we just set the

13   car out and somebody got hurt down the road -- we don't move

14   cars from customers.  That is their problem and we don't want

15   it on our railroad if it is not right.

16       Q   Have you disciplined a conductor for taking a car

17   out of a consist and leaving it somewhere?

18       A   No, sir.

19       Q   Were there any other meetings that you had with Mr.

20   Kirkland that day now, on Monday, the 26th, that we have not

21   covered?

22       A   No, sir.

23       Q   When did you -- did you see him the next morning,

24   the 27th?

25       A   I went to -- I remember talking with him in Mr.

1    Roberson's office in Columbia.

2        Q    Did you take him to the doctor?

3        A    No, sir, I did not.

4        Q    Who took him, do you --

5        A    I know Mr. Roberson went.  I don't know of Mr.

6    Marcum went with them or not.

7        Q    Do you know when that was?  Was that Monday the 26th

8    or Tuesday, the 27th?

9        A    No, no.  Monday after work, after he said his back

10   was tightening up, they went home.  He reported back to work

11   on Tuesday morning and he called the office in Columbia and

12   reported that he was not going to be able to work, that he

13   wanted to see a doctor.

14       Q    Okay.

15       A    And we got him to the doctor.

16            MR. GARLAND:   I believe that is all I have.

17            THE COURT:    Mr. Wettermark, we are going to take

18       a short break before we proceed with the cross

19       examination.

20            MR. WETTERMARK:    That is great.

21            THE COURT:    We will resume in just a few minutes.

22        We will be in a short recess.

23   (COURT IN RECESS)

24            THE COURT:    Mr. Wettermark, you may proceed.

25            MR. WETTERMARK:    Thank you.

1                          CROSS EXAMINATION

2     BY MR. WETTERMARK:

3          Q    Mr. Chapman, you sir, are an official of the Norfolk

4     Southern Railroad Company, aren't you?

5          A    Yes, sir.

6          Q    Would you agree with me that having kaolin on grab

7     irons of cars is an unsafe situation?

8          A    Yes, sir.

9          Q    It's not just a little bit unsafe, it's terribly

10    unsafe?

11         A    It's unsafe.  I don't know if there's a degree.

12         Q    You know from your experience working for the

13    railroad that these grab irons, these walkways, these are

14    structures that these men rely upon as a matter of life and

15    death to keep them safe?

16         A    Yes, sir.

17         Q    And to have kaolin on them puts them at risk,

18    doesn't it?

19         A    Yes, sir.

20         Q    Terribly unsafe?

21         A    Yes, sir.

22         Q    You have heard the testimony in this courtroom about

23    how long that situation went on, haven't you?

24         A    Yes, sir.

25         Q    If this situation lasted as long as we heard in this

1    courtroom, would you agree with me that Norfolk Southern

2    Railroad Company failed to provide this man a safe place to

3    work?

4            MR. GARLAND:    I object to the form of that

5        question, Your Honor, all that "this situation" and all

6        this; this is just such a --

7            THE COURT:    I overrule the objection.

8            MR. GARLAND:    It's an open-ended question.

9        Q    Mr. Wettermark:    Would you agree with me, if

10    indeed these men, for nearly eight years, had been going to W.

11    R. Grace and having kaolin on the grab irons and walkways time

12    after time after time, would you agree with me that someone

13    dropped the ball?

14        A    It's never happened on my term -- on my watch, so --

15    but I would agree that that's a situation that should have

16    been corrected.

17        Q    It happened one time on your watch, didn't it?

18    February 23rd, didn't this man get hurt when he slipped off

19    the car?

20            THE COURT:    You mean January?

21        Q    Mr. Wettermark:    January 23rd, I am sorry.    I

22    will slow down.

23        A    Okay.

24        Q    That was on your watch, wasn't it?

25        A    Yes, sir.

1      Q    And didn't Mr. Kirkland fall off a car because of

2  clay on it?

3      A    I don't think so.

4      Q    You don't think so?

5      A    No.

6      Q    Were you out there?

7      A    No.  You asked me a question what I thought.  I was

8  just going to tell you why I thought he -- if you want to know

9  why I think he fell, it didn't make the report, because it's

10  not based on any -- the problem being when I asked Mr.

11  Kirkland did he slip off the car, we was talking about the

12  feet and the hands type thing -- I deal with dynamics of

13  people mounting cars and dismounting cars, handling switches.

14  Okay? When you asked me the question, if Mr. Kirkland's feet

15  had slipped out from under him, I would have considered Mr.

16  Kirkland to went down where he was, if your feet slip out from

17  under you.  If you are handling -- in this situation, if he

18  was handling the brake, I don't think he would have sprung

19  away from the car the way he told me he went -- 12 feet on the

20  fall.

21      Q    When did he tell you he went 12 feet from the car

22  when he fell?

23      A    Well, I heard that testimony.

24      Q    You heard Mr. Kirkland tell these people that he

25  fell 12 feet away from the car?

1      A      Oh, no, no, no.  But he was -- when he explained to

2  us how he left the car, he -- the investigation reveals that

3  he didn't fall right beside the car, that it was like he was

4  kind of sprung away from the car.

5      Q      When he explained to you all, did he explain to you

6  that he had slipped in clay?

7      A      Well, he said there was clay on the car.

8      Q      Did he tell you he slipped in the clay?

9      A      He told me that his hand slipped off the brake

10  wheel.

11      Q      Do you recall him telling you that the reason he

12  slipped off this car was because of clay?

13      A      I -- he said there was clay on the car.  I don't

14  remember him saying, this clay is everywhere, and I wouldn't

15  have fell.  He told me it was raining, his gloves were

16  soaked.

17      Q      Well, let's not go on your recollection.  That night

18  there at the Aiken Depot, wasn't he required, as part of his

19  job, to fill out an accident report?

20      A      Yes, sir.

21      Q      You were his immediate supervisor, weren't you?

22      A      But I didn't have him fill that report out.

23      Q      Did you look at the report?

24      A      Well, it's been in the file; yes, sir.

25      Q      Did you review the report?

1      A    Oh, yes, I had to send all of them to the

2   Superintendent.

3      Q    And in his report, didn't he put, "while releasing

4   hand brake on cover topper loaded with clay, slipped on clay

5   on topper and fell to ground"?

6      A    Well, he didn't tell me that.

7      Q    He didn't tell you that?

8      A    No, sir.

9      Q    I see.  Did you -- you told this jury that you went

10  out to the scene afterwards, and -- I think Mr. Garland was

11  asking you questions, but I think you told him that when you

12  checked out the car out there at Warrenville, that -- tell us

13  again what you saw when you were out there.

14     A    Well, it was at the edge of dark at this time.

15     Q    Yes, sir.

16     A    We looked around the -- you know, I can remember

17  walking up the track, the length of the track and there were

18  other officers there, I don't remember exactly which ones of

19  the five of us.  The only thing I observed that was of any

20  consequence was that I couldn't see where anything had hit the

21  ground, and that there was a little bit of clay on the car.

22     Q    You did see the clay on the car?

23     A    Well, I am talking about on the -- you know, I never

24  said that there wasn't clay on the car.

25     Q    Was there clay on the grab irons?

1     A    There was a -- where we were, there was a -- like a

2    thin layer of dust of this stuff, but it had been raining all

3    day.

4     Q    Well, describe how thin a layer of dust it was that

5    you saw that night when you went back to the scene.

6     A    What do you mean how thick?  I mean, I don't know

7    the milliliters, but it's like a dusting, it's not -- it's not

8    a thickness, it's just -- let's say, like a dirty windshield

9    type -- you know, just a --

10     Q    Did Mr. Kirkland ride with you out to the scene?

11     A    No, sir.  Not that I remember.  I remember taking

12    him home, but I don't remember how we got to the scene.

