IN THE STATE COURT OF BIBB COUNTY
STATE OF GEORGIA

COPY

LESTER E. KIRKLAND, JR.,
      PLAINTIFF

VS

NORFOLK SOUTHERN
RAILWAY COMPANY,
        DEFENDANT

Civil Action No.

45273

TRIAL

held before

HON. WILLIAM P. ADAMS

and a JURY

VOLUME III of III

March 21, 2001
9:00 a.m.
Bibb County Courthouse
Macon, Georgia

REPORTED BY:  Julia J. Scarborough

HAWTHORNE & WEBB COURT REPORTING
P.O. Box 539
Macon, Georgia 31202-0539
(478) 746-2295 & (478) 477-9356

1    <u>APPEARANCES</u>:

2    <u>FOR PLAINTIFF</u>:              JAMES H. WETTERMARK, of
                                    Burge & Wettermark
3                                   2300 SouthTrust Tower
                                    420 North 20th Street
4                                   Birmingham, Alabama  35203

5                                   FRANK H. CHILDS, JR., of
                                    Groover & Childs
6                                   165 First Street
                                    Macon, Georgia  31201
7
     <u>FOR DEFENDANT</u>:              BENJAMIN M. GARLAND, of
8                                   Hall, Bloch, Garland & Meyer
                                    Suite 1500, 577 Mulberry Street
9                                   Macon, Georgia  31201

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          INDEX

3                       -----------

4                    VOLUME III of III

5

6    WITNESSES FOR THE PLAINTIFF:

7        Dr. Mary Kessler. . . . . . .  Direct/Wettermark      5

8                                       Cross/Garland          20

9                                       Redirect/Wettermark    27

10

11   WITNESSES FOR THE DEFENDANT:

12       Freddie Roberson. . . . . . .  Direct/Garland         28

13                                      Cross/Wettermark       38

14                                      Redirect/Garland       49

15       Geneva Billups-Bookman. . . .  Direct/Garland         50

16                                      Cross/Wettermark       61

17                                      Redirect/Garland       69

18                                      Recross/Wettermark     71

19       James Larry Wolfenbarger. . .  Direct/Garland         72

20                                      Cross/Wettermark       79

21

22

23

24

25

1                                          **EXHIBITS**

2

3      Plaintiff's Ex. No. 5          (Withdrawn). . . . . . . 171

4      Plaintiff's Ex. No. 41         (Tendered and admitted). . 171

5      Plaintiff's Ex. No. 43         (Tendered and admitted). . 171

6

7      Defendant's Ex. No.  6         (Tendered and admitted). . 96

8      Defendant's Ex. Nos. 7 - 10    (Tendered, objected) . . . 97

9                                     (Not admitted) . . . . . . 171

10     Defendant's Ex. Nos. 15 - 16   (Tendered and admitted). . 97

11     Defendant's Ex. Nos. 18 - 19   (Tendered and admitted). . 97

12     Defendant's Ex. No.  22        (Tendered and admitted). . 97

13     Defendant's Ex. No.  23        (Tendered and admitted). . 171

14     Defendant's Ex. No.  27        (Tendered and admitted). . 97

15     Defendant's Ex. No.  30        (Tendered and admitted). . 171

16     Defendant's Ex. No.  32        (Tendered and admitted). . 92

17

18     ===============================================

19

20     **CLOSING ARGUMENT** by Mr. Wettermark for Plaintiff. . . . 101

21                     by Mr. Garland for Defendant . . . . . 119

22                     by Mr. Childs for Plaintiff. . . . . . 135

23     **CHARGE BY THE COURT** . . . . . . . . . . . . . . 148

24     **EXCEPTIONS TO CHARGE.** . . . . . . . . . . . . . 167

25     **VERDICT OF THE JURY** . . . . . . . . . . . . . . 175

1          THE COURT:     Good morning, Ladies and Gentlemen,

2     welcome back.   I appreciate everybody being on time.   As

3     you will recall from my explanation yesterday about an

4     additional witness for the Plaintiff that was going to be

5     called out of turn, the first thing this morning, and

6     we're ready to do so.   Mr. Wettermark, you may proceed.

7                      **DR. MARY HOUSE KESSLER**

8                      Witness having been first

9                      duly sworn, testified on

10                       DIRECT EXAMINATION

11    BY MR. WETTERMARK:

12         Q     Would you tell us your name, please?

13         A     Mary House Kessler.

14         Q     What is your profession, Dr. Kessler?

15         A     I am in private practice as a vocational

16    rehabilitation specialist and a life care planner and a

17    counselor.

18         Q     What does a vocational rehabilitation specialist do?

19         A     I do evaluations on people who have injuries or

20    other types of disabilities and determine how that physical

21    problem has affected their ability to work.

22         Q     Could you give us a summary of your educational

23    background that allows you to be a vocational rehabilitation

24    specialist?

25         A     Yes.   I have an undergraduate degree in psychology,

1    a Master of Education in Counselor Education and a Ph.D. in

2    Counselor Education with the emphasis in vocational

3    rehabilitation services.

4        Q    And could you tell us a little bit about your work

5    background in the field of vocational rehabilitation?

6        A    Yes.  I began working in vocational rehabilitation

7    in 1967, and I have been an evaluator, that I did testing on

8    people with disabilities, and a vocational rehabilitation

9    counselor.  And I have been in private practice as a

10   vocational rehabilitation specialist since 1985.  I have also

11   taught graduate and undergraduate courses in vocational

12   rehabilitation and other related topics.  And I have worked

13   for the Social Security Bureau of Hearings and Appeals, and

14   have done several other types of work in vocational

15   rehabilitation services.

16       Q    At my request have you performed a vocational

17   assessment on Lester Kirkland?

18       A    Yes, I did.

19       Q    When did you meet with Mr. Kirkland and begin the

20   process of performing this assessment?

21       A    I met with him on January the 14th of 2000.

22       Q    Dr. Kessler, can you explain to us, just generally,

23   what is a vocational assessment; what are you trying to

24   determine?

25       A    I am trying to determine just how the resulting

1    problems from an injury or some type of disability have

2    changed the way a person can perform work and earn money for

3    performing that work.  So I look at how that injury, or the

4    resulting problems, have changed that person's ability to work

5    and earn.

6        Q    Can you describe to us the process you go through,

7    and the information that you try to acquire in making this

8    assessment?

9        A    Yes.  I read the medical information that is

10   provided for me to look at regarding the client, in this case,

11   of course, Mr. Kirkland, and then I interview Mr. Kirkland.  I

12   interviewed him on the 14th, and asked him a number of

13   questions about his education, his work history, also about

14   how the injury had changed things for him, and what he

15   couldn't do anymore that he could before, and what he could

16   still do, those kind of things.  And I use the information

17   that he gave me, as well as the medical information, to look

18   at the kind of jobs that he could no longer perform that he

19   used to be able to do.  And then I look at his wages before

20   the injury and what he could be expected to make after the

21   injury if he was back at work, at the time I saw him he was

22   not, but looked at what he potentially would be able to earn

23   when he began working, and then looked at the difference

24   between the jobs he used to be able to do and what he could do

25   now.  The wages he used to be able to earn and what he could

1    earn now, and then from those calculated an overall vocational

2    disability or overall loss, as far as working went.

3         Q    If I could, I wanted to ask you just a little bit

4    about Mr. Kirkland's pre-injury work status.  First of all,

5    did you look into his educational accomplishments, I should

6    say?

7         A    Yes, I did.

8         Q    And how much education did he have?

9         A    He had a 12th-grade education, completed high

10   school, and was able to read and write and those kinds of

11   things, but he did not have any additional technical training

12   or formal education after that.

13        Q    In our modern society, having a high school

14   education, is that -- in our society, are employers looking

15   more and more for more than just a high school education?

16        A    The tendency now is to look for more than a high

17   school education in jobs that used to just require the high

18   school education, and to require a high school education in

19   jobs that used to be open to people whether they finished

20   school or not, a high school.  So it's going more and more

21   toward more education.

22        Q    Did you look into his work experience before his

23   injury?

24        A    Yes.

25        Q    Tell us what that was.

1      A     His most recent job was for Norfolk Southern

2    Railroad as a conductor and trainman, and he was always

3    working over the road, rather than working in the yard.   He

4    climbed on cars, knocked off brakes, did paperwork for the

5    train as the conductor, he sometimes had to lift knuckles or

6    move drawheads.   And he had been in that job for approximately

7    -- or those jobs together, for approximately 18 years.

8    Before that he was still working for the same company, same

9    railroad, as a brakeman and a dispatcher from 1975 until 1980

10   as a brakeman, and from '86 to '92 he was a dispatcher part

11   time at the same time he was a conductor, just as needed.   And

12   before that, he just worked for a warehouse, a grocery

13   warehouse for about six months pulling orders -- excuse me,

14   and operating a forklift.

15     Q     Would it be fair to say that his entire career

16   before this injury had involved manual labor, labor type jobs,

17   or jobs where labor was essential to them?

18     A     Yes.   Even though he worked in some positions where

19   it was not required in those particular positions that he

20   perform manual labor, he was working at the same time in jobs

21   which did require him to perform manual labor, so, yes, he has

22   worked in jobs which required him to do some strenuous work at

23   times.

24     Q     You, of course, learned how much he was making on

25   these railroad jobs?

1        A    Yes.   Initially, I had calculated his pre-injury

2    wages at 902.68 as his average weekly wage, but I believe you

3    had corrected me on that, and informed me that it was actually

4    1059.91 as his average weekly wage.

5        Q    I got you some updated information about another job

6    that he was now eligible for?

7        A    That's right.

8        Q    Let me ask you this.  By either of those standards,

9    for someone who had a high school education, how had he done

10   in life up until the time of his injury as far as his earnings

11   capacity?

12       A    In my opinion he had done real well.

13       Q    Well, let me talk to you now, and ask you some

14   questions about his post-injury earnings capacity.  How do you

15   go about determining what this man is going to be able to make

16   now?  What do you look for?

17       A    Well, at the time that I was working on looking at

18   his wages after the injury, he wasn't working, so I had to

19   look at what he would have been able to earn in certain types

20   of jobs that he hadn't actually performed before, but that

21   were jobs that his restrictions didn't keep him from doing,

22   the restrictions the doctor had given him.  He could still

23   physically do those jobs if he got them.  So I looked at the

24   entry level wages for them, because -- and I say entry level,

25   because he hadn't done those jobs before, so he would have to

1    start out at entry level.  And so I looked at several jobs

2    that he would be able to perform within his physical abilities

3    and what they paid and averaged them together to look at what

4    his post-injury wages would likely be.

5         Q    Are there -- in the field of vocational

6    rehabilitation are there different titles that you give to

7    categories depending on how heavy the work is?

8         A    Yes.

9         Q    What level of work is he able to do now, according

10   to those titles?

11        A    Light work.

12        Q    And before his injury what level of work was he

13   doing?

14        A    He was performing very heavy work.

15        Q    And am I correct, what you are looking for now are

16   what jobs are out there in the light work category that

17   someone with a high school education and no prior experience

18   can reasonably hope to get?

19        Q    Correct.  And they would require some training, but

20   not going back to school for, just training on the job mainly.

21        Q    What type of jobs are available for him?

22        A    Jobs where preferably he could take some breaks from

23   one position all the time.  Preferably he wouldn't have to sit

24   constantly or stand constantly, and that didn't require him to

25   lift anything heavy, and that didn't require him to grip

1    things tightly with his dominant hand.  So I looked at jobs

2    like that that would require a high school education, and no

3    more than a high school education, and then the training on

4    the job.

5        Q    The jobs that meet that description, that meet all

6    those restrictions that you just talked about, are those

7    typically higher up jobs, or are they typically entry level

8    jobs?

9        A    Well, he would have to go into an entry level job,

10   because he had not performed most of these jobs before, ever,

11   like general clerk work or -- I looked at also cashier work

12   and counter clerk work, and those kinds of things, that he had

13   not done before.

14       Q    Did you make a determination of the types of wages

15   that these entry level jobs will pay him?

16       A    Yes.

17       Q    Can you give us the range of those wages that these

18   type of jobs are paying?

19       A    From 5.75 an hour up to 7.58 an hour, with an

20   average of 6.72 an hour, making the average weekly wage then

21   $268.80, as an average.

22       Q    Once you had made this determination did you then

23   make a determination as to the loss of access to wages that he

24   had suffered as a result of this injury?

25       A    Yes.

1      Q      And what was that determination?

2      A      With the updated information on what he had made

3    previously, it was a 75 percent loss.

4      Q      Did you also make a determination of the -- of his

5    loss of access to jobs, in other words, did you make a

6    determination as to which jobs he could have worked before the

7    injury that he is no longer able to work now?

8      A      Yes.

9      Q      And tell us what your determination in that regard

10   was.

11     A      He had a loss of approximately 79 percent of the

12   jobs that he could do before.  In other words, he could not

13   perform that many of the jobs that he could have performed

14   prior to the injury.

15     Q      And based upon both of these calculations did you

16   determine a vocational disability rating for this gentleman?

17     A      Yes.

18     Q      And what was that?

19     A      It was that of approximately 77 percent, which is an

20   average of his loss of access to jobs and his loss of access

21   to wages.

22     Q      That means he has suffered a 77 percent vocational

23   disability?

24     A      Yes.

25     Q      Since you have made these calculations, have I

1   informed you and have you learned, that Mr. Kirkland has, on

2   his own, been able to find a part-time job that pays $7 an

3   hour?

4          A    Yes, he told me that.

5          Q    And is it your understanding that in this job, he is

6   kind of on the honor system, where he can go to the Courthouse

7   for two or three hours and then come home and rest if he needs

8   to, and go back later on in the day?

9          A    Yes.

10         Q    What do you think about that job for him, is that a

11  good job?

12         A    I think it's a very good job for him.  It's what I

13  would call a good fit for him, because he can rest in the day

14  as he needs to, and still get the 25 hours that he is doing

15  now in.  And he can sit for part of the time, and stand for

16  part of the time, and it physically is not something that he

17  would have to lift heavy weights or do strenuous activity.  So

18  it's a job that I think is a very good job for him, and allows

19  for his need to change his position or to avoid lifting heavy

20  things, that kind of thing.

21         Q    He also testified to this Court that he started off

22  on this job making maybe 10 hours a week, and that he has

23  slowly been able to build his time up to now where he is up to

24  25 hours a week you just mentioned.  Is that an appropriate

25  way for someone, in his situation, to go about reentering the

1    work force?

2         A    Yes, it is.  Many times a position -- although that

3    was not done in his particular case -- but many times a

4    position will gradually increase someone's hours until they

5    can build them back up.  So, yes, he indicated to me that he

6    had started out working fewer hours and was building it up.

7         Q    He is 45 years old now.  When you are in that 45 to

8    50 range, does that pose problems as far as retraining,

9    education and things of that nature?

10        A    It can, yes.

11        Q    Can you explain that to us?

12        A    If someone has the same skills and education as

13   someone else, and they are very different ages; for example,

14   there is a 22-year-old or a 21-year-old, and a 45-year-old,

15   but they have the same education and the same skills, the

16   company, in many cases, will prefer to have the younger

17   individual, because they are someone who will be with them for

18   a number of years.  So when they train them for that job, the

19   possibility of them staying in that job or at least in the

20   company and rising in the work force there within the company

21   is greater than if it's someone who is 45 and will probably be

22   retiring at -- in a few years at a typical retirement age.  So

23   just the age itself can be a factor in whether someone is

24   chosen over someone who is younger who has the same kinds of

25   skills.

1        Q    Well, is that not also true for all of these cashier

2    jobs, these entry level jobs you are talking about, when he

3    goes to apply for these jobs will he be competing with

4    younger, healthier people for these jobs?

5        A    Yes, that's true.  Also for those jobs, the

6    likelihood of someone staying in that job for a number of

7    years is not as high as if it's a job that requires more

8    training than that, but competition with someone younger is

9    still an issue many times just for health reasons and the

10   ability to do the work.

11       Q    I'll tell you, Dr. Kessler, as I get older, I am

12   starting to get sensitive to those sort of issues.

13       A    As am I.

14       Q    Let me ask you this.  In his situation, is going

15   back to college, starting from scratch and going to college;

16   do you think that's a viable option as far as a vocational

17   rehabilitation plan?

18       A    I certainly wouldn't say it was impossible, because

19   Mr. Kirkland is an intelligent individual, and that -- it is

20   possible for him to do that, I believe.  But it's not really

21   something that I would look at if I were helping him look for

22   a job.  I would not recommend that he go back to four years of

23   school to train for another kind of job, just because by that

24   time he is going to be 49, if he started right now, and went

25   for four years.  And he is going to be that much closer to

1    retirement age and it's going to be that much more difficult

2    for him to find work in an area where there are going to --

3    even though he has gotten the training, he will still need to

4    be trained for that specific job, just on the job, they'll

5    still have to show him how do to that work and all of that.

6    So he will be pretty close to retirement age by that time, and

7    to retrain him for that job, even though he has gotten the

8    education required, is not nearly as likely as it is that they

9    will take someone in with the same four years of school and

10   who's younger and put them in that position.

11        Q    One job I wanted to ask about for him, there has

12   been talk about a clerk typist job, where he has to type 35

13   words per minute; can he do that type of work?

14             MR. GARLAND:    Your Honor, I am going to object to

15        the form of that without any showing as to what -- any

16        typing exams or anything else that obviously -- I just

17        don't think that's within her range to be able to talk --

18        answer questions like that.

19             THE COURT:    Well, you may need to lay some

20        foundation for her being able to respond to such a

21        question.

22        Q    Mr. Wettermark:    Are you familiar with the work

23   that's done by a clerk typist?

24        A    Generally, yes.  It would depend on the specific

25   job, but I know generally what a clerk typist does in work,

1    yes.

2         Q    Given this man's disability, do you have an opinion

3    as to how suited he is for that type of work?

4              MR. GARLAND:    Your Honor, I object to that.  She

5         says she would have to know the specific type.  I think

6         just a general clerk typist is so broad, I mean, you

7         would have to be specifically --

8              THE COURT:    Does she know whether he can type or

9         not?

10             MR. WETTERMARK:    I'm getting ready to ask her.

11             THE COURT:    Well, that would seem like the

12        question.  If she knows, how does she know?  If she

13        doesn't know, then we don't need to talk about it.

14        Q    Mr. Wettermark:    Well, let me ask you to assume

15   that he can't type at all, but that he is willing to -- and

16   let's just assume that he says he is willing -- he would be

17   willing to go train to try to learn to be a typist; is that a

18   viable -- in your opinion, is that a viable vocational

19   rehabilitation option for him?

20             MR. GARLAND:    I object to the form of that, that

21        misstates the evidence.  There is no evidence that he

22        can't type at all, in fact, to the contrary.

23             THE COURT:    Well, it was posed as a hypothetical

24        question?

25             MR. WETTERMARK:    Yes, sir.

1          THE COURT:    I will overrule the objection.

2     A    The Witness:    Well, he indicated to me that he

3 could not type, touch type, which would use all of his fingers

4 on both hands to type.  And, it's a job that he might

5 physically be able to do, but it would pose some real

6 challenges for him, I believe.

7     Q    What challenges would be posed?

8     A    For one thing, the use of his right thumb on his

9 dominant hand, which is used a lot in typing for space bar and

10 that kind of thing.  He can use that hand and that thumb, but

11 it's limited, and frequent use of it may give him some

12 problems.  Another thing is, with a typist whose major job is

13 to sit at a computer and type, it's very seldom that they get

14 to get up and move around, except for breaks, and he might

15 have some problems with the constant sitting.  I know that he

16 indicated to me he does have problems sitting for prolonged

17 times on a regular basis, or a daily basis.  And I think that

18 those two problems may cause him some challenges that he

19 wouldn't have in some types of jobs.  And of course, he would

20 need to learn to touch type, so I believe you put that in the

21 hypothetical that he did that.

22     Q    When you talk about touch type, you are talking like

23 real typists, and not the hunt and peck method?

24     A    Exactly.  To do 35 words an hour accurately --

25          THE COURT:    You mean a minute?

1          THE WITNESS:    Sorry.

2          THE COURT:    I could do 35 words an hour.

3      A    The Witness:    A minute, accurately, you would have

4    to use all 10 of your fingers pretty much, because if you used

5    two fingers to do 35 words a minute, you would have to really

6    be good doing that.

7          MR. WETTERMARK:    Dr. Kessler, thank you for

8       testifying for us.

