## EXHIBIT A

**Reorganized Debtors' Reply Memorandum**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (KG) |
| | ) | (Jointly Administered) |
| Reorganized Debtors. | ) | |
| | ) | |
| | ) | |

### REPLY IN SUPPORT OF THE REORGANIZED DEBTORS' MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. BANKR. P. 7056 FOR PARTIAL DISALLOWANCE OF CLAIM NO. 7021, FILED BY NORFOLK SOUTHERN RAILWAY

THE LAW OFFICES OF ROGER HIGGINS, LLC
Roger J. Higgins
1 North Bishop Street
Suite 14
Chicago, IL 60607-1823
Phone: (312) 666-0431

KIRKLAND & ELLIS LLP
Adam C. Paul
John Donley, P.C.
300 North LaSalle Street
Chicago, IL 60654
Phone: (312) 862-2000

PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
919 North Market Street, 17th Floor
PO Box 8705
Wilmington, DE  19899-8705 (Courier 19801)
Phone: (302) 652-4100
Fax: (302) 652-4400

Co-Counsel for the Reorganized Debtors

---

[1]    The Reorganized Debtors comprise W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc., or "Grace") and W. R. Grace & Co.-Conn. ("Grace-Conn.").

# TABLE OF CONTENTS

Table of Contents ................................................................................................................ ii

Table of Authorities ............................................................................................................ i

Introduction ......................................................................................................................... 1

Background .......................................................................................................................... 5

I.    Norfolk Southern Does Not Dispute the Material Facts Relevant to the Disallowance of Its Indemnification Claim ................................................................................................. 5

II.   Norfolk Southern's Railcars Were Often in Poor Material Condition ..................... 7

III.  Duties of a Norfolk Southern Train Conductor ..................................................... 8

IV.   The Grace Plant Had an Exemplary Safety Record—and Zero Reportable Accidents Caused by Slippery Kaolin ................................................................................... 8

V.    The Agreements' Indemnification Provisions ..................................................... 11

Argument ........................................................................................................................... 16

I.    The Court Should Grant Summary Judgment—There Are no Relevant Material Facts in Dispute .......................................................................................................................... 16

II.   None of the Agreements Clearly and Unequivocally Contemplate Indemnification on The Undisputed Facts of This Matter ................................................................................. 18

  A.   South Carolina Law Governs the Agreements and their Indemnities ............................. 18

  B.   The Indemnity Provisions Must be Strictly Construed Against Norfolk Southern .......... 20

  C.   Norfolk Southern's Indemnification Claim Does Not Fall Within the Scope of Any of the Agreements' Indemnities ....................................................................................... 23

  D.   Norfolk Southern's Own Internal Procedures Confirm That Mr. Kirkland's Accidents Did Not Fall Within the Ambit of the Agreements' Indemnities ........................................ 37

  E.   In Similar Cases, Courts Have Strictly Construed the Indemnification Against the Indemnitee Railroad ................................................................................................. 39

  F.   The Case to Which Norfolk Southern Cites Are Distinguishable—and Do Not Constitute Binding Precedent ..................................................................................................... 42

III.  Even If the Indemnifications Did Apply, Norfolk Southern's Indemnity Claim Must Still Fail    44

  A.   No Indemnity Under the 1990 Supplemental Agreement ............................................ 44

  B.   Another Kaolin Producer Filled the January 23 Railcar ............................................. 45

  C.   Norfolk Southern Was on Notice of the Presence of Kaolin on Railcars—and Knowingly Took Control of the January 26 Car, Having Adjudged It "Safe to Run" ......................... 45

  D.   Norfolk Southern Admitted at the FELA Action Trial That Kaolin Did Not Cause Mr. Kirkland's Accidents ................................................................................................. 49

IV.   Grace Did Not Breach Either the Operating  or Right-of-Way Agreements ................. 50

Conclusion ................................................................................................................. 51

<u>TABLE OF AUTHORITIES</u>

## Cases

*A.P.S., Inc. v. Std. Motor Prods.*, 295 B.R. 442 (D. Del. 2003) ................................ 18

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................ 16

*Arrow Oil & Gas, Inc. v. SemCrude, L.P. (In re SemCrude, L.P.)*, 407 B.R. 112 (Bankr. D. Del. 2009) ................................................................................................................ 18

*Brady v. Wabash R. Co.*, 49 S.W.2d 24 (Mo. 1932) ................................................... 37

*Caskey v. Olympic Radio & Television*, 343 F. Supp. 969 (D.S.C. 1972) ................... 45

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................... 16

*Century Indem. Co. v. Golden Hills Builders, Inc.*, 561 S.E.2d 355 (S.C. 2002) ........ 20

*Chi. & N. W. R. Co. v. Chi., R. I. & P. R. Co.*, 179 F. Supp. 33 (N.D. Iowa 1959) ....... 37

*Coffey v. Chemical Specialties*, 4 F.3d 984, 1993 U.S. App. LEXIS 21430 (4th Cir. 1993) ........ 45

*Davison v. Norfolk S. Ry. Co.*, Case no. CL02-36, 2003 Va. Cir. LEXIS 72 (Va. Cir. 2003) 32, 35

*Desert Palace, Inc. v. Hionas (In re Hionas)*, 361 B.R. 269 (Bankr. S.D. Fla. 2006) ................. 18

*Doe v. Grp. Hospitalization & Med. Servs.*, 3 F.3d 80 (4th Cir. 1993) ........................... 22

*E. I. Du Pont de Nemours & Co. v. Admiral Ins. Co.*, 1991 Del. Super. LEXIS 416, 1991 WL 236943 (Del. Super. Ct. Oct. 22, 1991) ................................................................ 18

*FabArc Steel Supply , Inc. v. Composite Constr. Sys.*, 914 So. 2d 344 (Ala. 2005) ......... 24, 26, 28

*Federal Pacific Electric v. Carolina Production Enterprises*, 378 S.E.2d 56 (S.C. Ct. App. 1989) ........................................................................................................... passim

*Freed v. Great Atlantic & Pacific Tea Co.*, 401 F.2d 266 (6th Cir. Ohio 1968) ........................ 20

*Gaines v. Illinois Cent. R.R.*, 796 F. Supp. 313 (N.D. Ill. 1992) ................................... 39

*Gloucester Holding Corp. v. U.S. Tape & Sticky Prods.*, LLC, 832 A.2d 116 (Del. Ch. 2003) ... 3, 21

*Henry v. Merck & Co.*, 877 F.2d 1489 (10th Cir. 1989) ............................................... 41

*In re Am. Metrocomm Corp.*, 274 B.R. 641 (Bankr. D. Del. 2002) ............................... 19

*Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632 (3d Cir. 1993) ........................... 16, 17

*Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487 (1941) ..................................................... 18

*Labelle v. Philip Morris Inc.*, 243 F. Supp. 2d 508 (D.S.C. 2001) ................................................ 45

*Love v. Love*, 38 S.E.2d 231 (S.C. 1946) .............................................................................. 20, 25

*McGill v. Moore*, 672 S.E.2d 571 (S.C. 2009) ...................................................................... 20, 24

*Molly Pitcher Canning Co. v. Cent. of G. R. Co.*, 253 S.E.2d 392 (Ga. Ct. App. 1979) ............. 42

*Montgomery v. JYD Int'l, Inc.*, 534 So.2d 592 (Ala. 1988) .............................................. passim

*O'Neal v. Celanese Corp.*, 10 F.3d 249 (4th Cir. 1993) ................................................................ 45

*Peloro v. United States*, 488 F.3d 163 (3d Cir. 2007) ................................................................... 17

*Pride v. S. Bell Tel. & Tel. Co.*, 138 S.E.2d 155 (S.C. 1964) ................................................. 23, 38

*Smart v. Gillette Co. Long-Term Disability Plan*, 70 F.3d 173 (1st Cir. 1995) ............... 32, 36, 49

*S. R. Co. v. Brunswick Pulp & Paper Co.*, 376 F. Supp. 96 (S.D. Ga. 1974) ......................... 43, 48

*S. R. Co. v. Ins. Co. of N. Am.*, 183 S.E.2d 912 (1971) ................................................................. 43

*Schulmeyer v. State Farm Fire & Cas. Co.*, 579 S.E.2d 132 (S.C. 2003) .............................. 20, 25

*Sol Walker & Co. v. Seaboard Coast Line Railroad Co.*, 362 So.2d 45 (Fla. App. 1978)21, 39, 48

*Spring Industries, Inc. v. Ohio DOT*, 51 Ohio Misc. 2d 6 (Ohio Ct. Cl. 1989) ........................... 21

*Thomas v. Atlantic Coast Line R. Co.*, 201 F.2d 167 (5th Cir. 1953) ......................................... 27

*Top Branch Tree Serv. & Landscaping, Inc. v. Omni Pinnacle, LLC*, 2007 U.S. Dist. LEXIS 30938 (E.D. La. Apr. 26, 2007) ................................................................................................ 21

*Travelers Indem. Co. v. Lake*, 594 A.2d 38 (Del. 1991) .............................................................. 18

*Trustees of Univ. of Pa. v. Lexington Ins. Co.*, 815 F.2d 890 (3d Cir. Pa. 1987) ........................ 16

*Union Pacific RR Co. v. El Paso Natural Gas Co.*, 408 P.2d 910 (Utah 1965) .............. 20, 40, 41

*United States v. Diebold, Inc.*, 369 U.S. 654 (1962) ................................................................... 17

*Welch v. Kan. City Southern Ry. Co.*, 940 F. Supp.2d 402 (W.D. LA. 2013 ......................... 27, 40

*Williams v. Teran, Inc.*, 221 S.E. 2d 526 (S.C. 1976) ....................................................... 3, 22, 23

*Wong Wing Foo v. McGrath*, 196 F.2d 120 (9th Cir. 1952) ....................................................... 16

**Statutes**

11 U.S.C. § 502(b)(1) ................................................................................................ 18

**Rules**

Fed. R. Civ. P. 56(c) ................................................................................................ 47

Fed. R. Evid. 801(d)(2)(D) ....................................................................................... 50

Fed. R. Evid. 803(8) .................................................................................................. 16

Fed. R. Evid. 804(b)(1) ............................................................................................. 16

**Treatises**

41 Am. Jur. 2d Indemnity § 13 .......................................................................... passim

Brian A. Garner, Garner's Modern American Usage 758-59 (2003) ............................ 27, 34

Gordon J Loberger & Kate Shoup, Webster's New World English Grammar Handbook, 2d ed., Hoboken, N.J.: Wiley (2009) ............................................................... 25, 33

New Oxford English Dictionary, 3d ed., at p. 371 (2010) ...................................... 5

Restat 2d of Torts, § 388 .................................................................................. 45, 46

Restat. 2d of Conflict of Laws, § 188 ................................................................... 19

## INTRODUCTION

This Reply Memorandum responds to the portion of *Norfolk Southern Railway Company's (I) Answering Brief in Opposition to Reorganized Debtors' Motion for Summary Judgment Pursuant to Fed. R. Bankr. P. 7056 for Partial Allowance and Partial Disallowance of Claim no. 7021 and (II) Opening Brief in Support of Norfolk Southern's Cross-Motion for Summary Judgment*, filed January 27, 2017 [Docket no. 32826] (Norfolk Southern's "Brief"), in which Norfolk Southern contends that the Court should deny the Reorganized Debtors' Summary Judgment Motion, because there are material facts in dispute.[2]

Norfolk Southern is wrong. There are facts in dispute—but they are not relevant to resolving, and ultimately disallowing, Norfolk Southern's indemnity claim. As discussed in this Reply Memorandum, the Agreements, on the undisputed facts of this contested matter, simply do not provide an indemnity to Norfolk Southern. Also, Norfolk Southern has failed to adduce any evidence that alleged negligent acts on the part of Grace were the proximate cause (Norfolk Southern's own formulation of the standard required to prove causation) of Mr. Kirkland's injuries. In fact, very much the opposite is true. Norfolk Southern's Brief refers to, and Mr. Kirkland's testimony adduces, facts that completely exculpate Grace. Norfolk Southern's indemnity claim must fail on one or both of the foregoing grounds.

There are scores of published cases, both federal and state, addressing various issues wherein railroads have claimed indemnities from their counterparties (or vice versa, as the case may be) pursuant to indemnity provisions in spur or sidetrack agreements similar in nature to the

---

[2] Capitalized terms not defined in this "Memorandum" shall have the meaning ascribed to them in the Omnibus Memorandum.

Norfolk Southern and Grace do not dispute that Norfolk Southern is entitled to allowance of $6,922.35, which arose from certain unpaid prepetition freight charges and the environmental clean-up services and truck scale fees.

Agreements.  There are a small number of such cases addressing a railroad seeking an indemnity from its counterparty (or vice versa) for damages occurring at a distance from the property subject to the spur or sidetrack agreement.  In its Brief, Norfolk Southern cites to three such cases.  Each one is distinguishable to the point of having no bearing on the undisputed facts of this contested matter.

