<u>Exhibit B</u>

**Reorganized Debtors' Response to Norfolk Southern's Cross-Motion**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| W. R. GRACE & CO., et al.,[1] | ) Case No. 01-01139 (KG) |
| | ) (Jointly Administered) |
| Reorganized Debtors. | ) |
| | ) |
| | ) |

**RESPONSE TO NORFOLK SOUTHERN'S *CROSS-MOTION FOR SUMMARY JUDGMENT ALLOWING CLAIM NO. 7021*, FILED ON JANUARY 27, 2017 [DOCKET NO. 32825]**

THE LAW OFFICES OF ROGER HIGGINS, LLC
Roger J. Higgins
1 North Bishop Street
Suite 14
Chicago, IL 60607-1823
Phone: (312) 666-0431

KIRKLAND & ELLIS LLP
Adam C. Paul
John Donley, P.C.
300 North LaSalle Street
Chicago, IL 60654
Phone: (312) 862-2000

PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
919 North Market Street, 17th Floor
PO Box 8705
Wilmington, DE  19899-8705 (Courier 19801)
Phone: (302) 652-4100
Fax: (302) 652-4400

Co-Counsel for the Reorganized Debtors

---

[1] The Reorganized Debtors comprise W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc., or "Grace") and W. R. Grace & Co.-Conn. ("Grace-Conn.").

## TABLE OF CONTENTS

Table of Contents ..................................................................................................................... i

Table of Authorities ................................................................................................................ ii

Introduction ............................................................................................................................ 1

Background ............................................................................................................................. 3

Argument ................................................................................................................................ 3

I.    Summary Judgment May Be Granted Only If There Are No Genuine Disputes Over Material Facts ......................................................................................................................... 4

II.    The Undisputed Facts Support Disallowance of Norfolk Southern's Indemnity Claim ......... 5

    A.    The Agreements Must Be Strictly Construed Against Norfolk Southern—as a Matter of Applicable South Carolina Law ............................................................................................... 5

    B.    None of the Agreements' Specific Provisions May Serve as a Basis for Norfolk Southern's Indemnity Claim .................................................................................................... 6

        1.    The 1990 Supplemental Agreement Does Not Apply ................................................. 6

        2.    The Operating Agreement Does Not Apply ............................................................... 7

        3.    The Right-of-Way Agreement Does Not Apply .......................................................... 8

    C.    Norfolk Southern Fails to Prove Causation ....................................................................... 9

        1.    The 1990 Supplemental Agreement Provides No Basis for Norfolk Southern's Indemnity Claim ..................................................................................................................... 10

        2.    The January 23 Railcar Was Consigned to Norfolk Southern By Another Kaolin Producer .................................................................................................................................. 10

        3.    Norfolk Southern Was on Notice of the Presence of Kaolin on Railcars—and Knowingly Took Control of the January 26 Car, Having Adjudged It "Safe to Run" ......... 11

        4.    Norfolk Southern Admitted at the FELA Action Trial That Kaolin Did Not Cause Mr. Kirkland's Accidents .............................................................................................................. 15

III.    If The Court Does Not Disallow Norfolk Southern's Indemnity Claim, Then It Should Nonetheless Deny Its Cross-Motion—and Permit the Reorganized Debtors to More Fully Develop the Record Before the Court ...................................................................................... 16

Conclusion .............................................................................................................................. 18

## TABLE OF AUTHORITIES

**Cases**

*Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 159-60 (1970) ............................................................ 4

*Caskey v. Olympic Radio & Television*, 343 F. Supp. 969, 977 (D.S.C. 1972)............................ 12

*Coffey v. Chemical Specialties*, 4 F.3d 984, 1993 U.S. App. LEXIS 21430, *10-*11 (4th Cir. 1993) ...................................................................................................................................................... 11

*Coolspring Stone Supply v. Am. States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993) .............. 15

*Davison v. Norfolk S. Ry. Co.*, Case no. CL02-36, 2003 Va. Cir. LEXIS 72, *7 (Va. Cir. 2003).. 8

*Federal Pacific Electric v. Carolina Production Enterprises*, 298 S.C. 23, 26 (S.C. Ct. App. 1989) ................................................................................................................................................. 5, 6, 8

*Freed v. Great Atlantic & Pacific Tea Co.*, 401 F.2d 266, 269-270 (6th Cir. Ohio 1968)............. 6

*Labelle v. Philip Morris Inc.*, 243 F. Supp. 2d 508 n5 (D.S.C. 2001)......................................... 11

*Montgomery v. JYD Int'l, Inc.*, 534 So. 2d 592, 595 (Ala. 1988)...................................... 7, 12, 14

*O'Neal v. Celanese Corp.*, 10 F.3d 249, 252 (4th Cir. 1993) ...................................................... 11

*Pride v. S. Bell Tel. & Tel. Co.*, 138 S.E.2d 155, 157 (S.C. 1964) ................................................ 5

*Rodriguez v. Brewington-Carr*, Civil Action No. 98-442-GMS, 2002 U.S. Dist. LEXIS 11537, at *10 (D. Del. Mar. 14, 2002)............................................................................................................. 15

