<u>EXHIBIT H</u>

**Grace's Motion to Dismiss**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JIM WRIGHT,                          )
                                     )
          Plaintiff,                 )
                                     )
     v.                              )      No:    99 C 1255
                                     )
W.R. GRACE & CO. - CONN., and        )      Judge Manning
CRYOVAC DIVISION W.R. GRACE &        )
CO. - CONN. n/k/a SEALED AIR         )      Magistrate Judge Ashman
CORPORATION,                         )
                                     )
          Defendants.                )

## NOTICE OF FILING

TO:   Amy C. Wright                      Caroline A. Mondschean
      Sikora & Wright, Ltd.              Hinshaw & Culbertson
      207 North Main Street              222 North LaSalle Street
      Suite 202                          Suite 300
      Crystal Lake, Illinois 60014       Chicago, Illinois 60601

     PLEASE TAKE NOTICE that on June 25, 1999, the undersigned filed Defendant W.R.

Grace & Co.-Conn.'s Motion To Dismiss Counts II-V Of Plaintiff's Complaint with the Clerk of

the United States District Court for the Northern District of Illinois, Eastern Division, a copy of

which is attached hereto and herewith served upon you.

                                        _____
                                        One of the Attorneys for Defendant
                                        W.R. Grace & Co. - Conn.

Patrick J. Lamb
Julie L. Gottshall
Katten Muchin & Zavis
525 West Monroe Street, Suite 1600
Chicago, Illinois  60661-3693
(312) 902-5200

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JIM WRIGHT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No:   99 C 1255 |
| | ) | |
| W.R. GRACE & CO. - CONN., and | ) | Judge Manning |
| CRYOVAC DIVISION W.R. GRACE & | ) | |
| CO. - CONN. n/k/a SEALED AIR | ) | Magistrate Judge Ashman |
| CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## MOTION TO DISMISS COUNTS II-V OF PLAINTIFF'S COMPLAINT

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendant W.R. Grace& Co. - Conn. ("Grace") by its attorneys, hereby moves this Court to dismiss Counts II through V of Plaintiff's Complaint. In support of its motion, Grace files simultaneously herewith its Memorandum of Law in Support of this Motion to Dismiss and further states:

1.       Counts II-V of Plaintiff's Complaint are deficient in law and fail to state a claim upon which relief may be granted.

2.       Plaintiff's claim for breach of oral contract fails because the alleged oral contract at issue was to have spanned a four year period.  Under the Statute of Frauds, Plaintiff may not seek to enforce this agreement which could not have been performed within a one year period and was not reduced to writing.

3.       In Count III Plaintiff claims that his at-will employment with  Grace was modified to a contractual agreement for employment until the age of 65 based on Grace's retirement plan and a supplement thereto.  It is plain from the language in the retirement plans that no reasonable person could have believed that an offer of employment for a specified term was made to Plaintiff.

Under Illinois law, under these circumstances, no contract for employment exists and Plaintiff's claim fails.

4.      Plaintiff's claim for promissory estoppel fails as a matter of law because no clear promise was ever made, either orally or in writing, to Plaintiff upon which he could claim to have relied. Therefore, Plaintiff may not state a claim for promissory estoppel upon which relief may be granted.

5.      Finally, Plaintiff seeks to recover for negligent misrepresentation but has not and cannot allege that Grace was in the business of supplying information to him and, therefore, cannot allege that Grace had a duty under a negligent misrepresentation theory. Furthermore, Grace did not intend to induce Plaintiff to act nor did Plaintiff justifiably rely on any of Grace's alleged statements.

6.      In addition to the foregoing, even if Plaintiff could state a common law claim in counts III-V, each of these claims is preempted by ERISA.

WHEREFORE, Defendant, W.R. Grace & Co. - Conn. prays that this Court dismiss Counts II through V of Plaintiff, Jim Wright's Complaint and for such other and further relief as this Court deems just.

Dated: _June 25_, 1999

_One of the Attorneys for Defendant_
W.R. Grace & Co. - Conn.

Patrick J. Lamb
Julie L. Gottshall
Katten Muchin & Zavis
525 West Monroe Street, Suite 1600
Chicago, Illinois  60661-3693
(312) 902-5200

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JIM WRIGHT,                                    )
                                               )
              Plaintiff,                        )
                                               )
        v.                                      )      No:    99 C 1255
                                               )
W.R. GRACE & CO. - CONN., and                   )      Judge Manning
CRYOVAC DIVISION W.R. GRACE &                   )
CO. - CONN. n/k/a SEALED AIR                    )      Magistrate Judge Ashman
CORPORATION,                                    )
                                               )
              Defendants.                       )

### MEMORANDUM IN SUPPORT OF W.R. GRACE & CO. -- CONN.'s MOTION TO DISMISS COUNTS II-V OF PLAINTIFF'S COMPLAINT

Counts II through V of Plaintiff's Complaint should be dismissed for failure to state a claim upon which relief may be granted. Each of these claims arise from Plaintiff's fundamental allegation that his employer, W.R. Grace & Co. – Conn. ("Grace") terminated him prior to his desired retirement age. To challenge that termination, Plaintiff alleges breach of both written and oral contracts (Counts II and III), promissory estoppel (Count IV), and negligent misrepresentation (Count V). Because Plaintiff does not, and indeed cannot, allege facts establishing a contractual obligation or overcoming the presumption of an at-will employment relationship, however, Counts II-V must be dismissed. Moreover, because Plaintiff relies principally on statements made in Grace's retirement plan documents for the promises and representations underlying his claims, whatever causes of action may remain are preempted by the Employee Retirement Income Security Act ("ERISA").

I.   **Plaintiff's Claim for Breach of Oral Contract (Count II) Is Barred By the Statute of Frauds.**

Plaintiff's count for breach of oral contract (Count II) must be dismissed because the agreement violates the statute of frauds, which precludes enforcement of oral contracts that cannot be performed within one year. *McInerney v. Charter Golf, Inc.*, 176 Ill.2d 482, 680 N.E.2d 1347 (Ill. 1997).[1/]  Plaintiff alleges that when he was age 58, two of his superiors "agreed" that he could work until age 62 and retire under the "normal retirement plan." (Complaint ¶¶ 13-14). Because the parties could not possibly have fulfilled this alleged four-year oral agreement within one year, it is unenforceable under the statute of frauds.

The Illinois Supreme Court has recently definitively decided that oral agreements similar to that alleged by Plaintiff are unenforceable under the statute of frauds. *McInerney*, 176 Ill.2d 482. In *McInerney*, the plaintiff alleged that his employer had breached an oral agreement to employ him for life. *Id.* at 485. The Court upheld summary judgment on the claim, finding that the oral agreement for lifetime employment, which implicitly anticipates a relationship of more than a year, was unenforceable under the Statute of Frauds. *Id.* at 488-491.

The oral agreement alleged by Plaintiff even more clearly violates the statute of frauds than the contract at issue in *McInerney*. In *McInerney*, the parties, in theory, could have fulfilled the lifetime employment guarantee within one year had the plaintiff died or the business crumbled. Here, however, the alleged oral agreement provided for a four-year employment term, which the parties could not under any circumstances have performed within the one year span anticipated

---

[1/]    The statute of frauds states that "[n]o action shall be brought * * * upon any agreement that is not to be performed within the space of one year from the making thereof, unless * * * in writing and signed by the party to be charged." 740 ILCS 80/1.

by the statute of frauds. Because the alleged agreement is therefore unenforceable as a matter of law, Count II must be dismissed.

## II.   No Written Contract of Employment Exists Between Plaintiff and Defendant.

Count III of Plaintiff's Complaint, which alleges breach of a written contract, likewise fails to state a claim. Plaintiff alleges that he had a contract of employment until age 65 based on language contained in the "W.R. Grace & Co. Retirement Plan for Salaried Employees" and the "W.R. Grace & Co. Supplemental Executive Retirement Plan" (collectively referred to as the "Retirement Plans," Exhibits A and B). *See* Complaint ¶¶ 25-28. No reasonable reading of the Retirement Plans, however, suggests that they formed a contract obligating Grace to retain Plaintiff (and indeed, all other employees covered by the Plans) until he attained age 65. In the absence of a contract, Plaintiff's third count for breach of written contract must be dismissed.

As a general rule, an employment relationship without a fixed duration is terminable at-will by either party. *Duldulao v. Saint Mary of Nazareth Hospital*, 115 Ill.2d 482, 505 N.E.2d 314 (Ill. 1987). To sustain a claim that an employment at-will relationship has been converted into a contractual relationship based on an employer's manual, an employee must demonstrate that the manual contains a promise clear enough that an employee would reasonably believe that an offer had been made. *Id.* at 490. Courts, however, have repeatedly held that an employee cannot show such a clear promise where the manual contains a disclaimer or other ambiguous language. *Id.* at 319; *Davis v. Times Mirror Magazines, Inc.*, 697 N.E.2d 380, 388, 297 Ill.App.3d 488, 498 (1st Dist. 1998) (disclaimer language in employee handbook in which employer reserved right to amend, modify or delete any provisions of the handbook precluded formation of employment contract.); *Condon v. AT&T Co, Inc.*, 569 N.E.2d 518, 521, 210 Ill.App.3d 701, 707 (2nd Dist. 1991) (incentive plan did not create employment contract because clear promise requirement

-3-

unmet). *See also Hughes v. Encyclopaedia Britannica*, 117 N.E.2d 880, 882, 1. Ill.App.2d 514, 518-519 1ˢᵗ Dist. 1954) (pension plan containing disclaimer did not give rise to contractual relationship with defendant).

