## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| W.R. GRACE & CO., *et al.*,[1] | ) Case No. 01-01139 (KG) |
| | ) Jointly Administered |
| Reorganized Debtors. | ) |
| | ) **Re: Docket Nos. 32825, 32837, 32838** |

### NORFOLK SOUTHERN RAILWAY COMPANY'S REPLY BRIEF (I) IN SUPPORT OF NORFOLK SOUTHERN'S CROSS-MOTION FOR SUMMARY JUDGMENT AND (II) IN RESPONSE TO THE REORGANIZED DEBTORS' MOTION TO STRIKE THE SHARPE AND CONLEY DECLARATIONS

**POTTER ANDERSON & CORROON LLP**
David J. Baldwin (DE Bar No. 1010)
R. Stephen McNeill (DE Bar No. 5210)
D. Ryan Slaugh (DE Bar No. 6325)
1313 North Market Street, Sixth Floor
Wilmington, DE 19899-0951
Telephone: (302) 984-6000
Facsimile: (302) 658-1192

*Counsel to Norfolk Southern Railway Company*

Dated: April 11, 2017

---

[1]    The Reorganized Debtors are W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc., or "Grace") and W. R. Grace & Co.-Conn. ("Grace-Conn.")

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ........................................................................................................ 3

I.  THE REORGANIZED DEBTORS' ARGUMENTS RAISE
    MATERIAL FACTUAL ISSUES THAT PRECLUDE SUMMARY
    JUDGMENT ON THE MERITS ............................................................ 3

    A.  The Parties Disagree Over Which Spout Was Used to Fill the
        Railcars Involved in the January 26 Accident ............................. 3

    B.  The Parties Disagree Over Whether the Railcars Were
        Overfilled ................................................................................ 6

    C.  The Debtors Interpretation of the Agreements Is Flawed and Unsupported
        by the Case Law ....................................................................... 7

    D.  The Debtors Assign Far Too Much Weight to the January 26 Conversation
        Between Mr. Kirkland and Mr. Chapman ................................. 14

II. THE TRIAL RECORD IS ADMISSIBLE IN THIS PROCEEDING .................. 19

    A.  The Trial Record Is Either Admissible for Both Parties
        or Inadmissible ....................................................................... 20

    B.  The Debtors Misinterpret the Voucher Argument .................... 21

    C.  Mr. Kirkland's Testimony Is Admissible under Federal Rule of Evidence
        804(b)(1) ................................................................................ 23

CONCLUSION .................................................................................................. 28

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Pages**

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) .................................................................................. 8

*FabArc Steel Supply, Inc. v. Composite Const. Sys., Inc.,*
    914 So.2d 344 (Ala. 2005).......................................................................... 8

*Gilstrap v. Culpepper,*
    320 S.E.2d 445 (S.C. 1984) ...................................................................... 11

*Humble Oil & Ref. Co. v. Phila. Ship Maint. Co.,*
    444 F.2d 727 (3d Cir. 1971) ...............................................................22 - 23

*Madden v. Antonov,*
    966 F. Supp. 2d 851 (D. Neb. 2013)......................................................... 24

*Master Blaster, Inc. v. Dammann,*
    781 N.W.2d 19 (Minn. Ct. App. 2010)..................................................... 22

*Peloro v. U.S.,*
    488 F.3d 163 (3d Cir. 2007) ..................................................................... 21

*Pride v. S. Bell Tel. & Tel. Co.,*
    138 S.E.2d 155 (S.C. 1964) ........................................................................ 8

*S. R. Co. v. Brunswick Pulp & Paper Co.,*
    376 F. Supp. 96 (S.D. Ga. 1974) ............................................................. 11

*S. R. Co. v. Insur. Co. of N. A.,*
    183 S.E.2d 912 (Ga. 1971) ....................................................... 12, 13, 14

*Schrier v. Indiana Harbor Belt R. Co.,*
    430 N.E.2d 204 (Ill. App. Ct. 1981)........................................................ 24

*Sol Walker & Co. v. Seaboard Coast Line R. Co.,*
    362 So.2d 45 (Fla. App. 1978) ................................................................. 12

*Union Pac. R. Co. v. El Paso Nat. Gas Co.,*
    408 P.2d 910 (Utah 1965)................................................................. 13, 14

*United N.Y. Sandy Hook Pilots Assoc. v. Rodermond Indus., Inc.,*
    394 F.2d 65 (3d Cir. 1968) ....................................................................... 23

*Universal Am. Barge Corp. v. J-Chem, Inc.,*
    946 F.2d 1131 (5th Cir. 1991) ................................................................. 22

*Webber v. S. Life & Trust Co.,*
  88 S.E. 124 (S.C. 1916) ....................................................................................... 18, 19

**Statutes**

49 U.S.C. § 20302 .......................................................................................................... 15

**Other Authorities**

*Fed. R. Evid.* 804(b)(1) .................................................................................... 23, 24, 25, 27

*Fed. R. Evid.* 807(a) ............................................................................................... 26, 27

*Fed. R. Evid.* 807(b) ..................................................................................................... 27

Restatement (Second) of Agency § 288 ................................................................. 18, 19

Norfolk Southern Railway Company ("Norfolk Southern")[2] hereby respectfully submits its brief (the "Reply Brief") (I) in support of its Cross-Motion and (II) in response to the Debtors' Motion to Strike the Sharpe and Conley Declarations [D.I. 32837] (the "Motion to Strike").

## PRELIMINARY STATEMENT

The Debtors' reply brief includes two declarations that offer new evidence in support of their Motion.[3] Rather than simply conceding that the competing declarations offered by the Parties create genuine issues of material fact that make summary judgment on the ultimate issue improper, the Debtors bombard Norfolk Southern and the Court with a five-brief, 110-page response,[4] filled with repetitive arguments that raise only four issues:

---

[2]    Capitalized terms used herein but not otherwise defined, shall have the meaning ascribed to them in *Norfolk Southern Railway Company's (I) Answering Brief in Opposition to Reorganized Debtors' Motion for Summary Judgment Pursuant to Fed. R. Bankr. P. 7056 for Partial Allowance and Partial Disallowance of Claim No. 7021 and (II) Opening Brief in Support of Norfolk Southern's Cross-Motion for Summary Judgment* [D.I. 32826] (the "NS Opening Brief").

[3]    Those two declarations were attached as D and E to the *Omnibus Memorandum in Support of Granting the Reorganized Debtors' Summary Judgment Motion, Denying Norfolk Southern's Cross-Motion and Disallowing Norfolk Southern's Indemnification Claim* [D.I. 32838] (the "Debtors' Omnibus Brief").

*The Declaration of David Drumming, Jr. in Support of the Reorganized Debtors' Omnibus Memorandum in: (A) Reply in Support of the Reorganized Debtors' Motion for Summary Judgment Pursuant to Fed. R. Bankr. P. 7056 for Partial Disallowance of Claim No. 7021, Filed by Norfolk Southern Railway; (B) Response to Cross-Motion for Summary Judgment Allowing Claim No. 7021; and (C) Support of an Order Finding the FELA Action Trial Record Inadmissible for the Purpose of Norfolk Southern Establishing Its Indemnification Claim* will be referred to herein as the "Drumming Declaration").

