1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3

4

5    In re:                    :

                               :    Chapter 11

6    W.R. GRACE & CO.,         :

     et al.,                   :    Case No. 01-01139 (KG)

7                              :

            Reorganized Debtors.  :    (Jointly Administered)

8    _____:

9

10

11

12                             United States Bankruptcy Court

13                             824 North Market Street

14                             Wilmington, Delaware

15                             May 3, 2017

16                             11:02 a.m. - 11:38 a.m.

17

18

19

20

21   B E F O R E :

22   HON KEVIN GROSS

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO OPERATOR:  GINGER MACE

1    HEARING re Objection to Claim No. 603 by Jim Wright

2    (Substantive) [Filed: 4/3/17] (Docket No. 32847).

3

4    HEARING re Motion for Entry of an Order Authorizing the

5    Reorganized Debtors to Exceed the Page Limit Requirement for

6    Omnibus Memorandum in Support of Granting the Reorganized

7    Debtors' Summary Judgment Motion, Denying Norfolk Southern's

8    Cross-Motion and Disallowing Norfolk Southern's

9    Indemnification Claim [Filed: 3/13/17] (Docket No. 32840).

10

11    HEARING re Motion of Norfolk Southern Railway Company to

12    Exceed Page Limitation for Reply Brief [Filed: 4/11/17]

13    (Docket No. 32852).

14

15    HEARING re Status Hearing Regarding Motion for Summary

16    Judgment Pursuant to Fed. R. Bankr. P. 7056 for Partial

17    Allowance and Partial Disallowance of Claim No. 7021, Filed

18    By Norfolk Southern Railway Company [Docket No. 929575] and

19    Norfolk Southern Railway Company's Cross-Motion for Summary

20    Judgment Allowing Claim No. 7021 [Docket No. 32825] and

21    related matters.

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    THE LAW OFFICES OF ROGER HIGGINS, LLC

4         Attorneys for the Reorganized Debtor

5

6    BY:  ROGER HIGGINS

7         DAVID GRASSMICK

8

9    PACHULSKI STANG ZIEHL & JONES

10         Attorneys for the Reorganized Debtor

11

12   BY:  JAMES O'NEILL

13

14   POTTER ANDERSON & CORROON LLP

15         Attorneys for Norfolk Southern

16

17   BY:  SCOTT BALDWIN

18         R. STEPHEN MCNEILL

19

     ALSO PRESENT TELEPHONICALLY:

20

21   ROBERT M. HORKOVICH

22   ADAM PAUL

23

24

25

```
 1                    P R O C E E D I N G S

 2              THE CLERK:  All rise.

 3              THE COURT:  Good morning, everyone.  Thank you.

 4    You may be seated.

 5              MR. O'NEILL:  Good morning, Your Honor.

 6              THE COURT:  We're here in W. R. Grace.  Mr.

 7    O'Neill, good morning.

 8              MR. O'NEILL:  Good morning, Your Honor.  James

 9    O'Neill, Pachulski Stang Ziehl & Jones, appearing on behalf

10    of the Reorganized Debtors, W. R. Grace.

11              THE COURT:  Yes.

12              MR. O'NEILL:  It's a pleasure to see you.  We

13    don't get to see you that often in this matter.

14              THE COURT:  No, you don't.  We haven't seen one

15    another for a while.

16              MR. O'NEILL:  But that because you're working hard

17    behind the scenes.

18              THE COURT:  All right.  Go ahead.

19              MR. O'NEILL:  Your Honor, joining me at counsel

20    table today is my co-counsel Roger Higgins and also David

21    Grassmick.

22              THE COURT:  Welcome, gentlemen.  Welcome.

23              MR. O'NEILL:  You entered a pro hoc order

24    yesterday for Mr. Grassmick, and we do --

25              THE COURT:  Yes.
```

1              MR. O'NEILL:  -- appreciate that.

2              THE COURT:  My pleasure.

3              MR. O'NEILL:  Also in the courtroom with us this

4     morning is our client, Richard Fink who's the vice-president

5     and associate general counsel of W.R. Grace.

6              THE COURT:  Mr. Fink, welcome to you too.  I also

7     welcome Mr. Baldwin and Mr. McNeill.

