Page 1

1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

4

5   In the Matter of:            Case No. 01-01139 (KG)

6

7   W.R. GRACE & CO., ET AL.,

8            Debtors.

9

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                  United States Bankruptcy Court

13                  824 North Market Street

14                  Wilmington, Delaware

15

16                  June 22, 2017

17                  2:02 p.m.

18

19  B E F O R E :

20  HON. KEVIN GROSS

21  U.S. BANKRUPTCY JUDGE

22

23

24

25  ECR OPERATOR:  GINGER MACE

1    Hearing on Evidentiary Matters Regarding Motion for Summary

2    Judgment Pursuant to Fed. R. Bankr. P. 7056 for Partial

3    Allowance and Partial Disallowance of Claim No. 7021, Filed

4    By Norfolk Southern Railway Company [Docket No. 929575] and

5    Norfolk Southern Railway Company's Cross-Motion for Summary

6    Judgment Allowing Claim No. 7021 [Docket No. 32825] and

7    related matters

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sherri L. Breach, CERT*D-397

1     A P P E A R A N C E S :

2     PACHULSKI, STANG, ZIEHL & JONES, LLP

3          Attorneys for Reorganized Debtors

4          919 North Market Street, 17th Floor

5          PO Box 8705

6          Wilmington, Delaware 19899

7

8     BY:  JAMES E. O'NEILL, ESQ.

9

10    THE LAW OFFICES OF ROGER HIGGINS, LLC

11         Attorneys for Reorganized Debtors

12         1 North Bishop Street, Suite 14

13         Chicago, Illinois 60607

14

15    BY:  ROGER J. HIGGINS, ESQ.

16         DAVID E. GRASSMICK, ESQ.

17

18

19

20

21

22

23

24

25

1   POTTER, ANDERSON & CORROON, LLP

2        Attorneys for Norfolk Southern Railway Co.

3        Hercules Plaza

4        1313 North Market Street, 6th Floor

5        PO Box 951

6        Wilmington, Delaware 19801

7

8   BY:  DAVID J. BALDWIN, ESQ

9        R. STEPHEN MCNEILL, ESQ.

10       D. RYAN SLAUGH, ESQ.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2            THE CLERK:  Please rise.

 3            THE COURT:  Good afternoon, everyone.  Thank you.

 4   You may be seated.  It's a pleasure to see you all.

 5            And, you know, before we begin, I got this binder

 6   on the summary judgment motions and I thought to myself, I

 7   really need a degree in engineering just to figure out what

 8   it is I should read and where the papers are.  And then I --

 9   and it really came about because I wanted to pull out the

10   papers dealing with the evidentiary issues which I have in a

11   separate binder.

12            And it took me a great deal of time just to get

13   through the papers and it's a little bit discouraging

14   because, you know, we're busy here with bankruptcy matters

15   and it just seemed to me to be a little bit, a little bit

16   more than I needed.

17            But I understand that the parties want to say

18   everything and want the Court to read everything.  And --

19   but sometimes it's better -- sometimes less is more is all

20   I'll say.

21            So with that --

22            MR. O'NEILL:  Your Honor, James O'Neill for the

23   record --

24            THE COURT:  Yes.

25            MR. O'NEILL:  -- appearing today on behalf of
```

1    Grace, the reorganized debtor with, as you know, my co-

2    counsel Roger Higgins and --

3              THE COURT:  Yes.

4              MR. O'NEIL:  -- also David Grassmick.

5              THE COURT:  Good afternoon, gentlemen.

6              MR. O'NEILL:  And I will fall on my sword a little

7    bit, Your Honor, with respect to the binder issue.  That's

8    the same binder that we submitted sometime ago for our

9    initial hearing --

10             THE COURT:  Yes.

11             MR. O'NEILL:  -- that was submitted.

12             THE COURT:  Yes.

13             MR. O'NEILL:  And at the time of this hearing I --

14   frankly, I wasn't sure what to do.  So I didn't do anything.

15             THE COURT:  Right.

16             MR. O'NEILL:  And that -- but that was probably

17   the wrong thing.

18        (Laughter)

19             THE COURT:  I don't think so.  I don't think so.

20   I --

21             MR. O'NEILL:  So I apologize, Your Honor.  I --

22             THE COURT:  No, not necessary.

23             MR. O'NEILL:  -- because I wasn't sure whether I

24   should pull them out and resubmit and I just thought that we

25   had submitted the binder already.  And I acknowledge that

1      there is -- we've thrown a lot at you.

2            THE COURT:  Yes.

3            MR. O'NEILL:  But you seem to do so well when we

4      throw a lot --

5         (Laughter)

6            MR. O'NEILL:  No.  I do apologize, Your Honor.

7      And we will try to be a little more succinct and focused

8      with respect to the binders.  This -- the dispute and the

9      papers are rather vast.

10            THE COURT:  Yes.

11            MR. O'NEILL:  And at times we do ask you to look

12      at smaller issues within the dispute, and I acknowledge that

13      you don't need every paper to decide some of those.

14            THE COURT:  Right.

15            MR. O'NEILL:  So, again, my apologies, Your Honor.

16      We certainly will be more sensitive to that going forward

17      and submit a smaller binder or kind of like a working binder

18      so that you just have the documents that are going to be

19      most relevant to the issues that we're talking about.

20            THE COURT:  Well, I think I have here what I need

21      now.

22            MR. O'NEILL:  Okay.

23            THE COURT:  And I can put together my own sort of

24      binders --

25            MR. O'NEILL:  Okay.

1              THE COURT:  -- to work with.  But it's just --

2      it's a large amount of material and it's a lot to go

3      through.

4              MR. O'NEILL:  It is.  And I -- again, Your Honor,

5      I apologize for not thinking it through a little bit more

6      and submitting you with a slimmed down binder of just the

7      other things and we'll --

8              THE COURT:  That's all right.

9              MR. O'NEILL:  -- endeavor to do --

10             THE COURT:  I've done that.

11             MR. O'NEILL:  -- we'll endeavor to do better.

12             THE COURT:  All right.  Thanks, Mr. O'Neill.

13             MR. O'NEILL:  Your Honor, Mr. Grassmick is going

14      to do the arguments --

15             THE COURT:  All right.

16             MR. O'NEILL:  -- on our behalf today.  So I can

17      turn over the lectern to him if we're ready to do that.

18             THE COURT:  I'm ready to hear --

19             MR. O'NEILL:  If you're ready.

20             THE COURT:  I'm ready to hear from you.

21             MR. O'NEILL:  Okay.  Thank you.

22             THE COURT:  Thank you.

23             Mr. Grassmick, good afternoon.

24             MR. GRASSMICK:  Good afternoon, Your Honor.  I

25      want to thank you for actually having the argument today.

1    You know, Mr. Higgins last time spoke about the fact that

2    Grace was comfortable on all the papers and believed no

3    matter how things went on the evidentiary rulings that we

4    would prevail.

5            But we found, you know, Mr. Higgins stressed and

6    the Court seemed to let us go forward today on the

7    proposition that the evidentiary questions are really a

8    gating question.  And the opportunity to resolve those

9    really can focus the issues in a way that makes it easier to

10   get to resolution on this issue and hopefully simplify your

11   task.

12           THE COURT:  I agreed with that and I thought that

13   it made sense to take it in a, you know, slightly smaller

14   bites.

15           MR. GRASSMICK:  Yes.  And thank you for that

16   opportunity, Your Honor.  The place that I want to begin is

17   just to talk a little bit about the rule on summary

18   judgment.

19           THE COURT:  Yes.

20           MR. GRASSMICK:  And that would be in the Federal

21   Rule of Civil Procedure Rule Number 56(c)(4) and the same

22   rule was 7056 under the Bankruptcy Rules.

23           THE COURT:  Right.

24           MR. GRASSMICK:  And the point under that rule

25   that's most relevant is where it suggests that affidavits or

1    declarations, an affidavit or declaration used to support or

2    oppose a motion must be made on personal knowledge, set out

3    facts that would be admissible in evidence, and show that

4    the affiant or declarant is competent to testify on the

5    matters as stated.

6              And the cases that we've cited in our briefing --

7    and I won't continue on to, you know, re-summarize those

8    cases.  The papers speak for themselves -- suggest that at

9    summary judgment it's very important to begin as a

10   preliminary matter to resolve those questions.  And that's

11   really the purpose that we have today.

12             THE COURT:  Right.

13             MR. GRASSMICK:  And I'm going to proceed in this

14   order.  I'm going to start with the motions to strike the

15   Conley and Sharpe declarations --

16             THE COURT:  All right.

17             MR. GRASSMICK:  -- and then I'm going to go on to

18   the motion on hearsay with regard to the testimony of Mr.

19   Kirkland.

20             I think the question in terms of the Sharpe and

21   Conley declarations is, in fact, very simple.  Now the last

22   time that we were in the court before the status hearing Mr.

23   Baldwin, you know, on behalf of Norfolk Southern, made a

24   comment in the record that it's worth quoting.  He said:

25             "The affidavit motion you'll see includes such

1              objections as objection to this because they

2              talked about facility.  But they didn't use, the

3              affiant did not use the same (indiscernible)

4              facility that was contained in the indemnification

5              agreement."

6         And Norfolk Southern, they accurately described

7    the entire purpose of the motions to strike.  And I -- I'm

8    going to deal with both Sharpe and Conley on that point.

9         And as the first point because the question about

10   the word "facility" goes in many respects to the very core

11   of this controversy.  In both the Sharpe and Conley

12   declarations the term "facility" is used as a capitalized

13   term.  And the suggestion being that it's being used in a

14   very precise, very defined way.

15        Now neither declaration expressly defines the

16   term, nor does either declaration state why the witness is

17   using the term in that way.

18             In the agreements between the parties, however,

19   the term "facility" takes a very precise meaning.  I'm going

20   to mention two of them.  In the agreement from December 15th

21   of 1980 the right of way agreement, the definition of

22   facility says, in part:

23             "Together with the right to maintain these

24             (indiscernible) a licensee's said cost and

25             expense, a portion of an existing warehouse

1          building with two appurtenant overhead canopies, a

2          shed, and a cyclone fence with two double-swing

3          gates thereon, all located substantially as shown

4          on said annexed print which said warehouse

5          building, canopies, shed, fence and gates shall

6          not become fixtures upon the realty, but shall

7          remain the property of the licensee and shall be

8          removed from the premises upon termination of this

9          agreement.  Said canopies and said shed being

10          hereinafter sometimes together referred to as

11          'facility.'"

12     And that's one definition of facility, and the

13  same definition is used substantially in the 1980 operating

14  agreement.  That's one possibility in terms of the meaning.

15     However, in 1990 there was another agreement

16  between the parties and it involves what Grace refers to as

17  the specialty loading spout or the NKC loading spout.

18          THE COURT:  Yes.

19          MR. BALDWIN:  And that definition read:

20          "Railroad hereby grants unto industry the right or

21          license to construct, maintain and use an overhead

22          loading structure with retractable loading spout,

23          herein after called facility, across and over an

24          industrial track of industry and located on said

25          facility being substantially as shown on print of

1            drawing number A00I02 dated June 14th, 1990,

2            annexed thereto and made a part thereof."

3            Therein lies the problem Your Honor.  It's term

4     use and agreements are very specific, precise defined term.

5     It's at the center of the dispute.  There are two

6     definitions of facility which in some ways are incompatible,

7     but that's an argument to be made at summary judgment, not

8     in regard to the evidence.

9            And although Mr. Baldwin suggested that was

10    perhaps a trivial way to deal with an objection, we think

11    foundational objections to the use of terms special and

12    center to the dispute are really at the core of the motion

13    to strike.  And it's important for those terms they be

14    clearly used and there be foundation, and we show that the

15    witness is competent to testify on those terms.

16            Misters Conley and Sharpe are a brakeman and

17    engineer respectively for Norfolk Southern Railroad --

18            THE COURT:  Yes.

19            MR. GRASSMICK:  -- can't imagine in the course of

20    their work they're engaged frequently with contracts.  And

21    at this point absence some testimony from them suggesting

22    their competency, that's why we've moved on those points in

23    particular to strike.

24            As to the other objections in the motion to strike

25    I don't have to repeat them.  They're very thorough and --

