# EXHIBIT A

**Montana Complaints Filed Against MCC**

Roger Sullivan
Allan M. McGarvey
John Lacey
McGarvey, Heberling, Sullivan & Lacey, P.C.
345 First Avenue East
Kalispell, MT 59901
(406) 752-5566
*Attorneys for Plaintiff*

MONTANA EIGHTH JUDICIAL DISTRICT, CASCADE COUNTY

| | |
|---|---|
| SUE C. O'NEILL,<br><br>    Plaintiff,<br><br>vs.<br><br>MARYLAND CASUALTY COMPANY, a Maryland Corporation; ROBINSON INSULATION COMPANY, a Montana Corporation for profit; and DOES A-Z,<br><br>    Defendants. | CAUSE NO. _____<br><br>***ASBESTOS RELATED CASE***<br><br><br><br>**COMPLAINT AND DEMAND<br>FOR JURY TRIAL** |

## PARTIES

1. Plaintiff is a resident of Lincoln County (Troy), Montana.

2. Defendant Maryland Casualty Company (Maryland Casualty) is a Maryland corporation with its principal place of business in Maryland.

3. Robinson Insulation Company (Robinson Insulation) is or was a Montana business corporation for profit with its principal place of business in Great Falls, Cascade County, Montana where Robinson Insulation operated a vermiculite expansion plant. Robinson Insulation engaged in conduct that resulted in the accrual of this tort action in Montana.

4. Does A - Z are corporations or persons, whose identities are unknown at

this time, and whose negligence and wrongful acts caused asbestos related bodily injuries in the listed Plaintiff. Plaintiff will seek to amend their complaint when the true names and capacities of Does A - Z are ascertained.

5.      Maryland Casualty and Robinson Insulation engaged in conduct that resulted in the accrual of this tort action in Montana.

6.      Venue in this action is proper in Cascade County, Montana, because at least one of the Defendants, Robinson Insulation, engaged in tortious conduct within Cascade County and is a resident of Cascade County.

7.      This Complaint is filed to protect statutes of limitations.

## GENERAL ALLEGATIONS

8.      Strip mining, processing and transportation of vermiculite ore, intermixed with a highly toxic form of asbestos, were conducted in the Libby area from approximately 1923-1990. Over the nearly 70 years of vermiculite mining operations, the top several hundred feet of Vermiculite Mountain, located outside of Libby, Montana, was removed. Millions of tons of asbestos contaminated vermiculite ore was excavated, processed and shipped into and out of Libby.

9.      The Plaintiff lived in homes contaminated with asbestos carried home on the clothing of workers at W.R. Grace including between 1963 and 1968.

10.     Plaintiff was ignorant of the nature and extent of the life threatening risks and injury arising from her exposure to asbestos.

## FIRST CLAIM
### Negligence in provision of industrial hygiene services
### v. Maryland Casualty (including transferred intent liability)

11.     All paragraphs above are incorporated by this reference.

12.     Maryland Casualty provided professional industrial hygiene services to address the safety of the mine and mill work site through what were represented to be competent Safety Engineers and professionals from the Engineering Division and the Medical Division of Maryland Casualty, under the supervision of industrial hygienist L.E. Park.

13.     From its first undertaking at the Mine facility, Park and others in the

Accident Prevention Department at Maryland Casualty knew that they "had an outstanding pneumoconiosis occupational disease exposure," and "soon learned that there were 30 employees who lacked normal lung function."

14.     Maryland Casualty knew that the 1959 series of chest x-rays on the Libby workers showed a one-third incidence of abnormal chest x-rays.

15.     Maryland Casualty knew that the 1964-1973 annual series of chest x-rays on the Libby workers showed a 25% plus incidence of abnormal chest x-rays.

16.     Maryland Casualty knew that a 1965 study showed 20% incidence of asbestosis in the Libby workers, with a likely incidence of twice that upon thorough testing.

17.     Maryland Casualty knew or should have known that from 1961 forward, men were dying of asbestos disease, and that each year more became diseased.

18.     Maryland Casualty knew or should have known that there were no showers for workers, no coveralls for workers, and that workers went home and into the community covered with asbestos dust, which was hazardous to all those who might come into contact with it.

19.     As part of its industrial hygiene services, Maryland Casualty's Engineering Division and Medical Division undertook to "engineer this risk," and undertook to design a "program for control and prevention" of asbestos dust and disease for the benefit of workers, their families and the community that would address dust control and personal protection from asbestos dust.

20.     In its provision of industrial hygiene services and its undertaking of industrial hygiene measures, Maryland Casualty had a duty of reasonable care to those (including workers, their families and the community) relying on the fulfillment of safe standards of industrial hygiene, and to those who were in need of disclosure of the nature and degree of the asbestos hazard known to Maryland Casualty.

21.     Maryland Casualty was negligent in their design of the industrial hygiene program, and in failing to disclose and disseminate, to the workers and individuals at risk, the nature and degree of the asbestos hazard Maryland casualty had acquired and

analyzed by its industrial hygiene professionals. Maryland Casualty was negligent:

(a)   in failing to include sufficient measures for education of workers, in the hazards of asbestos exposure;

(b)   in failing to include measures to warn workers, their families, and the community of the hazards of asbestos exposure;

(c)   in failing to include sufficient measures and standards for dust control through housekeeping, ventilation and exhaust air cleaning;

(d)   in failing to include sufficient measures and standards for maintenance of equipment and premises;

(e)   in failing to include a sufficient medical monitoring program;

(f)   in failing to disclose the nature and degree of the immediate and extreme asbestos hazard known to the professionals at Maryland Casualty;

(g)   in failing to sufficiently test and monitor the effectiveness of dust control at all locations where there was dust;

(h)   in failing to obtain available medical information on the incidence of disease and deaths at the Grace operations including from public agencies; and

(i)   in failing to sufficiently study and use the information on dust control and asbestos disease that it did have.

22.   Maryland Casualty undertook to address industrial hygiene concerns including prescription of warnings and worker education of the asbestos hazard for the mine and mill workers, their families and the community.

23.   By reason of its inspection, safety engineering and its knowledge of an undisclosed hazard, Maryland Casualty owed a duty of care to the mine and mill workers, their families and to the members of the Libby community to assure that warnings were designed to reasonably inform those at risk:

(a)   of the level of asbestos in the workplace;

(b)   of the hazards of asbestos carried home on workers' clothes;

(c)   of the toxicity of the asbestos and nature and degree of the health hazard and deadly health effects of asbestos inhalation;

(d)   of the hidden nature of the hazard, that its deadly effects operated invisibly and without obvious signs of irritation or harm, and that its

latent deadly effects would first manifest many years after what would, to the uneducated layman, would be an apparent innocuous exposure to harmless dust; and

(e)    of the means to limit exposure in the workplace and at home, such as changing and washing procedures that kept work clothes out of the home, and training on where, when and what type of respirator devices needed to be worn to keep the worker safe.

24.    As part of its industrial hygiene services and the creation of a program for control and prevention of asbestos disease, Maryland Casualty failed to design and prescribe the necessary warnings.

25.    Maryland Casualty was negligent in their design of the warning and education aspects of the safety program in that it failed:

(a)    to include sufficient measures for education of workers, in the hazards of asbestos exposure;

(b)    to include sufficient measures for apprising the workers of the high levels of asbestos dust at the worksite;

(c)    to include sufficient warnings and measures to apprise workers of consequences of unprotected exposure to asbestos dust at levels regularly encountered in the workplace;

(d)    to include sufficient measures to warn and apprise workers of the dangers of transporting work clothes to their homes; and

(e)    to include warnings and measures to warn workers, their families and the community of the hazards of asbestos exposure in a manner that met industrial hygiene standards for warnings of a hidden and deadly hazard.

26.    Maryland Casualty suppressed disclosure of inspection reports and hazard information that would have apprised workers of the fact, nature, and degree of the asbestos hazard.

27.    Maryland Casualty breached its duties to report injuries to the Montana Industrial Accident Board, and to deal with candor and in good faith with that Board and Grace workers with asbestos injury.

28.    Maryland Casualty's industrial hygienist and other representatives with expertise in industrial hygiene undertook a professional inspection of the Grace Libby

operations.

29.     In so doing, Maryland Casualty had a duty of reasonable care to the Libby workers, their families and to the community.

30.     Maryland Casualty was negligent in inspection of the Grace Libby operations, in failing to disclose to workers the nature and degree of the hazard and in failing to act upon known hazardous conditions due to insufficient worker education, insufficient warnings to workers, their families and to the community, insufficient dust control (including housekeeping, ventilation, exhaust air cleaning and maintenance), and insufficient medical monitoring.

31.     Workers had no coveralls and no showers.  As a result, workers, including Grace workers with whom Plaintiff lived, went home with asbestos dust on their clothing and in their cars, thereby contaminating her home and other homes with asbestos dust.

32.     At all times Plaintiff was ignorant of the nature and extent of the life threatening risks and injury involved, and would not have continued to live in such an environment if she had known the true facts.

33.     Without knowledge of the nature and extent of the asbestos hazard, Plaintiff was denied the options of avoiding exposure and protecting her home and family.

