1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3

4    In re:                         :

5                                   :    Chapter 11

6    W. R. GRACE & CO., et al.,     :    Case No. 01-01139 (KG)

7            Debtors.               :    (Jointly Administered)

8    _____:

9

10                                  United States Bankruptcy Court

11                                  824 North Market Street

12                                  Wilmington, Delaware

13                                  April 30, 2018

14                                  3:01 p.m. - 4:12 p.m.

15

16

17

18

19

20

21   B E F O R E :

22   HON KEVIN GROSS

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO OPERATOR:  GINGER MACE

1    HEARING re Maryland Casualty Company's Motion to Enforce the

2    Permanent Channeling Injunction and for Sanctions [Filed:

3    1/29/18] (Docket No. 32999).

4

5    HEARING re Agreed Motion to Extend Maryland Casualty

6    Company's Time to File Reply Papers with Respect to Its

7    Motion to Enforce the Permanent Channeling Injunction and

8    for Sanctions [Filed: 4/17/18] (Docket No. 33022).

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    CONNOLLY GALLAGHER LLP

4         Attorneys for Maryland Casualty

5

6    BY:  JEFFREY WISLER

7

8    ECKERT SEAMANS

9         Attorneys for Maryland Casualty

10

11   BY:  EDWARD LONGOSZ

12        KENNEDY RAMOS

13

14   MURTHA CULLINA LLP

15        Attorneys for Libby Mine

16

17   BY:  DANIEL COHN

18

19   GELLERT SCALI BUSENKELL & BROWN, LLC

20        Attorneys for Libby Mine

21

22   BY:  MIKE BUSENKELL

23

24

25

```
1                   P R O C E E D I N G S
2            CLERK:  Please rise.
3            THE COURT:  Good afternoon, everyone.  Thank you.
4    You may be seated.
5            MAN 1:  Good afternoon.
6            THE COURT:  I'm seeing a strange face in this
7    case, I know.  Mr. Wisler, good afternoon.
8            MR. WISLER:  Good afternoon, Your Honor.  Jeffrey
9    Wisler, on behalf of Maryland Casualty Company.  Your Honor,
10   I promise this won't take as long as last week's Patriot
11   hearing.
12           THE COURT:  Good.
13           MR. WISLER:  Your Honor, this is Maryland
14   Casualty's motion to enforce final orders of this Court,
15   including the permanent channeling injunction arising from
16   the confirmed plan of reorganization of W.R. Grace.
17           THE COURT:  Yes.
18           MR. WISLER:  Your Honor, I'd like to introduce you
19   to my co-counsel, Edward Longosz, from Eckert Seamans.
20           THE COURT:  Welcome.
21           MR. WISLER:  Mr. Longosz --
22           THE COURT:  Good to have you here.
23           MR. WISLER:  -- and I have been involved in this
24   case since -- well, as long as Mr. Cohn has, actually, also.
25           THE COURT:  Okay.
```

1          MR. WISLER:  I may have a little bit of time on

2     both of them, but we've been involved for a long time.  So,

3     with that, Your Honor, I'll turn the podium over to Mr.

4     Longosz.

5          THE COURT:  Thank you, Mr. Wisler.  Thank you,

6     sir.  Mr. Longosz, it's good to have you here.

7          MR. LONGOSZ:  Thank you, Your Honor.  I apologize,

8     over the weekend, I think my voice left me, not because I

9     was cheering for my favorite sports team, but because of the

10    pollen.

11         THE COURT:  I understand.

12         MR. LONGOSZ:  So, that's my Mr. Wisler is here,

13    just in case I need some reinforcements.

14         THE COURT:  We'll work through it.

15         MR. LONGOSZ:  Thank you, Your Honor.

16         THE COURT:  Yes.

17         MR. LONGOSZ:  So, Your Honor, what brings us here

18    today -- and again, good afternoon, and Edward Longosz, for

19    the record.  Thank you again for accommodating us from last

20    week's rescheduling, sir.

21         THE COURT:  Yes.

22         MR. LONGOSZ:  We appreciate that.

23         THE COURT:  I certainly understand that, Mr.

24    Longosz.

25         MR. LONGOSZ:  So, Your Honor, we're here -- and

1    I'll hearken back to what Yogi Berra said, déjà vu all over

2    again.

3              THE COURT:  Yes.

4              MR. LONGOSZ:  I've been living with this case

5    since 2001, since the outset, as has other counsel here.

6    I've gone through all the various motions and reiterations

7    through Judge Fitzgerald looking at the case, making some

8    rulings on motions to enforce, clarifications, setting up

9    the injunction with respect to Maryland Casualty and other

10   insurers.

11             THE COURT:  Yes.

12             MR. LONGOSZ:  Also, I was here and argued the

13   motion before Judge Carey, which leads us to why we're here

14   today.

15             Your Honor, just if I could give some -- frame the

16   issues and give some preliminary thoughts, I know --

17             THE COURT:  Please do, because I'm fairly -- you

18   know, I'm somewhat new to the matter.

19             MR. LONGOSZ:  Okay.

20             THE COURT:  And it would be helpful, anything --

21   any background you've got, Mr. Longosz.

22             MR. LONGOSZ:  Sure.  With respect to this case,

23   the case emanates out of the W.R. Grace bankruptcy,

24   obviously.

25             THE COURT:  Yes.

1          MR. LONGOSZ:  And what we have here today is only

2     one issue before the Court, and that's the motion to enforce

3     the permanent channeling injunction and order.

4          I think, and we believe, that there's only one

5     question, and that's the enforcement of the injunction.  We

6     don't believe that there's any question with respect to the

7     due process aspects of it.  You may have read the papers

8     something about a request for a stay based on the pending --

9          THE COURT:  Third Circuit, yes.

10          MR. LONGOSZ:  -- the Third Circuit.  I'll get into

11     that a little bit later and be happy to answer any questions

12     Court may have --

13          THE COURT:  Okay.

14          MR. LONGOSZ:  -- relative to that.  But Roberts --

15     just so I can stage for Roberts -- and we can talk about

16     some of the other things that happened on the way up to

17     Roberts -- Roberts is a non-Grace non-worker employee case.

18     I think that's very, very important for purposes of our

19     discussion today.

20          Roberts falls under the no workers' compensation

21     scheme.  So, Roberts is not covered by any workers'

22     compensation policy --

23          THE COURT:  Right.

24          MR. LONGOSZ:  -- doesn't get the benefit of any

25     policy; none of his claims would arise out of anything even

1   remotely close to workers' compensation policy.  The reason

2   that's important is -- as you know, and as you probably read

3   --

4            THE COURT:  Yes.

5            MR. LONGOSZ:  -- Judge Carey talked about claims

6   arising out of the workers' compensation policy, and that's

7   not contained within Exhibit 5.

8            THE COURT:  Right.

9            MR. LONGOSZ:  Okay.

10           THE COURT:  Right.

11           MR. LONGOSZ:  There is no allowance, for purposes

12  of this case and for purposes of Judge Carey, and we'll talk

13  about what he found.  There's no allowance for any claim by

14  a non-worker.  So, this is -- Roberts, I believe, wasn't

15  even somebody you could say was remote -- it's a

16  townsperson; it's an individual that lived in Libby, Montana

17  -- may have...

18           In Libby, Montana, just to give you some -- to

19  capture the essence of that section of Montana, there's

20  mountains; Libby's in a valley.  The Libby mine is a mine

21  that's up in the -- they call it Libby Mountain.  The mined

22  the ore there.  They packaged it and did some processing of

23  it.  It was brought down the mine, from the mine, to the

24  railroad yard.  It was loaded, and you've probably seen BNSF

25  mentioned --

1          THE COURT:  Yes.

2          MR. LONGOSZ:  -- through some of the papers, it

3    was loaded onto railcars and the railcars took it away to

4    its final destination or other destinations.

5          THE COURT:  Yes.

6          MR. LONGOSZ:  Now, there's some people that claim

7    that while the railcars were moving along the railroad,

8    people were fishing, they were hunting, they breathed the

9    asbestos as it's going along, so therefore, they would have

10   claims against the Railroad for not tarping the cars or

11   doing something relative to the cars.  They would likewise

12   have claims, or would have claims, against W.R. Grace.

13          So, to give context, Mr. Roberts was not even

14   close to being any of those individuals.

15          THE COURT:  Well, the claim is by Mrs. Roberts on

16   behalf of Mr. Roberts.

