# Exhibit A

FILED

03/21/2019

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: OP 19-0051

IN THE SUPREME COURT OF THE STATE OF MONTANA
No. OP-19-0051

_____

MARYLAND CASUALTY COMPANY,

Petitioner,

v.

THE ASBESTOS CLAIMS COURT, and THE HONORABLE AMY EDDY,
ASBESTOS CLAIMS COURT JUDGE,

Respondent.

_____

**OPENING BRIEF OF PETITIONER MARYLAND CASUALTY
COMPANY**

_____

Original Proceeding Arising from the Montana Asbestos Claims Court, *In re
Asbestos Litigation*, Cause No. AC-17-0694, The Honorable Amy Eddy Presiding
Judge; Applicable to *Hutt v. Maryland Casualty Company, et al,*, Cascade County;
Cause No. DDV-18-0175, Judge John Parker

_____

**APPEARANCES:**

Daniel W. Hileman
Kaufman Vidal Hileman Ellingson, P.C.
22 2nd Avenue, West
Kalispell, MT 59901
(406) 755-5700
dwh@kvhlaw.com
*Attorney for Petitioner, Maryland Casualty Company*

Allan M. McGarvey
Dustin Leftridge
345 1st Avenue East
Kalispell, Montana 59901
(406) 752-5566
*Attorneys for Plaintiff Ralph V. Hutt*

Edward J. Longosz, II
Mark A. Johnston
Kennedy C. Ramos
ECKERT SEAMANS CHERIN
    & MELLOTT, LLC
1717 Pennsylvania Avenue, NW
12th Floor
Washington, D.C. 20006
(202) 659-6600 Telephone
elongosz@eckertseamans.com
mjohnston@eckertseamans.com
kramos@eckertseamans.com
*Attorneys for Petitioner, Maryland Casualty Company*

Hon. Amy Poehling Eddy
920 South Main
Kalispell MT 59901
*Asbestos Claims Court Judge*

i

# TABLE OF CONTENTS

STATEMENT OF THE ISSUES..............................................................................1

STATEMENT OF THE CASE...............................................................................1

STATEMENT OF FACTS .....................................................................................2

   A.  General Background ...................................................................................3

   B.  MCC's Limited Role as Workers' Compensation Insurer .............................3

   C.  Inspections and Industrial Hygiene Input for the Libby Plant ......................5

         1.     *The State of Montana (the "State")* ....................................................6

         2.     *Johns-Manville ("J-M")* ........................................................6

         3.     *Federal Entities* ..............................................................7

         4.     *Grace's Internal Dust Control & Worker Safety*
                  *Activities* ...............................................................8

               *a.*     *Grace's Focus on Dust Control & Worker*
                      *Safety* ...........................................................8

               *b.*     *Grace's Medical Review* ...........................................9

               *c.*     *Grace's Safety Program* .........................................11

   D.  Ralph V. Hutt...........................................................................14

STANDARD OF REVIEW ...................................................................................15

SUMMARY OF THE ARGUMENT .....................................................................15

ARGUMENT ........................................................................................................17

   I.  The ACC Applied an Incorrect Standard on the Issue of
      Duty .........................................................................................................17

A.    The ACC's Order is Based on a Mistake of Law ...............................17

B.    Section 324A is the Proper Test for Determining
Whether a Duty Exists.........................................................................20

C.    The Vast Majority of Jurisdictions Have Applied
§ 324A Under Similar Facts.................................................................25

D.    Foreseeability Determines the Scope of the Duty,
Not Whether a Duty Exists..................................................................28

    1.    Foreseeability Determines to Whom a Duty
is Owed .....................................................................................28

    2.    Foreseeability Alone is an Unworkable Test
for Duty .....................................................................................32

II.    There is No Duty Under § 324A ....................................................................33

A.    There is No Increased Risk of Harm Under § 324A(a) .....................35

B.    There Was No Undertaking of a Duty Owed by Another
Under § 324(b) ....................................................................................36

C.    There Was No Reliance Under § 324(c) .............................................38

CONCLUSION ......................................................................................................40

# TABLE OF AUTHORITIES

## Cases

*Alder v. Bayer Corp., AGFA Div.*, 61 P.3d 1068, 1078 (Utah 2002) ......................31

*Am. Mut. Liab. Ins. Co. v. St. Paul Fire & Marine Ins. Co.*,
179 N.W.2d 864, 868, 870, n.2 (Wis. 1970) ..................................29

*Auler v. Van Natta*, 686 N.E.2d 172, 175 (Ind. Ct. App. 1997) ..............................30

*Berry v. Tessman*, 170 P.3d 1243, 1247 (Wyo. 2007).............................................31

*Brady v. Ralph M. Parsons Co.*, 82 Md. App. 519, 534
(Md. Ct. Spec. Ap. 1990)................................................................30

*Burns v. Gagnon*, 727 S.E.2d 634, 644 (Va. 2012) ..................................................31

*Butler v. Advanced Drainage Systems, Inc.*,
698 N.W. 2d 117, 127 (Wis. 2005) ...............................................41

*Cline v. Avery Abrasives, Inc.*, 409 N.Y.S.2d 91, 99
(N.Y. Sup. Ct. 1978).......................................................................29

*Commercial Union Ins. Co. v. DeShazo*, 845 So. 2d 766,
769-70 (Ala. 2002)..........................................................................28

*DeCaire v. Pub. Serv. Co.*, 479 P.2d 964, 967 (Colo. 1971)...................................30

*Derosia v. Liberty Mut. Ins. Co.*, 583 A.2d 881, 883 (Vt. 1990) ............................29

*Emanuel v. Great Falls School Dist.*, 2009 MT 185, ¶ 14,
351 Mont. 56, 60, 209 P.3d 244, 247-78............................................... 18, 22

*Erickson v. Curtis Inv. Co.*, 447 N.W.2d 165, 170 (Minn. 1989) ...........................30

*Fackelman v. Lac d'Amiante du Quebec*, 942 A.2d 127, 131
(N.J. Super. Ct. App. Div. 2008) .......................................................... 26, 35

*Fisher v. Swift Transp. Co., Inc.*, 2008 MT 105, ¶¶ 14-26,
342 Mont. 335, 339-42, 181 P.3d 601, 606-08 ..................................... 19, 32

*Gaudreau v. Clinton Irrigation Dist.*, 2001 MT 164, ¶¶ 21, 26,
306 Mont. 121, 125–27, 30 P.3d 1070, 1074-75..........................................34

*Gazo v. City of Stamford*, 765 A.2d 505, 510 (Conn. 2001) ...................................30

*Glanzer v. Shepard*, 135 N.E. 275 (N.Y. 1922)......................................................25

*Grady v. Jones Lang LaSalle Constr. Co., Inc.*,
193 A.3d 283, 290–91 (N.H. 2018)...............................................31

iv

*Grogan v. Uggla*, 535 S.W.3d 864, 875 (Tenn. 2017) ..............................................31

*Hamilton v. Beretta U.S.A. Corp.*, 750 N.E.2d 1055, 1061,
    *opinion after certified question answered*,
    264 F.3d 21 (2d Cir. 2001) ...................................................................37

*Hartford Steam Boiler Inspection & Ins. Co. v. Cooper*,
    341 So. 2d 665, 668 (Miss. 1977) ........................................................28

*Hauseman v. Koski*, 259 Mont. 498, 500,
    857 P.2d 715, 716 (1993) .....................................................................15

*In re All Maine Asbestos Litig.*, 581 F. Supp. 963, 978
    (D. Me. 1984), *on reconsideration sub nom. In re All Maine
    Asbestos Litig. (BIW cases)*, 651 F. Supp. 913 (D. Me. 1986),
    *opinion supplemented on denial of reconsideration sub nom.
    In re All Maine Asbestos Litig.*, 655 F. Supp. 1169 (D. Me. 1987),
    and *aff'd sub nom. In re All Maine Asbestos Litig. (BIW Cases)*,
    854 F.2d 1328 (Fed. Cir. 1988) ...........................................................30

*In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*,
    113 F.3d 1484, 1493 (8th Cir. 1997) ...................................................39

*Jackson v. Department of Family Servs.*, 1998 MT 46, ¶ 48,
    287 Mont. 473, 490, 956 P.2d 35, 46 ..................................................26

*Jackson v. State*, 1998 MT 46, ¶ 39, 287 Mont. 473, 487,
    956 P.2d 35, 44 ....................................................................................19

*Johnson v. Aetna Cas. & Sur. Co.*, 348 F. Supp. 627, 629
    (M.D. Fla. 1972) ..................................................................................28

*Kennard v. Liberty Mut. Ins. Co.*, 277 So. 2d 170, 172-73
    (La. Ct. App. 1972)...............................................................................28

*Kohr v. Johns-Manville Corp.*, 534 F. Supp. 256, 258
    (E.D. Pa. 1982) ....................................................................................29

*Krieg v. Massey*, 239 Mont. 469, 472, 781 P.2d 277, 279 (1989)..........................22

*Leroy v. Hartford Steam Boiler Inspection & Ins. Co.*,
    695 F. Supp. 1120, 1126-27 (D. Kan. 1988) ......................................28

*Lokey v. Breuner*, 2010 MT 216, ¶¶ 10-12, 358 Mont. 8, 10–11,
    243 P.3d 384, 385–86 ................................................................... 25, 35

