# Exhibit B

Amy Eddy
District Court Judge
920 South Main
Kalispell, MT 59901
(406) 758-5667

IN THE ASBESTOS CLAIMS COURT OF THE STATE OF MONTANA

| IN RE ASBESTOS LITIGATION, *Consolidated Cases*. | Cause No. AC-17-0694<br><br>ORDER RE: DEFENDANT MARYLAND CASUALTY COMPANY'S MOTION FOR SUMMARY JUDGMENT and PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT<br><br>Applicable to *Hutt v. Maryland Casualty Co., et al.*, Cascade County Cause No. DDV-18-0175, Judge John Parker |
|---|---|

    Pending before the Court is (1) Defendant Maryland Casualty Company's *Motion For Summary Judgment*, filed October 19, 2018 (50 pages); Plaintiff Ralph Hutt filed his *Brief in Response* on October 30, 2018 (25 pages), to which Maryland Casualty Company filed a *Reply* on November 9, 2018 (15 pages); and (2) Plaintiff's *Motion for Summary Judgment*, filed October 19, 2018 (25 pages); Maryland Casualty Company filed its *Response in Opposition* on October 30, 2018 (19 pages), to which Plaintiff filed a *Reply* on November 9, 2018 (15 pages).

    Over 100 exhibits, comprised of thousands of pages of documents, depositions, expert reports and affidavits were filed in support of these motions, as well as multiple thumb drives of document referred to in the exhibits, Plaintiffs' *Statement of Uncontroverted Facts*, and Maryland Casualty Company's *Statement of Disputed Facts*. Both matters came before the Court for a three-hour oral argument on January 7, 2019.[1] Having reviewed the file and being fully apprised, the Court hereby finds as follows:

**ORDER**

    Defendant Maryland Casualty Company's *Motion for Summary Judgment* is GRANTED in part, and DENIED in part, consistent with the below Rationale.

---

[1] The Court highlights the volume of the record before it to acknowledge that it would be impractical to include all facts set for by the parties. As such, the Court only includes those necessary to determine the matters to be resolved herein.

# RATIONALE

### A.  Procedural Background

Plaintiff Ralph Hutt was one of 884 plaintiffs included in *Adams, et al. v. Maryland Casualty Company, et al.*, Cascade County Cause No. DDV-16-0786, filed September 23, 2016. On March 20, 2018, this Court selected Hutt as a lead case for trial against Maryland Casualty Company (MCC), and directed him to file a separate complaint, which was done on March 23, 2018, and is filed as *Hutt v. Maryland Casualty Company, et al.*, Cascade County Cause No. DDV-18-0175. Hutt brought claims against MCC for (1) Negligence in Provision of Industrial Hygiene Services; and (2) Bad Faith Treatment of Workers with Rights to Occupational Disease Benefits (Breach of Fiduciary Duty, Deceit, Bad Faith Negligent Misrepresentation and Constructive Fraud, Malice).[2]

MCC moved for summary judgment arguing Hutt's claims are barred by the applicable three year statute of limitation as the claims accrued sometime in the 1990s, and alternatively, even if the claims did not accrue until October 8, 2002, the filing of Hutt's *Complaint* on September 23, 2016, was still untimely as it was not filed within 60 days of the expiration of the U.S. Bankruptcy Court's preliminary injunction governing these claims, which expired on February 3, 2014. MCC further argued that even if Hutt's claims were not barred by the applicable statute of limitations, they are unsupported by Montana law. Hutt argues his claims are not barred by the three-year statute of limitation,[3] and are well-supported by existing Montana law.

### B.  Factual Background

#### (1)  W.R. Grace Operations in Libby, Montana[4]

Mineral Carbon and Insulating Company first mined vermiculite in Libby in approximately 1922. MCC Ex. 1, at 6. Mineral Carbon changed its name to Zonolite Company ("Zonolite") in 1923. W.R. Grace ("Grace") acquired the assets of Zonolite in 1963. Grace was aware of the presence of tremolite in the vermiculite ore deposits when it purchased the Zonolite assets. MCC Ex. 1, at 6. The vermiculite was mined through open strip mining, with the material trucked to large hoppers that separate the vermiculite from waste rock. As part of its mining operations in Libby, Grace also operated the Libby Plant, which, relevant to this case, consisted of the original dry mill that was used from 1922 to 1974. MCC Ex. 1, at 6. Through a series of screening operations, the dry mill produced concentrated vermiculite. It also produced

---

[2] Hutt also brought Negligence and Strict Products Liability claims against the other Defendant, Robinson Insulation. Robinson Insulation is not a going concern and a receiver has been appointed.
[3] Hutt concedes any cause of action based on the two-year statute of limitation would be barred.
[4] MCC skillfully devotes most of the factual background of its briefing to Grace's conduct, presumably in an attempt to minimize its own contributions. As this case is not at this juncture about Grace's conduct, the Court has only included the barest framework of Grace's operations in Libby to provide context for MCC's subsequent involvement.

an extraordinary amount of dust contaminated with asbestos fibers. As is evident from the voluminous documentation produced in this matter, dust control was an ongoing issue that continually plagued Grace management. MCC Ex. 1, at 4-12.

Since 1956, Zonolite, and then Grace, required pre-employment physical examinations of the workers, including x-ray screenings in 1959. MCC Ex. 1, at 12. Annual x-ray screenings of all plant personnel began in 1964, with additional periodic x-ray screenings for some employees. Results of these screenings were made available to the personal physician for each employee, with instructions for the employee to contact his physician to discuss the results. MCC Ex. 1, at 13. It was not until 1970, after Hutt left employment with Grace, that Grace management began meeting with employees individually to discuss results and recommend further evaluation. MCC Ex. 1, at 14.

