**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| W.R. GRACE & CO., et al., | Case No. 01-01139 (AMC) |
| Reorganized Debtor. | **Related Docket No. 33099** |

**RESPONSE AND RESERVATION OF RIGHTS OF THE STATE OF MONTANA TO
THE REORGANIZED DEBTOR'S REQUEST FOR PARTIAL ALLOWANCE AND
PARTIAL DISALLOWANCE OF THE CLAIM BY THE MONTANA DEPT. OF ENV.
QUALITY FOR ENVIRONMENTAL REMEDIATION AT OPERABLE UNIT 3 OF THE
LIBBY ASBESTOS SUPERFUND SITE (SUBSTANTIVE OBJECTION)**

The Montana Department of Environmental Quality (the "MDEQ"), by and through its

undersigned counsel, hereby responds and reserves rights (the "Response") to the above-

captioned reorganized debtor's (the "Debtor") request for partial allowance and partial

disallowance of the claim filed by MDEQ for environmental remediation at operable unit 3

("OU3") of the Libby asbestos superfund site (Docket No. 33099) (the "Claim Objection").  In

support of this Response, the MDEQ states as follows:

**PRELIMINARY STATEMENT**

The MDEQ does not object to the conceptual relief sought in the Claim Objection – i.e.,

allowance and survival post-closure of the Debtor's chapter 11 case of the portion of MDEQ's

claim that was not resolved under the 2008 Order,[1] which approved the 2008 MDEQ Settlement

Agreement.  However, by the Claim Objection, the Debtor appears to seek to improperly limit

---

[1]    Capitalized terms used herein, but not defined herein shall have the meanings ascribed such terms in the
Claim Objection.

the claims related to OU3 that were timely asserted in what has been assigned claim no. 18496-1 (the "MDEQ OU3 Claim") to only the Potential MDEQ Future OU3 Response Costs.

**RESPONSE**

**A.    Additional Background**

1.    The Libby Asbestos Superfund Site (the "Libby Site") is located in Libby and Troy in Lincoln County, Montana.  In the early 1920s, the Zonolite Company began vermiculite ore mining operations in Libby.  Vermiculite from the Libby mine, bought by the Debtor in 1963, was contaminated with a toxic and highly friable form of asbestos called tremolite-actinolite series asbestos, often called Libby Amphibole asbestos.  The site has been divided into eight operable units to facilitate addressing contamination issues.

2.    OU3, the former mine site located approximately 6.5 miles east-northeast of Libby, Montana is comprised of 10,055 acres of asbestos-contaminated forest, the Rainy Creek watershed, and the Kootenai River.  The mine was a "mountain top removal," and the former mine area includes a tailings dam (Kootenai Development Impoundment Dam) and impoundment containing approximately 4 million cubic yards of asbestos tailings.

3.    Currently the remaining operable unit at the Libby Site is being remediated through the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 to 9675 ("CERCLA").  Under 42 U.S.C. §§ 9621(f)(2)(A & B), the state shall have the opportunity to concur or not concur with the United States Environmental Protection Agency's ("EPA") chosen remedial action (the "Record of Decision").  If under the Record of Decision, a relevant state law (an "ARAR") is not followed, the state may intervene under 42 U.S.C. § 9606 prior to entry of a consent decree to seek a requirement that the ARAR be met.

4.     Further, if the MDEQ does not believe that the federal remedy is complete, the MDEQ may also assert remedies under section 115 of Montana's Comprehensive Environmental Cleanup and Responsibility Act, §§ 75-10-705-728 ("CECRA").  Through CECRA, the MDEQ is authorized to gain access to, assign liability for, and order the remediation of a site that contains hazardous or deleterious substances threatening the health and welfare of Montana citizens.  Further, under § 75-10-715(2), not only may the state recover for remedial costs, but the state may also recover for "damages for injury to, destruction of, or loss of natural resources caused" by environmental contamination.  See CECRA § 75-10-715(2).  The MDEQ OU3 Claim specifically asserts claims under § 75-10-715.

5.     The Debtor is currently performing a CERCLA Remedial Investigation ("RI") and CERCLA Feasibility Study ("FS") for OU3 under EPA oversight.  The Debtor has completed the RI, and is working on development of the FS.  The purpose of the RI/FS is to assess site conditions and evaluate remedial alternatives, to the extent necessary, to select a remedy.

6.     Remediation of OU3 is being evaluated in two phases.  Phase 1 addresses the forested areas, and Phase 2 addresses the former mine site, Rainy Creek drainage, and the Kootenai River.  This process will culminate in EPA's selection of a final remedial plan for OU3 in a Record of Decision, which is currently estimated to occur in 2021, followed by the implementation of the selected remedy.

