```
1                    UNITED STATES BANKRUPTCY COURT
                    EASTERN DISTRICT OF PENNSYLVANIA
2
                                       .  Chapter 11
3    IN RE:                            .
                                       .  Case No. 01-01139 (AMC)
4    W.R. GRACE & CO., et al.,         .  (Jointly Administered)
                                       .
5                         Debtors.     .
     . . . . . . . . . . . . . . . . .
6    Continental Casualty Company,     .
     et al.,                           .
7                                      .
             Plaintiffs,               .  Adv. Proc. No. 15-50766
8        v.                            .
                                       .
9    Jeremy B. Carr, et al.,           .
                                       .
10           Defendants.               .
     . . . . . . . . . . . . . . . . .
11   Barbara Hunt, Personal            .
     Representative for the Estate of  .
12   Robert J. Hunt, deceased and Sue  .  Adv. Proc. No. 18-50402
     C. O'Neill,                       .
13                                     .
             Plaintiffs                .
14                                     .  Courtroom No. 5
         v.                            .  900 Market Street
15                                     .  Philadelphia, PA
     Maryland Casualty Company,        .
16                                     .  July 17, 2019
             Defendant.                .  10:00 A.M.
17   . . . . . . . . . . . . . . . . .

18                       TRANSCRIPT OF HEARING
                   BEFORE HONORABLE ASHELY M. CHAN
19                 UNITED STATES BANKRUPTCY JUDGE

20   APPEARANCES:

21   For CNA:                 Evan Miller, Esquire
                              BAYARD, P.A.
22                            600 N. King Street
                              Wilmington, Delaware 19801
23
                              - and -
24
                              Elizabeth DeCristofaro, Esquire
25                            FORD MARRIN ESPOSITO WITMEYER GLESER
                              Wall Street Plaza, 23rd Floor
                              New York, New York 10005
```

```
 1  Audio Operator:          Christina Jackson

 2  Transcription Service:   Reliable
                             1007 N. Orange Street
 3                           Wilmington, Delaware 19801
                             Telephone: (302) 654-8080
 4                           E-Mail:  gmatthews@reliable-co.com

 5  Proceedings recorded by electronic sound recording;
    transcript produced by transcription service.
 6

 7
    APPEARANCES (Continued):
 8
    For CNA:                 Michael Giannotto, Esquire
 9                           Brian Burgess, Esquire
                             GOODWIN PROCTER LLP
10                           901 New York Avenue, N.W.
                             Washington, D.C. 20001
11
    For Montana Plaintiffs:  Daniel Cohn, Esquire
12                           MURTHA CULLINA LLP
                             99 High Street
13                           Boston, Massachusetts 02110

14  For Maryland Casualty:   Jeffrey Wisler, Esquire
                             CONNOLLY GALLAGHER
15                           1201 North Market Street
                             Wilmington, Delaware 19801
16
                             - and -
17
                             Edward Longosz, Esquire
18                           ECKERT SEAMANS
                             1717 Pennsylvania Avenue, NW
19                           Washington, D.C. 20006

20  For W.R. Grace:          Roger Higgins, Esquire
      (Telephonic)           THE LAW OFFICES OF ROGER HIGGINS
21                           111 East Wacker Drive
                             Chicago, Illinois 60601
22
                             - and -
23
                             Pamela Marks, Esquire
24
    For Amici Appellees:     Robert Horkovich, Esquire
25    (Telephonic)           ANDERSON KILL
                             1251 Avenue of the Americas
                             New York, New York 10020
```

1          (Proceedings commence 10:03 a.m.)

2               COURT CLERK:  The court is in session.  You can be

3  seated.

4               THE COURT:  Okay.  I know that there are a number

5  of parties on the phone, but why don't we have everyone in

6  the courtroom state their name for the record, please.

7               MR. COHN:  Yes, Your Honor.  Good morning.  Daniel

8  Cohn for the Montana Plaintiffs.  And I'm joined here by

9  Allan McGarvey --

10              THE COURT:  Okay.  Good morning.  Welcome.

11              MR. COHN:  Also for the Montana Plaintiffs.  Thank

12  you.

13              THE COURT:  Okay.

14              MR. BURGESS:  Good morning, Your Honor. Brian

15  Burgess, CNA Companies.

16              THE COURT:  Okay.

17              MR. GIANNOTTO:  Your Honor, Michael Giannotto for

18  the CNA Companies.

19              THE COURT:  Okay.

20              MS. DECRISTOFARO:  Good morning, Your Honor.

21  Elizabeth DeCristofaro for CNA.

22              THE COURT:  Okay.

23              MR. WISLER:  Good morning, Your Honor.  Jeffrey

24  Wisler for Maryland Casualty Company.

25              THE COURT:  Welcome.

1          MR. LONGOSZ:  Good morning, Your Honor.  Ed

2  Longosz on behalf of Maryland Casualty Company.

3          THE COURT:  Okay.

4          MR. MILLER:  Good morning, Your Honor. Evan Miller

5  for CNA.

6          THE COURT:  Okay.  All right.

7          And then the parties on the phone, if you could

8  please introduce yourself without talking over each other.

9          MR. HIGGINS:  This is Robert Higgins representing

10 W.R. Grace.

11         THE COURT:  Okay.  Do we have anyone else on the

12 phone?

13         MS. MARKS:  Yeah, Pam Marks representing W.R.

14 Grace.

15         THE COURT:  Okay.  Anybody else?

16      (No verbal response)

17         THE COURT:  So, Tina, are there just two parties

18 on the phone?  Three.  Okay.

19         So, I hear that there's a third party on the line.

20         MR. HORKOVICH:  Robert Horkovich.

21         THE COURT:  Who:

22         THE CLERK:  Horkovich.

23         THE COURT:  Robert.  I'm going to slaughter your

24 name if you make me say it.  Robert, are you on the line?

25      (No verbal response)

1          THE COURT:  Okay.  Well, perhaps, Robert has

2     dropped off or muted us.  In any case, why don't we just, I

3     guess, just talk about how the day is going to go.  I did

4     receive the agenda, so I suppose CNA would take the first

5     argument.  And I'm not sure maybe Maryland would go after

6     that, when I know that they deferred to CNA for part of the

7     briefs.

8          So, did you have a proposed way that you were

9     going to present your argument to me today?

10          MR. BURGESS:  That's fine, Your Honor.  That's how

11     we were planning to proceed.

12          THE COURT:  Okay.  And then we'll hear from the

13     Montana Plaintiffs.

14          MR. COHN:  That's fine with us, Your Honor.

15          THE COURT:  Okay.  I'm not sure how long is going

16     to take.  I've blocked out the entire day until five.  I was

17     planning to take a lunch break at 12:30.  I thought all of

18     you would do your arguments.

19          I guess, I'm going to try really hard not to

20     interrupt you during your arguments, but I do have questions

21     that I'd like to ask both sides.  And I guess the one thing

22     that I would ask you to incorporate into your arguments today

23     are the Johns-Manville cases.

24          The way that I view this case is the Third Circuit

25     has viewed favorably the framework set up in the Second

1  Circuit case Quigley.  And when you look at Quigley, there

2  are three Johns-Manville cases there.  And they really set

3  out for me what the derivative, non-derivative inquiry is and

4  I'd just like both of you to consider that in your arguments

5  today.

6          Okay.  Any questions before we begin?

7      (No verbal response)

8          THE COURT:  Okay.  Well, please proceed then.

9          MR. BURGESS:  Good morning, Your Honor. Brian

10  Burgess for CNA.

11          This case turns on the scope of a channeling

12  injunction entered into the Grace bankruptcy under Section

13  524(g).  The purpose of that injunction is to channel claims,

14  asbestos-related personal injury claims brought against Grace

15  and certain protected third-parties, such as settled insurers

16  like CNA out of the state tort system and into a trust set up

17  for compensation; a trust that CNA contributed $84 million

18  dollars to, to resolve all this outstanding liabilities to

19  Grace that derived from its provision of insurance.

20          As Your Honor knows, this case is returning from

21  the Third Circuit which from Judge Carey's decision, in part,

22  and vacated, in part, remanding to address a few discreet

23  issues involving whether the claims as stated in the Montana

24  complaints are derivative of Grace's liability or wrongdoing

25  and whether they arise -- claims arise by reason of our

1  provision of insurance.

2          I think it's important to note that the Third

3  Circuit's opinion in its approach to the case sort of

4  narrowed the issues in particular by rejecting some of the

5  arguments that the parties had previously presented to Judge

6  Carey and so, I think narrowed the sort of scope of the

7  inquiry as to open those prongs.

8          As to the plaintiffs, it made clear that claims

9  were not limited to insurance policy proceeds.  I think to

10  the extent there's any ambiguity about what derivative means,

11  it can't mean that, that the claims are limited in that

12  manner.  But it also made clear that derivative is not the

13  same in this context under 524(g).

14          It's not the same as vicarious liability because

15  claims could be based on, in part, on the wrongdoing of the

16  insurer and would, nonetheless, be derivative including

17  claims that might be characterized as claims for direct

18  liability as a matter of state law, but nonetheless.

19          THE COURT:  Excuse me; has someone joined the

20  hearing?

21          MR. HORKOVICH:  Rob Horkovich rejoining.

22          THE COURT:  Okay.  It's nice to have you here.

23  We're in the middle of the beginning of CNA's argument.

24          MR. HORKOVICH:  Thank you.

25          MR. BURGESS:  It made clear that vicarious

1  liability is not the same as derivative in this context.  I'm

2  just going to note that even claims that might be -- claims

3  for negligence that might be characterized as direct under

4  state law could still be derivative in the relevant sense

5  under 524(g).

6           And on our side, it overbroad our proposition that

7  a claim was derivative necessarily but it was based on an

8  entry from Grace. Asbestos, as it noted, although that

9  involvement in Grace asbestos was certainly relevant, it

10 wouldn't be dispositive because there are other ways in which

11 the involvement of Grace's asbestos might be purely

12 incidental and not the sort of basis for the underlying legal

13 duty.

14          So, ultimately, we have two questions for the

15 court to address.  The Third Circuit set out to relevant

16 test.  As to the derivative requirements, whether CNA's

17 alleged liability under the Montana claim is just wholly

18 separate from Grace's wrongdoing or liability.  And as to the

19 statutory relationship whether the claims arise by reason of

20 CNA's provision of insurance which the court explained

21 depended on whether the provision of insurance is legally

22 relevant to the Montana claims based on the cause of action

23 under state law.

24          I thought in terms of sort of structuring my

25 argument, I thought it might be useful to first lay out how

1  we understand those tests and what we think they mean and

2  what we think they can't mean. And then I'll sort of go

3  through the application of why we think the Montana claims

4  under our understanding of the test satisfied both of those

5  requirements.

6          So, to sort of start with what understand my

7  friend on the other side's argument to be their view is that,

8  as to both prongs what the Third Circuit essentially adopted

9  was a legal element's test under which in order for a claim

10 to be subject to channeling under the injunction, it would

11 have to be the case that you would have to show in every

12 instance sort as a matter of like it would have to be charged

13 -- fleeted and charged to the jury and proved that Grace's

14 liability is an element of the offense and that actual

15 providing insurance is an element of the offense.

16          And we think that has to be wrong for a few

17 different reasons.  One of which, which we set out in length

18 in our reply brief is that as far as we're aware, the only

19 claim that that described is a claim essentially for

20 insurance policy proceeds where the fact that someone has an

21 insurance contract is itself an element to the offense.  The

22 fact that you're being held vicariously liability for the

23 insured's conduct is an element of the offense.

24          And if all that the test describes is the

25 insurance policy proceeds which the Third Circuit made quite

1   clear cannot be the limit of what is covered by 24(g) as to

2   insurers. We think that can't be right.

3        We think that test is also too narrow for a few

4   other reasons in terms of how the court actually described

5   the relevant elements.  To take the -- by reason of

6   insurance, for example, in the legal relevance.

7        The way the court set out the inquiry is that

8   stated on remand the task would be to identify the elements,

9   put the (indiscernible) under state law and then determine

10  whether the provision of insurance was legally relevant to

11  those elements.  It didn't indicate that you have to

12  determine whether the provision of insurance is itself an

13  element which we think would be a rather different test.

14       And we also think that that sort of understanding

15  is inconsistent with what the court said about the element in

16  footnote eight of the opinion where it indicated, you know,

17  describing our arguments to the extent we had sort of agued

18  that the provision of insurance was the basis for the duty

19  under state law.

20       And the court indicated well, you know, if so,

21  duty is clearly something that is legally relevant as a

22  matter of the cause of action.  It remanded because it didn't

23  know what the relevant choice of law was, what the elements

24  would be under state law, whether that state would adopt

25  324(a) as the plaintiffs had previously argued.  But it

1  indicated that sort of relationship, rather than being an

2  actual element, would be something that could satisfy.

3           And so, to as to the derivative requirements,

4  would the court, you know, specifically indicated that the

5  analyses were similar.  It also in describing it, again, it

6  didn't indicate that it should be an element of the offense.

7  It asked the question of whether Grace's liability or

8  wrongdoing is wholly separate from the claim against CNA.

9           And we also, and this is also something we

10  developed in our brief.  The Third Circuit gave some examples

11  that we think are instructive to what derivative can mean and

12  what it can't mean.

13          If referenced, for example, the Gas case, the

14  Dodds' decision. And what we draw from those cases is that

15  they're instances in which, particular in Gas and one of its

16  cause of action was under 414 of the restatement where it's

17  clear that the liability of the other party is not an element

18  of the offense.

19          It's much like in this sort of situation someone

20  is being held liable for not protecting, from not guarding

21  against injury that someone else created. And we think that

22  the reference to those decisions is a good indicator that the

23  court contemplated that as potentially being something that

24  could be subject to the derivative requirement,

25  notwithstanding it not being a formal element under the law.

1          And the plaintiffs have argued in reference to

2   those decisions that while, you know, there's no reason to

3   read the Third Circuit as embracing everything in those five

4   cases that are cited as necessarily being derivative. That's

5   not our argument.  But the court did with insights identify

6   particular theories and causes of action in those cases.

7          As to Gas, it specifically pinpointed 410 and 414

8   of the restatement.  As to Dodds, it noted the difference

9   between direct claim for supervisor, the liability versus an

10  indirect claim based on respondent's superior.

11          And given that all those citations were provided

12  in reference to the court's observation that the derivative

13  isn't restricted to instances in which there's no wrongdoing

14  on the part of a third-party, you think it has to have been

15  referencing those direct theories rather than, for example,

16  in Dodds, the claim that was contrasted responded superior is

17  by its nature something that exist without fault.  So, we

18  think those are good cues.

19          You mentioned the Johns-Manville decision at the

20  outset.  And I do think it's important to note that in the

21  Third Circuit's decision, it had a footnote referencing

22  Johns-Manville and the ways in which it thought it did not

23  necessarily control the inquiry.

24          We do think it is important in that it sets what

25  you're sort of looking to for -- like what could be

1  derivative. And, you know, there was also the footnote seven

2  in the court's opinion where you're going to be looking to

3  and I think it also might have referenced <u>Quigley</u> in this

4  regard, whether the cause of action is -- right.  Whether the

5  cause of action is something that is based on a duty that the

6  insured owed to the debtor and then that's the way in which

7  you're sort of -- the third party is bringing the cause of

8  action.

9           I also think, you know, <u>Manville</u> itself was

10  distinguishable on facts because their the claims were not

11  based on exposure to the Travelers' asbestos.  The idea was

12  that they had supposedly acquired knowledge of the risks by

13  virtue of providing insurance to Travelers.  But then the

14  idea was to try to hold them liable for claims based on

15  insurance coming out for other parties.

16           But to the extent, I do think --

17           THE COURT:  I'm just a little confused by that.

18           MR. BURGESS:  Yeah, sure.

19           THE COURT:  Because, you know, the Second Circuit

20  in <u>Manville</u> III talked about, they were focused on Travelers'

21  actions and whether or not those were derivative or non-

22  derivative claims.  And it was my understanding that

23  Travelers was the main liability carrier for Johns-Manville

24  through the decade where it was doing most of its mining or

25  manufacturing.  And it was, in fact, claims against

1  Travelers.  I'm not sure.

2              I know that Chubb was involved in Manville IV.

3              MR. BURGESS:  Sure.

4              THE COURT:  But it was really, you know, Travlers'

5  duty.

6              MR. BURGESS:  That's right.  There were claims

7  against Travlers.  My understanding is that the claims were

8  based, in part, on policies that they provided to other

9  carriers, asbestos liability related.

10             THE COURT:  Okay.  I mean I've literally read

11 Manville decision --

12             MR. BURGESS:  Sure, no I understand.

13             THE COURT:  -- like twenty times and I've never

14 seen a distinction about the --

15             MR. BURGESS:  Okay.

16             MR. GIANNOTTA:  Your Honor, can I add something on

17 CNA just because he wasn't around back then.  You know

18 because I was involved in the Manville part of this.

19             THE COURT:  Yeah.

20             MR. GIANNOTTA:  In Manville, Travelers was -- the

21 people who were suing Travelers were not necessarily exposed

22 to Manville asbestos.  They were exposed to asbestos of other

23 product manufacturers.  And Travelers was being sued on the

24 theory that it gained knowledge of the asbestos hazards

25 because it was Manville's insurer.  And, therefore, it should

1 have warned these other people.

2        But there was no -- And if you read the District

3 Court opinion and the Bankruptcy Court opinion in Manville,

4 it makes it clear what the facts are which those were the

5 facts.  And so, in that case, it wasn't an instance in where

6 Travelers was being sued for failure to protect these people

7 from their exposure to Manville asbestos.

8        It was a case where the folks were suing based on

9 exposure to somebody else's product.  And Travelers was being

10 sued on the theory that learned about the dangers of asbestos

11 from Manville and, therefore, it should have come in and

12 warned these other people.

13        So, there was no connection to Manville asbestos.

14 I mean some of the people were exposed to Manville asbestos,

15 but most of them were not.  And the District Court and the

16 Bankruptcy Court opinions do make that clear and, in fact, we

17 had briefed that to the Third Circuit the first time up.  And

18        so, in our view, it's a totally different

19 situation here where we're being sought to be held liable for

20 failing to protect people to exposure to the debtors'

21 asbestos.  That wasn't the case in Manville.

22        THE COURT:  Right, but the Third Circuit has said

23 in its opinion that it can't simply, you know I think what

24 the Bankruptcy Court did was it was looking at relevant Third

25 Circuit law in this context and was sort of making a

1  distinction that if you have injuries based upon Grace's

2  asbestos then that should be derivative.  And if it's not

3  Grace's and its non-derivative and the Third Circuit said

4  well that's not right.

5           You can't simply look at it to see whose asbestos

6  you're injured from, right.  That's what --

7           MR. GIANNOTTO:  I think that's incorrect, Your

8  Honor.  I think the Third Circuit said if it's not Grace's

9  asbestos that it's not derivative.  They did say that.  And

10  then they went onto say but if it is Grace's asbestos that's

11  relevant but not necessarily dispositive.

12           But I think the Third Circuit did say in its

13  opinion that if you are -- if it is not Grace's asbestos and

14  they cited Combustion Engineering which was a case like that

15  where it was somebody, you know the parent wanted to get the

16  benefit of the injunction but they had their own asbestos

17  products or something.

18           But I think the Third Circuit pretty clearly did

19  say that in the opinion of this case.  If it's somebody

20  else's asbestos then it's not derivative.  If its Grace's --

21  the debtors' asbestos then you got do more and you got to

22  apply a test.

23           And I can find the quote for you if you like.

24           THE COURT:  That's okay.  I mean we'll get into

25  Johns-Manville after he's, you know --

1          MR. GIANNOTTO:  Okay.  Thank you.

2          MR. BURGESS:  As my colleague was talking, I was

3   just pulling up the footnote in which the court addressed

4   Johns-Manville which I'm sure the court has read.

5          THE COURT:  I just want to make sure you speak

6   into the microphone.

7          MR. BURGESS:  Oh, I'm sorry.

8          THE COURT:  That's okay.

9          MR. BURGESS:  Yeah, okay.

10         As my colleague was talking, you know -- maybe is

11  that better?

12         THE COURT:  Yes.

13         MR. BURGESS:  Thank you.

14         I was looking up the footnote where the court

15  addresses -- the Third Circuit addressed the Johns-Manville

16  decision as I'm sure the court has also reviewed.  But I do

17  think there's a couple of important things to get out of that

18  footnote.

19         It noted in that instance, it was undisputed that

20  the claims were being directed at Travelers solely for its

21  own wrongdoing where it says here, that stands in contrast

22  (indiscernible) before us which centers on whether following

23  524(g) the Montana claim seek to recover from CNA directly or

24  indirectly for Grace's wrongdoing.

25         One thing that I think is important about that

1  footnote is its referenced to Grace's wrongdoing not solely

2  its liability.  We think that is an instance in which the

3  court sort of -- so in some instances where it set out the

4  test, it referred to Grace's liability.  In other instances,

5  such as this one, it referred to Grace's wrongdoing which we

6  think is a signal that the courts were using those concepts

7  interchangeably.

8        And really the relevant question is whether under

9  state law, Grace's -- the fact that Grace sort of engaged in

10 this wrongdoing is being as the trigger for establishing our

11 liability, for establishing, for example, our duty to act.

12 And we think it's significant in that regard that if you

13 review the Montana complaints the nature of the actions

14 against us are not based on risk that we independently

15 created.

16       They're always based on -- you know, there's a

17 section laying out the various wrongdoing that Grace engaged

18 in that some of the allegations included being in concert

19 with the state.  But wrongdoing that Grace engaged in to

20 create this tremendous risk of asbestos exposure.

21       The allegations against us consist entirely of

22 failure to protect against that, failure to warn about it,

23 failure to do adequate investigations about it.  And we think

24 that is indicative that liability is being sought here based

25 on Grace's wrongdoing that it's not wholly separate from it.

1          In reference to sort of the court's, the Third

2    Circuit's discussion about the relevance of asbestos and

3    being Grace's asbestos as my colleague noted, if it was not

4    Grace's asbestos, we think that is clearly non-derivative.

5          I think what the court said that was over-broad in

6    our argument and in Judge Carey's decision was that it's not

7    sufficient to say that it's Grace's asbestos.  It's obviously

8    relevant but it's not going to be dispositive in what the

9    Court instructed is to identify the elements that exist under

10   state law and to determine, based on those elements, whether

11   Grace's liability or wrongdoing is going to be sort of a

12   potential trigger for liability.

