IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (AMC) |
| | ) | (Jointly Administered) |
| Reorganized Debtor. | ) | |
| | ) | Hearing Date: September 9, 2019, at 10:00 a.m. |
| | ) | Related Docket nos.: 33099 & 33102 |
| | ) | |

**REPLY IN SUPPORT OF THE REORGANIZED DEBTOR'S CLAIM OBJECTION REQUESTING PARTIAL ALLOWANCE AND PARTIAL DISALLOWANCE OF MDEQ PREPETITION CLAIM (SUBSTANTIVE OBJECTION)**

### INTRODUCTION

At a time when Grace is seeking to close its final Chapter 11 case, the MDEQ Response has asserted new, open-ended, and vague prepetition claims, primarily relating to natural resource damages ("NRD"), at Operable Unit 3 ("OU3") in addition to the highly contingent 10% Cost Share and Post-Remedy O&M Costs that Grace proposes be allowed.[2] The MDEQ Response also states that MDEQ or another state entity is "expected to identify more damages." The MDEQ Response does not, however, provide sufficient information for this Court to liquidate or otherwise dispose of these open-ended claims and still-undisclosed additional damages.

But in having described in its Response at least some of its new claims, MDEQ has conceded what the record establishes: MDEQ has had for many years (in some instances, decades)

---

[1] W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc., or "Grace") is the sole remaining "Reorganized Debtor," and Case no. 01-1139 is the sole remaining open chapter 11 case.

[2] All capitalized terms not defined in this "Reply" shall also have the meaning ascribed to them in the "Claim Objection" (The Reorganized Debtor's Request for Partial Allowance and Partial Disallowance of the Claim by the Montana Dept. of Env. Quality ("MDEQ") for Environmental Remediation at Operable Unit 3 of the Libby Asbestos Superfund Site (Substantive Objection) [Docket no. 33099], filed June 7, 2019)). The "MDEQ Response" is the Response and Reservation of Rights of the State of Montana to The Reorganized Debtor's Request for Partial Allowance and Partial Disallowance of the Claim by the Montana Dept. of Env. Quality ("MDEQ") for Environmental Remediation at Operable Unit 3 of the Libby Asbestos Superfund Site (Substantive Objection) [Docket no. 33102], filed July 22, 2019.

more than sufficient information to "fairly contemplate" its prepetition claims—including the claims disclosed in the Response, as well as any additional damages claims it expects to disclose in the future. *W. Salem Storage, LLC v. Exide Techs. (In re Exide Techs.)*, 600 B.R. 753, 761 (Bankr. D. Del. 2019) (hereinafter, "*Exide*") ("all future response and natural resource damages cost[s] based on pre-petition conduct that can be fairly contemplated by the parties at the time of Debtors' bankruptcy are claims under the Code"). To compound matters, the Response further concedes that MDEQ has not investigated its potential prepetition OU3 claims, despite MDEQ's obligation to do so to avoid its claims being barred and discharged. *In re Solitron Devices, Inc.*, 510 B.R. 890, 898 (Bankr. S.D. Fla. 2016) (hereinafter, "*Solitron*") (NYSDEC claim discharged when no due diligence undertaken and no proof of claim filed); *In re Nat'l Gypsum Co.*, 139 B.R. 397, 408 (N.D. Tex. 1992) (hereinafter, "*Gypsum*") ("The 'fair contemplation' standard, however, is not meant to encourage or permit dilatory tactics on the part of … any … relevant government agency").

Finally, MDEQ attempts to preserve a broad reservation of rights in the 2008 MDEQ Settlement Agreement in lieu of ever filing a specific proof of claim ("<u>POC</u>") for the newly asserted costs. By doing so, MDEQ is essentially asking the Court to allow its prepetition OU3 claims to survive the closing of Grace's last remaining open chapter 11 case—without MDEQ ever being obligated to articulate those claims, and without having those claims ever becoming subject to the discharge injunction. MDEQ's argument subverts the "fresh start" principle of the Bankruptcy Code and the long-confirmed Plan's prepetition claim resolution and discharge provisions, and should therefore be denied. *Exide*, 600 B.R. at 759-60; *Gypsum*, 139 B.R. at 404 (quoting *In re Combustion Equipment Associates, Inc.*, 838 F.2d 35, 37 (2d Cir. 1988)); *In re Edge*, 60 B.R. 690, 699 n.8 (Bankr. M.D. Tenn. 1986) (internal citation omitted) ("The existence of a

claim certainly should not depend on ...[claimant's] appraisal of the likely success of post-bankruptcy collection efforts").

