## Exhibit C-3

### Second Amended Cross-Complaint

1  Gary S. Smolker, SBN 56117
   Alice M. Graham, SBN 83046
2  Law Offices of Smolker & Graham
   4720 Lincoln Blvd., Suite 280
3  Marina Del Rey, CA  90292-6977
   Tel:  (310) 574-9880  Fax: (310) 574-9883
4
5  Attorneys for Defendants and Cross-complainants
   Gary Smolker and Alice Smolker
6
7
8              SUPERIOR COURT OF THE STATE OF CALIFORNIA
9                   FOR THE COUNTY OF LOS ANGELES
10
11 TIG INSURANCE COMPANY, a California          ) Case No. BC 173952
   Corporation,                                 )
12                                              ) (Honorable Dzintra Janavs, Judge)
          Plaintiff,                            ) (Department 15)
13                                              )
          vs.                                   ) **SECOND AMENDED CROSS**
14                                              )
   GARY SMOLKER, an individual, and ALICE       ) **COMPLAINT**
15 SMOLKER, an individual, and DOES 1-10,       )
   inclusive,                                   )
16                                              )
17        Defendants.                           )
                                                ) Hearing date:  July 13, 1998
18 ─────────────────────────────────────        )
                                                ) Hearing Time:  8:30 a.m.
19 AND RELATED CROSS-ACTION                     )
                                                ) Department:    15
20                                              )
21
22 Attached hereto is a copy of Cross-complainants Gary Smolker's and Alice Smolker's Second
23 Amended Cross-Complaint.
24 Dated: July 12, 1998                 Law Offices of Smolker & Graham
25
26                                      _____
27                                            Gary S. Smolker
               Attorneys for Cross-complainants Gary and Alice Smolker
28

                                          -1-

1  Gary S. Smolker, SBN 56117
   Alice M. Graham, SBN 83046
2  Law Offices of Smolker & Graham
   4720 Lincoln Blvd., Suite 280
3  Marina Del Rey, CA 90292-6977
   Tel: (310) 574-9880 / Fax: (310) 574-9883
4
5  Attorneys for Defendants and Cross-complainants
   Gary Smolker and Alice Smolker
6
7
8              SUPERIOR COURT OF THE STATE OF CALIFORNIA
9                  FOR THE COUNTY OF LOS ANGELES
10

| 11 | TIG INSURANCE COMPANY, a California Corporation, | ) | Case No. BC 173952 |
|---|---|---|---|

11 TIG INSURANCE COMPANY, a California
   Corporation,                              )  Case No. BC 173952
12                                           )  (Honorable Dzintra Janavs, Judge)
        Plaintiff,                           )  (Department 15)
13                                           )
    vs.                                      )
14                                           )  **SECOND AMENDED CROSS-**
                                             )  **COMPLAINT FOR DAMAGES FOR**
15 GARY SMOLKER, an individual, and ALICE    )
   SMOLKER, an individual, and DOES 1-10,    )  **1. Fraud,**
16 inclusive,                                )
                                             )  **2. Negligent Performance of an**
17     Defendants.                           )  **Undertaking to Perform Services,**
                                             )  **Negligence and Violation of Statutory**
18 ─────────────────────────────────────     )  **Duty,**
                                             )
19 GARY SMOLKER and ALICE SMOLKER,           )  **3. Strict Liability,**
                                             )
20     Cross-complainants,                   )  **4. Willful Misconduct,**
                                             )
21    vs.                                    )  **5. Trespass, Assault, Battery, Interference**
                                             )  **with Private Right of Occupancy, Wrongful**
22 HOME SAVING TERMITE CONTROL,              )  **Eviction, Maintaining a Nuisance, Request**
   INC.; W.F. MORRIS; RIKK THOMPSON;         )  **for Injunction To Abate A Nuisance and To**
23 W.R. GRACE & CO.; GRACE DAVISON;          )  **Abate A Dangerous and Illegal Condition,**
   ALBERT J. COSTELLO; JAMES R. HYDE;        )
24 COREGIS GROUP, INC.; COREGIS              )  **6. Waste, Failure to Maintain and Care for**
   INSURANCE COMPANY; CALIFORNIA             )  **Improvements, Contribution from Co-**
25 INSURANCE COMPANY; TRUCK                  )  **tenants, Lien for Repayment and**
   INSURANCE EXCHANGE; TRUCK                 )  **Foreclosure of Lien for Repayment,**
26 UNDERWRITERS ASSOCIATION;                 )
27
28

                                    -1-

XC2nd227

FARMERS GROUP, INC.; FARMERS
INSURANCE GROUP OF COMPANIES;
PACIFIC VILLAS HOMEOWNERS'
ASSOCIATION; TIG INSURANCE
COMPANY; RELIANCE INSURANCE
COMPANY; FRONTIER PACIFIC
INSURANCE COMPANY; JAMES W.
HOLLAND; JULIE A HOLLAND; LANCE J.
ROBBINS; JOSEPH A. BAILEY, II;
ANGELA JORDAN VERDUN; GERALD W.
IVORY; MATTHEW JOHN FREDERICKS;
VIRGINIA A CIPRIANO; and ROES 1-200,
inclusive,

    Cross-defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**7. Breach of Contract, and Negligent
Performance of An Undertaking to Render
Services,**

**8. Bad Faith Breach of Contract,**

**9. Wrongful Interference, Prevention of
Assistance by Third Persons, Unfair
Business Practices, Unfair Competition and
Tortuous Wrongful Interference, and**

**10. Breach of Fiduciary Duty.**

Cross-complainants GARY SMOLKER and ALICE SMOLKER allege:

<u>FIRST CAUSE OF ACTION</u>

(Against Cross-defendants HOME SAVING TERMITE CONTROL, INC., W.F. MORRIS,

RIKK THOMPSON, , and ROES 1-25 for Fraud)

<u>**Cross-complainants**</u>

    1. Cross-complainants GARY SMOLKER and ALICE SMOLKER (hereinafter the

SMOLKERS) are, and at all times mentioned in this cause of action were, husband and wife,

residing at 15-63rd Avenue, Playa del Rey, California (hereinafter the PREMISES) with their two

minor daughters, Judi Smolker and Leah Smolker, and their family dog, Caramel.  Judi, who is

now 13 years old, and Leah who is now 10 years old, have lived at the PREMISES for their entire

lives. Playa del Rey, is located in Los Angeles County, California.

    2. The SMOLKERS, their children and their dog have been harmed by Home Saving

Termite Control Inc.'s (hereinafter HSTCI's) misrepresentations concerning and misuse of a

pesticide product in the PREMISES.

<u>**The Property in Question**</u>

    3. At all times herein mentioned the PREMISES, that certain property known as 15 63rd

-2-

XC2nd227

1  Avenue, Playa del Rey, CA. was a condominium project consisting of common area and six

2  individual condominium units, all as more particularly described, depicted, and defined in that

3  certain condominium plan recorded on 3-3-77 as Instrument No. 77-219328 in the official records

4  of the County Recorder of Los Angeles County, California (hereinafter CONDOMINIUM

5  PLAN); GARY SMOLKER has owned unit #4 thereat continuously since 1978. In October 1996

6  HSTCI chemically treated the PREMISES with pesticides for the purpose of killing termites.

7  HSTCI injected a chemical pesticide, which is not registered with the US EPA or with the

8  California Department of Pesticide Regulation, into the voids between the walls and between the

9  ceilings and floor and between the ceiling and roof for the purpose of killing termites.

10    4. This pesticide is still in the walls, etc. of the PREMISES. The presence of this

11  pesticide in the wall voids, etc. of the PREMISES constitutes an illegal, hazardous and dangerous

12  condition in the PREMISES, a health and safety hazard to members of the public who reside in or

13  visit the PREMISES or who are exposed to pesticide that is removed from the PREMISES, and

14  an injury to the interest (or estate) of everyone who owns an interest in the PREMISES.

15                              **Cross-defendants**

16    5. The true names or capacities, whether individual, corporate, associate or otherwise, of

17  cross-defendants ROES 1 through 200, inclusive, and each of them, are unknown to cross-

18  complainants, who therefore sue said cross-defendants by such fictitious names and ask leave to

19  amend this Cross-Complaint to show said cross-defendants' true names and capacities when the

20  same have been ascertained. Cross-complainants are informed and believe, and thereupon allege,

21  that each of the cross-defendants designated herein a ROES 1 through 180 inclusive is

22  negligently, fraudulently, contractually or otherwise legally responsible in some manner for events

23  and happenings herein referred to and negligently or otherwise unlawfully caused or is legally

24  responsible for injuries and damages to cross-complainants as herein alleged, and each of the

25  cross-defendants designated herein as ROES 181 through 200 inclusive became an owner of a

26  condominium unit at the PREMISES after January 1, 1998 and is an owner of a condominium

27  unit thereat.

28

-3-

XC2nd227

1      6. At all times mentioned in this cause of action Cross-defendant HOME SAVING

2  TERMITE CONTROL, INC. (hereinafter HSTCI) was a business which provided home

3  improvement goods and services to the general public and operated as both a general contractor

4  and as a structural pest-control operator. At all times herein mentioned HSTCI was managed and

5  operated by W.F. Morris (hereinafter MORRIS) in the County of Los Angeles, State of

6  California. At all times mentioned in this cause of action HSTCI held itself out as being a licensed

7  general building contractor (general building contractor's license number 245055) with special

8  expertise in installing pesticide treatment systems in residential building structures and as having

9  30 years experience as a general building contractor doing home improvement projects and new

10  construction contracting.

11     7. HSTCI has never had a general building contractor's license. The general building

12  contractor's license number (245055) which HSTCI identifies being its general contractor's

13  license is the general building contractor's license of W.F. Morris. HSTCI uses MORRIS'

14  general contractor's license and represents itself as being a general contractor at the direction of

15  MORRIS with MORRIS' permission and consent.

16     8. At all times herein mentioned HSTCI, under the direction of MORRIS, represented

17  that HSTCI used non-toxic non-chemical pesticides registered with and approved by the US EPA

18  and the State of California. However in October 1996, under the direction of MORRIS, HSTCI

19  applied unregistered toxic chemicals in the PREMISES as a pesticide treatment for eradicating

20  termites.

21     9. MORRIS is a resident of Los Angeles County, California. MORRIS is, and at all

22  material times MORRIS was, the "president", general manager, a major stockholder, and the

23  founder of HSTCI. MORRIS so dominates the management and operation of HSTCI, and

24  HSTCI and MORRIS so intermingle their individual licensed contractor activities and identities,

25  that MORRIS and HSTCI are alter egos of one another and should be treated as alter egos of one

26  another.

27     10. MORRIS prepared, or supervised the preparation of, the HSTCI Material Safety Data

28

-4-

XC2nd227

Sheet (hereinafter MSDS) for the chemical compound SYLOID 244 that is at issue in this case. The MSDS sets forth MORRIS' name as the responsible person to contact in case of an emergency with respect to SYLOID 244. MORRIS has no knowledge or expertise in the field of chemistry that would enable MORRIS to competently advise how to deal with a chemical contamination problem concerning SYLOID 244. MORRIS prepared, or supervised the preparation of, HSTCI's sales and informational materials that are at issue in this case (hereinafter SALES MATERIAL). HSTCI's SALES MATERIAL specifies that HSTCI utilizes a non-chemical treatment to eradicate termites.

11. MORRIS personally selected the chemicals which were applied as pesticides in the PREMISES. MORRIS personally designed the process for applying chemical pesticides in residential structures to eradicate termites infestations that was used by HSTCI at the PREMISES. MORRIS personally selected the equipment that was used by HSTCI to apply pesticides at the PREMISES in October 1996. The chemicals selected by MORRIS were not registered with the US EPA or approved by the State of California for use as pesticides and are toxic. The equipment for application of pesticides selected by MORRIS and utilized by HSTCI in the PREMISES was inappropriate for applying pesticides in residential structures. The pesticide application process designed by MORRIS and utilized by HSTCI in the PREMISES is unsafe and dangerous.

12. MORRIS is not a chemist, has not taken any courses in chemistry, has not read any books on chemistry or done any self-educating in chemistry, but at all times prior to the filing of this action represented himself as being expert in the chemical properties of the pesticides HSTCI applied in the PREMISES. MORRIS has no training or education in chemistry.

13. Cross-defendant RIKK THOMPSON (hereinafter THOMPSON) worked for HSTCI as a State Licensed Inspector and participated in activities which occurred at the PREMISES in Feb. 1997 which caused damage and injuries to the SMOLKERS.

14. In or about the time frame August through December 1996, Silicic Acid (hereinafter SYLOID 244), manufactured by Grace Davison (hereinafter GD), was sold by W.R. GRACE &

XC2nd227

1  CO. (hereinafter GRACE) and/or GD to HSTCI and purchased by HSTCI for use as a pesticide.

2  The SYLOID 244 sold by GRACE and/or GD to HSTCI was purchased by HSTCI in the form of

3  a dry white powder consisting of solid microscopic size particles of Silicic Acid. Under

4  MORRIS' supervision and direction SYLOID 244, in the form purchased from GRACE and/or

5  GD, was used and applied as a pesticide by HSTCI in the normal course of HSTCI's business.

6  On or about October 11 and 12, 1996 HSTCI injected SYLOID 244 into the PREMISES by a

7  process designed by MORRIS for that purpose.

8       15. At all times herein mentioned it was against the law for HSTCI to deliver, sell,

9  possess or use SYLOID 244 as a pesticide in California. It was against the law for MORRIS to

10  direct HSTCI to do so. It is now, and at all times herein mentioned it was, against the law, to use

11  SYLOID 244 in the PREMISES as a pesticide.

12  **FRAUDULENT CONDUCT**

13       16. At all times herein mentioned HSTCI advertised on its trucks, its stationary, its

14  inspection reports, its contract proposals and its contracts, and represented, that its work was

15  bonded and insured. MORRIS allowed and directed HSTCI to use MORRIS' general building

16  contractor's license to represent HSTCI was a bonded licensed general building contractor.

17       17. At all times herein mentioned HSTCI advertised on its trucks, its inspection reports,

18  its contract proposals and its contracts, and represented that HSTCI used a non-chemical process

19  to eradicate termites.

20       18. As part of HSTCI's home improvement business, MORRIS and HSTCI prepared a

21  written informational brochure to be passed out to members of the general public as a sales tool.

22  This brochure was used by HSTCI as a sales tool, in 1996, to obtain a contract to apply pesticides

23  in the PREMISES. This brochure purports to describe the safety and efficacy of HSTCI's termite

24  extermination goods and services, and purports to describe the method used by HSTCI for

25  eliminating and preventing termite infestations. This brochure also purports to describe HSTCI's

26  background, experience, training, expertise, licenses and other qualifications.

27       19. At all times herein mentioned, as part of its standard operating procedure, HSTCI

28

-6-

XC2nd227

1  provided its field crews with copies of this brochure to hand out to members of the general public

2  with the intent of inducing the public to purchase HSTCI's termite extermination goods and

3  services, i.e. to hire HSTCI to provide termite inspection, control and eradication services and

4  supplies.  In 1996 a copy of this brochure was provided to cross-complainant ALICE SMOLKER

5  and to the Pacific Villas Homeowners Association (hereinafter HOA) by an employee of HSTCI

6  working in the neighborhood of the PREMISES for ALICE SMOLKER to read and share with

7  other members of the homeowners association, as part of a sales campaign by HSTCI.  This

8  employee told ALICE SMOLKER that the pesticides that HSTCI used were not a chemical, were

9  harmless, and could not cause any displeasing side effects to people or property.

10

11  ### Intentional or Negligent Misrepresentation in the Written Sales Brochure

12

13       20.  HSTCI made the following representations of material fact in the informational sales

14  brochure given to ALICE SMOLKER and the HOA:  HSTCI's uses a non chemical method to

15  kill termites and to control against future termite infestations that is health and environmentally

16  safe.  No pesticide chemicals are used by HSTCI.  All pesticides used by HSTCI in its pest control

17  process are not toxic to mammals, and pose no health or environmental hazards.  A property

18  owner should not be concerned in having pesticide products applied by HSTCI in their structure

19  because HSTCI's pesticide products are not chemicals.  All pesticide products used by HSTCI are

20  safe and have been approved by the Environmental Protection Agency and the State of California.

21  How and where pesticides are applied by HSTCI in a structure guarantees there is no danger of

22  prolonged exposure to the pesticide in the living space.  Only HSTCI had the vision and the know

23  how to obtain the proper application process for pesticides and has designed the exclusive method

24  for safe application of pesticides in residential structures using specially devised equipment that

25  assures necessary correct penetration of HSTCI's pesticides in the structural voids of residential

26  structures.  HSTCI's construction knowledge, obtained through 30 years experience as general

27  building contractors (license number 245055) was mandatory in the development of this

28

-7-

XC2nd227

1   procedure and necessary equipment. HSTCI is truly committed to better health through safe pest

2   control. HSTCI has provided termite and pest control services, under the same ownership and

3   management, since 1965, using only the safest methods and chemicals available.

4        21. HSTCI's sales brochure also states: HSTCI's application of pesticides in residential

5   structures, through installation of the HSTCI pesticide system in a residential structure, causes

6   absolutely no unsightly damage to a residential structure that has been treated by HSTCI. HSTCI

7   guarantees it.

8        22. These representations were in fact false. They are false and misleading concerning

9   registration of the pesticides used with governmental agencies, approval of the pesticides used by

10   governmental agencies, the properties of the pesticides used by HSTCI, and the non-chemical

11   nature of the pesticides used by HSTCI. They are false and misleading concerning the safety and

12   effectiveness of HSTCI's pesticide products and method of applying pesticides. These statements

13   directly or indirectly falsely imply that HSTCI's pesticide products and methodology is

14   recommended or endorsed by a agency of the Federal Government and the State of California.

15   These representations falsely imply that the pesticides used by HSTCI are registered with the US

16   EPA and the State of California. These representations give false claims as to the safety of the

17   pesticides used by HSTCI, the safety of HSTCI's method of application, .and of the devises and

18   equipment utilized by HSTCI in its practise of pest control. Additionally, these representations

19   falsely imply that HSTCI is a bonded licensed general contractor.

20        23. The truth at the time this brochure was handed to ALICE SMOLKER by an employee

21   of HSTCI, at the time this brochure was read by members of the HOA, at the time HSTCI made a

22   oral sales pitch to the HOA, at the time HSTCI was hired to treat the PREMISES by the HOA

23   and at the time HSTCI applied HSTCI's pesticide in the PREMISES was as follows. HSTCI's

24   pesticide product SYLOID 244 was not approved by the US EPA. HSTCI's pesticide product

25   SYLOID 244 is not approved by the State of California. SYLOID 244 is not registered with the

26   US EPA. SYLOID 244 is not registered with the Department of Pesticide Regulation of the State

27   of California. It is against the law to possess or to use SYLOID 244 as a pesticide. At the time

28

1   HSTCI handed out its sales brochure to the HOA and ALICE GRAHAM, and at the time HSTCI
2   made its sales pitch to the HOA, HSTCI was using a different pesticide product than the one
3   HSTCI actually used in the PREMISES.  At the time HSTCI carried out its pesticide application
4   at the PREMISES, the EPA registration for the product HSTCI had been using expired and the
5   manufacturer elected not to try to renew it.  The pesticide product HSTCI had been using at the
6   time the sales brochure was passed out at the time the sales brochure was passed out and the
7   inspection of the PREMISES was carried out by HSTCI was EPA Toxicity Category III and it
8   was meant for commercial and industrial use only and it was a violation of federal law to use that
9   product in a manner inconsistent with its labeling.  The name of that product was a registered
10  trademark of W.R. Grace Company.    That product was hazardous to humans and domestic
11  animals and not to be used in areas where food is prepared or served.  That product was 95 %
12  amorphous silica gel and 4.7 % Ammonium Fluorsilicate.  The Ammonium Silicofluoride in that
13  product could decompose on heating, giving off HF, which is toxic.    Special protection to be
14  used with that product is safety glasses or goggles for eye protection, rubber or impervious gloves
15  for skin protection, and mask or respirator for respiratory protection.  Precaution is to be taken to
16  avoid inhalation of pesticide dust.  Rather than use a registered pesticide, or to warn the public of
17  precautions to be taken, MORRIS caused HSTCI to use "pure" SYLOID 244, one of the active
18  ingredients in the product HSTCI had been using (whose EPA registration expired), in the
19  PREMISES and refused and failed to give out the precautions set forth on the Material Safety
20  Data Sheet for Dri-Die, or on the Material Safety Data Sheet for SYLOID 244.

21      24.  HSTCI does not practise safe pest control.  HSTCI's proprietary method of applying
22  SYLOID 244 and/or silica gel in residential structures is inherently unsafe.  HSTCI made false
23  and misleading claims and used misleading non-numerical and/or comparative statements on the
24  safety of its products and procedures.  HSTCI did not warn of the dangers of being exposed to its
25  pesticide or give directions for the safe use of HSTCI's pesticide.  The following facts should
26  have been presented in HSTCI's informational sales brochure.  HSTCI uses toxic chemical
27  pesticide products that have to be used carefully in order to be safe.  The product applied in the

28

-9-

XC2nd227

1   wall voids of the home should only be used in industrial and commercial facilities. The following

2   special precautions should be taken: wear safety glasses or goggles for eye protection; wear

3   rubber or impervious gloves for skin protection; wear mask or respirator for respiratory

4   protection and avoid inhalation of pesticide dust. Pesticide dust particles can cause physical

5   injuries if they come in contact with eye, skin, or mouth. Pesticide dust particles are dangerous to

6   health if inhaled or swallowed. These pesticides should be kept out of the reach of children. It is

7   necessary to wear protective clothing when handling HSTCI's pesticides. It is necessary to avoid

8   inhaling HSTCI's pesticide and to not come in contact with it. It is toxic. The drying action of

9   the pesticide dust applied in structural voids by HSTCI can burn your entire esophagus, damage

10   your lungs, and can cause irritation of the mucous membranes of the nose and throat and irritation

11   of the skin. If the pesticide dust applied in the PREMISES gets into your mouth it can cause "dry

12   mouth" --- which causes a lessening of the amount of saliva in the mouth, which can result in

13   tooth decay and penetration of various toxic substances into the body that are normally destroyed

14   when they come in contact with the saliva in a person's mouth. Prolonged inhalation of the

15   pesticide dust applied by HSTCI in the PREMISES might cause scarring of the lungs, cough, and

16   shortness of breath. The pesticide used by HSTCI to eradicate subterranean termites may be fatal

17   if swallowed. Excessive absorption of that pesticide through skin may be fatal. It one of the most

18   toxic pesticides known and a leading cause of human poisoning and deaths from pesticides in the

19   US and throughout the world.

20       25. HSTCI's pesticide applicators, prior to and while applying pesticide dust (i.e.

21   SYLOID 244 and/or silica gel) in a residential structure, do not evaluate the equipment to be used

22   and the property to be treated and surrounding properties to determine the likelihood of harm or

23   damage. HSTCI's pesticide applicators do not care if pesticide dust they apply in a residential

24   structure invades the living quarters of the structure. HSTCI's applicators and inspectors have no

25   safety concern about contaminating the bodies or clothing of people not involved in the

26   application process with SYLOID 244 or silica gel, or of contaminating nontarget private

27   property.

28

XC2nd227

26. When HSTCI and MORRIS made the representations concerning the character and quality of HSTCI's pest control goods and services, set forth in HSTCI's informational brochure, HSTCI and MORRIS knew they were false or had no reasonable grounds for believing they were true. Their representations concerning the character and quality of the pesticides used by HSTCI were false. Their representations concerning the character and quality of the method of application of pesticides by HSTCI were false. When HSTCI and MORRIS prepared the informational brochure, when the informational brochure was passed out to members of the general public by HSTCI's field crew members, HSTCI and MORRIS made the representations contained therein with the intent to defraud and induce members of the general public, the HOA, and cross-complainants, to allow HSTCI to inspect their premises; to induce the general public, the HOA, and cross-complainants to hire HSTCI to provide pest control goods and services and to allow HSTCI to have access to their homes to apply pesticides.

27. ALICE SMOLKER and the HOA read HSTCI's informational sales brochure. They did not know the representations in HSTCI's informational sales brochure were false and believed they were true. In reliance on the false statements contained in HSTCI's informational sales brochure the HOA invited HSTCI to make a sales presentation to the HOA. HSTCI thereafter made an oral sales presentation. At the presentation, HSTCI personnel assured the HOA that the pesticides used by HSTCI were benign, were not chemicals, and would have no effect on human beings if human beings came in contact with them. Based on the written representations in the information brochure and the oral presentation of the same information, the HOA invited HSTCI to inspect the PREMISES for termite infestation and to make a proposal to provide services and goods to eradicate the termites in the PREMISES. Thereafter the HOA allowed HSTCI to inspect the PREMISES including the SMOLKERS' home to determine the location of termite infestation and dry rot. Based on the oral and written representations she had received from HSTCI, ALICE SMOLKER allowed HSTCI to inspect the SMOLKERS' home. Thereafter HSTCI submitted an inspection report dated July 13, 1996 to the HOA, reporting the results of HSTCI's inspection of the PREMISES, and a bid, contract proposal, for a contract to eradicate

-11-

XC2nd227

1  termite infestations indicated by HSTCI's inspection report to be present in the PREMISES.

2       28.  On Aug. 15, 1996 the HOA held a meeting to discuss and vote on termite treatment
3  of the PREMISES.  Based on the representations made by HSTCI in its sales brochure, its oral
4  presentation, and in its inspection report and proposed contract, the persons present voted to hire
5  HSTCI to treat the PREMISES for termites.  Attending the August 15, 1996 HOA meeting were
6  Carol Kay, Sam Eskenazi, Alice Smolker, Joe Bailey and Matt Fredericks.  The President of the
7  HOA, Matt Fredericks was authorized to hire a HSTCI to treat the PREMISES for termites.
8  Thereafter, the President sent out a Special Assessment Notice to pay for a termite treatment of
9  the PREMISES by HSTCI.  Each condominium unit owner, including GARY SMOLKER, was
10  assessed $1,325.33 by the HOA to pay for the services and goods to be provided by HSTCI,
11  without disclosing to GARY SMOLKER or giving to GARY SMOLKER notice of the work to
12  be done or the goods and services to be provided by HSTCI, the pest to be controlled, the
13  pesticide or pesticides to be used, or any warning or precautionary statements or notice about the
14  safety and use of the pesticides to be applied in the PREMISES.  The special assessment was
15  made by the HOA in reliance on the false representations made by HSTCI concerning the
16  pesticide treatment HSTCI proposed to perform in the PREMISES.  As a result of ALICE
17  SMOLKER's and the HOA's reliance on HSTCI's false representations, GARY SMOLKER paid
18  the amount ($1,325.33) assessed against him by the HOA to pay for termite eradication work by
19  HSTCI.  Thereafter the President of the HOA scheduled the termite treatment of the PREMISES
20  by HSTCI to take place in early October 1996.

21       29.  In reliance on the false representations made by HSTCI, ALICE SMOLKER and the
22  HOA allowed HSTCI to have access to GARY SMOLKER's condominium unit to do pest
23  control work therein and the HOA allowed HSTCI access to the entire PREMISES to do pest
24  control work.  At the time ALICE SMOLKER allowed HSTCI access to her home to do pest
25  control work, and at the time the HOA allowed HSTCI access to the entire PREMISES to do
26  pest control work ALICE SMOLKER and the HOA did not know the representations in HSTCI's
27  informational brochure were false and believed they were true.  Had ALICE SMOLKER known

28

-12-

XC2nd227

1    the true facts should would not have let HSTCI come into her home. Had the HOA known the

2    true facts the HOA would not have hired HSTCI to do pest control work at the PREMISES. At

3    the time GARY SMOLKER paid the pest control assessment to the HOA and at the time HSTCI

4    commenced its pest control treatment of the PREMISES, GARY SMOLKER had no notice or

5    knowledge that HSTCI proposed to inject micron sized pesticide particles under high pressure

6    into structural voids between walls, and into ceilings, in GARY SMOLKER's home. Had GARY

7    SMOLKER known the true facts, GARY SMOLKER would not have allowed HSTCI to have

8    access to his home. Had GARY SMOLKER known the true facts GARY SMOLKER would

9    have attended the HOA meeting where hiring a pest control company was voted on, and would

10   have spoken against and voted against hiring HSTCI. If the HOA still voted to go forward with

11   HSTCI, GARY SMOLKER would have initiated legal action to have an injunction issued to

12   prevent HSTCI from applying an unregistered poison in the PREMISES.

13                **Concealment Prior to and after Pesticide Application in the PREMISES**

14         30.  The information HSTCI provided to ALICE SMOLKER, GARY SMOLKER and the

15   HOA, prior to treating the PREMISES, was not adequate to protect the HOA from being

16   defrauded by HSTCI and MORRIS, or to enable the HOA to protect the PREMISES from

17   property damage being done to the PREMISES by HSTCI, or to protect cross-complainants

18   ALICE SMOLKER and GARY SMOLKER from being defrauded and caused to suffer property

19   damage and personal injuries, or to enable the SMOLKERS to adequately protect their health and

20   the health of their children and the health of their family dog. Nobody provided cross-

21   complainant GARY SMOLKER or cross-complainant ALICE SMOLKER with a Business &

22   Profession Code Section 8538 "Notice to Owner as to Work to be Done" by HSTCI prior to

23   HSTCI applying pesticides in the SMOLKERS' home. MORRIS and HSTCI concealed or

24   suppressed the following material facts prior to HSTCI treating the PREMISES with pesticides,

25   and continued to conceal the following material facts for a considerable time after HSTCI treated

26   the PREMISES with pesticides.

27         30(a).  HSTCI intended to inject and injected an unregistered poison, SYLOID 244, into

28
                                            -13-

XC2nd227

1   the structural voids of the PREMISES. It was against the law for HSTCI to apply this poison in

2   the PREMISES as a pesticide for eradicating or controlling termites. It is against the law for the

3   HOA and/or condominium unit owners to possess or to use this poison as a pesticide.

4         30(b). The microscopic SYLOID 244 pesticide particles applied by HSTCI in structural

5   voids of residential structures are dangerous because they are respirable. When inhaled, they can

6   go directly to the lungs where they can cause lung scaring cough and shortness of breath.

7         30(c). The standard operating procedure of HSTCI's inspectors and the equipment

8   provided to HSTCI's inspectors does not allow HSTCI's inspectors to make the full inspection

9   and evaluation of premises necessary to insure safe and proper application of pesticides in living

10   units that have ceilings as high as the ceilings in the living rooms of each of the residential

11   condominium units in the PREMISES.

12         30(d). The high pressure air flow with which three micron pesticide particles are blown

13   through aperture holes in walls into the structural voids between walls, and between ceiling and

14   floor or roof above, when HSTCI's proprietary process of applying pesticides is utilized, will also

15   blow the small respirable pesticide particles back into the living area of the residence being treated

16   by HSTCI.

17         30(e). Under normal operating conditions, when respirable pesticides particles are

18   injected into structural voids using the proprietary HSTCI system, some of the small respirable

19   pesticide particles blown into structural voids will not stay there, but will be blown back into the

20   living areas of the residence. Some of the respirable pesticide particles injected into the structural

21   voids will be "loose" in the voids and will re-enter the living area whenever there are temperature

22   gradients or pressure gradients between the voids and the living areas. Whenever the pressure

23   inside the structural void is higher than the pressure in the outside living area an air movement will

24   be created which will carry loose small respirable pesticide particles out of the structural voids

25   into the living area. Temperature gradients between the structural void and the living area will

26   also create air currents which may carry loose small respirable pesticide particles out of the

27   structural voids into the living areas of the treated residential units.

28

-14-

1    30(f).  The SYLOID 244 treatment utilized by HSTCI is not effective at killing termites or

2    at preventing future termite infestations.

3    30(g).  In the regular course of affairs, the HSTCI proprietary pesticide application system

4    creates unsightly spots on the walls where injection holes are drilled by HSTCI as part of

5    HSTCI's proprietary process for applying pesticides in residential structures.  The holes which

6    HSTCI drills in exterior walls compromise the integrity of the structure and can provide a path for

7    wind and rain to enter the PREMISES and cause rain damage and also provide a path which can

8    allow pesticide particles to be blown or shaken or be moved by temperature or pressure gradients

9    through the structural voids into the living quarters of the PREMISES.

10    30(h).  The Material Safety Data Sheet for the product HSTCI routinely applied in

11    structural voids at the time HSTCI passed out the HSTCI sales brochure to ALICE SMOLKER

12    and to the HOA, and at the time HSTCI inspected the PREMISES specified: that special

13    protection is necessary ---- Safety Glasses or Goggles should be worn for EYE PROTECTION,

14    Rubber or Impervious Gloves should be warn for SKIN PROTECTION, a Mask or Respirator

15    should be worn for RESPIRATORY PROTECTION, inhalation of pesticide dust should be

16    avoided.  "Apply this product only as specified on the label." "It is a violation of Federal law to

17    use this product in a manner inconsistent with its labeling."  The EPA Acute Toxicity Category of

18    this product is EPA Toxicity Category III.  It takes up to a pint to kill you.  It is for industrial and

19    commercial use only.

20    30(i).  The pesticide which HSTCI uses to kill subterranean termites in the normal course

21    of its business, and which HSTCI used in the PREMISES, is highly toxic, fatal if swallowed and

22    fatal if excessively absorbed through the skin.

23    31.  MORRIS and HSTCI concealed the facts set forth in paragraphs 30(a) through 30(i),

24    above, of this pleading by telling the general public, the HOA, and the SMOLKERS other facts to

25    mislead the HOA, ALICE GRAHAM and GARY SMOLKER and to prevent the HOA, ALICE

26    GRAHAM and GARY SMOLKER from discovering the concealed or suppressed facts.

27

28

-15-

XC2nd227

1    32. The pesticides used by HSTCI in its treatment of the PREMISES were of a toxic and

2  hazardous nature to humans, a health hazard, when used independently and/or in combination.

3  HSTCI treated the PREMISES with pesticides including, but not limited to, those listed in Exhibit

4  "A" attached to this second amended cross-complaint. During HSTCI's treatment of the

5  PREMISES, HSTCI illegally, negligently, recklessly, and carelessly failed to exercise reasonable

6  precautions to avoid contamination of the SMOLKERS' living quarters with said pesticides, and

7  illegally, negligently, recklessly and carelessly permitted said pesticides to enter the SMOLKERS'

8  living quarters. Upon entering the SMOLKERS' living quarters the pesticide applied by HSTCI

9  contaminated the air, floors, walls, air-handling equipment, carpets upholstery, furniture, bedding,

10  Judi and Leah's stuffed animals, and other objects located in the SMOLKERS' living area with

11  pesticide, and caused such objects to become sources of continuing pesticide exposure. The

12  existence of pesticide in the SMOLKERS' living quarters and garage area resulted in the

13  SMOLKERS and their two young daughters, Judi and Leah, their dog, Caramel, and their house

14  plants living in close proximity to the pesticide and being continuously exposed to the pesticide,

15  and resulted in various items of the SMOLKERS' personal property, including their automobiles,

16  being contaminated and recontaimated with pesticide. HSTCI and Roes 1 through 25, and each

17  of them, gained entry to the PREMISES and to the individual condominium owned by GARY

18  SMOLKER (the SMOLKERS' home) through fraud, deceit and false pretenses. Thereafter,

19  HSTCI and Roes 1 through 25, and each of them, illegally and recklessly treated the PREMISES

20  with an unregistered poison by illegally discharging the unregistered poison in GARY

21  SMOLKER's condominium unit without GARY SMOLKER's consent by injecting the

22  unregistered poison throughout the structure of the PREMISES such that the entire structure of

23  the PREMISES became contaminated with the unregistered poison and structural voids

24  surrounding GARY SMOLKER's condominium unit became filled with unregistered poison. At

25  or about the same time, HSTCI and Roes 1 through 3, and each of them, drilled holes in the

26  concrete slab in the parking structure where the SMOLKERS park their automobiles, and injected

27  another pesticide, a nerve type pesticide, through the concrete slab into the dirt below in the

28

-16-

XC2nd227

1  general area of where the SMOKERS' park their car which is near the SMOLKER's laundry

2  room and under the SMOLKERS' children's bed rooms.

3      33. The existence of the pesticide in the SMOLKERS' living quarters damaged the

4  SMOKERS' personal property, killed and injured house plants located thereat and made the

5  SMOLKERS' furniture, carpets, towels, bed sheets, clothing, etc. become a source of continuing

6  contact by the inhabitants of the SMOLKER's living quarters with residual pesticide in the

7  SMOLKERS' living quarters. All items of personal property contaminated with either the

8  SYLOID 244, or the nerve-gas type pesticide, or any other pesticide used by HSTCI in the

9  SMOLKERS' home and/or garage needed to be removed and replaced. However, the

10 SMOLKERS were not immediately aware of the nature or seriousness of the residual chemical

11 exposure problem they faced, or of the nature or scope of the danger posed by being continuously

12 exposed to chemical pesticides, or of the need to remove and replace their pesticide contaminated

13 personal property, to seal openings and resurface walls and ceilings through which pesticide dust

14 could continue to gain entry to their home or of the need to replace their dry rot infested deck.

15     34. Holes drilled by HSTCI and by Roes 1 through 10, and each of them, in the interior of

16 the walls of the SMOLKERS' home and in the exterior of the walls surrounding the

17 SMOLKERS' home were left unsealed. They needed to be sealed to prevent a path of entry in to

18 the living quarters of the SMOLKERS' home. Various paths of entry of pesticide dust were

19 readily visible in the walls and ceiling of the SMOLKERS' home before HSTCI injected pesticide

20 dust into the walls and ceilings surrounding the living quarters of the SMOLKERS' home under

21 high pressure, but were not sealed by HSTCI before or immediately after HSTCI injected

22 pesticide dust under high pressure into the walls and ceilings in the SMOLKERS' home.

23 Additional cracks were made in the walls of the SMOLKERS' home by HSTCI's, and Roes 1

24 through 25's, high pressure injection of pesticide particles, but were not sealed immediately after

25 being created by HSTCI and by Roes 1 through 25, and each of them, by HSTCI. Many of the

26 holes, cracks and openings created by HSTCI and Roes 1 thorough 25, and each of them, were

27 never sealed by HSTCI. After the HSTCI treatment, additional cracks were made in the walls and

28

-17-

XC2nd227

ceilings of the SMOLKERS' home by earthquake forces, and additional paths of entry of pesticide dust were created by rain water intrusion, by wind damage and wind penetration. Extensive dry rot on the upper deck of the SMOLKERS' home, that was not identified in HSTCI's inspection report, provided another path of entry for water intrusion into and pesticide contamination of the living quarters of the SMOLKERS' home. However, the SMOLKERS did not immediately realize they had to deal with these problems in order to prevent future bodily injury and to prevent further damage to their property.

35   On or about October 15, 1996 HSTCI sent HOA a bill in the amount of $7,2952.00 for work performed on or about Oct. 11 and 12, 1996, and a Notice of Work Completed and Not Completed which indicated that the work completed had been done in conformance with the representations previously made by HSTCI.    In reliance on these additional false representations, HOA paid HSTCI's bill dated October 15, 1996 in full on October 21, 1996 by HOA's check number 1410 in the amount of $7,952.00. The check was signed by ALICE SMOLKER, as Treasurer of the HOA. At that time ALICE SMOLKER did not know that HSTCI had applied an unregistered poison in the PREMISES or that the pesticide applied in the garage area was a nerve gas type insecticide or that HSTCI never should have applied its pesticide in the PREMISES in the fist place. If ALICE SMOLKER had known of the falsity of the representations made by HSTCI or the true facts or that HSTCI's workmanship was shoddy or that HSTCI had failed to exercise reasonable precautions to avoid contamination of the living quarters of her residence, she would not have signed that check or paid that bill.

36.   In early December 1996 GARY SMOLKER inquired of HSTCI about HSTCI's pesticide treatment of the PREMISES and complained about being exposed to pesticide introduced into his home by HSTCI. RIKK THOMPSON (RT) told said he would have HSTCI send GARY SMOLKER a Material Data Safety Sheet (MSDS) for the product applied in the PREMISES. On or about Dec. 13, 1996, HSTCI began sending crews to fix and clean-up GARY SMOLKER's condominium. The first HSTCI clean-up crew told GARY SMOLKER they found holes made by HSTCI in walls that were left unsealed and a crack at a window-door wall interface

-18-

XC2nd227

through which pesticide was entering into the SMOLKERS' bedroom.  They said they would patch all holes, cracks, and openings and clean-up residual pesticide dust in the SMOLKERS' living quarters.  Their clean-up work and patch work were inadequate, did not solve the problem. GARY SMOLKER called MORRIS again and complained again.  Thereafter MORRIS sent additional HSTCI crews to the SMOLKERS' home to do clean-up and repair work.  The HSTCI clean up crew members ( ROES 1 through 15, and each of them) represented they would "find" "patch" and "seal" holes, cracks and openings in the structures surrounding the SMOLKERS' living area through which pesticide particles had entered the living area of the SMOLKERS' residence.  Members of the HSTCI crew opined that pesticide particles were continuously entering the living areas of the SMOLKERS' residence through openings that allowed pesticide particles to be blown in from the wall voids surrounding the SMOLKERS' home into the living quarters of the SMOLKERS' residence.  They represented that they knew how to clean-up the pesticide residue in the SMOLKERS' home and had the proper equipment to do so.  They did not know how to clean-up the pesticide residue, and did not have the proper equipment for cleaning up the pesticide residue on the SMOLKERS' carpets, furniture, walls, etc. But the SMOLKERS did not know this, and believed them.  The HSTCI crew said they would clean up the pesticide dust particles that had gotten onto the furniture, plants, carpets, and into the air of the condominium, and that all their work would be performed in a professional workmanlike manner. In reliance on these representations the SMOLKERS allowed the crews from HSTCI to do dusting, vacuuming and caulking in their living quarters.  Clean-up and fix-it crews from HSTCI came back to the SMOLKERS' home on Dec. 13, 1996, Dec. 23, 1996, and on Jan. 17, 1997. The work they did was not done in a professional or workmanlike manner.  The methods they used to remove pesticide contamination were inappropriate and counter-productive.  The caulking work they did to patch the walls was sloppy and further damaged GARY SMOLKER's condominium by creating unsightly caulk marks on the walls, ceilings and window frames.

    37.  The HSTCI "fix-it" crews that came to the SMOLKERS' home did not patch and seal all holes, cracks and openings in the walls and ceilings.  They did not remove the pesticide

-19-

1    particles from the upholstered furniture, bedding, carpets, etc.  While in the SMOLKERS' home

2    the HSTCI "fix-up" crew members repeatedly represented to GARY SMOLKER that the

3    pesticide injected into the wall voids could have no deleterious effect on humans, was not

4    destructive or harmful to humans and did not and could not cause injury to humans or impairment

5    of human health.

6    38.  The HSTCI crews abandoned the job and did not complete the work MORRIS had

7    sent them to do and MORRIS/HSTCI had represented they would perform.  Holes and unsightly

8    patching left in the walls by HSTCI left obvious and unsightly damage in the SMOLKERS' home,

9    requiring resurfacing of walls and ceilings and repainting so that the interior of the SMOLKERS'

10   home did not look like a "patch."  Holes and openings had to be sealed to provide structural

11   integrity to the walls and ceiling surrounding the SMOLKERS' home to prevent rain water and

12   pesticide from entering the interior of the SMOLKERS' unit.  Stains from rain damage present

13   when HSTCI started their work grew larger in scope and new rain water stains appeared over

14   time after HSTCI abandoned its work, directly below holes HSTCI had made, but had failed to

15   seal on an exterior wall on an upper floor , and new water stains appeared on a wall and ceiling

16   under extensive dry rot damage to a deck HSTCI had not identified in its inspection report. on an

17   exterior wall on the SMOLKERS' upper deck.  GARY SMOLKER continued to have adverse

18   physical reactions to the pesticide residue in his home and continued to complain to MORRIS.

19   Then, on Feb. 20, 1997 and Feb. 24, 2997, W.F. MORRIS (MORRIS) and RIKK THOMPSON

20   (RT) came to the SMOLKERS' home to inspect and to fix the pesticide problem at the

21   SMOLKERS', but did not do any clean-up or "fix-it" work.  At that time MORRIS and RT

22   falsely represented that the 3 micron particles of synthetic amorphous silica (SYLOID 244)

23   injected into the wall voids surrounding the living quarters of the SMOLKERS' residence and into

24   the spaces between ceilings and floor above, were visible to the naked eye, and if they couldn't be

25   seen on carpet or furniture they were not there.  MORRIS and RT also falsely represented that

26   synthetic amorphous silica gel particles injected into the walls voids surrounding the

27   SMOLKERS' home would have no effect on any human whose skin came in contact with it, or

28

-20-

XC2nd227

1    who inhaled it.  MORRIS and RT also represented that the synthetic amorphous silica gel HSTCI

2    had injected into the walls of the SMOLKERS' home was a registered pesticide, registered with

3    and approved by the US EPA and the State of California..

### WRITTEN REPRESENTATIONS AND CONCEALMENT

### IN THE HSTCI MSDS AND MISREPRESENTATIONS

### CONCERNING HIRING BUD OFFERMAN

7    39.  In Feb. 1997, MORRIS and RT gave GARY SMOLKER a Material Safety Data

8    Sheet (MSDS) for the pesticide they claimed HSTCI had applied in the PREMISES and told

9    GARY SMOLKER that the MSDS completely described the properties of the pesticides HSTCI

10   had applied at the PREMISES.  The MSDS states that the chemicals described therein have been

11   approved by the US EPA.  The MSDS does not state any of the chemicals described therein is a

12   respirable dust that can harm a person's lungs if inhaled, or burn a persons esophagus if inhaled,

13   or that it would be illegal to use the chemicals described therein in their "pure" form as a

14   pesticide.  At the time MORRIS and RT handed GARY SMOLKER the MSDS MORRIS and RT

15   knew that the SYLOID 244 product described therein was an illegal poison; that SYLOID 244

16   was not registered with or approved by the US EPA or the State of California; that it had been

17   against the law for HSTCI to apply SYLOID 244 in the PREMISES in October 1996; that

18   HSTCI and MORRIS had received a cease and desist order from the State of California

19   Department of Pesticide Regulation, in December 1996 commanding HSTCI to immediately cease

20   and desist the use of the unregisterd poison SYLOID.  MORRIS and RT also knew that a person

21   who had inhaled SYLOID 244 applied by HSTCI in her home had had the entire mucous

22   membrane lining of her entire esophagus (the tube from mouth to stomach) burnt up by being

23   exposed to this material.  MORRIS and RT also knew that the pesticide (Dursban) applied by

24   HSTCI in the garage area of the PREMISES where the SMOLKERS park their automobiles is an

25   organophosphate.  They also knew that organophosphate pesticides, such as the one applied in

26   the SMOLKERS' garage by HSTCI (Dursban), attack the brain and nervous system, and are

27   similar to nerve-gas.  They are the leading cause of human poisoning and deaths from pesticides in

28

-21-

XC2nd227

1  the US and throughout the world.  However, MORRIS and RT concealed all of these facts from

2  GARY SMOLKER and instead insisted that the pesticides applied by HSTCI in the PREMISES

3  was a harmless product that could not irritate or harm a human being and was perfectly safe

4  product that couldn't possible cause any harm to anyone.

5        40.  Later, in February 1997, after GARY SMOLKER read the MSDS, GARY

6  SMOLKER complained to MORRIS that the MSDS indicates that the drying action of the

7  chemicals described in the MSDS can cause irritation of the mucous membranes of the nose and

8  throat and irritation of the skin; that the data sheet indicates these chemicals have a low potential

9  for adverse health effects; and that the data sheet indicates that animal tests indicate minimum

10  lung function impairment and silica deposition in respiratory macrophages and lymph nodes.

11  GARY SMOLKER complained to MORRIS this MSDS information contradicted MORRIS' and

12  RT's statements that there is no potential for adverse health effects from inhaling the chemical

13  dust HSTCI introduced/injected into the SMOLKERS' home.  In response to this criticism,

14  MORRIS said he wanted to make the SMOLKERS happy and would hire a health expert (chemist

15  or industrial hygienist) of GARY SMOLKER's choice at MORRIS' and HSTCI's expense to

16  advise the SMOLKERS on the health dangers of the pesticides applied in the SMOLKERS'

17  home, to investigate the pesticide contamination in the SMOLKERS' home, and to tell the

18  SMOLKERS what to do about it if GARY SMOLKER would select one for MORRIS to hire.

19  MORRIS said MORRIS/HSTCI would properly take care of the problem by doing whatever the

20  consultant chosen by GARY SMOLKER said had to be done.  MORRIS said that any competent

21  chemist would tell the SMOLKERS there was no danger in being exposed to SYLOID 244, that

22  SYLOID 244 is harmless.  MORRIS asked GARY SMOLKER to select a chemist or industrial

23  hygienist and to provide the chemist or hygienist's name to MORRIS for this purpose.  In

24  response to these representations and assurance, and in response to this request and offer, GARY

25  SMOLKER gave MORRIS and HSTCI the name, phone number and address of Bud Offerman

26  and his firm Indoor Environmental Engineering.  At the same time GARY SMOLKER told

27  MORRIS that GARY SMOLKER would use Bud Offerman and his firm Indoor Environmental

28

-22-

XC2nd227

1   Engineering as a consultant on the on-going pesticide problem, GARY SMOLKER told MORRIS

2   that GARY SMOLKER had previously interviewed and had been planning to use Bud Offerman

3   and Indoor Environmental Engineering as a consultant on another indoor environmental

4   contamination matter.  MORRIS said that he had never heard of Bud Offerman or Indoor

5   Environmental Engineering.  If that is who the Smolkers wanted MORRIS would contact Bud

6   Offerman to make arrangements to hire Offerman for the SMOLKERS.  GARY SMOLKER said

7   that would be fine.  At the time of this conversation the SMOLKERS had a proprietary interest, a

8   property interest, intellectual property interest and business interest in knowing of the existence of

9   Bud Offerman and in knowledge of the existence of Indoor Environmental Engineering.  Bud

10  Offerman's name and number and Indoor Environmental Engineering's name and number were

11  given to MORRIS with the express understanding that this information was in the nature of

12  proprietary business information and a trade secret that was to be used by MORRIS only for the

13  purpose of hiring Offerman and Indoor Environmental Engineering to work for the SMOLKERS

14  as consultants.  It was understood and agreed that Offerman and Indoor Environmental

15  Engineering would interview the SMOLKERS, document the SMOLKERS symptoms, do a

16  literature search re the dangers of silica gel, the scope of danger the SMOLKERS were being

17  exposed to, inspect the SMOLKERS' residence for potential pathways for silica dust particles to

18  enter living space, measure pressure conditions and relationships between walls, wall voids and

19  indoor living space and the impact of the ventilation system on the circulation and introduction of

20  pesticide into the SMOLKERS' living quarters, measure the concentration of airborne silica gel

21  dust particles if feasible in various locations and provide recommendations for improving the

22  indoor air quality of the SMOLKERS' home and recommendations on how to remove the

23  pesticide from the SMOLKERS carpets, furnishings, furniture, clothes, soft goods, etc. and how

24  to remove the silica gel from the wall voids and/or to seal or to encapsulate the silica gel so that it

25  would not be able to get into the SMOLKERS' living quarters for the benefit of the SMOLKERS.

26      41.  After several requests, on March 5, 1997, MORRIS gave GARY SMOLKER a copy

27  of the Material Data Sheet Morris prepared by GRACE Davison, a division of the W.R. Grace &

28

-23-

XC2nd227

1  Co., the manufacturer of the pesticide injected into the PREMISES.   GARY SMOLKER told
2  MORRIS he would contact the manufacturer to obtain the manufacturer's recommendations on
3  how to deal with the indoor air pollution caused by pesticide contamination and how to remove
4  the pesticide particles from the air and furniture and furnishings, etc. in the SMOLKERS' home.
5  Previously, GARY SMOLKER had requested that HSTCI arrange to have the sources of leaks of
6  pesticide into the SMOLKERS' home patched; carpeting and furniture cleaned; and air and air
7  handling equipment cleaned to get the pesticide dust out of the SMOLKERS' home.  Shortly after
8  receiving the manufacturer's MSDS, in March 1997, GARY SMOLKER contacted GRACE
9  Davison (GD) and W.R. Grace & Co. (GRACE) about the SYLOID 244 (aka silica gel) that
10 HSTCI claims was injected into the walls of his condominium and requested information on how
11 to remove the silica gel from his condominium.  Thereafter a series of faxes and letters and other
12 communications ensued between GARY SMOLKER on the one hand, and GRACE, GD,
13 COSTELLO and HYDE on the other hand.  This correspondence went on during March, April,
14 May, and July 1997.  During these communications GRACE, GD, COSTELLO and HYDE gave
15 imprecise, evasive and misleading answers to questions posed to them concerning the dangers
16 inherent in SYLOID 244, misrepresented the danger inherent in being exposed to SYLOID 244
17 failed to warn of and concealed the inherently dangerous properties of SYLOID 244and
18 misrepresented that SYLOID 244 was registered with and approved by the US EPA for use as a
19 pesticide and concealed that SYLOID 244 was not registered with or approved by the US EPA or
20 the State of California for use as a pesticide.  While these communications were ongoing,
21 MORRIS insisted he and HSTCI wanted to clean-up the pesticide contamination in the
22 SMOLKERS' home and to monitor test for the continuing presence of pesticide contamination in
23 the SMOLKERS' home.  GARY SMOLKER asked MORRIS to clarify what it was MORRIS
24 was proposing.  MORRIS never provided such clarification.

25      42.  In early May, GARY SMOLKER was contacted by Raymond Holybee (on 5/2/97) of
26 Truck Insurance Exchange (hereinafter TIE) and Farmers Insurance Group of Companies
27 (hereinafter FIG), by Carol Trimble (on May 5, 1997) of Coregis Insurance Company (hereinafter

28

-24-

XC2nd227

CIC), California Insurance Company (hereinafter CAINCO) and Coregis Group, Inc. (hereinafter
COREGIS), and by Joseph Fedoruk (hereinafter FEDORUK) (on May 8, 1997). Holybee said he
would wet vacuum the carpets in the SMOLKERS' an clean out all the air vents and air handling
equipment as a means of trying to mitigate the damages being suffered by the SMOLKERS and
would contact HSTCI, CIC, CAINCO, and COREGIS to do so as a joint venture.  GARY
SMOLKER replied that would probably be a half measure that would not solve the problem but it
would be okay to try if someone with a appropriate scientific background certified that it was safe
to do.  Trimble said she was sent by an insurance carrier who had issued an insurance policy to
HSTCI to solve the pesticide contamination problem in the SMOLKER home and asked if it
would be okay to send an industrial hygienist to do an investigation to determine what needed to
be done.  GARY SMOLKER replied that would be okay as long as whatever was done was safe,
and posed no danger to the SMOLKERS and whoever conducted the investigation explained
what they were going to do before they did anything in the SMOLKERS' home.  GARY
SMOLKER explained to Trimble that he wanted the carpets removed, drywall removed, etc. to
get rid of the chemical dust in the condo and in the walls surround the condo and he would
explain to Trimble's investigator why he thought that was the way to fix the pesticide
contamination problem.  GARY SMOLKER asked Trimble for information on the product used
by HSTCI, including the product label, with what government agencies the product was
registered, who approved the product for use as a pesticide, how it was supposed to be used to
assure safety, whether it was permissible to use it in a place where people lived, and how was it
supposed to be cleaned-up if it were spilled, leaked or otherwise contaminated a human residence.
Trimble said she would obtain this information and get back to GARY SMOLKER.  GARY
SMOLKER gave Trimble Mr. Holybee's phone number and TIE's claim number, and related that
Holybee had proposed that an industrial cleaning company clean all carpets and air ducts in the
SMOLKERS' home.  FEDORUK told GARY SMOLKER he had been hired by COREGIS to
ascertain the extent of the pesticide contamination and to advise the SMOLKERS and COREGIS
how to handle the pesticide contamination and had been told that GARY SMOLKER wanted him

-25-

1   (FEDORUK) to inspect the SMOLKERS' home. FEDORUK said he hadn't seen the product

2   label for the pesticide applied in the SMOLKERS' home, didn't know what chemical was applied

3   or if the chemical pesticide applied is a registered pesticide. GARY SMOLKER informed

4   FEDORUK that the SMOLKERS wanted new carpets and soft goods, the air handling equipment

5   replaced and the silica gel pesticide removed or encapsulated, explained why he thought this was

6   the right approach to handling the pesticide contamination problem, and that he (GARY

7   SMOLKER) was waiting for answers to questions he previously posed to HSTCI and Trimble.

8   GARY SMOLKER was led to believe that COREGIS was the insurer for HSTCI and GARY

9   SMOLKER is and was a third party beneficiary and intended insured under HSTCI's liability

10  insurance policy and under bonds issued to HSTCI and to MORRIS. GARY SMOLKER had

11  several conversations and written communications with FEDORUK from May through July 1997,

12  and understood that FEDORUK had agreed to try to protect the SMOLKERS from the harmful

13  effects of being continuously exposed to the pesticide applied in their home by HSTCI.

14  FEDORUK was apprised that GARY SMOLKER and the SMOLKERS' children were in physical

15  agony from the effect of the pesticides applied by HSTCI in the PREMISES and invited to inspect

16  GARY SMOLKER's condominium on several occasions. FEDORUK promised to advise GARY

17  SMOLKER how he (FEDORUK) would test for the amount of synthetic amorphous silica in the

18  air in GARY SMOLKER's condominium by use of NIOSH Method 7501 for analyzing

19  amorphous silica and to send GARY SMOLKER a copy of NIOSH Method 7501 for analyzing

20  amorphous silica, but never did so. FEDORUK failed to give any advise on how to deal with the

21  pesticide contamination and refused to answer follow-up questions posed to FEDORUK in

22  response to FEDORUK's discussion of how he would test for the presence of pesticide on how

23  FEDORUK proposed to measure the extent of pesticide contamination in GARY SMOLKER's

24  condominium. FEDORUK failed to warn the SMOLKERS of the dangers and concealed the

25  dangers of coming in contact with and/or of inhaling the synthetic amorphous silica gel injected

26  into the SMOLKERS' living quarters by HSTCI. FEDORUK, Trimble, Holybee, COSTELLO,

27  HYDE, BABBITS and DEAN & ASSOCIATES dragged out their dealings with the

28

-26-

XC2nd227

1  SMOLKERS, set the SMOLKERS up to be ambushed by COREGIS, CIC, CAINCO, TIE, and
2  HSTCI, defrauded the SMOLKERS, prevented third persons from giving aid to the SMOLKERS,
3  negligently failed to perform their undertakings to render services for the SMOLKERS and
4  negligently or intentionally failed to warn the SMOLKERS of dangers they knew they or should
5  have known, as more particularly set forth in later causes of action.

6      43. Cross-defendants HSTCI, W.F. MORRIS, RIKK THOMPSON, and ROES 1 through
7  15, and each of them, have known since HSTCI made its sale presentation to ALICE SMOLKER
8  and since HSTCI's application and use of pesticides at the PREMISES and knew while talking to
9  GARY SMOLKER that prolonged exposure or contact with the pesticides when used
10  independently, or in combination would be dangerous to the SMOLKERS' health, and would be a
11  danger to the health of anyone who came in contact with these pesticides. These cross-defendants
12  knew or should have known it was dangerous to breathe or to have the pesticides come in contact
13  with mouth, nose, eyes, throat or skin. Yet at all times to and including the present, these cross-
14  defendants and GRACE, GD, COSTELLO, HYDE and FEDORUK have concealed this
15  knowledge from the SMOLKERS. Instead HSTCI, MORRIS, TIE, TUA, and FIG have advised
16  the SMOLKERS and the HOA that it was safe to live in an environment that had been treated
17  with the pesticide, and that the SMOLKERS' bodies and their children's bodies would have no
18  adverse reactions to the pesticide in their home. Cross-defendants GRACE, GD, COSTELLO,
19  and HYDE advised the SMOLKERS to rely on HSTCI's advice. FEDORUK concealed the fact
20  that it is dangerous to inhale or to come in contact with the amorphous silica gel applied by
21  HSTCI in the PREMISES during FEDORUK's dealings with the SMOLKERS.

22      44. HSTCI, W.F. MORRIS, RIKK THOMPSON, and ROES 1 through 15, and each of
23  them, have known since commencement of the use of their pesticide at the PREMISES the
24  SYLOID 244 applied by HSTCI in the PREMISES pesticide was not registered with or approved
25  for use by the California Department of Food and Agriculture or the EPA and it was against the
26  law to deliver or sell or to possess or to use the pesticide with which the PREMISES were
27  treated. GRACE, GD, COSTELLO, HYDE and FEDORUK should have known HSTCI's use of

28

-27-

XC2nd227

1   the UNREGISTERED POISON in the PREMISES was illegal and a health danger when they
2   communicated with the SMOLKERS. Yet at all times to and including the present HSTCI, W.F.
3   MORRIS, RIKK THOMPSON, GRACE, GD, COSTELLO, HYDE, FEDORUK and ROES 1
4   through 15 concealed this knowledge from the SMOLKERS. At all times from when HSTCI,
5   W.F. MORRIS, RIKK THOMPSON, GRACE, GD, COSTELLO, HYDE, FEDORUK, and
6   ROES 1 thorough 15, and each of them, learned that the SMOLKERS were suffering from the ill
7   health effects caused by coming in contact with the pesticide to the present, they failed to inform
8   the SMOLKERS that the health problems the SMOLKERS and their children and dog were
9   experiencing were caused by exposure to the pesticides, and failed to take any measures to cure
10  or mitigate the damages and injuries and illness and adverse physical reactions to the pesticides
11  being suffered by GARY SMOLKER, JUDI SMOLKER, and LEAH SMOLKER, or to provide
12  any helpful information on how to handle the pesticides or how to remove the pesticides from the
13  SMOLKERS' home. At no time prior to December, 1996, were the SMOLKERS, or either of
14  them, aware, or have knowledge or have reason to suspect injuries they had suffered were caused
15  by the wrongdoing of cross-defendants HSTCI, W.F. MORRIS, RIKK THOMPSON, or ROES 1
16  through 15.

17      45. Each of the acts and omissions of cross-defendants described hereinabove, were done
18  falsely and fraudulently by or on behalf of HSTCI, MORRIS, THOMPSON, and ROES 1 through
19  15, with the intent to induce the HOA to hire HSTCI to treat the PREMISES for termites, to
20  induce ALICE SMOLKER to allow HSTCI to have access to the PREMISES and to pay
21  HSTCI's bill to HOA for treatment of the premises, to induce ALICE SMOLKER to allow
22  HSTCI to have entry to GARY SMOLKER's condominium; and thereafter, to cover-up the
23  illegal activities of HSTCI, MORRIS, THOMPSON, GRACE, GD and ROES 1 through 15. The
24  acts and omissions of GRACE, GD, COSTELLO, HYDE and FEDORUK described hereinabove,
25  were carried out as part of a scheme, plan and conspiracy to cover-up the danger of the pesticide
26  applied by HSTCI at the PREMISES, to cover-up HSTCI's responsibility for the damages
27  suffered by the SMOLKERS; to distract the SMOLKERS; to interfere with relationships of the

28

-28-

XC2nd227

cotenants who own or owned the common area of the PREMISES in which HSTCI applied pesticides; and to make it difficult for the SMOLKERS to have time, energy, strength, health, and financial resources necessary to prosecute a lawsuit against HSTCI and/or against the other cross-defendants named in this cross-complaint. The SMOLKERS were ignorant of the risks involved in HSTCI's application of pesticides in the PREMISES and in GARY SMOLKER's condominium thereat. The SMOLKERS would not have allowed HSTCI to treat the PREMISES with the pesticide, or allowed HSTCI to perform "repair" work and clean-up work in their home, or to give the SMOLKERS the run-around MORRIS, RT, HSTCI, GRACE, GD, COSTELLO, HYDE and FEDORUK gave the SMOLKERS if the SMOLKERS had known true facts. The SMOLKERS asked HSTCI, MORRIS, GRACE, GD, COSTELLO, HYDE, TIE, FIG, HOA, COREGIS, CIC, CAINCO, and each of them, to remediate the PREMISES, to remove all pesticide that entered the SMOLKERS' living quarters, and to remove and replace all personal property belonging to the SMOLKERS contaminated with the pesticide. Each of these cross-defendants refused to do so.

46. As a proximate result of the fraudulent acts and omissions of HSTCI, MORRIS, RT, and Roes 1-25, and each of them alleged herein GARY SMOLKER, JUDI SMOLKER, LEAH SMOLKER, and Caramel have been continuously exposed to pesticide applied by HSTCI in their home, have been denied of their peaceful possession, use and enjoyment of their home, have been forced to move out of their home, have been forced to pay rent to live in a hotel, have been forced to pay extraordinary sums for food and lodging while living out of their home, have had their personal property damaged and destroyed, have been made ill, have been injured and hurt in their health, strength and activity, sustaining injury to their nervous system and person, have suffered various physical injuries which have caused them great mental, physical and nervous pain and suffering all to GARY SMOLKER's and ALICE SMOLKER's damage in an amount to be proved at time of trial.. As a proximate result of the fraudulent acts and omissions of MORRIS, HSTCI, RT, and Roes 1-25, and each of them, alleged herein, ALICE SMOLKER has been continuously exposed to the pesticide, has been denied the

-29-

XC2nd227

peaceful possession, use and enjoyment of her home, and has had her personal property destroyed and damaged all to her damage in an amount to be proved at time of trial.  Seeing the physical injury, pain and suffering, endured by GARY SMOLKER, JUDI SMOLKER, LEAH SMOLKER and Caramel has caused great mental and nervous pain and suffering and emotional damage to ALICE SMOLKER all to her damage in an amount to be proved at time of trial.  As a result of such injuries the SMOLKERS have suffered general damages within the jurisdiction of this court in an amount to be proved at time of trial.

47.  As a result of the fraudulent acts and omissions of HSTCI, MORRIS, RT, and ROES 1 through 15, and each of them, as herein alleged, GARY SMOLKER's, JUDI SMOLKER's, and LEAH SMOLKER's illnesses, and injuries as above stated, were aggravated thereby further injuring GARY SMOLKER, JUDI SMOLKER, and LEAH SMOLKER, in their health, strength and activity, and causing further injury to their body and shock and injury to their nervous system, all of which injuries have caused and continue to cause further physical injury to GARY SMOLKER to his damage in an amount to be proved at time of trial and to cause the SMOLKERS, and each of them, great mental, physical and nervous pain and suffering and the SMOLKERS, and each of them, have been damaged thereby in a further sum within the jurisdiction of this court to be proved at time of trial.

48.  As a further proximate result of the fraudulent acts and omissions of HSTCI, MORRIS, RT, and ROES 1 through 25, and each of them, alleged herein, the SMOLKERS have been required to spend money and incur obligations, and will continue to spend money and incur obligations, for medical services, dental services, X-rays, drugs and sundries reasonably required in the treatment and relief of the injuries herein alleged, and have been forced to become involved in litigation with other cotenants who also own an undivided interest in the common area of the PREMISES, the SMOLKERS' insurance carrier (TIG Insurance Company), HOA, TIE, et al., and have lost their time, their ability to make a living, earnings, earnings capacity and will lose future earnings, have incurred and paid litigation costs, have been unable to promote their business in the fashion they would otherwise be able to promote their business, have been

-30-

XC2nd227

1    rendered unavailable to take on work they would otherwise be capable of taking on, have had to

2    deplete their savings and borrow money to pay living expenses and to pay business expenses, have

3    been required to spend money and incur obligations, and will continue to spend money and incur

4    obligations, for replacement of contaminated personal property (i.e. bedding, furniture, etc.), for

5    hauling away and disposal of contaminated property, for work done and to be done in an attempt

6    to clean-up and remove pesticide contamination from the air in their living quarters, from their

7    carpets, and other soft goods, etc., and have incurred and paid expenses and charges for repair

8    and construction work and painting to seal and repair holes drilled by HSTCI and sloppy "fix-up"

9    "caulking work done by HSTCI's fix-up crews and to fill and patch openings in walls and ceilings

10   and to seal walls and ceilings in an attempt to minimize the amount of pesticide that can escape

11   from the voids between the walls and ceilings of the PREMISES and thereafter enter into the

12   SMOLKERS' living quarters and will continue to incur and pay further expenses in connection

13   with efforts to mitigate damages caused by pesticide contamination, to prevent further pesticide

14   contamination, to remove residual pesticide contaminants, to replace contaminated items of

15   personal property, and will incur additional expenses for a new termite treatment of the

16   PREMISES, all to the SMOLKERS' damage in an amount to be proved at time of trial..

17        49.  As a proximate result of the fraudulent and illegal conduct of HSTCI, MORRIS, RT,

18   and Roes 1-25, and each of them, which led to the contamination of the PREMISES by HSTCI's

19   pesticide and recontamination and continuous contamination of the SMOLKERS' home by the

20   pesticide applied by HSTCI, it is necessary to, and when the Smolkers have enough money they

21   will, remove interior walls of GARY SMOLKERS' condominium , vacuum out pesticide residing

22   in the wall voids, and then replace the insulation and drywall and repaint same, remove and

23   replace duct work and air-handling equipment contaminated with pesticide, all to the

24   SMOLKERS' damage in a sum to be proved at trial.  As a further and proximate result of the

25   fraudulent conduct of HSTCI, MORRIS and RT, and each of them, herein alleged, the

26   SMOLKERS have been  prevented from attending to their usual occupation and lost earnings and

27   earnings capacity and are informed and believe and thereon allege that they will be prevented from

28

-31-

1 │ attending to their usual occupation in the future and will thereby sustain future loss of earnings all
2 │ to their damage in an amount to be proved at trial. As a further result of the conduct of cross-
3 │ defendants and each of them, the SMOLKERS have been threatened by their neighbors, the
4 │ SMOLKERS have been forced to become involved in controversies with other parties to this
5 │ litigation and have been prevented them from attending to their usual occupation and have lost
6 │ earnings and earning capacity as a direct result thereof. The SMOLKERS are informed and
7 │ believe and thereupon allege that as a direct result of the conduct of cross-defendants and each of
8 │ them, the SMOLKERS will continue to be involved in controversies with other parties to this
9 │ litigation and will lose further earnings and earning capacity as a result thereof. As a direct result
10 │ of the conduct of cross-defendants and each of them, the quality of the SMOLKERS life has been
11 │ diminished, the SMOLKERS have lost the free and comfortable use of their personal property and
12 │ their ability to enjoy the peaceful possession, use and enjoyment of their home, and the value of
13 │ GARY SMOLKER's condominium has been depreciated and stigmatized, all to the SMOLKERS
14 │ damage in a sum to be proved at time of trial.

15 │ 50. As a further proximate result of the fraudulent conduct of HSTCI, MORRIS, and RT
16 │ alleged herein, and the SMOLKERS spending money on costs of repair, cost to live somewhere
17 │ else, cost to replace contaminated personal property, and loss of time needed to deal with
18 │ pesticide contamination related matters, the SMOLKERS have been emotionally and financially
19 │ exhausted, have been forced to lower their living style, have had their privacy breached, have been
20 │ humiliated and caused to suffer emotional distress, all to their damage in an amount to be proven
21 │ at time of trial.

22 │ 51. As additional damages against cross-defendants HSTCI, MORRIS, RT, and Roes 1-
23 │ 25, and each of them, cross-complainants allege these cross-defendants and each of them were
24 │ guilty of malice, fraud, and/or oppression as defined in Civil Code Section 3294 in doing the
25 │ fraudulent and illegal acts described herein, and cross-complainants and each of them, should
26 │ recover, in addition to actual damages, damages to make an example of and to punish cross-
27 │ defendants HSTCI, MORRIS, RT and Roes 1-25, and each of them.

28 │

-32-

XC2nd227

SECOND CAUSE OF ACTION

(Against HSTCI, MORRIS, RT, and ROES 1 through 15,

for Negligence and Violation of Statutory Duties)

52. The SMOLKERS reallege and incorporate herein by reference each and every allegation contained in paragraphs 1 through 15, inclusive as through fully set forth herein.

53. Under California law and pursuant to the terms of the HSTCI contract with HOA, HSTCI was required to inspect the PREMISES and GARY SMOLKER's condominium before applying any pesticides (1) to evaluate whether it would be safe to apply pesticides in the PREMISES and in GARY SMOLKER's condominium unit, (2) to determine whether there is a reasonable possibility of contamination of the bodies or clothing of persons not involved in the application, (3) to determine if there is a reasonable possibility of contamination of nontarget private property, and (4) to determine if there were any holes, cracks, crevices, or openings in GARY SMOLKER's condominium unit through which the pesticide could enter into the living quarters of GARY SMOLKER's condominium unit during or after the application of pesticide. If HSTCI discovers that there are any walls, or ceilings or floors that have cracks or openings that may allow the SYLOID pesticide particles to enter a condominium unit from the wall voids of a unit that is being serviced, HSTCI is to not apply its pesticide. HSTCI did not carry out the inspection of GARY SMOLKER's condominium unit it was required to carry out before applying pesticide in the PREMISES and before applying pesticide in GARY SMOLKER's condominium unit, or if HSTCI carried out an inspection it carried out a grossly negligent and recklessly negligent inspection. At the time HSTCI treated the PREMISES and at the time HSTCI treated GARY SMOLKER's condominium there were holes, cracks and openings in walls, ceilings and columns in GARY SMOLKER'S condominium unit that might allow the pesticide dust particles being applied by HSTCI to the PREMISES and in GARY SMOLKER's condominium unit to enter GARY SMOLKER's condominium unit from the wall voids of the units being serviced. Under California law a pesticide applicator is required to protect persons, animals and property evaluating the property to be treated prior to and while applying a pesticide to determine the

-33-

XC2nd227

1  likelihood of harm or damage. No pesticide application is to be made or continued when there is
2  a reasonable possibility of contamination of the bodies or clothing of persons not involved in the
3  application process; there is a reasonable possibility of damage to nontarget private property; or
4  there is a reasonable possibility of contamination of nontarget private property. No person is to
5  directly discharge a pesticide onto a property without the consent of the owner or operator of the
6  property. On or about October 11, 1996 and October 12, 1996, HSTCI and ROES 1 through 10,
7  and each of them, entered upon the premises located at 15-63rd Ave., Playa del Rey, California,
8  hereinbefore described, and said cross-defendants, and each of them, negligently and carelessly
9  treated said property with toxic pesticides and chemicals, including, but not limited to those set
10 forth in Exhibit "A" attached to this cross-complaint. Said cross-defendants, and each of them,
11 negligently drilled holes in the interior walls and ceilings in GARY SMOLKER's condominium
12 unit and in the exterior walls surrounding GARY SMOLKER's condominium unit, negligently
13 injected an UNREGISTERED POISON into the wall voids surrounding GARY SMOLKERS'
14 condominium unit through said holes, and directly discharged the UNREGISTERED POISON
15 into and in the living quarters in GARY SMOLKER's condominium unit without GARY
16 SMOLKER's consent, negligently failed to seal all of the holes that they had drilled in the walls
17 and ceilings, and negligently and carelessly failed to take appropriate steps to assure that the
18 pesticide could not and would not escape from the voids between the walls into which it was
19 being injected. Said cross-defendants, and each of them, carelessly and negligently permitted said
20 toxic pesticides and chemicals to enter the SMOLKERS' living quarters, thereby contaminating
21 and damaging the air within said living quarters, the personal and real property within said living
22 quarters, and the people living in said living quarters, and made the SMOLKERS' living quarters
23 unhealthy to live in. Prior to doing this work HSTCI did not provide GARY SMOLKER with
24 clear written notice of the work to be done or any notice of work to be done. Nobody provided
25 GARY SMOLKER with notice of the work to be done by HSTCI. In doing the acts herein
26 described HSTCI and ROES 1 through 15 violated several statutes and laws regulating the sale,
27 use, possession and application of pesticides, including but not limited to California Food and
28

-34-

XC2nd227

1   Agriculture Code Sections 12993, 12995, and 11737; California Business & Professions Code

2   Sections 8538, 8553, 8638, 8641, 8642, 8643, 8648, and 8695; California Code of Administrative

3   Regulations, Title 3 Division 6 Sections 6600, 6614, and 6616; California Penal Code Sections

4   374.8, and 594 (a); and the following federal laws: 7 U.S. Code Section 136a et seq., and 18 U.S.

5   Code Section 1962. As a direct result of the negligent and unlawful conduct of HSTCI, MORRIS

6   and ROES 1 through 15, and each of them, the SMOLKERS suffered earning loss, loss of earning

7   capacity, loss of use of property, property damage, medical, dental and veterinary expenses,

8   general damage, and interference with their relations with their neighbors, and became embroiled

9   in this litigation, all to the SMOLKERS' damage in an amount to be proved at trial which is

10  within the jurisdiction of this court.

11      54. At all times herein mentioned, HSTCI, MORRIS and ROES 1 through 10, and each

12  of them, carelessly and negligently released, dispensed, applied, and otherwise handled toxic

13  chemicals and pesticides in and about the PREMISES so as to create a dangerous, hazardous,

14  unsafe and unhealthy condition in the SMOLKERS' living quarters and the garage area in which

15  the SMOLKERS park their automobiles, while said toxic chemicals and pesticides were under the

16  operation, management, and control of HSTCI, MORRIS and ROES 1 through 15, and each of

17  them. The new holes drilled in the walls and ceilings of the structure surrounding GARY

18  SMOLKER's condominium unit by HSTCI and previously existing holes, cracks and openings in

19  the walls and ceilings were not sealed by HSTCI and provided a path of entry for wind, rain and

20  the pesticide injected into the wall voids by HSTCI to enter into the SMOLKERS' living quarters.

21  During and after HSTCI's pesticide application in the PREMISES, the pesticide negligently and

22  illegally injected into the wall voids of the common area by HSTCI has been blown into the

23  SMOLKERS' living quarters. HSTCI, MORRIS, RT and ROES 1 through 15, and each of them,

24  knew of such dangerous condition, or should have known in the exercise of ordinary care of such

25  dangerous condition, and nevertheless failed to warn the SMOLKERS, or either of them, of said

26  defective, dangerous, hazardous and unsafe condition. Instead, MORRIS, RT, HSTCI and ROES

27  1-15, and each of them, assured the SMOLKERS that the pesticide applied by HSTCI in the

28

XC2nd227

1  PREMISES was perfectly safe, and could not cause any injury or irritation to any human being.

2  Nevertheless they agreed to clean-up the residual pesticide in the SMOLKERS' home and to

3  patch and seal the walls so further pesticide would no be able to enter the SMOLKERS' home

4  through the walls and ceilings of the PREMISES.

5    55. MORRIS, RT, HSTCI, and ROES 1-15, and each of them, did not exercise

6  reasonable care to prevent the inhabitants of the SMOLKER home from being further exposed to

7  pesticide contamination. HSTCI clean-up crews were sent to the SMOLKERS' home with the

8  wrong materials and equipment for removing pesticide contamination and the wrong materials and

9  equipment for patching holes and openings drilled by HSTCI in the premises and/or patching

10  previously existing holes and cracks through which pesticide could enter the SMOLKERS' home.

11  During their clean-up work, the HSTCI clean-up crews did further damage to the SMOLKERS

12  by making any ugly mess on the walls and ceiling where they did patch work, and by recirculating

13  pesticide that had settled on carpets, furniture, furnishings, blinds, plants, etc. instead of removing

14  of removing it, all to the SMOLKERS damage in an amount to be proved at time of trial.

15    56. As a proximate result of the negligent acts and omissions of HSTCI, MORRIS, RT,

16  and ROES 1-15, and each of them alleged herein GARY SMOLKER, JUDI SMOLKER, LEAH

17  SMOLKER, and Caramel have been continuously exposed to pesticide applied by HSTCI in their

18  home, have been denied of their peaceful possession, use and enjoyment of their home, have been

19  forced to move out of their home, have been forced to pay rent to live in a hotel, have been forced

20  to pay extraordinary sums for food and lodging while living out of their home, have had their

21  personal property damaged and destroyed, have been made ill, have been injured and hurt in their

22  health, strength and activity, sustaining injury to their nervous system and person, have suffered

23  various physical injuries which have caused them great mental, physical and nervous pain and

24  suffering all to GARY SMOLKER's and ALICE SMOLKER's damage in an amount to be

25  proved at time of trial.. As a proximate result of the negligent acts and omissions of MORRIS,

26  HSTCI, RT, and ROES 1-15, and each of them, alleged herein, ALICE SMOLKER has been

27  continuously exposed to the pesticide, has been denied the peaceful possession, use and

28

XC2nd227

1  enjoyment of her home, and has had her personal property destroyed and damaged all to her

2  damage in an amount to be proved at time of trial.  Seeing the physical injury, pain and suffering,

3  endured by GARY SMOLKER, JUDI SMOLKER, LEAH SMOLKER and Caramel has caused

4  great mental and nervous pain and suffering and emotional damage to ALICE SMOLKER all to

5  her damage in an amount to be proved at time of trial.  As a result of such injuries the

6  SMOLKERS have suffered general damages within the jurisdiction of this court in an amount to

7  be proved at time of trial.

8          57.  As a result of the negligent acts and omissions of HSTCI, MORRIS, RT, and ROES 1

9  through 15, and each of them, as herein alleged, GARY SMOLKER's, JUDI SMOLKER's, and

10  LEAH SMOLKER's illnesses, and injuries as above stated, were aggravated thereby further

11  injuring GARY SMOLKER, JUDI SMOLKER, and LEAH SMOLKER, in their health, strength

12  and activity, and causing further injury to their bodies and shock and injury to their nervous

13  systems, all of which injuries have caused and continue to cause further physical injury to GARY

14  SMOLKER and to his relationship with his children and to his availability to spend quality time

15  with his children, to GARY SMOLKER's damage in an amount to be proved at time of trial and

16  to cause the SMOLKERS, and each of them, great mental, physical and nervous pain and

17  suffering and the SMOLKERS, and each of them, have been damaged thereby in a further sum

18  within the jurisdiction of this court to be proved at time of trial.

19          58.  As a further proximate result of the negligent acts and omissions of HSTCI,

20  MORRIS, RT, and ROES 1 through 25, and each of them, alleged herein, the SMOLKERS have

21  been required to spend money and incur obligations, and will continue to spend money and incur

22  obligations, for medical services, dental services, X-rays, drugs and sundries reasonably required

23  in the treatment and relief of the injuries herein alleged, and have been forced to become involved

24  in litigation with other cotenants who also own an undivided interest in the common area of the

25  PREMISES regarding prevention of waste, protection of the entire PREMISES from injury

26  and/or loss due to the presence of the pesticide applied by HSTCI therein, and reimbursement of

27  expenses incurred in an attempt to remediate the pesticide contamination of the common area and

28

-37-

XC2nd227

1  enforcement of a lien against the interests of the non-contributing cotenants in the PREMISES,

2  litigation with their (the SMOLKERS' insurance carrier (TIG Insurance Company), HOA, TIE, et

3  al., and have lost their time, their ability to make a living, earnings, earnings capacity and will lose

4  future earnings, have incurred and paid litigation costs, have been unable to promote their

5  business in the fashion they would otherwise be able to promote their business, have been

6  rendered unavailable to take on work they would otherwise be capable of taking on, have had to

7  deplete their savings and borrow money to pay living expenses and to pay business expenses, have

8  been required to spend money and incur obligations, and will continue to spend money and incur

9  obligations, for replacement of contaminated personal property (i.e. bedding, furniture, etc.), for

10  hauling away and disposal of contaminated property, for work done and to be done in an attempt

11  to clean-up and remove pesticide contamination from the air in their living quarters, from their

12  carpets, and other soft goods, etc., and have incurred and paid expenses and charges for repair

13  and construction work and painting to seal and repair holes drilled by HSTCI and sloppy "fix-up"

14  "caulking work done by HSTCI's fix-up crews and to fill and patch openings in walls and ceilings

15  and to seal walls and ceilings in an attempt to minimize the amount of pesticide that can escape

16  from the voids between the walls and ceilings of the PREMISES and thereafter enter into the

17  SMOLKERS' living quarters and will continue to incur and pay further expenses in connection

18  with efforts to mitigate damages caused by pesticide contamination, to prevent further pesticide

19  contamination, to remove residual pesticide contaminants, to replace contaminated items of

20  personal property, and will incur additional expenses for a new termite treatment of the

21  PREMISES, all to the SMOLKERS' damage in an amount to be proved at time of trial..

22      59. As a proximate result of the negligent and illegal conduct of HSTCI, MORRIS, RT,

23  and ROES 1-25, and each of them, which led to the contamination of the PREMISES by

24  HSTCI's pesticide and recontamination and continuous contamination of the SMOLKERS' home

25  by the pesticide applied by HSTCI, it is necessary to, and when the Smolkers have enough money

26  they will, remove interior walls of GARY SMOLKERS' condominium , vacuum out pesticide

27  residing in the wall voids, and then replace the insulation and drywall and repaint same, remove

28

-38-

XC2nd227

1    and replace duct work and air-handling equipment contaminated with pesticide, and ask the court

2    to order similar remedial work on all condominium units in the PREMISES and/or ask the court

3    to order the entire condominium structure razed, all to the SMOLKERS' damage in a sum to be

4    proved at trial. As a further and proximate result of the negligent conduct of HSTCI, MORRIS

5    and RT, and each of them, herein alleged, the SMOLKERS have been prevented from attending

6    to their usual occupation, have lost control of their lives and privacy, have lost valuable time they

7    would rather spend on their children and other personal matters, and have lost earnings and

8    earnings capacity and are informed and believe and thereon allege that they will be prevented from

9    being able to live a normal life and will be prevented from attending to their usual occupation in

10    the future and will thereby sustain future loss of earning, loss of quality of life, loss of time with

11    their children, etc. all to their damage in an amount to be proved at trial. As a further result of the

12    conduct of cross-defendants and each of them, the SMOLKERS have been threatened by their

13    neighbors, ALICE SMOLKER has been sued by Carol Kay, the SMOLKERS have been forced to

14    bring an action for waste against the HOA, and an action for waste against the other co-tenant

15    owners of the common area of the PREMISES and to become involved in controversies with

16    other parties to this litigation which has caused the SMOLKERS aggravation and expense and has

17    prevented the SMOLKERS from attending to their usual occupation and to have lost earnings and

18    earning capacity as a direct result thereof all to the SMOLKERS' damage in an amount to be

19    proved at time of trial. The SMOLKERS are informed and believe and thereupon allege that as a

20    direct result of the conduct of cross-defendants and each of them, the SMOLKERS will continue

21    to be involved in controversies with other parties to this litigation and will lose further earnings

22    and earning capacity as a result thereof. As a direct result of the conduct of cross-defendants and

23    each of them, the quality of the SMOLKERS life has been diminished, the SMOLKERS have lost

24    the free and comfortable use of their personal property and their ability to enjoy the peaceful

25    possession, use and enjoyment of their home, and the value of GARY SMOLKER's condominium

26    has been depreciated and stigmatized, all to the SMOLKERS damage in a sum to be proved at

27    time of trial.

28

XC2nd227

1   60.  As a further proximate result of the negligent conduct of HSTCI, MORRIS, and RT

2   alleged herein, the SMOLKERS have had to spend their savings and to borrow money to pay

3   costs of repair, cost to live somewhere else, cost to replace contaminated personal property, and

4   their personal time has been taken up dealing with pesticide contamination related matters, the

5   SMOLKERS have been emotionally and financially exhausted, which has caused the SMOLKERS

6   to be n forced against their will to lower their living style, to deal with FEDORUK, KAY, TIE, et

7   al., and has resulted in having their privacy breached, has resulted in the SMOLKERS being

8   humiliated, all to the SMOLKERS' damage in an amount to be proven at time of trial.

9

10                          THIRD CAUSE OF ACTION

11              (Against PACIFIC VILLAS HOMEOWNERS' ASSOCIATION

12              and ROES 26 through 35 for Negligence, Waste, Assault and Battery)

13   61.  The SMOLKERS reallege and incorporate herein by reference each and every

14   allegation contained in paragraphs 1 through 15, inclusive, as though fully set forth herein.

15   62.  Cross-defendant PACIFIC VILLAS HOMEOWNERS' ASSOCIATION (hereinafter

16   HOA) is, and at all times material herein was, an unincorporated association which negligently

17   managed and maintained the common area of said condominium project.  For several years prior

18   to the events alleged herein concerning HSTCI, HOA negligently maintained, managed and

19   operated the common area of said condominium project.  In 1996 HOA negligently hired HSTCI,

20   and thereafter negligently monitored and negligently supervised HSTCI's illegal work at the

21   PREMISES and in GARY SMOLKER's condominium unit thereat, and thereafter negligently

22   failed to fix the damage done to the PREMISES and to GARY SMOLKER's condominium unit

23   thereat by HSTCI so as to care for and , maintain the common areas of the PREMISES as to

24   minimize further losses and injuries to the PREMISES the common areas of the PREMISES

25   and/or to GARY SMOLKER's condominium unit thereat, and/or to the SMOLKERS and their

26   young daughters and to their personal property.  The membership of the HOA now consists of,

27   and at all times material herein consisted of, each of the individual owners of one of the six

28

-40-

XC2nd227

1   condominium units within said condominium project. At all times each condominium unit owner

2   was a covenant with each other condominium unit owner and owned an undivided interest in the

3   common area of the PREMISES. Cross-complainants are informed and believe and based

4   thereon allege the ownership of the individual condominium units at all times material herein has

5   been and is as follows.

6   63. Cross-defendants MATTHEW JOHN FREDERICKS (hereinafter FREDERICKS)

7   and VIRGINIA K. CIPRIANO (hereinafter CIPRIANO) are now, and at all times material hereto

8   were co-owners of an undivided 1/6 interest in the common area and co-owners of Unit #1 in said

9   condominium project, as shown and defined on the CONDOMINIUM PLAN. FREDERICKS is,

10  and at all times material herein was, President of the HOA. FREDERICKS personally and

11  negligently monitored and supervised the illegal, recklessly negligent work performed by HSTCI

12  in connection with HSTCI's illegal use and application of an UNREGISTERED POISON at the

13  PREMISES and discharge of the UNREGISTERED POISON in GARY SMOLKER's

14  condominium unit, and the application of a nerve gas type pesticide in the garage area of the

15  PREMISES.

16  64. Cross-defendants GERALD W. IVORY (hereinafter IVORY) and ANGELA

17  JORDAN VERDUN (hereinafter VERDUN) are, and at all times material herein were, co-owners

18  of an undivided 1/6 interest in the common area and co-owners of Unit #2 as shown and defined

19  on the CONDOMINIUM PLAN. VERDUN was president of HOA before FREDERICKS.

20  During the time period VERDUN was president of HOA the roof and walls of the PREMISES

21  were allowed to leak due to inadequate care and maintenance. VERDUN hired an unlicensed

22  plumber to do plumbing, which plumber did his work in a negligent manner, and ignored and

23  refused to have needed maintenance and repair work done on the PREMISES all to the

24  SMOLKERS damage as hereinafter specified.

25  65. Cross-defendant JOSEPH A. BAILEY II (herein after BAILEY) is, and at all times

26  material herein was, the owner of an undivided 1/6 interest in the common area and owner of Unit

27  #3 as shown and defined on the CONDOMINIUM PLAN.

28

-41-

XC2nd227

66. Cross-complainant GARY SMOLKER is, and at all times material herein was, the owner of an undivided 1/6 interest in the common area and owner of Unit #4 as shown and defined on the CONDOMINIUM PLAN. GARY SMOLKER was not provided with a Business & Professions Code Section 8538 "Notice to Owner as to Work to be Done" by HSTCI or by the HOA prior to HSTCI's application of pesticides to the PREMISES.

67. Cross-defendant LANCE J. ROBBINS (hereinafter ROBBINS) is, and at times material herein was, the owner of an undivided 1/6 interest in the common area and owner of Unit #5 as shown and defined on the CONDOMINIUM PLAN.

68. CAROL D. KAY, TRUSTEE, CAROL D. KAY REVOCABLE 1989 TRUST (hereinafter KAY) was the owner of an undivided 1/6 interest in the common area and the owner of Unit #6 as shown and defined on the CONDOMINIUM PLAN at all times material hereto up to December 9, 1997. Thereafter and continuing as of the present, Cross-defendants James W. Holland and Julie A. Holland (hereinafter HOLLAND), husband and wife, became the owners of Unit #6 and of Kay's 1/16th undivided interest in the common area.

69. Cross-complainants are informed and believe and thereupon allege, that each of the cross-defendants designated herein as ROES 81 through 100, and each of them became an owner of a fee title interest in one or more of the individual condominium units at 15 - 63rd Ave., Playa del Rey, California after January 1, 1998 and is a necessary party for the court to give full relief with respect to abating the nuisance and dangerous condition created by HSTCI injecting poison into the wall voids of the structure and under the ground in the garage area at the PREMISES.

70. At all times herein mentioned, cross defendants PACIFIC VILLAS HOMEOWNERS' ASSOCIATION (hereinafter HOA) and ROES 26 through 35, and each of them, carelessly and negligently managed, operated, controlled, exercised control over, repaired, failed to repair, inspected, failed to inspect and otherwise carelessly and negligently supervised and monitored in all respects the common area of the PREMISES located at 15-63rd Ave., Playa del Rey, California, including but not limited to the three story frame, stucco and wood siding building structure and attached semi-subterranean garages located thereat and the surrounding

-42-

XC2nd227

66.  Cross-complainant GARY SMOLKER is, and at all times material herein was, the owner of an undivided 1/6 interest in the common area and owner of Unit #4 as shown and defined on the CONDOMINIUM PLAN.  GARY SMOLKER was not provided with a Business & Professions Code Section 8538 "Notice to Owner as to Work to be Done" by HSTCI or by the HOA prior to HSTCI's application of pesticides to the PREMISES.

67.  Cross-defendant LANCE J. ROBBINS (hereinafter ROBBINS) is, and at times material herein was, the owner of an undivided 1/6 interest in the common area and owner of Unit #5 as shown and defined on the CONDOMINIUM PLAN.

68.  CAROL D. KAY, TRUSTEE, CAROL D. KAY REVOCABLE 1989 TRUST (hereinafter KAY) was the owner of an undivided 1/6 interest in the common area and the owner of Unit #6 as shown and defined on the CONDOMINIUM PLAN at all times material hereto up to December 9, 1997.  Thereafter and continuing as of the present, Cross-defendants James W. Holland and Julie A. Holland (hereinafter HOLLAND), husband and wife, became the owners of Unit #6 and of Kay's 1/16th undivided interest in the common area.

69.  Cross-complainants are informed and believe and thereupon allege, that each of the cross-defendants designated herein as ROES 81 through 100, and each of them became an owner of a fee title interest in one or more of the individual condominium units at 15 - 63rd Ave., Playa del Rey, California after January 1, 1998 and is a necessary party for the court to give full relief with respect to abating the nuisance and dangerous condition created by HSTCI injecting poison into the wall voids of the structure and under the ground in the garage area at the PREMISES.

70.  At all times herein mentioned, cross defendants PACIFIC VILLAS HOMEOWNERS' ASSOCIATION (hereinafter HOA) and ROES 26 through 35, and each of them, carelessly and negligently managed, operated, controlled, exercised control over, repaired, failed to repair, inspected, failed to inspect and otherwise carelessly and negligently supervised and monitored in all respects the common area of the PREMISES located at 15-63rd Ave., Playa del Rey, California, including but not limited to the three story frame, stucco and wood siding building structure and attached semi-subterranean garages located thereat and the surrounding

-42-

XC2nd227

1   after they were damaged by wind, rain, earthquake forces and HSTCI drilling holes and then not

2   sealing the holes drilled in the structure allowing rain water, wind and pesticide to enter the

3   SMOLKERS home and to cause damage to the SMOLKERS and to the SMOLKERS' property

4   all to the SMOLKERS' damage in an amount to be proved at time of trial. THE HOA negligently

5   allowed the roof gutters to become clogged with debris allowing rain water to back up and seep

6   into the building, including the SMOLKERS' home causing damages due to rain water and

7   pesticide, causing damage to the SMOLKERS' home in an amount to be proved at time of trial.

8   The HOA negligently failed to seal holes drilled by HSTCI in the walls and ceiling of the building

9   which allowed wind and water and pesticide to blow into the SMOLKERS' home causing damage

10  to the SMOLKERS and to the SMOLKERS' property in an amount to be proved at time of trial.

11  HSTCI's termite treatment did not work; the building is still infested with termites which have

12  caused termite related damage to the PREMISES and to the SMOLKERS and to the

13  SMOLKERS' home all to the SMOLKERS' damage in an amount to be proved at time of trial.

14  Holes and caulking scares left in the SMOLKERS' home by the HOA's contractor HSTCI left

15  obvious and unsightly damage throughout the SMOLKERS' home necessitating repairs including

16  resurfacing the walls and ceilings and repainting so that the interior does not simply look like a

17  patch, all to the SMOLKERS' damage in an amount to be proven at time of trial.

18          72. No effort was made by the HOA to have the pesticide (SYLOID 244) applied in the

19  common areas of the PREMISES by HSTCI removed after the HOA was notified that the

20  SYLOID 244 applied in the PREMISES is a toxic and illegal  poison and that it is against the law

21  to possess or use SYLOID 244 as a pesticide. HOA by its negligent  and illegal conduct and

22  failure to act created and maintained a nuisance and dangerous and illegal condition on the

23  PREMISES and committed waste by neglecting and misusing the common areas of the

24  PREMISES to store an illegal poison in an unsafe and illegal manner, which necessitated that the

25  SMOLKERS sue HSTCI, TIE, GRACE, GD, HOA, and the other owners of an undivided

26  interest in the common area of the PREMISES in defense of the common area, and in self-defense

27  to abate said nuisance in order to protect the interests of GARY SMOLKER and the interests of

28

-44-

XC2nd227

after they were damaged by wind, rain, earthquake forces and HSTCI drilling holes and then not sealing the holes drilled in the structure allowing rain water, wind and pesticide to enter the SMOLKERS home and to cause damage to the SMOLKERS and to the SMOLKERS' property all to the SMOLKERS' damage in an amount to be proved at time of trial. THE HOA negligently allowed the roof gutters to become clogged with debris allowing rain water to back up and seep into the building, including the SMOLKERS' home causing damages due to rain water and pesticide, causing damage to the SMOLKERS' home in an amount to be proved at time of trial. The HOA negligently failed to seal holes drilled by HSTCI in the walls and ceiling of the building which allowed wind and water and pesticide to blow into the SMOLKERS' home causing damage to the SMOLKERS and to the SMOLKERS' property in an amount to be proved at time of trial. HSTCI's termite treatment did not work; the building is still infested with termites which have caused termite related damage to the PREMISES and to the SMOLKERS and to the SMOLKERS' home all to the SMOLKERS' damage in an amount to be proved at time of trial. Holes and caulking scares left in the SMOLKERS' home by the HOA's contractor HSTCI left obvious and unsightly damage throughout the SMOLKERS' home necessitating repairs including resurfacing the walls and ceilings and repainting so that the interior does not simply look like a patch, all to the SMOLKERS' damage in an amount to be proven at time of trial.

72. No effort was made by the HOA to have the pesticide (SYLOID 244) applied in the common areas of the PREMISES by HSTCI removed after the HOA was notified that the SYLOID 244 applied in the PREMISES is a toxic and illegal poison and that it is against the law to possess or use SYLOID 244 as a pesticide. HOA by its negligent and illegal conduct and failure to act created and maintained a nuisance and dangerous and illegal condition on the PREMISES and committed waste by neglecting and misusing the common areas of the PREMISES to store an illegal poison in an unsafe and illegal manner, which necessitated that the SMOLKERS sue HSTCI, TIE, GRACE, GD, HOA, and the other owners of an undivided interest in the common area of the PREMISES in defense of the common area, and in self-defense to abate said nuisance in order to protect the interests of GARY SMOLKER and the interests of

-44-

1  ROES 26 through 35, and each of them, alleged herein, ALICE SMOLKER has been
2  continuously exposed to the pesticide, has been denied the peaceful possession, use and
3  enjoyment of her home, and has had her personal property destroyed and damaged all to her
4  damage in an amount to be proved at time of trial.. Seeing the physical injury, pain and suffering,
5  endured by GARY SMOLKER, JUDI SMOLKER, LEAH SMOLKER and Caramel has caused
6  great mental and nervous pain and suffering and emotional damage to ALICE SMOLKER all to
7  her damage in an amount to be proved at time of trial. As a result of such injuries the
8  SMOLKERS have suffered general damages within the jurisdiction of this court in an amount to
9  be proved at time of trial.

10  75. As a result of the negligent acts and omissions of HOA, and ROES 26 through 35,
11  and each of them, and their failure to seal the holes drilled by HSTCI, and their failure to repair
12  the rain, wind and earthquake damage to the common area of the PREMISES as herein alleged,
13  GARY SMOLKER's, JUDI SMOLKER's, and LEAH SMOLKER's illnesses, and injuries as
14  above stated, were aggravated thereby further injuring GARY SMOLKER, JUDI SMOLKER,
15  and LEAH SMOLKER, in their health, strength and activity, and causing further injury to their
16  body and shock and injury to their nervous system, all of which injuries have caused and continue
17  to cause further physical injury to GARY SMOLKER to his damage in an amount to be proved at
18  time of trial and to cause the SMOLKERS, and each of them, great mental, physical and nervous
19  pain and suffering and the SMOLKERS, and each of them, have been damaged thereby in a
20  further sum within the jurisdiction of this court to be proved at time of trial.

21  76. As a further proximate result of the negligent acts and omissions of HOA and ROES
22  26 through 35, and each of them, and their failure to take remedial action and refusal to take
23  remedial action, alleged herein, the SMOLKERS have been required to spend money and incur
24  obligations, and will continue to spend money and incur obligations, for medical services, dental
25  services, X-rays, drugs and sundries reasonably required in the treatment and relief of the injuries
26  herein alleged, and have been forced to become involved in litigation with other cotenants who
27  also own an undivided interest in the common area of the PREMISES, the SMOLKERS'

28

-46-

XC2nd227

1  ROES 26 through 35, and each of them, alleged herein, ALICE SMOLKER has been

2  continuously exposed to the pesticide, has been denied the peaceful possession, use and

3  enjoyment of her home, and has had her personal property destroyed and damaged all to her

4  damage in an amount to be proved at time of trial.. Seeing the physical injury, pain and suffering,

5  endured by GARY SMOLKER, JUDI SMOLKER, LEAH SMOLKER and Caramel has caused

6  great mental and nervous pain and suffering and emotional damage to ALICE SMOLKER all to

7  her damage in an amount to be proved at time of trial. As a result of such injuries the

8  SMOLKERS have suffered general damages within the jurisdiction of this court in an amount to

9  be proved at time of trial.

10     75. As a result of the negligent acts and omissions of HOA, and ROES 26 through 35,

11  and each of them, and their failure to seal the holes drilled by HSTCI, and their failure to repair

12  the rain, wind and earthquake damage to the common area of the PREMISES as herein alleged,

13  GARY SMOLKER's, JUDI SMOLKER's, and LEAH SMOLKER's illnesses, and injuries as

14  above stated, were aggravated thereby further injuring GARY SMOLKER, JUDI SMOLKER,

15  and LEAH SMOLKER, in their health, strength and activity, and causing further injury to their

16  body and shock and injury to their nervous system, all of which injuries have caused and continue

17  to cause further physical injury to GARY SMOLKER to his damage in an amount to be proved at

18  time of trial and to cause the SMOLKERS, and each of them, great mental, physical and nervous

19  pain and suffering and the SMOLKERS, and each of them, have been damaged thereby in a

20  further sum within the jurisdiction of this court to be proved at time of trial.

21     76. As a further proximate result of the negligent acts and omissions of HOA and ROES

22  26 through 35, and each of them, and their failure to take remedial action and refusal to take

23  remedial action, alleged herein, the SMOLKERS have been required to spend money and incur

24  obligations, and will continue to spend money and incur obligations, for medical services, dental

25  services, X-rays, drugs and sundries reasonably required in the treatment and relief of the injuries

26  herein alleged, and have been forced to become involved in litigation with other cotenants who

27  also own an undivided interest in the common area of the PREMISES, the SMOLKERS'

28

-46-

XC2nd227

1  pesticide, and/or razing of the building, all to the SMOLKERS' damage in a sum to be proved at
2  trial.

3      78. The pesticide which resides between the walls in the PREMISES belongs to each
4  individual condominium owner and is under the control of HOA. The escape of the pesticide
5  from between the walls into the SMOLKERS' living quarters constitutes a trespass on the
6  SMOLKERS' living quarters and a battery on the bodies of the SMOLKERS and their children.
7  On or about April 8, 1997 the SMOLKERS made demand upon the HOA to get rid of the
8  pesticide in the walls and wall voids and in their living quarters. Thereafter the SMOLKERS
9  made repeated demands on the HOA to remove the pesticide for the walls, in between the wall
10 voids and from GARY SMOLKER's condominium unit. HOA refused to remove the pesticide
11 and continues to refuse to remove the pesticide. In September 1997 GARY SMOLKER made
12 demand upon the other condominium owners to remove the pesticide applied by HSTCI removed
13 from the entire building or to purchase his condominium. The owners rejected this demand.

14     79. As a further proximate result of the fraudulent conduct of HSTCI, MORRIS, and RT
15 alleged herein, and the SMOLKERS spending money on costs of repair, cost to live somewhere
16 else, cost to replace contaminated personal property, and loss of time needed to deal with
17 pesticide contamination related matters, the SMOLKERS have been emotionally and financially
18 exhausted, d have been forced to lower their living style, have had their privacy breached, have
19 been humiliated and caused to suffer emotional distress, all to their damage in an amount to be
20 proven at time of trial.

21     80. As additional damages against cross-defendants HOA, and ROES 26 through 35, and
22 each of them, cross-complainants allege these cross-defendants and each of them were guilty of
23 malice and/or oppression as defined in Civil Code Section 3294 in committing the trespass, assault
24 and battery and illegal storage and use of an unregistered pesticide and failing to take any steps to
25 mitigate the damages being caused to the SMOLKERS by said pesticides, and cross-complainants
26 and each of them should recover, in addition to actual damages, exemplary and punitive damages

27

28

-48-

XC2nd227

1  pesticide, and/or razing of the building, all to the SMOLKERS' damage in a sum to be proved at

2  trial.

3      78.  The pesticide which resides between the walls in the PREMISES belongs to each

4  individual condominium owner and is under the control of HOA.  The escape of the pesticide

5  from between the walls into the SMOLKERS' living quarters constitutes a trespass on the

6  SMOLKERS' living quarters and a battery on the bodies of the SMOLKERS and their children.

7  On or about April 8, 1997 the SMOLKERS made demand upon the HOA to get rid of the

8  pesticide in the walls and wall voids and in their living quarters.  Thereafter the SMOLKERS

9  made repeated demands on the HOA to remove the pesticide for the walls, in between the wall

10  voids and from GARY SMOLKER's condominium unit. HOA refused to remove the pesticide

11  and continues to refuse to remove the pesticide.  In September 1997 GARY SMOLKER made

12  demand upon the other condominium owners to remove the pesticide applied by HSTCI removed

13  from the entire building or to purchase his condominium.  The owners rejected this demand.

14      79.  As a further proximate result of the fraudulent conduct of HSTCI, MORRIS, and RT

15  alleged herein, and the SMOLKERS spending money on costs of repair, cost to live somewhere

16  else, cost to replace contaminated personal property, and loss of time needed to deal with

17  pesticide contamination related matters, the SMOLKERS have been emotionally and financially

18  exhausted, d have been forced to lower their living style, have had their privacy breached, have

19  been humiliated and caused to suffer emotional distress, all to their damage in an amount to be

20  proven at time of trial.

21      80.  As additional damages against cross-defendants HOA, and ROES 26 through 35, and

22  each of them, cross-complainants allege these cross-defendants and each of them were guilty of

23  malice and/or oppression as defined in Civil Code Section 3294 in committing the trespass, assault

24  and battery and illegal storage and use of an unregistered pesticide and failing to take any steps to

25  mitigate the damages being caused to the SMOLKERS by said pesticides, and cross-complainants

26  and each of them should recover, in addition to actual damages, exemplary and punitive damages

27

28

-48-

XC2nd227

1    consumers of the SYLOID manufactured, sold, and/or distributed and shipped by GRACE and/or
2    GD in this case (HOA, and the SMOLKERS) expected SYLOID 244 to be inherently safe due to
3    representations made by the distributor/applicator HSTCI and GRACE and GD backing up
4    HSTCI's claims that SYLOID 244 is an inherently safe product.  Due to its inherent
5    characteristics of being a pesticide, a respirable dust, and a dehydrating agent, no safe design of
6    SYLOID 244 is possible.  SYLOID 244 is a toxic dust capable of causing dermatitis, lung
7    damage, and dried out mucous membranes if it comes in contact with human beings.  SYLOID
8    244 was sold to HSTCI in California by GRACE and/or GD and delivered to HSTCI in
9    California, in the time frame July through October 1996, in violation of state and federal law.  The
10   SYLOID 244 sold to HSTCI by GRACE and/or GD was thereafter resold to HOA by HSTCI and
11   applied in the PREMISES in violation of state and federal law.  In connection with the sale of the
12   SYLOID 244 to the HOA by HSTCI, who served as GRACE's and GD's distributor of SYLOID
13   244 to the HOA and to the SMOLKERS, and in connection with the application of the SYLOID
14   244 in the PREMISES by HSTCI, adequate warnings of risks and dangers were not given to
15   HOA or to the SMOLKERS.

16       83.  SYLOID 244 was sold by GRACE and/or GD to HSTCI and purchased by HSTCI as
17   a dry white powder consisting of solid microscopic size particles of Silicic Acid.  SYLOID 244, in
18   the form purchased, was applied by HSTCI to the PREMISES on or about October 11 and 12,
19   1996 by a process designed and chosen by MORRIS.  This process consists, in part, of injecting
20   solid microscopic size pesticide particles suspended in a gaseous medium (i.e. air) under a
21   pressure of approximately 120 pounds per square inch into structural voids (anywhere there is a
22   *"dead space"*) in the building being treated.  This is accomplished by drilling holes (access
23   apertures) in the walls adjacent to the structural voids and injecting microscopic size solid
24   chemical pesticide particles approximately 3 microns in diameter (i.e. SYLOID 244) suspended in
25   a gaseous medium through these access apertures into the structural voids.  A sufficient number
26   of access apertures are supposed to be drilled through the walls of the structure to insure total
27   inside space penetration.  The solid microscopic pesticide particles (i.e. SYLOID 244) suspended

28

-50-

XC2nd227

1  consumers of the SYLOID manufactured, sold, and/or distributed and shipped by GRACE and/or
2  GD in this case (HOA, and the SMOLKERS) expected SYLOID 244 to be inherently safe due to
3  representations made by the distributor/applicator HSTCI and GRACE and GD backing up
4  HSTCI's claims that SYLOID 244 is an inherently safe product. Due to its inherent
5  characteristics of being a pesticide, a respirable dust, and a dehydrating agent, no safe design of
6  SYLOID 244 is possible. SYLOID 244 is a toxic dust capable of causing dermatitis, lung
7  damage, and dried out mucous membranes if it comes in contact with human beings. SYLOID
8  244 was sold to HSTCI in California by GRACE and/or GD and delivered to HSTCI in
9  California, in the time frame July through October 1996, in violation of state and federal law. The
10  SYLOID 244 sold to HSTCI by GRACE and/or GD was thereafter resold to HOA by HSTCI and
11  applied in the PREMISES in violation of state and federal law. In connection with the sale of the
12  SYLOID 244 to the HOA by HSTCI, who served as GRACE's and GD's distributor of SYLOID
13  244 to the HOA and to the SMOLKERS, and in connection with the application of the SYLOID
14  244 in the PREMISES by HSTCI, adequate warnings of risks and dangers were not given to
15  HOA or to the SMOLKERS.

16      83. SYLOID 244 was sold by GRACE and/or GD to HSTCI and purchased by HSTCI as
17  a dry white powder consisting of solid microscopic size particles of Silicic Acid. SYLOID 244, in
18  the form purchased, was applied by HSTCI to the PREMISES on or about October 11 and 12,
19  1996 by a process designed and chosen by MORRIS. This process consists, in part, of injecting
20  solid microscopic size pesticide particles suspended in a gaseous medium (i.e. air) under a
21  pressure of approximately 120 pounds per square inch into structural voids (anywhere there is a
22  *"dead space"*) in the building being treated. This is accomplished by drilling holes (access
23  apertures) in the walls adjacent to the structural voids and injecting microscopic size solid
24  chemical pesticide particles approximately 3 microns in diameter (i.e. SYLOID 244) suspended in
25  a gaseous medium through these access apertures into the structural voids. A sufficient number
26  of access apertures are supposed to be drilled through the walls of the structure to insure total
27  inside space penetration. The solid microscopic pesticide particles (i.e. SYLOID 244) suspended

28

-50-

XC2nd227

1   exposed to SYLOID 244 or know how to detect the presence of a dangerous concentration of

2   SYLOID 244 in the air they breathed or on any surface they came in contact with. GRACE and

3   GD failed to exercise reasonable care to inform cross-complainants of facts which make SYLOID

4   244 likely to be dangerous to people exposed to SYLOID 244. When GRACE and/or GD sold

5   SYLOID 244 to HSTCI they expected their product, SYLOID 244, to be applied by HSTCI in

6   residential structures to eradicate termites.

7       86. When GRACE and GD dealt with cross-complainants GRACE and GD knew the

8   SMOLKERS believed they were being exposed to harmful concentrations of SYLOID 244. But

9   GRACE and GD assured the SMOLKERS that exposure to SYLOID 244 would not be harmful.

10  and that there was a simple way to remove the SYLOID 244 that had contaminated the

11  SMOLKERS' carpets after GRACE and GD were told that SYLOID 244 had contaminated the

12  SMOLKERS' furniture and furnishings and was entering into the SMOLKERS' home from the

13  structural voids in the common area of the PREMISES through the walls and ceilings of the

14  SMOLKERS' home.

15      87. At all times herein mentioned it was against the law for HSTCI to deliver, sell,

16  possess or use SYLOID 244 as a pesticide in California and for MORRIS to direct HSTCI to do

17  so. It was against the law for GRACE and/or GD to sell and/or distribute, offer for sale, hold for

18  distribution, hold for sale, hold for shipment, release for shipment, to deliver or to ship SYLOID

19  244 for use as a pesticide. It was illegal, against the law, for MORRIS to direct HSTCI to use

20  and for HSTCI to use SYLOID 244 in the PREMISES as a pesticide. It was illegal, against the

21  law, for GD to manufacture SYLOID 244 for use as a pesticide. It was illegal, against the law,

22  for GD and/or GRACE to sell SYLOID 244 to HSTCI for use as a pesticide.

23      88. GRACE, GD and ROES 36 through 45, and each of them, are, and at all times herein

24  mentioned were, engaged in the business of manufacturing, compounding, designing,

25  synthesizing, assembling, mixing, combining, dispensing, distributing, storing, exporting, selling

26  and otherwise handling pesticides and other toxic chemicals, including but not limited to silica gel

27  under the trade name SYLOID 244, hereinafter "said Product", and providing services relative to

28

-52-

XC2nd227

1  exposed to SYLOID 244 or know how to detect the presence of a dangerous concentration of

2  SYLOID 244 in the air they breathed or on any surface they came in contact with.  GRACE and

3  GD failed to exercise reasonable care to inform cross-complainants of facts which make SYLOID

4  244 likely to be dangerous to people exposed to SYLOID 244.  When GRACE and/or GD sold

5  SYLOID 244 to HSTCI they expected their product, SYLOID 244, to be applied by HSTCI in

6  residential structures to eradicate termites.

7      86.  When GRACE and GD dealt with cross-complainants GRACE and GD knew the

8  SMOLKERS believed they were being exposed to harmful concentrations of SYLOID 244.  But

9  GRACE and GD assured the SMOLKERS that exposure to SYLOID 244 would not be harmful.

10  and that there was a simple way to remove the SYLOID 244 that had contaminated the

11  SMOLKERS' carpets after GRACE and GD were told that SYLOID 244 had contaminated the

12  SMOLKERS' furniture and furnishings and was entering into the SMOLKERS' home from the

13  structural voids in the common area of the PREMISES through the walls and ceilings of the

14  SMOLKERS' home.

15      87.  At all times herein mentioned it was against the law for HSTCI to deliver, sell,

16  possess or use SYLOID 244 as a pesticide in California and for MORRIS to direct HSTCI to do

17  so.  It was against the law for GRACE and/or GD to sell and/or distribute, offer for sale, hold for

18  distribution, hold for sale, hold for shipment, release for shipment, to deliver or to ship SYLOID

19  244 for use as a pesticide.  It was illegal, against the law, for MORRIS to direct HSTCI to use

20  and for HSTCI to use SYLOID 244 in the PREMISES as a pesticide.  It was illegal, against the

21  law, for GD to manufacture SYLOID 244 for use as a pesticide.  It was illegal, against the law,

22  for GD and/or GRACE to sell SYLOID 244 to HSTCI for use as a pesticide.

23      88.  GRACE, GD and ROES 36 through 45, and each of them, are, and at all times herein

24  mentioned were, engaged in the business of manufacturing, compounding, designing,

25  synthesizing, assembling, mixing, combining, dispensing, distributing, storing, exporting, selling

26  and otherwise handling pesticides and other toxic chemicals, including but not limited to silica gel

27  under the trade name SYLOID 244, hereinafter "said Product", and providing services relative to

28

XC2nd227

1  property which, in fact, occurred as a result of the said negligence of the cross-defendants and

2  each of them, sued in this Cause of Action.

3      92.  The defective, faulty, unsafe, hazardous, and dangerous character of said Product and

4  its component parts rendered the same unsafe for the use intended, reasonably foreseeable, and

5  recommended by cross-defendants, and each of them, sued in this Cause of Action, and such facts

6  were know to the cross-defendants, and each of them, sued in the Cause of Action, or could have

7  been discovered in the exercise of reasonable care by cross-defendants, and each of them, sued in

8  this Cause of Action.  Furthermore, said cross-defendants, and each of them, failed to warn the

9  SMOLKERS of the defective, faulty, unsafe, hazardous, and dangerous character of said Product

10 and failed to warn the SMOLKERS that exposure to or breathing in said Product could and

11 would cause serious injuries.  The distribution and sale of such product by GRACE and/or GD to

12 HSTCI was done in violation of U.S. Code Section 136a and in violation of California Food and

13 Agriculture Code Section 12993.  SYLOID 244 was negligently manufactured by GRACE and/or

14 GD, negligently sold by GRACE and/or GD and negligently distributed by GRACE and/or GD.

15 Technical support for SYLOID 244 and consultation concerning the removal of SYLOID 244

16 from the SMOLKERS' home was negligently provided to the SMOLKERS by GRACE and GD.

17     93.  As a proximate result of the negligent and illegal acts and omissions of GRACE, GD

18 and ROES 36 through 45, and each of them, alleged herein, GARY SMOLKER, JUDI

19 SMOLKER, LEAH SMOLKER, and Caramel have been continuously exposed to pesticide

20 applied by HSTCI in their home, have been denied of their peaceful possession, use and

21 enjoyment of their home, have been forced to move out of their home, have been forced to pay

22 rent to live in a hotel, have been forced to pay extraordinary sums for food and lodging while

23 living out of their home, have had their personal property damaged and destroyed, have been

24 made ill, have been injured and hurt in their health, strength and activity, sustaining injury to their

25 nervous system and person, have suffered various physical injuries which have caused them great

26 mental, physical and nervous pain and suffering all to GARY SMOLKER's and ALICE

27 SMOLKER's damage in an amount to be proved at time of trial..  As a proximate result of the

28

XC2nd227

1  property which, in fact, occurred as a result of the said negligence of the cross-defendants and
2  each of them, sued in this Cause of Action.

3      92. The defective, faulty, unsafe, hazardous, and dangerous character of said Product and
4  its component parts rendered the same unsafe for the use intended, reasonably foreseeable, and
5  recommended by cross-defendants, and each of them, sued in this Cause of Action, and such facts
6  were know to the cross-defendants, and each of them, sued in the Cause of Action, or could have
7  been discovered in the exercise of reasonable care by cross-defendants, and each of them, sued in
8  this Cause of Action. Furthermore, said cross-defendants, and each of them, failed to warn the
9  SMOLKERS of the defective, faulty, unsafe, hazardous, and dangerous character of said Product
10 and failed to warn the SMOLKERS that exposure to or breathing in said Product could and
11 would cause serious injuries. The distribution and sale of such product by GRACE and/or GD to
12 HSTCI was done in violation of U.S. Code Section 136a and in violation of California Food and
13 Agriculture Code Section 12993. SYLOID 244 was negligently manufactured by GRACE and/or
14 GD, negligently sold by GRACE and/or GD and negligently distributed by GRACE and/or GD.
15 Technical support for SYLOID 244 and consultation concerning the removal of SYLOID 244
16 from the SMOLKERS' home was negligently provided to the SMOLKERS by GRACE and GD.

17     93. As a proximate result of the negligent and illegal acts and omissions of GRACE, GD
18 and ROES 36 through 45, and each of them, alleged herein, GARY SMOLKER, JUDI
19 SMOLKER, LEAH SMOLKER, and Caramel have been continuously exposed to pesticide
20 applied by HSTCI in their home, have been denied of their peaceful possession, use and
21 enjoyment of their home, have been forced to move out of their home, have been forced to pay
22 rent to live in a hotel, have been forced to pay extraordinary sums for food and lodging while
23 living out of their home, have had their personal property damaged and destroyed, have been
24 made ill, have been injured and hurt in their health, strength and activity, sustaining injury to their
25 nervous system and person, have suffered various physical injuries which have caused them great
26 mental, physical and nervous pain and suffering all to GARY SMOLKER's and ALICE
27 SMOLKER's damage in an amount to be proved at time of trial.. As a proximate result of the

28

-54-

XC2nd227

1 future earnings, have incurred and paid litigation costs, have been unable to promote their
2 business in the fashion they would otherwise be able to promote their business, have been
3 rendered unavailable to take on work they would otherwise be capable of taking on, have had to
4 deplete their savings and borrow money to pay living expenses and to pay business expenses, have
5 been required to spend money and incur obligations, and will continue to spend money and incur
6 obligations, for replacement of contaminated personal property (i.e. bedding, furniture, etc.), for
7 hauling away and disposal of contaminated property, for work done and to be done in an attempt
8 to clean-up and remove pesticide contamination from the air in their living quarters, from their
9 carpets, and other soft goods, etc., and have incurred and paid expenses and charges for repair
10 and construction work and painting to seal and repair holes drilled by HSTCI and sloppy "fix-up"
11 "caulking work done by HSTCI's fix-up crews and to fill and patch openings in walls and ceilings
12 and to seal walls and ceilings in an attempt to minimize the amount of pesticide that can escape
13 from the voids between the walls and ceilings of the PREMISES and thereafter enter into the
14 SMOLKERS' living quarters and will continue to incur and pay further expenses in connection
15 with efforts to mitigate damages caused by pesticide contamination, to prevent further pesticide
16 contamination, to remove residual pesticide contaminants, to replace contaminated items of
17 personal property, and will incur additional expenses for a new termite treatment of the
18 PREMISES, all to the SMOLKERS' damage in an amount to be proved at time of trial..

19     96. As a proximate result of the negligent and illegal conduct of GRACE, GD, and ROES
20 36 through 45, and each of them, which led to the contamination of the PREMISES by HSTCI's
21 pesticide and recontamination and continuous contamination of the SMOLKERS' home by the
22 pesticide applied by HSTCI, it is necessary to, and when the Smolkers have enough money they
23 will, remove interior walls of GARY SMOLKERS' condominium , vacuum out pesticide residing
24 in the wall voids, and then replace the insulation and drywall and repaint same, remove and
25 replace duct work and air-handling equipment contaminated with pesticide, all to the
26 SMOLKERS' damage in a sum to be proved at trial. As a further and proximate result of the
27 negligent and illegal conduct of GRACE, GD, and ROES 36 through 45, and each of them, herein

28

-56-

XC2nd227

1  future earnings, have incurred and paid litigation costs, have been unable to promote their
2  business in the fashion they would otherwise be able to promote their business, have been
3  rendered unavailable to take on work they would otherwise be capable of taking on, have had to
4  deplete their savings and borrow money to pay living expenses and to pay business expenses, have
5  been required to spend money and incur obligations, and will continue to spend money and incur
6  obligations, for replacement of contaminated personal property (i.e. bedding, furniture, etc.), for
7  hauling away and disposal of contaminated property, for work done and to be done in an attempt
8  to clean-up and remove pesticide contamination from the air in their living quarters, from their
9  carpets, and other soft goods, etc., and have incurred and paid expenses and charges for repair
10 and construction work and painting to seal and repair holes drilled by HSTCI and sloppy "fix-up"
11 "caulking work done by HSTCI's fix-up crews and to fill and patch openings in walls and ceilings
12 and to seal walls and ceilings in an attempt to minimize the amount of pesticide that can escape
13 from the voids between the walls and ceilings of the PREMISES and thereafter enter into the
14 SMOLKERS' living quarters and will continue to incur and pay further expenses in connection
15 with efforts to mitigate damages caused by pesticide contamination, to prevent further pesticide
16 contamination, to remove residual pesticide contaminants, to replace contaminated items of
17 personal property, and will incur additional expenses for a new termite treatment of the
18 PREMISES, all to the SMOLKERS' damage in an amount to be proved at time of trial..

19     96. As a proximate result of the negligent and illegal conduct of GRACE, GD, and ROES
20 36 through 45, and each of them, which led to the contamination of the PREMISES by HSTCI's
21 pesticide and recontamination and continuous contamination of the SMOLKERS' home by the
22 pesticide applied by HSTCI, it is necessary to, and when the Smolkers have enough money they
23 will, remove interior walls of GARY SMOLKERS' condominium , vacuum out pesticide residing
24 in the wall voids, and then replace the insulation and drywall and repaint same, remove and
25 replace duct work and air-handling equipment contaminated with pesticide, all to the
26 SMOLKERS' damage in a sum to be proved at trial. As a further and proximate result of the
27 negligent and illegal conduct of GRACE, GD, and ROES 36 through 45, and each of them, herein

28

-56-

XC2nd227

1  others, and cross-complainants and each of them, should recover, in addition to actual damages,

2  damages to make an example of and to punish cross-defendants GRACE, GD, and ROES 36

3  through 45, and each of them.

4

5  ### FIFTH CAUSE OF ACTION

6  (Against GRACE, GD, HSTCI, MORRIS,

7  and ROES 36 through 55 for Strict Liability)

8  99.  The SMOLKERS incorporate herein by reference as though fully set forth herein

9  Paragraphs 81 through 85 with the same force and effect as though said paragraphs were set forth

10  fully at this point.

11  100.  At all times herein mentioned cross-defendants, and each of them, sued in this Cause

12  of Action, manufactured, designed, distributed, mixed, combined, released, dispensed, inspected,

13  failed to inspect, advertised, labeled, instructed, advised, handled and/or assisted in the assembly,

14  marketing, sale and servicing of said Product and the component parts thereof so that the same

15  could be purchased for use in the general public.  SYLOID 244 is "said product."

16  101.  At all times mentioned herein, cross-defendants, and each of them, sued in this

17  Cause of Action, knew that said Product and its component pats were to be purchased and used

18  without inspection for defects by HOA, the SMOLKERS, and other members of the general

19  public.

20  102.  "Said Product" and its component parts hereinabove referenced, were unsafe for

21  their intended use or reasonably foreseeable uses and foreseeable misuses by reason of defects in

22  their design, manufacture, distribution, inspection, labeling, marketing, sale, servicing, and

23  handling so that said Product and its component parts could not be safely used when said Product

24  left the control of each cross-defendant sued in this Cause of Action.  "Said Product" when used

25  as a pesticide, as it was in this case, did not meet the minimum safety expectations of the

26  product's ordinary consumers.  Due to its inherent characteristic of being a pesticide that is a

27  respirable dust and dehydrating agent no safe design of "said product" is possible.  However, the

28

-58-

XC2nd227

1    others, and cross-complainants and each of them, should recover, in addition to actual damages,

2    damages to make an example of and to punish cross-defendants GRACE, GD, and ROES 36

3    through 45, and each of them.

4

5                              FIFTH CAUSE OF ACTION

6                          (Against GRACE, GD, HSTCI, MORRIS,

7                      and ROES 36 through 55 for Strict Liability)

8        99. The SMOLKERS incorporate herein by reference as though fully set forth herein

9    Paragraphs 81 through 85 with the same force and effect as though said paragraphs were set forth

10   fully at this point.

11       100. At all times herein mentioned cross-defendants, and each of them, sued in this Cause

12   of Action, manufactured, designed, distributed, mixed, combined, released, dispensed, inspected,

13   failed to inspect, advertised, labeled, instructed, advised, handled and/or assisted in the assembly,

14   marketing, sale and servicing of said Product and the component parts thereof so that the same

15   could be purchased for use in the general public.  SYLOID 244 is "said product."

16       101. At all times mentioned herein, cross-defendants, and each of them, sued in this

17   Cause of Action, knew that said Product and its component pats were to be purchased and used

18   without inspection for defects by HOA, the SMOLKERS, and other members of the general

19   public.

20       102. "Said Product" and its component parts hereinabove referenced, were unsafe for

21   their intended use or reasonably foreseeable uses and foreseeable misuses by reason of defects in

22   their design, manufacture, distribution, inspection, labeling, marketing, sale, servicing, and

23   handling so that said Product and its component parts could not be safely used when said Product

24   left the control of each cross-defendant sued in this Cause of Action.  "Said Product" when used

25   as a pesticide, as it was in this case, did not meet the minimum safety expectations of the

26   product's ordinary consumers.  Due to its inherent characteristic of being a pesticide that is a

27   respirable dust and dehydrating agent no safe design of "said product" is possible.  However, the

28

                                         -58-

1 | was unlawful or that "said product" was not registered as a pesticide with either the US EPA or
2 | the State of California Department of Pesticide Regulation.

3 | 106. The SMOLKERS were not aware of said Product's defects at any at time prior to
4 | the initial incidents which occurred on or about Oct. 11, 1996 and thereafter and which caused
5 | injuries to the SMOLKERS. Said Product failed to perform as safely as an ordinary user, such as
6 | the SMOLKERS, would expect, in that the SMOLKERS were using the product in a manner
7 | reasonably foreseeable by the cross-defendants sued in the Cause of Action and for the intended
8 | purpose for which the product was specifically supplied to HSTCI, which was the purpose the
9 | product was specifically supplied to the HOA, namely to prevent future termite infestations and to
10 | eradicate existing termite infestations. As a result of said defect in said Product and its
11 | component parts, and as a result of cross-defendants' failure to warn of the deleterious effects of
12 | being exposed to said Product or the deleterious effects of inhaling said Product, on or about
13 | October 11, 1996, and continuously thereafter the SMOLKERS were caused to sustain those
14 | injuries described herein.

15 | 107. As a proximate result of the defect and exposure of the SMOLKERS, the exposure
16 | of the SMOLKERS' children, and the exposure of the SMOLKERS' property to the product as
17 | hereinabove alleged and as a proximate result of the failure to warn the SMOLKERS of the
18 | dangers posed by the product or how to handle the product, as a proximate result of the illegal
19 | sale and distribution of the Product and the subsequent exposure of the SMOLKERS and the
20 | SMOLKERS' children and the SMOLKERS' property to the product, the SMOLKERS sustained
21 | injuries to their property, to their health, to their strength and activity, as well as mental pain and
22 | suffering, the SMOLKERS are informed and believe and based thereon allege that they have and
23 | will continue to sustain in the future injuries to property, health, strength and activity, and physical
24 | and mental pain and suffering, emotional distress, all to their general damage in a sum within the
25 | jurisdiction of this court.

26 | 108. As a further proximate result of the failure to warn and of the defect in the product
27 | as hereinabove alleged, and injuries sustained by the SMOLKERS, and each of them, and their

28 |

-60-

XC2nd227

1  was unlawful or that "said product" was not registered as a pesticide with either the US EPA or

2  the State of California Department of Pesticide Regulation.

3      106. The SMOLKERS were not aware of said Product's defects at any at time prior to

4  the initial incidents which occurred on or about Oct. 11, 1996 and thereafter and which caused

5  injuries to the SMOLKERS. Said Product failed to perform as safely as an ordinary user, such as

6  the SMOLKERS, would expect, in that the SMOLKERS were using the product in a manner

7  reasonably foreseeable by the cross-defendants sued in the Cause of Action and for the intended

8  purpose for which the product was specifically supplied to HSTCI, which was the purpose the

9  product was specifically supplied to the HOA, namely to prevent future termite infestations and to

10  eradicate existing termite infestations. As a result of said defect in said Product and its

11  component parts, and as a result of cross-defendants' failure to warn of the deleterious effects of

12  being exposed to said Product or the deleterious effects of inhaling said Product, on or about

13  October 11, 1996, and continuously thereafter the SMOLKERS were caused to sustain those

14  injuries described herein.

15      107. As a proximate result of the defect and exposure of the SMOLKERS, the exposure

16  of the SMOLKERS' children, and the exposure of the SMOLKERS' property to the product as

17  hereinabove alleged and as a proximate result of the failure to warn the SMOLKERS of the

18  dangers posed by the product or how to handle the product, as a proximate result of the illegal

19  sale and distribution of the Product and the subsequent exposure of the SMOLKERS and the

20  SMOLKERS' children and the SMOLKERS' property to the product, the SMOLKERS sustained

21  injuries to their property, to their health, to their strength and activity, as well as mental pain and

22  suffering, the SMOLKERS are informed and believe and based thereon allege that they have and

23  will continue to sustain in the future injuries to property, health, strength and activity, and physical

24  and mental pain and suffering, emotional distress, all to their general damage in a sum within the

25  jurisdiction of this court.

26      108. As a further proximate result of the failure to warn and of the defect in the product

27  as hereinabove alleged, and injuries sustained by the SMOLKERS, and each of them, and their

28

-60-

XC2nd227

1  further proximate result of the product defect and failure to warn of the defect in the product, and

2  the illegal manufacture sale and distribution of the product as hereinabove alleged ALICE

3  SMOLKER has been continuously exposed to the pesticide, has been denied the peaceful

4  possession, use and enjoyment of her home, and has had her personal property destroyed and

5  damaged all to her damage in an amount to be proved at time of trial. Seeing the physical injury,

6  pain and suffering, endured by GARY SMOLKER, JUDI SMOLKER, LEAH SMOLKER and

7  Caramel has caused great mental and nervous pain and suffering and emotional damage to ALICE

8  SMOLKER all to her damage in an amount to be proved at time of trial. As a result of such

9  injuries the SMOLKERS have suffered general damages within the jurisdiction of this court in an

10  amount to be proved at time of trial.

11      111. As a further proximate result of the product defect and failure to warn of the defect

12  in the product, and the illegal manufacture sale and distribution of the product as hereinabove

13  alleged GARY SMOLKER's, JUDI SMOLKER's, and LEAH SMOLKER's illnesses, and

14  injuries as above stated, were aggravated thereby further injuring GARY SMOLKER, JUDI

15  SMOLKER, and LEAH SMOLKER, in their health, strength and activity, and causing further

16  injury to their body and shock and injury to their nervous system, all of which injuries have caused

17  and continue to cause further physical injury to GARY SMOLKER to his damage in an amount to

18  be proved at time of trial and to cause the SMOLKERS, and each of them, great mental, physical

19  and nervous pain and suffering and the SMOLKERS, and each of them, have been damaged

20  thereby in a further sum within the jurisdiction of this court to be proved at time of trial.

21      112. As a further proximate result of the product defect and failure to warn of the defect

22  in the product, and the illegal manufacture sale and distribution of the product as hereinabove

23  alleged the SMOLKERS have been required to spend money and incur obligations, and will

24  continue to spend money and incur obligations, for medical services, dental services, X-rays,

25  drugs and sundries reasonably required in the treatment and relief of the injuries herein alleged,

26  and have been forced to become involved in litigation with other cotenants who also own an

27  undivided interest in the common area of the PREMISES, the SMOLKERS' insurance carrier

28

-62-

XC2nd227

1  further proximate result of the product defect and failure to warn of the defect in the product, and

2  the illegal manufacture sale and distribution of the product as hereinabove alleged ALICE

3  SMOLKER has been continuously exposed to the pesticide, has been denied the peaceful

4  possession, use and enjoyment of her home, and has had her personal property destroyed and

5  damaged all to her damage in an amount to be proved at time of trial.  Seeing the physical injury,

6  pain and suffering, endured by GARY SMOLKER, JUDI SMOLKER, LEAH SMOLKER and

7  Caramel has caused great mental and nervous pain and suffering and emotional damage to ALICE

8  SMOLKER all to her damage in an amount to be proved at time of trial.  As a result of such

9  injuries the SMOLKERS have suffered general damages within the jurisdiction of this court in an

10  amount to be proved at time of trial.

11      111.  As a further proximate result of the product defect and failure to warn of the defect

12  in the product, and the illegal manufacture sale and distribution of the product as hereinabove

13  alleged GARY SMOLKER's, JUDI SMOLKER's, and LEAH SMOLKER's illnesses, and

14  injuries as above stated, were aggravated thereby further injuring GARY SMOLKER, JUDI

15  SMOLKER, and LEAH SMOLKER, in their health, strength and activity, and causing further

16  injury to their body and shock and injury to their nervous system, all of which injuries have caused

17  and continue to cause further physical injury to GARY SMOLKER to his damage in an amount to

18  be proved at time of trial and to cause the SMOLKERS, and each of them, great mental, physical

19  and nervous pain and suffering and the SMOLKERS, and each of them, have been damaged

20  thereby in a further sum within the jurisdiction of this court to be proved at time of trial.

21      112.  As a further proximate result of the product defect and failure to warn of the defect

22  in the product, and the illegal manufacture sale and distribution of the product as hereinabove

23  alleged the SMOLKERS have been required to spend money and incur obligations, and will

24  continue to spend money and incur obligations, for medical services, dental services, X-rays,

25  drugs and sundries reasonably required in the treatment and relief of the injuries herein alleged,

26  and have been forced to become involved in litigation with other cotenants who also own an

27  undivided interest in the common area of the PREMISES, the SMOLKERS' insurance carrier

28

-62-

XC2nd227

1    work and air-handling equipment contaminated with pesticide, all to the SMOLKERS' damage in

2    a sum to be proved at trial.  As a further proximate result of the product defect and failure to

3    warn of the defect in the product, and the illegal manufacture sale and distribution of the product

4    as hereinabove alleged, herein alleged, the SMOLKERS have been  prevented from attending to

5    their usual occupation and lost earnings and earnings capacity and are informed and believe and

6    thereon allege that they will be prevented from attending to their usual occupation in the future

7    and will thereby sustain future loss of earnings all to their damage in an amount to be proved at

8    trial.  As a further result of the conduct of cross-defendants and each of them, the SMOLKERS

9    have been threatened by their neighbors, the SMOLKERS have been forced to become involved

10   in controversies with other parties to this litigation and have been prevented them from attending

11   to their usual occupation and have lost earnings and earning capacity as a direct result thereof.

12   The SMOLKERS are informed and believe and thereupon allege that as a direct result of the

13   conduct of cross-defendants and each of them, the SMOLKERS will continue to be involved in

14   controversies with other parties to this litigation and will lose further earnings and earning

15   capacity as a result thereof.  As a direct result of the conduct of cross-defendants and each of

16   them, the quality of the SMOLKERS life has been diminished, the SMOLKERS have lost the free

17   and comfortable use of their personal property and their ability to enjoy the peaceful possession,

18   use and enjoyment of their home, and the value of GARY SMOLKER's condominium has been

19   depreciated and stigmatized, all to the SMOLKERS damage in a sum to be proved at time of trial.

20        114.  As a further proximate result of the product defect and failure to warn of the defect

21   in the product, and the illegal manufacture sale and distribution of the product as hereinabove

22   alleged, and the SMOLKERS spending money on costs of repair, cost to live somewhere else,

23   cost to replace contaminated personal property, and loss of time needed to deal with pesticide

24   contamination related matters, the SMOLKERS have been emotionally and financially exhausted,

25   have been forced to lower their living style, have had their privacy breached, have been humiliated

26   and caused to suffer emotional distress, all to their damage in an amount to be proven at time of

27   trial.

28

-64-

XC2nd227

work and air-handling equipment contaminated with pesticide, all to the SMOLKERS' damage in a sum to be proved at trial. As a further proximate result of the product defect and failure to warn of the defect in the product, and the illegal manufacture sale and distribution of the product as hereinabove alleged, herein alleged, the SMOLKERS have been prevented from attending to their usual occupation and lost earnings and earnings capacity and are informed and believe and thereon allege that they will be prevented from attending to their usual occupation in the future and will thereby sustain future loss of earnings all to their damage in an amount to be proved at trial. As a further result of the conduct of cross-defendants and each of them, the SMOLKERS have been threatened by their neighbors, the SMOLKERS have been forced to become involved in controversies with other parties to this litigation and have been prevented them from attending to their usual occupation and have lost earnings and earning capacity as a direct result thereof. The SMOLKERS are informed and believe and thereupon allege that as a direct result of the conduct of cross-defendants and each of them, the SMOLKERS will continue to be involved in controversies with other parties to this litigation and will lose further earnings and earning capacity as a result thereof. As a direct result of the conduct of cross-defendants and each of them, the quality of the SMOLKERS life has been diminished, the SMOLKERS have lost the free and comfortable use of their personal property and their ability to enjoy the peaceful possession, use and enjoyment of their home, and the value of GARY SMOLKER's condominium has been depreciated and stigmatized, all to the SMOLKERS damage in a sum to be proved at time of trial.

114. As a further proximate result of the product defect and failure to warn of the defect in the product, and the illegal manufacture sale and distribution of the product as hereinabove alleged, and the SMOLKERS spending money on costs of repair, cost to live somewhere else, cost to replace contaminated personal property, and loss of time needed to deal with pesticide contamination related matters, the SMOLKERS have been emotionally and financially exhausted, have been forced to lower their living style, have had their privacy breached, have been humiliated and caused to suffer emotional distress, all to their damage in an amount to be proven at time of trial.

-64-

XC2nd227

1   pesticide particles injected through the walls surrounding GARY SMOLKER's condominium
2   would not escape from the voids between the walls into the SMOLKERS' living quarters. As a
3   result of said cross-defendants' willful misconduct, conscious disregard for the safety of others,
4   and violation of laws regulating the use sale and possession of pesticides, toxic pesticide particles
5   including but not limited to silica gel, were emitted into the SMOLKERS' living quarters, and
6   stock-piled and stored in between the walls so that they would continue to enter the
7   SMOLKERS' living quarters after Oct. 11, 1996, thereby causing the SMOLKERS, the
8   SMOLKERS' children and their dog to be continuously exposed to said toxic particles and gases
9   and to suffer injuries on and after Oct. 11, 1996

10      118. At all times herein mentioned , HSTCI, MORRIS, and ROES 1 through 15, and
11   each of them, willfully and in conscious disregard of the safety of others, including the
12   SMOLKERS and their children, released, dispensed, and otherwise handled toxic chemicals and
13   pesticides in and about the PREMISES so as to create a dangerous, hazardous and unsafe
14   condition in the SMOLKERS' living quarters while said toxic chemicals were under the
15   operation, management, maintenance and control of cross-defendants, and each of them. Further
16   HSTCI, MORRIS and ROES 1 through 15, and each of them, knew of said dangerous condition
17   and nevertheless willfully and in conscious disregard for the safety of others, including the
18   SMOLKERS and their children, failed to warn the SMOLKERS of said defective, dangerous,
19   hazardous and unsafe condition, although cross-defendants knew that said toxic chemicals could
20   and would cause great bodily injury due to exposure, contact with or inhalation of such toxic
21   chemicals and therefore were aware of and foresaw the probability that severe bodily injury would
22   occur to persons exposed to such toxic chemicals. Despite such actual knowledge and awareness,
23   cross-defendants, and each of them, acted in conscious disregard for the health, safety, comfort
24   and lives of members of the public, including the SMOLKERS and their children, by choosing to
25   ignore and did ignore the aforementioned dangers and took no precautions or took precautions
26   known to cross-defendants to be insufficient and inadequate, or to otherwise initiate any
27   safeguards to minimize, prevent or warn of the extreme danger of exposure to such toxic

28

-66-

XC2nd227

1  pesticide particles injected through the walls surrounding GARY SMOLKER's condominium

2  would not escape from the voids between the walls into the SMOLKERS' living quarters. As a

3  result of said cross-defendants' willful misconduct, conscious disregard for the safety of others,

4  and violation of laws regulating the use sale and possession of pesticides, toxic pesticide particles

5  including but not limited to silica gel, were emitted into the SMOLKERS' living quarters, and

6  stock-piled and stored in between the walls so that they would continue to enter the

7  SMOLKERS' living quarters after Oct. 11, 1996, thereby causing the SMOLKERS, the

8  SMOLKERS' children and their dog to be continuously exposed to said toxic particles and gases

9  and to suffer injuries on and after Oct. 11, 1996

10      118. At all times herein mentioned , HSTCI, MORRIS, and ROES 1 through 15, and

11  each of them, willfully and in conscious disregard of the safety of others, including the

12  SMOLKERS and their children, released, dispensed, and otherwise handled toxic chemicals and

13  pesticides in and about the PREMISES so as to create a dangerous, hazardous and unsafe

14  condition in the SMOLKERS' living quarters while said toxic chemicals were under the

15  operation, management, maintenance and control of cross-defendants, and each of them. Further

16  HSTCI, MORRIS and ROES 1 through 15, and each of them, knew of said dangerous condition

17  and nevertheless willfully and in conscious disregard for the safety of others, including the

18  SMOLKERS and their children, failed to warn the SMOLKERS of said defective, dangerous,

19  hazardous and unsafe condition, although cross-defendants knew that said toxic chemicals could

20  and would cause great bodily injury due to exposure, contact with or inhalation of such toxic

21  chemicals and therefore were aware of and foresaw the probability that severe bodily injury would

22  occur to persons exposed to such toxic chemicals. Despite such actual knowledge and awareness,

23  cross-defendants, and each of them, acted in conscious disregard for the health, safety, comfort

24  and lives of members of the public, including the SMOLKERS and their children, by choosing to

25  ignore and did ignore the aforementioned dangers and took no precautions or took precautions

26  known to cross-defendants to be insufficient and inadequate, or to otherwise initiate any

27  safeguards to minimize, prevent or warn of the extreme danger of exposure to such toxic

28

-66-

XC2nd227

SMOLKER tried to obtain health and safety information concerning the pesticides applied by HSTCI in the premises from HSTCI and MORRIS. HSTCI and MORRIS replied to GARY SMOLKER's inquiries with evasive, deceptive, misleading, false and fraudulent replies and evasion. During the time period from March 1997 through August 1997 GARY SMOLKER attempted to obtain health and safety information from GRACE, GD, COSTELLO and HYDE on the product HSTCI had purchased from GRACE and GD and then applied in the PREMISES. GRACE, GD, COSTELLO, and HYDE's replies were imprecise, evasive, misleading, deceptive and fraudulent.

120. As a result of the willful and malicious acts and omissions and fraudulent and illegal conduct of cross-defendants, and each of them, as hereinabove described, the SMOLKERS and each of them were injured and required to and did employ physicians and dentists to examine, treat, and care for GARY SMOLKER, JUDI SMOLKER and LEAH SMOLKER, and did incur medical and dental expense. As a further result of said willful, fraudulent and illegal acts and omissions of cross-defendants and each of them, the SMOLKERS sustained property loss and property damage to their personal and real property and suffered a loss of earnings and loss of earning capacity. The SMOLKERS are informed and believe and thereupon allege that they will continue to incur medical and dental expenses, will suffer further property losses and damages, and loss of earnings, until the pesticide contamination problem is taken care of. The exact amount of such pecuniary losses and medical and dental expenses has not been ascertained at this time. The SMOLKERS will amend this cross-complaint to show such loss when ascertained or will offer proof thereof at the time of trial.

121. The aforesaid acts of cross-defendants, and each of them, were willful and in conscious disregard of the aforesaid foreseeable consequences and therefore justify the awarding of exemplary and punitive damages in an amount in excess of the minimum jurisdictional limits of the above-entitled court as shall be determined at the time of trial.

### SEVENTH CAUSE OF ACTION

(Action against HOA, FREDERICKS, CIPRIANO, BAILEY, HOLLAND, ROBBINS,

-68-

XC2nd227

1  SMOLKER tried to obtain health and safety information concerning the pesticides applied by

2  HSTCI in the premises from HSTCI and MORRIS.  HSTCI and MORRIS replied to GARY

3  SMOLKER's inquiries with evasive, deceptive, misleading, false and fraudulent replies and

4  evasion.  During the time period from March 1997 through August 1997 GARY SMOLKER

5  attempted to obtain health and safety information from GRACE, GD, COSTELLO and HYDE on

6  the product HSTCI had purchased from GRACE and GD and then applied in the PREMISES.

7  GRACE, GD, COSTELLO, and HYDE's replies were imprecise, evasive, misleading, deceptive

8  and fraudulent.

9        120.  As a result of the willful and malicious acts and omissions and fraudulent and illegal

10  conduct of cross-defendants, and each of them, as hereinabove described, the SMOLKERS and

11  each of them were injured and required to and did employ physicians and dentists to examine,

12  treat, and care for GARY SMOLKER, JUDI SMOLKER and LEAH SMOLKER, and did incur

13  medical and dental expense.  As a further result of said willful, fraudulent and illegal acts and

14  omissions of cross-defendants and each of them, the SMOLKERS sustained property loss and

15  property damage to their personal and real property and suffered a loss of earnings and loss of

16  earning capacity.  The SMOLKERS are informed and believe and thereupon allege that they will

17  continue to incur medical and dental expenses, will suffer further property losses and damages,

18  and loss of earnings, until the pesticide contamination problem is taken care of.  The exact amount

19  of such pecuniary losses and medical and dental expenses has not been ascertained at this time.

20  The SMOLKERS will amend this cross-complaint to show such loss when ascertained or will

21  offer proof thereof at the time of trial.

22        121.  The aforesaid acts of cross-defendants, and each of them, were willful and in

23  conscious disregard of the aforesaid foreseeable consequences and therefore justify the awarding

24  of exemplary and punitive damages in an amount in excess of the minimum jurisdictional limits of

25  the above-entitled court as shall be determined at the time of trial.

26                                    SEVENTH CAUSE OF ACTION

27        (Action against HOA, FREDERICKS, CIPRIANO, BAILEY, HOLLAND, ROBBINS,

28

-68-

XC2nd227

1  NONCONTRIBUTING COTENANTS and the HOA refused to do so.  In this respect, GARY

2  SMOLKER and ALICE SMOLKER, through the Law Offices of Smolker & Graham, have

3  initiated, filed and prosecuted and are still prosecuting an action in Los Angeles Superior Court,

4  Case No. BC 173952 against HSTCI, MORRIS, RT, GRACE, GD, TIE, HOLLAND, KAY,

5  ROBBINS, BAILEY, VERDUN, IVORY, FREDERICKS, CIPRIANO, and HOA (hereinafter

6  the ACTION).  It was necessary for the SMOLKERS to file the ACTION and to prosecute the

7  ACTION and to advance costs related to the ACTION for the protection of the COMMON

8  AREA.  This ACTION is for the benefit of the common interests of the COTENANTS.  The

9  filing of the ACTION and prosecution of the ACTION by the SMOLKERS is in the interest and

10 inures to the benefit of all COTENANTS.  The NONCONTRIBUTING COTENANTS have

11 committed waste on the COMMON AREA by refusing to deal with the pesticide contamination

12 of the PREMISES.  The HOA has committed waste on the COMMON AREA by refusing and

13 failing to deal with the pesticide contamination of the COMMON AREA for more than one year

14 after receiving notice of pesticide contamination of the COMMON AREA.  GARY SMOLKER

15 has been aggrieved by the waste committed by the NONCONTRIBUTING COTENANTS on the

16 COMMON AREA.  GARY SMOLKER has been aggrieved by the waste committed by HOA on

17 the COMMON AREA.  The HOA has neglected the COMMON AREA pesticide contamination

18 problem, and has neglected holes drilled in the COMMON AREA by HSTCI and left unsealed, to

19 the injury of GARY SMOLKER's interest in the COMMON AREA.

20        124.  Cross-defendant Truck Insurance Exchange (hereinafter TIE) issued insurance

21 policy number 09287-08-30 to the HOA.  The policy has been in effect since 1986 and continues

22 to date.  It was in effect at all times material to this cause of action.  The policy provides

23 commercial property, commercial general liability coverage, directors and officers liability

24 coverage, and medical payment coverage.  The SMOLKERS are intended beneficiaries, direct

25 insureds and additional insureds under the policy.  The policy provides for costs of repair or

26 replacement of damaged property (i.e. the COMMON AREA), reimbursement for losses or loss

27 of use of property (i.e. the COMMON AREA), and for payment of medical expenses for any

28

-70-

XC2nd227

1    NONCONTRIBUTING COTENANTS and the HOA refused to do so.  In this respect, GARY

2    SMOLKER and ALICE SMOLKER, through the Law Offices of Smolker & Graham, have

3    initiated, filed and prosecuted and are still prosecuting an action in Los Angeles Superior Court,

4    Case No. BC 173952 against HSTCI, MORRIS, RT, GRACE, GD, TIE, HOLLAND, KAY,

5    ROBBINS, BAILEY, VERDUN, IVORY, FREDERICKS, CIPRIANO, and HOA (hereinafter

6    the ACTION).  It was necessary for the SMOLKERS to file the ACTION and to prosecute the

7    ACTION and to advance costs related to the ACTION for the protection of the COMMON

8    AREA.  This ACTION is for the benefit of the common interests of the COTENANTS.  The

9    filing of the ACTION and prosecution of the ACTION by the SMOLKERS is in the interest and

10   inures to the benefit of all COTENANTS.  The NONCONTRIBUTING COTENANTS have

11   committed waste on the COMMON AREA by refusing to deal with the pesticide contamination

12   of the PREMISES.  The HOA has committed waste on the COMMON AREA by refusing and

13   failing to deal with the pesticide contamination of the COMMON AREA for more than one year

14   after receiving notice of pesticide contamination of the COMMON AREA.  GARY SMOLKER

15   has been aggrieved by the waste committed by the NONCONTRIBUTING COTENANTS on the

16   COMMON AREA.  GARY SMOLKER has been aggrieved by the waste committed by HOA on

17   the COMMON AREA.  The HOA has neglected the COMMON AREA pesticide contamination

18   problem, and has neglected holes drilled in the COMMON AREA by HSTCI and left unsealed, to

19   the injury of GARY SMOLKER's interest in the COMMON AREA.

20      124.  Cross-defendant Truck Insurance Exchange (hereinafter TIE) issued insurance

21   policy number 09287-08-30 to the HOA.  The policy has been in effect since 1986 and continues

22   to date.  It was in effect at all times material to this cause of action.  The policy provides

23   commercial property, commercial general liability coverage, directors and officers liability

24   coverage, and medical payment coverage.  The SMOLKERS are intended beneficiaries, direct

25   insureds and additional insureds under the policy.  The policy provides for costs of repair or

26   replacement of damaged property (i.e. the COMMON AREA), reimbursement for losses or loss

27   of use of property (i.e. the COMMON AREA), and for payment of medical expenses for any

28

-70-

XC2nd227

1 FREDERICKS' investigation of the SMOLKERS' complaints, FREDERICKS personally

2 ascertained, and reported to the other condominium unit owners, that the chemical pesticide

3 applied in the COMMON AREA structural voids by HSTCI was trespassing continuously from

4 the COMMON AREA structural voids through the COMMON AREA walls into the living

5 quarters of the individual condominium units, and that HSTCI had not sealed all holes in the

6 COMMON AREA that HSTCI had drilled as part of HSTCI's pesticide application process.

7    127. After receipt of the SMOLKERS' complaints, FREDERICKS personally handled a

8 property damage claim with TIE on behalf of the HOA, and on behalf of himself and the other

9 condominium unit owners concerning damage to the COMMON AREA and resulting damage to

10 the condominium unit owners, complained about by the SMOLKERS. FREDERICKS and the

11 HOA negligently and inadequately represented the interests of the HOA and of the condominium

12 owners in their dealings with TIE concerning insurance benefits from TIE for property damage

13 sustained in the COMMON AREA of the condominium complex due to HSTCI's trespass on the

14 PREMISES, trespass of particulate pesticide matter suspended in a gaseous medium from

15 COMMON AREA structural voids to the COMMON AREA hallway and into individual

16 condominium units; damages due to vandalism; smoke damages from poisonous particulate

17 matter suspended in a gaseous medium which contaminated the building and its contents;

18 additional property damages to the COMMON AREA due to wind damage; additional property

19 damages to the COMMON AREA due to earthquake damage; additional property damages to the

20 COMMON AREA due to rain damage; and additional damages ensuing to the COMMON AREA

21 and to the living quarters of the individual condominium units as a direct and proximate result of

22 TIE's failure and refusal to pay costs to repair the COMMON AREA of the PREMISES, TIE's

23 refusal to pay for remediation of the common area of the PREMISES. FREDERICKS and the

24 HOA refused and failed to press TIE to pay for losses suffered by the cotenants due to property

25 damage caused by pesticide contamination to the COMMON , wind damage to the COMMON

26 AREA, vandalism damage to the COMMON AREA, and earthquake damage to the COMMON

27 AREA..

28

-73-

1   FREDERICKS' investigation of the SMOLKERS' complaints, FREDERICKS personally

2   ascertained, and reported to the other condominium unit owners, that the chemical pesticide

3   applied in the COMMON AREA structural voids by HSTCI was trespassing continuously from

4   the COMMON AREA structural voids through the COMMON AREA walls into the living

5   quarters of the individual condominium units, and that HSTCI had not sealed all holes in the

6   COMMON AREA that HSTCI had drilled as part of HSTCI's pesticide application process.

7       127. After receipt of the SMOLKERS' complaints, FREDERICKS personally handled a

8   property damage claim with TIE on behalf of the HOA, and on behalf of himself and the other

9   condominium unit owners concerning damage to the COMMON AREA and resulting damage to

10  the condominium unit owners, complained about by the SMOLKERS. FREDERICKS and the

11  HOA negligently and inadequately represented the interests of the HOA and of the condominium

12  owners in their dealings with TIE concerning insurance benefits from TIE for property damage

13  sustained in the COMMON AREA of the condominium complex due to HSTCI's trespass on the

14  PREMISES, trespass of particulate pesticide matter suspended in a gaseous medium from

15  COMMON AREA structural voids to the COMMON AREA hallway and into individual

16  condominium units; damages due to vandalism; smoke damages from poisonous particulate

17  matter suspended in a gaseous medium which contaminated the building and its contents;

18  additional property damages to the COMMON AREA due to wind damage; additional property

19  damages to the COMMON AREA due to earthquake damage; additional property damages to the

20  COMMON AREA due to rain damage; and additional damages ensuing to the COMMON AREA

21  and to the living quarters of the individual condominium units as a direct and proximate result of

22  TIE's failure and refusal to pay costs to repair the COMMON AREA of the PREMISES, TIE's

23  refusal to pay for remediation of the common area of the PREMISES. FREDERICKS and the

24  HOA refused and failed to press TIE to pay for losses suffered by the cotenants due to property

25  damage caused by pesticide contamination to the COMMON , wind damage to the COMMON

26  AREA, vandalism damage to the COMMON AREA, and earthquake damage to the COMMON

27  AREA..

28

-73-

XC2nd227

1    from HSTCI and a MSDS from GraceDavison, a March 19, 1997 fax from CONVEY, and a copy

2    of US Patent No. 5,542,207 regarding HSTCI's proprietary termite eradication process. This

3    July 17, 1997 letters sets forth the SMOLKERS view on "What Needs to be Done." The letter

4    concludes with a description of the claims submitted by the SMOLKERS to HSTCI, COREGIS,

5    HOA, FIG/TIE, GRACE/GD, and TIG, and of statement about the TIG vs. Smolker lawsuit for

6    declaratory relief filed on July 2, 1997 which initiated this action. The letter concludes with the

7    following statements: "In our response to that lawsuit we intend to file a cross-complaint. We

8    intend to join all parties who have an interest in the outcome of the problem described herein."

9    The SMOLKERS filed their cross-complaint several months later, in October 1997, after many

10    more communications, with the other condominium unit owners and the HOA, focused on the

11    SMOLKERS' complaints about the injuries being suffered by the SMOLKERS and by everyone

12    who owned a condominium unit or that could be suffered by anyone who lived in or visited the

13    PREMISES because of the pesticide contamination problem.

14         129. In spite of such complaints and in spite of having actual notice that it is against the

15    law to maintain the COMMON AREA of the PREMISES with SYLOID 244 in the structural

16    voids of the COMMON AREA, that the SYLOID 244 powder present in the PREMISES poses a

17    threat to health and safety, and the presence of SYLOID 244 in the COMMON AREA of the

18    PREMISES was causing the SMOLKERS to be forced to live in intolerable living conditions, the

19    HOA and the OTHER CONDOMINIUM UNIT OWNERS refused to have repair work done to

20    the COMMON AREA necessary to prevent SYLOID 244 pesticide dust particles from continuing

21    to trespass from the structural voids of the COMMON AREA into cross-complainants' living

22    quarters and into the common hallway of the condominium complex and refused to have SYLOID

23    244 removed from the COMMON AREA of the PREMISES.

24         130. The SMOLKERS reallege and incorporate herein by reference each and every

25    allegation contained in paragraphs 1-15, 21-30(h), 32-34, 36-39, 41-50, 53-55, 62-78, 82-97,

26    101-114, and 17-119 with the same force and effect as though said paragraphs were set forth fully

27    at this point.

28

XC2nd227

1   from HSTCI and a MSDS from GraceDavison, a March 19, 1997 fax from CO

2   of US Patent No. 5,542,207 regarding HSTCI's proprietary termite eradication

3   July 17, 1997 letters sets forth the SMOLKERS view on "What Needs to be D

4   concludes with a description of the claims submitted by the SMOLKERS to H!

5   HOA, FIG/TIE, GRACE/GD, and TIG, and of statement about the TIG vs. Sn

6   declaratory relief filed on July 2, 1997 which initiated this action. The letter co

7   following statements: "In our response to that lawsuit we intend to file a cross

8   intend to join all parties who have an interest in the outcome of the problem de

9   The SMOLKERS filed their cross-complaint several months later, in October 1

10   more communications, with the other condominium unit owners and the HOA,

11   SMOLKERS' complaints about the injuries being suffered by the SMOLKERS

12   who owned a condominium unit or that could be suffered by anyone who lived

13   PREMISES because of the pesticide contamination problem.

14       129. In spite of such complaints and in spite of having actual notice tha

15   law to maintain the COMMON AREA of the PREMISES with SYLOID 244 i

16   voids of the COMMON AREA, that the SYLOID 244 powder present in the F

17   threat to health and safety, and the presence of SYLOID 244 in the COMMON

18   PREMISES was causing the SMOLKERS to be forced to live in intolerable liv

19   HOA and the OTHER CONDOMINIUM UNIT OWNERS refused to have re

20   the COMMON AREA necessary to prevent SYLOID 244 pesticide dust partic

21   to trespass from the structural voids of the COMMON AREA into cross-comp

22   quarters and into the common hallway of the condominium complex and refuse

23   244 removed from the COMMON AREA of the PREMISES.

24       130. The SMOLKERS reallege and incorporate herein by reference ea

25   allegation contained in paragraphs 1-15, 21-30(h), 32-34, 36-39, 41-50, 53-55

26   101-114, and 17-119 with the same force and effect as though said paragraphs

27   at this point.

28

XC2nd227

1   diminished the value of the PREMISES, attaches a stigma to the PREMISES, creates an

2   obstruction to the comfortable enjoyment and use of the PREMISES and is an illegal and

3   dangerous condition in the PREMISES.

4       134.  Cross-defendants, and each of them, named in this cause of action, by their conduct

5   and/or failure to act, created, maintained and/or concealed a nuisance and have not taken

6   reasonable steps to abate said nuisance, or to mitigate future damage caused by said nuisance,

7   although requested to do so.

8       135.  As a direct and proximate result of the nuisance caused by cross-defendants as

9   herein alleged, cross-complainants have sustained and will continue to sustain the damages alleged

10  above and the damages alleged in the paragraphs incorporated by reference in paragraph 125

11  above.

12      136.  As a direct and proximate result of cross-defendants' failure, and of the failure of

13  each individual cross-defendant, to take reasonable steps to abate said nuisance, or to mitigate the

14  potential future damage caused by said nuisance, although requested to do so, cross-complainants

15  have sustained and will continue to sustain the damages alleged above and the damages alleged in

16  the paragraphs incorporated by reference in paragraph 125 above.

17                         (EIGHTH CAUSE OF ACTION

18             Against cross- defendants W.R. GRACE & CO., GRACE DAVISION,

19                   ALBERT J. COSTELLO, JAMES R. HYDE,

20                and ROES 56-65 for Fraud and Interference)

21      137.  The SMOLKERS incorporate herein by reference as though full set forth herein

22  Paragraphs 40, 99 and 125 with the same force and effect as through said paragraphs were set

23  forth fully at this point.

24      138.  Cross-defendant ALBERT J. COSTELLO (hereinafter COSTELLO) is, and at all

25  times mentioned in this cause of action was, Chairman, President and Chief Executive Officer of

26  GRACE.  Cross-defendant JAMES R. HYDE (hereinafter HYDE) at all mentioned in this cause

27  of action was the President of GD and a Senior Vice President of GRACE.  At all times material

28  

-77-

1  herein GRACE managed the affairs of GD as part of GRACE's operations as an integrated global
2  operating company.

3      139. Cross-complainants are informed and believe and based thereon allege, at all times
4  mentioned in this cause of action, GRACE, GD, COSTELLO, HYDE and ROES 56 through 65,
5  and each of them, knew or had reason to know that SYLOID 244 is or is likely to be dangerous
6  to humans when used in powder form, the form in which it was sold to HSTCI, as a pesticide to
7  eradicate termites in residential structures. If SYLOID 244 gets into a person's mouth it can burn
8  that person's mouth and esophagus, making it impossible to swallow solid food, and creating
9  constant pain and discomfort. If SYLOID 244 gets into a person's mouth it can cause that person
10 to have, "dry mouth", a condition which causes a lessening of the amount of saliva in the mouth,
11 which can result in tooth decay and penetration of various toxic substances into the body that are
12 normally destroyed when they come in contact with saliva in a person's mouth. The drying action
13 of SYLOID 244 can cause irritation of mucous membranes in the nose mouth and throat,
14 irritation of the respiratory tract, and irritation of the skin. If SYLOID 244 particles penetrate to
15 the lung, they can cause lung damage. In the form SYLOID 244 is manufactured by GD and/or
16 GRACE, SYLOID 244 is a lung damaging respirable dust.

17     140. GRACE, GD, COSTELLO and HYDE expected, or should have expected, the use
18 of SYLOID 244, by HSTCI, as a pesticide in residential structures, would endanger persons who
19 inhaled the SYLOID 244 particles while visiting or residing in residential structures treated with
20 SYLOID 244. Individual SYLOID 244 particles are invisible to the naked eye. At the time
21 GRACE and/or GD sold SYLOID 244 to HSTCI, GRACE and GD had no reason to believe that
22 people living in residential structures treated with SYLOID 244 by HSTCI would realize the
23 danger of being exposed to SYLOID 244 or know how to detect the presence of a dangerous
24 concentration of SYLOID 244 in the air they breathed or on any surface they came in contact
25 with. GRACE and GD failed to exercise reasonable care to inform cross-complainants of facts
26 which make SYLOID 244 likely to be dangerous to people exposed to SYLOID 244. When
27 GRACE and/or GD sold SYLOID 244 to HSTCI they expected their product, SYLOID 244, to

28

-78-

XC2nd227

1   be applied by HSTCI in residential structures to eradicate termites. When GRACE and GD dealt

2   with cross-complainants GRACE and GD knew the SMOLKERS believed they were being

3   exposed to harmful concentrations of SYLOID 244 and GRACE and GD were told that SYLOID

4   244 had contaminated the SMOLKERS' furniture and furnishings and was entering into the

5   SMOLKERS' home from the structural voids in the common area of the PREMISES through the

6   walls and ceilings of the SMOLKERS' home.

7           141. At all times herein mentioned it was against the law for HSTCI to deliver, sell,

8   possess or use SYLOID 244 as a pesticide in California and for MORRIS to direct HSTCI to do

9   so. It was against the law for GRACE and/or GD to sell and/or distribute, offer for sale, hold for

10  distribution, hold for sale, hold for shipment, release for shipment, to deliver or to ship SYLOID

11  244 for use as a pesticide. It was illegal, against the law, for MORRIS to direct HSTCI to use

12  and for HSTCI to use SYLOID 244 in the PREMISES as a pesticide. It was illegal, against the

13  law, for GD to manufacture SYLOID 244 for use as a pesticide. It was illegal, against the law,

14  for GD and/or GRACE to sell SYLOID 244 to HSTCI for use as a pesticide.

15          142. On March 11, 1997 GARY SMOLKER (hereinafter GS) contacted GRACE and GD

16  and spoke to J.H. Convey (hereinafter CONVEY), Manager of Environmental Services for

17  GRACE and GD. CONVEY said he was familiar with HSTCI's proprietary pesticide treatment

18  process for eradicating termites and explained that HSTCI injects one pound of silica gel

19  (SYLOID 244) per thousand square feet of wall space after putting an electric charge on the

20  pesticide particles, into wall voids. CONVEY explained that the electrical charge was to keep the

21  particles from moving around. CONVEY said charged particles will stick to things, a charged

22  particle would stick to a wall better than an uncharged particle. CONVEY also said that the

23  product (silica gel/SYLOID 244) has no half life. It lasts for ever. CONVEY said that the

24  symptoms GS was experiencing were consistent with over exposure to silica gel. GS asked

25  CONVEY to explain how to get the silica gel product out of the air in his home, out of the

26  carpets, out of the ventilation system and how to stop it from leaking into his condominium.

27  CONVEY said he (CONVEY would get back to GS. GS faxed and mailed a letter to CONVEY

28

-79-

XC2nd227

1    on March 11, 1997 memorializing their conversation.

2        143. On March 18, 1997 GS made a follow-up call to CONVEY to find out what

3    CONVEY had found re how to clean up air, furniture, and furnishings in GS's home and loose

4    pesticide dust in the walls of the PREMISES. CONVEY was not in. GS left a message.

5        144. On March 19, 1998, GS received a fax from CONVEY dated March 19 ,1998 re

6    GS's concerns with the Silica Gel that was injected into the walls of the SMOLKERS' home by

7    HSTCI and request that GRACE and GD provide information on how to remove the silica gel

8    from the SMOLKERS' home. GRACE and GD through CONVEY recommended use of a high

9    efficiency wet collector type vacuum cleaner. CONVEY stated that it was GRACE's and GD's

10   belief *"that silica gel is an exceedingly safe product with a toxicological profile that in some*

11   *cases compares with water. With regard to termites, it does not poison termites; it simply*

12   *creates a dry environment in which they cannot exist. As such it offers a unique combination of*

13   *being specific to the target pest without toxic effects to human inhabitants. Due to its*

14   *desiccating properties, silica gel can cause drying of the mucous membranes and irritation of*

15   *the eyes to individuals who come in contact with it. As you know it is approved for use in food*

16   *and tooth paste, both of which are intended for human consumption, so apart from drying skin*

17   *and mucous membranes, it is considered safe."* At the time CONVEY, GRACE and GD made

18   these statements each of them had knowledge of material facts which they failed to disclose in this

19   fax as to safety precautions that need to be taken in connection with the use of silica gel, dangers

20   of being exposed to silica gel, and dangers of inhaling silica gel, that they did not disclose in this

21   fax. There are risks that are known or scientifically knowable that GRACE, GD, and CONVEY

22   failed to warn the SMOLKERS of during months of communications back-and-forth in which

23   GRACE, GD, COSTELLO and HYDE were asked directly "what dangers are th SMOLKERS

24   being exposed to" as a result of inhaling and/or continuously being exposed to SYLOID 244 silica

25   gel particles manufactured by GD and/or GRACE and sold to HSTCI by GRACE and/or GD

26   which were applied in the SMOLKERS' home by HSTCI.

27        145. The statements made in the March 19, 1997 fax are false and misleading as a matter

28

-80-

XC2nd227

1  of federal law found at 40 CFR Chapter 1, 7-1-96 edition, Part 156, Section 156.10 (a)(5),

2  concerning labeling requirements for pesticides and what constitutes false and misleading

3  statements regarding pesticidal claims and non-pesticidal claims. Claims as to the safety of the

4  pesticide or its ingredients , including statements such as "safe," "nonpoisonous," "noninjurious,"

5  "harmless" or "nontoxic to humans and pets" with or without such a qualifying phrase as "when

6  used as directed" are false and misleading as a matter of law. See 40 CFR Ch. 1 § 156.10 (a)(5)

7  (ix). GRACE and GS knew or should have known that the statements made in this fax were false

8  and misleading as to the safety of the product because W.R. Grace Company owns the

9  trademarked Dri-Die. Dri-Die is an insecticide for commercial and industrial use only that

10 MORRIS testified HSTCI used in residential structures instead of pure SYLOID 244 at the time

11 HSTCI gave its sales brochure to the HOA and at the time HSTCI inspected the PREMISES.

12 Dri-Die is 95% amorphous silica gel and that is where MORRIS got the idea to use pure

13 amorphous silica gel (SYLOID 244) as a pesticide when the EPA registration for Dri-Die expired.

14 The Material Safety Data Sheet for Dri-Die and the label for Dri-Die specify that DRi-Die is a

15 toxic substance and that special precautions must be taken and that inhalation of the pesticide dust

16 is to be avoided. After the State of California issued a cease and desist order to HSTCI, on 12-

17 16-96, ordering that HSTCI to immediately cease and desist using the unregistered poison

18 SYLOID 244, HSTCI commenced using Drione. Drione is a pesticide product that utilizes

19 amorphous silica gel as an active ingredient too. Drione is highly toxic. It takes only a few drops

20 to kill you. GRACE and GD are one of the leading experts in the manufacture and application of

21 silica products. The statements made in this fax were also false and misleading in failing to warn

22 the SMOLKERS of dangers known to GRACE and GD in that the information related in the fax

23 concealed that SYLOID 244 is a respirable dust, that the SYLOID 244 would move from in the

24 wall voids into the SMOLKERS home and into the common hallway, that it is against federal law

25 to use pesticides in a manner inconsistent with their labeling, and that SYLOID 244 (amorphous

26 silica gel) can't be effectively "vacuumed up." But, the SMOLKERS did not know the true facts

27 when they received CONVEY's fax. The SMOLKERS relied on these untrue statements: The

28

-81-

XC2nd227

1   SMOLKERS tried to arrange with the other interested parties for the pesticide dust to be
2   vacuumed up in their home and the SMOLKERS allowed themselves to be subjected to the run-
3   around they were about to get from TIE, TIG, FEDORUK and COREGIS related entities and
4   people because the SMOLKERS were not honestly warned of the dangers of inhaling SYLOID
5   244 pesticide dust particles. GRACE and GD concealed from the SMOLKERS special
6   precautions necessary to be taken with respect to being exposed to SYLOID 244 and concealed
7   dangers of being exposed to SYLOID 244. Eventually the SMOLKERS hired commercial
8   cleaning companies to vacuum the pesticide dust out of their carpets and out of their upholstered
9   couch and chair in reliance on the representations and recommendations made by GRACE and
10  GD in this fax from CONVEY dated March 19, 1998.  Only after having the vacuuming
11  suggested by CONVEY did the SMOLKERS discover that vacuuming does not remove the
12  pesticide particles sufficiently from the carpets and upholstered furniture which, even after
13  vacuuming, continue to be a source of continuing residual pesticide exposure. The SMOLKERS
14  did not know these statements were false when they received the fax from CONVEY. On the
15  same day GS received the fax from CONVEY GS called CONVEY to ask further questions and
16  was told CONVEY was out of the office and GS should fax his further questions to CONVEY.
17  On March 19, 1997 GS faxed and mailed a letter to CONVEY setting forth GS's further
18  questions, and mailed a copy of this letter to MORRIS.

19      146.  On or about March 20, 1998, GS faxed a copy of CONVEY's faxed suggestion to
20  MORRIS with a cover note which states *"Here is Grace's suggestion.  If it is all right with my
21  insurance carriers, it is okay with me, if your firm patches and plugs all holes, cracks and
22  fissures through which the dust might leak, and then uses a wet type collection vacuum cleaner to
23  try to get rid of the dust that has settled on the carpets.  Please let me know if you want to try this
24  method of clean-up."*  GS, who had already submitted claims to TIG and TIE, then asked, via
25  letters on March 25, 1998, insurance carriers TIG and TIE if they wanted to figure out and direct
26  what to do to clean up this problem.

27      147.  On April 2, 1998 GS called CONVEY to follow-up on CONVEY's fax dated March

28

-82-

XC2nd227

19, GS's prior phone call requesting information on how to remove the pesticide which prompted the fax and to invite CONVEY, and as follow up to a call GS placed to CONVEY on March 19 in response to the fax GS had just received from CONVEY, and to invite CONVEY to send a representative inspect the SMOLKERS' home at an inspection being set up with representatives from TIG and TIE. GS left a message inviting CONVEY to send a representative to attend the inspection and faxed an invitation to CONVEY. MORRIS was also invited and responded that he wanted to be present.

148. On April 3, 1997 GS faxed and mailed a letter to CONVEY and other interested parties regarding the upcoming inspection. In the fax mailed and faxed to CONVEY, GSS requested that GRACE and GD, through CONVEY, and the other interested parties advise the SMOLKERS "how to stop the chemical powder injected by the termite company into the cavities between the walls of the building from getting into [the SMOLKERS'] unit." GSS also asked for advice "on how to get the chemical powder that is already in my unit out of the airspace in my unit out of my carpets, etc. Who should be hired to carry out this work?"

149. An inspection of the SMOLKERS' home was scheduled, coordinated and noticed to take place on April 11, 1997. The inspection took place on April 11, 1997. Representatives from TIG attended and inspected the SMOLKERS' home. Morris did not attend. Nobody from GRACE, GD, HSTCI or TIE attended the inspection. A letter of complaint, dated April 14, 1997, for failure to attend the inspection was sent by GS to the HOA, TIE, MORRIS, HYDE and COSTELLO on April 14, 1997. HYDE, COSTELLO, GRACE and GD were asked to advise as to their intentions re taking care of the GRACE chemical dust problem in the SMOLKERS' home.

150. A separate individual letter dated April 16, 1998 was sent by GS to COSTELLO and another separate individual letter dated April 16, 1998 was sent by GS to HYDE on April 16, 1997. In these letters GS described the problems the SMOKERS were experiencing with GRACE's chemical being in their home and GS expressed the SMOLKERS extreme displeasure wit in the way CONVEY had failed and/or refused to answer the questions submitted in writing to

-83-

XC2nd227

1  CONVEY and left on CONVEY's voice mail re how to get GRACE's chemical out of the air in

2  the SMOLKERS' home, off the upholstered furniture, etc. Each letter ended with the following

3  sentence: "Please tell me how you suggest I solve this problem and where you suggest I get the

4  funds to pay someone to complete this work and to live away from home for a month."

5  151. On April 21, 1997 the SMOLKERS received a fax on FARMERS INSURANCE

6  GROUP OF COMPANIES' stationary notifying the SMOLKERS that "this claim" under the TIE

7  policy was being transferred to FARMERS INSURANCE GROUP OF COMPANIES

8  Environmental Claims Office. On the same date, April 21, 1997, the SMOLKERS received a fax

9  from MORRIS stating that MORRIS is trying to make arrangements to put air purifying units in

10 the SMOLKERS' home. The SMOLKERS replied, by fax on the next day, April 22, that air

11 purifying units would be contrary to CONVEY's advise to avoid recirculation of the pesticide

12 particles and asked that MORRIS have GRACE sign off on any clean-up procedure MORRIS

13 wanted to follow. A copy of the SMOLKERS' April 22, 1997 fax to MORRIS was faxed and

14 mailed to HYDE on April 22, 1997. Unbeknownst to the SMOLKERS, MORRIS had been in

15 contact with Offerman. MORRIS had received a proposal from Bud Offerman on or about April

16 16, 1997 to conduct an inspection of the Smolker residence for silica gel dust particles. A copy of

17 this proposal was sent to GRACE and GD in April 1997. A copy of this proposal was never sent

18 to the SMOLKERS. The SMOLKERS did not learn that Offerman had sent MORRIS a

19 proposal, in April 1996, to conduct an inspection of the SMOLKERS' home until the

20 SMOLKERS took MORRIS' deposition in this case.

21 152. On April 25, 1997 the SMOLKERS received a fax of a letter dated April 23, 1997,

22 from MORRIS in reply to the SMOLKERS' fax of April 22, 1997. HSTCI's stated among other

23 things, in its letter dated April 23, but faxed on April 25 to Gary Smolker: "You are a valued

24 customer. Please allow me and this company to now proceed with what we deem necessary to

25 resolve this problem. If what we propose does not produce fast satisfactory results I will refer

26 this matter to our liability insurance carrier." MORRIS' letter's concluding paragraph states:

27 "Gary, you have accused this company of causing this problem and maybe rightly so, but this is

28

-84-

XC2nd227

1   not a certainty. Allow us to find out for <u>sure</u> one way or the other. If this company is at fault, we

2   will do whatever is necessary to correct the condition." The methodology set forth in MORRIS'

3   April 23, 1997 letter was not compatible with the statement of work proposed by Offerman in

4   Offerman's proposal to MORRIS dated April 16, 1997. Unbeknownst to the SMOLKERS,

5   MORRIS sent a copy of this letter (MORRIS' letter dated April 23, 1997) to CONVEY for

6   comment and editing two days before faxing it to Gary Smolker two days later, and made changes

7   on it after sending the first version to CONVEY for review. The letter dated April 23, 1997 from

8   MORRIS was written as a joint effort of GRACE, GD, CONVEY, MORRIS, and HSTCI. On

9   April 26, 1997 the SMOLKERS received a written response to GS's several letters to

10  COSTELLO and HYDE. The last paragraph of this response states: "We suggest you seek

11  additional assistance from Home Savings Termite Control. It is our understanding Home Savings

12  has applied silica gel in this manner in numerous other locations. They would be more qualified

13  than we to offer you assistance in this matter." The letter stated it a copy was sent to MORRIS.

14  This letter misrepresented the qualifications of MORRIS. This letter misrepresented the

15  qualifications and resources of GRACE and GD. MORRIS is a high school graduate with no

16  formal or informal education or training in chemistry. GRACE and GD are among the world's

17  foremost leaders in the uses of silica products and the manufacture of silica products. MORRIS

18  sent CONVEY a copy of Offerman's April 16, 1997 proposal to inspect and test the

19  SMOLKERS' home. CONVEY, GRACE, GD, in turn advised Offerman on how to inspect the

20  SMOLKERS' home and how to test for the presence of airborne silica gel, via fax dated April 28,

21  1997 from CONVEY to OFFERMAN. The fact that CONVEY was in contact with Offerman

22  and giving Offerman advise on how to inspect the SMOLKERS home was concealed from the

23  SMOLKERS. The SMOLKERS did not learn of this fact until they deposed MORRIS in this is

24  case. By contacting Offerman in April 1996 and concealing the fact that CONVEY had contacted

25  Offerman and Offerman had contacted MORRIS, GRACE, GD, COSTELLO and HYDE

26  poisoned the SMOLKERS' pre-existing relationship with Offerman, interfered with the

27  SMOLKERS' relationship with Offerman, and made it impossible for the SMOLKERS to consult

28

-85-

XC2nd227

1  with Offerman about the pesticide contamination problem in the SMOLKERS' home and made it
2  impossible for the SMOLKERS to consult with Offerman about a chemical exposure damage
3  lawsuit against a former landlord that the SMOLKERS had originally contacted Offerman about
4  before their home was treated with pesticides by HSTCI. Had the SMOLKERS known that
5  MORRIS, HSTCI, GRACE, and GD were in contact with Offerman in April 1997, the
6  SMOLKERS could have joined in the conversation and had an "honest investigation" conducted
7  by Offerman in April 1996, instead of being constantly mislead by HSTCI, MORRIS, GRACE,
8  GD, COREGIS, FEDORUK, TIE, et al. about the immediacy of an inspection, and the
9  SMOLKERS could have avoided being exposed the silica gel they were exposed to until the
10 SMOLKERS started the SMOLKERS' active remodeling/clean-up construction work in their
11 home in May 1998. The Smolkers were delayed in beginning the SMOLKERS' extensive
12 remodeling/clean-up project to clean up the airborne pesticide in their home and pesticide
13 contaminated carpets, air handling equipment, etc. by CONVEY's, DURBIN's, COSTELLO's,
14 HYDE's, GRACE's and GD's fraudulent conduct re inspection of premises, the continuous
15 fraudulent concealment and fraudulent failure to warn of GRACE, GD, COSTELLO and HYDE,
16 and HSTCI's, GRACE's and GD's interference with the SMOLKERS' relationship with
17 Offerman and "theft" of the SMOLKERS' opportunity to consult with Offerman about the
18 pesticide problem in the SMOLKERS' home. According to GRACE's 1996 Annual Report:
19 "Grace Davison silica products are highly adaptable to new markets and new applications due to
20 the Company's unique silica gel technology and flexible manufacturing capabilities. The graphic
21 arts industry is just one example of new opportunities for silica gel adsorbents developed during
22 1996. Grace Davison has an aggressive market development program in place devoted to
23 researching the best new uses for its technology and bringing new products to market rapidly ---
24 often in highly proprietary applications. Mr. Hyde is quoted as saying "In my 35 years in the
25 business, I've never seen as many opportunities for Grace Davison. We have the right
26 technologies, the right products, the global reach and manufacturing flexibility to take full
27 advantage of the opportunities before us. New applications for our silica products are virtually
28

-86-

XC2nd227

limitless; we're continually expanding our market reach." GRACE's 1996 10K states "Grace's Davison unit ("Grace Davison") founded in 1832, is composed of two primary product groups (a) catalysts and (b) silica products and adsorbents...Grace Davison's sales and revenues were $732 million in 1996...Grace Davison has a direct selling force and distributes its products directly. On the Dri-Die product label it states that Dri-Die is a registered trademark of W.R Grace Company. Dri-Die is an insecticide that is 95% amorphous silica gel, and 5% inert ingredients, and has EPA Reg. No. 4816-240. The product label for Dri-Die states that it is for commercial/industrial use only, should be kept out of the reach of children and is toxic. "Avoid inhalation of dust. Do not use in food/feed areas of food/feed handling establishments, restaurants or other areas where food/feed's is commercial prepared or processed. Do not use in serving areas while food is exposed or facility is in operation. Serving areas are areas where prepared foods are served such as dining rooms...This product is toxic to fish...It is a violation of federal law to use this product in a manner inconsistent with its labeling." These facts were concealed by COSTELLO and HYDE from the SMOLKERS at all times the SMOLKERS were dealing with GRACE, GD, COSTELLO and HYDE.

153.  The April 22, 1997 letter referred to above was signed by Lynne M. Durbin (hereinafter DURBIN). The next day after receipt, on April 27, 1997, GS faxed DURBIN a letter asking DURBIN to confirm she was writing/speaking on behalf of COSTELLO and HYDE and asked DURBIN to forward information on MORRIS and HSTCI to the SMOLKERS. At this time HSTCI had been ordered by the State of California to cease and desist using GRACE's/GD's product SYLOID 244, but the SMOLKERS did not know that. The last paragraph of GS's letter states: "Please verify that Mr. Hyde and Mr. Costello intend to abandon me with the problem caused by W.R. Grace & Co.'s synthetic amorphous silica product."

154.  On April 30, 1997 the SMOLKERS received a fax from DURBIN addressed to GS. This letter states: "I recently received you April 27 letter to me regarding the application of silica gel as a pesticide in your condominium. In answer to your questions, I represent W.R. Grace, Mr. Hyde and Mr. Costello in this matter. / "As I indicated in my April 22 letter, Grace can add

-87-

1  nothing further to the information provided to you by Mr. Convey. However, he did not include

2  an MSDS for our product, I have enclosed one herewith. / "Once again, on behalf of W.R. Grace,

3  Messrs. Hyde and Costello, I refer you to Home Savings Termite Control for additional assistance

4  in this matter." A Material Safety Data Sheet dated June 15, 1995 was included with the fax

5  (hereinafter GD MSDS). These representations were false. "Grace" could have added

6  substantially to the information previously given to the SMOLKERS by CONVEY. GRACE,

7  GD, COSTELLO and HYDE knew that Offerman had made a proposal to MORRIS re inspection

8  of the SMOLKERS' home but concealed this fact and concealed the statement of work required

9  to make a proper inspection given by Offerman to MORRIS from the SMOLKERS.

10  COSTELLO, HYDE, GRACE and GD also concealed that CONVEY is an expert in such things

11  and would advise Offerman how to carry out the inspection of the SMOLKERS' home and how

12  to test for the presence of airborne silica gel particles in the air in the SMOLKERS' home. The

13  GD MSDS provided to the SMOLKERS by GRACE et al., transmitted and mailed along with

14  DURBIN's fax is misleading and conceals material facts.

15      155. DURBIN's letter contains material concealment's and is false and misleading.

16  DURBIN, COSTELLO, HYDE, GRACE and GD could have told the SMOLKERS that GD as a

17  chemical manufacturer does not merely cast its containers of chemicals into the stream of

18  commerce. GRACE and GD maintain an ongoing channel of information beyond that provided in

19  their Material Safety Data Sheet advising on the proper use, handling and testing of their product.

20  DURBIN on behalf of Grace, et al. could have told the SMOLKERS that SYLOID 244 is a

21  respirable dust, which makes SYLOID 244 inherently dangerous. GRACE, GD, COSTELLO

22  and HYDE could have advised the SMOLKERS of the scope of work Offerman advised should

23  be conducted at the SMOLKERS' home. GRACE et al. could have told the SMOLKERS that

24  CONVEY's suggestion that the SMOLKERS use a vacuum cleaner to remove SYLOID 244

25  from their carpets was equivalent to the suggestion that someone use a pot holder to handle

26  radioactive material. It wouldn't work. Grace could have told the SMOLKERS that SYLOID

27  244 was not registered with the EPA as a pesticide, and could have given the SMOLKERS

28

-88-

XC2nd227

1   handling information for Dri-Die, which is a trademark owned by W.R. Grace & Co. for a
2   pesticide that is 95% amorphous silica gel. The GD MSDS is for a series of grades of SYLOID
3   silcas manufactured by Grace Davison, including SYLOID 244. But does not break out
4   individual characteristics for each grade of product, and therefore concealed the danger of
5   particular products, such as SYLOID 244, in the general description of many grades of the
6   product. For example the GD MSDS states these products appearance is as a dry white powder,
7   average particle size 2.5-15.0 microns. This is misleading in that HSTCI claims SYLOID 244 is
8   3.0 microns. A particle that is 3.0 microns in diameter is inherently dangerous. By not stating the
9   diameter for SYLOID 244, the actual product HSTCI claims to have used in the PREMISES,
10  CONVEY et al. mislead the SMOLKERS as to the actual size and inherent dangerousness of
11  SYLOID 244. The GD MSDS states "They are insoluble and non-toxic." That statement about
12  toxicity is misleading and is a fraudulent statement. It is a violation of federal law to describe a
13  pesticide as being non-toxic. At the time the SMOLKERS received the GS MSDS the
14  SMOLKERS did not know these statements were false or that COSTELLO, HYDE, GRACE,
15  GD, CONVEY had mislead the SMOLKERS by not warning the SMOLKERS of the inherent
16  danger of being exposed to SYLOID 244. COSTELLO, HYDE, GRACE and GD knew or
17  should have known that SYLOID 244 is a toxic substance, a respirable dust, and inherently
18  dangerous, and that it was against the law to use SYLOID 244 as a pesticide. But they kept this
19  material information from the SMOLKERS. COSTELLO et al should have told the SMOLKERS
20  that SYLOID 244 was an unregistered poison, it was against the law for the SMOLKERS and the
21  HOA to have SYLOID 244 in the walls of the COMMON AREA and it is very dangerous to
22  inhale SYLOID 244 or to get it on your skin. Had COSTELLO et al. come forth with that
23  information, the SMOLKERS would have been able to bypass the run-around they were going to
24  be given by HSTCI, and the people working with the Coregis Insurance Organization. The
25  SMOLKERS would have "immediately" made arrangements to have their carpet removed their
26  upholstered furniture thrown away, their walls sealed, patched and painted, etc., instead of
27  waiting approximately one year after receipt of the April 30, 1997 letter/fax from DURBIN to do

28

XC2nd227

1    so.

2    156. On April 30, 1997 GS faxed back a question to DURBIN: "Is your product
3    registered and approved for use as a Pesticide by the California Department of Food and
4    Agriculture and/or by the United States Environmental Protection Agency? If so, please provide
5    registration number(s)." If COSTELLO, et al. had answered this question honestly and
6    forthrightly they would have saved the SMOLKERS about one year of suffering and being
7    poisoned by their SYLOID 244 product. DURBIN did not get back to the SMOLKERS with an
8    honest answer to this straightforward question. But on May 2, 1997 GS was contacted by
9    Raymond Holybee (hereinafter HOLYBEE) of TIE, FIG, et al. On May 5, 1997 GS was
10   contacted by Carol Trimble (hereinafter TRIMBLE)of the Coregis Insurance Organization. Had
11   COSTELLO et al answered GS's April 30, 1997 question honestly, the SMOLKERS would have
12   been able to avoid what happened next due to the SMOLKERS becoming involved with Holybee
13   and TRIMBLE. HOLYBEE said TIE et al. would to cleanup the SMOLKERS' home.
14   HOLYBEE said he wanted to clean the SMOLKERS' home and to inspect it. HOLYBEE
15   suggested starting with the carpets and air handling equipment. GS asked HOLYBEE to get a
16   health professional to say HOLYBEE's proposed cleaning method was safe. TRIMBLE said she
17   was an expert in pesticides and she would try to get a product label for GS. She represented an
18   insurance company (COREGIS INSURANCE) that insured HSTCI and they wanted to fix the
19   problem. TRIMBLE asked if it would be okay to send an industrial hygienist to do tests in GS's
20   condo so they could figure out what to do. GS asked if the pesticide used by HSTCI in the walls
21   was registered with the US EPA and the State of California Department of Agriculture.
22   TRIMBLE said that should be shown on the product label, and she would get a product label for
23   GS. At that time TRIMBLE knew or should have known that the pesticide injected into the walls
24   of the SMOLKERS home was not registered with either the US EPA or the California
25   Department of Pesticide Regulation or the California Department of Agriculture because five or
26   six months prior to this call the State of California had issued a cease and desist order to HSTCI
27   for using SYLOID 244, because SYLOID 244 is an unregistered pesticide. HSTCI use of

28

XC2nd227

1  unregistered poison SYLOID 244 came to the attention of the State of Californian when another
2  homeowner was poisoned and severely injured by inhaling SYLOID 244. But TRIMBLE,
3  COREGIS, CIC, and CAINCO concealed and suppressed this information. Had TRIMBLE told
4  GS that GS could call the California Department of Pesticide Regulation directly to find out if this
5  product was registered GS would have done so. At that time GS did not know there was such a
6  thing as the California Department of Pesticide Regulation. Nobody had yet informed the
7  SMOLKERS of the exact trade name of the product (SYLOID 2444) that HSTCI had injected in
8  the walls of the PREMISES. HSTCI, GRACE, TRIMBLE et al referred to the product as silica
9  gel and as amorphous silica gel. This concealed the true identity of the product from the
10 SMOLKERS. Only much later did the SMOLKERS learn that the product HSTCI claimed to
11 have injected into the walls is called SYLOID 244. To try to get to the bottom of this question,
12 on May 2, 1997 GS faxed and mailed a letter consisting of four pages of questions to MORRIS.
13 The first two items of information requested in GS's May 2, 1997 letter were as follows: "1. Is
14 the amorphous silica gel product your firm introduced in exterior wall voids of my condominium
15 unit registered and approved for use as a Pesticide by the California Department of Food and
16 Agriculture and/or the United States Environmental Protection Agency? If so, what is the
17 registration number(s)? / "2. Please provide a copy of all application requirements imposed on
18 your firm's use of that Pesticide by all governmental bodies and by your firm." A copy of this
19 four page letter was sent to DURBIN and to HOLYBEE. MORRIS never answered that letter.

20        157.  Having been told by GRACE, GD, and Mssrs. Hyde and Costello via DURBIN's
21 April 30, 1997 fax to get additional assistance from HSTCI, the SMOLKERS were now forced to
22 deal with Cross-defendants COREGIS GROUP, INC. (hereinafter COREGIS), COREGIS
23 INSURANCE COMPANY (hereinafter CIC), and CALIFORNIA INSURANCE COMPANY
24 (hereinafter CIC) who will collectively be referred to as the Coregis Insurance Organization
25 (hereinafter CIO). On May 5, 1997, Carol Trimble (hereinafter TRIMBLE) contacted GS.
26 TRIMBLE informed GS that she (TRIMBLE) worked for CIC; they wanted to fix the pesticide
27 contamination problem created by HSTCI. TRIMBLE proposed that an industrial hygienist of

28

XC2nd227

1  CIO's choosing be sent to inspect the SMOLKERS' home to make tests and recommendations on
2  how to take care of the pesticide contamination problem. GS replied that would be okay but GS
3  wanted (a) to be assured that whatever the industrial hygienist did was safe and posed no health
4  hazards to the SMOLKERS, (b) to have the analytical test procedure to be carried out explained
5  to GS in advance --- what the hygienist planned to do, how the test(s) work, and (c) GS asked to
6  be told whether the chemical used in his home was registered with the US EPA and the California
7  Department of Agriculture as a pesticide. During this conversation, GS told TRIMBLE that
8  chemicals had been injected in the walls of his condominium without his knowledge or consent.
9  The pest control company was hired by HOA not by GS. GS didn't know the pest control co.
10 was going to inject chemical dust under pressure into the wall voids that could be blown through
11 or leak through cracks and openings in the walls into living quarters. The pest control company
12 hadn't fixed the problem after 5 months. GS wanted to remove carpets, etc., remove drywall, etc.
13 to get rid of the chemical dust in the SMOLKERS' home. TRIMBLE said that she had expertise
14 in pesticides and pesticide problems and she would get back to GS that afternoon with
15 information on whether the chemical applied in the SMOLKERS' home was a pesticide registered
16 with the US EPA and/or the California Department of Food and Agriculture for use as a pesticide
17 and a copy of a product label for the silica gel applied in the PREMISES. At the time of this
18 conversation GS understood that the SMOLKERS were considered a valued customer of HSTCI
19 by HSTCI, that HSTCI would be turning this matter over to its insurer to handle if it was beyond
20 MORRIS' ability to provide fast satisfactory results (by virtue of MORRIS's letter/fax received
21 on April 25, 1997), that the CIO had the expertise to handle pesticide contamination problems and
22 through TRIMBLE was going to "produce fast satisfactory results" for the SMOLKERS. At the
23 end of the conversation GS faxed TRIMBLE a confirming letter, a copy of the May 2, 1997 letter
24 (containing four pages of questions) GS had sent to MORRIS, Mr. Holybee's phone number and
25 a brief explanation of HOLYBEE's proposal for fixing the pesticide contamination problem, and
26 informed TRIMBLE that GS had given he name and number to HOLYBEE: "I have given your
27 name and phone number to Raymond Holybee, Environmental Claims Rep. for Truck Insurance
28

-92-

XC2nd227

1   Exchange. Truck is the liability carrier for Pacific Villas Homeowners Association. Mr. Holybee
2   phone number is (213) 932-3553. Mr. Holybee has asked permission to have an industrial
3   cleaning company clean all carpets and air ducts in my condominium. Truck has assigned this
4   matter Claim No. 62-15351.

5       158. On May 8, 1997 GS made a follow up call to TRIMBLE, who was not in and left a
6   message. requesting the information TRIMBLE had promised to get for GS in the May 5, 1997
7   conversation. GSS also called HOLYBEE, who was not in, and left the message that GS would
8   like TRUCK to pay GS's expenses to move out of the condo while Truck sorts this out. On May
9   8, 1997 GS faxed and mailed written status reports and requests for assistance to DURBIN,
10  TRIMBLE, MORRIS, HOLYBEE and the HOA. In the May 8. 1997 fax to DURBIN,
11  TRIMBLE and MORRIS, GS, stated and asked, "I specifically want to be told what dangers are
12  being concealed from me and how can I have these hazardous substances (silica gel particles,
13  fibers, etc.) removed. Is the silica gel registered as a pesticide?" / "I would like Mr. Costello, Mr.
14  Hyde, W.R.Grace & Co., GraceDavison, Coregis Insurance and Home Savings Termite Control
15  to agree to pay and to advance our moving and living expenses for us to move out of our condo
16  and live in a hotel while they sort out this claim." A copy of that fax was sent to HOLYBEE and
17  the HOA. In the May 8, 1997 fax jointly addressed to HOLYBEE and the HOA, GS made a
18  similar request, "I would like Truck Insurance Exchange and/or the homeowners association to
19  agree to pay and to advance our moving and living expenses for us to move out of our condo and
20  live in a hotel while Truck and/or the homeowner association sorts out this claim." COSTELLO,
21  HYDE, GRACE, GD, DURBIN, CIO, MORRIS, and TRIMBLE never replied to GS's May 8,
22  1997 written request to be told "what dangers are being concealed from me and how can I have
23  these hazardous substances (silica gel particles, fibers, etc.) removed. Later, COSTELLO,
24  HYDE, GRACE, GD, and DURBIN gave GS misleading information and concealed the truth
25  about the lack of US EPA registration. On May 8, 1998, after those faxes were faxed, GS was
26  contacted by JOE FEDORUK (hereinafter FEDORUK).

27      159. FEDORUK said he had been informed by CIO that GS wanted FEDORUK to
28

-93-

XC2nd227

inspect GS's condominium and to mediate or arbitrate a dispute as a neutral. FEDORUK said his bill for services would be paid by TRIMBLE/CIO. FEDORUK said he didn't know what chemical had been used in GS's condominium, didn't know if it was a registered pesticide and hadn't seen a product label. GS told FEDORUK that GSS wanted to know if the silica gel was a registered pesticide and how to safely get it out of GS's soft goods, condominium air, walls, etc., or how to encapsulate it. GSS told FEDORUK that the pest control company (HSTCI) had inspected GS's condominium on at least six separate occasions and had spent half a day taking photographs of the interior of GS's condominium. GS told FEDORUK that GS wanted to get the pesticide out of the walls of GS's condo, out of the air handling equipment, off GS's carpets and to have GS's contaminated carpets and other contaminated belongings replaced. GS did not consider FEDORUK to be a neutral and had not asked for FEDORUK to mediate or arbitrate any dispute with TRIMBLE or CIO or HSTCI or to inspect GS's condo. That those directions were coming from CIO/HSTCI not from GS. GS sent a typed summary of GS's May 8, 1997 conversation with FEDORUK to TRIMBLE and to FEDORUK on May 8, 1997. TRIMBLE did not immediate respond. Had TRIMBLE responded immediately arrangements could have been made for FEDORUK to be informed how grossly obvious it was that HSTCI's pesticide had contaminated the SMOLKERS' home and to visit and to inspect the SMOLKERS' home if he chose to do so. It was grossly obvious that pesticide had contaminated the SMOLKERS' home because HSTCI had photographs of the large openings in the walls through which the pesticide had been injected and been blow/exploded out into the SMOLKERS' living quarters, the pressure at which the pesticide is injected into the walls guarantees that it will be blown back out into the living area, and HSTCI's clean-up crews had seen the large cactus in the SMOLKERS' living room coated (like a tree in the snow) with the white powder pesticide they had applied in the SMOLKERS' home, and had spent an afternoon cleaning the pesticide off the cactus, off the cabinet that stores the SMOLKERS' home computer, and had spent several days caulking cracks in the walls and ceilings through which the pesticide had been exploded under high pressure into the SMOLKERS' home during the application process, and thereafter continued to enter the

-94-

1   SMOLKERS' home. By the spatial distance from aperture holes drilled in the SMOLKERS'

2   home and various visible openings in the walls and ceiling it was obvious that the pesticide had

3   been blown into the SMOLKERS' living quarters.

4       160. On May 22, 1997 GS received a letter dated May 14, 1997 from TRIMBLE on

5   CIO/COREGIS stationary acknowledging receipt of GS's correspondence dated May 2, May 5,

6   and May 8, 1997. TRIMBLE's letter states in part: "We asked Dr. Joseph Fedoruk to contact

7   you and make arrangements to test your condominium unit in order to ascertain if there is

8   contamination and if so, how to deal with it." / "Our offer to test your condominium was made so

9   that we can investigate the claim you have presented to us. That offer still stands. Without the

10  opportunity to investigate, we are unable to consider your claim further. / "Please let us know if

11  you are prepared to allow Dr. Fedoruk to help us investigate your claim." On the next day (May

12  23, 1997) GS contacted FEDORUK, via fax, to make arrangements for FEDORUK to

13  investigate, visit and test the SMOLKERS' home and notified TRIMBLE by fax that GS had

14  done so. GS sent FEDORUK a 20 page fax by fax and by mail which stated: "Please call me at

15  (310) 574-9880 to discuss whatever you propose to do in my condominium." A copy of this note

16  was faxed to TRIMBLE and two page letter was faxed and mailed to TRIMBLE on May 23,

17  1997, with a copy mailed to FEDORUK. Upon receipt of the letter dated May 14, from

18  TRIMBLE, GS was led to believe that CIO/CIC, et al. had contacted FEDORUK and hired

19  FEDORUK to come to the SMOLKERS' home, to run tests, in order to ascertain how to deal

20  with the pesticide contamination. In reliance on this understanding GS sent the 20 fax to

21  FEDORUK on May 23, and waited to hear back from FEDORUK. GS understood from the May

22  letter dated May 14 from TRIMBLE that HSTCI, through CIO, was going forward with HSTCI's

23  promise to have an expert take care of the pesticide contamination in the SMOLKERS' home and

24  that GRACE et al. wanted the SMOLKERS to go along with this program by consulting with

25  FEDORUK. If CIO had not made arrangements with FEDORUK for FEDORUK to promptly

26  visit the SMOLKERS' home and to tell the SMOLKERS what he (FEDORUK) intended to do,

27  TRIMBLE never should have sent the letter dated May 14, 1997 to GS. Instead, TRIMBLE and

28

-95-

XC2nd227

1  GRACE et al. should have told the SMOLKERS they did not know when or if anyone would be

2  sent to the SMOLKERS' home to solve the pesticide problem and that the SMOLKERS should

3  take care of the problem themselves because the SMOLKERS were on their own and would

4  receive no cooperation of assistance. FEDORUK did not respond to GS's 20 page of May 23,

5  1998. TRIMBLE did not respond to GS's May 23, 1998 faxes during May or June, 1997.

6  During May and June 1997 GS became swamped by correspondence with TIG Insurance

7  Company concerning the wind damage, earthquake damage, etc. damages at his condominium and

8  bodily injuries being suffered by GS and his children in connection with the presence of pesticide

9  contamination in the SMOLKERS' home. On or about June 19, 1997, GS discovered through his

10  own investigation that a cease and desist order had been issued to HSTCI on 12/16/96 by the

11  State of California Department of Pesticide Regulation for the illegal use of the unregisterd poison

12  SYLOID 244. Thereafter, in early July, 1997, on or about July 5, 1997, GS filed a direct claim

13  under the statutory bonds and insurance policies with the bonding companies and insurance

14  companies listed by the Structural Pest Control Board as covering liability incurred by HSTCI

15  during its pest control operations for HSTCI's and MORRIS' use of an unregistered poison in the

16  SMOLKERS' home, failure to complete work, negligent construction work, unsafe pesticide

17  application processes, negligent handling and use of poisons, false and misleading statements and

18  misrepresentations. On July 8, 1997 GS made follow-up calls to FEDORUK and TRIMBLE re

19  their failure to respond to GS's May 23, 1997 faxes and to make arrangements for FEDORUK to

20  inspect the SMOLKERS' home. GS left messages describing the nature of GS's call and

21  requesting that they call back. On July 8, 1997 GS also called DURBIN. DURBIN was not in.

22  GSS left a message that GS was calling about GS's fax of April 30, 1997 that DURBIN had never

23  responded to.

24      161. On July 15, 1997 TRIMBLE called GS. TRIMBLE said she had received GS's

25  letter of July 5, 1997 making direct demand on HSTCI's carriers and that COREGIS is the

26  carrier. GS told TRIMBLE that GS hadn't heard back from FEDORUK. GS wants to know

27  what FEDORUK proposes to do but FEDORUK did not get in contact with GS and didn't

28

-96-

XC2nd227

1  respond to GS's fax, letter or phone call. GSS also told TRIMBLE that the "causation" of the
2  pesticide contamination in the SMOLKERS' home is obvious due to the high visibility of the
3  openings in the walls and ceiling in the home before application of the pesticide by HSTCI.
4  TRIMBLE said she would discuss this with FEDORUK and then get back to GS. After this
5  phone call, GS drafted and faxed a four page letter to TRIMBLE memorializing what had just
6  been discussed in their phone conversation. In the July 5, 1997 "direct demand letter" that
7  TRIMBLE was responding to in her July 15 phone call, GS had stated that the Smolker family
8  was a direct beneficiary under the liability policy issued to HSTCI, "It appears to me, as a matter
9  of law, I, and the other injured members of my family, my wife, and two small daughters, are
10 beneficiaries under such insurance policies, and we expect you to treat us as if we are your
11 insured. If you do not agree with this assessment, please let us know your thinking on the
12 matter." In TRIMBLE's July 15 phone call, TRIMBLE did not tell GS that TRIMBLE or
13 COREGIS, CIC, CAINCO or CIO disagreed with GS's opinion that the Smolker family was an
14 intended beneficiary of the COREGIS, CIC, CAINCO insurance policy or policies issued to
15 HSTCI. In GS's July 15, 1997 letter/fax to TRIMBLE, GS's repeated this position: "My position
16 is that my family is an intended beneficiary of this insurance -- see page 9 of that [the July 5,
17 1997] letter." GS went on to state in the July 15, 1997 letter summarizing the conversation they
18 just had (the conversation between TRIMBLE and GS), "I discussed with you that it would be
19 obvious to anyone familiar with HSTCI's process that HSTCI was reckless in its handling of
20 pesticides in my condominium unit. There are obvious openings in my walls and ceiling through
21 which pesticide would enter my living area if injected into structural voids between the walls and
22 ceiling. If HSTCI followed its procedure of injecting pesticide under high pressure into walls and
23 ceilings then the pesticide would naturally be forced to enter my living area. HSTCI personnel,
24 including Mr. Morris, said this procedure was followed. Holes that HSTCI drilled into walls and
25 ceiling indicate where pesticide was recklessly injected into structural voids without any
26 precaution being taken to avoid infiltration of the pesticide into my condominium unit and
27 consequential contamination of the airspace of my condominium unit and personal property

28

-97-

XC2nd227

1 | located therein. Further complicating matters, HSTCI applied an unregistered poison into the
2 | structural voids and structure of the building." / "As a first priority, I told you, I expect HSTCI to
3 | refer me to someone to clean the pesticide out of my carpet, furniture, furnishings, air, air
4 | handling equipment, walls and wood structural members, to repaint my walls and to redo my
5 | ceilings. I expect HSTCI, or its insurance carrier(s) to pay for this work. I would also want
6 | HSTCI to pay for loss of earnings capacity, i.e. time I spent trying to fix the problem. We can
7 | discuss payment for my loss of time, for physical injuries and mental distress later. Lets focus on
8 | clean-up." / "You said you wanted to discuss the above with Dr. Fedoruk. I await your
9 | instructions on what Dr. Fedoruk advises. I called Dr. Fedoruk on July 8 and left a message for
10 | him to call me back. Dr. Fedoruk never called me back. I would like to know what DR.
11 | Fedoruk purposes to remove any pesticide contamination in my living space, in the air in my unit,
12 | on the carpets in my unit, in the walls, etc. The pesticide makes its presence known to me by
13 | drying out my eyes, my lips, my throat, etc. whenever I come home. If Dr. Fedoruk has a more
14 | sensitive method for testing for the presence of the unregistered poison HSTCI introduced into
15 | the premises, please let me know." / "Thank you for your prompt attention to this request."
16 | Based on what TRIMBLE said in the July 15 conversation, the SMOLKERS were led to believe
17 | CIO was taking charge of getting the pesticide contamination cleaned-up. FEDORUK was an
18 | expert working on this matter for CIO, TIE, GRACE et al. and FEDORUK would soon advise
19 | the SMOLKERS about the pesticide contamination in their home.

20 |     162. On July 17, 1997 FEDORUK contacted GS by phone. During the phone
21 | conversation GS pointed out to FEDORUK that FEDORUK would be able to tell from looking at
22 | the openings in the walls and ceilings of the SMOLKERS' home, without making any
23 | measurements, that the living area of the SMOLKERS' home was contaminated with the poison
24 | applied by HSTCI under high pressure into the walls and ceiling of the SMOLKERS home and
25 | invited FEDORUK to come to the SMOLKERS' home to see for himself how obvious it is that
26 | the pesticide applied by HSTCI had to have come back into the SMOLKERS' home under the
27 | law of gravity, the law of pressure, and other basic laws of physics. FEDORUK said it is not

28

XC2nd227

1   possible to see three to five micron particles. That a particle has to be fifty to one hundred
2   microns to be visible. That you can only see refracted light on a five micron silicon particle.
3   FEDORUK said first he would figure out what was injected into the walls by HSTCI, then he
4   proposed that he take air samples to test for silica gel gravimetrically and microscopically. GS
5   voiced concern for safety and scientific soundness of whatever test FEDORUK ran, that the test
6   method of collecting test samples not cause more poison to be introduced into the SMOLKERS'
7   living environment and that the test be a recognized scientific method of testing for the presence
8   of amorphous silica, or whatever poison was applied in the PREMISES by HSTCI. GS and
9   FEDORUK discussed that using an air filter to trap air samples would cause a pressure differential
10  that could cause the three micron particles to be drawn out of the holes in the walls of the
11  SMOLKERS' home into the living areas of the SMOLKERS' home, and/or could stir the
12  particles up off the carpets and furniture into the air in the SMOLKERS' home. FEDORUK and
13  GS discussed that the SMOLKERS don't want FEDORUK to recirculate poison so that a higher
14  concentration of poison particles would be airborne that was now the case. FEDORUK and GS
15  discussed using mass balances to determine or estimate the difference between how many pounds
16  of silica gel were injected into the walls vs . how many pounds were still there to determine how
17  many pounds came back into the living area, and how air pressure differentials from the wind and
18  breezes at the beach create wind forces that would cause pesticide particles to move out of the
19  wall voids into the SMOLKERS' living quarters, and other physical phenomena that could be
20  evaluated to get a handle on how much pesticide had been introduced into the SMOLKERS'
21  living quarters. FEDORUK and GS also discussed the difficulty of making separations for
22  microscopic examination of dust (amorphous silica and crystalline silica) collected from air
23  samples, the difficulty of determining where to take the samples, the location of the collection
24  device vs the source of the contamination vs. where the silica is in the air or on furniture and
25  furnishings, the problems of the relative size of the particle to the filter, how the physical state of
26  the particle would influence concentration measurements, and the problem of not having a
27  baseline material because we really didn't know what HSTCI applied in the PREMISES, we only

28

1  know what HSTCI tells us they applied in the PREMISES. GS explained to FEDORUK that it
2  was GS's understanding that the quantity of amorphous silica gel in the air in the SMOLKERS'
3  living space could not be accurately or precisely determined gramametrically or microscopically.
4  GS invited FEDORUK to come to the SMOLKERS' home to make a simple visible inspection of
5  the walls and ceiling to look at pre-existing openings and later holes drilled by HSTCI.
6  FEDORUK said he could not answer the question "How will FEDORUK test for the presence of
7  silica gel?" but FEDORUK would figure out how to do so and FEDORUK would send GS
8  written materials explaining how samples to be taken by FEDORUK would be taken and how the
9  measurements to be made by FEDORUK would be made, and how the analysis of samples would
10 be done, and why they would be reliable. FEDORUK told GS that FEDORUK would send GS
11 materials that would explain that what FEDORUK proposed to do was not **bogus.** GS
12 memorialized GS's July 17, 1997 conversation with FEDORUK in a three page letter dated July
13 21, 1997 which was faxed and mailed to FEDORUK on July 21, 1997. GS spent a tremendous
14 amount of time talking to FEDORUK and corresponding with FEDORUK, which GS would not
15 had done if GRACE, GD, COSTELLO and HYDE had not failed to warn the SMOLKERS of the
16 substantial risks they were exposed to and had not concealed and suppressed material facts from
17 the SMOLKERS as hereinbefore alleged, all to the SMOLKERS' damage in an amount to be
18 proved at time of trial.

19     163.  On July 21, 1997, GS was contacted by Jamie Doody (hereinafter DOODY) of
20 RELIANCE. DOODY informed GS that United Pacific Insurance had issued a bond required by
21 the State of California to protect people with respect to work performed by HSTCI and that GS's
22 July 5, 1997 direct claim under the bond had been forwarded to her company by Segwick James,
23 HSTCI's insurance broker to be taken care of. DOODY said it was her job to take care of the
24 claim. Thereafter a long series of correspondence ensued between GS and DOODY wherein GS
25 provided DOODY with answers to DOODY's many questions and voluminous documentation
26 requested by DOODY. All of which turned out to be a waste of GS's time, and a tremendous
27 waste of GS's energy, and financial resources. GS would not have wasted his time and financial

28

-100-

XC2nd227

1  resources corresponding with DOODY and providing DOODY with voluminous documentation if
2  GRACE, GD, COSTELLO and HYDE had not failed to warn the SMOLKERS of the substantial
3  risks the SMOLKERS were being exposed to and had not concealed and suppressed material
4  facts from the SMOLKERS as hereinbefore alleged, all to the SMOLKERS' damage in an amount
5  to be proved at time of trial.

6       164.  On July 25, 1997 GS received a fax from FIG, signed by Dennis J. Patterson
7  (hereinafter PATTERSON), Director Environmental Claims, in response to prior correspondence
8  to TIE and FIG from GS regarding TIE's and FIG's failure to respond to GS's letters, failure to
9  admit or deny coverage, and failure to disclose all benefits, coverage and time limits or other
10 provisions of any policy issued by TIE to HOA that has coverage that applies to the
11 SMOLKERS, although a written claim for coverage was presented in March 1997. GS read the
12 fax and then called and spoke to PATTERSON about whether the individual condominium unit
13 owners are insured for property damage under the TIE policy, the status of the COREGIS
14 investigation, whether the pollution exclusion in the TIE policy applies, and that there was smoke
15 damage, earthquake damage, explosion and wind damage to the COMMON AREA of the
16 PREMISES.  GS told PATTERSON that it was GS's position that GS had an insurable interest in
17 the PREMISES, that the HOA did not own the PREMISES but only managed the PREMISES,
18 the PREMISES were owned .in common by the individual condominium unit owners.
19 PATTERSON said he would get back to GS about these issues but never did so.  During the
20 conversation PATTERSON told GS that GS had submitted all required claim documentation.  At
21 the end of the conversation, GS faxed PATTERSON a copy of a letter previously faxed to
22 HOLYBEE on May 8, 1997 in which GS made a first party property damage claim and third
23 party liability claim and direct claim for health problems.  In the July 25, 1997 fax to
24 PATTERSON, GS stated "From our conversation I understand you have all required claim
25 documentation.  If you require any further documentation to complete my claim, please let me
26 know."  PATTERSON never got back to GS and never responded to GS's July 25, 1997 fax.
27 From PATTERSON's July 25, 1997 conversation with GS, GS understood that PATTERSON
28

XC2nd227

1   agreed, on behalf of TIE, that GS was an insured and that PATTERSON was going to make sure

2   that COREGIS finished its investigation and fix of the pesticide contamination problem that

3   HOLYBEE had previously stated TIE would take charge of. Had GRACE and GD not illegally

4   sold SYLOID 244 to HSTCI in the first instance, or had GRACE and GD fixed the problem the

5   SMOLKERS were having once it was brought to their attention, the SMOLKERS would not

6   have wasted the tremendous amount of time they wasted by becoming sucked into being involved

7   with HSTCI, COREGIS, et al. TRIMBLE, HOLYBEE, etc., all to the SMOLKERS damage in an

8   amount to be proved at time of trial.

9        165. On July 28, 1997, HOLYBEE called GS. HOLYBEE told GS HOLYBEE wanted

10  to set up a meeting between all interested parties to settle this problem, but needed GS to invite

11  all interested parties to a settlement meeting. HOLYBEE volunteered that TIE and FIG would

12  sponsor this meeting at their headquarters, but that GS would have to invite everyone.

13  HOLYBEE told GS how to write a letter to invite everyone and said that the operating principle

14  was that everyone would speak frankly at this meeting and there would not be any secrets. That it

15  was necessary for everyone to know what everyone else knew and for their to be no secrets in

16  order to resolve this matter. HOLYBEE suggested that the meeting be held on Aug. 17 or 19 to

17  give everyone time to be prepared to settle this. GSS understood from this conversation that TIE

18  and FIG intended to take charge of settling this matter and needed GS to be present to approve

19  whatever the other parties agreed to do and that there would be an open frank discussion at this

20  meeting. In reliance on this suggestion GS prepared an invitation and mailed and faxed it to all

21  interested parties for whom he had a fax number on July 30, 1997. The meeting was scheduled

22  for August 18, 1997 at the offices of Farmers Insurance Group located at 4700 Wilshire Blvd.,

23  2nd floor, L.A.

24       166. On July 22, 1997, GS faxed and mailed a follow-up letter to DURBIN advising that

25  GS had received no reply to GS's July 8 phone call to DURBIN or April 30 fax to DURBIN. In

26  this letter/fax, GS informed DURBIN that HSTCI had refused to answer GS's questions about

27  HSTCI's application of silica gel in GS's condominium, and asked DURBIN to send GS a

28

-102-

XC2nd227

1  product label for the SYLOID 244 product, and asked again if GRACE's/GD's silica gel product
2  is registered and approved for use as a pesticide by the US Environmental Protection Agency
3  and/or the California Department of Pesticide Regulation.  On July 29, 1997 GS received a letter
4  dated July 24, 1997 from DURBIN in response to GS's fax of July 22, 1997, which included a
5  product label for SYLOID 244.  The product label states "CAUTION .Inhalation may irritate
6  respiratory tract.  Avoid breathing of dust or prolonged contact with skin.  Use with adequate
7  ventilation.  If dusty conditions prevail, wear gloves and NIOSH/MSHA approved dust mask.  If
8  material gets onto skin, wash well with soap and water."  The cover letter stated "Our facility is
9  registered as a pesticide manufacturing facility with the Environmental Protection Agency.  As to
10 the registration of the silica gel product, it is our understanding that it is registered by at least one
11 customer with the U.S. Environmental Protection Agency.  You will have to seek additional
12 information from Home Savings regarding its registration in California."  However,
13 Grace/DURBIN et al. did not provide the product label for the silica gel product that one of its
14 customers had registered so that the SMOLKERS could find out what precautions were supposed
15 to be taken in applying the product or in coming in contact with it or whether or not it was
16 permissible to use it in residential structures.  GRACE et al. continued to conceal dangerous
17 propensities of silica gel readily knowable to GRACE et al. and/or known to GRACE et al. from
18 the SMOLKERS.

19      167.  On July 28, 1997 GS received a letter darted July 22, 1997 from
20 DOODY/RELIANCE advising GS that GS's demand on RELIANCE's bond by letter dated July
21 5, 1997, and claim, was under investigation.  DOODY/RELIANCE stated they would review this
22 claim in detail and advise GS as to their investigation and of their decision within 30 days.  GS
23 provided additional information requested by DOODY to DOODY by letter dated July 30, 1997.

24      168.  On July 29, 1997, GS received the hard copy of the fax GS had received on July 25,
25 1997 from PATTERSON.  This letter showed a copy had been sent to HOLYBEE.  On the next
26 day, July 30, 1997, GS sent a letter dated July 30, 1997 to jointly addressed to PATTERSON,
27 Director of Environmental Claims and to Martin Feinstein President of Farmers Insurance Group,

28

-103-

XC2nd227

memorializing the conversation GS had with PATTERSON on July 25, 1997. In this letter GS stated, "It is my position that I am a first party claimant and insured under the above policy because I own one sixth of the common area which consists of the physical structure insured under the policy....The homeowners association does not own the building. The homeowners association, however, has responsibility for managing and maintaining the building....The individual condominium unit owners are owners in common of the building. Ergo, the unit owners have, and the association does not have, an insurable interest in the physical structure. The property damage portion of the insurance is appropriate for and should apply top the benefit of each unit owner. If it is Truck Insurance Exchange's position that I am not an insured under the property damage coverage provision of the policy at issue in this matter, please let me know as soon as possible...Truck was presented with evidence of my damages on numerous occasions, including when I was interviewed by John Hughes at the very beginning of Truck's processing of my claim. Truck was invited to make a physical inspection of my premises and to be given a guided tour. But refused to take up my offer to be shown my unit by me. Mr. Holybee's first comment when he first spoke to me on May 2 was: 'It looks like you've been jerked around.' I invited Mr. Holybee to inspect my unit. But he never took up my offer....Please let me know if you need any further 'proof' or 'evidence' of loss to adjust my claim." TIE, FIG, etc. never responded to this letter. On July 30, 1997 GS gave a written report to his fellow condominium owners of GS's response to Farmers' letter dated July 24 and a copy of GS's response to RELIANCE's letter dated July 22, 1997.

169. On July 31, 1997 GS received a fax from HOLYBEE concerning the upcoming meeting at HOLYBEE's office to discuss and settle this matter. In this letter HOLYBEE wrote, "If this meeting is going to succeed, I think that you and I should sit down and outline what is going to happen at the meeting and prepare a damage assessment. That is, how and what you need to present to the attendees in the way of damages, proof of damages, liability and possible remedies. You may want to offer one remedy or more than one, but you should also be prepared to discuss alternatives. I could help you prepare for this meeting in a 'strategy session' before the

-104-

XC2nd227

meeting. In that regard, may I suggest that we sit down some evening at your home, (where the damages are), and go over the damages and possible remedies. In making this offer to help, I want to make it clear that it is help. I am not going to make the initial presentation to others. As you recall, Truck has denied your claim and that is what I will tell everyone else at the meeting. You will need a camera (with a wide angle lens and flash), two rolls of 24 exposure film, a tape measure, graph paper and a flat tipped screwdriver. If you don't have any of these let me know, I may be able to bring some of these." GS called HOLYBEE the same day, after reading HOLYBEE's fax. HOLYBEE and GS agreed they would discuss the topics set forth in the fax the next day, August 1, 1997 in detail. GS understood from this letter, and from GS's brief conversation with HOLYBEE on July 31, 1997, that HOLYBEE, TIE and FIG were undertaking to and going to take care of the pesticide contamination problem, and that HOLYBEE had not spoken to PATTERSON about the conversation PATTERSON had with GS on July 25 or about the letter GS had sent to PATTERSON and FEINSTEIN on July 30, 1997. The next day, August 1, 1997, GS called HOLYBEE to discuss HOLYBEE's fax dated July 31 and to invite HOLYBEE to come to the SMOLKERS' home to go over any strategy HOLYBEE wanted to develop to help HOLYBEE deal with the other insurance carriers, the chemical company and HSTCI. GS was told HOLYBEE was not in. GS left a message for HOLYBEE to call back. HOLYBEE did not call back. On August 2, 1997 GS sent a follow-up written invitation MORRIS, HSTCI, TRIMBLE and DOODY to attend the August 18, 1997 meeting at Farmers, and requested that MORRIS produce the extensive amount of photographs his men had taken of the SMOLKERS' residence on January 17, 1997, and requested that HSTCI have the crew who took the photos make a presentation of what the photographs depict at the Aug. 18 meeting. GS's letter concluded, "I would like all facts concerning Wayne Franklin Morris' and Home Savings Termite Control's actions to be honestly and clearly and cleanly presented at this meeting by Wayne Morris and his crew. Please advise if you have any problem with doing so." On August 2, 1997 a separate invitation and claim was sent to Frontier Pacific Insurance Company.

XC2nd227

170. On July 29, 1997, GS received a three page fax from FEDORUK which starts, "The purpose of this letter is to provide you with follow up information concerning the type of testing that I propose to perform in your apartment to determine whether the Syloid Silicas (Syloid) product applied in your home has impacted the inside living spaces. Based upon information I have been provided the product applied to some portions of your home was Syloid Silicas (Syloid), which is composed of synthetic amorphous silica and is manufactured by W.R. Grace and Co." The letter goes on to describe in terms too general to be able to tell what exactly would be done to analyze samples and what analytical procedures would be followed in the testing procedures that FEDORUK proposed to perform to ascertain whether the interior spaces of GS's home had been impacted by this product. Among other things mentioned the letter goes on to say that dust would be collected and the collected on a filter, and "[t]he filter would be analyzed for amorphous silica using NIOSH Method 7501 for amorphous silica...The testing will be conducted under normal usage patterns in your home....I hope this information answers your questions about the proposed testing protocol. If you have any further questions about this or any other related matter please call me directly." On August 4, 1997, GS and FEDORUK had a phone conversation in which they discussed FEDORUK's' July 29 fax and proposed testing protocol. During this conversation FEDORUK said there is a lab procedure to filter out crystalline silica then chemically test for amorphous silica this is NIOSH Method 750l for testing for amorphous silica. FEDORUK promised to send GS a copy of NIOSH Method 7501 immediately. GS suggested that FEDORUK make a physical inspection of GS's home before designing FEDORUK's scientific testing procedures, and discussed GS's critique and reservations about the scientific validity, reproducibility and whether any meaningful information could be obtained if one followed FEDORUK's proposed procedural methodology. FEDORUK said he would flesh out his answers and send GS a fuller explanation as well as a copy of NIOSH Method 7501. At the bottom of FEDORUK's July 29 fax is a notation that a copy had been sent to "Carol Trimble, Coregis Group." FEDORUK never sent GS the information FEDORUK promised to send GS during FEDORUK's conversation with GS on August 4, 1997. On August 4, 1997 GS received a

XC2nd227

1  letter dated July 31v from DURBIN stating that COSTELLO, HYDE, GRACE and GD would
2  not be present at the meeting on August 18 and that they believe GS's remedy to be with HSTCI.
3  In reply to this letter, on August 4, 1997 GS sent a not, dated Aug. 4, 1997, to DURBIN, "over
4  DURBIN's letter dated July 24, asking,. "Please advise how Grace would test for the presence of
5  its product in the living space of my condo.  Is there a way to determine if there is silica gel
6  particles in the air or on the furniture in my condo by a scientifically run testing procedure?"
7  DURBIN et al never replied to this letter.  On Aug. 4, 1997, GS also sent a note to HOLYBEE,
8  typed over HOLYBEE's July 31 fax to GS, which stated, "I called on Aug. 1 and left a message
9  for you to call back to discuss this note from you to me."  Attached to this note were copies of
10 the product label GS recently received from DURBIN, and the Cease and Desist Order issued to
11 HSTCI, DURBIN's July 24 letter to GS.  GS's note went on to state, "[W]e have an illegal
12 poison injected into the structural voids in our building.  This is property damage, and the basis of
13 my first party claim against Truck.  If Farmers has any doubt about its obligation to treat me as a
14 first party claimant after reading its insurance policies, read also  Civil Code Section 1559, Desai
15 v. Farmers, Northwester Mutual v. Farmers, and Cainco v. Farmers.  ...I have four types of
16 damages (1) medical expenses for me and my children, (2) bodily injury, (3) loss of income and/or
17 earning capacity, i.e. time spent dealing with the termite co. , the homeowners association, the
18 insurance cos., etc. trying to resolve problems regarding the contamination of our property, and
19 (4) property damage --- personal property such as carpets, and upholstered furniture,
20 contaminated with poison, and real property contaminated with unlicensed poison in the walls,
21 etc.  Please advise what kind of further documentation, if any, Truck, and Farmers require."  A
22 copy of this letter was sent to Martin Feinstein and Dennis J. Patterson.  Nobody ever replied.
23 HOLYBEE didn't reply.  FEINSTEIN didn't reply.  PATTERSON didn't reply.

24      171.  On August 11, 1997 GS sent a follow-up letter to FEDORUK.  In this letter GS
25 wrote, "When we last spoke, you said you would send me a copy of NIOSH 7501 for amorphous
26 silica on August 4 and you would find out 'exactly' what Home Savings Termite Control, Inc.
27 (HSTCI) applied in my condominium unit.  I invited you to make a personal inspection of my unit

28

-107-

XC2nd227

to see for your self what is self-evident. / "I have not receive the promised copy of NIOSH 7501 or heard back from you. Please advise...What particular expertise do you have that qualifies you to design a test to determine whether SYLOID silicas are present in the living spaces of my condominium? What prior experience, or training, do you have testing for the presence of SYLOID silicas in a residence?...Do you have a license, experience or educational background that qualifies you to do testing for the presence of chemicals in residential environments? If so, please describe and be specific....Is it your normal practise to study the home environment? In what area, if any, do you do your academic research? Home environments? Please send me a list of your publications....What is the sensitivity of the analytical process(es) you propose to utilize to investigate the presence of SYLOID silicas in my home? Percentage accuracy? Detection limit? Reproducibility of test?" FEDORUK never replied to this letter, or spoke to GS again.

FEDORUK had wasted over three months of the SMOLKERS' time (from contacting GS in early May 1997 to dropping out of sight without notice in August 1997). By GRACE et al. telling the SMOLKERS and forcing the SMOLKERS to turn to HSTCI for information about GRACE's product, GRACE et al. had wasted over three months of the SMOLKERS' time and caused the SMOLKERS to be needlessly exposed to pesticide for that period of time, and longer. Had FEDORUK or CONVEY told the SMOLKERS that three micron particles could not be vacuumed out of the SMOLKERS' carpets and the only solution to the SMOLKERS' problem entailed removing the SMOLKERS' carpets, sealing and painting the SMOLKERS' walls, the SMOLKERS could have and would have done so in May 1997, instead of in May 1998. As a direct and proximate result of GRACE's, GD's, COSTELLO's and HYDE's fraudulent concealment and suppression of material facts the SMOLKERS were damaged by being exposed to residual pesticide contamination in their home for over a year after the SMOLKERS asked GRACE what to do about the problem and for more than a year after the SMOLKERS told COSTELLO and HYDE that the SMOLKERS were disappointed in the run-around they were getting from CONVEY in CONVEY's nonresponsiveness to the SMOLKERS' direct questions. As a direct and proximate result of this fraud on the part of GRACE, GD, COSTELLO and

-108-

1 | HYDE the SMOLKERS were damaged in an amount to be proved at time of trial.

2 | 172. On August 11, 1997, GS received a fax dated Aug. 8, 1997, from TRIMBLE that
3 | stated that MORRIS and TRIMBLE would attend the Aug. 18 meeting. MORRIS did not attend
4 | the meeting. The fax also stated that COREGIS would not be providing a copy of the HSTCI
5 | policy of insurance because the Insurance Information and Privacy Protection Act prohibits
6 | release of insurance policy information prior to filing a lawsuit. That is not one hundred percent
7 | true in that the Act does not apply to commercial policies and the insurance code and regulations
8 | thereunder require that insurance carriers disclose all insurance benefits to beneficiaries of their
9 | insurance policies. On Aug. 12, 1997 GS faxed back a note written over TRIMBLE's fax dated
10 | Aug. 8, received on Aug. 11. In this note GS stated, "We consider ourselves to be 'your' insured
11 | and/or a third party beneficiary of 'your policy.' See Civil Code § 1559. In that the law requires
12 | the pest control operator to carry liability insurance as a condition of obtaining a license to do
13 | business and Home Savings advertises that it is licensed, bonded and insured, we are one of the
14 | class for whose benefit the policy was expressly made. Ergo, it is 'our' policy." TRIMBLE
15 | never replied to this information and refused to provide any insurance information to the
16 | SMOLKERS even though the SMOLKERS were at a minimum entitled to coverage under the
17 | med pay provision of the CAINCO policy issued to HSTCI. On Aug. 15, GS received a fax from
18 | TRIMBLE stating that MORRIS would not be attending and "A representative of Home Savings
19 | Termite will not be making a presentation." On the same date, Aug. 15, 1997, GS faxed a note
20 | back to TRIMBLE inquiring as to TRIMBLE et al's investigation practices. In his Aug. 15,
21 | 1997, fax-letter GS stated, "I have invited Dr. Fedoruk to physically inspect my condo so that he
22 | can personally observe what is self-evident. Dr. Fedoruk has not accepted this invite, even though
23 | it would show him and you the workmanship of Home Savings and the obviousness of the interior
24 | of my condo living space being contaminated with an unregistered poison by Home Savings. Dr.
25 | Fedoruk said he would send me a copy of NIOSH Method 7501 for amorphous silica on Aug. r,
26 | 1997. I have never received it. I sent Dr., Fedoruk a follow up faxed written request for a copy
27 | of Method 7501 and answers to my questions on August 11, 1997. Dr. Fedoruk never

28 |

XC2nd227

responded." TRIMBLE never responded to this letter-fax, except on the same date she faxed back a reply which stated she had received a copy of the letter and "Coregis wants to investigate your claim. Our purpose in attending this meeting on Monday is to make arrangements to have a qualified individual come to your condominium unit and conduct the necessary tests." GS then faxed back, on the same date (Aug. 15, 1997), "Present your credentials, have your investigator present his or her credentials and complete outline of what he or she intends to do. We will proceed from there."

173. At the meeting on Aug. 18 at Farmers, the insurance carrier representatives refused to discuss their evaluation of the claim, or what they were willing to do to solve the problem. A few days later, on Aug. 22, GS received a letter from TRIMBLE dated Aug. 19, 1997, which states in part: "Following yesterday's meeting, we would like to proceed with the handling of your claim. In the next few days, we will be sending you a list of qualified people who can perform testing in your unit. Please review the list and let us know if you have a preference. If not, we will make the selection. In the interim, please do not alter the condition of your unit in any way, without giving us the opportunity to inspect and test. The condition of the building is evidence which must not be altered." Thereafter ensued lots more correspondence between GS and TRIMBLE, including letter dated Aug. 22 from GS to TRIMBLE, letter dated Aug. 22 from GS to McIntosh & Dean (which latter became Dean & Associates) and to Sara Thorpe, and letter dated Aug. 28 from TRIMBLE to GS. TRIMBLE never provided GS with a list of experts to chose from. In her Aug. 28, 1997 fax, TRIMBLE announced that she would like to set up the testing of GS's condominium by Indoor Environmental Engineering. At the beginning of TRIMBLE's involvement in this situation, GS had informed TRIMBLE in writing that Indoor Environmental Engineering/Bud Offerman was GS's expert. More correspondence ensued, including an exchange of faxes between TRIMBLE and GS on Aug. 28, two faxes from GS to TRIMBLE on Aug. 29, another follow-up letter from GS to FEDORUK requesting FEDORUK prior the information previously requested by GS (FEDORUK never responded to GS's Aug. 29, 1997 letter), a fax from TRIMBLE to GS on Sept. 2, 1997, telling GS that GS is not allowed to

-110-

1   talk to Offerman or Indoor Environmental, but should direct all questions for Offerman or Indoor

2   Environmental Engineering through Dean & Associates, , and faxes in reply from GS to

3   TRIMBLE and from GS to TRIMBLE's supervisor (Bettina Hooper, Divisional Claims Manger).

4   On Sept. 2, 1997, GS also sent a fax and letter to Martin Feinstein, President and CEO of Farmers

5   Insurance Group of Companies asking for help. Lots more correspondence and faxes ensued. On

6   Sept. 3, 1997 GS sent a fax to Indoor Environmental Engineering/Offerman asking when is the

7   soonest "you can come to my unit and do your testing?" as well as other questions. More faxes

8   to COREGIS, Indoor Environmental Engineering. This flurry of activity went on through Oct.

9   1997. GSS kept on asking COREGIS, TIE, et al. to make arrangements to inspect GS's home as

10   soon as possible. Dean & Associates and Babbits eventually forbid GS from talking to Offerman

11   and Environmental Engineering, admitted that they knew GS had given Offerman's name to

12   HSTCI and COREGIS/TRIMBLE, and claimed that Offerman was now their retained expert. In

13   a letter dated Sept. 23, 1997 from Dennis A. Babbits of Dean & Associates, to GS, Babbits,

14   states, "Thank you for your invitation to inspect the condominium located at 15-63rd Ave., #3,

15   Playa del Rey, California (the "Premises"). We will attempt to make arrangements with Indoor

16   Environmental Engineering ("IEE") for testing and inspection of the premises as soon as possible.

17   We must insist, at the request of IEE, that you not make direct contact with any representatives of

18   IEE for any purpose, including scheduling, unless authorized in writing to do so by this office.

19   IEE has been retained by this firm for consultation with respect to your claims of environmental

20   damage and will be our retained expert in any litigation which may result from the pest control

21   efforts of Home Saving Termite Control, Inc. at the premises....If you violate this directive we

22   will report such conduct to the State Bar of California. Please see A.B.A. Model Rules of

23   Professional Conduct, Rule 4.2 and California Rules of Professional Conduct, Rule 2-100. Please

24   note that Rule 2-100 is not limited to litigation (see Witkin California Procedure Fourth Edition

25   (1996) "Attorneys" Section 488)." Copies of this letter were sent by Babbits to Wayne Morris,

26   Home Saving Termite Control, Inc., Ms Bettina Hooper, Ms. Carole Trimble and ERC/Coregis

27   Specialty Group. This interference on the part of Babbits, Trimble, TIE, et al. with Offerman

28

-111-

XC2nd227

1   completely ruined the SMOLKERS' relationship with Offerman, made it impossible for the

2   SMOLKERS to retain Offerman in another chemical exposure case on which they had consulted

3   Offerman before HSTCI treated the PREMISES and made it impossible for the SMOLKERS to

4   consult with Offerman about the pesticide contamination in the SMOLKERS' home.  Eventually

5   Dean and Associates on behalf of HSTCI, COREGIS, TIE, GRACE, et al. made arrangements for

6   Indoor Environmental Engineering to inspect the SMOLKERS' home on October 8, 1997.  But,

7   Indoor Environmental Engineering never showed up.  Later, in the day, on October 8, 1997, the

8   SMOLKERS received a fax from Dean & Associates which states, "This is to let you know that

9   due to unforeseen circumstances there will not be an inspection of your home today as previously

10  arranged.  I will be in contact with you in the near futu5re to set up a new date for the inspection

11  and testing.  I apologize for any inconvenience this may cause you."  Dean & Associates, HSTCI,

12  COREGIS, TIE, GRACE et al. never contacted the SMOLKERS after that to set up a new date

13  for inspection and testing.  After the SMOLKERS filed their cross-complaint in Oct. 1997 the

14  SMOLKERS continued to try and  tried to make arrangements with cross-defendants to take care

15  of this problem, to no avail.  It was only when the SMOLKERS had made extensive arrangements

16  to have the carpets in their home removed, their walls sealed and painted, etc. in April 1998 that

17  HSTCI, GRACE et al. made a move.  The SMOLKERS told them they were fed up with waiting,

18  and going ahead with their own remediation.  At that point, in April 1998, HSTCI obtained an ex

19  parte order stopping the SMOLKERS from going forward with their "clean-up" work to allow

20  HSTCI, GRACE et al. to inspect and test the SMOLKERS'' home.

21         174.  In doing the acts herein described HSTCI was acting as a distributor of GRACE's

22  product and a distributor of GD's product SYLOID 244 and taking care of the pesticide

23  contamination problem as an agent of GRACE and GD after CONVEY sent his fax to GS.  In

24  doing the fraudulent acts herein described, TRIMBLE was acting as an agent of HSTCI,

25  MORRIS, GD, GRACE , COSTELLO and HYDE.

26         175.  As a proximate result of the fraudulent acts and omissions of GRACE, GD,

27  COSTELLO and HYDE, and each of them alleged herein GARY SMOLKER, JUDI SMOLKER,

28

-112-

1   LEAH SMOLKER, and Caramel have been continuously exposed to pesticide applied by HSTCI

2   in their home, have been denied of their peaceful possession, use and enjoyment of their home,

3   have been forced to move out of their home, have been forced to pay rent to live in a hotel, have

4   been forced to pay extraordinary sums for food and lodging while living out of their home, have

5   had their personal property damaged and destroyed, have been made ill, have been injured and

6   hurt in their health, strength and activity, sustaining injury to their nervous system and person,

7   have suffered various physical injuries which have caused them great mental, physical and nervous

8   pain and suffering all to GARY SMOLKER's and ALICE SMOLKER's damage in an amount to

9   be proved at time of trial.. As a proximate result of the fraudulent acts and omissions of GRACE,

10   GS, COSTELLO and HYDE, and each of them, alleged herein, ALICE SMOLKER has been

11   continuously exposed to the pesticide, has been denied the peaceful possession, use and

12   enjoyment of her home, and has had her personal property destroyed and damaged all to her

13   damage in an amount to be proved at time of trial. Seeing the physical injury, pain and suffering,

14   endured by GARY SMOLKER, JUDI SMOLKER, LEAH SMOLKER and Caramel has caused

15   great mental and nervous pain and suffering and emotional damage to ALICE SMOLKER all to

16   her damage in an amount to be proved at time of trial. As a result of such injuries the

17   SMOLKERS have suffered general damages within the jurisdiction of this court in an amount to

18   be proved at time of trial.

19       176.. As a result of the fraudulent acts and omissions of GRACE, GD, HYDE and

20   COSTELLO, and each of them, as herein alleged, GARY SMOLKER's, JUDI SMOLKER's, and

21   LEAH SMOLKER's illnesses, and injuries as above stated, were aggravated thereby further

22   injuring GARY SMOLKER, JUDI SMOLKER, and LEAH SMOLKER, in their health, strength

23   and activity, and causing further injury to their body and shock and injury to their nervous system,

24   all of which injuries have caused and continue to cause further physical injury to GARY

25   SMOLKER to his damage in an amount to be proved at time of trial and to cause the

26   SMOLKERS, and each of them, great mental, physical and nervous pain and suffering and the

27

28

XC2nd227

1 | SMOLKERS, and each of them, have been damaged thereby in a further sum within the
2 | jurisdiction of this court to be proved at time of trial.

3 |     177. As a further proximate result of the fraudulent acts and omissions of GRACE, GD,
4 | COSTELLO and HYDE, and each of them, alleged herein, the SMOLKERS have been required
5 | to spend money and incur obligations, and will continue to spend money and incur obligations, for
6 | medical services, dental services, X-rays, drugs and sundries reasonably required in the treatment
7 | and relief of the injuries herein alleged, and have been forced to become involved in litigation with
8 | other cotenants who also own an undivided interest in the common area of the PREMISES, the
9 | SMOLKERS' insurance carrier (TIG Insurance Company), HOA, TIE, et al., and have lost their
10 | time, their ability to make a living, earnings, earnings capacity and will lose future earnings, have
11 | incurred and paid litigation costs, have been unable to promote their business in the fashion they
12 | would otherwise be able to promote their business, have been rendered unavailable to take on
13 | work they would otherwise be capable of taking on, have had to deplete their savings and borrow
14 | money to pay living expenses and to pay business expenses, have been required to spend money
15 | and incur obligations, and will continue to spend money and incur obligations, for replacement of
16 | contaminated personal property (i.e. bedding, furniture, etc.), for hauling away and disposal of
17 | contaminated property, for work done and to be done in an attempt to clean-up and remove
18 | pesticide contamination from the air in their living quarters, from their carpets, and other soft
19 | goods, etc., and have incurred and paid expenses and charges for repair and construction work
20 | and painting to seal and repair holes drilled by HSTCI and sloppy "fix-up" "caulking work done
21 | by HSTCI's fix-up crews and to fill and patch openings in walls and ceilings and to seal walls and
22 | ceilings in an attempt to minimize the amount of pesticide that can escape from the voids between
23 | the walls and ceilings of the PREMISES and thereafter enter into the SMOLKERS' living
24 | quarters and will continue to incur and pay further expenses in connection with efforts to mitigate
25 | damages caused by pesticide contamination, to prevent further pesticide contamination, to remove
26 | residual pesticide contaminants, to replace contaminated items of personal property, and will incur
27 |
28 |

XC2nd227

1  additional expenses for a new termite treatment of the PREMISES, all to the SMOLKERS'

2  damage in an amount to be proved at time of trial..

3      178. As a proximate result of the fraudulent and illegal conduct of GRACE, and GD, and

4  each of them, which led to the contamination of the PREMISES by HSTCI's pesticide and

5  recontamination and continuous contamination of the SMOLKERS' home by the pesticide applied

6  by HSTCI, it is necessary to, and when the Smolkers have enough money they will, remove

7  interior walls of GARY SMOLKERS' condominium , vacuum out pesticide residing in the wall

8  voids, and then replace the insulation and drywall and repaint same, remove and replace duct

9  work and air-handling equipment contaminated with pesticide, all to the SMOLKERS' damage in

10  a sum to be proved at trial.  As a further and proximate result of the fraudulent conduct of

11  GRACE, GD, COSTELLO and HYDE, and each of them, herein alleged, the SMOLKERS have

12  been prevented from attending to their usual occupation and lost earnings and earnings capacity

13  and are informed and believe and thereon allege that they will be prevented from attending to their

14  usual occupation in the future and will thereby sustain future loss of earnings all to their damage

15  in an amount to be proved at trial.  As a further result of the conduct of cross-defendants and each

16  of them, the SMOLKERS have been threatened by their neighbors, the SMOLKERS have been

17  forced to become involved in controversies with other parties to this litigation and have been

18  prevented them from attending to their usual occupation and have lost earnings and earning

19  capacity as a direct result thereof.  The SMOLKERS are informed and believe and thereupon

20  allege that as a direct result of the conduct of cross-defendants and each of them, the

21  SMOLKERS will continue to be involved in controversies with other parties to this litigation and

22  will lose further earnings and earning capacity as a result thereof.  As a direct result of the

23  conduct of cross-defendants and each of them, the quality of the SMOLKERS life has been

24  diminished, the SMOLKERS have lost the free and comfortable use of their personal property and

25  their ability to enjoy the peaceful possession, use and enjoyment of their home, and the value of

26  GARY SMOLKER's condominium has been depreciated and stigmatized, all to the SMOLKERS

27  damage in a sum to be proved at time of trial.

28

XC2nd227

179.  As a further proximate result of the fraudulent conduct of GRACE, GD, COSTELLO and HYDE, and each of them alleged herein, and the SMOLKERS spending money on costs of repair, cost to live somewhere else, cost to replace contaminated personal property, and loss of time needed to deal with pesticide contamination related matters, the SMOLKERS have been emotionally and financially exhausted, have been forced to lower their living style, have had their privacy breached, have been humiliated and caused to suffer emotional distress, all to their damage in an amount to be proven at time of trial.

180.  As a direct and proximate result of GRACE's , GD's, COSTELLO's and HYDE's interference with the SMOLKERS' relationship and potential relationship with Offerman and Indoor Environmental Engineering, and misuse of confidential and proprietary information belonging to the SMOLKERS concerning Offerman and Indoor Environmental Engineering, the SMOLKERS have been damaged and injured in an amount to be proved at trial.

181.  As additional damages against cross-defendants GRACE, GD, COSTELLO and HYDE, and each of them, cross-complainants allege these cross-defendants and each of them were guilty of malice, fraud, and/or oppression as defined in Civil Code Section 3294 in doing the fraudulent and illegal acts described herein, and cross-complainants and each of them, should recover, in addition to actual damages, damages to make an example of and to punish cross-defendants GRACE, GD, COSTELLO and HYDE, and each of them.

## NINTH CAUSE OF ACTION

(Against TIG for Breach of Contract

and for Negligent Performance of An Undertaking to Render Services)

182.  The SMOLKERS incorporate herein by reference as though fully set forth herein Paragraphs 1 through 4 and 32 with the same force and effect as through said paragraphs were set forth fully at this point.

183.  Cross-defendant TIG INSURANCE COMPANY (hereinafter TIG) is, and at all times herein mentioned was, a California corporation transacting business in Los Angeles County,

-116-

XC2nd227

1   California. CUMMINS & WHITE, LLP (hereinafter C&W) is, and at all times mentioned in this
2   cause of action was, a law firm doing business in Los Angeles County, California. LARRY M.
3   ARNOLD (hereinafter ARNOLD) and LAURA N. MACPHERSON (hereinafter MP) were at all
4   times mentioned in this cause of action attorneys practicing law with C&W.

5   184. GARY SMOLKER has owned his condominium unit and lived at his condominium
6   unit at 15-63rd Ave., Playa del Rey, CA. since 1978. The SMOLKERS have had Homeowners
7   Insurance (policy number THO 2309 05 88), and a Personal Umbrella Policy (policy number U
8   3027 2661) and automobile insurance (policy number TRA 2308 70 78) with TIG and its
9   predecessor company continuously since 1988. The Homeowners Insurance policy provides
10  coverage to the SMOLKERS with respect to damage to personal property in the condominium,
11  including payment for loss of use of the condominium, repair of the condominium necessary to
12  mitigate damages to personal property, living expenses if it is necessary to move out of the
13  condominium etc. The automobile insurance policy provides coverage for damage to the
14  SMOLKERS' automobiles. Also, the SMOLKERS have an Earthquake Insurance policy (policy
15  number EQ 33244477) with TIG which came into existence in 1995, prior to the inception of this
16  policy earthquake coverage was provided by to the SMOLKERS by TIG under the homeowners
17  insurance policy issued by TIG to the SMOLKERS, which provides coverage for property
18  damage and loss of use due to damage caused by earthquake forces. As part of these insurance
19  agreements, TIG promised to provide a friendly staff to take all information and guide the
20  SMOLKERS through the claims process, 24 hours a day, 7 days a week, 365 days a year
21  including holidays, anytime the SMOLKERS needed help a trained TIG service representative
22  would be there to help the SMOLKERS, and to provide valuable referral services for auto losses
23  and for homeowner's losses. TIG promised, in writing, to provide the SMOLKERS with timely
24  response for restoration of their damaged property, including but not limited to emergency
25  protection of their contents..

26  185. While these policies were in full force and effect, the SMOLKERS sustained
27  property damage to their home, to their furniture, to their carpets, to their clothing and to other

28

-117-

XC2nd227

items of their personal property, and also suffered loss of use of such property. The property damage suffered by the SMOLKERS and loss of use of property suffered by the SMOLKERS are covered losses under said policies. The SMOLKERS asked TIG for emergency help. Their home (the insured condominium) suffered wind damage, earth quake damage, vandalism damage, and various other damages and was contaminated by a poisonous gas which left a poison residue on everything in their home making their home unfit to live in, and due to damage to their home had leaks in their walls and ceilings through which poisonous gas entered their home and contaminated their contents and made it unhealthy and unfit to live in. Their automobiles were contaminated by poisonous gas fumes which left a poison residue in their automobiles, making their automobiles unfit to be in.. On March 14, 1997 the SMOLKERS submitted a written claim to TIG for their losses due to property damage and loss of use of property and request for emergency help. Thereafter the SMOLKERS submitted further property damage claim and loss of use of property claim information to TIG. TIG undertook to properly investigate such claims for a determination of its coverage and to provide emergency help and valuable referrals.

185. The SMOLKERS, and each of them, have performed all conditions, terms, and covenants required by each of said insurance policies to be performed by them unless otherwise excused or equitably relied therefrom as not being prejudicial to TIG.

186. The SMOLKERS requested that TIG clean or replace all contaminated personal property, repair wind damage, earthquake damage, vandalism damage, and smoke damage to the condominium, to make these repairs promptly so as to prevent additional damage from occurring to the SMOLKERS' personal property and the SMOLKERS and refer the SMOLKERS to competent people to help in this emergency. The SMOLKERS requested that TIG to pay for the SMOLKERS loss of use of their home, including moving costs and rental costs to live somewhere else while their home (the insured condominium) was made fit to live in.

187. In complete breach of its insurance policy, and written promises and written representations made to the SMOLKERS, TIG refused and failed to properly investigate the SMOLKERS claim or to pay any part of the SMOLKERS' claim and instead denied coverage

-118-

XC2nd227

1   pursuant to *pro forma* letters. After an unreasonable amount of time passed, and after much
2   protest by the SMOLKERS to TIG because TIG had negligently handled the SMOLKERS' claim
3   by failing to inspect the site of the accident, the means by which the injury occurred or the
4   damaged goods, TIG sent out unqualified personnel to investigate the scene of the accident, the
5   cause of the accident, the items that had been damaged and the damage and injury suffered. For
6   example, it took TIG over one year to send an "expert" out to investigate the SMOLKERS'
7   automobile loss. TIG never reported to the SMOLKERS whether it accepted or denied the
8   SMOLKERS' claim of damage and loss to their automobiles. TIG never reported the result of its
9   investigation of the SMOLKERS' automobile loss claim to the SMOLKERS. TIG took over
10  seven months to begin to investigate the SMOLKERS' earthquake loss claim. TIG and its
11  investigators refused to look at earthquake damage the SMOLKERS reported to TIG in writing.
12  TIG refused to pay for a structural engineer the SMOLKERS hired to determine if their home
13  was fit to live in although the earthquake policy specifically states that TIG would do so. TIG
14  hired C&W, ARNOLD and MP to adjust the SMOLKERS' claim. C&W, ARNOLD and MP,
15  and each of them were unqualified to adjust the SMOLKERS' claim and performed a negligent
16  job of adjusting the SMOLKERS' claim. C&W, ARNOLD, and MP ignored information given to
17  them, and refused to look at damaged property which indicated a covered loss had occurred.
18  When these failings were reported to TIG, TIG stonewalled and refused to send anyone out to
19  check out the SMOLKERS' claim that C&W et al. had negligently adjusted the SMOLKERS'
20  claim and were purposefully ignoring evidence that the SMOLKERS' claim was covered. The
21  failure and refusal of TIG to pay for replacement or cleaning of the SMOLKERS' personal
22  property located in the condominium was a breach of the TIG policies. TIG engaged in a letter
23  writing war of attrition with the SMOLKERS in which TIG ignored what the SMOLKERS
24  wrote, and continually asked the SMOLKERS the same questions and ignored the SMOLKERS'
25  prior answers to the same questions. TIG resulted to pay the SMOLKERS for any of the
26  damages or losses suffered by the SMOLKERS which are covered under said policies and refused
27  to pay or provide other benefits owing to the SMOLKERS under such policies. The refusal of
28

-119-

XC2nd227

1  TIG to pay for the SMOLKERS to live somewhere else was one of many breaches of the TIG

2  policies.  The failure and refusal of TIG to make repairs necessary to mitigate damages was also a

3  breach of the TIG policies.

4      188.  As a direct and proximate result of TIG's breach of the insurance policies, and as a

5  direct and proximate result of TIG's negligent failure to perform a proper investigation and to

6  negligent failure to provide the helpful services TIG negligently undertook to provide to the

7  SMOLKERS, the SMOLKERS have suffered the following damages:

8      (a) damage to their health by living in the condominium;

9      (b) medical expenses due to additional damages to their health caused by continuing to

10  live in the condominium, including reasonable value of time spent going to doctors and time spent

11  taking children to doctors, and medical expense of medical care given to children;

12      (c) expenses of becoming embroiled in this litigation, including but not limited to loss of

13  earnings, loss of earning capacity; loss of future earnings; loss of future earning capacity; loss of

14  time, reasonable value of time spent in connection with this dispute, including time spent dealing

15  with other parties to this lawsuit, loss of time with their children, loss of time with each other;

16      (d) cost to replace all damaged goods, including cost to remove goods, cost to buy new

17  goods, reasonable value of time spent in connection therewith;

18      (e) cost to clean the air in the condominium;

19      (f) cost to do repair work, cleaning work in the condominium;

20      (g) cost to remove the pesticide dust from the wall voids and to do construction work

21  ancillary thereto, cost to seal and paint walls, costs to remove and replace carpets, costs to live

22  somewhere else while construction work is being performed, and reasonable value of time spent

23  finding people to do this work;

24      (h) benefits due under earthquake policy;

25      (i) benefits due under homeowners policy;

26      (j) benefits due under automobile policy;

27

28

-120-

XC2nd227

1    (k) costs of investigation, costs of mitigation of damages, costs of having to defend third

2    party lawsuits arising out of the pesticide contamination, costs of prosecution actions against third

3    parties related to the pesticide contamination;

4    (l) reasonable attorney fees, costs and disbursements in this action; ;

5    all to the SMOLKERS damage in a sum to be proved at time of trial.

6    ## TENTH CAUSE OF ACTION

7    Against TIG for Breach of Duty of Good Faith and Fair Dealing)

8    189.  The SMOLKERS reallege and incorporate herein by reference each and every

9    allegation contained in paragraphs 182 through 188 of this Cross-complaint.

10    190.  Each and every insurance policy sold by TIG to the SMOLKERS by TIG imposes

11    upon TIG an absolute duty of good faith and fair dealing and the duty to consider the

12    SMOLKERS' interests at least equally with its own in making coverage determinations and in

13    conducting investigations of the SMOLKERS' claims.  In refusing to promptly and competently

14    investigate the SMOLKERS' claims, as alleged above, TIG has knowingly acted in a manner that

15    conflicted with the interests of the SMOLKERS, and willfully and in bad faith considered its own

16    interests and disregarded the interests of the SMOLKERS.  TIG has failed to fulfill the

17    representations of coverage and services to be provided in its policies and ancillary materials.

18    TIG has failed to provide the SMOLKERS the coverage and the services which the SMOLKERS

19    purchased and for which the SMOLKERS paid insurance premiums to TIG.  As a result of such

20    conduct the SMOLKERS have incurred and continue to incur damages.

21    191.  In breach of its covenant of good faith and fair dealing, TIG rejected the

22    SMOLKERS' claim in a knee jerk fashion without any on site investigation of the premises. After

23    the SMOLKERS complained of this treatment TIG conducted a perfunctory on-site investigation

24    where facts indicating there was coverage were ignored by TIG.  Evidence available to TIG,

25    which it did not seek to discover, shows the losses complained about by the SMOLKERS were

26    covered.  Evidence given to TIG by the SMOLKERS was ignored by TIG.  TIG ignored the

27    earthquake claim submitted to it, until after TIG had denied the SMOLKERS claim.  TIG told the

28

-121-

XC2nd227

1   SMOLKERS that it was denying the SMOLKERS claim based on its legal interpretation of the
2   word "smoke." TIG claimed that it had found a legal authority, Henri Food Prod. Co. v. Home
3   Ins. Co. that held that vapor is not smoke. The Henri case actually held that vapor is smoke.
4   After this was pointed out to TIG, TIG was unwilling to accept either the Henri case definition of
5   smoke or the dictionary's definition of smoke. TIG said if the pesticide fume that invaded the
6   SMOLKERS residence could be called "smoke" then the damage caused by the residue of the
7   dust on the SMOLKERS' property was covered, but that TIG would not accept that solid
8   particles suspended in a gaseous medium is a satisfactory definition of smoke. The SMOLKERS
9   claimed, among other things, that the pesticide contamination was damage caused by smoke and
10  malicious mischief. In early June 1996 TIG had an opinion letter sent to the SMOLKERS that
11  concluded there was no coverage without discussing the Henri case or the illegality and
12  unlawfulness of the conduct of HSTCI. Eventually, in early July, 1997, TIG informed the
13  SMOLKERS that TIG did not want any more information from the SMOLKERS.

14      192. The SMOLKERS are informed and believe and based thereon allege that TIG
15  intends to and will continue to deny and withhold benefits due to the SMOLKERS unless and
16  until compelled to pay such benefits by a final judgment of this court.

17      193. As a direct and proximate result of the conduct of TIG, the SMOLKERS have
18  sustained substantial compensable losses, including benefits withheld, and economic losses such as
19  loss of time, loss of each other's companionship, loss of time with their children, loss of earnings
20  and earning capacity, reduced value of their home, loss of the quiet and peaceful use and
21  enjoyment of their home, being forced to live in an unhealthy environment, physical injury pain
22  and damage, and severe mental and emotional damage, and attorney fees in amounts not yet fully
23  ascertainable but within the jurisdiction of this court in an amount to be proved at trial.

24      194. Those breaches were flagrant, willful and wanton and were undertaken by TIG
25  solely to protect its own pecuniary interests, without regard to its obligations under the policies or
26  to the SMOLKERS' interests. TIG's conduct described herein was done willfully with a
27  conscious disregard of the SMOLKERS' rights and with intent to vex, cause unjust hardship to,

28

-122-

XC2nd227

1  injure and to annoy the SMOLKERS, such as to constitute oppression, fraud and malice under

2  California Civil Code Section 3294 and the SMOLKERS should recover in addition to actual

3  damages, punitive damages to make an example of and to punish TIG.

### ELEVENTH CAUSE OF ACTION

5  (Against TIE, FIG, FGI, TUA, CIC, CAINCO, COREGIS, RELIANCE and FRONTIER

6  for Breach of Contract and for Negligent Performance of An Undertaking to Render Services)

7  195.  The SMOLKERS hereby refer to and incorporate by reference each and every

8  allegation in paragraphs 32, 40, 99, 124, 163, and 164 of this Cross-complaint.  The subject

9  matter of this cause of action is negligent performance of undertakings to render services and

10  insurance coverage under various insurance policies in which cross-complainants are not

11  specifically named as insured.  Cross-complainants claim to be intended insured, and intended

12  beneficiaries, by virtue of the wording of policies, the specific laws under which certain policies

13  were issued, by virtue of representations made by insurance carriers to government and to the

14  public, and by virtue of representations made by carriers during their processing of cross-

15  complainants' claims.  The subject matter of this cause of action is also negligent performance of

16  undertakings to render services against cross-defendants who represented to cross-complainants

17  that they would promptly and professionally investigate cross-complainants' claim and/or take

18  care of the pesticide contamination in cross-complainants' home.  Cross-defendants named in this

19  cause of action are insurance carriers and claims' adjusters for insurance carriers who handled

20  cross-complainants property damage claim and medical benefits claim with respect to property

21  damage and physical injuries arising out of pesticide contamination of their home, negligent home

22  improvement work done at their home, and/or negligent maintenance of the PREMISES, and in

23  the case of TIE for earthquake damages, wind damages and other damages to the PREMISES.

24  Pursuant to the terms of their respective insurance policies, each insurance carrier named in this

25  cause of action, is jointly and severally liable for property damages caused by HSTCI's application

26  of pesticides at the PREMISES.

27

28

-123-

1       196. All conditions precedent to recovery under the insurance policies and bonds

2 identified below have either been satisfied, waived or are the subject of an estoppel.

3       197. Cross-complainants have given all cross-defendants named in this cause of action

4 notice of cross-complainants' claims in great detail. Said claims have been described with

5 particularity in notices sent from time to time to the cross-defendants, and each of them.

6       198. In breach of their respective insurance policies and/or bonds and representations to

7 cross-complainants, cross-defendant insurance carriers, and each of them, have failed and refused

8 to provide the insurance benefits as required by their respective insurance policies and/or bonds.

9       199. As a result of these breaches, the cross-defendants and each of them, are liable to

10 cross-complainants for damages in an amount yet to be ascertained for all costs of investigation,

11 all costs of mitigation of damages, cost to repair damaged property, cost to replace contaminated

12 property, cost to prosecute third party law suits that have arisen out of the pesticide

13 contamination, defense of third party law suits that have arisen out of this claim, cost to remediate

14 the pesticide contamination of their home and of the PREMISES, costs to repair the faulty

15 construction carried out by HSTCI, and for loss of time, loss of earnings, loss of earning capacity,

16 medical and dental expense, hospital expense, expense for medicines, pain and suffering, and

17 physical injuries suffered by GARY SMOLKER, and mental pain and suffering suffered by the

18 SMOLKERS, in an amount to be proved at time of trial.

19       200. Cross-defendants RELIANCE INSURANCE COMPANY (hereinafter

20 RELIANCE), and FRONTIER PACIFIC INSURANCE COMPANY (hereinafter FRONTIER)

21 are, and at all relevant times herein mentioned were, business entities transacting business in Los

22 Angeles County, California as insurance companies. RELIANCE and FRONTIER issued

23 statutory bonds, HSTCI and MORRIS were required by law to obtain, to provide payment to any

24 member of the public, such as the SMOLKERS, for damages resulting from work performed by

25 HSTCI and/or MORRIS and/or arising out of HSTCI's or MORRIS' fraudulent business

26 practices and/or willful and deliberate violation of applicable laws. The SMOLKERS have

27 suffered damage resulting from work performed by HSTCI and by MORRIS and have suffered

28

-124-

XC2nd227

1  damages arising out of HSTCI's and MORRIS's fraudulent business practices and willful and

2  deliberate violation of applicable laws.  The SMOLKERS have made claims for reimbursement of

3  the damages they suffered as a result of HSTCI's and MORRIS's work and for damages cross-

4  complainants suffered as a result of HSTCI's and MORRIS's fraudulent and willful and deliberate

5  violation of applicable laws to each of the insurance carriers named in this cause of action.

6       201.  FRONTIER issued its bond number 824118 on or about June 15, 1993, under the

7  surety name of Contractor's Surety Company, which was in effect at all times material to this

8  cause of action, and issued a blanket endorsement to that contractor's bond on April 18, 1994,

9  under the name FRONTIER which was in effect at all times material to this cause of action.  As a

10  matter of law, pursuant to *Business & Professions* Code § 7071.5, the SMOLKERS are intended

11  beneficiaries under the bond and under the blanket endorsement to bond issued by FRONTIER.

12  RELIANCE issued its bond number B2443649, on or about January 9, 1995, which was in effect

13  at all times material to this cause of action.  As a matter of law, pursuant to *Business &*

14  *Professions* Code §§ 8697 and 8697.2, the SMOLKERS are intended beneficiaries under the

15  bond issued by RELIANCE.

16       202.  Cross-defendant Truck Insurance Exchange (hereinafter TIE) issued insurance

17  policy number 09287-08-30 to the HOA.  The policy has been in effect since 1986 and continues

18  to date.  It was in effect at all times material to this cause of action.  The policy provides

19  commercial property, commercial general liability coverage, directors and officers liability

20  coverage, and medical payment coverage.  The SMOLKERS are intended beneficiaries, direct

21  insureds and additional insureds under the policy.  The policy provides for costs of repair or

22  replacement of damaged property (i.e. the COMMON AREA), reimbursement for losses or loss

23  of use of property (i.e. the COMMON AREA), and for payment of medical expenses for any

24  injury which occurs on the premises located at 15 63rd Ave., Playa del Rey, CA. (hereinafter the

25  INSURED PROPERTY) caused by an accident on the INSURED PROPERTY because of the

26  HOA's operation of the INSURED PROPERTY.  Medical payments are to be made regardless of

27  fault.  TIE's insurance policy provides coverage for bodily injury, property damage, personal

28

XC2nd227

injury and medical expenses arising out of the HOA's maintenance or use of the premises and operations necessary or incidental to those premises. In March 1997 the SMOLKERS submitted a written property damage claim to TIE with respect to the chemicals injected into the walls of the premises (COMMON AREA) by HSTCI and requested that TIE pay to remedy this property damage immediately to minimize and prevent future damage, i.e. before the pesticide/property damage snowballed to cause additional bodily injuries to persons living in the PREMISES and further property damage to the COMMON AREA and to the property of the individuals living in the PREMISES. TIE was advised that the pesticide was causing bodily injury to claimant. TIE, TUA, FIG, and FGI undertook to remove the pesticide on the carpets, on the furniture, and in the air handling equipment in the SMOLKERS' home. However, instead of doing what TIE, TUA, FIG and FGI undertook and promised to do, TIE, TUA, FIG, and FGI impeded, interfered with and obstructed the SMOLKERS' efforts to have the pesticide removed from their carpets, furnishings, air handling equipment in their home. TIE, et al. failed and refused to take any positive action to deal with the pesticide contamination property damage, to fix the problem after TIE et al. undertook to do so. Later the SMOLKERS asked TIE to pay for the wind damage and earthquake damage to the PREMISES covered by TIE's policy. TIE refused to inspect for such damages and refused to pay such damages. Later, the SMOLKERS asked TIE to reimburse the SMOLKERS for medical expenses incurred due to the HOA negligent management of the PREMISES. TIE also failed and refused to pay for medical expenses.

203. Cross-complainants are informed and believe, and based upon such information and belief allege: Cross-defendant TIE is, and at all times material herein was, a California corporation, transacting business in California as a liability insurance carrier. TIE represents itself as conducting business, and does conduct its business, as part of an insurance holding company group of companies known as the Farmers Insurance Group of Companies (hereinafter FIG). TIE is part of an inter-company reinsurance agreement with other members of FIG, has one or more cost allocation arrangement(s) and participates in a number of involuntary pooling agreements with members of FIG. FIG markets itself and its members as being members of a group who

-126-

XC2nd227

1   share claims offices and claims adjusters throughout the United States to provide assistance when

2   policyholders of any insurer in the group need help enabling their policyholders to recover from

3   their losses with a minimum of inconvenience. Prior to the HOA's purchase of TIE/FIG insurance

4   at issue in this action, TIE and FIG promised to provide the SMOLKERS *Fast, Fair, Friendly*

5   *Service* in responding to claims under TIE policies, including the claim presented by the

6   SMOLKERS to TIE and FIG that is at issue in this case. Other insurance carrier members of FIG

7   include Farmers Insurance Exchange, Fire Insurance Exchange, Mid-Century Insurance Company,

8   Farmers New World Life Insurance Company, Farmers Insurance Company of Washington, and

9   Texas Farmers Insurance Company.

10   204. In concert with TIE's and FIG's joint method of doing business, claims for damages

11   which are classified as environment claims by TIE are referred by TIE to the Environmental

12   Claims Unit of FIG for processing and adjustment. TIE and FIG represent themselves as being

13   expert in handling environmental contamination problems, remediation of environmental

14   contamination, and adjusting environmental claims under property damage and liability insurance

15   coverage insurance policies. In 1996 FIG had reserves of approximately \$99,800,000 for

16   environmental related losses, and paid approximately \$12,900,000 as payments for environmental

17   losses and loss adjustment expenses. TIE, FIG, FGI, and TUA hold themselves out to the public

18   and represent themselves as being experts in adjusting environmental contamination claims and in

19   providing fast fair adjustment services with respect to environmental contamination claims.

20   205. After the SMOLKERS discovered the common area of the PREMISES had suffered

21   property damage due to the presence of an illegal poison therein which was trespassing from the

22   common areas of the PREMISES into their living quarters and into the common area hallway,

23   through the common area walls, etc., the SMOLKERS presented a property damage claim to TIE

24   and FIG. Thereafter, TIE referred the claim received from the SMOLKERS' to the

25   Environmental Claims Group of FIG for processing and adjustment. Then GARY SMOLKER

26   (hereinafter GS) was contacted by Raymond Holybee (hereinafter HOLYBEE) from FIG who

27   said FIG would undertake to take care of the pesticide contamination problem, and would

28

-127-

XC2nd227

1  coordinate with HSTCI and HSTCI's insurance carrier in taking care of the pesticide
2  contamination problem.

3      206.  Farmers Group, Inc. (FGI) is a Nevada corporation doing business in California and
4  a member of FIG. FGI is a management company, not an insurance company. FGI manages, runs
5  and administers the affairs of FIG. Cross-defendant Truck Underwriters Association (TUA) is a
6  California corporation, 100% owned by FGI. TUA has a management agreement with TIE
7  whereby TUA manages certain of the business affairs of TIE as part of the FIG insurance holding
8  company relationship described above. All of these entities work together in adjusting claims
9  presented to TIE or FIG. They all promise to provide fast friendly service to each others clients,
10 customers and insureds.

11     207.  In early May, GARY SMOLKER was contacted by Raymond Holybee (on May 2,
12 1997) of Truck Insurance Exchange (hereinafter TIE) and Farmers Insurance Group of
13 Companies (hereinafter FIG), by Carol Trimble (hereinafter TRIMBLE), on May 5, 1997, of
14 Coregis Insurance Company (hereinafter CIC), California Insurance Company (hereinafter
15 CAINCO) and Coregis Group, Inc. (hereinafter COREGIS), and by Joseph Fedoruk (hereinafter
16 FEDORUK) (on May 8, 1997). HOLYBEE said he/TIE and FIG would wet vacuum the carpets
17 in the SMOLKERS' an clean out all the air vents and air handling equipment as a means of trying
18 to mitigate the damages being suffered by the SMOLKERS and would contact HSTCI, CIC,
19 CAINCO, and COREGIS to do so as a joint venture. FGI, FIG, TUA, and TIE undertook to do
20 this work for the SMOLKERS. GARY SMOLKER replied that would probably be a half
21 measure that would not solve the problem but it would be okay to try if someone with a
22 appropriate scientific background certified that it was safe to do. TRIMBLE said she was sent by
23 an insurance carrier who had issued an insurance policy to HSTCI to solve the pesticide
24 contamination problem in the SMOLKER home and asked if it would be okay to send an
25 industrial hygienist to do an investigation to determine what needed to be done. COREGIS,
26 CAINCO and CIC undertook to remediate the pesticide contamination problem in the
27 SMOLKERS' home. GARY SMOLKER replied that would be okay as long as whatever was

28

XC2nd227

1   done was safe, and posed no danger to the SMOLKERS and whoever conducted the investigation
2   explained what they were going to do before they did anything in the SMOLKERS' home.
3   GARY SMOLKER explained to TRIMBLE that he wanted the carpets removed, drywall
4   removed, etc. to get rid of the chemical dust in the condo and in the walls surround the condo and
5   he would explain to TRIMBLE's investigator why he thought that was the way to fix the
6   pesticide contamination problem.  GARY SMOLKER asked TRIMBLE for information on the
7   product used by HSTCI, including the product label, with what government agencies the product
8   was registered, who approved the product for use as a pesticide, how it was supposed to be used
9   to assure safety, whether it was permissible to use it in a place where people lived, and how was it
10  supposed to be cleaned-up if it were spilled, leaked or otherwise contaminated a human residence.
11  TRIMBLE said she would obtain this information and get back to GARY SMOLKER.  GARY
12  SMOLKER gave TRIMBLE Mr. Holybee's phone number and TIE's claim number, and related
13  that HOLYBEE had proposed that an industrial cleaning company clean all carpets and air ducts
14  in the SMOLKERS' home.  FEDORUK told GARY SMOLKER he had been hired by COREGIS
15  to ascertain the extent of the pesticide contamination and to advise the SMOLKERS and
16  COREGIS how to handle the pesticide contamination and had been told that GARY SMOLKER
17  wanted him (FEDORUK) to inspect the SMOLKERS' home.  FEDORUK undertook, on behalf
18  of and as the agent of COREGIS, CIC, CAINCO and TIE and FIG to advise the SMOLKERS on
19  how to solve the pesticide contamination problem in the SMOLKERS' home.  FEDORUK said he
20  hadn't seen the product label for the pesticide applied in the SMOLKERS' home, didn't know
21  what chemical was applied or if the chemical pesticide applied is a registered pesticide.  GARY
22  SMOLKER informed FEDORUK that the SMOLKERS wanted new carpets and soft goods, the
23  air handling equipment replaced and the silica gel pesticide removed or encapsulated, explained
24  why he thought this was the right approach to handling the pesticide contamination problem, and
25  that he (GARY SMOLKER) was waiting for answers to questions he previously posed to HSTCI
26  and TRIMBLE.  GARY SMOLKER was led to believe that COREGIS was the insurer for
27  HSTCI and GARY SMOLKER is and was a third party beneficiary and intended insured under
28

XC2nd227

1   HSTCI's liability insurance policy and under bonds issued to HSTCI and to MORRIS.  GARY
2   SMOLKER had several conversations and written communications with FEDORUK from May
3   through July 1997, and understood that FEDORUK had agreed, on behalf of CAINCO,
4   COREGIS, CIC and TIE and FIG to try to protect the SMOLKERS from the harmful effects of
5   being continuously exposed to the pesticide applied in their home by HSTCI.  FEDORUK was
6   apprised that GARY SMOLKER and the SMOLKERS' children were in physical agony from the
7   effect of the pesticides applied by HSTCI in the PREMISES and invited to inspect GARY
8   SMOLKER's condominium on several occasions.  FEDORUK promised to advise GARY
9   SMOLKER how he (FEDORUK) would test for the amount of synthetic amorphous silica in the
10  air in GARY SMOLKER's condominium by use of NIOSH Method 7501 for analyzing
11  amorphous silica and to send GARY SMOLKER a copy of NIOSH Method 7501 for analyzing
12  amorphous silica, but never did so.  FEDORUK failed to give any advise on how to deal with the
13  pesticide contamination and refused to answer follow-up questions posed to FEDORUK in
14  response to FEDORUK's discussion of how he would test for the presence of pesticide on how
15  FEDORUK proposed to measure the extent of pesticide contamination in GARY SMOLKER's
16  condominium.  FEDORUK failed to warn the SMOLKERS of the dangers and concealed the
17  dangers of coming in contact with and/or of inhaling the synthetic amorphous silica gel injected
18  into the SMOLKERS' living quarters by HSTCI.  FEDORUK, TRIMBLE, HOLYBEE,
19  BABBITS and DEAN & ASSOCIATES dragged out their dealings with the SMOLKERS, set the
20  SMOLKERS up to be ambushed by COREGIS, CIC, CAINCO, TIE, and HSTCI, prevented
21  third persons (Offerman and Indoor Environmental Engineering) from giving aid to the
22  SMOLKERS, negligently failed to perform their undertakings to render services for the
23  SMOLKERS and negligently or intentionally failed to warn the SMOLKERS of dangers they
24  knew they or should have known, as more particularly set forth in other causes of action.

25      208.  Cross-defendant COREGIS GROUP, INC. (hereinafter COREGIS) is a Delaware
26  Corporation transacting business in California as a holding company which owns 100% of the
27  stock of COREGIS INSURANCE COMPANY (CIC) and 100% of the stock of CALIFORNIA

28

-130-

XC2nd227

INSURANCE COMPANY (CAINCO). At all times mentioned in this cause of action, cross-defendants COREGIS, CIC and CAINCO operated as members of a multi-functional insurance holding company team known as the Coregis Insurance Organizations. At all times material hereto, CAINCO and CIC were, and still are, in the specialty insurance program business and were, and still are, specialists in pesticides and pest control operations. At all times herein mentioned, CAINCO and CIC wrote specially designed liability insurance policies for pest control operators under which pesticide exposure claims are to be administered by COREGIS, CIC and CAINCO as part of the Coregis Insurance Organizations (hereinafter CIO). As part of their business CIO issued Policy Number PC913-2999 to HSTCI through California Insurance Company, and filed a Certificate of Insurance with the Structural Pest Control Board of the State of California in which CIO and CAINCO certified that Commercial General Liability Policy No. PC913-2999 issued to HSTCI fulfills all the requirements set forth in Article 9 (commencing at Section 8890) of Chapter 14, Division 3 of the State of California. As a matter of law, pursuant to *Business & Professions* Code §§ 8690 and 8692, the SMOLKERS are intended beneficiaries of CAINCO policy number PC913-2999. As a matter of law, pursuant to the Certificate of Insurance and certifications made therein, which were filed by CAINCO and CIO with the Structural Pest Control Board, the SMOLKERS are intended beneficiaries under CAINCO policy number PC913-2999. CAINCO policy number PC913-2999 was in effect at all times material to this cause of action. Policy number PC913-2999 was in effect from at least 12/1/95 through 12/1/97. CAINCO policy number PC913-2999 contains, as part of its "Coverage C. Medical Payments" coverage for medical expenses for bodily injury caused by an accident. The SMOLKERS are intended beneficiaries and direct beneficiaries of this coverage. Further details of this coverage are described in paragraph 224 below.

209. Cross-defendant CIC is, and at all times herein mentioned was a Indiana corporation transacting business in California as an insurance company. Cross-defendant CAINCO is, and at all times herein mentioned was, a California corporation transacting business in Los Angeles, California as an insurance company. Now, and at all times mentioned in this cause of action,

-131-

XC2nd227

1    CAINCO did not have any employees; COREGIS and/or CIC managed the affairs of CAINCO.

2    210. At all times herein mentioned, COREGIS, CIC and CAINCO knew HSTCI was

3    required by law to carry general liability insurance in a form approved by the Structural Pest

4    Control Board as a condition of doing business in California under California *Business and*

5    *Professions Code Sections 8690, 86992, and 8692.* Insurance in force during all times material to

6    this cause of action was obtained by HSTCI from the Coregis Insurance Organizations and

7    provides coverage for loss due to damage to property or destruction of property, coverage for

8    loss due to bodily injury, sickness or disease as a result of an accident or occurrence due to any

9    activity of HSTCI which requires a license under Chapter 14 of the *Business and Professions*

10   *Code.* Liability insurance obtained by HSTCI from CIC and/or CAINCO, which was in force at

11   all times material to this cause of action, contains a medical pay provision which requires

12   CAINCO (and through other inter-company arrangements CIC) to pay the SMOLKERS' medical

13   expenses arising out of HSTCI's inspection services and/or pesticide application at the

14   PREMISES regardless of fault. Under the medical pay provision, CAINCO is to pay for the

15   SMOLKERS' medical expenses regardless of fault, including necessary medical, surgical, x-ray

16   and dental services, and necessary hospital services.

17   211. The SMOLKERS presented a claim for damages to HSTCI, MORRIS and CAINCO

18   with respect to damages the SMOLKERS had suffered as a direct result of MORRIS's and

19   HSTCI's negligent, fraudulent and illegal conduct. COREGIS, CAINCO and CIC promised to

20   fix the pesticide contamination in the SMOLKERS' home and directed the SMOLKERS to work

21   with JOSEPH FEDORUK, who is purportedly an expert in residential pesticide contamination

22   remediation, in order to have the problem professionally taken care of by the Coregis Insurance

23   Organizations. At the time the SMOLKERS were first contacted by the Coregis Insurance

24   Organizations the SMOLKERS did not know that an unregistered poison had been applied in

25   their home or that HSTCI had broken the law by applying SYLOID 244 in the PREMISES or

26   that it was against the law to possess or to use SYLOID 244 as a pesticide or appreciate the

27   dangers they were being exposed to by being exposed to SYLOID 244 and by being exposed to

28

-132-

XC2nd227

1    whatever chemical HSTCI had applied in their garage area.

2        212.  TRIMBLE represented to the SMOLKERS and undertook on behalf of CIO,
3    CAINCO, COREGIS, and CIC, it was the SMOLKERS' understanding after speaking to
4    TRIMBLE, and this understanding was solidified in several conversations and correspondence
5    with TRIMBLE, that COREGIS et al. would proceed rapidly to have the SMOLKERS' home
6    inspected to find out how to remediate the pesticide problem, and that that SMOLKERS were to
7    wait for FEDORUK to carry out his inspection before removing their contaminated furniture and
8    taking other steps to clean-up their home.  In reliance on the representation by TRIMBLE that
9    COREGIS et al. would proceed diligently and rapidly, through FEDORUK, to inspect the
10   SMOLKERS' home for the purpose of figuring out what should be done, the SMOKERS held off
11   on having their furniture disposed of, their carpets removed, etc. to get rid of the pesticide.  Had
12   the SMOLKERS known that FEDORUK would never come to their home and how irritating,
13   harmful, and dangerous it was to be continuously exposed to SYLOID 244 and to inhale
14   SYLOID 244 they would have proceeded rapidly to have their carpets removed, their upholstered
15   furniture removed, their walls sealed, etc. instead of being delayed until May 1998.  After the
16   SMOLKERS realized that COREGIS et al., and TIE et al., and RELIANCE and FRONTIER
17   were not going to have someone inspect the Smolkers' home, were not going to do anything to
18   help, and their children were getting sicker and sicker by being exposed to the pesticide applied in
19   their home by HSTCI the SMOLKERS had their carpets removed and replaced, the walls of their
20   home refinished sealed and painted, their air handling equipment air ducts cleaned out, etc.  This
21   remediation work was accomplished on or about May 1998 after constant assurances that
22   COREGIS and that TIE and FIG would take care of the problem and would send someone out to
23   inspect the SMOLKERS' home proved to be untrue.

24       213.  JOSEPH FEDORUK (FEDORUK) at all times material herein represented himself
25   to be a qualified analytical chemical expert, expert in how to detect and clean

26       214.  In 1996 and 1997 the SMOLKERS were, and still are, intended beneficiaries and
27   third party beneficiaries under insurance policies issued by TIE, CIC, and CAINCO, and under

28

-133-

XC2nd227

1    bonds issued by RELIANCE and FRONTIER. The SMOLKERS, and each of them, have

2    performed all conditions, terms, and covenants required by them under said liability policies and

3    bonds unless otherwise excused or equitably relieved therefore as not being prejudicial to the

4    insurers sued in this cause of action. The SMOLKERS cooperated with TIE, CIC, CAINCO,

5    RELIANCE, and FRONTIER by not removing their contaminated furniture and carpets while

6    waiting for TIE, CIC, et al to finish the investigation they promised to do. But TIE, CIC,

7    CAINCO, RELIANCE and FRONTIER so negligently performed their undertaking to promptly

8    investigate the pesticide contamination problem and to advise the SMOLKERS how to take care

9    of the pesticide contamination problem and the result of their investigation, that the SMOLKERS

10   were unduly exposed to pesticide poisons and suffered damages as a direct result thereof in an

11   amount to be proved at time of trial.

12       215. In 1977 the SMOLKERS submitted claims to TIE, CIC, and CAINCO under their

13   respective insurance policies, and to RELIANCE and FRONTIER under their respective bonds

14   for property damages (physical injury to tangible property and loss of use of property) and

15   medical expenses and bodily injuries suffered as a direct and proximate result of the illegal,

16   wrongful, dishonest, fraudulent and negligent conduct and malicious mischief and vandalism of

17   HSTCI described herein. Under the TIE policy the SMOLKERS also submitted a claim for

18   earthquake damage, and wind damage, as well as a claim for negligent management of the

19   PREMISES.

20       216. Eventually, after the passage of much time and many interactions with the

21   SMOLKERS, TIE, CIC, CAINCO, RELIANCE and FRONTIER each denied the SMOLKERS'

22   claim submitted to them. The failure and refusal of TIE, CIC, CAINCO, RELIANCE and

23   FRONTIER to accept the individual claim submitted to them individually was a breach of their

24   insurance agreements, policies and bonds and of their undertaking to render prompt investigation

25   services for the SMOLKERS. The failure of TIE, FIG, FGI, TUA, CIC, CAINCO and

26   COREGIS to clean up the pesticide contamination in the SMOLKERS' home was a breach of

27   their undertaking to do so. As a direct and proximate result of this conduct the SMOLKERS

28

-134-

XC2nd227

1   have sustained substantial compensable losses, including but not limited to loss of time, property

2   damage, medical and dental expenses, hospital expenses, benefits withheld, and economic losses

3   such as loss of earnings and earning capacity, reduced value of their home, loss of the quiet and

4   peaceful use and enjoyment of their home, loss of use of property, being forced to live in an

5   unhealthy environment, physical injury to GARY SMOLKER and pain and damage, and severe

6   mental and emotional damage to both SMOLKERS, costs of being involved in this action, costs

7   to investigate, costs to remediate the pesticide damage, cost to repair or replace contaminated

8   property, and attorney fees in amounts not yet fully ascertainable but within the jurisdiction of this

9   court in an amount to be proved at trial.

10       217. The SMOLKERS are informed and believe and based thereon allege that TIE, CIC,

11   CAINCO, RELIANCE and FRONTIER intend to and will continue to deny and withhold

12   payments due to the SMOLKERS unless and until compelled to pay such benefits by a final

13   judgment of this court.

14       218. As a direct and proximate result of these breaches, the SMOLKERS have suffered

15   the following damages: GARY SMOLKER, JUDI SMOLKER, LEAH SMOLKER, and Caramel

16   have been continuously exposed to pesticide applied by HSTCI in their home, have been denied of

17   their peaceful possession, use and enjoyment of their home, have been forced to move out of their

18   home, have been forced to pay rent to live in a hotel, have been forced to pay extraordinary sums

19   for food and lodging while living out of their home, have had their personal property damaged

20   and destroyed, have been made ill, have been injured and hurt in their health, strength and activity,

21   sustaining injury to their nervous system and person, have suffered various physical injuries which

22   have caused them great mental, physical and nervous pain and suffering all to GARY

23   SMOLKER's and ALICE SMOLKER's damage in an amount to be proved at time of trial.. As a

24   proximate result of these beaches ALICE SMOLKER has been continuously exposed to the

25   pesticide, has been denied the peaceful possession, use and enjoyment of her home, and has had

26   her personal property destroyed and damaged all to her damage in an amount to be proved at time

27   of trial. Seeing the physical injury, pain and suffering, endured by GARY SMOLKER, JUDI

28

-135-

1  SMOLKER, LEAH SMOLKER and Caramel has caused great mental and nervous pain and

2  suffering and emotional damage to ALICE SMOLKER all to her damage in an amount to be

3  proved at time of trial.  As a result of such injuries the SMOLKERS have suffered general

4  damages within the jurisdiction of this court in an amount to be proved at time of trial.

5      219.  As a direct and proximate result of these breaches, acts and omissions of cross-

6  defendants and each of them sued in this cause of action, as herein alleged, GARY SMOLKER's,

7  JUDI SMOLKER's, and LEAH SMOLKER's illnesses, and injuries as above stated, were

8  aggravated thereby further injuring GARY SMOLKER, JUDI SMOLKER, and LEAH

9  SMOLKER, in their health, strength and activity, and causing further injury to their body and

10  shock and injury to their nervous system, all of which injuries have caused and continue to cause

11  further physical injury to GARY SMOLKER to his damage in an amount to be proved at time of

12  trial and to cause the SMOLKERS, and each of them, great mental, physical and nervous pain and

13  suffering and the SMOLKERS, and each of them, have been damaged thereby in a further sum

14  within the jurisdiction of this court to be proved at time of trial.

15      220.  As a further direct and proximate result of these breaches, acts and omissions of

16  cross-defendants sued in this cause of action, and each of them, alleged herein, the SMOLKERS

17  have been required to spend money and incur obligations, and will continue to spend money and

18  incur obligations, for medical services, dental services, X-rays, drugs and sundries reasonably

19  required in the treatment and relief of the injuries herein alleged, and have been forced to become

20  involved in litigation with other cotenants who also own an undivided interest in the common area

21  of the PREMISES, the SMOLKERS' insurance carrier (TIG Insurance Company), HOA, TIE, et

22  al., and have lost their time, their ability to make a living, earnings, earnings capacity and will lose

23  future earnings, have incurred and paid litigation costs, have been unable to promote their

24  business in the fashion they would otherwise be able to promote their business, have been

25  rendered unavailable to take on work they would otherwise be capable of taking on, have had to

26  deplete their savings and borrow money to pay living expenses and to pay business expenses, have

27  been required to spend money and incur obligations, and will continue to spend money and incur

28

-136-

XC2nd227

1   obligations, for replacement of contaminated personal property (i.e. bedding, furniture, etc.), for

2   hauling away and disposal of contaminated property, for work done and to be done in an attempt

3   to clean-up and remove pesticide contamination from the air in their living quarters, from their

4   carpets, and other soft goods, etc., and have incurred and paid expenses and charges for repair

5   and construction work and painting to seal and repair holes drilled by HSTCI and sloppy "fix-up"

6   "caulking work done by HSTCI's fix-up crews and to fill and patch openings in walls and ceilings

7   and to seal walls and ceilings in an attempt to minimize the amount of pesticide that can escape

8   from the voids between the walls and ceilings of the PREMISES and thereafter enter into the

9   SMOLKERS' living quarters and will continue to incur and pay further expenses in connection

10  with efforts to mitigate damages caused by pesticide contamination, to prevent further pesticide

11  contamination, to remove residual pesticide contaminants, to replace contaminated items of

12  personal property, and will incur additional expenses for a new termite treatment of the

13  PREMISES, all to the SMOLKERS' damage in an amount to be proved at time of trial..

14      221.  As a proximate result of the fraudulent and illegal conduct of HSTCI, MORRIS, RT,

15  and Roes 1-25, and each of them, which led to the contamination of the PREMISES by HSTCI's

16  pesticide and recontamination and continuous contamination of the SMOLKERS' home by the

17  pesticide applied by HSTCI, it is necessary to, and when the Smolkers have enough money they

18  will, remove interior walls of GARY SMOLKERS' condominium , vacuum out pesticide residing

19  in the wall voids, and then replace the insulation and drywall and repaint same, remove and

20  replace duct work and air-handling equipment contaminated with pesticide, all to the

21  SMOLKERS' damage in a sum to be proved at trial.  As a further and proximate result of the

22  fraudulent conduct of HSTCI, MORRIS and RT, and each of them, herein alleged, the

23  SMOLKERS have been  prevented from attending to their usual occupation and lost earnings and

24  earnings capacity and are informed and believe and thereon allege that they will be prevented from

25  attending to their usual occupation in the future and will thereby sustain future loss of earnings all

26  to their damage in an amount to be proved at trial.  As a further result of the conduct of cross-

27  defendants and each of them, the SMOLKERS have been threatened by their neighbors, the

28

-137-

XC2nd227

1  SMOLKERS have been forced to become involved in controversies with other parties to this

2  litigation and have been prevented them from attending to their usual occupation and have lost

3  earnings and earning capacity as a direct result thereof. The SMOLKERS are informed and

4  believe and thereupon allege that as a direct result of the conduct of cross-defendants and each of

5  them, the SMOLKERS will continue to be involved in controversies with other parties to this

6  litigation and will lose further earnings and earning capacity as a result thereof. As a direct result

7  of the conduct of cross-defendants and each of them, the quality of the SMOLKERS life has been

8  diminished, the SMOLKERS have lost the free and comfortable use of their personal property and

9  their ability to enjoy the peaceful possession, use and enjoyment of their home, and the value of

10  GARY SMOLKER's condominium has been depreciated and stigmatized, all to the SMOLKERS

11  damage in a sum to be proved at time of trial:

12  222. As a further proximate result of breaches, acts and omissions of cross-defendants

13  and each of them alleged in this cause of action, the SMOLKERS have suffered the following

14  additional injuries: they have had to spend the SMOLKERS' money on costs of repair, cost to live

15  somewhere else, cost to replace contaminated personal property, and have lost time by being

16  unnecessarily required and needed to deal with pesticide contamination related matters because

17  cross-defendants and each of them negligently failed to perform the services they undertook to

18  perform and failed to promptly investigate the pesticide contamination problem. As a further

19  result of these breaches the SMOLKERS have been emotionally and financially exhausted, have

20  been forced to lower their living style, have had their privacy breached, have been humiliated and

21  caused to suffer emotional distress, all to their damage in an amount to be proven at time of trial.

22  223. Each of the cross-defendants named in this cause of action negligently breached the

23  undertaking to render services they undertook to perform on behalf of the SMOLKERS.

24  ## TWELFTH CAUSE OF ACTION

25  (Against TIE, CIC, CAINCO, and RELIANCE for

26  Bad Faith Breach of Insurance Contract)

27

28

-138-

XC2nd227

1    224.  The SMOLKERS reallege and incorporate herein by reference each and every

2    allegation contained in paragraphs 195 through 217 of this Cross-complaint.

3    225.  Each and every insurance policy or bond sold to HSTCI or MORRIS or HOA

4    described in this cause of action by TIE, CAINCO, CIC, and/or RELIANCE imposed upon TIE,

5    CAINCO, CIC and RELIANCE an absolute duty of good faith and fair dealing and duty to

6    consider the SMOLKERS' interests at least equally with its own in making coverage decisions

7    and in conducting investigations of the SMOLKERS' claims.  In refusing to promptly and

8    competently investigate the SMOLKERS' claims, as alleged above, TIE, CAINCO, CIC and

9    RELIANCE knowingly acted in a manner that conflicted with the interests of the SMOLKERS,

10    and willfully and in bad faith considered their own interests and disregarded the interests of the

11    SMOLKERS.  In refusing to provide the insurance benefits owing to the SMOLKERS and in

12    TIE, CIC, CAINCO and RELIANCE have failed to fulfill the representations of coverage in their

13    policies.  TIE, CIC, CAINCO, and RELIANCE have failed to provide the SMOLKERS the

14    coverage they are entitled to as third party beneficiaries and intended beneficiaries.  In breach of

15    their covenant of good faith and fair dealing TIE, CIC, CAINCO, and RELIANCE did not

16    honestly evaluate the SMOLKERS but instead conspired with COREGIS, and HSTCI to give the

17    SMOLKERS a run-around and to interfere with and destroy the SMOLKERS ability to do

18    business with Offerman and with Indoor Environmental Engineering, and prevented Offerman and

19    Indoor Environmental Engineering from providing assistance to the SMOLKERS  As a result of

20    such conduct the SMOLKERS have incurred and continue to incur damages in an amount to be

21    proved at time of trial.  TIE, CIC, CAINCO, RELIANCE, and FRONTIER made less than a

22    perfunctory investigation of the SMOLKERS claim, each of them failed and refused to come to

23    the SMOLKERS' residence to see what the SMOLKERS were talking about, each chose sides

24    and to be hostile to the SMOLKERS and set the SMOLKERS adrift to deal with and be involved

25    in FEDORUK's sham and non-existent inspection of the SMOLKERS' home.  TIE did not reply

26    to the SMOLKERS many letters of inquiry, but instead without any substantiation told the

27    SMOLKERS neighbors that the material injected into the PREMISES by HSTCI was safe, and

28

-139-

XC2nd227

1  TIE would work on getting the SMOLKERS' rugs cleaned and air handling equipment clean, but
2  instead harassed the SMOLKERS all to the SMOLKERS damage in an amount to be proved at
3  time of trial. Evidence available to TIE, CAINCO, CIC, and RELIANCE, which TIE, CAINCO,
4  CIC, and RELIANCE did not seek to discover, but instead consciously ignored, shows losses
5  complained about by the SMOLKERS are covered losses under TIE's policy, CAINCO's policy,
6  and RELIANCE's bond.

7      226. On or about August 11, 1997, GS received a letter from DOODY on behalf of
8  RELIANCE. This letter was a "run-around" letter and the beginning of bad-faith harassment by
9  RELIANCE, in which RELIANCE started denying RELIANCE had received the information sent
10 to RELIANCE and began to be completely unreasonable. In this letter RELIANCE refused to
11 attend the August 18 meeting and refused the SMOLKERS invitation to inspect their home.
12 RELIANCE asked for an explanation of why the SMOLKERS denied HSTCI request to inspect
13 their home, after the SMOLKERS had explained that HSTCI had inspected the SMOLKERS
14 home many times and part of the SMOKERS' claim was that HSTCI had done sloppy
15 construction work when HSTCI came back to do clean-up and to seal the holes and openings in
16 the SMOLKERS' home. HSTCI had left open holes in walls that HSTCI had drilled in the walls.
17 RELIANCE refused to come and see those holes. If RELIANCE, TIE, CAINCO or CIC had
18 sent a competent investigator to the SMOLKERS' home they could have promptly determined
19 that the methods HSTCI used were obviously unsafe, reckless and illegal, and that the losses
20 claimed by the SMOLKERS were covered under their insurance policies and bond. But they
21 refused to do so in spite of being asked to do so many times by the SMOLKERS. Each of these
22 insurance carriers maliciously and oppressively demanded that the SMOLKERS not clean-up the
23 pesticide contamination or alter the condition of their living quarters and promised to promptly
24 send someone to inspect and test the SMOLKERS' living quarters but failed and refused to do so.
25 These breaches of insurance contracts and bond by insurance carriers sued in this cause of action
26 were flagrant, willful and wanton and undertaken solely to protect their own pecuniary interests
27 without regard to their obligations under their insurance policy or bond to the SMOLKERS'

28

-140-

XC2nd227

1  interests. The insurance carriers' conduct described herein was done willfully with a conscious

2  disregard of the SMOLKERS' rights and with the intent to vex, cause unjust hardship to, injure

3  and annoy the SMOLKERS, such as to constitute oppression, fraud and malice under California

4  Civil Code Section 3294 and the SMOLKERS should recover in addition to actual damages,

5  punitive damages to make an example of and to punish TIE, CAINCO, CIC and RELIANCE..

6      227. As a direct and proximate result of this bad faith conduct and bad faith breach of

7  contract by TIE, CIC, CAINCO, and RELIANCE, , and each of them, the SMOLKERS have

8  sustained substantial compensable losses including loss of time, mental distress, medical and

9  dental expenses, hospital expenses, being forced to become embroiled in litigation with third

10  parties, costs and dispursements in this case, interference with relationships, property damage,

11  loss of use of property, insurance benefits withheld from the SMOLKERS by each of them, and

12  economic losses such as loss of earnings and earning capacity, reduced value of their home, loss

13  of the quiet and peaceful use and enjoyment of their home, cost to move out of their home and

14  live somewhere else, costs of investigation, costs of trying to mitigate damages, being forced to

15  live in an unhealthy environment, physical injury to GARY SMOLKER, pain and severe mental

16  and emotional damage to GARY SMOLKER and ALICE SMOLKER, and attorney fees in

17  amounts not yet fully ascertainable but within the jurisdiction of this court in an amount to be

18  proved at trial.

19      228. As a proximate result of the bad faith breach of contract of TIE, CAINCO, CIC and

20  RELIANCE, and each of them alleged herein, GARY SMOLKER, JUDI SMOLKER, LEAH

21  SMOLKER, and Caramel have been continuously exposed to pesticide applied by HSTCI in their

22  home, have been denied of their peaceful possession, use and enjoyment of their home, have been

23  forced to move out of their home, have been forced to pay rent to live in a hotel, have been forced

24  to pay extraordinary sums for food and lodging while living out of their home, have had their

25  personal property damaged and destroyed, have been made ill, have been injured and hurt in their

26  health, strength and activity, sustaining injury to their nervous system and person, have suffered

27  various physical injuries which have caused them great mental, physical and nervous pain and

28

-141-

XC2nd227

1  suffering all to GARY SMOLKER's and ALICE SMOLKER's damage in an amount to be
2  proved at time of trial.. As a proximate result of the bad faith breach of insurance contract or
3  bond of TIE, CAINCO, CIC and RELIANCE ,and each of them, alleged herein, ALICE
4  SMOLKER has been continuously exposed to the pesticide, has been denied the peaceful
5  possession, use and enjoyment of her home, and has had her personal property destroyed and
6  damaged all to her damage in an amount to be proved at time of trial.  Seeing the physical injury,
7  pain and suffering, endured by GARY SMOLKER, JUDI SMOLKER, LEAH SMOLKER and
8  Caramel has caused great mental and nervous pain and suffering and emotional damage to ALICE
9  SMOLKER all to her damage in an amount to be proved at time of trial.  As a result of such
10  injuries the SMOLKERS have suffered general damages within the jurisdiction of this court in an
11  amount to be proved at time of trial.

12     229.  As a result of the bad faith breach of insurance contract and/or bond of TIE,
13  CAINCO, CIC and RELIANCE, and each of them, as herein alleged, GARY SMOLKER's, JUDI
14  SMOLKER's, and LEAH SMOLKER's illnesses, and injuries as above stated, were aggravated
15  thereby further injuring GARY SMOLKER, JUDI SMOLKER, and LEAH SMOLKER, in their
16  health, strength and activity, and causing further injury to their body and shock and injury to their
17  nervous system, all of which injuries have caused and continue to cause further physical injury to
18  GARY SMOLKER to his damage in an amount to be proved at time of trial and to cause the
19  SMOLKERS, and each of them, great mental, physical and nervous pain and suffering and the
20  SMOLKERS, and each of them, have been damaged thereby in a further sum within the
21  jurisdiction of this court to be proved at time of trial.

22     230.  As a further proximate result of the bad faith breach of contract of TIE, CAINCO,
23  CIC and RELIANCE, and each of them, alleged herein, the SMOLKERS have been required to
24  spend money and incur obligations, and will continue to spend money and incur obligations, for
25  medical services, dental services, X-rays, drugs and sundries reasonably required in the treatment
26  and relief of the injuries herein alleged, and have been forced to become involved in litigation with
27  other cotenants who also own an undivided interest in the common area of the PREMISES, the

28

-142-

XC2nd227

1  SMOLKERS' insurance carrier (TIG Insurance Company), HOA, TIE, et al., and have lost their
2  time, their ability to make a living, earnings, earnings capacity and will lose future earnings, have
3  incurred and paid litigation costs, have been unable to promote their business in the fashion they
4  would otherwise be able to promote their business, have been rendered unavailable to take on
5  work they would otherwise be capable of taking on, have had to deplete their savings and borrow
6  money to pay living expenses and to pay business expenses, have been required to spend money
7  and incur obligations, and will continue to spend money and incur obligations, for replacement of
8  contaminated personal property (i.e. bedding, furniture, etc.), for hauling away and disposal of
9  contaminated property, for work done and to be done in an attempt to clean-up and remove
10 pesticide contamination from the air in their living quarters, from their carpets, and other soft
11 goods, etc., and have incurred and paid expenses and charges for repair and construction work
12 and painting to seal and repair holes drilled by HSTCI and sloppy "fix-up" "caulking work done
13 by HSTCI's fix-up crews and to fill and patch openings in walls and ceilings and to seal walls and
14 ceilings in an attempt to minimize the amount of pesticide that can escape from the voids between
15 the walls and ceilings of the PREMISES and thereafter enter into the SMOLKERS' living
16 quarters and will continue to incur and pay further expenses in connection with efforts to mitigate
17 damages caused by pesticide contamination, to prevent further pesticide contamination, to remove
18 residual pesticide contaminants, to replace contaminated items of personal property, and will incur
19 additional expenses for a new termite treatment of the PREMISES, all to the SMOLKERS'
20 damage in an amount to be proved at time of trial..

21        231.  As a further and proximate result of the bad faith breach of insurance contract and/or
22 bond of TIE, CAINCO, CIC and RELIANCE, and each of them, alleged herein, the SMOLKERS
23 have been  prevented from attending to their usual occupation and have lost earnings and earnings
24 capacity and are informed and believe and thereon allege that they will be prevented from
25 attending to their usual occupation in the future and will thereby sustain future loss of earnings all
26 to their damage in an amount to be proved at trial.  As a further result of the conduct of cross-
27 defendants and each of them, the SMOLKERS have been threatened by their neighbors, the

28

-143-

XC2nd227

1   SMOLKERS have been forced to become involved in controversies with other parties to this

2   litigation all to their damage in an amount to be proved at time of trial. The SMOLKERS are

3   informed and believe and thereupon allege that as a direct result of the conduct of cross-

4   defendants and each of them, the SMOLKERS will continue to be involved in controversies with

5   other parties to this litigation and will lose further earnings and earning capacity as a result

6   thereof. As a direct result of the conduct of cross-defendants and each of them, the quality of the

7   SMOLKERS life has been diminished, the SMOLKERS have lost the free and comfortable use of

8   their personal property and their ability to enjoy the peaceful possession, use and enjoyment of

9   their home, and the value of GARY SMOLKER's condominium has been depreciated and

10  stigmatized, all to the SMOLKERS damage in a sum to be proved at time of trial.

11

12                          THIRTEENTH CAUSE OF ACTION

13                          (Against TIE, TUA, FIG, FGI,

14                              for Fraud, and Interference )

15          232. The SMOLKERS reallege and incorporate herein by reference each and every

16  allegation contained in paragraphs 164 through 173 and 224 through 227.

17          233. At all times herein mentioned cross-defendant DEAN & ASSOCIATES (DEAN)

18  was a law firm doing business in Los Angeles County, and cross-defendant DENNIS A

19  BABBITS was a lawyer working for said law firm.

20          234. In early 1977 MORRIS told GARY SMOLKER to select an industrial hygienist to

21  investigate the pesticide contamination in GARY SMOLKER's condominium and MORRIS and

22  HSTCI would hire that person to do that investigation for GARY SMOLKER. In response to

23  this offer, GARY SMOLKER gave MORRIS and HSTCI the name phone number and address of

24  Bud Offerman and his firm Indoor Environmental Engineering. GARY SMOLKER had found

25  Mr. Offerman and his firm after long hard research looking for an industrial hygienist to consult in

26  connection with an indoor air pollution problem GARY SMOLKER had at his prior office.

27  MORRIS and HSTCI did not hire Offerman and Indoor Environmental Engineering to work for

28

                                    -144-

XC2nd227

1  GARY SMOLKER, instead MORRIS and HSTCI gave Offerman's name to COREGIS and

2  DEAN, who, interfered with the SMOLKERS' relationship with Offerman and his firm to the

3  extent that Offerman refused to speak to GARY SMOLKER. This was done by COREGIS,

4  CAINCO, HSTCI, BABBITS and DEAN in concert with and for the benefit of TUA, FIG, FGI,

5  CIC, CAINCO, and TIE.

6       235. COREGIS, CIC, CAINCO, TUA, FIG, FGI, BABBITS, and DEAN worked with

7  Offerman on this matter as adverse parties to the SMOLKERS' interests in this matter and

8  destroyed the SMOLKERS' opportunity to work with Offerman and Indoor Environmental

9  Engineering on the pesticide contamination problem in their home and on another chemical

10  exposure case that is currently pending in Los Angeles Superior Court. COREGIS, CAINCO,

11  CIC, TUA, FIG, FGI, BABBITS and DEAN interfered with the SMOLKERS' relationship and

12  opportunity to have a relationship with Offerman and Indoor Environmental Engineering with

13  knowledge of the SMOLKERS' proprietary interest and trade secret interest in knowing of

14  Offerman and Indoor Environmental Engineering and having an opportunity to do so with full

15  knowledge that it was a misappropriation of the SMOLKERS' trade secret and proprietary

16  information about Offerman and Indoor Environmental Engineering for them to hire Offerman

17  and/or Indoor Environmental Engineering.

18       236. As a result of the conduct of the cross-defendants sued in this cause of action

19  conduct the SMOLKERS' relationship with Offerman and Indoor Environmental Engineering is

20  ruined and the SMOLKERS have to find a new and different industrial hygienist to consult with

21  concerning their pesticide contamination problem and on their other case, all to the SMOLKERS'

22  damage and loss in an amount to be proved at trial.

23       237. TIE's, TUA's, FIG's, FGI's, DEAN's, and BABBITS' conduct described herein

24  was done willfully with a conscious disregard of the SMOLKERS' rights, and with an intent to

25  vex, harass, cause undue hardship to, injure and annoy the SMOLKERS, such as to constitute

26  oppression, fraud and malice under California Civil Code Section 3294 and the SMOLKERS

27

28

-145-

XC2nd227

1  should recover in addition to actual damages, damages to make an example of and to punish TIE,
2  TUA, FIG and FGI.

3  238. As a proximate result of the fraudulent acts and omissions of TIE, TUA, FIG and
4  FGI, and each of them alleged herein, GARY SMOLKER, JUDI SMOLKER, LEAH
5  SMOLKER, and Caramel have been continuously exposed to pesticide applied by HSTCI in their
6  home, have been denied of their peaceful possession, use and enjoyment of their home, have been
7  forced to move out of their home, have been forced to pay rent to live in a hotel, have been forced
8  to pay extraordinary sums for food and lodging while living out of their home, have had their
9  personal property damaged and destroyed, have been made ill, have been injured and hurt in their
10  health, strength and activity, sustaining injury to their nervous system and person, have suffered
11  various physical injuries which have caused them great mental, physical and nervous pain and
12  suffering all to GARY SMOLKER's and ALICE SMOLKER's damage in an amount to be
13  proved at time of trial.. As a proximate result of the fraudulent acts and omissions of TIE, TUA,
14  FIG, and FGI, and each of them, alleged herein, ALICE SMOLKER has been continuously
15  exposed to the pesticide, has been denied the peaceful possession, use and enjoyment of her
16  home, and has had her personal property destroyed and damaged all to her damage in an amount
17  to be proved at time of trial. Seeing the physical injury, pain and suffering, endured by GARY
18  SMOLKER, JUDI SMOLKER, LEAH SMOLKER and Caramel has caused great mental and
19  nervous pain and suffering and emotional damage to ALICE SMOLKER all to her damage in an
20  amount to be proved at time of trial. As a result of such injuries the SMOLKERS have suffered
21  general damages within the jurisdiction of this court in an amount to be proved at time of trial.

22  239. As a result of the fraudulent acts and omissions TIE, TUA, FIG and FGI, and each
23  of them, as herein alleged, GARY SMOLKER's, JUDI SMOLKER's, and LEAH SMOLKER's
24  illnesses, and injuries as above stated, were aggravated thereby further injuring GARY
25  SMOLKER, JUDI SMOLKER, and LEAH SMOLKER, in their health, strength and activity, and
26  causing further injury to their body and shock and injury to their nervous system, all of which
27  injuries have caused and continue to cause further physical injury to GARY SMOLKER to his

28

XC2nd227

1  damage in an amount to be proved at time of trial and to cause the SMOLKERS, and each of

2  them, great mental, physical and nervous pain and suffering and the SMOLKERS, and each of

3  them, have been damaged thereby in a further sum within the jurisdiction of this court to be

4  proved at time of trial.

5        240.  As a further proximate result of the fraudulent acts and omissions of TIE, TUA, FGI

6  and FIG, and each of them, alleged herein, the SMOLKERS have been required to spend money

7  and incur obligations, and will continue to spend money and incur obligations, for medical

8  services, dental services, X-rays, drugs and sundries reasonably required in the treatment and

9  relief of the injuries herein alleged, and have been forced to become involved in litigation with

10 other cotenants who also own an undivided interest in the common area of the PREMISES, the

11 SMOLKERS' insurance carrier (TIG Insurance Company), HOA, TIE, et al., and have lost their

12 time, their ability to make a living, earnings, earnings capacity and will lose future earnings, have

13 incurred and paid litigation costs, have been unable to promote their business in the fashion they

14 would otherwise be able to promote their business, have been rendered unavailable to take on

15 work they would otherwise be capable of taking on, have had to deplete their savings and borrow

16 money to pay living expenses and to pay business expenses, have been required to spend money

17 and incur obligations, and will continue to spend money and incur obligations, for replacement of

18 contaminated personal property (i.e. bedding, furniture, etc.), for hauling away and disposal of

19 contaminated property, for work done and to be done in an attempt to clean-up and remove

20 pesticide contamination from the air in their living quarters, from their carpets, and other soft

21 goods, etc., and have incurred and paid expenses and charges for repair and construction work

22 and painting to seal and repair holes drilled by HSTCI and sloppy "fix-up" "caulking work done

23 by HSTCI's fix-up crews and to fill and patch openings in walls and ceilings and to seal walls and

24 ceilings in an attempt to minimize the amount of pesticide that can escape from the voids between

25 the walls and ceilings of the PREMISES and thereafter enter into the SMOLKERS' living

26 quarters and will continue to incur and pay further expenses in connection with efforts to mitigate

27 damages caused by pesticide contamination, to prevent further pesticide contamination, to remove

28

-147-

XC2nd227

1    residual pesticide contaminants, to replace contaminated items of personal property, and will incur

2    additional expenses for a new termite treatment of the PREMISES, all to the SMOLKERS'

3    damage in an amount to be proved at time of trial..

4        241.  As a proximate result of the fraudulent and illegal conduct of TIE, TUA, FGI and

5    FIG, and each of them, the SMOLKERS have been prevented from attending to their usual

6    occupation and lost earnings and earnings capacity and are informed and believe and thereon

7    allege that they will be prevented from attending to their usual occupation in the future and will

8    thereby sustain future loss of earnings all to their damage in an amount to be proved at trial.  As a

9    further result of the conduct of cross-defendants and each of them, the SMOLKERS have been

10   threatened by their neighbors, and the SMOLKERS have been forced to become involved in

11   controversies with other parties to this litigation as a direct result thereof.  The SMOLKERS are

12   informed and believe and thereupon allege that as a direct result of the conduct of cross-

13   defendants and each of them, the SMOLKERS will continue to be involved in controversies with

14   other parties to this litigation and will lose further earnings and earning capacity as a result

15   thereof, as well as costs of litigation.  As a direct result of the conduct of cross-defendants and

16   each of them, the quality of the SMOLKERS life has been diminished, the SMOLKERS have lost

17   the free and comfortable use of their personal property and their ability to enjoy the peaceful

18   possession, use and enjoyment of their home, and the value of GARY SMOLKER's condominium

19   has been depreciated and stigmatized, all to the SMOLKERS damage in a sum to be proved at

20   time of trial.

21       242.  As a further proximate result of the fraudulent conduct of TIE, TUA, FGI and FIG,

22   alleged herein, the SMOLKERS have been injured and have suffered further losses as hereinafter

23   set forth: the SMOLKERS have spent money on costs of repair, cost to live somewhere else, cost

24   to replace contaminated personal property, and have loss the time they have expended dealing

25   with pesticide contamination related matters, the SMOLKERS have been emotionally and

26   financially exhausted, have been forced to lower their living style, have had their privacy breached,

27

28

XC2nd227

1  have been humiliated and caused to suffer emotional distress, all to their damage in an amount to
2  be proven at time of trial.

3  243. As additional damages against cross-defendants TIE, TUA, FGI and FIG, and each
4  of them, cross-complainants allege these cross-defendants and each of them were guilty of malice,
5  fraud, and/or oppression as defined in Civil Code Section 3294 in doing the fraudulent and illegal
6  acts described herein, and cross-complainants and each of them, should recover, in addition to
7  actual damages, damages to make an example of and to punish cross-defendants TIE, TUA, FGI
8  and FIG, and each of them. 320. On March 14, 1997 GS submitted a written damage claim to
9  FARMERS INSURANCE GROUP OF COMPANIES, Attention: Carolyn Eubank, Claims
10  Manager under Truck Insurance Exchange Policy No. 093870830. Thereafter, by letter dated
11  March 21, 1997, received on March 25, 1997, GS was advised by John Hughes of the FARMERS
12  INSURANCE GROUP OF COMPANIES that Mr. Hughes was the adjuster assigned to handle
13  the claim and that Mr. Smolker should direct all questions to Mr. Hughes, "Should you have any
14  questions, or if I can be of any assistance to you, please do not hesitate to contact me at your
15  convenience. By the statements in this letter from Mr. Hughes, the SMOLKERS understood that
16  TIE and FIG agreed to undertake to do whatever was necessary to get the pesticide applied by
17  HSTCI out of the SMOLKERS' and to prevent additional pesticide from coming into the
18  SMOLKERS' home. By return fax on March 25, 1997 GS sent Mr. Hughes a response setting
19  forth that the SMOLKERS had also submitted a claim to their personal line insurance carrier TIG,
20  who had assigned a claims adjuster (Kay Taylor), and gave Mr. Hughes the name and phone
21  number of the TIG adjuster (Kay Taylor) and the TIG Claim Number. The last paragraph of Mr.
22  Smolker's note to Mr. Hughes states, "I don't want to be living in an unhealthy pesticide
23  environment while you and Kay figure out what to do. Please advise what you want me to do."
24  . On May 8, 1997, GSS faxed and mailed a follow-up letter jointly addressed to HOLYBEE and
25  FREDERICKS. On July 16, 1997, GS drafted, faxed and mailed a four page follow-up letter
26  jointly addressed to Carolyn Eubank, Claims Manager, Farmers Insurance Group and to Raymond
27  Holybee, Truck Insurance Exchange. On July 17, 1997 GS faxed and mailed an additional

28

XC2nd227

1  follow-up letter to Carolyn Eubanks and to Raymond Holybee.  On July 17, 1997 GS also faxed

2  and mailed a follow up letter to Martin Feinstein, CEO/President, Farmers Insurance Group of

3  Companies.  TIE, FGI, FIG and TUA just played with the SMOLKERS instead of treating the

4  SMOLKERS' claim in a responsible manner.

5                          FOURTEENTH CAUSE OF ACTION

6              (Against COREGIS GROUP, INC., COREGIS INSURANCE COMPANY,

7                 CALIFORNIA INSURANCE COMPANY for Fraud and Interference)

8          244.  The SMOLKERS reallege and incorporate herein by reference each and every

9  allegation contained in paragraphs 1 through 15, 32, d 142 through 157, and 170 through 173 of

10  the Cross-complaint.

11          345.  Cross-defendant COREGIS GROUP, INC. (hereinafter COREGIS) is a Delaware

12  Corporation transacting business in California as a holding company which owns 100% of the

13  stock of COREGIS INSURANCE COMPANY (CIC) and 100% of the stock of CALIFORNIA

14  INSURANCE COMPANY (CAINCO).  At all times mentioned in this cause of action, cross-

15  defendants COREGIS, CIC and CAINCO operated as members of a multi-functional insurance

16  holding company team known as the Coregis Insurance Organization.  At all times material

17  hereto, CAINCO and CIC were, and still are, in the specialty insurance program business and

18  were, and still are, specialists in pesticides and pest control operations.  At all times herein

19  mentioned, CAINCO and CIC wrote specially designed liability insurance policies for pest control

20  operators under which pesticide exposure claims are to be administered by COREGIS, CIC and

21  CAINCO as part of the Coregis Insurance Organizations.

22          246.  Cross-defendant CIC is, and at all times herein mentioned was a Indiana corporation

23  transacting business in California as an insurance company.  Cross-defendant CAINCO is, and at

24  all times herein mentioned was, a California corporation transacting business in Los Angeles,

25  California as an insurance company.  Now, and at all times mentioned in this cause of action,

26  CAINCO did not have any employees; COREGIS and/or CIC managed the affairs of CAINCO.

27          247.  At all times herein mentioned, COREGIS, CIC and CAINCO knew HSTCI was

28

                                          -150-

XC2nd227

1    required by law to carry general liability insurance in a form approved by the Structural Pest

2    Control Board as a condition of doing business in California under California *Business and*

3    *Professions Code Sections 8690, 86992, and 8692.* Insurance in force during all times material to

4    this cause of action was obtained by HSTCI from the Coregis Insurance Organizations and

5    provides coverage for loss due to damage to property or destruction of property, coverage for

6    loss due to bodily injury, sickness or disease as a result of an accident or occurrence due to any

7    activity of HSTCI which requires a license under Chapter 14 of the *Business and Professions*

8    *Code.* Liability insurance obtained by HSTCI from CIC and/or CAINCO, which was in force at

9    all times material to this cause of action, contains a medical pay provision which requires

10   CAINCO (and through other inter-company arrangements CIC) to pay the SMOLKERS' medical

11   expenses arising out of HSTCI's inspection services and/or pesticide application at the

12   PREMISES regardless of fault.

13       248.  The SMOLKERS presented a claim for damages to HSTCI, MORRIS and CAINCO

14   with respect to damages the SMOLKERS had suffered as a direct result of MORRIS's and

15   HSTCI's negligent, fraudulent and illegal conduct. In response to this claim, COREGIS,

16   CAINCO and CIC undertook and promised to fix the pesticide contamination in the

17   SMOLKERS' home and at the PREMISES. COREGIS, CAINCO, and CIC Claim

18   Representative Trimble (hereinafter TRIMBLE) directed the SMOLKERS to work with JOSEPH

19   FEDORUK, who is purportedly an expert in residential pesticide contamination remediation. The

20   SMOLKERS did as they were told to do by TRIMBLE in order to have the pesticide

21   contamination problem professionally taken care of by the Coregis Insurance Organization.

22   However, CAINCO, COREGIS, and CIC had no intention of fixing the pesticide contamination

23   problem in the SMOLKERS' home. The suggestion that the SMOLKERS consult with

24   FEDORUK was a ruse made for the purpose of vexing, harassing and annoying the SMOLKERS.

25   Later, COREGIS, CAINCO, and CIC would insist that they wanted to inspect the SMOLKERS

26   home and that the SMOLKERS should not alter anything in the SMOLKERS home so that

27   CAINCO et al could inspect it in an altered state. Those were fraudulent misrepresentations as

28

-151-

XC2nd227

1  well. CAINCO et al had no intention of promptly inspecting or of promptly testing the air in the

2  SMOLKERS' home at any time. But the Smolkers did not know this for at the time.

3    250. At the time the SMOLKERS were first contacted by the Coregis Insurance

4  Organizations the SMOLKERS did not know that an unregistered poison had been applied in

5  their home or that HSTCI had been ordered by the State of California to cease and desist using

6  SYLOID 244, the pesticide HSTCI had applied in the PREMISES, or that another person had

7  recently been severely injured by inhaled SYLOID 244 applied in her home by HSTCI and had

8  filed a claim against HSTCI for resulting personal injuries. However, TRIMBLE knew this, as

9  did COREGIS, CAINCO, CIC and the Coregis Insurance Organization. But they concealed this

10 information from the SMOLKERS.

11   251. It was the SMOLKERS' understanding after speaking to TRIMBLE, and this

12 understanding was solidified in several conversations and correspondence with TRIMBLE, that

13 COREGIS et al. would proceed rapidly to have the SMOLKERS' home inspected to find out

14 how to remediate the pesticide problem, and that that SMOLKERS were to wait for FEDORUK

15 to carry out his inspection before removing their contaminated furniture and taking other steps to

16 clean-up their home. In reliance on the representation by TRIMBLE that COREGIS et al. would

17 proceed diligently and rapidly, through FEDORUK, to inspect the SMOLKERS' home for the

18 purpose of figuring out what should be done, the SMOKERS held off on having their furniture

19 disposed of, their carpets removed, etc. to get rid of the pesticide. Had the SMOLKERS known

20 that FEDORUK would never come to there home and how irritating, harmful, and dangerous it

21 was to be continuously exposed to SYLOID 244 and to inhale SYLOID 244 they would have

22 proceeded rapidly to have their carpets removed, their upholstered furniture removed, their walls

23 sealed, etc. instead of being delayed until May 1998. After the SMOLKERS realized that

24 COREGIS et al. were not going to have someone inspect their home, were not going to do

25 anything to help, and their children were getting sicker and sicker by being exposed to the

26 pesticide applied in their home by HSTCI the SMOLKERS had their carpets removed and

27 replaced, the walls of their home refinished sealed and painted, their air handling equipment air

28

-152-

1  ducts cleaned out, etc. This remediation work was accomplished on or about May 1998 after

2  constant assurances that COREGIS would send someone out to inspect the SMOLKERS' home

3  proved to be untrue.

4      252. JOSEPH FEDORUK (FEDORUK) at all times material herein represented himself

5  to be a qualified analytical chemical expert, expert in how to detect and clean up pesticide

6  contamination in a residential setting, and a neutral expert in dealing with such problems. Now,

7  and, at all material to this cause of action FEDORUK's business was headquartered in Orange

8  County, California. At all times herein mentioned FEDORUK was COREGIS', CAINCO's and

9  CIC's agent and did all the acts hereinafter alleged on behalf of COREGIS, CAINCO and CIC

10  with COREGIS', CAINCO's and CIC's knowledge and approval and at their behest.

11      253. In May 1997, FEDORUK undertook to render services to the SMOLKERS which

12  FEDORUK recognized, or should have recognized, were necessary for the protection of the

13  health of the SMOLKERS, the protection of the health of the SMOLKERS' children, and the

14  protection of the SMOLKERS' property. FEDORUK took charge of the SMOLKERS when the

15  SMOLKERS were helpless adequately to aid or protect themselves from the deleterious effects of

16  being exposed to pesticides applied in their home by HSTCI. FEDORUK undertook to assess the

17  risks posed to the SMOLKERS by exposure to pesticides applied in the PREMISES by HSTCI,

18  the probable impact on the SMOLKERS if the pesticides were not removed or neutralized, to

19  analyze and propose alternative procedures for dealing with pesticide contamination in the

20  SMOLKERS' home, and to provide the necessary expertise to assess the feasibility of these

21  alternatives for the SMOLKERS.

22      254. At this time, FEDORUK knew the SMOLKERS understood FEDORUK had been

23  contacted and engaged by COREGIS to investigate pesticide contamination introduced into the

24  living quarters of the SMOLKERS' home resulting from HSTCI's application of pesticides at the

25  PREMISES and that the Coregis Insurance Organization had told the SMOLKERS that the

26  SMOLKERS had to consent to FEDORUK inspecting and analyzing the pesticide contamination

27  in the SMOLKERS' home as a condition of the Coregis Insurance Organization's performing its

28

-153-

XC2nd227

1  promised remediation of the pesticide contamination in the SMOLKERS' home. FEDORUK was

2  invited several times by the SMOLKERS to inspect the SMOKERS' home and knew the

3  SMOLKERS were waiting for him to do so as part of the Coregis Insurance Organizations'

4  process of adjusting claims. All during May, June, July and August, 1998, FEDORUK

5  understood the Smolkers were waiting for FEDORUK to report to the SMOLKERS.

6      255. At all times material to this action, Dennis A. Babbits (hereinafter BABBITS) was

7  an attorney at law practicing law with the law firm of Dean & Associates. At all times material to

8  this action, Dean & Associates (hereinafter DEAN) was a law firm with an office in Los Angeles

9  County, California. While the SMOLKERS were being poisoned by pesticides applied in the

10  PREMISES, BABBITS and DEAN (on behalf of HSTCI, the Coregis Insurance Organizations,

11  TIE and FIG) intentionally prevented third persons (Offerman and Indoor Environmental

12  Engineering) from giving aid to the SMOLKERS necessary to prevent physical harm to the

13  SMOLKERS and intentionally obstructed the SMOLKERS' access to persons who could aid the

14  SMOLKERS.

15      256. As a proximate result of the fraudulent acts and omissions of COREGIS, CIC and

16  CAINCO (hereinafter collectively referred to as CORE), and each of them, and as a proximate

17  result of their interference with the SMOLKERS' relationship with Offerman, alleged herein

18  GARY SMOLKER, JUDI SMOLKER, LEAH SMOLKER, and Caramel have been continuously

19  exposed to pesticide applied by HSTCI in their home, have been denied of their peaceful

20  possession, use and enjoyment of their home, have been forced to move out of their home, have

21  been forced to pay rent to live in a hotel, have been forced to pay extraordinary sums for food and

22  lodging while living out of their home, have had their personal property damaged and destroyed,

23  have been made ill, have been injured and hurt in their health, strength and activity, sustaining

24  injury to their nervous system and person, have suffered various physical injuries which have

25  caused them great mental, physical and nervous pain and suffering all to GARY SMOLKER's and

26  ALICE SMOLKER's damage in an amount to be proved at time of trial.. As a proximate result

27  of the fraudulent acts and omissions of CORE, and each of them, alleged herein, ALICE

28

-154-

XC2nd227

1    SMOLKER has been continuously exposed to the pesticide, has been denied the peaceful

2    possession, use and enjoyment of her home, and has had her personal property destroyed and

3    damaged all to her damage in an amount to be proved at time of trial.  Seeing the physical injury,

4    pain and suffering, endured by GARY SMOLKER, JUDI SMOLKER, LEAH SMOLKER and

5    Caramel has caused great mental and nervous pain and suffering and emotional damage to ALICE

6    SMOLKER all to her damage in an amount to be proved at time of trial.  As a result of such

7    injuries the SMOLKERS have suffered general damages within the jurisdiction of this court in an

8    amount to be proved at time of trial.

9        257.  As a result of the fraudulent acts and omissions of CORE, and each of them, as

10   herein alleged, GARY SMOLKER's, JUDI SMOLKER's, and LEAH SMOLKER's illnesses, and

11   injuries as above stated, were aggravated thereby further injuring GARY SMOLKER, JUDI

12   SMOLKER, and LEAH SMOLKER, in their health, strength and activity, and causing further

13   injury to their body and shock and injury to their nervous system, all of which injuries have caused

14   and continue to cause further physical injury to GARY SMOLKER to his damage in an amount to

15   be proved at time of trial and to cause the SMOLKERS, and each of them, great mental, physical

16   and nervous pain and suffering and the SMOLKERS, and each of them, have been damaged

17   thereby in a further sum within the jurisdiction of this court to be proved at time of trial.

18       258.  As a further proximate result of the fraudulent acts and omissions of CORE, and

19   each of them, alleged herein, the SMOLKERS have been required to spend money and incur

20   obligations, and will continue to spend money and incur obligations, for medical services, dental

21   services, X-rays, drugs and sundries reasonably required in the treatment and relief of the injuries

22   herein alleged, and have been forced to become involved in litigation with other cotenants who

23   also own an undivided interest in the common area of the PREMISES, the SMOLKERS'

24   insurance carrier (TIG Insurance Company), HOA, TIE, et al., and have lost their time, their

25   ability to make a living, earnings, earnings capacity and will lose future earnings, have incurred

26   and paid litigation costs, have been unable to promote their business in the fashion they would

27   otherwise be able to promote their business, have been rendered unavailable to take on work they

28

XC2nd227

1  would otherwise be capable of taking on, have had to deplete their savings and borrow money to
2  pay living expenses and to pay business expenses, have been required to spend money and incur
3  obligations, and will continue to spend money and incur obligations, for replacement of
4  contaminated personal property (i.e. bedding, furniture, etc.), for hauling away and disposal of
5  contaminated property, for work done and to be done in an attempt to clean-up and remove
6  pesticide contamination from the air in their living quarters, from their carpets, and other soft
7  goods, etc., and have incurred and paid expenses and charges for repair and construction work
8  and painting to seal and repair holes drilled by HSTCI and sloppy "fix-up" "caulking work done
9  by HSTCI's fix-up crews and to fill and patch openings in walls and ceilings and to seal walls and
10  ceilings in an attempt to minimize the amount of pesticide that can escape from the voids between
11  the walls and ceilings of the PREMISES and thereafter enter into the SMOLKERS' living
12  quarters and will continue to incur and pay further expenses in connection with efforts to mitigate
13  damages caused by pesticide contamination, to prevent further pesticide contamination, to remove
14  residual pesticide contaminants, to replace contaminated items of personal property, and will incur
15  additional expenses for a new termite treatment of the PREMISES, all to the SMOLKERS'
16  damage in an amount to be proved at time of trial..

17      259.  As a proximate result of the fraudulent and illegal conduct of CORE, and each of
18  them, the SMOLKERS have been  prevented from attending to their usual occupation and lost
19  earnings and earnings capacity and are informed and believe and thereon allege that they will be
20  prevented from attending to their usual occupation in the future and will thereby sustain future
21  loss of earnings all to their damage in an amount to be proved at trial.  As a further result of the
22  conduct of cross-defendants and each of them, the SMOLKERS have been threatened by their
23  neighbors, the SMOLKERS have been forced to become involved in controversies and litigation
24  with other parties to this litigation as a direct result thereof.  The SMOLKERS are informed and
25  believe and thereupon allege that as a direct result of the conduct of cross-defendants and each of
26  them, the SMOLKERS will continue to be involved in controversies with other parties to this
27  litigation and will lose further earnings and earning capacity as a result thereof.  As a direct result

28

-156-

XC2nd227

of the conduct of cross-defendants and each of them, the quality of the SMOLKERS life has been diminished, the SMOLKERS have lost the free and comfortable use of their personal property and their ability to enjoy the peaceful possession, use and enjoyment of their home, and the value of GARY SMOLKER's condominium has been depreciated and stigmatized, all to the SMOLKERS damage in a sum to be proved at time of trial.

260.  As a further proximate result of the fraudulent conduct of CORE, and each of them, alleged herein, the SMOLKERS have suffered the following additional damages and losses: the SMOLKERS have spendt money on costs of repair, cost to live somewhere else, cost to replace contaminated personal property, and loss of time needed to deal with pesticide contamination related matters, the SMOLKERS have been emotionally and financially exhausted, have been forced to lower their living style, have had their privacy breached, have been humiliated and caused to suffer emotional distress, all to their damage in an amount to be proven at time of trial.

261.  As additional damages against cross-defendants CORE, and each of them, cross-complainants allege these cross-defendants and each of them were guilty of malice, fraud, and/or oppression as defined in Civil Code Section 3294 in doing the fraudulent and illegal acts described herein, and cross-complainants and each of them, should recover, in addition to actual damages, damages to make an example of and to punish cross-defendants COREGIS, CAINCO and CIC.

WHEREFORE, the SMOLKERS, and each of them, pray for judgment as follows:

ON ALL CAUSES OF ACTION EXCEPT THE SEVENTH CAUSE OF ACTION

1.  For general damages and special damages according to proof in an amount in excess of the minimum jurisdiction of the above entitled court.

2.  For damages for past and future medical and dental related expenses according to proof at time of trial.

3.  For damages to personal property and to real property, and for loss of use of property according to proof at time of trial.

-157-

XC2nd227

4. For exemplary damages and punitive damages in an amount the court deems just and reasonable.

5. Prejudgment interest as allowed by law.

6. Costs of suit herein.

7. Such other and further relief which the court deems just and proper.

### ON THE SEVENTH CAUSE OF ACTION

8. For an order directing the owners of each condominium at the PREMISES to pay a pro-rata contribute share of the costs incurred by cross-complainants and a prorata contributive share of the reasonable value of cross-complainants services in prosecuting this action against HSTCI, MORRIS, GRACE, GD and TIE, and that a lien be impressed on each owners interest in the PREMISES to secure the payment of that owners share and that such lien be foreclosed by the court.

9. For an order directing each owner to do whatever the court deems necessary to abate the nuisance and illegal condition of having an unregistered poison in the PREMISES.

10. For damages according to proof against HSTCI, MORRIS, GRACE, GD and TIE.

Law Offices of Smolker & Graham

_Gary S. Smolker_

Gary S. Smolker

Attorneys for Cross-complainants

XC2nd227

EXHIBIT A

| Trade Name | Hazardous Ingredients |
|---|---|
| Syloid 244 | Synthetic Amorphous Silica Gel |
| N/A | Borate Solution |
| Dursban | Organophosphates |

-48-

1    **DECLARATION OF SERVICE BY MAIL**

2

3    STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

4        I am employed in the County of Los Angeles, State of California.  I am over the age of 18

5    and not a party to the within action.  My business address is 4127 Via Marina, Ste 306, Marina

6    del Rey, California 90292.

7        On July 12, 1998, I served the foregoing document described as follows:

8

9    **Second Amended Cross-Complaint for Damages**

10

11   on the interested parties in this action by facsimile for the fax number(s) listed, and by placing a

12   true copy thereof enclosed in a sealed envelope(s), with postage thereon fully prepaid, and placing

13   such envelope(s) in the United States mail at Los Angeles, California, addressed as follows:

14

15   **SEE ATTACHED SERVICE LIST**

16

17       I am aware that on motion of party served, service is presumed invalid if postal

18   cancellation date or postage meter date is more than one (1) day after date of deposit for mailing

19   in affidavit.

20       I declare under the penalty of perjury under the laws of the State of California that the

21   foregoing is true and correct.

22       Executed on July 12, 1998 at Marina del Rey, California.

23

24

25   PETER J. NOVAK

26

27

28

DeclServ

Virginia K. Cipriano
3033 Sherbrook St., West
Apt. 306, Montreal
Quebec, Canada H3Z 1A3

Robert Hoffman, Esq.
Charlston, Revich & Williams
1840 Century Park East, 3rd fl
Los Angeles, CA 90067-2104

Sara M. Thorpe, Esq.
Gordon & Rees
275 Battery St., 20th floor
San Francisco, CA 94111

Jeffrey Horowitz, Esq.
DuBois, Billig, et al
6404 Wilshire Blvd., Ste 850
L.A., CA 90048-5510

Bob Ridenour
Borton, Petrini & Conron
707 Wilshire, Blvd., 51st fl
Los Angeles, CA 90017-3613

Booth Mitchel & Strange LLP
3080 Bristol St., Ste 550
P.O. Box 5046
Costa Mesa, CA 92628-5046

Joe W. Hilberman, Esq.
Fonda & Hilberman, LLP
1925 Century Park East, Ste 2250
Los Angeles, CA. 90067-2723

Michael B. Geibel, Esq.
Gibbs Giden Locher & Turner
2029 Century Park East, 34th Floor
Los Angeles, CA 90067-3039

Matthew John Fredericks
15 63rd Ave., #6
Playa del Rey, CA 90293

Gary E. Yardumian, Esq.
Prindle, Decker & Amaro
P.O. Box 22711
Long Beach, CA 90801-5511

Alan Zuckerman, Esq.
Hagenbaugh & Murphy
700 N. Central Ave., Ste 500
Glendale, CA 91203-1240

Cummins & White, LLP
2424 S.E. Bristol St., Ste 300
Newport Beach, CA 92660

John F. Walter, Esq.
Walter, Finestone & Richter
11601 Wilshire blvd., Ste 1900
Los Angeles, CA. 90025

William E. Davis III, Esq.
1925 Century Park East, Ste 500
Los Angeles, CA 90067-2700

Andrew S. Hollins, Esq.
Hollins, Schechter & Feinstein
P.O. Box 11021
Orange, CA 92856-8121