## IN THE UNITED STATES BANKRUPTCY COURT FILED
## FOR THE DISTRICT OF DELAWARE

2020 AUG 18 AM 9: 14

CLERK
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| W. R. Grace & Co, et al. | ) | Case No. 01-01139 (AMC) |
| Reorganized Debtors. | ) | (Jointly Administered) |
| | )Hearing date: Sept. 22, 2020    2p.m. | |
| | )Objection Deadline: Aug. 17, 2020 | |
| | ) | |

## GARY S. SMOLKER'S OBJECTIONS AND RESPONSE TO
## W.R. GRACE & CO.'S MOTION FOR SUMMARY JUDGMENT

### I. INTRODUCTION

Gary S. Smolker objects to this court granting W.R. Grace & Co.'s Motion for Summary Judgment.

Gary S. Smolker objects to the provision in the form of the proposed Order which states, *"and none of these claimants are entitled to any other Claim in the above-captioned chapter 11 case.*

Gary S. Smolker's claim exists in this bankruptcy proceeding because W.R. Grace & Co.(GRACE) illegally manufactured and illegally sold product manufactured by it, SYLOID 244, for use as a pesticide to Home Saving Termite Control, Inc. (TERMITE) for use as a pesticide in Gary S. Smolker's condominium unit.

SYLOID 244 is a highly engineering porous desiccant dust. It is capable of absorbing moisture and/or oils three times its weight. It consists of three micron particles of amorphous silicon dioxide. Amorphous silicon dioxide is sometimes called amorphous silica gel or amorphous silica dust.

SYLOID 244 is supposed to kill termites by dehydrating termites on contact.

1

Three micron particles of amorphous silicon dioxide (SYLOID 244) are not visible to the naked eye.

SYLOID 244 can do horrible damage to a human being who comes into unprotected contact with it. See attached Declaration of Gary Smolker.

At the time GRACE sold SYLOID 244 to TERMITE for use as a pesticide GRACE knew unprotected contacted with extremely small amorphous silica gel dust particles could be deadly. See written discussion of Dr. Paul Gross on page 22 of Exhibit A attached to the declaration of Gary Smolker.

Fine particles and large particles of amorphous silica dust get into the lungs and stay there. The smallest diameter of the respiratory tract is more than 100 microns, and the larges agglomerates of amorphous silica are only 1 to 5 microns in diameter. See written discussion of G. W. H. Schepers on page 21 of Exhibit A attached to the declaration of Gary Smolker.

After purchasing SYLOID 244 from GRACE, TERMITE illegally sold its extermination services - which consisted of installing SYLOID 244 in the wall and ceiling cavities in the condominium common areas and in the individual condominium units in a condominium complex where Gary S. Smolker resided – to the homeowners association that managed the common areas of the condominium complex.

Thereafter, SYLOID 244 was illegally installed by TERMITE in Gary S. Smolker's residence, a condominium unit in the condominium complex.

The manufacture, sale, and use of pesticides are regulated by federal and state laws.

At the time GRACE sold SYLOID 244 to TERMITE for use as a pesticide, SYLOID 244 was not registered as a pesticide or approved for use as a pesticide with the United States Environmental Protection Agency or registered with or approved for use as a pesticide by any federal regulatory agency that deals with the manufacture, sale and/or use of pesticides in the United States.

At the time GRACE sold SYLOID 244 to TERMITE for use as a pesticide, SYLOID 244 was not registered with or approved for use in the State of California

by the California Department of Pesticide Regulation or registered with or approved by any other California governmental agency that deals with manufacture, sale and/or use of pesticides in California.

GRACE violated a multitude of federal and state laws by manufacturing SYLOID 244 for use as a pesticide, by selling SYLOID 244 to TERMITE for use as a pesticide, and by delivering SYLOID 244 to TERMITE for use as a pesticide. See 7 U.S. Code 136 (a).  California Food & Agriculture Code Section 12993.

TERMITE installed SYLOID 244 in Gary Smolker's (SMOLKER'S) Condominium Unit and in the common areas surrounding SMOLKER'S condominium unit in such a way that SMOLKER and his family would come into unprotected contact with SYLOID 244 for more than four years. See September 6, 2000 Declaration of Peter J. Novak for more details.

A copy of the Declaration of Peter J. Novak is attached as Exhibit B to the Declaration of Gary Smolker.

SYLOID 244 was installed in SMOLKER'S condominium unit and in the common area surrounding SMOLKER'S condominium unit by TERMITE in such a way that SMOLKER's and SMOLKER'S family's personal property would be repeatedly contaminated with SYLOID 244 for more than four years. See September 6, 2000 Declaration of Peter J. Novak for more details.

A copy of the Declaration of Peter J. Novak is attached as Exhibit B to the Declaration of Gary Smolker.


A. NORMAL BREATING

How we breathe allows us to control our immune response, and restore, and restore our health.  Breathing correctly will help us live longer.  How we breathe effects all things. How we breathe effects the size and function of our lungs.

Breathing through the nose can cut exertion during intense exercise in half, will increase your stamina and offers huge gains in endurance.

Whatever happens to the nose affects what's happening in the mouth, the airways and the lungs.  The nose is critical because it clears air, heats it, and moistens it for easier absorption.

In a single breath, more molecules of air will pass through your nose that all the grains of sand on all the world's beaches – trillions and trillions of them.  These little bits of air come from a few feet or several yards away.  As they make their way towards you, they will twist and spool and they'll keep twisting and spooling and scrolling as they pass into you, traveling at a clip of about five miles per hour.

What directs this rambling path are turbinates, six maze-like bones (three on each side) that begin at the opening of your nostrils and end just below your eyes.

The lower turbinates at the opening of each nostril are covered in pulsing erectile tissue, itself covered in **mucous membrane**, a nappy sheen of cells that moistens and warms breath to your body temperature while simultaneously filtering out particles and pollutants.  All these invaders could cause infection, if they got into the lungs; the mucus membrane is the body's first line of defense. It's constantly on the move, sweeping along at a rate of about half an inch every minute, more than 60 feet per day.

This giant conveyor belt doesn't just move by itself.  It's pushed along by millions of tiny, hair like structures called cilia. Cilia sway with each inhale and exhale, but do so at a fast clip of up to 16 beats per second. Cilia closer to the nostrils gyrate at a different rhythm that those further along, their movements creating a coordinated wave that keeps mucus moving deeper.  The cilia grip is so strong that it can even push against the force of gravity.  No matter what position the nose (and head) is in, whether its upside-down or right-side up, the cilia will keep pushing inward and down.

Working together, the different areas of the turbinates will heat, clean, slow, and pressure air so that the lungs can extract more oxygen with each breath.

The magic of the nose, and its healing powers, wasn't lost on the agents. Around 1500 BCE, the Ebers Paprus, one of the oldest medical texts ever discovered, offered a description of how nostrils are supposed to feed air to the heart and lungs, not the mouth. A thousand years later, Genesis 2:7 described how

"the Lord formed man of the dust of ground, and breathed in through his nostrils the breath of life; and man became a living soul."

Each breath you take must first travel down the throat, past a cross-roads called the tracheal carina, which splits it into the right and left lungs. As it keeps going, that breath gets pushed into smaller and smaller tubes called the bronchioles until it dead ends at 500 million little bulbs called the alveoli.

What happens next – the path oxygen molecules take once they reach the alveoli - is complicated. Each of the alveoli is surrounded by a river of plasma filled with red blood cells. As these cells pass by, oxygen molecules will slip through the membranes of the alveoli and lodge themselves inside a red blood cell. In your blood cells are the protein called hemoglobin. Oxygen takes a "seat" inside hemoglobin; the red blood cells journey upstream, deeper into the body.

As blood passes through tissues and muscles, oxygen will disembark, providing fuel to hungry cells. As oxygen offload, other passengers namely carbon dioxide – the waste product of metabolism – will pile aboard, and the red blood cells will begin a return journey back to the lungs.

This exchange of oxygen and carbon dioxide changes the appearance of blood. The blood cells in the veins that care more carbon dioxide will appear blue; the arterial blood, still filled with oxygen will appear bright red.

Eventually, the blood cells make their round through the body and back to the lungs, where carbon dioxide will exit the alveoli, up the throat, and out the mouth and nose in an exhale. More oxygen eventually boards red blood cells again in the next breath and the process starts again.

Every healthy cell in the body is fueled with oxygen, and this is how it is delivered. It takes a blood cell about a minute to go through the entire process. Inside each of our 25 trillion red blood cells are 270 million hemoglobin, each of which has room for four oxygen molecules. That's a billion molecules of oxygen boarding and disembarking within each red blood cell trip through the body.

II. IT WAS IMPOSSIBLE FOR GARY SMOLKER TO EXPERIENCE HAVE NORMAL RESPIRATION WHILE SYLOID 244 WAS IS IN THE AIR HIS CONDO. See attached Declaration of Gary Smolker.

It was impossible for SMOLKER to freely breathe through his nose while sleeping in his condominium unit after TERMITE installed SYLOID 244.

The SYLOID 244 which invaded the living spaces in SMOLKER'S condominium unit made it impossible for SMOLKER to avoid unprotected contact with SYLOID 244.

