**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

RECEIVED / FILED

JAN - 4 2021

U.S. BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| W. R. Grace & Co, et al. | ) | Case No. 01-01139 (AMC) |
| Reorganized Debtors. | ) | (Jointly Administered) |
| | ) | Hearing date: Feb.1, 2021, 2 p.m. |
| | ) | Reply Deadline: Jan. 20, 2021, 2p.m. |
| _____ | ) | Docket Nos. 33154 and 33163 |

### GARY S. SMOLKER'S ("SMOLKER'S") DECLARATION IN OPPOSITION TO REORGANIZED DEBTOR W.R. GRACE & CO.'S ("GRACE'S") MOTION FOR SUMMARY JUDGMENT PURSUANT TO RULE 56 OF FEDERAL RULES OF CIVIL PROCEDURE

### I. INTRODUCTORY PRELIMINARY STATEMENT

On August 16, 2020 Gary S. Smolker ("SMOLKER") filed objections and response to Reorganized Debtor W.R. GRACE & CO.'S ("GRACE'S") Motion for Summary Judgment ("OBJECTION"), which included a Declaration of Gary S. Smolker dated August 15, 2020. SMOLKER incorporates be reference the entire OBJECTION and the content of the declaration Gary S. Smolker dated August 15, 2020 which appears at pages 8 and 9 and Exhibits A, B, and C attached thereto.

### II. DECLARATION OF GARY S. SMOLKER DATED DECEMBER 29, 2020

I, Gary S. Smolker, declare:

I make each of the following statements on the basis of my own personal knowledge.

In 1996, I owned a condominium in Playa del Rey, California, which I had owned as my own separate property for about 20 years.

I was living in that condominium with my second wife and our two very young daughters.

On or about October 10, 1197, Home Saving Termite Control, Inc. (TERMITE) applied SYLOID 244, a desiccant product containing amorphous silica gel manufactured by GRACE in my condominium under a contract with the homeowners association (Pacific Villa Homeowners Association) which managed and maintained the common areas of the condominium project for the purpose of eradicating termites existing in individual condominium units and in the common areas of the condominium project.

TERMITE purchased the SYOID 244 applied in my condominium unit and in the condominium complex from GRACE for use as a pesticide to eradicate termites.  GRACE sold the Syloid 244 to TERMITE to use as a pesticide.

It was against the law to use a termite insecticide, specifically SYLOID 244 in the State of California and in my condominium unit that had not been registered with the State of California Department of Pesticide Regulation and it was against the law to use a termite insecticide, specifically SYOLID 244 in my condominium unit, which had not been registered with the federal Environmental Protection Agency.

The label on the containers of SYLOID 244 sold by GRACE to TERMITE advised that unprotected contact with the product would irritate the skin, eyes, and respiratory tract.

SYLOID 244 was not registered with the Federal Environmental Protection Agency of the California Department of Pesticide Regulation at the time it was applied in my condominium unit and the common areas of the condominium project in which I lived with my wife and two young daughters.

GRACE did not comply with the requirements of federal law or California state law in the sale of SYLOID 244 to TERMITE.

GRACE failed to register SYLOID 244with the California Department of Pesticide Regulation as required by Califronia Food & Agriculture Code section 12993.

2

GRACE failed to register SYLOID 244 with the federal Environmental Protection Agency as required by the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. Section 136 et seq.

GRACE provided the product to TERMITE with a label containing a health warning against its use in a manner that would expose people to breathing the product or making skin contact with the product.

TERMITE's method of application of SYLOID 244 in my home would inevitably cause and did cause me, and my wife and our two young daughters to inhale it, and to have other unprotected contact with the product.

See Declaration of Peter J. Novak, dated November 6, 2000, attached as Exhibit "B" to the August 15, 2020 OBJECTION.

TERMITE'S application of SYLOID 244 exposed me, my wife and our two young daughters to SYLOID 244 and caused us to suffer substantial injuries.

Our two young daughters were traumatized, and my wife and I were traumatized.  Our two young daughters  developed sleep disorders which made it impossible for them to wake up in the morning to go to school.

They received medical treatment for their sleep disorder.  Neither one of them was able to graduate from high school because they could not attend class because they could not wake up in the morning and lacked energy to attend class regularly.

Our two young daughters went from being highly active youngsters to being unable to perform what were their normal routines before application of SYLOID 244 in our home.

My wife developed diverticulitis and breast cancer which caused her to be hospitalized for approximately one month and necessitated that she stop her ongoing treatment for cancer.

I suffered various medical injuries that required me to be treated by a battery of doctors, including a skin doctor, an ear nose and throat specialist, and an environmental doctor – all of whom gave testimony that my injuries were caused by exposure to SYLOID 244.

During the course of litigation in Los Angeles Superior Court, Judge Janavs placed a page limit on the length of my cross-complaint.  That page limitation made it impossible for me to state al facts necessary to state a cause of action.

During the course of litigation in Los Angeles Superior Court, GRACE and TERMITE brought motions for summary judgment and motions for summary adjudication.  Their motions for summary judgment were denied.

Deposition testimony given by government officials (a) Greg Adams, California Structural Board Specialist, (b) Jeffrey Humphreys, Deputy Director, Consumer Protection Bureau, Department of Agricultural Commissioner Weights and Measures of the County of Los Angeles, and (c) David Duncan, Active Chief of the Enforcement Branch of the Environmental Protection Agency of the State of California was submitted in opposition to GRACE'S Motion for Summary Judgment and Summary Adjudication. They were all involved in the regulation of the use of pesticides in the State of California. They all testified that GRACE had illegally and unlawfully sold its product SYLOID 244 to TERMITE.

The exhibits submitted in opposition to GRACE'S pending Motion for Summary Judgment are all true and exact copies of documents filed in Los Angeles Superior Court Case No. BC 173952; and exact copies of documents filed in the California Court of Appeal in the appeals which followed.  I know that from personal knowledge and from reviewing each document.

Exhibit "1" January 5, 2000Bifurcation Order filed in Los Angeles County Superior Court.

Exhibit "2"12/13/2000 Minute Order regarding GRACE'S and TERMITE'S Motions for Summary Judgment and Summary Adjudication filed in Los Angeles County Superior Court.

Exhibit "3 February 22, 2002 Stay Order

Exhibit "4" October 22, 2019 Motion to Consolidate Appeal Cases and for Monetary Compensation file in the California Court of Appeal.

Exhibit "5" Volume 1 of 2 Volumes of Exhibits [Index of Exhibits] filed in support of Motion to Consolidate Appeals and for Monetary Compensation and sub-exhibits.

Sub-Exhibits 62, 63, 64 and 65 – filed as part of Exhibit "5" in the Court of Appeal.

Exhibit "6" Volume 2 of 2 Volumes of Exhibits [Index of Exhibits] filed in support of Motion to Consolidate Appeals and for Monetary Compensation and sub-exhibits.

Sub-Exhibits 66-90 – filed as part of Exhibit "6" in the Court of Appeal.

Exhibit "7" Order filed November 5, 2019 by Presiding Justice Perluss

Exhibit "8" Order filed January 3, 2020 in California Court of Appeal.

Exhibit "9" - Opinion filed by Court of Appeal on January 22, 2020.

Exhibit "10" Petition for Rehearing dated February 6, 2020 filed in Court of Appeal.

Exhibit "11" Petition for Rehearing dated February 7, 2020, filed in Court of Appeal.

Exhibit "12" Petition for Rehearing dated February 10, 2020 filed in Court of Appeal.

Exhibit "13" Order filed in Court of Appeal on February 13, 2020.

Exhibit "14" Petition for Rehearing dated February 20, 2020 filed in Court of Appeal.

Exhibit "15" Order filed in Court of Appeal on Feb. 21, 2020.

Exhibit "16" Letter dated February 21, 2020 filed in Court of Appeal.

Exhibit "17" [Second] Order filed on February 21, 2020 in the Court of Appeal.

Also attached are true and correct copies of various sections of the California Food & Agricultural Code, various sections of California Code of Civil Procedure and California Rules of Court.

The dismissal of SMOLKER'S action against GRACE was not a decision on the merits.

As is fully discussed in SMOLKER'S Petitions for Rehearing of the Court of Appeals opinion and decision sustaining the Trial Court's Order of Dismissal of GRACE - dismissing GRACE from SMOLKER'S action against GRACE - by the was wrong as a matter of law. See Exhibits 10, 11, 12, and 14.

GRACE and its attorneys initiated and carried forward the proceedings in the Bankruptcy Court which resulted in Judge Carey signing the March 4, 2104 ORDER which he signed.

GRACE and its attorneys obtained that ORDER by trickery and by misleading Judge Carey and SMOLKER in the proceedings which ended in Judge Carey signing that Order.

They represented to me that the Order Judge Carey would sign would permit the California State Litigation go forward to judgment.  Look at Exhibit B in their first pleading submitted to Judge Carey, it does not correspond to the Order they eventually asked Judge Carey to sign.  The only thing I agreed to was to allow the California State Court litigation to go forward to judgment by lifting the stay order.

In the declaration of Richard C. Finke they filed in support of their motion no mention is made by Mr. Finke that GRACE had illegally sold an unregistered pesticide or that GRACE had filed a motion for summary judgment which was denied by the trial court.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on December 29, 2020   Gary S. Smolker, In Pro Per

_____

Gary S. Smolker
16055 Ventura Blvd., Suite 525
Encino, CA. 91436

Email: GSmolker@aol.com
Cell phone:1-310-749-9735
Office phone: 1-818-788-7290

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

RECEIVED / FILED

JAN - 4 2021

U.S. BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| W. R. Grace & Co, et al. | ) | Case No. 01-01139 (AMC) |
|     Reorganized Debtors. | ) | (Jointly Administered) |
| | )Hearing date: Feb.1, 2021,  2 p.m. | |
| | )Reply Deadline: Jan. 20, 2021, 2p.m. | |
| _____ | )Docket Nos. 33154 and 33163 | |

### GARY S. SMOLKER'S ("SMOLKER'S") DECLARATION IN OPPOSITION TO REORGANIZED DEBTOR W.R. GRACE & CO.'S ("GRACE'S") MOTION FOR SUMMARY JUDGMENT PURSUANT TO RULE 56 OF FEDERAL RULES OF CIVIL PROCEDURE

### I. INTRODUCTORY PRELIMINARY STATEMENT

On August 16, 2020 Gary S. Smolker ("SMOLKER") filed objections and response to Reorganized Debtor W.R. GRACE & CO.'S ("GRACE'S") Motion for Summary Judgment ("OBJECTION"), which included a Declaration of Gary S. Smolker dated August 15, 2020.  SMOLKER incorporates be reference the entire OBJECTION and the content of the declaration Gary S. Smolker dated August 15, 2020 which appears at pages 8 and 9 and Exhibits A, B, and C attached thereto.

### II. DECLARATION OF GARY S. SMOLKER DATED DECEMBER 29, 2020

I, Gary S. Smolker, declare:

I make each of the following statements on the basis of my own personal knowledge.

In 1996, I owned a condominium in Playa del Rey, California, which I had owned as my own separate property for about 20 years.

1

I was living in that condominium with my second wife and our two very young daughters.

On or about October 10, 1197, Home Saving Termite Control, Inc. (TERMITE) applied SYLOID 244, a desiccant product containing amorphous silica gel manufactured by GRACE in my condominium under a contract with the homeowners association (Pacific Villa Homeowners Association) which managed and maintained the common areas of the condominium project for the purpose of eradicating termites existing in individual condominium units and in the common areas of the condominium project.

TERMITE purchased the SYOID 244 applied in my condominium unit and in the condominium complex from GRACE for use as a pesticide to eradicate termites.  GRACE sold the Syloid 244 to TERMITE to use as a pesticide.

It was against the law to use a termite insecticide, specifically SYLOID 244 in the State of California and in my condominium unit that had not been registered with the State of California Department of Pesticide Regulation and it was against the law to use a termite insecticide, specifically SYOLID 244 in my condominium unit, which had not been registered with the federal Environmental Protection Agency.

The label on the containers of SYLOID 244 sold by GRACE to TERMITE advised that unprotected contact with the product would irritate the skin, eyes, and respiratory tract.

SYLOID 244 was not registered with the Federal Environmental Protection Agency of the California Department of Pesticide Regulation at the time it was applied in my condominium unit and the common areas of the condominium project in which I lived with my wife and two young daughters.

GRACE did not comply with the requirements of federal law or California state law in the sale of SYLOID 244 to TERMITE.

GRACE failed to register SYLOID 244 with the California Department of Pesticide Regulation as required by Califronia Food & Agriculture Code section 12993.

GRACE failed to register SYLOID 244 with the federal Environmental Protection Agency as required by the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. Section 136 et seq.

GRACE provided the product to TERMITE with a label containing a health warning against its use in a manner that would expose people to breathing the product or making skin contact with the product.

TERMITE's method of application of SYLOID 244 in my home would inevitably cause and did cause me, and my wife and our two young daughters to inhale it, and to have other unprotected contact with the product.

See Declaration of Peter J. Novak, dated November 6, 2000, attached as Exhibit "B" to the August 15, 2020 OBJECTION.

TERMITE'S application of SYLOID 244 exposed me, my wife and our two young daughters to SYLOID 244 and caused us to suffer substantial injuries.

Our two young daughters were traumatized, and my wife and I were traumatized.  Our two young daughters  developed sleep disorders which made it impossible for them to wake up in the morning to go to school.

They received medical treatment for their sleep disorder.  Neither one of them was able to graduate from high school because they could not attend class because they could not wake up in the morning and lacked energy to attend class regularly.

Our two young daughters went from being highly active youngsters to being unable to perform what were their normal routines before application of SYLOID 244 in our home.

My wife developed diverticulitis and breast cancer which caused her to be hospitalized for approximately one month and necessitated that she stop her ongoing treatment for cancer.

I suffered various medical injuries that required me to be treated by a battery of doctors, including a skin doctor, an ear nose and throat specialist, and an environmental doctor – all of whom gave testimony that my injuries were caused by exposure to SYLOID 244.

3

During the course of litigation in Los Angeles Superior Court, Judge Janavs placed a page limit on the length of my cross-complaint. That page limitation made it impossible for me to state al facts necessary to state a cause of action.

During the course of litigation in Los Angeles Superior Court, GRACE and TERMITE brought motions for summary judgment and motions for summary adjudication. Their motions for summary judgment were denied.

Deposition testimony given by government officials (a) Greg Adams, California Structural Board Specialist, (b) Jeffrey Humphreys, Deputy Director, Consumer Protection Bureau, Department of Agricultural Commissioner Weights and Measures of the County of Los Angeles, and (c) David Duncan, Active Chief of the Enforcement Branch of the Environmental Protection Agency of the State of California was submitted in opposition to GRACE'S Motion for Summary Judgment and Summary Adjudication. They were all involved in the regulation of the use of pesticides in the State of California. They all testified that GRACE had illegally and unlawfully sold its product SYLOID 244 to TERMITE.

The exhibits submitted in opposition to GRACE'S pending Motion for Summary Judgment are all true and exact copies of documents filed in Los Angeles Superior Court Case No. BC 173952; and exact copies of documents filed in the California Court of Appeal in the appeals which followed. I know that from personal knowledge and from reviewing each document.

Exhibit "1" January 5, 2000Bifurcation Order filed in Los Angeles County Superior Court.

Exhibit "2"12/13/2000 Minute Order regarding GRACE'S and TERMITE'S Motions for Summary Judgment and Summary Adjudication filed in Los Angeles County Superior Court.

Exhibit "3 February 22, 2002 Stay Order

Exhibit "4" October 22, 2019 Motion to Consolidate Appeal Cases and for Monetary Compensation file in the California Court of Appeal.

4

Exhibit "5" Volume 1 of 2 Volumes of Exhibits [Index of Exhibits] filed in support of Motion to Consolidate Appeals and for Monetary Compensation and sub-exhibits.

Sub-Exhibits 62, 63, 64 and 65 – filed as part of Exhibit "5" in the Court of Appeal.

Exhibit "6" Volume 2 of 2 Volumes of Exhibits [Index of Exhibits] filed in support of Motion to Consolidate Appeals and for Monetary Compensation and sub-exhibits.

Sub-Exhibits 66-90 – filed as part of Exhibit "6" in the Court of Appeal.

Exhibit "7" Order filed November 5, 2019 by Presiding Justice Perluss

Exhibit "8" Order filed January 3, 2020 in California Court of Appeal.

Exhibit "9" - Opinion filed by Court of Appeal on January 22, 2020.

Exhibit "10" Petition for Rehearing dated February 6, 2020 filed in Court of Appeal.

Exhibit "11" Petition for Rehearing dated February 7, 2020, filed in Court of Appeal.

Exhibit "12" Petition for Rehearing dated February 10, 2020 filed in Court of Appeal.

Exhibit "13" Order filed in Court of Appeal on February 13, 2020.

Exhibit "14" Petition for Rehearing dated February 20, 2020 filed in Court of Appeal.

Exhibit "15" Order filed in Court of Appeal on Feb. 21, 2020.

Exhibit "16" Letter dated February 21, 2020 filed in Court of Appeal.

Exhibit "17" [Second] Order filed on February 21, 2020 in the Court of Appeal.

Also attached are true and correct copies of various sections of the California Food
& Agricultural Code, various sections of California Code of Civil Procedure and
California Rules of Court.

The dismissal of SMOLKER'S action against GRACE was not a decision on
the merits.

As is fully discussed in SMOLKER'S Petitions for Rehearing of the Court
of Appeals opinion and decision sustaining the Trial Court's Order of Dismissal of
GRACE  - dismissing GRACE from SMOLKER'S action against GRACE - by the
was wrong as a matter of law. See Exhibits 10, 11, 12, and 14.

GRACE and its attorneys initiated and carried forward the proceedings in
the Bankruptcy Court which resulted in Judge Carey signing the March 4, 2104
ORDER which he signed.

GRACE and its attorneys obtained that ORDER by trickery and by
misleading Judge Carey and SMOLKER in the proceedings which ended in Judge
Carey signing that Order.

They represented to me that the Order Judge Carey would sign would permit
the California State Litigation go forward to judgment.  Look at Exhibit B in their
first pleading submitted to Judge Carey, it does not correspond to the Order they
eventually asked Judge Carey to sign.  The only thing I agreed to was to allow the
California State Court litigation to go forward to judgment by lifting the stay order.

In the declaration of Richard C. Finke they filed in support of their motion
no mention is made by Mr. Finke that GRACE had illegally sold an unregistered
pesticide or that GRACE had filed a motion for summary judgment which was
denied by the trial court.

I did not have enough time to file objections to the facts asserted by GRACE
or to make objections to the Declaration of Rosemary Lewis, or to write a
memorandum of points and authorities, or to write a statement of uncontestable
facts.  GRACE'S Motion for Summary Judgment did not follow the procedures set
forth Rule 56 of the Federal Rules of Civil Procedure.  If I am given more time to
prepare and file those additional papers, I will clearly demonstrate that GRACE'S
Motion for Summary Judgment should be denied.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on December 29, 2020   Gary S. Smolker, In Pro Per

Gary S. Smolker
16055 Ventura Blvd., Suite 525
Encino, CA. 91436

Email: GSmolker@aol.com
Cell phone:1-310-749-9735
Office phone: 1-818-788-7290

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

RECEIVED / FILED

JAN - 4 2021

U.S. BANKRUPTCY COURT
DISTRICT OF DELAWARE

Case No. 01—1139 (AMC) (Jointly Administered)

I am a resident of the State of California, over the age of eighteen years, and not a party to this action. My business address is 16055 Ventura Blvd., Suite 525, Encino, California 91436.

On December 29, 2020, I served a copy of the following (attached) document titled **GARY S. SMOLKER'S DECLARATION**

**VIA FEDERAL EXPRESS PRIORITY OVERNIGHT MAIL ON**

Law Offices of Roger Higgins, LLC, Attention Roger J. Higgins, Esq.
516 North Ogden Ave., Suite 136
Chicago, Illinois 60642

Pachulski Stang Ziehl & Jones, LLP, Attention James E. O'Neill, Esq.
919 North Market Street, 17th floor, Wilmington, Delaware 19899-8705

And I also served the original on United States Bankruptcy Court for the District of Delaware, Office of the Clerk, 824 Market Street, Wilmington, Delaware, 1 7 8 0 1

I declare under penalty of perjury under the laws of the United States that the above is true and correct.

Executed on December 29, 2020, at Encino, California.

_____

Lauren Elder

EXHIBIT

1

**Murawski & Grey, LLP**
David M. Grey, SB # 124793
Roberta L. Murawski, SB # 141721
11755 Wilshire Boulevard, Suite 1400
Los Angeles, California 90025-1520
(310) 477-5455 ● Fax (310) 479-6469

Attorneys for Cross-defendant and Cross-complainant
PACIFIC VILLAS HOMEOWNERS' ASSOCIATION

RECEIVED
DEC 2 7 1999
DEPT. 15

FILED
LOS ANGELES SUPERIOR COURT

JAN 0 5 2000

JOHN A. CLARKE, CLERK

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

# FOR THE COUNTY OF LOS ANGELES

**ORIGINAL**

| | |
|---|---|
| TIG INSURANCE COMPANY, a California Corporation, | Case No. BC 173952 |
| Plaintiff, | ASSIGNED TO JUDGE FRUIN - DEPARTMENT 15 |
| vs. | [PROPOSED] ORDER FOR BIFURCATION |
| GARY SMOLKER, an individual, and ALICE SMOLKER, an individual, and DOES 1-10, inclusive, | Complaint Filed: July 2, 1997 Trial Date: July 31, 2000 |
| Defendants. | |
| AND RELATED CROSS-ACTIONS. | |

THIS MATTER came before the Court, the Honorable Richard L. Fruin, on the Court's own motion regarding bifurcation of this case pursuant to Code of Civil Procedure §598, on December 21, 1999 at 8:30 a.m. in Department 15.

Based upon the status of the pleadings, the identities of the parties, the facts of the case as alleged, and the comments of counsel, the Court finds, pursuant to Code of Civil

EXHIBIT "A"                    1

ORDER FOR BIFURCATION

000104

Procedure §598. that the ends of justice, and the economy and efficiency of handling the litigation will be promoted by an order bifurcating the case.

THEREFORE, IT IS ORDERED:

## ORDERS REGARDING BIFURCATION

1.    The issues in the Cross-Complaints against W.R. Grace & Co. and Grace Davison, Home Savings Termite Control, Inc., Wayne F. Morris, Rikk Thompson, and the Pacific Villas Homeowners Association are hereby bifurcated from the remainder of this action.  For convenience, the issues involving these parties shall be called "the First Phase."

2.    The First Phase shall be scheduled for trial on July 31, 2000, at 9:00 a.m., in Department 15.  The Final Status Conference shall take place on July 21, 2000 at 8:30 a.m. in Department 15.  All documents required to be filed in advance of the Final Status Conference shall be filed and served no later than July 17, 2000.

3.    The issues in the Complaint and Cross-Complaints against all other parties, namely, TIG Insurance Company, Coregis Group, Inc., Coregis Insurance Company, California Insurance Company, Reliance Insurance Company, Truck Insurance Exchange, and the Interinsurance Exchange of the Automobile Club, called "the Second Phase," shall be deferred for a subsequent trial, and are hereby stayed.

4.    The stay for the Second Phase shall continue until either 20 days after a jury verdict in the First Phase, or 20 days after a Judgment is entered after a bench trial in the First Phase, whichever occurs first.

5.    Gary and Alice Smolker will be parties in both the First and Second Phases.

## ORDERS REGARDING DISCOVERY IN THE FIRST PHASE

6.    The parties in the First Phase shall continue with all discovery necessary to the First Phase.

2

7.    The parties in the First Phase shall serve all discovery requests and responses upon the all parties, including the Second Phase parties.   It is not necessary for the First Phase parties to serve discovery law and motion pleadings upon the Second Phase parties.

8.    The parties in the Second Phase shall have the right to attend any depositions noticed in the First Phase discovery; however, the Second Phase parties shall not have the right to ask any questions during those depositions.

9.    There shall be one, consolidated site inspection of the Pacific Villas condominium premises for both Phases.   All parties must participate in that site inspection. (or waive their right).

## ORDERS REGARDING DISCOVERY IN THE SECOND PHASE

10.   All discovery for the Second Phase parties is stayed until either 20 days after a jury verdict in the First Phase, or until 20 days after the entry of a Judgment in a bench trial in the First Phase.

11.   The time periods for responding to any outstanding discovery, or for filing any motions to compel any outstanding discovery for the Second Phase parties, shall be tolled as of December 21, 1999.   The tolling shall cease, and the time shall begin to run again, when the stay is lifted as set forth in paragraph 10 of this Order.  Each party shall be responsible for keeping track of its own dates, when they are tolled, and when they begin to run again.

12.   To the extent any Second Phase parties have any discovery motions on file as of December 21, 1999, those motions must be renoticed for a time after the discovery stay is lifted as set forth in paragraph 10 of this Order.

## OTHER ORDERS

13.   The Court may make other orders to clarify and enforce this bifurcation.

14.   Counsel for Pacific Villas Homeowners Association shall prepare a Proposed Order and file and serve it on all parties by December 28, 1999.   Any oppositions to the Proposed Order shall be filed by January 4, 2000.

6

15.    A hearing on the Proposed Order shall be held on January 5, 2000, at 9:00 a.m. in Department 15.

DATED: *Jan. 5, 2000*

*Richard L. Fruin*
RICHARD L. FRUIN
SUPERIOR COURT JUDGE

4

ORDER FOR BIFURCATION

# EXHIBIT 2

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | | | | |
|---|---|---|---|---|
| DATE: 12/13/00 | | | | **DEPT.** 15 |
| HONORABLE RICHARD FRUIN | JUDGE | R. ARCONTI | | DEPUTY CLERK |
| HONORABLE | JUDGE PRO TEM | | | ELECTRONIC RECORDING MONITOR |
| 1  L. BUNDE, C/A | Deputy Sheriff | G. LEVINE | | Reporter |

| | | | |
|---|---|---|---|
| 8:30 am | BC173952 | Plaintiff Counsel | BRIAN C. PORTER (X) GARY E. YARDUMIAN (X) |
| | TIG INSURANCE COMPANY VS GARY SMOLKER ET AL | Defendant Counsel | BRADLEY L. TAYLOR (X) DAVID M. GREY (X) ROBERTA L. MURAWSKI (X) |
| | 170.6 - Rothschild 12-19-97 Recusal - Lichtman 11-26-97 | | GARY SMOLKER (X) |

**NATURE OF PROCEEDINGS:**

MOTION OF CROSS-DEFENDANT AND CROSS-COMPLAINANT PACIFIC VILLAS HOMEOWNERS' ASSOCIATION, FOR SUMMARY JUDGMENT; ALTERNATIVELY, FOR SUMMARY ADJUDICATION;

The matter is called for hearing.

In keeping with the Court's orders of December 5 and 7, 2000, all pending discovery motions, including the motion to compel and motion in limine set this date, and the motion of Pacific Villas Homeowners Association for summary judgment are continued to December 22, 2000, at 8:30 a.m. in this department.

The Court has read and considered all declarations and exhibits filed in support of and in opposition to the remaining motions and has issued its tentative rulings this date. A copy of said tentative rulings shall be attached to this minute order for future reference.

The remaining motions for summary judgment are argued.

The motion of cross-defendant Rikk Thompson for summary judgment is granted, the Court finding no triable issue of fact.

Summary judgment is denied as to the motions of cross-defendants W.R. Grace & Company and Grace Davison, Home Saving Termite Control, and Morris.

Summary adjudication is granted in part on specific

| |
|---|
| **MINUTES ENTERED** 12/13/00 **COUNTY CLERK** |

Page    2 of    3    DEPT. 15

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | | | | DEPT. 15 |
|---|---|---|---|---|
| DATE: 12/13/00 | | | | |
| HONORABLE RICHARD FRUIN | JUDGE | R. ARCONTI | | DEPUTY CLERK |
| | JUDGE PRO TEM | | | ELECTRONIC RECORDING MONITOR |
| HONORABLE | | | | |
| 1 L. BUNDE, C/A | Deputy Sheriff | G. LEVINE | | Reporter |

| 8:30 am | BC173952 | Plaintiff Counsel | BRIAN C. PORTER (X) GARY E. YARDUMIAN (X) BRADLEY L. TAYLOR (X) |
|---|---|---|---|
| | TIG INSURANCE COMPANY VS GARY SMOLKER ET AL | Defendant Counsel | DAVID M. GREY (X) ROBERTA L. MURAWSKI (X) |
| | 170.6 - Rothschild 12-19-97 Recusal - Lichtman 11-26-97 | | GARY SMOLKER (X) |

**NATURE OF PROCEEDINGS:**

causes of action in the motions of cross-defendants
W.R. Grace & Company and Grace Davison, Home Saving
Termite Control, and Morris as fully set forth in
the tentative rulings attached hereto.

Further hearing on the motions of W.R. Grace & Company
and Grace Davison, Home Saving Termite Control, and
Morris as to the 13th, 14th and 15th causes of action
is continued to December 20, 2000, at 8:30 a.m. in
this department; no further briefing.

Further hearing on the same motions as to the eighth
and ninth causes of action is continued to January 25,
2001, at 8:30 a.m. in this department.  Moving parties
are to submit supplemental briefs by January 5, 2001;
supplemental opposition is to be submitted by
January 19, 2001.

Each moving party is to serve and file notice of
ruling.  Within two days, moving parties are to submit
formal orders for the Court's signature and filing on
the claims so far dismissed.

Page   3 of   3   DEPT. 15

MINUTES ENTERED
12/13/00
COUNTY CLERK

**# 1    TENTATIVE RULINGS**

**TIG INSURANCE COMPANY v. SMOLKER, et al, Case No. BC 173952**

**8:30 a.m., Wednesday, December 13, 2000**

**A. RULING ON MOTION OF CROSS-DEFENDANTS GRACE FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION ON CAUSES OF ACTION PLED IN THE SMOLKERS' FIFTH AMENDED CROSS-COMPLAINT;**

**B. RULING ON MOTION OF CROSS-DEFENDANTS TERMITE CONTROL AND MORRIS FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION ON CAUSES OF ACTION PLED IN THE SMOLKERS' FIFTH AMENDED CROSS-COMPLAINT:**

This action arises from Termite Control's application of Syloid 244, a desiccant product containing amorphous silica gel manufactured by Grace, to the Smolkers' condominium under a contract with Pacific Villas Home Owners Association.

Cross-complainants Gary and Alice Smolker plead in their 5th Amended Cross-Complaint the following causes of action against the parties who are moving for summary judgment and/or summary adjudication:

| C/A # | CLAIM | DEFENDANTS |
|---|---|---|
| 8 | Strict Liability | Grace, Termite Control, Morris |
| 9 | Negligence Per Se (7 USC 136(a); F&A 12993, 12995) | Grace |
| 10 | Negligence, Negligence Per Se | Termite Control, Morris, Thompson |
| 13 | Nuisance | Grace, Termite Control, Morris |
| 14 | Trespass | Termite Control, Morris |
| 15 | Assault/Battery | Termite Control, Morris |
| 30 | Fraud | Grace, Termite Control, Morris |
| 31 | Interference | Grace, Termite Control, Morris |

Cross-defendants W.R. Grace & Company and Grace Davison ("Grace") have moved for summary adjudication as to the eighth and ninth causes of action contained in the cross-complaint on the ground that those state court claims are preempted by the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA). Cross-defendants Home Termite Control, Inc. ("Termite

Control!") and W.F.Morris separately move for summary judgment and/or summary adjudication on the same basis. Grace and Termite Control/Morris have also joined in each other's motion. Grace and Termite Control also argue that any violation of FIFRA does not create in the Smolkers, or any other injured party, a private right of action.

Neither Grace nor Termite Control/Morris pleaded preemption as an affirmative defense nor have sought to amend their answers to plead such affirmative defense. The court shall nonetheless shall decide their preemption arguments, see Kennan v. Dow Chemical 717 F.Supp.799 (M.D.Fla. 1989), but orders each defendants to file an amendment to their answer within 10 days if they wish to preserve their preemption defense.

On the preemption argument, the basic facts--as revealed in a declaration ordered by the court and filed last Friday--are:

1. Syloid 244, the active ingredient, is not and never was registered with the EPA or the California Department of Pesticide (Cal EPA); and

2. Dri-Die Insecticide, said to be chemically identical to Syloid 244, was registered with the EPA at the time Syloid 244 was applied to the Smolkers' residence, but not by Grace or Termite Control because Dri-Die is a product of an unrelated company.

The court's tentative rulings on the motions are:

The court denies summary judgment to Grace. The court grants to Grace summary adjudication on the Smolkers' 13th, 30th and 31st causes of action for, respectively, nuisance, fraud and interference. The court requires further briefing as to the 8th cause of action for strict liability. The premise of Grace's motion--that FIFRA preempts the cause of action--appears inapplicable, but, since Grace has now proffered its label on the product sold to Termite Control the parties should brief whether there is a triable issue as to Smolkers' strict liability claim against Grace. The court also requires further briefing as to the ninth cause of action. There are two questions that require further examination: is Grace in violation of FIFRA for not registering Syloid 244 and, if so, can the Smolkers maintain a private cause of action for their failure to do so. The same questions are presented with respect to the analog state provisions. The court at the hearing will set a briefing schedule for a later ruling on the 8th and 9th causes of action against Grace.

The court denies summary judgment as to Termite Control and Morris. The court grants summary adjudication as to the 30th and 31st claims for, respectively, fraud and interference; denies summary adjudication as to the 8th and 10th claims for, respectively, strict liability and negligence; and sets a separate hearing on December 20, 2000 at 8:30 a.m. for ruling on the 13th, 14th and 15th claims for, respectively, nuisance, trespass and assault and battery. (No further briefing is permitted on the 13th, 14th and 15th causes of action.)

EVIDENCE OFFERED BY THE PARTIES RELATING TO THE FEDERAL PREEMPTION ISSUE:

MPs have offered into evidence certain declarations and exhibits that the declarants have attached and authenticated. The court receives into evidence the following declarations and the exhibits identified and authenticated therein: the revised declaration of Dr. Karim S. Damji dated October 4, 2000 (the Damji decl.) and exhibits 1, 2 and 3; the declaration of Dr. Damji dated November 30, 2000 (the 2nd Damji decl) and exhibits A-H; the declaration of Brian Porter including Exh. G (same as Exh. G to 2nd Damji decl.); the declaration of Dr. Rudolf H. Scheffrahn dated September 8, 2000 (the Scheffrahn decl.) and Exhibits Q and S and the declaration of Dr. Scheffrahn dated October 19, 2000 (the 2nd Scheffrahn decl.).

The court on December 4, 2000 requested Grace to provide the declaration of a Grace employee to answer specific questions. Grace on December 8, 2000 filed the declaration of Julian Convey, Manager of Environmental Services for W.R. Grace & Co. and Grace Davison. The court receives into evidence the Convey declaration and its Exh. AA.

Termite Control and Morris have requested t33he court to take judicial notice of an FDA report identified as "Registration Eligibility Document Silicon Dioxide and Silica Gel, List D, Case 4081." The court has done so. The same document is Exh. C to the 2nd Kamji declaration.

The court receives the Morris declaration for its factual statements regarding the pesticide application to the Smolkers residence and the Termite Control corporate structure and practices, e.g. paras. 1-6, 8, 9, 11-14, 16, 18-20, 23-27, but not for its statements of opinion, e.g. paras. 7, 10, 15, 17, 21 and 22, because no foundation is provided as to Morris' credentials or for materials he relied upon to state such opinions.

The court has not taken into consideration Smolkers' objections to MPs' declarations because the objections were filed after briefing was closed (on Monday of this week).

The court has reviewed the declarations and the referenced exhibits offered by cross-complainants' Smolkers as follows: declaration of Peter J. Novak dated November 6, 2000, declaration of Dr. James S. Smith dated November 6, 2000 and declaration of Ray C. Woodcock dated November 5, 2000. The Smolkers have offered three volumes of exhibits (Exhs. 1-52) including depositions excerpts, public records, letters, etc. The court has read the two declarations of Alice Smolker dated November 6, 2000 and November 8, 2000 (the latter pertaining to the Cunningham deposition) and the declaration of Gary Smolker dated November 29, 2000 (referencing exhibits 39-52 in the Appendix Submitted in Opposition).

The court has not yet ruled on MPs' evidentiary objections against the Novak, Smith and Woodcock expert declarations and to Alice Smolker's declaration.

The court, from those declarations and exhibits, has constructed the following chronology to describe the status of registration of AGS products used as a termite insecticide, and specifically Syloid 244, with the federal Environmental Protection Agency (EPA) and the State of California Department of Pesticide Regulation (Cal EPA), as of the date--October 11, 1996--

3

when Termite Control applied Syloid 244 (and Dursban TC) to the Smolkers' residence.

CHRONOLOGY RE REGISTRATION (FEDERAL AND CALIFORNIA) FOR AGS
TERMITE INSECTICIDE AND SPECIFICALLY FOR SYLOID 244:

| | |
|---|---|
| 1996 | Products containing amorphous silica gel (ASG) are registered with the U.S. Department of Agriculture and approved as an insecticide and acaracide for use in residential buildings. Damji decl., para. 16; 2nd Damji decl., para. 7; EPA's R.E.D. Facts, p. 2; EPA's Reregistration Eligibility Report, p.6 (Sept. 1991). |
| 1972 & 1988 | FIFRA as enacted in 1972 requires registration. "In 1988, FIFRA was amended to accelerate the reregistration of products with active ingredients registered prior to November 1, 1984. The amended Act provides a schedule for the reregistration process to be completed in nine years." FDA's Reregistration Eligibility Report, Introduction (Sept. 1991). |
| app.1975 | FMC acquires the Dri-Die trade name from Grace. FMC thereafter (date unknown) transfers the Dri-Die trade name to American Fairfield Corporation. Convey decl., para. F. |
| 10/10/79 | Dri-Die Insecticide (containing 95% ASG as the active ingredient) is registered with EPA by Fairfield American Corporation. 2nd Damji decl., para. 8, attaching label approval as Exh. D. [Damji is incorrect in stating Dri-Die was a registered Grace trade name in 1991, 1992 and 1995. See 2nd Damji decl., paras. 9, 11 and 12. Grace transferred the trade name about 1975, according to Convey.] |
| 12/31/87 | Federal Registration for Dri-Die Insecticide 87 (held by Grace) is canceled. Exh. 26, see also Exh. 14. [Dri-Die continued its FDA registration by Fairfield American Corporation. Grace may have canceled the registration because it had transferred the trade name to FMC in about 1975.] |
| 1991 | EPA conducts a re-registration eligibility study, and concludes that the "currently registered uses of silicon dioxide and silicon gel will not result in unreasonable public health risks or effects to the environment. No further generic data are necessary." FDA Reregistration Eligibility Report, Executive Summary. |
| 3/7/91 | Dri-Die Insecticide is reregistered with the EPA, after label revisions, by Fairfield American Corporation. 2nd Damji decl., paras. 9 and 10, attaching approved labels as Exhs. E and F. |
| 7/1/92 | Fairfield American Corporation, a wholly owned subsidiary of Roussel Bio Corporation, merges into Roussel Bio Corporation (later Roussel UCLAF Corporation), which was later acquired by AgrEvo Environmental (now known as |

4

000187

Aventis Environmental Science) . Porter decl., attaching EPA approval letter dated 12/11/92 as Exh. G; Convey decl., para. A.

| | |
|---|---|
| 12/11/92 | FDA approves Roussel's assumption of registrations granted to Fairfield American Corporation for Dri-Die Insecticide. 2nd Damji decl., para. 11, attaching the EPA approval letter dated 12/11/92 as Exh. G. |
| 1992 | Grace apparently discontinues manufacturing the product that Fairfield American Corporation sold as Dri-Die. Convey decl., para. F. |
| 1990s | Dri-Die, Dri-Out and Drione are registered with the federal EPA for use as a pest control compound. Scheffrahn decl., para. 10. ASG is sold under the names Dri-Die and Syloid. FDA Reregistration Eligibility Report, p. 2. Dri-Die is chemically identical to Syloid 244, differing only in the percentage of inert ingredients. Damji decl., para. 5. Syloid 244 is the Grace trade name for ASG. Morris decl., para. 14. According to the EPA approved label, Exh. Q: Dri-Die consists of 95% ASG as the active ingredient, and 5% inert ingredient. Parties stipulate that ASG is an active ingredient. |
| 1977-'94 | Dri-Die Insecticide is registered by Agrevo Environmental Health in California under Food & Agri. Code section 12811. The registration number is 4816-240-AA. See, Dept. Of Pesticide Regulation [Cal EPA] Product Data Report for Dri-Die, Exh. 27. |
| 6/14/95- | Dri-Die Insecticide is registered by Agrevo Environmental Health in California as a dust-applied termite insecticide. The registration number is 4816-240-ZB. 2nd Damji decl, paras. 5 and 6, attaching the relevant data report as Exh. A. The registration continues until 12/31/96. |
| 8/6/96 | Patent granted to Morris for new process for application of AGS. Exh. 1. [A new process may require a new approval from Cal EPA. See section 12833.] |
| prior to 10/96 | Termite Control employee Corey Arentz makes oral representations and provides brochure to Alice Smolker. A. Smolker decl., para. 4 and 6. Before application, Morris provided a Fact Sheet and a 5 Year Guarantee to Home Owners Association. These documents are exhibits A, B and C to Morris declaration. |
| 10/11/96 | Pesticide including Syloid 244 using Morris-patented process applied at Smolkers' residence. (The high pressure technique--application of 125 psi through holes drilled in the walls--is not a use specified on the Dri-Die label, see Exhs. 10, 11 and 12.) The label on the containers of Syloid 244 sold by Grace into California (and presumably to Termite Control) advised that unprotected contact with the product would irritate skin, eyes and respiratory tract. Convey decl., attaching Exh. AA. |

5

6/1/99        Dri-Out Insecticide registered by California EPA by Home Savings Termite
              Control. Exh. E; Morris decl., para. 20. Home Savings applied for the
              registration on 12/28/98. Exh. 12.

## CONCLUSIONS FROM THE EVIDENCE:

   1. Federal Registration: Grace's Syloid 244 has never been registered with the EPA. There
is no FDA-approved label for Syloid 244.

   2. Dri-Die Insecticide was registered with the EPA from and after 3/7/91 (and apparently
from 10/10/79) as a dust-applied termite insecticide. The court is told that Dri-Die's
chemical composition never changed. Convey decl., para. F. The court does not accept
that representation because it is stated on information and belief (without stating a factual
basis) and therefore lacks foundation. Syloid including Syloid 244 has the same chemical
ingredients as Dri-Die. [Smolkers' experts do not dispute that Dri-Die was registered;
their expert Novak asserts that Dri-Die's EPA approved label does not include the high
pressure application employed by Termite Control. To the extent that Syloid 244 is the
same as Dri-Out, it would appear that the warnings that Grace provided on its Syloid 244
label would confirm that the Dri-Die label does not contemplate the application technique
used by Termite Control.]

   2. State Registration: Dri-Die was registered (by Agrevo Environmental Health) with the
California EPA at the time when Grace's product Syloid 244 was applied to Smolkers'
residence. Syloid 244 was not state-registered.

   3. Dri-Out was registered by Home Savings with the California EPA effective June 1,
1999. Schnabel and Duncan assert (in their depo. testimony) that a registration by another
seller, or a registration by the applicator after the disputed application, does not comply
with California registration scheme.

   4. ASG is an active ingredient, so California Food & Agri Code section 12823 applies,
that is, a change in the inert component does not require re-registration.

   5. EPA registration means that the EPA approves the label, that the product may be sold
for the uses specified on the label. New uses should be indicated on a new approved label.
Novak decl., paras. QQ-RR. Compare Exh. 10 with Exh. 11, both Dri-Die labels.

## AS TO GRACE'S MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION:

   The Smolkers do not raise a triable issue of fact and accordingly summary adjudication
should be granted in Grace's favor and against the Smolkers on their 13th cause of action for
nuisance, on their 30th cause of action for fraud and on their 31st cause of action for interference.
The Smolkers neither allege nor raise a factual basis for a claim of nuisance, fraud or interference

6

against Grace.

As to Smolkers's strict liability and negligence claims against Grace, these facts are undisputed.

1. Grace manufactured the Syloid 244 product. Syloid 244 is functionally equivalent to Dri-Die Insecticide; Syloid 244 has the same active and inert ingredients as Dri-Die. [That Grace manufactured Syloid is alleged, see e.g. Fifth Cross-Complaint, para. 104, and admitted by the parties. See also, Morris decl. para. 14.]

2. Grace sold the Syloid 244 that was applied to the Smolkers house to Termite Control. [Morris decl., para. 9.]

3. Termite Control, not Grace, applied the Syloid 244 product to Smolkers's house. [Morris decl., paras. 5 and 7.]

4. The only representations that were given to the Smolkers about Syloid 244, before Termite Control's application, was given to them by Termite Control. [Morris decl, paras. 12 and 13; Alice Smolkers decl., para. 4.] The written representations that Termite Control provided to the Smolkers, before the application, are Exhibits A, B and C to the Morris declaration.

5. Grace made no representations to the Smolkers about the Syloid 244 product.[Alice Smolkers decl.]

6. Syloid 244 is not and never was registered with the EPA. The Dri-Die Insecticide label was registered with the EPA.

7. Syloid 244 is not and never was registered with the California EPA. The Dri-Die Insecticide was registered with the California EPA.

Grace's argument that such the strict liability claims are preempted by FIFRA doesn't succeed because Syloid 244 was not registered with the EPA and therefore FIFRA's section 136v(b) [prohibiting "any requirements" for a pesticide labeling which are "in addition to or different from" those imposed by the EPA] is not triggered.  It is unclear to the court whether, as Grace and Termite Control argue, EPA registration of Syloid 244 was not FIFRA-required because a similar product (described a "chemically identical") named Dri-Die was EPA-registered. Under that argument at least these questions remain before the preemption argument can be decided: is Syloid 244 identical in performance to Dri-Die; if so, does that mean that Syloid 244 is exempted from obtaining EPA registration (and also state registration); and, assuming so, was the application of Syloid 244 (high pressure injection in wall spaces) within the approved uses specified on Dri-Die's label.

The court rejects Grace's argument that, if Grace was required to register Syloid 244 with

7

the EPA, Grace nonetheless is not liable on any failure to warn claim for failing to do so, under authority of Kennan v. Dow Chemical 717 F.Supp.799 (M.D.Fla. 1989). In Kennan chemical company defendants prevailed on motions for summary judgment on the ground that EPA registration preempted strict liability wrongful death claims, even though the decedent was exposed to the PCP product both before the time it was required to be registered and after that time. The passage that Grace relies upon however relates to the evidentiary showing that the EPA had approved the actual chemical product label. The passage has this context:

"Plaintiff argues that the defendants have not established that the EPA approved their labels....Plaintiff specifically objects to the defendants introduction of the affidavits of individuals who do not have personal knowledge of whether or not the EPA approved of defendants' labels. [] The Court disagrees with plaintiff's implicit assumption that the preemption defense requires a showing that the EPA actually approved of defendants' labels. At most, such a showing would establish that the defendants violated federal regulations concerning labeling." (Id. at 809.)

The quoted portion indicates that the defendants in Kennan presented labels that their affiants said the EPA had approved, and the court rejected the plaintiff's objections that the affiants had not actually shown EPA approval. Because it was conceded that EPA registration was required, and labels supposedly approved by the EPA had been presented, proof of the specific action by the EPA was not necessary to the preemption argument.

Grace has not shown, and apparently cannot show, that label-based claims are preempted by EPA registration. Grace has not presented authority that if a product falls within the FIFRA scheme, state based claims are preempted even if the product has not been submitted for registration. Grace, however, has presented, without dispute, the label that was on the containers it sold to Termite Control. The court shall order briefing on the issue of whether Grace is subject to strict liability if the Smolkers' factual claim is limited, as it seems to be, to the assertion that the label is inadequate.

Grace's argument against Smolkers' negligence per se claim is that FIFRA and the analog state provisions (California Food & Agriculture sections 12811, 12993) do not provide a private right of action. The Smolkers in their negligence per se cause of action allege violations of FIFRA and state statutes but they also incorporate the failure to warn and negligent manufacturing allegations from the eighth cause of action. See, 5th Amended Cross-Complaint, ninth cause of action, paras. 103-04. Grace appears to not have complied with FIFRA in the sale of Syloid 244 to Termite Control, but there is no testimony or other evidence that compliance was required, and, if it was, it is unclear whether noncompliance would support a private right of action absent proof of actual negligence, i.e. proof sufficient to raise a triable issue on the eighth cause of action. The court will require further briefing on this issue.

AS TO MOTION MOTIONS BY TERMITE CONTROL AND MORRIS FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION:

8



Termite Control's and Morris' brief violate the 20 page limit. CRC 3139(d). They also violate CRC 342(b)by failing to repeat verbatim in their Separate Statement the specific causes of action listed in the Notice.

Summary adjudication is granted against the 30th and 31st causes of action, as there are no facts that are pled to state causes of action for fraud or interference.

On the Smolkers' 8th and 10th causes of action, the court denies summary adjudication as there are issues of fact. As to these causes of action, the positions of Grace and Termite Control are very different. Grace provided the product to Termite Control with a label containing a health warning against its use in a manner that would expose person to breathing the product or making skin contact with the product. The Woodcock declaration states, in essence, that Termite's Control's method of application of the Syloid 244 product would or could cause aspiration or other contact with the desiccant.

The court, in light of Grace's label warning, cannot find that there is no triable issue as to whether unprotected contact with Syloid 244 caused human injury.

The preemption argument, as to the strict liability claim (the 8th cause of action) against Termite Control, is undermined if not entirely demolished. EPA registration is not the issue; if the product was registered, there is still the issue of whether the use that Termite Control made of the product is a use permitted by the EPA's approval of the label. How can Termite Control, or Grace for that matter, argue that the EPA has determined that Syloid 244, or a closely similar product, is safe for an application that arguably exposes homeowners to unprotected contact with the product when Grace's own label for Syloid 244 warns against unprotected exposure to Syloid 244? There are questions of fact as to whether Termite's Control method of application exposed the Smolkers to unprotected contact with the product; and, if so, whether the product caused or could cause injury.

As to the negligence and negligence per se claims (the 10th cause of action) against Termite Control, the Smolkers identify as statutory violations 7 U.S.C. 136(a), California Food & Agriculture sections 12993 and 12995 and, in their interrogatory responses though not in the 5th Amended Cross-Complaint, Bus. & Prof. Code sections 8538, 8516 and 8648. The issue of no private right of action is appropriately addressed only after it is determined whether Syloid 244 was required to be registered. This was not briefed because the assumption of the MPs' papers was that Syloid 244, or a chemically identical product, was registered by Grace under the name Dri-Die. The court will inquire whether Termite Control wishes to brief this issue.

A ruling on Termite Control's motion as to the 13th, 14th and 15th causes of action is deferred to December 20, 2000 because the court wants to consider the motion in isolation as to these claims against Termite Control.

Morris appears to have presented authorities that he is not personally liable for Termite

9

Control's actions on an alter ego theory. So far as the court can determine, Morris presented no evidence to support his argument. His declaration doesn't say anything about Termite Control's maintenance of a separate corporate identity. Morris summary judgment motion therefore is denied.

## A. RULING ON MOTION OF CROSS-DEFENDANT RIKK THOMPSON FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION ON CAUSES OF ACTION PLED IN THE SMOLKERS' FIFTH AMENDED CROSS-COMPLAINT:

The motion is granted. The court dismisses the 5th amended cross-complaint as to Rikk Thompson.

Thompson is charged only in the tenth cause of action, which alleges that certain persons were negligent in the application or in making pre-application representations concerning Syloid 244. Thompson was not involved in the application. His first contact with the Smolkers was four months after the application. The Smolkers assert that when he visited the premises in January, 1997 that Thompson made representations that Syloid 244 was visible to the naked eye and was safe. The first representations appears to be true, see Woodcock decl., and the second even if untrue occurred months after the application occurred and caused no injury to the Smolkers. The court receives into evidence the Thompson declaration.

* * *

MPs are to serve notices of ruling. MPs are to provide within two days appropriate orders on the claims that are dismissed. This TR shall be attached to the minute order for future reference.

COPY OF TR SENT VIA FAX TO MPs10 AND RP ON 12/11/00 A.M.

000193

# EXHIBIT

# 3

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DATE: 02/22/02

DEPT. 15

HONORABLE Richard Fruin         JUDGE   R. AQUINO          DEPUTY CLERK

HONORABLE                JUDGE PRO TEM                ELECTRONIC RECORDING MONITOR
18
        V. CONNISH, CT ASST.    Deputy Sheriff   G. LEVINE          Reporter

1:30 pm BC173952                        Plaintiff
                                        Counsel      NO APPEARANCES
TIG INSURANCE COMPANY
VS                                      Defendant
GARY SMOLKER ET AL                      Counsel

170.6 - Rothschild 12-19-97
Recusal - Lichtman 11-26-97

NATURE OF PROCEEDINGS:

VOLUNTARY SETTLEMENT CONFERENCE / TRIAL SETTING
CONFERENCE;

(CONTINUED FROM JANUARY 30, 2002)

There are no appearances.

The matter is placed off calendar. The court orders
the matter stayed pending the outcome of defendant
W.R. Grace's bankruptcy proceedings.

Page   1 of   1    DEPT. 15

MINUTES ENTERED
02/22/02
COUNTY CLERK

000133

EXHIBIT

# EXHIBIT 4

COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

Court of Appeal Case No. B281406
(Related Appeals Pending in B286138, B287626, and B289828)

GARY SMOLKER

Cross-complainant and Appellant

vs.

W. R. GRACE & CO. et al.

Cross-defendants and Respondents

Appeal from the Superior Court of Los Angeles County,
Honorable Richard L. Fruin, Jr., Judge, Case No. BC173952

**NOTICE OF MOTION AND MOTION TO CONSOLIDATE APPEAL CASES FOR ORAL ARGUMENT AND FOR ORDER ORDERING ATTORNEY ROSEMARIE S. LEWIS, BORTON PETRINI LLP, BORTON PETRINI & CONRON LLP, KIRKLAND & ELLIS LLP, ATTORNEY ROGER J. HIGGINS, LAW OFFICES OF ROGER HIGGINS LLP, PACHULSKI STANG ZIEHL & JONES LLP, AND W.R. GRACE & C0. AND GRACE DAVIDSON TO PAY APPELLANT GARY SMOLKER $1,242,787.00 FOR DETRIMENT CAUSED TO APPELLANT BY THEIR UNETHICAL, UNLAWFUL AND ILLEGAL CONDUCT; MEMORANDUM; DECLARATION; PROPOSED ORDER**

1

Gary Smolker, State Bar No. 56117
16055 Ventura Blvd., Suite 525, Encino, CA. 91436
Telephone: 818-788-7290, Facsimile: 818-990-9888
gsmolker@aol.com
Attorney, in pro per, for Cross-complainant and Appellant

NOTICE OF MOTION AND MOTION TO CONSOLIDATE APPEAL CASES
FOR ORAL ARGUMENT AND FOR AN AWARD OF MONETARY
COMPENSATION IN THE AMOUNT OF $1,242,787.00 TO BE PAID TO
APPEALLANT GARY SMOLKER BY ATTORNEY ROSEMARY S. LEWIS,
BORTON PETRINI LLP, BORTON PETRINI & CONRON LLP, KIRKLAND &
ELLIS LLP, ATTORNEY ROGER J. HIGGINS, LAW OFFICES OF ROGER
HIGGINS LLP, PACHULSKI STANG ZIEHL & JONESS LLP, AND W.R.
GRACE & CO., AND GRACE DAVISON FOR DETRIMENT CAUSED TO
APPELLANT GARY SMOLKER BY THEIR UNETHICAL, UNLAWFUL, AND
ILLEGAL CONDUCT

To This Honorable Court and All Parties of Record:

Pursuant to California Code of Civil Procedure § 1048, California Rules of
Court, Rule 3.350, California Code of Civil Procedure §128,  California Code of
Civil Procedure Section 1021.5, Business & Professions Code Sections, 6068(c),
6068(d) and 6128 (a), California Rules of Profession Conduct, Rule 3.1(a)(1), Rule
3.1(a)(2), Rule 3.2, Rule 3.3 (a)(1), Rule 3.3 (a)(2), Rule 3.4 (a), Rule 4.1 (a), Rule
4.1 (b), Rule 8.4 (a), Rule 8.4 (c), Rule 8.4 (d), Rule 8.5 (a), Rule 8.5 (b)(2),
Business & Professions Code Section 17200, Civil Code Section 4, Civil Code
Section 3281, Civil Code Section 3282, Civil Code Section 4, Food and
Agricultural Code sections 12995, 12993, Section 11737.5, 11792, 11891, 11896,
11897, 12811, 12854, 122881, 12972, 12973, 12991. 12995, 13101, 13102, 12980,
12991, 12993, 12996,  Appellant Gary Smolker (APPELLANT) moves this court
to consolidate pending appeal case number B281406, case number B286138, case
number B287626, and case number B289828 for oral argument and to award
monetary compensation in the amount of $1,242,787.00 to be paid to
APPELLANT  by Attorney Rosemary S. Lewis, Attorney Roger J. Higgins, law
firms Borton Petrini LLP, Kirkland & Ellis LLP, Pachulski Stang Ziehl & Jones
LLP and Respondents W.R. Grace & Co. and Grace Davidson (GRACE).

The four appeal cases which Appellant requests be consolidated for the
purpose of being heard together at oral argument are appeals from judgments of
dismissal of APPELLANT'S action against each respondent and from cost awards
to respondents in Los Angeles Superior Court Case No. BC173952.

3

On April 6, 2018, this court, on its own initiative, issued an order stating appeal case number B281406, B286138, and B287626 will be considered together, at such time as briefing is complete in all cases.

On April 30, 2018, GRACE filed an application to shorten time for oral argument and for further relief from the April 6, 2018 order.

It it's application GRACE requested that the Court of Appeal hear each of the three pending appeals separately, and further that the appeal dismissing GRACE from Los Angeles Superior Court Case No. BC173952 be heard before the Court of Appeal held oral argument on any of the two other pending appeals.

On May 2, 2018, the Court of Appeal issued an order which states:

*"The court has read and considered respondents' April 30, 2018 application to shorten the time for oral argument and further relief from the April 6, 2018 order.*

*"IT IS HEREBY ORDERED that respondents' application is denied."*

On May 2, 2018, APPELLANT filed a Notice of Appeal from an amended judgment in favor of respondents Home Saving Termite Control, Inc. and W.F Morris (TERMITE CONTROL) filed on March 5, 2018 in Los Angeles Superior Court Case No. BC 173952.  That appeal is Court of Appeal Case No. B289828. See pages 330 through 338 of Volume 2 of Clerk's Transcript on Appeal in Court of Appeal Case No. B289828.

Appeal Case No. 287626 and Appeal Case No. 289828 are both appeals of Judgments of Dismissal of TERMITE CONTROL signed by Judge Fruin.

On November 17, 2017 Judge Fruin signed an order and a judgment dismissing TERMITE CONTROL (see pages 2915 and 298 and pages 3051 through 3066 of Clerk's Transcript on Appeal in Appeal Case B287626). APPELLANT filed a Notice of Appeal of the November 17, 2017 order and judgment dismissing TERMITE CONTROL on January 16, 2018 (see pages 3051 through 3066 of Clerk's Transcript on Appeal in Appeal Case B287626).

On March 5, 2018, while APPELLANT'S appeal of Judge Fruin's order and judgment was pending, Judge Fruin sua sponte, without a hearing, signed an Amended Judgment of Dismissal of TERMITE CONTROL (see pages 321 – 324

of Clerk's Transcript on Appeal for Appeal Case No. 289828).  Appeal Case No. B289828 is APPELLANT'S appeal from Judge Fruin's March 5, 2018 amended judgment of dismissal of TERMITE CONTROL.

On August 22, 2019, APPELLANT'S attorney asked GRACE'S attorney Rosemary S. Lewis to stipulate on behalf of her clients, W.R. Grace & Co. and Grace Davidson, that oral argument on all four appeal cases (Court of Appeal Case Nos. B281406, B286138, B287626 and B289828) be heard concurrently at the same time. See Exhibit 72, page 1116, in Volume 2 of Exhibits Referred to in Motion to Consolidate Appeals for Oral Argument and Other Relief.  From now on all references to Exhibits will be to Exhibits contained in either Volume 1 or Volume 2 of Exhibits Referred to In Motion to Consolidate Appeals for Oral Argument and Other Relief unless otherwise noted.

On August 23, 2019, GRACE'S attorney Rosemary S. Lewis replied: *"GRACE is not in agreement that oral argument in all 4 appeals be heard at the same time."* See Exhibit 77, pages 1132-1130.

APPELLANT'S attorney asked each attorney representing each respondent in each appeal case to agree to oral argument on all appeal cases being consolidated to be heard at the same time.  See Exhibits 71 – 85.  Each of respondents' attorneys refused to stipulate to have oral argument on all appeals heard at the same time except Mark Kincaid, attorney for TERITE CONTROL.

Mark Kincaid agreed that all four appeal cases could be consolidated for oral argument and heard at the same time. See Exhibit 73, page 1118.

Be advised, there is a "fly in the ointment" with respect to the ability to have finality in legal proceedings involving W.R. Grace & Co. and Grace Davidson in the Los Angeles Superior Court and in the California Court of Appeal:

- *"On April 2, 2001, cross-defendants and respondents W.R. Grace & Co. and Grace Davidson [GRACE] filed for Ch. 11 bankruptcy in the United States Bankruptcy Court for the district of Delaware, which imposed an automatic stay of proceedings in this litigation. "*    See lines 23 through 25 on page 98 of Volume 1 of Clerk's Transcript on Appeal in Court of Appeal Case No. B281406.

- The GRACE bankruptcy proceedings have not concluded.

5

- The United States Bankruptcy Court has never given up jurisdiction over APPELLANT or over GRACE in this litigation. See ORDER of United States Bankruptcy Judge Honorable Kevin J. Carey, dated March 4, 2015 which appears on pages 344 and 345 of Volume 2 of Clerk's Transcript on Appeal in Appeal Case No. B281406.

- No action against GRACE in the Los Angeles Superior Court can be finally disposed of with certainty by a judgment in the Los Angeles Superior Court because the United States Bankruptcy Court has (reserved) jurisdiction to determine the final disposition of APPELLANT'S claim against GRACE. Perhaps no action against GRACE in the California Court of Appeal (for example an award of compensation to APPELLANT) can be disposed of with certainty. See ORDER of United States Bankruptcy Judge Honorable Kevin J. Carey, dated March 4, 2015 which appears on pages 344 and 345 of Volume 2 of Clerk's Transcript on Appeal in Appeal Case No. B281406.

- It is possible that if an order is made by the Court of Appeal ordering GRACE to pay monetary compensation in the amount of $600,000.00 to APPELLANT, or to pay monetary compensation in any amount to APPELLANT, the Court of Appeal's order may not be enforceable because for all practical purposes it appears that the United States Bankruptcy Court has reserved jurisdiction to approve or disapprove any amount GRACE owes or is ordered to pay APPELLANT. See ORDER of United States Bankruptcy Judge Honorable Kevin J. Carey, dated March 4, 2015 which appears on pages 344 and 345 of Volume 2 of Clerk's Transcript on Appeal in Appeal Case No. B281406.

- GRACE and its attorneys organized, concocted, initiated, and carried forward the proceedings in the Bankruptcy Court that resulted in United States Bankruptcy Court Judge Carey signing the March 4, 2015 ORDER. GRACE is the sole draftsperson of the March 4, 2015 ORDER signed by the Honorable Kevin J. Carey dated March 4, 2015. APPELLANT did not participate in the drafting of that ORDER. A copy of Judge Carey's March 4, 2015 ORDER appears

on pages 344 and 345 of Volume 2 of the Clerk's Transcript on
Appeal in Appeal Case No. B281406.

- GRACE orchestrated what took place in all the proceedings that led to
  Judge Carey signing that order.  See Declaration of Roger J. Higgins
  on pages 192 of Volume 1 through page 357 of Volume 2 of the
  Clerk's Transcript on Appeal in Appeal Case No. 281406.

- GRACE AND its bankruptcy attorneys KIRKLAND & ELLIS LLC,
  THE LAW OFFICES OF ROGER HIGGINS LLC, attorney Roger J.
  Higgins, PACHULSKI  STANG ZIEHL & JONES LLP and W.R.
  Grace & Co.'s Vice President and Associate General Counsel Richard
  C. Fink obtained Judge Carey's signature on the March 4, 2015
  ORER by trickery, by misleading Judge Carey and APPELLANT by
  not disclosing the complete and true facts to either Judge Carey or to
  APPELLANT,  by misrepresenting the facts to Judge Carey and to
  APPELLANT in the proceedings which resulted in Judge Carey
  signing the March 4, 2015 ORDER.

- GRACE represented that the relief being sought by GRACE was to
  permit the California State Court Litigation to proceed to litigation.
  (CT 206): "RELIEF REQUESTED " "10. The Reorganized Debtors
  request that the Court enter the Order substantially in the form
  attached hereto as Exhibit B: (a) to the extent that Smolker responds
  to this Claims Objection, permitting the California State Court
  Litigation to proceed to judgment; or (ii) if Smolker does not respond
  to this Claims Objection, disallowing the Claims pursuant to
  Fed.R.Bank.P. 7055."  EXHIBIT B (CT 2017) states: "2. [if a
  response from Plaintiffs is filed] The Injunction set forth in Plan §8.11
  is lifted, and the litigation captioned *TIG Insurance Company v. Gary
  Smolker, et al.,* Case No. BC 173952 (Los Angeles County Sup.
  Ct.)(Janavs, J.)(the "California Stated Court Litigation") may proceed
  to judgment."

- That is not what Judge Carey's March 4, 2015 ORDER states. To the
  contrary, Judge Carey's ORDER does not allow for the California

7

State Court litigation to proceed to a FINAL JUDGEMENT without further interference by the Bankruptcy Court.

- The only thing APPEALLANT agreed to is succinctly stated on Page 328 of CT for Appeal Case 281406: ***"I agree to the lifting of the stay order so that the California State Court litigation may proceed."*** APPELLANT did not agree to the Bankruptcy Court retaining jurisdiction to determine all matters relating to the allowance or disallowance of APPELLANT'S claims against GRACE.

- See also "CLAIMANT GARY S. SMOLKER'S RESPONSE TO THE THIRTY-SEVENTH OMNIBUS OBJHECTION TO CERTAIN CLAIMS FILED REGARDING PREPETITION LITIGATION CAPTIONES TIG INSURANCE COMPANY V. GARY SMOLKER, ET. AL., CASE NO BC 173952 (LOS ANGELES COUNTY SUPERIOR COURT), DATED JANUARY 30, 2015 ("the 37th Omnibus Objection" which appears in the Clerk's Transcript for Appeal Case No. 281406 at pages 330 – 337, in which Gary Smolker states on page 331:

- *"In the 37th Omnibus Objection co-counsel for the Reorganized Debtors state they will ask the Court to enter an Order permitting the California State Court Litigation pending in the Los Angeles Superior Court, captioned TIG Insurance Company v. Gary Smolker, et al., Los Angeles Superior Court Case No. BC 173952 to proceed to judgment, if I respond to the 37th Omnibus Objection.*

- *"I too would like, and request, the Court to enter an Order permitting the California State Court Litigation, pending in the Los Angeles Superior Court, captioned TIG Insurance Company v. Gary Smolker, et al. Los Angeles Superior Court Case No. BC 173952 to proceed to judgment.*

- *"WHEREFORE, I, claimant Gary S. Smolker, request the Court to enter an order permitting the California State Court Litigation pending in the Los Angeles County Superior Court Case No. BC 173952 to proceed to judgment."*

8

- GRACE submitted the Declaration of Richard C. Finke, Vice President and Associate General Counsel of W.R. Grace & Co. in Support of GRACE'S 37th Omnibus Objection (CT 212 -214) in which Mr. Finke, in states: *Based upon a thorough review of their available books and records, the Reorganized Debtors have concluded they have not liability as to any of the claims discussed herein and in the Objection.* "  No mention is made by Mr. Finke that GRACE had illegal sold an unregistered pesticide product manufactured by GRACE to TERMITE CONTROL which TERMITE CONTROL had unlawfully applied in APPELLANT'S home for the purpose of eradicating termites.

- Mr. Finke's statement in support of GRACE'S application for the order signed by Judge Carey is a completely misleading statement made to Judge Carey by Mr. Finke on behalf of GRACE. At the time Mr. Finke made that statement GRACE and its California State Court litigation counsel – the Borton Petrini and Conron LLP law firm- had in their possession overwhelming evidence that GRACE is liable to APPELLANT for detriment caused to APPELLANT by GRACE's unlawful and illegal sale of its pesticide product SYLOID 244 to TERMITE CONTROL.  For example, since November 2000, GRACE and its attorneys have had in their possession the deposition testimony of  Greg Adams, California Structural Pest Control Board Specialist (Exhibit 65), deposition testimony Jeffrey Humphreys, Deputy Director, Consumer Protection Bureau, Department of Agricultural Commissioner Weights and Measures of the County of Los Angeles (Exhibit 67), deposition testimony of David Duncan, Active Chief of the Enforcement Branch of the Environmental Protection Agency of the State of California that GRACE illegally and unlawful sold its pesticide product SYLOID 244 to TERMITE CONTROL.  Exhibit numbers referred to Exhibits attached to Volumes 1 and 2 of Exhibits filed in support of this motion.

- In 2000, GRACE filed motions for summary judgment and summary adjudication against APPELLANT.  In which GRACE claimed it was not unlawful for GRACE to sell its pesticide product SYLOID 244 to TERMITE CONTROL. Said motions were heard and denied by Judge Fruin.  See additional discussion which follows under the heading "GRACE OBTAINED JUDGE CAREY'S MARCH 4, 2015 ORDER

9

UNETHICALLY, UNLAWFULLY, ILLEGALLY AND
FRAUDULENTLY."

- It is APPELLANT'S position that GRACE has purposely sought to
  mislead Judge Carey and Judge Fruin by false statements of law and
  fact, has purposefully asserted positions in the Bankruptcy Court
  proceedings and in the Superior Court proceedings without probable
  cause and for the purpose of harassing and maliciously injuring
  APPELLANT, and is using its *"permanent bankruptcy"* (which is has
  been ongoing for more than 18 years) as an unethical and illegal
  litigation defense scheme for no substantial purpose other than to
  delay and prolong the Los Angeles Court Case BC 173952 and to
  cause needlessly cause excessive expense.  It is also APPELLANT'S
  position that GRACE'S sole the purpose of obtaining Judge Carey's
  March 4, 2015 ORDER is to prevent the Los Angeles Superior and
  the California Court of Appeal from fully and finally disposing of Los
  Angeles Superior Court Case No. BC 173952, and to make the
  financial and emotional burden to APPELLANT to great that it would
  be impossible and impractical for APPELLANT to prosecute his
  claim.

- Judge Carey's March 4, 2015 makes bringing APPELLANT'S action
  against GRACE to trial impractical and futile.

## NAMED PARTIES AND THEIR RESPECTIVE ATTORNEYS OF RECORD

The parties in Appeal Case No. B281406 are W.R. Grace & Co. and Grace
Davidson (GRACE), respondents, and Gary Smolker, appellant (APPELLANT).
Rosemarie Lewis and Jeffrey Z. Liu of BORTON PETRINI, LLP and BORTON
PETRINI & CONRON LLP are GRACE'S attorneys.  Gary Smolker, appellant is
in pro per.  All parties have appeared. All briefing is complete.

It is alleged in APPELLANT'S complaint in the underlying action Los
Angeles Superior Court Case No. BC 173952 that GRACE illegally sold its
pesticide product SYLOID 244 to TERMITE CONTROL.  TERMITE CONTROL,
illegally used GRACE'S product SYLOID 244 in APPELLANT'S home.  The
application of SYLOID 244 in APPELLANT'S home directly and proximately

caused APPELLANT to suffer detriment; but for GRACE'S illegal sale of SYLOID 244 APPELLANT would not have suffered the damages alleged in the underlying Los Angeles Superior Court, Los Angeles action, Superior Court Case No. BC 173952.

At the time GRACE'S attorneys applied to Judge Carey to sign the March 4, 2015 ORDER, GRACE'S attorneys had in their possession overwhelming evidence that it was illegal for GRACE to sell SYLOID 244 to TERMITE CONTROL.

Under California law there is strict liability for damages that result from unlawful conduct.

In its application to Judge Carey for such order GRACE and its attorneys did not inform Judge Carey that GRACE was strictly liable to APPELLANT for all damages resulting from GRACE'S unlawful conduct. To the contrary, GRACE'S attorneys affirmatively misrepresented to Judge Carey that GRACE had no liability to APPELLANT.

At the time Judge Fruin granted GRACE'S motion to dismiss, Judge Fruin was fully aware of GRACE'S unlawful conduct, unlawful sale of an unregistered pesticide SYLOID 244 to TERMITE CONTROL to be used by TERMITE CONTROL as a pesticide to kill termites. Judge Fruin had previously received Exhibits attached to Volumes 1 and 2 of Exhibits filed in support of this motion in connection with motions for summary judgment and summary adjudication brought by GRACE. After review of such evidence Judge Fruin denied GRACE'S motions for summary judgment and summary adjudication of issues.

The parties in Appeal Case No. B286138 are Truck Insurance Exchange (TRUCK), respondent, represented by Peter Schwartz and Steven R. Inouye of GORDON REESE SCULLY MANSUKHANI, LLP; Coregis Group, Inc., Coregis Insurance Company and California Insurance Company (COREGIS ENTITIES), respondents, represented by Robert D. Hoffman of CHARLSTON, REVICH & WOLLITZ LLP; Interinsurance Exchange of the Automobile Club of Southern California (AUTO CLUB), respondent, represented by Raul L. Martinez and Elise Klein of LEWIS BRISBOIS BISGAARD & SMITH LLP. Gary Smolker, appellant, is in pro per. All parties have appeared. APPELLANT'S REPLY BRIEF is due October 25, 2019.

11

All of these respondents (TRUCK, COREGIS ENTITIES, and AUTO CLUB) processed a claim by APPELLANT for med pay benefits under insurance policies in which APPELLANT is a third party intended beneficiary. Med pay benefits are supposed to be a conflict free zone, an insurance carrier is supposed to pay up to a maximum set amount of medical expenses incurred by a claimant regardless of the liability of the insured to the injured party seeking reimbursement of medical expenses.

It is alleged in the underlying complaint, that each insurance entity dealt with APPELLANT in an unfair way, did more than deny APPELLANT'S claim for med pay insurance benefits in bad faith and that each insurance entity's conduct was not prompted by an honest mistake, bad judgment or negligence but rather by conscious and deliberate acts which not only unfairly frustrated APPELLANT'S reasonable expectations but also resulted in APPELLANT being exposed unnecessarily to toxic substances in his home.

It is APPELLANT'S position that respondent insurance entities and their respective defense counsel acted unethically and unlawfully and abused the legal system and legal process with respect to their filing and their processing of their motions to dismiss. They did so for the purpose of covering up the dangerous properties of SYLOID 244 – which if known to the public would cause them inordinate liability for medical payments, and property damage by causing needless excessive expense to APPELLANT and to cause inordinate excessive delay in the hopes that APPELLANT would die before his action was tried in the Los Angeles Superior Court.

The parties in Appeal Case No. B287626 are respondents TERMITE CONTROL, represented by MARK L. KINCAID; COREGIS ENTITIES, represented by Robert D. Hoffman of CHARLSTON, REVICH & WOLLITZ LLP; AUTO CLUB, respondent represented by Raul L. Martinez and Elise Klein of LEWIS BRISBOIS BISGAARD & SMITH LLP. Gary Smolker, appellant, is in pro per. All parties have appeared. APPELLANT'S REPLY BRIEF is due October 25, 2019.

Appeal Case No. B287626 consists of APPELLANT'S appeal from Judge Fruin's grant of TERMITE CONTROL'S Motion to Dismiss and APPELLANT'S appeals from Judge Fruin's denial of APPELLANT'S motions to tax costs awarded to AUTO CLUB and COREGIS ENTITIES.

Judge Fruin was fully aware of TERMITE CONTROL'S illegal conduct, use of SYLOID 244, an unregistered pesticide, TERMITE CONTROL'S false and misleading claims regarding TERMITE CONTROL'S termite eradication services, TERMITE CONTROL'S misrepresentations of the qualities of the SYLOID 244 product TERMITE CONTROL used to exterminate termites, TERMITE CONTROL'S misrepresentation that SYLOID 244 was approved by the EPA when it was not, Judge Fruin was also aware of TERMITE CONTROL'S misrepresenting that SYLOID 244 was not a chemical, TERMITE CONTROL'S misrepresentation that SYLOID 244 is a non- toxic mineral, and TERMITE CONTROL'S disparagement of the services of other termite extermination providers by making a false comparison of other exterminators' service to its own termite extermination services.  Judge Fruin was also aware that TERMITE CONTROL had previously been ordered to cease and desist representing that silica aerogel is not a chemical product when Judge Fruin granted each respondent's separate motion to dismiss.

The above described information had been presented to Judge Fruin in 2000, by APPELLANT in APPELLANT'S opposition to motions filed by TERMITE CONTROL for summary judgment and summary adjudication of issues.

TERMITE CONTROL'S motions for summary judgment and summary adjudication of issues were heard and denied by Judge Fruin.

The parties in Appeal Case No. B289828 are TERMITE CONTROL (respondents Home Saving Termite Control, Inc. and W.F. Morris), represented by MARK L. KINCAID and Gary Smolker, appellant, in pro per.  All parties have appeared.  APPELLANT'S OPENING BRIEF is due December 24, 2019. Attorney Kincaid has stipulated that all four appeal cases may be heard at the same time.

## NATURE OF APPEALS

The four appeal cases which Appellant requests be consolidated for the purpose of being heard together at oral argument are appeals from judgments of dismissal of Appellant's action against each respondent following Judge Fruin's grant of each respondent's separate motion to dismiss, also an appeal of an amendment of the Judgment of Dismissal of TERMITE CONTROL, and also appeals from cost awards made by Judge Fruin, over APPELLANT'S objection.

There is no legal basis or equitable basis or public policy basis for the dismissal of GRACE in Los Angeles Superior Court Case No. BC 173952 - the subject of Court of Appeal Case No. 286138.

There is no legal or equitable or public policy basis for the dismissal of any other respondent - the subject of Court of Appeal Case Numbers B286138, B287626 and B289626.

Judge Fruin's grant of GRACE's motion for dismissal was based on Judge Fruin's incorrect statement and analysis of the law with respect to the effect of Judge Carey's March 4, 2015 ORDER.

Judge Fruin incorrectly concluded that the filing of Judge Carey's March 4, 2015 ORDER started the time running in which APPELLANT is required to bring his action against GRACE to trial. In actuality, per California Code Civil Procedure section 583.340 (c) because Judge Carey's Order reserves jurisdiction to the Bankruptcy Court to allow or disallow APPELLANT'S claims against GRACE and any other party effected thereby, the filing of Judge Carey's March 4, 2015 tolled the period of time in which APPELLANT is required to bring his action to trial because it made bringing APPELLANT'S action to trial impractical and futile.

Additionally, on March 4, 2015, at the time Judge Carey signed his ORDER there was in place and in full force and effect a stay order issued by Judge Fruin on February 22, 2002 (CT 133). Judge Fruin's February 22, 2002 STAY ORDER states: *"The court orders that the matter is stayed pending the outcome of W.R. Grace's bankruptcy proceedings.*

At the time GRACE brought its motion to dismiss, APPELLANT was prohibited by Judge Fruin's February 22, 2002 stay order from bringing APPELLANT'S action against GRACE to trial.

Judge Fruin's February 22, 2002 STAY ORDER is not self-executing.

On December 20, 2016 there was a hearing on GRACE'S motion to dismiss.

At the December 20, 2016 hearing APPELLANT asked Judge Fruin to dissolve Judge Fruin's February 22, 2002 STAY ORDER.

Judge Fruin refused to do so.  CT 287 lines 15-21; CT 396 lines 14-20, CT 396 lines 1-4. Reporter's transcript page 16 bottom of page and page 25 bottom of page lines 20 -17.

Judge Fruin said, *"I'm not going to lift the stay which might have consequences to the parties, unless I get a motion, a service list, and I can make a ruling."* CT 396 lines 1-4 and Reporters Transcript page 26 lines 1 and 2, and Reporter's Transcript page 26 lines 9-11 for Appeal Case No.281406.

Judge Fruin's grant of TRUCK'S motion for dismissal was also based on Judge Fruin's erroneous legal conclusion that Judge Carey's March 4, 2015 ORDER started the time running – when in fact Judge Carey's March 4, 2015 ORDER  tolled the time APPELLANT had to bring his action against TRUCK to trial because it made it made bringing APPELLANT'S action against GRACE to trial impractical, and futile for APPELLANT to obtain a final judgment against GRACE in the State Court Action because the Bankruptcy Court reserved jurisdiction to approve or disapprove APPELLANT'S claims against GRACE.

At the time TRUCK brought its motion to dismiss APPELLANT was prohibited from bringing his action against TRUCK to trial by two stay orders issued by Judge Fruin: (1) Judge Fruin's February 22, 2002 Stay Order, and (2) Judge Fruin's Order for Bifurcation filed January 5, 2000 (CT 181- 184).

Judge Fruin's Order for Bifurcation prohibited APPELLANT from bringing has actions against TRUCK, COREGIS ENTITIES and AUTO CLUB to trial until after a final judgment was entered in APPELLANT'S action against GRACE and TERMITE CONTROL.  At the time TRUCK, COREGIS ENTITIES and AUTO CLUB brought their separate motions to dismiss APPELLANT'S action against them, there had not yet been a judgment entered in the State Court action against GRACE or TERMITE CONTROL.

Judge Fruin's grant of the COREGIS ENTITIES' motion for dismissal was also based on Judge Fruin's erroneous legal conclusion that Judge Carey's March 4, 2015 ORDER started the time running in which APPELLANT must bring his action against the COREGIS ENTITIES to trial.

Judge Fruin's grant of the AUTO CLUB'S motion for dismissal was also based on Judge Fruin's erroneous legal conclusion that Judge Carey's March 4,

2015 ORDER started the time running in which APPELLANT must bring his action against the AUTO CLUB to trial.

Judge Fruin's grant of TERMITE CONTROL'S motion for dismissal was also based on Judge Fruin's erroneous legal conclusion that Judge Carey's March 4, 2015 ORDER started the time running in which APPELLANT must bring his action against the TERMITE CONTROL to trial.

All litigants are entitled to finality.

It is completely wrong headed to argue that Judge Carey's March 4, 2015 ORDER removes the California State Litigation, Los Angeles Superior Court Case BC 173952 from the jurisdiction of the Bankruptcy Court.

It is completely wrong headed to argue that Judge Carey's March 4, 2015 ORDER removes Los Angeles Superior Court Case No. BC 173952 from the Bankruptcy Court.

Judge Carey's March 4, 2015 ORDER makes it impossible for APPELLANT to obtain "finality" in the California court system.

## I. GRACE'S BANKRUPTCY ATTORNEYS OBTAINED JUDGE CAREY'S MARCH 4, 2015 ORDER BY UNETHICAL, UNLAWFUL, ILLEGAL AND FRAUDULENT CONDUCT.

Intentionally withholding relevant information from the court when presenting a motion to a court is unethical, a fraud on the court, an abuse of the judicial system. Filing meritless motions, engaging in delaying tactics, and causing needless expense is unethical. <u>Chambers v. Nasco, Inc.</u> 501 U.S. 32 (1971).

It is the duty of an attorney to maintain defenses only as appear to him or her legal and just, and to employ only those means as are consistent with truth, and never seek to mislead a judge or any judicial officer by an artifice or false statement of fact or law. Business and Professions Code sections 6068 (c) and (d).

Every attorney is guilty of a misdemeanor who is guilty of deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party. Business and Professions Code section 6628 (a).

A lawyer shall not conduct a defense or assert a position in litigation without probable cause and for the purpose of harassing or maliciously injuring any person or present a defense in litigation that is not warranted under existing law, unless it can be supported by good faith. California Rules of Professional Conduct (CRPC), Rule 3.1 (a) (1) and (a) (2).

A lawyer shall not use means that have no substantial purpose other than to delay or prolong the proceeding or to cause needless expense. CRPC, Rule 3.2.

A lawyer shall not make a false statement of law or fact to a tribunal or fail to correct a false statement of material fact or law previously made by the lawyers. A lawyer shall not fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel. CRPC, Rule 3.3 (a) (1) and 3.3 (a) (2).

In the course of representing a client a lawyer shall not knowing (a) make a false statement of material fact or law to a third person. CRC, Rule 4.1.

It is professional misconduct for a lawyer to violate these rules, or the State Bar Act, knowingly assist, solicit, or induce another to do so, or do so through the acts of another. CRPC, Rule 8.4 (a).

It is professional misconduct for a lawyer to engage in any conduct involving dishonesty, fraud, deceit, or reckless or intentional misrepresentation.

GRACE'S bankruptcy attorneys KIRKLAND & ELLIS, LLP, LAW OFFICES OF ROGER HIGGINS, LLP, ROGER J. HIGGINS, and PACHULSKI STANG ZIEHL & JONES LLP application to Judge Carey which resulted in Judge Carey on March 4, 2015 signing the order they prepared for Judge Carey to sign involved dishonesty, fraud, deceit, or reckless or intentional misrepresentation.

They failed to inform Judge Carey that GRACE was guilty of unlawfully selling an unregistered pesticide to an exterminator (TERMITE CONTROL) for use as a pesticide to eradicate termites.

They failed to inform Judge Carey that GRACE had attempted to obtain a summary judgment in the Los Angeles Superior Court Case BC 173952 and failed to do so.

They failed to inform Judge Carey that GRACE had attempted to obtain a summary adjudication of issues in Los Angeles Superior Court Case No. BC 173952 and had failed to do so.

They failed to inform Judge Carey that it is uncontestable that GRACE's sale of SYLOID 244 to TERMITE CONTROL was an unlawful act.

They failed to inform Judge Carey that the ORDER they prepared for Judge Carey to sign was not the ORDER they had told APPELLANT they were going to ask Judge Carey to sign. They told APPELLANT that they were going to obtain an order which would allow APPELLANT remove APPELLANTS case from the Bankruptcy Court and allow APPELLANT to finish his case in the Los Angeles Superior Court. Instead they obtained an order signed by Judge Carey which keeps APPELLANT'S claims under the jurisdiction of the bankruptcy court, so that APPELLANT'S claims must still be approved or disapproved by the bankruptcy court.

They failed to inform Judge Carey that under California Civil Code section 3281, *"Every person who suffers detriment from the unlawful act or omission of another, may recover from the person at fault therefor in money, which is called damages."*

## II. GRACE'S CALIFORNIA STATE ATTORNEYS OBTAINED JUDGE FRUIN'S ORDER/JUDGMENT OF DISMISSAL OF APPELLANT'S ACTION AGAINST GRACE BY UNETHICAL, UNLAWFUL, ILLEGAL AND FRAUDULENT CONDUCT.

GRACE'S California State attorneys Rosemarie S. Lewis, Borton Petrini LLP did not timely serve GRACE'S moving papers on APPELLANT. APPELLANT'S attorney informed Judge Fruin that he had not been timely served with GRACE'S moving papers and did not have adequate time to respond. Judge Fruin ignored the fact that APPELLANT's attorney wasn't given adequate time to respond to GRACE'S moving papers and that GRACE had failed to timely serve GRACE'S moving paper's on APPELLANT'S attorney.

GRACE'S California State attorneys Rosemarie S. Lewis and Borton Petrini LLP did not inform Judge Fruin that GRACE obtained Judge Carey's March 4, 2015 ORDER by fraud.

Attorney Rosemarie S. Lewis and the Borton Petrini LLP law firm did not inform Judge Fruin that the order GRACE'S bankruptcy attorneys obtained from United States Bankruptcy Judge Carey was not the order GRACE's bankruptcy attorneys had told APPELLANT they were going to obtain.

Attorney Rosemarie S. Lewis and the Borton Petrini LLP law firm did not tell Judge Fruin that Judge Carey's March 4, 2015 ORDER was not the order APPELLANT had agreed to and that APPELANT was misled by GRACE'S bankruptcy attorneys about the type of order GRACE'S bankruptcy attorneys were applying for.

GRACE'S California attorneys did not inform Judge Fruin that under California Business and Professions Code section 17200 any "unlawful", "unfair" or "fraudulent business act or practice is deemed to be unfair competition. Section 17200 imposes strict liability. It is not necessary to show that the defendant intended to injure anyone. Virtually any law federal, state or local can serve as a predicate for a Section 17200 action. Section 17200 borrows violations of other laws and treats them as unlawful practices independently actionable under the Unfair Competition Act. The "unlawful business activity" which is proscribed by section 17200 includes anything that can properly be called a business practice and that at the same time is forbidden by law. An unfair business practice occurs when the practice offends established public policy or when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. State Farm Fire & Casualty Company v. Superior Court 45 Cal. App.4th 1093.

GRACE'S California attorneys processing of GRACE'S motion to dismiss offends established public policy. GRACES'S California attorneys processing of GRACE's motion to dismiss was immoral, unethical, oppressive, and unscrupulous.

III. GRACE AND ITS ATTORNEYS HAVE ACTED IN BAD FAITH, VEXATIOUSLY, WANTOMLY, AND FOR OPPRESSIVE REASONS. THIS COURT HAS THE POWER TO AWARD MONETARY COMPENSATION TO APPELLANT FOR THE DETRIMENT CAUSED TO APPELLANT BY GRACE'S ATTORNEYS AND GRACE'S BAD FAITH, UNETHICAL, FRAUDULNT, OPPRESSIVE AND UNSCRUPULOUS CONDUCT.

Chambers v. Nasco, Inc. (1991) 501 U.S. 32 (1991)

Bauguess v. Paine (1978) 22 Cal. 3d 626.

Satterfield v. Garmine (1967) 65 Cal.2d 738.

The judiciary has a solemn obligation to do justice. For the judiciary, nothing can be more important than justice. The interests of justice are paramount in all legal proceedings. Supreme Court Justice Kennard's concurring and dissenting opinion in Moncharsh v. Heily & Blase (1992) 3 Cal.4[th] 1.

IV. THIS COURT SHOULD ORDER GRACE'S ATTORNEYS TO PAY APPELLANT MONETARY COMPENSATION IN THE AMOUNT OF $1,242,787 FOR THE DETRIMENT CAUSED TO APPELLANT IN ACKNOWLEGEMENT OF THE PUBLIC POLICY THAT WILL BE VINDICATED BY GRANTING THIS MOTION TO CONSOLIDATE APPEAL CASES FOR ORAL ARGUMENT AND OTHER RELIEF.

Between November 21, 2016 and October 21, 2019 APPELLANT spent 1775.4 hours responding to GRACE'S motion to dismiss APPELLANT'S action in Los Angeles Superior Court Case No. BC 173952 and other respondent's copycat motions to dismiss APPELLANT'S action against them in Los Angeles Superior Court Case No. BC 173952.

Under Code of Civil Procedure Section 1021.5 this Court is obligated to award monetary compensation to the successful litigant when important social policy is vindicated in litigation, especially in a case like this where the financial burden on APPELLANT is so great due to the actions of GRACE and its attorneys.

A significant benefit to the general public should be recognized simply from the effectuation of fundamental statutory policy that requires attorneys to act honestly and chemical pesticide manufactures to not sell pesticides that have not been registered with the Environmental Protection Agency of the State of California.

V. ALLOWING GRACE'S MOTION TO DISMISSTO STAND IS AGAINST PUBLIC

GRACE willfully violated laws designed to protect the public causing horrific damages to be suffered.

The willful actions of dismissed parties GRACE, complained about in the underlying action and described in deposition testimony of Greg Adams, Jeffrey

Humphreys, and David Duncan, attached as Exhibits 65, 66, and 67 Volume 1 and Volume 2 of Exhibits filed in Support of this motion, are punishable as crimes.

*"In general, as between a person who has been enriched as a result of his or her violation of law, and a person intended to be protected by the law who is harmed by the violation, for the violator to retain the benefit would be unjust."* Cortez v. Purolator Air Filtration Products (2000) 23 Cal.4[th] 163, at 182.

The California legislature has found and declared that it is necessary and desirable to provide for the safe use of pesticides. California Food & Agriculture Code section 12980.

The words "pesticide" and "economic poison" are used interchangeably in the California Food & Agriculture Code.

*"It is unlawful for any person to manufacture, deliver, or sell any economic poison or any substance of mixture of substances that is represented to be an economic poison...which is not registered according to this chapter."* California Food & Agriculture Code section 12993.

Respondent GRACE manufactured a substance named SYLOID 244 for use as an economic poison (pesticide) but failed to register that pesticide as required by California Food and Agriculture Code section 12993.

GRACE failed to register its pesticide product SYLOID 244 with the Environmental Protection Agency as required by 7 U.S.C. §136 et seq.

The Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. §136 et seq.) provides for federal regulation of pesticide distribution, sale, and use.

All pesticides used, distributed, or sold in the United States must be registered (licensed) by the EPA.

GRACE illegally sold its unregistered pesticide product SYLOID 244 to TERMITE CONTROL for use as an economic potion (a pesticide) to eradicate termites.

GRACE knew that TERMITE CONTROL'S illegal application of SYLOID 244 in residential structures to eradicate termites would invade the airspace in occupied residential structures in which SYLOID 244 was "installed" by TERMITE CONTROL

TERMITE CONTROL illegally sold and applied the SYLOID 244 it had illegally purchased from GRACE in such a manner that SYLOID 244 invaded living areas in APPELLANT'S home.  That was an illegal act, an act prohibited by California Food & Agriculture sections 12993 and 12991 (e).

*"It is unlawful for any person, by himself, or through another to use ...or dispose of any economic poison, except in compliance with rules and regulations of the director."* California Food & Agriculture section 12991 (e).

After applying SYLOID 244 in APPELLANT'S home, TERMITE CONTROL was cited three times for violation of laws designed to protect the public – once by the State of California Structural Pest Control Board, once by the Los Angeles County Agricultural Commissioner, and once by the State of California Department of Food and Agriculture Pesticide Enforcement Branch.

In each citation TERMITE CONTROL was ordered to cease and desist using the economic poison (pesticide) SYLOID 244. See Exhibits 16 and 17 attached to "Request for Judicial Notice" filed on December 17, 2018 in Court of Appeal Case No. B286138.

Those three government entities regulate the use of pesticides in California. Each one of them ordered TERMITE CONTROL to immediate stop using SYLOID 244 because those three governmental agencies knew TERMITE CONTROL'S use of SYLOID 244 to eradicate termites would cause irreparable harm and presented an immediate hazard to the public.

*"The agricultural commissioner, upon a finding that the use, handling, delivery or sale of in violation of any provision of this division, or any regulation issued pursuant to it, is taking place, or appears imminent, and if such activity is allowed to proceed will present an immediate hazard or cause irreparable damage, may issue an order to the persons responsible to cease and desist from further commission of such violation."* California Food & Agriculture code section 13102.

See also, California Food & Agriculture Code section 13101, which states:

*"The director upon a finding that the use, handling, delivery or sale of economic poison in violation of any provision of this division, or any regulation issued pursuant to it, is taking place, or appears imminent, and such activity if allowed to proceed will present an immediate hazard or cause irreparable damage, may issue an order to the person responsible for such activity to cease and desist from further commission of such violation.*

TERMITE CONTROL was repeatedly ordered to immediately cease and desist the use of SYLOID 244 pursuant to California Food and Agriculture Section 11896 as well as pursuant to California Food & Agriculture sections 13102 and 13101.

*California Food & Agriculture Code section 11896 authorizes a government official, upon a finding that the use, handling, delivery or sale of an economic poison [a pesticide] in violation of any provision of the code regulating the sale and use of pesticides [Division 6], or any regulation issued pursuant to it, is taking place, or appears imminent, and such activity if allowed to proceed will present an immediate hazard or cause irreparable damage, may issue an order to persons responsible for such activity to cease and desist from further commission of such violation.*

TERMITE CONTROL'S application of SYLOID 244 in APPELLANT'S home was a criminal act.

- *California Food & Agriculture Code section 11891 provides that any person who violates any provision of Division 6 regulating the sale, use and handling of a pesticide is guilty of a misdemeanor.*

- *California Food & Agriculture Code section 12996 provides that every person who violates any provision of this division relating to pesticides, or any regulation issued pursuant to a provision of this division relating to pesticides is guilty of a misdemeanor ..."*

<u>Ongoing Public Health Hazard Presented by TERMITE CONTROL'S
Illegal Sales Tactics</u>

In its sales material, TERMITE CONTROL represents that SYLOID 244 is a non-toxic naturally occurring mineral.  Those representations are false.

SYLOID 244 does not exist in nature.

It is manmade.

SYLOID 244 is the trade name of a synthetic chemical manufactured in a chemical plant by GRACE.  See Exhibit 1 (GRACE Material Safety Data Sheet for SYLOID 244), Exhibit 2 (GRACE Technical Note for SYLOID 244), Exhibit 3 (another GRACE Technical Note for SYLOID 244),  page 23 of Exhibit 4 (December 18, 2008 GRACE DAVISON Silica Products – Residual Solvents Statement), Exhibit 4 (another GRACE Technical Note for SYLOID 244) - on pages 2 through 25 of "Motion to Take Judicial Notice" filed on December 7, 2018 in Court of Appeal Case No. B286138.

**SYLOID 244 is a toxic air contaminant** whose pesticidal use is regulated by the Department of Pesticide Regulation.  California Health & Safety Code section 39655 (a).

All pesticides sold in California come with the following implied warranties:

"(a) That the economic poison corresponds to all claims and descriptions which the registrant has made in respect to it in print.
"(b) That the economic poison is reasonably fit for use for any purpose for which it is intended according to any printed statement of the registrant."
California Food & Agriculture Code section 12854.

California Food & Agricultural Code section 11791 makes it a crime for a pest control operator to make any false or fraudulent claim, or misrepresent the effect of the pesticide to be applied.

*"It is unlawful for any person that is subject to this division to do any of the following:*
*"(a) Make any false or fraudulent claim, or misrepresent the effects of material or method to be applied, apply any worthless or improper material, or otherwise engage in any unfair practices.*

As part of its sales presentation to the residents of the condominium complex where APPELLANT lived, TERMITE CONTROL handed out an information brochure in which TERMITE CONTROL represented that: (A)

SYLOID 244 (a silica aerogel) is a safe non-toxic natural mineral that appears naturally in nature. (B) That SYLOID 244 is not a chemical. (C) That it is safe to live in a residential structure in which SYLOID 244 was installed by use of TERMITE CONTROL's patented method of installing SYLOID 244. Each of these statements are false.

In TERMITE CONTROL'S sales brochure TERMITE CONTROL states:

*"After reviewing the test results, we knew that silica aerogel was the only product that would accomplish everything we set out to do:*
*"3 Being a **natural mineral**, it poses no significant health or environmental hazard."*

*"QUESTION:*
*"Is the product used in the patented HOME SAVING DEHYDRATION SYSTEM® highly toxic?"*

*"ANSWER:*
*"NO. Silica aerogel is an inorganic natural mineral with <u>ABSOLUTELY</u> no toxic chemicals."*

*"QUESTION:*
*"Should a property owner be concerned in having these products that last forever in their structure?"*

*"ANSWER:*
*"Absolutely not. The <u>non chemical</u> [sic] silica aerogel is introduced with pneumatic equipment that electrostatically charges dust particles that cause them to cling to wood member surfaces. Once in place and static charge subsists the porous wood holds the tiny (3 micron) dust particles firmly in place."*

*"QUESTION:*
*"What is the silica aerogel used in the HOME SAVING DEHYDRATION SYSTEM®?*

*"ANSWER:*
*"It is selected silica sand that is reduced to a 3 micron particle size, providing a highly absorbent desiccant dust."*

*"QUESTION:*

*"Is silica aerogel dust approved by the Environmental Protection Agency?*

*"ANSWER:*
*"Since its advent."*

*"QUESTION:*
*"Since silica aerogel is made of silica, will this system application pose any added significant danger of structure occupant developing silicosis?*

*"ANSWER:*
*"No. How and where the silica aerogel is installed in the structure, there is no danger of prolonged exposure inside the living space after installation is completed."*

*"QUESTION:*
*"Is silica aerogel highly toxic and unsafe?*

*"ANSWER:*
*"NO. It is a* **natural mineral** *not a chemical."*

Each of these answers is false.

Previously on March 16, 1993 TERMITE CONTROL was ordered by the Structural Pest Control Board of the State of California to desist using such false statements.  See Exhibit 14 on pages 69 and 70 of "Second Motion to Take Judicial Notice" filed on December 19, 2018 in Court of Appeal Case No. B286138.


*"...inorganic silica aerogel [SYLOID 244] will remain in place permanently, killing any insect that comes in contact with it, indefinitely!  On contact, the highly absorbent silica aerogel particles cling to insects [sic] waxy exoskeleton absorbing its body fluids, causing death by dehydration."*

The above statement is true.  The very same properties of SYLOID 244 which enable it to kill insects on contact also enable it to cling to moist surfaces such as mucous membranes in the nose and throat and especially lung tissues in human beings.

The above quotes are taken directly from TERMITE CONTROL'S sales brochure.

A copy of TERMITE CONTOL's sales brochure was presented to the Court of Appeal and filed as Exhibit 10 on pages 42 through 55 in APPELLANT'S "Second Motion to Take Judicial Notice ..." - filed in the Court of Appeal on December 19, 2018.

In 1996, TERMITE CONTROL'S information brochure was delivered by TERMITE CONTROL to residents of the condominium complex and to the homeowner association in charge of management of the common area of the condominium complex in which APPELLANT lived in order to convince APPELLANT and the homeowner association that it was safe to have their property treated with SYLOID 244.

Previously, on March 16, 1993, TERMITE CONTROL had been ordered by the Structural Pest Control Board of the State of California to cease and desist making the false advertising claims that silica aerogel in not a "chemical" product.

TERMITE CONTROL was advised by the Structural Pest Control Board that silica aerogel is a pesticide chemical and that is why it is required to be registered with the EPA and with the State of California's Department of Pesticide Regulation.

A copy of the letter referred to above from the Structural Pest Control Board to TERMITE CONTROL was filed by APPELLANT as Exhibit 14, on pages 69 and 70 of "Second Motion to Take Judicial Notice" filed on December 19, 2018 in Appeal Case No. 286138.

During the entire time TERMITE CONTROL was installing GRACE'S product SYLOID 244 in residential structures to exterminate termites GRACE knew that small particles of silica aerogel (SYLOID 244) are dangerously toxic.

As early as November 1979 it was public knowledge in the scientific community that inhaling extremely small particles of silica aerogel can cause immediate death.

SYLOID 244 is a synthetic silica particle.

27

In a publication published in connection with a 1979 conference on "Health Effects of Synthetic Silica Particles", sponsored by GRACE, is published the following description of the toxicity of small particles of silica:

"*Regarding Dr. Schepers's question regarding the action of extremely small silica particles causing the death of small animals, I can speak with some degree of certainty regarding the effect of extremely fine particles of different dusts when in contact with the lining of the air spaces. If say, 20 mg of coarse particles of whatever character, whether kaolin or silica, in suspension, is injected intratrachially into rats' lungs, the animals will survive. If, however, 20 mg of extremely fine particles less than 0.5 μm in diameter is injected, those animals will die before the syringe is withdrawn from the trachea, the death being due to a fulminating pulmonary edema. What happens is, apparently, that the extremely fine particles are capable of penetrating the alveolar lining and injuring the endothelium of the capillary so that the capillaries lose their semipermeability and become permeable.*"  Statement made by Dr. Paul Gross, who was the Director of Pathology Research, Industrial Health Foundation, Inc., Pittsburgh, Pa. 15232.

Above quote is an excerpt from ASTM Special Technical Publication STP732 published by the American Society for Testing and Materials in 1981, Library of Congress Catalog Card Number 80-69063, titled, "Health Effects of Synthetic Silica Particles" found on page 63, Exhibit 12, attached to "Second Motion to Take Judicial Notice" filed on December 19, 2018 in Appeal Case No. 286138.  See also Exhibit 13, attached to the same motion.

ASTM Special Technical Publication STP732 is a report on the Symposium on Health Effects of Synthetic Silica Particulates held 5-6 November 1979 in Benalmadena-Costa (Torremolinos) Spain.

ASTM Committee E-34 on Occupational Health and Safety and the Industrial Health Foundation jointly sponsored the symposium.  Paul Gross presided as symposium chairman; D.D. Dunnom served as symposium coordinator and edited that publication.

A complete copy of TERMITE CONTROL'S information book referred to above is attached as Exhibit 10, on pages 42 – 55 of "Second Motion to Take Judicial Notice" filed on December 19, 2018 in Appeal Case No. 286138.

TERMITE CONTROL prepared and passed out a "Material Safety Data Sheet" (MSDS) for SYLOID 244, which was provided to APPELLANT after installation of SYLOID 244 in his home.

A copy of TERMITE CONTROL'S MSDS is attached as Exhibit 11 on pages 57-60 of "Second Motion to Take Judicial Notice" filed on December 19, 2018 in Appeal Case No. 286138.

In its MSDS (see Exhibit 11 on page 60 attached to "Second Motion to Take Judicial Notice filed on December 19, 2018) TERMITE CONTROL falsely represents [ under the heading 'REGULATORY STATUS"] that SYLOID 244 is approved by the EPA for use as a pesticide by providing an E.P.A. registration number. TERMITE CONTROL also falsely represented that SYLOID 244 was/is approved by the E.P.A. in its sales brochure. See page 52 of Exhibit 10 of "Second Motion to Take Judicial Notice" filed on December 19, 2018 in Appeal Case No. 286138.

SYLOID 244 was not approved by the federal EPA for use as a pesticide nor was it approved by the California governmental agencies that regulate use of pesticides in California.

The registration number provided by TERMITE CONTROL in its MSDS is the registration number of the plant that manufactures SYLOID 244.

It was a violation of a law designed to protect the public for TERMITE CONTROL to make these misrepresentations.

It is unlawful for any person, by himself, or through another, to do any of the following with respect to a pesticide:

*"(a) Make any material or substantial misrepresentation.*
*"(b) Make any false promises of a character likely to influence, induce or deceive.*
*"(c) Engage in illegitimate business or dishonest dealing.*
*"(d) Cause to be published or distributed any false or misleading advertisement.*
*"(e) For any person to use, store, transport, handle, or dispose of any economic poison, or of any container which holds or has held such economic poison, except in compliance with rules and regulations of the director."* Food & Agriculture section 12991.

29

Section 39655 (a) of the California Health & Safety Code defines TOXIC AIR CONTAMINANT as follows: *"(A) 'Toxic air contaminant" means an air pollutant which may cause or contribute to an increase in mortality or in serious illness, or which may pose a present or potential hazard to human health. ... A toxic air contaminant which is a pesticide shall be regulated in its pesticidal use by the Department of Pesticide Regulation pursuant to Article 1.5 (commencing with Section 14021) of Chapter 3 of Division 7 of the Food and Agricultural Code."*

SYLOID 244 is a toxic air contaminant.  SYLOID 244 not a safe non-chemical natural mineral.

California Food & Agriculture Code sections 12841, 12842, and 12843.

In the underlying litigation (TIG CASE) APPELLANT alleges in his Fifth Amended Cross-Complaint that SYLOID 244 is a toxic substance which was illegally manufactured, illegally sold, and illegally applied in APPELLANT'S home where it contaminated APPELLANT'S home and personal property, made APPELLANT and APPELANT'S wife and children sick, caused damage to their personal property, and caused APPELLANT to suffer financial losses, medical expenses, decontamination expenses, and physical and emotional damages.

In paragraph 72 on page 27 of APPELLANT'S Fifth Amended Cross-Complaint APPELLANT alleges that GRACE: *"...with knowledge of the dangerous properties of SYLOID 244...and its unfitness and danger to human occupants inhabiting an atmosphere containing SYLOID 244, and with knowledge that it was against the law to distribute, sell, offer for sale, hold for distribution, deliver, offer to deliver, release for delivery or manufacture SYLOID 244 for use as a pesticide, sold and delivered SYLOID 244 in the form of 3 micron particles of silica dust to HOME SAVINGS for use as a pesticide in the CONDOMINIUM COMPLEX; to be applied in the CONDOMINIUM COMPLEX by HOME SAVING via HOME SAVING'S 'proprietary pesticide sandblasting system.' Due to its inherent characteristics, no safe design of SYLOID 244 is possible for use of SYLOID 244 as a pesticide in HOME SAVING's 'proprietary sandblasting pest control process."*

In paragraph 73 on page 27 of APPELLANT'S Fifth Amended Cross-Complaint APPELLANT alleges, *"SYLOID 244 is an irritating toxic poisonous dusts capable of causing dermatitis, lung damage and dried out mucous membranes if it comes in contact with or is inhaled by human beings. At the time of GRACE's and GRACE DAVISON's sale and delivery of SYLOID 244 to HOME SAVING, SYLOID 244 was not registered for use as a pesticide with either the US EPA or with the State of California."*

In paragraph 74 on page 28 of APPELLANT'S Fifth Amended Cross-Complaint, APPELLANT alleges: *"It was against the law for GRACE DAVISON to manufacture, sell and deliver SYLOID 244 and against the law for GRACE to sell and deliver SYLOID 244 to HOME SAVING to use as a pesticide. It was against the law for HOME SAVING to apply SYLOID 244 in the CONDOMINIUM COMPLEX. California Food & Agriculture Section 12993; 7 US Code section 136(a). Business & professions Code sections 8538, 85553, 8638, 8642, 8648, 8695. California Code of Administrative Regulations Title 3 Division 6, sections 6600, 6614, 6616. Penal Code sections 374.8 and 594(a)"*

In paragraph 75 on page 28 of APPELLANT'S Fifth Amended Cross-complaint APPELLANT alleges, *"As a direct and proximate result of the acts and omissions of cross-defendants and each of them the SMOLKERS and each of them, involuntarily came in contact with SYLOID244, and were injured as a direct and proximate result thereof."*

A copy of APPELLANT'S Fifth Amended Complaint is in Volume 6 of the Clerk's Transcript of the Record on Appeal for Appeal Case No. B286138 on pages 1426 through 1495.

A copy of APPELLANT'S Fifth Amended Complaint is also in Volume 1 of the Clerk's Transcript of the Record on Appeal for Appeal Case No. B287626 on pages 91 through 160.

After installation of SYLOID 244 in APPELLANT'S condominium unit and in the wall voids in the walls surrounding APPELLANT'S condominium unit:

- APPELLANT'S young daughters Judi and Leah developed sleep disorders which made it impossible for them to wake up in the morning to go to school. They received medical treatment for their sleep disorder. The issue of whether this is an injury for which TERMITE CONTROL or GRACE or any other respondent should be

ordered to pay damages or reimburse medical expenses has not been tried as a result of the dismissals of APPELLANT'S action that are the subject of these appeal cases.

- APPELLANT'S wife Alice developed breast cancer and diverticulitis which caused her to be hospitalized for approximately one month and which necessitated that she suspend her treatment for cancer. The issue of whether these are an injury for which TERMITE CONTROL or GRACE or any other respondent should be ordered to pay damages or reimburse medical expenses has not been tried because of the dismissal of APPELLANT'S action against respondents.

- During the course of the underlying litigation, APPELLANT'S medical experts testified that APPELLANT suffered physically disabling maladies as a result of being exposed to SYLOID 244. APPELLANT was treated by a battery of physicians (including a skin doctor, an ear nose and throat doctor, an environmental health doctor and his primary care physician) - all of whom gave testimony to the effect that the medical injuries suffered by APPELLANT were caused by his exposure to SYLOID 244.

- APPELLANT was forced to watch his wife and children suffer from the injuries described above as respondents and each of them delayed resolution of the underlying case and succeeded in creating an **INFORMATION BAN** on the dangers presented to the public by the installation of SYLOID 244 in residential structures.

- Respondents filed demurrers and motions to strike APPELLANT'S original cross-complaint and amended cross-complaints which deprived APPELLANT of fair access to justice.

- Judge Janavs used respondents' demurrers and motions to strike as an excuse for creating an **INFORMATION BAN** on information regarding the danger to the public of SYLOID 244 installed in the wall voids of residential structures.

- Judge Janavs issued orders, as part of her rulings on respondents' demurrers and motions to strike, which limited the number of pages in APPELLANT'S amended cross-complaints.

- APPELLANT was forced to watch his wife and children suffer as APPELLLANT waited for APPELLANT'S trial of the underlying action against TERMITE CONTROL to commence.

- APPELLANT'S trial against TERMITE CONTROL did not go to completion because Trial Judge Fruin declared a mistrial while trial was in progress.

- Judge Fruin explained he was declaring and then declared a mistrial for the personal reason that continuing APPELLANT'S ongoing trial against TERMITE CONTROL would interfere with Judge Fruin's Christmas plans.
- After Judge Fruin came back from his Christmas holiday, on February 22, 2002, on his own initiative, Judge Fruin issued an order which imposed a stay on the entire litigation pending the outcome of cross-defendant W.R. Grace's bankruptcy proceedings.
- Judge Fruin's stay of the entire litigation pending the outcome of defendant GRACE'S bankruptcy proceedings tipped APPELLANT'S Los Angeles Superior Case No. BC 173952 into the abyss of never knowing when APPELLANT is allowed to bring APPELLANT'S case against respondents to trial.
- Judge Fruin's stay of the entire proceedings necessitated a drastic reordering of APPELLANT'S priorities.
- Judge Fruin's February 22, 2002 indefinite duration stay order deprived APPELLANT of access to justice.
- APPELLANT found his life literally obliterated by the presence of SYLOID 244 in his home and by the presence of SYLOID 244 on and in his and his family's personal belongings.
- APPELLANT'S working hours had been spent trying to find a way to decontaminate his home and personal property, to find a way to rid his home and personal property of SYLOID 244 contamination and to obtain funds to do what was needed to accomplish that goal.
- Trying to get rid of SYLOID 244 contamination worked its way into everything APPELLANT did in his life. Trying to get rid of SYLOID 244 swallowed APPELLANT'S life.
- As a result of Judge Fruin's indefinite stay on APPELLLANT'S entire action pending the outcome of W.R. Grace bankruptcy proceedings, APPELLANT was forced to SELL his condominium unit at a substantial loss.
- Whether the above described health problems, physical injuries, economic losses, and emotional damages were caused by exposure to SYLOID 244 was never tried because APPELLANT has not been able to have to APPELLANT'S constitutionally guaranteed day in court.

*"In general, as between a person who has been enriched as a result of his or her violation of law, and a person intended to be protected by the law who is harmed by the violation, for the violator to retain the benefit would be unjust."*
Cortez v. Purolator Air Filtration Products (2000) 23 Cal.4[th] 163, at 182.


## CONCLUSION

For the reasons set forth above, good cause has been established for this Court to Grant APPELLANT'S motion to consolidate appeal cases for oral argument and application for monetary compensation in the amount of $1,242,787.00.


Dated: October 22, 2019                    Respectively submitted,



_____

Gary Smolker, Appellant in pro per

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. THE JUDICIARIES SOLEMN OBLIGATION IS TO DO JUSTICE

If the Court of Appeal does not reverse the Judgment of Dismissal of GRACE which is erroneous on its face, this Court will not only be tolerating substantial injustice but becoming its active agent.

Every court has the power and the duty to "amend and control its process and orders so as to make them conform to law and justice." (Code Civil Proc. §128, subd. (a)(8). When they construe statutes, courts are enjoined to do so in a way that will promote justice. (E.g., Civ. Code §4; Code Civ. Proc. §§4 and 583.130).

Code of Civil Procedure § 583.130 states that, *"It is the policy of the state that a plaintiff shall proceed with reasonable diligence in the prosecution of an action but that all parties shall cooperate in bringing the action to trial or other disposition...the policy favoring trial or other disposition of an action on the merits are generally to be preferred over the policy that requires dismissal for failure to proceed with reasonable diligence in the prosecution of an action in construing the provisions of this chapter."*

The evidence proving that GRACE unlawfully sold its pesticide product SYLOID 244 is firmly established in the deposition testimony of the State of California officials and employees in charge of regulating the sale and use of pesticides in the State of California.

GRACE will not suffer any prejudice from delay in prosecution of Los Angeles Superior Court Case No. BC 173952 because uncontestable evidence that GRACE illegally sold its pesticide product SYLOID 244has been permanently recorded by way of deposition testimony of State of California officials.


The delay in prosecution of Los Angeles Superior Court Case No. BC 173952 was caused by GRACE filing for Bankruptcy protection and then while in Bankruptcy by GRACE obtaining Judge Carey's March 4, 2015 ORDER which

makes it impractical for APPELLANT to bring Los Angeles Superior Court Case No. BC 173952 to conclusion in the Los Angeles Superior.

APPELLANT did not bring his action against GRACE to trial because APPELLANT was enjoined from doing so by Judge Fruin's February 22, 2002 STAY order.

Under such circumstances it would be a miscarriage of justice to fail to reverse Judge Fruin's judgment of dismissal of GRACE.

## II. GRACE HAS UNCLEARD HANDS

GRACE obtained Judge Carey's order by failing to inform Judge Carey of all relevant facts available to GRACE and by misleading Judge Carey.

GRACE'S sale of SYLOID 244 is unlawful, it is criminal.

## III. APPELLANT WAS ENJOINED FROM BRINGING HIS ACTION AGAINST GRACE TO TRIAL.

Pursuant to Judge Fruin's February 22, 2019 STAY ORDER APPELLANT was enjoined from bringing his action against GRACE to trial.

## CONCLUSION

The just thing to do under the circumstances is to order GRACE's attorneys and GRACE to pay APPELLANT compensation in the amount of $1,242,787.00 for the detriment GRACE causes APPELLANT to suffer as a result of GRACE brining its meritless motion for dismissal of APPELLANT'S action.

FOR all the foregoing reasons APPELLANT'S motion to consolidate appeal cases for oral argument should be granted and APPELLANT'S application for monetary compensation should be granted.

Dated: October 22, 2019          Respectively submitted,

Gary Smolker, appellant in pro per

## DECLARTATION OF GARY SMOLKER

I, Gary Smolker declare:

1.  I am an attorney at law licensed to practice law in all the courts of the State of California.

2.  I have been continuously engaged in the private practice of law since 1973.

3. My hourly billing rate is $700 per hour.

4.  In the time period November 21, 2016 through October 21, 2019 I spent 1,775.4 hours of my time dealing with GRACE'S motion to dismiss and each of the other copycat motions to dismiss that followed.

5. Exhibits 62 through 65 contained in Volume 1 of Exhibits and Exhibits 66 through 69 in Volume 2 of Exhibits submitted herewith are exact copies of documents previously served on GRACE'S California State attorneys in Los Angeles Superior Court on or about November 6, 2000 in opposition to pending motions for summary judgment and summary adjudication filed in Los Angeles Superior Court Case No. BC 173952 by GRACE'S attorneys and/or TERMITE CONTROL'S attorneys scheduled to be heard on November 22, 2000.

6. Exhibits 73 through 90 of Exhibits contained in Volume 2 of Exhibits submitted herewith are exact copies of email correspondence I had with respondents' appellate attorneys in Court of Appeal Case Nos. B281406, B286138, B287626, and B289828 in the time period August 22, 2019 through October 14, 2019.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

This declaration is executed by Gary Smolker on October 22, 2019 at Encino, California.

_____

Gary Smolker

# EXHIBIT

# 5

COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

Court of Appeal Case No. B281406
(Related Appeals Pending in B286138, B287626, and B289828)

GARY SMOLKER

Cross-complainant and Appellant

vs.

W. R. GRACE & CO. et al.

Cross-defendants and Respondents

Appeal from the Superior Court of Los Angeles County,
Honorable Richard L. Fruin, Jr., Judge, Case No. BC173952

**VOLUME 1 OF 2 VOLUMES OF EXHIBITS REFERRED TO IN MOTION
TO CONSOLIDATE APPEALS FOR ORAL ARGUMENT AND OTHER
RELIEF (EXHIBITS 62, 63, 64 AND 65) pages 758-1014**

Gary Smolker, State Bar No. 56117
16055 Ventura Blvd., Suite 525, Encino, CA. 91436
Telephone: 818-788-7290, Facsimile: 818-990-9888
gsmolker@aol.com
Attorney, in pro per, for Cross-complainant and Appellant

1

# INDEX OF EXHIBITS

| EXHIBIT NO. | DESCRIPTION | PAGES |
|---|---|---|
| 62 | United States Patent No. 5,542,207 | 761-769 |
| 63 | Deposition Testimony of Matthew Fredericks | 775-821 |
| 64 | Deposition Testimony of Corey Arentz | 825-872 |
| 65 | Deposition Testimony of Greg Adams | 882-1014 |
| 66 | Deposition Testimony of Jeffrey Humphreys | 1019-1068 |
| 67 | Deposition Testimony of David Duncan | 1072-1096 |
| 68 | Borton Petrini & Conron, LLP | 1099-1101 |
| 69 | Structural Pest Control Letter | 1104-1105 |
| 70 | Notice of Deposit of Jury Fees | 1108-1109 |
| 71 | August 22, 2019 e-mail from GSS to Mark Kincaid | 1111-1114 |
| 72 | August 22, 2019 e-mail from GSS to all defense counsel | 1116 |
| 73 | August 22, 2019 e-mail from GSS to Mark Kincaid | 1118-1119 |
| 74 | August 22, 2019 e-mail from GSS to Jeffrey Z. Liu | 1121-1122 |
| 75 | August 23, 2019 e-mail from Rosemary S. Lewis to GSS | 1124-1126 |
| 76 | August 23, 2019 e-mail from GSS to Rosemarie S. Lewis, Raul Martinez, Robert Hoffman, and Peter Schwartz | 1128-1130 |
| 77 | August 23, 2019 e-mail from Rosemary S. Lewis to GSS | 1132-1133 |
| 78 | August 24, 2019 GSS email to Rosemarie S. Lewis | 1135-1137 |
| 79 | August 25, 2019 from Robert Hoffman to GSS | 1139-1142 |
| 80 | August 25, 2019 e-mail from GSS to Robert Hoffman, Raul Martinez, Peter Schwartz | 1144-1147 |
| 81 | August 26, 2019 e-mail from Raul Martinez to GSS | 1149-1152 |
| 82 | August 26, 2019 GSS e-mail to Raul Martinez and Peter Schwartz | 1154-1157 |
| 83 | August 26, 2019 e-mail from GSS to Raul Martinez | 1159-1162 |

| 84 | August 27, 2019 e-mail from Steven Inouye to GSS | 1164-1168 |
| 85 | August 27, 2019 e-mail from GSS to Steven Inouye | 1170-1174 |
| 86 | October 12, 2019 e-mail from GSS to Mark Kincaid | 1176-1179 |
| 87 | October 12, 2019 e-mail from GSS to Mark Kincaid | 1181-1183 |
| 88 | October 14, 2019 e-mail from Mark Kincaid to GSS | 1185-1187 |
| 89 | October 14, 2019 e-mail from Mark Kincaid to GSS | 1189-1191 |
| 90 | October 14, 2019 e-mail from GSS to Mark Kincaid | 1193-1195 |

Dated: October 14, 2019                 Respectfully submitted,


_Gary Smolker_

Gary Smolker, Appellant In Pro Per

SUB-
EXHIBIT
62

# EXHIBIT 62

Exhibit "62."

Unites States Patent Number 5,542,207, dated August 6, 1996, issued to Inventor Wayne F. Morris, Sr., entitled *Process for Controlling Insect Infestations In A Structure*, concerning Home Saving Termite Control's patented process for applying silica gel in residential structures for the purpose of eliminating termites.

A copy of this Exhibit was filed in LASC Case No. BC173952 On or about November 6, 2000 in opposition to pending Motions for Summary Judgment and Summary Adjudication scheduled to be heard on November 22, 2000

## Summary Description of Invention

The present invention is a process for injecting amorphous silica gel dust into structural voids: Aperatures are created through walls to give access to structural voids. An electrostatically charged amorphous silica gel dust is injected through these aperatures into the structural voids.

A sufficient number of access apertures must be drilled through the walls to insure total inside space penetration. The normal spacing for access aperatures is typically between three feet and four feet to obtain proper coverage.

The amorphous silica dust is supplied under pressure to a suitable spray gun.

As the interior wall spaces of the structural voids are being dusted, if the dust being injected utilizing the spray gun does not escape out through an adjacent access aperture, then the spacing of the access aperatures is not sufficiently close.

## Comment

United States Patent Number 5,542,207, dated August 6, 1996, states amorphous silica gel is not a chemical pesticide, and is not toxic to humans. It is a natural mineral in the form of a fine white powder/dust. Preferably, the particle size of the dust is three microns. It provides permanent protection in treated areas against future termite infestations.

The above statement is false and misleading. SYLOID 244 (the amorphous silica gel powder /dust) referred to above is a toxic air contaminant whose pesticidal use is regulated by the California Department of Pesticide Regulation. California Health and Safety code section 39655 (a).

On March 16, 1993, Mr. Wayne Morris was ordered by the Department of Pesticide Regulation to cease and desist making the false statement that silica gel is a "non-chemical" product. It is a pesticide chemical and that is why it is required to be registered with the EPA and the DPR." To

suggest and state otherwise as you do is false advertising and you must CEASE AND DESIST this immediately. "Exhibit 69."

In depositions taken in this case both Mr. Matt Fredericks, a condominium owner in the condominium complex where APPELLANT lived, and Mr. Greg Adams, a Structural, Pest Control Board Specialist, testified that TERMITE CONTROL'S process doesn't work, it doesn't kill all termites in the structure; after the application of the pesticide dust, termites still infest the structure.

They also testified; After the pesticide application of the pesticide dust into the wall voids, the pesticide dust will come back into the living space occupied by humans. Exhibits 63 and 65.

The patent states that pesticide dust must come back into the living space. In order to ensure the wall voids are filled with pesticide dust the applicator waits to see a burst of pesticide dust coming out of a hole (access aperature) he has drilled three or four feet away from the hole (access aperature) into which he is spraying the pesticide powder.

It is against the law for any person to use a pesticide in any manners that will result in it drifting to nontarget areas. Food Agriculture code section 12972.

US005542207A

# United States Patent [19]

## Morris, Sr.

[11] **Patent Number:** 5,542,207

[45] **Date of Patent:** Aug. 6, 1996

[54] **PROCESS FOR CONTROLLING INSECT INFESTATIONS IN A STRUCTURE**

[75] Inventor: **Wayne F. Morris, Sr.,** Leona Valley, Calif.

[73] Assignee: **Home Saving Termite Control, Inc.,** Leona Valley, Calif.

[21] Appl. No.: **343,845**

[22] Filed: **Nov. 23, 1994**

[51] Int. Cl.$^6$ .................................................. A01M 1/20
[52] U.S. Cl. ................................. 43/132.1; 43/124
[58] Field of Search ................. 43/131, 124, 132.1, 43/900

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,981,025 | 4/1961 | Woodson | ...................... 43/124 |
| 3,858,346 | 1/1975 | Bailey | ...................... 43/124 |
| 3,894,043 | 7/1975 | Moser et al. | |
| 4,190,686 | 2/1980 | Muis | |
| 4,430,108 | 2/1984 | Hojaji et al. | |
| 4,779,735 | 10/1988 | Kelso, Jr. | |
| 4,889,710 | 12/1989 | Hagarty | |
| 4,958,456 | 9/1990 | Chaudoin | ...................... 43/124 |
| 5,058,312 | 10/1991 | Jackson | ...................... 43/132.1 |
| 5,094,028 | 3/1992 | Hume | |

| | | | |
|---|---|---|---|
| 5,135,750 | 8/1992 | Nakashima | |
| 5,165,199 | 11/1992 | Tallon | ...................... 43/124 |
| 5,178,871 | 1/1993 | Thill | |
| 5,182,305 | 1/1993 | Steltenkamp | |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 0229046 | 10/1985 | Germany | ...................... 43/132.1 |

*Primary Examiner*—Jack W. Lavinder
*Assistant Examiner*—James Miner
*Attorney, Agent, or Firm*—Kelly, Bauersfeld & Lowry

[57] **ABSTRACT**

A process for eradicating termite infestations in a structure and preventing the reinfestation thereof includes the steps of identifying infested wood members, impregnating the infested wood members with a borate solution, and injecting an amorphous silica gel dust into structural voids adjacent to the exterior of the structure. The borate solution, which is applied to surfaces of the infested wood members, kills existing infestations of kaloterme. The amorphous silica gel dust is electrostatically charged as it is injected into the structural voids so as to cling to the surfaces of exposed wood members. This forms a shield against future infestations. Termite barricades impregnated with the borate solution are also inserted into selected wood members of the structure.

**25 Claims, 4 Drawing Sheets**





F I G. 1

FIG. 2





*F I G. 3*

*F I G. 5*

*F I G. 4*



F I G. 6

F I G. 7

F I G. 8

5,542,207

| 1 | 2 |

## PROCESS FOR CONTROLLING INSECT INFESTATIONS IN A STRUCTURE

### BACKGROUND OF THE INVENTION

This invention relates generally to processes for controlling insect infestations in a structure. More particularly, the present invention relates a process for eradicating existing termite colonies in a structure and preventing reinfestations through the use of minerals rather than chemical insecticides.

Kaloterme (dry wood termite) infestations in wood structures is a serious problem throughout much of the country. Termites can invade a residence and do serious damage before their presence is determined. Homeowners throughout the country expend significant amounts of money to discover kaloterme invasions, eradicate the termite colonies discovered, repair damage to structure, and inhibit future invasions. Among the procedures available to deal with kaloterme infestations are localized treatments of infested wooden members with a termiticide, and fumigation of the structure.

Fumigation of a structure is quite involved and is viewed as a drastic but necessary step to protect infested structures. Prior to fumigating the structure, all occupants must move out of the structure, all food items not in airtight bottles and cans (including those in refrigerators and freezers), must be removed or put in airtight specially approved plastic bags, and all medications, vitamins, cosmetics, etc., must be removed from the premises or bagged. Further, all live plants and pets must be removed from the premises, burglar alarms should be turned off, any natural gas supply to the premises must be turned off at the meter, trees, plants and shrubs must be trimmed back from the base of all exterior walls a minimum of twelve inches, and all vines climbing on walls and a attached trellises must be removed from the structure or killed. Additionally, property owners are often required to sign forms releasing the fumigation company of all responsibility and liability if damage should occur to roofs, skylights, solar panels, television antenna, rain gutters, landscaping, etc.

Once the structure to be fumigated has been so prepared, employees of the fumigation company must further prepare the structure by installing special tarpaulins over the structure in the form of a "tent". The structure is then ready for the introduction of either methyl bromide or vikane fumigants which, upon contact with kaloterme or wood destroying beetles, eradicates the undesired insect infestation.

Such chemical fumigants and termiticides are known to be hazardous to humans and the environment in general. Termiticides may be fatal if swallowed. Excessive absorption through the skin may be fatal and may cause substantial although temporary eye injury. Many such chemicals are toxic to birds and wildlife, and extremely toxic to fish and aquatic organisms. Moreover, the effects of chemical termiticides and fumigants, although believed to be safe for the intended purpose today, may prove to be unacceptably toxic at a later date as was the case with the chemical Chlordane, once approved by the Environmental Protection Agency but now banned for use by professional exterminators.

Present termite eradication procedures efficiently eliminate the termites that exist in the treated structure during the fumigant exposure time. However, there is absolutely no protection against termite reproductive swarms that could re-enter the structure again at any time following completion of the fumigation procedure. Thus, many structures require

refumigation within two to five years following an initial treatment.

What is needed, therefore, is a process for controlling insect infestations in a structure, which does not require chemical pesticides to accomplish the desired result, but rather utilizes materials that are known be toxic to kaloterme but not to humans and pets. Additionally, there is a need for a process for controlling insect infestations which provides a permanent termite shield for a treated structure to prevent future infestations of wood destroying insects. Such a process should utilize materials that are odorless, do not discolor or stain exterior wood surfaces, and the cost must be comparable to the cost of present fumigation techniques. The present invention fulfills these needs and provides other related advantages.

### SUMMARY OF THE INVENTION

The present invention resides in an improved process for controlling insect infestations in a structure, which satisfies the needs set forth above. The process comprises the steps of identifying an infested wood member of the structure, impregnating the infested wood member with a borate solution, and injecting an amorphous silica gel dust into structural voids adjacent to the exterior of the structure. The amorphous silica gel dust and the borate solutions have no acute toxicity level to humans, pets or the environment. Borates are effective in eradicating established termite colonies. Amorphous silica gels have proven useful in the control and prevention of annual alate reproductive termite swarmers from establishing future new colonies.

In accordance with the present invention, actual and probable infested wood members of the structure are first identified. A borate solution is applied to the infested wood members under pressure to impregnate them with the borate solution. In this regard, a closed container for the borate solution is pressurized with compressed air, and a controllable spray nozzle is utilized to dispense the borate solution from the container.

It is often necessary to create openings through a wall of the structure to permit placement of a spray nozzle adjacent to a selected wood member. In order to fully impregnate the infested wood member, a hole is drilled into the wood member, and the borate solution is injected into the drilled hole and simultaneously sprayed onto an exterior surface of the selected wood member.

Apertures are created through walls to give access to structural voids which are adjacent to the exterior of the structure. An electrostatically charged amorphous silica gel dust is injected through these apertures into the structural voids and, preferably, also inside attached columns and pilasters, and attic and subarea spaces of the structure. The amorphous silica gel dust tends to coat wood members with which it comes into contact, to provide a barrier or shield against future insect infestations.

Occasionally it is desirable to construct barricades within the wood members themselves against future infestations, or to eliminate existing colonies. This may be accomplished by impregnating termite barricades with a borate solution, and inserting the termite barricades into a wood member. Preferably, the barricades are inserted into the wood member in a diamond pattern which is calculated to intercept the most likely pathway of termite galleries. Additionally, the termite barricades preferably include an internal void which is filled with a liquid borate solution prior to inserting the barricades into the wood member.

5,542,207

| 3 | 4 |

Other features and advantages of the present invention will become apparent from the following more detailed description, taken in conjunction with the accompanying drawings which illustrate, by way of example, the principles of the invention.

BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings illustrate the invention, in such drawings:

FIG. 1 is a partially fragmented, partially schematic perspective view, illustrating the step of impregnating an infested wood member within a wall of a structure with a borate solution;

FIG. 2 is an enlarged, fragmented and partially sectional view taken generally along the line 2—2 of FIG. 1, illustrating the manner in which the infested wood member is impregnated with the borate solution utilizing a combination injector and surface applicator device;

FIG. 3 is a perspective view of a termite barricade insert, shown with a pre-treated plug removed therefrom;

FIG. 4 is a perspective view of a typical wood structural member, showing a preferred diamond pattern for inserting the termite barricade inserts of FIG. 3 therein in order to intercept typical termite galleries;

FIG. 5 is an enlarged, fragmented sectional view taken generally along the line 5—5 of FIG. 4;

FIG. 6 is a fragmented schematic view of a typical structure, illustrating the manner in which an amorphous silica gel dust is injected into structural voids adjacent to the exterior of the structure;

FIG. 7 is a perspective view of a spray nozzle that may be attached to the solution supply tank of FIG. 1, utilized for surface treatment of infested wood members; and

FIG. 8 is an elevational perspective view of an alternative spray nozzle having a rubber tip through which amorphous silica gel dust is injected into structural voids adjacent to the exterior of structure.

DETAILED DESCRIPTION OF THE
PREFERRED EMBODIMENT

As shown in the drawings for purposes of illustration, the present invention is concerned with a process for controlling insect infestations in a structure. The process comprises the steps of, generally, identifying an infested wood member 10 of the structure 12, impregnating the infested wood member with a borate solution 14, and injecting an amorphous silica gel dust 16 into structural voids adjacent to the exterior of the structure 12. Termite barricades 18 (FIGS. 3–5) may also be inserted into a selected wood member 10 of the structure 12 to cross known or suspected termite galleries, for the purpose of poisoning and eliminating complete colonies which may be infesting the wood member.

The solution 14 utilizes borates, a natural mineral, which is very low in toxicity to humans or pets, but which functions as a slow acting stomach poison in termites and other insects. Termites accumulate the ingredient while they are feeding. Since the borate solution 14 is a slow acting poison, the termites move throughout the colony and spread the material by the feeding of nymphs, soldiers and reproductives, or by cannibalism when these termites die. The utilization of the borate solution 14 in connection with the process of the present invention takes advantage of behavioral changes within the termite colony itself, i.e., the slow acting stomach poisoning effect of the borate solution allows

an infested termite to move within areas of the structure 12 infested by the termite colony, and when it dies the area is avoided by other termites.

The amorphous silica gel dust 16 utilized in connection with the process of the present invention is also a mineral in the form of a fine white powder/dust. Preferably, the particle size of the amorphous silica gel dust 16 is three microns. The amorphous silica gel dust 16 acts on contact to absorb termite body fluids through its waxy exoskeleton, which causes elimination of the insects by dehydration. The process is called physio-chemical action.

The process for controlling insect infestations utilizing the borate solution 14 and the amorphous silica gel dust 16 described above permits treatment of an infested structure 12 without the use of synthetic chemicals which may break down. The natural minerals provide permanent protection to the treated areas against future infestations. Thus, a treated structure 12 often never needs a full treatment again, in contrast with prior fumigation techniques, as the amorphous silica gel dust 16 creates a barrier on all treated members tending to prevent future infestations. If, however, succeeding inspections reveal further applications are necessary, only localized spot application treatment of a wood member 10 is typically required of those structural members which have been exposed to the elements and are not kept well sealed or painted.

In accordance with the present invention, actual and probable infested wood members 10 of the structure 12 must first be identified. This is done utilizing techniques known to those skilled in the art. The actual and probable infested wood members 10 are then treated to eliminate any kalo-terme present by impregnating the infested wood members with the borate solution 14 and/or by inserting termite barricades 18 which have been pre-treated with the borate solution 14. With reference to FIGS. 1 and 2, it is sometimes necessary to drill holes through walls 22 of the structure 12 to gain access to the infested wood members 10. A sufficient number of holes 24 are drilled in the walls 22 to adequately treat the infested wood member 10, and preferably an interval of three feet to four feet is desired. The borate solution 14 is stored within a regulated, pressurized stainless steel solution supply tank 26. The tank is connected, via an air hose 28, to a regulated compressed air source 30 which is utilized to pressurize the borate solution 14 within the tank 26. The tank is preferably provided a pressure gauge 32 and a fill cap 34 that locks closed under pressure.

The tank 26 is also provided a quick-connect coupler 36 to which is attached a pressure supply hose 38. Opposite the tank 26, the pressure supply hose 38 is attached to a high pressure liquid flow gun 40 capable of dispensing the pressurized borate solution 14 through a high pressure quick-connect coupler 42 on actuation of a lever 44. A single spray nozzle 46 may be attached to the coupler 42, as shown in FIG. 7, or a combination injector and surface applicator device 48 may be attached thereto (FIGS. 1 and 2).

The combination injector and surface applicator device 48 includes a coupling 50 having a conduit 52 extending therefrom to the high-pressure quick-connect coupler 42. The coupling 50 acts as a manifold for distributing the borate solution 14 into a pair of spray tubes 54 and a hollow, tapered, cone-shaped rubber tip 56. The tip 56 is designed to provide a temporary seal against an aperture extending through a wall and into an infested wood member 10 for purposes of saturating an interior portion of the wood member 10 (see FIG. 2). The spray tubes 54 have plugged ends 58, and a number of orifices 60 through which the

5,542,207

| 5 | 6 |

borate solution 14 is sprayed on opposing exterior surfaces of the infested wood member 10. By treating a wood member 10 utilizing the combination injector and surface applicator device 48, complete impregnation of the wood member 10 through the area adjacent to the spray tubes 54 is effected. The combination injector and surface applicator device 48 permits the borate solution 14 to be injected directly into a drilled hole 62 of the wood member 10 simultaneously with spraying an exterior surface thereof with the same borate solution.

With reference to FIGS. 3–5, the process also involves the steps of impregnating the termite barricades 18 with the borate solution 14, and inserting the termite barricades into the wood member 10 of the structure 12 in, preferably, a diamond pattern (see FIG. 4). The termite barricades 18 are preferably cylindrical wooden tubes of the same type of wood into which they will be inserted, including a hollow center 64 and grooves 66 which extend the length of the barricade 18. The termite barricades 18 are preferably pre-soaked in the borate solution 14, and prior to inserting them into the wood member 10, the hollow center 64 is filled with the borate solution and plugged using a pre-treated plug 68.

The termite infested wood member 10 is drilled in a manner so as to cross the termite galleries (if that can be ascertained from visual inspection of the wood member), or the wood member 10 is drilled to create the diamond pattern shown in FIG. 4, which is intended to intercept the most likely paths of the termite galleries. The pre-treated termite barricades 18 are installed in the pre-drilled holes so as to block gallery channels. This serves to prevent termite colony workers from travelling through their galleries collecting food supply for the colony. As the termite workers eat away at the gallery channel blockage created by the inserted termite barricades 18, they will consume the borate material contained therein. The borate poison is carried and spread throughout the entire termite colony during normal feeding habits causing complete colony (including queen) elimination. The termite barricades 18 may also be installed in noninfested wood members to aid in preventing termites from establishing colonies in such wood members for the life of the wood member.

Finally, the process of the present invention includes the steps of creating access apertures 70 through walls adjacent to structural voids which are adjacent to the exterior of the structure 12, and injecting the electrostatically charged amorphous silica gel dust 16 through the access apertures into the structural voids (FIGS. 6 and 8). A sufficient number of access apertures 70 must be drilled through the walls to insure total inside space penetration. The amount of Penetration varies with the types of insulation 72 utilized in the structural voids 74 and the tightness of the construction. Testing has shown that normal spacing for the access apertures 70 is typically between three feet and four feet to obtain proper coverage.

The amorphous silica gel dust is supplied under pressure to a suitable spray gun 76 which, Preferably, includes a cone-shaped tip 78 that may act as a temporary seal against the access aperture 70 through which the amorphous silica gel dust 16 is being sprayed. High pressure injection of the dust 16 through the spray gun 76 causes the amorphous silica gel dust to become electrostatically charged, which advantageously causes the dust to cling to the wood members it comes in contact with.

As shown in FIG. 6, in a typical application of the amorphous silica gel dust 16, a sufficient number access apertures 70 must be drilled to permit application of the dust

within the attic, between ceiling joists, between wall studs 80, on either sides of fire blocking 82, and between floor joists 84. It is desirable to treat all exposed wood members within all structural voids 74 adjacent to the exterior of the structure 12. As the interior wall spaces of the structural voids 74 are being dusted, if the dust 16 being injected utilizing the spray gun 76 does not escape out through an adjacent access aperture 70, then the spacing of the access apertures 70 is not sufficiently close.

From the foregoing it is to be appreciated that the improved process for controlling insect infestations in the structure 12 in accordance with the present invention, offers significant advantages over standard fumigation techniques in treating infested structures. There are no chemical pesticides to break down, which may cause a loss of residual deterrent against future reinfestation. The borate solution provides a permanent treatment of wood structures, making all treated wood members in the structure virtually termite proof. Although the process of the present invention was primarily designed for kalotorme eradication and control, household pests such as roaches, silverfish, firebrat, spiders, mites and carpenter ants cannot inhabit areas where the borate solution 14 has been applied. Moreover, many of the stringent requirements of structure preparation in connection with standard fumigation techniques are not required in view of the materials utilized in the present invention.

Although a particular process has been described in detail for purposes of illustration, various modifications may be made without departing from the spirit and scope of the invention. Accordingly, the invention is not to be limited, except as by the appended claims.

I claim:

1. A process for controlling insect infestations in a structure, comprising the steps of:

   identifying an infested wood member of the structure;

   impregnating the infested wood member with a borate solution; and

   injecting an amorphous silica gel dust into structural voids adjacent to the exterior of the structure.

2. The process of claim 1, wherein the identifying step includes the step of identifying actual and probable infested wood members of the structure.

3. The process of claim 1, wherein the impregnating step includes the step of applying the borate solution under pressure directly to the infested wood member.

4. The process of claim 3, wherein the applying step includes the steps of pressurizing a closed container for the borate solution with compressed air, and utilizing a controllable spray nozzle to dispense the borate solution from the container.

5. The process of claim 3, wherein the applying step includes the steps of simultaneously injecting the borate solution into the wood member and spraying an exterior surface thereof with the borate solution.

6. The process of claim 3, including the step of drilling a hole into the wood member to permit injecting the borate solution therein.

7. The process of claim 6, including the step of creating access apertures through a wall of the structure to permit placement of a spray nozzle adjacent to the wood member.

8. The process of claim 1, including the step of electrostatically charging the amorphous silica gel dust during the injecting step.

9. The process of claim 8, wherein the injecting step includes the steps of injecting the amorphous silica gel dust inside attached columns and pilasters, and attic and subarea spaces of the structure

5,542,207

7

10. The process of claim 8, including the step of creating access apertures through walls adjacent to the structural voids through which the amorphous silica gel dust may be sprayed.

11. The process of claim 1, including the step of inserting termite barricades into a selected wood member of the structure.

12. The process of claim 11, including the step of impregnating the termite barricades with a borate solution prior to the inserting step.

13. The process of claim 12, wherein the step of impregnating the termite barricades includes the step of providing each termite barricade with a quantity of liquid borate solution sealed therein prior to the inserting step.

14. The process of claim 12, wherein the inserting step includes the step of placing the termite barricades in a diamond pattern in the selected wood member.

15. A process for controlling insect infestations in a structure, comprising the steps of:

identifying actual and probable infested wood members of the structure;

impregnating the infested wood members by applying a borate solution under pressure directly thereto; and

injecting an electrostatically charged amorphous silica gel dust into structural voids adjacent to the exterior of the structure.

16. The process of claim 15, including the step of inserting termite barricades into a selected wood member of the structure.

17. The process of claim 16, including the step of impregnating the termite barricades with the borate solution prior to the inserting step.

18. The process of claim 17, wherein the step of impregnating the termite barricades includes the step of providing each termite barricade with a quantity of liquid borate solution sealed therein prior to the inserting step, and wherein the inserting step includes the step of placing the termite barricade in a diamond pattern in the selected wood member.

19. The process of claim 15, wherein the applying step includes the steps of pressurizing a closed container for the borate solution with compressed air, and utilizing a controllable spray nozzle to dispense the borate solution from the container.

20. The process of claim 15, including the steps of creating access apertures through a wall of the structure to

8

permit placement a spray nozzle adjacent to the wood members, drilling a hole into a selected wood member to permit injecting the borate solution therein, and simultaneously injecting the borate solution into the selected wood member and spraying an exterior surface thereof with the borate solution.

21. The process of claim 15, including the step of creating access apertures through walls adjacent to the structural voids through which the amorphous silica gel dust may be sprayed.

22. A process for controlling insect infestations in a structure, comprising the steps of:

identifying actual and probable infested wood members of the structure;

impregnating the infested wood members by applying a borate solution under pressure directly to the infested wood members, the applying step including the steps of pressurizing a closed container for the borate solution with compressed air, and utilizing a controllable spray nozzle to dispense the borate solution from the container;

creating access apertures through walls adjacent to structural voids which are adjacent to the exterior of the structure; and

injecting an electrostatically charged amorphous silica gel dust through the access apertures into the structural voids.

23. The process of claim 22, including the steps of creating openings through a wall of the structure to permit placement of a spray nozzle adjacent to a selected wood member, drilling a hole into the selected wood member, and simultaneously injecting the borate solution into the drilled hole of the selected wood member and spraying an exterior surface thereof with the borate solution.

24. The process of claim 23, including the step of impregnating termite barricades with a borate solution, and inserting the termite barricades into a wood member of the structure in a diamond pattern.

25. The process of claim 24, wherein the step of impregnating the termite barricades includes the step of providing each termite barricade with a quantity of liquid borate solution sealed therein prior to the inserting step.

* * * * *

Exhibit "1."

United States Patent Number 5,542,207, dated August 6, 1996, issued to

Inventor Wayne F. Morris, Sr., entitled *Process for Controlling Insect*

*Infestations In A Structure*, concerning Home Saving Termite Control's

patented process for applying silica gel in residential structures for the

purpose of eliminating termites.

Exhibit Filed in LASC case No. BC173952
on or about Nov. 6, 2000
in opposition to pending Motions
for Summary Judgment
scheduled to be heard on Nov. 22, 2000

"A sufficient number of holes are drilled in
walls to adequately treat the infested wood member
and preferably an interval of three to four feet is desired."

"As the interior wall spaces of the structural voids are
being dusted, if the dust being injected utilizing the
spray gun does not escape out through an adjacent aperture,
then the spacing of the access apertures is not sufficiently
close."

US005542207A

# United States Patent [19]

## Morris, Sr.

[11] Patent Number: 5,542,207

[45] Date of Patent: Aug. 6, 1996

[54] **PROCESS FOR CONTROLLING INSECT INFESTATIONS IN A STRUCTURE**

[75] Inventor: **Wayne F. Morris, Sr.**, Leona Valley, Calif.

[73] Assignee: **Home Saving Termite Control, Inc.**, Leona Valley, Calif.

[21] Appl. No.: **343,845**

[22] Filed: **Nov. 23, 1994**

[51] Int. Cl.$^6$ ............................ A01M 1/20

[52] U.S. Cl. .......................... 43/132.1; 43/124

[58] Field of Search .............. 43/131, 124, 132.1, 43/900

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,981,025 | 4/1961 | Woodson | 43/124 |
| 3,858,346 | 1/1975 | Bailey | 43/124 |
| 3,894,043 | 7/1975 | Moser et al. | |
| 4,190,686 | 2/1980 | Muis | |
| 4,430,108 | 2/1984 | Hojaji et al. | |
| 4,779,735 | 10/1988 | Kelso, Jr. | |
| 4,889,710 | 12/1989 | Hagarty | |
| 4,958,456 | 9/1990 | Chaudoin | 43/124 |
| 5,058,312 | 10/1991 | Jackson | 43/132.1 |
| 5,094,028 | 3/1992 | Hume | |
| 5,135,750 | 8/1992 | Nakashima | |
| 5,165,199 | 11/1992 | Tallon | 43/124 |
| 5,178,871 | 1/1993 | Thill | |
| 5,182,305 | 1/1993 | Sieliankamp | |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 0229046 | 10/1985 | Germany | 43/132.1 |

*Primary Examiner*—Jack W. Lavinder
*Assistant Examiner*—James Miner
*Attorney, Agent, or Firm*—Kelly, Bauersfeld & Lowry

[57] **ABSTRACT**

A process for eradicating termite infestations in a structure and preventing the reinfestation thereof includes the steps of identifying infested wood members, impregnating the infested wood members with a borate solution, and injecting an amorphous silica gel dust into structural voids adjacent to the exterior of the structure. The borate solution, which is applied to surfaces of the infested wood members, kills existing infestations of kaloterme. The amorphous silica gel dust is electrostatically charged as it is injected into the structural voids so as to cling to the surfaces of exposed wood members. This forms a shield against future infestations. Termite barricades impregnated with the borate solution are also inserted into selected wood members of the structure.

**25 Claims, 4 Drawing Sheets**



SUB-
EXHIBIT
63

# EXHIBIT 63

Exhibit "63."

A copy of the attached deposition transcript of deposition testimony of Mr. Matt Fredericks, President of Pacific Villas Homeowners Association, concerning Mr. Fredericks' observation of the application of Syloid 244 at Pacific Villas Condominium Complex in October 1996 by Home Saving Termite Control, Inc., was filed in opposition to pending motions for Summary Judgment/ Summary Adjudication in Los Angeles Superior Court Case BC173952 on or about November 6, 2000.

### Summary of Mr. Fredericks Testimony

Mr. Fredericks observed Home Saving Termite Control (TERMITE CONTROL) apply Syloid 244 in the condominium units where Appellant lived.

Mr. Fredericks observed:

TERMITE CONTROL drilled a series of holes in interior walls. TERMITE CONTROL injected SYLOID 244 in one hole at a time.

SYLOID 244 dust came out another hole: "Upon injecting one of the holes, the powder or gas would escape from an adjacent hole in a burst fashion."

Mr. Frederick also observed SYLOID 244 dust came out of light sockets and wall sockets while TERMITE CONTROL was injecting SYLOID 244 into one of the holes it had drilled inside the condominium units.

No precaution was taken to prevent SYLOID 244 getting into the living spaces in the condominium units. Mr. Frericks saw a TEMITE CONTROL worker spray SYLOID 244 dust straight up into the air instead of in a hole, creating a visible cloud of SYLOID 244 dust.

TEMITE CONTROL people created a bigger problem by cleaning pesticide dust with a vacuum cleaner. TERMITE CONTROL people used a regular vacuum cleaner to clean up SYLOID 244 dust discharged into condominium units.

Mr. Fredericks knew, invisible to the naked eye, pesticide dust filled the air in Mr. Fredericks' condominium unit. He observed at the extreme bottom of the dumb waiter in his unit a layer of

SYLOID 244 about an eighth of an inch to a quarter of an inch had settled months after the TERMITE CONTROL application of SYLOID 244 in his condominium unit.

The Syloid 244 injected into wall voids did not stay inside wall voids. Mr. Fredericks observed SYLOID 244 leaking out the phone jack and electrical box in his unit after he remodeled his unit.

He took a piece of plexiglass and set it below the phone jack, and electrical outlet, and left it there for a few days.

The kitchen phone jack collected about a quarter to a half teaspoon of white powder [SYLOID 244 powder dust], the electrical outlet in the living room collected slightly less over the course of about three days.

Mr. Fredericks remodeled his condominium unit in 1997. The Home Saving Termite Control, Inc. termite treatment was in 1996.

After TERMITE CONTROL finished its treatment, Mr. Fredericks discovered holes Home Savings Termite Control had drilled that they hadn't sealed.

The Home Saving Termite control process for permanently eradicating termites doesn't work. The condominium complex still had termites in 1997. Mr. Fredericks found termite pellets in his condominium unit in 1997.

1        MR. SMOLKER:  Yes.

2        THE WITNESS:  Yeah.  They would drill holes in

3  the walls and, with a high-pressure tank and some sort

4  of a nozzle device, inject a gas or powder into the

5  wall voids.

6        Q        BY MR. SMOLKER:  Okay.  And what did

7  they do after that?

8        MR. YARDUMIAN:  Objection.  Calls for

9  speculation.

10        Q        BY MR. SMOLKER:  That you observed.

11        MR. GREY:  Lacks foundation.  Overbroad.

12  Vague and ambiguous.

13        MR. CONDAS:  You can answer the question.

14            What did you observe them doing next

15  after they did all these things you just said, if any?

16        THE WITNESS:  That was on the interior.

17        MR. SMOLKER:  Okay.

18        THE WITNESS:  On the exterior --

19        Q        BY MR. SMOLKER:  And by "interior," you

20  mean inside the living units?

21        A        That is correct.  And the common area

22  hallway.  Should I continue?

23        MR. CONDAS:  Sure.

24        THE WITNESS:  On the exterior they would go

25  along the solid members of the structure, drill holes,

I-17

1   I'm not sure how far apart, but at certain intervals,

2   and inject the same material.

3          Q      BY MR. SMOLKER:  And then what?  Did

4   you observe them doing anything when they were done

5   injecting their material?

6          MR. GREY:  Overbroad.  Vague and ambiguous.

7   Lacks foundation.

8          MR. CONDAS:  You can tell him what you saw.

9          THE WITNESS:  After the injection of the

10  stuff, I don't remember anything that stands out.

11         Q      BY MR. SMOLKER:  Let's go back to the

12  interior units where you saw them drill the holes and

13  inject the gas or the powder.

14         A      Okay.

15         Q      When they drilled the holes, would they

16  drill one hole at a time and then inject in that hole,

17  or would they drill several holes before they

18  injected?

19         A      They drilled several holes.

20         Q      And do you have an estimate of how

21  many?  Are we talking about three or five or ten?

22         MR. GREY:  Overbroad.  Vague and ambiguous.

23         MR. CONDAS:  As to the number he saw or as to

24  the --

25         MR. SMOLKER:  Yeah.

1          MR. CONDAS:  -- number of total that were
2    drilled?
3          MR. SMOLKER:  No.
4          Q     How many ,ou saw as their pattern that
5    they would drill before they would start injecting?
6          A          Unfortunately, I did not pay attention
7    to the exact number of holes they drilled at any given
8    time, but there was always more than one.  I don't
9    recollect how many.
10         Q     Okay.  Now, when they drilled these
11   several holes, they then, when they were done drilling
12   the several holes, inject it into the first hole; is
13   that correct?
14         MR. CONDAS:  The first hole they drilled?
15         MR. SMOLKER:  Well, one of many holes.
16         Q     They didn't inject in all holes at the
17   same time.  They would inject it one hole at a time;
18   right?
19         A     That's correct.
20         Q     Okay.  So now we're having them inject
21   in the first hole, whichever it is.
22               When they inject in the first hole, did
23   you observe whether or not any of the dust or powder
24   or gas came out of the other holes?
25         A     Yes.

                         I-19

BARKLEY

1          Q        And what did you observe?

2          A        Upon injecting one of the holes, the

3   powder or gas would escape from an adjacent hole in a

4   burst fashion.

5          MR. YARDUMIAN:  Just interpose an objection

6   that the question or that his response lacks

7   foundation.  Calls for speculation.

8          MR. CONDAS:  I'm going to join.

9               Do you know for a fact what it was that

10  actually came out?

11         THE WITNESS:  Of the hole?

12         MR. CONDAS:  Yes.  It could have been

13  anything.  Do you know what it was?

14         THE WITNESS:  No.  I'm assuming it was what

15  they had shot.

16         MR. CONDAS:  Do not assume.

17         MR. GEIBEL:  Could we have some foundation of

18  where he is when he sees that?  In his unit or in

19  Mr. Smolker's unit or someone else's unit?

20         Q      BY MR. SMOLKER:  Now continuing on --

21         MR. GEIBEL:  Objection.  Question is vague and

22  ambiguous.  Strike the answer.  Nonspecific.

23         Q      BY MR. SMOLKER:  Did you see anything

24  come out of the light switches or the light sockets or

25  the phone jacks?  Any dust come out of that while they

I-20

BARKLEY
Court Reporters & Transcription

1    for lack of foundation.

2            MR. SMOLKER:  This is not about foundation.

3    This is about discovery.

4            MR. CONDAS:  I understand.

5            MR. SMOLKER:  And I'm just trying to find

6    information from which I can find admissible

7    information.  So if you want to do this some crazy way

8    to make it impossible, that's your business, but

9    please let me ask my question.

10           MR. CONDAS:  And I will continue to protect

11   the record as I see fit, and if telling him that

12   there's no foundation so he can answer the question,

13   that's exactly what will take place.

14               Now, I'm just asking you as a

15   professional courtesy to please lay a little bit of

16   foundation so that we don't have to sit here and

17   listen to everybody object and he can answer the

18   question.

19           MR. SMOLKER:  Thank you, very much.

20      Q       All right.  So continuing along with

21   what you saw, when you saw them inject the dust into a

22   hole, did you observe at or around the same time any

23   dust coming out of the light sockets or the phone

24   jacks in the room where you were watching this

25   injection going on?

                        I-22

BARKLEY

1          MR. GREY:  Vague and ambiguous.  Lacks
2     foundation.
3          MR. YARDUMIAN:  Calls for speculation.
4          MS. HESTER:  Join.
5          MR. CONDAS:  He says "dust."  Have you ever
6     seen dust coming out of light sockets or switches?
7          THE WITNESS:  You know, Guys.
8          MR. GREY:  Well, hold on a second.
9          THE WITNESS:  Yeah, please.
10         MR. GREY:  If you can respond to Mr. Smolker's
11    question with an answer, go ahead.  If you can't, just
12    say so, but other than that, don't make any comments.
13         THE WITNESS:  Ask me the question again.
14         MR. SMOLKER:  Could you read it back, please.
15              (Whereupon the question was read back.)
16         MR. GREY:  Now, if you understand the question
17    notwithstanding the objection and you feel you can
18    respond to it, go ahead.  If you don't understand the
19    question, just say you don't understand the question.
20         THE WITNESS:  Yes, I observed dust coming out
21    of the wall sockets.
22         Q     BY MR. SMOLKER:  Now, in which units
23    did you observe this happen, what you've just
24    described?
25         A     I can recall my unit particularly, Joe

I-23

BARKLEY

1        Now, after they drilled the holes and

2  then they injected the stuff in the holes, what did

3  you see them do next in the room when you watched them

4  do this?

5       MR. GREY:  Compound.  Overbroad.  Vague and

6  ambiguous.

7       THE WITNESS:  You have to run that past me

8  again.

9       Q    BY MR. SMOLKER:  Okay.  Did you ever

10  see them sealing any of the holes they drilled?

11      MR. GREY:  Vague and ambiguous.

12      THE WITNESS:  Yes.

13      Q    BY MR. SMOLKER:  Did you ever see them

14  do anything after they sealed a hole?  Could you

15  explain the hole sealing process that you observed?

16      MR. GREY:  Objection.  Lacks foundation.

17  Vague and ambiguous.

18      MR. CONDAS:  You can tell him what you saw.

19      THE WITNESS:  They would take a wooden plug

20  which looked like a -- it was cut from a dowel -- and

21  plug the hole and spackle over that opening to seal

22  it.

23      Q    BY MR. SMOLKER:  Okay.  Did you ever

24  see them use any paint to touch up the holes they had

25  drilled?

I-25

BARKLEY
Court Reporters & Transcriptions

1         A       No, I did not.

2         Q       Did you see them bring any paint into

3  the premises?

4         MR. YARDUMIAN:  Shot in the dark here.  By

5  "them," you mean Home Saving?

6         MR. SMOLKER:  Yeah.  The people that were

7  working for Home Saving.

8         THE WITNESS:  No, I didn't.

9         Q       BY MR. SMOLKER:  Did you see any of

10 their workers spray the dust just straight up into the

11 air instead of into a wall?

12        MR. GREY:  Vague and ambiguous.

13        MR. CONDAS:  Join.  Lacks foundation.

14        MR. YARDUMIAN:  Join.

15        MR. CONDAS:  Did you see?

16        THE WITNESS:  There was one incident like

17 that.

18        Q       BY MR. SMOLKER:  Could you describe the

19 incident?

20        MR. YARDUMIAN:  Objection.  Calls for a

21 narrative.  Calls for speculation.

22        MR. CONDAS:  Tell him what you saw.

23        THE WITNESS:  One of the workers was standing

24 on the ledge of the top bay window in my unit and

25 injecting into the window header when he lost his

I-26

BARKLEY
Court Reporters & Teleconferencing

1   footing, and I thought he was going to fall.  He

2   discharged the unit into the living room.

3        Q    BY MR. SMOLKER:  By "the unit," you

4   mean the pesticide dust or the container of it?

5        A    Yes.

6        MR. YARDUMIAN:  Objection.  Lacks foundation.

7   Calls for speculation.

8        MR. CONDAS:  It does call for speculation as

9   to what was in there.  Whatever went into the air,

10  that's what you saw, something go in the air.

11       THE WITNESS:  Correct.

12       Q    BY MR. SMOLKER:  And what went into the

13  air was whatever they were pumping into the walls;

14  right?

15       MR. GREY:  Objection.  Lacks foundation.

16       MR. CONDAS:  Join.

17            Do you know?

18       THE WITNESS:  It came from the nozzle.

19       MR. CONDAS:  That's fine.

20       Q    BY MR. SMOLKER:  And did it create a

21  cloud of dust?

22       MR. YARDUMIAN:  Objection.  Vague and

23  ambiguous.

24       Q    BY MR. SMOLKER:  Was it visible?

25       A    Yes.


                          I-27

BARKLEY
Court Reporters & Transcribers

1        Q     Now, prior to this pesticide treatment

2 that we've described, that you've described, did you

3 ever see dust coming out of light sockets in your

4 condominium unit?

5        MR. CONDAS:  Asked and answered.

6        MR. SMOLKER:  No.  I didn't ask him if he ever

7 saw this before Home Saving came to the premises.

8        MR. CONDAS:  Before Home Saving came to the

9 premises.

10        THE WITNESS:  I honestly never looked.

11        Q    BY MR. SMOLKER:  But did you ever see

12 it before, dust coming out of your light sockets?

13        MR. YARDUMIAN:  Objection.  The question's

14 vague.

15        MR. GEIBEL:  It's argumentative.  He didn't

16 look.

17        Q    BY MR. SMOLKER:  Have you ever seen

18 dust coming out of your light sockets before Home

19 Saving came to the premises that you're aware of?

20        A    No.

21        Q     How many crews did Home Saving have

22 work at the premises?

23        MR. GREY:  Vague and ambiguous.

24        MR. CONDAS:  Also not specific as to point in

25 time.  At any time?

I-28

BARKLEY

1    per crew.

2         Q    Do you have an estimate of how many

3    there were in total?

4         A    Per crew?

5         Q    Or just total for the two crews.

6         A    You know, I could estimate there was 12

7    or so people.

8         Q    Total?

9         A    Total.

10        Q    Did you see anyone from Home Saving

11   attempt to clean up any of the dust that you saw

12   discharged in any of the units?

13        MR. YARDUMIAN:  Objection.  Speculation.  It's

14   vague.

15        MR. CONDAS:  Join.

16             If you saw them cleaning up, you can

17   answer.

18        THE WITNESS:  Yes.

19        Q    BY MR. SMOLKER:  And what did they do?

20        A    They would use a vacuum cleaner and

21   cleaning rags as I recall.

22        Q    Was there anything special to you or

23   notable to you about the vacuum cleaner, or was it

24   just a normal vacuum cleaner?

25        MR. GREY:  Vague and ambiguous.

I-30

1          MR. CONDAS:  Join.  You can answer.

2          MR. YARDUMIAN:  Join.

3          THE WITNESS:  Looked like a vacuum cleaner.

4          Q       BY MR. SMOLKER:  Just looked like a

5     normal one?  Not some kind of special vacuum cleaner?

6          MR. YARDUMIAN:  Same objection.

7          THE WITNESS:  To me it looked just like a

8     regular vacuum.

9          Q       BY MR. SMOLKER:  And which units did

10    you see them vacuuming in?

11         A       I think every unit they were in.  As I

12    watched them, they were using the vacuum cleaner.

13         Q       And in which units did you see them use

14    their cleaning rags?

15         A       My unit.

16         Q       And did you, by any chance, see them

17    vacuuming in my unit?

18         A       No.  I don't remember them vacuuming

19    your unit.

20         Q       Whose unit do you remember seeing them

21    vacuuming in?

22         A       My unit, Verdon, Bailey, and Kay.

23         Q       And did you go into my unit while they

24    were doing their work?

25         A       One time I did go into your unit while

                          1-31

BARKLEY
Court Reporters & Legal Graphics

1          THE WITNESS:  You know, I don't know.

2          MR. CONDAS:  Do you recall?  Yes or no?

3          THE WITNESS:  No.

4          MR. CONDAS:  Thank you.

5          Q     BY MR. SMOLKER:  You don't recall?  I

6    didn't understand your -- what question you were

7    answering.

8          MR. CONDAS:  Then why don't you ask him the

9    question, and we'll get it on there then.

10         Q     BY MR. SMOLKER:  Do you remember when

11   you observed these people working, the Home Saving

12   people working, whether you saw them doing anything

13   that looked to you like they were trying to make sure

14   that the dust they were injecting in the walls

15   wouldn't get into the living area?

16         MR. GREY:  Vague and ambiguous.  Lacks

17   foundation.

18         MR. CONDAS:  Calls for speculation as well.

19   Yes or no?

20         MR. GREY:  Well, first of all, do you

21   understand the question?

22         THE WITNESS:  Yes, I understand.

23              I wouldn't know.  I'm not sure.

24         Q     BY MR. SMOLKER:  Okay.  Did you see

25   them do anything that you thought was a precaution

I-34

1   they were taking to make sure that the dust didn't get

2   into the living area?

3           MR. GREY:  Vague and ambiguous.  Lacks

4   foundation.

5           MR. YARDUMIAN:  Same objection.

6           MR. CONDAS:  Join in the objection.

7           MR. GREY:  Again, if you understand the

8   question, respond; otherwise, make it clear that you

9   don't understand the question.

10          THE WITNESS:  No.  Would you ask it again.

11          MR. SMOLKER:  Could you read it back.

12              (Whereupon the question was read back.)

13          THE WITNESS:  No.

14          Q       BY MR. SMOLKER:  Did they seal off any

15  of the light sockets that you saw?

16          MR. GREY:  Vague and ambiguous.

17          THE WITNESS:  I did not see that.

18          Q       BY MR. SMOLKER:  Did you see them seal

19  off any openings before they injected their dust?

20          MR. GREY:  Vague and ambiguous.

21          MR. CONDAS:  Also vague as to the terminology

22  used.

23          MR. YARDUMIAN:  Also assumes facts.

24          THE WITNESS:  No, I didn't see them do that.

25          Q       BY MR. SMOLKER:  And how long did you

I-35

BARKLEY
Court Reporters & Transcripts

1    observe them?  Were you there for an eight-hour day

2    observing them or one hour or what?

3            MR. YARDUMIAN:  Is the question in the

4    entirety of the time that he saw them?

5            MR. SMOLKER:  Yes.

6            THE WITNESS:  I was there the entire time.

7            Q      BY MR. SMOLKER:  So for about eight

8    hours?

9            A      Yes.  Something like that.

10           MR. YARDUMIAN:  So the question is clear or,

11   at least in my mind, the entire period of time in

12   which you observed the Home Saving people conducting

13   their work that you've described was for an entire

14   period of eight hours?  You saw them for eight hours?

15           MR. CONDAS:  He wants to know if you actually

16   stayed there and saw them uninterrupted for an

17   eight-hour period, or were you just there the eight

18   hours?

19           MR. GREY:  Or was it indeed eight hours.

20           THE WITNESS:  It's an approximation.  I was

21   there.  I did not stay in one place and observe anyone

22   for eight hours, no.

23           Q      BY MR. SMOLKER:  But you spent your

24   time going from room to room watching them work;

25   right?

                        I-36

BARKLEY

1              Did you ever see the pesticide dust
2    yourself?
3         MR. YARDUMIAN:  Objection.  Assumes facts.
4    Lacks foundation.  Calls for speculation.
5         THE WITNESS:  Yes.
6         Q    BY MR. SMOLKER:  Could you describe
7    what it looked like?
8         A    A white powder.
9         Q    And when did you first see this white
10   powder?
11        A    While they were applying to my top deck
12   loft.
13        Q    And what was the occasion?  What
14   brought about you seeing it?  What was going on?
15        A    They were injecting into the deck with
16   a hand-held canister and ran out of pressure, I
17   believe.  It opened up the canister.
18        Q    And you looked inside and saw white
19   powder?
20        A    Correct.
21        Q    Okay.  And did you see this pesticide
22   dust at any other time?
23        MR. YARDUMIAN:  Objection.  Assumes facts.
24   Lacks foundation.  Calls for speculation.
25        MR. CONDAS:  I'll join in the objection.  He's

I-38

BARKLEY
Court Reporters & Transcription

1    identified he saw white powder.  I think that's what

2    he's referring to.  The white powder you saw.

3         MR. GREY:  Well, let me just clarify.  You're

4    talking about the stuff he saw in the canister when

5    you say "Did he see it again"?

6         MR. SMOLKER:  Yes.

7         Q    Whatever they were injecting that you

8    saw them injecting when you looked inside this

9    canister, which I'm calling "pesticide dust," they're

10   calling "white powder."

11             Did you ever see it again?

12        MR. YARDUMIAN:  That same powder in that same

13   canister?

14        MR. SMOLKER:  No.  The pesticide dust.  The

15   kind of stuff they were applying in the building.

16        MR. YARDUMIAN:  The white dust.

17        MR. SMOLKER:  The white powder.

18        THE WITNESS:  Yes.

19        Q    BY MR. SMOLKER:  When else did you see

20   it?

21        A    During the injection of the deck I saw

22   it several times.

23        Q    What happened that led you to seeing

24   it?

25        A    It emerged from some of the cracks in

                              I-39

BARKLEY
Court Reporters & Transcribing Inc.

1    the deck when they injected.

2         Q       So are you telling us that you saw them

3    drill a hole; is that correct?  On the deck?

4         MR. CONDAS:  When?

5         Q       BY MR. SMOLKER:  According to what you

6    saw at the deck.

7         A       Yes.

8         Q       And then you saw them put a nozzle in

9    the hole?

10        A       That's correct.

11        Q       And then you saw them trigger the

12   nozzle so that the powder would go through the nozzle?

13        A       That's correct.

14        Q       And then you saw white powder come out

15   from cracks in the wood near where they were injecting

16   it?

17        A       Yes.

18        Q       And did you see this white powder at

19   any other time?

20        A       That day?

21        Q       Yes.

22        MR. CONDAS:  Obviously excluding everything

23   we've already discussed.  You want to know anything

24   additional; correct?

25        MR. SMOLKER:  No.  I want to know if this

I-40

BARKLEY
Court Reporters & Transcription

1   white powder is what he saw when they shot up in his

2   ceiling.  Was it the same kind of white -- did it look

3   like the same kind of white powder?

4          MR. CONDAS:  When they shot into the ceiling?

5          MR. SMOLKER:  Yes.  Just let him answer the

6   question.

7          MR. CONDAS:  Well, no, because if I don't

8   understand it, I'm not going to let him answer the

9   question.  That's why I'm asking.

10             When you say "shot in the ceiling," is

11  that when --

12         MR. SMOLKER:  That wasn't my question.  I was

13  just trying to answer your question.

14         MR. CONDAS:  Okay.  Well, then, could I get

15  you to rephrase the question.

16         Q      BY MR. SMOLKER:  Did you see something

17  that looked like this white powder at any other time

18  while the people were working at the premises?

19         MR. CONDAS:  Same objection.

20             You can answer the question.

21         THE WITNESS:  Yeah.  I probably saw it a

22  couple more times.

23         Q      BY MR. SMOLKER:  And could you explain

24  what were the occasions when you saw it so we'll know

25  what you're talking about?

                      I-41

BARKLEY

1      A      In the application of the deck, the
2  application to the bay window header when the
3  technician lost his footing.
4      Q      So that stuff that shot up in the air
5  looked like the same white powder?
6      A      Yes.
7      Q      Okay.  Did you see the same white
8  powder at any other time during their application
9  process?
10      A      I thought I saw it emerge from other
11  drilled holes sometimes when they would inject the
12  walls.
13      Q      Any other time during the pesticide
14  application?
15      A      On the exterior of the building when
16  injecting into the solid members of the structure, a
17  certain amount of blow back would occur.
18      Q      Can you tell us what you mean by "blow
19  back"?
20      A      Blow back is when -- upon injecting in
21  a confined space of the drilled hole, the back
22  pressure escapes around the nozzle tip out into the
23  air.
24      Q      So it came back from the same hole it
25  went in?

I-42

BARKLEY
Court Reporters & Transcribers

1       A      Correct.

2       Q      Previously you told us that you saw

3 some kind of dust come through the light sockets in

4 the interior of the units.

5               Was this dust, did it look like the

6 white powder also?

7       A      Yes.

8       Q      Now, after they -- and by "they," I'm

9 talking about the Home Saving crew that did the

10 pesticide application.  After they left the premises,

11 did you ever again see this white powder?

12      A      Yes.

13      Q      And when was that?

14      A      During the remodel of my kitchen.

15      Q      And what happened?

16      A      I removed the phone jack cover prior to

17 painting in the kitchen area and the white dust came

18 out of that cavity.

19      Q      Did you see the white dust at any other

20 time?

21      A      Yes.

22      Q      When was that?

23      A      When we went to use the dumbwaiter that

24 runs between the garage level and kitchen.

25      Q      Excuse me.  Why don't we stop a

I-43

BARKLEY
Court Reporters & Transcribers

1    second.  I'll get you a glass of water.  Would you

2    like a glass of water?

3            A       Thank you.

4                    (A brief recess was taken.)

5            Q       BY MR. SMOLKER:  Okay.  You were saying

6    when you went to use the dumbwaiter.

7            A       Yeah.  The dumbwaiter was covered with

8    the white dust, and the bottom of the dumbwaiter had

9    about an eighth inch, quarter inch settled layer of

10   white dust at the very extreme bottom of the

11   dumbwaiter.

12           Q       And to the best of your knowledge, is

13   this white dust that's at the bottom of your

14   dumbwaiter the same white dust you saw in the

15   canister?  I don't mean the same exact particles, but

16   the same kind of substance and the same kind of

17   appearance?

18           MR. YARDUMIAN:  Objection.  Calls for

19   speculation.

20           MR. CONDAS:  He can describes what he sees,

21   but he can't speculate if it's the same thing.

22           THE WITNESS:  There's white dust.

23           Q       BY MR. SMOLKER:  Does it appear the

24   same as the white dust you saw in the canister at the

25   deck?

                            I-44

BARKLEY

1      MR. YARDUMIAN:  Same objection.

2      MR. CONDAS:  You saw white dust.  You don't

3 know what it is?  One way or the other.  Do you know?

4      Q      BY MR. SMOLKER:  Does it have the same

5 appearance as the stuff they were applying in your

6 unit?

7      MR. CONDAS:  Again, calls for speculation.

8      MR. SMOLKER:  Appearance.  He can say if it

9 has the same appearance.

10      MR. RIDENOUR:  Vague and ambiguous.

11      MR. CONDAS:  White is white.  That's what he

12 testified to, Counsel.

13      Q      BY MR. SMOLKER:  To you, does it have

14 the same appearance as the stuff you saw them applying

15 in the unit?

16      MR. YARDUMIAN:  Same objection.

17      MR. CONDAS:  Same objection.

18           You can answer the question.

19      THE WITNESS:  Yes.

20      Q      BY MR. SMOLKER:  Okay.  Could you tell

21 us where your dumbwaiter is and what a dumbwaiter is?

22      MR. CONDAS:  Which question do you want

23 answered first?

24      MR. SMOLKER:  Where it is and then what it is.

25      THE WITNESS:  The dumbwaiter is located at the

I-45

BARKLEY

1    basement level about dead center of the unit, runs the

2    length of unit to the kitchen area and is primarily

3    for hoisting the groceries from the garage level to

4    the kitchen.  It's a manually operated dumbwaiter.

5           Q      BY MR. SMOLKER:  Okay.  And have you

6    seen this kind of white dust anywhere else?

7           MR. YARDUMIAN:  Calls for speculation.  Lacks

8    foundation.

9           MR. CONDAS:  Join.

10          You can answer the question.

11          THE WITNESS:  Yes.

12          Q      BY MR. SMOLKER:  Where is that?

13          A      At the electrical socket facing the

14   living room on the wall common with the kitchen.

15          MR. YARDUMIAN:  This is in your unit; correct?

16          THE WITNESS:  That's correct.

17          Q      BY MR. SMOLKER:  And could you explain

18   what it was you saw?

19          A      The white dust is in the electrical box

20   of the wall socket.

21          Q      And have you seen any white dust come

22   out of any of these cavities like the electrical box

23   you've just described?

24          A      Yes.

25          Q      And where was that?

I-46

BARKLEY

1          A      The same two, phone jack and the

2    electrical box.   Those two.

3          MR. YARDUMIAN·  Both in your unit?

4          THE WITNESS:  Yes.

5          Q      BY MR. SMOLKER:  And could you describe

6    what the occasion was when you saw the white dust

7    coming out?

8          MR. CONDAS:  Are we talking about something

9    that he's already discussed?  Lacks foundation.   If

10   it's anything other.  We're not going to rehash what

11   he's already told you.

12               Is this the same instance that you

13   talked about earlier?

14         THE WITNESS:  This is following the kitchen

15   remodel.

16         MR. CONDAS:  Okay.

17         THE WITNESS:  The electrical socket.

18         Q      BY MR. SMOLKER:  Let me ask a

19   question.  Go ahead and answer.  You were going to

20   describe what you saw after the remodel.

21         A      Yeah.  Once I saw the white powder in

22   the kitchen phone jack, I began to check all the

23   switch covers and the electrical sockets.

24         MR. YARDUMIAN:  Gary, can I ask a clarifying

25   question?

I-47

BARKLEY

1              MR. SMOLKER:  Sure.

2              MR. YARDUMIAN:  When you referred earlier to

3      the -- I think you called it the light outlet; is the

4      word you used?

5              THE WITNESS:  Yes.  It's an electrical outlet.

6              MR. YARDUMIAN:  You mean the switch box?

7      You're going to plug --

8              THE WITNESS:  The electrical outlet is the

9      plug in the wall of the kitchen facing the living

10     room.  The phone jack is in the kitchen side of that

11     phone jack.

12             MR. YARDUMIAN:  And when you're referring to a

13     switch blade, are you talking about something where

14     you --

15             THE WITNESS:  Those are switch blades,

16     correct.

17             MR. GREY:  Is that your opinion as an

18     electronic engineer, electrical engineer?

19             THE WITNESS:  (No response.)

20             Q      BY MR. SMOLKER:  And did you observe

21     any white powder leaking out of any of these openings

22     you've just described in your unit?

23             MR. YARDUMIAN:  Objection.  It's vague and

24     ambiguous.

25             MR. CONDAS:  Join as to the term "leak."

I-48

BARKLEY
Court Reporters & Transcripers

1          Do you understand that the question?

2      THE WITNESS:  Yeah.

3      MR. CONDAS:  Okay.

4      THE WITNESS:  I found the white powder was

5  escaping from those two particular places.

6      Q      BY MR. SMOLKER:  And how did you do

7  that?  What happened?

8      A      I took a piece of plexiglass and set it

9  below each, the phone jack and the electrical outlet,

10 and left it there for a few days.

11     Q      And what did you observe while you were

12 leaving the plexiglass there?

13     A      The kitchen phone jack collected about

14 a quarter to a half teaspoon of white powder, the

15 electrical outlet in the living room slightly less

16 over the course of about three days.

17     Q      And if you recall, approximately when

18 did you do this?  When did this happen?

19     A      During and after the kitchen remodel.

20     Q      And do you remember what month that

21 was?

22     A      No, I don't.  I don't.

23     Q      Do you have an estimate?  Was it more

24 than a month or two after the termite treatment at the

25 unit?

I-49

```
 1        A       It was certainly more than a month.
 2        Q       Is it your recollection that the
 3   termite treatment was in October of 1996?
 4        A       That's correct.
 5        Q       Was your remodel in 1996 or 1997, or do
 6   you remember?
 7        A       It was 1997.
 8        Q       So what you just told us about this
 9   escaping from the cavities, that happened in 1997?
10        A       Correct.
11        Q       And do you know if that was in the
12   first quarter or the second quarter or the first half
13   or second half of 1997?
14        A       I'd be guessing it's in the second
15   half.  I'd have to look it up.
16        MR. CONDAS:  Don't guess.
17        Q       BY MR. SMOLKER:  Now, before the
18   pesticide treatment of the condo, did you use your
19   dumbwaiter on a regular basis?
20        A       Yes.
21        Q       And did you ever notice any white
22   powder in it when you used it before the pesticide
23   treatment?
24        A       No.
25        Q       And when, after the pesticide treatment
```

I-50

BARKLEY

1    approximately, did you first notice the white dust in

2    the dumbwaiter?

3          MR. YARDUMIAN:  Sorry.  Could you read that

4    question back.

5                (Whereupon the question was read back.)

6          MR. YARDUMIAN:  Objection.  Lacks foundation.

7    Calls for speculation.

8          MR. CONDAS:  How soon after Home Saving was

9    there?  Do you recall?

10          THE WITNESS:  Honestly don't remember.

11          MR. CONDAS:  Okay.

12          Q     BY MR. SMOLKER:  Do you remember enough

13    to know if it was days, weeks, or months, or you just

14    don't have any idea?

15          A     Probably months.

16          Q     Let me see if I understand your answer

17    and you understood my question.

18                Is it your testimony that you first

19    noticed the white powder as best you can remember

20    months after Home Saving had treated the premises?

21          A     Yes.

22          MR. CONDAS:  Asked and answered, but you can

23    tell him one more time.

24          THE WITNESS:  I'm sorry?

25          MR. CONDAS:  You can tell him one more time.

I-51

BARKLEY

1    You can answer the question one more time.

2          THE WITNESS:  Yes.

3          Q      BY MR. SMOLKER:  That's what you meant?

4          A      That's what I meant.

5          Q      Okay.  And this white dust that you

6    saw, it looked like the same kind of white powder you

7    saw up on your deck when they opened the canister

8    while they were applying it?

9          MR. YARDUMIAN:  Objection.  Question's vague

10   and ambiguous.

11         MR. CONDAS:  Calls for speculation.

12               If you have an opinion, you can tell

13   him.

14         MR. YARDUMIAN:  And lacks foundation.

15         THE WITNESS:  Yeah.  In my opinion, it looked

16   the same.

17         Q      BY MR. SMOLKER:  Now, have you seen

18   Home Saving Termite Control treat any other premises

19   since they treated the premises at 15 63rd Avenue?

20         MR. GREY:  Question's vague and ambiguous.

21         MR. CONDAS:  Join.

22               You can answer the question.

23         THE WITNESS:  Yes.

24         Q      BY MR. SMOLKER:  And was that in the

25   last month or two?

I-52

BARKLEY

1    that again.  I'm not clear.

2           Q      BY MR. SMOLKER:  Yardumian was trying

3    to make a distinction between you and the homeowners

4    association, so I was trying to ask the question do

5    you have any notice being given to the homeowners

6    association of what the pesticide -- what Home Saving

7    was going to do other than just the contract that you

8    got?

9           A      No.

10          Q      Do you recall any notice being posted

11   in the hallway or in any part of the building, telling

12   people what kind of work Home Saving was going to be

13   doing in the premises before Home Saving arrived and

14   did its work?

15          MR. CONDAS:  Compound and vague.

16                 You may answer.

17          THE WITNESS:  No, I don't.

18          Q      BY MR. SMOLKER:  Okay.  Do you remember

19   giving a copy of any written notice to any other

20   homeowner, telling them what Home Saving was going to

21   be doing before Home Saving came and did its work?

22          MR. CONDAS:  I'm going to object.  Vague.

23          THE WITNESS:  No.

24          Q      BY MR. SMOLKER:  Were you told by

25   anyone that the pesticide that Home Saving was going

I-59

BARKLEY

1    and is attached hereto.)

2         Q      BY MR. SMOLKER:  Now, do you happen to

3    know whether all six units were treated?

4         MR. GREY:  Question's vague and ambiguous.

5    Lacks foundation.  Calls for expert opinion.

6         MR. YARDUMIAN:  Join.

7         MR. CONDAS:  You can answer, if you have any

8    knowledge.

9         THE WITNESS:  Yes.

10        Q      BY MR. SMOLKER:  Were all six units

11   treated?

12        A      No.

13        MR. GREY:  Same objections.

14        THE WITNESS:  All six units were not treated.

15        Q      BY MR. SMOLKER:  And what unit wasn't

16   treated?

17        MR. YARDUMIAN:  Objection.  Calls for

18   speculation.  Lacks foundation.

19        MR. CONDAS:  Join.

20             You may answer.

21        THE WITNESS:  Unit number 2.

22        Q      BY MR. SMOLKER:  And how do you know

23   that unit number 2 was not treated?

24        A      Unit number 2 belongs to Lance Robbins,

25   who was away on vacation, and we did not have access

                          I-64

BARKLEY
Court Reporters & Interpreters

1   to his unit.

2          Q      And were you the one that went around

3   with the Home Saving Termite people and opened the

4   doors to let them in so that they could treat each

5   unit that they worked in?

6          A      Yes.  I need to clarify that last

7   question, the answer, if I could.

8          Q      Sure.  I was just going to go through

9   how you did it.

10         A      In some cases I had keys to access

11  units, in others, the owners were home at the

12  beginning of the application and let the termite

13  company in, and I just remained as a presence to make

14  sure that no one's belongings were in jeopardy.

15         Q      And do you happen to remember who you

16  let in and who was already there?

17         A      If I recollect correctly, Carol Kay

18  initially was home and let the termite company in, and

19  Alice Smolker was home initially.  I think I opened up

20  the other ones.  I know I did for Joe Bailey.  I don't

21  remember about Angela's unit, and, of course, I gave

22  access to my own.

23         MR. YARDUMIAN:  I'm sorry.  Could you tell us

24  again who you may have opened up?  You said Bailey?

25         THE WITNESS:  Joe Bailey, yeah.  That's unit

I-65

BARKLEY
Court Reporters & Legal Technologies

1   number 4.  And I believe also Angela's, but I'm not

2   sure about that.

3           MR. YARDUMIAN:  Do you know Angela's last

4   name?

5           THE WITNESS:  Verdon.

6           DEPOSITION OFFICER:  Verdon?

7           THE WITNESS:  Verdon, V-e-r-d-o-n.

8           Q       BY MR. SMOLKER:  After Home Saving was

9   done with its treatment, did you discover that there

10  were any holes that Home Saving had drilled that they

11  hadn't sealed?

12          MR. CONDAS:  Objection as to the term

13  "sealed."

14          MR. YARDUMIAN:  Objection.  Calls for

15  speculation.

16          MR. CONDAS:  I'll join on that.

17              You may respond, if you can.

18          THE WITNESS:  The answer is yes, there were

19  some drilled holes that remained unsealed after the

20  application.

21          Q       BY MR. SMOLKER:  And could you describe

22  for us where you saw these holes?

23          A       Holes were reported to me --

24          MR. CONDAS:  No.  He wants to know where you

25  saw.

I-66

1          THE WITNESS:  My unit on the west wall and on

2   the ceiling above the catwalk and in the master

3   bedroom closet and the common area hallway in front of

4   my door.  That's all I recall.

5          Q      BY MR. SMOLKER:  And by "common area

6   hallway," do you mean the hallway that you go in

7   through the front door to get to where the mailbox is?

8          A      That's correct.

9          Q      And why do you conclude that these

10  holes were drilled by Home Saving?

11         A      They are identical to the holes they

12  drilled inside of my unit in diameter and the depth of

13  the hole.

14         Q      And did you see them drill any of the

15  holes in your unit which you later discovered were

16  left unsealed?

17         A      Yes.

18         Q      And did you ever see them drill any

19  holes in the common hallway?

20         A      I didn't actually see them drill the

21  holes in the common hallway.

22         Q      Did you happen to notice -- by the

23  hallway you're referring -- where in the hallway are

24  you referring to?  The ceiling, the walls, or where?

25         A      I didn't actually see them drill holes.

I-67

BARKLEY

1      Q      And approximately when did you notice
2  this hole in front of your unit?
3          MR. CONDAS:  I'm going to object.  It's been
4  established that you showed him.  Just so we don't
5  have anything about "notice" or not, so there's no
6  play on words.
7              You're talking about the occasion when
8  you showed him the hole?
9          MR. SMOLKER:  I didn't show him the hole.  He
10 didn't say I showed him the hole.
11         THE WITNESS:  That's true.  He did not show
12 me.  Either he told me about it or he wrote something,
13 and I took action to get the hole sealed.  I hired a
14 handyman to seal the hole.
15         MR. YARDUMIAN:  Could you raise your voice and
16 then could you also read back his response.
17             (Whereupon the answer was read back.)
18     Q      BY MR. SMOLKER:  Was it to seal one
19 hole or more than one hole, or you don't know what the
20 handyman did?
21     A      To seal more than one hole.
22     Q      Where were these holes located that the
23 handyman sealed?  In the common hallway?
24     A      In the common hallway ceiling.
25         MR. SMOLKER:  Okay.  Take a minute break

                        I-69

BARKLEY
Court Reporters & Transcription

1          The next in order is a letter dated
2    December 19, 1997, on Farmers Insurance Group
3    stationery jointly addressed to Sally Schubert,
4    S-c-h-u-b-e-r-t, and Carol Trimble, T-r-i-m-b-l-e.
5    It's from Raymond Holybee.
6          The next in order is a letter on
7    Farmers Insurance Group stationery.  It's dated
8    August 11th, 1997.  It's addressed to Matt
9    Fredericks.  It's from Raymond Bolybee.
10          The next in order is a letter dated
11    April 23rd, 1997.  It's addressed to Matt Fredericks.
12    It is from John Hughes, H-u-g-h-e-s.
13          The next in order is a letter dated
14    May 28th, 1998.  It's to Raymond Holybee, and it's
15    from Matt Fredericks.
16          The next in order is a letter dated
17    June 26th, 1998.  It's addressed to Matt Fredericks.
18    It's on Farmers Insurance Group Stationery, and it's
19    from Raymond Holybee.
20          Is that correct?
21      A      That's correct.
22    MR. SMOLKER:  Off the record.
23          (A brief recess was taken.)
24      Q      BY MR. SMOLKER:  Do you remember
25    approximately when the handyman sealed the holes?

I-75

BARKLEY
Court Reporters & Transcriptions

1         A       Yeah.  Give me a second.  Sometime in

2   June, but I'm not sure of the exact date.

3         Q       June 1998?

4         A       Correct.

5         Q       And these holes are the holes in the

6   common hallway?

7         A       Correct.

8         Q       Did you ever ask Home Saving to come

9   back and seal the holes?

10        MR. YARDUMIAN:  He as an individual or the

11  H.O.A.?

12        THE WITNESS:  Not those holes.

13        Q       BY MR. SMOLKER:  Not the common hallway

14  holes?

15        A       Right.  I wasn't aware of those at the

16  time I called Home Saving back to seal holes within my

17  unit.

18        MR. GEIBEL:  Gary hadn't punched them out

19  yet?  Just kidding.

20        MR. SMOLKER:  Off the record.

21             (Discussion held off the record.)

22        Q       BY MR. SMOLKER:  Did you call Home

23  Saving to seal the holes in your place?

24        A       Yes, I did.

25        Q       And when approximately was that?

I-76

BARKLEY
Court Reporters & Transcribers

1          A       I honestly don't remember.  1997, but I
2    couldn't tell you exactly when.
3          Q       And did they seal all the holes in your
4    place?
5          MR. YARDUMIAN:  That he asked them to?
6          THE WITNESS:  The ones I was aware of, yes.
7    The ones that I had spotted.
8          Q       BY MR. SMOLKER:  Did you later discover
9    there were yet more holes?
10         A       Yes.
11         Q       And were these also holes drilled by
12   Home Saving?
13         MR. YARDUMIAN:  Objection.  Calls for
14   speculation.
15         MR. CONDAS:  Join.
16               You may answer.
17         THE WITNESS:  It appeared that they were, yes.
18         Q       BY MR. SMOLKER:  And what did you do
19   about those more holes?
20         A       I sealed them.
21         Q       Yourself?
22         A       Yes.
23         Q       And approximately how many holes did
24   you find in your unit, both the ones you asked Home
25   Saving to seal and the ones that you sealed yourself?

                         I-77

BARKLEY
Court Reporters & Transcribers

1   These are just unsealed holes.

2          A      I don't remember the exact number.

3          Q      Is it more than two or three?

4          A      Yeah, it was two or three.

5          Q      What?

6          A      It was two or three holes.

7          Q      When the Home Saving people came back

8   to your unit, did they paint the holes that they

9   sealed so that the color was the same with the walls?

10         A      No.

11         MR. YARDUMIAN:  The question was compound.

12  Two different questions there.  Did they come back and

13  did they paint so that it matched.  The question is

14  vague and ambiguous.

15         Q      BY MR. SMOLKER:  Did you understand the

16  question?

17         MR. CONDAS:  He's right.  It is compound.  You

18  just want to answer them both.

19             Did they come back to paint?

20         THE WITNESS:  No, they did not come back to

21  paint.

22         Q      BY MR. SMOLKER:  And when they were

23  done sealing the holes that they sealed, did the

24  colors blend?  Did the part where they sealed the

25  holes blend in with whatever paint or finish you had

I-78

BARKLEY

1   on your walls?

2           A       No.

3           Q       Was it unsightly?

4       MR. GREY:  Vague and ambiguous.

5       MR. YARDUMIAN:  Join.

6       MR. CONDAS:  Join.

7       MR. RIDENOUR:  Objection.  Relevance.  Not

8   likely to lead to discovery of admissible evidence.

9       MR. CONDAS:  If you have an opinion, you can

10  express it.

11      THE WITNESS:  It stood out.

12          Q       BY MR. SMOLKER:  Do you feel that Home

13  Saving completed the work the homeowners association

14  contracted for Home Saving to do?

15      MR. GREY:  Could you please read back the

16  question for me.

17              (Whereupon the question was read back.)

18      MR. GREY:  Objection.  Question is vague and

19  ambiguous.  Lacks foundation.  Assumes facts and calls

20  for a legal conclusion.  Opinion of an expert.

21      MR. YARDUMIAN:  Join.

22      MR. CONDAS:  You may answer the question, if

23  you have an opinion.

24      THE WITNESS:  We still have termites.

25      MR. YARDUMIAN:  Move to strike as

I-79

BARKLEY
Court Reporters & Transcription

1  nonresponsive.

2          Q       BY MR. SMOLKER: Was it your

3  understanding that we, meaning the homeowners

4  association, contracted for Home Saving to eradicate

5  the termites in the building?

6          A       That's correct.

7          Q       And to use some kind of treatment so

8  that they wouldn't come back for at least five years?

9          A       That's correct.

10         Q       And is it your understanding that their

11  treatment didn't kill the termites?

12         MR. GREY:  Vague and ambiguous.  Lacks

13  foundation.

14         MR. YARDUMIAN:  Calls for speculation.  Calls

15  for an expert opinion.

16         MS. HESTER:  Join.

17         MR. CONDAS:  It's true.

18         THE WITNESS:  I found evidence of termites

19  after the treatment.

20         Q       BY MR. SMOLKER:  Where?

21         A       In the bay window frame.

22         Q       Is this in your unit?

23         A       In my unit.

24         Q       And what was the evidence you found?

25         MR. YARDUMIAN:  Objection.  Calls for

I-80

BARKLEY
Court Reporters & Transcription

1  speculation.  Lacks foundation.  Calls for an expert

2  opinion.

3          MS. HESTER:  Join.

4          MR. CONDAS:  Join.

5              You may respond.

6          THE WITNESS:  Accumulation of termite pellets

7  or termite debris.

8          Q      BY MR. SMOLKER:  And when approximately

9  did you find them or notice it?

10         A      I don't recall exactly when.

11         Q      Do you have an approximation or just no

12  idea?

13         A      Sometime last year in '97.

14         Q      Did you ask Home Saving to come back to

15  deal with the --

16         A      Yes.

17         Q      -- termite debris you found?

18         A      Yes.

19         Q      And what happened next?

20         A      They sent a technician out, and he spot

21  treated that area.

22         Q      Do you know approximately when that

23  happened?

24         A      I don't remember.

25         Q      Was that in 1997, or you don't even

                    I-81

BARKLEY

1          MR. GREY:  Do you mean what was said, or what

2    do you mean?

3          MR. SMOLKER:  Yeah.  What you heard.

4          Q     I believe you said you were present

5    when someone from Home Saving spoke?

6          A     I was.  I don't recall all the details

7    of that presentation.

8          Q     Do you remember any of the details?

9          A     Yeah.  I remember some of the details.

10          Q     Was anybody else present?

11          A     I believe the treasurer, Alice Smolker,

12    was present.

13          Q     Do you remember anyone else being

14    present?

15          A     No, I don't.

16          Q     Okay.  And what do you remember being

17    said?

18          A     I only remember a few points of the

19    sales presentation.  It's two years ago.

20          Q     And what points do you remember?

21          A     That the application is nontoxic and is

22    good for the life of the building and if it's

23    necessary for a re-treatment, that Home Saving will

24    come out and re-treat any area and they will post a

25    guarantee.  Something of that nature.

I-91

BARKLEY
Court Reporters & Transcription

1          Q          And was this oral presentation given to
2     you before or after you received the brochure which
3     we've marked as 100?
4          A          I believe it's the same time.
5          Q          What?
6          A          I believe it was at the same time I
7     received that brochure.
8          Q          Okay.  And who arranged for Home Saving
9     to inspect the premises?
10          MR. GREY:  Vague and ambiguous.
11          MR. YARDUMIAN:  Calls for speculation.
12          MR. CONDAS:  Sure does.  You mean who
13     originally arranged for them to be there?
14          MR. SMOLKER:  They have an inspection report
15     that's 101.  In order to get the inspection report, I
16     assume somebody went out and inspected.  In order to
17     go out and inspect, it assumes somebody talked to Home
18     Saving and said, "Come out and inspect."  They set a
19     date, they opened the rooms.  You know, they just
20     didn't come out of the air.
21          Q          Do you remember who arranged for the
22     inspection?  How that happened?
23          A          It was probably me, but I don't
24     remember the details of it.
25          Q          Okay.


                         I-92

BARKLEY
Court Reporters & Transcriptions

1          MR. GEIBEL:  And so we're all clear, you have

2     to be careful calling people good guys in this case.

3          THE WITNESS:  Good Guys is the name of the

4     termite company that I actually...

5          Q       BY MR. SMOLKER:  Okay.  So can you

6     briefly describe for us the procedure of getting the

7     bids, how that went, and then we'll just call it a day

8     and we'll resume.

9          A       I think I polled everyone in the

10    building.  I got the Home Saving -- I think it was a

11    flier of Home Saving Termite from Alice.  Lance

12    Robbins provided me with the number to the Good Guys,

13    and the other one I don't remember where I got them

14    from.

15         Q       So different homeowners gave you

16    different names?

17         A       Yes.

18         Q       Because you were in charge of trying to

19    arrange for the termite treatment?

20         A       Yes.

21         MR. GREY:  Objection.  Assumes facts.  Vague

22    and ambiguous.

23         MR. HOFFMAN:  Could I just get the last

24    response the witness gave right there.

25              (The deposition officer read the

I-94

BARKLEY
Court Reporters & Transcription

1   answer as follows:

2                   "A      I think I polled everyone in

3          the building.  I got the Home Saving -- I

4          think it was a flier of Home Saving Termite

5          from Alice.  Lance Robbins provided me with

6          the number to the Good Guys, and the other one

7          I don't remember where I got them from."

8           MR. SMOLKER:  Can we resume?

9           MR. HOFFMAN:  The last question, could I have

10   that.

11                   (The deposition officer read the

12   questions and answers as follows:

13                   "Q      So different homeowners gave

14          you different names?

15                   "A      Yes.

16                   "Q      Because you were in charge

17          of trying to arrange for the termite

18          treatment?

19                   "A      Yes."

20           THE WITNESS:  Maybe I should be more clear.

21   I'm the president, so I was doing all those things.

22           MR. CONDAS:  Okay.  Thanks.

23           MR. YARDUMIAN:  Can I just ask a question

24   while we're here.

25                   The material that Alice Smolker gave

I-95

SUB-
EXHIBIT
64

# EXHIBIT 64

Exhibit "64."

Transcript of Deposition testimony of Mr. Corey Arentz, Home Saving Termite Control
(TERMITE CONTROL) Pesticide Applicator, concerning the application of Syloid 244 at
Pacific Villas Condominium Complex by Home Saving Termite Control in October 1996 and
existence of unsealed holes in the common area hallway and on the deck of the Smolker's
condominium unit. Mr. Arentz's deposition was taken in 1998.

The attached copy of Mr. Arentz deposition transcript was filed in Los Angeles Superior Court
Case BC173952 on or about November 6, 2000 in opposition to pending motions for Summary
Judgment/ Summary Adjudication.

Mr. Arenz was a member – leader of the TERMITE CONTROL team which applied Syloid 244
in a condominium complex while APPELLANT was living there.

During his deposition testimony Mr. Arenz described TERMITE CONTROL'S SYLOID 244
installation process as follows: "Install injection points at various areas of the building to access
the wall voids and injecting silica aerogel into those voids."

Mr. Arentz personally drilled holes in certain areas of building to access wall voids and then
injected silica aerogel into those wall voids.

Unfortunately:

Mr. Arentz hasn't taken any course in pesticide hazards and safety practices.

Mr. Arentz has not taken any course in building and safety laws.

Mr. Arentz hasn't taken any course in poisonous and dangerous chemicals used in pest control.

Mr. Arentz hasn't taken any courses in the rules and regulations of pest control.

Mr. Arentz has not taken any courses in fumigation safety.

Mr. Arentz has not taken any courses in pesticide safety.

Mr. Arentz was told by TERMITE CONTROL that SYLOID 244 is not a chemical. IT is a
natural mineral. It is safe to be exposed to SYLOID 244 dust.

Mr. Arentz understood it is safe to be exposed to the silica dust he was installing in wall voids in
the house.

During his training, Mr. Arentz was told by TERMITE CONTROL that it is safe to have
SYLOID 244 dust in a treated house.

Mr. Arentz testified TERMITECONTROL standard procedure is to drill two holes in a wall then
inject the silica gel in one of them. The holes are drilled approximately 4 feet apart.

Page 823

Mr. Arentz testified that normal spacing between studs in a wooden residential structural is 16 inches on center. Mr. Arentz understood when he drilled holes 4 feet apart, and then sprayed SYLOID 244 under high pressure into one of the holes the SYLOID 244 he is injecting will travel a couple of studs each time he injects SYLOID 244 through a hole into a wall void until it comes out another hole.

SYLOID 244 penetrates the space between three studs. The dust has to travel inside the wall voids past more than one of the studs in the wall voids before it exists another hole drilled in the wall.

He shoots SYLOID 244 dust into the hole he has drilled (the access aperature) at a pressure of 125 pounds per square inch in order to accomplish this feat.

## Comment

SYLOID 244 is used by TERMITE CONTROL as a pesticide. It is not safe to come in contact with SYLOID 244. It is not safe to inhale SYLOID 244.

SYLOID 244 is a toxic air contaminant whose pesticidal use is regulated by the State of Califomia Department of pesticide Regulation. California Health & Safety Code Section 39655 (a).

Mr. Wayne Morris/ Home Saving Termite Control, Inc. was ordered by the STRUCTURAL PEST CONTROL BOARD in 1993 to CEAST and DESIST immediately stating (falsely representing) that silica gel is a "non-chemical" product. It is a pesticide chemical and that is exactly why it must be registered with both the United States Environmental Protection Agency and the California Department of Pesticide Regulation. Exhibit 69.

Grace states in its Safety Data Sheet for SYLOID 244 (a copy of Grace's Safety Data Sheet was filed in the Court of Appeal as Exhibit 7 attached to Appellant's Motion to take Judicial Notice" filed on December 7, 2018 in Court of Appeal Case No. B286138): "Wear protective clothing," "After swallowing: Seek medical attention."

1    crew that applied the pesticide system to the house?

2              A      Yes.

3              Q      And were you also here as part of

4    the crew that came to do some of the cleanup work

5    after I complained?

6              MR. YARDUMIAN:  Objection.  Assumes facts,

7    calls for speculation.

8                     You can answer.

9              THE WITNESS:  I don't know.  That's a good

10   question.

11             Q      BY MR. SMOLKER:  You don't know if

12   you came back to take care of some problems that I

13   brought up?

14             A      I believe it's possible.

15             Q      All right.  Could you tell us when

16   you were born?

17             A      12/1/56.

18             Q      Okay.  And could you briefly tell us

19   what your education was starting with high school.

20             A      G.E.D.

21             Q      So did you graduate from high

22   school?

23             A      No.

24             Q      Okay.  I'm sorry, I don't know what

25   G.D. stands for.

                         150

1          What does G.D. mean?

2     A     It was a test given for general

3  education knowledge.

4     Q     And you passed the G.D. test?

5     A     Yes.

6     Q     Is that considered the equivalent of

7  graduating from high school?

8     A     I believe so, yes.

9     Q     And when was that, approximately?

10    A     1975.

11    Q     And do you remember where you were

12 living when you passed that test?

13    A     Westchester.

14    Q     Westchester, California?

15    A     Yes.

16    Q     The Westchester that's about ten

17 minutes away from here?

18    A     Yes.

19    Q     And have you had any formal

20 education since 1975?

21    A     Yes.

22    Q     And could you briefly describe that.

23    A     About one semester at El Camino

24 College of general education also.

25    Q     Okay.  Anything else?

I-10



```
1        A       No.

2        Q       And general knowledge, could you

3   describe what that means.

4        MR. YARDUMIAN:  I'm sorry?

5        MR. SMOLKER:  He said he took one semester

6   at El Camino of courses in general knowledge.

7        MR. YARDUMIAN:  I think he said "general

8   education."

9        THE WITNESS:  Yes, right, general

10  education.

11       Q       BY MR. SMOLKER:  Okay.  What does

12  that mean?

13       MR. YARDUMIAN:  Do you want him to tell you

14  what kind of courses he took?

15       MR. SMOLKER:  Yeah.

16       Q       What kind of courses did you take?

17       A       Oh.  English, math, two study halls,

18  there was a science.

19       Q       And was it a general science class,

20  or a particular kind of science?

21       A       Actually, it was physical fitness,

22  cardiovascular and --

23       Q       Any other education?

24       A       No.

25       MR. YARDUMIAN:  You mean formal education?
```

I-11

BARKLEY

1    Inc., "Home Savings"?

2              MR. YARDUMIAN:  Why don't we call it "Home

3    Saving."

4         Q         BY MR. SMOLKER:  "Home Saving"?

5    Could I just use that shorthand and you'll understand

6    I mean the whole long name instead of all those

7    words?

8         A         Yes, that's --

9         Q         That's agreeable?

10        A         That's agreeable.

11        Q         Okay.  Have you worked continuously

12   for Home Saving since August 1995?

13        A         Yes.

14        Q         And what was your first position

15   when you were hired there?

16        A         Helper --

17        Q         And how long did that last?

18        A         -- trainee.

19        Q         Okay.

20        A         Approximately three months.

21        Q         And what did your duties consist of

22   when you were a helper/trainee?

23        A         Learning the process of the Home

24   Saving dehydration system.

25        Q         And did you take formal courses in

1    that?  Were there lectures given to you about that?

2            A       No.

3            Q       How did you learn the process of the

4    dehydration system?

5            A       On-the-job training.

6            Q       And what did the on-the-job training

7    consist of?

8            A       Installation, refinishing of walls

9    and other injection areas.

10           Q       Anything else?

11           A       Just that's mainly the process.

12           Q       Okay.  And could you briefly

13   describe the installation process for us.

14           A       To install injection points at

15   various areas of the building to access the wall

16   voids and injecting silica aerogel into those voids.

17           Q       Okay.  And after your approximate

18   three months of being a helper/trainee, what was your

19   next job at Home Saving?

20           A       Was lead person.

21           Q       Could you tell us what the job of a

22   lead person is.

23           A       To operate crews and properly

24   install the dehydration system.

25           Q       Okay.  And what have you found to

                            I-14

1  be, if any, of the problems in installing the

2  dehydration system?

3      MR. YARDUMIAN:  I'm sorry.  Objection.  The

4  question is totally overbroad, vague and ambiguous,

5  calls for speculation.  What kind of problem?  I

6  mean, it's not narrowly confined at all.

7      MR. SMOLKER:  I asked him what kind of

8  problem he found, exactly.  It's not narrowly

9  confined.

10     Q      Have you found any problems in

11 installing the dehydration system?

12     A      No.

13     Q      You said that you wanted to make

14 sure it was properly installed.

15            Have you found any ways of

16 improperly installing it?

17     MR. YARDUMIAN:  Objection.  Argumentative.

18            You can answer it if you understand

19 it.

20     THE WITNESS:  Repeat that question, please.

21     Q      BY MR. SMOLKER:  Have you found

22 that there was any possibility of improperly

23 installing the dehydration system?

24     MR. YARDUMIAN:  Calls for speculation.

25     THE WITNESS:  No --

                    I-15

B A R K L E Y

1       MR. YARDUMIAN:  Do you understand the

2  question?

3       THE WITNESS:  Yes and no.

4       MR. YARDUMIAN:  All right.  Don't answer

5  the question if you don't understand it.  If you

6  don't understand, tell him you don't understand.

7       THE WITNESS:  Okay.  Yes.

8            No, I do not understand that.

9       Q       BY MR. SMOLKER:  What did you mean

10 when you said it was your job to make sure the

11 dehydration system was properly installed?  What do

12 you do to make sure it's properly installed?

13      A       It is my job to make sure that it is

14 applied by the way of Home Saving dehydration system

15 method.

16      Q       And how do you do that?  How do you

17 do your job?  How do you perform your job?

18      A       By installing injection points in

19 certain areas of the building to access wall voids

20 and injecting silica aerogel in those wall voids.

21      Q       Do you personally do that?

22      A       Yes.

23      Q       So you're the one who personally

24 drills the holes?

25      A       I am -- yes.

                    I-16



1          Q      And you're the one who personally

2    pulls the trigger on the nozzle --

3          A      Yes.

4          Q      -- that lets the substance go

5    through into the walls?

6          A      Yes.

7          MR. YARDUMIAN:  You're talking in general,

8    as opposed to your property?

9          MR. SMOLKER:  I'm talking about what he

10   does in his job.

11         MR. YARDUMIAN:  Okay.  What he has done at

12   times in his job.

13         MR. SMOLKER:  This is I understand what his

14   job is.  He's describing for us what he does, what

15   his work consists of.

16         MR. YARDUMIAN:  I know.  I just think the

17   question's unfair in that it presumes that he does

18   that on all of those jobs.  So, I mean, can you

19   narrowly tailor it to have you in the past done it,

20   or did you do it here.  I mean, it's just overly

21   broad.

22         MR. SMOLKER:  I asked him what his job was.

23   He's the one that's giving the answer, not me.

24   You're turning his answer into an argument.  I asked

25   him what his job is.  He's telling us what his job

                        I-17



Page 832

1    is, what he does in his job.

2              MR. YARDUMIAN:  In connection with his job,

3    what has he done in terms of the method.

4              MR. SMOLKER:  I don't want to argue with

5    you about what his answer is.  He gave his answer.

6              MR. YARDUMIAN:  I think there was a

7    question pending.  I just think that the question's

8    overbroad.

9              Q      BY MR. SMOLKER:  Now, have you

10   taken any courses in pest identification?

11             A      Not -- no, I haven't.

12             Q      Have you taken any courses in

13   pesticide application equipment?

14             A      No, I haven't.

15             Q      Have you taken any courses in

16   pesticide hazards and safety practices?

17             A      No.

18             Q      Have you taken any courses in

19   structural repairs?

20             A      No.

21             MR. YARDUMIAN:  Gary, when you're using the

22   word "courses," you mean a formal course, or any type

23   of continuing education?  I just want to make sure.

24   Yesterday you made it clear that you had specific

25   areas of inquiry.  I just want to make sure you're

                        1·1ε

1  not overlapping the two.

2          MR. SMOLKER:  I'm just asking the

3  questions.  If he has a problem, he's been instructed

4  to tell us he doesn't understand it.  I don't want to

5  get in arguments with you.  And I would say for the

6  record I think you're trying to coach the witness.

7  I'm asking straightforward questions; he's giving

8  straightforward answers.  You're giving arguments to

9  me.  If you have an objection, make the objection.

10  Don't coach the witness with speeches.

11          MR. YARDUMIAN:  The question's vague as to

12  the term "courses."  The reason it's vague is I

13  presume you were going to make distinctions like you

14  did yesterday between courses, continuing education,

15  the different things with the branches that they

16  learn, which you did yesterday.

17          MR. SMOLKER:  I'm not here to listen to

18  your speeches.  If you want to make a speech, you

19  know, I'll just tell you that I think it's totally

20  improper and it's coaching the witness and I object.

21              Are you done with your talk?

22          MR. YARDUMIAN:  I'm just trying to clarify

23  and make sure the record is clear and the record is

24  fair and consistent with what you've done in the

25  past.

I-15



Page 834

1          Q          BY MR. SMOLKER:  Have you taken any

2    courses in report writing?

3          A          No.

4          Q          Have you taken any courses in

5    building and safety laws?

6          A          No.  May I ask --

7          Q          Sure.

8          A          -- when you refer to courses, is

9    that like a formal classroom training that you're

10   referring to, or --

11         Q          I'm referring to somebody comes and

12   gives a lecture, and you go and listen to it, and

13   they instruct you in a subject.

14         A          No.

15         Q          "No" what?

16         A          No, I have not taken courses of that

17   nature, no.

18         Q          Okay.  And it could be an hour

19   lecture, a day lecture, a week lecture.

20                    Would your answer be the same?

21         A          Yes.

22         Q          Okay.  You haven't taken anything

23   that fits that description?

24         A          No.

25         Q          "No" meaning, yes, I haven't taken

                            1-20

1    anything that fits that description?

2            A       I have not taken anything that fits

3    that description.

4            Q       Okay.  Have you taken any courses in

5    poisonous and dangerous chemicals used in pest

6    control?

7            A       No.

8            Q       Have you taken any courses in State

9    laws that have to do with safety and health?

10           A       No.

11           Q       Have you taken any courses in

12   biology?

13           A       At high school level, yes.

14           Q       Okay.  So this was before you got

15   your G.D.?

16           A       Yes.

17           Q       Have you taken any courses in

18   biology after you got your G.D.?

19           A       No.

20           Q       Have you taken any courses in the

21   rules and regulations of pest control?

22           A       No.

23           Q       Have you taken any courses in

24   fumigation safety?

25           A       No.

I-21.

BARKLEY

1        Q        Have you taken any courses in

2    pesticide safety?

3        A        No.

4        Q        Have you taken any courses in

5    construction repair?

6        A        No.

7        Q        Do you have any licenses?

8        A        Yes.

9        Q        What kind of licenses do you have?

10       A        I have an applicator's certificate.

11                This is referring to the -- my

12   employ; correct?

13       Q        Yes.

14       A        And I also have a branch 3

15   inspector's license.

16       Q        Okay.  And can you tell us what an

17   applicator's certificate is.

18       A        Applicator's certificate is a

19   certificate issued by Structural Pest Control Board

20   that allows the individual to apply certain types of

21   pesticides under the supervision or under the employ

22   and immediate supervision of an operator.

23       Q        Okay.  And what is a branch 3

24   inspector's license?

25       A        A branch 3 inspector's license is a

BARKLEY

1          A        No.

2          Q        And when the job started, it was

3     your job to take care of?

4          A        Yes.

5          MR. YARDUMIAN:  I'll just interpose an

6     objection belatedly.  The question is vague and

7     ambiguous as to the term "job."

8          Q        BY MR. SMOLKER:  By "job," I meant

9     getting the termite application done at this

10    building.

11                  That was your responsibility when

12    you started the job in the morning; right?

13         A        Yes.

14         MR. YARDUMIAN:  When you say "termite

15    application," are you talking A.S.G., or are you

16    talking this subterranean?

17         MR. SMOLKER:  I'll get to that.

18         MR. YARDUMIAN:  Okay.  That's why the

19    question is vague.

20         MR. SMOLKER:  Okay.  We'll get to it now.

21         MR. YARDUMIAN:  Okay, good.

22         Q        BY MR. SMOLKER:  Now, do you get

23    involved in subterranean termite work?

24         A        Yes.

25         Q        And do you apply the substance

                           I-45

BARKLEY

1    that's used in the subterranean work?

2         A    Yes.

3         Q    You personally?

4         A    Yes.

5         Q    Okay.  And on this job do you know

6    if any subterranean termite work was done?

7         A    Yes, to my recollection there was.

8         Q    And do you know who did it?

9         A    I did.

10        THE VIDEOGRAPHER:  Excuse me.  Mr. Smolker,

11   could I have you slide your mike up for me.

12        MR. SMOLKER:  Sure.

13        THE VIDEOGRAPHER:  Thank you very much.

14        Q    BY MR. SMOLKER:  Okay.  And when

15   you do subterranean termite work, is there any

16   paperwork that goes along with that?

17        A    Yes.

18        Q    What kind of paperwork goes along

19   with that?

20        A    The same type as what we're looking

21   at.

22        Q    Something called a "Work Performed

23   Description"?

24        A    Yes.

25        Q    Is it the same form, or a different

                    I-40

1          A       Yes.

2          Q       Okay.   Now, under standard

3    procedure, would you have also put holes in the

4    ceiling in the hallway as you're walking in from the

5    front door?  Do you understand the location?  Do you

6    know where you came into our building you walked up

7    some stairs --

8          A       Correct.

9          Q       -- and then you turned around and

10   there was a front door where the buzzer is?

11         A       Correct.

12         Q       And then I buzzed you in, and you

13   opened that door and you walked through this hallway?

14         A       Correct.

15         Q       And as you were walking through the

16   hallway, there were three units on your right and

17   three units on your left?

18         A       Correct.

19         Q       As you're walking down that hallway,

20   would you have put holes in that ceiling of that

21   hallway?

22         A       In certain areas, yes.

23         Q       You would?

24         A       Yes.

25         Q       Okay.   I'd like to go there now and

                           I-94

1    treatment?

2              A      Yes.

3              Q      And is this considered an exterior

4    wall?

5              A      Yes.

6              MR. SMOLKER:  Okay.  Now we can go off the

7    record.

8              THE VIDEOGRAPHER:  Going off the record.

9    The time is 2:43.

10                    (A brief recess was taken.)

11             THE VIDEOGRAPHER:  We're back on the

12   record.  The time is 2:44.

13             Q      BY MR. SMOLKER:  Corey, is it your

14   understanding from your field report, Exhibit 3-10,

15   that holes were drilled in the common walkway that we

16   walked through after we entered the front door?

17             A      Yes.

18             Q      And is it your understanding that

19   amorphous silica gel was injected into that ceiling,

20   the ceiling above the walkway?

21             A      Yes.

22             Q      And can you tell from your report

23   how many holes were drilled or --

24             A      No.

25             Q      Or how many pounds were applied?

                        I-124

```
 1          A      In that one hallway area?

 2          Q      Yes.

 3          A      No.

 4          Q      For what -- would that fall under

 5   the category "dust between floors"?

 6          A      Yes.

 7          Q      What else in this building would

 8   fall under the category of "dust between floors"?

 9          A      Between any floors such as --

10          Q      The ceiling above our head right

11   now?

12          A      Right.

13          Q      So that would be included in the 41

14   holes and 6 1/2?

15          A      Right.   Depending on the units

16   and --

17          Q      Okay.   And then the next thing under

18   that it says "dust attic."

19                 Do you see that?

20          A      Yes.

21          Q      Then it says "void."

22          A      Right.

23          Q      Then it says "30 holes."

24                 Are you with me?

25          A      Correct.
```

I-125

BARKLEY

1          Q        Could you tell us what "void" means.

2          A        The void would be the area between

3    the exterior roof on the outside and the finished

4    ceiling on the inside.  You have no crawlable attic

5    space, but you do have a void up there.

6          Q        So does that mean when we were up in

7    my bedroom the space between that ceiling and the

8    roof above it?

9          A        Yes.

10         Q        And where do you make those holes?

11         A        Around the exterior towards the

12   plate side of the structure.

13         Q        What I mean is, do you get up on the

14   roof and drill the hole down through the roof, or do

15   you go inside the unit and drill up through the

16   ceiling in the unit?

17         A        They've been done both ways.

18   It's -- it depends on the structure itself.

19         Q        Okay.  And can you tell from these

20   notes which way it was done in this case?

21         A        No.

22         Q        And do you have any independent

23   recollection of which way it's done in this case?

24         A        By the appearance of the building, I

25   would say they were more than likely done from the

                         I-126



1    inside.

2           Q       Okay.  And what about the appearance

3    of the building leads you to that conclusion?

4           A       Because I believe it probably would

5    have been easier than trying to get up on the roof.

6           Q       Okay.  So just the physical ease of

7    application?

8           A       Correct.

9           Q       Now, as part of your job of signing

10   this report, did you inspect the work of the people

11   that were in the other crew?

12          A       Oh, gosh.  There was two leadmen

13   here.  I doubt it.

14          Q       So when you say crew performance

15   "excellent all," you're just referring to the people

16   working for you and not everybody?

17          A       Correct.

18          Q       Okay.  Now, before we were talking

19   about the subterranean termite work.  I'd like to

20   return to that.  It's on the same form.

21          A       Okay.

22          Q       It's the top space on the form on

23   3-10.  And I have here you broke down the

24   subterranean tubes.  And I think we went passed

25   "other," and we were getting to -- I don't know if

                        1-117



1    I'm repeating myself -- "rod and treat subs, break

2    down tubes area."

3              Would you have done that?

4         A    According to the subterranean

5    termite treatments proposal, no.

6         Q    Okay.  What else -- would you have

7    drilled and treated the slab?

8         A    Yes.

9         Q    And what does "drill and treat slab"

10   mean?

11        A    That means we drill holes through

12   the slab to the dirt area below, and we create a

13   chemical barrier between the dirt and the slab itself

14   with an approved termiticide and create a chemical

15   barrier between the subterranean colony and the

16   structure itself.

17        Q    Okay.  And can you tell from the

18   contract or any other document that you have -- and

19   you could ask me if there's some document that I have

20   that I could give you -- what you used when you did

21   the subterranean termite work?

22        MR. YARDUMIAN:  What type of product?

23        MR. SMOLKER:  Yes.

24        THE WITNESS:  I would have used Dursban TC.

25        Q    BY MR. SMOLKER:  And how do you

I-128

BARKLEY

1    know that?

2              A       That is the regular termiticide that

3    we use at the company.

4              Q       But you know you use it, because

5    that's what you always use?

6              A       Yes.

7              Q       Okay.  Now, you said that you create

8    this chemical barrier between the termite colony and

9    the structure.

10             Did I hear that correct?

11             A       Yes.

12             Q       How do you do that?  What does that

13   mean?

14             A       Actually, just what it says.  We

15   create a chemical barrier that lies sandwiched, if

16   you will, between the concrete slab above and the

17   earth fill of the slab below.

18             Q       But I thought you said you also put

19   a barrier between the termite colony and the

20   structure.

21             A       The termite colonies live in the

22   ground, the subterranean termites.

23             Q       Okay.  So does that also mean that

24   you find out where the termites are?

25             A       No, sir.  You see where they're

I-129

1          Q        It's predetermined what it's going

2     to be?

3          A        Yes.

4          Q        Okay.  Now, when you're done with

5     your -- we'll call it subterranean termite work --

6     when you're done with your subterranean termite work,

7     do you put a tag that says you've done it?

8          A        Yes.  There should be a labeling

9     that has the products used, and it should be listed

10    on that.

11         Q        Where is the tag placed, on the

12    property?

13         A        Yes.  And the specific location

14    would be on that paperwork.

15         Q        And what does the tag say on it?

16    The product used and --

17         A        Products used.

18         Q        And what else?

19         A        And that's it.  You just list the

20    name of the products.

21         Q        And is this -- do you recall -- will

22    you be the one that places this tag?

23         A        Not necessarily.

24         Q        Do you know where the tag -- is

25    there a place the tag's supposed to be placed?

                          I-133

1          A          Not a specific area.  That's why I

2    say, on the sheet that has this information recorded,

3    just as this one says "kitchen sink areas" for this,

4    it should also be on that.

5          Q          Okay.  Would the normal posting

6    location be somewhere near where the Dursban

7    treatment was?

8          A          Yes.

9          Q          So in other words --

10          A          It will be in that area.  In other

11    words, if it's in the garage, we're not going to post

12    it in the attic.

13          Q          Right.  So you wouldn't put it in

14    the kitchen, it --

15          A          No.

16          Q          -- would be somewhere in the garage?

17          A          Right, correct.

18          Q          And you'd put it in a visual place

19    in the garage?

20          A          Yes.

21          Q          So someone could notice it?

22          A          Yes.

23          Q          Okay.  I'd like to take a two or

24    three-minute break and have you go to the garage.  We

25    won't have everybody walk down there, we'll just -- I

I-134

BARKLEY

1      mean, we can all walk down if we want.  Could you

2      just look and see if you could find the tag?

3                  A      Sure.

4                  Q      And if you can, then we'll bring

5      them down and you can point where the tag is?

6                  A      Sure.

7                  MR. YARDUMIAN:  Are we going to need to do

8      anything else while we're down there?

9                  MR. SMOLKER:  No.

10                 MR. YARDUMIAN:  Okay.

11                 MR. SMOLKER:  He's just going to see if he

12     can see the tag.

13                 MR. YARDUMIAN:  All right.

14                 MR. SMOLKER:  If he can, we'll all go down.

15     If he can't, he'll say he went in the garage and he

16     couldn't find it.

17                 MR. YARDUMIAN:  How about if he sees it, he

18     can just describe where it is.

19                 MR. SMOLKER:  I want to get a picture of

20     it.

21                 MR. YARDUMIAN:  Well, can't you take a

22     photograph?

23                 MR. SMOLKER:  Yeah, I could, but that isn't

24     what I want to do.

25                 MR. YARDUMIAN:  It seems more reasonable

                           I-135


BARKLEY

1    than to lug everyone down.

2            THE VIDEOGRAPHER:  We're going off the

3    record.  The time is 2:57.

4                    (A brief recess was taken.)

5            THE VIDEOGRAPHER:  We're back on the

6    record.  The time is 3:10.

7            Q       BY MR. SMOLKER:  Okay.  Is it true

8    that you've just inspected the subterranean garage

9    under my unit?

10           A       Yes.

11           Q       And you inspected Matt Fredricks'

12   laundry room?

13           A       Yes.

14           Q       And you inspected my laundry room?

15           A       Yes.

16           Q       And did you find a tag that would be

17   placed if there was subterranean termite work?

18           A       No.

19           Q       And is there any place where you

20   think it's reasonably likely there might be a tag for

21   subterranean termite work that you didn't look while

22   you were down there looking?

23           A       Excuse me, I'm sorry?  Could you say

24   that again, please.

25           MR. SMOLKER:  Could you repeat that,

                          I-136

BARKLEY

1      MR. SMOLKER:  Okay.  Do you want to mark

2  this 20.

3      MR. YARDUMIAN:  21.

4      MR. SMOLKER:  Excuse me, 21.

5           (Whereupon,

6  Defendants/Cross-Complainants' Exhibit 21

7  was marked for identification and is

8  attached hereto.)

9      Q      BY MR. SMOLKER:  Could you briefly

10  tell us what document 21 is.

11      A      This is a "Job Work Sheet" recording

12  the time of each individual and the products used.

13      Q      Is that a normal form that you use

14  in your --

15      A      Yes.

16      Q      -- work?

17           And next to -- I notice that it has

18  different columns; one is "name," and then there's

19  numbers from 1 to 31.

20           Is the 1 to 31 the days of the

21  month?

22      A      Yes.

23      Q      And then is the "name" the name of

24  the person that was on the job?

25      A      Yes.

II-173

BARKLEY

# JOB WORK SHEET

EXHIBIT 21
FOR I.D.
JEFF LAMAR, CSR #10510
WITNESS ___ 3/10 19 ___ C. Area 2
NO. PGS. ___

INSPECTOR ___ TERRY ___   MAP ___ 702 A3 ___   CROSS STREET ___ PACIFIC ___

APPOINTMENT DATE ___ 10-11-96 ___   TIME ___

KEY INSTRUCTIONS ___

TURN KEY TO ___

OWNER: ___

OCCUPANT OR CONTACT NAME & PHONE #: ___

PACIFIC VILLAS
ADDRESS:  15 63RD AVENUE, PLAYA DEL REY   90293

INSPECTORS ESTIMATED JOB TIME ___

SPECIAL EQUIPMENT NEEDED OR INSTRUCTIONS ___

FILE #  23187TY

DATE STARTED     10-11-96
DATE COMPLETED   10-12-96
OKAY TO BILL PER ___

| NAME | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LOREY | | | | | | | | | | | | 4505 | | | | | | | | | | | | | | | | | | | |
| WAYNE-JR | | | | | | | | | | | 8.04 | | | | | | | | | | | | | | | | | | | | |
| JOSH | | | | | | | | | | | 8.04 | | | | | | | | | | | | | | | | | | | | |
| MIKE | | | | | | | | | | | 11 | | | | | | | | | | | | | | | | | | | | |
| CAROLYN | | | | | | | | | | | 6.64 | | | | | | | | | | | | | | | | | | | | |
| LOREY | | | | | | | | | | | 1/2 | | | | | | | | | | | | | | | | | | | | |
| TERRY | | | | | | | | | | | 11 | | | | | | | | | | | | | | | | | | | | |
| BRENT | | | | | | | | | | | 6.64 | | | | | | | | | | | | | | | | | | | | |

| MATERIALS USED | | |
|---|---|---|
| QUANTITY | TYPE | AMOUNT |
| VARIOUS | ASB. | 2094.65 |
| | | |

| OTHER WORK NOT INCLUDED IN CONTRACT | | |
|---|---|---|
| TIME | WORK DONE | AUTH KEY |
| | | |

| JOB COSTS | |
|---|---|
| LABOR | |
| MATERIAL | |
| INSPECTION | |
| OFFICE | |
| TOTAL | |

CUSTOMER RELATIONS   (GOOD)  BAD  OTHER

COMMENTS:

FACT POSTED IN ___
UNDER SYNOPSIS ___
PACH ___

1  ladder, where I might not.  Things of this nature

2  having to do with the application of the system.

3          Q     And what would be a difficult part?

4          A     Well, in the event we might need

5  extension ladders and things of that nature.

6          Q     So by "difficult part," you mean in

7  terms of equipment needed?

8          A     Yes.

9          MR. YARDUMIAN:  This is in a hypothetical

10  inspection.

11          MR. SMOLKER:  He's explaining what his form

12  means and what he does when he does it.

13          Q     And you don't know if you did it in

14  this case; right?

15          A     Well, I'm sure I had to come in here

16  and look.  However, there was a lot of them done

17  prior to this one too, and they're all the same.  So

18  I probably pretty much knew what the layout was.

19          Q     Okay.  And is it your normal

20  practice when you do do interior inspections to put

21  your initial in that column?

22          A     Sometimes yes; sometimes no.

23          Q     Now, as part of your interior

24  inspection when you do it, do you look at the

25  integrity of the walls?

BARKLEY

1           A       Well, yes.

2           Q       What do you look for?

3           A       Walls, windows, doors, door casings,

4   difficulty of reaching those areas, making sure

5   there's no biting dogs in the house or birds that are

6   going to fly.

7           Q       Do you check the entirety of the

8   walls to see if there are any holes or openings in

9   the walls?

10          A       Oh, yes.

11          Q       That would include cracks in the

12  walls?

13          A       More holes left maybe by plumbers

14  doing repipes under sinks, things of this nature.

15          Q       Okay.  Do you look to see if there

16  are any cracks or openings that could allow the

17  silica gel that you inject to come out?

18          A       Well, if they're obvious, yes.  In

19  fact, you can see during installation.

20          Q       And what do you do if you find such

21  holes and openings?

22          MR. YARDUMIAN:  Through which silica might

23  come out?

24          MR. SMOLKER:  Yes.

25          THE WITNESS:  Avoid those areas.

II-259



1              MR. RIDENOUR:  I'm sorry, peanut gallery

2      couldn't hear you.

3              THE WITNESS:  Avoid those areas.

4              Q      BY MR. SMOLKER:  And by "avoid

5      those areas," what do you mean?

6              A      While injecting the areas around

7      there to where it's not going to come out into your

8      living area.

9              Q      So you make an effort to make sure

10     the silica gel won't come out into the area --

11             A      Correct.

12             Q      -- the living area?

13             A      Correct.

14             Q      And why do you do that?

15             A      Mainly because I don't want to clean

16     it up.

17             MR. GILBERT:  Sorry, I couldn't hear the

18     answer.

19             THE WITNESS:  Oh.  Mainly because of the

20     mess that it will make.

21             Q      BY MR. SMOLKER:  So you don't do it

22     for safety reasons?

23             A      No, sir.

24             Q      Is it your understanding that it's

25     safe to have the silica dust in the house?

                        II-260



1          A       Yes.

2          MR. YARDUMIAN:  Objection.  Lacks

3   foundation, calls for speculation, may call for an

4   expert opinion.

5          MR. RIDENOUR:  Join.

6          Q       BY MR. SMOLKER:  And where did you

7   get that understanding?

8          A       That was given to me through the

9   company through my training.

10          Q       That's what the company told you?

11          A       That's what the company has told me,

12   the training, and -- yes.

13          Q       The other day you told us how you

14   would drill a series of holes in the wall and then

15   you would inject the silica gel, and that you would

16   keep usually one hole ahead; in other words, you

17   drilled two holes and then inject silica gel in one

18   of them.

19          Do you remember that?

20          A       Yes.

21          Q       Is that your memory of how you did

22   it in this unit?

23          A       Oh, yes.  Yes.

24          Q       That's your standard way of doing

25   it?

II-261

1          A        That's my standard way of doing it.

2          MR. YARDUMIAN:  Well, there's a difference

3    between a standard way of doing it and your memory of

4    how you did it.

5          THE WITNESS:  Right.  Well, that's -- like

6    in this area where I'm going to be on an extension

7    ladder up there, I'm sure I injected the hole and

8    patched it all at the same time before I went on to

9    the next one just because of the situation there

10   involving --

11         Q        BY MR. SMOLKER:  Heights?

12         A        -- heights.

13         Q        And uncomfortable stretching?

14         A        Well, all of those things.

15         Q        But if it's possible, you do two at

16   a time if it's comfortable to do it that way?

17         A        Well, if it's comfortable doing it,

18   I will have my patch person one hole behind me so

19   we're just in a succession so everything will come

20   down and --

21         Q        But do you do two holes before you

22   shoot one?  I mean, is there always one open hole?

23         A        Not necessarily always, no.

24         Q        But normally?

25         A        No.

                              II-262



1      Q      Ideally?

2      A      No.

3      Q      What is the ideal way to do it?

4      MR. YARDUMIAN: Objection. Incomplete

5 hypothetical, calls for speculation.

6      THE WITNESS: I don't understand the

7 question, what's the ideal way of doing it.

8      Q      BY MR. SMOLKER: Yeah. If you had

9 your choice of how to do it in all the conditions you

10 could control, how many holes would you drill at a

11 time before you would inject the silica gel?

12      MR. YARDUMIAN: Also totally irrelevant.

13      You can answer.

14      THE WITNESS: Oh, I would never be a hole

15 ahead of myself. I would have my person right behind

16 me patching. I would install an injection point,

17 inject it, and that person would patch it. And by

18 the time they got done patching that one, then the

19 next one would be ready to patch.

20      Q      BY MR. SMOLKER: So you'd just do

21 one at a time?

22      A      Yes, sir.

23      Q      Now, yesterday -- by "yesterday" I

24 mean the last day of your depo -- we were talking

25 about injection points.

II-263

1          Is it your testimony that your

2     standard injection points are three-eighths of an

3     inch?

4          A     Yes, sir, inner diameter.

5          Q     Any other size would be an exception

6     to the rule; correct?

7               MR. YARDUMIAN:  In an interior injection?

8          Q     BY MR. SMOLKER:  In an interior

9     injection.

10         A     Yes.  For installing the dehydration

11    system, yes.

12         Q     How do you know if enough dust has

13    been injected in an injection hole?

14         A     We put roughly 1 pound per 1,000

15    feet of wall space, and we regulate that by watching

16    product run through the hose --

17              DEPOSITION OFFICER:  Pardon me.  Watching

18    what?

19              THE WITNESS:  By watching the material come

20    through a transparent hose on the equipment.

21         Q     BY MR. SMOLKER:  So do you measure

22    the walls to get the square footage of the wall?

23         A     Pretty much we can do it off of the

24    diagram.

25         Q     So an effort is made --

II-264

1              THE WITNESS:  Not really.

2              Q       BY MR. SMOLKER:  Is there excess

3     dust in there, or is all the dust --

4              A       Oh, sir, I wouldn't be able to tell

5     you unless I could see through a wall, which I can't.

6              Q       So you don't know if there's excess

7     dust?

8              A       No, sir, I do not.

9              Q       You've just been told that the dust

10    goes in and clings to the members, and that's as far

11    as you know about the dust inside the wall voids?

12             A       Yes, sir.

13             Q       Has anybody told you that there's an

14    ideal spacing between the injection points that you

15    should make when you're injecting the dust into a

16    wall such as a wall shown on figure 6?

17             A       We go approximately 4 feet, if

18    possible, depending on the wood in the structure.

19             Q       That's what you've been told to do?

20             A       Yes.

21             Q       Okay.  Have you been told to make

22    two holes and inject the dust in one hole and see if

23    it comes out the other hole?

24             A       No.

25             Q       Now, are you aware like taking

                        II-268

BARKLEY

1    figure 6, which is in front of you, sheet 4 --

2          A      4-13?

3          Q      4-13.  See those vertical members,

4    wood members?

5          A      Yes.

6          Q      Do you have a name for them?

7          A      Those are studs.

8          Q      Studs.

9                 Are you familiar with what's the

10   normal spacing between studs in a residence?

11         A      16 inches on center.

12         Q      Which means that if you went to the

13   center of a stud and then the center of the stud next

14   to it, the two centers would be 16 inches apart?

15         A      Yes.

16         Q      And that's the normal configuration

17   of studs in a residence wall?

18         A      Yes.

19         Q      Okay.  So if you did your normal

20   goal for holes of being 4 feet apart, then you would

21   be covering a couple of studs; right?

22         A      Yes.

23                MR. YARDUMIAN:  Objection.  It's an

24   incomplete hypothetical.

25         Q      BY MR. SMOLKER:  Did you understand

                        II-269



1   the hypothetical?

2         MR. YARDUMIAN:   That's why it's incomplete.

3   I don't think one could.   You said if there's a wall

4   and you go 4 feet to 4 feet, you would somehow cover

5   a stud.

6         MR. SMOLKER:   No.

7         Q     Did you understand the hypothetical?

8         A     That's how I understood it being,

9   that at 4-foot intervals, you would cover so much

10  wall space for each injection point.

11        Q     Right.   And in that wall space there

12  would be several studs, because the studs are

13  16 inches apart, and 4 feet is 48 inches.

14        A     Correct.

15        Q     So every 16 inches, if things were

16  normal, there would be a stud?

17        A     Correct.

18        Q     So if you went 48, you'd have at

19  least two studs between the hole?

20        A     Correct.

21        Q     Or more.   Three studs.

22        A     Three 16s are 48.

23        Q     Yeah.   So when you do your holes,

24  it's covering the space of three studs if you do it

25  4 feet apart?



1          A          Correct.

2          Q          So, in other words, for the dust to

3   get to one of those studs, it would have to pass by a

4   stud that stands between it and the hole; right?

5          MR. YARDUMIAN:  Objection.  I think this is

6   probably going beyond the scope of this witness'

7   testimony.  He's here to testify about the

8   application and his knowledge about that process

9   here.  You're now asking about the patent and how it

10  conceivably works.

11         MR. SMOLKER:  No.

12         MR. YARDUMIAN:  He's not here to testify as

13  an expert.  He's not here to testify about the

14  process, other than what happened here.

15         MR. SMOLKER:  Right, that's what we're

16  talking about.  I'm not talking about the patent.

17  I'm talking about the process.

18         Q          His process is -- as I understand

19  it, you have a goal to put the holes 4 feet apart;

20  right?

21         A          Correct.

22         Q          And you understand when you put

23  holes 4 feet apart, that in between those two holes

24  would be several studs in a wall; correct?

25         A          Correct.

II-271

1          Q       And we're now talking about his

2    understanding that the dust clings to the studs.

3              It's your understanding that the

4    dust clings to the studs, isn't it?

5          A       Correct.

6          Q       And isn't it your understanding that

7    in order to cling to the studs, the dust would have

8    to get past one of the studs in between the two

9    holes?

10         A       That would make sense, yes.

11         MR. SMOLKER:  Okay.  Off the record.

12         THE VIDEOGRAPHER:  Thank you.  We're going

13   off the record.  The time is 3:16.

14             (A brief discussion was held off the

15             record.)

16         THE VIDEOGRAPHER:  We're back on the

17   record.  The time is 3:25.

18         Q       BY MR. SMOLKER:  Corey, when you

19   make these holes and apply the dust into the holes,

20   do you use nozzles such as shown in figure 7 and

21   figure 8 below figure 6?

22         A       Yes.

23         Q       Okay.  And when you -- is it fair to

24   say you shoot this dust through the nozzle which goes

25   into the hole and then into the void behind it?

II-272

BARKLEY

1    the hose reel, I believe.

2              Q         So you have another gauge on the

3    hose?

4         A      Right, correct.

5         Q         And you set that gauge at 125 pounds

6    also?

7         A      Correct.

8         Q         And it's your understanding when

9    you're done setting these two gauges, that the

10   pressure coming off the compressor and the pressure

11   going through the hose and coming through the nozzle

12   is 125 pounds per square inch?

13        A      Yes.

14        Q      Okay.  And is it your understanding

15   that once the dust gets inside the void behind the

16   hole that it spreads out?

17        A      Yes.

18        Q      That it spreads out in such a way

19   that it covers all the studs that are in the void?

20        A      Yes.

21        Q      And is it your understanding that

22   somehow it gets through the -- through some space

23   between studs so that it can also cover the middle

24   stud?

25        A      Yes.

                         II-274



1           MR. YARDUMIAN:  Objection.  It calls for

2   speculation, lacks foundation.

3           Q       BY MR. SMOLKER:  And you got that

4   because that's what you were told is the way your

5   process works?

6           A       Yes.

7           Q       Did Wayne Morris tell you that?

8           A       Yes.

9           Q       Wayne Morris, the inventor of the

10  process?

11          A       Yes.

12          Q       We've been talking about a typical

13  application and a typical wall in a residence such as

14  in my condominium; right?

15          A       Yes.

16          Q       In my condominium in these walls

17  like in the living room, would there be any reason

18  why you would put the silica gel in at less than

19  125 pounds?

20          A       In the wall voids, no.

21          Q       Would there be any reason, for

22  example, why you might run it in my living room at as

23  low as 10 or 20 pounds per square inch?

24          A       No.

25          MR. YARDUMIAN:  Again, your question dealt

II-275



1    with the wall voids; correct?

2            MR. SMOLKER:  The wall voids in my living

3    room and inside my condominium.

4            Q      Did you understand that?

5            A      Yes.

6            Q      Was that what you were answering?

7            A      Yes.

8            Q      Would there be any reason why you

9    would run it as low as 40 or 50 pounds per square

10   inch?

11           A      No.

12           Q      Do you know of any reason why you

13   would run it at less pressure than 125 pounds per

14   square inch?

15           A      No.

16           Q      Now, typically when you're doing

17   this -- and by "this" I mean injecting the silica

18   dust into wall voids in a condominium such as this

19   building -- do you have somebody on the opposite side

20   of a wall seeing if the dust is coming through the

21   opposite side of the wall that you're injecting it

22   into?

23           A      No.

24           Q      And on this project did you have

25   anybody on the opposite side of any walls while there

BARKLEY

1    were injections being made to see if the dust was

2    coming through the other side of the wall?

3            A      Not to my knowledge, no.

4            Q      Do you agree with this statement

5    with respect to applying the dust in walls in my

6    condominium:  If the dust being injected utilizing

7    the spray gun does not escape through an adjacent

8    access aperture, then the spacing of access apertures

9    is not sufficiently close?

10           MR. YARDUMIAN:  Do you understand the

11   question?

12           THE WITNESS:  Not really.

13           Q      BY MR. SMOLKER:  Okay.  Do you know

14   what an aperture is?

15           A      I imagine that's --

16           MR. YARDUMIAN:  He's asking you if you know

17   what it is.

18           THE WITNESS:  No.

19           MR. YARDUMIAN:  Okay.

20           Q      BY MR. SMOLKER:  An aperture means

21   a hole.

22           A      Okay.

23           Q      Access aperture means an injection

24   point.

25           A      Okay.



1          Q       So why don't I change the words

2     around and see if you agree with this statement.

3          A       Okay.

4          Q       If the dust being injected utilizing

5     the spray gun does not escape through an adjacent

6     injection point, then the spacing of the injection

7     points is not sufficiently close?

8          A       No, I wouldn't say that.

9          Q       And as one of the ways of monitoring

10    whether or not you're putting in enough dust, do you

11    check to see if dust comes out of openings that you

12    drilled?

13         MR. YARDUMIAN:  The question's asked and

14    answered.

15         THE WITNESS:  No.

16         Q       BY MR. SMOLKER:  Is your only

17    method for judging whether or not enough dust was

18    applied the 1 pound per 1,000 square foot method?

19         A       Yes.

20         Q       Do you happen to know what chemicals

21    were used to do -- to install the dehydration system

22    at my condo?

23         MR. YARDUMIAN:  Objection.  Misstates the

24    testimony, assumes facts not in evidence.

25         MR. RIDENOUR:  Lacks foundation, also

                        II-278

BARKLEY

1    argumentative.

2              MR. YARDUMIAN:  Join with those.

3         THE WITNESS:  Huh?

4         MR. YARDUMIAN:  You can answer.

5         THE WITNESS:  No chemicals.

6              Q      BY MR. SMOLKER:  So it's your

7    understanding that no chemicals were used when you

8    installed the dehydration system?

9              A      Correct.

10             Q      So is it your understanding that

11   amorphous silica gel is not a chemical?

12             A      Correct.

13             Q      And where did you get that

14   understanding?

15             A      That information was passed on to me

16   through the company.

17             Q      And is it your understanding that

18   Drione is also not a chemical?

19             A      No.

20             Q      What is it, your understanding on

21   Drione?

22             A      Drione is a mixture of silica

23   aerogel, pyrethrins, and some other type of an ether

24   base that I can't pronounce.

25             Q      Okay.  So it's your understanding

II-279

BARKLEY

1   chemicals are currently being used in your

2   dehydration system, but they weren't being used at

3   the time it was applied in my condo?

4           A       Correct.

5           Q       At any time before your deposition,

6   did you ever look at the material safety data sheet

7   for Syloid 244?

8           A       I'm sure I have.

9           Q       But you don't recall?

10          A       No.

11          Q       And are you sure when you looked at

12  it whether or not that was part of the basis upon

13  which you came to the conclusion that Syloid 244 is

14  not a chemical?

15          A       Say that again.

16          Q       Let's start with Syloid 244, is it

17  your understanding that Syloid 244 was being used

18  when you were first hired by Home Saving Termite

19  Control?

20          A       Yes.

21          Q       And is it your understanding that

22  Syloid 244 was being used when the dehydration system

23  was put in my condo?

24          A       Yes.

25          Q       Okay.  And I understand that it's

II-280

BARKLEY

SUB-

EXHIBIT

65

# EXHIBIT 65

1    your understanding that Syloid 244 is not a chemical?

2              A        Correct.

3              Q        And I'm asking, did you come to this

4    understanding in part from reading the material

5    safety data sheet?

6              A        Oh, I'm sure I did, yes.

7              Q        Okay.  And what is your

8    understanding on Dursban?  Is that a chemical, or

9    not?

10             A        Dursban is a chemical, yes, sir.

11             Q        And how did you come to that

12   understanding?

13             A        It's a chemical product.

14             Q        Who told you that, or how did you

15   learn that?

16             A        Well, off the label.

17             Q        Did you ever read the label for

18   Syloid 244?

19             A        I'm sure I did, yes.

20             Q        Could you tell from reading the

21   label whether or not it was a chemical?

22             A        I believe that's listed as a mineral

23   product.

24             Q        On the label?

25             A        Possibly.  I couldn't even say for

II-281

BARKLEY

Exhibit "65."

A copy of the attached deposition transcript of the deposition testimony of Mr. Greg Adams, Structural Pest Control Board Specialist, State of California, regarding the customary application of silica gel-based pesticides, Home Saving Termite Control's illegal use of Syloid 244 as a pesticide, and toxicity of Syloid 244, was filed in Los Angeles Superior court case BC173952 on or about November 6, 2000 in opposition to pending motions for Summary Judgment and Summary Adjudication of Issues.

## Summary of Testimony of Mr. Greg Adams

Mr. Adams had spent 22 years in the pest control industry, before beginning to work as a Structural Pest Control Board Specialist. In the four years Mr. Adams had been with the Structural Pest Control Board he has investigated about 450 cases.

Mr. Adams testified: TERMITE CONTROL'S process doesn't work, doesn't kill termite colonies in wood.

If you apply SYLOID 244 inside a wall void it only sticks to the outside of the wood inside the walls, it won't have any adverse effect on any termites that are inside the wood.

It is likely there will be holes and cracks in a wall from which a dust being injected into the wall void will come back out into the living space.

In most wooden building structures, there are cracks and holes.

Mr. Adams inspected Appellant's condominium unit. During his inspection Mr. Adams saw holes drilled but not patched.

Mr. Adams testified: If you were to put SYLOID 244 powder in the walls under pressure, all those holes are a spot where the product would come through back into the home.

Mr. Adams also testified: It is common for there to be potential spots (holes and cracks) in walls that pesticide dust will come out of if pesticide dust was injected into a wall void under pressure.

When insecticide powders are applied into wall voids, once the powder is in the wall void it will settle to the bottom of the void and coat the bottom of the void from side to side.

Using a normal vacuum to suck up the dust/that comes back in the living space during and after SYLOID 244 is blown under pressure into wall voids could make things worse.

Normal vacuums, "recycle their own air."

Sometimes you would suck up dust particles that would go right through the filters of the vacuum and come right out the exhaust side of the vacuum back into the living space.

While Mr. Adams was investigating TERMITE CONTROL'S use of SYLOID 244, Mr. Adams contacted Grace Davidson: "I asked them if this product was registered with the E.P.A. as a pesticide." They said, "No, it wasn't."

Mr. Adams was interested in the EPA number on the Material Safety Data Sheet Home Saving. Termite control passed out to the public. Termite Control's Material Safety Data Sheet States: in parentheses, E.P.A. registration number 034700MD001. However, this product is not registered with the E.P.A.

Food and Agriculture Code Section 12972 provides, "The use of any pesticide by any person shall be in such a manner as to prevent substantial drift to nontarget areas." Mr. Adams was interested in whether TERMITE CONTROL provided any DRAFT PROTECTION to prevent drift of pesticide to a non-target area while applying SYLOID 244 in residential structures.

Mr. Adams asked Mr. Morris how TERMITE CONTROL made sure the SYLOID 244 applied under pressure, filled up the wall voids between studs: Mr. Morris replied: "Well, we drill a hole and then we drill the next hole. And then as we inject the first hole, we look to see if the material comes out the second hole, then we know it's made its way through those voids."

Mr. Adams testified that the "Inspection Report" provided by TERMITE CONTROL to the residents of the condominiums complex where APPELLANT lived did not contain the name of the pesticide to be applied in the condominium complex by TERMITE CONTROL which the Structural Pest Control Act requires, "It doesn't specifically name the name of the product."

Business and Professions code 8583 specifies that the name of the actual product must be disclosed. By law, pesticide operators are required to give preapplication notice of what products are going to be used before they make a pesticide application.

"If a structural pest control company performed a pesticide application prior to issuing the 8538 notice, that company would be in violation of Business and Professions code 8538."

It is part of Mr. Adam's job to write up a notice of violation if a licensed pest control operator performs a pesticide application without giving the notice required by 8538 before a pesticide was applied.

Mr. Adams also testified that TERMITE CONTROL and GRACE did not comply with Department of Pesticide Regulation requirements that pesticide labels contain directions for use. Mr. Adams saw bags of SYLOID 244, purchased from GRACE, which did not contain instructions for use when he inspected TERMITE CONROL'S facility.

Admas took photographs of bags of SYLOID 244 he saw at TERMITE CONTROL'S facility to document the point that he saw TERMITE and GRACE did not have an approved pesticide label for the SYLOID 244 pesticide being used by TERMITE CONTROL as a pesticide to kill termites.

During his investigation of TERMITE CONTROL Mr. Adams concluded the number that Home Savings was saying was an E.P.A. registration number on the Home Saving Material Safety Data

Sheet was not on E.P.A registration number. SYLOID 244 was not approved for use as a pesticide by the E.P.A..

TERITE CONTROL was using an unregistered pesticide, and actually provided information to the consumers that would lead them to believe, the pesticide product it was using was a registered pesticide.

Mr. Adams further testified: Is against the law to use a pesticide for which no specimen label exists. No specimen label existed for SYLOID 244.

The Food and Ag. Code requires that a pest control service vehicle that stores or transports pesticides for use maintain a specimen label book of labels that are not obliterated and clearly legible so that the service technician and emergency response people will have access to those labels for reference.

If the vehicle is involved in an accident, emergency response personnel have to have access to a label book with a list of pesticides in the vehicle–like a bill of lading of the products on that vehicle. A pesticide label will provide emergency spill cleanup information.

Emergency response people need information, "regarding the environment, personal protection, firefighting requirements, spill control requirements, medical information and things like that" provided in a Material Safety Data Sheet, that's produced by the manufacturer.

Mr. Adams was interested in finding out how long TERMITE CONTROL had been using SYLOID 244 purchased from GRACE as a pesticide.

On December 16, 1996, Mr. Wayne Morris- the owner of TERMITE CONTROL-told Mr. Adams; TERMITE CONTROL had been purchasing SYLOID 244 for use as a pesticide for a couple of years prior to December 16, 1996 from GRACE.

Mr. Adams wrote-up and issued a "NOTICE OF VIOLATION" specifying violations he found on December 16, 1996 while inspecting TERMITE CONTROL'S headquarters and storage facility.

Mr. Adams delivered the "Notice of Violation he had written to TERMITE CONTROL for violation of Business and Professions code sections 8646 and 8647 on December 16, 1966.

An 8646 violation is written for a disregard and violation of pesticide application, fumigation or extermination laws of the State of California.

A B& P Code 8647 violation is written for failure to comply in the sale or use of insecticides with the provision's of Chapter 2, commencing with section 12751 of Division 7 of the Food and Ag. Code.

Mr. Adams further testified, "The purpose of my notice of violation was to let him know that we allege that he was using an unregistered economic poison. A second purpose of my notice was to order him to cease and desist the use of it."

Mr. Adams was aware at his deposition that Mr. Wayne Morris and TERMITE CONTROL had previously ignored CEAST and DESIST orders.

Maureen Sharp was the Deputy Registrar of the Structural Pest Control Board and the supervisor of the enforcement unit of the Structural Pest Control Board. She had the authority to order Wayne Morris and Home Saving Termite Control to Cease and desist false advertising. By letter dated March 16, 1993 (Exhibit 69) Ms. Sharp ordered Wayne Morris and Home Saving Termite Control to immediately stop making the false advertising statement that silica gel is a "non-chemical product." She advised Mr. Morris; Silica gel is a pesticide chemical and that is exactly why it is required to be registered with the United States Environmental Protection Agency and the State of California Department of Pesticide Regulation before being use as a pesticide.

Upon receipt of that order Mr. Morris was required by law to cease and decist representing that silica gel is a non-chemical product.

B & P code 8646.5 provides that upon receiving a notice of noncompliance, "the licensee or registered company shall discontinue such pest control work until the procedure is brought into compliance."

## IN CONCLUSION

Mr. Adams found fault with TERMITE CONTROL'S application of SYLOID 244 in Appellant's home.

1. TERMITE CONTROL used an unregistered product.
2. It was inevitable that the product applied would migrate into a nontarget area, the living space in Appellant's home where people would come into contact with it.

A copy of the attached deposition transcript of the deposition testimony of Mr. Greg Adams, Structural Pest Control Board Specialist, state of California, regarding the customary application of silica gel-based pesticides, Home Saving Termite Control's illegal use of Syloid 244 as a pesticide, and toxicity of Syloid 244, was filed in Los Angeles Superior court case BC173952 on or about November 6, 2000 in opposition to pending motions for Summary Judgment and Summary Adjudication of Issues.

## Summary of Testimony of Mr. Greg Adams

Mr. Adams had spent 22 years in the pest control industry, before beginning to work at a Structural Pest Control Board Specialist. In the four years Mr. Adams had been with the Structural Pest central Board he has investigated about 450 cases.

Mr. Adams testified: TERMITE CONTROL'S process doesn't work, doesn't kill termite colonies in wood.

If you apply SYLOID 244 inside a wall void it only sticks to the outside of the wood inside the walls, it won't have any adverse effect on any termites that are inside the wood.

It is likely there will be holes and cracks in a wall from which a dust being injected into the wall void will come back out into the living space.

In most wooden building structures, there are cracks and holes.

Mr. Adams inspected Appellant's condominium unit. During his inspection Mr. Adams saw holes drilled but not patched.

Mr. Adams testified: If you were to put SYLOID 244 powder in the walls under pressure, all those holes are a spot where the product would come through.

Mr. Adams also testified: It is common for there to be potential spots (holes and cracks) in walls that pesticide dust will come out of if pesticide dust was injected into a wall void under pressure.

When insecticide powders are applied into wall voids, once the powder is in the wall void it will settle to the bottom of the void and coat the bottom of the void from side to side.

Using a normal vacuum to suck up the dust/that comes back in the living space during and after SYLOID 244 is blown under pressure into wall voids could make things worse.

Normal vacuums, "recycle their own air."

Sometimes you would suck up dust particles that would go right through the filters of the vacuum and come right out the exhaust side of the vacuum back into the living space.

While Mr. Adams was investigating TERMITE CONTROL'S use of SYLOID 244, Mr. Adams contacted Grace Davidson: "I asked them if this product was registered with the E.P.A. as a pesticide." They said, "No, it wasn't."

Mr. Adams was interested in the EPA number on the Material Safety Data Sheet Home Saving. Termite control passed out to the public  Termite Control's Material Safety Data SHeet States: in parentheses, E.P.A. registration number 034700MD001. However, this product is not registered with the E.P.A.

Food and Agriculture Code Section 12972 provides, "The use of any pesticide by any person shall be in such a manner as to prevent substantial drift to nontarget areas." Mr. Adams was interested in whether TERMITE CONTROL provided any DRAFT PROTECTION while applying SYLOID 244 in residential structures. Mr. Adams asked Mr. Morris how TERMITE CONTROL made sure the SYLOID 244 applied under pressure, filled up the wall voids between studs: Mr. Morris replied: "Well, we drill a hole and then we drill the next hole. And then as we inject the first hole, we look to see if the material comes out the second hole, then we know it's made its way through those voids."

Mr. Adams testified that "Inspection Report" provided by TERMITE CONTROL to the residents of the condominiums complex where APPELLANT lived did not contain the kind of information the Structural Pest Control Act requires, "It doesn't specifically name the name of the product."

Business and Professions code 8583 specifies that the name of the actual product must be disclosed. By law, pesticide operators are required to give preapplication notice of what products are going to be used before they make a pesticide application.

"If a structural pest control company performed a pesticide application prior to issuing the 8538 notice, that company would be in violation of Business and Professions code 8538."

It is part of Mr. Adam's job to write up a notice of violation if a licensed pest control operator performs a pesticide application without giving the notice required by 8538 before the pesticide was applied.

Mr. Adams also testified that TERMITE CONTROL and GRACE did not comply with Department of Pesticide Regulation requirements that pesticide labels contain directions for use. Mr. Adams saw bags of SYLOID 244, purchased from GRACE, did not contain instructions for use.

Admas took photographs of the bays of SYLOID 244 at TERMITE CONTROL'S facility to document the point that he saw TERMITE and GRACE did not have an approved pesticide label for SYLOID 244 being used by TERMITE CONTROL as a pesticide to kill termites.

The number that Home Savings was saying was an E.P.A. registration number on the Home Saving Material Safety Data Sheet was not on E.P.A registration number. SYLOID 244 was not approved for sure as a pesticide by the E.P.A..

Termite control was using an unregistered pesticide, and actually provided information to the consumers that would lead them to believe, the pesticide product it was using was a registered pesticide.

Mr. Adams further testified: Is against the law to use a pesticide for which no specimen label exists. No specimen label existed for SYLOID 244. The Food and Ag. code requires that a pest control service vehicle that stores or transports pesticides for use maintain a specimen label book of labels that are not obliterated and clearly legible so that the service technician has access to those labels for reference.

If the vehicle is involved in an accident, emergency response personnel have to have access to a label book with a list of pesticides in the vehicle–like a bill of lading of the products on that vehicle. A pesticide label will provide emergency spill cleanup information. Emergency response people need to have access to that information.

Emergency response people need information, "regarding the environment, personal protection, firefighting requirements, spill control requirements, medical information and things like that" provided in a Material Safety Data Sheet, that's produced by the manufacturer.

Mr. Adams was interested in finding out how long TERMITE CONTROL had been using SYLOID 244 purchased from GRACE as a pesticide.

On December 16, 1996, Mr. Wayne Morris- the owner of TERMITE CONTROL-told Mr. Adams: that Mr. Adams delivered the "Notice of violation he had written. TERMITE CONTROL had been purchasing SYLOID 244 for use as a pesticide for a couple of years prior to December 16, 1996 from GRACE. Termite control had been using the product TERMITE CONTROL purchased from GRACE in TERMITE CONTROL'S dehydration system for killing termites for years.

Mr. Adams wrote-up and issued a "NOTICE OF VIOLATION" specifying violations he found on December 16, 1996 while inspecting TERMITE CONTROL'S headquarters and storage facility. Mr. Adams delivered the "Notice of violation he had written to TERMITE CONTROL on December 16, 1996 at 10:16 am. for violation of Business and Professions code sections 8646 and 8647.

An 8646 violation is written for a disregard and violation of pesticide application, fumigation on extermination laws of the State of California.

A B& P Code 8647 violation is written for failure to comply in the sale or use of insecticides with the provision's pf Chapter 2, commencing with section 12751 of Division 7 of the Food and Ag. Code.

Mr. Adams further testified, "The purpose of my notice of violation was to let him know that we allege that he was using an unregistered economic poison. A second purpose of my notice was to order him to cease and desist the use of it."

Mr. Adams was aware at his deposition that Mr. Wayne Morris and TERMITE CONTROL ignore CEAST and DESIST orders.

On March 16, 1993 Maureen Sharp was the Deputy of the Structural Pest Control Board and she was the supervisor of the enforcement unit of the Structural Pest Control Board. She had the authority to order Wayne Morris and Home Saving Termite Control to Cease and desist false advertising. By letter dated March 16, 1993 (Exhibit 8) Ms. Sharp ordered Wayne Morris and Home Saving Termite Control to immediately stop making the false advertising statement that silica gel is a "non-chemical product." She advised Mr. Morris; Silica gel is a pesticide chemical and that is exactly why it is required to be registered with the United States Environmental Protection Agency and the State of California Department of Pesticide Regulation before being use as a pesticide. Mr. Adams testified that the purpose of a cease and desist order issued to Mr. Morris/ TERMITE CONTROL was to order him to stop what the Structural Pest Control Board believes to be a legal conduct.

Upon receipt of that order Mr. Morris was required by law to stop.

B & P code 8646.5 provides that upon receiving a notice of noncompliance, "the licensee or registered company shall discontinue such pest control work until the procedure is brought into compliance."

## IN CONCLUSION

Mr. Adams found fault with TERMITE CONTROL'S application of SYLOID 244 in Appellant's home.

1. TERMITE CONTROL used an unregistered product.
2. It was inevitable that the product applied would migrate into a nontarget area, the living space in Appellant's home where people would have the potential to come into contact with it.

1    Incomplete hypothetical.

2         MR. YARDUMIAN:  That means he didn't like the

3    answer.

4         MR. SMOLKER:  I didn't like the question.

5         THE WITNESS:  I'll take back the answer (laughter).

6         Q.    BY MR. YARDUMIAN:  In terms of your

7    experience as a -- strike that.

8              What is your experience as it relates to

9    pest control other than the investigatory experience?

10        A.    I spent 23 years in the pest control

11   industry.

12        Q.    And what did you do?

13        A.    First actually 22 years.  I spent ten years

14   working for a pest control firm, nine years working for one

15   firm, one year working for another firm, halfway in between

16   the ten years, and then I owned and operated my own

17   business for twelve years.

18        MR. SMOLKER:  Pest control business?

19        THE WITNESS:  Yes.  Not all that time in the very

20   beginning was as a licensee.  The company that I started

21   with made you go through the basic training before they'd

22   allow you to get a license.  I think I first got my license

23   in '74 or '75.

24        Q.    BY MR. YARDUMIAN:  What license did you

25   obtain?

                                                    75

1      Q.      BY MR. YARDUMIAN:  When you applied the

2 Dri-Die when you were in the industry working with Fenn,

3 did you use any type of masks or anything such as that?

4      A.      A respirator.

5      Q.      And was that a label requirement?

6      A.      Yes.

7      Q.      And take me through the application process

8 with this duster.  What do you do when you're using this

9 duster and applying this silica gel.

10      MR. SMOLKER:  Is it silica gel or Dri-Die or what?

11      MR. YARDUMIAN:  Dri-Die.

12      MR. SMOLKER:  Do you understand the question?

13      THE WITNESS:  Yes.

14           You would load up the tank on the duster

15 with the product.  You would approximate the size of the

16 attic space in square footage.  The dusters on the average

17 would produce X amount of dust for every minute that they

18 ran, and then you would place the duster up in the attic

19 space with the cord hanging down through the attic space

20 opening, and then you would close the lid on the attic

21 crawl hole with just the cord coming out.

22           And then you would plug the cord in and you

23 would let the duster run and you'd time the amount of time

24 that it ran.  And then you'd unplug it, and then you would

25 wait and let the dust somewhat settle in the attic before

94

1  was your understanding that the custom and practice in the

2  pest control industry back when you were in the industry

3  was that silica dust was indeed used to remediate pests

4  inside of wall voids, correct?

5       A.    If you apply it inside of a wall void and it

6  only sticks to the outside of the wood inside the walls, it

7  won't have any adverse effect on any termites that are

8  inside the wood unless you put the product inside the wood.

9       Q.    Okay.  I understand.

10      MS. GREY:  Can I make one request?  Could you read

11  that answer again?

12            (Record read.)

13      THE WITNESS:  Does that make sense?

14      Q.    BY MR. YARDUMIAN:  It does.  So if you have

15  termites inside, for example, a 2-by-4, you're going to

16  have to inject into the area of the wood they occupy?

17      A.    Right, inside the termite galleries.  Now,

18  there are times when you can drill a piece of wood and you

19  don't actually drill into a termite gallery and you put the

20  product inside that drill hole.  And at one point in time

21  it's possible for the termites to cross paths with that

22  product by, you know, boring a gallery through that spot

23  and then coming in contact with the product.

24      Q.    And in that type of situation, that's more

25  of a preventive type?

99

1    A.    No.    Actually, it's remedial treatment.
2  It's what they call a drill and treat.    It's a remedial
3  treatment.
4          But the best way to apply the chemical is
5  inside the galleries.    Sometimes when you drill the wood,
6  you can tell that you've crossed paths with one of those
7  galleries.
8    Q.    How is that?
9    A.    As you're drilling through the wood, you can
10  feel that you're drilling solid wood.    And then all of a
11  sudden, the drill bit will jump like it moved right through
12  a hollow spot inside the wood.    And then sometimes it's
13  possible to drill through a gallery and not know that you
14  drilled through a gallery.
15          So, normally, when you perform a drill and
16  treat, you do a systematic drilling of the entire piece of
17  wood that you intend to treat or you'll drill a series of
18  holes across the width of the board at regular intervals
19  and then you'll treat every hole that you've drilled.
20    Q.    When you say you treat every hole that you
21  drill, how do you go about that type of treatment with a
22  silica gel product?
23    A.    They have what they call duster bulbs which
24  are round, rubber bulbs that have a top to them that screws
25  on.    And out of that top comes a small pipe that's probably

100

1    about three-sixteenths of an inch in diameter that comes

2    down to a point that has about an eighth inch hole in the

3    point.

4                And then you load that bulb with the dust.

5    And when you simply squeeze the bulb, it forces the powder

6    out the end of the pipe.

7                So you place the end of the pipe on the hole

8    that you have drilled and then you squeeze the bulb and it

9    shoots the powder into the hole.

10        Q.        And hopefully into the gallery?

11        A.        And hopefully into the gallery.

12        Q.        And was that the manner by which you would

13    remediate termites with silica gel while you were in the

14    business of pest control?

15        MR. SMOLKER:  Objection.  Misquotes his prior

16    answer.  He said he used Dri-Die.  He didn't say he used

17    silica gel.

18        THE WITNESS:  I would have caught that one.

19                Dri-Die.

20        Q.        BY MR. YARDUMIAN:  Okay.

21        A.        The only time that I used Dri-Die was as a

22    preventive treatment.

23        Q.        Okay.  So you did not use a Dri-Die product

24    as a remediating treatment of termites when you were with

25    Fenn; is that accurate?

                                                        101

1   just ventilated up into the attic space.  And there wasn't

2   really like a fan or anything in there.  It was just a hood

3   over the stove with a hole with a screen on it going

4   through to the attic space.

5               And just the hot air rising from the stove

6   would take whatever it is up into the attic space.

7               So on the older homes, you look for things

8   like that.  And then, you know, if you had to, you would

9   just put some black paper over the opening.

10          Q.      BY MR. YARDUMIAN:  And why would you do

11  that?

12          A.      So that any dust that you applied in the

13  attic space would not come down into the living space.

14          Q.      On any occasion, to the best of your

15  recollection, while you were applying Dri-Die with Fenn,

16  did any of the dust enter the living space?

17          A.      No.

18          Q.      You described for us this white substance

19  you saw near the sliding glass door at the Smolker

20  property.  Did you ever see any type of dust residue or

21  anything like that in any of the properties inside of a

22  home where you had applied Dri-Die while you were with

23  Fenn?

24          A.      No.

25          Q.      While you were with Fenn, did you ever apply

                                                        107

1    Dri-Die into wall voids as a preventive measure?

2          A.    No.

3          Q.    Is there any reason why you didn't do it

4    that way?

5          A.    As a company, we just didn't do that.

6          Q.    And no reason that --

7          A.    Now, as a preventive measure for?

8          Q.    Pests.

9          MR. SMOLKER:  In pests, you're including termites.

10         Q.    BY MR. YARDUMIAN:  I think it's included.

11         A.    I don't think I used Dri-Die inside of walls

12    to mitigate pests.  But I have used dusts -- other

13    pesticide dust products inside of walls to control pests.

14         Q.    As a preventive measure?

15         A.    As a remedial treatment.

16         Q.    And did you do that with Fenn?

17         A.    Yes.

18         Q.    And on those occasions in which you used a

19    dust as a remedial treatment inside of the wall voids, did

20    you ever have an occasion where any of the dust came into

21    the living space?

22         A.    No.

23         Q.    What was the manner by which you introduced

24    the dust for this remedial treatment?

25         A.    Sometimes you would just simply move the

108

1    escutcheon that covers the hole in the wall where the pest

2    comes out of and stick the bulb duster tip through that

3    hole and apply the dust inside the wall.  And then in some

4    cases we would take electrical outlet covers off the wall

5    and apply the product inside the walls around those areas.

6    And then in areas where you couldn't get into the wall

7    without drilling a hole, we would actually just drill a

8    hole through the drywall in an inconspicuous spot and put

9    the dust inside.

10           Q.    And then again would you use the bulb to

11   inject it through the hole into the drywall?

12           A.    Yes, the bulb duster.  In those cases it was

13   to control -- in those cases, it was while I was doing

14   general pest control for ants, silver fish, crickets,

15   things like that.

16           Q.    As I understand it, when you're using a

17   light switch plate and you were to inject it, this dust

18   into the wall void, you would be taking off the switch

19   plate cover, getting your duster with the bulb, and

20   injecting into the wall void; is that right?

21           A.    You would -- if you took that wall cover

22   off, inside there you'll find an electrical box that's a

23   little bit smaller than the hole cut in the drywall that

24   covers it.  And you would put your -- the duster tip

25   between the electrical box and the drywall itself to gain

109

1   access into the void of the wall.

2         Q.      And then you use the bulb.  And what do you

3   do?  Just squeeze it?

4         A.      You just squeeze it a couple of times.

5         Q.      Is there any other pressure other than what

6   you're squeezing out of the volume of the bulb?

7         A.      No.

8         Q.      And as you understand it, when you would

9   inject the dust into the void, the dust would then go into

10  the channel or wherever it could go and attach to either

11  the drywall or to the wood member; is that right?

12        A.      In most cases when you dust inside of a wall

13  void like that in a general pest control treatment, it's to

14  control the pests that are normally entering the building

15  at the bottom or coming out of the wall around the

16  electrical outlet, so some of the dust would adhere around

17  the point of injection.  Most of it would fall to the

18  bottom and coat the bottom between the studs.

19        Q.      And in construction in California, it's not

20  unusual to just have gypsum drywall in the interior of a

21  home, correct?

22        A.      Correct.

23        Q.      And that is going to abut against some type

24  of floor surface, right?

25        A.      Correct.

110

1    Q.    So it's either a hard surface or a linoleum

2    or something.  There is going to be an abutment between the

3    drywall and the flooring surface, correct?

4    A.    Correct.

5    Q.    And that is an area from which the pests are

6    able to access either from outside coming in or from inside

7    going up into the wall area, correct?

8    A.    In most cases, the insect's intention is to

9    get inside your house.  So in most cases it's to stop the

10   insects from getting in from the outside.  Or in the case

11   of the electrical switch, it's to stop the insects from

12   coming out of the attic space, walking along the electrical

13   wire, and going into that electrical box and then popping

14   out next to that switch.

15         It would have a -- if you did have an insect

16   inside your house and it ran into the wall with the

17   intention of jumping up inside the wall, then the chemical

18   at the bottom would have an adverse effect on the bug at

19   that point in time?

20   Q.    And have you seen, based on your experience

21   and your background and your education and training,

22   instances where the pests are able to enter into the living

23   space from the interior wall voids at the junction between

24   the floor and the drywall?

25   A.    Yes.

111

1      Q.    Okay.

2      MR. SMOLKER:  Can I just ask him one question you

3  left out?

4              How about the insulation in the wall?  You

5  keep on talking about wall voids.  Don't most walls have

6  insulation in them?

7      MR. YARDUMIAN:  Go ahead.

8      MR. SMOLKER:  Like if you opened up that face

9  plate where the electrical switch was, do you think that

10  there would be insulation in that wall?

11      THE WITNESS:  I would have to say first, I would

12  ask when was the house built.  Because a lot of houses up

13  to a certain point in time were built with no insulation.

14  A lot of those houses have since been insulated, and then

15  at one point in time in construction, from that point on,

16  every single house has insulation in the walls.

17      MR. SMOLKER:  So when we're talking about wall

18  voids, are you excluding all the walls that have insulation

19  in it or are you including the walls that have insulation

20  in there, and by "voids" you're meaning the space between

21  the inside wall and the outside wall?

22      THE WITNESS:  By "voids" I mean the area between

23  the studs, inside the wall, whether or not it has

24  insulation.

25      Q.    BY MR. YARDUMIAN:  And in terms of the

                                                        112

1    junction between the drywall and the flooring, pests would

2    still be able to access the interior of a home underneath

3    the drywall along the flooring even if there was

4    insulation; is that accurate?

5         A.    Yes.

6         MR. SMOLKER:  Could we take a break for a minute or

7    two?

8         MR. YARDUMIAN:  That's fine.

9              (A discussion was held off the record.)

10             (A break was taken in the proceedings.)

11        Q.    BY MR. YARDUMIAN:  Mr. Adams, on those

12   occasions where you had used the dust as an insecticide in

13   the wall voids, had there ever been occasions on which this

14   dust came in through the junction of the floor with the

15   wall?

16        A.    No.

17        Q.    On any occasion in which you had put the

18   dust inside of the wall voids, has there been an occasion

19   where the dust came in from a switch plate?

20        A.    No.

21        Q.    In your history with the Structural Pest

22   Control Board as an investigator, have you had an occasion

23   to investigate silica gel applications?

24        A.    Yes.

25        Q.    What type of investigations have you done in

113

1   business for myself, I took all of my pesticide products

2   over to a buddy of mine who owned a company and said,

3   "Here.  Just take the rest of this stuff and use it up."

4   So he probably still had Ficam.

5          Q.    Ficam is a dust?

6          A.    It's a dust.  It's actually -- it's a powder

7   for a dust.  It can be applied in powder form for it was

8   also manufactured in what they called a wetable powder in

9   that you can put a powder in water suspension and apply it.

10         Q.    And in the powder form, how is it applied?

11  To wall voids?

12         A.    You could apply it to wall voids with the

13  hand dusters.

14         Q.    And how about in the wetable solution?

15         A.    In the wetable solution, you would mix it

16  into like a one-gallon spray can, and then you would apply

17  it as a liquid to surfaces.

18         Q.    Are you aware of any other mechanism by

19  which dusts are applied into wall voids other than the hand

20  duster that you described?

21         MR. SMOLKER:  By the hand duster, do you mean the

22  bulb?

23         THE WITNESS:  The bulb dusters --

24         MR. SMOLKER:  When you used the word "hand duster"

25  before, did you mean to refer to "bulb"?

                                                        119

1      THE WITNESS:  Yes.

2      MR. SMOLKER:  You didn't mean the thing that you

3  shot up into the air 360 degrees and then ran?

4      THE WITNESS:  No.

5          Let's see.  There was a piece of equipment

6  available that was a stainless steel can that you filled up

7  with the powder and it had a hose coming out of it to a --

8  you know, a -- you know, an injector, you know, switch or

9  whatever.  And you actually put air pressure in the can.

10     Q.    BY MR. YARDUMIAN:  Do those stainless cans

11  have a name in the industry?

12     A.    They were manufactured by a company called

13  B and G, and I think they were called press to blow

14  dusters.

15     Q.    And how is the air pressure injected into

16  it, if you know?

17     A.    It's compressed air from an air compressor.

18     MR. SMOLKER:  It's called press to blow what?

19     THE WITNESS:  Press to blow duster.

20          And prior to that, companies actually took

21  old water-filled fire extinguishers that you would unscrew

22  the top off and fill with water, and they would take those

23  old fire extinguishers and fill them up with dust.  And

24  then those old fire extinguishers had a compressed air

25  fitting at the top to pressurize those with and the

                                                    120

1    companies would pressurize those things and spray them out

2    of a fire extinguisher -- spray the dust out of a fire

3    extinguisher hose.

4        Q.    BY MR. YARDUMIAN:  So in terms of this press

5    to blow duster, when you were in the business, was that a

6    common and accepted method of applying dust into wall

7    voids?

8        A.    The press to blow duster was an elaborate

9    version of a bulb duster.  And I purchased one when they

10   first came out with them, and I think I used it maybe two

11   or three times, and then I put it in the storage room and

12   left it.

13       Q.    When you say it's elaborate, what do you

14   mean?

15       A.    A press to blow duster is a pretty simple

16   version of how to apply dust.  It's mechanical.  You

17   squeeze the bulb, the poison comes out.  It works every

18   time.

19           And then B and G came out with this press to

20   blow duster because you could load more dust into it, you

21   could add the compressed air to it, and you could do a lot

22   more treating in probably a shorter period of time.  And

23   the problem was that if the inside of the stainless steel

24   tank got any type of condensation in it at all, even from a

25   hot day setting in the truck, then you'd press the nozzle

                                                        121

1    to inject the dust and it would plug up just like that.

2         Q.    So that the bulb of the press to blow duster

3    would be clogged?

4         A.    Actually, it was the - either it was the

5    pickup tube inside the tank or they had a -- kind of a

6    corkscrew, stretchable hose that was at this length -- was

7    about a foot long when it was collapsed, but it would

8    stretch out to be ten feet long.  So you could leave the

9    tank setting on the ground and walk around with the end.

10             And it was the on and off lever at the end

11   of the hose.  Somewhere along there it would always get

12   plugged.  So --

13        Q.    Okay.  Based on your understanding during

14   this period of time that B and G had come out with a press

15   to blow duster, were there other pest control companies

16   that were using them in the industry to apply dusts into

17   wall voids?

18        A.    I'm sure there were.

19        Q.    And as an investigator with the Structural

20   Pest Control Board, have you come across that practice in

21   the last five years?

22        A.    No.

23        Q.    You're not saying it doesn't exist?  You're

24   just --

25        A.    I've not come across that in that amount of

                                                      122

1   time.  I've been with the board for four years.  And in

2   that amount of time, I think I've investigated about 250

3   cases.  And I've not crossed paths with that.

4         Q.      And in terms of your field inspections,

5   these probationary inspections, those types of things, you

6   have not come across those types of B and G compressed air

7   applications?

8         A.      No.

9         Q.      Can we jump to a document here in Exhibit

10  B --

11        MR. SMOLKER:  Excuse me.  Do you want to know why

12  it happened?  Why it plugged up?  Think about it.

13              The thing absorbs water.  You have

14  condensation.  Of course it absorbs water and it becomes a

15  big ball.  It's self-defeating.

16        Q.      BY MR. YARDUMIAN:  Let me ask you a question

17  in terms of the condensation.  When you experienced the

18  blockage of the press to blow duster, was the --

19        MR. SMOLKER:  Stupid idea.

20        Q.      BY MR. YARDUMIAN:  -- was the device able

21  to -- strike that.  You described some type of blockage

22  with the press to blow duster that you used, right?

23        A.      Uh-huh.

24        Q.      And you indicated there was some

25  condensation that apparently blocked the path for the air

123

1  to push out the dust from the inside tank; is that right?

2      A.    Correct.  Either condensation caused a dirt

3  clod inside the instrument and that plugged the line, or,

4  you know, sometimes I believe that the powder would be

5  forced through the hose so fast and under such pressure

6  that, if the dust started to blow down, then the rest of

7  the dust would catch up with that and it would create a

8  plug in the line.  It would pack the powder itself, even

9  though it was dry.  It would pack the powder in the hose.

10     Q.    And as a result of packing the powder, you

11 were not able to have any dust leave the hose; is that

12 correct?

13     A.    Correct.

14     Q.    Let's look at one of the documents.  I think

15 it's dated June 17 of '97.

16     A.    Uh-huh.

17     Q.    This is a State of California Pesticide

18 Episode Investigation Report.  Do you see that?

19     A.    Yes.

20     Q.    Is this document prepared in your hand?

21     A.    No.

22     Q.    How is it that you would come into

23 possession of this type of a document in connection with

24 your business?

25     A.    As a board specialist?

                                                    124

1   looked at the crack that's been patched, I looked at

2   some holes in the wall that had been drilled and

3   patched, I looked at the upstairs sliding window, I went

4   out on the balcony and looked, I looked at the hole in

5   the ceiling.

6       Q.   During the time of those inspections, did you

7   see any white dust?

8       A.   The only dust I saw was in one of the

9   windowsills.

10      Q.   And that would be near the slider, correct?

11      A.   Correct.

12      Q.   When you say you looked at the holes that had

13  been drilled but not patched, were those only holes on

14  the deck?

15      A.   They were -- I looked -- out on the balcony, I

16  looked at holes that had been patched.  The only holes

17  that I saw that weren't patched were in the hallway, and

18  those were holes that were pointed out to me by

19  Mr. Smolker.

20      Q.   What did you learn as a result of your

21  examination of the window and the crack and the holes

22  and slider, balcony and the hole in the ceiling, if

23  anything?

24      A.   That if you were to put powder in the walls

25  under pressure, that all of those holes were a spot

                                                      275

1    where the product could come through.

2        Q.    They were a potential path, correct?

3        A.    A potential path, right.

4        Q.    And based on your past experience in

5    application of Dri-Die, you had seen similar potential

6    paths where the powder could travel, correct?

7        A.    Correct.

8        Q.    And in those instances, in order to avoid the

9    dust coming into the living space, you simply tried to

10   either fill up the void or patch a crack, those type of

11   things; is that accurate?

12       A.    Correct, or not complete the treatment until

13   those things were corrected.

14       Q.    So based on your background and your education

15   and your experience, if there was a concern that the

16   dust in the voids and in the attic space was migrating

17   into the living space of an occupied unit, one would

18   just need to simply try to block those cracks and those

19   openings from which the dust could come into the living

20   space and resolve that situation?

21       MR. GREY:  Vague.  Ambiguous.  Lacks foundation.

22       Q.    BY MR. YARDUMIAN:  Is that accurate?

23       A.    Yes.

24       Q.    And based on your experience as a pest control

25   operator, if you were to inject Dri-Die or some other

                                                          276

1    registered desiccants into, say, wall voids or the attic

2    space and want to do it so as to preclude the dust from

3    coming into the living space, the effort that you would

4    need to undertake for the Smolker unit would just be to

5    block the hole and fill the cracks and minimize the

6    voids in the wall junctions; is that accurate?

7        A.    Prior to treatment?

8        Q.    Yes.

9        A.    Yes.

10       Q.    And after treatment, if your concern was, from

11   a consumer or a customer, that there was some migration,

12   the repair effort would be to simply try to minimize the

13   paths where it can travel; would that be fair?

14       A.    Yes.

15       Q.    And there would still be a benefit of the dust

16   being inside of the walls, wouldn't there?

17       A.    Yes.

18       Q.    Did you ever speak with Alice Smolker?

19       A.    No.

20       Q.    Ever speak to Alice Graham?

21       A.    No.

22       Q.    Did you ever meet her?

23       A.    The only person I ever met on this particular

24   property was Gary or Mr. Smolker.

25       Q.    Did you ever go to lunch with Gary Smolker?

277

PACESETTER REPORTING  *  (310) 545-8077

1    Q.    When you were applying the Dri-Die, were you

2  ever doing that by injecting it into wall voids, or were

3  you just using chemical desiccants for pest control when

4  you injected it into wall voids?

5    A.    I think the only time I used Dri-Die was as a

6  preventive measure against termites in an attic space.

7  But I have applied insecticide powders to wall voids.

8    Q.    When you're applying the insecticide powders

9  into the wall voids, was it your understanding that the

10  powder would attach to the wood member inside the

11  drywall or behind the drywall?

12    A.    No.

13    Q.    What was your understanding of what that powder

14  would do once it was in the void?

15    A.    That it would settle at the bottom of the void

16  and coat the bottom of the void from side to side and

17  prevent or exterminate or kill any insects that crawl

18  through it inside the wall, for like ants and silverfish

19  and crickets.

20    Q.    Mr. Smolker refers to a Ms. Sanchez,

21  Martha Sanchez, who's with the Department of Pesticide

22  Regulation.

23         Do you know her?  Let me ask you this question:

24  Did you ever contact Ms. Sanchez about Home Saving,

25  A.S.G. or Gary Smolker?

                                                      288

1    children or his wife, just himself.  I know he was

2    concerned.  He expressed a concern, but I don't recall

3    him exactly saying that they were suffering, like, the

4    same symptoms as him.

5         MR. YARDUMIAN:  Let's go off the record a second.

6              (Discussion held off the record.)

7         MR. YARDUMIAN:  Back on the record.

8         Q.   BY MR. YARDUMIAN:  I just want to ask a couple

9    more questions on this D.C.A. letter.  I think it's on

10   page 23.  There's a reference Mr. Smolker makes to holes

11   and cracks and openings which would have been revealed

12   in an inspection.  And I want to ask you a question

13   about your practice in the industry as an operator

14   and/or as a field rep.

15              Was it your experience that, when you were

16   injecting insecticides into the wall voids, that there

17   were always going to be cracks and holes and/or openings

18   that you would encounter in jobs that presented a

19   potential path for that dust?

20        A.   I don't know about always, but it was quite

21   common for you to observe potential spots that, you

22   know, that the product could come back through.

23        Q.   And would it be an appropriate method to

24   attempt to limit the entry of the dust into the living

25   space to apply it into the wall void and look for signs

                                                        290

1  that the dust is encroaching into the living space and

2  to then stop upon determining that the dust would be

3  encroaching into the area?

4      MR. GREY:  Can you read the question back for me,

5  please.

6      MR. YARDUMIAN:  Let me rephrase the question.  It

7  wasn't a very good question.

8      MR. GREY:  Thanks.

9      Q.    BY MR. YARDUMIAN:  Would it be the custom and

10  practice in the industry, when injecting a desiccant

11  into the inner wall void, that the individual operator

12  or an assistant would be monitoring potential cracks or

13  holes or openings from which the desiccant may be

14  entering into the living space?

15      A.    Your question is:  Is it a common practice to

16  have a second person watching?  That's what your

17  question --

18      Q.    My first question is:  Wouldn't you expect, in

19  any living structure, that you're going to likely

20  encounter holes and cracks and voids from which a dust

21  being injected behind the wall may come back into the

22  living space?

23      A.    In most structures, there are cracks and holes

24  and things that are not a result of the construction

25  practice of how they built the building, but there's

                                                    291

1    also some natural construction holes and voids from when

2    they built the building, you know, where the door

3    casings don't meet perfect against the wall and, you

4    know, that's common.

5        Q.    And solely because you have a gap or an

6    opening, that doesn't necessarily mean that a desiccant

7    should not be injected behind the wall; is that right?

8        A.    Right.  It doesn't -- just because you have a

9    crack or a crevice or a hole doesn't mean that a

10    desiccant will come out of it when you apply it.

11        Q.    And in fact, that's why the custom and practice

12    in the industry is that, when injecting with some type

13    of pressure a desiccant into a wall void, that either

14    the operator or the assistant is going to be looking for

15    potential signs that the dust may be coming back into

16    the living space; is that accurate?

17        A.    That's accurate.

18        Q.    And where that is seen, the custom and the

19    practice in the industry is to then stop applying the

20    pressure so that you stop the dust from coming into the

21    nontarget area, right?

22        A.    Correct.

23        Q.    And then the means by which an operator or his

24    crew would typically clean up any encroachment of that

25    dust into the living space is to have either a tack rag,

292

1    a wet rag or something to wipe down the dust; is that

2    accurate?

3          A.    Or a vacuum.

4          Q.    Or a vacuum?

5          A.    Right.

6          Q.    And that would just be a normal vacuum?

7          A.    You know, sometimes a tack rag is better.

8    Sometimes vacuums, you know, they recycle their own air.

9    And sometimes you could probably suck up some dust

10    particles that would go straight through the filters of

11    the vacuum and come right out the exhaust side of the

12    vacuum and back into the living space and probably make

13    it worse.

14          Q.    When you were applying the desiccants into the

15    wall voids --

16          A.    For pest control.

17          Q.    -- for pest control --

18          A.    Okay.

19          Q.    -- was it common to use vacuums after the

20    application?

21          A.    No.

22          Q.    But on occasion, vacuums had been used?

23          A.    Yes.

24          Q.    And on occasions, wet towels or rags had been

25    used?

                                                        293

1  honest, I haven't really read and studied all these

2  letters.

3      Q.   Sure.  I'm just asking if you remember any of

4  these things.

5      A.   And in some cases, you know, I was somewhat put

6  on sensory overload.

7      Q.   What else was included in that letter?

8      A.   A letter addressed to Matt Fredericks,

9  president of Pacific Villas Homeowners Association on

10  Home Saving Termite Control letterhead.

11      Q.   And that referred to the cease and desist?

12      A.   Yes.

13      Q.   Anything else?

14      A.   A letter from Grace Davidson dated March 19th

15  of 1997 addressed to Gary Smolker.

16      Q.   Have you ever spoken to anyone from

17  Grace Davidson about Syloid 244?

18      A.   It seems to me that, as part of the cease and

19  desist case, I contacted Grace Davidson.  And I think

20  around the same time that I asked for them to fax me the

21  MSDS sheet, Material Safety Data Sheet, I asked them if

22  this product was registered with the E.P.A. as a

23  pesticide.

24      Q.   What did they say?

25      A.   No, it wasn't.

                                                    300

1    Q.    Who did you speak to?

2    A.    I don't recall.

3    Q.    What, if anything, was your response to that

4    statement by them?

5    A.    I had no response to the person on the phone.

6    Q.    Did you do anything in furtherance -- strike

7    that.

8         Did you do anything after speaking with Grace

9    and learning that the product was not registered as a

10   pesticide?

11   A.    Actually, I think at that point in time, I

12   already knew it.  That just confirmed that Grace

13   Davidson acknowledged that it wasn't a registered

14   product.

15        I think around the same time I asked -- is it

16   okay if I add?

17   Q.    Yeah.

18   A.    There was a number on the Material Safety

19   Data Sheet that was produced by Home Saving with the

20   Home Saving -- the reason why I called them was because,

21   on the Home Saving -- besides I knew it wasn't, I also

22   had a question about the Material Safety Data Sheet that

23   had the Home Saving's letterhead on it or, you know,

24   logo and that.  And I had a copy and I had them fax me a

25   copy of the Grace Davidson MSDS sheet.  And then I

                                                    301

1  compared the two of them together.

2  And they're similar pretty much in all

3  respects, with the exception that on the Home Saving's

4  one under E.P.A. on page 4 of 4 -- on the Home Saving

5  one it says, "This product contains toxic chemicals in

6  excess of the applicable de minimis concentration as

7  specified under some insignia, 313 of title 3SARA."  And

8  then in parentheses, it's been added E.P.A. registration

9  number 034700MD001.

10  And then I asked Grace Davidson, "Is this

11  product registered with the E.P.A.?"  And they told me,

12  "No."

13  And then I gave them that number, and if I

14  recall, they told me that number was a manufacturer's

15  origination number; that that indicates what plant in

16  what state produced that product.  I also wanted to know

17  what that number was.

18  Q.  Did you have any notes which indicated their

19  response?

20  A.  Do I have any notes?

21  Q.  Yes.

22  A.  I'm sure I probably do.

23  Q.  Are they in this file?

24  A.  No.

25  Q.  What file would that be?

302

1   led you to believe that the Dursban T.C. had been

2   applied improperly for the Pacific Villas Homeowner's

3   Association; is that accurate?

4       A.   Yes.

5       Q.   Same question as it relates to the application

6   of the amorphous silica gel.  Based on what you saw and

7   your investigation, did you see -- did you form an

8   opinion as to whether or not the amorphous silica gel

9   was applied properly where you saw it at the unit?

10      MR. SMOLKER:  Objection.  Compound.  Complex.

11  Vague.

12      THE WITNESS:  The only question that I had with

13  regard to the actual application of the product that was

14  applied in Smolker's unit and out in the holes that I

15  observed in the hallway would be that the intent of

16  applying that product is to put it in the voids between

17  all of the studs of the walls and ceilings.  And in most

18  cases, studs are built on 16-inch centers.

19          In other words, there's 16 inches from the

20  center of one stud to the next stud, which creates about

21  a 14-inch void or hollow space between the sides of the

22  studs inside of the wall.

23          And when you drill the holes in the wall on

24  4-foot intervals and your intent is to apply that

25  product between every stud, you're drilling into one

424

1   stud bey, and then four feet over you're drilling into

2   another stud bey, but there's two stud beys in between

3   that you're not actually drilling into.

4          And when I had a discussion, I think, with

5   Wayne on that December 16th visit, I questioned him

6   about that method of applying the product.  And he

7   explained to me that even though you don't drill between

8   every void, the fact that he's putting the product in

9   under such high pressure and that the product is such a

10  fine material that it will work its way around those

11  studs and get into those voids in between the holes.

12         And it's true that the wall material that

13  covers the studs on the inside and the outside doesn't

14  always fit tight right up against the edge of the stud,

15  and there will be openings in between the wall covering

16  material and some of the studs that that material could

17  pass through.

18         And Wayne said -- and I said, "Well, how do you

19  assure yourself that when you're putting the product in

20  this one hole that it's actually getting over those stud

21  beys to that other hole?"

22         And he said, "Well, we drill a hole and then we

23  drill the next hole.  And then as we inject the first

24  hole, we look to see if the material comes out the

25  second hole.  If the material comes out the second hole,

425

1    then we know it's made its way through those voids."

2          And then I guess at one point if you decided

3    that it wasn't getting over there to that other void,

4    then you probably would drill some more holes in between

5    your 4-foot holes.

6    Q.    BY MR. YARDUMIAN:  This was a conversation with

7    Morris on December 16th, '96?

8    A.    Yes, yes.

9    Q.    Did you inquire with him specifically as to

10   whether they used that method at the Pacific Villas

11   Homeowner's Association?

12   A.    I was not aware of the Pacific Villas problem

13   on December 16.

14   Q.    Do you have any information as you sit here

15   today that that method was used at the Pacific Villas

16   Homeowner's Association?

17   A.    Other than I saw the four-foot holes on

18   centers.  And then I think in his termite inspection

19   reports, I think he somewhat describes -- or in some

20   material that's provided to the consumer, I think he

21   describes somewhat what I've just said.

22   Q.    Anything else?

23   A.    Yeah, because he gives some samples of what

24   size holes they're going to drill and kind of describes

25   pneumatic, electrostatic and stuff like that.

                                                    426

1     Q.   Is there anything else that leads you to

2     believe that that process was undertaken at the Pacific

3     Villas Homeowner's Association?

4     A.   Other than I think his process is also patented

5     and he describes that he will use his patented process

6     on the structures.  I would assume that that's how he

7     would apply it.  He would comply with his own patent,

8     his own patented process.

9          MR. YARDUMIAN:  Let's take a break for a moment.

10         (Recess taken.)

11         MR. YARDUMIAN:  Back on the record.

12    Q.   BY MR. YARDUMIAN:  I have some additional

13    questions.  I think I'm wrapping up.

14         Did you ever interview, either in person or

15    telephonically, any other residents, tenants or

16    homeowners in the Pacific Villas Homeowner's Association

17    besides Gary?

18    A.   No.

19    Q.   Did you ever speak with his wife?

20    A.   No.

21    Q.   Are there any materials that you recall

22    Gary Smolker forwarding to you that do not, to the best

23    of your knowledge, make up any part of your file?

24    A.   No.

25         You know, go back to that question about his

                                                    427

1    done, no.

2    Q.    So it's your understanding that none of his

3    product comes into living space, it's just a part of his

4    process?

5    MR. YARDUMIAN:  Objection.  It's vague as to time.

6    It calls for speculation.  It lacks foundation.  Calls

7    for expert opinions.

8    THE WITNESS:  As part of the installation process,

9    you would look to see if there were escape routes that

10   that product could take to where it would end up in the

11   living space or the exterior or a nontarget area.  And

12   you would address those issues prior to the installation

13   of the product.  Then you would install the product.

14   And if you had addressed those issues and

15   installed the product and it was done properly, then

16   there wouldn't be a concern of prolonged exposure in the

17   living space of the product, because ideally the product

18   wouldn't get into the living space.

19   Q.    BY MR. SMOLKER:  Is it your understanding from

20   Mr. Morris' explanation that none of the product comes

21   into the living space during the application of the

22   product?

23   MR. YARDUMIAN:  Objection.  Calls for speculation.

24   It's an incomplete hypothetical and it's vague.

25   THE WITNESS:  It's my understanding, with my

613

1      A.    I don't know if it is in an older inspection
2   report or a newer inspection report, but there's
3   reference to visually inspecting the building for all
4   potential avenues of escape of the product.  And then
5   that those escape routes would have to be addressed by
6   caulking and sealing before the process could take
7   place.
8      Q.    And do you have -- you want to look at that
9   first?
10     A.    Well, I'm wondering when we're going to get
11  back to it.
12     Q.    We are on it.  We're now talking about
13  prolonged exposure into living space.  We're going into
14  that in detail.  We're going into whether or not if it
15  got in and how much it got in and what you would have to
16  do to make sure none got in or -- that's where we are
17  now, page 10 of that claim.  It's a claim.  They're
18  claiming that how and where the silica aerogel is
19  installed in a structure, there's no danger of prolonged
20  exposure inside the living space after installation is
21  completed.
22         Is it your understanding that the Home Saving
23  Termite Control people seal off or cover or block
24  electrical outlets between the two holes?
25     A.    I don't know.

                                                        616

1      Q.   Would it be your opinion that they should?

2      MR. YARDUMIAN:  Objection.  It's an incomplete

3 hypothetical.  Calls for speculation.

4      THE WITNESS:  Some electrical boxes are sealed

5 during construction as part of the weathertight sealing

6 process.

7      Q.  BY MR. SMOLKER:  And some are even fire rated.

8      A.   I think as part of the preparation for the

9 installation of a product such as this and other

10 products that can be used in the same manner, that prior

11 to the installation of it, you should look for potential

12 avenues of escape, whether it be the interior living

13 space or any other places.

14      Sometimes if you had an avenue of escape up

15 into the attic space or into the substructure area, it

16 wouldn't matter how much product you put in that one

17 hole if it all escaped into the sub area and you drilled

18 another hole four feet over and no product eventually

19 came out of there.

20      Q.   I'm talking about a living area with a light

21 socket in between the two 4-foot holes, such as a

22 bedroom or a living room or any living area where people

23 habitate.

24      A.   Right.

25      Q.   Now, in your opinion, should the light socket

617

1   be sealed off before the product is applied?

2       MR. YARDUMIAN:  Objection.  It's an incomplete

3   hypothetical.

4       THE WITNESS:  I think you should consider it as an

5   avenue of escape and you should probably look at it to

6   see if it's not sealed already or if it needs to be

7   sealed.

8       Q.   BY MR. SMOLKER:  So you should take off the

9   face plate and see whether or not it's a sealed junction

10  box; is that what you're saying?

11      A.   You could possibly just look at the face plate

12  without removing the cover.  And if the face plate

13  itself is painted to the wall and the light switch

14  itself fits tight around the opening in the face plate,

15  you could just watch the face plate at the same time as

16  you're watching the other hole.

17      Q.   I'm talking about an electrical outlet, not a

18  light switch.  The thing you --

19      A.   You said a light switch.

20           So on an electrical outlet?

21      Q.   Sorry.  Yeah.

22      A.   The same thing could apply there.  What you

23  could do is if the face plate was painted to the wall,

24  you could just take masking tape and put it over the

25  electrical outlet --

                                                    618

1    Q.    Yes, exactly.

2    A.    -- to seal those openings off.  And, in

3    essence, you've sealed it.  You don't always have to

4    remove the face plate.

5    Q.    Exactly.

6    A.    You could probably also go as far as, like I

7    said before, you could inject your -- if you drilled a

8    hole in the void adjacent to the electrical outlet and

9    you had a hole four feet away and the electrical outlet

10    was within arm's reach, a person could inject one hole

11    and put his hand over the face plate and stop anything

12    that might come out.  So you could do it that way, too.

13        What I'm saying is you don't always have to

14    remove the face plates to inspect or to seal it.

15    Q.    I understand.  Is it your opinion that

16    something along the lines of what you just said should

17    be done, that someone should put either masking tape or

18    some other way of blocking the dust from coming out of

19    the light socket?

20    MR. YARDUMIAN:  Objection.  The question's vague and

21    ambiguous as phrased and it misstates Mr. Adam's

22    testimony.

23    THE WITNESS:  It's better to be safe than sorry, so

24    it wouldn't hurt.  But just because you see an

25    electrical outlet and it's, you know, open for something

619

1    to be plugged in it and the face plate's not painted to

2    the wall, doesn't mean that the electrical box isn't

3    sealed.  So it's better to be safe than sorry.

4        Q.    BY MR. SNOLKER:  And would it be your opinion

5    that if the junction box wasn't sealed, that the

6    pesticide would come through the electrical outlet as it

7    was being shot into the hole or a foot away in its path

8    to the other hole that's four feet away?

9        MR. YARDUMIAN:  Objection.  Incomplete hypothetical.

10   The question lacks foundation.  Calls for speculation.

11   And it's not reasonably likely to lead to the discovery

12   of admissible evidence.

13       THE WITNESS:  It's possible for that product to come

14   out of that electrical outlet.  I think it's kind of

15   like what I said before.  You know, if you have a

16   three-micron particle, that particle could come out a

17   four-micron hole.

18       Q.    BY MR. SNOLKER:  So isn't it true that in order

19   for you to know whether or not there was a danger of

20   prolonged exposure inside the living space after an

21   installation is completed, you're going to have to

22   actually watch the installation or know how they did it?

23       MR. GREY:  It's vague and ambiguous.

24       MR. PORTER:  Calls for speculation.

25       THE WITNESS:  In order for me to know whether there

                                                        620

PACESETTER REPORTING   *   (310) 545-8077

1      LONG BEACH, CALIFORNIA; FRIDAY, SEPTEMBER 15, 2000;

2                          9:55 A.M.

3                          - - - -

4                        GREG ADAMS,

5          called as a witness by the Cross-Defendants,

6          and having been first duly sworn by the

7          Certified Shorthand Reporter, was

8          examined and testified as follows:

9

10                       EXAMINATION

11    BY MR. SMOLKER:

12      Q.   Mr. Adams, I'm handing you a document which is

13    entitled "Wood Destroying Pests and Organisms Inspection

14    Report."  And it's been marked as Exhibit K.  There's

15    both an eight and a half by eleven version and an eight

16    and a half by fourteen version, if you need bigger print

17    to read it.

18      MR. GREY:  The actual exhibit though is on the eight

19    and a half by eleven?

20      MR. SMOLKER:  They're the same.  They're both going

21    to be attached.

22      MR. GREY:  Fair enough.  Thank you.

23              (Exhibit K was marked for identification by

24    the Certified Shorthand Reporter, a copy of which is

25    attached hereto.)

                                                         632

1      Q.    BY MR. SMOLKER:  Could you look at this

2  inspection report and tell us if it provides the kind of

3  information that the Structural Pest Control Act

4  requires be provided?

5      MR. YARDUMIAN:  Objection.  Vague and ambiguous.

6  Overbroad.

7      THE WITNESS:  It appears to contain most of the

8  required information, with the exception of -- I think

9  on the pesticide disclosure part of the report, in

10  regards to the proposed pesticide used as part of the

11  dehydration system, it doesn't specifically name the

12  name of the product.  It discloses what appears to be

13  the active ingredient, which is silica aerogel.

14      Q.    BY MR. SMOLKER:  Okay.

15      A.    The same thing with regard to the wood

16  preservative.  It has the active ingredient.  I think,

17  without looking at the 8538 notice, I think they have to

18  name the pesticide and its active ingredient.

19      Q.    Do you have that code section you just

20  mentioned?

21      A.    Yes.

22      Q.    Could you look at it.

23      A.    8538, there's three things that are required as

24  part of 8538 notification.

25          One is you need to identify the pest to be

                                                    633

1    controlled.  You have to actually identify the target

2    pest.

3            Then you have to identify the pesticide or

4    pesticides proposed to be used and the active

5    ingredients.

6            And then there's like a precautionary statement

7    as the third part that starts off with "State law

8    requires that you be given the following information."

9    And then there's a paragraph of information that should

10   be used verbatim on the inspection report.

11       Q.   And that's Business and Professions Code?

12       A.   Right.

13       Q.   Section 8538?

14       A.   Yes.

15       Q.   And so on your review, you determined that this

16   notification does not contain the name of the pesticide

17   proposed to be used that has the silica aerogel?

18       MR. YARDUMIAN:  Objection.  Misstates the testimony.

19   Assumes facts.  Incomplete hypothetical.  And it

20   mischaracterizes his testimony, as well.

21       THE WITNESS:  What I'm saying is that it discloses

22   what appears to be an active ingredient, which is silica

23   aerogel particles, but it doesn't name the actual

24   product.

25       Q.    BY MR. SMOLKER:  And it's your understanding

                                                          634

1  that, by law, it's required to name the actual product?

2      A.   Yes.

3      MR. YARDUMIAN:  Objection.  Misstates the testimony.

4  It calls for a legal conclusion.

5      THE WITNESS:  On the -- there's a paragraph above

6  that says, "For the treatment of subterranean termites

7  and fungus infections, the pesticide chemicals that may

8  be used on any property are as follows."  An example

9  would be, it says, "Dursban T.C.," and then in

10  parentheses, it says, "Chlorpyrifos."  That's the --

11  Dursban T.C. is the product name and the parentheses is

12  the active ingredient in that product.

13          The next one simply says, "Wood preservative,"

14  and then parentheses, "Copper Napthenate."  That's an

15  active ingredient, but just wood preservative is not

16  really the name of a product.

17          Disodium Octaborate Tetrahydrate, that's an

18  active ingredient in boric acid.  And boric acid comes

19  in many different product names.

20          Then in the paragraph below where it describes

21  the dehydration system, it just makes reference to

22  electrostatically charged silica aerogel particles,

23  which silica aerogel, I think, would be like the active

24  ingredient of a product.  Like in Drione, the active

25  ingredient is amorphous silica gel.

635

1    Q.   BY MR. SMOLKER: Now, you used the word active

2    ingredient.  Have you ever heard of the word "inert

3    ingredient"?

4    A.   Yes.

5    Q.   Are active ingredients and inert ingredients

6    the same thing?

7    A.   No.

8    Q.   Are active ingredient and inert ingredients

9    different things?

10    MR. YARDUMIAN:  Objection.  It lacks foundation.

11    Calls for speculation on behalf of this witness.

12    MR. PORTER:  It's also been asked and answered.

13    THE WITNESS:  The question is are active ingredients

14    an inert ingredients the same thing?

15    MR. SMOLKER:  Could you read back the question.

16    (The record was read by the reporter.)

17    MR. GREY:  Vague and ambiguous.

18    THE WITNESS:  Yes.

19    Q.   BY MR. SMOLKER:  Is it your understanding that

20    amorphous silica gel being discussed in this

21    notification is an inert ingredient?

22    MR. YARDUMIAN:  Vague.

23    MR. GREY:  Can you read back the question for me,

24    please.

25    (The record was read by the reporter.)

636

1    THE WITNESS:  In the inspection report that I looked

2 at?

3    Q.    BY MR. SMOLKER:  Yes.

4    A.    It doesn't make reference to amorphous silica

5 gel.

6    Q.    The silica gel that it's referring to, is it

7 your understanding that that's an inert ingredient?

8    MR. PORTER:  Vague and ambiguous.

9    MR. YARDUMIAN:  Objection.  It lacks foundation.

10 Calls for speculation.

11         This witness didn't prepare this document.  How

12 in the world is he supposed to understand what it's

13 supposed to refer to?  He can't answer the question.

14 Could you note for the record this is a waste of time.

15    Q.    BY MR. SMOLKER:  Do you remember the question

16 or do you want her to read it back?

17    A.    I think I remember the question.

18    MR. GREY:  The question also lacks foundation and

19 misstates the record.

20    THE WITNESS:  In reading what Home Savings describes

21 as their complete Home Saving Dehydration System, in

22 reading that paragraph, I would understand that the

23 electrostatically charged silica aerogel particles are

24 the product or chemical that's going to be applied and

25 is what's going to have the adverse effect on the

637

1    insects itself.  It's the part of the system that's

2    going to control or mitigate or exterminate the

3    infestation.  So because it's the heart of it, it's

4    taking the action against the insect, it would be

5    considered the active ingredient.

6        Q.   BY MR. SMOLKER:  And in your job, if you find

7    that somebody does not give -- let me step back a step.

8            Isn't it true that pest control operators are

9    required to give preapplication notice of what products

10   are going to be used and what the active ingredients of

11   those products they're using are before they make a

12   pesticide application?

13       MR. GREY:  Compound.  Vague and ambiguous.  Asked

14   and answered on more than one occasion.

15       MR. YARDUMIAN:  Join.

16       THE WITNESS:  The law requires, as part of the 8538

17   pesticide notification process, that the consumer be

18   provided with those three pieces of information:  The

19   target pest; the proposed pesticide that's to be used on

20   that target pest; and then that paragraph letting them

21   know the pesticides are toxic chemicals, et cetera,

22   et cetera, and phone numbers from the poison control

23   center, the local ag. department and the regulatory

24   agencies prior to the commencement of the work.

25       Q.   BY MR. SMOLKER:  And if a pest control operator

                                                    638

1    was to commence work before giving the consumer

2    notification of the name of the pesticide proposed to be

3    used and the active ingredient in that pesticide, would

4    the pest control operator have done something wrong?

5    　　MR. YARDUMIAN:  Objection.  It's vague and

6    ambiguous.  It's irrelevant.  It's an incomplete

7    hypothetical.

8    　　MR. PORTER:  Calls for a legal conclusion.

9    　　THE WITNESS:  If a structural pest control company

10   performed a pesticide application prior to issuing the

11   8538 notice, then the company would be in violation of

12   Business and Professions Code 8538.

13   　　Q.　BY MR. SMOLKER:  And is part of your job that

14   you personally perform to write up violation notices if

15   you find that structural pest control operators apply

16   pesticides to structures before they notify the consumer

17   of the name of the pesticide proposed to be used and the

18   active ingredient in that pesticide?

19   　　MR. GREY:  Could you read the question back, please.

20   　　　　(The record was read by the reporter.)

21   　　THE WITNESS:  It's part of my job to issue notices

22   of violation to licensed registered pest control

23   companies and individuals who violate any part of the

24   Structural Pest Control Act.

25   　　Q.　BY MR. SMOLKER:  Including that part of it --

639

1       A.    Including B & P Code 8538.

2       Q.    And that means that it would be part of your

3   job to write up a notice of violation if a licensed pest

4   control operator performed a pesticide application

5   without giving the notice required by 8538 before the

6   pesticide was applied?

7       A.    Yes.

8       Q.    Looking further at what I'm going to call this

9   inspection report, Exhibit K, and your interpretation of

10  it, is there a part of it that describes an inspection

11  of decks and patios?

12      MR. YARDUMIAN:  Objection.  Speculation.

13      THE WITNESS:  There's a part on the front page of

14  the inspection report that's numbered as item number 9,

15  decks/patios.  And it makes reference to masonry and

16  wood.  And then there's a series of boxes to the right

17  of that where a company will check boxes where they have

18  found certain findings that appear in the body of the

19  report.

20          And next to that is, under drywood termites,

21  the box is checked.  So I would interpret that as, the

22  inspector on that date, 7/13/96, had inspected the decks

23  and patios of the structure and had found an infestation

24  of drywood termites somewhere associated with the decks

25  and patios of the structure.  And then I would look at

                                                        640

1    correct?

2        A.    Correct.

3            (Whereupon Mr. Porter leaves the deposition.)

4        Q.    BY MR. SMOLKER:  Now, if there was dryrot on

5    the deck and patio and it wasn't found during the

6    inspection, would that mean that the inspection wasn't

7    done properly?

8        MR. YARDUMIAN:  Objection.

9        MR. GREY:  Lacks foundation.  Vague and ambiguous.

10        MR. YARDUMIAN:  Somewhat incomplete hypothetical.

11        MR. SMOLKER:  I'm talking about decks and patios.

12        MR. GREY:  Same objection.

13        Q.    BY MR. SMOLKER:  Is the person that's doing the

14    inspection, is there a standard for that person's work?

15        MR. GREY:  Vague and ambiguous.

16        THE WITNESS:  A licensed inspector has an obligation

17    to perform a diligent inspection of all of the visible

18    and accessible areas normally subject to inspection and

19    normally subject to attack by wood-destroying pests and

20    organisms.  Some inspectors do have bad days and are

21    looking up when they should be looking down.

22        Q.    BY MR. SMOLKER:  So there is a standard, and

23    the standard is diligence?

24        A.    A diligent inspection.

25            Now, there's a question as to what diligent

664

PACESETTER REPORTING   *   (310) 545-8077

1    means.  And actually the Structural Pest Control Act

2    states that you have to perform a bona fide inspection.

3        Q.   And where is that?

4        A.   I can't think of it.

5        Q.   I'm not testing your memory --

6        A.   No.  I like to be able to remember the B & P

7    Codes by numbers, but I can find it for you.

8        MR. SMOLKER:  I'll be right back.  Take a little

9    break again.

10           (Recess taken.)

11       Q.   BY MR. SMOLKER:  Did you find the part of the

12   act?

13       A.   That makes reference to a bona fide inspection?

14       Q.   Yes.

15       A.   Yes.

16       Q.   What section is that?

17       A.   B & P Code 8641.

18       Q.   What does is it say?

19       A.   It says, "Failure to comply with the provisions

20   of this chapter or any rule or regulation adopted by the

21   Board or the furnishing of a report of inspection

22   without the making of a bona fide inspection of the

23   premises for wood-destroying pests or organisms or

24   furnishing a notice of work completed prior to the

25   completion of the work specified in the contract is a

665

1    ground for disciplinary action."

2           I've looked up -- I don't recall what the

3    definition of bona fide is, but I've looked up the

4    definition of bona fide before in the dictionary.

5       MR. SMOLKER:  Off the record.

6           (Discussion held off the record.)

7       Q.    BY MR. SMOLKER:  Well, thank you for your

8    description of M.  We'll now move on to L.

9           Could you mark these two pages of photographs

10   as L.

11          (Exhibit L was marked for identification by

12   the Certified Shorthand Reporter, a copy of which is

13   attached hereto.)

14      Q.    BY MR. SMOLKER:  I'm now going to give you two

15   pages of copies of photographs.

16          Do you, by any chance, recognize these

17   photographs or copies of photographs?

18      A.    Yes.

19      Q.    And what are these photographs of?

20      A.    These are photographs that I took on my

21   visit to the Home Saving office and storage site on

22   December 16th of 1996.

23      Q.    And starting with the top left-hand corner of

24   what we'll call the first one, which under it says,

25   "Pesticide Storage site."

                                                      666

PACESETTER REPORTING  -  (310) 545-9077

Page 932

1          Did you type in or write the words "pesticide

2    storage site"?

3        A.    I used a Brother label maker and I made those

4    labels.

5        Q.    So each one of the words that go under each one

6    of the pictures is a label that you prepared yourself?

7        A.    Yes.

8        Q.    And what does a pesticide storage site picture

9    show?

10        A.    The back of a semi-truck trailer.

11        Q.    And did you see this semi-truck?

12        A.    Yes.

13        Q.    And did you open up the back of the trailer?

14        A.    I think we went in a side door of the trailer.

15        Q.    You got access to the interior of the trailer?

16        A.    Yes.

17        Q.    And is the picture to the right that has the

18    caption "Product inside storage site" a picture of what

19    you found inside the trailer?

20        A.    Yes.

21        Q.    And what is that a picture of?

22        A.    Paper bags of Syloid 244.

23        Q.    And looking at the left-hand bottom of

24    page 1 -- off the record.

25              (Discussion held off the record.)

                                                              667

Q.   BY MR. SMOLKER:  The bottom of the first page
has been marked L-1 and the bottom of the second page
has been marked L-2.

Looking at the left-hand bottom of page L-1,
what is that a picture of?

A.   That's a closer photograph of a bag of
Syloid 244.

Q.   And what's the right-hand picture -- well, the
left-hand picture has the caption "Product front of
bag," right?

A.   Correct.

Q.   And then to the right of that, there's a
picture that has the label, "Product back of bag"?

A.   Correct.

Q.   What's that a picture of?

A.   It's a picture of what would be a label with
additional information.

Q.   So did you pick up a bag and look at it from
all angles so you saw the entire bag?

A.   Yes.

Q.   And did you take pictures that you thought
would portray what the entire bag looked like from
different angles?

A.   Yes.

Q.   So by looking at the two bottom pictures on

668

PACESETTER REPORTING   *   (310) 545-8077

1    L-1, is that a good representation of what the bag

2    looked like?

3        A.    Yes.

4        Q.    Now, you said that on L-1 on the right-hand

5    bottom, there was a label?

6        A.    Yes.

7        Q.    And is L-1 your attempt to take a picture of

8    the label?

9        A.    Yes.

10       Q.    And do you remember anything about that label?

11       A.    The reason why I took a picture of the label

12   was to see if there were directions for use on the

13   label.  And I don't believe that there were directions

14   for use.  One of the requirements of a pesticide label

15   is directions for use.

16       Q.    And you said one of the requirements for a

17   pesticide label is directions for use.  Is there a law

18   on that, a code section?

19       A.    The Department of Pesticide Regulation requires

20   certain information on pesticide labels.  And one of the

21   requirements are or is directions for use.

22       Q.    So your purpose in taking this photograph was

23   to document that the label did not contain directions

24   for use?

25       A.    It was to document that the label didn't comply

669

1    with the label requirements for a pesticide product.
2    Without having a clearer picture, there are probably
3    some other items that aren't in the picture that are
4    required to be on pesticide products.
5            I think another reason why I took that picture
6    was -- I think if I had the photograph, I could look at
7    it and see that there was a number on the bag, which is
8    a manufacturer's product number that I was told --
9    without looking at my file, I contacted Grace Industries
10   at one point in time and I asked them what the number
11   was.
12           And he told me that that was like a lot number,
13   an origin -- a lot number and an origin number.  In
14   other words, it was the lot number that the product was
15   manufactured under and the origin number was the source
16   of where it was manufactured.  That's how I recall it.
17   And that number matches a number that Home Savings puts
18   in their brochures -- or not in their brochures, but on
19   their M.S.D.S. sheets and their service container labels
20   as being an E.P.A. registration number.
21           I think part of that number also identifies,
22   not just the lot number and the origin, but I think the
23   product.  Most E.P.A. registration numbers also work in
24   the same way, in that a person can tell by the E.P.A.
25   registration number what the product is and who the

670

1    manufacturer of the product was by just being given a

2    number.

3              Besides being able to look up in, like, an

4    E.P.A. registry, you know, register list of all the

5    products, like looking on the computer under such and

6    such a number, it will tell you who the manufacturer

7    was, what the product was, what the active ingredient

8    is.

9              From an E.P.A. registration number, a person

10   can sometimes recognize what the product was or is or

11   who the manufacturer was.

12        Q.   So I believe what you've told us is that there

13   was an E.P.A. number and you investigated what the

14   E.P.A. number was, and you were told it was the

15   establishment number.

16             By that I mean it establishes who the

17   manufacturer is; is that correct?

18        MR. YARDUMIAN:  Objection.  Misstates and

19   mischaracterizes the testimony.

20        THE WITNESS:  I don't believe that I was told that

21   it was an establishment number.

22        Q.   BY MR. SMOLKER:  You call it an origin number.

23   It told you what establishment made it, where it

24   originated from?

25        A.   Right.  You can tell by the package who the

                                                        671

1    manufacturer is, what the product name is, and there's
2    other information on the package.  I think I was told
3    that that number meant that it was manufactured -- it
4    came from a certain lot.  It came from this, you know,
5    one manufacturing period of time.  They probably
6    manufacture it in lots.  They manufacture 100,000 pounds
7    at one time, and then they move on to a different
8    product or something, and it comes from that lot.
9             And then I think the "MD" means that it was --
10   that it had come from Maryland, which means the
11   East Coast.  And then I think there's another number
12   that identifies it as the product.
13       Q.   We'll get to the MD.  That's on page 2.
14       A.   You have to ask Grace Industry what that
15   number -- what every aspect of that number means.  But
16   the point that I was trying to make or to prove was that
17   the number that Home Saving was saying was an E.P.A.
18   registration number was not an E.P.A. registration
19   number.
20       Q.   Is it fair to say that you were concerned and
21   wanted to find out whether or not Syloid 244 was a
22   registered pesticide product?
23       A.   I had already learned that Syloid 244 packaged
24   like this and used out of the bags like this as a
25   pesticide was an unregistered pesticide.  And what I was

                                                      572

1   trying to prove is that they were using an unregistered
2   pesticide, and actually provided information to the
3   consumers that would lead them to believe that it was a
4   registered pesticide.
5       MR. YARDUMIAN:  Just object.  Move to strike.
6   That's nonresponsive and calls for speculation.  Lacks
7   foundation.
8       Q.   BY MR. SMOLKER:  And did you prove that
9   termite -- Home Savings Termite Control was using an
10  unregistered pesticide, Syloid 244?
11      A.   I never had to prove it, but I feel comfortable
12  that with what evidence that I had obtained, that I
13  believe that they were using an unregistered pesticide.
14      Q.   And why do you believe that?
15      MR. YARDUMIAN:  Objection.  Foundation.
16  Speculation.
17      THE WITNESS:  Based on my original visit to the
18  office and my inspection of the service trucks and the
19  storage site.
20           And then subsequent information that I had
21  obtained in the form of termite inspection reports,
22  where at one point in time they went from disclosing the
23  product as part of -- that they were using as their
24  dehydration system as being electrostatically charged
25  silica aerogel, I eventually obtained inspection reports

673

1    where they actually specified Syloid 244 by name.  And

2    then I think they go on to describe it as amorphous

3    silica gel at that point.

4          In other words, they're giving -- they started

5    to give you what I told you before on the 8538 notice,

6    the name of the product and what they believe to be the

7    active ingredient, which was amorphous silica gel.  So

8    between all of those bits of information that I obtained

9    on various dates for months, I believe that they were

10   using an unregistered pesticide.

11       Q.   BY MR. SMOLKER:  And then you also -- did you

12   ever prove that they were misstating in their

13   Material Safety Data Sheet that the Syloid product that

14   they were using was a registered pesticide product?

15       MR. YARDUMIAN:  Objection.  Vague and ambiguous and

16   lacks foundation.  Calls for speculation.

17       THE WITNESS:  As part of my visit on December 16th

18   of 1996, on Wayne Morris' desk was a box of brochures

19   that he had just received back from the printer.  And I

20   asked if I could have a complete copy of his brochures

21   as he hands them out to the consumers.  And as part of

22   that packet, there is an M.S.D.S. sheet in there that

23   has Home Saving, like, letterhead or advertisement.

24       Q.   BY MR. SMOLKER:  Logo?

25       A.   Their logo printed across the top of it.  And

                                                           674

1  the body of the M.S.D.S. sheet is probably 90 percent

2  the same as Grace Industry's M.S.D.S. sheet, with the

3  exception of the logo and stuff.

4      And then in the body of the M.S.D.S. sheet,

5  Home Savings -- where on the Grace Industry's M.S.D.S.

6  sheet it identifies it by this number, the Home Savings

7  changes that to look like it's an E.P.A. registration

8  number in the brochure.

9      Q.   Let's look at L-2.  That's the second page that

10  you've been talking about.  Looking at the middle

11  picture, it says, "Micron size silica gel."

12      A.   Yes.

13      Q.   Is that what you're referring to?

14      A.   That's an actual service container label that I

15  was given by Wayne Morris.  The top picture on the

16  right --

17      Q.   This is on L-2?

18      A.   On L-2, it shows the top of a 50-gallon drum

19  with a service label -- service container label attached

20  to it.  And I took a picture of the service container

21  label with that label attached to it.  And then in a

22  conversation later with Wayne, I asked if I could have a

23  copy of a -- he also, as part of his brochures and

24  stuff, had some service container labels there that had

25  been laminated together that he puts on his service

675

1    containers.  And I asked him if I could have a copy of
2    one of the service container labels, and he readily gave
3    me a copy.  That's in my file.

4        Q.    And is this middle picture here a picture of
5    the label that's in the top right-hand picture that
6    says, "Service container label"?

7        A.    Yes.

8        Q.    So the top right is the overview, and then the
9    middle is just a close-up of the label itself?

10       A.    Yeah.  You know, the photocopy that I'm looking
11   at, you know, it's hard to tell.  But I'm sure that
12   that's the same service container label.  This service
13   container label in the middle of this photocopy is not a
14   picture of a label.  It's the actual label.  I think
15   when they made you your copies, they took the laminated
16   label and sat it on this in between two photographs and
17   photocopied it for you.

18       Q.    I see.  Then the bottom picture on L-2 says,
19   "Specimen label book on truck."

20             What is --

21       A.    When we asked them for their specimen label
22   book on this trailer above here on the top left picture
23   on L-2, inside the specimen label book is a copy of -- I
24   think it's the M.S.D.S. sheet for the product.  And
25   that's one of the copies where they had taken the

676

1   Grace Industry's letterhead across the top and had

2   printed their own label.

3       Q.   In other words, they put their logo and name in

4   the place where Grace had Grace's logo and name?

5       A.   Correct.

6       MR. YARDUMIAN:  Objection.  Speculation.  Lacks

7   foundation.

8       Q.   BY MR. SMOLKER:  And is there a legal

9   requirement to have specimen labels for pesticides?

10      A.   Yes.

11      Q.   And what is that legal requirement?

12      A.   I think it's a Food and Ag. Code.  I know it's

13  a Food and Ag. Code.  And it requires that a pest

14  control service vehicle that stores or transports

15  pesticides for use maintain a specimen label book of

16  labels that are not obliterated and clearly legible so

17  that the service technician has access to those labels

18  for reference.

19          Plus, I think if the vehicle is involved in an

20  accident, emergency response personnel have to have

21  access to a label book with a list of the -- like a bill

22  of lading of the products that are on that vehicle so

23  that they can grab that book, know what's on that truck,

24  have sample labels.

25          Another requirement of the label, of the

677

1   pesticide label is spill -- emergency spill cleanup

2   information.  And the emergency response people need to

3   have access to that stuff.

4       Q.   And this label we're talking about is a

5   pesticide use label?

6       A.   A specimen label?

7       Q.   Yes.

8       A.   There's two things.  There's a specimen label,

9   which is a sample of the actual manufacturer's label

10  that appears on the product; and then there's a

11  Material Safety Data Sheet, M.S.D.S. sheet, that's

12  produced by the manufacturer that has a lot of other

13  additional information regarding the environment,

14  personal protection, fire fighting requirements, spill

15  control requirements, medical information and things

16  like that.

17      Q.   But getting back to the specimen label, the

18  label you're talking about when you're referring to a

19  label, that's a pesticide label they're required to

20  have, correct?

21      A.   This is a label that appeared in Home Saving's

22  specimen label book.

23      Q.   Right.  I'm trying to find out what was

24  supposed to be in this --

25      A.   But it's not really a specimen label.  It's an

678

1   M.S.D.S. sheet that's been modified by Home Saving.

2      Q.  Can you tell us what a specimen label is?  You

3   told us that an M.S.D.S. sheet is not a specimen label.

4   What is a specimen label?  And by specimen label, I

5   assume you mean they didn't have a specimen label for

6   Syloid 244; is that what you're referring to?

7      A.  There is actually no specimen label for

8   Syloid 244.

9      Q.  In the book or in existence?

10      A.  At this point in time, as far as I knew?

11      Q.  Yes.

12      A.  In existence.  And subsequent to that, as part

13   of my further investigation, I could not obtain a

14   specimen label.

15      Q.  Is it your understanding that it's against the

16   law to use pesticides for which no specimen label

17   exists?

18      MR. YARDUMIAN:  Objection.  The question is an

19   incomplete hypothetical.  Lacks foundation.  Calls for

20   speculation.  It's irrelevant.

21      THE WITNESS:  In order for a pesticide to become a

22   registered pesticide for use, it has to have a specimen

23   label.  And as part of the registration process, the

24   specimen label is reviewed and either approved or not

25   approved as part of the registration process.  It has to

679

1   have a specimen label.

2       Q.    BY MR. SMOLKER:  And was there any significance

3   to you to the fact that you couldn't find a specimen

4   label either in the specimen label book or when you did

5   research to try to find a specimen label for Syloid 244?

6       A.    It told me two things:  One is, to the best of

7   my ability, I don't believe the specimen label existed;

8   two, Home Saving had taken an M.S.D.S. sheet and had put

9   its logo and things across the top, had changed some

10  information in the body of the M.S.D.S. sheet, and was

11  using that as a specimen label.  They, like, created

12  their own specimen label.

13      Q.    Is there anything wrong with creating your own

14  specimen label?

15      MR. YARDUMIAN:  Objection.  Vague and ambiguous.

16  Overbroad.  Calls for speculation.

17      THE WITNESS:  Other than it being against the law?

18      Q.    BY MR. SMOLKER:  Is it against the law?

19      A.    Yes.

20      Q.    What law is it against?  What are they doing

21  wrong?

22      A.    Like I said, as part of the registration

23  process with the Federal E.P.A. and California

24  Department of Pesticide Regulation, labels go through a

25  review and approval process.  And to generate a specimen

690

1  label for a product and to pass it off as a specimen

2  label, whether it be to your own service technicians or

3  the consumers, is -- I don't want to say fraud, but it's

4  against the law.

5      MR. YARDUMIAN:  Move to strike.  Nonresponsive.

6          The document at the bottom of L-2, did the

7  document itself indicate specimen label on it?

8      THE WITNESS:  No.

9      MR. YARDUMIAN:  You created that title at the bottom

10  of that, correct?

11     THE WITNESS:  Actually, I didn't -- the title

12  doesn't mean that I was saying that that's a specimen

13  label.  It means I took that picture of a document that

14  was contained in what they told me and identified as

15  their specimen label book that they maintain on the

16  truck for those purposes like I told you.

17         I think specimen label books and bills of

18  lading, there's a hazardous materials regulation out

19  there called HM -- I think it's HM 181 that requires

20  persons who transported pesticides meet certain training

21  requirements.  And also, I think that might specify the

22  requirements of trucks to have specimen label books,

23  et cetera, on them in the event of an emergency.

24     Q.    BY MR. SMOLKER:  Let's go back a step.

25         On L-2, the bottom picture, there's a label,

591

1   specimen label book on truck.

2       A.   Correct.

3       Q.   And there's a picture.  Is that a picture of a

4   book in which you're taking a picture of a particular

5   sheet?

6       A.   Yes.

7       Q.   And was this, like, a three-ring binder, this

8   book?

9       A.   Yes.

10      Q.   And you've opened the book to a particular

11  page, and that's what this is a picture of?

12      A.   Yes.

13      Q.   And if the book was closed, did the book have a

14  title on it?  Like was the book called "Specimen Label

15  Book" or was it just blank?

16      MR. YARDUMIAN:  Objection.  Speculation.

17      THE WITNESS:  I don't recall if it had a cover or

18  title on the book or if was blank, but we asked both

19  Cervantes and myself -- it's a common practice when you

20  perform a vehicle inspection to ask the person that's in

21  charge of the vehicle that day to hand you his specimen

22  label book.  And that individual should be able to

23  easily and readily go to the cab of the truck within

24  arm's reach of the driver's seat, grab that book and

25  hand it to you.

692

PACESETTER REPORTING    ·    (310) 545-8077

1    Q.    BY MR. SMOLKER:  And while you were doing your

2    inspection at Home Savings Termite Control facilities on

3    December 16th, 1996, did you ask the person in charge of

4    a vehicle to hand you a specimen label book?

5    A.    Yes.

6    Q.    And were you handed something?

7    A.    Yes.

8    Q.    And did you then open that book to this page

9    and take a picture that we now see as being the picture

10   at the bottom of L-2?

11   A.    Yes.

12   MR. SMOLKER:  I'd like you to mark this as M.

13              (Exhibit M was marked for identification by

14   the Certified Shorthand Reporter, a copy of which is

15   attached hereto.)

16   Q.    BY MR. SMOLKER:  I'll now show you M, what

17   we've marked as M.

18        Can you tell us what Exhibit M is?

19   A.    Yes.

20   Q.    What is M?

21   A.    It's a purchase invoice that I had asked for

22   when I was doing my office records inspection at the

23   time of my visit on December 16th of '96.  I asked if I

24   could have a copy of some -- either purchase records or

25   shipping papers from Grace Industries showing that

                                                    683

1    Home Saving had purchased and where they had purchased

2    the Syloid 244.

3        Q.    And is this a copy of the record you were

4    given?

5        A.    Yes.    This is a copy of -- I think this is a

6    shipping, like a bill of lading shipping paper showing

7    how many bags of Syloid 244 were delivered or shipped to

8    Home Saving.

9        Q.    And is it your understanding that this

10   indicates that Home Savings was buying Syloid 244 from

11   Grace Davidson?

12       MR. YARDUMIAN:    Objection.    Lacks foundation.    Calls

13   for speculation.

14       THE WITNESS:    Yes.

15       Q.    BY MR. SMOLKER:    And is it your understanding

16   that this -- the purpose of this document is to document

17   that product was shipped to Home Saving Termite Control,

18   Inc. from Grace Davidson on 12/9/96?

19       MR. YARDUMIAN:    Same objection.

20       THE WITNESS:    Yes.

21       Q.    BY MR. SMOLKER:    And is it your understanding

22   that this document indicates that 36 bags were ordered?

23       A.    Yes.

24       Q.    And is it your understanding that this document

25   indicates that 36 bags were shipped?

                                                              684

1      A.   It has a scheduled shipping date of 12/9.  I

2   don't know if --

3      Q.   It has date shipped in the middle.

4      A.   It says that they were shipped on 12/9.

5      Q.   And you got this document from the office of

6   Home Savings Termite Control, correct?

7      A.   Yes.

8      Q.   And you understand from this document that they

9   were receiving 30-pound bags?

10     A.   Yeah.

11     MR. YARDUMIAN:  Objection.  Speculation.

12     THE WITNESS:  Yes.

13     Q.   BY MR. SMOLKER:  And when you were there

14   looking at the bags, did the bags say anything on them

15   to indicate if they were 30-pound bags or what they

16   were?

17     A.   I don't recall if the bag itself had a weight

18   on it, but what I do remember is they're halfway decent

19   size bags.  And when I picked one up, based on the size

20   of the bag, I was surprised how light the bag was.

21     Q.   Did you ask anybody where the origin of these

22   bags were?  Where they were shipped from?

23     A.   As part of my interview with Wayne Morris, he

24   told me that he had been purchasing Syloid 244 directly

25   from Grace Davidson or Grace Industries.

695

Q.   Did he tell you for how long he'd been doing that?

A.   Without looking in my notes in my file, it seems to me like what he told me was that around the mid '90s, like -- I'd be able to tell you by looking at my file, but I think it was around -- it was a couple years before I visited the property.   I think they discontinued Dri-Die.

And he had contacted -- at around that same time, the company that originally developed Dri-Die had changed hands a few times.   A company came in and purchased them, held on to the company for maybe a year, year and a half, then turned around and sold it to another company.   But it was around that time that -- you couldn't buy Dri-Die anymore.

And he had contacted -- Wayne Morris told me he had contacted somebody from the company that he used to be buying Dri-Die from, or who was making Dri-Die.   And that person put him in direct contact with Grace Industries.

And then from that point on, he started buying -- I don't know if he first purchased Syloid 244 or if subsequent to that he ended up buying Syloid 244, but he was buying some form of an amorphous silica gel from Grace Industries.

696

1      Q.    So is it fair to say that you asked

2   Wayne Morris how long he had been purchasing Syloid 244?

3      A.    Yes.

4      Q.    And is it fair to say that your best

5   recollection is he told you he had been purchasing it

6   for a couple of years?

7      MR. YARDUMIAN:  Objection.  Misstates the testimony.

8   It's vague.  It's ambiguous.  He's already told you that

9   he could look at his notes and answer the question.

10     THE WITNESS:  To the best of my recollection, it was

11  that he stated that he had been purchasing it or he had

12  been buying it for a couple of years.

13     Q.    BY MR. SMOLKER:  And "it" being Syloid 244?

14     MR. YARDUMIAN:  Objection.  Speculation.

15     THE WITNESS:  Wayne, in most cases, probably -- you

16  know, 90 percent of the time or more, Wayne would call

17  it amorphous silica gel.  He didn't really use the word

18  "Syloid 244" too much.

19     Q.    BY MR. SMOLKER:  So let me rephrase that.

20          Did Morris tell you that Morris had been

21  purchasing amorphous silica gel from Grace for a couple

22  of years before your visit?

23     A.    Yes.

24     Q.    And did he tell you that it was this amorphous

25  silica gel that he had purchased and been purchasing

                                                    687

from Grace for a couple of years that he was using in

his pest control operations to kill termites?

A.    He was using it as the product in his

dehydration system.

Q.    Did Morris tell you he had been using and was

using this as the product in his dehydration system?

MR. YARDUMIAN:    Objection.    Vague and ambiguous.

Misstates testimony.

THE WITNESS:    He actually -- I don't know what he --

he kept saying amorphous silica gel and kept saying that

he believed that it was the same thing as Dri-Die, but

that he could no longer buy Dri-Die.    And that he had

gone directly to the source of the -- where whoever was

making Dri-Die used to get their amorphous silica gel

from.

And at the time of my visit, I kept saying

Syloid 244, Syloid 244.    And at the time of my visit, he

acknowledged that it was the Syloid 244 that we saw on

the trucks and in the storage site that he was using.

So I could say that on 12/16 of '96, he stated that he

was using Syloid 244.    He still called it amorphous

silica gel.

And he stated that, prior to that, he had been

purchasing it directly from Grace Industries and that --

and he referenced to it as amorphous silica gel.    I

688

1  don't know if it was actually Syloid 244 or -- see,

2  Syloid, if you ever look at the product, there's Syloid.

3  And it's my understanding that the number 244 makes

4  reference to the size of the particles, because there's

5  also Syloid 286, Syloid -- there's Syloid other numbers.

6  So the number makes reference to, it's my understanding,

7  the size of the particles.

8      Q.    BY MR. SMOLKER:  Where did you get that

9  understanding?

10     A.    In looking at the -- I think if you look at the

11  M.S.D.S. sheet, it lists Syloid and it has a little "R"

12  next to it as a registered trade.  Then it lists a whole

13  series of numbers.  And they start at high numbers and

14  go down to low numbers.

15          And then I had asked -- I think I had asked a

16  person from Grace Industries one time when I called

17  them, I said, "Well, I understand what Syloid means, but

18  what does the number mean?"  And I think they told me it

19  means the size of the particle.

20     MR. SMOLKER:  Can we mark this as N, please.

21          (Exhibit N was marked for identification by

22  the Certified Shorthand Reporter, a copy of which is

23  attached hereto.)

24     Q.    BY MR. SMOLKER:  Would you please look at

25  Exhibit N and tell us what that is.

699

A.   This is actually a copy of an invoice that I received, a copy of what I think is a billing invoice for Syloid 244 that I received from my office visit on 12/16 of '96.

Q.   At Home Saving Termite Control?

A.   Yes.

Q.   And how did you receive this invoice?

A.   I asked -- like I had stated once before, at the conclusion of my interview with Wayne, Wayne excused himself and went back to his house, but he directed the office staff to provide me with any information that I asked for.

So as I was going through the paperwork and records and things, at one point I asked them if there was any type of billing, shipping papers or paperwork to show that they had been purchasing the product directly from Grace.  And Exhibit M and N are the pieces of paper that they provided me with.

Q.   They use the word on both M and N, consignee number.  Do you see where it says that, c-o-n-s-i-n-g-e-e, up in the right-hand corner above the "ship to"?

A.   Yes.

Q.   Do you know what consignee number refers to?

MR. YARDUMIAN:  Speculation.  Lacks foundation of

690

1   this witness.

2       THE WITNESS:  No, I don't.

3       Q.   BY MR. SMOLKER:  Do you know what a consignee

4   is?

5       A.   Not really.

6       Q.   And do you understand from looking at this

7   invoice, Exhibit N, that the Syloid 244 was shipped from

8   Grace's San Leandro facility?

9       MR. YARDUMIAN:  Same objection.  Foundation.

10  Speculation.

11      THE WITNESS:  Yes.

12      Q.   BY MR. SMOLKER:  How do you come to --

13      A.   The photocopy is cut off on the left, but

14  there's a box that says, "Shipped from."  And it says

15  San Leandro, or it's an abbreviation for Leandro,

16  California.

17      Q.   And does this invoice indicate to you that

18  Home Saving Termite Control, Inc. has an account with

19  Grace Davidson?

20      MR. YARDUMIAN:  Please.  Lack foundation.  Calls for

21  speculation.

22      THE WITNESS:  Yes.

23      MR. YARDUMIAN:  Gary, you're going to get an answer

24  now.  You're not going to get an answer to the same

25  question later.  This is totally irrelevant from this

                                                    691

1   witness.  The document speaks for itself.  It says

2   account number.  That's what it is.  But this witness

3   doesn't know that.

4       MR. SMOLKER:  Can you mark this as Exhibit O,

5   please.

6               (Exhibit O was marked for identification by

7   the Certified Shorthand Reporter, a copy of which is

8   attached hereto.)

9       Q.   BY MR. SMOLKER:  I'm going to hand you

10  something that we've marked as Exhibit O.

11               Have you ever seen this before?

12      A.   Yes.

13      Q.   Does that document have a name?

14      A.   It's a notice of violation.

15      Q.   And it says, "Notice of Violation," and there's

16  a check mark in the "notice of violation" box, correct?

17      A.   Correct.

18      Q.   And then to the right of it, it says,

19  "Number 0243"?

20      A.   Correct.

21      Q.   Can you tell us what notice of violation means?

22      A.   It's a notice of violation that we issue to a

23  subject notifying them that we believe that a violation

24  was found at that time and on that date.  And then we

25  fill out the document, stating what we believe or allege

692

1    that the violations are.

2        Q.    And to the right, it says number 0243.  Does

3    that have any significance?

4        A.    Other than -- these forms are printed and then

5    they're, you know, numerically numbered and they're in

6    triplicate.  So that when you use one, it's basically

7    assigned a number so that it can't be confused with

8    another one.

9        Q.    So this is just a numerical reference?

10       A.    Yes.

11       Q.    It doesn't have any independent significance,

12   other than it's an identifying number?

13       A.    Correct.

14       Q.    And was this notice of violation issued to

15   Home Saving Termite Control, Inc.?

16       A.    Yes.

17       Q.    And was it issued on December 16th, '96?

18   MR. YARDUMIAN:  Objection.  Vague.

19   THE WITNESS:  Yes.

20       Q.    BY MR. SMOLKER:  And was it issued at around

21   10:16 in the morning?

22       A.    Yes.

23       Q.    And what is written, if you can read, under the

24   middle of the page where it says "Location of

25   violation"?  What's written there?

693

1      MR. YARDUMIAN:  Objection.  Foundation.

2      Q.   BY MR. SMOLKER:  Let me start before that.  Is

3   this your handwriting?

4      A.   Yes.

5      Q.   Did you write this notice of violation?

6      A.   Yes.

7      Q.   Can you, by any chance, read your handwriting

8   for us under location of violations?

9      A.   Without looking at the original, I don't know

10   what those first two letters -- oh, job site.  It says,

11   "Job site locations where chemical was used."

12      Q.   And then under that it says, sections

13   B & P Codes, is that 8646 and 8647?

14      A.   Yes.

15      Q.   And can you tell us what kind of violations is

16   being referred to by referencing B & P Code 8646 and

17   8647?

18      A.   I'd have to look at the Structural Pest Control

19   Act.

20      Q.   Want to do that?

21      A.   Yes, please.

22      MR. SMOLKER:  I'll be back in a minute.

23         (Recess taken.)

24      Q.   BY MR. SMOLKER:  You have a recollection of

25   what you were referring to when you wrote Business and

                                                  694

1    Professions Code 8646 and 8647, with looking at the

2    Structural Pest Control Act?

3        A.   Yes, I do.

4        Q.   What were you referring to?

5        A.   In 8646, it's disregard and violation of

6    pesticide application, fumigation or exterminating laws

7    of the state --

8        Q.   Disregard and what?

9        A.   Disregard and violation.

10       Q.   Oh, and violation.

11       A.   Of pesticide application, fumigation or

12   exterminating laws of the state or of any of its

13   political subdivisions is grounds for disciplinary

14   action.

15           B & P Code 8647 is failure to comply in the

16   sale or use of insecticides with the provisions of

17   chapter 2, commencing with section 12751 of Division 7

18   of the Food and Ag. Code is grounds for disciplinary

19   action.

20       MR. YARDUMIAN:  Can I ask a question?

21       MR. SMOLKER:  Sure.

22       MR. YARDUMIAN:  What does that mean, to be grounds

23   for disciplinary action?

24       MR. SMOLKER:  Off the record.

25           (Discussion held off the record.)

                                                    695

A.    The bottom line is that the product didn't comply with the law with regard to what's required for something to be considered a registered pesticide.

Q.    And do you consider that a silly law?

A.    No.

Q.    Do you consider giving him this notice of violation a silly thing to have done?

MR. YARDUNIAN:  Objection.  The question's argumentative.  Vague and ambiguous.

THE WITNESS:  No.  The purpose of my notice of violation was to let him know that we allege that he was using an unregistered economic poison.  And the second purpose of my notice was to order him to cease and desist the use of it.

And probably the -- the first part of that notice is important, but the second part of that notice is a more important immediate thing that needed to be done.  And like I told -- like I testified before, I explained to Wayne Morris that there were products out there currently available that he could readily buy over the counter and use in the same manner as part of his dehydration system that were registered.  It was just a matter of going and buying another product and using it tomorrow.

Q.    BY MR. SMOLKER:  Why do you care?  Amorphous

703

Q.    What is a licensed certification letter?  At the bottom it says, "At this time, the licensed certification letter is not ready.  I will forward it to you as soon as it is ready."

A.    I don't know what that means.

Q.    Okay.  And then the next page says, "Home Saving Termite Control notes."

A.    Correct.

Q.    Do you know whose notes these are?

A.    No.  These -- I think these notes were made by another specialist who was initially contacted by the Board.  And he did some, like, follow-up telephone calls regarding Dri-Die -- no -- yeah, regarding Dri-Die and Drione to determine, you know, if it was no longer available, et cetera.

And then at one point, I don't know what date, probably around October -- that was in September, and then October.  And he basically compiled this basic information that's in this document.

And then I think it might have been October -- I'd have to look at the file to see if, as a result of this, the case was open, or if the case was opened first.  But I think as a result of this information, a case was opened.  And then because Home Saving was in my area, my territory, the case was forwarded to me.

709

1          There's persons with the Board that actually

2    qualify cases, substantiate that it's a legitimate

3    complaint.  The Board has jurisdiction over it, does

4    some things to qualify it as a complaint before it ever

5    comes to me.

6          Q.   So there's a screening process?

7          A.   There's somewhat of a screening process.

8          MR. YARDUMIAN:  Could we take a break now.

9          MR. SMOLKER:  Sure.

10               (Lunch recess taken 12:35 - 1:30 p.m.)

11         Q.   BY MR. SMOLKER:  Mr. Adams, is it fair to say

12    that you were asked to investigate whether or not

13    Home Savings Termite Control was using an unregistered

14    pesticide?

15         A.   Yes.

16         Q.   And this document that we call Exhibit P, is it

17    fair to say that this information and research was

18    compiled by somebody else before you came into the case?

19         A.   The last two pages of --

20         Q.   The notes.

21         A.   Yes, of Exhibit P.  Yes.

22         Q.   And so when you started your investigation, you

23    had the benefit of the research and these notes from

24    9/26/96 to 10/17/96?

25         A.   Yes.

                                                        709

1    Q.   And do you happen to recall whether or not

2    these notes were forwarded to you?

3    A.   Yes.

4    Q.   Were they?

5    A.   Yes.

6    Q.   So you started your investigation from this

7    place?

8    A.   Yes.

9    Q.   Now, do you happen to recall when you started

10   your investigation, whether it was a consumer initiated

11   investigation or a Structural Pest Control Board

12   initiated investigation?

13   A.   I think it was a Structural Pest Control Board.

14   I'd have to look at the file.

15   Q.   But it's your current --

16   A.   Well, about the same time -- around the same

17   time, I think Sherry Kaufman might have filed a

18   complaint.

19   Q.   She did.  She did in around October.

20   A.   So I think probably as a result of those two

21   contacts, we did open a case.  The Board opened a case.

22   And that's the file that has most of my records and

23   follow-up records.

24   Q.   What I'm trying to determine is if you had a

25   separate file or separate case for the Board and then

                                                     710

1    another separate file or case for Sherry Kaufman.

2        A.   Yes.

3        Q.   So there were two separate cases?

4        A.   Yes.

5        Q.   And two separate files?

6        A.   Yes.

7        Q.   And so part of your job separate and apart from

8    looking into Sherry Kaufman's complaint was to determine

9    whether or not Home Savings Termite Control was using an

10   unregistered pesticide?

11       A.   Yes.

12       Q.   And was that the reason why you made the

13   inspection on December 16th, 1996?

14       MR. YARDUMIAN:  Objection.  It's vague and

15   ambiguous.  Calls for speculation.

16       THE WITNESS:  Yes.

17       Q.   BY MR. SMOLKER:  And on this cover letter,

18   which is page 2 of Exhibit P, it's dated December 13th,

19   it says, "Greg Adams informs me that he plans on doing

20   an office records check of Home Savings."

21       A.   Yes.

22       Q.   Do you remember telling Ila Hoffman that you

23   intended to do an office records check of Home Savings?

24       A.   Yes.

25       Q.   And that was with respect to your investigation

                                                        711

PACESETTER REPORTING  *  (310) 545-8077

1   of the illegal use of a pesticide, correct?

2      A.   Correct.

3      MR. SMOLKER:   I'd now like to ask the court reporter

4   to mark this as Exhibit Q.

5              (Exhibit Q was marked for identification by

6   the Certified Shorthand Reporter, a copy of which is

7   attached hereto.)

8      Q.   BY MR. SMOLKER:   Could you look at that.

9      A.   Okay.

10      Q.   What's the date of that letter?

11      A.   March 16th, 1993.

12      Q.   And who's the letter from?

13      A.   Maureen Sharp.

14      Q.   And who is or who was Maureen Sharp on

15   March 16th, 1993?

16      A.   The deputy registrar.

17      Q.   And as the deputy registrar, was she in charge

18   of the enforcement part of the Structural Pest Control

19   Board?

20      A.   She was the supervisor of the enforcement unit.

21      Q.   And as the supervisor of the enforcement unit

22   of the Structural Pest Control Board, did she have the

23   authority to order Wayne Morris and Home Savings Termite

24   Control to cease and desist false advertising?

25      MR. YARDUMIAN:  Objection.  Lacks foundation.  Calls

712

1  for speculation.  It's an incomplete hypothetical.

2     THE WITNESS:  She had the authority to complete any

3  aspect of enforcement.

4     Q.  BY MR. SMOLKER:  And would that include the

5  authority to issue a cease and desist order?

6     A.  Yes.

7     Q.  And what is the legal effect of a cease and

8  desist order being issued by the Structural Pest Control

9  Board to a licensed structural pest control operator or

10 its responsible managing officer?

11    MR. YARDUMIAN:  Objection.  Lacks foundation.  Calls

12 for a legal opinion.  It's vague and ambiguous.

13    THE WITNESS:  The purpose of a cease and desist

14 order is to order the individual or the company to stop

15 what we believe to be a violation.

16    Q.  BY MR. SMOLKER:  And is the company or the

17 individual required by law to stop once they receive

18 such an order?

19    MR. YARDUMIAN:  Same objections.

20    THE WITNESS:  Yes.  They're supposed to.

21    Q.  BY MR. SMOLKER:  And what's the consequence if

22 they don't?

23    MR. YARDUMIAN:  The question is vague, ambiguous.

24 It's an incomplete hypothetical.  It lacks foundation.

25 It's unintelligible.

713

1    THE WITNESS:  If they ignore a cease and desist

2    order, they will normally suffer some form of

3    disciplinary action.

4    Q.    BY MR. SMOLKER:  Is there a law that says that

5    pest control operators are supposed to obey cease and

6    desist orders issued by the Structural Pest Control

7    Board, or that failure to do so is grounds for

8    disciplinary action?

9    A.    I don't know of a specific law that reads or

10    pertains to cease and desist, but there is a law that

11    specifically pertains to notices of noncompliance.

12    Q.    What does it say about notices of

13    noncompliance?

14    A.    I'd have to look in the Structural Pest Control

15    Act.

16    Q.    You want to do that?

17    A.    It's 8646.5.

18    Q.    What does it say?

19    A.    It says, "A notice of noncompliance shall be

20    issued to a licensee or registered company whenever an

21    authorized representative of the Board finds that a

22    pesticide application, fumigation or extermination

23    procedure being performed by the licensee or registered

24    company is not in compliance with the applicable laws,

25    rules or regulations.

714

1          "Upon receiving such notice, the licensee or

2     registered company shall discontinue such pest control

3     work until the procedure is brought into compliance.

4     Failure to discontinue after receiving a notice of

5     noncompliance is a ground for disciplinary action."

6          So a cease and desist order -- that's why at

7     the top of the notice it says, cease -- or it says,

8     "Notice of violation," "Notice of noncompliance."

9     Sometimes we check one box, sometimes we check both

10    boxes or just a notice of noncompliance.

11         Q.   So in other words, the cease and desist is

12    something that's issued when you established, in your

13    own mind, that somebody is not complying and you're

14    afraid that unless you order them to stop doing whatever

15    they're doing, they'll continue to do it?

16         MR. YARDUMIAN:  Objection.  Calls for legal opinion.

17    Lacks foundation.  Calls for speculation.

18         THE WITNESS:  The purpose of a cease and desist

19    order is to order the persons to stop what they're

20    doing.  To just stop it.

21         Q.   BY MR. SMOLKER:  But before you order someone

22    to stop doing what they're doing, do you first make a

23    determination that what they're doing is illegal?

24         A.   Yes.

25         Q.   Or in other words, that it's not complying with

715

1    the law?

2        A.   Yes.

3        MR. SMOLKER:  Could you mark this as Exhibit R.

4              (Exhibit R was marked for identification by

5    the Certified Shorthand Reporter, a copy of which is

6    attached hereto.)

7        Q.   BY MR. SMOLKER:  Would you please look at what

8    we've marked as --

9        MR. GREY:  Let me object.  I don't think this is

10   appropriate.  I think it's misleading and argumentative

11   to show the witness a document that was written by

12   counsel to the judge in this case specifying legal

13   arguments and have the witness comment on it.

14              I just think that's totally improper and it may

15   be a breach of your obligations as counsel.  I honestly

16   don't know.  I think it's completely inappropriate.  I

17   think it's also an attempt to try to mislead the witness

18   and perhaps create some type of bias or prejudice by

19   inserting communications to the court by the parties.

20   It's just totally inappropriate in a deposition.

21       MR. SMOLKER:  Gary, anything?

22       MR. YARDUMIAN:  Nothing other than we said the last

23   time we went through this exercise and you asked your

24   questions on this document.

25       Q.   BY MR. SMOLKER:  Would you look at R, please.

                                                      716

MR. YARDUMIAN:  Is it the letter from the Borton &

Petrini firm?

MR. SMOLKER:  Yes.

THE WITNESS:  Okay.

Q.   BY MR. SMOLKER:  Would you agree with the

statement that amorphous silica gel is an inert material

when it's used for the purpose of killing termites?

MR. YARDUMIAN:  Objection.  Question lacks

foundation.  Calls for speculation.  It's vague and

ambiguous.  It's an incomplete hypothetical, given the

nature of the question and the reference to the document

prepared by Borton & Petrini.

THE WITNESS:  What was the question?

MR. SMOLKER:  Could you read it, please.

(The record was read by the reporter.)

THE WITNESS:  No.

Q.   BY MR. SMOLKER:  Would you agree with the

statement that amorphous silica gel is an active

ingredient when it is used for the purpose of killing

termites?

MR. YARDUMIAN:  Same objections.

THE WITNESS:  Yes.

Q.   BY MR. SMOLKER:  At the December 16th, 1996

inspection at Home Savings Termite Control's offices,

were you under the mistaken belief that -- excuse me.

717

1      On December 16th, 1996, did you issue your

2  notice of violation to Home Savings because you were

3  under the mistaken belief that the changing of the name,

4  percentage or both of an inert ingredient is a change

5  requiring a new registration?

6      MR. YARDUMIAN:  Objection.  The question assumes

7  facts not in evidence.  Calls for speculation.

8      MR. GREY:  I'm going to insert the same objections

9  that I raised initially with you presenting this

10  document to the witness.

11      MR. YARDUMIAN:  Maybe I'm wrong, but did Mr. Adams

12  issue the cease and desist?

13      MR. SMOLKER:  He issued the notice of violation,

14  which is one of our exhibits here.

15      MR. YARDUMIAN:  That wasn't my question.

16      MR. SMOLKER:  It says, "Cease and desist

17  immediately."  It's Exhibit O.

18      Q.   BY MR. SMOLKER:  You attempted to give

19  Exhibit O to Mr. Morris, didn't you?

20      A.   Yes.

21      Q.   And you issued Exhibit O, correct?

22      A.   Yes.

23      Q.   And Exhibit O is a notice of violation, isn't

24  it?

25      A.   Yes.

718

Q.   And it's also an order to cease and desist immediately the use of the unregistered economic poison, Syloid 244?

A.   Yes.

Q.   Were you under the mistaken impression when you issued this notice of violation and cease and desist order that Syloid 244 had to have its own registration as a pesticide before it would be legal for Mr. Morris and his company to use it?

MR. YARDUMIAN:  Objection.  The question is vague, ambiguous, unintelligible as phrased.  Assumes facts. Also, apparently incorporates into it a letter that was written at a point in time which I don't even think Exhibit O existed.

THE WITNESS:  Your question actually confused me.

Q.   BY MR. SMOLKER:  Do you think you made a mistake when you issued Exhibit O, the notice of violation and cease and desist to Mr. Morris?

MR. YARDUMIAN:  Objection.  Vague and ambiguous. Overly broad.

THE WITNESS:  No.

Q.   BY MR. SMOLKER:  And after reading this letter, this July 18th letter which we've marked as Exhibit R, do you think you made a mistake when you issued the notice of violation to Mr. Morris which is Exhibit O?

719

1    MR. YARDUMIAN:  That's not true, Counsel, and don't
2    mischaracterize the record in this case.  This letter
3    that was apparently written by the Borton & Petrini firm
4    does not incorporate Exhibit O, doesn't come close to
5    incorporating Exhibit O, and is referencing, as I
6    understand it, other documents which Mr. Adams did not
7    prepare.

8         And the type of manipulation that you're
9    attempting in this matter right now, as well as in this
10   case, shouldn't be tolerated and it is unfair.  It's
11   prejudicial and it's something that a witness shouldn't
12   have to sit through.  It assumes facts not in evidence.
13   And beyond that, it's unethical, slippery and an
14   embarrassment to the profession.

15   MR. GREY:  I would have to agree with
16   Mr. Yardumian's comments.  I'll add for the record that
17   witnesses, including Jeff Humphreys, have refused to
18   read this document in depositions.

19       Q.   BY MR. SMOLKER:  Do you remember the question?

20       A.   No.

21   MR. SMOLKER:  Could you read the question back,
22   please.

23            (The record was read by the reporter.)

24   THE WITNESS:  No.

25       Q.   BY MR. SMOLKER:  So this letter hasn't

720

1    convinced you that you were wrong in issuing Exhibit O?

2        MR. YARDUMIAN:  Argumentative.

3        MR. GREY:  Same objections.

4        THE WITNESS:  No.

5        Q.    BY MR. SMOLKER:  Is there anything about

6    Exhibit R, the July 18th, 2000 letter, that you don't

7    think you understand?

8        MR. YARDUMIAN:  Objection.  Calls for speculation.

9    Lacks foundation.

10       THE WITNESS:  No.

11       Q.    BY MR. SMOLKER:  So you think you understand

12   what they're talking about in the July 18th, 2000

13   letter?

14       MR. YARDUMIAN:  Same objections.

15       THE WITNESS:  I understand what they're talking

16   about.

17       MR. SMOLKER:  Good.  The next document, please mark

18   this as S.

19               (Exhibit S was marked for identification by

20   the Certified Shorthand Reporter, a copy of which is

21   attached hereto.)

22       MR. YARDUMIAN:  We know this is gospel because it's

23   written by Mr. Klac, M.D., and I hope he's one of your

24   better experts.

25       Q.    BY MR. SMOLKER:  Do you recall seeing that

                                                        721

1   letter before?

2       A.   The first page?

3       Q.   And the second page both.

4       A.   Both, either one?

5       Q.   Yeah.

6       A.   I recall seeing the first one dated

April 10th of '97.  I'm not sure about the second

letter, April 12th, even though it was, I think, sent to

me.  There were some envelopes of documents that I had

received from this Gerald Klaz that I would open the

envelope, look at the first page, see who it was from,

and sometimes I didn't even look at the stuff.  And I

just put it in my file.

14      Q.   So you remember receiving the --

15      A.   I think I remember receiving this letter hoping

that I enjoyed the spiritous, somewhat vocal meeting.

On the second letter --

18      Q.   That's the one dated April 12th entitled

19  "Addendum to letter 10 April 1997"?

20      A.   Yeah.  I may have, like, reviewed it or glanced

21  at it, but there's some parts in this letter that I

22  don't actually remember.

23      Q.   Okay.  Now, were you at a homeowner's meeting

24  at Village Park Homeowner's Association?

25      A.   Yes.

                                                   722

Q.   And did that happen in April 1997?

A.   Yes.

Q.   And did you hear someone from Home Savings Termite Control make a sales presentation?

A.   Yes.

Q.   And was that person Mr. Rikk Thompson?

A.   If it was Rikk Thompson, I don't recall him introducing himself.

Q.   And you got there a little late?

A.   Right.

Q.   You got there as it was just beginning or after it started?

A.   I was probably one of the last persons to walk in.

Q.   Had it already begun?

A.   I don't know if it had formally begun yet, but the representative of Home Savings was already sitting in his chair at the head of the room and some discussions had taken place.  And I think, if I recall correctly, this was like maybe the second presentation put on by Home Savings.

So maybe this person, Rikk, was back for the second time and he had been working with them for quite some time.  They may have all already known who he was.

Q.   But you don't remember the name of who the

723

PACESETTER REPORTING   ▾   (310) 545-8077

1    principal speaker was that made the Home Saving --

2        A.    No.

3        Q.    -- presentation?

4        A.    No.

5        Q.    And did you go to this meeting for the purpose

6    of observing how Home Savings presented its product and

7    its services?

8        MR. YARDUMIAN:  Objection.  Vague.

9        THE WITNESS:  We had been contacted, I think, by

10   this Gerald Klaz.  And he was referred to me directly,

11   and I contacted him.  And he said that he had some

12   questions about the system and the products that they

13   were using, and that the association and the complex had

14   been entertaining a lot of other ideas of alternative

15   methods of treatment.  And that a person from

16   Home Savings was going to be putting on a presentation

17   again.

18           And at that moment in time, I said, "Well, when

19   are they going to put on this presentation?"

20           And I think he said it was, like, Thursday

21   night or something.  And he said, "Why?  Would you be

22   interested in attending?"

23           And I said, "Well, if you're inviting me to

24   attend, I will attend."

25           And he said, "Well, you have my invitation."

                                                          724

1          And I said, "Well, are you a Board member?  Are
2     you on the Board of Directors?"  And I don't think he
3     was.

4          He said, "No, I'm just another homeowner.  But
5     as a homeowner, you know, this is a public meeting.  I
6     could invite anybody I want."

7          And the true purpose of me going to the
8     meeting was -- I think this meeting took place before
9     Lisa Kaus' property.  And I think I wanted to see what
10    type of material they were proposing to use.

11         MR. YARDUMIAN:  And wasn't it Drione?

12         THE WITNESS:  At the meeting?

13         MR. YARDUMIAN:  Yes.

14         THE WITNESS:  The salesperson was actually asked two
15    or three times by some members of the Board plus some
16    individuals in the crowd.  And he never would actually
17    say the product name.  He said, "If you want to know the
18    actual product name, I'll have to provide that
19    information to you."

20         MR. YARDUMIAN:  Do you know what product was applied
21    at that property?

22         THE WITNESS:  No.  I don't even know if -- what I
23    had heard was that the association, the Board members of
24    the association -- this thing had gotten so involved
25    with all these homeowners, and in some cases some of the

725

1    they were actually thanking me for knowing that there's

2    someone out there that's interested in protecting them.

3            And the only thing I felt really strange

4    about at the meeting was that the representative of

5    Home Savings couldn't readily disclose to them just the

6    name of the product.

7        MR. GREY:  Can you read his answer back, just the

8    very last phrase or sentence.

9            (The record was read by the reporter.)

10       MR. GREY:  What do you mean, you felt strange about

11   that?

12       THE WITNESS:  Well, he was asked, like, three times

13   by different individuals -- you know, the first time

14   someone just said, "Well, what's the name of the

15   product?"

16           And he said, "Well, you know, I don't have that

17   information with me, but I can get that information for

18   you."

19           And then another person said, "Well, don't you

20   use this product yourself?  You know, not necessarily on

21   a daily basis, but haven't you used this product

22   yourself?"

23           And he said, "Yes, I have used this product."

24           And then someone else said, "Well, I don't

25   understand how, if you've used this product yourself and

                                                      729

1   you're here giving us a sales presentation, why you

2   can't just tell us the name of the product."

3       And he said, "I will get you the name of the

4   product."

5       And I think he made reference to the fact that

6   he has to go through an 8538 pesticide -- he didn't say

7   8538, but he has to go through and provide a pesticide

8   notification. And that, at that time, they would be

9   provided with all that information.

10      MR. GREY:  Thank you.

11      Q.   BY MR. SMOLKER:  Do you know of any reason why

12  the salesman shouldn't have told them the name of the

13  product that they used?

14      MR. GREY:  Objection.  Argumentative.  Assume facts.

15      MR. YARDUMIAN:  Calls for speculation.

16      THE WITNESS:  I have no reason -- I don't know why,

17  other than --

18      MR. YARDUMIAN:  I think you answered the question.

19  If you're going to be guessing and speculating, if you

20  have any reason to know what the answer is, go ahead and

21  answer it.  If you don't know --

22      THE WITNESS:  Yeah.  I actually -- you know, I

23  didn't see the termite inspection reports prepared and

24  delivered for that project -- for this particular

25  project, but I had seen inspection reports prepared and

730

1   the Certified Shorthand Reporter, a copy of which is

2   attached hereto.)

3       Q.    BY MR. SMOLKER:  Would you look at Exhibit U.

4       A.    Yes.

5       Q.    Could you tell us what that is.

6       A.    It appears to be a certified copy of a license

7   history for company registration certificate number

8   PR927, Home Saving Termite Control, Incorporated.

9       Q.    And what do you understand that document to

10  represent or be attempting to do?

11      MR. YARDUMIAN:  Objection.  Foundation.  Calls for

12  speculation.  I don't think this witness has even

13  indicated he's seen this type of letter before.

14      THE WITNESS:  This is a record of license activities

15  or required activities that have taken place since the

16  company registration was issued.  And by "license

17  activities," I mean -- that could mean changes of

18  address of record, changes of qualifying managers,

19  violations issued, disciplinary action taken over the

20  course of the history of the license.  Those are the

21  normal things that appear on a license history.

22      Q.    BY MR. SMOLKER:  And is the license history an

23  official document of the Structural Pest Control Board?

24      MR. YARDUMIAN:  Objection.  Foundation.

25  Speculation.

736

1    THE WITNESS:  A certified copy of a license history

2    is an official document of the Structural Pest Control

3    Board, and it's normally submitted as evidence to a

4    court as part of a legal system or hearing.  It's kind

5    of a track record of the company.

6        Q.   BY MR. SMOLKER:  So would it be fair to say

7    that a license history is a summation of the history of

8    the licensee as reflected in the official records of the

9    Structural Pest Control Board?

10       MR. YARDUMIAN:  Objection.  Foundation.  Calls for

11   speculation.  Assumes facts not in evidence.

12       THE WITNESS:  Yes.

13       MR. SMOLKER:  Off the record.

14           (Recess taken.)

15       MR. SMOLKER:  We'll mark this as V.

16           (Exhibit V was marked for identification by

17   the Certified Shorthand Reporter, a copy of which is

18   attached hereto.)

19       Q.   BY MR. SMOLKER:  Have you seen that before?

20       A.   Yes.

21       Q.   Is that a notice of violation you issued?

22       A.   Yes.

23       Q.   And what was that -- what is this about?

24       A.   This was the day that I got a call that

25   Home Savings was going to be going to this person's

737

Q.    What did you tell Wayne?

A.    I told Wayne that, you know, I don't have a problem with your idea and your method and your system. Everybody's always trying to build a better mouse trap, an alternative method, a better way of doing things.

And there's only two things that matter:  One is it accomplishes what it sets out to do.  It eliminates or exterminates the reported infestation. Two, you have to use a registered pesticide with that system.

Q.    Is it fair to say that the criticism you have of the Home Savings method as used at the Smolker unit is limited only to the use of a product, the Syloid 244, that was not registered?

A.    I think there's two problems there.  One is that it's an unregistered product.  Two is that you have a product migrating into a nontarget area, which is the living space, which persons have the potential to come into contact with.

Q.    And in terms of the Smolker unit, what do you believe caused the Syloid 244 to migrate into the nontarget area?

MR. YARDUMIAN:  Objection.  It's incomplete hypothetical.  Assumes facts and calls for speculation.

THE WITNESS:  Probably the number one cause of the

761

product migrating from the target areas into the nontarget areas is what I would say is the looseness and the cracked-up part of the structure.

And when buildings are built, inside walls and outside walls aren't airtight. And all buildings settle, all buildings expand and contract and all buildings eventually crack somewhere, whether it be diagonally across the wall, straight up and down a corner where two walls come together, across the top where the ceiling and the walls join.

Sometimes the joint between the wall and the chimney where the brick and the drywall come together isn't tight. Electrical outlets aren't tight. Buildings breathe. Buildings naturally exchange their air. And how loose fitting a building is or how cracked up it is will determine how fast some things migrate from inside the walls to outside the walls.

Q.    BY MR. GREY:  You mentioned an incident where you personally were exposed to some type of product which may have contained either Syloid 244 or an amorphous silica gel.

Did I understand that correctly?

A.    Correct.

Q.    When did that occur?

A.    On Lisa Kaus' house.

762

Q.    And what effects do you believe you -- what did you feel when you were exposed?

A.    I had a dust mask on, which is mostly a nuisance dust mask.  It doesn't have a hepa filter on it.  It's not rated to certain -- down to a certain -- it will filter things down to a certain size, but things smaller than that, it won't stop.

And I entered the attic space on Lisa Haus' house.  I wanted to take the opportunity while I was there to not only observe their treatment and confirm that they had switched the product like they were told to, but I also wanted to look at their finished treatment process.

And so I went under her house, I went up in the attic space, I went through the living space, went around the outside completely and underneath the back deck.  And I had a copy of the Home Saving report to make reference to as to where they had performed their treatments for -- remedial treatments.  Then I also observed what we called preventive treatment part of the building.

And when I went up into the attic space, they had dusted the attic space pretty good.  And as I was crawling around in the attic space, I could see the Syloid 244 clinging to the underside of the roof

763

sheathing, the roof joists, and settling on top of the insulation in the attic space.

And I gingerly crawled through the attic space and I could -- my eyes dried out and I -- I was actually getting some of the dust through my mask.  And my mouth dried out.  And I felt a little bit of tightness in my chest.

Q.   Did you feel anything else --

A.   Then I bailed out of the attic space.

Q.   And when you got out of the attic space, how did you feel?

A.   Not as bad as I have felt before, having been exposed to other things before.  And a few minutes later, my eyes were okay, my mouth became normal, and the tightness in my chest lasted a little bit longer. And I think that has something to do with the fact that I was born with asthma when I was younger and I have hay fever and allergies to cats and things.

So sometimes I can just drive past a school where they've just mowed the lawn and get a few whiffs of the pollen in the air and I'll get tightness in my chest, hay fever symptoms.

Q.   Do you still suffer from asthma?

A.   No.  I got through that.

Q.   When you were in the attic space, as you were

764

1    crawling around, were you disturbing the product that

2    had been applied?

3        A.    Yes.

4        Q.    Were you able to see it actually floating in

5    the air?

6        A.    Yes.

7        Q.    How would you describe how that looked?

8        A.    Just as a real fine dust, kind of like on a

9    sunny day when the bright sunlight shines through a

10   window and you can see the dust particles in the air --

11   which are here right now, but you don't see them because

12   the conditions aren't right with the light coming

13   through the window.  Just like seeing fine little dust

14   particles floating.

15       Q.    Without the light?

16       A.    Right.  In fact, you can see them with your

17   flashlight.  When you shine your flashlight beam through

18   it, you can see the particles in the beam of the light.

19       Q.    Were you able to see the particles outside of

20   the beam of light?

21       MR. SMOLKER:  He didn't say he used a flashlight

22   beam of light.

23       MR. GREY:  Thank you.

24       Q.    BY MR. GREY:  When you were in the attic, you

25   didn't use a flashlight?

                                                        765

A.   Yes, I did use a flashlight.  Yes.

Q.   Were you able -- you were obviously -- strike that.

I take it you were able to see the particles of product in the beam of the flashlight?

A.   Yes.

Q.   Were you also able to see the particles if they were not in the flashlight beam?

A.   If I recall correctly, there's an area in her attic space where there's a skylight that goes up through the attic space.  And the skylight's boxed in, but where it fits to the roof, it doesn't fit as tight as possible.  And there is some light that shines through into her attic space.  And I could see it in the beams of the light coming through the openings.

Q.   But what I'm getting at is, I'm trying to compare -- you gave us an analogy of when you were in this conference room and you look through a beam of light, you'd see normal dust in this room?

A.   Yes.

Q.   And what I'm trying to get at is if what you saw in Lisa Kaus' attic was different than that.

A.   Without the use of my light?

Q.   Yes.

A.   Actually, if you turn your flashlight on in an

766

1   attic space, it gets pretty black (sic).

2       MR. SMOLHER:  You mean off.

3       THE WITNESS:  Yeah.  When you turn it off in an

4   attic space, it gets pretty black.  Pretty dark.  So I

5   don't think -- I don't usually turn my flashlight off

6   when I'm in the attic space.

7       Q.    BY MR. GREY:  So there was no other light

8   source other than the beam of light from your flashlight

9   and the skylight in the attic?

10      A.    Correct.

11      Q.    And is there any way to compare what you saw in

12  the beam of the flashlight to the analogy you gave us of

13  sunlight coming through into this conference room?

14      A.    Actually, the dust from the Syloid 244 is quite

15  heavy in the air.

16      Q.    And that's something that you could see?

17      A.    Yes.

18      Q.    Was there any coloration to what you saw?

19      A.    It's white.

20      Q.    Did it look like a white cloud, white cloud of

21  dust?

22      A.    Yeah.  You know, there's various thicknesses of

23  clouds.  There's some clouds you can't see through and

24  then there's, you know, fog that you can see through.

25  But you could definitely see the product floating in the

767

air.

Q.   And you knew it was the product and not normal dust?

A.   Yes.

Q.   How?

A.   Because of the amount of the product.  And plus, I had actually -- I saw some injection sites where they had drilled around the skylight area.  And when they put their injection tool up against that, they had blasted a bunch of the product up against the side wall of the skylight.  And, you know, between the injection site and the product and having seen the product before, you know, I just put one and one together and figured it was the Syloid 244.

MR. SMOLKER:  Can I interrupt one second here?

MR. GREY:  Yes.

MR. SMOLKER:  You're talking about your inspection at Lisa's house?

THE WITNESS:  Yes.

MR. SMOLKER:  And you're talking about Syloid 244?

THE WITNESS:  Yes.

MR. SMOLKER:  I'm confused.  Are you saying they were using Syloid 244 at Lisa's house?

THE WITNESS:  The first time she had a treatment done -- I think she had a treatment done in '96 prior to

768

1    my cease and desist order on 12/16 of '96.  And I was

2    there in February of '97 when they went to do a

3    call-back -- a retreatment.  I'd have to look at the

4    file, but I think she had her work done and her

5    inspection report prior to the cease and desist order.

6            And when I went to her property, I looked at

7    her termite inspection report.  And it seems to me

8    that -- I think her termite report was actually one of

9    the ones that said Syloid 244.

10        MR. SMOLKER:  Just to make sure I have the

11   chronology and product correct, it's your understanding

12   that Home Savings Termite Control treated Lisa Kaus'

13   house with Syloid 244, correct?

14        THE WITNESS:  Correct.

15        MR. SMOLKER:  And then later, Lisa Kaus saw

16   continuous termite activity, correct?

17        THE WITNESS:  Yes.

18        MR. SMOLKER:  And then she complained to termite

19   control?

20        THE WITNESS:  Correct.

21        MR. SMOLKER:  And then termite control came back to

22   do a new application to take care of the termite

23   activity she was complaining about?

24        THE WITNESS:  Correct.

25        MR. SMOLKER:  And you went to the property when

769

1    termite control was supposed to be there doing their

2    reapplication?

3        THE WITNESS:  Correct.

4        MR. SMOLKER:  And you went through the house to

5    investigate the first application of Syloid 244

6    application that termite control had originally done?

7        MR. YARDUMIAN:  Objection.  Misstates the testimony.

8        THE WITNESS:  Say that again.

9        MR. SMOLKER:  You said you did an inspection of the

10   actual premises while you were there?

11       THE WITNESS:  Correct.

12       MR. YARDUMIAN:  For the retreatment.

13       MR. SMOLKER:  And I'm asking, were you doing this

14   inspection when you were actually there to see how the

15   Syloid 244 had been applied to begin with?

16       MR. GREY:  Objection.  Misstates his testimony.

17   Assumes facts.

18       MR. SMOLKER:  It's a question.  It's not misstating

19   anything.

20       MR. YARDUMIAN:  The question's been asked and

21   answered.

22       THE WITNESS:  Yeah.

23       MR. SMOLKER:  I'm trying to clear this up, because

24   you just said you were in the attic.

25       Q.   BY MR. GREY:  Let me see if I can clear it up.

                                                          770

1          You were in the attic -- and we're talking
2    about the event where you were coughing and you had to
3    leave.
4         A.   Uh-huh.
5         Q.   And when you were in the attic, what was your
6    understanding of what product was in the attic?
7         A.   Syltid 244.
8         Q.   And that's because the building had been
9    treated sometime prior to the issuance of your cease and
10   desist order?
11        A.   I think so.
12        Q.   When you were in the attic, had the building
13   been retreated by Home Saving?
14        A.   No.
15        Q.   So you were in the attic --
16        A.   The retreatment call-back in, I think it was
17   February of '97, which I'd have to look at this -- yeah,
18   February of '97.  They were treating inside the garage
19   and around the -- not like a skylight, but a high window
20   inside the kitchen and under the deck in the backyard.
21        Q.   So when Home Saving came back for the
22   retreatment, it's your understanding that they didn't
23   treat in the attic space?
24        A.   Correct.
25        Q.   What is a structural pest control operator?

                                                      771

Q.    When you were in the attic at Kaus' house --

A.    Still in the attic?

Q.    Yeah.

       Did you say if you just waved your hand over the floor or near the wall it would make the Syloid 244 become airborne?

MR. YARDUMIAN:  Objection.  That misstates his testimony.

THE WITNESS:  Actually, the process of me crawling through the attic space as gingerly as I was trying to caused some of the product to float.

Q.    BY MR. SMOLKER:  Yes.  But even without you physically disturbing it, just the air current created by your movements?

MR. YARDUMIAN:  Objection.

MR. GREY:  Lacks foundation.

MR. YARDUMIAN:  Lacks foundation.  Calls for speculation.  Vague and ambiguous.

THE WITNESS:  I don't know if it was the air currents or my movement because I was displacing some of the insulation and stuff as I was crawling.  I don't know if it was my air currents.

Q.    BY MR. SMOLKER:  You said it was very fine -- or let me ask you.  Is it your testimony that the Syloid 244 was very fine?

762

A.    It is very fine.

Q.    Yes.  And is it very easy to disturb with the slightest amount of pressure?

MR. YARDUMIAN:  Objection.  Foundation. Speculation.

THE WITNESS:  I don't know how much pressure it takes to displace it.

Q.    BY MR. SMOLKER:  Well, would just waving your arm within inches of where it is cause it to become airborne?

MR. YARDUMIAN:  Objection.  Incomplete hypothetical. Speculation.

Go ahead and answer.

THE WITNESS:  Depends on how much air pressure you can make with your hand.  But when we were in the trailer, just moving some of the bags around caused some of it to float in the air.  So I don't know how much pressure it takes to make it float.

MR. YARDUMIAN:  Is that your question?

Q.    BY MR. SMOLKER:  Well, I'm just trying to find out how easy it is to float, based on your experience.

What was your experience?  Can you explain to us how easy it was to get airborne?

MR. YARDUMIAN:  Objection.  Vague and ambiguous. Lacks foundation.

783

1    THE WITNESS:  I've never waved my hand at it to try

2  to get it to move, but I have blown at it and I've

3  crawled through it.

4    Q.   BY MR. SMOLKER:  What happened when you blew at

5  it?

6    A.   It goes up in the air.  Now, if you're going to

7  ask me how hard I can blow or how little it takes for me

8  to blow to make it go up in the air, I have no idea.

9    Q.   When you blew at it, what was it on?  Was it on

10  wood or was it in a bag?

11    A.   Actually, I was underneath a house on  --

12  Lisa Kaus' house.  And I had found some of it where it

13  had come down from a wall void onto the mud sill under

14  the house.

15    Q.   Is the mud sill a piece of wood or a piece of

16  mud?

17    A.   It's a piece of wood.

18    Q.   So there was some Syloid 244 on a piece of

19  wood?

20    A.   There was white dust, a pile of white dust on

21  the sill.

22    Q.   Which you assumed was Syloid 244?

23    A.   Yes.

24    Q.   And did you blow on this pile that was on the

25  wood?

784

A.   Yes.

Q.   And what happened to the pile?

A.   It went up into the air.

Q.   So it didn't cling to the wood and stick to it?

A.   It was a pretty deep pile.  It was probably about three or four inches in diameter and probably about two inches tall.

Q.   Wow.

A.   And I think it was an area where they had treated the wall void and there was a gap at the bottom of the wall where the dust had gone out through the bottom of the wall onto the mud sill.

MR. SMOLKER:  Thank you.


EXAMINATION

BY MR. YARDUMIAN:

Q.   When you were in the Smolker unit, did you see any white dust floating in the air that you associated with Syloid 244?

A.   No.

Q.   Did you go out on the deck outside of the loft?

A.   Yes.

Q.   Did you observe any wood fungus in and around the wood deck?

A.   No.

785

CALIFORNIA—STATE AND CONSUMER SERVICES AGENCY                    GEORGE DEUKMEJIAN, Governor



## STRUCTURAL PEST CONTROL BOARD
1430 HOWE AVENUE, SACRAMENTO, CALIFORNIA  95825

Telephone Numbers:

Administration Unit (916) 924-2291

Examination/Licensing/Records Storage (916) 924-7294

Compliant Unit (916) 620-6320

(213) 620-2255

(415) 557-9114

[X] NOTICE OF VIOLATION                    No. 0243

[ ] NOTICE OF NON-COMPLIANCE

| FIRM  Hm F Savings | TIME 1:00 A.M. P.M. | DATE 12/1/86 |
|---|---|---|
| NAME  Termite Control Inc | LICENSE # PR 927 | |
| ADDRESS  8854 Elizabeth Lake Road | | |
| CITY  Leona Valley | STATE CA | ZIP 93351 |
| FIRM'S LICENSE #  PR 927 | OFFICE REGISTRATION #  PR 927 | |
| OPERATOR'S NAME  Wayne Morris | TITLE  OM PR 3724 | |
| ADDRESS  8854 Elizabeth Lake Road | | |

LOCATION OF VIOLATION(S)  No UL Laboratory Latest Chemicals Used

SECTIONS

B & P CODES  8646, 8647

CAC

NATURE OF VIOLATION(S):

Use of a Unregistered Electric Poison

REMARKS:

Using an UL listed incorrectly this use
of the Unregistered Electric Poison
Equipt - 44

| SPECIALIST  Bill Adams | TELEPHONE  805 270-0256 |
|---|---|
| SIGNATURE | TITLE  RM |

CERTIFIED COPY

Keith Okuma
Acting Registrar

WHITE  -  Issuing Agency

YELLOW  -  Person Notified

PINK  -  State

431-34  (4-85)

Defendant EXHIBIT #  0

WITNESS:  Adams

DATE:  9-15-00

Kimberly Bonnell, CSR#10668




## DIVISION OF INVESTIGATIO
## REQUEST FOR SERVIC

**NOTE:** TO REDUCE INVESTIGATION TIME AND CLIENT AGENCY COSTS,
PLEASE COMPLETE FORM AS FULLY AS POSSIBLE.

Structural Pest Control Board    AGENCY    PCA CODE 43    DOI CASE NUMBER

Complaint # 97-505

SUBJECT  Morris                Wayne            F.        Home Phone
         (Last Name)        (First Name)    (Middle Initial)

Address _____ City _____ Zip _____

DESCRIPTION: DOB _____ Sex _____ SSN _____ DL No. _____

EMPLOYMENT: Occupation _____    Business Name  Home Saving Termite Control, Inc.

Business Address  8854 Elizabeth Lake Road    City Leona Valley    Zip 93551

Business Telephone            (805) 270-0256

☐ Sole Owner    ☐ Partner    ☐ Corporate Officer    ☐ Director    ☐ Employee

LICENSING INFORMATION    License Number: _____    Date Issued: _____    Date Expires: _____    Status: _____

☑ I  Unlicensed (include certificate that subject is not licensed)    Automated Complaint Tracking System No.

☐ Applicant  Date of Application _____

Previous Investigation: ☑ None  ☐ DOI Case No(s). _____

Previous/Pending Administrative Discipline: _____

COMPLAINANT  SPCB            Home _____    Business _____

Home Address _____ Zip _____

Business Address _____ Zip _____

Date Complaint Filed _____  Location Where Violation Occurred _____

DETAILS OF COMPLAINT (Who, What, Where, When, Why, How; Include copy of relevant documents;
list any witnesses and telephone number; use separate sheets as necessary.)

Subject alleged to be performing structural pest control without a proper license.

ALLEGED VIOLATIONS (List Section and Code)

8550 B & P Code

ACTION REQUESTED BY BOARD/BUREAU (Explain in Detail)

Please investigate per detail and take appropriate action.

HOURS AUTHORIZED  10        AUTHORIZED BY Maureen Sharp        DATE

CLIENT ENFORCEMENT CONTACT _____  PHONE _____  ATSS NO. _____

RSI/RFS (NEW 10/91)

CERTIFIED COPY
STATE OF
CALIFORNIA
Keith Okuma
Acting Registrar

Defendant EXHIBIT # _____

WITNESS: _Adams_

DATE: _9-15-07_

Kimberly Bonnell, CSR#10668

STATE OF CALIFORNIA—STATE AND CONSU.   SEF   S AGENCY

PETE WILSON, Governor

State of California
Department of
Consumer
Affairs

## STRUCTURAL PEST CONTROL BOARD
1422 HOWE AVENUE, SACRAMENTO, CA 95825
Telephone Numbers:

Administration Unit   (916) 263-2540
Examination/Licensing/Records Storage   (916) 263-2544
Complaint Unit   (916) 263-2533
Outside of Sacramento Area   1-800-737-8188
FAX   (916) 263-2469



DATE:          December 13, 1996

TO:            Division of Investigation
               Attention:  Antonia Ponce
               1000 South Fremont Avenue, Suite 1041
               Alhambra, CA  91803

FROM:          Ila Hoffman
               Complaint Unit

SUBJECT:       HOME SAVING TERMITE CONTROL, INC.

Greg Adams informed me that he plans on doing an office records
check at Home Saving Termite Control, located at 8854 Elizabeth
Lake Road, Leona Valley, California 93551. He needs a Division
of Investigation case opened in order for an Investigator to
accompany him. Danny Elias told Greg that you, Antonia Ponce,
would be assigned to the case. Therefore, I am forwarding this
case to you. Greg Adams plans on going out to Home Saving on
Monday, December 16, 1996. He should be contacting you.

At this time the license certification letter is not ready. I
will forward it to you as soon as it is ready.

Thank you for your assistance.



CERTIFIED COPY

STATE OF

Kolli Ozuna
Acting Registrar

HOME SAVINGS TERMITE CONTROL
NOTE'S

Home Savings Termite Control Inc.
PR 0927

9-26-96

(213)265-8123

I telephoned Bert Lopez of Van Waters and Rogers(Pesticide supply company) and was informed that the company no longer sells Dri-Die and that the manufacturer no longer sells the product to P.C.O.'s.  He referred me to AgrEvo(manufacture), at (800)843-1702.

9-26-96

(310) 802-2238

I telephoned Target(pesticide supply company) and was told by Heidi Luce, that it no longer sells Dri-Die.  She said she would send me the label for Drione.

10-7-96

(818) 575-5466

I telephoned Maryann Nolan, Inspector III, with the Los Angeles Department of Agriculture.  She was able to look up the pesticide use reports for Home Savings and found that the company listed two pesticides containing silica based products.   In the months of March and July, Home Savings listed that it used Drione(EPA #4816-353AA) and Dri-Die(4816-240).  Home Savings listed that it used 1/4 ounce of Drione in March and 27 ounces of Drione in July.  Home Savings listed that it used Five hundred seventy six pounds of Dri-die in March and seven hundred thirty three pounds of Dri-Die in July.  Nolan said she would look up the use records and mail copies of this years use reports to my P.O. Box.

10-16-96

(800) 843-1702

I telephoned AgrEvo, the former manufacturer of Dri-Die.  I was informed by the female person answering the telephone, that the company used to be called Fairfield American Corporation.  She confirmed that Dri-Die has not been made for pest control use for several years.  AgrEvo now sells Drione.

CERTIFIED COPY
STATE OF
CALIFORNIA
Ken Okuma
Acting Registrar

## HOME SAVINGS TERMITE CONTROL

**10-16-96**

I spoke with Maryann Nolan, Inspector III, with the Los Angeles
Department of Agriculture, and she informed me that the
Agricultural Department had received an inquiry regarding Home
Savings Termite Control and the use of Silica/Dri-Die, in the
treatment of termites.  The inquiry came from Susan Roberts (310)
822-9696.  Nolan informed Roberts that the Dri-Die label is
approved to aid in the prevention of termites.  I informed Nolan
that I had checked with the former manufacturer and distributors
of Dri-Die, and that it is my understanding that the product has
not been distributed for a couple of years.

**10-17-96**

I spoke with Maryann Nolan, Inspector III, with the Los Angeles
Department of Agriculture, and she informed me that she again
spoke with Susan Roberts and Roberts asked Home Savings for the
EPA registration number of the Silica product.  Nolan said that
Roberts was given two separate EPA numbers, which appear to be
false.  The numbers are 63231-67-4 and 67-4816-240.  She was also
given SI:112926.00.  Nolan said that she would review with the
supervisor and keep me posted.



CERTIFIED COPY

STATE OF
CALIFORNIA

Keith Okuma
Acting Registrar

CF CALIFORNIA—STATE AND CONSUM... ERVICES AGE. CY                    PETE WILSON, Governor



**STRUCTURAL PEST CONTROL BOARD**
1422 HOWE AVENUE, SACRAMENTO, CA  95825-3280

Telephone Numbers:
Administration Unit  (916) 924-2291
Examination/Licensing/Records-Storage  (916) 924-2294
Complaint Unit  (916) 920-6323
(213) 897-7838
(415) 557-9114

Department of
Consumer
Affairs

*MHS*
*CALL +SONS*
*COPY OF HER*
*LTR TO W...*



CERTIFIED COPY

Kelli Okuma
Acting Registrar

March 16, 1993

Mr. Wayne Morris
Home Saving Termite Control, Inc.
10660 Last Valley Ranch Road
Leona Valley, CA  93551

Dear Mr. Morris:

I have recently received information regarding the Home Saving
Dehydration System.

I have checked with the Department of Pesticide Regulation (DPR) to
determine if the borate product and silica gel you advertise using
in this system were registered for use in California.

I found that the borate you use is Tim Bor which has a current
active registration.  The silica gel known as Pyrinone had its
registration inactivated on December 31, 1990.  Distributors had
two years to sell their supplies of this product or until
December 31, 1992.  After that date, Pyrinone could not be
purchased for use in California. You are permitted as the end-user
to use up your existing supplies only.  This product cannot be
purchased outside of California and used here.

Another thing which I want to point out to you is that borates and
silica gel are not "non-chemical" products.  They are pesticide
chemicals and this is exactly why they are required to be
registered with the EPA and the DPR.  To suggest and state
otherwise as you do is false advertising and you must CEASE AND
DESIST this immediately.

*3/23/93*                          *3/24/0*
*...ME SAVINGS (UNGANS)*        *BULLET:*
*...LL CALL MRS BECK ON DOUG*  *MARK WAYNE*
                                *CALL MRS*

GRINDED

Defendant EXHIBIT #  *Q*
WITNESS:  *Adams*
DATE:  *9-15-00*

Kimberly Bonnell, CSR#10668

Mr. Wayne Morris                    - 2 -                    March 16, 1993

Your letter of explanation regarding this system contains some
statements which at best are very misleading.  I am interested in
knowing exactly what the possible existing health hazards regarding
fumigants and the potentially dangerous exposure to structure
occupants and company employees are in light of the fact sheets
required to be given to consumers discuss the health risks.  If the
fumigation is performed and aerated according to the requirements
of the law, actual exposure to gaseous residue will not occur.  As
far as Vikane is concerned there are no known or even suspected
health concerns.  Methyl bromide's only known possible problem is
associated with animal birth defects and there is no evidence these
carry over into human birth defects.  As with all chemical
substances used today, these chemicals are being studied for any
cancer causing problems but to date there are none.  Statements
such as yours are inflammatory and are not to be used.

Your system explanation indicates that the silica gel and the
borates are dusts applied with high pressure dusting and spraying
equipment in one area and are said to be highly penetrating liquid
solutions in another area.  This confusion must be clarified.

Currently there is an active complaint case involving
Edward Wasserman and your company (Case No. 93-53-3A-80-93).  The
property in this case is located in Santa Monica.  The Specialist
has determined that there are several spots in the structure,
garage and poolhouse where drywood termite infestations are present
and extend into inaccessible areas.  It appears that a fumigation
is necessary to rectify this situation.  You are responsible for
taking care of the garage and poolhouse fumigation to resolve this
complaint.  Please contact Mr. Smitley at (818) 309-0268 to discuss
this matter further.

Your immediate attention to the matters discussed in this letter is
required.  I am requiring a copy of your corrected advertisement
regarding your system to clear up that portion of this letter.
Mr. Smitley will be working with you on the Wasserman matter.

Sincerely,


MAUREEN A. SHARP
Deputy Registrar

MAS:pmp

cc:  Carl Smitley



CERTIFIED COPY

Kelli Okuma
Acting Registrar



LAW OFFICES OF

# BORTON, PETRINI & CONRON, LLP

7107 WILSHIRE BOULEVARD
SUITE 5100
LOS ANGELES, CALIFORNIA 90017-3614
(213) 624-2800
FAX: (213) 489-3930
EMAIL: BPCLA@BPCLAW.COM
WEB SITE: WWW.BPCLAW.COM

July 18, 2000

Los Angeles
003418/045809

VIA FACSIMILE & U.S. MAIL-213-485-0946

Judge Richard Fruin
Los Angeles Superior Court
111 N. Hill St.
Dept. 15
Los Angeles, CA 90012

   Re: <u>TIG Insurance Co.</u> v. <u>Smolker</u>
     BC173952

Dear Judge Fruin:

  We do not have a copy of your ruling continuing the July 18, 2000 hearing, but understand from Mr. Smolker through a copy of his letter to you that no appearance is necessary. While we have not been responding to Mr. Smolker's communications with you, it appears that there now is a substantive question as opposed to the prior ministerial questions.

  With reference to your apparent question regarding Syloid 244, we do not believe that registration in this case is an issue. Instead of an anticipated prolonged, expensive, and uncertain litigation with reference to the cease and desist order, Home Savings Termite Control apparently decided to obtain a separate registration on its particular product containing pure ASG (Amorphus Silica Gel/Syloid 244). ASG is an inert natural material which has been used well over fifty years in different applications, such as in food, toothpaste, dental absorbants, etc. . It has been used in pest control and has been registered for use in pest control for a long time. It is our understanding that Home was cited because of the inspector's mistaken belief that the changing of the name, percentage, or both of an inert ingredient is a change requiring a new registration. Home had been using a registered product containing 95% ASG along with 5% of other ingredients. It changed to 100% ASG. As you can see from the copy of California Food and Agricultural Code Section 12823, a change in the name or percentage, or both, of

Defendant EXHIBIT #   R
WITNESS:   Adams
DATE:   9-15-00

Kimberly Bonnell, CSR#10668

## BORTON, PETRINI & CONRON, LLP

Judge Richard Fruin
July 18, 2000
Page 2

an inert ingredient is not a change in composition requiring a new registration.   We shall be more fully briefing this issue in a Motion for Summary Judgment/Summary Adjudication anticipated to be filed in the near future.

Very truly yours,

ROBERT N. RIDENOUR

RNR:el

cc:   Via Facsimile & U.S. Mail:

All counsel (see attached mailing list)

Cross References:
   "Director": § 35.
   "Economic poison": § 12753.
   Contents of labels of economic poisons: § 12851.
   Ingredients statement on label of economic poison: § 12883.
   Misbranding of economic poisons: 3 Cal Adm Code § 6220.

Collateral References:
   Am Jur 2d Pollution Control §§ 309, 310, 312.


## § 12822. Supplemental application for registration

A supplemental application for registration of any additional economic poison may be submitted at any time without payment of the penalty which is required by Section 12818.

Enacted Stats 1967 ch 15 § 2.

Prior Law:

(a) Former Ag C § 1071.2, as added by Stats 1945 ch 273 § 3 p 737, amended by Stats 1949 ch 505 § 3 p 864, Stats 1965 ch 882 § 3 p 2391.

(b) Former Ag C § 1071, as amended by Stats 1933 ch 426 p 1073, Stats 1935 ch 334 § 5 p 1158, Stats 1937 ch 888 § 2 p 2453, Stats 1939 ch 793 § 1 p 2324.

(c) Stats 1921 ch 729 § 12 p 1262.

   Cross References:
      "Economic poison": § 12753.

   Collateral References:
      Am Jur 2d Pollution Control § 315.


## § 12823. Change in inert ingredients

A change in the name or percentage, or both, of an inert ingredient is not a change in composition of the economic poison which requires a new registration unless the change in inert material results in a change in the use or application of the economic poison.

Enacted Stats 1967 ch 15 § 2.

Prior Law:

(a) Former Ag C § 1071.2, as added by Stats 1945 ch 273 § 3 p 737, amended by Stats 1949 ch 505 § 3 p 864, Stats 1965 ch 882 § 3 p 2391.

(b) Former Ag C § 1071, as amended by Stats 1933 ch 426 p 1073, Stats 1935 ch 334 § 5 p 1158, Stats 1937 ch 888 § 2 p 2453, Stats 1939 ch 793 § 1 p 2324.

(c) Stats 1921 ch 729 § 12 p 1262.

   Cross References:
      "Economic poison": § 12753.


## § 12824. Eliminating from use certain economic poisons; Evaluating

The director shall endeavor to eliminate from use in the state any economic poison which endangers the agricultural or nonagricultural environment, is not beneficial for the purposes for which it is sold, or

36

# GERALD KLAZ, M.D.

April 10th, 1997

State of Californa
Department of Consumer Affairs
Structural Pest Control Board
1422 Howe Avenue Suite 3
Sacramento, Californa 95825

Attn:  Greg Adams, Structural Pest Control Board Specialist

Dear Greg:

I hope that you enjoyed the spiritous and somewhat vocal meeting of the Village Park Home Owners Association the other evening on Thursday, April 3rd, 1997.

I am enclosing for you two brochures that were distributed in the past by Home Savings Termite Control Inc.  From what I recall the same person, Rick Thompson, who made the presentation this time , has been here on at least one or two other occasions since the decision on how to treat our termites has been an ongoing process for several years.

I believe these two brochures were distributed in the 1995 and 1996 meeting.

I hope that they are helpful to you in your investigations.

We would at this time like to obtain information in the "M.S.D.S." for products containing silica gel and or borate compounds.  We will attempt to get these from Home Savings Termite Control but since we want them in advance of granting them any contract, they seem to be a bit resistant.  If you department has information in this regard, we would certainly appreciate your sending it to us as soon as possible. ]

Again it was a pleasure meeting you  and I hope that no insurmountable problems were created.

Very truly yours,

Gerald Klaz, Board Member Village Park Home Owners Association
2700 Pearl Street Unit 50
Santa Monica, Californa 90405
GK/jb
encl.

CERTIFIED COPY

Keith Okumi
Acting Regis...

Post Office Box 1525
Gateway Station
Culver City, CALIFORNIA
90232-1525

Voice:  (213) 650-5950
FAX:  (310) 392-6121

Defendant EXHIBIT # ___5___
WITNESS: __Adams__
DATE: __9-15-00__
Kimberly Bonnell, CSR=1066S

# GERALD KLAZ, M.D.

12 April 1997

Addendum to letter or 10 April 1997

Dear Greg,

The more I look into this the crazier it gets. I really need to know how much truth in advertising (i.e. lying by the salesmen) your agency will allow.

I am enclosing the M.S.D.S. of "Orione Insecticide" that Home Savings is now using and passing off as an "amorphous Silica Gel" treatment. It seems obvious to me that the active ingredients are the Pyrethrins and the Piperonyl butoxide that are in the product, and the Amorphous Silica Gel a carrying agent, and is not the active toxin. This, of course, is in total contradiction to the salesman's representation, that their treatment is with "non-toxins" and only uses a "natural substance" of Silica Gel.

Secondly, Amorphous Silica Gel is defined by CalOSHA as a form of silica that is like Clay or "Dirt". On its own, I don't understand how it can be represented as a Termite Toxin.

Thirdly, I need help in finding a reference or source of information about which State or other Governmental Agency is concerned with the Health hazard or Health safety of the occupant of the "condo" that is treated with a 5 micron (inhaleable) silica. Inhalation of a silica substance of this size is known to cause Silicosis, a serious pulmonary disease, and can also cause "pulmonary irritation" and be detrimental to persons with existing pulmonary problems. (Home Savings freely admitted that the powder has been known to enter the atmosphere of the treated home, and thus would be breathed by its occupants.)

Thank you for your help in this matter.

Very truly yours,


GK

CERTIFIED COPY

Koth Jhana
Acting Hr d .. .

Post Office Box 1525
Gateway Station
Culver City, CALIFORNIA
90232-1525

Voice:  (213) 650-5950
FAX:   (310) 392-6121

OF CALIFORNIA—STATE AND CONSUMER SERVICES AGENCY                                        PETE WILSON, Governor

# STRUCTURAL PEST CONTROL BOARD
1422 HOWE AVENUE, SACRAMENTO, CA 95825

Telephone Numbers:

Administration Unit (916) 263-2540
Examination/Licensing/Records Storage (916) 263-2544
Complaint Unit (916) 263-2533
Outside of Sacramento Area 1-800-737-8188
FAX (916) 263-2469




CERTIFIED COPY

Keiti Okuma
Acting Registrar

I, Donna J. Kingwell, say:

I am the duly appointed Registrar/Executive Officer of the Structural Pest Control Board of the State of California and a legal custodian of its records.   On the date below indicated, a diligent search was made under my direction of the records of said Board.

<u>LICENSE HISTORY – COMPANY REGISTRATION CERTIFICATE NO. PR 927</u>

On December 7, 1987, Company Registration Certificate No. PR 927 was issued in Branches 1, 2 and 3 to Home Saving Termite Control, Inc., with Wayne Franklin Morris, Qualifying Manager and an address of 11948 West Washington Blvd., Suite 201, Los Angeles, California 90066.

On August 21, 1990, Company Registration Certificate No. PR 927 paid a fine of $50 levied by the Los Angeles County Agricultural Commissioner for violation of section 8505.17 of the Business and Professions Code.

On April 25, 1991, Company Registration Certificate No. PR 927 paid a fine of $50 levied by the Los Angeles County Agricultural Commissioner for violation of section 8505.17 of the Business and Professions Code.

On October 8, 1991, Company Registration Certificate No. PR 927 paid a fine of $100 levied by the Los Angeles County Agricultural Commissioner for violation of section 8505.17 of the Business and Professions Code.

On February 9, 1993, Company Registration Certificate No. PR 927 reflected a change of address to 10660 Lost Valley Ranch Road, Leona Valley, California 93551.

On January 4, 1994, Company Registration Certificate No. PR 927 reflected a change of address to 8854 Elizabeth Lake Road, Leona Valley, CA 93551.

Defendant EXHIBIT # ___11___

WITNESS: _Adams_

DATE: ___9-15-00___

Kimberly Bonnell, CSR#10668

-2-

## LICENSE HISTORY - COMPANY REGISTRATION CERTIFICATE NO. PR 927

On August 13, 1997, Company Registration Certificate No. PR 927 paid a fine of $350 levied by the Los Angeles County Agricultural Commissioner for violation of section 6600 of the Food and Agricultural Code.

I hereby certify that the above truly and correctly states information contained in said records.

Dated this 16th day of December 1997, in the City of Sacramento, County of Sacramento, State of California.



DONNA J. KINGWELL
Executive Officer/Registrar

DJK:cla
SEAL

THE STRUCTURAL PEST CONTROL BOARD HAS NOT ADOPTED A REGULATION AUTHORIZING INTERVENTION BY THIRD PARTIES IN ADJUDICATIVE PROCEEDINGS WHICH COME BEFORE THE BOARD.



STATE OF CALIFORNIA—STATE AND CONSU.    SEF    S AGENCY



PETE WILSON, Governor

**State of California Department of Consumer Affairs**

## STRUCTURAL PEST CONTROL BOARD
1422 HOWE AVENUE, SACRAMENTO, CA 95825
Telephone Numbers:

Administration Unit  (916) 263-2540
Examination/Licensing/Records Storage  (916) 263-2544
Complaint Unit  (916) 263-2533
Outside of Sacramento Area  1-800-737-8188
FAX  (916) 263-2469

DATE:            December 13, 1996

TO:              Division of Investigation
                 Attention: Antonia Ponce
                 1000 South Fremont Avenue, Suite 1041
                 Alhambra, CA  91803

FROM:            Ila Hoffman
                 Complaint Unit

SUBJECT:         HOME SAVING TERMITE CONTROL, INC.

Greg Adams informed me that he plans on doing an office records check at Home Saving Termite Control, located at 8854 Elizabeth Lake Road, Leona Valley, California 93551. He needs a Division of Investigation case opened in order for an Investigator to accompany him. Danny Elias told Greg that you, Antonia Ponce, would be assigned to the case. Therefore, I am forwarding this case to you. Greg Adams plans on going out to Home Saving on Monday, December 16, 1996. He should be contacting you.

At this time the license certification letter is not ready. I will forward it to you as soon as it is ready.

Thank you for your assistance.



CERTIFIED COPY

Kolli Okuma
Acting Registrar

# EXHIBIT 66

*TIG Insurance Company vs. Gary Smolker, etal.*

Court of Appeal Case Nos. B281406, B286138, B287626, B289828

<u>COMBINED PROOF OF SERVICE FOR ALL PENDING APPEAL CASES</u>

I am a resident of the State of California, over the age of eighteen years, and not a party to this action.  My business address is 16055 Ventura Blvd., Suite 525, Encino, CA. 91436.  On October 14, 2019, I served the following document:

VOLUME 1 OF 2 VOLUMES OF EXHIBITS REFERRED TO IN MOTION TO CONSOLIDATE APPEALS FOR ORAL ARGUMENT AND OTHER RELIEF

__X__  VIA MAIL, by placing a true copy of the document(s) listed above in a sealed envelope with postage fully prepaid in United States mail in the State of California at Encino, California, addressed as set forth in the attached service list:

See attached list.

I am familiar with the Smolker Law Firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on the same day with the postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on October 14, 2019, at Encino, California.

_____

LESLIE GONZALEZ

**Combined Service List**

TIG Insurance Co. V Gary Smolker, et. Al.
LASC Case No. BC173952
Appeal Case Nos. B281406, B286138, B287626, B289828

## SERVICE LIST
*Smolker v. W.R. Grace & Co., et al.*
Second Appellate District, Division Seven, Case No. B281406
Superior Court of Los Angeles County, Case No. BC173952

ROSEMARIE S. LEWIS (158891)
JEFFREY Z. LIU (276849)
BORTON PETRINI, LLP
626 Wilshire Boulevard, Suite 975
Los Angeles, CA 90017
(213) 624-2869
Rlewis@bortonpetrini.com
Jliu@bortonpetrini.com
*Attorney for Cross-Defendants and Respondents*
  *W.R. Grace & Co. And Grace Davidson*

*(Served via United States Postal Service)*

## SERVICE LIST

*Smolker v. Truck Insurance Exchange, et al.*
Second Appellate District, Division Seven, Case No. B286138
Los Angeles County Superior Court, Case No. BC173952

PETER SCHWARTZ #109859
STEVEN R. INOUYE #245024
GORDON & REES LLP
633 W. 5th Street 52nd Floor
Los Angeles, CA 90071
Pschwartz@gordonrees.com
Sinouye@grsm.com

*Attorney for Cross-Defendant and Respondent*
*Truck Insurance Exchange*

*(Served via Unites States Postal Service)*

ROBERT DANIEL HOFFMAN #123458
CHARLSTON, REVICH & WOLLITZ LLP
1925 Century Park East, Suite 320
Los Angeles, CA 90067
County: Los Angeles County
Rhoffman@crwllp.com

*Attorneys for Cross-Defendants and Respondents*
*Coregis Group, Inc., Coregis Insurance Co., and California Insurance Company*

*(Served via Unites States Postal Service)*

RAUL LUIS MARTINEZ #82465
ELISE DALE KLEIN #111712
LEWIS BRISBOIS BISGAARD & SMITH LLP
633 W. 5th Street, Suite 4000
Los Angeles, CA 90071
Martinez@lbbslaw.com
Klein@lbbslaw.com

*Attorneys for Cross-Defendant and Respondent*
*Interinsurance Exchange of the Automobile Club of So. Cal*

*(Served via Unites States Postal Service)*

## SERVICE LIST

Mark Kincaid, Esq. SB#118640
26 Alhaja Way
Hot Springs Village,
Arkansas, 71909
Tel: 714-255-69955
Fax: 714-784-2546
Email: mkincaid@mkincaidlaw.com

**Attorneys for Home Savings
Termite Control, Inc., Wayne
Morris**

*TIG Insurance Company vs. Gary Smolker, etal.*

Court of Appeal Case Nos. B281406, B286138, B287626, B289828

<u>COMBINED PROOF OF SERVICE FOR ALL PENDING APPEAL CASES</u>

I am a resident of the State of California, over the age of eighteen years, and not a party to this action. My business address is 16055 Ventura Blvd., Suite 525, Encino, CA. 91436. On October 22, 2019, I served the following document:

VOLUME 1 OF 2 VOLUMES OF EXHIBITS REFERRED TO IN MOTION TO CONSOLIDATE APPEALS FOR ORAL ARGUMENT AND OTHER RELIEF

 __X__  VIA MAIL, by placing a true copy of the document(s) listed above in a sealed envelope with postage fully prepaid in United States mail in the State of California at Encino, California, addressed as set forth in the attached service list:

See attached list.

I am familiar with the Smolker Law Firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on the same day with the postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on October 22, 2019, at Encino, California.

_____

LESLIE GONZALEZ

## **GRACE BANKRUPTY ATTORNEY SERVICE LIST**

KIRKLAN & ELLIS LLP
333 South Hope Street
29th Floor
Los Angeles, CA 90071
Telephone: (213) 680-8400


KIRKLAN & ELLIS LLP
Adam Paul, Esq.
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200


THE LAW OFFICES OF ROGER HIGGINS, LLC
Roger J. Higgins, Esq.
111 East Wacker Drive, Suite 2800
Chicago, IL 60601
Telephone: (312) 836-4047


PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd.
13th Floor
Los Angeles, CA 90067-4003
Telephone:(310) 277-6910


PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones, Esq.
919 North Market Street, 17th Floor
PO BOX 8705
Wilmington, DE 19899-8705
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

# EXHIBIT

# 6

COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN


Court of Appeal Case No. B281406
(Related Appeals Pending in B286138, B287626, and B289828)

GARY SMOLKER

Cross-complainant and Appellant


vs.


W. R. GRACE & CO. et al.

Cross-defendants and Respondents


Appeal from the Superior Court of Los Angeles County,

Honorable Richard L. Fruin, Jr., Judge, Case No. BC173952


**VOLUME 2 OF 2 VOLUMES OF EXHIBITS REFERRED TO IN MOTION**

**TO CONSOLIDATE APPEALS FOR ORAL ARGUMENT AND OTHER**

**RELIEF (EXHIBITS 66-90) pages 1019-1195**


Gary Smolker, State Bar No. 56117
16055 Ventura Blvd., Suite 525, Encino, CA. 91436
Telephone: 818-788-7290, Facsimile: 818-990-9888
gsmolker@aol.com
Attorney, in pro per, for Cross-complainant and Appellant


1

# INDEX OF EXHIBITS

| EXHIBIT NO. | DESCRIPTION | PAGES |
|---|---|---|
| 62 | United States Patent No. 5,542,207 | 761-769 |
| 63 | Deposition Testimony of Matthew Fredericks | 775-821 |
| 64 | Deposition Testimony of Corey Arentz | 825-872 |
| 65 | Deposition Testimony of Greg Adams | 882-1014 |
| 66 | Deposition Testimony of Jeffrey Humphreys | 1019-1068 |
| 67 | Deposition Testimony of David Duncan | 1072-1096 |
| 68 | Borton Petrini & Conron, LLP | 1099-1101 |
| 69 | Structural Pest Control Letter | 1104-1105 |
| 70 | Notice of Deposit of Jury Fees | 1108-1109 |
| 71 | August 22, 2019 e-mail from GSS to Mark Kincaid | 1111-1114 |
| 72 | August 22, 2019 e-mail from GSS to all defense counsel | 1116 |
| 73 | August 22, 2019 e-mail from GSS to Mark Kincaid | 1118-1119 |
| 74 | August 22, 2019 e-mail from GSS to Jeffrey Z. Liu | 1121-1122 |
| 75 | August 23, 2019 e-mail from Rosemary S. Lewis to GSS | 1124-1126 |
| 76 | August 23, 2019 e-mail from GSS to Rosemarie S. Lewis, Raul Martinez, Robert Hoffman, and Peter Schwartz | 1128-1130 |
| 77 | August 23, 2019 e-mail from Rosemary S. Lewis to GSS | 1132-1133 |
| 78 | August 24, 2019 GSS email to Rosemarie S. Lewis | 1135-1137 |
| 79 | August 25, 2019 from Robert Hoffman to GSS | 1139-1142 |
| 80 | August 25, 2019 e-mail from GSS to Robert Hoffman, Raul Martinez, Peter Schwartz | 1144-1147 |
| 81 | August 26, 2019 e-mail from Raul Martinez to GSS | 1149-1152 |
| 82 | August 26, 2019 GSS e-mail to Raul Martinez and Peter Schwartz | 1154-1157 |
| 83 | August 26, 2019 e-mail from GSS to Raul Martinez | 1159-1162 |

| 84 | August 27, 2019 e-mail from Steven Inouye to GSS | 1164-1168 |
| 85 | August 27, 2019 e-mail from GSS to Steven Inouye | 1170-1174 |
| 86 | October 12, 2019 e-mail from GSS to Mark Kincaid | 1176-1179 |
| 87 | October 12, 2019 e-mail from GSS to Mark Kincaid | 1181-1183 |
| 88 | October 14, 2019 e-mail from Mark Kincaid to GSS | 1185-1187 |
| 89 | October 14, 2019 e-mail from Mark Kincaid to GSS | 1189-1191 |
| 90 | October 14, 2019 e-mail from GSS to Mark Kincaid | 1193-1195 |

Dated: October 14, 2019                Respectfully submitted,


Gary Smolker, Appellant In Pro Per

SUB-
EXHIBT
66

Exhibit "66"

A copy of the attached deposition transcript of Deposition testimony of Mr. Jeffrey Humphreys, Deputy Director, Consumer Protection Bureau, Department of Agricultural Commissioner Weights and Measure of the County of Los Angeles, regarding customary application of silica gel-based pesticides and Home Saving Termite Control's illegal use of Syloid 244 was provided to respondents by mail on or about November 6, 2000. It was filed in LASC Case No. BC173952 as an exhibit in Appellant's opposition to pending motion for Summary Judgment and Summary Adjudication.

## Summary of Jeffrey Humphrey's Testimony

Mr. Humphreys was the Deputy Director of the consumer protection Bureau of the Department of the Agricultural commissioner of the county of Los Angeles when his deposition was taken on August 31, 2000.

Mr. Humphreys used to work in the pesticide regulation division where he was supervising inspector. During his tenure in the pesticide regulation division his division did a string operation on TERMITE CONTROL along with the State Department of Pesticide regulation.

A specialist with the Structural Pest Control Board went with his men to the TERMITE CONTROL facility in Leona Valley to look at what TERMITE CONTROL used as a pesticide.

Mr. Humphreys is familiar with the fact that several complaints had been filed against TERMITE CONTROL.

One complainant complained the silica gel-treatment was ineffective., "She saw that termite adults were flying all over the treated area days after."

Mr. Humphreys is always interested in seeing pesticide product labels because compliance with instructions on a pesticide label is one of the code sections his division enforces.

Section 12973 of the Food and Ag. Code requires that a pesticide applicator comply with the directions on the pesticide product label of the product they are using. In order for his people "determine whether or not a pesticide applicator has complied with the label, "we need to see it."

When Mr. Morris was asked to produce the pesticide label for the pesticide product SYLOID 244 TERMITE CONTROL was using. Mr. Morris could not produce one because SYLOID 244 was not a registered pesticide product.

Mr. Humphreys testified: Mr. Morris/ TERMITE CONTROL needs to use an EPA - registered pesticide product because it is the law.

Mr. Humphreys testified; "I believe the section 12999.5, I believe, of the Food and Ag. Code... to the best of my memory requires people to use registered pesticides that are registered with the

California Environmental Protection Agency. I think that's the code section. It's been a while." "Anyone who uses pesticides has to use an EPA- registered product, whether they're licensed by the board or whether they grow tomatoes." It is the job of his office to enforce that particular law.

Another law requires pest control applicators to report their usage of pesticides to the Los Angeles County Agricultural Commissioner.

Structural Pest Control Operators are required to submit "on a monthly basis, a pesticide use report on a form that is provided to them by the state or by his department. It's a state form."

People who are in the business of eradicating termites are considered structural pest control operators. "All pesticides that they used during the month, yes, have to be reported. The amount—the name of the pesticides, the EPA registration number, and the amount used."

1.Mr. Humphreys stated it is against the law to report use of a pesticide product that is not being used.

2.The following questions were answered by Mr. Humpreys regarding report of pesticide usage.

"Q: Is there anything wrong about using the name "Drione" to report the usage of the silica gel Mr. Morris has been using?"

Mr. Humphereys: A: If he's using- let me broaden this a bit and say that if he's using the name of a product that he's not, in fact, using, yes it would be a violation."

"Q: It would be a violation of what?"

Mr. Humphereys: "A: It would be a violation of that section of the Business and Professions Code that requires them to submit that monthly use report."

"Q: And is this the kind of violation that your office is authorized to take action on?"

Mr. Humphereys: "A: Yes, it is something that we would take- we could take action on."

Mr. Humphereys testified that his office keeps monthly summary pesticide use reports completed by pest control companies on file typically for about two or three years.

Upon review of TERMITE CONTROL'S pesticide use reports Mr. Miguel Luna, one of the people working for Mr. Humphreys, discovered that TERMITE CONTROL had not reported the silica gel used by TERMITE CONTROL and that "the silica gel material used by Home Saving Termite Control is not an EPA –registered product."

Mr. Morris was written up for using SYLOID 244 because SYLOID 244 was not registered pesticide, Mr. Morris/ Home Saving Termite Control, Inc. was issued a cease and desist: "we ordered him not to use the SYLOID 244 product because it was not a registered pesticide."

1      Long Beach, California, Thursday, August 31, 2000

2                          1:25 p.m.

3

4                      JEFFREY HUMPHREYS,

5    produced as a witness by the Defendants, and having been

6    again duly sworn by the Certified Shorthand Reporter,

7    was examined and testified as follows:

8

9                         EXAMINATION

10   BY MR. SMOLKER:

11      Q      Would you please state your full name for the

12   record.

13      A      Jeffrey Neil Humphreys.

14      Q      Mr. Humphreys, are you the deputy director of

15   the Consumer Protection Bureau of the Department of the

16   Agricultural Commissioner of the County of Los Angeles?

17      A      Yes.

18      Q      Is your current work address 11012 Garfield

19   Avenue, South Gate, California 90280?

20      A      Yes, it is.

21      Q      Is the phone number (562) 940-8916?

22      A      My actual phone number is 940-8922.  That will

23   get to my phone.

24      Q      Thank you.

25             Mr. Humphreys, my name is Gary Smolker.  And

                                                          73

1    we're here in a deposition because a lawsuit has been

2    filed against Home Saving Termite Control, Inc.  Have

3    you ever heard of a company called Home Saving Termite

4    Control, Inc.?

5        A    Yes, I have.

6        Q    And I would like to abbreviate the name of

7    Home Saving Termite Control, Inc. to just be Termite

8    Control.  If I use the name Termite Control, can we

9    agree I'm talking about Home Saving Termite Control,

10   Inc., or would you rather me use the whole name?

11       A    You don't want to call it Home Saving?

12       Q    I'll call it Home Saving.

13       A    That will be easier.

14       Q    Okay.

15            How did it come about that you had heard of

16   Home Saving before?

17       A    Well, they're a -- they were a registered

18   company.  I used to work in the -- our pesticide

19   regulation division.  I was supervising inspector there.

20   And, of course, they're a company that operates

21   primarily in the West L.A. area, so I was familiar with

22   them a little bit in that regard, and they are

23   registered with us.

24            And then we did a -- I'll have to refer back

25   to a report or something for the date.  But at some time

74

1    during my tenure there we did a -- I guess you could

2    call it a sting operation on their location up in Leona

3    Valley.  One of my inspectors did, along with a state --

4    Department of Pesticide Regulation -- a state -- I think

5    he was with the Structural Pest Control Board --

6    specialist went up there and took a look at the kinds

7    of -- what was being used as a pesticide up at the

8    facility up there in Leona Valley.

9              Then I think we got involved in an

10   investigation here -- I think we're calling it the Ann

11   Verdun investigation -- regarding Home Saving's -- I

12   believe it's Home Saving's application of product -- the

13   same product in Ms. Verdun's condo unit.

14        Q    Are you familiar with the fact that complaints

15   have been filed against Home Saving concerning its use

16   of pesticides?

17              MR. YARDUMIAN:  Objection.  Overbroad.

18              THE WITNESS:  Am I to answer this or --

19   BY MR. SMOLKER:

20        Q    You're to answer, yes.

21        A    All right.

22              MR. PORTER:  It's your choice whether you want

23   to answer or not.

24              THE WITNESS:  All right.

25              Yes.  There were -- in addition to the Ann

75

1    Verdun case?

2    BY MR. SMOLKER:

3       Q       Any complaints.  Yes.

4           MR. GREY:  Let me caution the witness.

5           Mr. Humphreys, from time to time the attorneys

6    may object to some of the questions.  It's really your

7    choice whether or not to answer the question or not.

8           More important than that, though, is you need

9    to make sure that you understand the question that's

10   being asked.  And if for any reason you don't understand

11   the question or if you're not sure of what's meant, just

12   ask the attorney -- whether it's me or anyone else -- to

13   please rephrase the question.  We want to make sure you

14   understand the question.

15          THE WITNESS:  In this case I understand the

16   question, but I have to jog my memory a little bit

17   because it's so long ago.

18   BY MR. SMOLKER:

19      Q       Do you need some help?

20      A       I believe there was a case in Culver City that

21   we had investigated.  I can't recall the name or

22   anything, but I believe there was one in Culver City.

23          MR. SMOLKER:  Could you mark this as Number 1,

24   please.

25          MR. GREY:  Were there any exhibits to the

                                                    76

1   prior -- I don't remember if there were any exhibits to

2   the prior volume.  But if those were numbers as well and

3   you're using numbers, there may be some confusion.

4            MR. SMOLKER:  Letters.

5            MR. PORTER:  Okay.

6            (Exhibit 1 marked for identification.)

7   BY MR. SMOLKER:

8       Q       Does Exhibit 1 refresh your memory about a

9   prior complaint against Home Saving Termite Control?

10      A       Yeah.  The name rings a bell, Sherry Kaufman.

11      Q       Yes.  Have you seen Number 1 before?  Take

12  your time.  I'm not trying to rush you.

13      A       This was -- I don't know.  This looks like the

14  start of our investigation of a Sherry Kaufman.

15      Q       It says on the first sheet "Assigned by

16  Humphreys."  Do you happen to know if that's you?

17      A       Yes, that would be me.

18      Q       It says "Assigned to Luna."  Is that someone

19  who worked for you?

20      A       Yes, it was.

21      Q       So is it your understanding that Mr. -- is it

22  Mr. or Ms. Cassidy?

23      A       David Cassidy.

24      Q       Is it your understanding that Mr. Cassidy

25  filled out this report and gave it to you?

77

1      A      Yes, he did.

2      Q      Then you assigned the investigation of this

3  matter to Mr. Luna?

4      A  ·   Yes.

5      Q      And is this pesticide -- this form is called

6  "Pesticide Episode Investigation Report"; is that

7  correct?

8      A      Yes, it is.

9      Q      What is a pesticide episode investigation

10  report?

11      A      A -- well, it's a form, number one, that's a

12  preprinted form that the state produces.  A report, in

13  general, is really a report of the -- of an

14  investigation of what we do on any kind of

15  pesticide-related complaint that comes in.

16      Q      And what is your purpose in doing an

17  investigation?  What was -- for example, what was your

18  purpose in doing an investigation on the matter

19  described in Exhibit 1?

20          MR. YARDUMIAN:  Objection.  It's vague and

21  ambiguous.

22          MR. GREY:  Also assumes facts.

23          THE WITNESS:  I'm going to agree.  I'm not --

24  BY MR. SMOLKER:

25      Q      You don't understand the question?

78

1    fumigant or something.  They would call us.  That would

2    be an area of our jurisdiction because it might indicate

3    that the pesticide had not been applied properly, that

4    is, the directions -- label directions hadn't been

5    followed.

6        Q    On page 2 at the top of the report, the first

7    sentence says, "Ms. Kaufman told me that the silica gel

8    treatment was ineffective.  She saw that termite adults

9    were flying all over the treated area days after."

10              Is that more the kind of area you get -- your

11   office gets involved in or the kind of area the

12   Structural Pest Control Board gets involved in?

13              MR. GREY:  Vague, ambiguous, lacks foundation,

14   assumes facts.

15              THE WITNESS:  Well, there are some assumptions

16   you have to make here.  These termites are drywood, not

17   subterranean termites.  But, generally speaking, it

18   would be an area that the board would be involved in,

19   the fact that termites have not been -- that they still

20   had termites even after paying for a treatment.

21   BY MR. SMOLKER:

22       Q    Going to page 3 of this report, what I think

23   is the second paragraph, "From 11-04-96 until 11-07-96 I

24   left three messages in Mr. Morris's voice mail,

25   requesting the label of the silica gel."

                                                      88

1          Why would your office be interested in seeing

2     the label of the silica gel?

3          MR. YARDUMIAN:  Objection.  Foundation,

4     speculation.

5          MR. PORTER:  Same.

6          THE WITNESS:  We're always interested in

7     seeing the product labels because that's one of the code

8     sections we enforce, Section 12973 of the Food and Ag

9     Code, that requires that the applicator comply with the

10    directions on the label of the product they're using.

11    So to determine whether or not they complied with the

12    label, we need to see it.

13    BY MR. SMOLKER:

14         Q    12973 what code?

15         A    California Food and Agricultural Code.

16         Q    I'm not as good as the shorthand reporter.  I

17    have, "requires that the applicator comply with" what?

18         A    California Food and Agriculture Section 12973.

19         Q    What does it require?

20         A    That the applicator comply with the directions

21    on the pesticide product label.

22         Q    And you said that your office enforces this

23    code.  How does your office enforce this code, this one

24    we're talking about, 12973?

25         A    How?

                                                      89

1    Which step?

2    BY MR. SMOLKER:

3        Q      To do something about a mishap, not following

4    the label.

5        A      All these are misdemeanors.  But we can also

6    take civil penalties, of course.  If it's a misdemeanor,

7    it has to meet a criteria beyond reasonable doubt.  And

8    if we take civil administrative penalties, it's

9    preponderance of the evidence.

10       Q      Reading down on page 3 about seven lines down,

11   it says, "I asked him for the label of the silica gel.

12   He responded he purchases his silica gel from Grace

13   Davison, the same supplier of the silica to Dri-Die and

14   Drione insecticide manufacturer.  Mr. Morris remarked

15   that his material is the same as that used to

16   manufacture Drione and Dri-Die, so if the silica gel is

17   already approved by EPA, he thinks that he doesn't need

18   to apply for an EPA registration number.  I explained to

19   Mr. Morris that if he is using silica gel to control

20   drywood termites, he should apply to have his material

21   under EPA registration, so he may be able to have a

22   label for the specific use of it."

23              I want to ask you about several of the

24   statements made here.  Would there be anything wrong if

25   Mr. Morris was using silica gel that was not approved as

                                                          91

1    a product but was just an ingredient in other products

2    without having any --

3        A    Other products such as what?

4        Q    Dri-Die and Drione.

5            MR. GREY:  Objection.

6            Can the court reporter please read the

7    question back?

8                (The record was read as follows:

9                "Q    I want to ask you about

10               several of the statements made here.

11               Would there be anything wrong if

12               Mr. Morris was using silica gel that was

13               not approved as a product but was just an

14               ingredient in other products without

15               having any --

16                A    Other products such as what?

17                Q    Dri-die and Drione.")

18           MR. GREY:  The question is compound,

19    ambiguous, lacks foundation.

20           THE WITNESS:  I do not understand.

21    BY MR. SMOLKER:

22        Q    Mr. Morris, as I understand, is making an

23    explanation for why he can use silica gel without having

24    a label.  Is that your understanding of what Mr. Luna

25    was telling you in this report?

92

1          MR. YARDUMIAN:  Objection.  It misstates the

2     testimony.  It calls for speculation, assumes facts.

3          MR. PORTER:  It's also an incomplete

4     hypothetical.

5          THE WITNESS:  It's my understanding that

6     Mr. Morris is trying to explain why he's using the

7     material he's using.

8     BY MR. SMOLKER:

9          Q     Yes.  And then -- I'm going to call him your

10    man -- Mr. Luna explained to Mr. Morris that if he is

11    using silica gel to control drywood termites, he should

12    apply to have his material under EPA registration.  Do

13    you agree with that advice that Mr. Luna is reporting he

14    gave Mr. Morris?

15         MR. YARDUMIAN:  Objection.  Incomplete

16    hypothetical, calls for speculation.

17         THE WITNESS:  I do agree with Mr. Luna's

18    advice that -- as I read it here, as I understand it,

19    that he should use an EPA-registered product.  If it

20    requires Mr. Morris to register that product himself,

21    then Mr. Morris should do that.

22    BY MR. SMOLKER:

23         Q     Why is it that you would agree that Mr. Morris

24    should use an EPA-registered product?

25         MR. YARDUMIAN:  Objection.  Calls for

93

1   speculation, lack of foundation, calls for an expert

2   opinion.

3           MR. PORTER:  Same.

4           THE WITNESS:  Well, the reason he should do it

5   is because it's the law.

6   BY MR. SMOLKER:

7       Q       In other words, it's against the law to use a

8   product as a pesticide that isn't registered?

9           MR. GREY:  Objection.  Argumentative,

10  misstates the witness's testimony, vague and ambiguous.

11          MR. YARDUMIAN:  Lack of foundation, calls for

12  a legal opinion.

13          THE WITNESS:  Section 12999.5, I believe, of

14  the Food and Ag Code --

15  BY MR. SMOLKER:

16      Q       I'm sorry.  12995?

17      A       I don't have the code here in front of me, but

18  I believe it's 12999.5.

19      Q       Was there a 7 in there?

20      A       No.

21      Q       1299.5?

22      A       One, two, three nines, point five.

23      Q       Okay.  12999.5 to the best of your memory.

24      A       To the best of my memory requires people to

25  use registered -- pesticides that are registered with

                                                94

1    the California Environmental Protection Agency.  I think

2    that's the code section.  It's been a while.

3        Q    Maybe this will --

4        A    Does it -- do you have a document that

5    describes the code section?

6        Q    I have several that I'm going to show you.

7    One says "12995."

8        A    No.  It's three nines.  Oh.  Maybe -- who

9    knows?

10       Q    I think I have the notice of violation

11   somewhere.

12       A    Okay.

13            MR. YARDUMIAN:  It's got to be somewhere,

14   Gary.

15   BY MR. SMOLKER:

16       Q    Does this help refresh your memory?  I'm not

17   claiming anything here is right or anything, but --

18       A    We'll go with that.

19       Q    12995?

20       A    Okay.

21       Q    We'll get to that in a minute.

22            So is it fair to say it's your understanding

23   that there's a law that requires people who sell pest

24   control services to use registered pesticide products?

25            MR. YARDUMIAN:  Objection.  Foundation.

                                                        95

1           THE WITNESS:  It's broader than that.  Anybody

2   who uses pesticides has to use an EPA-registered

3   product, whether they're licensed by the board or

4   whether they grow tomatoes.

5   BY MR. SMOLKER:

6       Q     Is it fair to say that the job of your office

7   is to enforce that particular law?

8       A     Yes.

9       Q     That's one of the functions of your office?

10      A     One of the laws we enforce, yes.

11      Q     Reading on that same page 3, the next

12  paragraph --

13          Would it help if I gave you a highlighter?

14      A     No.  I'm fine.

15      Q     -- "I asked Mr. Morris how has he been

16  reporting the usage of silica gel to control drywood

17  termites to the Los Angeles County Agricultural

18  Commissioner."

19          Is there a law that requires pest control

20  applicators to report the usage of pesticides to the

21  Los Angeles County Agricultural Commissioner?

22          MR. YARDUMIAN:  Objection.

23          THE WITNESS:  Yes, there is.

24          MR. YARDUMIAN:  Same objections.

25  //

                                                    96

BY MR. SMOLKER:

    Q    Could you tell me the substance or the gist of
that law?

    A    For structural pest control operators -- I
believe it's in the Business and Professions Code.   I
can't remember the code section -- but it requires
that -- I can't remember the code section, but it
requires that, yes, structural pest control operators
submit on a monthly basis a pesticide use report on a
form that's provided to them by the state or by our
department.   It's a state form.

    Q    Do I understand you correctly that there's a
state law that requires pest control operators to submit
a monthly report of their pesticide usage?

    A    Uh-huh.

    Q    That's correct?

    A    Yes.   For most applicators it's in the Food
and Ag Code, but for structural pest control operators
it's the Business and Professions Code.

    Q    By pest control operators, is that a way of
describing --

    A    Structural pest control operators.

    Q    Are people who are in the business of
eradicating termites considered structural pest control
operators?

                                                        97

1    A    Yes, they are.

2    Q    If you or I hired someone to eradicate the

3 termites in our home or where we live, the name of that

4 kind of person would be structural pest control

5 operator?

6    A    Yes.

7    Q    To take our money the structural pest control

8 operator would have to have a structural pest control

9 operator's license?

10    A    Yes.

11    Q    To do it correctly, when they were done

12 applying the pesticide in our home, in their monthly

13 report they would have to report that, if they were in

14 Los Angeles, to your office?

15        MR. YARDUMIAN:  Objection.  Vague and

16 ambiguous, overbroad.

17        THE WITNESS:  Could you rephrase that?

18 BY MR. SMOLKER:

19    Q    If they did their job correctly, at the end of

20 the month they would have to submit a report to your

21 office that would include in it the application they

22 made at our house to kill the termites?

23    A    If they did it incorrectly or correctly, they

24 still have to report how much pesticide they used that

25 month.

98

1      Q      Including the pesticide they used at our

2  house?

3           MR. GREY:  Objection.

4  BY MR. SMOLKER:

5      Q      In other words, all pesticides they used.

6  That's the law.

7           MR. YARDUMIAN:  The question is vague,

8  overbroad.

9           THE WITNESS:  All pesticides that they used

10  during the month, yes, have to be reported.  The

11  amount -- the name of the pesticide, the EPA

12  registration number, and the amount used.

13  BY MR. SMOLKER:

14      Q      Then the next sentence said, "He responded he

15  had been using the name of Drione."  I'm reading the

16  sentence after, "I asked Mr. Morris how has he been

17  reporting the usage of silica gel."  It says, "He

18  responded he has been using the name of Drione."

19           Is there anything wrong about using the name

20  "Drione" to report the usage of the silica gel

21  Mr. Morris has been using?

22           MR. YARDUMIAN:  Objection.

23           MR. GREY:  Vague, ambiguous, lacks foundation,

24  calls for expert opinion.

25           MR. YARDUMIAN:  And calls for a legal

99

1    conclusion.

2           MR. PORTER:  Same.

3           THE WITNESS:  If he's using -- let me broaden

4    this a bit and say that if he's using the name of a

5    product that he's not, in fact, using, yes, it would be

6    a violation.

7    BY MR. SMOLKER:

8       Q    It would be a violation of what, the Business

9    and Professions Code that you were telling us about?

10          MR. GREY:  I would caution both the witness

11   and Mr. Smolker as well, you two are talking over each

12   other.  And we get a bad record and an aggravated court

13   reporter, and that's just not right.  Try to really slow

14   down, both of you, please.

15          THE WITNESS:  Okay.

16          MR. YARDUMIAN:  Also, if Mr. Humphreys could

17   wait until the entire question is asked, we may try to

18   protect our record and interpose our objections.

19          THE WITNESS:  I'll slow down.

20   BY MR. SMOLKER:

21      Q    I'll try and slow down too.  I'm sorry for

22   jumping into the middle of your sentence.

23          Can you read back whatever partial question I

24   asked?  Then I'll rephrase it.  I don't remember where I

25   was.

                                                      100

1              (The record was read as follows:
2                  "Q    It would be a violation of
3              what, the Business and Professions Code
4              that you were telling us about?")
5    BY MR. SMOLKER:
6        Q    You were explaining to us that if Mr. Morris
7    was using the name of a product in his monthly pesticide
8    use reports that he was not, in fact, using, it would be
9    a violation.  My question is:  It would be a violation
10   of what?
11             MR. YARDUMIAN:  Same objections.
12             THE WITNESS:  It would be a violation of that
13   section of the Business and Professions Code that
14   requires them to submit that monthly use report.
15   BY MR. SMOLKER:
16       Q    And is this kind of violation the kind of
17   violation that your office is authorized to take action
18   on?
19             MR. YARDUMIAN:  Objection.  The question is
20   vague, ambiguous, calls for a legal opinion.
21             MR. PORTER:  Same.
22             THE WITNESS:  Yes, it is something that we
23   would take -- we could take action on.
24   BY MR. SMOLKER:
25       Q    Going to the next page, the first full

                                                    101

1    sentence of Exhibit 2, first full paragraph, "On

2    12-02-96 I called L.A. County Ag Inspector Maryann Nolan

3    and asked her to fax me the monthly summary pesticide

4    use reports for Home Saving Termite Control."

5              Let me ask you, first, does your office keep

6    monthly summary pesticide use reports?

7        A    Do you mean do we keep them on file, ones that

8    are completed by the pest control company?

9        Q    Yes.  Once you receive them, do you throw them

10   away?  What do you do once you get one of these monthly

11   use reports?

12       A    Yes, we keep them on file typically for about

13   three years, two or three years.

14       Q    Then what happens after two or three years?

15       A    They're disposed of.

16       Q    Do you make a Xerox copy before you dispose of

17   them or do you just completely clear all your files out?

18       A    We just throw them away.

19       Q    Do you have computer information that

20   summarizes this for everyone before you throw these

21   away?

22       A    Yeah.  We have a program where -- with the

23   state where we enter the pesticide use data, and it's

24   sent up -- at least it was the last time I was there --

25   it was sent up on a floppy disk to Sacramento.  And then

                                                          102

1    you moved to, the South Gate address on Garfield Avenue?

2         A     No.   The new address is -- for the main

3    office, I'm talking about here -- where our pesticide

4    regulation division is located is 12300 Lower Azusa

5    Road, Arcadia.   And I don't have the zip.

6         Q     12300 Lower Azusa Road, Arcadia, California?

7         A     Yes.

8         Q     That's the new address for the main office?

9         A     Yes.

10        Q     Where what is?   The pesticide registration,

11   did you call it?

12        A     I said our pesticide regulation division where

13   I formerly worked is located in that office now.

14        Q     If somebody still had these records, would

15   that be most likely the pesticide regulation division?

16        A     Yes.

17              MR. SMOLKER:   Could you please mark this as

18   Number 3.

19              (Exhibit 3 marked for identification.)

20   BY MR. SMOLKER:

21        Q     I'm asking you to look at 3.   3 is a

22   collection of documents on what appears to be a

23   preprinted State of California form entitled "Monthly

24   Summary Pesticide Use Report."

25              Is this the kind of form that you were telling

                                                        104

1    us about on which monthly summary pesticide use reports

2    are reported to your office?

3         A     Yes.  This is the report that structural pest

4    control operators use to tell us how much pesticide was

5    used in Los Angeles County.

6         Q     Now, this report, by coincidence, happens to

7    say that it's for Home Saving Termite Control, Inc., and

8    it happens to be for the months of use of April, May,

9    September, October, March, and February.

10             How about if we --

11             MR. PORTER:  Mr. Smolker, what are you doing

12   to the exhibit you just marked?

13             MR. SMOLKER:  It's still going to be the same

14   exhibit.  I'm going to put the months in order instead

15   of having them out of order.

16             MR. PORTER:  Okay.

17   BY MR. SMOLKER:

18        Q     By coincidence, this collection that we've

19   called 3 are the monthly use reports for February,

20   March, April, May, September, and October.

21             Now, if Mr. Luna had a file that went along

22   with his pesticide episode investigation report and had

23   the pesticide use reports that were faxed to him by

24   Inspector Maryann Nolan and Home Saving Termite Control,

25   Inc. in that file, where would that file be at?

                                                        105

1   notice of violation file perhaps.  But usually, yes, it

2   should have all of the pertinent information.

3        Q    If I, for example, wanted to get a copy of the

4   Sherry Kaufman file ror this pesticide episode -- if I

5   asked for it, how should I describe it to your office so

6   your office would know what I'm asking for?

7        A    You would ask for it by name.  We file them

8   alphabetically by the name of the complainant up here

9   that's listed, first complainant listed on the front

10  page there, filed by complainant by year.

11       Q    So if I wanted this file, would I ask for the

12  Sherry Kaufman complaint filed in 1996?  Would that be

13  the proper way to ask for this?

14       A    Yes.  That would be the easiest, fastest way

15  to do it.

16       Q    Which office would be the best office to

17  direct my inquiry to?  The South Gate office or the

18  Arcadia office?

19       A    Arcadia office.

20       Q    Reading down on that page 4 of that report,

21  the next paragraph, "From reviewing the above-mentioned

22  use reports, I found out that Dri-Die insecticide has

23  been currently reported in very significant amounts.

24  The use of Drione has been currently reported too.  I

25  haven't found the use of silica gel.  It appears that

108

1  the silica gel use by Home Saving Termite Control, Inc.

2  is not reported.  The silica gel material used by Home

3  Saving Termite Control is not an EPA-registered product.

4  This report is sent to my supervisor, Mr. Jeff

5  Humphreys, for further investigation."

6         Do you have any independent recollection of

7  receiving this report for further investigation?

8     A     Well, I obviously did.  No, I do not.  I don't

9  specifically remember when and how it came back across

10 my desk.

11    Q     But do you remember that it did come across

12 your desk?

13    A     Well, I signed off on it.  So, yes, I'd have

14 to say it came across my desk.

15    Q     I'm not trying to make you say things by

16 leading you in such a suggestive way you have no choice

17 in the matter.  If you think I'm trying to trick you or

18 something, that's not my intention.  I don't want you to

19 say anything you don't feel real full-hearted and

20 confident about.  If you don't remember, that's

21 perfectly okay with me.  I'm not trying to embarrass

22 you.  I'm trying to learn things here.

23    A     Okay.

24    Q     Let's assume that you did get this report.

25 I'm asking you what would be your customary next action

109

1    if you got a report that said something like this, that

2    somebody is using a product -- in this case, silica

3    gel -- and is not reporting it?  What would your normal

4    or customary reaction, if you had one, be?

5              MR. YARDUMIAN:  Objection.  The question is

6    vague and ambiguous, lack of foundation, calls for

7    speculation.

8              THE WITNESS:  I think, given the fact that we

9    have a problem here with the monthly use reports, the

10   incorrect -- possible incorrect reporting of an

11   insecticide, I might order the inspector that covers the

12   Leona Valley area to do a headquarters inspection and

13   confirm what kind of pesticides are at the location of

14   the company headquarters.

15   BY MR. SMOLKER:

16        Q    Once somebody like Miguel Luna made a report

17   like this to you, would it be your normal practice to

18   double-check what he had told you?  In other words,

19   would it be your normal practice to check the monthly

20   use report yourself to confirm that what he said is

21   true, that it's reporting Drione and Dri-Die, but it's

22   not reporting silica gel?

23        A    Yes.  That would be my normal practice.

24        Q    If you did things in a normal way and you

25   received this report, you would have also looked at the

110

1    monthly use reports being referred to in this report?

2        A    I probably would have, yes.

3        Q    Could you briefly tell us why you would

4    inspect this further?  By that I mean why would you be

5    concerned that someone might be using an unregistered

6    product and someone is giving wrong information on their

7    monthly use reports?  Why would that make you

8    investigate further?

9            MR. GREY:  Compound, overbroad.

10           THE WITNESS:  Again, the use of a pesticide

11   that's not registered is a violation of the law.

12   BY MR. SMOLKER:

13       Q    It's your job to investigate these kinds of

14   violations of the law?

15       A    Yes.

16       Q    The purpose being if you find out that it was

17   done intentionally, you're going to do something about

18   it?

19       A    Correct.

20           MR. SMOLKER:  Now I'd like to mark as the next

21   in order, as Number 4, something that at your last

22   deposition was marked as Exhibit D.

23           MR. YARDUMIAN:  Why don't you refer to the

24   same exhibit?

25           MR. SMOLKER:  Because I want to have this all

                                                      111

1    together in one book.

2            MR. YARDUMIAN:  It will be in one series of

3    the deposition.

4            MR. SMOLKER:  Mark that 4, please.

5            (Exhibit 4 marked for identification.)

6            MR. YARDUMIAN:  Why don't we take a break.

7            (Recess.)

8    BY MR. SMOLKER:

9        Q    We had just finished looking at Exhibit

10   Number 2, which has as its last entry, "Inspection

11   performed at offices of Home Saving in Leona Valley,"

12   L-e-o-n-a, "on 12-17-96 by Inspector John Cervantes.

13   Inspection report pending."

14           The next thing I'm asking you to look at is

15   Exhibit 4.  Is Exhibit 4 the inspection report for the

16   inspection of Home Saving in Leona Valley?

17           MR. PORTER:  Objection.  Lacks foundation.

18           THE WITNESS:  Yeah.  Yes.

19   BY MR. SMOLKER:

20       Q    Looking at the last page of this -- what I'm

21   going to call "inspection report," it says, "Report

22   reviewed and approved by Jeff Humphreys, date 1-15-97."

23           Is that your signature, Mr. Humphreys?

24       A    Yes, it is.

25       Q    Does that indicate that you read and approved

                                                    112

1    Exhibit 4?

2                MR. GREY:  Vague and ambiguous, lacks

3    foundation.

4                THE WITNESS:  Yes.

5    BY MR. SMOLKER:

6        Q    Now, the report states on page 2 that there

7    were containers that bore an EPA registration number

8    034700 MD 001 on the containers.  Do you see that at the

9    top of page 2?

10       A    Uh-huh.  Yes.

11       Q    Did it bother you that it was concluded that

12   there wasn't an EPA registration number but the

13   containers had this EPA registration number

14   034700 MD 001 on them?

15               MR. YARDUMIAN:  Objection.  Vague and

16   ambiguous, assumes facts, lacks foundation.

17               THE WITNESS:  Yeah.  I don't -- I don't know

18   how to respond to that.

19   BY MR. SMOLKER:

20       Q    . Let me ask another question.  Reading down in

21   the next paragraph, it says that there was a material

22   safety data sheet for Syloid silicas.  Following me?

23       A    Uh-huh.

24       Q    "Under trade names this sheet listed

25   Syloid 244."  That's the product we're talking about.

113

1    "Under the section on regulatory status it lists the

2    number 'EPA registration number 034700 MD 001.'  That is

3    the number that appeared on the service container

4    labels."

5            Does it bother you that your men concluded

6    that this product doesn't have an EPA registration

7    number, but there's an EPA registration number in the

8    material safety data sheet which is the same as the EPA

9    number on the containers of this material?

10           MR. YARDUMIAN:  Same objections.

11           MR. PORTER:  Compound also.

12           THE WITNESS:  I don't know what my inspector

13   assumed here.  I can comment on this.

14   BY MR. SMOLKER:

15       Q     Would you comment on that?

16       A     If I saw a number like this, 034700 MD 001, I

17   would not assume that that was an EPA registration

18   number.  I don't know if -- frankly, I don't -- and I

19   probably read this at the time and recognized -- or

20   maybe I worked under the assumption.  I don't know

21   what -- but that perhaps this was written by Mr. Morris,

22   that perhaps this was stenciled on something other.  But

23   this looks more like an EPA establishment number rather

24   than a registration number.

25       Q     I'm going to later show you the actual

114

1          MR. PORTER:  I'll join and add that it's an

2    incomplete hypothetical.

3    BY MR. SMOLKER:

4          Q     Do you want her to read the question back?

5          A     No.  Because I agree with the two counsels

6    here, that it's very tough to understand.  Can we just

7    put the question without all the prefacing, just a

8    simple sentence?

9          Q     Sure.

10          Does each individual pesticide product that an

11    individual uses as a pesticide product have to be

12    registered with the EPA before it can be used?

13          MR. YARDUMIAN:  Same objections.

14          MR. PORTER:  Same.

15          THE WITNESS:  Yes.  The product that, for

16    example, this company is using, has to be registered

17    with the California EPA.

18    BY MR. SMOLKER:

19          Q     And by "this company" we're referring to Home

20    Saving Termite Control?

21          A     Right.  The one referenced here in the report.

22          Q     And the product we're referring to is

23    Syloid 244?

24          MR. GREY:  Objection.  Misstates the

25    testimony, assumes facts.

                                                      118

1          MR. YARDUMIAN:  Join.  It's an incomplete

2  hypothetical as well.

3          MR. PORTER:  Asks for a legal conclusion.

4          THE WITNESS:  Yes.  I think we're talking here

5  about this Silica 244.

6  BY MR. SMOLKER:

7    Q    Yeah.  It's the stuff in the 50-pound bags

8  that you saw and took a picture of?

9          MR. YARDUMIAN:  Objection.  Vague, ambiguous,

10  assumes facts, lacks foundation.

11  BY MR. SMOLKER:

12    Q    At the bottom of the page, "It contained a

13  pallet" -- "Mr. Morris unlocked the door, and we went

14  inside the trailer.  It contained a pallet of about

15  50 large bags.  The bags were marked with the name

16  Syloid Silica 244."  That's what we're referring to,

17  right?

18          MR. YARDUMIAN:  Objection.  Vague and

19  ambiguous, calls for speculation.

20          THE WITNESS:  I believe that's what we're

21  talking about.

22  BY MR. SMOLKER:

23    Q    What you're saying is that before Mr. Morris

24  could use these bags of Syloid silica 244 as a

25  pesticide, Mr. Morris would have to have the Syloid 244

                                              119

1    registered as a pesticide; is that correct?

2            MR. YARDUMIAN:  Same objections.

3            THE WITNESS:  That's correct.

4            MR. PORTER:  Same objections.

5    BY MR. SMOLKER:

6        Q    Then the report goes on to say, on the next

7    page, "We told Mr. Morris we were going to write

8    violations against Home Saving Termite Control for use

9    of an unregistered economic poison, Food and Agriculture

10   Code 12995."

11           Does the word or phrase "economic poison" --

12   is that synonymous with "pesticide"?

13           MR. GREY:  Vague, ambiguous, lacks foundation.

14           THE WITNESS:  Yes, it is.

15   BY MR. SMOLKER:

16       Q    So is it fair to say that what Mr. Morris was

17   being written up for was for using Syloid 244 because

18   Syloid 244 was not a registered pesticide?

19           MR. YARDUMIAN:  Objection.  Lacks foundation,

20   calls for speculation, assumes facts.

21           MR. PORTER:  Same.  Join.

22           THE WITNESS:  Run the question by me again.

23           MR. SMOLKER:  Could you read it back, please.

24           MR. YARDUMIAN:  Listen to the question, Gary.

25   Very speculative.

                                                    120

1          (The record was read as follows:

2              "Q     So is it fair to say that what

3          Mr. Morris was being written up for was

4          for using Syloid 244 because Syloid 244

5          was not a registered pesticide?")

6          THE WITNESS:  Yes.

7  BY MR. SMOLKER:

8      Q    Now, when you read and approved this report --

9  on the last page it has your name as being someone who

10  reviewed and approved it -- did you agree that it was

11  okay if -- to write up Mr. Morris for violating Food and

12  Agriculture Code Section 12995 if he was using

13  Syloid 244 and Syloid 244 was not registered as a

14  pesticide?

15      A    We issued him a cease and desist, and we

16  ordered him not to use the Syloid 244 product because it

17  was not a registered pesticide.  I believe that's what

18  we did here.

19      Q    That is.  And I'll show you the violation

20  notice.  You also issued a violation notice.  That will

21  be the next thing I'll show you.  Would you like to see

22  it now?

23      A    Sure.

24          MR. SMOLKER:  Can we mark this as number 5.

25          (Exhibit 5 marked for identification.)

                                                      121

BY MR. SMOLKER:

Q    Number 5 is a multipage document.  It's three pages long.  The first page has at the top of it the words "Structural Violation File."  The next page is something called "State of California Violation Notice." The third and last page looks to me like the second page of the violation notice.  Let's look at the violation notice.

A    Okay.

Q    Do you want to comment on the violation notice?

MR. YARDUMIAN:  Totally overbroad.  No question pending.

BY MR. SMOLKER:

Q    I could ask you a specific question.  You said, "I believe we issued a cease and desist order ordering Mr. Morris to stop using Syloid 244."  Now you can read the actual violation notice so you don't have to trust your memory.  Does this refresh your memory of what you did?

A    Yes, it does.

Q    What do you now remember that your office did?

A    We issued a -- Mr. Cervantes issued the cease and desist order.

Q    That's also called a violation notice.  What

122

1    do the words "violation notice" mean, top left-hand

2    corner?

3              MR. YARDUMIAN:  The question is vague as

4    phrased.

5              THE WITNESS:  The violation notice is simply

6    the title of this form.

7    BY MR. SMOLKER:

8         Q    Does it notify someone that they've violated a

9    law?

10             MR. YARDUMIAN:  Objection.  Misstates the

11   witness's testimony.

12             THE WITNESS:  Our intent with these -- let me

13   state it varies from county to county.  And in our

14   county, when we find somebody not complying with a

15   provision of the law, we document it on an inspection

16   report, as indicated here on the third page, and then we

17   notify the person.  We indicate that -- we formalize the

18   notification on this form, this violation notice.  This

19   is where we, I think, give a clear understanding to the

20   person who's committed the violation.  That's the intent

21   of this form.

22   BY MR. SMOLKER:

23        Q    The person will now know what they did wrong?

24        A    In a more clear way than they would by just

25   reading the inspection form, yes.

                                                    123

1       Q      At the time this violation notice was issued,

2    was John Cervantes one of the people working for you?

3       A      Yes.

4              Let me back up.  In addition to being a

5    violation notice -- we don't often do this, but in some

6    cases where we suspect that a violation is going to

7    continue to occur, we will issue a cease and desist.

8    And that's number F down there -- letter F.  And that's

9    where we order somebody that they are to cease and

10   desist whatever they may be doing, in this case, using

11   the Syloid 244 product.

12      Q      In the case that we're in now, certain of the

13   defendants have made the contention that it was a

14   mistake for the violation notice to have been issued and

15   for the cease and desist order to be issued and that

16   there was absolutely nothing wrong with Mr. Morris or

17   Home Saving Termite Control using Syloid 244.

18             Have you learned anything since the violation

19   notice was issued that would change your mind to make

20   you feel that this violation notice shouldn't have been

21   issued?

22             MR. YARDUMIAN:  Objection.  First of all, I'd

23   like to object to your characterization of any arguments

24   of counsel.  And second of all, I think the question is

25   vague and ambiguous and your prefatory speeches and your

                                                          124

1   attempts to influence this witness are improper.

2           MR. GREY:  I would add to that and caution

3   you, Mr. Smolker, again, I think your questions are

4   argumentative, not in the tone of your questioning but

5   in terms of the logical flow, and the prefatory comments

6   are completely inappropriate.  And I will add again, if

7   you continue with that, I will terminate the deposition

8   and go into court and make a motion for protective

9   order.  You're not asking the questions.  That's

10  improper.

11          THE WITNESS:  Mr. Smolker, I will also say I

12  do not appreciate those comments at the start of a

13  question like that.  If you just -- you're wasting my

14  time by doing that, and I would appreciate it if we

15  could move on.

16          Do I feel it's appropriate that this violation

17  should have been written as a cease and desist?  I think

18  that's the appropriate type of question.

19  BY MR. SMOLKER:

20      Q     I wanted you to know that there's a strong

21  argument --

22          MR. YARDUMIAN:  Drop it.  Don't characterize.

23  You're wasting his time.  Ask a question.

24  BY MR. SMOLKER:

25      Q     Do you still think it's appropriate that the

                                                    125

1    cease and desist order was issued?

2        A    Yes.  Since it was issued on December 16,

3    1996, there's nothing, as far as I know or have heard,

4    to change my mind or opinion that a cease and desist

5    order should have been written.

6        Q    One more question about this document.  Then

7    we'll get on to the appropriateness of the cease and

8    desist order and the violation of it.  The first page is

9    called at the top "Structural Violation File."  Have you

10   ever seen this document before?

11       A    Yes.

12       Q    Is this something that your office keeps or

13   some other office or what?

14       A    This is a form that I prepare.  It's a cover

15   sheet that goes on every violation which we pursue an

16   action on, whether it's a warning letter or whether it's

17   some kind of enforced monetary action or whatever, or a

18   suspension or action like that.  And basically what I do

19   is summarize the inspector's findings in this narration

20   on the left.  And that is the narration that typically

21   goes on the notice of proposed action that goes out.

22           MR. YARDUMIAN:  When you say "left," you mean

23   the left-hand portion of what exhibit?

24           THE WITNESS:  This is Exhibit 5.

25           MR. YARDUMIAN:  You're referring to the left

                                                         126

1    of the columns which are on the right?

2              THE WITNESS:  Left of the vertical line.

3              MR. YARDUMIAN:  Okay.  Thank you.

4    BY MR. SMOLKER:

5         Q    Have you seen this cover sheet before, page 1

6    of Number 5?

7         A    Yes.  I'm pretty sure I wrote it.

8         Q    Where it says, "1.  Supervisor," then there

9    are initials after the "1" --

10             Are you following me, at the top right-hand

11   corner?

12        A    Yes.

13        Q    -- are those your initials?

14        A    Yes.

15        Q    Above your initials it says "AB29"; is that

16   right?

17        A    AB294.

18        Q    What does AB294 stand for?

19        A    Assembly Bill 294.

20        Q    What is that about?

21        A    Assembly Bill 294 was legislation that was

22   passed back in the early '80s that allowed the

23   agricultural commissioners to seek civil penalty -- to

24   take civil penalty actions against structural pest

25   control operators.

                                                    127

1     Q    "It is our understanding that Home was cited

2    because of the inspector's mistaken belief that the

3    changing of the name, percentage, or both of an inert

4    ingredient is a change requiring a new registration.

5    Home has been using a registered product containing

6    95 percent ASG."  ASG is previously defined as --

7          MR. YARDUMIAN:  You're not reading anything

8    anymore.

9    BY MR. SMOLKER:

10    Q    -- amorphous silica gel Syloid 244 in the

11    sentence above.

12          "Home has been using a registered product

13    containing 95 percent ASG along with 5 percent of other

14    ingredients.  It changed to 100 percent ASG."

15          That's the background from which I'm going to

16    ask you a question.

17          Do you believe that Inspector Cervantes was

18    mistaken in believing that changing the name and

19    percentage of amorphous silica gel required a new

20    registration before Home Saving could use the

21    Syloid 244?

22          MR. GREY:  Objection.

23          THE WITNESS:  I told Mr. Cervantes that he was

24    to issue a cease and desist based on what he found.  So

25    I really don't know what he believed.  I believe he

136

1   understood the law -- the intent of the law.  But he

2   worked under my direction, and he issued a cease and

3   desist under my direction.

4   BY MR. SMOLKER:

5        Q     Now we'll get to your understanding of the

6   law.  Is it your understanding of the law that if a

7   person merely changes the percentage of an ingredient

8   from 95 percent amorphous silica gel to 100 percent

9   silica gel, that person does not need to have a

10  registration for this new product that's now 100 percent

11  amorphous silica gel?

12            MR. YARDUMIAN:  Incomplete hypothetical, calls

13  for a legal conclusion.

14            THE WITNESS:  Actually, it's -- I'm not sure I

15  quite understand -- can respond to it.  In terms of what

16  it takes to register a pesticide product, I'm certainly

17  not the expert.  Cal EPA has a registration branch that

18  could really better answer that question, what it takes

19  to register a pesticide.

20            In terms of increasing percentages or

21  decreasing percentages, who can and cannot do it, I

22  certainly -- Mr. Morris was not in the position -- he

23  was not using an EPA-registered product and EPA

24  registered when he was using the Syloid 244.  That was

25  why we took our action.  Now --

137

1 not familiar with what the full examination scope is in

2 that regard.  But I believe it covers those areas

3 regarding report-writing and sample-taking and due

4 process and some general issues like that.

5   Q And do you have any knowledge of the training

6 of the Structural Pest Control Board specialists?

7   A No.

8   Q Now, the next in order, which I think is

9 Number 8 --

10    (Exhibit 8 marked for identification)

11 BY MR. SMOLKER:

12   Q You're aware that Ms. Ann Verdun also reported

13 a complaint to your office, aren't you?

14   A It looks like she reported it to me.  This is

15 my handwriting.

16   Q Okay.

17   A I guess.  Or I took it from some other source.

18 I really don't know.  I think it represented itself, so

19 I think she must have called in.

20   Q Then you assigned it to Mr. Limon -- right? --

21 L-i-m-o-n?

22   A Yes.

23   Q 8 is a multipage document.  And the first page

24 is your brief summary of what you were told, correct?

25   A Right.

145

1        THE WITNESS:  I think what it says is what it

2   says.  What it means is what it says.  We were unable to

3   confirm Ms. Verdun's complaint that her asthma was due

4   to the pesticide application.

5   BY MR. SMOLKER:

6        Q    Are you or Mr. Limon voicing an opinion in

7   this report that Mrs. Verdun's asthma was not related to

8   the pesticide application?

9        MR. GREY:  Objection.  The question is

10  compound, overbroad, lacks foundation.

11       THE WITNESS:  No.  We are not making that

12  statement.

13  BY MR. SMOLKER:

14       Q    Looking at page 2 of the report, it says in

15  the second paragraph, "I proceeded to take wipe samples

16  from the living room sliding door from a patched hole

17  located on the north side of the door at a height of

18  about seven feet.  I also took samples from inside the

19  electrical outlet located directly below where the

20  previous sample was taken and from the bottom of the

21  dumbwaiter compartment."

22            You with me?

23       A    Yes.

24       Q    Can you tell me what a wipe sample is, if you

25  know what he's referring to?

147

1    to extract off this smooth surface, higher quantity of

2    the pesticide than off the carpet.

3         Q    Why is that?

4         A    Why is that?

5         Q    Yeah.

6         A    Well, there are just more nooks and crannies

7    into which the pesticide can fall in the carpet than

8    there are on the smooth glass surface.  And it also --

9    it depends on the material, how well it adsorbs the

10   pesticide, if it -- whether or not it frees the

11   pesticide up easily or clings on to it.

12             MR. PORTER:  Did you say "absorb" or "adsorb"?

13             THE WITNESS:  A-d, adsorbs.

14             MR. GREY:  Thank you.

15   BY MR. SMOLKER:

16        Q    Reading further down on page 3, "She also

17   asked if it was safe for her to live in her home.  I

18   said I could not tell her yes or no.  I told her I would

19   complete my report and turn it in to my supervisor and

20   he would probably send it to the health department."

21             A couple of questions about that:  What is

22   being referred to in "would probably send it to the

23   health department"?  Who or what is the health

24   department referred to here?

25        A    L.A. County Health Department, epidemiology

                                                        149

1    branch, when we have cases like this, where people --

2    they're asking us, "Is our place safe to live in?"

3    That's what people want to know.  This is a tough call

4    for us.  And we're really not in the position to make

5    that call.  So in the past we've worked with the health

6    department, especially if we've got some good samples --

7    air samples, wipe samples, that sort of thing -- we've

8    worked with the health department.

9              Unfortunately, probably prior to Ms. Verdun's

10   calling us, the physician that we worked closely with

11   quit and went to work for Kaiser.  And he wasn't

12   replaced by health.  But they did keep on his assistant,

13   Phil Jacobs whose responsibility is to help us in these

14   kinds of things.

15             So in this case, Mr. Limon -- I don't know

16   what our conversation was between Mr. Limon and I.  But

17   certainly this is a possibility, where we could ask

18   Mr. Jacobs to look into this or to give us an opinion or

19   to contact Ms. Verdun.

20        Q    Did you understand Mrs. Verdun's question to

21   be whether or not it's safe to live in an environment

22   where there's silica gel?  Is that what you understood

23   Ms. Verdun was asking?

24        A    I wasn't there.  I'm not sure it's silica gel

25   in general or the amount that was used or -- I'm

                                                    150

1   really -- I have to agree with what the inspector wrote

2   here, that it really is not our call to make a

3   determination whether the house is safe to live in or

4   not.

5       Q    Did you understand that her question was

6   prompted by the Home Saving Termite Control application

7   of silica gel in her condominium?

8       A    Yes.

9       Q    So is it your understanding that you were

10  telling her that -- or whoever was telling her, was

11  telling her that he couldn't tell her whether or not it

12  was safe to live in her home after that application?

13           MR. YARDUMIAN:  Objection.  Vague and

14  ambiguous, calls for speculation from this witness.

15           THE WITNESS:  Well, you know, I'm sorry.  I'm

16  going to ask you to repeat the question.

17  BY MR. SMOLKER:

18      Q    Sure.  I'll take it step by step.

19           You understand that Ms. Verdun had her home

20  treated by Home Saving Termite Control, correct?

21      A    Yes.

22      Q    And that after that treatment she was

23  concerned about whether or not it was safe to live in

24  her home?

25      A    Yes.

                                              151

1    Q    And that she asked the man who worked for you,

2  Mr. Limon, whether or not it was safe to live in her

3  home after the Home Saving Termite Control treatment?

4    A    Yes.

5    Q    That he, in turn, told her that he could not

6  say whether it was or was not safe?

7    A    Yes.

8    Q    It's your opinion, isn't it, that that was the

9  correct answer to Mrs. Verdun's question?

10    MR. YARDUMIAN:  Objection.  Incomplete

11  hypothetical, lacks foundation, calls for speculation

12  from this witness.

13    THE WITNESS:  Well, I think that it is -- I've

14  instructed the inspectors that they are not to make

15  health calls -- or make calls as to the health or

16  possible health effects of these pesticide applications.

17  We refer them.  We ask of them that they see their

18  doctor.  It's the doctor's call to make that

19  determination.

20  BY MR. SMOLKER:

21    Q    I think your answer has been perfectly clear,

22  and thank you.

23    I would like to go into it a little bit

24  because, as I understand it -- I want to make sure I

25  understand this very well -- you've instructed the

152

1          THE WITNESS:  What was the question?

2          MR. SMOLKER:  Could you read the question

3   back?

4          (The record was read as follows:

5              "Q     Is it fair to say that you

6          didn't have enough information about

7          Syloid 244 to make a recommendation about

8          whether or not it was safe to live in

9          Ms. Verdun's house?")

10         THE WITNESS:  Well, I think, given the fact

11  that it's -- it was not a registered product, we don't

12  have the information on it, it's a call that, yes, I

13  don't think we as the county, county inspectors not

14  being health officials, should make.  I think it was

15  the -- yes, it's a combination of the nature of the

16  material being a nonregistered product that causes us to

17  hesitate to make a call like that.

18  BY MR. SMOLKER:

19      Q     You said "combination."  Was there anything

20  other than the nature of the material being

21  unregistered?

22      A     Well, we don't know how it was applied either,

23  if it was put in -- realize this was applied -- what? --

24  a year prior to our going out there?

25      Q     Yes.

                                                      155

1    A    We don't know how much was applied or even --
2  in fact, all we have, frankly, is her testimony that it
3  was Home Saving that came out and did it.  I'm not
4  sure -- or maybe we did get a work report from Home
5  Saving on this.  I don't know.
6        Yes.  Okay.  Then we did know that.  There did
7  appear to be a work order here.  But we don't know how
8  much was applied or anything like that.  And of course
9  we've also got the situation where we're not able to
10  even -- our lab isn't even able to test for it.
11    Q    You would want to know a lot more than
12  Ms. Verdun could tell you before you could answer her
13  question?
14    A    Not only that.  In a case like this, as I
15  stated, I think it would be best for a medical
16  professional to research it and make that determination
17  for her.
18    Q    Why is that?
19    A    I think health professionals are better able
20  to advise people on their health.
21    Q    Did you think that -- I think you said his
22  name was Mr. Jacobs or Mr. Jacobson.  I don't remember
23  what --
24    A    Phil Jacobs.
25    Q    Did you think Mr. Jacobs had the appropriate

156

SUB-
EXHIBIT
67

# EXHIBIT 67

1    A    Well, we -- at the end of virtually every

2  investigation we indicate whether enforcement action is

3  going to be taken, yes or no.  And in this case no

4  violation was written; therefore, no enforcement action

5  was going to be taken.  Based upon the information we

6  were able to gather here, determine here, we weren't

7  able to determine whether a violation occurred.

8    Q    If you were able to determine that at the time

9  of the application in Ms. Verdun's unit, which according

10  to the report was 10-96, that Syloid 244 was the

11  pesticide that was used, would that have been a

12  violation, in your opinion?

13       MR. YARDUMIAN:  Objection.  Incomplete

14  hypothetical, calls for speculation, assumes facts.

15       THE WITNESS:  Well, I would say had we known,

16  yes, that Syloid 244 was used, had we been able to

17  conclusively determine that Syloid 244 was used, we

18  probably would have issued a violation in this case.

19  BY MR. SMOLKER:

20    Q    Are there different kinds of violations?  What

21  kind would you have issued?

22    A    I believe --

23       MR. YARDUMIAN:  Overbroad.

24       THE WITNESS:  I believe we would have -- had

25  we determined that a nonregistered pesticide was used,

168

Exhibit "67."

The attached transcript of deposition testimony given by Mr. David Duncan, the Acting Chief of the Enforcement Branch of the Department of the Environmental Protection Agency of the State of California, concerning W. R. Grace & Co.'s argument that Syloid 244 didn't need to be registered as a pesticide, was provided to respondents on November 6, 2000 as an Exhibit to an opposition to pending motions for Summary Judgment and Sommons Adjudication in LASC Case No. BC173952.

### Summary of David Duncan's Testimony

At the time his deposition was taken (September 18, 2000) Mr. Duncan was the Acting Chief of the Enforcement Branch of the Department of Pesticide Regulation of the Environmental Protection Agency of the State of California.

Mr. Duncan testified: The Department of Pesticide Regulation has vested authority to regulate sales use and registration of pesticides. The Pesticides Enforcement Branch oversees the enforcement activities that go on at the local level, and does its own investigations and inspections.

When a substance is being used as a pesticide and is being advertised as controlling pests it is required to be registered before it is sold.

It was required by law that the product SYLOID 244 be registered as a pesticide before it could be manufactured, sold or used for the purpose of killing termites in California.

Whatever is going to be used as a pesticide has to be registered; each individual pesticide product that uses Silica Aero Gel as a component has to be individually registered as a pesticide, even if the pesticide product is pure Silica Aero Gel. Each pesticide product needs its own registration.

If a product that was registered simply changed its name from "Kills Bugs" to "Kills Termites" that newly "named product" would have to get a new registration not only with the California Department of Pesticide Regulation but also with U.S.E.P.A.

Each pesticide product has its own pesticide label.

When the name of a product is changed the newly named product needs to obtain its own approved pesticide label and its own pesticide registration number.

The Statement in the July 18, 2000 letter from GRACE'S counsel Borton, Petrini & Conron, LLP addressed to Judge Fruin (Exhibit 68) "ASG (Amorphous Silica Gel/ SYLOID 244) is an inert natural material" is not true. "It's a lie," "It is not an inert ingredient, it is an active ingredient."

For commercial sale of substance as a pesticide to the public for the purpose of killing termites it doesn't matter if the same substance was used as an ingredient used in the manufacture of other products. The fact that amorphous silica gel is used in the manufacture of a benign product such as tooth paste irrelevant. It still has to be registered as a pesticide.

Food and Ag. Code Section 12823 does not apply to SYLOID 244 because SYLOID 244 was never registered as a pesticide.

1    Q.    And could you tell us what your current job is?

2    A.    I am the acting branch chief to pesticide

3    enforcement at the Department of Pesticide Regulation.

4    Q.    And is the pesticide enforcement branch part of

5    the Department of Pesticide Regulation?

6    A.    Yes.

7    Q.    And is the Department of Pesticide Regulation

8    part of the State of California Environmental Protection

9    Agency?

10    A.    Yes.

11    Q.    And could you tell us what the Department of

12    Pesticide Regulation is?

13    A.    Okay.  It's part of the executive branch of the

14    State of California.  It's a department that has vested

15    authority to regulate sales use and registration of

16    pesticides.

17    Q.    And could you give us a brief description of what

18    the powers and duties of the Department of Pesticide

19    Regulation are?

20    A.    Yeah, the specifics are found in the Food and Ag

21    Code, Division 67 and a little part of Division 13.

22        And I have a mission statement here for the

23    department, as well, if you are interested in that.

24        MR. SMOLKER:  Great.  Could we mark that as

25    Exhibit 1.

1    about violations of statutes concerning the sale,

2    application or use of pesticides?

3    A.     Again, it's the way we operate, it isn't a

4    mandate, but it's something we do.

5    Q.     Is it the duty of DPR to receive complaints about

6    a particular pesticide that has been registered by the

7    DPR?

8    A.     It's our policy to do that.

9    Q.     Okay.  Could you give us a brief description of

10   what your branch does?

11   A.     Yes.  The Pesticide Enforcement Branch oversees

12   the enforcement activities that go on at the local

13   level, that is county level, so the enforcement

14   activities that the County Agricultural Commissioner

15   implements in addition to that, the State will make its

16   own inspection, own investigations relative to certain

17   areas of the Food and Ag Code and the FIFRA, which is

18   the Federal Insecticide, Fungicide and Rodenticide Act.

19   So we do oversight activities as well as our own

20   investigations and inspections.

21   Q.     Okay.  Can you tell us when a substance is

22   considered a pesticide requiring registration?

23   A.     Well, I think if you look up the Code you will

24   find the definition of a pesticide in the Food and Ag

25   Code.  And if a chemical is being used to do any of the

1  things that are identified in the Code to control a

2  pesticide, then it is considered a pesticide.

3  Q.     When a substance is being used as a pesticide and

4  is being advertised as controlling pests, is it required

5  that that substance be registered before it's sold in

6  California?

7  A.     Yes.

8  Q.     Is DPR required to investigate when registrants

9  misrepresent their products during the registration

10  process?

11      MR. YARDUMIAN:  Objection, calls for legal

12  conclusion, calls for speculation.

13  Q.     MR. SMOLKER:  You don't know?

14  A.     What happens now?  I go ahead and answer the

15  question?

16  Q.     Have you ever had your deposition taken before?

17  A.     No.

18  Q.     I will explain the process.

19  A.     Okay.

20  Q.     She has given you an oath where you've agreed to

21  tell the truth.

22  A.     Right.

23  Q.     So this has the same solemnity as if you were in

24  a courtroom.  So even though we are in a conference

25  room, this should be treated with the same seriousness

1  environmental monitoring branch, and became a program

2  Supervisor IV, Level 4, at enforcement.  And I have been

3  the acting branch brief enforcement for about 13 months

4  now.

5  Q.    And this started in 1981?

6  A.    My career started in 1981 with them, yes.

7  Q.    And could you briefly review your educational

8  background for us?

9  A.    Yeah.  I have a Bachelor of Science degree from

10  the University of California Riverside in egronomy and

11  plant science.  And I have some graduate courses but no

12  Master's Degree.

13  Q.    And have you gone to seminars and conferences on

14  pesticide related topics?

15  A.    Oh, yes, every year.

16  Q.    We are concerned in this case with a product

17  called Syloid 244.

18  A.    Uh-huh.

19  Q.    It was claimed by a pest control operator that

20  Syloid 244 kills termites as part of the process of

21  selling the pest control operator's services and

22  products.

23       Under such a scenario, would it be required by

24  law that the product Syloid 244 be registered as a

25  pesticide before it could be sold by the pest control

1   operator for the purpose of killing termites?

2   A.    Yes.

3   Q.    Syloid 244, we are told, is Amorphous Silica Gel,

4   it's also called Silica Aero Gel.  And the man before

5   you who was answering questions, his name is

6   Mr. Schnabel, he told us that -- I hope I get this

7   right, that he once made a search of your database.

8   Does the Department of Pesticide Regulation have the

9   same database for registration and enforcement?

10  A.    It's a database that's used by anybody who wants

11  to in the department, and it is pesticide labels and

12  other information.

13  Q.    And he told us that what he did was that you

14  have -- by you I mean DPR.  Is that okay if I call DPR

15  you?

16  A.    As long as you do not mean enforcement.

17  Q.    I just mean DPR.

18  A.    Right.

19  Q.    He told me that you, DPR, have your own chemical

20  code for different chemicals that are used in

21  pesticides.

22  A.    Yes.

23  Q.    Do you agree with that statement?

24  A.    Yes.

25  Q.    And he told us that the -- and it's an internal

1    code that you use to be able to do searches to find out

2    about the use of that chemical in various pesticides.

3         Would you agree with that?

4    A.    Yes.

5    Q.    And he told us that the internal chemical code of

6    DPR for Silica Aero Gel is 559, and he said that what

7    the database -- and that 529 is the DPR reference

8    number.  But if you knew the reference number for a

9    particular chemical you could search on the DPR database

10   and you could find other products containing the same

11   chemical.  Do you agree with that?

12   A.    Yes.

13   Q.    And he told us that he did this for Silica Aero

14   Gel and he found at one time 113 products containing

15   Silica Aero Gel, and that some of them were registered

16   pesticides.  Are you following me?

17   A.    Okay.

18   Q.    So if it's true, I'm not saying that's true or

19   not, but if it was true that there were other registered

20   pesticide products that used Silica Aero Gel, maybe even

21   as many as 113 other products that used Silica Aero Gel,

22   if a company just wanted to use pure Silica Aero Gel as

23   a pesticide and wanted to tell people that it was a

24   pesticide and could be used to kill termites, would that

25   company still have to register its own product of the

1    pure Silica Aero Gel?

2          MR. GREY:  Would you pleased read the question

3    back?

4          (Record read by the reporter.)

5          THE WITNESS:  Yes, they would.

6          MR. GREY:  Objection, compound, vague and

7    ambiguous, lacks foundation.

8          MR. YARDUMIAN:  Incomplete hypothetical, as well.

9    Q.    MR. SMOLKER:  Did you understand the question?

10   A.    Yeah.

11   Q.    Is your answer to the question yes?

12   A.    (Witness nods head.)

13         MR. HOME:  Also, if you would, nodding your head

14   doesn't work.

15         THE WITNESS:  Yes.  Whatever it is that's going

16   to be used as a pesticide has to be registered.

17   Q.    MR. SMOLKER:  So the mere fact that a chemical

18   substance was a component of a different pesticide

19   product that was registered does not give a free pass to

20   people to just use that chemical substance and sell it

21   as pesticide?

22         MR. YARDUMIAN:  Objection, vague and ambiguous,

23   argumentative as phrased.

24         THE WITNESS:  I don't understand the question.

25   Q.    MR. SMOLKER:  Okay.  Is it true that when a

1   formulation of different substances is approved as a

2   pesticide, that is not in turn giving registration to

3   each one of its component parts, it's giving

4   registration to the whole formulation that was submitted

5   in the pesticide application?

6          MR. YARDUMIAN:  Same objection.

7          THE WITNESS:  Pesticides products are registered,

8   so whatever is unique about that particular product is

9   what is registered.  Each product needs its own

10  registration.

11         MR. HOME:  If a product that was registered

12  simply to change its name from Kills Bugs to Kills

13  Termites, would that require a reapplication?

14         THE WITNESS:  If a company was going to change

15  the name, which means that they would be changing the

16  label of the pesticide, then they would have to change

17  that registration with not only DPR but U.S. EPA, as

18  well.

19         MR. HOME:  Okay.  Thank you.

20         MR. SMOLKER:  I would like to show you part of a

21  specimen label for a pesticide called Dri-Die

22  insecticide.  We will make that 2.

23                (Defendants' Exhibit 2 was marked

24                for identification.)

25         MR. SMOLKER:  And I would like to show you part

1    of a specimen label for a pesticide called Drione

2    insecticide.  We will mark that number 3.

3                    (Defendants' Exhibit 3 was marked

4                    for identification.)

5    Q.      MR. SMOLKER:  When you look at the Dri-Die

6    insecticide, you see where it says active ingredients?

7    A.      Yes, I do.

8    Q.      Can you see where it says Amorphous Silica Gel 95

9    percent?

10   A.      Yes.

11   Q.      Now, and it also has an EPA registration number

12   on it?

13   A.      Yes.

14   Q.      And you see when you look at -- that was Exhibit

15   2.  You see when you look at Exhibit 3 the specimen

16   label for Drione Insecticide?

17   A.      Yes.

18   Q.      It has as one of its active ingredients Amorphous

19   Silica Gel 40 percent?

20   A.      Yes.

21   Q.      Assuming that these two products are registered

22   pesticides, they have been properly registered by the

23   Federal EPA and the California Department of Pesticide

24   Regulation, if a person wanted to sell yet another

25   insecticide product that had as its active ingredients

1   Amorphous Silica Gel and wanted to tell the public that

2   this product was used to kill termites and would kill

3   termites, would that person have to register that

4   product, also?

5        MR. YARDUMIAN:  Objection, vague and ambiguous,

6   incomplete hypothetical.

7        THE WITNESS:  Shall I answer the question?

8   Q.   MR. SMOLKER:  Yes.

9   A.   The question would be answered yes.  It would

10  have to be registered both with U.S. EPA and with DPR.

11  Q.   So the fact that the Amorphous Silica Gel is

12  called out as an active ingredient, Dri-Die Insecticide

13  would not obviate the need to register the new product

14  that was 100 percent Amorphous Silica Gel?

15       MR. YARDUMIAN:  Same objection.

16       THE WITNESS:  No.

17  Q.   MR. SMOLKER:  And the fact that that active

18  ingredient in Drione Insecticide is Amorphous Silica Gel

19  40 percent, would that ameliorate the need for the new

20  person to register the product that was 100 percent

21  Amorphous Silica Gel that was a pesticide before it

22  could be used as a pesticide to kill pests?

23       MR. YARDUMIAN:  Same objection.

24       THE WITNESS:  No.

25  Q.   MR. SMOLKER:  I would like to show you -- well,

1   Ms. Reporter, could you mark as number 4 a letter dated

2   July 18th, 2000, on the letterhead of Borton, Petrini &

3   Conron?

4       MR. GREY:  I'm going to object, Counsel, I think

5   it's inappropriate to show the witness a letter written

6   by one of the attorneys to the judge as part of the

7   litigation proceeding and question the witness on that.

8   It's inappropriate, it lacks foundation, it's in my

9   opinion an attempt to manipulate the taking of evidence

10  in this case.  As other witnesses have told you, they

11  refuse to look at the document.

12      MR. YARDUMIAN:  I will join in the objections.

13          (Defendants' Exhibit 4 was marked

14          for identification.)

15  Q.   MR. SMOLKER:  We have marked as exhibit --

16      MR. HOME:  I am going to join in that objection,

17  as well.

18  Q.   MR. SMOLKER:  We have marked as Exhibit 4 a

19  two-page letter dated July 18th, 2000, on the letterhead

20  of Boron, Petrini & Conron apparently signed by Robert

21  Ridenour addressed to Judge Richard Fruin with an

22  attachment which is a copy of Food and Ag Code Section

23  12823.

24      Could you please look at this letter and

25  attachment?

1      MR. HOME:  Can we take a break for just a minute?

2      MR. SMOLKER:  Sure.

3      (Break.)

4  Q.  MR. SMOLKER:  Now, looking at Exhibits 2 and 3

5  for a second, which we are going to correlate with

6  Exhibit 3 in a second, is it true that in Drione,

7  Exhibit 3, Amorphous Silica Gel is an active ingredient

8  according to this label?

9  A.     Yes, it is.

10  Q.     Is it true in Exhibit 2 that in Dri-Die

11  Insecticide Amorphous Silica Gel is an active

12  ingredient?

13  A.     Yes.

14  Q.     Now, does active ingredient mean a -- the

15  causative agent that causes the pesticidal action?

16  A.     Yes.

17      MR. YARDUMIAN:  Objection, foundation.

18  Q.  MR. SMOLKER:  So, for example, if the purpose of

19  a pesticide was to kill termites, would the active

20  ingredient in the pesticide be the substance in the

21  pesticide that was responsible for killing the termites?

22  A.     Yes.

23  Q.     And do you understand from your reading of the

24  Dri-Die Insecticide label Amorphous Silica Gel kills

25  termites?

1    A.    Looking at the active ingredient combination I

2    would assume that one of those active ingredients would

3    be killing the pests.

4    Q.    Okay.

5    A.    It's hard for me to say which one it is.

6    Q.    In order to be an active ingredient does it have

7    to have --

8    A.    Pesticidal activity.

9    Q.    So it has to be something that either kills them

10    or prevents their coming back or mitigates them?

11    A.    Yes.

12    Q.    So then if you call Amorphous Silica Gel ASG, are

13    you following me?

14    A.    Yes.

15    Q.    In terms of killing termites, is the statement in

16    this letter "ASG is an inert natural material" true for

17    purposes of killing termites?

18         MR. YARDUMIAN:  Objection, incomplete

19    hypothetical, vague and ambiguous, calls for

20    speculation.

21         THE WITNESS:  It is not true.

22    Q.    MR. SMOLKER:  And why isn't it true?

23         MR. YARDUMIAN:  Same objection.

24         THE WITNESS:  It's a lie.

25    Q.    MR. SMOLKER:  Because we know it kills termites,

1  right?

2  A.    Because it is not an inert ingredient, it is an

3  active ingredient.

4  Q.    And in terms of registering substances as

5  pesticides for the purpose of killing pests such as

6  termites, does it matter to the Department of Pesticide

7  Regulation if the same substance is used in toothpaste?

8      MR. YARDUMIAN:  Objection, incomplete

9  hypothetical, calls for speculation, vague and

10  ambiguous.

11  Q.    MR. SMOLKER:  What I mean by that is could a

12  person say I don't have to register this as a pesticide

13  even though I am using it to kill termites because it's

14  used in toothpaste?

15      MR. HOME:  Objection, incomplete hypothetical and

16  vague and ambiguous.

17      THE WITNESS:  Normally if a pesticide is going to

18  have an active ingredient that kills pests it needs to

19  be registered, period.  There are exceptions to that,

20  but normally it needs to be registered as a pesticide.

21      The exception would be experimental use, and so

22  on, that are handled through a policy with the

23  University of California.

24  Q.    MR. SMOLKER:  And that's a special permitting

25  procedure --

1  A.      Special procedure.

2  Q.      Okay.  But for commercial sale of a substance as

3  a pesticide to the public for the purposes of killing

4  termites, does it have to be registered?

5        MR. YARDUMIAN:  Same objections.

6        THE WITNESS:  Yes, it does.  The fact that it may

7  be an ingredient in some other products is irrelevant.

8  Q.      MR. SMOLKER:  And the fact that's an ingredient

9  even in something as benign as toothpaste, is that

10  irrelevant?

11  A.      Yes, it is.

12  Q.      Now, the next sentence here in this letter is "It

13  has been used in pest control and has been registered

14  for use in pest control for a long time."  I am

15  referring to Amorphous Silica Gel.  Are you with me?

16  A.      Yes.

17  Q.      And then it says, "It is our understanding that

18  Home was cited because of the inspector's mistaken

19  belief that changing of the name, percentage or both of

20  an inert ingredient is a change requiring a new

21  registration."

22        Let's explore that sentence for a second.  Are

23  you following me?

24  A.      Okay, let's explore it.

25  Q.      We have a product here, Amorphous Silica Gel, we

1  have two pesticide labels, one for Dri-Die Insecticide

2  and one for Drione Insecticide which both indicate

3  Amorphous Silica Gel has been used in pest control for

4  some time.  That's what these pesticide labels mean,

5  correct?

6  A.    Yes.

7  Q.    And we have in this case a pest control operator

8  who decided to use 100 percent Amorphous Silica Gel in

9  pest control for pesticides he was selling to the

10  public.  And this pest control operator was cited by the

11  County Agricultural Commissioner and also separately

12  cited by the Structural Pest Control Board for using an

13  unregistered pesticide.

14  A.    Okay.

15  Q.    And this is claiming that the inspector, whoever

16  cited the pest control operator, made a mistake because

17  just changing the name, percentage, or both, of

18  Amorphous Silica Gel is a change requiring a new

19  registration.

20       Was the inspector under a mistaken belief -- if

21  you changed the ingredients of a registered pesticide

22  isn't it true you do have to get a new registration if

23  you are not the registrant?

24       MR. YARDUMIAN:  Object to the prefatory comments.

25  Number one, argumentative; number two, assume facts not

1   in evidence; number three, vague and ambiguous and

2   overbroad.  And the question is completely

3   unintelligible and calls for speculation on behalf of

4   this witness who didn't issue anything and knows not

5   what the state of mind was of the individual who issued

6   any citations.

7        MR. HOME:  I will join in that objection.

8        MR. YARDUMIAN:  And it's a waste of time.

9        THE WITNESS:  Okay.  Well, I will waste your time

10  briefly, hopefully.  And that would be to say that the

11  assumption here would be that a product -- there can be

12  minor changes in a product without the need for a

13  registration change; however, that product would first

14  have to be registered as a pesticide.  You can't make

15  minor changes to a product that isn't registered as a

16  pesticide and use it as a registered pesticide, that

17  doesn't work.

18       MR. YARDUMIAN:  In terms of the minor change in

19  the product, you mean the product that would be, say,

20  the inert ingredient?

21       THE WITNESS:  If there are two -- if there is one

22  registered product, one registered pesticide registered

23  with U.S. DPA and DPR, and there are minor changes made

24  to that, those changes I think are further described in

25  the Food and Ag Code as to what is appropriate.  Then

1    there isn't a need for a new registration.

2        What I am saying is that if the product is not

3    registered to begin with, this law does not apply to

4    that.

5    Q.    So, in other words, are you saying that Food and

6    Ag Code Section 12823 does not apply to Syloid 244,

7    which is the pure Amorphous Silica Gel, because Syloid

8    244 was never registered?

9    A.    That's right.

10   Q.    So are you saying that 12823 in order to come

11   into effect would require the registrant to change its

12   own registered product?

13       MR. YARDUMIAN:  Objection, incomplete

14   hypothetical.

15       THE WITNESS:  No.

16   Q.    MR. SMOLKER:  No?

17   A.    No.  What I am saying is for that law to apply it

18   must apply to an already previously registered product.

19   Q.    Let's take what happened in this case, the pest

20   control operator was using a product called Syloid 244.

21   And Syloid 244 we are told is Amorphous Silica Gel.

22   A.    Okay.

23   Q.    But Syloid 244 is not a registered pesticide

24   product?

25   A.    That's right.

1  Q.    Can the applicator use pure Syloid 244 and not

2  have to register it using the fact that he is using 100

3  percent Amorphous Silica Gel instead of 95 percent

4  Amorphous Silica Gel and somebody else has a

5  registration for a pesticide product that has 95 percent

6  Amorphous Silica Gel?

7         MR. YARDUMIAN:  Objection, incomplete

8  hypothetical, vague and ambiguous.  It's not really

9  intelligible as phrased.

10        MR. HOME:   Join.

11        MR. YARDUMIAN:  I think the question would be

12  fine if you indicated that the prior product had 95

13  percent Syloid 244 in it.

14        THE WITNESS:  Okay.  The product can't be used as

15  a pesticide unless its registered.

16  Q.    MR. SMOLKER:  The problem we are having is the

17  person writing this letter is claiming that there didn't

18  have to be a registration of the Syloid 244 product

19  because the Syloid 244 product, the chemical that makes

20  it up, Amorphous Silica Gel, is part of a registered

21  product; in fact, it's 95 percent of the active

22  ingredient in another product?

23        MR. HOME:  Objection, assume facts not in

24  evidence.

25        THE WITNESS:  Yes, I understand what you are

BARRON & RICH  775 University  Sacramento, CA 916/927-0543          30

1    saying.  And it doesn't matter.  If a product were 95

2    percent Diazanon and another were 100 percent Diazanon,

3    the other one would still have to be a registered

4    pesticide to be used.  Silica Gel, whetner it's 95

5    percent or 100 percent, has to be a registered

6    pesticide.

7    Q.    Okay.  And this Code section that allows a change

8    in inert ingredients, Food and Ag Code Section 12823,

9    does not apply to the situation you just described?

10        MR. YARDUMIAN:  Objection, calls for a legal

11   conclusion.

12        THE WITNESS:  Well, what I can say is that our

13   interpretation is that the law refers to products that

14   are already registered, and minor changes in those

15   already registered products to other products do not

16   require a re-registration, but in this case Syloid 244

17   is not a registered product.

18   Q.    MR. SMOLKER:  So however you cut it, Syloid 244

19   can't piggyback on to Drione or Dri-Die Insecticide's

20   registration?

21        MR. YARDUMIAN:  Objection, vague and ambiguous,

22   argumentative as phrased.

23        THE WITNESS:  No, it can't.

24        MR. SMOLKER:  I have no further questions.  Thank

25   you.

07/18 '00 12:17    ID:BORTON PETRINI    PA...

REGIONAL OFFICES
BAKERSFIELD
TELEPHONE (661) 322-3051
FAX (661) 322-4004

FRESNO
TELEPHONE (559) 268-0117
FAX (559) 237-7808

MODESTO
TELEPHONE (209) 576-1701
FAX (209) 527-6753

REDDING
TELEPHONE (530) 221-1301
FAX (530) 222-4049

SACRAMENTO
TELEPHONE (916) 484-3600
FAX (916) 484-3609

SAN BERNARDINO
TELEPHONE (909) 381-0527
FAX (909) 381-0606

LAW OFFICES OF

# BORTON, PETRINI & CONRON, LLP

707 WILSHIRE BOULEVARD
SUITE 5100
LOS ANGELES, CALIFORNIA 90017-3613
(213) 624-2800
FAX (213) 489-3930
EMAIL BPCLA@BPCLAW.COM
WEB SITE WWW.BPCLAW.COM

H. C. BORTON 1874-1948
JAMES PETRINI 1907-1976
JOHN H. CONRON 1907-1971
KENNETH D. PRESENT 1903-1984

REGIONAL OFFICES
SAN DIEGO
TELEPHONE (619) 237-3424
FAX (619) 531-0704

SAN FRANCISCO
TELEPHONE (415) 421-2181
FAX (415) 421-6101

SAN JOSE
TELEPHONE (408) 298-3607
FAX (408) 298-3306

SAN LUIS OBISPO
TELEPHONE (805) 541-4260
FAX (805) 541-4660

SANTA ANA
TELEPHONE (714) 424-8700
FAX (714) 424-8701

VENTURA
TELEPHONE (805) 650-7176
FAX (805) 650-0064

IN REPLY REFER
TO OUR FILE NO

Los Angeles
003418/045809

July 18, 2000

<u>VIA FACSIMILE & U.S. MAIL-213-485-0946</u>

Judge Richard Fruin
Los Angeles Superior Court
111 N. Hill St.
Dept. 15
Los Angeles, CA 90012

      Re:   <u>TIG Insurance Co.</u> v. <u>Smolker</u>
             BC173952

Dear Judge Fruin:

    We do not have a copy of your ruling continuing the July 18, 2000 hearing, but understand from Mr. Smolker through a copy of his letter to you that no appearance is necessary. While we have not been responding to Mr. Smolker's communications with you, it appears that there now is a substantive question as opposed to the prior ministerial questions.

    With reference to your apparent question regarding Syloid 244, we do not believe that registration in this case is an issue. Instead of an anticipated prolonged, expensive, and uncertain litigation with reference to the cease and desist order, Home Savings Termite Control apparently decided to obtain a separate registration on its particular product containing pure ASG (Amorphus Silica Gel/Syloid 244). ASG is an inert natural material which has been used well over fifty years in different applications, such as in food, toothpaste, dental absorbants, etc. . It has been used in pest control and has been registered for use in pest control for a long time. It is our understanding that Home was cited because of the inspector's mistaken belief that the changing of the name, percentage, or both of an inert ingredient is a change requiring a new registration. Home had been using a registered product containing 95% ASG along with 5% of other ingredients. It changed to 100% ASG. As you can see from the copy of California Food and Agricultural Code Section 12823, a change in the name or percentage, or both, of



07/18  '00 12:17    ID:

## BORTON, PETRINI & CONRON, LLP

Judge Richard Fruin
July 18, 2000
Page 2

an inert ingredient is not a change in composition requiring a new registration.   We shall be more fully briefing
this issue in a Motion for Summary Judgment/Summary Adjudication anticipated to be filed in the near future.

Very truly yours,

ROBERT N. RIDENOUR

RNR:el

cc:  Via Facsimile & U.S. Mail:

All counsel (see attached mailing list)

CASE NAME: TIG INSRURANCE   VS SMOLKER

DEPONENT:  DAVID DUNCAN

DATE:      9/18/00

## INSTRUCTIONS FOR CORRECTING TRANSCRIPT

Please make your corrections, if any, below.  Do not change any of
the questions.  DO NOT MAKE ANY CORRECTIONS ON THE TRANSCRIPT.  If
necessary, use another sheet of paper using the example below.

              Page  Line  Correction

Example:  1     5      change 1995 to 1993

PAGE  LINE  CORRECTION

1. 6   2   change "to pesticide enforcement" to "of pesticide

2. 6   21  change "Division 67" to "Division 6 and 7"

3. 9   2   change first use of "pesticide" to "pest"

4. 14  21  I believe I said "date of pesticide" not "nature"

5. _   3   should read "acting branch chief of enforcement"

6. _   10  agronomy is spelled with an 'a' not "e"

7. _   7   "Pesticides" should read "Pesticide"

8. 25  23  "DPA" should read EPA

9. _   24  US EPA not U.S.A.

10. 41 20  "ran" instead of "wrap"

11. 47 18  DPR not EPA

12. _____

13. _____

14. _____

15. _____

_____            _____
Date                       Signature

Page 1095

§ 12821          CHEMICALS, LIVESTOCK REMEDIES, FEED

Cross References:
  "Director": § 35.
  "Economic poison": § 12753.
  Contents of labels of economic poisons: § 12851.
  Ingredients statement on label of economic poison: § 12883.
  Misbranding of economic poisons: 3 Cal Adm Code § 6220.

Collateral References:
  Am Jur 2d Pollution Control §§ 309, 310, 312.

§ 12822. Supplemental application for registration

A supplemental application for registration of any additional eco-
nomic poison may be submitted at any time without payment of the
penalty which is required by Section 12818.

Enacted Stats 1967 ch 15 § 2.

Prior Law:

(a) Former Ag C § 1071.2, as added by Stats 1945 ch 273 § 3 p 737, amended by Stats 1949
ch 505 § 3 p 864, Stats 1965 ch 862 § 3 p 2391.

(b) Former Ag C § 1071, as amended by Stats 1933 ch 426 p 1073, Stats 1935 ch 334 § 5 p
1158, Stats 1937 ch 888 § 2 p 2453, Stats 1939 ch 793 § 1 p 2324.

(c) Stats 1921 ch 729 § 12 p 1262.

  Cross References:
    "Economic poison": § 12753.

  Collateral References:
    Am Jur 2d Pollution Control § 318.

§ 12823. Change in inert ingredients

A change in the name or percentage, or both, of an inert ingredient is
not a change in composition of the economic poison which requires a
new registration unless the change in inert material results in a
change in the use or application of the economic poison.

Enacted Stats 1967 ch 15 § 2.

Prior Law:

(a) Former Ag C § 1071.2, as added by Stats 1945 ch 273 § 3 p 737, amended by Stats 1949
ch 505 § 3 p 864, Stats 1965 ch 862 § 3 p 2391.

(b) Former Ag C § 1071, as amended by Stats 1933 ch 426 p 1073, Stats 1935 ch 334 § 5 p
1158, Stats 1937 ch 888 § 2 p 2453, Stats 1939 ch 793 § 1 p 2324.

(c) Stats 1921 ch 729 § 12 p 1262.

  Cross References:
    "Economic poison": § 12753.

§ 12824. Eliminating from use certain economic poisons; Evaluating

The director shall endeavor to eliminate from use in the state any
economic poison which endangers the agricultural or nonagricultural
environment, is not beneficial for the purposes for which it is sold, or

36

1      IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2         IN AND FOR THE COUNTY OF LOS ANGELES

3

4   TIG INSURANCE COMPANY, a         )

5   California corporation,          )

6                    Plaintiff,

7            -vs-                        No. BC 207 829

8   GARY SMOLKER, an individual,

9   and ALICE SMOLKER, an            )

10  individual, and DOES 1-10,       )

11  Inclusive,                       )

12              Defendants.          )

13  _____ )

14  AND RELATED CROSS ACTIONS        )

15  _____ ).

16

17                DEPOSITION OF

18               DAVID DUNCAN

19            September 18, 2000

20

21

22          Taken before SHARON CABELLO

23         Certified Shorthand Reporter

24             State of California

25             CSR License #3080

CERTIFIED
COPY

# EXHIBIT 68

SUB-
EXHIBIT
68

# EXHIBIT 68

```
 1        IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2            IN AND FOR THE COUNTY OF LOS ANGELES

 3

 4   TIG INSURANCE COMPANY, a        )

 5   California corporation,         )

 6                    Plaintiff,     )

 7            -vs-                   )  No. BC 211 283

 8   GARY SMOLKER, an individual,    )

 9   and ALICE SMOLKER, an           )

10   individual, and DOES 1-10,      )

11   Inclusive,                      )

12                    Defendants.    )

13   _____)

14   AND RELATED CROSS ACTIONS       )

15   _____)
```

CERTIFIED
COPY

```
16

17                DEPOSITION OF

18                DAVID DUNCAN

19             September 18, 2000

20

21

22          Taken before SHARON CABELLO

23          Certified Shorthand Reporter

24               State of California

25             CSR License #3080
```

Exhibit "68."


Borton, Petrini, Canon letter to Judge Fruin dated July 18, 2000


Grace has been relentless in its effort to hide the fact that for many years it illegally manufactured and illegally sold toxic air pollutant SYLOID 244 dust to TERMITE CONTROL for TERMITE CONTROL to illegally use as a pesticide.

Attached hereto as Exhibit 68 is a copy of a letter submitted to Judge Fruin by GRACE'S attorneys Borton, Petrini, Canon, LLP dated July 18, 2000 in which GRACE'S attorneys tried to convince Judge Fruin that GRACE'S pesticide product SYLOID 244 did not need to be registered with the United States Environmental Protection Agency or with the Department of Pesticide Regulation of the State of California.

Attached hereto as Exhibit 67 is a copy of the transcript of the deposition testimony of Mr. David Duncan, Acting Chief of the Enforcement Branch of the Department of Pesticide Regulation of the State of California.

Mr. Duncan explains in his deposition testimony that it was against the law for TERMITE CONTROL to use SYLOID 244 as a pesticide because SYLOID 244 wasn't a registered pesticide. Mr. Duncan testified that it is required by law that the pesticide product SYLOID 244 be registered as a pesticide before it could be manufactured, used or sold as a pesticide for the purpose of killing termites in California.

LAW OFFICES OF

# BORTON, PETRINI & CONRON, LLP

707 WILSHIRE BOULEVARD
SUITE 5100
LOS ANGELES, CALIFORNIA 90017-3613
(213) 624-2800
FAX: (213) 489-3930
EMAIL: BPCLA@BPCLAW.COM
WEB SITE: WWW.BPCLAW.COM

July 18, 2000

Los Angeles
003418/045809

VIA FACSIMILE & U.S. MAIL-213-485-0946

Judge Richard Fruin
Los Angeles Superior Court
111 N. Hill St.
Dept. 15
Los Angeles, CA 90012

     Re:    TIG Insurance Co. v. Smolker
           BC173952

Dear Judge Fruin:

    We do not have a copy of your ruling continuing the July 18, 2000 hearing, but understand from Mr. Smolker through a copy of his letter to you that no appearance is necessary. While we have not been responding to Mr. Smolker's communications with you, it appears that there now is a substantive question as opposed to the prior ministerial questions.

    With reference to your apparent question regarding Syloid 244, we do not believe that registration in this case is an issue. Instead of an anticipated prolonged, expensive, and uncertain litigation with reference to the cease and desist order, Home Savings Termite Control apparently decided to obtain a separate registration on its particular product containing pure ASG (Amorphous Silica Gel/Syloid 244). ASG is an inert natural material which has been used well over fifty years in different applications, such as in food, toothpaste, dental absorbants, etc. . It has been used in pest control and has been registered for use in pest control for a long time. It is our understanding that Home was cited because of the inspector's mistaken belief that the changing of the name, percentage, or both of an inert ingredient is a change requiring a new registration. Home had been using a registered product containing 95% ASG along with 5% of other ingredients. It changed to 100% ASG. As you can see from the copy of California Food and Agricultural Code Section 12823, a change in the name or percentage, or both, of

Defendant EXHIBIT #   R
WITNESS:   Adams
DATE:     9-15-00

Kimberly Bonnell, CSR#10668

07/18 '00 12:17    ID:LANIERFAX3800    FAX:    PAGE    3

## BORTON, PETRINI & CONRON, LLP

Judge Richard Fruin
July 18, 2000
Page 2

an inert ingredient is not a change in composition requiring a new registration.   We shall be more fully briefing this issue in a Motion for Summary Judgment/Summary Adjudication anticipated to be filed in the near future.

Very truly yours,

ROBERT N. RIDENOUR

RNR:el

cc:   Via Facsimile & U.S. Mail:

All counsel (see attached mailing list)

§ 12821          CHEMICALS, LIVESTOCK REMEDIES, FEED

Cross References:
"Director": § 35.
"Economic poison": § 12753.
Contents of labels of economic poisons: § 12851.
Ingredients statement on label of economic poison: § 12883.
Misbranding of economic poisons: 3 Cal Adm Code § 6220.

Collateral References:
Am Jur 2d Pollution Control §§ 309, 310, 312.

§ 12822. Supplemental application for registration

A supplemental application for registration of any additional economic poison may be submitted at any time without payment of the penalty which is required by Section 12818.

Enacted Stats 1967 ch 15 § 2.

Prior Law:

(a) Former Ag C § 1071.2, as added by Stats 1945 ch 273 § 3 p 737, amended by Stats 1949 ch 505 § 3 p 864, Stats 1965 ch 882 § 3 p 2391.

(b) Former Ag C § 1071, as amended by Stats 1933 ch 426 p 1073, Stats 1935 ch 334 § 5 p 1158, Stats 1937 ch 888 § 2 p 2453, Stats 1939 ch 793 § 1 p 2324.

(c) Stats 1921 ch 729 § 12 p 1262.

Cross References:
"Economic poison": § 12753.

Collateral References:
Am Jur 2d Pollution Control § 318.

§ 12823. Change in inert ingredients

A change in the name or percentage, or both, of an inert ingredient is not a change in composition of the economic poison which requires a new registration unless the change in inert material results in a change in the use or application of the economic poison.

Enacted Stats 1967 ch 15 § 2.

Prior Law:

(a) Former Ag C § 1071.2, as added by Stats 1945 ch 273 § 3 p 737, amended by Stats 1949 ch 505 § 3 p 864, Stats 1965 ch 882 § 3 p 2391.

(b) Former Ag C § 1071, as amended by Stats 1933 ch 426 p 1073, Stats 1935 ch 334 § 5 p 1158, Stats 1937 ch 888 § 2 p 2453, Stats 1939 ch 793 § 1 p 2324.

(c) Stats 1921 ch 729 § 12 p 1262.

Cross References:
"Economic poison": § 12753.

§ 12824. Eliminating from use certain economic poisons; Evaluating

The director shall endeavor to eliminate from use in the state any economic poison which endangers the agricultural or nonagricultural environment, is not beneficial for the purposes for which it is sold, or

36

SUB-

EXHIBIT

69

# EXHIBIT 69

Exhibit "69"

Structural Pest Control Board Letter to Mr. Wayne Morris dated March 16, 1993

Attached hereto is a copy of a letter dated March 16, 1993 addressed to Mr. Wayne Morris, Termite Control, Inc., 10660 Last Valley Ranch Road, Leona Valley, CA 98551.

Mr. Greg Adams [Exhibit 65] gave extensive testimony regarding this letter during his deposition in LASC Case No. BC173952.

Mr. Adams explained that Mr. Morris and TEMRITE CONTROL were legally required to CEAST AND DESIST stating that silica gel is a "non-chemical" product used to kill termites.

It was explained, in that letter, to Mr. Morris that silica aerogel is a pesticide chemical and that is why it is required to be registered with the Federal EPA and the California Department of Pesticide Regulation before being used as a pesticide to eradicate termites.

CF CALIFORNIA—STATE AND CONSUM. ERVICES AGE CY                    PETE WILSON, Governor



**STRUCTURAL PEST CONTROL BOARD**
1422 HOWE AVENUE, SACRAMENTO, CA  95825-3280

Telephone Numbers:
Administration Unit  (916) 924-2291
Examination/Licensing/Records-Storage  (916) 924-2294
Complaint Unit  (916) 920-6323
(213) 897-7838
(415) 557-9114

*MHS*
*CALL PSONS*
*ccpy of pet*
*Ltr to WASCZYN*



CERTIFIED COPY

Keli Okuma
Acting Registrar

March 16, 1993

Mr. Wayne Morris
Home Saving Termite Control, Inc.
10660 Last Valley Ranch Road
Leona Valley, CA  93551

Dear Mr. Morris:

I have recently received information regarding the Home Saving Dehydration System.

I have checked with the Department of Pesticide Regulation (DPR) to determine if the borate product and silica gel you advertise using in this system were registered for use in California.

I found that the borate you use is Tim Bor which has a current active registration. The silica gel known as Pyrinone had its registration inactivated on December 31, 1990. Distributors had two years to sell their supplies of this product or until December 31, 1992. After that date, Pyrinone could not be purchased for use in California. You are permitted as the end-user to use up your existing supplies only. This product cannot be purchased outside of California and used here.

Another thing which I want to point out to you is that borates and silica gel are not "non-chemical" products. They are pesticide chemicals and this is exactly why they are required to be registered with the EPA and the DPR. To suggest and state otherwise as you do is false advertising and you must CEASE AND DESIST this immediately.

*3/23/93*                    *3/24/0*

*HOME SAVINGS: (W NORMS)*         *BWLEFT:*
*ALL CALL NUS BACK OU DOOR*    *TALK WAYNE*
                               *CALL MO.*

Defendant EXHIBIT # ___Q___
WITNESS:  Adams
DATE:  9-15-00

Kimberly Bonnell, CSR#10668

Mr. Wayne Morris                    - 2 -                    March 16, 1993

Your letter of explanation regarding this system contains some statements which at best are very misleading. I am interested in knowing exactly what the possible existing health hazards regarding fumigants and the potentially dangerous exposure to structure occupants and company employees are in light of the fact sheets required to be given to consumers discuss the health risks. If the fumigation is performed and aerated according to the requirements of the law, actual exposure to gaseous residue will not occur. As far as Vikane is concerned there are no known or even suspected health concerns. Methyl bromide's only known possible problem is associated with animal birth defects and there is no evidence these carry over into human birth defects. As with all chemical substances used today, these chemicals are being studied for any cancer causing problems but to date there are none. Statements such as yours are inflammatory and are not to be used.

Your system explanation indicates that the silica gel and the borates are dusts applied with high pressure dusting and spraying equipment in one area and are said to be highly penetrating liquid solutions in another area. This confusion must be clarified.

Currently there is an active complaint case involving Edward Wasserman and your company (Case No. 93-53-3A-80-93). The property in this case is located in Santa Monica. The Specialist has determined that there are several spots in the structure, garage and poolhouse where drywood termite infestations are present and extend into inaccessible areas. It appears that a fumigation is necessary to rectify this situation. You are responsible for taking care of the garage and poolhouse fumigation to resolve this complaint. Please contact Mr. Smitley at (818) 309-0268 to discuss this matter further.

Your immediate attention to the matters discussed in this letter is required. I am requiring a copy of your corrected advertisement regarding your system to clear up that portion of this letter. Mr. Smitley will be working with you on the Wasserman matter.

Sincerely,

MAUREEN A. SHARP
Deputy Registrar

MAS:pmp .

cc:  Carl Smitley



CERTIFIED COPY

Kelli Okuma
Acting Registrar



SUB-

EXHIBIT

70

# EXHIBIT 70

**Exhibit "70"**

July 27, 2017 Civil Deposit of Jury Fees for upcoming APPELLANT VS TERMITE CONTROL
Retrial, scheduled to commence on October 2, 2017.

JUL 3 1 2017

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF LOS ANGELES

Reserved for Clerk's Stamp

COURT ADDRESS:

111 North Hill Street, Los Angeles, CA 90012

PLAINTIFF:

TIG INSURANCE COMPANY

DEFENDANT:

GARY SMOLKER

## CIVIL DEPOSIT

CASE NUMBER:
BC173952

CLERK: PREPARE A FORM FOR EACH DEPOSITOR PAYING SEPARATELY

PLEASE REPORT TO THE CLERK'S OFFICE/CASHIER:
☐ Room 102, Central Civil    ☐ Clerk's Office , Room_____    ☐ Department Number_____

| | Distribution Codes | Amt Due | | | Distribution Codes | Amt Due |
|---|---|---|---|---|---|---|
| ☐ | 251 | DAILY JURY FEES  Dates:_____  # of day(s)_____ x$_____ | | ☐ | 74 | DEPOSIT IN TRUST | |
| ☒ | 72 | JURY FEES  Trial Date:_____  (Initial Deposit) $ 150 | 150 | ☐ | 101 | FIRST PAPERS-  GENERAL JURISDICTION | |
| ☐ | 252 | REPORTERS FEES  Dates:_____  # of 1/2 day(s)_____ x$_____  Full Day_____ | | ☐ | 101 | FIRST PAPERS-LIMITED OVER $10,000 | |
| | | | | ☐ | 141 | With declaration Limited to $10,000  (per B&P 6322.1(a)) | |
| | | | | ☐ | 130 | Limited to $10,000 | |
| ☐ | 721 | SANCTIONS ORDERED ON  Date:_____ | | ☐ | 211 | RECLASSIFICATION FEE | |
| ☐ | 213 | MOTIONS/APPLICATION TO CONT. HEARING | | ☐ | 150 | COMPLEX LITIGATION TRIAL/PLAINTIFF | |
| | 200 | MOTIONS/APPLICATION TO CONT.TRIAL | | ☐ | 151 | COMPLEX LITIGATION TRIAL/DEFENDANT | |
| | | Other: | | | | | |

To be paid via: ☐ Cash  ☐ Check  ☐ Certified Check/Money Order  ☐ Credit Card

☐ On or Before_____    ☐ Forthwith

Payment will be made by ☐ Plaintiff_____    ☐ Defendant_____

JOHN A. CLARKE, Executive Officer/Clerk

DATE _____    BY: _____

Deputy Clerk

TO BE COMPLETED BY DEPOSITOR                    CASHIER'S VALIDATION

Depositor's Name: Mark L. Kincaid

☐ Plaintiff in Pro Per    ☐ Defendant in Pro Per

☒ Counsel for    ☐ Plaintiff _____
Name of Party

☒ Defendant Home Saving Termite Control, Inc
Name of Party

Address of depositor   1851 East First Street, Suite 900
Street

Santa Ana, California 92705
City/State/Zip

CIV 083 03-04 (Rev. 05/06)
LASC Approved

## CIVIL DEPOSIT
Distribution: Original - Case File   Copy-Customer

# PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF ORANGE

I am employed in the County of Orange, State of California.  I am over the age of eighteen years and not a party to the within entitled action; my business address is 1851 East First Street, Suite 900, Santa Ana, California 92705.

On July 27, 2017, I caused to be served the foregoing document described as **CIVIL DEPOSIT** on the interested parties as follows:

## SEE ATTACHED SERVICE LIST

[X]   **(BY MAIL)** – By placing [ ] the original [X] a true copy thereof enclosed in a sealed envelope(s) addressed as to the above-named counsel of record or parties in propria persona. I deposited such envelope in the mail at Santa Ana, California, with postage thereon fully prepaid.  I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  It is deposited with the U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[ ]   **(BY PERSONAL DELIVERY)** – By placing [ ] the original [X] a true copy thereof enclosed in a sealed envelope(s) addressed as to the above-named counsel of record or parties in propria persona. I caused such envelope to be delivered to the addressee.

[ ]   **(BY FEDERAL EXPRESS NEXT-DAY DELIVERY)** – By placing [ ] the original [X] a true copy thereof enclosed in a sealed envelope(s) addressed as to the above-named counsel of record or parties in propria persona.  I caused such envelope to be deposited in the Federal Express box located at 1851 East First Street, Santa Ana, California 92705, which is regularly maintained by Federal Express, with delivery fees pre-paid and provided for, addressed to the person on who said document is to be served.

[ ]   **(BY FACSIMILE)** – I caused said document, along with a signed copy of this Declaration, to be transmitted to a facsimile machine telephone number as last given by said counsel or party in propria persona as noted above.

[X]   **(STATE)** – I declare under penalty of perjury under the laws of the State of California that the forgoing is true and correct.

Dated: July 27, 2017

W. Kyle Briggs

SUB-

EXIBIT

71

# EXHIBIT 71

August 22, 2019 e-mail from GSS to Mark Kincaid

From: Gary Smolker <gsmolker@aol.com>
To: mkincaid <mkincaid@mkincaidlaw.com>
Subject: #4 Re Stipulation Regarding Record on Appeal in Appeal Case No. B289828
Date: Thu, Aug 22, 2019 12:04 pm

MLK

Thank you for your prompt reply (copy below).

The filed record on appeal is incomplete.

The reason I want to add to the filed record on appeal is I want the record on appeal to be complete.

After I finish writing my motion to consolidate oral argument on all pending appeals I will prepare a proposed stipulation for you to review.

Again, thank you for your cooperation in putting together a full complete record on appeal without duplication of whatever has already been filed in the Court of Appeal.

Gary Smolker
Appellant In Pro Per

cell phone:   310-749-9735
office phone: 818-788-7290


——Original Message——
From: Mark Kincaid <mkincaid@mkincaidlaw.com>
To: Gary Smolker <gsmolker@aol.com>
Sent: Wed, Aug 21, 2019 3:46 pm
Subject: RE: #3 Stipulation Regarding Record on Appeal in Appeal Case No. B289828

Ok, but why do you want to add more stuff?  The record is the underlying pleadings + the motions/replies to dismiss + your oppositions/replies.  The appellate court is going to determine whether there is a legal basis for the dismissal and whether, assuming a legal basis, the trial court abused its discretion in granting the motions. Anything much beyond what I have ID'd above is surplusage to that determination.

From: Gary Smolker <gsmolker@aol.com>
Sent: Tuesday, August 20, 2019 7:34 PM
To: Mark Kincaid <mkincaid@mkincaidlaw.com>
Subject: #3 Stipulation Regarding Record on Appeal in Appeal Case No. B289828

Tuesday, August 20, 2019

MLK

I am agreeable to stipulating that the record in Court of Appeal Case No. 286138 and the record on appeal in Court of Appeal Case No. B287626 may be used in Court of

Appeal Case No. B289828.

However, I am going to want and to ask the Court of Appeal to review more documents and transcripts then are already before the Court of Appeal as part of one or more previously filed record(s) on appeal.

I think it is a good idea to stipulate to use a previously filed prior record on appeal of another prior appeal case instead of having the same documents again produced for the new appeal.

Do you have a copy of the filed record on appeal for Court of Appeal Case No. B289828?  Have you purchased a copy?

I am preparing a motion to consolidate oral argument on Appeal Case No. B289828 with the other oral arguments -  be combined with oral arguments on Appeal Case Nos. B281406, B286138 and B287626.

As soon as I finish preparing that motion, I will prepare a proposed stipulation regarding the record on appeal in Appeal Case No. 289828 wherein we will stipulate that the record on appeal in Appeal Case No. B289828 includes the record on appeal filed in Appeal Case No. 29828 and that each one of us may refer to the documents and transcripts filed in Appeal Case No. 287626.

May I also include in our stipulation that the Record on Appeal in Appeal Case No. 289828 also includes the record filed in Appeal Case No. B286138 and that each one of us may refer to documents filed in Appeal Case No. B287626?

Please advise.

Thank you.

Very truly yours,

Gary Smolker
Appellant In Pro Per

cell phone    310-749-9735
office phone 818- 788-7290

——Original Message——
From: Mark Kincaid <mkincaid@mkincaidlaw.com>
To: Gary Smolker <gsmolker@aol.com>
Sent: Tue, Aug 20, 2019 6:00 am
Subject: FW: Record on Appeal in Appeal Case No. B289828

8/22/2019                                    #4 Re Stipulation Regarding Record on Appeal in Appeal Case No. B289828

Here was my earlier response.  I purchased the combined Clerk's Record which contains a case number B286138.  It consists of 14 original volumes and 6 supplemental volumes.  It appears that all of the documents which are needed for our appeal including the notices of appeal (2), original motion to dismiss, supplemental motion to dismiss, supplemental points and authorities and appendix, your opposition and supplemental oppositions and the reply are all included in that record.

Again I was surprised that there is another record in B289828 that was filed almost two years later.  That said, it is likely that the new record is a much smaller rehash of what is already included in the combined Clerk's Record.  What I would suggest is that we stipulated that the record in B286138 can be used in the B289828 appeal.

**From: Mark Kincaid**
**Sent: Wednesday, August 14, 2019 9:13 PM**
**To: 'Gary Smolker <gsmolker@aol.com>**
**Cc: marklkincaid@yahoo.com**
**Subject: RE: Record on Appeal in Appeal Case No. B289828**

**From: Gary Smolker <gsmolker@aol.com>**
**Sent: Wednesday, August 14, 2019 3:38 PM**
**To: Mark Kincaid <mkincaid@mkincaidlaw.com>**
**Subject: Record on Appeal in Appeal Case No. B289828**

## Record on Appeal in Appeal Case No. B289828

Dear Mr. Kincaid,

I have not yet received  a copy of the filed record on appeal.

I do not know what is in the filed record or what is missing.

Of course, you, on behalf of your client, should be given an opportunity to designate what is missing in the filed record on appeal.

Did you receive a Notification of Costs to prepare record on appeal - sent by Los Angeles Superior Court Civil Appeals Unit  - Didn't receive.

Did you purchase a copy of the record on appeal?  Never got the opportunity.

Do you have a copy of the filed record on appeal?  No.

Do you know what is in the filed record on appeal?  No.

Did you receive a copy of ORDER signed by Administrative Presiding Justice Elwood Lui, filed on November 14, 2018 regarding filing notice of designation of record on appeal for appeal filed on May 2, 2018?  Nope.

I am in the process of preparing a motion to consolidate appeal cases.

I don't know what is in the filed record on appeal in Court of Appeal Case No. B289828.

SUB-
EXIBIT

72 -73

# EXHIBIT 72

August 22, 2019 e-mail from GSS to all defense counsel

When I receive a copy of the filed Record on Appeal for Appeal Case No. B289828 would you like me to send you a copy of the INDEX specifying what is in the record on appeal?  Yes.

I will attend to straightening out the record on appeal in Appeal Case No. B289828 after I receive a copy of the record on appeal.  Thank you.

Very truly yours,

Gary Smolker
Appellant In Pro Per
Cell Phone: 310-749-9735
Office Phone: 818-788-7290


——Original Message——
From: Mark Kincaid <mkincaid@mkincaidlaw.com>
To: gsmolker@aol.com <gsmolker@aol.com>
Sent: Tue, Aug 13, 2019 6:40 pm
Subject: Appeal

I was surprised to have received a notice that Appellant's brief is due in 40 days.  I've already filed my ROB in response to your original brief.  I was never served with your request for record on appeal and note that the record on this appeal is 347.  I will say that you've successfully mucked this appeal up so as to confuse everyone.  We had a record on the previous appeals that exceeded 2000 pages.  Are we going to use the old record or the new record?   Good news is that I get paid by the hour.  The bad news is this is cutting into my golf time.

Let me know your thoughts on the record.

MLK

8/22/2019                                    Stipulation To Have Hearing on All Pending Appeals at same time

From: Gary Smolker <gsmolker@aol.com>
To: mkincaid <mkincaid@mkincaidlaw.com>; raul.martinez <raul.martinez@lewisbrisbois.com>; rhoffman
    <rhoffman@crwlip.com>; rlewis <rlewis@bortonpetrini.com>; pschwartz <pschwartz@gordonrees.com>; pschwartz
    <pschwartz@grsm.com>; sinouye <sinouye@grsm.com>; elise.klein <elise.klein@lewisbrisbois.com>
Subject: Stipulation To Have Hearing on All Pending Appeals at same time
Date: Thu, Aug 22, 2019 12:19 pm

Appeal Cases B281406, B286138, B287626, and B289828

COUNSEL:

On April 6, 2018, the Court of Appeal issued an order which states that appeal case number B281406, B286138, and B287626 will be considered together, at such time as briefing is complete in all cases.

Will you, on behalf of your client or clients, agree/stipulate to include Appeal Case No. B289828 in the appeals to be considered together, at such time as briefing is complete in all cases?

Please advise.

I am in the process of preparing a motion to file in the Court of Appeal in which I will request that oral argument on all four pending appeals be heard together, considered together, at such time as briefing is complete in all cases.

I would like to inform the Court of Appeal whether you stipulate to have oral argument on all four pending appeals be heard/considered together, at such time as briefing is complete in all four pending appeals.

Thank you.

Very truly yours,

Gary Smolker
Appellant In Pro Per

Cell Phone:    310-749-9735
Office Phone:  818-788-7290

# EXHIBIT 73

August 22, 2019 e-mail from GSS to Mark Kincaid

SUB-
EXIBIT

73

8/22/2019                                              #2 Re: Stipulation To Have Hearing on All Pending Appeals at same time a

**From:** Gary Smolker <gsmolker@aol.com>

**To:** mkincaid <mkincaid@mkincaidlaw.com>

**Cc:** raul.martinez <raul.martinez@lewisbrisbois.com>; elise.klein <elise.klein@lewisbrisbois.com>; rhoffman <rhoffman@crwllp.com>; pschwartz <pschwartz@grsm.com>; sinouye <sinouye@grsm.com>; rlewis <rlewis@bortonpetrini.com>; jlui <jlui@bortonpetrini.com>

**Subject:** #2 Re: Stipulation To Have Hearing on All Pending Appeals at same time a

**Date:** Thu, Aug 22, 2019 2:00 pm

---

THANK YOU.


—Original Message—
From: Mark Kincaid <mkincaid@mkincaidlaw.com>
To: Gary Smolker <gsmolker@aol.com>
Sent: Thu, Aug 22, 2019 1:47 pm
Subject: RE: Stipulation To Have Hearing on All Pending Appeals at same time a

I'll stipulate to have all oral arguments concurrently and to have the prior record be included in the B289828 appeal.

**From:** Gary Smolker <gsmolker@aol.com>
**Sent:** Thursday, August 22, 2019 2:20 PM
**To:** Mark Kincaid <mkincaid@mkincaidlaw.com>; raul.martinez@lewisbrisbois.com; rhoffman@crwllp.com; rlewis@bortonpetrini.com; pschwartz@gordonrees.com; pschwartz@grsm.com; sinouye@grsm.com; elise.klein@lewisbrisbois.com
**Subject:** Stipulation To Have Hearing on All Pending Appeals at same time

Appeal Cases B281406, B286138, B287626, and B289828

COUNSEL:

On April 6, 2018, the Court of Appeal issued an order which states that appeal case number B281406, B286138, and B287626 will be considered together, at such time as briefing is complete in all cases.

Will you, on behalf of your client or clients, agree/stipulate to include Appeal Case No. B289828 in the appeals to be considered together, at such time as briefing is complete in all cases?

Please advise.

I am in the process of preparing a motion to file in the Court of Appeal in which I will request that oral argument on all four pending appeals be heard together, considered together, at such time as briefing is complete in all cases.

I would like to inform the Court of Appeal whether you stipulate to have oral argument on all four pending appeals be heard/considered together, at such time as briefing is complete in all four pending appeals.

Thank you.

Very truly yours,

Gary Smolker
Appellant In Pro Per

Cell Phone:      310-749-9735
Office Phone:  818-788-7290

SUB-

EXHIBIT

74-77

# EXHIBIT 74

August 22, 2019 e-mail from GSS to Jeffrey Z. Liu

From: Gary Smolker <gsmolker@aol.com>
To: jliu <jliu@bortonpetrini.com>
Subject: Fwd: #2 Re: Stipulation To Have Hearing on All Pending Appeals at same time a
Date: Thu, Aug 22, 2019 2:10 pm

----Original Message----
From: Gary Smolker <gsmolker@aol.com>
To: mkincaid <mkincaid@mkincaidlaw.com>
Cc: raul.martinez <raul.martinez@lewisbrisbois.com>; elise.klein <elise.klein@lewisbrisbois.com>; rhoffman <rhoffman@crwllp.com>; pschwartz <pschwartz@grsm.com>; sinouye <sinouye@grsm.com>; rlewis <rlewis@bortonpetrini.com>; jliu <jliu@bortonpetrini.com>
Sent: Thu, Aug 22, 2019 2:00 pm
Subject: #2 Re: Stipulation To Have Hearing on All Pending Appeals at same time a

THANK YOU.

----Original Message----
From: Mark Kincaid <mkincaid@mkincaidlaw.com>
To: Gary Smolker <gsmolker@aol.com>
Sent: Thu, Aug 22, 2019 1:47 pm
Subject: RE: Stipulation To Have Hearing on All Pending Appeals at same time a

I'll stipulate to have all oral arguments concurrently and to have the prior record be included in the B289828 appeal.

From: Gary Smolker <gsmolker@aol.com>
Sent: Thursday, August 22, 2019 2:20 PM
To: Mark Kincaid <mkincaid@mkincaidlaw.com>; raul.martinez@lewisbrisbois.com; rhoffman@crwllp.com; rlewis@bortonpetrini.com; pschwartz@gordonrees.com; pschwartz@grsm.com; sinouye@grsm.com; elise.klein@lewisbrisbois.com
Subject: Stipulation To Have Hearing on All Pending Appeals at same time

Appeal Cases B281406, B286138, B287626, and B289828

COUNSEL:

On April 6, 2018, the Court of Appeal issued an order which states that appeal case number B281406, B286138, and B287626 will be considered together, at such time as briefing is complete in all cases.

Will you, on behalf of your client or clients, agree/stipulate to include Appeal Case No. B289828 in the appeals to be considered together, at such time as briefing is complete in all cases?

Please advise.

I am in the process of preparing a motion to file in the Court of Appeal in which I will request that oral argument on all four pending appeals be heard together, considered together, at such

time as briefing is complete in all cases.

I would like to inform the Court of Appeal whether you stipulate to have oral argument on all four pending appeals be heard/considered together, at such time as briefing is complete in all four pending appeals.

Thank you.

Very truly yours,

Gary Smolker
Appellant In Pro Per

Cell Phone:    310-749-9735
Office Phone: 818-788-7290

# EXHIBIT 75

August 23, 2019 e-mail from Rosemary J. Lewis to GSS

SUB

EXHIBIT

75

8/23/2019
RE: Stipulation To Have Hearing on All Pending Appeals at same time

**From:** Rosemarie S. Lewis <rlewis@bortonpetrini.com>
**To:** 'Gary Smolker' <gsmolker@aol.com>; mkincaid@mkincaidlaw.com <mkincaid@mkincaidlaw.com>; raul.martinez@lewisbrisbois.com <raul.martinez@lewisbrisbois.com>; rhoffman@crwllp.com <rhoffman@crwllp.com>; pschwartz@gordonrees.com <pschwartz@gordonrees.com>; pschwartz@grsm.com <pschwartz@grsm.com>; sinouye@grsm.com <sinouye@grsm.com>; elise.klein@lewisbrisbois.com <elise.klein@lewisbrisbois.com>
**Subject:** RE: Stipulation To Have Hearing on All Pending Appeals at same time
**Date:** Fri, Aug 23, 2019 1:50 pm

W. R. Grace will not stipulate to consolidation of the 4th appeal.

# Rosemarie S. Lewis
*Managing Partner – Los Angeles & Orange County*

626 Wilshire Boulevard, Suite 975
Los Angeles, CA 90017
rlewis@bortonpetrini.com

Tel: (213) 624-2869
Fax: (213) 489-3930

| Bakersfield | Fresno | Los Angeles | | Modesto | Orange County | Sacramento |
|---|---|---|---|---|---|---|
| (661) 322-3051 | (559) 268-0117 | (213) 624-2869 | BORTON PETRINI LLP | (209) 576-1701 | (562) 596-2300 | (916) 858-1212 |
| San Bernardino | San Diego | | | | San Jose | San Rafael |
| (909) 884-7427 | (619) 232-2424 | | | | (408) 535-0870 | (415) 677-0730 |

www.bortonpetrini.com

CONFIDENTIALITY NOTICE: This communication and any accompanying document(s) are confidential and privileged. They are intended for the sole use of the addressee.If you receive this transmission in error, you are advised that any disclosure, copying, or distribution, or the taking of any action in reliance upon the communication is strictly prohibited. Any inadvertent disclosure shall not compromise or waive the attorney-client privilege and/or attorney work-product privilege as to this communication, any attachments or otherwise. If you have received this communication in error, please contact at rlewis@bortonpetrini.com or by telephone at (213) 624-2869. This e-mail address is not valid for delivery of legal notices or legal mail. Thank you.

**From:** Gary Smolker [mailto:gsmolker@aol.com]
**Sent:** Thursday, August 22, 2019 12:20 PM
**To:** mkincaid@mkincaidlaw.com; raul.martinez@lewisbrisbois.com; rhoffman@crwllp.com; Rosemarie S. Lewis;

8/23/2019                                                    RE: Stipulation To Have Hearing on All Pending Appeals at same time

pschwartz@gordonrees.com; pschwartz@grsm.com; sinouye@grsm.com; elise.klein@lewisbrisbois.com

**Subject:** Stipulation To Have Hearing on All Pending Appeals at same time

Appeal Cases B281406, B286138, B287626, and B289828

COUNSEL:

On April 6, 2018, the Court of Appeal issued an order which states that appeal case number B281406, B286138, and B287626 will be considered together, at such time as briefing is complete in all cases.

Will you, on behalf of your client or clients, agree/stipulate to include Appeal Case No. B289828 in the appeals to be considered together, at such time as briefing is complete in all cases?

Please advise.

I am in the process of preparing a motion to file in the Court of Appeal in which I will request that oral argument on all four pending appeals be heard together, considered together, at such time as briefing is complete in all cases.

I would like to inform the Court of Appeal whether you stipulate to have oral argument on all four pending appeals be heard/considered together, at such time as briefing is complete in all four pending appeals.

Thank you.

Very truly yours,

Gary Smolker

8/23/2019

Appellant In Pro Per

Cell Phone:    310-749-9735

Office Phone:  818-788-7290

# EXHIBIT 76

August 23, 2019 e-mail from GSS to Rosemarie S. Lewis, Raul Martinez, Robert Hoffman, and Peter Schwartz

SUB-
EXHIBIT
76

8/23/2019                                  Re: Stipulation To Have Hearing on All Pending Appeals at same time

From: Gary Smolker <gsmolker@aol.com>
To: rlewis <rlewis@bortonpetrini.com>; mkincaid <mkincaid@mkincaidlaw.com>; raul.martinez
    <raul.martinez@lewisbrisbois.com>; rhoffman <rhoffman@crwllp.com>; pschwartz <pschwartz@gordonrees.com>;
    pschwartz <pschwartz@grsm.com>; sinouye <sinouye@grsm.com>; elise.klein <elise.klein@lewisbrisbois.com>; liu
    <liu@bortonpetrini.com>
Subject: Re: Stipulation To Have Hearing on All Pending Appeals at same time
Date: Fri, Aug 23, 2019 4:11 pm

Friday, August 23, 2019

Ms. Lewis,

Thank you for your response, on behalf of GRACE, that GRACE agree that oral argument on all
four appeals be heard at the same time after briefing is complete.

GRACE is not been asked to stipulate to consolidation of the fourth appeal.

GRACE is being asked to stipulate to oral argument being heard on all four appeals at the same
time concurrently, after briefing is complete.

Very truly yours,

Gary Smolker,
Appellant In Pro Per
cell phone:   310-749-9735
office phone: 818:788-7290

----------------------

Attorney Raul Martinez, Will you stipulate, on behalf of your client the AUTO CLUB, that oral
argument on all four appeals may be heard concurrently after briefing is complete?

Attorney Robert Hoffman, Will you stipulate, on behalf of your clients the COREGIS
ENTITIES, that oral argument on all four appeals may be heard concurrently after briefing is
complete?

Attorney Peter Schwartz, will you stipulate on behalf of your client TRUCK, that oral argument
on all four appeals may be heard concurrently after briefing is complete?

Please advise.

Thank you.

Very truly yours,

Gary Smolker

8/23/2019

Appellant in Pro Per

Cell phone: 310-749-9735
Office phone:  818-788-7290

-----Original Message-----
From: Rosemarie S. Lewis <rlewis@bortonpetrini.com>
To: 'Gary Smolker' <gsmolker@aol.com>; mkincaid@mkincaidlaw.com <mkincaid@mkincaidlaw.com>;
raul.martinez@lewisbrisbois.com <raul.martinez@lewisbrisbois.com>; rhoffman@crwllp.com <rhoffman@crwllp.com>;
pschwartz@gordonrees.com <pschwartz@gordonrees.com>; pschwartz@grsm.com <pschwartz@grsm.com>;
sinouye@grsm.com <sinouye@grsm.com>; elise.klein@lewisbrisbois.com <elise.klein@lewisbrisbois.com>
Sent: Fri, Aug 23, 2019 1:50 pm
Subject: RE: Stipulation To Have Hearing on All Pending Appeals at same time

W. R. Grace will not stipulate to consolidation of the 4th appeal.

---

## Rosemarie S. Lewis
### *Managing Partner – Los Angeles & Orange County*

626 Wilshire Boulevard, Suite 975
Los Angeles, CA 90017
rlewis@bortonpetrini.com

Tel: (213) 624-2869
Fax: (213) 489-3930

### www.bortonpetrini.com

CONFIDENTIALITY NOTICE: This communication and any accompanying document(s) are confidential and privileged. They are intended for the sole use of the addressee.If you receive this transmission in error, you are advised that any disclosure, copying, or distribution, or the taking of any action in reliance upon the communication is strictly prohibited. Any inadvertent disclosure shall not compromise or waive the attorney-client privilege and/or attorney work-product privilege as to this communication, any attachments or otherwise. If you have received this communication in error, please contact at rlewis@bortonpetrini.com or by telephone at (213) 624-2869. This e-mail address is not valid for delivery of legal notices or legal mail. Thank you.

From: Gary Smolker [mailto:gsmolker@aol.com]
Sent: Thursday, August 22, 2019 12:20 PM
To: mkincaid@mkincaidlaw.com; raul.martinez@lewisbrisbois.com; rhoffman@crwllp.com; Rosemarie S. Lewis;
pschwartz@gordonrees.com; pschwartz@grsm.com; sinouye@grsm.com; elise.klein@lewisbrisbois.com
Subject: Stipulation To Have Hearing on All Pending Appeals at same time

Appeal Cases B281406, B286138, B287626, and B289828

COUNSEL:

Re: Stipulation To Have Hearing on All Pending Appeals at same time

On April 6, 2018, the Court of Appeal issued an order which states that appeal case number B281406, B286138, and B287626 will be considered together, at such time as briefing is complete in all cases.

Will you, on behalf of your client or clients, agree/stipulate to include Appeal Case No. B289828 in the appeals to be considered together, at such time as briefing is complete in all cases?

Please advise.

I am in the process of preparing a motion to file in the Court of Appeal in which I will request that oral argument on all four pending appeals be heard together, considered together, at such time as briefing is complete in all cases.

I would like to inform the Court of Appeal whether you stipulate to have oral argument on all four pending appeals be heard/considered together, at such time as briefing is complete in all four pending appeals.

Thank you.

Very truly yours,

Gary Smolker
Appellant In Pro Per

Cell Phone:    310-749-9735
Office Phone:  818-788-7290

# EXHIBIT 77

August 23, 2019 E-mail from Rosemarie S. Lewis to GSS

SUB-
EXHIBIT
77

8/24/2019

Re: Stipulation To Have Hearing on All Pending Appeals at same time

**From:** Rosemarie S. Lewis <rlewis@bortonpetrini.com>
**To:** Gary Smolker <gsmolker@aol.com>
**Cc:** Mark Kincaid <mkincaid@mkincaidlaw.com>; raul.martinez@lewisbrisbois.com <raul.martinez@lewisbrisbois.com>; rhoffman@crwlip.com <rhoffman@crwlip.com>; pschwartz@gordonrees.com <pschwartz@gordonrees.com>; pschwartz@gram.com <pschwartz@gram.com>; sinouye@gram.com <sinouye@gram.com>; elise.klein@lewisbrisbois.com <elise.klein@lewisbrisbois.com>; tlu@bortonpetrini.com <tlu@bortonpetrini.com>
**Subject:** Re: Stipulation To Have Hearing on All Pending Appeals at same time
**Date:** Fri, Aug 23, 2019 8:14 pm

---

Grace is NOT in agreement that oral argument on all 4 appeals be heard at the same time.

On Aug 23, 2019, at 4:11 PM, Gary Smolker <gsmolker@aol.com> wrote:

Friday, August 23, 2019

Ms. Lewis,

Thank you for your response, on behalf of GRACE, that GRACE agree that oral argument on all four appeals be heard at the same time after briefing is complete.

GRACE is not been asked to stipulate to consolidation of the fourth appeal.

GRACE is being asked to stipulate to oral argument being heard on all four appeals at the same time concurrently, after briefing is complete.

Very truly yours,

Gary Smolker,
Appellant In Pro Per
cell phone:   310-749-9735
office phone: 818:788-7290

---

Attorney Raul Martinez, Will you stipulate, on behalf of your client the AUTO CLUB, that oral argument on all four appeals may be heard concurrently after briefing is complete?

Attorney Robert Hoffman, Will you stipulate, on behalf of your clients THE COREGIS ENTITIES, that oral argument on all four appeals may be heard concurrently after briefing is complete?

Attorney Peter Schwartz, will you stipulate on behalf of your client TRUCK, that oral argument on all four appeals may be heard concurrently after briefing is complete?

Please advise.

Thank you.

Very truly yours,

Gary Smolker
Appellant in Pro Per

Cell phone: 310-749-9735
Office phone:  818-788-7290

---

-----Original Message-----
**From:** Rosemarie S. Lewis <rlewis@bortonpetrini.com>
**To:** 'Gary Smolker' <gsmolker@aol.com>; mkincaid@mkincaidlaw.com <mkincaid@mkincaidlaw.com>; raul.martinez@lewisbrisbois.com <raul.martinez@lewisbrisbois.com>; rhoffman@crwlip.com <rh
**Sent:** Fri, Aug 23, 2019 1:50 pm
**Subject:** RE: Stipulation To Have Hearing on All Pending Appeals at same time

W. R. Grace will not stipulate to consolidation of the 4th appeal.

---

Rosemarie S. Lewis
*Managing Partner – Los Angeles & Orange County*
<image004.png>
626 Wilshire Boulevard, Suite 975          Tel: (213) 624-2869
Los Angeles, CA 90017                      Fax: (213) 489-3930

8/24/2019                    Re: Stipulation To Have Hearing on All Pending Appeals at same time

rlewis@bortonpetrini.com

<image004.png>

www.bortonpetrini.com

CONFIDENTIALITY NOTICE: This communication and any accompanying document(s) are confidential and privileged. They are intended for the sole use of the addressee. If you receive this transmission in error, you are advised that any disclosure, copying, or distribution, or the taking of any action in reliance upon the communication is strictly prohibited. Any inadvertent disclosure shall not compromise or waive the attorney-client privilege and/or attorney work-product privilege as to this communication, any attachments or otherwise. If you have received this communication in error, please contact at rlewis@bortonpetrini.com or by telephone at (213) 624-2869. This e-mail address is not valid for delivery of legal notices or legal mail. Thank you.

From: Gary Smolker [mailto:gsmolker@aol.com]
Sent: Thursday, August 22, 2019 12:20 PM
To: mkincaid@mkincaidlaw.com; raul.martinez@lewisbrisbois.com; rhoffman@rcwdlp.com; Rosemarie S. Lewis; pschwartz@gordonrees.com; pschwartz@grsm.com; zinouye@grsm.com; elise.klein@lewisbrisbois.com
Subject: Stipulation To Have Hearing on All Pending Appeals at same time

Appeal Cases B281406, B286138, B287626, and B289828

COUNSEL:

On April 6, 2018, the Court of Appeal issued an order which states that appeal case number B281406, B286138, and B287626 will be considered together, at such time as briefing is complete in all cases.

Will you, on behalf of your client or clients, agree/stipulate to include Appeal Case No. B289828 in the appeals to be considered together, at such time as briefing is complete in all cases?

Please advise.

I am in the process of preparing a motion to file in the Court of Appeal in which I will request that oral argument on all four pending appeals be heard together, considered together, at such time as briefing is complete in all cases.

I would like to inform the Court of Appeal whether you stipulate to have oral argument on all four pending appeals be heard/considered together, at such time as briefing is complete in all four pending appeals.

Thank you.

Very truly yours,

Gary Smolker
Appellant In Pro Per

Cell Phone:    310-749-9735
Office Phone:  818-788-7290
<image004.png><image004.png>

SUB-
EXHIBIT
78-83

# EXHIBIT 78

August 24, 2019 GSS email to Rosemarie S. Lewis

8/24/2019     Case 01-01139-AMC   Doc 33177   Filed 01/04/21   Page 506 of 767

Will TRUCK, COREGIS ENTITIES, and AUTO CLUB Stipulate To Have Hearings on All Four Pending Appeals at same time?

From: Gary Smolker <gsmolker@aol.com>
To: rlewis <rlewis@bortonpetrini.com>
Cc: mkincaid <mkincaid@mkincaidlaw.com>; raul.martinez <raul.martinez@lewisbrisbois.com>; rhoffman <rhoffman@crwllp.com>; pschwartz <pschwartz@gordonrees.com>; pschwartz
     <pschwartz@gordonrees.com>; sinouye <sinouye@grsm.com>; elise.klein <elise.klein@lewisbrisbois.com>; liu <liu@bortonpetrini.com>
Subject: Will TRUCK, COREGIS ENTITIES, and AUTO CLUB Stipulate To Have Hearings on All Four Pending Appeals at same time?
Date: Sat, Aug 24, 2019 11:59 am

Saturday, August 24, 2019

TO: ATTORNEYS MARTINEZ (attorney for AUTO CLUB), HOFFMAN (attorney for COREGIS ENTITIES) AND SCHWARTZ (attorney for TRUCK)

FROM: GARY SMOLKER, attorney for Gary Smolker, appellant in pro per

SUBJECT: STIPULATION THAT ORAL ARGUMENT ON ALL FOUR APPEALS BE HEARD AT THE SAME TIME

I am in the process of writing a motion to have all four appeal cases heard concurrently, at the same time after all briefing is complete.

I would like to inform the Court of Appeal whether you clients agree to have oral argument on all four pending appeal cases heard at the same time, after all briefing is complete.

Do(es) your client(s) agree that argument on all four pending appeal cases (Court of Appeal Case Nos. B281406, B286138, B287626, and B289828) shall be heard concurrently by the Court of Appeal?

Attorney Mark Kincaid, on behalf of his clients Home Saving Termite Control, Inc. and W.F. Morris has agreed to have all four pending appeal cases heard concurrently after all briefing is complete.

Attorney Rosemary Lewis, on behalf of her clients W.R. Grace & Co. and Grace Davidson, has not agreed to have oral argument on all four pending appeal cases heard concurrently.

Please advise by return email.

Thank you.

Very truly yours,

Gary Smolker
Appellant, In Pro Per
Cell phone:   310-749-9735
Office phone: 818-788-7290

-----Original Message-----
From: Rosemarie S. Lewis <rlewis@bortonpetrini.com>
To: Gary Smolker <gsmolker@aol.com>
Cc: Mark Kincaid <mkincaid@mkincaidlaw.com>; raul.martinez@lewisbrisbois.com <raul.martinez@lewisbrisbois.com>; rhoffman@crwllp.com <rhoffman@crwllp.com>;
pschwartz@gordonrees.com <pschwartz@gordonrees.com>; pschwartz@grsm.com <pschwartz@grsm.com>; sinouye@grsm.com <sinouye@grsm.com>;
elise.klein@lewisbrisbois.com <elise.klein@lewisbrisbois.com>; liu@bortonpetrini.com <liu@bortonpetrini.com>
Sent: Fri, Aug 23, 2019 8:14 pm
Subject: Re: Stipulation To Have Hearing on All Pending Appeals at same time

Grace is NOT in agreement that oral argument on all 4 appeals be heard at the same time.

On Aug 23, 2019, at 4:11 PM, Gary Smolker <gsmolker@aol.com> wrote:

Friday, August 23, 2019

Ms. Lewis,

Thank you for your response, on behalf of GRACE, that GRACE agree that oral argument on all four appeals be heard at the same time after briefing is complete.

GRACE is not been asked to stipulate to consolidation of the fourth appeal.

GRACE is being asked to stipulate to oral argument being heard on all four appeals at the same time concurrently, after briefing is complete.

Very truly yours,

Gary Smolker,
Appellant In Pro Per

cell phone:  310-749-9735
office phone: 818:788-7290

_____

Attorney Raul Martinez, Will you stipulate, on behalf of your client the AUTO CLUB, that oral argument on all four appeals may be heard concurrently after briefing is complete?

Attorney Robert Hoffman, Will you stipulate, on behalf of your clients the COREGIS ENTITIES, that oral argument on all four appeals may be heard concurrently after briefing is complete?

Attorney Peter Schwartz, will you stipulate on behalf of your client TRUCK, that oral argument on all four appeals may be heard concurrently after briefing is complete?

Please advise.

Thank you.

Very truly yours,

Gary Smolker
Appellant in Pro Per

Cell phone: 310-749-9735
Office phone:  818-788-7290

——Original Message——
From: Rosemarie S. Lewis <rlewis@bortonpetrini.com>
To: 'Gary Smolker'
<gsmolker@aol.com>; mkincaid@mkincaidlaw.com <mkincaid@mkincaidlaw.com>; raul.martinez@lewisbrisbois.com <raul.martinez@lewisbrisbois.com>; rhoffman@crwllp.com <rh
Sent: Fri, Aug 23, 2019 1:50 pm
Subject: RE: Stipulation To Have Hearing on All Pending Appeals at same time

W. R. Grace will not stipulate to consolidation of the 4th appeal.

_____

## Rosemarie S. Lewis
### *Managing Partner – Los Angeles & Orange County*
<image004.png>
626 Wilshire Boulevard, Suite 975                    Tel: (213) 624-2869
Los Angeles, CA 90017                                Fax: (213) 489-3930
rlewis@bortonpetrini.com
<image004.png>

www.bortonpetrini.com

CONFIDENTIALITY NOTICE: This communication and any accompanying document(s) are confidential and privileged. They are intended for the sole use of the addressee. If you receive this transmission in error, you are advised that any disclosure, copying, or distribution, or the taking of any action in reliance upon the communication is strictly prohibited. Any inadvertent disclosure shall not compromise or waive the attorney-client privilege and/or attorney work-product privilege as to this communication, any attachments or otherwise. If you have received this communication in error, please contact at rlewis@bortonpetrini.com or by telephone at (213) 624-2869. This e-mail address is not valid for delivery of legal notices or legal mail. Thank you.

From: Gary Smolker [mailto:gsmolker@aol.com]
Sent: Thursday, August 22, 2019 12:20 PM
To: mkincaid@mkincaidlaw.com; raul.martinez@lewisbrisbois.com; rhoffman@crwllp.com; Rosemarie S. Lewis; pschwartz@bortonrees.com; nschwartz@grsm.com; sinouye@grsm.com; elise.klein@lewisbrisbois.com
Subject: Stipulation To Have Hearing on All Pending Appeals at same time

Appeal Cases B281406, B286138, B287626, and B289828

COUNSEL:

On April 6, 2018, the Court of Appeal issued an order which states that appeal case number B281406, B286138, and B287626 will be considered together, at such time as briefing is complete in all cases.

Will you, on behalf of your client or clients, agree/stipulate to include Appeal Case No. B289828 in the appeals to be considered together, at such time as briefing is complete in all cases?

Please advise.

I am in the process of preparing a motion to file in the Court of Appeal in which I will request that oral argument on all four pending appeals be heard together, considered together, at such time as briefing is complete in all cases.

I would like to inform the Court of Appeal whether you stipulate to have oral argument on all four pending appeals be heard/considered together, at such time as briefing is complete in all four pending appeals.

Thank you.

Very truly yours,

Gary Smolker
Appellant In Pro Per

Cell Phone:    310-749-9735
Office Phone:  818-788-7290
<Image004.png><Image004.png>

SUB-

EXHIBIT

79

# EXHIBIT 79

August 25, 2019 from Robert Hoffman to GSS

8/25/2019        8-25-19 opposition of Coregis Parties to Smolker request to delay hearing in three briefed appeals pending briefing in duplicative unnece...

From: Robert Hoffman <rhoffman@crwllp.com>
To: Gary Smolker <gsmolker@aol.com>
Cc: mkincaid@mkincaidlaw.com <mkincaid@mkincaidlaw.com>; raul.martinez@lewisbrisbois.com <raul.martinez@lewisbrisbois.com>; pschwartz@gordonrees.com <pschwartz@gordonrees.com>; pschwartz@grsm.com <pschwartz@grsm.com>; sinouye@grsm.com <sinouye@grsm.com>; elise.klein@lewisbrisbois.com <elise.klein@lewisbrisbois.com>; liu@bortonpetrini.com <liu@bortonpetrini.com>; rlewis@bortonpetrini.com <rlewis@bortonpetrini.com>
Subject: 8-25-19 opposition of Coregis Parties to Smolker request to delay hearing in three briefed appeals pending briefing in duplicative unnecessary fourth appeal
Date: Sun, Aug 25, 2019 11:36 am

Mr. Smolker,

    In response to your August 24, 2019 e-mail below, please be advised that respondents Coregis Group, Inc., Coregis Insurance Company and California Insurance Company ("Coregis Parties") decline to stipulate to, and oppose, the relief you have requested.

    On April 6, 2018, the Court of Appeal had ordered that there would be a single hearing after the parties had completed the briefing in Court of Appeal Case Nos. B281406, B286138 and B287626 ("Three Appeals"). Court of Appeal Case No. B289828 ("Fourth Appeal") provides no legitimate basis to delay the scheduling of that combined hearing in the Three Appeals.

    Among other things, the Fourth Appeal relating to the dismissal of your cross-claims against Home Savings Termite Control, Inc. and Wayne F. Morris ("HSTCI" Parties) is duplicative of Court of Appeal Case No. B287626 in which you had already appealed the dismissal of the HSTCI Parties, including the costs awarded to the HSTCI Parties. On June 20, 2019, the HSTCI Parties filed their respondent's brief in that appeal such that the appellate issues pertaining to the HSTCI Parties have already been fully briefed.

    Accordingly, the Coregis Parties oppose your request that the combined hearing on the Three Appeals be delayed until the duplicative and unnecessary Fourth Appeal has been briefed. Please include this e-mail as an exhibit to any motion you file regarding this matter.

    Nothing stated or not stated herein shall constitute a waiver of any claims, rights, causes of action, rights of action, defenses, positions or remedies possessed by the Coregis Parties, all of which are expressly reserved.

Very truly yours,
Bob Hoffman
CHARLSTON, REVICH & WOLLITZ LLP
1925 Century Park East, Suite 320
Los Angeles, California 90067
Direct line: (310) 551-7016
Email: rhoffman@crwllp.com / Website: www.crwllp.com

*CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it, may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this message is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify us by reply e-mail at rhoffman@crwllp.com or by telephone at (310) 551-7016, and destroy the original transmission and its attachments without reading them or saving them to disk. Thank you.*

From: Gary Smolker [mailto:gsmolker@aol.com]
Sent: Saturday, August 24, 2019 11:59 AM
To: rlewis@bortonpetrini.com
Cc: mkincaid@mkincaidlaw.com; raul.martinez@lewisbrisbois.com; Robert Hoffman; pschwartz@gordonrees.com; pschwartz@grsm.com; sinouye@grsm.com; elise.klein@lewisbrisbois.com; liu@bortonpetrini.com
Subject: Will TRUCK, COREGIS ENTITIES, and AUTO CLUB Stipulate To Have Hearings on All Four Pending Appeals at same time?

Saturday, August 24, 2019

TO: ATTORNEYS MARTINEZ (attorney for AUTO CLUB), HOFFMAN (attorney for COREGIS ENTITIES) AND SCHWARTZ (attorney for TRUCK)

FROM: GARY SMOLKER, attorney for Gary Smolker, appellant in pro per

SUBJECT: STIPULATION THAT ORAL ARGUMENT ON ALL FOUR APPEALS BE HEARD AT THE SAME TIME

I am in the process of writing a motion to have all four appeal cases heard concurrently, at the same time after all briefing is complete.

Page 1139

I would like to inform the Court of Appeal whether you clients agree to have oral argument on all four pending appeal cases heard at the same time, after all briefing is complete.

Do(es) your client(s) agree that argument on all four pending appeal cases (Court of Appeal Case Nos. B281406, B286138, B287626, and B289828) shall be heard concurrently by the Court of Appeal?

Attorney Mark Kincaid, on behalf of his clients Home Saving Termite Control, Inc. and W.F. Morris has agreed to have all four pending appeal cases heard concurrently after all briefing is complete.

Attorney Rosemary Lewis, on behalf of her clients W.R. Grace & Co. and Grace Davidson, has not agreed to have oral argument on all four pending appeal cases heard concurrently.

Please advise by return email.

Thank you.

Very truly yours,

Gary Smolker

Appellant, In Pro Per

Cell phone:   310-749-9735

Office phone: 818-788-7290

-----Original Message-----
From: Rosemarie S. Lewis <rlewis@bortonpetrini.com>
To: Gary Smolker <gsmolker@aol.com>
Cc: Mark Kincaid <mkincaid@mkincaidlaw.com>; raul.martinez@lewisbrisbois.com <raul.martinez@lewisbrisbois.com>; rhoffman@crwllp.com <rhoffman@crwllp.com>; pschwartz@gordonrees.com <pschwartz@gordonrees.com>; pschwartz@grsm.com <pschwartz@grsm.com>; sinouye@grsm.com <sinouye@grsm.com>; elise.klein@lewisbrisbois.com <elise.klein@lewisbrisbois.com>;
liu@bortonpetrini.com <liu@bortonpetrini.com>
Sent: Fri, Aug 23, 2019 8:14 pm
Subject: Re: Stipulation To Have Hearing on All Pending Appeals at same time

Grace is NOT in agreement that oral argument on all 4 appeals be heard at the same time.

On Aug 23, 2019, at 4:11 PM, Gary Smolker <gsmolker@aol.com> wrote:

Friday, August 23, 2019

Ms. Lewis,

Thank you for your response, on behalf of GRACE, that GRACE agree that oral argument on all four appeals be heard at the same time after briefing is complete.

GRACE is not been asked to stipulate to consolidation of the fourth appeal.

GRACE is being asked to stipulate to oral argument being heard on all four appeals at the same time concurrently, after briefing is complete.

Very truly yours,

Gary Smolker,
Appellant In Pro Per
cell phone:   310-749-9735
office phone: 818:788-7290

-----------------

Attorney Raul Martinez, Will you stipulate, on behalf of your client the AUTO CLUB, that oral argument on all four appeals may be heard concurrently after briefing is complete?

Attorney Robert Hoffman, Will you stipulate, on behalf of your clients the COREGIS ENTITIES, that oral argument on all four appeals may be heard concurrently after briefing is complete?

Attorney Peter Schwartz, will you stipulate on behalf of your client TRUCK, that oral argument on all four appeals may be heard concurrently after briefing is complete?

Please advise.

Thank you.

Very truly yours,

Gary Smolker
Appellant in Pro Per

Cell phone: 310-749-9735
Office phone: 818-788-7290

-----Original Message-----
From: Rosemarie S. Lewis <rlewis@bortonpetrini.com>
To: 'Gary Smolker'
<gsmolker@aol.com>; mkincaid@mkincaidlaw.com <mkincaid@mkincaidlaw.com>; raul.martinez@lewisbrisbois.com <raul.martinez@lewisbrisbois.com>; rhoffman@crwllp.com <rhoffman@crwllp.com>
Sent: Fri, Aug 23, 2019 1:50 pm
Subject: RE: Stipulation To Have Hearing on All Pending Appeals at same time

W. R. Grace will not stipulate to consolidation of the 4th appeal.

---

## Rosemarie S. Lewis
### *Managing Partner – Los Angeles & Orange County*
<image004.png>

| 626 Wilshire Boulevard, Suite 975 | Tel: (213) 624-2869 |
|---|---|
| Los Angeles, CA 90017 | Fax: (213) 489-3930 |
| rlewis@bortonpetrini.com | |

<image004.png>

www.bortonpetrini.com

CONFIDENTIALITY NOTICE: This communication and any accompanying document(s) are confidential and privileged. They are intended for the sole use of the addressee. If you receive this transmission in error, you are advised that any disclosure, copying, or distribution, or the taking of any action in reliance upon the communication is strictly prohibited. Any inadvertent disclosure shall not compromise or waive the attorney-client privilege and/or attorney work-product privilege as to this communication, any attachments or otherwise. If you have received this communication in error, please contact at rlewis@bortonpetrini.com or by telephone at (213) 624-2869. This e-mail address is not valid for delivery of legal notices or legal mail. Thank you.

From: Gary Smolker [mailto:gsmolker@aol.com]
Sent: Thursday, August 22, 2019 12:20 PM
To: mkincaid@mkincaidlaw.com; raul.martinez@lewisbrisbois.com; rhoffman@crwllp.com; Rosemarie S. Lewis; pschwartz@gordonrees.com; pschwartz@grsm.com; sinouye@grsm.com; elise.klein@lewisbrisbois.com
Subject: Stipulation To Have Hearing on All Pending Appeals at same time

Appeal Cases B281406, B286138, B287626, and B289828

COUNSEL:

On April 6, 2018, the Court of Appeal issued an order which states that appeal case number B281406, B286138, and B287626 will be considered together, at such time as briefing is complete in all cases.

Will you, on behalf of your client or clients, agree/stipulate to include Appeal Case No. B289828 in the appeals to be considered together, at such time as briefing is complete in all cases?

Please advise.

I am in the process of preparing a motion to file in the Court of Appeal in which I will request that oral argument on all four pending appeals be heard together, considered together, at such time as briefing is complete in all cases.

8/25/2019        8-25-19 opposition of Coregis Parties to Smolker request to delay hearing in three briefed appeals pending briefing in duplicative unnece...

I would like to inform the Court of Appeal whether you stipulate to have oral argument on all four pending appeals be heard/considered together, at such time as briefing is complete in all four pending appeals.

Thank you.

Very truly yours,

Gary Smolker
Appellant In Pro Per

Cell Phone:    310-749-9735
Office Phone:  818-788-7290
<image004.png><image004.png>

# EXHIBIT 80

August 25, 2019 e-mail from GSS to Robert Hoffman, Raul
Martinez, Peter Schwartz

SUB-
EXHIBIT
80

8/25/2019                              Will TRUCK and AUTO CLUB Stipulate to Have Hearings on all Four Pending Appeals at the same time?

From: Gary Smolker <gsmolker@aol.com>
To: rhoffman <rhoffman@crwlp.com>
Cc: mkincaid <mkincaid@mkincaidlaw.com>; raul.martinez <raul.martinez@lewisbrisbois.com>; pschwartz <pschwartz@gordonrees.com>; pschwartz <pschwartz@grsm.com>; slnouye <slnouye@grsm.com>; elise.klein <elise.klein@lewisbrisbois.com>; liu <liu@bortonpetrini.com>; rlewis <rlewis@bortonpetrini.com>
Subject: Will TRUCK and AUTO CLUB Stipulate to Have Hearings on all Four Pending Appeals at the same time?
Date: Sun, Aug 25, 2019 12:49 pm

August 25, 2019

TO: ATTORNEY RAUL MARTINEZ, attorney for the AUTO CLUB
TO: ATTORNEY PETER SCHWARTZ, attorney for TRUCK

FROM:  GARY SMOLKER, attorney for appellant Gary Smolker, in pro per

SUBJECT: STIPULATION THAT ORAL ARGUMENT ON ALL FOUR PENDING APPEALS BE HEARD AT THE SAME TIME

I am in the process of writing a motion to ask the Court of Appeal to have oral argument on all four pending appeals at the same time after briefing is complete.

I would like to inform the Court of Appeal whether your clients agree to have oral argument on all four pending appeals heard at the same time, after all briefing is complete.

Does your client agree that argument on all four pending appeal cases (Court of Appeal Case Nos. B281406, B286138, B287626, and B289828) shall be heard concurrently by the Court of Appeal after all briefing is complete?

Please advise by return email.

Mark Kincaid on behalf of Home Saving Termite Control, Inc. and W.F. Morris has agreed to so stipulate.

Rosemary S. Lewis on behalf of W.R. Grace & Co. and Grace Davidson has declined to stipulate.

Robert Hoffman on behalf of the COREGIS ENTITIES (Coregis Group, Inc., Coregis Insurance Company, and California Insurance Company) has declined to stipulate and opposes the relief I have requested.

Thank you.

Very truly yours,

Gary Smolker, appellant in pro per
Cell phone:  310-749-9735
Office phone: 818-788-7290

_____

Mr. Hoffman,

Thank you for your prompt response to my inquiry (copy below).

Very truly yours,

Gary Smolker, appellant in pro per
Cell Phone:  310-749-9735
Office Phone: 818-788-7290

——Original Message——
From: Robert Hoffman <rhoffman@crwlp.com>
To: Gary Smolker <gsmolker@aol.com>
Cc: mkincaid@mkincaidlaw.com; raul.martinez@lewisbrisbois.com raul.martinez@lewisbrisbois.com; pschwartz@gordonrees.com; pschwartz@grsm.com <pschwartz@grsm.com>; slnouye@grsm.com <slnouye@grsm.com>; elise.klein@lewisbrisbois.com <elise.klein@lewisbrisbois.com>; liu@bortonpetrini.com <liu@bortonpetrini.com>; rlewis@bortonpetrini.com <rlewis@bortonpetrini.com>
Sent: Sun, Aug 25, 2019 11:36 am
Subject: 8-25-19 opposition of Coregis Parties to Smolker request to delay hearing in three briefed appeals pending briefing in duplicative unnecessary fourth appeal

Mr. Smolker,
    In response to your August 24, 2019 e-mail below, please be advised that respondents Coregis Group, Inc., Coregis Insurance Company and California Insurance Company ("Coregis Parties") decline to stipulate to, and oppose, the relief you have requested.

    On April 6, 2018, the Court of Appeal had ordered that there would be a single hearing after the parties had completed the briefing in Court of Appeal Case Nos. B281406, B286138 and B287626 ("Three Appeals"). Court of Appeal Case No. B289828 ("Fourth Appeal") provides no legitimate basis to delay the scheduling of that combined hearing in the Three Appeals.

8/25/2019

Among other things, the Fourth Appeal relating to the dismissal of your cross-claims against Home Savings Termite Control, Inc. and Wayne F. Morris ("HSTCI Parties") is duplicative of Court of Appeal Case No. B287626 in which you had already appealed the dismissal of the HSTCI Parties, including the costs awarded to the HSTCI Parties. On June 20, 2019, the HSTCI Parties filed their respondent's brief in that appeal such that the appellate issues pertaining to the HSTCI Parties have already been fully briefed.

Accordingly, the Coregis Parties oppose your request that the combined hearing on the Three Appeals be delayed until the duplicative and unnecessary Fourth Appeal has been briefed. Please include this e-mail as an exhibit to any motion you file regarding this matter.

Nothing stated or not stated herein shall constitute a waiver of any claims, rights, causes of action, rights of action, defenses, positions or remedies possessed by the Coregis Parties, all of which are expressly reserved.

Very truly yours,
Bob Hoffman
CHARLSTON, REVICH & WOLLITZ LLP
1925 Century Park East, Suite 320
Los Angeles, California 90067
Direct line: (310) 551-7016
Email: rhoffman@crwllp.com / Website: www.crwllp.com

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it, may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this message is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify us by reply e-mail at rhoffman@crwllp.com or by telephone at (310) 551-7016, and destroy the original transmission and its attachments without reading them or saving them to disk. Thank you.

From: Gary Smolker [mailto:gsmolker@aol.com]
Sent: Saturday, August 24, 2019 11:59 AM
To: rlewis@bortonpetrini.com
Cc: mkincaid@mkincaidlaw.com; raul.martinez@lewisbrisbois.com; Robert Hoffman; pschwartz@gordonrees.com; pschwartz@grsm.com; sinouye@grsm.com; elise.klein@lewisbrisbois.com; liu@bortonpetrini.com
Subject: Will TRUCK, COREGIS ENTITIES, and AUTO CLUB Stipulate To Have Hearings on All Four Pending Appeals at same time?

Saturday, August 24, 2019

TO: ATTORNEYS MARTINEZ (attorney for AUTO CLUB), HOFFMAN (attorney for COREGIS ENTITIES) AND SCHWARTZ (attorney for TRUCK)

FROM: GARY SMOLKER, attorney for Gary Smolker, appellant in pro per

SUBJECT: STIPULATION THAT ORAL ARGUMENT ON ALL FOUR APPEALS BE HEARD AT THE SAME TIME

I am in the process of writing a motion to have all four appeal cases heard concurrently, at the same time after all briefing is complete.

I would like to inform the Court of Appeal whether you clients agree to have oral argument on all four pending appeal cases heard at the same time, after all briefing is complete.

Do(es) your client(s) agree that argument on all four pending appeal cases (Court of Appeal Case Nos. B281406, B286138, B287626, and B289828) shall be heard concurrently by the Court of Appeal?

Attorney Mark Kincaid, on behalf of his clients Home Saving Termite Control, Inc. and W.F. Morris has agreed to have all four pending appeal cases heard concurrently after all briefing is complete.

Attorney Rosemary Lewis, on behalf of her clients W.R. Grace & Co. and Grace Davidson, has not agreed to have oral argument on all four pending appeal cases heard concurrently.

Please advise by return email.

Thank you.

Very truly yours,

Gary Smolker
Appellant, In Pro Per
Cell phone:   310-749-9735
Office phone: 818-788-7290

-----Original Message-----
From: Rosemary S. Lewis <rlewis@bortonpetrini.com>
To: Gary Smolker <gsmolker@aol.com>
Cc: Mark Kincaid <mkincaid@mkincaidlaw.com>; raul.martinez@lewisbrisbois.com <raul.martinez@lewisbrisbois.com>; rhoffman@crwllp.com <rhoffman@crwllp.com>; pschwartz@gordonrees.com <pschwartz@gordonrees.com>; pschwartz@grsm.com <pschwartz@grsm.com>; sinouye@grsm.com <sinouye@grsm.com>; elise.klein@lewisbrisbois.com <elise.klein@lewisbrisbois.com>; liu@bortonpetrini.com <liu@bortonpetrini.com>
Sent: Fri, Aug 23, 2019 8:14 pm
Subject: Re: Stipulation To Have Hearing on All Pending Appeals at same time

8/25/2019                    Will TRUCK and AUTO CLUB Stipulate to Have Hearings on all Four Pending Appeals at the same time?

Grace is NOT in agreement that oral argument on all 4 appeals be heard at the same time.

On Aug 23, 2019, at 4:11 PM, Gary Smolker <gsmolker@aol.com> wrote:

Friday, August 23, 2019

Ms. Lewis,

Thank you for your response, on behalf of GRACE, that GRACE agree that oral argument on all four appeals be heard at the same time after briefing is complete.

GRACE is not been asked to stipulate to consolidation of the fourth appeal.

GRACE is being asked to stipulate to oral argument being heard on all four appeals at the same time concurrently, after briefing is complete.

Very truly yours,

Gary Smolker,
Appellant In Pro Per
cell phone:   310-749-9735
office phone: 818:788-7290

————————

Attorney Raul Martinez, Will you stipulate, on behalf of your client the AUTO CLUB, that oral argument on all four appeals may be heard concurrently after briefing is complete?

Attorney Robert Hoffman, Will you stipulate, on behalf of your clients THE COREGIS ENTITIES, that oral argument on all four appeals may be heard concurrently after briefing is complete?

Attorney Peter Schwartz, will you stipulate on behalf of your client TRUCK, that oral argument on all four appeals may be heard concurrently after briefing is complete?

Please advise.

Thank you.

Very truly yours,

Gary Smolker
Appellant in Pro Per

Cell phone: 310-749-9735
Office phone:  818-788-7290

————Original Message————
From: Rosemarie S. Lewis <rlewis@bortonpetrini.com>
To: 'Gary Smolker'
<gsmolker@aol.com>; mkincaid@mkincaidlaw.com <mkincaid@mkincaidlaw.com>; raul.martinez@lewisbrisbois.com <raul.martinez@lewisbrisbois.com>; rhoffman@crwllp.com <rhoffman@crwllp.com>
Sent: Fri, Aug 23, 2019 1:50 pm
Subject: RE: Stipulation To Have Hearing on All Pending Appeals at same time

W. R. Grace will not stipulate to consolidation of the 4th appeal.

## Rosemarie S. Lewis
### Managing Partner – Los Angeles & Orange County
<image004.png>
626 Wilshire Boulevard, Suite 975                    Tel: (213) 624-2869
Los Angeles, CA 90017                                Fax: (213) 489-3930
rlewis@bortonpetrini.com
<image004.png>

www.bortonpetrini.com

CONFIDENTIALITY NOTICE: This communication and any accompanying document(s) are confidential and privileged. They are intended for the sole use of the addressee.If you receive this transmission in error, you are advised that any disclosure, copying, or distribution, or the taking of any action in reliance upon the communication is strictly prohibited. Any inadvertent disclosure shall not compromise or waive the attorney-client privilege and/or attorney work-product privilege as to this communication, any attachments or otherwise. If you have received this communication in error, please contact

at rlewis@hortonpetrini.com or by telephone at (213) 624-2869. This e-mail address is not valid for delivery
of legal notices or legal mail. Thank you.

From: Gary Smolker [mailto:gsmolker@aol.com]
Sent: Thursday, August 22, 2019 12:20 PM
To: mkincaid@mkincaidlaw.com; raul.martinez@lewisbrisbois.com; rhoffman@crwllp.com; Rosemarie S.
Lewis: pschwartz@gordonrees.com; pschwartz@grsm.com; sinouye@grsm.com; elise.klein@lewisbrisbois.com
Subject: Stipulation To Have Hearing on All Pending Appeals at same time

Appeal Cases B281406, B286138, B287626, and B289828

COUNSEL:

On April 6, 2018, the Court of Appeal issued an order which states that appeal case number B281406, B286138, and B287626 will be considered together, at such time as briefing is complete in all cases.

Will you, on behalf of your client or clients, agree/stipulate to include Appeal Case No. B289828 in the appeals to be considered together, at such time as briefing is complete in all cases?

Please advise.

I am in the process of preparing a motion to file in the Court of Appeal in which I will request that oral argument on all four pending appeals be heard together, considered together, at such time as briefing is complete in all cases.

I would like to inform the Court of Appeal whether you stipulate to have oral argument on all four pending appeals be heard/considered together, at such time as briefing is complete in all four pending appeals.

Thank you.

Very truly yours,

Gary Smolker
Appellant In Pro Per

Cell Phone:    310-749-9735
Office Phone:  818-788-7290
<image004.png><image004.png>

SUB-

EXHIBIT

81

# EXHIBIT 81

August 26, 2019 e-mail from Raul Martinez to GSS

8/26/2019                    RE: [EXTERNAL] Will TRUCK and AUTO CLUB Stipulate to Have Hearings on all Four Pending Appeals at the same time?

From: Martinez, Raul <Raul.Martinez@lewisbrisbois.com>
To: Gary Smolker <gsmolker@aol.com>
Subject: RE: [EXTERNAL] Will TRUCK and AUTO CLUB Stipulate to Have Hearings on all Four Pending Appeals at the same time?
Date: Mon, Aug 26, 2019 4:53 pm

We will not stipulate.



**Raul L. Martinez**
Partner
Raul.Martinez@lewisbrisbois.com

T: 213.680.5049  F: 213.481.0621

633 W. 5th Street, Suite 4000, Los Angeles, CA 90071  |  LewisBrisbois.com

Representing clients from coast to coast. View our locations nationwide.

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the
intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete
this email and any attachment from your computer and any of your electronic devices where the message is stored.

From: Gary Smolker [mailto:gsmolker@aol.com]
Sent: Sunday, August 25, 2019 12:49 PM
To: rhoffman@crwllp.com
Cc: mkincaid@mkincaidlaw.com; Martinez, Raul; pschwartz@gordonrees.com; pschwartz@grsm.com; sinouye@grsm.com; Klein, Elise; liu@bortonpetrini.com; rlewis@bortonpetrini.com
Subject: [EXTERNAL] Will TRUCK and AUTO CLUB Stipulate to Have Hearings on all Four Pending Appeals at the same time?

External Email

August 25, 2019

TO: ATTORNEY RAUL MARTINEZ, attorney for the AUTO CLUB
TO: ATTORNEY PETER SCHWARTZ, attorney for TRUCK

FROM: GARY SMOLKER, attorney for appellant Gary Smolker, in pro per

SUBJECT: STIPULATION THAT ORAL ARGUMENT ON ALL FOUR PENDING APPEALS BE HEARD AT THE SAME TIME

I am in the process of writing a motion to ask the Court of Appeal to have oral argument on all four pending appeals at the same time after briefing is complete.

I would like to inform the Court of Appeal whether your clients agree to have oral argument on all four pending appeals heard at the same time, after all briefing is complete.

Does your client agree that argument on all four pending appeal cases (Court of Appeal Case Nos. B281406, B286138, B287626, and B289828) shall be heard concurrently by the Court of Appeal after all briefing is complete?

Please advise by return email.

Mark Kincaid on behalf of Home Saving Termite Control, Inc. and W.F. Morris has agreed to so stipulate.

Rosemary S. Lewis on behalf of W.R. Grace & Co. and Grace Davidson has declined to stipulate.

Robert Hoffman on behalf of the COREGIS ENTITIES (Coregis Group, Inc., Coregis Insurance Company, and California Insurance Company) has declined to stipulate and opposes the relief I have requested.

Thank you.

Very truly yours,

Gary Smolker, appellant in pro per
Cell phone:  310-749-9735

8/26/2019          RE: [EXTERNAL] Will TRUCK and AUTO CLUB Stipulate to Have Hearings on all Four Pending Appeals at the same time?

Office phone: 818-788-7290

_____

Mr. Hoffman,

Thank you for your prompt response to my inquiry (copy below).

Very truly yours,

Gary Smolker, appellant in pro per
Cell Phone:    310-749-9735
Office Phone: 818-788-7290

-----Original Message-----
From: Robert Hoffman <rhoffman@crwllp.com>
To: Gary Smolker <gsmolker@aol.com>
Cc: mkincaid@mkincaidlaw.com <mkincaid@mkincaidlaw.com>; raul.martinez@lewisbrisbois.com <raul.martinez@lewisbrisbois.com>; pschwartz@gordonrees.com <pschwartz@gordonrees.com>; pschwartz@grsm.com <pschwartz@grsm.com>; sinouye@grsm.com <sinouye@grsm.com>; elise.klein@lewisbrisbois.com <elise.klein@lewisbrisbois.com>; liu@bortonpetrini.com <liu@bortonpetrini.com>; rlewis@bortonpetrini.com <rlewis@bortonpetrini.com>
Sent: Sun, Aug 25, 2019 11:36 am
Subject: 8-25-19 opposition of Coregis Parties to Smolker request to delay hearing in three briefed appeals pending briefing in duplicative unnecessary fourth appeal

Mr. Smolker,
     In response to your August 24, 2019 e-mail below, please be advised that respondents Coregis Group, Inc., Coregis Insurance Company and California Insurance Company ("Coregis Parties") decline to stipulate to, and oppose, the relief you have requested.

     On April 6, 2018, the Court of Appeal had ordered that there would be a single hearing after the parties had completed the briefing in Court of Appeal Case Nos. B281406, B286138 and B287626 ("Three Appeals"). Court of Appeal Case No. B289828 ("Fourth Appeal") provides no legitimate basis to delay the scheduling of that combined hearing in the Three Appeals.

     Among other things, the Fourth Appeal relating to the dismissal of your cross-claims against Home Savings Termite Control, Inc. and Wayne F. Morris ("HSTCI Parties") is duplicative of Court of Appeal Case No. B287626 in which you had already appealed the dismissal of the HSTCI Parties, including the costs awarded to the HSTCI Parties. On June 20, 2019, the HSTCI Parties filed their respondent's brief in that appeal such that the appellate issues pertaining to the HSTCI Parties have already been fully briefed.

     Accordingly, the Coregis Parties oppose your request that the combined hearing on the Three Appeals be delayed until the duplicative and unnecessary Fourth Appeal has been briefed. Please include this e-mail as an exhibit to any motion you file regarding this matter.

     Nothing stated or not stated herein shall constitute a waiver of any claims, rights, causes of action, rights of action, defenses, positions or remedies possessed by the Coregis Parties, all of which are expressly reserved.
Very truly yours,
Bob Hoffman
CHARLSTON, REVICH & WOLLITZ LLP
1925 Century Park East, Suite 320
Los Angeles, California 90067
Direct line: (310) 551-7016
Email: rhoffman@crwllp.com / Website: www.crwllp.com

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it, may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this message is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify us by reply e-mail at rhoffman@crwllp.com or by telephone at (310) 551-7016, and destroy the original transmission and its attachments without reading them or saving them to disk. Thank you.
From: Gary Smolker [mailto:gsmolker@aol.com]
Sent: Saturday, August 24, 2019 11:59 AM
To: rlewis@bortonpetrini.com
Cc: mkincaid@mkincaidlaw.com; raul.martinez@lewisbrisbois.com; Robert Hoffman; pschwartz@gordonrees.com; pschwartz@grsm.com; sinouye@grsm.com; elise.klein@lewisbrisbois.com; liu@bortonpetrini.com
Subject: Will TRUCK, COREGIS ENTITIES, and AUTO CLUB Stipulate To Have Hearings on All Four Pending Appeals at same time?

Saturday, August 24, 2019

TO: ATTORNEYS MARTINEZ (attorney for AUTO CLUB), HOFFMAN (attorney for COREGIS ENTITIES) AND SCHWARTZ (attorney for TRUCK)

FROM: GARY SMOLKER, attorney for Gary Smolker, appellant in pro per

SUBJECT: STIPULATION THAT ORAL ARGUMENT ON ALL FOUR APPEALS BE HEARD AT THE SAME TIME

I am in the process of writing a motion to have all four appeal cases heard concurrently, at the same time after all briefing is complete.

I would like to inform the Court of Appeal whether you clients agree to have oral argument on all four pending appeal cases heard at the same time, after all briefing is complete.

8/26/2019                    RE: [EXTERNAL] Will TRUCK and AUTO CLUB Stipulate to Have Hearings on all Four Pending Appeals at the same time?

Do(es) your client(s) agree that argument on all four pending appeal cases (Court of Appeal Case Nos. B281406, B286138, B287626, and B289828) shall be heard concurrently by the Court of Appeal?

Attorney Mark Kincaid, on behalf of his clients Home Saving Termite Control, Inc. and W.F. Morris has agreed to have all four pending appeal cases heard concurrently after all briefing is complete.

Attorney Rosemary Lewis, on behalf of her clients W.R. Grace & Co. and Grace Davidson, has not agreed to have oral argument on all four pending appeal cases heard concurrently.

Please advise by return email.

Thank you.

Very truly yours,

Gary Smolker
Appellant, In Pro Per
Cell phone:   310-749-9735
Office phone: 818-788-7290
-----Original Message-----
From: Rosemarie S. Lewis <rlewis@bortonpetrini.com>
To: Gary Smolker <gsmolker@aol.com>
Cc: Mark Kincaid <mkincaid@mkincaidlaw.com>; raul.martinez@lewisbrisbois.com <raul.martinez@lewisbrisbois.com>; rhoffman@crwllp.com <rhoffman@crwllp.com>; pschwartz@gordonrees.com
<pschwartz@gordonrees.com>; pschwartz@grsm.com <pschwartz@grsm.com>; sinouye@grsm.com <sinouye@grsm.com>; elise.klein@lewisbrisbois.com <elise.klein@lewisbrisbois.com>;
liu@bortonpetrini.com <liu@bortonpetrini.com>
Sent: Fri, Aug 23, 2019 8:14 pm
Subject: Re: Stipulation To Have Hearing on All Pending Appeals at same time

Grace is NOT in agreement that oral argument on all 4 appeals be heard at the same time.


On Aug 23, 2019, at 4:11 PM, Gary Smolker <gsmolker@aol.com> wrote:

Friday, August 23, 2019

Ms. Lewis,

Thank you for your response, on behalf of GRACE, that GRACE agree that oral argument on all four appeals be heard at the same time after briefing is complete.

GRACE is not been asked to stipulate to consolidation of the fourth appeal.

GRACE is being asked to stipulate to oral argument being heard on all four appeals at the same time concurrently, after briefing is complete.

Very truly yours,

Gary Smolker,
Appellant In Pro Per
cell phone:   310-749-9735
office phone: 818:788-7290

------------------------

Attorney Raul Martinez, Will you stipulate, on behalf of your client the AUTO CLUB, that oral argument on all four appeals may be heard concurrently after briefing is complete?

Attorney Robert Hoffman, Will you stipulate, on behalf of your clients the COREGIS ENTITIES, that oral argument on all four appeals may be heard concurrently after briefing is complete?

Attorney Peter Schwartz, will you stipulate on behalf of your client TRUCK, that oral argument on all four appeals may be heard concurrently after briefing is complete?

Please advise.

Thank you.

Very truly yours,

Gary Smolker

SUB-

EXHIBIT

82

# EXHIBIT 82

August 26, 2019 GSS e-mail to Raul Martinez and Peter Schwartz

8/26/2019                    RE: [EXTERNAL] Will TRUCK and AUTO CLUB Stipulate to Have Hearings on all Four Pending Appeals at the same time?

Appellant in Pro Per

Cell phone: 310-749-9735
Office phone:  818-788-7290

——Original Message——
From: Rosemarie S. Lewis <rlewis@bortonpetrini.com>
To: 'Gary Smolker'
<gzsmolker@aol.com>; mkincaid@mkincaidlaw.com <mkincaid@mkincaidlaw.com>; raul.martinez@lewisbrisbois.com <raul.martinez@lewisbrisbois.com>; rhoffman@crwllp.com <rhoffman@crwllp.com>
Sent: Fri, Aug 23, 2019 1:50 pm
Subject: RE: Stipulation To Have Hearing on All Pending Appeals at same time

W. R. Grace will not stipulate to consolidation of the 4th appeal.

---

## Rosemarie S. Lewis
*Managing Partner – Los Angeles & Orange County*
<image004.png>
626 Wilshire Boulevard, Suite 975            Tel: (213) 624-2869
Los Angeles, CA 90017                        Fax: (213) 489-3930
rlewis@bortonpetrini.com
<image004.png>

www.bortonpetrini.com

CONFIDENTIALITY NOTICE: This communication and any accompanying document(s) are confidential and privileged. They are intended for the sole use of the addressee.If you receive this transmission in error, you are advised that any disclosure, copying, or distribution, or the taking of any action in reliance upon the communication is strictly prohibited. Any inadvertent disclosure shall not compromise or waive the attorney-client privilege and/or attorney work-product privilege as to this communication, any attachments or otherwise. If you have received this communication in error, please contact at rlewis@bortonpetrini.com or by telephone at (213) 624-2869. This e-mail address is not valid for delivery of legal notices or legal mail. Thank you.

From: Gary Smolker [mailto:gzsmolker@aol.com]
Sent: Thursday, August 22, 2019 12:20 PM
To: mkincaid@mkincaidlaw.com; raul.martinez@lewisbrisbois.com; rhoffman@crwllp.com; Rosemarie S.
Lewis; pachwartz@gordonrees.com; pachwartz@grsm.com; sinouye@grsm.com; elise.klein@lewisbrisbois.com
Subject: Stipulation To Have Hearing on All Pending Appeals at same time

Appeal Cases B281406, B286138, B287626, and B289828

COUNSEL:

On April 6, 2018, the Court of Appeal issued an order which states that appeal case number B281406, B286138, and B287626 will be considered together, at such time as briefing is complete in all cases.

Will you, on behalf of your client or clients, agree/stipulate to include Appeal Case No. B289828 in the appeals to be considered together, at such time as briefing is complete in all cases?

Please advise.

I am in the process of preparing a motion to file in the Court of Appeal in which I will request that oral argument on all four pending appeals be heard together, considered together, at such time as briefing is complete in all cases.

I would like to inform the Court of Appeal whether you stipulate to have oral argument on all four pending appeals be heard/considered together, at such time as briefing is complete in all four pending appeals.

Thank you.

Very truly yours,

Gary Smolker
Appellant In Pro Per

Cell Phone:    310-749-9735
Office Phone:  818-788-7290
<image004.png><image004.png>

8/26/2019                    Will/DO TRUCK and AUTO CLUB Stipulate to Have Hearings on all Four Pending Appeals at the same time?

From: Gary Smolker <gsmolker@aol.com>
To: pschwartz <pschwartz@gordonrees.com>
Cc: mkincaid <mkincaid@mkincaidlaw.com>; raul.martinez <raul.martinez@lewisbrisbois.com>; pschwartz <pschwartz@gordonrees.com>; pschwartz <pschwartz@grsm.com>; sinouye
<sinouye@grsm.com>; elise.klein <elise.klein@lewisbrisbois.com>; liu <liu@bortonpetrini.com>; rlewis <rlewis@bortonpetrini.com>; rhoffman <rhoffman@crwflp.com>
Subject: Will/DO TRUCK and AUTO CLUB Stipulate to Have Hearings on all Four Pending Appeals at the same time?
Date: Mon, Aug 26, 2019 7:23 pm

August 26, 2019

Mr. Martinez and Mr. Schwartz:

I am about to file a motion to consolidate appeal cases for oral argument and for an award of attorney fees as sanctions.

Please advise by return email whether your clients the AUTO CLUB and TRUCK INSURANCE EXCHANGE stipulate to hearing all four appeal
cases (Court of Appeal Cases No.s B281406, B286138, B287626, and B289828) at the same time.

Thank you.

Very truly yours,

Gary Smolker, Appellant In Pro Per
cell phone:  310-749-9735
office phone: 818-788-7290


——Original Message——
From: Gary Smolker <gsmolker@aol.com>
To: rhoffman <rhoffman@crwflp.com>
Cc: mkincaid <mkincaid@mkincaidlaw.com>; raul.martinez <raul.martinez@lewisbrisbois.com>; pschwartz <pschwartz@gordonrees.com>; pschwartz <pschwartz@grsm.com>; sinouye
<sinouye@grsm.com>; elise.klein <elise.klein@lewisbrisbois.com>; liu <liu@bortonpetrini.com>; rlewis <rlewis@bortonpetrini.com>
Sent: Sun, Aug 25, 2019 12:49 pm
Subject: Will TRUCK and AUTO CLUB Stipulate to Have Hearings on all Four Pending Appeals at the same time?

August 25, 2019

TO: ATTORNEY RAUL MARTINEZ, attorney for the AUTO CLUB
TO: ATTORNEY PETER SCHWARTZ, attorney for TRUCK

FROM:  GARY SMOLKER, attorney for appellant Gary Smolker, in pro per

SUBJECT: STIPULATION THAT ORAL ARGUMENT ON ALL FOUR PENDING APPEALS BE HEARD AT THE SAME TIME

I am in the process of writing a motion to ask the Court of Appeal to have oral argument on all four pending appeals at the same time after
briefing is complete.

I would like to inform the Court of Appeal whether your clients agree to have oral argument on all four pending appeals heard at the same time,
after all briefing is complete.

Does your client agree that argument on all four pending appeal cases (Court of Appeal Case Nos. B281406, B286138, B287626, and B289828)
shall be heard concurrently by the Court of Appeal after all briefing is complete?

Please advise by return email.

Mark Kincaid on behalf of Home Saving Termite Control, Inc. and W.F. Morris has agreed to so stipulate.

Rosemary S. Lewis on behalf of W.R. Grace & Co. and Grace Davidson has declined to stipulate.

Robert Hoffman on behalf of the COREGIS ENTITIES (Coregis Group, Inc., Coregis Insurance Company, and California Insurance Company)
has declined to stipulate and opposes the relief I have requested.

Thank you.

Very truly yours,

Gary Smolker, appellant in pro per
Cell phone:  310-749-9735
Office phone: 818-788-7290

Page 1154

8/26/2019                    Will/DO TRUCK and AUTO CLUB Stipulate to Have Hearings on all Four Pending Appeals at the same time?

Mr. Hoffman,

Thank you for your prompt response to my inquiry (copy below).

Very truly yours,

Gary Smolker, appellant in pro per
Cell Phone:    310-749-9735
Office Phone: 818-788-7290

-----Original Message-----
From: Robert Hoffman <rhoffman@crwllp.com>
To: Gary Smolker <gsmolker@aol.com>
Cc: mkincaid@mkincaidlaw.com <mkincaid@mkincaidlaw.com>; raul.martinez@lewisbrisbois.com <raul.martinez@lewisbrisbois.com>; pschwartz@gordonrees.com
<pschwartz@gordonrees.com>; pschwartz@grsm.com <pschwartz@grsm.com>; sinouye@grsm.com <sinouye@grsm.com>; elise.klein@lewisbrisbois.com
<elise.klein@lewisbrisbois.com>; liu@bortonpetrini.com <liu@bortonpetrini.com>; rlewis@bortonpetrini.com <rlewis@bortonpetrini.com>
Sent: Sun, Aug 25, 2019 11:36 am
Subject: 8-25-19 opposition of Coregis Parties to Smolker request to delay hearing in three briefed appeals pending briefing in duplicative unnecessary fourth appeal

Mr. Smolker,
     In response to your August 24, 2019 e-mail below, please be advised that respondents Coregis Group, Inc., Coregis Insurance Company and California Insurance
Company ("Coregis Parties") decline to stipulate to, and oppose, the relief you have requested.

     On April 6, 2018, the Court of Appeal had ordered that there would be a single hearing after the parties had completed the briefing in Court of Appeal Case Nos.
B281406, B286138 and B287626 ("Three Appeals"). Court of Appeal Case No. B289828 ("Fourth Appeal") provides no legitimate basis to delay the scheduling of that
combined hearing in the Three Appeals.

     Among other things, the Fourth Appeal relating to the dismissal of your cross-claims against Home Savings Termite Control, Inc. and Wayne F. Morris ("HSTCI"
Parties") is duplicative of Court of Appeal Case No. B287626 in which you had already appealed the dismissal of the HSTCI Parties, including the costs awarded to the
HSTCI Parties. On June 20, 2019, the HSTCI Parties filed their respondent's brief in that appeal such that the appellate issues pertaining to the HSTCI Parties have
already been fully briefed.

     Accordingly, the Coregis Parties oppose your request that the combined hearing on the Three Appeals be delayed until the duplicative and unnecessary Fourth
Appeal has been briefed. Please include this e-mail as an exhibit to any motion you file regarding this matter.

     Nothing stated or not stated herein shall constitute a waiver of any claims, rights, causes of action, rights of action, defenses, positions or remedies possessed by
the Coregis Parties, all of which are expressly reserved.
Very truly yours,
Bob Hoffman
CHARLSTON, REVICH & WOLLITZ LLP
1925 Century Park East, Suite 320
Los Angeles, California 90067
Direct line: (310) 551-7016
Email: rhoffman@crwllp.com / Website: www.crwllp.com

---

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it, may contain confidential information that
is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure,
copying, distribution or use of any of the information contained in or attached to this message is STRICTLY PROHIBITED. If you have received this transmission in error,
please immediately notify us by reply e-mail at rhoffman@crwllp.com or by telephone at (310) 551-7016, and destroy the original transmission and its attachments
without reading them or saving them to disk. Thank you.
From: Gary Smolker [mailto:gsmolker@aol.com]
Sent: Saturday, August 24, 2019 11:59 AM
To: rlewis@bortonpetrini.com
Cc: mkincaid@mkincaidlaw.com; raul.martinez@lewisbrisbois.com; Robert Hoffman; pschwartz@gordonrees.com; pschwartz@grsm.com; sinouye@grsm.com; elise.klein@lewisbrisbois.com;
liu@bortonpetrini.com
Subject: Will TRUCK, COREGIS ENTITIES, and AUTO CLUB Stipulate To Have Hearings on All Four Pending Appeals at same time?

Saturday, August 24, 2019

TO: ATTORNEYS MARTINEZ (attorney for AUTO CLUB), HOFFMAN (attorney for COREGIS ENTITIES) AND SCHWARTZ (attorney for
TRUCK)

FROM: GARY SMOLKER, attorney for Gary Smolker, appellant in pro per

SUBJECT: STIPULATION THAT ORAL ARGUMENT ON ALL FOUR APPEALS BE HEARD AT THE SAME TIME

I am in the process of writing a motion to have all four appeal cases heard concurrently, at the same time after all briefing is complete.

I would like to inform the Court of Appeal whether you clients agree to have oral argument on all four pending appeal cases heard at the same
time, after all briefing is complete.

Do(es) your client(s) agree that argument on all four pending appeal cases (Court of Appeal Case Nos. B281406, B286138, B287626, and
B289828) shall be heard concurrently by the Court of Appeal?

8/26/2019                Will/DO TRUCK and AUTO CLUB Stipulate to Have Hearings on all Four Pending Appeals at the same time?

Attorney Mark Kincaid, on behalf of his clients Home Saving Termite Control, Inc. and W.F. Morris has agreed to have all four pending appeal cases heard concurrently after all briefing is complete.

Attorney Rosemary Lewis, on behalf of her clients W.R. Grace & Co. and Grace Davidson, has not agreed to have oral argument on all four pending appeal cases heard concurrently.

Please advise by return email.

Thank you.

Very truly yours,

Gary Smolker
Appellant, In Pro Per
Cell phone:   310-749-9735
Office phone: 818-788-7290
-----Original Message-----
From: Rosemarie S. Lewis <rlewis@bortoepetrini.com>
To: Gary Smolker <gsmolker@aol.com>
Cc: Mark Kincaid <mkincaid@mkincaidlaw.com>; raul.martinez@lewisbrisbois.com <raul.martinez@lewisbrisbois.com>; rhoffman@crwllp.com <rhoffman@crwllp.com>; pschwartz@gordonrees.com
<pschwartz@gordonrees.com>; pschwartz@grsm.com <pschwartz@grsm.com>; sinouye@grsm.com <sinouye@grsm.com>; elise.klein@lewisbrisbois.com <elise.klein@lewisbrisbois.com>;
liu@bortoepetrini.com <liu@bortoepetrini.com>
Sent: Fri, Aug 23, 2019 8:14 pm
Subject: Re: Stipulation To Have Hearing on All Pending Appeals at same time

Grace is NOT in agreement that oral argument on all 4 appeals be heard at the same time.

On Aug 23, 2019, at 4:11 PM, Gary Smolker <gsmolker@aol.com> wrote:

Friday, August 23, 2019

Ms. Lewis,

Thank you for your response, on behalf of GRACE, that GRACE agree that oral argument on all four appeals be heard at the same time after briefing is complete.

GRACE is not been asked to stipulate to consolidation of the fourth appeal.

GRACE is being asked to stipulate to oral argument being heard on all four appeals at the same time concurrently, after briefing is complete.

Very truly yours,

Gary Smolker,
Appellant In Pro Per
cell phone:   310-749-9735
office phone: 818:788-7290

---------------------

Attorney Raul Martinez, Will you stipulate, on behalf of your client the AUTO CLUB, that oral argument on all four appeals may be heard concurrently after briefing is complete?

Attorney Robert Hoffman, Will you stipulate, on behalf of your clients the COREGIS ENTITIES, that oral argument on all four appeals may be heard concurrently after briefing is complete?

Attorney Peter Schwartz,will you stipulate on behalf of your client TRUCK, that oral argument on all four appeals may be heard concurrently after briefing is complete?

Please advise.

Thank you.

Very truly yours,

Gary Smolker
Appellant in Pro Per

8/26/2019                    Will/DO TRUCK and AUTO CLUB Stipulate to Have Hearings on all Four Pending Appeals at the same time?

Cell phone: 310-749-9735
Office phone:  818-788-7290

-----Original Message-----
From: Rosemarie S. Lewis <rlewis@bortonpetrini.com>
To: 'Gary Smolker'
<gsmolker@aol.com>; mkincaid@mkincaidlaw.com <mkincaid@mkincaidlaw.com>; raul.martinez@lewisbrisbois.com <raul.martinez@lewisbrisbois.com>; rhoffman@crwllp.com <rhoffman@crwllp.com>
Sent: Fri, Aug 23, 2019 1:50 pm
Subject: RE: Stipulation To Have Hearing on All Pending Appeals at same time

W. R. Grace will not stipulate to consolidation of the 4th appeal.

## Rosemarie S. Lewis
### Managing Partner – Los Angeles & Orange County

<image004.png>
626 Wilshire Boulevard, Suite 975                    Tel: (213) 624-2869
Los Angeles, CA 90017                                Fax: (213) 489-3930
rlewis@bortonpetrini.com
<image004.png>

www.bortonpetrini.com

CONFIDENTIALITY NOTICE: This communication and any accompanying document(s) are confidential
and privileged. They are intended for the sole use of the addressee.If you receive this transmission in error,
you are advised that any disclosure, copying, or distribution, or the taking of any action in reliance upon the
communication is strictly prohibited. Any inadvertent disclosure shall not compromise or waive the
attorney-client privilege and/or attorney work-product privilege as to this communication, any attachments
or otherwise.  If you have received this communication in error, please contact
at rlewis@bortonpetrini.com or by telephone at (213) 624-2869. This e-mail address is not valid for delivery
of legal notices or legal mail. Thank you.

From: Gary Smolker [mailto:gsmolker@aol.com]
Sent: Thursday, August 22, 2019 12:20 PM
To: mkincaid@mkincaidlaw.com; raul.martinez@lewisbrisbois.com; rhoffman@crwllp.com; Rosemarie S.
Lewis; pschwartz@gordonrees.com; pschwartz@grsm.com; sincuve@grsm.com; elise.klein@lewisbrisbois.com
Subject: Stipulation To Have Hearing on All Pending Appeals at same time

Appeal Cases B281406, B286138, B287626, and B289828

COUNSEL:

On April 6, 2018, the Court of Appeal issued an order which states that appeal case number B281406, B286138, and B287626 will be considered together, at such time as briefing is complete in all cases.

Will you, on behalf of your client or clients, agree/stipulate to include Appeal Case No. B289828 in the appeals to be considered together, at such time as briefing is complete in all cases?

Please advise.

I am in the process of preparing a motion to file in the Court of Appeal in which I will request that oral argument on all four pending appeals be heard together, considered together, at such time as briefing is complete in all cases.

I would like to inform the Court of Appeal whether you stipulate to have oral argument on all four pending appeals be heard/considered together, at such time as briefing is complete in all four pending appeals.

Thank you.

Very truly yours,

Gary Smolker
Appellant In Pro Per

Cell Phone:    310-749-9735
Office Phone:  818-788-7290
<image004.png><image004.png>

# EXHIBIT 83

August 26, 2019 e-mail from GSS to Raul Martinez

SUB-
EXHIBIT
83

8/26/2019                Re: [EXTERNAL] Will TRUCK and AUTO CLUB Stipulate to Have Hearings on all Four Pending Appeals at the same time?

From: Gary Smolker <gsmolker@aol.com>
To: Raul.Martinez <Raul.Martinez@lewisbrisbois.com>
Subject: Re: [EXTERNAL] Will TRUCK and AUTO CLUB Stipulate to Have Hearings on all Four Pending Appeals at the same time?
Date: Mon, Aug 26, 2019 7:43 pm

Thank you.

I will advise the Court of Appeal.

-----Original Message-----
From: Martinez, Raul <Raul.Martinez@lewisbrisbois.com>
To: Gary Smolker <gsmolker@aol.com>
Sent: Mon, Aug 26, 2019 4:53 pm
Subject: RE: [EXTERNAL] Will TRUCK and AUTO CLUB Stipulate to Have Hearings on all Four Pending Appeals at the same time?

We will not stipulate.



**LEWIS BRISBOIS**

Raul L. Martinez
Partner
Raul.Martinez@lewisbrisbois.com

T: 213.680.5049  F: 213.481.0621

633 W. 5th Street, Suite 4000, Los Angeles, CA 90071  |  LewisBrisbois.com

Representing clients from coast to coast. View our locations nationwide.

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

From: Gary Smolker [mailto:gsmolker@aol.com]
Sent: Sunday, August 25, 2019 12:49 PM
To: rhoffman@crwllp.com
Cc: mkincaid@mkincaidlaw.com; Martinez, Raul; pschwartz@gordonrees.com; pschwartz@grsm.com; sinouye@grsm.com; Klein, Elise; liu@bortonpetrini.com; rlewis@bortonpetrini.com
Subject: [EXTERNAL] Will TRUCK and AUTO CLUB Stipulate to Have Hearings on all Four Pending Appeals at the same time?

| External Email |

August 25, 2019

TO: ATTORNEY RAUL MARTINEZ, attorney for the AUTO CLUB
TO: ATTORNEY PETER SCHWARTZ, attorney for TRUCK

FROM:  GARY SMOLKER, attorney for appellant Gary Smolker, in pro per

SUBJECT: STIPULATION THAT ORAL ARGUMENT ON ALL FOUR PENDING APPEALS BE HEARD AT THE SAME TIME

I am in the process of writing a motion to ask the Court of Appeal to have oral argument on all four pending appeals at the same time after briefing is complete.

I would like to inform the Court of Appeal whether your clients agree to have oral argument on all four pending appeals heard at the same time, after all briefing is complete.

Does your client agree that argument on all four pending appeal cases (Court of Appeal Case Nos. B281406, B286138, B287626, and B289828) shall be heard concurrently by the Court of Appeal after all briefing is complete?

Please advise by return email.

Mark Kincaid on behalf of Home Saving Termite Control, Inc. and W.F. Morris has agreed to so stipulate.

Rosemary S. Lewis on behalf of W.R. Grace & Co. and Grace Davidson has declined to stipulate.

Robert Hoffman on behalf of the COREGIS ENTITIES (Coregis Group, Inc., Coregis Insurance Company, and California Insurance Company) has declined to stipulate and opposes the relief I have requested.

Thank you.

Very truly yours,

Gary Smolker, appellant in pro per

8/26/2019     Re: [EXTERNAL] Will TRUCK and AUTO CLUB Stipulate to Have Hearings on all Four Pending Appeals at the same time?

Cell phone:  310-749-9735
Office phone: 818-788-7290

Mr. Hoffman,

Thank you for your prompt response to my inquiry (copy below).

Very truly yours,

Gary Smolker, appellant in pro per
Cell Phone:  310-7⸺-9735
Office Phone: 818-788-7290

——Original Message——
From: Robert Hoffman <rhoffman@crwllp.com>
To: Gary Smolker <gsmolker@aol.com>
Cc: mkincaid@mkincaidlaw.com <mkincaid@mkincaidlaw.com>; raul.martinez@lewisbrisbois.com <raul.martinez@lewisbrisbois.com>; pschwartz@gordonrees.com <pschwartz@gordonrees.com>;
pschwartz@grsm.com <pschwartz@grsm.com>; sinouye@grsm.com <sinouye@grsm.com>; elise.klein@lewisbrisbois.com <elise.klein@lewisbrisbois.com>; liu@bortonpetrini.com
<liu@bortonpetrini.com>; rlewis@bortonpetrini.com <rlewis@bortonpetrini.com>
Sent: Sun, Aug 25, 2019 11:36 am
Subject: 8-25-19 opposition of Coregis Parties to Smolker request to delay hearing in three briefed appeals pending briefing in duplicative unnecessary fourth appeal

Mr. Smolker,
     In response to your August 24, 2019 e-mail below, please be advised that respondents Coregis Group, Inc., Coregis Insurance Company and California Insurance Company ("Coregis Parties")
decline to stipulate to, and oppose, the relief you have requested.

     On April 6, 2018, the Court of Appeal had ordered that there would be a single hearing after the parties had completed the briefing in Court of Appeal Case Nos. B281406, B286138 and B287626
("Three Appeals"). Court of Appeal Case No. B289828 ("Fourth Appeal") provides no legitimate basis to delay the scheduling of that combined hearing in the Three Appeals.

     Among other things, the Fourth Appeal relating to the dismissal of your cross-claims against Home Savings Termite Control, Inc. and Wayne F. Morris ("HSTCI Parties") is duplicative of Court of
Appeal Case No. B287626 in which you had already appealed the dismissal of the HSTCI Parties, including the costs awarded to the HSTCI Parties. On June 20, 2019, the HSTCI Parties filed their
respondent's brief in that appeal such that the appellate issues pertaining to the HSTCI Parties have already been fully briefed.

     Accordingly, the Coregis Parties oppose your request that the combined hearing on the Three Appeals be delayed until the duplicative and unnecessary Fourth Appeal has been briefed. Please
include this e-mail as an exhibit to any motion you file regarding this matter.

     Nothing stated or not stated herein shall constitute a waiver of any claims, rights, causes of action, rights of action, defenses, positions or remedies possessed by the Coregis Parties, all of which are
expressly reserved.
Very truly yours,
Bob Hoffman
CHARLSTON, REVICH & WOLLITZ LLP
1925 Century Park East, Suite 320
Los Angeles, California 90067
Direct line: (310) 551-7016
Email: rhoffman@crwllp.com / Website: www.crwllp.com

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it, may contain confidential information that is legally privileged. If you are not
the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or
attached to this message is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify us by reply e-mail at rhoffman@crwllp.com or by telephone at (310) 551-
7016, and destroy the original transmission and its attachments without reading them or saving them to disk. Thank you.
From: Gary Smolker [mailto:gsmolker@aol.com]
Sent: Saturday, August 24, 2019 11:59 AM
To: rlewis@bortonpetrini.com
Cc: mkincaid@mkincaidlaw.com; raul.martinez@lewisbrisbois.com; Robert Hoffman; pschwartz@gordonrees.com; pschwartz@grsm.com; sinouye@grsm.com; elise.klein@lewisbrisbois.com;
liu@bortonpetrini.com
Subject: Will TRUCK, COREGIS ENTITIES, and AUTO CLUB Stipulate To Have Hearings on All Four Pending Appeals at same time?

Saturday, August 24, 2019

TO: ATTORNEYS MARTINEZ (attorney for AUTO CLUB), HOFFMAN (attorney for COREGIS ENTITIES) AND SCHWARTZ (attorney for
TRUCK)

FROM: GARY SMOLKER, attorney for Gary Smolker, appellant in pro per

SUBJECT: STIPULATION THAT ORAL ARGUMENT ON ALL FOUR APPEALS BE HEARD AT THE SAME TIME

I am in the process of writing a motion to have all four appeal cases heard concurrently, at the same time after all briefing is complete.

I would like to inform the Court of Appeal whether you clients agree to have oral argument on all four pending appeal cases heard at the same
time, after all briefing is complete.

8/26/2019                    Re: [EXTERNAL] Will TRUCK and AUTO CLUB Stipulate to Have Hearings on all Four Pending Appeals at the same time?

Do(es) your client(s) agree that argument on all four pending appeal cases (Court of Appeal Case Nos. B281406, B286138, B287626, and B289828) shall be heard concurrently by the Court of Appeal?

Attorney Mark Kincaid, on behalf of his clients Home Saving Termite Control, Inc. and W.F. Morris has agreed to have all four pending appeal cases heard concurrently after all briefing is complete.

Attorney Rosemary Lewis, on behalf of her clients W.R. Grace & Co. and Grace Davidson, has not agreed to have oral argument on all four pending appeal cases heard concurrently.

Please advise by return email.

Thank you.

Very truly yours,

Gary Smolker
Appellant, In Pro Per
Cell phone:  310-749-9735
Office phone: 818-788-7290
———Original Message———
From: Rosemarie S. Lewis <rlewis@bortonpetrini.com>
To: Gary Smolker <gsmolker@aol.com>
Cc: Mark Kincaid <mkincaid@mkincaidlaw.com>; raul.martinez@lewisbrisbois.com <raul.martinez@lewisbrisbois.com>; rhoffman@crwllp.com <rhoffman@crwllp.com>; pschwartz@gordonrees.com <pschwartz@gordonrees.com>; pschwartz@grsm.com <pschwartz@grsm.com>; sinouye@grsm.com <sinouye@grsm.com>; elise.klein@lewisbrisbois.com <elise.klein@lewisbrisbois.com>; liu@bortonpetrini.com <liu@bortonpetrini.com>
Sent: Fri, Aug 23, 2019 8:14 pm
Subject: Re: Stipulation To Have Hearing on All Pending Appeals at same time

Grace is NOT in agreement that oral argument on all 4 appeals be heard at the same time.


On Aug 23, 2019, at 4:11 PM, Gary Smolker <gsmolker@aol.com> wrote:

Friday, August 23, 2019

Ms. Lewis,

Thank you for your response, on behalf of GRACE, that GRACE agree that oral argument on all four appeals be heard at the same time after briefing is complete.

GRACE is not been asked to stipulate to consolidation of the fourth appeal.

GRACE is being asked to stipulate to oral argument being heard on all four appeals at the same time concurrently, after briefing is complete.

Very truly yours,

Gary Smolker,
Appellant In Pro Per
cell phone:  310-749-9735
office phone: 818:788-7290


——————————

Attorney Raul Martinez, Will you stipulate, on behalf of your client the AUTO CLUB, that oral argument on all four appeals may be heard concurrently after briefing is complete?

Attorney Robert Hoffman, Will you stipulate, on behalf of your clients the COREGIS ENTITIES, that oral argument on all four appeals may be heard concurrently after briefing is complete?

Attorney Peter Schwartz, will you stipulate on behalf of your client TRUCK, that oral argument on all four appeals may be heard concurrently after briefing is complete?

Please advise.

Thank you.

Very truly yours,

8/26/2019                Re: [EXTERNAL] Will TRUCK and AUTO CLUB Stipulate to Have Hearings on all Four Pending Appeals at the same time?

Gary Smolker
Appellant in Pro Per

Cell phone: 310-749-9735
Office phone:  818-788-7290

-----Original Message-----
From: Rosemarie S. Lewis <rlewis@bortonpetrini.com>
To: 'Gary Smolker'
<gsmolker@aol.com>; mkincaid@mkincaidlaw.com <mkincaid@mkincaidlaw.com>; raul.martinez@lewisbrisbois.com <raul.martinez@lewisbrisbois.com>; rhoffman@crwllp.com <rhoffman@crwllp.com>
Sent: Fri, Aug 23, 2019 1:50 pm
Subject: RE: Stipulation To Have Hearing on All Pending Appeals at same time

W. R. Grace will not stipulate to consolidation of the 4th appeal.

---

Rosemarie S. Lewis
*Managing Partner – Los Angeles & Orange County*
<image004.png>
626 Wilshire Boulevard, Suite 975              Tel: (213) 624-2869
Los Angeles, CA 90017                          Fax: (213) 489-3930
rlewis@bortonpetrini.com
<image004.png>
             www.bortonpetrini.com
CONFIDENTIALITY NOTICE: This communication and any accompanying document(s) are confidential
and privileged. They are intended for the sole use of the addressee. If you receive this transmission in error,
you are advised that any disclosure, copying, or distribution, or the taking of any action in reliance upon the
communication is strictly prohibited. Any inadvertent disclosure shall not compromise or waive the
attorney-client privilege and/or attorney work-product privilege as to this communication, any attachments
or   otherwise.   If   you   have   received   this   communication   in   error,   please   contact
at rlewis@bortonpetrini.com or by telephone at (213) 624-2869. This e-mail address is not valid for delivery
of legal notices or legal mail. Thank you.

From: Gary Smolker [mailto:gsmolker@aol.com]
Sent: Thursday, August 22, 2019 12:20 PM
To: mkincaid@mkincaidlaw.com; raul.martinez@lewisbrisbois.com; rhoffman@crwllp.com; Rosemarie S.
Lewis; pschwartz@gordonrees.com; pschwartz@grsm.com; sinesym@grsm.com; elise.klein@lewisbrisbois.com
Subject: Stipulation To Have Hearing on All Pending Appeals at same time

Appeal Cases B281406, B286138, B287626, and B289828

COUNSEL:

On April 6, 2018, the Court of Appeal issued an order which states that appeal case number B281406, B286138, and B287626 will be considered together, at such time as briefing is complete in all cases.

Will you, on behalf of your client or clients, agree/stipulate to include Appeal Case No. B289828 in the appeals to be considered together, at such time as briefing is complete in all cases?

Please advise.

I am in the process of preparing a motion to file in the Court of Appeal in which I will request that oral argument on all four pending appeals be heard together, considered together, at such time as briefing is complete in all cases.

I would like to inform the Court of Appeal whether you stipulate to have oral argument on all four pending appeals be heard/considered together, at such time as briefing is complete in all four pending appeals.

Thank you.

Very truly yours,

Gary Smolker
Appellant In Pro Per

Cell Phone:   310-749-9735
Office Phone:  818-788-7290
<image004.png><image004.png>

SUB-
EXHIBIT
84—90

# EXHIBIT 84

August 27, 2019 e-mail from Steven Inouye to GSS

8/27/2019                    Re: Will/DO TRUCK and AUTO CLUB Stipulate to Have Hearings on all Four Pending Appeals at the same time?

From: Steven Inouye <sinouye@grsm.com>
To: Gary Smolker <gsmolker@aol.com>; Peter Schwartz <pschwartz@grsm.com>
Cc: mkincaid@mkincaidlaw.com <mkincaid@mkincaidlaw.com>; raul.martinez@lewisbrisbois.com <raul.martinez@lewisbrisbois.com>; elise.klein@lewisbrisbois.com
   <elise.klein@lewisbrisbois.com>; liu@bortonpetrini.com <liu@bortonpetrini.com>; rlewis@bortonpetrini.com <rlewis@bortonpetrini.com>; rhoffman@crwlp.com
   <rhoffman@crwlp.com>
Subject: Re: Will/DO TRUCK and AUTO CLUB Stipulate to Have Hearings on all Four Pending Appeals at the same time?
Date: Tue, Aug 27, 2019 9:09 am

Dear Mr. Smolker,

Truck will not stipulate to your proposal.

Regards,

Steven


Sent from my Verizon, Samsung Galaxy smartphone


-------- Original message --------
From: Gary Smolker <gsmolker@aol.com>
Date: 8/26/19 7:22 PM (GMT-08:00)
To: Peter Schwartz <pschwartz@grsm.com>
Cc: mkincaid@mkincaidlaw.com, raul.martinez@lewisbrisbois.com, Peter Schwartz <pschwartz@grsm.com>, Peter Schwartz <pschwartz@grsm.com>,
Steven Inouye <sinouye@grsm.com>, elise.klein@lewisbrisbois.com, liu@bortonpetrini.com, rlewis@bortonpetrini.com, rhoffman@crwllp.com
Subject: Will/DO TRUCK and AUTO CLUB Stipulate to Have Hearings on all Four Pending Appeals at the same time?

August 26, 2019

Mr. Martinez and Mr. Schwartz:

I am about to file a motion to consolidate appeal cases for oral argument and for an award of attorney fees as sanctions.

Please advise by return email whether your clients the AUTO CLUB and TRUCK INSURANCE EXCHANGE stipulate to hearing all four appeal cases
(Court of Appeal Cases No.s B281406, B286138, B287626, and B289828) at the same time.

Thank you.

Very truly yours,

Gary Smolker, Appellant In Pro Per
cell phone:  310-749-9735
office phone: 818-788-7290


-----Original Message-----
From: Gary Smolker <gsmolker@aol.com>
To: rhoffman <rhoffman@crwllp.com>
Cc: mkincaid <mkincaid@mkincaidlaw.com>; raul.martinez <raul.martinez@lewisbrisbois.com>; pschwartz <pschwartz@gordonrees.com>; pschwartz
<pschwartz@grsm.com>; sinouye <sinouye@grsm.com>; elise.klein <elise.klein@lewisbrisbois.com>; liu <liu@bortonpetrini.com>; rlewis
<rlewis@bortonpetrini.com>
Sent: Sun, Aug 25, 2019 12:49 pm
Subject: Will TRUCK and AUTO CLUB Stipulate to Have Hearings on all Four Pending Appeals at the same time?

August 25, 2019

TO: ATTORNEY RAUL MARTINEZ, attorney for the AUTO CLUB
TO: ATTORNEY PETER SCHWARTZ, attorney for TRUCK

FROM:  GARY SMOLKER, attorney for appellant Gary Smolker, in pro per

SUBJECT: STIPULATION THAT ORAL ARGUMENT ON ALL FOUR PENDING APPEALS BE HEARD AT THE SAME TIME

I am in the process of writing a motion to ask the Court of Appeal to have oral argument on all four pending appeals at the same time after briefing is
complete.

I would like to inform the Court of Appeal whether your clients agree to have oral argument on all four pending appeals heard at the same time, after all
briefing is complete.

Does your client agree that argument on all four pending appeal cases (Court of Appeal Case Nos. B281406, B286138, B287626, and B289828) shall be
heard concurrently by the Court of Appeal after all briefing is complete?

8/27/2019                    Re: Will/DO TRUCK and AUTO CLUB Stipulate to Have Hearings on all Four Pending Appeals at the same time?

Please advise by return email.

Mark Kincaid on behalf of Home Saving Termite Control, Inc. and W.F. Morris has agreed to so stipulate.

Rosemary S. Lewis on behalf of W.R. Grace & Co. and Grace Davidson has declined to stipulate.

Robert Hoffman on behalf of the COREGIS ENTITIES (Coregis Group, Inc., Coregis Insurance Company, and California Insurance Company) has declined to stipulate and opposes the relief I have requested.

Thank you.

Very truly yours,

Gary Smolker, appellant in pro per
Cell phone:   310-749-9735
Office phone: 818-788-7290

---

Mr. Hoffman,

Thank you for your prompt response to my inquiry (copy below).

Very truly yours,

Gary Smolker, appellant in pro per
Cell Phone:   310-749-9735
Office Phone: 818-788-7290

-----Original Message-----
From: Robert Hoffman <rhoffman@crwllp.com>
To: Gary Smolker <gsmolker@aol.com>
Cc: mkincaid@mkincaidlaw.com <mkincaid@mkincaidlaw.com>; raul.martinez@lewisbrisbois.com <raul.martinez@lewisbrisbois.com>;
pschwartz@gordonrees.com <pschwartz@gordonrees.com>; pschwartz@grsm.com <pschwartz@grsm.com>; sinouye@grsm.com <sinouye@grsm.com>;
elise.klein@lewisbrisbois.com <elise.klein@lewisbrisbois.com>; lliu@bortonpetrini.com <lliu@bortonpetrini.com>; rlewis@bortonpetrini.com
<rlewis@bortonpetrini.com>
Sent: Sun, Aug 25, 2019 11:36 am
Subject: 8-25-19 opposition of Coregis Parties to Smolker request to delay hearing in three briefed appeals pending briefing in duplicative unnecessary
fourth appeal

Mr. Smolker,
        In response to your August 24, 2019 e-mail below, please be advised that respondents Coregis Group, Inc., Coregis Insurance Company and
California Insurance Company ("Coregis Parties") decline to stipulate to, and oppose, the relief you have requested.

        On April 6, 2018, the Court of Appeal had ordered that there would be a single hearing after the parties had completed the briefing in Court of
Appeal Case Nos. B281406, B286138 and B287626 ("Three Appeals"). Court of Appeal Case No. B289828 ("Fourth Appeal") provides no legitimate
basis to delay the scheduling of that combined hearing in the Three Appeals.

        Among other things, the Fourth Appeal relating to the dismissal of your cross-claims against Home Savings Termite Control, Inc. and Wayne F.
Morris ("HSTCI" Parties") is duplicative of Court of Appeal Case No. B287626 in which you had already appealed the dismissal of the HSTCI Parties,
including the costs awarded to the HSTCI Parties. On June 20, 2019, the HSTCI Parties filed their respondent's brief in that appeal such that the appellate
issues pertaining to the HSTCI Parties have already been fully briefed.

        Accordingly, the Coregis Parties oppose your request that the combined hearing on the Three Appeals be delayed until the duplicative and
unnecessary Fourth Appeal has been briefed. Please include this e-mail as an exhibit to any motion you file regarding this matter.

        Nothing stated or not stated herein shall constitute a waiver of any claims, rights, causes of action, rights of action, defenses, positions or remedies
possessed by the Coregis Parties, all of which are expressly reserved.
Very truly yours,
Bob Hoffman
CHARLSTON, REVICH & WOLLITZ LLP
1925 Century Park East, Suite 320
Los Angeles, California 90067
Direct line: (310) 551-7016
Email: rhoffman@crwllp.com<mailto:rhoffman@crwllp.com> / Website: www.crwllp.com<https://urldefense.proofpoint.com/v2/url?u=http-
3A__www.crwllp.org_&d=DwMFaQ&c=f_a5GUMXoHxU9qrd_Nsg1PnqS-j5caRJn92wWy7kEGQ&r=bZ7p-
Rq1xIrzvYSEuo0PKw&m=RBydJfqQwK6SbBpuiWJavtDMQ35BXGfXthC3FxPvz8M&s=2FXkNPVOxvmegXfUDkzMILPXILMeXj_RC7O_rwP-
ips&e=>

---

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it, may contain confidential
information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby

8/27/2019                    Re: Will/DO TRUCK and AUTO CLUB Stipulate to Have Hearings on all Four Pending Appeals at the same time?

notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this message is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify us by reply e-mail at rhoffman@crwllp.com<mailto:rhoffman@crwllp.com> or by telephone at (310) 551-7016, and destroy the original transmission and its attachments without reading them or saving them to disk. Thank you.
From: Gary Smolker [mailto:gsmolker@aol.com]
Sent: Saturday, August 24, 2019 11:59 AM
To: rlewis@bortonpetrini.com
Cc: mkincaid@mkincaidlaw.com; raul.martinez@lewisbrisbois.com; Robert Hoffman; pschwartz@gordonrees.com; pschwartz@grsm.com; sinouye@grsm.com; elise.klein@lewisbrisbois.com; liu@bortonpetrini.com
Subject: Will TRUCK, COREGIS ENTITIES, and AUTO CLUB Stipulate To Have Hearings on All Four Pending Appeals at same time?

Saturday, August 24, 2019

TO: ATTORNEYS MARTINEZ (attorney for AUTO CLUB), HOFFMAN (attorney for COREGIS ENTITIES) AND SCHWARTZ (attorney for TRUCK)

FROM: GARY SMOLKER, attorney for Gary Smolker, appellant in pro per

SUBJECT: STIPULATION THAT ORAL ARGUMENT ON ALL FOUR APPEALS BE HEARD AT THE SAME TIME

I am in the process of writing a motion to have all four appeal cases heard concurrently, at the same time after all briefing is complete.

I would like to inform the Court of Appeal whether you clients agree to have oral argument on all four pending appeal cases heard at the same time, after all briefing is complete.

Do(es) your client(s) agree that argument on all four pending appeal cases (Court of Appeal Case Nos. B281406, B286138, B287626, and B289828) shall be heard concurrently by the Court of Appeal?

Attorney Mark Kincaid, on behalf of his clients Home Saving Termite Control, Inc. and W.F. Morris has agreed to have all four pending appeal cases heard concurrently after all briefing is complete.

Attorney Rosemary Lewis, on behalf of her clients W.R. Grace & Co. and Grace Davidson, has not agreed to have oral argument on all four pending appeal cases heard concurrently.

Please advise by return email.

Thank you.

Very truly yours,

Gary Smolker
Appellant, In Pro Per
Cell phone:   310-749-9735
Office phone: 818-788-7290
-----Original Message-----
From: Rosemarie S. Lewis <rlewis@bortonpetrini.com>
To: Gary Smolker <gsmolker@aol.com>
Cc: Mark Kincaid <mkincaid@mkincaidlaw.com>; raul.martinez@lewisbrisbois.com <raul.martinez@lewisbrisbois.com>; rhoffman@crwllp.com <rhoffman@crwllp.com>; pschwartz@gordonrees.com <pschwartz@gordonrees.com>; pschwartz@grsm.com <pschwartz@grsm.com>; sinouye@grsm.com <sinouye@grsm.com>; elise.klein@lewisbrisbois.com <elise.klein@lewisbrisbois.com>; liu@bortonpetrini.com <liu@bortonpetrini.com>
Sent: Fri, Aug 23, 2019 8:14 pm
Subject: Re: Stipulation To Have Hearing on All Pending Appeals at same time
Grace is NOT in agreement that oral argument on all 4 appeals be heard at the same time.

On Aug 23, 2019, at 4:11 PM, Gary Smolker <gsmolker@aol.com<mailto:gsmolker@aol.com>> wrote:

Friday, August 23, 2019

Ms. Lewis,

Thank you for your response, on behalf of GRACE, that GRACE agree that oral argument on all four appeals be heard at the same time after briefing is complete.

GRACE is not been asked to stipulate to consolidation of the fourth appeal.

GRACE is being asked to stipulate to oral argument being heard on all four appeals at the same time concurrently, after briefing is complete.

Very truly yours,

Gary Smolker,
Appellant In Pro Per
cell phone:   310-749-9735
office phone: 818:788-7290

-----------------------

https://mail.aol.com/webmail-std/en-us/PrintMessage                                              3/5

8/27/2019                   Re: Will/DO TRUCK and AUTO CLUB Stipulate to Have Hearings on all Four Pending Appeals at the same time?

Attorney Raul Martinez, Will you stipulate, on behalf of your client the AUTO CLUB, that oral argument on all four appeals may be heard concurrently after briefing is complete?

Attorney Robert Hoffman, Will you stipulate, on behalf of your clients the COREGIS ENTITIES, that oral argument on all four appeals may be heard concurrently after briefing is complete?

Attorney Peter Schwartz, will you stipulate on behalf of your client TRUCK, that oral argument on all four appeals may be heard concurrently after briefing is complete?

Please advise.

Thank you.

Very truly yours,

Gary Smolker
Appellant in Pro Per

Cell phone: 310-749-9735
Office phone: 818-788-7290
------Original Message------
From: Rosemarie S. Lewis <rlewis@bortonpetrini.com><mailto:rlewis@bortonpetrini.com>>
To: 'Gary Smolker' <gsmolker@aol.com><mailto:gsmolker@aol.com>>; mkincaid@mkincaidlaw.com><mailto:mkincaid@mkincaidlaw.com>
<mkincaid@mkincaidlaw.com><mailto:mkincaid@mkincaidlaw.com>>; raul.martinez@lewisbrisbois.com><mailto:raul.martinez@lewisbrisbois.com>
<raul.martinez@lewisbrisbois.com><mailto:raul.martinez@lewisbrisbois.com>>; rhoffman@crwllp.com><mailto:rhoffman@crwllp.com>
<rhoffman@crwllp.com><mailto:rhoffman@crwllp.com>>; pschwartz@gordonrees.com><mailto:pschwartz@gordonrees.com>
<pschwartz@gordonrees.com><mailto:pschwartz@gordonrees.com>>; pschwartz@grsm.com><mailto:pschwartz@grsm.com>
<pschwartz@grsm.com><mailto:pschwartz@grsm.com>>; sinouye@grsm.com><mailto:sinouye@grsm.com>
<sinouye@grsm.com><mailto:sinouye@grsm.com>>; elise.klein@lewisbrisbois.com><mailto:elise.klein@lewisbrisbois.com>
<elise.klein@lewisbrisbois.com><mailto:elise.klein@lewisbrisbois.com>>
Sent: Fri, Aug 23, 2019 1:50 pm
Subject: RE: Stipulation To Have Hearing on All Pending Appeals at same time
W. R. Grace will not stipulate to consolidation of the 4th appeal.

Rosemarie S. Lewis
Managing Partner – Los Angeles & Orange County

<image004.png>

626 Wilshire Boulevard, Suite 975
Los Angeles, CA 90017
rlewis@bortonpetrini.com><mailto:rlewis@bortonpetrini.com>

Tel: (213) 624-2869
Fax: (213) 489-3930

<image004.png>

www.bortonpetrini.com<https://urldefense.proofpoint.com/v2/url?u=http-
3A__www.bortonpetrini.com_&d=DwMFaQ&c=f_a5GUM XoHxU9qrd_Nsg1PnqS-j5caRJn92wWy7kEGQ&r=bZ7p-
Rq1xltzvYSEuo0PKw&m=RBydJfqOwK6SbBpuiWJavtDMQ35BXGfXthC3FxPvz8M&s=mBmiXge9rJ58R235ghQ9DXJivr1taIGMH_rfFmNUKVc&e=>

CONFIDENTIALITY NOTICE: This communication and any accompanying document(s) are confidential and privileged. They are intended for the sole use of the addressee. If you receive this transmission in error, you are advised that any disclosure, copying, or distribution, or the taking of any action in reliance upon the communication is strictly prohibited. Any inadvertent disclosure shall not compromise or waive the attorney-client privilege and/or attorney work-product privilege as to this communication, any attachments or otherwise. If you have received this communication in error, please contact at rlewis@bortonpetrini.com><mailto:rlewis@bortonpetrini.com>> or by telephone at (213) 624-2869. This e-mail address is not valid for delivery of legal notices or legal mail. Thank you.

From: Gary Smolker [mailto:gsmolker@aol.com]
Sent: Thursday, August 22, 2019 12:20 PM
To: mkincaid@mkincaidlaw.com><mailto:mkincaid@mkincaidlaw.com>; raul.martinez@lewisbrisbois.com><mailto:raul.martinez@lewisbrisbois.com>;
rhoffman@crwllp.com><mailto:rhoffman@crwllp.com>; pschwartz@gordonrees.com><mailto:pschwartz@gordonrees.com>;
pschwartz@grsm.com><mailto:pschwartz@grsm.com>; sinouye@grsm.com><mailto:sinouye@grsm.com>
elise.klein@lewisbrisbois.com><mailto:elise.klein@lewisbrisbois.com>
Subject: Stipulation To Have Hearing on All Pending Appeals at same time

Appeal Cases B281406, B286138, B287626, and B289828

COUNSEL:

8/27/2019                    Re: Will/DO TRUCK and AUTO CLUB Stipulate to Have Hearings on all Four Pending Appeals at the same time?

On April 6, 2018, the Court of Appeal issued an order which states that appeal case number B281406, B286138, and B287626 will be considered together, at such time as briefing is complete in all cases.

Will you, on behalf of your client or clients, agree/stipulate to include Appeal Case No. B289828 in the appeals to be considered together, at such time as briefing is complete in all cases?

Please advise.

I am in the process of preparing a motion to file in the Court of Appeal in which I will request that oral argument on all four pending appeals be heard together, considered together, at such time as briefing is complete in all cases.

I would like to inform the Court of Appeal whether you stipulate to have oral argument on all four pending appeals be heard/considered together, at such time as briefing is complete in all four pending appeals.

Thank you.

Very truly yours,

Gary Smolker
Appellant In Pro Per

Cell Phone:    310-749-9735
Office Phone:  818-788-7290
<image004.png><image004.png>

_____

This email communication may contain CONFIDENTIAL INFORMATION WHICH ALSO MAY BE LEGALLY PRIVILEGED and is intended only for the use of the intended recipients identified above. If you are not the intended recipient of this communication, you are hereby notified that any unauthorized review, use, dissemination, distribution, downloading, or copying of this communication is strictly prohibited. If you are not the intended recipient and have received this communication in error, please immediately notify us by reply email, delete the communication and destroy all copies.

GORDON REES SCULLY MANSUKHANI, LLP
YOUR 50 STATE PARTNER™
http://www.grsm.com

SUB-
EXHIBIT
85

# EXHIBIT 85

August 27, 2019 e-mail from GSS to Steven Inouye

8/27/2019                Re: Will/DO TRUCK and AUTO CLUB Stipulate to Have Hearings on all Four Pending Appeals at the same time?

From: Gary Smolker <gsmolker@aol.com>

To: sinouye <sinouye@grsm.com>; pschwartz <pschwartz@grsm.com>

Cc: mkincaid <mkincaid@mkincaidlaw.com>; raul.martinez <raul.martinez@lewisbrisbois.com>; elise.klein <elise.klein@lewisbrisbois.com>; liu
      <liu@bortonpetrini.com>; rlewis <rlewis@bortonpetrini.com>; rhoffman <rhoffman@crwlip.com>

Subject: Re: Will/DO TRUCK and AUTO CLUB Stipulate to Have Hearings on all Four Pending Appeals at the same time?

Date: Tue, Aug 27, 2019 11:23 am

Mr. Inouye,

Thank you for your response on behalf of TRUCK.

I will so advise the Court of Appeal.

Very truly yours,

Gary Smolker, Appellant, In Pro per
cell phone:    310-749-9735
office phone: 818-788-7290


——Original Message——
From: Steven Inouye <sinouye@grsm.com>
To: Gary Smolker <gsmolker@aol.com>; Peter Schwartz <pschwartz@grsm.com>
Cc: mkincaid@mkincaidlaw.com <mkincaid@mkincaidlaw.com>; raul.martinez@lewisbrisbois.com <raul.martinez@lewisbrisbois.com>;
elise.klein@lewisbrisbois.com <elise.klein@lewisbrisbois.com>; liu@bortonpetrini.com <liu@bortonpetrini.com>; rlewis@bortonpetrini.com
<rlewis@bortonpetrini.com>; rhoffman@crwlip.com <rhoffman@crwlip.com>
Sent: Tue, Aug 27, 2019 9:09 am
Subject: Re: Will/DO TRUCK and AUTO CLUB Stipulate to Have Hearings on all Four Pending Appeals at the same time?

Dear Mr. Smolker,

Truck will not stipulate to your proposal.

Regards,

Steven


Sent from my Verizon, Samsung Galaxy smartphone


——— Original message ———
From: Gary Smolker <gsmolker@aol.com>
Date: 8/26/19 7:22 PM (GMT-08:00)
To: Peter Schwartz <pschwartz@grsm.com>
Cc: mkincaid@mkincaidlaw.com, raul.martinez@lewisbrisbois.com, Peter Schwartz <pschwartz@grsm.com>, Peter Schwartz
<pschwartz@grsm.com>, Steven Inouye <sinouye@grsm.com>, elise.klein@lewisbrisbois.com, liu@bortonpetrini.com, rlewis@bortonpetrini.com,
rhoffman@crwlip.com
Subject: Will/DO TRUCK and AUTO CLUB Stipulate to Have Hearings on all Four Pending Appeals at the same time?

August 26, 2019

Mr. Martinez and Mr. Schwartz:

I am about to file a motion to consolidate appeal cases for oral argument and for an award of attorney fees as sanctions.

Please advise by return email whether your clients the AUTO CLUB and TRUCK INSURANCE EXCHANGE stipulate to hearing all four appeal
cases (Court of Appeal Cases No.s B281406, B286138, B287626, and B289828) at the same time).

Thank you.

Very truly yours,

Gary Smolker, Appellant In Pro Per
cell phone:    310-749-9735
office phone: 818-788-7290


——Original Message——

8/27/2019                    Re: Will/DO TRUCK and AUTO CLUB Stipulate to Have Hearings on all Four Pending Appeals at the same time?

From: Gary Smolker <gsmolker@aol.com>
To: rhoffman <rhoffman@crwlip.com>
Cc: mkincaid <mkincaid@mkincaidlaw.com>; raul.martinez <raul.martinez@lewisbrisbois.com>; pschwartz <pschwartz@gordonrees.com>;
pschwartz <pschwartz@grsm.com>; sinouye <sinouye@grsm.com>; elise.klein <elise.klein@lewisbrisbois.com>; liu <liu@bortonpetrini.com>;
rlewis <rlewis@bortonpetrini.com>
Sent: Sun, Aug 25, 2019 12:49 pm
Subject: Will TRUCK and AUTO CLUB Stipulate to Have Hearings on all Four Pending Appeals at the same time?

August 25, 2019

TO: ATTORNEY RAUL MARTINEZ, attorney for the AUTO CLUB
TO: ATTORNEY PETER SCHWARTZ, attorney for TRUCK

FROM:  GARY SMOLKER, attorney for appellant Gary Smolker, in pro per

SUBJECT: STIPULATION THAT ORAL ARGUMENT ON ALL FOUR PENDING APPEALS BE HEARD AT THE SAME TIME

I am in the process of writing a motion to ask the Court of Appeal to have oral argument on all four pending appeals at the same time after briefing
is complete.

I would like to inform the Court of Appeal whether your clients agree to have oral argument on all four pending appeals heard at the same time,
after all briefing is complete.

Does your client agree that argument on all four pending appeal cases (Court of Appeal Case Nos. B281406, B286138, B287626, and B289828)
shall be heard concurrently by the Court of Appeal after all briefing is complete?

Please advise by return email.

Mark Kincaid on behalf of Home Saving Termite Control, Inc. and W.F. Morris has agreed to so stipulate.

Rosemary S. Lewis on behalf of W.R. Grace & Co. and Grace Davidson has declined to stipulate.

Robert Hoffman on behalf of the COREGIS ENTITIES (Coregis Group, Inc., Coregis Insurance Company, and California Insurance Company) has
declined to stipulate and opposes the relief I have requested.

Thank you.

Very truly yours,

Gary Smolker, appellant in pro per
Cell phone:   310-749-9735
Office phone: 818-788-7290

_____

Mr. Hoffman,

Thank you for your prompt response to my inquiry (copy below).

Very truly yours,

Gary Smolker, appellant in pro per
Cell Phone:   310-749-9735
Office Phone: 818-788-7290

——Original Message——
From: Robert Hoffman <rhoffman@crwlip.com>
To: Gary Smolker <gsmolker@aol.com>
Cc: mkincaid@mkincaidlaw.com <mkincaid@mkincaidlaw.com>; raul.martinez@lewisbrisbois.com <raul.martinez@lewisbrisbois.com>;
pschwartz@gordonrees.com <pschwartz@gordonrees.com>; pschwartz@grsm.com <pschwartz@grsm.com>; sinouye@grsm.com
<sinouye@grsm.com>; elise.klein@lewisbrisbois.com <elise.klein@lewisbrisbois.com>; liu@bortonpetrini.com <liu@bortonpetrini.com>;
rlewis@bortonpetrini.com <rlewis@bortonpetrini.com>
Sent: Sun, Aug 25, 2019 11:36 am
Subject: 8-25-19 opposition of Coregis Parties to Smolker request to delay hearing in three briefed appeals pending briefing in duplicative
unnecessary fourth appeal

Mr. Smolker,
        In response to your August 24, 2019 e-mail below, please be advised that respondents Coregis Group, Inc., Coregis Insurance Company
and California Insurance Company ("Coregis Parties") decline to stipulate to, and oppose, the relief you have requested.

        On April 6, 2018, the Court of Appeal had ordered that there would be a single hearing after the parties had completed the briefing in Court
of Appeal Case Nos. B281406, B286138 and B287626 ("Three Appeals"). Court of Appeal Case No. B289828 ("Fourth Appeal") provides no
legitimate basis to delay the scheduling of that combined hearing in the Three Appeals.

8/27/2019                    Re: Will/DO TRUCK and AUTO CLUB Stipulate to Have Hearings on all Four Pending Appeals at the same time?

Among other things, the Fourth Appeal relating to the dismissal of your cross-claims against Home Savings Termite Control, Inc. and Wayne F. Morris ("HSTCI" Parties") is duplicative of Court of Appeal Case No. B287626 in which you had already appealed the dismissal of the HSTCI Parties, including the costs awarded to the HSTCI Parties. On June 20, 2019, the HSTCI Parties filed their respondent's brief in that appeal such that the appellate issues pertaining to the HSTCI Parties have already been fully briefed.

Accordingly, the Coregis Parties oppose your request that the combined hearing on the Three Appeals be delayed until the duplicative and unnecessary Fourth Appeal has been briefed. Please include this e-mail as an exhibit to any motion you file regarding this matter.

Nothing stated or not stated herein shall constitute a waiver of any claims, rights, causes of action, rights of action, defenses, positions or remedies possessed by the Coregis Parties, all of which are expressly reserved.

Very truly yours,
Bob Hoffman
CHARLSTON, REVICH & WOLLITZ LLP
1925 Century Park East, Suite 320
Los Angeles, California 90067
Direct line: (310) 551-7016
Email: rhoffman@crwllp.com<mailto:rhoffman@crwllp.com> / Website: www.crwllp.com<https://urldefense.proofpoint.com/v2/url?u=http-3A__www.crwllp.org_&d=DwMFaQ&c=f_a5GUMXoHxU9grd_Nsg1PnqS-l5caRJn92wWv7kEGQ&r=bZ7p-Ro1xltzvYSEuo0PKw&m=RBydJfqOwK6SbBpuIWJavtDMQ35BXGfXthC3FxPvz8M&s=2FXkNPVOxvmegXfUDkzMlLPXll.MeXj_RC7O_rwP-ips&e=>

_____

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it, may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this message is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify us by reply e-mail at rhoffman@crwllp.com<mailto:rhoffman@crwllp.com> or by telephone at (310) 551-7016, and destroy the original transmission and its attachments without reading them or saving them to disk. Thank you.
From: Gary Smolker [mailto:gsmolker@aol.com]
Sent: Saturday, August 24, 2019 11:59 AM
To: rlewis@bortonpetrini.com
Cc: mkincaid@mkincaidlaw.com; raul.martinez@lewisbrisbois.com; Robert Hoffman; pschwartz@gordonrees.com; pschwartz@grsm.com; sinouye@grsm.com; elise.klein@lewisbrisbois.com; liu@bortonpetrini.com
Subject: Will TRUCK, COREGIS ENTITIES, and AUTO CLUB Stipulate To Have Hearings on All Four Pending Appeals at same time?

Saturday, August 24, 2019

TO: ATTORNEYS MARTINEZ (attorney for AUTO CLUB), HOFFMAN (attorney for COREGIS ENTITIES) AND SCHWARTZ (attorney for TRUCK)

FROM: GARY SMOLKER, attorney for Gary Smolker, appellant in pro per

SUBJECT: STIPULATION THAT ORAL ARGUMENT ON ALL FOUR APPEALS BE HEARD AT THE SAME TIME

I am in the process of writing a motion to have all four appeal cases heard concurrently, at the same time after all briefing is complete.

I would like to inform the Court of Appeal whether you clients agree to have oral argument on all four pending appeal cases heard at the same time, after all briefing is complete.

Do(es) your client(s) agree that argument on all four pending appeal cases (Court of Appeal Case Nos. B281406, B286138, B287626, and B289828) shall be heard concurrently by the Court of Appeal?

Attorney Mark Kincaid, on behalf of his clients Home Saving Termite Control, Inc. and W.F. Morris has agreed to have all four pending appeal cases heard concurrently after all briefing is complete.

Attorney Rosemary Lewis, on behalf of her clients W.R. Grace & Co. and Grace Davidson, has not agreed to have oral argument on all four pending appeal cases heard concurrently.

Please advise by return email.

Thank you.

Very truly yours,

Gary Smolker
Appellant, In Pro Per
Cell phone:    310-749-9735
Office phone: 818-788-7290
-----Original Message-----
From: Rosemarie S. Lewis <rlewis@bortonpetrini.com>
To: Gary Smolker <gsmolker@aol.com>
Cc: Mark Kincaid <mkincaid@mkincaidlaw.com>; raul.martinez@lewisbrisbois.com <raul.martinez@lewisbrisbois.com>; rhoffman@crwllp.com <rhoffman@crwllp.com>; pschwartz@gordonrees.com <pschwartz@gordonrees.com>; pschwartz@grsm.com <pschwartz@grsm.com>; sinouye@grsm.com <sinouye@grsm.com>; elise.klein@lewisbrisbois.com <elise.klein@lewisbrisbois.com>; liu@bortonpetrini.com <liu@bortonpetrini.com>
Sent: Fri, Aug 23, 2019 8:14 pm
Subject: Re: Stipulation To Have Hearing on All Pending Appeals at same time
Grace is NOT in agreement that oral argument on all 4 appeals be heard at the same time.

8/27/2019                    Re: Will/DO TRUCK and AUTO CLUB Stipulate to Have Hearings on all Four Pending Appeals at the same time?

On Aug 23, 2019, at 4:11 PM, Gary Smolker <gsmolker@aol.com<mailto:gsmolker@aol.com>> wrote:

Friday, August 23, 2019

Ms. Lewis,

Thank you for your response, on behalf of GRACE, that GRACE agree that oral argument on all four appeals be heard at the same time after briefing is complete.

GRACE is not been asked to stipulate to consolidation of the fourth appeal.

GRACE is being asked to stipulate to oral argument being heard on all four appeals at the same time concurrently, after briefing is complete.

very truly yours,

Gary Smolker,
Appellant In Pro Per
cell phone:   310-749-9735
office phone: 818:788-7290

_____

Attorney Raul Martinez, Will you stipulate, on behalf of your client the AUTO CLUB, that oral argument on all four appeals may be heard concurrently after briefing is complete?

Attorney Robert Hoffman, Will you stipulate, on behalf of your clients the COREGIS ENTITIES, that oral argument on all four appeals may be heard concurrently after briefing is complete?

Attorney Peter Schwartz, will you stipulate on behalf of your client TRUCK, that oral argument on all four appeals may be heard concurrently after briefing is complete?

Please advise.

Thank you.

Very truly yours,

Gary Smolker
Appellant in Pro Per

Cell phone: 310-749-9735
Office phone:  818-788-7290
-----Original Message-----
From: Rosemarie S. Lewis <rlewis@bortonpetrini.com<mailto:rlewis@bortonpetrini.com>>
To: 'Gary Smolker' <gsmolker@aol.com<mailto:gsmolker@aol.com>>; mkincaid@mkincaidlaw.com<mailto:mkincaid@mkincaidlaw.com>
<mkincaid@mkincaidlaw.com<mailto:mkincaid@mkincaidlaw.com>>; raul.martinez@lewisbrisbois.com<mailto:raul.martinez@lewisbrisbois.com>
<raul.martinez@lewisbrisbois.com<mailto:raul.martinez@lewisbrisbois.com>>; rhoffman@crwllp.com<mailto:rhoffman@crwllp.com>
<rhoffman@crwllp.com<mailto:rhoffman@crwllp.com>>; pschwartz@gordonrees.com<mailto:pschwartz@gordonrees.com>
<pschwartz@gordonrees.com<mailto:pschwartz@gordonrees.com>>; pschwartz@grsm.com<mailto:pschwartz@grsm.com>
<pschwartz@grsm.com<mailto:pschwartz@grsm.com>>; sinouye@grsm.com<mailto:sinouye@grsm.com>
<sinouye@grsm.com<mailto:sinouye@grsm.com>>; elise.klein@lewisbrisbois.com<mailto:elise.klein@lewisbrisbois.com>
<elise.klein@lewisbrisbois.com<mailto:elise.klein@lewisbrisbois.com>>
Sent: Fri, Aug 23, 2019 1:50 pm
Subject: RE: Stipulation To Have Hearing on All Pending Appeals at same time
W. R. Grace will not stipulate to consolidation of the 4th appeal.

Rosemarie S. Lewis
Managing Partner – Los Angeles & Orange County

<image004.png>

626 Wilshire Boulevard, Suite 975
Los Angeles, CA 90017
rlewis@bortonpetrini.com<mailto:rlewis@bortonpetrini.com>

Tel: (213) 624-2869
Fax: (213) 489-3930

<image004.png>

www.bortonpetrini.com<https://urldefense.proofpoint.com/v2/url?u=http-3A__www.bortonpetrini.com_&d=DwMFaQ&c=f_a5GUMXgHxU9qrd_Nsg1PnqS-j5caRJn92wWy7kEGQ&r=bZ7p-Rq1xItzvYSEuo0PKw&m=RBydJfqQwK6SbBpuIWJavtDMQ35BXGfXthC3FxPvz8M&s=mBmlXge9rJ58R235ghQ9DXJivr1taIGMH_rfFmNUKVc&e=>

CONFIDENTIALITY NOTICE: This communication and any accompanying document(s) are confidential and privileged. They are intended for the sole use of the addressee.If you receive this transmission in error, you are advised that any disclosure, copying, or distribution, or the taking of any

https://mail.aol.com/webmail-std/en-us/PrintMessage

8/27/2019                    Re: Will/DO TRUCK and AUTO CLUB Stipulate to Have Hearings on all Four Pending Appeals at the same time?

action in reliance upon the communication is strictly prohibited. Any inadvertent disclosure shall not compromise or waive the attorney-client privilege and/or attorney work-product privilege as to this communication, any attachments or otherwise. If you have received this communication in error, please contact at rlewis@bortonpetrini.com<mailto:rlewis@bortonpetrini.com> or by telephone at (213) 624-2869. This e-mail address is not valid for delivery of legal notices or legal mail. Thank you.


From: Gary Smolker [mailto:gsmolker@aol.com]
Sent: Thursday, August 22, 2019 12:20 PM
To: mkincaid@mkincaidlaw.com<mailto:mkincaid@mkincaidlaw.com>;
raul.martinez@lewisbrisbois.com<mailto:raul.martinez@lewisbrisbois.com>; rhoffman@crwllp.com<mailto:rhoffman@crwllp.com>; Rosemarie S. Lewis; pschwartz@gordonrees.com<mailto:pschwartz@gordonrees.com>; pschwartz@grsm.com<mailto:pschwartz@grsm.com>;
sinouye@grsm.com<mailto:sinouye@grsm.com>; elise.klein@lewisbrisbois.com<mailto:elise.klein@lewisbrisbois.com>
Subject: Stipulation To Have Hearing on All Pending Appeals at same time

Appeal Cases B281406, B286138, B287626, and B289828

COUNSEL:

On April 6, 2018, the Court of Appeal issued an order which states that appeal case number B281406, B286138, and B287626 will be considered together, at such time as briefing is complete in all cases.

Will you, on behalf of your client or clients, agree/stipulate to include Appeal Case No. B289828 in the appeals to be considered together, at such time as briefing is complete in all cases?

Please advise.

I am in the process of preparing a motion to file in the Court of Appeal in which I will request that oral argument on all four pending appeals be heard together, considered together, at such time as briefing is complete in all cases.

I would like to inform the Court of Appeal whether you stipulate to have oral argument on all four pending appeals be heard/considered together, at such time as briefing is complete in all four pending appeals.

Thank you.

Very truly yours,

Gary Smolker
Appellant In Pro Per

Cell Phone:    310-749-9735
Office Phone:  818-788-7290
<image004.png><image004.png>

---

This email communication may contain CONFIDENTIAL INFORMATION WHICH ALSO MAY BE LEGALLY PRIVILEGED and is intended only for the use of the intended recipients identified above. If you are not the intended recipient of this communication, you are hereby notified that any unauthorized review, use, dissemination, distribution, downloading, or copying of this communication is strictly prohibited. If you are not the intended recipient and have received this communication in error, please immediately notify us by reply email, delete the communication and destroy all copies.


GORDON REES SCULLY MANSUKHANI, LLP
YOUR 50 STATE PARTNER™
http://www.grsm.com

SUB-

EXHIBIT

86

# EXHIBIT 86

October 12, 2019 e-mail from GSS to Mark Kincaid

REQUEST FOR STIPULATION REGARDING RECORD ON APPEAL IN APPEAL CASES B287626 AND B289828

**From:** Gary Smolker <gsmolker@aol.com>
**To:** mkincaid <mkincaid@mkincaidlaw.com>
**Subject:** REQUEST FOR STIPULATION REGARDING RECORD ON APPEAL IN APPEAL CASES B287626 AND B289828
**Date:** Sat, Oct 12, 2019 12:49 pm
**Attachments:** 11-12-2019 Volume 1 of Exhibits  Referred to in Motion to Consolidate Appeals, etc.docx (28K)

October 12, 2019

REQUEST FOR STIPULATION REGARDING RECORD ON APPEAL IN COURT OF APPEAL CASE NOS. B287626 AND B289828

Mr. Kincaid,

I am in the process of making a motion to consolidate all pending appeals for oral argument and other relief.

In that motion I will refer to exhibits not in the record yet, a copy of those documents will be filed with that motion.

Attached is the *"current"* list of exhibits that are being referred to in that motion - each of the exhibits referred to in that list will be filed in support of that motion.

More exhibits will probably be referred to in the final version of my motion.

A copy of those additional exhibits - not previously a part of the record on appeal the Court of Appeal Cases B287626 and B289828 - will be filed with my motion to consolidate appeal cases for oral argument and other relief.

ACTION REQUESTED

I am writing you this letter seeking your agreement and your stipulation on behalf of your clients, Home Saving Termite Control, Inc. and W.F. Morris, to have all exhibits filed in the court of appeal be included in the record on appeal for Court of Appeal Cases B286138 and B289828.

THANK YOU

Thank you for previously agreeing (in your email to me dated August 22, 2019) that oral argument on all four pending appeal cases may be heard together at the same time and for agreeing that the prior record be included in the B289828.

IMMEDIATE ACTION REQUESTED

Previously, I filed several motions for the court to take judicial notice.

Do you agree that the exhibits in those motions to take judicial notice will be included in the record on appeal in Appeal Case B289828? Appeal Case B287626?

Do you agree that the exhibits filed in connection with my motion to consolidate appeal cases for oral argument and for other relief will be included in the record on appeal in Appeal Cases 287626 and B289828?

In connection with my motion to consolidate and in connection with briefs I will be filing in Appeal Cases B287626 and B289828 you will be provided with a copy of any document you had not been previously served on you.

NEXT STEP

Please advise.

Thank you.

Very truly yours,

Gary Smolker
Appellant In Pro Per

COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN


Court of Appeal Case No. B281406
(Related Appeals Pending in B286138, B287626, and B289828)

GARY SMOLKER

Cross-complainant and Appellant


vs.


W. R. GRACE & CO. et al.

Cross-defendants and Respondents


Appeal from the Superior Court of Los Angeles County,

Honorable Richard L. Fruin, Jr., Judge, Case No. BC173952


**VOLUME 1 OF X  EXHIBITS REFERRED TO IN MOTION TO CONSOLIDATE APPEALS FOR ORAL ARGUMENT AND OTHER RELIEF (EXHIBITS 62, 63, 64 AND 65) pages 758-1014**

Gary Smolker, State Bar No. 56117
16055 Ventura Blvd., Suite 525, Encino, CA. 91436
Telephone: 818-788-7290, Facsimile: 818-990-9888
gsmolker@aol.com
Attorney, in pro per, for Cross-complainant and Appellant

1

| EXHIBIT NO. | DESCRIPTION | PAGES |
|---|---|---|
| 62 | United States Patent No. 5,542,207 | 761-769 |
| 63 | Deposition Testimony of Matthew Fredericks | |
| 64 | Deposition Testimony of Corey Arentz | |
| 65 | Deposition Testimony of Greg Adams | |
| 66 | Deposition Testimony of Jeffrey Humphreys | |
| 67 | Deposition Testimony of David Duncan | |
| 68 | Borton Petrini & Conron, LLP | |
| 69 | Structural Pest Control Letter | |
| 70 | Notice of Deposit of Jury Fees | |

2

# EXHIBIT 87

October 12, 2019 e-mail from GSS to Mark Kincaid

SUB-
EXHIBIT
87

From: Gary Smolker <gsmolker@aol.com>
     To: mkincaid <mkincaid@mkincaidlaw.com>
Subject: #2 Re: REQUEST FOR STIPULATION REGARDING RECORD ON APPEAL IN APPEAL CASES B287626 AND B289828
   Date: Sat, Oct 12, 2019 4:31 pm

Mr. Kincaid,

Thank you for your prompt response to my request for stipulation.

We both agree to what you stated below.

Additionally, I am asking you to stipulate to additional documents described below.

Very truly yours,

Gary Smolker
Appellant In Pro per


-----Original Message-----
From: Mark Kincaid <mkincaid@mkincaidlaw.com>
To: Gary Smolker <gsmolker@aol.com>
Sent: Sat, Oct 12, 2019 2:17 pm
Subject: RE: REQUEST FOR STIPULATION REGARDING RECORD ON APPEAL IN APPEAL CASES B287626 AND B289828

I not sure what you are requesting but I suggest that we stipulate to include and incorporate for all purposes in our appeal (B289828) the transcripts that are already on file in case no. B286138 consisting of Volumes 1-14 and Supplemental Volumes 1-6. There is no need to include a new list of documents if the idea is to able to use what has already been filed in the B286138 case.

From: Gary Smolker <gsmolker@aol.com>
Sent: Saturday, October 12, 2019 2:49 PM
To: Mark Kincaid <mkincaid@mkincaidlaw.com>
Subject: REQUEST FOR STIPULATION REGARDING RECORD ON APPEAL IN APPEAL CASES B287626 AND B289828

October 12, 2019

REQUEST FOR STIPULATION REGARDING RECORD ON APPEAL IN COURT OF APPEAL CASE NOS. B287626 AND B289828

Mr. Kincaid,

I am in the process of making a motion to consolidate all pending appeals for oral argument and other relief.

In that motion I will refer to exhibits not in the record yet, a copy of those documents will be filed with that motion.

Attached is the **"current"** list of exhibits that are being referred to in that motion - each of the exhibits referred to in that list will be filed in support of that motion.

More exhibits will probably be referred to in the final version of my motion.

A copy of those additional exhibits - not previously a part of the record on appeal the Court of Appeal Cases B287626 and B289828 - will be filed with my motion to consolidate appeal cases for oral argument and other relief.

ACTION REQUESTED

I am writing you this letter seeking your agreement and your stipulation on behalf of your clients, Home Saving Termite Control, Inc. and W.F. Morris, to have all exhibits filed in the court of appeal be included in the record on appeal for Court of Appeal Cases B286138 and B289828.

THANK YOU

Thank you for previously agreeing (in your email to me dated August 22, 2019) that oral argument on all four pending appeal cases may be heard together at the same time and for agreeing that the prior record be included in the B289828.

IMMEDIATE ACTION REQUESTED

Previously, I filed several motions for the court to take judicial notice.

Do you agree that the exhibits in those motions to take judicial notice will be included in the record on appeal in Appeal Case B289828? Appeal Case B287626?

Do you agree that the exhibits filed in connection with my motion to consolidate appeal cases for oral argument and for other relief will be included in the record on appeal in Appeal Cases 287626 and B289828?

In connection with my motion to consolidate and in connection with briefs I will be filing in Appeal Cases B287626 and B289828 you will be provided with a copy of any document you had not been previously served on you.

NEXT STEP

Please advise.

Thank you.

Very truly yours,

#2 Re: REQUEST FOR STIPULATION REGARDING RECORD ON APPEAL IN APPEAL CASES B287626 AND B289828

Gary Smolker
Appellant In Pro Per

# EXHIBIT 88

October 14, 2019 e-mail from Mark Kincaid to GSS

SUB-

EXHIBIT

88

In connection with my motion to consolidate and in connection with briefs I will be filing in Appeal Cases B287626 and B289828 you will be provided with a copy of any document you had not been previously served on you.

NEXT STEP

Please advise.

Thank you.

Very truly yours,

Gary Smolker

Appellant In Pro Per

# EXHIBIT 89

October 14, 2019 e-mail from Mark Kincaid to GSS

SUB-
EXHIBIT
89

Previously, I filed several motions for the court to take judicial notice.

Do you agree that the exhibits in those motions to take judicial notice will be included in the record on appeal in Appeal Case B289828? Appeal Case B287626?

Do you agree that the exhibits filed in connection with my motion to consolidate appeal cases for oral argument and for other relief will be included in the record on appeal in Appeal Cases 287626 and B289828?

In connection with my motion to consolidate and in connection with briefs I will be filing in Appeal Cases B287626 and B289828 you will be provided with a copy of any document you had not been previously served on you.

NEXT STEP

Please advise.

Thank you.

Very truly yours,

Gary Smolker
Appellant In Pro Per

# EXHIBIT 90

October 14, 2019 e-mail from GSS to Mark Kincaid

SUB-
EXHIBIT
90

**From:** Mark Kincaid <mkincaid@mkincaidlaw.com>
**To:** Gary Smolker <gsmolker@aol.com>
**Subject:** RE: #2 Re: REQUEST FOR STIPULATION REGARDING RECORD ON APPEAL IN APPEAL CASES B287626 AND B289828
**Date:** Mon, Oct 14, 2019 10:06 am

---

In rereading my earlier email, my proposed language is too expansive and could be misconstrued.  I suggest the following language in the stipulation, "The parties stipulate that the Clerk's Record on Appeal which is already on file in case no. BC286138 consisting of Volumes 1-14 and Supplemental Volumes 1-6 shall be deemed a part of the record in this appeal BC289828."


**From:** Gary Smolker <gsmolker@aol.com>
**Sent:** Saturday, October 12, 2019 6:31 PM
**To:** Mark Kincaid <mkincaid@mkincaidlaw.com>
**Subject:** #2 Re: REQUEST FOR STIPULATION REGARDING RECORD ON APPEAL IN APPEAL CASES B287626 AND B289828


Mr. Kincaid,


Thank you for your prompt response to my request for stipulation.


We both agree to what you stated below.


Additionally, I am asking you to stipulate to additional documents described below.


Very truly yours,


Gary Smolker

Appellant In Pro per


——Original Message——
**From:** Mark Kincaid <mkincaid@mkincaidlaw.com>
**To:** Gary Smolker <gsmolker@aol.com>
**Sent:** Sat, Oct 12, 2019 2:17 pm
**Subject:** RE: REQUEST FOR STIPULATION REGARDING RECORD ON APPEAL IN APPEAL CASES B287626 AND B289828

10/14/2019          RE: #2 Re: REQUEST FOR STIPULATION REGARDING RECORD ON APPEAL IN APPEAL CASES B287626 AND B289828

I not sure what you are requesting but I suggest that we stipulate to include and incorporate for all purposes in our appeal (B289828) the transcripts that are already on file in case no. B286138 consisting of Volumes 1-14 and Supplemental Volumes 1-6. There is no need to include a new list of documents if the idea is to able to use what has already been filed in the B286138 case.

**From:** Gary Smolker <gsmolker@aol.com>
**Sent:** Saturday, October 12, 2019 2:49 PM
**To:** Mark Kincaid <mkincaid@mkincaidlaw.com>
**Subject:** REQUEST FOR STIPULATION REGARDING RECORD ON APPEAL IN APPEAL CASES B287626 AND B289828

October 12, 2019

REQUEST FOR STIPULATION REGARDING RECORD ON APPEAL IN COURT OF APPEAL CASE NOS. B287626 AND B289828

Mr. Kincaid,

I am in the process of making a motion to consolidate all pending appeals for oral argument and other relief.

In that motion I will refer to exhibits not in the record yet, a copy of those documents will be filed with that motion.

Attached is the *"current"* list of exhibits that are being referred to in that motion - each of the exhibits referred to in that list will be filed in support of that motion.

More exhibits will probably be referred to in the final version of my motion.

A copy of those additional exhibits - not previously a part of the record on appeal the Court of Appeal Cases B287626 and B289828 - will be filed with my motion to consolidate appeal cases for oral argument and other relief.

ACTION REQUESTED

I am writing you this letter seeking your agreement and your stipulation on behalf of your clients, Home Saving Termite Control, Inc. and W.F. Morris, to have all exhibits filed in the court of appeal be included in the record on appeal for Court of Appeal Cases B286138 and B289828.

THANK YOU

Thank you for previously agreeing (in your email to me dated August 22, 2019) that oral argument on all four pending appeal cases may be heard together at the same time and for agreeing that the prior record be included in the B289828.

IMMEDIATE ACTION REQUESTED

10/14/2019          #2 Re: REQUEST FOR STIPULATION REGARDING RECORD ON APPEAL IN APPEAL CASES B287626 AND B289828

**From:** Gary Smolker <gsmolker@aol.com>
**To:** mkincaid <mkincaid@mkincaidlaw.com>
**Subject:** #2 Re: REQUEST FOR STIPULATION REGARDING RECORD ON APPEAL IN APPEAL CASES B287626 AND B289828
**Date:** Mon, Oct 14, 2019 1:54 pm

Mr. Kincaid,

Thank you for your prompt response.

The trial court had all the documents before it, in its files, before the trial court made its decision on motions to dismiss, except for your recent email (copy below) refusing to allow the Court of Appeal and other defense counsel's prior emails refusing to have all appeal cases consolidated for purposes of oral argument.

As a general rule the court of appeal "will notice only those arguments and those documents pointed out in the briefs." However, that rule is largely for the convenience of the reviewing court.

The reviewing court is empowered to decide a case on any proper points or theories, and will exercise that authority under fair procedure in an appropriate case.

The Court of Appeal will look at whichever documents the Court of Appeal needs to look at in order to make the correct decision.

This is an appropriate case to look at the documents I am about to provide to the Court of Appeal.

In the event you were not aware of the above, I am giving you a chance to change your declination of my request for stipulation.

I would like the Court of Appeal to clearly understand your position if it is any different than stated in your email (copy below).

Very truly yours,

Gary Smolker
Appellant in Pro Per


——Original Message——
From: Mark Kincaid <mkincaid@mkincaidlaw.com>
To: Gary Smolker <gsmolker@aol.com>
Sent: Mon, Oct 14, 2019 10:02 am
Subject: RE: REQUEST FOR STIPULATION REGARDING RECORD ON APPEAL IN APPEAL CASES B287626 AND B289828

I cannot stipulate the new documents being included in the record as they were not before the trial court any time prior to the issues of the dismissal order and judgment.   The Court of Appeals works with the record that was before the trial court in determining whether the trial court erred in granting the motion and dismissing the case.  You did not include the deposition transcripts or other documents in your opposition(s) and supplemental filings.

**From:** Gary Smolker <gsmolker@aol.com>
**Sent:** Saturday, October 12, 2019 2:49 PM
**To:** Mark Kincaid <mkincaid@mkincaidlaw.com>
**Subject:** REQUEST FOR STIPULATION REGARDING RECORD ON APPEAL IN APPEAL CASES B287626 AND B289828

October 12, 2019

REQUEST FOR STIPULATION REGARDING RECORD ON APPEAL IN COURT OF APPEAL CASE NOS. B287626 AND B289828

Mr. Kincaid,

I am in the process of making a motion to consolidate all pending appeals for oral argument and other relief.

In that motion I will refer to exhibits not in the record yet, a copy of those documents will be filed with that motion.

Attached is the *"current"* list of exhibits that are being referred to in that motion - each of the exhibits referred to in that list will be filed in support of that motion.

More exhibits will probably be referred to in the final version of my motion.

A copy of those additional exhibits - not previously a part of  the record on appeal the Court of Appeal Cases B287626 and B289828 - will be filed with my motion to consolidate appeal cases for oral argument and other relief.

ACTION REQUESTED

I am writing you this letter seeking your agreement and your stipulation on behalf of your clients, Home Saving Termite Control, Inc. and W.F. Morris, to have all exhibits filed in the court of appeal be included in the record on appeal for Court of Appeal Cases B286138 and B289828.

THANK YOU

Thank you for previously agreeing (in your email to me dated August 22, 2019) that oral argument on all four pending appeal cases may be heard together at the same time and for agreeing that the prior record be included in the B289828.

## IMMEDIATE ACTION REQUESTED

Previously, I filed several motions for the court to take judicial notice.

Do you agree that the exhibits in those motions to take judicial notice will be included in the record on appeal in Appeal Case B289828? Appeal Case B287626?

Do you agree that the exhibits filed in connection with my motion to consolidate appeal cases for oral argument and for other relief will be included in the record on appeal in Appeal Cases 287626 and B289828?

In connection with my motion to consolidate and in connection with briefs I will be filing in Appeal Cases B287626 and B289828 you will be provided with a copy of any document you had not been previously served on you.

NEXT STEP

Please advise.

Thank you.

Very truly yours,

Gary Smolker
Appellant In Pro Per

*TIG Insurance Company vs. Gary Smolker, etal.*

Court of Appeal Case Nos. B281406, B286138, B287626, B289828

<u>COMBINED PROOF OF SERVICE FOR ALL PENDING APPEAL CASES</u>

I am a resident of the State of California, over the age of eighteen years, and not a party to this action.  My business address is 16055 Ventura Blvd., Suite 525, Encino, CA. 91436.  On October 14, 2019, I served the following document:

VOLUME 2 OF 2 VOLUMES OF EXHIBITS REFERRED TO IN MOTION TO CONSOLIDATE APPEALS FOR ORAL ARGUMENT AND OTHER RELIEF

  __X__   VIA MAIL, by placing a true copy of the document(s) listed above in a sealed envelope with postage fully prepaid in United States mail in the State of California at Encino, California, addressed as set forth in the attached service list:

See attached list.

I am familiar with the Smolker Law Firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on the same day with the postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on October 14, 2019, at Encino, California.

_____

LESLIE GONZALEZ

**Combined Service List**

TIG Insurance Co. V Gary Smolker, et. Al.
LASC Case No. BC173952
Appeal Case Nos. B281406, B286138, B287626, B289828

## SERVICE LIST
*Smolker v. W.R. Grace & Co., et al.*
Second Appellate District, Division Seven, Case No. B281406
Superior Court of Los Angeles County, Case No. BC173952

ROSEMARIE S. LEWIS (158891)
JEFFREY Z. LIU (276849)
BORTON PETRINI, LLP
626 Wilshire Boulevard, Suite 975
Los Angeles, CA 90017
(213) 624-2869
Rlewis@bortonpetrini.com
Jliu@bortonpetrini.com
*Attorney for Cross-Defendants and Respondents*
 *W.R. Grace & Co. And Grace Davidson*

*(Served via United States Postal Service)*

## SERVICE LIST

*Smolker v. Truck Insurance Exchange, et al.*
Second Appellate District, Division Seven, Case No. B286138
Los Angeles County Superior Court, Case No. BC173952

PETER SCHWARTZ #109859
STEVEN R. INOUYE #245024
GORDON & REES LLP
633 W. 5th Street 52nd Floor
Los Angeles, CA 90071
Pschwartz@gordonrees.com
Sinouye@grsm.com

*Attorney for Cross-Defendant and Respondent*
  *Truck Insurance Exchange*

*(Served via Unites States Postal Service)*


ROBERT DANIEL HOFFMAN #123458
CHARLSTON, REVICH & WOLLITZ LLP
1925 Century Park East, Suite 320
Los Angeles, CA 90067
County: Los Angeles County
Rhoffman@crwllp.com

*Attorneys for Cross-Defendants and Respondents*
*Coregis Group, Inc., Coregis Insurance Co., and California Insurance Company*

*(Served via Unites States Postal Service)*

RAUL LUIS MARTINEZ #82465
ELISE DALE KLEIN #111712
LEWIS BRISBOIS BISGAARD & SMITH LLP
633 W. 5th Street, Suite 4000
Los Angeles, CA 90071
Martinez@lbbslaw.com
Klein@lbbslaw.com

*Attorneys for Cross-Defendant and Respondent*
*Interinsurance Exchange of the Automobile Club of So. Cal*

*(Served via Unites States Postal Service)*

## SERVICE LIST

Mark Kincaid, Esq. SB#118640
26 Alhaja Way
Hot Springs Village,
Arkansas, 71909
Tel: 714-955-69955
Fax: 714-784-2546
Email: mkincaid@mkincaidlaw.com

**Attorneys for Home Savings
Termite Control, Inc., Wayne
Morris**

*TIG Insurance Company vs. Gary Smolker, etal.*

Court of Appeal Case Nos. B281406, B286138, B287626, B289828

<u>COMBINED PROOF OF SERVICE FOR ALL PENDING APPEAL CASES</u>

I am a resident of the State of California, over the age of eighteen years, and not a party to this action. My business address is 16055 Ventura Blvd., Suite 525, Encino, CA. 91436. On October 22, 2019, I served the following document:

VOLUME 2 OF 2 VOLUMES OF EXHIBITS REFERRED TO IN MOTION TO CONSOLIDATE APPEALS FOR ORAL ARGUMENT AND OTHER RELIEF

  **X**  VIA MAIL, by placing a true copy of the document(s) listed above in a sealed envelope with postage fully prepaid in United States mail in the State of California at Encino, California, addressed as set forth in the attached service list:

See attached list.

I am familiar with the Smolker Law Firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on the same day with the postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on October 22, 2019, at Encino, California.

_____

LESLIE GONZALEZ

## GRACE BANKRUPTY ATTORNEY SERVICE LIST

KIRKLAN & ELLIS LLP
333 South Hope Street
29th Floor
Los Angeles, CA 90071
Telephone: (213) 680-8400

KIRKLAN & ELLIS LLP
Adam Paul, Esq.
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

THE LAW OFFICES OF ROGER HIGGINS, LLC
Roger J. Higgins, Esq.
111 East Wacker Drive, Suite 2800
Chicago, IL 60601
Telephone: (312) 836-4047

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd.
13th Floor
Los Angeles, CA 90067-4003
Telephone:(310) 277-6910

PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones, Esq.
919 North Market Street, 17th Floor
PO BOX 8705
Wilmington, DE 19899-8705
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

# EXHIBIT 7

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

DIVISION SEVEN

**COURT OF APPEAL – SECOND DIST.**

# FILED

## Nov 05, 2019

DANIEL P. POTTER, Clerk

muribe          **Deputy Clerk**

GARY SMOLKER,

    Plaintiff and Appellant,

    v.

W. R. GRACE & CO. et al.,

    Cross-defendants and
    Respondents.

B281406

(Super. Ct. No. BC173952)
Los Angeles County

    The court has read and considered appellant's October 23, 2019 motion to consolidate appeals and for order ordering attorney Rosemarie S. Lewis et al. to pay appellant for detriment caused to appellant. No opposition thereto was filed. Good cause appearing therefor,

    IT IS HEREBY ORDERED that the motion is denied in its entirety.

Perluss

Presiding Justice

# EXHIBIT
# 8

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

**COURT OF APPEAL – SECOND DIST.**

# FILED

Jan 03, 2020

DANIEL P. POTTER, Clerk

muribe          **Deputy Clerk**

|  |  |
|---|---|
| GARY SMOLKER,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>W.R. GRACE & COMPANY, et al.,<br><br>    Cross Defendants and Respondents. | B281406, B286138, B287626<br><br>(Los Angeles County<br>Super. Ct. No. BC173952)<br><br>**ORDER** |

On April 6, 2018, this Court issued the following order: "Appellant has three pending appeals arising out of LASC Case No. BC173952. Briefing is complete in this case, B281406, but not in B286138 (Truck Insurance Exchange v. Smolker) and B287626 (Smolker v. Home Savings Termite Control, Inc.). Appellant has asserted in this case that the same issues arise in all three cases. Accordingly, the cases will be considered together, at such time as briefing is complete in all cases."

The Court is of the tentative view that the trial court did not err in granting the motions to dismiss. The only issue to be addressed at oral argument is the procedural issue arising from the dismissals; the merits of the case are not at issue at this time,

and the Court will not entertain argument pertaining to those issues.

Consistent with the April 6, 2018 order, each side shall have a maximum of 30 minutes of argument time in this matter. Respondents shall advise the Court prior to argument how they intend to divide their time, and appellant shall advise whether he wishes to reserve any portion of his time for rebuttal.


PERLUSS, P. J.          ZELON, J.          FEUER, J.

# EXHIBIT

# 9

**FILED**

Jan 22, 2020

DANIEL P. POTTER, Clerk

CLynch               Deputy Clerk

Filed 1/22/2020

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| GARY SMOLKER,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>W.R. GRACE & CO., et al.,<br><br>    Cross-Defendants and<br>    Respondents. | B281406<br><br><br>(Los Angeles County<br>Super. Ct. No. BC173952) |
| GARY SMOLKER,<br><br>    Cross-Complainant and<br>    Appellant,<br><br>    v.<br><br>TRUCK INSURANCE<br>EXCHANGE, et al.,<br><br>    Cross-Defendants and<br>    Respondents. | B286138<br><br><br>(Los Angeles County<br>Super. Ct. No. BC173952) |

GARY SMOLKER,

    Cross-Complainant and
    Appellant,

    v.

HOME SAVINGS TERMITE
CONTROL, INC., et al.,
    Cross-Defendants and
    Respondents.

B287626

(Los Angeles County
Super. Ct. No.  BC173952)

      APPEAL from judgments of the Superior Court of Los
Angeles County, Richard Fruin, Judge.  Affirmed.

      Gary Smolker, in pro. per., for Appellant.

      Borton Petrini, Rosemarie Lewis and Jeffrey Z. Liu for
Cross-Defendants and Respondents W.R. Grace & Co. and Grace
Davidson in Case No. B281406.

      Gordon Rees Scully Mansukhani, Peter Schwartz and
Steven R. Inouye for Cross-Defendant and Respondent Truck
Insurance Exchange in Case No. B286138.

      Charlston, Revich & Wollitz and Robert D. Hoffman for
Cross-Defendants and Respondents Coregis Group, Inc., Coregis
Insurance Company, and California Insurance Company in Case
Nos. B286138 and B287626.

      Lewis Brisbois Bisgaard & Smith, Raul L. Martinez and
Elise D. Klein for Cross-Defendant and Respondent
Interinsurance Exchange of the Automobile Club of Southern
California in Case Nos. B286138 and B287626.

      Kincaid & Associates and Mark L. Kincaid for Cross-
Defendants and Respondents Home Savings Termite Control,
Inc. and W.F. Morris in Case No. B287626.

---

In long-pending litigation arising out of the use of a chemical product for residential termite remediation, Gary Smolker filed cross-complaints against, inter alia, W.R. Grace & Co. (Grace); Grace Davidson;[1] Truck Insurance Exchange (Truck); Coregis Group, Inc., Coregis Insurance Company, and California Insurance Company (collectively, the Coregis Entities); the Interinsurance Exchange of the Automobile Club of Southern California (Auto Club); Home Savings Termite Control, Inc. (Home); and W.F. Morris.  The trial court dismissed the cross-complaints as to all cross-defendants.  Smolker appeals the judgments and the denial of his motions to tax costs.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

I.    Early Litigation (1997-2001)

This litigation began in July 1997, when TIG Insurance Company filed a declaratory relief action in connection with its denial of coverage for insurance claims concerning a condominium owned by spouses Smolker and Alice Graham.[2] (*Smolker v. Pacific Villas Homeowners Assn.,* (Mar. 19, 2007, B138229) [nonpub. opn.].)  Over the next several years, Smolker and Graham cross-complained against a number of companies and individuals.  On October 10, 1997, they filed a cross-complaint against, inter alia, Grace, Davidson, Morris, and Home.  They cross-complained against the Coregis Entities and Truck in their first amended cross-complaint, filed November 4,

---

[1]    This respondent's surname is spelled in multiple ways in the record; we use the spelling used by her appellate counsel in Case No. B281406.

[2]    Graham is not a party to this appeal.

3

1997. In May 1999, in their fourth amended cross-complaint, they asserted claims against Auto Club.

On January 5, 2000, the trial court bifurcated the case into what it designated a "First Phase" and a "Second Phase." The court placed Grace, Davidson, Home, and Morris in the First Phase, deferring the issues in the complaint and cross-complaints involving Truck, the Coregis Entities, and Auto Club until the Second Phase. The court stayed the Second Phase "until either 20 days after a jury verdict in the First Phase, or 20 days after a Judgment is entered after a bench trial in the First Phase, whichever occurs first." Discovery was stayed for the Second Phase parties while the First Phase took place but the court ordered that all First Phase discovery requests and responses be served on the Second Phase parties; Second Phase parties could attend, but not participate in, First Phase depositions; and both First and Second Phase parties must participate in a consolidated site inspection or waive the right of inspection.

Grace filed for bankruptcy on April 2, 2001. Grace and Davidson filed a notice of automatic bankruptcy stay in the trial court on April 5, 2001, and the trial court then stayed the state litigation as to Grace. Smolker filed a claim in the bankruptcy proceedings in August 2001.

The trial on the cross-complaints against Home and Morris began on December 3, 2001. The court declared a mistrial on December 11, 2001.

II.    Bankruptcy Proceedings and Stay (2001-2015)

On January 22, 2002, the bankruptcy court issued an order enjoining the prosecution of the state court litigation pending a

final judgment in the bankruptcy adversary proceeding or further order of the bankruptcy court.

The Law Offices of Smolker and Graham, counsel for Smolker and Graham, advised the superior court by letter on February 8, 2002, that the bankruptcy court had stayed the state court action.  Shortly thereafter, on February 22, 2002, the trial court ordered the state court litigation "stayed pending the outcome of defendant W.R. Grace's bankruptcy proceedings."

Approximately 13 years passed.  In early 2015, Grace filed a claims objection requesting that the bankruptcy court make further orders with respect to the state court litigation.  Smolker advised Grace's bankruptcy counsel that he did not object to the bankruptcy court lifting the injunction staying the state court action, and he (Smolker) filed a request in the bankruptcy court for "an Order permitting the California State Court Litigation . . . to proceed to judgment."

On March 4, 2015, the bankruptcy court ordered that "the litigation captioned, *TIG Insurance Company v. Gary Smolker, et al.,* Case No. BC 173952 (Los Angeles County Sup. Ct.) . . . may proceed to judgment."  This order was served on Smolker and the trial court on March 4, 2015.  Although the order was sent to the department in which the state court litigation was pending, there is no indication in the record that any party served and filed a notice of termination or modification of stay as required by California Rules of Court, rule 3.650(d).  The state court litigation did not resume.

III.    Further Litigation in the Trial Court (2016-2017)

On November 18, 2016, Grace and Davidson moved to dismiss the cross-complaints against them on the ground that

Smolker had not brought them to trial within five years as required by Code of Civil Procedure[3] section 583.310.  The court granted the motion to dismiss on January 17, 2017, and dismissed the cross-complaints with prejudice as to Grace and Davidson.  Smolker appeals the judgment in Case No. B281406.

On April 6, 2017, Smolker moved to set a trial date for his cross-complaints against First Phase cross-defendants Home and Morris.  The court granted the motion and set a trial date of October 2, 2017.

Between April and August 2017, Truck, Auto Club, and the Coregis Entities also moved for dismissal of the cross-complaints against them because Smolker had not brought them to trial within five years.[4]  The trial court granted all the motions and dismissed the cross-complaints.[5]  Smolker appeals the judgments as to Truck, Auto Club, and the Coregis Entities in Case No. B286138.  He appeals the trial court's denial of his motion to tax costs with respect to Auto Club and the Coregis Entities in Case No. B287626.

---

[3]  All further statutory references are to the Code of Civil Procedure.

[4]  Truck filed its motion to dismiss on April 17, 2017.  Auto Club moved to dismiss the cross-complaint against it on July 11, 2017.  The Coregis Entities filed their motion to dismiss on August 18, 2017.

[5]  The court dismissed the cross-complaint against Truck on August 24, 2017, the cross-complaint against Auto Club on September 27, 2017, and the cross-complaint against the Coregis Entities on October 17, 2017.

Home and Morris, the parties who had proceeded to the trial in 2001 that ended in a mistrial, moved on July 3, 2017, for a discretionary dismissal of the cross-complaint against them because it had not been brought to trial within two years after the mistrial was declared. (§ 583.420, subd. (a)(3)(A).)  The court dismissed the cross-complaint against Home and Morris on November 17, 2017.  Smolker appeals the judgment and the denial of his motion to tax costs in Case No. B287626.

## DISCUSSION

An action, including a cross-complaint, must be brought to trial within five years after it is commenced. (§ 583.310.)  If this deadline is not met, the action "shall be dismissed by the court . . . ." (§ 583.360, subd. (a).)  Additionally, if a matter proceeds to trial but results in a mistrial, the court may in its discretion dismiss the action for delay in prosecution if the action is not brought to trial again within two years.  (§ 583.420, subd. (a)(3)(A).)[6]  In calculating time elapsed for the purpose of each statute, time during which the prosecution of the action was stayed is excluded.  (§§ 583.340, subd. (b); 583.420, subd. (b).)  On appeal, Smolker argues that the motions to dismiss were all erroneously granted.  We first address the issue common to all

---

[6]    At oral argument, citing section 583.320, subdivision (a)(1), Smolker argued that the trial court could only dismiss the action if it was not brought to trial again within three years after the mistrial was declared.  Section 583.320, subdivision (a)(1) concerns mandatory dismissals for delay in prosecution, while section 583.420, subdivision (a)(3)(A) grants the trial court the discretion to dismiss an action for delay in prosecution if it is not brought to trial again within two years of a mistrial.  Here, the court granted a discretionary dismissal under section 583.420.

7

appeals, and then turn to the remaining arguments in each
matter.

I.      Arguments Concerning 2002 Trial Court Stay

In all three appeals, Smolker contends that while the
bankruptcy court may have lifted its stay of the state court
litigation in 2015, the 2002 state court order staying the
litigation remained in effect and prevented him from prosecuting
his cross-complaints.  As a result, Smolker claims, the trial court
had no power to consider the cross-defendants' motions to
dismiss, and it erred when it considered the time period after the
bankruptcy stay was lifted in calculating the time to bring the
cross-complaints to trial (or retrial, in the case of Home and
Morris).  (§§ 583.310; 583.340, subd. (b); 583.420, subd. (b).)

We conclude that Smolker is estopped from arguing that
the 2002 state court stay requires reversal of the judgments.  The
trial court's 2002 stay order was entered in response to the
bankruptcy court's order staying the litigation.  The bankruptcy
court's 2015 order that the state court proceedings could resume,
therefore, removed any external barrier to the litigation
proceeding in the trial court.  Once the federal stay was lifted, the
trial court had the power to resume the litigation, and Smolker
regained the ability to prosecute his cross-complaints:  All he had
to do was notify the trial court that the bankruptcy court had
lifted its stay on the state court proceedings so that the trial court
could lift its own stay.[7]  In fact, Smolker was required to do so:

---

[7]      Smolker asserts in Case No. B281406 that there is no
evidence that he was served with the 2015 order of the
bankruptcy court lifting its stay, and he claims in Case No.
B286138 that this order was not properly served on him, but the

California Rules of Court, rule 3.650(d) provides that "[w]hen a stay is vacated, is no longer in effect, or is modified, the party who filed the notice of the stay must immediately serve and file a notice of termination or modification of stay.  If that party fails to do so, any other party in the action who has knowledge of the termination or modification of the stay must serve and file a notice of termination or modification of stay."[8]

---

trial court found that Smolker was served with the order lifting the stay on March 4, 2015, and its finding is supported by the record.  Smolker also contended at oral argument that the bankruptcy court order that the litigation could proceed did not lift its prior stay because it did not expressly so state, but the reasonable interpretation of the court's order that the litigation could proceed to judgment is that this order superseded its prior injunction of state court proceedings.  If Smolker believed there was any ambiguity in the bankruptcy court's order, it was his obligation to seek clarification of that order.

[8]     While the obligation to provide notice set forth in California Rules of Court, rule 3.650(d) applied not only to Smolker but to the cross-defendants with knowledge of the lifting of the stay, only Smolker, as the proponent of the cross-complaints, bore the additional duty to "proceed with reasonable diligence" in the prosecution of his action.  (§ 583.130; see also *Jordan v. Superstar Sandcars* (2010) 182 Cal.App.4th 1416, 1422 ["A plaintiff has an obligation to monitor the case in the trial court, to keep track of relevant dates, and to determine whether any filing, scheduling, or calendaring errors have occurred].")  Defendants and cross-defendants are required to cooperate in bringing actions to trial or other disposition (§ 583.130), but they have "no affirmative duty to do more than meet the plaintiff step by step."  (*State Compensation Ins. Fund v. Selma Trailer & Manufacturing Co.* (1989) 210 Cal.App.3d 740, 754.)

9

Smolker did not inform the trial court that the bankruptcy stay had been lifted and his cross-complaints could proceed. Smolker's failure to satisfy his obligation to advise the trial court that the stay had been lifted both contravened his "affirmative obligation" as a party pursuing an action "to do what is necessary to move the action forward to trial in timely fashion" (*Tanguilig v. Neiman Marcus Group, Inc.* (2018) 22 Cal.App.5th 313, 322) and interfered with the trial court's inherent power to control the litigation before it. (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 967.) Having elected to leave his cross-complaints to languish under an obsolete stay, in contravention of the California Rules of Court and his duty to proceed with reasonable diligence in the prosecution of his action (§ 583.130), Smolker cannot now challenge the dismissal of his cross-complaints on the basis of that stay. "Under the doctrine of waiver, a party loses the right to appeal an issue caused by affirmative conduct or by failing to take the proper steps at trial to avoid or correct the error." (*Telles Transport, Inc. v. W.C.A.B.* (2001) 92 Cal.App.4th 1159, 1167; see also *Tomas v. Vaughn* (1944) 63 Cal.App.2d 188, 196 ["[A] party may not be heard to complain because a judgment does not permit him to obtain an advantage as a result of his own wrong"].)

II.    Case No. B281406

Smolker argues that he was denied a fair hearing when the court accepted Grace and Davidson's supplemental brief despite their failure to timely serve it on him by facsimile as the court had directed. The record, however, includes evidence that the supplemental brief was faxed, e-mailed, and mailed to Smolker

on December 30, 2016, the date that Smolker reports the briefing was due. Smolker has not established any error.

Smolker also contends that Grace and Davidson failed to provide competent evidence that Graham "was no longer a party to the underlying litigation when [they] filed their 'Motion to Dismiss.' Therefore, it was a clear error of law for the trial court to grant Respondents' 'Motion to Dismiss.'" This is the entirety of Smolker's presentation on this issue: he provides no argument to support his conclusion and fails to cite legal authority or the underlying record. "It is a fundamental rule of appellate review that the judgment appealed from is presumed correct and ""all intendments and presumptions are indulged in favor of its correctness."' [Citation.]' [Citation.] An appellant must provide an argument and legal authority to support his contentions. This burden requires more than a mere assertion that the judgment is wrong. 'Issues do not have a life of their own: If they are not raised or supported by argument or citation to authority, [they are] . . . waived.' [Citation.] It is not our place to construct theories or arguments to undermine the judgment and defeat the presumption of correctness. When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived." (*Benach v. City of Los Angeles* (2007) 149 Cal.App.4th 836, 852.)

III.    Case Nos. B286138 and B287626

In Case No. B286138, Smolker appeals from the court's dismissal of his cross-complaints against Truck, Auto Club, and the Coregis Entities. He repeats these arguments nearly verbatim in Case No. B287626, adding Home and Morris to the

11

list of parties whose cross-complaints he contends should not have been dismissed.

Smolker argues that these cross-defendants filed their motions to dismiss in violation of the trial court's 2000 bifurcation order, and that the court erred when it granted the motions.  His entire discussion of this point consists of a quotation from the bifurcation order.  Smolker also presents a bullet-point list of what he identifies as important public policy issues presented by his cross-complaints, but he provides no citations to evidence in the record, legal analysis, or authority in support of his listed assertions.  Finally, in the "overview" section of his briefing in Case No. B287626, Smolker purports to appeal the denial of his motions to tax costs claimed by Auto Club, the Coregis Entities, Home, and Morris.  Smolker, however, does not mention the motions to tax costs again in his briefing and never identifies any error in the trial court's rulings on these motions.  Smolker has failed to present adequate factual and legal analysis on these issues.  ""'An appellate court cannot assume the task of discovering the error in a ruling and it is the duty of counsel by argument and the citation of authority to show the reasons why the rulings complained of are erroneous.  Contentions supported neither by argument nor by citation of authority are deemed to be without foundation and to have been abandoned." [Citations.]' [Citation.]"  (*In re Phoenix H.* (2009) 47 Cal.4th 835, 845; see also *Placer County Local Agency Formation Com. v. Nevada County Local Agency Formation Com.* (2006) 135 Cal.App.4th 793, 814 ["We need not address points in appellate briefs that are unsupported by adequate factual or legal analysis"].)

12

## DISPOSITION

The judgments are affirmed.  Respondents shall recover their costs on appeal.

ZELON, J.

We concur:

PERLUSS, P. J.

FEUER, J.

# EXHIBT
# 10

<u>Appeal Nos. B281406, B286138, B287626 and B289828</u>

COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

---

B281406

GARY SMOLKER,

Cross-Complainant and Appellant,

v.

W.R. GRACE & CO. and GRACE DAVISON

Cross-defendants and Respondents.

---

B286138

GARY SMOLKER,

Cross-complainant and Appellant

v.

TRUCK INSURANCE EXCHANGE, et al.,

Cross-defendants and Respondents.

---

B287626

GARY SMOLKER,

Cross-complainant and Appellant,

v.

HOME SAVING TERMITE CONTROL, INC., et al.

Cross-defendants and Respondents.

1

On Appeal from the Orders of the Superior Court of California

for the County of Los Angeles

Honorable Richard Fruin, Jr., Judge Presiding (BC 173952)

APPELLANT GARY SMOLKER'S PETITION FOR REHEARING OF
DECISIONS OF THE COURT OF APPEAL FILED ON JANUARY 22, 2020 IN
APPEAL CASES B281406, B286138, and B287626

Gary Smolker (56117)

Attorney in Pro Per for Appellant Gary Smolker

16055 Ventura Blvd. Suite 525

Encino, California 91436

Phone: (818) 788-7290

Fax: (818) 990-0120

gsmolker@aol.com

TO BE FILED IN THE COURT OF APPEAL                                                APP-008

| | COURT OF APPEAL CASE NUMBER: |
|---|---|
| COURT OF APPEAL    SECOND **APPELLATE DISTRICT, DIVISION** SEVEN | B281406 |

| | SUPERIOR COURT CASE NUMBER: |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY:         STATE BAR NUMBER: 56117 | BC173952 |
| NAME: GARY SMOLKER, IN PRO PER | |
| FIRM NAME: | |
| STREET ADDRESS: 16055 VENTURA BOULEVARD, SUITE 525 | |
| CITY: ENCINO                STATE: CA      ZIP CODE: 991436 | |
| TELEPHONE NO.: (818) 788-7290        FAX NO.: | |
| E-MAIL ADDRESS: GSMOLKER@AOL.COM | |
| ATTORNEY FOR (name): | |

APPELLANT/ GARY SMOLKER
PETITIONER:

RESPONDENT/          W.R. GRACE & CO., ET AL.
REAL PARTY IN INTEREST:

## CERTIFICATE OF INTERESTED ENTITIES OR PERSONS

(Check one):   [ X ]  INITIAL CERTIFICATE        [ ]  SUPPLEMENTAL CERTIFICATE

**Notice:** Please read rules 8.208 and 8.488 before completing this form. You may use this form for the initial certificate in an appeal when you file your brief or a prebriefing motion, application, or opposition to such a motion or application in the Court of Appeal, and when you file a petition for an extraordinary writ. You may also use this form as a supplemental certificate when you learn of changed or additional information that must be disclosed.

This form is being submitted on behalf of the following party (name ):

a. [ X ]  There are no interested entities or persons that must be listed in this certificate under rule 8.208.

b. [ ]  Interested entities or persons required to be listed under rule 8.208 are as follows:

| Full name of interested entity or person | Nature of interest (Explain): |
|---|---|
| 1) | |
| 2) | |
| 3) | |
| 4) | |
| 5) | |

[ ] Continued on attachment 2.

The undersigned certifies that the above-listed persons or entities (corporations, partnerships, firms, or any other association, but not including government entities or their agencies) have either (1) an ownership interest of 10 percent or more in the party if it is an entity; or (2) a financial or other interest in the outcome of the proceeding that the justices should consider in determining whether to disqualify themselves, as defined in rule 8.208(e)(2).

Date: JANUARY 24, 2018   February 6, 2020

GARY SMOLKER
(TYPE OR PRINT NAME)

▶                                    _____
                                     (SIGNATURE OF APPELLANT OR ATTORNEY)

Page 1 of 1

Form Approved for Optional Use
Judicial Council of California
APP-008 [Rev. January 1, 2017]

**CERTIFICATE OF INTERESTED ENTITIES OR PERSONS**

Cal. Rules of Court, rules 8.208, 8.488
www.courts.ca.gov

3

TO BE FILED IN THE COURT OF APPEAL

APP-008

| COURT OF APPEAL SECOND APPELLATE DISTRICT, DIVISION SEVEN | COURT OF APPEAL CASE NUMBER: B286138 |
|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY:     STATE BAR NUMBER: 56117

NAME: GARY S. SMOLKER

FIRM NAME: SMOLKER LAW FIRM

STREET ADDRESS: 16055 VENTURA BOULEVARD, SUITE 525

CITY: ENCINO     STATE: CA     ZIP CODE: 91436

TELEPHONE NO.: (818) 788-7290     FAX NO.:

E-MAIL ADDRESS: GSMOLKER@AOL.COM

ATTORNEY FOR (name): ATTORNEY IN PRO PER FOR APPELLANT GARY SMOLKER

SUPERIOR COURT CASE NUMBER:
BC173952

APPELLANT/ GARY SMOLKER
PETITIONER:

RESPONDENT/     TRUCK INSURANCE EXCHANGE, ET AL.
REAL PARTY IN INTEREST:

## CERTIFICATE OF INTERESTED ENTITIES OR PERSONS

(Check one):  [X] INITIAL CERTIFICATE  [ ] SUPPLEMENTAL CERTIFICATE

**Notice: Please read rules 8.208 and 8.488 before completing this form. You may use this form for the initial certificate in an appeal when you file your brief or a prebriefing motion, application, or opposition to such a motion or application in the Court of Appeal, and when you file a petition for an extraordinary writ. You may also use this form as a supplemental certificate when you learn of changed or additional information that must be disclosed.**

1. This form is being submitted on behalf of the following party (name):

2. a. [X] There are no interested entities or persons that must be listed in this certificate under rule 8.208.

   b. [ ] Interested entities or persons required to be listed under rule 8.208 are as follows:

| Full name of interested entity or person | Nature of interest (Explain): |
|---|---|
| (1) | |
| (2) | |
| (3) | |
| (4) | |
| (5) | |

[ ] Continued on attachment 2.

The undersigned certifies that the above-listed persons or entities (corporations, partnerships, firms, or any other association, but not including government entities or their agencies) have either (1) an ownership interest of 10 percent or more in the party if it is an entity; or (2) a financial or other interest in the outcome of the proceeding that the justices should consider in determining whether to disqualify themselves, as defined in rule 8.208(e)(2).

Date: ~~FEBRUARY 25, 2019~~ _February 6, 2020_

_[signature]_

GARY S. SMOLKER

(TYPE OR PRINT NAME)          ►         (SIGNATURE OF APPELLANT OR ATTORNEY)

Page 1 of 1

Form Approved for Optional Use
Judicial Council of California
APP-008 [Rev. January 1, 2017]

CERTIFICATE OF INTERESTED ENTITIES OR PERSONS

Cal. Rules of Court, rules 8.208, 8.488
www.courts.ca.gov

TO BE FILED IN THE COURT OF APPEAL | APP-008

| | COURT OF APPEAL CASE NUMBER: |
|---|---|
| COURT OF APPEAL    SECOND APPELLATE DISTRICT, DIVISION    SEVEN | B287626 |

| ATTORNEY OR PARTY WITHOUT ATTORNEY:                    STATE BAR NUMBER: 56117 | SUPERIOR COURT CASE NUMBER: |
|---|---|
| NAME: GARY S. SMOLKER | BC173952 |
| FIRM NAME: SMOLKER LAW FIRM | |
| STREET ADDRESS: 16055 VENTURA BOULEVARD, SUITE 525 | |
| CITY: ENCINO          STATE: CA    ZIP CODE: 91436 | |
| TELEPHONE NO.: (818) 788-7290          FAX NO.: | |
| EMAIL ADDRESS: GSMOLKER@AOL.COM | |
| ATTORNEY FOR (name):  ATTORNEY IN PRO PER FOR APPELLANT GARY SMOLKER | |

APPELLANT/ GARY SMOLKER
PETITIONER:

RESPONDENT/          HOME SAVINGS TERMITE CONTROL INC., ET AL.
REAL PARTY IN INTEREST:

## CERTIFICATE OF INTERESTED ENTITIES OR PERSONS

Check one):  [X] INITIAL CERTIFICATE    [ ] SUPPLEMENTAL CERTIFICATE

**Notice:** Please read rules 8.208 and 8.488 before completing this form. You may use this form for the initial certificate in an appeal when you file your brief or a prebriefing motion, application, or opposition to such a motion or application in the Court of Appeal, and when you file a petition for an extraordinary writ. You may also use this form as a supplemental certificate when you learn of changed or additional information that must be disclosed.

This form is being submitted on behalf of the following party (name):

a.  [X] There are no interested entities or persons that must be listed in this certificate under rule 8.208.

b.  [ ] Interested entities or persons required to be listed under rule 8.208 are as follows:

| Full name of interested entity or person | Nature of interest (Explain): |
|---|---|
| (1) | |
| (2) | |
| (3) | |
| (4) | |
| (5) | |

[ ] Continued on attachment 2.

The undersigned certifies that the above-listed persons or entities (corporations, partnerships, firms, or any other association, but not including government entities or their agencies) have either (1) an ownership interest of 10 percent or more in the party if it is an entity; or (2) a financial or other interest in the outcome of the proceeding that the justices should consider in determining whether to disqualify themselves, as defined in rule 8.208(e)(2).

Date: FEBRUARY 25, 2019  *February 6, 2020*

                                                      ▶ _____
                                                         (SIGNATURE OF APPELLANT OR ATTORNEY)

GARY S. SMOLKER
(TYPE OR PRINT NAME)

Page 1 of 1

Form Approved for Optional Use
Judicial Council of California
APP-008 [Rev. January 1, 2017]

CERTIFICATE OF INTERESTED ENTITIES OR PERSONS

Cal. Rules of Court, rules 8.208, 8.488
www.courts.ca.gov

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES                                                    7

I.    INTRODUCTION

II.   The Court of Appeal Is Required to Grant This Petition for
      Rehearing Because A Court of Appeal Many Not Render A
      Decision Based Upon An Issue Which Was Not Proposed
      Or Briefed by Any Party To The Proceeding, Without
      First Affording The Parties An Opportunity To Present
      Their Views On The Matter Through Supplemental
      Briefing.

III.  The Court of Appeal Is Required to Grant This Petition for
      Rehearing Because It's Decision Is In Violation of State Policy.
      The Court of Appeal's Decision Is Bad Public Policy.

III.  The Court of Appeal Is Required to Grant This Petition for
      Rehearing Because It's Decision Is A Violation of Appellant's Constitution
      Rights.

V.    The Court of Appeal Is Required to Grant This Petition for
      Rehearing Because It's Decision Is Based on the Five Year
      Rule Code of Civil Procedure Section 583.310 (CCP §583.310).
      All future references to sections of the Code of Civil Procedure
      will be referred to as CCP §.The Five Year Rule Does Not Apply

To Computation of Time Appellant Had To Bring Action To Trial.

VI.  The Court of Appeal Is Required to Grant This Petition for Rehearing Because The Court of Appeal's Decision Ignores The New Trial; The Three Year Rule" (CCP §583.320 (a) (1)). CCP §583.320 (a) (1) provides that if a new trial is granted after a mistrial the action shall again to be brought to trial within three years after the mistrial. A mistrial was granted in the underlying action. Respondents' motion to dismiss were brought and granted before the time Appellant had to bring his action to trial. Therefore, the trial court's grant of respondents' motion to dismiss for failure of Appellant action to trial within the mandatory time must be reversed.

VII.  The Court of Appeal Is Required to Grant This Petition for Rehearing Because The Court of Appeal's Decision Ignores California Rules of Court, Rule 3.515 (j).  Rule 3.525 (j) provides the time during which any stay of proceedings is in effect must not be included in determining whether the action stayed should be dismissed for lack of prosecution. A stay (Trial Judge Fruin's February 22, 2001 stay order) was in effect at the time respondents' brought there motions to dismiss for lack of prosecution and at the time respondents' motions to dismiss for lack of prosecution were granted.

Therefore, the trial court's orders/judgments of dismissal must be reversed.

VIII. The Court of Appeal Is Required to Grant This Petition for Rehearing Because The Court of Appeal's Decision Ignores the "tolling period" of CCP §583.340 (b). CCP §583.340 (b) provides the 2-, 3-, and 5-year periods under CCP §§ 583.310, 583.320, and 583.420 are tolled for any time during which prosecution or trial of the action was stayed or enjoined. Any period during which the statutes were tolled must be added to the date on which the statutory period for bringing an action to trail would otherwise end, extending the time the plaintiff has to bring the action to trial. At the time respondents brought their motions to dismiss for lack of prosecution and at the time respondents' motions were granted prosecution of Appellant's action was stayed by Trial Judge Fruin's February 22, 2002 stay order. Therefore, Trial Judge Fruin's orders of dismissal and judgments of dismissal of Appellant's action against respondents must be reversed. Additionally, at the time insurance carriers respondents Truck Insurance Exchange (TRUCK), Interinsurance Exchange of the Automobile Club of Southern California (AUTO CLUB) and Coregis Group, Inc., Coregis Insurance Company and California Insurance Company (COREGIS ENTITIES) motions to dismiss were granted prosecution of Appellant's action against them was stayed

by Trial Judge Fruin's January 5, 2000 order.

IX.   The Court of Appeal Is Required to Grant This Petition for

Rehearing Because The Court of Appeal's Decision

Affirming Home Saving Termite Control Inc.' and

W.F. Morris (TERMITE CONTROL) motions to dismiss

under Code of Civil Procedure §583.420 (A) (3) ignores the

Provisions of California Rule of Court Rule 3.515 (j)

and Code of Civil Procedure §353.340 which provide

that the time any stay of proceedings is in effect must

not be included in determining whether the action

stayed should be dismissed for lack of prosecution.

Therefore the trial court's judgment of dismissal of

TERMITE CONTROL was be reversed.  Additionally,

before a court may grant a discretionary dismissal

under CCP §583.420 to TERMITE CONTROL,

TERMITE CONTROL must demonstrate actual

Prejudice, constraints on TERMITE CONTROL'S

ability to defend against the allegations of Appellant's

lawsuit.  TERMITE CONTROL failed to do so.

Additionally, CCP §583.420 does not apply to

Appellant's action.  CCP §583.420 (a) (3) (A)

only comes into effect after a new trial has been granted,

a new trial is begun, and a mistrial is declared during the new trial.

That did not happen.

X.    The Court of Appeal Is Required to Grant This Petition for
Rehearing Because Parties Are Entitled to An Opportunity
to Brief Issues.  APPELLANT was denied an opportunity to
brief issues.  Therefor the Court of Appeal is required
to grant this Petition for Rehearing.

XI.    The Court of Appeal Is Required to Grant This Petition for
Rehearing Because the Court of Appeal's Decision
Mischaracterizes the Facts, Misstates Important Facts,
Leaves Out Important Facts, Ignores Important Legal
Authority, Supports A False and Misleading
Narrative of What Appellant's Action is About,
Supports A False Narrative of What Appellant's
Appeals Are About, and Deprives the Public of
Important Information.

XII.    The Court of Appeal Is Required to Grant This Petition for
Rehearing Because Parties Are Entitled to An Opportunity
to Brief Issues.  APPELLANT was denied an opportunity to
brief issues.  Therefor the Court of Appeal is required
to grant this Petition for Rehearing.

XIII.    The Court of Appeal Is Required to Grant This Petition for
Rehearing Because In Reaching It's Decision the Court of Appeal's Ignored
Important Facts In It's Own Files.

XIV. The Court of Appeal Is Required to Grant This Petition for Rehearing Because The Court of Appeal's Decision Does Not Discuss Important Public Interest Issues Before the Court.

XIII. CONCLUSION

CERTIFICATE OF COMPLIANCE

PROOF OF SERVICE

## TABLE OF AUTHORITIES

Page(s)

CASES

Hurtado v. Statewide Home Loan Co.

(1985) 167 Cal.App.3d 1019

The People v. The Los Angeles County Superior Court

(George Vasquez. Real Party in Interest)

(2018) 27 Cal.App.5[th] 36

Saterfield v. Garmire

(1967) 65 Cal.2d 638

Chambers v. Nasco, Inc.

(1991) 501 U.S. 32


CONSTITUTIONS

Constitution of the United States

    First Amendment

    Seventh Amendment

    Fourteenth Amendment

California Constitution

    Section 1

    Section 3 (a)

Section 3 (b) (1)

Section 7(a)

Section 16

STATUTES

Business & Professions Code

Section 6068

Section 6628

Section 8646

Section 8647

Section 17200

Section 17500

California Code of Civil Procedure

Section 4

Section 128 (a) (3)

Section 128 (a) (5)

Section 128 (a) (8)

Section 583.130

Section 583.310

Section 583.320

Section 583.340 (b)

Section 583.340 (c)

Section 583.420 (a) (3) (A)

Section 2031.030 (c) (2)

CIVIL CODE

Section 4

Section 1770 (a) (2)

Section 1770 (a) (5)

Section 1770 (a) (8)

Section 3281

Section 3282

Section 3517

FOOD AND AGRICULTURE CODE

Section 11737

Section 11791 (a)

Section 11791 (b)

Section 11791 (c)

Section 11791 (d)

Section 11891

Section 12842

Section 12972

Section 12980

Section 12991 (a)

Section 12991 (c)

Section 12991 (d)

Section 12991 €

Section 12993

Section 12995

GOVERNMENT CODE

Section 68081

UNITED STATES CODE

Section 136 (a)

RULES OF COURT

Rule 3.515 (j)

Rule 3.650 (a)

Rule 3.650 (d)

Rule 3.1342 (a)

Rule 3.1342 (b)

Rule 3.1342 (d)

Rule 3.1342 (e)

Rule 8.200 (a) (4)

Rule 8.200 (a) (4)

Rule 8.256 (c)

CALIFORNIA CODE OF JUDICIAL ETHICS

Canon 1

Canon 3 A

Canon 3 B (1)

Canon 3 B (5)

Canon 3 B (7)

Canon 3 B (7) (a)

Canon 3 D (2)

Canon 4

## CALIFORNIA RULES OF PROFESSIONAL RESPONSIBILITY

Rule 3.1 (a) (1)

Rule 3.1 (a) (2)

Rule 3.2

Rule 3.3 (a) (2)

Rule 3.3 (a) (3)

Rule 4.1

Rule 8.4 (a)

Rule 8.4 (c)

## OTHER AUTHORITY

California Civil Appellate Practice (Third Edition)

Chapter 17, Section 17.78, pages 17.36 and 17.36-1

Chapter 17, Section 17.79, page 17.36-1

# ARGUMENT

## I.    Introduction

On January 22, 2020 the Court of Appeal filed its decision affirming the judgments and orders of trial Judge Richard Fruin dismissing Appellant Gary Smolker's (APPELLANT'S) action against W.R. Grace & Co. and Grace Davison (GRACE) for failure to bring action to trial within five years as required by Code of Civil Procedure §583.310 and §583.60.  From now on Code of Civil Procedure will be referred to as CCP.

CCP §583.310 (the Five Year Rule for bringing an action to trial) does not apply to the facts of this matter.  Judge Fruin's order dismissing APPELLANT'S action is wrong as a matter of law and the Court of Appeal's opinion affirming Judge Fruin's ruling is wrong as a matter of law.

A mistrial was declared in the underlying action on December 11, 2001.

The correct rule for the amount of time APPELLANT had for bringing APPEALLANT'S action to trial would be CCP §583.320 if APPELLANT'S action had not been stayed by the February 22, 2002 stay order staying prosecution of APPELLANT'S action against GRACE "pending the outcome of the W.R. Grace's bankruptcy proceedings" and if GRACE had not filed for bankruptcy protection on April 2, 2001.

The impact of GRACE filing for bankruptcy was to put a stay on APPELLANT's action against GRACE.  W.R. Grace's bankruptcy proceedings are still pending.

If APPELLANT'S action against GRACE was not stayed by Judge Fruin's February 22, 2002 stay order, pursuant to CCP §583.320, APPELLANT would have three years from the time a mistrial was declared [three years from December 11, 2001] added to the time the bankruptcy stay was in effect in which to bring APPELLANT'S action against GRACE to trial.

GRACE argues that the automatic bankruptcy stay was lifted on March 4, 2015 by order of United States Bankruptcy Kevin J. Carey, entered in the Bankruptcy Court on March 4, 2015.  APPELLANT disagrees, but assuming the

automatic bankruptcy stay was lifted on March 4, 2015, pursuant to CCP §583.320 APPELLANT would have until March 3, 2018 to bring APPELANT'S action against GRACE to trial.

GRACE filed a motion to dismiss for APPLELLANT'S alleged failure to bring his action against GRACE to trial in time permitted to do so, on November 18, 2016, more than on 15 months prior to the deadline for APPELLANT to bring his action against GRACE to trial.

GRACE'S motion to dismiss for APPELLANT'S alleged failure to bring APPELLANT'S action against GRACE to trial in time permitted was granted on January 17, 2017, more than one year prior to the time APPELLANT was required to bring his action against GRACE to trial pursuant to CCP §583.320 (a) (1) if there were no stays in effect or other reasons to toll the time in which APPELLANT was required to bring his action against GRACE to trial.

It is clear from the above discussion that Judge Fruin's grant of GRACE's motion to dismiss was wrong as a matter of law.

It is clear from the above discussion that the Court of Appeal's decision filed on January 22, 2020 affirming Judge Fruin's order dismissing GRACE is wrong as a matter of law.  The Court of Appeal decision filed on January 22, 2020 should have reversed Judge Fruin's order dismissing GRACE.

It is clear from the above discussion that the Court of Appeals' decision filed on January 22, 2020 affirming Judge Fruin's order dismissing GRACE from APPEALLANT'S action is defective.

There is more.  The Court of Appeal's decision filed on January 22, 2020 ignores CCP §583.320, does not discuss CCP §583.320.

The Court of Appeal's January 22, 2020 decision affirming Judge Fruin's order dismissing GRACE also ignores - does not discuss - California Rule of Court, Rule 3.515 (j).

Rule 3.515 (j) provides the time during which any stay of proceedings is in effect must not be included in determining whether the action stayed should be dismissed for lack of prosecution.

Per Rule 3.515 (j) Judge Fruin's order dismissing Grace is wrong as a matter of law and the Court of Appeal's affirmance of Judge Fruin's order dismissing GRACE is wrong as a matter of law.

The Court of Appeal's January 22, 2020 decision affirming Judge Fruin's order dismissing GRACE also ignores – does not discuss – the tolling of the period of time within an action must be brought to trial pursuant to CCP §583.340 (b).

Pursuant to CCP §583.340 (b) in computing the time in which action must be brought to trial there shall be excluded the time prosecution of the action as stayed or enjoined.

The Court of Appeal's decision filed on January 22, 2020 affirming the orders and judgments of dismissal of TRUCK, the AUTO CLUB, COREGIS ENTITIES and TERMITE CONTROL is defective.

It does not discuss the impact of CCP §583.320, or the effect of CCP §583.340 (b) or California Rules of Court, Rule 3.515 (j) on the time APPELLANT had to bring his action against TRUCK, AUTO CLUB, COREGIS ENTITIES and TERMITE CONTROL to trial. Judge Fruin granted respondents motion to dismiss prior to the expiration of the time APPELLANT had to bring his action against them to trial. Judge Fruin's orders should be reversed.

Judge Fruin's orders and judgments dismissal violate APPELLANT'S constitutional right to have a trial of his action against each one of them under Frist Amendment, the Seventh Amendment and the Fourteenth Amendment of the Constitution of the United States and violate APPELLANT'S constitutional right to have a trial against each one of them under Section 1, Section 3 (a), Section 7 (a) and under Section 16 of the California Constitution. It is the policy of the State of California to have a trial on the merits. Judge Fruin's orders and judgments of dismissal deprive APPELLANT of the right to have a trial on the merits.

CCP §581.130 states that it is the policy of the state to have trials on the merits and that all parties shall cooperate in bringing actions to trial or other dispositions

The Court of Appeal's January 22, 2020 decision does not discuss the state policy to have trial on the merits and the failure of respondents to cooperate in bringing this action to trial.

Respondents did not cooperate in bringing this action to trial.  To the contrary their attorneys obstructed binging this case to trial by violating Rules of Professional Conduct Rule 3.1 (a) (1), Rule 3.1 (a) (2), Rule 3.2, Rule 3.3 (a) (2), Rule 3.3 (a) (3), Rule 4.1, Rule 8.4 (a), and Rule 8.4 (c), and Business and Professions Code Sections 6068 (c) and 6068 (d).

II.    The Court of Appeal Is Required to Grant This Petition for

Rehearing Because A Court of Appeal Many Not Render A

Decision Based Upon An Issue Which Was Not Proposed

Or Briefed by Any Party To The Proceeding, Without

First Affording The Parties An Opportunity To Present

Their Views On The Matter Through Supplemental

Briefing.

Government Code section 68081 provides that before an appellate court "renders a decision in a proceeding other than a summary denial of a petition for extraordinary writ, based upon an issue which was not proposed or briefed by any party to the proceeding, the court shall afford the parties an opportunity to present their views on the matter through supplemental briefing. If the court fails to afford that opportunity, a rehearing shall be ordered upon timely petition of any party.

Because that did not happen here, a rehearing is mandatory. The Court of Appeal based its decision on the idea that APPELLANT waived his constitutional right to a trial on the merits and is estopped from arguing that the February 22, 2020 court stay requires reversal of the judgments.  That was not briefed by any of the parties.

The Court of Appeal's decision states that all APPELLANT had to do was notify the trial court that the bankruptcy court had lifted its stay.  However, GRACE'S attorney claimed at oral argument that GRACE informed the trial court that the bankruptcy court had lifted the stay.

A party cannot involuntarily waive a constitutional right.  There is no law or legal principle that supports the court's position.  This issue must be briefed.

III.    The Court of Appeal Is Required to Grant This Petition for

Rehearing Because It's Decision Is In Violation of State Policy.

The Court of Appeal's Decision Is Bad Public Policy.

The state policy is to try actions on their merits. CCP §583.130.

IV.    The Court of Appeal Is Required to Grant This Petition for

Rehearing Because It's Decision Is A Violation of Appellant's Constitution

Rights.

APPELLANT has an inviolate constitution right to have his case tried before a jury under both the US Constitution and the California Constitution. See Seventh Amendment to US Constitution.  See Section 16 of the California Constitution.   The Court of Appeal's January 22, 2020 decision does not discuss APPELLANT'S constitutional right to have a jury trial of his action.

V.    The Court of Appeal Is Required to Grant This Petition for

Rehearing Because It's Decision Is Based on the Five Year

Rule Code of Civil Procedure Section 583.310 (CCP §583.310).

All future references to sections of the Code of Civil Procedure

will be referred to as CCP §.The Five Year Rule Does Not Apply

To Computation of Time Appellant Had To Bring Action To

Trial.

Because there was a mistrial the time which APPELLANT had to bring his action to trial was extended to three years after the mistrial and three years after lifting of the stay.  The trial court granted respondents motions to dismiss before the deadline for APPELLANT to bring his action to trial.

Because of the February 22, 2002 stay order the time APPELLANT had to bring his action to trial was suspended.  See Rules of Court, Rule 3.515 (j).  Also see CCP §583.340.

VI.    The Court of Appeal Is Required to Grant This Petition for

Rehearing Because The Court of Appeal's Decision Ignores

The New Trial; The Three Year Rule" (CCP §583.320 (a) (1)).

CCP §583.320 (a) (1) provides that if a new trial is granted after

a mistrial the action shall again to be brought to trial within

three years after the mistrial. A mistrial was granted in the

underlying action. Respondents' motion to dismiss were

brought and granted before the time Appellant had

to bring his action to trial. Therefore, the trial court's grant

of respondents' motion to dismiss for failure of Appellant

action to trial within the mandatory time must be reversed.

A mistrial was declared on December 11, 2001.

VII.  The Court of Appeal Is Required to Grant This Petition for
Rehearing Because The Court of Appeal's Decision Ignores
California Rules of Court, Rule 3.515 (j).  Rule 3.525 (j)
provides the time during which any stay of proceedings
is in effect must not be included in determining whether
the action stayed should be dismissed for lack of prosecution.
A stay (Trial Judge Fruin's February 22, 2001 stay order) was
in effect at the time respondents' brought there motions to
dismiss for lack of prosecution and at the time respondents'
motions to dismiss for lack of prosecution were granted.

VIII.  The Court of Appeal Is Required to Grant This Petition for
Rehearing Because The Court of Appeal's Decision Ignores
the "tolling period" of CCP §583.340 (b). CCP §583.340 (b)
provides the 2-, 3-, and 5-year periods under CCP §§ 583.310, 583.320, and
583.420 are tolled for any time during which prosecution or trial of the
action was stayed or enjoined.  Any period during which the statutes were
tolled must be added to the date on which the statutory period for
bringing an action to trail would otherwise end, extending
the time the plaintiff has to bring the action to trial.  At the
time respondents brought their motions to dismiss for lack of
prosecution and at the time respondents' motions were granted
prosecution of Appellant's action was stayed by Trial Judge Fruin's
February 22, 2002 stay order.  Therefore, Trial Judge Fruin's orders

of dismissal and judgments of dismissal of Appellant's action against respondents must be reversed.  Additionally, at the time insurance carriers respondents Truck Insurance Exchange (TRUCK), Interinsurance Exchange of the Automobile Club of Southern California (AUTO CLUB) and Coregis Group, Inc., Coregis Insurance Company and California Insurance Company (COREGIS ENTITIES) motions to dismiss were granted prosecution of Appellant's action against them was stayed by Trial Judge Fruin's January 5, 2000 order.

IX.  The Court of Appeal Is Required to Grant This Petition for Rehearing Because The Court of Appeal's Decision Affirming Home Saving Termite Control Inc.' and W.F. Morris (TERMITE CONTROL) motions to dismiss under Code of Civil Procedure §583.420 (A) (3) ignores the Provisions of California Rule of Court Rule 3.515 (j) and Code of Civil Procedure §353.340 which provide that the time any stay of proceedings is in effect must not be included in determining whether the action stayed should be dismissed for lack of prosecution. Therefore the trial court's judgment of dismissal of TERMITE CONTROL was be reversed.  Additionally, before a court may grant a discretionary dismissal under CCP §583.420 to TERMITE CONTROL,

TERMITE CONTROL must demonstrate actual

Prejudice, constraints on TERMITE CONTROL'S

ability to defend against the allegations of Appellant's

lawsuit.  TERMITE CONTROL failed to do so.

Additionally, CCP §583.420 does not apply to

Appellant's action.  CCP §583.420 (a) (3) (A)

only comes into effect after a new trial has been granted,

a new trial is begun, and a mistrial is declared during the new trial.

That did not happen.

X.    The Court of Appeal Is Required to Grant This Petition for

Rehearing Because Parties Are Entitled to An Opportunity

to Brief Issues.  APPELLANT was denied an opportunity to

brief issues.  Therefor the Court of Appeal is required

to grant this Petition for Rehearing.

The Court of Appeal's decision incorrectly states that the record indicates
GRACE timely served its supplemental brief and declaration by fax on
APPELLANT on December 10, 2016.  That is a complete misstatement.  GRACE
was to serve its "Supplemental Brief" on APPELLANT by fax on December 30,
2016.  See Clerk's Transcript 398:26-38, CT. 398:1, and CT 401:22-27.  See Proof
of Service in Clerk's Transcript on Page 356.  The Proof of Service indicates the
Declaration of Roger Higgins was not served by fax on APPELLANT on
December 30, 2016.  See Proof of Service of GRACE "Supplemental Brief" on
Appellant on page 403 of the Clerk's Transcript on Appeal.  The Proof of Service
indicates GRACE's "Supplemental Pleading" was not served by fax on
APPELLANT.  See GRACE'S January 13, 2017 Reply to APPELLANT'S
Opposition. Attached to the Liu declaration is a fax conformation on page 429 of
the Clerk's Transcript on appeal which indicates that 15 pages were faxed to

APPELLANT on December 30, 2016. The Declaration of Roger Higgins is 166 pages, the Supplemental Brief is 47 pages long.

## CONCLUSION

For all the foregoing reasons APPELLANT'S Petition for Rehearing should be granted.

February 6, 2020

Respectfully submitted,

_____

Gary Smolker, Attorney in Pro Per

for Cross-complainant and Appellant Gary Smolker

## CERTIFICATE OF COMPLIANCE

Pursuant to California Rules of Court, rule 8.204(c)(1) I hereby certify that Appellant's Petition for Rehearing is a total of 3,980 pages, as counted by the word processing program used to generate it.

February 6, 2020

By: _____

Gary Smolker, in Pro Per

Attorney for Cross-complainant and Appellant Gary Smolker

*TIG Insurance Company vs. Gary Smolker, etal.*

Court of Appeal Case Nos. B281406, B286138, B287626, B289828

<u>COMBINED PROOF OF SERVICE FOR ALL PENDING APPEAL CASES</u>

I am a resident of the State of California, over the age of eighteen years, and not a party to this action.  My business address is 16055 Ventura Blvd., Suite 525, Encino, CA. 91436.  On February 6, 2020, I served the following titled and attached document:

**Appellant's Petition for Rehearing**

  **X**  VIA MAIL, by placing a true copy of the document(s) listed above in a sealed envelope with postage fully prepaid in United States mail in the State of California at Encino, California, addressed as set forth in the attached service list:

See attached list.

I am familiar with the Smolker Law Firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on the same day with the postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.


I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on February 6, 2020, at Encino, California.

CARLOS GONZALEZ

**Combined Service List**

TIG Insurance Co. V Gary Smolker, et. Al.
LASC Case No. BC173952
Appeal Case Nos. B281406, B286138, B287626, B289828

**SERVICE LIST**
*Smolker v. W.R. Grace & Co., et al.*
Second Appellate District, Division Seven, Case No. B281406
Superior Court of Los Angeles County, Case No. BC173952

ROSEMARIE S. LEWIS (158891)
JEFFREY Z. LIU (276849)
BORTON PETRINI, LLP
626 Wilshire Boulevard, Suite 975
Los Angeles, CA 90017
(213) 624-2869
Rlewis@bortonpetrini.com
Jliu@bortonpetrini.com
*Attorney for Cross-Defendants and Respondents*
 *W.R. Grace & Co. And Grace Davidson*

*(Served via United States Postal Service)*

**SERVICE LIST**
*Smolker v. Truck Insurance Exchange, et al.*
Second Appellate District, Division Seven, Case No. B286138
Los Angeles County Superior Court, Case No. BC173952

PETER SCHWARTZ #109859
STEVEN R. INOUYE #245024
GORDON & REES LLP
633 W. 5th Street 52nd Floor
Los Angeles, CA 90071
Pschwartz@gordonrees.com
Sinouye@grsm.com

*Attorney for Cross-Defendant and Respondent*
*  Truck Insurance Exchange*

*(Served via Unites States Postal Service)*


ROBERT DANIEL HOFFMAN #123458
CHARLSTON, REVICH & WOLLITZ LLP
1925 Century Park East, Suite 320
Los Angeles, CA 90067
County: Los Angeles County
Rhoffman@crwllp.com

*Attorneys for Cross-Defendants and Respondents*
*Coregis Group, Inc., Coregis Insurance Co., and California Insurance Company*

*(Served via Unites States Postal Service)*

RAUL LUIS MARTINEZ #82465
ELISE DALE KLEIN #111712
LEWIS BRISBOIS BISGAARD & SMITH LLP
633 W. 5th Street, Suite 4000
Los Angeles, CA 90071
Martinez@lbbslaw.com
Klein@lbbslaw.com

*Attorneys for Cross-Defendant and Respondent*
*Interinsurance Exchange of the Automobile Club of So. Cal*

*(Served via Unites States Postal Service)*

Smolker v. Home Saving Termite Control, Inc., et al.
LASC Case No. BC173952, APPEAL CASE NO. 287626

## <u>SERVICE LIST</u>

Mark Kincaid, Esq.
26 Alhaja Way
Hot Springs Village.
Arkansas, 71909
Tel: 714-955-69955
Fax: 714-784-2546
Email: mkincaid@mkincaidlaw.com

**Attorneys for Home Savings
Termite Control, Inc., Wayne
Morris**

Robert Hoffman, Esq. SB #123458
Charleston, Revich & Wollitz LLP
1925 Century Park East, Suite 320
Los Angeles, CA 90067
Tel: 310-551-7040
Fax: 310-203-9321
Email: rhoffman@crwllp.com

**Attorneys for Goregis Group Inc., Goregis Insurance Co., California Insurance Co.**

Lewis Brisbois Bisgaard & Smith LLP
Raul Martinez SB# 82465
Elise D. Klein SB# 111712
633 West 5th Street, Suite 4000
Los Angeles, CA 90071
Tel: 213-250-1800
Fax: 213-250-7900
Email: Martinez@lbbslaw.com

Email: Elise.Klein@lewisbrisbois.com

**Attorneys for Inter-Insurance Exchange of the
Automobile Club of Southern California**

Smolker v. Home Saving Termite Control, Inc., et al.
LASC Case No. BC173952, APPEAL CASE NO. 287626

## SERVICE LIST  Appeal Case No. 289828

Mark Kincaid, Esq. SB#118640
26 Alhaja Way
Hot Springs Village,
Arkansas, 71909
Tel: 714-955-69955
Fax: 714-784-2546
Email: mkincaid@mkincaidlaw.com

**Attorneys for Home Savings
Termite Control, Inc., Wayne
Morris**

SERVICE LIST

Clerk of the Los Angeles Superior Court

111. North Hill Street

Los Angeles, CA  90012-3014

# EXHIBIT 11

<u>Appeal Nos. B281406, B286138, B287626 and B289828</u>

## COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

---

B281406

GARY SMOLKER,

Cross-Complainant and Appellant,

v.

W.R. GRACE & CO. and GRACE DAVISON

Cross-defendants and Respondents.

---

B286138

GARY SMOLKER,

Cross-complainant and Appellant

v.

TRUCK INSURANCE EXCHANGE, et al.,

Cross-defendants and Respondents.

---

B287626

GARY SMOLKER,

Cross-complainant and Appellant,

v.

HOME SAVING TERMITE CONTROL, INC., et al.

Cross-defendants and Respondents.

1

On Appeal from the Orders of the Superior Court of California

for the County of Los Angeles

Honorable Richard Fruin, Jr., Judge Presiding (BC 173952)

# APPELLANT GARY SMOLKER'S PETITION FOR REHEARING OF DECISIONS OF THE COURT OF APPEAL FILED ON JANUARY 22, 2020 IN APPEAL CASES B281406, B286138, and B287626

Gary Smolker (56117)

Attorney in Pro Per for Appellant Gary Smolker

16055 Ventura Blvd. Suite 525

Encino, California 91436

Phone: (818) 788-7290

Fax: (818) 990-0120

gsmolker@aol.com

TO BE FILED IN THE COURT OF APPEAL

APP-008

| | COURT OF APPEAL CASE NUMBER |
|---|---|
| COURT OF APPEAL, SECOND APPELLATE DISTRICT, DIVISION SEVEN | B281406 |

| ATTORNEY OR PARTY WITHOUT ATTORNEY: STATE BAR NUMBER: 56117 | SUPERIOR COURT CASE NUMBER: |
|---|---|
| NAME: GARY SMOLKER, IN PRO PER | BC173952 |
| FIRM NAME: | |
| STREET ADDRESS: 16055 VENTURA BOULEVARD, SUITE 525 | |
| CITY: ENCINO  STATE: CA  ZIP CODE: 991436 | |
| TELEPHONE NO.: (818) 788-7290  FAX NO.: | |
| E-MAIL ADDRESS: GSMOLKER@AOL.COM | |
| ATTORNEY FOR (name): | |

APPELLANT/ GARY SMOLKER
PETITIONER:

RESPONDENT/    W.R. GRACE & CO., ET AL.
REAL PARTY IN INTEREST:

## CERTIFICATE OF INTERESTED ENTITIES OR PERSONS

(Check one):  [x] INITIAL CERTIFICATE  [ ] SUPPLEMENTAL CERTIFICATE

**Notice:** Please read rules 8.208 and 8.488 before completing this form. You may use this form for the initial certificate in an appeal when you file your brief or a prebriefing motion, application, or opposition to such a motion or application in the Court of Appeal, and when you file a petition for an extraordinary writ. You may also use this form as a supplemental certificate when you learn of changed or additional information that must be disclosed.

1. This form is being submitted on behalf of the following party (name ):

2. [x] There are no interested entities or persons that must be listed in this certificate under rule 8.208.

   b. [ ] Interested entities or persons required to be listed under rule 8.208 are as follows:

| Full name of interested entity or person | Nature of interest (Explain): |
|---|---|
| (1) | |
| (2) | |
| (3) | |
| (4) | |
| (5) | |

[ ] Continued on attachment 2.

The undersigned certifies that the above-listed persons or entities (corporations, partnerships, firms, or any other association, but not including government entities or their agencies) have either (1) an ownership interest of 10 percent or more in the party if it is an entity; or (2) a financial or other interest in the outcome of the proceeding that the justices should consider in determining whether to disqualify themselves, as defined in rule 8.208(e)(2).

February 10, 2020

Date: JANUARY 24, 2018

_____          ▶ _____
GARY SMOLKER                                (SIGNATURE OF APPELLANT OR ATTORNEY)
(TYPE OR PRINT NAME)

Page 1 of 1

Form Approved for Optional Use
Judicial Council of California
APP-008 [Rev. January 1, 2017]

CERTIFICATE OF INTERESTED ENTITIES OR PERSONS

Cal. Rules of Court, rules 8.208, 8.488
www.courts.ca.gov

5

TO BE FILED IN THE COURT OF APPEAL                                          APP-008

| | COURT OF APPEAL CASE NUMBER: |
|---|---|
| COURT OF APPEAL     SECOND APPELLATE DISTRICT, DIVISION   SEVEN | B288135 |

| ATTORNEY OR PARTY WITHOUT ATTORNEY:          STATE BAR NUMBER:  55117 | |
|---|---|
| NAME  GARY S. SMOLKER | SUPERIOR COURT CASE NUMBER: |
| FIRM NAME  SMOLKER LAW FIRM | BC173952 |
| STREET ADDRESS:  16055 VENTURA BOULEVARD, SUITE 525 | |
| CITY:  ENCINO                          STATE: CA       ZIP CODE: 91436 | |
| TELEPHONE NO.: (818) 788-7290          FAX NO.: | |
| E-MAIL ADDRESS:  GSMOLKER@AOL.COM | |
| ATTORNEY FOR (name):   ATTORNEY IN PRO PER FOR APPELLANT GARY SMOLKER | |

APPELLANT/ PETITIONER:   GARY SMOLKER

RESPONDENT/          TRUCK INSURANCE EXCHANGE, ET AL.

REAL PARTY IN INTEREST:

CERTIFICATE OF INTERESTED ENTITIES OR PERSONS

(Check one):    [ X ]  INITIAL CERTIFICATE       [   ]  SUPPLEMENTAL CERTIFICATE

Notice:  Please read rules 8.208 and 8.488 before completing this form. You may use this form for the initial certificate in an appeal when you file your brief or a prebriefing motion, application, or opposition to such a motion or application in the Court of Appeal, and when you file a petition for an extraordinary writ. You may also use this form as a supplemental certificate when you learn of changed or additional information that must be disclosed.

This form is being submitted on behalf of the following party (name):

a. [ X ]  There are no interested entities or persons that must be listed in this certificate under rule 8.208.

b. [   ]  Interested entities or persons required to be listed under rule 8.208 are as follows:

| Full name of interested entity or person | Nature of interest (Explain): |
|---|---|
| (1) | |
| (2) | |
| (3) | |
| (4) | |
| (5) | |

[   ]  Continued on attachment 2.

The undersigned certifies that the above-listed persons or entities (corporations, partnerships, firms, or any other association, but not including government entities or their agencies) have either (1) an ownership interest of 10 percent or more in the party if it is an entity; or (2) a financial or other interest in the outcome of the proceeding that the justices should consider in determining whether to disqualify themselves, as defined in rule 8.208(e)(2).

Date: ~~FEBRUARY 25, 2019~~  February 10, 2020

_SMOLKER_
(TYPE OR PRINT NAME)

▶ _[signature]_
(SIGNATURE OF APPELLANT OR ATTORNEY)

Page 1 of 1

CERTIFICATE OR INTERESTED ENTITIES OR PERSONS

TO BE FILED IN THE COURT OF APPEAL

APP-008

| | |
|---|---|
| R APPEAL SECOND APPELLATE DISTRICT, DIVISION SEVEN | COURT OF APPEAL CASE NUMBER: B287526 |
| RNEY OR PARTY WITHOUT ATTORNEY: STATE BAR NUMBER: 56117 | SUPERIOR COURT CASE NUMBER: BC173952 |

- GARY S. SMOLKER
NAME: SMOLKER LAW FIRM
ET ADDRESS: 16055 VENTURA BOULEVARD, SUITE 525
ENCINO STATE: CA ZIP CODE: 91436
PHONE NO.: (818) 788-7290 FAX NO.:
L ADDRESS: GSMOLKER@AOL.COM
RNEY FOR (name): ATTORNEY IN PRO PER FOR APPELLANT GARY SMOLKER

PELLANT/ GARY SMOLKER
TITIONER:

SPONDENT/ HOME SAVINGS TERMITE CONTROL INC., ET AL.
L PARTY IN INTEREST:

## CERTIFICATE OF INTERESTED ENTITIES OR PERSONS

ck one): [X] INITIAL CERTIFICATE    [ ] SUPPLEMENTAL CERTIFICATE

ice: Please read rules 8.208 and 8.488 before completing this form. You may use this form for the initial
tificate in an appeal when you file your brief or a prebriefing motion, application, or opposition to such a
tion or application in the Court of Appeal, and when you file a petition for an extraordinary writ. You may
use this form as a supplemental certificate when you learn of changed or additional information that must
disclosed.

his form is being submitted on behalf of the following party (name ):

. [ ] There are no interested entities or persons that must be listed in this certificate under rule 8.208.

[ ] Interested entities or persons required to be listed under rule 8.208 are as follows:

| Full name of interested entity or person | Nature of interest (Explain): |
|---|---|
| | |
| | |
| | |
| | |

[ ] Continued on attachment 2.

undersigned certifies that the above-listed persons or entities (corporations, partnerships, firms, or any other
ociation, but not including government entities or their agencies) have either (1) an ownership interest of 10 percent or
re in the party if it is an entity; or (2) a financial or other interest in the outcome of the proceeding that the justices
uld consider in determining whether to disqualify themselves, as defined in rule 8.208(e)(2).

February 10, 2020

FEBRUARY 25, 2019

S OLKER
(TYPE OR PRINT NAME)                    (SIGNATURE OF APPELLANT OR ATTORNEY)

Page 1 of 1

CERTIFICATE OF INTERESTED ENTITIES OR PERSONS

ved for Optional Use
ncil of California
v. January 1, 2017]

Cal. Rules of Court, rules 8.208, 8.488
www.courts.ca.gov

5

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................... 12

I.     INTRODUCTION ........................................ 17

II.    The Court of Appeal Is Required to Grant This Petition for     21
       Rehearing Because A Court of Appeal Many Not Render A
       Decision Based Upon An Issue Which Was Not Proposed
       Or Briefed by Any Party To The Proceeding, Without
       First Affording The Parties An Opportunity To Present
       Their Views On The Matter Through Supplemental
       Briefing.

III.   The Court of Appeal Is Required to Grant This Petition for     22
       Rehearing Because It's Decision Is In Violation of State Policy.
       The Court of Appeal's Decision Is Bad Public Policy.

III.   The Court of Appeal Is Required to Grant This Petition for     22
       Rehearing Because It's Decision Is A Violation of Appellant's Constitution
       Rights.

IV.    The Court of Appeal is required to Grant this Petition for     23
       Rehearing Because It's Decision Is a Violation of Appellant's
       Constitutional Rights.

V.     The Court of Appeal Is Required to Grant This Petition for     23
       Rehearing Because It's Decision Is Based on the Five Year
       Rule Code of Civil Procedure Section 583.310 (CCP §583.310).

All future references to sections of the Code of Civil Procedure will be referred to as CCP §.The Five Year Rule Does Not Apply To Computation of Time Appellant Had To Bring Action To Trial.

VI.   The Court of Appeal Is Required to Grant This Petition for          23
Rehearing Because the Court of Appeal's Decision Ignores
The New Trial; the Three Year Rule" (CCP §583.320 (a) (1)).
CCP §583.320 (a) (1) provides that if a new trial is granted after
a mistrial the action shall again to be brought to trial within
three years after the mistrial. A mistrial was granted in the
underlying action. Respondents' motion to dismiss were
brought and granted before the time Appellant had
to bring his action to trial. Therefore, the trial court's grant
of respondents' motion to dismiss for failure of Appellant
action to trial within the mandatory time must be reversed.

VII.   The Court of Appeal Is Required to Grant This Petition for          24
Rehearing Because The Court of Appeal's Decision Ignores
California Rules of Court, Rule 3.515 (j).  Rule 3.525 (j)
provides the time during which any stay of proceedings
is in effect must not be included in determining whether
the action stayed should be dismissed for lack of prosecution.
A stay (Trial Judge Fruin's February 22, 2001 stay order) was
in effect at the time respondents' brought there motions to

7

dismiss for lack of prosecution and at the time respondents'
motions to dismiss for lack of prosecution were granted.
Therefore, the trial court's orders/judgments of dismissal
must be reversed.

VIII. The Court of Appeal Is Required to Grant This Petition for        24
Rehearing Because The Court of Appeal's Decision Ignores
the "tolling period" of CCP §583.340 (b). CCP §583.340 (b)
provides the 2-, 3-, and 5-year periods under CCP §§ 583.310, 583.320, and
583.420 are tolled for any time during which prosecution or trial of the
action was stayed or enjoined.  Any period during which the statutes were
tolled must be added to the date on which the statutory period for
bringing an action to trail would otherwise end, extending
the time the plaintiff has to bring the action to trial.  At the
time respondents brought their motions to dismiss for lack of
prosecution and at the time respondents' motions were granted
prosecution of Appellant's action was stayed by Trial Judge Fruin's
February 22, 2002 stay order.  Therefore, Trial Judge Fruin's orders
of dismissal and judgments of dismissal of Appellant's action
against respondents must be reversed.  Additionally, at the time
insurance carriers respondents Truck Insurance Exchange (TRUCK),
Interinsurance Exchange of the Automobile Club of Southern
California (AUTO CLUB) and Coregis Group, Inc., Coregis
Insurance Company and California Insurance Company

(COREGIS ENTITIES) motions to dismiss were granted

prosecution of Appellant's action against them was stayed

by Trial Judge Fruin's January 5, 2000 order.

IX.   The Court of Appeal Is Required to Grant This Petition for          25

Rehearing Because the Court of Appeal's Decision

Affirming Home Saving Termite Control Inc.' and

W.F. Morris (TERMITE CONTROL) motions to dismiss

under Code of Civil Procedure §583.420 (A) (3) ignores the

provisions of California Rule of Court Rule 3.515 (j)

and the provisions of Code of Civil Procedure §353.340 which provide

that the time any stay of proceedings is in effect must

not be included in determining whether the action

stayed should be dismissed for lack of prosecution.

Therefore the trial court's judgment of dismissal of

TERMITE CONTROL was be reversed.  Additionally,

before a court may grant a discretionary dismissal

under CCP §583.420 to TERMITE CONTROL,

TERMITE CONTROL must demonstrate actual

Prejudice, actual constraints on TERMITE CONTROL'S

ability to defend against the allegations of Appellant's

lawsuit.  TERMITE CONTROL failed to do so.

Additionally, CCP §583.420 (a) (3) (A) does not apply to

Appellant's action.  CCP §583.420 (a) (3) (A)

9

comes into effect after a new trial has been granted, when after a new trial begun, a mistrial is declared during the new trial. That did not happen.

X.    The Court of Appeal Is Required to Grant This Petition for    26
Rehearing Because Parties Are Entitled to an Opportunity
to Brief Issues.  APPELLANT was denied an opportunity to
brief issues.  Therefor the Court of Appeal is required
to grant this Petition for Rehearing.

XI.   The Court of Appeal Is Required to Grant This Petition for    28
Rehearing Because the Court of Appeal's Decision
Mischaracterizes the Facts, Misstates Important Facts,
Leaves Out Important Facts, Ignores Important Legal
Authority, Supports A False and Misleading
Narrative of What Appellant's Action is About,
Supports A False Narrative of What Appellant's
Appeals Are About, and Deprives the Public of
Important Information.

XIV.  CONCLUSION                                    30
CERTIFICATE OF COMPLIANCE                           31
PROOF OF SERVICE

INTENTIONALLY LEFT BLANK

TABLE OF AUTHORITIES

Page(s)

CASES

Hurtado v. Statewide Home Loan Co.                                   25

(1985) 167 Cal.App.3d 1019

The People v. The Los Angeles County Superior Court                  30

(George Vasquez. Real Party in Interest)

(2018) 27 Cal.App.5th 36

Saterfield v. Garmire                                                30

(1967) 65 Cal.2d 638

Chambers v. Nasco, Inc.                                              30

(1991) 501 U.S. 32

CONSTITUTIONS

Constitution of the United States

First Amendment                                                      20

Seventh Amendment                                                    20

Fourteenth Amendment                                                 20

California Constitution

Section 1                                                            20

Section 3 (a)                                                        20

Section 3 (b) (1)                                                    30

Section 7(a)                                                         20

Section 16                                                21

STATUTES

Business & Professions Code

    Section 6068 (c)                                  20

    Section 6628 (d)                                  20

    Section 8646

    Section 8647

    Section 17200

    Section 17500

California Code of Civil Procedure

    Section 4

    Section 128 (a) (3)

    Section 128 (a) (5)

    Section 128 (a) (8)

    Section 583.130                                   19, 21

    Section 583.310                                   23

    Section 583.320 (a)(1)                             17, 18, 19, 22, 23

    Section 583.340 (b)                                19, 22, 23

    Section 583.340 (c)

    Section 583.420 (a) (3) (A)                        25

    Section 583.60                                     17

    Section 2031.030 (c) (2)

CIVIL CODE

Section 4

Section 1770 (a) (2)

Section 1770 (a) (5)

Section 1770 (a) (8)

Section 3281

Section 3282

Section 3517

FOOD AND AGRICULTURE CODE

Section 11737                                      29

Section 11791 (a)                                  29

Section 11791 (b)                                  29

Section 11791 (c)                                  29

Section 11791 (d)                                  29

Section 11891                                      29

Section 12842                                      29

Section 12972

Section 12980                                      29

Section 12991 (a)                                  29

Section 12991 (c)                                  29

Section 12991 (d)                                  29

Section 12991 (e)                                  29

Section 12993                                      29

Section 12995                                      29

GOVERNMENT CODE

    Section 68081                             20

UNITED STATES CODE

    Section 136 (a)

RULES OF COURT

    Rule 3.515 (j)                       18, 19, 22, 23, 24

    Rule 3.650 (a)

    Rule 3.650 (d)

    Rule 3.1342 (a)

    Rule 3.1342 (b)

    Rule 3.1342 (d)

    Rule 3.1342 (e)

    Rule 8.200 (a) (4)

    Rule 8.200 (a) (4)

    Rule 8.256 (c)

CALIFORNIA CODE OF JUDICIAL ETHICS

    Canon 1

    Canon 3 A

    Canon 3 B (1)

    Canon 3 B (5)

    Canon 3 B (7)

    Canon 3 B (7) (a)

    Canon 3 D (2)

Canon 4

CALIFORNIA RULES OF PROFESSIONAL RESPONSIBILITY

Rule 3.1 (a) (1)                                        20

Rule 3.1 (a) (2)                                        20

Rule 3.2                                                20

Rule 3.3 (a) (2)                                        20

Rule 3.3 (a) (3)                                        20

Rule 4.1

Rule 8.4 (a)

Rule 8.4 (c)                                            20

GOVERNMENT CODE

Section 68081                                           21

OTHER AUTHORITY

California Civil Appellate Practice (Third Edition)

Chapter 17, Section 17.78, pages 17.36 and 17.36-1      25

Chapter 17, Section 17.79, page 17.36-1

INTENTIONALLY LEFT BLANK

## ARGUMENT

I.    Introduction

On January 22, 2020 the Court of Appeal filed its decision affirming the judgments and orders of trial Judge Richard Fruin dismissing Appellant Gary Smolker's (APPELLANT'S) action against W.R. Grace & Co. and Grace Davison (GRACE) for failure to bring action to trial within five years as required by Code of Civil Procedure §583.310 and §583.60.  From now on Code of Civil Procedure will be referred to as CCP.

CCP §583.310 (the Five Year Rule for bringing an action to trial) does not apply to the facts of this matter.  Judge Fruin's order dismissing APPELLANT'S action is wrong as a matter of law and the Court of Appeal's opinion affirming Judge Fruin's ruling is wrong as a matter of law.

A mistrial was declared in the underlying action on December 11, 2001.

The correct rule for the amount of time APPELLANT had for bringing APPEALLANT'S action to trial would be CCP §583.320 (a) (1).  APPELLANT'S action had been stayed by the February 22, 2002 stay order staying prosecution of APPELLANT'S action against GRACE "pending the outcome of the W.R. Grace's bankruptcy proceedings" and GRACE had filed for bankruptcy protection on April 2, 2001.

The impact of GRACE filing for bankruptcy was to put a stay on APPELLANT's action against GRACE.  W.R. Grace's bankruptcy proceedings are still pending. The February 22, 2002 stay order is connected to the Grace Bankruptcy proceedings.  Therefor the February 22, 2002 stay order is still in effect and will stay in effect "pending the outcome of the W.R. Grace's bankruptcy proceedings."

Whether the February 22, 2002 stay order is in effect or not [it is APPELLANT'S position that it is still in effect] pursuant to CCP §583.320 (a)(1), APPELLANT would have three years from the time a mistrial was declared [three years from December 11, 2001] added to the time the bankruptcy stay was in effect in which to bring APPELLANT'S action against GRACE to trial.

GRACE argues that the automatic bankruptcy stay was lifted on March 4, 2015 by order of United States Bankruptcy Kevin J. Carey, entered in the Bankruptcy Court on March 4, 2015.  Assuming the automatic bankruptcy stay was lifted on March 4, 2015, pursuant to CCP §583.320 (a) (1), APPELLANT would have until March 3, 2018 to bring APPELANT'S action against GRACE, against TERMITE CONTROL, against TRUCK, against AUTO CLUB, and against the COREGIS ENTITIES to trial.

GRACE filed a motion to dismiss for APPLELLANT'S alleged failure to bring his action against GRACE to trial on November 18, 2016, more than on 15 months prior to the deadline imposed by the GRACE bankruptcy (if one ignores the Feb. 22, 2002 stay) for APPELLANT to bring his action against GRACE to trial.

GRACE'S motion to dismiss for APPELLANT'S alleged failure to bring APPELLANT'S action against GRACE to trial in time permitted was granted on January 17, 2017, more than one year prior to the time APPELLANT was required to bring his action against GRACE to trial pursuant to CCP §583.320 (a) (1) as a result of stay orders related to the GRACE bankruptcy.

It is clear from the above discussion that Judge Fruin's grant of GRACE's motion to dismiss was wrong as a matter of law.

Similarly, Judge Fruin's grant of the other respondents' separate motions to dismiss was clear legal error for the same reason: the time in which plaintiff was allegedly required to bring his action to trial against TRUCK, AUTO CLUB, and TERMITE CONTROL had not run at the time each of the other respondent's motions to dismiss were granted.

It is clear from the above discussion that the Court of Appeal's decision filed on January 22, 2020 affirming Judge Fruin's order dismissing GRACE is wrong as a matter of law.  The Court of Appeal decision filed on January 22, 2020 should have reversed Judge Fruin's order dismissing GRACE, should have reversed Judge Fruin's order dismissing TRUCK, should have reversed Judge Fruin's order dismissing the AUTO CLUB and should have reversed Judge Fruin's order dismissing the COREGIS ENTITIES.

It is clear from the above discussion that the Court of Appeals' decision filed on January 22, 2020 affirming Judge Fruin's orders dismissing GRACE, TRUCK,

AUTO CLUB, COREGIS ENTITIES, and TERMITE CONTROL from APPEALLANT'S action is defective.

There is more.  The Court of Appeal's decision filed on January 22, 2020 ignores CCP §583.320 (a)(1), does not correctly discuss CCP §583.320 (a)(1).

Similarly the Court of Appeal's January 22, 2020 decision affirming Judge Fruin's orders dismissing GRACE, TRUCK, AUTO CLUB, COREGIS ENTITIES and TERMITE CONTROL also ignores - does not discuss - California Rule of Court, Rule 3.515 (j).

Rule 3.515 (j) provides the time during which any stay of proceedings is in effect must not be included in determining whether the action stayed should be dismissed for lack of prosecution.

Per Rule 3.515 (j) Judge Fruin's orders dismissing GRACE, TRUCK, AUTO CLUB, COREGIS ENITIES and TERMITE CONTROL is wrong as a matter of law and the Court of Appeal's affirmance of Judge Fruin's orders dismissing GRACE, et al. is wrong as a matter of law.

The Court of Appeal's January 22, 2020 decision affirming Judge Fruin's order dismissing GRACE, TRUCK, AUTO CLUB, CORETIS ENTITIES and TERMITE CONTROL also ignores – does not discuss – the tolling of the period of time within an action must be brought to trial pursuant to CCP §583.340 (b).

Pursuant to CCP §583.340 (b) in computing the time in which action must be brought to trial there shall be excluded the time prosecution of the action was stayed or enjoined.

The Court of Appeal's decision filed on January 22, 2020 affirming the orders and judgments of dismissal of TRUCK, the AUTO CLUB, COREGIS ENTITIES and TERMITE CONTROL is defective.

It does not properly address or discuss the impact of CCP §583.320 (a) (1), or the effect of CCP §583.340 (b) or California Rules of Court,  Rule 3.515 (j) on the time APPELLANT had to bring his action against TRUCK, AUTO CLUB, COREGIS ENTITIES and TERMITE CONTROL to trial.

19

Judge Fruin granted respondents motion to dismiss prior to the expiration of the time APPELLANT had to bring his action against them to trial.  Judge Fruin's orders should be reversed.

Additionally, Judge Fruin's orders and judgments of dismissal violate APPELLANT'S constitutional right to have a trial of his action against each one of them under Frist Amendment, the Seventh Amendment and the Fourteenth Amendment of the Constitution of the United States.

Judge Fruin's orders and judgments of dismissal violate APPELLANT'S constitutional right to have a trial against each one of them under Section 1, Section 3 (a), Section 7 (a) and under Section 16 of the California Constitution.

Judge Fruin's orders and judgments of dismissal violate the policy of the State of California to have a trial on the merits expressed in CCP §583.120.

The Court of Appeal's January 22, 2020 decision does not discuss APPELLANT'S inviolate constitutional right to have a jury trial or the policy of the state of California expressed in CCP §583.130.

Judge Fruin's orders and judgments of dismissal deprive APPELLANT of APPELLANT'S inviolate constitutional right to have a trial on the merits.

CCP §581.130 states that it is the policy of the state to have trials on the merits and that all parties shall cooperate in bringing actions to trial or other dispositions

The Court of Appeal's January 22, 2020 decision does not discuss the state policy to have trial on the merits or the grave sacred constitutional right to have a trial on the merits.  Similarly, the January 22, 2020 decision completely fails to discuss the failure of respondents to cooperate in bringing this action to trial.

Respondents did not cooperate in bringing this action to trial.  To the contrary their attorneys obstructed binging this case to trial by violating Rules of Professional Conduct Rule 3.1 (a) (1), Rule 3.1 (a) (2), Rule 3.2, Rule 3.3 (a) (2), Rule 3.3 (a) (3), Rule 4.1, Rule 8.4 (a), and Rule 8.4 (c), and Business and Professions Code Sections 6068 (c) and 6068 (d).

GRACE, TRUCK, AUTO CLUB, and COREGIS ENTITIES did not advise the Court that the five year rule does not apply to this action.  They did not advise the court that the three years after mistrial rule applies to this action.

GRACE, TRUCK, AUTO CLUB, COREGIS ENTITIES, and TERMITE CONTROL did not provide the court with competent evidence that delay in going to trial in any way restrains or restrained or constrains or constrained their ability to defendant APPELLANT'S action.

As a minimum GRACE, TRUCK, AUTO CLUB, COREGIS ENTITIES and TERMITE CONTROL must do that before the Court would be able to positively consider granting a motion to dismiss for lack of diligent prosecution.

More than 50 depositions were taken in APPELLANT'S action.

Critical information is contained in those depositions. GRACE, TRUCK, AUTO CLUB, COREGIS ENTITIES and TERMITE CONTROL have not lost their ability to defend APPELLANT'S action.  See Hutado v. Statewide Home Loan Co. (1985) 167 Cal.App. 3d, 1019.

II.     The Court of Appeal Is Required to Grant This Petition for

Rehearing Because A Court of Appeal Many Not Render A

Decision Based Upon An Issue Which Was Not Proposed

Or Briefed by Any Party To The Proceeding, Without

First Affording The Parties An Opportunity To Present

Their Views On The Matter Through Supplemental

Briefing.

Government Code section 68081 provides that before an appellate court "renders a decision in a proceeding other than a summary denial of a petition for extraordinary writ, based upon an issue which was not proposed or briefed by any party to the proceeding, the court shall afford the parties an opportunity to present their views on the matter through supplemental briefing. If the court fails to afford that opportunity, a rehearing shall be ordered upon timely petition of any party.

Because that did not happen here, a rehearing is mandatory. The Court of Appeal based its decision on the idea that APPELLANT waived his constitutional right to a trial on the merits and is estopped from arguing that the February 22, 2002 court stay requires reversal of the judgments. That was not briefed by any of the parties.

The Court of Appeal's decision states that all APPEALLANT had to do was notify the trial court that the bankruptcy court had lifted its stay. It is not APPELLANT'S role to read Judge Fruin's mind, nor does APPELANT have to the ability to do so. Judge Fruin's order states that the action is stayed pending the outcome of Grace's bankruptcy proceeding. Judge Fruin's stay order does notstate that the action is stayed while the bankruptcy stay is in effect.

The Court of Appeal's argument that APPELLANT lost his inviolate constitutional right to a jury trial because he did not inform Judge Fruin a bankruptcy stay had been lifted is an act of judicial gymnastics – makes no sense, is pulled out of the air. Furthermore, GRACE'S attorney rightly claimed at oral argument that GRACE itself informed Judge Fruin that the bankruptcy court had lifted the stay, and referred the Justices to a page in the record on appeal that shows proof of service that Judge Fruin was informed of the lifting of the bankruptcy stay by GRACE'S attorneys..

A party cannot involuntarily waive a constitutional right. There is no law or legal principle that supports the court's position that APPELLANT waived his constitutional right to a jury trial by not informing Judge Fruin that the Bankruptcy Court had lifted a stay order. This issue must be briefed.

III.    The Court of Appeal Is Required to Grant This Petition for

Rehearing Because It's Decision Is In Violation of State Policy.

The Court of Appeal's Decision Is Bad Public Policy.

The Policy of the State of California is to try actions on their merits. CCP §583.130.

IV.    The Court of Appeal Is Required to Grant This Petition for

Rehearing Because It's Decision Is A Violation of Appellant's Constitution

Rights.

APPELLANT has an inviolate constitution right to have his case tried before a jury under both the US Constitution and the California Constitution. See Seventh Amendment to US Constitution. See Section 16 of the California Constitution.

The Court of Appeal's January 22, 2020 decision does not discuss APPELLANT'S constitutional right to have a jury trial of his action.

V.     The Court of Appeal Is Required to Grant This Petition for

Rehearing Because In it's Decision the Court of Appeal is affirming that

APPELLANT was required to bring his action to trial within five years of

filing his Action.


The Five Year Rule Does Not Apply To Computation of Time Appellant Had To Bring Action ToTrial.

Because there was a mistrial the time which APPELLANT had to bring his action to trial was extended to three years after the mistrial and three years after lifting of the stay. The trial court granted respondents motions to dismiss before the deadline for APPELANT to bring his action to trial.

Because of the February 22, 2002 stay order the time APPELLANT had to bring his action to trial was suspended. See Rules of Court, Rule 3.515 (j). Also see CCP §583.340.

VI.    The Court of Appeal Is Required to Grant This Petition for

Rehearing Because the Court of Appeal's Decision Ignores

The New Trial; The Three Year Rule" (CCP §583.320 (a) (1)).

CCP §583.320 (a) (1) provides that if a new trial is granted after

23

a mistrial the action shall again to be brought to trial within
three years after the mistrial. A mistrial was granted in the
underlying action. Respondents' motion to dismiss were
brought and granted before the time Appellant had
to bring his action to trial. Therefore, the trial court's grant
of respondents' motion to dismiss for failure of Appellant
action to trial within the mandatory time must be reversed.

A mistrial was declared on December 11, 2001. Additionally, because of the
February 22, 2002 stay order, the time APPELLANT had to bring his action to trial
was suspended. See California Rules of Court, Rule 3.515 (j)  Also see CCP
§583.340 (b).

VII.   The Court of Appeal Is Required to Grant This Petition for
Rehearing Because The Court of Appeal's Decision Ignores
California Rules of Court, Rule 3.515 (j).  Rule 3.525 (j)
provides the time during which any stay of proceedings
is in effect must not be included in determining whether
the action stayed should be dismissed for lack of prosecution.
A stay (Trial Judge Fruin's February 22, 2001 stay order) was
in effect at the time respondents' brought their motions to
dismiss for lack of prosecution and at the time respondents'
motions to dismiss for lack of prosecution were granted.

VIII.  The Court of Appeal Is Required to Grant This Petition for
Rehearing Because The Court of Appeal's Decision Ignores
the "tolling period" of CCP §583.340 (b).

24

CCP §583.340 (b)provides the 2-, 3-, and 5-year periods under CCP §§ 583.310, 583.320 (a)(1), and 583.420 are tolled for any time during which prosecution or trial of the action was stayed or enjoined.  Any period during which the statutes were tolled must be added to the date on which the statutory period for bringing an action to trail would otherwise end.

CCP §583.340 (b) extends the time the plaintiff has to bring an action to trial.  At the time respondents brought their motions to dismiss for lack of prosecution and at the time respondents' motions were grantedprosecution of Appellant's action was stayed by Trial Judge Fruin's February 22, 2002 stay order.

Therefore, Trial Judge Fruin's orders of dismissal and judgments of dismissal of Appellant's action against respondents must be reversed.

Additionally, at the time the insurance carriers respondents Truck Insurance Exchange (TRUCK), Interinsurance Exchange of the Automobile Club of Southern California (AUTO CLUB) and Coregis Group, Inc., Coregis Insurance Company and California Insurance Company (COREGIS ENTITIES) motions to dismiss were granted prosecution of Appellant's action against them was stayed by Trial Judge Fruin's January 5, 2000 order.

Judge Fruin's January 5, 2000 order totally forbid APPELLANT from bringing his action against the insurance carrier respondents to trial until after completion of a trial APPELLANT'S action against TERMITE CONTROL and GRACE.

IX.    The Court of Appeal Is Required to Grant This Petition for

Rehearing Because The Court of Appeal's Decision

Affirming Home Saving Termite Control Inc.' and

W.F. Morris (TERMITE CONTROL) motions to dismiss

under Code of Civil Procedure §583.420 (a) (3) (A) ignores the

Provisions of California Rule of Court Rule 3.515 (j)

and the provisions Code of Civil Procedure §353.340 (b) which provide

25

that the time any stay of proceedings is in effect must

not be included in determining whether the action

stayed should be dismissed for lack of prosecution.

Therefore the trial court's judgment of dismissal of

TERMITE CONTROL must be reversed.

Additionally, if CCP §583.420 (a)(3)(A) applied to APPELLANT'S action, which it doesn't before a court would be allowed to grant a discretionary dismissal under CCP §583.420 (a)(3)(A) to TERMITE CONTROL, TERMITE CONTROL would have to demonstrate actual prejudice, actual constraints on TERMITE CONTROL'S ability to defend against the allegations of Appellant's lawsuit. See Hutado v. Statewide Home Loan Co. (1985) 167 Cal.App.3d 1019.TERMITE CONTROL failed to do so in its motion to dismiss.

Additionally, CCP §583.420(a)(3)A) does not apply to Appellant's action. CCP §583.420 (a) (3) (A) only comes into effect after a new trial has been granted, then a new trial has begun, and after the second new trial has begun a mistrial is declared during the second or third or fourth, etc. etc., new trial. See California Civil Appellate Practice (Third Edition) Section 17.78 on pages 17-36 and 17-36.1.

X.    The Court of Appeal Is Required to Grant This Petition for

Rehearing Because Parties Are Entitled to An Opportunity

to Brief Issues.  APPELLANT was denied an opportunity to

brief issues.  Therefor the Court of Appeal is required

to grant this Petition for Rehearing.

The Court of Appeal's decision incorrectly states that the record indicates GRACE timely served its supplemental brief and declaration by fax on APPELLANT on December 10, 2016.  That is a complete misstatement.

GRACE was to serve its "Supplemental Brief"/Declaration on APPELLANT by fax on December 30, 2016. See Clerk's Transcript 398:26-38, CT. 398:1, and CT 401:22-27.

26

See Proof of Service in Clerk's Transcript on Page 356. The Proof of Service indicates the Declaration of Roger Higgins was not served by fax on APPELLANT on December 30, 2016.

See Proof of Service of GRACE "Supplemental Brief" on Appellant on page 403 of the Clerk's Transcript on Appeal. The Proof of Service indicates GRACE's "Supplemental Pleading" was not served by fax on APPELLANT.

See GRACE'S January 13, 2017 Reply to APPELLANT'S Opposition. Attached to GRACE'S "Reply: to APPELLANT'S new supplemental pleadings is the Liu declaration which refers t a fax conformation on page 429 of the Clerk's Transcript on appeal.

The fax confirmation indicates that 15 pages were faxed to APPELLANT on December 30, 2016. The Declaration of Roger Higgins is 166 pages in length; the GRACE Supplemental Brief is 47 pages long. Hence, the records prove that GRACE did not serve its pleading by fax on APPELLANT.

When defendants file a motion to dismiss for lack of prosecution they are required by Rule of Court, Rule 3.1342 to set the hearing at least 45 days after they serve their motion. This gives the plaintiff time to read digest and consider the motion to dismiss pleadings before the hearing date.

By California Rules of Court, Rule 3.1342 (b), Plaintiffs are given 15 days after service of motion to dismiss in which to file an opposition.

In this case it was ordered by Judge Fruin that GRACE would serve its supplemental pleadings on APPELLANT by fax by no later than December 30, 2016 and that GRACE's motion to dismiss would be heard 17 days later, on January 16, 2017.

Instead of being given a minimum of 45 days to digest the voluminous new pleadings served by mail on Appellant, Appellant was given 17 days to digest that material. However, GRACE'S pleadings were to be faxed to APPELLANT on December 30, 2016. GRACE mailed but never faxed its 213 pages of new pleadings to APPELLANT. That is a clear denial of due process.

GRACE'S original motion to dismiss – Notice of Motion, and Motion to Dismiss; Memorandum of Points and Authorities; Declaration of Jeffrey Z. Liu; (Proposed Order) – consisted of 26 pages and was served by mail on APPELLANT on November 18, 2016.

APPELLANT did not have time to study the additional 213 new pages of GRACE'S new pleadings served by mail on APPELLANT on December 30, 2017 before the January 17, 2017 hearing on GRACE'S motion to dismiss.

If you count the number of pages contained in each of the other respondents' motions to dismiss, and look at the timing of when their separate motions to dismiss were filed, and consider the voluminous discovery and discovery demands served on APPELLANT by TERMITE CONTROL you will clearly see that APPELLANT was denied the opportunity to brief issues.

XI.  The Court of Appeal Is Required to Grant This Petition for

Rehearing Because the Court of Appeal's Decision

Mischaracterizes the Facts, Misstates Important Facts,

Leaves Out Important Facts, Ignores Important Legal

Authority, Supports A False and Misleading

Narrative of What Appellant's Action is About,

Supports A False Narrative of What Appellant's

Appeals Are About, and Deprives the Public of

Important Information.

Nowhere in its January 22, 2020 decision does the Court of Appeal mention that APPELLANT'S action is about SYLOID 244. Or that APPELLANT claims that SYLOID 244 is highly toxic, that SYLOID 244 was applied in APPELLANT'S condominium in such a way that it would continuously leak into APPELLANT'S condominium.

Nowhere in its January decision does the Court of Appeal mention that APPLELLANT alleges that SYLOID 244 was illegally manufactured by GRACE and illegally sold to TERMITE CONTROL for use as a pesticide.

Nowhere in its decision does the Court of Appeal mention that APPELLANT alleges that TERMITE CONTROL fraudulently represented that SYLOID 244 was a mineral, was not a chemical, that SYLOID 244 was not toxic, and that SYLOID 244 was approved by the US EPA for use as a pesticide.

Judge Fruin had in his court file and the Court of Appeal has in its files Violation Notices served on TERMITE CONTROL for illegal use of SYLOID 244, that state that SYLOID 244 was not registered with the EPA for use as a pesticide.

Judge Fruin had in his file and the Court of Appeal has in its file a the excerpt of a report at a symposium sponsored by GRACE that fine particles of amorphous silica gel (the active component in SYLOID 244) would kill a rat if it were injected in dry form into the lungs of a rat.

Both Judge Fruin and the Court of Appeal have in its files a report from a government official from a lady in whose home SYLOID 244 was applied by TERMITE CONTROL that she breathed in SYLOID 244 in the air in her home which burned her throat. Furthermore, she reported that her doctor reported to her that inhaling SYLOID 244 burned her esophagus.

Judge Fruin and the Court of Appeal have in their files the written brochure handed out by TERMITE CONTROL which falsely represents the properties of SYLOID 244 given to APPELLANT'S wife Alice Graham and the Declaration of Peter J. Novak, and the testimony of an government employee who investigated APPELLANT'S complaint which specifies in detail that SYLOID 244 is inherently dangerous, that its method of application is inherently dangerous and that the SYLOID 244 applied in a home came out of the walls in APPELLANT'S home and will come out of wall voids in other people's homes.

The decision of the Court of Appeal does not discuss California Food & Agriculture Code sections 11737, 11791 (a), 11791 (b), 11791 (c), 11791 (d), 11891, 12842, 12972, 12980, 12991 (a), 12991 (c), 12991 (d) 12991 (e), 12993, or

29

12995. All those code sections regulate the use and sale of pesticides. APPELLANT alleges that TERMITE CONTROL violated all of them. Government Agencies in charge of regulation of Pesticides in California agree that it was against the law for TERMITE CONTROL to apply SYLOID 244 in APPELLANT'S home. TERMITE CONTROL falsely represented in its reports to government regulators that it was not using SYLOID 244 while it was using SYLOID 244.

The public has a right to know these things. See California Constitution Section 3(b) (1).

Judge Fruin declared a mistrial of APPELLANT'S action which began on December 3, 2001 and ended on December 11, 2001.

APPELLANT had filed an Expert Witness List Information document on April 25, 2001 which stated that APPELLANT intended to call 23 expert witnesses at that trial. Judge Fruin said he cancelled the trial because to continue the trial would interfere with his Christmas vacation. See pages 22 , 23, and 24 of Volume 1 of Clerk's Supplemental Transcript on Appeal for Appeal case B286738

The public has the right to know that. See California Constitution Section 3 (b) (1).

These are issues of great significance to a large segment of the population.

The opinion also does not discuss violations of the Rules of Professional Responsibility of the other attorney in this action by failing to advise the courts of adverse legal authority, by overwhelming APPELLANT and the court system with paperwork, by purposefully failing to give APPELLANT adequate time to brief issues, and by causing undue delay and expense by filing separate motions to dismiss.

See also The People v. The Los Angeles County Superior Court (George Vazquez, Real Party in Interest (2018) 27 Cal.App.5[th] 36; Saterfield v. Garmine (1967) 65 Cal.2d 638; Chambers v. Nasco,Inc. (1991) 501 U.S. 32

CONCLUSION

For all the foregoing reasons APPELLANT'S Petition for Rehearing should be granted.

February 7, 2020

Respectfully submitted,

_Gary Smolker_

_____

Gary Smolker, Attorney in Pro Per

for Cross-complainant and Appellant Gary Smolker


CERTIFICATE OF COMPLIANCE

Pursuant to California Rules of Court, rule 8.204(c)(1) I hereby certify that Appellant's Petition for Rehearing is a total of 5,835 pages, including information of cover pages, etc., as counted by the word processing program used to generate it.

February 7, 2020

By: _Gary Smolker_

_____

Gary Smolker, in Pro Per

Attorney for Cross-complainant and Appellant Gary Smolker

# EXHIBIT

# 12

<u>Appeal Nos. B281406, B286138, B287626 and B289828</u>

COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

B281406

GARY SMOLKER,

Cross-Complainant and Appellant,

v.

W.R. GRACE & CO. and GRACE DAVISON

Cross-defendants and Respondents.

B286138

GARY SMOLKER,

Cross-complainant and Appellant

v.

TRUCK INSURANCE EXCHANGE, et al.,

Cross-defendants and Respondents.

B287626

GARY SMOLKER,

Cross-complainant and Appellant,

v.

HOME SAVING TERMITE CONTROL, INC., et al.

Cross-defendants and Respondents.

1

On Appeal from the Orders of the Superior Court of California

for the County of Los Angeles

Honorable Richard Fruin, Jr., Judge Presiding (BC 173952)

## APPELLANT GARY SMOLKER'S PETITION FOR REHEARING OF DECISIONS OF THE COURT OF APPEAL FILED ON JANUARY 22, 2020 IN APPEAL CASES B281406, B286138, and B287626

Gary Smolker (56117)

Attorney in Pro Per for Appellant Gary Smolker

16055 Ventura Blvd. Suite 525

Encino, California 91436

Phone: (818) 788-7290

Fax: (818) 990-0120

gsmolker@aol.com

TO BE FILED IN THE COURT OF APPEAL

**APP-008**

| COURT OF APPEAL    SECOND APPELLATE DISTRICT, DIVISION SEVEN | COURT OF APPEAL CASE NUMBER:<br>B281406 |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY:    STATE BAR NUMBER: 56117<br>NAME: GARY SMOLKER, IN PRO PER<br>FIRM NAME:<br>STREET ADDRESS: 16055 VENTURA BOULEVARD, SUITE 525<br>CITY: ENCINO    STATE: CA    ZIP CODE: 991436<br>TELEPHONE NO.: (818) 788-7290    FAX NO.:<br>E-MAIL ADDRESS: GSMOLKER@AOL.COM<br>ATTORNEY FOR: (name): | SUPERIOR COURT CASE NUMBER:<br>BC173952 |

APPELLANT/ GARY SMOLKER
PETITIONER:

RESPONDENT/    W.R. GRACE & CO., ET AL.
REAL PARTY IN INTEREST:

### CERTIFICATE OF INTERESTED ENTITIES OR PERSONS

*(Check one):*  [X] INITIAL CERTIFICATE  [ ] SUPPLEMENTAL CERTIFICATE

**Notice: Please read rules 8.208 and 8.488 before completing this form. You may use this form for the initial certificate in an appeal when you file your brief or a prebriefing motion, application, or opposition to such a motion or application in the Court of Appeal, and when you file a petition for an extraordinary writ. You may also use this form as a supplemental certificate when you learn of changed or additional information that must be disclosed.**

1. This form is being submitted on behalf of the following party *(name )*:

2. a. [X] There are no interested entities or persons that must be listed in this certificate under rule 8.208.

   b. [ ] Interested entities or persons required to be listed under rule 8.208 are as follows:

| Full name of interested<br>entity or person | Nature of interest<br>*(Explain)*: |
|---|---|
| (1) | |
| (2) | |
| (3) | |
| (4) | |
| (5) | |

[ ] Continued on attachment 2.

The undersigned certifies that the above-listed persons or entities (corporations, partnerships, firms, or any other association, but not including government entities or their agencies) have either (1) an ownership interest of 10 percent or more in the party if it is an entity; or (2) a financial or other interest in the outcome of the proceeding that the justices should consider in determining whether to disqualify themselves, as defined in rule 8.208(e)(2).

February 10, 2020

Date: ~~JANUARY 24, 2018~~

GARY SMOLKER
(TYPE OR PRINT NAME)

(SIGNATURE OF APPELLANT OR ATTORNEY)

Page 1 of 1

3

TO BE FILED IN THE COURT OF APPEAL

APP-008

| COURT OF APPEAL       SECOND APPELLATE DISTRICT, DIVISION  SEVEN | COURT OF APPEAL CASE NUMBER:<br>B286138 |
|---|---|

| ATTORNEY OR PARTY WITHOUT ATTORNEY:          STATE BAR NUMBER:  56117<br>NAME: GARY S. SMOLKER<br>FIRM NAME: SMOLKER LAW FIRM<br>STREET ADDRESS: 16055 VENTURA BOULEVARD, SUITE 525<br>CITY: ENCINO                              STATE: CA     ZIP CODE: 91436<br>TELEPHONE NO.: (818) 788-7290          FAX NO.:<br>E-MAIL ADDRESS: GSMOLKER@AOL.COM<br>ATTORNEY FOR (name):    ATTORNEY IN PRO PER FOR APPELLANT GARY SMOLKER | SUPERIOR COURT CASE NUMBER:<br>BC173952 |
|---|---|

APPELLANT/  GARY SMOLKER
PETITIONER:

RESPONDENT/         TRUCK INSURANCE EXCHANGE, ET AL.
REAL PARTY IN INTEREST:

## CERTIFICATE OF INTERESTED ENTITIES OR PERSONS

(Check one): [ X ] INITIAL CERTIFICATE   [  ] SUPPLEMENTAL CERTIFICATE

**Notice:  Please read rules 8.208 and 8.488 before completing this form. You may use this form for the initial certificate in an appeal when you file your brief or a prebriefing motion, application, or opposition to such a motion or application in the Court of Appeal, and when you file a petition for an extraordinary writ. You may also use this form as a supplemental certificate when you learn of changed or additional information that must be disclosed.**

1.  This form is being submitted on behalf of the following party (name ):

2.  a.  [ X ]  There are no interested entities or persons that must be listed in this certificate under rule 8.208.

    b.  [  ]  Interested entities or persons required to be listed under rule 8.208 are as follows:

| Full name of interested<br>entity or person | Nature of interest<br>(Explain): |
|---|---|
| (1) | |
| (2) | |
| (3) | |
| (4) | |
| (5) | |

[  ]  Continued on attachment 2.

The undersigned certifies that the above-listed persons or entities (corporations, partnerships, firms, or any other association, but not including government entities or their agencies) have either (1) an ownership interest of 10 percent or more in the party if it is an entity; or (2) a financial or other interest in the outcome of the proceeding that the justices should consider in determining whether to disqualify themselves, as defined in rule 8.208(e)(2).

Date: ~~FEBRUARY 25, 2019~~ February 10, 2020

GARY S. SMOLKER
(TYPE OR PRINT NAME)

► _(signature)_
(SIGNATURE OF APPELLANT OR ATTORNEY)

Page 1 of 1

Form Approved for Optional Use
Judicial Council of California
APP-008 [Rev. January 1, 2017]

CERTIFICATE OF INTERESTED ENTITIES OR PERSONS

Cal. Rules of Court, rules 8.208, 8.488
www.courts.ca.gov

4

TO BE FILED IN THE COURT OF APPEAL

APP-008

**COURT OF APPEAL** SECOND APPELLATE DISTRICT, DIVISION SEVEN

| COURT OF APPEAL CASE NUMBER: |
| B287626 |

ATTORNEY OR PARTY WITHOUT ATTORNEY:  STATE BAR NUMBER: 56117
NAME: GARY S. SMOLKER
FIRM NAME: SMOLKER LAW FIRM
STREET ADDRESS: 16055 VENTURA BOULEVARD, SUITE 525
CITY: ENCINO    STATE: CA    ZIP CODE: 91436
TELEPHONE NO.: (818) 788-7290    FAX NO.:
E-MAIL ADDRESS: GSMOLKER@AOL.COM
ATTORNEY FOR (name): ATTORNEY IN PRO PER FOR APPELLANT GARY SMOLKER

| SUPERIOR COURT CASE NUMBER: |
| BC173952 |

APPELLANT/ GARY SMOLKER
PETITIONER:
RESPONDENT/    HOME SAVINGS TERMITE CONTROL INC., ET AL.
REAL PARTY IN INTEREST:

## CERTIFICATE OF INTERESTED ENTITIES OR PERSONS

Check one):  [X] INITIAL CERTIFICATE    [ ] SUPPLEMENTAL CERTIFICATE

**Notice:** Please read rules 8.208 and 8.488 before completing this form. You may use this form for the initial certificate in an appeal when you file your brief or a prebriefing motion, application, or opposition to such a motion or application in the Court of Appeal, and when you file a petition for an extraordinary writ. You may also use this form as a supplemental certificate when you learn of changed or additional information that must be disclosed.

This form is being submitted on behalf of the following party (name ):

a. [X] There are no interested entities or persons that must be listed in this certificate under rule 8.208.

b. [ ] Interested entities or persons required to be listed under rule 8.208 are as follows:

| Full name of interested entity or person | Nature of interest (Explain): |
|---|---|
| (1) | |
| (2) | |
| (3) | |
| (4) | |
| (5) | |

[ ] Continued on attachment 2.

The undersigned certifies that the above-listed persons or entities (corporations, partnerships, firms, or any other association, but not including government entities or their agencies) have either (1) an ownership interest of 10 percent or more in the party if it is an entity; or (2) a financial or other interest in the outcome of the proceeding that the justices should consider in determining whether to disqualify themselves, as defined in rule 8.208(e)(2).

Date: ~~FEBRUARY 25, 2019~~ February 10, 2020

GARY S. SMOLKER
(TYPE OR PRINT NAME)    (SIGNATURE OF APPELLANT OR ATTORNEY)

Page 1 of 1

Approved for Optional Use
Judicial Council of California
APP-008 [Rev. January 1, 2017)    **CERTIFICATE OF INTERESTED ENTITIES OR PERSONS**    Cal. Rules of Court, rules 8.208, 8.488
www.courts.ca.gov

5

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES                                                        12

I.      INTRODUCTION                                                        17

II.     The Court of Appeal Is Required to Grant This Petition for          21
        Rehearing Because A Court of Appeal Many Not Render A
        Decision Based Upon An Issue Which Was Not Proposed
        Or Briefed by Any Party To The Proceeding, Without
        First Affording The Parties An Opportunity To Present
        Their Views On The Matter Through Supplemental
        Briefing.

III.    The Court of Appeal Is Required to Grant This Petition for          22
        Rehearing Because It's Decision Is In Violation of State Policy.
        The Court of Appeal's Decision Is Bad Public Policy.

III.    The Court of Appeal Is Required to Grant This Petition for          22
        Rehearing Because It's Decision Is A Violation of Appellant's Constitution
        Rights.

IV.     The Court of Appeal is required to Grant this Petition for          23
        Rehearing Because It's Decision Is a Violation of Appellant's
        Constitutional Rights.

V.      The Court of Appeal Is Required to Grant This Petition for          23
        Rehearing Because It's Decision Is Based on the Five Year
        Rule Code of Civil Procedure Section 583.310 (CCP §583.310).

All future references to sections of the Code of Civil Procedure will be referred to as CCP §.The Five Year Rule Does Not Apply To Computation of Time Appellant Had To Bring Action To Trial.

VI.    The Court of Appeal Is Required to Grant This Petition for Rehearing Because the Court of Appeal's Decision Ignores The New Trial; the Three Year Rule" (CCP §583.320 (a) (1)). CCP §583.320 (a) (1) provides that if a new trial is granted after a mistrial the action shall again to be brought to trial within three years after the mistrial. A mistrial was granted in the underlying action. Respondents' motion to dismiss were brought and granted before the time Appellant had to bring his action to trial. Therefore, the trial court's grant of respondents' motion to dismiss for failure of Appellant action to trial within the mandatory time must be reversed.

23

VII.   The Court of Appeal Is Required to Grant This Petition for Rehearing Because The Court of Appeal's Decision Ignores California Rules of Court, Rule 3.515 (j).  Rule 3.525 (j) provides the time during which any stay of proceedings is in effect must not be included in determining whether the action stayed should be dismissed for lack of prosecution. A stay (Trial Judge Fruin's February 22, 2001 stay order) was in effect at the time respondents' brought there motions to

24

dismiss for lack of prosecution and at the time respondents'

motions to dismiss for lack of prosecution were granted.

Therefore, the trial court's orders/judgments of dismissal

must be reversed.

VIII. The Court of Appeal Is Required to Grant This Petition for          24

Rehearing Because The Court of Appeal's Decision Ignores

the "tolling period" of CCP §583.340 (b). CCP §583.340 (b)

provides the 2-, 3-, and 5-year periods under CCP §§ 583.310, 583.320, and

583.420 are tolled for any time during which prosecution or trial of the

action was stayed or enjoined.  Any period during which the statutes were

tolled must be added to the date on which the statutory period for

bringing an action to trail would otherwise end, extending

the time the plaintiff has to bring the action to trial.  At the

time respondents brought their motions to dismiss for lack of

prosecution and at the time respondents' motions were granted

prosecution of Appellant's action was stayed by Trial Judge Fruin's

February 22, 2002 stay order.  Therefore, Trial Judge Fruin's orders

of dismissal and judgments of dismissal of Appellant's action

against respondents must be reversed.  Additionally, at the time

insurance carriers respondents Truck Insurance Exchange (TRUCK),

Interinsurance Exchange of the Automobile Club of Southern

California (AUTO CLUB) and Coregis Group, Inc., Coregis

Insurance Company and California Insurance Company

8

(COREGIS ENTITIES) motions to dismiss were granted

prosecution of Appellant's action against them was stayed

by Trial Judge Fruin's January 5, 2000 order.

IX.    The Court of Appeal Is Required to Grant This Petition for          25

Rehearing Because the Court of Appeal's Decision

Affirming Home Saving Termite Control Inc.' and

W.F. Morris (TERMITE CONTROL) motions to dismiss

under Code of Civil Procedure §583.420 (A) (3) ignores the

provisions of California Rule of Court Rule 3.515 (j)

and the provisions of Code of Civil Procedure §353.340 which provide

that the time any stay of proceedings is in effect must

not be included in determining whether the action

stayed should be dismissed for lack of prosecution.

Therefore the trial court's judgment of dismissal of

TERMITE CONTROL was be reversed.  Additionally,

before a court may grant a discretionary dismissal

under CCP §583.420 to TERMITE CONTROL,

TERMITE CONTROL must demonstrate actual

Prejudice, actual constraints on TERMITE CONTROL'S

ability to defend against the allegations of Appellant's

lawsuit.  TERMITE CONTROL failed to do so.

Additionally, CCP §583.420 (a) (3) (A) does not apply to

Appellant's action.  CCP §583.420 (a) (3) (A)

9

comes into effect after a new trial has been granted, when after

a new trial begun, a mistrial is declared during the new trial.

That did not happen.

X.    The Court of Appeal Is Required to Grant This Petition for          26

Rehearing Because Parties Are Entitled to an Opportunity

to Brief Issues.  APPELLANT was denied an opportunity to

brief issues.  Therefor the Court of Appeal is required

to grant this Petition for Rehearing.

XI.    The Court of Appeal Is Required to Grant This Petition for          28

Rehearing Because the Court of Appeal's Decision

Mischaracterizes the Facts, Misstates Important Facts,

Leaves Out Important Facts, Ignores Important Legal

Authority, Supports A False and Misleading

Narrative of What Appellant's Action is About,

Supports A False Narrative of What Appellant's

Appeals Are About, and Deprives the Public of

Important Information.


XIV.  CONCLUSION                                                           36

CERTIFICATE OF COMPLIANCE                                                  36

PROOF OF SERVICE

INTENTIONALLY LEFT BLANK

## TABLE OF AUTHORITIES

|  | Page(s) |
|---|---|
| CASES | |
| Hurtado v. Statewide Home Loan Co. | 25 |
| (1985) 167 Cal.App.3d 1019 | |
| The People v. The Los Angeles County Superior Court | 35 |
| (George Vasquez. Real Party in Interest) | |
| (2018) 27 Cal.App.5th 36 | |
| Saterfield v. Garmire    Chambers v. Nasco, Inc. | 35 |
| (1967) 65 Cal.2d 638     (1991) 501 U.S. 32 | |
| Falahati v. Kondo  (2005) 127 Cal.App.4th 823 | 29 |

| CONSTITUTIONS | |
|---|---|
| Constitution of the United States | |
| First Amendment | 20 |
| Seventh Amendment | 20 |
| Fourteenth Amendment | 20 |
| California Constitution | |
| Section 1 | 20 |
| Section 3 (a) | 20 |
| Section 3 (b) (1) | 30 |
| Section 7(a) | 20 |

Section 16                                    21

STATUTES

Business & Professions Code

    Section 6068 (c)                         20

    Section 6628 (d)                         20

    Section 8646

    Section 8647

    Section 17200

    Section 17500

California Code of Civil Procedure

    Section 4

    Section 128 (a) (3)

    Section 128 (a) (5)

    Section 128 (a) (8)

    Section 583.130                          19, 21

    Section 583.310                          23

    Section 583.320 (a)(1)                    17, 18, 19, 22, 23

    Section 583.340 (b)                       19, 22, 23

    Section 583.340 (c)

    Section 583.420 (a) (3) (A)               25

    Section 583.60                            17

    Section 2031.030 (c) (2)

Civil Code Section 4

Section 1770 (a) (2)

Section 1770 (a) (5)

Section 1770 (a) (8)

Section 3281

Section 3282

Section 3517

FOOD AND AGRICULTURE CODE

| | |
|---|---|
| Section 11737 | 34 |
| Section 11791 (a) | 34 |
| Section 11791 (b) | 34 |
| Section 11791 (c) | 34 |
| Section 11791 (d) | 34 |
| Section 11891 | 29 |
| Section 12842 | 34 |
| Section 12972 | |
| Section 12980 | 34 |
| Section 12991 (a) | 29 |
| Section 12991 (c) | 34 |
| Section 12991 (d) | 34 |
| Section 12991 (e) | 34 |
| Section 12993 | 34 |
| Section 12995 | 34 |

GOVERNMENT CODE

    Section 68081                                    20

UNITED STATES CODE

    Section 136 (a)                                  34

RULES OF COURT

    Rule 3.515 (j)                                   18, 19, 22, 23, 24

    Rule 3.650 (a)

    Rule 3.650 (d)

    Rule 3.1342 (a)

    Rule 3.1342 (b)

    Rule 3.1342 (d)

    Rule 3.1342 (e)

    Rule 8.200 (a) (4)

    Rule 8.200 (a) (4)

    Rule 8.256 (c)

CALIFORNIA CODE OF JUDICIAL ETHICS

    Canon 1

    Canon 3 A

    Canon 3 B (1)

    Canon 3 B (5)

    Canon 3 B (7)

    Canon 3 B (7) (a)

    Canon 3 D (2)

Canon 4

## CALIFORNIA RULES OF PROFESSIONAL RESPONSIBILITY

Rule 3.1 (a) (1)                    20

Rule 3.1 (a) (2)                    20

Rule 3.2                            20

Rule 3.3 (a) (2)                    20

Rule 3.3 (a) (3)                    20

Rule 4.1

Rule 8.4 (a)

Rule 8.4 (c)                        20

## GOVERNMENT CODE

Section 68081                       21

California Constitution, Art VI §14    30


## OTHER AUTHORITY

California Civil Appellate Practice (Third Edition)

Chapter 17, Section 17.78, pages 17.36 and 17.36-1    25

Witkin, California Procedure, *Appeal* §§ 782-812    30

Witkin, Manual on Appellate Court Opinions, §38    30

# ARGUMENT

## I.   Introduction

On January 22, 2020 the Court of Appeal filed its decision affirming the judgments and orders of trial Judge Richard Fruin dismissing Appellant Gary Smolker's (APPELLANT'S) action against W.R. Grace & Co. and Grace Davison (GRACE) for failure to bring action to trial within five years as required by Code of Civil Procedure §583.310 and §583.60.  From now on Code of Civil Procedure will be referred to as CCP.

CCP §583.310 (the Five Year Rule for bringing an action to trial) does not apply to the facts of this matter.  Judge Fruin's order dismissing APPELLANT'S action is wrong as a matter of law and the Court of Appeal's opinion affirming Judge Fruin's ruling is wrong as a matter of law.

A mistrial was declared in the underlying action on December 11, 2001.

The correct rule for the amount of time APPELLANT had for bringing APPEALLANT'S action to trial would be CCP §583.320 (a) (1).  APPELLANT'S action had been stayed by the February 22, 2002 stay order staying prosecution of APPELLANT'S action against GRACE "pending the outcome of the W.R. Grace's bankruptcy proceedings" and GRACE had filed for bankruptcy protection on April 2, 2001.

The impact of GRACE filing for bankruptcy was to put a stay on APPELLANT's action against GRACE.  W.R. Grace's bankruptcy proceedings are still pending. The February 22, 2002 stay order is connected to the Grace Bankruptcy proceedings.  Therefor the February 22, 2002 stay order is still in effect and will stay in effect "pending the outcome of the W.R. Grace's bankruptcy proceedings."

Whether the February 22, 2002 stay order is in effect or not [it is APPELLANT'S position that it is still in effect] pursuant to CCP §583.320 (a)(1), APPELLANT would have three years from the time a mistrial was declared [three years from December 11, 2001] added to the time the bankruptcy stay was in effect in which to bring APPELLANT'S action against GRACE to trial.

17

GRACE argues that the automatic bankruptcy stay was lifted on March 4, 2015 by order of United States Bankruptcy Kevin J. Carey, entered in the Bankruptcy Court on March 4, 2015.  Assuming the automatic bankruptcy stay was lifted on March 4, 2015, pursuant to CCP §583.320 (a) (1), APPELLANT would have until March 3, 2018 to bring APPELANT'S action against GRACE, against TERMITE CONTROL, against TRUCK, against AUTO CLUB, and against the COREGIS ENTITIES to trial.

GRACE filed a motion to dismiss for APPELLANT'S alleged failure to bring his action against GRACE to trial on November 18, 2016, more than on 15 months prior to the deadline imposed by the GRACE bankruptcy (if one ignores the Feb. 22, 2002 stay) for APPELLANT to bring his action against GRACE to trial.

GRACE'S motion to dismiss for APPELLANT'S alleged failure to bring APPELLANT'S action against GRACE to trial in time permitted was granted on January 17, 2017, more than one year prior to the time APPELLANT was required to bring his action against GRACE to trial pursuant to CCP §583.320 (a) (1) as a result of stay orders related to the GRACE bankruptcy.

It is clear from the above discussion that Judge Fruin's grant of GRACE's motion to dismiss was wrong as a matter of law.

Similarly, Judge Fruin's grant of the other respondents' separate motions to dismiss was clear legal error for the same reason: the time in which plaintiff was allegedly required to bring his action to trial against TRUCK, AUTO CLUB, and TERMITE CONTROL had not run at the time each of the other respondent's motions to dismiss were granted.

It is clear from the above discussion that the Court of Appeal's decision filed on January 22, 2020 affirming Judge Fruin's order dismissing GRACE is wrong as a matter of law.  The Court of Appeal decision filed on January 22, 2020 should have reversed Judge Fruin's order dismissing GRACE, should have reversed Judge Fruin's order dismissing TRUCK, should have reversed Judge Fruin's order dismissing the AUTO CLUB and should have reversed Judge Fruin's order dismissing the COREGIS ENTITIES.

It is clear from the above discussion that the Court of Appeals' decision filed on January 22, 2020 affirming Judge Fruin's orders dismissing GRACE, TRUCK,

AUTO CLUB, COREGIS ENTITIES, and TERMITE CONTROL from APPEALLANT'S action is defective.

There is more. The Court of Appeal's decision filed on January 22, 2020 ignores CCP §583.320 (a)(1), does not correctly discuss CCP §583.320 (a)(1).

Similarly the Court of Appeal's January 22, 2020 decision affirming Judge Fruin's orders dismissing GRACE, TRUCK, AUTO CLUB, COREGIS ENTITIES and TERMITE CONTROL also ignores - does not discuss - California Rule of Court, Rule 3.515 (j).

Rule 3.515 (j) provides the time during which any stay of proceedings is in effect must not be included in determining whether the action stayed should be dismissed for lack of prosecution.

Per Rule 3.515 (j) Judge Fruin's orders dismissing GRACE, TRUCK, AUTO CLUB, COREGIS ENITIES and TERMITE CONTROL is wrong as a matter of law and the Court of Appeal's affirmance of Judge Fruin's orders dismissing GRACE, et al. is wrong as a matter of law.

The Court of Appeal's January 22, 2020 decision affirming Judge Fruin's order dismissing GRACE, TRUCK, AUTO CLUB, CORETIS ENTITIES and TERMITE CONTROL also ignores – does not discuss – the tolling of the period of time within an action must be brought to trial pursuant to CCP §583.340 (b).

Pursuant to CCP §583.340 (b) in computing the time in which action must be brought to trial there shall be excluded the time prosecution of the action was stayed or enjoined.

The Court of Appeal's decision filed on January 22, 2020 affirming the orders and judgments of dismissal of TRUCK, the AUTO CLUB, COREGIS ENTITIES and TERMITE CONTROL is defective.

It does not properly address or discuss the impact of CCP §583.320 (a) (1), or the effect of CCP §583.340 (b) or California Rules of Court, Rule 3.515 (j) on the time APPELLANT had to bring his action against TRUCK, AUTO CLUB, COREGIS ENTITIES and TERMITE CONTROL to trial.

Judge Fruin granted respondents motion to dismiss prior to the expiration of the time APPELLANT had to bring his action against them to trial. Judge Fruin's orders should be reversed.

Additionally, Judge Fruin's orders and judgments of dismissal violate APPELLANT'S constitutional right to have a trial of his action against each one of them under Frist Amendment, the Seventh Amendment and the Fourteenth Amendment of the Constitution of the United States.

Judge Fruin's orders and judgments of dismissal violate APPELLANT'S constitutional right to have a trial against each one of them under Section 1, Section 3 (a), Section 7 (a) and under Section 16 of the California Constitution.

Judge Fruin's orders and judgments of dismissal violate the policy of the State of California to have a trial on the merits expressed in CCP §583.120.

The Court of Appeal's January 22, 2020 decision does not discuss APPELLANT'S inviolate constitutional right to have a jury trial or the policy of the state of California expressed in CCP §583.130.

Judge Fruin's orders and judgments of dismissal deprive APPELLANT of APPELLANT'S inviolate constitutional right to have a trial on the merits.

CCP §581.130 states that it is the policy of the state to have trials on the merits and that all parties shall cooperate in bringing actions to trial or other dispositions

The Court of Appeal's January 22, 2020 decision does not discuss the state policy to have trial on the merits or the grave sacred constitutional right to have a trial on the merits. Similarly, the January 22, 2020 decision completely fails to discuss the failure of respondents to cooperate in bringing this action to trial.

Respondents did not cooperate in bringing this action to trial. To the contrary their attorneys obstructed binging this case to trial by violating Rules of Professional Conduct Rule 3.1 (a) (1), Rule 3.1 (a) (2), Rule 3.2, Rule 3.3 (a) (2), Rule 3.3 (a) (3), Rule 4.1, Rule 8.4 (a), and Rule 8.4 (c), and Business and Professions Code Sections 6068 (c) and 6068 (d).

GRACE, TRUCK, AUTO CLUB, and COREGIS ENTITIES did not advise the Court that the five year rule does not apply to this action.  They did not advise the court that the three years after mistrial rule applies to this action.

GRACE, TRUCK, AUTO CLUB, COREGIS ENTITIES, and TERMITE CONTROL did not provide the court with competent evidence that delay in going to trial in any way restrains or restrained or constrains or constrained their ability to defendant APPELLANT'S action.

As a minimum GRACE, TRUCK, AUTO CLUB, COREGIS ENTITIES and TERMITE CONTROL must do that before the Court would be able to positively consider granting a motion to dismiss for lack of diligent prosecution.

More than 50 depositions were taken in APPELLANT'S action.

Critical information is contained in those depositions. GRACE, TRUCK, AUTO CLUB, COREGIS ENTITIES and TERMITE CONTROL have not lost their ability to defend APPELLANT'S action.  See <u>Hutado v. Statewide Home Loan Co.</u> (1985) 167 Cal.App. 3d, 1019.

II.  The Court of Appeal Is Required to Grant This Petition for

Rehearing Because A Court of Appeal Many Not Render A

Decision Based Upon An Issue Which Was Not Proposed

Or Briefed by Any Party To The Proceeding, Without

First Affording The Parties An Opportunity To Present

Their Views On The Matter Through Supplemental

Briefing.

Government Code section 68081 provides that before an appellate court "renders a decision in a proceeding other than a summary denial of a petition for extraordinary writ, based upon an issue which was not proposed or briefed by any party to the proceeding, the court shall afford the parties an opportunity to present their views on the matter through supplemental briefing. If the court fails to afford that opportunity, a rehearing shall be ordered upon timely petition of any party.

Because that did not happen here, a rehearing is mandatory. The Court of Appeal based its decision on the idea that APPELLANT waived his constitutional right to a trial on the merits and is estopped from arguing that the February 22, 2002 court stay requires reversal of the judgments. That was not briefed by any of the parties.

The Court of Appeal's decision states that all APPEALLANT had to do was notify the trial court that the bankruptcy court had lifted its stay. It is not APPELLANT'S role to read Judge Fruin's mind, nor does APPELANT have to the ability to do so. Judge Fruin's order states that the action is stayed pending the outcome of Grace's bankruptcy proceeding. Judge Fruin's stay order does notstate that the action is stayed while the bankruptcy stay is in effect.

The Court of Appeal's argument that APPELLANT lost his inviolate constitutional right to a jury trial because he did not inform Judge Fruin a bankruptcy stay had been lifted is an act of judicial gymnastics – makes no sense, is pulled out of the air. Furthermore, GRACE'S attorney rightly claimed at oral argument that GRACE itself informed Judge Fruin that the bankruptcy court had lifted the stay, and referred the Justices to a page in the record on appeal that shows proof of service that Judge Fruin was informed of the lifting of the bankruptcy stay by GRACE'S attorneys..

A party cannot involuntarily waive a constitutional right. There is no law or legal principle that supports the court's position that APPELLANT waived his constitutional right to a jury trial by not informing Judge Fruin that the Bankruptcy Court had lifted a stay order. This issue must be briefed.

III.   The Court of Appeal Is Required to Grant This Petition for

Rehearing Because It's Decision Is In Violation of State Policy.

The Court of Appeal's Decision Is Bad Public Policy.

The Policy of the State of California is to try actions on their merits. CCP §583.130.

IV.   The Court of Appeal Is Required to Grant This Petition for

Rehearing Because It's Decision Is A Violation of Appellant's Constitution

22

Rights.

APPELLANT has an inviolate constitution right to have his case tried before a jury under both the US Constitution and the California Constitution. See Seventh Amendment to US Constitution. See Section 16 of the California Constitution.

The Court of Appeal's January 22, 2020 decision does not discuss APPELLANT'S constitutional right to have a jury trial of his action.

V.    The Court of Appeal Is Required to Grant This Petition for

Rehearing Because In it's Decision the Court of Appeal is affirming that

APPELLANT was required to bring his action to trial within five years of

filing his Action.

The Five Year Rule Does Not Apply To Computation of Time Appellant Had To Bring Action ToTrial.

Because there was a mistrial the time which APPELLANT had to bring his action to trial was extended to three years after the mistrial and three years after lifting of the stay. The trial court granted respondents motions to dismiss before the deadline for APPELANT to bring his action to trial.

Because of the February 22, 2002 stay order the time APPELLANT had to bring his action to trial was suspended. See Rules of Court, Rule 3.515 (j). Also see CCP §583.340.

VI.    The Court of Appeal Is Required to Grant This Petition for

Rehearing Because the Court of Appeal's Decision Ignores

The New Trial; The Three Year Rule" (CCP §583.320 (a) (1)).

CCP §583.320 (a) (1) provides that if a new trial is granted after

a mistrial the action shall again to be brought to trial within

three years after the mistrial. A mistrial was granted in the

underlying action. Respondents' motion to dismiss were

brought and granted before the time Appellant had

to bring his action to trial. Therefore, the trial court's grant

of respondents' motion to dismiss for failure of Appellant

action to trial within the mandatory time must be reversed.

A mistrial was declared on December 11, 2001. Additionally, because of the February 22, 2002 stay order, the time APPELLANT had to bring his action to trial was suspended. See California Rules of Court, Rule 3.515 (j) Also see CCP §583.340 (b).

VII.   The Court of Appeal Is Required to Grant This Petition for

Rehearing Because The Court of Appeal's Decision Ignores

California Rules of Court, Rule 3.515 (j). Rule 3.525 (j)

provides the time during which any stay of proceedings

is in effect must not be included in determining whether

the action stayed should be dismissed for lack of prosecution.

A stay (Trial Judge Fruin's February 22, 2001 stay order) was

in effect at the time respondents' brought their motions to

dismiss for lack of prosecution and at the time respondents'

motions to dismiss for lack of prosecution were granted.

VIII.   The Court of Appeal Is Required to Grant This Petition for

Rehearing Because The Court of Appeal's Decision Ignores

the "tolling period" of CCP §583.340 (b).

24

CCP §583.340 (b)provides the 2-, 3-, and 5-year periods under CCP §§ 583.310, 583.320 (a)(1), and 583.420 are tolled for any time during which prosecution or trial of the action was stayed or enjoined.  Any period during which the statutes were tolled must be added to the date on which the statutory period for bringing an action to trail would otherwise end.

CCP §583.340 (b) extends the time the plaintiff has to bring an action to trial.  At the time respondents brought their motions to dismiss for lack of prosecution and at the time respondents' motions were grantedprosecution of Appellant's action was stayed by Trial Judge Fruin's February 22, 2002 stay order.

Therefore, Trial Judge Fruin's orders of dismissal and judgments of dismissal of Appellant's action against respondents must be reversed.

Additionally, at the time the insurance carriers respondents Truck Insurance Exchange (TRUCK), Interinsurance Exchange of the Automobile Club of Southern California (AUTO CLUB) and Coregis Group, Inc., Coregis Insurance Company and California Insurance Company (COREGIS ENTITIES) motions to dismiss were granted prosecution of Appellant's action against them was stayed by Trial Judge Fruin's January 5, 2000 order.

Judge Fruin's January 5, 2000 order totally forbid APPELLANT from bringing his action against the insurance carrier respondents to trial until after completion of a trial APPELLANT'S action against TERMITE CONTROL and GRACE.

IX.    The Court of Appeal Is Required to Grant This Petition for

Rehearing Because The Court of Appeal's Decision

Affirming Home Saving Termite Control Inc.' and

W.F. Morris (TERMITE CONTROL) motions to dismiss

under Code of Civil Procedure §583.420 (a) (3) (A) ignores the

Provisions of California Rule of Court Rule 3.515 (j)

and the provisions Code of Civil Procedure §353.340 (b) which provide

that the time any stay of proceedings is in effect must

not be included in determining whether the action

stayed should be dismissed for lack of prosecution.

Therefore the trial court's judgment of dismissal of

TERMITE CONTROL must be reversed.

Additionally, if CCP §583.420 (a)(3)(A) applied to APPELLANT'S action, which it doesn't before a court would be allowed to grant a discretionary dismissal under CCP §583.420 (a)(3)(A) to TERMITE CONTROL, TERMITE CONTROL would have to demonstrate actual prejudice, actual constraints on TERMITE CONTROL'S ability to defend against the allegations of Appellant's lawsuit. See Hutado v. Statewide Home Loan Co. (1985) 167 Cal.App.3d 1019.TERMITE CONTROL failed to do so in its motion to dismiss.

Additionally, CCP §583.420(a)(3)A) does not apply to Appellant's action. CCP §583.420 (a) (3) (A) only comes into effect after a new trial has been granted, then a new trial has begun, and after the second new trial has begun a mistrial is declared during the second or third or fourth, etc. etc., new trial. See California Civil Appellate Practice (Third Edition) Section 17.78 on pages 17-36 and 17-36.1.

X.    The Court of Appeal Is Required to Grant This Petition for

Rehearing Because Parties Are Entitled to An Opportunity

to Brief Issues.  APPELLANT was denied an opportunity to

brief issues.  Therefor the Court of Appeal is required

to grant this Petition for Rehearing.

The Court of Appeal's decision incorrectly states that the record indicates GRACE timely served its supplemental brief and declaration by fax on APPELLANT on December 10, 2016.  That is a complete misstatement.

GRACE was to serve its "Supplemental Brief"/Declaration on APPELLANT by fax on December 30, 2016. See Clerk's Transcript 398:26-38, CT. 398:1, and CT 401:22-27.

See Proof of Service in Clerk's Transcript on Page 356.  The Proof of Service indicates the Declaration of Roger Higgins was not served by fax on APPELLANT on December 30, 2016.

See Proof of Service of GRACE "Supplemental Brief" on Appellant on page 403 of the Clerk's Transcript on Appeal.  The Proof of Service indicates GRACE's "Supplemental Pleading" was not served by fax on APPELLANT.

See GRACE'S January 13, 2017 Reply to APPELLANT'S Opposition. Attached to GRACE'S "Reply: to APPELLANT'S new supplemental pleadings is the Liu declaration which refers t a fax conformation on page 429 of the Clerk's Transcript on appeal.

The fax confirmation indicates that 15 pages were faxed to APPELLANT on December 30, 2016.  The Declaration of Roger Higgins is 166 pages in length; the GRACE Supplemental Brief is 47 pages long.  Hence, the records prove that GRACE did not serve its pleading by fax on APPELLANT.

When defendants file a motion to dismiss for lack of prosecution they are required by Rule of Court, Rule 3.1342 to set the hearing at least 45 days after they serve their motion.  This gives the plaintiff time to read digest and consider the motion to dismiss pleadings before the hearing date.

By California Rules of Court, Rule 3.1342 (b), Plaintiffs are given 15 days after service of motion to dismiss in which to file an opposition.

In this case it was ordered by Judge Fruin that GRACE would serve its supplemental pleadings on APPELLANT by fax by no later than December 30, 2016 and that GRACE's motion to dismiss would be heard 17 days later, on January 16, 2017.

Instead of being given a minimum of 45 days to digest the voluminous new pleadings served by mail on Appellant, Appellant was given 17 days to digest that material.  However, GRACE'S pleadings were to be faxed to APPELLANT on December 30, 2016.  GRACE mailed but never faxed its 213 pages of new pleadings to APPELLANT.  That is a clear denial of due process.

GRACE'S original motion to dismiss – Notice of Motion, and Motion to Dismiss; Memorandum of Points and Authorities; Declaration of Jeffrey Z. Liu; (Proposed Order) – consisted of 26 pages and was served by mail on APPELLANT on November 18, 2016.

APPELLANT did not have time to study the additional 213 new pages of GRACE'S new pleadings served by mail on APPELLANT on December 30, 2017 before the January 17, 2017 hearing on GRACE'S motion to dismiss.

If you count the number of pages contained in each of the other respondents' motions to dismiss, and look at the timing of when their separate motions to dismiss were filed, and consider the voluminous discovery and discovery demands served on APPELLANT by TERMITE CONTROL you will clearly see that APPELLANT was denied the opportunity to brief issues.

XI.   The Court of Appeal Is Required to Grant This Petition for

Rehearing Because the Court of Appeal's Decision

Mischaracterizes the Facts, Misstates Important Facts,

Leaves Out Important Facts, Ignores Important Legal

Authority, Supports A False and Misleading

Narrative of What Appellant's Action is About,

Supports A False Narrative of What Appellant's

Appeals Are About, and Deprives the Public of

Important Information.

The January 22, 2020 decision is based upon issues which were not proposed or brief by any party.

ISSUE ONE: THAT APPELLANT WAIVED APPELLANT'S INVIOLATE CONSTITUTIONAL RIGHT TO A JURY TRIAL OF APPELLANT'S ACTION BY NOT INFORMING JUDGE FRUIN OF UNITED STATES BANKRUPTCY JUDGE CAREY'S MARCH 4, 2015 ORDER.

ISSUE TWO: THAT APPELLANT IS ESTOPPED FROM CLAIMING JUDGE FRUIN'S FEBRUARY 22, 2002 STAY ORDER STAYED PROSECUTION OF APPELLANT'S ACTION BECAUSE APPELLANT DID NOT INFORM JUDGE FRUIN OF UNITED STATES BANKRUPTCY JUDGE CAREY'S MARCH 4, 2015 ORDER.

ISSUE THREE: THAT MOVING PARTIES DO NOT HAVE THE BURDEN OF PROVING THAT THEY SERVED ALL NECESSARY PARTIES WITH A COPY OF THEIR MOTION TO DISMISS.

The court is well aware of how Government Code section 68081 works and how due process works.  See Falahati v. Kondo (2005) 127 Cal.App.4th 823.

The Kondo case was decided by Justice Johnson, Presiding Justice Perluss and Justice Zelon concurred.

Months after a judgment was entered, in order to assure compliance with Government Code section 68081, the court offered both sides the opportunity to submit letter briefs on an issue neither raised nor briefed by either party.

The court is well aware of the tremendous power the court has under Code of Civil Procedure sections 128 (a) (3), 128 (a) (5) and 128 (a) (8) and of the interplay of the constitutional right of due process to those sections of the Code Civil Procedure.

See The People v. The Los Angeles County Superior Court (George Vasquez, Real Party in Interest) (2018) 27 Cal.App.5th 36. The Vazquez decision was written by Justice Feuer, Presiding Justice Perluss, and Justice Zelon concurred.

The Court of Appeal prevented APPELLANT from fully presenting his appeals.  The court's order dated January 3, 2020 stating, *"... the merits of the case are not at issue at this time, and the court will not entertain argument pertaining to those issues"* is a denial of due process which prevented APPELLANT from fully presenting his appeal.

The court's order dated January 3, 2020 stating, *"The Court has read and considered appellant's January 2, 2020 request to file a supplemental brief and*

*additional documents, Good cause appearing therefor, IT IS HEREBY ORDERED that appellant's request is denied."* is a denial of due process which prevented APPELLANT from fully presenting APPELLANT'S appeal.

An appellate court opinion is a statement of the reasons for the appellate court's decision. See California Constitution art VI, §14. It usually contains a discussion of the facts and an explanation of the court's reasoning, including why it accepted or rejected the parties' legal contentions.

On the content and form of an opinion, See 9 Witkin, California Procedure, *Appeal* §§ 782-812 (5th ed 2008).

The function of an appellate opinion is to state the reasons that led the court to decide the case the way it did. Such a statement of reasons has value from the standpoint of the judges, litigants, and the legal profession in general.

*"Most commentators recognize the multiple functions of a judicial opinion and reject the notion that it should do not more than decide the controversy between the immediate parties. ... they maintain that important controversies should be decided by creative, thoughtful discussion of principles and precedents, looking beyond the particular litigants and litigation."* (Witkin, Manual on Appellate Court Opinions, §38.

Nowhere in its January 22, 2020 decision does the Court of Appeal mention that APPELLANT'S action is about SYLOID 244. Or that APPELLANT that the basis of APPELLANT'S action is the claim that SYLOID 244 is highly toxic, that SYLOID 244 was applied in APPELLANT'S condominium in such a way that it would continuously leak into APPELLANT'S condominium.

Nowhere in its January decision does the Court of Appeal mention that APPELLLANT alleges that SYLOID 244 was illegally manufactured by GRACE and illegally sold to TERMITE CONTROL for use as a pesticide.

Nowhere in its decision does the Court of Appeal mention that APPELLANT alleges that TERMITE CONTROL fraudulently represented that SYLOID 244 was a mineral, was not a chemical, that SYLOID 244 was not toxic, and that SYLOID 244 was approved by the US EPA for use as a pesticide.

Judge Fruin had in his court file and the Court of Appeal has in its files Violation Notices served on TERMITE CONTROL for illegal use of SYLOID 244, that state that SYLOID 244 was not registered with the EPA for use as a pesticide, therefore that GRACE illegally sold SYLOID 244 to TERMITE CONTROL and TERMITE CONTROL illegally applied SYLOID 244 in APPELLANT'S Home.

See deposition testimony of Greg Adams, California Structural Pest Control Board Specialist (Exhibit 65), deposition testimony of Jeffrey Humphrey's, Deputy Director, Consumer Protection Bureau, Department of Agricultural Commissioner Weights and Measures of the County of Los Angeles (Exhibit 66), and deposition testimony of David Duncan, Active Chief of the Enforcement Branch of the Environmental Protection Agency of the State of California (Exhibit 67) attached to APPELLANT'S "Motion to Consolidate Appeal Cases ..." filed in the Court of Appeal on October 23, 2019.

In 2000, GRACE filed motions for summary judgment and summary adjudication against APPELLANT in which GRACE claimed it was not unlawful for GRACE to sell its pesticide product SYLOID 244 to TERMITE CONTROL. TERMITE CONTROL filed motions for summary adjudication that it was not illegal for TERMITE CONTROL to apply SYLOID 244 in APPELLANT'S home and that SYLOID 244 is not dangerous.

Said motions were heard and denied by Judge Fruin. Judge Fruin had those motions in his file when he granted GRACE'S motion to dismiss and when he granted TERMITE CONTROL'S motion to dismiss. The Court of Appeal had a copy of Judge Fruin's ruling in its files when it affirmed Judge Fruin's dismissal of APPELLANT'S action against GRACE and TERMITE CONTROL.

The Court of Appeal has in its files references to page numbers in the record on appeal which contain Judge Fruin's ruling and reasoning for denial of GRACE'S motion for summary adjudication and reasoning for denial of TERMITE CONTROL'S motion for summary adjudication. See Clerk's Transcript on Appeal pages 184 and 185 for Appeal Case No. 287626. Judge Fruin concluded GRACE'S product SYLOID 244 was never registered with the EPA:

*"Grace's Syloid 244 has never been registered with the EPA. There is no FDA-approved label for Syloid 244."* See top of page 189 of record on appeal B287626.

Most importantly Judge Fruin had in his files when he granted GRACE'S motion to dismiss and when he granted TERMITE CONTROL'S motion to dismiss and the Court of Appeal had in its files when it affirmed Judge Fruin's dismissal of APPELLANT'S action against GRACE and TERMITE CONTROL the Declaration of Peter J. Novak dated November 6, 2000 – see pages 98 through 120 of volume 1 of clerk's supplemental transcript. Judge Fruin relied on Peter Novak declaration in reaching his conclusion that SYLOID 244 is dangerous. Furthermore, GARCE provided SYLOID 244 to TERMITE CONTROL *"with a label containing a health warning against its use in a manner that would expose a person to breathing the product or making skin contact with the product. The Woodcock declaration states, in essence, that Termite's Control's method of application of the Syloid 244 product would or could cause aspiration or other contact with the desiccant. The court in light of Grace's label warning, cannot find there is no triable issue as to whether unprotected contact with Syloid 244 caused human injury."* See page 192 of clerk's record on appeal for Appeal Case No. B287626.

Judge Fruin had in his file and the Court of Appeal has in its file a excerpt of a report at a symposium sponsored by GRACE that fine particles of amorphous silica gel (the active component in SYLOID 244) would kill a rat if it were injected in dry form into the lungs of a rat. See Exhibit 12 to APPELLANT'S "Second Motion to Take Judicial Notice of Evidence of Dangerous Properties of Desiccant SYLOID 244" filed in the Court of Appeal on December 19, 2019.

The Court of Appeal has in its files and Judge Fruin had in his files: [A] A copy of the TERMITE CONTROL Information Book given to consumers (Exhibit 10 to motion filed in Court of Appeal on December 19, 2019) in which TERMITE CONTROL fraudulently represents that SYOID 244 is not a chemical, it is a natural mineral, it is safe, and it has been approved by the US EPA. See Exhibit 10 to motion filed in Court of Appeal on December 19, 2018. [B] Letter dated March 6, 1993 from California Structural Pest Control Board to Wayne Morris/Home Saving Termite Control, informing Mr. Morris that amorphous silica gel is not a "non-chemical" product, ordering Mr. Morris to cease and desist claiming that it is:

*"Another thing I want to point out to you is that borates and silica gel are non "non-chemical" products. They are pesticide chemicals and this is exactly why they are required to be registered with the EPA and the DPR. To suggest and state otherwise as you do is false advertising and you must CEASE AND DESIST this immediately."* See Exhibit 14 to motion filed in Court of Appeal on December 19, 2018. The Court of Appeal also has in its files [C] California Structural Pest Control Board "Notice of Violation" No. 0243 dated December 16, 1996, issued to Home Saving Termite Control, Inc.; and [D] California Department of Pesticide Regulation Pesticide Enforcement Branch "Violation Notice" No. V95-12-96/97 dated December 16, 1996, issued to Home Saving Termite Control, Inc. Which are attached as Exhibit 16 and 17 to motion filed in Court of Appeal on December 19, 2018.

Both Judge Fruin and the Court of Appeal have in its files an official complaint made under penalty of perjury, dated 2/27/87, in the records of the Structural Pest Control Board, made by Sherry Kaufman in whose home SYLOID 244 was applied by TERMITE CONTROL. When she entered her home after TERMITE CONTROL'S application of SYLOID 244 in her home, she immediately began having health problems such as burning chest, burning mucous membranes. Over time her symptoms got worse. She visited Charles Schnider (spelling?) DDS, M.D. who diagnosed her as having esophagitis and gastritis (spelling?) due to inhaling irritant silica gel. She asked for the EPA approved pesticide label from Mr. Morris, which was never forthcoming. Inspector John Cervantes who took Ms. Kaufman's report investigated to find out if Mr. Morris had correctly reported the pesticide he was using in the monthly pesticide use reports he made to the appropriate government agency. Inspector Cervantes found out Mr. Morris did not. See pages 81 through 85 of Volume 1 of Supplemental Clerk's Transcript on Appeal for Appeal Case No. 287626 mislabeled Appeal Case No. B286138.

Ms. Kaufman's complaint was that when she came home after the SYLOID 244 application to kill termites and inhaled in the air in her home it was full of SYLOID 244. The SYOLID 244 burned her throat. She went to see a doctor. Her doctor reported to her that inhaling SYLOID 244 burned her esophagus.

Judge Fruin and the Court of Appeal have in their files the written brochure handed out by TERMITE CONTROL which falsely represents the properties of SYLOID 244 given to APPELLANT'S wife Alice Graham, the Declaration of Peter J. Novak, and the testimony of government employee Greg Adams, who investigated APPELLANT'S complaint.  Peter Novak's and Greg Adam's testimony state clearly that the method TERMITE CONTROL uses to apply SYLOIDF 244 in homes is unsafe, that SYOLID 244 is toxic, that SYLOID 244 is inherently dangerous, and that the SYLOID 244 applied in APPELLANT'S home came out of the walls in APPELLANT'S home,  and that SYLOID 244 applied in the walls of other people's homes will come out of wall voids in other people's homes.

The use of pesticides is highly regulated in the State of California and by the Federal government.

The decision of the Court of Appeal does not discuss California Food & Agriculture Code sections 11737, 11791 (a), 11791 (b), 11791 (c), 11791 (d), 11891, 12842, 12972, 12980, 12991 (a), 12991 (c), 12991 (d) 12991 (e), 12993, or 12995 which are code sections which regulate the use and sale of pesticides in California, nor does it discuss United States Code Section 136 (a) which regulates the use of pesticides.

APPELLANT alleges that TERMITE CONTROL violated all of them. Government Agencies in charge of regulation of Pesticides in California agree that it was against the law for TERMITE CONTROL to apply SYLOID 244 in APPELLANT'S home.  TERMITE CONTROL falsely represented in its reports to government regulators that it was not using SYLOID 244 while it was using SYLOID 244.

The public has a right to know these things. See California Constitution Section 3(b) (1).

Judge Fruin declared a mistrial of APPELLANT'S action which began on December 3, 2001 and ended on December 11, 2001.

APPELLANT filed an Expert Witness List Information document on April 25, 2001 which stated that APPELLANT intended to call 23 expert witnesses at

5. Must the Court of Appeal consider the impact of its decision on the judicial system, on the judiciary and on the public at large?

6. What does California Rules of Court, Rule 3.1342(e)(1) [specifying what judges must consider when ruling on a motion to dismiss] mean: *In ruling on the motion, the court must consider "(e) Relevant Matters*
*all matters relevant to a proper determination of the motion, including (1) The court's file in the case and the declarations and supporting data submitted by the parties ... "* ?

7. What constitutes a ***"fraud on the court"?***

8. Must the Court of Appeal, and the trial court, consider the ***"unclean hands"*** doctrine codified in California Civil Code section 3517 (*"No one can take advantage of his own wrong."*) when ruling on a motion to dismiss for failure to timely bring an action to trial?

9. Is there such a thing as an ***"obsolete stay"?***

10. Is there a reasonable diligence to bring an action to trial requirement prerequisite to the application of California Code of Civil Procedure section 583.340 subdivision (b), which provides: *"In computing the time within which an action must be brought to trial pursuant to this article, there shall be excluded the time during which any of the following conditions existed: (b) Prosecution of trial of the action was stayed or enjoined."*?

11. Can a plaintiff or cross-complainant be ***"estopped"*** from claiming a state court stay order tolls the time in which that party must bring their action to trial?

12. What constitutes an abuse of California Rules of Court, Rule 8.1115 (a) which provides that: *"Except as provided in (b), an opinion of the Court of Appeal...that is not certified for publication or ordered published must not be cited or relied on by a court or party, and nay action. (b) Exception  An unpublished opinion may be cited or relied on: (1) When the opinion is relevant under the doctrines of law of the case, res judicata, or collateral estoppel; or (2) When the opinion is relevant to a criminal or disciplinary action because it states reasons for a decision affecting the same defendant or respondent in another action."*

13. What constitutes an abuse of Government Code section 68081 which provides that before an appellate court *"renders a decision in a proceeding other*

that trial scheduled to commence on December 3, 2001. Judge Fruin said he cancelled the trial because to continue the trial would interfere with his Christmas vacation. See pages 22, 23, and 24 of Volume 1 of Clerk's Supplemental Transcript on Appeal for Appeal case B286738.

On May 15, 2017, Judge Fruin set APPELLANT'S second trial against TERMITE CONTROL to commence on October 2, 2017 at 9:30 a.m. in his courtroom. On September 29, 2017 – the Friday before October 2, 2017 trial date, Judge Fruin declared that he was going to grant TERMITE CONTROL'S motion to dismiss APPEALLANT'S action against TERMITE CONTROL.

The public has the right to know that. See California Constitution Section 3 (b) (1).

These are issues of great significance to a large segment of the population.

The opinion also does not discuss violations of the Rules of Professional Responsibility by the other attorney in this action.

The other attorneys failed to advise the Superior Court and failed to advise the Court of Appeal that CCP §583.320 provides that if a mistrial is declared the plaintiff has three years from the date of mistrial in which to bring his action to trial. Under Rules of Professional Conduct Rule 3.3 (a) (1) and 3.3 (a) (2), they were required to inform both the Superior Court and the Court of Appeal.

The positions that opposing counsel took in the underlying action and in the appeals were not warranted under existing law. That is a violation of Rules of Professional Conduct Rule 3.1 (a) (2).

They overwhelmed APPELLANT by filing voluminous pleadings, sequentially in such a way as to deny APPELLANT the opportunity to brief issues. That is a violation of Rules of Professional Conduct, Rule 3.2.

See The People v. The Los Angeles County Superior Court (George Vazquez, Real Party in Interest (2018) 27 Cal.App.5th 36; Saterfield v. Garmine (1967) 65 Cal.2d 638; Chambers v. Nasco, Inc. (1991) 501 U.S. 32

## CONCLUSION

For all the foregoing reasons APPELLANT'S Petition for Rehearing should be granted.

February 10, 2020

Respectfully submitted, *[signature]*

_____

Gary Smolker, Attorney in Pro Per

for Cross-complainant and Appellant Gary Smolker

## CERTIFICATE OF COMPLIANCE

Pursuant to California Rules of Court, rule 8.204(c)(1) I hereby certify that Appellant's Petition for Rehearing is a total of 7,665 pages, including information of cover pages, etc., as counted by the word processing program used to generate it.

February 10, 2020

By: _____ *[signature]*

Gary Smolker, in Pro Per

Attorney for Cross-complainant and Appellant Gary Smolker

*TIG Insurance Company vs. Gary Smolker, etal.*

Court of Appeal Case Nos. B281406, B286138, B287626, B289828

<u>COMBINED PROOF OF SERVICE FOR ALL PENDING APPEAL CASES</u>

I am a resident of the State of California, over the age of eighteen years, and not a party to this action. My business address is 16055 Ventura Blvd., Suite 525, Encino, CA. 91436. On February 10, 2020, I served the following titled and attached document:

**Petition for Rehearing**

  **X**  VIA MAIL, by placing a true copy of the document(s) listed above in a sealed envelope with postage fully prepaid in United States mail in the State of California at Encino, California, addressed as set forth in the attached service list:

See attached list.

I am familiar with the Smolker Law Firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on the same day with the postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on February 10, 2020, at Encino, California.

Giuliana Asturias

Combined Service List

TIG Insurance Co. V Gary Smolker, et. Al.
LASC Case No. BC173952
Appeal Case Nos. B281406, B286138, B287626, B289828

## SERVICE LIST
*Smolker v. W.R. Grace & Co., et al.*
Second Appellate District, Division Seven, Case No. B281406
Superior Court of Los Angeles County, Case No. BC173952

ROSEMARIE S. LEWIS (158891)
JEFFREY Z. LIU (276849)
BORTON PETRINI, LLP
626 Wilshire Boulevard, Suite 975
Los Angeles, CA 90017
(213) 624-2869
Rlewis@bortonpetrini.com
Jliu@bortonpetrini.com
*Attorney for Cross-Defendants and Respondents*
  *W.R. Grace & Co. And Grace Davidson*

*(Served via United States Postal Service)*

<u>SERVICE LIST</u>

*Smolker v. Truck Insurance Exchange, et al.*
Second Appellate District, Division Seven, Case No. B286155
Los Angeles County Superior Court, Case No. BC173952

PETER SCHWARTZ #109859
STEVEN R. INOUYE #245024
GORDON & REES LLP
633 W. 5th Street 52nd Floor
Los Angeles, CA 90071
Pschwartz@grsm.com
Sinouye@grsm.com

*Attorney for Cross-Defendant and Respondent*
  *Truck Insurance Exchange*

*(Served via Unites States Postal Service)*


ROBERT DANIEL HOFFMAN #123458
CHARLSTON, REVICH & WOLLITZ LLP
1925 Century Park East, Suite 320
Los Angeles, CA 90067
County: Los Angeles County
Rhoffman@crwllp.com

*Attorneys for Cross-Defendants and Respondents*
*Coregis Group, Inc., Coregis Insurance Co., and California Insurance Company*

*(Served via Unites States Postal Service)*

RAUL LUIS MARTINEZ #82465
ELISE DALE KLEIN #111712
LEWIS BRISBOIS BISGAARD & SMITH LLP
633 W. 5th Street, Suite 4000
Los Angeles, CA 90071
Martinez@lbbslaw.com
Klein@lbbslaw.com

*Attorneys for Cross-Defendant and Respondent*
*Interinsurance Exchange of the Automobile Club of So. Cal*

*(Served via Unites States Postal Service)*

Smolker v. Home Saving Termite Control, Inc., et al.
LASC Case No. BC173952, APPEAL CASE NO. 287626

## SERVICE LIST

Mark Kincaid, Esq.
26 Alhaja Way
Hot Springs Village,
Arkansas, 71909
Tel: 714-955-6955
Fax: 714-784-0540
Email: mkincaid@kincaidlaw.com

Attorneys for Home Savings
Termite Control, Inc., Wayne
Morris

Robert Hoffman, Esq. SB #123458
Charleston, Revich & Wollitz LLP
1925 Century Park East, Suite 320
Los Angeles, CA 90067
Tel: 310-551-7040
Fax: 310-203-9321
Email: rhoffman@crwllp.com

**Attorneys for Goregis Group Inc., Goregis Insurance Co., California Insurance Co.**

Lewis Brisbois Bisgaard & Smith LLP
Raul Martinez SB# 82465
Elise D. Klein SB# 111712
633 West 5th Street, Suite 4000
Los Angeles, CA 90071
Tel: 213-250-1800
Fax: 213-250-7900
Email: Martinez@lbbslaw.com

Email: Elise.Klein@lewisbrisbois.com

**Attorneys for Inter-Insurance Exchange of the
Automobile Club of Southern California**

Smolker v. Home Saving Termite Control, Inc., et al.
LASC Case No. BC173952, APPEAL CASE NO. 287626

Smolker v. Home Saving Termite Control, Inc., et al.
LASC Case No. BC173952, APPEAL CASE NO. 289828

## SERVICE LIST

APPEAL CASE NO. 289828

Mark Kincaid, Esq. SB#118640
26 Alhaja Way
Hot Springs Village,
Arkansas, 71909
Tel: 714-955-69955
Fax: 714-784-2546
Email: mkincaid@mkincaidlaw.com

**Attorneys for Home Savings
Termite Control, Inc., Wayne
Morris**

SERVICE LIST

Clerk of the Los Angeles Superior Court

111. North Hill Street

Los Angeles. CA  90012-3014

# EXHIBIT 13

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
SECOND APPELLATE DISTRICT

DIVISION 7

GARY SMOLKER,
Plaintiff and Appellant,
v.
W. R. GRACE & CO. et al.,
Cross-defendants and Respondents.

B281406, B286138, B287626
Los Angeles County Super. Ct. No. BC173952

COURT OF APPEAL – SECOND DIST.

FILED

Feb 13, 2020

DANIEL P. POTTER, Clerk

muribe                    Deputy Clerk

THE COURT:

Petition for rehearing is denied.

\* _____

EXHIBIT

14

<u>Appeal Nos. B281406, B286138, B287626 and B289828</u>

## COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

B281406

### GARY SMOLKER,

Cross-Complainant and Appellant,

v.

### W.R. GRACE & CO.  and GRACE DAVISON

Cross-defendants and Respondents.

B286138

### GARY SMOLKER,

Cross-complainant and Appellant

v.

### TRUCK INSURANCE EXCHANGE, et al.,

Cross-defendants and Respondents.

B287626

### GARY SMOLKER,

Cross-complainant and Appellant,

v.

### HOME SAVING TERMITE CONTROL, INC., et al.

Cross-defendants and Respondents.

1

On Appeal from the Orders of the Superior Court of California

for the County of Los Angeles

Honorable Richard Fruin, Jr., Judge Presiding (BC 173952)

## APPELLANT GARY SMOLKER'S PETITION FOR REHEARING OF DECISIONS OF THE COURT OF APPEAL FILED ON JANUARY 22, 2020 IN APPEAL CASES B281406, B286138, and B287626

Gary Smolker (56117)

Attorney in Pro Per for Appellant Gary Smolker

16055 Ventura Blvd. Suite 525

Encino, California 91436

Phone: (818) 788-7290

Fax: (818) 990-0120

gsmolker@aol.com

TO BE FILED IN THE COURT OF APPEAL                                          APP-008

| | COURT OF APPEAL CASE NUMBER: |
|---|---|
| T OF APPEAL    SECOND APPELLATE DISTRICT, DIVISION SEVEN | B281405 |

| ATTORNEY OR PARTY WITHOUT ATTORNEY    STATE BAR NUMBER: 56117 | SUPERIOR COURT CASE NUMBER: |
|---|---|
| NAME: GARY SMOLKER, IN PRO PER | BC173952 |
| FIRM NAME: | |
| STREET ADDRESS: 16055 VENTURA BOULEVARD, SUITE 525    ZIP CODE: 991436 | |
| CITY: ENCINO    STATE: CA | |
| TELEPHONE NO.: (818) 788-7290    FAX NO.: | |
| E-MAIL ADDRESS: GSMOLKER@AOL.COM | |
| ATTORNEY FOR (name): | |

| APPELLANT/ GARY SMOLKER |
|---|
| PETITIONER: |
| RESPONDENT/    W.R. GRACE & CO., ET AL. |
| REAL PARTY IN INTEREST: |

## CERTIFICATE OF INTERESTED ENTITIES OR PERSONS

(Check one):  [ x ] INITIAL CERTIFICATE    [ ] SUPPLEMENTAL CERTIFICATE

**Notice:** Please read rules 8.208 and 8.488 before completing this form. You may use this form for the initial certificate in an appeal when you file your brief or a prebriefing motion, application, or opposition to such a motion or application in the Court of Appeal, and when you file a petition for an extraordinary writ. You may also use this form as a supplemental certificate when you learn of changed or additional information that must be disclosed.

1.  This form is being submitted on behalf of the following party (name ):

a. [ x ] There are no interested entities or persons that must be listed in this certificate under rule 8.208.

b. [ ] Interested entities or persons required to be listed under rule 8.208 are as follows:

| Full name of interested entity or person | Nature of interest (Explain): |
|---|---|
| (1) | |
| (2) | |
| (3) | |
| (4) | |
| (5) | |

[ ] Continued on attachment 2.

The undersigned certifies that the above-listed persons or entities (corporations, partnerships, firms, or any other association, but not including government entities or their agencies) have either (1) an ownership interest of 10 percent or more in the party if it is an entity; or (2) a financial or other interest in the outcome of the proceeding that the justices should consider in determining whether to disqualify themselves, as defined in rule 8.208(e)(2).

Date: JANUARY 24, 2018    February 24, 2020

GARY SMOLKER
(TYPE OR PRINT NAME)    (SIGNATURE OF APPELLANT OR ATTORNEY)

Page 1 of 1

| Form Approved for Optional Use | CERTIFICATE OF INTERESTED ENTITIES OR PERSONS | Cal. Rules of Court, rules 8.208, 8.488 |
|---|---|---|
| Judicial Council of California | | www.courts.ca.gov |
| APP-008 [Rev. January 1, 2017] | | |

TO BE FILED IN THE COURT OF APPEAL                                      APP-008

COURT OF APPEAL       SECOND APPELLATE DISTRICT, DIVISION  SEVEN

COURT OF APPEAL CASE NUMBER:
B286135

ATTORNEY OR PARTY WITHOUT ATTORNEY:        STATE BAR NUMBER:  55117
NAME  GARY S. SMOLKER
FIRM NAME  SMOLKER LAW FIRM
STREET ADDRESS: 16055 VENTURA BOULEVARD, SUITE 525
CITY  ENCINO                    STATE:  CA     ZIP CODE:  91436
TELEPHONE NO.  (818) 788-7290            FAX NO.:
EMAIL ADDRESS:  GSMOLKER@AOL.COM
ATTORNEY FOR (name):   ATTORNEY IN PRO PER FOR APPELLANT GARY SMOLKER

SUPERIOR COURT CASE NUMBER:
BC173952

APPELLANT/   GARY SMOLKER
PETITIONER:

RESPONDENT/        TRUCK INSURANCE EXCHANGE, ET AL.
REAL PARTY IN INTEREST:

CERTIFICATE OF INTERESTED ENTITIES OR PERSONS

Check one):   [ X ]  INITIAL CERTIFICATE    [  ]  SUPPLEMENTAL CERTIFICATE

Notice:  Please read rules 8.208 and 8.488 before completing this form. You may use this form for the initial certificate in an appeal when you file your brief or a prebriefing motion, application, or opposition to such a motion or application in the Court of Appeal, and when you file a petition for an extraordinary writ. You may also use this form as a supplemental certificate when you learn of changed or additional information that must be disclosed.

This form is being submitted on behalf of the following party (name ):

[ X ]  There are no interested entities or persons that must be listed in this certificate under rule 8.208.

b.  [  ]   Interested entities or persons required to be listed under rule 8.208 are as follows:

| Full name of interested entity or person | Nature of interest (Explain): |
|---|---|
| 1) | |
| 2) | |
| 3) | |
| 4) | |
| 5) | |

[  ]  Continued on attachment 2.

The undersigned certifies that the above-listed persons or entities (corporations, partnerships, firms, or any other association, but not including government entities or their agencies) have either (1) an ownership interest of 10 percent or more in the party if it is an entity; or (2) a financial or other interest in the outcome of the proceeding that the justices should consider in determining whether to disqualify themselves, as defined in rule 8.208(e)(2).

DATE: FEBRUARY 25, 2019     February 19, 2020     Feb, 20, 2020

SMOLKER
(TYPE OR PRINT NAME)                            (SIGNATURE OF APPELLANT OR ATTORNEY)

Page 1 of 1

CERTIFICATE OF INTERESTED ENTITIES OR PERSONS

Form Approved for Optional Use
Judicial Council of California
APP-008 [Rev. January 1, 2017]

Cal. Rules of Court, rules 8.208, 8.488
www.courts.ca.gov

TO BE FILED IN THE COURT OF APPEAL                                    APP-008

| COURT OF APPEAL: SECOND APPELLATE DISTRICT, DIVISION SEVEN | COURT OF APPEAL CASE NUMBER: B297626 |

| ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER: 50117 | SUPERIOR COURT CASE NUMBER: |

GARY S. SMOLKER
NAME: SMOLKER LAW FIRM
ADDRESS: 16055 VENTURA BOULEVARD, SUITE 525
ENCINO                                STATE: CA    ZIP CODE: 91436
PHONE NO.: (818) 788-7290             FAX NO.:
E-MAIL ADDRESS: GSMOLKER@AOL.COM
ATTORNEY FOR (name): ATTORNEY IN PRO PER FOR APPELLANT GARY SMOLKER

BC173952

APPELLANT/
PETITIONER: GARY SMOLKER

RESPONDENT/
REAL PARTY IN INTEREST: HOME SAVINGS TERMITE CONTROL INC., ET AL.

## CERTIFICATE OF INTERESTED ENTITIES OR PERSONS

(Check one):  [X] INITIAL CERTIFICATE  [ ] SUPPLEMENTAL CERTIFICATE

Notice: Please read rules 8.208 and 8.488 before completing this form. You may use this form for the initial certificate in an appeal when you file your brief or a prebriefing motion, application, or opposition to such a motion or application in the Court of Appeal, and when you file a petition for an extraordinary writ. You may also use this form as a supplemental certificate when you learn of changed or additional information that must be disclosed.

1. This form is being submitted on behalf of the following party (name):

2. [ ] There are no interested entities or persons that must be listed in this certificate under rule 8.208.

[ ] Interested entities or persons required to be listed under rule 8.208 are as follows:

| Full name of interested entity or person | Nature of interest (Explain): |
|---|---|
| | |

[ ] Continued on attachment 2.

The undersigned certifies that the above-listed persons or entities (corporations, partnerships, firms, or any other association, but not including government entities or their agencies) have either (1) an ownership interest of 10 percent or more in the party if it is an entity; or (2) a financial or other interest in the outcome of the proceeding that the justices should consider in determining whether to disqualify themselves, as defined in rule 8.208(e)(2).

Date: FEBRUARY 26, 2019    Feb 26, 2020

SMOLKER
(TYPE OR PRINT NAME)                        (SIGNATURE OF APPELLANT OR ATTORNEY)

Page 1 of 1

Form Approved for Optional Use
Judicial Council of California
APP-008 [Rev. January 1, 2017]

Cal. Rules of Court, rules 8.208, 8.488
www.courts.ca.gov

5

CLERK'S OFFICE
COURT OF APPEAL-SECOND DIST.
**RECEIVED**

FEB 2 0 2020

DANIEL P POTTER                    Clerk

Appeal Nos. B281406, B286138, B287626 and B289828

# COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

---

### B281406

### GARY SMOLKER,

Cross-Complainant and Appellant,

v.

### W.R. GRACE & CO.  and GRACE DAVISON

Cross-defendants and Respondents.

---

### B286138

### GARY SMOLKER,

Cross-complainant and Appellant

v.

### TRUCK INSURANCE EXCHANGE, et al.,

Cross-defendants and Respondents.

---

### B287626

### GARY SMOLKER,

Cross-complainant and Appellant,

v.

### HOME SAVING TERMITE CONTROL, INC., et al.

Cross-defendants and Respondents.

1

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES

I.    INTRODUCTION – At Best the Three Justices Who Signed the
      January 22, 2020 Decision Have Simply Not Done Their Due
      Diligence and are Uninformed.  The Court's Decision is
      Not Well Reasoned, Is not supported by the Law, and is
      Not Supported by the Facts.

II.   The Court of Appeal Does Not Understand the Appeal Cases
      Before It

      II [A].W.R. Grace & CO. and Grace Davidson (GRACE) Knowingly
      Put People's Health at Risk for Profit and Then
      Knowingly-covered up Their Putting Profits before People's Health
      and Welfare

      II [B]. GRACE and their Attorneys Knowingly Violated California
      Rules of Court, Rule 8.115 which provides,
      *(a) Unpublished Opinions*
      *Except as provided in (b), an opinion of a California Court of Appeal*
      *...that is not certified for publication or ordered published **must** not*
      *be cited or relied on by a court or a party in any other action.*
      *(b) Exception*
      *An unpublished opinion may be cited or relied on: (1) When the opinion*
      *is relevant under the doctrines of law of the case, res judicata, or collateral*
      *estoppel; or (2)When the opinion is relevant to a criminal or disciplinary*
      *action because it states reasons for a decision affecting the same defendant*
      *or respondent in another such action.*

      II [C]. Governmental Regulatory Authorities and the Trial Judge
      Determined that GRACE illegally manufactured and then illegally
      sold the toxic pesticide product SYLOID 244 (consisting of
      synthetically manufactured three micron particulates of amorphous
      silica gel) to Home Saving Termite Control, Inc. and W.F. Morris
      (TERMITE CONTROL), and that SYLOID 244 was then illegally
      applied in Appellant Gary Smolker's (APPELLANT'S) home.

6

[II. C1]. A question not addressed in the Court of Appeal's decision is whether SYLOID 244 is manmade manufactured asbestos.

[II. C2]. Another question not addressed in the Court of Appeal decision is whether injury from exposure to SYLOID 244 should be treated as injury an asbestos related injury.

Il [D]. Governmental Regulatory Authorities testified that TERMITE CONTROL unlawfully failed to report that TERMITE CONTROL was using SYLOID 244 in monthly pesticide usage reports TERMITE CONTROL is/was legally required to make to State and local regulatory authorities.

II [E]. The Court has well established equitable powers under Code of Civil Procedure sections 128 (a) (3), 128 (a) (5), 128 (a) (8) and Civil Code section 3517 to make sure that APPELLANT'S action against GRACE and TERMITE CONTROL gets adjudicated. The People v. The Los Angeles Superior Court (George Vasquez, Real Party in Interest) (2018) 27 Cal.App.5th 36.

II [F]. APPELLANT'S action is part of the "War Against Cancer." The legislature has enacted a special statute of limitations (Code of Civil Procedure section 340.2) for injury or illness caused by exposure to asbestos. SYLOID 244 is a synthetically manufactured form of asbestos.

II [G]. The California Supreme Court in Hamilton v. Asbestos Corp., Ltd. (2000) 22 Cal.4th 1127 recognized that one's exposure to asbestos – by inhaling small asbestos fibers – causes inflammation and scar tissue in the lungs, which over time causes asbestosis in the lungs, can cause a cancer, frequently mesothelioma, in the abdominal cavity, and can cause yet other additional types of cancers in other parts of the body.

II [H]. The very same lung injuries have been observed when very small particles of the synthetic asbestos product SYLOID 244 enter the lungs. *"Health Effects of Synthetic Silica Particulates"*, American Society for Testing and Materials Special Technical Publication 732 (1981), page 22. See Exhibit 12

7

to APPELLANT'S "Second Motion to Take Judicial Notice of
Evidence of Dangerous Properties of Desiccant SYLOID 244"
Filed in the Court of Appeal on December 19, 2019.  The Symposium
On Health Effects of Synthetic Silica Particulates was held
Nov. 5-6, 1979 in Benalmadena-Costa (Torremolinos) Spain.
Davison Chemical Division, W.R. Grace & Co. was one of
the sponsors of the symposium.

II [I]. In <u>Hamilton</u> the California Supreme Court points out
that it is the size of the asbestos fibers that make inhaling
asbestos fibers dangerous.
*Airborne asbestos fibers are inhaled*
*into the lungs and pass into the airways. Many are intercepted*
*and rejected by the clearance mechanisms of the airways,*
*but fibers that are not intercepted my reach the alveoli.*
***Fibers smaller than 50 microns in length are able to enter***
***the alveoli. fn. 3 Fibers that enter the alveoli are deposited***
***on the tissue surface and attract <u>macrophages</u>, white blood***
***cells that attempt to absorb and eliminate the fibers. This***
***effort fails, and causes an inflammation that in turn***
***stimulates <u>fibroblasts</u> – specializes cells that make connective***
***tissue – to increase their production of such tissue.***

***The result is <u>fibrosis</u> or scarring, a gradual but irreversible***
***thickening and stiffening of the connective tissue. fn.4.***
***Asbestos disease is <u>dose-reponse related:</u> the longer or the***
***more intense the asbestos exposure, the greater the injury.***
***In addition, scarring continues even after the victim is no***
***longer exposed to asbestos, because the fibers remain***
***embedded in the connective tissue and the tissue continues***
***to react to them.***

***The scarring process makes the connective tissue***
***Increasingly resistant to gas exchange, and the affected***
***Alveoli eventually cease to function. If [22 Cal.4ᵗʰ 1135]***
***enough alveoli are thus affected, a characteristic symptom***
***of asbestosis appears: increasing shortness of breath***
***under exertion.***  **EMPHASIS ADDED**

II. [I] The SYLOID 244 product consists of three micron particles

8

of silicon dioxide.

II [J]. Cancer is the Emperor of all Maladies. Cancer and
liability for asbestos related disease is of wide public concern.
In the Hamilton case more than 10 amicus attorneys appeared for
Plaintiff and Respondent Hamilton.

I am informed and believe asbestos is defined in a publication
entitled "The Physical and Molecular Structure of Asbestos" by
Richard Gaze. 1965 – Annals of the New York Academy of
Sciences – Wiley as follows:

*The name "asbestos" is used to describe any mineral that breaks
down into fibers when it is crushed or processed.*

III.    The Court of Appeal's Decision Omits or Misstates
        Issues and Important Material Facts

III [A]. In its decision, the court states that APPELLANT appeals
the denial of his motion to tax costs claimed by TERMITE
CONTROL in Appeal Case No. B287636.  That is not true.
APPELLANT appeals his motion to tax costs claimed by
TERMITE CONTROL in Appeal Case No. B289828.  Appeal
filed on May 2, 2018 from judgment filed on March 5, 2018.
On October 23, 2019, APPELLANT filed a motion to consolidate
appeals.  On November 5, 2019, the court denied APPELLANT'S
motion to consolidate appeals.

III [B]. On February 22, 2019 APPELLANT filed an application for
extension of time to file APPELLANT'S Opening Brief in Appeal Case
No. B287626 to April 3, 2019 and filed a separate application for
extension of time to file APPELLANT'S opening brief in Appeal
Case No. B286138 to April 3, 2019.  APPELLANT filed his Opening Briefs
in Case No. B287626 and Case No. B286138 on February 25, 2019.
APPELLANT'S request for extension of time were denied with the "note"
request is moot, appellant filed opening brief

III [C]. At the bottom of page 19 and top of page 20 of  APPELLANT'S
Opening Brief in Case No. B287626,

9

APPELLANT states, *The Court of Appeal has imposed a time limit of February 25, 2019 for SMOLKER to file SMOLKER'S Appellant's Opening Brief in Appeal case B287626 and also simultaneously imposed a time limit of February 25 2019 on SMOLKER to filed SMOLKER'S Appellant's Opening Brief in Appeal Case No. 286138.*

*The time limit of February 25, 2019 imposed by the Court of Appeal on filing SMOLKER'S Appellant Opening Brief in Appeal Case No. B286138 and imposed by the Court of Appeal in filing SMOLKER'S Appellant's Opening Brief in Appeal Case No. B287626 does not allow SMOLKER enough time to discuss the above listed issues.*

*On February 22, 2019, SMOLKER filed an application for extension of time to file Appellant's Opening Brief Amount in this appeal case, Appeal Case B286138.*

*If the Curt grants SMOLKER's application for more time to file Appellant's Opening Brief, SMOLKER will do so.*

III [D]. The Los Angeles County Superior Court Civil Appeals Unit made it impossible for APPELLANT to brief Appeal Case No. 287626 by imposing a ten day limit of time for APPELLANT to hand deliver 27 missing documents to  the Los Angeles Superior Court, Central
Appeals Unit, 111 North Hill St., Room 111A, Los Angeles, CA 90012. See pages 3253 through 3258 of  Volume 14 of Clerk's Transcript on Appeal for Appeal Case No. B287626.

IV [E]. The court misconstrues Code of Civil Procedure section 583.340 (b), misinterprets Bruce v. E-Commerce Exch., Inc. (2011) 51 Cal.4[th] 717, and fails to mention and discuss controlling case authority on the issue of whether there is a reasonable diligence requirement prerequisite to the application of 583.340 (b): Ocean Services Corp. v. Ventura Port District (1993) 15 Cal.App.4[th] 1762; Brock v. Kaiser Foundation Hospitals (1992) 10 Cal.App. 4th 1790, 1798-1799.

In Ocean Services Corp the court states,
*Code of Civil Procedure section 583.340 subdivision (b), provides that The five-year period "shall be" tolled if '[p]prosecution or trial of the Action was stayed or enjoined.' This is consistent with the treatment*

*given to other statutory excuses; it increases certainty and minimizes
the need for a judicial hearing to ascertain whether or not the statutory
period has run." (17 Cal. Law Revision Com. Rep. 9 Jan. 1984) p. 919.)
It is also consistent with the general policy favoring trial over dismissal.
(§ 583.130.)"*

For purposes of computing the tolling period, *plaintiff's diligence, or lack
thereof, has no place in the analysis.*
The trial court, and the Court of Appeal, has no power to shorten the
tolling period on the theory that counsel could have been more diligent
in vacating the stay order.

<u>Burns v. E-Commerce Exh. Inc.</u> (2011) 51 Cal.4[th] 717 stands for the
proposition that 583.340 (b) governs stays that are used to stop
prosecution of an action.

Judge Fruin's January 5, 2000 Order for Bifurcation completely blocked
prosecution of APPELLANT'S action against the insurance carriers until
AFTER a trial against GRACE and TERMITE CONTROL was completed.

The Court of Appeal's does not give words their plain meaning.

The plain meaning of Judge Fruin's February 22, 2002 stay order is that the
matter is stayed pending the **outcome** of defendant W.R. Grace's
bankruptcy proceedings. **EMPHASIS ADDED**

IV [F]. The Court of Appeal completely ignores the fact that GARCE and
TERMITE CONTROL brought summary judgment and summary
adjudication motions in which they provided their case
they were not guilty of illegal conduct and their product was not
dangerous. To argue that they are in some way impaired by the passage
of time in defending themselves after they prosecuted those
motions is unreasonable.

V. This Petition for Rehearing is Timely.  California Rules of Court,
Rule 8.268(a)(1).

VI. CONCLUSION

VII. Certificate of Compliance

11

VII. Proof of Service

TABLE OF AUTHORITIES

CASES

The People v. The Los Angeles Superior Court
(George Vasquez, Real Party in Interest (2108)
27 Cal.App.5th 36

Hamilton v. Asbestos Corp., Ltd. (2000) 22 Cal.4th 1127

Bruce v. E-Commerce Exch., Inc. (2011) 51 Cal.4th 717

Ocean Services Corp. v. Ventura Port District (1993)
15 Cal.App.4th 1762

Brock v. Kaiser Foundation Hospitals (1992) 10 Cal.App.4th
1790, 1798-1799

CALIFORNIA RULES OF COURT

Rule 8.115

Rule 8.268(a)(1)

CIVIL CODE

Section 3517

CODE OF CIVIL PROCEDURE

Section 128 (a)(3)

Section 128 (a)(5)

Section 128 (a)(8)

Section 340.2

CALIFORNIA CODE OF JUDICIAL ETHICS

Canon 3

CALIFORNIA RULES OF PROFESSIONAL CONDUCT

Rule 3.1

Rule 3.3

Rule 4.1

OTHER AUTHORITIES

"Health Effects of Synthetic Silica Particulates" American Society
for Testing and Materials,  Special Technical Publication 732 (1981)

"The Physical and Molecular Structure of Asbestos" by
Richard Gaze. 1965 – Annals of the New York Academy of
Sciences – Wiley

ARGUMENT

I.    INTRODUCTION – At Best the Three Justices Who Signed the
      January 22, 2020 Decision Have Simply Not Done Their Due
      Diligence and are Uninformed.  The Court's Decision is
      Not Well Reasoned, Is not supported by the Law, and is
      Not Supported by the Facts.

      Appellant requested permission to file additional briefs by letter addressed to
Honorable Presiding Justice Perluss on December 30, 2019.  Appellant's request
was denied.

On January 3, 2020 Appellant received an order in each appeal case which states in part, *"The only issue to be addressed at oral argument is the procedural issue arising from the dismissals, the merits of the case are not at issue at this time, the Court will not entertain argument pertaining to those issues."*

A good faith through investigation of the procedural issue of dismissal entails would include an examination of the merits of the case.

For example the court cannot properly evaluate the issue of unclear hands – whether respondents' unclear hands bars dismissal of the case - without understanding the merits of the case.

For example, the court cannot property evaluate whether there is any merit to respondents motions for dismissal without considering that motions for summary judgment and summary adjudication were brought and lost by respondents GRACE and TERMITE CONTROL.

For example, the court cannot properly evaluate whether there is any merit to respondents' motions without considering that they rely on an order to the Bankruptcy Court obtained by citing an unpublished opinion of this court in violation of Rules of Court, Rule 8.115.

II.  The Court of Appeal Does Not Understand the Appeal Cases Before It

II [A].W.R. Grace & CO. and Grace Davidson (GRACE) Knowingly Put People's Health at Risk for Profit and Then Knowingly-covered up Their Putting Profits before People's Health and Welfare

That was decided in the motions for summary adjudication lost by GRACE and TERMITE CONTROL.

II [B]. GRACE and their Attorneys Knowingly Violated California Rules of Court, Rule 8.115 which provides,
*(a) Unpublished Opinions*
*Except as provided in (b), an opinion of a California Court of Appeal ...that is not certified for publication or ordered published* **must** *not be cited or relied on by a court or a party in any other action.*
*(b) Exception*

15

*An unpublished opinion may be cited or relied on: (1) When the opinion is relevant under the doctrines of law of the case, res judicata, or collateral estoppel; or (2)When the opinion is relevant to a criminal or disciplinary action because it states reasons for a decision affecting the same defendant or respondent in another such action.*

GRACE submitted and relied upon the unpublished opinion of this court in its submittal to Judge Carey which resulted in Judge Carey signing the March 4, 2015 Order. Appellant was unaware that had happened until Appellant read and digested GRACE'S motion for dismissal.

II [C]. Governmental Regulatory Authorities and the Trial Judge Determined that GRACE illegally manufactured and then illegally sold the toxic pesticide product SYLOID 244 (consisting of synthetically manufactured three micron particulates of amorphous silica gel) to Home Saving Termite Control, Inc. and W.F. Morris (TERMITE CONTROL), and that SYLOID 244 was then illegally applied in Appellant Gary Smolker's (APPELLANT'S) home.

That was part of APPELLANT'S opposition to GRACE'S and TERMITE CONTROL'S motions for summary judgment and summary adjudication. A copy of violation orders were submitted to this court as part of APPELLANT'S motion to consolidate appeal cases.

[II. C1]. A question not addressed in the Court of Appeal's decision is whether SYLOID 244 is manmade manufactured asbestos. It is APPELLANT'S position that SYLOID 244 is a manmade asbestos product.
[II. C2]. Another question not addressed in the Court of Appeal decision is whether injury from exposure to SYLOID 244 should be treated as injury an asbestos related injury. See Code of Civil Procedure section 340.2/

II [D]. Governmental Regulatory Authorities testified that TERMITE CONTROL unlawfully failed to report that TERMITE CONTROL was using SYLOID 244 in monthly pesticide usage reports TERMITE CONTROL is/was legally required to make to State and local regulatory authorities.

Copies of that deposition testimony was provided to the court as part of APPELLANT'S motion to consolidate appeal cases.

II [E]. The Court has well established equitable powers under
Code of Civil Procedure sections 128 (a) (3), 128 (a) (5),
128 (a) (8) and Civil Code section 3517 to make sure that
APPELLANT'S action against GRACE and TERMITE
CONTROL gets adjudicated. The People v. The Los Angeles
Superior Court (George Vasquez, Real Party in Interest) (2018)
27 Cal.App.5th 36.

II [F].  APPELLANT'S action is part of the "War Against
Cancer." The legislature has enacted a special statute of
limitations (Code of Civil Procedure section 340.2) for
injury or illness caused by exposure to asbestos.  SYLOID
244 is a synthetically manufactured form of asbestos.

It is APPELLANT'S position that SYLOID 244 is a manufactured asbestos
product.

II [G]. The California Supreme Court in Hamilton v.
Asbestos Corp., Ltd. (2000) 22 Cal.4th 1127 recognized
that one's exposure to asbestos – by inhaling small
asbestos fibers – causes inflammation and scar tissue
in the lungs, which over time causes asbestosis in the lungs,
can cause a cancer, frequently mesothelioma, in the abdominal
cavity, and can cause yet other additional types of cancers
in other parts of the body.

II [H]. The very same lung injuries have been observed when
very small particles of the synthetic asbestos product SYLOID
244 enter the lungs.  *"Health Effects of Synthetic Silica
Particulates"*, American Society for Testing and Materials
Special Technical Publication 732 (1981), page 22. See Exhibit 12
to APPELLANT'S "Second Motion to Take Judicial Notice of
Evidence of Dangerous Properties of Desiccant SYLOID 244"
Filed in the Court of Appeal on December 19, 2019.  The Symposium
On Health Effects of Synthetic Silica Particulates was held
Nov. 5-6, 1979 in Benalmadena-Costa (Torremolinos) Spain.
Davison Chemical Division, W.R. Grace & Co. was one of
the sponsors of the symposium.

17

II [I]. In Hamilton the California Supreme Court points out
that it is the size of the asbestos fibers that make inhaling
asbestos fibers dangerous.

*Airborne asbestos fibers are inhaled*
*into the lungs and pass into the airways. Many are intercepted*
*and rejected by the clearance mechanisms of the airways,*
*but fibers that are not intercepted my reach the alveoli.*
***Fibers smaller than 50 microns in length are able to enter***
***the alveoli. fn. 3 Fibers that enter the alveoli are deposited***
***on the tissue surface and attract macrophages, white blood***
***cells that attempt to absorb and eliminate the fibers. This***
***effort fails, and causes an inflammation that in turn***
***stimulates fibroblasts – specializes cells that make connective***
***tissue – to increase their production of such tissue.***

***The result is fibrosis or scarring, a gradual but irreversible***
***thickening and stiffening of the connective tissue. fn.4.***
***Asbestos disease is dose-reponse related: the longer or the***
***more intense the asbestos exposure, the greater the injury.***
***In addition, scarring continues even after the victim is no***
***longer exposed to asbestos, because the fibers remain***
***embedded in the connective tissue and the tissue continues***
***to react to them.***

***The scarring process makes the connective tissue***
***Increasingly resistant to gas exchange, and the affected***
***Alveoli eventually cease to function. If [22 Cal.4th 1135]***
***enough alveoli are thus affected, a characteristic symptom***
***of asbestosis appears: increasing shortness of breath***
***under exertion.*** **EMPHASIS ADDED**

II. [I] The SYLOID 244 product consists of three micron particles
of silicon dioxide.

II [J]. Cancer is the Emperor of all Maladies. Cancer and
liability for asbestos related disease is of wide public concern.

In the Hamilton case more than 10 amicus attorneys appeared for
Plaintiff and Respondent Hamilton.

I am informed and believe asbestos is authoritatively defined in a publication entitled "The Physical and Molecular Structure of Asbestos" by Richard Gaze. 1965 – Annals of the New York Academy of Sciences – Wiley as follows:

*The name "asbestos" is used to describe any mineral that breaks down into fibers when it is crushed or processed.*

III.   The Court of Appeal's Decision Omits or Misstates Issues and Important Material Facts

III [A]. In its decision, the court states that APPELLANT appeals the denial of his motion to tax costs claimed by TERMITE CONTROL in Appeal Case No. B287636.  That is not true. APPELLANT appeals his motion to tax costs claimed by TERMITE CONTROL in Appeal Case No. B289828.  Appeal filed on May 2, 2018 from judgment filed on March 5, 2018. On October 23, 2019, APPELLANT filed a motion to consolidate appeals.  On November 5, 2019, the court denied APPELLANT'S motion to consolidate appeals.

III [B]. On February 22, 2019 APPELLANT filed an application for extension of time to file APPELLANT'S Opening Brief in Appeal Case No. B287626 to April 3, 2019 and filed a separate application for extension of time to file APPELLANT'S opening brief in Appeal Case No. B286138 to April 3, 2019.  APPELLANT filed his Opening Briefs in Case No. B287626 and Case No. B286138 on February 25, 2019. APPELLANT'S request for extension of time were denied with the "note" request is moot, appellant filed opening brief

III [C]. At the bottom of page 19 and top of page 20 of  APPELLANT'S Opening Brief in Case No. B287626,

APPELLANT states, *The Court of Appeal has imposed a time limit of February 25, 2019 for SMOLKER to file SMOLKER'S Appellant's Opening Brief in Appeal case B287626 and also simultaneously imposed a time limit of February 25 2019 on SMOLKER to filed SMOLKER'S Appellant's Opening Brief in Appeal Case No. 286138.*

*The time limit of February 25, 2019 imposed by the Court of Appeal on filing SMOLKER'S Appellant Opening Brief in Appeal Case No. B286138 and imposed by the Court of Appeal in filing SMOLKER'S Appellant's Opening Brief in Appeal Case No. B287626 does not allow SMOLKER enough time to discuss the above listed issues.*

*On February 22, 2019, SMOLKER filed an application for extension of time to file Appellant's Opening Brief Amount in this appeal case, Appeal Case B286138.*

*If the Curt grants SMOLKER's application for more time to file Appellant's Opening Brief, SMOLKER will do so.*

III [D]. The Los Angeles County Superior Court Civil Appeals Unit made it impossible for APPELLANT to brief Appeal Case No. 287626 by imposing a ten day limit of time for APPELLANT to hand deliver 27 missing documents to  the Los Angeles Superior Court, Central
Appeals Unit, 111 North Hill St., Room 111A, Los Angeles, CA 90012. See pages 3253 through 3258 of  Volume 14 of Clerk's Transcript on Appeal for Appeal Case No. B287626.

IV [E]. The court misconstrues Code of Civil Procedure section 583.340 (b), misinterprets Bruce v. E-Commerce Exch., Inc. (2011) 51 Cal.4th 717, and fails to mention and discuss controlling case authority on the issue of whether there is a reasonable diligence requirement prerequisite to the application of 583.340 (b): Ocean Services Corp. v. Ventura Port District (1993) 15 Cal.App.4th 1762; Brock v. Kaiser Foundation Hospitals (1992) 10 Cal.App. 4th 1790, 1798-1799.

In Ocean Services Corp the court states,
*Code of Civil Procedure section 583.340 subdivision (b), provides that The five-year period "shall be" tolled if '[p]prosecution or trial of the Action was stayed or enjoined.' This is consistent with the treatment given to other statutory excuses; it increases certainty and minimizes the need for a judicial hearing to ascertain whether or not the statutory period has run." (17 Cal. Law Revision Com. Rep. 9Jan. 1984) p. 919.) It is also consistent with the general policy favoring trial over dismissal. (§ 583.130.)"*

For purposes of computing the tolling period, *plaintiff's diligence, or lack*

*thereof, has no place in the analysis.*
The trial court, and the Court of Appeal, has no power to shorten the tolling period on the theory that counsel could have been more diligent in vacating the stay order.

<u>Burns v. E-Commerce Exh. Inc.</u> (2011) 51 Cal.4[th] 717 stands for the proposition that 583.340 (b) governs stays that are used to stop prosecution of an action.

Judge Fruin's January 5, 2000 Order for Bifurcation completely blocked prosecution of APPELLANT'S action against the insurance carriers until AFTER a trial against GRACE and TERMITE CONTROL was completed.

The Court of Appeal's does not give words their plain meaning.

The plain meaning of Judge Fruin's February 22, 2002 stay order is that the matter is stayed pending the **outcome** of defendant W.R. Grace's bankruptcy proceedings.  **EMPHASIS ADDED**

IV [F].  The Court of Appeal completely ignores the fact that GRACE and TERMITE CONTROL brought summary judgment and summary adjudication motions in which they provided they argued their case they were not guilty of illegal conduct and their product was not dangerous. To argue that they are in some way impaired by the passage of time in defending themselves after they prosecuted those motions is unreasonable.

V. This Petition for Rehearing is Timely.  California Rules of Court, Rule 8.268(a)(1).

CONCLUSION

The Court's January 22, 2020 decision raises issues of statewide concern about the fair administration of justice, what to do when attorneys are not honest in their dealings with the court – when attorneys violate Rules of Professional Conduct  Rules 3.1, 3.3, and 4.1.

The Court's January 22, 2020 decision also raises a question of whether the California Code of Judicial Ethics, Canon 3 as violated by the trial judge not keeping himself informed of what was going on in the GRACE bankruptcy,

and having declared a mistrial when APPELLANT had prepared over 20 expert witnesses lied up, then dismissing APPELLANT'S action against TERMITE CONTROL the day before the second trial was to commence.

This Petition for Rehearing should be granted so that APPELLANT and the other parties may fully brief those issues.

Dated: February 20, 2020       Respectfully submitted,

_____

Gary Smolker, Attorney in Pro Per

CERTIFICATE OF COMPLIANCE

Pursuant to California Rules of Court, rule 8.204(c)(1), I hereby certify that Appellant's Petition for Rehearing is a total of 4,430 words, including information on cover pages, etc., as counted by the word processing program used to generate it.

February 20, 2020

By:_____

      Gary Smolker, in Pro Per
Attorney for Appellant Gary Smolker

*TIG Insurance Company vs. Gary Smolker, etal.*

Court of Appeal Case Nos. B281406, B286138, B287626, B289828

<u>COMBINED PROOF OF SERVICE FOR ALL PENDING APPEAL CASES</u>

I am a resident of the State of California, over the age of eighteen years, and not a party to this action. My business address is 16055 Ventura Blvd., Suite 525, Encino, CA. 91436. On February 20, 2020, I served the following titled and attached document:

**Petition for Rehearing**

  **X**   VIA MAIL, by placing a true copy of the document(s) listed above in a sealed envelope with postage fully prepaid in United States mail in the State of California at Encino, California, addressed as set forth in the attached service list:

See attached list.

I am familiar with the Smolker Law Firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on the same day with the postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on February 20, 2020, at Encino, California.

Sabrina Jones

Combined Service List

TIG Insurance Co. V Gary Smolker, et. Al.
LASC Case No. BC173952
Appeal Case Nos. B281406, B286138, B287626, B289828

## SERVICE LIST
*Smolker v. W.R. Grace & Co., et al.*
Second Appellate District, Division Seven, Case No. B281406
Superior Court of Los Angeles County, Case No. BC173952

ROSEMARIE S. LEWIS (158891)
JEFFREY Z. LIU (276849)
BORTON PETRINI, LLP
626 Wilshire Boulevard, Suite 975
Los Angeles, CA 90017
(213) 624-2869
Rlewis@bortonpetrini.com
Jliu@bortonpetrini.com
*Attorney for Cross-Defendants and Respondents*
 *W.R. Grace & Co. And Grace Davidson*

*(Served via United States Postal Service)*

<u>SERVICE LIST</u>
*Smolker v. Truck Insurance Exchange, et al.*
Second Appellate District, Division Seven, Case No. B286138
Los Angeles County Superior Court, Case No. BC173952

PETER SCHWARTZ #109859
STEVEN R. INOUYE #245024
GORDON & REES LLP
633 W. 5th Street 52nd Floor
Los Angeles, CA 90071
Pschwartz@gordonrees.com
Sinouye@grsm.com

*Attorney for Cross-Defendant and Respondent*
  *Truck Insurance Exchange*

*(Served via Unites States Postal Service)*


ROBERT DANIEL HOFFMAN #123458
CHARLSTON, REVICH & WOLLITZ LLP
1925 Century Park East, Suite 320
Los Angeles, CA 90067
County: Los Angeles County
Rhoffman@crwllp.com

*Attorneys for Cross-Defendants and Respondents*
*Coregis Group, Inc., Coregis Insurance Co., and California Insurance Company*

*(Served via Unites States Postal Service)*

RAUL LUIS MARTINEZ #82465
ELISE DALE KLEIN #111712
LEWIS BRISBOIS BISGAARD & SMITH LLP
633 W. 5th Street, Suite 4000
Los Angeles, CA 90071
Martinez@lbbslaw.com
Klein@lbbslaw.com

*Attorneys for Cross-Defendant and Respondent*
*Interinsurance Exchange of the Automobile Club of So. Cal.*

*(Served via Unites States Postal Service)*

Smolker v. Home Saving Termite Control, Inc., et al.
LASC Case No. BC173952, APPEAL CASE NO. 287626

## SERVICE LIST

Mark Kincaid, Esq.
26 Alhaja Way
Hot Springs Village,
Arkansas, 71909
Tel: 714-955-69955
Fax: 714-784-2546
Email: mkincaid@manhandlaw.com

Attorneys for Home Savings
**Termite Control, Inc., Wayne
Morris**

Robert Hoffman, Esq. SB #123458
Charleston, Revich & Wollitz LLP
1925 Century Park East, Suite 320
Los Angeles, CA 90067
Tel: 310-551-7040
Fax: 310-203-9321
Email: rhoffman@crwllp.com

**Attorneys for Goregis Group Inc., Goregis Insurance Co., California Insurance Co.**

Lewis Brisbois Bisgaard & Smith LLP
Raul Martinez SB# 82465
Elise D. Klein SB# 111712
633 West 5th Street, Suite 4000
Los Angeles, CA 90071
Tel: 213-250-1800
Fax: 213-250-7900
Email: Martinez@lbbslaw.com

Email: Elise.Klein@lewisbrisbois.com

**Attorneys for Inter-Insurance Exchange of the
Automobile Club of Southern California**

Smolker v. Home Saving Termite Control, Inc., et al.
LASC Case No. BC173952, APPEAL CASE NO. 287626

Smolker v. Home Saving Termite Control, Inc., et al.
LASC Case No. BC173952, APPEAL CASE NO. 289828

## SERVICE LIST

APPEAL CASE NO. 289828

Mark Kincaid, Esq. SB#118640
26 Alhaja Way
Hot Springs Village,
Arkansas, 71909
Tel: 714-955-69955
Fax: 714-784-2546
Email: mkincaid@mkincaidlaw.com

**Attorneys for Home Savings
Termite Control, Inc., Wayne
Morris**

SERVICE LIST

Clerk of the Los Angeles Superior Court

111. North Hill Street

Los Angeles, CA  90012-3014

# EXHIBIT

# 15

**FILED**

Feb 21, 2020

DANIEL P. POTTER, Clerk

_CLynch_ Deputy Cl

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
SECOND APPELLATE DISTRICT
DIVISION: 7

DATE: February 20, 2020

GARY SMOLKER,
Plaintiff and Appellant,

v.

W. R. GRACE & CO. et al.,
Cross-defendants and Respondents.

B281406, B286138, B287626
Los Angeles County Super. Ct. No. BC173952

THE COURT:

Appellant Smolker's February 20, 2020 request to file a late, second petition for
rehearing is denied (Cal. Rules of Court, rule 8.268(b)(1)(A)).

_____
Presiding Justice

EXHIBIT
16

FEB 2 1 2020
  DIV 7 - MR

SMOLKER LAW FIRM
SUITE 525
16055 VENTURA BOULEVARD
ENCINO, CA 91436-2609
TELEPHONE (818) 788-7290

E-MAIL
GSmolker@aol.com

BY HAND DELIVERY

February 21, 2020

Honorable Dennis M. Perluss, Presiding Justice
Division Seven, Second Appellate District
The Court of Appeal of the State of California
300 South Spring Street, Floor 2, North Tower
Los Angeles, CA. 90013

RE: Appeal Cases 281406, 286138, and 287626
GOOD CAUSE FOR RELIEVING APPELLANT FOR FAILURE TO FILE A
TIMELY PETITION

Dear Justice Perluss,

I am in pro per.

I do everything by hand.

I do not have a computer program that automatically prepares a table of authorities
with appropriate references to page number where authority appears or which
automatically prepares the table of contents and references the appropriate page
number where each argument begins in the body of a brief.

I have been deluged with more demands on my resources than I can possibly
handle in these three appeal cases.

When preparing my First Petition for Rehearing, I did not have time to list all
important issues because I had to take mandatory legal education classes.

Be that as it may be, the Second Petition for Rehearing addresses important
questions of law that are of state wide import (such as whether injury caused by
SYLOID 244 should be treated as an asbestos related injury under Code of Civil
Procedure section 340.2 or is special additional legislation required) which will

SMOLKER LAW FIRM

effect large segments of the population consisting of people who either have cancer, or have been exposed to SYLOID 244 and have become ill and don't know why, or who will be exposed to SYLOID 244 in the future.

Normally, the Supreme Court will not review an unpublished opinion.

These cases may be the exception because the respondents all benefited from GRACE citing, relying on, and referring to the Court of Appeal's unpublished opinion in Appeal Case No. B138229, filed on May 19, 2007 (see page 222 of record on appeal in Case No. 281406) referred to in the Declaration of Richard C. Finke (see page 212, et seq. of record on appeal in Appeal Case NO. 281406).

Not only is that conduct prohibited by California Rules of Court, Rule 8.115, that conduct also violates California Rules of Professional Conduct, Rule 3.1 (Meritorius Claims and Contentions), Rule 3.3 (Candor Towards the Tribunal). Richard Finke states in his declaration, *"Based upon a thorough review of their available books and records, the Reorganized Debtors have concluded that they have no liability as to any claims..."*

Prior to the time Mr. Finke made that statement. GRACE had filed and lost motions for summary judgment and summary adjudication. In response to those motions, trial judge Honorable Richard Fruin, Jr. found that GRACE had – against the law – sold GRACE'S unregistered pesticide product SYLOID 244.

I have been working around the clock on these appeal cases.

When I received notice of the setting of a time for oral argument I wrote a letter/motion to the court stating that briefing was not complete.

I needed more time to submit more briefs.

Different people have different ideas on how, practically, to live.

Human beings by their nature, have a proclivity to make rules, laws and customs.

All human beings are, by some kind of biological endowment, so ineradicably concerned with morality that we create a structure of laws and rules wherever we are. The idea that human life can be free or moral concerns is a fantasy.

2

SMOLKER LAW FIRM

There is a difference between right and wrong conduct, between moral and immoral conduct.

In my opinion, in my view of morality, respondents have succeeded in overwhelming me, in taxing my limited resources, in depriving me of my "right" to state my case and deprived the public of the public's right to know about the nature of SYLOID 244 by unethical and immoral conduct.

Those issues, in my opinion, need to be directly addressed in the Court of Appeal's Decision in these cases.

For that reason, I request that you excuse me from my failure to file a timely petition under Cal. Rules of Court, rule 8.268(D)(4), which states: *Before the decision is final and for good cause, the presiding justice may relieve a party from a failure to file a timely petition or answer.*

Very truly yours,

Gary Smolker,
Appellant in Pro Per

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on February 21, 2020, at Encino, California

_____
Gary Smolker

COPY SERVED ON ALL COUNSEL AND ON THE SUPERIOR COURT OF LOS ANGELES.

See attached proof of service.

2/22/2020

Case 01-01139-AMC   Doc 33177   Filed 01/04/21   Page 764 of 767
B286138 - Truck Insurance Exchange et al. v. Smolker [ Trial Court Case No: BC173952 ]

**From:** Uribe, Melissa <Melissa.Uribe@jud.ca.gov>
**To:** pschwartz@gordonrees.com <pschwartz@gordonrees.com>; rhoffman@crwllp.com <rhoffman@crwllp.com>; martinez@lbbslaw.com <martinez@lbbslaw.com>; elise.klein@lewisbrisbois.com <elise.klein@lewisbrisbois.com>; gsmolker@aol.com <gsmolker@aol.com>
**Subject:** B286138 - Truck Insurance Exchange et al. v. Smolker [ Trial Court Case No: BC173952 ]
**Date:** Fri, Feb 21, 2020 5:10 pm
**Attachments:** B281406_OFF_Smolker.pdf (106K)

Please see attached.

**Melissa Uribe**, Assistant Deputy Clerk
COURT OF APPEAL, SECOND APPELLATE DISTRICT
300 South Spring Street | Second Floor | North Tower | Los Angeles, CA 90013
General: 213-830-7000 |
melissa.uribe@jud.ca.gov | courts.ca.gov/2dca | facebook.com/2dcoa

*Committed to providing fair and equal access to justice for all Californians*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
SECOND APPELLATE DISTRICT
DIVISION: 7

DATE: February 21, 2020

GARY SMOLKER,
Plaintiff and Appellant,
v.
W. R. GRACE & CO. et al.,
Cross-defendants and Respondents.

B281406, B286138, B287626
Los Angeles County Super. Ct. No. BC173952

**COURT OF APPEAL – SECOND DIST.**

# FILED

Feb 21, 2020

DANIEL P. POTTER, Clerk

muribe                    **Deputy Clerk**

THE COURT:

Appellant Smolker's February 21, 2020 request seeking leave to file a late second petition for rehearing, submitted shortly before the close of business on the final day of this court's jurisdiction in this matter, is denied (Cal. Rules of Court, rule 8.268(b)(1)(A)).

*Perluss*

Presiding Justice

# EXHIBIT 17

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
SECOND APPELLATE DISTRICT
DIVISION: 7

DATE: February 21, 2020

GARY SMOLKER,
Plaintiff and Appellant,

v.

W. R. GRACE & CO. et al.,
Cross-defendants and Respondents.

B281406, B286138, B287626
Los Angeles County Super. Ct. No. BC173952

**COURT OF APPEAL – SECOND DIST.**

# FILED

## Feb 21, 2020

DANIEL P. POTTER, Clerk

muribe _____ **Deputy Clerk**

THE COURT:

Appellant Smolker's February 21, 2020 request seeking leave to file a late second petition for rehearing, submitted shortly before the close of business on the final day of this court's jurisdiction in this matter, is denied (Cal. Rules of Court, rule 8.268(b)(1)(A)).

_Perluss_
Presiding Justice