# EXHIBIT B

**NASH-Realia Appeal**


Positive
As of: June 28, 2021 10:21 PM Z

# North American Serv. Holdings, Inc. v. Erick M. Black, L.L.C. (In re Realia, Inc.)

United States Bankruptcy Appellate Panel for the Ninth Circuit

February 24, 2012, Argued and Submitted at Phoenix, Arizona; March 13, 2012, Filed

BAP No. AZ-11-1334-JuPaD

**Reporter**
2012 Bankr. LEXIS 1083 *

In re: REALIA, INC., Debtor. NORTH AMERICAN SERVICE HOLDINGS, INC., Appellant, v. ERIC M. BLACK, L.L.C., Appellee.

**Notice:** THIS DISPOSITION IS NOT APPROPRIATE FOR PUBLICATION. ALTHOUGH IT MAY BE CITED FOR WHATEVER PERSUASIVE VALUE IT MAY HAVE (SEE *FED. R. APP. P. 32.1*), IT HAS NO PRECEDENTIAL VALUE. SEE 9TH CIR. BAP RULE 8013-1.

**Subsequent History:** Affirmed by *N. Am. Serv. Holdings, Inc. v. Eric M. Black, L.L.C. (In re Realia, Inc.), 2014 U.S. App. LEXIS 7138 (9th Cir., Apr. 16, 2014)*

**Prior History:** [*1] Appeal from the United States Bankruptcy Court for the District of Arizona. Bk. No. 2:05-15022. Adv. No. 2:10-00962. Honorable Redfield T. Baum, Sr., Bankruptcy Judge, Presiding.

## Core Terms

leases, bankruptcy court, tenant, landlord, sale order, effective, assigned, parties, option to purchase, reimburse, ending, summary judgment, Properties, documents, Buyer, rent, commercial lease agreement, free and clear, purchase price, summary judgment motion, matter of law, adversary proceedings, motion to dismiss, court's decision, default judgment

## Case Summary

### Procedural Posture

Appellant challenged a decision of the United States Bankruptcy Court for the District of Arizona, which held that appellant did not retain an option to purchase real property after the Chapter 7 trustee sold the property in a *11 U.S.C.S. § 363(f)* sale to appellee.

### Overview

Appellant was the assignee of leases of property owned by debtor. There were two versions of the leases, one did not contain an option to purchase the property, and the other version, executed at a later date, did contain an option. The bankruptcy court approved the sale of the property to appellee. The bankruptcy court held that the leases were never assumed by the trustee in connection with the sale of the property or at any other time. The bankruptcy court further found that leases not assumed by the trustee were "deemed rejected" under *11 U.S.C.S. § 365(d)(1)*. On appeal, the court held that the purported leases with the option did not fall within the scope of *§ 365* because they lacked the requisite landlord/tenant relationship and the debtor had de minimis executory burdens. The court held that the sale order was a final order which did not include the leases with the option. The evidentiary record showed that the trustee and the buyer negotiated for the sale of the property subject to the leases without the option. Alternatively, the option did not survive the sale because appellant's interest in the option was an interest included within the scope of *11 U.S.C.S. § 363(f)*.

### Outcome
The court affirmed the district court's decision.

## LexisNexis® Headnotes

Bankruptcy Law > Procedural Matters > Jurisdiction > General Overview

Civil Procedure > ... > Subject Matter Jurisdiction > Supplemental Jurisdiction > Ancillary Jurisdiction

*HN1*[⤓] **Procedural Matters, Jurisdiction**

Generally, disputes between purchasers of a debtor's assets and third parties are not within the bankruptcy court's

jurisdiction. However, a bankruptcy court has ancillary jurisdiction to interpret its own orders after the closing of a case. Ancillary jurisdiction should only be used when necessary to resolve bankruptcy issues, not to adjudicate state law claims that can be adjudicated in state court.

Bankruptcy Law > ... > Judicial Review > Standards of Review > De Novo Standard of Review

Bankruptcy Law > Procedural Matters > Adversary Proceedings > Judgments

*HN2*[ ] **Standards of Review, De Novo Standard of Review**

The bankruptcy appellate panel reviews de novo the bankruptcy court's grant of a motion for summary judgment. De novo means review is independent, with no deference given to the trial court's conclusion. The panel may affirm the bankruptcy court's decision on any ground supported by the record. In reviewing the bankruptcy court's decision on a motion for summary judgment, the bankruptcy appellate panel applies the same standards as the bankruptcy court. Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and, when viewing the evidence most favorably to the non-moving party, the movant is entitled to prevail as a matter of law. *Fed. R. Civ. P. 56*, incorporated by *Fed. R. Bankr. P. 7056*. Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, could affect the outcome of the case. The substantive law will identify which facts are material.

Bankruptcy Law > Administrative Powers > Executory Contracts & Unexpired Leases > General Overview

*HN3*[ ] **Administrative Powers, Executory Contracts & Unexpired Leases**

Only true leases fall within the scope of *11 U.S.C.S. § 365*.

