## Exhibit F

**Complaint**



THIS DOCUMENT IS NOT IN PROPER FORM ACCORDING
TO FEDERAL AND/OR LOCAL RULES AND PRACTICES
AND IS SUBJECT TO REJECTION BY THE COURT.

REFERENCE _____ LRCvP5.4
                (Rule Number/Section)

1    Rune Kraft
      rk@kraft.legal
2    Kraft Legal | United States
3    108 West 13th Street
      Wilmington, Delaware 19801
4     302 408 1000

5

6               UNITED STATES DISTRICT COURT

7               FOR THE DISTRICT OF ARIZONA

8

9    Rune Kraft,                         Case No.    **CV21-00575-PHX-DJH**

          Plaintiff,
10    vs.

11    Chevron Corporation, a Delaware corporation,    **COMPLAINT**
     Valley Pacific Petroleum Services, Inc., a California
12    corporation, Valley Pacific Petroleum Systems, Inc.,
13    a California corporation, French Camp, LLC, a
     California limited liability company, Valley Pacific
14    Investments, a California based business entity,
     Silvas Oil Company, Inc. a California corporation,
15    Acclaim Credit Technologies, a California
     corporation, Cunningham & Associates Real Estate,
16    LLC, an Arizona limited liability company, Burr
     Commercial Properties, a California corporation,
17    International Credit Recovery, Inc., a California
18    company, W.R. Grace & Company, a Connecticut
     company, Mitchell Brown General Engineering, Inc.,
19    a California company, San Joaquin Sand & Gravel, a
     California company, Kaweah River Rock Company,
20    a California business entity, California State Board of
     Equalization, an entity of the State of California,
21    Tulare County Superior Court, an entity of the State
     of California, Orix Financial Services, Inc., a New
22    York company,   James Oliver, Alroy J. Oliver,
     Richard D. Oliver and Larry P. Oliver, residents of
23    California, Eric M. Black, LLC, a California limited
24    liability company, Cemex, Inc., a Louisiana
     corporation, Lehigh Hanson, Inc., a Delaware
25    corporation; and DOES 1-10, Inclusive,

26         Defendants.

# 1. Jurisdiction

1. This is an action for: civil relief under 18 U.S.C. §§ 1961 *et seq.*, which gives this court authority pursuant to 18 U.S.C § 1964 (a); relief under the California Cartwright Act (Sections 16600 *et seq.* of the California Business & Professions Code; and relief under the California Unfair Practices Act (Section 17000 *et seq.* of the California Business & Professions Code). This action is also between citizens of different states, and the amount in controversy, exclusive of interest and costs, exceeds the sum of $ 75,000. Thus, the district court has jurisdiction pursuant to both 28 U.S.C. § 1331 and § 1332. Venue is proper in this judicial district based on 28 U.S.C. § 1391(b)(1) and (2).

# 2. Parties

2. Rune Kraft ("Kraft") is based outside the United States and manages and develops businesses and assets globally. Realia, Inc., a Delaware corporation, Concreteworks, Inc., a Delaware corporation, Artesia Holdings, Inc., a Delaware corporation, Pacific Equipment Management Company, Inc., a Delaware corporation, Pacific Real Estate Holdings, Inc., a Delaware corporation, North American Service Holdings, Inc., a Delaware corporation, and Kraft Americas Holdings, Inc., a Delaware corporation, have assigned their claims related to this matter to Kraft.

3. Chevron Corporation, a Delaware corporation, is based in San Ramon, California and manages and develops businesses and assets globally. 1 U.S.C. § 1 states that in determining the meaning of any Act of Congress, unless the context indicates otherwise, the words "person" and "whoever" include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals. The Defendant is responsible for the global activities of Chevron, including establishing and maintaining the standards that ensure compliance with all applicable laws, at all times. Its role in the fraudulent schemes alleged herein is that it either ordered, participated in, or turned a blind eye to the unlawful activities and has allowed the continued use of the resources of the Chevron to support the fraudulent scheme. It has thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes, whether they are or have been directly employed by the Chevron or indirectly employed by the Chevron as

COMPLAINT

1

contractors. Chevron Corporation has acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by persons either directly or indirectly employed by Chevron, members of the conspiracy, to further the crimes described herein.

4. Valley Pacific Petroleum Services, Inc. ("Chevron-VP Oil") and Valley Pacific Petroleum Systems, Inc. ("Chevron-Fischer Oil") are California corporations based in Stockton, California engaged in the business of distributing gasoline, diesel and oil related products received from Chevron Corporation. French Camp, LLC, a Stockton, California based company, is a subsidiary, affiliate or agent of the Valley Pacific entities and has the same offices and officers as the Valley Pacific entities. Valley Pacific Investments, a Fresno, California based business entity ("VPI"), was a subsidiary, affiliate or agent of the Valley Pacific entities and French Camp. Silvas Oil Company ("Chevron-Silvas Oil"), Inc. a California corporation, is a subsidiary, affiliate, or agent of Chevron Corporation based in Fresno, California. It has an assignee, Acclaim Credit Technologies, a California corporation, based in Visalia, California (collectively with Chevron Corporation "Chevron Entities"). 1 U.S.C. § 1 states that in determining the meaning of any Act of Congress, unless the context indicates otherwise, the words "person" and "whoever" include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals. The Defendants are responsible for the activities in the United States of the Chevron Entities, including establishing and maintaining the standards that ensure compliance with all applicable laws, at all times. Their roles in the fraudulent schemes alleged herein are that they either ordered, participated in, or turned a blind eye to the unlawful activities and have allowed the continued use of the resources of the Chevron Entities to support the fraudulent scheme. They have thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes, whether they are or have been directly employed by the Chevron Entities or indirectly employed by the Chevron Entities as contractors. These corporate entities have acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This

2

complaint describes with particularity numerous overt acts taken by persons either directly or indirectly employed by the Chevron Entities, members of the conspiracy, to further the crimes described herein.

5. Cunningham & Associates Real Estate, LLC, an Arizona limited liability company is based in Phoenix, Arizona ("Cunningham"). The Defendant aided and abetted the Chevron Entities in monetizing the "diesel fuel fraud" described herein in a case under title 11, which are offenses involving fraud connected with a case under title 11 and "specified unlawful activity" listed in section 18 U.S.C. § 1961(D).

6. Burr Commercial Properties, a California corporation, is based in San Diego, California ("Burr"). The Defendant aided and abetted the Chevron Entities in monetizing the "diesel fuel fraud" described herein in a case under title 11, which are offenses involving fraud connected with a case under title 11 and "specified unlawful activity" listed in section 18 U.S.C. § 1961(D).

7. International Credit Recovery, Inc., a California company, is based in Fresno, California ("ICR"). The Defendant has received property it had no lawful rights to receive from a case under title 11, which are offenses involving fraud connected with a case under title 11 and "specified unlawful activity" listed in section 18 U.S.C. § 1961(D).

8. W.R. Grace & Company, a Connecticut company, is based in Columbia, Maryland. The Defendant has received property it had no lawful rights to receive from a case under title 11, which are offenses involving fraud connected with a case under title 11 and "specified unlawful activity" listed in section 18 U.S.C. § 1961(D).

9. Mitchell Brown General Engineering, Inc., a California company, is based in Porterville, California. The Defendant has received property it had no lawful rights to receive from a case under title 11, which are offenses involving fraud connected with a case under title 11 and "specified unlawful activity" listed in section 18 U.S.C. § 1961(D).

10. San Joaquin Sand & Gravel, a California company, is based in Madera, California ("San Joaquin"). The Defendant has received property it had no lawful rights to receive from a case under title 11, which are offenses involving fraud connected with a case under title 11 and "specified unlawful activity" listed in section 18 U.S.C. § 1961(D).

11. Kaweah River Rock Company, a California business entity, is based in Woodlake, California ("Kaweah"). The Defendant has received property it had no lawful rights to receive

from a case under title 11, which are offenses involving fraud connected with a case under title 11 and "specified unlawful activity" listed in section 18 U.S.C. § 1961(D).

