## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| W. R. GRACE & CO., et al.,[1] | ) Case No. 01-01139 (AMC) |
| | ) (Jointly Administered) |
| Reorganized Debtor. | ) |
| | ) **Hearing Date: 10:00 a.m. E.T., May 1, 2023** |
| | ) **Objection Deadline: March 21, 2023** |

### NOTICE OF STATE OF MONTANA'S RESPONSE IN SUPPORT OF REORGANIZED DEBTOR'S MOTION TO APPROVE SETTLEMENT AGREEMENT RESOLVING STATE OF MONTANA'S REMAINING CLAIM 18496-1

To:     (i) The Office of the United States Trustee; (ii) Counsel for the WRG Asbestos PI Trust; (iii) Counsel for the Asbestos PI Future Claimants Representative; (iv) Counsel for the Asbestos PD Future Claimants Representative; (v) Counsel for the WRG Asbestos PD Trust (7A); (vi) Counsel for the WRG Asbestos PD Trust (7B); (vii) Counsel for the CDN ZAI PD Claims Fund; (viii) Those parties that requested service and notice of papers in accordance with Fed. R. Bankr. P. 2002; (ix) Counsel for Reorganized Debtors; and (x) counsel for United States.

On January 10, 2023, the Reorganized Debtor filed the *Reorganized Debtor's Motion to Approve Settlement Agreement Resolving State of Montana's Remaining Claim 18496-1* (the "Motion") with the United States Bankruptcy Court for the District of Delaware,  824 Market Street, Wilmington, Delaware 19801 (the "Bankruptcy Court").   The   State   of   Montana, through the Department of Environmental Quality (DEQ) and the Natural Resource Damage Program (NRDP), now provides the Court with the *State of Montana's Response in Support of Reorganized Debtor's Motion to Approve Settlement Agreement Resolving State of Montana's*

---

[1]    W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc., or "Grace") is the sole remaining "Reorganized Debtor," and Case No. 01-1139 is the sole remaining open chapter 11 case.

*Remaining Claim 18496-1* (Response in Support), along with the attached public comments received and the State of Montana's responses to the public comment.

A copy of the State of Montana's Response in Support is provided to the following:

(i)     Counsel for the Reorganized Debtor, Roger J. Higgins, Esq., The Law Offices of Roger Higgins, LLC, 516 North Ogden Ave., Suite 136, Chicago, IL 60642, and Laura Davis Jones, Esq. and James E. O'Neill, Esq., Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, PO Box 8705, Wilmington, DE 19899-8705 (Courier 19801);

(ii)    The Office of the United States Trustee, Richard L. Schepacarter, Esq., U.S. Department of Justice, Office of the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801;

(iii)   Counsel for the WRG Asbestos PI Trust, Marla Rosoff Eskin, Esq., Campbell & Levine, LLC, 222 Delaware Avenue, Suite 1620, Wilmington, DE 19801, and Philip E. Milch, Esq., Campbell & Levine, LLC, 310 Grant Street, Suite 1700, Pittsburgh, PA 15219;

(iv)    Counsel for the Asbestos PI Future Claimants Representative, John C. Phillips, Jr., Esq., Phillips, Goldman, McLaughlin & Hall, P.A., 1200 North Broom Street, Wilmington, DE 19806;

(v)     Counsel for the Asbestos PD Future Claimants Representative, R. Karl Hill, Esq., Seitz, Van Ogtrop & Green, P.A., 222 Delaware Avenue, Suite 1500, P.O. Box 68, Wilmington, DE 19899, and Alan B. Rich, Esq., Attorney and Counselor, 4244 Renaissance Tower, 1201 Elm Street, Dallas, TX 75270;

(vi)    Counsel for the WRG Asbestos PD Trust (7A), Richard B. Schiro, WRG Asbestos PD Trust, c/o Wilmington Trust, Attn: Corporate Trust Administration, 1100 N. Market Street, Wilmington, DE 19890-1625, and Deborah D. Williamson, Esq., Dykema Cox Smith, 112 E. Pecan Street, Suite 1800, San Antonio, TX 78205;

(vii)   Counsel for the WRG Asbestos PD Trust (7B), Edward B. Cottingham, Jr., Esq., The Cottingham Law Firm, 317 Wingo Way, Suite 303, P.O. Box 810, Mt. Pleasant, SC 29465, and M. Dawes Cooke, Esq., Barnwell Whaley Patterson & Helms LLC, P.O. Drawer H, Charleston, SC 29402; and

(viii)  Counsel for the CDN ZAI PD Claims Fund, Daniel K. Hogan, Esq., The Hogan Firm, 1311 Delaware Avenue, Wilmington DE 19806, and Yves Lauzon, Esq.. Michel Belanger, Esq., Lauzon Belanger Lesperance Inc., 286, Rue St-Paul Quest, Bureau 100, Montreal, Quebec, H26 2A3 Canada.

Dated:  March 21 ,2023

/s/ Jessica Wilkerson

_____

Jessica Wilkerson
MDEQ Legal Counsel

[remainder of this page is intentionally left blank]

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| W. R. GRACE & CO., et al., | ) Case No. 01-01139 (AMC) |
| | ) (Jointly Administered) |
| Reorganized Debtor. | ) |
| | ) **Hearing Date: 10:00 a.m. E.T., May 1, 2023** |
| | ) **Objection Deadline: March 21, 2023** |

**STATE OF MONTANA'S RESPONSE IN SUPPORT OF REORGANIZED DEBTOR'S MOTION TO APPROVE SETTLEMENT AGREEMENT RESOLVING STATE OF MONTANA'S REMAINING CLAIM 18496-1**

### INTRODUCTION

The State of Montana requests the Court enter an order substantially in the form of Docket No. 929655-2 (the "Approval Order") and approve the settlement agreement (the "Settlement Agreement") attached thereto as an Exhibit, thereby settling Claim No. 18496-1, in which the Montana Department of Environmental Quality ("MDEQ") has asserted claims concerning Operable Unit 3 ("OU3") of the Libby Asbestos Superfund Site.

### BACKGROUND

The State of Montana, through the Department of Environmental Quality (DEQ) and the Natural Resource Damage Program (NRDP), solicited public comments on the proposed Settlement Agreement for an initial thirty-day period from January 12, 2023, to February 13, 2023, as required by Section 713 of the Montana Comprehensive Cleanup and Responsibility Act (CECRA), Montana Code Annotated (MCA) Section 75-10-713. In response to a public comment request, the State of Montana extended the public comment period through March 15, 2023, and held a public meeting on March 6, 2023, where people also provided oral public comment. Numerous members of the public submitted comments, both in support of and raising concerns

with the Settlement Agreement for the Libby Operable Unit 3 (OU3) Bankruptcy Settlement with W.R. Grace & Co. (Grace).

The State of Montana considered all comments received.  All received public comments are provided in full in Attachment A. In the State of Montana's response to public comments, similar comments are categorized together, summarized, and answered overall, with specific responses to comments as needed.

## ANALYSIS

1.     Through consideration of all public comments, the State of Montana has determined that the public comments do not disclose factors or information that indicate that the Settlement Agreement is inappropriate, improper, or inadequate; the State of Montana therefore supports prompt entry of an order by the Court approving the Settlement Agreement.  The State of Montana has determined that the settlement is fair, adequate, reasonable, and consistent with the goals of the Comprehensive Environmental Response, Compensation and Liability Act, as amended, 42 U.S.C. § 9601 et seq. (CERCLA) and CECRA, § 75-10-701 *et seq*.

## RELIEF REQUESTED

2.     The State of Montana Debtor respectfully requests that the Court approve the Settlement Agreement and enter the proposed Approval Order in substantially the form as shown in Docket No. 929655-2.

## NOTICE

3.     Notice of this Motion has been given to:  (i) the Office of the United States Trustee; (ii) Counsel for the WRG Asbestos PI Trust; (iii) Counsel for the Asbestos PI Future Claimants Representative; (iv) Counsel for the Asbestos PD Future Claimants Representative; (v) Counsel for the WRG Asbestos PD Trust (7A); (vi) Counsel for the WRG Asbestos PD Trust (7B); (vii)

Counsel for the CDN ZAI PD Claims Fund; (viii) those parties that requested service and notice of papers in accordance with Fed. R. Bankr. P. 2002; (ix) counsel for the Reorganized Debtors; and (x) counsel for United States.

**[remainder of this page is intentionally left blank]**

WHEREFORE, the State of Montana requests the Court enter the Approval Order in substantially the form in Docket No. 929655-2: (i) approving the Settlement Agreement; (ii) Allowing the Allowed State Claim on the terms set forth in the Settlement Agreement; (iii) dismissing the Partial Allowance Motion and MDEQ Response as moot; (iv) completing the mediation; (v) authorizing Reorganized Debtor and the State to enter into and take all actions contemplated in the Settlement Agreement; and (vi) granting such other relief as may be appropriate.

Dated:  March 21, 2023

/s/ Jessica Wilkerson

Jessica Wilkerson
MDEQ Legal Counsel

[remainder of this page is intentionally left blank]

## Attachment A

**Response to Public Comments Received by the State of Montana for the Libby Operable
Unit 3 Bankruptcy Settlement Agreement**

**Response to Public Comments Received by the State of Montana for the Libby Operable Unit 3 Bankruptcy Settlement Agreement**



March 21, 2023

# Table of Contents

Section I: Introduction.................................................................................................2

Section II. Comment Summary and Response by Category .......................................3

   Category A: Timing of Settlement Agreement ........................................................3

   Category B: Amount of Financial Assurance ..........................................................5

   Category C: Grace's Short and Long-term Liability................................................7

   Category D: Public Participation.............................................................................7

   Category E: Sufficiency of Natural Resources Damages Settlement Amount and Allowed Uses
..................................................................................................................................8

   Category F: Constitutionality of Settlement Agreement ........................................10

   Category G: The Libby Asbestos Superfund Oversight Committee.......................10

   Category H: The Settlement Does not Affect Grace's Obligations under Superfund or the Montana Dam Safety Act...........................................................................................10

Copies of Public Comments Received .......................................................................12

# Section I: Introduction

The State of Montana, through the Department of Environmental Quality (DEQ) and the Natural Resource Damage Program (NRDP), solicited public comments on a proposed Settlement Agreement for an initial thirty-day period from January 12, 2023, to February 13, 2023, as required by Section 713 of the Montana Comprehensive Cleanup and Responsibility Act (CECRA), Montana Code Annotated (MCA) Section 75-10-713.  In response to a public comment request, the State of Montana extended the public comment period through March 15, 2023, and held a public meeting on March 6, 2023, where people also provided oral public comment.  Numerous members of the public submitted comments, both in support of and raising concerns with the Settlement Agreement for the Libby Operable Unit 3 (OU3) Bankruptcy Settlement with W.R. Grace & Co. (Grace).

Operable Unit 3 generally consists of the former mine site and also includes areas of forest, the Kootenai River, Rainy Creek, and Rainy Creek Road.

The State considered all comments received, which included comments that raised concerns with issues outside the scope of the bankruptcy claim that was being settled in the Settlement Agreement; and requested financial assurances that would not be possible to acquire. Questions related to a public figure of which the State of Montana has no knowledge are not addressed.  All received public comments are provided in full in at the end of this document. In this response to

public comments, similar comments are categorized together, summarized, and answered overall, with specific responses to comments as needed.

