## THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| W. R. GRACE & CO., et al.,[1] | ) Case No. 01-01139 (AMC) |
| | ) (Jointly Administered) |
| Reorganized Debtor. | ) |
| | ) **Re docket nos. 929655, 929657, & 33305** |
| | ) |

### ORDER APPROVING SETTLEMENT AGREEMENT RESOLVING STATE OF MONTANA'S CLAIM FOR OPERATING UNIT 3 OF THE LIBBY ASBESTOS SUPERFUND SITE

Upon consideration of the Reorganized Debtor's Motion to Approve Settlement Agreement Resolving State of Montana's Claim for Operating Unit 3 of the Libby Asbestos Superfund Site (the "Motion"); it appearing that the relief requested is in the best interests of the Reorganized Debtor, its estates, its creditors, and other parties-in-interest; the State of Montana having had a sufficient period of time to conduct a 30-day public comment period, and having provided any public comments received and responses to the Court; based upon information that the Reorganized Debtor and the State have provided, the Court having determined that the settlement is fair, adequate, reasonable, and consistent with the goals of the Comprehensive Environmental Response, Compensation and Liability Act, as amended, 42 U.S.C. § 9601 et seq. and the Montana Comprehensive Environmental Cleanup and Responsibility Act, Montana Code Annotated ("MCA") § 75-10-701 et seq.;  the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing

---

[1]    W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc., or "Grace") is the sole remaining Reorganized Debtor and Case No. 01-1139 is the sole remaining open chapter 11 case.

Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012; consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b), and considering that this Court may enter an order consistent with Article III of the United States Constitution; venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; notice of the Motion having been adequate and appropriate under the circumstances; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED that:[2]

1.      The Motion is granted in its entirety.

2.      The *Settlement Agreement*, a true and correct copy of which is attached as the <u>Exhibit</u> to this Order (the "<u>Settlement Agreement</u>"), is approved in its entirety.

3.      The Reorganized Debtor is authorized to enter into, and take all actions contemplated in, the Settlement Agreement on the terms and conditions set forth therein.

4.      The *Reorganized Debtor's Request for Partial Allowance and Partial Disallowance of the Claim by the Montana Dept. of Env. Quality ("MDEQ") for Environmental Remediation at Operable Unit 3 of the Libby Asbestos Superfund Site (Substantive Objection)*, the State's *Response and Reservation of Rights of the State of Montana to the Reorganized Debtor's Request for Partial Allowance and Partial Disallowance of the Claim by the Montana Dept. of Env. Quality for Environmental Remediation at Operable Unit 3 of the Libby Asbestos Superfund Site (Substantive Objection)* [Docket No. 33102], and the Reorganized Debtor's *Reply in Support of the Reorganized Debtor's Claim Objection*

---

[2]      Capitalized terms not defined in this order shall have the meaning ascribed to them in the Settlement Agreement.

*Requesting Partial Allowance and Partial Disallowance of MDEQ Prepetition Claim (Substantive Objection)* [Docket No. 33110] are dismissed as moot.

5.      The mediation scheduled in the *Stipulation and Agreed Order re Mediation of Contested Matter re Claim No. 18496-1* [Docket No. 33124], as supplemented by the *Joint Stipulation and Agreed Order Selecting Mediator in Contested Matter re Claim No. 18496-1* [Docket No. 33126], and as amended by the *Amendment to the Stipulation and Agreed Order re Mediation of Contested Matter re Claim No. 18496-1* [Docket No. 33144], has been completed.

6.      The Reorganized Debtor shall direct its claims agent Rust Consulting, Inc. to record: (i) the Allowed State Claim as an allowed, non-contingent, and liquidated claim on the terms and conditions set forth in the Settlement Agreement; and (ii) the State Claim (Claim No. 18496-1) as disallowed in all other respects and expunged.

7.      Notice of the Motion as provided therein shall be deemed good and sufficient notice of such motion and the requirements of Fed. R. Bankr. P. 6004(a) and the local rules of the Court are satisfied by such notice.

8.      The Court shall retain jurisdiction to hear and determine all matters arising from or relating to the implementation of this Order.

9.      This Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing and shall not be stayed under, as the case may be, Fed. R. Bankr. P. 7062, Fed. R. Bankr. P. 6004(h), Fed. R. Bankr. P. 9014, or otherwise.

DOCS_DE:242683.1 91100/001

10.     In the event of any conflict between the terms of this Order, the Motion, or the Settlement

Agreement, the Settlement Agreement shall govern.

Dated:    March 23rd , 2023

_____
Honorable Ashely M. Chan
United States Bankruptcy Judge

DOCS_DE:242683.1 91100/001

<u>**E**XHIBIT TO **O**RDER</u>

**Settlement Agreement**

SETTLEMENT AGREEMENT

This settlement agreement, including all attachments and exhibits ("Settlement Agreement"), is entered into as of _December 19_, 2022, by and among W.R. Grace & Co. ("Grace") and the State of Montana ("State").[1]  Each of the foregoing are sometimes referred to herein collectively as the "Parties" and individually as a "Party."

RECITALS

WHEREAS, on or about April 2, 2001, Grace and its fellow Debtors (as that term is defined below) filed voluntary petitions with the U.S. Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101, et seq., as amended (the "Bankruptcy Code");

WHEREAS, on November 14, 2007, MDEQ (as defined below) filed an amended proof of claim, designated No. 18496 (the "MDEQ 2007 Claim"), in W.R. Grace & Co.'s Chapter 11 Case (designated Case No. 01-1139-AMC) with respect to the Libby Asbestos Superfund Site (as defined below);

WHEREAS, the State of Montana and its departments, agencies, and programs filed a number of other proofs of claim, which are all listed in Exhibit H with their respective treatment under the Plan;

WHEREAS, by stipulation (the "MDEQ 2008 Stipulation" a copy of which is attached hereto in Exhibit G) dated May 20, 2008, the Debtors and MDEQ settled the MDEQ 2007 Claim for the entirety of the Libby Asbestos Superfund Site and all of its Operable Units, with the exception of Operable Unit 3 ("OU3"), as to which the State reserved claims;

WHEREAS, on July 21, 2008, the Bankruptcy Court entered its *Order Authorizing Stipulation Resolving Claims of Montana Department of Environmental Quality* [Docket No. 19110] (the "MDEQ 2008 Order", a copy of which is attached hereto in Exhibit G), approving the MDEQ 2008 Stipulation and disallowing and expunging all other remaining State Claims (as that term is defined below) filed by MDEQ in the Chapter 11 Cases that arose from or otherwise related to the Libby Asbestos Superfund Site;

WHEREAS, consistent with the MDEQ 2008 Order, the Debtors directed their claims agent to designate the remaining portion of the MDEQ 2007 Claim as Claim No. 18496-1, and no other Claims by the State of Montana remain pending against Reorganized Debtors in the Chapter 11 Cases;

WHEREAS, the Bankruptcy Court confirmed the Plan by orders dated January 31, 2011, and February 15, 2011. *See Memorandum Opinion Regarding Objections to Confirmation of First Amended Joint Plan of Reorganization and Recommended Supplemental Findings of Fact and*

---

[1]  Capitalized terms not defined herein shall have the meaning ascribed to them in the *First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W.R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders as Modified Through December 23, 2010* [Docket No. 26368].

1

*Conclusions of Law* [Docket No. 26154] and *Recommended Findings of Fact, Conclusions of Law and Order Regarding Confirmation of First Amended Joint Plan of Reorganization as Modified Through December 23, 2010* [Docket No. 26155], dated January 31, 2011, and the *Order Clarifying Memorandum Opinion and Order Confirming Joint Plan as Amended Through December 23, 2010* [Docket No. 26289], dated February 15, 2011 (together, the "Confirmation Order");

**WHEREAS,** on February 3, 2014 (the "Plan Effective Date"), the Debtors substantially consummated the transactions contemplated under the Plan. *See Notice of Occurrence of the Effective Date of the First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W.R. Grace and Co., et al, the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders As Modified Through December 23, 2010*, dated February 13, 2014 [Docket No. 31732];

**WHEREAS,** pursuant to the operation of the Plan, the Debtors became the Reorganized Debtors on the Plan Effective Date;

**WHEREAS,** since consummation of the Plan, each of the Reorganized Debtors' Chapter 11 Cases has been closed, except for Grace's Chapter 11 Case;

**WHEREAS,** Grace and its affiliates are performing a "Remedial Investigation and Feasibility Study" ("RI/FS") for OU3 under the lead-agency oversight of the United States Environmental Protection Agency ("EPA") pursuant to CERCLA;

**WHEREAS,** the Parties recognize the potential under certain circumstances that the continued presence of the KDID (as defined below) could result in State expenditures regarding the ongoing operation and maintenance of the KDID and that State law regulates but does not require financial assurance for the KDID;

**WHEREAS,** KDC is currently in the process of design and construction, at its expense, of a KDID Spillway (as defined below). The Parties recognize the potential need for significant repair or replacement of the KDID Spillway in the future;

**WHEREAS,** by motion filed in the Bankruptcy Court dated June 7, 2019, Grace filed its *Request for Partial Allowance and Partial Disallowance of the Claim by the Montana Dept. of Env. Quality ("MDEQ") for Environmental Remediation at Operable Unit 3 of the Libby Asbestos Superfund Site (Substantive Objection)* [Docket No. 33099] (the "Partial Allowance Motion"), asserting that the Court should partially allow and partially disallow Claim No. 18496-1;

**WHEREAS,** on July 22, 2019, MDEQ filed its *Response and Reservation of Rights of the State of Montana to the Reorganized Debtor's Request for Partial Allowance and Partial Disallowance of the Claim by the Montana Dept. of Env. Quality for Environmental Remediation at Operable Unit 3 of the Libby Asbestos Superfund Site (Substantive Objection)* [Docket No. 33102] (the "MDEQ Response");

2

**WHEREAS,** following the filing of the Partial Allowance Motion and the MDEQ Response, the Parties engaged in a Court-ordered mediation process, which resulted in a compromise resolution documented by this Settlement Agreement; and

**WHEREAS,** the Parties are entering into this Settlement Agreement to avoid the risk, expense, and burden of litigation, and to resolve their disputes according to the terms of this Settlement Agreement.

**NOW THEREFORE,** in consideration of the above recitals, the covenants, conditions, and promises exchanged between the Parties, the receipt of which is hereby acknowledged, and other good and valuable consideration including the benefits provided and to be provided by the Parties, as set out in this Settlement Agreement, including Sections 4, 5, 6, 7, and 8, the Parties agree as follows:

1.     <u>Recitals.</u>  The above recitals are incorporated herein for context and definitional purposes but do not constitute independent agreements between the Parties, and do not independently establish legal rights or obligations.

