objective or authority to engage in any trade or business. Subject to Section 3.3.1 of this Agreement, all payments and disbursements from the Trust by the Trustee shall be made and applied solely for these purposes, it being understood and agreed that any payments to the Trustee pursuant to this Agreement are in furtherance of such purposes; and at no time shall the Trust (or the Trustee on behalf of the Trust) conduct investment or business activities that compromise these purposes.

2.1.2   Tax Status. Initially, Grace intends, but is not required to ensure, that the Trust constitutes an "environmental remediation trust," as provided by Treasury Regulations §301.7701-4(e); and the Trust shall at all times be administered, and all provisions of this agreement shall be construed, in a manner that is consistent with such intent. At any time, however, , Grace may take such steps as are required to elect to treat the Trust as a "qualified settlement fund," as provided by Treasury Regulations §1.468B-1; and, following such election, the Trust shall at all times be administered, and all provisions of this agreement shall be construed, in a manner that is consistent with such intent. Grace intends that it be considered to be the Trust's "administrator," within the meaning of Treasury Regulations. Neither the State nor the Trustee shall have any duty or obligation in connection with the tax treatment of the Trust, other than to cooperate in good faith with Grace in connection therewith. Grace shall be solely responsible for ensuring compliance with the Regulations required of an environmental remediation trust or qualified settlement fund, as the case may be. Neither the State nor the Trustee shall be responsible for preparing or filing any reports or returns relating to federal, state, or local income taxes with respect to this Agreement other than the Trustee preparing or filing returns or reports for the Trustee's compensation; provided, that the Trustee hereby is authorized to execute and deliver any tax returns in such forms presented to it and shall have no liability with respect to the preparation or content of such tax returns. With respect to any amounts payable under this Agreement, the Parties shall deliver to the Trustee such tax forms or other documents reasonably requested by the Trustee as shall be prescribed by the Internal Revenue Code or other applicable law at such time or times reasonably required by the Trustee, including such tax forms or other documents, as applicable, to allow the Trustee to determine the amount to deduct or withhold (and to allow the Trustee to so deduct or withhold) pursuant to the Internal Revenue Code, including under Sections 1471 through 1474 of the Code (FATCA). Without limiting any other provision of this Agreement, the State expresses no opinion and makes no agreements regarding the tax status of the Trust, but leaves such matters and the resulting tax consequences to Grace's discretion.

2.2   Creation of and Transfer of Assets to the Trust.

2.2.1   Establishment of Trust. The Parties hereby irrevocably establish the Trust, which shall bear the name "KDID O&M Performance Trust." Within five (5) business days of the date hereof, the Trustee shall establish a trust account (the "Trust Account"). The purpose of the Trust Account shall be to receive and administer the Trust Assets and to facilitate the making of payments hereunder, all in accordance with this Agreement. Grace shall contribute the Trust Assets to the Trust in the manner and at the times set forth in the Settlement Agreement. In addition, if the Surety's payment on the Surety Bond is triggered and Surety contributes funds to the Trust, the Trustee shall place and maintain such funds in a separate sub-account to be known as the "Pre-2042 KDID O&M Account," within the Trust Account. As of December 31, 2042, any funds present in the Pre-2042 KDID O&M Account shall be transferred to and become part of the Trust Account, and that sub-account shall terminate. The State shall have no obligation to contribute assets or property to the Trust at any time. The Trustee hereby accepts and agrees to hold the Trust Assets

in the Trust Account for the benefit of the Beneficiaries for the purposes described in Section 2.1, subject to the terms of this Agreement. The Trustee shall have no responsibility, and assumes no liability, to pursue collection of Trust Assets to be contributed under the Settlement Agreement from any source. Instead, all obligations with respect to the Settlement Agreement's requirements for funding of the Trust are to be solely exercised by Grace.

2.2.2    Ownership Trust Assets. All legal rights and incidents of ownership of the Trust Assets shall be held solely by the Trustee. However, except and until otherwise provided in this Agreement, Grace shall be treated as the owner of the Trust Assets for federal income tax purposes pursuant to Treasury Regulations § 301.7701-4(e)(2).

2.2.3    Additional Contributions. The Trustee is authorized to accept contributions to the Trust from, and only from, the Parties or the Surety. The Trustee is not required to accept any contribution that the Trustee believes is not appropriate for administration as part of the Trust Assets.

2.3    Investment and Safekeeping of Trust Assets.

2.3.1    Segregation of Trust Assets. The Trust Assets shall be held in trust and segregated from all, and shall not be comingled with any, other assets of Grace, the State or the Trustee.

2.3.2    Investment Requirements. The Trustee shall have the authority to invest the Trust Assets in such a manner as the Trustee deems appropriate in the Trustee's discretion and in accordance with the guidelines applicable to the Trust Account set forth in this Section 2.3 (the "Investment Policy"), as may be amended in writing from time to time by Grace, the State and the Trustee. The Trustee shall consult initially and from time to time with Grace and the State regarding the nature and allocation of investments of the Trust Assets. All investment transactions effected for the Trust Account shall be deemed in compliance with the Investment Policy unless Grace or the State notifies Trustee in writing of its objection within sixty (60) days of its receipt of the most recent Account Statement pursuant to Section 5.1 of this Agreement. The compliance of an investment with the Investment Policy shall be determined on the date of purchase, based on the market value and asset class or type as of that date compared to the value of the Trust Account as of the most recent valuation date.

2.3.3    Investment Provisions.

(a)    Cash Sweep Vehicle. Grace authorizes the Trustee to automatically sweep uninvested cash balances in the Trust Account into (i) any money market mutual fund that (A) complies with the criteria set forth in (I) Securities and Exchange Commission Rule 2a-7 under the Investment Company Act of 1940, as amended, or (II) Securities and Exchange Commission Rule 3c-7 under the Investment Company Act of 1940, as amended, and (B) has portfolio assets of at least $5,000,000,000 or (ii) any bank deposit account offered by a commercial bank which has a combined capital and surplus and undivided profits of not less than $500,000,000, in each chosen by Trustee (referred to as "sweep vehicles"), which may include sweep vehicles advised by the Trustee and/or its affiliates or deposit accounts at the Trustee or an affiliated bank. Grace understands that Trustee will derive financial benefits from affiliated sweep vehicles (including

PNC Bank, National Association deposit sweep accounts), which benefits are in addition to the fees set forth in the Schedule of Account Fees described in Section 4.5 of this Agreement.

        (b)    <u>Investments in Other Securities</u>.  Grace authorizes the Trustee to invest in: (i) direct obligations of, or obligations the principal of and interest on which are directly and fully guaranteed or insured by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America); (ii) investments in commercial paper having, at such date of acquisition, a credit rating of at least A-2 from S&P or P-2 from Moody's; (iii) repurchase agreements with a term of not more than 180 days for securities described in clause (i) of this sentence and entered into with a financial institution satisfying the criteria described in clause (ii) of Section 2.3.3(a); (iv) corporate debt obligations with a Moody's rating of at least A3 or an S&P rating of at least A-, or their equivalent; (v) shares or units issued by a company that is registered as an investment company under the Investment Company Act of 1940, as amended, that is traded on a national securities exchange and has a rating of at least four stars from Morningstar, Inc.; and (vi) any other security approved in writing by Grace and the State (collectively, "Other Securities").  "Moody's" means Moody's Investors Service, Inc. "S&P" means Standard & Poor's Rating Services, a Standard & Poor's Financial Services LLC business.  In each case, Grace understands that the Trustee may receive financial or advisory fees related to the issuance of the security or instrument, including securities or instruments for which Trustee (or its affiliates) serve(s) as manager, promoter or placement agent or where Trustee (or its affiliates) has issued, structured or underwritten the Other Securities.

        (c)    <u>Disclosure Regarding Use of Affiliated Products and Services</u>. Grace understands and agrees that the Trustee may, if appropriate for the Trust Account, (i) invest in Funds or Other Securities that are affiliated with Trustee and that these affiliated investments may constitute all of the investments in the Trust Account; (ii) engage subadvisors affiliated with the Trustee to manage all or a portion of the assets in the Trust Account; and/or (iii) engage model portfolio providers in connection with management of assets in the Trust Account.  Grace further understands that the Trustee may derive financial and other benefits as a result of the Trustee purchasing Funds or Other Securities affiliated with Trustee or utilizing subadvisors and/or model portfolio providers affiliated with Trustee.

        (d)    <u>Disclosure Regarding Additional Fund Fees</u>.  Grace understands that the Trustee (and/or its affiliates) may provide advisory or other services to a company that is registered as an investment company under the Investment Company Act of 1940, as amended, (a "Fund") which is selected for the Trust Account and that the Trustee may receive advisory, recordkeeping, administrative, shareholder servicing, and/or other fees for such advisory and other services.  These types of fees are paid, directly or indirectly, by the Fund to the Trustee (and/or its affiliates) and are described in detail in the prospectus, private offering memorandum or other offering documents for the Fund.  Grace should carefully read these documents since these fees will ultimately be borne by the Trust as an investor in the Fund through the net asset value of the Fund and cost of Fund shares or units.  Fees received by the Trustee from the Funds are in addition to the compensation paid to the Trustee under this Agreement and may result in the Trust paying multiple layers of fees for the same asset.  Purchases of Fund shares will be made in accordance with Trustee's standard practices in effect from time to time.

(e)    Special Disclosures for Fund Shares.  Grace understands that Funds and Other Securities available through the Trustee are not backed or guaranteed by the Trustee (or its affiliates), are not bank deposits and are not insured by, issued by, guaranteed by or obligations of the Federal Deposit Insurance Corporation, the Federal Reserve Board or any other government agency.  Such Funds and Other Securities involve investment risks, including possible loss of value.  There is no assurance that sweep vehicles will be able to maintain a stable net asset value of $1.00 per share.  For more complete information about Funds, including charges and expenses, Grace shall refer to the prospectus, private offering memorandum or other offering documents for the Funds.  Grace acknowledges (i) that it understands the information set forth in this Section 2.3.3 and (ii) receipt and review of the prospectus or summary prospectus, private offering memorandum or other offering documents for the selected Funds.

