## ARTICLE III
## DISPOSITION OF TRUST ASSETS

3.1     Distributions for KDID Spillway Work Costs.  The Trustee shall distribute to or for the benefit of Grace (or the State, under the limited conditions described in Section 3.1.2(b) [Early Distribution for Emergency], 3.1.3 [Nonperformance Determination], or Section 3.1.4 [Cessation of Grace]) such amounts, at such times, as Grace or the State may incur as KDID Spillway Work Costs in accordance with the standards prescribed in the Settlement Agreement (which the Trustee shall have no duty to verify or confirm).  Distributions shall be made only in accordance with Statements provided to the Trustee pursuant to the provisions of this Article III.

3.1.1    General Intent.  As provided in the Settlement Agreement, to the greatest extent practicable, the Parties intend that no distributions will be made by the Trustee until January 1, 2126. Beginning January 1, 2126, distributions for KDID Spillway Work Costs may be made from the Trust in accordance with Section 3.2.

3.1.2    Early Distributions. Notwithstanding the Parties' general intent as described in Section 3.1.1, if at any time after January 1, 2072 (a) a written determination by the DNRC Director or its delegee that describes a repair or replacement that is KDID Spillway Work reasonably necessary to perform before 2126, with the engineering basis for such determination is delivered to the Trustee pursuant to Section 5(e)(i) of the Settlement Agreement or (b) the Trustee receives written instruction from the State for the payment of costs to respond to or address an emergency at the KDID Spillway, consistent with the standards and procedures of the Dam Safety Act, MCA 85-15-215, or any superseding law pursuant to Section 5(e)(ii) of the Settlement Agreement (which the Trustee shall have no duty to verify or confirm), distributions for such KDID Spillway Work Costs shall be made by the Trustee in accordance with Section 3.2.

3.1.3    KDID Spillway Work Nonperformance Determination. If, at any time after December 31, 2025, DNRC certifies in a writing delivered to Grace and the Trustee, that all requirements have been met for a Nonperformance Determination, including providing Grace an opportunity to cure such nonperformance in accordance with the Settlement Agreement, the State may assume all rights and authorities of Grace under this Agreement with respect to such work described in the Nonperformance Determination, including the right to request and obtain distributions in accordance with 3.2.

3.1.4    Cessation of Grace. Pursuant to Section 6(e) of the Settlement Agreement, upon notice from the State to the Trustee and Grace, accompanied by documentation of the basis for the notice, if Grace (or any merged or successor entity that assumes Grace's obligations to the State under the Settlement Agreement) ceases to exist or fails to continue to operate as a going concern, all rights and authorities of Grace under this Agreement shall automatically and without further action cease, and all Trust Assets shall inure completely to the benefit of the State only without any prerequisite Nonperformance Determination referenced in Section 3.1.3; provided, however, Grace shall have thirty (30) days after such notice to object to any assertion of Grace's cessation in a writing delivered to the Trustee and the State.

3.2     Process for Issuance of Distributions.  The Trustee shall make distributions for KDID Spillway Work Costs under Section 3.1 to Grace or the State (under the conditions described

in Section 3.1.3 or Section 3.1.4, which governs the State's contingent rights to distribution), as the case may be, in accordance with the following provisions.

    3.2.1  <u>Distribution Request</u>. The Beneficiary seeking the distribution shall submit to the Trustee and the other Beneficiary:

        (a)    A statement setting forth the exact amount of the distribution (the "Statement"), upon which the Trustee may conclusively rely;

        (b)    A written certification that the distribution is for KDID Spillway Work Costs within the restricted purposes of the Trust and the Settlement Agreement;

        (c)    For completed work that has already been paid for by the Beneficiary seeking distribution, the invoices and receipts sufficient to demonstrate that work (or the relevant portion thereof) has been performed and payment has been made (which the Trustee shall have no duty to review);

        (d)    For distributions directly to a contractor or vendor (without advance payment by the Beneficiary seeking distribution), a copy of the contract for the performance of the work accompanied by the relevant invoice(s) for payment due to the specified contractor or vendor (which the Trustee shall have no duty to review) and

        (e)    Trustee shall have no responsibility to confirm receipt of any or all required supporting documentation for each distribution or the completeness of any such supporting documentation provided with each distribution request other than to confirm a distribution request has been received from an authorized Beneficiary.

    3.2.2  <u>Distribution Payment</u>. Within three (3) business days after receipt of a distribution request submitted in accordance with Section 3.2.1, the Trustee shall issue such distribution in accordance with the Statement.

    3.3    <u>Terminating Distributions</u>. Upon the conditions, and to the extent, provided in this Section 3.3, the remaining Trust Assets shall be distributed in accordance with this Section 3.3; and the Trust shall terminate.

    3.3.1  <u>By Agreement</u>. At any time after the year 2072 but prior to the full termination of the Trust under Section 3.3.2 or Section 3.3.3, the Beneficiaries may agree, considering all of the relevant circumstances in existence at the time – including the value of the Trust versus the cost of a replacement KDID Spillway – that the Trust should be used for a reasonable and prudent purpose (other than replacement or significant repair of the KDID Spillway) related to the KDID Spillway or the KDID. In that event, the Trustee shall effectuate such terminating distributions as the Beneficiaries jointly direct in writing.

    3.3.2  <u>Upon Expiration of Term</u>. Consistent with the terms of the Settlement Agreement, the Trust shall terminate on the date that is 110 years from the date of this Agreement. The Trustee shall not unduly prolong the duration of the Trust and shall, at the expiration of the period described in the immediately preceding sentence, endeavor to resolve, settle, or otherwise dispose of all claims against the Trust pursuant to written instructions from the Beneficiaries, and

then distribute the remaining Trust Assets to Grace to be used solely for purposes related to the KDID, subject to the prior payment of the Trustee's fees, expenses and indemnities accrued through the date of termination.

3.3.3    Upon Certification of a Condition of Early Termination.    Consistent with the terms of the Settlement Agreement, the Trust shall terminate if either the State or Grace certifies in writing to the Trustee and the other Beneficiary, that a Condition of Early Termination has been met pursuant to Section 6(a)(iii) or Section 6(d)(i) and such other Beneficiary does not within thirty (30) days after actual receipt of such certification object to the termination of the Trust in writing to the Trustee and the Beneficiary making such certification. In accordance with such certification in the absence of objection from the other Beneficiary, the Trustee shall effect terminating distributions of the remaining Trust Assets to Grace, subject to the prior payment of any outstanding Trustee's fees, expenses and indemnities accrued through the date of termination.

## ARTICLE IV
## TRUSTEESHIP

4.1    Appointment. PNC Bank, National Association, not in its individual capacity, but in its representative capacity as Trustee, is hereby appointed to serve as the Trustee to administer the Trust in accordance with the terms of this Agreement, and the Trustee hereby accepts such appointment and agrees to serve in such representative capacity, effective upon the date of this Agreement.

4.2    [Reserved]

4.3    General Authority and Obligations.    The Beneficiaries intend that the Trustee's powers be exercisable solely in a manner that is consistent with, and in furtherance of, the purposes of the Trust set forth in this Agreement, consistent with Settlement Agreement, and not otherwise. The Trustee undertakes to perform such duties, and only such duties, as are specifically set forth in this Agreement. No implied duties, covenants or obligations shall be read into this Agreement. The Trustee shall have the authority to bind the Trust, and any successor Trustee, or successor or assign of the Trust, but shall for all purposes hereunder be acting in its representative capacity as Trustee and not individually. The Trustee shall have no obligations to perform any activities for which the Trust lacks sufficient funds. The Trust and the Trustee shall not and are not authorized to engage in any trade or business with respect to the Trust Assets or any proceeds therefrom.

4.4    Powers. The Trustee shall have the following powers in administering the Trust.

4.4.1    Pennsylvania Law. Except as otherwise provided in this trust agreement, the Trustee shall have all powers granted to trustees under 20 Pa. C.S.§ 7780.5 and 20 Pa. C.S.§ 7780.6..

4.4.2    Additional Powers. Without limiting the Trustee's powers under 4.4.1 in any manner, the Trustee is further authorized to perform any and all acts necessary to accomplish the purposes of the Trust and facilitate the Parties' compliance with the Settlement Agreement, including the execution (including on behalf of the Trust) of agreements, instruments and other documents necessary to implement this Agreement, the Settlement Agreement, or any order of the Court or as may be necessary and proper to carry out the provisions of this Agreement, and, to the

extent directed by the Beneficiaries in writing, the Settlement Agreement. Additionally, the Trustee may, among other things, invest the Trust Assets as provided in this Agreement and file documents in Court on behalf of itself and the Trust.

4.4.3    Limitations on the Trustee's Authority. The Trust and the Trustee shall not and are not authorized to engage in any trade or business with respect to the Trust Assets or any proceeds therefrom. Without limiting the Trustee's right to payment of its fees, expenses and indemnities hereunder, the Trustee shall not make distributions for purposes other than as expressly set forth in Article III of this Agreement. Notwithstanding anything to the contrary in this Agreement, the Settlement Agreement, 20 Pa. C.S.§ 7780.5, 20 Pa. C.S.§ 7780.6 or any other law, the Trustee shall not have the power to resolve any dispute between or among the Beneficiaries, the Parties and/or any other Person regarding the interpretation, application or enforcement of this Agreement or the Settlement Agreement and/or the administration of the Trust, including through mediation, arbitration or other alternative dispute resolution procedures.