13     Q    Mr. Chapman, do you recall that I took your

14    deposition just one week ago?

15     A    Yes, sir.

16     Q    You were under oath then, didn't you?

17     A    Yes, sir.

18     Q    Do you recall that I asked you at that time whether

19    you had gone back to the scene that night?

20     A    Yes, sir.

21     Q    And didn't you tell us, sir, under oath, that you

22    hadn't gone back there?

23     A    Well, I tell you what.  I also told you that you had

24    me tes --

25          THE COURT:    Hold on, wait a minute now.

1          THE WITNESS:    Oh, I'm sorry.

2          THE COURT:      Just answer his question.

3          THE WITNESS:    Oh, yes, sir.

4      Q    Mr. Wettermark:      You did, under oath, you said, I

5    didn't go back to the scene?

6      A    Well, I didn't remember going back.  And I had

7    answered that way several times, because I didn't remember.

8      Q    I see.  And you have remembered since last week?

9      A    Well, I have sat through a lot of testimony, and I

10   got an opportunity to read all the reports.  The reason I do

11   the reports is so I'll know what happened three years later,

12   hopefully.

13     Q    What are you telling us, sir?  Are you saying that

14   you remember going back to the scene now?

15     A    No.  I remember when a man told me -- when they

16   started talking about getting Mr. Kirkland back home, I

17   remembered taking Mr. Kirkland from that location and going to

18   his apartment.

19     Q    But you didn't remember that last week when I asked

20   you if you went back to the scene?

21     A    No, I didn't.

22     Q    In fact, you said several times, under oath, I

23   didn't go back there that night?

24          MR. GARLAND:    What page are you on?

25     A    The Witness:      I don't know that.  I don't know that

182

1    I said I didn't go back there that night, but I didn't

2    remember going back there that night.

3              THE COURT:     And if you would refer to a page in

4         the deposition when you do use it.

5              MR. WETTERMARK:     Yes, sir, page 23.

6         Q    Mr. Wettermark:     Let me ask you this specific

7    question, sir.  Didn't I ask you, when you were under oath,

8    just one week ago, page 23, question, "At any point in time,

9    did you or anybody else go with Mr. Kirkland back to the scene

10   of the accident"?  And was not your answer, "I -- I didn't.  I

11   don't remember being at the scene of the accident with Mr.

12   Kirkland"?

13        A    I didn't -- no, sir.  I didn't.  At that time, I

14   surely didn't.

15        Q    So what you are saying is you have remembered it

16   since then?

17        A    Well -- yes, sir.

18        Q    Let me ask you about something.  When you first got

19   there did you go check out Mr. Kirkland's injuries?  That

20   Friday afternoon, when you first got to the Aiken Depot,

21   when you learned he was hurt did you go check out his injury?

22        A    Yes, sir.  Yes.  He was in the room, that was the

23   reason I came down there.

24        Q    Sure it was.  Did you go look at his hand?

25        A    Yes -- well, yes.  I asked him about his hand, that

183

1    was the obvious injury.  I mean, he was showing me his hand.

2        Q    Did you look at it?

3        A    Well, yes, sir.

4        Q    What was wrong with it?

5        A    Well, I didn't notice anything -- I didn't notice

6    anything particular.

7        Q    Didn't see any bruising or swelling?

8        A    No broken bones.

9        Q    Didn't see a thumb that was deformed?

10       A    No, sir.

11       Q    Nothing like that that day?

12       A    No, sir.  And when I started asking him, I said, you

13   know, can you use it.  And he would do this (indicating).

14       Q    As I understand it, did you ever tell him, Mr.

15   Kirkland, we want you to work with us so this won't be a

16   reportable accident?

17       A    No, I never used that.  I'm not --

18       Q    Did anybody else say that to him?

19       A    Not in my presence.

20       Q    Not in your presence?

21       A    No, sir.

22       Q    Did anybody put ice on his back?

23       A    Ice is available, and there was -- and he did have

24   ice, but I am not the doctor.  I don't -- you know.

25       Q    Did anybody put ice on his back, sir?

1       A    I didn't.  I don't remember anybody putting ice on

2   his back.

3       Q    Anybody put ice on his hand, sir?

4       A    I remember him carrying an ice bag as we went home.

5       Q    Do you remember any of the other officials sitting

6   there making jokes, saying, oh, Dr. Roberson, you do this, Dr.

7   Chapman, you do this?

8       A    No, sir.

9       Q    That didn't happen?

10      A    No, I don't -- I don't remember that.  I wasn't -- I

11  don't remember any tomfoolery around an injury.

12      Q    This following Monday morning -- let me ask you

13  this:  Do you recall, sir, that on that Friday evening, Mr.

14  Burgess told you that he wanted you to go out to W. R. Grace

15  that following Monday and get this situation squared away?

16      A    No, sir.  I don't remember him telling me that.

17  But I do remember going straight to W. R. Grace Monday

18  morning.

19      Q    Oh, so just coincidentally, you went to W. R. Grace?

20      A    No, no.  I am not saying that.  I am just telling

21  you that I don't remember Mr. Burgess point blank telling me

22  to do that.

23      Q    Is it your testimony, sir, that this crew did not

24  call you while they were at W. R. Grace and ask you to come

25  out there and come and see for yourself the problem with the

1    cars?

2        A    Yes, sir, that's true.

3        Q    Now, tell me again; when did you go to W. R. Grace

4    that morning?

5        A    First thing.  It's an hour and a half drive or so

6    from Columbia.  I am not sure if I got up at 6:00 or 5:00, or

7    whatever, but my first move of the day was to drive to Aiken

8    and -- to drive to the place where the man loaded the cars and

9    talk to the people there.

10       Q    What time did you get there?

11       A    I would say around 8:00 -- 8:00 o'clock, or

12   somewhere in that neighborhood.

13       Q    Who did you talk to when you got there?

14       A    The fellow who operates the load out there at W. R.

15   Grace, the guy who does the work.

16       Q    Who was that?

17       A    Oh, I don't know that.

18       Q    How did you know who he was?

19       A    Well, it's -- he was working in an industry scene;

20   he is -- they are there working.

21       Q    Was he a front-end loader operator?

22       A    No, no, no.  He was working around the railroad

23   cars, right there where they load, and clean them off.

24       Q    Just go up and talk to somebody you saw walking

25   around there?

1      A   No.  The guy that was -- appeared to be in charge of

2  the group of people working, like the dock master or the guy

3  on the dock.

4      Q   You don't know his name?

5      A   Oh, no, sir.  I sure don't.

6      Q   What was his position?

7      A   He was a worker there at the -- a loader, I guess,

8  or -- I don't know what their titles are, but he was a worker

9  there at Grace.

10     Q   Did you ask, "I want to talk to the man in charge?"

11     A   Oh, no, no, I didn't do -- I never talked to the man

12  in charge.

13     Q   Why did you go out there that morning?

14     A   To talk to the people who cleaned the cars and

15  loaded the cars to try to eliminate the potential problem.

16     Q   And the problem was clay being on the grab irons?

17     A   Yes, sir.

18     Q   Well, why didn't you go to the bossman?

19     A   The bossman don't load or clean the cars.

20     Q   Well, did you talk to all the people who load and

21  clear the cars?

22     A   Well, the guys that were -- the people that were out

23  there on day shift, I talked to a couple of guys that were

24  there that were loaders.

25     Q   Well, Mr. Chapman, if you are going to a business to

1    try to correct an unsafe situation, doesn't it make sense to

2    go talk to the man in charge and not just talk to the one of

3    the guys working on the dock?

4         A    Well, in the industry, the people who do the work

5    are the people I usually deal with.  I generally don't deal

6    with the people in the top of the building in the back office.

7    I deal with the people that are on the dock.  I am a front

8    line supervisor.  I don't -- I wear cotton pants and boots to

9    work, and gloves.