9          THE COURT:    Mr. Garland?

10         MR. GARLAND:    May it please the Court?

11         THE COURT:    Yes, sir.

12                    CROSS EXAMINATION

13   BY MR. GARLAND:

14     Q    Dr. Kessler, we just met.    And I take it you have

15   worked for the Burge and Wettermark firm before; is that

16   correct?

17     A    Yes, I have.

18     Q    Since about 1986, would that be about right?

19     A    Probably around there, yes.

20     Q    Can you give us some idea of how many cases a year

21   you do with Mr. Wettermark and his firm?

22     A    I really never counted them.    It would be an

23   estimate.

24     Q    What would be your best estimate?

25     A    I probably work with Mr. Wettermark for --

1        Q     The firm, I meant?

2        A     For the firm, I would say 15 -- 12, 15 cases a year

3    is an estimate.

4        Q     Now, you have met Mr. Kirkland on one occasion; is

5    that correct?

6        A     Yes.

7        Q     When was that?

8        A     Before today.  I have seen him today.

9        Q     When was that meeting?

10       A     I met with him on January the 14th, 2000.

11       Q     Were you employed -- you were employed by the Burge

12   and Wettermark firm; is that correct?

13       A     That is correct.

14       Q     Were you employed to try to find him a job?

15       A     No, I was not.

16       Q     Are you familiar with certain vocational

17   rehabilitation firms that are in the business of trying to

18   find individuals work?

19       A     Yes.

20       Q     That is not your function in this case, is it?

21       A     That's correct, not in this case.

22       Q     Were you advised, after you had the meeting with him

23   in February of 2000, that within the next month or two he was

24   offered positions in clerical work for the railroad

25   centralized clerk's office in Atlanta?  Did Mr. Wettermark or

1    Mr. Kirkland, or anybody tell you about that?

2         A    Yes.   I believe Mr. Wettermark had mentioned that he

3    had applied for a dispatching job and had not been able to get

4    that job, and then there was another clerical job that was

5    talked about, I think the --

6         Q    Where was that job?

7         A    -- clerk typist.   Pardon me?

8         Q    Do you remember the other clerical job, where that

9    was, what location?

10        A    Where?   No, I really don't.

11        Q    Do you specific -- let me ask you this question.   Do

12   you know what the position of clerk in a centralized rail yard

13   involves?

14        A    Are you talking about like yard clerk?

15        Q    Do you know what a clerk in a centralized yard -- in

16   the Atlanta yard; do you know what those positions involve?

17        A    I know generally what they involve, yes.

18        Q    Do you know what Mr. Kirkland's, position as

19   conductor, involved with reference to paperwork, railroad

20   paperwork?

21        A    I know that he did the paperwork for the train and

22   had to keep up with the cars and the load and all of that kind

23   of thing.

24        Q    Do you know if that's part of what a centralized

25   clerk position involves, or do you not know that?

1      A     It is what -- part of that, yes, it is part of that

2      job.

3      Q     Do you know the pay of the centralized clerk

4      position that was offered?

5      A     No, I don't know what that was.

6      Q     Would that be material in trying to assess

7      post-injury wage rates?

8      A     I am sorry, I don't understand what you are asking

9      me.

10     Q     Would that be relevant to you, to know that?

11     A     Only if he were able to do that job and were

12     qualified for it.

13     Q     Now, assuming he decides to take the job, and

14     assuming secondly that the job pays around $40,000 a year,

15     that's nowhere near your estimate of what he can earn, is it?

16     A     No, that's not the entry level job that he is doing

17     now.

18     Q     That would be transferring from one division in a

19     company to another; would that be right?

20     A     Yes.

21     Q     Now, you wouldn't advise him not to take that job

22     since that is not in your calculation range, would you?

23     A     Certainly not.

24     Q     But you did not know that figure until I just

25     announced it to you, did you?

1     A    No.   I had not heard that figure.

2     Q    Do you know what is involved in checking titles in a

3  courthouse?

4     A    Yes, I do.

5     Q    Do you know that there is a term called paralegals

6  that perform that function for law firms and mortgage

7  companies?

8     A    Yes, I know that paralegals do that work.

9     Q    Did you consider, when you took this assessment of

10  Mr. Kirkland, that he was qualified for paralegal work,

11  title-checking work?

12     A    No.   He has never been trained as a paralegal.

13     Q    The fact that he has done that, does that speak well

14  for his abilities?

15     A    Well, he indicated to me that he was not actually

16  checking titles.  What he indicated to me he was doing when I

17  talked with him about his present job, is that he was looking

18  up information about loans, taxes, deeds, and he had to have

19  help from the clerical staff at the courthouses where he went

20  to see if liens had been satisfied, because he didn't know how

21  to look that up himself without assistance, and that he was

22  just beginning to learn about zoning and title searches, but

23  he had not done any title searches as of yet.  He didn't know

24  how.

25     Q    And that was as of February 2000?

1       A    That was as of today.

2       Q    Now, if he has testified that part of the functions

3   that he does there is searching titles, isn't searching titles

4   exactly what you have just reiterated, finding out if there

5   are liens, and that sort of thing; isn't that --

6       A    Yes.  And he said he was doing that with help.

7       Q    Now, in making this evaluation you did not consider

8   any alternative railroad employment, did you?

9       A    No, I did not.

10      Q    You did not consider, did you, that -- the

11  employment of any outside vocational rehabilitation firm for

12  the specific project of trying to locate employment, did you?

13      A    That wouldn't be considered in a vocational

14  evaluation.

15      Q    In your evaluation.  In your opinion, is that a good

16  idea?

17      A    Is what a good idea?

18      Q    To have an outside vocational rehabilitation firm

19  employed, not just to make an assessment, but employed to try

20  to find him work in different areas?

21      A    Yes.  I think he is going to need that if he finds

22  other work.

23      Q    You wouldn't fault the railroad if they employed

24  such a vocational rehabilitation firm, would you?

25      A    Certainly not.  As I said, I think he will need that

1   if he is going to get work.

2       Q   And do you have any knowledge, has anyone, Mr.

3   Wettermark or Mr. Kirkland, told you about any such firm being

4   employed and what leads they have given to him, or your

5   assessment as to whether or not he can perform these jobs?

6       A   Yes.

7       Q   And have you advised that he can't perform those

8   jobs?

9       A   No, I have not.

10      Q   You have no knowledge of that, then?

11      A   Well, I have the knowledge of what Mr. Kirkland told

12   me earlier, that he had been given by one vocational

13   rehabilitation person 13 -- I think he said 13 jobs to look at

14   and --

15      Q   Did he go through the specific count as to what

16   industries they were in and that sort of thing?

17      A   No.  He did say that 10 of that 13, though, required

18   him to have like a degree in management or something of that

19   type --

20      Q   That's what he --

21      A   -- marketing, something like that?

22      Q   That's what he told you?

23      A   Yes.

24      Q   Have you talked with the vocational rehabilitation

25   person that has been so engaged?

1    A    No.

2    Q    So is it true, Ms. Kessler, that the figures you

3    gave, the percentages, were based on an interview in February

4    of 2000, when Mr. Kirkland had no job that; is that fair?

5    A    Yes.

6    Q    And as jobs are taken, or jobs are offered, would it

7    be fair to re-assess that?

8    A    Yes, if it is different information, certainly.

9         MR. GARLAND:   Thank you.  That's all.

10        THE COURT:   Any redirect?

11                    REDIRECT EXAMINATION

12   BY MR. WETTERMARK:

13   Q    The job that he was able to find on his own paid $7

14   an hour; is that right within the middle of the area you

15   thought he would probably be able to get?

16   A    Well, yes, because I had said 6.72, and Mr. Kirkland

17   told me that when he first started there he was making $6 an

18   hour, and now he is making $7 an hour, so it's right between

19   there.

20        MR. WETTERMARK:   Thank you, Doctor.

21        THE COURT:   May she be excused?

22        MR. WETTERMARK:   Yes.  Thank you for coming.

23        THE COURT:   Mr. Wettermark, does that now

24   conclude the Plaintiff's case in chief?

25        MR. WETTERMARK:   That does indeed, Your Honor.

1          THE COURT:     All right, Ladies and Gentlemen, the

2     Defense may now resume its presentation of its case.

3          MR. GARLAND:    Thank you, Your Honor.   Call Mr.

4     Roberson.

5                         **FREDDIE ROBERSON**

6                      Witness having been first

7                      duly sworn, testified on

8                       DIRECT EXAMINATION

9     BY MR. GARLAND:

10         Q    State your full name for us, please, Mr. Roberson.

11         A    Freddie Lee Roberson.

12         Q    Where do you reside, Mr. Roberson?

13         A    1352 Country Squire Drive in Columbia, South

14    Carolina.

15         Q    How old are you, sir?

16         A    I am 57.

17         Q    Married?

18         A    Yes.

19         Q    Were you -- are you retired at this point?

20         A    Yes, I am.

21         Q    Were you retired from Norfolk Southern Railroad?

22         A    Yes.

23         Q    What was the date of your retirement?

24         A    March the 1st, the year 2000.

25         Q    About a year, all right.

1      A     Yes, sir.

2      Q     Prior to your retirement, Mr. Roberson, what

3  position did you hold for Norfolk Southern Railroad?

4      A     I was Superintendent of Terminal in Columbia, South

5  Carolina from '89 until the day of my retirement.

6      Q     Now, where is the Office of the Trainmaster located

7  in reference to your office in Columbia; in other words, the

8  office that Mr. Chapman held and his predecessors?

9      A     They were in the same building on the same floor,

10  the opposite ends of the building.

11     Q     Who was the trainmaster there before Mr. Chapman?

12     A     John Mask.

13     Q     Mr. Roberson, from the period -- in the time you

14  were employed there, and particularly from 1995 to 1997, did

15  you ever have occasion to fill in for that Trainmaster's

16  position?

17     A     Yes.   Whenever the trainmaster is on vacation the

18  Trainmaster from the adjoining territory assumes his

19  responsibility, but I always help out because I am closer and

20  whenever there is an incident, and I am notified, I respond.

21     Q     Are you familiar with the W. R. Grace and Company?

22     A     Yes, sir, I am.

23     Q     Are you familiar with other kaolin companies in that

24  area served by Norfolk Southern?

25     A     I can't recall any other right now.

1    Q    When you were filling -- either filling in as

2    Trainmaster or just doing your own job, were there -- did you

3    receive any complaints from any Norfolk Southern employees

4    about certain conditions existing at the W. R. Grace and

5    Company?

6    A    W. R. Grace.  Yes, I received one complaint from W.

7    R. Grace.

8    Q    What was the nature of that complaint?

9    A    The conductor called me and told me the walkway was

10   unsafe, because it had rained and the kaolin was on the ground

11   and it was slippery.  And I responded to it.

12   Q    Who was that conductor?

13   A    It was Lester Kirkland.

14   Q    And what steps, if any, were taken at W. R. Grace

15   and Company as a result of that response?

16   A    I told Mr. Kirkland not to enter the place until he

17   heard different.  And I went out and talked to the foreman at

18   the W. R. Grace and took him out to the place and showed him

19   what the problem was.  And he assured me that he would correct

20   it immediately.

21   Q    How was it corrected?

22   A    They concreted the walkway?

23   Q    Did that seem to help that problem?

24   A    For a while it did, because after they concreted it

25   sometimes they didn't wash the clay off.  And our employees

1   were told, if it wasn't washed clean do not enter.

2        Q    You are familiar with the operational rules and

3   safety rules of the railroad, are you not?

4        A    Yes, sir, I am.

5             MR. GARLAND:    May I approach the witness?

6             THE COURT:     Yes, sir.

7        Q    Mr. Garland:    Are you familiar with Rule 586,

8   Defendant's Exhibit 3, relating to the job and responsibility

9   of the conductors on the train?

10       A    Yes, sir, I am.

11       Q    What generally does that rule provide that a

12  conductor should do, if anything, if he encounters an unsafe

13  condition of a car?

14       A    It gives the conductor the responsibility and the

15  authority to make decisions himself if there is anything

16  unsafe about his train or with his crew members.

17       Q    Does that give him authority and obligation to pull

18  a car if he determines it's unsafe and not take it back in the

19  consist?

20       A    If it's unsafe he has the authority not to pull it.

21       Q    Right, not to pull it, right.  Did you have any

22  discussions, other than what you have told us, with Mr.

23  Kirkland about that rule or responsibility for any cars at the

24  W. R. Grace and Company?

25       A    I am sorry.  Would you repeat that again?

1     Q   Did you have -- what discussion, if any, did you

2  have with Mr. Kirkland -- you indicated a moment ago of some

3  discussion you had with him; was there any other discussions

4  of that same nature?

5     A   No, sir.  The only complaint I received was the

6  walkway.

7     Q   Did Mr. Kirkland ever complain to you about any

8  kaolin dust being left on the cars and not blown off?

9     A   No, sir.

10     Q   Mr. Roberson, what is the procedure of Norfolk

11  Southern to investigate a circumstance where there has been an

12  employee injury?

13     A   We have what we call emergency response teams, and

14  we have an area of responsibility.  And any time there is an

15  incident, a derailment or personal injury, there is a list of

16  people to be notified to respond.

17     Q   Are you sometimes called on to be a member of such

18  team?

19     A   Yes, sir.

20     Q   It all goes by territory; is that right, if you are

21  near it and that sort of thing?

22     A   Yes, sir, that's correct.

23     Q   Let me focus your attention now, please, sir, on

24  Friday, January 23rd, 1998, and ask you if you were a member

25  of such an investigative team that involved an injury by Mr.

1    Kirkland?

2        A    Yes, sir, I was.

3        Q    Let me show you, please, sir, a document identified

4    as Defendant's Exhibit 7, and ask if you -- ask you what that

5    document is and if you are familiar with that document?

6              THE COURT:      7?

7              MR. GARLAND:    7.

8        A    The Witness:    Yes, sir.  This is the injury

9    write-up after our investigation of the incident.

10       Q    Can you look through that document and tell me if

11   you are one of the investigating officials mentioned there?

12       A    Yes, sir, my name is here.

13       Q    What did -- tell the jury, please, what the

14   investigation consisted of, in other words, what you all did

15   out there, what you looked at, just what happened with that

16   investigation --

17       A    Well, when any --

18       Q    Refer, please, to your note there if you need to to

19   make that response.

20       A    When we receive notification of an injury we respond

21   to the incident, and the first thing we want to know is if

22   it's a severe injury, where he needs medical attention or an

23   emergency vehicle.  And once we get to the scene if the victim

24   is able to talk, we quiz him or question him to find out what

25   took place.  This is a preventive measure from having it

1    reoccur.  And once we get the employee's statement, he tells

2    us what he did and how the injury took place, then we kind of

3    go over the incident and see if that's the way it actually

4    took place, and we gather all the evidence that we can as far

5    as defective equipment, the walking area, the hand hold, or

6    anything out of the ordinary, to see if the incident was

7    caused by defective equipment or unsafe walkways, or to rule

8    out anything to see if it was possibly just negligence on the

9    employee.

10        Q    And in this case, starting with defective equipment,

11   was any found?

12        A    No, sir.  There --

13        MR. WETTERMARK:    I'm going to object to asking

14   him a general question.  He can testify what he found,

15   I'll object to him talking about what was found by other

16   people.

17        MR. GARLAND:   I'll ask him.

18        Q    Mr. Garland:   To your personal knowledge, was any

19   defective equipment found?

20        MR. WETTERMARK:    Same objection.

21        Q    Mr. Garland:   Did you find any?

22        THE COURT:    He just worded it -- did this

23   gentleman find any defective equipment.  I think that's a

24   proper question.

25        MR. WETTERMARK:    Well, I guess -- let me object

1              to the foundation.  He needs to lay the foundation that

2              this gentleman, what equipment, when it was inspected,

3              and then he can ask, is my objection.

4                   THE COURT:      Go ahead, Mr. Garland.

5          Q    Mr. Garland:    You are testifying about the

6      inspection made on the 23rd of January, 1998; those are my

7      questions and what, if any defective equipment, did you find?

8          A    We found no defects in the equipment.

9                   MR. WETTERMARK:      Objection.  Move to strike, when

10             he says we found, because I don't know if he's talking

11             about what he found or what someone else found.

12                  MR. GARLAND:    I'll ask --

13                  THE COURT:      It shouldn't be a conclusory

14             response, I mean, it should be, you know, what did he do,

15             and specifically.

16         Q    Mr. Garland:    Did you look at the brake wheel

17     yourself?

18         A    Yes, sir, I did.

19         Q    Tell us what you found, if anything, with reference

20     to defective equipment.

21         A    It was told that the brake wheel -- the brake

22     itself --

23                  THE COURT:      Now, I'm not clear.  It was told --

24             you mean, somebody told you something; is that what

25             you're talking about?

```
 1              THE WITNESS:    Mr. Kirkland did.
 2              THE COURT:      We just need to know specifically,
 3         you know, if you were told something who told you.  I
 4         think if Mr. Kirkland told you something, I would
 5         overrule any objection to that point.  Go ahead.
 6         A    The Witness:    Mr. Kirkland told me that the brake
 7    was inoperative.  And after inspection, I found that the brake
 8    was, in fact, operative.
 9         Q    Did you make any inspection with reference to
10    employees, Mr. Kirkland's shoes, for instance?
11         A    Yes, sir, we did.  I did.
12         Q    Tell us what you found, if anything, with reference
13    to the inspection of his shoes?
14         A    Yes.  His boots were made by Wolverine, they were
15    steel-toed, had a defined heel and they had worn, slick soles.
16         Q    What other inspection was made about the
17    circumstances there, if you recall?
18         A    Inspection was made of the brake platform.  And the
19    brake platform did have kaolin on it.  We found kaolin on the
20    draw head, that is, the coupler that holds the cars together.
21    And we found kaolin on the grab irons.
22         Q    Was that a rainy day?
23         A    Yes, sir, it was.
24         Q    Let me show you, please, Defendant's Exhibit 8, and
25    see if you can identify this document?
```

1      A    Yes, sir.

2      Q    Is that a document that was prepared by you?

3      A    Well, actually it was prepared by Mr. Chapman.

4      Q    What involvement, if any, now, did you have with

5  that document?  Does your name appear there?

6      A    Yes, sir, my name is here.

7      Q    What involvement, if anything, did you have with the

8  preparation of that document, or the content of it?

9      A    Mr. Chapman told me --

10         THE COURT:    Well, now, I don't think that was the

11         question.  Just what role did you have in preparing the

12         document; is that the question?

13      Q   Mr. Garland:   What was your involvement with the

14  document or the contents of that document?  What do you know

15  about the document personally, I think, is what I'm asking,

16  Mr. Roberson?

17      A    Actually nothing.

18      Q    That's fine.  Now, was the limit of your

19  involvement, the involvement there on Friday, the 23rd of

20  January, with this incident?

21      A    I didn't understand the question.

22      Q    Was the limit of your involvement the involvement of

23  what you have told us about on the afternoon of Friday,

24  January 23rd?

25      A    Yes, sir.

1       Q    Let me ask you this, Mr. Roberson, during the period

2   of time that you were there, from 19 -- I think you said 1989

3   to your retirement, other than this incident with Mr.

4   Kirkland, are you aware of any other railroad employee who

5   ever was injured as a result of slipping or falling from a car

6   loaded at the Grace and Company?

7       A    No, sir.

8            MR. GARLAND:    That's all.

9            THE COURT:    Mr. Wettermark?

10                         CROSS EXAMINATION

11  BY MR. WETTERMARK:

12      Q    Mr. Roberson, during your tenure with the Norfolk

13  Southern Railroad Company were you, as a -- as the

14  Superintendent of Terminals were you an official of the

15  Norfolk Southern Railroad Company?

16      A    Yes, sir.

17      Q    And you were the Superintendent of Terminals over

18  the Columbia Yard and Andrews Yard?

19      A    Yes, sir, that's correct.

20      Q    How far is it from Andrews Yard, where you were

21  the Superintendent of Terminals, over to Aiken, South

22  Carolina?

23      A    Approximately 50 miles.

24      Q    And whose responsibility was the Aiken area and the

25  W. R. Grace?

1      A    That belonged to the Trainmaster.

2      Q    Trainmaster Mask and then Trainmaster Chapman?

3      A    Yes, sir.

4      Q    Now, I would like to ask you a little bit about the

5  evening of Friday the 23rd.  Did you go out to the scene of

6  the accident?

7      A    Yes, sir.

8      Q    You went to Warrenville?

9      A    Yes, sir.

10      Q    And did you personally inspect the cars at

11  Warrenville?

12      A    And when you were out there you saw the walkways and

13  grab irons and the foot holds were all contaminated with wet,

14  slick kaolin clay; is that right?