The singular nature of this contested matter begins with kaolin (a type of soft clay)—which the Reorganized Debtors have mined and processed at, and shipped from, the Grace Plant with an exemplary safety record over the course of several decades.  Neither Norfolk Southern nor the Reorganized Debtors will dispute that kaolin will, all other things being equal, become slippery when wet, and during the mining, manufacturing and shipping of the product, tend to settle on every surface.  Norfolk Southern will also not dispute that it was more than well aware of the nature of kaolin—having shipped it from the Grace Plant for decades.  Norfolk Southern will likewise not dispute that Grace over the years prior to January 1998 loaded and consigned to Norfolk Southern thousands of railcars filled with kaolin, which Norfolk Southern transshipped without ever notifying Grace of a single incident (other than Mr. Kirkland) involving injury to a Norfolk Southern employee, whether from setting or releasing a railcar handbrake or otherwise.  Moreover, Norfolk Southern does not dispute that Mr. Kirkland's January 26, 1998 accident occurred when he was attempting to release the handbrake of a railcar consigned to Norfolk Southern when that railcar was part of a Norfolk Southern-owned and –controlled train that was stopped at a Norfolk Southern-owned and –controlled facility.[3]  Finally, Norfolk Southern cannot dispute that it was, itself, found negligent for its own actions in failing to provide Mr. Kirkland

---

[3]    Norfolk Southern has conceded that it cannot establish that Mr. Kirkland's January 23 accident occurred on a railcar loaded at the Grace Plant.  Indeed, its own accident reports state that the railcar originated at J. M. Huber.  (Brief at p. 28; January 23 Accident Reports.)

with a safe workplace at a time when it had full control over the area and had taken full responsibility for the railcar at issue.

This should be the end of it. The Agreements do not clearly and unequivocally express any intent whatsoever by either party that Grace should indemnify Norfolk Southern in a circumstance such as this, where a Norfolk Southern employee was injured at a Norfolk Southern facility miles from the Grace Plant, where Norfolk Southern had full control over—and responsibility for—every aspect of the situation. *Montgomery v. JYD Int'l, Inc.*, 534 So.2d 592, 595 (Ala. 1988) ("The more control the indemnitee retains over the area, the less reasonable it is for the indemnitor to bear the responsibility for injuries that occur in that area"); *see also* 41 AM. JUR. 2D INDEMNITY § 13 (same). What's more, Norfolk Southern is at once an indemnitee seeking indemnification for its own negligence and also the party that drafted the Agreements. Therefore, the Agreements cannot be construed to imply what they do not unequivocally express—and which actually clearly and unequivocally express precisely the opposite intent, which was to allocate the risk of liability for injury and other damages on or about the Industrial Track and various Facilities (as those terms are defined and discussed in this Reply Memorandum). *Gloucester Holding Corp. v. U.S. Tape & Sticky Prods.*, LLC, 832 A.2d 116, 129 (Del. Ch. 2003) ("courts should not enlarge the right to indemnification by implication"); *Federal Pacific Electric v. Carolina Production Enterprises*, 378 S.E.2d 56, 57 (S.C. Ct. App. 1989) (indemnities strictly construed against indemnitee seeking indemnity for its own negligence); *Williams v. Teran, Inc.*, 221 S.E. 2d 526, 529 (S.C. 1976) (internal citation omitted). In light of these undisputed facts and well-established principles of law, the Reorganized Debtors submit that there is no amount of additional evidence that Norfolk Southern can adduce to carry its burden of proof.

If the Court were, however, to find that the Agreements' indemnities could as a matter of law encompass the damages arising from Mr. Kirkland's accidents, Norfolk Southern's indemnity claim would still fail. And that is because Norfolk Southern has not adduced to date any admissible evidence to support its contention that allegedly negligent acts on Grace's part caused Mr. Kirkland's two accidents. Indeed, Norfolk Southern's Brief relies entirely on the FELA Action trial record and the Conley and Sharpe Declarations to assert that either Grace was negligent and thus contractually liable to indemnify Norfolk Southern or it was otherwise strictly liable. As discussed in the Inadmissible Hearsay Memorandum, the FELA Action trial record, and Mr. Kirkland's testimony in particular, are inadmissible hearsay. Norfolk Southern may not use the trial record (or Mr. Kirkland's testimony, in particular) to carry its burden of proof. Likewise, much of what is set forth in the Conley and Sharpe Declarations is equally inadmissible, whether as hearsay, for lack of foundation or otherwise. *See* Motion to Strike, *passim*.

But even if those documents were admissible, Norfolk Southern has still failed to adduce any evidence whatsoever that Grace's allegedly negligent acts in any way caused Mr. Kirkland's accidents (Norfolk Southern having admitted in its Brief (p. 24) that it must prove that Grace was negligent before it can assert an indemnity liability claim against Grace). Indeed, for purposes of their Cross-Motion, Norfolk Southern does not dispute that its own accident reports state that Grace had nothing to do with the January 23 railcar. (Brief at p. 24.) What's more, Norfolk Southern's own Brief (pp. 29-30) establishes that its management—Trainmaster Chapman, who was Mr. Kirkland's direct supervisor—made a knowing and conscious decision that the January 26 railcar was "safe to run."

This decision by Norfolk Southern's own management thus establishes beyond a doubt that Grace did nothing wrong in loading that railcar. Mr. Chapman's testimony that he believes that kaolin residue that may have been present on railcar exteriors did not cause Mr. Kirkland's accidents and resulting injuries confirms that fact. In other words, Grace's actions cannot have been the cause (proximate or otherwise) of Mr. Kirkland's January 26 accident. Norfolk Southern's complete lack of evidence regarding any causal link between Grace and Mr. Kirkland's accidents gives the Court an entirely separate and distinct ground on which to allow the Reorganized Debtors' Summary Judgment Motion and disallow Norfolk Southern's indemnity claim.

Nonetheless, and out of an abundance of caution, the Reorganized Debtors have adduced two declarations, by Messrs. Drumming and Silas, which both make clear that Grace did nothing wrong. The Reorganized Debtors submit that, notwithstanding any assertion by Norfolk Southern that it must cross-examine Messrs. Drumming and Silas before this Court can grant summary judgment to the Reorganized Debtors, there is still more than sufficient basis for this Court to disallow Norfolk Southern's indemnity claim, based solely on Norfolk Southern's failure to carry its burden of proof.

### BACKGROUND

1.      The Proposed Findings of Fact are incorporated herein by reference.

**I.      NORFOLK SOUTHERN DOES NOT DISPUTE THE MATERIAL FACTS RELEVANT TO THE DISALLOWANCE OF ITS INDEMNIFICATION CLAIM**

2.      Norfolk Southern does not dispute that the accidents that occurred on Friday, January 23, 1998, and on Monday, January 26, 1998, respectively, each occurred on a railcar attached to a "consist" owned and operated by Norfolk Southern as the train sat at a Norfolk Southern-owned and –controlled facility. (Proposed Findings of Fact, ¶¶ 39-51; Kirkland

Complaint at ¶ 5-6; Norfolk Southern January 23 Accident Reports.)  A "consist" is a complete train comprising one or more locomotives and railcars.  NEW OXFORD ENGLISH DICTIONARY, 3d ed., at p. 371 (2010).

3.      Norfolk Southern does not dispute that the railcar from which Mr. Kirkland slipped on January 23, 1998, was identified by Norfolk Southern's own investigating team as having come from J. M. Huber, another kaolin producer unrelated to any of the Reorganized Debtors.  (Brief at p. 28; Proposed Findings of Fact, ¶ 41; Norfolk Southern January 23 Accident Reports.)

4.      Norfolk Southern does not dispute that the Norfolk Southern January 23, 1998 Accident Reports state that at the time he fell Mr. Kirkland was wearing: (i) wet leather gloves; and (ii) steel-toed boots manufactured by Wolverine, which had "worn-out" and "slick" soles. (Proposed Findings of Fact, ¶ 46; Norfolk Southern January 23 Accident Reports.)

5.      Norfolk Southern does not dispute that it had taken consignment of the January 26 railcar hours prior to Mr. Kirkland's January 26 accident, which means that it had determined that the railcar was safe to operate.  (Operating Agreement at ¶ 6.)

6.      The Operating Agreement provided that Norfolk Southern delivered the railcars to the Grace Plant on the Industrial Track.  (Operating Agreement at ¶ 8.)

7.      Norfolk Southern either owned the railcars or otherwise had control over the cars prior to them being delivered to the Grace Plant.  (Operating Agreement at ¶¶ 7-8.)

8.      Regardless of whether the railcars were connected to a Norfolk Southern consist, and regardless of whether Norfolk Southern or Grace had control over the cars, Norfolk Southern and their employees had sole discretion in determining when and if the railcars could be moved on the Industrial Track and whether they were in safe operating order such that they could be

moved.  Grace was not responsible for determining whether the railcars were safe to move or to work on.  (Operating Agreement at ¶ 6.)

9.      Grace was not authorized to move, or order the movement of, the railcars off the Industrial Track and onto the main lines.  (Operating Agreement at ¶ 6.)

10.      Norfolk Southern consigned the railcars to Grace when Norfolk Southern employees uncoupled them from the train or engine at the loading station.   (Operating Agreement at ¶ 8.)

11.      Liability for the contents of and control over the railcars transferred to Norfolk Southern when the loaded cars were coupled with the engine on the Industrial Track prior to being hauled away.  (Operating Agreement at ¶ 8.)

## II.    NORFOLK SOUTHERN'S RAILCARS WERE OFTEN IN POOR MATERIAL CONDITION

12.      In Mr. Drumming's experience, during the 1990's these Norfolk Southern-owned or –controlled railcars:

> [W]ere in generally poor condition.  The railcars were almost always encrusted on flat surfaces with dried and caked kaolin deposited from often years of prior use.  I estimate based upon my experience that, in 1998, up to approximately 10% of the railcars delivered by Norfolk Southern to the Grace Plant were rejected due to material or mechanical deficiencies such as faulty brakes (such as brake shoes not coming into proper contact with the wheels) faulty handbrake and quick release mechanisms and cleanout doors that did not open, or if opened, could not be closed properly.  Very often, Norfolk Southern's railcars, when loaded and consigned to Norfolk Southern pursuant to the Operating Agreement, leaked kaolin from various seams and corners such that a plume of kaolin would billow from the railcar when in transit in a Norfolk Southern-controlled and –operated train.

(Drumming Declaration at ¶ 9.)

### III.  DUTIES OF A NORFOLK SOUTHERN TRAIN CONDUCTOR

13.    Norfolk Southern's *Rules of Equipment Operation and Handling*, which were effective as of May 2, 1993 (the "Conductors' Rules"), state in relevant part:

> 581.    Conductors have charge of trains to which they are assigned and of all employees thereon.  They are responsible for the safe and proper management of their trains, for protection and care of the passengers and property, for performance of duty by train employees, and for observance and enforcement of all rules and instructions.

> 586.    Conductors must, if possible, remedy defects in their equipment, and must remove from the consist any cars that are unsafe to run.  They must report all defective brakes, hot boxes or other defects, as well as repairs made between terminals.  They must comply with instructions for reporting materials applied to cars and disposition of defective parts.

> M.    Employees must not do any work in a manner that will jeopardize their own safety or the safety of others.  They must know that appliances, tools, supplies and facilities used in performing their duties are in proper condition.  If not, they must have them put in order before using them.  It is the duty of every employee to examine them to determine their condition.

(Attached hereto as Exhibit A.)  These extracts of the Conductors' Rules were admitted as defendant's exhibits 3-5 in the FELA Action trial record.

14.    On January 23 and 26, 1998, respectively, Mr. Kirkland was conductor on a Norfolk Southern-controlled and -operated train transporting twenty-eight rail cars from Norfolk Southern's Aiken depot to its siding at Warrenville.  (Proposed Findings of Fact ¶¶ 37, 47; Norfolk Southern January 23, 1998 Accident Reports; Kirkland Complaint at ¶¶ 5-6.)

### IV.  THE GRACE PLANT HAD AN EXEMPLARY SAFETY RECORD—AND ZERO REPORTABLE ACCIDENTS CAUSED BY SLIPPERY KAOLIN

15.    Kaolin has been mined and processed at the Grace Plant since the 1940's. Kaolin is soft white clay that is an essential ingredient in the manufacture of china and porcelain and is

widely used in the making of paper, rubber, paint, and many other products. (Drumming Declaration at ¶ 5.)

16.    In January 1998, the Grace Plant produced two separate types of kaolin. Both were produced as a powder. The Grace Plant produced and shipped approximately 60 railcars of non-specialty kaolin per month. (*Id.*) The Grace Plant also produced and shipped on average approximately three railcars per month of NKC, a specialty kaolin product, although the number of railcars loaded per month could vary considerably, depending upon customer demand. (*Id.* at ¶ 7.)

17.    In January 1998, the Grace Plant had two separate facilities for loading railcars with kaolin. One loading chute (the "Main Loading Chute") was used to load approximately 60 railcars per month with non-specialty kaolin. The Main Loading Chute was built prior to Grace acquiring the Grace Plant in 1980. (Drumming Declaration ¶ 4.) The Main Loading Chute itself is not mentioned in the Right-of-Way Agreement or the Operating Agreement. The Main Loading Chute is located near the "shed" described in Drawing no. TB-80-0185, which is attached to the Right-of-Way Agreement. (Drumming Declaration at ¶ 4; Right-of-Way Agreement at ¶ 1.)

18.    The covered, immobile, overhead loading structure with a spout described in the 1990 Supplemental Agreement (the "Specialty Product Loading Chute") is shown in Drawing No. AD-0102, which is annexed to and made a part of the 1990 Supplemental Agreement. From 1992 until approximately 2001, the Specialty Product Loading Chute was used solely to fill approximately three railcars per month with a specialty kaolin product known as NKC. NKC was manufactured and shipped in a powder form. In approximately 2001, Grace discontinued manufacturing NKC, and discontinued using the Specialty Product Loading Chute for that

purpose. The Specialty Product Loading Chute then went unused for several years. (Drumming Declaration at ¶ 7.)