*S. R. Co. v. Brunswick Pulp & Paper Co.*, 376 F. Supp. 96, 99 (S.D. Ga. 1974)........................ 14

*Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir. 1983) .................................................. 15

*Smart v. Gillette Co. Long-Term Disability Plan*, 70 F.3d 173, 179 (1st Cir. 1995) .................... 8

*Sol Walker & Co. v. Seaboard Coast Line Railroad Co.*, 362 So.2d 45, 47 (Fla. App. 1978)..... 14

*Union Pac. R. Co. v. El Paso Natural Gas Co.*, 408 P.2d 910, 914 (1965) .................................. 6

*Williams v. Teran, Inc.*, 221 S.E. 2d 526, 529 (S.C. 1976)........................................................... 5

**Rules**

Fed. R. Bankr. P. 7056 ..................................................................................................................... 4

Fed. R. Civ. P. 56(c) ............................................................................................................. 4, 13, 15

Fed. R. Civ. P. 56(e) ............................................................................................................ 4

Fed. R. Evid. 801(d)(2)(D) ................................................................................................. 16

**Treatises**

41 Am. Jur. 2d Indemnity § 13 ....................................................................................... 7, 12

Restat 2d of Torts, § 388 .............................................................................................. 11, 12

## INTRODUCTION

This memorandum responds to Norfolk Southern's Cross-Motion (and the portion of the Norfolk Southern Brief in support thereof) requesting the Court allow its indemnity claim. Norfolk Southern asserts that summary judgment is warranted based on supposedly undisputed facts in three declarations filed contemporaneously with the Cross-Motion, certain accident reports, and the FELA Action trial record.  (Brief at p. 3.)  Norfolk Southern is wrong as a matter of law and fact.

First, as discussed in the Reply Memorandum, the parties' Agreements do not clearly and unequivocally express any obligation for Grace to indemnify Norfolk Southern for its proven negligence in causing Mr. Kirkland's injuries.  Mr. Kirkland incurred those injuries on railcars that Norfolk Southern had adjudged "safe to run."  Norfolk Southern had complete dominion and control over those railcars when Mr. Kirkland's accidents occurred—the cars were attached to Norfolk Southern trains stopped at Norfolk Southern facilities.  Moreover, well-established South Carolina law requires that those Agreements be strictly construed against Norfolk Southern, because it drafted the Agreements and because it is seeking indemnity for its own negligence (as determined by the FELA Action jury), thereby precluding any argument on Norfolk Southern's part that the Agreements should be more broadly construed.  The Court need therefore look no further before denying Norfolk Southern's Cross-Motion, granting the Reorganized Debtors' Summary Judgment Motion, disallowing Norfolk Southern's indemnity claim and putting a timely end to this contested matter.

If the Court were, however, to find that the Agreements' indemnities could as a matter of law encompass the damages arising from Mr. Kirkland's accidents, Norfolk Southern's indemnity claim would still fail.  And that is because Norfolk Southern has not adduced to date any admissible evidence to support its Cross-Motion.  Indeed, Norfolk Southern's Brief relies

entirely on the FELA Action trial record and the Conley and Sharpe Declarations to assert that either Grace was negligent and thus contractually liable to indemnify Norfolk Southern or it was otherwise strictly liable. As discussed in the Inadmissible Hearsay Memorandum, the FELA Action trial record, and Mr. Kirkland's testimony in particular, are inadmissible hearsay. Norfolk Southern may not use them to carry its burden of proof. Likewise, much of what is set forth in the Conley and Sharpe Declarations is equally inadmissible, whether as hearsay, for lack of foundation or otherwise. *See* Motion to Strike, *passim.*

But even if those documents were admissible, Norfolk Southern has still failed to adduce any evidence whatsoever that Grace's allegedly negligent acts in any way proximately caused Mr. Kirkland's accidents (Norfolk Southern having admitted in its Brief (p. 24) that it must prove that Grace was negligent before it can assert an indemnity liability claim against Grace). Indeed, for purposes of this Cross-Motion, Norfolk Southern does not dispute that its own accident reports state that Grace had nothing to do with the January 23 railcar. (Brief at p. 24.) What's more, Norfolk Southern's own Brief (pp. 29-30) establishes that its management— trainmaster Chapman, who was Mr. Kirkland's direct supervisor—made a knowing and conscious decision that the January 26 railcar was "safe to run." This decision by Norfolk Southern's own management establishes beyond a doubt that Grace did nothing wrong in loading that railcar. In fact, this decision by Norfolk Southern's management completely exculpates Grace—as does Mr. Chapman's testimony at the FELA Action trial that slipping on kaolin residue that may have been present on the railcar exteriors did not cause Mr. Kirkland's injuries. Norfolk Southern's complete lack of evidence regarding any causal link between Grace and Mr. Kirkland's accidents gives the Court an entirely separate and distinct ground on which to deny

2

the Cross-Motion, allow the Reorganized Debtors' Summary Judgment Motion and disallow Norfolk Southern's indemnity claim.