Even a cursory review of the Retirement Plans at issue demonstrates that they fall far short of establishing a contract guaranteeing Plaintiff employment until age 65. The Plans contain explicit disclaimers vesting absolute power with the Company to terminate or change the Plans – language diametrically opposed to the formation of a contract. For example, the Plans state:

- "Although the Company expects to continue the plan for future periods, through the actions of its Board of Directors (or its designee) it reserves the right to change, suspend, or end the plan at any time. If the plan should end, the money in the trust fund may be used for the benefit of participants and beneficiaries." (See Retirement Plan for Salaried Employees at page 31.)

- "The supplemental plan may be terminated by Grace at any time for any or all employees. Grace may also change any plan feature at any time." (See Supplemental Plan at page 8.)

Moreover, the Plans contain numerous provisions explaining the calculation of benefits *if the employment ends before the employee reaches age 65*. For example, the Plans provide a method by which to calculate retirement benefits if employment ends prior to age 62 (Retirement Plan for Salaried Employees, p. 10, Supplemental Plan , p. 6). Additionally, the Plans explicitly provide for the forfeiture of benefits if employment ends prior to vesting (Retirement Plan for Salaried Employees, p. 18).

Given the disclaimers and provisions contemplating the cessation of employment prior to the "normal retirement age," not even the most generous interpretation of the Retirement Plans would support a contract for guaranteed employment to age 65. Indeed, the strained interpretation alleged by Plaintiff would mean that Grace could not terminate *any* employee covered by the Retirement Plans prior to his or her sixty-fifth birthday -- an absurd result clearly not

contemplated by the Plan language. Because the Plans relied upon by Plaintiff do not create a contract of employment, Count III must be dismissed.

III.   **No Promises Were Made Upon Which Plaintiff Can Sustain A Claim for Promissory Estoppel.**

Plaintiff's fourth count for promissory estoppel must be dismissed for the same reasons as Counts II and III. To state a claim for promissory estoppel, Plaintiff must allege (1) a promise, unambiguous in its terms, (2) which Grace expected and could have foreseen would be relied upon by Plaintiff, (3) reliance by Plaintiff upon the promise and (4) damages. *Moore v. Illinois Bell Telephone Co.*, 508 N.E.2d 519, 521, 155 Ill.App.3d 781, 785 (2nd Dist. 1987). As set forth above, however, the alleged promises relied on by Plaintiff -- the oral agreement that he could retire at age 62, and the Retirement Plans -- do not constitute an unambiguous and enforceable promise sufficient to sustain a promissory estoppel claim.

The instant case presents a situation nearly identical to that presented in *Moore v. Illinois Bell Telephone Co.*, 508 N.E.2d 519, 155 Ill.App.3d 781 (2nd Dist. 1987). In *Moore*, the plaintiff argued that his employer's Incentive Plan contained various contractual obligations owed to him regarding his compensation. *Id.* at 520. The court found that, given the disclaimer contained in the Incentive Plan permitting the employer to reduce, modify or withhold awards, the Incentive Plan did not contain a promise clear enough to constitute a contract *or* support a promissory estoppel claim. *Id.* at 521-22.

Plaintiff's promissory estoppel claim similarly fails. Because the written Retirement Plans do not establish an employment contract, Plaintiff has not alleged an unambiguous promise upon which he may rely to form the basis of a promissory estoppel claim. Nor do Plaintiff's allegations regarding the oral reassurances allegedly made to him fulfill the need for an unambiguous

promise. As the Illinois Supreme Court has held, "promissory estoppel does not bar the application of the Statute of Frauds." *McInerney*, 176 Ill.2d at 492. Accordingly, Count IV of Plaintiff's Complaint should be dismissed.

**IV.    Plaintiff Cannot Establish A Claim For Negligent Misrepresentation.**

Plaintiff's claim for negligent misrepresentation likewise should be dismissed for failure to state a claim. To sustain a claim for negligent misrepresentation, Plaintiff must allege: (1) a duty owed by the defendant to accurately communicate information; (2) a false statement of material fact; (3) carelessness or negligence in ascertaining the truth of the statement; (4) the defendant's intention to induce action by the plaintiff; (5) action by the plaintiff in reliance on the statement; and (6) damage as a result of the reliance. *Brown Leasing, Inc. v. Stone*, 284 Ill.App.3d 1035, 1045, 673 N.E.2d 430,437 (1st Dist. 1996). Plaintiff, however, has failed to allege any facts establishing a duty by Grace to communicate accurate information to employees such as Plaintiff; that Grace intended to induce him to act; or that he justifiably relied on Grace's representations. Absent such facts, Plaintiff cannot maintain a negligent misrepresentation action.

The Illinois Supreme Court recently elucidated the components necessary to sustain a negligent misrepresentation claim in *Brogan v. Mitchell International, Inc.*, 181 Ill.2d 178, 692 N.E.2d 276 (Ill. 1998). There, an employee sued his employer for misrepresentations allegedly made during a job interview. *Id.* at 181. The Court found that in order to state such a claim, plaintiff's complaint must first allege facts establishing a duty owed by the defendant to communicate accurate information. *Id.* at 184, citing *Board of Education v. A, C & S, Inc.*, 131 Ill.2d 428,452, 546 N.E.2d 580 (Ill. 1989). The Court further stated that, to date, the Illinois Supreme Court has recognized a duty to communicate accurate information under *only* two circumstances: (1) where the alleged misrepresentations result in physical injury to a person or

-6-

harm to property or, (2) where one is in the business of supplying information for the guidance of others in their business transactions. *Id.* at 183-184. Because the plaintiff did not allege facts establishing that his employer was in the business of supplying information to others for guidance in their business transactions, the court upheld dismissal of the negligent misrepresentation claim. *Id.* at 186.

The Illinois appellate court for the First District employed similar reasoning in *Neptuno Treuhand-Und Verwaltungsgesellschaft MBH v. Arbor*, 295 Ill.App.3d 567, 692 N.E.2d 812 (1st Dist. 1998). There, an employer sued the Board of Trade and its Chairman for providing a letter of reference for a trader, which omitted that the trader had been disciplined. The court upheld dismissal of the negligent misrepresentation claim on two grounds: first, that the defendants were not in the business of providing such information, and therefore did not have any duty to communicate accurate information; and second, that the plaintiff did not justifiably rely on the information communicated. *Id.* at 818.

Plaintiff's claim must be dismissed as well. Count V is based on representations allegedly made to Plaintiff regarding the termination of his employment and his severance package (Complaint ¶ 22). Plaintiff has not alleged that Grace, a manufacturing entity, is in the business of providing termination and severance information. *See id.* at 574 (former employer not in business of providing accurate employment references);*Brown*, 284 Ill.App.3d at 1045 (bank directors not in business of supplying information for others for guidance in business dealings). Moreover, under no conceivable set of facts did Grace intend to induce Plaintiff to act nor did Plaintiff justifiably rely on Grace's statement. As Plaintiff alleges throughout his Complaint, he was *involuntarily* terminated (Count I, ¶¶ 9-10, 12-13; Count II, ¶¶ 20-21; Count III, ¶ 36).. Because Plaintiff did not willfully choose to end his employment, he could not have relied on, and

Grace could not have intended him to rely on, representations regarding what would become of his position or the amount of severance available. Accordingly, Plaintiff's negligent misrepresentation claim fails to state a cause of action and must be dismissed.

## V.    In The Alternative, Counts III -V of Plaintiff's Complaint Are Preempted By ERISA.

To the extent that Plaintiff's claims in Counts III-V may survive under common law, they must in the alternative be dismissed as preempted by Section 502(a)(1)(B) of ERISA.[2]  Counts III-V require interpretation of Grace's retirement plan, which constitutes an employee benefit plan within the meaning of ERISA.  *See, Cortez v. Michael Reese Health Plan, Inc.*, 980 F. Supp. 277, 279 (N.D. Ill. 1997) (where resolution of state law claims requires construing ERISA plan, state law claims are preempted); *Anglin v. Sears Roebuck and Co.*, 1993 WL 437430, *3 (N.D. Ill. 1993) (where court's inquiry must be directed to benefits plan, causes of action for breach of contract and promissory estoppel "related to" benefit plan and were thereby preempted). "In light of ERISA's broad purposes and expansive preemption provisions, [the Seventh Circuit] has held that 'Congress has blotted out (almost) all state law on the subject of pensions, so a complaint about pensions rests on federal law no matter what label its author attaches.'" *Tolle v. Carroll Touch, Inc.*, 977 F.2d 1129, 1136 (7th Cir. 1992), citing *Bartholet v. Reishauer A.G.*, 953 F.2d 1073 (7th Cir. 1992). Indeed, ERISA preemption is broad enough to exist whenever "the employee benefit plan is a critical factor in establishing liability"under state law. *Id., citing Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133 (1990). *See also Cortez v. Michael Reese Hospital*, 980 F. Supp. 277, 279 (N.D. Ill. 1997) (state law claims preempted by ERISA where

---

[2]    Section 502(a)(1)(B) states that: "A civil action may be brought ... by a participant or beneficiary ... to recover benefits ... to enforce his rights under the terms of the plan, or to clarify his rights to future benefits..." 29 U.S.C. §1132(a)(1)(B).