The *Declaration of Carl Silas in Support of the Reorganized Debtors' Omnibus Memorandum in: (A) Reply in Support of the Reorganized Debtors' Motion for Summary Judgment Pursuant to Fed. R. Bankr. P. 7056 for Partial Disallowance of Claim No. 7021, Filed by Norfolk Southern Railway; (B) Response to Cross-Motion for Summary Judgment Allowing Claim No. 7021; and (C) Support of an Order Finding the FELA Action Trial Record Inadmissible for the Purpose of Norfolk Southern Establishing Its Indemnification Claim* will be referred to herein as the "Silas Declaration," and collectively with the Drumming Declaration, the "Debtors' Declarations").

[4] The Debtors attached three other briefs as Exhibits A through C to their 13-page Debtors' Omnibus Brief. Those three briefs, which are identified below, along with the hyper-technical arguments in the separately-filed Motion to Strike collectively make up the Reorganized Debtors' 110-page response to the NS Opening Brief (collectively, the "Debtors' Reply").

(i) whether the so-called "Main Loading Spout" was utilized on the day of the Accidents and is governed by the Agreements; (ii) whether the railcars were overfilled on the days of the Accidents; (iii) whether the single use of the phrase "on or about" in each Agreement warrants an artificially narrow reading of the Agreements; and (iv) whether Mr. Chapman made a "safe to run" decision on January 26, 1998 that single-handedly absolved the Debtors from any and all liability for overfilling the railcars with kaolin that morning.  Each of these issues revolves around one or more disputed material facts and, thus, cannot serve as a basis for summary judgment at this time.

Although none of the issues identified above can be resolved on summary judgment, one live legal issue between the Parties remains that appropriately may be resolved on summary judgment:  whether the Trial Record is admissible in this proceeding or whether it should be excluded.  Unlike the Debtors, who take the position that the portions of the Trial Record that they deem beneficial are admissible while the portions favorable to Norfolk Southern are inadmissible, Norfolk Southern's position is a simple one.  Either the Trial Record, or at a minimum Mr. Kirkland's testimony therein, is

---

The 51-page *Reply in Support of the Reorganized Debtors' Motion for Summary Judgment Pursuant to Fed. R. Bankr. P. 7056 for Partial Disallowance of Claim No. 7021, Filed by Norfolk Southern Railway*, which was attached to the Debtors' Omnibus Brief as Exhibit A, shall be referred to herein as the "Debtors' Reply Brief").

The 18-page *Response to Norfolk Southern's Cross-Motion for Summary Judgment Allowing Claim No. 7021, Filed on January 27, 2017 [Docket No. 32825]*, which was attached to the Debtors' Omnibus Brief as Exhibit B, shall be referred to herein as the "Debtors' Response Brief").

The 20-page *Memorandum in Support of the Court's Entry of an Order Finding that the FELA Action Trial Record is Inadmissible for the Purpose of Norfolk Southern Establishing its Indemnification Claim*, which was attached to the Debtors' Omnibus Brief as Exhibit C, shall be referred to herein as the "(Debtors' Inadmissibility Brief").

admissible, or it is not.[5]  The Debtors declined to participate in the Georgia Litigation, and thus, should not be permitted to selectively quote from the Trial Record at will, while simultaneously barring Norfolk Southern from responding with its own portions of that same Trial Record.

## ARGUMENT

I.    **THE REORGANIZED DEBTORS' ARGUMENTS RAISE MATERIAL FACTUAL ISSUES THAT PRECLUDE SUMMARY JUDGMENT ON THE MERITS.**

   A.    **The Parties Disagree Over Which Spout Was Used to Fill the Railcars Involved in the January 26 Accident.[6]**

For the first time in their Reply Brief, the Debtors present their own evidence, in the form of the Debtors' Declarations.  In their Motion, the Debtors relied heavily, and exclusively, upon documents that had been produced by Norfolk Southern in response to the Objection for their purported "undisputed" facts.  See generally Debtors' Proposed Facts.  Despite finally offering their own evidence for the first time, the Debtors continue to insist that they are entitled to summary judgment based solely on the evidence provided by Norfolk Southern.  See Debtors' Omnibus Brief, at ¶9 (indicating that the Debtors are presenting their own evidence "out of an abundance of caution" in case the Court

---

[5]    The Parties previously agreed that either could offer the Trial Record in this adversary proceeding, but the Debtors have now reneged on that agreement.  See Email from Roger Higgins, counsel to the Debtors, to Etta R. Mayers and David J. Baldwin, counsel to Norfolk Southern, dated March 26, 2015, attached hereto as **Exhibit A.**

[6]    The Debtors continue to assert that Norfolk Southern has "failed to carry its burden of proof that the Debtors had anything to do with Kirkland's January 23 railcar accident."  Debtors' Reply Brief, at ¶106.  Of course, Norfolk Southern recognized that this was a disputed fact, and did not seek summary judgment in connection with the January 23 Accident on that basis.  See NS Opening Brief, at 9-10.  Thus, Norfolk Southern has no burden to carry on this issue at this time.

determines that a trial is required). The Debtors, however, cannot avoid obvious disputed facts by ignoring their own evidence.

The Debtors assert that the so-called "Specialty Loading Spout" was the product of the 1990 Amendment, and that it was only used three times per month on average, in loading a specialty form of kaolin known as NKC.[7] Drumming Declaration, at ¶7. Yet, the 1990 Amendment provides no indication that the "overhead loading structure with retractable loading spout" covered thereby was intended to be used for specialty kaolin loads. 1990 Amendment at ¶1. Indeed, the words "specialty" and "NKC" do not appear anywhere in the 1990 Amendment. The only evidence on this point in the record was offered by Mr. Drumming in his declaration.

Regardless of the veracity of Mr. Drumming's assertions regarding the intended use of the Specialty Loading Spout, he acknowledges that the Debtors used both spouts in the "1990s," and this acknowledgment is consistent with the Conley Declaration submitted by Norfolk Southern. Drumming Declaration, at ¶8; Conley Declaration at ¶6. Neither party has offered specific evidence[8] from the date of either accident to identify which loading spout was used on those days, so summary judgment on the issue of the indemnification provided by paragraph 5 of the 1990 Amendment must be denied on this basis.

---

[7]     Mr. Drumming admits, however, that "the number of railcars loaded per month could vary considerably, depending on customer demand." Drumming Declaration, at ¶7. Neither Mr. Drumming nor Mr. Silas offer specific evidence with respect to the number of NKC shipments loaded in January 1998, much less on the date of either of the Accidents.

[8]     In the NS Opening Brief, Norfolk Southern understood that the Debtors were primarily using the loading spout identified in the 1990 Agreement because (a) the 1990 Agreement did not specifically identify the alleged special purpose of the loading spout and (b) common business rationale dictates that a company requesting permission to construct a new loading spout intends to construct that spout for regular use.