8              MR. BALDWIN:  Thank you, Your Honor.

9              THE COURT:  Good to have you here.

10             MR. BALDIN:  Good morning.

11             MR. MCNEILL:  Good morning, Your Honor.

12             THE COURT:  Good morning.

13             MR. O'NEILL:  Your Honor, what's on the -- what's

14    still on the agenda for today is item number 4, which is a

15    status hearing on competing motions for summary judgment

16    with respect to a claim filed by Northern -- by Norfolk

17    Southern.  And I wanted to just let the Court know that Mr.

18    Higgins is going to be presenting our part of the status

19    report --

20             THE COURT:  All right.

21             MR. O'NEILL:  -- and discussing matters with the

22    Court.  And so I will turn the podium over to him.

23             THE COURT:  All right.  Thank you, Mr. O'Neill.

24             MR. O'NEILL:  Thank you.

25             MR. HIGGINS:  Good morning, Your Honor.  Roger

1    Higgins for the Reorganized Debtors.

2              THE COURT:  Yes, Mr. Higgins.  Good to have you

3    here.

4              MR. HIGGINS:  So we are now -- just to give you a

5    frame of reference -- we're now down to eight claims left

6    against W.R. Grace, and it befits there being the last date

7    of about 12,000 of them, these are the ones that are shall

8    we say not going quietly into the night.

9              THE COURT:  All right.

10             MR. HIGGINS:  We do have one that was noticed up

11   for today for Jimmy Wright that was an employment-based

12   claim.  We have been able to settle that.  That claim

13   objection will be withdrawn here in the next couple of weeks

14   once payment's been made.

15             THE COURT:  All right.

16             MR. HIGGINS:  So we have today Norfolk Southern's

17   claim which is a railroad indemnity claim.  I think it's

18   been pretty well explained in the papers, perhaps even

19   overly exhaustively so.  But there are, as Mr. O'Neill said,

20   two competing motions for summary judgment, one filed by the

21   Reorganized Debtors and one filed by Norfolk Southern.

22             In the course of the briefing, it became clear to

23   the Reorganized Debtors that there was a gating issue here,

24   which is the admissibility of certain testimony by one

25   Lester Kirkland.  And also the issue of whether the Court

1    should strike two declarations that were filed on January

2    27th by Norfolk Southern because of a series of hearsay and

3    foundation and other evidentiary problems.

4            And it's our belief, Your Honor, that if the Court

5    were to address those two items first before attending to

6    summary judgment that depending on how you rule, it could

7    clear the way to disposing of this claim more quickly than

8    otherwise.  If not, I think that, you know, there's -- there

9    are other paths to take that maybe take a little bit longer.

10   And in the Reorganized Debtor's view would ultimately reach

11   the same conclusion.

12           THE COURT:  Do you need argument on the --

13           MR. HIGGINS:  Your Honor, what we would propose --

14           THE COURT:  -- on the motion?

15           MR. HIGGINS:  -- what we would propose is that you

16   hear argument on the hearsay and to the extent necessary on

17   the motions to strike.  And from there, depending on how you

18   rule, we could then set the competing summary judgments for

19   oral argument.  That said, I will note that Norfolk Southern

20   I believe and I don't want to put too many words into

21   counsel's mouth, but I believe that Norfolk Southern is

22   essentially saying now that as to their summary judgment

23   motion that there's, you know, competing facts or facts

24   immaterial to -- material facts in dispute.

25           We believe that that's not the case, that you can

1    go forward on the Reorganized Debtor's summary judgment

2    motion, but that it would be easier to do so once you've

3    dealt with the hearsay and the motion to strike.

4            THE COURT:  All right.

5            MR. HIGGINS:  We do have one last issue and that

6    is a potential witness, a train master named Chapman, whom

7    we identified in our pleadings as somebody who had made a

8    rather telling admission on behalf of Norfolk Southern.

9    We've made inquiries with Norfolk Southern as to whether Mr.

10   Chapman is available to testify and if he is, you know, of

11   sufficiently good health and young enough, that we don't

12   have to worry about perpetuating his testimony.

13           We don't believe we need to go forward with

14   discovery at this point before we deal with summary

15   judgment, but we do want to obtain assurances with Norfolk

16   Southern that he is indeed in good health.  I'm --

17   unfortunately, I do have to report that as of today, Norfolk

18   Southern has not to the best of our knowledge ever contacted

19   Mr. Chapman and has merely told us they have no reason to

20   believe that he's in ill health.  I think we would rather

21   see a more positive statement that Mr. Chapman is available.

22           THE COURT:  All right.

23           MR. HIGGINS:  And thank you, Your Honor.

24           THE COURT:  Thank you, Mr. Higgins.

25           Mr. Baldwin, it's good to see you.

1           MR. BALDWIN:  Good to see you, Your Honor.  It's

2      been a long time.