```
 1              THE COURT:  And you've gone -- you've certainly
 2     gone through them in the papers.
 3              MR. GRASSMICK:  Yeah.  And they're very complete.
 4     And so unless you have questions I think those objections
 5     stand for themselves.  And I guess, you know, if Norfolk
 6     Southern suggests something about them in their response
 7     that I need to say something more about, I can reserve that
 8     and come back to it --
 9              THE COURT:  And they're largely --
10              MR. GRASSMICK:  -- at that time.
11              THE COURT:  -- based on the lack of personal
12     knowledge; is that --
13              MR. GRASSMICK:  Well, there's two points.  One is
14     the lack of personal knowledge and the other is the set of
15     hearsay objections --
16              THE COURT:  Yes.
17              MR. GRASSMICK:  -- where they say things that are
18     generally known throughout the community and so they fall
19     into lack of personal knowledge or, I mean, or foundation,
20     whatever you want to call it or likewise hearsay.
21              THE COURT:  Okay.
22              MR. GRASSMICK:  It's two broad categories and it's
23     consistent throughout depending upon the specific claim
24     being advanced.
25              THE COURT:  Right.  All right.
```

1            MR. GRASSMICK:  All right.  So if you're fine with

2    that I'm going to move on to the --

3            THE COURT:  Yes.

4            MR. GRASSMICK:  -- the Kirkland testimony.

5            THE COURT:  Yes.

6            MR. GRASSMICK:  Now the question about the

7    Kirkland testimony, it has to really do as we begin with

8    looking at the purpose of the hearsay rule.  And in the

9    advisory committee notes under, you know, the eight series

10   of rules --

11           THE COURT:  Yes.

12           MR. GRASSMICK:  -- the first advisory committee

13   note addressed the point about using a hearsay rule and the

14   continued use of the hearsay rule.  And the point they focus

15   on is the fact, and I'm just going to quote a small portion

16   of it:  "The belief or perhaps hope that cross-examination

17   is effective in exposing imperfections of perception, memory

18   and narration is fundamental."

19           With the key principle, and one of the key reasons

20   that they keep hearsay at all as an evidentiary objection is

21   the fact they believe cross-examination is perhaps the most

22   vital means that's available to a party to ensure that

23   testimony is reliable.

24           That same advisory committee now goes on to

25   discuss the question of abandoning the hearsay rule entirely

1    which is something that was considered --

2                THE COURT:  Yes.

3                MR. GRASSMICK:  -- and they rejected it --

4                THE COURT:  Yes.

5                MR. GRASSMICK:  -- and they explained that they

6    rejected it because in balance and fairness it's important

7    to keep hearsay and to maintain it as a vital objection and,

8    in particular, because of the need to maintain cross-

9    examination as ultimately the test that proves the veracity

10   of testimony.

11               They discuss in part, and I'm going to deal with

12   this a little bit more later on.  The distinction that if

13   you have a record with cross-examination, that's important.

14   But it might even be better in many instances to have live

15   witness testimony because it's temperament and demeanor,

16   often times, that tell the story about the testimony.  It's

17   not what the words are that comes out of the witness's

18   mouth.  It's the facial reactions.  It's the pace at which

19   they speak.  It's how they pause.  It's the awkward long

20   pause before answering a question when they usually respond

21   very quickly.

22               Even before we go on, I think it's conceded at

23   this point.  Grace never had the opportunity to cross-

24   examine Mr. Kirkland live and so there was never a chance to

25   examine his demeanor.  And we don't have a written record

1    with that type of testimony either, and there's no Grace

2    cross-examination.  So Grace never had any opportunity to

3    examine Mr. Kirkland and thoroughly go through what he said

4    and test it through cross-examination.

5              And I'm going to explain why those points are

6    important a little bit later.

7              Norfolk Southern hangs its hat really on three

8    points.  The first point is what they call vouching.

9              THE COURT:  Vouching, which is a new -- which was

10   a new concept to me --

11             MR. GRASSMICK:  And it's a new concept, but it's a

12   concept, I don't believe, that we need to spend a lot of

13   time on at all.  I think it's conceded in the cases we cite

14   and in particular Morse Federal Practice discusses it that

15   vouching is something that today is suggested only in cases

16   where you can't implead a party into an action.  Georgia

17   accepts impleader.  Norfolk Southern never tried to implead

18   Grace into the Northern -- into the action in Georgia.

19             I -- you know, my client is here and I suppose I

20   could ask him to be more precise.  But I'm imaging in the

21   context of this, personal jurisdiction wouldn't have been an

22   issue because Grace has the ability to waive personal

23   jurisdiction.

24             THE COURT:  Yes.

25             MR. GRASSMICK:  And so the fact that it wasn't

1  attempted to implead us means vouching probably doesn't

2  matter.

3          Secondly, though, even if vouching mattered, the

4  fact that you vouch someone into a matter doesn't mean that

5  your interests are aligned.  It means you have privity.

6  Well, people who have contracts have privity.  That doesn't

7  mean that their interests are aligned at all.

8          And so the fact that you've been vouched doesn't

9  mean you share any interest.  And, in fact, the fact -- and

10 I believe it's the Blommer (ph) Court that we've cited

11 suggest voucher is an issue that can be litigated which

12 suggests the person being vouched is adverse to the person

13 trying to vouch them in.  And that's an issue of itself in

14 contention.

15         So the fact of vouching no matter how you would

16 choose to resolve it, Your Honor, doesn't prove that Norfolk

17 Southern is a predecessor in interest.

18         Now I don't think I need to repeat the discussion

19 of what's required for 804(b)(1) in terms of that.

20         THE COURT:  Right.

21         MR. GRASSMICK:  I mean, I'm not going to skip that

22 entirely, but --

23         THE COURT:  Well, that certainly is the key, the

24 key distinction.

25         MR. GRASSMICK:  Yes.  And in 804(b)(1) the key

1    point is that Grace had to have Norfolk Southern act as

2    their predecessor in interest.

3              THE COURT:  Right.

4              MR. GRASSMICK:  And the key point for Grace is

5    really at this set point what I would call adverse

6    interests.  And there's a number of adverse interests, I'm

7    going to go through a number of proofs to demonstrate the

8    adversity.

9              Just at a global level it's clear the parties were

10   adverse to the scope of the indemnity and that's a matter

11   that they would be litigating.  It's clear that Grace has an

12   interest in escaping the indemnity either by blaming Mr.

13   Kirkland or by blaming Norfolk Southern.  In other words,

14   Grace has an interest in putting Norfolk Southern's conduct

15   on trial.  And Norfolk Southern certainly has no interest in

16   any examination of Mr. Kirkland in exposing any of Norfolk

17   Southern's failings.

18             Third point there, had Grace been impleaded into

19   the Georgia action where Norfolk Southern and Grace would

20   have been directly adverse --

21             THE COURT:  Right.

22             MR. GRASSMICK:  -- I'm fairly confident to say

23   that Grace would have moved against Norfolk Southern under

24   the Georgia equivalent of Rule 26 to dismiss the matter on

25   the question of spoliation.

1            The record here is actually pretty clear.  The

2    incidents occurred on January 23rd and January 26th of 1998.

3            THE COURT:  Right.

4            MR. GRASSMICK:  Grace wasn't informed of those

5    incidents until 20 months later when the rail cars were

6    moved.  Grace had no opportunity to inspect the brakes on

7    the rail cars.  Grace had no opportunity to inspect the rail

8    cars and just determine if there was Kaolin on the rail

9    cars.  And that meant Grace had no opportunity to obtain

10   exculpatory evidence.

11           The fact that rail cars were not preserved so that

12   Grace could use them meant Grace was not in control of the

13   litigation.  It never had the opportunity to be in control

14   of the litigation, and the material that was really vital to

15   Grace's defense was destroyed.  You know, you can't use that

16   material if it's gone.

17           Now in terms of the conduct of the litigation

18   itself, Norfolk Southern never sought discovery from Grace.

19   There was no written discovery search on Grace.

20           THE COURT:  No depositions taken of Grace.

21           MR. GRASSMICK:  No depositions taken of Grace.

22   Nothing was done in the Kirkland Felough (ph) litigation to

23   obtain any cooperation from Grace or absent Grace's

24   cooperation to use subpoena power to compel Grace to produce

25   materials.

1          That's very telling, Your Honor, because there was

2    no material that Norfolk Southern sought from Grace that

3    would exculpate Grace.  And as I'm going to get to with Mr.

4    Kirkland's testimony, the entire point of much of Norfolk

5    Southern's case was to inculpate Grace because that would be

6    a way for them to plead the indemnity.

7          The Drummond (ph) declaration which Grace

8    submitted in support of its summary judgment position is an

9    example, Your Honor, of the type of testimony that Grace

10   would have offered had they been asked.  Mr. Drummond was an

11   employee at the time of the Kirkland incidents.  Mr.

12   Drummond would have been available as a witness at that

13   time.  Other persons would have been available as witnesses

14   at that time.  And those witnesses would have had strong

15   exculpatory testimony.

16          It's very difficult for Norfolk Southern to

17   contend they acted as Grace's predecessor in interest when

18   they didn't seek any material from Grace that would aide in

19   that litigation.

20          Now the next point on Mr. Kirkland is dealing

21   specifically with Mr. Kirkland's cross-examination.

22          THE COURT:  Yes.

23          MR. GRASSMICK:  Now clearly Grace didn't get to

24   cross-examine him.  You have in the record the trial

25   testimony, and I wouldn't encourage you to read all of it.

1    It takes a while.  But it's important to look at the

2    structure of Mr. Kirkland's examination and in particular

3    his cross-examination by Norfolk Southern.  That cross-

4    examination is divided into three parts.

5              In the first part of the cross-examination Mr.

6    Garland (ph), Norfolk Southern's attorney, basically attacks

7    Mr. Kirkland for Mr. Kirkland's own negligence.

8              THE COURT:  Right.

9              MR. GRASSMICK:  Crosses him on things like his

10   boots, his gloves, his behavior, if he took the cars if he

11   thought they were safe.

12             The middle third of the cross-examination attacks

13   Grace.  Mr., you know, Garland, operating for Norfolk

14   Southern, seeks to get Mr. Kirkland to implicate Grace as

15   being the bad actor.  We've cited examples of that

16   examination --

17             THE COURT:  Yes.

18             MR. GRASSMICK:  -- in our briefing, including

19   examples where Norfolk Southern's lawyers try to get Mr.

20   Kirkland to say the accident itself actually took place at

21   Grace, you know, shifting the location to the Grace plant as

22   opposed to some other facility.

23             Now had Grace cross-examined Mr. Kirkland, Grace

24   would have looked at a number of documents that were in the

25   record and examined Mr. Kirkland about those documents.  And

1    they would do what I'll call at the moment a timeline cross

2    and a little bit of a bulletin board cross.

3         The first document Grace probably would have used

4    in the timeline cross was Exhibit F to Mr. McNeil's (ph)

5    declaration which was the first incident report prepared by

6    Mr. Kirkland.  It's a January 23rd incident report.  The

7    incident report has a very brief description of the

8    accident.  There's no detail and the incident report doesn't

9    mention Grace.

10        That report was already in evidence after Mr.

11   Kirkland's direct and Grace would use that to anchor a

12   timeline.

13        The second document in a timeline cross again

14   comes from an exhibit to Mr. McNeil's declaration, Exhibit

15   G, and it's a Norfolk Southern report about the January 23rd

16   incident.  Now that report has a number of points and in

17   bulletin board fashion Grace would have used Mr. Kirkland to

18   bring these points out.

19        It would point out on page 3 of that document that

20   Norfolk Southern said the car on January 23rd was a Huber

21   car.  It was not a Grace car.  Okay.  Huber is another

22   Kaolin manufacturer and Norfolk Southern said the car on the

23   23rd is a Huber car.

24        Now what's significant about that, Your Honor, is

25   Huber isn't heard from ever again in this matter.  Huber

1    doesn't exist.  We don't know what's going on with J.M.

2    Huber because they haven't told us.  They produced no

3    correspondence with J.M. Huber, no discussions with J.M.

4    Huber.  They haven't produced a settlement agreement with

5    J.M. Huber because presumably they haven't done any

6    agreements that are similar to Grace's because each of the

7    industries along the line have such agreements.

8            We don't have any of that, Your Honor.  So they're

9    a mystery at this point, but they're in the report, but

10   they're a mystery.

11           The next piece of the timeline, Your Honor, would

12   appear on page 3 of the Norfolk Southern report because it

13   talks about January 26th.  And this is crucial to

14   establishing the timeline.  It's very vital because it says

15   on Monday, January 26th, at 7 a.m. Trainmaster Chapman spoke

16   with Conductor Kirkland.  That's Monday morning, the day of

17   the second incident.

18           At 11:45 a.m. Kirkland requested that Trainmaster

19   Chapman meet him at the Akon depo.  Conductor Kirkland

20   reported the more he worked the tighter his back became.

21   Kirkland advised he could finish the day, but he was not

22   sure how fit he would be for service if the pain persisted.

23           If Grace is developing this cross-examination

24   directly, which is not what they developed, that would point

25   to, first, a supervening cause that the fact that Norfolk

1     Southern didn't relieve a person who declared himself unfit

2     for service and take him off the line makes it Norfolk

3     Southern's fault, not Grace's, regardless of any other facts

4     that exist.

5             But more importantly, that establishes that at

6     11:45 Mr. Kirkland and Mr. Chapman were having a

7     conversation.

8             Further, if you go through the rest of that

9     report, there is no mention of an incident taking place on

10    January 26th.  The report goes on, however, to say that on

11    Tuesday, January 27th, at 7 a.m. Kirkland reported for work

12    at the Akon depo.  It doesn't mention a January 26th episode

13    at all.

14            To be fair, Your Honor, Grace would have spent a

15    fair amount of time examining Mr. Kirkland about why Norfolk

16    Southern didn't seem to notice his January 26th accident.

17    That nowhere happens in the Norfolk Southern cross-

18    examination of Mr. Kirkland.

19            More telling, Your Honor, though is the next

20    document which would be Exhibit H to Mr. McNeil's

21    declaration, which is Mr. Kirkland's accident report for

22    January 26th.  And Mr. Kirkland states in his report that

23    the accident on the 16th occurred at 12:10 p.m.  That's 25

24    minutes after he spoke with Mr. Chapman.

25            In a jury trial in Georgia, Your Honor, asking Mr.

1    Kirkland to explain that time after he had spoken to Mr.

2    Chapman at 11:45 is a powerful cross-examination tool and

3    that's the type of tool that I mentioned at the outset.  It

4    doesn't matter what Mr. Kirkland's answer is.  It matters

5    what his face looks like to the jury.  Grace never had the

6    opportunity to get that type of admission from Mr. Kirkland.

7             At this point, Your Honor, this gets a little bit

8    better because Grace at that point would seriously want to

9    examine Mr. Kirkland's credibility.  And it would be

10   entitled at that point to have a line of cross-examination

11   about that credibility.

12            Charles Sylis (ph), at Grace, and David Drummond

13   had actually spoken specifically about Mr. Kirkland's

14   credibility in a variety of contexts.  And Kirkland -- or

15   Grace is aware that Kirkland said repeatedly to Grace

16   employees when he was at the Grace facility that someday he

17   planned to sue Grace and get rich.  That is distinctly a

18   cross question that would have gone to Mr. Kirkland from

19   Grace, Your Honor.  That appears nowhere in the record and

20   that goes directly to Mr. Kirkland's credibility when he

21   attacks Grace.

22            Now Mr. Drummond's declaration, which we've

23   already put into evidence --

24            THE COURT:  Yes.

25            MR. GRASSMICK:  -- talks about Mr. Kirkland being

1   a character.  If Mr. Drummond was asked what being a

2   character meant, he would say that that meant Kirkland was

3   arrogant, snobbish, didn't want to get dirty, didn't want to

4   work, didn't like the job, whiner, complained about

5   everything, negative person.

6           Each of those points, Your Honor, would be a cross

7   question.  And, again, that's a bulletin board cross where

8   it doesn't matter what Mr. Kirkland's response is.  What

9   matters is that a jury judging Mr. Kirkland's credibility

10  has the opportunity to see the answer Mr. Kirkland gives.

11          Grace would have gone in some detail with Mr.

12  Kirkland's allegations about the depth of the Kaolin.  Mr.

13  Kirkland said it was like two inches, five inches, six

14  inches of Kaolin.  That's what I'm going to call the ruler

15  cross-examination, Your Honor, because Grace likely would

16  have gone to Mr. Kirkland -- it's a jury trial in Georgia --

17  taken a 12 inch ruler --

18          THE COURT:  Yes.

19          MR. GRASSMICK:  -- handed it to Mr. Kirkland and

20  said, Mr. Kirkland, can you show us how much Kaolin was on

21  the ruler.

22          Now, Your Honor, you've seen photographs of the

23  cars in the record.  The follow up to the ruler question

24  would be to put a photograph up on the screen and just have

25  Mr. Kirkland verify that's the car that his wife took a

1    photograph of the day of the incident.

2            And the jury at that point could do its own

3    thinking, Your Honor.  Norfolk Southern didn't do that, Your

4    Honor.  And so they didn't question Mr. Kirkland's

5    credibility and truthfulness as it applied to Grace.

6            Now I'm not going to go through the complete

7    cross, Your Honor, but there's one more piece and I'm going

8    to, you know, be a little unfair to Mr. Kirkland here.  I'm

9    going to suggest it's the sneak part of the cross-

10   examination.

11           In the record, and these are attached to Mr.

12   McNeil's declaration, there are photographs that were taken

13   by Mr. Kirkland or one of his associates at the Grace plant.

14           THE COURT:  Right.

15           MR. GRASSMICK:  Well, Mr. Drummond's declaration

16   pointed out you're not allowed onto the Grace plant without

17   permission and you can't take photographs without

18   permission, and that no one asked for permission to take

19   those photographs.

20           So then Mr. Kirkland's cross-examination which

21   would go directly to Mr. Kirkland's attitude towards Grace

22   and his veracity about Grace would be just to get an

23   admission from Mr. Kirkland that he never obtained

24   permission of Grace to go onto the Grace plant to take those

25   photographs.