34.     Maryland Casualty's non-disclosure and suppression of the asbestos hazard and reports and information relating thereto was done in order to hide from the workers the nature and degree of the hazard and the fact that workers had rights to occupational disease benefits for their injurious exposures under MODA which Maryland Casualty would owe a direct duty to pay. With asbestosis experienced at a rate of 41.5% of Mine workers with over 10 years of service, and lung disease at a rate of 92% of Mine workers with 21-25 years of service, Maryland Casualty faced enormous cost of medical and/or disability benefit claims under MODA.

35.     Maryland Casualty's knowledge of, and motive with respect to, the impact of the suppressed facts on occupational disease claims included a November 25, 1967 letter to Maryland Casualty from the attorney it retained to defend the MODA claim of Zonolite worker Lilas D. Welch, attached as Exhibit 1.

36.     Suppressed and undisclosed facts included that "a great many of [Maryland Casualty's] insured's employees suffer from lung abnormalities"; the fact that asbestos fibers in "the dust in the mill did far exceed what were considered to be allowable concentrations" (see attached Exhibit 1 at p.1); the fact that not only the mill but "the entire yard area may subject workmen to what might be termed to be 'injurious exposure.'"

37.     The suppression and nondisclosure of the asbestos hazard and reports and information relating thereto was motivated by Maryland Casualty's realization that it had "a severe problem, and that [it] might expect a good many [MODA] claims involving asbestosis."

38.     Maryland Casualty deliberately suppressed warnings and sought to avoid disclosure of the asbestos hazard from the Libby Operations of W.R. Grace because it did not want "to expose the entire situation to ... the general public" and deliberately strategized to suppress inspection reports "to keep them out of the hands of ...the general public," as described in the November 25, 1967 letter attached as Exhibit 1.

39.     Maryland Casualty acted with knowledge and intention that workers at W.R. Grace were being harmed by the workplace and take-home exposures to asbestos and by the absence of warning and disclosure of the hazards of those exposures, such that Maryland Casualty is liable to all who were injured by exposures to asbestos from the Grace operations and/or by the concealed nature of the hazard under the rule of transferred intent.

40.     Maryland Casualty's acts and omissions were willful, reckless, and constituted actual malice. Although Maryland Casualty knew that its acts and omissions created a high probability of harm to the Plaintiff and to others that would be exposed to asbestos from Grace's Libby work site, Maryland Casualty nevertheless deliberately acted in conscious disregard for and indifference to this probability of harm such that it is appropriate to impose an assessment of punitive or exemplary damages in a sufficient amount to punish Maryland Casualty, deter similar conduct, and to serve as an example and warning to other legal entities similarly situated that conduct of the kind engaged in

by Maryland Casualty is unacceptable in our society.

41.    As a direct and proximate result of Maryland Casualty's negligence in performance of industrial hygiene professional services for the protection of workers and others, including inadequate warnings, inspections and disclosure of known hazards, Plaintiff suffers from asbestos disease, asbestos related bodily injuries, and has incurred damages as alleged herein.

## SECOND CLAIM
### Negligence v. Robinson Insulation

42.    All paragraphs above are incorporated by this reference.

43.    For many years, Defendant Robinson Insulation obtained asbestos contaminated vermiculite from Libby, Lincoln County, Montana.  Said asbestos contaminated vermiculite was transported by rail from Lincoln County to Great Falls, Cascade County, Montana, where Defendant Robinson Insulation expanded the asbestos contaminated vermiculite and processed it into various manufactured products.

44.    After expanding the deadly asbestos contaminated vermiculite and processing it into manufactured products, Robinson Insulation sold said vermiculite and vermiculite products to the J. Neils/St. Regis/Champion lumber mill in Libby and to others for use and for resale in Libby, Montana.  Said expanded vermiculite and vermiculite products were transported from Great Falls back to Libby and delivered to the said lumber mill and to other sites in Libby.

45.    Plaintiff was exposed to Defendant Robinson Insulation's unreasonably dangerous asbestos contaminated products, which Robinson Insulation wrongfully placed in the stream of commerce for use and consumption by the general public.

46.    During Plaintiff's period of exposure to asbestos and contaminated vermiculite, which was generated and released by Robinson Insulation's business activities, Robinson Insulation knew that extended exposure to asbestos was unreasonably dangerous and hazardous to an individual's health.  Nevertheless, Robinson Insulation concealed and failed to disclose such knowledge to their employees, the public, and the Plaintiff.  Robinson Insulation gave no indication that it was unsafe and in

fact a serious health hazard for Plaintiff to be exposed to asbestos generated and released by Robinson Insulation's business activities. Plaintiff was at all times ignorant of the nature and extent of the life threatening risk involved in exposure to the asbestos generated and released by Defendant's business activities.

47.     Robinson Insulation owed the Plaintiff a duty to act with reasonable care concerning their business operations, so as not to jeopardize their health and welfare from exposure to its asbestos contamination and asbestos products.

48.     Robinson Insulation breached its duty of care by negligently, carelessly, and recklessly generating, handling, storing, releasing, disposing of, and failing to control and contain unreasonably dangerous and hazardous asbestos created by and/or resulting from its for profit business operations.

49.     Although Robinson Insulation knew or had ample reason to know that its acts or omissions created a high degree of harm to the Plaintiff, it nevertheless deliberately acted in conscious disregard of and indifference to the risk imposed upon the Plaintiff by their continued exposure to asbestos.

50.     As a direct and proximate result of Plaintiff's exposure to asbestos-laced vermiculite generated and released by Robinson Insulation's business activities, Plaintiff suffers from asbestos disease, asbestos related bodily injuries, and has incurred damages as alleged herein.

### THIRD CLAIM
### Strict Products Liability v. Robinson Insulation

51.     All paragraphs above are incorporated by this reference.

52.     At times relevant to this action, Defendants Robinson Insulation and Wood Products Defendants were engaged in the business of manufacturing, fabricating, modifying, expanding, labeling, distributing, supplying, selling, marketing, packaging, and/or advertising multiple products containing vermiculite. Said vermiculite was laced with deadly asbestos.

53.     After expanding the deadly asbestos contaminated vermiculite and processing it into manufactured products, Robinson Insulation sold said vermiculite and vermiculite products to the Wood Products Defendants for use and for resale at their

lumber mill in Libby, Montana. Said expanded vermiculite and vermiculite products were transported from Great Falls back to Libby where the products were sold by the Wood Products Defendants to various parties for use on construction and other projects in Lincoln County.

54.    Defendants Robinson Insulation and Wood Products Defendants knew and intended that the above referenced vermiculite and asbestos contaminated products would be used without inspection for defects therein or in any of their component parts and without knowledge of the hazards involved in such use.

55.    Defendants Robinson Insulation and Wood Products Defendants distributed and/or sold said asbestos-laced vermiculite products to the public and to the Plaintiff.

56.    Said asbestos-laced vermiculite products were defective and unreasonably dangerous for their intended purpose in that the inhalation of asbestos fibers causes serious disease and/or death to humans. The defect existed in the said products at the time they left the possession of Defendant Robinson Insulation and Wood Products Defendants. Said products did, in fact, cause injury and damage to Plaintiff, while being used in a reasonably foreseeable manner, thereby rendering the same defective, unsafe, and unreasonably dangerous for use.

57.    Plaintiff did not know of the substantial danger of using said asbestos-laced vermiculite products, nor was said danger readily recognizable by them. Defendants Robinson Insulation and Wood Products Defendants further failed to adequately warn of the risk of contamination to which Plaintiff was exposed.

58.    As a direct and proximate result of the unlawful actions of Defendants Robinson Insulation and Wood Products Defendants and as a direct and proximate result of exposure to Robinson Insulation's and the Wood Products Defendants' unreasonably dangerous asbestos contaminated vermiculite products, Plaintiff suffers from asbestos disease, asbestos related bodily injuries, and incurred damages as alleged herein.

## FOURTH CLAIM
### Does A-Z

59.    All paragraphs above are incorporated by this reference.

60.    Does A-Z are corporations or persons unknown at this time whose

negligence and wrongful acts caused asbestos disease in the Plaintiff. Plaintiff will seek to amend their complaint when the true names and capacities of Does A-Z are ascertained.

## DAMAGES

61. All paragraphs above are incorporated by this reference.

62. As a direct and proximate result of the acts of the Defendants, the Plaintiff has suffered and will suffer:

    a.    Loss of enjoyment of established course of life;

    b.    Loss of services which can no longer be performed;

    c.    Loss of earnings and/or earning capacity;

    d.    Physical, mental and emotional pain and suffering;

    e.    Medical expenses, rehabilitation expenses and related expenses;

    f.    Loss of insurability for medical coverage;

    g.    Loss of medical and disability benefits, including those available under the Montana Workers' Compensation Act; and

    h.    Great grief and sorrow.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays for damages against the Defendants as follows:

1. Reasonable damages for lost enjoyment of established course of life, past and future;

2. Reasonable damages for loss of services which can no longer be performed;

3. Reasonable damages for physical, mental and emotional pain and suffering, past and future.

4. Reasonable damages for medical expenses, rehabilitation expenses, and related expenses incurred to date and reasonable certain to be incurred in the future;

5. Advance payment of past and present medical expenses and special damages not reasonably in dispute;

6. Reasonable damages for loss of earnings and/or earning capacity;

7. Reasonable damages for grief and sorrow;

8. For costs of suit;

9. For punitive damages; and

10.    For such further relief as is just and equitable under the circumstances.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

DATED this _____ day of April, 2018.