17          MR. LONGOSZ:  Roberts, and --

18          THE COURT:  Is that right?

19          MR. LONGOSZ:  Right.  And Mr. Roberts was not a

20   worker --

21          THE COURT:  Right.

22          MR. LONGOSZ:  -- not a mine worker --

23          THE COURT:  Right.

24          MR. LONGOSZ:  -- not a railroad rep.  Didn't have

25   anything to do with Maryland Casualty or the mine where

1    Maryland Casualty was a workers' compensation carrier.

2          THE COURT:  Exactly.  And that's what Judge Carey

3    ruled, that the workers' compensation claims remained

4    viable, but non-workers' compensation claims are subject to

5    the injunction.

6          MR. LONGOSZ:  Correct.

7          THE COURT:  Okay.

8          MR. LONGOSZ:  And that's why we're here on the

9    motion to enforce.

10         THE COURT:  Right.

11         MR. LONGOSZ:  I think the Plaintiffs take a

12   different view of that, or -- I'm not sure what their view

13   is, other than the fact that they think they get the

14   benefit, somehow, of the workers' compensation scheme, that

15   Maryland Casualty was doing work in the mine as a workers'

16   compensation carrier, so therefore, that carries over to

17   non-employees, that Judge Carey rejected.  I believe he used

18   the word "rejected" that argument.

19         THE COURT:  Yes.

20         MR. LONGOSZ:  So, the Libby claimants lost that

21   argument, did not appeal, nor did Maryland Casualty.  I

22   guess we were all comfortable with that decision in the

23   sense that we could go -- if claimants filed a claim on

24   behalf of a worker in State Court, it would be a claim bad

25   faith for the provision of workers' comp, the delivery of

1    workers' compensation insurance, any iteration of claim they

2    had arising out of workers' compensation program as an

3    employee.  Those cases will be fought in State Court.  And

4    Judge Carey said, "to the extent that such cases even

5    existed", and we'll let the State Court whether that's even

6    a viable claim.

7            So, in fact, the Libby claimants, Mr. Hutt in

8    particular, has filed a State Court claim.  Read something

9    about this Asbestos Claims Court.  I'll talk about that a

10   little bit.

11           THE COURT:  Yes.

12           MR. LONGOSZ:  But that's included within the

13   Asbestos Claims Court cases.  It's actually set for trial in

14   February of next year.

15           THE COURT:  Okay.

16           MR. LONGOSZ:  And we haven't gotten through

17   discovery.  We haven't even gotten to the point of

18   determining, or having the Court determine, whether a viable

19   State Court claim exists for purposes of Mr. Hutt.  But he

20   did file a case; it's a viable case there.  The problem is

21   now Ms. Roberts has filed on behalf of her husband, a State

22   Court claim --

23           THE COURT:  Yes.

24           MR. LONGOSZ:  -- or hasn't dismissed the State

25   Court claim that was filed.  And we also have another case -

1    - well, there's many, many cases; there's hundreds of cases

2    now.  But we were just in State Court last week, actually

3    the day before we were supposed to argue this, on a case

4    called Hunt.  And Hunt is another non-worker where the

5    Plaintiffs are continuing to pursue that case.

6              And you may have seen in their opposition, they

7    filed an adversary complaint relating to Mr. Hunt.  That is

8    neither here nor there for purposes of our motion today.

9              THE COURT:  Okay.  Okay.

10             MR. LONGOSZ:  But it's a State -- it's a non-

11   worker who is proceeding with his claim in State Court,

12   notwithstanding the bar imposed by the injunction in this

13   case.

14             Now, I will -- just for full disclosure, both

15   Maryland Casualty and the Plaintiffs had alerted the State

16   Court Judge that we have this motion pending and put the

17   Court on notice.  The Court -- the State Court Judge said,

18   well, that's nice, but until I see an order, you know, I'm

19   going to issue a scheduling order.  And there's a scheduling

20   order there, so --

21             THE COURT:  Is this the one where trial is

22   scheduled for September?

23             MR. LONGOSZ:  I believe --

24             THE COURT:  Or is that a different matter?

25             MR. LONGOSZ:  That's a different matter.

1                THE COURT:  Okay.

2                MR. LONGOSZ:  The trial -- Judge, there are

3      deadlines in September --

4                THE COURT:  Okay.

5                MR. LONGOSZ:  -- for everybody.  The trial is not

6      scheduled until next February.

7                THE COURT:  Okay, okay.

8                MR. LONGOSZ:  But there's very, very rigorous

9      deadlines.  In fact, experts are due in July.

10               THE COURT:  All right.

11               MR. LONGOSZ:  And we were just -- Maryland

12     Casualty was just amended and brought into the case and

13     served.

14               THE COURT:  Okay.  And this is the Roberts case?

15               MR. LONGOSZ:  That was the Hunt case.

16               THE COURT:  The Hunt case, we're talking about.

17     Okay.

18               MR. LONGOSZ:  In Roberts, there's nothing going on

19     in State Court.

20               THE COURT:  Okay.

21               MR. LONGOSZ:  Okay.  And that's -- and the reason

22     be brought it is because it was a case reflective of a non-

23     worker.  It is a true non-worker traditional case, and it

24     was a good case for this Court to look at and us to be able

25     to explain to the Court why the injunction applied and

1    should be enforced.  And there are no deadlines.  It was --

2    with the advent of the Asbestos Claims Court, it got

3    everybody's attention --

4            THE COURT:  Okay.

5            MR. LONGOSZ:  -- and brought to this Court.  Just

6    to give a little context to the Asbestos Claims Court,

7    apparently back in 2001 or the late 1990s, the Legislature

8    enacted a provision that allowed for the Montana Supreme

9    Court to put into effect what's called an Asbestos Claims

10   Court.  Because of all these W.R. Grace cases that were

11   emanating out of, in particular, Libby, Montana.

12           THE COURT:  Okay.

13           MR. LONGOSZ:  And Libby, Montana probably has 2000

14   residents, 3000 residents, all of which are claiming they

15   have an asbestos-related disease.  If you notice, the plan

16   the carveout for the Libby claimants --

17           THE COURT:  Yes.

18           MR. LONGOSZ:  -- which they're availing themselves

19   of.  The trust is there and they're availing themselves of

20   the trust proceeds.  The Libby, I think, was dedicated as an

21   EPA cleanup site.  It's very, very -- it ended up being

22   very, very bad after 70 years of mining there.

23           But that said, Grace filed bankruptcy in '01.

24           THE COURT:  Yes.

25           MR. LONGOSZ:  Therefore, the necessity of the

1    Asbestos Claims Court was not necessary, was unnecessary.

2    Fast forward to last year, Grace comes out of bankruptcy.  A

3    couple years ago, BNSF, International Paper, a variety of

4    other defendants were being sued, the State of Montana, were

5    all being sued, and the courts were being overwhelmed.  The

6    state courts were being overwhelmed, underfunded.

7         So, the Supreme Court in late last year decided to

8    turn the key, so to speak, to the Asbestos Claims Court, and

9    bring that court to life, and dedicated a District Court

10   judge, Judge Eddy, to oversee the Asbestos Claims Court, and

11   to bring all these vermiculite, W.R. Grace, Libby, Montana

12   cases under its fold.  I think there's probably close to

13   2000 claims; the last week could count, there's probably

14   1600, 1700 claims that are either before the Court or will

15   be before the Court.

16        So, what the Court's trying to do is parse those

17   cases.

18        THE COURT:  Sure.

19        MR. LONGOSZ:  There's a variety of things that are

20   going to be coming up before that Court, including whether

21   in fact these people, these individuals, have asbestos-

22   related disease, number one, or whether they're injured or

23   impaired.  So, there's going to be a big hearing in July

24   relative to that.  It's particularly important for the

25   Railroad, the State of Montana, International Paper, and

1   some of the other defendants.  To wit, Maryland Casualty is

2   being sued, or being served in lawsuits that have been filed

3   that we didn't know about, weekly, monthly, with respect to

4   cases before the Asbestos Claims Court.

5            Thus far, the only cases that have been brought,

6   or had been brought, worker cases, or cases that we could

7   discern might have been worker cases, or at least are in our

8   policy period.  Now what's happened is that there -- a lot

9   of cases are being brought in.  There's no differentiation

10  or distinction between worker and non-worker cases.

11           THE COURT:  Okay.  Okay.

12           MR. LONGOSZ:  Notwithstanding the order, Judge

13  Carey's order.  And Judge, really, just -- I don't want to

14  fast-forward to the end --

15           THE COURT:  Is the Robert's case, is this -- is

16  the Robert's case a test case, in effect?