*Lopez v. Great Falls Pre-Release Servs., Inc.*, 295 Mont. 416, 422,
    986 P.2d 1081, 1085 (1999) ......................................................... 18, 23

*Mang v. Eliasson*, 153 Mont. 431, 437, 458 P.2d 777, 781 (1969) .........................34

*McClue v. Safeco Ins. Co. of Illinois*, 2015 MT 222, ¶ 8,
    380 Mont. 204, 206, 354 P.3d 604, 606 .........................................15

*Miller v. Bristol-Myers Co.*, 485 N.W.2d 31 (Wis. 1992) ...............................44

*Mueller v. Daum & Dewey*, Inc., 636 F. Supp. 192, 195
    (E.D.N.C. 1986) ..............................................................29

*Myers v. United States*, 17 F.3d 890, 903 (6th Cir. 1994) .......................................41

*Nelson v. Driscoll*, 1999 MT 193, ¶ 39, 295 Mont. 363, 378,
    983 P.2d 972, 982 ................................................................ 19, 26

*Obenauer v. Liberty Mut. Ins. Co.,* 908 F.2d 316, 317
    (8th Cir. 1990) ......................................................................29

*Onsager v. Frontera Produce Ltd.*, 2014 WL 3828374, at *5
    (D. Mont. 2014) ........................................................ 23, 34, 35, 36

*Orr v. State*, 2004 MT 354, ¶ 47, 324 Mont. 391, 407,
    106 P.3d 100, 111 ..............................................................21

*Ostendorf v. Clark Equip. Co.*, 122 S.W.3d 530, 539
    (Ky. 2003) ..........................................................................30

*Palsgraf v. Long Island R. Co.*, 162 N.E. 99 (N.Y. 1928) ...............................33, 34

*Patentas v. United States*, 687 F.2d 707, 716 (3d Cir. 1982) ..........................39, 41

*Patton v. Simone*, No. CIV. A. 90C-JL-219,
    1993 WL 54462, at *7-9 (Del. Super. Ct. Jan. 28, 1993).............................28

*Pippin v. Chicago Hous. Auth.*, 399 N.E.2d 596, 600 (Ill. 1979)...........................30

*Prindel v. Ravalli County*, 2006 MT 62, ¶¶ 25, 36, 331 Mont. 338,
    349-50, 355 133 P.3d 165, 174, 178..............................................23

*Pulka v. Edelman*, 358 N.E.2d 1019, 1022 (N.Y. 1976),
    *rearg. denied* 362 N.E.2d 640 (N.Y. 1977).....................................37

*Root v. Stahl Scott Fetzer Co.*, 88 N.E.3d 980, 991 (Ohio 2017)*,*
    *appeal not allowed*, 96 N.E.3d 300 (Ohio 2018) .........................................31

*Salvo v. Hewitt, Coleman & Assocs., Inc.*, 260 S.E.2d 708, 711
    (S.C. 1979)..........................................................................29

*Samson v. State*, 2003 MT 133, ¶ 24, 316 Mont. 90, 69 P.3d 1154 .................23, 32

*Schoenwald v. Farmers Co-op. Ass'n of Marion*,
    474 N.W.2d 519, 520 (S.D. 1991).................................................29

*Seay v. Travelers Indemnity Co.*, 730 S.W.2d 774, 776
(Tex. App.—Dallas 1987, no writ) .................................................................29

*Simon v. Omaha Pub. Power Dist.*, N.W.2d 157, 168
(Neb. 1972) ........................................................................................................30

*Sims v. Am. Cas. Co.*, 206 S.E.2d 121, 130, *aff'd sub nom.*
*Providence Washington Ins. Co. v. Sims*, 209 S.E.2d 61
(Ga. 1974) ..........................................................................................................28

*Smith v. Allendale Mut. Ins. Co.*, 303 N.W.2d 702, 709
(Mich. 1981) ......................................................................................................28

*Stacy v. Aetna Cas. & Sur. Co.*, 484 F.2d 289, 292
(5th Cir. 1973) ...................................................................................................12

*Stanley v. McCarver*, 92 P.3d 849, 853 (Ariz. 2004) ............................................30

*Stewart v. Standard Pub. Co.*, 102 Mont. 43, 55 P.2d 694, 696
(1936)..................................................................................................................26

*Swift v. Am. Mut. Ins. Co. of Bos.*, 504 N.E.2d 621, 624 (Mass. 1987)...................12

*Thompson v. Bohlken*, 312 N.W.2d 501, 507 (Iowa 1981); ...................................28

*Truitt v. Diggs*, 611 P.2d 633, 637 (Okla. 1980) ....................................................31

*Vaughan v. E. Edison Co.*, 719 N.E.2d 520, 525
(Mass. App. Ct. 1999)........................................................................................30

*Vesel v. Jardine Mining Co.*, 110 Mont. 82,
100 P.2d 75, 80 (1939) ......................................................................................26

*Windsor v. Pittsburg Coal*, 1993 Mont. Dist. LEXIS 707, *4-6
(Mont. Dist. Ct. 1993)........................................................................................44

*Wurst v. Nat'l Oil & Supply Co.*, 780 S.W.2d 97, 102
(Mo. Ct. App. 1989) ..........................................................................................28

## **Statutes**

Mont. Code Ann. § 39-71-1501 ................................................................................27

Mont. Code Ann. § 39-71-1502....................................................................... 19, 28

Mont. Code Ann. § 39-71-1508(1) ...........................................................................28

Mont. Code Ann. § 50-71-201 ..................................................................................37

## **Other Authorities**

57A Am. Jur. 2d Negligence § 78..............................................................................18

*Breach of Assumed Duty to Inspect Property as Ground for
    Liability to Third Party*, 13 A.L.R. 5th 289....................................................25

Restatement (Second) of Torts § 323 (1965).................................................... 23, 24

Restatement (Second) of Torts § 324A (1965)............................................... passim

## STATEMENT OF THE ISSUES

1.     Did the Asbestos Claims Court commit a mistake of law by failing to apply the Restatement (Second) of Torts § 324A ("§ 324A") in order to determine whether Maryland Casualty Company, a workers' compensation insurer, owed an affirmative duty to an employee of its insured, W.R. Grace & Co.?

2.     Did Maryland Casualty Company owe a duty to W.R. Grace & Co. employee Ralph Hutt under the correct legal standard set forth in § 324A?

## STATEMENT OF THE CASE

Petitioner and Defendant Maryland Casualty Company ("MCC") petitioned this Court for a writ of supervisory control, requesting the Court to correct a mistake of law by the Asbestos Claims Court ("ACC") in denying, in part, MCC's Motion for Summary Judgment.  Specifically, the ACC concluded that MCC, a workers' compensation insurance provider, had a common law duty to warn employees of its insured, W.R. Grace & Co. ("Grace"), of hazardous conditions at Grace's facility in Libby, Montana ("Libby Plant") based on foreseeability alone. Respondent and Plaintiff Ralph V. Hutt ("Hutt") responded on February 8, 2019, objecting to the exercise of supervisory control.  On February 19, 2019, this Court exercised supervisory control, and ordered full briefing in order to review the legal issues presented by MCC's Petition.  For the reasons set forth herein, this Court should reverse the ACC's January 13, 2019 Order denying MCC's Motion for

Summary Judgment, determine that § 324A is the proper test for assessing whether a duty exists, and conclude that, applying § 324A, MCC owed no duty to Hutt as a matter of law.

## STATEMENT OF FACTS

The issues before this Court are purely legal questions. Nevertheless, this Court's legal determinations will be informed by the facts framing those legal questions.  The ACC's January 13, 2019 Order ("Order" or "ACC's Order") narrates a misplaced and unsupported version of the facts, while ignoring the reality of the insurance relationship and MCC's role at the Libby Plant in order to impose a non-existent legal duty through a foreseeability analysis.  In doing so, the ACC's analysis was based on a fundamental mistake of law.

Under the correct legal analysis, § 324A should be utilized to determine whether a workers' compensation insurer owes a duty to warn or protect an employee of its insured.  Applying § 324A, the record unequivocally demonstrates that MCC owed Hutt no duty because it did not, as a matter of law, increase the risk of harm, assume a duty owed by Grace, or commit any act or omission upon

which Grace or Hutt relied that caused injury to Hutt. A brief recitation of the facts is necessary to accurately frame these issues.[1]

## A.    General Background

Hutt alleges that he was injured due to asbestos exposure during the approximately 18-month period from 1968-1969 he worked at the Libby Plant. It is undisputed that Grace owned and operated the Libby Plant from 1963-1990.

Persons alleging injuries from exposure to asbestos in Libby filed suit against Grace beginning in the 1970s. By 2001, Grace was involved in over 65,000 asbestos-related personal injury lawsuits, causing it to file for bankruptcy on April 2, 2001. Grace's bankruptcy proceedings lasted for approximately 12 years. Asbestos-related suits against Grace and against MCC, as Grace's workers' compensation provider, were prohibited for a portion of the bankruptcy by a series of temporary restraining orders and preliminary injunctions. On February 3, 2014, Grace's Chapter 11 Plan and the permanent injunction took effect.

## B.    MCC's Limited Role as Workers' Compensation Insurer

Mineral Carbon and Insulating Co. first mined vermiculite in Libby in approximately 1922. Ex. 1 at 7.[2] Mineral Carbon changed its name to "Zonolite

---

[1] Because this Court is generally aware of the facts relative to the Libby asbestos-related litigation, the facts as stated herein are limited to those relevant to Hutt's claim against MCC, and to further explain the relationship between Grace and MCC.