"The Miners originally sued Grace for its failure to provide a safe working environment. Grace successfully avoided financial responsibility for these claims, however, by filing for protection under Chapter 11 of the federal bankruptcy laws in April 2001. The Miners thereafter sued the State for its role in failing to protect them." *Orr v. State*, 2004 MT 354, ¶7, 324 Mont. 391, 106 P.3d 100.

### (2) Involvement of the State of Montana and Its Statutory Duty to Warn

The Montana State Board of Health conducted regular inspections of the Zonolite and then Grace facilities in Libby:

> During each State inspection between 1956 and 1974, the State inspectors found unsanitary and unhealthful conditions. The State notified Zonolite, and later Grace, of the dangerous conditions after each inspection, explaining the seriousness of asbestosis and its likely fatal outcome, but did not inform the Mine workers, including the Miners, of the dangers. With the exception of identifying the hazardous conditions and telling the Mine's owners/managers to correct the problems, the State took no steps to ensure that the Mine's owners/managers responded in a manner that provided a safe working environment.

*Orr*, ¶6.

The workers ultimately sued the State for its role in failing to protect them. "They allege[d] that the State negligently failed to warn them of the known dangers to all Mine workers and their families associated with working at the Mine, and that as a result of the State's negligence, the Miners have suffered grave injuries and damages." *Orr*, ¶7. The Montana Supreme Court found the State had a statutory duty to warn Zonolite and Grace employees of the asbestos hazards at the workplace. Due to that ruling, *Orr* did not reach the question of whether the State owed a similar common law duty to warn that is advanced herein against MCC.

**(3)   Maryland Casualty Company's Provision of Workers' Compensation Coverage for W.R. Grace**

Maryland Casualty Company (MCC), as Grace's workers' compensation carrier, provided workers' compensation insurance for the Libby Plant beginning in 1963 when Grace purchased the Libby Plant. MCC Ex. 2. The Workers' Compensation and Employers Liability Insurance Policy in effect when Grace purchased the Libby Plant, and during Hutt's employment at Grace, contained the following provision:

> We have the right, but are not obliged to inspect your workplaces at any time. Our inspections are not safety inspections. They relate only to the insurability of the workplaces and the premiums charged. We may give you reports on the conditions we find. We may also recommend changes. While they may help reduce losses, we do not undertake to perform the duty of any person to provide for the health or safety of your employees or the public. We do not warrant that your workplaces are safe or healthful or that they comply with laws, regulations, codes or standards. Insurance rate service organizations have the same rights we have under this provision.

MCC Ex. 13.

MCC takes the position that while it had the right to inspect the workplace and make recommendations, it was not retained by Grace to provide industrial hygiene services or to implement a safety plan, and that those tasks were contracted to other entities, including the State of Montana, Bureau of Mines, U.S. Public Health Service, and Johns-Manville. MCC Exs. 26, 33-45, 73.8. MCC further argues it had no right to control the operations of Grace, other than of course by withdrawing insurance coverage.

Hutt argues that despite the language of the workers' compensation policy, MCC voluntarily undertook to provide industrial hygiene services, and develop and implement an overall program for controlling the dust and protecting personnel through adoption of a Safety Program for Grace.

Clayton Shoup is MMC's designated Rule 30(b)(6) corporate representative as to these topics. Mr. Shoup testified that from 1964-1969, dust was a "grave concern" at the Libby Plant, and as part of accident prevention services MCC had staff on site assisting with the dust problem. *Shoup Depo.*, pp. 13-14. During this time, Mr. Larry Park was the Home Office Supervisor from the Accident Prevention Department at the Engineering Division of MCC, and was at the center of discussions between Grace, MCC and other entities about the dust problem. *Shoup Depo.*, p. 15. Also assigned by MCC to consider the dust problem were two safety inspectors, Mr. Walker and Mr. Baker; and Medical Director, Dr. Chenowith, from MCC's Medical Division. *Shoup Depo.*, p. 16.

It is clear that when Grace purchased Zonolite in 1963, there were already concerns about the health of Grace workers. Dr. Woodrow Nelson was a physician in Libby during this time. Dr. Nelson had written to Grace about his concerns with workers developing lung conditions due to asbestos exposure. *Shoup Depo.*, p. 98. Internal Grace documents reflect Grace believed Dr.

4

Nelson had "potentially uncovered a potential health problem at the Libby mine and mill which could increase our insurance costs and endanger our employees." Hutt Ex. 12, dated 8/31/64. Grace recommended forwarding Dr. Nelson's concerns to MCC. *Id*. In responding initially to Dr. Nelson's concerns, Grace wrote to him:

> I have discussed your work and your recommendation in part with the Maryland Casualty Company, our insurance carriers, and requested they contact you.
>
> Dr. Robert F. Chenowith, M.D. of the Maryland Casualty Company . . . is interested in this problem. I am forwarding a copy of your letter and report to Dr. Chenowith.
>
> The Zonolite Division is definitely interested in the welfare of its employees. Maryland Casualty Company is formulating a program for control and prevention in relation to the dust problem.

Hutt Ex. 13.

> Grace then wrote to its insurance agency:
>
> Enclosed are copies of correspondence regarding a potential Workers' Compensation problem at Zonolite's Libby, Montana open pit Vermiculite mine operation.
>
> It is our opinion that this information should be forward to Maryland Casualty Co. for their recommendations and assistance in this matter.

Hutt. Ex. 14, dated 9/3/64.

Following this exchange of correspondence, Mr. Park wrote to his Assistant Regional Supervisor at MCC, Mr. Zanone, regarding the problem at Grace, "We shall refer the correspondence and our file to Dr. Chenowith and assure you of our continued follow-up through this department. Since the causes of fibrosis is highly controversial, we will certainly need all of the medical research and control it is possible to obtain." Hutt. Ex. 18, dated 9/14/64. Mr. Zanone then replied to the concerns of Grace's insurance agency and commented, "the dust problem has been referred to our Engineering Division and they in conjunction with out Medical Division are presently formulating a program for control and prevention." Hutt Ex. 20, dated 9/15/64.