7.     The Kootenai Development Impoundment Dam ("KDID") is located within Rainy Creek, which drains into the Kootenai River upstream of Libby and Troy. The Department of Natural Resources & Conservation (the "DNRC") has classified the KDID as a high hazard dam, largely due to its height and volume of retainage.  The KDID is 135 feet high and is made of

Libby Amphibole asbestos mine waste rock.  The embankment and tailings impoundment are comprised of more than 4 million cubic yards of mine tailings that contain substantial amounts of Libby Amphibole asbestos.  The Debtor is renewing its DNRC Operation Permit that includes addressing deficiencies from a DNRC inspection and design review by the External Technical Review Board.  The Debtor is planning dam stabilization work, which will be overseen by DNRC.  However, the state's position is that this work does not address environmental concerns or an environmental remedy for OU3.  The Debtor has been informed that the work being undertaken to address KDID safety and stability does not preclude any CERCLA environmental remedy that may require additional work or may require removal of Libby Amphibole asbestos contaminated materials from the floodplain.  If the dam remains, it will become part of the CERCLA remedy and be included in all Operational and Functional and Operations and Maintenance considerations.

**B.    The Claim Objection**

8.    The Debtor seeks to limit MDEQ's claims in the Debtor's bankruptcy case to:

> … a single, contingent claim (the "MDEQ Surviving Claim") for the following costs that [the MDEQ] may incur after the date of entry of this Order pursuant to Section 104(c)(3) of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9604(c)(3), arising from implementation by the United States Environmental Protection Agency of remedial action at Operable Unit 3 ("OU3") at the Libby Asbestos Superfund Site in Libby, Montana with federal funds: (a) [the MDEQ's] 10% share of the remedial action costs (the "10% Cost Share"); and (b) the State's obligation to pay 100% of the post-remedy operation and maintenance costs (the "Post-Remedy O&M Costs," which together with the 10% Cost Share are the "Potential MDEQ Future OU3 Response Costs") . . . .

See Claim Objection, Exhibit A, Proposed Order ¶ 3.

9.      Accordingly, it appears that the Debtor is seeking to disallow claims that may be asserted under CECRA, including, but not limited to:

a.  <u>Per Se Injury for Asbestos MCL Exceedances</u>: Rainy Creek, Carney Creek, and other surface water bodies in OU3 have numerous historic exceedances of the asbestos MCL (DEQ-7 surface water limit of $7x10^6$ fibers per liter), and continue to experience exceedances during snowmelt, rain events, and other disturbances. Episodic exceedances are expected to occur into the foreseeable future both due to the location of the KDID and its millions of cubic yards of impounded asbestos laden tailings and waste rock within the stream channel, and due to periodic releases due to erosion following wildfires or other soil disturbing events.

b.  <u>Loss of Use for Recreational Fishing for Rainy, Carney Creeks</u>: Under Montana stream access laws (§23-2-301, MCA, <u>et</u> <u>seq</u>.), the public has access below the high water mark of any stream capable of recreational use. The public would normally have the right to access Rainy and Carney C reeks for fishing purposes, but access is presently restricted due to asbestos exposure risk, and is likely to remain restricted in the future. The Montana Department of Justice Natural Resource Damage Program ("NRDP"), on behalf of the state, may also determine that further testing of the Kootenai River corridor is warranted, and other damages and potential restoration actions may be identified that extend to the river corridor. Additional characterization will be needed to determine how far past Troy such contamination extends, as test results demonstrated the presence of asbestos, but was not conducted downstream from that location. NRDP may determine, through the assessment and planning process outlined at paragraph 5 below, to perform removal, capping, vegetative covers, or other restoration actions for sandbars, riverbanks, and alluvium of the Kootenai River and Rainy and Carney Creeks.

c.  <u>Loss of Spawning Fishery Due to the KDID and other Rainy Creek Impoundments</u>: The KDID is a high hazard dam composed of asbestos containing rock and other materials that block fish passage into the upper reaches of Rainey Creek for spawning. This reduction in the amount of spawning habitat reduces the fish available in both the creeks themselves as well as the Kootenai River.

d.  <u>Lost Hunting Opportunities in USFS Portions of OU3</u>: Hunting is managed and administered by the Montana Department of Fish, Wildlife, and Parks for the benefit of the public. Any person in possession of a Montana hunting license would normally have the right to access the public lands (which comprise a portion of OU3) for the purposes of hunting and fishing. Such access may not be possible depending on the remedy selected for OU3 resulting in a lost recreational and subsistence opportunities.