13         And I can sort of transition maybe know into why I

14   think the different causes of action that or the different

15   sort of legal theories that plaintiffs have specified why

16   they would fit those tests as we understand it.

17         Before getting into that, I do think it's worth

18   noting as we did in our briefs that previous in the

19   litigation plaintiffs had always relied on 324(a) as their

20   legal theory and the basis for liability as discussed by

21   Judge Carey in his opinion is something they cited in the

22   briefs.

23         So, we think it's interesting that they decided to

24   change course in this proceeding.  That issue as Your Honor

25   probably knows is now before the Montana Supreme Court in

1  terms of whether 324(a) is the relevant source of a legal

2  duty is what the proper way to describe this cause of action.

3  Because that's before the Montana Supreme Court and involves

4  an issue of state law and not inclined to sort of parse out

5  those sort of differences.

6          Instead as we did in our reply brief and as to

7  certification, our view is that even under their sort of

8  framing of their alternative theories we think they still

9  would qualify as derivative and rising by reason of the

10 provision of insurance.  And so, I'll go through starting

11 with 324(a) and then I can also address their additional

12 theories if that's okay with the court.

13          THE COURT:  Sure.

14          MR. BURGESS:  So beginning with 324(a) which is

15 often referred to as the Good Samaritan Rule.

16          "It's imposing a duty on one who undertakes to

17          render services that it should recognize is

18          necessary for the protection of a third-party."

19          And also would have to fall within one of three

20 conditions to be subject to liability.  So, the key to that

21 is both the undertaking to provide services and the

22 recognition that there is a serious risk to a third-party.

23          So what's triggering the duty there is the

24 creation of a risk by someone else in this instance, Grace.

25 And we think it's important there would not be a preexisting

1  duty for CNA to protect people. The idea is that because

2  they've undertaken an obligation, allegedly undertaken an

3  obligation to Grace and because being in that position, they

4  necessarily became aware of a risk that Grace created by

5  virtue of its wrongdoing.

6          We think that has to qualify as derivative under

7  the court's test because the conduct that Grace engaged in,

8  what Montana plaintiffs have themselves alleged and was

9  clearly established throughout these bankruptcy proceedings

10 was Grace's wrongful, you know, dangerous operations that

11 created the serious risk.

12         And, again, when you look to the complaint, the

13 underlying state court complaint and the allegations that are

14 pressed against us, there's no suggestion that CNA created a

15 new independent risk separate from Grace.  The whole basis

16 for the liability asserted against us is that we did not do

17 more to protect against or to mitigate a risk that Grace had

18 created.

19         And the other side has argued that we are sort of

20 -- well, they've made a couple different arguments in regard

21 to that.  One, they claim that we are only focused on the

22 facts and they say it's divorced from the elements of state

23 law.  But I don't think that's accurate because, again, what

24 is creating the duty under 324(a) has to be a recognition

25 that another party, in this instance Grace, has created a

1  serious risk.  But for that, there would not be such a duty.

2           So that is serving as a trigger to our alleged

3  legal liability as a matter of state law.  We agree it's not

4  a formal element in the sense of it would have to be

5  something pleaded and proved to the jury.  But for the

6  reasons I articulated earlier, we don't think that that can

7  be the test because it's not consistent with the way the

8  Third Circuit framed the issue and it's not consistent with

9  recognizing that the scope of 524(g) can extend beyond claims

10 just for insurance policy proceeds.

11          And the Montana Plaintiffs have also now tried to

12 argue that it's a mistake to say that Grace was the sort of

13 agent of the harm, agent of the risk.  They say that it's a

14 mistake to refer to them as being equivalent to a mistake to

15 refer to them as being equivalent to a knife wielding

16 terrorist.  And, instead, the underlying risk is just that

17 asbestos is risky in that you know properly controlled and

18 maintained, it wouldn't present the risk.  But that is just

19 the way the case was ever framed by them.

20          Again, if you look at the Montana complaints in

21 the way in which they are saying that there was a risk that

22 was created that gave rise to a duty, it's littered

23 throughout the complaint's allegations of Grace's wrongdoing,

24 that the wrongdoing created this risk of asbestos exposure,

25 that they did not comply with various federal and state law

1  requirements.  That, you know, as others were giving them

2  warnings or guidance, they were not following it.

3           And, of course, as to CNA, CNA came onto the scene

4  as Grace's insurer in the early 70s, you know, decades after

5  Grace had been in operation. And the allegations in their

6  complaint speak to a -- or a danger and a risk that was

7  present and known about for years before CNA came there.

8           So, we think it's clear that they are basing our

9  alleged liability, our alleged duty as matter of state law on

10  wrongdoing that Grace itself has engaged in.  So that's the

11  342(a) and why we think it would satisfy derivative.

12          We think their competing theories that they've now

13  raised on remand satisfy the derivative requirement and for

14  similar reasons.  The duty to warn claim, for example, the

15  alleged duty is predicated on their being a serious risk of

16  harm that we were in a position to discover as a worker's

17  compensation insurer.

18          And, once again, the serious risk that that must

19  be referencing that would be the trigger for our legal duty

20  is the wrongdoing that Grace engaged, the dangerous

21  operations it was involved in, and the claim against us is

22  for not warning about that risk and protecting people from

23  that risk.

24          Similarly, with their professional negligence

25  theory which we sort of understood as being very similar to

1   the 324(a), but sort of a 324(a) light.  You still have to

2   have an undertaking.  You still have to have sort of a

3   recognition of a serious risk.  They would just say that you

4   don't necessarily have to satisfy one of the three prongs

5   that 324(a) specifies must generally be satisfied before

6   there would be potential liability.

7           But because, again, the theory of liability, the

8   theory about why we acquire a legal duty that an ordinary

9   bystander wouldn't have to step in and prevent a harm is

10  because we engaged in services to Grace, because we had an

11  undertaking so our obligations flow to Grace.  And in that

12  capacity, we became aware of harm that Grace was creating and

13  that we failed to take adequate measures to stop that harm.

14  So that's we think those claims also would satisfy the

15  derivative requirement.

16          As to the statutory relationship part of the test

17  where again the question is, is it legally relevant; not is

18  it an element of the offense.  And, here, the whole sort of

19  basis for the claims against us arise based on inspections

20  and loss control services that we allegedly undertook by

21  virtue of our role as an insurer.  That those are the only

22  basis for the claim that we somehow acquired a legal duty to

23  step in and prevent harm that Grace was creating or to warn

24  others about that harm.

25          And we put forward in briefing here and have done

1  consistently in the Third Circuit and before Judge Carey,

2  it's well established and well acknowledged that a provision

3  of insurance, central aspects to it, inherent aspects to it

4  involve engaging in inspections, engaging in loss control

5  services to sort of understand the nature of the risk and to

6  be able to take measures to potentially mitigate that risk.

7  But that derives directly from the provision of insurance.

8         And the statutory language arises by reason of the

9  provision of insurance.  It's not arises by virtue of a

10  provision in the insurance contract that obligated you to do

11  x or y.  So, we think the relevant question is, is this a

12  duty that we allegedly acquired under state law, under their

13  theories because of things we were doing in our capacity as

14  an insurer.

15         And they've raised a few arguments in

16  contravention of that.  They've said, insurers may engage in

17  these activities but that's not, there's no reason someone

18  else couldn't be doing it.  It doesn't have to be connected

19  to your role as an insurer.  Someone else could have just

20  been providing these industrial hygiene services on their

21  own.

22         And we think that argument proves far too much.

23  That's not what the relevant inquiry is in terms of whether

24  something is legally relevant.  I mean, after all, as we

25  noted in our briefs, it would be possible for a non-insurer

1  to also indemnify, create an indemnity contract, not one

2  would dispute that bear possibility provides a reason to say,

3  well, you know, this is not arising by reason of insurance

4  when you're seeking to collect proceeds under a policy.

5          They've also raised the point that the contract

6  provision itself specifies that we are not obligated to

7  engage in these inspections and services.  And we are not

8  undertaking it for the benefit of a third party.  And they

9  say how can a contract that disavows this sort of obligation

10  be a source of it.

11          And we think that that just mixes up what is the

12  federal question here in terms of by reason of the provision

13  of insurance versus what might happen in the state law

14  litigation.

15          The fact that the contract provisions make clear

16  that we are undertaking these services on our own behalf just

17  as part of an obligation -- part of something insurers do to

18  identify the relevant risk and to try to mitigate it to the

19  potential extent.

20          It's a reason why under 324(a), for example, there

21  might well not be an undertaking that was recognized that

22  needs to be for the protection of third parties or it might

23  be a reason why one of the different prongs isn't met, but we

24  still think the nature of their claim under any of the

25  theories is based on the things that we took on that they

1  specifically acknowledged.

2          I think this is at page 45 in their brief -- only

3  arose by reason of the provision of insurance, by reason of

4  the services that we were providing to Grace and --

5          THE COURT:  And did you provide those services,

6  those inspection, hygiene inspection services?  You did

7  provide those services under the contract or you did perform

8  those services?

9          MR. BURGESS:  So, we are -- we don't have a record

10 on those issues because parties have cross-moved for summary

11 judgment and we are proceeding on the basis of their

12 allegations in their complaint.  And that that is the nature

13 of the claims that they are seeking to develop under state

14 law.

15          So, we're willing to take on for the purposes of

16 this proceeding that, yes, they made those allegations.  But

17 there's just not a record and we don't think it would be

18 appropriate to develop it here given that the parties have

19 cross-moved for summary judgement and we're proceeding on the

20 basis of how they have framed the case.

21          THE COURT:  I was just curious whether you

22 performed the services.

23          MR. BURGESS:  No, sure.  I mean as to CNA there's

24 been no sort of state court proceedings.  In the plaintiff's

25 briefs they sometimes refer to issues that were developed in

1   discovery in the litigation against MCC, but that just

2   doesn't pertain to us.

3          THE COURT:  Okay.

4          MR. BURGESS:  If the court would like, I can speak

5   now about the issue of certification or I could also wait --

6          THE COURT:  Why don't you hold off on the

7   certification.

8          MR. BURGESS:  Sure.  Sure.

9          THE COURT:  Okay.  So should we get Maryland

10  Casualty up here?

11         MR. LONGOSZ:  Your Honor, Ed Longosz on behalf of

12  Maryland Casualty.  I think at this juncture, counsel has

13  covered the issues, so rather than I'd like to give time back

14  to the court.  And then perhaps later, we'll see how it

15  affects us.

16         THE COURT:  Sure.  Absolutely.  Thank you.

17         MR. COHN:  Your Honor, may I please the court.  I

18  represent the two thousand individuals approximately whose

19  lives have been shattered by asbestos disease.  They're

20  referred to as the Montana Plaintiffs but I don't want to

21  lose sight of the fact that we're talking about real people

22  and real suffering.

23         They have a right to seek justice under state law

24  unless there is a critically important supervening federal

25  interest in preventing that.

1        And we would respectfully submit that there is no

2   such interest here, that the statue as the Third Circuit has

3   interpreted permits us to proceed on two bases.  One is that

4   the claims that are being asserted do not meet the derivative

5   liability requirement and they also don't meet the statutory

6   relationship requirement.  And well we should keep in mind

7   that the injunction made by those claims only if both of

8   those tests are met.

9        Now, the Third Circuit provided us with very

10  specific instructions on how to proceed on remand.  The first

11  step is -- well, of course, to determine which state's law

12  applies.  But here the parties have stipulated them.  Montana

13  law applies.

14       So, the first step is to determine the elements

15  necessary to make the Montana Plaintiff's claims under

16  Montana law -- the legal element of those claims.

17       And then the next step is to match those legal

18  elements against the statutory standard.  The entire focus of

19  the Third Circuit's instructions here relate to the legal

20  elements of the claims.

21       I will talk in a few minutes about legally

22  relevant and what that means, but the starting point, the

23  focus, is on the legal elements of the state law claims.

24  That's our starting point and that we see error that was made

25  by Judge Carey the first time around was not to use that as

1  the starting point, but to deal in generalities instead.

2          So, with respect to the derivative requirements,

3  Your Honor, the question is not was there some kind of

4  factual similarity between the claims that we're asserting

5  against the insurers and the claims that we're asserting

6  against Grace.

7          The question is not whether the injury was caused

8  by Grace's asbestos or Grace's wrongdoing or any of those

9  other issues that relate to other claims against other

10  parties.

11          The question is whether Grace's liability is a

12  legal element of the claim against the insurers.  That's how

13  we determine whether there's derivative liability.

14          Now what that formulation accomplishes that's

15  different from what we argued to the Third Circuit. And the

16  formulation is broader than what we argued.  We had argued

17  that in the insurance context, the only situation in which

18  there could be liability or there would be derivative

19  liability would be in the case of the indemnity clause under

20  an insurance policy which says that the insurer agrees to pay

21  the claims of its insureds.

22          The Third Circuit did broaden that to include

23  right in retrospect is kind of an obvious expansion which is

24  to say but no there could be documents like respondeat

25  superior or piercing the corporate veil or other situations

1  where an insurer, maybe unlikely to happen in the real world,

2  but an insurer would be being held liable for the wrongdoing

3  of Grace, if Grace was the one who is the actual actor on the

4  scene creating the liability.

5  So, but that expansion, Your Honor, was -- did not

6  fundamentally change the realities of the world and of

7  asbestos cases as they relate to insurers.  And your question

8  about Johns-Manville goes right to that point.

9  So, in Johns-Manville, the entire focus of the

10  Second Circuit's jurisprudence had to do with whether the

11  claim could be enjoined to be -- was that a claim could be

12  enjoined only to the extent necessary to protect the risk of

13  the bankruptcy estate and the risk is the insurance policy

14  and the insurance policy proceeds.

15  And it was -- the Second Circuit made it very

16  clear that these asbestos reorganizations depend on insurance

17  policy proceeds as a critical asset.  They get distributed.

18  It's supposed to be fairly in accordance with the Chapter 11

19  plan.  And that's why insurers get protected by injunctions.

20  And the injunction to the extent that it goes beyond

21  protecting the risk of the bankruptcy estate the Second

22  Circuit said there was no jurisdiction to do it, bear in mind

23  that was before Section 524(g).

24  So, the decision was rendered in terms of

25  jurisdiction.  But really jurisdiction is the same question.

1  It's whether there is a supervening federal interest in

2  preventing people from asserting their state law claims.

3         Now Mr. Giannotto stood up and said, well in

4  Johns-Manville, there's this distinction because Travelers

5  was being sued for not protecting people from somebody else's

6  asbestos.  That may be true that Traveler's is being sued.

7  Traveler's is being sued for not protecting people from a lot

8  of people's asbestos, but there were claimants who were

9  exposed to Johns-Manville asbestos.  He acknowledged that.

10         And the Second Circuit was concerned those claims

11  could proceed against an insurer for wrongdoing where those

12  claims had independent basis under state law and would not

13  affect the policy proceeds.  And we can all see immediately

14  why that makes perfect sense because since the restructuring,

15  the reorganization purpose that's at issue is to assure that

16  the bankruptcy estate has sole control over insurance

17  policies and their proceeds.  What reason could there be

18  beyond that for to protecting insureds.

19         Now there are, you know, these cases that don't

20  apply here, you know, the respondeat superior cases, the

21  piercing corporate veil, those kinds of things which, as I

22  will demonstrate in a moment, are just plain not applicable

23  here.  And that's an expansion that the Third Circuit made

24  and the Second Circuit's concept in Johns-Manville based on

25  the Third Circuit's reading of Section 544(g), the statute.

1          But that expansion that's is not the situation

2    that we find here in this case.  And, to me, it's just an

3    instance of an appellate court doing what appellate courts

4    are supposed to do which is just thinking about future cases,

5    not just the present case.

6          Now the fact that this court's task is to

7    ascertain -- and this is in the words of the court -- what

8    liability under the relevant law demands has two important

9    implications.  One is that you have to look at it on a cause

10   by cause of action basis.  There can be both derivative and

11   non-derivative claims held by the same parties against the

12   same defendant.

13         In fact, this case is an instance of that.  The

14   Montana Plaintiffs have claims under the CNA and the MCC

15   insurance policies.  The CNA policies, of course, were

16   settled during the bankruptcy.  The MCC policies had been

17   settled years before.  So, MCC actually did not write a check

18   for one red cent to the bankruptcy.  But their policies no

19   longer exist.  So, we don't have those claims in actual fact

20   because the claims have gone away.

21         But we, under the terms of the policy, we have

22   those kinds of indemnification claims and that will be

23   expected.  That's the way that the statute is drafted and the

24   way it's been interpreted by the Third Circuit is that yeah

25   you can -- the fact that you have derivative claims doesn't

1  mean you can't also have non-derivative claims.

2  And those non-derivative claims almost by

3  definition, it would be for the same injuries, caused by

4  Grace's asbestos and the fact pattern would be similar that

5  was -- it always is joint tortfeasor context.  And that's why

6  you have to focus on the legal elements because, otherwise,

7  there's no way of distinguishing between what's a derivative

8  claim and what's a non-derivative claim.

9  So, the second implication, Your Honor, is that

10  the -- and really, I guess, I already said it is that the

11  discipline of the process -- the way that we have an actual

12  legal standard to apply here as opposed to just some kind of

13  gut instinct about what's, you know, what's derivative and

14  what's not derivative is to actually look at the elements of

15  state law for each cause of action.

16  So, just discussing the derivative requirements,

17  Your Honor.  I'll get to how Montana law applies to that, but

18  let me first stay with the statute for a second and talk

19  about the statutory relationship requirement.

20  The court said here too it's a purely legal

21  analysis.  You start off with the legal elements of the

22  claim.  And the question is, is the provision of insurance

23  legally relevant.  Is the provision of insurance legally

24  relevant to the Montana Plaintiff's claims?

25  The question is not whether the provision of

1  insurance is factual relevant, whether the insurers would not

2  have been involved with Grace's facilities, but for providing

3  insurance.  It's not that insurers customarily provide

4  certain kinds of services.  It is not that.

5          It is, is the provision of an insurance to Grace a

6  legal element of the claim against the insurers for negligent

7  provision of industrial hygiene services and for breach of a

8  duty to warn.  We're suing, Your Honor, not for provision of

9  insurance, but for provision of industrial hygiene services.

10 Those are the claims that we're starting.

11         However, the insurers wish to characterize it,

12 those are the claims that we're stating.  And we would

13 respectfully submit that under Montana law, we have our

14 claims for damages caused by lack of due care in providing

15 those services.

16         Now, the court said that similar and, again, I'm

17 quoting.  It said,

18             "Similar to the derivative liability analysis

19             above, the court should examine the elements

20             necessary to make the Montana claims under the

21             applicable law."

22         And then determine whether providing with a

23 provision of insurance is relevant legally to those elements.

24 Legal relevance is tied to the elements.  It's not -- legal

25 relevance is not some abstract concept, whatever may -- there

1  may be the insurance policy.  It's a legal document,

2  therefore, it's legally relevant.

3           That's not the analysis at all.  The legal

4  relevance, the court said this.  You have to determine

5  whether provision of insurance is relevant legally to the

6  elements of the claim under Montana law.

7           Now, the court did not say had to be as Mr.

8  Burgess pointed out, the court did not say it had to be an

9  element of the claim.  It said it had to be legally relevant

10  to the elements of the claim.  So is that broader?  Could

11  that be broader?

12           Not on the circumstances of this case.  And how do

13  we know that?  Because of Quigley.  The phrase legally

14  relevant comes from Quigley.  That's where the Third Circuit

15  got it from.  And in Quigley, what legal relevance meant was

16  that the statutory relationship had to be a legal element of

17  the claim against the non-debtor third party.

18           Quigley, of course, was the case where Pfizer let

19  its subsidiary use its name, put it on its packages and it

20  had apparent manufacturer liability.  Absolutely no doubt the

21  reason Pfizer did it was because of the statutory

22  relationship, right.  The parent subsidiary.

23           There's a business rationale for it.  I guess

24  those insurers like to go and conduct inspections for their

25  own purposes.  Pfizer was all about corporate branding,

1  wanted its name on all the products in the corporate group.

2  Made perfect sense as a business rationale.

3         There's absolutely no doubt that Pfizer did it.

4  The reason they do it -- they let the subsidiary engage in

5  the liability generating conduct was because of the parent

6  subsidiary relationship.  And yet, Quigley said no that's not

7  what the statue is all about.

8         What the statute is all about is that the -- your

9  liability is arising because of the use of the name.  It's

10 not arising because of the parent subsidiary relationship.

11 The parent subsidiary relationship was not a legal element of

12 the claim.

13        So, how else do we know it?  How else do we know

14 that that's what the court means in this case?  Well, there's

15 a fact that the court remanded.  The elements that Mr.

16 Burgess and Mr. Giannotti made so articulately just now, they

17 made to the Third Circuit.  And the Third Circuit

18 acknowledged it.

19        In the Third Circuit Opinion, there is reference

20 to the policy, the insurance policy, the insurance policy

21 disclaimer, the fact, the argument that was made about how

22 insurers do this customarily.

23        If that was what legal elements meant then the

24 Third Circuit would not have remanded.  There would have been

25 no need for a remand.  What the remand was with specific

1   instructions.  Look at the relevance, the legal relevance of

2   the provision of insurance to the elements of our claims

3   under state law.

4          And then you might ask well then why use the term

5   legal relevance.  Well it was used in Quigley, why reinvent

6   the wheel.  But I think the reason is probably that, again,

7   Appellate Courts have to be mindful not just of this case.

8   They have to be mindful of future cases.  And legal

9   relevance, you know, could provide some wiggle room in future

10  cases.

11         You know imagine a case, for example, let's say

12  that the law of the state provided that the limitations

13  period for a certain cause of action is three years.  But if

14  asserted against an insurer the cause of action was six

15  years.  I think maybe a court would want to be fully consider

16  whether a claim brought in the fourth year, you know, maybe

17  provision of insurance would be legally relevant, even though

18  that wouldn't be an element of the claim.

19         There are other situations that one could imagine

20  where in a future case, you know, having on different

21  circumstances where the court might think that it was an act

22  of genius, to use the term legal relevance rather than say it

23  had to be a legal element.