On these facts, this Court would be well within its discretion to simply disallow all such prepetition OU3 claims (other than the 10% Cost Share and the Post-Remedy O&M Costs) to avoid the further prejudice to the Court and Grace that would arise from protracted litigation over this threshold question of identifying MDEQ's prepetition OU3 claims. *Plains Mktg., L.P. v. Bank of Am., N.A. (In re Semcrude, L.P.)*, 443 B.R. 472, 476 (Bankr. D. Del. 2011) (internal citations omitted) (leave to amend proof of claim may be denied due to prejudice, delay, or a "repeated failure to cure deficiencies"); *Exide*, 600 B.R. at 760 (creditor on notice of Exide prepetition conduct; claim discharged); *Gypsum*, 139 B.R. at 408, 412 ("any claim not asserted in the Proof of Claim is barred"). Alternatively, the Court should require MDEQ to promptly file an amended proof of claim stating its claims in sufficient detail such that the Court can expeditiously liquidate or otherwise dispose of them.

### FACTUAL PREDICATE

1.  Factual predicate in support of this Reply and the Claim Objection is set forth in two declarations:

- *Declaration of Keith N. Cole in Support of the Reorganized Debtor's Request for Partial Allowance and Partial Disallowance of the Claim by the Montana Dept. of Env. Quality ("MDEQ") for Environmental Remediation at Operable Unit 3 of the Libby Asbestos Superfund Site (Substantive Objection)* (the "First Cole Declaration"), attached as Exhibit C to the Claim Objection.

- *Declaration of Keith N. Cole in Support of the Reply in Support of the Reorganized Debtor's Claim Objection Requesting Partial Allowance and Partial Disallowance of MDEQ Prepetition Claim (Substantive Objection)* (the "Second Cole Declaration"), attached hereto as Exhibit A.

The Second Cole Declaration refers to exhibits in the *Appendix of Exhibits to the Reply in Support of the Reorganized Debtor's Claim Objection Requesting Partial Allowance and Partial*

*Disallowance of MDEQ Prepetition Claim (Substantive Objection)* (the "Appendix") filed substantially contemporaneously herewith. The First Cole Declaration and the Second Cole Declaration are incorporated by reference as if fully set forth herein, and the exhibits set forth in the Appendix are incorporated as if attached hereto.[3]

2.  In further support of the relief requested in this Reply and in the Claim Objection, Grace has also attached the *Report Summarizing the Opinion of Judi L. Durda Regarding the Sufficiency of Available Information for MDEQ to Identify Natural Resource Damage Claims Arising from the Release of Asbestos at Operable Unit 3 of the Libby Asbestos Superfund Site* (the "Durda Report") as Exhibit B. Ms. Durda will be available to testify in support of the Durda Report. Ms. Durda concludes in her Report that "sufficient information is available for MDEQ to identify natural resource damage claims that may have arisen from the release of Libby amphibole asbestos at OU3 of the Libby Asbestos Superfund Site." Durda Report at ¶¶ 9, 17-26.

## ANALYSIS

I. **MDEQ HAS ASSERTED NO COGNIZABLE PREPETITION CLAIMS OTHER THAN THE HIGHLY CONTINGENT 10% COST SHARE AND POST-REMEDY O&M COSTS**

3.  MDEQ is wrong as a matter of law and fact when it asserts that it is entitled to the presumption of *prima facie* validity under Fed. R. Bankr. P. 3001(f) for any claims other than the 10% Cost Share and the Post-Remedy O&M Costs. The 2007 MDEQ POC, even if taken together with the 2008 MDEQ Settlement Agreement's mere reservation of rights, does not articulate the facts necessary to aver even a single such cognizable claim. *Semcrude*, 443 B.R. at 478 (quoting *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992)) ("claimant must allege facts sufficient