Unprotected contact with SYLOID 244 adversely effected SMOLKER'S nose, mouth, throat and respiration.  See attached Declaration of Gary Smolker.

 SMOLKER recently learned that there is scarring of his lungs.  See May 1, 2019 and July 23, 2020 CT of the Chest attached as Exhibits C and D to Declaration of Gary Smolker.

SMOLKER attributes lung scarring revealed on the May 1, 2019 CT of His Chest and on the July 23, 2020 CT of His Chest to unprotected contact with SYOLID 244(illegally sold by GRACE to TERMITE) which occurred while SMOLKER was living in his condominium unit.

Soon after TERMITE installed SYLOID 244 in SMOLKER'S Condominium Unit, SMOLKER began to suffer constant chronic nose and throat irritation and shortness of breath.

Simultaneously SMOLKER had a painfully dry mouth, a painfully dry throat and extremely dry skin.

He had headaches, light headedness, difficulty concentrating and dizziness, chronic sinus problems and sore throat.

He suffered nervousness, depression, and had trouble sleeping.

He was told he had reactive airwave disease and that his problems were caused by unprotected contact with SYLOID 244.

Throughout the time period commencing in when TERMITE installed SYLOID 244 in SMOLKER'S condominium unit until SMOLKER permanently moved out of his condominium unit in February 2002, SMOLKER could not breathe properly.

On or about October 10, 1997 SMOLKER filed suit in Los Angeles Superior Court against GRACE and TERMITE for damages in Los Angeles Superior Court Case No. BC 173952.

At the time SMOLKER filed suit did not know that his lungs were scarred. He did not learn that his lungs were scared until on or about May 1, 2020.

## II. RESPONSE AND OBJECTIONS TO STATEMENTS MADE IN GRACE'S MOTION FOR SUMMARY JUDGMENT

1. GRACE misstates California law and bankruptcy law.

Under California law the statute of limitations on a person's claim, does not begin to run until that person knows or should know he has been injured. SMOLKER did not receive a copy of the May 1, 2019 CT of CHEST revealing his lungs had been scared prior to May 1, 2019 and did not understand what that meant when he received it.

On July 13, 2020 SMOLKER had a fist meeting with a pulmonologist. The pulmonologist ordered the July 23, 2020 CT of Chest. SMOLKER has not conferred with his pulmonologist about that CT scan yet.

As a result of this pending Chapter 11 bankruptcy SMOLKER has been prevented from and unable to file any further claim against GRACE since GRACE filed for bankruptcy protection on April 2, 2001. The filing of the Chapter 11 bankruptcy petition had the effect of tolling the statute of limitations for filing a new claim against GRACE since April 2, 2001.

2. GRACE and its attorneys committed a fraud on the Bankruptcy court by representing they knew of no potential liability to SMOLKER when they made their motion to life Judge Carey's stay. GRACE had previously lost a motion for summary judgment in which GRACE claimed it had not illegally manufactured and it had not illegally sold SYLOID 244 to TERMITE. SMOLKER did not learn of this fraud until much after Judge Carey signed his order allowing the Superior Court case to go forward. SMOLKER asked the Court of Appeal to sanction GRACE and its attorneys for committing such fraud. Neither GRACE nor its attorneys denied that they had defrauded the bankruptcy court.

7

3. SMOLKER did not have an affirmative obligation under California law to bring his Los Angeles Superior Court action against GRACE to trial because SMOLKER was enjoined and prohibited from doing so by an order issued by trial judge Richard Fruin, Jr.

4. SYLOID 244 is a very dangerous product. SYLOID 244 is repeatedly identified by name in SMOLKER'S FIFTH AMENDED COMPLAINT. The way it is installed by TERMITE is unsafe. See Declaration of Peter J. Novak.The public deserves to know that.

Dated: August 15, 2020

*[signature: Gary J M Smolker]*

## DECLARATION OF GARY S. SMOLKER

I Gary S. Smolker declare:

I make each of the following statements on my own personal knowledge.

Home Saving Termite Control, Inc. was cited for using SYLOID 244 because it was against the law to use SYLOID 244 when it was used in my condominium. It was against the law because it was not registered or approved by any governmental agency.

After installation of SYLOID 244 in my condominium complex and in my condominium unit I

- I could not breathe properly.
- When I inhaled my nose burned. When I went to sleep I put a coating of Vaseline on my nostrils.
- When I went to sleep my lips dried out. I put a coating of Vaseline on my lips to prevent them from drying out.
- My mouth and throat were constantly painfully dry. My skin dried out.

Attached hereto as Exhibits A, B, C, and D are true and correct copies of

- Exhibit "A" Excerpt of discussion of amorphous synthetic silica in American Society for Testing Materials.
- Exhibit "B" Declaration of Peter J. Novak, filed on November 6, 2002 in Los Angeles Superior Court Case No. BC 173952.
- Exhibit "C" May 1, 2019 CT OF THE CHEST
- Exhibit "D" July 23, 2020 CT OF THE CHEST

GRACE and its attorneys did not disclose to the bankruptcy court when applying for an order lifting the stay on prosecution of the Los Angeles Superior Court action the important fact that GRACE had made and lost a motion for summary judgment in the Los Angeles Superior Court case. In ruling on that motion the trial judge ruled that GRACE had not registered SYLOID 244 prior to selling it to TERMITE as a pesticide.

I was unable to bring my action against GRACE to trial because Judge Fruin, the trial judge in the Los Angeles Superior Court action, had issued an order preventing me from doing so.

I did not agree to receive service by email. I did not receive GRACE's Motion for Summary Judgment by US Mail until a few days ago. I was not given enough time to respond.

I declare under penalty of perjury under the laws of the United States that the foregoing statement of facts is true and correct.

This declaration is executed on August 15, 2020.

GARY S. SMOLKER

# Exhibit A

# HEALTH EFFECTS OF SYNTHETIC SILICA PARTICULATES

D. D. Dunnom, *editor*

**ASTM STP 732**

AMERICAN SOCIETY FOR
TESTING AND MATERIALS

F

Copyright © by AMERICAN SOCIETY FOR TESTING AND MATERIALS 1981
Library of Congress Catalog Card Number: 80-69063

NOTE
The Society is not responsible, as a body,
for the statements and opinions
advanced in this publication.

5–(
mi
For
pos
edi

Printed in Baltimore, Md.
May 1981

# Foreword

The Symposium on Health Effects of Synthetic Silica Particulates was held 5–6 Nov. 1979 in Benalmadena-Costa (Torremolinos), Spain. ASTM Committee E-34 on Occupational Health and Safety and the Industrial Health Foundation jointly sponsored the symposium. Paul Gross presided as symposium chairman; D. D. Dunnom served as symposium coordinator and edited this publication.

9 (1980),

$19.75,

y of the
re Using

y of the
re Using

y of the
ASTM

y of the
g ASTM

y of the
D 1739,

iculates;
roducts,

ation of
S 55-S7

of the
roducts,

of the
ASTM

sed for

# A Note of Appreciation
# to Reviewers

This publication is made possible by the authors and, also, the unheralded efforts of the reviewers. This body of technical experts whose dedication, sacrifice of time and effort, and collective wisdom in reviewing the papers must be acknowledged. The quality level of ASTM publications is a direct function of their respected opinions. On behalf of ASTM we acknowledge with appreciation their contribution.

*ASTM Committee on Publications*

v.
IE      185
        194

        199
        210

        214

        221

# Introduction

This volume is the result of an effort by ASTM Committee E-34 on Occupational Health and Safety to collect, in one place, current knowledge and commentary on human health problems resulting from exposure to synthetic silica dusts. Such information is needed by a task group of Committee E-34 in its assignment of writing standard practices for human occupational exposure to silica dusts. Such dusts include not only the quartz dusts, which have been extensively studied, but also the large and diverse class of silicas resulting from chemical and physical processing of silica minerals or from the synthesis of small particle silica powders by several industrial routes. These latter products have been found to be only poorly differentiated in scientific studies and, consequently, have been classed with quartz or other mineral silicas in health regulations.

It was the intention, in the organization of the symposium in 1979, to elicit data relating to human health effects of the synthetic silicas, but not to exclude data from studies with quartz or other mineral silicas which would bear upon an understanding of disease processes resulting from exposure to synthetic silica dusts. It was desired, further, to bring into consideration the totality of physiological responses to silica dust inhalation rather than confine the attention of the symposium to fibrotic lung responses. Finally, encouragement was given to the discussion of silica dust disease mechanisms in terms of the physical chemistry of the silica particulates, as well as in terms of physiological chemistry. It was not expected that these broad objectives could be fulfilled in this first, small conference, but it is hoped that the efforts presented here will lead to further interest and activity along these lines with ultimate success in the understanding and effective control of silica dust exposure related illness.

It will be noted that the papers by Drs. Baumann and Heppleston have been presented without discussion, for the reason that the authors were unable to present these because of unforeseen circumstances. They are included in this publication in order to complete the picture of the present understanding of the physiological effects of silica particulates which the reader will obtain.

In addition to the authors and the symposium chairman, Dr. Paul Gross, whose efforts are represented in this volume, credit must be given to many individuals and organizations whose assistance made the symposium and this publication of its proceedings possible. I wish to acknowledge, particularly, the assistance of the sponsoring organizations, ASTM and the Industrial

1

2   HEALTH EFFECTS OF SYNTHETIC SILICA PARTICULATES

Health Foundation; in the latter organization, the support of Dr. D. C. Braun and G. H. Reilly was invaluable.