Bankruptcy Law > Administrative Powers > Executory Contracts & Unexpired Leases > Rejections

*HN4*[ ] **Executory Contracts & Unexpired Leases, Rejections**

In analyzing whether a lease is a true lease falling within the scope of *11 U.S.C.S. § 365*, not every interest that might qualify as a lease under state law is subject to the automatic rejection provision of *§ 365*.

Bankruptcy Law > Administrative Powers > Executory Contracts & Unexpired Leases > General Overview

*HN5*[ ] **Administrative Powers, Executory Contracts & Unexpired Leases**

The legislative history of *11 U.S.C.S. § 502(b)* indicates that the fact that the lessee assumes and discharges substantially all the risks and obligations ordinarily attributed to the outright ownership of the property is more indicative of a financing transaction than of a true lease.

Bankruptcy Law > ... > Judicial Review > Standards of Review > General Overview

Contracts Law > Contract Interpretation > Intent

*HN6*[ ] **Judicial Review, Standards of Review**

When construing an agreed or negotiated form of order, the bankruptcy appellate panel approaches the task as an exercise of contract interpretation rather than the routine enforcement of a prior court order. At bottom, the goal is to determine the rights, duties, and reasonable expectations of the parties, as disclosed to and blessed by the court. The paramount goal of contract interpretation is to determine the intent of the parties.

Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem > General Overview

*HN7*[ ] **Contract Interpretation, Ambiguities & Contra Proferentem**

Where a contract is ambiguous, the interpreting court must look beyond the language of the contract to ascertain the parties' intentions. Words and other conduct are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight.

Bankruptcy Law > ... > Administrative Powers > Estate Property Lease, Sale & Use > Sales Free of Interest

*HN8*[ ] **Estate Property Lease, Sale & Use, Sales Free of Interest**

11 U.S.C.S. § 363(f) authorizes a Chapter 7 trustee to sell property free and clear of any "interest" in such property. The term "interest" has an expansive scope. Moreover, courts have noted that the purpose of the "free and clear" language is to allow the debtor to obtain a maximum recovery on its assets in the marketplace.

**Counsel:** Appearances: Robert C. Warnicke, Esq. of Gordon Silver argued for appellant North American Service Holdings, Inc.

William E. Manning, Esq. of Saul Ewing LLP argued for appellee Eric M. Black, L.L.C.

**Judges:** Before: JURY, PAPPAS, and DUNN, Bankruptcy Judges.

# Opinion

MEMORANDUM

This appeal raises the question whether, as a matter of law, appellant, North American Service Holdings, Inc. ("NASH"), retained an option to purchase real property after the chapter 7 [1] trustee sold the property in a § 363(f) sale to appellee, Eric M. Black, Inc. ("EMB"). [2] Having conducted an independent and de novo review of the record, we conclude that it did not and AFFIRM.

**I. FACTS**

**A. Prepetition Events**

Realia, a Delaware corporation, was in the business of buying, developing and managing real estate. On July 31, 2003, Realia acquired three properties from The Artesia Companies, Inc. ("TAC"). One of those properties — which was the subject of this appeal — was located in Visalia, California.

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532. "Rule" references are to the Federal Rules of Bankruptcy Procedure and "Civil Rule" references are to the Federal Rules of Civil Procedure.

[2] To add to the complex procedural background of this case, the appellee, Eric M. Black, L.L.C., was not the purchaser of the property [*2] at the bankruptcy sale. It appears from the record that at the summary judgment hearing on this matter, the court treated Eric M. Black, L.L.C. and Eric Black, Inc. as affiliates and for purposes of this appeal we do the same. We collectively refer to both entities as "EMB."

Realia paid $431,010.40 for the property and, of that amount, $346,650.33 was in the form of an assumption by Realia of debt owed by TAC to Volley Properties, LLC ("Volley Properties"). The obligation to Volley Properties was secured by a first deed of trust on the property. It is unclear whether the property had other liens against it at the time of the sale.

After acquiring the Visalia property, Realia entered into a commercial lease dated August 1, 2003 with the prior owner TAC. TAC was in the construction materials business and used a portion of the property as its office. Realia entered into [*3] a separate lease agreement dated August 1, 2003 with Artesia, Inc. ("Artesia") for the balance of the property. The business of Artesia is not apparent from the record. Both leases were for a term effective August 1, 2003 and ending July 31, 2013. These leases were allegedly preliminary agreements, as negotiations between Realia and its lessees, TAC and Artesia, were ongoing.

Later, Realia and TAC as to one lease, and Realia and Artesia as to the other, entered into further agreements, dated November 1, 2003, but made effective August 1, 2003. Similar to the previous leases, the initial term of these leases were also effective August 1, 2003 and ended on July 31, 2013. The leases further provided that the lessee could renew the lease for ten-year periods from July 31, 2013 through July 31, 2043. Further, unlike the previous leases, paragraph 2 of the new agreements shows that Realia, as landlord, granted TAC and Artesia the option to purchase the Visalia property. The agreements credited a portion of the rental payments and other payments towards the purchase price. Evidently, there were further amendments to the leases on December 1, 2003 and again on January 31, 2004. The January [*4] 31, 2004 version of the leases modified the monthly credit accumulations towards the purchase price under the option. For purposes of this appeal, these later agreements are largely ignored, with the focus being on the November 1, 2003 agreements.