12. California State Board of Equalization is an entity of the State of California that administered sales and use taxes in California and is based in Sacramento, California ("BOE"). The Defendant doggedly sought to collect sales and use taxes in a corrupt manner as no sales and use taxes were owed and the entities it sought to collect the sales and use taxes from had nothing to do with these purported sales and use taxes. The Defendant has received property it had no lawful rights to receive from a case under title 11, which are offenses involving fraud connected with a case under title 11 and "specified unlawful activity" listed in section 18 U.S.C. § 1961(D). The conduct of the BOE was in bad faith and fraudulent.

13. Tulare County Superior Court is an entity of the State of California claiming to adjudicate controversies on behalf of the State of California and is based in Visalia, California. The Defendant systematically allowed the court to be used without jurisdiction and as a conduit of theft. For example, the Defendant aided and abetted the Chevron Entities in monetizing the "diesel fuel fraud" when it had no lawful authority to do so due to lack of jurisdiction. And for example, the Defendant demanded and collected funds from Plaintiff: without a contract, which is required pursuant to California Code of Civil Procedure 483.010; without a notice and hearing, which is required pursuant to California Codes of Civil Procedure 484.040 and 484.050; and without collateral, which is required pursuant to California Code of Civil Procedure 490.020 and 489.220. Plainly, at this court, "the fix was in". The court had a culture of cheating and cover-ups, which had evolved from uncontrolled chaos to institutionalized kleptocracy. Local officers of the court, regardless of who they were representing, were "in" on the scheme. Specifically, there was an embedded culture of expectation and entitlement based on the use of the court as a conduit of theft. The attitude of attorneys was "as long as I get my share, what do I care about the law, the parties and ethical guidelines". In addition to local attorneys in private practice, local attorneys working for local law enforcement and local judicial officers were also "in" on the scheme, and local private practice attorneys knew it. There was zero fear among local private practice attorneys that anybody would enforce their violations of law which of course further stimulated the anarchistic conditions. For example, Plaintiff observed an example of a local attorney taking part in a scheme to forge evidence, using the forged evidence at the court, and making false statements

COMPLAINT

4

about the "evidence" to the court and this being reported to the Visalia Police Department, the Tulare County District Attorneys' Office, and the local judicial officer in charge of the matter at the court, every time accompanied with *prima facie* evidence, and every time nothing was done. The conduct of the Tulare Court was in bad faith and fraudulent.

14. Orix Financial Services, Inc., a New York company, is based in Dallas, Texas. Its role in the fraudulent schemes alleged herein is that it either ordered, participated in, or turned a blind eye to the unlawful activities at the Tulare Court. As a result, the Defendant has received moneys it had no lawful rights to receive by means of the institutionalized kleptocracy at the Tulare County Superior Court. It has thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes, whether they are or have been directly employed by Orix or indirectly employed by Orix as contractors. Orix has acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by persons either directly or indirectly employed by Orix, members of the conspiracy, to further the crimes described herein.

15. James Oliver, Alroy J. Oliver, Richard D. Oliver and Larry P. Oliver are California residents and live in the Visalia area of California. Their role in the fraudulent schemes alleged herein is that they either ordered, participated in, or turned a blind eye to the unlawful activities at the Tulare Court. As a result, the Defendants have received considerations and moneys they had no lawful rights to receive by means of the institutionalized kleptocracy at the Tulare County Superior Court. They have thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes, whether they are or have been directly employed by them or indirectly employed by them as contractors. They have acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by persons either directly or indirectly employed by them, members of the conspiracy, to further the crimes described herein.

COMPLAINT

5

16. Eric M. Black, LLC, a California limited liability company, is based in Visalia, California. The Defendant has received property it had no lawful rights to receive from a case under title 11, which are offenses involving fraud connected with a case under title 11 and "specified unlawful activity" listed in section 18 U.S.C. § 1961(D).

17. Cemex, Inc., a Louisiana corporation, is based in Houston, Texas. The Defendant has failed to pay for the use of plant and equipment used to manufacture ready-mix concrete at locations in the City of Farmersville and the City of Tulare, California. Cemex is a leading global manufacturer of cement with operations in California, including cement manufacturing plants and cement import terminals. The Defendant has engaged in acts and practices that violate the California Cartwright Act (Sections 16600 *et seq.* of the California Business & Professions Code) and the California Unfair Practices Act (Section 17000 *et seq.* of the California Business & Professions Code). The Defendant is operating a cartel, the ultimate form of collusion by competitors in any industry, to engage in conduct that falls into the category of agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. The Defendant is cartelizing the markets through the trade variable "availability". The Defendant is: geographically allocating control over the supply of cement and thus exercise control over the market price; is geographically allocating control over the supply of cement and thus exercise control over the transportation costs; and has secret agreements between cartel members by which they extend secret discounts to one another and thus stifle competition within the State of California and exercise unparalleled and unlawful control over the market price.

18. Lehigh Hanson, Inc., a Delaware corporation, is based in Irving, Texas. The Defendant has failed to pay for the use of plant and equipment used to manufacture ready-mix concrete at a location in the City of Porterville, California. Lehigh Hanson is a leading global manufacturer of cement with operations in California, including cement manufacturing plants and cement import terminals. The Defendant has engaged in acts and practices that violate the California Cartwright Act (Sections 16600 *et seq.* of the California Business & Professions Code) and the California Unfair Practices Act (Section 17000 *et seq.* of the California Business & Professions Code). The Defendant is operating a cartel, the ultimate form of collusion by competitors in any industry, to

engage in conduct that falls into the category of agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. The Defendant is cartelizing the markets through the trade variable "availability". The Defendant is: geographically allocating control over the supply of cement and thus exercise control over the market price; is geographically allocating control over the supply of cement and thus exercise control over the transportation costs; and has secret agreements between cartel members by which they extend secret discounts to one another and thus stifle competition within the State of California and exercise unparalleled and unlawful control over the market price.

### 3. Statement of Claim for Relief.

19. This is an action for: civil relief under 18 U.S.C. §§ 1961 *et seq.*, which gives this court authority pursuant to 18 U.S.C § 1964 (a); relief under the California Cartwright Act (Sections 16600 *et seq.* of the California Business & Professions Code); relief under the California Unfair Practices Act (Section 17000 *et seq.* of the California Business & Professions Code). This action is also between citizens of different states, and the amount in controversy, exclusive of interest and costs, exceeds the sum of $ 75,000. Thus, the district court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332. FRCP 8(a)(1)

20. Plaintiff has a legal entitlement to business relations and property rights unhampered by schemes prohibited by the RICO predicate statutes, 18 U.S.C. §§ 1962(c), 1961(1), and the California antitrust and unfair practices statutes, Sections 16600 *et seq.* and of Section 17000 *et seq.* of the California Business & Professions Code. FRCP 8(a)(2)

21. Plaintiff seeks to have the district court order: (1) that any transactions, including derivative transactions that has injured Plaintiff in his business and property are invalidated based on the district court's authority pursuant to 18 U.S.C. § 1964 (a); and (2) that the Plaintiff shall recover  threefold the damages he has sustained, and the cost of the suit based on 18 U.S.C. § 1964 (c) and California Bus. & Prof. Code §§ 16750(a), 17070,17082. FRCP 8(a)(3)

## 4. The Facts.

### 4.1 The Specified Unlawful Activity Claims

22. On April 6, 2017 Plaintiff received the BOE's response to a subpoena that he had caused to be issued in Tulare Court Case No. 217841 which related to an allegation that had been made by Alroy J. Oliver and Richard D. Oliver that they had been forced to pay the BOE about $ 100,000 in sales taxes that supposedly were owed by the taxpayer The Artesia Companies, Inc., for Account No. 097827995. Al and Richard Oliver also claimed that they had an agreement with Plaintiff and that in this agreement Plaintiff had indemnified them.

23. The BOE's response contained ledgers and checks. However, the records did not show any payments made by Al and Richard Oliver to the BOE, as they had alleged at the Tulare Court.