Through consideration of all public comments, the State has determined that the public comments do not disclose factors or information that indicate that the Settlement Agreement is inappropriate, improper, or inadequate; the State therefore supports prompt entry of an order by the Bankruptcy Court approving the Settlement Agreement. The State has determined that the settlement is fair, adequate, reasonable, and consistent with the goals of the Comprehensive Environmental Response, Compensation and Liability Act, as amended, 42 U.S.C. § 9601 et seq. (CERCLA) and CECRA, § 75-10-701 *et seq*.

# Section II. Comment Summary and Response by Category

## Category A: Timing of Settlement Agreement

**Summary:** Many commenters stated that the Settlement Agreement with Grace should be put on hold or rejected because it was negotiated and filed with the bankruptcy court prior to completion of the CERCLA feasibility study being conducted by Grace with oversight by the United States Environmental Protection Agency (EPA) in consultation with the DEQ and prior to completion of a restoration plan that would be drafted by NRDP. One commenter expressed concern that the fact that the restoration plan has not been drafted yet and thus restoration projects have not yet been identified is an indication that the settlement was driven by political processes. One commenter expressed concern that NRDP does not have enough information to quantify a natural resource damage claim.

**Response:** The timing of this Settlement Agreement is a result of *The Reorganized Debtor's Request for Partial Allowance and Partial Disallowance of the Claim by the Montana Dept. of Env. Quality ("MDEQ") for Environmental Remediation at Operable Unit 3 of the Libby Asbestos Superfund Site (Substantive Objection) (Objection)*, filed by Grace in June 2019. Below is a brief summary of the bankruptcy court filings related to this Settlement Agreement:

- 2001: Grace filed voluntary Chapter 11 Bankruptcy Petition.
- 2003: DEQ filed Proof of Claim, which the State subsequently amended.
- 2007 DEQ filed Amended Proof of Claim (2007 Proof of Claim): Amid negotiations for the 2008 Settlement Agreement, DEQ amended its Proof of Claim for claims for remedial costs and natural resource damages for the entire Site, including OU3.
- 2008 Settlement Agreement: DEQ received $5.1 million for operations and maintenance costs and other related action at the Site OUs. Libby OU3 is the only operable unit not addressed in this Settlement Agreement.
- 2019 Objection: Grace sought to resolve DEQ's pending 2007 Proof of Claim by partially disallowing the remaining claims.

- DEQ was not expecting Grace to file the Objection and asked the Court to overrule it because it impermissibly limited the State's claims reserved in the 2008 Settlement Agreement.
- Pursuant to Court order, Grace and DEQ/NRDP entered confidential mediation to try to resolve these issues. Mediation began in March 2020 and concluded in December 2022.

The 2007 Proof of Claim was meant to preserve the State's ability to pursue additional claims against Grace for remedy and restoration costs and protect the State from potential future liability still present at Libby OU3 related to costs that CERCLA requires the State to pay when a PRP is unable to pay. It was a placeholder for remedial costs and natural resource damage claims at OU3 at least until the CERCLA remedial process had progressed to remedy selection for OU3.

Because restoration is the residual of remedy, ideally, the natural resource damages would be quantified after a final remedy is selected.  If the State had been proceeding with litigation outside of bankruptcy court, NRDP would not have brought a claim until the final remedy had been selected because this is prohibited by CERCLA.  *See* 42 U.S.C. § 9613, prohibiting a natural resource trustee from bringing an NRD claim prior to selection of a remedial action. However, the bankruptcy process gives a bankruptcy court certain powers to liquidate natural resource damages before a final remedy (cleanup) has been selected, and if a creditor (such as NRDP acting on behalf of the Governor as trustee) declines to participate in this process, then federal bankruptcy law gives the court certain powers to resolve the State's claim.  If Grace had not filed its Objection when it did, the State would not have acted on resolving its pending claim until EPA had selected a final remedy or later. However, once Grace pulled the State into bankruptcy court through its filing, the State needed to defend its 2007 Proof of Claim or risk losing the protections it afforded. This included addressing NRD portions of the pending claim. Therefore, although NRDP recognizes the commenters' concerns about settling natural resource damages prior to a feasibility study (or prior to selection of the final remedy), if the State had simply waited until later in the CERCLA process, the bankruptcy court could have resolved the State's claim, and Montana could have received $0 for NRD, rather than $18.5 million.

It is important to note that the State of Montana has had to settle NRD claims in other bankruptcies prior to selection of a final remedy, most notably, in the ASARCO bankruptcy.

This Settlement Agreement preserves the State's ability to pursue certain additional claims against Grace and protects the State from future liability in case Grace does not complete certain actions at Libby OU3. This is achieved through:

- Financial assurance for Kootenai Development Impoundment Dam (KDID) and its spillway; and
- Creation of an Allowed Contingent OU3 State Share Claim, which allows the State to pursue a claim in Bankruptcy Court against Grace if EPA needs to implement an EPA-selected remedial action using federal Superfund money and DEQ is required to pay a 10% cost share and 100% of operations and maintenance costs.

The Settlement Agreement protects the State from future financial liability, but does not interfere with or replace the remedy selection process currently being conducted pursuant to CERCLA.

Currently, Grace is writing the feasibility study with EPA and DEQ oversight in a 4-step approach. This process is approximately halfway completed. Once a feasibility study has been finalized, EPA will write a proposed plan and provide it for public review and comment and then the Record of Decision (ROD) will be finalized. Current timelines estimate that a ROD will be completed in 2027. The Settlement Agreement does not affect Grace's obligations to perform and pay for this work under Superfund; it does allow DEQ to pursue Grace for its additional claim for CERCLA cost share if Grace is no longer participating and paying for the remedial process.

Much of the data that will be used for the feasibility study has already been collected under the remedial investigation because the remedial investigation is intended to characterize the full nature and extent of the contamination and risks to human health and the environment at a Superfund site, while the feasibility study is focused on evaluating the cleanup alternatives. NRDP utilized relevant and reliable data from the remedial investigation in developing Exhibit E, *Alleged Injury and Examples of Restoration Options to Address Alleged State Natural Resource Damages at or Relating to Operable Unit 3 of the Libby Asbestos Superfund Site.*

With regards to the fact that a restoration plan has not been developed with this Settlement Agreement, NRDP has developed restoration plans at the time of a settlement, but generally when the final remedy (cleanup) is known, such as the consent decree for the 2011 Exxon Yellowstone River oil spill.  NRDP has also developed restoration plans following entry of a settlement agreement, as is the case here.  In order to make sure that restoration funds are not spent on actions that should be funded by Grace under remedy and to ensure that the restoration actions do not hinder or affect the remedy, this restoration plan will be developed after the final remedy (cleanup) for Operable Unit 3 (the mine site plus other areas) is selected and the $18.5 million has been received by NRDP.  There will be a significant public involvement process, consisting of public meeting, requests for input from the community, local government, and stakeholders, and public comment on draft documents. The restoration plan is a critical piece of the CERCLA process.  Restoration funds cannot be spent on restoration actions until a restoration plan has been put out for public comment, the Governor has considered the public comment, and signed the plan.

However, there is an opportunity to perform "early restoration" before the entire settlement has been received to start addressing the injured resources and lost uses.  The early restoration document requires scoping and public comment as well, but instead of addressing the use of all of the settlement funds, it generally identifies one or a few projects. At other sites, early restoration has consisted of recreational projects (such as fishing access sites/open space along rivers) and projects to improve fish populations, such as removing barriers to fish passage in rivers/creeks.

## Category B: Amount of Financial Assurance

**Summary:** Many commenters stated that the financial assurance should be increased to cover a 500-year flood event and catastrophic failure of the KDID and should last 500 years, instead of

100 years.  Another comment was supportive of the establishments of financial assurance with an estimated worth of up to $300 million for the Kootenai Development Impoundment Dam and associated structure to provide maintenance for the next century regardless of whether Grace remains a viable company.  One commenter expressed concern about what happens if Grace is no longer viable after 100 years and indicated that the trustee of the financial assurance should be a Montana bank.

One commenter questioned how the State can ensure that the financial assurance would actually be provided.

**Response:**

DEQ identified the potential design, construction, and maintenance of the KDID and its spillway as the primary financial liability to the State should Grace ever go bankrupt requiring the State to assume responsibility for certain remedy implementation and long term maintenance costs. As a result, DEQ focused on those features when negotiating financial assurance mechanisms with Grace to protect against those risks.  The selected financial assurance mechanisms, which include two 100-year trust accounts and a 20-year surety bond, will provide funding for long-term operation and maintenance of the KDID and maintenance, and potential replacement of the spillway currently being constructed as long as the KDID remains on the site. The Settlement Agreement does not in any way replace or limit the State's authority to regulate the dam through the Dam Safety Act, which is under the authority of the Department of Natural Resources and Conservation (DNRC). Nor is it intended to provide funding for response in the case of a catastrophic or other failure of the KDID or spillway. Those objectives are beyond the scope of the agreement and are addressed through other state authority.

Specifically, paragraph 6(h) addresses catastrophic failure of the KDID and states that the

> State reserves completely and without limitation whatsoever, and does not release in any  way, any claims or causes of action of any kind that it may have arising out of or in connection with the occurrence of a future (post-Approval Order) catastrophic failure of the KDID or its integral components that results in a substantial or complete failure of the  KDID structure and the downstream migration below the current location of the Mill Pond of a substantial portion of impounded tailings. The parties agree that such above-described catastrophic failure of the KDID or its integral components does not describe any conditions present as of the Settlement Agreement Effective Date.

In addition, the Settlement Agreement does not in any way interfere with or replace the CERCLA process or the State's role in the process. Paragraph 6(d)(ii) of the Settlement Agreement address the State consultative role and provides that "[n]othing in this Settlement Agreement shall limit the State's participation in a consultative role with EPA regarding OU3 to the extent provided by law."

The parties to the Settlement Agreement determined that the Financial Assurance should last for 100 years because that seemed like the longest term that could be reasonably relied-upon to

continue to be effective.  Anything shorter did not sufficiently provide protections to the State and anything more was not likely to be tracked effectively. While the State's preference is to engage in business within the state to the extent possible, the Settlement Agreement requires only that the financial assurance mechanisms contained be managed by "a reputable banking or financial institution" and does not specify location of the institution. *Settlement Agreement* at Paragraphs 4(b)(i) and 4(c)(i)  W.R. Grace chose the bank with which to hold the Pre-2042 KDID Operation and Maintenance Performance Trust and the KDID Spillway Replacement Trust, which is PNC Bank in Pittsburgh, PA and meets the Settlement Agreement Requirements.

## Category C: Grace's Short and Long-term Liability

**Summary:** The Settlement Agreement should be rejected because it shifts liability and responsibility for future property damage caused by failure of the KDID from Grace to private citizens. In short, the Settlement Agreement does not hold Grace accountable to a sufficient degree.