2.     <u>Definitions.</u>  Capitalized terms used but not otherwise defined in this Settlement Agreement shall have the meanings set forth below:

(a)     "<u>Allowed Contingent OU3 State Share Claim</u>" shall have the meaning set forth in Section 7 hereof.

(b)     "<u>Allowed Financial Assurance</u>" shall mean the financial assurance set forth in Sections 4, 5, and 6 hereof.

(c)     "<u>Allowed Natural Resource Damages Claim</u>" shall have the meaning set forth in Section 8(h) hereof.

(d)     "<u>Allowed State Claim</u>" shall mean: a) Allowed Financial Assurance; b) Allowed Contingent OU3 State Share Claim; and c) Allowed Natural Resource Damages Claim.

(e)     "<u>Approval Order</u>" shall mean the final and non-appealable order entered approving this Settlement Agreement pursuant to Fed. R. Bankr. P. 9019.

(f)     "<u>CECRA</u>" shall mean the Montana Comprehensive Environmental Cleanup and Responsibility Act, Montana Code Annotated ("<u>MCA</u>") § 75-10-701 *et seq.*

(g)     "<u>CERCLA</u>" shall mean the federal Comprehensive Environmental Response, Compensation, and Liability Act, as amended, 42 U.S.C. § 9601 *et seq.*

(h)     "<u>Chapter 11 Cases</u>" shall have the meaning set forth in the Plan, which for the avoidance of doubt, states:

"**Chapter 11 Cases**" shall mean the cases commenced by the Filing, on the Petition Date, by the Debtors of voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

3

(i)    "<u>Claim</u>" shall have the meaning set forth in the Plan, which for the avoidance of doubt, states:

**"Claim"** shall mean a claim (as defined in Bankruptcy Code § 101(5)) against a Debtor including any right to: (i) payment from any of the Debtors, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (ii) an equitable remedy for breach of performance if such breach gives rise to a right to payment from any or all of the Debtors, whether or not such right to an equitable remedy is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured.

(j)    "<u>Claim No. 18496-1</u>" shall have the meaning set forth in the Recitals hereof.

(k)    "<u>Confirmation Order</u>" shall have the meaning set forth in the Recitals hereof.

(l)    "<u>Day</u>" shall mean a calendar day unless expressly stated to be a working day. "Working day" shall mean a day other than a Saturday, Sunday, or Federal holiday. In computing any period of time under this Settlement Agreement, where the last day would fall on a Saturday, Sunday, or Federal holiday, the period shall run until the close of business of the next Working Day.

(m)    "<u>Debtors</u>" shall have the meaning set forth in the Plan, which for the avoidance of doubt includes:

collectively, W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos

4

Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, and H-G Coal Company.

(n) "Distribution" or "Distributions" shall mean payment(s) by a trustee from a Financial Assurance Trust.

(o) "DNRC" shall mean the Montana Department of Natural Resources and Conservation, the governmental department that has the statutory responsibility for implementing and/or administering the DNRC's Dam Safety Program. In the event of a reorganization, name change, or other restructuring, DNRC shall mean the successor department headed by a cabinet level official appointed by the Governor with the foregoing statutory responsibility for implementing and/or administering DNRC's Dam Safety Program.

(p) "DNRC's Dam Safety Program" shall mean the program, within the DNRC or its successor agency, with the legal authority to issue dam permits and regulate the construction, operation, and maintenance of Montana's dams to protect life and property from damages due to failure under the Montana Dam Safety Act, MCA § 85-15 as may be amended or superseded from time to time, and including any successor program to the DNRC's Dam Safety Program.

(q) "DNRC Director" shall mean the Montana cabinet level official appointed by the Governor to direct the DNRC, or, in the event of a reorganization or other restructuring, such governmental department that has responsibility for implementing and/or administering the DNRC's Dam Safety Program, or its equivalent, pursuant to the Montana Dam Safety Act, MCA § 85-15-105, et seq., as may be amended or superseded from time to time.

(r) "EPA" shall mean the United States Environmental Protection Agency.

(s) "Financial Assurance Trust," "Financial Assurance Trusts," "Trust," or "Trusts" shall mean the KDID O&M Performance Trust and the KDID Spillway Replacement Trust, individually or collectively as the case may be, and any accounts established within either Trust.

(t) "Force Majeure Condition" shall mean a superior or irresistible force such as an Act of God, which is beyond the control of the Grace Parties and could not be avoided by the exercise of reasonable care.

(u) "Grace" shall have the meaning set forth in the introductory paragraph of this Settlement Agreement, and its successors and lawful assigns.

(v) "Grace Party" or "Grace Parties" shall mean Grace, KDC, and W.R. Grace & Co.-Conn., and their respective affiliates and successors with interests of any kind as to OU3, and

their respective officers, directors, managers, shareholders, members, partners, consultants, employees, agents, and attorneys.

(w)     "Including" shall not be read restrictively, and shall mean including but not limited to, unless otherwise expressly stated.

(x)     "KDC" shall mean the Kootenai Development Company, and its successors and lawful assigns.  KDC is a Montana domestic for profit company in good standing, which is the owner of land within OU3 where the KDID is located, and is the holder of a permit for operation of the KDID issued by the DNRC.

(y)     "KDID" shall mean the Kootenai Development Impoundment Dam, including the KDID Spillway.

(z)     "KDID Operation and Maintenance" or "KDID O&M" shall mean the routine inspection, monitoring, operation, maintenance, repair, and other activities performed periodically by KDC consistent with a dam safety operating permit issued under the Montana Dam Safety Act, MCA § 85-15-105, *et seq.*, and implementing regulations, and any superseding dam safety law and regulation.  KDID Spillway Work is not "KDID O&M" for purposes of either this Settlement Agreement or the KDID O&M Performance Trust.

(aa)    "KDID O&M Performance Trust" shall have the meaning set forth in Section 4(b) hereof.

(bb)    "KDID Spillway" shall mean the expanded structure that is under construction in or about the year 2022, with a design life of approximately 100 years, for the intended purposes of allowing controlled release of excess surface water to flow past the KDID and protecting the structural integrity of the KDID.

(cc)    "KDID Spillway Replacement Trust" shall mean the trust established to provide funds for future possible KDID Spillway Work after 2072 as set forth in Section 4(c) hereof.

(dd)    "KDID Spillway Work" shall mean work that may become reasonably necessary to undertake after 2072 for replacement of the KDID Spillway, or for significant repair thereof likely to extend the life of the KDID Spillway, as may be determined by the DNRC Director or delegee in writing, in accordance with the applicable law and regulations of Montana governing dam safety in force at the time of any such determination.  KDID Spillway work does not include work on any aspect of the construction currently underway of the KDID Spillway as described in (bb) above.

(ee)    "Libby Asbestos Superfund Site" shall mean the former Zonolite Mine and all areas (including any structure, soil, air, water, sediment, or receptor) in and near Lincoln County, Montana, that have been contaminated by natural or human caused releases or migration of hazardous substances and/or pollutants or contaminants at or from the Zonolite Mine.  For purposes of this Settlement Agreement, and without limitation, the Libby Asbestos Superfund Site includes OU3.

6

(ff)    "MDEQ" shall mean the Montana Department of Environmental Quality and successor agencies and programs.

(gg)    "MDEQ 2007 Claim" shall have the meaning set forth in the Recitals hereof.

(hh)    "MDEQ 2008 Order" shall have the meaning set forth in the Recitals hereof.

(ii)    "MDEQ Response" shall have the meaning set forth in the Recitals hereof.

(jj)    "MDEQ 2008 Stipulation" shall have the meaning set forth in the Recitals hereof.

(kk)    "Natural Resource Damages" or "NRD" shall mean any compensatory relief and/or other natural resources damages, including the reasonable costs of assessing such damages and other associated costs, that are recoverable pursuant to any State or Federal law, or amendments thereto, including but not limited to Section 107(a)(4)(C) of CERCLA, 42 U.S.C. § 9607(a)(4)(C), or Section 311(f) of the Clean Water Act, 33 U.S.C. § 1321(f), or MCA § 75-10-715(2)(b), or state or federal common law, by the State, for injury to, destruction of, loss of, or loss of use of Natural Resources or resource services resulting directly or indirectly from releases or threatened releases of hazardous or deleterious substances to, at, or from the Libby Asbestos Superfund Site. Natural Resource Damages include, without limitation: i) the costs of restoration, rehabilitation, replacement, or acquisition of the equivalent, of allegedly injured or lost Natural Resources or natural resource services; ii) assessment costs; iii) the costs of planning and monitoring such restoration activities; and iv) administrative, program, legal, technical, and all other related costs, and; (v) any other compensation for diminution in value or loss of use or non-use values.

(ll)    "Natural Resources" shall have the meaning provided in Section 101(16) of CERCLA, 42 U.S.C. § 9601(16), and MCA § 75-10-701(12).

(mm)    "Natural Resource Damage Program" or "NRDP" shall mean the Program that is administratively attached to the Montana Department of Justice and acts on behalf of the Governor in his capacity as the State's Natural Resource Damages Trustee with respect to Natural Resource Damages matters, and shall include successor agencies and programs.

(nn)    "Nonperformance Determination" shall have the meaning set forth in Section 5(d) hereof (Access to Trust Funds, State Access to Trust Funds).

(oo)    "NRD Funds" shall have the meaning set forth in Section 8(a) hereof.

(pp)    "Operable Unit 3" or "OU3" shall mean property in or around the Zonolite Mine owned by Grace or Grace-owned subsidiaries (excluding OU-2) and any area (including any structure, soil, air, water, sediment or receptor) impacted by the release and/or release and subsequent migration of hazardous substances and/or pollutants or contaminants from such property, including, but not limited to, the mine property, the Kootenai River and the sediments therein, Rainy Creek, Rainy Creek Road (sometimes referred to as Rainey Creek and Rainey Creek Road), and areas in which tree bark is contaminated with such hazardous substances and/or pollutants or contaminants.

7

(qq)    "Partial Allowance Motion" shall have the meaning set forth in the Recitals hereof.

(rr)    "Party" or "Parties" shall have the meaning set forth in the introductory paragraph of this Settlement Agreement.

(ss)    "Plan" shall mean the First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W. R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders as Modified Through December 23, 2010 [Docket No. 26368].

(tt)    "Pre-2042 KDID Operation and Maintenance Performance Bond" or "Surety Bond" shall have the meaning set forth in Section 4(a) hereof.

(uu)    "Post-Remedy O&M Costs" shall have the meaning set forth in Section 7 hereof.