(f)    Trustee Selected Brokers.  Grace agrees that in cases where the Trustee selects brokers for trades, the Trustee may select brokers that are not affiliated with Trustee or brokers that are affiliated with Trustee.  Grace consents to transactions for the Trust Account being executed through brokers affiliated with the Trustee in accordance with this Agreement and the affiliated broker's execution policies.  Grace may revoke the consent provided in this Section at any time by directions to the Trustee.  If the Trustee buys or sells securities for which an affiliated broker acts as a dealer or underwriter, the Trustee may buy those securities from, or sell those securities to, either the affiliated broker or a member of an underwriting syndicate of which an affiliated broker is a member.  Grace consents to brokers selected by the Trustee retaining commissions, including an affiliate of the Trustee.  Grace further agrees that, if execution is through an affiliated broker, the affiliated broker is entitled to receive and retain, without credit or offset, brokerage commissions, commission equivalents, mark-ups, mark-downs and dealer spreads on transactions effected for the Trust Account, in accordance with the affiliated broker's standard fee schedules.  Upon request, the Trustee will provide additional information to Grace concerning commissions, commission equivalents, mark-ups and mark-downs and other transaction costs.  Grace understands and agrees that the Trustee has an indirect financial incentive to select an affiliated broker to execute transactions in the Trust Account, as it results in compensation to its affiliate.

(g)    Brokerage Fees and Pricing.  The Trustee will seek to obtain best execution in selection of brokers (both affiliated and unaffiliated, as applicable) for execution of securities trades for the Trust Account.  When selecting brokers the Trustee may take into account the full range and quality of brokerage services including execution capability, trading expertise, accuracy of execution, commission rates, research, reputation and integrity, fairness in resolving disputes, financial responsibility, responsiveness, and any other relevant factors.  The Trustee also may consider brokerage and research services provided by brokers even though the Trust Account may not benefit from such research.  Broker commission rate is one component of price and a factor considered with other factors.  The Trustee will not be obligated to seek the lowest commission rate in advance of a Trust Account transaction or to select brokers based on its purported commission rate.  Accordingly, the Trustee shall not be deemed to have acted unlawfully solely for causing Grace to pay a higher commission for a securities trade than other brokers would have charged for the same transaction.

(h)    Aggregation of Trades.  The Trustee may, in its sole discretion, but is not required to, combine purchases and sales of securities held in the Trust Account with

purchases and sales occurring on the same day of the same securities held in accounts of other clients of the Trustee (or its affiliates). When securities transactions are combined, the actual prices applicable to the combined transactions may be averaged, and the Trust Account and the other accounts may be deemed to have purchased or sold their proportionate shares of the securities involved at the average price then calculated. Grace understands that the Trustee may not be able to seek better pricing or lower costs on securities transactions by combining Trust Account securities transactions as described in this Section 2.3.3(h) and that combined securities transactions may or may not benefit the Trust Account.

2.3.4 <u>Construction of Investment Authority</u>. Nothing in this Section shall be construed as authorizing the Trustee to cause the Trust to carry on any business or to divide the gains therefrom, including the business of an investment company, or a company "controlled" by an "investment company," required to register as such under the Investment Company Act of 1940, as amended. The sole purpose of this Section 2.3 is to authorize the investment of the Trust Assets or any portions thereof as may be reasonably prudent pending use of the Trust Assets for the purposes of the Trust. Each of the Beneficiaries acknowledge and agree to the provisions of Section 2.3.

## ARTICLE III
## DISPOSITION OF TRUST ASSETS

3.1 <u>Distributions for KDID O&M Costs</u>. The Trustee shall distribute to or for the benefit of Grace (or the State, under the limited conditions described in Section 3.1.3 [Nonperformance Determination] or Section 3.1.4 [Cessation of Grace]) such amounts, at such times, as Grace or the State may incur as KDID O&M Costs in accordance with the standards prescribed in the Settlement Agreement (which the Trustee shall have no duty to verify or confirm). Distributions shall be made only in accordance with Statements provided to the Trustee pursuant to the provisions of this Article III.

3.1.1 <u>General Intent</u>. As provided in the Settlement Agreement, to the greatest extent practicable, the Parties intend that no distributions will be made by the Trustee until January 1, 2043 (except for any funds that may be distributed from the Pre-2042 KDID O&M Account). Distributions for KDID O&M Costs may be made from the Trust, including the sub-account, in accordance with Section 3.2.

3.1.2 RESERVED.

3.1.3 <u>KDID O&M Nonperformance Determination</u>. If, at any time after December 31, 2025, DNRC certifies in a writing delivered to Grace and the Trustee, that all requirements have been met for a Nonperformance Determination, including providing Grace an opportunity to cure such nonperformance in accordance with the Settlement Agreement, the State may assume all rights and authorities of Grace under this Agreement with respect to such KDID O&M work described in the Nonperformance Determination, including the right to request and obtain distributions in accordance with 3.2.

3.1.4 <u>Cessation of Grace</u>. Pursuant to Section 6(e) of the Settlement Agreement, upon notice from the State to the Trustee and Grace, accompanied by documentation of the basis

for the notice, if Grace (or any merged or successor entity that assumes Grace's obligations to the State under the Settlement Agreement) ceases to exist or fails to continue to operate as a going concern, all rights and authorities of Grace under this Agreement shall automatically and without further action cease, and all Trust Assets shall inure completely to the benefit of the State only without any prerequisite Nonperformance Determination referenced in Section 3.1.3; provided, however, Grace shall have thirty (30) days after such notice to object to any assertion of Grace's cessation in a writing delivered to the Trustee and the State.

    3.2   Process for Issuance of Distributions. The Trustee shall make distributions for KDID O&M Costs under Section 3.1 to Grace or the State (under the conditions described in Section 3.1.3 or Section 3.1.4, which governs the State's contingent rights to distribution), as the case may be, in accordance with the following provisions.

        3.2.1   Distribution Request. The Beneficiary seeking the distribution shall submit to the Trustee and the other Beneficiary:

            (a)   A statement setting forth the exact amount of the distribution (the "Statement"), upon which the Trustee may conclusively rely;

            (b)   A written certification that the distribution is for KDID O&M Costs within the restricted purposes of the Trust and the Settlement Agreement and, in the case of a distribution from the Pre-2042 KDID O&M Account, that such distribution does not decrease the balance of Trust Account, at any time during the year in which such distribution is to be made, below the "Maximum Sum of Bond Amount in Given Default Year" for the following year as reflected on the Surety Bond Amount Schedule attached to the Settlement Agreement as Exhibit B, which certification shall set forth the amounts necessary to demonstrate compliance with such requirement;

            (c)   For completed KDID O&M that has already been paid for by the Beneficiary seeking distribution, the invoices and receipts sufficient to demonstrate that work (or the relevant portion thereof) has been performed and payment has been made (which the Trustee shall have no duty to review);

            (d)   For distributions directly to a contractor or vendor (without advance payment by the Beneficiary seeking distribution), a copy of the contract for the performance of the work accompanied by the relevant invoice(s) for payment due to the specified contractor or vendor (which the Trustee shall have no duty to review) and

            (e)   Trustee shall have no responsibility to confirm receipt of any or all required supporting documentation for each distribution or the completeness of any such supporting documentation provided with each distribution request other than to confirm a distribution request has been received from an authorized Beneficiary.

        3.2.2   Distribution Payment. Within three (3) business days after receipt of a distribution request submitted in accordance with Section 3.2.1, the Trustee shall issue such distribution in accordance with the Statement.

3.3     Terminating Distributions.  Upon the conditions, and to the extent, provided in this Section 3.3, the remaining Trust Assets shall be distributed in accordance with this Section 3.3; and the Trust shall terminate.

3.3.1   RESERVED.

3.3.2   Upon Expiration of Term. Consistent with the terms of the Settlement Agreement, the Trust shall terminate on March 31, 2122. The Trustee shall not unduly prolong the duration of the Trust and shall, following the date provided in the immediately preceding sentence,, endeavor to resolve, settle, or otherwise dispose of all claims against the Trust pursuant to written instructions from the Beneficiaries, and then (unless otherwise directed in writing by agreement between the State and Grace) shall distribute the remaining Trust Assets to Grace and the State equally, subject to the prior payment of the Trustee's fees, expenses and indemnities accrued through the date of termination.

3.3.3   Upon Certification of a Condition of Early Termination. Consistent with the terms of the Settlement Agreement, the Trust shall terminate if either the State or Grace certifies in writing to the Trustee and the other Beneficiary, that a Condition of Early Termination has been met pursuant to Section 6(a)(iii) or Section 6(d)(i) and such other Beneficiary does not within thirty (30) days after actual receipt of such certification object to the termination of the Trust in writing to the Trustee and the Beneficiary making such certification. In accordance with such certification in the absence of objection from the other Beneficiary, the Trustee shall effect terminating distributions of the remaining Trust Assets to Grace, subject to the prior payment of any outstanding Trustee's fees, expenses and indemnities accrued through the date of termination.

## ARTICLE IV
## TRUSTEESHIP

4.1     Appointment. PNC Bank, National Association, not in its individual capacity, but in its representative capacity as Trustee, is hereby appointed to serve as the Trustee to administer the Trust in accordance with the terms of this Agreement, and the Trustee hereby accepts such appointment and agrees to serve in such representative capacity, effective upon the date of this Agreement.

4.2     [Reserved]

4.3     General Authority and Obligations.  The Beneficiaries intend that the Trustee's powers be exercisable solely in a manner that is consistent with, and in furtherance of, the purposes of the Trust set forth in this Agreement, consistent with Settlement Agreement, and not otherwise. The Trustee undertakes to perform such duties, and only such duties, as are specifically set forth in this Agreement. No implied duties, covenants or obligations shall be read into this Agreement. The Trustee shall have the authority to bind the Trust, and any successor Trustee, or successor or assign of the Trust, but shall for all purposes hereunder be acting in its representative capacity as Trustee and not individually. The Trustee shall have no obligations to perform any activities for which the Trust lacks sufficient funds. The Trust and the Trustee shall not and are not authorized to engage in any trade or business with respect to the Trust Assets or any proceeds therefrom.