4.5    Compensation. The Trustee shall be entitled to receive compensation from Grace for its services under this Agreement in accordance with the Schedule of Account Fees, a copy of which the Trustee delivered to the Beneficiaries with this Agreement. Additionally, brokerage fees and commissions may be charged to the Trust Account in connection with certain securities trades executed by the Trustee and subadvisors in accordance with this Agreement. In consideration for receiving commissions from the Trust Account, brokerage firms may provide Trustee with research, products and other services which may be used to assist Trustee in providing investment advice the Beneficiaries and other clients. Grace authorizes the Trustee to debit the Trust Account (or such other PNC Bank account owned by Grace as Grace may request) for the Trustee's compensation in accordance with the Schedule of Account Fees then in effect and all of the other costs and expenses described above. Within forty-five (45) days after receipt by Grace of a Statement from the Trustee setting forth (a) the amount of any compensation, fees or expenses due to the Trustee, or (b) any amount debited from the Trust Account during the Statement period, Grace shall transfer funds in the amount of such debit, compensations fees or expenses to the Trust to be added to and included as part of the Trust Assets in order to reimburse the Trust in full for any amounts debited from the Trust Account by the Trustee pursuant to this Section 4.5, Section 4.6, Section 4.7 or Article VI. Within one (1) day of the expiration of such forty-five (45) day period, Grace shall notify the State if Grace does not transfer such additional funds to the Trust in accordance with the immediately preceding sentence.

4.6    Limitation on Liability of Trustee.

The following provisions shall govern the Trustee's rights, powers, obligations and duties under this Agreement, notwithstanding anything herein to the contrary:

(a)    Absent actual fraud, bad faith, willful misconduct, gross negligence or a material breach of its obligations under this Agreement as established by a final judgement of the Court no longer subject to appeal: (i) the Trustee shall incur no liability for any action taken or omitted to be taken in accordance with any instruction, direction or request of a Beneficiary that is not inconsistent with the terms of this Agreement, including with regard to distributions under Article III; and (ii) the Trustee shall not be liable for any loss to the Trust or any claim of inequality, partiality or unreasonableness resulting from any action taken in accordance with such direction.

- 11 -

The Trustee shall have no duty or obligation to review or confirm whether any action taken by it pursuant to any such instructions, directions or requests complies with the terms of this Agreement (unless such instruction, direction or request on its face is not consistent with the terms of this Agreement), the Settlement Agreement or any other agreement, order or instrument. The Trustee shall have no duty to provide advice to, or communicate with or warn or apprise, any Beneficiary concerning instances in which the Trustee would or might have exercised the Trustee's own discretion in a manner different from the manner directed by a Beneficiary.

(b)     No provision of this Agreement, the Settlement Agreement, or any Court order shall require the Trustee to expend or risk its own personal funds or otherwise incur any personal financial liability in the performance of any of its duties or the exercise of any of its authorities as Trustee hereunder. Notwithstanding the foregoing, the Trustee shall satisfy from its own funds any liability imposed by a court of competent jurisdiction on account of Trustee's actual fraud, bad faith, willful misconduct, gross negligence or material breach of its obligations under this Agreement.

(c)     The Trustee shall not be deemed to have knowledge of any event or information held by or imputed to any Person (including, an affiliate, or other line of business or division of the Trustee) other than itself in its capacity as Trustee. The Trustee shall not be deemed to have notice or knowledge of any event or information, or be required to act upon any event or information (including the sending of any notice), unless a Responsible Officer of the Trustee receives written notice thereof and such notice references the fact or event. "Responsible Officer" means any officer of the Trustee with direct responsibility for the administration of this Agreement. The availability or delivery (including pursuant to this Agreement) of reports or other documents (including news or other publicly available reports or documents) to the Trustee shall not constitute actual or constructive knowledge or notice of information contained in or determinable from those reports or documents, except for such reports or documents that this Agreement expressly requires the Trustee to review.

(d)     Any Person (i) into which the Trustee may be merged or consolidated, (ii) which may result from any merger, conversion, or consolidation to which the Trustee shall be a party or (iii) which may succeed to all or substantially all of the corporate trust business of the Trustee shall be the successor of the Trustee hereunder, without the execution or filing of any instrument or any further act on the part of any of the parties. For purposes of this Agreement, "Person" means an individual, corporation, company, partnership, association, joint stock company, statutory or common law trust, unincorporated organization, joint venture, governmental authority, limited liability company, limited liability partnership or other entity.

(e)     The Trustee may act directly or through its agents, attorneys, custodians, servicers, managers, nominees or other skilled professionals, and the Trustee shall not be held responsible or liable for, or have any duty to supervise, any action, inaction, misconduct, or negligence of any such Persons selected by the Trustee with due care. Any expenses incurred by the Trustee in acting through agents, attorneys, custodians, services, managers or other skilled professionals shall be debited from the Trust Account in accordance with Section 4.5.

(f)     The Trustee shall not be responsible or liable for special, indirect, punitive, or consequential loss or damage of any kind whatsoever (including loss of profit)

- 12 -

irrespective of whether the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(g)  The Trustee shall be entitled to rely conclusively, without investigation or other action on its part, on statements opinions, certificates, reports, directions, signatures, instruments, notices, advice, requests, waivers, consents, receipts, resolutions, bonds, calculations and other documents purported to be received from any Beneficiary, as contemplated by this Agreement, not only as to due execution, validity and effectiveness, but also as to the truth and accuracy of any information contained therein, and such reliance shall not constitute negligence (or gross negligence), bad faith or willful misconduct in connection with the Trustee's handling of funds or otherwise, and the Trustee shall not be liable or accountable to any Person by reason of such reliance. The Trustee shall not be responsible for the content or accuracy of any such documents provided to the Trustee, and shall not be required to recalculate, certify, or verify any information contained therein.

(h)  The Trustee may, at the expense of the Beneficiaries (i) request, rely on and act in accordance with officer's certificates of the Beneficiaries and opinions of counsel, and (ii) consult with, and request advice from, legal counsel selected by the Trustee as to any matters arising in connection with this Agreement, the interpretation and administration of any of the provisions of this Agreement or the Trustee's rights and obligations under this Agreement. The Trustee shall incur no liability and shall be fully protected in acting or refraining from acting in accordance with such officer's certificates and opinions of counsel and the written or oral advice of such legal counsel selected by the Trustee in good faith.

(i)  The Trustee shall incur no liability if, by reason of any provision of any present or future law or regulation thereunder, or by any force majeure event, including but not limited to any act of God, natural disaster, epidemic, pandemic, quarantine, shelter-in-place or similar directives, guidance, policy or other action by any governmental authority, accidents, labor disputes, disease, national emergency, loss or malfunction of utilities or computer software or hardware, the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility, acts of war, terrorism, insurrection, revolution or other circumstances beyond its reasonable control, the Trustee shall be prevented or forbidden from doing or performing any act or thing which the terms of this Agreement provide shall or may be done or performed, or by reason of any exercise of, or failure to exercise, any discretion provided for in this Agreement.

(j)  The Trustee shall not be required to take any action hereunder if it shall have reasonably determined, or shall have been advised by its counsel, that such action is likely to result in liability on the part of the Trustee or is contrary to the terms hereof or is not in accordance with applicable laws.

(k)  Any permissive or discretionary act or privilege of, or right or power conferred upon, the Trustee enumerated in this Agreement shall not be deemed to be or otherwise construed as a duty or obligation, and the Trustee shall not be personally liable or accountable for the performance of any such act, privilege, right or power except as otherwise expressly provided herein.

- 13 -

(l)    The Trustee shall not be held responsible or liable for or in respect of, and makes no representation or warranty with respect to (i) the preparation, filing, correctness or accuracy of any financing statement, continuation statement or recording of any document (including this Agreement) or instrument in any public office at any time, or (ii) the monitoring, creation, maintenance, enforceability, existence, status, validity, priority or perfection of any security interest, lien or collateral or the performance of any collateral.

(m)    The Trustee shall not be held responsible or liable for or in respect of, and makes no representation or warranty with respect to, the correctness or enforceability of the recitals contained in this Agreement or in any related document.

(n)    The Trustee shall not be held responsible or liable for, and shall have no duty to supervise, investigate or monitor, the actions or omissions of any other Person, including the Beneficiaries, in connection with this Agreement or otherwise, and except as expressly set forth in Article III of this Agreement, the Trustee may assume performance by all such Persons of their respective obligations.

(o)    In the event that (i) the Trustee is unsure as to the application or interpretation of any provision of this Agreement, (ii) this Agreement is silent or is incomplete as to the course of action that the Trustee is required or permitted to take with respect to a particular set of facts, or (iii) more than one methodology can be used to make any determination to be performed by the Trustee hereunder, then the Trustee may give written notice to the Beneficiaries requesting joint written instruction and, to the extent that the Trustee acts or refrains from acting in good faith in accordance with any such written instruction, the Trustee shall not be personally liable to any Person. If the Trustee shall not have received such written instruction within ten (10) days of delivery of notice to the Beneficiaries (or within such shorter period of time as may reasonably be specified in such notice or as may be necessary under the circumstances) it may, but shall be under no duty to, take or refrain from taking any action, and shall have no liability to any Person for such action or inaction.

(p)    In order to verify Grace's identity and/or determine the authority of the person opening the Account, both W.R. Grace & Co. and KDC must submit to the Trustee a completed Certification Regarding Beneficial Owners of Legal Entity Customers attached as Appendix II to this Agreement at the time the Account is opened and at such other times as the Trustee may request. Grace agrees that if requested by the Trustee, Grace will provide copies of its governing documents and any other documentation requested by the Trustee to verify the information provided on Appendix II. Grace understands, however, that the Trustee assumes no responsibility and has no obligation to review Grace's governing documents for any purpose other than to verify Grace's identity and/or the authority to open the Trust Account. Grace certifies that it is authorized to disclose the information provided in the Certification Regarding Beneficial Owners of Legal Entity Customers and, to the best of its knowledge, certifies that the information is complete and correct. Grace authorizes the Trustee to share the information provided in the Certification Regarding Beneficial Owners of Legal Entity Customers with any individual authorized to open or update the Trust Account.

(q)     The Trustee shall have no notice of, shall not be subject to, and shall not be required to comply with, any other agreement unless the Trustee in any capacity is a party thereto and has executed the same, even though reference thereto may be made herein.

(r)     Whenever the Trustee (a) receives any amounts, the application or disposition of which is not clearly addressed hereunder, (b) determines that it is uncertain about how to distribute any amounts which it has received, or (c) determines that there is any dispute among the Beneficiaries hereto about how such amounts should be distributed, the Trustee may choose to defer distribution of the amounts which are the subject of such uncertainty or dispute. If the Trustee in good faith believes that the uncertainty or dispute will not be promptly resolved, the Beneficiaries agree that the Trustee shall have the right, at its option, to deposit with, or commence an interpleader proceeding in respect of, such amounts in the Court for a determination by the Court as to the correct application of such amounts hereunder.