10        Q    Well, when you left there, what assurance had you

11   been given that there wouldn't be this problem any more with

12   clay being on the cars?

13        A    Well, they told me that they had a way to clean the

14   cars off and they would do the best job they could.

15        Q    Who told you that?

16        A    The gentlemen who do the work at the plant.

17        Q    What about the guys on second shift?  Who was going

18   to tell them to do it?

19        A    Well, I'm not -- I don't know.  I don't know if we

20   -- I don't know.

21        Q    What about the people on third shift; who would have

22   told those workers on the dock to clean the cars off?

23        A    Well, I don't know that they load three shifts, but

24   be that as it may, I didn't talk to anybody on the second

25   shift or the third shift.

1     Q   Wouldn't it have made sense to go talk to the man in

2  charge so he could make sure that the message got delivered to

3  all three shifts?

4     A   The standard would be that we wouldn't move the cars

5  if they weren't right; that's what makes sense.

6     Q   And you are telling us that Mr. Kirkland and his

7  crew didn't call you back later on that morning and say, get

8  out here, we are not moving these cars because they are so

9  covered with clay?

10     A   I went to the plant.  I went and talked to the crew

11  -- me and Mr. Kirkland rode around a little bit.  And after

12  that, the next time I remember talking to the crew was back at

13  the Aiken Depot when I was called to come back there.

14     Q   Well, let me ask you -- I'm going to ask you to go

15  forward a little bit in time.

16     A   Okay.

17     Q   After you got back to the Aiken Depot, after you

18  found out that Mr. Kirkland had hurt himself again --

19     A   Yes, sir, aggravated himself, yes.

20     Q   You saw the cars then, didn't you?

21     A   Yes, sir.

22     Q   And you saw them covered with clay, didn't you?

23     A   Yes, sir.

24     Q   Did you go get in your car and go back down to W. R.

25  Grace, and say, look, I was just here a few minutes ago, and

1    you sent cars out, just like you said you wouldn't?

2         A    No.  No.  I made some exclamation to the crew,

3    because I was upset that they even pulled the cars to begin

4    with.  We had just been through this Friday night.

5         Q    Where did these cars go after Mr. Kirkland got

6    hurt?

7         A    Same place they went on the 23rd.  They go to be

8    switched, classified from Warrenville and then outbounded.

9         Q    What do you mean, they go -- they went to

10   Warrenville like that?

11        A    Like what?

12        Q    With clay all over them?

13        A    Well --

14        Q    Have you seen these pictures?

15        A    I saw some pictures yesterday.

16        Q    Do you see this engine with clay all on the running

17   board?

18        A    Yes, but I didn't notice any clay on the running

19   board when I was there that day.

20        Q    Oh, so you didn't see any of this clay that day?

21        A    No, sir.  I didn't say that.  I said I didn't see no

22   -- there's clay all over that engine.  I didn't see that.  We

23   use that engine every day at that job.  It don't go out of

24   there, it stays there for a week.  Tomorrow, we are going to

25   get back on that engine, and nobody said anything about that

1    engine to me.

2         Q    Are you telling this jury that when you went out

3    there there wasn't clay all over this engine like this?

4         A    No, sir.  I said I didn't see it.

5         Q    Well, let me show you this picture.

6         A    I didn't go to look at the engine, I went to see the

7    employee.

8         Q    Did you see a car that had this much clay on it?

9         A    Well, from my vantage point, you can't -- you have

10   got to get up on the car to see that.  You can't see that

11   standing on the ground.

12        Q    Well, what are you telling us?  Are you telling us

13   you didn't go look at the cars?

14        A    Well, I looked at the cars from, I guess, from

15   whenever I was at the office.  I mean, what do you -- I don't

16   know when I said I looked at cars again.

17        Q    Let me ask you, sir.  After Ms. Kirkland was injured

18   on Monday and told you that he had slipped on the clay --

19        A    Right.

20        Q    -- told you that the cars that had come from W. R.

21   Grace covered with clay --

22        A    Yes, sir.

23        Q    -- did you not go look at the cars?

24        A    On Friday night, yes, sir, I did.

25        Q    No, I'm talking about on Monday.  Did you not go

1    look at the cars that day?

2        A    No, sir.  I had to leave.

3        Q    Are you telling this jury, sir, that that very

4    morning, you personally had gone out to W. R. Grace --

5        A    Yes, sir.

6        Q    -- talked to them about the clay problem --

7        A    Yes, sir.

8        Q    -- three hours later, you got one of your men, who

9    is injured --

10       A    Yes, sir.

11       Q    -- says that he got injured because of clay on

12   these very W. R. Grace cars, and you are telling this jury

13   that you didn't even go bother to go look at them?

14       A    Well, I think I left and went to --

15           THE COURT:    Mr. Wettermark, if you would kind of

16       stay over this way unless you need to approach the

17       witness for some particular reason.

18           MR. WETTERMARK:    You're correct, Your Honor.

19       A    The Witness:    What I did, something called me away

20   and I left.  And I have heard in testimony that it was a

21   crossing accident; I don't remember that.  But when I found --

22   my intention was to go down there and make sure Mr. Kirkland

23   was all right.  That's my first -- that's the first thing I

24   would do.

25       Q    You agree with me that having clay on the cars like

192

1  that is very dangerous?

2      A    Yes, sir.

3      Q    What steps, as the trainmaster in charge, did you

4  take on that Monday, to make sure that these cars weren't

5  switched by any other trains until they were cleaned up?

6      A    Well, we weren't going to work the industry again

7  until Monday morning.  Before we worked the industry, I went

8  and talked to the people who loaded the cars and told them

9  that --

10     Q    No, sir.

11     A    -- that we wouldn't pull the cars unless they were

12  clean.

13     Q    I am talking about Monday morning.  After Mr.

14  Kirkland was injured that Monday, January the 26th --

15     A    He was injured on Friday.

16     Q    You went out on that Monday morning and talked to

17  the people at W. R. Grace; is that right?

18     A    Yes, sir, that's right.

19     Q    Three hours later, you got a call, come to the Aiken

20  Depot?

21     A    Yes, sir.

22     Q    And when you got to the Aiken Depot, you found out

23  that Mr. Kirkland was injured, didn't you?

24     A    Yes, sir.

25     Q    And I think you just told this jury, if I remember

1    correctly a few minutes ago, that you kind of cussed because

2    you were mad about W. R. Grace leaving the clay on the cars?

3         A    No, sir.

4         Q    Well --

5         A    I was mad because we pulled the cars with the same

6    contaminant -- the same problem we had on Friday night when a

7    man was hurt, and we had went over the -- even though he knew

8    the policy, we had went over it on Friday, we had went over it

9    on our ride on Monday.  And instead of going down there and

10   telling the guy that, no, I can't pull your cars because they

11   are dirty, he pulls the cars anyway.

12        Q    Mr. Chapman --

13        A    That's what makes me mad.

14        Q    Are you trying to blame this man for what has

15   happened to him?

16        A    No, sir.  But I am telling you it wouldn't have

17   happened if he had followed the policy and not pulled the

18   cars.

19        Q    Mr. Chapman, don't you know, sir, that this man

20   tried for eight years to get permission not to pull these

21   cars?

22        A    No, sir, I didn't know that.

23        Q    Well, what about on this night?  You knew that he

24   was hurt on Monday, you knew he was hurt; is that right?

25        A    Well, I knew he had a tender spot, yes, sir.

1      Q    And you knew that the reason he had gotten hurt is

2  because of clay on these W. R. Grace cars, didn't you?

3      A    Yes, sir.

4      Q    You were the company official in charge, weren't

5  you?

6      A    Yes, sir.

7      Q    Did you take any steps whatsoever to take these cars

8  out of service?