15      A    Yes, sir.

16      Q    And in fact, am I correct, not only were the cars

17  still contaminated when you went out there, but actually on

18  the ground underneath the cars, you saw where clay had washed

19  off from the rain and was on the walkways underneath the

20  cars?

21      A    Yes, sir.

22      Q    That's not a safe condition, is it, sir?

23      A    Well, I wouldn't think so.

24      Q    I mean, you know, from your experience on the

25  railroad, that it's -- really it's very unsafe to have a slick

1    substance like that on grab irons and on foot holds?

2        A    That is correct.

3        Q    So would you agree with me that those cars were not

4    in a safe condition as you saw them on that Friday night?

5        A    Yes.

6        Q    Mr. Roberson, could you tell me, sir, what was done

7    to clean those cars up before they were picked up by a train

8    that night?

9        A    I don't recall.

10       Q    Nothing, was it?  I mean, the truth of the matter

11   is, those cars were put on a Norfolk Southern train just as

12   they were that night?

13       A    I don't recall.

14       Q    You said that you inspected Mr. Kirkland's boots?

15       A    Yes, sir.

16       Q    Do you recall what color they were?

17       A    No, sir.

18       Q    Do you recall what type of sole they had?

19       A    No, sir.

20       Q    Were they a low -- you just don't have any

21   recollection of the type of sole?

22       A    No, sir, I don't.

23       Q    On the railroad, as an official, if you think that

24   an employee has violated a rule, isn't the practice on the

25   railroad to convene an investigation and to subject that

1    employee to disciplinary action?

2         A    Yes, sir.

3         Q    If you had thought that Mr. Kirkland had violated a

4    rule out there on January 23rd, it would have been your

5    responsibility, or at least one of the official's

6    responsibility, to convene an investigation and to charge him

7    with a rule violation; isn't that right?

8         A    Yes, sir.

9         Q    Was any investigation convened on Mr. Kirkland?

10        A    Not to my knowledge.

11        Q    Did you see Mr. Kirkland on Monday?

12        A    No, sir.

13        Q    Did you have any contact with him on the following

14   Monday?

15        A    No, sir.

16        Q    What about the following Tuesday?

17        A    I don't think so.

18        Q    Did you go with him to the doctor's office?

19        A    I don't recall.  I honestly don't.

20        Q    Fair enough.  If Mr. Kirkland -- if you see an

21   employee who is wearing boots that are slick, that aren't

22   safe, as an official of the railroad, isn't it your

23   responsibility to instruct that employee not to wear those

24   boots anymore?

25        A    Yes, sir.

1     Q     Was any such instruction made to Mr. Kirkland?

2     A     Yes, sir.

3     Q     Are you telling us that you told him not to wear

4  those boots anymore?

5     A     I didn't tell him, but --

6     Q     Do you know that he was wearing those same boots on

7  Monday morning?

8     A     No, sir, I don't.

9     Q     In the present -- you don't know anything about

10  Monday at all; is that right?

11     A     No, sir.

12     Q     Then I just won't ask you about that.  I wanted to

13  ask you, you said that some years ago you do remember a

14  complaint about the walkways being slippery?

15     A     Yes, sir.

16     Q     And you instructed Mr. Kirkland not to go in there

17  until the condition was corrected?

18     A     Yes, sir.

19     Q     And is it your testimony that he no longer went in

20  there until the condition was corrected?

21     A     As far as I know, I don't know.

22     Q     W. R. Grace, they have to have their cars switched

23  every day, don't they?

24     A     Yes, sir.

25     Q     They don't get to -- if the cars don't get switched,

1    they can't run their business?

2        A    That's correct.

3        Q    How long did it take to put in this walkway you were

4    telling us about?

5        A    I don't recall.

6        Q    A week?  Two weeks?  A month?

7        A    I don't recall.  But when I did talk to the foreman,

8    they do have a pulley where they can pull the cars up forward

9    where the conductor can couple to them without having to enter

10   the unsafe walkway.

11       Q    But are you telling us that Norfolk Southern stopped

12   switching this plant for however long it took for them to put

13   in this walkway?

14       A    I don't know for a fact that they did, but it's

15   possible.

16       Q    You talked about this rule on conductors.  If a

17   conductor sees an unsafe condition on a customer's premises,

18   or on cars that are coming out of a customer's premises, isn't

19   he supposed to report that to supervisors?

20       A    He can handle it any way he deems necessary, it

21   depends on how serious the nature is.

22       Q    If he reports it to a supervisor, to officials of

23   the railroad, and they instruct him to switch the plant

24   anyway, what is he supposed to do?

25       A    If it's unsafe, he is still not supposed to switch

1    it.

2        Q    Do you all have in your rule book any rules on

3    insubordination?

4        A    Yes, sir.

5        Q    Are you aware of employees of the railroad being

6    fired for insubordination?

7        A    Yes, sir.

8        Q    If an employee of the railroad refuses to follow the

9    instructions of a supervisor, do you think he ought to be

10   concerned about maybe getting fired for insubordination?

11       A    No, sir, not if the conditions wasn't safe.

12       Q    There was no question in your mind, following that

13   evening of Friday the 23rd, that there was an unsafe condition

14   with these cars coming up out of Grace; you had seen it with

15   your own eyes, hadn't you?

16       A    Would you repeat that question?

17       Q    After you inspected these cars at Warrenville on

18   Friday the 23rd, am I correct that there was no question in

19   your mind that there was an unsafe condition on these cars

20   that had come out of Grace?

21       A    Yes, sir.

22       Q    Do you know what was done to correct that?

23       A    No, sir, I don't.

24       Q    Let me show you, sir, some photographs that were

25   taken the following Monday.  I will show you first what has

1    been identified as Plaintiff's Exhibit -- well, let me get --

2    there's another one I want to show you that has the walkway.

3    Let me show you Plaintiff's Exhibit number 15, and I will try

4    to get up here, I don't mean to turn you around in the seat, I

5    know how uncomfortable that is.  Do you see all that white

6    stuff on that walkway?

7        A    Yes, sir.

8        Q    What is that, if you know?

9        A    That is kaolin.

10       Q    Would you agree with me that that's a very

11   unacceptable and unsafe condition, to have a car coated with

12   that much kaolin?

13       A    Not necessarily.

14       Q    Let me show you, sir, what I will identify as

15   Exhibit number 23.  Do you see the walkway on this locomotive

16   engine?

17       A    Yes, sir.

18       Q    What color is that walkway supposed to be?

19       A    It is supposed to be black.

20       Q    What color is it on this photograph?

21       A    It is white.

22       Q    Do you know what that white stuff is?

23       A    It appears to be kaolin.

24       Q    Would you agree with me that that's an unsafe

25   condition on that locomotive engine?

1      A    Yes, sir, that should be corrected.

2      Q    Do you think it's acceptable to have as much kaolin

3  on the walk -- on the platforms that we just saw in that

4  photograph?

5      A    Of the locomotive?

6      Q    No, sir, of the car.

7      A    I do not take any exception to the buildup on that

8  particular picture.

9      Q    You don't take any exception to the -- you don't

10  take any exception to having that much kaolin on the walkway?

11      A    No, sir.

12      Q    Do you take any exception to having the kaolin on

13  this grab iron?

14      A    No, sir.

15      Q    That's fine too, huh?

16      A    No, sir, it's not fine.  But it could be easily

17  corrected.

18      Q    You knew that Mr. Kirkland told you that the reason

19  he fell off this car was that his feet and hands slipped

20  because the walkway and the grab irons were contaminated with

21  kaolin, don't you?

22      A    No, sir.

23      Q    Didn't he tell you that?

24      A    No, sir.

25      Q    He never told you that he slipped because of the

1 kaolin?

2   A No, sir.

3   Q If you would, look at the report you have been

4 referring to.

5     MR. WETTERMARK: May I approach the witness, Your

6  Honor?

7     THE COURT: Yes, sir.  What's the number of the

8  particular report we're talking about?

9     MR. WETTERMARK: The one -- January 23rd, that's

10  Exhibit Number 7.

11     THE COURT: Defense Exhibit 7?

12     MR. WETTERMARK: Yes.

13   Q Mr. Wettermark: If you would, look at the last

14 paragraph -- do you see it, where your thumb is?  And tell me

15 if I am reading this right.  It says, "Kirkland fell backward

16 landing on his left lower back area.  In the attempt to break

17 his fall, Kirkland bruised the palm area of his right hand.

18 Kirkland attributes his loss of grip and footing to product

19 contamination on the car, steady rain caused the clay residue

20 to become slippery."  Did I read that correct, sir?

21   A Yes, sir.

22   Q Are you still telling us that he didn't tell you

23 that he slipped on -- he lost his grip and footing and slipped

24 because of product contamination on the car?

25   A He said he lost his grip from the wheel, and we did

1    not find any kaolin on the brake wheel.

2         Q    Did he not tell you that his feet slipped?

3         A    After his hand slipped, yes, sir.

4         Q    Oh, he did tell you his feet slipped?

5         A    Yes, sir.

6         Q    I thought I -- I'm sorry, I must have misunderstood

7    you.  When you went out there and inspected the car, you found

8    indeed that there was kaolin on this walkway?

9         A    Yes, sir.

10        Q    Explain this to me, Mr. Roberson, after one of your

11   employees has been injured when he slipped on the walkway, and

12   after you see the kaolin on the walkway, how can you say that

13   you think it's safe to have that stuff on the walkway?

14        A    If his feet were the ones that slipped first, I

15   would consider the walkway unsafe, but his hands are the one

16   that slipped first, that's where he lost his hand hold.

17        Q    So it's safe until he slips; is that what you are

18   telling us?

19        A    No, sir.  He didn't say his feet slipped first.  He

20   said his hand slipped, and when he lost his grip with his

21   hands then he slipped with his feet.

22        Q    Do you know whether -- well, you don't know anything

23   about Monday, I gather.  That's all I have, Mr. Roberson,

24   thank you, sir.

25             THE COURT:    Any redirect?

1          MR. GARLAND:   Just a few questions, Your Honor.

2                    REDIRECT EXAMINATION

3     BY MR. GARLAND:

4          Q    Mr. Roberson, focusing again on Friday the 23rd,

5     were you present when any discussion was held with Mr.

6     Kirkland with reference to the condition of his boots?

7          A    Yes, sir.

8          Q    Who else was present at that time?

9          A    Mr. Burgess -- Mr. Burgess is the one that made the

10    inspection and talked to him and -- but we were there.

11         Q    Tell us what discussion was held with Mr. Kirkland

12    in your presence about the boots.

13         A    Mr. Burgess told him that the boots were

14    unacceptable and he needs to get a new pair of boots.

15         Q    Did he say that he was going to do that?

16         A    Yes, sir.

17         Q    In your experience, Mr. Roberson, with a kaolin

18    plant, is there always kaolin dust in the air around one of

19    those plants?

20         A    Yes, sir.

21         Q    Kind of the nature of the beast?

22         A    Yes, sir.

23         Q    And is it true that if it's not -- if it's not wet,

24    that that just kind of blows around and blows off; is that

25    right?

1      A     Yes, sir, that's correct.

2      Q     During your career have you ever encountered a

3   situation where a conductor was disciplined in any manner for

4   pulling a car that he considered unsafe from a consist?

5      A     No, sir.

6      MR. GARLAND:    That's all.

7      MR. WETTERMARK:     No more questions.

8      THE COURT:     May he be excused?  Thank you, sir.

9      MR. GARLAND:   We call Ms. Bookman.

10                   **GENEVA BILLUPS-BOOKMAN**

11                   Witness having been first

12                   duly sworn, testified on

13                   DIRECT EXAMINATION

14   BY MR. GARLAND:

15      Q     Ms. Bookman, I understand you are suffering from

16   some laryngitis?

17      A     Yes, sir.  I am, excuse me.

18      Q     Just talk as best you can into that microphone,

19   then, thank you.  Would you give us your name, please?

20      A     My name is Geneva Billups-Bookman.

21      Q     Where do you live, Ms. Bookman?

22      A     I live in Columbia, South Carolina.

23      Q     And by whom are you employed?

24      A     GENEX Services.

25      Q     Tell us what GENEX Services is.

1          A     GENEX Services is a rehabilitation company.  We

2    assist persons in obtaining employment, often after they have

3    been injured in work related accidents.

4          Q     GENEX Corporation is no way related in ownership or

5    otherwise to the Norfolk Southern Railway, is it?

6          A     No, sir, it is not.

7          Q     Give the Jury, please, just some information about

8    yourself, please, ma'am.  Where were you born?

9          A     I was born in Manning, South Carolina, Clarion

10   County.

11         Q     Where did you attend school?

12         A     I attended South Carolina State College.

13         Q     Do you have a degree from there?

14         A     I obtained a Master's Degree in Rehabilitation,

15   vocational rehabilitation counseling.

16         Q     What year did you obtain a Master's Degree in

17   vocational rehabilitation counseling?

18         A     In 1984.

19         Q     From college, where did you then go to work, please?

20         A     I began working at South Carolina State, I was

21   employed by them before completing my Master's.

22         Q     What was your next job assignment?

23         A     I began working with Continental Rehabilitation

24   Resources, it is also a rehabilitation company.  I worked for

25   five years assisting persons in obtaining employment after

1    work injuries.

2         Q    After that five year experience, where did you next

3    go to work?

4         A    I worked for 3.5 years with the State of South

5    Carolina as a vocational rehabilitation counselor, placement.

6         Q    That was there in Columbia, South Carolina?

7         A    In Columbia, South Carolina, yes.

8         Q    Then after working with the South Carolina

9    Vocational Rehabilitation Department, where did you then go?

10        A    I was then hired by GENEX Services in the same

11   capacity, working as a vocational rehabilitation coordinator.

12        Q    Is that your current title?

13        A    Yes.

14        Q    Now, what territory do you -- is it a geographic

15   territory that you cover as a rehabilitation counselor?

16        A    Mainly the -- from the Columbia area to Charleston

17   and into Augusta.

18        Q    And at this time, how many -- I don't know whether

19   you refer to them as clients or cases or files or -- how many

20   folks are you helping trying to get employment?

21        A    Currently, I have a case load of 24 clients.

22        Q    Is one of your cases involving Mr. Kirkland?

23        A    Yes.

24        Q    By whom were you, or your company, hired to try to

25   assist Mr. Kirkland in finding employment?

1          A     Norfolk Southern is the referral source.

2          Q     And as part of -- just explain to the jury generally

3    what the process is, and what the process has been, with Mr.

4    Kirkland.   In other words, what you do when you meet him and

5    what papers you prepare and that sort of thing, please, ma'am?

6          A     I initially -- I began working with Mr. Kirkland, I

7    believe, in April.   I did --

8          Q     In April of 2000?

9          A     April of 2000, I'm sorry, April 2000.   We met.   I

10   conducted what is called an initial vocational assessment, and

11   that is an in person interview.   I collected his work history

12   at that initial meeting.   I then proceeded to -- based on the

13   work history, I conducted what is called a job quest, a

14   vocational assessment, where I inputted his -- the skills that

15   he acquired in his prior vocational history into a

16   computerized job quest, it's a job match program.   And that

17   program matched jobs that were considered light duty or

18   sedentary in their physical demands, other jobs of which he

19   might qualify for.

20         Q     Let me ask you something where you are right there

21   about that initial assessment.   Is it correct that you prepare

22   monthly summaries of what went on in the case?

23         A     Yes.   Monthly reports.

24         Q     Monthly reports?

25         A     Monthly reports were forwarded to Norfolk Southern,

1    and that is a summary of the activities for that month that I

2    engaged in with Mr. Kirkland.

3         Q    And at some later date, forwarded to Mr. Wettermark;

4    is that --

5         A    Mr. Wettermark.

6         Q    Would you please look at Defendant's Exhibit 32, Ms.

7    Bookman, and let me ask you, is that a copy of the monthly

8    reports that you have just been describing relating to Mr.

9    Kirkland's case?

10        A    Yes, sir.  It is.

11        Q    Would you now go, please, to -- I guess, would it be

12   the first one, which would be in the reverse order, and you

13   were just talking about you tried to identify some potential

14   areas of employment, begin looking, and is there -- can you

15   find in your records a listing of these various types of areas

16   of employment that you started working on?

17        A    Yes.  The job quest or the job match actually

18   identified sedentary and light duty jobs based on Mr.

19   Kirkland's prior experience that would -- and which he might

20   qualify for.  From that list, job leads were forwarded to him

21   and job lead -- I'm sorry.

22        Q    Can you give us the list that you began to work on

23   and then other areas of job potential that was filled in?

24        A    One particular category work -- work category is

25   insurance clerk, and also, based on some prior experience, a

1    dispatcher.  And at that time jobs were forwarded in that

2    particular category each month, job leads were sent.

3         Q    Can you find, please, ma'am, in there, is there a

4    list of -- and I believe, if you will look maybe at the one of

5    June the 9th.  Beginning on page 3 and 4 of the June 9th, can

6    you find that one?

7         A    Yes.  The job leads that were forwarded during that

8    month -- there were five job leads.  Based also on Mr.

9    Kirkland's part-time established -- he established that he was

10   employed on a part-time basis as a title searcher, or a deed

11   searcher for a mortgage company.  Based on those particular

12   skills, I proceeded to establish if we might be able to find

13   full-time employment in that area.

14        Q    Now, on page 4 there, does that list 11 different

15   jobs identified by category?  Do you see that list on the June

16   9th report?

17        A    Yes, sir, 11.

18        Q    And those things have numbers by them, are those

19   computerized numbers?

20        A    Actually they are jobs in that particular category

21   based on his skills, these are jobs in which he might qualify.

22        Q    How many are listed in that list, please?

23        A    Eleven.

24        Q    Can you just read what those are?

25        A    The first is desk officer, manager, tariff manager,

1    customer service representative, and that's actually twice,

2    it's in different categories, one customer service

3    representative would be with a utilities company, and the

4    others might be in another capacity, cardiac monitor

5    technician, insurance clerk, information clerk, a reader, a

6    psychic reader, also an election clerk, surveillance system

7    monitor.  And again, these are just job categories that the

8    computer will print out.

9        Q    And you go from that list to try to find specifics

10   in these categories?

11       A    Yes, based on a real listing, based on his regional

12   area.  And, of course, other things are considered, his

13   interests as well as -- well, his physical capacity is already

14   -- these are all sedentary, and light duty jobs.

15       Q    Now, in all of the jobs, are all of these full-time

16   jobs?

17       A    Yes, they were -- I only asked the computer to do --

18   to show full-time jobs.

19       Q    Would you refer, please, to your report of July

20   7th.  And on page 4 of that report what do you note about

21   full-time versus part-time employment there at the top, just

22   read that, if you will.

23       A    "Mr. Kirkland -- Mr. Kirkland informs me that

24   although he has had difficulty with his telephone system, he

25   has continued to carry out his part-time work and he continues

1    to report problems with his physical health, particularly

2    pertaining to his back."

3         Q    Is it correct that Mr. Kirkland would indicate to

4    you that he could only engage in part-time activities?

5         A    At that time, yes, sir.

6         Q    Now, coming forward, please, ma'am.  Looking again,

7    now, at that same note or report of August, August 9th, 2000,

8    the next monthly report, at the top of page 3 of that report,

9    is there any reference made to full-time employment with his

10   current employer, and if so, what is stated in that record,

11   please, ma'am?

12        A    At that time Mr. Kirkland discussed -- states that

13   he discussed with his current employer -- I am sorry, I will

14   read it.  I think I will give a better account if I read it.

15   He states, Mr. Kirkland, "states that he has discussed this

16   with his current employer and is told that full-time work

17   could be available to him if he is physically able to work in

18   this capacity."

19        Q    Now, if you please, go to the next report, which

20   would have been the October report.  And the page 2 there,

21   the first -- top paragraph, and you may read it if this

22   refreshes your recollection.  What, if anything, was discussed

23   with Mr. Kirkland then about positions that were open at this

24   time with real estate companies?  And what, if anything, did

25   you report and did he report?  The middle of that first

1   paragraph on page 2.

2       A    Research is focused in these physical demand

3   categories, and job leads are obtained through the Internet,

4   America's Job Bank, the state newspaper.

5       Q    Excuse me, is that page 2, now, of the October -- I

6   am sorry -- the October number is the fax number.  We are

7   still in the September 7th report.  The September --

8       A    September 7th.

9       Q    -- 7th report on page 2.

10      A    Page 2?

11      Q    At the long paragraph at the top of page 2,

12  starting, "However, while some of these employers" --

13      A     "However, while some of the employers contained

14  have open positions mainly in sales with real estate

15  companies, Mr. Kirkland continues to report to this case

16  manager that he feels he is doing all he physically can in

17  regards to employment working in his current part-time

18  position."