19.     During Mr. Drumming's entire 28-year career at the Grace Plant, Norfolk Southern routinely delivered empty railcars to the Grace Plant. Grace employees filled the cars with kaolin at the Grace Plant. Grace then consigned the filled railcars to Norfolk Southern. Norfolk Southern then transported the railcars to transshipment points, where they were attached to long-haul trains for transshipment to Grace plants in Lake Charles, Louisiana, and Valleyfield, Quebec. (*Id.* at ¶ 4.)

20.     During the 1990's and beyond, the risks attendant to the mining, manufacture and shipping of kaolin were well-known throughout the industry. One important safety concern at the Grace Plant was ensuring that Grace employees had proper safety footwear, gloves, eyewear and hardhats. As a matter of routine, visitors are briefed on taking due care in the mining, manufacturing and shipping areas of the Grace Plant and they are issued hard hats and safety glasses. (*Id.* at ¶ 5.)

21.     Grace employees had to set and release railcar handbrakes—exactly the same operation during which Mr. Kirkland injured himself—multiple times during each railcar loading operation. (*Id.* at ¶¶ 11-12.)   Mr. Silas states in his declaration that, "[f]rom my experience working on railcars, I know that if you are wearing proper shoes with a good grip, you will not slip off the platform while working the brake, even if the platform is coated with kaolin." (Silas Declaration at ¶ 6.) It is thus unsurprising that, during Mr. Drumming's approximately 28-year career at the Grace Plant, he is "not aware of a single reportable incident involving a Grace employee or a Norfolk Southern employee slipping and injuring him or herself as a result of setting and releasing handbrakes on railcars while those cars were located at the Grace Plant."

(*Id.* at ¶ 11.)  Mr. Drumming also declared that, to the best of his knowledge, there was not a single reportable incident involving injury from slipping on wet kaolin at the Grace Plant for any reason during his 28 years at the plant.  (Drumming Declaration at ¶ 4.)  Mr. Silas likewise declared that he knew "of no incident where a Grace employee (or anyone else, Norfolk Southern employee or otherwise) fell or slipped from a railcar while working the handbrake." (Silas Declaration at ¶ 5.)

22.    The Grace Plant was—and continues to be—regulated by the United States Mine Safety and Health Administration ("MSHA"), which is part of the Department of Labor.  MSHA inspects the Grace Plant semi-annually for health and safety compliance.  Railcar safety is within the scope of MSHA inspections, and MSHA could, and would, issue citations for railcar loading and handling safety violations.  To the best of Mr. Drumming's knowledge, MSHA never assessed the Grace Plant any penalties for non-compliance with established health and safety requirements.  In particular, to the best of Mr. Drumming's recollection, MSHA has never cited Grace for any railcar safety violations during the past 28 years.  (Drumming Declaration at ¶ 6.)

## V.    THE AGREEMENTS' INDEMNIFICATION PROVISIONS

23.    The Operating Agreement and Right-of-Way Agreement each have two sets of similar indemnification provisions.

24.    In one set of indemnities, both Agreements provide in relevant part that:

- Grace was to be "solely responsible for, and shall bear all cost, expense and liability resulting from loss of or damage to property by fire;"

- Grace was to be "solely responsible for, and shall bear all cost, expense and liability resulting from death, personal injury, and loss and damage to property, caused solely by" Grace's negligence or by Grace's violation of the Operating and Right-of-Way Agreements;

- Norfolk Southern was to be "solely responsible for and shall bear all cost, expense and liability resulting from death, personal injury, and property loss and damage, caused solely by" Norfolk Southern's negligence; and

- If Grace and Norfolk Southern were both negligent, then they were to be "jointly responsible for and bear equally all cost, expense and liability resulting from death, personal injury and property loss and damage caused by their joint and concurring negligence;"

(Right-of-Way Agreement at ¶ 10; Operating Agreement at ¶ 5.)

25.    The two provisions vary in one substantive way.   Operating Agreement ¶ 5 governs indemnity solely as to the "***track*** governed by this agreement and the ***right of way*** therefor." (Operating Agreement at ¶ 5 (emphasis added).)  The Right-of-Way Agreement ¶ 10 indemnity applies to the "***property*** covered by this agreement." (Right-of-Way Agreement at ¶ 10 (emphasis added).)

26.    The second set of indemnities covers the "Facility."  Both Agreements define Facility in a substantially similar way, enumerating a specific set of properties—neither of which definitions enumerates the Main Loading Chute:

> a portion of an existing warehouse building, with two appurtenant overhead canopies, a shed, and a cyclone fence with two double swing gates therein, all located substantially as shown on said annexed print; which said warehouse building, canopies, shed, fence and gates shall not become fixtures upon the realty but shall remain the property of Licensee and shall be removed from the premises upon termination of this agreement. Said canopies and said shed being hereinafter sometimes together referred to as "Facility".

(Right-of-Way Agreement at ¶ 1.)

> Railroad, moreover, hereby grants unto Industry the right or license to construct, maintain and use (a) two double swing gates across said industrial track; (b) two overhead canopies over said industrial track; and (c) a shed over said industrial track; all at the locations shown on said annexed print. Said overhead canopies and said shed being hereinafter sometimes together referred to as "Facility".

(Operating Agreement at ¶ 1.)

27.     The two agreements contain substantially identical indemnities for use of the

Facility:

> Licensee proposes to construct, maintain and use said Facility with full cognizance of the risk of loss of life, personal injury and property loss or damage which may be caused by or result from railroad operations on said industrial track at the location of said Facility, or which may accrue from or by reason of the construction, installation, maintenance, presence or use of said Facility by Licensee; and Licensee covenants that said Facility shall be constructed, maintained and used solely at the risk of Licensee, and that neither Company nor any associated controlled or affiliated corporation, shall assume any responsibility in the premises; Licensee hereby specifically agreeing, notwithstanding any other provision of this agreement, to indemnify and save harmless Company and any associate, controlled or affiliated corporation, from and against the consequences of any and all such loss, injury or damage, whether or not negligence of Company may have caused or contributed to such loss, injury or damage.

(Right-of-Way Agreement at ¶ 20.)

> Industry proposes to construct, maintain and use said Facility with full cognizance of the risk of loss of life, personal injury and property loss or damage which may be caused by or result from railroad operations on said industrial track at the location of said Facility, or which may accrue from or by reason of the construction, installation, maintenance, presence or use of said Facility by Industry; and Industry covenants that said Facility shall be constructed, maintained and used solely at the risk of Industry and that neither Railroad, nor any associated, controlled or affiliated corporation, shall assume any responsibility in the premises; Industry hereby specifically agreeing, notwithstanding any other provision of this agreement, to indemnify and save harmless, Railroad, and any associated, controlled or affiliated corporation, from and against the consequences of any and all such loss, injury or damage, whether or not negligence of Railroad may have caused or contributed to such loss, injury or damage.

(Operating Agreement at ¶ 16.)

28.     The 1983 Supplemental Agreement does not contain any indemnification

provisions.

29.    The 1990 Supplemental Agreement contains an indemnification provision substantially similar to Operating Agreement ¶ 16 and Right-of-Way Agreement ¶ 20.  (1990 Supplemental Agreement at ¶ 5.)  The 1990 Supplemental Agreement defines "Facility" as follows:

> Railroad hereby grants unto Industry the right on license to construct, maintain and use an overhead loading structure with retractable loading spout, hereinafter called "Facility," across and over an industrial track of Industry; the location of said Facility being substantially as shown on print of Drawing No . AD-0102, dated June 14, 1990, annexed hereto and made a part hereof.

(1990 Supplemental Agreement at ¶ 1.)

30.    It is undisputed that the 1990 Supplemental Agreement indemnity applies only to use of the Specialty Product Loading Chute.  (*Id.* at ¶ 5.)

31.    In January 1998, the Specialty Product Loading Chute was used to load NKC into approximately three railcars per month, although that number could vary considerably, depending upon customer demand.  (Drumming Declaration at ¶ 7.)  Approximately 50-60 railcars per month approximately were filled using the Main Loading Chute.  (*Id.* at ¶ 4.)  It is undisputed that Norfolk Southern has provided no evidence that the railcars at issue in the January 23 and January 26, 1998 accidents, respectively, were filled with NKC from the Specialty Product Loading Chute.

32.    It is therefore undisputed that the 1990 Supplemental Agreement has no bearing on Norfolk Southern's indemnification claim.

## VI.    NORFOLK SOUTHERN AND MR. KIRKLAND WERE ON NOTICE CONCERNING SAFETY ISSUES RELATING TO THE MINING, PROCESSING AND SHIPPING OF KAOLIN

33.    Norfolk Southern cannot dispute that the Agreements governed the business relationship between it and Grace and that the gravamen of that business relationship was the bulk shipment by rail of processed kaolin.  Norfolk Southern cannot dispute that it provided bulk

shipment of kaolin at least as early as 1980, and perhaps as early as the 1940's, when mining and processing of kaolin began at the Grace Plant under prior ownership.

34.    Mr. Kirkland was the only Norfolk Southern employee to ever complain about kaolin dust on loaded railcars. (Drumming Declaration at ¶ 15.) Grace employees routinely accommodated Mr. Kirkland's requests "to keep Norfolk Southern happy." (*Id.*)

35.    It is undisputed that Mr. Kirkland testified in the FELA Action that kaolin was a safety hazard. (Tr. I:85:9-11.) In particular, Mr. Kirkland testified kaolin was slippery and that because of that risk he avoided climbing on railcars unless absolutely necessary. (Tr. I:87:22-24 ("I never had to get on the car -- you try to stay off of the loaded cars as much as you can. I mean, you try to avoid it."); Tr. I:91:9-14 ("It's just slick [on the railcars], you just be as very careful as you can and try to find -- you go one foot at a time and try to find a corner to put your foot in, so it won't slide, you know, and then you get up in your little stance so that you can -- and try to make sure that you keep a good handhold, because if you lose your handhold, you are going -- you know.").) Mr. Kirkland asked Grace to take extra measures to remove loose kaolin from railcars in order to reduce the risk from what Kirkland knew to be a potentially slippery surface. (Tr. I:85:13-19; Tr. II:24:15-18; Tr. II:24:25-25:1.)

36.    It is equally undisputed that Mr. Kirkland further testified that, on the morning of January 26, 1998, some hours prior to his accident at Norfolk Southern's Aiken facility, he complained to a Grace employee, Mr. Wood, and to Mr. Chapman about there being an excessive amount of kaolin dust on the railcars sitting on the Grace Plant sidetrack, ready to be consigned to Norfolk Southern for transshipment. (Tr. I:110:12-112-8.). Mr. Kirkland then testified:

> Then I look at Mr. Chapman, and I said, well, what do I do now,
> Mr. Chapman, I says, here's the cars, here's the problem, I said, it's

covered in clay. I said, best thing we can do is just leave the cars
sitting right here until they clean them up. He said, this is a good
customer, you are going to switch this place. I said, you want me to
switch this place. He said, yes, you have got to switch them, got in
his car drove off. Me and Chris sat there going, what can you do, I
mean, what could I do.

(Tr. I:112:10-18.) Finally, it is undisputed that Mr. Chapman testified at the FELA Action trial

in his capacity as Mr. Kirkland's direct supervisor and the trainmaster on both January 23 and

January 26, that he did not believe that kaolin residue that may have been present on railcar

exteriors had anything to do with Mr. Kirkland's accidents and resulting injuries.    (Tr. II:178:1-

20.)

## ARGUMENT

### The Court Should Disallow Norfolk Southern's Indemnification Claim, Because the Undisputed Facts Establish No Basis for Indemnity

**I.    THE COURT SHOULD GRANT SUMMARY JUDGMENT—THERE ARE NO RELEVANT MATERIAL FACTS IN DISPUTE**

37.    In its Summary Judgment Motion, the Reorganized Debtors carried their burden

of proof to establish that there were no genuine issues of material fact at that time. *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 323 (1986).   The burden of proof shifted back to Norfolk Southern to

present specific evidence that there is a genuine issue for trial. *Josey v. John R. Hollingsworth*

*Corp.*, 996 F.2d 632, 637 (3d Cir. 1993) (citing *Celotex*, 477 U.S. at 324).   "Factual disputes that

are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 247 (1986).

38.    Here, Norfolk Southern has relied upon the FELA Action trial record to create

factual disputes.  But as discussed in the Inadmissible Hearsay Memorandum, *passim*, the Court

should not consider the trial record for that purpose, because no Grace entity was a party to that

FELA Action. *See, e.g.*, Fed. R. Evid. 803(8), Fed. R. Evid. 803(8) Advisory Committee note,

citing with approval, *Wong Wing Foo v. McGrath*, 196 F.2d 120, 123 (9th Cir. 1952) (a prior proceeding's transcript is not admissible to prove the truth of matters asserted by a witness quoted therein); *Trustees of Univ. of Pa. v. Lexington Ins. Co.*, 815 F.2d 890, 905 (3d Cir. Pa. 1987) ("Admission of prior testimony [against a non-party] through a court transcript, merely because the testimony was observed and recorded pursuant to duty imposed by law, would emasculate large portions of the hearsay rule." (citing Fed. R. Evid. 803(8)); *see also* Fed. R. Evid. 804(b)(1) (requiring party against which former testimony is being offered to have had the opportunity at the time to examine the witness whose former testimony is being proffered and the witness must be unavailable for examination in the instant proceeding). The Court should instead, under the doctrine of defensive collateral estoppel consider those aspects of the trial record that bind Norfolk Southern to a number of undisputable facts, which cumulatively help establish that Norfolk Southern's indemnity claim should be disallowed. *See, e.g.*, *Peloro v. United States*, 488 F.3d 163, 175 (3d Cir. 2007).