Finally, if this Court were to deny the Reorganized Debtors' Summary Judgment Motion and not summarily disallow Norfolk Southern's indemnity claim on either of the grounds set forth above, it should still deny Norfolk Southern's Cross-Motion and set this contested matter for trial. The Reorganized Debtors submit that, in such a circumstance, there would be a genuine dispute between the parties over a wide range of material facts. To that end, and out of an abundance of caution, the Reorganized Debtors have adduced the declarations of two current, long-term employees who knew of Mr. Kirkland, and who were employed at the Grace Plant in 1998. Messrs. Drumming and Silas establish that, in 1998, Grace employees went above and beyond in cleaning railcars—which directly contradicts the statements made in the Conley and Sharpe Declarations, and in Norfolk Southern's Brief. Finally, the declarations establish that Grace did nothing wrong in January 1998, when Mr. Kirkland injured himself on Norfolk Southern-owned and –controlled railcars when those railcars were located at Norfolk Southern-owned and –controlled facilities.

## BACKGROUND

1.    The Reply Memorandum, the Proposed Findings of Uncontested Facts, the Drumming Declaration and the Silas Declaration are incorporated by reference.

## ARGUMENT

### This Court Should Deny Norfolk Southern's Cross-Motion and Disallow Norfolk Southern's Indemnity Claim

2.    As set forth in the Reply Memorandum, the undisputed facts lead inexorably to one conclusion: this Court should grant the Reorganized Debtors' Summary Judgment Motion and disallow Norfolk Southern's indemnity claim. The Court should concomitantly deny

3

Norfolk Southern's Cross-Motion.  If the Court does not grant the Summary Judgment Motion, it should still deny Norfolk Southern's Cross-Motion.  In such a circumstance, there would be genuine disputes over material facts, which would require a trial.  The Court should, in that circumstance, enter an order setting this contested matter for trial.

## I.    SUMMARY JUDGMENT MAY BE GRANTED ONLY IF THERE ARE NO GENUINE DISPUTES OVER MATERIAL FACTS

3.    It is axiomatic that summary judgment must be denied when the moving party fails to carry its burden of proof.  *See* Fed. R. Civ. P. 56(e) (applicable to this matter pursuant to Fed. R. Bankr. P. 7056); *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 159-60 (1970).  It is equally axiomatic that when, as here with Norfolk Southern, the movant has failed to carry its burden of proof, the Reorganized Debtors need not adduce any evidence of their own.  The Court may look solely to the record created by Norfolk Southern.  *Id.* at 160 (citing Advisory Committee Note on 1963 Amendment to subdivision (e) of Rule 56).

4.    This Court should deny Norfolk Southern's Cross-Motion on one or both of two entirely separate bases.  First, as a matter of well-established South Carolina law, the five indemnities in the four Agreements clearly and unequivocally express no intent for Grace to indemnify Norfolk Southern on the undisputed facts of this contested matter.  Second, Norfolk Southern's own Brief (pp. 24, 29-30) establishes that there is no causal link between Grace's actions and Mr. Kirkland's accidents.  The Reorganized Debtors submit that the Court thus need not look to either the Drumming or Silas Declarations.  The Reorganized Debtors have adduced those declarations solely out of an abundance of caution in the event that the Court does find one or more material facts in dispute.  *See* Fed. R. Civ. P. 56(c).

## II.    THE UNDISPUTED FACTS SUPPORT DISALLOWANCE OF NORFOLK SOUTHERN'S INDEMNITY CLAIM

### A. The Agreements Must Be Strictly Construed Against Norfolk Southern—as a Matter of Applicable South Carolina Law

5.    An indemnity provision must be construed strictly in favor of the indemnitor when the indemnitor is not in the insurance business, and the indemnification is given incident to a contract whose main purpose is not indemnification. *Federal Pacific Electric v. Carolina Production Enterprises*, 298 S.C. 23, 26 (S.C. Ct. App. 1989) (internal citations omitted) ("Because it is somewhat unusual for an indemnitor to indemnify the indemnitee for losses resulting from the indemnitee's own negligence, a contract containing an indemnity provision that purports to relieve an indemnitee from the consequences of its own negligence will be strictly construed").  Grace is not in the insurance business, and the Agreements' indemnities are clearly incident to the main purpose of those Agreements. *See* Reply Memorandum at ¶ 48.

6.    South Carolina law also mandates that an indemnity drafted by the putative indemnitee should be strictly construed against that party. *Williams v. Teran, Inc.*, 221 S.E. 2d 526, 529 (S.C. 1976) (internal citation omitted).  Here, it is undisputed that Norfolk Southern drafted the Agreements. *See* Reply Memorandum at ¶¶ 49-50.

7.    So, too, an indemnity should be strictly construed against an indemnitee seeking indemnification for its own negligence. *Pride v. S. Bell Tel. & Tel. Co.*, 138 S.E.2d 155, 157 (S.C. 1964) ("Since such provisions tend to induce a want of care, they are not favored by the law and will be strictly construed against the party relying thereon").  It is undisputed that Norfolk Southern has been found negligent, and Norfolk Southern's own pleadings establish that it is seeking an indemnity for its own negligence. *See* Reply Memorandum at ¶¶ 48, 51.  (FELA Action Judgment.)