"resolution of the ... claim ... requires construing the ERISA plan"), *citing Rice v. Panchal*, 65 F.3d 637,644-45 (7th Cir. 1995).

Here, Plaintiff's claims for breach of written contract, promissory estoppel, and negligent misrepresentation clearly require interpretation of Grace's Retirement Plans.  Counts III and IV rest upon Plaintiff's allegations that the plan documents constitute a written employment contract or clear promise to him for employment to age 65.  To determine if indeed a contract or promise was made, this Court will need to read, understand, and evaluate the plan documents -- an analysis that invokes ERISA.  Moreover, a finding in Plaintiff's favor on either count would essentially decree that *all* Grace employees covered by the plan have guaranteed employment until age 65 -- a tremendous expansion of the Company's obligations under those plans best decided under the rubric of ERISA.  *Tolle*, 977 F.2d at 1136 (employee's breach of contract claim based on statements made in plan documents preempted by ERISA).

Plaintiff's claim for negligent misrepresentation also necessarily relies upon the Retirement Plans' terms.  At least two of the statements Plaintiff cites in support of his claim -- that the company was unable to give him credit for service for the four years he did not work under his pension plan, and that the present value of the severance money he would receive would fully compensate his for all of his losses -- unquestionably require an interpretation of the terms of the Plans, and therefore fall squarely within the bounds of ERISA.  *See* Complaint, Count V, ¶22(c) & (d).  Obviously, these allegations necessitate an interpretation of the Retirement Plan and are, therefore, preempted by ERISA. *See Dranchak v. Akzo Nobel, Inc.*, 88 F.3d 457, 458 (7th Cir. 1996) (rules governing payment to participants from pension and welfare plans necessarily "relate to" those plans and fall under federal ERISA law); *Cortez v. Michael Reese Health Plan, Inc.*, 980 F. Supp. 277, 279 (N.D. Ill. 1997) (where resolution of state law claims requires construing

ERISA plan, state law claims are preempted); *Anglin v. Sears Roebuck and Co.*, 1993 WL 437430, *3 (N.D. Ill. 1993) (where court's inquiry must be directed to benefits plan, causes of action for breach of contract and promissory estoppel "related to" benefit plan and were thereby preempted)

## CONCLUSION

Plaintiff's claims constitute a transparent attempt to launch an end-run around his status as an at-will employee. Not one of the alleged promises made to Plaintiff survives even minimal scrutiny: the alleged oral statements "guaranteeing" Plaintiff another four years of employment are unenforceable under the Statute of Frauds, and the Retirement Plans fall far short of containing a clear promise. As such, Plaintiff cannot establish an obligation on Grace's part to sustain Counts II, III, or IV. With respect to the negligent representation claim, Plaintiff cannot establish a the Grace had a duty to give him accurate information regarding the termination of his employment, or that Grace intended him to or he did rely on those statements. If Counts III-V can somehow survive, they are preempted by ERISA, and must be dismissed on that basis. Accordingly, Defendant, W.R. Grace & Co, respectfully requests that this Court dismiss Counts II-V of Plaintiff's Complaint.

Dated: June 25, 1999                    Respectfully submitted:


                                        *Jui L. Gotshall*
                                        One of the Attorneys for Defendant
                                        W.R. Grace & Co. - Conn.


-10-

Patrick J. Lamb
Julie L. Gottshall
Katten Muchin & Zavis
525 West Monroe Street, Suite 1600
Chicago, Illinois  60661-3693
(312) 902-5200

Doc #:CH01 (85011-00008) 20596904v3:6/24/1999/Time:16:50





(THU) 4. 1' 99 12:08/ST. 11    /NO. 4860155497 P 13

FROM PITNEY HARDIN KIPP &SZUCY

## Table of Contents

Participation ........................................................1
Who's Eligible? ....................................................1
When Participation Starts ...................................1
Hour of Service ...................................................2
Cost ....................................................................3

How the Plan Works .........................................4
Credited Service .................................................4
Final Average Pay ..............................................4
Primary Social Security Benefit .........................5
The Retirement Formula .....................................5
An Example .........................................................6
Minimum Benefits ..............................................6
Maximum Benefits ..............................................6
Maximum Compensation ....................................7
If You Made Contributions .................................7

Retirement ..........................................................9
Normal Retirement .............................................9
Early Retirement .................................................9
If You Work Past Age 70½ ..............................10

How Benefits Are Paid ....................................11
Normal Payment Methods ...............................11
Optional Payment Methods .............................11
Electing an Option ...........................................12
When to Apply .................................................13
Divorced or Separated Participants .................13
Payment of Small Benefits ..............................14

If You Are Disabled .........................................15

Survivor Benefits .............................................16
Coverage Before Retirement Payments Start ....16
Coverage After Retirement Payments Start .......17

(THU) 4. 1'99 12:09/ST. 12    /NO. 4860155497 P 14

FROM PITNEY HARDIN KIPP &SZUCG

Although participation starts automatically when you meet the requirements, you'll be asked to provide any information needed to run the plan. If you prefer, however, you may elect to waive participation at any time. If you do, you should know that:

☐ you won't earn any benefits for the time you waive participation, and

☐ you may apply to become a participant on a later date, as of the first of any month, if you're still eligible.

Contact your human resources office for more information about participation.

## Hour of Service

An hour of service is the basic unit for measuring service under the plan, and includes each hour you're paid (or are entitled to be paid) by the Company for:

☐ your work

☐ vacation, holidays, illness, incapacity (including disability), layoff, jury duty, military duty, and approved leaves of absence, up to 501 hours for any period in which you aren't working

☐ back pay that's awarded or agreed to by the Company.

Exempt salaried employees (employees who aren't eligible for overtime) receive 45 hours of service for each week in which they have at least one hour of service.

For purposes of determining when you may start participation in the plan and your vesting service (page 18), you may be credited with hours of service for employment while you were ineligible for the plan or for employment with a Grace unit that isn't covered by the plan. Contact your human resources office for more information.

## Cost

The Company pays the full cost of the plan. Company contributions to support the plan are based on the advice of independent actuaries, and are deposited in a trust fund that up for the sole benefit of participants and their beneficiaries

Before January 1, 1975, however, contributions by participip were required; see page 7 for information on these contribu Contributions by participants under certain merged plans (page 27) may have ended at a different date; contact your human resources office for details.

(THU) 4. 1'99 12:09/ST. 12:04/NO. 4860155497 P. 15

FROM PITNEY HARDIN KIPP &SZU

## How the Plan Works

Benefits reflect your credited service, final average pay, and estimated primary Social Security benefit.

### Credited Service

You earn a month of credited service for each month in which you're a participant and have at least one hour of service. In addition, service you earned under a prior plan may count as credited service under this plan; contact your human resources office for details. And, if you temporarily transfer to a unit of the Company that isn't covered by the plan, you'll earn credited service during the transfer if you're not covered by another retirement plan.

Credited service *doesn't* include:

☐ a permanent transfer to a unit not covered by this plan or to an ineligible employment status,

☐ any period in which you didn't make contributions required under this plan or a prior plan, and

☐ service while you're ineligible for the plan.

### Final Average Pay

Your *final average pay* equals the monthly average of your pay for the 60 consecutive months in which your pay is the greatest during the 180-month period before your employment ends. If there isn't a 60-consecutive-month period that may be used to determine your final average pay, your final average pay will equal the monthly average of your pay during your total period of employment.



Your *pay* includes all earnings you receive from the Compa before any deductions are made, but excludes:

☐ special pay,

☐ benefits of stock options, and

☐ the Company's cost of your coverage or participation in any employee benefit plan, including this plan.

### Primary Social Security Benefit

Benefits under the retirement plan take into account benefits you'll receive from Social Security, which is another import source of retirement income. Therefore, an estimate of your primary Social Security benefit is used to figure your benefit from this plan. This estimate is the monthly benefit Social Security will pay you at age 65 (or at your current age, if you over age 65), and is based on your career earnings and the te of the Social Security Act at the time your employment ends excludes any Social Security benefits that may be payable to members of your family.

### The Retirement Formula

Your monthly benefit under the retirement plan equals:

1.5 percent    *times* your final average pay *times* your credit service, *minus*

    1.25 percent *times* your estimated primary So Security benefit *times* your credited service.