Although the "Main Loading Chute" was not expressly identified in the License Agreement, the Debtors began using it no later than June 1989. Drumming Declaration, at ¶4 ("The Main Loading Chute was in operation when I began working at Grace . . . ."). The Debtors otherwise fail to allege any facts demonstrating that the Main Loading Chute was in use prior to the execution of the Agreements. All other structures on the property were expressly identified either in the text of the Agreement or on the diagram attached thereto. License Agreement, at ¶6. To the extent the Debtors assert that the Main Loading Chute is not covered by the License Agreement and was in operation prior to the execution of the Agreements—and Norfolk Southern is entitled to discovery to test those assertions— then the Debtors would have been in violation of paragraph 6 of the License Agreement from day one. Id., at ¶6 ("Any buildings, structures or improvements erected by [the Debtors] on said premises, if permitted hereby, shall be . . . located as described herein or shown on the attached print."). If the Debtors commenced using the Main Loading Chute subsequent to the effective date of the Agreements, the Debtors would still be in violation of paragraph 6. Id. ("[The Debtors] will not construct or install upon said premises any buildings, structures or improvements unless specifically permitted hereby or by written consent of [Norfolk Southern]."). Without proof of permission from Norfolk Southern to use the "Main Loading Chute," the Debtors are required to indemnify Norfolk Southern for Mr. Kirkland's injuries because they "were caused solely by . . . the violation by [The Debtors] or its agents or employees of the terms of this agreement." Id., at ¶10(b).

Rather than admitting an obvious material factual dispute, the Debtors proceed to make unnecessary and inappropriate challenges to the Sharpe and Conley Declarations

(together, the "NS Declarations") in an effort to eliminate this disputed fact.[9]  Norfolk Southern could make similar hyper-technical arguments with respect to the Debtors' Declarations, but it will not burden the Court with such premature, and frivolous, arguments.  Issues surrounding foundation, hearsay and other evidentiary arguments can be resolved, if necessary, at trial, after the Parties have had an opportunity to take discovery and depose the respective declarants.

**B.      The Parties Disagree Over Whether the Railcars Were Overfilled.**

Much like the dispute over which spout was used to fill the railcars, an open dispute also remains regarding whether the railcars were overfilled.  Once again, the Debtors raise technical arguments to try to avoid this unquestionable outcome, but those arguments must fail.  See, e.g., Drumming Declaration, at ¶14 (distinguishing between the similar terms "overrun" and "overfilled"); ¶¶ 24, 28 (using three related terms:  "overrun," "spill," and "overfilled").  Regardless of the terminology used to describe how the kaolin ended up on the railcars, the Debtors do not dispute that, at least occasionally, their kaolin ended up covering a railcar.  Mr. Drumming admits as much in several locations in his declaration. See, e.g., id. at ¶20 ("The flat, non-climbing surfaces do appear to be caked with kaolin."); id. ("[I]t is difficult for me to tell, based on my experience, whether what appears to be

---

[9]      For example, the Debtors quibble over Mr. Conley's and Mr. Sharpe's use of the term "Facility" because that term is defined in the Agreements.  Motion to Strike, at 2-3, 5-6.  The term "Grace Facility" in the NS Declarations has the same meaning as the term "Grace Plant" in the Debtors' Declarations, and this objection is simply frivolous.  Likewise, the Debtors state that the words "'slip and fall' are conclusory and Sharpe fails to state facts indicating what those mean."  Motion to Strike, at 5.  Norfolk Southern's witnesses are not required to define every term used in their declarations to make their statements evidence for purposes of summary judgment.  Finally, the Debtors object to several portions of the NS Declarations as conclusory—which is not even an evidentiary objection—because they do not like the personal observations of Mr. Sharpe and Mr. Conley.  See, e.g., Motion to Strike, at 7 (objecting to the statement "I saw that the railcar was dangerously overfilled.").  These hyper-technical objections are just a few examples of the Debtors' attempt to avoid discovery and a trial on this matter.

kaolin on the various surfaces was fresh powder or old, caked deposits."); id. at ¶28 (referencing "occasional overruns" and fresh kaolin spills).

Because the Debtors' Declarations contain no specifics regarding the condition of the railcars on the dates of the Accidents, they cannot claim that the railcars indisputably were not covered with overfilled/overrun/spilled kaolin on those days. Moreover, other than testimony from the Trial Record, the only evidence about the state of the railcars on the dates of the Accidents is from Mr. Conley (¶10) and Mr. Sharpe (¶¶7, 8). At best, the Debtors' Declarations provide the Debtors with an argument that the kaolin on the railcars on those days was residue from years of build-up, rather than fresh clay. That is a quintessential disputed material fact that prevents summary judgment.

**C. The Debtors Interpretation of the Agreements Is Flawed and Unsupported by the Case Law.**

Supported by their version of the "undisputed facts," the Debtors rely on inapposite case law—including an ERISA case that has been abrogated by the United States Supreme Court—to support their flawed interpretation of the Indemnification Provisions. Notably, the Debtors, despite all the grammatical citations in the Debtors' Reply, ignore the import of the conjunction "or." Before turning to the reasons why the Debtors arguments must fail, however, Norfolk Southern will frame the issues for the Court based on the actual procedural posture of this case—something the Debtors fail to address in 110 pages of briefing.

**1. The Disputed Facts Above Must Be Resolved in Norfolk Southern's Favor for Purposes of the Debtors' Motion.**

Given the significant disputed facts discussed above, the Court can grant summary judgment in favor of the Debtors only if it adopts Norfolk Southern's view of the disputed facts. Otherwise, the Motion must be denied so that the Parties may begin the discovery

process and prepare for trial. This Court may not "weigh the evidence or make credibility determinations," and must resolve all inferences in the light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). When appropriately viewed through this prism, the Motion must be denied.

> 2. The Indemnification Provisions Unambiguously Provide for Norfolk Southern's Indemnification Claim.

The Debtors argue that the Indemnification Provisions "clearly and unequivocally do not state that the Debtors are contractually liable to indemnify Norfolk Southern for the accidents at issue here." Debtors' Reply Brief, at ¶47. To support this argument, the Debtors rely on factually and legally distinguishable cases finding that ambiguity in a contract must be interpreted against the drafter. Id. at ¶50. If the Agreements are clear, as the Debtors assert, the Court need not resort to rules of interpretation to determine the intent of the Parties in entering the Agreements. Indeed, the Debtors' own cases provide that ambiguity in a contract is a basis to deny summary judgment. See FabArc Steel Supply, Inc. v. Composite Const. Sys., Inc., 914 So.2d 344, 361 (Ala. 2005) ("Because ambiguity remains, a summary judgment as to the meaning and proper application of the allegation provision to the facts of this case was improper.")

> a. The Indemnification Provisions Expressly Indemnify Norfolk Southern for its Own Negligence.