3           THE COURT:  Yes, it has.

4           MR. BALDWIN:  This is about kaolin.  You know we

5      have kaolin road?  Well, it turns out kaolin is a powdery

6      substance that they dig out of the ground, and it is used to

7      make various ceramic-type products.  And in South Carolina,

8      there was a Grace facility -- there is I think still -- that

9      mined kaolin and loaded it up into Norfolk Southern hopper

10     cars.  There was an accident that occurred back in 1998,

11     January of 1998 -- actually two accidents where a Norfolk

12     Southern employee fell off the car and, you know, one of the

13     issues is was this because of any contributing negligence of

14     Grace in overflowing a car and putting this slippery stuff

15     on there.

16          THE COURT:  Right.

17          MR. BALDWIN:  There are all kinds of factual

18     issues that have to do with where was the car located, was

19     there any FILLA case brought solely against Norfolk Southern

20     by the employee and he won a jury verdict against Norfolk

21     Southern in Georgia.  He didn't join Grace.  Grace was

22     invited to enter the case by Norfolk Southern, and they

23     declined.

24          And there are numerous indemnity agreements

25     between the railroad and Grace about -- that applied

1    different circumstances.  Some are sort of no fault

2    indemnifications that they would have to indemnify us even

3    if they're not at fault.  I don't want to characterize it

4    too much because we're not getting into it.  I want to get

5    into the -- I'm just stating this as background.

6                  THE COURT:  Yes.

7                  MR. BALDWIN:  But some of the issues have to do

8    with really whether -- the real issue's whether these

9    indemnifications kick in and require them to pay either 100

10   percent of the damages that were paid to this gentleman or

11   50 percent or something -- some other number.

12                  This claim has been sitting for virtually forever.

13   We filed a claim in March of 2003.

14                  THE COURT:  Okay.

15                  MR. BALDWIN:  They filed an objection six and a

16   half years later in July of 2009, so they weren't in any big

17   fat rush.  Mr. Kirkland is the employee, and he

18   unfortunately passed away in October of 2009.

19                  THE COURT:  Okay.

20                  MR. BALDWIN:  He's the employee who --

21                  THE COURT:  Who was injured?

22                  MR. BALDWIN:  Yes.

23                  THE COURT:  Yes.

24                  MR. BALDWIN:  And we worked for quite a long time

25   to try to come up with a stipulated basis on which to

1    provide the Court agreed facts that you could use to rule on

2    the indemnification rights back and forth.  We weren't able

3    to do that.  We finally agreed that either party could rely

4    on the trial record from the Georgia proceeding, which we

5    had supplied to W.R. Grace.

6              W.R. Grace essentially repudiated that agreement

7    when it filed for summary judgment on October 31, 2016.  And

8    in their opening papers, they made the same argument that

9    they're talking about now, which is whether the -- sorry,

10   it's allergies; tree pollen season --

11             THE COURT:  Yes, it is.

12             MR. BALDWIN:  -- whether the Kirkland testimony

13   would be allowed into the record.  And they took the

14   position in their opening papers -- and this is robustly

15   briefed -- that the Kirkland testimony could -- that any

16   testimony in the record could come in for them, but could

17   never come -- but could not come in for us, could help them

18   but could not help us.

19             THE COURT:  Okay.

20             MR. BALDWIN:  And not only is that not what we

21   agreed, but it required a while set of briefing.  They have

22   now -- we filed a cross-motion for summary judgment and

23   their papers are -- well, Mr. --

24             THE COURT:  I have the -- yes, I have the binder

25   and I --

1           MR. BALDWIN:  I hope you got them two-sided as we

2     have because I tell my secretary I'm too old to carry

3     single-sided and that issue's going to come up a little bit

4     later.

5           THE COURT:  That's why you have Mr. McNeill.

6           MR. BALDWIN:  Well, yeah.  Yeah, but even Mr.

7     McNeill couldn't handle it if it was single-sided.

8           THE COURT:  No, that's right.

9           MR. BALDWIN:  You know, old people like us

10    certainly couldn't handle it, and I mean no disrespect to

11    the Court, but --

12          THE COURT:  No, of course.

13          MR. BALDWIN:  -- but I'm going to come back to

14    that.  They filed about 200 -- the briefing is 210 pages.

15    They filed 144 pages of briefing on this simple summary

16    judgment motion, and some of their briefing consisted of

17    attachments which were repetitive briefs on some of these

18    issues.  So the attachments were A, B, C which were

19    additional briefs, so in addition to declarations that you

20    would ordinarily see.