```
 1              And, again, that's like a bulletin board style
 2     cross, Your Honor.  It doesn't matter what the answers are.
 3     It's the ability of the jury to evaluate what he says.  And
 4     also it's the fact at that point, the skill of the cross-
 5     examiner to point out any contradictions in what Mr.
 6     Kirkland may say because as you've gone through the
 7     character question about suing Grace, and after you've gone
 8     through the character question about being a whiner and a
 9     complainer, and after you've gone through the ruler cross-
10     examination about measurement, and then you go through the
11     cross-examination about how are you taking pictures when you
12     don't have permission to be on the facility, that puts a
13     witness under a little bit of pressure.  And that's not the
14     cross Norfolk Southern did of Mr. Kirkland.  And Grace has
15     never had the opportunity to put those questions.
16              The point about the hearsay rule and on the
17     predecessor in interest on 804(b)(1) is that you must have a
18     fair and accurate representation of Grace's interests.
19     Well, Grace's interests are represented in the kinds of
20     questions I'm just positing and those are not the kinds of
21     questions that Norfolk Southern was interested at least in
22     that regard.  And this has to do with the kinds of cross-
23     examinations of Mr. Kirkland and predecessor in interest.
24              I want to talk about the settlement agreement that
25     was exercised between Mr. Kirkland and Norfolk Southern.
```

1     That was Exhibit V to Mr. McNeil's declaration.

2               And on the first page of the settlement agreement

3     it says after some money, "receipt of which is hereby

4     acknowledged I, Lester Kirkland, Jr." -- gives his social

5     security number -- "do hereby release and forever discharge

6     Norfolk Southern Railway Company, CSX Transportation,

7     Consolidated Rail Corporation and W.R. Grace."

8               Your Honor, I don't have any reason why CSX and

9     Con Rail are released in this document.  I can think of a

10    lot of reasons why they're released and the speculation here

11    goes that we have different sets of predecessors in

12    interests at work --

13              THE COURT:  Yes.

14              MR. GRASSMICK:  -- that there's a relationship

15    between the railroad corporations and there might be other

16    indemnities that we haven't heard about.  There might be

17    other contracts that we haven't heard about.  But it's fair

18    to say that on predecessor in interests there's a lot more

19    going on than has been provided to us by Norfolk Southern.

20              Grace knows its interests weren't being protected,

21    and for all Grace can tell it's the interests of CSX and Con

22    Rail that are being protected here.  But we don't know.

23    There's no documents that have been produced by Norfolk

24    Southern in regard to that.

25              And so it's not fair to say based on the record

1    before the Court that Norfolk Southern has made any showing,

2    anything close to a showing that they acted as a predecessor

3    in interest, nor could they.

4              So, Your Honor, I'll move on to the residual

5    section -- exception, and just a couple of brief points and

6    then I can wrap it up.

7              THE COURT:  All right.  Does it matter -- let me

8    ask you this, Mr. Grassmick.  Does it matter if -- because

9    the claim was filed some time ago.

10             MR. GRASSMICK:  Yes.

11             THE COURT:  Does it matter if W.R. Grace would

12   have had the opportunity to depose Mr. Kirkland, but didn't?

13             MR. GRASSMICK:  Your Honor, it does matter

14   because, you know, lawyers aren't supposed to testify, but I

15   can say that I have been associated with law firms defending

16   this case for a long time that Grace has vigorously pursued

17   things that they believed that they had to pursue and they

18   provided, you know, vigorous representation to make sure

19   their interests were protected, when they could.

20             And this is a case that was waiting till the end

21   because it's a complex case and not a simple case.  And the

22   questions about causation are central.  And at this point

23   the questions about causation hinge on the testimony of one

24   person, Mr. Kirkland.

25             THE COURT:  Right.

1              MR. GRASSMICK:  And Grace would have had the

2     opportunity.  It's fair to say that there's a couple of

3     things from the documents we've seen today that we can't

4     answer.  It's pure speculation, but it might be the case,

5     and Grace may have pursued this, that there was no accident

6     at all on January 26th.  Norfolk Southern doesn't say there

7     was.  They have no documents that show there were.

8              On the 26th, however, Mr. Kirkland makes a point

9     of putting Grace in his accident report and the testimony

10    from Grace people is he planned to sue Grace and get rich.

11    I mean, I can go further with speculation and say I would

12    think his lawyer would have advised him not to sue Grace

13    because he didn't need to under FELA and there's no reason

14    to bring Grace in to fight you when you can fight just

15    Norfolk Southern.  It makes for a simpler FELA action in the

16    Georgia State Court.

17             And so legal strategy can go back and forth and

18    debate that and think about that.  It's all speculation.

19             But it is fair to say that with vigorous cross-

20    examination the complaint against Grace might go away.

21    There still might be a substantial complaint against Norfolk

22    Southern.

23             THE COURT:  Yes.

24             MR. GRASSMICK:  And, Your Honor, I haven't even

25    dealt with the issue about the brakes.  I mean, Grace would

1    have wanted to explore the brakes if they had the

2    opportunity to do so, but they didn't because the rail car

3    wasn't preserved.

4              And so there's a lot of other issues.  Mr.

5    Kirkland's complaint originally alleged brakes.  They didn't

6    respond to Norfolk Southern's summary judgment motion on the

7    issue of brakes.  And, again, Your Honor, it's purely

8    speculation, but, you know, as you're fighting Norfolk

9    Southern.  You're a plaintiff's lawyer working on a

10   contingency fee.  There's no reason to fight about brakes if

11   you don't need that to win your case because you're going to

12   win just as big an award from the jury on the basic FELA

13   charge as you are on the Safety Appliance Act charge.

14             And so that's just what plaintiffs' lawyers do

15   when they understand how to win the case.  They're --

16             THE COURT:  Right.

17             MR. GRASSMICK:  -- very smart.

18             THE COURT:  All right.  Thank you for the answer.

19             MR. GRASSMICK:  Yeah.  The residual substance

20   last, Your Honor.

21             THE COURT:  Yes.

22             MR. GRASSMICK:  And if what -- looking for -- just

23   from picking cases from the advisory committee notes --

24             THE COURT:  All right.

25             MR. GRASSMICK:  -- you know, in the history of

1    Rule 807 --

2         MR. BALDWIN:  Excuse me, Your Honor.  I'm sort of

3    (indiscernible) my job because many of the statements that

4    counsel has made are not in the record and I believe

5    Delaware lawyers are bound to cite to things that are in the

6    record.  And if -- and, for example, this business about the

7    test -- he told people that he was going to sue Norfolk

8    Southern, it's not in the record.  That's completely made

9    up.

10         If he's going to make up some more cases that --

11   and if -- I have a whole host of these things that are new

12   arguments.  They filed three briefs on this point, so they

13   ought to have gotten the arguments in.  If he's going to

14   cite new cases that we haven't seen, I would like to object

15   to that.

16         THE COURT:  All right.  Are these cases in your

17   briefs?

18         MR. GRASSMICK:  Your Honor, for the Drummond

19   declaration --

20         THE COURT:  Yes.

21         MR. GRASSMICK:  -- the Sylas declaration

22   everything I've talked about is in them except the one

23   quotation about suing Grace.

24         THE COURT:  All right.  All right.

25         MR. GRASSMICK:  And, you know, those are points

1    that we've argued being very careful on how we characterize

2    Mr. Kirkland because the man is deceased and we don't want

3    to -- we want to be fair to him.

4              THE COURT:  Right.  Okay.

5              MR. BALDWIN:  Well, the question is, is he about

6    to cite cases that he didn't cite in his briefs.  He hasn't

7    answered that.

8              THE COURT:  Oh.

9              MR. GRASSMICK:  I'm not going to cite any cases.

10   I'm going to refer to the advisory committee notes.

11             MR. BALDWIN:  As long as they're cited in the

12   briefs we have no objection to that.

13             MR. GRASSMICK:  Okay.

14             THE COURT:  Are they cited in your briefs?

15             MR. GRASSMICK:  We've mentioned the advisory

16   committee notes in the brief.  We've mentioned the fact

17   about how Rule 807 is supposed to be interpreted.

18             THE COURT:  All right.

19             MR. GRASSMICK:  Okay.

20             THE COURT:  All right.  That would be sufficient.

21   You know, let me say this to you.  Whether they're in the

22   briefs or not, certainly I would look to the advisory

23   committee notes in formulating a decision.  But I do

24   understand the objection.

25             MR. GRASSMICK:  Okay.  So noted, Your Honor.  And

Page 36

1   I'll be careful here.

2            THE COURT:  Okay.

3            MR. GRASSMICK:  I was just going to put out the

4   advisory committee notes and we've cited to part of this

5   expressly, and I'll get to there.

6            They note that the exception is very narrow, the

7   residual exception.  The advisory committee notes also note

8   that the point again is you're supposed to speak to

9   reliability.

10           And the part that we actually expressly cited was

11   that for a deceased witness you can't use the residual

12   exception if there's another witness available who could

13   testify on the point, even if that witness might not be as

14   good.

15           And in our briefing, what we specifically stated

16   was that Norfolk Southern was in a position to use expert

17   testimony to speak about everything Mr. Kirkland speaks

18   about because an expert could have relied on Mr. Kirkland's

19   testimony even though that testimony itself may not be

20   admissible.

21           And that's a crucial point, Your Honor, because in

22   the many rounds of briefing that we did Norfolk Southern had

23   every opportunity to put in a declaration from an expert

24   witness.  The expert witness could have read everything Mr.

25   Kirkland said and offered opinion testimony specifically on

1    the cause of Mr. Kirkland's incidents and talked about

2    Grace.

3              And that would have been entirely proper to come

4    from an expert.  That would have been reliable to come from

5    an expert because the expert knows that in the future going

6    forward if Norfolk Southern, you know, lives to see summary

7    judgment or pass summary judgment, the expert is going to be

8    crossed.  And so experts are not going to put together a

9    declaration making statements that they don't believe they

10   can support on cross-examination.

11             In many respects if Norfolk Southern had used an

12   expert, that would have been a better choice simply because

13   an expert could have live testimony and would be crossed --

14             THE COURT:  Right.

15             MR. GRASSMICK:  -- and would be able to do

16   something Mr. Kirkland can't, offer an opinion on causation.

17   They didn't do that.  And that's probably the most important

18   point about the residual exception.  If there's another

19   witness available you don't look at the residual exception.

20             Now we did cite in our briefs, and I don't

21   remember the specific case, that says the residual exception

22   is narrow --

23             THE COURT:  Yes.

24             MR. GRASSMICK:  -- and you don't use the residual

25   exception if the evidence in question falls under another

1    exception because former testimony is 804(b)(1).  Normally I

2    would say as a matter of black letter law you can't use the

3    residual exception.

4           Now because Mr. Kirkland has passed, you know,

5    being very fair here that's why you look at the availability

6    of other witnesses, and there are other witnesses available

7    and they chose not to use them.  And that's a very important

8    point, Your Honor, because they briefed this in January.

9    They then had a subsequent reply.  They had replies on our

10   hearsay.  The fact that you have hundreds of pages of brief.

11   I mean, they've had like four bites at the apple to submit

12   an expert declaration on this point and salvage the point,

13   and they haven't taken it.  And so the residual exception is

14   not the place to look to help them.

15          The last part on the residual exception has to go

16   back to everything on cross-examination of Mr. Kirkland, and

17   that's -- he's not reliable.  I mean, there's no opportunity

18   to question him on his reliability, but it's plain that when

19   you look at the pieces in the record Grace never had the

20   opportunity to test his reliability.

21          But just from the pieces of paper from what the

22   Grace witnesses have said, which would become the basis of a

23   Kirkland cross-examination, it's not fair to say that

24   there's anything at all reliable about Mr. Kirkland's

25   testimony about Grace.

1              Now Mr. Kirkland's testimony might be fine about

2    Norfolk Southern because Norfolk Southern had the

3    opportunity to cross-examine him about Norfolk Southern.

4              THE COURT:  Right.

5              MR. GRASSMICK:  And the bottom third, the last

6    third of Mr. Kirkland's examination, his cross-examination,

7    deals with his future employment opportunities, his illness,

8    and what have you.

9              Now that's significant to the last point, Your

10   Honor, and that has to do with sort of the fairness of this,

11   could Mr. Kirkland's testimony have been preserved.

12             In that last third of the testimony, but as we've

13   talked about before, and as -- actually as we talked about

14   at the last status hearing, Norfolk Southern was aware of

15   Mr. Kirkland's physical condition.  At the trial Mr.

16   Kirkland testified he already had colon problems and we --

17   he passed away from colon cancer a number of years later.

18             So as of 2000 Norfolk Southern was aware that Mr.

19   Kirkland was not necessarily the healthiest man.  So at the

20   time Norfolk Southern filed its proof of claim Norfolk

21   Southern could have moved under Rule 27 or 7027 to seek at

22   that point in time to have Mr. Kirkland deposed to preserve

23   his testimony.

24             In 2007 and 2008 Grace and Norfolk Southern spoke

25   about the possibility of mediation, and at that point in

1   time Norfolk Southern could have moved under Rule 27 to

2   preserve his testimony.

3         Grace subsequently filed an objection making it

4   clear it wasn't just going to pay the claim.  At that point

5   in time before Mr. Kirkland died in 2009 Norfolk Southern

6   had the opportunity again to try to preserve Mr. Kirkland's

7   testimony under Rule 27.  And at no case (sic) did they take

8   that opportunity.

9         Norfolk Southern is the master of its own case,

10  Your Honor.  I mean, they mastered their own proof of claim.

11  Grace's responsibility isn't to master their witnesses.

12  That's their responsibility.  They were in the best position

13  to know about Mr. Kirkland's condition.  They were familiar

14  with his condition.  His condition was an issue at the

15  trial, Your Honor, to be frank because his condition, you

16  know, went directly to the question of damages.  It's --

17         THE COURT:  Yeah.

18         MR. GRASSMICK:  -- been litigated.  And --

19         THE COURT:  But if they thought they could use the

20  trial testimony why would they want to preserve the

21  testimony under Rule 27?

22         MR. GRASSMICK:  Because it's a risk, Your Honor,

23  and there's a risk you'll lose the evidentiary ruling.  So

24  it's much better as a litigation posture to preserve the

25  testimony.

1            THE COURT:  Sure.

2            MR. GRASSMICK:  You know, sometimes lawyers call

3     that belt and suspenders.  But you call -- you do belt and

4     suspenders for a reason, Your Honor, and that's because

5     evidentiary rulings are litigated.  And if the rulings go

6     against you, that's not a reason to lose your case.

7            It's a strategy call or a tactics call.  And

8     tactics calls aren't -- the fact that someone made a

9     difficult tactics call one way isn't a reason to give them

10    leeway on the introduction of evidence.  It's the suggestion

11    that, well, you made a tactical call and now you have to

12    live with that tactical call.

13            THE COURT:  How about the argument that you're

14    using, the test -- the trial testimony, why shouldn't they

15    be allowed to use it as well?

16            MR. GRASSMICK:  Because the federal rules

17    recognize exactly, Your Honor, that evidence is admissible

18    for some parties against others, but not others.  That

19    happens all the time with party admissions.  Parties can't

20    use their own admissions.  You can always use a party

21    admission against a party.

22            And the easiest example we have here of that, Your

23    Honor, is where Grace has used Mr. Chapman's testimony where

24    we cite Mr. Chapman saying he doesn't believe Kirkland's

25    testimony and he doesn't believe Kirkland's explanation of

1    the incident.  And that's in our reply brief.

2            And that's one of the things that was an important

3    example.  Your Honor, that's the reason last time we were

4    talking about the importance of Mr. Chapman because Grace is

5    trying to make sure Mr. Chapman is available as a live

6    witness.  And so we don't want to be caught in the bind that

7    Norfolk Southern is caught in now.  And so because we

8    understand we would be vulnerable to the same arguments.

9            And so we've made an attempt to preserve that

10   evidence and seek to make it available if it's necessary.

11           THE COURT:  Okay.  All right.

12           Anything further on your opening?

13           MR. GRASSMICK:  I have nothing further on my

14   opening, Your Honor.  I think that -- that's sufficient with

15   what we have.

16           THE COURT:  All right.  Thank you, Mr. Grassmick.

17       (Pause)

18           MR. BALDWIN:  Give me just a minute, Your Honor.

19   If --

20           THE COURT:  Take your --

21           MR. BALDWIN:  -- I can get reordered.

22           THE COURT:  Absolutely.  Take your time, Mr.

23   Baldwin.

24       (Pause)

25           MR. BALDWIN:  Your Honor, I'm going to go right in

1   the same order that Mr. Grassmick went, but I want to do --

2   respond a little more to your last point where you said why

3   don't they -- how are they able to use the record and we're

4   not.

5              He cites to Chapman, but they are proposing to use

6   Mr. Kirkland's testimony in Wholesale.  Mr. Kirkland is not

7   -- you know, we said Mr. Chapman was not binding us because

8   he was just testifying as a witness.  It was not in his

9   ordinary course.  But in any event Kirkland was not binding

10  us.  Kirkland was suing us.  And yet their opening brief is

11  based on the trial record which they say is inadmissible

12  except for them.  So that can't be the case.

13             THE COURT:  In other words, Mr. Kirkland can't

14  bind Norfolk Southern.

15             MR. BALDWIN:  Right.  He wasn't making any

16  admissions for Norfolk Southern.

17             THE COURT:  Right.

18             MR. BALDWIN:  And so if we can't use it, they

19  can't use it.  And it was the basis of pretty much their

20  entire opening brief.  This was the basis for their argument

21  which was we get to -- you know, we get to use the record

22  and you don't because it -- there was a great term in there

23  about non-mutual defensive collateral estoppel or something

24  which to me sounded something like double secret probation

25  or something.

1              I loved it.  But it has nothing to do with this

2     case because what that non-mutual defensive collateral

3     estoppel means is we're not allowed to re-litigate issues

4     from the underlying case, and we're not.  I think they

5     misunderstood and until recently have misunderstood we're

6     not claiming that we're re-litigating whether Norfolk

7     Southern was liable.  It was liable.  It was found liable.

8              THE COURT:  Right.

9              MR. BALDWIN:  It was negligent --

10             THE COURT:  Right.

11             MR. BALDWIN:  -- according to the jury.  So that

12    whole doctrine doesn't come in and that was the main basis

13    for their saying they ought to be able to put the testimony

14    in.  I think they've backed away from it, but, you know,

15    we're going to see.

16             THE COURT:  Okay.

17             MR. BALDWIN:  The -- let's go to the affidavits

18    which is where they --

19             THE COURT:  They started.  Yes.

20             MR. BALDWIN:  -- chose to start.

21             THE COURT:  Yes.

22             MR. BALDWIN:  Their quotations are selective and

23    they're inaccurate.  The case -- they cite just a couple of

24    cases and I would like to read a little something from the

25    Bender case versus Norfolk Southern.  So it's the Middle

1    District of Pennsylvania.

2            And in this case citing to U.S. Supreme Court in

3    Celatex (ph) Bender -- the Bender case quotes the rule:

4            "A party may object that the material cited to

5            support or dispute a fact cannot be presented in a

6            form that would be admissible evidence.

7            "Thus, when the admissibility of evidence is

8            challenged the party relying on the evidence must

9            demonstrate that such evidence is capable of

10           admission at trial before it can be considered by

11           the Court on summary judgment.

12           "However, this requirement does" -- citing Celatex

13           U.S. Supreme Court -- "'not mean that the non-

14           moving party must produce evidence in the form

15           that would be admissible at trial in order to

16           avoid summary judgment.  Obviously, Rule 56 does

17           not require the non-moving party to depose her own

18           witnesses.  Rule 56 permits a proper summary

19           judgment motion to be opposed by any materials

20           listed in Rule 56 except the mere pleadings

21           themselves, and it is from this list that one

22           would normally expect the non-moving party to make

23           the showing that specific facts show there's

24           genuine issue for trial.'

25           "Although" -- and this is end quote and back to