<div style="margin-left: 40%;">

McGARVEY, HEBERLING, SULLIVAN
& LACEY, P.C.

By:    _____
ROGER SULLIVAN
ALLAN McGARVEY
JOHN F. LACEY
Attorneys for Plaintiff

</div>

**EXHIBIT 92a, p.2**

O-32

> . . . the asbestos problem has existed certainly since 1956, and generally with increasing severity.

> Nevertheless, as I informed you, I would hesitate to allow in evidence the State Board reports if it is possible to keep them out of the hands of the Industrial Accident Board, and through it, the general public.

-4-

Many recommendations were presented by the State Board, and it would appear insured gradually attempted to correct the situation. It must however further be considered that it might appear to others that the action taken by insured might not to correct the situation which was presented, might not to the unbiased observer, appear to have been either extremely effective, or quickly performed.

State Board records reveal that additional recommendations were made in 1959, and at that time actual dust samples in the dry mill had revealed an asbestos content, which, while not extremely severe, was, in the words of the Board report "significant".

In 1962, dust samples revealed a high asbestos content, and the Board's conclusion at that time were that "no progress had been made in reducing dust concentrations in the dry mill to an acceptable level, and that indeed the dust concentrations had been increased substantially..." Further recommendations were made relative to alleviation of the problem.

In 1963, concentrations again were determined to be well in excess of "acceptable levels" and at that time the State Board recommended that "considerable effort should be made immediately to improve the dust control procedures at the plant to reduce dustiness to an acceptable level".

A study of the information furnished by the State Board would therefore make it appear that the asbestos problem has existed certainly since 1956, and generally with increasing severity. It does however now appear that preventive measures have, at least commenced having effect, and according to Mr. Lovick, it would seem that considerable strides have been made within the last couple of years.

Nevertheless, as I informed you, I would hesitate to allow in evidence the State Board reports if it is possible to keep them out of the hands of the Industrial Accident Board, and through it, the general public.

...le I have not researched the problem, it has even ...urred to me that insured's inability to curb the problem ... the State Board's recommendations through the years, ...ht be alleged at least to have constituted willful and ...ton conduct on its part, with whatever complications ...t particular charge might carry with it.

EXHIBIT 1
to O'NEILL
COMPLAINT

# EXHIBIT 92a, Page 3

"... The only persons aware of the studies are the insured's officials, and Dr. Little. ... I would much like to avoid having evidence presented ... which would reveal the extent and severity of the problem."

-5-

further, Mr. Lovick, for the first time, thought to advise me of certain studies which have been conducted by a local Radiologist since around 1963 or 1964, which apparently have involved obtaining annual x-rays of all employees for study. The information furnished by Mr. Lovick was to the effect that the Radiologist was convinced that a good many of the employees suffered from lung abnormalities which could be the result of encroaching asbestosis.

This information of course appeared to me to be of extreme importance, and we made arrangements to travel to Whitefish, Montana immediately to interview the Radiologist. The party involved, Dr. William Little, informed me that his studies most certainly did indicate there to be present a great deal of lung abnormalities among the insured's employees, far in excess of the percentage one would find in examining the ordinary population, and he did in addition point out that the situation was even more severe, when considering that he was in general examining young, hearty male workmen.

Dr. Little stated that we did indeed have a severe problem, and that we might expect a good many claims involving asbestosis.

He did further indicate however that in his view, the more recent steps taken by the insured to alleviate the problem were having their effect, in that it appeared to him from his most recent studies, that a lesser percentage existed of new or previously non-discovered abnormalities, as well as some decrease in the speed of the progress of the disease in those workers suffering from it throughout the course of his studies.

We might point out that apparently the only persons aware of the studies are the insured's officials, and Dr. Little. Again, as you may well realize, I would much like to avoid having evidence presented by the opposing party which would reveal the extent and severity of the problem with which we are concerned.

Claimant Welch had been employed in the warehouse situate in the yard at the mill site since 1956, or from a time three years prior to Montana's adoption of the Industrial Disease Act. In addition, "asbestosis" was not added as a compensable industrial disease until 1965.

# EXHIBIT 92a, Page 5

-5-

" . . . you might wish to seriously consider a compromise settlement in hopes of, in this manner, avoiding the necessity of exposure of all the more damaging aspects of our own situation at the Hearings . . . "

At any rate, the problem now presented is that claimant which may well have suffered "an injurious exposure" as that term may be defined in the Occupational Disease Act, at most every point he was employed, including the ware-house. The fact also now must be considered that a great many of Insured's employees suffer from lung abnormalities and a good many of them have probably never been in the mill, which of course simply means that they are contracting the disease in the yard or in fact at any point there a dust condition may exist.

I had explained to Dr. Oscar Sauder, of Milwaukee, Wisconsin, in a recent conference, my own theory of defense concerning exposure at the warehouse, however in reviewing the Patholo-gist's report, and report of Dr. Thomas Power, retained by the Industrial Accident Board to perform a biopsy on claim-ant Welch, Dr. Sauder felt that Mr. Welch must have suffered injurious exposure even while employed in the warehouse.

He advised that he did not feel he could assist us in any way at the Hearing, in that all information available to him would indicate that the claim might well be compensable. He has now provided me with his written report in this respect, copy of which I am attaching, and you will notice that he feels claimant must have suffered a considerable exposure not only in the mill in 1949, but also in the warehouse since 1956.

When all of the above developed so rapidly, it occurred to me that discretion might be the better part of valor in the instant case, and that you might wish to seriously consider a compromise settlement in hopes of, in this manner, avoiding the necessity of exposure of all of the more damaging aspects of our own situation at the Hearings . . . . It was my feeling that when considering the studies made by insured's own radiologist, that the problem of asbestosis among insured's employees might better be met through a continued attempt by the employer to alleviate the dust problem prior to facing either the Industrial Accident Board, or a competent claimant's attorney.

As you are aware of course, this matter has been set down for Hearing in Kalispell on November 29, 1967. I attempted to obtain a stay through counsel representing claimant. He advised however that his own client was becoming so impatient that he simply could not agreed to a delay at this time, and accordingly if there is any hope of avoiding a Hearing, it must necessarily involve attempting to obtain some authority and disposing of the matter prior to that date.

# EXHIBIT 92a, p.7

> . . . it would appear that it will be necessary to expose the entire situation to the Industrial Accident Board, whose records may well be available to unions and the general public.

-7-

It is my feeling that we may attribute our present situation primarily to the fact that it appears that no one has ever quite realized the extent of the problem which exists. Certainly Mr. Lovick, who has been extremely cooperative and helpful, felt that there was not a contamination problem present at any point other than at the dry mill itself, and possibly at the loading and unloading hoppers. Now however, we find that dust from the mill itself may from time to time permeate the entire yard, and of course it may well be argued, and perhaps with some validity due to the incorrectly placed exhaust, that the entire yard area may subject workmen to what might be termed to be "injurious exposure". Mr. Lovick does inform that funds are now available which will allow moving the exhaust, and correcting that particular problem.

I might point out that the Radiologist involved, Dr. Little did mention his amazement at the percentage of workers presenting lung abnormalities at the insured's plant, as compared to a problem such as silicosis at a typical mine. His own explanation was that generally in a mine, the only persons directly exposed are the hard-rock miners themselves, and then only on those occasions when silican dioxide is existent in the ore, and he differentiates that situation from our own where the entire area may from time to time be permeated with injurious dust.

I believe it should be further pointed out that we have no genuine guidelines to assist us in approaching this problem. As I understand from information furnished by Mr. Lovick, the Libby, Montana Vermiculite mine and plant may well be the only one in the world where an identical situation exists, and while the problem of asbestosis has been subject to considerable study, it has generally involved either asbestos miners, or persons working with asbestos in some commercial form. In our case, we are concerned primarily with Tremolite, an extremely short fiber asbestos which cannot be used for commercial purposes, and which accordingly has not figured in previous studies.

As I informed you in our telephone conversation, it may be that I can obtain a favorable decision in the instant case on technicalities alone, however it would appear that it will be necessary to expose the entire situation to the Industrial Accident Board, whose records may well be available to unions and the general public. Most certainly claimant's counsel around the area are going to be well aware of the existence of the problem if all information is placed in evidence.

November 25, 1967

<u>AIR MAIL</u>

Maryland Casualty Company
1415 East Ankey Street
Portland, Oregon

ATTENTION: John Hopkins

Re: Your Claim No:   750 C 890
Insured:             W. R. Grace & Co.
                     (Zonolite Division)
Claimant:            LILAS D. WELCH
Policy:              R 001598

Dear Mr. Hopkins:

This will confirm our recent telephone conversation concerning the above matter. As I informed you at that time, very recent developments in the case seem to me to require that we re-assess our own position, and as Mr. Robert Conley, of American Adjustment Company, was not available, we contacted you direct, and in accordance with your suggestions, I am forwarding this report to you, with copy to Mr. Conley.

At the time I contacted you, I was conferring with Mr. Earl Lovick, of the insured's Libby, Montana offices, and we had thoroughly reviewed all phases of the case. In addition, we had gone over all material provided by the Montana State Board of Health, and had discussed the entire situation with Mr. Benjamin F. Wake, the State Board's Chief Industrial Hygiene Engineer with the Division of Disease Control.