17           MR. LONGOSZ:  It could be for the purposes of this

18  Court, yes.

19           THE COURT:  Yes.

20           MR. LONGOSZ:  Because I think what the Court does

21  here is going to have applicability to the other cases.  It

22  will have applicability to the other cases because if there

23  is a case similar to Roberts, the Plaintiffs should be -- if

24  the Court agrees with our position and Judge Carey's

25  position -- then those cases would be dismissed, and the

1    Plaintiffs will have to critically look through their cases

2    to discern whether they have their worker or non-worker --

3              THE COURT:  Right.

4              MR. LONGOSZ:  -- whether covered by the workers'

5    compensation policy or not.  From what we can tell -- we

6    just got this information recently -- there's probably about

7    200 to 300, maybe in that 270 zone, of cases that appear to

8    be worker cases, at least from our count, out of the 1600 or

9    so cases.  So, we know that there are some cases out there

10   that have to be teased out, but this, in effect, yeah, we

11   could call this a bell weather test case.

12             THE COURT:  Okay.  Because you haven't brought a

13   defendant class, for example, in --

14             MR. LONGOSZ:  No, and we could have brought 1500

15   of these --

16             THE COURT:  Yeah.

17             MR. LONGOSZ:  -- or 100 of these, or 200 of these.

18   But pretty much the Plaintiffs know.  And that's why the due

19   process argument doesn't really work.  Everybody knows what

20   a worker is and does -- a worker is not.  Actually, the

21   Plaintiffs know the Defendants we don't know, but they know

22   which ones are workers and non-workers.

23             So, the applicability would be there with respect

24   to them.  They're all represented by the same Plaintiffs'

25   counsel in Montana.

1           THE COURT:  Okay.

2           MR. LONGOSZ:  So, there is one other firm, the

3    Lewis firm, who was involved in the bankruptcy in this

4    court, who has some claimants.  But none of those claimants,

5    curiously, have filed a lawsuit against Maryland Casualty to

6    our knowledge --

7           THE COURT:  Okay.

8           MR. LONGOSZ:  -- or prosecuted one.  It's only the

9    McGarvey firm, that Mr. Cohn's here today.

10          THE COURT:  All right.

11          MR. LONGOSZ:  Really, what we want, it's the

12   sanction part of this is to tell them to stop.  Stop filing

13   cases and dismiss the cases that are not properly before the

14   State Courts.  We're not sitting here saying we want lots of

15   money or lots of sanctions.  I think the Court knows what

16   we're looking for in terms of the end.

17          But we had to make sure that we let the Court know

18   we take this very, very seriously.  And these are, in some

19   ways, contemptuous because Judge Carey did have a very

20   defined, very direct opinion --

21          THE COURT:  Yes, he did.

22          MR. LONGOSZ:  -- and order.  And so, we want to

23   make sure that everybody understood the gravity of what

24   we're talking about, including Your Honor.

25          THE COURT:  Absolutely.

1          MR. LONGOSZ:  Now, I think the Plaintiffs may

2     claim they are between a rock and a hard spot in Roberts.

3     Are they allowed to proceed; not allowed to proceed?  The

4     Plaintiffs never came to the Court for relief after Judge

5     Carey's opinion.  Never sought -- said, well, wait a minute,

6     let's move to reconsider, let's appeal, or let's get further

7     clarification of what you really meant, Judge Carey, in

8     connection with your opinion and your order.  And that never

9     happened.  But what was happening was that it was business

10    as usual for the Plaintiffs.

11          Now, if we could go back -- so going back in time

12    to during the bankruptcy proceeding, recall that Judge

13    Fitzgerald entered an order in 2002 denying Girard's motion

14    to clarify and the scope of the preliminary injunction to

15    modify the preliminary injunction.  The Libby claimant --

16    and what Judge Fitzgerald said is that this applies to, you

17    know, the insurers, including Maryland Casualty and CNA --

18    the Plaintiffs, the Libby claimants, lost that motion with

19    Judge Fitzgerald.

20          The Third Circuit agreed with Judge Fitzgerald.

21    The plan was later confirmed on February 3rd, 2014.

22          THE COURT:  Yes.

23          MR. LONGOSZ:  Roberts, as a non-employee, files

24    his suit February 25th, 2014.  So, Judge Carey -- the plans

25    confirm that Roberts files a suit, maybe because they

1    thought that there was a tolling provision they had to file

2    within the 60 days after the plan of confirmation, based on

3    Judge Fitzgerald's order.  So, they filed that.  But they

4    initiate their DJ in October of 2014, October 21, 2014.

5    Judge Carey issued his opinion on October 17, 2016.

6              And if the Court looks at the timeline, Judge

7    Carey, almost a year to issue that opinion.  And I say it

8    took him so long because he was looking at the case --

9    although he did say that he wished Judge Fitzgerald had not

10   retired --

11             THE COURT:  Yes, I --

12             MR. LONGOSZ:  -- during arguments.  So, but that

13   said, he took the time, the care, the consideration to look

14   at what was going on, to look at whether these claims, or

15   maybe some of these claims, were part of, derivative of,

16   subject to (indiscernible) asbestos.

17             And in fact, Judge Carey made a very prophetic

18   comment during the course of the proceeding, as he said to

19   Mr. Cohn that, "Maybe I don't quite see things the way you

20   do.  Maybe I see them through a different prism."  And that

21   was prophetic because when the decision came out, Judge

22   Carey did see things through a different prism.

23             Quite frankly, we were hoping that workers'

24   compensation claims would not be allowed because we view

25   those as statutory claims, and you could only bring a

1    statutory claim.  But Judge Carey to do a carveout for the

2    plaintiffs--

3              THE COURT:  Yes.

4              MR. LONGOSZ:  -- based on what was before him.

5              THE COURT:  I assume that's a somewhat finite

6    group of people, too, isn't it?

7              MR. LONGOSZ:  It is.

8              THE COURT:  Yes.

9              MR. LONGOSZ:  It is.

10             THE COURT:  Yeah.

11             MR. LONGOSZ:  You're either a worker or you're not

12   a worker.

13             THE COURT:  Right.

14             MR. LONGOSZ:  Either you worked in a mine as a

15   Grace employee or not.  If you were a Grace employee and

16   worked in the mine, you were covered by workers'

17   compensation --

18             THE COURT:  Yes.

19             MR. LONGOSZ:  -- insurance.

20             THE COURT:  Yes.

21             MR. LONGOSZ:  And whatever flowed out of that, the

22   provision of workers' compensation insurance, the Libby

23   claimants could, Judge Carey said, make whatever claims you

24   want to.  Now, we would argue that the only claim you could

25   make is a workers' compensation claim.

1            THE COURT:  Right.

2            MR. LONGOSZ:  And for example, if you were denied,

3    you made a workers' compensation claim, you were denied that

4    claim and you thought there was bad faith in the denial of

5    that, you can proceed to file that under the construct of

6    the laws of Montana.  Plaintiffs may take it, or obviously

7    are trying to take it a step further, and say well, there

8    should have been this industrial hygiene, there should have

9    been all these things for the workers.

10            So, maybe they do have a cause of action by virtue

11    of the provision of workers' compensation insurance.  Of

12    course, the State Court is going to have to look at that to

13    see if there was a duty required, whether there were bundled

14    or unbundled services, what the scope of the involvement of

15    Maryland casualty was, was it just a workers' compensation

16    carrier, did it provide more, or just workers' compensation

17    benefits to W.R. Grace at the time?

18            THE COURT:  Yes.

19            MR. LONGOSZ:  I suggest to the Court they did not,

20    but that's for another day, another court.

21            THE COURT:  Another court, yes.

22            MR. LONGOSZ:  Right.  But unless you're a worker

23    and you get the benefit of that policy, you don't have a

24    ground to stand on for purposes of bringing an action.  And

25    that's why Judge Carey was so careful in his language and

1    his opinion.

2            The Plaintiffs were trying to suggest, and they

3    were trying to push beyond the edges of just workers'

4    compensation, and they talked about things like negligence

5    and things of that nature.  And Judge Carey brought that

6    back and said, no, no, no.  You can't just bring this

7    wholesale negligence action because that would be channeled

8    into the channeling injunction, and you can't bring those.

9            The reason Plaintiffs were trying to do that is

10   because they wanted to expand the scope of that declaratory

11   judgment action.  Because I guarantee what they would've

12   been doing is saying, ah, Judge Carey allowed those, so

13   therefore I can add my 1600 claims on behalf of non-workers

14   that are clearly not channeled.  And that, as Judge Carey

15   said, was absolutely wrong --

16            THE COURT:  Okay.

17            MR. LONGOSZ:  -- and was not correct.  The funny

18   thing is -- and I hate to say that -- it's colloquial, the

19   funny thing is -- the Plaintiffs chose to appeal the CNA

20   case.