Co." in 1923, and Grace acquired its assets in 1963.  *Id*.  By virtue of Grace's acquisition of Zonolite on or around April 16, 1963, MCC, as Grace's workers' compensation carrier, provided workers' compensation insurance for the Libby Plant.  Ex. 2.  MCC provided workers' compensation coverage to Grace until 1973.

The language of MCC's workers' compensation policies circumscribed MCC's role with Grace, and provided the following with respect to MCC's right to conduct inspections of Grace facilities, including the Libby Plant:

> We have the right, but are not obliged to inspect your workplaces at any time*.  **Our inspections are not safety inspections.**  They relate only to the insurability of the workplaces and the premiums charged. We may give you reports on the conditions we find.  We may also recommend changes.  While they may help reduce losses, **we do not undertake to perform the duty of any person to provide for the health or safety of your employees or the public.  We do not warrant that your workplaces are safe or healthful or that they comply with laws, regulations, codes or standards.**  Insurance rate service organizations have the same rights we have under this provision.

Ex. 3 (emphasis added).  By these undisputed terms, MCC's visits to the Libby Plant were clearly related to the insurability of the workplace and the premiums charged; they were not done for the benefit of Grace or its workers, and they were not safety inspections.  There was no other agreement between MCC and Grace to provide services outside of the workers' compensation policies.

---

[2] For clarity, pin cites refer to the pdf page number, as opposed to internal pagination.

MCC made its first visit to the Libby Plant on or around July 1964, and it made visits on a roughly quarterly basis thereafter. *See* Ex. 4. At each site visit, MCC's loss control representatives met with Libby Plant management personnel, toured the facilities, and provided oral and written recommendations. In addition, MCC's home office supervisor/engineer analyst, Lawrence Park ("Park") provided written recommendations to Grace.

### C.    Inspections and Industrial Hygiene Input for the Libby Plant

There is no dispute that Grace exercised exclusive control and authority over the Libby Plant. Dust control at the Libby Plant was an ongoing concern that required constant attention and monitoring. Grace's efforts included internal measures as well as evaluating input from government and private entities. Ex. 1 at 12 (Grace sworn statement to the EPA, providing that "Some of the measures taken by Grace … may have been implemented in response to or in cooperation with recommendations from … the Montana State Board of Health. However, regardless of government requirements, Grace had a policy of minimizing excess dust at the Libby facility."). Grace was solely responsible for the safety and working conditions, and Grace alone determined whether, and to what extent, any changes were made.

### 1. *The State of Montana (the "State")*

The State's Industrial Hygiene Department conducted and/or participated in seven inspections of the Libby Plant from 1956 to 1967. At its inspections, the State took air samples, evaluated whether the results exceeded the applicable limits, made recommendations concerning dust control and system repair, and commented on progress or the lack of progress made since previous inspections.

### 2. *Johns-Manville ("J-M")*

Though essentially ignored in the ACC's Order, starting as early as January 1968, Grace repeatedly and consistently consulted with J-M regarding dust control at the Libby Plant. Specifically, Grace sought J-M's guidance on:

- Industrial hygiene procedures, Ex. 5 (1/5/1968 internal letter from Grace Safety Administrator discussing meeting with J-M Research and Engineering representative and developing industrial hygiene survey), Ex. 6 (3/19/1968 letter from Grace Safety Administrator to Libby Plant Superintendent discussing plans for J-M to conduct industrial hygiene survey);

- Dust measurement procedures and standards, Ex. 7 (2/13/1968 internal letter from Grace Safety Administrator addressing discrepancy between threshold limit values ("TLV") for dust recommended by J-M and MCC);

- Safety protocols and employee training, Ex. 8 (3/3/1969 internal Grace correspondence recommending training by J-M personnel); and

- Collaboration with government entities, Ex. 9 (8/20/1968 internal Grace correspondence regarding consultation with J-M about U.S. Public Health's request for study of workers); Ex. 10 (7/8/1969 internal letter from Grace Vice President of Manufacturing and Engineering discussing consulting with J-M regarding collaboration with U.S. Public Health).

- At Grace's request, J-M even conducted an industrial hygiene survey of the Libby Plant in 1968.  Ex. 11.

MCC did not participate in any of Grace's correspondence or collaboration

with J-M.

### 3. *Federal Entities*

Grace also received industrial hygiene and worker monitoring input from

federal entities including the Bureau of Mines ("BOM") and U.S. Public Health.

In particular, BOM conducted safety a survey of the Libby Plant in 1965, Ex. 12,

and U.S. Public Health:

- Surveyed the Libby Plant to conduct dust studies and readings in June 1968, Ex. 13;

- Met with Grace management in Cincinnati, Ohio in February 1968 to assess Grace's approach to dust control and worker health at the Libby Plant, Ex. 7; and again in August 1969, to discuss appropriate dust collection methods, Grace's ventilation systems, respirator use, and Grace's need for "a program of dust controls, monitoring of work-place air and installation and maintenance of suitable equipment," Ex. 14 at 5-6; and

- Sought permission to use data from the Libby Plant to conduct studies on worker mortality and health, Ex. 15; Ex. 16.  Grace, on the advice of J-M, eventually agreed to participate in the mortality study.  Ex. 9; Ex. 10; Ex. 17 at 2.

Because Grace did not require or solicit MCC's input with respect to these

recommendations, MCC was not privy to any of Grace's communications with

BOM or U.S. Public Health, nor did MCC participate in any of Grace's meetings

with either entity.

7

#### *4. Grace's Internal Dust Control & Worker Safety Activities*

While not reflected in the ACC's Order, Grace alone was responsible for evaluating, considering, and choosing whether or not to implement the recommendations it received and solicited. Ex. 5; Ex. 18 (providing recommendations based on three separate entities' industrial hygiene surveys); Ex. 19 (7/26/1969 internal letter from Libby Plant Manager stating, "While we still have a ways to go to have a dust-free operation, we have done some things to improve conditions in the mill and in the surrounding area…" and describing changes made).

#### *a.        Grace's Focus on Dust Control & Worker Safety*

Grace also conducted its own internal dust control efforts. For instance, Grace took its own monthly dust samples; conducted its own plant inspections; and implemented its own rules and regulations concerning worker health. Ex. 8, Report at III.A.1 ("Dust monitoring at Libby is done by an Engineering Department technician on a monthly basis."); Ex. 20 (1965 internal Grace Report, stating "Our record is not as good as it should be as far as the state is concerned. We made some improvements but not nearly enough.").

Grace consistently conducted its own internal reports on planned dust control efforts. Ex. 21 (1964 "Report on Dust Control at Libby Operation"); Ex. 8 at 3-18 (1969 Report on "Insitu and Environmental Dust Control for Vermiculite

Mining and Expanding Operations," including cost projections for required changes). While MCC recommended that Grace maintain dust levels at the TLV recommended at the time by the American Conference of Governmental Industrial Hygienists ("ACGIH") for dust containing asbestos, 5 million particles per cubic foot ("mppcf"), Grace rejected that recommendation. Ex. 22 at 2; Ex. 23 (12/10/1965 letter from Grace to Park inquiring about MCC's recommended 5 mppcf limit); Ex. 24 (12/28/1965 letter from Park to Grace explaining 5 mppcf limit); Ex. 25 (1/25/1966 internal letter from Zonolite Company Division Manager stating, "For our own purposes, we have voluntarily set our standards at 10 mppcf total dust. … Mr. Park[']s recommendations are unreasonable and impossible and unnecessary."); Ex. 26 (Report from MCC stating that, according to Libby Plant management, 5 mppcf limit was "out the window"). Grace also maintained an internal Safety Committee, comprised of employees and management. Ex. 27 (1964 Safety Committee Notice).

### b.    *Grace's Medical Review*

Pre-employment physicals for workers were required by Zonolite starting in 1956, and it began conducting x-ray screening in 1959. Ex. 1 at 13-14. In 1964, Grace began taking x-rays on an annual basis. *Id*. In 1964, local Libby doctors informed Grace that comparisons of recent x-ray studies with the 1959 studies showed an increased incidence of chronic respiratory disease among employees

with prolonged exposure to dust.  Grace informed MCC, and in September 1964,
MCC, through Park, agreed to refer the Libby doctors' correspondence to MCC's
Medical Director, Dr. Robert Chenowith.  Ex. 28.

Grace provided the radiological records, spirometry reports, and other Libby
Plant employee records to Dr. Chenowith sometime at the end of 1964 or the
beginning of 1965.  MCC, in turn, forwarded them to Dr. William Spicer of the
University of Maryland School of Medicine's Division for Pulmonary Disease for
study and recommendation.  Ex. 29.

After review of the records, Dr. Spicer concluded the evidence suggested
"that this plant has an important health problem," and recommended "a complete
epidemiologic and physiologic study … followed by the institution of whatever
dust control measures are deemed necessary and a repeat of the testing procedure
in two-three years."  *Id.*  Dr. Spicer provided his results and analysis, along with an
outline of the type of epidemiological study recommended.