On September 24, 1964, Mr. Park then provided the outline of the W.R. Grace and Company Zonolite Division Safety Program to his supervisor. Hutt. Ex. 22. The purpose of the program was to "see that everything practical is done to control dust, protect personnel who are exposed to dust which cannot be controlled, and follow through with periodical x-rays of persons exposed to discover any incidents of lung damage or fibrous growth in the lung which may decrease breathing function." Hutt. Ex. 22. Mr. Park goes on to state that MCC should utilize information from the State of Montana and Bureau of Mines to determine whether operations conform with standard best practices. MCC is candid in stating it does not want to establish the standards but will work to bring Grace into conformity with the standards in the industry.

5

Mr. Park goes on to discuss that in addition to prevention, the Safety Plan will include medical monitoring, provision of janitorial services, and access to sanitary facilities so that employees can bathe before putting on their street clothes.  Hutt. Ex. 22.  Once the Safety Program was adopted, MCC would then publish "the program to each and every representative servicing this risk to expedite the initiation of the progress."  Hutt. Ex. 22.  On October 7, 1964, MCC represented "the contemplated program will be most comprehensive covering all phases of accident prevention as well as industrial hygiene as they relate to Zonolite operations."  Hutt. Ex. 27.  MCC ultimately drafted a Safety Program in cooperation with Grace.  Hutt Ex. 36*; Shoup Depo.*, pp. 31, 135.

MMC then undertook to "service the risk" in Libby.  Mr. Park recommended the risk be serviced, i.e., inspected, quarterly due to the "unusually high incidence, (approximately one-third) of basilar fibrosis" found in the 1959 survey of all Zonolite employees, followed by the 1964 survey demonstrating that  "important increases incidents [sic] of chronic respiratory disease that existed in Zonolite employees who had prolonged exposure to dust."  Hutt Ex. 39.  Mr. Park went on to explain to the MCC Seattle office the extent of the changes in pathology and respiratory function of the Zonolite employees due to dust exposure and then wrote:

> You appreciate that the above is highly confidential and must not get out of your own office.  At the same time, it gives you a little of the insight into why we are so concerned with these operations and why we must provide the best safety engineering service available on as frequent basis as possible.

Hutt. Ex. 39.

In December of 1964, MCC was still in the process of finalizing the Safety Program, but the proposed Safety Program had already passed a first reading of MCC and Grace.  Hutt Ex. 49.  MCC explained that part of the delay was they it had not been able to inspect the property until July of 1964, as they usually do not service risk in Montana.  This internal document also explains MCC was aware of the "risk" in Montana and "actually endorsed the policy to cover asbestosis as well."  Hutt. Ex. 49.

In the meantime, Dr. Chenowith, MCC's Medical Director, had asked Dr. Spicer at the University of Maryland School of Medicine to review the records of Grace employees.  Dr. Spicer opined there was an "important health problem" at the Libby Plant, and that if accurately studied would probably result in a doubling of the incidence of disease.  Hutt Ex. 59.

MCC worked throughout 1965 to complete and implement its recommendations to control dust and minimize risk to workers.  On June 1, 1966, Mr. Park wrote a letter to Grace following a recent visit and commended Grace on the progress made to date and stated that if Grace continued to follow the plan, its "employees in this operation can be assured freedom from Asbestosis by close observation of the Industrial Hygiene Practices which are established."  Hutt Ex. 81.

However, on September 7, 1966, Mr. Park wrote again to the MCC Seattle office expressing his concerns about the results of the 1965 and 1966 radiological reports of Grace

6

employees, and asking the information be kept confidential until a full review could be done by MCC's doctor. Hutt Ex. 86. However, during the summer and fall of 1967, MCC also seemed pleased with how Grace had implemented its recommendations to reduce the dust. Hutt. Exs. 94.1, 97.

Nonetheless, the problem persisted. In November 25, 1967, an internal MCC memo from counsel, prepared in the context of a workers' compensation claim, outlines Grace's inability to curb the problem in Libby at the recommendation of the State Board of Health, and the extent of the harm to its workers—for which MCC would be responsible for any claims. Hutt Ex. 102. The attorney recommends the claim be settled so as to avoid "the necessity of exposure of all of the more damaging aspects of our own situation." Hutt Ex. 102. The attorney goes on to discuss and question exactly how candid MCC should be to the State Board of Health. The attorney argues that the sheer extent of the harmful dust exposure, and the impact on employees would indicate that candor toward the State Board of Health would be important. The attorney also explains that while this singular case may be resolved, "it will be necessary to expose the entire situation to the Industrial Accident Board, whose records may well be available to unions and the general public." Hutt. Ex. 102. At this point in time, MCC was not reporting asbestos dust exposure injuries to the Industrial Accident Board as required. *DeBlock Depo.*, pp. 13-17 (Neil DeBlock is MCC's Rule 30(b)(6) corporate representative for claims handling).

Also at this point in time, MCC was on notice the U.S. Department of Public Health had tested the dust found in the Libby Plant and determined it contained between 60-80% asbestos fibers, which was 10-100 times more than the safe limit. *Shoup Depo.*, pp. 87, 88, 93. MCC was also in possession of the State Board of Health Reports containing similar findings. *Shoup Depo.*, pp. 80, 124-126. This is in addition to its own medical monitoring of the employees.

This situation continued with MCC making periodic inspections of the Libby Plant and making recommendations for improvements, some which were immediately adopted, some of which may have been rejected, and some of which were adopted on a long-term basis. In MCC's own words, these inspections were done by MCC "in the interest of accident prevention and public safety." MCC Ex. 14.