5

e. <u>Cost of Natural Resource Damage Assessments, Other Natural Resource Damage Claims, Restoration Plans, and Legal Costs</u>: Under 42 U.S.C. § 9607(a)(4)(C), "damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release" of hazardous substances are recoverable from responsible parties. NRDP would likely prepare a pre-assessment screen in accordance with 43 CFR §§ 11.23-11.25, followed by a natural resource damage assessment in accordance with 43 CFR §§ 11.30-11.38, which would be expected to identify more damages than are peripherally identified here. NRDP would then present a written demand for damages to the potentially responsible party in accordance with 43 CFR § 11.91 (and CERCLA § 107). The state reserves all additional claims that might be identified through a natural resource damage assessment. Following a recovery for damages, NRDP would prepare a restoration plan in accordance with 43 CFR § 11.93 and associated regulations, and carry out the restoration actions identified therein. NRDP would concurrently pursue damages based on CECRA, which allows for the recovery for natural resource damages, and includes the ability to recover legal fees associated with such recovery under § 75-10-715(2)(b), MCA.

10.      Fed. R. Bankr. P. 3001(f) provides that "[a] proof of claim executed and filed in accordance with [the Federal Rules of Bankruptcy Procedure] shall constitute prima facie evidence of the validity and amount of the claim." The prima facie validity of the MDEQ OU3 Claim is "strong enough to carry over a mere formal objection without more." <u>Wright v. Holm (In re Holm)</u>, 931 F.2d 620, 623 (9th Cir. 1991). However, where an objection is filed, the objecting party bears the initial burden of presenting sufficient evidence to overcome the presumed validity and amount of the claim. <u>See In re Allegheny Int'l, Inc.</u>, 954 F.2d 167, 173–74 (3d Cir. 1992) (stating that "[t]he objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claims' legal sufficiency").

11.      The Debtor is required to present to the Court "evidence equal in force to the prima facie case." <u>In re Allegheny Int'l</u>, 954 F.2d at 173. <u>See also Official Committee of Unsecured Creditors of Radnor Holdings Corp. v. Tennebaum Capital Partners, LLC (In re Radnor Holdings Corp.)</u>, Case No. 06-10894 (PJW), Adv. Pro. No. 06-50909, 2006 WL 3346191

(Bankr. D. Del. Nov. 17, 2006) (the debtor is required to present to the Court "substantial evidence" in support of its Objection) (citing In re Mid-American Waste Sys., Inc., 284 B.R. 53, 65 (Bankr. D. Del. 2002) (party objecting to properly filed proof of claim bears the initial burden of presenting sufficient evidence to overcome the presumed validity and amount of claim); Brown v. IRS (In re Brown), 82 F.3d 801 (8th Cir. 1996) (a claim's presumptive validity is not altered unless an objection is supported by substantial evidence)). In short, the Debtor must "show facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves." In re Holm, 954 F.2d at 623.

12.     It is only if the objecting party overcomes the prima facie effect of the claim that the burden reverts to the claimant. In re Allegheny Int'l, 954 F.2d at 174. "The threshold question then is whether the [Trustee] has rebutted the otherwise prima facie effect of the proof of claim." In re L. Washington & Assoc., Inc., Case No. 00-12173 DWS, 2000 WL 1780329, at *2 (Bankr. E.D. Pa. Nov. 22, 2000).

13.     In this case, the Claim Objection contains no "substantial evidence" to overcome the presumptive validity of the MDEQ OU3 Claim, and the Claim Objection presents evidence that is far less than equal in force to MDEQ's documented (including facts that have developed since the original filing) and prima facie case.

14.     Accordingly, MDEQ objects to the extent the relief sought in the Claim Objection seeks to limit in anyway the claims and rights specifically preserved by MDEQ in the 2008 Order and the 2008 MDEQ Settlement Agreement (Docket Nos. 19110 and 19110-1), which includes for OU3, "without limitation, any liability of Debtors for injunctive relief, administrative order enforcement, cost recovery, and liability for damages for injury to, destruction of, or loss of natural resources under CERCLA or CECRA."

## RESERVATION OF RIGHTS

15.     The MDEQ continues its due diligence regarding the MDEQ OU3 Claim.  The MDEQ reserves its rights, claims, defenses, and remedies, including (without limitation) the right to amend, modify, or supplement this Response, to seek discovery or produce discovery (including expert discovery, to the extent required), and to raise additional arguments during any hearing on the Claim Objection.

## CONCLUSION

WHEREFORE, the MDEQ respectfully requests that this Court (a) overrule the Claim Objection to the extent set forth herein and (b) grant the MDEQ such further relief as this Court deems appropriate.

Dated:  July 22, 2019                          Respectfully submitted,

By:____/s/ Kevin J. Mangan_____
Kevin J. Mangan (Del. Bar No. 3810)
Ericka F. Johnson (Del. Bar No. 5024)
WOMBLE BOND DICKINSON (US) LLP
1313 North Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone:  (302) 252-4320
Facsimile:  (302) 252-4330

*Counsel for the Montana Department of Environmental Quality*

8