24         But when you look at Quigley and what Quigley did

25  and how Quigley used the term legal relevance and you realize

1  that the Third Circuit was very plainly endorsing the <u>Quigley</u>

2  methodology, there is no doubt that in this case under these

3  circumstances, the court, the Third Circuit is telling this

4  court that provision of insurance would need to be a legal

5  element of the Montana Plaintiff's claims against the

6  insurers.

7  And by negative implication I think that my

8  adversaries here have conceded that it's not that.  It is not

9  a legal element of the claims against them.  Those claims

10  are, as they outlined, I mean they add this claim under

11  Section 324(a), but the basic claims are for negligent

12  performance of industrial hygiene services, not a provision

13  of insurance, Your Honor; negligent performance of industrial

14  hygiene services.

15  And there Montana law is clear that there simply

16  needs to be a -- that there needs to be the performance of

17  professional services under circumstances where is

18  foreseeable that a third-party would be injured if those

19  services were not performed with due care.

20  And does there have to be a contract?  You know,

21  you have the subcontractor cases, Your Honor, where you had a

22  subcontractor who's held liable to another subcontractor.  No

23  contractual relationship between them, but there was a

24  contract between the defendant subcontractor and the general

25  contractor.

1        And my (indiscernible) we tried to analogize that

2    to contract between the insurers and Grace and let's see

3    (indiscernible), Your Honor.  It doesn't matter because what

4    the Supreme Court of Montana has said on multiple occasions

5    is that that contract is just an incidental fact.  It's

6    background.

7        What's important and what gives rise to the

8    liability is the rendering of professional services under

9    circumstances where it's foreseeable that specified third

10   parties or a class of third parties would be injured if those

11   services were not performed with due care.

12       And the reason we know that the Supreme Court of

13   Montana is serious about that is the Kent case -- Kent vs.

14   Columbia Falls where there is no contract. And, yet, there

15   was the negligent performance of engineering services.

16       Your Honor, I don't know if you recall, but that

17   was the case where the -- where engineers for the city of

18   Columbia Falls -- well the straddling point was there was a

19   separation there was a subdivision.  The subdivision required

20   for city approval.  The City Engineers could have just gone

21   out and inspected it and stamped approved or disapproved, but

22   they didn't do that.

23       They went --

24       THE COURT:  Were these the steps in the library?

25   Was that the case about -- well --

1          MR. COHN:  No.

2          THE COURT:  I get your point, though, about the

3   services.  I understand your argument about that.

4          MR. COHN:  Yeah.  Well, Your Honor, you know this

5   was the case where it was a subdivision approval and these

6   were these trails in the subdivision.  And somebody was using

7   the trails, got injured and sued the city on the basis of its

8   engineering services.

9          And the court said well yeah, the city had gone

10  out and not just, you know, done the stamping, you know

11  stamping approved or disapproved on the subdivision plans.

12  The City Engineers actually had gone out and participated in

13  the designing of the trails.

14         And based on that, based on that negligent

15  provision of the engineering services under circumstances

16  where it was foreseeable, the people would use the trails and

17  could get injured, the Supreme Court of Montana said that's

18  enough for liability for lack of due care in the performance

19  of professional services.

20         And so, here where the insurers perform

21  professional services.  They had engineers, they had doctors,

22  they had industrial hygienists on site, it was enough.  And

23  it doesn't matter whether those services were performed under

24  contract or gratuitously or whatever.  That's not what gives

25  rise to liability.

1          THE COURT:  I think we all agree that Montana law

2  doesn't require privity.  The way that I read Montana law is

3  that if you provide services under a contract and its

4  foreseeable that certain third-parties may be injured, that a

5  duty arises under Montana law, whether it's under Montana

6  common law or under the restatement.

7          You know when I read your briefs, you know, they

8  sound (indiscernible) and I understand your point that

9  they've already made the argument that the restatement

10  applies.  I wasn't really sure about the distinctions between

11  the cases that you were specifically relying upon and the

12  restatement.  They seemed pretty clear to me.

13          If you perform services and there is some

14  foreseeable harm that could occur to a third party then a

15  duty arises under Montana law.  That's generally what I think

16  that Montana law holds.

17          MR. COHN:  Right.  Yes.  And I think the parties

18  agree on that.  The difference, Your Honor, is that the

19  insurers emphasize that there has to be a contract under

20  which it performed.  And then they say well the contract --

21          THE COURT:  I thought the argument was, you know,

22  that the services were only provided because there was a

23  contract.  If there was no insurance contract, the services

24  wouldn't be provided, so.

25          MR. COHN:  Yes.  And that's the exact kind of

1  thing that the Montana Supreme Court has said, yeah that's

2  just a background fact.  It's not an element of liability.

3  And not only that, but the services could be performed

4  gratuitously.  Even Section 324(a) what the restatement says,

5  services could be performed gratuitously.  So, the contract

6  is not an essential element -- I mean it's not a legal

7  element of the cause of action.

8          So, the next argument that they make is well but

9  wait.  There has to be a risk that the person is -- well on

10 the duty to warn side there'd have to be something that had

11 to warn and I'll get to that in a second.

12         But on the negligent side of things what we're

13 asserting, Your Honor, is not that the insurer has just

14 arrived on the scene and we're just kind of passively

15 observed that there was a hazard at the premises.  If you had

16 occasion to read that asbestos court decision, Your Honor,

17 what you saw was that MCC was there day in and day out

18 pervasively involved with engineering issues at the plant

19 with the (indiscernible) to the plant.

20         I mean they were designing signs for warnings, you

21 know.  That drain is dangerous or, you know, watch out for

22 that window or whatever.  But they didn't create a sign

23 saying that the levels of asbestos dust in the air are

24 harmful, use a respirator.

25         So, we're talking about the pervasive provision of

1  industrial hygiene services as being the basis for liability.

2  And that goes well beyond anything that of the insurance

3  contract requires and, in any event, as noted.

4          The existence of a contract has nothing to do with

5  the basis for liability.  The basis for liability is if

6  you're going to go in there don't have to, but if you're

7  going to go in there and provide professional services and

8  the professional services are the type that deal with safety

9  and it's foreseeable that if you don't use a duty of care

10  that certain people will be injured then you're liable to

11  those people.  And you also under Montana law have a duty to

12  warn those people.

13          Now I want to discuss -- I want to focus

14  specifically on duty to warn under Montana law because an

15  important difference in our position in that voice by the

16  insurers has to do with blaming Grace for the creation of the

17  unsafe conditions and saying that that is relevant either to

18  derivative liability or to the provision of insurance.

19          And the importance of the duty to warn, the duty

20  to warn under Montana law is not simply that if you walk past

21  a pothole and it looks dangerous or whatever and you don't

22  issue a warning that you have liability.  That's not how it

23  works.

24          It's that you have to so engage with a hazardous

25  situation so as to create an expectation that you would

1   provide a warning.  You did not, however, have to create the

2   hazardous.  You just had to engage with it sufficiently so

3   that you should be held responsible under the law.

4           Now in this case and so roughly if we were looking

5   at a situation where the hazard was simply created by Grace

6   and the insurers had no role whatsoever in that, there could

7   still be a duty to warn just by reason of the pervasive

8   activities that I just described of the insurers engaging

9   with the hazard.

10          But what I want to emphasize here, Your Honor, and

11  that's the importance of the knife wielding terrorist that my

12  brother, Mr. Burgess, liked so much.  The plea here is that

13  asbestos is just a contact.  It is -- in this context these

14  were not -- this was not asbestos -- this was not an asbestos

15  product that was being produced at the Grace facility. This

16  was a non-asbestos insulation, at least it was supposed to

17  be.  And the problem was at the vermiculite, which was the

18  material that they wanted to use, was contaminated by a vein

19  of asbestos.

20          And so, when you then processed it at the plant,

21  it gave rise to levels of asbestos dust.  Well that's, you

22  know, that's the kind of hazard that exists at industrial

23  companies all over the country.  You know, you either create

24  as a byproduct of the manufacturing process or you're just

25  dealing with an already existing contaminate and it has to be

1  controlled.

2        And there are, and we cite in our brief, there are

3  safe levels of asbestos.  There also happen to be vermiculite

4  lines that don't have asbestos in them but when they have

5  asbestos in them, you have to deal with it.  And that was the

6  situation that Grace faced.

7        So, Grace -- you know, there's no doubt that Grace

8  failed to do it that's why our clients are sick.  But the

9  insurers themselves in this case also created the hazard.

10  They created it by their (indiscernible) of actions of going

11  onsite and of developing the safety measures that were

12  insufficient.  They engaged with the hazard not only

13  sufficiently to have a duty to warn, but they engaged

14  sufficiently that they themselves are responsible for the

15  negligent provision of industrial hygiene services.  And

16  that's our cause of action.

17        I mean a jury will either accept it or not accept

18  it.  You can obviously tell from the asbestos court's

19  decision on summary judgment that the asbestos court was

20  impressed with the robustness of the record on this subject.

21  But ultimately, it's going to be up to a jury to determine

22  whether there's liability, but that's the theory that we're

23  asserting and it's a valid theory under Montana law, and we

24  should be permitted to go forward because it has directly to

25  do with the actions of the insurers.

1          It is -- and it is in that sense, it is not

2    derivative.  When we look at those -- we heard reference to

3    the Gas case and the other ones that were cited in that

4    footnote.  There may be a quest whether in the situation

5    where let's say you negligently hire an employee or

6    negligently supervise an employee, then the employee goes out

7    and does something that generates liability for you.

8          Okay so there are three causes of action, right.

9    There's just respondeat superior.  You're just responsible

10   for what your employee did.  You negligently hired him.  You

11   negligently supervised him.  I mean and it may be at those

12   last two like conceivably be considered derivative, but

13   that's not the point here because in each of those situations

14   where you're talking about liability, there is, I'll call it,

15   an active party and then the non-active party.  And the quest

16   is whether the non-active party is derivatively liable for

17   the active party's actions.

18         Here, and so it is -- are the insurers liable as

19   non-active parties for Grace's actions as an active party?

20   That's not what we're asserting, Your Honor.  We're not

21   asserting that the insurers are liable for what Grace did.

22   It's actually all the reverse.  It's that we're saying that

23   they were the active parties, that they were actively

24   involved with provision of industrial hygiene services, that

25   they didn't recommend adequate levels of protection of the

1  workers from dust control.

2          It may even be that Grace has claims against the

3  insurers in their capacity as industrial hygiene

4  professionals because if Grace relied on them to have fixed

5  up a, you know, problem that existed at the plant or would

6  have prevented a problem from arising, but the point is that

7  this is not -- all the situations that you look at where

8  there is any possibility of interpreting that footnote in the

9  Third Circuit opinion as saying, oh yeah that's derivative

10 liability, all of those involved a non-active party that

11 didn't actually do the stuff that generated liability.

12         And, here, we are saying the insurers did the

13 stuff that generated liability.  And when they say, oh yeah,

14 but Grace did it.  Grace primarily did it or Grace did it

15 too, what that really amounts to is the precise argument that

16 the Third Circuit opinion rejects which is that and when they

17 say, oh yeah, but Grace did it, or Grace primarily did it, or

18 Grace did it too, what that really amounts to is the precise

19 argument that the Third Circuit opinion rejects which is that

20 it's dispositive that Grace's asbestos caused the injury.

21 It's presumed this is an asbestos Chapter 11 case, Your

22 Honor.  The reason Grace is in bankruptcy is because it has

23 asbestos claims against it.

24         Grace as, obviously, dealing with asbestos.

25 That's the background.  That's the situation that we're all

1   dealing with here.  And the Third Circuit made it clear that

2   the fact that that's all true and that Grace was actively

3   involved with asbestos and generating asbestos is not what is

4   at issue here.

5        What is at issue is what, are the elements of the

6   cause of action against the third-party.  And we would

7   respectfully submit that we have, that our causes of action

8   are for actions that they undertook; not a position, or a

9   capacity or something else having to do that makes them

10  liable for what Grace did, but rather we're suing them for

11  their own actions.  And of course that cause of action must

12  exist under Montana law.  We provided lots of authority why

13  we think it does.  And if there is any question about that

14  we'll talk about it in the context of certification.

15       We have alleged causes of action based on the

16  actual actions and activities of these insurers.  And based

17  on that it's not derivative of Grace's liability.  And

18  because its industrial hygiene services, professional

19  services, not -- it's not the provision of insurance.

20  Provision of insurance is not a legal element of those claims

21  and, therefore, it doesn't meet either the derivative,

22  statutory requirement or the -- I'm sorry, either the

23  derivative liability, the requirement or the statutory

24  relationship requirement.

25       THE COURT:  Thank you.

1          MR. COHN:  Thank you, Your Honor.

2          THE COURT:  Did you want to respond to his

3  comments before I ask my questions?

4          MR. BURGESS:  Sure.

5          THE COURT:  Okay.

6          MR. BURGESS:  So, a few brief points in response.

7          THE COURT:  Okay.

8          MR. BURGESS:  One is that, as far as I -- I

9  started out by pointing out that the Third Circuit clearly

10  excluded a test that produces a result that only insurance

11  policy proceeds are going to be covered.  And as far as I

12  understand my friend's argument I think his position is,

13  ultimately, yes, in this context it's going to be just

14  limited to insurance policy proceeds.  Certainly, there was

15  no indication of another potential cause of action that could

16  allow it to sweep more broadly.

17          He suggests that, well, we argue something broader

18  before the Third Circuit.  They rejected our broader

19  proposition, but now we're making a different test that it's

20  based on the legal elements.  I don't think that's correct in

21  terms of how it was briefed.  As we noted in our reply brief,

22  on Page 3, in the Third Circuit they specifically linked the

23  legal elements test to producing result that it is tied to

24  only insurance policy proceeds.

25          Judge Carey at, I believe, Pages 14 and 15 of his

1  underlying opinion also linked those two parts together.  So,

2  as I understand their position it's that even though the

3  Third Circuit categorically made clear that it's not going to

4  be limited to insurance policy proceeds they nevertheless,

5  *sub silentio*, adopted a test that is going to dictate that

6  result.  We just don't think that is a plausible way to read

7  the Third Circuit's opinion.

8        Mr. Cohn did say in, sort of, discussing the

9  <u>Dodds</u>, and the <u>Gas</u> and other cases, I'm not sure if there's a

10 qualification on that position or just an argument he's

11 making in the alternative that, well, okay, maybe those

12 claims which clearly could extend broadly maybe they would be

13 derivative.  He drew a distinction between a non-active party

14 and an active party in the, sort of, <u>Gas</u> situation and claims

15 being brought against the employer for negligently

16 supervising the independent contractor who then, in turn,

17 creates a harm.

18        So, I guess in his formulation the employer would

19 be the non-active party and the independent contractor would

20 be the active party.  He says, well, maybe that is

21 derivative.  I think we actually agree with that formulation

22 in terms of the non-active party versus the active party, but

23 it is just crystal clear when reviewing the actual Montana

24 plaintiff complaints that we are the non-active party in this

25 assertion.  All the dangers are being created by Grace.

1          The notion -- he uses the term affirmative

2    conduct, but it's not a situation where we went in, in doing

3    our inspections, and created some additional risk, created a

4    risk that would exist over and above what existing was based

5    on Grace's operations and its wrongful conduct in failing to

6    control asbestos.

7          The allegations consist entirely of things we

8    allegedly failed to do to update the risk that someone else

9    had created.  So, I think under his formulation, in terms of

10   what an active party and a non-active party, we have to be

11   understood as the non-active party.  The point about why we

12   are active is just, well, we're alleging that you assumed

13   this duty and you, yourself engaged in some negligence and by

14   virtue of that negligence you were unable to abate a harm

15   that existed that you were obliged to do.

16          I think that is just another way of arguing that

17   to the extent the insurer is being held partially responsible

18   for its own wrongdoing that that can't be derivative.  Again,

19   that is exactly what the Third Circuit excluded in its

20   decision.

21          On the legal relevance and the provision of

22   insurance prong my friend, Mr. Cohn, notes that the court did

23   not, in fact, state that legal relevance is going to be the

24   same thing as an element, but then I think as he, sort of,

25   applied it, and by reference Quigley, the view is that

1  actually that's all its going to be.  Again, I don't think

2  that is a good way to read the opinion because not only did

3  legal relevance come from Quigley -- and I do want to talk a

4  little bit about why we think Quigley is distinguishable on

5  this issue, but not only did it come from Quigley, but Judge

6  Carey used it as the underlying test in his decision.

7        And this court did not suggest he got the relevant

8  test wrong as to the statutory relationship.  Did say he got

9  it wrong on the derivative requirement because he treated the

10 roll-up Grace asbestos in causing the injury as dispositive

11 for derivative.  That was wrong.  But as to the statutory

12 relationship and legal relevance the court accepted that his

13 assumption that legal relevance was the governing test even

14 in its Footnote 8, sort of, suggested it doesn't appear there

15 is any dispute between the parties between what the relevant

16 legal standard would be because while, you know, CNA's test

17 has been characterized as being a but for test.  In fact,

18 that is not so.  They're saying given that these

19 (indiscernible) were part and parcel of the provision of

20 insurance and were the predicate for the duty under State

21 Law, certainly that is the kind of thing that would qualify

22 as legal relevance.

23       So, Mr. Cohn asked, well, why the remand then

24 because that would be pretty simple.  I think the reason is

25 because the court -- you know, Judge Carey had proceeded

1   under the assumption that 324(a) would apply and that legal

2   relevance with the assessed on the basis of that, sort of,

3   cause of action.  Their point is there's not a free floating

4   common law that the court, the Federal Court can just, sort

5   of, adopt.  We're doing this by reference to a particular

6   State Law.  We need to identify what State Law applies.  We

7   don't know if that state has adopted 324(a) of the

8   restatement that the court pointed that out specifically in

9   Footnote 9 of its opinion.

10          So, while we don't quarrel with the, sort of,

11  assessment of what legal relevance could be, we're not

12  equipped to, sort of, evaluate whether it is legally relevant

13  to the actual cause of action.  You have to first identify

14  what the choice of law is and what the elements are under

15  that State Law, but then in doing the inquiry you are

16  determining whether it is legally relevant to the elements,

17  not whether it is, in fact, an element of the claim.  Mr.

18  Cohn, I don't think, can identify any sort of situation here

19  in which those wouldn't be one in the same.

20          As to Quigley, so a couple responses on that.  The

21  underlying -- so, there the, sort of, statutory relationship

22  was the corporate relationship between a parent and a

23  subsidiary and, you know, the relevant cause of action was

24  being an apparent manufacturer under the restatement.

25          Mr. Cohn makes various arguments about the

1   inherent connection between a parent and a subsidiary and how

2   it would follow naturally as a matter of business logic for

3   the parent to put its name on a subsidiaries products, but

4   none of that was developed in Quigley.  None of those, sort

5   of, arguments were made.  That was not -- there is no, sort

6   of, consideration of whether ownership by itself would, sort

7   of, give rise to this or really what is triggering the duty

8   is just Pfizer decided in its discretion, and maybe ownership

9   is what gave it the ability to do  this, but to put its name

10  on the product.  That need not be connected intrinsically to

11  ownership.

12           By contrast, here, we have identified authority

13  after authority that says this is just what you do in

14  providing insurance.  It's not just the contract of the

15  agreement to indemnify.  Part and parcel of providing

16  insurance is to engage in inspections to determine your level

17  of risk and to provide recommendations to the insured in

18  order to try to mitigate that risk.  That is part of what it

19  means to provide insurance.  So, we think the link is much

20  stronger here then it was in the Quigley situation and that,

21  indeed, it wasn't that, sort of, argument and in any event

22  wasn't developed in Quigley.

23           Another point I wanted to make about Quigley and,

24  sort of, its reference to the Johns-Manville line of decision

25  on the derivative issue.  I think it's important to note that

1   Quigley did not reach the question of whether the parent

2   manufacturer claim was derivative.  So --

3           THE COURT:  But it sort of suggested that it was

4   non-derivative.  I mean that's why it undertook the entire

5   analysis of Johns-Manville cases because the plaintiffs on

6   appeal to the Second Circuit were saying, Judges, these are

7   non-derivative claims; therefore, you don't have

8   jurisdiction.

9           MR. BURGESS:  Right.

10          THE COURT:  Quigley clarified that jurisdiction is

11  a separate inquiry then derivative, non-derivative analysis

12  and that jurisdiction is a broader analysis.  And in that

13  case because the parent and the sub shared the same insurance

14  it clearly had an impact on the estate.

15          I think it would not have gone to such great

16  lengths to distinguish all the Johns-Manville cases about the

17  derivative issue if they had found -- I mean, I thought that

18  they, sort of, implied that it was non-derivative litigation

19  which is why they were trying to distinguish it on the

20  jurisdiction question.

21          MR. BURGESS:  I mean, I agree if they had found

22  that it was --

23          THE COURT:  They didn't specifically make the

24  finding that the litigation was non-derivative, but that,

25  sort of, was the implication.

1          MR. BURGESS:  I guess I don't read it that way.  I

2    mean, I think there were two different paths to that result

3    and one of them would have been to say even if it is non-

4    derivative jurisdiction is broader and that's what they, in

5    fact, held.  Another would have been to say its derivative as

6    to which would be more complicated.  Derivative, sort of,

7    would be imbedded in an issue of Pennsylvania Law that maybe

8    the Second Circuit didn't feel as inclined to opine on.  I'm

9    not even sure if Pennsylvania, for example, would take

10   certification from the Second Circuit.

11         Whatever was, sort of, driving that Second Circuit

12   three judge panel, which I think is hard to discern,

13   certainly the Third Circuit's endorsement of aspects of

14   Quigley I don't think can extend to an implication that the

15   four hundred, the apparent manufacturer claim would

16   necessarily be non-derivative given that the court didn't

17   even -- the Second Circuit didn't explicitly reach that

18   issue.

19         I think that suggestion that that would

20   necessarily be non-derivative is hard to reconcile with the

21   things the Third Circuit did say in identifying Gas and Dodds

22   which clearly are instances in which, notwithstanding it

23   being a claim that could be characterized as direct liability

24   because it is predicated, in part, on something that the

25   defendant, itself, did.  It nonetheless is putting those as

1  potential examples of something that would be derivative in

2  the relevant sense under 524(g).