---

[3] The CERCLA exhibits in the Appendix may also be found in full at https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.scs&id=0801744&doc=Y&colid=34512&region=08&type=SC, except for Exhibit 19, which is not yet posted (last visited August 26, 2019).

to support the claim"); *In re Residential Capital, LLC*, 2013 Bankr. LEXIS 5027, at *14-15 (Bankr. S.D.N.Y. Nov. 27, 2013) (internal citation omitted) ("When a claimant fails to comply with the Rule 3001 documentation requirements, the claimant is not entitled to *prima facie* validity of the claim"). In other words, MDEQ has not done enough pursuant to Fed. R. Bankr. P. 3001(a) & (c) to meet its initial burden of filing a proof of claim with a "written statement setting forth" MDEQ's prepetition claims with "sufficient information" for Grace to evaluate those claims. *In re Today's Destiny, Inc.*, 2008 Bankr. LEXIS 3577, at *17-*22 (Bankr. S.D. Tex. 2008) (distinguishing between proofs of claim that conformed or substantially conformed to Fed. R. Bankr. P. 3001 and those proofs of claim that failed to state cognizable claims).

4. In November 2007, MDEQ filed the 2007 MDEQ POC, which amended prior proofs of claim for the entire Libby Asbestos Superfund Site. The POC asserted two specific claims, the first of which was for $55 million in future remediation costs arising from the then-Debtors' prepetition activities. 2007 MDEQ POC at p 5; *see also Response to Motion of Debtors for Entry of an Order Authorizing Settlement Agreement Resolving the United States' Proofs of Claim Regarding Certain Environment Matters* [Docket no. 17806] (same). MDEQ also asserted a claim "for past remediation expenses incurred by DEQ in the total amount of $10,022.16, plus prejudgment interest, pursuant" to CECRA. 2007 MDEQ POC at pp. 4-5. All of the remaining statements in the 2007 MDEQ POC consisted of various reservations, and references to the underlying statutes and other matters, and none of them assert cognizable claims.

5. The 2007 MDEQ POC was partially resolved as follows:

- Grace and MDEQ negotiated the 2008 MDEQ Settlement Agreement, which settled ***all of*** MDEQ's prepetition claims for the entire Libby Site other than OU3 for $5.167 million to be paid on or about the Effective Date. 2008 MDEQ Settlement Agreement;
- In July 2008, the Court entered the 2008 Order, which stated in relevant part, that "the remaining portion of Claim No. 18496 [addressing OU3] shall be resolved as provided in the"

2008 MDEQ Settlement Agreement, and "the Court shall retain jurisdiction to hear and determine all matters arising from or relating to the implementation of this Order." 2008 Order at 2;

- The 2008 MDEQ Settlement Agreement "specifically reserved" ... "claims relating to Operable Unit 3." 2008 MDEQ Settlement Agreement at ¶ 2.

MDEQ has not subsequently asserted any cognizable prepetition OU3 claims.

6.  MDEQ's Response suggests, however, that MDEQ's reserving its rights means that it does not need to assert cognizable claims conforming to the requirements of Fed. R. Bankr. P. 3001 et seq. But MDEQ is incorrect. The reservation of statutory rights did not assert any claims at all. Indeed, it was no more than an "express notice that certain rights are not abandoned or waived," or "a keeping back or withholding." BLACK'S LAW DICTIONARY (11th ed. 2019). In other words, the 2008 rights reservation is the very antithesis of a cognizable claim, and the Bankruptcy Code and Rules require MDEQ to assert cognizable claims in an amended proof of claim before that claim can be adjudicated. *Allegheny Int'l*, 954 F.2d at 173; *Semcrude*, 443 B.R. at 478; *Today's Destiny*, 2008 Bankr. LEXIS 3577, at *22.