Thanks and appreciation are extended to the following organizations for their support and assistance:

> Cabot Corporation
> Davison Chemical Division, W. R. Grace & Co.
> Degussa, G.m.b.H.
> Dow Corning Corporation
> Malvern Mineral Company
> PPG Industries, Inc.
> PPG Industries Foundation

Finally, I wish to express my gratitude to PPG Industries, Inc., for their support of the entire project, and to the many typists who labored along with me on the transcripts of the discussions of the papers and on the voluminous correspondence.

*D. D. Dunnom*

PPG Industries, Inc., Pittsburgh, Pa. 15222; symposium coordinator and editor

22    HEALTH EFFECTS OF SYNTHETIC SILICA PARTICULATES

that of particles of 50 or 100 Å. In a short-term test with erythrocytes, 50 Å particles are not so soluble, so they will behave as was shown. 20 Å particles will dissolve very rapidly at a pH of 6 and produce a supersaturated solution of monomer that can migrate to other sites and re-polymerize. The monomeric silicic acid has no local effect. It depends on how much silica was ingested by cells. A very high concentration of monomeric silica can cause damage to kidneys by precipitation with kidney cell disruption. Certainly particles of 20-Å size dissolve very quickly and form supersaturated solutions. I think that the high solubility of those particles caused their toxicity.

It is obvious that calcium ions would be adsorbed on a negatively charged surface so that there would be calcium ions nearby instead of sodium ions. If the concentration were high enough, they probably would displace sodium. On pure silica, at pH 6, very little calcium is absorbed, but I do not think anybody has ever examined the adsorption of calcium ions on top of the aluminum negative charge sites.

*Paul Gross*[2] (*written discussion*)—Regarding Dr. Schepers's question about the action of extremely small silica particles causing the death of animals, I can speak with some degree of certainty regarding the effect of extremely fine particles of different dusts when in contact with the lining of the air spaces. If, say, 20 mg of coarse particles of whatever character, whether kaolin or silica, in suspension, is injected intratrachially into rats' lungs, the animals will survive. If, however, 20 mg of extremely fine particles less than 0.5 $\mu$m in diameter is injected, those animals will die before the syringe is withdrawn from the trachea, the death being due to a fulminating pulmonary edema. What happens is, apparently, that the extremely fine particles are capable of penetrating the alveolar lining and injuring the endothelium of the capillary so that the capillaries lose their semipermeability and become permeable.

*R. K. Iler* (*author's closure*)—Particles of 20 Å are 500 times smaller than 1-$\mu$m particles which are not soluble. These particles of 20 Å diameter will dissolve at a pH above 6 or 7 quite rapidly, regardless of what kind of organic material is adsorbed, because the monomeric silica that develops diffuses out through any of these adsorbed coatings. I know of no way to keep the particles from going into solution by an adsorption mechanism if the pH is above, say, 7.

*J. H. Dauber*[3] (*written discussion*)—I believe that the pH of the intestinal contents is close to neutral. Although the pancreatic secretions into the intestine are somewhat basic, the pH in the intestine is probably not above 7.

[2]Director of Pathology Research, Industrial Health Foundation, Inc., Pittsburgh, Pa. 15232.
[3]Assistant Professor of Medicine, University of Pennsylvania, Philadelphia, Pa.

ICULATES

of particle size of crys-
rs. I think the first indi-
svatter, who found that
:e much more extensive
coarser particle size. I
'r. Iler has brought out
. who found that the ef-
using dissolution of the
llular enzymes, so as to
ect of silica upon mem-
in what particular por-
of membranes.

ire or less chemical and
attracted to the surface
· such attraction to oc-
quaternary ammonium
iich makes up the sur-
negatively charged. As
it distortion causes the
contents. I believe that
surface. I believe that
nation.

the principal effect of
This is contrary to the
and Heppleston.

ep regarding cytotox-
ca particles. Any par-
ith a membrane with
me membrane tightly
irticle has to interact
the damage is done
htly wrapped around
ne disruption, as Dr.
e is a chance for leak-
it is this membrane
ze is important prob-
s for the cell to ingest
tually no phagocyto-
y ingested and, once

*H. K. Ferch (written discussion)*—I think that it is important to discuss "What is particle size?". If one looks at ground quartz one may find a certain figure such as 3 or 5 microns, for instance, by any method. If one looks at finely divided materials, independent of the method of manufacturing, there is more or less of a tendency for agglomeration. Fine particles, especially, tend to form agglomerates. The problem is, in the normal inhalation test, what size particles are able to get into the lung? Very fine particle size hydrophilic materials should be very dusty but, in relation to coarser synthetic silicas, the amount which is able to go into the lungs of test animals is much smaller. Very finely divided material forms larger agglomerates not able to go into the pulmonary tract, while larger particles are able to do this because the degree of agglomeration is much reduced.

*G. W. H. Schepers (written discussion)*—By chemical analysis of tissues we found that the fine particles and the large particles got into the lungs and stayed there. After all, the smallest diameter of the respiratory tract still is more than 100 $\mu$m, and the largest agglomerates of amorphous silica are only 1 to 5 $\mu$m in diameter.

*R. K. Iler (author's closure)*—I would add that two things must be distinguished: the size of the agglomerate of the originally independent particles and the size of those independent particles that make up the agglomerate. In most of the cases we are talking about, agglomerates of silicas are in the micron range.

# Exhibit  B

Gary S. Smolker, SBN 56...
Alice M. Graham, SBN 33046
Law Offices of Smolker & Graham
4720 Lincoln Boulevard, Suite 280
Marina Del Rey, CA 90292-6977
Tel: (310) 574-9880
Fax: (310) 574-9883

Attorneys for Defendants and Cross Complainants
Gary Smolker and Alice Smolker

ORIGINAL FILED

NOV 0 6 2000

ANGEL...

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

TIG INSURANCE COMPANY. a California corporation,

    Plaintiff,

    vs.

GARY SMOLKER, an individual, and ALICE SMOLKER, an individual, and DOES 1-10, inclusive,

    Defendants.

AND RELATED CROSS ACTIONS

Case No. BC 173 952

(Honorable Richard Fruin, Judge)
(Department 15)

DECLARATION OF PETER J. NOVAK

Hearing:      November 22, 2000
Time:         8:30 a.m.
Dept.:        15

Action filed:  July 7, 2000
Trial date:    Vacated

Peter J. Novak, declares:

-1-

Declaration of Peter J. Novak

Exhibit "C="

000098

1.  I am a residential home builder and real estate developer with thirty years of experience in the residential home building industry. My educational background and training are in mechanical engineering and civil engineering.

2.  I have been responsible for the construction of approximately 10,000 single family residences, condominium units and apartments units in Southern California over the past twenty years.

3.  One of my residential housing projects, the 632 unit Medici apartment complex, is now under construction in downtown Los Angeles. I was in charge of the design of the 632 apartment unit Medici apartment project in downtown Los Angeles, and am now in charge of the construction of the Medici apartment project.

4.  The Medici apartment complex is a $90 million new construction project, located on the west side of the Harbor Freeway about five minutes from the Los Angeles County Courthouse. There are approximately 500 workers on the Medici construction site each day.

5.  I make this declaration in my capacity as an expert in residential design and construction; an expert in safety issues in residential design and construction; an expert in the physics of air movement and particle movement; and, in my capacity as an expert in how air enters, moves around in, and leaves a house.

6.  I have reviewed the following materials attached as Exhibits "1" through "23" to the Smolkers' "Appendix of Exhibits Submitted in Opposition to Motions for Summary Judgment":

(a)  United States Patent Number 5,542,207, dated August 6, 1996, issued to Inventor Wayne F. Morris, Sr., entitled *Process for Controlling Insect Infestations In A Structure*, concerning Home Saving Termite Control's patented process for applying silica gel in residential structures for the purpose of eliminating termites. Exhibit "1."

-2-

Declaration of Peter J. Novak

000099

This patent states:  A sufficient number of holes must be drilled through the walls to insure total inside space penetration.  Testing has shown that normal spacing for the access apertures is typically between three and four feet to obtain proper coverage.  *"As the interior wall spaces of the structural voids are being dusted, if the dust being injected utilizing the spray gun does not escape out through an adjacent access aperture then the spacing of the access apertures is not sufficiently close."*

(b) Grace Davison Material Safety Data Sheet, Ref. No. 7013, dated June 15, 1995, Product: Syloid Silicas (Xerogel/aerogel grades) concerning the danger of inhaling Syloid 244 and the danger of having dermal contact with Syloid 244.  Exhibit "2."

(c) Deposition testimony of Mr. Matt Fredericks, President of Pacific Villas Homeowners Association,  concerning Mr. Fredericks' observation of the application of Syloid 244 at Pacific Villas Condominium Complex in October 1996 by Home Saving Termite Control, Inc.  Exhibit "3."

(d) Deposition testimony of Mr. Corey Arentz, Home Saving Termite Control Pesticide Applicator, concerning application of Syloid 244 at Pacific Villas Condominium Complex by Home Saving Termite Control in October 1996 and existence of unsealed holes in the common area hallway and on the deck of the Smolkers' condominium unit at time of the Mr. Arentz's deposition in 1998.  Exhibit "4."