On January 31, 2004, TAC assigned its interest in its lease to Artesia.

On September 9, 2004, an entity named Valley Pacific Petroleum Services, Inc. ("VP") obtained a default judgment against Realia for $373,352.62 and recorded a lien against the Visalia property. The amount of the judgment supposedly reflected amounts owed by TAC to VP for fuel and the like. VP alleged that Realia was the successor corporation to TAC.

In connection with this allegation, VP maintained that Realia's secured creditor, Kraft Americas Holding, Inc. ("KAHI"), a Delaware corporation, controlled Realia. KAHI held a security interest on all assets of Realia which, besides the real

property, included equipment and machinery.[3] KAHI was also a shareholder of TAC, but allegedly sold all its shares on May 2, 2002, which would have been prior to the sale of the property to debtor. In addition, an individual by the name of Rune Kraft ("Kraft"), who had been a director of [*5] TAC, allegedly resigned on May 1, 2002. Kraft was also involved with KAHI and was chairman, director and an officer of NASH.[4]

### B. Bankruptcy Events

It is not entirely clear from the record why Realia filed it chapter 11 petition on August 16, 2005. Less than ten days after the filing, VP moved to dismiss or convert the case. Debtor contested the dismissal or conversion, alleging that VP was not a creditor in its case. The hearing on the motion to dismiss or convert was continued from time to time, but eventually the bankruptcy court converted debtor's [*6] case to one under chapter 7 on December 13, 2005. Roger W. Brown was appointed the chapter 7 trustee.

Debtor's Schedule A listed its 100% ownership interest in five pieces of real property, including the office building in Visalia, with a total value of $914,000. Debtor also listed personal property as 100% stock ownership in Concreteworks, Inc., $193,000 in accounts receivable, $476,000 in machinery and equipment, and the leases (presumably the ones relating to the Visalia property) valued at $406,000. Debtor's Schedule D showed KAHI with a security interest in all debtor's assets in an amount over $1 million and Volley Properties as being secured by the Visalia property in the amount of $301,000. Debtor listed the leases on the Visalia property in Schedule G and no unsecured creditors in Schedule F.

Upon conversion of the case, debtor provided the trustee with information about its properties, including the lease agreements related to the Visalia property. According to the record, the trustee was given the version of the leases which did not contain the option provisions.

### The Sale Under Section 363(f)

In July 2006, the trustee moved to sell the Visalia property free and clear of all [*7] claims and interests under *§ 363(f)*. The trustee's application showed that the buyer was EMB, the purchase price was $425,000, and the property was severely overencumbered.[5] The application further showed that the property was subject to two leases, which would not be affected by the sale: "Commercial Lease Agreement with The Artesia Companies, Inc. as tenant, effective August 1, 2003 and ending July 31, 2013, and Commercial Lease Agreement with Artesia, Inc. as tenant, effective August 1, 2003 and ending July 31, 2013." The sale was subject to overbid.

Attached to the application was a letter of intent setting forth the basic terms of the purchase. The letter of intent stated that "Buyer [*8] has conducted all due diligence and is satisfied with the subject property in its entirety." The letter also reflected that "Buyer is aware that the property is subject to two existing leases . . . ." No leases were attached to the application contained in the record.

On August 2, 2006, the bankruptcy court heard the sale motion and presided over the auction. In the transcript of that hearing, trustee's counsel stated that the trustee intended to assume and assign the leases,[6] with all the terms of the leases applicable to the purchaser. Hr'g Tr. August 2, 2006 at 7:9-14. However, the record indicates that the trustee had obtained only the version of the leases between debtor and its lessees which did not contain the option. Moreover, there was no further discussion regarding whether the trustee met the requirements for assumption under *§ 365*, and there are no documents in the record — other than one line in the sale order — that show an assignment ever occurred.

Kraft, the principal of KAHI, was at the hearing and represented by counsel. Interested in overbidding EMB's price, Kraft's counsel brought up the issue of the option in [*9] the November 1, 2003 leases. Mr. Black stated that he had recently heard about the option to purchase and asked the court for any such provision to be set aside. He further stated that he was interested in purchasing the property with or

---

[3] It appears any KAHI secured position on the Visalia real property would have been junior to Volley Properties' lien.

[4] From what we can tell, Kraft is the link among the various entities involved in this appeal. It appears that he owned KAHI which in turn was the 100% shareholder of TAC. He was also a director of TAC. TAC sold the Visalia property to Realia and then TAC and Realia entered into the purported lease containing the option. TAC then assigned its interest in the lease to Artesia and Artesia assigned its interest in the lease to NASH. Kraft controlled NASH, and there are allegations in the record that he also had controlled Realia.

[5] The trustee's amended application showed that Volley Properties' lien was for $355,000. There were also numerous tax liens and judgment liens filed against the property with VP's judgment lien greater than $320,000. At the sale hearing, the trustee explained that certain tax liens would be paid from the proceeds and that debtor owned other properties that could partially satisfy some of the liens. This offer of proof apparently satisfied the court as a basis for authorizing the sale free and clear.