24. What the records did show was that the BOE had received payments it was not entitled to from a case under title 11, Case No. 2:05-bk- 15022-RTB, which are offenses involving fraud connected with a case under title 11 and "specified unlawful activity" listed in section 18 U.S.C. § 1961(D).

25. The Artesia Companies, Inc. stopped selling tangible products in California which are subject to a state sales tax of about 7% to the BOE in the summer of 2003 and as of August 31, 2003, there was no money owed on this account ("the sales tax fraud"). Yet, the subpoenaed records reflect that the SBOE continued to collect money related to this account, after this date. The conduct of the BOE was in bad faith and fraudulent.

26. Further, even if sales taxes were owed to the BOE, and no sales taxes were owed, Al and Richard Oliver would have had no authority to interact with the BOE about any purported sales tax obligations of The Artesia Companies, Inc. And Al and Richard Oliver had no contracts with Plaintiff making Plaintiff responsible for answering for their debts, defaults, or miscarriages.

27. Falsely and fraudulently, Al and Richard Oliver had represented to the Tulare County Superior Court that they had had made payments to the SBOE in the amount of about $ 100,000, which the subpoenaed information showed that they had not. And the Tulare Court collected $ 634,678 from Plaintiff based on this representation. How this was accomplished remains a mystery to Plaintiff.

28. Further, the Tulare Court collected the funds from Plaintiff: without a contract, which is required pursuant to California Code of Civil Procedure 483.010; without a notice and hearing, which is required pursuant to California Codes of Civil Procedure 484.040 and 484.050; and without collateral, which is required pursuant to California Code of Civil Procedure 490.020 and 489.220. The conduct of the Tulare Court was in bad faith and fraudulent.

29. Al and Richard Oliver, their other two brothers Jim and Larry, and the Tulare Court engaged in similar fraudulent conduct related to 7 ready mix concrete trucks that had been financed through Orix and an alleged unpaid balance of about $ 50,000. At the time, each truck was probably worth about $ 30,000 - $ 40,000, making the 7 trucks worth close to $ 250,000. Thus, with a loan balance of about $ 50,000 and the trucks being worth five times as much, whoever had control over the trucks had a ready profit of about $ 200,000 ("the equipment fraud -trucks").

30. Despite these facts, and again Plaintiff does not understand how the Oliver brothers managed this, they represented to the Tulare Court that they had an agreement with Plaintiff and that in this agreement Plaintiff had indemnified them so the court should collect $ 200,000 from Plaintiff.

31. Further, the Tulare Court collected the $ 200,000 from Plaintiff: without a contract, which is required pursuant to California Code of Civil Procedure 483.010; without a notice and hearing, which is required pursuant to California Codes of Civil Procedure 484.040 and 484.050; and without collateral, which is required pursuant to California Code of Civil Procedure 490.020 and 489.220. The conduct of the Tulare Court was in bad faith and fraudulent.

## 4.2   The Antitrust and Unfair Practices Claims

32. Plaintiff was formerly engaged in the business of manufacturing and selling ready mix concrete and pre-cast concrete products in Tulare County, Kings County and Fresno County California.  Plaintiff's companies perfected a low-cost system for manufacturing concrete and delivering it to its customers' construction sites.  Plaintiff had operations at 8 locations and had a business plan for expanding to 30 additional locations where he expected to quickly obtain a minimum 20% market share as the lowest cost producer in the region.

COMPLAINT

9

33. Defendants Cemex and Lehigh Hanson are companies in the business of selling cement to customers located in California. The California cement market is dominated by the multiple U.S. subsidiaries of three large families of affiliated companies headed by the parent company of Defendant Cemex, Cemex S.A.B. de C.V. ("Cemex"), a Mexican corporation, the parent company of Defendant Lehigh Hanson, Heidelberg Cement AG, a German corporation, and Taiheiyo Cement Corporation, a Japanese corporation (together, the "cement cartel"). The members of the cement cartel have combined to unreasonably restrain trade in the sale of cement to concrete manufacturers that are unaffiliated with the cartel ("independent concrete producers") throughout Tulare County, Kings County and Fresno County, California (the "relevant market").

34. Although Defendant Cemex and Defendant Lehigh Hanson are just selected members of the cement cartel, their participation in a conspiracy to restrain trade and illegally inflate cement prices in the relevant market renders each of them jointly and severally liable for all of the damages inflicted upon Plaintiff by the cartel or any of its members.

35. The cement cartel employed acquisitions and mergers to obtain total control over domestic production of cement within 200 miles of the relevant market. Domestic producers located more than 200 miles away were unable to compete within the relevant market because of the cost of transporting cement by rail or truck.

36. The U.S. cement manufacturing market is insulated from competition from new entrants because of the cement industry's high barriers to entry which include:

- The high cost of building cement manufacturing facilities
- Limited access to natural resources needed for cement production
- Substantial delay and costs associated with zoning and environmental approvals required for a cement production facility.

37. Beginning at a time unknown and continued up to the date of the filing of the complaint, the cement cartel succeeded in eliminating competition in the sale of cement to independent concrete producers in the relevant market.

38. The elimination of competition allowed cartel members to dramatically increase cement prices to independent concrete producers.

39.  The elimination of competition allowed cartel members to arbitrarily curtail the supply of cement to independent concrete producers and uniformly charge them cement prices that substantially exceeded the prices they charged to a concrete manufacturing subsidiary of another cartel member.

40.  The primary mechanism used by the cement cartel to eliminate competition in the relevant market was an allocation of independent concrete producer customers among the cartel members.  With only occasional and very limited exceptions, independent concrete producers were only able to obtain cement from an existing supplier.  Other cement cartel members refused to compete for the business of another cartel member's customer.

41.  The only cement manufacturer that would sell cement to Plaintiff was a cartel member known as Hanson Permanente Cement, which was later acquired by the corporate family of affiliated cartel members known as Heidelberg.

42.  Plaintiff continuously sought alternative sources of cement supply.  Plaintiff consistently asked for cement to be picked up and paid for in advance at the supplier's location.

    A.  In each case, the prospective alternative supplier failed or refused to do business with Plaintiff.

    B.  Sometimes the prospective alternative supplier asked who was currently supplying the company with cement and then refused to do business with Plaintiff once it was disclosed that Plaintiff was already a customer of Hanson.

    C.  Often the prospective alternative supplier simply failed to respond to Plaintiff's request for quotation and multiple follow-up inquiries.

43.  The cost of transporting cement from the supplier's manufacturing facility to the purchaser's concrete facility is a significant cost factor for the purchaser.  Hence, purchasers generally prefer the cement supplier that is closest to its concrete facility and, in a competitive market the closest cement supplier would have a competitive advantage.  However, Plaintiff was only able to purchase cement from Hanson's cement facility in Santa Clara, California (located approximately 200 miles away) even though other cartel members had cement manufacturing operations that often were closer to the applicable Plaintiff concrete manufacturing facility (e.g. cement facilities in Tehachapi, Lebec and Mojave located about 100 miles away).

COMPLAINT

11

44. Unless there was an agreement among the members of the cement cartel not to compete for other cartel members' customers, it was not rational economic behavior for Hanson's competitors to turn down opportunities to compete for Plaintiff's business. The refusal to compete was particularly irrational when Hanson's competitors had a competitive advantage due to their closer proximity to Plaintiff's facilities.

45. The cement suppliers dealt with independent concrete producers in California as follows:

    i.    Each independent concrete producer only had a single cement supplier for many years – sometimes for decades.

    ii.    Competing cement suppliers never sought their business.

    iii.    Often the independent concrete producer's only permitted cement supplier was not the closest possible cement supplier (resulting in economically irrational and inefficient transportation of cement throughout California).

    iv.    Most independent concrete producers did not seek alternative suppliers because it was understood that attempting to do so would have been futile

    v.    Cement suppliers do not have a single price for the cement they sell. The price for cement sold by a single supplier at a particular facility varies according to the intended destination of the cement. Although independent concrete producers must pick up cement at their supplier's location and bear the cement transportation cost to their concrete production facilities themselves, the price of cement is always quoted based upon the location of the concrete facility where the cement is being taken.

    vi.    Cement prices quoted by different suppliers are always the same for a particular destination.