**Response:** As discussed in Category B above, the response, liability, and consequences to any future KDID failure are beyond the scope of this Settlement Agreement and are reserved to be addressed, if needed, outside of the proposed Settlement Agreement. The full authority of the State to appropriately respond to issues and regulatory oversight of the KDID are maintained outside of this agreement. Moreover, paragraph 6(h) specifically reserves the state's rights and abilities to act in the case of a catastrophic failure of the KDID. Moreover, paragraph 5(d) specifies that "[t]his Settlement Agreement does not modify or amend in any way DNRC's authority and powers or regulatory process pursuant to the Montana Dam Safety Act or the DNRC's Dam Safety Program, as they may be amended or superseded from time to time. The procedures in Section 5(d) and (e) solely lay out the process to be followed for the State to access funds in the Financial Assurance Trusts."

## Category D: Public Participation

**Summary:**  The public comment period should be extended and a public meeting should be held in Libby.

**Response:**  As a result of the request by multiple members of the Cabinet Resource Group and the Cabinet Resources Group itself, DEQ and NRDP held a public meeting in Libby, Lincoln County, Montana at the Libby City Hall on Monday, March 6, 2023, at 6 pm. The comment period was also extended to March 15, 2023. The public meeting and extension of the comment period were done pursuant to Sec. 75-10-713, Montana Code Annotated.  All comments received at the meeting and through the extended comment period are included in this response to public comment.

## Category E: Sufficiency of Natural Resources Damages Settlement Amount and Allowed Uses

**Summary of Comments:** The $18.5 million for natural resource damages is insufficient.  There was also support for the sufficiency of the $18.5 million natural resource damage settlement and support for the restriction that the funds cannot be transferred to the state's general fund and cannot be used for costs unrelated to restoration efforts specific to the OU3/Lincoln County area.

One commenter incorrectly thought that the $18.5 million was to be paid instead of the $250 million that Grace already paid to the U.S. Environmental Protection Agency for the cleanup, thus reducing the payments required of Grace for the cleanup.  A question was raised as to how the State will ensure that Grace actually pays the $18.5 million over the next ten years.

One commenter said that the funds should be set aside for people who have been injured or died from Libby Asbestos.  One commenter suggested that some of the funds be earmarked for care of pets with mesothelioma.  Another commenter suggested that the settlement should have funds earmarked for private property.

**Response:**

In order to address the sufficiency of the $18.5 million, it is important to explain what this settlement does not do.  This settlement is in addition to the $250 million that the United States received to clean up the reminder of the Libby Asbestos Superfund Site (besides OU3).  This settlement is also in addition to the $5.1 million that DEQ already received for all of the operable units besides OU3.

The natural resource damages portion of this settlement also does not address the cleanup of OU3 of the Libby Asbestos Superfund site.  The $18.5 million natural resource damage settlement legally cannot be spent on the CERCLA response actions (cleanup) at the Libby Asbestos site.  Those remedial actions must be performed by Grace for OU3, and the EPA and DEQ settlements for the other operable units.  This $18.5 million settlement cannot be used for any future DEQ cost-share or operation and maintenance obligations under CERCLA.  As noted above, DEQ has also reserved in the proposed Settlement Agreement the right to pursue a future cost-share claim against Grace at OU3, if that ever became necessary.

The CERCLA responses actions at OU3 will proceed separately and with a separate source of funds from the $18.5 million to be paid to the State through NRDP.  Most importantly, this means that EPA, in consultation with DEQ, is entrusted with the authority and obligation to ensure that Grace performs a cleanup that meets all CERCLA requirements, including ensuring that OU3 is protective of human health and the environment and that the cleanup meets all environmental laws and regulations.

The costs of implementing this protective cleanup under CERCLA will be paid entirely separately from the $18.5 million.  The State will only use the natural resource damage

settlement funds on restoration-related costs and actions defined in the Settlement Agreement, and is prohibited from spending these funds on the final remedy that will be identified in the Record of Decision for OU3 (cleanup).

The use of the $18.5 million is restricted in the proposed settlement. It must be used "solely to restore, replace, rehabilitate, or acquire the equivalent of injured natural resources and services in or related to OU3 or the Lincoln County area, and support therefor, including costs for State restoration plan development and implementation, and administrative, program, legal, technical, and all other related costs, to the extent lawful under CERCLA or CECRA…" The natural resources that the State alleges may have been damaged include surface water, riparian areas, wetlands, ponds, groundwater, fish and wildlife, and lost recreational use, as well as other natural resources and services.

We acknowledge with compassion the incredible suffering, health impacts, and death that the people of Lincoln County have suffered from the Libby Asbestos NPL Site and we in no way intend to diminish those losses. Under federal and State Superfund law, natural resource damages cannot be spent in compensation for personal injury or death. Natural resource damage settlement funds can only be spent on private property where the restoration action is benefiting a public resource (e.g., a project on the banks of a river that will help improve fish populations within the river). Natural resource damages cannot be used to address private property damage because they are recovered solely for injured natural resources held in trust for the public, but the significant financial assurance will help ensure that the KDID does not fail and contaminate residents and businesses such as the commenter's hunting and fishing lodge on the Kootenai River. See response to Category B for further information about the financial assurance. Similarly, although we empathize with the loss of a pet, natural resource damages legally cannot be spent on pets.

The basis for the $18.5 million natural resource damage settlement is outlined in Exhibit E of the settlement, *Alleged Injury and Examples of Restoration Options to Address Alleged State Natural Resource Damages at or Relating to Operable Unit 3 of the Libby Asbestos Superfund Site.* The State balanced all relevant factors, including bankruptcy and other litigation risk considerations. The State may bring another natural resource damage claim if there is a "catastrophic" new release (essentially, the dam fails and significant new contamination occurs). Over the years, NRDP has settled other natural resource damage claims totaling $254 million (with another $70 million+ of interest accrued) working with various trustees. Based on all of the available information, including Exhibit E and our professional experience, the State believes the settlement is fair, adequate, reasonable, and consistent with the goals of CERCLA and the Montana Comprehensive Environmental Cleanup and Responsibility Act, MCA § 75-10-701 *et seq*.

To ensure that the $18.5 million settlement will actually be paid in full, if Grace doesn't pay the $18.5 million on time, Grace will owe penalties in the amount of $5,000 per day for the 1st through 14th day of a late payment; $6,500 per day for the 15th through 30th day of a late payment; and $8,500 per day for the 31st day and beyond day of such breach. Further, if the State has to sue to enforce the Settlement Agreement, the State can recover its expenses and

costs, including attorneys' fees.  Although no litigation mechanisms can fully eliminate all potential enforcement-related risk, the Settlement Agreement includes protective provisions utilized by state and federal agencies in similar contexts.

## Category F: Constitutionality of Settlement Agreement

**Summary:** The Settlement Agreement does not adequately protect the right to a clean and healthy environment contained in the Montana State Constitution and should be rejected.

**Response**:  As outlined in greater detail in the responses to the other categories of comments, the proposed Settlement Agreement protects our surface waters, sediments, and floodplains from recontamination by requiring significant financial assurance for the KDID.  The State is obtaining financial assurance through the proposed Settlement Agreement that otherwise could not be required under existing state regulatory programs overseen by DNRC's Dam Safety Program.

The Settlement Agreement does not replace or interfere in any way with the CERCLA process, nor does it displace any other existing regulatory authority of the State to protect human health and the environment.

Similarly, the natural resource damage portion of the settlement provides a significant opportunity to implement restoration actions to improve Montana's surface waters, riparian areas, wetlands, ponds, groundwater, and fish and wildlife.  All of these actions will help provide a clean and healthful environment for current and future generations of Montanans.

## Category G: The Libby Asbestos Superfund Oversight Committee and Public Engagement

**Summary:** One commenter suggested that the Libby Asbestos Superfund Oversight Committee (LASOC) be used as an advisory council to assist in strategic coordination of the planning and implementation of projects paid for by the Natural Resource Damage funds ($18.5 million). There was support for the engagement of local groups, leaders and citizens in evaluating projects that will be undertaken with Natural Resource Damage funds.

**Response**: Once the Settlement Agreement is entered, the Trustee will determine whether to establish an advisory council.

## Category H: The Settlement Does Not Affect Grace's Obligations under Superfund or the Montana Dam Safety Act.

**Summary:** Commenters were supportive that the Settlement Agreement will not affect Grace's requirements to continue to perform Superfund work, subject to EPA oversight with DEQ consultation. The $18.5 million natural resource damage settlement is entirely separate from the Superfund obligations Grace continues to have at OU3.  Also, the Settlement Agreement would

not affect Grace's obligations under the Montana Dam Safety Act, MCA § 85-15-105 et seq or the Montana Department of Natural Resources and Conservation's regulatory powers.  There were various comments about the engineering of the KDID, including length and potential costs of Grace's obligations.

Commenters expressed concern about a fire event releasing asbestos and consider the settlement agreement insufficient in addressing these concerns, and the lack of funding specific to a fire event's remediation. There are further concerns about the liability and funding to clean-up a possible dam failure.


**Response:**  The State agrees that this is an important feature of the proposed Settlement Agreement.  Among other things, the Settlement Agreement preserves DEQ's rights to participate in the cleanup process with EPA under Superfund, including the State's rights to sue EPA to require a Superfund cleanup that complies with State law.  Similarly, the settlement does not affect DNRC's authority under the Montana Dam Safety Act, which will allow DNRC to continue to provide oversight of the KDID; ensuring the integrity of the KDID was of importance to many commenters. Because this settlement does not affect DNRC's oversight of the KDID (including the sufficiency of the engineering, etc.), the comments about the engineering of the KDID are noted.

The State's proposed Settlement Agreement does not affect Grace's obligations to perform and pay for work under Superfund that may be required by EPA in consultation with DEQ, or required by the Forest Service, as appropriate, including any future fire-related actions under CERCLA.  The Settlement Agreement also does not interfere with or replace the remedy selection process currently being conducted pursuant to CERCLA.  The State passed the wildfire comment and noted the community questions about the OU3 remedy to the U.S. Forest Service and EPA so that they are aware of the remedy concerns expressed by the community.

# Copies of Public Comments Received

| No. | Individual/Organization |
|---|---|
| 1, 21 | Colleen Hinds |
| 2 | Will Prunty |
| 3, 4 | Ethan Danger |
| 5 | Morgan Kinney |
| 6 | Tim and Joanne Linehan, Linehan Outfitting Company |
| 7, 24, 26 | Kathryn Slora & James Nash |
| 8 | Becky Stovall |
| 9 | Cesar Hernandez, Cabinet Resource Group |
| 10, 19, 20, verbal | Cesar Hernandez |
| 11 | Doug Griffiths |
| 12 | Julie Waters-Barcomb |
| 13 | Pat Hanson and Maury Anderson |
| 14, verbal | Representative Steve Gunderson |
| 15 | Bob Lambrecht |
| 16 | Eugene J. Hogan Jr. |
| 17 | No Name Provided |
| 18 | Kristin Smith, President, Kootenai River Development Council (KRDC) |
| 22 | Sara Lou Springer |
| 23 | Rob Kjos |
| 25 | Bruce Vincent, Libby Chamber of Commerce |
| 27 | Jane Fritz |

## Natural Resource Damage Program

| | |
|---|---|
| **From:** | colleen hinds <colleenhinds@hotmail.com> |
| **Sent:** | Thursday, January 12, 2023 12:07 PM |
| **To:** | Natural Resource Damage Program |
| **Subject:** | [EXTERNAL] Libby Asbestos Settlement Comments |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

The State of Mt. needs to hold a high bar for industry esp. Mining endeavors on the reclamation of a used Natural Resource. The proposed  11.5 million or even 18.5 million is Paltry Peanuts for compensation. Look at what tab tax payers are picking up for the debacle at Zortman-Landusky! Even tho' "modern man" uses minerals freely the Earth is finite and collectively we should all do better but people cannot keep taking on the clean up burden of failed industry. Thank-you,  Colleen HINDS Sent from my iPhone

**Natural Resource Damage Program**

| | |
|---|---|
| **From:** | William Tina Jamie Mindy Rajah Sophie Prunty Family <pruntyfamily4@hotmail.com> |
| **Sent:** | Thursday, January 12, 2023 8:41 PM |
| **To:** | Natural Resource Damage Program |
| **Subject:** | [EXTERNAL] Libby Asbestos Settlement Comments. |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

We moved to the Libby area more than a decade ago.  We were told the city was safe.  We loss our "fur baby" in 2021 to mesothelioma.