(vv)    "Reorganized Debtor" or "Reorganized Debtors" shall have the meaning set forth in the Plan, which for the avoidance of doubt provides that:

"**Reorganized Debtor,**" "**Reorganized Debtors**" or "**Reorganized Grace**" shall mean the Debtor(s) from and after the Effective Date.

(ww)    "RI/FS" shall mean the Remedial Investigation/Feasibility Study, as defined by the National Contingency Plan at 40 CFR § 300.5, and further described in 40 CFR § 300.430.

(xx)    "Settlement Agreement" shall refer to this agreement as described in the introductory paragraph hereof.

(yy)    "Settlement Agreement Effective Date" shall be the date on which the order approving this Settlement Agreement becomes final and non-appealable as described in Section 3 hereof.

(zz)    "State" shall mean the State of Montana, and includes without limitation its Governor, Attorney General, MDEQ, NRDP, DNRC, and any other departments, agencies, and programs of the State of Montana, and their respective employees, agents, and attorneys.

(aaa)    "State Claim" shall mean all Claims arising from or related to the Libby Asbestos Superfund Site that the State has, or could have, asserted in the Chapter 11 Cases. For the avoidance of doubt: a) State Claim does not include claims, causes of action, or other rights or powers that either are not Claims or otherwise could not have been asserted by the State in the Chapter 11 Cases; and b) the State Claim shall be deemed to include: i) all claims, liabilities, obligations, causes of action, and rights to payment set forth in, asserted in, arising from, reserved in, or otherwise related to each of the Chapter 11 Cases, Claim No. 18496-1, the MDEQ 2008 Stipulation approved by the MDEQ 2008 Order, and the MDEQ Response; ii) all other actual and potential claims relating to, connected to, or arising out of OU3 or the Libby Asbestos Superfund Site that were or could have been asserted in the Chapter 11 Cases; and (iii) any and all claims,

8

liabilities, obligations, or causes of action by the State, of any kind or nature that it had, has or will have in the future for NRD at or related to OU3 or the Libby Asbestos Superfund Site; *provided, however*, that the State Claim does not include any State Reserved Rights, as defined below in Section (bbb). The "State Claim" does not include those claims set forth in Exhibit H.

(bbb)    "State Reserved Rights" shall mean the rights reserved in Sections 6(d)(ii) (State Consultative Role), 6(d)(iii) (CERCLA § 121), 6(g) (Effect of Financial Assurance), and 6(h) (Catastrophic Failure Reservation) hereof. In addition, the State Reserved Rights includes the State's rights to enforce this Settlement Agreement against any of the Grace Parties (including a right to any payment) or seek relief for a breach thereof, including under Section 8(i) (Stipulated Penalty for Failure to Make Section 8(a) Payments).

(ccc)    "10% Cost Share" shall have the meaning set forth in Section 7 hereof.

3.    **Settlement Agreement Approval Process and Effective Date.** This Settlement Agreement shall become effective after the process described in this Section 3 on the date the order approving this Settlement Agreement becomes final and non-appealable (the "Settlement Agreement Effective Date").

(a)    Upon execution of this Settlement Agreement by all Parties, the Parties shall confer regarding the motion in the Bankruptcy Court, pursuant to Fed. R. Bankr. P. 9019, § 75-10-701, *et seq.*, MCA, and 42 U.S.C. § 9607, which Grace shall file, seeking entry of the Approval Order. The Parties agree that the form of proposed Approval Order attached hereto as Exhibit I shall be attached to the motion seeking entry thereof. Within ten (10) days of the filing of the motion, the State shall publish notice and a brief description (as to which the Parties shall confer beforehand) in a newspaper of general circulation in Lincoln County, and provide a 30-day public comment period conducted by the State, which shall take place concurrent with the judicial approval process contemplated herein. The State reserves the right to withdraw or withhold its consent to the Settlement Agreement if the public comments received disclose facts or considerations that indicate the Settlement Agreement is inappropriate, improper, or inadequate. After the conclusion of the public comment period, the Parties shall confer regarding the State's response to the motion filed by Grace, and within thirty (30) days after the conclusion of the 30-day public comment period the State shall file its response and provide the Court with copies of all comments received and the State's responses thereto.

(b)    If public comments received do not disclose facts or considerations that indicate that this Settlement Agreement is inappropriate, improper, or inadequate, the State agrees to support prompt entry of the Approval Order by the Bankruptcy Court.

(c)    The Parties agree to take such other action as may be required to support prompt entry of the Approval Order by the Bankruptcy Court.

(d)    The Parties acknowledge and agree that the terms and conditions of this Settlement Agreement are conditioned, in all respects, on the approval of this Settlement Agreement by the Bankruptcy Court. If this Settlement Agreement is not approved by the Bankruptcy Court for any reason, it and any underlying agreements in principle, including any term sheet, will be immediately null and void and of no further force and effect.

4.    **Financial Assurance - Funding.**    Grace shall provide Allowed Financial Assurance as described herein to address the potential that the continued presence of the KDID could result in State financial obligations, either for ongoing KDID O&M or for a possible future need to reconstruct the spillway structure in 100 years and/or other Spillway Work.  The Allowed Financial Assurance is to provide financial assurance to the State for Grace's performance obligations in connection with OU3.  The Allowed Financial Assurance includes the Pre-2042 KDID Operation and Maintenance Performance Bond and the Financial Assurance Trusts in the amounts, under the procedures, and for the purposes set forth below.  The Financial Assurance Trusts and the Surety Bond provide rights to funds for the State to perform certain required work (KDID O&M and Spillway Work), but only as set forth below.  Grace or KDC may draw upon the Financial Assurance Trusts, but only under the procedures as set forth below.

(a)    Pre-2042 KDID Operation and Maintenance Performance Bond.

(i)    Grace shall obtain a surety bond substantially in the form attached to this Settlement Agreement as Exhibit A to assure performance of KDID O&M for each of the next twenty years (2023 through 2042) (the "Pre-2042 KDID Operation and Maintenance Performance Bond" or "Surety Bond").  Grace shall acquire the initial Surety Bond in the amount of $3,500,000 within 90 days after the Settlement Agreement Effective Date, and renew the Surety Bond each year until 2042 with declining payout amounts as identified in Paragraph 1 of Exhibit B (Surety Bond Amount Schedule, showing how the amount of the required surety will decline each year to reflect the reduced remaining time period for performance).

(ii)    The surety's payment on the Surety Bond into the Pre-2042 KDID O&M account within the KDID O&M Performance Trust would be triggered only by: (1) DNRC Director's issuance of a Nonperformance Determination for failure to perform KDID O&M that is uncured, in accordance with Section 5(d)(iii); or (2) non-replacement of the Surety Bond within forty-five (45) days of Surety's written notice of cancellation.

(iii)    If surety's payment on the Surety Bond is triggered as described above, the surety will pay the proceeds into a Pre-2042 KDID O&M account within the KDID O&M Performance Trust.  All funds in the Pre-2042 KDID O&M account shall be used only for the restricted purpose of KDID O&M.  Grace, KDC, and the State, may obtain funds from the Pre-2042 KDID O&M account under the procedures and conditions set forth below in Section 5 concerning Access to Trust Funds.

(iv)    If surety's payment on the Surety Bond is triggered as described in Section 4(a)(ii)(2) above (for non-replacement of the Surety Bond) at any time prior to 2042, then withdrawals prior to 2042 from the KDID O&M Performance Trust by Grace or KDC shall be limited to amounts that do not decrease the balance of KDID O&M Performance Trust funds, at any time during a given year, below the "Maximum Sum of Bond Amount in Given Default Year" for the following year, as reflected on the Surety Bond Amount Schedule, attached hereto as Exhibit B.

(v)     As of December 31, 2042, if any funds are present in the Pre-2042 KDID O&M account, all such funds shall be transferred to or become part of (by virtue of the termination of the Pre-2042 KDID O&M account or otherwise) the KDID O&M Performance Trust for use Post-2042, and such amounts shall be in addition to the funding of the KDID O&M Performance Trust under Section 4(b). No such transfer of funds from the Pre-2042 KDID O&M account to the Post-2042 KDID O&M Performance Trust shall affect the obligations described in Section 4(b).

(b)     Post-2042 KDID O&M Performance Trust.

(i)     *Establishment.* Grace shall establish, within 90 days after the Settlement Agreement Effective Date, the KDID O&M Performance Trust, with the form of instrument substantially in the form attached to this Settlement Agreement as Exhibit C, to be managed by a reputable banking or financial institution.

(ii)     *Purpose and Access.* Funds in the KDID O&M Performance Trust shall be used only for the restricted purpose of funding KDID O&M, and may be available only as provided under Section 5 (Access to Trust Funds). Further, funds from the KDID O&M Performance Trust shall not be available before January 1, 2043 (except for any funds that may be deposited in the Pre-2042 KDID O&M account under Section 4(a), subject to the limitations in 4(a)(iv)).

(iii)     *Funding of the KDID O&M Performance Trust.* Grace shall fund the KDID O&M Performance Trust in ten equal annual installments of $166,000, with the first installment required within 90 days of the Settlement Agreement Effective Date. Each installment will be placed into the KDID O&M Performance Trust.

(iv)     *Duration and Final Distribution.* The KDID O&M Performance Trust shall remain in full force and effect until its funds are depleted or the year 2122. If funds remain in the KDID O&M Performance Trust in the year 2122, the funds shall be used and/or distributed pursuant to written agreement between the State and Grace, or in the absence of such an agreement, divided between Grace and the State equally on March 31, 2122.

(c)     KDID Spillway Replacement Trust.

(i)     *Establishment.* Grace shall establish, within 90 days after the Settlement Agreement Effective Date, the KDID Spillway Replacement Trust with the form of instrument substantially in the form attached to this Settlement Agreement as Exhibit D, to be managed by a reputable banking or financial institution.

(ii)     *Purpose and Access.* Funds in the KDID Spillway Replacement Trust shall be used only for the restricted purpose of funding KDID Spillway Work, including as the restricted purpose may be modified under Section 4(c)(iii), and may be available only as provided under Section 5 (Access to Trust Funds). Further, funds from the KDID Spillway Replacement Trust shall not be available before January 1, 2126, except as provided under Section 4(c)(iii) or Section 5(e) (governing early access), below.

11

(iii)   *Reasonable Modification of Restricted Purpose after 2072.* After the year 2072, nothing in this Settlement Agreement precludes the Parties from agreeing in writing, in consideration of all of the relevant circumstances in existence at the time (including the value of the KDID Spillway Replacement Trust versus the cost of a replacement spillway), that funds in the KDID Spillway Replacement Trust should be used for a reasonable and prudent purpose related to the KDID Spillway or the KDID other than replacement or significant repair of the KDID Spillway. Any such written agreement shall be submitted to the trustee, and shall constitute the basis for payments by trustee.