4.4    Powers. The Trustee shall have the following powers in administering the Trust.

4.4.1    Pennsylvania Law. Except as otherwise provided in this trust agreement, the Trustee shall have all powers granted to trustees under 20 Pa. C.S.§ 7780.5 and 20 Pa. C.S.§ 7780.6..

4.4.2    Additional Powers. Without limiting the Trustee's powers under 4.4.1 in any manner, the Trustee is further authorized to perform any and all acts necessary to accomplish the purposes of the Trust and facilitate the Parties' compliance with the Settlement Agreement, including the execution (including on behalf of the Trust) of agreements, instruments and other documents necessary to implement this Agreement, the Settlement Agreement, or any order of the Court or as may be necessary and proper to carry out the provisions of this Agreement, and, to the extent directed by the Beneficiaries in writing, the Settlement Agreement. Additionally, the Trustee may, among other things, invest the Trust Assets as provided in this Agreement and file documents in Court on behalf of itself and the Trust.

4.4.3    Limitations on the Trustee's Authority. The Trust and the Trustee shall not and are not authorized to engage in any trade or business with respect to the Trust Assets or any proceeds therefrom. Without limiting the Trustee's right to payment of its fees, expenses and indemnities hereunder, the Trustee shall not make distributions for purposes other than as expressly set forth in Article III of this Agreement. Notwithstanding anything to the contrary in this Agreement, the Settlement Agreement, 20 Pa. C.S.§ 7780.5, 20 Pa. C.S.§ 7780.6 or any other law, the Trustee shall not have the power to resolve any dispute between or among the Beneficiaries, the Parties and/or any other Person regarding the interpretation, application or enforcement of this Agreement or the Settlement Agreement and/or the administration of the Trust, including through mediation, arbitration or other alternative dispute resolution procedures.

4.5    Compensation. The Trustee shall be entitled to receive compensation from Grace for its services under this Agreement in accordance with the Schedule of Account Fees, a copy of which the Trustee delivered to the Beneficiaries with this Agreement. Additionally, brokerage fees and commissions may be charged to the Trust Account in connection with certain securities trades executed by the Trustee and subadvisors in accordance with this Agreement. In consideration for receiving commissions from the Trust Account, brokerage firms may provide Trustee with research, products and other services which may be used to assist Trustee in providing investment advice the Beneficiaries and other clients. Grace authorizes the Trustee to debit the Trust Account (or such other PNC Bank account owned by Grace as Grace may request) for the Trustee's compensation in accordance with the Schedule of Account Fees then in effect and all of the other costs and expenses described above. Within forty-five (45) days after receipt by Grace of a Statement from the Trustee setting forth (a) the amount of any compensation, fees or expenses due to the Trustee, or (b) any amount debited from the Trust Account during the Statement period, Grace shall transfer funds in the amount of such debit, compensations fees or expenses to the Trust to be added to and included as part of the Trust Assets in order to reimburse the Trust in full for any amounts debited from the Trust Account by the Trustee pursuant to this Section 4.5, Section 4.6, Section 4.7 or Article VI. Within one (1) day of the expiration of such forty-five (45) day period, Grace shall notify the State if Grace does not transfer such additional funds to the Trust in accordance with the immediately preceding sentence.

4.6    Limitation on Liability of Trustee.

- 11 -

The following provisions shall govern the Trustee's rights, powers, obligations and duties under this Agreement, notwithstanding anything herein to the contrary:

(a)    Absent actual fraud, bad faith, willful misconduct, gross negligence or a material breach of its obligations under this Agreement as established by a final judgement of the Court no longer subject to appeal: (i) the Trustee shall incur no liability for any action taken or omitted to be taken in accordance with any instruction, direction or request of a Beneficiary that is not inconsistent with the terms of this Agreement, including with regard to distributions under Article III; and (ii) the Trustee shall not be liable for any loss to the Trust or any claim of inequality, partiality or unreasonableness resulting from any action taken in accordance with such direction. The Trustee shall have no duty or obligation to review or confirm whether any action taken by it pursuant to any such instructions, directions or requests complies with the terms of this Agreement (unless such instruction, direction or request on its face is not consistent with the terms of this Agreement), the Settlement Agreement or any other agreement, order or instrument. The Trustee shall have no duty to provide advice to, or communicate with or warn or apprise, any Beneficiary concerning instances in which the Trustee would or might have exercised the Trustee's own discretion in a manner different from the manner directed by a Beneficiary.

(b)    No provision of this Agreement, the Settlement Agreement, or any Court order shall require the Trustee to expend or risk its own personal funds or otherwise incur any personal financial liability in the performance of any of its duties or the exercise of any of its authorities as Trustee hereunder. Notwithstanding the foregoing, the Trustee shall satisfy from its own funds any liability imposed by a court of competent jurisdiction on account of Trustee's actual fraud, bad faith, willful misconduct, gross negligence or material breach of its obligations under this Agreement.

(c)    The Trustee shall not be deemed to have knowledge of any event or information held by or imputed to any Person (including, an affiliate, or other line of business or division of the Trustee) other than itself in its capacity as Trustee. The Trustee shall not be deemed to have notice or knowledge of any event or information, or be required to act upon any event or information (including the sending of any notice), unless a Responsible Officer of the Trustee receives written notice thereof and such notice references the fact or event. "Responsible Officer" means any officer of the Trustee with direct responsibility for the administration of this Agreement. The availability or delivery (including pursuant to this Agreement) of reports or other documents (including news or other publicly available reports or documents) to the Trustee shall not constitute actual or constructive knowledge or notice of information contained in or determinable from those reports or documents, except for such reports or documents that this Agreement expressly requires the Trustee to review.

(d)    Any Person (i) into which the Trustee may be merged or consolidated, (ii) which may result from any merger, conversion, or consolidation to which the Trustee shall be a party or (iii) which may succeed to all or substantially all of the corporate trust business of the Trustee shall be the successor of the Trustee hereunder, without the execution or filing of any instrument or any further act on the part of any of the parties. For purposes of this Agreement, "Person" means an individual, corporation, company, partnership, association, joint stock company, statutory or common law trust, unincorporated organization, joint venture, governmental authority, limited liability company, limited liability partnership or other entity.

(e)     The Trustee may act directly or through its agents, attorneys, custodians, servicers, managers, nominees or other skilled professionals, and the Trustee shall not be held responsible or liable for, or have any duty to supervise, any action, inaction, misconduct, or negligence of any such Persons selected by the Trustee with due care. Any expenses incurred by the Trustee in acting through agents, attorneys, custodians, services, managers or other skilled professionals shall be debited from the Trust Account in accordance with Section 4.5.

(f)     The Trustee shall not be responsible or liable for special, indirect, punitive, or consequential loss or damage of any kind whatsoever (including loss of profit) irrespective of whether the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(g)     The Trustee shall be entitled to rely conclusively, without investigation or other action on its part, on statements opinions, certificates, reports, directions, signatures, instruments, notices, advice, requests, waivers, consents, receipts, resolutions, bonds, calculations and other documents purported to be received from any Beneficiary, as contemplated by this Agreement, not only as to due execution, validity and effectiveness, but also as to the truth and accuracy of any information contained therein, and such reliance shall not constitute negligence (or gross negligence), bad faith or willful misconduct in connection with the Trustee's handling of funds or otherwise, and the Trustee shall not be liable or accountable to any Person by reason of such reliance. The Trustee shall not be responsible for the content or accuracy of any such documents provided to the Trustee, and shall not be required to recalculate, certify, or verify any information contained therein.

(h)     The Trustee may, at the expense of the Beneficiaries (i) request, rely on and act in accordance with officer's certificates of the Beneficiaries and opinions of counsel, and (ii) consult with, and request advice from, legal counsel selected by the Trustee as to any matters arising in connection with this Agreement, the interpretation and administration of any of the provisions of this Agreement or the Trustee's rights and obligations under this Agreement. The Trustee shall incur no liability and shall be fully protected in acting or refraining from acting in accordance with such officer's certificates and opinions of counsel and the written or oral advice of such legal counsel selected by the Trustee in good faith.

(i)     The Trustee shall incur no liability if, by reason of any provision of any present or future law or regulation thereunder, or by any force majeure event, including but not limited to any act of God, natural disaster, epidemic, pandemic, quarantine, shelter-in-place or similar directives, guidance, policy or other action by any governmental authority, accidents, labor disputes, disease, national emergency, loss or malfunction of utilities or computer software or hardware, the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility, acts of war, terrorism, insurrection, revolution or other circumstances beyond its reasonable control, the Trustee shall be prevented or forbidden from doing or performing any act or thing which the terms of this Agreement provide shall or may be done or performed, or by reason of any exercise of, or failure to exercise, any discretion provided for in this Agreement.

(j)     The Trustee shall not be required to take any action hereunder if it shall have reasonably determined, or shall have been advised by its counsel, that such action is

likely to result in liability on the part of the Trustee or is contrary to the terms hereof or is not in accordance with applicable laws.

(k)    Any permissive or discretionary act or privilege of, or right or power conferred upon, the Trustee enumerated in this Agreement shall not be deemed to be or otherwise construed as a duty or obligation, and the Trustee shall not be personally liable or accountable for the performance of any such act, privilege, right or power except as otherwise expressly provided herein.

(l)    The Trustee shall not be held responsible or liable for or in respect of, and makes no representation or warranty with respect to (i) the preparation, filing, correctness or accuracy of any financing statement, continuation statement or recording of any document (including this Agreement) or instrument in any public office at any time, or (ii) the monitoring, creation, maintenance, enforceability, existence, status, validity, priority or perfection of any security interest, lien or collateral or the performance of any collateral.

(m)    The Trustee shall not be held responsible or liable for or in respect of, and makes no representation or warranty with respect to, the correctness or enforceability of the recitals contained in this Agreement or in any related document.