(s)     Each of the Beneficiaries hereby agrees that (y) the Trustee (A) except as otherwise expressly set forth herein, has not provided nor will it provide in the future, any advice, counsel or opinion regarding this Agreement or the transactions contemplated hereby, including with respect to the tax, financial, investment, securities law or insurance implications and consequences of the consummation, funding and ongoing administration of this Agreement or the initial and ongoing selection and monitoring of financing arrangements, (B) has not made any investigation as to the accuracy or completeness of any representations, warranties or other obligations of any Person under this Agreement or any other document or instrument (other than the Trustee's representations and warranties, if any, expressly set forth in this Agreement) and shall not have any liability in connection therewith and (C) has not prepared or verified, nor shall it be responsible or liable for, any information, disclosure or other statement in any disclosure or offering document delivered in connection with this Agreement; and (z) it will make its own decisions regarding its rights and protections and will not rely on the Trustee regarding such decisions.

(t)     All written directions given by any Beneficiary to the Trustee relating to the Trust Assets must be in writing, signed by a representative of such Beneficiary identified on Appendix I hereto (an "Authorized Person") and delivered to the Trustee, as such Appendix I may be amended from time to time by a Beneficiary by notice to the Trustee delivered in accordance with this Agreement. Directions may be delivered to the Trustee in person or by U.S. Mail, overnight courier, facsimile or email. Email directions will be deemed authorized and signed by an Authorized Person if sent from an email address provided in Appendix I (Authorized Persons) attached to this Agreement, as the same may be updated from time to time by the Beneficiaries and delivered to the Trustee ("Authorized Persons List"), with visible electronic copies to all other Authorized Persons. The Trustee will have no liability under this Agreement for relying on and acting upon any form of directions which it believes to be genuine. If an Authorized Person uses email to send directions to the Trustee, the applicable Beneficiary will cause all Authorized Persons to send emails from the email address provided in the Authorized Persons List. The Trustee will assume that all emails sent from a designated email address have been authorized and sent by an Authorized Person, until either Beneficiary notifies the Trustee by delivery of an updated Authorized Persons List that the email address is no longer valid. All emails sent by the Trustee to an Authorized Person's designated email address will be deemed delivered when sent by the Trustee; however, nothing in this Section shall reduce the Trustee's obligations

- 15 -

to provide certain notices by means other than email in accordance with Section 6.7. With respect to notice for which only email is required pursuant to this Agreement, each Beneficiary waives all claims resulting from an Authorized Person's failure to receive sent emails. The Trustee will be deemed to have received and accepted directions (and obligated to act on the directions) only when the Trustee has received and had a reasonable time, taking into account the manner and nature of the directions, to review the directions and confirm to the applicable Beneficiary that the directions have been accepted by the Trustee. Under no circumstances will telephone, telephone voice messaging, and other forms of telephonic, oral communication, text, skype or other forms of instant messaging constitute valid and effective directions under this Agreement. The Trustee's execution of any directions requires a commercially reasonable period of time for processing and is subject to the Trustee's internal policies and procedures, customary processing guidelines and securities deadlines, mutual fund company processing deadlines, and applicable market closings.

(u)    The Trustee shall not be liable for failing to comply with its obligations under this Agreement or any related document in so far as the performance of such obligations is dependent upon the timely receipt of directions and/or other information from any Beneficiary which are not received or not received by the time required. The Trustee shall not have any responsibility for the accuracy of any information provided to any other Person that has been obtained from, or provided to the Trustee by, any Beneficiary.

4.7    Exculpation and Indemnification. The Trustee shall not be personally liable for any claim, cause of action, or other assertion of liability arising out of or in relation to the discharge of the powers and duties conferred upon the Trust and/or Trustee by the Settlement Agreement or this Agreement unless the Court, by a final order that is not reversed on appeal, finds that the Trustee committed actual fraud, bad faith, willful misconduct, or gross negligence or materially breached its obligations under this Agreement in relation to those powers or duties. There shall be an irrebuttable presumption that any action taken or not taken with the express approval of the Court does not constitute an act of actual fraud, bad faith, willful misconduct, or gross negligence or a material breach of this Agreement. Except as set forth in the preceding sentence, the Trustee shall have no liability for any action taken, or errors in judgment made, in good faith by it or any of its officers, employees or agents. Nothing in this Agreement shall be construed to exculpate the Trustee from any liability resulting from any act or omission constituting actual fraud, willful misconduct, or gross negligence or a material breach of this Agreement (in each case as determined by a final, non-appealable order from a court of competent jurisdiction).

To the fullest extent permitted by law and without prejudice to any separate agreement relating to indemnification of the Trustee, Grace shall indemnify, protect, defend and hold harmless the Trustee (in its capacity as such and in its individual capacity), its affiliates and their respective directors, officers, employees, shareholders, representatives, trustees, grantors, beneficiaries, certificate holders, members, agents, attorneys, accountants and their heirs, successors and permitted assigns (each, an "Indemnified Person") from and against any and all fees, expenses, damages, losses, claims, liabilities, penalties, causes of action, demands, judgments, taxes (excluding any taxes of the Trustee on, or measured by, compensation received by the Trustee), suits or costs (in each case including reasonable attorneys' fees and expenses, court costs and costs of investigation) of any kind or nature whatsoever arising out of or in connection with this Agreement that may be imposed upon, incurred by or asserted against such Indemnified Person, including in connection with (i) the exercise or performance of any of the Trustee's rights, powers

- 16 -

or duties hereunder, and (ii) any enforcement (including any dispute, action, claim or suit brought) by the Trustee of any indemnification or other obligation of Grace (each of the foregoing, a "Claim"); provided, that Grace shall not be required to indemnify an Indemnified Person for any Claim resulting from such Indemnified Person's actual fraud, gross negligence, bad faith or willful misconduct or material breach of this Agreement (in each case, as determined by a final, non-appealable order from a court of competent jurisdiction). Notwithstanding the foregoing, unless and until a final, non-appealable order of a court of competent jurisdiction determines that an Indemnified Person acted with gross negligence, bad faith or willful misconduct or materially breached this Agreement, Grace shall advance or reimburse, as reasonably determinable by the Trustee, any and all amounts due to such Indemnified Person pursuant to the foregoing indemnity.

4.8    Termination / Resignation of the Trustee. The duties, responsibilities, and powers of the Trustee will terminate on the date the Trust is terminated in accordance with this Agreement, or by an order of the Court. Further, the Trustee may resign at any time by giving at least thirty (30) days prior written notice thereof to the Beneficiaries and any Co-Trustee; and the resignation shall become effective upon the delivery of the Trust Assets to the successor Trustee appointed under 4.10. Sections 4.5 through 4.7 above shall survive the termination or assignment of this Agreement and the resignation or removal of the Trustee.

4.9    Replacement. The Trustee may be removed, with or without cause, and replaced upon thirty (30) days written notice by a joint written determination of the Beneficiaries. The removal shall become effective upon the delivery of the Trust Assets to the successor Trustee appointed under 4.10.

4.10    Appointment of Successor Trustee. If, at any time a successor Trustee is required for any reason, such successor shall be jointly appointed in writing by the Beneficiaries. Any successor Trustee appointed hereunder shall execute an instrument accepting such appointment hereunder and shall file such acceptance with the Parties. Thereupon, such successor Trustee shall, without any further act, become vested with all the properties, rights, powers, trusts, and duties of its predecessor in the Trust with like effect as if originally named herein; and a removed or resigning Trustee shall, when requested in writing by the successor Trustee, execute and deliver an instrument or instruments conveying and transferring to such successor Trustee under the Trust all the Trust Assets in the custody of such predecessor Trustee. A successor Trustee appointed under this 4.10 shall be a national banking association, or bank or trust company chartered under the laws of Pennsylvania, having a capital and surplus of at least $200,000,000. If no successor Trustee is timely appointed, and shall have timely accepted such appointment, then the Trustee may, at the sole expense of Grace (including with respect to attorney's fees and expenses), petition the Court for the appointment of a successor Trustee.

4.11    No Bond. Notwithstanding any state law to the contrary, the Trustee, including any successor Trustee, shall be exempt from giving any bond or other security in any jurisdiction.

## ARTICLE V
## TRUST RECORDS, TAX REPORTING

5.1    Accounting. The Trustee will provide quarterly statements to the Beneficiaries that include a listing of all transactions, receipts, and disbursements during the preceding quarter,

together with a current listing of the Trust Assets held in the Trust Account ("Account Statements"). Each of the Beneficiaries agrees that the Account Statements in a form customarily used by the Trustee with respect to its trust accounts are acceptable as confirmation of all Trust Account transactions. Each of the Beneficiaries understands that it may, at no additional cost, request from Trustee a more detailed transaction report which may be Trustee's form of confirmation or a broker dealer's confirmation, as applicable. Upon receipt of Account Statements, each of the Beneficiaries agrees to promptly review them and to file any objections within sixty (60) days after the receipt of the Account Statement. If no objection is received by Trustee within the sixty (60)-day period, the Account Statement will be deemed approved and ratified by the Beneficiaries and will be final and binding on the Beneficiaries. On or before February 1 of each calendar year, the Trustee shall provide the Beneficiaries with a statement reflecting the Trust Assets' balance, as of December 31 of the immediately preceding year; summarizing all Trust transactions from such preceding year.

5.2     Trust Records. The Trustee shall maintain proper books, records, and accounts relating to all transactions pertaining to the Trust, and the assets and liabilities of the Trust, in such detail and for such period of time as may be necessary to enable the Trustee to make full and proper accounting required under the Section 5.1 and to comply with applicable provisions of law and good accounting practices; and the Beneficiaries shall have the right, upon reasonable advance written notice delivered to the Trustee, to inspect such books and records. Except as otherwise provided herein, or as reasonably directed by the Beneficiaries in writing, the Trustee shall not be required to file any accounting or seek approval of the Court with respect to the administration of the Trust, or as a condition for making any payment or distribution out of the Trust Assets.