9      A    Yes, sir.

10     Q    And how did you take these cars out of service?

11     A    I didn't take them out of service.  I talked to --

12  you asked me if I took any steps--

13     Q    Yes, sir.

14     A    I am not going to take the car out of service.  I go

15  talk to -- like I told you, I go talk to the customer to get

16  him to clean his act up so he gives us a good car.  I

17  reiterate to the conductor it's his authority not to pull the

18  car from a customer if it ain't right.  That's how we get --

19     Q    Mr. Chapman --

20     A    Yes.

21     Q    -- isn't it the truth of the matter, sir, that on

22  that Monday when you got back to the Aiken Depot, you found

23  out that Mr. Kirkland had re-injured himself, slipping again

24  on these cars, didn't you call a relief crew?

25     A    I don't remember that.  But I do remember I sent the

1    crew home.

2          Q    Well, don't you remember that you got the crew to go

3    take these cars down to Warrenville to --

4          A    I didn't allow the crew to take the cars to

5    Warrenville.  They probably continued to work what was going

6    on.  I left Aiken.  I don't know where I went.

7          Q    Sir, I guess that's what I am trying to find out.

8          A    Okay.

9          Q    Why didn't you tell this crew, don't switch those

10   cars any more; don't take them to Warrenville; they are

11   dangerous?

12         A    Whatever called me away took me away in a hurry;

13   that's all I can remember.

14         Q    Sir, isn't the truth of the matter, the reason that

15   you didn't take those cars out of service and the reason that

16   you allowed them to be sent down to Warrenville to be put on

17   another train is because that's what had been happening for

18   years and years and years?

19         A    Well, to be honest with you, I wasn't aware of the

20   problem until Friday, so my plan for remedying all this and

21   taking care of everything else was not -- was maybe not as

22   expedient as it should have been, but no, sir.  I would never

23   put a man in a situation that's dangerous, nor required him to

24   pull a car that had contaminant on it.

25         Q    Can I ask you something?  Did you used to work in

1   the railroad's equivalent of their police department?

2       A    Yes, sir.

3       Q    So you know, sir, in your experience there, you know

4   the importance of giving accurate testimony, don't you?

5       A    Oh, yes, sir.

6       Q    How do they blow the -- how do they blow the -- how

7   are they supposed to blow the clay off these cars?

8       A    With a little hand wand, like a car wash type setup.

9       Q    Have you watched them do it?

10      A    No, sir.  I haven't been there at the time that they

11  had finished their loading process and was going to blow the

12  cars off.  No, sir.  I haven't.

13      Q    Are you telling us that you have never gone out

14  there and seen how they do it?

15      A    No, sir.  I've never seen that -- no, sir.  I told

16  you I had only been out to the place maybe three times since I

17  worked there, and twice was because of this incident.

18      Q    Well, there ain't no question -- there's no question

19  in your mind after that Monday that this man was injured, was

20  there?

21      A    Well, I wasn't -- he had not let on to me that he

22  was injured.  If an employee is limping around, he will be

23  taken out of service.  He won't be able to -- he won't be able

24  to do his work; we can't have him out there hobbling.  And Mr.

25  Kirkland never let on to me that he was in any situation until

1   Monday afternoon when he said his back was tightening up, that

2   he wasn't going to be able to -- he didn't think he was going

3   to be able to go.  And I put that in the report.

4       MR. WETTERMARK:   Give me one second, sir.

5       THE COURT:   Yes, sir.

6       Q   Mr. Wettermark:   How did you find out -- that

7   Monday morning, how did you find out that Mr. Kirkland had

8   re-injured himself?

9       A   I don't remember.  I have cell phones, a pager in

10  your pocket, a radio that has about four frequencies that we

11  use.  I'm not -- I don't remember.  I don't remember how I was

12  contacted.

13      Q   How many times have you been back to W. R. Grace

14  since that Monday?

15      A   Maybe once or twice, but I left in -- I never had

16  any -- I never received any further complaints about the

17  customer or the cars, so --

18      Q   I guess that's my question, though; how many times

19  -- after that Monday, how many times did you go back to W. R.

20  Grace?

21      A   I don't know the answer to that.

22      Q   Have you ever -- did you ever go back there?

23      A   Oh, yes, sir, yes, I am sure I was back around. It's

24  part of the territory.

25      Q   Just a normal courtesy type call?

1     A    No.  I don't -- I wouldn't call on them.  I observed

2   the employees working.

3     Q    Oh, you went back to see your employees working?

4     A    If I was there, yes, sir.

5     Q    Well, let me ask -- when was the last -- did you

6   ever go back to W. R. Grace specifically about the clay

7   problem?

8     A    No, sir.

9     Q    Let me see if I understand this.

10    A    Okay.

11    Q    You are telling the jury that that Monday morning

12  you went and talked to the supervisors there about the clay

13  problem; is that right?

14    A    I talked to the fellows that work at the dock, yes,

15  sir.

16    Q    And then that very afternoon, one of your men was

17  injured slipping on the slick clay; is that right?

18    A    Yes.  I supposed injured tightening the brake up,

19  yes, sir.

20    Q    And you never went back to W. R. Grace to find out

21  about the clay problem?

22    A    No, sir.

23    Q    You didn't go back there the next day and raise hell

24  with them because they had ignored your visit the day before?

25    A    No, sir.

1     Q   Didn't go back there a week later to make sure that

2    they had stopped this habit that had caused one of your men to

3    get hurt?

4     A   I didn't go back -- no, sir -- I didn't go back and

5    raise any kind of Cain with the customer, no, sir.

6         MR. WETTERMARK:   That's all, sir.  Thank you.

7         THE COURT:   Any redirect?

8         MR. GARLAND:   Nothing further, Your Honor.

9         THE COURT:   All right, you may step down.  What

10   do you have next, Mr. Garland?

11        MR. GARLAND:   Your Honor, I was -- we have Michael

12   Maher.  Now, he may be -- I don't know exactly how long

13   he would be.  And of course, now, Mr. Roberson, they have

14   informed me has had an accident problem on the way.  He's

15   on his way, and he's coming from South Carolina.  I don't

16   know whether to start with Mr. Maher or wait until in the

17   morning.

18        THE COURT:   Mr. Maher is the rehab --

19        MR. GARLAND:   He's the rehab.

20        THE COURT:   It's a little after 5:00, we have put

21   in a pretty full day today.  The railroad -- Mr. Garland

22   has a witness he could call, it might be hard to say how

23   long it would take.  Of course, the goal is to try to be

24   sure we can get it to you tomorrow afternoon.  And if we

25   got in one more witness today, that would help us be a

1    little more sure that we'll have it to you tomorrow

2    afternoon.  Let's hear another witness.  Why don't we do

3    one more witness.  One more witness.  Call Mr. Maher, if

4    you would.

5                           MICHAEL MAHER

6                      Witness having been first

7                      duly sworn, testified on

8                      DIRECT EXAMINATION

9    BY MR. GARLAND:

10        Q    Give us your full name, please, sir.

11        A    It's Thomas Michael Maher, M-A-H-E-R.

12        Q    Where do you reside, Mr. Maher?

13        A    In Roanoke, Virginia.

14        Q    By whom are you employed?

15        A    Norfolk Southern Corporation.

16        Q    And in what capacity are you employed by Norfolk

17   Southern?

18        A    I am System Manager, Disability Support Services.

19        Q    How long have you been with Norfolk Southern?

20        A    With the company since August of 1981.

21        Q    Give us, if you will, please, sir, a little

22   information.  Where were you born and raised?

23        A    Charleston, West Virginia.

24        Q    Where did you -- did you go to high school there?

25        A    Yes, Charleston Catholic High School.

1      Q    Went to college there?

2      A    Went to Marshall University.  I have a degree in

3  Counseling and Rehabilitation Services, and a nursing degree.

4      Q    Now, when you -- did you work elsewhere before

5  hiring on with the railroad?