19      Q    And at that point, what was the closure goal date

20  indicated to return him to full-time employment, please?

21      A    At that time, the closure goal was, "Mr. Kirkland

22  will return to gainful employment within appropriate

23  functional physical capacities by December 2000."

24      Q    Now, is it true that each of these monthly reports

25  that you are reading from will state the jobs that you

1     identified that would be in his capacity; is that correct?

2          A     Correct.

3          Q     Now, go over, please, ma'am, to the November 13th,

4     report that you prepared.

5          A     (Witness complies.)

6          Q     And there at the first page of that, the overview,

7     does it -- do you state how many available sedentary type

8     positions that you have identified during that monthly period?

9          A     At that time, five available sedentary positions

10    were identified.

11         Q     And in that report, what, if anything, is stated

12    about encouraging some college courses at the technical

13    college there, Piedmont Technical College; is there any

14    discussion held about that?

15         A     Yes.  We did -- Mr. Kirkland and I discussed him

16    taking a placement exam and obtaining a catalog from Piedmont

17    Technical College to determine if he might be interested in,

18    or might be eligible for, retraining in a course of study at

19    the technical college.

20         Q     Was it your understanding his employer would pay for

21    that tuition?

22         A     Actually, he -- that was something of an

23    understanding that I received, yes, sir.

24         Q     Now, at the bottom of that page, please, where you

25    make your analysis, please read us the first part of that,

1    just the first sentence of your analysis of it as of November

2    13th, 2000.

3         A       "Mr. Kirkland continues to state that he is

4    physically unable to perform any job duties that require

5    full-time work."

6         Q    Now, did that hinder the job search somewhat, when

7    he continues to represent he is unable to consider any

8    full-time employment as of November?

9         A    Yes, sir.  For as long as the client is -- his

10   explanation is that he does not feel like he is physically

11   able to engage in full-time work, that does indeed hinder.

12        Q    And are you still, to this very day, working with

13   him on a month by month basis?

14        A    Yes, sir.

15        Q    Is it -- do you have a new goal at this point as to

16   trying to obtain a full-time employment date at this

17   particular point?

18        A    Yes.  We revise the goal after it has not been

19   attained by the original target date.  The original -- the

20   target date is May 2001.

21        Q    Ms. Bookman, have you ever had any notices or

22   documents or phone calls, or anything, with any of his doctors

23   that have said to you, you know, you are wasting your time

24   trying to find a full-time job, I'm saying he is only -- can

25   do part-time work?  Has anything like that ever come to your

1    attention?

2         A    No, sir, I did not.

3         Q    What you are telling us about that is solely what

4    Mr. Kirkland tells you; is that correct?

5         A    Yes, sir.

6              MR. GARLAND:    That's all I have.

7              THE COURT:    Mr. Wettermark.

8                        CROSS EXAMINATION

9    BY MR. WETTERMARK:

10        Q    Good morning, Ms. Bookman, you and I have met by

11   phone, but not in person.

12        A    Yes, sir.

13        Q    Ms. Bookman, I promise you I will be brief.  The

14   first thing I wanted to ask you about, you have been working

15   with Lester now for, what, getting close to a year?

16        A    Yes, sir, a year.

17        Q    Am I correct that, in working with him, he has been

18   fully cooperative with you in trying to find work?

19        A    Yes, sir, he has.

20        Q    He has followed up every lead you have given him,

21   hasn't he?

22        A    Yes, sir.

23        Q    And I think when you and I talked last week and we

24   took your deposition, I think you told me then that he has

25   gone above and beyond the call of duty in trying to find work?

1       A      He contacts me even if I have not contacted him to

2    give me follow up leads.

3       Q      I mean, he has shown you -- I mean, you can tell

4    that he really is trying hard to find something to do, isn't

5    he?

6       A      Based on my assessment, he works hard.

7       Q      The -- at one point in time did you and he actually

8    go to the South Carolina Department of Vocational

9    Rehabilitation to see if they could do anything to help?

10      A      Yes, we did.  We met at the South Carolina

11   Department of Vocational Rehabilitation.

12      Q      Were they able to do anything to assist him at that

13   time?

14      A      At that time they were not, because they stated that

15   he was employed on a part-time basis.

16      Q      So if he has got this part-time job, then that

17   disqualifies him from their services?

18      A      Yes, sir, it did at that time.

19      Q      Even if he is trying to move up into a full-time

20   job?

21      A      Exactly, because that was one of the questions, yes.

22      Q      So throughout your entire contact with him when he

23   has talked to you about how he is working this part-time job,

24   has he told you the whole time that he is trying to increase

25   his hours?

1      A      Initially, Mr. Kirkland said that he felt at that

2      time that he could only do part-time work.  Within the last

3      couple of months -- and I would have to look at my reports to

4      be exact, within the last couple of months, he stated that he

5      was trying to increase his hours to full time, but initially

6      he stated that part time was all that he felt physically he

7      could do.

8      Q      I noticed in several places in your records where he

9      reported to you that he was working with his doctors trying to

10     get them to come up with the right combination of painkillers

11     to help him increase his work; do you recall that?

12     A      Yes.  He stated to me that he had difficulty with

13     his medication in trying to -- working full time.  Basically

14     he stated it interfered with his ability to take the

15     medication.

16     Q      And I guess you know that he is taking these

17     narcotic pain control medications, the Oxycontin?

18     A      Yes.  He mentioned the Oxycontin.

19     Q      That's a pretty potent pain reliever, I guess?

20     A      It's a narcotic, yes, sir.

21     Q      Does that -- as a vocational specialist, trying to

22     help someone find something to do, is that a problem, the fact

23     that he is taking narcotic medications and has to take them

24     every day all day?

25     A      It is significant, because -- and I need to have

1    that information as I am looking for -- assisting him with

2    looking for employment.  When he tells me that he is taking a

3    narcotic drug, I target -- I specifically target job leads

4    that would not require him to be around moving machinery, and,

5    yes, that does, it hinders the search.

6         Q    Am I correct that basically, when all is said and

7    done, what has happened here is, the jobs that you are able to

8    target for him are basically entry level jobs that pay pretty

9    close to minimum wage?

10        A    Yes, sir.

11        Q    Basically he is having to start all over again in

12   the work force at age 45 as if he was a 17-year-old getting

13   out of high school?

14        A    Well, of the jobs his work history entailed, a

15   lengthy history with one employer --

16        Q    I didn't mean to interrupt, but you made me think of

17   something.

18        A    Yes, sir.

19        Q    Actually the fact that he has worked 20 something

20   years for one company, actually that creates difficulties

21   trying to get him into other work, too, doesn't it?

22        A    It would then all basically be new -- any employer

23   would then be new.

24        Q    In your -- as a vocational specialist, when you are

25   trying to find someone a new job, am I correct that basically

1    about in a vocational profession, about a 50-mile radius from

2    his home is what is considered reasonable as far as how far he

3    ought to go trying to find work?

4        A    Yes, sir.

5        Q    And within 50 miles of his home, as I understand it,

6    there is Columbia, South Carolina, and there's -- I guess the

7    Greenville/Spartanburg area, and then on the other end,

8    there's Augusta, Georgia area?

9        A    Correct.

10       Q    And those are all fairly large metropolitan areas?

11       A    Yes, and jobs are more likely to be found in the

12   more metropolitan areas.

13       Q    Did the railroad ever discuss with you, or ask your

14   opinion, as to whether or not he would be able to do one of

15   their jobs, like a clerk typist job in Atlanta?  Did they ever

16   discuss that with you?

17       A    No, not -- I don't recall.

18       Q    Never mentioned to you jobs in Atlanta?

19       A    Not in Atlanta.  My job was to help him find

20   employment in the geographical area.

21       Q    Last week when I was talking to you you told me also

22   that because he is 45 now, and he is going back into this job

23   market, he is having to compete against younger, healthier

24   people?

25       A    In talking to Mr. Kirkland, he does often find that

1    when he is looking for employment he does encounter that there

2    are -- the younger work force, the jobs that he is looking at,

3    yes.

4        Q    He has followed up on every single job lead you have

5    given him, hasn't he?

6        A    He is able -- the way that I can tell that, is that

7    he is able to give me feedback on the contacts that he has

8    made with the employers that I sent -- that I forwarded to

9    him.

10       Q    Do you find that people in his situation, people who

11   have been disabled from their old jobs and now are trying to

12   find new work, do you find that they ever get discouraged, get

13   down in the dumps when they can't find work?

14       A    They certainty report to me the frustration of job

15   hunting, it's a frustrating thing for anyone.

16       Q    Just for example, I wanted to ask you about this,

17   can you pull up your -- I think it's your report of -- can I

18   show you my copy?

19            MR. WETTERMARK:    May I approach the witness?

20            THE COURT:    Yes, sir.

21       Q    Mr. Wettermark:    I am having a hard time figuring

22   out which report is which.  I think I am looking at the July

23   7th report, and it's way back on page 5, it's a summary of

24   vocational services.  Can you find that?

25       A    July 7th?

1    Q    Yes.  It looks like -- there we go.  This is the
2   list of possible -- I guess, is this the list of possible type
3   jobs that you found at this particular time?
4    A    Yes, sir.
5    Q    And it looks like there is five possible jobs.  I
6   wanted to run through them with you real quick so we can get a
7   sense of what he is up against.  I think the first one is, the
8   employer is the Loan Zone, and the position is titled deed
9   searcher, but under openings, it says that there's no
10  openings, no openings are anticipated within the next six
11  months.
12   A    Yes.  I sent those leads when there is the potential
13  for a job opening.
14   Q    Sure, you want to consider everything, basically?
15   A    Yes.
16   Q    But at that time there were no openings for that
17  job?
18   A    Yes.
19   Q    The second job looks like it's with Wachovia
20  Mortgage, it's a loan title searcher, residential loan
21  processor, but then under experience it says 45 words per
22  minute and IBM, two years conventional and/or government loan
23  processor.  So that would pretty much exclude Lester from that
24  job, wouldn't it?
25   A    Not necessarily.  When I contact the employers, even

1    though their initial experience or requirements that are

2    written may state that they require that, of course, sometimes

3    that is what they will prefer, but the door is still open for

4    a person to apply and they may consider training.

5        Q    Sure, it doesn't hurt to try?

6        A    Well, exactly.  Only when the employer has said that

7    there is a potential.

8        Q    The third job on that particular month was SunTrust

9    Mortgage title deed searcher, and again, under openings, no

10   positions are open in the Columbia or South Carolina area.

11   Did I read that right?

12       A    Yes, at that time.

13       Q    The fourth job, First Carolina Mortgage, position,

14   title searcher, deed searcher, and again, under openings, no

15   opening in this area are anticipated; is that right?

16       A    Correct, at that time, yes.

17       Q    And then the final one, Countrywide Home Loans,

18   position, loan deed title search, again, openings, no title

19   searcher positions.  Jim not aware of any other positions

20   being currently available.  Did I read that right?

21       A    Yes, sir.  Again, at that time, yes.

22       Q    I mean, would it be fair to say -- and it's been

23   tough and it's going to be tough to find this man a job?

24       A    Yes, sir, difficult for anyone to find anyone a job,

25   yes, sir.

1          MR. WETTERMARK:     We appreciate your help, ma'am,

2      thank you.

3          THE COURT:     Mr. Garland?

4                    REDIRECT EXAMINATION

5  BY MR. GARLAND:

6      Q    If you would turn to that same page you were just

7  reading from, page 6 of that July 7th report?

8      A    Yes, sir.

9      Q    And the Carolina Mortgage at the top, the one Mr.

10  Wettermark read, no openings available.  He didn't read the

11  next sentence, what does it say?

12      A    It says one loan officer position may be available

13  within the next six months.

14      Q    So do I understand that when you put these in there,

15  although they may say nothing available at the time, you have

16  had some conversations with them and, as you say, it doesn't

17  hurt to apply, they give you enough information to feel that

18  it's worth applying, and if he qualifies, he qualifies?

19      A    Exactly.  Sometimes the -- although they are not

20  open, I will list these because the employer, or someone at

21  the company, has told me that they will -- that there is the

22  possibility of jobs coming open.  They are not sure often of

23  the date, but they actually sometimes encourage application.

24      Q    So when you see one of these listings in here, one

25  month it's five, and the next month some other number, and so

1  forth, these are all kind of pre-qualified leads that you are

2  passing on, it's not just something you pull out of the air

3  somewhere?

4      A    No, sir.

5      Q    Now, Mr. Kirkland, in your opinion, Ms. Bookman, is

6  an intelligent gentleman; is he not?

7      A    Yes, sir.

8      Q    He's very articulate, speaks very well and often,

9  doesn't he?

10     A    Yes.

11     Q    He also writes very well, does he not?

12     A    Yes, sir.  He does.

13     Q    You have had correspondence with him.  Did he

14  discuss with you anything at all about whether he should

15  accept a clerk position with the rail yard in Atlanta,

16  Georgia, the centralized rail yard?

17     A    Yes, at one time he did mention that.

18     Q    In your work, do you find that people sometimes do

19  have to relocate to take advantage of good job openings or

20  promotions?

21     A    Yes, sir.

22     Q    That is not unusual in the job market, is it?

23     A    No, sir.

24     Q    In fact, is that more the general norm in big

25  companies that centralize areas and so forth around?

1        A    Yes, sir.

2              MR. GARLAND:   That's all I have.

3              THE COURT:    Is that it?

4              MR. WETTERMARK:     I have just a few follow-up

5    questions.

6                     RECROSS EXAMINATION

7  BY MR. WETTERMARK:

8        Q    Does a loan officer -- that requires experience, you

9  can't just come in off the street and be a loan officer, can

10  you?

11        A    Usually it does require experience.

12            MR. WETTERMARK:    Well, that's all.  Thank you.

13            THE COURT:    May she be excused?

14            MR. GARLAND:   Please.

15            THE COURT:    Why don't we take our mid-morning

16    break, it's about that time, I would say.  We'll take

17    about a 10-minute break.  And just remember not to talk

18    about the case yet.  We'll be in a short recess.

19  (COURT IN RECESS)

20            THE COURT:    You may proceed, Mr. Garland.

21

22

23

24

25

1                        JAMES LARRY WOLFENBARGER

2                        Witness having been first

3                        duly sworn, testified on

4                          DIRECT EXAMINATION

5      BY MR. GARLAND:

6          Q    Dr. Wolfenbarger, would you give us your full name,

7      please?

8          A    James Larry Wolfenbarger.

9          Q    Where do you live, Mr. Wolfenbarger?

10         A    I live here in Macon.

11         Q    And by whom are you employed?

12         A    I am employed by Macon State College.

13         Q    What is your position on the faculty at Macon State

14     College?

15         A    I am Chairman of the Division of Business

16     Administration.

17         Q    And give the jury some indication, please, of your

18     academic background, where you went to school and that sort of

19     thing.

20         A    Okay.  I, after high school, went to Carson Newman

21     College, small liberal arts school in upper East Tennessee,

22     and got a Bachelor's degree in business management there; and

23     then went to University of Tennessee and received a Ph.D. at

24     the University of Tennessee in 1974.

25         Q    Are you a native of that area?

1      A     I am, East Tennesseean.

2      Q     How long have you been in Macon?

3      A     Lived in Macon since 1988.

4      Q     Prior to becoming the Chairman of the Economic

5    Department at Macon College, what college were you affiliated

6    with and in what capacity?

7      A     Prior to that I was at Georgia College and State

8    University from '87 until last summer and --

9      Q     What was your position on the faculty there?

10      A     I was Chairman of the Department of Economics and

11    Finance.

12      Q     Is one thing that you do, or able to do, are make

13    economic analyses of economic losses?

14      A     Yes, sir.

15      Q     Now, have you, at our request, performed an economic

16    analysis of economic losses involving Mr. Lester Kirkland in

17    this case?

18      A     Yes, I have.

19      Q     Did you, as part of your performing this analysis,

20    review any other economic papers prepared by any other expert?

21      A     Well, I used a lot of data and information on my

22    own, and used data provided to me from your office and from

23    various government statistical data to put together the

24    analysis.

25      Q     All right.  Give us, please, some of the basis of

1    the analysis, what you have considered leading up to the

2    calculations, please, sir.

3        A    Okay.   There is a list of these, and I can go down

4    them, considered his date of birth of 5/19/55; date of injury,

5    January 26th, 1998; his age at the date of injury was 42; life

6    expectancy in 1998 at injury was 34.8 years.   Railroad work

7    life expectancy at date of injury in '98 was 16.4 years.   His

8    base railroad income as a conductor, the job he was on at

9    injury, the base income I used was $49,665 per year.

10       Q    Is that an average of some years, and if so, what is

11   the average of that?

12       A    Yes, it is.   It's an average for the years 1993

13   through 1997.   The income in those years did not consistently

14   rise or fall.   They were up and down.   So I used the average

15   for those years as my best estimate of a base railroad income

16   for my analysis.

17       Q    Just right there, let me interrupt you a minute, Dr.

18   Wolfenbarger.   Have you an opinion one way or the other

19   whether it's more realistic, shall we say, to pick out a two

20   year average or maybe a four- or five-year average when you

21   are trying to get an average income?

22       A    Well, normally I use the last year of income, if

23   it's an income that's shown progressive increases.   But in

24   some cases, due to overtime work or lack of, or circumstances

25   that I am not sure what happened -- for example, if a person

1    had -- I'll just use simple numbers.  If a person had income
2    of 20,000 last year, but the year before that had income of
3    30,000, then I think it would be unfair to use the 20,000
4    figure, so I tried to look back some years to see what a
5    reasonable number would be as an average base.
6         Q    Have you done that in this case?
7         A    Yes.
8         Q    All right.  Go ahead, please, sir.
9         A    Okay.  Another thing I considered was the growth
10   rate for future increases in conductor income, and I used the
11   actual average annual change from 1987 to 1997 for conductor
12   position with the railroad, and that figure on an average
13   annual basis was 1.98 percent.  Also I considered federal and
14   state income taxes, they were 17 and 6 percent respectively,
15   for a total of 23 percent for income taxes.  I considered
16   employee business expenses.  The day I had for 1997 federal
17   tax returns indicated a relatively high business expense
18   figure of 23.75 percent.
19        Q    This was from Mr. Kirkland's tax returns?
20        A    That was from his tax returns.  That's extremely
21   high in the cases that I have seen over my years of doing
22   this, and so I didn't use the entire amount.  I think the
23   actual figure I used was more like 8 percent, it's not in
24   front of me here, but it's much lower than this.
25        Q    What were the bulk of those, do you recall?

1      A    Of those business expenses?  It doesn't say, it just

2   said -- well, I think most of it, yes, it was in the area of

3   mileage for using the automobile, I guess, to get to and from

4   work.

5      Q    Okay.  Go ahead.

6      A    Another thing I considered was base

7   employer-provided health benefits.  Basically that calculation

8   is required if you assume a person loses a job, say in this

9   case with the railroad, then they also lose the benefits that

10  go with that, in this case some health benefits, and so the

11  base of those health benefits in the year 2000 was $7,947,

12  from date of provided by the railroad.

13     Q    Let me ask you this question, then.  In making an

14  assumption, if he stays employed by the railroad, but just in

15  another position and he keeps the same health benefits, then

16  that goes out; is that correct?

17     A    Yes.  I would consider this only if there is no

18  further employment either at the railroad or any other place

19  where health benefits would not be provided.

20     Q    And by the same token, if you consider full time

21  employment at another place with insurance, that would --

22     A    Assuming the insurance is essentially the same, then

23  that figure would not be included in the analysis.

24     Q    Continue please.

25     A    I -- if you include health benefits in the analysis,

1   they have to appreciate or grow through time, so I looked at

2   the growth rate of health benefits provided by the railroad

3   over the 1991 through year 2000 time frame, and it's -- the

4   average annual change was 4.54 percent, so that's the growth

5   rate for health benefits in the future.   I used a consumer

6   price index average annual change since 1983 through the year

7   2000, 3.25 percent in the analysis.   I also considered an

8   alternative railroad income base as a clerical position with

9   the railroad, wage grade 10, and date of provided for me,

10  indicated that wage grade 10 in the year 2001 pays, on an

11  annual basis, $40,058.   The growth rate of the alternative

12  railroad job was 3.56 percent for future calculations.   That's

13  based on the actual average annual change since -- in the 1991

14  through 2001 years, again provided -- data provided for this

15  clerical wage grade job, or wage grade 10 job, I'm sorry.   I

16  also considered non-railroad earnings capacity, a job not

17  connected with the railroad, and the figure I used there was

18  $7 an hour for full-time work of -- for the year.   And, last,

19  but not least, considered discount rates provided through the

20  Wall Street Journal treasury bonds, notes and bills issues.   I

21  used U. S. Treasury strip rates for discount rates.   And

22  that's the,   I think, the major pieces of information and data

23  that I used in performing the analysis.