39.    Likewise, much of what is set forth in the Conley and Sharpe Declarations is equally inadmissible, whether as hearsay, for lack of foundation or otherwise. *See* Motion to Strike, *passim*.

40.    But even if the Court were to take the FELA Action trial record into account in "the light most favorable to" Norfolk Southern, the Court should still grant summary judgment to the Reorganized Debtors, because there is no basis on which Norfolk Southern can succeed on its indemnity claim. *Josey*, 996 F.2d at 637 (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). The undisputed facts allow no other conclusion. On the undisputed facts of this matter, the Agreements provide no source of indemnification obligation, and even if they did, Norfolk Southern has not carried its burden of proof to establish that allegedly negligent acts of Grace

proximately caused Mr. Kirkland's injuries.    In fact, the Brief refers to, and Mr. Kirkland's

testimony adduces, facts that completely exculpate Grace.    This Court should therefore grant the

Reorganized Debtors' Summary Judgment Motion, and disallow Norfolk Southern's indemnity

claim.

II.    **NONE OF THE AGREEMENTS CLEARLY AND UNEQUIVOCALLY CONTEMPLATE INDEMNIFICATION ON THE UNDISPUTED FACTS OF THIS MATTER**

   **A. South Carolina Law Governs the Agreements and their Indemnities**

   41.    Bankruptcy Code section 502(b)(1) provides in relevant part that a claim may be

disallowed when "such claim is unenforceable against the debtor, and unenforceable against

property of the debtor, ***under any agreement or applicable law*** for a reason other than because

such claim is contingent or unmatured." 11 U.S.C. § 502(b)(1) (emphasis added); *see also In re*

*Smit*h, 66 B.R. 58, 59 (Bankr. D. Md. 1986); *Desert Palace, Inc. v. Hionas (In re Hionas)*, 361

B.R. 269, 271 (Bankr. S.D. Fla. 2006).    Here, the Agreements are silent as to choice of governing

law.    Therefore, this Court must determine the proper substantive law under which to determine

the scope of the Agreements' indemnification provisions.

   42.    As a federal court sitting in Delaware, this Court applies Delaware choice-of-law

principles to determine the appropriate State's law to apply to the Norfolk Claim. *Arrow Oil &*

*Gas, Inc. v. SemCrude, L.P. (In re SemCrude, L.P.)*, 407 B.R. 112, 134 (Bankr. D. Del. 2009)

(internal citations omitted); *A.P.S., Inc. v. Std. Motor Prods.*, 295 B.R. 442, 453 (D. Del. 2003)

(citing *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487 (1941)).    In resolving choice-of-

law questions, Delaware courts apply the "most significant relationship test" articulated in the

RESTATEMENT (SECOND) OF THE CONFLICT OF LAWS. *See, E. I. Du Pont de Nemours & Co. v.*

*Admiral Ins. Co.*, 1991 Del. Super. LEXIS 416, *4, 1991 WL 236943 (Del. Super. Ct. Oct. 22,

1991) (citing *Oliver B. Cannon & Son, Inc. v. Dorr-Oliver, Inc.*, Del. Supr., 394 A.2d 1160, 1166

(1978) (adopting the Restatement rule in contract cases)); *see also Travelers Indem. Co. v. Lake*,

594 A.2d 38, 41 (Del. 1991) (adopting the Restatement rule for tort cases).

43.    RESTATEMENT (Second) Conflict of Laws § 188 provides in relevant part:

> (1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.

> (2) In the absence of an effective choice-of-law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

> (a) the place of contracting,

> (b) the place of negotiation of the contract,

> (c) the place of performance,

> (d) the location of the subject matter of the contract, and

> (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

RESTAT. 2D OF CONFLICT OF LAWS, § 188.

44.    Here, Grace-Conn. is a Delaware corporation and Grace is a Connecticut

corporation, and their headquarters is located in Maryland. Norfolk Southern is a Virginia

corporation, with headquarters in Norfolk, VA.    But neither of these States has any direct

connection to the Agreements, nor did the incidents giving rise to Mr. Kirkland's injuries occur

in those states.    Instead, the business activities that are the subject of the Agreements and the

subject matter of the Agreements involve the Industrial Track, which is located on a parcel of

Norfolk Southern's property adjacent to the Grace Plant in Aiken, South Carolina.    Mr. Kirkland

injured himself on Norfolk Southern property located in Warrenville, South Carolina, and in

Aiken, South Carolina, albeit many miles from the property at issue in the Agreements. (Tr.

I:90:3-95:15; Tr. I:112: 7-16.)    Finally, Mr. Kirkland's state of residence at the time of the

accident was in Cross Hills, South Carolina. (Tr. I:77:9)  Therefore, South Carolina has the

closest relationship to the Agreements at issue, and this Court should apply its substantive law in

interpreting the Agreements and, more broadly, in resolving Norfolk Southern's indemnity

claim. *See, e.g.*, *In re Am. Metrocomm Corp.*, 274 B.R. 641, 660-61 (Bankr. D. Del. 2002)

(analysis of factors, which determined that under those facts, the place of performance was the

most substantial factor in determining governing law).

### B.  The Indemnity Provisions Must be Strictly Construed Against Norfolk Southern

#### *1.      True Intent Drawn from the Contract as a Whole*

45.      Under South Carolina law, a court must interpret an unambiguous contract within

its four corners. *McGill v. Moore*, 672 S.E.2d 571, 576 (S.C. 2009) (omitting internal citation);

*Schulmeyer v. State Farm Fire & Cas. Co.*, 579 S.E.2d 132, 134 (S.C. 2003) (same) (internal

citation omitted).  In so doing, the court must ascertain the parties' true intent from the contract

as a whole. *Schulmeyer* 579 S.E.2d at 134 ("An insurance contract is read as a whole document

so that 'one may not, by pointing out a single sentence or clause, create an ambiguity'") (internal

citations omitted).

#### *2.      An Indemnity Must Be Clear and Unequivocal to Be Enforceable*

46.      Moreover, under South Carolina law (as well as in railroad indemnity cases more

generally), contractual indemnities must expressly obligate an indemnitor to indemnify an

indemnitee in clear and unequivocal terms—express language that in the context of this matter,

quite simply does not exist. *Federal Pacific Electric v. Carolina Production Enterprises*, 378

S.E.2d 56, 57 (S.C. Ct. App. 1989) (internal citations omitted); *Freed v. Great Atlantic & Pacific

Tea Co.*, 401 F.2d 266, 269-270 (6th Cir. Ohio 1968) (same); *Union Pac. R. Co. v. El Paso

Natural Gas Co.*, 408 P.2d 910, 914 (1965) (same).  In determining whether there is such express

language, applicable South Carolina law provides that courts must interpret a term to give effect

to its plain, ordinary, and popular meaning.  *Century Indem. Co. v. Golden Hills Builders, Inc.*,

561 S.E.2d 355, 358 (S.C. 2002).  Such plain meaning is determined by looking to ordinary,

grammatical sense of the clause.  *Love v. Love*, 38 S.E.2d 231, 233 (S.C. 1946) ("In construing a

will, the rule requires that it be read in the ordinary and grammatical sense of the words

employed, unless some obvious absurdity or some repugnancy or inconsistency with the declared

intention of the testator, as abstracted from the whole will, should follow from so reading it");

*Spring Industries, Inc. v. Ohio DOT*, 51 Ohio Misc. 2d 6, 8 (Ohio Ct. Cl. 1989) (same in the

context of construing a contract); *Top Branch Tree Serv. & Landscaping, Inc. v. Omni Pinnacle,*

*LLC*, 2007 U.S. Dist. LEXIS 30938 (E.D. La. Apr. 26, 2007) (When construing a contract,

"[c]ourts are not captives of grammars and dictionaries. Neither are they free to ignore common

usage and dictionary-tested meaning") (internal citation omitted).

　　　　47.　　As discussed below, the indemnity provisions in any of the Agreements clearly

and unequivocally ***do not*** state that Grace is contractually liable to indemnify Norfolk Southern

for the accidents at issue here.  Indeed, a plain reading of each of the Agreements leads

inexorably to precisely the opposite conclusion—each of the Agreements allocates the risk of

liability solely for accidents occurring on or about the Industrial Track and the Facilities, and

nowhere else.

### 3. The Agreements and Their Indemnity Provisions Must Be Construed Strictly in Grace's Favor

　　　　48.　　An indemnity provision must be construed strictly in favor of the indemnitor

when the indemnitor is not in the insurance business, and the indemnification is given incident to

a contract whose main purpose is not indemnification.  *Federal Pacific Electric*, 378 S.E.2d at 57

("Because it is somewhat unusual for an indemnitor to indemnify the indemnitee for losses

resulting from the indemnitee's own negligence, a contract containing an indemnity provision that purports to relieve an indemnitee from the consequences of its own negligence will be strictly construed"); *see also Sol Walker & Co. v. Seaboard Coast Line Railroad Co.*, 362 So.2d 45, 49 (Fla. App. 1978) (internal citations omitted); 41 AM. JUR. 2D INDEMNITY § 13 (citing *Gloucester Holding Corp. v. U.S. Tape & Sticky Prods.*, LLC, 832 A.2d 116, 129 (Del. Ch. 2003) ("courts should not enlarge the right to indemnification by implication")).  It is undisputed that Grace is not in the insurance business, and the indemnification provisions in the Agreements were clearly given incident to the operation of the Industrial Track, the lease of the Grace Plant and the use of the "Facility" (as the Agreements define that term).  Therefore, South Carolina law requires the Agreements to be strictly construed in Grace's favor.  Thus, even if the Agreements could be construed to contain some ambiguity about where they allocate the risk of indemnity for Mr. Kirkland's accidents, this Court would nonetheless be bound to strictly construe any such ambiguity in Grace's favor, and not in Norfolk Southern's.

49.     The South Carolina Supreme Court has long held that, "where the contract is susceptible of more than one interpretation, a doubt shall be resolved against the party whose business it was to speak without ambiguity." *Williams v. Teran, Inc.*, 221 S.E. 2d 526, 529 (S.C. 1976) (internal citation omitted).  Thus it is incumbent upon the "author[] of the agreement" to make what it is seeking clear in the agreement. *Id.*

50.     It is undisputed that Norfolk Southern drafted each of the Agreements.  Indeed, it is apparent from the face of the Agreements that they are all form agreements. *Doe v. Grp. Hospitalization & Med. Servs.*, 3 F.3d 80, 89 (4th Cir. 1993) ("language must be construed against the drafting party, particularly when, as here, the contract is a form provided by the insurer rather than one negotiated between the parties") (citing *Kunin v. Benefit Trust Life Ins.*

*Co.*, 910 F.2d 534, 539 (9th Cir.) (using a presumption such as construction against the drafter in evaluating the reasonableness of an interpretation is not inconsistent with review for abuse of discretion), *cert. denied*, 498 U.S. 1013 (1990); *Glocker v. W. R. Grace & Co.*, 974 F.2d 540, 544 (4th Cir. 1992) (when exercising de novo review, the court must apply such traditional rules of contract interpretation as the construction of ambiguity against the drafter); *Phillips v. Lincoln Nat'l Life Ins. Co.*, 978 F.2d 302, 314 (7th Cir. 1992) (when the parties did not negotiate the material terms of the contract, the court construed all ambiguities against the drafter in conducting de novo review); *Masella v. Blue Cross & Blue Shield of Connecticut, Inc.*, 936 F.2d 98, 107 (2d Cir. 1991) (construing ambiguities in insurance contracts subject to de novo review against the drafter). Therefore, any ambiguity or doubt about the scope of the indemnification provisions found therein must be resolved in Grace's favor. *Williams v. Teran*, 221 S.E. 2d at 529; *Montgomery v. JYD Int'l*, 534 So.2d at 595 (Ala. 1988); 41 AM. JUR. 2D INDEMNITY § 13.

51.    Finally, Norfolk Southern's own negligence, as found by the FELA Action jury, must be taken into account in construing the Agreements and their indemnification provisions against Norfolk Southern, because courts strictly construe indemnification provisions against negligent indemnitees. *Pride v. S. Bell Tel. & Tel. Co.*, 138 S.E.2d 155, 157 (S.C. 1964) ("Since such provisions tend to induce a want of care, they are not favored by the law and will be strictly construed against the party relying thereon").

### C. Norfolk Southern's Indemnification Claim Does Not Fall Within the Scope of Any of the Agreements' Indemnities

#### *1. The 1990 Supplemental Agreement's Indemnity Does Not Apply*

52.    Norfolk Southern has asserted that Grace's "negligent use" of the Specialty Product Loading Chute inculpates the 1990 Supplemental Agreement's indemnity as the basis for its indemnity claim, because a personal injury to a railroad employee from slipping on kaolin

was "foreseeable" at the time that the parties entered into that agreement. Norfolk Southern further asserts that "the fact that the kaolin was a proximate cause of the January 26 Accident is sufficient" to establish Grace's indemnity obligation. Brief at p. 31. Norfolk Southern is wrong.

53.    First, as discussed in Section III below, Norfolk Southern has adduced no evidence that the Specialty Product Loading Chute was used to fill either the January 23 or January 26 railcars. Second, even if the Specialty Product Loading Chute was used, Norfolk Southern has failed to establish that its use was the proximate cause of Mr. Kirkland's January 26 accident. *See*, *infra*, *id.* What's more, Norfolk Southern admitted—in adjudging the January 26 railcar "safe to operate"—that Grace was not negligent in any such use of the Specialty Product Loading Chute. *See*, *infra*, Section III.C.  (Tr. I:111:18-25 (On, January 26, Mr. Chapman overruled Mr. Kirkland and said that Norfolk Southern should take consignment of that day's railcars); Tr. I:85:22-89:9 (On January 23, Mr. Mass, Mr. Kirkland's trainmaster, did not agree with Mr. Kirkland that the condition of the railcars in that day's consist were unsafe).) Finally, it is undisputed that Mr. Chapman, the trainmaster on January 23 and January 26, 1998, and Mr. Kirkland's direct supervisor, testified that he did not believe that kaolin residue that may have been present on railcar exteriors caused Mr. Kirkland's accidents and resulting injuries. *See*, *infra*, Section III.D.  (Tr. II:178:1-20.) Thus, without more, Norfolk Southern may not rely upon the 1990 Supplemental Agreement's indemnity for its indemnity claim.