8.      Finally, under South Carolina law (as well as in railroad indemnity cases more generally), contractual indemnities must expressly obligate an indemnitor to indemnify an indemnitee in clear and unequivocal terms—express language that in the context of this matter, quite simply does not exist to support Norfolk Southern's indemnity claim. *Federal Pacific Electric*, 298 S.C. at 26; *Freed v. Great Atlantic & Pacific Tea Co.*, 401 F.2d 266, 269-270 (6th Cir. Ohio 1968) (same); *Union Pac. R. Co. v. El Paso Natural Gas Co.*, 408 P.2d 910, 914 (1965) (same).

9.      With these principles in mind, each of the five indemnities in the Agreements clearly and unequivocally expresses no intent whatsoever that, on the undisputed facts of this matter, Grace should be contractually obligated to indemnify Norfolk Southern for damages incurred as a result of Mr. Kirkland's accidents. This Court may without more deny Norfolk Southern's Cross-Motion—and concomitantly grant the Reorganized Debtors' Summary Judgment Motion, thereby disallowing Norfolk Southern's indemnity claim.

### B.  None of the Agreements' Specific Provisions May Serve as a Basis for Norfolk Southern's Indemnity Claim

#### 1.      *The 1990 Supplemental Agreement Does Not Apply*

10.      As discussed in Reply Memorandum § II.C.1, the indemnity provision in 1990 Supplemental Agreement ¶ 5 clearly and unequivocally delimits the scope of Grace's indemnity obligation for personal injury to Norfolk Southern employees to only those circumstances where Grace used the Specialty Product Loading Chute and the  employees were on or about the Industrial Track and the Specialty Product Loading Chute.   Strict construction of the indemnity—required because Norfolk Southern drafted the Agreement and is seeking indemnity for its own negligence—precludes any argument that Grace would be liable to Norfolk Southern for injuries suffered by Norfolk Southern employees due to Norfolk Southern's own, undisputed

negligence, when those employees were under the full dominion and control of Norfolk Southern, on equipment owned by and under the complete control of Norfolk Southern, when that equipment was located at a Norfolk Southern facility miles away from the Grace Plant. *Montgomery v. JYD Int'l, Inc.*, 534 So. 2d 592, 595 (Ala. 1988) ("The more control the indemnitee retains over the area, the less reasonable it is for the indemnitor to bear the responsibility for injuries that occur in that area"); *see also* 41 AM. JUR. 2D INDEMNITY § 13 (same). Therefore, the 1990 Supplemental Agreement provides no basis for Norfolk Southern's indemnity claim.

### 2.   *The Operating Agreement Does Not Apply*

11.    As discussed in Reply Memorandum § II.C.2, there are two indemnity provisions in the Operating Agreement:

- Paragraph 5, which allocates indemnity liability between Grace and Norfolk Southern as to "death, personal injury and property loss and damage" relating to the Industrial Track; and

- Paragraph 16, which requires Grace to indemnify Norfolk Southern for consequences of "loss, injury or damage" relating to railroad operations on the Industrial Track "at the location of" the "Facility," as the Operating Agreement defines that term.

12.    Under those same, well-established principles of South Carolina law discussed above, neither of these two indemnities can be construed to apply to Norfolk Southern's indemnity claim. First, Operating Agreement ¶ 5 applies solely to the Industrial Track, and the scope of the Industrial Track does not include the Main Loading Chute and does not clearly and unequivocally encompass accidents occurring on Norfolk Southern railcars at Norfolk Southern facilities hours after those railcars were consigned to Norfolk Southern. *See* Reply Memorandum at ¶¶ 57-72.

13.    The second indemnity, Operating Agreement ¶ 16, applies solely to the "Facility," which is defined as comprising an express list of two overhead canopies and a shed. (Operating

7

Agreement at ¶ A.)   That list does not include the Main Loading Chute.  Therefore, Norfolk Southern is constrained by the strict construction of the paragraph 16 indemnity from arguing that the term, "Facility," should be expansively read to include what is not there.  *Davison v. Norfolk S. Ry. Co.*, Case no. CL02-36, 2003 Va. Cir. LEXIS 72, *7 (Va. Cir. 2003) ("The maxim *expressio unius est exclusion alterius* 'instructs that when parties list specific items in a document, any item not so listed is typically thought to be excluded'.") (citing *Smart v. Gillette Co. Long-Term Disability Plan*, 70 F.3d 173, 179 (1st Cir. 1995)); *Federal Pacific Electric*, 378 S.E.2d at 57.  The indemnity therefore cannot be cannot be broadly construed to include accidents occurring on Norfolk Southern railcars at Norfolk Southern facilities hours after those railcars were consigned to Norfolk Southern.  *See* Reply Memorandum at § II.C.2.a.