**Important!** Benefits produced under the formula assume th payments will be made under the life annuity payment meth starting at age 62 or later. If payments are made under a met other than a life annuity or if payments start before age 62, t benefit calculated under the formula will be reduced.

(THU) 4. 1'99 12:09/ST. 12:04/NO. 4860155497 P 16

FROM PITNEY HARDIN KIPP &SZUCH

## An Example

An employee retires at age 65 and has 30 years of credited service, final average pay of $2,400 per month, and an estimated primary Social Security benefit of $850 per month. The employee's monthly benefit under the retirement plan would equal:

| | | | |
|---|---|---|---|
| 1.5 percent x $2,400 x 30 years | = | $1,080.00 | |
| 1.25 percent x $850 x 30 years | = | 318.75 | |
| monthly retirement plan benefit | = | $761.25 | ($9,135 per year) |

When the employee's benefits from the plan and Social Security are combined, the employee's total monthly retirement income equals $1,611.25 ($761.25 + $850), or $19,335 per year.

## Minimum Benefits

If you were a participant in the prior Grace Salaried Plan or Davison Salaried Plan, or in a merged plan (page 27), your benefit under this plan may be subject to certain minimum-benefit rules. Contact your human resources office for more information.

## Maximum Benefits

Federal law limits the maximum benefit anyone may receive in any year from a plan such as the retirement plan. Only certain highly-paid employees are affected by these limits. If affected, your benefit from the plan may be reduced. In this event, you'll be given an explanation of why and how the reduction is made.

## Maximum Compensation

Federal law places limits on the earnings you receive from the Company in any year that may be used to determine benefits earned under any of the Company's qualified benefit plans during that year. For example, in 1995 only the first $150,000 of earnings an employee receives from the Company may be used to determine benefits during 1995. The Company will notify and explain any action that's taken if you're affected by this.

## If You Made Contributions

Participants were required to contribute to the retirement plan until January 1, 1975. (Contributions by participants under certain merged plans may have ended on a different date.) Your contributions, if any, have remained in the plan's trust fund and have earned interest (contact your human resources office for details on interest earned under the plan).

Your contributions will remain in the plan's trust fund until your employment ends. Any time after your employment ends and before your plan payments are scheduled to start, you may elect to withdraw your contributions and interest. In this event, your plan payments will be reduced to reflect the portion of your benefit that your contributions would have provided if they hadn't been withdrawn. You may obtain details about the reduction by contacting your human resources office.

If you prefer, however, you may leave your contributions in the plan and receive plan payments that include the benefit that your contributions provide.

If no other survivor benefits are payable upon your death, your beneficiary will receive any unpaid portion of your contributions and interest. Keep in mind that your spouse automatically is the beneficiary, unless your spouse had consented in writing, in the presence of a plan administrator or notary public, to pay this amount to a different beneficiary.

6

7

Important! As of July 31, 1984, participants had the option of electing a transfer to the savings and investment plan—or a refund of certain smaller amounts—of their retirement plan contributions and interest. If you elected a transfer or refund as of this date, your benefit was reduced to reflect the benefit your contributions provided. You received a statement reporting the actual reduction in your case. Contact your human resources office if you have any questions.

## Retirement

When is the best time to retire? It's a decision only you may make. But you have flexibility—the plan has two types of retirement: normal and early.

### Normal Retirement

Normal retirement occurs at the end of the month in which your employment ends on or after the date you reach age 65.

### Early Retirement

If you want to stop working at a younger age, you may retire the end of any month on or after your 55th birthday. You must apply for early retirement—it isn't automatic. Contact your human resources office for details.

You have an important decision to make if you retire early: whether to start payments right away or to delay them to a later date. If payments start before age 62, your benefit will be reduced to reflect the likelihood that you'll receive more payments. In this event, the reduction will be based on your age when payments start.

| For Each Month from Age | The Reduction E |
| --- | --- |
| 57 to 62 | ⅙ percent (2 percent per |
| 56 to 57 | ¼ percent (3 percent per |
| 55 to 56 | ⅓ percent (4 percent per |



(THU) 4. 1'99 12:10/ST. 12 '/NO. 4860159497 P. 18

FROM PITNEY HARDIN KIPP &SZUCH

For example, suppose your monthly benefit under the plan equals $761.25 (see page 6 for an example of how this benefit is figured) under the life annuity method of payment. The following example shows the reduction to your benefit if early retirement payments were to start at different ages.

| Age When Payments Start | Total Reduction | Monthly Benefit |
|---|---|---|
| 62 or later | n/a | $761.25 |
| 61 | 2 percent | $746.03 |
| 60 | 4 percent | $730.80 |
| 59 | 6 percent | $715.58 |
| 58 | 8 percent | $700.35 |
| 57 | 10 percent | $685.13 |
| 56 | 13 percent | $662.29 |
| 55 | 17 percent | $631.84 |

If you elect early retirement and delay the start of payments until age 62 or later, no early retirement reduction will be made to your benefit because of your age. Your normal retirement date at age 65 is the latest you may delay the start of early retirement payments. But, if you elect to delay the start of early retirement payments, you may change your mind at any time and elect to have payments start at an earlier date.

### If You Work Past Age 70½

If you remain a participant upon reaching age 70, you may be required under federal law to start receiving payment of your retirement benefit after you reach age 70½. If you're affected by this law, your human resources office will contact you before the date payment of your benefit is scheduled to start.

## How Benefits Are Paid

### Normal Payment Methods

If you're single when your payments are scheduled to start, your normal payment method is a *life annuity*. This method provides you with lifetime monthly payments, but no payments continue to anyone upon your death. Payments are greatest under this method because only one lifetime is covered—yours.

If you're married when your payments are scheduled to start, your normal payment method is a *50 percent joint and survivor annuity*. This method provides you with reduced monthly payments for life. Upon your death, your spouse will receive one-half of your monthly payments for life. Payments are reduced under this method to cover two lifetimes—yours and your spouse's.

You'll receive written material about this and optional methods when you retire. This material includes specific information on how these methods compare in your case.

### Optional Payment Methods

The plan's payment options include:

- *Joint and Survivor Annuity:* This option provides you with reduced monthly payments for life and, upon your death, lifetime monthly payments for your spouse. Your spouse will receive either 100, 75, 66⅔, or 50 percent of your monthly payments you elect. Payments under this option are reduced to cover two lifetimes—yours and your spouse's.

- *Life Annuity:* This option is the same as the normal method for single participants and is available as an option to participants who are married when their payments are scheduled to start. remember, under this option payments stop upon your death.

(THU) 4. 1'99 12:10/ST. 12. /NO. 4860155497 P 19

FROM PITNEY HARDIN KIPP &SZUCH

☐ *Ten-Year Certain and Life Annuity:* This option provides you with reduced monthly payments for life, with payments guaranteed for at least 10 years. If you die before all guaranteed payments are made, your spouse or beneficiary will receive the remaining guaranteed payments; payments to your spouse or beneficiary will stop after the last guaranteed payment is made. But, if you die after all guaranteed payments are made, no payments continue upon your death. Payments under this option are reduced to provide the guarantee they will be made for at least 10 years.

If your spouse or beneficiary dies before all guaranteed payments are made, the value of the remaining guaranteed payments will be paid to your spouse's or beneficiary's estate in a lump sum. But, if your spouse or beneficiary doesn't survive you, the value of any guaranteed payments remaining at your death will be paid to your estate in a lump sum.

☐ *Level Income:* This option applies if you retire before age 62 and receive plan payments before Social Security benefits start. It provides greater payments from the plan before age 62 and reduced payments from the plan after age 62, so that your monthly retirement income will be about the same before and after Social Security benefits start.

**Electing an Option**

If you're single when payments are scheduled to start, you may elect any option *except a joint and survivor annuity.*

If you're married when payments are scheduled to start, the *only* option you may elect is a joint and survivor annuity, with your spouse as beneficiary, unless your spouse consents in writing to elect a different option in the presence of a plan administrator or notary public. If payments are to be made under a joint and survivor annuity, you must provide proof of your age and your spouse's age.

The election of an option takes effect as of the date your benefit payments are scheduled to start. You may elect or change an option any time within 90 days after you receive notification from the plan administrator of the payment methods available to you under the plan or before the date your benefit payments are scheduled to start, whichever is later.

Generally, you may not change a beneficiary or payment method after the date payments are scheduled to start. Under a 10-year certain and life annuity, however, you may name a new beneficiary at any time if you're single (if married, your spouse automatically is your beneficiary). Contact your human resources office if you have any questions on electing an option.

**When to Apply**

Because it may take up to 90 days after all necessary documents have been received before benefit payments will start, you should apply for benefits well in advance of the date you want payments to start. Contact your human resources office for details.

**Divorced or Separated Participants**

If you're divorced or legally separated, your benefit at the time of the divorce or legal separation may be subject to the terms of any qualified judgment, decree, or order.