The Debtors' arguments regarding the strict interpretation of provisions that indemnify a party against its own negligence are likewise similarly misplaced. Quite simply, Norfolk Southern's negligence is irrelevant, and the case on which the Debtors primarily rely supports that conclusion. See Pride v. S. Bell Tel. & Tel. Co., 138 S.E.2d 155, 157 (S.C. 1964) ("[T]his court has held that generally a common carrier is protected by a contractual provision relieving it of liability for ordinary negligence when the contract

8

is private and in no way connected with its public service or the public interest.")  The

Debtors admit that Norfolk Southern is a common carrier,[10] and they make no effort—nor

could they—to argue that the Agreements are not private contracts.

Moreover, the Indemnification Provisions, as well as other provisions of the

Agreements, unquestionably establish that Norfolk Southern was intended to be

indemnified against its own negligence in the circumstances at issue here.  See, e.g.,

License Agreement, at ¶20 (providing indemnification "whether or not negligence of

[Norfolk Southern] may have caused or contributed to such loss, injury, or damage"); Side

Track Agreement, at ¶16 (same); 1990 Amendment, at ¶5 (same).  Even the general

Indemnification Provisions require the Parties to "bear equally all cost, expense and

liability" when "caused by their *joint and concurring* negligence."  License Agreement, at

¶10(d) (emphasis added); Side Track Agreement, at ¶5(d) (emphasis added).  Thus,

regardless of which Indemnification Provisions apply, Norfolk Southern's negligence, as

found by the jury in the Georgia Litigation, is irrelevant.

> b. The Debtors Omit the Key Phrase Providing Norfolk Southern
> with Indemnity on These Facts.

In their lengthy analysis of the specific Indemnification Provisions, the Debtors

ignore the critical language providing Norfolk Southern with indemnification.  For

example,[11] paragraph 5 of the 1990 Amendment provides, in its entirety:

> Industry proposes to construct, maintain and use said
> Facility with full cognizance of the risk of loss of life,
> personal injury or property loss or damage which may be
> caused by or result from railroad operations on said

---

[10]   Debtors' Reply Brief, at ¶85.

[11]   Paragraph 16 of the Side Track Agreement and paragraph 20 of the License Agreement are
substantially similar to paragraph 5 of the 1990 Amendment for purposes of this discussion, and will not be
addressed for brevity.

> industrial track at the location of said Facility, *or which may accrue from or by reason of the construction, installation, maintenance, presence or use of said Facility by Industry*; and Industry covenants that said Facility shall be constructed, maintained and used solely at the risk of Industry, and that neither Railroad, nor any associated controlled or affiliated corporation, shall assume any responsibility in the premises; Industry hereby specifically agreeing, notwithstanding any other provisions of said Agreement, to indemnify and save harmless Railroad, and any associated, controlled or affiliated corporation, from and against the consequences of any and all such loss, injury or damage, whether or not negligence of Railroad may have caused or contributed to such loss, injury or damage.

1990 Amendment, at ¶5 (emphasis added). In their six-page discussion of this provision, the Debtors focus on the first half of the first clause and the single word "use." The italicized language above, however, provides a second, independent basis for which the Debtors are required to indemnify Norfolk Southern in connection with the Facility, and it is not limited by the phrase "at the location of said Facility" like the clause emphasized by the Debtors.

A sharp distinction exists between the phrases "railroad operations," which is limited to the track at the location of the Facility, and "construction, installation, maintenance, presence or use," which is not so geographically limited. Indeed, it would not be difficult to posit a scenario where construction and maintenance of the Facility occurred somewhere other than "on said industrial track at the location of said Facility." Thus, these two provisions, separated by the conjunction "or" must be read as identifying two (or more) distinct risks of "loss of life, personal injury or property loss or damage." The Debtors agreed to indemnify Norfolk Southern from "such loss, injury or damage" regardless of any negligence of Norfolk Southern. 1990 Amendment at ¶5.

> c. The Limiting Language "On or About" Does Not Apply to Limit Norfolk Southern's Right to Indemnity.

10

In a final effort to place artificial limitations on the otherwise clear language of the Indemnification Provisions, the Debtors argue that the phrase "on or about the track," which appears exactly once in each of the Agreements at issue,[12] must be read to limit all the Indemnification Provisions regardless of the absence of that phrase in any of them. See Debtors' Reply Brief, at ¶59 ("It is in the full context of Paragraphs 3, 4, and 5 that the scope of Grace's 'full cognizance of the risk . . . of personal injury' must be read."). This interpretation flies in the face of basic rules of contractual interpretation and South Carolina law, which mandate that Courts shall interpret contracts based on their "plain terms" and shall not "read into" a contract words that "'impart intent wholly unexpressed when the contract was executed.'" Gilstrap v. Culpepper, 320 S.E.2d 445, 447 (S.C. 1984) (quoting Blakeley v. Rabon, 221 S.E.2d 767 (S.C. 1976)).

Even if the Debtors' interpretation were accurate—and it is not—the cases they cite to support this limitation are easily distinguishable. While the Debtors state the obvious—that the cases from outside South Carolina cited by Norfolk Southern are not binding precedent—they conveniently ignore that none of their cases constitute binding precedent, either. Compare Debtors' Reply Brief, at § II.E (identifying four non-South Carolina cases) with id. at § II.F (distinguishing four non-South Carolina cases). Next, the Debtors proceed to argue that the cases cited by Norfolk Southern are "factually distinguishable," despite an admission that one of Norfolk Southern's cases has facts "quite similar to" a case cited by the Debtors. Id. at ¶102; compare S.R. Co. v. Brunswick Pulp & Paper Co., 376 F. Supp. 96, 99 n.3 (S.D. Ga. 1974) (holding that a negligently loaded log that fell

---

[12]    Each of these provisions addresses the Debtors' obligation to maintain the Facility to avoid safety issues on the track itself. See License Agreement, at ¶18; Right of Way Agreement, at ¶14, 1990 Amendment, at ¶3.

from a railcar was the proximate cause of the injury and occurred "in or about" the track)

with Sol Walker & Co. v. Seaboard Coast Line R. Co., 362 So.2d 45, 49 (Fla. App. 1978)

(distinguishing Brunswick Pulp and finding that an indemnification agreement did not

apply to an injury caused by the negligent loading of scrap iron on a rail car because the

injury did not occur "on or about" the track).

Though it may be factually distinguishable with respect to the damages, Southern

Railway Company v. Insurance Company of North America, 183 S.E.2d 912 (Ga. 1971),

contains contractual language that is much closer to the language at issue in this dispute

than any contractual provision at issue in the cases cited by the Debtors. Southern Railway

involved an agreement between Southern Railway, the original counterparty to the

Agreements at issue in this case, and Chattahoochee Brick, a brickmaker who wished to

construct "an overhead conveyor above an industrial track and an unloading pit beneath

said track, with a shed over said pit." Id. at 914. The indemnification provision provided

that

> Chattahoochee Brick will "construct, maintain and use" the
> described facilities, "with full cognizance of the risk of
> . . . damage to persons or property which may be caused by
> or result from railroad operations upon the track crossing
> under said conveyor and shed and above said pit or in the
> vicinity of same, or which may accrue from or by reason of
> the construction, installation, maintenance or operation of
> said Facilities by Industry (Chattahoochee Brick) above and
> under said industrial track, or the use of the same by Industry
> as contemplated hereunder."