21          Finally, on March 31st, they filed their hearsay

22    motion, which Mr. Higgins was just talking about, which was

23    actually a redux of the admissibility issues that had been

24    briefed robustly by the parties throughout.  And they have

25    decided that their best chance is to pull this hearsay

1    motion out and the motion challenging out affidavits.  The

2    affidavit motion you'll see includes such objections as

3    objection to this because they talked about facility but

4    they didn't use -- the affiant did not use the same

5    definition of facility that was contained in the

6    indemnification agreement.  So that testimony can't be

7    considered by the Court.

8            I hope not be conveying my view about the validity

9    of those objections too much.  But with regard to this, we

10   think that they put in counter affidavits to ours and so we

11   think they're basically with respect to the indemnification

12   issue, you have a couple of facts.  You know, where were

13   these -- where did the especially the second accident occur?

14   Who car was it?  On whose property was it?  Based on the

15   descriptions in the indemnification agreements, is it

16   covered or is it not covered, and so forth.

17           So where was it, who was involved, whether Grace

18   was negligent, those are the principal arguments.  And so we

19   say we think you have basically countered our facts by

20   raising a question of facts.  So we ought to go to trial.

21   So rather than going to trial, what they're trying to do is

22   come at you with two rounds -- two bites of the apple.  They

23   want you to pull out these discreet evidentiary issues, but

24   they're not willing to conceive that if the evidentiary

25   issues go against them and that the affidavits come in and

1    that the Kirkland testimony comes in, that there still would

2    be questions of fact.

3         So what they're asking you to do is take this huge

4    pile of briefing, consider it, pull out one tiny portion and

5    then give them their first bite and then come back for a

6    second bite where the Court has to consider all these papers

7    again because our papers are -- the issues are intertwined.

8    We have simply said we've already briefed this.  See pages

9    da-da-da-da-da-da.  So you're going to have to go back and

10   look at all these papers anyway.

11        So the question is it's a matter of judicial

12   economy and the economy for the parties should we have to do

13   this 210-page briefing extravaganza and then have them pull

14   out just the nose of the elephant for your close inspection

15   and leaving the rest of the elephant for a bigger bite.  We

16   don't think they can honestly look Your Honor in the eye and

17   agree that we would not be entitled to go to trial if they

18   prevailed on these motions because we would -- even if these

19   affidavits were partly not considered and even if the

20   Kirkland testimony was partly not considered, we would come

21   up with other witnesses who would testify, although we think

22   they've made it as difficult as possible for us by waiting

23   until after Mr. Kirkland passed away and then saying, oh, my

24   goodness, Mr. Kirkland's passed away so we're going to

25   object to your use of his testimony but not ours.

1        So we think it's inefficient for the Court.  We'll

2   do whatever the Court wants, but we think since we've had to

3   go to the expense of all this, unless they can tell you why

4   you shouldn't which they haven't, then we should either

5   conceded that these evidentiary issues were resolved in

6   summary judgment and go to trial or argue the whole thing

7   together so our client doesn't have to go through recidivist

8   expenses.

9        THE COURT:  So in other words, what you're saying,

10  Mr. Baldwin, is rather than have an argument first on the

11  evidentiary issues and then have a hearing on summary

12  judgment, going to have a hearing on the evidentiary issues

13  and summary judgment?

14       MR. BALDWIN:  Yes, all together.

15       THE COURT:  All right.

16       MR. BALDWIN:  Which is what the Court ordinarily

17  would do when you would be --

18       THE COURT:  Right.

19       MR. BALDWIN:  -- considering a summary judgment

20  motion.  This is not even a very large claim really in the

21  scheme of things, W.R. Grace, I think, it's about a $1.5

22  million settlement.  But going back to 2001, under the plan,

23  of course, there's interest on the claim so I forget what it

24  is.  It's two or $2 million now --

25       THE COURT:  The interest alone would be large.

1          MR. BALDWIN:  It's the best investment our client

2     could find right now, Your Honor --

3          THE COURT:  Yes.

4          MR. BALDWIN:  -- is to keep it in the -- keep our

5     funds undeposited with W.R. Grace.

6          THE COURT:  Why the claim was filed in 2003?  Why

7     is it?  And it's only now being considered by the Court on

8     summary judgment?

9          MR. BALDWIN:  I think Your Honor has to ask W.R.

10    Grace about that.  They -- you know, we had some talks over

11    the years, but they had other things to -- other fish to fry

12    and they waited six years even to file an objection.

13         THE COURT:  Yes.

14         MR. BALDWIN:  And in the meantime, our guy died

15    right after that.  So I don't think that it's really

16    excusable, but there you have it.  And I would like to say

17    something about Mr. Chapman.