```
 1              the Bender case -- "Although evidence may be
 2              considered in a form which is inadmissible at
 3              trial, the content  of the evidence must be
 4              capable of admission at trial.  So, accordingly,
 5              the party offering the evidence must demonstrate
 6              that it could satisfy the applicability
 7              requirements."
 8         We don't have to show that for every single
 9    statement made in here that the affiants have laid out
10    exactly their personal knowledge.  We showed that they've
11    been working on the railroad all the live long days, and
12    they have been working at this plant and they talked about
13    how the cars were routinely overfilled, and they talked
14    about the reputation and so forth.  And all of that is going
15    to be admissible at trial subject to cross-examination and
16    they'll be able to test whether they saw the Kaolin being
17    overfilled or not.
18         And I would like a couple more quotes there from
19    the same case that they used throughout their objection.
20         THE COURT:  Yes.
21         MR. BALDWIN:  "However, if the statement is
22              capable of being admissible at trial despite it
23              currently being in an inadmissible form, the
24              statement may be considered for purposes of
25              deciding motion for summary judgment."
```

1              And another -- the final quote is, the possibility

2        that the evidence will be admitted, "This may be

3        demonstrated by the proponent showing some likelihood that

4        the declarant will appear and testify at trial."

5              So the standard is really not as it was

6        represented to be.  Those are selective quotations.  Yes,

7        there needs to be competent evidence and so forth, and there

8        needs to be personal knowledge and so forth, but --

9              THE COURT:  At trial.

10             MR. BALDWIN:  At trial.

11             THE COURT:  Yes.

12             MR. BALDWIN:  But it's obvious on the face of the

13       affidavit that the person never had personal knowledge

14       because he never worked there or he never had an opportunity

15       to see it or something like that, that they can't defeat

16       summary judgment because the affidavit doesn't contain every

17       subsidiary aspect of the testimony.

18             And if it was required when Your Honor got

19       affidavits they would be like telephone books, if you

20       remember those --

21             THE COURT:  Yes.

22             MR. BALDWIN:  -- and they wouldn't be like, they

23       wouldn't be like short and sweet affidavits that bankruptcy

24       judges love because of the mountain of paper that they're

25       moving.

1          THE COURT:  Right.

2          MR. BALDWIN:  I also want to say that I share the

3   Court's frustration with the volume of paper.  It was not

4   generated by us.  This particular motion is the subject of

5   -- this argument is the subject of three motions.

6          THE COURT:  Yes.

7          MR. BALDWIN:  They moved in their opening brief.

8   They anticipated this argument because they argued that they

9   should be allowed to use the underlying record and we

10  shouldn't.  Then they filed an inadmissible hearsay brief.

11  Then the third thing they filed is the motion which they

12  said was just formally tying up the inadmissible hearsay

13  brief.  They filed a recidivist document that was a motion

14  to exclude the testimony of Mr. Kirkland.  And then they

15  filed a separate motion to exclude the affidavits.  So --

16          THE COURT:  I know.  I know it's frustrating.  I

17  was frustrated when I saw the material and I considered,

18  frankly, striking it and telling people to re-file the

19  briefs, an answering brief, you know, an opening brief, an

20  answering brief, a reply brief.  But then I thought, well,

21  that would be a waste of people's time and effort.

22          MR. BALDWIN:  Similarly we considered opposing the

23  motions on the basis that they violated the Court's rules on

24  page limits and recidivist briefs and so on without having

25  previously sought permission of the Court.

Page 49

```
 1              THE COURT:  Right.

 2              MR. BALDWIN:  So I'm proud to have been quoted at

 3    the last hearing as saying that their -- I guess I implied

 4    that their objection to the word, facility, was not well

 5    founded.  And Mr. Grassmick says, well, of course it's

 6    confusion because we have lots of definitions in these

 7    agreements that talk about facility, so how do we know which

 8    one your guys were using.