As we were of course earlier aware through reports furnished insured by the State Board of Health, the original plant inspection conducted in 1956 revealed a dust problem in the dry mill. At that time however, the asbestos content of the dust had not been determined.

Through the years however, the plant inspections did reveal asbestos content, and of course the percentage of such fibers found to exist in the dust in the mill did far exceed what were considered to be allowable concentrations.



EXHIBIT
92a

-2-

Many recommendations were presented by the State Board, and it would appear insured gradually attempted to correct the situation. It must however further be considered that it might appear to others that the action taken by insured to correct the situation which was presented, might not to the unbiased observer, appear to have been either extremely effective, or quickly performed.

State Board records reveal that additional recommendations were made in 1959, and at that time actual dust samples in the dry mill had revealed an asbestos content, which, while not extremely severe, was, in the words of the Board report "significant".

In 1962, dust samples revealed a high asbestos content, and the Board's conclusions at that time were that "no progress had been made in reducing dust concentrations in the dry mill to an acceptable level, and that indeed the dust concentrations had been increased substantially...." Further recommendations were made relative to alleviation of the problem.

In 1963, concentrations again were determined to be well in excess of "acceptable levels" and at that time the State Board recommended that "considerable effort should be made immediately to improve the dust control procedures at the plant to reduce dustiness to an acceptable level".

A study of the information furnished by the State Board would therefore make it appear that the asbestos problem has existed certainly since 1956, and generally with increasing severity. It does however now appear that preventive measures have at least commenced having effect, and according to Mr. Lovick, it would seem that considerable strides have been made within the last couple of years.

Nevertheless, as I informed you, I would hesitate to allow in evidence the State Board reports if it is possible to keep them out of the hands of the Industrial Accident Board, and through it, the general public.

While I have not researched the problem, it has even occurred to me that insured's inability to curb the problem at the State Board's recommendations through the years, might be alleged at least to have constituted willful and wanton conduct on its part, with whatever complications that particular charge might carry with it.

-5-

Further, Mr. Lovick, for the first time, thought to advise me of certain studies which have been conducted by a local Radiologist since around 1963 or 1964, which apparently have involved obtaining annual x-rays of all employees for study. The information furnished by Mr. Lovick was to the effect that the Radiologist was convinced that a good many of the employees suffered from lung abnormalities which could be the result of encroaching asbestosis.

This information of course appeared to me to be of extreme importance, and we made arrangements to travel to Whitefish, Montana immediately to interview the Radiologist. The party involved, Dr. William Little, informed me that his studies most certainly did indicate there to be present a great deal of lung abnormalities among the insured's employees, far in excess of the percentage one would find in examining the ordinary population, and he did in addition point out that the situation was even more severe, when considering that he was in general examining young, hearty male workmen.

Dr. Little stated that we did indeed have a severe problem, and that we might expect a good many claims involving asbestosis.

He did further indicate however that in his view, the more recent steps taken by the insured to alleviate the problem were having their effect, in that it appeared to him from his most recent studies, that a lesser percentage existed of new or previously non-discovered abnormalities, as well as some decrease in the speed of the progress of the disease in those workers suffering from it throughout the course of his studies.

We might point out that apparently the only persons aware of the studies are the insured's officials, and Dr. Little. Again, as you may well realize, I would much like to avoid having evidence presented by the opposing party which would reveal the extent and severity of the problem with which we are concerned.

Claimant Welch had been employed in the warehouse situate in the yard at the mill site since 1956, or from a time three years prior to Montana's adoption of the Industrial Disease Act. In addition, "asbestosis" was not added as a compensable industrial disease until 1965.

-4-

No dust counts had been obtained in the warehouse or yard area by the State Board, and it appeared that no information with respect to contamination of those areas was available.

I understood that insured's own engineers were never able to find a measurable amount of dust in the yard area, and accordingly it was my thought that our primary defense would rest upon the fact that claimant's last injurious exposure must have been prior to the effective date of the Act, and the inclusion of asbestosis.

As you know however, I have felt that the Industrial Accident Board would require us to provide all available relevant information obtained by the State Board of Health, and while we were willing to admit the existence of asbestos fibers in the dust in the dry mill, it was not felt that tests there conducted were truly relevant to the issues in this case involving employment in the warehouse.

In a letter to me of June 28, 1967, Mr. Robert Swanberg, Chairman of the Industrial Accident Board, had urged a "full disclosure of all pertinent material on this question to avoid controversies that will merely prolong the litigation without materially effecting its outcome", and further discussions with him made it appear that he agreed that a total disclosure of all information in the State Board's hands might well not be justified in the instant case.

Now however, I am informed by Mr. Wake, of the State Board of Health, that while he had limited his own dust counts to the dry mill, he did believe that a problem would exist with respect to the drillers in the mine itself, as well as with respect to truck drivers loading and unloading under and into hoppers. Further, while this information did not appear in any of his reports, he stated that the exhaust at the mill was so placed as to create a dust problem in the yard itself. The warehouse is located in the yard, and accordingly it would now appear that the entire area may be considered to be possibly permeated with concentrations of asbestos fiber in excess of allowable percentages.

Mr. Lovick has now advised that the company did receive a request from union officials to change the mill exhaust around a year ago, and my recollection is that Mr. Wake had made such a recommendation, however apparently on an oral basis.

-5-

At any rate, the problem now presented is that claimant Welsh may well have suffered "an injurious exposure" as that term may be defined in the Occupational Disease Act, at most every point he was employed, including the warehouse. The fact also now must be considered that a great many of insured's employees suffer from lung abnormalities and a good many of them have probably never been in the mill, which of course simply means that they are contracting the disease in the yard or in fact at any point where a dust condition may exist.

I had explained to Dr. Oscar Sander, of Milwaukee, Wisconsin, in a recent conference, my own theory of defense concerning exposure at the warehouse, however in reviewing the Pathologist's report, and report of Dr. Thomas Power, retained by the Industrial Accident Board to perform a biopsy on claimant Welsh, Dr. Sander felt that Mr. Welsh must have suffered injurious exposure even while employed in the warehouse.

He advised that he did not feel he could assist us in any way at the Hearing, in that all information available to him would indicate that the claim might well be compensable. He has now provided me with his written report in this respect, copy of which I am attaching, and you will notice that he feels claimant must have suffered a considerable exposure not only in the mill in 1949, but also in the warehouse since 1956.

When all of the above developed so rapidly, it occurred to me that discretion might be the better part of valor in the instant case, and that you might wish to seriously consider a compromise settlement in hopes of, in this manner, avoiding the necessity of exposure of all of the more damaging aspects of our own situation at the Hearings rooms. It was my feeling that when considering the studies made by insured's own Radiologist, that the problem of asbestosis among insured's employees might better be met through a continued attempt by the employer to alleviate the dust problem prior to facing either the Industrial Accident Board, or a competent claimant's attorney.

As you are aware of course, this matter has been set down for Hearing in Kalispell on November 29, 1967. I attempted to obtain a stay through counsel representing claimant. He advised however that his own client was becoming so impatient that he simply could not agreed to a delay at this time, and accordingly if there is any hope of avoiding a Hearing, it must necessarily involve attempting to obtain some authority and disposing of the matter prior to that date.

-6-

As you explained to me in our telephone conversation of
November 22, 1967, you did not feel we would be in a
position to obtain such authority without this written
report, and I am accordingly forwarding it to you at the
first opportunity.

I may say that it now appears that counsel intends at the
Hearing of November 29, to establish his record through
claimant himself, as well as other employees who may be
expected to testify in general terms as to the dust problem
at the mill, and most probably at other points around the
premises.

In addition, it appears that counsel has subpoenaed insured's
Safety Engineer, who we would assume, is well aware of the
major aspects of our problem, and a good bit of damaging
testimony may get into the record at that time.

On the other hand however, I do not believe counsel intends
to attempt at that time to obtain reports of the State Board
of Health, and in fact, Mr. Swanberg of the Industrial Accident
Board has indicated to me that he may well continue the Hearing,
resetting it in Helena at a later date to pick up this
information.

In this latter regard, I am now convinced that we have a
good argument with respect to the privileged character of
State Board reports, through a provision included in the
Session Laws of 1967 relating to State Board of Health
records and information.

As indicated on previous occasions however, I simply do not
feel when considering the extent of the problem here
presented, that we can afford to antagonize the Industrial
Accident Board by refusing to be at least somewhat candid
in making information available upon which it may make a
reasonable decision.

The question of relevancy now of course presents difficulty,
in that if dust from the mill is being exhausted in the
yard area where the warehouse is situate, the content of
the dust at the dry mill may well be considered to relate
directly to Mr. Welch's condition.  Even our own expert,
Dr. Oscar Sander, would be forced to hold to this view,
were he in fact examined.

-7-

It is my feeling that we may attribute our present situation primarily to the fact that it appears that no one has ever quite realized the extent of the problem which exists. Certainly Mr. Lovick, who has been extremely cooperative and helpful, felt that there was not a contamination problem present at any point other than at the dry mill itself, and possibly at the loading and unloading hoppers. Now however, we find that dust from the mill itself may from time to time permeate the entire yard, and of course it may well be argued, and perhaps with some validity due to the incorrectly placed exhaust, that the entire yard area may subject workmen to what might be termed to be "injurious exposure". Mr. Lovick does inform that funds are now available which will allow moving the exhaust, and correcting that particular problem.