21            THE COURT:  Right,

22            MR. LONGOSZ:  And the first part of our case, the

23   Maryland Casualty case, was almost for a very, very similar

24   grounds.  You know, Judge Carey found the same as he did for

25   CNA.

1          THE COURT:  Yes.

2          MR. LONGOSZ:  Why didn't the Plaintiff appeal?

3     Only they know for sure.  But what we're left with is a

4     final order in this case.  And whatever the Third Circuit

5     may or may not do at any other time is of no consequence and

6     no moment to this case because we have a final order that

7     needs to be implemented and enforced.  And in fact --

8          THE COURT:  But if the Third Circuit goes against

9     you on the appeal --

10         MR. LONGOSZ:  If it does?

11         THE COURT:  -- and it does -- wouldn't that have

12    an impact here too?

13         MR. LONGOSZ:  Well -- I thought my counsel was

14    sending me a note --

15         THE COURT:  Oh, oh.  You thought he was going to

16    save you.  No, but --

17         MR. LONGOSZ:  The lifeline.

18         THE COURT:  Wouldn't that have an effect?

19         MR. LONGOSZ:  What do you mean by goes against me?

20    Here's the problem.  The issues with respect to -- the Third

21    Circuit can do a variety of things.  The real issue before

22    the Third Circuit right now is CNA prevailed on those issues

23    relating to the negligence components.

24         THE COURT:  Yes,

25         MR. LONGOSZ:  And CNA also prevailed because the

1    workers' comp policy was covered under Exhibit 5.  And it

2    was a very lively argument.  I don't know if counsel

3    provided the argument or a copy of the argument, the Third

4    Circuit argument; we can certainly provide that to the

5    Court.  But I think the only thing we would get out of it is

6    perhaps a dicta that would not necessarily be wholesale

7    applicable to Maryland Casualty.  Because the issues are not

8    Maryland Casualty issues that are teed up with respect to

9    the Third Circuit.

10           Third Circuit doesn't have the issues where Judge

11   Carey parsed out the claims and only permitted the workers'

12   compensation claims to go forward.

13           THE COURT:  Okay.

14           MR. LONGOSZ:  So, CNA has different arguments, a

15   different construct before it.  And maybe there's wishful

16   thinking, maybe there's hope, maybe let's wait and see what

17   they do, and if they -- if there's any language in there

18   that we could come back and convince Judge Gross could weigh

19   against Maryland Casualty, let's wait and see what happens.

20   The problem is the appeal our case and consolidate it with

21   the CNA case.

22           THE COURT:  Yeah.

23           MR. LONGOSZ:  If they had believed in their

24   position, they would have done that.  I think the real issue

25   there is really -- is going to see whether in fact that

 1    Exhibit 5 holds up on the CNA side.

 2              THE COURT:  Okay.

 3              MR. LONGOSZ:  Pretty solid on the other arguments;

 4    very, very solid on the other arguments.

 5              So, then what we have is Roberts is served in

 6    February of 2017 and the amended complaint is filed on May

 7    17, 2017, and then the Asbestos Claims Court is activated in

 8    November, at the end of November 2017.  That's why we filed

 9    this motion, because all of a sudden, all these cases were

10    coming to a head.

11              And not to say there haven't been discussions, you

12    know, relative to the effective -- what was the effect of

13    the Third Circuit, what would be the affect of a decision

14    here.  There's a lot of discussion going on with the Libby

15    claimants.

16              And in fact, you know, it's interesting.  A

17    question one might want to pose is that if the Third Circuit

18    affirms, does that mean that Judge Gross doesn't have to

19    make any decisions and all those cases go away except for

20    the worker cases?  I guarantee you're not going to get that

21    commitment.

22              THE COURT:  No.

23              MR. LONGOSZ:  You're not going to get that.

24              THE COURT:  I wouldn't think so.

25              MR. LONGOSZ:  I tried to get it and in fact

1    couldn't.  So, to answer your question, no, the Third

2    Circuit, we don't be believe is going to be case dispositive

3    --

4             THE COURT:  Okay.

5             MR. LONGOSZ:  -- anything that's before this

6    Court, especially when we're looking at a final order.  If

7    in fac there is -- if there is anything to tease out of this

8    by Libby claimants, they're very good at pivoting, and if

9    Your Honor decides to enforce the injunction, as we request,

10   I'm sure that there is -- and the Third Circuit comes down

11   with a decision or opinion, there may be some sort of

12   equitable claim that they could make relative to that.

13            But it's just like -- it's like any case where you

14   have the law as it is today, and a Third Circuit can decide,

15   or a Fourth Circuit can decide something two, three, four

16   years from now that could change what happened in the past.

17   And while it's not something maybe so imminent, there was

18   never a request -- and I find it telling there was never a

19   request to stay Roberts when we first filed the motion.  And

20   I guess one wanted to see how the briefing went, one wanted

21   to see how the argument went, and then maybe finally come

22   back to Judge Gross and say, eh, could you wait and see what

23   the Third Circuit says?

24            If it was so important for that Third Circuit

25   opinion, Libby claimants, the Roberts, Roberts would have

1    filed a motion to stay right away.

2              THE COURT:  Mm hmm.

3              MR. WISLER:  In fact, we were expecting it, if in

4    fact the Plaintiffs were so solid in their position.

5              Again, just to set the stage, following the Hutt

6    DJ action, it is our belief that all non-employees should

7    have been dismissed rather than -- rather, none that we know

8    were dismissed, but many were filed.  And there could be no

9    more guidance than that which was provided to the parties

10   than what Judge Carey provided.

11             It's interesting that -- I'm going to go through a

12   little bit of the argument with respect to Judge Carey's

13   opinion.  But the Plaintiff argues in their briefing, and I

14   found it to be interesting that they said they got what they

15   wanted; we won.  You know, they lost four out of six

16   arguments.  And they lost the four arguments that would've

17   put non-employees in the Plaintiffs' chair in State Court.

18             So, maybe they did get what they wanted.  They

19   were able to salvage the employee claims and be able to file

20   workers and employees of W.R. Grace, but they didn't win the

21   Hutt case or the Osborn case, based on Judge Carey's

22   opinion.

23             So, the reason I said déjà vu all over again, the

24   Plaintiffs have argued this, and they've argued this for the

25   last 17 years.  They argued it during plan confirmation, and

1    we won.  They argued it before Judge Carey, and we won.

2    There's nothing new here with respect to this response.  In

3    fact, Plaintiff never responded substantively even to our

4    motion, and there's a reason for that.

5          So, Your Honor, I'm just going to talk a little

6    bit about our motion.  I think it's been well briefed.

7          THE COURT:  Yes.

8          MR. LONGOSZ:  I think the most hard-hitting part

9    of it -- I'd ask the Court to look at it again as our reply

10   brief.  I think our reply brief really sets it in a concise

11   manner where we stand with respect to this.

12         But just to set the stage, Libby Plaintiffs Hutt

13   and Osborn were former Grace mine employees represented by

14   the same Montana firm, and they sought to test the limits of

15   the channeling injunction by filing the dec action.  No

16   problem there.  I think that's an appropriate way to do it.

17         Hutt and Osborn sought clarification as to the

18   scope of the channeling injunction.  The procedure they used

19   correctly sought permission to file certain specific State

20   Court claims for negligence in the provisional industrial

21   hygiene and bad faith treatment of workers.  And if you look

22   at all these State Court claims, they all have, and they all

23   talk about, negligence in the provision of industrial

24   hygiene.

25         The problem is, they do it on behalf of non-

1    workers.  They just think they can mix and match, they can

2    just throw, you know, the same claims, regardless of what

3    happened in Hutt and Osborn, so that this Court or any court

4    could allow those claims to proceed.

5         Hutt and Osborn's adversary complaint contained

6    three arguments as to why they had not yet filed a court

7    claim at the time should be allowed to proceed outside of

8    the channeling injunction.  And this is important.  The

9    adversary counts, 1 and 4, said that 524(g) does not permit

10   the channeling injunction to enjoin Plaintiffs' claims.

11        524(g) permits third-party injunction only to the

12   extent claims alleged liability derivative of the Debtors,

13   and that arise by specific relationship, including provision

14   of insurance.  Okay?  Recall that Judge Carey rejected that

15   argument.

16        THE COURT:  Yeah.

17        MR. LONGOSZ:  Counts 2 and 4 said if the claims

18   arise by provision of insurance, that insurance must be

19   workers' compensation policies, which are excluded because

20   they were not listed in Exhibit 5 of the plan.  Plaintiffs

21   prevailed on that.

22        Adversary counts 3 and 5 asked if claims arise by

23   provision of insurance, such insurance must be workers'

24   compensation policies, and coverage for workers'

25   compensation benefits may not be channeled by 524(g)

1     injunction.  Plaintiffs -- Judge Carey rejected that

2     argument.