Dr. Chenowith promptly forwarded Dr. Spicer's correspondence to Grace,
along with the recommendation that "Dr. Spicer's recommendations be carried
out."  Ex. 30.  In response, Grace internally noted "We are going to follow
Maryland Casualty's recommendations but we are going to try to get them to pay
the bill…"  Ex. 31.  When this endeavor was not successful, Grace dropped the
idea, and the study was not performed.  Ex. 32 at 5 (3/30/1965 internal letter from

10

Grace Safety Administrator stating, "Regarding the elaborate studies and tests recommended by Dr. Spicer, I feel that they would be of greater value to the medical and health professions than to us. The fact that employees had contracted lung conditions is not as important now as determining if there is a health exposure (by scheduled air samplings and analysis), and applying proper controls.").

Aside from the epidemiological study, after reviewing radiological records received from Grace in 1969, MCC recommended more frequent x-rays at 6-month intervals for certain employees. Ex. 33. However, Grace flatly rejected this recommendation. Ex. 34 (12/9/1969 letter from Grace Safety Administrator stating, "I question the idea of a repeat x-ray examination in six months of the sixty employees listed in your letter… The best approach to the overall problem, I think, is one of dust control."); Ex. 35 at 11 (12/23/1969 internal letter from Libby Plant Manager stating, "My opinion would be that there should be no change in the annual schedule."). In the same 1969 letter, Park wrote, "I would assume that all these men have been advised of their physical examination findings and will therefore be prudent and wear their respirators conscientiously when exposed to a dusty atmosphere," Ex. 33; however, Grace did not inform employees of their x-ray test results until the 1970s. Ex. 1 at 14.

### c.    Grace's Safety Program

In 1964, after learning of the local Libby doctors' concerns, MCC offered to

assist Grace with an "outline [of] a program for control as well as prevention." Ex. 28.[3]  While there are some additional references to the formulation of a program or plan in 1964 correspondence between Grace and MCC, Ex. 36; Ex. 37,[4] Ex. 38, there is no evidence demonstrating that any program or outline drafted by or in cooperation with MCC was ever finalized, formalized, approved, or implemented.

Moreover, it is clear that Grace ultimately retained responsibility and control over any dust control procedures at the Libby Plant.  Ex. 39 (1964 internal letter to Grace Vice President stating, "We cannot solely rely on Maryland Casualty Company's doctor to be 'interested in this problem.'  Zonolite, and you in particular, must direct the effort to minimize Grace's exposure. … Please draw up

---

[3] It is not unusual for a workers' compensation insurer to assist with or contribute to an insured's safety plan or program as a loss-control function.  *See Swift v. Am. Mut. Ins. Co. of Bos.*, 504 N.E.2d 621, 624 (Mass. 1987) (discussing workers' compensation insurer's accident prevention program as part of its insurance business); *Stacy v. Aetna Cas. & Sur. Co.*, 484 F.2d 289, 292 (5th Cir. 1973) (noting that workers' compensation insurer representative participated in insured's safety program by making monthly site visits to insured, inquiring into accidents, attending safety meetings with insured's personnel, and making recommendations concerning safety improvements when safety program personnel encountered problems they could not answer).

[4] The record contains a document entitled, "W.R. Grace Co. Zonolite Division Safety Program & Organization."  Ex. 37.  Although the ACC and Hutt refer to this document as a Safety Program drafted by MCC, the ACC's Order neglects to mention that this document is unsigned, undated, not on MCC letterhead, and contains no cover letter providing any context or foundation for its source. Further, it appears to be a draft, as it contains handwritten edits from an unknown author or authors.  Any reference to this document as an "MCC Safety Program" is without foundation or support.

12

a program and report to me before January 8 who is going to do what, when, and the extent of any information in the possession of Zonolite with respect to this potential problem."); Ex. 20 (1965 internal letter to Grace Vice President stating, "We must engineer the whole job and I would hope that we could tie down some kind of a definite plan by September 1, 1965.").

In addition, despite early discussions of a program, Grace continued to internally discuss *the need to* formulate and implement dust control changes and procedures, and *the need for* a plan or program of control, into 1968 and 1969. Ex. 5 (1968 Grace internal plans for industrial hygiene survey, affected worker study, air sampling, protective devices, and housekeeping); Ex. 18 at 5 (1968 letter stating it is "essential that a companywide program of dust control be established."); Ex. 8 at 1, 2-18 (1969 internal letter from Grace Safety Administrator containing "recommendation that authorization be granted to proceed with the program outlined in the report," and including "Program for Establishing Required Changes," as well as projected costs); Ex 14 at 5 (Grace report noting that U.S. Public Health recommended "a program of dust controls, monitoring of workplace air and installation, and maintenance of suitable equipment should be undertaken …").  Despite MCC's 1964 offer, there is *no evidence* that an MCC drafted or outlined safety program was ever finalized,

approved, implemented, or adopted by Grace, which maintained exclusive and total control over the Libby Plant.

### D.    Ralph V. Hutt

Hutt worked at the Libby Plant for a short period of time from March 1968 to October 1969.  Ex. 40 at 52:21-24.  Hutt had never heard of MCC during his employment by Grace.  *Id.* at 94:22-95:16.

Hutt and 883 other plaintiffs filed a complaint against MCC on September 23, 2016, in Montana's Eighth Judicial District, Cascade County.  *Nancy Adams, et al. v. Maryland Casualty Company, et al.*, DDV-16-0786.  On March 20, 2018, the ACC designated Hutt as a lead plaintiff and directed him to file a separate complaint.  On or about March 23, 2018, Hutt filed the instant Complaint against MCC, Robinson Insulation Company and Does A-Z.[5]  Ex. 41.  Hutt's Complaint alleges that he was injured due to, *inter alia*, asbestos exposure relating to Grace's mining operations in Libby, Montana.  *Id.* at ¶ 19.  Hutt alleges that MCC negligently designed an industrial hygiene program and failed to disclose and warn workers of the known hazards associated with asbestos at the Libby Plant.  *Id.* at ¶¶ 13-37.

---

[5] To date, Robinson Insulation Company has not appeared in this matter, nor has Hutt identified Does A-Z.  It remains unclear why Robinson is a defendant.

## STANDARD OF REVIEW

The standard of review on summary judgment is *de novo*. *McClue v. Safeco Ins. Co. of Illinois*, 2015 MT 222, ¶ 8, 380 Mont. 204, 206, 354 P.3d 604, 606. This Court's standard of review on questions of law is whether the district court's interpretation of the law is correct. *Hauseman v. Koski*, 259 Mont. 498, 500, 857 P.2d 715, 716 (1993).

## SUMMARY OF THE ARGUMENT

The ACC's Order is based on a mistake of law. Specifically, the ACC determined that MCC, a workers' compensation insurance provider, owed a duty to warn its insured's employees of a hazardous condition at the insured's facility based solely on foreseeability of the harm. This is not the law in Montana. Rather, in keeping with the basic principles of tort law adopted by this Court, the ACC should have applied the Restatement (Second) of Torts § 324A in assessing whether and to what extent MCC owed any duty to Hutt. The ACC's failure to do so constitutes reversible error.

The ACC's analysis and conclusion were contrary to Montana law and fundamental tort principles. There is generally no duty to act to protect, warn, or rescue ***even if harm is foreseeable***. Instead, the proper analysis requires a determination that (1) a duty exists, and (2) the scope of the duty extends to the third party. Foreseeability determines the ***scope of the duty***, not whether a duty

15

exists.  In deciding that MCC owed a duty based upon foreseeability alone, the ACC skipped the first necessary step of this analysis, and incorrectly concluded that a duty existed because the harm was foreseeable.  However, foreseeability of injury alone is an unworkable and inappropriate standard for determining whether a duty to warn exists.  This Court has not previously endorsed such an overly simplistic analysis of duty and should decline to do so here.

Section 324A provides the widely accepted common law exception for liability to a third party based on an undertaking.  Pursuant to § 324A, an actor may incur liability to a third party if the undertaking increases the risk of harm, if the actor assumes a duty owed by another, or if the harm suffered is due to reliance on the actor's undertaking.  To impose a duty, the harm suffered must also have been foreseeable; however, the foreseeability analysis operates in conjunction with the duty analysis, rather than in its place.  Both a duty to act and foreseeability of harm must be present, but neither on its own is sufficient for imposition of a duty.

Applying the correct standard, § 324A, the undisputed record evidence demonstrates that MCC owed no duty to Hutt, as none of the necessary circumstances are present: no undertaking by MCC increased the risk of harm under the appropriate analysis; MCC did not assume or supplant any duty owed to Hutt by Grace; and importantly, Hutt's injury is not the result of his or Grace's reliance on MCC.  As MCC owed Hutt no duty as a matter of law, MCC

16

respectfully asks this Court to reverse the ACC's Order, and grant summary judgment in favor of MCC.

## ARGUMENT

## I.   The ACC Applied an Incorrect Standard on the Issue of Duty

After assessing MCC and Hutt's cross-motions for summary judgment, the ACC ultimately concluded that:

> [U]nder circumstances where a workers' compensation insurer has developed a Safety Program, of which a duty to warn employees of hazards is an essential component; and through its own affirmative action of engaging in medical monitoring of workers has actual knowledge a known hazard is injuring workers, the workers' compensation insurer has a common law duty to warn workers of the hazard.

Order, Ex. 42 at 17.  The ACC's conclusion is fundamentally flawed.