In regard to Grace and the Libby Plant, MCC used the combined resources of its Engineering Division and its Medical Division to formulate a program for control and prevention in the following four areas:

(1) Dust control and prevention;
(2) Studying worker lung impairment;
(3) Developing a worker safety program; and
(4) Addressing workers' compensation occupational disease claims.

*Shoup Depo.*, pp. 19-20.

Shoup acknowledged that any Safety Program should conform to industry standards, and industry standards, even in the 1960s, required warning workers of hazards. *Shoup Depo.*, pp. 156-157. Shoup agreed that the greater the hazard, or the more hidden the hazard, the greater

7

need for warnings. *Id*. The warnings could include employee training and/or signage regarding the risk. *Shoup Depo*., pp. 158-160. In fact, MCC provided the Libby Plant with all types of signage to be used to warn employees of various risks in the 1960s, but not for asbestos until the early 1970s. MCC never recommended that Grace utilize signage or employee warnings to advise employees of the presence and risk of asbestos in their workplace, and how to minimize that risk, despite acknowledging that type of warning would have been appropriate under these circumstances. *Shoup Depo*., pp. 169, 172.

With specific reference to claims handling, MCC takes the position that MCC owed no duties to Grace workers to advise them of their exposure to asbestos or known changes to their lung condition until after a workers' compensation claim had been filed. This included notifying the workers they had a potential claim. *DeBlock Depo*., pp. 22-26. MCC agreed that after a claim was filed, MCC then owed numerous duties to the claimant. MCC did not distinguish routine claims from instances where an insurer was engaged in medical monitoring of workers, and had information about the health of the workers that was not available to the workers regarding a latent disease:

> Q: Is it your position that Maryland Casualty did not think it important that the worker have knowledge of the information the worker needed in order to file a claim?
> 
> \* \* \*
> 
> A: We don't normally as a practice tell folks how to file claims. I mean, that just not what we do. We handle claims after they come to us.
> 
> Q: What usually happens is the worker gets hurt, the employer or the insurer doesn't even know, the worker gives notice, I fell off a ladder, I'm hurt. And then the— Maryland Casualty or the insurer responds to that in a—and addresses the claim. That's what usually happens, right?
> 
> A: After receiving the claim, yes.
> 
> Q: Yeah. But in this case, if the worker doesn't know he's been injured but Maryland Casualty does, is it your position that Maryland Casualty doesn't need to say anything?
> 
> \* \* \*
> 
> A: Without receiving the claim, it wouldn't know, without an investigation, whether or not any injury a worker may or may not have is any way related to any type of on-the-job injury.
> 
> Q: If Maryland Casualty did know that the workers were injured, and that they were injured at work, and that they were injured by the high concentration asbestos dust in the work, and that a lot of workers had that, and that it presented the likelihood of a great number of claims, then do you think that Maryland Casualty should have told the workers that they had been injured?
> 
> \* \* \*
> 
> A: Once again, we wouldn't—we would have no basis to know what caused any type of injuries till we received the claim from an individual, so we can investigate and do the proper due diligence to determine compensability.
> 
> Q: And that die diligence would include for example, asking a doctor, Was this injury casually related to the workplace event?

8

    A:      That due diligence would include multiple items, including investigating determining employment, determining how long they were there. But yes, part of that include an IME from a doctor to determine causality.

    Q:      But if the—Maryland Casualty already had had its doctor, indeed the director of its medical division, evaluate the studies that had been done that showed that in fact these workers were being injured, wouldn't that meet that element of investigation?

\*   \*   \*

    A:      I don't believe so, until the claim is actually filed.

*DeBlock Depo.*, pp. 25-26.

### (3) Plaintiff Ralph Hutt

Plaintiff Ralph Hutt is currently 76 years old. He was born and raised in Michigan where he lived prior to enlisting in the Army in 1963. After being honorably discharged in 1966, he moved to Troy, Montana where his parents and siblings had relocated. After moving to Montana, Hutt lived with his parents and was employed at the Libby Plant from March of 1968 to October of 1969. During his employment with Grace, Hutt worked in the dry mill doing cleanup work and operated the skip car/track. He also ran the transfer point and drove equipment in the mine near the dump pile. Hutt was provided a paper respirator but was told by his supervisor he could "wear [it] if [he] wanted or not" because "it was just dust and it wouldn't hurt [him]." Hutt wore the paper respirator once, but because it just "plugged up," he never wore it again. When Hutt requested a supplied air respirator, Grace told him he had to buy his own, but he could not afford one. Hutt testified in his deposition that he had no knowledge the dust contained asbestos, and that he was unaware of anyone getting sick from the mine until 2002 when he received a letter from the CARD Clinic. Hutt Ex. 53: *Hutt Depo.*, p. 27.

After Hutt left Grace in 1968, he worked various forestry jobs around Wyoming, New Mexico, Montana and Idaho. In the 1990s he was logging for Tucker Engineering out of Sandpoint, ID, when he started having difficulty breathing at altitude. Hutt Ex. 53: *Hutt. Depo.*, pp. 24-25. He ultimately had to leave this job because of breathing difficulties, and he relocated to Oregon where he has remained ever since.

While Hutt was employed at Grace, MCC was engaged in medical monitoring of certain categories of Grace employees, as described above. Hutt testified he recalled having a chest x-ray before he was hired, and another at the beginning of 1968 prior to him leaving employment there. Hutt Ex. 53: *Hutt Depo.*, pp. 66-67. During his deposition Hutt had no recollection of ever being informed by Grace during his employment of the results of these chest x-rays, or that he had been diagnosed with an asbestos related disease. Hutt Ex. 53: *Hutt Depo.*, pp. 66-67. Hutt's recollection is inconsistent as to whether he ever saw any warning signs regarding asbestos, or the need to wear a respirator.