3          The only other comment I wanted to make, and then

4  Mr. Longosz, I don't know if he has any points he wants to

5  address in terms of the State Court litigation or the MCC.

6  There were lots of references in Mr. Cohn's argument to the

7  asbestos court litigation and supposed evidence that's been

8  unearthed.

9          THE COURT:  I'm not going to consider that.

10          MR. BURGESS:  Right.  So, that was the only point

11  I wanted to make.  Thank you, Your Honor.

12          My colleague apprised me of another point I might

13  want to make.

14          THE COURT:  Sure.

15          MR. BURGESS:  Just in terms of, sort of,

16  understanding the nature of the cause of actions that are

17  asserted under State Law, and this is a point I was trying to

18  drive at in the characterization Mr. Cohn gave between active

19  and non-active participant.

20          For example, in their failure to WARN claim, I

21  think it's particularly stark.  The nature of the cause of

22  action is that we, as a Worker's Compensation insurer, and

23  that was, sort of, embedded in the test that the asbestos

24  court gave that we, as a Worker's Compensation insurer,

25  became aware of a risk that a serious hazard that existed.

1  We think that has to be the quintessential example of what
2  would be derivative.

3          While the allegation is that we breached a duty,
4  it's a duty that we acquired solely by virtue of their
5  creating a risk in failing to prevent it or warn against it
6  which we think is different from a potential claim that -- I
7  mean you can imagine a hypothetical example in which we are
8  engaged in industrial hygiene services or other things that
9  we would say arise by reason of the provision of insurance,
10 but nonetheless aren't derivative because, you know, we knock
11 something down in the plant and that led to a release of
12 additional asbestos.

13         There, it is a risk that we created.  I think that
14 has to be contrasted with a risk that is -- the claim is
15 that, well, we didn't adequately take measures to mitigate or
16 to warn people about or to prevent it.  This is a difference
17 that is fundamental to, sort of, 324(a) about whether we are
18 doing something to make things worse than they, otherwise,
19 would have been but for our involvement at all or it's
20 something that the claim is, well, you know, there was a harm
21 here that someone -- a risk that someone else is creating.
22 By our actions we didn't take measure that could have
23 adequately prevented it.  We think that has to be a
24 fundamental distinction between whether something is going to
25 qualify as derivative or non-derivative.

1          MR. LONGOSZ:  Good morning, again, Your Honor.

2          THE COURT:  Good morning.

3          MR. LONGOSZ:  If I may just have a few minutes.

4          THE COURT:  Sure.

5          MR. LONGOSZ:  I take from the court's comments

6    that the court is not going to get into the subtleties or the

7    point, counterpoint of the State Court action.  I don't want

8    the court to take away from this by virtue of my silence or

9    not, not addressing some of these points that we necessarily

10   agree. I think there is a lot of disagreement.

11         The one thing, though, I think is important for

12   the court to understand to know, if it doesn't already, that

13   the underlying case or, at least, the HUD case.  Two things

14   occurred.  We were two weeks before trial.  The Supreme Court

15   of Montana decided to vacate the trial date and except the

16   writ of supervisory control which is tantamount to assert

17   petition to decide this issue.  We had full briefing on it.

18         The issue of whether this foreseeability and duty

19   analysis is what Montana is going to follow or whether 324(a)

20   is what Montana is going to follow.  We do have argument on

21   that August 14th in the Supreme Court of Montana.  So, I

22   think with respect to any guidance that that may afford or

23   provide for this court regarding the specifics of what

24   framework is followed and how Maryland Casualty or any of the

25   insurers may be judged relative to that framework it will

1  provide some definition to it.

2          So, the issue is teed up and framed in the Montana

3  Supreme Court.  So, from that standpoint -- the other thing

4  is there was a mention made of, for example, the Kent

5  [phonetic] decision and a lot of other cases.  One of the

6  reasons that we believe that the Montana Supreme Court is

7  going to look t this is because it hasn't looked at 324(a) in

8  any kind of wholesome way.  It's looked at the restatement,

9  restatement 323 and it has mentioned 324.

10          There is a Federal Court in Montana in the

11  Austringer [phonetic] case that specifically said sitting as

12  a Federal Court looking at Montana State Law it's my belief,

13  as the Federal District Court Judge, that Montana State Court

14  would follow a 324(a) analysis.  And then looking at it under

15  the lens of the prism of 324(a).  That materially effects

16  specifically what occurs relative to whether its Maryland

17  Casualty or any other insurer specifically because in this

18  case and in these cases Maryland Casualty as well as other

19  insurers fully provided, and in this case, Worker's

20  Compensation Insurance.

21          That is all the services that were provided.

22  There was no un-bundled service.  So, in other words there

23  was no separate service to do these industrial hygiene

24  inspections or industrial hygiene professional services.

25  That contrasted with these cases, like a Kent case and all

1  these other cases in Montana that talk about a professional

2  services contract to do a particular type of service.

3          The other thing is that the Kent case is

4  interesting because it was a statutory requirement.  That was

5  a statutory case where statutory engineers went out and

6  conducted their engineering studies and worked on that case.

7  As the court is probably aware, in looking at that case, it's

8  totally different then the circumstances we're dealing with

9  here.

10          So, there are subtleties to this.  There are

11  subtleties to what occurred and didn't occur relative to

12  this, but I think the factor permeating all this is that it

13  arose out of insurance provided to the W.R. Grace and but for

14  that insurance and but for W.R. Grace's actions, as Mr.

15  Burgess talked about, we wouldn't be here today.

16          The irony -- I would just close with this, the

17  irony of this all is, and we talk about Johns-Manville, as it

18  turns out, and this is, sort of, a side note, but I think an

19  important one to understand the context is that Grace reached

20  out to Johns-Manville for advice and to ask them how to do an

21  industrial hygiene program in their facility unbeknownst to

22  C&A, unbeknownst to Maryland Casualty, unbeknownst to anybody

23  else.  So, the reach-out was there.

24          It seems like Johns-Manville seems to haunt all of

25  us no matter coming and going in this, but I thought that

1  that was an anecdote to provide information, but important

2  information just to show that Grace was on its own, doing its

3  own thing and working its own asbestos mine.  And to the

4  extent the insurers did anything it was provided insurance,

5  provided Worker's Comp Insurance and it was Grace's facility,

6  its asbestos that caused us to be here and the harm that was

7  caused.

8           Again, as we go along if the court has any

9  questions I'm happy to answer.

10          THE COURT:  Thank you.

11          MR. LONGOSZ:  Thank you.

12          THE COURT:  Do you feel the need to respond to any

13  of that?

14          MR. COHN:  Yes, just very briefly.  Your Honor,

15  first of all, that last anecdote, while entertaining, appears

16  nowhere in the record and I don't think --

17          THE COURT:  I'm not going to put it in my opinion.

18  Don't worry.

19          MR. COHN:  I did want to just go back to a couple

20  of things that Mr. Burgess said at the very end which is he

21  talked about the case in Montana against Maryland Casualty

22  things they did as a Worker's Compensation insurer.  I really

23  just wanted to remind the court that in that case, because of

24  Judge Carey's decision that permits Montana plaintiffs to sue

25  Maryland Casualty on the basis of its conduct as a Worker's

1  Compensation insurer that is a totally different situation

2  from what we face here on the issue of meeting the statutory

3  standard.  We don't need to meet the statutory standard

4  because the injunction doesn't even apply to Maryland

5  casualty as a Worker's Compensation insurer.  So, I just want

6  to make sure the record is clear on that.

7          The second thing I wanted to return to was, you

8  know, Mr. Burgess made a very telling point at the end.  He

9  was talking about, you know, it would be one thing if we were

10  on the premises and we created some new problem,  you know,

11  we kicked over a barrel of, you know, asbestos dust or

12  something and it made it worse, but actually we were just

13  there and the problem already existed.  That is another way

14  of saying what they have been saying all along which is

15  Grace's asbestos caused a problem and that's all that this

16  court should focus on.

17          Our allegations are that Maryland Casualty and C&A

18  engaged in highly specific pervasive conduct in dealing with

19  the asbestos situation, had the opportunity to recommend an

20  industrial hygiene program that would have solved the

21  problem, failed to do so and failed to do the alternative

22  thing that would have solved the problem which is to put up

23  warning signs saying there are harmful levels of asbestos

24  dust, be warned.

25          Thank you, Your Honor.

1          THE COURT:  You're welcome.

2          Okay.  So, the way that I see the Third Circuit

3     opinion is it lays out Quigley as the framework upon which it

4     bases its analysis.  It tells me that I must look at State

5     Law and it uses Quigley as a basis to do so.

6          When I look at Quigley, Quigley didn't actually

7     make any determination about whether the litigation was

8     derivative or non-derivative, but what Quigley did do was it

9     made the distinction that satisfying this derivative, non-

10    derivative analysis is not a necessary requirement to resolve

11    jurisdiction.  It's not an independent requirement that folks

12    have to satisfy.  And in order to demonstrate that it took a

13    thorough analysis of three of the Johns-Manville cases; the

14    MacArthur case, Manville III and Manville IV.

15         It used those cases to try to clarify to the

16    parties that the derivative, non-derivative inquiry is not a

17    separate jurisdictional hurdle that parties must overcome,

18    that jurisdiction is a broad question of whether or not there

19    is a potential impact to the estate.  So, after going a great

20    length through all of that found that there was jurisdiction

21    because of the shared insurance between the parent and the

22    sub.  Then on the 524 analysis it didn't even get to the

23    derivative portion of it because it found with regard to the

24    statutory relationship it resolved that in favor of the

25    plaintiffs in that case.

1        So, when I look at the Quigley case, you know, it

2   begs the question when I look at the Third Circuit case what

3   does it mean to have derivative liability in the context of

4   asbestos bankruptcies; it's a very specific meaning.  And the

5   Third Circuit is relying upon the Second Circuit's test and

6   the state test was not something laid out in Quigley, per

7   say, it was Quigley that referenced the three Johns-Manville

8   cases.

9        I think it's important for us to take a journey

10  and just revisit the Johns-Manville cases one more time so

11  that you can understand what my questions are and what my

12  concerns are.

13       You know, the Johns-Manville case is an important

14  case not only because it was cited in Quigley and set out the

15  State Law, which the Third Circuit used, but Johns-Manville,

16  obviously, was the basis of the formation of Section 524(g).

17  So, it's a very important case to understand.

18       I understand -- just not to make it too

19  painstaking, but I just want to lay out my understanding of

20  what happened in Johns-Manville to make sure that I

21  understand how that applies to this case.

22       In Johns-Manville you had a debtor who

23  manufactured asbestos for decades and had Travelers act as

24  its primary insurer.  And at the time of the bankruptcy

25  Johns-Manville was facing tens of thousands of litigation

1  from these parties who were injured by asbestos.  And when it

2  entered bankrutcy the insurance policies were the most

3  valuable asset that <u>Johns-Manville</u> had.

4          So, as a result the Bankruptcy Court,

5  understandably, wanted to put a value on these insurance

6  policies, but at the time the insurance companies were

7  engaged in huge litigation with the debtors.  They were not

8  going to just turn over the policy limits to <u>Johns-Manville</u>.

9  They were engaged in extensive litigation.  And the

10  bankruptcy judge came up with an ingenious solution to solve

11  that problem which was to say, okay, we need to get

12  settlement of the insurance policies.

13          So, in order to induce the insurers to contribute,

14  I don't know, $770 million dollars we're going to give them

15  something.  We're going to tell them that in exchange for

16  giving us this pot of money that we're going to put into a

17  trust to cover claims of people who have been injured by

18  <u>Johns-Manville's</u> asbestos, we're going to give you an

19  injunction.  We're going to make sure that no one can sue.

20  Not only are the people not allowed to sue <u>Johns-Manville</u>

21  they cannot sue the insurance company because you guys just

22  contributed hundreds of millions of dollars.

23          I need to just -- we're just going to go through

24  this thoroughly so that you understand all of this.

25          So, I'm going to take some quotes now from the

1  <u>Travelers Indemnity Company v. Bailey</u>, the Supreme Court case

2  that reversed <u>Manville III</u>.  And I'm also going to draw from

3  <u>Manville IV</u> as well.

4         So, in the <u>Johns-Manville</u> case when the settlement

5  was entered into by the debtor with the insurance companies

6  there was a settlement agreement that was executed.  And the

7  term that was used was "palsy claims" and it was a very, very

8  broad term that basically said that any kind of claims that

9  are arising out of or relating to any of the policies. It was

10 a very, very broad claim, but the parties had a very clear

11 understanding of what they were trying to say.

12        So, just hold on while I find all of the

13 references here that I want to raise.

14        So, at the time that the insurance companies and

15 the debtor entered into this settlement they filed the

16 settlement agreement and then began two years' worth of

17 negotiations on a settlement agreement.  As part of this the

18 debtors made certain statements. And I just want to make sure

19 that I find the statements completely.

20        It's just going to take me one moment to find all

21 of the language here.

22        Well, essentially, <u>Manville</u> and its insurers made

23 certain statements in support of their settlement agreement.

24 They basically said that we understand, that the injunction

25 that we seek to have to protect the insurance companies and

1    us it relates to the insurance policies, to the rates.  And

2    when they raised these statements there were objections

3    filed.  And there was an objection filed by one of the

4    committees in the case.

5              Okay.  I swear I just had that.  Hold on.  I'm

6    sorry.  I have all this stuff.  I have all these papers to

7    look at.  Okay.  Right.

8              So, just to back up; in Manville -- I am now

9    quoting from the decent in Bailey which just talked about the

10   underlying background.  There Travelers -- in Manville's

11   memorandum in support of the insurance settlement agreement

12   it clarified that it did not seek to have the Bankruptcy

13   Court release its settling insurers from claims by third-

14   parties based on the insurers own tortious misconduct towards

15   a third-party, but rather sought only to release the insurers

16   from the rights Manville might, itself, have against them or

17   rights derivative of Manville's rights under the policies

18   being compromised and settled.

19             This understanding reflected not only the basis

20   fact that the settlement was between Manville and its

21   insurers, and not third-parties, but also the parties

22   knowledge that the Second Circuit had held that the

23   Bankruptcy Courts lack power to discharge independent claims

24   of third-parties against non-debtors.

25             Travelers even agreed with this.  Travelers

1   similarly acknowledged the limits of the Bankruptcy Courts
2   power noting that,

3           "The court has in rem jurisdiction over the
4           policies and thus the power to enter appropriate
5           orders to protect that jurisdiction.  It is stated
6           that the injunction is intended only to restrain
7           claims against the rates, the policies which are
8           or may be asserted against the settling insurers
9           even though a legal representative of the
10          Bankruptcy Court noted that all parties seemed to
11          agree that any injunction, channeling order and
12          release is limited to this court's jurisdiction
13          over the rates."

14          Okay.  Then we have the committee who filed a
15  specific objection.  Okay.  Then the committee of asbestos
16  related litigants and/or creditors challenged the definition
17  of policy claims of that 1984 settlement agreement and they
18  said the settling insurer's breach of covenant of good faith
19  and fair dealing, and consumer protection statutes clearly
20  arise out of or relate to the policies which was that broad
21  policy claim definition.  But these claims are not direct
22  actions for proceeds.  They are independent third-party
23  claims against the settling insurers which are not derivative
24  of Manville's right.

25          The Manville estate never has or can ever have any

1 right in these claim proceeds for they are not contractual.

2 They are personal rights which the victims have for the

3 tortious conduct of the settling insurers.  In support of the

4 contention the committee asserted that it is well-established

5 that the bankruptcy court has no jurisdiction to grant the

6 discharge of any injunction of and injunction against these

7 independent non-derivative claims as the settlement agreement

8 requires.

9          In response to these and other objections to the

10 settlement the parties executed a letter agreement on June

11 3rd, 1985 which indicated that it was to operate as an

12 amendment to the 1984 settlement agreement.  One portion of

13 the letter agreement stated the court has in rem jurisdiction

14 over the policies and, thus, the power to enter appropriate

15 orders to protect that jurisdiction.  The channeling order is

16 intended only to channel claims against the race of the

17 Manville estate to the settlement fund and the injunction is

18 intended only to restrain claims against the race, i.e. the

19 policies, which are or may be asserted against the settling

20 insurers.

21          The letters were executed by Travelers counsel and

22 indicated that the forgoing is confirmed on behalf of the

23 Travelers Indemnity Company and each of its affiliates.

24 After hearings the Bankruptcy Court entered an order on

25 September 26th, 1985 that approved, pursuant to Rule 9019 of

1  the Rules of Bankruptcy Procedure, the 1984 insurance

2  settlement agreement together with the June 3rd, 1985 letter

3  agreement.

4          Fast-forward to 1986, there was a settlement order

5  entered in 1986 and a confirmation order entered in 1986, and

6  it still had the broad language of policy claims, but it

7  didn't specifically talk about the parties understanding of

8  what types of litigation it covered or didn't cover.

9          So, then you have MacArthur.  You have MacArthur

10  who was a distributor of Johns-Manville's products and it had

11  a vendor endorsement on Johns-Manville's insurance policies.

12  It argued that it was covered for any kind of liability that

13  it faced based upon the sale of Johns-Manville's products.

14  That it had that vendor endorsement and it was entitled to

15  place a claim against that insurance policy against

16  Travelers.  And it argued to the Bankruptcy Court that the

17  Bankruptcy Court did not have jurisdiction to enjoin its

18  litigation, its claims against the insurer, which the

19  settlement agreement was going to stop, because it had

20  independent claims.  It had the right to do it and the

21  Bankruptcy Court had no jurisdiction to stop them from doing

22  that.

23          So, the Bankruptcy Court looked at it, the

24  District Court looked at it and ultimately the Second Circuit

25  looked at it and it said, well, the vendor endorsement claims

1  that MacArthur has are related strictly to the policy. It's

2  subject to the policy limits.  It's based upon the conduct of

3  Johns-Manville.  No one was alleging any kind of conduct that

4  MacArthur had done something wrong as a distributor.  It was

5  just, you know, selling products of Johns-Manville.

6          So, it said that because the claim that MacArthur

7  was seeking to file against the insurer was related to solely

8  conduct of Johns-Manville and only related to policy proceeds

9  because if they won in their litigation they would have a

10 claim against the Johns-Manville insurance policies.  That is

11 clearly property of the estate and that the conduct and the

12 property that you're trying to get that is a derivative

13 analysis and we're saying that because it was the debtor's

14 conduct and these are assets of the estate this is derivative

15 litigation and you're just like all the other personal injury

16 asbestos claimants.

17         So, as a result of that the Bankruptcy Court was

18 entirely within its rights and had jurisdiction to bar these

19 types of claims.  So, those vendor endorsement claims, those

20 are derivative claims.  It's helpful for me to understand

21 what the Second Circuit thinks are derivative claims and what

22 are non-derivative claims.  Those are derivative claims.

23         Then, after MacArthur was issued twenty-six

24 independent actions were then filed in four different states

25 across the country only against the insurance companies.  And

1  as a result of these twenty-six lawsuits Travelers filed a

2  motion or an adversary proceeding in the Johns-Manville case

3  seeking to enjoin that litigation, stop it.   And the

4  Bankruptcy Court made its holdings, the District Court made

5  its holdings and then the Second Circuit got a hold of it.

6          Well, first, I guess what the Bankruptcy Court did

7  was it said let's do this, let's try to settle it and he got

8  former Governor Cuomo to mediate these issues.   Cuomo was

9  involved and Cuomo got this wonderful settlement agreement

10  together.   He got almost $500 million dollars of additional

11  proceeds from Travelers to kick-in to pay-off these lawsuits.

12  And there were all different types of claims.   There were

13  statutory claims, common law claims and the settlement

14  agreement was executed by Travelers.

15          Some of the -- not everyone agreed to settle, but

16  many of them agreed to settle and they had the settlement

17  agreement.   And as part of that it required the Bankruptcy

18  Court to enter a clarifying order stating that the Bankruptcy

19  Court called these twenty-six independent actions, direct

20  actions even though they're not your typical direct actions

21  against insurance companies, but, you know, they were actions

22  that were filed directly against the insurance companies.

23          The clarifying order said that all of the twenty-

24  six actions were enjoined by the 1986 settlement order that

25  we previously entered and, therefore, we're going to allow

1  Travelers to kick-in this $455 million dollars and in

2  exchange we're giving this clarifying order saying that all

3  this litigation now has to stop.  It was never allowed to

4  proceed.  It was covered by the 1986 settlement orders. It

5  should have been enjoined from way back then.

6        So, when they did that it went up on appeal to the

7  District Court and, ultimately, to the Second Circuit.  The

8  Second Circuit did a number of things.  It said, well, we

9  have to figure out whether or not this litigation is

10 derivative or non-derivative.  And in order to do that it

11 didn't just lump all the twenty-six claims into one barrel.

12 It said we need to look at each and every single one of

13 these.  And when it looked at each and every single one of

14 these it had -- there was, I think, three different that they

15 specifically looked at.

16        The first one that they looked at was under the

17 West Virginia Unfair Trade Practices Act.  There they said

18 that those claims were based upon this act and although that

19 act, itself, does not provide for damages for violation of

20 its provisions the Supreme Court of Appeals of West Virginia

21 has identified the types of damages recoverable under the act

22 as including attorney's fees and even punitive damages.

23 Moreover, it is clear under West Virginia Law that settlement

24 of the underlying tort case against the tortfeasor does not

25 preclude a separate and independent recovery against a

1  tortfeasor's insurer arising out of its alleged bad faith

2  insurance practices.

3         Thus, it is evident that plaintiff's direct action

4  claims constitute independent tort claims.  They were talking

5  about the West Virginia claims. So, these are independent

6  tort claims.  These are non-derivative claims.

7         It also gave an example of what would be a

8  derivative claim.  And it looked at the claims that were

9  referenced in Davis.  Davis was a Louisiana case where the

10 actual statute allows a third-party to sue an insurer

11 directly when an insurer is bankrupt.  That is a direct

12 action case.

13        So, some of the claims here, in Johns-Manville,

14 were, obviously -- those were the types of claims that they

15 had.  They are premised on the statute that provides a direct

16 action against the insurer when the insurer is insolvent.

17 The recovery is against the policy and is, thus, limited to

18 the coverage of the policy.  These were the types of claims

19 in play in Davis and, in our view, Davis was correctly

20 decided.  To the extent the clarifying order limits claims

21 based on that Louisiana statute the order is on sound

22 jurisdictional ground.  That is -- those are derivative

23 claims.