7.  MDEQ therefore retains the burden of proof under Bankruptcy Code section 501 and Fed. R. Bankr. P. 3001 to state its claims. *Semcrude*, 443 B.R. at 476. Grace had no evidentiary burden. *See, e.g., In re Gilbreath*, 395 B.R. 356, 364 (Bankr. S.D. Tex. 2008) (omitting internal citations) ("incomplete or insufficient proofs of claim are not *prima facie* valid ... and [t]he debtor ... 'has no evidentiary burden to overcome' in objecting to a claim that is not *prima facie* valid"). In summary, MDEQ's own actions and writings directly contradict the argument set forth in the MDEQ Response that MDEQ has somehow met its initial burden of proof. MDEQ Response at ¶¶ 10-14. Such claims were simply not currently cognizable, and are therefore disallowable. *Today's Destiny*, 2008 Bankr. LEXIS 3577, at *22; *Gypsum*, 139 B.R. at 412.

## II. MDEQ CAN "FAIRLY CONTEMPLATE" ALL OF ITS PREPETITION OU3 CLAIMS

8. MDEQ's Response has finally—more than sixteen years after the bar date and eleven years after the 2008 MDEQ Settlement Agreement was approved by this Court in its 2008 Order—articulated a number of new, if vague and open-ended, claims, "including, but not limited to" a potpourri of potential prepetition OU3 NRD claims. MDEQ's Response reveals some of those claims, and asserts that it or another state entity (the Natural Resource Damages Program, part of the Montana Department of Justice) is *"expected* to identify more damages than are peripherally identified here." MDEQ Response at ¶ 9.e (emphasis added). All of these new claims are distinct from the 10% Cost Share and Post-Remedy O&M Costs asserted in the 2007 MDEQ POC. They are instead claims for compensatory damages. *See* CERCLA, 42 U.S.C. § 9607(a)(4)(C), § 9607(f); CECRA, MONT. CODE ANN. § 75-10-715(2)(b); 43 C.F.R. § 11.14(l) (defining "damages" as "the amount of money sought by the natural resource trustee as compensation for injury, destruction, or loss of natural resources").

9. The MDEQ Response states that these potential new claims included the:

- Alleged exceedance of certain concentration limits in certain surface waters. MDEQ Response at ¶ 9.a;

- Alleged "[l]oss of use" of certain creeks for recreational fishing. MDEQ Response at ¶ 9.b;

- Alleged "[l]oss of spawning fishery" in connection with a dam or impoundments. MDEQ Response at ¶ 9.c; and

- Alleged "[l]ost hunting opportunities" on lands that are owned by the federal government. MDEQ Response at 9.d.

MDEQ also asserted that it had other potential claims but does not identify them.

10. In making these claims, MDEQ has conceded what the record establishes, Durda Report at ¶ 9 & 27-30: MDEQ has long (for decades in some instances) been capable of "fairly contemplating" all of its prepetition OU3 Claims—including those it has not yet disclosed. Fed.

7

R. Evid. 801(d)(2) (opposing party statements are not hearsay); *see also, e.g., Hirth v. Donovan (In re Hirth)*, 2014 Bankr. LEXIS 5008, at *24 (B.A.P. 9th Cir. 2014) (Consent Order "construe[d] ... as including statements against interest"); Fed. R. Evid. 401 (relevance); *Exide*, 2019 600 B.R. at 759-60;[4] *Solitron*, 510 B.R. at 898 (NYSDEC had prepetition environmental claim that was discharged even though RI and other investigations and remedies had yet to occur); *see also In re Johns-Manville Corp.*, 552 B.R. 221, 232-33 (Bankr. S.D.N.Y. 2016) (analyzing differing approaches courts have taken to determine whether environmental claims arose prepetition). As discussed further below, the claims are fair contemplatable, and at least some of these claims likely have little merit.

*Alleged Per Se Injury for Asbestos MCL Exceedances*

11.    For example, in Response ¶ 9.a, MDEQ asserts that water bodies in OU3 "have numerous historic exceedances of the asbestos MCL"—thereby conceding that it has long known of this potential claim. MDEQ has had relevant water quality data since at least the 1990s. Second Cole Declaration at ¶ 3. Though that is sufficient by itself to establish that MDEQ could fairly contemplate the relevant claims, further water quality data were collected in the early 2000s, prior to November 2007, when MDEQ last amended its proof of claim. *Id.* at ¶ 9. Thereafter another *711 surface water samples* were collected and analyzed. *Id.* at ¶ 10. EPA also placed this information in context by finding that the asbestos in surface water posed no human health or ecological risk. *Id.* at 18-20.