(e) Deposition testimony of Mr. Evenor A. Masis, Environmental Health Specialist, Department of Health Services, County of Los Angeles, regarding Mr. Masis' observations during Mr. Masis' inspection of Mr. Fredericks' condominium unit in September 1997, and the danger of inhaling amorphous silica gel.  Exhibit "5."

-2-

Declaration of Peter J. Novak

(f) Deposition testimony of Mr. Greg Adams, State of California, Structural Pest Control Board Specialist, regarding customary application of silica gel based pesticides, Home Saving Termite Control's illegal use of Syloid 244 as a pesticide and toxicity of Syloid 244.  Exhibit "6."

(g) Deposition testimony of Mr. Jeffrey Humphreys, Deputy Director, Consumer Protection Bureau, Department of Agricultural Commissioner Weights and Measures of the County of Los Angeles, regarding customary application of silica gel based pesticides and Home Saving Termite Control's illegal use of Syloid 244.  Exhibit "7."

(h) Deposition testimony of Mr. Mike Cunningham, Foreman of Air Duct Cleaning Company, regarding Mr. Cunningham's discovery of Syloid 244 in the air ducts of the Smolkers' residence during Mr. Cunningham's inspection of the air ducts at the Smolker residence in 1998.  Exhibit "8."

(i) Specimen label for Drione Insecticide.  Exhibit "9."

(j) Specimen label for Dri-Die Insecticide.  Exhibit "10."

(k) Label for Dri-Out Insecticide.  Exhibit "11."

(l) Application for Registration of Economic Poison (Pesticide) submitted by Home Saving Termite Control, Inc. ("Termite Control") to the Pesticide Registration Branch of the Department of Pesticide Regulation of the Environmental Protection Agency of the State of California ("DPR").  Exhibit "12."

(m) Confidential Statement of Formula submitted by Termite Control to the US EPA.  Exhibit "13."

(n) Letter addressed to Mr. Duane Schnabel, Registration Specialist, DPR, from Michael J. Block, Ph.D. on behalf of Termite Control.  Exhibit "14."

-4-

Declaration of Peter J. Novak

(o) Certificate of Registration (License No. 18740) issued on 06/01/99 to Termite Control by

DPR for Dri-Out Insecticide. Exhibit "15."

(p) W. R. Grace & Co. product data sheet for Syloid 244. Exhibit "16."

(q) Physical and Chemical Characteristics Study by Michael J. Block, Ph.D., completed on June

30, 1998. Exhibit "17."

(r) Deposition testimony of Mr. David Duncan, Acting Chief, State of California, Environmental

Protection Agency, Department of Pesticide Regulation, Enforcement Branch, concerning W. R. Grace &

Co.'s argument that Syloid 244 didn't need to be registered as a pesticide. Exhibit "18."

(s) Deposition testimony of Mr. Duane L. Schnabel, Senior Registration Specialist, DPR,

concerning the new pesticide product Dri-Out; Dri-Out is repackaged Syloid 244, one hundred percent

Syloid 244. Mr. Schnabel testified: The nominal size of the pesticide dust constituting Dri-Out (Syloid

244) is 1.8 microns aerodynamic diameter. The pesticide use label for Dri-Out specifies the allowed uses

for the pesticide product Dri-Out. Mr. Schnabel further testified: The Dri-Out pesticide use label does

not allow for this product to be released in the air people breath, does not allow for it to be released onto

people's clothing or beds or pillows or couches, etc. It is against the law for this product to be released

in the air people breath, or to be released onto their clothing, etc. Exhibit "19."

(t) The informational brochure entitled: "Information Regarding the Home Saving Dehydration

System" given by Termite Control to Mrs. Smolker. Exhibit "20."

(u) The informational brochure entitled: "Information Regarding the Home Saving Dehydration

System" previously passed out to members of the public by Termite Control, that is part of the officials

records of the State of California, Structural Pest Control Board. Exhibit "21."

(v) Grace Davison packing slip for Syloid 244. Exhibit "22."

-5-

Declaration of Peter J. Novak

(F) The article entitled *Lethality of Inert Dust Materials, etc.* attached to the Smolkers' "Appendix of Exhibits Submitted in Opposition to Summary Judgment Motions" as Exhibit 23.

I have also reviewed the Declaration of Ray C. Woodcock, CIH, dated November 5, 2000.

7.  Based upon the materials described in paragraph six, I have concluded and assumed the following.

[A]  Syloid 244 particles are so small they are measured in microns.  A micron is one millionth of a meter.  A micron is so small that about 400 would fit over the dot in the "i" in the word micron.  Under ideal conditions, the unaided eye can see particles as small as 10 microns.  Syloid 244 consists of ultra fine particles of 2.5 micron average particle size of amorphous silica gel.

[B]  On or about October 11, 1996, Syloid 244 was applied in the condominium complex, and in the condominium unit, in which the Smolkers live in the following manner.

[C].  A series of $3/8^{th}$ inch injection holes were drilled by Termite Control personnel in the interior of each condominium unit.  These holes were drilled approximately three to four feet apart, four feet apart if possible.  Several injection holes were drilled at a time before any Syloid 244 was applied.

[D]  After several holes were drilled, a nozzle was placed at one injection hole through which Syloid 244 dust was blasted at a pressure of 125 pounds per square inch into the wall or ceiling void behind that injection hole.  Termite Control's standard procedure, which was followed in the Smolkers' condominium unit, was for the Termite Control pesticide applicator to blast Syloid 244 in through one injection hole and to continue blasting until after Syloid 244 would start coming out back into the residence through another injection hole.

[E]  A cloud of Syloid 244 dust would come out of an adjacent $3/8^{th}$ inch injection hole in a burst fashion into the living area of each condominium unit as Syloid 244 was simultaneously being blasted into

-6-

Declaration of Peter J. Novak

000103

the wall void through an adjacent 3/8th inch injection hole. Additionally, Syloid 244 dust would simultaneously come out of electrical sockets and phone jacks in the walls into the living area as Syloid 244 injection into the wall void was simultaneously taking place through a nearby 3/8th inch injection hole.

[F] After the injection process was completed, Termite Control personnel filled in some of the 3/8th inch injection holes they had drilled with wooden plugs, then put spackel over the plugs. Other 3/8th inch injection holes that Termite Control personnel had drilled were left open.

[G] The structural void above the drop ceiling in the common area hallway was treated with Syloid 244 by Termite Control personnel. After the injection process was completed, the series of 3/8th inch injection holes drilled into the common area hallway ceiling were left open. These holes were left open for over a year. They were not sealed until June 1998.

[H] Syloid 244 dust got into the air and onto non-target personal property in every condominium unit treated by Termite Control, including the condominium unit in which the Smolkers live. It was no accident that Syloid 244 got into the air in the Smolkers' home. It was no accident that Syloid 244 applied by Termite Control contaminated the Smolkers' personal property. It was known in advance to Termite Control that this was likely to happen.

[I] Before starting the job at the condominium complex in which the Smolkers live, Termite Control knew that each treated condominium unit would become contaminated with Syloid 244 dust particles during the application process.

[J] Termite Control personnel brought dust rags and ordinary vacuum cleaners to the job site.

-7-

Declaration of Peter J. Novak

[K] Termite Control personnel vacuumed carpets and rugs on floors and dusted furniture in each unit as each unit became contaminated with Syloid 244 as a matter of course during the Termite Control pesticide application process.

[L] Termite Control personnel did not close holes in the framing covering before commencing to inject Syloid 244 in wall and ceiling voids. Termite Control did not seal off electrical sockets, phone jacks, light switches, or any other openings in walls, to prevent Syloid 244 from entering the living area of the units being treated. Termite Control personnel did not close and refinish all holes in framing covering after completion of their application of Syloid 244 in the premises. No steps were taken by Termite Control personnel to assure containment of all Syloid 244 dust particles injected into wall and ceiling voids; furniture and furnishings were not protected from becoming contaminated.

[M] Termite Control personnel applied 6 pounds of Syloid 244 in each condominium unit.

[N] After Termite Control completed its work and left the job site, Syloid 244 dust particles injected into structural voids by Termite Control personnel continued to come into individual condominium units through electrical sockets, phone jacks and other openings in the walls, ceilings, at interfaces of walls and ceilings, at interfaces of walls and windows, and other penetrations of the covering over the framing of the treated units.

[O] It is necessary to wear goggles, respirators, and protective clothing when Syloid 244 is in the air being breathed.

8. In my opinion:

[AA] Syloid 244 is toxic and an inherently unsafe product that cannot safely be allowed to contaminate residential living areas where it can come in contact with human beings and be inhaled over a prolonged period of time.

-3-

Declaration of Peter J. Novak

[BB] Not only is Syloid 244 an inherently unsafe product with toxic properties, but it was applied in the Smolkers' home in a manner which enhanced its toxicity and made it unsafe to live in the Smolkers' home.