[6] Assumption was not mentioned in the sale application.

without the leases, but without the option. Hr'g Tr. August 2, 2006 at 14:8-12. After further discussion, the court stated: "Well, as I understand the current status of this, that the leases will be assigned whatever right, title, and interest the estate has; and then it will be between the buyer and the tenants to decide legally where that leaves them, assuming somebody closes on the property." Id. at 14:13-17. EMB and KAHI then bid on the property, with EMB's final bid in the amount of $465,000 and KAHI's "back-up" bid for $455,000.

The court approved the sale by order entered on August 9, 2006. The order stated:

> IT IS FURTHER HEREBY ORDERED that the Trustee shall assign to Buyer any interest the Estate may have in the two(2) commercial leases described as follows: a. Commercial Lease Agreement with The Artesia Companies, Inc. as tenant, effective August 1, 2003 and ending July 31, 2013; and Commercial Lease Agreement with Artesia, Inc. as tenant, [*10] effective August 1, 2003 and ending July 31, 2013.

### The Trustee's Adversary Proceeding

After the entry of the sale order and prior to the closing of the sale, the issue whether EMB was bound by the option in the November 1, 2003 leases persisted. Apparently, KAHI contacted the trustee, claiming that TAC and Artesia had a purported option to purchase the property until October 1, 2010, for the purchase price of $439,630 less certain credits. As a result, on November 8, 2006, the trustee commenced an adversary proceeding in the bankruptcy court against KAHI; TAC; Artesia; and others, seeking to avoid the unrecorded real estate option under *§ 544*. The trustee alleged that there were no documents evidencing the option or any other purported interest, claim, or contract right of the defendants in the property that were recorded as of the petition date. The bankruptcy court granted a default judgment against all defendants in February 2007.

In apparent reliance on the default judgment and the leases with no option given by the trustee to it, EMB closed its purchase of the Visalia property on February 28, 2007.

### The Assignment Of The Leases To NASH

On March 31, 2007, Artesia assigned the two commercial [*11] leases to NASH for $806,378.65. According to the assignment, NASH assumed all the obligations under the leases.

### The Unlawful Detainer

After the closing, EMB received no rent from TAC or Artesia. Consequently, on April 25, 2007, EMB filed an action for unlawful detainer against TAC and Artesia. The California state court granted the requested relief by order dated May 9, 2007. After judgment was entered, NASH appeared in state court to seek relief from that judgment, as assignee under the leases dated November 1, 2003 between Realia and TAC and Realia and Artesia. The state court denied NASH's requested relief. [7] It was at this time that Mr. Black supposedly saw the leases that contained the option for the first time.

### The Motion To Set Aside The Default Judgment

On May 22, 2008, Artesia moved to set aside the default judgment in the trustee's § 544 adversary proceeding, contending that it had not been properly served. The bankruptcy court denied the motion in a written Minute Entry Order filed on July 30, 2008. The court found that Artesia had been properly served; Artesia had not acted timely with its motion to [*12] set aside the default; and Artesia had no meritorious defense to the trustee's adversary complaint. The order denying Artesia's motion was entered August 11, 2008.

Artesia appealed that order to the district court. The district court reversed the bankruptcy court's decision, finding that Artesia had not been properly served and therefore the bankruptcy court did not have personal jurisdiction over Artesia. The matter was remanded to the bankruptcy court. On April 16, 2009, the trustee dismissed his complaint in the § 544 adversary proceeding.

### The Delaware State Court Action

On September 20, 2007, NASH sued EMB in the Delaware Chancery Court to enforce the option to purchase the property referenced in the lease dated November 1, 2003 between Realia and Artesia. More than two years later, on November 18, 2009, the Delaware Chancery Court stayed its proceeding for six months so that EMB could seek clarification of the bankruptcy court's sale order and whether that sale assigned the leases with the option.

### The Closing And Reopening Of The Case

On June 9, 2008, debtor's chapter 7 case was closed. EMB

---

[7] Neither Artesia nor NASH occupied the property at the time of this appeal.

moved to reopen the bankruptcy case, and the bankruptcy court granted the motion to reopen on **[*13]** March 11, 2010.

**EMB's Adversary Complaint**

On June 1, 2010, EMB filed a complaint against NASH in the bankruptcy court seeking declaratory relief. In Count I, EMB sought a declaration that the August 2003 leases were the only leases assigned to EMB in the sale order and that any option to purchase contained in the November 1, 2003 leases was unenforceable as against EMB. In Count II, EMB sought a declaration that the option to purchase contained in the November 1, 2003 leases was not enforceable against EMB as a bona fide purchaser without notice of the option to purchase.

**NASH'S Motion To Dismiss The Adversary Complaint**

On July 2, 2010, NASH moved to dismiss the complaint under Civil *Rule 12(b)(1)* and *(3)*. NASH maintained that the bankruptcy court did not have jurisdiction over the matter because NASH had never appeared in the bankruptcy court and the dispute was between two parties to a lease. NASH asserted that the dispute was governed purely by state law. NASH further argued that the commercial lease agreements contained provisions that if a dispute arose under the agreement, Delaware law applied.