46. In the absence of an illegal agreement to allocate customers, eliminate competition and charge inflated prices, it would not have been in the cement suppliers' best economic interest to:

    a)    Consistently refrain from seeking the business of customers previously served by the cement supplier's competitor.

COMPLAINT

12

b) Consistently refrain from selling cement to a prospective customer whose close proximity provides the cement supplier with a competitive advantage.

47. In a competitive market that is not restrained by an illegal agreement to allocate customers it is not plausible that cement suppliers would conduct their businesses as they did.

48. The primary mechanism used by the cement cartel to insulate itself from foreign competition was to obtain control over all ports where cement from foreign competitors could be imported into the relevant market.

49. Approximately 25 percent of the cement sold in California is imported from foreign countries. However, members of the cement cartel have obtained exclusive ownership, rights and control over all of the cement offloading facilities at every port along the California coast. In some ports, individual members of the cement cartel have secured control of the facilities. In others, two cartel members have combined to form a joint venture that controls the facilities.

50. Cartel members will only offload their own cement at the port facilities that they control. They will not offload the cement of foreign competitors who want to compete on price with low cost imported cement.

51. Because the cost of transporting cement more than 200 miles by rail or truck makes it economically prohibitive to compete, the cement cartel's control of the California port facilities has insulated it from price competition from foreign imports into the relevant market.

52. If the cement cartel had not obtained control of all of the cement offloading facilities at California's ports, competition from cement imports would have exerted substantial downward pressure on cement prices in the relevant market.

- Foreign cement producers were selling cement at foreign ports at an average price of $15.00/ton.
- After adding in transportation costs and offloading costs the price of cement at California ports would have averaged approximately $34.00/ton.
- The cement cartel was selling both domestic and imported cement in the relevant market at two to three times that price during the same time period.

COMPLAINT

13

53.  As a result of the cement cartel's total control over domestic and foreign competition in the relevant market and the illegal allocation of independent concrete producer customers, each member of the cartel has had unfettered control over the prices it charges its customers for cement. However, the cartel members also enhanced their illegal manipulation of cement prices through explicit and/or implicit agreements on cement prices.

54.  The illegal pricing agreements among cement suppliers have further stabilized cement prices at inflated levels that are not subject to normal competitive pressures.

55.  The members of the cement cartel have frequent opportunities to communicate about cement pricing that enables illegal coordination through price signaling and/or express price fixing agreements:

- Cement cartel members report financial results to a central trade association known as the Portland Cement Association ("PCA") which then publishes a monthly report of current financial data that consolidates the data reported by cartel members by geographic market. The PCA's monthly report includes total sales revenue and total quantity sold which allows cartel members to determine the average price per ton of cement sold in any particular geographic market and thereby provides a signal to all competitors about the price levels that each should charge in the future.

- Cement cartel members meet frequently at trades association conferences.

- The corporate officers of different cement cartel members often meet in their capacity as officers or directors of another cartel member, another cartel member's subsidiary and/or joint ventures between two or more cartel members. Interlocking directorates among competitors is a per se violation of the antitrust laws.

56.  Cement prices in the relevant market increased dramatically and were two to three times higher than the level of cement prices in the states of Washington and Oregon.  Cement prices in the relevant market also were approximately three times higher than the prices that would have been available to cement purchasers if the cement cartel did not have the ability to exclude competition from foreign manufacturers seeking to bring cement into the relevant market through California's seaports.

57.   Cement prices continued to rise even during periods of economic retraction that dramatically reduced construction activity and drove the demand for cement well below the manufacturing capacity of domestic cement manufacturers.   If there had been no illegal allocation of cement customers and no illegal agreements to fix cement prices, it would not have been economically rational for cement manufacturers to raise cement prices in the face of a dramatic decline in demand.

58.   The existence of a vibrant market of independent concrete producers seeking lower cement prices provides a potential incentive for new cement manufacturing competitors to enter the relevant market (despite the overwhelming barriers to entry) and offer cement at prices that are lower than the inflated pricing the cartel has imposed through its illegal conduct.   Hence, the cement cartel views independent concrete producers as threats to the cartel's efforts to illegally inflate cement prices.

59.   During the past several decades members of the cement cartel have entered the downstream concrete business through acquisitions and mergers and have sought to leverage their market power in the cement market to also dominate and control the business activities of the companies in the downstream concrete market.

60.  Through the following conduct, the cement cartel has weakened independent concrete producers (including Plaintiff's companies) in an effort to eliminate them from the market or coerce them to sell their assets or businesses to members of the cartel:

- The prices of cement to independent concrete producers that are set by the cartel are always significantly higher than the prices charged to the concrete manufacturing subsidiaries of cement cartel members.

- Each cartel member has entered into cement swap agreements that provide other cartel members, and their concrete subsidiaries, with preferential cement pricing that is not available to independent concrete producers.   These agreements ensure that wherever an independent concrete producer is competing with a concrete manufacturing subsidiary of a cement cartel member for the opportunity to supply concrete to a construction site, the cost of cement to the independent concrete producer will always be significantly higher.

COMPLAINT

15

- Cartel members have severely restricted the quantity of cement they supply to independent concrete producers to cripple their ability to compete in the concrete market or to grow their concrete businesses.

61.    The conduct described above has severely weakened the ability of independent concrete producers to compete in the relevant market.  Some independent concrete producers have gone out of business. Others have been acquired by members of the cement cartel after their businesses have been irrevocably weakened.  This has led to a consolidation of the concrete market and a concentration of concrete competitors under the control of the cement cartel.

62.  Plaintiff had a business plan to expand its operations into 30 additional geographic locations.  Because of its low-cost business model, Plaintiff reasonably expected to swiftly capture at least 20 percent of the market in each of those locations and enjoy profits equal to 20 percent of its revenues, after deduction of the capital costs of its expansion.

63.  The combined effect of the cement cartel's inflated prices for cement to independent concrete producers like Plaintiff's companies, the competitive advantage that lower cement prices provided to the cement cartel's concrete manufacturing subsidiaries and the severe restrictions on the quantity of cement that was made available to Plaintiff made it impossible for it to implement its expansion plans and ultimately forced Plaintiff to cease doing business in the concrete market. As a consequence of the cement cartel's illegal conduct, Plaintiff lost the going concern value of its then existing concrete business and the going concern value of its planned business expansion.

64.  The cartel members have also used a mobile cement storage facility and two mobile concrete manufacturing facilities owned by Plaintiff and have used them for their own benefit.

   a)  Plaintiff offered to enter into long-term leases of his mobile facilities upon attractive lease terms but, despite numerous attempted communications on this subject, Plaintiff was unable to get any response to its offer.

   b)  After many months of continued use of its mobile facilities without any indication concerning the acceptability of a long-term lease, Plaintiff made it clear that further use would have to be on less attractive month to month lease terms.

   c)  Plaintiff has regularly sent invoices for monthly rental charges, insurance charges and interest on the unpaid balance.  Each invoice stated that the lease could be

16

terminated at any time on 30 days' notice. However, Plaintiff has never received any notice of termination of the leasing arrangement.

d) Plaintiff's mobile facilities continue to be used to the present day. The terms of its month-to-month lease have never been rejected. To the contrary, the continued use of its mobile facilities, after multiple written communications that clearly communicated the required terms and conditions of such continued use, conveyed a legal acceptance of the lease terms offered by Plaintiff.

e) No lease payments have ever been made to Plaintiff.

## 4.3 The Title 11 Offenses Involving Fraud

65. Chevron Corporation is one of the largest oil companies in the world. This was accomplished largely through mega-mergers, e.g., in 1961 Standard Oil Co. (Kentucky), in 1984 Gulf Oil Corp, in 1984 Getty Oil (though subsequent merger with Texaco), in 1988 Tenneco Oil Co. (large portion of Tenneco's oil industry assets), in 2000 Texaco, and in 2005 Unocal Corp. Already in 1984, through the Gulf merger alone, Chevron became the No. 1 U.S. refiner and marketer as well as the nation's market leader in gas liquids.