During my follow up with the entity that is handling the super fund cleanup, I was advised domestic animal research and evaluation was dropped off when considering how to use the funding.

We talk about what asbestos does to the human being physically but disregard collateral damages, such as losing our companions.  Some of the settlement should go to care of our animal companions, just as it went to humans that were physically affected.

If we would have known what was going to happen to Rajah we would have never gone to Libby.

I hope to hear in the future that some of this funding goes to the care of our companions, so at least our loss of Rajah brings some relief to other families that are struggling with a loss similar to ours.

# We live outside of Libby on Highway 2.  We lost Rajah, our Morkie, in Aug of 2021. She was 11 years old. We traveled throughout the country in attempt to save her.

# She was eventually diagnosed with mesothelioma and passed away within a week after being diagnosed because she was unable to take in oxygen due to lung failure.

We were told the parks in Libby were safe and that's the only reason we walked Rajah there. The parks and kootenai falls are the only places she could have come in contact with asbestos.

Shouldn't the superfund allocate funds for medical bills and expenses relating to these loses or establish a foundation to supply portable oxygen and at home oxygen units to area residents for there furry family members affected by similar situations to help with quality life and make them as comfortable as possible when dealing with a disease like mesothelioma.

It was a huge loss to us that words can't describe, she gave us such unconditional love, but we are hoping to bring attention to this issue.  We talk about people being physically affected by the asbestos but we forget about the other ways this horrific contamination has caused hurt and loss in other ways.

Will Prunty
Libby, Montana

Get Outlook for iOS [aka.ms]

## Natural Resource Damage Program

**From:**          Ethan Danger <dangermechanic1@gmail.com>
**Sent:**          Thursday, January 12, 2023 10:08 PM
**To:**            Natural Resource Damage Program
**Subject:**       [EXTERNAL] wr grace

**Follow Up Flag:**    Follow up
**Flag Status:**       Flagged

what guarantee do we have that they will fund that dam?

**Natural Resource Damage Program**

| | |
|---|---|
| **From:** | Ethan Danger <dangermechanic1@gmail.com> |
| **Sent:** | Thursday, January 12, 2023 10:11 PM |
| **To:** | Natural Resource Damage Program |
| **Subject:** | [EXTERNAL] Libby Asbestos Settlement Comments |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

how will a bankrupt company fund a dam for 100 years? they sold this town out before and they will again

**Natural Resource Damage Program**

| | |
|---|---|
| **From:** | Morgan Kinney <MKinney22@outlook.com> |
| **Sent:** | Friday, January 20, 2023 4:28 AM |
| **To:** | Natural Resource Damage Program |
| **Subject:** | [EXTERNAL] Libby Asbestos Settlement Comments |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

You know, I heard about this on the radio. the way the radio station phrased it, it suggested that the governor was going to forgive WR Grace And consider their bill paid. And my first thought was "look at that millionaire out of state governor of ours using his political seat and power to help out his friends in big business."

Whereupon I found myself reading the article today, and there's a lot of glaring things that I find missing in it.
For example, WR Grace agreed to pay $250 million for the cleanup work and the damage is done to our state with their vermiculite mine. This came about in 2008: that's 15 Years ago, and no one in the article or anywhere else apparently has shown how much WR Grace has paid towards their settlement in that time. If they paid $2,000,000 a year, that would be $30 million. With their offer of 18.5 million, that comes to $48.5 million:  they would be getting off the hook to the tune of $200.5 million.
Tell me, is that what our state is worth? We are one of the cleanest, most beautiful states in the entirety of the country. The people here claim to live by a code of ethics that always seems to include taking full responsibility for yourself, and taking care of this landscape. This is a place to take pride in, and a place to cherish for generations to come.

What does it say about us and how we care for this state if we let an institution like WR Grace ruin it, and then get off from taking care of their responsibilities?

The EPA is a federal agency: they operate off of the federal government budget, which is supported of course with our federal taxes. Our taxes, paid by Montanans, went towards the $600 million cleanup that it actually cost to mitigate the WR Grace Superfund site. It doesn't matter how small of an amount our taxes actually contributed to that 600 million, what matters is that in some way we, the citizens of Montana, got stuck with WR Grace's  bill and responsibility. WR Grace already got a break by only having to pay 250 million dollars.
And governor Gianforte wants to give them another one? A big money, out of state, property developer: when have they ever actually cared about more than what they could stuff in their pockets?
If Greg Gianforte was actually someone who's supported Montana and its people, he would not let WR Grace off the hook. He's willing to sell us down the river for what he considers a 'good deal'. In the article, he is quoted as saying "after years of negotiation following Grace's historic damage Libby and communities in Lincoln County can more fully recover". I'm sorry, but the man has only been in office for two years. He had nothing to do with any prior negotiations, and to be perfectly honest, if he was man with any integrity there would be no negotiations, WR Grace would pay what they agreed to pay and they would take responsibility for their mess, the damage to the environment, the poor health

related to the asbestos that they put out into the world, and the deaths of the people in Libby who got sick from it.

Several thousand people are sick, 400 have died, and we live in a nation that for some reason thinks that state sponsored health care is a bad thing. Republicans like Gianforte have seemed to go out of their way to make it appear like the worst thing in the world to charge the citizens of this country a little more in taxes so everyone can benefit from health care. The people who have been sick from the asbestos in Libby have been paying for their health care out of pocket, or they've been using the paltry and laughable state health care that's available to people of extreme low income, or they make the choice to not go at all. That reality is part of the WR Grace legacy.

Gianforte wants to accept their insulting settlement and let them skate out the door.  He wants to help WR Grace keep their money, and is setting up the stepping stones for them to weasel and worm their way out of every part of what they agreed to do. We let them settle this, and in 10 years, they will try to pass off or get out of paying to maintain the slurry pond, or whatever else, under some sort of reason or claim that winds up keeping money in their pockets.

Absolutely, is this an accusation that Gianforte is using his seat as governor of Montana to help big business shirk their responsibilities And leave Montanans in a lurch.
I would love to tell him that to his face, but we all know that he doesn't have the integrity to make the time for his constituents. Whether it's my single voice, or every voice in the state, he absolutely should put aside his agenda and his beliefs and actually listen and interact with the people of this state.
But he will not.

Morgan Kinney, B.A Anthropology
406-207-3929
MKinney22@outlook.com

**From:**    Linehan Outfitting
**To:**    Natural Resource Damage Program
**Subject:**    [EXTERNAL] Libby Asbestos Settlement Comments
**Date:**    Sunday, January 22, 2023 1:34:27 PM

To Whom It may Concern:

After taking several hours to pour over the documented materials associated with the WR Grace/Libby Asbestos Settlement I have several serious concerns.

It seems to me that in the state's efforts to move forward with this mess it may be putting the cart ahead of the horse.  I do not agree with accepting any settlement, in any way, shape, or form, before the entire EPA Feasibility Study is completed.  This ongoing generational asbestos horror show is much too grave and serious to simply accept a settlement before all details, known and potential, have been surrounded and accounted for both from an environmental and socio economic point of view.

Additionally I'm struck and concerned by the lack of attention or details associated with potential damage to private properties in the event of any incident with the Kootenai Development Impoundment Dam.  I'm aware the current EPA funding and cleanup included reparations on private property and that this ettlement document clearly states, "THE FUNDS WOULD BE USED TO RESTORE, REPLACE, OR REHABILITATE, INJURED NATURAL RESOURCES IN THE LINCOLN COUNTY AREA, AND RELATED COSTS.  But I'm seriously concerned about the unimaginable loss of value of private property in the event of a disaster or failure of any kind with the Kootenai Development Impoundment.  Words are great but often meaningless.  The Kootenai River flows through the towns of Libby and Troy and there are hundreds of private property owners whose private real estate would be worthless in the event of a catastrophe for a period of many years while being rehabilitated if that's even included in the settlement to begin with.   And I have a feeling private property values would stayed permanently mired in toxic mud (no pun intended) as a result of the scar of being yet again subjected to the horror of asbestos contamination.  Many of these private properties provide income for families here in Libby and Troy and  without said income, families would be left in a dark place yet again.

God forbid this will ever be necessary but I think the settlement should also include language and compensation funding to private property owners for the loss of value and income from their real estate during and after rehabilitation.  Period.

I have a fly fishing and hunting lodge on the banks of the Kootenai River.  Suffice it to say I'm pretty sure my business would suffer total destruction if there is ever an incident at the Kootenai Development Impoundment Dam.  Think about it.  Would you spend money to go stay at a lodge knowing the front yard was contaminated with asbestos?  That's what I thought.  And please keep in mind there are many businesses along the banks of the Kootenai River that would suffer same private property horrors.

For these reasons I think the settlement is grossly inadequate and at the very least should be scrapped until the entire EPA Feasibility Study is completed, reviewed, amended, and all issues

surrounding potential loss of value to private properties is better qualified.

Thank you for the opportunity to comment.

Tim and Joanne Linehan

Linehan Outfitting Company
35309 Yaak River Road
Troy, MT 59935
406-295-4872
800-596-0034
www.fishmontana.com [fishmontana.com]

For the latest photos and updates, follow us on Facebook and Instagram:
www.facebook.com/LinehanOutfittingCompany [facebook.com]
www.instagram.com/LinehanOutfittingCompany [instagram.com]

**From:** Kathi Slora & Jim Nash
**To:** Natural Resource Damage Program
**Subject:** [EXTERNAL] Libby Asbestos Settlement Comments
**Date:** Monday, January 23, 2023 12:09:31 PM

Libby Asbestos Settlement Comments:

The OU3 Feasibility study is not completed so this settlement agreement is premature.

The settlement amount is insufficient to cover the cost of catastrophic dam failure or future inflation costs in today's dollars

What is a 100-year assurance when some areas of the country have seen 100-year events happening every year? A 500-year assurance is more reasonable. Should the dam fail, we would have a huge ecological disaster on our hands.

I request that a public hearing be held to address these concerns.