(iv)   *Funding of the KDID Spillway Replacement Trust.* Grace shall fund the KDID Spillway Replacement Trust in ten equal annual installments of $106,000, with the first installment required within 90 days after the Settlement Agreement Effective Date. Each installment will be placed into the KDID Spillway Replacement Trust.

(v)   *Duration and Final Distribution.* If funds remain in the KDID Spillway Replacement Trust in 2132, any remaining funds shall be i) used and/or distributed pursuant to written agreement between the Parties; or if no such agreement is reached before June 30, 2132; ii) distributed to Grace, *provided, however,* such monies must be used solely for purposes relating to the KDID. The KDID Spillway Replacement Trust shall remain in full force and effect until such time as its funds are depleted or the year 2132, whichever is earlier.

(d)   Failure to make Financial Assurance Trust funding payments as required by this Section 4 after notice and an opportunity to cure, is a material breach of this Settlement Agreement.

5.   **Access to Trust Funds.** All access to the funds in the Financial Assurance Trusts and all Distributions from such Trusts, are subject to the provisions, procedures and requirements set forth in this Section 5.

(a)   Distributions from the Financial Assurance Trusts shall be for KDID O&M or KDID Spillway Work, respectively. Parties shall not seek or use funds from any Financial Assurance Trust for uses outside of the relevant trust's restricted purpose, except as provided under Section 4(c)(iii) (*Reasonable Modification of Restricted Purpose after 2072*).

(b)   *Trust Distributions - Documentation Requirements.* The following documentation is required for all Distributions from Financial Assurance Trusts. Each Party shall send the other a copy of all submittals to a trustee, as provided in Section 13 (Notice), or in the time and manner as otherwise agreed to the parties. In addition to other documentation that may be requested by trustee(s), the Party seeking a Distribution (Grace and/or KDC, or the State) shall submit the following to the trustee(s):

(i)   A certification that the Distribution that is sought is for work within the restricted purposes of the Financial Assurance Trust from which the Distribution is sought;

12

(ii)    For completed work that has already been paid for by the Party seeking Distribution, the invoices and receipts sufficient to demonstrate that work (or the relevant portion thereof) has been performed and payment has been made; and

(iii)    For Distribution directly to a contractor or vendor (without advance payment by the Party seeking Distribution), the contract between the contractor or vendor and the Party seeking Distribution for the performance of the work, accompanied by the relevant invoice(s) for payment due to the specified contractor or vendor.

(c)    *Grace Access to Trust Funds.* Distributions from the Financial Assurance Trusts shall be made to Grace or KDC (or their contractors) upon request to the trustee consistent with the restricted purposes of the Financial Assurance Trusts, except that to prevent funding from the Trust for duplicative work, no Grace Party may request Distributions for specific work that has been fully performed by the State after a Nonperformance Determination.

(d)    *State Access to Trust Funds.* Distributions from the Financial Assurance Trusts shall be made to the State (or its contractors if so directed by the State) upon State request to the trustee consistent with the restricted purposes of the Financial Assurance Trusts, but only in the event of an uncured Nonperformance Determination by the DNRC Director for KDID O&M or KDID Spillway Work, respectively, for performance of the work described in the final Nonperformance Determination. The State shall also have access to the Financial Assurance Trusts if the events described under Section 6(e) (Cessation of Grace) were to occur. This Settlement Agreement does not modify or amend in any way DNRC's authority and powers or regulatory process pursuant to the Montana Dam Safety Act or the DNRC's Dam Safety Program, as they may be amended or superseded from time to time. The procedures in Section 5(d) and (e) solely lay out the process to be followed for the State to access funds in the Financial Assurance Trusts.

(i)    *Nonperformance Determination.* A Nonperformance Determination means a final written determination by the DNRC Director that specifically: x) describes substantial and material nonperformance by KDC of KDID O&M or KDID Spillway Work; and y) establishes that the following conditions precedent have been met. The DNRC Director is the only State official who may issue a Nonperformance Determination. All Nonperformance Determination(s) are subject to the following conditions precedent, and substantive and procedural requirements.

(ii)    *Conditions Precedent to Nonperformance Determination.* No Nonperformance Determination for KDID O&M or KDID Spillway Work may be issued without first providing to Grace or KDC:

(A)    Written actual notice by the DNRC Director or DNRC's Dam Safety Program that specifically: i) describes the work (either KDID O&M or KDID Spillway Work) allegedly not substantially and materially performed; and ii) identifies the provision(s) in the then-applicable operating permit or other such permit or license for dam operation under the DNRC's Dam Safety Program (and associated engineering reports, if any) requiring such work;

(B)    A reasonable opportunity to confer with the DNRC Director to attempt to resolve the matter in good faith; and

13

(C)    An opportunity to cure within ninety (90) days after receipt by Grace or KDC of the written actual notice, unless a longer period of time to cure is agreed to in writing by the DNRC Director or delegee.

(iii)    *Cure.*    Grace Parties may cure an alleged substantial and material nonperformance of KDID O&M work or KDID Spillway Work by: x) providing to the DNRC Director or delegee information demonstrating that the subject work has been performed; y) performing the subject work; or z) submitting to the DNRC Director or delegee a plan for performance of such work according to a schedule that may recognize time for governmental approvals, seasonal conditions including fire and fire restrictions, weather, needs for complex engineering planning and review, and other fact specific considerations. The Parties agree and acknowledge that some KDID O&M work and some KDID Spillway Work may require years of planning and implementation. If Grace or KDC exhibits good faith intent to perform such work and demonstrates reasonable diligence, it shall be provided time to perform without any Nonperformance Determination, and appropriate extensions of time to cure shall not be unreasonably withheld by the DNRC Director or delegee.

(iv)    *Force Majeure.* Provided that notice is timely given in writing to the DNRC Director or delegee within ten (10) days of discovery of a *Force Majeure* Condition, Grace and KDC shall be temporarily excused from nonperformance arising out of a *Force Majeure* Condition; however, in no event shall a *Force Majeure* Condition excuse nonperformance for a period of greater than one hundred twenty (120) days, absent agreement in writing (that may be by electronic communications such as email) between the Parties. During such period of a *Force Majeure* Condition as described in this subsection, no Nonperformance Determination may issue. A Nonperformance Determination may issue, subject to all other requirements for Nonperformance Determinations, after the expiration of one hundred twenty (120) days, absent written agreement between the Parties to extend such period.

(e)    *Early Access to Funds from the KDID Spillway Replacement Trust Beginning in 2072.* Funds from the KDID Spillway Replacement Trust may be available between January 1, 2072, and December 31, 2125, for KDID Spillway Work in the event of the following (and subject to Section 5(a) through (e) except as provided in Section 5(e)(ii) below):

(i)    *Early Repair or Replacement Determined by the DNRC Director or Delegee.* A written determination by the DNRC Director or delegee that describes a repair or replacement that is KDID Spillway Work reasonably necessary to perform before 2126, with the engineering basis for such determination. In advance of any such determination, the DNRC Director or delegee and Grace shall confer, and if, during such advance conferring, the KDID dam safety engineer of record (or equivalent) identifies in writing and specifically provides the engineering bases for any concerns, then the determination must be supported by an explanation from a certified professional engineer addressing each of the concerns identified by the KDID dam safety engineer of record. Considering the engineering information, the DNRC Director or delegee shall determine whether the described repair or

14

replacement is KDID Spillway Work that is reasonably necessary to perform before 2126; or

(ii) *Emergency Response Distributions to the State.* The State may access the Spillway Replacement Trust for costs to respond to or address an emergency, consistent with the procedures and standards of the Dam Safety Act, MCA 85-15-215 or any superseding law. Notwithstanding Section 5(d), no Nonperformance Determination regarding the emergency response at the KDID Spillway is required as a prerequisite for Distributions under this Section 5(e)(ii) to the State specifically for and limited to an emergency consistent with MCA 85-15-215.

(f) *Record Keeping and Periodic Accounting.* The Parties and KDC must maintain copies of records referenced in Section 5(b)-(d), including all requests for Distribution and Distributions from any Financial Assurance Trust and associated documentation, for a period of eight (8) years following such Distribution. Such records referenced in Section 5(b)-(d) shall be made available to either Party within sixty (60) days of written request. Grace shall arrange for an annual statement incorporating such information to be provided to each Party by the trustee on or before May 1 of the calendar year following the year covered by such statement.

6. **Financial Assurance – General Terms.**

(a) *Non-Duplication of Financial Assurance with EPA Requirements.* The Parties wish to avoid redundancy to the fullest extent possible, without defeating the purpose of the Allowed Financial Assurance contained herein or decreasing the scope and value of the Allowed Financial Assurance commitments. The Parties further recognize that EPA may request or require financial assurance from Grace or KDC as part of a draft or final EPA agreement, decree or order pertaining to the OU3 remedy, and that it is possible that financial assurance for KDID O&M and/or KDID Spillway Work could be a part of the financial assurance requested or required by EPA. Accordingly, the following terms apply.

(i) Upon request of either Party to the other, the Parties shall cooperate in jointly expressing to EPA in writing that they have negotiated the Surety Bond and Financial Assurance Trusts regarding KDID O&M and/or KDID Spillway Work that adequately provide financial assurance regarding KDID O&M and/or KDID Spillway Work, with the intent that EPA accept as sufficient the financial assurance established in this agreement for purposes of KDID O&M and/or KDID Spillway Work.

(ii) If and only if EPA so requests and requires, the Parties agree that EPA may be made the primary beneficiary of the Surety Bond or relevant Financial Assurance Trusts established by this Settlement Agreement and that, if so, the Parties will jointly request that the State be identified as a secondary beneficiary of the Surety Bond or relevant Financial Assurance Trust. The Parties will implement these beneficiary designations promptly when EPA agrees to them.

(iii) To the extent that EPA declines the opportunity to become a primary beneficiary of the Surety Bond or Financial Assurance Trusts, and requests and requires, and a Grace Party provides, financial assurance for KDID O&M and/or

15

KDID Spillway Work as part of an agreement, decree, or order that exceeds the value and scope of the financial assurance provided in this Settlement Agreement for KDID O&M and/or KDID Spillway Work, then the financial assurance obligations for KDID O&M and/or KDID Spillway Work, respectively, shall terminate and the balance of the trust so terminated shall be returned to Grace immediately. In such case, Grace shall propose that EPA financial assurance (to the extent it covers KDID O&M and/or KDID Spillway Work, respectively) designate the State as a secondary beneficiary, and upon EPA concurrence shall include the State as a secondary beneficiary in such EPA financial assurance. The value of financial assurance for KDID O&M consists of: i) average annual payments of $175,000/year in 2021 dollars for 20 years for a total of $4.3 million for pre-2042 KDID O&M (described in Section 4(a)); and ii) ten annual installments totaling $1.66 million for post-2042 KDID O&M (described in Section 4(b)).