(n)    The Trustee shall not be held responsible or liable for, and shall have no duty to supervise, investigate or monitor, the actions or omissions of any other Person, including the Beneficiaries, in connection with this Agreement or otherwise, and except as expressly set forth in Article III of this Agreement, the Trustee may assume performance by all such Persons of their respective obligations.

(o)    In the event that (i) the Trustee is unsure as to the application or interpretation of any provision of this Agreement, (ii) this Agreement is silent or is incomplete as to the course of action that the Trustee is required or permitted to take with respect to a particular set of facts, or (iii) more than one methodology can be used to make any determination to be performed by the Trustee hereunder, then the Trustee may give written notice to the Beneficiaries requesting joint written instruction and, to the extent that the Trustee acts or refrains from acting in good faith in accordance with any such written instruction, the Trustee shall not be personally liable to any Person. If the Trustee shall not have received such written instruction within ten (10) days of delivery of notice to the Beneficiaries (or within such shorter period of time as may reasonably be specified in such notice or as may be necessary under the circumstances) it may, but shall be under no duty to, take or refrain from taking any action, and shall have no liability to any Person for such action or inaction.

(p)    In order to verify Grace's identity and/or determine the authority of the person opening the Account, both W.R. Grace & Co. and KDC must submit to the Trustee a completed Certification Regarding Beneficial Owners of Legal Entity Customers attached as Appendix II to this Agreement at the time the Account is opened and at such other times as the Trustee may request. Grace agrees that if requested by the Trustee, Grace will provide copies of its governing documents and any other documentation requested by the Trustee to verify the information provided on Appendix II. Grace understands, however, that the Trustee assumes no responsibility and has no obligation to review Grace's governing documents for any purpose other

than to verify Grace's identity and/or the authority to open the Trust Account. Grace certifies that it is authorized to disclose the information provided in the Certification Regarding Beneficial Owners of Legal Entity Customers and, to the best of its knowledge, certifies that the information is complete and correct. Grace authorizes the Trustee to share the information provided in the Certification Regarding Beneficial Owners of Legal Entity Customers with any individual authorized to open or update the Trust Account.

(q)     The Trustee shall have no notice of, shall not be subject to, and shall not be required to comply with, any other agreement unless the Trustee in any capacity is a party thereto and has executed the same, even though reference thereto may be made herein.

(r)     Whenever the Trustee (a) receives any amounts, the application or disposition of which is not clearly addressed hereunder, (b) determines that it is uncertain about how to distribute any amounts which it has received, or (c) determines that there is any dispute among the Beneficiaries hereto about how such amounts should be distributed, the Trustee may choose to defer distribution of the amounts which are the subject of such uncertainty or dispute. If the Trustee in good faith believes that the uncertainty or dispute will not be promptly resolved, the Beneficiaries agree that the Trustee shall have the right, at its option, to deposit with, or commence an interpleader proceeding in respect of, such amounts in the Court for a determination by the Court as to the correct application of such amounts hereunder.

(s)     Each of the Beneficiaries hereby agrees that (y) the Trustee (A) except as otherwise expressly set forth herein, has not provided nor will it provide in the future, any advice, counsel or opinion regarding this Agreement or the transactions contemplated hereby, including with respect to the tax, financial, investment, securities law or insurance implications and consequences of the consummation, funding and ongoing administration of this Agreement or the initial and ongoing selection and monitoring of financing arrangements, (B) has not made any investigation as to the accuracy or completeness of any representations, warranties or other obligations of any Person under this Agreement or any other document or instrument (other than the Trustee's representations and warranties, if any, expressly set forth in this Agreement) and shall not have any liability in connection therewith and (C) has not prepared or verified, nor shall it be responsible or liable for, any information, disclosure or other statement in any disclosure or offering document delivered in connection with this Agreement; and (z) it will make its own decisions regarding its rights and protections and will not rely on the Trustee regarding such decisions.

(t)     All written directions given by any Beneficiary to the Trustee relating to the Trust Assets must be in writing, signed by a representative of such Beneficiary identified on Appendix I hereto (an "Authorized Person") and delivered to the Trustee, as such Appendix I may be amended from time to time by a Beneficiary by notice to the Trustee delivered in accordance with this Agreement. Directions may be delivered to the Trustee in person or by U.S. Mail, overnight courier, facsimile or email. Email directions will be deemed authorized and signed by an Authorized Person if sent from an email address provided in Appendix I (Authorized Persons) attached to this Agreement, as the same may be updated from time to time by the Beneficiaries and delivered to the Trustee ("Authorized Persons List"), with visible electronic copies to all other Authorized Persons. The Trustee will have no liability under this Agreement for relying on and acting upon any form of directions which it believes to be genuine. If an

- 15 -

Authorized Person uses email to send directions to the Trustee, the applicable Beneficiary will cause all Authorized Persons to send emails from the email address provided in the Authorized Persons List. The Trustee will assume that all emails sent from a designated email address have been authorized and sent by an Authorized Person, until either Beneficiary notifies the Trustee by delivery of an updated Authorized Persons List that the email address is no longer valid. All emails sent by the Trustee to an Authorized Person's designated email address will be deemed delivered when sent by the Trustee; however, nothing in this Section shall reduce the Trustee's obligations to provide certain notices by means other than email in accordance with Section 6.7. With respect to notice for which only email is required pursuant to this Agreement, each Beneficiary waives all claims resulting from an Authorized Person's failure to receive sent emails. The Trustee will be deemed to have received and accepted directions (and obligated to act on the directions) only when the Trustee has received and had a reasonable time, taking into account the manner and nature of the directions, to review the directions and confirm to the applicable Beneficiary that the directions have been accepted by the Trustee. Under no circumstances will telephone, telephone voice messaging, and other forms of telephonic, oral communication, text, skype or other forms of instant messaging constitute valid and effective directions under this Agreement. The Trustee's execution of any directions requires a commercially reasonable period of time for processing and is subject to the Trustee's internal policies and procedures, customary processing guidelines and securities deadlines, mutual fund company processing deadlines, and applicable market closings.

         (u)    The Trustee shall not be liable for failing to comply with its obligations under this Agreement or any related document in so far as the performance of such obligations is dependent upon the timely receipt of directions and/or other information from any Beneficiary which are not received or not received by the time required. The Trustee shall not have any responsibility for the accuracy of any information provided to any other Person that has been obtained from, or provided to the Trustee by, any Beneficiary.

        4.7    <u>Exculpation and Indemnification</u>. The Trustee shall not be personally liable for any claim, cause of action, or other assertion of liability arising out of or in relation to the discharge of the powers and duties conferred upon the Trust and/or Trustee by the Settlement Agreement or this Agreement unless the Court, by a final order that is not reversed on appeal, finds that the Trustee committed actual fraud, bad faith, willful misconduct, or gross negligence or materially breached its obligations under this Agreement in relation to those powers or duties. There shall be an irrebuttable presumption that any action taken or not taken with the express approval of the Court does not constitute an act of actual fraud, bad faith, willful misconduct, or gross negligence or a material breach of this Agreement. Except as set forth in the preceding sentence, the Trustee shall have no liability for any action taken, or errors in judgment made, in good faith by it or any of its officers, employees or agents. Nothing in this Agreement shall be construed to exculpate the Trustee from any liability resulting from any act or omission constituting actual fraud, willful misconduct, or gross negligence or a material breach of this Agreement (in each case as determined by a final, non-appealable order from a court of competent jurisdiction).

To the fullest extent permitted by law and without prejudice to any separate agreement relating to indemnification of the Trustee, Grace shall indemnify, protect, defend and hold harmless the Trustee (in its capacity as such and in its individual capacity), its affiliates and their respective directors, officers, employees, shareholders, representatives, trustees, grantors, beneficiaries, certificate holders, members, agents, attorneys, accountants and their heirs, successors and

permitted assigns (each, an "Indemnified Person") from and against any and all fees, expenses, damages, losses, claims, liabilities, penalties, causes of action, demands, judgments, taxes (excluding any taxes of the Trustee on, or measured by, compensation received by the Trustee), suits or costs (in each case including reasonable attorneys' fees and expenses, court costs and costs of investigation) of any kind or nature whatsoever arising out of or in connection with this Agreement that may be imposed upon, incurred by or asserted against such Indemnified Person, including in connection with (i) the exercise or performance of any of the Trustee's rights, powers or duties hereunder, and (ii) any enforcement (including any dispute, action, claim or suit brought) by the Trustee of any indemnification or other obligation of Grace (each of the foregoing, a "Claim"); provided, that Grace shall not be required to indemnify an Indemnified Person for any Claim resulting from such Indemnified Person's actual fraud, gross negligence, bad faith or willful misconduct or material breach of this Agreement (in each case, as determined by a final, non-appealable order from a court of competent jurisdiction). Notwithstanding the foregoing, unless and until a final, non-appealable order of a court of competent jurisdiction determines that an Indemnified Person acted with gross negligence, bad faith or willful misconduct or materially breached this Agreement, Grace shall advance or reimburse, as reasonably determinable by the Trustee, any and all amounts due to such Indemnified Person pursuant to the foregoing indemnity.

4.8    Termination / Resignation of the Trustee. The duties, responsibilities, and powers of the Trustee will terminate on the date the Trust is terminated in accordance with this Agreement, or by an order of the Court. Further, the Trustee may resign at any time by giving at least thirty (30) days prior written notice thereof to the Beneficiaries and any Co-Trustee; and the resignation shall become effective upon the delivery of the Trust Assets to the successor Trustee appointed under 4.10. Sections 4.5 through 4.7 above shall survive the termination or assignment of this Agreement and the resignation or removal of the Trustee.

4.9    Replacement. The Trustee may be removed, with or without cause, and replaced upon thirty (30) days written notice by a joint written determination of the Beneficiaries. The removal shall become effective upon the delivery of the Trust Assets to the successor Trustee appointed under 4.10.