5.3     Tax Information. Subject to definitive guidance from the Internal Revenue Service or a judicial decision to the contrary, the Trustee shall furnish to Grace or any other party contributing Trust Assets to the Trust such statements and additional information as to items of income, deduction, and credit of the trust for that tax year attributable to the portion of the Trust treated as owned by that party in accordance with Treasury Regulations § 1.671-4 and § 301.7701-4(c)(2).

5.4     The Beneficiaries may elect to register to use password protected sections of websites sponsored by PNC Bank, National Association through which the Beneficiaries can access the Trust Account ("Sites"). The Beneficiaries will be required to accept a website user agreement(s) for the Sites (the "Website Agreement"). If there is a conflict between the terms of a Website Agreement and this Agreement, the terms of the Website Agreement will apply to the Parties' use of the Site.

5.5     Tax Reporting. To the extent directed in writing by the Beneficiaries, the Trustee shall also file (or cause to be filed) any other statements, returns, or disclosures, each in the form presented to the Trustee, for filing relating to the Trust that are required by any applicable governmental unit (which the Trustee shall have no duty to verify or confirm).

**ARTICLE VI**
**MISCELLANEOUS PROVISIONS**

6.1    Amendments and Waivers.  Any provision of this Agreement may be amended or waived only by mutual written consent of the Trustee, the State, and Grace.  Consent will not be unreasonably withheld for an amendment proposed by Grace  the sole effect of which is to further the Trust's qualification as an "environmental remediation trust," provided that such change does not affect the substantive rights or obligations of the Parties or the Trustee. All fees, costs and expenses (including reasonable attorneys' fees, costs and expenses) incurred by the Trustee in connection with any amendment or waiver shall be payable by Grace.

6.2    Tax Treatment.  The Trust created by this Agreement is intended by Grace to be treated as an Environmental Remediation Trust for federal income tax purposes and, to the extent provided by law, this Agreement shall be governed and construed in all respects consistent with such intent.

6.3    Cooperation.  The Trustee shall take such actions and execute such documents as are reasonably requested by the Beneficiaries in writing with respect to effectuating the Settlement Agreement and this Agreement and the transactions contemplated thereby. To the extent that the Beneficiaries request the Trustee to take such an action, the Trustee shall do so at the sole expense of Grace, who agree to separately fund and pay such expense(s).

6.4    Governing Law; Jurisdiction; Jury Trial.  The Trust Assets, the rights, duties, and obligations arising under this Trust Agreement shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth of Pennsylvania without giving effect to the principles of law thereof that would require the application of the laws of any other jurisdiction. Each of the signatories hereto irrevocably submits to the non-exclusive jurisdiction of any State or Federal court sitting in Allegheny County, Pennsylvania in respect of any action or proceeding pertaining solely to the construction of the Trust Agreement or the administration of the Trust. Each party to this agreement irrevocably waives, to the fullest extent permitted by applicable law, any objection or defense that it may now or hereafter have to the laying of venue of any such proceedings pertaining solely to the construction of the Trust Agreement or the administration of the Trust in any such court and any claim that any proceeding brought in any such court has been brought in an inconvenient forum.  EACH PARTY HERETO HEREBY WAIVES THE RIGHT THAT IT MAY HAVE TO A TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION PERTAINING SOLELY TO THE CONSTRUCTION OF THE TRUST AGREEMENT OR THE ADMINISTRATION OF THE TRUST, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.  EACH OF THE SIGNATORIES HERETO HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS, COMPLAINT AND OTHER PROCESS ISSUED IN ANY SUCH ACTION OR SUIT AND AGREES THAT SERVICE OF SUCH SUMMONS, COMPLAINT AND OTHER PROCESS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO IT AT ITS NOTICE ADDRESS AS PROVIDED HEREIN AND THAT SERVICE SO MADE SHALL BE DEEMED COMPLETED UPON SIGNATORY'S ACTUAL RECEIPT THEREOF. Nothing in this Paragraph 6.4 shall be construed to establish choice of law,

jurisdiction, or venue, or waive any jury rights that may exist in connection with any proceeding not solely pertaining to the construction of the Trust Agreement or the administration of the Trust..

6.5    Situs. The initial situs of the Trust shall be the State of Pennsylvania. With the written consent of the Beneficiaries, the Trustee shall have the power to remove all or part of the Trust Assets or to change the situs of administration of the Trust from one jurisdiction to another within the continental United States, and to elect, by a separate acknowledged instrument filed with the Trust records, that, notwithstanding Section 6.4, the law of such other jurisdiction shall govern the administration of the Trust, provided that the Trustee shall not make such an election if it would alter any beneficial interest under the Trust. The Trustee's authority to change the situs of administration of the Trust and elect that the laws of another jurisdiction shall thereafter govern the administration of the Trust does not impose a duty on the Trustee to monitor the laws of any jurisdiction other than the jurisdiction in which the Trust is then administered.

6.6    Severability. If any provision of this Agreement, or application thereof to any person or circumstance, shall be determined by the Court in a final judgment no longer subject to appeal to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Agreement shall be valid and enforced to the fullest extent permitted by law consistent with the intent of the Parties to allow funds for KDID Spillway Work to be available at relevant times.

6.7    Sufficient Notice. Subject to Section 4.6(t), any notice or other communication required under this Agreement shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if: (a) sent by email; and (b) with respect to any notice or other communication required pursuant to Sections 3.1.4, 3.3, 4.5, 4.6(o) or 4.8, also (i) sent through a nationally recognized reliable overnight delivery service, or (ii) deposited, registered or certified mail and first class postage prepaid, in a post office or letter box addressed to the person for whom such notice is intended, to the name and address set forth below, or (iii) personally delivered to such other address provided in writing to the other Parties hereto by an authorized representative of the respective Party.

As to the State of Montana:

Montana Department of Environmental Quality
PO Box 200901
Helena, MT 59620-0901
asteinmetz@mt.gov
Attention: Amy Steinmetz

Montana Natural Resource Damage Program
P.O. Box 201425
Helena, MT 59620-1425
Attention: Libby Asbestos Superfund Site Settlement Agreement
nrdp@mt.gov
with a copy (which shall not constitute notice) to: khausrath@mt.gov, HarleyHarris@mt.gov, and jessica.wilkerson@mt.gov.

KDW COMMENTS
10/1/22

## APPENDIX I

### AUTHORIZED PERSONS

The following named persons are officers, fiduciaries, agents, partners or other authorized persons duly elected or appointed and authorized to sign written directions on behalf of [State/Grace] under this Agreement.  The directions of any one of the following persons is sufficient unless a greater number appears here: _____ **(insert number)**.

| Authorized Person Name | Title | Telephone Number | E-mail Address |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**Above information is <u>required</u> for all authorized individuals**

APPENDIX II

## CERTIFICATION REGARDING BENEFICIAL OWNERS OF LEGAL ENTITY CUSTOMERS

### I. GENERAL INSTRUCTIONS

#### What is the purpose of this form?

To help the government fight financial crime, federal regulation requires financial institutions to obtain, verify and record information about the beneficial owners of legal entity Clients. Legal entities can be abused to disguise involvement in terrorist financing, money laundering, tax evasion, corruption, fraud, and other financial crimes. Requiring the disclosure of key individuals who ultimately own or control a legal entity (i.e., the beneficial owners) helps law enforcement investigate and prosecute these crimes.

#### Who has to complete this form?

This form must be completed by the person opening or updating an account on behalf of a legal entity. For the purposes of this form, a legal entity includes a corporation, limited liability company or other entity that is created by a filing of a public document with a Secretary of State or similar office, a general partnership, and any similar business entity formed in the United States or a foreign country. Legal entity does not include sole proprietorships, unincorporated associations, or individuals opening or updating accounts on their own behalf.

> **PLEASE CAREFULLY REVIEW THE CERTIFICATIONS IN THE GRAY BOXES BELOW TO DETERMINE IF CLIENT IS EXCLUDED FROM COMPLETING ALL OR PORTION OF THIS FORM.**

#### What information do I have to provide?

This form requires you to provide the name, address, date of birth and Social Security number (or passport number or other similar information, in the case of Non-U.S. Persons) for the following individuals (i.e., the beneficial owners):[1]

    (i)    Each individual, if any, who owns, directly or indirectly, 25 percent or more of the equity interests of the legal entity Client (e.g., each individual that owns 25 percent or more of the shares of a corporation); **and**

    (ii)    An individual with significant responsibility for managing the legal entity Client (e.g., a Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, General Partner, Managing Member, President, Vice President, or Treasurer).

Regardless of the number of individuals identified under section (i), you must provide the identifying information of one individual under section (ii). It is possible that in some circumstances the same individual might be identified under both sections (e.g., the President of Acme, Inc. who also holds a 30% equity interest). Thus, a completed form

---

[1] If a trust, directly or indirectly, owns 25 percent or more of the equity interests of a legal entity, the trustee is deemed to be the beneficial owner of the equity interest for purposes of this form and the trustee must complete this form with the trustee's information. For accounts opened by an intermediary on behalf of the intermediary's underlying customer, the intermediary is deemed to be legal entity subject to reporting under this form, not the intermediary's underlying customers. Accordingly, this form should be completed by the intermediary entity with the intermediary's information.

will contain the identifying information of at least one individual (under section (ii)), and up to five individuals (i.e., one individual under section (ii) and four 25 percent equity holders under section (i)).

You may also be asked to provide a copy of a driver's license or other identifying document for each beneficial owner and controlling party listed on this form.

**Note regarding updating information:** From time to time the information provided in this form may need to be updated due to changes in the ownership or controlling party of the legal entity Client or its beneficial owners. Further, from time to time PNC may be required to verify the continued accuracy of the information provided. .

## II. CLIENT CERTIFICATION FOR EXCLUDED LEGAL ENTITIES AND NON-PROFIT CORPORATIONS

**Excluded Legal Entity Certification.** Below is a list of Client entities that are **not** required to complete this form. Please review the list below carefully. If you determine that Client entity is an excluded legal entity, please complete the certification below.