6      A    Yes.  I worked as a nurse in Portsmouth, Ohio.

7      Q    For what period of time?

8      A    1978 to August of 1981.

9      Q    When you first hired on with the railroad, what

10  division or department were you in?

11      A    I was a brakeman on the Virginia division in

12  Roanoke, Virginia.

13      Q    Go ahead and walk us through, please, your railroad

14  career, as to what positions you held and where they were

15  located.

16      A    I was a brakeman in Roanoke from August of '81 until

17  approximately June of 1983; and then I took a leave of

18  absence, went back to Ohio, worked as a nurse, went back to

19  get some more schooling; became a claim agent in Norfolk,

20  Virginia, in approximately November of 1985; and then went to

21  Chicago, Illinois, as a claim agent in September of 1990; and

22  then came back to Roanoke as a Senior Claim Agent in the

23  summer of '96.  I forget the exact date.  And then was --

24  worked as a Senior Claim Agent, District Claim Agent, and then

25  came over to the section I am in now as a manager in -- on

1    June 1st of 1998.  And then I took the present position March

2    1st of last year.

3         Q    Present position being the man in charge of that

4    department; is that right?

5         A    Yes, sir.

6         Q    Explain to us exactly what is the Vocational

7    Rehabilitation Department.  What is -- how is it set up, what

8    is the purpose of it?

9         A    Well, it's -- the disability support services

10   section is a program that is a benefit of all railroad

11   employees, and it's designed to help injured and ill employees

12   return to work.  It's composed of two sections, two

13   components, I guess; one is medical management, and that's

14   where we hire outside registered nurses who are trained in

15   occupational injuries, and they work with the employee, with

16   the doctor and the family as a consultant to help the employee

17   get back to work as soon and safely as possible.  And then, if

18   at some point in time during that period there appears that

19   the employee is not going to be able to go back to their

20   former position then the vocational rehabilitation component

21   takes over, and we work in trying to primarily -- our primary

22   goal is to try to get the employee back to some position

23   within the company.  And if those doesn't appear possible,

24   then we hire outside vocational counselors to work with the

25   employee in trying to find something for them outside the

1    railroad.

2         Q    Now, have you had occasion to work with Mr. Lester

3    Kirkland?

4         A    Yes, sir.

5         Q    And his lawyer, Mr. James Wettermark?

6         A    Yes, sir.

7         Q    Let me show you some correspondence.  And have you

8    corresponded with both gentlemen?

9         A    Yes, sir I have.

10        Q    Let me show you Defendant's Exhibit 15.  And is that

11   a letter that you wrote to Mr. Wettermark with a copy to Mr.

12   Kirkland?

13        A    Yes, sir, it is.

14        Q    And the date of that is what, please?

15        A    That is August 12th, 1999.

16        Q    Now, what are you asking for in that letter, please,

17   sir?

18        A    Well, I offered the medical management, if he wanted

19   to talk to a medical management nurse to let me know.  And

20   then also, I was requesting updated medical reports in order

21   to send them to the medical department.  I work very closely

22   with, of course, all departments of the railroad, but the

23   medical department especially.  It's the railroad's medical

24   department who determines what the medical qualification of

25   all its employees to be able to work for the railroad.

1     Q   Look at Defendant's Exhibit 16, which is another

2  letter, and the date of that is what, please?

3     A   This letter is dated August 31st, 1999.

4     Q   From you to who?

5     A   It's from me to Mr. Wettermark with a copy to Mr.

6  Kirkland.

7     Q   Now, does this -- what does this letter deal with,

8  please, sir?

9     A   Well, prior to writing this letter, it was my

10  understanding that Mr. Kirkland was interested in working as a

11  dispatcher.  It's my understanding he had prior dispatcher

12  experience.  Dispatchers are employees that coordinate the

13  movement of trains out on the road, not necessarily within a

14  yard.  And so I was mentioning there were some dispatcher

15  positions in Atlanta, Georgia and Dearborn, Michigan.

16     Q   Do you recognize Defendant's Exhibit 17?

17     A   Yes.  This letter is dated September 8th, 1999.

18  It's from Mr. Wettermark to me with a copy to Mr. Kirkland.

19     Q   And the nature of that is what, please?

20     A   Mr. Wettermark was apprising me that he had talked

21  with Mr. Kirkland concerning the dispatcher jobs, and that he

22  would -- was interested in a position in his own geographic

23  area.

24     Q   Now look at Defendant's Exhibit 18.  What is the

25  date of that letter?

1          A    It's dated September 16th, 1999, it's from Mr.

2     Wettermark to me with a copy to Mr. Kirkland.

3          Q    That is from --

4          A    I'm sorry, excuse me.  It's from me to Mr.

5     Wettermark dated September 16th, 1999.

6          Q    What does that letter deal with, please, sir?

7          A    It's -- well, I said, I understand the desire to

8     stay in his own locality and that there were no light duty

9     positions in his geographical area at this time.  And that I

10    would notify him if one did come up.  And then went -- talked

11    some more about some further medical reports.

12         Q    Now, coming on forward, look at Defendant's Exhibit

13    19.  And what is the date of that letter, please, sir?

14         A    It's December 16th, 1999; it's from me to Mr.

15    Wettermark.

16         Q    What is the -- look at the third paragraph, and what

17    does that letter concern, primarily?

18         A    I was letting them know that there were clerical

19    vacancies in the centralized yard office in Atlanta that were

20    available, and also that there were dispatcher vacancies in

21    the Crew Management Center in Atlanta.  All of those positions

22    were available at that time.

23         Q    Defendant's Exhibit 22, do you recognize that

24    letter, please?

25         A    Yes, sir, this is a letter from me to Mr. Kirkland,

1    dated February 18th of 2000.

2        Q    Does that deal with the dispatcher's position and

3    also the request to know about any medication that he may be

4    taking?

5        A    Yes.  We were arranging a meeting between Mr.

6    Kirkland and the superintendent of -- in Greenville, to

7    discuss aspects of the dispatcher position.  And then there

8    was -- Mr. Kirkland had mentioned some of the medications that

9    he had been taking, and I was asking for more specifics, you

10   know, the dosage, the frequency, so that I could pass that

11   information on to the medical department for them to -- which

12   is important for them to determine medical qualification to

13   work.

14       Q    Did you receive Exhibit 27?  Do you recognize that,

15   and if so what is that letter and who is it from?

16       A    This is a letter dated March 9th, 2000, from Mr.

17   Wettermark to me, indicating the dosage and frequency of the

18   medication.  He was responding to my last letter.

19       Q    Did it come about that because of the dosage of

20   medication that he could not hold a dispatcher's job?

21       A    That's correct.

22       Q    Why was that, as you understand it?

23       A    Well, you have to be -- in communicating with the

24   medical department it is my understanding that you can not

25   take certain medications, primarily narcotics, within six

1    hours of reporting for your tour of duty, nor during your tour

2    of duty.  So essentially, you have to be narcotic free for at

3    least six hours prior to going to work.  And that was

4    indicated that he wasn't.

5        Q    And I show you a letter identified as Defendant's

6    Exhibit 24, letter of March 20th, 2000.  Look at that, and

7    please tell me who it's to and what the subject of that letter

8    is.

9        A    This is a letter from me to Mr. Kirkland, and this

10   was after I understood that Mr. Kirkland had met with Mr.

11   Alley, who was in charge of the dispatchers in Greenville.

12   And Mr. Kirkland met with Mr. Alley, they discussed aspects of

13   the job and --

14       Q    Does that advise him of the clerical vacancies, and

15   if so, where and how many?

16       A    Yes.  There were -- at the time of this letter,

17   there were 11 clerical vacancies in the centralized yard

18   office in Atlanta, Georgia.  And -- but I went on to state

19   some other requirements.