24        Q    Dr. Wolfenbarger, did you, based on all those --

25  that information, did you make a calculation assuming

1    alternative railroad employment, that is, employment as a

2    clerk in the centralized office in Atlanta, and did you, from

3    that calculation, come up with a present value of the loss to

4    Mr. Kirkland of his income, including those mitigating amounts

5    received through that clerical work?  Did you do that?

6         A    Yes.

7         Q    And can you give us the amount of that, please?

8         A    Yes.  The present value of lost net railroad income,

9    and by net, I simply mean including mitigating income from an

10   alternative, the alternative railroad position, clerical

11   position, wage grade 10, and the present value of that is

12   186,732.

13        Q    So that would be the present value of the loss to

14   Mr. Kirkland if he had taken, or if he takes the railroad

15   clerkship position; is that correct?

16        A    Right.  It's -- it includes the loss of the

17   conductor's position and then deducts out the present value of

18   employment as a clerk.

19        Q    Now, did you make another calculation, Dr.

20   Wolfenbarger, assuming that he does not take the clerkship job

21   with the railroad, but assuming further that he continues with

22   his job with the title checking company there in South

23   Carolina and goes on a full-time basis, and if so, what would

24   the present value of that be to Mr. Kirkland, the loss of that

25   be?

1     A     Okay.  The present value of his lost railroad

2  income, again, including the mitigating, or offsetting income

3  from a non-railroad employment at the $7 an hour figure that

4  we mentioned earlier, the present value of that is 390,834,

5  3-9-0-8-3-4.

6     Q     And that assumes full time work there with insurance

7  provided by that company?

8     A     Right.

9     Q     And in your opinion, are those correct presentations

10  of present value of loss of railroad work?

11     A     Yes, sir.

12          MR. GARLAND:    That's all I have.

13          THE COURT:    Mr. Wettermark?

14                    CROSS EXAMINATION

15  BY MR. WETTERMARK:

16     Q     Dr. Wolfenbarger, I didn't catch -- you said that

17  you -- what is your Ph.D. degree in?

18     A     Economics.  I am sorry, I may not have said it.

19     Q     And I thought -- I wasn't sure, are you Chairman of

20  the Department of Economics, or the Department of --

21     A     I am Chairman of the Depart -- well, it's called the

22  Division of Business Administration, which includes economics

23  and all other traditional business areas, marketing,

24  management, accounting, so forth.

25     Q     Have you had a lot of experience doing these type of

1    calculations?

2        A    Quite a bit.

3        Q    How have you gotten your experience?

4        A    Well, I -- sporadically, as a younger man, and then

5    over the last, I guess, seven years or so, I have done more of

6    the calculations when asked, probably on average 12, 15 cases,

7    maybe, a year.

8        Q    Hired by Norfolk Southern before?

9        A    Yes, have been.

10       Q    Now, I was -- when you calculated his work life

11   expectancy, and his life expectancy, did you calculate those

12   as of today?

13       A    No.   I calculated those at date of injury.

14       Q    But isn't the award that's going to be made in this

15   courtroom based upon his future as of today?

16       A    The award will be based on -- as of today, right.

17   The calculations can be made from -- to do it today would mean

18   that myself or anyone else would have to do it immediately

19   before walking into the courtroom, some time this morning.

20       Q    But isn't it true that if you -- if you were to

21   calculate his work life expectancy as of today --

22       A    Uh-huh (Affirmative).

23       Q     -- compared to his work life expectancy as of the

24   date of the accident --

25       A    Right.

1      Q     -- his work life expectancy as of today, plus his

2  past lost time is greater than his total work life expectancy

3  at the time of the accident?

4      A     Right.

5      Q     I know you and I know what we're talking about.  I

6  probably --

7      A     Let me explain.  I think that -- when you look at

8  life expectancy or work life expectancy, they might differ by

9  a slight amount over a one- or two-year period.  But I may

10  have been misleading.  The figures I gave you did not ignore

11  the time period since '98.  It includes past lost wages and

12  future lost wages in this calculation.

13      Q     These numbers include his past lost wages?

14      A     Yes.  Well, since '98, since the -- since work date

15  time of injury.

16      Q     What were you -- what was his gross wage?  What did

17  you come up as an average for his gross wages?

18      A     Your average for the base year for the start of the

19  calculations?

20      Q     Yes.

21      A     Base railroad income as a conductor, 49,665 for the

22  year 1998.

23      Q     Now, I'm not going to quibble with you about going

24  back and averaging the past five years, but let's just take

25  that for a second.  Let's just say he's making right at

1    $50,000 a year --

2         A    Uh-huh (Affirmative).

3         Q    -- is that right?  He's been off work now for over

4    three years; is that right?

5         A    Yes.

6         Q    And just by rough calculation, I'm going $50,000 a

7    year gross, and I know you have to take taxes out, $50,000 a

8    year for over three years, that comes up to over $150,000.

9         A    You are looking at gross figures without deducting

10   federal tax, state tax, business expenses, these are

11   present --

12        Q    What is the net figure, then, let's do it that way?

13        A    Well, the net figure and these -- there's lots of

14   these pages, so -- for example, in 1998, the $47,000 --

15        Q    What is the net figure you used as a basis for your

16   calculations?

17        A    I told you, the 49,665 was the average base that I

18   used to start the calculations, and used that for the year

19   1998.

20        Q    What was your -- what was your figure you used after

21   tax and expenses that you used?

22        A    Well, for example, in 1998, the net income figure

23   would have been --

24             THE COURT:    Was that your question?  I don't

25        think that was responsive --

1      Q    Mr. Wettermark:    My question is this, you had to

2   determine a base income to project into the future, didn't

3   you?

4      A    Right.

5      Q    And you had to determine that income after taxes and

6   expenses?

7      A    Yes.

8      Q    What is that number that you determined?

9      A    That number, and this number is going to be low,

10  because I had -- when I did this, I initially included tier

11  one and tier two railroad retirement taxes.

12     Q    Well, I don't care about what you did in the past.

13  I want to know what number -- base, after tax number, did

14  you use to make the calculations you just told this jury

15  about?

16     A    All right.  It requires me to make a calculation;

17  can I do that?

18     Q    Sure.

19     A    The net figure would be $33,232.

20     Q    $33,232.  Let's start -- let me just -- I tell you,

21  just let me take that.  So am I not correct that you take that

22  $33,000, you multiply it by more than three years, and it's

23  almost $100,000 in past lost wages?

24     A    Again, these figures were before this adjustment, so

25  you grow this at a rate of -- give me a second -- for example,

1    in the second year, it would be 33,890, and then 34,561, so a

2    little over $100,000 for three years.

3         Q    So his past lost wages, just from the date of the

4    accident to the present, he's already lost over $100,000?

5         A    Yes.  But you are pointing at that figure, and I am

6    not sure what relevance that has to what you were just asking

7    me.

8         Q    I am getting to that.  I hate to turn you around.  I

9    know that's rude, and I don't mean to.

10        A    That's fine.

11        Q    What I'm trying to say is that -- are you telling me

12   that this represents past and future losses?

13        A    That -- past and future losses are inside that

14   figure, but that figure is a figure that's the result of

15   calculating his lost railroad job, mitigating income of

16   which I subtracted out for an alternative railroad job as a

17   clerk.

18        Q    But --

19        A    In other words, that figure there is not the

20   railroad job per se, by itself left alone.

21        Q    But I just want to make sure I understand what you

22   are telling us.  You are saying that even when he rip --

23   factor in that he's already lost for sure over $100,000 in

24   past lost wages --

25        A    Yes.

1      Q   -- you are saying that the total -- you are saying

2  that he is going to lose less than $86,000 in the next 15, 16

3  years?

4      A   Can I explain the best I can?

5      Q   Sure.

6      A   He -- assumption one, he loses a railroad job as

7  conductor.  Assumption two, he is offered and receives and

8  takes a job as clerk.  His net loss is not the figure that we

9  have been dealing with that I have been talking about.  His

10  net loss would be his lost income as conductor minus the

11  present value of his lost -- not lost income, but earned

12  income, as a clerk.  Now, if I could break those two numbers

13  down, and this may help -- it may make it more palatable to

14  you, if you look only at his lost income as conductor and

15  said, okay, that's it, I don't want to consider anything else,

16  then that figure is 558,098, okay, that's that figure, but

17  that's offset by a figure of 167,264 -- I'm sorry, that's

18  offset by a figure of $371,366 from the clerk's job with the

19  railroad.

20      Q   What you have -- am I correct that one of the things

21  you have done to get these numbers is, you have assumed that

22  the clerk's job, if he was able to do it, you have assumed

23  that he would get four percent wage increases every year in

24  that job, didn't you?

25      A   The actual numbers that I was provided with show

1    that in the years of -- give me a second -- in the years from

2    1991 to the year 2001, that the average growth rate of the

3    clerical position, wage grade 10, was 3.56.

4         Q    Where did that come from?

5         A    Railroad data, data provided by the railroad.

6         Q    By the railroad's lawyers?

7         A    Yes.

8         Q    And how much did they tell you the conductor's

9    raises were?

10        A    They didn't tell me what the raises were, they gave

11   me data and I calculated the raises.  The growth rate of a

12   conductor income based on 1987 through '97 data that I was

13   given, the average annual change there was 1.98 percent, or

14   almost 2 percent.

15        Q    So you are saying that the clerk's job gets these

16   3.5 percent wage increase, and the conductor's job is only

17   getting these 1 and something percent wage increases?

18        A    I'm saying that historically, that is what has

19   happened, yes.

20        Q    I wonder why conductors are making 50, 60, 70,

21   $80,000 a year and clerks are only making 40, if the wage

22   rates -- increases are so different?

23        A    One is a base figure, one is a wage rate growth.

24   You could have a person making $10 an hour getting large

25   raises and a person making $100 an hour getting smaller

1    raises.

2        Q    I got you.  Just out of curiosity, if you look at

3    your numbers, and let's just pick out calendar year -- I just

4    want to -- let's try 1996.  What did you consider his gross

5    income for 1996?

6        A    In my analysis, I didn't consider it, except it was

7    part of the -- to calculate the average base.

8        Q    Sure.  What did you use?  What gross figure did you

9    use to calculate your average?

10       A    Well, I may not have it in this, but I will look and

11   see.  Pardon me, lots of pages.

12       Q    That's all right, I will wait.

13       A    The figure I have, I think this is correct, the

14   gross figure for 1996 was 56,606, rounded off.

15       Q    Were you given any information about any unusual

16   absences that he had from work that would have affected how

17   much he made?  Were you told that, for example, that in one of

18   the years he was off work for a month and a half, and it's not

19   the sort of thing that would likely be repeated in the future?

20       A    Not to my knowledge.

21       Q    Is that something you would want to go ahead and

22   take into consideration if you are protecting someone's future

23   income?

24       A    Yes, usually.

25       Q    Were you told that -- do you know how -- are you

1    familiar with how the conductor's jobs work on a seniority

2    basis?

3        A    Not exactly, but approximately, that seniority

4    determines position.

5        Q    You know how seniority systems work in general,

6    don't you?

7        A    Right.

8        Q    And basically, the more seniority you have, the

9    better jobs you are able to obtain?

10       A    You are asked -- you have some choice when choices

11   are allowed, yes, you are offered jobs.

12       Q    Were you told that his seniority now is such that he

13   would have stood for working a job called the Newberry

14   switcher that pays nearly 70 to $80,000 a year?

15       A    No.

16       Q    If he was able to work that job, that could make a

17   pretty huge difference in the numbers you came up with,

18   wouldn't it?

19       A    Certainly, yes.  70, 80,000 is more than a base that

20   I dealt with, right.

21       Q    Did you take taxes out of -- I assume any money he

22   gets, he's going to have to invest it?

23       A    Right.

24       Q    Did you take the tax consequences of the investments

25   out?

1    A    Yes.

2    Q    What tax rate did you use?

3    A    I used the tax rate that I used in the calculation

4  of finding net income.  As I mentioned earlier, 17 percent

5  federal tax, and 6 percent state tax.

6    Q    Do these figures represent -- do these figures

7  include what is necessary to pay for insurance for this man,

8  these two figures that I see on the board there?

9    A    Health insurance?

10   Q    Yes, sir.

11   A    No.  In the case of -- in the first number, that was

12 the net figure of two railroad jobs, and in that case there

13 would be no lost health benefits if you are working for the

14 railroad.

15   Q    Was it your understanding that whatever job he goes

16 to now he will have to start over at the entry level for that

17 job?

18   A    It wasn't put to me in that manner.  I was asked to

19 make a calculation based on a $7-an-hour wage rate for a

20 non-railroad job, for that second calculation.

21   Q    $7 an hour, what is that a year?

22   A    Well, just a moment and I can tell you.  I think I

23 have that.  $14,560.

24   Q    Are you telling us, sir, that including over

25 $100,000 in past lost wages, and again, I am not -- I won't do

1    this to you.  I need to stand back over here.  This number I

2    am looking at is the bottom number.  This is the number where

3    you took out the $7 an hour -- 390,000 -- are you telling us

4    that this number includes over $100,000 for past losses, and

5    that the difference between a job that pays 50 to $55,000 a

6    year, and a job that pays $14,000 a year, you are saying that

7    the difference over the next 14 something years is only going

8    to be that much?

9         A    Well, I could -- the numbers -- it is a matter of

10   subtracting one number from another.  If I haven't shuffled it

11   all around and thrown it in the floor by now, I will try to

12   find it, and explain what I am saying.  The -- as we said

13   earlier, the lost -- if you looked at the conductor's job, the

14   past and future lost income present value is $558,098, and the

15   value of the -- present value of the future alternative

16   non-railroad job is $167,264, so if you subtract 167,264 from

17   558,098, you get 390,834.

18        Q    All right.  That's -- well, let me ask you this.

19   Have you ever negotiated any wage contracts, or ever

20   negotiated any contracts for any people?

21        A    Negotiated with employees, like faculty members, if

22   you call -- not negotiate, but we talk about assigning raises

23   or recommending raises.

24        Q    And you are telling us that -- would you exchange --

25             THE COURT:    All right, Mr. Wettermark, you want

1  to use that again, I mean, if so, take it over to the --

2    MR. WETTERMARK:  I'll just stand -- well, I don't

3  have any more questions, thank you, sir.

4    THE COURT:  Any redirect?

5    MR. GARLAND:  No redirect.

6    THE COURT:  May this witness be excused?

7    MR. GARLAND: Yes.

8    THE COURT:  All right, Mr. Garland, what do you

9  have next?

10    MR. GARLAND:  Your Honor, that concludes the

11  evidence of the railroad with the exception of tendering

12  into the documents we discussed this morning.

13    THE COURT:  We'll address that shortly.  Is there

14  any rebuttal evidence to be presented by the Plaintiff?

15    MR. WETTERMARK:  No, sir.

16    THE COURT:  All right, Ladies and Gentlemen, what

17  all that means is that the evidence is in, except a

18  couple of matters of some of the exhibits you have heard

19  talk about I have got to discuss with the attorneys.  We

20  can do while you all go to lunch.  So the evidence is in,

21  the next step will be for the lawyers to speak to you in

22  their closing arguments before I will give you the law on

23  the matter and submit it to you for your deliberations.

24  So we are on schedule, basically as to what we had been

25  thinking we could do, and that's good, but -- so we are

1      going to take an early lunch break today, let us tend to

2      a little housekeeping, as I call it, so that when you

3      come back the lawyers will be ready to move right into

4      the arguments, to present to you.  So we are going to

5      take an early lunch break and we are going to break until

6      1:00 o'clock.  That's a little longer, but that gives us

7      time to take care of some things, and you all can have a

8      leisurely lunch.  And remember my instruction, not to

9      have any discussions about the case, either among

10     yourselves or with anyone else you may see at lunch,

11     don't let any of these folks that are involved in the

12     case to talk about the case around you, just a reminder

13     on that instruction.  I want everyone else to stay where

14     you are while these 12 jurors are excused for lunch until

15     1:00 o'clock.

16  (JURY LEAVES COURTROOM).

17          THE COURT:    All right.  As far as the exhibits,

18     we, of course, chatted about those briefly this morning

19     before we started.  I don't know of anything to do other

20     than let you all tell me what needs a ruling, if

21     anything, or if you all sorted it out.

22          MR. GARLAND:   Your Honor, let me tender Exhibit 32,

23     which is Ms. Bookman's summary that she testified with.

24          THE COURT:    All right, let's -- number 32 is --

25          MR. GARLAND:   And we have stipulated that all of --

1        THE COURT:    -- Admitted.

2        MR. GARLAND:    -- all of the correspondence to Mr.

3  Maher, from Mr. Maher, from either Mr. Wettermark or Mr.

4  Kirkland will be admissible, or admitted, and --

5        THE COURT:   Now, that's going to be a combination

6  of some Plaintiff's Exhibits, some Defense Exhibits, not

7  necessary a collective exhibit where they are all pulled

8  together in some chronological order.  Just lay all of

9  these pieces of paper on them and let them figure it out.

10       MR. GARLAND:  Defendant's Exhibit 3, 4, and 5, are

11  the rules that were admitted yesterday.  And my Exhibits

12  1 and 2, which I think track his exhibits, the accident

13  reports, were admitted yesterday, I believe.

14       THE COURT:   What I had admitted yesterday were

15  Defense Exhibits 3, 4, 5, and 12, 14, 24, 25, 26, 29, 34.

16       THE COURT:   Yes, sir.  And I think some of those

17  would encompass this correspondence you have been

18  speaking of.

19       THE COURT:   Let me be sure I'm straight on that.

20  Those were just various letters, we talked about one of

21  the Plaintiff's witnesses, maybe the Plaintiff himself,

22  when he went through those letters.

23       MR. GARLAND:  What would be better, for me to maybe

24  go through mine, my correspondence?  Are we talking about

25  Maher or I guess we are talking about our agreement?  Can

1    we just put that together?

2         MR. WETTERMARK:    Usually the easiest way to do it

3    is, my exhibits, I have a list every one that I had.  All

4    you have got to do is, you can go through it.

5         MR. GARLAND:   You want me to just start with these?

6      Shall I give you the numbers now?

7         MR. WETTERMARK:    We are trying to find out --

8    we're going to just put all of them in evidence?

9         MR. GARLAND:   Right.

10        MR. WETTERMARK:    What we want to do is see --

11        MR. GARLAND:   If what I don't have you have in

12   evidence we will supply a list to the reporter.

13        MR. WETTERMARK:  We don't need to do that in front

14   of, Your Honor, do we?

15        THE COURT:    No, sir.  I was thinking not, but

16   there may have been some exhibits that were used that

17   were other than correspondence between Mr. Maher and the

18   Plaintiff, or Plaintiff's counsel.  Any issues about

19   those?

20        MR. WETTERMARK:    I don't know -- I mean, I --

21   what other offers --

22        MR. GARLAND:   I'll tender Exhibits 7 and 8, the

23   reports identified and described by Mr. Roberson this

24   morning.

25        MR. WETTERMARK:    And I object to those, on the

1   grounds of hearsay.

2        THE COURT:    Well, not everything in the reports

3   are hearsay, I don't guess -- I mean, he was involved in

4   the -- what is reflected in the report, to some extent,

5   perhaps others were involved as well.  I don't know, I

6   haven't read the reports, but --

7        MR. WETTERMARK:    Well, I mean, this is a -- it's

8   a report, apparently it was prepared by J. L. Wagner,

9   although it doesn't say who prepared it, it contains --

10  just the whole thing is hearsay.

11       THE COURT:    Just give them to me and I am going

12  to go read them.  I'm not going to read them right this

13  minute, but -- 7 and 8, there's an objection.  All right.

14    What else do you have?

15    MR. GARLAND:   Defendant's Exhibits 6, 9, and 11.  I

16  don't think any of those were admitted yesterday, were

17  they?

18       THE COURT:    I don't have that 11 was ever

19  referenced by any witness, or used with any witness.