54.    But even if there were more, which there is not, Norfolk Southern still could not rely upon the 1990 Supplemental Agreement's indemnity. Nothing in the 1990 Supplemental Agreement expresses in clear and unequivocal terms that Grace is liable to indemnify Norfolk Southern for injuries sustained many miles from the Grace Plant, when Norfolk Southern had long since taken full responsibility for, and had full control over, the railcar at issue, after its

management had explicitly adjudged the car to be "safe to run." AM. JUR. 2D INDEMNITY § 13

(citing *FabArc Steel Supply , Inc. v. Composite Constr. Sys.*, 914 So. 2d 344, 358 (Ala. 2005);

*see also, infra*, ¶¶ 109-114.

55.    A plain reading of the four corners of the 1990 Supplemental Agreement confirms

this conclusion. *McGill v. Moore*, 672 S.E.2d 571, 576 (S.C. 2009) (omitting internal citation):

> Industry [Grace] will maintain ... [the Specialty Product Loading
> Chute] at all times during the life of said Agreement in such
> condition that ... [the Specialty Product Loading Chute] or the use
> thereof by Industry shall not be or become an obstruction to or
> interfere with the safe and proper maintenance of said Industrial
> track, or railroad operations upon said track, ***or endanger life or
> limb of employees of Railroad or other persons on or about said
> track***.

1990 Supplemental Agreement at ¶ 3 (emphasis added).

56.    The prepositional phrase *"**on or about said track**"* modifies—and limits—the

entire preceding phrase, *"**employees of Railroad or any other persons**."* Gordon J Loberger &

Kate Shoup, WEBSTER'S NEW WORLD ENGLISH GRAMMAR HANDBOOK, 2d ed., Hoboken, N.J.:

Wiley (2009), at 201-03 (discussing prepositional phrases).    This construction is entirely

consistent with the broader context of the 1990 Supplemental Agreement—which deals solely

with the Specialty Loading Chute and its appurtenances. *Love*, 38 S.E.2d at 233  (grammatical

sense applies in the absence of an inconsistency, repugnancy or obvious absurdity).

57.    In drafting this clause, Norfolk Southern clearly intended that Grace use the

Specialty Product Loading Chute in a way that did not endanger life or limb of Norfolk Southern

employees when those employees were on or about the Industrial Track and the Specialty

Product Loading Chute.    Paragraph 4 of the 1990 Supplemental Agreement confirms this

interpretation, as it specifically requires Grace to maintain the Specialty Product Loading Chute

at the location set forth in the agreement.    The same paragraph further prohibits Grace from

moving the Specialty Product Loading Chute without Norfolk Southern's written consent.  (1990 Supplemental Agreement at ¶ 4.)

58.    Paragraph 5 of the 1990 Supplemental Agreement therefore must be read in the context of the paragraph 3 and 4 limitations on the scope of Grace's duty to use the Specialty Product Loading Chute without endangering Norfolk Southern employees when those employees were physically in the vicinity of the Industrial Track and the associated Facilities.  *Schulmeyer* 579 S.E.2d at 134 ("An insurance contract is read as a whole document so that 'one may not, by pointing out a single sentence or clause, create an ambiguity'") (internal citations omitted); 41 AM. JUR. 2D INDEMNITY § 13 (citing *Nat'l Union Fire Ins. Co. v. Wadsworth Golf Constr. Co.*, 863 A.2d 347, 354 (Md. Ct. Spec. App. 2004) ("contractual terms cannot be read out of the agreement altogether, and the meaning of a provision is not discerned by reading it in isolation, but by recognizing its relation to the other terms of the complete contractual relationship") (internal citation omitted)).  Paragraph 5 is a single sentence, comprising three clauses, the first of which reads:

> Industry proposed to construct, maintain and use said Facility with full cognizance of the risk of ***loss of life, personal injury or property loss or damage*** which may be caused ***by or result from railroad operations on said industrial track at the location of said Facility***, or ***which may accrue by reason of*** the construction installation, maintenance, presence or ***use of said Facility by Industry***;

(1990 Supplemental Agreement at ¶ 5 (emphasis added).)

59.    It is in the full context of Paragraphs 3, 4 and 5 that the scope of Grace's "full cognizance of the risk … [of] … personal injury" must be read.  In other words, Grace was on notice of the risk of personal injury to Norfolk Southern employees from Grace's use of the Specialty Product Loading Chute when those employees were on, or in the vicinity of, the Industrial Track and the Specialty Product Loading Chute.  There is nothing in this first clause

that requires Grace to be cognizant of the risk of personal injury at any other location, particularly when Norfolk Southern had taken full control over, and full responsibility for, the railcar at issue. AM. JUR. 2D INDEMNITY § 13 (citing *FabArc Steel Supply, Inc. v. Composite Constr. Sys.*, 914 So.2d at 358).

60. The second clause of Paragraph 5 allocates the risk of use of the Specialty Product Loading Chute to Grace, and purports to absolve Norfolk Southern of "any responsibility in the premises." (1990 Supplemental Agreement at ¶ 5.) The only possible interpretation of the term, "the premises," is in reference to paragraph 5's first clause, where Grace is to assume, when using the Specialty Product Loading Chute, the risk of personal injury to Norfolk Southern employees *only* when they are "on or about" the Industrial Track near the Specialty Loading Chute. To give this clause a broader scope would be to render Grace as Norfolk Southern's insurer—which as many courts have held, is impermissible, when the main purpose of the agreement is to govern the parties' business relationship. *Federal Pacific Electric*, 378 S.E.2d at 57; *Pugh v. Prairie Constr. Co.*, 602 N.W.2d 805, 809 (Iowa 1999) ("where an indemnification is not given by one in the insurance business but is given incident to a contract whose main purpose is not indemnification, the indemnity provision must be construed strictly in favor of the indemnitor") (citing 41 AM. JUR. 2D INDEMNITY § 13); *Welch v. Kan. City S. Ry. Co.*, 940 F. Supp. 2d 402, 415 (W.D. La. 2013) (same, interpreting sidetrack agreement indemnity) (citing *Thomas v. Atlantic Coast Line R. Co.*, 201 F.2d 167 (5th Cir. 1953)).

61. The indemnity itself is contained in the third and final clause of paragraph 5, which reads in relevant part:

> Industry hereby specifically agreeing, notwithstanding any other provision of said Agreement, to indemnify and save harmless Railroad ... ***from and against the consequences of any and all such loss, injury or damage***, whether or not negligence of the

> Railroad may have caused or contributed to such loss, injury or damage.

(1990 Supplemental Agreement at ¶ 5 (emphasis added).)

62.     The emphasized language, "any and all *such* loss, injury or damage," refers to the "risk of loss of life, personal injury or property loss or damage" found in the first clause. Brian A. Garner, GARNER'S MODERN AMERICAN USAGE 758-59 (2003) ("*Such* is properly used as an adjective when reference has previously been made to a category of people or things"). As discussed above, the first clause specifically limits Grace's contractual risk of personal injury to Norfolk Southern employees from its use of the Specialty Product Loading Chute to when those employees are on or about the Industrial Track and the Specialty Product Loading Chute. Thus, the limitation in the first clause of paragraph 5 delimits the scope of the third clause's indemnity. Mr. Kirkland's accidents do not fall within that limitation. Those accidents both occurred many miles from the Grace Plant, at a Norfolk Southern-owned and –controlled facility, in each case long after Norfolk Southern had inspected the railcars, adjudged them "safe to run," attached them to a Norfolk Southern-owned and –controlled train and taken them to the relevant facility. *See Montgomery v. JYD Int'l*, 534 So.2d at 595; 41 AM. JUR. 2D INDEMNITY § 13.

63.     Finally, the phrase, "notwithstanding any other provision of said Agreement," does not expand the limitations of the emphasized language, "any and all *such* loss, injury or damage." The "notwithstanding" phrase relates solely to Grace's agreement to indemnify for the specified "loss, injury or damage," without any limitation on that indemnity within its defined scope. NEW OXFORD ENGLISH DICTIONARY, 3d ed., at p. 1201 (2010) (notwithstanding means "nevertheless," "in spite of" and, originally, "not providing an obstacle to"). Thus, it does nothing to change the limitation in the first clause of the paragraph 5 indemnity, which specifically limits the scope of Industry's cognizance of the risk of "*such* loss, injury or damage"

to Industry's cognizance of "such loss ..." only at the location of the Facility, and nowhere else. Thus the "notwithstanding" phrase does not require Grace to be cognizant of the risk of personal injury at any other location, particularly when Norfolk Southern had taken full control over, and full responsibility for, the railcar at issue. *See supra* at ¶ 59; AM. JUR. 2D INDEMNITY § 13 (citing *FabArc Steel Supply, Inc. v. Composite Constr. Sys.*, 914 So.2d at 358). To foist a different construction on the "notwithstanding" phrase to broaden the scope of "such" would be to give the phrase another meaning entirely—which would be anything but the "clear and unequivocal" reading demanded of an indemnity sought by the agreement's drafter for its own negligence. *Federal Pacific Electric*, 378 S.E.2d at 57 (strict construction of indemnity sought for prospective indemnitee's own negligence requires an "intention ... expressed in clear and unequivocal terms").

64.     Therefore, a reading of paragraph 5 within the context of the entire 1990 Supplemental Agreement leads to only one conclusion:  Grace's obligation to indemnify Norfolk Southern for injuries suffered as a proximate cause of Grace's negligent use of the Specialty Product Loading Chute (a formulation with which Norfolk Southern agrees—*see* Brief at p. 31) ends once Norfolk Southern agreed—by taking consignment—that the railcar loaded using that chute was safe to operate. *See, infra* § III.C. (Norfolk Southern knowingly adjudged the January 26 railcar "safe to run" pursuant to its Conductors' Rules, when it took consignment).

### 2. *The Operating Agreement and Right-of-Way Agreement Indemnities Do Not Provide a Basis for Norfolk Southern's Indemnity Claim*

#### a)     *The Operating Agreement*

65.     There are two indemnity provisions in the Operating Agreement:

- Paragraph 5, which allocates indemnity liability between Grace and Norfolk Southern as to "death, personal injury and property loss and damage" relating to the Industrial Track; and

- Paragraph 16, which requires Grace to indemnify Norfolk Southern for consequences of "loss, injury or damage" relating to railroad operations on the Industrial Track "at the location of" the "Facility," as the Operating Agreement defines that term.

66.    There is nothing in either of those provisions to provide a basis for Grace to be contractually obligated to indemnify Norfolk Southern for Mr. Kirkland's accidents:

- First, neither indemnity refers at all to the Main Loading Chute;

- Second, the scope of both indemnities is limited, such that even if either one of them could be construed to refer to the Main Loading Chute, it still would not extend to cover accidents to Norfolk Southern employees on railcars after Norfolk Southern has inspected the railcars, adjudged them safe to operate, and thereafter taken consignment of them.

Norfolk Southern therefore cannot look to the Operating Agreement as a basis for its indemnity claim.

(1)    Paragraph 5 Track Indemnity

67.    The Operating Agreement's paragraph 5 indemnity has the following preamble:

> The liability of the parties to this agreement, as between themselves, for death, personal injury and property loss and damage, *which occurs by reason of, or arises out of, or is incidental to, the construction, operation, maintenance, use, presence or removal of the track covered by this agreement and the right of way therefor*, shall be determined in accordance with the following provisions

(Operating Agreement at ¶ 5 (emphasis added).)   The well-established rules of construction discussed above make it clear that the Operating Agreement is intended to allocate the risk of liability for operations involving the Industrial Track—no more, and no less.   As Norfolk Southern's indemnity claim does not implicate the Industrial Track, the paragraph 5 indemnity is of no moment. *Federal Pacific Electric*, 378 S.E.2d at 57.

68.    But even if the ¶ 5 indemnity's subject matter was broader than just the Industrial Track, and somehow included the Main Loading Chute within the scope of the term "track" or "industrial track," it still would not encompass Mr. Kirkland's accidents.  There is nothing in the

construction of the paragraph that specifically refers to any obligation of Grace to indemnify Norfolk Southern for accidents occurring to Norfolk Southern employees when those employees are on Norfolk Southern railcars deemed by Norfolk Southern management to be "safe to run," and which had been consigned to, are fully in the control of, and are the responsibility, of Norfolk Southern, when the site of the accident is on Norfolk Southern property miles away from the Grace Plant and the Industrial Track in particular. *Federal Pacific Electric*, 378 S.E.2d at 57; *Montgomery v. JYD Int'l*, 534 So.2d at 595; 41 AM. JUR. 2D INDEMNITY § 13.

69.     The specific subparagraphs specifically allocating the risk of liability do not broaden this limitation of scope. For example, paragraph 5(a) applies solely to "loss of or damage to property by fire." It thus applies solely to fires on the Industrial Track.

70.     Paragraphs 5(b) and 5(c) are mirror images of one another. The former allocates liability to Grace for Grace's sole negligence or for a violation of the terms of the agreement. The latter allocates liability to Norfolk Southern for its sole negligence. Both apply solely to negligence in the "construction, operation, maintenance, use, presence or removal of" the Industrial Track. There is nothing to indicate any broader application.