### 3. *The Right-of-Way Agreement Does Not Apply*

14.    The Right-of-Way Agreement has parallel provisions to those found in the Operating Agreement, with similar limitations:

- Paragraph 10, which allocates indemnity liability as to "death, personal injury and property loss and damage" relating to the Industrial Track; and

- Paragraph 20, which requires Grace to indemnify Norfolk Southern for consequences of "loss, injury or damage" relating to railroad operations on the Industrial Track "at the location of" the "Facility," as the Right-of-Way Agreement defines that term.

15.    Neither of these two indemnities clearly and unequivocally express a contractual obligation for Grace to indemnify Norfolk Southern for its indemnity claim.  As discussed in the Reply Memorandum, the negligence indemnity provision (Right-of-Way Agreement ¶ 10) does not apply, because the Main Loading Chute is not an enumerated part of "the property covered by this agreement," to which the indemnity applies, and that term cannot be expansively read to include the Chute.  *See* Reply Memorandum at ¶ 81.  The scope of "property" also cannot be expansively read to include railcars, particularly as the railcars are owned and operated by

Norfolk Southern. *Id.* at ¶ 82. Finally, the indemnity's reference to the "use" of "property," as with use of the term "track" (referred to herein as the Industrial Track) in the Operating Agreement cannot be broadly construed to include accidents occurring on Norfolk Southern railcars at Norfolk Southern facilities miles away from the Grace Plant, hours after those railcars were consigned to Norfolk Southern. *Id.* at ¶ 83.

16.     Right-of-Way Agreement ¶ 20 is virtually identical to Operating Agreement ¶ 16 and 1990 Supplemental Agreement ¶ 5. And for the same reasons, this indemnity cannot support Norfolk Southern's indemnity claim. There is no reference to the Main Loading Chute in the definition of "Facility," which means that damages arising from the use of the Main Loading Chute are not indemnifiable under this provision. Moreover, the indemnity cannot be cannot be broadly construed to include accidents occurring on Norfolk Southern railcars at Norfolk Southern facilities hours after those railcars were consigned to Norfolk Southern. *See* Reply Memorandum at § II.C.2.b.(2).

**C. Norfolk Southern Fails to Prove Causation**

17.     Norfolk Southern in its Brief concedes that each of the five indemnities discussed above requires that Norfolk Southern establish that Grace committed a negligent act that proximately caused Mr. Kirkland's injuries. (Brief at p, 24.) Two of the indemnities require Norfolk Southern establish that Grace is negligent. (Operating Agreement at ¶ 5; Right-of-Way Agreement at ¶ 10.) The remaining three indemnities require Norfolk Southern establish a causal link between Grace's actions and Mr. Kirkland's injuries—which Norfolk Southern states also requires establishing that an allegedly negligent act by Grace proximately cause Mr. Kirkland's injuries. (Operating Agreement at ¶ 16; Right-of-Way Agreement at ¶ 20; 1990 Supplemental Agreement at ¶ 5.) Norfolk Southern contends that the FELA Trial Record, the Conley and Sharpe Declarations, and the various accident reports compiled by Norfolk Southern

in 1998 provide evidence sufficient to prove causation under one or more of the five indemnities. Norfolk Southern is wrong.  Even if each one of Norfolk Southern's evidentiary proffers is admitted and viewed in a light most favorable to Norfolk Southern, Norfolk Southern has adduced no evidence to establish to prove Grace's negligence caused Kirkland's injuries.  In fact, Norfolk Southern's Brief, itself, highlights that Norfolk Southern's own actions completely exculpate the Reorganized Debtors.

### 1.    *The 1990 Supplemental Agreement Provides No Basis for Norfolk Southern's Indemnity Claim*

18.    The 1990 Supplemental Agreement's indemnity language does not support Norfolk Southern's indemnity claim because Norfolk Southern has adduced no evidence that the Specialty Product Loading Chute was used to fill either of the railcars on which Kirkland claimed he injured himself on January 23 and January 26, 1998.  Therefore, Norfolk Southern has no basis to claim an indemnity under the 1990 Supplemental Agreement.

### 2.    *The January 23 Railcar Was Consigned to Norfolk Southern By Another Kaolin Producer*

19.    Norfolk Southern does not dispute that the railcar from which Mr. Kirkland slipped on January 23, 1998, was identified by Norfolk Southern's own investigating team as having come from J. M. Huber, another kaolin producer unrelated to any of the Reorganized Debtors.  (Brief at p. 24; Proposed Findings of Fact, ¶ 41; Norfolk Southern January 23 Accident Reports.)  Indeed, Norfolk Southern expressly excluded the January 23 railcar accident from the scope of its Cross-Motion.  (Brief at p. 24.)  Therefore, without more, Norfolk Southern has failed to carry its burden of proof that Grace had anything to do with Kirkland's January 23 railcar accident.