(THU) 4. 1'99 12:10/ST. 1: :/NO. 4860155497 P. 20

FROM PITNEY HARDIN KIPP &SZUCH

### Payment of Small Benefits

If the total, lump-sum value of your benefit doesn't exceed $3,500, your full benefit will be paid to you or your beneficiary in a single, lump sum; your spouse's consent to receive a lump sum, however, may be required in certain cases. Otherwise, if the benefit payable to you in the form of a life annuity doesn't exceed $25 per month, you may, with your spouse's consent (if applicable), elect to receive your benefit in a lump sum by applying before the date your employment ends. In addition, if the survivor benefit payable to your spouse or beneficiary doesn't exceed $25 per month, your spouse or beneficiary may elect to receive this benefit in a lump sum by applying before the date payments are scheduled to start. Contact your human resources office for details.

You'll qualify as disabled under the retirement plan if you receive Social Security disability benefits. In this event, you'll continue to earn credited service under the retirement plan until the *earliest* of:

☐ the date Social Security disability payments end, unless these payments end solely because they are referred to as Social Security retirement payments upon reaching age 65

☐ the date payment of your benefit under a long-term disability plan of the Company stops, if you're age 65 or older

☐ the date payment of your retirement plan benefit is scheduled to start.

If you qualify as disabled, your benefit under the plan will refle credited service earned before and during your disability, and your final average pay and estimated primary Social Security benefit as of the date you qualified as disabled.

You may elect to start benefit payments under the plan any time after you reach age 55. But benefit payments must start by the later of your normal retirement date at age 65 or the date payment of your benefit under a long-term disability plan of the Company stops.

15

(THU) 4. 1' 99 12:11/ST. 12:04/NO. 4860155497. P 2;

FROM PITNEY HARDIN KIPP &SZU...

## Survivor Benefits

Different survivor coverage applies before and after retirement payments are scheduled to start.

### Coverage Before Retirement Payments Start

If you die before your retirement payments are scheduled to start, your spouse will receive lifetime monthly survivor payments if you and your spouse had been married at least one year and you were vested at the time of your death.

Survivor coverage for your spouse is provided automatically under a 50 percent joint and survivor annuity. When you reach age 55, however, you may increase your spouse's survivor coverage by electing a 66⅔, 75, or 100 percent joint and survivor annuity. You may elect a different joint and survivor annuity and change your spouse's survivor coverage any time after age 55 and before your retirement payments are scheduled to start. Contact your human resources office for details.

If you qualified for survivor coverage, your spouse will receive the survivor portion of the joint and survivor annuity that's calculated as follows:

☐ The credited service, final average pay, and estimated primary Social Security benefit for use in the formula (page 5) will be determined as of the date you died or the date your employment ended, whichever is earlier. In addition, if you qualified as disabled under the plan, any credited service you earned during your disability (page 15) will be included in the calculation.

☐ The joint and survivor annuity reduction factor will be based on your age and your spouse's age as of the date of your death.

☐ The calculation will be made assuming your employment h: ended when you died and you were eligible to elect to start receiving payments. If you were *under age 62* at the time of death, the calculation will reflect the early retirement reducti (page 9) in effect when you died or when your employment ended, whichever is earlier, based on your age when you die Moreover, if you were *under age 55* at the time of your deatl further reduction will be made based on an actuarial factor th reflects your attained age.

**Important!** The survivor coverage in effect before retirement payments start is provided at no cost to you unless:

☐ upon reaching age 55 (or at a later date) you elected a joint an: survivor option that provided *increased* survivor protection fol your spouse and you then cancelled or reduced this increased protection, or

☐ you elect an option under which your actual retirement paymei are made and this option provides less survivor protection than the method in effect before your retirement payments started.

In either case, the cost of survivor coverage will result in a reduction to your actual retirement benefit based on the specifi survivor coverage you elected and how long the coverage was effect. In any event, however, this reduction won't exceed

½ percent for each year the coverage was in effect and the tc reduction won't exceed 5 percent.

### Coverage After Retirement Payments Start

If you die on or after the date your retirement payments are scheduled to start, any survivor benefits that are payable will t made as provided under the payment method in effect.

(THU) 4. 1'99 12:12/ST. 12 '/NO. 4860155497 P. 25

FROM PITNEY HARDIN KIPP &SZUCH

You or your beneficiary will be told if any additional information is needed to make a claim acceptable. All material related to a claim, such as the plan's official documents, may be examined by you or your beneficiary. Copies of any materials or records that support the claim should be sent with the appeal.

A decision on an appeal usually will be made within 60 days of when it's received, or 120 days in special cases. If a decision on an appeal can't be made within 60 days, you'll be notified in writing before the end of this 60-day period of the special circumstances that require an extended period of consideration of your appeal. The plan administrator's decision on an appeal is final. If you or your beneficiary has filed a claim for benefits which has been denied on appeal by the plan administrator and you or your beneficiary believes the claim has been improperly denied, in whole or in part, you or your beneficiary has certain rights. See page 33 for details.

## Employing Units

An employing unit is a division or department of W. R. Grace & Co., or any company owned or controlled by W. R. Grace & Co., authorized by Grace's Board of Directors to participate in the retirement plan. As of January 1, 1989, these employing units were authorized to participate in the plan.

**W. R. Grace & Co.**
New York Headquarters Staff
Grace Credit Corp.

**W. R. Grace & Co.—Conn.**

**Agricultural Chemicals Group**
Agricultural Chemicals Group Staff
Antilles Chemical Company
Fertilizer Operations

**Grace Specialty Businesses**
Grace Specialty Businesses Group Staff
Ambrosia Chocolate Operations
American Breeders Service
Baker & Taylor Books
Baker & Taylor Video
Cocoa Products
Farr Better Feeds
Grace Distribution
Grace Transportation Services Staff
Grace Transportation Services, Inc.
Ochoa Fertilizer Co., Inc.
Soft Kat, Inc.
Walnut Grove Products

FROM PITNEY HARDIN KIPP &SZUCH    (THU) 4. 1'99 12:12/ST. 12 /NO. 4860155497 P 24

## When Benefits Are Not Paid

Benefits under the retirement plan aren't paid to you or your beneficiary if:

[ ] your employment ends before you're vested

[ ] you die and didn't qualify for survivor protection

[ ] you can't be contacted because we don't have your current address.

## Claims for Benefits

### What to Do

Generally, you or your beneficiary will be notified whenever a benefit becomes payable. You may be asked to provide certain information, such as proof of birth for you and your spouse and proof of marriage. Payments may be delayed until this information is provided.

If you believe you're entitled to a benefit and haven't been notified that one is payable, or if you disagree with the amount the benefit that's payable, you may file a written claim with the plan administrator, which is the plan's Administrative Committee. The Administrative Committee has full and exclusive authority to interpret all plan provisions and to decide claims for all benefits that are filed.

A decision on a claim will be made by the Administrative Committee as soon as possible, but no later than 90 days after a claim is filed, or 180 days in special cases. If a decision on a claim can't be made within 90 days, you'll be notified in writing before the end of this 90-day period of the special circumstances that require an extended period of consideration of your claim and the approximate date as of which the Administrative Committee expects to reach a decision on your claim.

### If a Claim Is Denied

If a claim is denied, in whole or in part, you or your beneficiary will receive a written notice from the Administrative Committee explaining why and on which plan provisions the claim has been denied. The notice will also explain how to file an appeal. An appeal must be made within 60 days after a denial by writing to the Administrative Committee. You or your beneficiary also may choose to name a representative to handle your appeal.

'FROM PITNEY HARDIN KIPP &SZUC'    (TUE) 4. 1'99 12:11/ST. 11:    1/NO. 4860155497 P. 22

## Vesting

### What Vesting Means

If your employment ends before retirement for a reason other than disability (if you qualify under the plan) or death, you'll have a right to receive retirement payments from the plan if you're vested. You're vested if you're age 55 or older or have at least five years of vesting service when your employment ends.

You earn a year of vesting service for each calendar year in which you have at least *1,000 hours of service* and are *age 18 or older*. In addition, subject to the rules of this plan, you'll continue to earn vesting service during a permanent transfer to a unit not covered by this plan or to an ineligible employment status. You won't receive any vesting service, however, for any period in which you elected to stop contributions you were required to make under this plan (or a prior plan), if you were eligible to make such contributions.

### If Your Employment Ends

If your employment ends before you're vested, you'll lose any benefit you earned under the plan. This is called a forfeiture. Your forfeited benefit won't be paid to you or anyone else, and will be used to reduce Company contributions to the plan.

Keep in mind, however, that your employment doesn't end during:

- ☐ a layoff of up to one year or an approved leave of absence
- ☐ a temporary or permanent transfer to a unit not covered by this plan or to an ineligible employment status.

If you're vested when your employment ends, your benefit will be based on your credited service, final average pay, and estimated primary Social Security benefit at the time your employment ended.

Vested payments aren't automatic; you must apply. You may elect to start receiving your vested payments any time upon reaching age 55, but not later than age 65. If these payments st before age 62, they will be reduced the same as an early retirement benefit. Because it may take up to 90 days after all necessary documents have been received before benefit payments will start, you should apply for benefits well in advance of the date you want payments to start. Contact your human resources office for details.