Id. at 916. Further, just like the Indemnification Provisions at issue here, Chattahoochee

Brick agreed that

> Railroad shall have no responsibility in connection
> therewith, but that said Facilities shall be so placed,
> constructed, maintained and used solely at the risk of
> Industry, and Industry will indemnify and save harmless

> Railroad from and against any and all such loss, injury or
> damage, whether the same may result from the negligence of
> Railroad or otherwise.

Id. The railcars were dropped at the pit for unloading, and while they were being unloaded

by Chattahoochee Brick, the railcars became unbraked and rolled down the track,

ultimately crashing into buildings and kilns owned by Chattahoochee Brick. Id. Even

though Southern was negligent in braking the cars, Chattahoochee Brick's insurer, as

subrogee, was unable to recover from Southern for the damage caused because Southern

was released by contract for any liability that it may have. Id. In fact, the court ruled that

the trial court erred in denying Southern's summary judgment motion on that issue. Id.

Although the railroad was a defendant in Southern Railway, the interpretation of the

contractual language applies with equal force here, where the railroad is the Plaintiff.

Further, an examination of the El Paso case reveals that it does not squarely support

the Debtors' position. See generally Union Pac. R. Co. v. El Paso Nat. Gas Co., 408 P.2d

910 (Utah 1965). In El Paso, the court implied that it may have reached a different

conclusion if the damages had "at least some causal connection with the construction,

existence, maintenance or operation of the pipeline other than an incident which happened

*merely coincidental to its existence.*" Id. at 260 (emphasis added). While Norfolk Southern

could seek indemnification based solely on the existence (i.e. "presence") of the loading

spout, industrial track and Facility based on the language of the Indemnification Provisions,

here it is seeking indemnification based on the Debtors "use" of such devices. Because the

Debtors do not—and cannot—dispute their use of these devices, the holding in El Paso, which is not binding in any event, carries no precedential value.[13]

Ultimately, a thorough review of the cases cited by both parties demonstrates that Norfolk Southern's cases are far more persuasive than the Debtors' cases. First, the contractual language in Southern Railway, which was drafted by the same party as the Agreements, is extraordinarily similar. Second, the Debtors cases rely heavily upon the "on or about" language, which appears only once in the Agreements, and does not appear in any of the Indemnification Provisions; thus, those cases are ultimately unpersuasive. Third, even if the Debtors are correct that the Accidents occurred away from the Grace Facility, they cannot dispute[14] that both loading spouts, the industrial track, and the "Facility" were all "used" by the Debtors in connection with the filling of the railcars, just like Chattahoochee Brick was using its Facilities to unload the railcars. That use distinguishes El Paso, and further supports Norfolk Southern's interpretation of the Indemnification Provisions. Accordingly, the Indemnification Provisions apply, and the Debtors are not entitled to summary judgment.

**D.     The Debtors Assign Far Too Much Weight to the January 26 Conversation Between Mr. Kirkland and Mr. Chapman.**

Because the Debtors cannot establish that the Indemnification Provisions are inapplicable, they turn to a last-ditch argument to place full blame for the January 26

---

[13]     Another fact distinguishing El Paso is that the contract between the parties did not contain any provision indemnifying Union Pacific for its own negligence in running over an El Paso employee who was crossing the easement. El Paso, 408 P.2d at 259-60. The court's decision implies that had such a provision been present, Union Pacific would have been entitled to indemnification despite the lack of a causal connection between the construction of the pipeline and the accident. Id.

[14]     Even if the Debtors dispute these facts, Norfolk Southern is entitled to a presumption in its favor on these facts for purposes of the Debtors' Motion, as discussed above.

Accident on Norfolk Southern.  Relying on two pages of testimony from the allegedly inadmissible Trial Record and three pages of the Norfolk Southern Rules for Equipment Operation and Handling, effective as of May 2, 1993 (the "Conductors' Rules"), which were also taken directly from the Trial Record, the Debtors concoct an elaborate argument that Norfolk Southern adjudged the railcars "safe to run."  This argument has a number of holes, and ultimately, establishes, at best, more disputed facts that render summary judgment inappropriate.

1.  The Phrase "Safe to Run" Does Not Appear in the Conductors' Rules.

Although the Debtors reference the phrase "safe to run" at least 39 times in the Debtors' Reply, that term does not appear in the excerpts of the Conductors' Rules attached to the Debtors' Reply Brief.  Presumably, the Debtors derived this term from section 586 of the Conductors' Rules, which requires conductors to "remove from the consist any cars that are *unsafe to run*."  Conductors' Rules, § 586 (emphasis added).  The Debtors twist this phrase to infer that because the railcar on which Mr. Kirkland slipped was not removed from the consist, there was an active decision by Norfolk Southern to declare the cars safe to run.  But the inverse of a negative decision is not always a positive one.  For example, the Debtors do not concede that their decision not to reject the railcar at issue when it was delivered by Norfolk Southern means that they affirmatively determined that the railcar, including the allegedly defective handbrake,[15] was not defective.  Compare Drumming Declaration, at ¶9 (noting that the Debtors rejected up to 10% of all railcars delivered by

---

[15]    Critically, Count III of Mr. Kirkland's complaint, wherein he alleged under the Handbrake Act, 49 U.S.C. §20302, that Norfolk Southern allowed a railcar that was not equipped with a safe, secure, and efficient handbrake to be operated on its lines, Kirkland Complaint ¶9, was dismissed on summary judgment because the presence of kaolin on the brake prevented a finding that the brake was defective. See Order Granting Defendant's Motion for Partial Summary Judgment as to Count III of Plaintiff's Complaint, attached hereto as **Exhibit B**.

Norfolk Southern "due to material or mechanical deficiencies such as faulty brakes . . . ") with Debtors' Inadmissibility Brief, at ¶15 (arguing that the Accidents were the result of "defective handbrakes"). Indeed, such a concession would obviate large portions of the Debtors' Declarations as well as several of their legal positions.

### 2. The Conductors' Rules Applied Only to Mr. Kirkland.

Even if the Debtors' interpretation of the Conductors' Rules was correct—and it is not—the Conductors' Rules are inadmissible under the Debtors' own arguments. The excerpts of the Conductors' Rules provided by the Debtors were attached to the Trial Record, which the Debtors go to great lengths to argue is inadmissible. These excerpts, on their face, indicate that they apply only to Norfolk Southern conductors, such as Mr. Kirkland, not their supervisors, such as Mr. Chapman. Indeed, Norfolk Southern offered these excerpts into evidence in the Georgia Litigation as part of their efforts to establish that Mr. Kirkland was negligent. Trial Tr. vol. II, 11:11-13:20. Because the jury ultimately found that Mr. Kirkland was not negligent, the Debtors, under their theory of "defensive collateral estoppel" cannot now use these exhibits to establish that Norfolk Southern adjudged the cars "safe to run." "Safe to run" is a made-up phrase contrived by the Debtors in this litigation, so if the Trial Record is generally inadmissible as the Debtors assert, these excerpts of the Conductors' Rules are also inadmissible under the Debtors' theory.