18         THE COURT:  Yes.

19         MR. BALDWIN:  And it has to do with -- a little

20    bit has to do with these binders I mentioned.  What they

21    also want to do is pull out -- they say they don't want to

22    call it discovery because then we would get discovery.  So

23    they don't want to call it discovery.  They just want to

24    take his deposition.  And we said, well, if you're going to

25    take his deposition, let's enter into a deposition schedule

1    and then we get to take depositions.  And they said no, no,

2    no.  You're missing our point.  We don't want discovery.  We

3    just want a statement from him under oath with a court

4    reporter because possibly he could be owed.

5            What they say is -- and I hope that this doesn't

6    offend you as it does me -- he's retired and he could be 65

7    or thereabouts and therefore, we have to take his deposition

8    because he could drop dead any moment.  Now, I don't think

9    I'm the only one around 65 in this courtroom.

10           THE COURT:  No, you're not, Mr. Baldwin.  We're

11   the same age.

12           MR. BALDWIN:  And I don't think that's proof.

13   They have not filed a motion to preserve his testimony, so

14   why are we talking about this.  They don't have any reason

15   to believe that he is not in good health, and what they --

16   and what we said is what makes you think he's not in good

17   health, and they said because he might be 65.  That's

18   nothing.  If you want to consider this now, that's no

19   evidence at all.

20           What we said to them in return is because this

21   accident happened in 1998, most of the witnesses would be

22   retired and nearly at their death's door of 65 as well.  So

23   tell us who your witnesses are with knowledge and how old

24   they are, let's set up a briefing schedule, and let's do it.

25   But we're not going to just pull it out and have you do Mr.

1    Chapman.

2             And I will tell you we've explained this many

3    times to Mr. Higgins and I'm sorry he doesn't understand

4    because I must have been inarticulate.  But when we were

5    briefing our cross-motion for summary judgment and we were

6    looking for affidavits, we looked for Mr. Chapman.  We had

7    our people reach out to him.  They even went to his house

8    and left him a note.  So to say we haven't tried to contact

9    Mr. Chapman is wrong, and we've conveyed this to them.  We

10   didn't see any bodies.  We didn't see anything.  He just is

11   retired and probably didn't want to talk to us.  But we

12   don't one way or the other, but if it applies to Chapman, it

13   applies to every one of these other unnamed people.

14            The main witness on their side is a guy named Mr.

15   Woods.  He's also passed away along with Mr. Kirkland.  So

16   we want to know if they're not going to wait until the

17   summary judgment's decided, then let's do discovery.  If

18   they're going to press for Chapman, then we want all their

19   guys, and we're going to give them an expedited discovery

20   request and get them.  And if the Court wants to consider

21   this with no motion, I'm happy to rely on my oral comments.

22            THE COURT:  All right.

23            MR. BALDWIN:  Thank you, Your Honor.

24            THE COURT:  Yes, Mr. Baldwin.  Thank you.  Mr.

25   Higgins, anything further?

1          Oh, Mr. Chapman, let me just say there are

2    mechanisms to take his deposition within the rules and you

3    ought to follow those.  I don't think that Norfolk Southern

4    has an obligation to provide you with information about Mr.

5    Chapman.  If you want to subpoena him or whatever it is you

6    want to do, I think you ought to do that.

7          MR. HIGGINS:  Your Honor, all we were looking for

8    with respect to Mr. Chapman -- and I must say that counsel

9    was somewhat more forthcoming this time than he has been in

10   the past -- in the -- all we wanted to know is is he in good

11   health.  That's the -- and I think if you were in good

12   health, well, that would be the end of it from our

13   perspective.  We have no interest in taking him, quote,

14   unquote, out of turn.  We have gone back and looked at each

15   one of our witnesses, the ones we believe that Norfolk

16   Southern would be interested in if, indeed, we get that far,

17   and we're happy to report they were all healthy.

18          They were all -- at least two of them are still

19   working at Grace.  They're not yet 65.  I'd say that as

20   somebody who is now in his seventh decade along with others.

21   And the one gentleman who is retired is in fine health.

22          THE COURT:  All right.

23          MR. HIGGINS:  We just wanted to know is he okay.

24          THE COURT:  Okay.

25          MR. HIGGINS:  And, you know, we just haven't

1    gotten a very clear answer to that.

2              THE COURT:  All right.  And why so long?  Help me

3    out on that --

4              MR. HIGGINS:  Well --

5              THE COURT:  -- because I haven't been involved in

6    this case all along.

7              MR. HIGGINS:  Sure.  And to be honest, Your Honor,

8    I wasn't going to go into that, you know, as this is a

9    status conference, but I'm happy to discuss that.  So if you

10   look at the W.R. Grace's bankruptcy, it is one of the

11   longest.  I don't know that it's number one, but it's

12   certainly in the top three or four longest bankruptcies from

13   petition date 4/2/01 to the effective date of February 3rd

14   of 2014.