 9              Well, they weren't using any of those.  They're

10    trainmen and they don't deal with the contracts.  I think

11    for their affiants they had them read the contracts and then

12    they said, oh, now we know what the contracts are.  It's not

13    true that we didn't define facility.

14              In the second paragraph of the declaration of Mr.

15    Sharpe he says -- I'm sorry.  In the third paragraph:

16              "During my employment with Norfolk Southern I

17              worked the rail route that service the W.R. Grace

18              & Company, Grace facility in Nitka -- Natka, South

19              Carolina, the Grace facility defined."

20              Both affidavits, the term is defined.  We don't

21    need to go down the rabbit hole with they don't get to say

22    facility because facility is used in another formal context.

23    That's -- that was an incorrect objection and an incorrect

24    argument on the objection.  So they are correct in using the

25    term, facility.
```

1           And just to close the loop on that Mr. -- I don't

2   have it right in front of me.  Mr. Connolly's deposition

3   said -- defined it in the same way.

4           THE COURT:  Okay.  His deposition did you say or

5   his declaration?

6           MR. BALDWIN:  His declaration.

7           THE COURT:  Okay.

8           MR. BALDWIN:  It's in paragraph 3 of the

9   declaration which is at Document ID 328827 and the other one

10  is 328828.

11          THE COURT:  All right.

12          MR. BALDWIN:  And they define depositions or they

13  define the facilities.

14          THE COURT:  Yes.

15          MR. BALDWIN:  So based on the case I just

16  described to you citing U.S. Supreme Court, all of their

17  testimony is admissible.  They're not giving personal

18  opinions.  They're based on -- they're competent and they're

19  -- it doesn't have to be admissible at this point.

20          One of the cases they cited --

21      (Pause)

22          MR. BALDWIN:  -- is really kind of right on the

23  money here, the Bell versus Lakawana (ph) County case.  And

24  in that's case there was a train engineer and he gave

25  testimony about --

1          (Pause)

2               MR. BALDWIN:  I think I'm citing you the wrong

3     case, Your Honor.

4               THE COURT:  All right.

5               MR. BALDWIN:  Anyway, the other case they cited

6     involved a train engineer who was getting -- he was giving

7     testimony about a conductor --

8               THE COURT:  Yes.  Yes.

9               MR. BALDWIN:  -- and --

10              THE COURT:  Yes.

11              MR. BALDWIN:  -- they -- the opponent said, he's

12    not a conductor.  He was an engineer.  He can't talk about

13    what conductors do.  And he talked about how they behaved,

14    whether they had time for lunch and so on.  And the Court

15    said, yes, he can.  He's been a railroad guy for all these

16    years.  I'm not going to strike that at this point.  He only

17    struck a couple of paragraphs of the affidavit which clearly

18    had to do with his opinions.

19              So if someone is giving an opinion that's not

20    fact, then that can be struck.  If somebody -- if there's

21    any possibility that this is -- the person is going to be

22    there at trial, which there is -- they're both alive and

23    kicking.  Then the Court should consider that there's a

24    possibility that the admissible evidence can come from them.

25              And along those lines I should say that I have now

1   had a chance to talk to Mr. Chapman and despite his being in

2   his 60s and obviously elderly and ready to drop dead at any

3   moment from mere age, he says he's alive and well and

4   kicking and happy to participate in proceedings.  So I hope

5   that allays Mr. Higgins' concerns about Mr. Chapman.

6           So I think that takes care of our first argument

7   on --

8           THE COURT:  Did you file any directed to the

9   declarations?  I didn't see it.

10          MR. BALDWIN:  Yes, we -- well, we did, Your Honor.

11  We filed an opposition to the declarations --

12          THE COURT:  Okay.  I'll find --

13          MR. BALDWIN:  -- and we sort of back of the handed

14  it I guess I would say because the papers were so long.

15          THE COURT:  Yes.

16          MR. BALDWIN:  So, you know, if the Court feels the

17  need I'm happy to go through line by line on the objections

18  that they have made.  But I think the Court has the guidance

19  of the United States Supreme Court and that covers -- you

20  know, that covers whether they know enough to measure inches

21  and so on and so forth.

22          THE COURT:  Yes, I agree.

23          MR. BALDWIN:  So thank you.  I'll get to the more

24  meat of it.

25          (Pause)

1        MR. BALDWIN:  I want to again raise the objection

2   of arguments that were never made in the three briefs just

3   directed to this.  And I just made a couple of notes.

4        The one about Mr. Kirkland telling somebody he

5   couldn't wait to sue the company and retire, that's just

6   made up out of whole cloth because it's not in the record

7   anywhere.  I believe it's been conceded that.  The question

8   --

9        THE COURT:  Yes.  And I won't consider that

10  comment.

11       MR. BALDWIN:  Yeah.  And the question of now

12  there's some sort of supervening cause, that's also new.

13  The question of -- the suggestion that there might be

14  different predecessors in interest because the release

15  covered CSX and Con Rail, I guess.

16       THE COURT:  Yes.

17       MR. BALDWIN:  That's just out of the blue.  I

18  think once you file three briefs on the same subject you're

19  pretty much locked into those.  So I'm disappointed that we

20  have to address new arguments.

21       But I guess the first premise that underlies

22  everything is that Grace is aggrieved that it didn't get to

23  come into the case and what a great job it would have done

24  if it had come into the case.

25       You know, attached to Mr. McNeill's affidavit at

1    Exhibit 1, Exhibit I, sorry, is a letter dated December

2    15th, 1999 from Mr. Garland.  Mr. Garland was the counsel

3    who represented Norfolk Southern in the Georgia litigation.

4    And it's true that shortly after the deposition of Mr.

5    Kirkland Norfolk Southern realized that he was saying, I

6    slipped on this because of the overfilling of the cars from

7    W.R. Grace.

8              And immediately Mr. Kirkland put W.R. Grace on

9    notice that this couldn't possibly have an impact on your

10   indemnification and they offered to, in a series of letters

11   that go back and forth, so I, J, K through S there's a

12   series of letters virtually begging Grace to come into the

13   case which they say they were not permitted to do.

14             And the first thing they say is, well, why didn't

15   you bring us into the case as a third party defendant.

16   Well, that's -- that would be a strategic blunder, as the

17   Court knows, because you would have two corporate defendants

18   pointing fingers at each other in front of a state jury

19   saying, no, you're more to blame, no, you're more to blame.

20             And it wouldn't -- Norfolk Southern had no

21   incentive to do that because under FELA even if the jury had

22   found that Grace was also negligent, Norfolk Southern would

23   be negligent for failure to provide a safe working

24   environment.  So tagging Grace would not have helped Norfolk

25   Southern and it would have threatened to increase the

1   verdict and make it more likely that the plaintiff would

2   win.

3          But the notion that Grace would have come in is

4   just a fiction.  Grace's position is also set forth in

5   Exhibit J and they basically say in the letter of September

6   29 from the division counsel, Ms. Lynn Durbin (ph) to Mr.

7   Garland, they lay out that they don't think the

8   indemnification agreement applies and that they're liable

9   under the indemnification agreement.  And this goes back and

10  forth.

11         Now the first letter when Mr. Kirkland was deposed

12  was a good 14 months before trial and Norfolk Southern

13  tendered the case to them and said, why don't you come in

14  and handle it.  If they had wanted to enter the case as a

15  party, not my -- that's not what I would have done, but if

16  they had chosen to do that, or if they had chosen to pick

17  different counsel, or if they had chosen to give directions

18  to the counsel and pay him, they certainly were free to do

19  that.  And so they had 14 months before they ever were going

20  to go to trial.  So we think they were properly vouched in.

21         And we think that also under, you know, under Rule

22  804 Mr. Kirkland is not available and the predecessor in

23  interest, Norfolk Southern, had a similar motive to take his

24  testimony at trial that Grace would have because at trial

25  the only issue was -- the -- Grace was not sued at trial.

1          THE COURT:  That's right.

2          MR. BALDWIN:  They mentioned the brake -- you

3    know, there was a FELA claim and there was a brake claim,

4    and there were a couple of repetitions of those.  The -- and

5    the reason I'm mentioning the brake claim is because there

6    are some cases that say if you're -- if the indemnity is

7    being sued for two alternate claims, one of which is

8    indemnifiable and one of which is not indemnifiable, then

9    maybe you don't have a common interest.

10          That didn't happen here because the judge granted

11   summary judgment against the brake claim, so the brake claim

12   was out.

13          THE COURT:  Oh, okay.

14          MR. BALDWIN:  So all we had left -- now the brake

15   claim possibly would not have been indemnifiable.  But all

16   we had left then was the FELA claim.  So there -- you know,

17   we're in -- we're at loggerheads with Grace now over the

18   indemnification agreement, but not then.

19          And they said that -- you know, they have said in

20   their papers that we might have tried to make Grace liable

21   and that might have been their incentive.  But we had no

22   incentive to make Grace liable because that didn't get to --

23   that would not get Norfolk Southern off the hook.  That

24   would be a waste of time.

25          The FELA duty as we pointed out in our papers is

1    non-delegable so we can't delegate it to somebody else, but

2    we can delegate that -- you know, we can be indemnified for

3    our duty.  That's why the railroad takes pains when it has -

4    - to have indemnification agreements with all of its

5    subcontract -- all of its contractors so that it can be

6    indemnified even if it's found liable, even if it's found a

7    hundred percent liable.

8              THE COURT:  Right.

9              MR. BALDWIN:  So depending upon which

10   indemnification agreement applies, Norfolk Southern is going

11   to be allowed to be indemnified by 50 percent or 100 percent

12   depending up which applies even if Norfolk Southern is

13   liable.

14             So they haven't cited any cases that show that

15   there was an unreasonable delay here.  They cite to some

16   insurance coverage cases.  In my other hat I do a lot of

17   insurance coverage --

18             THE COURT:  Yes.

19             MR. BALDWIN:  -- work --

20             THE COURT:  Yes.

21             MR. BALDWIN:  -- and these notice decisions on

22   insurance -- in insurance coverage cases all have to do with

23   the facts of the cases and they have to do with the law that

24   the particular jurisdiction has.

25             For example, in Delaware it's prejudice rule, so

1   if you're late giving notice, but they're not prejudiced

2   you're still entitled to coverage.

3            THE COURT:  Right.

4            MR. BALDWIN:  So they've cited -- they didn't cite

5   any cases under these doctrines that we cited to get the

6   transcripts in that say --

7            MR. GRASSMICK:  Your Honor, I want to repeat Mr.

8   Baldwin's objection of cases not cited in the briefing.

9            MR. BALDWIN:  Well --

10            THE COURT:  But he's answering your citation of

11   the cases, is he not?

12            MR. GRASSMICK:  Which were in the briefs, Your

13   Honor.

14            THE COURT:  Which were in the briefs.

15            MR. BALDWIN:  They cited insurance coverage cases,

16   Your Honor, for the proposition about how many months is too

17   much of a delay.

18            THE COURT:  Right.

19            MR. BALDWIN:  In the general voucher cases they do

20   say somebody has to be timely noticed and maybe that's what

21   he's talking about.  But as far as the cases that they

22   provided us that talk about X number of months is too much,

23   those seem to be just insurance coverage cases.

24            THE COURT:  Okay.

25            MR. BALDWIN:  So those really are not applicable

1    here at all.

2            So the question is are these really crocodile

3    tears when Grace says, oh, my goodness, we could have done

4    the best job in the world.  We could have cross-examined

5    him.  We could have looked at him.  We could have put it up

6    on the blackboard.  We could have gotten a ruler and, boy,

7    that guy would have been toast.

8            They didn't do that.  They were offered the chance

9    to do that and they didn't do that.  And Mr. Garland is a

10   very fine trial lawyer and he cross-examined Mr. Kirkland to

11   try to establish that Mr. Kirkland was contributorally (sic)

12   negligent.  And the jury didn't buy it.  In fact, Mr.

13   Kirkland had asked for $1.5 million and the jury gave him

14   $1.9 million.

15           So I guess it's possible that W.R. Grace has

16   better lawyers, but they didn't decide at the time when they

17   were given -- when they had the chance to show what good

18   lawyers they were they didn't take it and they didn't come

19   in.

20           And so now that Mr. Kirkland, there's a full

21   record and he's deceased, now they say, oh, my goodness,

22   there's gambling going on here.  I'm shocked.  And, you

23   know, we could have done much better.  It's just not

24   believable they -- that they could have -- that they would

25   have done it.  They had a chance to do it and they didn't do

1    it and it's all complete speculation.

2              And what we've been up against is illustrated by

3    Mr. Kirkland's death, for example.  He -- we provided his

4    death certificate.  No.  We provided his obituary and they

5    said, we're not going to concede that he's dead.  And so

6    then we provided -- then we had to go to the State of

7    Georgia or North -- or South Carolina, I forget, and get his

8    official stamped death certificate.  And they said, okay,

9    for purposes of this motion we'll concede he's dead.  But --

10             THE COURT:  Right.

11             MR. BALDWIN:  -- they dropped a couple of

12   footnotes saying they were reserving their rights.

13             On -- one reason that we did not -- in addition to

14   what the Court suggested that we had no reason to think that