I might point out that the Radiologist involved, Dr. Little did mention his amazement at the percentage of workers presenting lung abnormalities at the insured's plant, as compared to a problem such as silicosis at a typical mine. His own explanation was that generally in a mine, the only persons directly exposed are the hard-rock miners themselves, and then only on those occasions when silican dioxide is existent in the ore, and he differentiates that situation from our own where the entire area may from time to time be permeated with injurious dust.

I believe it should be further pointed out that we have no genuine guidelines to assist us in approaching this problem. As I understand from information furnished by Mr. Lovick, the Libby, Montana Vermiculite mine and plant may well be the only one in the world where an identical situation exists, and while the problem of asbestosis has been subject to considerable study, it has generally involved either asbestos miners, or persons working with asbestos in some commercial form. In our case, we are concerned primarily with Tremolite, an extremely short fiber asbestos which cannot be used for commercial purposes, and which accordingly has not figured in previous studies.

As I informed you in our telephone conversation, it may be that I can obtain a favorable decision in the instant case on technicalities alone, however it would appear that it will be necessary to expose the entire situation to the Industrial Accident Board, whose records may well be available to unions and the general public. Most certainly claimant's counsel around the area are going to be well aware of the existence of the problem if all information is placed in evidence.

-8-

Additionally, when considering the most recent develop-
ments, it would appear to me that the Industrial Accident
Board might well ignore technicalities and determine the
instant claim to be compensable, allowing us to test its
decision at the District or Supreme Court level.

At the time I contacted counsel relative to a possible
stay of the proceedings, I informed him that we might be
willing to consider some sort of compromise in order to
avoid the expense of proceeding further.  I asked if he
had a figure of his own in mind, and was informed that
he did not, and I am accordingly unable to provide you
with any information to pass along concerning possible
compromise and settlement.

We will of course advise you of all developments as they
occur, and should you wish to discuss the matter further
personally, I would appreciate your contacting me by
telephone.  In this regard, I will be in other industrial
accident Hearings on Monday and Tuesday, November 27 and
28, however arrangements for such discussion can be made
through my personal secretary, Mrs. Klehm, should it be
necessary.

I am at this time attaching statement submitted by Dr.
Oscar Sander in the sum of $50.00, and request that draft
in payment be issued and forwarded to this office, in order
that we may personally thank the Doctor for his assistance.

Sincerely,

S. Y. Larrick

SYL/nk

Enclosures:    Dr. Sander's Report
               Dr. Sander's Statement

CC:  Mr. Robert Conley
     American Adjustment Company
     Great Falls, Montana 59401
     (With Enclosures as Listed Above)
     Your File:  1 C 34-016160

Roger Sullivan
Allan M. McGarvey
John Lacey
McGarvey, Heberling, Sullivan & Lacey, P.C.
345 First Avenue East
Kalispell, MT 59901
(406) 752-5566
*Attorneys for Plaintiff*

MONTANA EIGHTH JUDICIAL DISTRICT, CASCADE COUNTY

| | |
|---|---|
| BARBARA HUNT, Personal Representative for the Estate of ROBERT J. HUNT, deceased, | **CAUSE NO. BDV-02-924** |
| Plaintiff, | |
| vs. | |
| FISCHBACH AND MOORE, INCORPORATED, a Foreign Corporation for Profit; FISCHBACH AND MOORE ELECTRIC, INC., a Foreign Corporation for Profit; FISCHBACH POWER SERVICES, INC., a Foreign Corporation for Profit; FISCHBACH CORPORATION, a Delaware Corporation for Profit; FISCHBACH AND MOORE ELECTRIC, LLC, a Limited Liability Company; FISCHBACH, LLC, a Limited Liability Company; ATLANTIC RICHFIELD COMPANY, a Foreign for Profit Corporation; THE ANACONDA COMPANY, a Montana For Profit Corporation; ANACONDA DELAWARE CORPORATION, a Foreign for Profit Corporation; ATLANTIC RICHFIELD DELAWARE CORPORATION, a Delaware For Profit Corporation; COLUMBIA FALLS ALUMINUM | **THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

COMPANY, a For Profit Corporation;
TIDE BAY. INC., a Corporation for Profit;
MARYLAND CASUALTY COMPANY, a
Maryland Corporation; ROBINSON
INSULATION COMPANY, a Montana
Corporation; DOES A - Z, Inclusive; and
DOES 1 - 1,000, Inclusive,

          Defendants.

COMES NOW Barbara Hunt, Personal Representative of the Estate of Robert J. Hunt, demanding trial by jury, and her complaint against the defendants alleges as follows:

## GENERAL ALLEGATIONS

1.    At all times mentioned hereinafter, Plaintiff is a resident and citizen of the State of Montana.

2.    Defendants Fischbach and Moore, Incorporated; Fischbach and Moore Electric, Inc.; Fischbach Power Services, Inc.; and Fischbach Corporation are or were business corporations for profit organized and existing under the laws of states other than Montana with principal places of business in states unknown to Plaintiff.

3.    Defendants Fischbach and Moore Electric, LLC and Fischbach, LLC are limited liability companies for profit organized and existing under the laws of states unknown to Plaintiff with principal places of business in states unknown to Plaintiff. [Hereinafter Defendants Fischbach and Moore, Incorporated; Fischbach and Moore Electric, Inc.; Fischbach Power Services, Inc.; Fischbach Corporation; Fischbach and Moore Electric, LLC; and Fischbach, LLC may be referred to from time to time as the "Fischbach and Moore Defendants.]

4.    Defendant The Anaconda Company is and/or was a business corporation for profit with its principal place of business in the State of Montana.

5.    Defendants Atlantic Richfield Company (ARCO), Atlantic Richfield Delaware Corporation, and The Anaconda Delaware Corporation are or were business corporations for profit organized and existing under the laws of states other than Montana

with principal places of business in states unknown to the Plaintiff. Defendants Atlantic Richfield Company (ARCO), Atlantic Richfield Delaware Corporation, and The Anaconda Delaware Corporation were involved in merger agreements, which ultimately resulted in the purchase and/or acquisition of Defendant The Anaconda Company by ARCO. As a result of the merger agreement and acquisition of The Anaconda Company, Defendants ARCO, Atlantic Richfield Delaware Corporation, and The Anaconda Delaware Corporation assumed liability for all claims which could have been brought against The Anaconda Company. For purposes of this action, the allegations and claims against The Anaconda Company are also allegations and claims against ARCO, Atlantic Richfield Delaware Corporation, and The Anaconda Delaware Corporation, as successor corporations. [The Anaconda Company, ARCO, Atlantic Richfield Delaware Corporation, and The Anaconda Delaware Corporation may be referred from time to time herein as the "ARCO Defendants."]

6.      Defendant Columbia Falls Aluminum Company is a business corporation for profit with its principal places of business in the State of Montana.

7.      Defendant Tide Bay, Inc. is a business corporation for profit organized and existing under the laws of a state unknown to Plaintiff and with its principal place of business in a state unknown to the Plaintiff.

8.      Defendant Maryland Casualty Company is a Maryland corporation with its principal place of business in Maryland.

9.      Defendant Robinson Insulation Company (Robinson Insulation) is or was a Montana business corporation for profit with its principal place of business in Great Falls, Cascade County, Montana where Robinson Insulation operated a vermiculite expansion plant. Robinson Insulation engaged in conduct in Cascade County that resulted in the accrual of this tort action in Montana.

10.     Defendants Does A through Z, inclusive, are legal entities, whose identity, capacities, and names are unknown to and not ascertained by the Plaintiff at this time. Plaintiff therefore brings this action against said Defendants by such fictitious names. The Plaintiff will seek leave to amend the complaint to state the true names and

capacities of Does A through J when the same have been ascertained, together with
further appropriate charging allegations. At all times relevant to this action Defendants
Doe A through Z were officers, employees, and/or agents of one or more of the named
Defendants, who were acting within the course and scope of their employment or agency
on behalf of the named Defendants, and were acting in the furtherance of the business
interests of the named Defendants. Defendants Does A through Z are and/or were the
administrators and/or managers of the named defendants' operations. Each unlawful act
or omission of Defendants Does A through Z, alleged herein, is imputable to the named
Defendants.

11.    The true names and capacities of the Defendants named herein as Does 1
through 1000, inclusive, are unknown to the Plaintiff, who therefore bring this action
against Does 1 through 1,000, inclusive, by such fictitious names. The Plaintiff will seek
leave to amend the complaint to state the true names and capacities of Does 1 through
1,000 when the same have been ascertained, together with further appropriate charging
allegations. The Plaintiff is informed, believe, and thereon allege that each of the
Defendants, fictitiously named Does 1 through 1,000, is legally responsible for the
occurrences herein alleged and that Plaintiff's damages as herein alleged were
proximately caused by said fictitiously named Defendants' unlawful acts or omissions.
Defendants Does 1 through 1,000, inclusive, are natural persons, corporations,
partnerships, joint ventures, or other legal entities who wrongfully and unlawfully caused
or contributed to Plaintiff's injuries and damages.