3               So, the only one we're left with, if the claims

4     arise by provision of insurance, that insurance must be

5     workers' compensation policies.  And workers' compensation

6     policies, by their very nature, can only be and include

7     workers, which are excluded because they are not listed in

8     Exhibit 5 to the plan.  That's the only counts that

9     Plaintiff prevailed on.

10              So, put another way, Judge Carey permitted the

11    proposed claims on these narrow grounds.  Part of the

12    argument encompassed within Counts 2 and 4, was that if

13    Plaintiffs' claims arose by provision of insurance, that

14    insurance must be workers' compensation policies because the

15    CGL --

16              THE COURT:  Yes.

17              MR. LONGOSZ:  -- policies excluded claims made by

18    workers, and Plaintiffs Hutt and Osborn were workers.  So,

19    workers' compensation workers; workers' compensation covers

20    employees; Judge Carey said not included in Exhibit 5;

21    Maryland Casualty, too bad; you have to -- you may be

22    responsible, based on the State Court, for employees.

23              I say relief, or the relief requested in Counts 2

24    and 4 was specifically premised on Plaintiffs' status as

25    workers.

1          Now, Judge Carey rejected the broader relief, as I

2     talked about, in Counts 1 and 4, and said that he determined

3     that the asbestos PI channeling injunction was proper under

4     the requirements of 524(g), and that 524(g)'s exclusion for

5     workers' compensation benefits was only for statutory claims

6     for benefits, not tort claims like Hutt's and Osborn's.  So

7     again, he linked it back to 2 and 4, where he permitted

8     workers to proceed.

9          And just on Paragraph -- just referring the Court

10    again to our motion to enforce, Paragraph 27 of the motion,

11    where Judge Carey -- and I don't want to read the whole part

12    in here, but I think it's very important.  "Accordingly, I

13    reject the Plaintiffs' arguments asserting Counts 1 and 6

14    that the Bankruptcy Code 524(g) limits the reach of asbestos

15    PI channeling injunction and prevents this injunction from

16    enjoining Plaintiffs' claims."

17         And Judge Carey goes on to talk about that.  "But

18    I think it's important to say Plaintiffs' claims seek to

19    hold MCC indirectly liable for the conduct of claims against

20    or demands of the Debtors, and those are precisely the non-

21    employee claims.  Also, MCC's provision of insurance to the

22    Debtors is legally relevant to, or at the very least a close

23    nexus to the Plaintiffs' claims because MCC's liability

24    could affect erase of the Debtors' estate, determining that

25    524(g)(4)(A)(2) protects an insurer from claims such as the

1    negligence claim and the bad faith claim is not beyond the

2    jurisdiction of this court."

3              THE COURT:  So, what you would like me to do,

4    basically, is to somewhat narrowly apply Judge Carey's

5    ruling to the Roberts case and say the Roberts case is not a

6    workers' compensation case, and therefore, it is enjoined --

7              MR. LONGOSZ:  And it's not an employee case.

8              THE COURT:  That's right.

9              MR. LONGOSZ:  Not an employee case.

10             THE COURT:  Right.

11             MR. LONGOSZ:  I would love it if the Court would

12   say it's not a workers' compensation case, and we argue

13   that, and I would argue that only workers' compensation

14   cases could proceed.  But in fairness, I think that is

15   certainly something we'll have to argue with respect to the

16   State Court as to what is the extent of the type of claim

17   that can emanate for a worker arising out of a workers'

18   compensation claim --

19             THE COURT:  Okay.

20             MR. LONGOSZ:  -- or case.

21             THE COURT:  Okay.

22             MR. LONGOSZ:  But yes, Your Honor, it's -- if

23   you're not a worker, and you're not -- and you're not

24   covered -- if you're not a worker, you're not covered by

25   workers' compensation.  Only employees are covered by

1    workers' compensation, and only workers' compensation

2    claims, however they may be, only employees with workers'

3    compensation claims or coverage or are entitled to the

4    provision of insurance, and therefore -- so that would be --

5    that's the enforcement of Judge Carey's order.

6              THE COURT:  Okay.

7              MR. LONGOSZ:  And if Judge Carey were here, we'd

8    be asking him for the same thing.

9              THE COURT:  Understood.

10             MR. LONGOSZ:  Your Honor, I think you -- I don't

11   want to beat the dead horse.  I think it's pretty clear what

12   we are asking for.  I do believe that the form in the

13   enforcement motion is proper.  I think we cited cases where

14   -- we wouldn't be asking for an injunction on the

15   injunction.  We don't have to file another adversary

16   proceeding.  I think the case law is in -- and this Court

17   certainly has the power to enforce those orders.  And we're

18   asking the Court to do that.

19             THE COURT:  Okay.

20             MR. LONGOSZ:  The stay, I think we've amply

21   indicated to the Court why the stay doesn't -- the Court

22   does not need to wait for the Third Circuit opinion.  It

23   does not to stay this.  We're asking for enforcement of a

24   final order of this Court.  The channeling injunction is --

25   for purposes of the due process argument, is a universal --

1    has universal enforceability.  And so, therefore, it's

2    pretty simple in terms of what we're asking for here.

3            So, there's no consolidation, there's no necessity

4    for any kind of consolidation, there's no necessity for

5    coming back to the Court and refiling this with some

6    procedural fix that the Plaintiffs are suggesting --

7    actually, they haven't really suggested one other than they

8    would accept service on behalf of all those people that are

9    non-employees.  So, we don't know who they are.  They

10   suggest we should give them names.  How do we know?  We

11   haven't followed the cases.  But what the Court does here in

12   Roberts, I think is going to have a pronounced effect and

13   universal effect on what happens with respect to the non-

14   worker cases.

15            THE COURT:  All right.

16            MR. LONGOSZ:  Thank you, Your Honor.

17            THE COURT:  Thank you.  Thank you, Mr. Longosz.

18   Mr. Cohn?

19            MR. COHN:  Yes.

20            THE COURT:  Mr. Busenkell, good afternoon.

21            MR. BUSENKELL:  Oh, yes.  Good afternoon.

22            THE COURT:  Good afternoon, sir.

23            MR. COHN:  So, we have a legal problem and a

24   practical problem.  Why don't I start off with the legal

25   problem?

```
 1                THE COURT:  All right.
 2                MR. COHN:  So, as against Maryland Casualty --
 3                THE COURT:  Yes.
 4                MR. COHN:  -- the only two parties were Mr. Hutt
 5      and Mr. Osborn, and both of them were workers.  They asked
 6      the Court for permission to -- well, for a declaration that
 7      the asbestos PI channeling injunction did not apply to their
 8      claims, and they prevailed.  They got that.
 9                Mr. Longosz is correct that we were not delighted
10      with the decision as it related to persons other than
11      workers.  But as it happened, Mr. Hutt and Mr. Osborn were
12      both workers and they got what they wanted.  And the
13      prevailing party, as you know, it's elemental civil
14      procedure, is unable to appeal.  No matter how --
15                THE COURT:  Okay.
16                MR. COHN:  -- deleterious the decision might be to
17      their friends, their -- you know, their other co-plaintiffs,
18      other people represented by the same law firm.  It's still
19      elementary civil procedure, Your Honor, that if you're the
20      prevailing party, you cannot appeal.
21                Now, a very similar decision was issued by Judge
22      Carey at the same time as to CNA, and in that case, the
23      parties that we represented lost.  And so, we took that
24      appeal.  So, we did what we could, Your Honor, and brought
25      that case up to the Third Circuit.
```

1            THE COURT:  Okay.

2            MR. COHN:  So, it's simply not the case that --

3    oh, and I'm sorry...  And so, when we talk about this, Judge

4    Carey's order -- and I'm now just back to the Maryland

5    Casualty branch of things -- when we talk about that being a

6    final order, it is indeed a final order, Your Honor, as to

7    Mr. Hutt and Mr. Osborn.  No one else was a party to it, and

8    it's therefore not a final order as to anyone.  It's not

9    binding and enforceable against anyone.  It is -- other than

10   the parties to that case.

11           Now, it's certainly an indication that as to how

12   Judge Carey would rule if similar issues were brought before

13   him, and one can assume that he's not going to change his

14   mind if other claimants come before him and bring the same -

15   - you know and bring the same issues.

16           THE COURT:  Right.

17           MR. COHN:  But just as a matter of civil

18   procedure, Your Honor, we could not appeal and did not

19   appeal.  And the only two parties who were the subject of

20   that opinion prevailed against Maryland Casualty and are

21   pursuing their claims out in Montana against Maryland

22   Casualty.  There is no final order that is enforceable

23   against anyone else.