### A.   The ACC's Order is Based on a Mistake of Law

To maintain a cause of action for negligence, a plaintiff must prove four essential elements: (1) duty; (2) breach; (3) cause; and (4) damages.  *Lopez v. Great Falls Pre-Release Servs., Inc.*, 295 Mont. 416, 422, 986 P.2d 1081, 1085 (1999), *overruled on other grounds as stated in Emanuel v. Great Falls School Dist.*, 2009 MT 185, ¶ 14, 351 Mont. 56, 60, 209 P.3d 244, 247-78.  The first question at issue is what legal test applies to determine whether MCC owed a duty to Hutt.  Whether a legal duty exists is a question of law for the court to decide. *Emanuel*, ¶ 11.

17

The legal duty analysis is twofold.  It requires determining: (1) whether a duty exists; and (2) the scope or range of that duty.  Both elements are necessary for imposition of a duty, but neither alone is sufficient.  57A Am. Jur. 2d Negligence § 78; *Emanuel*, ¶ 12 & n.1 (concluding that because plaintiff was not a foreseeable plaintiff, court need not determine whether there was a special relationship giving rise to a duty to act); *Fisher v. Swift Transp. Co., Inc.*, 2008 MT 105, ¶¶ 14-26, 342 Mont. 335, 339-42, 181 P.3d 601, 606-08 (determining first that duty of care existed, and then moving on to determine whether defendant was within the foreseeable zone of risk).  Although "an analysis concerning legal duty is incomplete without a discussion of foreseeability," *Nelson v. Driscoll*, 1999 MT 193, ¶ 39, 295 Mont. 363, 378, 983 P.2d 972, 982, foreseeability is not dispositive. The Court also looks to policy considerations in determining whether or not to impose a duty of care, including "(1) the moral blame attached to a defendant's conduct; (2) the prevention of future harm; (3) the extent of the burden placed on the defendant; (4) the consequences to the public of imposing such a duty; and (5) the availability and cost of the insurance involved." *Jackson v. State*, 1998 MT 46, ¶ 39, 287 Mont. 473, 487, 956 P.2d 35, 44.

In its analysis, the ACC recited Montana case law governing the foreseeability and public policy factors[6] for consideration in imposition of a duty, while failing to address whether a duty existed.  The ACC then noted case law governing the lack of a general duty to act to protect another absent a special relationship or special circumstances.  The ACC also briefly mentioned the existence of cases from this Court extending duties to third parties based on premises liability and contractual relationships; however, it went on to note that it was not relying on those cases because they "are factually distinguishable."

The ACC nevertheless reasoned that:

> [T]he facts of the present case reveal direct involvement on the part of MCC which calls instead for a straightforward foreseeability analysis in determining the scope of the defendant's duty of care which does not require application of any special rule to extend a duty of care to MCC under these circumstances.

Order at 16.  The ACC then rejected application of § 324A, despite acknowledging that doing so under the facts of this case "may place Montana in the minority of jurisdictions."  *Id.* at 17, n.7.

---

[6] The ACC's public policy factor analysis was evidently a rationalization of its desired outcome.  For instance, there is no support in the record for the ACC's conclusion that "the parties concede the availability of insurance to cover any claims against MCC."  Although MCC is an insurance company, Hutt's claims are not claims for insurance coverage.  In addition, Montana's public policy as stated in the Montana Safety Culture Act, discussed *infra*, recognizes that "Ensuring immunity to insurers in the provision of safety consultation services encourages and promotes safety in the workplace and improves the relationship between employers and employees."  Mont. Code Ann. § 39-71-1502.

19

It is unclear exactly how the ACC concluded that a duty existed, given its somewhat opaque analysis.    For instance, the ACC's holding appears to incorporate several factors unrelated to a foreseeability analysis, such as "direct involvement," reference to a safety program, the "affirmative action of engaging in medical monitoring," and "actual knowledge [of] a known hazard."   Order at 16, 17.  If the ACC considered these non-foreseeability factors analytically significant to its duty analysis, or relied on these factors in reaching its conclusion, it failed to articulate a basis in Montana case law for doing so.  Rather, the ACC stated that its conclusion was based on "existing common law of Montana," and "a straightforward foreseeability analysis … which does not require application of any special rule."  Order at 16, 17.  The ACC's analysis and ultimate conclusion are internally inconsistent, unsupported, and irreconcilable with basic principles of tort law adopted by this Court.

## B.    *Section 324A is the Proper Test for Determining Whether a Duty Exists*

A legal duty can arise from several sources, including by contract, statute,[7] or common law.  Only the third source is at issue here.  It is a fundamental principle of tort law that an actor generally owes a duty of reasonable care if he

---

[7] In *Orr v. State*, this Court determined that the State had a ***statutory*** duty to protect Grace miners by warning them of the hazards in their workplace.  2004 MT 354, ¶ 47, 324 Mont. 391, 407, 106 P.3d 100, 111.  This Court declined to address whether the State had a common law duty.  *Id.* ¶ 47.

chooses to act; however, there is generally ***no duty to act affirmatively***. There is ***no duty to act*** to protect, rescue, or warn another, even if the actor realizes that action on his part is necessary for protection of another. *See* Restatement (Second) of Torts (1965) (hereinafter, "Restatement") § 314 ("The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action.").

The origin of this rule is "the early common law distinction between action and inaction, or 'misfeasance' and 'non-feasance.'" Restatement § 314, cmt. c. With respect to nonfeasance, or the failure to act, there must be special circumstances imposing a duty, such as custody or control of the plaintiff or a third person, control of land or chattels, or assumption of a duty. *See Krieg v. Massey*, 239 Mont. 469, 472, 781 P.2d 277, 279 (1989).

Montana law clearly embraces these principles. *Emanuel*, ¶¶ 12, 16 & n.1 (citing § 314, and finding that, because it was not foreseeable that third-party student would intentionally run over a pedestrian off of school grounds and after school hours, court need not consider whether special relationship of custody or control existed); *Prindel v. Ravalli County*, 2006 MT 62, ¶¶ 25, 36, 331 Mont. 338, 349-50, 355 133 P.3d 165, 174, 178 (noting that there is generally "no duty to protect others against harm from third persons," but "because [Defendant] County entered into a custodial relationship with [third-party], it owed a special duty to

certain citizens to protect them from a foreseeable risk of harm....") (citations omitted); *Lopez*, 295 Mont. at 424-425, 986 P.2d at 1086 (Noting that, "[a]s a general rule, there is no duty to protect others against harm from third persons," but finding that pre-release center for inmates had a special relationship of custody or control over resident such that it owed duty to protect those within foreseeable zone of risk created by negligent supervision), *as amended on denial of reh'g* (Oct. 14, 1999), *and holding modified by Samson v. State*, 2003 MT 133, ¶ 25, 316 Mont. 90, 96-97, 69 P.3d 1154, 1159; *see also Onsager v. Frontera Produce Ltd.*, 2014 WL 3828374, at *5 (D. Mont. 2014) (applying § 324A under Montana law).

Here, there are no facts that would give rise to an affirmative duty akin to those described in cases of a special relationship of custody or control or premises liability.  The distinction between misfeasance and nonfeasance is critical in this case.  Starting with the common law rule that there is generally no duty to act, warn, protect, or rescue another, if one ***undertakes*** to act, he may, under certain circumstances, incur a duty to another or third-parties.  Absent a specific relationship or undertaking, there is no duty to act.  Here, the only relevant exception is whether a duty to act was assumed or undertaken.

Section 324A of the Restatement provides the common law circumstances under which a party may be held liable to a third party[8] for the party's negligent performance of an undertaking:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement § 324A.

Sections 323 and 324A, which provide exceptions to the general no-duty-to-act or protect rule, derive from the common law principle often attributed to Justice Benjamin Cardozo in *Glanzer v. Shepard*, 135 N.E. 275, 276 (N.Y. 1922), that "It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all."  The Montana Supreme Court has recognized and adopted the long-standing principle of tort law that one who assumes to act, even though gratuitously, may thereby

---

[8] While § 324A concerns liability to a third party based on an undertaking, a liability for a two-party undertaking is covered by the Restatement § 323, "Negligent Performance of Undertaking to Render Services."

become subject to the duty of acting carefully, if he acts at all." *Lokey v. Breuner*, 2010 MT 216, ¶ 10, 358 Mont. 8, 10, 243 P.3d 384, 385 (quotations omitted); *see also Nelson*, ¶ 37 (citing § 323).

Montana law clearly embraces these assumed undertaking principles in two-party undertaking situations. *Nelson*, ¶ 38 (defendant police officer assumed duty to protect decedent from harm when officer prevented decedent from driving her vehicle and kept a close eye on her from his car to ensure that she did not attempt to drive); *Jackson v. Department of Family Servs.*, 1998 MT 46, ¶ 49, 287 Mont. 473, 490, 956 P.2d 35, 46 ("[A]doption agencies assumed a duty to refrain from making negligent misrepresentations when they begin volunteering information to potential adoptive parents."); *Vesel v. Jardine Mining Co.*, 110 Mont. 82, 100 P.2d 75, 80 (1939) (employer who gratuitously assumed to render medical services to injured employee was bound to exercise reasonable care in performance of such services); *Stewart v. Standard Pub. Co.*, 102 Mont. 43, 50-51, 55 P.2d 694, 696 (1936) (defendant who constructed, maintained, had control of sidewalk for purposes of snow removal, and employed janitors to clean sidewalk, assumed duty of maintaining and removing snow from sidewalk).