On October 27, 1969, MCC provided Grace with its *Radiological Interpretation of X-Rays—Annual Follow Up*. MCC Ex. 56. While provided after Hutt had left his employment with Grace, the *Annual Follow-Up* included Hutt on a list of employees whose health needed to be

9

closely monitored by Grace as they had been identified as having "fibrotic changes, emphysema, or other lung [illegible]," and recommended follow-up x-rays every six months. The *Annual Follow-Up* also states, MCC "would assume that all of these men have been advised of their physical examination findings . . ." As outlined above, Hutt testified in his deposition on September 19, 2018, that he had no recollection of ever receiving any testing results. This deposition testimony was consistent with the *Affidavit* he filed on October 16, 2018, stating he "was never told of the results of any x-rays taken of [him] at the hospital at [his] employer's direction." It is also consistent with evidence in the record, described above, that Grace did not meet with employees directly until the early 1970s.

However, on April 26, 2017, Hutt had a new patient visit with Dr. Sukhraj Balhan at Pulmonary and Sleep Specialists in Roseburg, Oregon. The history portion of this office visit states:

> Patient is a lifelong nonsmoker however would and Libby Montana and of asbestos mine in 1967 for about 10 months. Patient was evaluated at that time and was told he has asbestosis.

MCC Ex. 57 (typos in original).

Hutt was also previously seen at Kalispell Regional Hospital on August 29, 1989, for a chest x-ray during the course of a hernia operation. The conclusion of the radiologist report for that chest x-ray states, "Bilateral mild hyperinflation with scarring at the lung bases and there is mild blunting of the costophremic angles, which is also probably secondary to chronic scarring, and it would be helpful if there were previous x-rays." Ex. 71.[5] Dr. Carrie Redlich, who was retained as an expert witness by Hutt, testified that conclusion of this radiologist report "shows evidence of pleural scarring and is consistent with asbestos related disease." Ex. 72.

Moreover, Hutt was seen at the CARD Clinic on June 19, 2018, for an Annual Visit. The note of this visit states:

> Ralph is here today for annual followup of his asbestos related disease. Ralph is living in Winston, OR, which he finds a very suitable climate for him, and without any problems that could exacerbate breathing problems. Ralph has been followed at the CARD since November of 2014 when we diagnosed with extensive asbestos related disease. His exposure history was very significant, he was a former W.R. Grace employee spending at least one year on the skip track, which was one the most highly dusty areas contaminated

---

[5] Curiously, while in the possession of Hutt, this document was not produced in discovery to MCC until October 25, 2018, after MCC had filed the present *Motion for Summary Judgment*. More curious, Hutt does not reference this record in his *Brief in Response*, filed October 30, 2018, instead representing to the Court in his briefing that prior to 2002, "there is no evidence of any medical diagnosis or any medical record of a lung condition caused by asbestos exposure." *Brf. Resp.*, p. 7. Nor did Hutt direct the Court to his own expert's testimony, taken the day after the 1989 record was produced, that the 1989 findings were consistent with an asbestos related disease.

> with Libby amphibole. In addition to this, he lived with his father for 3yr; his father worked at Zonolite facility and would bring his dusty clothing home through out that period.
>
> Ralph started having significant problems with his breathing when he was working as a sawyer, which was his occupation most of his life. He had been working in Wyoming at altitudes as high as 9000 to 10,000 feet and was running out of breath, though gradually in the 1990s he could no longer do his work and left his job. He was evaluated in his region in Oregon for his lung problems and was diagnosed with asbestos related disease sometime in the early-to-mid 1990s.

MCC Ex. 58.

Hutt testified in his deposition that the CARD record, while overall accurate, is not accurate that he was diagnosed with an asbestos related disease in the 1990s. Hutt asserts he was not actually diagnosed with an asbestos related disease until October 8, 2002, when Dr. Jaworski and Dr. Orsborn in Roseburg, OR, diagnosed him with:

> bilateral pleural thickening, parenchymal scarring in his right lung, and left diaphragmatic calcification suggesting prior asbestos exposure linked to his probable asbestos exposure at the vermiculite mine. In 2014, Dr. Black confirmed Plaintiff's diagnosis of diffuse pleural and interstitial disease, including extensive bilateral calcified pleural thickening with reticular changes, parenchymal bands and sub-pleural lines, all of which was the indicia of Libby asbestos disease.

Ex. 59.

During his deposition, Hutt testified he was not aware prior to 2002 that he had an asbestos related disease, and did not recall whether he had ever had a chest x-ray before 2002, or who any of his medical providers were prior to 2002. Ex. 53: *Hutt Depo.*, p. 15:8-21. In 2002 he had received a letter from the CARD Clinic encouraging him to get screened. Prior to this letter, he had not heard of the CARD Clinic. As outlined above, he was then screened in Oregon. While he continued to exchange information with the CARD Clinic, he was not actually physically seen there until 2014.

The Court has reviewed Hutt's deposition in its entirety and it is replete with instances of Hutt's lack of memory. Other than his date of birth and service in the Army, Hutt simply cannot recall any dates with any accuracy unless his memory is refreshed by a written document. Hutt did testify in his deposition that he would truthfully and accurately report his history and symptoms to any doctor he met with. Hutt now argues that the medical histories contained in the medical records are "manifestly dubious" and inadmissible hearsay in any event.

Hutt never filed a workers' compensation claim because the statutory timeframe to do so, one year from the last day of employment, had passed.