24        Then they talked about the vast majority of the

25 claims in the instant litigation and they analogize them to

1  the Fifth Circuit case <u>Matter of Zale Corp.</u>  There you had an

2  insurance company who insured the debtor and then there was

3  an excess insurance provider and the excess insurance

4  provider wanted to sue the direct insurer.  And in that case

5  they were raising different types of claims such as bad faith

6  tort claims and those claims were considered independent

7  claims.  As a result of those independent claims those were

8  deemed by the court to be non-derivative claims.

9          So, I think that, basically, the Second Circuit

10  then said that most of the plaintiffs in <u>Johns-Manville</u> were

11  plaintiffs who were seeking to recover directly from a

12  debtor's insurer for the insurer's own independent

13  wrongdoing.  They were pursuing assets of Travelers only, not

14  of the debtor's assets.  They raise no claims against

15  <u>Manville's</u> insurance coverage.  Therefore, they deem that the

16  Bankruptcy Court had no jurisdiction to enter the clarifying

17  order.  It went beyond the court's jurisdiction.

18          Now, this went up on appeal.  The Supreme Court

19  granted cert on this case.  It's interesting what the Supreme

20  Court did, but I think it's also relevant here.

21          The first thing that the Supreme Court did was it

22  recognized that the term policy claims was a broad term.  It

23  also recognized that there was some argument that these types

24  of claims were -- well, let me just give you the specific

25  language.

1            Okay.  So, the Supreme Court said,

2            "The definition of policy claims contains nothing

3            limiting it to derivative actions. And there is

4            language in the 1986 orders directly to the

5            contrary.  The 1986 order is not only enjoined

6            bringing expansively defined policy claims against

7            the settling insurers, but they go onto provide

8            that the injunction has no application to a claim

9            previously brought against a settling insurer

10            seeking any and all damages other then or in

11            addition to policy proceeds for bad faith or other

12            insurer misconduct alleged in connection with the

13            handling or disposition of claims.  There is no

14            doubt about the implication that this same sort of

15            claim brought after the 1986 orders become final

16            will be barred."

17            So, basically, the Supreme Court said that there

18    was a carve out in those orders saying that at the time that

19    the settlement order was entered if there were certain types

20    of these independent claims which were filed these were

21    carved out, these were not enjoined by the injunction.  They

22    could go forward.  But he said because that similar exception

23    was not read into the broad policy claims definition for

24    future claims it doesn't apply to any kind of future claims.

25            It also said -- of course, then it went onto the

1  res judicata which was that it felt that in <u>MacArthur</u> the

2  second circuit had already ruled on jurisdiction.  Now, there

3  was no argument in <u>MacArthur</u> about whether or not a

4  bankruptcy court had jurisdiction to enjoin non-derivative

5  claims. It was simply derivative because it found that it was

6  a derivative claim.  But the Second Circuit did opine that

7  there was jurisdiction.

8          So, the Supreme Court, the majority opinion ruled

9  that because they already ruled on jurisdiction in <u>MacArthur</u>

10 decades ago that that was final and there was no way that a

11 party could collaterally attack that issue any further.

12         So, the holding of the Supreme Court doesn't

13 dislodge at all the jurisdictional analysis that was

14 performed in <u>Manville III</u>.  In fact, it recognized that under

15 the enactment of the channeling injunction in the bankruptcy

16 code that, you know, you do have to demonstrate that claims

17 are derivative in order to be subject to that injunction.

18         So, when it bounced back to the Second Circuit on

19 remand the Second Circuit had to determine whether or not

20 Chubb was barred, similarly, by this.  And they found that

21 they were not collaterally estopped from challenging whether

22 or not the clarifying order was jurisdictionally void because

23 of certain due process concerns.  Chubb hadn't gotten notice

24 of the settlement order being entered.  They didn't have a

25 proper counsel at the time.

1          So, with regard to Chubb the Second Circuit

2   reaffirmed its jurisdictional analysis which is that a

3   Bankruptcy Court simply does not have any jurisdiction to

4   enjoin non-derivative claims which they defined, essentially,

5   as any tort claims, claims alleging independent wrongdoing by

6   insurance companies.  And in my view the only kind of cases

7   that are derivative claims in this context of asbestos

8   litigation and bankrutpcy are the direct insurer actions.

9          So, I need you to help me understand why the

10  claims that are being raised by these Montana plaintiffs

11  under Johns-Manville would not be considered non-derivative

12  claims.  They are identical.  These are tort claims alleging

13  independent misconduct.  I'm not saying that these claims are

14  true, but they're alleging the same exact claims that were

15  alleged in Manville III.  I just don't.

16         I guess my final point is that I think that the

17  channeling injunction provided an important protection for

18  insurance companies. It said if you give us money from your

19  policy proceeds and you settle-up then we're going to protect

20  you, you're not going to get sued, but if you commit some

21  independent tort you will be held liable for that.  You can

22  be held liable for that.  The channeling injunction does not

23  protect that.  That is an independent claim.  That is a non-

24  derivative claim.

25         So, help me understand the distinction about the

1  claims at issue here and why my understanding of  Johns-

2  Manville wouldn't apply since you got the history.

3          MR. GIANNOTTO:  Michael Giannotto, Your Honor.

4          Yeah, I congratulate you.  I looked through those

5  cases as did Mr. Cohn, and I'm amazed that, you know, you

6  just read them and had them down pretty well.

7          Can I start out by saying one thing?  The Third

8  Circuit in our case here, Grace, has a footnote about the

9  Manville case as saying the Montana plaintiffs have cited

10  Manville, but that case was reversed by the Supreme Court.

11  Anyway, you know, that -- to the extent that that -- that

12  case was reversed by the Supreme Court and in that case the

13  people conceded that the actions were not derivative.  It

14  said something like that in the footnote.

15          The Manville case, as your summary of the Manville

16  is that only actions for policy proceeds are derivative.  And

17  the Third Circuit specifically said here, in our case, that

18  is not the case.  And as part of that general discussion of

19  derivativeness when saying that suits for policy proceeds are

20  not the only kind of derivative action that is where they

21  cited the footnote in Manville as part of that discussion and

22  said, well, the plaintiffs cite Manville, but there something

23  was conceded and it was reversed by the Supreme Court anyway,

24  and it was before 524(g) was even out there.

25          So, if you interpret Manville as saying only suits

1    for policy proceed are barred -- and I can understand how you

2    can interpret it that way, but I am going to get to that.

3    The Third Circuit has rejected that interpretation; plain and

4    simple.   That is our primary view, the Third Circuit has

5    rejected that interpretation.

6              Now, in Manville you had a situation where it was

7    pre-524(g).  And the Third Circuit decided that in order for

8    it to have jurisdiction something had to effect the estate,

9    the --

10             THE COURT:  Are you talking about the Second

11   Circuit?

12             MR. GIANNOTTO:  The Second Circuit.  I'm sorry.

13   It was pre-524(g). Here we have 524(g) which gives -- and you

14   know, you cited some cases saying the Third Circuit cited

15   Zale or something.  You can't -- there's no power to have a

16   cause of action against a non-debtor by a third-party, but

17   524(g) does just that.  That is what it says.  It enjoins

18   certain claims by third-parties against non-debtors like

19   insurers that qualify under 524(g).

20             So, the extent that Manville said that under that

21   pre-524(g) framework you can't do that, 524(g) is an

22   exception to that saying --

23             THE COURT:  Well, 524(g) talks about derivative

24   litigation.  It's going to enjoin derivative claims, correct?

25   It's not going to enjoin non-derivative litigation.

1          MR. GIANNOTTO:  That's correct.

2          THE COURT:  Okay.  And so what the Second Circuit

3    did say was, they said this is derivative litigation and this

4    is non-derivative litigation.  So, even though 524(g) was not

5    yet in place it was, in fact, based upon all this litigation.

6    And it clearly set forth what's derivative litigation in this

7    context which is direct action litigation against the

8    insurers.  That is derivative litigation.  They weren't

9    saying, you know, in the entire world like the Third Circuit

10   was saying in its opinion.

11          It is saying in the context of a bankruptcy

12   asbestos case -- you know, I'm not saying that there might

13   not be other types of derivative litigation, but they clearly

14   gave -- that is an example.  The direct action insurance

15   litigation as derivative litigation and they gave the

16   independent tort claims that third-parties have against

17   insurers as non-derivative litigation.

18          MR. GIANNOTTO:  But not claims like this.  I agree

19   with you.  MacArthur, Davis, they held that if you --

20          THE COURT:  Derivative.

21          MR. GIANNOTTO:  They're suing for policy proceeds.

22          THE COURT:  Yeah.

23          MR. GIANNOTTO:  You know, you can do that.

24          THE COURT:  Right.

25          MR. GIANNOTTO:  Even pre-524(g).  Okay.

1            THE COURT:  Yeah.

2            MR. GIANNOTTO:  Okay.  And, again, I'm starting

3   with the proposition that under your interpretation and maybe

4   under the Second Circuit's interpretation only these direct

5   actions for proceeds are barred.  That is directly contrary

6   to what the Third Circuit said in our case in Grace.

7            THE COURT:  You mean because of the footnote?

8            MR. GIANNOTTO:  No, because they said specifically

9   in the text of the opinion --

10           THE COURT:  They did say that.

11           MR. GIANNOTTO:  -- that they want to limit it to

12  policy proceeds, but we don't interpret this as limited to

13  policy proceeds.  Not in the footnote, but in the text.

14           Now, in Manville let's look at the types of things

15  they said were non-derivative.  Okay.  You cited the West

16  Virginia cases.  That is not like this.  The West Virginia

17  cases were cases brought under statute saying when insurance

18  companies had to adjust claims they adjusted them in a way

19  that violated the statute. They didn't notify people on time.

20  They didn't process their claims fairly.  And the damages you

21  get for that are like pain and suffering or because you

22  didn't get your money on time because you, as an insurance

23  company, didn't process the claim on time.  They're not like

24  the bad faith claims they have asserted against MCC.

25           THE COURT:  Because there were bad faith claims in

1  the West Virginia case.

2          MR. GIANNOTTO:  Right, but not the kind they're

3  asserting.  They were bad faith claims saying you didn't

4  process our claims properly.  And the damages for that aren't

5  your damages for asbestos related disease.  Your damages are

6  from the delay, and hassle, and having to hire counsel

7  because they didn't process them correctly.  They have

8  nothing to do with Manville's conduct.  They have to do that

9  once a claim was asserted and the insurance company is under

10  a duty after the claim is asserted to process it fairly, and

11  there is a statute that says you got to notify, you got to

12  conduct an investigation within a certain period of time and

13  all that.  If they don't do that you can sue them and say,

14  look, you know, you were supposed to pay us these proceeds

15  under the policy and you didn't.  You didn't adjust our

16  claims properly.

17          That has nothing to do -- first of all, it has

18  nothing to do with asbestos.  The injury has to do with

19  failure to process the claim.  And it has nothing to do with

20  the debtor.  It is not like this case where they're saying we

21  want recovery for asbestos related injuries caused by our

22  exposure to asbestos admitted by Grace.  And we're seeking to

23  hold you liable because you didn't step-in and protect us or

24  warn us about the dangers caused by Grace's admissions of

25  asbestos.

1        In the bad faith cases they're saying we had a

2   claim and you didn't process it properly after we made a

3   claim, and we have now suffered damages because we have to

4   hire a lawyer to sue you or whatever.  It's a different kind

5   of animal.

6        Another kind of case that Manville talked about

7   were the cases where the insurer was being sued as a joint

8   tortfeasor with other people, but if you read -- this is what

9   I tried to mention before, probably in-artfully.  If you go

10  back to the Bankruptcy Court decision and you go back to the

11  District Court decision, in that case they were suing

12  Travelers not because they were exposed to Manville products,

13  but because they were exposed to combustion engineering

14  products.  And they said Travelers, your combustion

15  engineering is insured and you learned all this stuff from

16  Manville, and you should have warned us.  But the injury in

17  that case was caused by the combustion engineering.

18        There was no claim that Travelers failed to

19  protect them from Manville asbestos as the claim is here that

20  we failed to protect them.  So, that -- and, in fact, when we

21  briefed this issue before Judge Carey and we briefed the

22  issue before the Third Circuit because, as Mr. Cohn pointed

23  out, the plaintiff's position before Judge Carey and before

24  the Third Circuit was that only actions for policy proceeds

25  were --

1          THE COURT:  Derivative.

2          MR. GIANNOTTO:  -- barred, were derivative.

3          That they, themselves, acknowledged, and we will

4    find it in the briefs and send them to you.  I don't have the

5    briefs here.  I didn't know Manville was going to be that big

6    a piece.  They acknowledged that that was the case, that

7    these were claims against people for exposure to other

8    people's asbestos, not Manville asbestos.

9          So, the Third Circuit was dealing with those kinds

10   of cases.  Okay.  So, it wasn't dealing with our case right

11   here.  So, if you do limit it to policy proceeds I don't

12   think you can because then you're directly contrary to the

13   Third Circuit decision.

14         THE COURT:  No, I'm just trying -

15         MR. GIANNOTTO:  No, I understand.

16         THE COURT:  To be perfectly honest I think the

17   Third Circuit gave me directions which are inherently

18   conflicting.  It actually told me that I shouldn't consider

19   Manville III at all, but to be perfectly honest I don't know

20   how I cannot consider Manville III that the Second Circuit

21   has specifically said -- the Supreme Court said that it was

22   not touching the jurisdictional inquiry analysis in Manville

23   III; it said it.  It said it was a narrow holding.

24         Manville IV on remand, it said our jurisdictional

25   analysis still stands and this is what we are holding.

1  Quigley even says, when it cites to Manville III, this is

2  still good law.  Judge Carey mentioned in a footnote Quigley,

3  Manville III is still good law.  So, you know, I'm not sure -

4  - you know, at this point I think I have to acknowledge that

5  Manville III is good law.  The Second Circuit absolutely

6  recognizes Manville III, the jurisdictional analysis as being

7  good law.

8            MR. GIANNOTTO:  Well, here we don't have a

9  jurisdictional question.

10            THE COURT:  We don't have a jurisdictional

11  question.

12            MR. GIANNOTTO:  The Third Circuit found that --

13            THE COURT:  I call it jurisdictional inquiry

14  because at the time they didn't have Section 524.  I'm saying

15  that they were using the derivative, non-derivative inquiry

16  analysis as a way to help them determine whether or not they

17  had jurisdiction in those cases.  And I understand the

18  jurisdiction is not an issue here, but I'm saying that they

19  were using -- the Second Circuit uses the derivative, non-

20  derivative analysis to help it determine whether or not it

21  has jurisdiction in a case.

22            It's not a hurdle that must be satisfied because

23  if there's another way to satisfy jurisdiction you don't even

24  need to bring up the derivative, non-derivative analysis, but

25  it says that it's a tool that helps us determine whether or

1    not we have jurisdiction.  And it's helpful to me and I think

2    the Third Circuit because the derivative, non-derivative

3    analysis is exactly what we're dealing with in Section

4    524(g).

5           So, it is critical to me to understand what the

6    Second Circuit considers to be derivative litigation and what

7    they consider to be non-derivative litigation.  And so far

8    the only thing that the Second Circuit has said is derivative

9    litigation are the direct actions against insurance

10   companies.  I'm not saying that there isn't something more

11   than that, but they're basically saying claims against

12   insurers based upon the insurers own misconduct.

13          Here, these are tort claims, negligence and duty

14   to warn.  These are the independent allegations of wrongdoing

15   that they are laying at your feet.  So, these appear to me to

16   be non-derivative actions. And let's just be clear, in all

17   these cases it comes down to what does it mean to say you

18   have derivative liability.  It means two things.  You have to

19   say derivative litigation is litigation that's looking to the

20   conduct of the debtor, the insured.  It's looking to the

21   assets of the estate.  When you have those two things, when

22   you have litigation that's going to affect assets of the

23   estate and litigation that is specifically relying upon the

24   conduct of the debtor that is derivative litigation.

25          So, in direct action litigation you've got actions

1  against the policy proceeds, which is the race.  So, that is

2  the property.  Then the conduct is they're not alleging that

3  the insured did anything wrong, it's the actions of the

4  debtor.  In these independent tort actions these are separate

5  actions.  And I'm not saying that they are right and I'm not

6  saying that they're going to win, but I'm saying that these

7  are independent claims that they have laid at your feet,

8  claims of negligence and duty to warn.

9        MR. GIANNOTTO:  Yeah.  And I guess I will

10  respectfully disagree.  That's the same argument they make to

11  the Third Circuit and the Third Circuit rejected that

12  argument.

13        THE COURT:  Okay.  But then how do you explain

14  that the Third Circuit said I need to look at Quigley for the

15  framework of derivative litigation.  I look at <u>Quigley</u> and

16  <u>Quigley</u> talks about the three <u>Johns-Manville</u> cases and the

17  derivative, non-derivative analysis. That is what they talk

18  about.

19        MR. GIANNOTTO:  What they said is let's look at

20  what <u>Quigley</u> said, let's look at the <u>Quigley</u> framework and

21  under the <u>Quigley</u> framework a relevant inquiry is whether the

22  duty that the plaintiffs are asserting now arise from a duty

23  we would have to Grace, the debtor.

24        THE COURT:  We need to talk about that.

25        MR. GIANNOTTO:  All right.

1          THE COURT:  Let's pull up Johns-Manville III at

2   this point. The Second Circuit talked about the state duty

3   because that is really what the Third Circuit told me to do.

4   It said look at State law, right.  And where did it get that?

5   It got that from Manville III.  All right.  Hopefully, I'm

6   looking at the right Manville.  I think I'm looking at

7   Manville IV.

8          Okay.  On Page 67 of the Johns-Manville III case

9   it was addressing the Bankruptcy Courts reliance on its

10  factual findings.  The Bankruptcy Court made a lot of

11  findings like Judge Carey did which is that, you know, all

12  the facts are related to what the debtor did wrong here with

13  the asbestos.

14         So, what the Second Circuit said was -- just to

15  back-up here, this is what the Second Circuit said.

16              "The District Court made particular note of the

17              Bankruptcy Courts extensive factual findings

18              regarding Manville's dominating presence in the

19              asbestos industry and its thirty year involvement

20              with Travelers.  The Court embraced the Bankruptcy

21              Courts factual findings that Travelers learned,

22              virtually, everything it knew about the asbestos

23              from its relationship with Manville and that the

24              direct action claims against Travelers inescapably

25              relate to its insurance relationship with

1          Manville."

2          The Second Circuit says about this,

3          "There is no doubt that these findings by the

4          Bankruptcy Court document the factual origins of

5          Travelers alleged malfeasance.  The factual

6          findings are, however, only part of the liability

7          equation.  What remained was a legal

8          determination.  Did Travelers owe a duty to the

9          direct action plaintiffs independent of its

10          contractual obligations to indemnify those injured

11          by the tortious conduct of Manville."

12          This is the State Law test.  This is the test that

13  you guys need to satisfy.  And here the question was, and

14  I'll just repeat it, did Travelers owe a duty to the direct

15  action plaintiffs independent of its contractual obligation

16  to indemnify those injured by the tortious conduct of

17  Manville. And I will translate it to our case, did CNA owe a

18  duty to the Montana plaintiffs independent of its contractual

19  obligations to indemnify those injured by the tortious

20  conduct of Grace.  Here, they have a duty, there's a duty

21  under State Law.

22          MR. GIANNOTTO:  Well, we don't know if there's a

23  duty under State Law.

24          THE COURT:  I don't know.  Right.

25          MR. GIANNOTTO:  I guess I --

1           THE COURT:   That's the language.

2           MR. GIANNOTTO:   -- can only say what I can say.

3   They argued that, the Third Circuit.   The Third Circuit

4   opinion --

5           THE COURT:   The Third Circuit has a footnote and

6   the footnote talks about a duty, and I can't find that

7   reference anywhere in Manville III.   And the footnote is in

8   Footnote 7.   This is how they characterize the framework,

9               "Our framework comports with that developed by the

10              Second Circuit in Quigley where in it looked to

11              the relevant State Law to determine whether the

12              plaintiffs rights derive from the debtor's rights

13              and the alleged duty the third-party owed to the

14              plaintiffs derived from the duty it owed to the

15              debtor."

16          It cites Pages 54 to 58, but I'm reading you right

17  now the specific quote from Johns-Manville III about what the

18  specific State Law inquiry is and that is it.   And tell me,

19  so spend your alliance upon the Third Circuit for a moment,

20  sir, and tell me how you would answer this question.   Did CNA

21  owe a duty to the Montana plaintiffs independent of its

22  contractual obligations to indemnify those injured by the

23  tortious conduct of Grace?   Answer that question for me.

24          MR. GIANNOTTO:   I don't know.

25          THE COURT:   I'm going to give you a lunch break.

1  So, don't worry about it.  We'll come back.

2          MR. GIANNOTTO:  Okay.

3          THE COURT:  I want you to --

4          MR. GIANNOTTO:  I can say this.  All right.  We

5  will forget about the Third Circuit if it doesn't exist, but

6  I mean that's why we're here because there's a Third Circuit

7  opinion.  I can read to you the language of the Third Circuit

8  opinion that says, you know -- what you're basically or what

9  you are --

10         THE COURT:  My interpretation.

11         MR. GIANNOTTO:  Your interpretation is that the

12 Third Circuit opinion means that the only actions against us

13 that are enjoined are actions for policy proceeds.  The Third

14 Circuit noted a footnote.  That is not the case.  And in the

15 case of the cases they cite like Dodds and Gas, they're using

16 cases where the defendant is going to have to pay money out

17 of his own pocket, not where he's indemnifying the other

18 person that he is supposedly derivative of.  So, the paying

19 out of the pocket.

20         I mean you had said before you interpret

21 derivative as meaning there was something like --

22         THE COURT:  The conduct.

23         MR. GIANNOTTO:  It's taking money from the rest of

24 the estate.  I don't think the second part is correct.

25         THE COURT:  Okay.  I just want you, on our

1   lunchbreak -- I'm going to have you focus on these.  First,

2   you are going to answer me that question right there about

3   the State Law duty.  You're going to answer me that question.