12.    The record is thus clear. Regardless of whether MDEQ would prevail in its assertion that it has compensable damages, MDEQ could have asserted a water-quality damages

---

[4]    In *Exide*, Judge Carey also held that the creditor's claims were discharged prepetition claims under the *Grossman's* standard (which the Third Circuit expressly did not apply to environmental claims). 600 B.R. at 760 n.19 (citing *Jeld-Wen, Inc. v. Van Brunt (In re Grossman's, Inc.)*, 607 F.3d 114, 125 n. 11 (3d. Cir. 2010)).

claim prior to the March 31, 2003 claims bar date. It could have also articulated the claim in any of the multiple claim amendments between then and 2007—not to mention at any time since then. Durda Report at ¶¶ 17-27.a. But MDEQ has not asserted its water quality claim until now and it still not done so in a proof of claim.

13. MDEQ's assertion of the claim does not mean that is necessarily compensable. Under the relevant rules, MDEQ would need to show that the pertinent waters were potable before the release occurred. *See* 43 C.F.R. § 11.62(b)(i). Also importantly, the relevant surface water is not used as a source of drinking water. Durda Report at ¶ 27.a.; Second Cole Declaration at ¶ 24. Therefore, the public has not experienced any loss of services resulting from the alleged exceedances, which means that MDEQ may not be entitled to any damages for this claim. *See generally* 43 C.F.R. § 11.71; Durda Report at ¶¶ 13, 27.a. If necessary, Grace can provide further fact and law to support disallowance on these grounds and others (for each of the newly asserted claims) at the appropriate time.

***Purported Loss of Hunting & Fishing NRD Claims***

14. Similarly, MDEQ's new allegations in Response ¶¶ 9.b and 9.d concerning alleged losses of recreational fishing and hunting opportunities are claims that MDEQ could have fairly contemplated for many years. Durda Report at ¶¶ 17-26, 27.b, 27.d. Yet MDEQ concedes that it has not investigated these claims, despite its legal obligation to do so to avoid potential disallowance and discharge. *Solitron*, 510 B.R. at 898; MDEQ Response at ¶ 9.e. Even without investigation, MDEQ concedes that it has had knowledge by alleging fishing and hunting access restrictions. To the extent that MDEQ has any access concerns about a gate and sign at the beginning of Rainy Creek Road, these were in place by the early 2000s, before MDEQ's 2007 proof of claim. Second Cole Declaration at ¶ 23. Whether the gate and sign actually restrict access to hunting areas or stream beds for fishing is a factual question, but MDEQ would have had actual

and obvious notice of the issue long ago. Durda Report at ¶ 23. The record thus establishes that MDEQ did not have to wait until July 2019 to assert claims for purported losses of fishing and hunting opportunities in OU3, but could have done so years ago.

15. As with its water-quality claims, it appears that MDEQ may face significant legal and factual hurdles in establishing any compensable harm. Though MDEQ alleges (without providing any evidence) that access by recreational anglers up Rainy and Carney Creeks below the high water mark "is presently restricted due to asbestos exposure risk," any harm would be theoretical. The small and overgrown creeks are hard to access for multiple reasons that have nothing to do with asbestos, and they are not believed to offer any significant recreational fishing attraction. Second Cole Declaration at ¶ 22; Durda Report at ¶ 27.b Any hypothetical angler walking up the heavily vegetated stream bed would also confront barriers such as small under-road culverts. Second Cole Declaration at ¶ 22; Durda Report at ¶ 27.b. He or she would also be legally barred from trespassing on the private property above the high water mark adjacent to the stream beds.

16. MDEQ's claims for purported losses of hunting on Federal lands likewise would face hurdles. For instance, the EPA Remedial Project Manager stated at a June 7, 2017 meeting of the Lincoln County Commission: "The more research we do, the more we realize that recreational exposures are fine." *See Commissioners Given Update on Area Asbestos Sites*, THE WESTERN NEWS (June 13, 2017), https://www.thewesternnews.com/article/20170613/ARTICLE/170619985) (last accessed on August 22, 2019). EPA has also reached detailed conclusions about the lack of human health risk from recreational exposures at the Libby Site. Second Cole Declaration at ¶¶ 19, 21; Appendix Exhibit 18 (Site-Wide Human Health Risk

Assessment (2015) ("HHRA")); Appendix Exhibit 19 (Site-Wide HHRA Addendum (2018)); Durda Report at ¶ 27.d.