[CC] Syloid 244 was not used in the Smolkers' home in a manner consistent with the Dri-Die, Drione, or Dri-Out pesticide use labels. Dri-Die, Drione, and Dri-Out pesticide use labels are attached as Exhibits "9," "10," and "11" to the Smolkers' "Appendix of Exhibits Submitted in Opposition to Motions for Summary Judgment." None of these labels allow pesticide to be blasted into living areas of a home. Syloid 244 was blasted, by pneumatically pressurized means, into the living areas of the Smolkers' home. The Drione and Dri-Die labels due not allow application of the pesticide by pneumatically pressurized means. The Dri-Out label only allows application by pressurized means into wall and ceiling voids in instances where the pesticide will be contained in the wall and ceiling voids. The manner in which Syloid 244 was used in the Smolkers' home resulted in the Syloid 244 not being contained, but instead getting into the air and all over personal belongings in the Smolkers' home. The method used by Termite Control guaranteed that the lived in part of the Smolkers' home would become contaminated with Syloid 244. A more detailed explanation of the fact that the Syloid 244 applied in the Smolkers' home was in a manner not consistent with the above listed pesticide use labels is set forth in subparagraph QQ below.

[DD] It was inherently unsafe to use Syloid 244 the way it was used in the Smolkers' home because Syloid 244 which has been injected into wall voids flows out through the walls into the living area during the pesticide application process and after the termite treatment is completed when pressure forces are applied to the wall voids. When pressure forces are applied to the wall voids by leaning on the walls, opening and closing doors, opening or closing windows, running a clothes dryer in the home, or by wind blowing into the walls from outside the building, Syloid 244 may be driven into the home.

-9-

Declaration of Peter J. Novák

[EE] I was present when the Smolkers' home was inspected by Termite Control's and W. R. Grace & Co.'s expert, Dr. Douglas Fowler on April 23, 2000. On that day, two face plates in the Smolkers' living room were removed by me to inspect the condition inside the walls. I removed these face plates after I was told they had been removed by Dr. Fowler.

[FF] One face plate is located on a wall between two Termite Control injection holes. Behind that face plate is a box and phone wires for the Smolkers' phone. Behind the box and phone wires is another wall which is the exterior boundary of the building. When I looked behind this face plate I couldn't see any silica gel powder. The silica gel powder that had landed in the box behind that face plate had been removed by wind movement, which caused silica gel to flow into the Smolkers' home.

[GG] Face plate two is located on a dividing wall in the Smolkers' living room which separates the living room from another room on the same floor. Behind this face plate is a box and wires for an electrical switch. When I looked behind this face plate I saw generous amounts of silica gel in the box behind the face plates and on the electrical wires in the box. Approximately two years later, in June 2000, I was present when cross-defendants inspected the Smolkers' home again. At that time I removed the same face plate. Pressure forces in the interior wall had caused the silica gel that had been in the box behind face plate two on April 23, 1998 to have flowed out of that box into the interior of the Smolkers' home.

[HH] While in the Smolkers' home, on April 23, 1998, I also inspected the Smolkers' bedroom. The Smolkers' bedroom is located on the fourth floor of the Smolkers' home. In the Smolkers' bedroom I saw that Termite Control had drilled a series of injection holes, separated by inches not feet. These injection holes had been drilled from the inside of the Smolkers' bedroom into a wall located about three feet away from the pillows on the Smolkers' bed.

-10-

Declaration of Peter J. Novak

[II]  The bedroom wall these holes were drilled into abuts and surrounds and contains a sliding glass door. The sliding glass door opens on to a deck.

[JJ]  From inside the Smolkers' bedroom there is a direct view of the ocean. From the deck outside the Smolkers' bedroom there is a direct view of the ocean. There is unimpeded flow of ocean breezes from the ocean to the deck, to the glass door and to the wall in which these holes were drilled.

[KK]  There is not always a perfect seal between sliding glass door frames and the walls they are put into. There was not a perfect seal between the sliding glass door frame and wall interface of the wall in which these injection holes were drilled.

[LL]  Syloid 244 blasted through these injection holes came out of these injection holes into the Smolkers' bedroom and onto the Smolkers' bed, pillow cases, bed sheet, headboard, carpets, etc. during the pesticide treatment. After completion of the Syloid 244 treatment, additional Syloid 244 which was remaining in this wall void came out of the wall void into the Smolkers' bedroom through openings in that wall -- when the ocean breezes and wind blew against that wall, and when the sliding glass door was opened and closed.

[MM]  While in the Smolkers' home, I also observed the injection holes drilled by Termite Control personnel in the dining room ceiling of the Smolkers' home. These injection holes were drilled near a large opening in the Smolkers' dinning room ceiling covered by a decorative grill. When Syloid 244 was blasted though the injection holes drilled in the dinning room ceiling of the Smolkers' home, the Syloid 244 blasted above the drop ceiling came out of opening in the drop ceiling down into the Smolkers' dining room.

-1-.

Declaration of Peter J. Novak

[NN] I also personally observed evidence that during the Termite Control application of Syloid 244, Syloid 244 came blasting out of pre-existing wall penetrations made by nails driven into the walls in Leah Smolker's bedroom to hold shelf brackets in Leah Smolkers' bedroom.

[OO] I had personally been in Leah Smolker's bedroom before the pesticide treatment in 1996 by Termite Control. I know from my own personal observation, that in 1996, at the time of the Syloid 244 treatment by Termite Control, there were wooden shelves on the walls in Leah Smolker's bedroom.

[PP] In approximately May 1998, I took down the shelves in Leah Smolker's bedroom and also took down the metal brackets supporting those shelves. At that time I observed, the faces of the metal brackets that had been facing the walls in Leah's bedroom were coated with Syloid 244. They were covered with Syloid 244 because Syloid 244 had been applied into the walls in Leah's bedroom with such great force, into the wall voids, that Syloid 244 particles came blasting back out through open space in the walls created when the nails were driven into the walls the nails had been nailed into.

[QQ] Utilization of the Home Saving Termite Control, Inc. *patented application process* for applying silica gel based pesticide in an already built residential structure would be against the permitted uses specified for Drione Insecticide in the Drione specimen label. Utilization of the Home Saving Termite Control, Inc. *patented application process* for applying silica gel based pesticide in an already built residential structure would be against the permitted uses specified for Dri-Die Insecticide in the Dri Die specimen label. Utilization of the Home Saving Termite Control, Inc. *patented application process* for applying silica gel based pesticide in an already built residential structure would be against the permitted uses specified for Dri-Out Insecticide in the Dri-Out pesticide use label.

With respect to treatment for Drywood Termites:

-12-

Declaration of Peter J. Novak

000109

The DRIONE label does not allow application of Drione by use of pneumatic pressurized dusting equipment disbursing Drione particles at 125 pounds per square inch. The Drione label only allows use of an electric or hand operated rotary duster, to distribute Drione through an entry, e.g. crawl hole into attic and crawl space of a building. The application in the Smolkers home was with the use of pressurized dusting equipment disbursing amorphous silica gel particles at a pressure of 125 pounds per square inch through 3/8th inch holes drilled in walls and ceilings. The Drione label does not allow injection of Drione by use of a duster for the purpose of killing termites anyway but through an entry crawl hole into attics and crawl spaces of buildings. The application in the Smolker home was to the total structure by a high pressure (125 pounds per square inch) application. The Drione label cautions: *"If reasonably heavy infestation has already developed, fumigation should be employed."* The treatment carried out in the Smolkers' home was a substitute for fumigation. The Drione label states: *"Do not apply when weather conditions favor drift from areas treated."* The method of application utilized in the Smolkers' home guaranteed that the pesticide applied would drift from the areas treated (the interiors of walls and ceilings). The Drione label states: *"Care should be taken to avoid depositing the product onto exposed surfaces or introducing the material into the air."* The method of application of the product in the Smolkers' home resulted in the product getting onto to exposed surfaces and into the air, and guaranteed that the product would get onto exposed surfaces and into the air. No care was taken to avoid introducing the material into the air.

The Dri-Die label does not allow the use of pneumatic pressurized dusting equipment disbursing pesticide particles at a pressure of 125 pounds per square inch in wall or ceiling voids. The Dri-Die label only allows the use of an electric or hand operated rotary duster to distribute the pesticide product through an entry crawl hole into attics, crawl spaces and other infested areas of buildings. The

-13-

Declaration of Peter J. Novak

000110

application in the Smolker home was to the total structure by high pressure (125 pounds per square inch)

application of pesticide product through 3/8ᵗʰ inch holes drilled into walls and ceilings.

The Dri-Out label does not allow pressurized application of Dri-Out to areas where dust particle containment cannot be assured. The application in the Smolker home was not done in a way that assured pesticide dust particle containment. The application performed in the Smolker home guaranteed and resulted in pesticide dust particles getting into the living area of the Smolker home and all over the Smolkers' personal belongings. The Dri-Out label requires that: *"All holes in framing covering must be closed and refinished."* All holes in the framing covering in the Smolker home were not closed or refinished before the pesticide application or after the pesticide application. As a result of Termite Control not closing all holes before applying the pesticide in the Smolker home, pesticide dust particles were blasted into the Smolkers' living, bedrooms, air ducts, etc. during the pesticide application. As a result of not sealing all holes after the pesticide application, pesticide continued to come into the Smolkers' bedrooms, living room, etc. after the pesticide application.