EMB responded, arguing that NASH waived any objection to personal jurisdiction because **[*14]** it did not object to the Delaware court's imposition of the stay of the state court proceeding. EMB also maintained that the bankruptcy court had subject matter jurisdiction under its "related to" jurisdiction because the dispute over what was assigned by the trustee arose out of the sale approved by the bankruptcy court.

At an August 12, 2010 hearing, the bankruptcy court granted NASH's motion to dismiss in part. The court dismissed Count II of the complaint, finding that Count I was the proper procedural vehicle to request the court to consider whether there should be a clarification of the sale order.

**EMB'S Motion For Summary Judgment**

On March 15, 2011, EMB moved for summary judgment, arguing that the undisputed facts showed that the only leases assigned to EMB by the court's sale order were the August 1, 2003 leases. EMB provided a statement of uncontroverted facts in support.

NASH responded to the motion, arguing that several other documents were "effective" August 1, 2003 besides the two leases referred to by EMB. NASH further maintained that the bankruptcy court made clear at the August 2, 2006 sale hearing, that any buyer would take the property subject to whatever right, title, **[*15]** and interest the estate had in the leases. NASH asserted that it was irrelevant what EMB or the trustee knew or did not know. Rather, NASH's position was that the narrow issue before the court was what interest did the estate have in the leases at the time the sale was approved. In addition, NASH maintained that the trustee's § 544 complaint, filed four months prior to the actual closing of the sale, put EMB on notice of the existence of the additional documents. Therefore, according to NASH, EMB should have known about the lease incentives and option at the time of the closing. NASH provided a statement of controverted facts and separate statement of facts in support.

On April 26, 2011, NASH filed a cross motion for summary judgment. In that motion, NASH requested the court to find, as a matter of law, that the lease agreements effective August 1, 2003 and ending July 31, 2013, referenced on page 2 of the sale order, included, among other documents, the subsequent lease agreements dated November 1, 2003, December 1, 2003, and January 31, 2004.

On June 1, 2011, the bankruptcy court heard argument from the parties on the summary judgment motions and took the matter under advisement. On **[*16]** June 14, 2011, the bankruptcy court ruled that the leases were never assumed by the trustee in connection with the sale of the Visalia property or at any other time. The court further found that leases not assumed by the chapter 7 trustee are "deemed rejected" under *§ 365(d)(1)*. The court therefore concluded that Artesia did not retain its rights under the option to purchase because of the rejection of its leases. The court further reasoned that the option was not an executory contract under the holding of *Unsecured Creditors' Comm. of Robert L. Helms Constr. & Dev. Co., Inc. v. Southmark Corp. (In re Robert L. Helms Constr. & Dev. Co., Inc.), 139 F.3d 702 (9th Cir. 1998)*. In the end, the court granted EMB's motion for summary judgment and denied NASH's cross motion for summary judgment.

On July 6, 2011, the court entered the Final Declaratory Judgment in favor of EMB. That judgment provides that EMB took the property "free and clear of any option agreement . . . contained in those certain leases dated November 1, 2003." NASH timely appealed the bankruptcy court's decision to grant summary judgment in favor of EMB.

**II. JURISDICTION**

As a threshold matter, we must determine whether the [*17] bankruptcy court had jurisdiction to issue a final judgment and whether we, in turn, have jurisdiction to review the judgment on appeal. See *Krasnoff v. Marshack (In re Gen. Carriers Corp.), 258 B.R. 181, 188-89 (9th Cir. BAP 2001)*. **HN1**[↑] Generally, disputes between purchasers of a debtor's assets and third parties are not within the bankruptcy court's jurisdiction. *Miller v. Kemira, Inc. (In re Lemco Gypsum, Inc.), 910 F.2d 784, 789 (11th Cir. 1990)*; *In re Hall's Motor Transit Co., 889 F.2d 520, 522-23 (3d Cir. 1989)*. However, a bankruptcy court has ancillary jurisdiction to interpret its own orders after the closing of a case. See generally *Battle Ground Plaza, LLC v. Ray (In re Ray), 624 F.3d 1124, 1130 (9th Cir. 2010)* (Ancillary jurisdiction enables a court to vindicate its authority and effectuate its decrees). Ancillary jurisdiction should only be used "when necessary to resolve bankruptcy issues, not to adjudicate state law claims that can be adjudicated in state court." *In re Ray, 624 F.3d at 1136*.

Here, the parties have different interpretations of the sale order based on statements the judge made during the sale hearing; namely, whether the sale included the assignment of the leases [*18] with or without the option. Because this aspect of the parties' dispute could arise only in a bankruptcy proceeding, we conclude that the bankruptcy court properly exercised its ancillary jurisdiction over the matter. See also *Travelers Indem. Co. v. Bailey, 557 U.S. 137, 129 S.Ct. 2195, 2205, 174 L. Ed. 2d 99 (2009)* ("[T]he Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders."). Therefore, we have jurisdiction under *28 U.S.C. § 158*.