66. As a result, Chevon Corporation had the ability to coerce markets and strongarm its direct and indirect customers. And they did.

67. Relevant to this action what appears to be a trust was established by Chevron Corporation and Valley Pacific Petroleum Services, Inc. to absorb the business of J.A. Fischer Oil, which was named Valley Pacific Petroleum Systems, Inc. dba J.A. Fischer Oil.

68. And relevant to this action is the sale of about 17,000,000 gallons of diesel fuel at prices that were on average $ 0.18 per gallon higher than what the prices should have been by the associated-in-fact enterprise of Chevron Corporation, Valley Pacific Petroleum Services, Inc. and Valley Pacific Petroleum Systems, Inc. dba J.A. Fischer Oil:

| Samples of Prices per Gallon | | | | | |
|---|---|---|---|---|---|
| Diesel Per Gallon | Retail Price | Rack Price | Delivered Price | Chevron Price | Damages Per Gallon |
| 28-Aug-00 | 1. 85 | 1. 73 | 1. 78 | 1.96 | 0.18 |

| | | | | |
|---|---|---|---|---|
| 10-Sep-01 | 1.67 | 1.55 | 1.60 | 1.73 | 0.13 |
| 26-Aug-02 | 1.56 | 1.44 | 1.49 | 1.73 | 0.24 |
| | | | Average | 0.18 |

69. Including interest at 1.5% per month, compounded monthly, the damages are as follows:

| Damages | | | | |
|---|---|---|---|---|
| Year | Diesel Gallons | Annual Damages | Interest | Cumulative Damages |
| 1976 | 500,000 | 90,000 | 8,775 | 98,775 |
| 1977 | 500,000 | 90,000 | 28,036 | 216,811 |
| 1978 | 500,000 | 90,000 | 51,053 | 357,864 |
| 1979 | 500,000 | 90,000 | 78,559 | 526,423 |
| 1980 | 500,000 | 90,000 | 111,427 | 727,850 |
| 1981 | 500,000 | 90,000 | 150,706 | 968,556 |
| 1982 | 500,000 | 90,000 | 197,643 | 1,256,200 |
| 1983 | 500,000 | 90,000 | 253,734 | 1,599,933 |
| 1984 | 500,000 | 90,000 | 320,762 | 2,010,695 |
| 1985 | 500,000 | 90,000 | 400,861 | 2,501,556 |
| 1986 | 500,000 | 90,000 | 496,578 | 3,088,135 |
| 1987 | 500,000 | 90,000 | 610,961 | 3,789,096 |
| 1988 | 500,000 | 90,000 | 747,649 | 4,626,744 |
| 1989 | 500,000 | 90,000 | 910,990 | 5,627,735 |
| 1990 | 600,000 | 108,000 | 1,107,938 | 6,843,673 |
| 1991 | 600,000 | 108,000 | 1,345,046 | 8,296,719 |
| 1992 | 600,000 | 108,000 | 1,628,390 | 10,033,109 |
| 1993 | 600,000 | 108,000 | 1,966,986 | 12,108,095 |
| 1994 | 600,000 | 108,000 | 2,371,609 | 14,587,704 |
| 1995 | 600,000 | 108,000 | 2,855,132 | 17,550,836 |
| 1996 | 700,000 | 126,000 | 3,434,698 | 21,111,534 |
| 1997 | 800,000 | 144,000 | 4,130,789 | 25,386,324 |
| 1998 | 800,000 | 144,000 | 4,964,373 | 30,494,697 |
| 1999 | 1,000,000 | 180,000 | 5,964,016 | 36,638,713 |
| 2000 | 1,000,000 | 180,000 | 7,162,099 | 43,980,812 |
| 2001 | 1,000,000 | 180,000 | 8,593,808 | 52,754,620 |
| 2002 | 1,000,000 | 180,000 | 10,304,701 | 63,239,321 |

| 2003 | 100,000 | 18,000 | 12,333,423 | 75,590,743 |
|------|---------|--------|------------|-------------|
| 2004 | | | 14,740,195 | 90,330,938 |
| 2005 | | | 17,614,533 | 107,945,471 |
| 2006 | | | 21,049,367 | 128,994,838 |
| 2007 | | | 25,153,993 | 154,148,832 |
| 2008 | | | 30,059,022 | 184,207,854 |
| 2009 | | | 35,920,532 | 220,128,386 |
| 2010 | | | 42,925,035 | 263,053,421 |
| 2011 | | | 51,295,417 | 314,348,838 |
| 2012 | | | 61,298,023 | 375,646,861 |
| 2013 | | | 73,251,138 | 448,897,999 |
| 2014 | | | 87,535,110 | 536,433,109 |
| 2015 | | | 104,604,456 | 641,037,565 |
| 2016 | | | 125,002,325 | 766,039,891 |
| 2017 | | | 149,377,779 | 915,417,669 |
| 2018 | | | 178,506,445 | 1,093,924,115 |
| 2019 | | | 213,315,202 | 1,307,239,317 |
| 2020 | | | 254,911,667 | 1,562,150,984 |

70. A fraudulent claim related to the above detailed 17,000,000 gallons fraudulent scheme was brought by the Chevron Entities at the Tulare Court ("diesel fuel fraud").

71. The court adjudicated the claim without jurisdiction, as no summons and complaint were served.

72. However, Plaintiff has learnt that this kind of conduct at the state court was not "incidental" but the norm. Plainly, at this court, "the fix was in". See paragraph 13 above

73. The Chevron Entities used this court in the diesel fuel fraud and as described herein, several other entities also used this court to obtain void and/or fraudulent judgments proving that, the kleptocratic activities were not "incidents" but the norm and had become institutionalized.

## 5. Predicate Acts.

### 5.1 Mail Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1341)

COMPLAINT

19

| PREDICATE ACT # | APPROX. DATE | DESCRIPTION OF MAIL FRAUD 18 U.S.C. § 1341 |
|---|---|---|
| 1 | 31-Jul-06 | Mail matter containing funds related to "the equipment fraud - trucks" sent from Tulare Court in Visalia, California to Al Oliver in Visalia, California |
| 2 | Sep. 2006 | Mail matter regarding Plaintiff's business or property containing funds obtained from defrauding Plaintiff of property sent and delivered via United States Postal Service from the 11 U.S.C. proceeding court in Phoenix to ICR in Fresno, California |
| 3 | Sep. 2006 | Mail matter regarding Plaintiff's business or property containing funds obtained from defrauding Plaintiff of property sent and delivered via United States Postal Service from the 11 U.S.C. proceeding court in Phoenix to Chevron-VP Oil in Stockton, CA |
| 4 | Sep. 2006 | Mail matter regarding Plaintiff's business or property containing funds obtained from defrauding Plaintiff of property sent and delivered via United States Postal Service from the 11 U.S.C. proceeding court in Phoenix to Chevron-Silvas Oil in Fresno, CA |
| 5 | Sep. 2006 | Mail matter regarding Plaintiff's business or property containing funds obtained from defrauding Plaintiff of property sent and delivered via United States Postal Service from the 11 U.S.C. proceeding court in Phoenix to VPI in Fresno, California |
| 6 | Sep. 2006 | Mail matter regarding Plaintiff's business or property containing funds obtained from defrauding Plaintiff of property sent and delivered via United States Postal Service from the 11 U.S.C. proceeding court in Phoenix to Cunningham in Phoenix, AZ |
| 7 | Dec. 2006 | Mail matter regarding Plaintiff's business or property containing funds obtained from defrauding Plaintiff of property sent and delivered via United States Postal Service from the 11 U.S.C. proceeding court in Phoenix to Mitchell Brown in Porterville, California |
| 8 | Dec. 2006 | Mail matter regarding Plaintiff's business or property containing funds obtained from defrauding Plaintiff of property sent and delivered via United States Postal Service from the 11 U.S.C. proceeding |