Respectfully yours,

Kathryn Slora & James Nash

75 Smeads Bench Rd

Noxon, MT 59853

406-847-5610

**From:** Becky Stovall
**To:** Natural Resource Damage Program
**Subject:** [EXTERNAL] Libby Asbestos Settlement Comments
**Date:** Thursday, January 26, 2023 9:21:56 AM

This settlement is inadequate and premature. The OU3 feasibility study has not been completed.  The amount is insufficient to cover catastrophic dam failure or future inflation costs in today's dollars. The assurance on the tailings dam needs to be increased to 500 years. This settlement needs to increased to an amount that takes these facts into consideration. Thank you for your consideration on this matter.

 *The Cabinet Resource Group*

Libby Asbestos Settlement Comments                    1/14/2023

MT. Natural Resource Damage Program
P.O.B. 201425
1720 Ninth Ave.
Helena, MT 59620-1425

Dear People,

Greetings; and assuming that you work on the behalf of the Citizens of Montana? This settlement agreement is premature, being as the official OU-3 Feasibility Study for the W.R. Grace / Libby Superfund site has not been released and is still about a year out from completion. If there is any hurry here, it is probably not in the best interests of Montana's citizenry.

A quaint reminder of a not to recent State blunder regarding other mining activity in the state is appropriate here and should give pause to this hastily arranged settlement proposal. The insufficient bond required by the MT Dept. of Environmental Quality for the Zortman – Landusky mine fiasco only costs the Montana taxpayer between $2-3 million per year to mitigate water quality restoration. That's money that will never help hungry or sick children, the handicapped or veterans, shelter the homeless or a host of other civic responsibilities that government is meant to address. This proposal is basically a bond, and the bond for Zortman-Landusky was @ $36 million and look where that has left us? It might seem odd to be comparing this settlement with a mining reclamation bond, but that is exactly what it is!

CRG has seen and read the tables (or anecdotal total amounts) that purport to show the fabulous compounded sums the settlement purports if nothing happens by the year 2142. They are a pittance premised on W.R. Grace existence even a few years from now. What the NRDP should be doing / considering is conducting a worst-case scenario study that would determine the breadth and expense if the OU-3 tailings facility were to fail. Look at California as an immediate example; moving from drought to severe atmospheric river flooding in a fortnight.

What is a 100-year assurance, when some areas of the country have seen 100-year events happening every year or other year? Climatically things are changing and we can no longer use past time frames as a reliable reference. This settlement agreement should minimally require a $100 million dollar down payment up front and a 500-year assurance to be even worth considering.

To quote some of the ambiguities of the proposed settlement would / should be relevant here:

*1. "Prior to use of funds, a restoration plan would be developed and adopted by the Governor after adequate public notice and opportunity for hearing and consideration of all public comment. …. The overall goal of the restoration plan is to identify actions that singly or in combination restore, rehabilitate, replace, or acquire the equivalent of injured natural resources or lost services such that they can provide the level of services available under baseline conditions.*

The question here is why is the Governor or DEQ putting the cart before the horse? Why hasn't a restoration plan identifying the above mentioned components been developed and submitted by DEQ to the Governor? DEQ has been working on the Grace Superfund issue for over two decades, surely they should know by now what needs there are for this settlement. Or is this just an attempt by DEQ to secure funding that would only pay administration costs and do little for the citizens of MT?

*2. "The natural resource damages component of the Settlement between Grace and the State was negotiated and executed on a cash-out basis, with funds paid to the State over a period of 10 years. No particular project or projects are required by the Settlement, no particular project has been identified by the State at the time of this Report, and the projects ultimately implemented by the State may differ from the examples provided below …."*

This makes the agreement clearly sound like a case of "Political Expediency", and the names, aims and departmental or political discussions that drove this settlement agreement should be made public knowledge.

*3. "Although some remediation has occurred, a final remedy has not been selected for OU3, and remediation of the entire forested watershed area within OU3 has not occurred and may not occur."*

This sentence in the settlement agreement distinctly characterizes the premature nature of this proposal and why it should be rejected outright. After the 400 plus deaths (and potentially 2400 more) directly related to this imbroglio you would think that any sane person directing this situation could / would at least wait until the Operational Unit (OU-3) Feasibility Study were completed before granting W.R. Grace this "Get Out of Bankruptcy Card".

The Cabinet Resource Group (CRG) requests an extension of this comment period until a public hearing / meeting has been arranged and executed in the impact area of this Superfund site. Until such Agency / State action is taken and a final resolution reached as a result of the OU-3 Feasibility Study, CRG rejects any and all provisions of this settlement agreement.

Sincerely,

Cesar Hernandez on behalf of
The Cabinet Resource Group Board

MT Natural Resource Damage Program                    1/17/2023
P.O.B. 201425
1720 Ninth Avenue
Helena, MT 59620-1425
Attn: Libby Asbestos Settlement Comments

Dear People,

   Greetings! 20 years of cleanup, study, analysis and whatnot over the W.R Grace
Vermiculite / Asbestos Superfund site; 400+ deaths and an acknowledged 2400
other potential victims, and you folks + the Gianforte administration are right with
bailing on your responsibilities for a pittance? "Inconceivable as per Vecini from
the Princess Bride"!

Your / this Settlement Agreement is premature in every sense of the word. Having
followed this whole issue from the first warnings of Gayla Bennfield and Les
Skramstad (both deceased asbestosis victims) that there was a nightmare occurring
in Libby. To the scathing revelations that the regulatory agencies were not only
negligent in their oversight, but also complicit in the deceptions of W.R. Grace
about the dangers of asbestos. Through the mockery of justice that was served from
the trial verdict for W.R. Grace and company, you regulators and self serving
politicians can't get it right.

Why does the public have to tell you that you are putting the cart before the horse?
Why can you not see that making a FINAL settlement even before the official
process and public presentation of the OU-3 Feasibility Study, which in part would
address and recommend actions related to the proposed settlement is completed in
2024 is off the wall? What is the hurry? Or is the hurry a compromised reflection of
political expediency on the part of an administration enamored to the whims of
corporate dominion?

The wording itself within the settlement agreement gives away the fact the State
does not know the final extent of natural resource damage involved.

***"Prior to use of funds, a restoration plan would be developed and adopted by the
Governor after adequate public notice and opportunity for hearing and
consideration of all public comment. .... The overall goal of the restoration plan
is to identify actions that singly or in combination restore, rehabilitate, replace, or***

*acquire the equivalent of injured natural resources or lost services such that they can provide the level of services available under baseline conditions."*

Your agency then goes on to accept what amounts to a pittance in relation to the cost ($68 Million) of what the State settled with over 2000 folks impacted by its decades long regulatory malfeasance. This type of logic and action is so representative of the people's government when it comes to regulating big business and industry. How many examples of this would you like cited? The Butte Berkley Pit, Zortman-Landusky, Montana Power, the Colstrip tailings impoundments?

*"The natural resource damages component of the Settlement between Grace and the State was negotiated and executed on a cash-out basis, with funds paid to the State over a period of 10 years. No particular project or projects are required by the Settlement, no particular project has been identified by the State at the time of this Report, and the projects ultimately implemented by the State may differ from the examples provided below …."*

How much burden (**death & taxes**) should the citizen taxpayers be required to carry before regulators and politicians awaken to the fact that our Constitution and laws enshrine a right to a Clean and Healthy Environment? That the cost of doing business in the State of Montana should also ensure compliance with our laws, and that taxpayers are simply tired of carrying water for the outside interests unwilling to carry their own weight?

*"Although some remediation has occurred, a final remedy has not been selected for OU3, and remediation of the entire forested watershed area within OU3 has not occurred and may not occur."*

This sentence indicates that the settlement is little better than a quit-claim by the State for a nominal financial gain that would probably be eaten up by administrative actions accomplishing nothing. Is this what Montana taxpayers deserve?

I'll tell you what I think the taxpayer minimally deserves:
1. At least one public hearing on the proposed settlement, to explain to the general public what it encapsulates. As well as an opportunity for the public to question the public officials responsible for its design.
2. A minimum up-front payment from W.R. Grace in the amount of $100 million to be paid upon signing. Sequestered in an interest bearing security this might

begin to cover the costs associated with any catastrophic failure of the KIDD tailings dam & impoundment.

3. A 500 year financial assurance from W.R. Grace should anything happen that disrupts safe maintenance of the 1100-acre mine site and tailings impoundment.

4. Disclosure of the names, administrative direction and all correspondence between W.R Grace and all public officials involved in this settlement proposal.

5. Postponement of this settlement agreement until the full process of the EPA OU-3 Feasibility Study have been completed and decisioned.

Until then, you folks are just undermining the rights of Montana citizens and further burdening MT taxpayers should things go South. Considering all of the ongoing climactic changes happening across the planet it is better to be safe than sorry because **"Shit Happens"!** The State needs to reject this settlement proposal in its entirety.

Sincerely,

*Cesar Hernandez*

Cesar Hernandez, 38354 Dubay Road, Polson, MT 59860

**Natural Resource Damage Program**

**From:**          Doug Griffiths <douggriff@montanasky.tv>
**Sent:**          Thursday, January 26, 2023 7:08 PM
**To:**            Natural Resource Damage Program
**Subject:**       [EXTERNAL] Libby Asbestos Settlement Comments

**Follow Up Flag:**   Follow up
**Flag Status:**      Flagged

If hyperinflation of the currency is our future, and by all appearances that will be the case, 18.5 million dollars will evaporate in a heartbeat.

This proposed settlement is in this way and several others an abomination.

Doug Griffiths

Libby, Montana

**From:**       Julie Waters-Barcomb
**To:**         Natural Resource Damage Program
**Subject:**    [EXTERNAL] Libby Asbestos Settlement Comments
**Date:**       Friday, January 27, 2023 12:32:24 PM

I am writing to express my concern regarding the Libby Asbestos
Settlement Agreement.  I think it is astounding that the Governor and
State Regulators are pushing this settlement EVEN BEFORE the official
EPA Feasibility Study is completed. What can they be thinking?

   It is definitely premature to release this inadequate statement
before the Feasibility Study is complete.  In addition, the settlement
amount is insufficient to cover the cost of a  dam failure or the cost
of future inflation costs in today's dollars. The 100 year assurance on
the vermiculite mine tailings dam is an insufficient time frame. How
about 500 years? That seems more reasonable.

   I urge you to not accept the current Settlement Agreement before the
EPA Study is completed and released to the public.

Thank you

Julie Waers-Barcomb

**From:**        anderhan@frontiernet.net
**To:**          Natural Resource Damage Program
**Subject:**     [EXTERNAL] Libby Asbestos Settlement Comments
**Date:**        Saturday, February 4, 2023 4:10:56 PM

We would like to comment on the Libby Asbestos Settlement Agreement.  We have lived in Libby for over forty years and continue to be very frustrated about the WR Grace mine situation.  Due to climate change, the flooding of the dam would be catastrophic for the surrounding area, including the Kootenai River to the Columbia River and farther on.

The feasibility study needs to be completed first, before the settlement occurs, and we feel that the amount of money for a dam failure needs to be high enough for any future problems.

Also a 100 year assurance on the tailings dam is insufficient.