(iv)    Notwithstanding anything to the contrary herein, no financial assurance provided under this Settlement Agreement shall terminate by virtue of a Grace Party negotiating financial assurance with EPA for KDID O&M and/or KDID Spillway Work under terms involving a lesser value or scope, and under such circumstances, the financial assurance obligations herein shall remain in full force and effect absent written agreement from the State to the contrary.

(b)    *Avoidance of Double Recovery.* If the State obtains Distribution of Trust funds, it may not seek to require a Grace Party to perform or seek to recover the costs for performance of the same work for which a Distribution was made in accordance with the purpose of the Trust, unless such funds have been used for that purpose, exhausted, and further work is required.

(c)    Additional Terms Governing Bond.

(i)    *Bond Issuer Rating.* An issuer of the bonds described above must, at the time of the original issuance, be included on the United States Treasury T-list (Department Circular 570). If any issuer's ratings drop below a rating of A- from A.M. Best, then the bond must be replaced by Grace within 60 days of Grace's receipt of notice of such ratings drop.

(ii)    *Initial Bond Funding.* Failure to acquire and maintain initial surety bonding as required by this Settlement Agreement, after notice and an opportunity to cure, within ninety (90) days, is a material breach of this Settlement Agreement.

(d)    Termination of Grace Financial Assurance Obligations.

(i)    *Termination.* If the KDID is required to be removed, substantially or completely, then Grace's continuing obligations to provide the Surety Bond and Trusts hereunder will immediately terminate and any funds provided by Grace to any Financial Assurance Trust hereunder will be returned by the trustee from the Trust to Grace in full, including any interest earnings and return on investment, if any, then held in such Trust. The termination of any Financial Assurance Trust or Surety Bond in accordance with this subsection 6(d)(i) shall have no effect on Grace's payment obligations in Section 8 herein.

16

(ii)    *State Consultative Role.*  Nothing in this Settlement Agreement shall limit the State's participation in a consultative role with EPA regarding OU3 to the extent provided by law.

(iii)    *CERCLA § 121.*  The State preserves whatever rights it may have pursuant to Section 121 of CERCLA as in effect on the Settlement Agreement Effective Date, the exercise of which: y) shall have no bearing on the rights and obligations of the Parties, except as provided in Section 6(d); and z) shall not give rise to any claim or cause of action by the State against Grace Parties.  Grace Parties reserve all of their rights and defenses.

(e)    *Cessation of Grace.*  If at any time after the Settlement Agreement Effective Date, Grace (and any merged or successor entity that assumes Grace's obligations to the State hereunder) ceases to exist or fails to continue to operate as a going concern, upon notice thereof, accompanied by documentation of the basis for the notice, to the trustee(s) and sureties of the Financial Assurance Trusts and/or Surety Bonds established hereunder, all such Trusts and Surety Bonds shall inure completely to the benefit of the State for use for the Trust purposes and may be accessed by the State consistent with Section 5 (Access to Trust Funds), but without a prerequisite for a Nonperformance Determination.

(f)    *No Other Claims for Financial Assurance.*  The State agrees that in consideration of the Allowed Financial Assurance provided herein, the State shall have no claims or causes of action at any time against a Grace Party for financial assurance in connection with KDID O&M or KDID Spillway Work.

(g)    *Effect of Financial Assurance.*  Neither the provision of the Allowed Financial Assurance, nor any termination thereof pursuant to Section 6(d)(i), shall expand, limit, or otherwise affect any obligations, rights, or remedies Grace Parties may or may not have with respect to OU3 now or in the future, except to establish by agreement the only financial assurance to the State for KDID O&M and KDID Spillway Work.  Except as expressly provided in this Settlement Agreement, the provision of financial assurance herein shall not alter or limit the regulatory powers, rights, or remedies otherwise available to the State.

(h)    *Catastrophic Failure Reservation.*  The State reserves completely and without limitation whatsoever, and does not release in any way, any claims or causes of action of any kind that it may have arising out of or in connection with the occurrence of a future (post-Approval Order) catastrophic failure of the KDID or its integral components that results in a substantial or complete failure of the KDID structure and the downstream migration below the current location of the Mill Pond of a substantial portion of impounded tailings.  The parties agree that such above-described catastrophic failure of the KDID or its integral components does not describe any conditions present as of the Settlement Agreement Effective Date.

(i)    *Grace Reservation.*  Grace reserves completely and without limitation whatsoever all of its rights, claims, counter-claims, and defenses as to any reserved State claim or cause of action.

7.    **Resolution of Montana Claim for Contingent CERCLA OU3 Costs.**  The Parties acknowledge that under Section 104(c)(3) of CERCLA, 42 U.S.C. § 9604(c)(3), before

17

EPA can implement an EPA-selected remedial action at a CERCLA site using federal Superfund money, two conditions must be met, upon request by EPA: (1) the State must agree to pay 10% of the costs of the EPA selected remedial action costs (the "10% Cost Share"); and (2) the State must agree to pay 100% of the post-remedy operation and maintenance costs that are described in the EPA Record of Decision ("Post-Remedy O&M Costs").

(a)     To provide for the contingency under which the State agrees to pay the 10% Cost Share and the Post-Remedy O&M Costs for OU3 for the purpose of enabling EPA implementation of an EPA-selected remedial action at OU3, the Settlement Agreement provides for an "Allowed Contingent OU3 State Share Claim" as defined below in this Section 7.

(i)     "Allowed Contingent OU3 State Share Claim" shall mean the 10% Cost Share for OU3 Remedy and 100% of the Post-Remedy O&M Costs for OU3, in each case subject to any rights to challenge EPA's incurrence or imposition of any such costs, and any Grace Parties' rights, claims, counter-claims, and defenses. Notwithstanding the foregoing sentence, the Allowed Contingent OU3 State Share Claim does not include claims for KDID O&M and KDID Spillway Work that fall within the Trusts' purposes as set forth above.

(ii)     Although the Allowed Contingent OU3 State Share Claim remains a contingent claim that is not now liquidated, it is "Allowed" in the sense that Grace: x) is waiving any right to require the present liquidation of such Claim; and y) is agreeing and stipulates that the discharge set forth in 11 U.S.C. § 1141, the Plan, and the Confirmation Order shall not apply to any Allowed Contingent OU3 State Share Claim. Nonetheless, in connection with any State assertion of any claim or other right to relief against a Grace Party, the Parties agree that the jurisdiction of any court or adjudicative body over liquidation of the Allowed Contingent OU3 State Share Claim, should liquidation ever be sought, is not determined by this Settlement Agreement; and, except as expressly waived in the preceding sentence, the Parties, for themselves and all Grace Parties, reserve and retain all of their rights, claims, counter-claims, and defenses regarding: i) jurisdiction; ii) liquidation; and iii) removal of contingencies as to the Allowed Contingent OU3 State Share Claim. In addition, Grace Parties reserve all rights, claims, counter-claims, and defenses relating to whether the Allowed Contingent OU3 State Share Claim is capped at $50 million.

(b)     The Parties agree that the Allowed Contingent OU3 State Share Claim could arise only if EPA itself were to construct the selected OU3 remedial action using federal Superfund money and the State were to provide to EPA the requisite agreements under 42 U.S.C. § 9604(c)(3). The Parties agree that neither such event has occurred as of the Settlement Agreement Effective Date.

(c)     No Grace Party shall be liable to pay, or indemnify the State for, any amount if the State has received payment from any other source for the Allowed Contingent OU3 State Share Claim.

18

8.    **Natural Resource Damages.**

(a)    Grace shall provide a total of $18.5 million ("NRD Funds") in payments to the NRDP in a series of installments. The first payment of $5 million will be paid within 180 days of the Settlement Agreement Effective Date, without interest being due. The remaining balance of $13.5 million will bear interest at a rate of 4.19% per annum (beginning on the Settlement Agreement Effective Date), and shall be paid to NRDP in nine (9) annual installments of $1.5 million plus interest with the first installment paid within one (1) year of the Settlement Agreement Effective Date. These payments constitute consideration for the State's agreement, as to the Grace Parties, to release its interests in NRD claims and fully and finally resolve NRD claims by the State as provided in Sections 9(a) and 9(b)(ii) herein.

(b)    *Payment Instructions.* All payments made to the State pursuant to Section 8(a) of this Settlement Agreement, including interest, shall be made by electronic funds transfer in accordance with instructions in Exhibit F (State Wiring Instructions). Grace shall contact the Chief Financial Officer of the Central Services Division of the Montana Department of Justice (dojaccountants@mt.gov) at least 48 hours prior to initiating a transfer to provide notice of the date, time, and amount of the expected transfer. Grace must copy the NRDP at the e-mail addresses provided in Section 13 (Notice). NRDP shall deposit the payments received, and any subsequent interest and earnings, into a State special revenue fund (non-budgeted) to be established in accordance with Section 17-2-102(1)(b)(i), MCA.

(i)    This account shall be operated and maintained by the NRDP as set forth in this Settlement Agreement. No portion of the amounts deposited under this Settlement Agreement, or any interest or earnings thereon, is to be treated as State General Fund money, nor is any portion to be converted or transferred to the State General Fund or any other fund. The monies paid to the State, and the interest and earnings thereon, shall be available only for the purposes described in this Settlement Agreement and for no other purpose.

(ii)    Any payments received by the State after 4:00 pm Mountain Standard Time shall be credited on the next business Day.

(c)    The funds in the above-described account and the interest and earnings thereon shall be used solely to restore, replace, rehabilitate, or acquire the equivalent of injured natural resources and services in or related to OU3 or the Lincoln County area, and support therefor, including costs for State restoration plan development and implementation, and administrative, program, legal, technical, and all other related costs, to the extent lawful under CERCLA or CECRA, which shall not be further recoverable from Grace Parties.

(d)    The report entitled *Alleged Injury and Examples of Restoration Options to Address Alleged State NRD at OU3* is attached as Exhibit E. The Parties agree that the benefits from projects similar to the exemplary projects identified in the report are intended and anticipated to provide natural resource and other benefits in OU3 and elsewhere in the general vicinity. Exhibit E describes the nature of the alleged injuries, types or examples of potential restoration projects, criteria for selecting projects, and the types of ecological values to be provided. The restoration projects to be implemented with the NRD Funds should provide substantial aquatic, riparian, and

19

terrestrial ecological services. In addition, the projects should enhance recreation and thus provide human use benefits.