4.10    Appointment of Successor Trustee. If, at any time a successor Trustee is required for any reason, such successor shall be jointly appointed in writing by the Beneficiaries. Any successor Trustee appointed hereunder shall execute an instrument accepting such appointment hereunder and shall file such acceptance with the Parties. Thereupon, such successor Trustee shall, without any further act, become vested with all the properties, rights, powers, trusts, and duties of its predecessor in the Trust with like effect as if originally named herein; and a removed or resigning Trustee shall, when requested in writing by the successor Trustee, execute and deliver an instrument or instruments conveying and transferring to such successor Trustee under the Trust all the Trust Assets in the custody of such predecessor Trustee. A successor Trustee appointed under this 4.10 shall be a national banking association, or bank or trust company chartered under the laws of Pennsylvania, having a capital and surplus of at least $200,000,000. If no successor Trustee is timely appointed, and shall have timely accepted such appointment, then the Trustee may, at the sole expense of Grace (including with respect to attorney's fees and expenses), petition the Court for the appointment of a successor Trustee.

4.11    No Bond.  Notwithstanding any state law to the contrary, the Trustee, including any successor Trustee, shall be exempt from giving any bond or other security in any jurisdiction.

# ARTICLE V
# TRUST RECORDS, TAX REPORTING

5.1    Accounting.  The Trustee will provide quarterly statements to the Beneficiaries that include a listing of all transactions, receipts, and disbursements during the preceding quarter, together with a current listing of the Trust Assets held in the Trust Account ("Account Statements").  Each of the Beneficiaries agrees that the Account Statements in a form customarily used by the Trustee with respect to its trust accounts are acceptable as confirmation of all Trust Account transactions.  Each of the Beneficiaries understands that it may, at no additional cost, request from Trustee a more detailed transaction report which may be Trustee's form of confirmation or a broker dealer's confirmation, as applicable.   Upon receipt of Account Statements, each of the Beneficiaries agrees to promptly review them and to file any objections within sixty (60) days after the receipt of the Account Statement.  If no objection is received by Trustee within the sixty (60)-day period, the Account Statement will be deemed approved and ratified by the Beneficiaries and will be final and binding on the Beneficiaries.  On or before February 1 of each calendar year, the Trustee shall provide the Beneficiaries with a statement reflecting the Trust Assets' balance, as of December 31 of the immediately preceding year; summarizing all Trust transactions from such preceding year.

5.2    Trust Records.  The Trustee shall maintain proper books, records, and accounts relating to all transactions pertaining to the Trust, and the assets and liabilities of the Trust, in such detail and for such period of time as may be necessary to enable the Trustee to make full and proper accounting required under the Section 5.1 and to comply with applicable provisions of law and good accounting practices; and the Beneficiaries shall have the right, upon reasonable advance written notice delivered to the Trustee, to inspect such books and records.  Except as otherwise provided herein, or as reasonably directed by the Beneficiaries in writing, the Trustee shall not be required to file any accounting or seek approval of the Court with respect to the administration of the Trust, or as a condition for making any payment or distribution out of the Trust Assets.

5.3    Tax Information.  Subject to definitive guidance from the Internal Revenue Service or a judicial decision to the contrary, the Trustee shall furnish to Grace or any other party contributing Trust Assets to the Trust such statements and additional information as to items of income, deduction, and credit of the trust for that tax year attributable to the portion of the Trust treated as owned by that party in accordance with Treasury Regulations § 1.671-4 and § 301.7701-4(e)(2).

5.4    Online Account Access.  The Beneficiaries may elect to register to use password protected sections of websites sponsored by PNC Bank, National Association through which the Beneficiaries can access the Trust Account ("Sites").  The Beneficiaries will be required to accept a website user agreement(s) for the Sites (the "Website Agreement").  If there is a conflict between the terms of a Website Agreement and this Agreement, the terms of the Website Agreement will apply to the Parties' use of the Site.

5.5    Tax Reporting. To the extent directed in writing by the Beneficiaries, the Trustee shall also file (or cause to be filed) any other statements, returns, or disclosures, each in the form presented to the Trustee, for filing relating to the Trust that are required by any applicable governmental unit (which the Trustee shall have no duty to verify or confirm).

## ARTICLE VI
## MISCELLANEOUS PROVISIONS

6.1    Amendments and Waivers. Any provision of this Agreement may be amended or waived only by mutual written consent of the Trustee, the State, and Grace. Consent will not be unreasonably withheld for an amendment proposed by Grace the sole effect of which is to further the Trust's qualification as an "environmental remediation trust," provided that such change does not affect the substantive rights or obligations of the Parties or the Trustee. All fees, costs and expenses (including reasonable attorneys' fees, costs and expenses) incurred by the Trustee in connection with any amendment or waiver shall be payable by Grace.

6.2    Tax Treatment. The Trust created by this Agreement is intended by Grace to be treated as an Environmental Remediation Trust for federal income tax purposes and, to the extent provided by law, this Agreement shall be governed and construed in all respects consistent with such intent.

6.3    Cooperation. The Trustee shall take such actions and execute such documents as are reasonably requested by the Beneficiaries in writing with respect to effectuating the Settlement Agreement and this Agreement and the transactions contemplated thereby. To the extent that the Beneficiaries request the Trustee to take such an action, the Trustee shall do so at the sole expense of Grace, who agree to separately fund and pay such expense(s).

6.4    Governing Law; Jurisdiction; Jury Trial. The Trust Assets, the rights, duties, and obligations arising under this Trust Agreement shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth of Pennsylvania without giving effect to the principles of law thereof that would require the application of the laws of any other jurisdiction. Each of the signatories hereto irrevocably submits to the non-exclusive jurisdiction of any State or Federal court sitting in Allegheny County, Pennsylvania in respect of any action or proceeding pertaining solely to the construction of the Trust Agreement or the administration of the Trust. Each party to this agreement irrevocably waives, to the fullest extent permitted by applicable law, any objection or defense that it may now or hereafter have to the laying of venue of any such proceedings pertaining solely to the construction of the Trust Agreement or the administration of the Trust in any such court and any claim that any proceeding brought in any such court has been brought in an inconvenient forum. EACH PARTY HERETO HEREBY WAIVES THE RIGHT THAT IT MAY HAVE TO A TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION PERTAINING SOLELY TO THE CONSTRUCTION OF THE TRUST AGREEMENT OR THE ADMINISTRATION OF THE TRUST, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. EACH OF THE SIGNATORIES HERETO HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS, COMPLAINT AND OTHER PROCESS ISSUED IN ANY SUCH ACTION OR SUIT AND AGREES THAT SERVICE OF SUCH SUMMONS,

COMPLAINT AND OTHER PROCESS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO IT AT ITS NOTICE ADDRESS AS PROVIDED HEREIN AND THAT SERVICE SO MADE SHALL BE DEEMED COMPLETED UPON SIGNATORY'S ACTUAL RECEIPT THEREOF. Nothing in this Paragraph 6.4 shall be construed to establish choice of law, jurisdiction, or venue, or waive any jury rights that may exist in connection with any proceeding not solely pertaining to the construction of the Trust Agreement or the administration of the Trust.

6.5    Situs.  The initial situs of the Trust shall be the State of Pennsylvania. With the written consent of the Beneficiaries, the Trustee shall have the power to remove all or part of the Trust Assets or to change the situs of administration of the Trust from one jurisdiction to another within the continental United States, and to elect, by a separate acknowledged instrument filed with the Trust records, that, notwithstanding Section 6.4, the law of such other jurisdiction shall govern the administration of the Trust, provided that the Trustee shall not make such an election if it would alter any beneficial interest under the Trust. The Trustee's authority to change the situs of administration of the Trust and elect that the laws of another jurisdiction shall thereafter govern the administration of the Trust does not impose a duty on the Trustee to monitor the laws of any jurisdiction other than the jurisdiction in which the Trust is then administered.

6.6    Severability.  If any provision of this Agreement, or application thereof to any person or circumstance, shall be determined by the Court in a final judgment no longer subject to appeal to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Agreement shall be valid and enforced to the fullest extent permitted by law consistent with the intent of the Parties to allow funds for KDID O&M  to be available at relevant times.

6.7    Sufficient Notice. Subject to Section 4.6(t), any notice or other communication required under this Agreement shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if: (a) sent by email; and (b) with respect to any notice or other communication required pursuant to Sections 3.1.4, 3.3, 4.5, 4.6(o) or 4.8, also (i) sent through a nationally recognized reliable overnight delivery service, or (ii) deposited, registered or certified mail and first class postage prepaid, in a post office or letter box addressed to the person for whom such notice is intended, to the name and address set forth below, or (iii) personally delivered to such other address provided in writing to the other Parties hereto by an authorized representative of the respective Party.

As to the State of Montana:

Montana Department of Environmental Quality
PO Box 200901
Helena, MT 59620-0901
asteinmetz@mt.gov
Attention: Amy Steinmetz

Montana Natural Resource Damage Program
P.O. Box 201425
Helena, MT 59620-1425

Attention: Libby Asbestos Superfund Site Settlement Agreement
nrdp@mt.gov
with a copy (which shall not constitute notice) to: khausrath@mt.gov,
HarleyHarris@mt.gov, and jessica.wilkerson@mt.gov.

As to Grace:

Senior Vice President, Government Relations and EHS
W. R. Grace & Co.
7500 Grace Drive
Columbia MD 21044
with a copy (which shall not constitute notice) to: Asif.Arshad@grace.com;
Tony.Penfold@grace.com; and Anthony.Yoo@grace.com

As to the Trustee:

PNC Bank, N.A.
116 Allegheny Center
Mailstop: P-YB35-02-Z
Pittsburgh, PA 15212

With a copy to:
Deputy General Counsel, Asset Management Group
300 Fifth Avenue
Pittsburgh, PA 15222


6.8    Headings.    The Section headings contained in this Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Agreement or any term or provision hereof.

6.9    Consistency of Agreements and Construction.    To the extent reasonably possible, the provisions of this Agreement shall be interpreted in a manner consistent with the Settlement Agreement. Where the provisions of this Agreement are irreconcilable with the provisions of the Settlement Agreement, the provisions of the Settlement Agreement shall prevail.