> **IF CLIENT CHECKS A BOX BELOW, STOP HERE. YOU DO NOT NEED TO COMPLETE THE REST OF THIS FORM.**
>
> Client certifies, by checking the applicable box below, that it is:
> - ☐ a trust created pursuant to a trust agreement or other contractual arrangement (i.e., the trust was not created by a filing with a Secretary of State or similar office - e.g., a statutory business trusts)
> - ☐ a publicly held company traded on a U.S. stock exchange
> - ☐ a majority-owned subsidiary of a publicly held company traded on a U.S. stock exchange
> - ☐ registered with the Securities and Exchange Commission as a registered investment adviser
> - ☐ registered with the Securities and Exchange Commission as a registered investment companies
> - ☐ a U.S. government agency or instrumentality
> - ☐ a public accounting firm registered under Section 102 of the Sarbanes-Oxley Act
> - ☐ an entity established under the laws of the U.S. or any State, or of any political subdivision of any State or under an interstate compact
> - ☐ opening an account for the purpose of participating in an employee benefit plan under the Employment Retirement Income Security Act of 1974
> - ☐ a state-regulated insurance company
> - ☐ a "U.S. financial institution" regulated by a federal functional regulator (i.e., federally regulated banks, brokers or dealers, futures commissions merchants and introducing brokers in commodities).
> - ☐ a pooled investment vehicle operated or advised by a "U.S. financial institution" or an SEC registered investment adviser

**Non-Profit Corporation Certification (see Excluded Legal Entities above for non-profit trust entities).** Client formed as a non-profit corporation or similar legal entity that does not have ownership interests (including, charitable, nonprofit, not-for-profit, public benefit or similar corporations) are not required to complete the Beneficial Owner sections of this form.

> **IF CLIENT IS A NON-PROFIT CORPORATION, PLEASE COMPLETE THE CERTIFICATION BELOW AND PROCEED TO SECTION IIId.**
> ☐ Client certifies, by checking this box, it is a non-profit corporation or similar legal entity that has filed organizational documentation with the appropriate State authority and, if requested by PNC Bank, National Association, will promptly provide to PNC Bank, National Association, a copy of its certificate of incorporation or certificate of good standing issued by the state in which the Client is incorporated.

**IF CLIENT CANNOT MAKE ANY OF THE CERTIFICATIONS IN THE ABOVE BLUE BOXES, CLIENT MUST COMPLETE SECTION III OF THIS FORM.**

## III. CERTIFICATION OF BENEFICIAL OWNER(S)

**Persons opening or updating an account on behalf of a legal entity must provide the following information:**

a.  Name, Type, Address, and Taxpayer Identification Number (TIN) of Legal Entity for Which the Account is Being Opened or Updated (i.e., the Client):

Entity Name:  _____

Entity Type (e.g. Corporation, Partnership, etc.):  _____

Entity Address:  _____

Entity TIN:  _____

b.  Name and Title of Person Opening or Updating Account:

Name:  _____

Title:  _____

c.  **Beneficial Owner(s):**  The following information for <u>each individual</u>, if any, who, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, owns 25 percent or more of the equity interests of the legal entity listed above.

> **If no individual meets the definition of "Beneficial Owner" check the box below and continue to Section III(d).**
> ☐  **Beneficial Owner Not Applicable**

**For U.S. Persons:** *Indicate if you are a U.S. Citizen, U.S. Resident Alien or Immigrant Refugee and provide Social Security Number (SSN)*

**For Non-U.S. Persons:** *Provide SSN, Individual Taxpayer Identification Number (ITIN), Passport or Other Acceptable ID Information*

| Name | % of Owner-ship | Date of Birth | Residential Street Address | For U.S. Persons: | For Non-U.S. Persons: |
|---|---|---|---|---|---|
| | | | | ☐ U.S. Citizen<br><br>☐ U.S. Resident Alien<br><br>☐ Immigrant Refugee<br><br><br>SSN #:<br><br>_____ | Passport or Other Acceptable ID Type:<br><br>_____<br><br>ID #:<br><br>_____<br><br>Country of Issuance:<br><br>_____<br><br>SSN / ITIN #:<br><br>_____ |
| | | | | ☐ U.S. Citizen<br><br>☐ U.S. Resident Alien<br><br>☐ Immigrant Refugee<br><br><br>SSN #:<br><br>_____ | Passport or Other Acceptable ID Type:_____<br><br>ID #:<br><br>_____<br><br>Country of Issuance:<br><br>_____<br><br>SSN / ITIN #:<br><br>_____ |
| | | | | ☐ U.S. Citizen<br><br>☐ U.S. Resident Alien<br><br>☐ Immigrant Refugee<br><br><br>SSN #:<br><br>_____ | Passport or Other Acceptable ID Type:_____<br><br>ID #:<br><br>_____<br><br>Country of Issuance:<br><br>_____<br><br>SSN / ITIN #:<br><br>_____ |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | _____ |
| | | | | ☐ U.S. Citizen<br><br>☐ U.S. Resident Alien<br><br>☐ Immigrant Refugee<br><br><br>SSN #:<br>_____ | **Passport or Other Acceptable ID**<br>Type:_____<br><br>ID #:<br>_____<br><br>Country of Issuance:<br><br>_____<br><br>SSN / ITIN #:<br><br>_____ |

**Controlling Party:** The following information for <u>one individual</u> with significant responsibility for managing the legal entity listed above, such as:

- An executive officer or senior manager (e.g., Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, General Partner, Managing Member, President, Vice President, Treasurer); or
- Any other individual who regularly performs similar functions.
  (If appropriate, an individual listed under Section II(c) above may also be listed in this Section III(d)).

**For U.S. Persons:** *Indicate if you are a U.S. Citizen, U.S. Resident Alien or Immigrant Refugee and provide Social Security Number (SSN)*

**For Non-U.S. Persons:** *Provide SSN, Individual Taxpayer Identification Number (ITIN), Passport or Other Acceptable ID Information*

| Name | Title | Date of Birth | Residential Street Address | For U.S. Persons: | For Non-U.S. Persons: |
|------|-------|---------------|---------------------------|-------------------|----------------------|
|      |       |               |                           | ☐ U.S. Citizen ☐ U.S. Resident Alien ☐ Immigrant Refugee SSN #:_____ | **Passport or Other Acceptable ID** Type:_____ ID #:_____ Country of Issuance:_____ SSN / ITIN #:_____ |

Exhibit E –   Alleged Injury and Examples of Restoration Options to Address Alleged State
NRD at OU3

**Alleged Injury and Examples of Restoration Options
to Address Alleged State Natural Resource Damages at or Relating to
Operable Unit 3 of the Libby Asbestos Superfund Site**

This report provides information and analysis in support of the State of Montana (State) and
W.R. Grace & Co. (Grace)'s belief that a settlement payment of $18.5 million is sufficient to
restore, replace, rehabilitate, and/or acquire the equivalent of injured natural resources within the
State's trusteeship, and therefore will compensate the public for the State's claim for alleged
injuries to natural resources resulting from the release of hazardous substances in or related to
Operable Unit 3 (OU3) of the Libby Asbestos Superfund Site (Site).[1] This report includes an
overview of the nature of the alleged injuries and service losses, with references to related
studies and data; it is not an exhaustive summary of this information. This report also describes
the types of restoration projects that could be implemented to compensate for losses, the types of
ecological values that could be provided, and the anticipated criteria for selecting restoration
projects. The settlement reflects the judgment and experience of experts for Grace and the
Montana Natural Resource Damage Program ("NRDP").

The NRDP's mission is to act on behalf of the Governor of the State of Montana, the trustee, to
recover damages for natural resources injured by the release of hazardous substances and to
restore, rehabilitate, replace, or acquire the equivalent of the injured natural resources.

## I.    NATURE OF THE STATE'S ALLEGED INJURIES

Information collected at the Site under the oversight of the U.S. Environmental Protection
Agency (EPA) in consultation with the Montana Department of Environmental Quality (DEQ)
and other agencies pursuant to the Comprehensive Environmental Response, Compensation and
Liability Act, 42 U.S.C. §§ 9601 *et seq.* (CERCLA), as well as other information, has been used
by the State and Grace to evaluate the nature of potential natural resource injuries and potential
lost services in connection with the settlement agreement. Some of this information, including
relevant background information, is summarized below. The State has not conducted a formal
natural resource damage assessment (NRDA) at the Site under U.S. Department of Interior
(DOI) regulations promulgated under CERCLA, 43 C.F.R. Part 11, or under the Montana
Comprehensive Environmental Cleanup and Responsibility Act, 75-10-701, MCA, *et seq.*
(CECRA). This document does not include all of the information that would be in an NRDA and
is based on the information gathered to date.

---

[1] As indicated in the Settlement Agreement between the State and Grace, each Party denies the allegations of the
other. Grace asserts that there are no significant natural resource damages (NRD) at or related to OU3; the State
asserts that there are more significant NRD at or related to OU3. The Settlement Agreement represents a
compromise that compensates the State (as trustee) for the damages that it alleges in exchange for a release of all of
the State's NRD claims against Grace in or related to the Libby Asbestos Superfund Site. The Settlement
Agreement to which this report is attached is solely on behalf of the State and Grace, and does not expand or limit
the legal rights or obligations of any person or entity other than the State and Grace.

A.    Site History and Assessment

OU3 of the Site consists of a former vermiculite mine and adjoining forested lands, located approximately 7 miles to the northeast of the town of Libby, Montana. The former mined area and immediately surrounding area are owned and managed by the Kootenai Development Company (KDC), a Grace subsidiary; other land within OU3 is managed by the U.S. Forest Service.

The former vermiculite mine was operated from the early 1920s to 1990, initially by the Zonolite Company, which sold the mine and processing facilities to a predecessor company to Grace in 1963. Historically, vermiculite from the former mine was used in insulation, feed additives, soil amendments, packaging, and construction materials. Vermiculite ore, excavated overburden (waste rock), mine tailings, and associated material from the former mine contain amphibole-type asbestos, a material in the geology in the mine area that is termed Libby amphibole asbestos (LA). Such materials also may contain non-asbestos hazardous substances.