20       Q    How did he respond to your advice to him that there

21   were clerical vacancies, 11 at that time, in Atlanta, Georgia?

22       A    Well, primarily, he didn't want to move to Atlanta

23   to take advantage of those opportunities to return to work.

24   He wanted -- was more interested in staying near his home.

25       Q    Did you offer the services of any outside

1   rehabilitation firm to try to assist him in finding full time

2   employment in the area, or that area of South Carolina?

3       A    Yes, sir.

4       Q    What firm did you employ?

5       A    The particular name of the firm was GENEX.  We

6   utilize maybe nine or ten different companies throughout the

7   system, and that was just one that there would be someone

8   nearby.

9       Q    Have you had occasion in the past to be familiar

10  with and use GENEX?

11      A    Well, yes, we have used GENEX a lot.  I was not

12  familiar --

13      Q    Are they nationwide or just in Carolina?  Where are

14  they?

15      A    No.  They are -- well, all I am concerned about is

16  system-wide.  They are at least -- they cover a good part of

17  the eastern United States.

18      Q    And is that the system where Norfolk Southern

19  operates?

20      A    Yes.

21      Q    And it was, in fact, a vocational rehabilitation

22  counselor assigned to Mr. Kirkland's case?

23      A    Yes, sir.

24      Q    And what was her name?

25      A    It's Geneva Bookman-Billups.

1     Q   And that was -- was that at a time when the other

2   employment within the railroad has been exhausted in that you

3   have offered him these clerical positions, and for his own

4   reason, he decided not to accept that, and is it that time

5   when you employed this outside agency?

6     A   That's correct.  I mean, it's as a last resort,

7   really, because our primarily goal is to try to get the

8   employees back to work within the company.

9     Q   If Mr. Kirkland had decided to accept one of the

10   clerkship jobs, Mr. Maher, would his benefits, by that I mean

11   insurance and all that, been the same in a clerk position with

12   Norfolk Southern as it was as a conductor with Norfolk

13   Southern?

14     A   Yes, sir, the benefits are essentially the same.

15     Q   Company-wide?

16     A   Yes, sir.

17     Q   Now, you have testified of your career with the

18   railroad.  In your personal observations and knowledge, are

19   railroad employees transferred or moved from divisions to

20   divisions and states to states throughout the system?

21     A   Yes, sir.  If you want to work for the railroad, you

22   sometimes have to go where the job is.

23     Q   And do you know whether or not the centralized

24   clerks in Atlanta -- in fact, the office grew because of

25   moving in clerks from throughout the system into a centralized

1    location?

2       A    Yes.  And it's still growing, because they still

3    need positions to be filled.

4       Q    Let me ask you one other thing.  If the vacancies

5    are still there would those vacancies still be available to

6    Mr. Kirkland?

7       A    Absolutely.  This program is available to Mr.

8    Kirkland as long as he remains an employee.

9       Q    And you still participate in it, but Ms. Bookman is

10   now the one who is trying to locate the job in South Carolina;

11   is that correct?

12      A    Outside, yes.

13          MR. GARLAND:   I think that is all I have of this

14      witness.

15          THE COURT:    Mr. Wettermark?

16                  CROSS EXAMINATION

17   BY MR. WETTERMARK:

18      Q    Mr. Maher, as far as responding, communication

19   between Mr. Kirkland and you, he has -- every time you have

20   responded to him he has been quick to write back to you or

21   call you back, hasn't he?

22      A    As far as I can recall, yes.

23      Q    Do you recall that early on, when you made him

24   offers of rehabilitation, that he wrote you a letter saying,

25   look, I am still seeing my doctors.  I'm not ready to give

1    up.  I'm going back to work as a conductor. -- Oh, I'm sorry.

2    And I apologize, Mr. Maher, I know that puts you in an

3    uncomfortable position, too.  Do you recall early on that he

4    wrote you several letters, basically saying, I am still being

5    seen by my doctors.  I'm hoping to get back to work as a

6    trainman.  I'm not quite ready for your services?

7        A    As best I can recall, yes.

8        Q    And then finally, when his doctors disqualified him,

9    said he couldn't ever go back to work as a trainman, he wrote

10   you that first letter in March of 1999, saying, my doctors

11   have disqualified me, I am ready for your help?

12       A    Well, I would have to look at the letter to know

13   exactly what he said, but as best I can recall, yes.

14       Q    In that very first letter asking for your help,

15   didn't he have just one request, in that he told you that

16   because of his family considerations, his family being there,

17   that he would ask you to try to find work in his geographical

18   area?

19       A    Yes.

20       Q    Pretty reasonable request, isn't it?

21       A    I certainly respect anyone wanting to stay in their

22   locale?

23       Q    Are you married?

24       A    I am divorced.

25       Q    Do you have children?

1      A    Yes, sir.

2      Q    Do they live near you?

3      A    They relocated with me when I came down from Chicago

4  to Roanoke.

5      Q    Would you be willing to move away from your children

6  to go find work?

7      A    In order to feed myself and them, I would go

8  wherever the paycheck is.

9      Q    So you would move to another state and leave your

10  children behind, to find work?

11      A    I have done that temporarily before, yes.  In fact,

12  every move entails that.

13      Q    Would you do that on a permanent basis, sir?

14      A    If it was necessary for employment and I thought it

15  was better -- for my betterment and my family's, my

16  children's, yes, I would.

17      Q    Did you learn from your conversations, or letters

18  with Mr. Kirkland, that he was divorced and that his daughter,

19  his daughter of his heart, lived in South Carolina, and if he

20  went to Atlanta he would have to leave her behind?

21      A    I don't recall really the particulars of that, but I

22  understand something like that, that he wanted to stay near

23  his family.

24      Q    It is my understanding, sir, that all the time -- I

25  guess it was nearly two years now, that you have been working

1    on his rehabilitation, you have only made him one job offer on

2    Norfolk Southern that's in his area, and that was the

3    dispatcher's job in Greenville?

4        A    In Greenville, South Carolina, yes.

5        Q    And he immediately said, "Yes, let me try that one";

6    is that right?

7        A    Yes, sir.

8        Q    And he went and did the interview and did everything

9    you asked of him.  And it was the railroad that says, no, you

10   can't work this job for medical reasons?

11       A    That's correct.

12       Q    And the medical reasons were because railroad

13   employees are subject to strict requirements as far as what

14   medications they can take?

15       A    That's -- well, in conjunction with the federal

16   government, federal regulations, yes.

17       Q    Sure.  These guys are subjected to random drug

18   screen by the Federal Railway Administration?

19       A    Well, I don't know about that.

20       Q    What about the clerks?  Can clerks take narcotic

21   medications?

22       A    Non-safety-sensitive jobs -- well, no job can take

23   narcotics, but non-safety-sensitive jobs have a less

24   restricting medication profile than safety-sensitive jobs,

25   such as a dispatcher.

1      Q     I think what you just said is common sense; no jobs

2    can they work if they are taking narcotic medications, right?

3      A     All I know is the medical department has medically

4    qualified him for a clerical position, now that's with

5    knowledge of all the existing medication that he is taking.

6      Q     Actually, the process with that dispatcher's job in

7    Greenville, didn't it happen just the way all these clerk jobs

8    are, where you sent him a letter and said, there's a job

9    available in Greenville.  And he said, great, I want to apply

10   for it.  He went to apply for it, and only then did the

11   medical department look into him?

12     A     Well, it was my understanding that he wasn't

13   applying for it, he went to talk to Mr. Alley to find out more

14   about it.  And during that conversation, certain things that

15   -- it's my understanding, certain things that Mr. Kirkland

16   said indicating that he may not -- he may not feel like he can

17   do it.

18     Q     Do you have any written letters or any record from

19   the railroad's medical department saying that he is qualified

20   for a clerk's position?