20       MR. GARLAND:    If it wasn't referenced, I'll

21  withdraw it.  I had it in my --

22       THE COURT:    What are 6 and 9?

23       MR. GARLAND:    I'll withdraw that one.  6 is the

24  freight car inspection report.

25       MR. WETTERMARK:    I don't have any problem with

1   that.  I think this is a business record.

2        MR. GARLAND:    Now, 9 --

3        THE COURT:    So 6 is admitted.

4        MR. WETTERMARK:    Yes, sir.

5        MR. GARLAND:    -- 9 is a report of personal injury.

6        MR. WETTERMARK:    See, I will object to this,

7   because this was prepared by Mr. Wagner, and it's --

8        THE COURT:    Well, let me read -- I will look at

9   that one more carefully.  That's 9, objection to 9,

10  ruling withheld.  What else do you want to offer, Mr.

11  Garland, that either needs to be admitted or objection

12  stated and a ruling made?

13       MR. GARLAND:    Here is another, Exhibit 10, is

14  another one that is a report document.

15       THE COURT:    Show that to Mr. Wettermark, is that

16  the same category as these others?

17       MR. GARLAND:    Exact same.

18       MR. WETTERMARK:    Objection, hearsay.

19       MR. GARLAND:    And that completes our submission,

20  Your Honor.

21       THE COURT:    Like Defendant's Exhibit 1, I don't

22  have a reference to 2 ever being used.  I don't know what

23  1 is, but you're not offering number 1?

24       MR. GARLAND:    If you've already got them, Number 1

25  is the employee's report of the 23rd.  Number 2 is

1      employee's report of the 26th.  Have you got those in

2      your --

3              THE COURT:     Those may have been admitted as

4      Plaintiff's Exhibits; is that what you are saying?

5              MR. GARLAND:   They were, I think.

6              THE COURT:     So they don't need to be --

7              MR. GARLAND:   What numbers have you got?

8              MR. WETTERMARK:     28.

9              MR. GARLAND:   Same exhibits.

10             THE COURT:     Number 1 won't -- Defendant's Exhibit

11     1 won't be offered because it duplicates the Plaintiff's

12     exhibit?

13             MR. GARLAND:   Correct.

14             THE COURT:     I had number 15, 16, 17, 18, 19, 22,

15     27, or 24 and 27.  And that may be the series --

16             MR. GARLAND:   That's the series of the

17     correspondence.

18             THE COURT:      -- Of the correspondence.  Okay, so

19     those are covered.  So it's just four Defense Exhibits,

20     7, 8, 9, 10, to which there is an objection, and I'm

21     going to go read them and rule before you all argue,

22     okay?  The Jury Verdict Form, I will rule on momentarily.

23      I am going to -- that is, not right this minute, but

24     before you argue.  And of course, the charges, it may be

25     helpful to you all using your lunch break to look at what

1    I gave you, and then we can have a little charge

2    conference before 1:00 o'clock.

3         MR. WETTERMARK:    Okay.

4         THE COURT:    What time do you want to get back

5    together?  And I'll figure out the exhibits, resolve the

6    Jury Verdict Form, and the charge.

7         MR. GARLAND:    I will need at least an hour for

8    lunch.

9         THE COURT:    That's fine.  I don't think it will

10   take us that long to talk once we get together.

11        MR. WETTERMARK:    12:45?

12        MR. GARLAND:    12:45.

13        THE COURT:    Yes, 12:45, and see if you can read

14   over what I have done on that charge.  I expect each of

15   you might have some comments about it, but I have tried

16   to, you know, do a balanced kind of charge that takes in

17   account where I understand everybody is coming from and

18   what you have submitted by way of requests to charge.

19   The aggravation charge -- Mr. Garland, are you going to

20   argue that he had preexisting problems --

21        MR. GARLAND:    Yes.

22        THE COURT:    Well, there's a standard charge.  And

23   of course, you all -- Mr. Wettermark submitted a couple

24   of requests, I guess I need to address that.  I don't

25   have an impeachment charge in here.  I don't know --

1    that's one of the standards that sometimes gets

2    requested.   And I haven't heard anybody request that in

3    this case, so I don't have it in what you will look at.

4    But we'll break until we get together at 12:45 in my

5    office.   Is there anything else we need to talk about

6    right this minute?

7          MR. GARLAND:    Could I just inquire how they intend

8    to break up, or if they do break up their closing

9    arguments, that will just give me some guidance as to

10    what's coming?

11          MR. WETTERMARK:    I'm going to do the opening

12    closing and Frank is going to slam the lid on you.

13          THE COURT:    Is Mr. Childs going to argue?

14          MR. WETTERMARK:    Yes, sir.

15          MR. GARLAND:    Will he -- he will conclude?

16          MR. WETTERMARK:    Yes.

17          THE COURT:    So you will do the opening, then Mr.

18    Garland, and then Mr. Childs?

19          MR. WETTERMARK:    Correct.

20          MR. GARLAND:    Okay, what is the timing -- what time

21    is --

22          THE COURT:    Well, there's a limit in the Uniform

23    Rules somewhere, what, an hour a side, or something like

24    that?

25          MR. WETTERMARK:    I hope we don't use that much.

1           MR. GARLAND:    I certainly won't use that much --

2      but I --

3           THE COURT:    Jurors probably would be appreciative

4      if you didn't use that much.

5           MR. WETTERMARK:    That's my thought process.

6           THE COURT:    Yes.  Okay.  Does that cover us for

7      the moment?

8           MR. WETTERMARK:    Yes, sir.

9           THE COURT:    All right, we'll get together at

10     12:45 in my office, and arguments at 1:00.

11     (LUNCH RECESS 11:45 a.m. To 1:00 p.m.)

12          THE COURT:    Please be seated.  Members of the

13     Jury, welcome back.  We are now ready proceed to the

14     closing argument phase of the trial.  In this case, the

15     Plaintiff has the right to open and conclude, they will

16     go first and then Mr. Garland, and then the Plaintiff

17     will have the last word before I charge you.  My best

18     estimate on the way this will proceed, we will probably

19     take a short break after Mr. Garland's argument, and then

20     do the final argument and the charge of the Court, so

21     that's the way we will proceed.

22

23

24

25

CLOSING ARGUMENT BY MR. WETTERMARK FOR PLAINTIFF

        THE COURT:  Mr. Wettermark, go ahead.

        MR. WETTERMARK:     Thank you, your Honor, and
Members of the Jury.  What was it, two days ago, when I
stood before you, I told you that this was a case about
safety in the work place.  I think you now know why I
felt that is what this case was about.  I also told you
that this was a case about a man, Mr. Kirkland, what he
has been through, how he has conducted himself.  I told
you that by the end of this case, you would be impressed
by the type of gentleman that has come before you asking
for your verdict.  I think you now know why I felt so
strongly about my client.  We are here to determine, as I
discussed with you earlier, whether he is entitled to
compensation, and how much that compensation should be.
But really, we are here for almost a higher purpose.
This is a Court of Justice, and Lester Kirkland has come
to this courtroom, to you, seeking justice for what has
happened to him.  To get justice in a case takes two
different things:  It takes the law, and it takes the
truth.  And in this Court, there are different functions.
The law is going to be provided by the Judge, His Honor,
in just a few minutes; he is going to tell you what the
law is.  And when you go back to deliberate you won't
have 12 different ideas in what the law is, there's only

1       one law, and that is the law that the Judge is going to

2       give you.  The truth, that's your responsibility, that's

3       why we have you here.  You are going to be asked to

4       determine what is the truth about what happened on the

5       Aiken local from 1990 until 1998; what is the truth about

6       what happened on that Friday and that Monday; what is the

7       truth about what has happened to this gentleman since

8       then.  I want to talk to you about what I think the truth

9       is in this case, but before I do, I would like to talk to

10      you about what the law is in this case.  The Judge is

11      going to tell you that the railroad has a duty to provide

12      its employees with a safe place to work.  And when you

13      hear his charge, you are going to hear two terms that I

14      think are very important in this case.  The railroad's

15      duty to provide a safe place in which to work, it's a

16      continuing duty, and it's a non-delegable duty.  By

17      continuing, that means it is not something you can do on

18      Mondays and not on Tuesdays; it's not something you can

19      do this week and not next week, but continuing duty means

20      that the railroad has the obligation every day to provide

21      its employees with a safe place to work.  The second term

22      is equally important in this case.  It's a non-delegable

23      duty.  The Judge is going to tell you, his exact words

24      are going to be, the railroad's duty to provide Plaintiff

25      a safe place to work is a non-delegable duty, that is, it

1     may not be delegated.  What that means is, the railroad

2     is not entitled to come into this courtroom and say, oh,

3     well, we weren't responsible for trying to keep those

4     cars safe, that was W. R. Grace's responsibility, and you

5     all have heard some of that in this case.  Well, the law

6     says, no, sir.  The safe place to work responsibility,

7     that belongs to the railroad, and it's your

8     responsibility each and every day that you send your

9     employees to work.  That's why I think, when you go back

10    to the deliberations room and consider the law that the

11    Judge is going to give you, it's very, very clear in this

12    case that the railroad has failed in its duty to this

13    gentleman.  There is one other portion of the Judge's

14    charge that you're going to hear that I also think is

15    very important in this case.  You know, you have heard

16    all the evidence about how this gentleman has tried to

17    find work, what he can do; you have heard the doctors

18    talk about his disabilities; and you have heard how he

19    has gone and applied for every single job that has been

20    made available to him.  The only request he had, was try

21    to find me work within these three major metropolitan

22    areas of Columbia, Greensboro [sic] /Spartanburg,

23    Augusta, or anywhere in between, because I have such

24    strong personal and family reasons for needing to stay

25    here.  And I think all of you will agree that a man who

1   has a commitment to his family, to his daughter, who

2   doesn't want to be an absentee father, I think that's a

3   mighty reasonable reason for wanting to stay in a

4   geographical location.  But what is the law going to tell

5   you about that?  Well, the answer is going to be clear.

6   The Judge is going to tell that the Plaintiff, that's Mr.

7   Kirkland, the Plaintiff was not required to accept

8   employment if the place of employment was in an

9   unreasonably distant geographical area from the area

10  where the Plaintiff lived at the time of his particular

11  injury.  So the law tells you that his request was a very

12  reasonable one.  And I'm going to digress right now, and

13   -- because I know I am talking about the law, but, it

14  just seems incredible to me, that on the Norfolk Southern

15  Railroad Company, with their three major operations, in

16  Columbia, in Augusta, and in Greenville/Spartanburg, it

17  seems incredible to me that if they really wanted to help

18  this man get back to work, that they couldn't find the

19  job on the railroad for him. Remember, I asked about all

20  the different departments, whether it was the claims

21  department, the marketing department, the sales

22  department, whatever departments they had, they offered

23  him one job, and he accepted it.  And then they said, oh,

24  you are not medically qualified to do that job.  I hope

25  you understand -- I hope you can use your good judgment

1   to figure out what is going on here. You know, I don't

2   want to seem like a cynic, but it just seems so strange

3   to me to have a rehabilitation department that's run by

4   people out of the claims department.  I hope you know

5   what was going on with these job offers.  The law is

6   very, very favorable to Mr. Kirkland's position in this

7   case, and so, that's why I hope, when the Judge tells you

8   the law, that you all will all pay very close attention

9   because you will hear exactly what I just told you.  The

10  truth, that's your job.  Well, how are you supposed to

11  figure out what the truth is?  Well, you have got -- the

12  evidence in the case is really all you have.  You have

13  the exhibits, you have the testimony, and most important,

14  you have your common sense, and when you evaluate

15  people's testimony in the case, you need to be critical,

16  and you need to ask tough questions.  For example, when

17  Mr. Kirkland testified, you need to ask yourself, was he

18  straightforward and honest or was he evasive?  Did he try

19  to exaggerate his problems, or did he try to tell us in a

20  straightforward manner?  You need to take into

21  consideration the interest that people have in this case.

22  For goodness sakes, take into consideration the interest

23  he has in this case, and his future rides on what you

24  Ladies and Gentlemen are going to decide this afternoon.

25  You need to consider that.  Ask yourself, did he try to

1  exaggerate or embellish, or did he tell things straight

2  down the middle?  I don't think you will ever have an

3  opportunity to hear a more honest and straightforward

4  person testify in a court of law.  Consider what the

5  railroad's witnesses had to say, by contrast.  Were they

6  evasive?  Did Mr. Chapman try to talk about things -- Mr.

7  Chapman, I will just -- I will just say it straight out.

8  Per his testimony, he was making up things as he was

9  going along.  And his testimony was so incredible that I

10  think anybody with common sense is going to reject it.

11  Common sense, to me, is the thing that separates our case

12  from the railroad's case.  If anything that I have said

13  to you, or anything you have heard from any of the

14  witnesses doesn't make common sense, then you ought to

15  disregard it.  But I have asked you to do the same thing

16  on the railroad's side, because I think what you will

17  find is that a lot of what the railroad witnesses were

18  saying simply didn't make common sense.  It seems

19  incredible to me that given this Aiken local, that the

20  railroad was not able to find a single witness, other

21  than the two company officials, who were responsible.

22  They weren't able to bring you a single witness to say

23  that what these gentlemen told you was true.  Don't you

24  think they would have brought a single person from W. R.

25  Grace to say, oh, we cleaned those cars off every day.

1    Don't you think they could have brought a single working

2    man from the railroad to say, oh, no, I worked that job,

3    they clean those cars off.  Every single worker that I

4    could find who had worked this job in the past eight

5    years came into this courtroom and told you the truth

6    about the situation.  And I am going to tell you

7    something, you better believe it took some courage and

8    some gumption on the part of those gentlemen to come in

9    here and to tell you about this terribly unsafe

10   situation, knowing that -- knowing that tomorrow they are

11   going to be back at work looking Mr. Chapman and their

12   supervisors in the eye.  Don't you know that those

13   gentlemen were telling you the exact truth when they came

14   in here, knowing that they were going to go back to work

15   for that same company tomorrow.  No, if you will apply

16   your common sense to what you have heard in this case, I

17   don't think there is going to be any question that this

18   is a case where the railroad has failed in its obligation

19   to provide its employees with a safe place to work.  You

20   know what?  I mean, they admitted -- Mr. Chapman,

21   admitted, he said, no, that's not safe; of course it is

22   not safe to have wet kaolin on the car.  Mr. Roberson

23   seemed to think that maybe it was safe.  But there is no

24   question, from the evidence in this case, that Mr.

25   Kirkland was injured as a result of an unsafe condition.

1    And once that happens, then the law says that he is

2    entitled to recover compensation.  The Judge will tell

3    you, this isn't a workers' comp case.  There is no

4    workers' compensation for railroad workers because they

5    are covered by this federal law.  And if they want to get

6    compensation for their injuries they have to come before

7    a jury like you, and under this federal law prove to you

8    that they were injured because of the railroad's

9    negligence.  And in this case, the railroad was grossly

10   negligent, and then they have to prove to you what would

11   be a fair and reasonable amount of compensation for them

12   to recover.  Well, in this case, the Judge is going to

13   tell you that there's three types of compensation that

14   can be awarded.  There's past lost wages; there is future

15   lost wages; including his fringe benefits, which in this

16   case, is his health insurance, which is so very, very

17   important; and then finally, it's pain and suffering,

18   which is something that is up to you to determine what a

19   fair sum is.  Well, I had these charts here on Monday

20   telling you what the injury in this case was.  And as you

21   have heard all of the doctors testify, you have seen each

22   and every single thing that is on this chart come true.

23   The doctors have testified and the MRI scans are in

24   evidence that show the damage to L4 and the L3 disk.

25   Remember the anatomical model that the doctor was showing

1   you that had the big red bulging?  Great depiction of

2   what is wrong with this man's back.  And there is no

3   question, the doctor's have testified, in just

4   unequivocal terms that his back injury was caused by this

5   fall.  Dr. Eisenberg testified twice, his testimony was,

6   he said, "I felt he had suffered a traumatic injury to

7   his lower back and right thumb as a result of the

8   above-described accident on January 23rd, 1998.  And in

9   view of the pain and tingling and sensations in his leg,

10  I also felt there was what could be termed a lumbar

11  radiculopathy", that means there could be evidence of

12  irritation of one of the nerves coming out now in the

13  patient's leg.  And then I asked him specifically, "Is

14  there any question that the damage to his disk was caused

15  by this fall?"  And I asked him, "Do you have an opinion

16  as to whether or not the damage that was found to these

17  disks, the L5 disk and the L3 disk, do you have an

18  opinion as to whether or not the condition of these disks

19  were caused or contributed to by the injury that he

20  described when he first saw you?"  And his answer was,

21   "Within a reasonable degree of medical certainty I feel

22  the patient's accident, as detailed before, was the cause

23  of his pain and his persistent pain."  The second

24  condition that they have found, and that they have been

25  treating him for, is the aggravation of these benign

1    arthritic type changes in his spine. And remember, both

2    Dr. Eisenberg and Dr. Epstein told you that these are

3    wear and tear changes that everybody gets to some degree,

4    but it's not a problem until you have trauma. You know,

5    Dr. Epstein says, you know, you have a fall like this and

6    it adds five or ten years to your spine. He said,

7    people, when they get older, you are not like young

8    people, that -- you can't be jumping off walls and stuff

9    like you could when you are young. And of course, that

10    explains why a fall like this has affected him so badly,

11    because he does have the underlying wear and tear changes

12    that everybody gets; and then you have this terrible

13    fall, and it aggravates these changes, and so now you

14    have this complicated process going on in your spine. I

15    asked Dr. Epstein to describe what anatomically happens.

16    And remember, he said, "We are not sure, we just know

17    that's what happens. We don't know for sure from an

18    anatomical standpoint exactly what has happened." And

19    the same thing from Dr. Eisenberg, we asked him to

20    explain this, and he says, what happens is, this trauma

21    to the spine, it sets off this situation where it just

22    grows worse and worse over time. Let me see if I can

23    tell you exactly what he said, because I think it's

24    important. I said, "Explain to the jury, if you would,

25    what role does a traumatic insult to the spine play in

1   the acceleration and causing of degenerative changes?"

2   And that's what we are talking about here, these

3   degenerative changes.  And the answer was, "Yes.  A

4   traumatic injury, as Mr. Kirkland suffered, can cause

5   disruption, protrusion of the disk material that we have

6   referred to before, it can cause injury to muscle,

7   ligaments, it can cause down the line production of

8   osteophytes, which are bony outgrowths which can

9   contribute to the narrowing of the little holes where the

10  nerves come out from.  These can all be the sequelae, or

11  these can all be finally seen after injuries such as Mr.

12  Kirkland sustained."  So I don't think there is any

13  question that he had this injury that I described to you

14  on Monday.  I think you have heard testimony from four

15  doctors, explaining the injury, the railroad had has not

16  contested that.  They haven't brought a single doctor in

17  here, to say, oh, no, we didn't do this to this man's

18  back.  There is no question in this case that the

19  traumatic condition of his spine and his hand were caused

20  by this fall.  The seriousness of the injury -- well, I

21  mean, my goodness, you all heard enough of the testimony

22  about how serious it is, how this man has been -- I want

23  to say condemned, I hate to say something like that in

24  front of him, but he has been condemned to a life of

25  pain.  Every single doctor who has testified said, this

1    man is going to have chronic pain for the rest of his

2    life.  He goes to the doctor once every six weeks and

3    gets injections in his spine.  Every day of his life he

4    has to take three heavy doses of a narcotic, called

5    Oxycontin.  Every day of his life he has to take nerve

6    medications, antiinflammatory medications, and

7    antidepressant medications.  There is no question in this

8    case that this is a very serious injury.  So, what is

9    fair compensation for Mr. Kirkland?  Well, let me go

10   through the three elements of compensation with you and

11   tell you my thoughts about what has been proved in this

12   case and what I think the proof in this case is -- or

13   what would be reasonable compensation.

14        This is the chart I showed you when we first started

15   this case, and I tried to fill it in with what the

16   evidence in the case would have been.  His past lost

17   wages, from January 26 of '98 until the present -- you

18   know, this Newberry switcher job is his job, it's

19   something he worked for for 25 years to get the seniority

20   to be able to hold it.  And I think that we are entitled

21     -- he worked for that for 25 years, he would be working

22   that job now, and that's what I think is the appropriate

23   measure of his damages in the future.  But to give the

24   railroad the benefit of the doubt, I calculated his past

25   lost wages, one year, at the rate of the Aiken local, and

1  then the last two years at the rate of the Newberry

2  local, and it comes to $149,539.  And this is his after

3  tax lost, I have already taken income taxes out of that.