71.     Paragraph 5(d) has the same scope as paragraphs 5(b) and (c), except that it allocates liability to each party equally for "their joint and concurring negligence." Once again, there is nothing to indicate a broader application.

72.     ¶ 5(e) addresses "clearance requirements," which by their very nature apply only to the Industrial Track. ¶ 5(f) requires each party found liable under the paragraph to hold the other party harmless. It provides no basis for expanding the scope of indemnity to include Mr. Kirkland's accidents, because it does not clearly and unequivocally express any such expansion.

*Federal Pacific Electric*, 378 S.E.2d at 57.  Likewise, ¶¶ 5(g) and 5(h) do not either expand or further limit the scope of either party's potential indemnity obligation to the other.  *Id.*

(2)    <u>Paragraph 16 Facility Indemnity</u>

73.     The Operating Agreement ¶ 16 indemnity is substantially similar to the 1990 Supplemental Agreement ¶ 5—with one major difference, which is the meaning of "Facility." The "Facility" defined in the Operating Agreement (and in the Right-of-Way Agreement, as discussed below) does not include any mention of the Main Loading Chute.  (Operating Agreement at 1.A ("Said overhead canopies and said shed being hereinafter sometimes together referred to as 'Facility'.").)  In other words, unlike the 1990 Supplemental Agreement, which Grace entered into with Norfolk Southern for the express purpose of constructing the Specialty Product Loading Chute and associated facilities, the Operating Agreement (and the Right-of-Way Agreement) does not include the Main Loading Chute.  Indeed, both Agreements are entirely silent as to the Main Loading Chute.  South Carolina law, which requires courts to strictly construe indemnity agreements against the drafter and against an indemnitee seeking indemnity for its own negligence—which is, of course, in both cases Norfolk Southern—thus precludes any argument by Norfolk Southern that the term, "Facility," defined in the Operating Agreement (and in the Right-of-Way Agreement, as discussed below) should be more expansively construed to include an item not clearly, unequivocally and expressly listed as being part of that definition.  *Davison v. Norfolk S. Ry. Co.*, Case no. CL02-36, 2003 Va. Cir. LEXIS 72, *7 (Va. Cir. 2003) ("The maxim *expressio unius est exclusion alterius* 'instructs that when parties list specific items in a document, any item not so listed is typically thought to be excluded'.") (citing *Smart v. Gillette Co. Long-Term Disability Plan*, 70 F.3d 173, 179 (1st Cir. 1995)).

74.     Indeed, the specific exclusion of the "two double swing gates across said industrial track" from the term, "Facility," in the Operating Agreement (and Right-of-Way Agreement) and the specific inclusion of the Specialty Product Loading Chute confirms the point.  Norfolk Southern was the drafter of all of the Agreements.  It knew—and had control over—which items were included within a particular definition.  Here, in the Operating Agreement, only the canopy and the shed compose the "Facility," as the Operating Agreement defines that term.  Thus, black-letter law strict construction of the paragraph 16 indemnity excludes the Main Loading Chute from the term, "Facility."  *Federal Pacific Electric*, 378 S.E.2d at 57.

75.     But even if the term "Facility" could be read to include the Main Loading Chute—which it cannot—the scope of the paragraph 16 indemnity is no broader than the 1990 Supplemental Agreement indemnity—which means that it cannot apply to Mr. Kirkland's accidents.  First, as the 1990 Supplemental Agreement ¶ 4 requires the Specialty Product Loading Chute to remain in its location, so too does Operating Agreement ¶ 15 require the Facility to remain in its location.  Similarly, Operating Agreement ¶ 14 parallels the 1990 Supplemental Agreement ¶ 3 requirement.  As with 1990 Supplemental Agreement ¶ 3, the prepositional phrase "*on or about said track*" modifies—and limits—the entire preceding phrase, "*employees of Railroad or any other persons*."  Gordon J Loberger & Kate Shoup, WEBSTER'S NEW WORLD ENGLISH GRAMMAR HANDBOOK, 2d ed., Hoboken, N.J.: Wiley (2009), at 201-03 (discussing prepositional phrases).  Thus as with 1990 Supplemental Agreement ¶ 3, Norfolk Southern clearly intended that Grace use the Facility (which *does not include* the Main Loading Chute).  Thus, Grace was on notice of the risk of personal injury to Norfolk Southern

employees from Grace's use of the Facility when those employees were on, or in the vicinity of, the Industrial Track and the Facility. *See* ¶¶ 55-57, *supra*.

76.    Similarly, the first clause of Operating Agreement ¶ 16, as with the first clause of the 1990 Supplemental Agreement ¶ 5, requires Grace to be cognizant of the risk of personal injury in the vicinity of the Facility (and the relevant Industrial Track) and not at any other location. *See* ¶ 60, *supra*. The only possible interpretation of the term, "in the premises," in clause 2 of the paragraph 16 indemnity is in reference to earlier in the clause, where Grace is to assume, when using the Facility, the risk of personal injury to Norfolk Southern employees ***only*** when they are "on or about" the Industrial Track near the Facility. *See* ¶ 60, *supra*.

77.    As with 1990 Supplemental Agreement ¶ 5, the phrase "any and all ***such*** loss, injury or damage," in the third clause refers to the "risk of loss of life, personal injury or property loss or damage" found in the first clause. Brian A. Garner, GARNER'S MODERN AMERICAN USAGE 758-59 (2003) ("*Such* is properly used as an adjective when reference has previously been made to a category of people or things"). Thus, as with 1990 Supplemental Agreement ¶ 5, the first clause specifically limits Grace's contractual risk of personal injury to Norfolk Southern employees from its use of the Facility to when those employees are on or about the Industrial Track and the Facility and nowhere else. *See* ¶ 62, *supra*.

78.    Therefore, as with the 1990 Supplemental Agreement, Operating Agreement ¶ 16 cannot be construed to require Grace to indemnify Norfolk Southern for injuries suffered by a Norfolk Southern employee at a Norfolk Southern facility long after the railcars at issue were consigned to Norfolk Southern, which had adjudged them safe to operate.

b)    *The Right-of-Way Agreement*

79.    The Right-of-Way Agreement has parallel provisions to those found in the Operating Agreement, with similar limitations:

- Paragraph 10, which allocates indemnity liability as to "death, personal injury and property loss and damage" relating to the Industrial Track; and

- Paragraph 20, which requires Grace to indemnify Norfolk Southern for consequences of "loss, injury or damage" relating to railroad operations on the Industrial Track "at the location of" the "Facility," as the Operating Agreement defines that term.

(1)    Paragraph 10 Property Indemnity

80.    The Right-of-Way Agreement's paragraph 10 indemnity has the following preamble:

> The liability of the parties to this agreement, as between themselves, for death, personal injury and property loss and damage, which occurs by reason of, or *arises out of, or is incidental to, the use or occupancy by Licensee of the property covered by this agreement*, shall be determined in accordance with the following provisions:

(Right-of-Way Agreement at ¶ 10 (emphasis added).)    The wording of this preamble is substantially identical to the wording of the preamble to Operating Agreement ¶ 5, discussed above in Section IV.B.2.a).(1). The principle difference is the reference to "property covered by this agreement," as compared to "track covered by this agreement and the right of way therefor." (Right-of-Way Agreement at ¶ 10; Operating Agreement at ¶ 5.)

81.    The term "property" is not defined, but the scope may be adduced by referring to the Industrial Track and Facility descriptions in Right-of-Way Agreement ¶ 1. Neither the Industrial Track description nor the "Facility" definition refer at all to the Main Loading Chute. As with Operating Agreement ¶ 5, Right-of-Way Agreement ¶ 10 does not explicitly refer to the Main Loading Chute. Therefore, as Norfolk Southern is both drafter and indemnitee, this omission should be strictly construed against Norfolk Southern, and the term "Facility" should not be expansively read to include what was not specifically enumerated. *Federal Pacific Electric*, 378 S.E.2d at 57; *Davison v. Norfolk S. Ry. Co.*, 2003 Va. Cir. LEXIS 72, *7.

82.     But, as with Operating Agreement ¶ 5, even if "property" could be construed to include the Main Loading Chute, the scope of Right-of-Way Agreement ¶ 16 is restricted to the property covered by the agreement.  It cannot be read to include Norfolk Southern property that is not the subject of the agreement—such as a railcar.  Moreover, use of "property," as with use of the term "track" in the Operating Agreement, cannot be broadly construed to include accidents occurring on Norfolk Southern railcars at Norfolk Southern facilities hours after those railcars were consigned to Norfolk Southern.  *See* ¶ 68, *supra*; *Federal Pacific Electric*, 378 S.E.2d at 57.

83.     As with Operating Agreement ¶ 5, the various subparagraphs of Right-of-Way Agreement ¶ 10 do not in any way expand the scope of the indemnity set forth therein.  ¶ 5(a) deals solely with fire.  Subparagraphs 10(b), (c), (d) and (e) are substantially the same as the corresponding paragraphs in the Operating Agreement (which are subparagraphs 5(c), (d) and (f)), and provide no basis for reading Mr. Kirkland's accidents into the indemnity.  Finally, subparagraphs 10(f) and (g) provide no basis for indemnity, just as Operating Agreement ¶¶ 5(g) and (h) do not.

### (2)     Paragraph 20 Facility Indemnity

84.     The paragraph 20 "Facility" indemnity is virtually identical to Operating Agreement ¶ 16.  It thus does not encompass the Main Loading Chute either, because the term "Facility" does not specifically enumerate the Main Loading Chute (and in fact the entire Agreement is completely silent as to the Main Loading Chute).  *Smart v. Gillette Co. Long-Term Disability Plan*, 70 F.3d 173 at 179 (applying the "hoary maxim" of "*expressio unius est exclusio alterius*").  (Right-of-Way Agreement at ¶ 1.A ("Said canopies and said shed being hereinafter sometimes together referred to as 'Facility'.").)  The exclusion of the warehouse building and cyclone fence enumerated in the preceding sentence from the term "Facility" confirms that the

Main Loading Chute cannot be part of the "Facility." *Id.* Likewise, the analysis of the 1990 Operating Agreement "Facility" indemnity, which specifically enumerates the Specialty Loading Chute, thereby demonstrating that Norfolk Southern knew when to include an item in a defined term, leads to the same conclusion as to the scope of the Right-of-Way Agreement "Facility" indemnity. The paragraph 20 indemnity cannot be construed to require Grace to indemnify Norfolk Southern for injuries suffered by a Norfolk Southern employee at a Norfolk Southern facility long after the railcars at issue were consigned to Norfolk Southern, which had adjudged them safe to operate. *See* ¶¶ 54-64, 73-78, *supra*.

### D. Norfolk Southern's Own Internal Procedures Confirm That Mr. Kirkland's Accidents Did Not Fall Within the Ambit of the Agreements' Indemnities

85.     At the time of the accidents, Norfolk Southern was a common carrier. 49 U.S.C. § 10102(5) (defining a "rail carrier" as a type of common carrier). (Operating Agreement at ¶ 8.) As a common carrier, Norfolk Southern, as "the receiving carrier," had the duty "to inspect for itself and ascertain at its peril, before accepting the tendered cars for shipment on its lines or handling them in any way ... that such cars are equipped in every way and comply in every respect with the requirements of the Safety Appliance Acts." *Brady v. Wabash R. Co.*, 49 S.W.2d 24, 27 (Mo. 1932); *see also Chi. & N. W. R. Co. v. Chi., R. I. & P. R. Co.*, 179 F. Supp. 33, 43 (N.D. Iowa 1959) ("Neither the Safety Appliance Act nor the common law requires a carrier to accept ... a car equipped in violation of the Safety Appliance Act. It is both the right and duty of a carrier to refuse to accept such defective car in interchange if acceptance would necessarily involve its own use of such car in violation of the Act").

86.     It is thus not surprising that Norfolk Southern instituted its Conductors' Rules, extracts of which Norfolk Southern had admitted as exhibits in the FELA Action. Those rules clearly state that the conductor—who in the case of both the January 23 and January 26 incidents

was Mr. Kirkland, himself—has "charge of trains to which they are assigned." (Conductors' Rules 581.) He was charged with "observance and enforcement of all rules and instructions." (*Id.*) Pursuant to those rules, the conductor—here, Mr. Kirkland—was required, before taking consignment, to "examine" railcars "to determine their condition. (Conductors' Rules M.) If a railcar was "unsafe to run," Mr. Kirkland was required "to remove [it] from the consist." (Conductors' Rules 586.)

87.    Norfolk Southern has not adduced any evidence that any railcars were removed from the consist on January 26, 1998. In fact, as discussed below, very much the opposite happened. *See, infra,* § III.C. Norfolk Southern management adjudged the railcars "safe to run," which means that Grace was not negligent in its loading or cleaning of the railcars—a point confirmed by the fact that Grace employees had climbed numerous times on those very same railcars consigned to Norfolk Southern on January 26, releasing and setting the handbrakes (precisely the evolution Mr. Kirkland was reportedly performing when he injured himself (Complaint at ¶¶ 5-6)), and further confirmed by the fact that not a single Grace employee was ever injured in doing so. (Drumming Declaration at ¶ 11; Silas Declaration at ¶ 4.)