10

### 3.    *Norfolk Southern Was on Notice of the Presence of Kaolin on Railcars—and Knowingly Took Control of the January 26 Car, Having Adjudged It "Safe to Run"*

20.    As discussed in Norfolk Southern's Brief (Brief at pp. 29-30), Norfolk Southern management in the person of Trainmaster Chapman, Mr. Kirkland's supervisor, adjudged the January 26 railcar as "safe to run." (Brief at pp. 28-29; Tr. I:110:12-112:18; Conductors' Rules, *passim*.) Norfolk Southern had been shipping kaolin for Grace and other South Carolina kaolin producers for decades before the Kirkland incidents. By 1998, Norfolk Southern was well aware that railcars used to ship bulk kaolin frequently had kaolin residue on them, often crusted into film from years, if not decades of use. (Brief at pp. 6-7, 29.) The presence of kaolin dust (whether wet and slippery or otherwise) on railcars was an "open and obvious" hazard. *O'Neal v. Celanese Corp.*, 10 F.3d 249, 252 (4th Cir. 1993). It is a matter of well-settled products liability law that, on these facts, Norfolk Southern was on full and proper notice of the potential hazards of kaolin and was thus able to manage its rail operations accordingly. Under the well-established "bulk supplier rule," Grace cannot be held liable for injuries occurring after Norfolk Southern had determined a railcar to be "safe to run," and had taken control of, and dominion over, that car. RESTAT 2D OF TORTS, § 388 cmt. n (2nd 1979) ("Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous."); *Coffey v. Chemical Specialties*, 4 F.3d 984, 1993 U.S. App. LEXIS 21430, *10-*11 (4th Cir. 1993) (applying RESTAT 2D OF TORTS, § 388 bulk supplier rule as a matter of South Carolina law); *Labelle v. Philip Morris Inc.*, 243 F. Supp. 2d 508 n5 (D.S.C. 2001) ("A manufacturer is not the insurer against all injuries caused by its product) (citations omitted); *Caskey v. Olympic Radio & Television*, 343 F. Supp. 969, 977 (D.S.C. 1972) ("If a product is inherently dangerous no matter how carefully made, then the manufacturer may be

11

under a duty to give an appropriate warning of this fact, or may protect itself from liability by the giving of an appropriation warning."). Given its longstanding knowledge and experience in shipping South Carolina kaolin in bulk powder form, Norfolk Southern cannot look to Grace for indemnity once it has taken consignment of a railcar and the claimed damage or injury occurs hours later and miles away at a time when the railcars were under its—Norfolk Southern's— complete dominion and control. RESTAT 2D OF TORTS, § 388 cmt. n (2nd 1979); *see also, Montgomery v. JYD Int'l*, 534 So. 2d at 595; 41 AM. JUR. 2D INDEMNITY § 13 (same).

21.    Norfolk Southern's own Conductors' Rules confirm the point. Rule 581 states in relevant part that "Conductors have charge of trains to which they are assigned and … are responsible for the safe and proper management of their trains … and for observance and enforcement of all rules and instructions. (*Id.*) The Conductors' Rules also require conductors to ensure that a railcar is "safe to run." Indeed, those rules mandate that the conductor "must remove from the [train] any cars that are unsafe to run." (Conductors' Rules no. 586.) In other words, Norfolk Southern's own rules mandate that a railcar must be safe to operate in all respects before it takes consignment.

22.    Norfolk Southern asserts in its Brief—and Mr. Kirkland testified at the FELA Action trial—that Norfolk Southern management in the person of Trainmaster Chapman, Mr. Kirkland's supervisor, instructed Mr. Kirkland to take consignment of the January 26 railcar, notwithstanding Mr. Kirkland complaints about kaolin on the car. (Brief at pp. 10 n. 10, 29-30.) Mr. Kirkland testified that, on the morning of January 26, 1998, some hours prior to his accident at Norfolk Southern's Aiken facility, he complained to a Grace employee, Mr. Wood, and to Mr. Chapman about there being an excessive amount of kaolin dust on the railcars sitting on the

Grace Plant sidetrack, ready to be consigned to Norfolk Southern for transshipment. (Tr. I:110:12-112-8.). Mr. Kirkland then testified:

> Then I look at Mr. Chapman, and I said, well, what do I do now, Mr. Chapman, I says, here's the cars, here's the problem, I said, it's covered in clay. I said, best thing we can do is just leave the cars sitting right here until they clean them up. He said, this is a good customer, you are going to switch this place. I said, you want me to switch this place. He said, yes, you have got to switch them, got in his car drove off. Me and Chris sat there going, what can you do, I mean, what could I do.

(Tr. I:112:10-18.)

23.    This is significant. Norfolk Southern management found that all of the railcars Norfolk Southern took consignment of from the Grace Plant on January 26, 1998, were "safe to run," pursuant to Norfolk Southern's own Conductors' Rules—otherwise, Mr. Chapman would not have instructed Mr. Kirkland to take consignment of the cars. Fed. R. Evid. 801(d)(2)(A); Fed. R. Civ. P. 56(c). Norfolk Southern's admission, in the context of its own Conductors' Rules, thus establishes that the Grace Plant's loading of the January 26 railcar (and the other railcars) did not create an unsafe condition. Therefore, Norfolk Southern's admission further establishes that Grace's actions in loading the January 26 railcar cannot be the cause of Mr. Kirkland's accident some hours later, when that railcar was stopped at Norfolk Southern's Aiken facility, attached to a Norfolk Southern-owned and –controlled train.