# If You Are Rehired

## Participation

Participation resumes automatically on the date you're rehired if you're eligible and you were a participant when your employment ended. Otherwise, participation will start when you meet the requirements (page 1); any service you had when your employment ended will count to determine when participation starts.

## Restoring Prior Service

The vesting and credited service you had when your employment ended will be restored automatically if you were vested when your employment ended or if you're rehired before a break in service has lasted five, consecutive calendar years. A break in service occurs when your employment ends for a reason other than retirement, disability (if you qualify under the plan), or death, and you don't have more than 500 hours of service in a calendar year.

If you're absent from work because of pregnancy, childbirth, adoption, or related child care, you'll receive hours of service—up to a maximum of 501 hours—if you otherwise would incur a break in service in either the calendar year in which your absence starts or in the following year.

If you weren't vested when your employment ended and your break in service lasts at least five, consecutive calendar years, the vesting and credited service you had when your employment ended will be restored if the years the break lasted are fewer than the years of vesting service you had when your employment ended.

**Important!** If you received a lump-sum payment of your benefit when your employment ended—unless you received such a lump-sum payment as the result of the divestiture of the unit for which you worked—you must repay the lump sum, including interest, within five years after you're rehired in order to restore prior credited service. In addition, if you received payment of your contributions and interest when your employment ended, repayment of this money within five years after you're rehired may be required to restore the full retirement benefit you earned before your employment ended. Contact your human resources office for more information on whether or not you may restore prior service by repaying benefits you've received.

These rules for restoring vesting and credited service apply only if your employment ends on or after January 1, 1976 and you're rehired on or after January 1, 1985. Contact your human resources office for details on the rules that apply if your employment ended or you were rehired on different dates.

## If Payments Have Started

Retirement payments will stop if you're rehired as an eligible employee and you're paid for at least 40 hours during any month (or payroll period, if that payroll period is four or five weeks).

Retirement payments will resume after your employment ends. Your new benefit will reflect your credited service and earnings before and after rehire, and will be reduced by the value of payments you've already received.

(THU) 4. 1'99 12:12/ST. 12:04/NO. 4860155497 P. 26

FROM PITNEY HARDIN KIPP &BZUCH

Grace Specialty Chemicals Co.
Grace Specialty Chemicals Co. Group Staff
Amicon Division
Chomerics, Inc.
Construction Products Division
Cryovac Division
Davison Chemical Division
Dearborn division
Dewey & Almy Chemical Division
Emerson & Cuming, Inc.
Organic Chemicals Division
Polyfibron Division

Natural Resources Group
Natural Resources Group Staff
Grace Drilling Company
Grace Equipment Company
Grace Offshore Company
Grace Petroleum Corporation
HOMCO International, Inc.
ST Services

Research Division
Research Division Staff

Contact your human resources office for information on whether or not a specific employing unit participates in the plan or to obtain a current list of employing units covered by the plan.

## Merged Plans

| Plan Name | Date of Merg |
|---|---|
| Dewey & Almy Chemical Company Retirement Annuity Plan | July 1, 19: |
| American Breeders Service, Inc. Employees' Retirement Plan | May 16, 19( |
| Lachman-Rose Company Inc. Pension Trust* | January 1, 197 |
| Kiddie City Pension Plan and Trust* | January 1, 197 |
| Retirement Plan for Salaried Employees of the Davison Chemical Division of W. R. Grace & Co.—Retirement Plan for Employees of Robertson Chemical Corporation** | January 1, 197 |
| Elm Coated Fabrics Co. Inc. Employees Pension Trust* | May 1, 197 |
| Employees' Retirement Plan of Ambrosia Chocolate Company | January 1, 197 |
| Retirement Plan of W. R. Grace & Co. Chemical Group (Duncan Plant) | January 1, 197 |
| Retirement Plan of W. R. Grace & Co. Chemical Group (Woburn Plant) | January 1, 197 |
| Retirement Plan of W. R. Grace & Co. Chemical Group (Simpsonville Plant) | January 1, 197 |
| W. R. Grace & Co. Retirement Plan "M" for Salaried and Hourly Employees (as it pertains to salaried employees) | January 1, 197 |
| Red Barn Chemical Company Retirement Plan (as it pertains to salaried employees) | January 1, 197 |

[THU] 4. 1'99 12:12/ST. 12 '/NO. 4860155497 P. 27

FROM PITNEY HARDIN KIPP ASZUCH

| Plan Name | Date of Merger |
|---|---|
| Lawrence Maid Employees' Pension Trust* | April 1, 1976 |
| Elmex Corporation Pension Trust* | April 1, 1976 |
| Retirement Plan for Employees of TEC Systems, Inc. (as it pertains to salaried employees) | February 1, 1979 |
| Robert B. Peters Co., Inc. Employees Pension Trust (as it pertains to salaried employees) | February 1, 1979 |
| Retirement Plan of W. R. Grace & Co. Chemical Group—Evans (as it pertains to salaried employees) | October 1, 1979 |
| Golding Industries Inc. Retirement Plan for Salaried Employees | July 2, 1981 |
| Dearborn Chemical Pension Plan | March 10, 1982 |

Copies of the merged plans as well as plan-merger documents (including portions of any corporate merger documents that describe or control the plan merger) are available for inspection by former participants in a merged plan. Copies of such documents may be obtained at a reasonable charge upon written request to the administrative committee. Contact your human resources office for more information.

\* These plans have been divested after their merger into this plan; Grace, however, maintains liabilities for retirees and participants who were vested when their employment ended.

\*\* The Robertson Plan was initially merged into a previous Davison Plan as of August 1, 1963.

The following pages describe other information you should know about the plan and your rights.

**Plan Sponsor**

The sponsor is W. R. Grace & Co., One Town Center Road, Boca Raton, FL 33486-1010.

**Plan Administrator**

The plan administrator is the Administrative Committee of the W. R. Grace & Co. Retirement Plan for Salaried Employees, W. R. Grace & Co., One Town Center Road, Boca Raton, FL 33486-1010, (407) 362-2000. The Administrative Committee is responsible for the management and operation of the plan and has exclusive authority to interpret the plan and decide all claim for benefits filed under the plan.

**Trustee**

All contributions to support this plan go into a trust fund held by The Northern Trust Company, 50 South LaSalle Street, Chicago, IL 60675.

**Plan Year**

Plan records are kept on a plan-year basis, which is the same as calendar year (January 1st to December 31st).

(THU) 4. 1'99 12:13/ST. 12:04/NO. 4860155497. P. 22

FROM PITNEY HARDIN KIPP &SZI

## Plan Identification

The official name of the plan is the W. R. Grace & Co. Retirement Plan for Salaried Employees. The Internal Revenue Service identifies the Company by the number 13-5114230, and the Department of Labor identifies the plan by the number 001. The plan is classified as a "defined-benefit plan.

## If You Can't Receive Payments

If the Company determines that you or a beneficiary isn't able to receive payments—for example, if you're physically or mentally disabled—it may have payments made to the person or institution who is responsible for you or your beneficiary.

## Legal Service

The agent for service of legal process for the plan is the General Counsel, W. R. Grace & Co., One Town Center Road, Boca Raton, FL 33486-1010. Legal process also may be served on the plan administrator or trustee.

## Plan Documents

This booklet describes the main features of the plan as of its most recent amendment on January 1, 1989. It's written in everyday terms and avoids technical terms wherever possible. You should know that the plan also has official documents; this booklet isn't an official document. The official documents—not this booklet—must be used to resolve any question about benefits from the plan.

You may review the official documents by contacting your human resources office. You may obtain copies of these documents by writing to the plan administrator. A reasonable charge may be made for copying these materials.

## Rights to Benefits

Generally, your benefit from the plan may not be assigned, sold transferred, or pledged to a creditor or anyone else. But benefits may be subject to the terms of any qualified domestic relations order resulting from divorce or separation from your spouse.

## The Plan's Future

Although the Company expects to continue the plan for future periods, through the actions of its Board of Directors (or its designee) it reserves the right to change, suspend, or end the plan at any time. If the plan should end, the money in the trust fund may be used only for the benefit of participants and beneficiaries

In the event of a complete plan termination, all participants will become fully vested in their retirement benefits, to the extent funded. In the event of a partial termination, all participants affected by the partial termination will become fully vested in the benefits they have earned.

Moreover, in the event of a complete plan termination, the asset held in the plan's trust fund will be used to fund the retirement benefits of each plan participant, former participant, and beneficiary, as follows:

☐ first, to fund benefits provided by employee contributions

☐ second, to fund certain benefits already being paid

☐ third, to fund benefits to the limit insured by the Pension Benefit Guaranty Corporation (see the following explanation of "Benefit Insurance")

☐ fourth, to fund all other vested benefits, except those that become vested solely because the plan ended

☐ fifth, to fund any other benefits earned under the plan.