Further, the Debtors offer no evidence that Mr. Chapman was even familiar with the Conductors' Rules, much less that they governed his actions. Even if Mr. Chapman was bound by the Conductors' Rules, the Debtors fail to provide a complete copy of the Conductors' Rules, and it is inappropriate to infer that Mr. Chapman violated these rules without a review of the complete document. At best, the Debtors have raised material disputed facts as to whether Mr. Chapman's actions constituted an affirmative decision by

Norfolk Southern as to whether the cars were "safe to run" and whether such a decision supersedes the Debtors' own negligent actions in overfilling the cars.

3.  Mr. Chapman's Actions and Testimony Do Not Constitute Binding Admissions on Behalf of Norfolk Southern.

Given the Debtors' hyper-technical objections to the NS Declarations, their statement about the interpretation of Mr. Kirkland's testimony can only be described as insincere.[16] The Debtors brazenly assert that "To be clear, 'switch this place,' when used in this context, was Mr. Chapman's clear directive to Mr. Kirkland, as the train's conductor, to take consignment of the kaolin-laden railcars from the Grace [Facility] and consign empty railcars to the Grace [Facility] to be filled." Debtors' Reply Brief, at ¶109. Their only support for this assertion is a citation to paragraph 8 of the License Agreement, which says nothing about "switching," Mr. Chapman, or Mr. Kirkland. Id. From there, and again with no foundation, the Debtors summarily conclude that Mr. Chapman's discussion with Mr. Kirkland was a determination that the cars were "safe to run." Id. at ¶110. Mr. Kirkland's own testimony belies that assertion. Indeed, Mr. Kirkland identifies the basis for Mr. Chapman's instructions as switching the cars for "a good customer." Tr. I:112:10-18.[17]

---

[16]    By the Debtors' own admission, Mr. Kirkland's testimony from the Trial Record is inadmissible hearsay. See Debtors' Inadmissibility Brief, at 2. As will be discussed in Section II below, Norfolk Southern disagrees with this assertion, but if Mr. Kirkland's testimony is inadmissible against the Debtors, it is also inadmissible against Norfolk Southern.

[17]    This is similar to Mr. Drumming's assertion that they would clean the railcars at Mr. Kirkland's request "to keep Norfolk Southern happy." Drumming Declaration, at ¶15. The Debtors cannot simultaneously argue both that their "unnecessary" cleaning of the cars is not evidence of negligence, but that Mr. Chapman's instructions to Mr. Kirkland to "switch the cars" exculpates the Debtors from negligence. Rather, evidence from both sides demonstrates that the relationship between the Parties was mutually beneficial and that each party was willing to make accommodations to the other to maintain the relationship.

The Debtors' misplaced accusations do not end there, however.  They next argue that Mr. Chapman's alleged decision that the cars were "safe to run" somehow constitutes an "admission" by Norfolk Southern that the cars were properly loaded, not dangerous and would not impede the safe operations of the railcar, and this alleged admission in some way exculpates the Debtors of their liability under the Agreements.  Debtors' Reply Brief, at ¶113.  As noted above, there is no testimony in the Trial Record that Mr. Chapman made a determination about the safety of the cars.  Even assuming he did, that would not exculpate the Debtors from their liability for their negligence under the Agreements.  At worst, Mr. Chapman, and Norfolk Southern through him, were negligent in ordering the movement of the railcars,[18] but such negligence is irrelevant to the issue of the Debtors' negligence under the Agreements.  Moreover, Mr. Chapman did not have authority to release the Debtors from their obligations under the Agreements, as such a determination would be outside the scope of his employment and therefore not attributable to Norfolk Southern.  See Webber v. S. Life & Trust Co., 88 S.E. 124, 126 (S.C. 1916) (explaining that a principal is only bound by an agent who "acts within the scope of his authority"); see also Restatement (Second) of Agency § 288 (1958) ("Authority to make statements of fact does not of itself include authority to make statements admitting liability because of such facts.").  To the extent the Debtors argue that Mr. Chapman did have such authority—which he did not—they raise another factual dispute.

---

[18]    Notably, if the railcars were properly deemed "safe to run," the Debtors have offered no alternative to support the jury's verdict against Norfolk Southern in the Georgia Litigation.  The defective handbrake was eliminated on summary judgment (see **Exhibit B**), and Mr. Kirkland's own negligence was eliminated by the verdict, so if the presence of kaolin did not create the unsafe environment, what was the basis for the jury's verdict?  The Debtors have the entire Trial Record at their disposal, yet they point to no evidence in support of a plausible alternative source of Norfolk Southern's negligence unrelated to the kaolin.

18

The Debtors' citation to Mr. Chapman's own testimony from the Trial Record fairs no better. Citing Mr. Chapman's testimony offering his opinion that Mr. Kirkland's accident was not caused by kaolin, the Debtors assert that Norfolk Southern admitted that kaolin did not cause the accident. Debtors' Reply Brief, at ¶115-16. Even if this testimony is admissible—and it contains hearsay from Mr. Kirkland within it—it is simply an opinion of one Norfolk Southern employee, not the corporate entity itself.[19] The Debtors' bald assertion as to Norfolk Southern's corporate position is inconsistent with the Voucher Letters, which continued to assert that the Debtors were responsible for the Accidents during, and after, the Georgia Litigation. See Voucher Letters. Moreover, this argument is inconsistent with the Debtors' subsequent position that "Norfolk Southern sought at seemingly every turn to: Absolve itself of all liability and put that liability on Grace for the operating condition of the railcars; . . . and [e]stablish that Grace was negligent in some way . . . ." Debtors' Inadmissibility Brief, at ¶14. By simultaneously arguing that Norfolk Southern's "trial strategy" was to "implicate the [Indemnification Provisions]" but that its corporate position was that the kaolin did not cause the Accidents, the Debtors' arguments lack all credibility. See id. at ¶20. Once again, the best the Debtors' can posit is a material disputed fact that prevents the entry of summary judgment.

## II.    THE TRIAL RECORD IS ADMISSIBLE IN THIS PROCEEDING.

Although the Debtors' fail in their efforts to avoid the disputed facts discussed above, their arguments in the Debtors' Inadmissibility Brief are appropriate for the Court to consider on summary judgment. Norfolk Southern has asserted that the Trial Record,

---

[19]    See Webber, 88 S.E. at 126; Restatement (Second) of Agency § 288 cmt. b (1958) (explaining that an agent's statement is not admissible against a principal unless done "in the capacity of agent and connected with the business of the principal.").

and especially Mr. Kirkland's testimony, should be admissible in this action for a number
of reasons, and the Debtors have disputed these assertions. The Court's resolution of this
pure legal issue will help narrow the dispute moving forward.