15             THE COURT:  Right.

16             MR. HIGGINS:  And during the course of that, there

17   were as I alluded to earlier, you know, something on the

18   order of 12,000 non-asbestos claims filed.  We are now down

19   to eight, as I said, Norfolk Southern being one of those.

20   The -- so the history of this is a little bit more fulsome

21   than counsel was alluding to.

22             So the trial -- the accidents happened in January

23   of 1998.

24             THE COURT:  Right.

25             MR. HIGGINS:  There was one accident on Friday,

1    the 23rd, where Mr. Kirkland apparently fell off of a train

2    and hurt himself.  He was sent back to work on the 26th

3    where he apparently slipped on a railcar that may or may not

4    have been from Grace.  We don't really know.  And but even

5    if it had come from Grace, then, you know, we think that

6    it's not covered by the indemnity.

7             And Mr. Kirkland never worked again.  He filed

8    suit in July of 1998 against Norfolk Southern.  Norfolk

9    Southern took Mr. Kirkland's deposition -- and I will add

10   that, to back up, that in the accident reports that Mr.

11   Kirkland filled out in January 23rd and 26th, he reported

12   that these were Grace railcars.  In the Norfolk Southern

13   accident report, their investigation -- they only did one

14   for the 23rd that we're aware of -- it identified the

15   railcar as having come from another railcar or another

16   kaolin manufacture called J.M. Huber.

17            And the one on the 26th as far as we are aware,

18   Norfolk Southern despite its own rules and regulations on

19   this point never produced an accident report for this

20   January 26th incident.  Fast forward to July of 1998, so

21   Norfolk Southern is long since on notice about Grace's

22   potential involvement in their view of the world.

23            In September of 1999, Grace receives a letter from

24   Norfolk Southern's Georgia trial counsel, the first time

25   Grace ever knew about this.  Grace for reasons that we could

1    spend a long time on, but will become abundantly clear

2    declined to join this going -- these are accidents which

3    occurred on Norfolk Southern facilities -- Norfolk Southern

4    rail sightings miles aware the Grace plant, hours after the

5    cars had been turned over.   These are all non-disputed

6    facts --

7              THE COURT:  Okay.

8              MR. HIGGINS:  -- when they, you know, view --

9    perhaps take a view of what they mean, but the facts are

10   uncontroverted here.  So Grace declined to be involved.

11   Norfolk Southern never interpleaded or sought to join Grace.

12   They could have done so under the applicable Georgia rules

13   just like applicable federal rules.  The trial was held in

14   late '00 and I believe that there was a judgment against

15   Norfolk Southern of over $1.9 million that was later settled

16   for 1.5, and this was in January of '01.

17              Well, Grace filed bankruptcy in April of '01 --

18              THE COURT:  Right.

19              MR. HIGGINS:  -- which brought all litigation and,

20   you know, to be very honest, I would have to ask Mr. Fink

21   how many hundreds of cases were ongoing at that point, but

22   they all came to a screeching halt.  The claim's bar date

23   was set for March 31st of '03.  Norfolk Southern filed their

24   claim on March 30th I think it was in -- and the Reorganized

25   -- well, then Debtors undertook a program to start knocking

1   claims out.  And Norfolk Southern's claim came up in 2007,

2   and Grace identified this claim as one that would have been

3   ripe for mediation and sought to go to mediation with

4   Norfolk Southern.  The talks died.

5          So then in the summer of '09, July of '09, the

6   Reorganized Debtors filed their objection.  Now

7   understanding that counsel has made a big deal out of Mr.

8   Kirkland passing away in I believe it was September of '09,

9   Norfolk Southern was on clear notice as early as two years

10  before that this was not a claim that was going to go

11  quietly into the night.  It was not a claim that was going

12  to be allowed by Grace without there being some discussion,

13  some litigation, some arbitration, some mediation.

14          And yet they didn't see fit to see if Mr. Kirkland

15  -- how Mr. Kirkland was doing, and this is if you dig deeply

16  enough into this trial record, you realize that Mr. Kirkland

17  died of colon cancer, and he'd already had surgery in 2000

18  for colon -- for colon issues.  I mean Norfolk Southern was

19  very clearly on notice about Mr. Kirkland's ill health and

20  they did nothing to try and find him, to perpetuate his

21  testimony under Rule 27 or Bankruptcy Rule 7027.