15   we would not be able to use Mr. Kirkland's testimony, we

16   didn't think we would be up against anything like this, is

17   that Grace told us that we could rely on the underlying

18   trial record.  We were negotiating about if we couldn't

19   resolve questions how were we going to set -- tee this up

20   for the Court so we don't have to retry the whole case.

21             THE COURT:  Right.

22             MR. BALDWIN:  And I would like to point out the

23   record --

24        (Pause)

25             MR. BALDWIN:  This is -- we've attached a series

1    of letters and I guess it's Exhibit 10-A to the McNeill

2    deposition --

3              THE COURT:  Is that 10-A?  I think they --

4              MR. BALDWIN:  Yeah.

5              THE COURT:  -- they were letters.

6              MR. BALDWIN:  There was an e-mail and so what's

7    the citation for this?

8              MR. GRASSMICK:  This is to Norfolk Southern's

9    reply brief.

10             MR. BALDWIN:  Okay.  Norfolk Southern's reply

11   brief. It's Exhibit A and it sets forth a number of proposed

12   stipulations.  And as you can see from the cover e-mail they

13   came to us from Mr. Higgins.  And so they changed their

14   mind.  I'm not saying they're bound by it.

15             But I'm saying that right up until the time they

16   filed this brief against us, we had an understanding.  We

17   were under the reasonable understanding that both sides were

18   going to be able to refer to the trial record.  And then all

19   of a sudden they got this bright idea that maybe they could

20   file a motion for summary judgment without having taken any

21   discovery and suddenly say they could use it and we

22   couldn't.  That was a surprise to us.

23             And so we never had a reason to think we were

24   going to have to deal with this kind of gamesmanship.

25             I think our brief is pretty clear on the voucher

1    doctrine and on the rule of evidence that allows this to be

2    used and allows them to be bound.  But I think it's probably

3    important to have focus a little bit on this supposed

4    conflict of interest.

5            They're -- they say we've always had a conflict of

6    interest and, you know, we never were on the same page in

7    the underlying case.  Docket Item 32845 is their motion for

8    an order barring the Kirkland testimony and FELA action as

9    hearsay evidence.

10           THE COURT:  Yes.

11           MR. BALDWIN:  Their third bite at this apple.  And

12   they say we decline -- we didn't respond to their 2008

13   letter to mediate the claim.  That's not true.  In our next

14   paper we show a letter from Theresa Brown-Edwards where she

15   says, you told us you were going to tell us what the likely

16   payout was and you give that as information to us and we'll

17   deal with you.  And we didn't, of course, we didn't get it.

18           In fact, their letter which they cite says, sorry,

19   I was going to put together a big summary of the arguments

20   for you, but I didn't do it.  And how about if we just

21   mediate.  And she said, get us the stuff and then we'll

22   mediate.

23           And so that's just kind of a point of honor for my

24   client, I guess, that they -- that we didn't just ignore

25   that.

1          But they cite several -- really three, only three

2     bits of testimony where they -- that they say highlight the

3     conflicts that they had -- that there was in the underlying

4     trial.

5          First of all, page 14 of this paper they say we

6     excluded Grace.  I've explained to you, Your Honor, that

7     that -- nobody wanted to exclude Grace.  It would have been

8     a horrendous decision to bring Grace in.  But once the

9     action was tendered to Grace, they could have joined the

10    action.

11         And it's true that we waited until after Mr.

12    Kirkland was deposed which was some months, like I think a

13    year or so into the case, but that didn't really hurt them

14    in any way because they still had 14 months to go before the

15    case was tried.  They could have come in and the fact that

16    they didn't means that you should disregard all of this

17    wonderful stuff that they would have done.

18         On page 15 they start to talk about how the

19    Norfolk Southern cross-examination was adverse to Grace.

20    And if -- I think it deserves a look.

21         THE COURT:  There are some questions and answers

22    that appear to be along those lines.

23         MR. BALDWIN:  Well, first of all, let's go through

24    them because -- and out of three or four volumes of trial

25    transcript --

1           THE COURT:  Yes.

2           MR. BALDWIN:  -- this is all they find.  So if

3    they want to take these three questions and answer segments

4    out, fine.  But that wasn't Norfolk Southern's motivation

5    and, you know, they didn't have a legal incentive to do

6    that.

7           So question by Mr. Garland, this is cross-

8    examination of Mr. Kirkland:

9               "You testified sometimes you would complain to

10              him, Wood, a Grace employee before you pulled the

11              cars off and he would send a fellow back and let

12              him blow it some more; is that right?

13              "Answer:  Yes, sir.

14              "Question:  But then you're saying now sometimes

15              you would complain and he wouldn't do it.

16              "Answer:  Yes, sir.  Sometimes I would complain

17              and he wouldn't -- and he wouldn't blow the cars

18              off.

19              "Question:  Did he give you any reason?

20              "Answer:  No, sir."

21          Now he's trying to test Mr. Kirkland on his

22   direct.  This is not something that's developed out of the

23   blue by Mr. Garland.  He's trying to ask him to explain

24   testimony that he's -- it's already been brought out by Mr.

25   Kirkland's attorney on direct.  This was not an initiated by

1    Mr. -- by Grace's -- by Norfolk Southern's counsel and it's

2    really not going to any indemnification issues.  It's

3    equally going to the fact that they were trying to show that

4    Mr. Kirkland was negligent because sometimes you ask them to

5    blow the cars and off and they would clean them, and so

6    sometimes you didn't and now you slipped and you fell.

7    You're a dope.

8            So the real -- the only real defense that Norfolk

9    Southern had was to hammer on the contributory negligence of

10   Mr. Kirkland.

11           The next section also page 15:

12           "Mr. Garland:  Have you had occasion when new

13           people come to work to tell them anything about

14           the Kaolin and, if so, what did you tell them?

15           "Answer by Mr. Kirkland" --

16           I want to note he doesn't say anything there about

17   Grace.  He just says about the Kaolin.  Kirkland blurts out

18   non-responsively:

19           "I tell the new people that come, you know, we are

20           having a lot of trouble with the Grace plant and

21           it's real dangerous.  And I tell them to be, be

22           careful out there and I try to let them stay up at

23           the switch.  And I have more experience so I go

24           down there and try to mess with it."

25           He -- he's not answering Kirkland's (sic)

1     question.  Kirkland (sic) is not saying, isn't it true that

2     Grace really caused the accident.

3             And the final thing is a longer colloquy where Mr.

4     Kirkland was trying to impeach Mr. -- I mean, Mr. Garland

5     was trying to impeach him.  And I bring this out so that

6     when we go through it and you think about in terms of

7     impeaching him and making him guilty and negligent, that's

8     what it did:

9             "Question:  Was that -- when you made that little

10             slip was there a Grace -- was that at Grace &

11             Company or was that at Warren?

12            "Answer:  No, sir.  It was back at Akon Depot.

13            "Question:  But you didn't testify yesterday that

14             you didn't have to get up.  You were able to just

15             couple and take them off.  Do you remember that

16             testimony?"

17            So he's trying to mess him up on his

18     inconsistencies.

19            "Answer:  Yes, sir.  I remembered it as three cars

20             on Friday.

21            "Question:  But it's different you say on Monday.

22            "Answer:  Yes, sir, because there was like a bunch

23             of loads on Friday and I didn't remember getting

24             up on the cars on Friday.  I may have, but they

25             might have been in the middle of the cut.

1              "Question:  So when you're talking to us yesterday

2              about just being able to couple it up and not have

3              any -- get on it until you got down the road and

4              you were just talking about Friday, is that what

5              you were telling us or do you not remember which

6              day it was?

7              "Answer:  I know I had to get on the cars on

8              Monday because they were shipping like all the

9              loads so I had to get on those loads.  They had

10             loaded all weekend and they were out of empties

11             and we took them more empties.  On Fridays they

12             have a lot of cars out there and I may -- and I

13             may or may not have had to get up on those cars.

14             I don't remember.  So we try not to get on them if

15             we don't have to.

16             "Question:  So you're really not sure whether you

17             got on them or not?  Is that what you're telling

18             us now?

19             "Well, I'm pretty sure I didn't get on them

20             because the way I work -- because the way I work

21             the plant.  I try to keep them set up next to my

22             empties, then I don't get on them unless I have

23             to.

24             "Question:  And you can't really remember one way

25             or the other now; is that correct?

1          "Answer:  No.  I really can't."

2          So this doesn't go to Grace.  This goes to

3     questioning him.  He doesn't even have his days straight.

4     He doesn't have it straight whether he got up on the cars on

5     Friday for the Friday accident or not.  And these -- this is

6     the best they got.  In the entire trial record they picked

7     out three, these three sections to show proof that W.R.

8     Grace was trying to try the case in a manner which was

9     intended to put them, you know, put them at a disadvantage.

10          One more thing.

11          THE COURT:  Norfolk Southern was trying the case

12     --

13          MR. BALDWIN:  Yes.  Yes.

14          THE COURT:  -- in a way to put Grace at --

15          MR. BALDWIN:  I should remember that, you know.

16     I've worked --

17          THE COURT:  Yes.

18          MR. BALDWIN:  -- for them for 20 years or so.

19          THE COURT:  All right.

20      (Pause)

21          MR. BALDWIN:  I don't know what I would do without

22     Mr. McNeill to handle all these heavy -- on this heavy work

23     --

24          THE COURT:  Yes.

25          MR. BALDWIN:  -- framework.

1          (Pause)

2               MR. BALDWIN:  Okay.  Exhibit to Mr. McNeill's

3     declaration which I think was -- it's Exhibit H.  I think it

4     was originally submitted, by the way, by Grace.  But there

5     was a statement here that Norfolk Southern has never

6     contended there was a second accident on the 26th of the

7     month, on the Monday.  And this document is entitled,

8     personal injury report.  It's dated January 26th.  It says

9     what's -- it tells the date of the incident, incident date

10    January 26th, '88, incident city Akon, South Carolina, mile

11    post pulled.

12               And here's the description of what happened from

13    Mr. Kirkland in his own hand:  "Pulled seven loads from W.R.

14    Grace plant in Akon.  Brought all seven loads which were

15    covered in clay back to the -- back to Akon and ran around

16    cars in-house."  I think there's a little bit missing from

17    the edge of this, but:

18               "While applying the handbrakes on the cars

19               conductor slipped on N.S. 245061 and twisted or

20               tore or pulled something in his lower back.

21               Brakeman Ct. Sharpe saw the accident."

22               As he says in his deposition -- in his

23    declaration.

24               THE COURT:  Right.

25               MR. BALDWIN:  So there is evidence in the record

Page 70

1    that there was a January 26th accident.

2             And for -- I guess one final thing, spoliation,

3    brand new argument, brand new on the plane from Chicago to

4    here.

5             And if Your Honor has no questions I'll --

6             THE COURT:  Let me ask you this question, Mr.

7    Baldwin.  If I were to strike the Kirkland testimony at

8    trial, would that be devastating to your case?

9             MR. BALDWIN:  I think it would make it more

10   difficult, but we now have find an eyewitness to his

11   slipping on the Grace car who can also testify to the

12   overfilling of the car and the Kaolin and to the habit and

13   routine of Grace overfilling the cars.

14            So I think we can make the case.  I think it will

15   be -- it will require more live witnesses, and this is --

16   this should have been a business matter taken care of

17   between two grownups because I think they still work

18   together.

19            THE COURT:  Yes.

20            MR. BALDWIN:  And we can make the case, but we

21   think we're entitled to it, especially since they never gave

22   us any indication for years, it was like 13 years between

23   the time we filed our claim and the time they started doing

24   something about it.

25            THE COURT:  Right.

1          MR. BALDWIN:  They never gave us any indication.

2   And to the contrary they were planning to use it and they

3   have used it.

4          So I think if it gets stricken it gets stricken

5   for both and then maybe they can't make their case.

6          THE COURT:  All right.

7          MR. BALDWIN:  Anything else, Your Honor?

8          THE COURT:  No, sir.

9          MR. BALDWIN:  All right.  Thank you.

10          THE COURT:  Thank you, Mr. Baldwin.

11          MR. GRASSMICK:  One second, Your Honor.

12          THE COURT:  Take your time, Mr. Grassmick.

13          MR. GRASSMICK:  I can put the papers there and I

14   can hand Mr. Baldwin his cup.  But then I need to fill up my

15   cup.

16          THE COURT:  Take your time.

17          MR. GRASSMICK:  Fuel is important.

18          THE COURT:  It is.  It's amazing how you dry out

19   in speaking to the judge.

20      (Laughter)

21          MR. GRASSMICK:  And it's amazing how you dry up

22   when you had salty potato chips at lunch.

23          THE COURT:  All right.  That's --

24          MR. GRASSMICK:  Rule Number 1.

25          THE COURT:  Well, now you know not to do that.