12.    This court has subject matter jurisdiction over this action and personal
jurisdiction over each of the parties.

13.    Venue in this action is proper in Cascade County, Montana, because one of
the Defendants is a resident of and engaged in tortious conduct within Cascade County.

14.    The Defendants' unlawful conduct caused Plaintiff Robert Hunt to be
exposed to and to inhale ferruginous bodies, fibrous silicate minerals, vermiculite dust,
asbestos dust, and/or other carcinogenic particles (herein referred to as "asbestos").

15.    Asbestos is an extremely deadly substance consisting of tiny needle like

fibers that are sharply pointed and easily penetrate and lodge in the linings of the lungs. Human lungs are unable to remove asbestos that has speared itself into lung tissue, and the asbestos spears cannot be washed out of the lung tissues by blood. As a result, affected lung areas become inflamed, in time heavily scarred, and ultimately nonfunctional. For those who undergo this disease process, it becomes increasingly more difficult to breathe. Ultimately, the person suffocates. The sinister effects of asbestos exposure are compounded by the fact that diseases caused by asbestos have long latency periods. It is not uncommon for persons to be first diagnosed with potentially fatal diseases many years following their initial exposure to asbestos.

16.     For many years, Defendant Robinson Insulation obtained asbestos contaminated vermiculite from Libby, Lincoln County, Montana. Said asbestos contaminated vermiculite was transported by rail from Lincoln County to Great Falls, Cascade County, Montana, where Defendant Robinson Insulation expanded the asbestos contaminated vermiculite and processed it into various manufactured products.

17.     After expanding the deadly asbestos contaminated vermiculite and processing it into manufactured products, Robinson Insulation sold said vermiculite and vermiculite products to the wood product company Defendants for use and for resale at their lumber mill in Libby, Montana. Said expanded vermiculite and vermiculite products were transported from Great Falls back to Libby where the products were sold by the wood product company Defendants and for use on construction projects in Lincoln County. Robinson Insulation also sold said expanded asbestos contaminated vermiculite and vermiculite products to The Anaconda Company and Columbia Falls Aluminum Company which were used at their Columbia Falls aluminum plant thereby exposing Robert J. Hunt to asbestos.

18.     Beginning in 1964 until 1974, Plaintiff Robert Hunt was employed by Tide Bay, Inc. and the Fischbach and Moore Defendants on construction projects in Libby and Columbia Falls, Montana, including construction projects at the W. R. Grace mine and mill (Grace Libby Facility) (1970-1971); the Libby lumber mill, owned by the wood product company Defendants (1973-1974); and the Columbia Falls aluminum plant

owned by The Anaconda Company and the Columbia Falls Aluminum Company (CFAC) (1964-1965). Throughout the entire period of said employment on each such construction project, Plaintiff Robert Hunt was required to work in work environments that exposed him to unreasonably dangerous asbestos fibers.

19.     Prior to Plaintiff Robert Hunt's employment with Tide Bay, Inc. and the Fischbach and Moore Defendants on said construction projects at the Grace Libby Facility; the Libby lumber mill; and the Columbia Falls aluminum plant, the Defendants knew that exposure to asbestos and inhalation of asbestos fibers was unreasonably dangerous and hazardous to human health, and knew or should have known that Plaintiff Robert Hunt's employment at the Grace Libby Facility, the Libby lumber mill, and the Columbia Falls aluminum plant would in fact injure Plaintiff Robert Hunt and his co-workers. Nevertheless, Defendants concealed such knowledge from the workers and advised that it was safe to work on said construction projects and on the premises where Plaintiff Robert Hunt was required to work. Throughout the period of his employment, Defendants failed to manage, to operate, and to supervise said construction projects and said premises with due regard for the unreasonably dangerous work conditions to which workers were exposed.

20.     During his employment with the Fischbach and Moore Defendants at the Grace Libby Facility, Plaintiff Robert Hunt was exposed to unreasonably hazardous and abnormally dangerous asbestos and asbestos contaminated vermiculite.

21.     During his employment with the Fischbach and Moore Defendants at the Libby lumber mill owned by the wood product company Defendants, Plaintiff Robert Hunt was exposed to unreasonably hazardous and abnormally dangerous asbestos and asbestos contaminated vermiculite.

22.     During his employment with Defendant Tide Bay, Inc. and the Fischbach and Moore Defendants at the Columbia Falls aluminum plant owned by Defendants. The Anaconda Company and CFAC, Plaintiff Robert Hunt was exposed to unreasonably hazardous and abnormally dangerous asbestos.

23.     Plaintiff Robert Hunt was also exposed to Defendant Robinson Insulation's

unreasonably dangerous asbestos contaminated products, which Robinson Insulation unlawfully placed in the stream of commerce for use and consumption by the general public, including the Plaintiff Robert Hunt, his co-workers, and his employers.

24.     All of the herein referenced acts and omissions were maliciously done by Defendants with the intent that innocent human beings, including Robert J. Hunt, would remain unaware of the hazards and extreme health risks associated with exposure to asbestos resulting from Defendant's business activities for profit. Although Defendants knew that their acts and omissions created a high degree of risk to Robert J. Hunt, his coworkers, and the public at large, and that the dangerous condition of the workplace and exposure to asbestos would in fact injure or harm Robert J. Hunt and his coworkers, Defendants nevertheless deliberately acted in conscious disregard for and indifference to the harm imposed upon Robert J. Hunt and his coworkers by the continuing exposure to abnormally dangerous asbestos and the conditions of employment created by Defendants.

25.     In 1963 W.R. Grace & Co. (Grace) purchased an existing vermiculite mine and mill in Libby, Montana (the Mine) from the Zonolite Company (Zonolite), in the process assuming all liabilities of Zonolite. Grace operated the Mine from 1963 until 1990. The vermiculite was intermixed with a highly toxic form of asbestos. The extraction of vermiculite from the ground and processing of it generated substantial airborne dust containing asbestos. The dust was produced at the mine site, as well as in the town of Libby where expansion, bagging, storage and transport facilities were located.

26.     The Grace/Zonolite workers were not provided with coveralls or showers. As a result workers went home and into the community with asbestos dust on their clothing and in their cars, thereby extending the asbestos exposure. Similarly, invisible asbestos fibers from the mining operations infiltrated a broad variety of Libby area work sites, forests, recreation areas, homes, gardens, and numerous other distinct locations, resulting in hundreds of distinct routes and circumstances of exposure.

27.     As a result of failing to control dust from the mining, milling, processing, bagging, transport and a variety of uses of the vermiculite, workers, family members,

members of the community, and others were exposed to the highly toxic asbestos.

28.     The Plaintiff was a member/resident of the community of Libby, Montana, and as such was distinctly exposed to asbestos in unique exposure events and in a wide variety of temporally separated, geographically distinct, and highly differentiated routes and circumstances. While the Plaintiff had repeated or continuous exposures, each of the Plaintiff's individual exposures are unique in time, location, form, and degree of asbestos contact, and as a result of which Plaintiff has been diagnosed with asbestos disease. Dates of residence in the Libby area and exposure, including events of injurious exposure in Libby are 1964, 1970-1971, 1973-1974 and 1980-1981.

29.     At all times Plaintiff was ignorant of the nature and extent of the life threatening risks and injury involved, and would not have continued to be exposed to such an environment if he had known the true facts.

30.     Without knowledge of the nature and extent of the asbestos hazard, Plaintiff was denied, in the unique circumstances of his exposures, the options of avoiding exposure, demanding protective devices, demanding safer operations, changing jobs, or protecting himself and his family.

### FIRST CAUSE OF ACTION
### (Failure to Provide a Safe Workplace)

The Plaintiff realleges paragraphs 1-30 of the General Allegations and adopts same as paragraphs of this First Cause of Action.

31.     Defendant Tide Bay, Inc., the Fischbach and Moore Defendants, the ARCO Defendants, and Defendant CFAC failed to provide Plaintiff Robert Hunt with a safe place to work and with safe equipment with which to perform his work. During Plaintiff Robert Hunt's employment, each of said Defendants knowingly used abnormally dangerous products in the workplace, to-wit: asbestos containing products and materials.

32.     Defendant Tide Bay, Inc., the Fischbach and Moore Defendants, the ARCO Defendants, and Defendant CFAC failed to advise Plaintiff Robert Hunt and other similarly situated workers of the abnormally dangerous characteristics of asbestos and the extreme hazard to human health existing in the work environment in which they were

compelled to work.

33.    Defendant Tide Bay, Inc., the Fischbach and Moore Defendants, the ARCO Defendants, and Defendant CFAC failed to take reasonable precautions to avoid the risk inherent in the workplace and violated statutes and regulations designed to protect Plaintiff Robert Hunt and other workers similarly situated.

34.    Defendant Tide Bay, Inc., the Fischbach and Moore Defendants, the ARCO Defendants, and Defendant CFAC failed to warn Plaintiff Robert Hunt of the life threatening risks at his place of work and, in particular, failed to warn him of the danger to his health caused by breathing asbestos fibers.

35.    Defendant Tide Bay, Inc., the Fischbach and Moore Defendants, the ARCO Defendants, and Defendant CFAC failed and omitted to take reasonable precautions or to exercise reasonable care to publish, adopt, and enforce a safety plan and a safe method of handling asbestos contaminated vermiculite and asbestos containing materials.