24           So, the issue then becomes what is the proper rule

25   of law?  And the proper rule of law is the issue that's been

1    brought in front of the Third Circuit, and that will most

2    certainly be relevant to how the rest of these cases

3    decided.  The best way to express, Your Honor -- I mean, we

4    set out, of course, all the arguments in our brief, but the

5    best way to sum it up is to say that there were broad

6    arguments that were made and there were narrow arguments.

7              The narrow arguments had to do with the workers'

8    compensation policy not being with in Exhibit 5 to the Grace

9    plan --

10              THE COURT:  Right, right.

11              MR. COHN:  -- and that's the argument that

12    prevailed against Maryland Casualty.  There were broader

13    arguments as well, though, having to do with whether Section

14    524(g)(4) can even apply to a claim against an insurer for

15    its own wrongdoing.  It is clear, Your Honor, that claims

16    against insurance companies to collect on an insurance

17    policy is clearly -- clearly, those are barred by the

18    channeling injunction in this case and may be barred under

19    Section 524(g)(4).

20              But it is by no means clear, and we -- and a major

21    portion of the argument before the Third Circuit was devoted

22    to our contention that it is not permissible under Section

23    524(g)(4) for an injunction to -- for a channeling

24    injunction to bar claims against an insurer for its own

25    wrongdoing.  Those aren't those, you know, claims against,

1    demands against the Debtor that are referred to in the

2    statute.  And they don't arise by reason of the provision of

3    insurance to the Debtor in the sense that one doesn't need

4    to plead that insurance was provided in order to have a

5    claim against an insurer for its own misconduct.

6            And to understand that, Your Honor, I think we do

7    need to speak about what the basis of the claims against

8    Maryland Casualty is.

9            THE COURT:  All right.

10           MR. COHN:  So, the claims are that Maryland

11   Casualty supplied industrial hygienists, doctors, you know,

12   experts in safety, workplace safety, to Grace at the Libby

13   facility, and that they can do their job.  And they do their

14   job in two respects.

15           One was that they discovered that there was a

16   hazardous situation there and failed to tell the workers or

17   anybody else.  And in fact, as to Maryland Casualty, we have

18   included in the record, there is a letter from an attorney

19   for Maryland Casualty actually saying let's keep this under

20   wraps because we don't want people to know, because it's

21   going to increase our exposure as an insurance company, as

22   an insurance company, and particularly as to workers'

23   compensation claims.  So, there's the deliberate suppression

24   of knowledge that the insurance company had, but that the

25   workers and other residents of Libby, Montana did not have

1    about the hazards of asbestos.

2              And the second way in which they breached their

3    duty was to -- that they're supposed to be experts on

4    industrial hygiene and they faced a situation where there

5    was asbestos dust all over the place, all over the Libby

6    facility and from the Libby facility.  It was all over the

7    town.  I think Mr. Longosz referred to the whole railroad

8    track area, you know, when the train would go barreling

9    through town at 60 miles an hour, asbestos dust would just

10   be -- go up into the air and just blanket the town.

11             So, that was how bad the situation was, Your

12   Honor, and yet, and yet, Maryland Casualty does not appear

13   to have said that the workers needed to have protective gear

14   or in any way be protected from the hazards of asbestos

15   dust.  And of course, it was at its highest concentrations

16   inside the Libby workplace.

17             So, the legal question that all this presents, and

18   the question that will need to be resolved by the courts of

19   Montana, if we're permitted to proceed that far --

20             THE COURT:  Yes.

21             MR. COHN:  -- is who is within ambit of the

22   foreseeable injury from that misconduct?  So, clearly, the

23   workers.  I mean, obviously if you're there onsite and

24   there's dust covering the whole workplace and its asbestos

25   dust, and you know that people are showing lung

1    abnormalities because you've got x-rays of the workers,

2    clearly the workers are within the foreseeable ambit of, you

3    know, who'd be injured by your breach of duty.

4          Our assertion, Your Honor, is that it was also

5    foreseeable that when a worker went home to his family,

6    walked in the door, you know, still covered with asbestos

7    dust, because part of the problem was there were no showers,

8    there were no procedures for them to emerge from the

9    facility at least, without asbestos dust all over them.

10          So, they would go home.  You know, they'd hug

11   their wives and their children, and many of those came down

12   with asbestos disease.  Was that foreseeable?  Well, that's

13   an issue for the Montana courts.  Mr. Longosz will

14   presumably argue no, but that's an issue for the Montana

15   courts to decide.

16          And similarly, with respect to the community at

17   large, if you see asbestos dust blanketing -- you know,

18   blanketing the community, and people are walking down the

19   street and it's in the air, and Libby is in a valley --

20          THE COURT:  Right.

21          MR. COHN:  -- and the air just kind of

22   recirculates it.

23          THE COURT:  Right.

24          MR. COHN:  Was it foreseeable that community

25   members would be harmed by this breach of duty by Maryland

1    Casualty?  That too is a question for the Montana courts.

2            Now, I understand the argument that says that,

3    well, we were just a workers' compensation carrier and what

4    we did when we went to the workplace to -- you know, had

5    only to do with our duties as a workers' compensation

6    carrier.

7            But under Montana law -- and we cited cases in the

8    Third Circuit briefing on this, and in fact, it was the

9    subject of oral argument that they showed a lot of interest

10   in -- once you undertake the duty -- and in this case it may

11   have been a duty that they undertook as workers'

12   compensation carrier, but it doesn't matter on what basis

13   that undertook the duty -- the question was, who was within

14   foreseeable ambit of harm, who would have been injured if

15   they breached that duty?

16           THE COURT:  Yeah.

17           MR. COHN:  So, that ultimately will be the issue.

18   I'm not -- I'm laying it out here, really, by way of

19   background because no one would suggest that that's a

20   federal issue.

21           THE COURT:  Right.

22           MR. COHN:  The federal issue is, assuming that

23   that claim is valid under state law, is it within the

24   channeling injunction?  In other words, if the way that it

25   arises is not because of an insurance policy, but if it

1   arises because, for one reason or another, Maryland Casualty

2   undertook these activities and foreseeably could predict

3   that people would be injured by a breach of those -- by the

4   improper execution of those responsibilities, may such a

5   claim proceed, notwithstanding the asbestos PI channeling

6   injunction.  That's the issue that will ultimately need to

7   be decided by this Court.

8            Now, the question is when, and what's the orderly

9   process for adjudication?  Well, given that those issues of

10  statutory construction which are applicable to CNA and to

11  MCC, having to do with, you know, not the narrow issue of

12  was the CNA workers' compensation policy listed in Exhibit

13  5, but the broader issue of how does -- what limits do

14  Section 524(g)(4) place on a channeling injunction as it

15  relates to the insurer's own misconduct.  That issue is

16  before the Third Circuit, and the Third Circuit will

17  presumably decide it.

18           It is true that they could perhaps come up with

19  narrow grounds for a decision vis-à-vis CNA.  I mean, far be

20  it from me to predict what a panel of judges as brilliant

21  as, you know, Judge Ambro and the two others would --

22           THE COURT:  Right.

23           MR. COHN:  -- would say.  But I think we're

24  certainly going to learn something and that that something

25  will be valuable for this Court in terms of its disposition

1    of the claims against not just CNA, but also MCC.

2              THE COURT:  When was the argument before the Third

3    Circuit, Mr. Cohn, again?

4              MR. COHN:  It was in March, Your Honor.

5              THE COURT:  March.  Okay.

6              MR. COHN:  Yeah.  So, I'm told that under their

7    procedures, we actually could get a decision as early as

8    next month, but I'm kind of, you know, it's --

9              THE COURT:  It's possible.

10             MR. COHN:  I would expect that they might take a

11   little bit longer.

12             THE COURT:  Right.

13             MR. COHN:  So, now let's talk about some practical

14   concerns.

15             THE COURT:  Okay.

16             MR. COHN:  Because really, what this is all about

17   is an orderly adjudication.  So, well, the first practical

18   problem I just want you to be familiar with, because it

19   really goes to this whole idea that somehow the conduct of

20   the Libby claimants' counsel has been contemptuous.  Here is

21   the problem that we face.  If the injunction does not apply

22   to bar these claims, the statute of limitations does -- you

23   know, does apply, and claims must be brought during the

24   limitations period.

25             So, the question is, how do you deal with that

1   when there is a genuine issue that's been presented about

2   whether the injunction applies or does not apply?  This is

3   not the classic situation, Your Honor, where you say, well,

4   don't worry about if an injunction applies because the

5   limitations period is stayed during the applicability of an

6   injunction.

7          Here, it's the converse situation.  It's that in

8   the situation where the injunction does not apply, we need

9   to make sure that we keep our eye on the statute of

10  limitations.