The ACC's Order neglected to cite, let alone substantively discuss, a single Montana case concerning these assumed undertaking principles. The ACC further neglected to provide any rationale for why it believed this Court would reject

application of § 324A.  The ACC's Order simply failed to provide any rationale for ignoring the substantial argument provided and this Court's guidance through well-developed case law on the topic.    Rather, the ACC purported to apply a straightforward foreseeability analysis, while it also appeared to consider a number of additional factors with no genesis or support in Montana case law.  The ACC's inscrutable duty standard, which has no utility or useful rationale in hindsight or in future application, is undoubtedly a mistake of law.

### C.    *The Vast Majority of Jurisdictions Have Applied § 324A Under Similar Facts*

In declining to adopt or apply § 324A, the ACC noted that doing so under these facts would place Montana in "the minority of jurisdictions."[9] Order at 17, n.7 (citing *Breach of Assumed Duty to Inspect Property as Ground for Liability to Third Party*, 13 A.L.R. 5th 289).  On this point, the ACC was correct.  The vast majority of jurisdictions to consider the issue have determined that § 324A is the proper rubric by which to evaluate whether a duty attaches to an insurer's

---

[9] The ACC did not explain why it predicted that this Court would depart from the majority view on the applicability of § 324A.

25

loss-prevention services or inspections.   No fewer than 20 jurisdictions have

determined that § 324A governs the analysis.[10]

There are at least 24 additional state jurisdictions that have adopted or

applied § 324A in non-insurance contexts.[11]   Of these, at least 6 jurisdictions have

---

[10] *Commercial Union Ins. Co. v. DeShazo*, 845 So. 2d 766, 769-70 (Ala. 2002); *Patton v. Simone*, No. CIV. A. 90C-JL-219, 1993 WL 54462, at *7-9 (Del. Super. Ct. Jan. 28, 1993); *Johnson v. Aetna Cas. & Sur. Co.*, 348 F. Supp. 627, 628-29 (M.D. Fla. 1972); *Sims v. Am. Cas. Co.*, 206 S.E.2d 121, 130, *aff'd sub nom. Providence Washington Ins. Co. v. Sims*, 209 S.E.2d 61 (Ga. 1974); *Thompson v. Bohlken*, 312 N.W.2d 501, 507 (Iowa 1981); *Leroy v. Hartford Steam Boiler Inspection & Ins. Co.*, 695 F. Supp. 1120, 1126-27 (D. Kan. 1988); *Kennard v. Liberty Mut. Ins. Co.*, 277 So. 2d 170, 172-73 (La. Ct. App. 1972); *Smith v. Allendale Mut. Ins. Co.*, 303 N.W.2d 702, 709 (Mich. 1981); *Hartford Steam Boiler Inspection & Ins. Co. v. Cooper*, 341 So. 2d 665, 667-78 (Miss. 1977); *Wurst v. Nat'l Oil & Supply Co.*, 780 S.W.2d 97, 102 (Mo. Ct. App. 1989); *Fackelman v. Lac d'Amiante du Quebec*, 942 A.2d 127, 131 (N.J. Super. Ct. App. Div. 2008); *Cline v. Avery Abrasives, Inc.*, 409 N.Y.S.2d 91, 99 (N.Y. Sup. Ct. 1978); *Mueller v. Daum & Dewey*, Inc., 636 F. Supp. 192, 195 (E.D.N.C. 1986); *Obenauer v. Liberty Mut. Ins. Co.,* 908 F.2d 316, 317 (8th Cir. 1990) (applying North Dakota law); *Kohr v. Johns-Manville Corp.*, 534 F. Supp. 256, 258 (E.D. Pa. 1982); *Salvo v. Hewitt, Coleman & Assocs., Inc.*, 260 S.E.2d 708, 711 (S.C. 1979); *Schoenwald v. Farmers Co-op. Ass'n of Marion*, 474 N.W.2d 519, 520 (S.D. 1991); *Seay v. Travelers Indemnity Co.*, 730 S.W.2d 774, 776 (Tex. App.—Dallas 1987, no writ); *Derosia v. Liberty Mut. Ins. Co.*, 583 A.2d 881, 883 (Vt. 1990); *Am. Mut. Liab. Ins. Co. v. St. Paul Fire & Marine Ins. Co.*, 179 N.W.2d 864, 870, n.2 (Wis. 1970).

not had occasion to apply § 324A to the workers' compensation insurance context because of state workers' compensation schemes that extend an employer's statutory immunity for workplace injuries or diseases to the insurer.[12]

Notably, in 1993 Montana expressed its own similar public policy against imposing tort liability on workers' compensation insurers by adopting the Montana Safety Culture Act.  Mont. Code Ann. § 39-71-1501, *et seq*.  The Act provides that:

> The furnishing of or the failure to furnish safety consultation services related to, in connection with, or incidental to a workers'

---

[11] *Stanley v. McCarver*, 92 P.3d 849, 853 (Ariz. 2004); *DeCaire v. Pub. Serv. Co.*, 479 P.2d 964, 967 (Colo. 1971); *Gazo v. City of Stamford*, 765 A.2d 505, 510 (Conn. 2001); *Pippin v. Chicago Hous. Auth.*, 399 N.E.2d 596, 600 (Ill. 1979); *Auler v. Van Natta*, 686 N.E.2d 172, 175 (Ind. Ct. App. 1997); *Ostendorf v. Clark Equip. Co.*, 122 S.W.3d 530, 539 (Ky. 2003); *In re All Maine Asbestos Litig.*, 581 F. Supp. 963, 978 (D. Me. 1984), *on reconsideration sub nom. In re All Maine Asbestos Litig. (BIW cases)*, 651 F. Supp. 913 (D. Me. 1986), *opinion supplemented on denial of reconsideration sub nom. In re All Maine Asbestos Litig.*, 655 F. Supp. 1169 (D. Me. 1987), and *aff'd sub nom. In re All Maine Asbestos Litig. (BIW Cases)*, 854 F.2d 1328 (Fed. Cir. 1988); *Brady v. Ralph M. Parsons Co.*, 82 Md. App. 519, 534 (Md. Ct. Spec. Ap. 1990); *Vaughan v. E. Edison Co.*, 719 N.E.2d 520, 525 (Mass. App. Ct. 1999); *Erickson v. Curtis Inv. Co.*, 447 N.W.2d 165, 170 (Minn. 1989); *Simon v. Omaha Pub. Power Dist.*, N.W.2d 157, 168 (Neb. 1972); *Grady v. Jones Lang LaSalle Constr. Co., Inc.*, 193 A.3d 283, 290–91 (N.H. 2018); *Root v. Stahl Scott Fetzer Co.*, 88 N.E.3d 980, 991 (Ohio 2017), *appeal not allowed*, 96 N.E.3d 300 (Ohio 2018); *Truitt v. Diggs*, 611 P.2d 633, 637 (Okla. 1980); *Grogan v. Uggla*, 535 S.W.3d 864, 875 (Tenn. 2017); *Alder v. Bayer Corp., AGFA Div.,* 61 P.3d 1068, 1078 (Utah 2002); *Burns v. Gagnon*, 727 S.E.2d 634, 644 (Va. 2012); *Berry v. Tessman*, 170 P.3d 1243, 1247 (Wyo. 2007).

[12] These states include Arizona, Colorado, Connecticut, Illinois, Minnesota and New Hampshire.

> compensation insurance contract or agreement to provide workers'
> compensation coverage does not subject the insurer or its agents,
> employees, or service contractors to liability for damages from injury,
> loss, or death, whether direct or consequential, occurring as a result of
> any act or omission by any person in the course of providing safety
> consultation services.

Mont. Code Ann. § 39-71-1508(1).    Through adoption of the Montana Safety

Culture Act, Montana explicitly recognized that "Ensuring immunity to insurers in

the provision of safety consultation services encourages and promotes safety in the

workplace and improves the relationship between employers and employees."

Mont. Code Ann. § 39-71-1502.    Though not specifically adopted until 1993, the

Montana Safety Culture Act demonstrates that current Montana public policy

rejects the type of claim Hutt purports to bring.

### D.    *Foreseeability Determines the Scope of the Duty, Not Whether a Duty Exists*

### 1.    Foreseeability Determines to Whom a Duty is Owed

Foreseeability is not incompatible with § 324A; rather, it is complementary.

While the foreseeability inquiry does not create the duty, it determines to whom

the duty of reasonable care is owed.    Put another way, foreseeability determines the

scope of the risk created by an actor's conduct.    *See Samson*, ¶ 22; *see also Fisher*,

¶¶ 14-29 (analyzing duty in terms of whether a duty exists, followed by

foreseeability of harm to plaintiff and policy considerations).

The perennial case illustrating the concept of foreseeability is *Palsgraf v. Long Island R. Co.*, 162 N.E. 99 (N.Y. 1928).  In *Palsgraf*, a train station guard dislodged a package from a passenger who was boarding a moving train while trying to help the passenger board.  The package contained fireworks, although nothing in its appearance gave notice of its contents.  When the fireworks fell, they exploded and dislodged scales at the other end of the platform, which fell and injured the plaintiff.  In finding that the defendant railroad was not negligent with respect to the plaintiff, Justice Cardozo, who was then Chief Justice of the New York Court of Appeals, explained:

> The conduct of the defendant's guard, if a wrong in its relation to the holder of the package, was not a wrong in its relation to the plaintiff, standing far away.  Relatively to her it was not negligence at all. Nothing in the situation gave notice that the falling package had in it the potency of peril to persons thus removed.  Negligence is not actionable unless it involves the invasion of a legally protected interest, the violation of a right.  Proof of negligence in the air, so to speak, will not do. …  If no hazard was apparent to the eye of ordinary vigilance, an act innocent and harmless, at least to outward seeming, with reference to her, did not take to itself the quality of a tort because it happened to be a wrong, though apparently not one involving the risk of bodily insecurity, with reference to some one else.