11

C.  **Legal Analysis**

(1)  **Standard of Review for Motions for Summary Judgment**

Summary judgment is proper only when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Rule 56(c), Mont.R.Civ.P. The movant has the initial burden to show that there is a complete absence of any genuine issue of material fact. To satisfy this burden, the movant must make a clear showing as to what the truth is so as to exclude any real doubt as to the existence of any genuine issue of material fact. *Minnie v. City of Roundup*, 257 Mont. 429, 431, 849 P.2d 212, 214 (1993). The burden then shifts to the party opposing the motion to show, by more than mere denial and speculation, that there are genuine issues for trial. *Sunset Point v. Stuc-O-Flex Int'l*, 287 Mont. 388, 392, 954 P.2d 1156, 1159 (1998). The party opposing the summary judgment is entitled to have any inferences drawn from the factual record resolved in his or her favor. Rule 56(c), Mont.R.Civ.P.

Summary judgment motions encourage judicial economy through the elimination of unnecessary trial, delay and expense. *Bonawitz v. Bourke*, 173 Mont. 179, 182, 567 P.2d 32, 33 (1977). However, summary judgment is not to be utilized to deny the parties an opportunity to try their cases before a jury. *Brohman v. State*, 230 Mont. 198, 202, 749 P.2d 67, 70 (1988). "Summary judgment is an extreme remedy and should never be substituted for a trial if a material fact controversy exists." *Clark v. Eagle Sys., Inc.*, 279 Mont. 279, 283, 927 P.2d 995, 997 (1996) (citations omitted). If there is any doubt as to the propriety of a motion for summary judgment, it should be denied.

(2)  **Statute of Limitations**

An action for personal injury must be commenced within three years from the time that the claim or cause of action accrues. Mont. Code Ann. § 27-2-204. A claim or cause of action accrues "when all elements of the claim or cause exist or have occurred, the right to maintain an action on the claim or cause is complete, and a court or other agency is authorized to accept jurisdiction of the action." Mont. Code Ann. §27-2-102(1)(a). Generally, lack of knowledge by the claimant of the claim or cause of action, or its accrual, does not postpone the beginning of the period of limitations. Mont. Code Ann. §27-2-102(2). However, when the facts constituting the claim are by their nature concealed or self-concealing, the period of limitations does not commence "until the facts constituting the claim have been discovered or, in the exercise of due diligence, should have been discovered by the injured party. . . ." Mont. Code Ann. §27-2-102(3). "Asbestosis is a latent disease that is, by its nature, self-concealing. Thus, the inquiry in this case is when [Hutt] discovered or, in the exercise of due diligence, should have discovered that he had asbestosis." *Kaeding v. W.R. Grace & Co.*, 1998 MT 160, ¶17, 289 Mont. 343, 961 P.2d 1256.

In *Kaeding*, the plaintiff relied upon *Hando v. PPG Indust., Inc.*, 236 Mont. 493, 771 P.2d 956 (1989), to argue that until there was an actual medical diagnosis of asbestosis, the statute of limitation did not begin to run. The Montana Supreme Court rejected this argument. While acknowledging that *Hando* also involved diagnosis of a latent disease, and that the statute of limitation was not triggered in that case until a medical diagnosis was rendered, this was not

12

always required. Instead, the Court found that, "While Kaeding may not have received a technical diagnosis of asbestosis, several doctors who examined Kaeding prior to 1994 were of the opinion that his medical problems were attributable, at least in part, to asbestosis." *Kaeding*, ¶23.

There are multiple examples in the record where Hutt appeared to represent to his medical providers that he had previously been told he had been diagnosed with asbestosis during his employment with Grace, and also at some point in the 1990s when his breathing had become very labored leading to a change of employment. These representations are supported by the 1989 Kalispell Regional Hospital radiology report that Hutt's own expert agrees is consistent with an asbestos related disease. While the Court agrees Hutt was diagnosed with an asbestos related disease on October 8, 2002, by Dr. Jaworski and Dr. Orsborn in Roseburg, Oregon, this does not preclude a finding that Hutt was diagnosed as early as 1968 during his employment with Grace, or in the 1990s in Oregon after he had become increasingly impaired from his symptoms, lost his employment, and moved to a lower elevation.

The question is whether, in the exercise of due diligence, Hutt knew or should have discovered that he had an asbestos related disease in the 1990s. As outlined above, Hutt now argues that the medical histories contained in the medical records are "manifestly dubious" and inadmissible hearsay in any event. The Court has no reason to believe the medical histories, taken long before this litigation ensued, are "manifestly dubious". Indeed, consistent with the pattern apparent in his deposition testimony, it is just as likely Hutt simply does not recall these events. Additionally, subject to other evidentiary requirements, statements in medical records, such as medical histories are admissible as an exception to the hearsay rule:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness . . . [s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

Rule 803(4), Mont.R.Evid.

Despite the Court's reservations as to when Hutt, in the exercise of due diligence, knew or should have discovered that he had an asbestos related disease, considering that a party opposing summary judgment is entitled to have any inferences drawn from the factual record resolved in his favor, the Court finds genuine issues of material fact exist precluding summary judgment.

The Court also rejects MCC's argument that the preliminary injunction entered by the U.S. Bankruptcy Court bars Hutt's claims. Mont. Code Ann. §27-2-406 expressly provides:

> When the commencement of an action is stayed by injunction or other order of the court or judge or statutory prohibition, the time of the continuance of the injunction or prohibition is not part of the time limited for the commencement of the action.

This statute is controlling as to permit Hutt's substantive claims under Montana law.

**(2)   Through its provision of industrial hygiene services and implementation of a safety program, was MCC negligent in failing to warn the workers of the asbestos hazard they were exposed to during Grace's operations in Libby?**

"To succeed in a negligence claim, a plaintiff must establish that the defendant had a legal duty; the defendant breached that duty; the breach caused injury; and damages. Thus, any claim of negligence first requires that the defendant owe a legal duty to the plaintiff. Whether a legal duty exists is a matter of law to be decided by the court." *Bassett v. Lamantia*, 2018 MT 119, ¶10, 391 Mont. 309, 417 P.3d 299 (internal citations omitted). In determining whether a duty exists, courts must consider: whether imposing a duty comports with public policy and "whether the defendant could have foreseen that his conduct could have resulted in an injury to the plaintiff." *Fisher v. Swift Transp. Co.*, 2008 MT 105, ¶ 17, 342 Mont. 335, 181 P.3d 601.