4   Second, I want you to look at the Johns-Manville III case

5   when it distinguishes MacArthur and Davis from this case

6   here.  It's on Page 63, okay.

7           "The claims at issue in MacArthur and Davis differ

8            significantly from the statutory and common law

9            claims at issue here.  Travelers candidly admits

10           that both the statutory and common law claims seek

11           damages from Travelers that are unrelated to the

12           policy proceeds, quite unlike the claims in

13           MacArthur and Davis where plaintiffs sought

14           indemnification or compensation for the tortious

15           wrongs of Manville to be paid out of the proceeds

16           of Manville's insurance policies.  Instead, the

17           plaintiffs seek to recovery directly from

18           Travelers, a non-debtor insurer, for its own

19           alleged misconduct.  Plaintiffs neither seek to

20           recovery insurance proceeds nor rely on the

21           insurance policies for recovery."

22          This is why I say when you look at derivative

23   liability that is what derivative liability means.  And here

24   let's say the Montana plaintiffs go, they proceed with their

25   litigation and they win against your client.  Do they get a

1 claim against the insurance policy proceeds?  They absolutely

2 do not get a claim against the insurance policy proceeds.

3 They get a claim against CNA.  They will get a judgment

4 against CNA and they will come against CNA for its own

5 personal assets.  They will not come against the policy

6 proceeds.  You cannot possibly dispute that.

7          MR. GIANNOTTO:  I don't dispute that.

8          THE COURT:  Okay.  So, that's part of the problem

9 and then the other problem is whose conduct are you coming

10 after?  And you have to answer that legal question for me

11 when we get back from lunch.  Then I want to hear about that.

12          MR. GIANNOTTO:  Okay.

13          THE COURT:  So, you have to understand the dilemna

14 I face, okay.  The Third Circuit has given me instructions on

15 remand and my personal opinion, it conflicts.  You can't tell

16 me that I can't look at Manville III, but I must look at

17 Quigley in order to understand the framework of derivative,

18 non-derivative analysis.

19          So, what I'm going to do is I'm going to look the

20 Third Circuit's opinion and I'm going to try and read it in a

21 way that makes sense.  And the way that I'm inclined to read

22 that opinion now is to hold that the Third Circuit outlined,

23 outside of the context of asbestos cases and bankruptcy, what

24 it means to have derivative litigation and non-derivative

25 litigation, and it gave me some examples.

1        Then, with regard to my specific instructions here,

2   I am to look at state law, based upon the framework

3   established in Quigley and Quigley establishes that framework

4   based upon Manville III.  So, when I look at that, I'm going

5   to say, Okay, well, the Third Circuit said that, you know,

6   derivative liability means all of these other things outside

7   of the context, but for my specific task, I should look at

8   Quigley.

9        And when I look at Quigley and I determine where

10  the state law requirement came from, I have to answer that

11  question.  And when I answer that question, I can find no

12  other answer than to say that they are bringing independent

13  tortious claims against your client, which are simply non-

14  derivative claims.

15       And the only basis -- like you can't -- like, is

16  there any impact that this litigation would have on the

17  estate?  Is there any impact that it would have?

18            MR. GIANNOTTO:  Yes.

19            THE COURT:  Okay.  And you're going to tell me it's

20  that settlement agreement provision that you guys entered

21  into; is that what you're going to tell me?

22            MR. GIANNOTTO:  Correct.

23            THE COURT:  Okay.  Now, I'll tell you why that

24  doesn't make sense.  To me, in order for you to have

25  jurisdiction over a case, you have to have this potential

1    impact on the estate.  What it means is that there has to be

2    some direct result.

3            Here, if the Montana plaintiffs win, they will have

4    a judgment against CNA.  The direct result of their

5    litigation will be a judgment that they will enforce against

6    CMA against its own assets, and that, that First Step, will

7    not impact the estate at all.  And if you're going to try to

8    argue in front of me, that, Well, but Judge, the $13 million,

9    it's going to have to come out of the trust, I'll tell you

10   this, I'll tell you that you cannot possibly consent to

11   jurisdiction.

12           And I know under the Third Circuit, it talked about

13   it and I cannot make any ruling on jurisdiction, but it

14   doesn't make any sense to me that parties in a bankruptcy

15   could make an agreement to give you jurisdiction.  Because

16   you know what you would do from here on out in every single

17   settlement agreement that you enter into with a debtor who

18   has asbestos litigation facing them?  You would say, Okay,

19   debtor, if I, the insurance company, is sued outside of the

20   Bankruptcy Court, and they win some kind of judgment against

21   me, then you must reimburse me a dollar for whatever that

22   amount is, and that gives me jurisdiction.  That's what you

23   would do in every single case and then you would guarantee

24   that that type of litigation would be, you know, you could

25   try and argue it has some impact on the estate.

1    And that can't possibly be correct.  That would

2  just be a perversion of what jurisdiction means.

3  Jurisdiction is talking about indemnification claims that you

4  get before entering into bankruptcy; the debtors, you know,

5  indemnifying its officers.  You can't get indemnification --

6  you can't get -- the impact on the estate can't just be

7  because you agree to it in my opinion.

8    MR. GIANNOTTO:  And, Your Honor, when we were

9  before the Third Circuit and the jurisdictional question was

10  raised -- and I apologize for not being as familiar with the

11  issue as I should be -- you know, we would argue the

12  jurisdictional question.  And the jurisdictional basis here

13  is more than the fact that the trust will have to indemnify

14  us up to a certain amount.

15    You know, in this case, we're basically suing to

16  enforce our rights under statute, and so this case arises

17  under the Bankruptcy Code.  And we had cases that we cited to

18  the Third Circuit -- I don't remember what they were -- but

19  in this case, we have certain rights granted by 524(g), and

20  we're suing to enforce those rights and this Court has

21  jurisdiction.  You know, 524(g) is not a jurisdictional

22  statute; it's a statute that gives you power to order relief

23  --

24    THE COURT:  If your claims are derivative.

25    MR. GIANNOTTO:  I understand, but that's just --

1  again, we have to decide whether they're derivative, but it's

2  not a matter of, you know, independently now saying, Does it

3  affect the bankruptcy, whereas, does it not affect the

4  bankruptcy?

5       Unless you want to say that the derivative requires

6  that, which, in my view, the Third Circuit says is not the

7  case in our particular case.  So we're turning around in

8  circles.

9       But, the fact is, it's not just the $13 million.

10 If our cases covered -- and I'll step aside, you know, the

11 Supreme Court ultimately held the Travelers v Bailey -- and,

12 again, I haven't read it in years -- but my memory is that

13 they held that the injunction there didn't cover these

14 claims.

15      THE COURT:  It covered future claims.  And so --

16 and so if you had those claims, that carve-out covered it.

17      So, it said in the future claims, it's not going to

18 cover it, and I think that what Judge Steve's said in

19 dissent, which I personally found a little bit more

20 persuasive, but, you know, the Supreme Court said what it

21 said, you know, what he said was that, Yeah, some of these --

22 number one, he said that derivative claims weren't even

23 mentioned.  So, it wasn't even mentioned.  If it had been

24 mentioned, then it wouldn't be there, right?

25      I mean, the order didn't talk about it.  The

1  policy-claim definition wasn't limited to just derivative

2  litigation.  It was a broad, very broad definition.

3          MR. GIANNOTTO:  Right.  But the Supreme Court

4  ultimately held that the injunction was broad enough to cover

5  it and you couldn't challenge jurisdiction anymore.  And

6  Judge Lifland, the Bankruptcy Court judge, himself, had

7  entered into that weird settlement with Mario Cuomo and the

8  whole thing --

9          THE COURT:  Yeah.  Yeah.

10          MR. GIANNOTTO:  -- you know, said the injunction

11  always covered this.

12          And 524(g), by the way, was based on Lifland's

13  injunction.  So, you know --

14          THE COURT:  But the Second Circuit has held, with

15  regard to Chubb -- because it did have jurisdiction to look

16  at that -- with regard to Chubb, it absolutely could not

17  enjoin that third-party litigation.

18          MR. GIANNOTTO:  Right.  Again, because the third --

19  but the Third Circuit has a different view.

20          But, again, I think that --

21          THE COURT:  I need to reconcile the Third Circuit's

22  instructions to me, right?

23          MR. GIANNOTTO:  I'm trying to help you, because I

24  know that you have certain views you've formed there the

25  opinion and I have other views I formed from the opinion.

1          THE COURT:  And, you know, when I read the opinion,

2     I was really -- you know, I tried to understand the best I

3     could, but, you know, really, they didn't really get into --

4     I mean the opinion is quite short, right, I mean, just a page

5     or two on all of this.

6          And you know, in order to fully understand what it

7     means to be derivative litigation, you have to look at the

8     Johns-Manville cases, you just have to.

9          MR. GIANNOTTO:  And, again, that is what was

10    briefed before the Third Circuit -- the Manville case, the

11    Quigley case -- and, you know, the Plaintiffs' position, the

12    Montana Plaintiffs' position was that under those cases, only

13    the policy proceeds are protected.

14          THE COURT:  I understand.

15          MR. GIANNOTTO:  And the Third Circuit specifically

16    said, That's not the case.

17          THE COURT:  Right.  And I'm not taking a position,

18    I'm just telling you what my interpretation of a Second

19    Circuit case is.

20          MR. GIANNOTTO:  Right.  And, also, we'll come back

21    after lunch.  I hope you you're going to grill him as hard as

22    you're grilling me --

23          (Laughter)

24          MR. GIANNOTTO:  -- but we'll come back after lunch

25    -- only kidding -- but, again, the claims in Manville were

1  different from the claims here.  The claims in <u>Manville</u>, you

2  know, under the West Virginia statutes were claims for

3  failure to process a claim properly, and so it's a different

4  kind of damage.

5        THE COURT:  Okay.  Let's do this, let me raise one

6  other thing.

7        MR. GIANNOTTO:  Sure.

8        THE COURT:  So, you're going to answer the state

9  law question, and to me, that's really the problem with the

10 Third Circuit case, because it references, you know, my need

11 to look at state law, and where that comes from is <u>Johns-</u>

12 <u>Manville III</u>.  If you scan find me a way to distinguish that,

13 and that that's not -- that that law -- that that test is not

14 the test that I should be applying, I'm certainly interested

15 in hearing that, but I think that's where the Third Circuit

16 got its test from.  It came from <u>Manville III</u>.  You may not

17 have realized it, because it was talked about in <u>Quigley</u>, but

18 that's where that test came from.

19       Okay.  So, the only other thing, besides that, that

20 I would like you to -- so, you'll answer that legal question.

21 You'll talk to me about my interpretation of what derivative

22 litigation is, which is that little passage that I read for

23 you from <u>Manville III</u> about the distinction, you know, on

24 McArthur and Davis on the one hand and then the claims in

25 <u>Manville III</u> on the other hand and they were talking about

1  how, you know, the distinction about the conduct and the

2  property of the estate.  You know, I need you to tell me why

3  that's not the derivative analysis test that I should be

4  performing.

5       The last one comes from Quigley.  You know, there's

6  -- the Johns-Manville case had all this discussion about

7  derivative litigation, but there's not a lot of talk about

8  the statutory relationship, and, you know, it's confusing,

9  you know, because when I first read it, I'm admit that I was

10  totally on your side.  I mean, this is -- and I'm not saying

11  that I'm not -- but it just seems to me that on the statutory

12  relationship, it seems like you have the better argument, but

13  for the insurance contract, we wouldn't be here.

14       We are talking about duties that specifically arise

15  from the fact that you had this insurance contract.  But when

16  I looked closely at Quigley, when it talks about the

17  statutory relationship, there was something there that the

18  judge said that bothered me.  When it talks about the

19  statutory relationship, it talks about the four types -- the

20  reasons why those four examples are given as the statutory

21  relationship and they're all talking about how there's

22  litigation liability that could arise out of each of them.

23       And when they talk about the insurance piece, they,

24  again, talked specifically about direct actions against

25  insurers.  So, other than this one cite, there's just not a

1    lot of discussion about, you know, what exactly it means.

2    But I want you to focus on the relationship, because that's,

3    I think, the key:  Is the relationship critical to -- that

4    insurance relationship, is that critical to me finding the

5    statutory relationship?

6            Okay.  So, in terms of questions for you, you know,

7    I don't have many questions for you.  I read your brief.

8    There were certain things you said in there that were just

9    not applicable.  I think that with regard to whether the

10   restatement -- you guys can all sit -- when you talk about

11   the restatement, I'm really not inclined to grant the motion

12   to certify this question.  I really think that this is, where

13   we're talking about the same type of issue.

14           You know, in the Johns-Manville cases, there was

15   never such a fulsome discussion of state law in that case, as

16   there is here today.  And I think it's not necessary because,

17   although each of you argue that under your -- under both of

18   your statutes -- under both of your readings of what Montana

19   would require for negligence and duty to warn, that you would

20   both win.

21           I think that at the end of the day, both of yours

22   tests are quite similar, which is that if you perform a

23   service and it's foreseeable that a third party might be

24   harmed by your provision of that service, that there is some

25   duties.  That's generally how I see both of the types of

1  claims that you raised, and under each of those, those are

2  independent tort claims, as I view these.

3           So, I really don't think that there's any need

4  here, and I think you only invited the Bankruptcy Court to

5  look at whether it was necessary to certify these questions,

6  because you thought that if I needed some clarification --

7  and I don't -- I think that these are tort claims.  They're

8  alleging tort claims.  I don't know if you're going win at

9  the end of the day, but they appear to be independent tort

10 claims to me.

11          So, let's take a break now.  It's 12:30.  I'm

12 inclined to come back at either 1:30 or 2:00, and you're

13 welcome to take until 2:00 so that you can both eat and try

14 to answer all of my questions.  So, what would you like us to

15 do, meet back at 1:30 or 2:00?

16          MR. GIANNOTTO:  Either/or -- whichever is more

17 convenient for you, Judge, is okay.

18          THE COURT:  Okay.  1:30.  Let's say 1:30.  Okay.

19 All right.  Thank you, all.

20          You can leave everything in the courtroom.  She's

21 going to lock everything up.  So, as long as you trust

22 everyone currently in the room now, she's going to lock the

23 door, so you can keep whatever papers you want in here, okay?

24          MR. COHEN:  May I have just 10 seconds, Your Honor?

25          THE COURT:  Yeah.

1         (Pause.)

2              MR. COHEN:  Your Honor, we are both --

3              THE COURT:  Give us another case.

4         (Laughter)

5              MR. COHEN:  Both, Counsel and I, unfortunately, are

6    not in possession of hard copies of Manville III.  Is there

7    any way that we could prevail upon you to --

8              THE COURT:  I can give you -- yeah, okay.  I won't

9    give you my color copies, but I can print out Manville 3 and

10   anything else that you'd like during the break.

11             MR. GIANNOTTO:  Manville III and Quigley, I guess.

12             THE COURT:  Manville and Quigley?

13             MR. COHEN:  We have Quigley.

14             MR. GIANNOTTO:  Oh, we have Quigley?

15             MR. COHEN:  Yeah.

16             THE COURT:  Okay.  All right.  We will do that now,

17   so everybody just sit tight.

18             Kristen, do you have all the cites or I can give

19   them to you now.

20             MR. COHEN:  Thank you, Your Honor.

21             THE COURT:  Sure, of course.  This is Manville III

22   and this is Quigley.

23             THE CLERK:  Okay.

24             THE COURT:  Now, what I would do is, so that they

25   don't see all of my handwritten notes --

 1          THE CLERK:  I can just do --

 2          THE COURT:  How many copies should I -- easy to

 3    have an adversary proceeding, and whatever my opinion is in

 4    this case, you know, we'll just see what the Third Circuit

 5    says about that, and whatever comes back to me, then I'll

 6    handle those matters.

 7          Does that sound good?

 8          MR. GIANNOTTO:  So, you think we'll go up?

 9          THE COURT:  Excuse me?

10          MR. GIANNOTTO:  You think we'll go up?

11          THE COURT:  I can't imagine that I'll be so -- and

12    I will try, in my opinion, to try to persuade both of you

13    about my reasoning, but I anticipate that there will be

14    vigorous appeals of my decision.  How could I possibly

15    satisfy both of you?

16          Okay.  Well, thank you all, and she'll be out in

17    just a moment with that.

18          Anything else?

19          (No verbal response)

20          THE COURT:  Okay.  Thank you.

21          MR. COHEN:  Thank you, Your Honor.

22          MR. GIANNOTTO:  Thank you, Your Honor.

23       (Recess taken at 12:30 p.m.)

24       (Proceedings resumed at 1:35 p.m.)

25          THE COURT:  All right.  But anyways, it's not

1  personal.  This is just a pure, legal argument, which I think

2  you can all tell that I find is fascinating, absolutely

3  fascinating.  Okay.

4          MR. GIANNOTTO:  Okay.  Michael Giannotto, again,

5  for CNA.  Two preliminary things before I answer your

6  questions forthrightly -- as forthrightly, as I can.

7          One is, you know, these issues sort of came up

8  today.  To the extent that you think it would be helpful for

9  the parties to submit, you know, five-page briefs or

10  something addressing them, because we sort of addressed them

11  on the fly here, we'd welcome that.

12          THE COURT:  You know, I spent a lot of time looking

13  at all of the Manville cases, the McArthur case, Manville

14  III, Manville IV, the Supreme Court case, you know, the Davis

15  case, so I feel pretty comfortable with them.  I'm not sure

16  if you feel the need to point something out in those cases

17  that I've missed, but I'm certainly open to that if you ask

18  me to do that.

19          MR. GIANNOTTO:  Well, let's wait until the end of

20  the argument --

21          THE COURT:  Okay.  And see how it goes?

22          MR. GIANNOTTO:  -- after you hear me point the

23  holes in it.

24          THE COURT:  Okay.

25          (Laughter)

1          MR. GIANNOTTO:  The second is just to make clear

2    throughout the argument, when you talk about, you know, was

3    there a legal duty independent of proceeds, you know, what

4    we're talking about is that the plaintiffs allege there is a

5    legal duty where --

6          THE COURT:  I completely agree.

7          MR. GIANNOTTO:  The (indiscernible) Court hasn't

8    decided whether there's any legal duty here under state law

9    and --

10         THE COURT:  I completely agree.  I mean, they could

11   be losers.  I mean, they could be totally losers --

12         MR. GIANNOTTO:  Right.

13         THE COURT:  -- and, in fact, in Manville IV, the

14   Second Circuit ended it with a really curious -- or maybe it

15   was at the end of Manville III -- but it said, Look, we think

16   that what the Bankruptcy Court was trying to do all along

17   was, it knew that the state law claims were going nowhere, so

18   instead of, you know, prolonging the torture, it just ended

19   it.  It saw that there was no basis for the state law claims,

20   so it reached a little bit farther than it ought to try and

21   get to the end of the day, which is what the Second Circuit

22   thought was going to happen, which is that they weren't going

23   to win anything.

24         So, I'd make no opinion -- I have no opinion

25   whatsoever as to whether or not there's merit or whether they

1  have claims at all.  I'm just trying to understand the

2  mandate that's been --

3            MR. GIANNOTTO:  Right.  And the third thing, all of

4  my remarks on what Manville allowed and didn't allow, I

5  should have prefaced with what I said about 100 times this

6  morning, but I'll say it again, that we think the Third

7  Circuit decided that -- to limit these claims to policy

8  proceeds claims --

9            THE COURT:  I completely agree.  In my opinion, I'm

10  not going make any kind of statements saying that -- I mean,

11  I can tell you what I think based upon my interpretation or

12  reading of it, but I clearly understand that derivative

13  litigation is not limited strictly to claims against

14  insurers, those direct-action claims.  I completely agree

15  that that's not something that I'm going to touch.  That's

16  what the Third Circuit said, so it goes beyond that.  There

17  are some other types of claims that would constitute

18  derivative claims; in addition to that, I don't know what

19  they may be, but that's what they said.

20            MR. GIANNOTTO:  So, to get to your actual questions

21  --

22            THE COURT:  Yes.

23            MR. GIANNOTTO:  -- final, with the drumroll -- you

24  asked whether -- focusing on a statement in Quigley that was

25  discussing Manville, whether he or the plaintiffs are seeking

1   compensation for the tortious wrongs of Grace to be paid out

2   of proceeds of Grace's insurance policies, whether, in this

3   case, that's what they're seeking.  And the answer so that is

4   no, they're not seeking that.

5          They're seeking compensation from CNA's and MCC's

6   own assets, allegedly based on tortious wrongs that CNA and

7   MCC committed, okay.  That's -- so, the answer is, no,

8   they're not seeking proceeds to the policies.

9          As a follow-up question, you had said something

10  like, well, how would this benefit the estate?  And we talked

11  a little bit about the indemnity, and we expressed our views

12  on that, but, you know, this will affect the estate,

13  regardless of whether they're seeking the proceeds of the

14  insurance policies, in several ways.  They're not as direct

15  as if they were paying the policy proceeds.

16         One way is that it's going to deter future

17  settlements.  One of the reasons -- and the Third Circuit

18  points this out both, here and in other opinions they've

19  issued in bankruptcies -- that a lot of these asbestos

20  bankruptcies, the sole, or at least a primary set that the

21  debtor has to fund these trusts is insurance proceeds -- and

22  it's true, you could say, Well, the insurance company is only

23  settling its liabilities under the policies and that, you

24  know, whatever.

25         But the fact is, that's not how insurance companies

1  work, and insurance companies, when they settle, they want

2  finality, and that's what 524(g) gives them or they think it

3  gives them, that they're going to be rid of all claims that

4  are based on the debtors' conduct, and that's going to be the

5  end of it.

6      And I think to the extent that there's a ruling

7  here that these types of claims that they're trying to assert

8  are not covered by the injunction, it's going to deter people

9  from settling in the future.  And I'm sure Mr. Cohn is going

10  to say, No, it's not, but I'm just telling you from my

11  experience with insurance companies, they want finality; they

12  don't want, Well, we'll pay a fortune now and then we'll

13  litigate something a little later on.

14      The other way to potentially affect the trust is

15  that if we were held liable in Montana for causing their

16  injuries, we would, absent the bankruptcy, we would have a

17  contribution claim or maybe even a common law indemnity claim

18  against Grace, because we would argue that they're the

19  primary wrongdoer.  So, we would be asserting that against

20  the trust, you know, as what's called an indirect PI trust

21  claim; it's a claim for contribution or common law indemnity.