*Alleged Loss of Spawning Fishery Habitat*

17.  MDEQ's new allegation in Response ¶ 9.c regarding an alleged loss of fish spawning habitat due to physical obstacles to fish passage imposed by the Kootenai Development Impoundment Dam ("KDID") and other structures is likewise a claim that MDEQ has long been able to fairly contemplate. Construction of the KDID commenced in 1971, and the State has regulated it through the decades with the most recent permit issued on April 3, 2019. Second Cole Declaration at ¶¶ 2, 5.

18.  Like the other new NRD claims, however, MDEQ does not set forth a basis for any compensable injury. Durda Report at ¶¶ 11, 27.c. Neither CERCLA nor Montana's CECRA provides an NRD claim arising from a mere physical obstruction such as a dam, which seems to be central to MDEQ's claim. Instead, these statutes provide causes of action for damages resulting from a release of a "hazardous substance" (or in the case of CECRA, of a "hazardous or deleterious substance"). *See* CERCLA, 42 U.S.C. § 9607(a); CECRA, MONT. CODE ANN. § 75-10-715(2)(b). The ecological risk assessments performed by EPA and others establish that asbestos is not harming the fish. Second Cole Declaration at ¶ 18. Nor is it clear that the small creeks upstream of the dam ever provided spawning habitat.

*Undisclosed Additional Claims*

19.  In addition to these newly articulated claims, MDEQ asserts that undisclosed additional claims are "expected." Response at ¶ 9.e. MDEQ also asserts that it can pursue more remediation of the Libby Site under CECRA "if the MDEQ does not believe that the federal remedy is complete." MDEQ Response at ¶ 4 and 9.e.

20. The record demonstrates that MDEQ can "fairly contemplate" these claims. Second Cole Declaration, *passim*; Durda Report, *passim*. State knowledge by 2001 was extensive, and more than a decade of supplemental site-specific and intensive study since then has produced voluminous and detailed reports supplemented the data and assessed risks to human health and ecological receptors; the State has been involved with this entire process. Second Cole Declaration, *passim*; Appendix Exhibits 1-19, *passim*; Durda Report, *passim*. So, whether these claims are for future response costs or natural resource damages, they are clearly bankruptcy claims subject to the discharge injunction. *Exide*, 600 B.R. at 761 (internal citations omitted); *Gypsum*, 139 B.R. at 409. To argue otherwise would be to subvert Bankruptcy Code principles of notice, finality, and discharge of prepetition claims. *Johns-Manville,* 552 B.R. at 230 (quoting H.R. REP. NO. 95-595, at 309 (1978), reprinted in 1978 U.S.C.C.A.N. 5963, 6266). Because MDEQ has not stated its claims for any such NRD or additional remediation, these claims may be barred and discharged without further hearing. *Gypsum*, 139 B.R. at 412; *Solitron*, 510 B.R. at 898.

21. Furthermore, MDEQ's assertion of an additional, contingent remediation claim, MDEQ Response at ¶ 4 and 9.e., is unlikely to result in a compensable cause of action. The remedy that EPA will select under CERCLA for OU3, in consultation with MDEQ, will culminate more than a decade of study and scientific characterization. Durda Report at ¶¶ 19-21; Second Cole Declaration at ¶¶ 7–21, 25; Appendix Exhibits 14-19. Pursuant to federal requirements, including the National Contingency Plan, the OU3 remedy will be based on a thorough assessment of the human health and ecological risks that may require remediation and a detailed study of the technological alternatives for addressing such risks, and it will take into consideration state law requirements and various required federal factors such as cost-effectiveness. *See* 40 C.F.R. §

300.430(d), (e), and (f). States do not select the remedy at federal CERCLA sites such as the Libby Site, but have a defined role for providing input. CERCLA, 42 U.S.C. § 9621(f); 40 C.F.R. §§ 300.500-300.525. MDEQ has been a significant participant in all stages of this evaluation, with frequent technical meetings and receipt by MDEQ of draft and final plans and reports and all data. Second Cole Declaration at ¶ 7. MDEQ performs this function under the 2009 EPA/MDEQ cooperative agreement, and Grace provides funding for MDEQ's efforts based on this cooperative agreement. Claim Objection at ¶ 6; First Cole Declaration at ¶¶ 10, 26-29.