Termite Control's pressurized application process is inherently dangerous and unsafe because it cannot be carried out without contamination of the air and personal belongings in homes being treated.

[RR] For the reasons stated above, had Termite Control used Dri-Die or Drione in the Smolkers' home, instead of applying Syloid 244, in the manner described above, such use would have been in a manner inconsistent with the directions for use specified in the pesticide use labels for Drione Insecticide, Dri-Die Insecticide, and Dri-Out Insecticide attached as Exhibits "10," "11," and "12" to the Smolkers' "Appendix of Exhibits Submitted in Opposition to Motions for Summary Judgment."

-14-

Declaration of Peter J. Novak

[RR] Syloid 244 was deliberately blasted into the Smoikers' home in a way that had previously been forbidden by the US EPA. According to the Drione, Dri-Die, and Dri-Out pesticide use labels referred to above, it was a violation of federal law to use this product in that manner.

9. In my opinion the application of Syloid 244 in the manner described above presented a clear and unreasonable risk of harm to occupants of the Smoiker residence because:

[AAA] Syloid 244 can cause bodily injury to human beings when it is inhaled or comes in contact with their skin. The Home Saving Termite Control, Inc. *patented application process* for applying Syloid 244 in wall voids and ceiling voids in an already built residential structure requires that Syloid 244 dust particles contaminate human living space in the interior of the residential structure being treated. The Syloid 244 product that gets into the home treated by the Home Saving Termite Control, Inc. process exposes residents to the danger of having dermal contact with the Syloid 244 and to the danger of inhaling the Syloid 244 introduced into their home.

[BBB] The force applied while injecting small particles at 125 pounds per square inch through 3/8th inch holes drilled into walls and ceilings in the interior of already built wood frame construction residence will carry particles along a path in the voids back into the living spaces of the residence being treated. According to the testimony of Mr. Fredericks no steps are taken by Termite Control personnel to protect furniture inside the home, or carpeting or other personal belongings. An attempt is made to clean up pesticide dust with damp rags and regular vacuum cleaners. That is not an effective measure for removing this dust. HEPA vacuum cleaners would have to be used to get the dust out of carpets. Porous fabrics contaminated with such dust would become a total loss. All porous materials and furniture should have been removed from the house being treated before the home was treated or should have been protected from being exposed to amorphous silica dust during treatment and after treatment.

-15-

Declaration of Peter J. Novak

[CCC] It is impossible to contain Syloid 244 pesticide particles in wall or ceiling voids that are being pressurized by a continuous blast of dust being applied at 125 pounds per square inch pressure. At that pressure, if there were no cracks or other openings in the walls to release pressure build-up, the build up of pressure inside the walls and ceilings would cause the framing covering (drywall) to either crack, fracture, blow up or pull apart from the walls it was nailed to. Nails holding drywall into studs could be pulled out, pulling out the nails holding drywall into the wooden studs to create openings for the pressure to be released. The pressure build-up inside the wall voids will depend upon the tightness of the containment. Successful application cannot be done without venting (to release pressure build-up in) the space being treated. The air used to convey the amorphous silica gel into the wall voids has to go somewhere.

[DDD] If the air pressure is the same on both sides of a crack or other opening in a wall there will be no air flow. However, it doesn't take much pressure difference at all to move air. How much air moves, and how fast will depend on the size of the opening and the pressure difference.

[EEE] The coverings customarily used on wood framed buildings are not built to withstand 125 pound per square inch pressure forces.

[FFF] Standard atmospheric pressure at sea level is 14.7 pounds per square inch, which is 33.96 feet of water, or 407.52 inches of water, which is 29.92 inches of mercury, or 760 millimeters of mercury. The feet, inches or millimeters is the highest column of water or mercury you can pull in a manometer with a vacuum at one end and open to the air at the other end. The pressures needed to cause significant flows in air are very small, and measured in Pa (Pascals) as opposed to the huge differences of pounds per square inch. One Pascal is only 0.4% of an inch of water. One standard atmosphere (14.7 pounds per square inch) is 101,325 Pascals. One Pascal is less than one hundred thousandth of an atmosphere,

Declaration of Peter J. Novak

"normal" air pressure. Syloid 244 dust particles blasted into wall or ceiling voids will go from the point of injection (at the high pressure of 125 pounds per square inch) to the point of least pressure that they can gain access to by the path of least pressure resistance. It is only pressure difference that drives flow, not pressure. In the article on the *Lethality of Inert Dust Materials, etc.* (See Exhibit "23" attached to the Smolkers' "Appendix of Exhibits Submitted in Opposition to Motions for Summary Judgment") the authors report: *Field trials have showed that wherever there are openings, the dust laden air will deposit a coating as it escapes to the outside. In dustings of homes, many have appeared to be on fire as the dust billowed out from under shingles and through attic vents, giving the appearance of smoke. "*

[GGG] Mr. Fredericks testified that months after the pesticide treatment, he found Syloid 244 escaping from two wall plate outlets, coming out of the cavities behind the wall of a phone jack in his kitchen from the cavity behind the wall of an electrical box in his living room. Mr. Fredericks testified that he took a piece of Plexiglas and set it beneath each, the phone jack and the electrical outlet, and left the Plexiglas there for three days. The Plexiglas under the kitchen phone jack collected a quarter to a half teaspoon of Syloid 244. The Plexiglas under the electrical outlet in Mr. Fredericks' living room collected slightly less Syloid 244 over the course of three days. Mr. Fredericks testified that he thought this happened in the second half of 1977.

In all cases in housing performance it is the pressure differences that are the most most important. Flows only occur when pressure differences are applied across openings, paths or holes. The direction of flow will be in the direction of the pressure difference, from the positive pressure region to the negative pressure region, along the pressure difference gradient. If the pressure difference is positive from inside to outside then the flow will be from inside to outside. If the pressure difference is negative from inside to outside (positive from outside to in), the flow will be from outside to in.

-17-

000114

Openings for phone jacks, electrical plugs, electrical switches, and such, will serve as pressure relief valves through which Syloid 244 dust particles will escape (vent) from the high pressure region of the wall or ceiling voids they are being blasted into, back into the relatively lower pressure region of the room or through cracks holes and opening to outside the building.

As the Syloid 244 dust particles seek to escape out the holes cracks and openings in electrical plugs, phone jacks etc. they will bang against the wall plates in which these openings are located. Thereafter, the particles which were unable to immediately escape through the opening will doing the injection blasting procedure will temporarily accumulate in junction boxes behind the wall plates. When air pressures are applied these pesticide particles may become airborne again and come into the living space of the living unit on the other side of the wall plate.

For months after the pesticide treatment is completed, in the example reported by Mr. Fredericks, pesticide dust was observed to be continuing to come out of the wall coverings. Almost a year after the treatment, in September 1997, Mr. Masis observed the pesticide dust on the floor and counter top and wall plate in Mr. Fredericks' unit, and pesticide dust *"coming out of the outlet covers as one hits the walls."*

[HHH] After the Syloid 244 treatment is completed the Syloid 244 which has accumulated in these junction boxes will become airborne whenever air flows through the junction boxes. Air flowing through a junction box into the interior of the residence will carry the now airborne Syloid 244 powder with it into the interior of the treated home.

[III] County of Los Angeles Environmental Health Specialist Evenor Masis testified that Mr. Fredericks complained that synthetic chemicals were leaking from the walls in Mr. Fredericks' condominium unit into Mr. Fredericks' condominium unit on September 16, 1997. An inspection was

-15-

000115

conducted on September 13, 1997, Mr. Masis saw white dust (amorphous silica gel) coming out from outlet covers as one hit the walls in Mr. Fredericks' unit. The reason Syloid 244 was seen flowing out of the electrical outlet cover plate in Mr. Fredericks' condominium unit by Mr. Masis when Mr. Masis pushed on the wall in which the cover plate is located is because the pressure of pushing on the wall caused the volume of air molecules inside the wall to be pushed together and thereby the region of the "void" inside the wall became pressurized. The pressurized air in the wall void then escaped through the light switch cover or electrical outlet cover carrying Syloid 244 particles through the opening in the cover plate. This is the same physical principle upon which a bellows work. This is the same effect as a bellows, in which the wall acts the same as the membrane of a bellows. Pushing the membrane together in a bellows pushes the air contained within the membrane out of the opening in the membrane, and likewise pushing a wall will push the air contained within the wall out of an opening in the wall.

[JJJ] Mr. Fredericks testified that Mr. Fredericks saw Syloid 244 accumulate on a spoon Mr. Fredericks put on his kitchen counter under a light switch in September 1997, approximately a year after the Syloid 244 treatment. When outside force is applied, Syloid 244 can and does move out junction boxes in wall cavities into the interior of living units.

[KKK] A room is a quasi-enclosed container. Opening or closing doors, opening or closing windows, or running a clothes drier in a laundry, room will cause pressure differentials in the rooms of a house which will cause drywall to deflect and act like the membrane of a bellows.