### III. ISSUE

Whether the bankruptcy court erred in granting summary judgment in favor of EMB.

### IV. STANDARD OF REVIEW

**HN2**[↑] We review de novo the bankruptcy court's grant of a motion for summary judgment. *Ilko v. Cal. St. Bd. of Equalization (In re Ilko), 651 F.3d 1049, 1055 (9th Cir. 2011)*. De novo means review is independent, with no deference given to the trial court's conclusion. See *First Ave. W. Bldg., LLC v. James (In re Onecast Media, Inc.), 439 F.3d 558, 561 (9th Cir. 2006)*. We may affirm the bankruptcy court's decision on any ground supported by the record. *Shanks v. Dressel, 540 F.3d 1082, 1086 (9th Cir. 2008)*.

### V. DISCUSSION

In reviewing the bankruptcy court's decision on a motion for summary judgment, we apply the same standards as the bankruptcy [*19] court. Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and, when viewing the evidence most favorably to the non-moving party, the movant is entitled to prevail as a matter of law. Civil *Rule 56*, incorporated by *Rule 7056*; *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, could affect the outcome of the case. The substantive law will identify which facts are material. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*.

### A. Section 365

The bankruptcy court found that the chapter 7 trustee had not assumed any version of the leases and, furthermore, the leases were deemed rejected under *§ 365(d)(1)*. NASH contends that the bankruptcy court ruled on these issues without the benefit of briefing on the applicability of *§ 365*.[8] On appeal, NASH does not challenge the bankruptcy court's decision with respect to the assumption issue, but contends the court erred by concluding that the leases were rejected as a matter of law under *§ 365(d)(1)*.

We need not decide whether NASH had sufficient notice that in ruling on the summary judgment motion the bankruptcy court intended to consider the assumption or rejection issues, or whether if the court sua sponte ruled on these issues, it erred in so doing. We have independently reviewed the record and have considered not only the arguments NASH made to the bankruptcy court, but also the arguments and the evidence on which it relies as set forth in its brief and in oral argument to this Panel. Having considered such arguments and evidence, our analysis regarding *§ 365* differs from that employed by the bankruptcy court because we address the threshold question whether the leases containing the option were true leases falling within the scope of *§ 365*. See *City of S.F. Mkt. Corp. v. Walsh (In re Moreggia & Sons, Inc.), 852 F.2d 1179, 1182 (9th Cir. 1988)* (**HN3**[↑] only true leases fall within the scope of *§ 365*). We conclude that they are not. Our review is based on uncontroverted [*21] facts in the record on summary judgment — the lease documents.

---

[8] In the underlying summary judgment motion and cross motion, the parties did not mention [*20] *§ 365* at all. Rather, their arguments and statements of undisputed facts centered on the parties' and the court's statements at the hearing and on what the trustee or EMB knew, or should have known, regarding the sale.

HN4[↑] In analyzing whether a lease is a true lease falling within the scope of *§ 365*, the Ninth Circuit in In re Moreggia & Sons, Inc. observed that "not every interest that might qualify as a lease under state law is subject to the automatic rejection provision of *§ 365*." 852 F.2d at 1182. Thus, because state law was not dispositive on the "true lease" question, the court instructed that the "appropriate focus" was on the "economic realities of [the] particular situation." Id. at 1182. Therefore, even assuming that the leases containing the option were "true leases" under Delaware law, [9] we turn our focus to the "economic realities" of those agreements.

Here, we believe that under In re Moreggia & Sons, Inc., the purported leases with the option do not fall within the scope of *§ 365* because they lack the requisite landlord/tenant relationship and the debtor, Realia, had de minimis executory burdens. We considered the following provisions:

• The rent payable for each renewal term (which span as long as forty years) remained the same.

• With each rental [*22] payment, the tenant obtained a "credit" towards the purchase price of the property.

• The tenant had sole discretion to make all necessary repairs and maintenance to the building. The landlord agreed to reimburse the tenant for all repairs and maintenance within ten days of the tenant making such a request.

• The tenant had the right without the landlord's consent to remodel, redecorate, and make additions. However, the landlord also was required to reimburse the tenant within ten days of tenant making a request.

• The tenant paid all charges for utilities, including electricity, gas, water, waste, alarm and any other utilities, but then again was entitled to reimbursement from the landlord.

• The tenant also paid all charges for parking lot paving and resurfacing, and again the landlord was required to reimburse the tenant within ten days of tenant making such a request.

• Paragraph 15 of the lease provides that the tenant was responsible for managing the building and for collecting all rental payments on behalf the landlord, and was also responsible for paying Volley Properties, the first trust deed holder on the property.

• When the option was exercised, the purchase price varied not [*23] only by the rental credit, but also by the amounts not "reimbursed" by the landlord, i.e., for the utilities, improvements, etc.

• The leases gave the tenant the "right" to skip rent for up to three consecutive months at its discretion.

• The landlord was prohibited from encumbering the property, and tenant had the right to demand the release of any such encumbrance.

• Default of the landlord under the lease gave the tenant the right to add twelve percent interest to the amounts not reimbursed.