| | | court in Phoenix to W.R. Grace in Columbia, MD |
|---|---|---|
| 9 | Dec. 2006 | Mail matter regarding Plaintiff's business or property containing funds obtained from defrauding Plaintiff of property sent and delivered via United States Postal Service from the 11 U.S.C. proceeding court in Phoenix to VPI in Fresno, California |
| 10 | Dec. 2006 | Mail matter regarding Plaintiff's business or property containing funds obtained from defrauding Plaintiff of property sent and delivered via United States Postal Service from the 11 U.S.C. proceeding court in Phoenix to Cunningham in Phoenix, AZ |
| 11 | Feb. 2007 | Mail matter regarding the Visalia property containing funds to be used to defraud Plaintiff of property sent and delivered via United States Postal Service by Eric M. Black, LLC to the 11 U.S.C. proceeding court in Phoenix |
| 12 | Apr. 2007 | Mail matter regarding Plaintiff's business or property containing funds obtained from defrauding Plaintiff of property sent and delivered via United States Postal Service from the 11 U.S.C. proceeding court in Phoenix to San Joaquin in Madera, CA |
| 13 | Apr. 2007 | Mail matter regarding Plaintiff's business or property containing funds obtained from defrauding Plaintiff of property sent and delivered via United States Postal Service from the 11 U.S.C. proceeding court in Phoenix to Kaweah in Woodlake, CA |
| 14 | Apr. 2007 | Mail matter regarding Plaintiff's business or property containing funds obtained from defrauding Plaintiff of property sent and delivered via United States Postal Service from the 11 U.S.C. proceeding court in Phoenix to Burr in San Diego, CA |
| 15 | Apr. 2007 | Mail matter regarding Plaintiff's business or property containing funds obtained from defrauding Plaintiff of property sent and delivered via United States Postal Service from the 11 U.S.C. proceeding court in Phoenix to Cunningham in Phoenix, AZ |
| 16 | Jan. 2008 | Mail matter regarding Plaintiff's business or property containing funds obtained from defrauding Plaintiff of property sent and delivered via United States Postal Service from the 11 U.S.C. proceeding |

| | | court in Phoenix to BOE in Sacramento, California |
|---|---|---|
| 17 | Mar. 2008 | Mail matter regarding Plaintiff's business or property containing funds obtained from defrauding Plaintiff of property sent and delivered via United States Postal Service from the 11 U.S.C. proceeding court in Phoenix to BOE in Sacramento, California |
| 18 | 23-Jan-09 | Mail matter containing funds related to "the sales tax fraud" sent from Tulare Court in Visalia, California to Al Oliver in Visalia, California |
| 19 | 16-Aug-10 | Mail matter containing funds related to "the sales tax fraud" sent from Tulare Court in Visalia, California to Al Oliver in Visalia, California |
| 20 | 7-Sep-16 | Mail matter containing funds related to "the sales tax fraud" sent from Tulare Court in Visalia, California to Al Oliver in Visalia, California |

## 5.2  Money Laundering. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1956(a))

| PREDICATE ACT # | APPROX. DATE | DESCRIPTION OF MONEY LAUNDERING 18 U. S. C. § 1956(a) |
|---|---|---|
| 21 | 30-Jun-06 | Al Oliver caused funds to be transferred from Al Oliver in California to attorney G. Scott Benker in California, intending to promote specified unlawful activity |
| 22 | 30-Jun-06 | Orix caused funds to be transferred from Orix in Texas to attorneys Raymond A. Policar et al. in California, intending to promote specified unlawful activity |
| 23 | 31-Jul-06 | Al Oliver caused funds to be transferred from the Tulare County Superior Court in California to Orix in Texas, intending to promote specified unlawful activity. |
| 24 | 5-Aug-06 | A payment related to "the equipment fraud - trucks" received from Al Oliver in California was deposited by Orix in Texas, intending to promote specified unlawful activity. |
| 25 | Sep. 2006 | ICR caused funds to be transferred from the 11 U.S.C. proceeding court in Phoenix to ICR in California, intending to promote specified unlawful activity. |

| 26 | Sep. 2006 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by ICR in California, intending to promote specified unlawful activity. |
| 27 | Sep. 2006 | Chevron-VP Oil caused funds to be transferred from the 11 U.S.C. proceeding court in Phoenix to Chevron-VP Oil in California, intending to promote specified unlawful activity. |
| 28 | Sep. 2006 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by Chevron-VP Oil in California, intending to promote specified unlawful activity. |
| 29 | Sep. 2006 | Chevron-Silvas Oil caused funds to be transferred from the 11 U.S.C. proceeding court in Phoenix to Chevron-Silvas Oil in California, intending to promote specified unlawful activity. |
| 30 | Sep. 2006 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by Chevron-Silvas Oil in California, intending to promote specified unlawful activity. |
| 31 | Sep. 2006 | VPI caused funds to be transferred from the 11 U.S.C. proceeding court in Phoenix to VPI in California, intending to promote specified unlawful activity. |
| 32 | Sep. 2006 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by VPI in California, intending to promote specified unlawful activity. |
| 33 | Sep. 2006 | Cunningham caused funds to be transferred from the 11 U.S.C. proceeding court in Phoenix to Cunningham in Arizona, intending to promote specified unlawful activity. |
| 34 | Sep. 2006 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by Cunningham in Arizona, intending to promote specified unlawful activity. |
| 35 | Dec. 2006 | Mitchell Brown caused funds to be transferred from the |

COMPLAINT

23

| | | |
|---|---|---|
| | | 11 U.S.C. proceeding court in Phoenix to Mitchell Brown in California, intending to promote specified unlawful activity. |
| 36 | Dec. 2006 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by Mitchell Brown in California, intending to promote specified unlawful activity. |
| 37 | Dec. 2006 | W.R. Grace caused funds to be transferred from the 11 U.S.C. proceeding court in Phoenix to W.R. Grace in Maryland, intending to promote specified unlawful activity. |
| 38 | Dec. 2006 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by W.R. Grace in Maryland, intending to promote specified unlawful activity. |
| 39 | Dec. 2006 | VPI caused funds to be transferred from the 11 U.S.C. proceeding court in Phoenix to VPI in California, intending to promote specified unlawful activity. |
| 40 | Dec. 2006 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by VPI in California, intending to promote specified unlawful activity. |
| 41 | Dec. 2006 | Cunningham caused funds to be transferred from the 11 U.S.C. proceeding court in Phoenix to Cunningham in Arizona, intending to promote specified unlawful activity. |
| 42 | Dec. 2006 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by Cunningham in Arizona, intending to promote specified unlawful activity. |
| 43 | Feb. 2007 | Eric M. Black, LLC caused funds to be transferred to the 11 U.S.C. proceeding court in Phoenix, intending to promote specified unlawful activity. |
| 44 | Apr. 2007 | San Joaquin caused funds to be transferred from the 11 U.S.C. proceeding court in Phoenix to San Joaquin in California, intending to promote |