Sincerely,

Pat Hanson and Maury Anderson

As a longtime resident of Libby and as Representative of House District 1 and a member of the Libby Asbestos Superfund Oversight Committee (LASOC), I have closely followed the process of resolution undertaken by the State of Montana concerning the U.S. Bankruptcy Court settlement agreement concerning the remainder of the Montana Department of Environmental Quality's (DEQ's) amended proof of claim in W.R. Grace & Co.'s ("Grace") Chapter 11 bankruptcy case for the Libby Asbestos Superfund Site.

I am pleased that this necessary step of resolution has reached the point of this settlement compromise and write to convey my support of finalization of this process.

My support is based upon a few important elements of the settlement:

1. The settlement will not affect Grace's requirements to continue to perform Superfund work, subject to EPA oversight with DEQ consultation.  Also, this settlement agreement would not affect Grace's obligations under the Montana Dam Safety Act, MCA § 85-15-105 et seq or the Montana Department of Natural Resources and Conservation's regulatory powers.
2. The Multiple Accounts Analysis process that yielded the conclusion that leaving the KDID in place with flood-routing capacity equivalent to nearly a 10,000 year flood event was the best long-term alternative.
3. The establishments of trusts with an estimated worth of up to $300 million that will generate funds needed for the Kootenai Development Impoundment Dam and associated structure related maintenance for the next century regardless of whether Grace remains a viable company.
4. The $18.5 million, plus interest, paid by Grace to cover costs related to the development and implementation of restoration actions related to Operable Unit 3 or the Lincoln County area. It is important that these funds cannot be transferred to the state's general fund and cannot be used for costs unrelated to restoration efforts specific to our area.
5. The clear indication that has been signaled by the Natural Resources Damage Program administrators that engagement of local groups, leaders and citizens will be central to determining projects that will be undertaken with Natural Resource Damage funds.

When this settlement is finalized, I understand that it is common practice within the Natural Resources Damage Program to form an advisory council to assist in strategic coordination of the planning and implementation of projects paid for by the Natural Resource Damage funds ($18.5 million). I suggest that the administrators consider utilizing LASOC as that advisory council and look forward to discussing this possibility in the near future.

In conclusion, I support the finalization of the proposed settlement and look forward to working with the Montana Natural Resource Damage Program in developing local public-input infrastructure within that program to assure restoration planning and implementation benefits the local lands, biota and citizens.

Sincerely,

Representative Steve Gunderson
Montana House District 1

| | |
|---|---|
| **From:** | Bob Lambrecht |
| **To:** | Natural Resource Damage Program |
| **Subject:** | [EXTERNAL] Libby Asbestos Settlement Comments |
| **Date:** | Monday, February 13, 2023 12:33:56 PM |

To : Montana Natural Resource Damage Program

I do not believe that the agreement should be settled at this point because (1) the EPA Operational Unit -3 (OU-3) Feasibility Study has not been completed yet, (2) the settlement amount is not sufficient to cover the cost of a future catastrophic dam failure and (3) the 100 year assurance on the vermiculite mine tailings dam is not long enough to ensure proper amelioration.

Robert Lambrecht
70 Bear Tracks Ln.
Trout Creek, MT 59874-9620

Sent from my iPad

**From:** Gene Hogan
**To:** Natural Resource Damage Program
**Subject:** [EXTERNAL] Libby Asbestos Settlement Comments
**Date:** Monday, February 13, 2023 2:00:59 PM

To Whom It May Concern:

I am writing today to voice my concern regarding the premature settlement being proposed for the Libby Asbestos situation caused by W.R. Grace.  I lived in the Troy area at the height of the problem uncovered at the mine, played on some of the ball fields covered in residue from the mine, walked in the residue put on volleyball courts in Troy, and fished the Kootenai below the mine site.  The detriment to the environment and many human lives was, and is, substantial and needs to be addressed in a conscientious manner.

I find it very alarming that a settlement is being proposed even before the OU-3 Feasibility Study has been completed.  If we are unsure of all the particulars regarding detriment to the earth and humans, and what it will take to try and mitigate these, how can a settlement amount be justified yet?  Of particular importance are potential factors due to weather events like flooding or earthquakes that might initiate a failure of the tailings dam.  In addition, the under drains are plugging up and beginning to fail, something which the OU-3 Feasibility
Study is sure to disclose.  Failure of the tailings dam would be catastrophic in many regards, not the least of which is the degradation of the Kootenai River.

The 100 year assurance on the vermiculite mine tailings dam is an insufficient time frame.  A 500 year assurance is much more reasonable.

Please do what is right for the people and environment of Montana.  Montana is so beautiful and should be an example to the forty nine other states of the union in what good stewards of the land we are.  Do NOT rush this critical decision, and instead let all the facts be disclosed before any settlements are formulated.

Thank you for listening.

Sincerely,

Eugene J. Hogan Jr.
243 N. Fork Yaak Rd.
Troy, Montana 59935

(541)-270-3964

**From:** kd7cni
**To:** Natural Resource Damage Program
**Subject:** [EXTERNAL] Libby Asbestos settlement
**Date:** Wednesday, March 8, 2023 7:48:41 PM

Glad to hear everyone is collecting from WR Grace. But do you know what is really sad is that the people that are dying or dead from the asbestos are still waiting. Why don't you look them in the eye and wave that check in their faces and see how they feel about it. Why don't you get some action for them...

Sent from Yahoo Mail on Android [go.onelink.me]

# KOOTENAI RIVER
## DEVELOPMENT COUNCIL

March 10, 2023

Montana Natural Resource Damage Program
Attn: Libby Asbestos Settlement Comments
P.O. Box 201425
1720 Ninth Avenue
Helena, MT 59620-1425

Please consider the following comment on the proposed Libby Asbestos Settlement Agreement
between the State of Montana and W.R. Grace.

The Kootenai River Development Council (KRDC) is a private nonprofit providing economic and
community development services to south Lincoln County, Montana. KRDC cultivates community
health and economic growth by providing leadership in project development and access to local, state
and federal resources. With this focus on both economic and community development, KRDC is
encouraged by the continual progress toward conclusion of the Libby Asbestos Superfund Site which,
is critical for Libby to move on from the stigma associated with it.

KRDC understands the proposed settlement will bring resolution to another significant piece of the
Libby project, while not affecting W.R. Grace's obligation at the former mine site under the
Comprehensive Environmental Response, Compensation and Liability Act or its obligations under the
Montana Dam Safety Act or the Montana Department of Natural Resources and Conservations. We
also understand that the proposed settlement establishes financial assurance to ensure the tailings
impoundment dam is operated and maintained in an appropriate and safe manner long into the future,
regardless of W.R. Grace's status.

We would like to thank the State of Montana for negotiating the Natural Resource Damage settlement
of $18.5 million for use in natural resource restoration or rehabilitation in or related to Operable Unit
#3 or the Lincoln County area. Additionally, we appreciate the State's indication that spending of
these funds will include robust public involvement and will be focused directly in Lincoln County and
the Libby area.

KRDC encourages the State and W.R. Grace to finalize the proposed settlement and looks forward to
working with the State of Montana in implementing that settlement. Sincerely, Kootenai River
Development Council

Kristin Smith, President
Kootenai River Development Council, Inc.

---

*Kootenai River Development Council, Inc.,        P.O. Box 621,        60 Port Blvd. T3,        Libby, Montana  59923*

Libby Asbestos Settlement Comments                              2/12/2023

MT. Natural Resource Damage Program
P.O.B. 201425
1720 Ninth Ave.
Helena, MT 59620-1425

Dear People,

Greetings! These are additional comments regarding the proposed Settlement
Agreement. After the Monday, March 6, 2023 Public Meeting / Hearing it continues
to be clear that the proposed Settlement Agreement is premature.

1. The Settlement Agreement  (SA) does not cover the resource damages resulting
   from the W.R Grace establishment of a High Risk Tailings Impoundment Dam
   in the middle of a perennial stream; and which are waters of the United States.
   Should removal of the dam and tailings be a required action as a result of any
   Superfund decision resulting out of the OU-3 Feasibility Study, the potential for
   additional unforeseen natural resource damages may occur.

2. The second most critical issue the Settlement Agreement fails to address is the
   Fire issue. Rainey Creek drainage encompasses approximately 50,000 acres of
   National Forest land. Most of the forest trees within the drainage are imbedded
   with asbestos fibers. Because of the danger posed by fire, the US Forest Service,
   EPA, DEQ, W.R.Grace and Lincoln County developed the Libby Asbestos
   Response Plan (LARP). The plan details a specifically trained 6-man (Hazmat
   Protected) initial fire response crew for the area as well as decontamination
   procedures. It has also determined that any fire in the area should / would
   receive priority air resource delivery systems. The LARP documentation for
   these decisions also includes provisions for the evacuation of Libby were an
   uncontrollable wind blown fire situation to occur. Such a fire poses the risk that
   much or all of the remedial actions taken to clean up the town of Libby over the
   last decades would disappear. Yet nowhere in the proposed Settlement
   Agreement is the risk or awareness of a FIRE situation addressed. As a matter of
   fact, the only assurance in the document is that W.R.Grace is protected from
   being sued by the State of Montana for resource damages!

3. The Settlement Agreement pages 105-111 "section (c ) Hazardous Substances Associated with Natural Resource Injuries" reference sediment sampling that indicates exceedences of Water Quality parameters.

"Site investigations conducted as part of the RI and BERAs were used by EPA to assess the degree to which these constituents were present in OU3 and posed ecological risk. The RI and BERAs provide data with which to assess the range of possible natural resource damages in OU3. The data collected for these studies are referenced below in the context of potential types of natural resource injuries and service losses."

In addition, screening-level toxicity benchmarks were exceeded in one or more Site media (soil and sediment) for:
☐ Antimony,
☐ Benzo(b)fluoranthene,
☐ Benzo(k)fluoranthene,
☐ Cadmium,
☐ Fluoride,
☐ Mercury,
☐ Naphthalene,
☐ Nitrogen as nitrite,
☐ Thallium, and
☐ Asbestos.

*In stream sediment, concentrations above screening level ecotoxicological benchmark values are not a per se injury, but indicate the potential for injury to the surface water in Montana as the State's water quality standards are based on measurements that include a fraction of suspended sediments.*

Considering that W.R. Grace does not have an MPDES permit for any discharges from their tailings impoundment facility. The SA is in essence and indictment that resource damages and violations of the Clean Water Act are not only ongoing but have been occurring in an unregulated fashion for decades. This SA as crafted is but a guarantee that exceedences of Montana water quality discharges standards will continue to go unregulated and unpunished. This is not only improper and inappropriate, but indicative of the total inadequacy of the State's negotiations in this process.

After hearing details about the Settlement Agreement negotiations process from the attorneys at the March 6, 2023 public hearing in Libby, MT, it sounds like the negotiations were conducted under less than good faith conditions. "Take it or leave it" is not conduct becoming of a resolution process. It is in fact *inappropriate*!

That Gov. Gianforte and Atty. General Knudsen would sanction participation in such a process under these conditions is *improper*. This severely contrasts with their legislative position asking for an additional $2 million dollars to defend against constitutionally challenged bills that come out of the 2023 legislative session. That they can ask for public funds in this respect but not provide similar legal support on behalf of natural resource damages resulting from the Libby Superfund Site is telling and improper!