       (e)     The State has not conducted a natural resource damage assessment at the Libby Asbestos Superfund Site, but it has been able to form a position on NRD sufficient to resolve the matter using available information and the data developed during the RI/FS. The Parties believe that the information gathered indicates that the settlement amount is sufficient to restore, replace, rehabilitate, and/or acquire the equivalent of injured natural resources under the State's trusteeship, and therefore will compensate the public for the State's claim for alleged injuries to natural resources resulting from the release of hazardous substances. The Parties further stipulate that they believe that the settlement is a compromise and constitutes a final, fair, and reasonable resolution of all of the State's NRD claims, past, present, and future, against Grace, and is in the public interest and consistent with CERCLA and CECRA.

       (f)     The State commits to prioritize projects at sites within Lincoln County, subject to the State's required administrative decision-making processes.

       (g)     *Implementation.* Restoration projects in OU3 are subject to the following:

       (i)     Design and construction of any restoration projects in OU3, if any, may not begin until EPA has certified completion of all remedial action construction in OU3, except for projects that the State, EPA, and a Grace Party agree to integrate with remedial action. Initial restoration planning may begin earlier;

       (ii)     No restoration project in OU3 may hinder, interfere with, adversely impact, or increase, in any way, the cost (including operation and maintenance cost) of any remedial action work or structure, KDID O&M, the KDID Spillway, or mine reclamation activities in OU3;

       (iii)     No restoration project in OU3 may hinder, interfere with, or adversely impact use and enjoyment of OU3 property; and

       (iv)     As to restoration work that is not in OU3, this Settlement Agreement shall not limit whatever rights the State may have to conduct and/or implement such work.

       (h)     The "Allowed Natural Resource Damages Claim" consists of the NRD Funds to be paid under Section 8(a)).

       (i)     Stipulated Penalty for Failure to Make Section 8(a) Payments. If Grace breaches the payment obligations in Section 8(a), then Grace shall pay, as a stipulated penalty, in addition to the interest required by Section 8(a), penalties in the amount of $5,000 per day for the 1st through 14th day of such breach; $6,500 per day for the 15th through 30th day of such breach; $8,500 per day for the 31st day of such breach and beyond for so long as payment of all amounts due under Section 8(a) and 8(i) are unpaid. If the State prevails in an action to enforce this Settlement Agreement for the breach of the payment obligations in Section 8(a) and 8(i), the State (and only the State) shall be reimbursed by Grace for all costs and expenses associated with such claim, including attorney's time and fees. The stipulated penalties under this Section 8(i) shall be in addition to any other remedies available to the State.

20

9.    **Settlement**.

(a)    In consideration of the actions performed and to be performed by the Parties and the funding provided and to be provided by Grace as described herein, the Parties agree that, upon the Settlement Agreement Effective Date:

(i)    The State shall be deemed to have the Allowed State Claim under the Plan in full and complete satisfaction of the State Claim;

(ii)    The Allowed State Claim is an Allowed Environmental Claim, as the Plan defines that term;

(iii)    The State Claim is disallowed in all other respects;

(iv)    The State has no remaining, and shall have no other, Claim in the Chapter 11 Cases; and

(v)    The State Claim and any and all other Claims of the State (which for the avoidance of doubt are claims that were or could have been asserted in the Chapter 11 Cases) are discharged, barred, and enjoined pursuant to the Plan, the Confirmation Order, 11 U.S.C. § 524, and 11 U.S.C. § 1141 in exchange for the Allowed State Claim.

(b)    Covenants Not to Sue.

(i)    State's Covenant Not to Sue. Except as reserved in the State Reserved Rights, the State is forever barred, estopped, and enjoined from asserting any causes of action or relief against the Reorganized Debtors under CECRA, CERCLA, any other statute, common law, or any other theory of liability arising from or related to releases, threatened releases, or migration of hazardous or deleterious substances, pollutants, or contaminants at or from the Libby Asbestos Superfund Site. The preceding sentence does not bar, estop, or enjoin State causes of action or relief:

(x)    for a release of a hazardous substance or solid waste resulting from Reorganized Debtors' operation of any portion of the Libby Asbestos Superfund Site or from their transportation, treatment, storage, or disposal, or the arrangement for the transportation, treatment, storage, or disposal, of a hazardous substance or a solid waste at or from the Libby Asbestos Superfund Site after the Settlement Agreement Effective Date (except for road, dam, or mine maintenance, forest management, or similar property management activities, each in compliance with regulatory requirements; or as provided by any EPA Record of Decision or other final EPA decision document; or in compliance with any administrative order, settlement agreement, directive, governmental permit, or government approval, respectively, by EPA or the State); or

21

(y) arising from the disposal or release or threat of release of a hazardous substance, pollutant, or contaminant outside of the Libby Asbestos Superfund Site.

(ii)     State's Covenant Not to Sue for NRD Claim.  The State is forever barred, estopped, and enjoined from asserting any additional NRD claims, and will not pursue any other or additional NRD claims, against Grace Parties at or relating to the Libby Asbestos Superfund Site, except as reserved in Section 6(h)(Catastrophic Failure Reservation).

(iii)     Effect of Reorganized Debtors Suing the State of Montana.  If the Reorganized Debtors sue the State of Montana for any claim or liability arising from or related to releases, threatened releases, or migration of hazardous or deleterious substances, pollutants, or contaminants at or from the Libby Asbestos Superfund Site, then notwithstanding anything to the contrary in Section 9(b)(i), the State reserves completely and without limitation whatsoever all of its rights, claims, counter-claims, and defenses as to any such claim brought by Grace against the State.  Nothing in this Section 9(b)(iii) alters or affects the respective rights of the Parties to enforce the terms of this Settlement Agreement or with respect to the rights reserved in Section 6(h).

(c)     Nothing in this Settlement Agreement does or is intended to revive or modify the prior disallowance or expungement of certain State Claims (*e.g.*, *see* MDEQ 2008 Order and MDEQ 2008 Stipulation), or eliminate or diminish the efficacy of the Reorganized Debtors' discharge injunction with respect thereto.  The treatment provided in this Settlement Agreement with respect to the Allowed State Claim shall be in lieu of any treatment provided under the Plan with respect to the Allowed State Claim.

(d)     Nothing in this Settlement Agreement shall release or discharge the State Reserved Rights or the rights set forth in Section 9(b)(iii), and for the avoidance of doubt, the reservations in the State Reserved Rights and Section 9(b)(iii) do not constitute discharged Claims.

(e)     The claims identified in Exhibit H are no longer pending against the Reorganized Debtors, and the Settlement Agreement does not alter the Plan's treatment of, or otherwise affect, those claims.

10.     **Other Costs under the Memorandum of Agreement.**

(a)     As of the date of this Settlement Agreement, Grace has reimbursed the State, pursuant to a 2020 Memorandum of Agreement ("MOA"), for approximately $1,000,000. Reimbursement of documented State costs pursuant to that MOA is part of the overall value to the State under this Settlement Agreement.  Under this Settlement Agreement, within 60 days of receipt of an invoice for the following Grace will reimburse: a) further future costs pursuant to the MOA (including those incurred after April 2022 and all previously rejected invoices or portions of invoices and invoice items from the date of the MOA to the Settlement Agreement Effective date); and b) reimburse fully the unpaid 25% of costs submitted previously and in the future pursuant to the MOA, until the Settlement Agreement Effective Date.  Notwithstanding anything to the contrary stated in this paragraph or the MOA, the cost reimbursements pursuant to the MOA shall not exceed

22

a cumulative total of $1,500,000, and the State shall not submit invoices to Grace after the Settlement Agreement Effective Date. Upon payment by Grace of invoices submitted pursuant to the MOA on or before the Settlement Agreement Effective Date up to a maximum cumulative total under the MOA of $1,500,000 paid to the State, the MOA shall terminate.

11.   **Cooperation in Implementation and Dispute Resolution.**

(a)   The Parties agree that each would benefit from a cooperative and collaborative working relationship and will endeavor to jointly determine ways that this might be accomplished in the future. The Parties agree that it may be reasonable and appropriate to schedule periodic meetings between the parties to discuss the implementation of this Settlement Agreement, which either Party may request.

(b)   The Parties agree that, except in unique or exigent circumstances that make it impracticable or impossible to do so, prior to filing a lawsuit or otherwise seeking judicial review of this Settlement Agreement, written notice shall be provided that identifies the dispute and requested resolution. Any dispute regarding this Settlement Agreement or its implementation shall in the first instance be the subject of informal negotiations between the Parties, including elevation to the management levels of the respective Parties. The Parties agree to consider at the time whether the dispute is amenable to resolution through mediation or other alternative dispute resolution mechanisms.

12.   **Representations and Warranties.**

(a)   Each undersigned representative of a Party certifies that she or he is fully authorized to enter into the terms and conditions of this Settlement Agreement and to execute and legally bind such Party to this Settlement Agreement.

(b)   The State represents and warrants that i) it has full authority to enter into this Settlement Agreement; and ii) the State has not sold, transferred, or assigned the State Claim to any other person or entity.

(c)   Grace represents and warrants that i) it has full authority to enter into this Settlement Agreement; and ii) Grace has not sold, transferred, or assigned any rights or obligations established by the Settlement Agreement.

(d)   This Settlement Agreement is solely on behalf of the State and the Grace Parties.

13.   **Notice.** Each notice and other communication required hereunder will be in writing and will be sent by email and either: delivered in person; sent by certified mail, return receipt requested; or delivered by a recognized delivery service with acknowledgement of receipt, and will be deemed to have been given on the date of its delivery, if mailed to each of the Parties

thereto at the following respective addresses or such other address as may be specified in any notice delivered or mailed as set forth below:

GRACE

W. R. Grace & Co.
7500 Grace Drive
Columbia MD 21044
Attention: General Counsel
Anthony.Yoo@grace.com

KDC

Kootenai Development Company
7500 Grace Drive
Columbia MD 21044
Attention: Remediation Manager
Nick.Raines@grace.com

with a copy (which shall not constitute notice) to: Tony.Penfold@grace.com

STATE

Montana Department of Environmental Quality
PO Box 200901
Helena, MT 59620-0901
asteinmetz@mt.gov
Attention: Amy Steinmetz

Montana Natural Resource Damage Program
P.O. Box 201425
Helena, MT 59620-1425
Attention: Libby Asbestos Superfund Site Settlement Agreement
nrdp@mt.gov

with a copy (which shall not constitute notice) to: khausrath@mt.gov, HarleyHarris@mt.gov, and jessica.wilkerson@mt.gov.

The above-listed contacts may be changed by giving notice of a change to the other Parties in writing.