6.10    Counterparts.    This Agreement may be executed in multiple counterparts, each of which shall be deemed an original that is binding on the signatory thereto, but all of which together shall constitute one and the same instrument.    Signatures to this Agreement transmitted by facsimile, email, portable document format (or .pdf), or by any other electronic means intended to preserve the original graphic and pictorial appearance of this Agreement shall have the same effect as the physical delivery of the paper document bearing original signatures.


*The remainder of this page is left blank by intention.*

*Signatures are provided on the following page.*

- 21 -

KDW COMMENTS
10/1/22

IN WITNESS WHEREOF, the undersigned Parties and the Trustee enter into this Agreement as of the date first above written.


FOR THE STATE OF MONTANA:


By:_____

Name:_____

Title:_____


FOR W.R. GRACE & CO.


By:_____

Name:_____

Title:_____


FOR PNC BANK, NATIONAL ASSOCIATION, NOT IN ITS INDIVIDUAL CAPACITY, BUT SOLELY AS TRUSTEE:


By:_____

Name:_____

Title:_____

KDW COMMENTS
10/1/22

## APPENDIX I

## AUTHORIZED PERSONS

The following named persons are officers, fiduciaries, agents, partners or other authorized persons duly elected or appointed and authorized to sign written directions on behalf of [State/Grace] under this Agreement.  The directions of any one of the following persons is sufficient unless a greater number appears here: ____ **(insert number)**.

| Authorized Person Name | Title | Telephone Number | E-mail Address |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

**Above information is <u>required</u> for all authorized individuals**

APPENDIX II

CERTIFICATION REGARDING BENEFICIAL OWNERS OF LEGAL ENTITY CUSTOMERS

I. GENERAL INSTRUCTIONS

### What is the purpose of this form?

To help the government fight financial crime, federal regulation requires financial institutions to obtain, verify and record information about the beneficial owners of legal entity Clients. Legal entities can be abused to disguise involvement in terrorist financing, money laundering, tax evasion, corruption, fraud, and other financial crimes. Requiring the disclosure of key individuals who ultimately own or control a legal entity (i.e., the beneficial owners) helps law enforcement investigate and prosecute these crimes.

### Who has to complete this form?

This form must be completed by the person opening or updating an account on behalf of a legal entity. For the purposes of this form, a legal entity includes a corporation, limited liability company or other entity that is created by a filing of a public document with a Secretary of State or similar office, a general partnership, and any similar business entity formed in the United States or a foreign country. Legal entity does not include sole proprietorships, unincorporated associations, or individuals opening or updating accounts on their own behalf.

## PLEASE CAREFULLY REVIEW THE CERTIFICATIONS IN THE GRAY BOXES BELOW TO DETERMINE IF CLIENT IS EXCLUDED FROM COMPLETING ALL OR PORTION OF THIS FORM.

### What information do I have to provide?

This form requires you to provide the name, address, date of birth and Social Security number (or passport number or other similar information, in the case of Non-U.S. Persons) for the following individuals (i.e., the beneficial owners):[1]

(i)     Each individual, if any, who owns, directly or indirectly, 25 percent or more of the equity interests of the legal entity Client (e.g., each individual that owns 25 percent or more of the shares of a corporation); **and**

(ii)    An individual with significant responsibility for managing the legal entity Client (e.g., a Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, General Partner, Managing Member, President, Vice President, or Treasurer).

Regardless of the number of individuals identified under section (i), you must provide the identifying information of one individual under section (ii). It is possible that in some circumstances the same individual might be identified under both sections (e.g., the President of Acme, Inc. who also holds a 30% equity interest). Thus, a completed form

---

[1] If a trust, directly or indirectly, owns 25 percent or more of the equity interests of a legal entity, the trustee is deemed to be the beneficial owner of the equity interest for purposes of this form and the trustee must complete this form with the trustee's information. For accounts opened by an intermediary on behalf of the intermediary's underlying customer, the intermediary is deemed to be legal entity subject to reporting under this form, not the intermediary's underlying customers. Accordingly, this form should be completed by the intermediary entity with the intermediary's information.

will contain the identifying information of at least one individual (under section (ii)), and up to five individuals (i.e., one individual under section (ii) and four 25 percent equity holders under section (i)).

You may also be asked to provide a copy of a driver's license or other identifying document for each beneficial owner and controlling party listed on this form.

**Note regarding updating information:** From time to time the information provided in this form may need to be updated due to changes in the ownership or controlling party of the legal entity Client or its beneficial owners. Further, from time to time PNC may be required to verify the continued accuracy of the information provided. .

## II. CLIENT CERTIFICATION FOR EXCLUDED LEGAL ENTITIES AND NON-PROFIT CORPORATIONS

**Excluded Legal Entity Certification.** Below is a list of Client entities that are **not** required to complete this form. Please review the list below carefully. If you determine that Client entity is an excluded legal entity, please complete the certification below.

**IF CLIENT CHECKS A BOX BELOW, STOP HERE. YOU DO NOT NEED TO COMPLETE THE REST OF THIS FORM.**

Client certifies, by checking the applicable box below, that it is:
- ☐ a trust created pursuant to a trust agreement or other contractual arrangement (i.e., the trust was not created by a filing with a Secretary of State or similar office - e.g., a statutory business trusts)
- ☐ a publicly held company traded on a U.S. stock exchange
- ☐ a majority-owned subsidiary of a publicly held company traded on a U.S. stock exchange
- ☐ registered with the Securities and Exchange Commission as a registered investment adviser
- ☐ registered with the Securities and Exchange Commission as a registered investment companies
- ☐ a U.S. government agency or instrumentality
- ☐ a public accounting firm registered under Section 102 of the Sarbanes-Oxley Act
- ☐ an entity established under the laws of the U.S. or any State, or of any political subdivision of any State or under an interstate compact
- ☐ opening an account for the purpose of participating in an employee benefit plan under the Employment Retirement Income Security Act of 1974
- ☐ a state-regulated insurance company
- ☐ a "U.S. financial institution" regulated by a federal functional regulator (i.e., federally regulated banks, brokers or dealers, futures commissions merchants and introducing brokers in commodities).
- ☐ a pooled investment vehicle operated or advised by a "U.S. financial institution" or an SEC registered investment adviser

**Non-Profit Corporation Certification (see Excluded Legal Entities above for non-profit trust entities).** Client formed as a non-profit corporation or similar legal entity that does not have ownership interests (including, charitable, nonprofit, not-for-profit, public benefit or similar corporations) are not required to complete the Beneficial Owner sections of this form.

> **IF CLIENT IS A NON-PROFIT CORPORATION, PLEASE COMPLETE THE CERTIFICATION BELOW AND PROCEED TO SECTION IIId.**
> ☐ Client certifies, by checking this box, it is a non-profit corporation or similar legal entity that has filed organizational documentation with the appropriate State authority and, if requested by PNC Bank, National Association, will promptly provide to PNC Bank, National Association, a copy of its certificate of incorporation or certificate of good standing issued by the state in which the Client is incorporated.

**IF CLIENT CANNOT MAKE ANY OF THE CERTIFICATIONS IN THE ABOVE BLUE BOXES, CLIENT MUST COMPLETE SECTION III OF THIS FORM.**

## III. CERTIFICATION OF BENEFICIAL OWNER(S)

**Persons opening or updating an account on behalf of a legal entity must provide the following information:**

a. Name, Type, Address, and Taxpayer Identification Number (TIN) of Legal Entity for Which the Account is Being Opened or Updated (i.e., the Client):

Entity Name: _____

Entity Type (e.g. Corporation, Partnership, etc.): _____

Entity Address: _____

Entity TIN: _____

b. Name and Title of Person Opening or Updating Account:

Name: _____

Title: _____

c. **Beneficial Owner(s):** The following information for <u>each individual</u>, if any, who, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, owns 25 percent or more of the equity interests of the legal entity listed above.

> **If no individual meets the definition of "Beneficial Owner" check the box below and continue to Section III(d).**
> ☐ **Beneficial Owner Not Applicable**

**For U.S. Persons:** *Indicate if you are a U.S. Citizen, U.S. Resident Alien or Immigrant Refugee and provide Social Security Number (SSN)*

**For Non-U.S. Persons:** *Provide SSN, Individual Taxpayer Identification Number (ITIN), Passport or Other Acceptable ID Information*

| Name | % of Owner-ship | Date of Birth | Residential Street Address | For U.S. Persons: | For Non-U.S. Persons: |
|---|---|---|---|---|---|
| | | | | □ U.S. Citizen<br><br>□ U.S. Resident Alien<br><br>□ Immigrant Refugee<br><br>SSN #:<br><br>_____ | Passport or Other Acceptable ID Type:<br><br>_____<br><br>ID #:<br><br>_____<br><br>Country of Issuance:<br><br>_____<br><br>SSN / ITIN #:<br><br>_____ |
| | | | | □ U.S. Citizen<br><br>□ U.S. Resident Alien<br><br>□ Immigrant Refugee<br><br>SSN #:<br><br>_____ | Passport or Other Acceptable ID Type:_____<br><br>ID #:<br>_____<br><br>Country of Issuance:<br><br>_____<br><br>SSN / ITIN #:<br><br>_____ |
| | | | | □ U.S. Citizen<br><br>□ U.S. Resident Alien<br><br>□ Immigrant Refugee<br><br>SSN #:<br><br>_____ | Passport or Other Acceptable ID Type:_____<br><br>ID #:<br>_____<br><br>Country of Issuance:<br><br>_____<br><br>SSN / ITIN #: |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| | | | | ☐ U.S. Citizen<br><br>☐ U.S. Resident Alien<br><br>☐ Immigrant Refugee<br><br>SSN #:<br>_____ | **Passport or Other Acceptable ID**<br>Type:_____<br><br>ID #:<br>_____<br><br>Country of Issuance:<br>_____<br><br>SSN / ITIN #:<br>_____ |

**Controlling Party:** The following information for <u>one individual</u> with significant responsibility for managing the legal entity listed above, such as:

- An executive officer or senior manager (e.g., Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, General Partner, Managing Member, President, Vice President, Treasurer); or
- Any other individual who regularly performs similar functions.
  (If appropriate, an individual listed under Section II(c) above may also be listed in this Section III(d)).