Mining operations included blast and drag line mining and milling of ore, with ore processing taking place onsite during most of the time the mine was in operation. Both dry milling and wet milling were conducted at the mine site up to approximately 1974, after which the entire operation used wet processing (MWH 2016). In 1972, the State issued to Grace an operating permit under the Metal Mine Reclamation Act. Grace operated the mine under its permits, and performed reclamation of mined lands as they were taken out of operation (MWH 2016). Mining operations ceased completely by 1990, followed by further reclamation efforts that included demolition of mine facilities, re-contouring of the mined areas, and revegetation (MWH 2016).

In October 2002, EPA added the Libby Asbestos Superfund Site to the National Priorities List. EPA divided the site into multiple operable units. For OU3, a remedial investigation (RI) under CERCLA began in 2007. The RI was performed in phases, and included collection of more than 3,300 environmental samples for LA analysis and more than 500 samples for non-LA analysis (W.R. Grace & Co. et al. 2019). Surface water, sediment, sediment pore water, groundwater, soil, mine wastes, forest duff, tree bark, air, and fish and mammal tissue were sampled for analysis.

EPA conducted baseline ecological risk assessments (BERAs) as part of the RI. The objective of the risk assessments was to determine the potential for current or future unacceptable risk to ecological receptors (e.g., fish, aquatic invertebrates, terrestrial plants, terrestrial invertebrates, birds and mammals) within OU3. EPA published two BERAs that were the culmination of the ecological studies. The first evaluated ecological risks potentially associated with non-asbestos hazardous substances, such as inorganics (Non-Asbestos BERA) (USEPA 2013). The second examined ecological risk potentially associated with LA (Asbestos BERA) (USEPA 2014). A summary of the risk assessments is presented in the final RI report (MWH 2016). Grace and the State considered the data collected for the BERAs and RI, as well as additional information, in their respective evaluations of potential natural resource injuries and service losses in and relating to OU3. Some of the data and analyses are discussed in greater detail in subsequent

sections of this document. The State does not agree with all analyses and conclusions presented in these reports.

### B.    OU3 Habitats

OU3 provides a range of habitats for aquatic and upland species: creeks and their associated riparian zones, ponds, wetlands, and upland habitats.

#### 1.    Aquatic Habitats

The primary surface waters in OU3 that are most likely to have received asbestos and other non-asbestos hazardous substances released as a result of mining activities are within the Rainy Creek watershed (~46.1 km$^2$) and include Rainy Creek, Fleetwood Creek, Carney Creek, portions of the Fine Tailings Impoundment (FTI), the Mill Pond, and potentially the Kootenai River. Rainy Creek is divided into Upper Rainy Creek (north of the mine area) and Lower Rainy Creek. Rainy Creek flows into the Kootenai River approximately 3.9 km south of the mine area.

Fleetwood Creek flows east to west on the northern border of the mine area and through a portion of the coarse tailings pile prior to discharging to the FTI. Carney Creek lies south of the mine area and flows along the toe of the West Waste Rock Pile before joining Lower Rainy Creek just downstream of the Mill Pond. Rainy Creek and portions of both tributary creeks are perennial (USEPA 2013) and provide habitat for fish and aquatic invertebrate communities (MWH 2016). Riparian areas occur along the creeks and provide ecological benefits such as channel stability, shade for the stream, erosion control, energy flow, nutrient cycling, water cycling, hydrological function, and plant and animal habitat (USDA 1996).

In addition to the creeks, there are ponded areas in OU3, including Carney Pond, Fleetwood Pond, and the Mill Pond. The FTI includes a ponded area that varies in size depending on precipitation. The FTI (~70 acres) was established in 1972 to receive and settle mine tailings, through construction of the Kootenai Development Impoundment Dam (KDID) across Rainy Creek. Water enters the FTI from Upper Rainy Creek, Fleetwood Creek, surface runoff, and groundwater. The Mill Pond, which is located in the Rainy Creek channel downstream (south) of the KDID and just north of the confluence of Carney Creek, was constructed to supply water for mining operations and discharges into Rainy Creek. Wetlands are present on and adjacent to the FTI and portions of the other waterways, and provide similar ecological benefits and services as those provided by riparian habitats.

In addition to the physical impacts of mining operations, physical alterations of the OU3 habitats have occurred over the years due to a variety of other activities, including timbering operations, channelization for road construction, and placement of culverts and impoundments (USDA 2000).

#### 2.    Terrestrial Habitats

Upland habitats within OU3 consist primarily of the former mined area and surrounding forests.

The area disturbed by mining (including the former mined area and former tailings impoundment) covers approximately 1,100 acres of OU3 (MWH 2016). This area is characterized by native rock, soil, and vegetation, as well as waste rock and tailings resulting from past mining activities. During the period of mine operation, this area was largely unvegetated. Mining activities not only involve physical disturbance by heavy machinery and excavation, but also include removal of topsoil and placement of waste rock, which changes the physical conditions of the soil environment (e.g., Sheoran et al. 2010; Baig 1992).

Mined areas were reclaimed as mining in those areas was phased out. More extensive reclamation efforts at the former mine began in 1991 after mine closure. These efforts included hydroseeding and reforestation with pine and deciduous trees. Other reclamation efforts included regrading, trenching, and other physical measures to stabilize the mine surface.

At present, vegetative communities of the former mined area include forests, steppe shrub, and grassland habitat, with grassland and steppe shrub providing the predominant cover. Some bare soil areas exist, primarily on steeply sloped waste rock piles and other steep slopes.

Outside of the former mined area, the OU3 terrestrial habitats consist of temperate montane forests, portions of which have been historically logged. Douglas fir is the most common tree type, present at about 35% of the forested OU3 area, followed by lodgepole pine (17%) and spruce-fir (17%), with western larch forest on about 11% of the forested land area. The remaining area is populated with various deciduous species common in northwest Montana (MWH 2016). The OU3 forest outside of KDC/Grace ownership is part of the Kootenai National Forest.

C.    Hazardous Substances Associated with Alleged Natural Resources Injuries

Due to proximity to the mine and associated access roads, the aquatic and terrestrial habitats of the Rainy Creek watershed have been exposed to LA and other non-asbestos constituents released from the mine area. Although some remediation has occurred, a final remedy has not been selected for OU3, and remediation of the entire forested watershed area within OU3 has not occurred and may not occur. Therefore, surface waters within the Rainy Creek Watershed in OU3 remain exposed to LA fibers and other non-asbestos contaminants. Depending on their concentrations and other circumstances, these constituents have the potential to adversely affect the aquatic, riparian, and terrestrial species that reside or forage in these habitats, and thereby result in natural resource injury. Natural resource injury caused by the release of a hazardous substance could be the source of natural resource damages, as defined under CERCLA, CECRA, and related guidance.

The Non-Asbestos BERA (USEPA 2013), Asbestos BERA (USEPA 2014), and RI report (MWH 2016) identified a number of hazardous substances released from the Site mining and milling activities and present within OU3 at concentrations that could pose risk to ecological receptors and/or exceed Circular DEQ-7 Montana Numeric Water Quality Standards (DEQ-7 Standards) or Residential Regional Screening Levels (RSLs). These substances include:

- Aluminum,
- Barium,
- Chromium,
- Cobalt,
- Copper,
- Iron,
- Lead,
- Manganese,
- Nickel,
- Selenium,
- Vanadium,
- Gross alpha, and
- LA.[2]

In addition, screening-level toxicity benchmarks were exceeded in one or more Site media (soil and sediment) for:

- Antimony,
- Benzo(b)fluoranthene,
- Benzo(k)fluoranthene,
- Cadmium,
- Fluoride,
- Mercury,
- Naphthalene,
- Nitrogen as nitrite,
- Thallium, and
- Asbestos.

Site investigations conducted as part of the RI and BERAs were used by EPA to assess the degree to which these constituents were present in OU3 and posed ecological risk. The RI and BERAs provide data with which to assess the range of possible natural resource damages in OU3. The data collected for these studies are referenced below in the context of potential types of natural resource injuries and service losses.

**D.    Per Se Injuries**

Under the DOI NRDA regulations, natural resource injury is defined to exist when concentrations of hazardous substances are in excess of certain quality standards under the

---

[2] Regardless of whether there is a relevant standard for LA concentrations in the surface water, for purposes of this report, measured concentrations of LA in surface water are compared to DEQ-7 standards and maximum contaminant levels based on effects from exposure to chrysotile asbestos. DEQ-7 does not provide an aquatic life standard.

circumstances specified in the regulations (see 43 C.F.R. § 11.62); this is sometimes referred to as "per se" injury.

A review of the available data collected as part of the RI demonstrates the potential per se injuries described below.

### 1. Surface Water

As part of its screening analysis, the Non-Asbestos BERA identified the potential for risk to aquatic receptors from barium in surface water (USEPA 2013). In addition, concentrations above chronic DEQ-7 Standards for aquatic life for total lead and total iron were observed in surface water samples from Fleetwood Pond (MWH 2016). Dissolved aluminum was detected in one seep sample from the Site at a level of 110 ug/L. All other dissolved aluminum results were non-detects.[3]

Surface water was sampled in the Asbestos BERA (USEPA 2014) for LA. Results for water are typically expressed as million fibers per liter (MFL). Though there is no specific surface water quality standard for LA, for purposes of this report, the results were compared with EPA's maximum contaminant level (MCL) and the DEQ-7 Standard for surface water for asbestos fibers of 7 MFL.[4] All of the following results are from the RI (see, e.g., Table 5-17a):

- In Upper Rainy Creek, 48 samples were collected from three locations. LA was below the 7 MFL criterion in all samples, though LA was detected in two locations.
- In Fleetwood Creek and Fleetwood Pond, 46 surface water samples were collected at three stations; concentrations of LA >10 µm ranged from 0 MFL to 289 MFL.[5] Six samples were above 7 MFL in Fleetwood Creek and Fleetwood Pond (13% of the samples).
- In Carney Creek and Carney Pond, 72 surface water samples were collected at five stations; concentrations of LA >10 µm ranged from 0 MFL to 26 MFL.[6] Three samples were above 7 MFL in Carney Creek and none in Carney Pond (4% of the samples). An additional 21 samples were collected from seven seep locations near Carney Creek; concentrations of LA >10 µm ranged from 0 to 32 MFL.
- In Lower Rainy Creek, 263 samples were collected at 11 stations; concentrations of LA >10 µm ranged from 0 MFL to 66 MFL. Twenty-five samples were above 7 MFL in Lower Rainy Creek (10% of the samples).