21     A     Well, I have communications with Dr. Lena in the

22   medical department.

23     Q     Do you have anything in writing that says he is

24   qualified to be a clerk on Norfolk Southern Railroad?

25               MR. GARLAND:   You mean other than Exhibit 24, which

1      says that?

2              MR. WETTERMARK:    I am asking him.

3              MR. GARLAND:    Well, I think you ought to show

4      him --

5              THE COURT:    Well, you will have a chance for

6      redirect.

7         Q    Mr. Wettermark:    Are you aware of any records

8      that you have from the Medical Department of the railroad,

9      saying that he is qualified to be a clerk?

10        A    Medical records?

11        Q    Or communication from the medical department that

12     you can show this jury, where the Medical department and says

13     he is qualified to be a clerk?

14        A    Well, the way the process works is, I send the memo

15     to the medical department asking Dr. Lena, she's one of the

16     medical directors, to review the medical file, in this case of

17     Mr. Kirkland.  And then to advise me of Mr. Kirkland's medical

18     qualification to return to either his former position or to an

19     alternate position.  And in the communication back, I was

20     surprised that he qualified for a clerical position,

21     non-safety-sensitive position.

22        Q    I guess my question is, do you have anything in

23     writing from the medical department saying he is qualified as

24     a clerk?

25        A    We have my writings of my communication over the

1    phone with the medical department.

2        Q    Do you have -- I mean, that's not what I'm asking

3    you. Do you have any documents with you from the medical

4    department that says, Norfolk Southern Medical Department,

5    this man is qualified as a clerk?

6        A    That's not how the process works.  I don't get -- I

7    send the medical department medical reports.  Then I ask them

8    to review them and let me know, meaning call me up or

9    sometimes they may send me an internal memo, but most of the

10   times, Dr. Lena calls me up and I jot down notes and send them

11   in a letter apprising whoever of that medical determination.

12       Q    And again, and I don't mean to put -- my question

13   simply was, in Mr. Kirkland's case, do you have anything in

14   writing from the medical department?

15       A    Directly from the medical department, no.  I have a

16   communi -- my writing of that communication over the phone.

17       Q    Do you know what narcotic medications he takes now?

18       A    At this minute, no.  But the last thing I saw was

19   Ultram, which I can't remember if that's an artificial or a

20   non-narcotic.  I forget how it's classified.

21       Q    Did you know that the pain management doctor who is

22   treating him has him taking 20 milligrams of Oxycontin three

23   times a day, three doses a day?

24       A    I don't remember the exact -- that's one of the

25   medications I saw in that letter.

1       Q    Oxycontin is a very powerful narcotic, is it not?

2       A    It's new since I was a nurse, I am not acquainted

3   with it.

4       Q    You have been watching TV these last months, and

5   read about all the uproar over Oxycontin abuse out on the

6   street world, haven't you?

7       A    I'm vaguely familiar with it through newspaper

8   articles, yes.

9       Q    Mr. Maher, in the last two years is there not a

10  single job on Norfolk Southern Railway that you could find for

11  this gentleman, in either Columbia, South Carolina;

12  Greenville/Spartanburg, South Carolina; or Augusta, Georgia,

13  or any of the towns in between?

14      A    Within the last two years the dispatcher position

15  was one we found that unfortunately didn't turn out to be

16  feasible.  But other than the clerical positions in Atlanta at

17  the present, those are the only ones available.

18      Q    You weren't able to find him any clerical positions

19  in any of those towns I just mentioned?

20      A    No, sir, that's why we hired the GENEX vocational

21  counselor.

22      Q    Weren't able to find him anything in sales or

23  marketing or accounting, or even where you came from, claims,

24  no jobs like that were -- that you could find for him,

25  anywhere in those cities in South Carolina, or anywhere

1   between?

2       A   No, sir.

3       Q   Do you all have a safety department?

4       A   Yes, sir.

5       Q   Could you find him a place in there?

6       A   There were no positions available.

7       Q   Think they might need some people in that

8   department?

9       A   We can't create positions.

10      Q   You came out of the claims department of the

11  railroad?

12      A   Yes, sir.

13      Q   The claims department, your -- when people get hurt

14  like that, you are kind of their -- you are the person who is

15  on the other side; is that right?

16      A   That's your characterization.  No, I have never --

17  never once looked at it that way.

18      Q   How many times have you dealt with lawyers, like

19  myself, who represent injured railroad workers?

20      A   I haven't the slightest idea, many times.

21      Q   Hundreds?  And you are not telling this jury that we

22  are not adversaries, are you?

23      A   You create that, that's your terminology.  My --

24  when an employee -- when I was a claim agent, when an employee

25  got injured, my goal was to help them get back to work as soon

1    as possible.

2        Q    It wasn't your goal also to try to settle his claim

3    for as little as possible?

4        A    To settle the claims fairly.

5        Q    And did you always -- your idea of what was fair,

6    was that always the same as the employee's idea of what was

7    fair?

8                MR. GARLAND:    Your Honor, I am going to object to

9        this line of questioning.

10               THE COURT:    Sustained.

11               MR. WETTERMARK:    You're right.

12               THE COURT:    You've gotten a little afield there,

13       Mr. Wettermark.

14               MR. WETTERMARK:    It's getting late, Your Honor.

15       Mr. Maher, thank you for coming down here.

16               THE COURT:    Any redirect?

17               MR. GARLAND:    Just briefly.

18                       REDIRECT EXAMINATION

19    BY MR. GARLAND:

20        Q    Mr. Maher, Exhibit 24, a letter that you wrote March

21    20th, 2000, to Mr. Kirkland, please read the first two

22    sentences of the second paragraph to the Jury.

23        A    "Norfolk Southern's medical department informed me

24    you were medically qualified to return to an alternate

25    clerical position within the company.  There are currently

1    eleven clerical vacancies in the centralized yard office in

2    Atlanta, Georgia."

3         Q    Did Mr. Kirkland indicate to you his interest in

4    pursuing any of those eleven clerical jobs in Atlanta?

5         A    No, sir.

6         MR. GARLAND:    That's all.

7         THE COURT:    Is that all for this witness?

8         MR. WETTERMARK:    Just one more question.

9                        RECROSS EXAMINATION

10   BY MR. WETTERMARK:

11        Q    Let me just ask this.   To be a clerk, don't you have

12   to be an accomplished typist?

13        A    35 words per minute, yes, sir.

14        Q    Can this man type?

15        A    I haven't the slightest idea, but if he can't, I'll

16   send him to typing school.

17             MR. WETTERMARK:    I see.  Thank you, sir.

18             MR. GARLAND:   One other question.

19             THE COURT:    One more question?

20                        REDIRECT EXAMINATION

21   BY MR. GARLAND:

22        Q    Mr. Maher, you also have offered, have you not,

23   vocational training and/or college training if that's

24   required, or if he desires it?

25        A    If that is what is necessary to help get back to

1    work, that's what -- that's part of the program.

2        Q    And has he indicated any indication to you that that

3    is something that he desires up to this point?

4        A    I haven't heard.

5        Q    But that offer is still open to him; is that

6    correct?

7        A    As long as he is an employee, the whole program

8    benefits are available.

9            MR. GARLAND:    That's all I have.

10           THE COURT:    May he be excused?

11           MR. WETTERMARK:    Yes, sir.

12           MR. GARLAND:    Yes, sir.

13           THE COURT:    We are going to call it a day.  All

14       right.  I think, again, we put in a full work day today,

15       so will take our evening break.  Please recall my

16       instructions about not talking about the case among

17       yourselves as you leave, or with anybody at home, or

18       being around anybody talking about the case out in the

19       hall when you get here in the morning, or what not.  We

20       will start again tomorrow at 9:00 o'clock.  My best

21       information from the attorneys is we should finish the

22       evidence before lunch tomorrow, which should, at a

23       minimum, allow us to do our closing arguments and charge

24       of the -- that I will give you first thing after lunch,

25       and give it to you tomorrow afternoon.  Once it's in your

1     hands, it will be up to you as to how long you need, of

2     course.  That's our best sense of how tomorrow should

3     proceed, and if we get the evidence in earlier, before

4     lunch, we can take an early lunch break, or whatever, we

5     will just -- but that's the way it looks for tomorrow.