4  The second element of his future -- of his wages, is his

5  future lost wages and benefits. And again, there is two

6  elements of that.  One is his future wage loss; and two,

7  is his future health insurance.  Well, you will recall

8  that there were -- Dr. Johnson made several different

9  calculations as to how to do this.  This calculation,

10  775,000, is assuming that he gets this job, which he

11  already has, $7 an hour, and assuming he is able to

12  increase that to 40 hours a week, and then get pay raises

13  from that starting salary of $7 an hour.  In other words,

14  the difference between what he would have made working

15  for the rest of his life on the railroad and what he is

16  going to make working the rest of his life at a new job

17  that starts at $7 an hour is $775,000.  His insurance,

18  and there is no dispute about this -- this amount, even

19  the railroad's economist said his insurance costs -- I

20  think their economist came up with a cost that was almost

21  identical to this.  His health insurance is going to cost

22  $121,000, and that's critical.  Don't you know that there

23  ain't nobody in this country who is going to insure this

24  man now; he has to keep his health insurance.  If he

25  doesn't have this health insurance, this is what he uses

1    to pay his medical bills, his prescription expenses.  And

2    his job, the $7 an hour job doesn't provide him with any

3    medical insurance.  So the future medical insurance is

4    $121,000, and that brings his total out-of-pocket loss,

5    his financial loss, is $1,046,778.  The last element of

6    compensation is his pain and suffering.  I told you all

7    on Monday that that's your job, that you have to -- I

8    can't bring an economist in here to tell you how much

9    pain and suffering is worth, the law depends upon you to

10   make this determination.  And the standard is to be fair,

11   to be reasonable, and I mean that very sincerely.  To be

12   fair to Mr. Kirkland, to be fair to the railroad, to try

13   to come up with something that is suitable for what has

14   happened to this gentleman, and include in it the

15   permanent physical disability and the loss of enjoyment

16   of life.  You know, think about this for a second.  This

17   man was -- he was active; he played golf and tennis; you

18   saw the pictures of how he used to play with his family,

19   this stuff has all been taken away from him.  It has been

20   taken away from him by the railroad.  I don't know how

21   you put a price tag on that, and it's left to your good

22   judgement.  When I sit down -- and I will be honest with

23   you, when I sat down and tried to think of what I could

24   recommend to you of being fair, my first reaction when I

25   put up here was, that's not enough, that's not enough for

1    what has happened to this man.  And it's your decision,

2    though, and it's within your rights and your power, to

3    either increase this amount, or decrease it if you think

4    that's necessary.  But you need to decide collectively,

5    the 12 of you, what is a fair sum of money for what this

6    man has to go through for the rest of his life, which

7    brings the total compensation to $1,546,778.  I know a

8    lot of you are sitting here saying, my gosh, that's a lot

9    of money.  Well, you are right, it is a lot of money, but

10   the rest of your life is a long time.  There are people

11   who don't think that juries should be allowed to decide

12   compensation for injured people.  They say, oh, no, we

13   ought to have a board of doctors and a board of

14   economists and let them figure out.  We shouldn't entrust

15   this to ordinary people, they don't have the education or

16   they don't have the experience.  We need professionals

17   and experts to make this type of decision.  I don't think

18   that's true.  I think that in this country, our jury

19   system is what separates us from much of the other world,

20   because we depend and we think that a collection of 12 of

21   our citizens, like you, from diverse backgrounds, are the

22   best people suited to sit down and to consider what the

23   professionals have to say, consider what the doctors and

24   the economists have to say, but you folks are in the best

25   decision [sic] to make these type of determinations.

1    Sure, $1.5 million, that's a lot of money; the rest of

2    your life is a long time.  You know, I wish it was

3    possible for us -- by us, I mean me, Mr. Kirkland, the

4    Judge, Mr. Garland, the railroad representatives, all of

5    us, to come back here in five years and sit down and say,

6    okay, what has happened to Mr. Kirkland for the last five

7    years.   Is he working or is he not working?  Has he had

8    that surgery the doctors say he might have?  Has he had

9    the thumb surgery he may have to have?  And maybe at that

10   time, reevaluate, and give him that 5 years worth of his

11   compensation, and then maybe come back in 10 years, in 15

12   years, and in 20 years, and make the determination at

13   that time, but we can't.  And so the law relies upon you

14   to make an award now that will take care of this man for

15   the rest of his life; and that's why a number like this

16   is not so large; that's why a number like this is very

17   fair, very reasonable.  You know, I could not help but

18   think, when I see this 45-year-old man walking like

19   an-80-year-old man now, he is my age, and I sit there and

20   can't help but think, what is going to happen to him when

21   he is 65 and he starts having the normal wearing out that

22   65 and 70 year old people have.   What is going to happen

23   when he starts having the aging infirmities, and slowing

24   down because of age, and he has still got this bad back?

25   These are the sort of things that you all need to

consider when you make an award now to try to compensate
him for the future.  The only other thing I would ask you
to do is -- and I think it's appropriate, you need to ask
yourself this question, you need -- and be hard about it.

You need to say, Look, Mr. Wettermark has said that he
thinks over $1.5 million is fair compensation for Mr.
Kirkland.  You need to ask yourself this question:  What
sort of man is it, that we are being asked to give money
to.  Well, let me tell you, and I think you have got some
glimpses in this courtroom about what type of man he is,
he is not an educated man, got a high school education.
But you know what, he made the most of that education by
combining it with hard work and getting up to a job that
would pay him $70,000, $80,000 a year.  Remember when he
told you about working as a dispatcher?  I mean, here is
a guy who is working as a conductor, and goes and gets a
second job within the company as a dispatcher, works it
on weekends so that he can learn more about the railroad.

You know what, he is a company man.  You know, in some
places that may be good, may not be good, but he was so
loyal to this company -- I mean, when they came out there
that night and said, work with us, don't report this
injury, even when his thumb -- you saw his thumb. --
Even when his thumb was obviously deformed, and he is the
sort of man who is so loyal to his company that he was

1    willing to work with them and put off going to the

2    doctor.  He is the sort of man whose fellow workers

3    thought enough of him to come in here and testify on his

4    behalf knowing full well that they were testifying

5    against their bosses, and they were going to go back to

6    work tomorrow.  And you heard about the railroad's

7    disciplinary process.  He is the sort of man those men

8    did not think twice about saying, yes, we will come from

9    South Carolina to tell the truth about what happened to

10   this man.  No, this is a case where there is no question

11   that this is a man who, under the evidence in this case,

12   deserves this compensation.  Justice:  That's what we

13   want here, and that's what you can give by returning full

14   and fair compensation for Lester Kirkland.

15        THE COURT:    Mr. Wettermark, would you move your

16   chart, please?

17        MR. WETTERMARK:  Yes, sir.

18

19

20

21

22

23

24

25

CLOSING ARGUMENT BY MR. GARLAND FOR THE DEFENDANT

1          THE COURT:    Mr. Garland.

2          MR. GARLAND:  May it please the Court?

3          THE COURT:    Yes, sir.

4          MR. GARLAND:  Members of the Jury, let me thank you

for your attention throughout this trial.  And the Jury

in the box is the one thing that is unique about the

American system that no other country has, and that's

where the decisions are made, that's where the cases are

presented.  I appreciate -- I know all of us appreciate,

from both sides, your service as jurors. It's a great

civic duty, and we appreciate it.

Let me review some of the facts in this case with

you, as we collectively try to come to a fair and just

decision in this lawsuit.  First of all, Judge Adams will

charge you, as we mentioned earlier in the case, this is

not a situation where just because an employee gets

injured on the job, compensation follows.  Judge Adams is

going to charge that you must find by a preponderance of

the evidence that the cause of the injury was the

negligence of the railroad, negligence of the railroad.

He will also charge you to consider what negligence, if

any, the Plaintiff had.  Did he fail to do anything that

would have created a different result, that's part of

your decision, that's part of the evidence in this case.

1      You will recall, probably, the best description of Grace

2      Company there was Mr. Roberson this morning.  He frankly

3      said -- here's a gentleman with no interest, and there's

4      no money to Mr. Roberson, he just tells it like it is.

5      And he told us several things, I think, that are

6      significant.  He said -- and you heard all the testimony

7      about all during the years making complaints about the

8      Grace and Company, complaints about the Grace and

9      Company.  Well, he tied it down and said what they were

10     complaining about then, now, and he even talked to Mr.

11     Kirkland, was about the fact that those things weren't

12     paved, the sidings there weren't paved, and the kaolin

13     would get muddy down there and they would have to walk in

14     that.  And he told about going out there, seeing about

15     that, and seeing what -- as a result of that these

16     walkways were paved.  And you further recall what he said

17     that he and Mr. Kirkland talked about it, Mr. Kirkland

18     being the conductor on that run, and Mr. Roberson said,

19     you don't have to go in there if you see a condition

20     that's unsafe.  Now, what he was saying, really, is

21     exactly what is involved in Rule 586 that there's no

22     dispute about.  Everybody that testified recognized that

23     there are certain rules that the railroad has, therefore,

24     as Mr. Roberson said, the benefit of the employees, and

25     they make sense.  And one of the rules is, when you get

1    advanced and promoted to the conductor you are in charge

2    of the train, and more importantly, I think, from a

3    safety standpoint, it says conductors must -- it doesn't

4    say they can or they might, or they can think about it,

5    that they must remedy defects of equipment.  And again,

6    must, not maybe if you want to, or something, must remove

7    from the consist, and that's the coupling of the train,

8    any cars that are unsafe to run, any cars that are unsafe

9    to run.  Now, how does that apply, Members of the Jury,

10    in this case?  Mr. Kirkland was the conductor of that

11    train on the day in question.  He now says that he came

12    out there to Grace and Company, and he knew those cars

13    were unsafe, for whatever reason.  But this rule doesn't

14    say, if you know they are unsafe, then think about or

15    call somebody, or -- it says take them out.  Mr. Roberson

16    said, and is uncontested in the case, that no conductor

17    has ever been disciplined, no conductor has ever been

18    disciplined for following this rule, for taking out cars.

19     Mr. Chapman said this happens every week or so, that

20    will happen somewhere along in his territory, that a

21    conductor will see a car, for whatever reason -- and it

22    has to be that way, because the conductor is the man on

23    the ground.  You can't be calling back to Columbia to Mr.

24    Chapman or to Mr. Roberson, and saying, "I am out here,

25    and here is what I see," and all that.  It doesn't say

1    that, it says conductor is right there, he is the man who

2    says go or not go at that point.  Now, that's a hard

3    duty.  It's a hard duty for Members of the Jury, I know,

4    for you to play that into this thing, but it's got to be

5    played in order for this case to be decided fairly.  This

6    is a man who -- and he suffered the result of it, but he

7    violated his duty there, in that if he knew that

8    condition was, as he said it is now, then he was under an

9    obligation to himself and his crew to have left that car

10   right there.

11        Now, what else did Mr. Roberson say?  And he goes

12   all the way back to 1990, Mr. Chapman said the same

13   thing, but he only goes back a year or so, they said

14   there has never been, never been a Norfolk Southern

15   employee injured there on Grace and Company.  And Mr.

16   Roberson went further and said, which I think is common

17   sense, and thank goodness, we don't leave our common

18   sense outside the courtroom, he says in a kaolin plant,

19   you are going to have this dust, you are going to have

20   the dust in any kaolin plant, and when it rains the dust

21   will not blow off by the blowing device.  You recall we

22   -- in Mr. Kirkland's testimony, he was having a lot of

23   time to think about this.  What else could they do but

24   blow it off?  He couldn't come up with an answer really

25   there, after reflecting on that a long time.  Should he

 1   have brushed it off?  I don't know.  That's something you

 2   will have to ask yourself.  He said that wasn't his job,

 3   it was the Grace and Company job, but then again, should

 4   the wheel have been dusted.  But you will recall what Mr.

 5   Chapman and what Mr. Roberson said about the wheel, there

 6   was no clay on the wheel.  You will recall the testimony

 7   that Mr. Roberson said, and sometimes the first statement

 8   is the best, he said that night out there when he talked

 9   to Mr. Kirkland and he did his investigation, he said his

10   hand slipped off of the wheel, and his hand had wet

11   gloves and so forth on it.  You will also recall his

12   testimony about what else was found there and what

13   comments were made and talked about, and the comment was

14   that the shoes -- the soles on his shoes were slick.  He

15   was ordered -- or told to have new soles, because

16   obviously you need traction.  You know, when you are on

17   that thing, it's like an egg carton, I mean, it's no a

18   straight -- you see those pictures there, it has the

19   little holes where the water goes through and all that,

20   and you kind of get traction on that, but it's also

21   important to have shoe traction.  And that was what the

22   investigative team found, it was something that could be

23   done to minimize that situation.

24        Judge Adams will also charge you in that same line,

25   that the railroad is not, and can not be, an insurer of

1    the safety of the employees.  He will charge you the law

2    is that the railroad employees must use ordinary care for

3    their own safety, and of course, that ties right in with

4    these -- Rule M that you will have out with you, says, a

5    railroad employee should not take any action that would

6    endanger himself or anybody -- any other employee there.

7    Those are things that have to be considered when you are

8    coming to come conclusion about what happened in the

9    apportionment if you find negligence on the part of the

10    Defendant, then the negligence on the part of the

11    Plaintiff is somehow apportioned in there as Judge Adams

12    will charge you.  I think that whatever damages were done

13    were done that Friday with that fall.  I think the Monday

14    incident -- and there has been some conflicting testimony

15    about that, that you will recall, the conflict in the

16    testimony, that's for you to resolve.  But I do have to

17    say this, that Mr. Sharpe's testimony has to be

18    considered.  Remember he said, oh, yes, he remembered

19    hearing something about Mr. Chapman that day, but then

20    three years later, today -- three weeks later, you will

21    recall his statement given to Mr. Hollis over there in

22    Columbia about it, and the question was, was Mr. Chapman

23    even out there on Monday, and he didn't even know.  So I

24    think you have to weigh that into this whole formula to

25    really see exactly what was happening.  But what has

1    happened since then, coming forward?  You remember, the

2    testimony is undisputed, when he said he needed to go to

3    a doctor, he was sent to a doctor, he has seen a lot of

4    doctors. Undisputed, there's been no surgery performed.

5    And what do the doctors say about that?  What did Dr.

6    Epstein, the neurosurgeon, say about that?  He said, and

7    I think this was -- probably summarize the whole thing

8    just in a sentence or two.  He said, to the best of my

9    ability, he thought he had considerable arthritic changes

10   in his back that appeared to me to be years old.  And

11   that traumatic event, slipping and falling, certainly

12   could have aggravated it in some way, but then he says, I

13   didn't see anything in the films or in the patient that

14   absolutely convinced me that one acute problem had

15   occurred as a result of the accident.  And I might add, a

16   huge number of people are referred here for various

17   traumas and pains.  And then he goes on to say, and you

18   will recall, he said that in the arthritic, degenerative

19   condition of his spine it was the kind of situation, just

20   kind of waiting to happen.  And you remember him using

21   the example, he then said people have that condition in

22   their back, one morning they are going to just bend down

23   in the shower to get the soap and that's going to be

24   that, they are going to have a problem in the back, a

25   back problem.  You will also recall that he said, as did

1    the other doctor, that he -- I think the other doctor

2    said over 80 percent of the working male population over

3    age 40 is going to have back pain of some sort.  He says

4    people, you know, deal with it differently, some continue

5    to work, and some don't, and that sort of thing.  But

6    that's -- I think the medical evidence on that, there has

7    been a lot of medical treatment, Dr. Downey, you recall,

8    the one that prescribes all the pain medication, you

9    heard him and saw him on the video, and has some things

10    you could consider there about some of the things he said

11    about pain.  And it seems like his idea would be, well,

12    just let's put some more medicine on there, just consider

13    all that.  You also recall each doctor said, that, well,

14    no, we haven't operated, we haven't used any surgery

15    because it's not warranted, because we haven't got an

16    x-ray that shows anything that really can be fixed.  And

17    the question was, well, the pain -- they say that's

18    subjective, and they say that's just what he tells, and

19    there is no meter -- you recall that, somebody said that,

20    there is no meter to register.  They are relying on what

21    Mr. Kirkland says about that, and that's the evidence on

22    that issue.

23        Judge Adams will also charge you that in the event

24    you find any negligence in this case, with respect to

25    damages, the law is that every Plaintiff is required to

mitigate their damages.  I invite your close attention to

the Judge's instructions on that point, because that is

the law of Georgia.  Mitigation of damages:  Now, what

does that mean?  With reference to lost earnings, what

that means is, that if a job is available that you take

it, that you try to find it.  Now, what is the evidence

in the case, Members of the Jury, about that?  The

evidence in the case is -- and you will see the letters

back and forth, and when you see the letters -- and you

have heard Mr. Kirkland, he is very articulate, a very

intelligent fellow, there's no question about that, you

see his letters he writes, you know, anybody that would

come in here like the lady this morning and said he is

only -- can earn $7, or something like that, I think is

being unfair to him.  Because when you read what he has

written, how he describes things, and you have heard him

testify, this is a man who any company would be proud to

have on the payroll, and certainly the railroad.  Now,

when they -- I will have to give them a point here.  When

they tried to send him to Michigan for a job, now, I'm

not going to stand and argue with that, that there is

anything too reasonable about that, but that's in the

case.  But I will say this, I will say this:  In Atlanta,

Georgia, which is not but about a three-hour drive -- he

lives an hour away, you remember, he doesn't live where

 1   his stepdaughter lives.  He lives up here on the lake and
 2   she lives there with his ex-wife, about an hour away from
 3   there.  But Atlanta, Georgia is three hours away.  You
 4   heard testimony, the consolidation of those clerkship
 5   offices, from places like Macon, Columbia, places like --
 6   in Atlanta, all of a sudden produced an application pool
 7   right there, and there were -- you will have the letter
 8   out with you, a letter dated a year ago today, Exhibit
 9   24, when Mr. Maher writes and says, it's unfortunate
10   about the dispatcher's job, and you will hear that.  And
11   he did want that job, and unfortunately when he gave them
12   the list of all the stuff that he was taking, they said,
13   this is a sensitive thing, you have to be on duty at all
14   times, you can't move, you know, and trains are coming
15   in, you are dispatching -- not like a clerical clerk in a
16   yard office, which is kind of doing, in a lot of sense,
17   what he did before when he was conductor, making up the
18   orders and all that sort of stuff, that he is experienced
19   doing.  When he says, we're sorry, you know, that didn't
20   work out, but there are 11 clerical vacancies in the
21   office, and do you want to apply.  And you will see his
22   response four days later, to which it was not -- I
23   submit, on a decision that major, I kind of feel like
24   maybe his mind was made up about that, no, that's no good
25   to me, send me one over here.  Well, you don't -- you

1       can't make up a job, there are jobs there or there are

2       not.  And this argument about they have got different

3       divisions, if there is no job there, Mr. Kirkland

4       wouldn't want anybody to make him up a job.  He wants a

5       job that's there and available, and here was 11 of them,

6       11 of them.  He would have to move.  I think that is too

7       far, he couldn't commute, there is no question about

8       that.  What was the evidence about that?  Ms. Bookman

9       says that that is not at all uncommon in the companies to

10      advance up, sometimes you have to move to another city,

11      you have to move to another state.  And this isn't moving

12      to Michigan, I mean, this is, you know, South Carolina

13      and Georgia, sort of things, all the folks coming back

14      and forth to Alabama and South Carolina in this case.

15      It's not, you know, it's not an unreasonable request, is

16      what I am saying, and it does indicate the railroad is

17      working with him and trying to -- try to find placement.

18      And what then about Ms. Bookman?  She testified, with

19      months of reports, that you will have out in evidence,

20      and I submit, please look at those, because, as she said,

21      these are not just jobs I pick out of the phone book or

22      out of the newspaper, these are jobs where she would have

23      a contact with somebody, and say, now, here are the

24      qualifications, they would say, well, we are trying, you

25      probably know, maybe from some of your job ads you are

1   seeing, they might like to have a year or so experience,

2   they may like to have that, but they will certainly

3   consider somebody with some sort of other experience, and

4   that's what she said.  And she said the only leads she

5   turned over were those type of bona fide leads on jobs,

6   and you will see how many there were over that period of

7   probably about nine months.  But ever since he answered

8   this letter in March of 2000, a year ago, when he answers

9   this letter and says, no, I am not going to take those

10   jobs over there, although they pay $40,000 a year.  And

11   this business about $70,000, you have heard the evidence

12   about that.  Good gracious, you will have his income tax

13   returns, you can't hardly add them together and get

14   that.  But what he is saying is, and the experts they

15   brought over here from Birmingham said, he was looking at

16   somebody else's W-2, a Mr. Walls, who has the Newberry

17   switch.  Well, you recall Mr. Kirkland said he used to

18   have the Newberry switch operation, but he moved to get

19   closer to his home.  He moved to get closer to his home.