88.    These facts, and the conclusion to be drawn therefrom, are entirely consistent with Mr. Kirkland's accidents being beyond the intended scope of the Agreements' indemnities. Grace loaded the railcars, they were inspected (and thereby adjudged "safe to run") by and consigned to Norfolk Southern and hauled away by Norfolk Southern. Mr. Kirkland's accidents happened hours after those events. There is nothing in the Agreements that even begins to indicate that the parties intended—or Grace bargained to be—Norfolk Southern's de facto insurer for all slip-and-fall injuries occurring on railcars adjudged by Norfolk Southern as "safe to run," when those cars were Norfolk Southern's control, particularly when the problem with

the railcar(s) at issue was an apparently faulty handbrake. *Pride v. S. Bell Tel. & Tel. Co.*, 138 S.E.2d 155, 157 (S.C. 1964) (provision indemnifying a party tends "to induce a want of care, they are not favored by the law and will be strictly construed against the party relying thereon"). (Complaint at ¶¶ 5-6 (describing faulty handbrake).)

### E. In Similar Cases, Courts Have Strictly Construed the Indemnification Against the Indemnitee Railroad

89.    Courts have generally tended to strictly construe sidetrack agreement indemnities against a railroad indemnitee, particularly where the railroad, itself, was negligent.

### 1. *Sol Walker & Co. v. Seaboard Coast Line Railroad Co.*, 362 So.2d 45 (Fla. App. 1978)

90.    The *Sol Walker* case is particularly instructive in illustrating this proposition. *Sol Walker*, 362 So.2d at 47. There, the industry loaded the railcar at issue with scrap iron while the railcar was on the sidetrack. The railroad thereafter took control of the car and transported it from the sidetrack to a rail yard it controlled that was several miles away. The next day, a piece of scrap iron fell from the car and injured a railroad switchman. The indemnification provision at issue was similar to the Supplemental Agreement's provision in that the phrase "on or about" in reference to the track meant that an accident occurring miles from the track at issue, and at a point in time considerably removed from the train's departure therefrom, was not indemnifiable. *Id.*; *see also Gaines*, 796 F. Supp. at 316 (explaining the *Sol Walker* case and the meaning of "on or about").

### 2. *Gaines v. Illinois Cent. R.R.*, 796 F. Supp. 313, 316 (N.D. Ill. 1992)

91.    In *Gaines*, a brakeman was thrown from a train that derailed when it was traveling on a track adjacent to the sidetrack at issue. The *Gaines* court distinguished the *Sol Walker* case, stating that "[a]n accident which occurs miles from a sidetrack referenced in an indemnity

provision cannot be equated to an accident which takes place on an adjacent track." *Gaines v. Illinois Cent. R.R.*, 796 F. Supp. 313, 316 (N.D. Ill. 1992).

92.     The *Gaines* court noted a number of cases (some of which are discussed below) that have addressed broader language than merely "on or about." The court noted that a loss or injury need not have occurred on the sidetrack for the "on or about" language to require indemnification, "but it must bear some relationship to one of those tracks." *Id.* at 318.

### 3. *Welch v. Kan. City Southern Ry. Co.*, 940 F. Supp.2d 402 (W.D. LA. 2013)

93.     The *Welch* court interpreted *Gaines* as leaving the door ajar for indemnifications for liabilities arising "in connection with" a sidetrack. *Welch v. Kan. City Southern Ry. Co.*, 940 F. Supp.2d 402, 415 (W.D. LA. 2013). In that case, the court found that an indemnification provision allocating responsibility to the industry for injuries that occurred "on or about" a sidetrack did not require the industry to indemnify the railroad for injuries incurred by a railroad employee suffered from a leaky railcar loaded at the industry's facility. *Id.* at 412. That finding is highly analogous to this contested matter, where Mr. Kirkland injured himself

### 4. *Union Pacific RR Co. v. El Paso Natural Gas Co.*, 408 P.2d 910 (Utah 1965)

94.     The *El Paso* case, however, firmly shuts the door left ajar by *Welch* and *Gaines*. Defendant constructed a pipeline generally parallel to plaintiff Union Pacific's track. Defendant indemnified Union Pacific with an extremely broad provision that held Union Pacific harmless "from and against any and all liability … of whatsoever nature." Defendant's employee was driving a truck over a crossing of Union Pacific's track about a mile and a half from the pipeline in order to perform certain maintenance on the pipeline. A Union Pacific train struck Defendant's employee, severely injuring him. Defendant's employee sued Union Pacific for negligence and obtained a judgment. Union Pacific notified defendant of the lawsuit and its

intent to hold defendant responsible on the ground that there was "clear intent that there be no limitation to losses which could be classified as "proximately" or "legally" caused by the pipeline." In other words, Union Pacific contended that the indemnity obligation was unlimited, encompassing any loss that would not have occurred "but for" the existence of the pipeline. *Union Pacific RR Co. v. El Paso Natural Gas Co.*, 408 P.2d 910, 912 (Utah 1965).

95.     The Utah Supreme Court held that this was far too broad an interpretation, noting that if defendant's employee had been "traveling through some distant city" and injured in an accident, "it could be said that "but for" the existence of the pipeline, he would not have been hurt in Chicago at that particular time.

96.     Although this case ultimately turned on the issue of whether Union Pacific was unequivocally indemnified for its own acts of negligence, which the court held it was not, it is illustrative here of the overly expansive nature of Norfolk Southern's claim.  Norfolk Southern wants to be indemnified for two accidents occurring on railcars which it controlled as a common carrier and bailee at facilities it owned, controlled and operated.  In other words, Norfolk Southern is looking to Grace as its insurer.  Its position is thus not dissimilar to that of Union Pacific.  Indeed, by Norfolk Southern's theory, it could seek to be indemnified for an accident involving a Grace railcar when that railcar was thousands of miles away.

97.     At some point, the connection between Grace's loading of the January 26 railcar and Mr. Kirkland's accident that day—assuming that there is such a connection—becomes attenuated and is superseded by another, intervening act of Norfolk Southern's, as discussed above.  *Henry v. Merck & Co.*, 877 F.2d 1489, 1495 (10th Cir. 1989) (intervening, supervening causation).

### F. The Case to Which Norfolk Southern Cites Are Distinguishable—and Do Not Constitute Binding Precedent

98.    Norfolk Southern cites several cases for the proposition that the Agreements' indemnities encompass accidents such as Mr. Kirkland's, despite their having happened on Norfolk Southern-owned and -controlled railcars at Norfolk Southern-owned and –controlled facilities hours after Norfolk Southern inspected those cars, found them safe to run and accepted their consignment.  Each of the cases is distinguishable.

99.    The principal case to which Norfolk Southern cited is wholly inapposite to this contested matter.  *Molly Pitcher Canning Co. v. Cent. of G. R. Co.*, 253 S.E.2d 392 (Ga. Ct. App. 1979).  There, the railroad had a sidetrack agreement with industry where there were spur tracks. The railroad acknowledged that it should not use one of the tracks, known as the tank track. Railroad later used the track anyway, and damaged property of industry, which both parties acknowledged was not on the property covered by the sidetrack agreement.  At issue was whether the indemnity in the sidetrack agreement barred industry from recovering from railroad as a result of railroad's negligence.  The court found that the terms of the sidetrack agreement "revealed the absence of express and unequivocal language that is a condition precedent to the indemnification of an indemnitee against his sole negligence.  *Id.* at 395.  The court thus held that the indemnity was no bar to industry recovering from railroad.  *Id.* at 396.

100.    This case does not help Norfolk Southern.  First, the facts were distinguishable. Second, the case actually supports the Reorganized Debtors' argument that there is nothing in the Agreements that specifically requires Grace to act as Norfolk Southern's indemnitor for accidents occurring on Norfolk Southern-controlled and –owned railcars consigned to it, when those accidents occurred miles away from the Grace Plant.  (The spur track at issue was

immediately adjacent to industry's plant damaged by railroad's negligence when it was intending to operate on the track covered by the relevant agreement.) *Id.* at 395.

101.    The *Molly Pitcher* court cited a Georgia Supreme Court case (to which Norfolk Southern also cited) for the proposition that a railroad could be held liable under a spur agreement for damage to industry's property some 1,600 feet from the property governed by the agreement. *S. R. Co. v. Ins. Co. of N. Am.*, 183 S.E.2d 912 (1971), for the proposition that damage occurring 1,600 feet from the premises at issue in the indemnity was within the scope of that indemnity.    There, too, the fact pattern was completely different, for railroad was found negligent when brakes on railcars stored on a track governed by the relevant agreement were released and the railcars rolled down the track and into the buildings that were not within the scope of the agreement.    Once again, this case does not address a fact analogous to this contested matter, and thus cannot be relied upon by Norfolk Southern.

102.    Norfolk Southern cited to a third case that is equally distinguishable— notwithstanding facially favorable language in a footnote in that case. *S. R. Co. v. Brunswick Pulp & Paper Co.*, 376 F. Supp. 96, 99 n.3 (S.D. Ga. 1974).    In that case, and on facts quite similar to the *Sol Walker* case, industry loaded wood pulp containing a log (which should not have been there) into a railcar and consigned the railcar to railroad.    A railroad employee attempted to move the log and was severely injured. *Id.*    The court held that industry's negligent loading of the log into the railcar along with the wood pulp was a "proximate cause" of the railroad employee's injuries.

103.    As discussed below in the next section, the facts of this contested matter are entirely different.    Norfolk Southern's own actions adjudged the railcar "safe to run," thereby completely exculpating Grace.

**III.    EVEN IF THE INDEMNIFICATIONS DID APPLY, NORFOLK SOUTHERN'S INDEMNITY CLAIM MUST STILL FAIL**

104.    Norfolk Southern in its Brief concedes that each of the five indemnities discussed above requires that Norfolk Southern establish that Grace committed a negligent act that proximately caused Mr. Kirkland's injuries.  (Brief at p, 24.)  Two of the indemnities require Norfolk Southern establish that Grace is negligent.  (Operating Agreement at ¶ 5; Right-of-Way Agreement at ¶ 10.)  The remaining three indemnities require Norfolk Southern establish a causal link between Grace's actions and Mr. Kirkland's injuries—which Norfolk Southern states also requires establishing that an allegedly negligent act by Grace proximately cause Mr. Kirkland's injuries.  (Operating Agreement at ¶ 16; Right-of-Way Agreement at ¶ 20; 1990 Supplemental Agreement at ¶ 5.)  Norfolk Southern contends that the FELA Trial Record, the Conley and Sharpe Declarations, and the various accident reports compiled by Norfolk Southern in 1998 provide evidence sufficient to prove causation under one or more of the five indemnities. Norfolk Southern is wrong.  Even if each one of Norfolk Southern's evidentiary proffers is admitted and viewed in a light most favorable to Norfolk Southern, Norfolk Southern has adduced no evidence to establish to prove Grace's negligence caused Kirkland's injuries.  In fact, Norfolk Southern's Brief, itself, highlights that Norfolk Southern's own actions completely exculpate the Reorganized Debtors.

**A.  No Indemnity Under the 1990 Supplemental Agreement**

105.    The 1990 Supplemental Agreement's indemnity language does not support Norfolk Southern's indemnity claim because Norfolk Southern has adduced no evidence that the Specialty Product Loading Chute was used to fill either of the railcars on which Kirkland claimed he injured himself on January 23 and January 26, 1998.  Therefore, Norfolk Southern has no basis to claim an indemnity under the 1990 Supplemental Agreement.

**B. Another Kaolin Producer Filled the January 23 Railcar**

106.    Norfolk Southern does not dispute that the railcar from which Mr. Kirkland slipped on January 23, 1998, was identified by Norfolk Southern's own investigating team as having come from J. M. Huber, another kaolin producer unrelated to any of the Reorganized Debtors. (Brief at p. 24; Proposed Findings of Fact, ¶ 41; Norfolk Southern January 23 Accident Reports.)   Indeed, Norfolk Southern expressly excluded the January 23 railcar accident from the scope of its Cross-Motion.  (Brief at p. 24.)   Therefore, without more, Norfolk Southern has failed to carry its burden of proof that Grace had anything to do with Kirkland's January 23 railcar accident.

**C. Norfolk Southern Was on Notice of the Presence of Kaolin on Railcars—and Knowingly Took Control of the January 26 Car, Having Adjudged It "Safe to Run"**

107.    As discussed in Norfolk Southern's Brief (Brief at pp. 29-30), Norfolk Southern management in the person of Trainmaster Chapman, Mr. Kirkland's supervisor, adjudged the January 26 railcar as "safe to run."  (Brief at pp. 28-29; Tr. I:110:12-112:18; Conductors' Rules, *passim*.)  In 1998, Norfolk Southern was thus well aware that railcars used to ship bulk kaolin frequently had kaolin on them, often crusted into film from years, if not decades of use.  (Brief at pp. 6-7, 29.)  The presence of kaolin dust (whether wet and slippery or otherwise) on railcars was "open and obvious" hazard.  *O'Neal v. Celanese Corp.*, 10 F.3d 249, 252 (4th Cir. 1993).  It is a matter of well-settled products liability law that, on these facts, Norfolk Southern was on full and proper notice of the potential hazards of kaolin and was thus able to manage its rail operations accordingly.  Under the well-established "bulk supplier rule," Grace cannot be held liable for injuries occurring after Norfolk Southern had determined a railcar to be "safe to run," and had taken control of, and dominion over, that car.  RESTAT 2D OF TORTS, § 388 cmt. n (2nd 1979) ("Where warning is given, the seller may reasonably assume that it will be read and heeded");

*Coffey v. Chemical Specialties*, 4 F.3d 984, 1993 U.S. App. LEXIS 21430, *10-*11 (4th Cir. 1993) (applying RESTAT 2D OF TORTS, § 388 bulk supplier rule as a matter of South Carolina law); *Labelle v. Philip Morris Inc.*, 243 F. Supp. 2d 508 n5 (D.S.C. 2001) (citations omitted); *Caskey v. Olympic Radio & Television*, 343 F. Supp. 969, 977 (D.S.C. 1972) (a "manufacturer may be under a duty to give an appropriate warning of this fact, or may protect itself from liability by the giving of an appropriation warning."). Given its longstanding knowledge and experience in shipping South Carolina kaolin in bulk powder form, Norfolk Southern cannot look to Grace for indemnity once it has taken consignment of a railcar and the claimed damage or injury occurs hours later and miles away at a time when the railcars were under its—Norfolk Southern's—complete dominion and control. RESTAT 2D OF TORTS, § 388 cmt. n (2nd 1979); *see also*, *Montgomery v. JYD Int'l*, 534 So.2d at 595; 41 AM. JUR. 2D INDEMNITY § 13 (same).