24.    With this admission that Norfolk Southern management deemed the railcars picked up from Grace on January 26 to be safe to operate, Norfolk Southern cannot establish causation, as required by the five indemnities in the Agreements. What's more, the admission that all of the railcars were "safe to run" means Norfolk Southern cannot prove that Grace "caused" Mr. Kirkland's injuries, which occurred miles away and hours later at Norfolk Southern's Aiken, railyard on January 26, 1998, when that car was under Norfolk Southern's

13

complete control and dominion. *Montgomery v. JYD Int'l*, 534 So. 2d at 595 (no indemnity when indemnitee has control of the area of the accident and indemnitor does not).

25.     This proposition is well illustrated by contrasting the undisputed facts of this matter both to the *Brunswick* case cited by Norfolk Southern, and the *Sol Walker* case, discussed in the Reply Memorandum, at ¶¶ 90, 102-03. In *Brunswick*, the industry consigned a railcar of wood pulp with a log in the car. A railroad employee was later severely injured by the log. *S. R. Co. v. Brunswick Pulp & Paper Co.*, 376 F. Supp. 96, 99 (S.D. Ga. 1974). In *Sol Walker*, industry loaded the railcar at issue with scrap iron and consigned the car to railroad. The next day, a piece of scrap iron fell from the railcar and injured a railway employee. *Sol Walker & Co. v. Seaboard Coast Line Railroad Co.*, 362 So.2d 45, 47 (Fla. App. 1978). In each of these cases, there was an identifiable and negligent action by the industry as to the nature of the cargo itself that led directly to the injury at issue.

26.     Here, there was no such identifiable action. Moreover, the cargo of kaolin has never been at issue. On January 26, Grace loaded railcars with kaolin in the same way it loaded railcars every other day. After Grace finished loading the car, closed it and sealed it, and finally blew it free of kaolin dust, Grace presented the car (and other similar cars) to Norfolk Southern for consignment. Norfolk Southern's trainmaster, Mr. Chapman, who was Mr. Kirkland's direct supervisor, determined that the car was "safe to run." Chapmen's evaluation that the car—and the others—were "safe to run" exculpates Grace. Grace had loaded the car properly. The cargo was not dangerous. The exterior of the railcar—to the extent that there was kaolin on it—did not impede the safe operation of the railcar, including for purposes of coupling it to the consist (the train) and setting and releasing the handbrake on the railcar. Therefore, Grace did nothing different, or wrong, in loading the January 26 railcar.

14

27.     On page 24 of its Brief, Norfolk Southern articulated the burden of proof—
"negligence proximately caused those injuries"—that it had to meet before it could implicate any
of the five indemnities in the Agreements.  It has failed completely to meet that burden.  It has
failed to adduce any evidence whatsoever of any allegedly negligent act by Grace that caused
Mr. Kirkland's January 26 accident.  In fact, Norfolk Southern has accomplished precisely the
opposite—it has completely exculpated Grace by its management having adjudged the January
26 railcar "safe to run."  Therefore, Norfolk Southern's indemnity claim must fail.

### 4.     *Norfolk Southern Admitted at the FELA Action Trial That Kaolin Did Not Cause Mr. Kirkland's Accidents*

28.     Norfolk Southern made another telling admission at the FELA Action trial.  Mr.
Chapman testified at trial that slipping on kaolin residue that may have been present on the
railcar exteriors did not cause Mr. Kirkland's accident:

> Q [Wettermark] And didn't Mr. Kirkland fall off a car because of clay on it?
>
> A [Chapman] I don't think so.
>
> Q [Wettermark] You don't think so?
>
> A [Chapman] No.
>
> Q [Wettermark] Were you out there?
>
> A [Chapman] No. You asked me a question what I thought. I was just going to tell you why I thought he -- if you want to know why I think he fell, it didn't make the report, because it's not based on any -- the problem being when I asked Mr. Kirkland did he slip off the car, we was talking about the feet and the hands type thing -- I deal with dynamics of people mounting cars and dismounting cars, handling switches.  Okay? When you asked me the question, if Mr. Kirkland's feet had slipped out from under him, I would have considered Mr. Kirkland to went down where he was, if your feet slip out from under you. If you are handling -- in this situation, if he was handling the brake, I don't think he would have sprung away from the car the way he told me he went -- 12 feet on the fall.

(Tr. II:178:1-20.)[2]

29.    Mr. Chapman testified in his capacity as a member of Norfolk Southern's management. Mr. Chapmen's testimony also expressed his professional expertise regarding how to mount and dismount a railcar and how to operate a railcar's brakes. Mr. Chapman's testimony expressed Norfolk Southern's corporate position at the FELA Action trial that the presence of kaolin did not cause Mr. Kirkland's accident. The FELA Action jury did not make any factual findings as to whether kaolin was the proximate cause of Mr. Kirkland's accident. Thus, Norfolk Southern in the FELA Action and the Reorganized Debtors here in this contested matter agree that kaolin did not cause Mr. Kirkland's accidents. This admission alone is sufficient for this Court to disallow Norfolk Southern's indemnity claim.