FROM PITNEY HARDIN KIPP &SZUY    (THU) 4. 1'99 12:13/ST. 12:04/NO. 4860155497 P 29

If the retirement plan ends, benefits generally will be provided under a group annuity contract bought from an insurance company with plan assets. Any plan assets that remain after all plan benefits have been provided for will be returned to the Company.

### Benefit Insurance

If the plan ends, certain benefits may be insured by the Pension Benefit Guaranty Corporation (PBGC). Generally, the PBGC guarantees most vested, normal-age retirement benefits, early retirement benefits, and certain disability and survivor benefits. The PBGC, however, doesn't guarantee all types of benefits under covered plans, and the amount of benefit protection may be limited.

The PBGC guarantees vested benefits at the level in effect on the date the plan ends. However, if a plan has been in effect fewer than five years before it ends, or if benefits have been increased within five years of when it ends, the whole amount of the plan's vested benefits or the benefit increase may not be guaranteed. Additionally, there's a ceiling, adjusted periodically, on the amount of monthly benefit PBGC guarantees.

For more information on PBGC insurance protection and its limits, write to the Office of Communications, PBGC, 2020 K Street, N.W., Washington, DC 20006. Or you may call the PBGC at (202) 778-8840

### Your Rights

Participants and beneficiaries of this plan have certain rights provided under ERISA—the Employee Retirement Income Security Act.

ERISA doesn't require an employer to provide benefits, but i does set standards on how a plan is run, and requires that you kept fully informed of your rights and benefits. For example, each year you'll receive a summary of the plan's annual finan report at no cost to you.

In addition, you have the right to examine without charge all documents related to the plan, including copies of all docume led with the Department of Labor and the Internal Revenue Service. These documents may be reviewed by contacting yo human resources/personnel office or the plan administrator.

Copies of all plan documents and related materials may be obtained by writing to the plan administrator. A reasonable charge may be made for copying these materials.

You also have the right to receive a statement of your benefit under the plan once each year at no cost to you by writing to plan administrator. The statement will show whether or not you're vested. If you're vested, it will show the benefit you would receive at age 65 if you left the Company. If you aren' vested, it will show how much longer you must work to beco vested.

The people who operate the plan, the fiduciaries, must do so prudently and in the interest of participants and beneficiaries.

You may not be red or discriminated against by any employe for exercising your rights under ERISA, or to prevent you fr obtaining a benefit.

If your claim for a benefit is denied in whole or in part by the Administrative Committee, you must receive a written explanation. You have the right to request a review and reconsideration of your claim by the Administrative Committ

FROM PITNEY HARDIN KIPP &SZUCH    (THU) 4. 1'99 12:13/ST. 12:04/NO. 4860155497 P. 30

There are steps you may take to enforce your rights. For example, if you request in writing plan materials and don't receive them within 30 days, you may file suit in a federal court. The court may require the plan administrator to provide these materials and pay you up to one hundred dollars for each day's delay, unless they weren't sent because of reasons beyond the control of the plan administrator.

You also may file suit in a state or federal court if you feel that you have been improperly denied a benefit, in whole or in part. The court that decides your claim will generally accept the Administrative Committee's final decision unless it finds that the Administrative Committee's decision was "arbitrary and capricious." If the plan fiduciaries misuse the plan's money or if you're discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or file a suit in federal court.

If you file a suit, the court will decide who should pay court costs and legal fees. If you're successful, the court may order the party you've sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees if, for example, it finds your claim frivolous.

If it should become necessary to take legal action to enforce your rights, legal process may be served on any designated agent named in this booklet.

You're encouraged to contact the plan administrator if you have any questions about the plan. For more information about your rights, you may contact the Pension and Welfare Benefits Administration, U.S. Department of Labor, 200 Constitution Avenue, N.W., Washington, DC 20210.

34

FROM PITNEY HARDIN KIPP &SZUC.    (THU) 4. 1'99 12:14/ST. 12:04/NO. 4860155497 P 31

# The W. R. Grace & Co.
# Supplemental Executive
# Retirement Plan

**March 1993**



## Contents

2    Introduction

2    Participation

3    How the Plan Works

3    Credited Service
3    Final Average Pay
4    Examples of Final Average Pay

5    Primary Social Security Benefit
5    Federal Limits on Pension Benefits
6    How Benefits Are Calculated

6    Retirement

6    Normal Retirement
6    Early Retirement

7    How Benefits Are Paid

7    Normal Method if Single
7    Normal Method if Married
7    Other Payment Methods

7    Pre-Retirement Survivor
     Coverage

8    Vesting

8    Other Information

## Introduction

The W. R. Grace & Co.
Supplemental Executive Retirement
Plan (the supplemental plan) was
adopted by the Grace Board of
Directors as of October 4, 1984 for
the purposes of:

♦   formalizing the Company's
commitment to provide full
retirement benefits to eligible
executives whose benefits under
the W. R. Grace & Co. Retirement
Plan for Salaried Employees (the
salaried plan) exceed the maximum
limit payable under federal tax law;

♦   recognizing deferred
compensation in benefit
calculations;

♦   recognizing as credited
service, under certain
circumstances, periods of
employment with Grace during
which executives are or have been
ineligible to participate in the
salaried plan.

Unlike the salaried plan, the
supplemental plan is not a
"qualified" plan under federal tax
law. All benefits under the
supplemental plan are paid by the
Company from its general assets.
The Board of Directors is
responsible for the supplemental
plan's maintenance and operation
and has appointed the
Compensation, Employee Benefits
and Stock Incentive Committee to
administer the plan. The following
pages summarize the main features
of the supplemental plan. Because
the supplemental plan is tied to the
salaried plan, please refer to the
summary of the salaried plan for
more information on your retirement
benefits. Please contact the Human
Resources Division at the Boca
Raton Headquarters Office if you
have any questions or require
assistance.

## Participation

As an executive of Grace or a
company controlled by Grace (an
affiliate), you are eligible for the
supplemental plan if, on or after
October 4, 1984, your annual base
salary is at least $75,000 and you
are earning credited service under
the salaried plan at the same time.

In addition, under certain
circumstances you may be
considered eligible for the
supplemental plan even if you are
not earning credited service under
the salaried plan, upon the
recommendation of Grace's senior
management and the approval of
Grace's Board of Directors.

2

FROM PITNEY HARDIN KIPP &SZU…    (THU) 4. 1'99 12:14/ST. 12:04/NO. 4860155497 P 34

## How the Plan Works

The same pension formula is used to calculate benefits under the supplemental and salaried plans. Benefits under either plan will be based on your credited service, final average pay, and estimated primary social security benefit.

Although the same pension formula is used, calculations under the supplemental plan include deferred compensation and, as credited service, certain periods of employment that may not be included by the salaried plan. Moreover, calculations under the supplemental plan are not subject to federal limits on benefit payments that apply to the salaried plan. Your benefit under the supplemental plan will equal the difference between the total benefit calculated and the benefit actually payable to you under the salaried plan.

### Credited Service

Subject to the exclusions that follow, credited service under the supplemental plan includes:

♦ each month during which you participate in the salaried plan and have at least one hour of service;

♦ any period during which you qualify as disabled under the salaried plan;

♦ all other employment with a division of Grace or an affiliate that does not participate in the salaried plan.

Credited service, however, will not include any period during which:

♦ you were satisfying the salaried plan's participation eligibility requirements (or would have been satisfying these requirements if the Grace company for which you were working had been covered by the salaried plan);

♦ you were eligible to contribute to the salaried plan (or any prior contributory retirement plan) and elected not to do so;

♦ you waive participation in the salaried plan;

♦ you are away from work on an approved leave of absence for any reason other than disability;

♦ you are not an employee of Grace or an affiliate (except for employment before acquisition by Grace that counts as credited service under the salaried plan).

If your employment with Grace and all of its affiliates terminates and you are rehired by Grace or an affiliate at a later date, your prior employment may count as credited service under the supplemental plan. Contact the Human Resources Division for details.

### Final Average Pay

Pension benefits under both the salaried and supplemental plans reflect your final average pay, which is the monthly average of your pay for the 60-consecutive months (five consecutive years) in which your pay is the greatest during the last

3

180 months (15 years) of your continuous employment with Grace or an affiliate.

Under the supplemental plan, your pay includes earnings you receive (or are eligible to receive) from Grace or an affiliate, including base salary and/or annual incentive compensation awards (maximum of five) you elect to defer or have previously elected to defer under the Company's Deferred Compensation Program, before any deductions are made.

If you elect to defer base salary or annual incentive compensation (or both), your final average pay is determined as if you had received the deferred amount or amounts in the month in which they would have otherwise been paid. That is, if you should elect to defer your 1993 incentive compensation award until after retirement, and you otherwise would have received this award in March 1994, your final average pay would be determined as if you had received the award in March 1994.

As under the salaried plan, the definition of pay under the supplemental plan does not include special pay, income related to stock options or stock awards, long-term incentive awards, and Company contributions made in your behalf to any benefit plan, including this plan.