A.   **The Trial Record Is Either Admissible for Both Parties or Inadmissible.**

Despite their arguments that the Trial Record is inadmissible, the Debtors have
offered no evidence, other than the Debtors' Declarations, that was not part of the Trial
Record.   The Accident Reports, the Conductors' Rules, Mr. Chapman's alleged
admissions, and all the other evidence cited by the Debtors was pulled directly from the
Trial Record itself. Despite the passage of *fourteen (14) years* since Norfolk Southern filed
its claim, no formal discovery has taken place in this matter.[20] The substantial majority of
both parties' summary judgment motions was based on evidence derived from the Trial
Record. While Norfolk Southern believes that the entire Trial Record should be available
to both Parties, if it is barred from responding to the Debtors' evidence from the Trial
Record with other portions of the Trial Record, then the Debtors should not be permitted
to rely upon the Trial Record either.

In support of their position that they may use the Trial Record but Norfolk Southern
may not, the Debtors rely on a twisted interpretation of the doctrine of collateral estoppel.
Importantly, Norfolk Southern does not deny that it was found negligent by the jury in the
Georgia Litigation, nor does it deny that the Debtors were not a party to that litigation. But
neither of these issues is dispositive of the collateral estoppel analysis, as the Debtors would
have this Court believe. Collateral estoppel "prevents parties from relitigating an issue that

---

[20]     As noted in footnote 5 above, the Parties previously agreed that each side would be entitled to use
the Trial Record for purposes of this contested matter.

has already been actually litigated." Peloro v. U.S., 488 F.3d 163, 174 (3d Cir. 2007).  The

Debtors admit that "the only issue decided in the [Georgia Litigation] was Norfolk

Southern's negligence."  Debtors' Inadmissibility Brief, at ¶28.  Thus, that is the only issue

barred by collateral estoppel.

Collateral estoppel, which is also known as issue preclusion, simply does not speak

to the evidence that was introduced in reaching a decision on the issue.  If it did, then all

evidence submitted to the decision-maker, both for and against, must be included in

assessing how the issue was resolved.  Accordingly, if the Debtors are permitted to submit

evidence from the Trial Record, they cannot stop Norfolk Southern from submitting

contrary evidence from the same record.[21]

### B.    The Debtors Misinterpret the Voucher Argument.

Far from the Debtors' interpretation of voucher, Norfolk Southern's voucher

argument is quite simple.  Norfolk Southern notified the Debtors of their potential liability

for indemnification arising out of the Georgia Litigation, invited the Debtors to participate

in the action, and the Debtors' declined to do so.  The Debtors cannot dispute that they

were notified of their potential liability eighteen (18) months prior to the entry of the

judgment in the Georgia Litigation and voluntarily chose to allow Norfolk Southern to

handle the defense.  They now seek to avoid the ramifications of that decision by revising

history to reflect what would have happened if they had made a different decision.  See

Debtors' Inadmissibility Brief, at ¶20, n.6 (positing what the Debtors would have argued

at trial if they were present).  That is not permitted by the voucher doctrine.

---

[21]     In this way, the current dispute is similar to the typical deposition designation process, where each
party designates portions of out-of-court deposition transcripts in support of their respective cases.

A primary purpose of the voucher doctrine is to help avoid inconsistent results in indemnification litigation. Universal Am. Barge Corp. v. J-Chem, Inc., 946 F.2d 1131, 1138 (5th Cir. 1991). "An alleged indemnitor who is vouched into a court proceeding may be subject to having the prior determination used against the vouchee in the subsequent indemnification action even if the vouchee does not appear and defend in the first action." Id. at 1139.

> Generally, once the alleged indemnitor is vouched in, the vouchee must choose either to appear and defend or to decline the tender, though the vouchee must make this choice without the benefit of an authoritative determination of the primary defendant's right of indemnification. If the vouchee declines, the vouchee loses certain prerogatives in any subsequent indemnification action brought by the primary defendant, and results of the primary lawsuit may be binding in the subsequent action.

Id. This is voucher in a nutshell. The Debtors' arguments to the contrary must be dismissed.

To avoid the application of the voucher doctrine the Debtors make two arguments. First, they argue that voucher requires the vouchee to be joined in the action. This argument can be disposed of quickly by reading the actual language from Master Blaster, rather than the Debtor's paraphrasing of it. See Master Blaster, Inc. v. Dammann, 781 N.W.2d 19, 27 (Minn. Ct. App. 2010) ("The common-law process of vouching has been, *for the most part*, supplanted by modern third-party pleading practice under the applicable federal and state rules of civil procedure.") (emphasis added).[22] The Debtors cite no case indicating that the doctrine of voucher has been abrogated in South Carolina or the Delaware federal courts, and the Third Circuit has expressly adopted the doctrine. See Humble Oil & Ref. Co. v.

---

[22]    Notably, Master Blaster itself permitted voucher. Id. at 26.

<u>Phila. Ship Maint. Co.</u>, 444 F.2d 727, 734 (3d Cir. 1971); <u>United N.Y. Sandy Hook Pilots</u>

<u>Assoc. v. Rodermond Indus., Inc.</u>, 394 F.2d 65 (3d Cir. 1968).  The Debtors conclusory,

and incomplete statements regarding the viability of the voucher doctrine are incorrect.

Second, the Debtors argue that the Voucher Letters were not timely submitted to

the Debtors to properly vouch them into the Georgia Litigation.  On the contrary, Norfolk

Southern notified the Debtors of its position shortly after the conclusion of Mr. Kirkland's

deposition, presumably when it first learned of the Debtors' negligence.  The voucher

request was therefore timely under the five-factor test articulated by the Third Circuit.

Moreover, the trial in the Georgia Litigation did not occur for another eighteen (18)

months, so any "locking in" of Mr. Kirkland's testimony could have been remedied had

the Debtors chosen to take over the representation.  When considering all the facts—not

just the Debtors' cherry-picked ones—Norfolk Southern has established that the Debtors

were properly vouched into the Georgia Litigation.

### C.    Mr. Kirkland's Testimony Is Admissible under Federal Rule of Evidence 804(b)(1).

To establish that Mr. Kirkland's testimony falls within Rule 804(b)(1), Norfolk

Southern must establish that (1) Mr. Kirkland is unavailable, (2) his testimony "was given

as a witness at a trial, hearing or lawful deposition," and (3) that the testimony is being

offered against a party or its predecessor in interest."  Fed. R. Evid. 804(b)(1).  Despite the

Debtors' frivolous assertion that Mr. Kirkland may not be deceased,[23] the only real dispute

is with respect to whether Norfolk Southern is a predecessor-in-interest to the Debtors.  On

that point, the Debtors' arguments are misguided.

---

[23]    Attached as **Exhibit C** hereto is a certified copy of Mr. Kirkland's death certificate which indicates that he is, in fact, unavailable to testify as a witness in these proceedings.

1.  The Voucher Doctrine Satisfies Rule 804(b)(1)(B).

If the Court agrees that the Debtors were properly vouched in to the Georgia Litigation, then privity exists between Norfolk Southern and the Debtors for purposes of the Georgia Litigation.  Where parties are in privity with each other with respect to an issue, one party cannot plausibly argue that the other is not its predecessor in interest with respect to that issue.  Even if the Court rules in favor of the Debtors on the voucher doctrine, that does not lead to the conclusion that Norfolk Southern is not a predecessor in interest to the Debtors for purposes of Rule 804(b)(1).