22          In 2012 and 2013, the two sides did engage in

23  discussions about using the trial record about whether how

24  specifically the stipulation was to be and to be very blunt,

25  counsel mischaracterized the end of those discussions

1    because there was never an agreement on anything.  They were

2    settlement talks that went nowhere.  They were settlement

3    talks again in 2015.  Again, a discussion in 2015 about

4    using facts.  No progress.

5            It was in that light that Grace took a step back

6    and evaluated the entire claim, did some significant factual

7    investigation, realizing that, you know, from Grace's

8    perspective, the case was shall we say considerably stronger

9    than at first impression.  And it was in that light that we

10   filed the summary judgment motion which said that with or

11   without the FILLA record -- the FILLA trial record --

12           THE COURT:  Yes.

13           MR. HIGGINS:  -- Norfolk Southern has failed to

14   carry its burden of proof.  We don't have any more than

15   that.  And Norfolk Southern filed its response and its

16   cross-motion January 27th advancing certain arguments as to

17   why Mr. Kirkland's testimony in particular was to be

18   admitted.

19           And it was in the fact of that briefing that the

20   Reorganized Debtors understood I think more clearly.  I wish

21   that I has perfect foresight.  I don't necessarily, nor does

22   my client.  At that point we realized that this issue of

23   whether Mr. Kirkland's testimony is admissible for the

24   purposes of Norfolk Southern carrying its burden of proof,

25   that without that testimony, they cannot even under their

1    own theory carry the burden of proof.

2            We believe that even with that testimony that they

3    will ultimately fail.  We believe that the Court could rule

4    in summary -- even with the testimony the Court would rule

5    in summary judgment in the Reorganized Debtor's favor.  But

6    it's a cleaner, simpler task for the Court to separate the

7    wheat from the chaff in terms of what facts are disputed and

8    what facts aren't disputed.

9            The facts that are not disputed is Mr. Kirkland

10   was on a railcar on January 23rd, presumably from J.M.

11   Huber.  There's been no evidence introduced otherwise.  He

12   fell in that railcar while it was attached to a Norfolk

13   Southern-controlled train, after Norfolk Southern had taken

14   consignment of the car, after Norfolk Southern had adjudged

15   their car safe to run.  These are unassailable facts found

16   in that trail record that counsel if referring to.

17           And that railcar was at a Norfolk Southern-owned

18   citing in Warrenville, South Carolina ten miles away from

19   the Grace plant.  Several hours after Grace consigned that

20   railcar that had been adjudged safe to run -- or how about

21   this, not unsafe to run since the conductor's rules talk

22   about the cars being detached from the (indiscernible) or

23   the trains when they are unsafe to run.  So the car was

24   adjudged not unsafe to run.  And Mr. Kirkland was injured

25   apparently and then sent back to work.

1            The next data point there is the railcar is picked

2    up at the Grace plant on -- sometime in the morning of

3    January 26th, the following Monday morning.  Railcar is once

4    again adjudged not unsafe to run, which we can discuss in

5    some detail.  The railcar is attached to a Norfolk Southern

6    train.  It goes away to the (indiscernible) Depot where Mr.

7    Kirkland apparently injured himself again.

8            And it is our view and it has been Grace's view

9    from the very beginning that those accidents fall way --

10   well outside the scope of the indemnities under applicable

11   law.  And we are fully prepared.  I'm happy to argue that

12   all day long today, but what we saw an opportunity for the

13   Court to be able to short circuit this rather voluminous bit

14   of pleading or briefing.  Over half of which by the way is

15   the trial transcript from the FILLA trial --

16            THE COURT:  Okay.

17            MR. HIGGINS:  -- in that so.

18            THE COURT:  All right.

19            MR. HIGGIN:  You know, we will plead guilty to of

20   having run a bit long in our briefs, but, you know, we've

21   addressed that with the Court.  So we think that, Your

22   Honor, respectfully, if you are -- can rule on whether Mr.

23   Kirkland's testimony should be admissible, which we believe

24   it should not be.  And if you take a proper view of the

25   deformities, the weaknesses in those two declarations and

1    that's Messrs. Sharp and Connelly, that a lot of the chaff

2    starts to fall away leaving the wheat behind and that we

3    believe that then the Court can look at the remaining wheat,

4    which is the undisputed facts and be able to come to a

5    conclusion.

6              THE COURT:  Would you like me to rule, make the

7    evidentiary rulings without argument or do you want argument

8    on that?

9              MR. HIGGINS:  Your Honor, we'd be happy -- if you

10   want to make that evidentiary ruling without argument, we're

11   happy to do it that way.