```
1            MR. GRASSMICK:  Yeah.  Rule Number 1, never eat

2    the potato chips --

3            THE COURT:  Right.

4            MR. GRASSMICK:  -- at lunch.

5            THE COURT:  Right.

6            MR. GRASSMICK:  Your Honor, I'm going to try to go

7    in close to the order Mr. Baldwin went.

8            THE COURT:  Okay.

9            MR. GRASSMICK:  But I'm going to begin in a couple

10   of spots that are different, but I'll give you sort of an

11   adequate warning because the issue I want to begin with is

12   the claim about -- by Norfolk Southern that Grace didn't

13   enter the case.

14            And as presented that issue is really a red

15   herring for a couple of reasons.

16            First, Grace said in response to the vouching

17   letters it wasn't affected by the indemnity.  Based on that

18   Grace should never enter the case.  It -- you know, just as

19   a basic bit of legal practice you don't enter cases unless

20   someone sues you, joins you, or you sue them.  When you say

21   we're not involved, you're not involved --

22            THE COURT:  Right.

23            MR. GRASSMICK:  -- and you go away.

24            What's interesting, though, is Mr. Baldwin

25   suggested for Norfolk Southern it would have been a bad idea
```

1    for Norfolk Southern to bring Grace into the case.  I'll

2    accept that point.  He's just conceded the predecessor in

3    interest argument because what he suggested is they could

4    not, Norfolk Southern could not function as Grace's

5    predecessor in interest because the adversity between the

6    parties would become apparent had they joined Grace into the

7    case.

8            Now he didn't go into a lot of detail about that,

9    but he explained the bad legal points that Norfolk Southern

10   would face because Grace would in a jury trial in Georgia

11   point to Norfolk Southern because if you implead Grace you

12   implead them on the indemnity --

13           THE COURT:  Right.

14           MR. GRASSMICK:  -- and Grace is going to defend

15   itself by saying, we're not liable on the indemnity and,

16   Norfolk Southern, that big railroad injured poor Mr.

17   Kirkland.  And Grace is going to take the position that

18   there was nothing Grace did at the Grace plant to cause the

19   injury, but that the injury was caused by at least two

20   things:  Defective brakes, and as we said in our briefing,

21   Grace would have kept that brake issue in the case through

22   the jury trial.  Grace would not have let that issue go

23   away.

24           In our reply brief is where we brought up

25   spoliation because Grace pointed out in our reply brief on

1    the hearsay motion Grace certainly would have argued

2    spoliation had it been in the Georgia trial because that

3    proved the adversity.

4              And, further, and this really gets to the

5    adversity on that point.  It's the thing that I pointed out

6    about supervening cause.  The supervening cause argument is

7    in Grace's summary judgment briefing because we quote Mr.

8    Chapman explaining what's going on in the process and we

9    suggest in all of our briefing, Grace suggests in all of its

10   briefing that Norfolk Southern by choosing to take the rail

11   cars from the Grace plant in the first instance deemed them

12   safe and based on their report that Norfolk Southern

13   basically put a sick man back to work.  And that constitutes

14   a supervening cause.

15             So Norfolk Southern's argument here about we

16   didn't bring Grace in and that that was a good business

17   decision for us is itself a concession that of course

18   there's an adversity between the parties.  They can't serve

19   as the predecessor in interest.

20             The last point is that -- that Mr. Baldwin there

21   suggested, well, we tendered the case to Grace.  Well, a

22   tender is something you normally do with an insurance

23   company.

24             THE COURT:  Right.

25             MR. GRASSMICK:  Now Mr. Baldwin's right.  That's a

1    standard insurance practice, part of his insurance practice.

2    You may or may not tender to an indemnitor and it depends

3    upon the nature of your agreement.  This case there was a

4    tender and Grace rejected it.  That doesn't mean Grace

5    enters the case.  That means Grace walks away and says, sue

6    us, and the way you sue us in this case properly is by

7    impleader.

8              In many respects that sums up the issue on voucher

9    and that sums up the issue clearly on predecessor in

10   interest.

11             The second point I want to deal with has to do

12   with reliance on the record.

13             THE COURT:  Okay.

14             MR. GRASSMICK:  And there's a difference here

15   between what's authentic evidence and what's admissible

16   evidence.  The question of what's authentic has to do with

17   where you obtain it and where you obtain evidence will

18   debate authenticity.

19             Norfolk Southern here can't contest the

20   authenticity of the trial record because they produced it

21   and suggested it's an authentic record.  The question of

22   admissibility, however, isn't described because it's a whole

23   record or not a whole record.  It's described evidence by

24   evidence within the record.  So you would look at the

25   testimony of Mr. Kirkland differently than you would look at

1    the testimony of Mr. Chapman.

2            Mr. Kirkland's testimony is admissible against

3    Norfolk Southern because Norfolk Southern had Mr. Kirkland

4    under oath in a trial proceeding in a jury setting and cross

5    examined him.  That's 804(b)(1).  804(b)(1) says Mr.

6    Kirkland is admissible against Norfolk Southern.

7            THE COURT:  Right.

8            MR. GRASSMICK:  Mr. Chapman is admissible against

9    Norfolk Southern for two reasons.  804(b)(1), if he's an

10   unavailable witness it's a witness that was examined on

11   direct examination by Norfolk Southern under oath in a jury

12   trial.  That makes it admissible.

13           It makes it admissible, however, it's not a

14   hearsay at all because Mr. Chapman was employed by Norfolk

15   Southern and he's a Norfolk Southern employee who is brought

16   to trial by Norfolk Southern to testify on their behalf.  So

17   it's a party admission.  It doesn't even come in as a

18   hearsay exception.

19           It's not a question of either we get the record or

20   they get the record.  It's a basic evidence class question

21   about the differential application of the rules depending

22   upon the situation of the party.  And on that basis I think

23   it's very clear.

24           We also argued in our briefing defensive

25   collateral or, you know,  variations like collateral

1    estoppel depending upon which brief we were in.  And the

2    case law on that was pretty clear.  You can have non-mutual

3    collateral estoppel depending upon the different situation

4    of the party.

5            I don't think you need to reach that point, Your

6    Honor.  You can simplify it and focus purely on the rules.

7            Now the question here about did Grace say you

8    could use the record, it's absolutely not the case.  As Mr.

9    Higgins explained I think in the status hearing last time,

10   there were no discussions about using the record.  That's

11   just like a settlement discussion.  That's actually covered

12   in our briefing.

13           Grace contended in its briefing that one of the

14   points to consider on the residual hearsay exception is

15   what's called the doctrine of acquiescence.  And the

16   doctrine of acquiescence happens when one party with

17   superior knowledge attempts to use that to deceive another

18   party in negotiation.

19           And what we said in the briefing, Your Honor, is

20   that Norfolk Southern knew Mr. Kirkland was likely

21   unavailable the entire time they engaged in negotiation with

22   Grace about just working off the trial record.  Norfolk

23   Southern only told Grace that Mr. Kirkland was unavailable

24   when Grace moved for summary judgment.

25           So when you look at the timeline Norfolk Southern

1   knew since Mr. Kirkland's FELA trial that Mr. Kirkland was

2   potentially unavailable.  And there were great points in the

3   record where Norfolk Southern has control of their witness

4   who (indiscernible) 27.

5           Norfolk Southern, after Mr. Kirkland's death, then

6   engaged in negotiation with Grace pretending he was alive.

7   So negotiation, are we going to use the trial record,

8   proceeds very differently if Grace knows Mr. Kirkland is

9   alive than if Grace knows Mr. Kirkland is dead.

10          It's speculation what was going on and what they

11  were considering.  And Grace hasn't engaged in that

12  speculation, Your Honor.  But in the briefing Grace

13  specifically argued it was that difference in position of

14  knowledge which is the reason why you don't look at fairness

15  as going in Norfolk Southern's favor, but you look at

16  fairness as going in Grace's favor because Norfolk Southern

17  controlled all the information, not Grace.  And there was

18  nothing Grace could have done to acquire that knowledge

19  because Grace doesn't get to go looking for Mr. Kirkland.

20          You know, Mr. Baldwin would have us in court today

21  suggesting ethical problems if Grace had been chasing down

22  Mr. Kirkland seeking Mr. Kirkland's testimony.  It just

23  doesn't work that way.

24          I want to take a step back and talk about the

25  motions to strike.

1           THE COURT:  Yes.

2           MR. GRASSMICK:  And the important distinction from

3     the vendor case that Mr. Baldwin spoke about has to do with

4     the form of the evidence as opposed to the substance of the

5     evidence.  And the easiest way to deal with the capable --

6     the question of capable of being admitted, and this is

7     discussed a little bit in the BNSF case that we cited in

8     some of our briefing.

9           And it's easiest to see with the question of

10    experts.  If you have an expert declaration such as what

11    Grace has suggested Norfolk Southern should have used

12    instead of Mr. Kirkland's testimony, an expert declaration

13    would be per se hearsay.  But on a summary judgment motion

14    you would accept that declaration from an expert because you

15    would understand notwithstanding it's in the form of hearsay

16    that's what an expert would testify to at trial.

17          THE COURT:  Right.

18          MR. GRASSMICK:  For a percipient witness under the

19    rule the witness has to demonstrate personal knowledge and

20    competence and statements like, I worked a long time,

21    doesn't demonstrate personal knowledge or competence because

22    to demonstrate personal knowledge or competence about

23    something about how Grace filled rail cars, one would need

24    to testify to things like, I watched Grace fill rail cars.

25    I understand what overfilling is and a rail car is

1    overfilled when X happens.  I was at the Grace plant on the

2    day of the incident.  I watched them fill the rail cars.

3    That's how you would demonstrate personal knowledge.  That's

4    not what their declarations say.

5            Their declarations say, I worked a long time for

6    the railroad and I've talked to a lot of people and I know

7    this went on.  That's a foundational question and at any

8    trial that evidence is not coming in until they would go

9    back and lay a foundation.  That's not an objection to form.

10   It's an objection to substance.

11           THE COURT:  But how about on a motion for summary

12   judgment?

13           MR. GRASSMICK:  That -- you have to form a --

14   objections for personal knowledge are the essence of the

15   rule.  That's why it says personal knowledge and competence

16   because you can't just make general statements because

17   that's the way that you can put a declaration in to

18   improperly avoid summary judgment.  And that's why the

19   personal knowledge question becomes very important.

20           And you can contrast the declarations that Grace

21   used with like Mr. Drummond where Mr. Drummond laid out

22   specifically the reasons that he knew things saying days he

23   saw things, why he saw things, how he was familiar with them

24   because of the type of activities he engaged in on his job.

25           And in this case, and it's speculation, it's not

1    clear why a railroad engineer who would never leave a

2    locomotive would understand what went on when Grace filled a

3    rail car.  And to make a statement, Grace failed to

4    supervise, when you're sitting in a rail car, you know, at

5    the far end of the plant and, you know, do whatever it is

6    you do in a rail car at the far end of the plant where

7    you're hooking up cars, I mean, that's where you beg the

8    judge at the trial and say, Your Honor, I need a little

9    foundation here.

10             THE COURT:  Right.

11             MR. GRASSMICK:  And that's the point.  And what

12   Mr. Baldwin says about the cases is right, about

13   distinguishing between form and substance.  But these

14   objections are, in fact, based on substance because of the

15   nature of the position of the person, the fact they worked

16   for the railroad a long time, not at the Grace plant, puts

17   them in a very difficult position to say how they could know

18   those things.

19             Mr. Baldwin seems to suggest he provides a

20   definition of facility which is distinct which would suggest

21   that it -- there -- a cure there is at minimum to strike the

22   word facility to prevent confusion in the record between

23   facility, facility and facility because at this point the

24   record is confusing.  And it's not clear the term is defined

25   and that's why we had a motion to strike on facility because

1    that's not clear.  And that's why, again, you would have the

2    same foundational objection to which in a trial setting in

3    theory would be resolved by the witness using different

4    words, but not and making very clear they're not speaking to

5    the facility in the sense of how cars were loaded.

6            THE COURT:  Right.

7            MR. GRASSMICK:   And that becomes the important

8    distinction on that point.

9            I don't think I'm going to go line by line through

10   the declaration because I don't think the Court needs that.

11   I think --

12           THE COURT:  All right.

13           MR. GRASSMICK:  -- based on what Grace has said

14   and what Mr. Baldwin has said and what's in the writing,

15   unless you have questions, Your Honor --

16           THE COURT:  There's plenty there.

17           MR. GRASSMICK:  There is plenty there.

18           THE COURT:  Yes.

19           MR. GRASSMICK:  And understanding what's going on.

20           THE COURT:  Thank you.

21           MR. GRASSMICK:  I do want to mention a little bit

22   more about the letters on voucher.

23           THE COURT:  Yes.

24           MR. GRASSMICK:  This is telling in relation to one

25   of the things that Mr. Baldwin raised about these other

1   parties, you know, Con Rail and CSX, that was part of their

2   voucher argument because the settlement agreement was one of

3   the exhibits they attached to support the vouching in

4   position.  That's their document, not Grace's document and

5   that's one of the documents they were using to perfect their

6   voucher case.

7           I'm suggesting here on oral argument for Grace,

8   Your Honor, that that's not how you look at that document.

9   You look at that document to say, there's a lot going on

10  that's not been discussed here and there's a lot going on

11  with the parties.

12          I objected, Your Honor, to what Mr. Baldwin was

13  suggesting about insurance law generally.  I know he's a

14  very good insurance lawyer, Your Honor.  I practice a little

15  insurance myself and I understand the notice cases.  But

16  what's important here is that on voucher Grace specifically

17  cited to cases dealing with the length of time for voucher

18  and those were in its reply brief.  Those are the Humble Oil

19  case, United New York Sandy Hook Pilots Association case,

20  and the Ferrell Wise (ph) case that specifically talked

21  about delay in notifying a party and making it improper to

22  vouch them in.

23          Although it's fair to say Grace also cited some

24  insurance cases.  The voucher cases were directly on point

25  and suggested to adequately vouch a party in you need to be

```
 1    able to give them the ability to control the litigation.

 2            The footnote in our reply brief, and did we find

 3    it?  Yes.  The footnote in our reply brief is on page 5.

 4    And in Footnote 4 in the reply brief Grace expressly said

 5    that we would grant spoliation motion under the right

 6    context under Rule 26.  And that goes on here to voucher

 7    point because (indiscernible) control of this litigation

 8    properly because, among other things, there was a brake

 9    action under the safety appliance act which can exonerate

10    Grace completely under the indemnity, Grace needed access to

11    the cars the day of the incident.

12            Once the car is removed, evidence is spoiled.  I

13    mean, you need a proper foundation to do that.  You need to

14    seek inspection under Rule 26.  You need to have them say,

15    oh, we can't let you inspect it.  We need to fight a little

16    bit about what that means and then you move for Rule 26

17    sanctions.  And the point is that hasn't happened.