36.    Defendant Tide Bay, Inc., the Fischbach and Moore Defendants, the ARCO Defendants and Defendant CFAC failed to develop a method to make safe the work environment of Plaintiff Robert Hunt and his co-workers.

37.    As a direct and proximate result of the failure to provide Plaintiff Robert Hunt with a safe place to work by Defendant Tide Bay, Inc., the Fischbach and Moore Defendants, the ARCO Defendants and Defendant CFAC, and said Defendants' unlawful conduct as alleged herein, Plaintiff Robert Hunt developed asbestos related lung disease, died therefrom, and Plaintiff suffered damages as herein alleged.

## SECOND CAUSE OF ACTION
### (Negligence - all Defendants except Maryland Casualty)

38.    Paragraphs 1-37 above are incorporated by this reference.

39.    The illness, disability, and death of Plaintiff Robert Hunt are the direct and proximate result of negligence on the part of the Defendants, and each of them.

40.    The negligence and unlawful conduct of said Defendants, in addition to that hereinabove alleged, consisted of:

(a)    Failing to provide the Plaintiff Robert Hunt with a safe place to

work, in that he was required to utilize facilities and work under conditions that were unreasonably dangerous;

(b)    Creating a defective and dangerous situation;

(c)    Failing to properly inspect the premises for unsafe working conditions;

(d)    Failing to correct unsafe conditions of employment;

(e)    Failing to warn Plaintiff Robert Hunt of the dangers of exposure to Defendants' asbestos containing materials and of the dangers existing in his place of work;

(f)    Failing to provide proper safeguards against exposure to dangerous asbestos;

(g)    Improper and negligent supervision, which permitted the ultrahazardous and dangerous condition to be created and persist in the workplace.

41.    As a direct and proximate result of the negligence of the Defendants, Plaintiff Robert Hunt developed asbestos related lung disease, died therefrom, and Plaintiff suffered damages as herein alleged.

## THIRD CAUSE OF ACTION
### (Intentional and Malicious Acts or Omissions - all Defendants except Maryland Casualty)

42.    Paragraphs 1-41 above are incorporated by this reference.

43.    Plaintiff Robert Hunt's severe and permanent lung disease, his death from asbestos-related disease, and his resulting damages were proximately caused by the intentional and malicious acts or omissions of the Defendants.

44.    Defendants, and each of them, knew of facts and intentionally disregarded facts that created a high probability of injury to the Plaintiff; deliberately proceeded to act in conscious and intentional disregard of the high probability of injury to Plaintiff; and deliberately proceeded to act with indifference to the high probability of injury to the Plaintiff.

45.    As a direct and proximate result of the Defendants' intentional and malicious acts or omissions, Plaintiff Robert Hunt developed asbestos related lung disease, died therefrom, and Plaintiff suffered damages as herein alleged.

## FOURTH CAUSE OF ACTION
### (Common Law Strict Liability - all Defendants except Maryland Casualty)

46.    Paragraphs 1-45 above are incorporated by this reference.

47.    Defendant Tide Bay, Inc., the Fischbach and Moore Defendants, the ARCO Defendants, and Defendant CFAC engaged in abnormally dangerous business activity on the premises of said Defendants, failed to control abnormally dangerous asbestos contaminated materials on said premises, and failed to protect Plaintiff Robert Hunt from exposure to asbestos, which was an extra hazardous and abnormally dangerous material on the premises of said Defendants.

48.    Defendant Tide Bay, Inc., the Fischbach and Moore Defendants, the ARCO Defendants, and Defendant CFAC are strictly liable to the Plaintiff for all damages proximately caused as a result of causing Plaintiff Robert Hunt's exposure to abnormally dangerous asbestos.

49.    As a direct and proximate result of said Defendants' release of abnormally dangerous asbestos on and from their property or under their control, Robert Hunt developed asbestos related lung disease, died therefrom, and Plaintiff suffered damages as herein alleged.

## FIFTH CAUSE OF ACTION
### (Strict Products Liability - all Defendants except Maryland Casualty)

50.    Paragraphs 1-49 above are incorporated by this reference.

51.    At all times herein mentioned, Defendants Robinson Insulation, and Does 1 through 1,000, and each of them, were engaged in the business of manufacturing, designing, researching, fabricating, modifying, labeling, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, servicing, installing, contracting for installation, repairing, marketing, warranting, rebranding, manufacturing for others, packaging and/or advertising a certain substance, the generic name of which is asbestos

and other products containing asbestos, including, but not limited to, vermiculite concentrate, expanded vermiculite, and zonolite.

52.    Defendants Robinson Insulation, and Does 1 through 1,000, and each of them, knew and intended that their asbestos containing products would be used without inspection for defects therein or in any of their component parts and without knowledge of the hazards involved in such use.

53.    Said asbestos and asbestos containing products were defective and unreasonably dangerous for their intended use and purpose in that the inhalation of asbestos contaminated dust and/or asbestos fibers cause serious disease and/or death. The defect existed in the said products at the time they left the possession of Defendants Robinson Insulation, and Does 1 through 1,000.  Said products did, in fact, cause personal injuries, including asbestos related lung disease to "exposed persons," including Plaintiff Robert Hunt, while being used in a reasonably foreseeable manner, thereby rendering said products defective, unsafe, and unreasonably dangerous for use.

54.    "Exposed persons" did not know of the substantial danger of using said products.  Said dangers were not readily recognizable by said exposed persons. Defendants Robinson Insulation, and Does 1 through 1,000, and each of them, further failed to adequately warn of the risks to which Plaintiff Robert Hunt and others similarly situated were exposed.

55.    As a direct and proximate result of the unreasonably dangerous asbestos containing products of Defendants Robinson Insulation, and Does 1 through 1,000, and as a direct and proximate result of the unlawful actions of said Defendants, Plaintiff Robert Hunt was exposed to unreasonably dangerous asbestos fibers, and Plaintiff suffered the injuries and damages alleged herein.

## SIXTH CAUSE OF ACTION
### (Negligence in provision of industrial hygiene services v. Maryland Casualty only)

55.    Paragraphs 1-30 above are incorporated by this reference.

56.    Maryland Casualty provided professional industrial hygiene services to address the safety of the mine and mill work site through what were represented to be

competent Safety Engineers and professionals from the Engineering Division and the Medical Division of Maryland Casualty, under the supervision of industrial hygienist L.E. Park.

57.    From its first undertaking at the Mine facility, Park and others in the Accident Prevention Department at Maryland Casualty knew that they "had an outstanding pneumoconiosis occupational disease exposure," and "soon learned that there were 30 employees who lacked normal lung function."

58.    Maryland Casualty knew that the 1959 series of chest x-rays on the Libby workers showed a one-third incidence of abnormal chest x-rays.

59.    Maryland Casualty knew that the 1964-1973 annual series of chest x-rays on the Libby workers showed a 25% plus incidence of abnormal chest x-rays.

60.    Maryland Casualty knew that a 1965 study showed 20% incidence of asbestosis in the Libby workers, with a likely incidence of twice that upon thorough testing.

61.    Maryland Casualty knew or should have known that from 1961 forward, men were dying of asbestos disease, and that each year more became diseased.

62.    Maryland Casualty knew or should have known that there were no showers for workers, no coveralls for workers, and that workers went home and into the community covered with asbestos dust, which was hazardous to all those who might come into contact with it.

63.    As part of its industrial hygiene services, Maryland Casualty's Engineering Division and Medical Division undertook to "engineer this risk," and undertook to design a "program for control and prevention" of asbestos dust and disease for the benefit of workers, their families and the community that would address dust control and personal protection from asbestos dust.

64.    In its provision of industrial hygiene services and its undertaking of industrial hygiene measures, Maryland Casualty had a duty of reasonable care to those (including workers, their families and the community) relying on the fulfillment of safe standards of industrial hygiene, and to those who were in need of disclosure of the nature

and degree of the asbestos hazard known to Maryland Casualty.

65.    Maryland Casualty was negligent in their design of the industrial hygiene program, and in failing to disclose and disseminate, to the workers and individuals at risk, the nature and degree of the asbestos hazard Maryland casualty had acquired and analyzed by its industrial hygiene professionals. Maryland Casualty was negligent:

    (a)    in failing to include sufficient measures for education of workers, in the hazards of asbestos exposure;

    (b)    in failing to include measures to warn workers, their families, and the community of the hazards of asbestos exposure;

    (c)    in failing to include sufficient measures and standards for dust control through housekeeping, ventilation and exhaust air cleaning;

    (d)    in failing to include sufficient measures and standards for maintenance of equipment and premises;

    (e)    in failing to include a sufficient medical monitoring program;

    (f)    in failing to disclose the nature and degree of the immediate and extreme asbestos hazard known to the professionals at Maryland Casualty;

    (g)    in failing to sufficiently test and monitor the effectiveness of dust control at all locations where there was dust;

    (h)    in failing to obtain available medical information on the incidence of disease and deaths at the Grace operations including from public agencies; and

    (i)    in failing to sufficiently study and use the information on dust control and asbestos disease that it did have.