11         THE COURT:  Yes.

12         MR. COHN:  So, the limitations period in Montana

13  begins to run when the injury is diagnosed.  So, you get a

14  diagnosis from your doctor and you have to bring suit within

15  -- I think it's three years.  Three?

16         MAN 1:  Yeah, three.

17         MR. COHN:  Thank you.  Three years thereafter.

18  And there are ways you can bring suit, but then you can sit

19  on the complaint.  You don't have to serve it right away.

20         THE COURT:  Which is what you did?

21         MR. COHN:  Exactly.  So, the idea is you draw it

22  out as long as possible, the time when -- because we don't

23  want to put Maryland Casualty to the task of responding to

24  complaints if they are barred by the injunction.  And

25  frankly, we don't want to ourselves litigating cases that

1  are barred by the injunction.  So, the whole idea is to --

2  is when cases aren't -- if we don't know yet whether the

3  cases are barred by the injunction, let's put it off as long

4  as we can.

5          In the case of -- and the Asbestos Court, the

6  formation of the Asbestos Court, has actually very

7  conveniently provided a means to do that, because that court

8  is sequencing cases.  And so, Mr. Hutt is going first

9  because we know that Mr. Hutt is allowed to proceed free of

10  the channeling injunction.

11          THE COURT:  Right.

12          MR. COHN:  And others wait their turn and can --

13  and by then, we'll have a final decision of the --

14          THE COURT:  Third Circuit.

15          MR. COHN:   -- of the Third Circuit, and you know,

16  I think, thereafter probably this Court, as it relates to

17  specific claims.  So, that's the rubric in which we're

18  operating.

19          Now, Mr. Longosz did make reference to the Hunt

20  case.

21          THE COURT:  Yes.

22          MR. COHN:  I apologize, by the way.  We didn't set

23  it up this way to have there be only one letter's difference

24  between the names of the two subject Plaintiffs here.

25          THE COURT:  Right.

1          MR. COHN:  But the Hunt case, for odd reasons, is

2     not in the Asbestos Court.  I think it's the only case

3     that's been referred to here this afternoon that is not in

4     the Asbestos Court.

5          THE COURT:  Okay.

6          MR. COHN:  And as Mr. Longosz indicates, that

7     judge has put it on a -- you know, on a schedule to be -- to

8     actually be tried.

9          THE COURT:  Right.

10          MR. COHN:  And I understand the practical

11    difficulty that Mr. Longosz faces.  And now, I can tell you

12    that there has never been a motion in that court to stay the

13    proceedings in that case.  But whether there is or there

14    isn't, the fact is that if this Court were to, on a purely

15    practical basis, issue a temporary stay of proceedings in

16    that case, we would not object, Your Honor, because that is

17    a practical problem that we all face, which is a case that

18    is going to trial at a time when we don't yet have a final

19    order determining whether the claim can.

20          But as to all the other cases, Your Honor, there

21    is no need, in terms of protecting Maryland Casualty from

22    having to respond to cases at a time when it's not clear

23    whether those cases can proceed.  There are no other cases

24    to which that applies.  And so, therefore, there is no need

25    at this point for -- you know, for the entry of relief by

1    this Court.  And conversely, Your Honor, there is certainly

2    -- well, there are two forms of very important harm that

3    will take place if this Court does proceed.

4             One is just the waste of judicial time and

5    resources for you to essentially try to anticipate what the

6    Third Circuit is going to do on those issues that overlap,

7    which are the major ones, you know, the broad issues that I

8    described of whether Section 524(g)(4) applies.

9             You cannot simply apply Judge Carey's decision

10   because Judge Carey's decision only binds the parties

11   thereto.  And so, you need to make up your own mind and

12   write a decision, and that decision will -- you know, you

13   could be perfectly prescient and know exactly what Judge

14   Ambro is going to write for that panel, and yet why go

15   through the effort?  I mean, why does that make sense as a

16   deployment of judicial resources?  Why not first get

17   guidance from the Third Circuit and then, to the extent that

18   there are remaining issues that are open, you know, let's

19   come back here and figure out how we're going to deal with

20   them?

21            To the extent the Third Circuit is clear on what -

22   - on it, then obviously, you know, short of a, you know,

23   rehearing (indiscernible) or the Supreme Court, or whatever

24   --

25            THE COURT:  Right.

1          MR. COHN:  -- short of that, Your Honor, we

2     recognize that.  If we lose there, we have to dismiss those

3     cases that the Court rules are barred by the injunction.

4     But not until then, Your Honor.  And that leads to the

5     second point.

6          Okay.  It's not just a waste of judicial

7     resources; it's the unfairness to the people that Mr.

8     Longosz would have you dismiss their cases.  If we don't

9     know -- if we don't know yet whether those cases can proceed

10    or not proceed under the injunction, and we're required to

11    dismiss them, the limitations period has run.

12          So, what happens if we now -- if it now turns out

13    we prevail in the Third Circuit, and you say, well, based on

14    that rationale, you can bring these cases -- you can bring

15    these cases down here, or you can bring them to Montana?  Is

16    Mr. Longosz going to take the position at that point that

17    the statute of limitations bars us from refiling those

18    cases?

19          So, what justice requires, Your Honor, is that you

20    not take any action requiring dismissal of the cases until

21    it is finally decided that those cases are barred by the

22    asbestos channeling injunction.  And in the meantime, Your

23    Honor, we commit, as we have in fact done in the Montana

24    Asbestos Court, that we are not going to try to move forward

25    on any cases where there is a dispute about whether the

1    injunction applies.

2              So, that, I would respectfully submit, is both the

3    practical and the just outcome of the proceedings today.

4              THE COURT:  All right.  Thank you, Mr. Cohn.

5    Thank you.  I understand your position.  Mr. Wisler?

6              MR. LONGOSZ:  Your Honor, I think I've lost my

7    voice, so if Mr. Wisler could reply for me.

8              THE COURT:  That's fine.

9              MR. LONGOSZ:  Thank you.

10             THE COURT:  Of course.  Mr. Wisler, yes, sir.

11             MR. WISLER:  Thank you, Your Honor.

12             THE COURT:  Mr. Cohn has offered a stay --

13             MR. WISLER:  Right.

14             THE COURT:  -- as I understand it.

15             MR. WISLER:  That won't help, and I'm going to

16   explain to Your Honor why.

17             THE COURT:  Okay.

18             MR. WISLER:  Mr. Cohn says there's two problems.

19   There's actually three.  There are legal and practical

20   problems, but there's also factual issues that are

21   important.

22             You know, Mr. Cohn spent a lot of time talking to

23   you about the theory of his claims.  But it's inescapable

24   that all of those claims arise out of Grace asbestos.  And

25   those claims are derivative claims against Grace, and that's

1    why there was a bankruptcy and a plan of reorganization, and

2    a Section 524 channeling injunction.  That's why we're here.

3              Now, was there some issue about whether -- before

4    Judge Carey ruled, was there some issue that could be

5    brought in good faith as to whether workers or non-workers

6    could bring these bad faith claims?  Sure.  And that's why

7    we litigated.  And that's why Judge Carey ruled.  But now we

8    know.

9              The second factual issue is, Your Honor -- I don't

10   think Your Honor ought to do this; you're too busy -- but if

11   you go back and look at the transcript from the argument in

12   front of Judge Carey a couple years ago, you will find Mr.

13   Cohn saying exactly the same things about theories of duty

14   to warn workers, and towns and dust, and all of their

15   claims.  It's the same argument they're making to you again.

16   Those are the facts.

17             Let me read a line from Judge Carey's opinion.

18             THE COURT:  All right.

19             MR. WISLER:  "While I am sympathetic to the

20   individuals that may have suffered serious injuries, the

21   purpose of the asbestos PI trust is to ensure that there is

22   a fund available to compensate the victims, and there is

23   such a trust, as well as the future claimants, while also

24   providing finality to insurers who contributed to the

25   trust."

1          There's a trust with hundreds of millions of

2   dollars, and Mr. Cohn's clients have access to those funds

3   for their claims.  In fact, as Mr. Cohn will tell you, they

4   got multipliers for their claims as part of plan

5   confirmation.  And Maryland Casualty contributed to those

6   funds.  That's why Maryland Casualty is legally entitled to

7   the benefit of the asbestos PI channeling injunction.