*Id.* at 99 (quotation omitted).  Justice Cardozo went on to describe this principle as "the range of reasonable apprehension."  *Id.* at 101.  The Montana Supreme Court has embraced Justice Cardozo's foreseeability analysis.  *See Mang v. Eliasson*, 153

Mont. 431, 437, 458 P.2d 777, 781 (1969); *Gaudreau v. Clinton Irrigation Dist.*, 2001 MT 164, ¶¶ 21, 26, 306 Mont. 121, 125–27, 30 P.3d 1070, 1074-75.

The U.S. District Court for the District of Montana demonstrated the compatibility of § 324A and foreseeability in its analysis in *Onsager*. 2014 WL 3828374, at *5. In *Onsager*, the District Court considered whether an auditor that contracted with a farm owner to audit the farm owner's facilities owed a duty to the end consumer. *Id.* at *4. The District Court first determined that the proper analysis for whether the auditor owed the plaintiff the duty of reasonable care was application of § 324A:

> Although the Montana Supreme Court has not yet had occasion to expressly adopt § 324A, this Court predicts it would do so if presented with the facts as alleged by Onsager. The Montana Supreme Court has "adopted the 'long-standing principle of tort law that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all.'" *Lokey*, 243 P.3d at 385 (quoting *Nelson v. Driscoll*, 983 P.2d 972, 981 (Mont. 1999). As the *Lokey* court recognized, this common law principle is embodied in sections 323 and 324 of the Restatement (Second) of Torts. *Lokey*, 243 P.3d at 385 (citing *Nelson*, 983 P.2d at 981). Section 323 imposes a duty of reasonable care on those who gratuitously or for consideration render services to another. The particular provision at issue here is § 324A, which largely parallels § 323 but addresses liability to third persons. The fact that the Montana Supreme Court effectively adopted § 323 and cited § 324 with approval in *Lokey* suggests it would also adopt § 324A.

*Id.* at *5.[13]

Next, the District Court concluded that plaintiff stated a claim under subsections (b) and (c) of § 324A because the allegations demonstrated the auditor should have recognized that its audit was necessary for the safety and protection of end consumers like the plaintiff, the auditor undertook the farm owners' duty to ensure that its food products were not contaminated with potentially lethal pathogens, and the farm owner relied on the auditor's passing score when distributing its produce. *Id.* at *5-6.

Finally, the District Court found that the imposition of a duty under the facts at hand was consistent with Montana common law because the plaintiff was within the scope of risk created by the auditor's negligent audit, and the auditor could have foreseen that a negligent audit would result in injury to consumers. *Id.* at *7. The District Court also concluded that, on balance, Montana's public policy considerations weighed in favor of imposition of the duty of reasonable care under the circumstances. *Id.* Accordingly, the foreseeability analysis applies ***in conjunction with***, as opposed to ***in place of*** the § 324A analysis.

---

[13] Despite the *Onsager* court's reasoned analysis and prediction that this Court would likely adopt § 324A if presented with the opportunity to do so, the ACC failed to rebut, discuss, or even cite to *Onsager*.

## 2.    Foreseeability Alone is an Unworkable Test for Duty

While foreseeability is a necessary component of a duty, foreseeability alone is insufficient for imposition of a duty.  The New York Court of Appeals has persuasively explained, "[f]oreseeability should not be confused with duty.  The principle expressed in *Palsgraf* … is applicable to determine the scope of duty— only after it has been determined that there is a duty. Since there is no duty here, that principle is inapplicable."  *Pulka v. Edelman*, 358 N.E.2d 1019, 1022 (N.Y. 1976), *rearg. denied* 362 N.E.2d 640 (N.Y. 1977).

The determination of whether a duty exists is essentially a policy determination.  In recognizing a new test for imposition of a duty, or a novel application of such a test, courts generally consider the implications of such a determination.  The ACC's Order imposing a duty to warn based on foreseeability was, in contrast, designed to achieve a particular result.

Here, imposing a duty of care and specifically, a duty to act to protect or warn of another's conduct based on foreseeability of injury and nothing more would lead to absurd, unpredictable results, with limitless liability.  *See, e.g., Hamilton v. Beretta U.S.A. Corp.*, 750 N.E.2d 1055, 1061, *opinion after certified question answered*, 264 F.3d 21 (2d Cir. 2001) ("This judicial resistance to the expansion of duty grows out of practical concerns both about potentially limitless liability and about the unfairness of imposing liability for the acts of another.").

32

The duty rule that arises from the ACC's Order is patently unworkable. If foreseeability of harm were sufficient to impose a duty to warn a third party, under the facts of this case, every Libby doctor who reviewed Libby workers' radiological reports produced by Grace could potentially have been under a duty to warn Grace employees—regardless of those employees' status as patients or non-patients. Every individual privy to Grace correspondence or the State of Montana Reports could conceivably be liable under a failure to warn theory.

Stepping away from the facts of this case, imposition of a failure to warn based on foreseeability of harm to a third party is similarly absurd and unpredictable. Every individual who passed an uncovered manhole on the street could potentially become charged with warning all future passersby of the danger posed. Indeed, it is difficult to imagine the boundaries of liability for failure to warn if foreseeability of harm alone is the controlling factor.

## II.   <u>There is No Duty Under § 324A</u>

Applying the appropriate § 324A analysis, it is clear that MCC owed no duty to Hutt. The first step in the § 324A analysis is to assess the scope of the alleged undertaking, as liability extends only to an actor "who undertakes … to render services to another which he should recognize as necessary for the protection of a third person …" The scope of an undertaking, if any, determines the scope, if any,

of the duty.[14]  *See Patentas v. United States*, 687 F.2d 707, 716 (3d Cir. 1982) (applying federal maritime law) ("In other words, the scope of a good samaritan's duty is measured by the scope of his or her undertaking.").

Hutt generally alleges that MCC undertook to design a program for control and prevention of asbestos dust and disease, and to address industrial hygiene concerns, including prescription of warnings and worker education of the asbestos hazard at the mine.  Ex. 41 at ¶¶ 21-24.  However, the record is conspicuously devoid of any evidence that a safety plan contributed to or drafted by MCC was ever finalized, approved, or implemented.  Grace continued to discuss ***the need for*** a safety plan or program well into 1968 and 1969.  Ex. 5; Ex. 8; Ex. 18 at 5.  Grace clearly did not mistake MCC's discussions regarding a draft safety plan for an undertaking.  *Compare id. with* Ex. 36; Ex. 38.  Rather, MCC's activities with respect to Grace were informational, with Grace retaining the responsibility for

---

[14] Notwithstanding the § 324A subfactors, a finding that MCC participated in ***some*** affirmative activity or had ***some*** type of involvement with respect to Grace, is not sufficient on its own to conclude that it had a duty to warn workers of the asbestos hazards posed by the Libby Plant.  There must be some congruence between the undertaking and the duty alleged.  "The scope of this undertaking defines and limits an actor's duty under section 324A."  *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 113 F.3d 1484, 1493 (8th Cir. 1997).

evaluating, implementing, or discarding that information.[15]  These facts are fatal to any claim that MCC should have recognized that any "undertaking" to draft a safety plan or program was necessary for protection of a third person.  If no such program was ever implemented, no "undertaking" occurred.

### A.    There is No Increased Risk of Harm Under § 324A(a)

Notwithstanding whether there has been an "undertaking," one of the § 324A subfactors (a), (b), or (c) must be present in order for liability to attach. Section 324A(a) provides that liability may attach when the actor's failure to exercise reasonable care increases the risk of harm.

Importantly, for § 324A(a):

> The test is not whether the risk was increased over what it would have been if the defendant had not been negligent. Rather, a duty is imposed only if the risk is increased over what it would have been had the defendant not engaged in the undertaking at all. This must be so because the preliminary verbiage in Section 324A assumes negligence on the part of the defendant and further assumes that this negligence caused the plaintiff's injury. If we were to read subsection (a) as plaintiffs suggest, i.e., that a duty exists where the negligence increased the risk over what it would have been had the defendant exercised due care, a duty would exist in every case. Such a reading would render subsections (b) and (c) surplusage and the apparent

---

[15] *See Fackelman*, 942 A.2d at 134 ("[T]he record also clearly establishes that Owens Corning treated Aetna's undertaking as informational only.  Owens Corning created a safety committee, adopted safety protocols, and implemented those measures. There is no suggestion in this record that its request for information and occasional assistance was indicative of a surrender of its responsibility for safety to a third party.").

purpose of all three subsections to limit application of the section would be illusory.[16]

*Myers v. United States*, 17 F.3d 890, 903 (6th Cir. 1994) (applying Tennessee law); *see also Butler v. Advanced Drainage Systems, Inc.*, 698 N.W. 2d 117, 127 (Wis. 2005).

Here, there are no allegations that MCC's conduct relating to any site visits, draft safety plan, or medical monitoring *increased* the risk of harm under the proper comparison required under § 324A(a).[17]    Again, the correct inquiry is whether the defendant's undertaking increased the risk ***compared to what the risk would have been absent the undertaking***.    Removing MCC from the facts of this case, the risk to workers posed by the Libby Plant remains the same.    No alleged "undertaking" performed by MCC increased the risk of harm to Hutt at the Libby Plant.    Accordingly, there can be no liability under § 324A(a).