**(a)   Foreseeability**

"Thus, duty is mainly a question of foreseeability—whether the person injured was within the scope of risk created by the defendant's action." *Bassett*, ¶10; *Lopez v. Great Falls Pre-Release Servs.*, 1999 MT 199, ¶28, 295 Mont. 416, 986 P.2d 1081. "While the question of duty is usually presented in terms of the actor's obligation, "the essential question [is] whether the plaintiff's interests are entitled to legal protection against the defendant's conduct." *Bassett*, ¶25 (quoting W.L. Prosser, Handbook of the Law of Torts 325 (4th ed. 1971)).

> The amount of care demanded by the standard of reasonable conduct must be in proportion to the apparent risk. As the danger becomes greater, the actor is required to exercise caution commensurate with it. Those who deal with instrumentalities that are known to be dangerous . . . must exercise a great amount of care because the risk is great. They may be required to take every reasonable precaution suggested by experience or prudence.

*Estate of Strever v. Cline*, 278 Mont. 165, 173, 924 P.2d 666, 670 (1996) (quoting W. Page Keeton et al., Prosser and Keeton on Torts § 34, at 208 (5th ed. 1984)).

The Montana Supreme Court has explained foreseeability consistent with Judge Cardozo's description in *Palsgraf v. Long Island Railroad Company*, 248 N.Y. 339, 162 N.E. 99, 100 (N.Y. 1928):

> "The risk reasonably to be perceived defines the duty to be obeyed." [*Palsgraf*, 162 N.E. at 100.] That is to say, a defendant owes a duty with respect to those risks or hazards whose likelihood made the conduct unreasonably dangerous, and hence negligent in the first instance.

*Bassett*, ¶25.

14

In the present case, there is no question the Zonolite and Grace workers were within the scope of risk created by MCC's conduct. MCC had actual knowledge that workers were continuously being exposed to a hidden asbestos hazard, that the workers were being diagnosed in increasing amounts with lung abnormalities related to asbestos exposure, and that with proper precautions the risk to worker could be reduced or eliminated. MCC knew Zonolite and Grace were not implementing the safety measures to control dust and protect workers as expediently as necessary, and nonetheless did not recommend or require that employee training or signage be implemented to warn the workers. As is evident from the record, MCC did recommend or require signage for other risks—it even supplied the signs—indicating MCC, in cooperation with Grace, undertook to warn workers of other types known hazards.

### (b) Public Policy Considerations

The policy considerations to be weighed in determining whether to impose a duty include:
(1)   the moral blame attached to the defendant's conduct;
(2)   the desire to prevent future harm;
(3)   the extent of the burden to the defendant and the consequences to the community of imposing a duty to exercise care with resulting liability for breach; and
(4)   the availability, cost and prevalence of insurance for the risk involved.

*Estate of Strever v. Cline*, 278 Mont. 165, 173, 924 P.2d 666, 670 (1996).

Each of these policy considerations weigh in favor of imposing a duty to warn to MCC:

First, the moral blame attached to MCC's conduct is significant. MCC had actual knowledge that not only workers, but community members, were being exposed to a hidden asbestos hazard that was causing significant injury.

Second, not only is there a general desire to prevent future harm to workers and community members from asbestos exposure, this was a stated desire of MCC from at least a risk management perspective. Additionally, MCC knew the failure to control the dust or warn of the hazards of exposure would continue to increase the risk of harm to workers, as it acknowledged the duration of exposure was a significant aspect of the risk of harm to workers.

Third, the burden imposed on MCC to warn workers of the asbestos hazard was minimal. Posting signs and training employees of hazards would have been have been almost no burden on MCC, particularly considering it was posting signs regarding other hazards. In fact, Mr. Shoup testified that signage and training employees of hazards was an integral part of the Safety Program developed by MCC in cooperation with Grace. Additionally, the consequence to the community of not imposing a duty to warn under these circumstances is great, and the failure to warn has clearly resulted in catastrophic consequences to workers and the community at large.

Finally, the parties concede the availability of insurance to cover any claims against MCC.

MCC relies on the Restatement (Second) of Torts, §302, comment a, to argue that the duty of one who fails to act must be more narrowly drawn than the duty of one who take affirmative action:

> A negligent act or omission may be one which involves an unreasonable risk of harm to another through either
>
> (a)  the continuous operation of a force started or continued by the act or omission, or
> (b)  the foreseeable action of the other, a third person, an animal, or a force of nature.
>
> [Comment] a.  This Section is concerned only with the negligent character of the actor's conduct, and not with his duty to avoid the unreasonable risk. In general, anyone who does an affirmative act is under a duty to others to exercise the care of a reasonable man to protect them against an unreasonable risk of harm to them arising out of the act. *The duties of one who merely omits to act are more restricted, and in general are confined to situations where there is a special relation between the actor and the other which gives rise to the duty.* As to the distinction between act and omission, or "misfeasance" and "non-feasance," see § 314 and Comments. If the actor is under no duty to the other to act, his failure to do so may be negligent conduct within the rule stated in this Section, but it does not subject him to liability, because of the absence of duty.

Restatement (Second) of Torts, §302, comment a (emphasis added).