22      You know, in addition to the contractual indemnity,

23  we have -- there's 4.5 million left out of an original

24  thirty-million statutory indemnity.  So, even though this is

25  not going to be paid out of policy proceeds, if there is a

1  duty and if we are held liable, it will impact the estate

2  both, now, and it will impact future estates.

3         And I think that's one of the reasons that Congress

4  passed 524(g), was that, you know, we cite all these things

5  and the Third Circuit does.  For the Third Circuit, Congress

6  wanted to encourage these kinds of settlements and make money

7  available for plaintiffs, you know, so they wouldn't have to

8  go through the tort system; they could just get the money

9  from the trust.

10        Are the Manville facts different from our facts?

11 Absolutely.  And I think this is important.  You know,

12 Manville, if you want to read just the bear holding, yes, I

13 think Manville III holds that only suits for policy proceeds

14 are protected under pre-524(g) law.

15        But the facts in the Manville case, you know, it so

16 forth brings up is this idea that Mr. Cohen brought up.

17 Sometimes courts, you know, will give broad pronouncements

18 but they're not thinking of all the situations.  And in

19 Manville, I was surprised when I read the decision just now

20 that I was correct when I said to you this morning, that they

21 pointed out two examples in that case.  One was people were

22 suing under West Virginia law for bad faith damages, for

23 annoyance, and convenience.  They weren't suing for asbestos-

24 related injuries.  They were suing because the insurance

25 company breached its duties that it had under state law,

1  independent duties under state law to settle claims, to

2  process claims fully.  And their damages were not their

3  asbestos-related injury.  They were that, and that's not

4  this.

5        Secondly, they pointed to the Zale case, which

6  based on my reading of the Manville opinion, again, involved

7  getting rid of bad faith claims against the insurance company

8  --

9        THE COURT:  Which is a claim that is pending

10  against your colleague -- you know, MCC right?  They have a

11  bad faith claim pending against them, and I'm not saying -- I

12  know that -- I saw the summary judgment -- I think it didn't

13  work on the current one, but they are alleging bad faith

14  against MCC.

15        MR. GIANNOTTO:  Yeah, that's a different kind of

16  bad faith claim.  What the Manville case was talking about

17  was a bad faith claims that arises because there has been a

18  claim.  You have to investigate and pay the claim and you

19  don't.

20        Their claim against MCC -- and Mr. Longosz can

21  speak more about it -- is more -- it's a weird claim.  It

22  never arose before, that's why the Montana Court -- the lower

23  court threw it out.

24        But it's basically saying, because you knew of the

25  dangers and didn't warn in guy, that's bad faith.  That's

1   just sort of saying the same thing, almost, that they're

2   saying on their duty to warn theory, only they're

3   encompassing it within bad faith.

4         But what a traditional bad faith claim is, and what

5   the bad faith claims the Second Circuit was talking about,

6   were not claims seeking recompense for asbestos-related

7   injuries, like, you know, I got sick, I can't breathe, pay me

8   whatever it costs for my doctors and employment.

9         It's a bad faith claim where someone doesn't

10  process the claim right and you get all upset because you're

11  not getting the money and maybe you can't pay your mortgage

12  and you lose your house and you have to hire an attorney.

13  That is not derivative, okay?  And that's what they were --

14  that's the fact of that case.  I agree the wording is

15  broader, but that's the facts of that case.

16        That's not the facts of this case.  The facts of

17  this case, and the facts of the bad faith claim against MCC

18  is they are suing for recompense and tort for the asbestos-

19  related injuries that they incurred or allegedly incurred,

20  due to their exposure to asbestos released by Grace.

21        THE COURT:  Okay.  Stop right there, because you

22  know that the Third Circuit has already addressed that issue

23  in its opinion.  It can't -- you can't simply tell me -- I

24  mean, this is the argument that you made to them, right,

25  which is they said was too broad.  Let's just look at that

1  case briefly.

2          Okay.  Likewise, CNA's proposed interpretation is

3  equally unpersuasive that a debtors' product can you describe

4  a plaintiff's injury is not enough to render a third party

5  liable for the conduct of, claims against, or demands of the

6  debtor.

7          And so, they did not like the interpretation in the

8  Pittsburgh Corning case, such a rule, however, has the

9  potential to include third-party liability.

10          So, you can't just tell me, you have to give me

11  something more.

12          MR. GIANNOTTO:  No, I was going to give you

13  something more.

14          THE COURT:  Okay.  I'm sorry.

15          MR. GIANNOTTO:  I was going to give you more.

16          THE COURT:  All right.

17          MR. GIANNOTTO:  The predicate is that they're

18  alleging injury due to exposure from asbestos released by

19  Grace, and their claim against us is, you learned of that

20  danger and you engaged in industrial hygiene services and you

21  didn't protect us from that danger which caused our injuries.

22  You didn't protect us.  You didn't warn us.  And so, it's not

23  like the bad faith claim where you're just all on your own

24  and you committed tort, caused them new damages and all that.

25          Here, the basis of their claim, under any of their

1  theories, under their professional-negligence theory, which

2  has no base in Montana law, in my view, but that theory, the

3  duty to warn theory, the 324(a) theory, under all of those

4  theories, they're premised on the fact that these people were

5  injured because of Grace's asbestos emissions, and we didn't

6  do anything to protect them.  And so, our liability, under

7  any of those theories, is dependent upon Grace's wrongful

8  conduct.

9       THE COURT:  Although, it's not an element under

10 state law, right?  I mean, under state law, it's a duty,

11 there's a breach of a duty, so on and so forth.  So, it's the

12 duty part, and the duty, the breach of duty, it doesn't have

13 to do with anything.  I mean, no one is going to say anything

14 about Grace for that duty.

15      MR. GIANNOTTO:  I disagree with you, Your Honor.

16      THE COURT:  Tell me.

17      MR. GIANNOTTO:  I will.  I think the hot court,

18 when it decides these issues, will issue clarification, but

19 there's a difference under Montana law, and the law in almost

20 every jurisdiction, between them needing to taking action to

21 protect someone from an existing danger, and creating a

22 danger yourself.

23      THE COURT:  Like a formative action.

24      MR. GIANNOTTO:  So, they cite all these cases, you

25 know, where either the actor created the danger by his

1    conduct or was under some statute duty to warn or something,

2    which we don't have here, okay.

3    But in the case of failure to warn, the

4    restatement, which is generally accepted by the Montana

5    courts; admittedly, they haven't adopted this provision,

6    although -- 324 -- unless Mr. Longosz pointed out, the

7    Federal District Court has predicted it would be Montana law.

8    There are limited circumstances in which someone

9    who fails to take action to protect someone or warn them of a

10    danger can be held liable.  And those are laid out.  You

11    know, you could have a statutory duty to do it.  You could

12    have custody of someone, like, if you're a jail guard and you

13    have a prisoner or something, and if you're a property-owner,

14    you have special duties of property-owners that go back all

15    the way to the time of the (indiscernible), and they've got

16    to protect people.

17    But the only one that applies here, we argue, is

18    the restatement, 324(a), and that's a specific provision that

19    deals with whether when you undertake actions to protect

20    someone from a danger that exists, you could be liable under

21    certain circumstances.  In order for that provision to apply,

22    you have to be taking action to protect someone from a

23    danger, and that met the cause of action.  The element of the

24    cause of action is you have to protect someone from a danger,

25    and here, that danger was caused by Grace.

1          Is it true -- by "element," what they mean is, do

2    we have to prove, as part of our cause of action, that Grace

3    is also liable, like you would have to do under sponde and

4    superior, like, they're liable and we're now the parent or

5    something?  No.

6          But we have to show, as part of -- or they have to

7    show, if 324(a) is the cause of action, that there was a

8    danger and we undertook to protect them from it.  And here,

9    the basis of their complaint is that we undertook, as Grace's

10   -- they don't want to call it as their insurer; they say it's

11   separate, but whatever -- as the people that were in that

12   plant, we undertook to protect them from this danger, and

13   that's no longer the cause of action.

14         Here, the danger was created by Grace's wrongdoing.

15   The conk-on-the-head example, that doesn't exist.  You know,

16   we're not doing anything to protect them.  If we had gone in

17   there, as Mr. Burgess said, and somehow rammed into a bag of

18   asbestos and it fell on someone's head, okay, we created the

19   danger.  It has nothing to do with Grace's wrongful conduct.

20   We just rammed into a bag of asbestos.

21         But here, the whole cause of action, whether it's

22   based on failure to warn, professional services, 324(a), the

23   whole thing is, there's a danger out there and you start to

24   address it and you learned about it and you didn't do right

25   by these Plaintiffs, and that means that the element of any

1  of these causes of action is that there is a danger out there

2  that we're undertaking to protect them from and, here, that

3  danger was created by Grace's wrongful conduct.

4        And that's different froth bad faith cases that

5  Manville is talking about.  There, the danger or the risk was

6  created by the insurance company by its sloppy claims-

7  handling issues.

8        THE COURT:  Claims handling, I understand.

9        MR. GIANNOTTO:  It wasn't like this.  So, what I'm

10  saying is, yes, the Manville case, on its face says, is it

11  proceeds or not proceeds?  And if that's the case, you know,

12  if Manville governs here, we lose because we don't think it

13  does, because they're not seeking the policy proceeds.

14  That's absolutely clear, and one of the things that Mr. Cohn

15  and I can agree on (indiscernible).

16        But if you look at the facts of Manville, they're

17  different from the facts here.  And let's also look at the

18  facts of Quigley, because I think this is important.  You

19  know, in Quigley, as you know, it was this apparent

20  manufacturer thing and whether it was by reason of being the

21  parent or whatever, and, you know, they never really argued

22  in detail what "legally relevant" meant, because the Pfizer

23  basically said we don't think that's the right test.

24        But look at things here.  Here, what they allege is

25  that we had a duty to warn or we had a duty to protect them

1  or whatever, but every one of those duties that they allege

2  that we had, derives directly from their allegation that we

3  undertook these industrial hygiene services, okay, and argues

4  that those industrial hygiene services are insurance.

5        So, if you accept our view that the industrial

6  hygiene services are insurance, then their cause of action

7  arises by reason of the provisions of insurance, because the

8  legal duty we have is based on providing those industrial

9  hygiene services or learning the dangers and not warning

10  them; it derives from that.

11        Quigley is different.  In Quigley, Pfizer put its

12  name or logo or something on the product.  Its duty to the

13  people it sold it to didn't derive from services that it was

14  providing for the benefit of subsidiary or to the subsidiary.

15  It was not acting as a parent when it sold those products.

16  It was acting as a vendor of products trying to make a buck.

17        Here, we were always acting as an insurer, and, you

18  know, the Third Circuit has a footnote that says, if your

19  duty derives from the provision of -- you know, it's another

20  one of those.

21        THE COURT:  Can you show me where it says that in

22  the underlying case, and I'll see it, but I could not find

23  that.  I mean, I know where the Third Circuit's footnote is -

24  -

25        MR. GIANNOTTO:  Okay.

1        THE COURT:  -- and they have that duty statement,

2   but when I go back to the case where I got it from, I could

3   not find where -- I just come up with a legal test that I

4   made your answer before, which is what was outlined in

5   Manville III and Quigley.

6        MR. GIANNOTTO:  But, again, you know, in this case,

7   we always act -- if you agree with us that industrial-hygiene

8   services are insurance, are a part of insurance -- and I know

9   they disagree with that, okay -- but if you agree with that

10  provision, that under any of their theories of our theories,

11  any duty that we would have had to these plaintiffs arose

12  from the provision of insurance because they all arose from

13  what we learned or what we did when we --

14       THE COURT:  So, you're arguing statutory

15  relationship?

16       MR. GIANNOTTO:  Right.  That -- I just wanted to

17  get to that on Quigley.

18       THE COURT:  Right.  So, answer me this, you know,

19  when I read those Montana cases, it seemed like what the kind

20  of model was developing was that, you know, if you had, you

21  know, the accountant -- like I said before, if you had an

22  accountant perform a service for Party A, right, and as part

23  of providing those services, it was foreseeable that someone

24  was going to rely upon that accounting report that they

25  prepared, and they person ends up being damaged, that they

1  have a duty of care to that third party, even though there's

2  no privity of contract between the injured party and the

3  accountant.

4          And so, here, help me understand why that analogy

5  doesn't not apply.  Here, I think that it looks to me like

6  CNA provided these inspection, hygiene services to Grace, so

7  they provided these services to Grace.  It was foreseeable

8  that employees could get injured if they didn't perform these

9  properly.  So, if they were negligent in performing that

10 service, doesn't that mean that they could then have a claim

11 of negligence against CNA?

12         MR. GIANNOTTO:  All right.  There's two things --

13 there's two points to this.  One is, in the case of the

14 accountant and the people buying the pipe and the people

15 buying the steel, it was the entity being sued that created

16 the danger.  The accountant made a crummy evaluation of a

17 company and then people relied on it, to its detriment.

18         Here, as I was trying to explain, Grace created the

19 danger --

20         THE COURT:  Well, okay, but look at what they're

21 arguing.  They're saying, obviously, we all know that Grace

22 created a danger -- the asbestos was bad.  But I think that

23 what they are alleging is that in addition to Grace creating

24 this asbestos danger, you guys were supposed to come in and

25 perform a service, and you did not perform that service

1  properly.

2        If you -- in an ideal world, if we could have

3  rolled the clock back for decades, right, and CNA had the

4  opportunity to perform hygiene-inspection services, they

5  would have said, Listen, everyone, take showers, wear this,

6  you know, signage all over the place.  In order for us, CNA,

7  to perform our duties properly under the contract, this is

8  what we would have done, and if they would have done, that

9  then the only -- then I would agree that, you know, they

10  didn't do anything wrong under the contract.  It just would

11  have been Grace's asbestos.

12        Do you see what I mean?

13        MR. GIANNOTTO:  Well, I think --

14        THE COURT:  That's why I think that they're

15  (indiscernible).

16        MR. GIANNOTTO:  Right.  But what you're confusing

17  is, can they state a cause of action against us for an

18  independent tort with whether -- assuming they can, and that

19  can be argued in the Montana courts --

20        THE COURT:  Yeah.

21        MR. GIANNOTTO:  -- whether that tort is derivative

22  within the meaning of 524(g).

23        THE COURT:  Yes.

24        MR. GIANNOTTO:  The fact that they can assert a

25  cause of action, I mean, the only reason we need 524(g) is

1  because they might be able to assert a cause of action

2  against us.

3         And we're arguing in Montana they're going to try

4  to assert a claim and they may be successful in asserting a

5  legitimate claim against us for negligence, okay.  We're not

6  disputing that.  I mean, we're assuming that's true.

7         But for purposes here, the question isn't whether

8  they can allege some tort against us that holds us liable

9  outside of --

10        THE COURT:  Right.  You think it's derivative.

11        MR. GIANNOTTO:  -- (indiscernible), the issue is

12 whether what they're seeking to hold us liable for is

13 derivative of Grace's wrongdoing within the meaning of this

14 Third Circuit opinion.

15        And my argument is that it is, because the theory -

16 - any of the theories discussed today on which they would

17 seek to hold us liable, is for failure to protect or warn

18 their clients of dangers created by Grace.  So, they're

19 derivative of Grace conduct not just because the people were

20 injured by Grace asbestos -- the Third Circuit said that's

21 necessary, but not sufficient -- but it's not just that they

22 were injured by substance exposure to Grace asbestos, but

23 because we're being sued for failing to protect them from a

24 danger created by Grace's wrongful conduct.  That's the basis

25 of the claim.  That's what they would have to show under any

1  of their theories of 324(a) as an element of the claim.  Not

2  that Grace, itself, is liable, but that there is a danger out

3  there and we failed to protect them from that.

4       So, I don't think the issue is whether they can

5  assert an independent tort or -- I don't know if it's

6  independent -- whether they can assert a tort against us and

7  recover from us, even if they couldn't assert a tort against

8  Grace or (indiscernible).  I think if they can assert a cause

9  of action, that's fine.

10       The issue is whether whatever that cause of action

11  is they can assert against us, whether that's derivative of

12  Grace's wrongdoing, and I think it is for the reasons that

13  we've given in our briefs.

14       THE COURT:  You know, when we talk about the

15  injunction under the Bankruptcy Code, you know, we talk about

16  wanting to incent insurance companies to provide money for

17  the trust so that they can be paid out in an orderly fashion.

18  But when I read -- you know, when I read the strict language

19  of these Johns-Manville cases, it made me think that while

20  certainly claims against the insurance policies should be

21  enjoined, because that's what you're giving the money up for,

22  does that give the insurance companies a license to do

23  whatever they want when they perform that contract, that

24  while they should be protected from properly performing under

25  the insurance policy, it shouldn't give them a license to do

1  whatever they want and to, you know, commit towards and

2  things like that.

3       It just seemed to me, you know, when I read those

4  cases, that they were saying that the injunction is only

5  there to protect the insurance companies for claims that

6  arise under the policy and you can't -- you know, these

7  third-party actions where there are separate allegations,

8  which, you know, we have no idea if they're right or wrong,

9  but if they are right and they do have these claims, you

10 know, do they -- do you have a license?  Like, does it give

11 you extra protection?

12      Like, does that injunction really say that it can

13 go farther than not just the policy, but if you actually did

14 do something wrong under the policy, you know, it seems like

15 you shouldn't.  And I think that what you would say is that,

16 Judge, with regard to bad faith claims where we independently

17 did not handle a claim correctly -- someone made a claim and

18 we didn't do it, okay, that's a third-party action, that's

19 not derivative -- I think you would agree with that, right?

20      MR. GIANNOTTO:  Yes.

21      THE COURT:  Okay.  But if you're telling us, Judge,

22 that the claim against us is not because of our claims

23 handling, but, you know, some common law claim that is, you

24 know, different than that, that, you know, that is going to

25 be derivative, I think.

1        MR. GIANNOTTO:  I think a couple of things.  One, I

2   mean, you use the word "license."  You know, this is all

3   based on past conduct.  No one is asking for a permit to

4   commit towards into the future.

5        So, I think the question is, when we settle, you

6   know --

7        THE COURT:  Yeah, when you settle --

8        MR. GIANNOTTO:  -- do we believe we're settling

9   these kinds of claims.

10        THE COURT:  And explain to me the language that's,

11   you know, in there, and, you know, I mean, this is just

12   language about what the debtor said, what Johns-Manville

13   said, Travelers said about understanding that this didn't

14   extend to third-party tort actions that, you know, it went

15   into, it was objected to, and now it's in the agreements --

16   it's part of the agreement that, you know, and even the

17   Supreme Court said, Well, we understand that these certain

18   kinds of tort actions that were filed at the time of the

19   settlement, they were not enjoined, but future ones -- so,

20   the Supreme Court, itself, understood when it was reviewing

21   Manville III that there were certain types of claims, that

22   people had struck a deal with insurance companies and said,

23   these are third-party tort claims, the Bankruptcy Court has

24   no jurisdiction over them.

25        You know, like there's this whole history, this

1  whole background about the types of claims that cannot be

2  brought -- that can be brought, that are not enjoined by the

3  channeling injunction.  You know, those sentiments, they

4  trouble me.  They make me think, okay, everyone knew -- it

5  was almost like Travelers knew from the outset that, you

6  know, certain third-party actions like these tort claims,

7  they just call them "independent," they don't go into this

8  really, you know, detailed analysis that you are claims-

9  handling versus, you know, common-law tort -- I don't know --

10 whatever -- they don't make that distinction.

11         They just say, you know, third-party tort actions

12 against the insurance companies were never meant to be

13 enjoined by the channeling injunction.  They were -- you

14 know, that doesn't affect the rates, so why would it?  You

15 know, the Court has no jurisdiction.

16         And the Supreme Court even recognized that at the

17 time that the settlement order was entered, those types of

18 claims could still continue, but then the Supreme Court said

19 that because it only affected prior claims, they couldn't

20 possibly be accepted in the future.  And the Supreme Court

21 also said, you know, there's nowhere in there that says

22 derivative and the Second Circuit clearly calls things that

23 are derivative.

24         And I guess where we're struggling is that when I

25 don't have the history that you do with the Johns-Manville

1    cases, so I don't know every single type of different cause

2    of action there, but it basically, you know, there two pots:

3    there's derivative and non-derivative.  The only derivative

4    claims that I can see that I can understand are the direct-

5    action claims, which I know I can't limit myself under the

6    Third Circuit, but all the other types of claims, you know,

7    they just call them, you know, wrongful misconduct, torts,

8    things like that, which sounds just like what they're saying

9    here to me.

10          MR. GIANNOTTO:  And, you know, I can't go all the

11   way back into Manville --

12          THE COURT:  I know.

13          MR. GIANNOTTO:  -- but I don't go back to 1980.  I

14   was a practice lawyer, but I wasn't on the Manville

15   bankruptcy.

16          But, you know, there was a mishmosh of evidence

17   that was put before Judge Lifland in 2003, 2004 when this

18   whole thing came up with Governor Cuomo or ex-Governor Cuomo,

19   at the time.  You know, what I can tell you is that 524(g),

20   when it was enacted, you know, subsequent to the -- it didn't

21   apply to the Manville -- it retroactively applied to the

22   Manville (indiscernible) 524(h) basically said the Manville

23   injunction was okay and it's sort of more global where it's -

24   - but, you know, my memory is that if you look at the

25   legislative history of that provision, there's nothing

1   specific there that says what -- this is limited to policy

2   proceeds or it's not.  I think that's clear.

3          But I think the idea behind this was to make it as

4   broad as possible to encourage insurers to settle and to get

5   as much money into this pot as you want.  And the question of

6   having a license to violate people's rights, I think is the

7   wrong way to look at it.  I think the right way to look at it

8   is, you know, Plaintiffs' attorneys will always have ways to

9   sort of sue the insurance company or come up with theories to

10  sue the insurance companies, and we're trying to get

11  finality, and that's what this statute was meant to do, was

12  get us finality.

13         And, again, I disagree with you on the <u>Manville</u>

14  that there's just this pot of proceeds and everything else.