22. If after all of this study and evaluation, MDEQ were to decide that it wanted to impose a different remedy for the Libby Site, MDEQ's efforts would confront significant legal and factual barriers. The Montana remedy selection criteria under CECRA are essentially the same as under CERCLA, and it is hard to understand how MDEQ could show the required basis for action under CECRA following completion of the EPA-selected remedy. *Compare* 40 C.F.R. § 300.430(e)(9) *with* MONT. CODE ANN. § 75-10-721 ("Degree of Cleanup Required"). Moreover, basic principles of conflict preemption and other legal issues that can be addressed at the appropriate time also would stand in MDEQ's way in any effort to impose serial remedies for the same hazardous substance release.

### III. THE COURT SHOULD DISALLOW ALL PREPETITION CLAIMS OTHER THAN THE 10% COST SHARE AND THE POST-REMEDY O&M COSTS, BECAUSE MDEQ HAS FAILED TO TIMELY AMEND ITS PROOF OF CLAIM

23. MDEQ's effort to avoid application of the discharge injunction to its prepetition OU3 claims is now prejudicing both the Reorganized Debtors and this Court, forcing both Grace and this Court to expend legal resources needlessly. On these facts, the Court would be well within its discretion to disallow MDEQ's currently still-notional OU3 NRD and other claims—if only because MDEQ has yet to investigate, let alone articulate, all of its claims, despite having had

many years to do so. *Gypsum*, 139 B.R. at 412; *see also* Del. Bankr. L.R. 3001(d)(vi) (failure to timely provide sufficient information is a basis for disallowance).

24.  If the Court, however, declines to disallow MDEQ's new claims, then Grace respectfully requests that the Court:

- Require MDEQ to file its amended proof of claim within thirty (30) days of entry of such an order, and to do so in a manner that specifically and fully articulates each and every claim and the basis for it; and

- Enter an order that, in the event MDEQ were to fail to comply with the above within the allotted timeframe, would without further hearing or objection disallow and discharge all of MDEQ's OU3-related prepetition claims other than the MDEQ Surviving Claim (comprising the contingent 10% Cost Share and the Post-Remedy O&M Costs).

**[remainder of this page is intentionally left blank]**

WHEREFORE, the Reorganized Debtor requests the Court:

(a) Either:

(i) Enter the Order in substantially the form attached to the Claim Objection as <u>Exhibit A</u>, (a) Allowing the MDEQ Surviving Claim on the terms set forth in the Claim Objection; (b) Disallowing Claim no. 18496-1 in all other respects; (c) Discharging all other MDEQ claims on the terms and conditions set forth in the Plan and Confirmation Order; (d) Retaining the Court's jurisdiction over the MDEQ Surviving Claim, Claim no. 18496-1, and all matters relating thereto; or

(ii) Enter an order requiring MDEQ to file an amended proof of claim within thirty (30) days that specifically and fully articulates each and every claim and the basis for it, and if no such proof of claim is filed, disallow all MDEQ prepetition OU3 claims other than the 10% Cost Share and the Post-Remedy O&M Costs; and

(b) In any case grant such other relief as may be appropriate.

Dated: August 26, 2019

THE LAW OFFICES OF ROGER HIGGINS, LLC
Roger J. Higgins
516 N. Ogden Avenue
Suite 136
Chicago, IL 60642
Phone: (312) 480-1984

and

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ James E. O'Neill*
Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
919 North Market Street, 17th Floor
PO Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Phone: (302) 652-4100
Fax: (302) 652-4400

Co-Counsel for the Reorganized Debtor

15

DOCS_DE:225114.1 91100/001