[LLL] Los Angeles County Environmental Health Specialist Masis testified that he observed lines of Syloid 244 powder on the kitchen floor, kitchen counter top, and top of outlet cover plate in Mr. Fredericks' unit, and on the top of outlet cover plates in Mr. Fredericks' living room, when he inspected Mr. Fredericks' condominium unit in September 1997. That is not surprising given the lightness of

-19-

Declaration of Peter J. Novak

Syloid 244, and given that Syloid 244 was still coming out of outlet covers when one hit the walls in Mr. Fredericks' unit in September 1997. Syloid 244 powder is so light that Syloid 244 particles that have landed on carpets will become airborne again when someone walks on the contaminated carpet. To the Syloid 244 dust particles on a carpet the dynamic reaction to the force of the pressure of someone walking on the carpet is the same as the dynamic reaction to the force from jumping on a trampoline. Given that fact and how light Syloid 244 particles are, it is not remarkable at all that Mr. Masis was able to see bands of Syloid 244 that had settled out of the air on Mr. Fredericks' kitchen counter, kitchen floor and face plates in Mr. Fredericks' living, approximately one year after Termite Control applied Syloid 244 in Mr. Fredericks' condominium unit.

. . [MMM] Vacuuming a Syloid 244 contaminated carpet can also cause Syloid 244 particles to become airborne again. The vacuum cleaner to be used should use "HEPA filtration" because that is the only type system that has the ability to catch Syloid 244 sized particulate matter. Unless the gasket connecting the filter to the vacuum cleaner is tight fitting and unless the vacuum bag is capable of catching one micron or smaller particles, vacuuming will cause particles that have settled on carpets to be shot back up into the air. Unless the gasket is tight fitting the particles in air sucked in by the vacuum will go around the filter and be thrown back out up into the atmosphere. Unless the vacuum bag can trap very fine particles the small Syloid 244 particles will go right through the openings in the vacuum bag back into the atmosphere. The mechanical force of a vacuum cleaner sucking in particles will grind the particles into even smaller sizes that will shoot out of any openings in the vacuum cleaner back into the atmosphere. Likewise, the force of the dusting motion while "dusting" Syloid 244 particles with a dust rag will stir the small Syloid 244 dust particles from the surface they have landed on back into the air.

Declaration of Peter J. Novak

000117

creation of a force by a dusting motion will cause a disturbance of the air which will stir the small loid 244 particles back into the air.

[NNN] While in the Smolkers' home, I personally observed where Termite Control had drilled ection holes in the Smolkers' living room in relation to the location of the studs and face plates for one jacks and electrical outlets in the walls in the Smolkers' living room. Termite Control drilled ection holes on the same side of the studs as the outlets in the face plates. This is one of the unsafest actices imaginable.

[OOO] Wall studs are normally constructed 16 inches, on center, apart from each other in what :come the so called "wall voids." Drywall is nailed to the studs to create interior walls. Syloid 244 jected into an injection hole would be expected to follow the path of least resistance. In the situation :scribed in paragraph [NNN], Syloid 244 would be expected to come blasting through the opening in .e face plate, instead of blasting past the stud, because that would be the path of least resistance. The :asons for this are as follows. The holes in the face plate are closer to the injection hole then to the ud. Syloid 244 has to get past the stud to get to the next injection hole, and in order to spread over the ·ood members in the wall void on the other side of the stud. It would be easier for Syloid 244 to go irough the "bigger" holes in the face plates than through the smaller slight opening(s) between the stud ad the drywall nailed to the stud that the Syloid 244 has to go though in order to get to the next yection hole, in order to spread over the wood members in the wall void on the other side of the stud.

10. It is my opinion that Syloid 244 is an inherently unsafe product because it is made of small articles that have toxic properties which can cause bodily injuries to human beings who inhale them and ɔ human beings who have bodily contact with them.

-21-

Declaration of Peter J. Novak

000118

11. The method by which Syloid 244 was applied in the Smolkers' home was inherently unsafe ause it was a virtual certainty that the Smolkers' home would become contaminated with Syloid 244 en Syloid 244 was applied by injection at 125 pounds per square inch into wall voids and ceiling voids ough injection holes drilled in the walls and ceilings in the Smolkers' home.

12. It was knowable in advance to Termite Control, to Mr. W. F. Morris, to Mr. Rikk ompson, to W. R. Grace & Co., and to Grace Davison that the Home Saving Termite Control, Inc. thod of attempting to apply a thin coating of Syloid 244 to inaccessible wood members inside walls { ceilings through an *application process* using high pressure (i.e., 125 pounds per square inch of ssure) to force a mixture of Syloid 244 and air through holes drilled in framing covering into the uctural voids in an already built residential structure requires that Syloid 244 contaminate human living ace.

13. It is well known that air ducts in residential structures are not necessarily well sealed. I am ormed and believe, and it is my opinion, based on the testimony given by Mr. Cunningham (See Exhibit " attached to the Smolkers' "Appendix of Exhibits Submitted in Opposition to Motions for Summary idgment), that Syloid 244 was used in a manner in the Smolkers' home by Termite Control that caused /loid 244 to get into the air ducts in the Smolkers' home. Once in the air ducts, when the Smolkers ran le heating system in their home, the hot air coming out of the air ducts to heat their home carried with it yloid 244 pesticide particles, which got on the Smolkers' skin and which the Smolkers inhaled.

14. A good construction manager should be trained to recognize activities or conditions which ould be detrimental to building occupants. It is widely known in the construction industry that dust ligrating out of work area into occupied spaces can cause injury or illness. It is also well known that

-22-

Declaration of Peter J. Novak

000119

1    airborne particles created during construction work settle out on nearby surfaces, only to become

2    airborne again during later activities, such as cleaning.

3        15. In my opinion, it was reckless of W. R. Grace & Co. to sell Syloid 244 to Termite Control.

4    It was reckless of Termite Control to use Syloid 244 the way Syloid 244 was used in the Smolkers'

5

6    home.

7        I have personal knowledge of the facts set forth herein, except as to those stated on information

8    and belief and, as to those, I am informed and believe them to be true. I am competent to testify, and if

9

10   called upon to testify, could and would testify as set forth herein.

11       I declare under penalty of perjury under the laws of the State of California that the foregoing is

12   true and correct. Executed on November 6, 2000, at Marina del Rey, California.

13

14

15

16                          PETER J. NOVAK

17

18

19

20

21

22

23

24

25

26

27

28

-23-

Declaration of Peter J. Novak

000120

# Exhibit C



MEDICAL IMAGING
Center of Southern California                    Bradley A. Larson, M.D.

**Neal Shanblatt**
1304 15th Street
Suite 402
Santa Monica. CA 90404

**Name:** Smolker, Gary S
**MRN #:** 120630
**DOB:** 11/05/1945
**Exam Date:** 05/01/2019 17:45
**Referring Phys.:** Neal Shanblatt

## CT OF THE CHEST WITHOUT CONTRAST WITH SAGITTAL AND CORONAL REFORMATTED IMAGES

### HISTORY
This is a 73-year-old male for follow-up of pericardiac opacity

### TECHNIQUE
Utilizing the Siemens Sensation 64 slice MDCT scanner, axial images were obtained of the chest from the thoracic inlet to the upper abdomen. The axial data set was used to obtain sagittal and coronal multiplanar reformatted images.

|              | CT DI (mGy) | DLP (mGy*cm) |
|--------------|-------------|--------------|
| Chest without | 15.99       | 564.56       |

In order to minimize radiation exposure to the patient while maintaining optimal image quality, this CT scanner uses protocols incorporating automated exposure control, with tube current (mA) and photon energy (kV) tailored to individual patient size.

Study was performed at medical imaging Center of Southern California, Santa Monica

### COMPARISON
Radiographs April 29, 2019, performed that medical imaging Center of Southern California

### FINDINGS

Visualized lower neck and axilla are unremarkable. There are no enlarged axillary lymph nodes.

There is no mediastinal or hilar lymph node enlargement. Esophagus demonstrate a normal course. There are no endobronchial lesions.

Pulmonary arteries and thoracic aorta are normal in caliber. Heart size is within normal limits. There is heart valvular calcification. There is coronary artery calcification. There is no pericardial effusion. There is prominent epicardial and pericardial fat at the level of the cardiac apex. Image 73, series 2.

There is no pleural effusion.

There is no alveolar consolidation.

Bilateral posterior lower lobes demonstrate mild subpleural parenchymal scarring and bronchiectasis, most prominent toward the lung bases. Image 104, series 4.

Thoracic spine demonstrates mild scoliosis. There is multilevel degenerative disc disease.


SMART HEART AND HEALTH

**Santa Monica**
2811 Wilshire Blvd., Ground Floor
Santa Monica, CA 90402
Tel: (310) 829-9788 Fax: (310) 829-4826
**Beverly Hills**
8777 Beverly Blvd.,
Los Angeles, CA 90048
Tel: (424) 355- 0433 Fax: (866) 417- 7220


SMART BRAIN AND HEALTH



MEDICAL IMAGING
Center of Southern California

Bradley A. Jabour, M.D., chis of Radiology

Sternoclavicular joints the mustard osteoarthritis, greater on the left side.

Visualized abdomen is unremarkable.