• Finally, at some point in time prior to the end of the renewed term ending in 2043, the credits would have more than paid the full option purchase price, leaving not even one dollar due at the end.

Taken together, these provisions do not indicate a landlord/tenant relationship. Although the tenant was required to pay rent, there was no increase in rent for as long as forty years. Thus, the landlord-debtor did not receive any return on its investment nor did the rent appear to be based on the market value of the property in the future. Moreover, the allocation of responsibilities between the landlord and tenant shows that the tenant was not only in possession of the property, but also in control. [*24] The tenant was given "sole discretion" to make repair and renovation decisions about the property, paid all utilities and taxes, managed the property, collected rent (presumably its own), and paid the first trust deed holder on the property. Although the tenant could seek "reimbursement" for certain items, if those amounts were not paid by the landlord, they would be credited towards the purchase price. Furthermore, the landlord was penalized for not making the reimbursements with an interest rate of 12%. Finally, the landlord could not encumber its own property. In short, under these leases, the tenant had far more than permission to use the property in exchange for rent. See *Int'l Trade Adm. v. Rensselaer Polytechnic Inst., 936 F.2d 744 (2nd Cir. 1990)* (noting that HN5[↑] the legislative history of *§ 502(b)* indicates that "the fact that the lessee assumes and discharges substantially all the risks and obligations ordinarily attributed to the outright ownership of the property is more indicative of a financing transaction than of a true lease . . . ."). [10]

Moreover, the terms of the leases show that the landlord-debtor had essentially no ongoing executory burdens. The

---

[9] Each of the leases provided that they should be construed under Delaware law.

[10] Another unusual feature of the lease agreements highlighted at the hearing on this matter was that the tenants were not required to [*25] be in possession nor did it matter that they had defaulted at the time they wished to exercise the option.

landlord was required to reimburse the tenant for certain expenses and provide financing in the event the tenant exercised the option. However, these responsibilities were conditional and essentially under the control of the tenant.

For these reasons, we conclude that the purported leases were not "true leases." [11] Based on the terms of the leases that contain the option clauses, there is no dispute concerning material facts. We thus conclude that the leases containing the option were not unexpired non-residential leases within the scope of *§ 365*. [12] Given our conclusion, *§ 365(h)(2)* is inapplicable.

**B. Section 363**

Accordingly, our focus shifts to the legal effect of the sale. Keeping in mind that the sale order is a final order, we first construe the sale order and then consider whether NASH's interest in the leases containing the option was extinguished through the sale free and clear.

**1. Construction Of The Sale Order**

*HN6*[↑] "When construing an agreed or negotiated form of order, such as the Sale Order in this case, we approach the task as an exercise of contract interpretation rather than the routine enforcement of a prior court order." *In re Trico Marine Servs., Inc., 450 B.R. 474, 482 (Bankr. D. Del. 2011)*; see *City of Covington v. Covington Landing Ltd. P'ship, 71 F.3d 1221, 1227 (6th Cir. 1995)* **[*28]** ("An agreed order, like a consent decree, is in the nature of a contract, and the interpretation of its terms presents a question of contract interpretation."); *Rifken v. CapitalSource Fin., LLC (In re Felt Mfg. Co., Inc.), 402 B.R. 502, 511 (Bankr. D.N.H. 2009)* ("The terms of court orders, plans of reorganization, and stipulations between parties are typically examined under principles of contract interpretation."). "At bottom, the goal is to determine the rights, duties, and reasonable expectations of the parties, as disclosed to and blessed by the Court. The paramount goal of contract interpretation is to determine the intent of the parties." *Trico Marine, 450 B.R. at 482* (citing *Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 587 (3d Cir. 2009))*.

The sale order plainly stated:
> IT IS FURTHER HEREBY ORDERED that the Trustee shall assign to Buyer any interest the Estate may have in the two(2) commercial leases described as follows: a. Commercial Lease Agreement with The Artesia Companies, Inc. as tenant, effective August 1, 2003 and ending July 31, 2013; and Commercial Lease Agreement with Artesia, Inc. as tenant, effective August 1, 2003 and ending July 31, 2013.

NASH attempts **[*29]** to create an ambiguity in the wording of the order by arguing that several other documents were "effective" August 1, 2003, besides the two leases referred to by EMB. NASH further maintains that the bankruptcy court made clear at the August 2, 2006 sale hearing, that any buyer would take the property subject to whatever right, title, and interest that the estate had in the leases. In other words, it was an "as is" sale, subject to later surprises.

We are not persuaded by NASH's arguments. *HN7*[↑] Where a contract is ambiguous, "the interpreting court must look beyond the language of the contract to ascertain the parties' intentions." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc., 702 A.2d 1228, 1232 (Del. 1997)*; *Restatement (Second) of Contracts § 202(1)*(1979) ("Words and other conduct are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is

---

[11] The arrangement appears to be a land sale contract with TAC as the buyer. However, it is also possible that TAC and Realia were one and the same and there really was never a bona fide "sale" between those parties. In any event, we need not give a label to the transaction.