COMPLAINT

24

| | | specified unlawful activity. |
|---|---|---|
| 45 | Apr. 2007 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by San Joaquin in California, intending to promote specified unlawful activity. |
| 46 | Apr. 2007 | Kaweah caused funds to be transferred from the 11 U.S.C. proceeding court in Phoenix to Kaweah in California, intending to promote specified unlawful activity. |
| 47 | Apr. 2007 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by Kaweah in California, intending to promote specified unlawful activity. |
| 48 | Apr. 2007 | Burr caused funds to be transferred from the 11 U.S.C. proceeding court in Phoenix to Burr in California, intending to promote specified unlawful activity. |
| 49 | Apr. 2007 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by Burr in California, intending to promote specified unlawful activity. |
| 50 | Apr. 2007 | Cunningham caused funds to be transferred from the 11 U.S.C. proceeding court in Phoenix to Cunningham in Arizona, intending to promote specified unlawful activity. |
| 51 | Apr. 2007 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by Cunningham in Arizona, intending to promote specified unlawful activity. |
| 52 | Jan. 2008 | BOE caused funds to be transferred from the 11 U.S.C. proceeding court in Phoenix to BOE in California, intending to promote specified unlawful activity. |
| 53 | Jan. 2008 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by BOE in California, |

| | | intending to promote specified unlawful activity. |
|---|---|---|
| 54 | Mar. 2008 | BOE caused funds to be transferred from the 11 U.S.C. proceeding court in Phoenix to BOE in California, intending to promote specified unlawful activity. |
| 55 | Mar. 2008 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by BOE in California, intending to promote specified unlawful activity. |
| 56 | 1-Oct-08 | Al Oliver caused funds to be transferred from Al Oliver in California to attorney G. Scott Benker in California, intending to promote specified unlawful activity |
| 57 | 2-Jan-09 | Al Oliver caused funds to be transferred from Al Oliver in California to attorney G. Scott Benker in California, intending to promote specified unlawful activity |
| 58 | 23-Jan-09 | Al Oliver caused funds to be transferred from the Tulare County Superior Court in California to Al Oliver in California, intending to promote specified unlawful activity. |
| 59 | 26-Jan-09 | A payment related to "the sales tax fraud" received from the Tulare County Superior Court in California was deposited by Al Oliver in California, intending to promote specified unlawful activity. |
| 60 | 1-Aug-10 | Al Oliver caused funds to be transferred from Al Oliver in California to attorney G. Scott Benker in California, intending to promote specified unlawful activity |
| 61 | 16-Aug-10 | Al Oliver caused funds to be transferred from the Tulare County Superior Court in California to Al Oliver in California, intending to promote specified unlawful activity. |
| 62 | 19-Aug-10 | A payment related to "the sales tax fraud" received from the Tulare County Superior Court in California was deposited by Al Oliver in California, intending to promote specified unlawful activity. |
| 63 | 15-Mar-16 | Al Oliver caused funds to be transferred from Al Oliver in California to attorney E. Warren Gubler in California, intending to promote specified unlawful activity |
| 64 | 15-Aug-16 | Al Oliver caused funds to be transferred from Al Oliver in California to attorney E. Warren Gubler in California, intending to promote specified unlawful activity |

| 65 | 7-Sep-16 | Al Oliver caused funds to be transferred from the Tulare County Superior Court in California to Al Oliver in California, intending to promote specified unlawful activity. |
| 66 | 10-Sep-16 | A payment related to "the sales tax fraud" received from the Tulare County Superior Court in California was deposited by Al Oliver in California, intending to promote specified unlawful activity. |

## 5.3 Monetary Transactions in Property Derived from Specified Unlawful Activity. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1957(a))

| PREDICATE ACT # | APPROX. DATE | DESCRIPTION OF MONETARY TRANSACTIONS IN PROPERTY DERIVED FROM SPECIFIC UNLAWFUL ACTIVITY 18 U. S. C. § 1957(a) |
|---|---|---|
| 67 | 5-Aug-06 | A payment related to "the equipment fraud - trucks" received from Al Oliver in California was deposited by Orix in Texas, which was a monetary transaction in criminally derived property that is of a value greater than $ 10,000 and was derived from specified unlawful activity. The funds transacted were criminally derived, commingled or not. |
| 68 | Sep. 2006 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by ICR in California, which was a monetary transaction in criminally derived property that is of a value greater than $ 10,000 and was derived from specified unlawful activity. The funds transacted were criminally derived, commingled or not. |
| 69 | Sep. 2006 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by Chevron-VP Oil in California, which was a monetary transaction in criminally derived property that is of a value greater than $ 10,000 and was derived from specified unlawful activity. The funds transacted were criminally derived, commingled or not. |
| 70 | Sep. 2006 | A payment related to the fraud connected with a case |

COMPLAINT

27

| | | under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by Chevron-Silvas Oil in California, which was a monetary transaction in criminally derived property that is of a value greater than $ 10,000 and was derived from specified unlawful activity. The funds transacted were criminally derived, commingled or not. |
| 71 | Sep. 2006 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by VPI in California, which was a monetary transaction in criminally derived property that is of a value greater than $ 10,000 and was derived from specified unlawful activity. The funds transacted were criminally derived, commingled or not. |
| 72 | Sep. 2006 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by Cunningham in Arizona, which was a monetary transaction in criminally derived property that is of a value greater than $ 10,000 and was derived from specified unlawful activity. The funds transacted were criminally derived, commingled or not. |
| 73 | Dec. 2006 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by Mitchell Brown in California, which was a monetary transaction in criminally derived property that is of a value greater than $ 10,000 and was derived from specified unlawful activity. The funds transacted were criminally derived, commingled or not. |
| 74 | Dec. 2006 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by W.R. Grace in Maryland, which was a monetary transaction in criminally derived property that is of a value greater than $ 10,000 and was derived from specified unlawful activity. The funds transacted were criminally derived, commingled or not. |
| 75 | Dec. 2006 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by VPI in California, which was a monetary transaction in criminally derived property that is of a value greater than $ 10,000 and |

COMPLAINT

28

| | | was derived from specified unlawful activity. The funds transacted were criminally derived, commingled or not. |
|---|---|---|
| 76 | Dec. 2006 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by Cunningham in Arizona, which was a monetary transaction in criminally derived property that is of a value greater than $ 10,000 and was derived from specified unlawful activity. The funds transacted were criminally derived, commingled or not. |
| 77 | Apr. 2007 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by San Joaquin in California, which was a monetary transaction in criminally derived property that is of a value greater than $ 10,000 and was derived from specified unlawful activity. The funds transacted were criminally derived, commingled or not. |
| 78 | Apr. 2007 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by Kaweah in California, which was a monetary transaction in criminally derived property that is of a value greater than $ 10,000 and was derived from specified unlawful activity. The funds transacted were criminally derived, commingled or not. |
| 79 | Apr. 2007 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by Burr in California, which was a monetary transaction in criminally derived property that is of a value greater than $ 10,000 and was derived from specified unlawful activity. The funds transacted were criminally derived, commingled or not. |
| 80 | Apr. 2007 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by Cunningham in Arizona, which was a monetary transaction in criminally derived property that is of a value greater than $ 10,000 and was derived from specified unlawful activity. The funds transacted were criminally derived, commingled or not. |
| 81 | Jan. 2008 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by BOE in California, |

| PREDICATE ACT # | APPROX. DATE | DESCRIPTION |
|---|---|---|
| | | which was a monetary transaction in criminally derived property that is of a value greater than $ 10,000 and was derived from specified unlawful activity. The funds transacted were criminally derived, commingled or not. |
| 82 | Mar. 2008 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by BOE in California, which was a monetary transaction in criminally derived property that is of a value greater than $ 10,000 and was derived from specified unlawful activity. The funds transacted were criminally derived, commingled or not. |
| 83 | 26-Jan-09 | A payment related to "the sales tax fraud" received from the Tulare County Superior Court in California was deposited by Al Oliver in California, which was a monetary transaction in criminally derived property that is of a value greater than $ 10,000 and was derived from specified unlawful activity. The funds transacted were criminally derived, commingled or not. |
| 84 | 19-Aug-10 | A payment related to "the sales tax fraud" received from the Tulare County Superior Court in California was deposited by Al Oliver in California, which was a monetary transaction in criminally derived property that is of a value greater than $ 10,000 and was derived from specified unlawful activity. The funds transacted were criminally derived, commingled or not. |
| 85 | 10-Sep-16 | A payment related to "the sales tax fraud" received from the Tulare County Superior Court in California was deposited by Al Oliver in California, which was a monetary transaction in criminally derived property that is of a value greater than $ 10,000 and was derived from specified unlawful activity. The funds transacted were criminally derived, commingled or not. |