The financial aspects of the SA are particularly onerous considering that W.R.Grace and Company was purchased on Sept. 22, 2021 by private capital entity Standard Industries for *$7 Billion in CASH!*  In consideration, the sum of $18.5 million for natural resource damages related to OU-3 Libby Superfund site is not only outrageous but also *inadequate!*

The State has reserved the right to withdraw or withhold its consent to the Settlement Agreement if comments received disclose facts or considerations that indicate the Settlement Agreement is **inappropriate, improper or inadequate**.

It is my belief that all three of the conditions for withdrawing consent of the Settlement Agreement have been met. In addition, part of my personal testimony on this issue includes a letter directly addressed to bankruptcy Judge Chan and it is requested it be made an official part of the Settlement Agreement record. Thank you.

Sincerely,

To the Honorable Judge Chan

Dear Sir,

Greetings! I am a 73-year old Marine combat veteran of the Vietnam War and a fifty-year resident of Montana.  When I enlisted (9/21/67) my **government considered me a natural resource to use as part of its armed** forces. Libby residents, Les Skramstad and Gayla Bennefield (both deceased), were friends of mine and natural resources to their community as they battled W.R.Grace and their own State Government  (MT) to bring awareness of the asbestos health crisis in Lincoln County, MT.  Les was a mill worker at the W.R. Grace mine. Gayla was the unwary child of another W.R. Grace millworker who inadvertently brought home the asbestos contamination he worked in. Both Les and Gayla had the life virtually choked out of their lungs because W.R. Grace knowingly was allowed to conduct its unsafe business activities in their hometown.

 I know this is not something you can or will address as you make your decision regarding W.R. Grace's bankruptcy petition; but it should be. However, your eventual decision in this case must be just and fair (not just to W.R. Grace), unless **the Law** does not embody those tenets.

The Natural Resources Damage Settlement Agreement between the State of Montana and W.R Grace as crafted is neither of those, because W.R. Grace has craftily utilized the shield of bankruptcy in a manner that the State can accept their offer or potentially receive nothing.  Given that choice as but fiat, few would deign to refuse; and you are the arbiter of that.

The general public is constantly reminded through Supreme Court decisions that corporations are considered people for all intent and purposes. If such is the case, then corporations should be held to the same standard of responsibility and punishments that occur to people charged

and found guilty of crimes. The usual punishment for murder is life imprisonment if not death.

Yet over 400 people (that should be called the natural resources of Libby and Lincoln County) have died from mesothelioma (asbestos poisoning) and another 2,400 are officially categorized as having and showing early signs of the disease.

The W.R. Grace Company is a Serial Superfund repeater: 1978, the Acton, Massachusetts Superfunds Site (chemicals), 1995, the Woburn, Mass. Superfund site (again, chemicals).  Neither of which have reached the immediate human death threshold, as has the Libby Superfund site.

Justice is never served when a negligent murderer is allowed to use the law; in this case bankruptcy to evade responsibility, and its acceptance by the Courts only ensures that bad corporate behavior is repeated.

On Sept. 22, 2021 the W.R. Grace &Company was sold to private equity entity Standard Industries for $7 Billion in Cash!

So your honor, I'm not asking for much and just maybe you should consider remanding the natural resource negotiations back to the parties until the Operational Unit 3 (OU-3) Feasibility Study being conducted by Grace, MT DEQ and the EPA is concluded. Barring that, maybe you would consider doubling all of the financial amounts in the Settlement Agreement and adding that W.R. Grace must ensure the dam, behind which 3.2 million cubic yards of asbestos contaminated tailings reside for not just 100 years, but 400 years. One year for each of the known 400 people from this community who have died due to their negligence. Thank you.

Sincerely,

Cesar Hernandez, 38354 Dubay Road, Polson, MT 59860

## LIBBY ASBESTOS SETTLEMENT COMMENTS

Montana Natural Resource Damage Program
Greetings to All , Harley Harris, Program Director;

   These are additional comments formed after the March 6th info/presentation meeting in Libby. Also in discovery that W.R. Grace sold out to Standard Industries for $7 billion cash. The Feasibility Study for OU-3 is not complete. The tailings dam already leaks and there is no discharge permit for the caustic contaminants already flooding water resource at the site.

   We all know in this world Capitalism speaks with a voice louder than folks. The wealthy owners make $$$bank and tell the blue collar workers "be thankful you have a job!"

So, the Government steps in to protect the citizens. Government Agencies are established to regulate industry because they lack the conscience to do it for themselves.

   Therefore, I assert this Settlement Agreement is premature, inadequate, improper, and inappropriate to accept payment now ESPECIALLY as there is no written plan of how to spend it. How much actually will be "boots on the ground"? There seems to be a lot of shuffling papers, smoke & screen, to all government agreements. Transparency comes to mind.

   Thank-you for all your time. You are definitely in the rock space but the citizens of Libby and users of the Kootenai River are even farther downstream. No pun intended.

   Sincerely, Colleen Hinds
        10 Picadilly Lane
        Heron, Montana 59844

**From:**       Robert Springer
**To:**         Natural Resource Damage Program
**Subject:**    [EXTERNAL] Libby asbestos settlement agreement
**Date:**       Wednesday, March 15, 2023 4:52:28 AM

Dams fail. The vermiculite mine tailings pose a long term problem. W.R. Grace should be responsible to cover future damn failures for at least 500 years.

Sincerely,
Sara Lou Springer
440 elk creek road, Heron, Mt
Sent from my iPad

**From:**      Rob Kjos
**To:**        Natural Resource Damage Program
**Subject:**   [EXTERNAL] Libby Asbestos Settlement Comments
**Date:**      Wednesday, March 15, 2023 11:36:38 AM

NRDP People

    I attended the meeting in Libby last week and the one last June. I have yet to hear an actual plan to prevent catastrophic failure of the dam at OU3. I called the forest service hydrologist for the area to get info on Rainy Creek flow rates, dam leakage and standing as far as 303d list. I was refered to Grace personel. Who's in charge here?  It is an earth dam with leakage of 50 gal. per minute in dry times and 2,000 gal. per minute at peak times. That dam will eventually fail.

    The way the last presentation went, it seems the state realizes the agreement is premature, but we have no choice on account of Grace bankruptcy and now the sale of their business.Who is in charge here?

    The other question I have that may have nothing or everything to do with this settlement agreement, altho citizens united would prevent me from knowing the answer. How much money has rep. Gunderson made from Grace?

    Rainy Creek is not on the 303d list, but it sounds like it should be from pages 105 -111 sec. C of the settlement agreement. Who is in charge here? Is MDEQ doing their job?

    The NRDP lawyers seemed to infer that if this settlement agreement is not accepted the people may end up with nothing. That may be true with the recent sale of their business. Who is in charge here?

                Thank you ?
                Rob Kjos
                139 Cottonwood Road
                Heron, Mt. 59844

| | |
|---|---|
| **From:** | Rob Kjos |
| **To:** | Natural Resource Damage Program |
| **Subject:** | [EXTERNAL] Libby Asbestos Settlement Comments |
| **Date:** | Wednesday, March 15, 2023 11:36:38 AM |

NRDP People

I attended the meeting in Libby last week and the one last June. I have yet to hear an actual plan to prevent catastrophic failure of the dam at OU3. I called the forest service hydrologist for the area to get info on Rainy Creek flow rates, dam leakage and standing as far as 303d list. I was refered to Grace personel. Who's in charge here?  It is an earth dam with leakage of 50 gal. per minute in dry times and 2,000 gal. per minute at peak times. That dam will eventually fail.

The way the last presentation went, it seems the state realizes the agreement is premature, but we have no choice on account of Grace bankruptcy and now the sale of their business.Who is in charge here?

The other question I have that may have nothing or everything to do with this settlement agreement, altho citizens united would prevent me from knowing the answer. How much money has rep. Gunderson made from Grace?

Rainy Creek is not on the 303d list, but it sounds like it should be from pages 105 -111 sec. C of the settlement agreement. Who is in charge here? Is MDEQ doing their job?

The NRDP lawyers seemed to infer that if this settlement agreement is not accepted the people may end up with nothing. That may be true with the recent sale of their business. Who is in charge here?

Thank you ?
Rob Kjos
139 Cottonwood Road
Heron, Mt. 59844

**From:** Kathi Slora & Jim Nash
**To:** Natural Resource Damage Program
**Subject:** [EXTERNAL] Libby Asbestos Settlement Comments
**Date:** Wednesday, March 15, 2023 2:16:30 PM

Libby Asbestos Settlement Comments

I attended the public hearing on the W.R. Grace Settlement Agreement on March 6th, 2023 in Libby, Montana. It was apparent to me that because of bankruptcy complications, the settlement is pretty much a done deal and W. R. Grace has found a loophole. I wonder why we are asked for public comment as it does not seem to move the needle.

The settlement agreement does not address the fire issue. In the settlement agreement, the state agrees not to sue for a natural resource damage claim against Grace or affiliated entities at the Site, unless there is a "catastrophic" new release (essentially, the dam fails and significant new contamination occurs). (Sec. 9(b)(ii)). This seems to address dam failure but not the threat of fire. Most of the trees in the 50,000 acres are imbedded with asbestos. A special 6-man fire response crew is on constant standby to monitor this area during fire season. Nathan Gassmann, the district ranger for the Kootenai National Forest said "The asbestos-laced trees present a unique hazard for Forest Service firefighters, only 20 of whom are trained and equipped with respirators to fight fires in Superfund Operable Unit 3. We don't have another 500 firefighters to call, we have the 20." If an uncontrollable, wind-driven fire were to occur, Libby would need to be evacuated. Asbestos laden smoke would be dispersed over hundreds of miles affecting the Flathead Valley, Missoula regions and communities to the east. Don Whittemore, fire incident commander has been quoted as saying, "The amount of organic material that's liberated from a large fire is extraordinary. Now, throw into that a cancer-causing material. To me, that's really, really scary. It's got the fuels. It's got the topography. It just needs the weather alignment." Whittemore said small test burns and fires in laboratory settings that have been conducted by those agencies don't reflect what would happen with the asbestos, smoke and ash if

a large, intense fire sent a smoke column from OU3 high into the atmosphere. An insightful article was written in Columbian Insight magazine.
https://columbiainsight.org/climate-change-wildfires-and-superfund-sites-libby/ [columbiainsight.org]


It seems to me that the settlement agreement exempts W.R. Grace if a catastrophic fire event extends outside of the OU3 area. 9 {b)(ii) State's Covenant Not to Sue for NRD Claim. The State is forever barred, estopped, and enjoined from asserting any additional NRD claims, and will not pursue any other or additional NRD claims against Grace Parties at or relations to the Libby Asbestos Superfund Site, except as reserved in Section 6(h) (Catastrophic Failure Reservation). Section 6(h) refers to dam failure.  How would this affect health & welfare, property loss or relocation? Has fire even been considered in the W.R. Grace Settlement Agreement?