14.    **No Admissions; Fair and Reasonable Settlement.**    Neither Party makes any admissions, and Grace denies all allegations of liability in connection with any and all State Claims or causes of action that it has or may assert for remediation, response, natural resource damages, or any other matter, action, or relief. Grace asserts that there are minimal or no NRD at or related to OU3; the State asserts that there are NRD in OU3. This Settlement Agreement represents a compromise resolution that compensates the State for damages that it alleges in exchange for a

24

release of all of the State's NRD claims against Grace in or related to the Libby Asbestos Superfund Site. Both Parties acknowledge and agree that this Settlement Agreement is fair, reasonable, in the public interest, and consistent with CERCLA and CECRA. Nothing in this Settlement Agreement, nor entry into this Settlement Agreement, shall establish or be interpreted to establish any liability of any Grace Party, or be used as evidence of any such liability on the part of any Grace Party, in connection with any matters related to the Libby Asbestos Superfund Site or releases or threatened releases of hazardous or deleterious substances therefrom.

15.    **Acceleration of Payments.**  Notwithstanding anything to the contrary herein, Grace has the right to accelerate funding, without payment of unmatured interest, of any payments set forth in this Settlement Agreement, upon thirty (30) days written notice to the State

16.    **Assignment.**  Grace has the right to assign rights, obligations, and interests herein, upon thirty (30) days written notice to the State, to the maximum extent permissible by law, provided that such assignment does not materially impair fulfillment of the payment obligations imposed on Grace herein. In the event that an assignee fails to fulfill any obligations of this Settlement Agreement, any unfulfilled obligations remain an obligation of Grace that is enforceable under this Settlement Agreement.

17.    **Parties Bound.**  This agreement binds and inures to the benefit of the Parties and their successors and lawful assigns.

18.    **Cure Period for Involuntary Delay in Payments.**  An applicable deadline by which a payment obligation of Grace arises under this Settlement Agreement shall be suspended temporarily for a period of sixty (60) days if:

(a)    Grace is precluded from making any such payment due to (a) a failure of electronic bank systems despite reasonable efforts of the Grace Parties under the circumstances, or (b) a *Force Majeure* Condition; and

(b)    Grace promptly notifies the State within ten (10) days of such event pursuant to the notice provisions of this Settlement Agreement.

(c)    Grace shall endeavor in good faith to make any such payment as soon as is practicable within the sixty (60) day period. If Grace is unable to make the payment within the sixty (60) day period, the Parties shall work together in good faith to resolve the payment issue as expeditiously as possible; *provided, however*, that in no event shall a failure of electronic bank systems or *Force Majeure* Condition excuse nonperformance for a period of greater than one-hundred twenty (120) days, absent written agreement between the Parties.

19.    **Third Parties and Non-Affect.**  This Settlement Agreement is solely on behalf of the State and the Grace Parties. The State is not representing any other entities in entering into this Settlement Agreement. The terms of this Settlement Agreement shall neither expand nor limit the legal rights or obligations of any person or entity other than the State and Grace Parties.

25

Nothing in this Settlement Agreement shall be interpreted to create any rights or causes of action of any person or entity except the State and Grace Parties.

20.    **Advice of Counsel.**  Each of the Parties represents that such Party has: a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Settlement Agreement; b) executed this Settlement Agreement upon the advice of such counsel; c) read this Settlement Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and d) had the opportunity to have this Settlement Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Settlement Agreement.

21.    **Entire Agreement.**  This Settlement Agreement contains the entire agreement and understanding concerning the subject matter of this Settlement Agreement, and supersedes and replaces all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter.  Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation or warranty, express or implied, written or oral, not otherwise contained in this Settlement Agreement to induce any Party to execute this Settlement Agreement.  The Parties further acknowledge that they are not executing this Settlement Agreement in reliance on any promise, representation or warranty not contained in this Settlement Agreement, and that any such reliance would be unreasonable.  This Settlement Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party and approved by the Bankruptcy Court.

22.    **No Party Deemed Drafter.**  The Parties acknowledge that the terms of this Settlement Agreement are contractual and are the result of arms' length negotiations between the Parties and their chosen counsel.  Each Party and its counsel cooperated in the drafting and preparation of this Settlement Agreement.  In any construction to be made of this Settlement Agreement, the Settlement Agreement will not be construed against any Party.

23.    **Severability.**  If any provision of this Settlement Agreement or the application or enforcement thereof is held invalid after the Settlement Agreement Effective Date, the invalidity shall not affect other provisions or applications of this Settlement Agreement that can be given effect without the invalid provision or application and, to this end, the provisions of this Settlement Agreement are declared to be severable.

24.    **Headings; Titles and Subtitles.**  The organization of this Settlement Agreement, as well as the headings, titles and subtitles used herein are for convenience only and are not to be considered in construing or interpreting this Settlement Agreement.

25.    **Counterparts.**  This Settlement Agreement may be executed in counterparts with the same force and effect as if executed in one complete document.  Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Settlement

Agreement. Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Settlement Agreement for any purpose.

26.  **Modification.**  Any material or non-material modification of this Settlement Agreement shall be made only by written agreement of the Parties and shall take effect only upon court approval. The Parties' consent hereto is conditioned upon the approval of the Settlement Agreement in its entirety and without modification, addition, or deletion, except as agreed in writing by the Parties.

**IT IS HEREBY AGREED**

**FOR W.R. GRACE & CO.:**

KEITH N. COLE
Senior Vice President – Public Affairs & EHS
W. R. Grace & Co.
7500 Grace Dr.
Columbia, MD 21044

**FOR THE STATE OF MONTANA:**

THE HONORABLE GREG GIANFORTE
Governor of Montana
State Capitol
Helena, Montana 59620-0801

[signature page continues on
following page]

27

AUSTIN KNUDSEN
Attorney General
Office of the Attorney General
Justice Building, Third Floor
215 North Sanders
P.O. Box 201401
Helena, Montana 59620-1401

HARLEY R. HARRIS
Supervising Assistant Attorney General
Montana Natural Resource Damage Program
1301 Lockey Avenue
P.O. Box 201425
Helena, Montana 59620-1425

CHRISTOPHER DORRINGTON
Director
Montana Department of Environmental Quality
1520 E 6th Avenue
Helena, MT 59601

AUSTIN KNUDSEN
Attorney General
Office of the Attorney General
Justice Building, Third Floor
215 North Sanders
P.O. Box 201401
Helena, Montana 59620-1401

HARLEY R. HARRIS
Supervising Assistant Attorney General
Montana Natural Resource Damage Program
P.O. Box 201425
Helena, Montana 59620-1425

CHRISTOPHER DORRINGTON
Director
Montana Department of Environmental Quality
1520 E 6th Avenue
Helena, MT 59601

Exhibits

Exhibit A - Surety Bond Form

Exhibit B – Surety Bond Amount Schedule

Exhibit C - KDID O&M Performance Trust

Exhibit D - KDID Spillway Replacement Trust

Exhibit E - Alleged Injury and Examples of Restoration Options to Address Alleged State NRD at OU3

Exhibit F – State Wiring Instructions

Exhibit G – MDEQ 2008 Order and MDEQ 2008 Stipulation

Exhibit H – List of Other State Proofs of Claim and their Treatment in the Plan

Exhibit I – Proposed Approval Order

Exhibit A - Surety Bond Form

Bond No: _____

*DRAFT FORM OF DOCUMENT*

## PERFORMANCE BOND
### Pre-2042 KDID Operation and Maintenance Trust Funding

Date bond was executed: _____

Effective date: _____

Principal: _____

Surety Name & Address: _____

_____

**KNOW ALL MEN BY THESE PRESENTS**, that we, _____ (W.R. Grace & Co.) (hereinafter called the Principal), as Principal, and _____, a corporation duly organized under the laws of the State of _____ (hereinafter called the Surety) as Surety, are held and firmly bound unto (The State of Montana), (hereinafter called the Obligees), as Obligees, in the initial amount of (Three Million Five Hundred Thousand Dollars and 00/100 Dollars--------- ($3,500,000.00) to be automatically adjusted January 1 of each calendar year to the following penal sum:

| Year | Maximum Penal Sum If Default in Given Year |
|---|---|
| January 1, 2023 | $ 3,500,000 |
| January 1, 2024 | $ 3,391,500 |
| January 1, 2025 | $ 3,277,260 |
| January 1, 2026 | $ 3,157,094 |
| January 1, 2027 | $ 3,030,810 |
| January 1, 2028 | $ 2,898,212 |
| January 1, 2029 | $ 2,759,098 |
| January 1, 2030 | $ 2,613,260 |
| January 1, 2031 | $ 2,460,485 |
| January 1, 2032 | $ 2,300,553 |
| January 1, 2033 | $ 2,133,240 |
| January 1, 2034 | $ 1,958,315 |
| January 1, 2035 | $ 1,775,539 |
| January 1, 2036 | $ 1,584,668 |
| January 1, 2037 | $ 1,385,453 |
| January 1, 2038 | $ 1,177,635 |
| January 1, 2039 | $ 960,950 |
| January 1, 2040 | $ 735,127 |
| January 1, 2031 | $ 499,886 |
| January 1, 2042 | $ 254,942 |
| January 1, 2043 | $ 0 |

070015_0005-1879881686-21/0.1

for the payment whereof Principal and Surety bind themselves, their heirs, executors, administrators, successors, and assigns, jointly and severally, firmly by these presents.

**WHEREAS,** the Principal is required under the  Settlement Agreement executed by and between W.R. Grace & Co. and the State of Montana on or about December 1, 2022, and the Approval Order entered by the court on _____, to obtain and maintain a surety bond as financial assurance for performance of KDID O&M during the period 2023 to 2042 ("Pre-2042 KDID O&M Performance Bond") as these terms are defined in the Settlement Agreement;

**WHEREAS,** this surety bond is a component of the financial assurance required by the Settlement Agreement; and

**WHEREAS,** the Principal shall also establish, as a other component of the financial assurance required by the Settlement Agreement, a standby trust fund ("Pre-2042 KDID O&M account within the KDID O&M Performance Trust)" to receive payment from a surety bond if the principal defaults under the terms of the Settlement Agreement;

**NOW, THEREFORE,** this obligation is issued in accordance with the terms of the Settlement Agreement and in fulfillment of a component of Principal's financial assurance obligations thereunder. This obligation shall remain in full force and effect, with declining payout amounts as set forth above, through December 31, 2042, subject, however to the following conditions:

1) No right of action shall accrue on this bond to or for the use of any person or corporation other than the Obligees named herein or the heirs, executors, administrative authority, or successors of the Obligees.