**For U.S. Persons:** *Indicate if you are a U.S. Citizen, U.S. Resident Alien or Immigrant Refugee and provide Social Security Number (SSN)*

**For Non-U.S. Persons:** *Provide SSN, Individual Taxpayer Identification Number (ITIN), Passport or Other Acceptable ID Information*

| Name | Title | Date of Birth | Residential Street Address | For U.S. Persons: | For Non-U.S. Persons: |
|---|---|---|---|---|---|
| | | | | ☐ U.S. Citizen<br><br>☐ U.S. Resident Alien<br><br>☐ Immigrant Refugee<br><br><br>SSN #:<br><br>_____ | **Passport or Other Acceptable ID** Type:_____<br><br>ID #:<br><br>_____<br><br>Country of Issuance:<br><br>_____<br><br>SSN / ITIN #:_____ |

Exhibit D - KDID Spillway Replacement Trust Form

EXHIBIT D

_____, 2022

## TRUST AGREEMENT

### KDID Spillway Replacement Trust

This Environmental Remediation Trust Agreement (the "Agreement") is made as of this _____ day of _____ 2022, by and among W.R. Grace & Co. and Kootenai Development Company ("KDC") (collectively herein "Grace"), as settlor and beneficiary; the State of Montana on behalf of its agencies and departments named in the Settlement Agreement (the "State") as beneficiary, (each, individually, a "Party," and collectively, the "Parties"); and PNC Bank, National Association, not in its individual capacity, but solely as Trustee (the "Trustee").

## RECITALS

WHEREAS, Grace and the State have entered into a Settlement Agreement that provides for the formation of this trust, to be administered in the manner described herein.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants and agreements contained herein, and pursuant to the Settlement Agreement, the Parties and the Trustee hereby agree as follows:

### ARTICLE I
### DEFINITIONS

1.1    Definitions. The following terms as used in this Agreement shall have the definitions given below:

    1.1.1    "Account Statement" shall have the meaning given in Section 5.1.

    1.1.2    "Agreement" shall be this Trust Agreement.

    1.1.3    "Beneficiaries" means the State and Grace.

    1.1.4    "Condition of Early Termination" shall mean each of the conditions of termination set out in Sections 6(a)(iii), 6(d)(i), or 6(e) of the Settlement Agreement. The terms in the Settlement Agreement shall control whether a Condition of Early Termination exists, however, such conditions are summarized generally here for convenience:

        (a)    Section 6(a)(iii): United States Environmental Protection Agency declines the opportunity to become a primary beneficiary of the Surety Bond or Financial Assurance Trusts, and requests and requires, and a Grace Party provides, financial assurance for KDID O&M and/or KDID Spillway Work as part of an agreement, decree, or order that exceeds the value and scope of the financial assurance provided in this Settlement Agreement for KDID O&M and/or KDID Spillway Work;

(b)    Section 6(d)(i): The KDID is required to be removed, substantially or completely; or

(c)    Section 6(e): Grace (or any merged successor entity that assumes Grace's obligations to the State under the Settlement Agreement) ceases to exist or fails to continue to operate as a going concern.

1.1.5    "Court" means the Court of Common Pleas of Allegheny County of the Commonwealth of Pennsylvania, or, if that Court abstains from exercising jurisdiction or is otherwise without jurisdiction over any matter arising out of this Agreement, the Commonwealth of Pennsylvania court otherwise having competent jurisdiction with respect to such matters. The term "Court" does not refer to or include the federal bankruptcy court that enters the Settlement Agreement, which court shall have no continuing involvement with the administration of this Trust.

1.1.6    "DNRC" shall have the meaning set forth in the Settlement Agreement.

1.1.7    "Environmental Remediation" means actions taken and costs paid in accordance with as provided under Treasury Regulations § 301.7701-4(e)(1), including the costs of assessing environmental conditions, monitoring remedial activities, preventing future releases, and otherwise implementing the requirements of the Settlement Agreement.

1.1.8    "Internal Revenue Code" or means the Internal Revenue Code of 1986, as amended; and "Treasury Regulations" means regulations promulgated under the Internal Revenue Code and published in Title 26 of the Code of Federal Regulations, as amended.

1.1.9    "Including" shall not be read restrictively, and shall mean including but not limited to.

1.1.10    "KDID" shall have the meaning set forth in the Settlement Agreement.

1.1.11    "KDID O&M Performance Trust" shall have the meaning set forth in the Settlement Agreement.

1.1.12    "KDID Spillway" shall have the meaning set forth in the Settlement Agreement.

1.1.13    "KDID Spillway Work" shall have the meaning set forth in the Settlement Agreement.

1.1.14    "KDID Spillway Work Costs" shall include, without limitation, (x) all costs incurred to conduct KDID Spillway Work (including funding for all work and associated activities, planning, implementation, post-implementation tasks, and costs for materials and equipment necessary or reasonable for purposes of conducting KDID Spillway Work), (y) all costs incurred for purposes related to the KDID Spillway or the KDID in accordance with a post-2072 written agreement of the Parties submitted to the Trustee pursuant to Section 3.3.1 of this Agreement (provided that the Trustee shall have no duty to verify or confirm consistency with such post-2072 written agreement), and (z) all fees and expenses (including reasonable consulting and legal fees and expenses) associated with the Trustee's activities hereunder.

1.1.15  "Nonperformance Determination" shall have the meaning set forth in the Settlement Agreement.

1.1.16  "Parties" under this Agreement shall have the meaning given in the preamble.

1.1.17  "Settlement Agreement" means the Settlement Agreement between W.R. Grace & Co. and the State, dated as of _____, 2022, negotiated and entered to settle the claim number 18496-1 in *In re W.R. Grace & Co., et al.*, before the United States Bankruptcy Court for the District of Delaware, under Case No. 01-011139 (AMC), as amended by W.R. Grace & Co. and the State hereafter, in accordance with the terms of the Settlement Agreement.

1.1.18  "State" shall have the meaning given in the preamble.

1.1.19  "Statement" shall have the meaning given in Section 3.2.1(a).

1.1.20  "Trust" means the KDID Spillway Replacement Trust established pursuant to this Agreement.

1.1.21  "Trust Assets" means the funds transferred to, or earned by, the Trust pursuant to this Agreement.

1.1.22  "Trustee" means the trustee of the Trust.  At any time that multiple trustees are acting, the term "Trustee" shall apply to each of the co-trustees.

1.2    Other.  To the extent a term in this Agreement is not defined above, to the extent practicable, such term shall have the meaning provided, if any, in the Settlement Agreement.

## ARTICLE II
## CREATION AND MANAGEMENT OF TRUST ASSETS

2.1    Objectives and Purposes.

2.1.1  General.  The exclusive objectives and purposes of the Trust are to collect and disburse funds for KDID Spillway Work Costs, as required under the Settlement Agreement, with no objective or authority to engage in any trade or business.  Subject to Section 3.3.1 of this Agreement, all payments and disbursements from the Trust by the Trustee shall be made and applied solely for these purposes, it being understood and agreed that any payments to the Trustee pursuant to this Agreement are in furtherance of such purposes; and at no time shall the Trust (or the Trustee on behalf of the Trust) conduct investment or business activities that compromise these purposes.

2.1.2  Tax Status.  Initially, Grace intends, but is not required to ensure, that the Trust constitutes an "environmental remediation trust," as provided by Treasury Regulations §301.7701-4(e); and the Trust shall at all times be administered, and all provisions of this agreement shall be construed, in a manner that is consistent with such intent. At any time, however, , Grace may take such steps as are required to elect to treat the Trust as a "qualified settlement fund," as

provided by Treasury Regulations §1.468B-1; and, following such election, the Trust shall at all times be administered, and all provisions of this agreement shall be construed, in a manner that is consistent with such intent. Grace intends that it be considered to be the Trust's "administrator," within the meaning of Treasury Regulations. Neither the State nor the Trustee shall have any duty or obligation in connection with the tax treatment of the Trust, other than to cooperate in good faith with Grace in connection therewith. Grace shall be solely responsible for ensuring compliance with the Regulations required of an environmental remediation trust or qualified settlement fund, as the case may be. Neither the State nor the Trustee shall be responsible for preparing or filing any reports or returns relating to federal, state, or local income taxes with respect to this Agreement other than the Trustee preparing or filing returns or reports for the Trustee's compensation; provided, that the Trustee hereby is authorized to execute and deliver any tax returns in such forms presented to it and shall have no liability with respect to the preparation or content of such tax returns. With respect to any amounts payable under this Agreement, the Parties shall deliver to the Trustee such tax forms or other documents reasonably requested by the Trustee as shall be prescribed by the Internal Revenue Code or other applicable law at such time or times reasonably required by the Trustee, including such tax forms or other documents, as applicable, to allow the Trustee to determine the amount to deduct or withhold (and to allow the Trustee to so deduct or withhold) pursuant to the Internal Revenue Code, including under Sections 1471 through 1474 of the Code (FATCA). Without limiting any other provision of this Agreement, the State expresses no opinion and makes no agreements regarding the tax status of the Trust, but leaves such matters and the resulting tax consequences to Grace's discretion.

2.2    <u>Creation of and Transfer of Assets to the Trust</u>.

2.2.1    <u>Establishment of Trust</u>. The Parties hereby irrevocably establish the Trust, which shall bear the name "KDID Spillway Replacement Trust." Within five (5) business days of the date hereof, the Trustee shall establish a trust account (the "<u>Trust Account</u>"). The purpose of the Trust Account shall be to receive and administer the Trust Assets and to facilitate the making of payments hereunder, all in accordance with this Agreement. Grace shall contribute the Trust Assets to the Trust in the manner and at the times set forth in the Settlement Agreement. The State shall have no obligation to contribute assets or property to the Trust at any time. The Trustee hereby accepts and agrees to hold the Trust Assets in the Trust Account for the benefit of the Beneficiaries for the purposes described in Section 2.1, subject to the terms of this Agreement. The Trustee shall have no responsibility, and assumes no liability, to pursue collection of Trust Assets to be contributed under the Settlement Agreement from any source. Instead, all obligations with respect to the Settlement Agreement's requirements for funding of the Trust are to be solely exercised by Grace.