The results tended to reflect seasonal variation. Concentrations were generally highest during high flows such as spring runoff.

---

[3] The reporting limit for dissolved aluminum in surface water was 90 µg/L, which is above the DEQ-7 aquatic life chronic standard for dissolved aluminum of 87 µg/L.

[4] The 7 MFL criterion applies only to fibers greater than 10 microns (10 µm) in length.

[5] The contractor reported that the sample result of 289 MFL in Fleetwood Pond (and duplicate sample result of 219 MFL) is suspect, as it is an order of magnitude higher than the next highest sample of 28 MFL at that location and was collected through a method that might have introduced higher sediment concentrations in the sample.

[6] Resampling following the 26 MFL result, at the same location about 6 weeks later, had a 0 MFL result. The next highest sample at that location was 7.5 MFL.

Some of the above conditions, if all criteria under the DOI regulations were met, would be defined as surface water injury. This report does not determine whether any of these conditions satisfy the DOI regulatory definition, but this information was used in evaluating the scope of potential injuries.

Concentrations of LA in reference ponds and creeks in and around OU3 tended to be below detection or very low. The Asbestos BERA reports that LA fibers in the Kootenai River were low and not different between samples from upstream and downstream of the confluence of Rainy Creek.

### 2.    Groundwater

LA was analyzed in groundwater samples as part of the RI (MWH 2016). Groundwater sampling was conducted in 8 shallow wells and 6 bedrock wells, with most wells sampled 2 to 3 times for a total of 20 shallow well samples and 14 bedrock samples. Two samples from the shallow groundwater wells showed LA concentrations above 7 MFL. The two results above 7 MFL may reflect sampling anomalies[7] and sampling issues and detections in equipment rinse blanks led to adjustment of the groundwater results (Appendix I to the RI [MWH 2016]); further samples were not collected.

Fewer samples were collected for non-asbestos contaminants. Samples for non-asbestos contaminants showed some elevated concentrations of site contaminants compared to screening levels established for assessment of potential drinking water exposures in people. Iron and manganese Residential RSLs for tap water (non-regulatory criteria) were exceeded in groundwater samples (USEPA 2013), and the DEQ-7 Standard and EPA MCL for gross alpha was exceeded in one groundwater sample from a bedrock well (USEPA 2013; MWH 2016).

Some of the above conditions, if all criteria under the DOI regulations were met, would be defined as groundwater injury. This report does not determine whether any of these conditions satisfy the DOI regulatory definition, but this information was used in evaluating the scope of potential injuries.

### 3.    Sediment Pore Water

LA was measured in instream sediment pore water at Lower Rainy Creek and reported in the RI (MWH 2016). LA concentrations up to 623 MFL were measured in pore water (fibers >10 μm).[8] On average, LA concentrations were greater in pore water samples than in surface water samples collected from the same locations in Lower Rainy Creek. The data indicate that biological

---

[7] "Elevated LAA levels are thought to be related to suspended sediment in the water at the time of sampling, given that the other samples collected from both piezometers had significantly lower LAA levels. In addition, sampling pump issues were noted during the April 2015 sampling…" (MWH 2016, Table 5-16b, p. 312)

[8] Pore water sample concentrations were variable across replicate samples and across samples collected during the sample durations (MWH 2016).

resources could be exposed to higher levels of hazardous substances in pore water compared to surface water.

Non-asbestos contaminants were not analyzed in sediment pore water, which the parties have considered.

### 4.    Sediment

In stream sediment, concentrations above screening level ecotoxicological benchmark values are not a per se injury, but indicate the potential for injury to the surface water in Montana as the State's water quality standards are based on measurements that include a fraction of suspended sediments. Sediment was analyzed in the Asbestos BERA by first sieving and grinding samples to reduce particle size to ≤250 µm and identifying LA fibers based on optical characteristics using polarized light microscopy. Visual area estimates are subjective, and results are considered semi-quantitative. Results are associated with bins of approximate ranges in percentages; Bin A represents non-detect samples, Bin B1 is <0.2% LA, B2 is 0.2% to <1% LA, and C is ≥1% LA.

Sediment samples from Lower Rainy Creek, Fleetwood Creek, Carney Creek, the FTI, and the Mill Pond contained LA fibers above detection (USEPA 2014). Sample results were highest in Carney Creek adjacent to the mine area and in Rainy Creek below the FTI. Most samples from Upper Rainy Creek were non-detect (Bin A). A total of 62 sediment samples collected in the above areas were in Bin C and ranged from 1% to 10% LA fibers.

Several non-asbestos analytes exceeded threshold effect concentrations (TECs) and/or sediment-based wildlife benchmarks in site sediments, as reported in the Non-Asbestos BERA (USEPA 2013) and summarized in Table 1, below. The TECs and other toxicity benchmark values are typically used in the screening stage of an ecological risk assessment to identify the potential for ecological risk.

A hazard quotient (HQ) is the ratio of the hazardous substance concentration in the exposed media compared to some toxicity benchmark or quality criterion. HQ values represent the maximum detected concentration divided by the toxicity benchmark, so a maximum HQ value greater than 1 indicates the maximum sediment concentration exceeded the toxicity benchmark. Calculated HQ values for OU3 sediment ranged from <1.0 to 54 for several non-asbestos analytes. Of the analytes with HQ values greater than 1, aluminum, barium, chromium, cobalt, copper, lead, manganese, nickel, vanadium, and zinc were also found to exceed sediment concentrations measured in reference samples.

*Table 1. Hazard Quotient Values for Analytes that Exceeded Sediment Screening Values*

| Analyte | Maximum HQ for TEC-Based Benchmark | Maximum HQ for Sediment-Based Wildlife Benchmark |
|---------|------------------------------------|--------------------------------------------------|
| Aluminum | **1.6** | NC |
| Arsenic | *0.72* | **5.1** |
| Barium | NC | **23** |
| Cadmium | **1.0** | *0.07* |

| Analyte | Maximum HQ for TEC-Based Benchmark | Maximum HQ for Sediment-Based Wildlife Benchmark |
|---|---|---|
| Chromium | 16 | 9.7 |
| Cobalt | NC | 1.8 |
| Copper | 5.5 | 54 |
| Lead | 2.8 | 3.3 |
| Manganese | 20 | 43 |
| Mercury | *0.56* | 1.6 |
| Nickel | 6.4 | 3.2 |
| Selenium | NC | 1.5 |
| Vanadium | NC | 46 |
| Zinc | *0.78* | 1.1 |
| Benzo(b)fluoranthene | 1.4 | *0.011* |
| Benzo(k)fluoranthene | 1.2 | *0.0094* |
| Naphthalene | 16 | *0.017* |

Notes: **BOLD** – sediment concentrations exceeded toxicity benchmark and were statistically greater than reference sediment concentrations; **BOLD** (no shading) – sediment concentrations exceeded toxicity benchmark but were statistically equal to or less than reference sediment concentrations; *Italics* – sediment concentrations did not exceed toxicity benchmark (HQ ≤ 1); HQ – hazard quotient; NC – not calculated, no screening value; TEC – threshold effect concentration; Data from Non-Asbestos BERA (USEPA 2013).

The Non-Asbestos BERA does not evaluate antimony in Site sediments, though antimony was detected in Site ponds and these data are reported in the OU3 RI. Antimony concentrations in two samples (one from Carney Creek Pond [4 mg/kg] and one from the FTI Pond [5 mg/kg]) exceeded the TEC (2 mg/kg) and the probable effect concentration (4 mg/kg).

Exposure to contaminated sediment can affect the growth and survival of invertebrates and limit the habitat available for colonization. In addition, biological resources higher in the food web potentially could be at risk from exposure to contaminants from eating contaminated invertebrates or from incidental ingestion of sediment while foraging. The studies in the EPA BERAs, noted below, evaluated such endpoints.

E.    EPA Studies Performed to Evaluate Ecological Risk

The Asbestos BERA and Non-Asbestos BERA examined the potential risks to a variety of ecological receptors from LA and non-asbestos hazardous substance concentrations in soil. The following site-specific studies were conducted as part of the BERAs to evaluate the extent to which hazardous substances in surface water, sediment, and soil may pose risk to ecological receptors in OU3:

- Laboratory juvenile trout toxicity tests (non-asbestos contaminants)
- In situ juvenile trout toxicity tests
- In situ egg/alevin trout toxicity tests
- Resident trout lesion study
- Resident trout population study

- H. azteca (benthic invertebrate) sediment toxicity test
- C. tentans (benthic invertebrate) sediment toxicity test
- Resident benthic macroinvertebrate population study
- Laboratory tadpole sediment toxicity tests
- Resident frog lesion study
- Resident mouse lesion study
- Literature-based evaluation of sensitivity of birds to LA relative to small mammals

The results of these studies, along with EPA's habitat evaluations, weight of evidence evaluation, and analysis of uncertainties, are detailed in the BERAs.

F.    **Summary of Potential Natural Resource Injuries and Service Loss at or related to OU3**

The data collected as part of the RI and BERA investigations indicate that natural resources within OU3 are exposed to LA and a subset of other non-LA hazardous substances. Past, present, and future injured OU3 resources could include:

- Small, large, and aquatic-dependent mammals
- Birds
- Fish
- Reptiles and amphibians
- Aquatic invertebrates
- Terrestrial invertebrates
- Terrestrial and aquatic plants
- Wetland and upland habitats.

To the extent that injury occurred, the following categories of resource services, among others, could theoretically have been reduced:

- Habitat services for biological resources, such as habitat for feeding and reproduction
- Fishing, particularly recreational fishing below the ordinary high-water mark per Montana stream access laws (§23-2-301, MCA, *et seq.*)
- Drinking water supply (to the extent relevant)
- Non-consumptive uses such as wildlife viewing and photography and other outdoor recreation activities below the ordinary high-water mark per Montana stream access laws (§23-2-301, MCA, *et seq.*)
- Primary and secondary contact recreational activities such as swimming and boating below the ordinary high-water mark per Montana stream access laws (§23-2-301, MCA, *et seq.*)
- Option and existence values.