6     So again, which a reminder about my instruction on not

7     discussing the case, I want everyone else to stay where

8     you are while these Jurors are excused, and return at

9     9:00 o'clock in the morning.

10  (JURY LEAVES COURTROOM)

11          THE COURT:     You need to say something, Mr.

12  Garland?

13          MR. GARLAND:   Your Honor, I would like to tender in

14  these exhibits introduced this afternoon.

15          THE COURT:     You talking about the ones -- let's

16  see -- you want to let Mr. Wettermark look at the ones

17  you are wanting to tender at this time?  I know you used

18  a number with the witnesses, I don't know if you are

19  talking about -- There's a number of letters and

20  documents laying there on the bench, I don't know if

21  those are all -- for the sake of the record, we'll need

22  to run through the numbers to be sure we've got our

23  signals all straight on what's being tendered and whether

24  there's any objections and what not.  Why don't you run

25  through those, Mr. Garland?

1           MR. GARLAND:    All right, sir.   Exhibit 23,

2       Defendant's Exhibit 23, a letter of March 6th, 2000 from

3       Mr. Maher.

4           THE COURT:    Perhaps, you all can --

5           MR. WETTERMARK:    Make a deal with you.

6           THE COURT:    -- Look through those and --

7           MR. WETTERMARK:    Why don't you take this home

8       with you and see if you have correspondence that's not on

9       this list.

10          THE COURT:    I may let you all do that after I

11      step out rather than taking up the court reporter's time,

12      and --

13          MR. WETTERMARK:    We'll work it out.

14          MR. GARLAND:    We'll work it out.

15          THE COURT:    You all get it all straight about

16      what you want to offer, and if there's any objections

17      that require a ruling or not, no objections, then just

18      what will be admitted without objection, and be sure we

19      have got the record clear on that, myself and the court

20      reporter.

21          As far as tomorrow morning, Mr. Wettermark, you had

22      earlier noted some potential objection to the Defendant's

23      economist.   I assume that will come up in the morning.

24      You will call an economist, Mr. Garland?

25          MR. GARLAND:    And he has taken out that calculation

1     about --

2         THE COURT:    That's the one you had cited a case

3     that you said was -- that I never got a -- is that issue

4     gone; is that what you are telling me?

5         MR. WETTERMARK:    No, that issue is still here.

6         THE COURT:    I never got a cite.

7         MR. GARLAND:    Looks like to me, Judge, that's just

8     a question of cross examination, if he contends he does

9     it someway different, he contends he does it correctly.

10        THE COURT:    And there were two issues I made a

11    note of, one was about the mortality table that this

12    economist would propose to use that relates to railroad

13    employees, and arguably is not a -- doesn't meet the

14    standards for such tables, according to the position Mr.

15    Wettermark would apparently take.  I don't know.  I mean,

16    I just want to -- if there is anything I can look at this

17    evening, so we don't get bogged down in the morning with

18    the jury here, I would like to do that.

19        MR. GARLAND:    Judge, there are two tables, and I

20    think his witness went into a discussion of the two.  He

21    says he uses one and not the other.  This economist

22    agrees that there are two, and he says he uses this one

23    and not the other, and he will give reasons why.  As this

24    one (indicating), this one gave reasons why he didn't use

25    the railroad specific.

1          THE COURT:    Right.  He did testify something

2     about the railroad -- or table specific to railroad

3     employees, and apparently said it wouldn't be

4     trustworthy, I think is what he said, or reliable.

5          MR. GARLAND:    I think in this particular case they

6     are pretty close to the same.  They are not always close

7     to the same, but I think they are in this case.

8          THE COURT:    Well, I mean, they have the same work

9     expectancy, or life expectancy, whatever may be there.  I

10    don't know that there's really an issue; is there, Mr.

11    Wettermark?

12          MR. GARLAND:    James, do you know the difference?

13          THE COURT:    Well, maybe you all can chat about

14    that, too, after I step out.  If we could get together in

15    the morning at 8:30 -- I know you are little weary, it's

16    been a long day; you all kept things moving, I appreciate

17    that, made good progress with the case.  And maybe you

18    can kind of catch your breath and talk to one another

19    this evening, and maybe in the morning, we can quickly

20    move through the issues.  That's the only thing I had

21    left was just your potential objection to the economist

22    Mr. Garland would call on a couple of points.  Maybe you

23    all can talk and sort them out, and if you can't I'll

24    rule on them.  But why don't we do that at 8:30 in the

25    morning?

1          MR. WETTERMARK:     That would be great.

2          THE COURT:     Maybe so you all can just kind of

3    streamline things.  The verdict form, we talked about it

4    at the pretrial conference.  You had submitted something,

5    Mr. Wettermark as an attachment to the proposed pretrial

6    order and -- where you had quite a breakdown of

7    liability, and what not, and then as we discussed it, I

8    think we evolved to the -- maybe the idea of just the

9    general verdict form, but --

10         MR. WETTERMARK:     I'm inclined to do a general

11   verdict form, just find in favor of the --

12         THE COURT:     Plaintiff in the amount of?  Here's

13   -- I mean, this is one we've used, I mean.

14         MR. WETTERMARK:     I think that's probably what we

15   ought to use.

16         MR. GARLAND:   I would like to be heard on that.  I

17   think -- we requested in the pretrial and still request

18   the special verdict that takes into consideration

19   negligence and contributory negligence, and then breaks

20   it down like that.  And I think that is -- that's the one

21   I know we have used in this court on other occasions.  I

22   feel that more specifically answers all the questions in

23   a case like this.

24         THE COURT:     Well, I guess -- I had, thus far in

25   my short career, tended to kind of let the lawyers try to

1     reach some agreement, if they could, on a verdict form,

2     and thus far, I haven't had a problem with it.  I have

3     occasionally suggested something, as the lawyers and I

4     have discussed it together, and we would work towards a

5     consensus.  If we couldn't do that I guess I will make a

6     ruling.

7          MR. GARLAND:    Can we talk about this in the

8     morning?

9          THE COURT:    We can talk about that in the

10    morning, too, when we're fresh.  I think it's been a long

11    day.  All right, so the verdict form, the exhibits, and

12    any issues about the Defendant's economist.  As I

13    understand it, we'll first do Dr. Kessler in the morning

14    at 9:00 o'clock when we start, and that will conclude the

15    Plaintiff's case in chief.  The Defense will then have a

16    chance to continue with its case, again, with the idea

17    that we'll conclude the evidence by lunch.  Does that

18    still look like a reasonable prediction?

19         MR. WETTERMARK:      I think we are right on

20    schedule.

21         THE COURT:    It seems like we are.  Was there

22    anything else to talk about today or to be sure we are

23    prepared for tomorrow?

24  COURT IN RECESS:  5:45 p.m.

25

CERTIFICATE OF REPORTER

GEORGIA, JONES COUNTY:

I, Julia J. Scarborough, CCR, B-908, CERTIFY that acting in such capacity on March 20, 2001, I reported the trial in the above captioned case held before Hon. William Adams, and on the foregoing pages, numbered 6 through 228, both inclusive, have transcribed a true and accurate transcript of the same.

I FURTHER CERTIFY that I am not counsel for nor related to any of the parties; nor am I interested in the event or the outcome thereof.

WITNESS my hand and official seal this _30th_ day of April 2001.

_Julia J. Scarborough_ CCR
Certificate No. B-908