20   He is really -- on this point, I will have to say, he is

21   trying a little bit to have his cake and eat it to,

22   because he said, but I would move right back there, but I

23   wouldn't move here, you know, and that sort of thing.  I

24   think you have kind of got to put all of this stuff in

25   the hat and kind of toss it around a little to really

1    see.  But Ms. Bookman's leads were valid leads, and what

2    did she say you will see in those reports, up until the

3    last month, about a month before trial, he always says, I

4    can't work anything but this part-time job.  I can't work

5    anything but 20 hours a week.  And she said that was a

6    handicap, because all these jobs were full-time jobs.

7    They weren't 20-hour-a-week jobs.  And now, to his

8    credit, he is saying, I can do 40 hours and I am going to

9    stay with my title checking job, which is -- the road of

10   the future is in this paralegal business, and that's

11   really what he is doing, paralegal work.  He is in the

12   courthouse checking records, checking mortgages, and if

13   that's his career, I think he will do great in it,

14   because he certainly -- he can write, he can talk, he

15   knows that, he has been doing it now for a year.  And to

16   his credit, he says he is ready for full time.  And he

17   said, too, that yes, they have insurance packages, which

18   you would assume that they would.  Now, when you look at

19   these astronomical numbers here, this is not the Georgia

20   lottery, this isn't a lottery, these numbers were not

21   pulled off of his tax returns, these numbers were pulled

22   somewhere else.  And I think that's awfully critical to

23   examine and look at when you get that.  Now, where were

24   the numbers on his tax return? They were pulled off by

25   Dr. Wolfenbarger, the economist, the Head of the

1    Department out here at Macon State.  He used the exact

2    numbers from his tax return, and what did he come up

3    with?  He came up with a number of $186,732, would have

4    been his loss had he accepted the railroad clerk offer,

5    that would been the difference over the rest of his

6    working life in the amount of money, including the three

7    years he has lost, and the dollars -- he would put less

8    dollars in his pocket.  And that, Ladies and Gentlemen of

9    the Jury, I think is a classic example of mitigation of

10   damages that's required by law, required by law.  Then he

11   goes on, though, and says something else.  If he really

12   doesn't want to move to Atlanta, if he decides to stay

13   there and he really does like this title checking job and

14   he is -- like he said, is going to become full time, work

15   40 hours a week, and just assuming $7 an hour is what his

16   pay was starting on, and if you take that on out, then

17   his loss would have been 390,000, quite a difference you

18   will see.  But you will also see that these numbers, they

19   don't come from anybody else's W-2, and you heard the

20   thing about, you people work overtime, make more money

21   and all this stuff, these came from Mr. Kirkland's, which

22   I think is the highest and best evidence if you get to

23   the point of finding damages in this case.

24       Members of the Jury, I have enjoyed being with you

25   the last three days, and I do thank you for your

1     attention.  This is obviously an important case to, not

2     only Mr. Kirkland, the Plaintiff, but to the railroad. I

3     think we have brought in the witnesses -- we have tried

4     to show what was the situation back in the '90s.

5     Unfortunately, there have been bad things about the

6     railroad, and as we talked about earlier, one of the -- I

7     guess it could be good or bad, you are out in the

8     elements, which is kind of nice, you are not cooped up in

9     a room or an office.  But out there in those elements, if

10    one of the elements is a kaolin company, you are going to

11    be around some kaolin dust.  If one of the elements is a

12    paper mill, you are going to be around a paper mill

13    smell, it's a trade off.  And that's the real world, as

14    Mr. Roberson described it to you today about the

15    railroad.  And if you are out there, then you are in what

16    is there.  Now, I won't have a chance to speak with you

17    again in the case, but I do thank you and please give

18    close consideration to Judge Adams's charge and to the

19    evidence that will be out with you.  And I am confident

20    you will return a verdict that speaks the truth in the

21    case under the law.  Thank you.

22

23

24

25

1          THE COURT:    As I said, Ladies and Gentlemen, we

2     will take a short break before we finish the argument and

3     give you the charge of the Court, so short break for that

4     purpose.   Don't talk about the case yet.

5     (COURT IN RECESS)

**CLOSING ARGUMENT BY MR. CHILDS FOR THE PLAINTIFF**

1

2          THE COURT:      All right, Mr. Childs, you may

3     proceed.

4          MR. CHILDS:      Thank you, Your Honor.  May it please

5     the Court?

6          THE COURT:      Yes, sir.

7          MR. CHILDS:      Ladies and Gentlemen of the Jury, I

8     am sure you are all glad to know we have gotten to this

9     point where the case will soon be in your hands.  The

10    Judge, as he indicated a few minutes ago, will charge you

11    what the law is.  And then you will retire to the Jury

12    room, and deliberate, and find a verdict in this case.

13         I want to thank you for your service here today and

14    yesterday and Monday, and this week; you have all got

15    family and jobs, and places you needed to be this week.

16    But there is not a person within the sound of my voice

17    right now who knows when he or she, or a member of his or

18    her family, might be sitting here in this courtroom.  And

19    the wheels of justice don't really start to turn until

20    these 12 chairs are filled and we have a jury here to

21    decide the kind of issues you have heard about this week.

22    So you will never perform a more valuable service as a

23    citizen than your jury service here this week.  I wanted

24    to just comment briefly -- you all have heard the

25    evidence this week, and the 12 of you can remember it

1      better collectively than any one of us lawyers can

2      remember it.   I am not going to spend any time much

3      talking to you about that.   The other lawyers have done

4      that already.   But I did just want to mention one or two

5      things to you, and then the closing arguments will be

6      through when I finish this.   One thing, during Mr.

7      Garland's argument, and I jotted down a few things while

8      he was talking.   And Mr. Garland is a very good lawyer.

9      He is a friend of mine, and I have a great deal of

10     respect for him.   His law firm has been representing the

11     railroad in these kinds of cases for probably close to

12     100 years, and I am not exaggerating that.   His law firm

13     has a history with the railroad going back several

14     generations of lawyers, they do a fine job for the

15     railroad.   Mr. Garland is an outstanding lawyer and he

16     defends these cases vigorously, and he is good at it.

17     But Mr. Garland made a few comments that I hate to not

18     say something about, and again, you will all remember the

19     evidence better than I do, and better than any one

20     lawyer, that's why we have 12 people on this jury.   But

21     Mr. Garland talked to you about Dr. Epstein.   Dr.

22     Epstein, I am sure you recall, was the neurosurgeon.   Mr.

23     Garland sort of pooh-poohed what he said was wrong with

24     Lester Kirkland.   This is in evidence, this is

25     Plaintiff's Exhibit number 43, and you will have it out

1    there with you, and it's Dr. Epstein's office notes.  And
2    you will see that Dr. Epstein said, part of his report
3    said, that even though in his opinion he had this disk
4    degeneration, the accident a year ago was sufficient to
5    aggravate any underlying disk deterioration, and lead to
6    the present condition.  That's what Mr. Wettermark was
7    talking about, and what the Judge is going to charge you.
8        I am sure at my age I have got some degenerative disk
9    disease going on in my back, we all do.  It's just part
10   of the aging process.  But knock on wood, most days I
11   feel pretty good.  I get up, and I am glad to get up in
12   the morning.  I am pain free.  I am glad to see another
13   day coming.  And I get up out of the bed and I am ready
14   to go and I am feeling good.  You know, I don't know what
15   that is worth to have that taken away from me. Lester
16   Kirkland has had it taken away from him.  He won't have
17   another morning where he gets up, he sees the sun coming
18   up, and hears the birds out there chirping, and the sky
19   is blue, and he is just feeling good, because he has got
20   another day of life.  He won't ever have that kind of day
21   again.  But that's -- see, my disk degeneration is not
22   bothering me, even though it's back there.  Well, now, if
23   I am leaving here this evening going back to my office,
24   or going home in my car, and I get hit by somebody else
25   running a red light, my disk degeneration is going to

1      (indicating) kick in there.  Like the doctor explained,

2      you can have years of all of this stuff added in a second

3      to your spine, and that's what happened to Lester

4      Kirkland and that's what the doctor said, and that's what

5      the Judge is going to charge you about aggravation.  You

6      know, we all live the way we are with our physical

7      conditions, and there is not one word of evidence in this

8      case that Lester Kirkland had been missing any work or

9      hadn't been able to work or been having back pain.  It

10     started with this incident.  And the railroad is liable

11     for it.  Mr. Garland also made a couple of comments about

12     the kaolin on the cars.  Well, if you go to a kaolin

13     mine, you have just got to deal with a little kaolin

14     around. Fortunately, you all have got the pictures of the

15     cars, of the engines, and of the hopper cars, with that

16     kaolin coated on it so thick you can't even see what

17     color the cars and the engines are supposed to be, that's

18     how thick that stuff is on there, and some of you all

19     have worked in kaolin, and around it.  We talked to you

20     about that in voir dire.  And we all know that it gets

21     slippery, even when it's not wet it's slippery.  And when

22     it gets wet, it's worse.  So you have got the pictures,

23     look at those pictures and see how much clay was on those

24     cars.  You know, and the railroad talked about the rules,

25     these rules, this conductor is supposed to do all this.

1   The conductor does this -- what is a conductor to do when

2   he is put in a position as this man right here was, when

3   his boss tells him, you will switch those cars out, you

4   will take those empties in there and you will take the

5   loaded cars out or you will be fired.  What are you going

6   to do?  Mr. Mask told him that, Trainmaster Mask, that's

7   undenied in this case.  You all might remember he

8   testified Monday where he was embarrassed with that

9   episode with his crew people standing there with him.

10   You will move them or you are fired.  We have got a

11   dispute about what happened on that Monday, when he was

12   hurt the second time, with Mr. Chapman over there.

13   Lester Kirkland said, Mr. Chapman told me, you will move

14   those cars.  What do most folks do when your boss tells

15   you, you are going to do it, you are going to do it or

16   you are fired.  And he knows the railroad will suspend

17   you and put you on a disciplinary action and fire you

18   before they can look at you good twice.  What is a man

19   going to do when he wants his job?  He is going to do

20   what his boss tells him.  So all these rules are nice;

21   it's nice to have them in their books.  They look good

22   and they sound good, but the reality of being on the job

23   is something else.  That's where your common sense comes

24   in.  Yes, the rules are fine until they interfere with a

25   customer.  This is a good customer, this Grace plant is a

1    big customer, they pay us a lot of money, and we are not

2    going to make them mad.  We are not going to ruffle those

3    feathers, so you guys just hold on a little tighter and

4    be a little more careful when you are slipping and

5    sliding around on that clay, on these hopper cars, don't

6    make them mad.  Don't make the customer mad.

7        Dr. Eisenberg, also, getting back to the pain,

8    Eisenberg was the first doctor that saw him, and he said

9    that Lester Kirkland's condition and his pain was

10    consistent with a bulging disk.  He said, sure, pain is

11    subjective.  You can't see it, but what he was s telling

12    the doctor was consistent with what the doctor was

13    finding on the MRIs and the other tests.  Sure he's in

14    pain.  You know, this case is about a lot of things, but

15    one thing that is not an issue is whether he is injured

16    and whether he has been in pain, that's a given.  They

17    haven't even brought you one word of evidence to try to

18    deny or dispute that, that's not an issue.  This man is

19    hurt, he has been hurting for three years, and he is

20    going to continue to hurt to some degree for the rest of

21    his life.  Even Ms. Bookman, the lady who came here this

22    morning from South Carolina, working for the railroad,

23    trying to find him a job, she said it's difficult to find

24    Mr. Kirkland a job.  He tries everything he can, but it's

25    difficult. He is 45 years old.  What do you think an

1    employer is going to say when they take a history from

2    him and he fills out his employment application?  How is

3    your health?  How is your health, Lester?  And he writes

4    down on there, I have been disabled and out of work for

5    three years.  What do you think that employer is going to

6    say to him when they have got people lined up just as

7    qualified, better qualified younger and healthier?  Ms.

8    Bookman told us this morning, it's difficult to find this

9    man a job, even though he is doing the best he can do.

10   You all heard the witnesses in this case.  This kaolin is

11   like -- one of the witnesses said it's like walking on

12   grease, it's like grease has been poured across the

13   walkways and grease is on the hand rail.  And another one

14   described it as being like oil has been poured on there,

15   trying to hold -- particularly when it's wet, like trying

16   to hold something that has been oiled down and greased

17   down, and you are trying to hold on to it.  You know, the

18   W. R. Grace plant employees, they don't want to fool with

19   it, all they want to do, they want to dump it down this

20   shoot into the hopper, and let the railroad guys deal

21   with it.  The W. R. Grace people don't want to fool with

22   it.  They want to get back in the plant.  They don't want

23   to clean off the railroad cars.  They don't look at that

24   as their job.  These guys out there, they have got no

25   equipment, no means of doing anything to clean off the

1    cars.  There is nobody looking after them, unless the

2    railroad supervisors look after them, unless they go out

3    there and tell the plant people, you have got to get this

4    safe for our folks.  We don't want them hurt on this

5    stuff, you all have got to clean these cars.  But like

6    Lester Kirkland was told, they are a good customer, they

7    are a good customer, and we don't want to ruffle any

8    feathers.

9        Like Mr. Wettermark said, use your common sense,

10   just use your common sense, that's the best thing in the

11   world to do when you are trying to decide a lawsuit,

12   that's the best thing in the world to use when you are

13   judging credibility of witnesses.  And sometimes in

14   lawsuits, you have to decide, you know, I wonder if that

15   witness was not being truthful.  You know, sometimes

16   people get on the witness stand and they don't tell the

17   truth, sometimes that's a mistaken recollection,

18   sometimes it's intentional, but it happens.  And in this

19   case it has happened, and you all have got to decide who

20   to believe, who is the best witness.  Who is the best

21   witness; who was the most believable witness, that's for

22   you all to decide the credibility of the witnesses.  You

23   know, this case boils down to Lester Kirkland versus the

24   company, Norfolk Southern Railroad.  And you know who the

25   railroad is, the railroad is the management, the

1     officials, the people who sit around giving orders. Those

2     are the people in the company, those are people Mr.

3     Roberson, who was here this morning, he has moved on up

4     in management, he is management.  Mr. Chapman, sitting

5     over there, Mr. Chapman is not just a witness in this

6     case, he testified.  But you know what he is?  He is the

7     representative -- he is sitting here representing Norfolk

8     Southern Railroad, he is the man they designated to be

9     their representative at this trial.  You think he doesn't

10    have an interest in it?  This is this worker, this

11    employee, against that corporation, and that is the way

12    it's come down, Ladies and Gentlemen, and that's what you

13    all are going to have to decide, who is the most

14    believable.  Mr. Maher they brought down here, the guy

15    who was a claims agent, or used to try to settle claims

16    saving the railroad money.  Now, they have put him over

17    there -- you talking about putting the fox in the hen

18    house, they put him over there now saying, well, I am

19    going to find you a job.  It's for you all to decide

20    credibility, those are company people, those are Norfolk

21    Southern people.  They are not in the union, they are not

22    the workers out there on the line every day doing the

23    job.  Credibility.  Mr. Chapman, the policeman, started

24    as a policeman on the railroad's -- I think he called it

25    Property Protection Division, he's a policeman for the

1     railroad.  You all heard him testify.  Mr. Wettermark

2     said he seemed to be just making it up as he went along,

3     he was either doing that or he has got a terrible memory,

4     I will submit to you.  For you all to decide, that's a

5     matter of credibility.  He denies he told them on that

6     Monday to switch those cars.  You heard Mr. Kirkland say,

7     Mr. Chapman told me I better switch them.  And the other

8     crewmen who heard it testified for you, Mr. Sharpe, I

9     believe his name was, he heard Mr. Chapman say that.  Mr.

10    Chapman says, no, I didn't.  You all have got to decide

11    who was telling the truth and who wasn't.  And then --

12    and then Mr. Chapman had the audacity to act like he was

13    mad.  He said, yes, I was mad when I saw those cars on

14    Monday.  I saw all that clay and that kaolin, and I was

15    mad.  Well, I thought he was going to say he was mad

16    because they didn't clean up the cars.  Who did he say he

17    was mad with?  I was mad at Lester, because I told him on

18    Friday not to go over there.  Most unbelievable story I

19    think you will ever hear, that goes to credibility.  Who

20    are you going to believe in this case?  That's for you

21    all to decide.  And then -- and then, Mr. Chapman also

22    said, yes, I looked at him on that Friday evening, I

23    didn't see anything wrong with him, his back or his

24    thumb.  And the other gentleman who was on his crew, the

25    agent -- you all remember this -- said -- I said, Bo, I

1   believe your thumb is broke in two places, told him that

2   on that Friday night when it was sitting there like that

3   (indicating).  Mr. Chapman told you, I looked him over

4   good, I didn't see anything.  I didn't see anything wrong

5   with him.  Who are you going to believe?

6         The railroad talks a good game.  They have a good

7   game plan for defending cases like this when people like

8   Lester get hurt.  They say, oh, we are going to help you

9   find a job.  They like to come into Court, we are going

10  to put him to work as a clerk in Atlanta, we are going to

11  find him a job somewhere.  But, as Mr. Wettermark said,

12  there is not a job in South Carolina in these three huge

13  hubs, there is not a job for Lester close to home?  The

14  one you all have heard about, he said, yes, I would love

15  to be a dispatcher.  Well, too bad, we can't give you

16  that job because of the medication.  And there must not

17  be another job in South Carolina, but they want to come

18  in here to Court and tell us, well, we are going to send

19  him to Atlanta to clerk.  What makes you think they would

20  keep him in Atlanta as a clerk, even if he went?  What do

21  you think he would be faced -- a job he can't do, he

22  can't type.  He has got a thumb that doesn't work.  He

23  doesn't know how to do it.  He would have no seniority to

24  guarantee him any time working as a clerk.  How long do

25  you think that would last?  Even if he took it, even if

1    he took it.  But they love to come into Court and tell

2    you what all they are going to do.  They talk a good

3    game, but when you examine it a little closer, it's a

4    hollow, hollow thing, and nothing to it.  You know, this

5    case, again is captioned, "Lester Kirkland versus Norfolk

6    Southern Railroad."  It could be David against Goliath.

7    Little Lester Kirkland is suing the Norfolk Southern

8    Railroad, and he is entitled to his day in Court.  Some

9    of you all know how it is to be an employee, not in

10   management, but a worker, out there working every day.

11   And in the railroad, like in a lot of companies, like in

12   a lot of huge companies, you have got the workers and

13   then you have got management, and sometimes they get

14   along and sometimes they don't.  And in cases like this,

15   they don't.  But the equalizer in a case like this, for

16   anybody, is a Jury, is you 12 Ladies and Gentlemen,

17   hearing this evidence and deciding what the verdict in

18   this case ought to be.  Mr. Wettermark says, we can't

19   come back in five years and let's see how Lester is

20   doing, and we will do something else in five years.  This

21   is his only day in Court, this is the only day he will

22   have an opportunity to receive an award for what he has

23   lost monetarily, and for the pain and suffering he has

24   been through and going to go through.  You all have got

25   the figures that Mr. Wettermark gave you, you have heard

1 a lot of figures.  I think the ones Mr. Wettermark gave

2 you are right on, you all can do whatever you want to.

3 It's a lot of money, but think if your income stopped

4 today, your income stopped, think what you would have

5 made the rest of your work life, that's what we are

6 looking at.  We are looking at what Lester Kirkland would

7 have made the rest of his work life, then reduced down to

8 present cash value, and the pain and suffering is for you

9 all to decide.  Mr. Wettermark said 500,000, some of you

10 all know what it is like to have a bad back and not be

11 able to get up and carry on with your day to day living.

12 Some of you have a medical background, and work in a

13 medical setting, and you know what it's like to lose your

14 health and the ability to get up and feel good in the

15 morning.  That's for the 12 of you, Ladies and Gentlemen,

16 to put an amount of money.  Again, we thank you for your

17 attention, we thank you for your consideration in this

18 case, we thank you for your service as jurors.  And we

19 are certainly content and satisfied to turn this

20 gentleman's fate, the rest of his life, over to you this

21 afternoon, because we know you will do what you think is

22 right, and what justice calls for.  Thank you.

23

24

25