108.    Norfolk Southern's own Conductors' Rules confirm the point. Rule 581 states in relevant part that "Conductors have charge of trains to which they are assigned and … are responsible for the safe and proper management of their trains … and for observance and enforcement of all rules and instructions. (*Id.*) The Conductors' Rules also require conductors to ensure that a railcar is "safe to run." Indeed, those rules mandate that the conductor "must remove from the [train] any cars that are unsafe to run." (Conductors' Rules no. 586.) In other words, Norfolk Southern's own rules mandate that a railcar must be safe to operate in all respects before it takes consignment.

109.    Norfolk Southern asserts in its Brief—and Mr. Kirkland testified at the FELA Action trial—that Norfolk Southern management in the person of Trainmaster Chapman, Mr. Kirkland's supervisor, instructed Mr. Kirkland to take consignment of the January 26 railcar, notwithstanding Mr. Kirkland complaints about kaolin on the car. (Brief at pp. 10 n. 10, 29-30.)

Mr. Kirkland testified that, on the morning of January 26, 1998, some hours prior to his accident at Norfolk Southern's Aiken facility, he complained to a Grace employee, Mr. Wood, and to Mr. Chapman about there being an excessive amount of kaolin dust on the railcars sitting on the Grace Plant sidetrack, ready to be consigned to Norfolk Southern for transshipment.   (Tr. I:110:12-112-8.).  Mr. Kirkland then testified:

> Then I look at Mr. Chapman, and I said, well, what do I do now, Mr. Chapman, I says, here's the cars, here's the problem, I said, it's covered in clay. I said, best thing we can do is just leave the cars sitting right here until they clean them up. He said, this is a good customer, you are going to switch this place. I said, you want me to switch this place. He said, yes, you have got to switch them, got in his car drove off. Me and Chris sat there going, what can you do, I mean, what could I do.

(Tr. I:112:10-18.)   To be clear, "switch this place," when used in this context, was Mr. Chapman's clear directive to Mr. Kirkland, as the train's conductor, to take consignment of the kaolin-laden railcars from the Grace Plant and consign empty railcars to the Grace Plant to be filled.  (Operating Agreement at ¶ 8.)

110.    This is significant.  Norfolk Southern management found all of the railcars that Norfolk Southern took consignment of from the Grace Plant on January 26, 1998, were "safe to run," pursuant to Norfolk Southern's own Conductors' Rules—otherwise he would not have instructed Mr. Kirkland to take consignment of the cars.  Fed. R. Evid. 801(d)(2)(A); Fed. R. Civ. P. 56(c).  Norfolk Southern's admission, in the context of its own Conductors' Rules, thus establishes that the Grace Plant's loading of the January 26 railcar (and the other railcars) did not create an unsafe condition.   Therefore, Norfolk Southern's admission has established that Grace's actions in loading the January 26 railcar cannot be the cause of Mr. Kirkland's accident some hours later, when that railcar was stopped at Norfolk Southern's Aiken facility, attached to a Norfolk Southern-owned and –controlled train.

111.    With this admission that Norfolk Sothern management deemed the railcars picked up from Grace on January 26 to be safe to operate, Norfolk Southern cannot establish causation, as required by the five indemnities in the Agreements. What's more, the admission that was all of the railcars were "safe to run" means that Norfolk Southern cannot prove that Grace "caused" Mr. Kirkland's injuries, which occurred miles away and hours later at Norfolk Southern's Aiken, railyard on January 26, 1998, when that car was under Norfolk Southern's complete control and dominion. *Montgomery v. JYD Int'l*, 534 So.2d at 595 (no indemnity when indemnitee has control of the area of the accident and indemnitor does not).

112.    This proposition is well illustrated by contrasting the undisputed facts of this matter to the *Brunswick* case to which Norfolk Southern cited, and the *Sol Walker* case, discussed *supra*, at ¶¶ 90, 102-03. In *Brunswick*, the industry consigned a railcar of wood pulp with a log in the car. A railroad employee was later severely injured by the log. *S. R. Co. v. Brunswick Pulp & Paper Co.*, 376 F. Supp. 96, 99 (S.D. Ga. 1974). In *Sol Walker*, industry loaded the railcar at issue with scrap iron and consigned the car to railroad. The next day, a piece of scrap iron fell from the railcar and injured a railway employee. *Sol Walker*, 362 So.2d at 47. In each of these cases, there was an identifiable action by the industry that led directly to the injury at issue.

113.    Here, there was no such identifiable action. Moreover, the cargo of kaolin has never been at issue. On January 26, Grace loaded railcars with kaolin in the same way it loaded railcars every other day. After Grace finished loading the car, closed it and sealed it, and finally blew it free of kaolin dust, Grace presented the car (and other similar cars) to Norfolk Southern for consignment. Norfolk Southern's trainmaster, Mr. Chapman, who was Mr. Kirkland's direct supervisor, determined that the car was "safe to run." Chapman's evaluation that the car—and

the others—were "safe to run" exculpates Grace. Grace had loaded the car properly. The cargo was not dangerous. The exterior of the railcar—to the extent that there was kaolin on it—did not impede the safe operation of the railcar, including for purposes of coupling it to the consist (the train) and setting and releasing the handbrake on the railcar. Therefore, Grace did nothing different, or wrong, in loading the January 26 railcar.

114.    On page 24 of its Brief, Norfolk Southern articulated the burden of proof— "negligence proximately caused those injuries"—that it had to meet before it could implicate any of the five indemnities in the Agreements. It has failed completely to meet that burden. It has failed to adduce any evidence whatsoever of any allegedly negligent act by Grace that caused Mr. Kirkland's January 26 accident. In fact, Norfolk Southern has accomplished precisely the opposite—it has completely exculpated Grace by its management having adjudged the January 26 railcar "safe to run." Therefore, Norfolk Southern's indemnity claim must fail.

**D. Norfolk Southern Admitted at the FELA Action Trial That Kaolin Did Not Cause Mr. Kirkland's Accidents**

115.    Norfolk Southern made another telling admission at the FELA Action trial. Mr. Chapman testified at trial that slipping on kaolin residue that may have been present on the railcar exteriors did not cause Mr. Kirkland's accident:

> Q [Wettermark] And didn't Mr. Kirkland fall off a car because of clay on it?
>
> A [Chapman] I don't think so.
>
> Q [Wettermark] You don't think so?
>
> A [Chapman] No.
>
> Q [Wettermark] Were you out there?
>
> A [Chapman] No. You asked me a question what I thought. I was just going to tell you why I thought he -- if you want to know why I think he fell, it didn't make the report, because it's not based on

any -- the problem being when I asked Mr. Kirkland did he slip off the car, we was talking about the feet and the hands type thing -- I deal with dynamics of people mounting cars and dismounting cars, handling switches. Okay? When you asked me the question, if Mr. Kirkland's feet had slipped out from under him, I would have considered Mr. Kirkland to went down where he was, if your feet slip out from under you. If you are handling -- in this situation, if he was handling the brake, I don't think he would have sprung away from the car the way he told me he went -- 12 feet on the fall.

(Tr. II:178:1-20.) [4]

116.   Mr. Chapman testified in his capacity as a member of Norfolk Southern's management.  Mr. Chapman's testimony also expressed his professional expertise regarding how to mount and dismount a railcar and how to operate a railcar's brakes.  Mr. Chapman's testimony expressed Norfolk Southern's corporate position at the FELA Action trial that the presence of kaolin did not cause Mr. Kirkland's accident.  The FELA Action jury did not make any factual findings as to whether kaolin was the proximate cause of Mr. Kirkland's accident.  Thus, Norfolk Southern in the FELA Action and the Reorganized Debtors here in this contested matter agree that kaolin did not cause Mr. Kirkland's accidents.  This admission alone is sufficient for this Court to disallow Norfolk Southern's indemnity claim.

## IV.   GRACE DID NOT BREACH EITHER THE OPERATING OR RIGHT-OF-WAY AGREEMENTS

117.   Norfolk Southern asserts in its Brief that, even if Grace were not negligent, it nonetheless somehow violated the terms of Right-of-Way Agreement ¶ 18 due to the presence of kaolin dust on the railcars, thereby exposing it to indemnity liability pursuant to Right-of-Way Agreement ¶ 10(b).  (Norfolk Southern Brief at p. 32.)  This argument fails for the following reasons:

---

[4]   Mr. Chapman's FELA Action testimony is not hearsay.  It is admissible evidence in this contested matter, because it is a statement made by an opposing party (Norfolk Southern) in the form of its employee speaking within the scope of his employment at the time he made the statement.  Fed. R. Evid. 801(d)(2)(D).

- The term, "Facility," does not include the railcars. *Smart v. Gillette Co. Long-Term Disability Plan*, 70 F.3d at 179;

- The paragraph requires Grace to maintain the Facility so as not to "endanger life or limb of … persons on our about said track." This paragraph clearly applies only to the Grace Plant and the Industrial Track. The accidents occurred elsewhere;

- In view of the bulk supplier rule and Grace's exemplary safety record of zero injuries at the Grace Plant, the mere presence of kaolin dust on a railcar cannot constitute a violation of Right-of-Way Agreement ¶ 18.

## CONCLUSION

118.    The conclusion to be drawn from the undisputed facts and well-established law is clear. The Agreements must be strictly construed against Norfolk Southern, because it is the Agreements' drafter, and it is seeking indemnification for its own negligence. Therefore, Norfolk Southern's indemnity claim must fail as a matter of law, because the Agreements do not clearly and unequivocally express that Grace has any contractual indemnity liability when Mr. Kirkland's accidents both occurred on railcars under Norfolk Southern's control, responsibility for which Norfolk Southern had taken hours earlier, when those railcars were attached to Norfolk Southern-owned and –controlled consists stopped at Norfolk Southern-owned and –controlled facilities.

**[remainder of this page is intentionally left blank]**

WHEREFORE, the Reorganized Debtors respectfully seek this Court's entry of an order: (i)

Disallowing Norfolk Southern's indemnity claim; (ii) denying Norfolk Southern' Cross-Motion;

and (iii) granting such other relief as may be appropriate.

Dated:  March 8, 2017

THE LAW OFFICES OF ROGER HIGGINS
Roger J. Higgins
1 North Bishop Street
Suite 14
Chicago, IL 60607-1823
Phone: (312) 666-0431

and

KIRKLAND & ELLIS LLP
Adam C. Paul
John Donley, P.C.
300 North LaSalle Street
Chicago, IL 60654
Phone: (312) 862-2000

and

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ James E. O'Neill*
Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
919 North Market Street, 17th Floor
PO Box 8705
Wilmington, DE  19899-8705 (Courier 19801)
Phone: (302) 652-4100
Fax: (302) 652-4400

Co-Counsel for the Reorganized Debtors

<u>EXHIBIT A</u>

**Norfolk Southern's Conductors' Rules**

300




DEFENDANT'S EXHIBIT

586. Conductors must, if possible, remedy defects in their equipment, and must remove from the consist any cars that are unsafe to run. They must report all defective brakes, hot boxes or other defects, as well as repairs made between terminals. They must comply with instructions for reporting materials applied to cars and disposition of defective parts.



FORM NS-1

**NORFOLK SOUTHERN**

NS

RULES FOR
EQUIPMENT OPERATION
AND
HANDLING

EFFECTIVE MAY 2, 1993

SUPERSEDING ALL PREVIOUS RULES
AND INSTRUCTIONS INCONSISTENT
THEREWITH

302


DEFENDANT'S EXHIBIT 5

581. Conductors have charge of trains to which they are assigned and of all employees thereon. They are responsible for safe and proper management of their trains, for protection and care of passengers and property, for performance of duty by train employees, and for observance and enforcement of all rules and instructions.



FORM NS-1

NS NORFOLK SOUTHERN

RULES FOR
EQUIPMENT OPERATION
AND
HANDLING

EFFECTIVE MAY 2, 1993

SUPERSEDING ALL PREVIOUS RULES
AND INSTRUCTIONS INCONSISTENT
THEREWITH

301

DEFENDANT'S EXHIBIT

**M.** Some platforms, bridges and other structures, switch stands and tunnels will not clear a person on the top or side of a car or engine. Employees must become familiar with these and other places and protect themselves from injury.

Employees must not do any work in a manner that will jeopardize their own safety or the safety of others. They must know that appliances, tools, supplies and facilities used in performing their duties are in proper condition. If not, they must have them put in order before using them. It is the duty of every employee to examine them to determine their condition.

Employees must expect the movement of trains, engines or cars at any time, on any track, in either direction.



FORM NS-1

NORFOLK SOUTHERN

RULES FOR
EQUIPMENT OPERATION
AND
HANDLING

EFFECTIVE MAY 2, 1993

SUPERSEDING ALL PREVIOUS RULES
AND INSTRUCTIONS INCONSISTENT
THEREWITH