**III.    IF THE COURT DOES NOT DISALLOW NORFOLK SOUTHERN'S INDEMNITY CLAIM, THEN IT SHOULD NONETHELESS DENY ITS CROSS-MOTION—AND PERMIT THE REORGANIZED DEBTORS TO MORE FULLY DEVELOP THE RECORD BEFORE THE COURT**

30.    If the Court were to find that there were not sufficient material facts in the record as it stands now to disallow Norfolk Southern's indemnity claim, it would mean that the Court has found, in one or more of the Conley and Sharpe Declarations and Mr. Kirkland's January 26 Accident Report, sufficient material facts in genuine dispute so as to require further development of the record before the Court can render judgment. *Coolspring Stone Supply v. Am. States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993) (internal citations omitted); *Rodriguez v. Brewington-Carr*, Civil Action No. 98-442-GMS, 2002 U.S. Dist. LEXIS 11537, at *10 (D. Del. Mar. 14, 2002) (same); *see also Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir. 1983) ("summary

---

2    Mr. Chapman's FELA Action testimony is not hearsay. It is admissible evidence in this contested matter, because it is a statement made by an opposing party (Norfolk Southern) in the form of its employee speaking within the scope of his employment at the time he made the statement. Fed. R. Evid. 801(d)(2)(D).

16

judgment cannot be granted where, as here, the party opposing summary judgment propounds a reasonable conflicting interpretation of a material disputed fact") (internal citation omitted).

31.     The Reorganized Debtors have therefore filed the Silas and Drumming Declarations to meet their potential obligations under Fed. R. Civ. P. 56(c). These declarations establish that the Grace Plant has had an exemplary safety record for more than thirty years. Indeed, there has not been a single injury arising from the setting or releasing of railcar handbrakes at the Grace Plant during that entire period—nor has there been a single such injury or incident attributable to the presence of kaolin residue on the exterior of a railcar. (Drumming Declaration at ¶¶ 5, 30 ("To the best of my knowledge, there was never a single reportable incident involving injury from a fall on slick kaolin during my 28 years at the Grace Plant, nor was there a single reportable incident involving injury from setting or releasing railcar handbrakes"); Silas Declaration at ¶ 5.)  And the reason for that is, as Mr. Silas states in his declaration, "[f]rom my experience working on railcars, I know that if you are wearing proper shoes with a good grip, you will not slip off the platform while working the brake, even if the platform is coated with kaolin." (Silas Declaration at ¶ 6.)  Moreover, the Silas and Drumming Declarations also establish that Grace employees went above and beyond in cleaning railcars— which directly contradicts the statements made in the Conley and Sharpe Declarations—and confirms Mr. Chapman's testimony that he believed that kaolin residue on the railcars' exteriors did not cause Mr. Kirkland's accidents and resulting injuries. (Drumming Declaration at ¶¶ 1, 14, 15, 20, 25, 28; Silas Declaration at ¶¶ 3-4.)  Finally, the declarations establish that Grace did nothing wrong in January 1998, when Mr. Kirkland injured himself on Norfolk Southern-owned and –controlled railcars when those railcars were located at Norfolk Southern-owned and – controlled facilities. (Drumming Declaration, *passim*; Silas Declaration, *passim*.)  Thus, if this

Court were to determine that the Agreements do encompass Norfolk Southern's indemnity claim on its face, the Drumming and Silas Declarations at the very least present genuine issues of material fact that would require a trial.

### CONCLUSION

32.     The Reorganized Debtors submit that, for the reasons set forth in this Memorandum and in the Reply Memorandum, the Court should disallow Norfolk Southern's Cross-Motion, while also granting the Reorganized Debtors' Summary Judgment Motion and disallowing Norfolk Southern's indemnity claim.   In the alternative, the Reorganized Debtors submit that if the Court does not summarily disallow Norfolk Southern's indemnity claim, there would be many material facts in dispute, which would dictate entry of an order scheduling this contested matter for trial.

**[remainder of this page is intentionally left blank]**

DOCS_DE:212635.1 91100/001

WHEREFORE, the Reorganized Debtors respectfully seek this Court's entry of an order: (i) disallowing Norfolk Southern's indemnity claim; (ii) denying Norfolk Southern' Cross-Motion; and (iii) granting such other relief as may be appropriate.

Dated:  March 8, 2017

THE LAW OFFICES OF ROGER HIGGINS
Roger J. Higgins
1 North Bishop Street
Suite 14
Chicago, IL 60607-1823
Phone: (312) 666-0431

and

KIRKLAND & ELLIS LLP
Adam C. Paul
John Donley, P.C.
300 North LaSalle Street
Chicago, IL 60654
Phone: (312) 862-2000

and

PACHULSKI STANG ZIEHL & JONES LLP

/s/ James E. O'Neill
Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
919 North Market Street, 17th Floor
PO Box 8705
Wilmington, DE  19899-8705 (Courier 19801)
Phone: (302) 652-4100
Fax: (302) 652-4400

Co-Counsel for the Reorganized Debtors