**Important:** If your active employment with Grace and all its affiliates terminates and you are then rehired by Grace or an affiliate, any deferred base salary or annual incentive compensation will count when calculating final average pay only if credited service for the

month in which you would have received that salary or incentive compensation is restored under the supplemental plan.

## Examples of Final Average Pay

If an executive retires on January 1, 1995 and the executive's pay was greatest during the five-year period immediately before retirement, here is an example how final average pay is determined.

| | Base Salary Paid | Annual Incentive Compensation | | Total Pay |
| | | Paid | Deferred | |
| --- | --- | --- | --- | --- |
| 1990 | $ 90,000 | $ 20,000 | -0- | $100,000 |
| 1991 | 90,000 | 20,000 | -0- | 110,000 |
| 1992 | 100,000 | 10,000 | $ 10,000 | 120,000 |
| 1993 | 110,000 | -0- | 20,000 | 130,000 |
| 1994 | 120,000 | -0- | 20,000 | 140,000 |
| | $500,000 | $50,000 | $50,000 | $600,000 |

Under the supplemental plan, the executive's final average pay would equal $120,000 ($600,000 ÷ 5). Under the salaried plan, however, the executive's final average pay would equal $110,000 ($550,000 ÷ 5), since the deferred incentive compensation would not be included. Remember, the benefit payable under the supplemental plan would equal the difference between the calculations under the supplemental plan's formula and the salaried plan's formula.

Keep in mind that the incentive compensation in this example represents when awards are paid or would otherwise have been paid if a deferral had not been elected. That is, the total incentive compensation shown for 1992 represents an award of $20,000 made in 1992 for 1991 services, for which the executive elected to defer 50 percent in December of 1990.

4

The calculation works the same if the executive had deferred base salary and not incentive compensation. Again, total pay, including deferred base salary, would be used to determine final average pay under the supplemental plan as shown in the following example.

| | Base Salary | | Annual Incentive Compensation | Total Pay |
|---|---|---|---|---|
| | Paid | Deferred | Paid | |
| 1990 | $ 68,000 | $ 12,000 | $ 20,000 | $ 100,000 |
| 1991 | 78,000 | 12,000 | 20,000 | 110,000 |
| 1992 | 88,000 | 12,000 | 20,000 | 120,000 |
| 1993 | 98,000 | 12,000 | 20,000 | 130,000 |
| 1994 | 108,000 | 12,000 | 20,000 | 140,000 |
| | $440,000 | $60,000 | $ 100,000 | $600,000 |

Under the supplemental plan, the executive's annual final average pay would equal $120,000 ($600,000 ÷ 5). Under the salaried plan, however, the executive's annual final average pay would equal $108,000 ($540,000 ÷ 5), since the deferred base salary ($60,000 for five years) would not be included.

Again, remember that the benefit payable under the supplemental plan would equal the difference between the calculations under the supplemental plan's formula and the salaried plan's formula.

### Primary Social Security Benefit

An estimate of your primary social security benefit is used in calculating benefits under both the salaried and supplemental plans. The estimate of the monthly benefit social security will pay you at age 65 (or at your current age, if you're over age 65), is based on your career earnings (assuming no additional earnings from the time your employment with Grace terminates) and the terms of the Social Security Act in effect at the time your employment terminates.

Any social security benefit payable to your spouse or other family member will not be considered in these calculations.

### Federal Limits on Pension Benefits

Benefit payments under tax qualified pension plans, such as the salaried plan, are subject to a maximum limit under federal tax law. For 1993, benefits payable at the "social security" retirement age (see below) from a qualified pension plan may not exceed $115,641 per year ($9,637 per month); this limit is scheduled to change each year based on a cost-of-living index. Moreover, this limit is reduced if payments start before social security retirement age. Social security normal retirement age is age 65 for those born before 1938, gradually increasing to 66 for those born between 1938 and 1954, and gradually increasing to 67 for those born after 1954.

In addition, in 1993 the annual compensation used to calculate benefits under qualified benefit plans is limited to $235,840. This limit is scheduled to change each year based on the same cost-of-living index used in determining other qualified plan limits.

5

### How Benefits Are Calculated

Your normal annual retirement benefit under the supplemental plan will be calculated as follows:

1.5 percent of your final average pay *times* your years of credited service,

*minus* 1.25 percent *times* your estimated primary social security benefit *times* your years of credited service,

*minus* any applicable reductions (i.e., if you start receiving plan payments before age 62; if payments are made under a method other than a life annuity; if you elect an option that provides reduced survivor protection for your spouse at retirement; and, if applicable, you elected a transfer or refund of your contributions from the salaried plan),

*minus* the actual annual benefit payable to you under the salaried plan (including any reductions made to reflect the federal maximum annual benefit limit, the exclusion of deferred compensation, or the exclusion of compensation in excess of limits defined by federal tax laws).

If you were employed by Grace or an affiliate when employee contributions were required under the salaried plan and you were ineligible for the salaried plan, the portion of your supplemental plan benefit that is based on credited service for that period will be reduced by 30 percent.

In addition, supplemental plan benefits are reduced by benefits you either received or are eligible to receive from any other pension or profit sharing plan of Grace or an affiliate (excluding the Grace savings and investment plans), including legislated or negotiated plans which Grace or an affiliate has funded. If you are entitled to receive such pension (or profit sharing) benefits, the reduction to your supplemental plan benefit will reflect the credited service (or the years of participation in a profit sharing plan) that counts both under the other pension plan (or profit sharing plan) and the supplemental plan, the payment method that applies, and the date payments start under the supplemental plan.

## Retirement

Your election to retire under the salaried plan automatically applies to the supplemental plan.

### Normal Retirement

Generally, normal retirement occurs at the end of the month in which you reach age 65. But if you continue to work past age 65, normal retirement occurs at the end of the month in which your employment terminates.

### Early Retirement

If you wish to retire at a younger age, you may do so on the last day of any month on or after your 55th birthday. If you retire early, you may elect to start receiving payments immediately or delay them until a later date. However, if payments start before age 62, your

6

benefit will be reduced to reflect the likelihood that you will receive benefits for a longer period of time. The reduction is based on your age when payments start.

## How Benefits Are Paid

The payment method you elect under the salaried plan will automatically apply to the supplemental plan.

### Normal Method If Single

Your normal payment method is a life annuity if you're single when payments are scheduled to start. This method provides you with lifetime monthly payments, with no payments continuing to anyone following your death. The dollar amount of this type of payment is greatest because only one lifetime is covered -- yours.

### Normal Method If Married

If you are married when your payments are scheduled to start, your normal payment method is a 50 percent joint and survivor annuity. This method provides you with reduced monthly payments for life. Following your death, your spouse (your spouse at the time your benefits commenced), if surviving you, will receive one-half of your monthly payment for life. Payments are reduced under this method to cover two lifetimes -- yours and your spouse's.

### Other Payment Methods

The plan's other alternate payment methods available to you include:

♦ Joint and survivor annuities of 100, 75, or 66-2/3 percent of your monthly payments, as you elect;

♦ Life annuity on your life only (which is available as an option to married participants);

♦ Ten-year certain and life annuity (with death benefits, if any, payable to your spouse or designated beneficiary);

♦ Level income benefits.

Certain restrictions apply to the availability of the above options, based on your marital status and time of election, as described in the summary of the salaried plan.

## Pre-Retirement Survivor Coverage

Under the supplemental plan, pre-retirement survivor coverage for your spouse is the same as the pre-retirement survivor coverage provided under the salaried plan. All elections that apply to pre-retirement survivor coverage under the salaried plan automatically apply to the supplemental plan.

7

## Vesting

Vesting refers to your right to a pension benefit under the supplemental plan. You become vested under the supplemental plan when:

♦    you reach age 55, if you are an employee of Grace or an affiliate at that time,

♦    you have at least five years of "vesting service" with Grace or an affiliate, as determined under the salaried plan, or

♦    you are otherwise vested under the salaried plan.

In the event you terminate employment for any reason other than disability as recognized under the salaried plan, and are not vested, you will not be eligible to receive any pension benefit from the supplemental plan. However, if you are subsequently rehired, this benefit may be restored, subject to the break-in-service rules of the supplemental plan.

## Other Information

The supplemental plan may be terminated by Grace at any time for any or all employees. Grace may also change any plan feature at any time.

In addition, Grace as administrator of the supplemental plan has the discretionary authority to determine eligibility for plan benefits and to otherwise interpret the terms of the supplemental plan. The decisions of Grace with regard to interpreting the terms of the plan are final.

8

CERTIFICATE OF SERVICE

I, Rena M. Honorow, being duly sworn, state that I caused copies of the foregoing Notice Of Filing and Defendant W.R. Grace & Co.-Conn.'s Motion To Dismiss Counts II-V Of Plaintiff's Complaint referred to therein, to be served upon the person to whom the Notice is addressed by enclosing said copies in a properly addressed envelope, postage prepaid, and depositing same in the United States mail at 525 West Monroe Street, Chicago, Illinois, this 25th day of June, 1999.

Rena M. Honorow