2.  Norfolk Southern and the Debtors Were Not Adverse with Respect to the Georgia Litigation.

Contrary to the Debtors' assertions, Norfolk Southern and the Debtors were not "adverse to each other at the time of the [Georgia Litigation]."  Debtors' Inadmissibility Brief, at 3.  As identified in the NS Opening Brief, Norfolk Southern owed Mr. Kirkland a nondelegable duty under FELA, to provide him with a safe work environment.  NS Opening Brief, at 19.  Accordingly, any negligence by the Debtors that created an unsafe working environment would be attributable to Norfolk Southern under FELA.  See Madden v. Antonov, 966 F. Supp. 2d 851, 857 (D. Neb. 2013) (stating that "under FELA, while a railroad can be liable for its own negligence, it can also be liable based on a dangerous condition caused or created solely by the negligent acts of a third party."); Schrier v. Indiana Harbor Belt R. Co., 430 N.E.2d 204, 207 (Ill. App. Ct. 1981) (explaining that the duty of an employer to provide a safe place to work under FELA exists "even when the employees are on the premises of a third party over which the employer has no control.").  Whether the Debtors, Norfolk Southern, or both were negligent in causing the Accidents, Norfolk Southern would be—and in fact was found by the jury to be—liable to Mr.

Kirkland for his injuries. The only way for Norfolk Southern to avoid liability in the Georgia Litigation would be to establish that Mr. Kirkland was himself negligent, and that is why Norfolk Southern's trial strategy focused on Mr. Kirkland's alleged negligence. See NS Opening Brief, at 19, n.15.

Rather than accepting the undeniable conclusion that Norfolk Southern was liable for any negligence on behalf of the Debtors under FELA, the Debtors argue that they would have done things differently if they were involved in the Georgia Litigation. That fact is irrelevant under the Rule 804(b)(1) analysis where, as here, the Debtors were given ample notice of the upcoming trial and an opportunity to participate. In electing not to participate in the Georgia Litigation, the Debtors made a conscious decision that Norfolk Southern could adequately represent their interests therein. The Debtors may not now argue that Norfolk Southern failed in that task. Indeed, Norfolk Southern obtained a full release of the Debtors in its settlement with Mr. Kirkland.

The Debtors' list of "evidence" in support of their argument that Norfolk Southern was adverse to their interest is both unsupported and simply wrong. As noted above, Norfolk Southern could not simultaneously "absolve itself of all liability and put that liability on Grace for the operating condition of the railcars." Debtors' Inadmissibility Brief, at ¶14. The other accusations in paragraph 14 of the Debtors' Inadmissibility Brief are not supported with citations, and are likewise inconsistent with the unavoidable legal conclusion that the Debtors' negligence would be attributed to Norfolk Southern under FELA. Id. For these reasons, the fact that Norfolk Southern and the Debtors were, and continue to be, adverse to each other with respect to the Indemnification Provisions had no bearing on the outcome of the Georgia Litigation.

The Debtors' efforts to cite to testimony from Mr. Kirkland that is allegedly adverse to the Debtors similarly must fail. Indeed, of the three excerpts from the Trial Record relied upon by the Debtors in support of this argument, only one of them actually implicates Grace's potential negligence. See id. at ¶19. The second excerpt asks only about kaolin itself; Mr. Kirkland's response brought the Debtors into the discussion. Id. The third excerpt reflects counsel's efforts to clarify Mr. Kirkland's testimony about when he climbed on top of the cars, and only the first two (of twelve) lines discuss the location of the accident. Id. While the first excerpt could be read to imply that the Debtors were generally negligent in its filling of the railcars, that testimony does not point to either of the Accidents. Moreover, three questions out of Kirkland's multi-day testimony in the Georgia Litigation hardly establishes that "Norfolk Southern's trial strategy was not to escape its own liability to Mr. Kirkland, but to implicate the Agreements' various indemnities." Id. at ¶20. This blatant mischaracterization of the Trial Record is inappropriate and contrary to FELA.

### 3. The Trial Record is Admissible under the Residual Hearsay Exception.

The Trial Record, and particularly Mr. Kirkland's testimony, alternatively, may be admitted under the residual hearsay exception of Rule 807(a). Rule 807(a) provides for the admission of a statement that is otherwise hearsay if

> (1) the statement has equivalent circumstantial guarantees of trustworthiness; (2) it is offered as evidence of a material fact; (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and (4) admitting it will best serve the purposes of these rules and the interests of justice.

Fed. R. Evid. 807(a). As a record of a trial before a jury, the Trial Record may be the most trustworthy piece of evidence possible. As discussed above, the Trial Record has been

cited extensively by both parties to support a number of different positions and material facts. Moreover, because Mr. Kirkland is now deceased, the Debtors cannot plausibly argue that any other evidence, much less more probative evidence, can be obtained by Norfolk Southern through other efforts, reasonable or otherwise. Thus, the first three factors of Rule 807(a) are easily satisfied.

With respect to the issue of whether admitting the Trial Record will serve the interests of justice, Norfolk Southern submits that the procedural history of this dispute supports the admission of the Trial Record. First, the voucher doctrine binds the Debtors to the outcome of the Georgia Litigation because they chose not to participate. Second, the Debtors waited six (6) years to file their Objection and thirteen (13) years to file their summary judgment motion; Mr. Kirkland's unavailability as a result of those exorbitant delays should not prejudice Norfolk Southern's ability to prosecute its claim. Third, because the foregoing actions were intentional and solely within the Debtors' control, the "fair opportunity" to challenge the admission of the Trial Record required by Rule 807(b) has been provided to the Debtors.

Ultimately, whether pursuant to Rule 804(b)(1) or Rule 807(a), the Trial Record should be admitted in this dispute. Given Mr. Kirkland's death, the Trial Record is the most probative evidence available with respect to the Accidents. Moreover, both Parties have heavily relied upon the Trial Record, and its exhibits, in support of their respective summary judgment motions. If the Court determines that the Trial Record is inadmissible with respect to Norfolk Southern, then the Debtors also should not be permitted to rely upon the testimony contained therein. Issue preclusion binds a party to an outcome, and binding a party to portions of the evidence without giving it an opportunity to submit other

27

evidence that was considered by the fact-finder would be inequitable.

## CONCLUSION

For the foregoing reasons, Norfolk Southern respectfully requests that the court (i) deny the Debtors' Motion, (ii) grant Norfolk Southern's Cross-Motion for Summary Judgment with respect to the admission of the Trial Record into evidence, and (iii) grant Norfolk Southern any further relief to which it is otherwise entitled.

Respectfully submitted,

Dated: April 11, 2017
      Wilmington, Delaware

**POTTER ANDERSON & CORROON LLP**

David J. Baldwin (DE Bar No. 1010)
R. Stephen McNeill (DE Bar No. 5210)
D. Ryan Slaugh (DE Bar No. 6325)
1313 North Market Street, Sixth Floor
Wilmington, DE  19899-0951
Telephone:  (302) 984-6000
Facsimile:  (302) 658-1192

*Counsel to Norfolk Southern Railway Company*