12             THE COURT:  All right.

13             MR. HIGGINS:  Absolutely.  And we're happy to do

14   oral argument to make it easier for you to make this ruling,

15   but we'd be highly pleased if you did it without oral

16   argument.

17             THE COURT:  All right.  How about you, Mr.

18   Baldwin?  Do you want oral argument on the evidentiary

19   issues?

20             MR. BALDWIN:  If the Court's going to consider

21   them separately, I don't really think we would need them.  I

22   think there's a lot of briefing.  I think you're going to

23   have to read all the briefs anyway.

24             THE COURT:  Yes.

25             MR. BALDWIN:  So I --

1            THE COURT:  So you'd just as soon get here on the

2    motion for summary judgment, argue the evidentiary issues as

3    well as summary judgment?

4            MR. BALDWIN:  Yes.  Yes.

5            THE COURT:  All right.

6            MR. HIGGINS:  And just --

7            THE COURT:  Well, here's what I need -- I think I

8    need to read the papers

9            MR. HIGGINS:  Okay.

10           THE COURT:  -- to make that decision to see

11   whether as Mr. Higgins suggests, that will make my task in

12   the long run easier if I rule in Grace's favor on the

13   evidentiary issues or if I should just hear the whole thing

14   at one time, which I'm inclined to do.  I'm inclined to hear

15   the motions for summary judgment, the cross-motions for

16   summary judgment, as well as your evidentiary objections at

17   the same time.  Just I think that might be the easier way,

18   but let me look at the papers and make that decision.  And

19   then we can schedule you promptly for argument.

20           I assume you're ready to go to argument.  You

21   could go, you know, tomorrow if necessary.

22           MR. BALDWIN:  Yeah, we probably could, Your Honor,

23   but that's fine.  I'm happy to do that.  I just want to say

24   that undisputed facts that supposedly -- that were recited

25   are not undisputed and they're mostly pulled from the trial

1    record, which they say is inadmissible, so.

2            THE COURT:  Okay.  All right.  Okay.  I

3    understand.  And so let me look at the -- let me look at all

4    of this because it may make sense for me to rule on the

5    evidentiary issues first just so you know what your argument

6    if that's a summary judgment argument.

7            MR. BALDWIN:  Well, you know, it's possible, Your

8    Honor.  Since we briefed this initially on one set of

9    assumptions, it's possible that we may need to file some

10   sort of revised brief of now this motion came up at the end

11   after we have briefed the whole thing for months.

12           THE COURT:  Okay.  In other words you --

13           MR. BALDWIN:   You know, I just want to consider

14   -- have an opportunity to consider how it affects the papers

15   we've already put in after we get the Court's ruling.

16           THE COURT:  All right.  In other words, you may

17   want to brief your summary judgment motion differently?

18           MR. BALDWIN:  Yes, Your Honor.

19           THE COURT:  Okay.  All right.

20           MR. HIGGINS:  Your Honor, we would have to see

21   what they wanted to do --

22           THE COURT:  Right.

23           MR. HIGGINS:  -- before I make -- we make any

24   decision about what we would want to do.

25           THE COURT:  Okay.  Well, let me go back and --

1    because frankly, I've looked at the briefs quickly, but I

2    haven't really studied them as I have to do, you know, and

3    decide whether I can rule on the evidentiary issues separate

4    from the motions for summary judgment or we should just have

5    argument on both.  And I certainly understand both parties'

6    positions on that, and I'll make that decision.

7              What else can we accomplish today, gentlemen?  Mr.

8    O'Neill?

9              MR. O'NEILL:  I think we've accomplished all that

10   we can for today on this matter, Your Honor.

11             THE COURT:  All right.  And -- all right.  You'll

12   be hearing from me on my decision how to proceed from this

13   point forward.  All right.

14             MR. O'NEILL:  Thank you very much, Your Honor.

15             MR. BALDWIN:  Thank you.

16             MR. HIGGINS:  Thank you.

17             THE COURT:  I thank you very much for being here

18   and for your arguments and help.  And you'll hear from me,

19   and we'll stand in recess.

20             MR. O'NEILL:  Thank you, Your Honor.

21             MR. BALDWIN:  Thank you, Your Honor.

22             MR. HIGGINS:  Thank you, Your Honor.

23             THE COURT:  Thank you.

24                         * * * * *

25

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5
     Sonya Ledanski    Digitally signed by Sonya Ledanski Hyde
6                       DN: cn=Sonya Ledanski Hyde,
                        o=Veritext, ou,
7    Hyde               email=digital@veritext.com, c=US
                        Date: 2017.05.10 14:02:03 -04'00'
8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  May 10, 2017