18            But on the question of voucher --

19            THE COURT:  Yes.

20            MR. GRASSMICK:  -- it's very clear that's what it

21    means in the beginning to control the litigation.

22            Norfolk Southern knew on January 26th that Grace

23    was involved in the accident because Mr. Kirkland's accident

24    report said, Grace was the person who the car came from and

25    it was Grace's plant where I picked this up.  Only after Mr.
```

1    Kirkland had been deposed, however, did Norfolk Southern

2    notify Grace.  That's a serious problem with control of

3    litigation because Mr. Kirkland's testimony at that point

4    has basically been set in tone -- in stone.  You don't get

5    to re-depose him.  You don't get a second bite at that

6    apple.  And you're going to impeach him if he deviates from

7    any of that testimony.

8              THE COURT:  Yes.

9              MR. GRASSMICK:  You know, that deposition has

10   never been produced so that we can talk about what was set

11   in stone.  We've only seen the trial transcript.  None of

12   the written discovery has been produced.  We've only seen

13   the trial transcript.  So it's not even clear what Norfolk

14   Southern sought to obtain from Mr. Kirkland in discovery or

15   from any other party in discovery because we haven't seen

16   that.

17             THE COURT:  Okay.

18             MR. GRASSMICK:  And so for control it's very hard

19   to suggest it was timely and adequate for control under the

20   voucher cases because they make clear it had to be very

21   different.

22             And voucher cases also make clear that you need an

23   identify in terms of indemnity and the indemnity provisions

24   in the Grace agreements with Norfolk Southern are not

25   identical to the FELA claim that was raised against Norfolk

1    Southern.  It doesn't -- in no case, and we've argued this

2    on the voucher in the briefing, just based on the claim

3    against them and the indemnities there's no identity.  You

4    don't have voucher.

5          Which if I can -- the last point for voucher

6    cases, you're supposed to implead.  And that doesn't matter

7    what you think the strategy is, you know, it doesn't matter

8    if it's bad strategy for Norfolk Southern to implead.  The

9    law is pretty clear that if you want to seek indemnity and

10   you can't use voucher to escape it, you're going to have to

11   sue Grace for indemnity, and to avoid double litigation and

12   things like that the proper avenue was to implead and that's

13   the way you provide the assurance necessary for the parties.

14   You don't get to stay predecessor in interest afterwards.

15          I don't think, Your Honor, I need to belabor the

16   points on cross-examination.  Mr. Baldwin was nice enough to

17   go through some of the testimony.  I would actually say that

18   the entire middle third of the trial transcript is adverse

19   to Grace.  But the last example, the long piece that Mr.

20   Baldwin read, I want to read a portion of it and talk about

21   why it was included in the brief.

22          THE COURT:  All right.

23          MR. GRASSMICK:  The question was, "Was that --

24   when you made that little slip was that there at Grace &

25   Company or was that at Warner?"  That's the point of that

1    whole long passage, Your Honor, because the question that

2    was put by Norfolk Southern directly to Mr. Kirkland was

3    asking Mr. Kirkland was the accident at Grace.  That's why

4    that's a selection that's adverse --

5              THE COURT:  All right.

6              MR. GRASSMICK:  -- to Grace.  Then the next point

7    about that was, and this is thinking as a trial lawyer why

8    you get the next part where he's confused, because you want

9    the record to be confused on that point as to where Mr.

10   Kirkland was injured.

11             And so when Mr. Kirkland says, it was Warner, boy,

12   Mr. Kirkland's a little confused.  It could have been at

13   Grace, couldn't it.  And that's the point of putting that

14   testimony in adverse to Grace when you're making a record

15   not for that trial, but you're making a record to be used in

16   the future when you seek indemnity.

17             To be cynical, Your Honor, since Norfolk Southern

18   knew Mr. Kirkland was ill and Grace wasn't there, it's not

19   clear that from the start they weren't making a record

20   designed to inculpate Grace in the hopes that Mr. Kirkland

21   would later be available and they would be able to get the

22   testimony in.

23        (Pause)

24             MR. GRASSMICK:  Defense strategies are things that

25   Norfolk Southern has talked about.  I think it comes down to

1    this and this was why the interests are adverse.  If Grace

2    is involved in the action, Grace's strategy is to exonerate

3    Grace.  It's not to exonerate Norfolk Southern.  Grace's

4    strategy at trial is to say, it's Mr. Kirkland's fault.

5    It's Norfolk Southern's fault.  It's not Grace's fault.  And

6    the cross-examination strategy of Mr. Kirkland would be

7    geared towards that.

8              It's (indiscernible), Your Honor, and that's how

9    litigation operates.  And to suggest that Norfolk Southern

10   had the same interest is wrong because Norfolk Southern's

11   interest is to escape its FELA duty or to inculpate Grace to

12   use that evidence later at an indemnity trial because the

13   point of indemnity isn't settled.  You're just not, oh, you

14   have to indemnify, you have an agreement.  That's a point as

15   the Blumber Chalkley (ph) case indicates is litigated.

16             THE COURT:  Right.

17             MR. GRASSMICK:  And because that's going to be

18   litigated that means directly when there's an indemnity

19   you're always adverse.

20             The point about the accident taking place on the

21   26th --

22             THE COURT:  Yes.

23             MR. GRASSMICK:  -- that's not a real -- a matter

24   that needs to be settled today.  The point that we made

25   wasn't that Mr. Kirkland's report didn't say the 26th.  It's

1   the Exhibit G, the Norfolk Southern report doesn't mention

2   an accident on the 26th.

3          THE COURT:  It doesn't seem -- yes.  I understand

4   what you're saying.

5          MR. GRASSMICK:  Yeah.  And so we're taking is it

6   seems since they talk about the 23rd and the 26th and the

7   27th and they say Mr. Kirkland came in fine to work on the

8   27th, there's a piece missing there from the second half of

9   the 26th since Mr. Kirkland says there was an accident.

10          THE COURT:  Right.

11          MR. GRASSMICK:  And since Mr. Kirkland filled out

12   a report, but it's in Mr. Kirkland's writing, and there's no

13   testimony that I'm aware of, and maybe my reading of the

14   record was incomplete, but there was no testimony that I'm

15   aware of, Your Honor, talking about where this report

16   floated and through whom and how it was verified and

17   distributed because that wasn't central to the litigation.

18   Most of the things they tried in the field of trial were

19   just about the 23rd.

20          But the point being that that's an inconsistency

21   and that's the type of inconsistency that is crucial to

22   Grace's defense.  But because it's Mr. -- as Mr. Baldwin

23   correctly points out, as Norfolk Southern points out,

24   Norfolk Southern had a non-delegable duty which means it

25   doesn't matter to their liability whether the accident was

1    on the 23rd and the 26th, as long as there's one accident

2    that's enough for Norfolk Southern to be found liable.

3             Can -- as -- you know, there's points we've made

4    in our briefing about the jury instructions.  The jury

5    instructions don't seek separate findings for the 23rd and

6    26th.  The jury instructions don't seek any findings at all

7    about Grace.  The jury instructions simply seek finding of

8    liability.  So it's not an issue at Mr. Kirkland's trial.

9    And so it's not an issue that Norfolk Southern is going to

10   cross-examine on.

11            However, because the Norfolk Southern document

12   indicates Huber cars were used on the 23rd, that's an issue

13   that Grace is going to beat into the ground because Grace is

14   absolutely exonerated if there's no accident on the 26th.

15   And that makes Kirkland's demeanor and testimony even more

16   important on whether or not something happened and on what

17   the cause of the incident was because Grace walks completely

18   from any indemnity if it can defeat the accident on the

19   26th.  I think that's pretty settled, Your Honor.

20            THE COURT:  Yes.

21            MR. GRASSMICK:  And I think -- I'll stop on that,

22   barring my co-counsel not shaking their heads violently at

23   me.  Unless you have any questions, Your Honor.

24            THE COURT:  I don't.  I don't.  Thank you, Mr.

25   Grassmick.  I appreciate --

1           MR. GRASSMICK:  Thank you.

2           THE COURT:  -- your argument.

3           MR. BALDWIN:  Your Honor, may I sur-surreply since

4    we've gotten --

5           THE COURT:  Yes.

6           MR. BALDWIN:  -- three briefs --

7           THE COURT:  Yes.

8           MR. BALDWIN:  -- at least.

9           The new arguments in the reply are that there was

10   a safe to run determination made.  That's -- that has

11   nothing to do with this evidentiary point.  It's one of

12   their arguments from their summary judgment.

13          THE COURT:  Right.

14          MR. BALDWIN:  They sent a sick man back to work.

15   That's a summary judgment argument.

16          They say that our argument is you have to put in

17   the whole record or not.  Under voucher the whole record

18   would come in.  Under the evidence rule Mr. Kirkland's

19   testimony would come in only as he's unavailable.

20          The notion that we knew Mr. Kirkland had some

21   colon cancer and so we were waiting -- we were setting it up

22   and waiting for him to die is absolutely outrageous.  It's

23   not in the record.  Mr. Kirkland's complaint was March 23 of

24   '03 and he didn't die until October 22 of '09.  And, you

25   know, his trial was in, you know, shortly after the -- a

1    couple of years after the complaint was filed.

2           If Grace is right that merely having indemnitor

3    indemnitee relationship makes you adverse then the voucher

4    doctrine would not have any more validity because by

5    definition the indemnitor doesn't want to pay the

6    indemnitee.  And so if that was enough to create adversary,

7    you could never tender the defense or ask them to come in in

8    an indemnification case.

9           And it's incorrect that we were required to

10   implead W.R. Grace.  We were required to, if we wanted to

11   product our indemnification rights, to notify them and we

12   tendered the litigation to them.  That's not just an

13   insurance term because if you look at our brief, Footnote 17

14   -- by the way I do want to say I agree with Mr. Grassmick

15   that the voucher concept is kind of an old-fashioned concept

16   that in many places has been done away with.  It's not done

17   away with in Georgia and it's not done away with here, the

18   Third Circuit.  It's alive and well.

19          And the Third Circuit in the Humble Oil case,

20   which they cited, says that at our Footnote 17 you can vouch

21   them in, whether written or oral, where you give them --

22   it's five factors:  Full and fair information concerning the

23   pending action; unequivocal certain and explicit demand to

24   undertake the defense; three, it contains an offer to

25   surrender control.  So it's not just an insurance case and I

1    haven't gotten my practice areas mixed up; be given so

2    shortly after the institution of suit as to permit complete

3    control of pretrial procedures by the indemnitor; generally

4    provides notice of the -- that if the indemnitor refuses to

5    defend it will be bound by any subsequent litigation between

6    them.

7            So the only thing that's really at issue here is

8    whether under the facts of this case they got notice early

9    enough to do something about it, and if they -- and would

10   they have done anything different.  And we say because it's

11   not for a foregoing conclusion that you couldn't re-depose

12   somebody, that would be in the discretion of the Court if

13   they thought they weren't deposed properly. If they wanted

14   to enter the case once they took over the defense, they

15   being us, they could do it.  And they certainly could

16   control the defense from them on.

17           So the issue is what -- the only issue under Third

18   Circuit law is whether they got notice in time.  All the

19   other things are really red herrings.  If they have 14

20   months to go to trial, they got notice in time and their

21   insurance cases don't show otherwise.

22           Thank you, Your Honor.

23           THE COURT:  Thank you, Mr. Baldwin.

24           Anything further?

25           MR. GRASSMICK:  No.

Page 94

1          MR. BALDWIN:  No, Your Honor.

2          THE COURT:  All right.  Well, I've got a volume of

3   material to review.  I've got the arguments to consider.

4   And I will do so and I'll go back and write something and

5   issue it.

6          It's an important decision I recognize because it

7   certainly implicates the motions for summary judgment and I

8   take the matter very seriously.

9          So I appreciate the argument.  I think you.  I

10  know -- I know that it's created a little bit of, oh,

11  emotion among counsel.  But hopefully we'll get past that

12  and move on.

13         All right.  So I thank you all.  I wish you safe

14  travel and we'll stand in recess.

15      (A chorus of thank you)

16          THE COURT:  Thank you, everyone.  Thank you.

17  Thank you.

18      (Whereupon, proceedings concluded at 3:52 p.m.)

19

20

21

22

23

24

25

Page 95

1                    I N D E X

2

3                    RULINGS

4   DESCRIPTION                        PAGE    LINE

5   Hearing on Evidentiary Matters Regarding

6   Motion for Summary Judgment Pursuant to Fed.

7   R. Bankr. P. 7056 for Partial Allowance and

8   Partial Disallowance of Claim No. 7021,

9   Filed By Norfolk Southern Railway Company

10  [Docket No. 929575] and Norfolk Southern

11  Railway Company's Cross-Motion for Summary

12  Judgment Allowing Claim No. 7021 [Docket No.

13  32825] and related matters            --      --

14

15

16

17

18

19

20

21

22

23

24

25

1           C E R T I F I C A T I O N

2

3       I, Sherri L. Breach, CERT*D-397, certified that the

4   foregoing transcript is a true and accurate record of the

5   proceedings.

6
    Sherri L.          Digitally signed by Sherri L. Breach
7                       DN: cn=Sherri L. Breach, o=Veritext,
    Breach              ou, email=digital@veritext.com,
                        c=US
8   _____    Date: 2017.06.30 15:29:14 -04'00'

9   Sherri L. Breach

10  AAERT Certified Electronic Reporter & Transcriber CERT*D-397

11

12  Date:  June 30, 2017

13

14

15

16

17

18

19

20

21

22  Veritext Legal Solutions

23  330 Old Country Road

24  Suite 300

25  Mineola, NY 11501