66.    Maryland Casualty undertook to address industrial hygiene concerns including prescription of warnings and worker education of the asbestos hazard for the mine and mill workers, their families and the community.

67.    Maryland Casualty had a duty of care to the mine and mill workers, their families and to the members of the Libby community to assure that warnings were designed to reasonably inform those at risk:

(a)    of the level of asbestos in the workplace;

(b)    of the hazards of asbestos carried home on workers' clothes;

(c)    of the toxicity of the asbestos and nature and degree of the health hazard and deadly health effects of asbestos inhalation;

(d)    of the hidden nature of the hazard, that its deadly effects operated invisibly and without obvious signs of irritation or harm, and that its latent deadly effects would first manifest many years after what would, to the uneducated layman, would be an apparent innocuous exposure to harmless dust; and

(e)    of the means to limit exposure in the workplace and at home, such as changing and washing procedures that kept work clothes out of the home, and training on where, when and what type of respirator devices needed to be worn to keep the worker safe.

68.    As part of its industrial hygiene services and the creation of a program for control and prevention of asbestos disease, Maryland Casualty failed to design and prescribe the necessary warnings.

69.    Maryland Casualty was negligent in their design of the warning and education aspects of the safety program in that it failed:

(a)    to include sufficient measures for education of workers, in the hazards of asbestos exposure;

(b)    to include sufficient measures for apprising the workers of the high levels of asbestos dust at the worksite;

(c)    to include sufficient warnings and measures to apprise workers of consequences of unprotected exposure to asbestos dust at levels regularly encountered in the workplace;

(d)    to include sufficient measures to warn and apprise workers of the dangers of transporting work clothes to their homes; and

(e)    to include warnings and measures to warn workers, their families and the community of the hazards of asbestos exposure in a manner that met industrial hygiene standards for warnings of a hidden and deadly hazard.

70.    Maryland Casualty's representatives with expertise in industrial hygiene inspected the Grace Libby operations.

71.    In so doing, Maryland Casualty had a duty of reasonable care to the Libby workers, their families and to the community.

72.    Maryland Casualty was negligent in inspection of the Grace Libby operations, in failing to disclose to workers the nature and degree of the hazard and in failing to act upon known hazardous conditions due to insufficient worker education, insufficient warnings to workers, their families and to the community, insufficient dust control (including housekeeping, ventilation, exhaust air cleaning and maintenance), and insufficient medical monitoring.

73.    Plaintiff worked at the vermiculite mine and Mill in the Libby area and/or lived or recreated in the Libby area and was exposed to and inhaled asbestos dust from the mill operations.

74.    Workers had no coveralls and no showers. As a result, workers including Plaintiff went home with asbestos dust on their clothing and in their cars, thereby contaminating their homes with asbestos dust.

75.    At all times Plaintiff was ignorant of the nature and extent of the life threatening risks and injury involved, and would not have continued to live and work in such an environment if they had known the true facts.

76.    Without knowledge of the nature and extent of the asbestos hazard, Plaintiff was denied the options of avoiding exposure, demanding protective devices, demanding safer operations, changing jobs, and protecting their home and family.

77.    Maryland Casualty acted with knowledge and intention that workers at W.R. Grace were being harmed by the workplace and take-home exposures to asbestos and by the absence of warning and disclosure of the hazards of those exposures, such that Maryland Casualty is liable to all who were injured by exposures to asbestos from the Grace operations and/or by the concealed nature of the hazard.

78.    Maryland Casualty's unlawful acts and omissions were willful, wanton,

reckless, fraudulent, oppressive, malicious, and unjustifiable. Although Maryland Casualty knew that its acts and omissions created a high degree of harm to the Plaintiff and his co-workers and that its conduct would in fact injure and harm the Plaintiff and his co-workers, Maryland Casualty nevertheless deliberately acted in conscious disregard for and indifference to the harm to the Plaintiff. Such conduct justifies imposition of punitive or exemplary damages in a sufficient amount to punish Maryland Casualty and to serve as a warning to other legal entities similarly situated that conduct of the kind engaged in by Maryland Casualty is unacceptable in our society.

79.    As a direct and proximate result of Maryland Casualty's negligence in performance of industrial hygiene professional services for the protection of workers and others, including inadequate warnings, inspections and disclosure of known hazards, Plaintiff suffered from asbestos disease, asbestos related bodily injuries, and died as a result thereof, and incurred damages as alleged herein.

## DAMAGES

80.    As a direct and proximate result of the negligent and unlawful conduct of the Defendants, and each of them, as herein alleged, Plaintiff Robert Hunt developed asbestos related disease, and died therefrom, has undergone medical treatment for this condition, and has incurred medical, hospital, and related expenses.

81.    As a direct and proximate result of the negligent and unlawful conduct of the Defendants, and each of them, as herein alleged, Plaintiff Robert Hunt has suffered loss of earning capacity.

82.    As a direct and proximate result of the negligent and unlawful conduct of the Defendants, and each of them, as herein alleged, Plaintiff Robert Hunt has suffered great mental and physical pain and suffering.

83.    As a direct and proximate result of the negligent and unlawful conduct of the Defendants, and each of them, as herein alleged, Plaintiff Robert Hunt experienced loss and destruction of his established course of life, including his death as a result of asbestos-related disease.

84.    As a direct and proximate result of the negligent and unlawful conduct of the Defendants, and each of them, as herein alleged, Plaintiff Robert Hunt has been damaged due to his loss of insurability for expenses related to necessary medical care.

## WRONGFUL DEATH

85.    All paragraphs above are incorporated by this reference.

86.    As a direct and proximate result of the actions of the Defendants as alleged above, Plaintiff suffered from asbestos disease, asbestos related bodily injuries, and died as a result thereof, incurring the damages alleged herein. The heirs of Plaintiff have suffered the loss of his care, comfort, society, and support and have incurred damages as alleged herein.

## PUNITIVE AND EXEMPLARY DAMAGES
### (All Defendants)

87.    Defendants' unlawful acts and omissions were willful, wanton, reckless, fraudulent, oppressive, malicious, and unjustifiable.  Although Defendants knew that the Defendants' acts and omissions created a high degree of harm to the Plaintiff and his co-workers and that their unreasonably dangerous products, conduct, and/or workplace would in fact injure and harm the Plaintiff and his co-workers, the Defendants nevertheless deliberately acted in conscious disregard for and indifference to the harm to the Plaintiff.  Such conduct justifies imposition of punitive or exemplary damages in a sufficient amount to punish all Defendants, and to serve as a warning to other legal entities similarly situated that conduct of the kind engaged in by the Defendants is unacceptable in our society.

## JURY DEMAND

Plaintiff demands trial by jury.

WHEREFORE, the Plaintiff prays for damages against Defendants as follows:

1.    For reasonable compensation for past and future medical and related expenses of Plaintiff proximately caused by Defendants' unlawful conduct.

2.    For reasonable compensation for Plaintiff's lost earning capacity and

economic loss proximately caused by Defendants' unlawful conduct.

3.    For reasonable compensation for Plaintiff's pain and suffering proximately caused by Defendants' unlawful conduct.

4.    For reasonable compensation for the loss of enjoyment of life suffered by Plaintiff and proximately caused by Defendants' unlawful conduct.

5.    For reasonable compensation for the loss of insurability proximately caused by Defendants' unlawful conduct.

6.    On behalf of those so injured, the Personal Representative prays for distinct and separate assessment and recovery of reasonable damages for the heirs' loss of care, comfort, society and support of the deceased by reason of the wrongful death of their loved one;

7.    For punitive and exemplary damages in a sufficient amount to punish the Defendants, and to serve as a warning to entities similarly situated that conduct of the kind engaged in by Defendants is unacceptable in our society.

8.    For costs and disbursements incurred herein.

9.    For such other and further relief as the Court may deem just.

DATED this ⌊30th⌋ day of March, 2018.

<div style="text-align:center">

McGARVEY, HEBERLING, SULLIVAN
& LACEY, P.C.

</div>

By: _____
ROGER SULLIVAN
ALLAN McGARVEY
JOHN F. LACEY
Attorneys for Plaintiff

## CERTIFICATE OF MAILING

I hereby certify that on the ___13___ day of March, 2018, a true and correct copy of the foregoing was served by United States mail, first-class postage prepaid, upon the following:

Chad Adams
Browning, Kaleczyc, Berry & Hoven, P.C.
P O Box 1697
139 N. Last Chance Gulch
Helena, MT 59624
*Attorneys for Fischbach and Moore Electric, Inc., Fischbach & Moore Electric, LLC, Fischbach and Moore, Incorporated, Fischbach Power Services, Inc., Fischbach Corporation, Fischbach LLC.*

Patrick M. Sullivan
Poore, Roth & Robinson, P.C.
1341 Harrison Avenue
Butte, MT 59701
*Attorneys for Anaconda Company and Atlantic Richfield Company*

Joe Seifert
Keller Law Firm, PC
50 South Last Chance Gulch
P.O. Box 59624
Helena, MT 59601
*Attorney for Maryland Casualty Company*

Edward J. Longosz
Kennedy Ramos
Eckert Seamans Cherin & Mellott, LLC
1717 Pennsylvania Avenue NW, 12th Floor
Washington, DC 2006
*Attorneys for Maryland Casualty Company*

Betsy Cummings