8          But Judge Carey's last few words are important.

9   There has to be finality.  And we're here enforcing final

10  orders of the Court, and that's important in bankruptcy, as

11  Your Honor knows.

12         THE COURT:  Yes.

13         MR. WISLER:  Judge Carey's order is final.  With

14  due respect to Mr. Cohn, I'm not a civil procedure

15  professor, but the idea that he couldn't have appealed an

16  order that denied and dismissed two counts of his complaint,

17  or four counts of his complaint, is nonsense.  But it

18  doesn't matter.  The order is in fact final.  The Third

19  Circuit cannot reverse that order.

20         THE COURT:  Right.

21         MR. WISLER:  The Third Circuit may, as Mr. Longosz

22  suggested, have some dicta that could affect it.  But not

23  only can't the Third Circuit Reverse it, but Your Honor, at

24  what point do we consider a bankruptcy court final and

25  enforceable, when I suppose someday in a completely separate

1    appeal, in a completely separate adversary proceeding, there

2    may some day be some dicta or words out of the Third Circuit

3    that could affect a ruling that happened before?  You see

4    that all the time.

5              THE COURT:  It does, yes.

6              MR. WISLER:  So, we're here because there are

7    final orders to enforce.  And Your Honor, I don't file -- I

8    don't put my name on sanctions motions lightly.  But this

9    takes us to the third piece I was telling you about, which

10   is the practical piece.

11             Since 2001, this has been a non-ending shell game.

12   And this is not a criticism of Mr. Cohn.  I don't mean it to

13   be personal at all.  But if you look back at the history of

14   this case, it started with complaints against Maryland

15   Casualty for, among other things, aiding and abetting W.R.

16   Grace in conspiracy with W.R. Grace.  And Judge Fitzgerald

17   ruled that those claims were enjoined by the injunction that

18   was in place in the case.

19             And the next move of the Libby claimants and the

20   (indiscernible) attorneys and Plaintiffs' attorneys in

21   Montana was to get rid of those counts and call it something

22   else.

23             THE COURT:  Mm hmm.

24             MR. WISLER:  And since then, we've seen claims as

25   in Maryland Casualty's insurer, just Maryland Casualty not

1   as insurer.  We've seen claims for negligence.  We now see

2   claims for strict liability.  The claims morph as this Court

3   rules.  As Judge Fitzgerald ruled that one thing was dead,

4   the Plaintiffs' attorneys came up with something else that

5   they said, well -- it reminds me of a "Saturday Night Live"

6   skit, Your Honor.  It was a person could win a million

7   dollars if they guess the color that you thought of.  And

8   they said, "yellow", and the moderator said, "Darn, I was

9   thinking of an off-yellow."  And that's what they do.  They

10  say, well, this isn't yellow; it's off-yellow.

11           THE COURT:  Yeah.

12           MR. WISLER:  But the practical problem is, Your

13  Honor, every time this Court rules, something new comes out

14  of Montana.  And the latest twist is -- excuse me one second

15  -- that they filed a complaint in this court and asked for a

16  declaratory judgment on two individuals as a test case.  And

17  they won two of their four counts of that complaint.

18           THE COURT:  Yes.

19           MR. WISLER:  And they did that as a test case.

20  There's no question about that.  But now their position is,

21  well, we won these two counts, so we can go ahead with

22  everybody on these worker claims.  But if Maryland Casualty

23  comes in here and says, Your Honor, enforce Judge Carey's

24  ruling -- they say, well, hold on, that only applies to Hutt

25  and Osborn; I've got some new plaintiffs for you, I'm going

1    to file a new adversary proceeding, which they did two weeks

2    ago.  We've got new plaintiffs for you, Judge.  And if Your

3    Honor rules against them, they'll have new plaintiffs for

4    you again, with more off-yellow, or off-orange, or off-blue,

5    whatever the case may be.  That's our practical problem.

6            We can't keep chasing the shell game.  There are

7    final orders in place.  And if they get changed next month,

8    or next year, or 10 years from now, that doesn't change the

9    fact that they're being violated.  And we didn't file the

10   motion to enforce to punish people.  We filed the motion to

11   enforce so Your Honor would say orders of this Court mean

12   something.

13           THE COURT:  Yeah.

14           MR. WISLER:  And finally, on the due process and

15   Your Honor's point about we didn't bring a sort of class

16   claim, or whatever it is.  Your Honor, the asbestos PI

17   channeling injunction is a form of -- it was part of a plan

18   confirmation order.  And plan confirmation orders, to the

19   extent they have injunctions, are enforceable against the

20   world.

21           Mr. Cohn doesn't argue that the asbestos PI

22   channeling injunction isn't something applicable to all of

23   his co-counsels' potential plaintiffs in Montana, because it

24   is enforceable against all of them.  It's a Federal Court

25   injunction that applied all claims -- claimants who would

1    file.  So, yes, there is a -- we'll call it a clarification

2    order from Judge Carey, and only two parties were parties to

3    that because those are the only two parties that Mr. Cohn

4    brought to this Court.  But that was only a channeling

5    injunction -- I'm sorry, a declaratory judgment to clarify

6    an injunction that we're here to enforce.  And that's the

7    asbestos PI channeling injunction.

8              And we know from Judge Carey's ruling that the

9    asbestos PI channeling injunction enjoins claims against

10   non-workers, against -- I'm sorry, by non-workers --

11             THE COURT:  Right.

12             MR. WISLER:  -- against Maryland Casualty.  That's

13   what we know.  That's what we're here to enforce.  Due

14   process, stays, everything else doesn't that.  The orders

15   are final, regardless of whether they change someday or not.

16             THE COURT:  All right.  Thank you, Mr. Wisler.

17   That was helpful.  Mr. Cohn, anything further from you?

18             MR. COHN:  Just one brief point, Your Honor.

19             THE COURT:  Yes.

20             MR. COHN:  It is simply not the case that Judge

21   Carey's decision says that non-worker claims are barred.

22   What he said is that claims are barred except to the extent

23   that they arise out of or are based upon MCC's workers'

24   compensation policies.

25             So, I understand that they're taking the position

1   that a non-worker cannot state a claim that arises out of

2   the workers' compensation policies.  But in this case, to

3   the extent that Maryland Casualty undertook duties as

4   workers' compensation carrier, had a duty to disclose

5   dangers they had found in the workplace, sent the industrial

6   hygienist in, they should have fixed the dust problem --

7   they didn't -- to the extent that those duties were

8   undertaken as a workers' compensation carrier, but others

9   had the right to benefit from the ambit of foreseeable harm

10  if those duties were breached, those people too resubmit can

11  bring claims.

12          And Judge Carey -- that was not an issue that he

13  ruled upon.  And not only that, I don't think he would have

14  ruled upon it because, as he himself said in his decision,

15  "Those are matters for state law.  My role is to describe

16  what the channeling injunction permits or bars.  My role is

17  not to decide whether these are valid claims under state

18  law."

19          So, to the extent that anyone, a worker, or a

20  spouse of a worker, or a community member wants to go to

21  Montana and bring suit arising out of the workers'

22  compensation policies, they may do so under Judge Carey's

23  order.  I didn't dwell on this the first time because Judge

24  Carey's order doesn't apply anyway because it was just as

25  between the parties.  But when you look at what he actually

1    said, he is not barring anybody from bringing suit arising

2    out of the MCC workers' compensation policies.  Thank you.

3              THE COURT:  Thank you, Mr. Cohn.

4              MR. WISLER:  Your Honor, just a dozen words.

5              THE COURT:  You get the last word.  It's your

6    motion.

7              MR. WISLER:  Thank you, Your Honor.  Mr. Cohn's

8    right.  He didn't make that argument before.  That's the

9    off-yellow that we fear that will never end.

10             THE COURT:  Right.  Yeah.  Okay.  Well, you know,

11   I'm not going to rule today.  I'm obviously going to reserve

12   decision because I want to go back, I want to look at Judge

13   Carey's opinion again, and look at the arguments again.  And

14   then I'll issue a ruling this promptly as I can.  It's

15   clearly an important matter.

16             And you know, my sense is that the channeling

17   injunction was intended to bring some banality to disputes.

18   And what I have to determine is whether or not the claims,

19   in particular of Ms. Roberts, fall within -- without that

20   finality.  And I think that's really the issue before the

21   Court, and the one that I'll have to decide, and the one

22   that I'll have to decide carefully because it obviously has

23   implications.

24             So, I appreciate your briefing.  I appreciate the

25   arguments.  And then I'll reserve decision and decide the

1    matter.  All right.  Thank you all.  Thank you for good

2    arguments.  Safe travel.

3              ALL:  Thank you, Your Honor.

4              THE COURT:  And with that, we'll stand in recess.

5    Good afternoon, everyone.

6              MR. WISLER:  Good afternoon, Your Honor.

7                        * * * * *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  C E R T I F I C A T I O N

2

3       I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5

6   Sonya Ledanski Hyde

Digitally signed by Sonya
Ledanski Hyde
DN: cn=Sonya Ledanski Hyde, o,
ou, email=digital1@veritext.com,
c=US
Date: 2018.05.07 15:30:47 -04'00'

7

8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  May 7, 2018