## B.    *There Was No Undertaking of a Duty Owed by Another Under § 324(b)*

Liability under § 324A(b) may lie when one "has undertaken to perform a duty owed by the other to the third person."    This section applies to an actor who

---

[16] Accordingly, the ACC's dicta in footnote 6, commenting on a supposedly increased risk of harm based on MCC's failure to warn, misapprehends and misapplies § 324A(a).

[17] "'[I]ncreased risk' means some physical change to the environment or some other material alteration of circumstances."    *Patentas*, 687 F.2d at 717.

supplants, rather than supplements, a service or duty for another.  The Restatement provides the following illustrative example:

> [A] managing agent who takes charge of a building for the owner, and agrees with him to keep it in proper repair, assumes the responsibility of performing the owner's duty to others in that respect.  He is therefore subject to liability if his negligent failure to repair results in injury to an invitee upon the premises who falls upon a defective stairway, or to a pedestrian in the street who is hurt by a falling sign.

Restatement § 324A, cmt. d.

Here, it is undisputed that Grace, as Hutt's employer, owed Hutt a non-delegable duty to ensure a safe workplace.  *See* Mont. Code Ann. § 50-71-201.  MCC made clear in its policies that it did not assume any duty owed by Grace with respect to the workplace conditions.  Ex. 3.  There is similarly no evidence that MCC assumed any duty or responsibility with respect to the drafting of a safety plan.  Notwithstanding the fact that there is no evidence that any plan contributed to by MCC was every formalized, approved, or implemented, the correspondence in the record regarding the drafting or outlining of a plan made clear that the drafting was done *in collaboration with Grace* and *subject to Grace's input, approval, and exclusive control*.  Ex. 36; Ex. 38.  This is necessarily inconsistent with any claim that MCC assumed or Grace delegated responsibility for any such plan.  Again, liability lies under § 324A(b) when an actor assumes a duty *in lieu of* another's performance.  Moreover, the record evidence demonstrates that Grace

continued to discuss the need for and form of a safety plan well into 1968 and 1969.  Accordingly, there are no facts supporting liability under § 324A(b).

### C.    *There Was No Reliance Under § 324(c)*

Finally, subsection (c) provides that liability may attach to an undertaking if "the harm is suffered because of reliance of the other or the third person upon the undertaking."  Comment (e) provides that liability may arise under this scenario, "Where the reliance of the other, or of the third person, has induced him to forgo other remedies or precautions against such a risk."  Because the record affirmatively demonstrates that neither Hutt nor Grace relied on MCC or on any safety plan to which MCC contributed, § 324A does not support the existence of a duty.

As Hutt had never even heard of MCC during his employment by Grace, he could not have relied on MCC's conduct or omissions for any purpose.  Ex. 40 at 94:22-95:16.  Further, Grace repeatedly resisted and often flatly rejected MCC's recommendations.  Ex. 25; Ex. 26; Ex. 31; Ex. 32; Ex. 34; Ex. 35 at 11; Ex. 33.  Grace did not rely on MCC's quarterly site visits or any resulting recommendations, as those site visits were clearly for MCC's insurance purposes and not for safety, as provided by MCC's policy.  Ex. 3.  In *Windsor v. Pittsburg Coal*, Montana's Twenty-Second Judicial District Court assessed whether a parent corporation of a mine/employer owed an employee an independent duty.  1993

Mont. Dist. LEXIS 707, *4-6 (Mont. Dist. Ct. 1993) (citing *Miller v. Bristol-Myers Co.*, 485 N.W.2d 31 (Wis. 1992) (applying § 324A)).  The court noted that, "Merely providing recommendations … to assist the subsidiary in fulfilling its duty to provide a safe work place and assisting in safety inspections has been held not sufficient to impose a duty on the parent to provide for safety at the subsidiary's work place." *Windsor*, 1993 Mont. Dist. LEXIS 707, at *5 (quotation omitted).

Additionally, Grace sought industrial hygiene and worker safety input from multiple other sources—including the State, the BOM, U.S. Public Health, and J-M.  *See Statement of Facts Section C, supra.*  Grace alone exercised the ultimate control and authority to evaluate the necessity of these entities' recommendations, and Grace determined which to implement and which to ignore.  Ex. 32 at 5; Ex. 8. Thus, MCC's recommendations and suggestions regarding worker safety precautions and industrial hygiene did not cause Grace to forego other remedies.

Nor did Grace rely on any draft safety program or outline contributed to by MCC.  *See, e.g.*, Ex. 39 (1964 Grace letter stating, "We cannot solely rely on Maryland Casualty Company's doctor to be 'interested in this problem.'  Zonolite, and you particularly, must direct the effort to minimize Grace's exposure.  … Please draw up a program and report to me …"); Ex. 14 at 5.  Again, there is no evidence demonstrating that any safety plan drafted or contributed to by MCC was ever finalized, approved, or implemented.  There is simply no evidence that Grace

relied on MCC detrimentally with respect to any such plan, or that Grace chose to forego other remedies or precautions caused by its workplace conditions due to any conduct of MCC. *See* Restatement § 324A, cmt. e.

Because the record does not satisfy any of § 324A's subsections, there is no reasoned rationale for extending a duty of care from MCC to Hutt.

## CONCLUSION

For the foregoing reasons, the ACC committed a consequential mistake of law in failing to apply the Restatement § 324A in assessing whether and to what extent MCC owed a duty to Hutt. MCC respectfully asks this Court to reverse the ACC's mistake of law, apply § 324A, and conclude that under the proper analysis, MCC owed no duty to Hutt.

Dated: March 21, 2019

By: */s/ Kennedy C. Ramos*
Edward J. Longosz, II, *pro hac vice*
Mark A. Johnston, *pro hac vice*
Kennedy C. Ramos, *pro hac vice*
ECKERT SEAMANS CHERIN &
    MELLOTT, LLC
1717 Pennsylvania Avenue, NW
12th Floor
Washington, D.C. 20006
(202) 659-6600 Telephone
(202) 659-6699 Facsimile
elongosz@eckertseamans.com
mjohnston@eckertseamans.com
kramos@eckertseamans.com

Daniel W. Hileman
Kaufman Vidal Hileman Ellingson,
P.C.
22 2nd Avenue, West
Kalispell, MT 59901
(406) 755-5700
dwh@kvhlaw.com

*Attorneys for Petitioner, Maryland Casualty Company*

# <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 11(4)(3) of the Montana Rules of Appellate Procedure, I certify that this Brief is double spaced (except for point headings, footnotes and quotes), printed with proportionately spaced Times New Roman Typeface, 14 point, and contains 9,910 words as calculated by Word, excluding any table of contents, table of citations, certificate of service, certificate of compliance, and Ex. or exhibits.


Dated: March 21, 2019                                   */s/ Kennedy C. Ramos*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have served true and accurate copies of the foregoing Opening Brief of Petitioner Maryland Casualty to the following on March 21, 2019:

Hon. Amy Poehling Eddy
920 South Main
Kalispell MT 59901
Asbestos Claims Court Judge

Allan M. McGarvey (Attorney)
John Lacey
Dustin Leftridge
345 1st Avenue E
Kalispell MT 59901
Representing: Ralph V. Hutt

Dated: March 21, 2019                                 */s/ Kennedy C. Ramos*

# CERTIFICATE OF SERVICE

I, Kennedy C. Ramos, hereby certify that I have served true and accurate copies of the foregoing Brief - Appellant's Opening to the following on 03-21-2019:

Charles J. Seifert (Attorney)
P.O. Box 598
Helena MT 59624
Representing: Maryland Casualty Corporation
Service Method: eService

Daniel W. Hileman (Attorney)
22 Second Ave. W., Suite 4000
Kalispell MT 59901
Representing: Maryland Casualty Corporation
Service Method: eService

Allan M. McGarvey (Attorney)
345 1st Avenue East
Kalispell MT 59901
Representing: Ralph V. Hutt
Service Method: eService

Dustin Alan Richard Leftridge (Attorney)
345 First Avenue East
Montana
Kalispell MT 59901
Representing: Ralph V. Hutt
Service Method: eService

Edward J. Longosz (Attorney)
1717 Pennsylvania Avenue NW
Suite 1200
Washington DC 20006
Representing: Maryland Casualty Corporation
Service Method: eService

Joseph M. Sullivan (Attorney)
101 River Drive North
Great Falls MT 59401
Representing: Transportation Insurance Co., American Property Casualty Insurance Association

Service Method: eService

Maxon R. Davis (Attorney)
P.O. Box 2103
Great Falls MT 59403
Representing: Transportation Insurance Co., American Property Casualty Insurance Association
Service Method: eService

Amy Eddy (Respondent)
920 S. Main, Ste. 310
Kalispell MT 59901
Service Method: Conventional

Tammy Peterson (Interested Observer)
Asbestos Court Clerk
Helena MT 59601
Service Method: Conventional

Matthew Cuffe (Interested Observer)
512 California
Libby MT 59923
Service Method: Conventional

Mark A. Johnston (Attorney)
1717 Pennsylvania Ave. NW, 12th Floor
Washington DC 20006
Representing: Maryland Casualty Corporation
Service Method: Conventional

Electronically Signed By: Kennedy C. Ramos
Dated: 03-21-2019