MCC argues the Montana Supreme Court cited §302 with approval in *Emanuel v. Great Falls School District*, 2009 MT 185, ¶14, 351 Mont. 56, 209 P.3d 244.  However, *Emanuel* contains no citation to §302.  Instead, *Emanuel*, ¶14, n. 1, cites to the Restatement (Second) of Torts, §314, which provides, "The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action."  However, *Emanuel* does not adopt or apply §314, but merely cites it as authority relied upon one of the parties for their argument. *Emanuel*, ¶12.  Nonetheless, to MCC's point, the Montana Supreme Court has found, "As a general rule, there is no duty to protect others against harm from third persons. Traditionally, we have recognized, a person is not liable for the actions of another and is under no duty to protect another from harm in the absence of a special relationship of custody or control." *Lopez v. Great Falls Pre-Release Servs.*, 1999 MT 199, ¶24, 295 Mont. 416, 986 P.2d 1081.

However, the comprehensive briefing before this Court makes clear that the Montana Supreme Court has extended duties of care to third-parties in numerous types of situations, including premises liability, third-party beneficiaries of contractual relationships, special relationships, etc.  These cases will not be cited or distinguished here because not only are they factually distinguishable, but the facts of the present case reveal direct involvement on the part of MCC which calls instead for a straightforward foreseeability analysis in determining the scope of the defendant's duty of care which does not require application of any special rule to extend a duty of care to MCC under these circumstances.

16

### (d) Application of Restatement (Second) of Torts, §324A

MCC argues that the Court should adopt and apply the Restatement (Second) of Torts, §324A, as Hutt advocated should be applied during proceedings before the U.S. Bankruptcy Court. The Restatement (Second) of Torts, §324A provides as follows:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
> (a) his failure to exercise reasonable care increases the risk of such harm, or
> (b) he has undertaken to perform a duty owed by the other to the third person, or
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

The Restatement (Second) of Torts, §324A, has not been adopted by the Montana Supreme Court, and appears to have only been cited one time in reported Montana cases in the context of a parent corporation's liability to the employees of a subsidiary. *See Windsor v. Pittsburg Coal*, 1993 Mont. Dist. LEXIS 707 (Twenty-Second Judicial District Court of Montana, Stillwater County, Judge Todd Baugh, presiding). This Court declines to adopt or apply the Restatement (Second) of Torts, §324A herein as the existing common law of Montana is adequate to make a determination of duty in this case.[6] Nor will the Court hold Hutt to arguments made during proceedings in other jurisdictions.

Accordingly, the Court finds that under circumstances where a workers' compensation insurer has developed a Safety Program, of which a duty to warn employees of hazards is an essential component; and through its own affirmative action of engaging in medical monitoring of workers has actual knowledge a known hazard is injuring workers, the workers' compensation insurer has a common law duty to warn workers of the hazard.[7] However, due to conflicts in the record as to whether Hutt saw signs warning of the asbestos hazard, the Court finds genuine issues of material fact exist as to whether MCC breached the duty to warn.

### (3) Bad Faith Interference with Workers Compensation Coverage

Hutt has pled a cause of action against MCC for common law bad faith interference with Hutt's ability to file a workers' compensation claim based on MCC's alleged duty of good faith and fair dealing owed to Grace workers, such as Hutt. Hutt alleges various underlying causes of

---

[6] Even if the Court were to adopt and apply §324A, a cogent argument can be made that MCC did undertake, in cooperation with Grace, to implement a Safety Program, and that in failing to warn workers MCC increased the risk of harm to workers who MCC knew would suffer greater harm the longer they were exposed to the hazard.

[7] Under the specific facts of this case, this holding may place Montana in the minority of jurisdictions, although neither party clearly presents authority to the Court as to how other jurisdictions have ruled on this issue. *See Breach of Assumed Duty to Inspect Property as Ground for Liability to Third Party*, 13 A.L.R.5th 289.

action (breach of fiduciary duty, deceit, bad faith negligent misrepresentation, constructive fraud, malice) to demonstrate MCC breached its duties to Hutt.

Montana first recognized a cause of action for insurance bad faith in the context of a workers' compensation claim in 1980, more than a decade after Hutt's exposure came to an end. *See Vigue v. Evans Products Co.*, 187 Mont. 1, 608 P.2d 488; *Hayes v. Aetna Fire Underwriters*, 187 Mont. 148, 609 P.2d 257. The bad faith action recognized in *Hayes* and *Vigue* applies uniquely to conduct associated with the handling of a worker's claim for benefits. The authority relied upon by Hutt further underscores this point. Here, no claim had been filed by Hutt or was being adjusted by MCC at the relevant time and this Court is unaware of any authority recognizing a claim for bad faith interference with the filing of a workers' compensation claim. While Montana law supports the proposition that a workers' compensation insurer owes a duty of good faith and fair dealing to an insured's workers, such duties do not arise until a claim has been filed—as illustrated by the authority relied upon by Hutt.

Hutt attempts to avoid this conclusion by arguing that in circumstances where the insurer has acted to prevent claims, there is no requirement of claims adjusting for the duty of good faith and fair dealing to attach. However, in pursuing this argument Hutt ignores long-standing precedent establishing that a workers' compensation insurer has no duty to solicit workers' compensation claim from workers. *Ricks v. Teslow Consol.*, 162 Mont. 469, 485, 512 P.2d 1304, 1312 (1973).

Accordingly, the Court finds there is no genuine issue of material fact that Hutt, who did not file a workers' compensation claim, cannot maintain a common law bad faith claim against MCC.

## CONCLUSION

(1) As articulated above, genuine issues of material fact exist as to when Hutt, in the exercise of due diligence, knew or should have discovered that he had an asbestos related disease. This is a potentially dispositive question of fact to be resolved by the jury.

(2) As a matter of law, MCC owed a duty of care to warn Zonolite and Grace workers of the hidden hazard of asbestos exposure. However, genuine issues of material fact exist as to whether MCC breached this duty to Hutt.

(3) As a matter of law, Hutt has no common law insurance bad faith claim against MCC.

DONE and DATED this 13th day of January, 2019.

/s/ Amy Eddy

_____

Amy Eddy, Asbestos Claims Court Judge