15  I think if you look at the everything else they had, they

16  were all claims that are different from the claims here.  And

17  we're not -- I'm not drawing a distinction between bad faith

18  claims, handling claims, and negligence claims.  I'm drawing

19  a distinction between claims that are not dependent on

20  Grace's wrongdoing and claims that are.

21         And that could be common law negligence claims,

22  like the asbestos hitting someone on the head that the Third

23  Circuit used; that would be a common law negligence claim

24  against us, if we run through a bag of asbestos and knock

25  someone on the head or something.

1          It's not negligence versus non-negligence; it's

2    whether our liability derives from the wrongful conduct of

3    Grace.  And when the liability is premised, as it is here,

4    under any theory on our failure to protect them from or warn

5    them of dangers Grace created, it is derived from Grace's

6    wrongful conduct, within the meaning of the Third Circuit

7    opinion.

8          And, again, if you look at those cases -- you said

9    Dodds and Gas or whatever, they were not asbestos cases, so

10   they don't really matter, I think they do really matter.  I

11   think that what they basically say is, where your liability

12   is based on the fact that someone else screwed up and hurt

13   someone, but you're liable because you failed to supervise or

14   failed to do this or failed to do that, you can be liable,

15   even though you're independently liable in court.  You know,

16   the other guy in Gas couldn't be liable because of the

17   workers' compensation statute.  You're independently liable

18   in tort, because your liability is based on the wrongful

19   conduct of that other person, and it's not seeking that other

20   person's money or policy proceeds; it's seeking your own

21   money.  It's an independent tort, but it's dependent -- you

22   know, a tort -- but it's dependent on what the other fella

23   said.

24          So, I think --

25          THE COURT:  And, you know, then there's that

 1  troubling language.  You know, there's just not a lot of

 2  stuff out there about the statutory relationship and in the

 3  Quigley case, you know, when they talk about the insurance --

 4          MR. GIANNOTTO:  Yeah, they mention -- when they're

 5  giving examples --

 6          THE COURT:  I know, they just do one sentence on

 7  the insurance --

 8          MR. GIANNOTTO:  Right.  And it mentioned direct

 9  action.

10          THE COURT:  Right.  I know.

11          MR. GIANNOTTO:  But look more closely at -- if you

12  look more closely at Quigley, what Quigley said is its view

13  is that Congress meant to protect causes of action that have

14  traditionally been brought against people in these positions

15  by third parties.

16          THE COURT:  And it's not limited to those.  I mean,

17  I saw that.

18          MR. GIANNOTTO:  And so, you know, these types of

19  claims against the Workers' Comp insurer or -- if we're not

20  an insurer, whatever they want to call us -- our claims that

21  have been traditionally brought.  I mean, in talking in the

22  HUD case where this whole issue was briefed, there are many

23  cases cited, and the issue is under what circumstances ask a

24  workers' comp insurer or someone else who provides industrial

25  hygiene services be held liable?  And individual plaintiffs

1    have been suing such insurers under such theories for years

2    and years and years.

3         We disagree over whether in this case there's a

4    duty or over whether in this case what the standards are, but

5    that type of case has been brought for a long time.  And then

6    Quigley also said, we don't -- we want to decline to enjoin

7    claims that only have an accidental nexus to the bankruptcy.

8         This doesn't have an accidental nexus to the

9    bankruptcy.  These people were injured by Grace's conduct and

10   they're suing us for failure to prevent Grace -- prevent the

11   dangers caused by Grace's conduct.  It's not an accidental

12   nexus to the bankruptcy; it's a key part of this bankruptcy

13   and it's a key part of why we and other insurers settled.

14        So, I agree that Quigley said direct, you know, it

15   was giving examples and it, again, gave the examples of

16   direct action, and I'll, of course, go back to my same thing,

17   the Third Circuit said that's not where it's limited.  I

18   think the way that you limit it is what the Third Circuit

19   said.  You look at the elements of the cause of action, you

20   look at them and then you decide whether that's wholly

21   separate -- they didn't say "separate" -- wholly separate

22   from Grace's liability or wrongdoing, you're dependent on it.

23        And here, if you look at the elements of the cause

24   of action, every theory of a cause of action here involves

25   that there had been a danger that we responded to improperly

1  or failed to warn about, and that danger was created by

2  Grace's wrongful conduct.  It wasn't created because asbestos

3  was never (indiscernible) or whatever, and they're trying to

4  argue it.

5         It was created because Grace undertook operations,

6  milling operations, processing operations, which released

7  asbestos into the air.  And we didn't create the danger.  I

8  mean, they might -- they try to argue the points we increased

9  the danger, because if we had warned them, then people

10  wouldn't have been -- people would have walked away and

11  wouldn't have been exposed.  But we didn't increase the

12  danger over what Grace created.  Grace created a danger that

13  was out there.  What they're saying is we didn't fix it and

14  we were negligent in not fixing it or not warning about it.

15         And so, every one of them -- and that's how you

16  distinguish, it seems to me, between what the Third Circuit

17  meant and what it didn't mean.  And, again, the claims in

18  Manville, although the language is broad in Manville -- I

19  agree, the language is broad -- don't encompass these types

20  of claims.  So, that's all I can say.

21         THE COURT:  That's the best explanation I have come

22  up with so far, so thank you for giving me that.

23         MR. GIANNOTTO:  Thank you.

24         THE COURT:  Thank you.  Did you want to respond to

25  that?

1       MR. COHEN:  Maybe I should wait and hear from Mr.

2  Longosz?

3       THE COURT:  Oh, I'm sorry, I didn't mean to cut him

4  off.

5       MR. LONGOSZ:  I'm trying to take a backseat to most

6  of this, Your Honor.

7       THE COURT:  Yeah.

8       MR. LONGOSZ:  I don't want to be repetitive, so I

9  just want to point out a few things that probably rises out

10 of some of the questions that the Court had.

11      The one thing that's interesting is I think there

12 was a reference to performing duties under the contract, and

13 that's why, initially, this morning, I mentioned the contract

14 and the insurance contract.  And that would be the case if,

15 in fact, the Court was looking at or the record had a

16 separate contract to perform services.

17      So, we've heard a lot about industrial hygiene

18 services.  That's not will Workers' Comp -- that's not the

19 Workers' Comp policy or contract, so to speak; that would be

20 a separate contract to perform those services.

21      So, if, in fact, CNA, Maryland Casualty, an

22 insurer, there was a contract to perform certain services --

23 industrial hygiene services, safety services on the site, be

24 on the site all the time -- that would be a circumstance

25 where it would be outside of the discussion we're having here

1  --

2          THE COURT:  Right.  But you're saying that's not

3  the case under your contract?

4          MR. LONGOSZ:  It's not at all.

5          THE COURT:  Okay.

6          MR. LONGOSZ:  And I think the --

7          THE COURT:  I mean, I only saw the excerpts.

8  Right.  I only saw the excerpts of the contract which say

9  that this was a service.  I mean, it -- what it actually said

10 was, It's not a duty we have to you, it's a right we have and

11 we can't be held liable if we mess that up or don't do it or

12 whatever.

13         MR. LONGOSZ:  You have the duty, but not the right

14 to inspect your place, and as it turns out --

15         THE COURT:  Well, we have the right, but not the

16 duty to.

17         MR. LONGOSZ:  Right.  Not the duty.

18         THE COURT:  Right.

19         MR. LONGOSZ:  Which is important, and Counsel had

20 mentioned, well, Maryland Casualty was there every day.  No,

21 they weren't there every day.  Incompetent came occasionally,

22 quarterly to come and do this assessment so they could

23 understand what was going on in the facility for purposes of

24 insurance, for purposes operating, purposes of making sure

25 you keep claims down.  I mean, that's what Workers' Comp

1   policies do.

2          But, no, there wasn't this unbundled service that

3   we've all been sort of talking about that, certainly, we

4   wouldn't sit here and suggest to the Court that we would be

5   included under the channeling injunction for that.  For

6   example, Maryland Casualty never took control, nor did any of

7   the insurers, take control of the site.

8          The insurer was not there for the health and safety

9   of the workers.  That's not contained within the workers'

10  compensation policy, and that's all that we can look to.

11         There was never a contract for industrial-hygiene

12  services.  And one might want to interpret the Maryland

13  Casualty and what they did on the site and make an

14  interpretation of those types of things, and that's why we

15  flipped over to the argument of 324(a), and, again, we're

16  talking about that component that includes workers and the

17  worker claims.

18         And that's why the Supreme Court is looking at

19  324(a), because what that does -- and it goes beyond the

20  question that the Court asked about professional -- those

21  cases -- that line of cases of professional services.  In

22  this case Maryland Casualty or the insurers were not

23  providing "professional services"; they were providing the

24  insurance whatever was included in the insurance policy.

25  They were providing the insurance contract to insure workers

1  who happened to be injured on the site.

2          But 324(a), it talks about an undertaking should

3  recognize as is necessary for the protection of their people,

4  but I -- third persons -- but I think the most important

5  component of that is the A, B, and C, which nobody wants to

6  talk about -- A, being an increased risk of harm based on

7  negligence in the undertaking that leaves the third party in

8  the worst position than if no undertaking had taken place in

9  the first place; the second component being an undertaking

10 that supplants, rather than supplements a duty owed by the

11 other to the third party; and C is the third party suffered

12 harm because of his reliance, meaning Grace's reliance or the

13 others' reliance on the undertaking.

14          So, here, as we're arguing before the --

15          THE COURT:  So, I thought that last one was, you

16 know, so, if an employee relied upon it, then that's a

17 problem.

18          MR. LONGOSZ:  It's not the employee.

19          THE COURT:  Okay.

20          MR. LONGOSZ:  It's Grace.

21          THE COURT:  Okay.

22          MR. LONGOSZ:  And so, it would be a problem if it

23 was the employee, but it's not the employee; it's Grace and

24 that's what the --

25          THE COURT:  Well, let's just take a look at that

1  for a second.

2          MR. LONGOSZ:  So, this undertaking to render

3  services to another --

4          THE COURT:  Yeah, C.

5          MR. LONGOSZ:  -- the "another" being Grace, and the

6  undertaking must do harm unless the actor should recognize is

7  necessary for the protection of a third person.

8          THE COURT:  It's very confusing when they have

9  "others" and things like that.

10          Okay.  So, one who undertakes gratuitously or for

11  consideration, so that would be CNA -- well, I know you're

12  MCC -- but I'll just say, CNA --

13          MR. LONGOSZ:  The insurer, yeah.

14          THE COURT:  -- to another, which would be Grace,

15  which he should recognize is necessary for the protection of

16  the third party -- that's the Montana plaintiffs -- is

17  subject to liability to the Montana plaintiffs for physical

18  harm resulting from his failures.  CNA's failure to exercise

19  reasonable care to protect his undertaking in the harm --

20  this is C -- the harm is suffered because of reliance of the

21  other or the third party upon the undertaking.

22          So, that means -- I read C to say that harm is

23  suffered because of reliance of the third person upon the

24  undertaking.  So, that's the employee here.

25          So, I think that -- and I'm not saying that they

1  have a case; I have no idea if they have a case -- but if

2  they did, they would probably go under C and say, Well, I'm

3  the employee, I'm the third person, and I relied upon that.

4  I thought you were going to keep me safe.

5         MR. LONGOSZ:  The third person -- the third party

6  suffered harm because of his reliance or the others' reliance

7  on the undertaking.

8         THE COURT:  Okay.  So, I was down at C, but, okay.

9  One who undertakes gratuitously or for consideration to

10  render services to another -- so, that's CNA rendering

11  services to Grace --

12         MR. LONGOSZ:  Right.

13         THE COURT:  -- which he should recognize -- CNA

14  should recognize -- as necessary for the protection of the

15  third person -- here, the Montana plaintiffs or its things --

16  is subject to -- so, CNA is subject to liability of the third

17  person -- that's the Montana plaintiffs -- for physical harm

18  resulting from CNA's failure to exercise reasonable care to

19  protect his undertaking if the harm is suffered because of

20  reliance of the third person -- the plaintiffs -- upon the

21  undertaking.

22         So, if they could prove that the employee relied

23  upon your undertaking to perform the inspection hygiene

24  services, that that -- and they suffered from it -- then that

25  looks like it could be a possible --

1          MR. LONGOSZ:  The problem is that they weren't

2    performing, nor were they --

3          THE COURT:  I know, I just wanted to make sure that

4    we understood, that because I think that there is, you know,

5    if you read this, get through all the "others" and everything

6    else, I think that there is an avenue there, but you guys are

7    making, you know, very good arguments unfortunately for me.

8          MR. LONGOSZ:  And, again, it all emanates out of

9    what?  It emanates out of Grace's facility, Grace's asbestos,

10   Grace's -- as Mr. Eugene Otto said -- the Grace facility.

11   You know, neither none of the insurers put the facility in

12   place, nor what was occurring in that facility in place.

13          And the other thing that's really, really

14   interesting, Grace -- the wrongful conduct or the conduct has

15   to be or the recommendations have to be followed by Grace.

16   And as we know -- and that's why I gave that anecdotal

17   comment -- but there's nothing that has come forward or will

18   come forward, and that's why it needs to be looked at,

19   regarding whether, in fact, you know, those, if, in fact, you

20   get to the point of there being recommendations and all of

21   those things need to occur, they have to be followed.

22          THE COURT:  Okay.

23          MR. LONGOSZ:  And we're not to that point.  So, I

24   wanted to make sure that the Court understood that

25   distinction there.

1       The other thing is there was a question about the

2   bad faith, and looking at the <u>Manville</u> cases, they don't give

3   us a whole lot other than, you know, essentially a bad faith-

4   type of case to go on or the one -- the two different cases -

5   -

6       THE COURT:  Right.  They talk about the West

7   Virginia and they talk about the --

8       MR. LONGOSZ:  And let's talk about personal injury

9   cases or cases arising out of ARD, as we talked about, and

10  they had ample opportunity.  You know, we had one, two,

11  three, four, and, obviously, they had ample opportunity to

12  talk about other areas.

13      And it's interesting that the Third Circuit, in

14  this case, did talk about the ceiling-tile approach where, of

15  course, you're walking by and a ceiling tile with asbestos

16  hits you in the head, so that's not derivative of Grace's

17  asbestos, even though it may contain Grace's asbestos.

18      It's interesting that at the confirmation hearing,

19  the -- I think it was the future claimants' representative or

20  the representative, the testimony there was, sure, we would

21  look at derivative from the standpoint of, let's say Maryland

22  Casualty or CNA was driving out to -- and this is in the

23  record -- was driving to go do -- to go look at the facility,

24  and he hits a pedestrian or he's in a car accident and, you

25  know, it's Maryland Casualty and CNA can't claim that it was

1    derivative because he was going to go see Grace's facility or

2    Grace's asbestos.

3           Very similar to the example, which the Third

4    Circuit gave us all, which is, you know, contrary or

5    contrasted with the examples that the Manville decisions give

6    us.  So, I think if the Court is looking for that

7    distinction, rather than a distraction, I think that really

8    gives us some guidance, in terms of maybe an approach here as

9    to what's derivative and what isn't.

10           THE COURT:  Okay.  Thank you very much.

11           MR. COHEN:  I just -- we've been here a long time

12    and I just want to sum up very briefly, Your Honor.  The

13    Third Circuit opinion gives a very clear set of instructions

14    concerning derivative liability, which is to look at the

15    elements under Montana law and to determine whether the

16    insured alleged liability is dependent on or wholly separate

17    from that of Grace.

18           It's apparent from the briefing and the arguments

19    that under Montana law, Grace's liability is -- excuse me --

20    the insurer's liability is completely separate from that of

21    Grace.  That is the beginning and the end of the inquiry, and

22    so we would respectfully submit that you make that

23    determination, as to derivative liability, and also that you

24    determine that the statutory-relationship test is also not

25    satisfied by the Montana plaintiffs' claims.  Thank you.

1          THE COURT:  Okay.

2          MR. GIANNOTTO:  I don't think there's anything I

3   can reply to that.

4          THE COURT:  Well, he just told me what he wants,

5   which I know what he wants.

6          Okay.  Well, I'm happy to just rule on what I have

7   before me now.  If you feel the need to file something, I

8   will listen to that.  If you want to do that.

9          MR. GIANNOTTO:  Can we confer and get back to your

10  clerk tomorrow on that?

11         THE COURT:  Feel free to confer.  Eat chocolate.

12  Confer.  Tell me what you'd like to do.  I'm going to sit

13  here, though, unless you want me to -- is it going to take

14  you awhile to confer?

15         MR. GIANNOTTO:  We'll just go in the hall.

16         THE COURT:  Oh, I'm sorry, I didn't mean to kick

17  you out.  I can just go.

18         All right.  So, Barbara, why don't you just call me

19  when they're done conferring, okay?

20         THE CLERK:  Okay.

21         THE COURT:  All right.  Thank you, everybody.

22         COUNSEL:  Thank you, Your Honor.

23         (Recess taken at 2:21 p.m.)

24         (Proceedings resumed at 2:26 p.m.)

25         THE COURT:  I think I want the briefing, I do.

1          MR. GIANNOTTO:  Okay.

2          THE COURT:  You know, you made some very persuasive

3   arguments and I want you to flush it out.  You know, I've got

4   the opinion, you know, in good shape, and all my law, and I

5   can move things around, and I want to give you guys a quick

6   disposition, but this is a nuance that had not occurred to

7   me, which sounds like it may have some merit, so I'd like you

8   to brief that issue.

9          So, I don't know if you independently decided that

10  you were going to brief something?

11         MR. GIANNOTTO:  No, that's fine, Your Honor.  We

12  had decided that whatever you wanted was fine with us.

13         THE COURT:  Oh, you're just saying that now to

14  cover yourself.

15         (Laughter)

16         THE COURT:  But you understand, you know, my

17  trouble.  My trouble is I'm trying to reconcile, you know,

18  the broad language in the Johns-Manville cases, you know,

19  with derivative and non-derivative to understand, and I think

20  your distinction about, you know, your argument about, you

21  know, on the one hand, like if you independently messed up

22  the claims handling versus you did something wrong under the

23  insurance contract, which is derivative litigation, I want to

24  see your argument.  I want to understand it.

25         MR. GIANNOTTO:  Okay, Your Honor.

1          THE COURT:  Okay.  All right.  So, I don't want to

2    be a pain, and it doesn't have to be long, but I just want to

3    understand your argument better.  So, how long do you want to

4    take to --

5          MR. GIANNOTTO:  You know, it's the summer schedule

6    and we haven't conferred --

7          THE COURT:  Yeah.

8          MR. GIANNOTTO:  -- but would two weeks be okay?

9          THE COURT:  That's fine.

10          MR. GIANNOTTO:  Would that work?

11          THE COURT:  That's fine.

12          MR. GIANNOTTO:  Now, wait.  Do people want more

13    than that?  Is the two weeks okay with everybody?

14          THE COURT:  Okay.  So, I'll say -- that's the 31st,

15    and then would you like two weeks to respond to him, then?

16          MR. COHEN:  Yes, Your Honor, thank you.

17          THE COURT:  Okay.  So, Barb, what's two weeks from

18    the --

19          THE CLERK:  The 31st?

20          THE COURT:  Yeah.

21          THE CLERK:  The 14th of August.

22          THE COURT:  Okay.  And then, if you want, we don't

23    have to come back and argue; I can just rule on the papers to

24    make it simple.

25          Do you want a reply?

1    MR. GIANNOTTO:  Yeah, can we get three days for a

2  reply after that?

3    THE COURT:  You can get longer -- you can take a

4  week, if you want?

5    MR. GIANNOTTO:  Okay.  Well --

6    THE COURT:  How about August 14th here?

7    MR. GIANNOTTO:  People are on vacation; that's the

8  problem.

9    THE COURT:  No problem.  Okay.  So, how about you

10  file your reply by August 21st?

11    MR. GIANNOTTO:  Okay.

12    THE COURT:  Yeah?  And then I'll rule on the

13  papers, unless you want it offline back here.  I don't think

14  you need to, but ...

15    MR. GIANNOTTO:  That sounds great.

16    He only flies back here.  We train here.

17    THE COURT:  You guys are from New York?

18    MR. GIANNOTTO:  D.C.

19    THE COURT:  D.C., okay.

20    Okay.  So, I bought myself some time to consider

21  these additional arguments, and then I'll try to get out the

22  opinion as soon as I possibly can.

23    MR. GIANNOTTO:  Thank you, Your Honor.

24    THE COURT:  Thank you.

25    MR. COHEN:  Thank you very much.

1           THE COURT:  Have a good day.

2           MR. COHEN:  Is there an expectation on the number

3    of pages?

4           THE COURT:  Well, I think, let's just all be

5    reasonable, right?

6           MR. COHEN:  Okay.

7           THE COURT:  I think we are -- we're professionals

8    here.  All right.  Thank you everybody.

9           Actually, Barb, you got those dates?

10          THE CLERK:  Yes, Your Honor.

11          THE COURT:  Well, you know, I don't like telling

12   you, so I'm going to go tell Una.

13          THE CLERK:  And I (indiscernible).

14          THE COURT:  So, I heard you guys were scared when -

15   - you know, we depend on the Delaware clerks to make all the

16   notations on the docket and there's a claim objection that

17   the debtor filed to, for some environmental claims, so even

18   though my secretary clearly said that that argument was going

19   to happen in August, I think the wrong thing hit the docket

20   and then that must have, you know, scared everyone.  We just

21   want to make sure that they enter the right docket entry in

22   this one.

23          MR. GIANNOTTO:  We were wondering who the audience

24   was here today.  There were a bunch of people here and they

25   couldn't have all been your clerk.

1          THE COURT:  Well, I have my permanent clerk.  I

2   have my summer intern.  I have (indiscernible) all the summer

3   interns, because this is, you know, for us, this us and

4   Philadelphia, this is a pleasure to have all of you really

5   smart lawyers come in here and challenge us be

6   intellectually.  So, this is a great day.  So, it's really

7   interesting and it's good for them to see, and my judicial

8   assistant was here, as well.

9          We were all very entertained.

10          COUNSEL:  Thank you, Your Honor.

11          THE COURT:  Thank you.

12      (Proceedings concluded at 2:30 p.m.)

13

14

15                          CERTIFICATE

16

17      I certify that the foregoing is a correct transcript

18   from the electronic sound recording of the proceedings in the

19   above-entitled matter.

20

   /s/Mary Zajaczkowski              July 19, 2019
21   Mary Zajaczkowski, CET**D-531

22

23

24

25