**IMPRESSION**
1.  Prior pericardiac opacity: Prior pericardiac opacity depicted on the previous chest x-ray corresponds to slightly prominent, but otherwise normal pericardial and epicardial fat.  No further follow-up recommended for this finding.
2.  Coronary arteries: There is prominent coronary artery calcification.  If indicated, this can be further evaluated with a dedicated calcium scoring study.
3.  Lungs: No alveolar consolidation or findings of acute pneumonitis or acute lung disease.  Mild chronic parenchymal scarring.

summary pages


Alexis  Wong, MD
Fellow of the American College of Radiology



SMART HEART AND HEALTH
Preventive Imaging

**Santa Monica**
2811 Wilshire Blvd., Ground Floor
Santa Monica, CA 90403
Tel: (310) 829-9788 Fax: (310) 829-4826
**Beverly Hills**
8727 Beverly Blvd.,
Los Angeles, CA 90048
Tel: (424) 355- 0433 Fax: (866) 412- 7220



SMART BRAIN AND HEALTH
Advanced Brain Therapeutic

# Exhibit D



## MEDICAL IMAGING
### Center of Southern California

**Bradley A. Jabour, M.D.**, Chief of Radiology

**Gerald Markovitz**
11600 Wilshire Blvd.
Suite 512
Los Angeles, CA 90025

**Name:** Smolker, Gary S
**MRN #:** 120630
**DOB:** 11/05/1945
**Exam Date:** 07/23/2020 08:47
**Referring Phys.:** Gerald Markovitz

## CT OF THE CHEST WITHOUT CONTRAST WITH SAGITTAL AND CORONAL REFORMATTED IMAGES

### HISTORY
This is a 74-year-old male with dyspnea on exertion, crackles at the lung on auscultation. Evaluate for interstitial lung disease.

### TECHNIQUE
Utilizing the Siemens Sensation 64 slice MDCT scanner, axial images were obtained of the chest from the thoracic inlet to the upper abdomen. The axial data set was used to obtain sagittal and coronal multiplanar reformatted images.

|                                | CT DI (mGy) | DLP (mGy*cm) |
|--------------------------------|-------------|--------------|
| Chest without                  | 19.3        | 664.3        |
| Chest supine inhalation        | 3.4         | 92.2         |
| Chest supine exhalation        | 4.8         | 28.86        |
| Chest supine high resolution   | 3.43        | 92.64        |
| Chest prone                    | 3.76        | 124.06       |

In order to minimize radiation exposure to the patient while maintaining optimal image quality, this CT scanner uses protocols incorporating automated exposure control, with tube current (mA) and photon energy (kV) tailored to individual patient size.

Study was performed at Medical Imaging Center of Southern California, Santa Monica

### COMPARISON
CT scan of the chest dated May 1, 2019.

### FINDINGS

On the supine exhalation view images reticular stranded opacities are identified in the basilar segments of the right and left lower lobes and there is overall generally decreased ventilation of the bilateral lower lobes on this acquisition. Many of the subpleural reticulations and strands are not conspicuous on the prone or inhalation images which indicates that this represents atelectasis. No signs of air trapping.

Punctate calcified granuloma in the left lower lobe.

Mild bronchiectasis is seen in the basal segments of right and left lower lobes suggesting residue from remote inflammatory process.

The pulmonary interstitium is otherwise within normal. No cystic lung disease. No tree-in-bud opacities, no signs of bronchiolitis.

No pleural effusion, no pneumothorax.


**SMART HEART AND HEALTH**
*Preventive Imaging*

**Santa Monica**
2811 Wilshire Blvd., Ground Floor
Santa Monica, CA 90403
Tel: (310) 829-9788 Fax: (310) 829-4828
**Beverly Hills**
8727 Beverly Blvd.,
Los Angeles, CA 90048
Tel: (424) 355- 0433 Fax: (866) 412- 7220



**SMART BRAIN AND HEALTH**
*Advanced Brain Therapeutics*



**MEDICAL IMAGING**
Center of Southern California

*Bradley A. Jabour, M.D.*, Chief of Radiology

The heart is not enlarged.  No pericardial effusion.  Moderate to severe coronary artery calcifications are seen.

No thoracic aortic aneurysm.  The pulmonary artery is not dilated.

No mediastinal lymphadenopathy.  No mediastinal mass lesion is seen.

The thyroid gland appears unremarkable.  No axillary lymphadenopathy.  The chest wall is within normal limits.

No acute fractures, no destructive osseous abnormalities.

**IMPRESSION**
1.  No CT signs of diffuse interstitial lung disease.
2.  Bibasilar (both lower lobes) parenchymal stranding and bronchiolectasis, finding that are likely related to remote episode of inflammation.
3.  Old pulmonary granulomatous disease.

**William  Feske, MD**


**SMART HEART AND HEALTH**
Preventive Imaging

**Santa Monica**
2811 Wilshire Blvd., Ground Floor
Santa Monica, CA 90403
Tel: (310) 829-9788 Fax: (310) 829-4828
**Beverly Hills**
8727 Beverly Blvd.,
Los Angeles, CA 90048
Tel: (424) 355- 0433 Fax: (866) 412- 7220


**SMART BRAIN AND HEALTH**
Advanced Brain Therapeutics

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

Case No. 01-01139 (AMC) (Jointly Administered)

I am a resident of the State of California, over the age of eighteen years, and not a party to this action. My business address is 16055 Ventura Blvd., Suite 525, Encino, CA 91436. On August 15, 2020, I served the following titled and attached document:

**GARY S. SMOLKER'S OBJECTIONS AND RESPONSE TO W.R. GRACE & CO.'S MOTION FOR SUMMARY JUDGMENT**

  **X**  VIA MAIL, by placing a true copy of the document(s) listed above in a sealed envelope with postage fully prepaid in United States mail in the State of California, at Encino, California, addressed as set forth in the attached service list:

See attached list. Additionally the original document was served by FedEx Priority Overnight on the U.S. Bankruptcy Court for the District of Delaware

I am familiar with the Smolker Law Firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on the same day with the postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

ORGINAL SENT FOR FILING TO THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE VIA FEDERAL EXPRESS OVERNIGHT MAIL

I declare under penalty of perjury under the laws of the United States that the above is true and correct.

Executed on August 15, 2020, at Encino, California.

Leslie S. Gonzalez

## Service List of Interested Entities

*(Served via United States Postal Service)*

Co-counsel for the Reorganized Debtor,
Adam C. Paul, Esq. and John Donley, Esq.,
Kirkland & Ellis LLP,
300 North LaSalle Street,
Chicago, IL 60654

Roger J. Higgins, Esq.,
The Law Offices of Roger Higgins, LLC,
516 North Ogden Ave., Suite 136,
Chicago, IL 60642

Laura Davis Jones, Esq. and James E. O'Neill, Esq.,
Pachulski Stang Ziehl & Jones LLP,
919 North Market Street, 17th Floor,
PO Box 8705,
Wilmington, DE 19899-8705 (Courier 19801)

The Office of the United States Trustee,
Richard L. Schepacarter, Esq.,
U.S. Department of Justice,
Office of the U.S. Trustee,
844 King Street, Suite 2207,
Lockbox 35, Wilmington, DE 19801

WRG Asbestos PI Trust
Marla Rosoff Eskin, Esq. and Mark T. Hurford, Esq.,
Campbell & Levine, LLC,
222 Delaware Avenue, Suite 1620,
Wilmington, DE 19801

Philip E. Milch, Esq.,
Campbell & Levine, LLC,
310 Grant Street, Suite 1700,
Pittsburgh, PA 15219

Counsel for the Asbestos PI Future Claimants Representative,
John C. Phillips, Jr., Esq., Phillips, Goldman,
McLaughlin & Hall, P.A.,
1200 North Broom Street,
Wilmington, DE 19806

Counsel for the Asbestos PD Future Claimants Representative,
R. Karl Hill, Esq., Seitz, Van Ogtrop & Green,
P.A., 222 Delaware Avenue, Suite 1500,
P.O. Box 68,
Wilmington, DE 19899

Alan B. Rich, Esq., Attorney and Counselor,
4244 Renaissance Tower,
1201 Elm Street, Dallas, TX 75270

Counsel for the WRG Asbestos PD Trust (7A),
Richard B. Schiro, WRG Asbestos PD Trust, c/o Wilmington Trust, Attn: Corporate Trust
Administration, 1100 N. Market Street,
Wilmington, DE 19890- 1625
Deborah D. Williamson, Esq., Dykema Cox Smith,
112 E. Pecan Street, Suite 1800,
San Antonio, TX 78205

Counsel for the WRG Asbestos PD Trust (7B), Edward B. Cottingham, Jr., Esq.,
The Cottingham Law Firm,
317 Wingo Way, Suite 303,
P.O. Box 810, Mt.
Pleasant, SC 29465

M. Dawes Cooke, Esq.,
Barnwell Whaley Patterson & Helms LLC,
P.O. Drawer H,
Charleston, SC 29402

Counsel for the CDN ZAI PD Claims Fund,
Daniel K. Hogan, Esq.,
The Hogan Firm,
1311 Delaware Avenue,
Wilmington DE 19806

Yves Lauzon, Esq., Michel Belanger, Esq.,
 Lauzon Belanger Lesperance Inc.,
286, Rue St-Paul Ouest, Bureau 100,
Montreal, Quebec, H26 2A3 CANADA

**United States Bankruptcy Court**
**Office of the Clerk**
**824 Market Street**
**Wilmington, Delaware 19801**

*(Original  for filing served via Federal Express Priority Overnight mail.)*