[12] Even if the leases with the option were subject to *§ 365*, the trustee's purported assignment of those **[*26]** leases vis-a-vis the estate was ineffective. Under *§ 365(f)(2)*, the trustee was required to assume the leases before assigning them. *Section 363(f)(2)* provides that a trustee may assign an executory contract or unexpired lease only if the trustee first assumes such contract or lease in accordance with provisions of *§ 365* and provides adequate assurance of future performance by the assignee of such contract or lease. (Emphasis added.) It is undisputed that the trustee did not assume any version of the leases and it is only through assumption that the debtor's estate would have been bound to accept the obligations and the benefits under the leases. See *NLRB v. Bildisco & Bildisco, 465 U.S. 513, 531-32, 104 S. Ct. 1188, 79 L. Ed. 2d 482 (1984)*. Without assumption, the estate was not bound to accept the obligations and benefits under the leases. Thus, as a matter of law, the trustee's purported assignment of the leases to EMB (regardless of which version) was legally ineffective to transfer the obligations and rights under the leases to EMB. See *New Falls Corp. v. Boyajian (In re Boyajian), 367 B.R. 138, 145 (9th Cir. BAP 2007)*, aff'd, *564 F.3d 1088 (9th Cir. 2009)* ("Stated as a basic principle, an assignee merely steps **[*27]** into the shoes of his assignor. The question of what rights and remedies pass with a given assignment depends on the interest of the parties."). Moreover, we observe that there is no document in the record evidencing an assignment whereby EMB agreed to step into the shoes of debtor with respect to the leases containing the option. In reality, as further explained below, the record shows that EMB did not bargain for or intend to purchase the property subject to the leases containing the option.

given great weight").

The evidentiary record shows that the trustee and EMB negotiated for the sale of the property subject to the two leases without the option. This is evident because there was no mention of the leases with the option in the record until the actual sale hearing. The bankruptcy [*30] court observed: "[A] fair reading of the transcript is that the trustee did not have the complete set of documents then [at the sale hearing] that is now before this court . . . ." Hr'g Tr. June 1, 2011 at 24:21-25;25:1. It follows that the trustee's application to sell the property and the attached letter of intent could have only been referencing the leases without the option when those pleadings were submitted to the court.

Mr. Black's statements at the hearing are consistent with our conclusion because he stated that he would purchase the property with or without the leases, but without the option. The trustee's adversary proceeding filed subsequent to the sale hearing also demonstrates that the parties to the sale — EMB and the trustee on behalf of the estate — did not negotiate or intend the sale of the property subject to the leases with the option. As the bankruptcy court observed, "there probably wouldn't have been a closing without [the trustee's] action." Hr'g Tr. June 1, 2011 at 26:1. Finally, what is telling in this matter is that at no time during the sale hearing did NASH's principal, Mr. Kraft, produce the leases with the option.

Given this background, we cannot construe [*31] the sale order as being ambiguous when the reasonable intentions and expectations of the parties show otherwise. Accordingly, we conclude that, as a matter of law, the sale order is a final order which did not include the leases with the option.

### 2. NASH's Interest In the Option Was Extinguished By The Sale

Alternatively, we conclude that the option did not survive the sale. *HN8*[⬆] *Section 363(f)* authorizes a chapter 7 trustee to sell property free and clear of any "interest" in such property. We have construed the term "interest" to have an expansive scope. *Clear Channel Outdoor, Inc. v. Knupfer (In re PW, LLC), 391 B.R. 25, 41-2 (9th Cir. BAP 2008)* (citing *United States v. Knox-Schillinger (In re Trans World Airlines, Inc.), 322 F.3d 283 (3d Cir. 2003)* (finding that travel vouchers issued in connection with settlement of a discrimination action and discrimination claims made by the EEOC were "interests" subject to *§ 363(f)(5)*); see also *P.K.R. Convalescent Ctrs., Inc. v. Va. (In re P.K.R. Convalescent Ctrs., Inc.), 189 B.R. 90, 94 (Bankr. E.D. Va. 1995)* (statutory right to recapture depreciation on sale of health facility an interest within meaning of *§ 363(f)(5)*). Moreover, courts have noted [*32] that the purpose of the "free and clear" language is to allow the debtor to obtain a maximum recovery on its assets in the marketplace. See *In re Med. Software Solutions, 286 B.R. 431 (Bankr. D. Utah 2002)* (citing *WBO P'ship v. Va. Dep't of Med. Assistance Serv. (In re WBO P'ship), 189 B.R. 97, 108 (Bankr. E.D.Va. 1995))*.

We decide, as a matter of law, that NASH's interest in the option was an interest included within the scope of *§ 363(f)*. NASH does not complain that it did not have proper notice of the sale, nor can it when its principal was at the sale hearing. Further, NASH's continued silence left the bankruptcy court unaware that NASH might exploit the situation to undermine the intended goal of the bankruptcy sale to dispose of Realia's property free and clear of any interests. Therefore, we conclude that the property was sold free and clear of NASH's interest in the option.

### VI. CONCLUSION

For the reasons stated, we AFFIRM.

**End of Document**