## 5.4   Bank Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1344(1))

| PREDICATE ACT # | APPROX. DATE | DESCRIPTION OF BANK FRAUD 18 U. S. C. § 1344(1) |
|---|---|---|

COMPLAINT

| 86 | 5-Aug-06 | A payment related to "the equipment fraud - trucks" received from Al Oliver in California was deposited by Orix in Texas, knowingly executing a scheme to defraud a financial institution. |
| 87 | Sep. 2006 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by ICR in California knowingly executing a scheme to defraud a financial institution. |
| 88 | Sep. 2006 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by Chevron-VP Oil in California knowingly executing a scheme to defraud a financial institution. |
| 89 | Sep. 2006 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by Chevron-Silvas Oil in California knowingly executing a scheme to defraud a financial institution. |
| 90 | Sep. 2006 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by VPI in California knowingly executing a scheme to defraud a financial institution. |
| 91 | Sep. 2006 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by Cunningham in Arizona knowingly executing a scheme to defraud a financial institution. |
| 92 | Dec. 2006 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by Mitchell Brown in California knowingly executing a scheme to defraud a financial institution. |
| 93 | Dec. 2006 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by W.R. Grace in Maryland knowingly executing a scheme to defraud a financial institution. |
| 94 | Dec. 2006 | A payment related to the fraud connected with a case |

COMPLAINT

31

| | | under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by VPI in California knowingly executing a scheme to defraud a financial institution. |
|---|---|---|
| 95 | Dec. 2006 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by Cunningham in Arizona knowingly executing a scheme to defraud a financial institution. |
| 96 | Apr. 2007 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by San Joaquin in California knowingly executing a scheme to defraud a financial institution. |
| 97 | Apr. 2007 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by Kaweah in California knowingly executing a scheme to defraud a financial institution. |
| 98 | Apr. 2007 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by Burr in California knowingly executing a scheme to defraud a financial institution. |
| 99 | Apr. 2007 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by Cunningham in Arizona knowingly executing a scheme to defraud a financial institution. |
| 100 | Jan. 2008 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by BOE in California knowingly executing a scheme to defraud a financial institution. |
| 101 | Mar. 2008 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by BOE in California knowingly executing a scheme to defraud a financial institution. |
| 102 | 26-Jan-09 | A payment related to "the sales tax fraud" received from |

| | | the Tulare County Superior Court in California was deposited by Al Oliver in California, knowingly executing a scheme to defraud a financial institution. |
| 103 | 19-Aug-10 | A payment related to "the sales tax fraud" received from the Tulare County Superior Court in California was deposited by Al Oliver in California, knowingly executing a scheme to defraud a financial institution. |
| 104 | 10-Sep-16 | A payment related to "the sales tax fraud" received from the Tulare County Superior Court in California was deposited by Al Oliver in California, knowingly executing a scheme to defraud a financial institution. |

## 5.5 Bank Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1344(2))

| PREDICATE ACT # | APPROX. DATE | DESCRIPTION OF BANK FRAUD 18 U. S. C. § 1344(2) |
|---|---|---|
| 105 | 5-Aug-06 | A payment related to "the equipment fraud - trucks" received from Al Oliver in California was deposited by Orix in Texas, intending to obtain bank property and obtaining bank property. |
| 106 | Dec. 2006 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by Mitchell Brown in California, intending to obtain bank property and obtaining bank property. |
| 107 | Dec. 2006 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by W.R. Grace in Maryland, intending to obtain bank property and obtaining bank property. |
| 108 | Dec. 2006 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by VPI in California, intending to obtain bank property and obtaining bank property. |
| 109 | Dec. 2006 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding |

| | | court in Phoenix was deposited by Cunningham in Arizona, intending to obtain bank property and obtaining bank property. |
|---|---|---|
| 110 | Sep. 2006 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by ICR in California, intending to obtain bank property and obtaining bank property. |
| 111 | Sep. 2006 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by Chevron-VP Oil in California, intending to obtain bank property and obtaining bank property. |
| 112 | Sep. 2006 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by Chevron-Silvas Oil in California, intending to obtain bank property and obtaining bank property. |
| 113 | Sep. 2006 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by VPI in California, intending to obtain bank property and obtaining bank property. |
| 114 | Sep. 2006 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by Cunningham in Arizona, intending to obtain bank property and obtaining bank property. |
| 115 | Apr. 2007 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by San Joaquin in California, intending to obtain bank property and obtaining bank property. |
| 116 | Apr. 2007 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by Kaweah in California, intending to obtain bank property and obtaining bank property. |
| 117 | Apr. 2007 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding |

34

| | | court in Phoenix was deposited by Burr in California, intending to obtain bank property and obtaining bank property. |
| --- | --- | --- |
| 118 | Apr. 2007 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by Cunningham in Arizona, intending to obtain bank property and obtaining bank property. |
| 119 | Jan. 2008 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by BOE in California, intending to obtain bank property and obtaining bank property. |
| 120 | Mar. 2008 | A payment related to the fraud connected with a case under title 11 received from the 11 U.S.C. proceeding court in Phoenix was deposited by BOE in California, intending to obtain bank property and obtaining bank property. |
| 121 | 26-Jan-09 | A payment related to "the sales tax fraud" received from the Tulare County Superior Court in California was deposited by Al Oliver in California, intending to obtain bank property and obtaining bank property. |
| 122 | 19-Aug-10 | A payment related to "the sales tax fraud" received from the Tulare County Superior Court in California was deposited by Al Oliver in California, intending to obtain bank property and obtaining bank property. |
| 123 | 10-Sep-16 | A payment related to "the sales tax fraud" received from the Tulare County Superior Court in California was deposited by Al Oliver in California, intending to obtain bank property and obtaining bank property. |

## 6. Plaintiff's Property Has Been Used in the Defendants' Racketeering Activity.

74. Defendants Cemex and Lehigh Hanson are running a cartel, which is a criminal enterprise under the laws of the United States of America, using Plaintiff's property: the mobile cement storage facility and the two mobile concrete manufacturing facilities.

75. The cartel is being operated by using the mail, the wire, and banks.

- Each time the mail is being used to operate the cartel it constitutes one count of mail fraud, including for: solicitation of buyers for concrete using Plaintiff's property, the; billing for deliveries of concrete using Plaintiff's property; collecting funds from sales of concrete using Plaintiff's property; and depositing the collected funds in bank accounts in California - in violation of Title 18, United States Code, Sections 1341 and 2.

- Each time the wire is being used to operate the cartel it constitutes one count of wire fraud, including for: solicitation of buyers for concrete using Plaintiff's property, the; billing for deliveries of concrete using Plaintiff's property; collecting funds from sales of concrete using Plaintiff's property; and depositing the collected funds in bank accounts in California and wiring of the collected funds to various locations in the United States, including Texas, and outside the United States, including Mexico and Germany - in violation of Title 18, United States Code, Sections 1343 and 2.

- Each time banks are being used to operate the cartel it constitutes one count of money laundering, including for: funds received from buyers of concrete using Plaintiff's property; transferring such funds out of the accounts the funds were deposited in; subsequently transferring such funds from accounts in the State of California into bank accounts located elsewhere in the United States, and outside the United States, including Mexico and Germany - in violation of Title 18, United States Code, Section 1956(h).

76. Defendants Cemex and Lehigh Hanson commit, at a minimum ,at least 100 such predicate acts each day, and have thus committed thousands and thousands of predicate acts per 18 U.S.C. § 1961. All in violation of 18 U.S.C. § 1962.

77. In Tulare County, Kings County and Fresno County California and elsewhere, in a matter within the jurisdiction of the legislative branch of the Government of the United States and

the State of California and subject to the legislatively passed statutes, Defendants Cemex and Lehigh Hanson  knowingly and willfully used and caused to be used Plaintiff's property, that is, Defendants used and caused to be used property derived from specified unlawful activity to solicit buyers by wire and mail, manufacture concrete by use of wire, mail and banks, bill for deliveries of concrete by use of wire, mail and banks and collect funds from sales of concrete by use of wire and mail, which they then deposited and caused to be deposited in bank accounts in California and wiring of the collected funds to various locations in the United States, including Texas, and outside the United States, including Mexico and Germany. constituting monetary transactions in property derived from specified unlawful activity.

Respectfully submitted on this 2nd day of April 2021.

_____

Plaintiff
Rune Kraft
  rk@kraft.legal
Kraft Legal | United States
108 West 13th Street
Wilmington, Delaware 19801
  302 408 1000