Sincerely yours,
Kathryn Slora
75 Smeads Bench Rd
PO Box 1493
Noxon, MT 59853
406-847-5610
Nox5510@blackfoot.net



905 West 9th Street
Libby, Montana 59923
(406)293-4167
www.LibbyChamber.org

Montana Natural Resource Damage Program                                    March 14, 2023
Attn: Libby Asbestos Settlement Comments
P.O. Box 201425
1720 Ninth Avenue
Helena, Mt 59620-1425

Dear Sirs,

Please accept the Libby Area Chamber of Commerce comment on the proposed Libby Asbestos Settlement Agreement between the State of Montana and W.R. Grace.

The Libby Chamber represents over 300 local businesses. These businesses have a vested interest in the long-term resolution of issues related to the asbestos related cleanup that have long plagued our area.

The settlement negotiated by the State of Montana answers many concerns specific to the Operating Unit # 3 including the long-term management of the Kootenai Development Impoundment Dam and the necessary long-term restoration planning for natural resource damages.

The Libby Chamber understands that the proposed settlement does not affect Grace's obligation to continue to perform cleanup under the Comprehensive Environmental Response, Compensation and Liability Act and that Grace will continue that work with EPA and DEQ oversight.

We also understand that this settlement does not affect Grace's obligations under the Montana Dam Safety Act or the Montana Department of Natural Resources and Conservations regulatory powers and support the State of Montana's negotiated settlement that includes financial assurances (trusts and bonds) from Grace that will ultimately grow to $300 million and will be used for care, maintenance and, if necessary, eventual replacement of the spillway being constructed at the KDID even if Grace no longer exists as a company. We are pleased that the current engineered design for this infrastructure is to protect our area for up to a 10,000-year rain event and will receive scheduled reviews by a team of world-class engineers as required by the state of Montana's DNRC Dam Safety regulations.

We understand that the State of Montana negotiated a Natural Resource Damage settlement of $18.5 million for use in natural resource restoration or rehabilitation in or related to Operable Unit #3 or the Lincoln County area. We are thankful that the state of Montana has given every indication that the NRD projects that will be paid for by the NRD settlement will be Libby-area-centric in their genesis, design and implementation. It is our area that has been impacted and it should be our area that is served by the expenditure of the negotiated settlement.

While the businesses and leaders of our area work to remove the stigma often attached to our area as a superfund site and lean forward into the next, positive, phase of community invigoration, long-term steps such as agreed to in this negotiated settlement assist us in that movement forward.

In conclusion, the Libby Area Chamber of Commerce encourages the finalization of the proposed settlement and looks forward to working with the State of Montana in implementing that settlement.

Sincerely,

Bruce Vincent, President

Libby Area Chamber of Commerce

office@LibbyChamber.org    |    info@LibbyChamber.org

**From:**      Hausrath, Katherine
**To:**           Jim Nash
**Subject:**   RE: [EXTERNAL] Fire Liability Response.
**Date:**       Tuesday, March 14, 2023 7:36:45 PM

Jim,

I believe the primary questions you asked were whether the proposed Libby Asbestos settlement agreement releases Grace from liability for future "catastrophic failure" of the KDID, which it does not.  This is one of the exceptions to the covenant not to sue in Section 9 we discussed.  Also, you asked why the financial assurance would terminate if the dam were removed, which as DEQ's attorney mentioned at the public meeting, is so that Grace does not have an obligation to provide financial assurance for a structure that no longer exists.

Re questions below:

#3: The State of Montana's proposed settlement agreement does not affect Grace's obligations to perform and pay for work under Superfund that may be required by EPA in consultation with DEQ, or required by the Forest Service, as appropriate, including any future fire-related actions under CERCLA.  The Settlement Agreement also does not interfere with or replace the remedy selection process currently being conducted pursuant to CERCLA.

#1, 2, and 4: Montana NRDP does not have any involvement in any of the CERCLA response actions related to firefighting, so I cannot answer the remainder of your questions, but I suggest you contact Pamela Baltz with the US Forest Service.  According to this press release, her phone number is 406-293-6211. Kootenai National Forest - News & Events (usda.gov) [fs.usda.gov]

Regards,

Katherine Hausrath
Assistant Attorney General
Montana Natural Resource Damage Program
Cell phone: 422-3679

---

**From:** Jim Nash <nox5510@blackfoot.net>
**Sent:** Tuesday, March 14, 2023 4:31 PM
**To:** Hausrath, Katherine <KHausrath@mt.gov>
**Subject:** [EXTERNAL] Fire Liability Response.

Katherine,

  Could you email back a summary of your answers to my questions as discussed over the phone. I have added a few more as an afterthought.

Questions related to the Libby OU-3 mine site fire.

1) Does WR Grace currently have total liability for all costs related to fire fighting? Both yearly and on an

active fire?

2)  Does WR Grace currently have liability for fire related impacts on affected populations?  Examples such as short and long term health costs, relocation expenses, property damage and financial loss

3) Does anything in the dam settlement agreement release WR Grace from fire related liability?

4) Can you refer me to someone who is the most knowledgeable on this issue?

Regards,

Jim Nash
ph: 406-847-5610

**From:**  Jane Fritz
**To:**  Natural Resource Damage Program
**Subject:**  [EXTERNAL] Libby Asbestos Settlement Comments
**Date:**  Wednesday, March 15, 2023 10:29:53 PM

March 15, 2023

To:  Montana Natural Resource Damage Program
From: Jane Fritz

Re: Libby Asbestos Settlement Comments

I understand that the public comment period on this issue has been extended until midnight, today, March 15. I am grateful that the State extended the comment period at least another week since I was unable to attend the public meeting in person on March 6 due to illness.

I am a semi-retired environmental writer and independent radio producer who has lived in Lincoln County, Montana at Bull Lake, with my primary home being in Sandpoint, Idaho. I covered the asbestos issue in Libby back in the early 2000s for national and regional public radio programs and the Spokane NW Inlander when the EPA began working in Libby. I attended many meetings and interviewed many people for my stories including residents who are now deceased due to the asbestos contamination there. I also interviewed former Interior Secretary Christie Whitman when she fast tracked the area as a Super Fund site. This story was one of the most significant stories of corporate malfeasance and government irresponsibility in my journalist career.

So despite the many years of clean up and despite hundreds of deaths, I am confounded to hear that the State of Montana is about to settle with W.R. Grace for future liabilities for a paltry amount of money — $18.5 million. This amount of money in today's or future dollars is totally insufficient to cover any potential catastrophic tailings dam failure if one were to occur. What would it mean to both Libby, Troy and the Kootenai River and its tributaries? And what about asbestos in the forests? Let's say a massive wildfire occurred, with tremolite asbestos becoming airborne. Would Libby need to be evacuated? And then what? It seems to me that this town, already ravaged by an irresponsible corporation like W.R. Grace, would fall far beyond the excesses of Montana's "Bad Actor" law. Like Zortman-Landusky, the public would be left with an enormous mess to clean up while footing the bill, with Grace freed from any liabilities once $18.5 million was spent.

And what kind of a guarantee is a 100-year time frame? Perhaps a 500-year guarantee with bonding would be more responsible given Climate Change impacts to weather related events. Nothing in the proposed Settlement seems appropriate to me as far as time goes.

Lastly, I do not understand why the State is in such a hurry to settle with W.R. Grace before the official EPA (OU-3) Feasibility Study is released for public review. This seems like the cart before the horse to me, especially given that this study is meant to examine and detail the extent of natural resource damage and provide a range of alternatives for rehabilitation. W.R. Grace has done enough damage and taken enough lives in Montana and elsewhere and should be held to account for all future scenarios that surely go beyond 100 years and likely would exceed your proposed settlement amount.

It's time to slow down this settlement process and release the feasibility study for review first. The people and the land have suffered enough to take any more risks. Please wait and go back to the drawing board.

Thank you for your consideration of my comments.

Jane Fritz


Jane E. Fritz, writer/producer
AudioPress
PO Box 2418
Sandpoint, ID  83864
(208) 597-6123
janefritz19@gmail.com

Comments received on the record in person at the Public Meeting Held in Libby, MT on March 6, 2023 at 6:00 pm.


Representative Steve Gunderson – 167 Skyline Rd, Libby MT

I'm the house representative for House District 1, as well as the Chair of LASOC, Libby Asbestos Super Fund Oversight Committee. I would like to add my public comment as a representative of nearly 10,000 people of Montana House District 1, and again there may be comments made on the NRDP settlement, that are being made without having the full picture of what the settlement is about and why it is so important to our community. One of the misconceptions of the settlement is that Grace will be off the hook after the settlement is paid. This is not true. Grace has made a separate 300 million dollar commitment to rebuild the KDID impoundment dam and spillway on all the OU3, to standards that far exceed Montana DEQ Dam Standards, and is designed to withstand the 1,000 year flood event. Grace has created funding to maintain that infrastructure for 100 years and beyond.  This commitment is a totally separate project, separately funded from the 18.5 NRDP Settlement and Grace's commitment to clean up Libby's Asbestos issue.  LASOC will continue to lobby for authority to manage this fund as the local committee, best suited to oversight this new funding. As the current chair of LASOC, and House District 1 Representative, for the last 7 years, I have intimate knowledge of W.R. Grace's Commitment to Libby.  Grace will continue to support the cleanup of the remaining operable Unit OU3, the mine site, until it's signed off and released by the EPA. LASOC, has developed legislatively, to be the voice of the Libby and Lincoln County and has made a commitment to maintain the remedy EPA brought to Libby after more than a decade of cleanup as a super fund site. As being one of the locals affected by the impacts of the Libby Asbestos related disease, I bring a commitment to ensuring Grace completes its obligations. Thank you.


Cesar Hernandez –  38354 Dubay Road Rd., Polson MT 59860

Thank you for the presentation. Cleared up a lot of things. I also still firmly believe the settlement agreement is premature. I wish that you guys would return to the bankruptcy judge and explain to him about the feasibility study. And explain to him that Natural Resource Damage Program, believes but does not have complete information on the resource damages that have occurred in Operational Unit 3, even though it's stated that you do believe you have sufficient data, to start thinking about this expenditure of 18.5 million dollars. I also believe that the issue that - I do not understand why Grace is 100 year commitment, if they are not, if the settlement does not deal with the tailings impoundment and the tailings, and why it's even in this agreement. I think 100 years is like say, the 100 year event. We know that 100 year events are happening, sometimes they happen twice a year, you know. So, 100 years without any money behind it is, it's nothing. It's a promise. Grace is not around, in 100 years you got a

worthless promise. I think that Representative Gunderson, said that this dam is designed for 1,000 years – that's a bunch of baloney. Nobody designs dams for 1,000 years in this country or anywhere else in the world. You can ask the Church that, you can ask, you know, the Southern or the Railroad, you know, that just had the disaster in Ohio.  We don't design for those standards, and nowhere, and I've been in discussions with W.R. Grace, have they ever said that they will guarantee 300 million dollars for the replacement of KID Dam. So again, I emphasize, I have no idea why that statement is even in the settlement, and if it's in this settlement, then minimally, it should be for 500 years or a 1,000 years, you know – not per whatever is stated there, the other thing that I have a problem with and you guys really clarified things about the 18.5 million is why these other monies are in PNC bank. The damages were done here, in Lincoln County. The damages were done in the state of Montana, and if there's any money coming from Grace, it should be at Montana Banks earning interest in our structures, you know, paying trustees that work for us, not people in Pennsylvania.