2) The Surety shall become liable on this bond and fund the Trust obligation, described in Section 4(a) of the Settlement Agreement, only when:

    a. the Principal receives a written Nonperformance Determination, as described in Section 5(d) of the Settlement Agreement;
    b. the Principal receives written notice from the Director of the Montana Department of Natural Resources and Conservation, as set forth in Section 6(e) of the Settlement Agreement, with documentation of the basis of the notice, that the Principal (or any merged or successor entity that assumed the Principal's obligations under the Settlement Agreement) has ceased to exist or has failed to continue to operate as a going concern; or
    c. the Surety cancels the bond pursuant to Paragraph 5 below and the Principal fails to provide alternative security within 45 days of surety cancellation notice.

3) The liability of the Surety shall not be discharged by any payment or succession of payments hereunder, unless and until payment or payments shall amount in the aggregate to the penal sum of the bond according to the schedule of bond liability above.

4) The schedule of penal sum liability above is not cumulative. Regardless of the number of years this bond shall remain in force or the number of claims that may be made, in no event shall the aggregate maximum liability of the Surety exceed the penal sum of this bond as defined above.

5) The Surety may cancel the bond by sending notice of cancellation by certified mail to the Principal, the Obligees, and to the Trustee at the addresses below. Cancellation shall not occur before 120 days have lapsed beginning on the date that both the Principal and the Obligees received the notice of cancellation, as evidenced by the return receipts. If the Principal fails to provide alternative security within 45 days of surety cancellation notice, the Principal shall be deemed to be in default under this bond and Surety shall fund the Trust at the Penal sum of the bond according to the schedule above.

6) Provided that the Obligees agree in writing, this bond may be replaced by alternative security including cash, or a letter of credit from a bank agreeable to the Obligees; otherwise, the alternative security shall be in the form of a surety bond consistent with the terms of the Settlement Agreement, including Section 4(a), from another surety which meets the bond issuer rating requirements set forth within Section 6(c)(i) of the Settlement Agreement.

7) In accordance with Section 6(a)(iii) or Section 6(d)(i) of the Settlement Agreement, respectively, and after 60 days written notice to the Obligees, this bond, and Principal's continuing obligation to provide the same, shall terminate:
   a. to the extent the EPA declines the opportunity to become a primary beneficiary of the bond or financial assurance trusts and requests and requires, and Principal provides, financial assurance for the KDID O&M as part of an agreement, decree or order that exceeds the value and scope of the financial assurance provided for within the Settlement Agreement; or
   b. in the event the KDID is required to be removed, substantially or completely.

Those persons whose signature appear below hereby certify that they are authorized to execute this surety bond on behalf of the Principal and Surety and that the surety is authorized to do business in the State of Montana.

Sealed with our seals and dated this ____ day of _____, 20__.

<strong>Principal</strong>

By:_____

Senior Director, Finance and Treasury
7500 Grace Drive, Columbia MD 21044
Attention: Asif Md Arshad

Address for Notification

<strong>Surety</strong>

By:_____

Attorney-in-Fact

_____
_____
_____

Address for Notification

<strong>Obligee</strong>

By:_____

_____
_____
_____

Address for Notification

Trustee

_____

_____

_____

Address for Notification

Exhibit B - Surety Bond Amount Schedule

### Exhibit B - Surety Bond Amount Schedule

Summary of contingent future payout of the bond should payment by surety be required (referenced as "default" in below):

1) **Pre-2042 KDID O&M Performance Bond (Section 4.b)**

### KDID O&M Performance Bond Payout

| Year | Future Value of Expense | Maximum Sum of Bond Amount in Given Default Year |
|---|---|---|
| 2023 | $ 175,000 | $ 3,500,000 |
| 2024 | $ 178,500 | $ 3,391,500 |
| 2025 | $ 182,070 | $ 3,277,260 |
| 2026 | $ 185,711 | $ 3,157,094 |
| 2027 | $ 189,426 | $ 3,030,810 |
| 2028 | $ 193,214 | $ 2,898,212 |
| 2029 | $ 197,078 | $ 2,759,098 |
| 2030 | $ 201,020 | $ 2,613,260 |
| 2031 | $ 205,040 | $ 2,460,485 |
| 2032 | $ 209,141 | $ 2,300,553 |
| 2033 | $ 213,324 | $ 2,133,240 |
| 2034 | $ 217,591 | $ 1,958,315 |
| 2035 | $ 221,942 | $ 1,775,539 |
| 2036 | $ 226,381 | $ 1,584,668 |
| 2037 | $ 230,909 | $ 1,385,453 |
| 2038 | $ 235,527 | $ 1,177,635 |
| 2039 | $ 240,237 | $ 960,950 |
| 2040 | $ 245,042 | $ 735,127 |
| 2041 | $ 249,943 | $ 499,886 |
| 2042 | $ 254,942 | $ 254,942 |

Exhibit C - KDID O&M Performance Trust Form

EXHIBIT C

_____, 2023

## TRUST AGREEMENT

### KDID O&M Performance Trust

This Environmental Remediation Trust Agreement (the "Agreement") is made as of this _____ day of _____ 2023, by and among W.R. Grace & Co. and Kootenai Development Company ("KDC") (collectively herein "Grace"), as settlor and beneficiary; the State of Montana on behalf of its agencies and departments named in the Settlement Agreement (the "State") as beneficiary, (each, individually, a "Party," and collectively, the "Parties"); and PNC Bank, National Association, not in its individual capacity, but solely as Trustee (the "Trustee").

## RECITALS

WHEREAS, Grace and the State have entered into a Settlement Agreement that provides for the formation of this trust, to be administered in the manner described herein.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants and agreements contained herein, and pursuant to the Settlement Agreement, the Parties and the Trustee hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1    Definitions. The following terms as used in this Agreement shall have the definitions given below:

1.1.1    "Account Statement" shall have the meaning given in Section 5.1.

1.1.2    "Agreement" shall be this Trust Agreement.

1.1.3    "Beneficiaries" means the State and Grace.

1.1.4    "Condition of Early Termination" shall mean each of the conditions of termination set out in Sections 6(a)(iii), 6(d)(i), or 6(e) of the Settlement Agreement. The terms in the Settlement Agreement shall control whether a Condition of Early Termination exists, however, such conditions are summarized generally here for convenience:

(a)    Section 6(a)(iii): United States Environmental Protection Agency declines the opportunity to become a primary beneficiary of the Surety Bond or Financial Assurance Trusts, and requests and requires, and a Grace Party provides, financial assurance for KDID O&M and/or KDID Spillway Work as part of an agreement, decree, or order that exceeds the value and scope of the financial assurance provided in this Settlement Agreement for KDID O&M and/or KDID Spillway Work;

(b)     Section 6(d)(i): The KDID is required to be removed, substantially or completely; or

(c)     Section 6(e): Grace (or any merged successor entity that assumes Grace's obligations to the State under the Settlement Agreement) ceases to exist or fails to continue to operate as a going concern.

1.1.5   "Court" means the Court of Common Pleas of Allegheny County of the Commonwealth of Pennsylvania, or, if that Court abstains from exercising jurisdiction or is otherwise without jurisdiction over any matter arising out of this Agreement, the Commonwealth of Pennsylvania court otherwise having competent jurisdiction with respect to such matters.  The term "Court" does not refer to or include the federal bankruptcy court that enters the Settlement Agreement, which court shall have no continuing involvement with the administration of this Trust.

1.1.6   "DNRC" shall have the meaning set forth in the Settlement Agreement.

1.1.7   "Environmental Remediation" means actions taken and costs paid in accordance with as provided under Treasury Regulations § 301.7701-4(e)(1), including the costs of assessing environmental conditions, monitoring remedial activities, preventing future releases, and otherwise implementing the requirements of the Settlement Agreement.

1.1.8   "Internal Revenue Code" or means the Internal Revenue Code of 1986, as amended; and "Treasury Regulations" means regulations promulgated under the Internal Revenue Code and published in Title 26 of the Code of Federal Regulations, as amended.

1.1.9   "Including" shall not be read restrictively, and shall mean including but not limited to.

1.1.10  "KDC" shall have the meaning set forth in the Settlement Agreement.

1.1.11  "KDID" shall have the meaning set forth in the Settlement Agreement.

1.1.12  "KDID Spillway" shall have the meaning set forth in the Settlement Agreement.

1.1.13  "KDID Spillway Work" shall have the meaning set forth in the Settlement Agreement.

1.1.14  "KDID Operation and Maintenance" or "KDID O&M" shall have the meaning set forth in the Settlement Agreement.

1.1.15  "KDID O&M Costs" shall include, without limitation, (y) all costs incurred to conduct KDID O&M  (including funding for the routine inspection, monitoring, operation, maintenance, repair and other activities performed periodically by KDC consistent with a dam safety operating permit issued under the Montana Dam Safety Act and implementing regulations and any superseding dam safety law and regulation , and costs for materials and equipment necessary or reasonable for purposes of conducting KDID O&M  and (z) all fees and expenses

(including reasonable consulting and legal fees and expenses) associated with the Trustee's activities hereunder.

1.1.16   "Nonperformance Determination" shall have the meaning set forth in the Settlement Agreement.

1.1.17   "Parties" under this Agreement shall have the meaning given in the preamble.

1.1.18   "Pre-2042 KDID Operation and Maintenance Performance Bond" or "Surety Bond" shall have the meaning set forth in the Settlement Agreement.

1.1.19   "Pre-2042 KDID O&M Account" shall have the meaning set forth in Section 2.2.1 hereof.

1.1.20   "Settlement Agreement" means the Settlement Agreement between W.R. Grace & Co. and the State, dated as of _____, 2022, negotiated and entered to settle the claim number 18496-1 in *In re W.R. Grace & Co., et al.*, before the United States Bankruptcy Court for the District of Delaware, under Case No. 01-011139 (AMC), as amended by W.R. Grace & Co. and the State hereafter, in accordance with the terms of the Settlement Agreement.

1.1.21   "State" shall have the meaning given in the preamble.

1.1.22   "Statement" shall have the meaning given in Section 3.2.1(a).

1.1.23   "Surety" shall mean the surety acting as obligor for the Pre-2042 KDID Operation and Maintenance Performance Bond.

1.1.24   "Trust" means the KDID O&M Performance Trust, and any sub-account therein, established pursuant to this Agreement.

1.1.25   "Trust Assets" means the funds transferred to, or earned by, the Trust pursuant to this Agreement.

1.1.26   "Trustee" means the trustee of the Trust. At any time that multiple trustees are acting, the term "Trustee" shall apply to each of the co-trustees.

1.2   Other. To the extent a term in this Agreement is not defined above, to the extent practicable, such term shall have the meaning provided, if any, in the Settlement Agreement.

## ARTICLE II
## CREATION AND MANAGEMENT OF TRUST ASSETS

2.1   Objectives and Purposes.

2.1.1   General. The exclusive objectives and purposes of the Trust are to collect and disburse funds for KDID O&M Costs, as required under the Settlement Agreement, with no