2.2.2    <u>Ownership Trust Assets</u>. All legal rights and incidents of ownership of the Trust Assets shall be held solely by the Trustee. However, except and until otherwise provided in this Agreement, Grace shall be treated as the owner of the Trust Assets for federal income tax purposes pursuant to Treasury Regulations § 301.7701-4(e)(2).

2.2.3    <u>Additional Contributions</u>. The Trustee is authorized to accept contributions to the Trust from, and only from, the Parties. The Trustee is not required to accept any contribution that the Trustee believes is not appropriate for administration as part of the Trust Assets.

2.3    Investment and Safekeeping of Trust Assets.

2.3.1    Segregation of Trust Assets.  The Trust Assets shall be held in trust and segregated from all, and shall not be comingled with any, other assets of Grace, the State or the Trustee.

2.3.2    Investment Requirements.  The Trustee shall have the authority to invest the Trust Assets in such a manner as the Trustee deems appropriate in the Trustee's discretion and in accordance with the guidelines applicable to the Trust Account set forth in this Section 2.3 (the "Investment Policy"), as may be amended in writing from time to time by Grace, the State and the Trustee. The Trustee shall consult initially and from time to time with Grace and the State regarding the nature and allocation of investments of the Trust Assets.  All investment transactions effected for the Trust Account shall be deemed in compliance with the Investment Policy unless Grace or the State notifies Trustee in writing of its objection within sixty (60) days of its receipt of the most recent Account Statement pursuant to Section 5.1 of this Agreement.  The compliance of an investment with the Investment Policy shall be determined on the date of purchase, based on the market value and asset class or type as of that date compared to the value of the Trust Account as of the most recent valuation date.

2.3.3    Investment Provisions.

(a)    Cash Sweep Vehicle. Grace authorizes the Trustee to automatically sweep uninvested cash balances in the Trust Account into (i) any money market mutual fund that (A) complies with the criteria set forth in (I) Securities and Exchange Commission Rule 2a-7 under the Investment Company Act of 1940, as amended, or (II) Securities and Exchange Commission Rule 3c-7 under the Investment Company Act of 1940, as amended, and (B) has portfolio assets of at least $5,000,000,000 or (ii) any bank deposit account offered by a commercial bank which has a combined capital and surplus and undivided profits of not less than $500,000,000, in each chosen by Trustee (referred to as "sweep vehicles"), which may include sweep vehicles advised by the Trustee and/or its affiliates or deposit accounts at the Trustee or an affiliated bank.  Grace understands that Trustee will derive financial benefits from affiliated sweep vehicles (including PNC Bank, National Association deposit sweep accounts), which benefits are in addition to the fees set forth in the Schedule of Account Fees described in Section 4.5 of this Agreement.

(b)    Investments in Other Securities.  Grace authorizes the Trustee to invest in: (i) direct obligations of, or obligations the principal of and interest on which are directly and fully guaranteed or insured by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America); (ii) investments in commercial paper having, at such date of acquisition, a credit rating of at least A-2 from S&P or P-2 from Moody's; (iii) repurchase agreements with a term of not more than 180 days for securities described in clause (i) of this sentence and entered into with a financial institution satisfying the criteria described in clause (ii) of Section 2.3.3(a); (iv) corporate debt obligations with a Moody's rating of at least A3 or an S&P rating of at least A-, or their equivalent; (v) shares or units issued by a company that is registered as an investment company under the Investment Company Act of 1940, as amended, that is traded on a national securities exchange and has a rating of at least four stars from Morningstar, Inc.; and (vi) any other security approved in writing by Grace and the State (collectively, "Other Securities").  "Moody's" means Moody's Investors

Service, Inc. "S&P" means Standard & Poor's Rating Services, a Standard & Poor's Financial Services LLC business. In each case, Grace understands that the Trustee may receive financial or advisory fees related to the issuance of the security or instrument, including securities or instruments for which Trustee (or its affiliates) serve(s) as manager, promoter or placement agent or where Trustee (or its affiliates) has issued, structured or underwritten the Other Securities.

      (c)   Disclosure Regarding Use of Affiliated Products and Services. Grace understands and agrees that the Trustee may, if appropriate for the Trust Account, (i) invest in Funds or Other Securities that are affiliated with Trustee and that these affiliated investments may constitute all of the investments in the Trust Account; (ii) engage subadvisors affiliated with the Trustee to manage all or a portion of the assets in the Trust Account; and/or (iii) engage model portfolio providers in connection with management of assets in the Trust Account. Grace further understands that the Trustee may derive financial and other benefits as a result of the Trustee purchasing Funds or Other Securities affiliated with Trustee or utilizing subadvisors and/or model portfolio providers affiliated with Trustee.

      (d)   Disclosure Regarding Additional Fund Fees. Grace understands that the Trustee (and/or its affiliates) may provide advisory or other services to a company that is registered as an investment company under the Investment Company Act of 1940, as amended, (a "Fund") which is selected for the Trust Account and that the Trustee may receive advisory, recordkeeping, administrative, shareholder servicing, and/or other fees for such advisory and other services. These types of fees are paid, directly or indirectly, by the Fund to the Trustee (and/or its affiliates) and are described in detail in the prospectus, private offering memorandum or other offering documents for the Fund. Grace should carefully read these documents since these fees will ultimately be borne by the Trust as an investor in the Fund through the net asset value of the Fund and cost of Fund shares or units. Fees received by the Trustee from the Funds are in addition to the compensation paid to the Trustee under this Agreement and may result in the Trust paying multiple layers of fees for the same asset. Purchases of Fund shares will be made in accordance with Trustee's standard practices in effect from time to time.

      (e)   Special Disclosures for Fund Shares. Grace understands that Funds and Other Securities available through the Trustee are not backed or guaranteed by the Trustee (or its affiliates), are not bank deposits and are not insured by, issued by, guaranteed by or obligations of the Federal Deposit Insurance Corporation, the Federal Reserve Board or any other government agency. Such Funds and Other Securities involve investment risks, including possible loss of value. There is no assurance that sweep vehicles will be able to maintain a stable net asset value of $1.00 per share. For more complete information about Funds, including charges and expenses, Grace shall refer to the prospectus, private offering memorandum or other offering documents for the Funds. Grace acknowledges (i) that it understands the information set forth in this Section 2.3.3 and (ii) receipt and review of the prospectus or summary prospectus, private offering memorandum or other offering documents for the selected Funds.

      (f)   Trustee Selected Brokers. Grace agrees that in cases where the Trustee selects brokers for trades, the Trustee may select brokers that are not affiliated with Trustee or brokers that are affiliated with Trustee. Grace consents to transactions for the Trust Account being executed through brokers affiliated with the Trustee in accordance with this Agreement and the affiliated broker's execution policies. Grace may revoke the consent provided in this Section

at any time by directions to the Trustee. If the Trustee buys or sells securities for which an affiliated broker acts as a dealer or underwriter, the Trustee may buy those securities from, or sell those securities to, either the affiliated broker or a member of an underwriting syndicate of which an affiliated broker is a member. Grace consents to brokers selected by the Trustee retaining commissions, including an affiliate of the Trustee. Grace further agrees that, if execution is through an affiliated broker, the affiliated broker is entitled to receive and retain, without credit or offset, brokerage commissions, commission equivalents, mark-ups and mark-downs and dealer spreads on transactions effected for the Trust Account, in accordance with the affiliated broker's standard fee schedules. Upon request, the Trustee will provide additional information to Grace concerning commissions, commission equivalents, mark-ups and mark-downs and other transaction costs. Grace understands and agrees that the Trustee has an indirect financial incentive to select an affiliated broker to execute transactions in the Trust Account, as it results in compensation to its affiliate.

(g)  Brokerage Fees and Pricing. The Trustee will seek to obtain best execution in selection of brokers (both affiliated and unaffiliated, as applicable) for execution of securities trades for the Trust Account. When selecting brokers the Trustee may take into account the full range and quality of brokerage services including execution capability, trading expertise, accuracy of execution, commission rates, research, reputation and integrity, fairness in resolving disputes, financial responsibility, responsiveness, and any other relevant factors. The Trustee also may consider brokerage and research services provided by brokers even though the Trust Account may not benefit from such research. Broker commission rate is one component of price and a factor considered with other factors. The Trustee will not be obligated to seek the lowest commission rate in advance of a Trust Account transaction or to select brokers based on its purported commission rate. Accordingly, the Trustee shall not be deemed to have acted unlawfully solely for causing Grace to pay a higher commission for a securities trade than other brokers would have charged for the same transaction.

(h)  Aggregation of Trades. The Trustee may, in its sole discretion, but is not required to, combine purchases and sales of securities held in the Trust Account with purchases and sales occurring on the same day of the same securities held in accounts of other clients of the Trustee (or its affiliates). When securities transactions are combined, the actual prices applicable to the combined transactions may be averaged, and the Trust Account and the other accounts may be deemed to have purchased or sold their proportionate shares of the securities involved at the average price then calculated. Grace understands that the Trustee may not be able to seek better pricing or lower costs on securities transactions by combining Trust Account securities transactions as described in this Section 2.3.3(h) and that combined securities transactions may or may not benefit the Trust Account.

2.3.4  Construction of Investment Authority. Nothing in this Section shall be construed as authorizing the Trustee to cause the Trust to carry on any business or to divide the gains therefrom, including the business of an investment company, or a company "controlled" by an "investment company," required to register as such under the Investment Company Act of 1940, as amended. The sole purpose of this Section 2.3 is to authorize the investment of the Trust Assets or any portions thereof as may be reasonably prudent pending use of the Trust Assets for the purposes of the Trust. Each of the Beneficiaries acknowledge and agree to the provisions of Section 2.3.