## II.    TYPES OF RESTORATION PROJECTS AND RESULTANT SERVICES

The natural resource damages component of the Settlement between Grace and the State was negotiated and executed on a cash-out basis, with funds paid to the State over a period of 10 years. No particular project or projects are required by the Settlement, no particular project has been identified by the State at the time of this Report, and the projects ultimately implemented by the State may differ from the examples provided below, but the State must use settlement funds for restoration projects and support therefor, including costs for State restoration plan development and implementation, and administrative, program, legal, technical and all other related costs, to the extent lawful under CERCLA or CECRA. The State intends and anticipates using Settlement funds in connection with projects that provide natural resource and other benefits in and around OU3.

The following sections describe various types of exemplary restoration projects that may be constructed to benefit and improve aquatic and terrestrial natural resources and the services they provide. Additional types of restoration projects may also be considered. Other restoration actions selected to implement previous State NRD settlements at other sites can be found within the restoration plans for those sites, which are available on NRDP's website. Nothing in this report is intended to bind any party to a specific injured resource or particular type of project.

### A.    Aquatic Habitat Improvement Restoration Projects

Potentially injured resources identified at the Site include fish and other aquatic biota. A variety of restoration projects could be implemented to restore lost services. Below is a summary of types of aquatic habitat improvement projects that would restore aquatic ecological services.

In addition to the specific service benefits described below, the illustrative aquatic restoration activities all generally provide improved water quality, thereby providing favorable habitat to increase populations of in-stream biota. This should benefit upland predators that rely on stream food sources. Restoration of aquatic ecological resources ultimately benefits the entire ecosystem through increased biodiversity and results in enhanced recreational opportunities. Many of the restoration activities described below have been implemented in projects in the Kootenai and adjacent watersheds with significant success.

The selection of any specific creek restoration activities could be geographic (to prioritize a specific watershed or a specific creek segment to be identified, potentially including within OU3 once remediation has been completed) in accordance with the criteria outlined in Section III.

### 1.    Riparian Improvement

Riparian improvement projects include revegetation, reducing livestock access, removing/enhancing roads, streambank stabilization, floodplain restoration, reconstructing stream channel(s), constructing floodplain wetland cells, woody debris placement, microtopography creation, bank treatment, seeding and mulching, and planting. These types of projects can provide a host of services. Revegetation of the riparian area reduces contaminant mobility by providing filtration of overland flow and reduces sedimentation by providing soil

stabilization. Vegetation provides habitat cover for both upland and in-stream species, and limits surface water temperature fluctuations by providing shade. Floodplain restoration projects, including reconnecting the floodplain area and constructed wetlands, reduce erosion and subsequent sedimentation by reducing flow velocities, and provide opportunities for natural stream channel changes over time. Road removal and streambank stabilization projects, often supported by and conducted in conjunction with revegetation and floodplain restoration, reduce sedimentation (Yochum 2018) and can lead to an overall improvement in habitat conditions, thereby contributing to more robust and abundant populations of fish and wildlife. Engineered floodplains and riparian plantings also may improve groundwater quality by providing filtration of runoff and reducing overland flow, thereby encouraging groundwater recharge.

### 2.    In-Stream Habitat Improvements and Channel Modifications

In-stream habitat improvement and channel modification activities can create habitat for biota by providing variable structures and improved channel flow. Modifying stream morphology by adding meanders and creating variable pool-riffle-run habitat directly improves habitat for fish (particularly trout) and invertebrates. Installing boulders, woody debris, and other large structures creates shelter and resting areas for fish that mimic natural features in streams and rivers. These features also create cover and reduce flow velocity to provide habitat for invertebrates (Wohl et al. 2015). These kinds of habitat improvements would advance and restore more natural hydraulic conditions and restore natural sediment transport processes, thereby improving water quality. The improvement and addition of habitat through stream channel modifications should result in increased fish and invertebrate populations, providing both ecological and recreational benefits.

### 3.    Fish Passage

Conceptual fish passage projects include restoration activities such as removal of fish passage barriers in creeks and streams and addition of screens to reduce fish access to artificial diversions. These types of habitat improvements would benefit a variety of native and other fish species.

Removal of barriers and enhancement of passage structures such as culverts and fish ladders can directly benefit fish survival and spawning by enabling fish to regain access to diverse habitats and additional food sources. Restored access to spawning habitat should result in a direct increase in fish numbers, which would benefit imperiled species and increase recreational fishing opportunities by increasing fish populations and expanding accessible fishing areas. Limiting access to unsuitable habitat by placing screens on irrigation and power diversions can also encourage fish to instead utilize appropriate habitats for foraging and spawning. This should increase survival and reproduction rates for fish, especially trout (Yochum 2018).

### B.    Terrestrial Habitat Improvement Restoration Projects

Activities can be implemented to improve upland terrestrial habitat and benefit ecological resources in the surrounding area. Example projects include selective removal of non-native plant species and/or planting of native trees and vegetation in OU3 and surrounding forest areas.

### 1.    Native Planting and Removal of Non-Native Species

Planting native trees and vegetation has direct benefits for not only the immediate area, but globally as well. Planting in burned, logged, or other denuded areas restores habitat for wildlife, giving birds, mammals, and reptiles improved nesting/burrowing, foraging, and hunting opportunities. Invertebrates will also benefit from increased access to food and shelter, as well as improved soil health. Trees also sequester carbon, reducing atmospheric carbon dioxide levels that contribute to global climate change (Dumroese et al. 2019).

Native planting and removal of non-native species activities in targeted areas would result in increased opportunities for multiple recreational uses in forested areas. Forest planting also improves surface water quality and has the potential to improve groundwater quality, through increased soil stabilization and filtration and reduction of evaporation from soil.

### C.    Recreational Fishing

A replacement recreational fishing project for potential lost recreational use could include acquisition of land and construction of a fishing access site or other recreational access site in Lincoln County in cooperation with Montana Fish Wildlife, and Parks or a local governmental entity. It would be constructed in accordance with then-current construction and design requirements for fishing access sites.

## III.    CRITERIA FOR SELECTING RESTORATION PROJECTS[9]

Prior to use of funds, a restoration plan would be developed and adopted by the Governor after adequate public notice and opportunity for hearing and consideration of all public comment. The DOI regulations, 43 C.F.R. § 11.82(a), provide that a reasonable number of possible alternatives for the restoration, rehabilitation, or replacement of the injured natural resources be developed and considered. The overall goal of the restoration plan is to identify actions that singly or in combination restore, rehabilitate, replace, or acquire the equivalent of injured natural resources or lost services such that they can provide the level of services available under baseline conditions. Restoration in areas where remedial action will be implemented typically follows implementation of the remedial action and is intended to provide restoration beyond that provided by the remedial actions. Additional data collection and analysis may be needed to evaluate the priority of the different restoration actions.

The Natural Resource Damage Program (NRDP), which acts on behalf of the Governor as trustee, typically develops a restoration plan in consultation with the Montana Department of

---

[9] The criteria described in this Section III are intended to provide a synopsis of the State's process for evaluating and selecting potential restoration projects. This Section does not, however, fully define that process or otherwise affect in any way the State or the Governor's authority and discretion established by law.

Fish, Wildlife and Parks, local government (e.g., Libby and Lincoln County, the local Water Quality Protection District), watershed groups and non-profits, other agencies, and the public. A recent example of this process is outlined in the *East Helena Asarco Smelter Final Restoration Plan and Environmental Assessment Checklist* (NRDP 2019), available at 11.04.2019-East-Helena-Restoration-Plan-Signed-by-Gov.pdf (dojmt.gov). NRDP would follow a similar process and gather restoration action ideas from all relevant entities from their planning documents, meetings, and a public solicitation for project ideas. The criteria outlined below are taken from the *East Helena Asarco Smelter Final Restoration Plan and Environmental Assessment Checklist.*

In developing possible alternatives for the restoration, replacement, rehabilitation, or acquiring the equivalent of the injured natural resources or services, NRDP anticipates evaluating the alternatives under the following criteria, which meet the requirements of CERCLA and CECRA, and the provisions of 43 C.F.R. § 11.82. In addition, NRDP also anticipates evaluating the additional "policy criteria" outlined at the end of this section. These criteria have been developed by the State to promote State of Montana goals.

**Technical Feasibility:** This criterion evaluates the degree to which a restoration action employs well-known and accepted technologies and the likelihood that the action will achieve its objectives. Actions that are technologically infeasible will be rejected. However, actions that are innovative or that have some element of uncertainty as to their results may be approved. Different actions will use different methodologies with varying degrees of feasibility. Accordingly, application of this criterion will focus on an evaluation of an action's relative technological feasibility.

**Relationship of Expected Costs to Expected Benefits:** This criterion examines whether the costs of an action to restore, rehabilitate, replace, and/or acquire equivalent resources are commensurate with the benefits provided. In doing so, the costs associated with a restoration action, including costs other than those needed simply to implement the action, and the benefits that would result from an action, will be determined. Application of this criterion is not a straight cost-benefit analysis, nor does it establish a cost-benefit ratio that is by definition unacceptable. Quantifying the benefits of a project will sometimes require collection of additional data or information and additional analysis.

**Cost-effectiveness:** This criterion evaluates whether a particular restoration action accomplishes its goal in the least costly way possible. As outlined in the natural resource damage regulations, cost-effectiveness means that when two or more activities provide the same or a similar level of benefits, the least costly activity providing that level of benefits will be selected (43 C.F.R. § 11.14(j)). To apply this criterion in a meaningful fashion, all of the benefits a restoration action would produce must be considered, not just cost; otherwise, the focus would be too narrow. Take the example of a restoration action that would fully restore a given resource in a short period of time compared to another restoration action that would restore the same resource at less cost but over a longer period of time. Considering only that the second action is less expensive than the first action ignores the benefits resulting from a relatively shorter recovery period. In this