## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| W. R. GRACE & CO., et al.,[1] | ) Case No. 01-01139 (KG) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) |
| | ) |

## PROPOSED FINDINGS OF UNCONTESTED FACTS IN SUPPORT OF THE REORGANIZED DEBTORS' MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. BANKR. P. 7056 FOR PARTIAL DISALLOWANCE OF CLAIM NO. 7021, FILED BY NORFOLK SOUTHERN RAILWAY

The Reorganized Debtors respectfully request the Court adopt the attached proposed findings of uncontested facts for purposes of adjudicating the Reorganized Debtors' *Motion for Summary Judgment Pursuant to Fed. R. Bankr. P. 7056 for Partial Disallowance of Claim No. 7021, Filed by Norfolk Southern Railway Company.*

### I.    THE CHAPTER 11 CASES AND THE NORFOLK SOUTHERN PROOF OF CLAIM

1.    On April 2, 2001, the above-captioned debtors (the "Debtors") filed petitions for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

2.    On March 27, 2003, Norfolk Southern Railway ("Norfolk Southern") filed a proof of claim, no. 7021 (the "Norfolk Southern POC," a copy of which is attached hereto as Exhibit A), asserting a right to indemnification from the Debtors under following agreements, copies of which are attached to the Norfolk Southern POC:[2]

---

[1]    The Reorganized Debtors comprise W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc., or "Grace") and W. R. Grace & Co.-Conn. ("Grace-Conn.").

[2]    On or about July 7, 1998, Norfolk Southern became the successor-in-interest to Southern Railway Company ("Southern"). (Norfolk Southern POC at Addendum.) "Norfolk Southern" and "Southern" are used interchangeably in this *Proposed Findings of Uncontested Facts.*

- Agreement between Southern and W. R. Grace & Co. ("Grace"), dated as of December 15, 1980, regarding Norfolk Southern's lease of a parcel of property with an existing warehouse building with overhead canopies, a shed, a cyclone fence and gates (the "Grace Plant") in Natka, South Carolina (the "Right-of-Way Agreement," Exhibit A to the Norfolk Southern POC);

- Agreement between Southern and Grace, dated as of December 15, 1980, regarding Norfolk Southern's operation of railroad right-of-way for 1,678 feet of "industrial track" (the "Grace-Leased Track") located at the Grace Plant and Grace's right to construct certain gates, canopies and a shed (the "Operating Agreement," Exhibit B to the Norfolk Southern POC);

- Supplemental agreement between Southern and Grace, dated November 7, 1983, regarding the operation of an additional 477 feet of Grace-Leased Track. (the "1983 Supplemental Agreement," Exhibit C to the Norfolk Southern POC);

- Supplemental agreement between Southern and Grace, dated October 3, 1990, by which Southern permitted Grace to construct an overhead loading structure with a spout (the "Retractable Spout") (the "1990 Supplemental Agreement," Exhibit D to the Norfolk Southern POC);

3.     On July 20, 2009, the Debtors filed their *Objection to the Proof of Claim Filed by Norfolk Southern Railway Company* [Docket no. 22553] (the "Objection," a copy of which is attached hereto as Exhibit B);

4.     On or about August 26, 2009, Norfolk Southern filed its *Preliminary Response of Norfolk Southern Railway to Debtors' Objection to the Proof of Claim Filed by Norfolk Southern*

*Railway* [Docket no. 22975] (the "Norfolk Southern Response," a copy of which is attached hereto as Exhibit C).

5.    On February 3, 2014, the Reorganized Debtors substantially consummated the transactions contemplated by the Plan and emerged from chapter 11. *Notice of Occurrence of The Effective Date of The First Amended Joint Plan of Reorganization Under Chapter 11 of The Bankruptcy Code of W. R. Grace and Co., et al, the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders As Modified Through December 23, 2010*, dated February 13, 2014 [Docket no. 31732].

6.    On March 19, 2014, the Court entered its *Final Decree (A) Closing Certain of The Chapter 11 Cases, (B) Removing Certain of The Chapter 11 Cases From The Joint Administration Order, and (C) Waiving the Requirement That the Reorganized Debtors File a Final Report For the Merged Subsidiaries* [Docket no. 31880], which closed the cases of 45 of the Reorganized Debtors.

7.    On October 14, 2014, the Court entered its *Final Decree: (A) Closing Certain of the Chapter 11 Cases; (B) Removing Such Cases From the Joint Administration Order; and (C) Waiving The Requirement to File a Final Report For Such Cases* [Docket no. 32429-1], closing a further 15 cases.

8.    Grace and Grace-Conn. are the only remaining open chapter 11 cases.

## II.    THE RIGHT-OF-WAY & OPERATING AGREEMENTS

### A. The Right-of-Way Agreement

9.    On December 15, 1980, Grace (referred to therein as "Licensee") and Norfolk Southern (referred to therein as the "Company") entered into the Right-of-Way Agreement. (Exhibit A, Right-of-Way Agreement at ¶ 1(A).)

10.    Norfolk Southern drafted the Right-of-Way Agreement, and it was signed by both parties. (Exhibit A, Right-of-Way Agreement.)

11.    The Right-of-Way Agreement permitted Grace to use the Grace-Leased Track for kaolin mining and manufacturing.[3] (Exhibit A, Right-of-Way Agreement at ¶ 2.)

**B.    The Operating Agreement**

12.    On December 15, 1980, Grace (referred to therein as "Industry") and Norfolk Southern (referred to therein as "Railroad") also entered into the Operating Agreement, by which Norfolk Southern operated trains on the Grace-Leased Track.    (Exhibit A, Operating Agreement.)

13.    Norfolk Southern drafted the Operating Agreement, and it was signed by both parties. (Exhibit A, Operating Agreement at ¶ A.)

**C.    The 1983 Supplemental Agreement**

14.    On November 7, 1983, Grace and Norfolk Southern entered into the 1983 Supplemental Agreement, whereby Norfolk Southern agreed to operate an additional 477 feet of track as part of the Grace-Leased Track. (Exhibit A, 1983 Supplemental Agreement at ¶ 1.)

15.    Norfolk Southern drafted the 1983 Supplemental Agreement, and it was executed by both Parties. (Exhibit A, 1983 Supplemental Agreement.)

**D.    The 1990 Supplemental Agreement**

16.    On October 3, 1990, Grace and Southern entered into the 1990 Supplemental Agreement, which gave Grace the right to construct and maintain the Retractable Spout, which

---

[3]    Kaolin is soft white clay that is an essential ingredient in the manufacture of china and porcelain and is widely used in the making of paper, rubber, paint, and many other products. *See* Ciullo, Peter A., *Industrial Minerals and Their Uses: a Handbook and Formulary.* (Westwood, N.J.: Noyes Publ. 1996) at pp. 41-43, ISBN 978-0-8155-1408-4 (Accessed at googlebooks.com on October 17, 2012).

the 1990 Supplemental Agreement defined as the "Facility." (Exhibit A, 1990 Supplemental Agreement.)

17.    The Retractable Spout is an immobile structure fixed in place at the loading station shown in Drawing No. AD-0102, which is annexed to and made a part of the 1990 Supplemental Agreement. (Exhibit A, 1990 Supplemental Agreement at ¶ 1.)

18.    Norfolk Southern drafted the 1990 Supplemental Agreement, and it was signed by both parties. (Exhibit A, 1990 Supplemental Agreement.)

19.    The 1990 Supplemental Agreement supplements the Operating Agreement. (Exhibit A, 1990 Supplemental Agreement at ¶ 6.)

### III.    THE NORFOLK SOUTHERN JANUARY 23, 1998 ACCIDENT REPORTS

20.    Norfolk Southern created a report, dated January 23, 1998, for a "non-reportable injury" to Lester F. Kirkland. ("Initial Norfolk Southern January 23, 1998 Accident Report," attached hereto as Exhibit D.)

21.    On January 29, 1998, Norfolk Southern created an update to the Initial Norfolk Southern January 23, 1998 Accident Report. ("Update to Initial Norfolk Southern January 23, 1998 Accident Report," attached hereto as Exhibit E, which together with the Initial Norfolk Southern January 23, 1998 Accident Report are the "Norfolk Southern January 23, 1998 Accident Reports.")

22.    Norfolk Southern furnished the Norfolk Southern January 23, 1998 Accident Reports to the Reorganized Debtors.

### IV.    THE GEORGIA STATE COURT ACTION

23.    On July 3, 1998, Mr. Kirkland filed a complaint (the "Kirkland Complaint") against Norfolk Southern in Georgia state court in Bibb County, Georgia, thereby commencing an action (the "Georgia State Court Action") which was captioned *Lester F. Kirkland Jr. v*

*Norfolk Southern Railway Co.*, C. A. No. 45273.   (Exhibit A, Norfolk Southern POC at Addendum; Kirkland Compliant, attached to the Norfolk Southern Complaint as Exhibit E.)

24.     Neither Grace-Conn. nor any other Grace affiliate were named in the Kirkland Complaint or otherwise party to the Georgia State Court Action.  (Exhibit A, Kirkland Complaint *passim*; Exhibit C, Norfolk Southern Response *passim*.)

25.     On March 21, 2001, Judgment was entered on the Jury Verdict in favor of the Plaintiff for $1,924,500.  (Exhibit A, Judgment attached to Norfolk Southern POC as Exhibit F.)

26.     On July 6, 2001, a document captioned *Plaintiff's Satisfaction of Judgment and Dismissal of Action* was entered onto the docket of the Georgia State Court Action.  (Exhibit A, *Plaintiff's Satisfaction of Judgment and Dismissal of Action*, attached as Exhibit G to the Norfolk Southern POC.)

27.     The Addendum to the Norfolk Southern POC states that the settlement amount (the "Settlement") was $1,500,000.  (Exhibit A, Addendum at 2.)

## V.     RAIL CAR MOVEMENT AT THE GRACE PLANT

28.     The Operating Agreement provided that Norfolk Southern delivered empty rail cars to the Grace Plant on the Grace-Leased Track and hauled away rail cars loaded with kaolin. (Exhibit A, Operating Agreement at ¶ 8; Exhibit B, Objection, *passim*; Exhibit C, Norfolk Southern Response, *passim*.)

29.     Norfolk Southern also performed the same service for other kaolin producers along the same rail line, including J. M. Huber.   (Norfolk Southern January 23 Accident Reports.)

30.     Norfolk Southern either owned the rail cars or otherwise had control over the cars prior to them being delivered to the Grace Plant.  (Exhibit A, Operating Agreement at ¶¶ 7-8.)

31.    Regardless of whether the rail cars were connected to an Norfolk Southern engine, and regardless of whether Norfolk Southern or Grace had control over the cars, Norfolk Southern and their employees had sole discretion in determining when and if the rail cars could be moved on the Grace-Leased Track and whether they were in safe operating order such that they could be moved.  Grace was not responsible for determining whether the rail cars were safe to move or to work on.  (Exhibit A, Operating Agreement at ¶ 6.)

32.    Grace was not authorized to move, or order the movement of, the rail cars off the Grace-Leased Track and onto the main lines.  (Exhibit A, Operating Agreement at ¶ 6.)

33.    Norfolk Southern consigned the rail cars to Grace when Norfolk Southern employees uncoupled them from the train or engine at the loading station.  (Exhibit A, Operating Agreement at ¶ 8.)

34.    Liability for the contents of and control over the rail cars transferred to Norfolk Southern when the loaded cars were coupled with the engine on the Grace-Leased Track prior to being hauled away onto Norfolk Southern–owned and –controlled track.  (Exhibit A, Operating Agreement at ¶ 8.)

## VI.    MR. KIRKLAND'S ACCIDENTS

35.    Mr. Kirkland began his employment with Norfolk Southern in 1975.  (Exhibits D and E, Norfolk Southern January 23, 1998 Accident Reports; Exhibit A, Kirkland Complaint.)

36.    At the time of the accidents at issue, Mr. Kirkland was a train conductor on Norfolk Southern trains.  (Exhibit A, Kirkland Complaint at ¶ 5; Exhibits C and D, Norfolk Southern January 23 Accident Reports.)

### A.  The January 23 Accident

37.    On January 23, 1998, Mr. Kirkland was conductor on a Norfolk Southern-controlled and -operated train transporting twenty-eight rail cars from Norfolk Southern's Aiken

depot to its siding at Warrenville. (Exhibits D and E, Norfolk Southern January 23, 1998 Accident Reports; Exhibit A, Kirkland Complaint at ¶ 5.)

38.    At Norfolk Southern's Warrenville siding, the rail cars were switched in "classification order" for "through train pick-up." (Exhibits D and E, Norfolk Southern January 23, 1998 Accident Reports.)

39.    The track at the Warrenville siding was owned and controlled by Norfolk Southern. (Exhibit A, Kirkland Complaint at ¶ 5; Exhibits D and E, Norfolk Southern January 23 Accident Reports.)

40.    The rail cars in the train at the Warrenville siding were consigned to, and under the control of, Norfolk Southern at the time of the January 23 accident. (Exhibit A, Kirkland Complaint at ¶ 5; Exhibits D and E, Norfolk Southern January 23 Accident Reports.)

41.    At least one of those cars, identified in the Norfolk Southern January 23 Accident Reports as rail car SOU 99418, was shipped on January 23, 1998, from J.M. Huber, a kaolin-producing entity unrelated to any of the Reorganized Debtors, and consigned to and under the control of Norfolk Southern. (Exhibits D and E, Norfolk Southern January 23 Accident Reports.)

42.    As part of the rail car switching evolution, Mr. Kirkland was required to release the handbrake to rail car SOU 99418. (Exhibits D and E, Norfolk Southern January 23 Accident Reports.)

43.    Mr. Kirkland stated that, at approximately 1:40 p.m., he mounted rail car SOU 99418 to release the actual handbrake, because the quick release did not work. (Exhibit A, Kirkland Complaint at ¶ 5; Exhibits D and E, Norfolk Southern January 23 Accident Reports.)

44.    Mr. Kirkland stated that his hands slipped on the handbrake as he attempted to release it, and he fell to the ground, injuring his back and right hand.  (Exhibit A, Kirkland Complaint at ¶ 5; Exhibits D and E, Norfolk Southern January 23 Accident Reports.)

45.    No one witnessed Mr. Kirkland fall.   (Norfolk Southern January 23 Accident Reports.)

46.    The Norfolk Southern January 23, 1998 Accident Reports state that at the time he fell Mr. Kirkland was wearing: (i) wet leather gloves; and (ii) steel-toed boots manufactured by Wolverine, which had "worn-out" and "slick" soles.   (Exhibits D and E, Norfolk Southern January 23 Accident Reports.)

**B.  The January 26 Accident**

47.    At 7:00 a.m., Monday, January 26, 1998, Mr. Kirkland reported to the Aiken depot for work, whereupon he stated to Trainmaster Chapman, his supervisor, that his back "felt better" and that "the thought that he would be okay."  (Exhibit E, Update to January 23 Accident Report.)

48.    The Kirkland Complaint states that, on January 26, 1998, Mr. Kirkland "was again attempting to apply a handbrake on a rail car located at the Aiken Depot, near Aiken, South Carolina." (Exhibit A, Kirkland Complaint at ¶ 6.)

49.    The rail car was consigned to, and under the control of, Norfolk Southern. (Kirkland Complaint at ¶ 6.)

50.    The Aiken Depot is a Norfolk Southern–owned and –controlled facility.  (Exhibit A, Kirkland Complaint at ¶ 6; Exhibits D and E, Norfolk Southern January 23 Accident Reports.)

51.    The Kirkland Complaint states that Mr. Kirkland slipped and aggravated the injuries he suffered in his January 23 accident.  (Exhibit A, Kirkland Complaint at ¶ 6.)

52.     The Update to the Initial Norfolk Southern January 23, 1998 Accident Report, which is dated January 29, 1998, relates events from January 26-28, 1998, but it does not mention whether Mr. Kirkland slipped or had any other accident on January 26, 1998.  (Exhibit E, Update to Initial Norfolk Southern January 23 Accident Report.)

**VII.    THE GEORGIA STATE COURT ACTION TRIAL RECORD**

53.     In 2012, as part of settlement negotiations between the parties, Norfolk Southern furnished what it stated was the complete trial record in the Georgia State Court Action.  The Norfolk Southern January 23 Accident Reports—which were prepared by Norfolk Southern employees—are located at pp. 304-06 and pp. 309-13, respectively, of volume IV of the trial record furnished by Norfolk Southern.   (Exhibits D and E, Norfolk Southern January 23 Accident Reports.)

**[Remainder of page left intentionally blank]**

Dated: October 13, 2016

THE LAW OFFICES OF ROGER HIGGINS, LLC
Roger J. Higgins
1 North Bishop Street
Suite 14
Chicago, IL 60607-1823
(312) 666-0431

and

KIRKLAND & ELLIS LLP
Adam C. Paul
John Donley
300 North LaSalle Street
Chicago, IL 60654
(312) 862-2000

and

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705
(302) 652-4100
(302) 652-4400

Co-Counsel for the Reorganized Debtors

## EXHIBIT A

## Norfolk Southern POC

# WR Grace

**Bankruptcy Form 10**

Index Sheet

SR00000520

| Claim Number: | 00007021 | | Receive Date: | 03/27/2003 |
|---|---|---|---|---|

## Multiple Claim Reference

Claim Number _____

- [ ] MMPOC — Medical Monitoring Claim Form
- [ ] PDPOC — Property Damage
- [ ] NAPO — Non-Asbestos Claim Form
- [ ] Amended

Claim Number _____

- [ ] MMPOC — Medical Monitoring Claim Form
- [ ] PDPOC — Property Damage
- [ ] NAPO — Non-Asbestos Claim Form
- [ ] Amended

## Attorney Information

| Firm Number: | 00298 | Firm Name: | Potter Anderson & Carroon LLP |
|---|---|---|---|
| Attorney Number: | | Attorney Name: | |

Zip Code: 19899-0951

Cover Letter Location Number: SR00000520

| Attachments Medical Monitoring | Attachments Property Damage | Non-Asbestos |
|---|---|---|
| [ ] TBD | [ ] TBD | [x] Other Attachments |
| [ ] TBD | [ ] TBD | |
| [ ] TBD | [ ] TBD | |
| [ ] TBD | [ ] TBD | |
| [ ] TBD | [ ] TBD | |
| | [ ] Other Attachments | |

**Other**

- [ ] Non-Standard Form
- [ ] Amended
- [ ] Post-Deadline Postmark Date

| UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF Delaware | GRACE NON-ASBESTOS PROOF OF CLAIM FORM |
|---|---|

| Name of Debtor: W. R. Grace & Co. – Conn | Case Number 01-1140 | |
|---|---|---|

NOTE: Do not use this form to assert an Asbestos Personal Injury Claim, a Settled Asbestos Claim or a Zonolite Attic Insulation Claim. Those claims will be subject to a separate claims submission process. This form should also not be used to file a claim for an Asbestos Property Damage Claim or Medical Monitoring Claim. A specialized proof of claim form for each of these claims should be filed.

| Name of Creditor (The person or other entity to whom the Debtor owes money or property): <br><br> Norfolk Southern Railway Company <br><br> Name and address where notices should be sent: <br><br> c/o William H. Johnson <br> Norfolk Southern Corporation <br> Three Commercial Place <br> Norfolk, VA  23510 – 9242 | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. <br> ☐ Check box if you have never received any notices from the bankruptcy court in this case. <br> ☐ Check box if the address differs from the address on the envelope sent to you by the court. | THIS SPACE IS FOR COURT USE ONLY |
|---|---|---|

| Account or other number by which creditor identifies Debtor: | Check here ☐ replaces <br> if this claim ☐ amends a previously filed claim, dated: _____ | |
|---|---|---|

Corporate Name, Common Name, and/or d/b/a name of specific Debtor against whom the claim is asserted:
W.R. Grace & Co. – Conn

| 1. Basis for Claim <br> ☐ Goods sold <br> ☐ Services performed <br> ☐ Environmental liability <br> ☐ Money loaned <br> ☐ Non-asbestos personal injury/wrongful death <br> ☐ Taxes <br> ☒ Other  See Attached Addendum | ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a) <br> ☐ Wages, salaries, and compensation (fill out below) <br><br> Your SS #: _____ <br> Unpaid compensation for services performed <br> from _____ to _____ (date) |
|---|---|

| 2. Date debt was incurred: | 3. If court judgment, date obtained: |
|---|---|

| 4. Total Amount of Claim at Time Case Filed: | $ 1,584,182.18 plus any other amounts under the agreements identified in the attached addendum |
|---|---|

If all or part of your claim is secured or entitled to priority, also complete Item 5 below.
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

5. Classification of Claim. Under the Bankruptcy Code all claims are classified as one or more of the following: (1) Unsecured Nonpriority, (2) Unsecured Priority, (3) Secured. It is possible for part of a claim to be in one category and part in another. CHECK THE APPROPRIATE BOX OR BOXES that best describe your claim and STATE THE AMOUNT OF THE CLAIM AT TIME CASE FILED.

| ☒ SECURED CLAIM (check this box if your claim is secured by collateral, including a right of setoff.) <br><br> Brief Description of Collateral: <br> ☐ Real Estate    ☒ Other (Describe briefly) <br> See Attached Addendum <br><br> Amount of arrearage and other charges at time case filed included in secured claim above, if any: $ _____ <br><br> Attach evidence of perfection of security interest <br><br> ☐ UNSECURED NONPRIORITY CLAIM <br><br> A claim is unsecured if there is no collateral or lien on property of the debtor securing the claim or to the extent that the value of such property is less than the amount of the claim. | ☐ UNSECURED PRIORITY CLAIM - Specify the priority of the claim. <br><br> ☐ Wages, salaries, or commissions (up to $4650), earned not more than 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3). <br><br> ☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(4). <br><br> ☐ Taxes or penalties of governmental units - 11 U.S.C. § 507(a)(7). <br><br> ☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(____). |
|---|---|

| 6. Credits: The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim. | This Space is for Court Use Only |
|---|---|
| 7. Supporting Documents: Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary. | |
| 8. Acknowledgement: Upon receipt and processing of this Proof of Claim, you will receive an acknowledgement card indicating the date of filing and your unique claim number. If you want a file stamped copy of the Proof of Claim form itself, enclose a self addressed envelope and copy of this proof of claim form. | WR Grace    BF.28.110.5494 <br> 00007021 <br> SR=520 |

| Date <br> 3/25/03 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): <br> Shana Dwyer    Shana Dwyer <br> Supervisor, Cust Acct | |
|---|---|---|

RECD MAR 2 7 2003

### ADDENDUM TO PROOF OF CLAIM FILED BY
### NORFOLK SOUTHERN RAILWAY COMPANY

On April 2, 2001 (the "Petition Date"), W.R. Grace & Co. and its affiliated debtors (collectively referred to herein as the "Debtors") each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, 11 U.S.C. 101 *et seq.*

Prior to the Petition Date, on or about December 15, 1980, Southern Railway Company, and W.R. Grace & Co. entered into an agreement (the "Right-of-Way Agreement") pursuant to which W.R. Grace & Co. was permitted to occupy and use portions of a railroad right-of-way with respect to its kaolin manufacturing business located in Natka, South Carolina. A copy of the Right-of-Way Agreement is attached hereto as Exhibit A.

On or about December 15, 1980, Southern Railway Company and W. R. Grace & Co. entered into another agreement pursuant to which Southern Railway Company would operate an industrial railroad track to serve W. R. Grace's kaolin manufacturing business (the "Track Agreement"). A copy of the Track Agreement is attached hereto as Exhibit B.

On or about November 7, 1983, Southern Railway Company and W.R. Grace & Co. entered into an agreement which supplements the Track Agreement (the "November 1983 Agreement") and provides for Southern Railway Company's operation of an additional 477 feet in industrial track. A copy of the November 1983 Agreement is attached hereto as Exhibit C.

On or about October 3, 1990, Southern Railway Company and W.R. Grace & Co.-Conn, formerly W.R. Grace & Co., entered into a supplemental agreement pursuant to which Southern Railway Company granted W.R. Grace & Co.-Conn the right or license to construct, maintain and use an overhead loading structure with retractable loading spout across and over Southern Railway Company's industrial track (the "September 1990 Agreement"). A copy of the

September 1990 Agreement is attached hereto as Exhibit D. The Right-of-Way Agreement, the Track Agreement, the November 1983 Agreement and the September 1990 Agreement are all collectively referred to herein as the "Agreements").

On or about July 8, 1998, Lester F. Kirkland, Jr. commenced a personal injury lawsuit in the State Court of Bibb County, Georgia styled *Lester F. Kirkland, Jr. v. Norfolk Southern Railway Company*, Civil Action No. 45273 (the "Kirkland Action"). A copy of the Kirkland Action is attached hereto as Exhibit E. On several occasions, Norfolk Southern Railway Company ("Norfolk Southern"), as successor-in-interest to Southern Railway Company, sought to have the Debtors participate in, and assume the handling of, the Kirkland Action as provided in the indemnification provisions set forth in the Agreements. Despite Norfolk Southern's requests, the Debtors declined to participate in the Kirkland Action and/or to indemnify Norfolk Southern in that regard.

On or about March 21, 2001 the jury in the Kirkland Action returned a verdict in favor of the plaintiff, and against Norfolk Southern, in the amount of $1,924,500.00, with interest thereon at the legal rate as provided by law and costs of such action. A copy of the Jury Verdict and Judgment is attached hereto as Exhibit F. On or about July 2, 2001, the parties settled the Kirkland Action for the sum of $1,500,000.00 (the "Kirkland Settlement"). Norfolk Southern paid the Kirkland Settlement on or about July 6, 2001. A copy of the Satisfaction of Judgment entered on the docket in the Kirkland Action is attached hereto as Exhibit G. In its defense of the Kirkland Action, Norfolk Southern incurred fees and expenses in the amount of $61,664.66.

Norfolk Southern asserts any and all claims it has or may have against the Debtors under the following agreements: the Right-of-Way Agreement, the Track Agreement, the November 1983 Agreement and the September 1990 Agreement. These claims include, but are not limited

to, those amounts that Norfolk Southern has incurred as a result of, and in the defense of, the Kirkland Action.

In addition, Norfolk Southern is in the business of providing, among other things, freight services for the transportation of various goods (the "Transportation Services"). As set forth in the Statement of Charges attached hereto as Exhibit H, for the period from August 16, 2000 through April 2, 2001, Norfolk Southern provided the Debtors with Transportation Services in the amount of $20,415.52 for which it has not been paid. Accordingly, Norfolk Southern has a claim against the Debtors in the amount of $20,415.52.

Finally, as set forth in the invoices attached hereto as Exhibit I, the Debtors are indebted to Norfolk Southern for (i) expenses incurred by Norfolk Southern on the Debtors' behalf for environmental clean up by Ferguson Harbour at Chattanooga, Tennessee and (ii) track scale testing. Accordingly, Norfolk Southern has a claim against the Debtors in the amount of $2,102.00.

By this proof of claim, Norfolk Southern also asserts its right to setoff the amounts owed by the Debtors to Norfolk Southern against any claim that may be brought against Norfolk Southern by the Debtors, the Debtors in possession, any trustee or any estate representative.

Norfolk Southern also expressly asserts and reserves all other rights, including, without limitation, (i) the right of recoupment, (ii) any other defenses to any cause of action, (iii) to amend this claim, and (iv) to assert this claim or any portion of it against any other Debtor if a basis to do so is subsequently discovered. To the extent that these claims are used defensively, as a right of setoff, Norfolk Southern asserts that such claims are secured claims.

All notices with respect to this proof of claim should be sent as directed on the proof of

claim form with a copy to:

POTTER ANDERSON & CORROON LLP
Laurie Selber Silverstein
Monica Leigh Loftin
Hercules Plaza – 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, Delaware 19899
(302) 984-6000

PA&C 576035

4

# Exhibit A

Form.626 (4-4-77)

THIS AGREEMENT, made between
SOUTHERN RAILWAY COMPANY, a Virginia corporation,

hereinafter styled COMPANY; and
XXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXX        (illegible) 10/71
    W. R. Grace & Co.,    a Connecticut Corporation,
hereinafter styled LICENSEE;

W I T N E S S E T H:

THAT the PARTIES HERETO agree as follows:

1. COMPANY, in consideration of the covenants of Licensee, hereby grants unto
Licensee the right to occupy and use for the purpose or purposes hereinafter mentioned.

A.   One      parcel(X) of the right of way or property of
Company at   NATKA, South Carolina   , having an
area of  13,193   (square feet) (acres), more or less, the
location and dimensions of which are substantially as shown
in   blue   outline on print of Drawing No. TB-80-0185
dated    June 27, 1980    , XXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXX, hereunto annexed and made a
part hereof; TOGETHER with the right to maintain thereon, at
Licensee's sole cost and expense, a portion of an existing
warehouse building, with two appurtenant overhead canopies,
a shed, and a cyclone fence with two double swing gates therein,
all located substantially as shown on said annexed print; which said
warehouse building, canopies, shed, fence and gates shall not become
fixtures upon the realty but shall remain the property of Licensee
and shall be removed from the premises upon termination of this
agreement. Said canopies and said shed being hereinafter sometimes
together referred to as "Facility".

B. The          of Company, or use of
square feet, more or less, therein, at
            , the location and dimensions of
said structure of Company or of the area therein to be
occupied by Licensee hereunder, being substantially as
shown in       outline on print of Drawing No.
        , dated           , revised
or last revised           , hereunto
annexed and made a part hereof; TOGETHER with the right

Company reserves unto itself, and its permittees, the permanent right to maintain, operate,
renew or reconstruct upon, under or over said premises, any existing pipe, electric trans-
mission, telephone, telegraph, and signal lines, or any other facilities of like character,
Licensee hereby agreeing that this agreement is subject to any or all such rights and uses;
Company hereby further reserving unto itself the right to enter upon said premises at any
and all times for the purpose of operating, maintaining, reconstructing or relocating such
existing track or tracks as may be located on said premises. The privilege herein granted
is subject also to such rights as the owners or users thereof may have to use any road or
highway, or portion thereof, which may be located upon or which may traverse said premises.

2. Licensee will use said premises for  mining and manufacturing plant
    in connection with the   Kaolin manufacturing
    business of Licensee.

3. Licensee will pay unto Company the rent or sum of ONE HUNDRED ----------------
------------------- DOLLARS ($100.00 ) per annum, payable annually, in advance, beginning as

2883-227

Form 626

of the effective date hereof.  If Licensee shall default in the payment of rental hereunder for a period of 30 days after the same shall be due, a service charge in the amount of 1/2 of 1% of such rent for each month or portion thereof that the same shall remain unpaid shall be charged to Licensee.  Licensee will pay such service charge together with rental due hereunder.

4.  Licensee will use said premises for the purposes aforesaid and for no other purpose.  This license is a personal privilege to Licensee and shall not be assigned without the written consent of Company; nor shall Licensee, except with such consent, permit said premises to be used for any purpose by any other person.

5.  Licensee will pay all taxes, licenses or other charges assessed or levied upon the property of or business conducted by Licensee upon said premises of Company, or against Company by reason of the location of such property or business of Licensee upon said premises.

6.  Licensee will not construct or install upon said premises any buildings, structures or improvements unless specifically permitted hereby or by written consent of Company.  Any buildings, structures or improvements erected by Licensee on said premises, if permitted hereby, shall be substantially constructed or installed, maintained and used in such manner as not to interfere with the operation and maintenance of the railroad of Company, shall be kept in good repair and presentable condition, shall be located as described herein or shown on the attached print, and shall not be relocated upon Company premises except with the written consent of Company.  Buildings or structures of Licensee, if permitted hereunder, shall have roofs of metal or other non-combustible material to reduce fire risks.  Licensee agrees to keep said premises in clean and sanitary condition, free of waste, trash, or unsanitary or inflammable matter, and to prevent the posting of advertising bills or signs upon said premises, except the usual business sign of Licensee.

7.  Licensee will not permit smoking within any building of Company occupied by Licensee, and will post and maintain in a conspicuous place, or places, within said premises a sign or signs, reading "NO SMOKING ALLOWED", or words of similar import.

8.  If the premises occupied hereunder by Licensee consists of a building or other structures of Company, or space therein, Licensee

(a) accepts the premises in their present condition; it being agreed that all maintenance and repairs needed to keep the premises in as tenantable condition as at present shall be made by the Licensee at Licensee's sole cost and expense, the term "premises" as used in this subparagraph to include, without limitation, air conditioning, heating, sprinkler systems, plumbing, wiring facilities and other equipment or facilities which may be furnished by Company and employed in the use and occupancy of the premises; and that Company shall have no obligation to perform any maintenance or to make any repair or replacement with respect to the premises except those required to be made to the roofing, foundations, and outside walls (exclusive of windows, doors and facilities attached to or adjacent to the outside walls such as loading docks).  It is further agreed that Licensee in fulfilling the obligations assumed by Licensee herein shall make provision for the immediate repair and maintenance of all doors, windows, or other facilities comprising the premises which serve to protect the premises from the elements, damage by vandalism or other causes, and that where any such repair or maintenance is not or is not considered by Licensee to be the responsibility of Licensee, Licensee shall notify Company immediately of the need for such repair and maintenance, Licensee failing in either respect, to be liable to Company for all damage resulting.  Company shall have no obligation to furnish Licensee any water, heat, light or other public utilities for use by Licensee in Licensee's occupation and use of said premises, and all facilities for supplying light, water, heat and other public utilities required by Licensee in connection with Licensee's use of said premises shall be of character and design approved by Company and shall be installed and maintained therein at the expense of Licensee, and in accordance with the requirements of Company as to proper installation and construction; Licensee agreeing to pay all expenses and charges for such utilities and to install separate meters necessary in connection therewith.

(b) will not make any alterations in, additions to or improvements to said

2883-227

- 7 -

Form 626

premises, or the appurtenances thereof, of any kind whatsoever, without the
written consent of Company being first obtained. All alterations or or addi-
tions to the electric light or power wires or fixtures upon said premises which
may be made by Licensee with the consent of Company shall be made in strict
accord with the requirements of the National Electrical Code and at the expense
of Licensee; and

(c) will, while in possession hereunder, comply, and cause its agents and
employees to comply, with all such reasonable rules and regulations as may be
prescribed by Company looking to the prevention of fires and compliance with
insurance contracts and policies. Licensee will promptly comply with any
requirements of any insurance inspector of Company looking to the enforcement
of said rules and regulations, and will use its best efforts at all times for
the prevention of fires; the insurance inspector of Company to have the right
at all reasonable times to enter said premises for the inspection thereof.

9. At its own expense, Licensee shall maintain said premises in condition,
and occupy and use the same in such manner as may be necessary, to meet all requirements
of Federal, State, and local safety and health, environmental protection, and sanitation
laws and regulations, and shall at its own expense make any and all corrections or addition
to the leased premises that may be necessary to bring them into compliance with the afore-
said laws and regulations which may apply to the use and occupancy of said premises by
Licensee.

10. The liability of the parties to this agreement, as between themselves, for
death, personal injury and property loss and damage, which occurs by reason of, or arises
out of, or is incidental to, the use or occupancy by Licensee of the property covered by
this agreement, shall be determined in accordance with the following provisions:

(a) Licensee shall be solely responsible for, and shall bear all cost,
expense and liability resulting from loss of or damage to property by
fire;

(b) Licensee shall be solely responsible for, and shall bear all cost,
expense and liability resulting from death, personal injury, and loss and
damage to property, caused solely by the negligence of Licensee, or of the
agents or employees of Licensee, or by the violation by Licensee or its
agents or employees of the terms of this agreement, or by the negligence
of Licensee concurring with the negligence of a third party;

(c) Except as provided in subparagraph (a) above, Company shall be solely
responsible for and shall bear all cost, expense and liability resulting from
death, personal injury, and property loss and damage, caused solely by the
negligence of Company, or of the agents or employees of Company, or by the
negligence of Company concurring with the negligence of a third party;

(d) Except as provided in subparagraph (a) above, Company and Licensee
shall be jointly responsible for and bear equally all cost, expense and
liability resulting from death, personal injury and property loss and
damage caused by their joint and concurring negligence;

(e) Each of the parties hereto, for the liability imposed upon such party
by this agreement, shall indemnify and hold entirely harmless the other party
hereto;

(f) Knowledge on the part of Company of a continuing violation of the terms
of this agreement by Licensee shall constitute neither negligence nor
acquiescence on the part of Company, and shall in no event relieve Licensee
of any of the responsibilities imposed upon Licensee hereunder; and

(g) The term "Company", as used in this paragraph, shall include not only
Company specifically named in the first sentence of this agreement, but also
all of the corporate affiliates of Company so named.

11. (a) In connection with the use of the premises covered by this agreement

2883-227                                    - 3 -

Form 626

Licensee agrees to observe and be bound by the rules of the Company with respect to standard clearances for all railroad tracks located on or adjacent to the premises covered by this agreement; that is to say, the Licensee agrees to maintain and preserve an overhead space of 22 feet measured perpendicularly from the top of the rail (except that overhead clearance where wire lines extend over said track shall be such as may be prescribed by the Company) and a space 20 feet in width, measured 10 feet on each side from the center line of said track; provided, however, that the side clearance of 10 feet must be increased one and one-half (1-1/2) inches for every degree of curvature, which space shall be kept clear of any obstruction whatever, including but not limited to all structures, facilities or property of the Licensee which are or may be placed or erected above or parallel to said track.

(b) Notwithstanding anything contained in this agreement, and irrespective of any joint or concurring negligence of Company, Licensee shall assume sole responsibility for and shall indemnify, save harmless and defend Company from and against all claims, actions, or legal proceedings arising, in whole or in part, from the failure of Licensee to comply with any clearance requirements set forth in this agreement. In this connection, it is specifically understood that knowledge on the part of Company of a violation of any such clearance requirements, whether such knowledge is actual or implied, shall not constitute a waiver and shall not relieve Licensee of its obligations to indemnify Company for losses and claims resulting from any such violation.

12. In the event that the whole or any part of the premises occupied by Licensee hereunder shall be taken for any purpose under the power of eminent domain, Licensee shall not be entitled to share in any award resulting from any such taking, nor shall Licensee have any claim against the Company for any expense which may be incurred by Licensee as a result of such taking or as a result of termination of this agreement by reason of such taking, as hereinafter provided. In the event that the taking shall be of the whole of the property herein occupied by Licensee or of such part as shall render said premises untenantable for the uses at such time made of the premises by the Licensee, then this agreement and all rights and interests acquired hereunder shall terminate as of the date of the vesting of title to the property in the condemning authority, and in no event shall Licensee have any claim for the value of any unexpired period of this agreement.

13. Company may terminate this agreement at any time by 30 days' written notice to Licensee of election so to do, and if Licensee shall default in the payment of rentals, or violate any other covenants herein, Company may terminate this agreement by 10 days' written notice to Licensee of election so to do; service of such notice to be made either (a) by delivering a copy of the notice to Licensee, or (b) by mailing the same to or leaving it at the last known address of Licensee and posting in any conspicuous place upon said premises. Licensee may also terminate this agreement by 30 days' written notice to Company of election so to do. Upon the termination of this agreement, in any manner, Licensee will vacate said premises of Company, remove all property (including structures, if any) of Licensee therefrom, and surrender possession of said premises to Company in as good condition as they were in prior to construction or placing of said property thereupon, and, in default thereof, Company may, in addition to any other legal remedy it may have, at its election (a) remove the property of Licensee from and restore the condition of said premises of Company, at the expense of Licensee, or (b) subject to notice as hereinafter provided, take possession of any property left on said premises by Licensee and dispose of the same by sale or otherwise for the purpose of applying the proceeds thereof against unpaid rental or to other payments due pursuant to the terms of this agreement, or for other purposes as hereinafter mentioned; except that if said property so left on said premises by Licensee has no value, in the judgment of Company, or cannot be conveniently sold, the same may be disposed of in such manner as Company may determine to relieve itself of the burden of caring for such property; provided, however, that prior to the sale or other disposition of such property Company shall notify, or attempt to notify, Licensee of Company's intent so to sell or dispose of such property. If this agreement shall be terminated by Company it agrees, upon written

demand by Licensee, to refund the unearned portion of any rent paid in advance; provided, however, that Company's obligation to refund unearned rental shall be conditioned upon the fulfillment of all of the obligations of Licensee under the terms of this agreement. The terms and provisions of this paragraph shall survive the termination of this agreement.

14.  This agreement shall take effect as of the ___1st___ day of ___June___ 19 _80_.

15.  Licensee will maintain and renew, at its sole cost, the two double swing gates across the industrial track on said premises at the locations indicated on said annexed print said gates to be of such design and specification as may be prescribed by Company, to be equipped outside, and to be constructed in such manner as to provide, when opened an un-obstructed space on each side of the center line of said track of not less than ten  feet and a total clearance of not less than twenty feet. Licensee shall also provide a substantial de-vice on each side of said track to which the wings of said gates may be fastened and made stationary parallel, or substantially parallel, with said track when railroad equipment is moving through the gateways; each of said devices to be so arranged that when the wings of said gates are fastened thereto the distance between the side of each wing and the center lin of said track will not be less than ten feet in the clear.

16.  Notwithstanding any other provisions of this agreement, Licensee will assume full responsibility for the safe and proper maintenance and use of said gates, and, except for loss, damage or injury caused solely by the negligence of Company, Licensee will indemnify and save harmless  Company, and any associated, controlled or affiliated corporation, from and against the consequences of any property loss or damage, loss of life or personal injury whatever accruing from or by reason of the construction, main-tenance or use of said gates or by reason of the presence of the same across said track, whether or not negligence of Company  may have contributed to such loss, injury or damage.

17.  Licensee will construct, and maintain said Facility at all times during the life of this agreement, at its sole cost and expense, in strict accord with plans and specifications (if any) shown and noted on said annexed print and such other speci-fications as may be reasonably prescribed by Company, and, moreover, in all respects in accordance with requirements of Company; it being understood that the work of constructing and maintaining said Facility shall, at all times during its progress, be subject to the inspection and supervision, and upon its completion to the approval, of the duly authorized representative of Company.

18.  Licensee will maintain said Facility at all times during the life of this agreement in such condition that said Facility or the use thereof by Licensee shall not be or become an obstruction to, or interfere with, the safe and proper maintenance of said industrial track, or railroad operations upon said track, or endanger life or limb of em-ployees of Company or other persons on or about said track.

19.  Said Facility shall be maintained at the location indicated upon said annexed print, and shall not be relocated without the consent, in writing, or Company.

20.  Licensee proposes to construct, maintain and use said Facility with full cognizance of the risk of loss of life, personal injury and property loss or damage which may be caused by or result from railroad operations on said industrial track at the loca-tion of said Facility, or which may accrue from or by reason of the construction, installa-tion, maintenance, presence of use of said Facility by Licensee; and Licensee covenants that said Facility shall be constructed, maintained and used solely at the risk of Licensee, and the neither Company nor any associated controlled or affiliated corporation, shall assume any responsibility in the premises; Licensee hereby specifically agreeing, notwith-standing any other provision of this agreement, to indemnify and save harmless Company and any associate, controlled or affiliated corporation, from and against the consequences of any and all such loss, injury or damage, whether or not negligence of Company may have caused or contributed to such loss, injury or damage.

21.  Notwithstanding the provisions of Article II of this agreement, the clear-ances for said industrial track, as to the existing structures of Licensee shown and de-picted on said annexed print, may be limited or restricted to the dimensions shown on said print, provided Licensee shall place and maintain, at its own cost and expense, warning signs, satisfactory to Company, at conspicuous places on each of said structures where

**2883-227**                                             -5-

standard clearances do not obtain to the effect that such structures will not clear man
on side or on top of car.

Notwithstanding any other provisions of this agreement, Licensee shall in-
demnify and save harmless Company, and any associated, controlled or affiliated corpora-
tion, from and against the consequences of any loss of life, personal injury or property
loss or damage which may result from or be attributable to any limited or restricted
clearances for said industrial track, whether or not negligence of Company may have
caused or contributed to such loss, injury or damage.

IN WITNESS WHEREOF the parties hereto have executed these presents in duplicate,
each part being an original, this ___15th___ day of ___December___, 19 _80_.

In presence of:                               SOUTHERN RAILWAY COMPANY,
                                                By

_____       _____
As to Company.                                      Vice President.

In presence of:                               W. R. GRACE & CO.,
                                         XXXXXXXXXXXXXXXXXXXXX
                                         By

___D. K. Crawford___           _____
As to Licensee.                                    -Vice-President.

-6-

DAG:jat
7-16-80
33458-1

2883-227



NOTES :

SOU. RY. OWNS AND MAINTAINS TRACK NO. 22-2 FROM P.S
STA. 0+00 TO STA. 1+43 AND FROM C.P. STA. 15+27 TO
P.S. STA. 16+78 = 294 T.F.

INDUSTRY OWNS AND MAINTAINS TRACK FROM STA. 1+43 TO
STA. 15+27 = 1384 T.F. SHOWN GREEN
GATES ACROSS TRACK SHOWN ORANGE

ENCROACHMENT BY W.R. GRACE COMPANY SHOWN RED
AREA = 13193 S.F.



AIKEN CO. S.C.
V-36b/6

SECTION B-B
SCALE 1"=10'

FRAME CANOPY ROOF
10.4' x 7.6'

WAREHOUSE

W.R. GRACE COMPANY

INS TRACK NO. 22-2 FROM P.S
AND FROM C.P. STA. 15+27 TO
SHOWN RED.

INS TRACK FROM STA. 1+43 TO
SHOWN GREEN

GRACE COMPANY SHOWN BLUE

SOUTHERN
RAILWAY SYSTEM

OFFICE OF AV.P. M.W&S.          ATLANTA, GA.

NATKA , S.C.

ENCROACHMENT BY AND TRACK SERVING
W.R. GRACE
COMPANY

| REV. | DATE | BY | REVISION DESCRIPTION |
|------|------|----|----|

FILE NO. 107-3-7970  DWG NO. T8-80-01/R5
VAL MAP 36L/6   MP. AR. 21   DATE 6-27-85
DES.                OR. SEC.

SCALE: 1"=100'
DO NOT SCALE THIS DRAWING FOR DIMENSIONS NOT GIVEN
0    100    200

# Exhibit B

(Rev. 4-1-75)

THIS AGREEMENT, made between
SOUTHERN RAILWAY COMPANY, a Virginia corporation, its successors and assigns,

hereinafter styled Railroad, party of the first part; and ~~XXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXX~~ August 1941
    W. R. Grace & Co., a Connecticut Corporation,

hereinafter styled Industry, party of the second part;

## W I T N E S S E T H:

THAT the PARTIES HERETO agree as follows:

A.   Railroad will ——————————operate, to afford Industry facilities for the
receipt and shipment of carload freights of Industry over the lines of Railroad in
accordance with lawfully published tariffs, an industrial track described as follows:

A double-ended side track, at NATKA, South Carolina, 1678 feet,
more or less, in length, measured between the switch points thereof, located sub-
stantially as shown in red and green on print of Drawing No. TB-80-0185, dated
June 27, 1980, annexed hereto and made a part hereof.  Said double-ended side track
being hereinafter referred to as "track" or "industrial track".

Railroad, moreover, hereby grants unto Industry the right or license
to construct, maintain and use (a) two double swing gates across said industrial
track; (b) two overhead canopies over said industrial track; and (c) a shed over
said industrial track;  all at the locations shown on said annexed print.  Said
overhead canopies and said shed being hereinafter sometimes together referred to as
"Facility".

B.   Said track is to be——————————operated upon and subject to the terms
and conditions set out in Exhibit "A" hereto annexed and made a part hereof.

This agreement shall be effective as of the 1st day of June , 19 80 .
Either party hereto may terminate this agreement by sixty ( 60 ) days' written
notice to the other of election so to do.

IN WITNESS WHEREOF, the parties hereto have executed this agreement in duplicate
each part being an original, as of the 15th day of December , 19 80 .

In presence of:                               SOUTHERN RAILWAY COMPANY,
                                              By

_____                       _____
As to Railroad.                                    Vice President.

In presence of:                               W. R. GRACE & CO. ~~XXXXXXXXXXXXXXXXXXX~~ August 1941
                                              By                                      JWH

_____                       _____
D. K. Crawford                                     Vice President.
As to Industry.

JMJ:jat    7-30-80
     33458

2883-228

2E (rev. 3-7-78)

EXHIBIT "A"

1.  Industry will acquire and hereby guarantees to Railroad full right and lawful authority to maintain and operate any portion of said industrial track which may be located beyond the limits of the right of way of Railroad, or upon or across any public highway.

2.  Title to the rails, materials and fixtures in the portion of said track extending between survey stations 1 + 43 and 15 + 27 thereon, is vested in Industry, and title that portion of said industrial track extending from the southerly switch point thereof to survey station 1 + 43 thereon and that portion of said track extending from survey station 15 + 27 thereon to the northerly switch point thereof, is and shall remain vested in Railroad.  Railroad shall have entire control of said track and the operation thereof, and may use the same as well for the business of third persons, not parties hereto, as for that of Industry; provided that such use of said portion of track owned by Industry for the benefit of third persons shall not unreasonably interfere with the business of Industry.

3.  Industry will, at the cost and expense of Industry, maintain the portion of said industrial track owned by Industry, as aforesaid, in good condition and repair and in all respects in accordance with the reasonable requirements of Railroad looking to the safe and convenient operation of engines and cars on said track; it being understood that Railroad will maintain the portion of said track owned by Railroad, as aforesaid.  Upon request of Industry, Railroad will assist Industry in locating a qualified railroad contractor to perform, for the account of Industry, that portion of the maintenance work for which Industry is responsible under this paragraph; provided, that Railroad shall not be responsible for the performance of any such contractor to perform such maintenance work shall relieve Industry of Industry's primary obligation to maintain its portion of said track.

4.  Industry agrees, except as to the existing structures shown and depicted on said annexed print, to observe and be bound by the rules of Railroad for standard clearances; that is to say, Industry agrees to maintain and preserve an overhead space of 22 feet measured perpendicularly from the top of the rail (except that overhead clearance where wire lines extend over said track shall be such as may be prescribed by Railroad) and a space 20 feet in width, measured 10 feet on each side from the center line of said track (except that side clearances where platforms, and doorway for track entering building, are involved shall be such as may be prescribed by Railroad), provided, however, that all side clearances for said track must be increased one and one-half (1-1/2) inches for every degree of curvature therein, which space shall be kept clear of any obstruction whatever including, but not limited to, all structures, facilities or property of Industry which are or may be placed or erected above or parallel to said track; provided, however, that as to said existing structures where standard clearances do not obtain, the clearances for said track may be limited or restricted to the dimensions shown on said annexed print; provided, further that Industry shall place and maintain, at its cost and expense, warning signs, satisfactory to Railroad, at conspicuous places on each of said structures to the effect that such structures will not clear man on side or on top of car.

Notwithstanding any other provision of this agreement, Industry shall indemnify and save harmless Railroad, and any associated, controlled or affiliated corporation, from and against the consequences of any loss of life, personal injury or property loss or damage which may result from or be attributable to any limited or restricted clearances for said industrial track, whether or not negligence of Railroad may have caused or contributed to such loss, injury or damage.

5.  The liability of the parties to this agreement, as between themselves, for death, personal injury and property loss and damage, which occurs by reason of, or arises out of, or is incidental to, the construction, operation, maintenance, use, presence or removal of the track covered by this agreement and the right of way therefor, shall be determined in accordance with the following provisions:

(a)  Industry shall be solely responsible for, and shall bear all cost, expense and liability resulting from loss of or damage to property by fire;

(b)  Industry shall be solely responsible for, and shall bear all cost, expense and liability resulting from death, personal injury, and loss and damage to property, caused solely by the negligence of Industry, or of the agents or employees of Industry, or by the violation by Industry or its agents or employees of the terms of this agreement, or by the negligence of Industry concurring with the negligence of a third party;

(c)  Except as provided in subparagraph (a) above, Railroad shall be solely responsible for and shall bear all cost, expense and liability resulting from death, personal injury, and property loss and damage, caused

2883-228

2f (rev. 3-7-78)

- 2 -

solely by the negligence of Railroad, or of the agents or employees of Railroad, or by the negligence of Railroad concurring with the negligence of a third party;

(d)  Except as provided in subparagraph (a) above, Railroad and Industry shall be jointly responsible for and shall bear equally all cost, expense and liability resulting from death, personal injury, and property loss and damage, caused by their joint and concurring negligence;

(e)  Notwithstanding anything contained in this agreement, and irrespective of the sole, joint, or concurring negligence of Railroad, Industry shall assume sole responsibility for and shall indemnify and save harmless and defend Railroad from and against all claims, actions, or legal proceedings arising, in whole or in part, from the failure of Industry to comply with any clearance requirements set forth in this agreement.  In this connection it is specifically understood that knowledge on the part of Railroad of a violation of any such clearance requirements, whether such knowledge is actual or implied, shall not constitute a waiver and shall not relieve Industry of its obligations to indemnify Railroad for losses and claims resulting from any such violation;

(f)  Each of the parties hereto, for the liability imposed upon such party by this agreement, shall indemnify and hold entirely harmless the other party hereto;

(g)  Knowledge on the part of Railroad of a continuing violation of the terms of this agreement by Industry shall constitute neither negligence nor acquiescence on the part of Railroad, and shall in no event relieve Industry of any of the responsibilities imposed upon Industry hereunder; and

(h)  The term "Railroad", as used in this paragraph, shall include not only Railroad specifically named in the first sentence of this agreement, but also all of the corporate affiliates of Railroad so named.

6.  Cars shall not be moved to or from said industrial track except by Railroad.  Industry will provide and furnish, at its own cost and expense, and keep ready for use at all times in a convenient place, a metal sign (or signs) at least 12 inches by 15 inches, reading "STOP"--"Men at Work", the letters in the word "STOP" to be at least four (4) inches high, and the letters in the words "Men at Work" at least two (2) inches high, and the color of which shall be white with blue background, which said sign(s) shall be used (1) whenever work is being done or activity performed in or about any car or series of cars, either by men and/or equipment; (2) whenever any car or series of cars is being loaded or unloaded either by hand or by the use of any mechanical means or device without regard to whether said mechanical means or device is connected to said car or series of cars; (3) whenever any work is being done or activity performed on or about the tracks themselves by men and/or equipment without regard to whether any car or series of cars is located on the tracks at the time the work is being done or the activity is being performed; and (4) at any other time when Industry employees and/or Industry equipment are engaged in such activity that the movement of cars could cause injury or damage to employees and/or equipment.  If Industry loads or unloads to or from rail tank cars placed on said track by Railroad, said sign(s) shall be of the size and coloring specified herein, provided, however, that said sign(s) shall read "STOP"--"Tank Car Connected" and shall be maintained in place until the car is disconnected from any mechanical means or device used in connection with the loading or unloading thereof, including, but not limited to, any hose, pipe, conveyor belt or coupling of any type; it being understood and agreed that tank cars must not be left connected to any such mechanical means or device, as above defined, except when loading or unloading is going on and while a competent person is present and in charge.  If the commodity loaded or unloaded into or from said rail tank cars is defined as hazardous or flammable in the regulations of the United States Department of Transportation, it is further understood and agreed that (a) brakes must be set and wheels blocked on all cars being loaded or unloaded and (b) smoking is to be prohibited in loading or unloading areas and "No Smoking" sign(s), satisfactory to Railroad, are to be posted in conspicuous locations approved by Railroad in loading or unloading areas, said sign(s) to be provided at the cost and expense of Industry.  Industry agrees to keep the premises around and about said track clean

2f· (rev. 3-7-78)

~ 3 -

and free of undergrowth and dead grass, and waste paper, trash or any other flammable or unsightly matter.

If any of the aforesaid situations are present necessitating the use of the aforesaid sign(s), the placement of which shall be solely the responsibility of Industry, said sign(s) shall be conspicuously displayed to give necessary warning as follows:

(a) On each end of the car involved or on the outermost end of the end car in a series of cars; or,

(b) Alternatively on the tracks beyond the end of the car involved or on the tracks beyond the outermost end of the end car in a series of cars; or,

(c) If no car or series of cars is involved on the tracks themselves at a location beyond the limits of any work being done or activity performed;

(d) Provided, that if the track involved is a "dead end" track sign(s) need only be deployed in the manner stated above to cover the direction from which train movement might occur.

7. Notwithstanding any other provision of this agreement, Industry will, moreover, indemnify and save harmless Railroad, and any associated, controlled, or affiliated corporation, from and against any loss of or damage to any cars of Railroad or cars of other railroad companies in use by Railroad, while being moved by Industry upon said industrial track, and from and against any loss of life, personal injury and any property loss or damage which may occur during or which result from the movement of said cars by Industry, as aforementioned, whether or not negligence on the part of Railroad may have caused or contributed to such loss, damage, injury or death.

8. All carload shipments consigned to Industry for delivery on said industrial track shall be deemed to have been fully and completely delivered as soon as the car containing such shipment shall have been placed on the industrial track and detached from the engine or train by which it was moved. Railroad shall not be liable as common carrier, nor as bailee, for any property loaded into any car on said industrial track until said car is attached or coupled to the engine or train by which it is to be moved from said industrial track towards its destination, or until a bill of lading shall have been issued to Industry therefor, and until said car is so attached or coupled up, or a bill of lading is issued therefor, the said car and its contents shall be deemed and held to be in the possession of Industry so far as liability therefor is concerned.

9. Notwithstanding any other provision hereof, Industry agrees to comply entirely at its own expense with all requirements imposed by any governmental agency, state, federal or local, with respect to clearances, walkways, specification and condition or maintenance of that part of the subject track which is owned or maintained by Industry.

10. The provisions of this agreement shall inure to the benefit of, and shall . be binding upon, any other railroad company now operating on which may hereafter operate over or upon the track covered by this agreement, and shall also be binding upon any third party who, as successor or assignee of Industry or with the consent of Industry, may use said track, or who may enter upon the premises served by said track; it being understood and agreed that Industry will promptly furnish to Railroad notice, in writing, of any such use or entry by any such third party. Industry hereby guarantees the strict performance of the terms of this agreement by any such third party until the use of said track by such third party shall have been covered by the execution of an appropriate agreement with Railroad. This contract is not assignable or transferable by Industry except with the written consent of Railroad, signed by an executive officer.

11. Upon the termination of this agreement Railroad may discontinue the operation of said industrial track and remove its property and fixtures therefrom; and Industry shall take up and remove from the right of way or property of Railroad the track materials in any portion of said track owned by Industry and located on Railroad right of way or property, the work of taking up said track materials to be done, if Railroad elects, by the forces

2f (rev. 1-7-78)

- 4 -

of Railroad, but at the expense of Industry.  Notwithstanding any other provision hereof, if Industry shall fail to comply with any of its covenants in this agreement contained, Railroad shall have the right forthwith to discontinue operation of said industrial track, without liability to Industry, until Industry shall have complied with all of said covenants.

12. Industry will construct, maintain and renew, at its sole cost, said double swing gates across said track at the location indicated on said annexed print; said gates to be of such design and specification as may be prescribed by Railroad, to be equipped with Railroad's standard switch lock, so applied that said gates may be locked from the outside, and to be constructed in such manner as to provide, when opened, an unobstructed space on each side of the center line of said track of not less than ten feet and a total clearance of not less than twenty feet.  Industry shall also provide a substantial device on each side of said track to which the wings of said gates may be fastened and made stationary parallel, or substantially parallel, with said track when railroad equipment is moving through the gateway; each of said devices to be so arranged that when the wings of said gates are fastened thereto the distance between the side of each wing and the center line of said track will not be less than ten feet in the clear.

Notwithstanding any other provisions of this agreement, Industry will assume full responsibility for the safe and proper maintenance and use of said gates; and, except for loss, damage or injury caused solely by the negligence of Railroad, Industry will indemnify and save harmless Railroad, and any associated, controlled or affiliated corporation, from and against the consequences of any property loss or damage, loss of life or personal injury whatever accruing from or by reason of the construction, maintenance or use of said gates or by reason of the presence of the same across said track, whether or not negligence of Railroad may have contributed to such loss, injury or damage.

13. Industry will construct, and maintain said Facility at all times during the life of this agreement, at its sole cost and expense, in strict accord with plans and specifications (if any) shown and noted on said annexed print and such other specifications as may be reasonably prescribed by Railroad, and, moreover, in all respects in accordance with the requirements of Railroad; it being understood that the work of constructing and maintaining said Facility shall, at all times during its progress, be subject to the inspection and supervision, and upon its completion to the approval, of the duly authorized representative of Railroad.

14. Industry will maintain said Facility at all times during the life of this agreement in such condition that said Facility or the use thereof by Industry shall not be or become an obstruction to, or interfere with, the safe and proper maintenance of said industrial track, or railroad operations upon said track, or endanger life or limb of employees of Railroad or other persons on or about said track.

15. Said Facility shall be maintained at the location indicated upon said annexed print, and shall not be relocated without the consent, in writing, of Railroad.

16. Industry proposes to construct, maintain and use said Facility with full cognizance of the risk of loss of life, personal injury and property loss or damage which may be caused by or result from railroad operations on said industrial track at the location of said Facility, or which may accrue from or by reason of the construction, installation, maintenance, presence or use of said Facility by Industry; and Industry covenants that said Facility shall be constructed, maintained and used solely at the risk of Industry and that neither Railroad, nor any associated, controlled or affiliated corporation, shall assume any responsibility in the premises; Industry hereby specifically agreeing, notwithstanding any other provision of this agreement, to indemnify and save harmless Railroad, and any associated, controlled or affiliated corporation, from and against the consequences of any and all such loss, injury or damage, whether or not negligence of Railroad may have caused or contributed to such loss, injury or damage.

2883-228

# Exhibit C

THIS SUPPLEMENTAL AGREEMENT, made between

SOUTHERN RAILWAY COMPANY, a Virginia corporation, its successors and assigns, hereinafter styled Railroad, party of the first part; and

W. R. GRACE & CO., a Connecticut corporation, hereinafter styled Industry, party of the second part;

W I T N E S S E T H: That

WHEREAS, under the terms and conditions of that certain written agreement (hereinafter referred to as "Agreement") between the parties hereto dated December 15, 1980, Railroad operates an existing industrial track at NATKA, South Carolina to serve the business of Industry; and

WHEREAS, Industry has, at its own cost and expense, constructed an additional industrial track, 477 feet, more or less, in length, springing from said existing industrial track and the parties hereto enter into this supplemental agreement to provide for the operation of said additional industrial track;

NOW, THEREFORE, the PARTIES HERETO agree as follows:

1.  Railroad will operate said additional industrial track upon all of the terms and conditions and subject to all of the provisions of said Agreement, as herein modified; the location of said additional industrial track being substantially as shown in red on print of Drawing No. AC-0020-R1, dated March 2, 1983, revised June 26, 1983, annexed hereto and made a part of this supplemental agreement.

2.  Industry hereby guarantees to Railroad the right to operate any portion of said additional industrial track which may be located beyond the limits of the right of way of Railroad, or upon or across any public highway.

3.  Title said said additional industrial track is vested in Industry and Industry shall maintain the same in all respects in accordance with the provisions of Article 3 of Exhibit "A" of said Agreement.

4.  This supplemental agreement shall be effective as of the 1st day of September , 19 83, is supplemental to said Agreement and modifies

the same as herein provided but not otherwise; and said Agreement, as herein modified, shall continue in effect until terminated as therein provided.

IN WITNESS WHEREOF, the parties hereto have executed this agreement in duplicate, each part being an original, as of the 7th day of November , 19 83.

In presence of:

_____
As to Railroad.

SOUTHERN RAILWAY COMPANY,
By

_____
Vice President.

In presence of:

_____
As to Industry.

W. R. GRACE & CO.,
By

_____
Vice President Mfg.
Davison Chemical Division

JMJ    8/17/83
33458

- 2 -

2883-228.



# Exhibit D

THIS SUPPLEMENTAL AGREEMENT, made between                         2883-228

SOUTHERN RAILWAY COMPANY, a Virginia corporation, hereinafter called
Railroad; and

W. R. GRACE &   CO-CONN.  , a Connecticut corporation, hereinafter called    (formerly W. R. Grace & Co.)
Industry; and

                    W I T N E S S E T H:  That

        The parties hereto agree that, effective as of the  17th  day
of   SEPTEMBER  , 1990     , the written agreement dated December 15,
1980, between Railroad and Industry concerning the operation and maintenance
of an industrial track 1678 feet in length at NATKA, South Carolina as
supplemented by agreement dated November 7, 1983 to provide for an additional
track 477 feet in length, (hereinafter together referred to as "Agreement") is
hereby modified in the following manner, but not otherwise, that is to say:

        1.    Railroad hereby grants unto Industry the right or license to
construct, maintain and use an overhead loading structure with retractable
loading spout, hereinafter called "Facility," across and over an industrial
track of Industry; the location of said Facility being substantially as shown
on print of Drawing No. AD-0102, dated June 14, 1990, annexed hereto and made
a part hereof.

        2.    Industry will construct and maintain said Facility at all times,
during the life of said Agreement, at its sole cost and expense, in strict
accord with plans and specifications (if any) shown and noted on said annexed
print and such other specifications as may be reasonably prescribed by
Railroad, and, moreover, in all respects in accordance with the requirements
of Railroad; it being understood that the work of constructing and maintaining
said Facility shall, at all times during its progress, be subject to the
inspection and supervision, and upon its completion to the approval, of the
duly authorized representative of Railroad.

        3.    Industry will maintain said Facility at all times during the
life of said Agreement in such condition that said Facility or the use thereof
by Industry shall not be or become an obstruction to, or interfere with, the
safe and proper maintenance of said industrial track, or railroad operations
upon said track, or endanger life or limb of employees of Railroad or other
persons on or about said track.

        4.    Said Facility shall be maintained at the location indicated upon
said annexed print, and shall not be relocated without the consent, in
writing, of Railroad.

        5.    Industry proposes to construct, maintain and use said Facility
with full cognizance of the risk of loss of life, personal injury or property
loss or damage which may be caused by or result from railroad operations on
said industrial track at the location of said Facility, or which may accrue
from or by reason of the construction, installation, maintenance, presence or
use of said Facility by Industry; and Industry covenants that said Facility
shall be constructed, maintained and used solely at the risk of Industry, and
that neither Railroad, nor any associated, controlled or affiliated
corporation, shall assume any responsibility in the premises; Industry hereby
specifically agreeing, notwithstanding any other provisions of said Agreement,
to indemnify and save harmless Railroad, and any associated, controlled or
affiliated corporation, from and against the consequences of any and all such
loss, injury or damage, whether or not negligence of Railroad may have caused
or contributed to such loss, injury or damage.

        6.    This agreement is supplemental to said Agreement and modifies
the same as herein provided, but not otherwise, and said Agreement, as herein
modified, shall continue in effect until terminated as therein provided.


RECEIVED
SEP 24 1990

IN WITNESS WHEREOF, the parties hereto have executed this supplemental agreement in duplicate, each part being an original, as of the _3 RD_ day of _OCTOBER_ , 19_90_ .

In presence of:

_As_ to Railroad

SOUTHERN RAILWAY COMPANY,
By

Vice President - Transportation

In presence of:

_As to_ Industry.

W. R. GRACE & CO.,
By

Emil Eichhorn
Executive Vice President

LHG:prj
2327c
3345B
9-11-90



AIKEN COUNTY, SOUTH CAROLINA

SOUTHERN RAILWAY COMPANY

V/S 368/6

R/W LINE 7

FENCE 2

PROP. ASPHALT PAVING S

EXISTING BUILDING S

NOTE: ALL NEW DRAINAGE FEATURES ARE NOTED

TO SOUTH AIKEN

151.42 DIA. OFM

151 TO P/L IN MT

50'

SOUTHERN
RAILWAY SYSTEM

CAROLINA DIVISION

OFFICE OF A/V ENGR.        ATLANTA, GA.

NATKA, SOUTH CAROLINA

TRACK SERVING

"WCR GRACE COMPANY

SCALE 1"= 50'

50    0    50

# Exhibit E

IN THE STATE COURT OF BIBB COUNTY
STATE OF GEORGIA

RECEIVED
STATE COURT OF
BIBB COUNTY GEORGIA

1998 JUL -3  A 8: 45

*[signature]* CLERK STATE COURT

LESTER F. KIRKLAND, JR.,          )
                                  )
            Plaintiff             )
                                  )    JURY TRIAL DEMANDED
      v.                          )
                                  )    CIVIL ACTION FILE NO. 45223
NORFOLK SOUTHERN RAILWAY          )
COMPANY, a corporation,           )
                                  )
            Defendant             )

COMPLAINT FOR DAMAGES

COMES NOW Lester F. Kirkland, Jr., Plaintiff in this action, and files his Complaint for

Damages against Defendant as follows:

I. PARTIES, JURISDICTION, VENUE

1.      The Defendant, Norfolk Southern Railway Company, is a Virginia corporation which

does business in Bibb County, Georgia and has done business in Bibb County, Georgia at all times

referred to herein. The Defendant, Norfolk Southern Railway Company, is subject to the jurisdiction

of this Court, venue is proper, and it may be served with Summons and Complaint as allowed by law.

2.      The Defendant, Norfolk Southern Railway Company, is a common carrier by railroad

engaged in the business of operating a railroad in interstate commerce for hire for the purpose of

carrying freight in interstate commerce. The Defendant, Norfolk Southern Railway Company,

conducts a significant portion of its railroad operations in Bibb County, Georgia.

3.      The Plaintiff, at all times referred to herein, was an employee of the Defendant and

was acting within the line and scope of his employment for the Defendant. The Plaintiff's duties of

employment for the Defendant were in furtherance of interstate commerce or directly or closely affected interstate commerce.

4.     This action is brought pursuant to the provisions of the Federal Employers Liability Act, 45 U.S.C., §51, et seq.

## II.  FACTS

5.     On January 23, 1998, the Plaintiff was employed as a conductor on a train being operated by the Defendant, Norfolk Southern Railway Company, near Warrenville, South Carolina. As part of the Plaintiff's duties, he was attempting to release a handbrake on a railroad car in the course of switching operations.  The handbrake was in a defective condition and would not release when the Plaintiff applied it properly.  As the Plaintiff attempted to release the defective handbrake, he slipped in a slick and dangerous substance which had been allowed to cover the rail car on which the handbrake was located.  When he slipped, he fell from the rail car and landed on the ground suffering severe and permanent injuries to his back and hand.

6.     Following his injuries, the Plaintiff continued to try to perform his job.  On January 26, 1998, he was again attempting to apply a handbrake on a rail car which was located at the Aiken Depot, near Aiken, South Carolina.  This car was covered with a clay like slick and dangerous substance.  While attempting to apply this handbrake, the Plaintiff slipped and reinjured his back and aggravated the previous injury which he had suffered to his back.

## III.  COUNT ONE (JANUARY 23, 1998 INJURY)

7.     All of the Plaintiff's injuries and damages were caused, in whole or in part, by the negligence of the Defendant, its agents, servants or employees while acting within the line and scope of their employment for said Defendant, or by reason of a defect or insufficiency due to the

2

Defendant's negligence in its railroad cars, work practices, maintenance practices, and safety practices at the time and place where the Plaintiff suffered his injuries.

### IV.  COUNT TWO (JANUARY 23, 1998 INJURY)

8.    All of the Plaintiff's injuries and damages were caused, in whole or in part, by the negligent failure of the Defendant to use reasonable care to provide to the Plaintiff a reasonably safe place for the Plaintiff to perform his work and labor for the Defendant.

### V.  COUNT THREE (JANUARY 23, 1998 INJURY)

9.    All of the Plaintiff's injuries and damages were caused, in whole or in part, by a violation by the Defendant railroad of that Act of Congress commonly referred to as the Safety Appliance Acts and more specifically the Handbrake Act, 49 U.S.C. §20302, in that the defendant railroad allowed to be operated on its line of road a railroad car which was not equipped with a safe, secure, and efficient handbrake.

### VI.  COUNT FOUR (JANUARY 26, 1998 INJURY)

10.    All of the Plaintiff's injuries and damages were caused, in whole or in part, by the negligence of the Defendant, its agents, servants or employees while acting within the line and scope of their employment for said Defendant, or by reason of a defect or insufficiency due to the Defendant's negligence in its railroad cars, work practices, maintenance practices, and safety practices at the time and place where the Plaintiff suffered his injuries.

### VII.  COUNT FIVE (JANUARY 26, 1998 INJURY)

11.    All of the Plaintiff's injuries and damages were caused, in whole or in part, by the negligent failure of the Defendant to use reasonable care to provide to the Plaintiff a reasonably safe place for the Plaintiff to perform his work and labor for the Defendant.

## VIII.  DAMAGES

12.    The Plaintiff avers that as a result, in whole or in part, of the Defendant's negligence, he has suffered and seeks to recover for the following special injuries and damages:

      (a)    Past lost wages and benefits;

      (b)    Future lost wages and benefits;

      (c)    Permanent impairment of his ability to earn a living;

      (d)    Past medical expenses;

      (e)    Future medical expenses.

13.    The Plaintiff avers that as a result, in whole or in part, of the Defendant's negligence, he has suffered and seeks to recover for the following general injuries and damages:

      (a)    Past physical pain and mental anguish;

      (b)    Future physical pain and mental anguish;

      (c)    Permanent physical disability;

      (d)    Inability to carry out and enjoy the usual and normal activities of life.

14.    The Plaintiff seeks to recover a sum that will fully and fairly compensate him for his special and general damages.  Because of the severity of his injuries, the Plaintiff expects such fair compensation to be in excess of Two Million Dollars ($2,000,000.00).

## IX.  JURY DEMAND

15.    The Plaintiff demands a trial by a jury.


**WHEREFORE**, the Plaintiff prays for a trial by jury, that summons issue, that judgment be entered in favor of him and against the Defendant and that the following relief be granted:

4

(a)    That the Plaintiff be awarded special and general damages in an amount to fully and

fairly compensate him for his injuries;

(b)    That the cost of this action be assessed against the Defendant;

(c)    That this Court grant such other and further relief as it deems just and proper.

BURGE & WETTERMARK

By: _____

James H. Wettermark
Georgia Bar Number 750417

2300 SouthTrust Tower
Birmingham, Alabama 35203
(205) 251-9729

5

# Exhibit F

STATE COURT OF BIBB COUNTY
STATE OF GEORGIA

LESTER E. KIRKLAND, JR.

PLAINTIFF

VS.                                    CIVIL ACTION NO. 45273

NORFOLK SOUTHERN RAILWAY COMPANY

DEFENDANT

JUDGMENT

This action came on for trial before the Court and a jury, Honorable William P. Adams,

presiding, and the issues having been tried and the jury having rendered it's verdict;

IT IS ORDERED AND ADJUDGED that the Plaintiff, Lester E. Kirkland, Jr. recover of the

Defendant, Norfolk Southern Railway Company.the sum of $1,924.500.00, with.interest thereon at

the legal rate as provided by law and costs of this action

Dated at Macon, Bibb County, Georgia, this 21st day of March, 2001.

_____
JUDGE, STATE COURT OF BIBB COUNTY

_____
Plaintiff's Attorney

FILED IN OFFICE:
This 21st Day of March, 2001

_____
Deputy Clerk

IN THE STATE COURT OF BIBB COUNTY
STATE OF GEORGIA

LESTER E. KIRKLAND, JR.,                    :

        Plaintiff,                        :

vs.                                          :        CIVIL ACTION NO. 45273

NORFOLK SOUTHERN RAILWAY                     :
COMPANY,                                     :

        Defendant.                        :

---

JURY VERDICT

We, the jury, find for the:

( X )  Plaintiff in the amount of $ 1,924,500 .00

OR

(   )  Defendant.

This 21ᵘ day of March, 2001.

FILED IN OFFICE
21ˢᵗ ___ DAY OF March 2001
_Mary Jo Powell_
Deputy Clerk

_Terry L. Jenkins_
Foreperson

# Exhibit G

RECEIVED
STATE COURT OF
BIBB COUNTY GEORGIA

IN THE STATE COURT OF BIBB COUNTY
STATE OF GEORGIA

2001 JUL 11 AM 11: 33

*[signature]*
GLERK STATE COURT

LESTER E. KIRKLAND, JR.,                :
                                        :
            Plaintiff,                  :
                                        :
vs.                                     :        CIVIL ACTION
                                        :        NO. 45273
NORFOLK SOUTHERN RAILWAY                :
COMPANY,                                :
                                        :
            Defendant.                  :

## PLAINTIFF'S SATISFACTION OF JUDGMENT
## AND DISMISSAL OF ACTION

The above styled matter having been settled by and between the parties, the Clerk is

hereby authorized to mark "Satisfied of Record" the judgment entered in this case dated

March 21, 2001 and to dismiss this action upon payment of costs by Defendant.

This 6 __th__ day of July, 2001.

*[signature]*

JAMES H. WETTERMARK
Attorney for Plaintiff

Burge & Wettermark
2300 SouthTrust Tower
420 North 20th Street
Birmingham, AL 35203-3204

# Exhibit H

STATEMENT OF CHARGES DUE NORFOLK SOUTHERN RAILWAY COMPANY
FOR THE ACCOUNT OF W R GRACE
AS COVERED BY BILLS LISTED BELOW:

UN 792
CUSTOMER NUMBER 003600
Accruing Station: Various

| Freight Bill # | FB Date | Waybill # | Waybill Date | Amount Billed | Amount Paid | Correction | Net Amt. Due |
|---|---|---|---|---|---|---|---|
| Pre-petition | | | | | | | |
| 6229247419 | 8/16/00 | 901213 | 8/15/00 | $970.00 | $0.00 | $0.00 | $970.00 |
| 6318590884 | 11/13/00 | 901541 | 11/10/00 | $250.00 | $0.00 | $0.00 | $250.00 |
| 7057520946 | 2/26/01 | 841393 | 2/21/01 | $4,820.35 | $0.00 | $0.00 | $4,820.35 |
| 7071431096 | 3/12/01 | 843174 | 3/6/01 | $4,923.70 | $0.00 | $0.00 | $4,923.70 |
| 7082184937 | 3/23/01 | 844720 | 3/16/01 | $4,889.25 | $0.00 | $0.00 | $4,889.25 |
| 7091351826 | 4/2/01 | 888455 | 1/25/01 | $4,562.22 | $0.00 | $0.00 | $4,562.22 |
| **Total** | | | | **$20,415.52** | **$0.00** | **$0.00** | **$20,415.52** |

# Exhibit I

Page: 1 Document Name: untitled
_____

                              Print
D494            * *  Display / Print / Fax / Memo Invoice  * *        GBQ34
+-------------------------------------------------------+ Screen 1      of 4      +
                        Norfolk Southern Corporation
Invoice: 1102001401  Date: 2001-02-08  Account: QG8252      Bill: M12703
Bill to: W R GRACE COMPANY
         ATTN  MR MARTIN BOURQUIN
         DAVISON CHEMICAL DIVISION
         4000 NORTH HAWTHORN STREET
         CHATTANOOGA, TN 37406
Description of Work:
         TO BILL FOR EXPENSES INCURRED BY NORFOLK SOUTHERN FOR
         ENVIROMENTAL CLEAN-UP BY FERGUSON-HARBOUR
         AT CHATTANOOGA, TN 7-21-00
         NS BILL # M12703      BJA

Please PAY this Amount:          $1,202.00




F1=Help                   F3=High Keys
          F8=Forward                     F10=MainMenu F11=PrevMenu F12=PrevScrn
                                                      06/05/01 12:52:04




_____

Date: 6/5/2001 Time: 12:54:23 PM

MAR 24 2003 16:03  FR NS LAW DEPT      757 533 4943 TO 713026581192      P.02/02

Page: 1 Document Name: untitled

```
                        Print
D494            * *  Display / Print / Fax / Memo Invoice  * *          GBQ34
+-----------------------------------------------------+ Screen 1    of 3    +
                    Norfolk Southern Corporation
Invoice: 1103005270  Date: 2001-03-22  Account: QG8250     Bill: M13100
Bill to: W. R. GRACE COMPANY
         ATTN:  DON RABENSBURG
         4000 NORTH HAWTHORNE ST.
         CHATTANOOGA, TN 37405
Description of Work:
         TRACK SCALE TESTING
         CHATTANOOGA, TN
         M13100 (NH)(337-9) (QG-8250) (FC)
         NS TARIFF 8002-A

Please PAY this Amount:          $900.00




F1=Help                   F3=High Keys
          F8=Forward               F10=MainMenu F11=PrevMenu F12=PrevScrn
                                                  06/05/01 12:52:19
```

Date: 6/5/2001 Time: 12:54:36 PM

## EXHIBIT B

**Reorganized Debtors' Objection to Norfolk Southern Claim**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., *et al.* | ) | Case No. 01-01139 (JKF) |
| | ) | |
| Debtors. | ) | Jointly Administered |

**Hearing Date: August 24, 2009, 10:30 am**
**Objection Deadline: August 7, 2009**

## DEBTORS' OBJECTION TO THE PROOF OF CLAIM FILED BY NORFOLK SOUTHERN RAILWAY COMPANY

The above-captioned debtors (the "Debtors") object to Claim No. 7021 (the "Norfolk Claim," which is attached as Exhibit 1), which was filed by Norfolk Southern Railway Company ("Norfolk"). In support of this Objection, the Debtors state the following:

### Introduction

Norfolk is allegedly the successor in interest to Southern Railway Company ("Southern"), the company from which Grace licensed warehouse space in Natka, South Carolina, and also licensed railway track and related freight services into and from that location. In 1998, one of Southern's employees, a conductor named Lester Kirkland, twice slipped and fell from Southern's train cars as he tried to pull defective handbrakes on trains that were owned, maintained and operated by Southern. In each instance, the portion of the railway track where Mr. Kirkland fell was not part of the railway track that was leased by Grace from Southern. In July 1998, Mr. Kirkland sued Norfolk for negligence on account of the injuries that he allegedly sustained during his falls from Norfolk train cars. Grace was not named as a defendant in Mr. Kirkland's lawsuit. To the contrary, Mr. Kirkland's allegations ***did not reference or implicate***

*Grace*; the complaint failed to mention Grace, let alone allege that Grace's acts or omissions contributed in any way to Mr. Kirkland's injuries.

On March 21, 2001, the jury returned a verdict in favor of Mr. Kirkland on account of his negligence claims against Norfolk, and ordered Norfolk to pay $1,924,500 to Mr. Kirkland. Shortly thereafter, Norfolk entered into a settlement agreement with Mr. Kirkland, and agreed to pay him $1.5 million in satisfaction of its liabilities from his injuries and the related judgment. The Norfolk Claim seeks (in part) contractual reimbursement for this $1.5 million, as well as an additional $61,664 for costs associated with Norfolk's defense of the Kirkland action.

Norfolk's request for indemnification has no legal basis and should be disallowed because the underlying agreements at issue do not allow indemnification under the present circumstances. Specifically, Mr. Kirkland alleged that when he slipped and fell, he was: (i) injured during the course of his employment by Norfolk; (ii) riding a train that was owned, operated and maintained by Norfolk; (iii) injured on account of a defective handbrake located on Norfolk's train; and (iv) fell while passing over railway track that was not subject to Grace's agreements with Norfolk. What is more, Norfolk did not implead or otherwise formally seek to have Grace added to the complaint as a co-defendant or other necessary party. In short, Grace simply had no tie to the Kirkland litigation.

In addition to the above-referenced amounts, the Norfolk Claim also requests $20,415 on account of allegedly unpaid transportation services, and $2,102 for environmental cleanup costs and track scale testing. The Debtors do not object to Norfolk's claim for $2,102 associated with environmental cleanup and track scale testing. However, Grace has paid Norfolk for all but $4,820 of the amounts owed to Norfolk for transportation services under the agreements. Grace accordingly objects to $15,595 of Norfolk's alleged $20,415 in unpaid freight charges. The

2

Debtors therefore ask the Court to enter an order that disallows and expunges the Norfolk Claim's requests for indemnification ($1.5 million), related legal fees ($61,664), and allegedly unpaid transportation services for which the Debtors have already made payment ($15,595) (a proposed order is attached as Exhibit 2).

## Jurisdiction

1.     This Court has jurisdiction over this matter under 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A) and (O).

2.     The statutory bases for relief requested herein are 11 U.S.C. §§ 105(a) and 502, Rules 3001 and 3007 of the Federal Rules of Bankruptcy Procedure, and Rule 3007-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware.

## Facts and Background

3.     On December 15, 1980, one of the Debtors, W. R. Grace & Co.-Conn. ("Grace"), a Connecticut Corporation, and Southern, a Virginia Corporation, entered into an licensing agreement (the "Licensing Agreement"), which granted Grace the right to use Southern's land and railroad right-of-way in Natka, South Carolina.  (Licensing Agreement, Proofs of Claim Exhibit A, at pg. 1.)  Pursuant to the Licensing Agreement, Grace was permitted to use Southern's property for Kaolin mining and manufacturing.[1]  The Licensing Agreement specifically granted Grace the right to maintain on Southern's property an existing warehouse building with overhead canopies, a shed, and a cyclone fence and gates.  (Licensing Agreement ¶ 1(A).)

4.     On December 15, 1980, Grace and Southern also entered into an operating agreement (the "Operating Agreement"), whereby Southern agreed to operate the 1,678 feet of industrial railroad track leading to and from the Natka, South Carolina, warehouse that was the

---

[1] Kaolin is soft white clay that is an essential ingredient in the manufacture of china and porcelain and is widely used in the making of paper, rubber, paint, and many other products. *See* http://www.britannica.com/EBchecked/topic/311676/kaolin.

3

subject of the Licensing Agreement.  This track was used to transport shipments of Kaolin from the warehouse.  Pursuant to the Operating Agreement, Southern assumed control of the operation of the subject railroad track.  (Proofs of Claim Exhibit B, Operating Agreement, titled "Exhibit A" ¶ 2.)

5.    The Licensing Agreement and Operating Agreement each contained a provision that allocated liability between the parties for their acts of independent or joint negligence. Pursuant to the Licensing Agreement, Southern was solely responsible for any damages or liability resulting from the negligence or acts of its employees; Grace was solely responsible for damages or liability resulting from the negligence or acts of its employees; and Southern and Grace were jointly responsible for loss caused by their joint and concurring negligence. (Licensing Agreement, ¶ 10; Operating Agreement, ¶5.)  Specifically, the Licensing Agreement and Operating Agreement each state, in relevant part:

> The liability of the parties to this agreement, as between themselves, for death, personal injury and property loss and damage, which occurs by reason of, or arises out of, or is incidental to, the use or occupancy by Licensee of the property covered by this agreement, shall be determined in accordance with the following provisions:
>
> \*\*\*
>
> (b) *Licensee [Grace] shall be solely responsible for,* and shall bear all cost, expense and liability resulting from *death, personal injury, and loss and damage to property, caused solely by the negligence of Licensee, or of the agents or employees of Licensee,* or by the violation by Licensee or its agents or employees of the terms of this agreement, or by the negligence of Licensee concurring with the negligence of a third party;
>
> (c) Except as provided in subparagraph (a) above, *Company [Southern] shall be solely responsible for* and shall bear all cost, expense and liability resulting from *death, personal injury, and property loss and damage, caused solely by the negligence of Company, or of the agents or employees of Company,* or by the negligence of Company concurring with the negligence of a third party;
>
> (d) Except as provided in subparagraph (a) above, Company and Licensee shall be solely responsible for and shall bear equally all cost, expense and liability

4

resulting from the death, personal injury and property loss and damage caused by their joint and concurring negligence;

(e) Each of the parties hereto, for the liability imposed upon such party by this agreement, shall indemnify and hold entirely harmless the other party hereto.

(*Id.*) (emphasis added).

6.     On November 7, 1983, Grace and Southern entered into a supplemental agreement (the "Supplemental Agreement"), whereby Southern agreed to operate an additional 477 feet of industrial track leading from Grace's warehouse building in Natka, South Carolina, in accordance with same terms as the track covered under the existing Operating Agreement. (Supplemental Agreement.)

7.     On October 3, 1990, Grace and Southern entered into an additional supplemental agreement (the "Second Supplemental Agreement," collectively with the Licensing Agreement, Operating Agreement and Supplemental Agreement, the "Agreements"), which gave Grace the right to construct and maintain an overhead loading structure with a retractable spout over the industrial track in Natka, South Carolina. (Second Supplemental Agreement, Proof of Claim Exhibit C.)  Pursuant to the Second Supplemental Agreement, the terms of the previous agreements were to continue until terminated by the parties.  (Supplemental Agreement ¶ 4.)

8.     According to the Norfolk Claim, sometime prior to July 7, 1998, Norfolk became the successor in interest to Southern.[2]  (Proof of Claim Addendum, at pg. 2.)

9.     On July 7, 1998, Lester F. Kirkland, Jr., a resident of South Carolina and an employee of Norfolk, filed a personal injury lawsuit against Norfolk in Bibb County, Georgia, under the Federal Employers Liability Act, 45. U.S.C. § 51 *et. seq.*  According to Mr. Kirkland's complaint (the "Kirkland Complaint"), on January 23, 1998, he was employed by Norfolk and was working as a conductor on a Norfolk train that was near Warrenville, South Carolina, when

---

[2] The Debtors can neither admit nor deny this allegation, and therefore have not objected to Norfolk's standing to sue under any or all of the Agreements or otherwise.  However, to the extent that Norfolk is not the successor in interest to Southern under the Agreements, the Debtors reserve their rights to object to Norfolk's standing to prosecute its claim.

he attempted to release a defective handbrake, which would not release properly.  As Mr. Kirkland attempted to release the handbrake, he allegedly slipped "on a slick and dangerous substance," which Norfolk had "allowed to cover the rail car," and he sustained injuries as a result of his ensuing fall.  (Proof of Claim Exhibit D, Kirkland Complaint, at ¶5.)  The alleged incident took place on railway track that was not the subject of any of the Agreements or otherwise controlled or operated by Grace.

10.    The Kirkland Complaint also alleges that on January 26, 1998, Mr. Kirkland was again injured when attempting to apply a Norfolk handbrake on a Norfolk train car that was located at the Aiken Depot, near Aiken, South Carolina.  (Kirkland Complaint, at ¶6.)  The Aiken Depot likewise was some distance away from land that was subject to the Agreements or otherwise leased, operated or otherwise controlled by Grace.

11.    The Kirkland Complaint was brought exclusively against Norfolk.  The five-count Kirkland Complaint alleges that Mr. Kirkland's injuries were the result of Southern's "negligence in its railroad cars, work practices, maintenance practices, and safety practices" and "negligent failure … to use reasonable care to provide to [Mr. Kirkland] a reasonably safe place" to work.  (Kirkland Complaint, at ¶¶7-8.)  The Kirkland Complaint does not name Grace as a defendant, and it does not allege that Grace was negligent or that Mr. Kirkland's injuries were in any way caused by the acts or omissions of Grace.  (*See* Kirkland Complaint.)

12.    On March 21, 2001, the jury in Mr. Kirkland's lawsuit against Southern returned a verdict in favor of Mr. Kirkland.  Despite the fact that Mr. Kirkland had only requested $1.5 million, the jury awarded Mr. Kirkland judgment in the sum of $1,924,500, plus interest.  (Proof of Claim Exhibit F.)

13.    On April 2, 2001, the Debtors filed their petitions for relief under Chapter 11 of Title 11 of the United States Code.  (Dkt. No. 1.)

14.    On July 2, 2001, Mr. Kirkland and Norfolk allegedly entered into a settlement agreement on account of Norfolk's liability to Mr. Kirkland, pursuant to which Norfolk agreed to pay Mr. Kirkland $1.5 million.  Norfolk allegedly paid this amount to Mr. Kirkland on or about

6

July 6, 2001. (Proof of Claim Exhibit G.)

15.     On April 22, 2002, the Bankruptcy Court issued a bar date order in these cases (Dkt. No. 1963), which established March 31, 2003, as the deadline for filing pre-petition: non-asbestos, asbestos property damage, and medical-monitoring claims. (*Id.*)

16.     On March 27, 2003, Norfolk filed the Norfolk Claim, which seeks a total of $1,584,182 for: (a) indemnification on account of its $1.5 million post-judgment settlement with Mr. Kirkland; (b) $61,664 in legal fees from its defense of the Kirkland lawsuit; (c) $20,415 on account of allegedly outstanding freight charges; and (d) $2,102 on account of environmental clean up costs and track scale testing charges in Chattanooga, Tennessee, where Grace allegedly leased track from Southern.

## Argument

### A.     The Agreements are Governed by South Carolina Law.

17.     As a Federal Court sitting in Delaware, this Court applies Delaware choice of law principles to determine the appropriate State's law to apply to the Norfolk Claim. *A.P.S., Inc. v. Standard Motor Prods., Inc.*, 295 B.R. 442, 453 (D. Del. 2003), *citing Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487 (1941).

18.     Delaware courts have adopted the Restatement (Second) of Conflicts of Laws' "most significant relationship test" to govern choice of law principles. *Travelers Indem. Co. v. Lake*, 594 A.2d 38, 41 (Del. 1991) (adopting the Restatement rule for tort cases); *Cannon v. Dorr-Oliver, Inc.*, 394 A.2d 1160, 1166 (Del. Super. 1978) (adopting the Restatement rule in contract cases). The Restatement identifies the following factors for the Court to consider when determining which State's law applies to contracts, such as the Agreements at issue here, that lack a choice of law provision: (i) the place of contracting; (ii) the place of negotiation; (iii) the place of performance; (iv) the location of the subject matter of the contract; and (v) the place of incorporation and business of the commercial parties. Restatement (Second) of Conflict of Laws § 188 (1971). These factors are evaluated according to their relative importance to the particular

7

issue and in accordance with the following principles that are identified in Section 6 of the Restatement: (i) the needs of the interstate and international systems; (ii) the relevant policies of the forum; (iii) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (iv) the protection of justified expectations; (v) the basic policies underlying the particular field of law; (vi) certainty, predictability and uniformity of result; and (vii) ease in the determination and application of the law to be applied. *Liggett Group Inc. v. Affiliated FM Ins. Co.*, 788 A.2d 134, 138 (Del. Super. 2001).

19.     Under these factors, the Norfolk Claim and the underlying Agreements should be governed by South Carolina law. Although the parties are both incorporated in separate states (Grace in Connecticut and Southern in Virginia), neither of these States has any direct connection to the Agreements or the injuries giving rise to Mr. Kirkland's injuries. Instead, the business activities that are the subject of the Agreements, the events giving rise to Mr. Kirkland's injuries, and Mr. Kirkland's state of residence are all in South Carolina. In particular, the subject matter of the Agreements is 1,678 feet of track and a parcel of Southern's property located near Natka, South Carolina; the Agreements were performed in South Carolina; and Mr. Kirkland allegedly slipped and incurred his injuries while traveling over railway track located in South Carolina. Therefore, South Carolina has the closest relationship to the Agreements at issue, and its substantive law should apply to the Agreements. *Maxus Exploration Co. v. Moran Bros., Inc.*, 817 S.W.2d 50, 53 (Tex. 1991) (stating "[w]e agree that the general rule in [Restatement] section 188 controls the choice of law governing contractual rights and duties, and that these include indemnity agreements.") (internal citation omitted).

### B.    Norfolk Fails to Allege Facts Sufficient to Recover on its Indemnification Claims.

20.     Under South Carolina law, "a contract of indemnity will not be construed to indemnify the indemnitee against losses resulting from its own negligent acts unless such intention is expressed in clear and unequivocal terms." *Federal Pacific Elec. v. Carolina Prod.*

8

*Enterprises*, 298 S.C. 23, 26 (S.C. App. Ct. 1989); *Laurens Emergency Med. Specialists, PA v. M.S. Bailey & Sons Bankers*, 355 S.C. 104, 111 (S.C. 2003).[3]  Therefore, given that the jury in the Kirkland trial has already determined that Norfolk's negligence was a proximate cause of Mr. Kirkland's injuries, Norfolk has the burden of establishing that the indemnification provisions in the Agreements pursuant to which it seeks recovery from the Debtors are expressed clearly and unequivocally.  Far from satisfying this lofty burden, neither the Kirkland Complaint nor the Norfolk Claim allege that Grace's actions or omissions *in any way contributed* to Mr. Kirkland's injuries, let alone that the Debtors have a contractual indemnification obligation under the above-quoted language from Paragraph 10 of the Licensing Agreement and Paragraph 5 of the Operating Agreement, or otherwise.

21.     There has been absolutely no allegation -- either in the Kirkland Complaint or in the Norfolk Claim -- that Grace was negligent or otherwise involved in the events that resulted in Mr. Kirkland's injuries.  Therefore, the Court is left with a situation where (i) a jury has found that Norfolk's negligence was the proximate cause of Mr. Kirkland's injuries; and (ii) there is no allegation or indication in Norfolk's Proof of Claim that Grace in any way contributed to Mr. Kirkland's injuries.

22.     Norfolk accordingly has failed to allege facts that, even if proven, would allow it to recover for reimbursement under the Agreements, and Norfolk has failed to satisfy its initial burden to recover for its proof of claim.  *In re Allegheny Intern., Inc.*, 954 F.2d 167, 173 (3d Cir. 1992) ("Initially, the claimant must allege facts sufficient to support the claim.").  Therefore, under the Agreements, Norfolk is "solely responsible and shall bear all costs, expense and liability" resulting from Mr. Kirkland's accidents.  (Licensing Agreement 10(c); Operating

---

[3] The law in Georgia, where Mr. Kirkland obtained judgment against Norfolk, is no different: "Georgia law is very clear that a contract does not indemnify the indemnitee against its own negligence unless it says so, because "[p]ublic policy is reluctant to cast the burden of negligent actions upon those who are not actually at fault." *UPS, Inc. v. Colt Sec. Agency, Inc.*, 676 S.E.2d 22, 24 (Ga. Ct. App. 2009), *quoting Allstate Ins. Co. v. City of Atlanta*, 202 Ga. App. 692, 693 (1992).  Similarly, in Delaware, "[w]hile a contract for indemnification may provide for indemnification for the indemnitee's own negligence, that intention must be evidenced by unequivocal language. *American Ins. Group v. Risk Enterprise Management, Ltd.*, 761 A.2d 826, 829 (Del. 2000), *quoting Precision Air, Inc. v. Standard Chlorine of Del., Inc.*, 654 A.2d 403 (Del. 1995).

Agreement 5(c)). Therefore, based on Norfolk's clear failure to allege any facts to satisfy its initial burden on its claim, the Norfolk Claim should be disallowed and expunged.

### C.    There is Likewise No Allegation of "Joint and Concurrent" Negligence.

23.    Under the terms of the Licensing and Operating Agreements, Grace was not obligated to indemnify Norfolk for Norfolk's own negligent conduct, unless such negligence was "joint and concurring" with Grace. To establish joint and concurrent negligence with Grace, Norfolk must establish that Grace was also negligent, and that the combination of each party's negligence directly caused Mr. Kirkland's injury. *See, e.g., Garbe v. Halloran*, 150 Ohio St. 476, 481 (1948) ("[c]oncurrent negligence consists of the negligence of two or more persons concurring, not necessarily in point of time, but in point of consequence in producing a single indivisible injury.")

24.    As noted above, there is absolutely no allegation or indication from the Kirkland Complaint or the Norfolk Claim that Grace's acts or omissions contributed *in any way* to Mr. Kirkland's injuries, let alone that such actions rose to the level of "joint and concurring" negligence with the negligent acts of Norfolk.[4]

25.    To the extent that Norfolk is alleging that Grace was jointly and concurrently negligent with Norfolk, such a claim would be inconsistent with the terms of the Operating and Licensing Agreements, which stated that it was Norfolk's sole responsibility to move the freight and to maintain and operate the train cars where Mr. Kirkland was injured:

- "Railroad *will operate*...for the receipt and shipment of carload freights of Industry over the lines of Railroad..." (Operating Agreement ¶ A.) (emphasis added);

- "Industry [Grace] will acquire and hereby guarantees to Railroad full right and lawful

---

[4] The jury in Mr. Kirkland's negligence action against Norfolk Southern entered a judgment in favor of Mr. Kirkland. Therefore, it has already been determined that Norfolk Southern's negligence was a proximate cause of Mr. Kirkland's injuries and, therefore, the Agreements' provision concerning situations where Grace is solely negligent (Licensing Agreement ¶ 10(b); Operating Agreement ¶ 5(b)) could not be applicable under the current circumstances.

authority to *maintain and operate* any portion of said industrial track." (Operating Agreement titled "Exhibit A" ¶ 1.) (emphasis added);

- "Railroad shall have *entire control of said track and the operation thereof...*" (*Id.* at ¶ 2.) (emphasis added); and

- "Cars shall not be moved to or from said industrial track *except by Railroad.*" (*Id.* at ¶ 6.) (emphasis added).

26.    Thus, Norfolk was responsible for its cars and the track where Mr. Kirkland's injuries occurred. What is more, according to the above-quoted language, not only was Grace not responsible for maintaining track that was not subject to the Agreements or the operations of Norfolk's cars, it was expressly prohibited from doing so.

27.    Therefore, to the extent that Mr. Kirkland was injured on account of slipping while pulling a defective handbrake on a Norfolk car that was traveling on track not leased by Grace -- as alleged in his complaint (Proof of Claim, Kirkland Complaint, at pg. 2) and as found by the jury in the underlying action -- his injuries related to Norfolk's obligations under the Agreements. Because Mr. Kirkland's injuries were determined to have been the result of Norfolk's failure to maintain these instrumentalities for which it had exclusive responsibility, Grace could not possibly have been jointly and concurrently negligent in Norfolk's operation of carload freights under the Agreements.

28.    This result and the underlying allocation of responsibility between the parties is not surprising. Norfolk's primary business is the ownership and operation of railway tracks and the transportation of goods over those tracks. *See , e..g,* Norfolk's Website, attached as Exhibit 3 and available at, http://www.nscorp.com/nscportal/nscorp/) ("Our Vision: Be the *safest,* most *customer-focused* and *successful* transportation company in the world") (emphasis in original); *see also* Norfolk Southern 2008 Annual Report, attached as Exhibit 4 ("Description of Business: Norfolk Southern Corporation (NYSE: NSC) is one of the nation's premier transportation companies. Its Norfolk Southern Railway subsidiary *operates* approximately 21,000 route miles in 22 states and the District of Columbia, serving every major port in the eastern United States

11

and providing superior connections to western rail carriers....") (emphasis added).

29.     Grace is not in the business of operating train cars or railway track, and its express responsibilities under the Agreements accordingly are limited to maintaining the specific track that is the subject of the Agreements; not maintaining or operating Norfolk's train cars and its remaining railways.

**D.     Mr. Kirkland's Allegations Support the Finding that Norfolk was Ultimately Responsible for the Conditions that Gave Rise to Mr. Kirkland's Injury.**

30.     Besides the contractual allocation of responsibilities, the remaining factors surrounding Mr. Kirkland's falls likewise support a finding that Norfolk was solely responsible for Mr. Kirkland's injuries.  Mr. Kirkland was an employee of Norfolk; he was injured while traveling on track maintained by Norfolk; he was injured on a train that Norfolk owned and operated; and his injuries were caused while attempting to engage a defective Norfolk handbrake on that Norfolk train car.  The Kirkland Complaint specifically alleged that Mr. Kirkland's injuries were the result of Norfolk's equipment: "[t]he handbrake was in a defective condition and would not release when Plaintiff applied it properly."  (Kirkland Complaint, at ¶5.)  Thus, the allegations and jury verdict in Mr. Kirkland's case support a finding that Norfolk's negligence was the sole proximate cause of Mr. Kirkland's injuries.

Mr. Kirkland's Allegations Support the Finding that Norfolk was Ultimately Responsible for the Conditions that Gave Rise to Mr. Kirkland's Injury.

**E.     The Norfolk Claim Seeks Indemnification For Amounts That Exceed Any Possible Indemnification Under the Present Facts.**

31.     To the extent that Grace is found to have been jointly negligent with Norfolk, then Grace objects to the amount of indemnification sought in the Norfolk Claim.  The Norfolk Claim seeks indemnification for the entire amount of Norfolk's settlement with Mr. Kirkland, and all of Norfolk's related legal fees.  However, the jury in the underlying litigation already determined that Norfolk was negligent and that its negligence was a proximate cause of Mr. Kirkland's

91100-001\DOCS_DE:150960.1

injuries. Therefore, even if it could be established that Mr. Kirkland's injuries were the product of "joint and concurring negligence" between Norfolk and Grace, then Norfolk would not be entitled to indemnification for the totality of these amounts. Instead, pursuant to the terms of the Agreement, Norfolk would be entitled to at most $780,832, or half of the amounts that it paid to settle and defend its litigation with Mr. Kirkland ($1.5 million for settlement and $61,664 in legal fees).[5]

### F.    A Portion of Norfolk's Alleged Freight Charges Remain Unpaid.

32.    Grace has satisfied all but $4,820.35 of Norfolk's alleged unpaid freight charges, and accordingly objects to $15,595.17 of Norfolk's claim for $20,415.52 in unpaid freight charges. This amount consists of several freight bills that were sent to Grace on various dates. However, Grace paid most of these freight charges: On April 24, 2001, Grace issued Norfolk a check for $1,220 to cover freight charges for $970 and $250; On April 26, 2001, Grace issued Norfolk a check for $4,889.25; on May 10, 2001, Grace issued Norfolk a check for $5,402.22 to cover charges for $840 and $4,562.22; and on August 16, 2001, Grace issued Norfolk a check for $4,923.70. Therefore, Grace has paid all but $4,820 of Norfolk's requested freight charges, and the Debtors request that the Court enter an order disallowing the remaining $15,595.17, for which the Debtors have already made payment.

### G.    The Debtors Object to Any Additional Untimely Claims that Norfolk May Assert.

33.    In addition to the specific claims that are addressed above, the Norfolk Claim also purports to reserve Norfolk's right to amend the Norfolk Claim to assert additional claims that it may have under the Agreements. (Proof of Claim Addendum, at pg. 3.) To the extent that Norfolk attempts to assert any additional claims relating to the Agreements, the Debtors object to

---

[5] The Debtors can neither admit nor deny the reasonableness of Norfolk's settlement or associated legal fees. Therefore, the Debtors do not object to the reasonableness of such amounts in this Objection, but they reserve the right to do so at a later time.

any such claims that arose on or before April 1, 1998, as being untimely under the applicable 3 year statute of limitations. *See* 10 Del. C. § 8121 (2005) (Delaware adopts the shorter of the Delaware's statute of limitations or the limitations period where the claim arose); DEL. CODE ANN. tit. 10, § 8106 (3 year statute of limitations for breach of contract claims under Delaware law); S.C. CODE ANN. § 15-3-530 (1976) (3 year statute of limitations for breach of contract claim under South Carolina law). The Debtors also reserve their rights to assert any and all additional objections that may apply to any such unarticulated claims that relate to the Agreements.

## Reservation

34.    The Debtors hereby reserve the right to object in the future to any of the Norfolk Claim listed in this Objection on any ground, and to amend, modify and/or supplement this Objection, including, without limitation, to object to amended claims and newly-filed claims and to file all other objections relating to the Norfolk Claim.[6] Separate notice and hearing will be scheduled for any such objection.

## Notice

35.    The Debtors will serve copies of this Objection on (i) the Office of the United States Trustee and (ii) the Claimants, (iii) counsel to each of the official committees appointed by the United States Trustee; (iv) counsel for the personal injury future claimants' representatives; (v) counsel to the property damage future claimants' representative, (vi) counsel to the debtor in possession lender and (vii) all parties that have requested that they be served with all pleadings filed in these cases pursuant to Federal Rule of Bankruptcy Procedure 2002. The Debtors submit that notice of this Objection as outlined above is sufficient under Bankruptcy Rule 3007 and that no further notice is necessary.

---

[6] Grace makes no specific objection to Norfolk's environmental cleanup and track scale testing claims in the amount of $2,102.00, but reserves the right to revise its Objection as the claim proceeds.

91100-001\DOCS_DE:150960.1

**No Previous Request**

36.    No previous request for the specific relief set forth herein has been made to this or any other court.

**Compliance With Rule 3007-1**

37.    This Objection and related exhibits attached hereto, complies with Rule 3007-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware.

**Conclusion**

38.    The Norfolk Claim seeks contractual indemnification under the Agreements for amounts that Norfolk has paid to defend and settle Mr. Kirkland's negligence lawsuit against Norfolk.  According to those Agreements, the Debtors cannot be held responsible for any of those amounts unless it is first established that either Grace's sole negligence caused Mr. Kirkland's injuries or Grace's joint and concurring negligence with Norfolk caused Mr. Kirkland's injuries.  The jury in the underlying action already determined that Norfolk's negligence was a proximate cause of Mr. Kirkland's injuries.  Therefore, Norfolk could not possibly establish that Grace was solely negligent, and Norfolk's only possibility for recovery under the Agreements would be on account of joint and concurring negligence between Norfolk and Grace.  However, while the Norfolk Claim seeks indemnification from Grace, it fails to provide any evidence, or even to make any allegations, that Grace was jointly and concurrently negligent in causing Mr. Kirkland's injuries.  Indeed, neither the Norfolk Claim nor the Kirkland Complaint assert that Grace's actions had anything to do with Mr. Kirkland's injury, and the circumstances described in the Kirkland Complaint all concern instrumentalities for which Norfolk was responsible.  The Debtors therefore ask the Court to enter an order that disallows and expunges the Norfolk Claim' for indemnification ($1.5 million), related legal fees ($61,664), as well as Norfolk's claim for allegedly unpaid transportation services for which the Debtors have already made payment ($15,595.17).

15

Dated:  July 20, 2009

Respectfully submitted,


KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Samuel L. Blatnick
Andrew B. Fromm
300 N. LaSalle St.
Chicago, IL  60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

and

The Law Offices of Janet S. Baer P.C.,
Janet S. Baer, P.C.
70 W. Madison St., Suite 2100,
Chicago, IL 60602.
Phone: 312-641-2162.
Fax:  312-641-2165.

and

PACHULSKI STANG ZIEHL & JONES LLP

_James E. O'Neill_

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Kathleen P. Makowski (Bar No. 3648)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
(302) 652-4100

Co-Counsel for Debtors and Debtors in Possession

16

## Exhibit C

## Norfolk Southern Response

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. Grace & Co., et al., | ) | Case No. 01-01139 (JKF) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | Re: Docket No. 22553 |

### PRELIMINARY RESPONSE OF NORFOLK SOUTHERN RAILWAY TO DEBTORS' OBJECTION TO THE PROOF OF CLAIM FILED BY NORFOLK SOUTHERN RAILWAY

Norfolk Southern Railway ("NS")[1] files this Preliminary[2] Response (the "Response") to the Debtors' Objection to the Proof of Claim Filed by Norfolk Southern Railway [Docket No. 22553] (the "Objection") and in support hereof, respectfully represents as follows:

### INTRODUCTORY STATEMENT

1.       In drafting their Objection to NS' indemnity claim (the "Indemnity Claim")[3], the Debtors misconstrue the nature of the relationship between the parties, the breadth of the agreements concerning indemnity as between the parties and the facts of the underlying litigation that give rise to NS' Indemnity Claim against the Debtors. In sum, the agreements

---

[1] NS is the successor in interest to Southern Railway Company.

[2] In accordance with Rule 3007-1(h) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, NS submits that discovery will be required in order for this Court to make a final adjudication of this claim dispute. As such, NS requests that the currently scheduled September hearing date be used as a status/scheduling conference to discuss an appropriate time table for necessary discovery, motion practice and to set a date for an evidentiary hearing on the Objection.

[3] As part of their Objection, the Debtors do not object to the $2,102.00 requested as part of claim number 7021 for environmental cleanup costs. The Debtors did, however, object to the $20,415.52 requested as part of claim number 7021 for unpaid freight charges. NS consents to the freight charge portion of the claim being reduced to $4,820.35 as the Debtors' suggest. Thus, the only portion of claim number 7021 that remains in dispute is the Indemnity Claim.

1

between Grace and NS require Grace to indemnify NS for injuries to NS' employees resulting

from Grace's use of the facility located at Natka, South Carolina (the "Facility").   As set forth

below, it was the Grace's use (or more precisely, misuse) of the Facility that caused the accident

giving rise to Mr. Kirkland's injuries.   Thus, it is Grace's obligation under the Agreements

(defined below) to indemnify NS for that loss.

## BASES FOR NS'S INDEMNITY CLAIM

**The Agreements**

2.       On or about March 27, 2003, NS filed its Indemnity Claim as part of claim

number 7021 against W.R. Grace & Co. ("Grace").   The Indemnity Claim is based on several

agreements between NS and Grace.   Those agreements are as follows:

    a.   Agreement between Southern Railway Company and W.R. Grace & Company of December 15, 1980 (the "First Agreement") (attached as Exhibit A);

    b.   Agreement between Southern Railway Company and W.R. Grace & Company of December 15, 1980 (the "Second Agreement") (attached as Exhibit B); and

    c.   Supplemental Agreement between Southern Railway Company and W.R. Grace & Company of September 17, 1990 (the "Third Agreement") (attached as Exhibit C) (collectively with the First and Second Agreements, the "Agreements").

3.       The First Agreement permitted Grace to use NS' property for kaolin[4] mining

and manufacturing (Objection ¶ 3) and provides in pertinent part as follows:

Licensee will maintain said Facility at all times during the life of this agreement in such condition that said Facility or the use thereof by Licensee shall not be or become an obstruction to, or interfere with, the safe and proper maintenance of said industrial track, or railroad

---

[4] Kaolin is soft white clay that is an essential ingredient in the manufacture of china and porcelain and is widely used in the making of paper, rubber, paint and many other products.  (Objection fn. 1).  As set forth below, kaolin from the Grace Facility is the "clay" or "clay like substance" that caused Mr. Kirkland to slip and injure himself.

2

operations upon said track, or endanger life or limb of employees of Company or other persons about said track. (First Agreement ¶ 18).

The liability of the parties to this agreement, as between themselves, for death, personal injury and property loss and damage, *which occurs by reason of, or arise out of, or is incidental to, the use or occupancy by Licensee of the property covered by this agreement,* shall be determined in accordance with the following provisions:

(b) Licensee shall be solely responsible for, and shall bear all cost, expense and liability resulting from death, personal injury, and loss and damage to property, caused solely by the negligence of Licensee or its agents or its employees of the terms of this agreement (First Agreement ¶ 10(b)) (emphasis supplied).

4.      The Second Agreement provides that Grace shall be solely responsible for liability resulting in death or personal injury caused solely by its negligence. (Second Agreement ¶ 5(b)). Paragraph 16 of the Second Agreement further provides that Grace is responsible for, among other things, all injuries accruing by reason of Grace's use of the property.

5.      The Third Agreement supplemented the First and Second Agreement to provide for the construction of an overhead loading structure with a retractable loading spout.  The spout was used to load kaolin into rail cars. The Third Agreement, provides, in the same fashion as do the First and Second Agreements, that Grace would maintain the Facility "in such condition that said Facility or the use thereof by Industry shall not ... interfere with, the safe and proper...railroad operations upon said track, or endanger life or limb of employees of Railroad or other person on or about said track." (Third Agreement ¶ 3).  The Third Agreement, like the two before it, further provides that:

Industry proposes to construct, maintain and use said Facility with full cognizance of the risk of loss of life, personal injury or property loss or damage which may be caused by or result from railroad operations on said industrial track at the location of said Facility, *or which may accrue from or by reason of the* construction, installation, maintenance, presence or *use of said Facility by Industry*; and Industry covenants that said Facility

3

shall be constructed, maintained and used *solely at the risk of Industry,* and that neither Railroad, nor any associated, controlled or affiliated corporation, shall assume any responsibility in the premises; *Industry hereby specifically agreeing, notwithstanding any other provision of said Agreement, to indemnify and save harmless Railroad,* and any associated, controlled or affiliated corporation, *from and against the consequences of any and all such loss, injury or damage,* whether or not negligence of Railroad may have caused or contributed to such loss, injury or damage." (Third Agreement ¶ 5) (emphasis supplied).

### The Kirkland Complaint

6.    On or about July 8, 1998, Mr. Kirkland sued his employer, NS, for damages resulting from injuries he sustained on two separate dates – January 23, 1998 and January 26, 1998 (the "Complaint").[5] On July 27, 1998, NS answered the Complaint, denying liability.  By September 15, 1999, it was clear to NS that Grace was the party responsible for Mr. Kirkland's injuries.  As set forth in the September 15, 1999 letter attached as Exhibit D, Mr. Kirkland's deposition testimony revealed that the cause of his slips from the rail cars was the kaolin covering the cars left as a result of Grace's loading practices.  The September 15 letter further notified Grace that NS was seeking indemnification pursuant to the Agreements and asked that Grace take over the defense of the Kirkland action.  Grace refused.[6]

---

[5] In their Objection, Grace states that "[d]espite the fact that Mr. Kirkland had only requested $1.5 million, the jury awarded Mr. Kirkland judgment in the sum of $1,924,500 plus interest." (Objection ¶ 12).  However, in his complaint, Mr. Kirkland sought damages "in excess of $2 million") (See Kirkland Complaint ¶ 14 attached as Exhibit D to NS' proof of claim).

[6] In their Objection, Grace states that "[t]here has been absolutely no allegation – either in the Kirkland Complaint or in the Norfolk Claim – that Grace was negligent or otherwise involved in the events that resulted in Kirkland's injuries." (Objection ¶ 21).  In making this statement, Grace ignores all correspondence from NS' counsel at the time of the Kirkland litigation.

4

7.    Many letters followed from NS' counsel informing Grace of the status of the case and factual developments that, as the case progressed, highlighted Grace's culpability in Mr. Kirkland's injuries and, in light of Grace's indemnification obligations, repeating NS' request for Grace's participation.  Grace stubbornly denied liability.  Eventually, the case went to trial and ended in a jury verdict against NS. Subsequently, NS was able to reach a settlement with Mr. Kirkland.  Even throughout settlement discussions, NS' counsel kept Grace informed of the progress and developments in the case and of NS' intention to enforce its contractual indemnity rights against Grace.

8.    In spite of the substantial evidence and the plain language of the Agreements, Grace continues their denial in the Objection.

**The Kirkland Accidents**

9.    In contradiction to Grace's protestation in the Objection that "Grace had no tie to the Kirkland litigation" (Objection p. 2), a review of the record in the state court litigation shows precisely the opposite is true.

10.    First, Mr. Kirkland's accident reports summarize the story of how Mr. Kirkland was injured:

"While releasing handbrake on covered hopper loaded with clay, slipped on clay on hopper and fell to ground." (Personal Injury Report dated January 23, 1998, attached as Exhibit E).

"Pulled 7 loads from W.R. Grace plant in Aiken, S.C. Brought all 7 loads which were covered in clay back to Aiken and ran around cars in house track to take to Warrenville, S.C. to be set off.  While applying handbrakes on cars, conductor slipped

5

on NS245061 and twisted or tore or pulled something in lower back." (Personal Injury Report dated January 26, 1998, attached as Exhibit F).

11.    Mr. Kirkland's testimony further indicates that the cause of his injuries was the kaolin on the cars that were being removed from the Grace Facility.  Of the three loads picked up by Mr. Kirkland on January 23, 1998 from the Grace facility all three were "just covered in clay, just all over." (Transcript p. 85 line 3).[7]  Upon returning to the Aiken, S.C. depot with the clay covered cars, Mr. Kirkland "grabbed the brake wheel, and I was pulling it toward me again, to see if I could manually pull it off, and when I did I slipped off the car." (Id. p. 95 lines 22-24).

12.    Similarly, on January 26, upon arrival at the Grace Facility to remove the seven kaolin loaded rail cars scheduled for pick-up that day, "they were just covered [with kaolin]" (Id. p. 110 line 15).  When Mr. Kirkland pointed out the situation to Mr. Wood, the Grace plant manager, Mr. Wood replied to Mr. Kirkland that he would "look into it" (Id. p. 112 line 7).  Upon return to the Aiken depot with the seven kaolin loaded cars, Mr. Kirkland was attempting to apply the brake and "slipped again. My foot – my right foot slipped on that clay… I grabbed myself and was about to cry." (Id. p. 113 lines 7 - 10).  According to the testimony at trial, "…the commodity -- the stuff is supposed to be in the car, not on the car…" (Id. p. 117 lines 4-5).

13.    The Grace Facility was used to mine and manufacture kaolin and then load that kaolin into the rail cars.  To accomplish the task of loading the kaolin, Grace used the retractable loading spout covered by the Third Agreement.  However, while filling the rail cars, the kaolin would spill and end up all over the cars.  At one point in

---

[7] Excerpts of the trial transcript are attached as Exhibit G in the order in which they are cited.

6

time, Grace employees washed the rail cars off with water. (Id. p. 75 line 24). Later, Grace installed a blowing machine for this purpose. (Id.). However, Grace seldom kept up its end of the bargain when it came to cleaning the kaolin from the rail cars. (Id. p. 71 lines 7 – 17 (describing how after complaining about the clay on the cars, the situation at Grace would be get better for a day or two and then go back to the "same piling up, not cleaning them off."). The end result of the kaolin on the cars was the creation of a "slick" surface akin to "pouring oil on them, and trying to step on them." (Id. p. 70 lines 5 - 6). It was this dangerous condition caused solely by Grace that resulted in Mr. Kirkland's falls.[8] Thus, it is Grace's obligation to indemnify NS for its losses associated with Mr. Kirkland's claims. For Grace to plead otherwise belies the facts of the incidents and the language of the Agreements.[9]

## CONCLUSION

14.    Under the Agreements, among other obligations, Grace was charged with the specific responsibility of using and maintaining the Facility so as not to endanger life or limb of NS' employees. It was Grace's use of the Facility, specifically, Grace's failure to properly load the kaolin into the rail cars and clean the rail cars, that on two occasions caused Mr. Kirkland to slip and injure himself. Thus, under the Agreements, it is Grace's responsibility to indemnify NS for all losses associated with Mr. Kirkland's injuries. Those losses are reflected in the Indemnity Claim, supported by the documents attached thereto and the facts as set forth herein.

---

[8] Photos of the kaolin covered rail cars removed from the Grace Facility are attached as Exhibit H.
[9] NS  reserves all its rights to a portion of the Indemnity Claim as provided under the Agreements should the Court ultimately determine that fault should be shared between NS and Grace.

7

WHEREFORE, NS requests that the Court deny Debtors' Objection and sustain NS' Indemnity Claim and for such other and further relief as is just and proper under the circumstances.

Dated: August 26, 2009
Wilmington, Delaware

POTTER ANDERSON & CORROON, LLP

David J. Baldwin (DE ID 1010)
Etta R. Wolfe (DE ID 4164)
1313 North Market Street, 6th Floor
Wilmington, DE 19899
302.984.6000 (phone)
302.658.1192 (facsimile)

Counsel for Norfolk Southern Railway

8

930498v.1

# EXHIBIT "A"

(Rev. 4-1-75)

THIS AGREEMENT, made between
SOUTHERN RAILWAY COMPANY, a Virginia corporation, its successors and assigns,

hereinafter styled Railroad, party of the first part; and ~~XXXXXXGXXXXXEGNXXXXX XXXXXXXXXXXXXXXXXXX~~ _Aug 1974_
W. R. Grace & Co., a Connecticut Corporation,

hereinafter styled Industry, party of the second part;

W I T N E S S E T H:

THAT the PARTIES HERETO agree as follows:

A. Railroad will————————————operate, to afford Industry facilities for the
receipt and shipment of carload freights of Industry over the lines of Railroad in
accordance with lawfully published tariffs, an industrial track described as follows:

A double-ended side track, at NATKA, South Carolina, 1678 feet,
more or less, in length, measured between the switch points thereof, located sub-
stantially as shown in red and green on print of Drawing No. TB-80-0185, dated
June 27, 1980, annexed hereto and made a part hereof. Said double-ended side track
being hereinafter referred to as "track" or "industrial track".

Railroad, moreover, hereby grants unto Industry the right or license
to construct, maintain and use (a) two double swing gates across said industrial
track; (b) two overhead canopies over said industrial track; and (c) a shed over
said industrial track; all at the locations shown on said annexed print. Said
overhead canopies and said shed being hereinafter sometimes together referred to as
"Facility".

B. Said track is to be————————————operated upon and subject to the terms
and conditions set out in Exhibit "A" hereto annexed and made a part hereof.

This agreement shall be effective as of the _1st_ day of _June_, 19_80_.
Either party hereto may terminate this agreement by _sixty_ ( 60 ) days' written
notice to the other of election so to do.

IN WITNESS WHEREOF, the parties hereto have executed this agreement in _duplicate_,
each party being an original, as of the _15th_ day of _December_, 19 80.

In presence of:                              SOUTHERN RAILWAY COMPANY,
                                             By
_____                      _____
As to Railroad.                                   Vice President.

In presence of:,                             W. R. GRACE & CO.
                                             ~~XXXXXXXXXXXXXXXXXXXX~~ _Aug 1974_
                                             By                        _JWH_
_D. K. Crawford_                              _____
As to Industry.                                   Vice President.

JMJ:jat    7-30-80
    33458

2883-228

EXHIBIT "A"

1.    Industry will acquire and hereby guarantees to Railroad full right and lawful authority to maintain and operate any portion of said industrial track which may be located beyond the limits of the right of way of Railroad, or upon or across any public highway.

2.    Title to the rails, materials and fixtures in the portion of said track extending between survey stations 1 + 43 and 15 + 27 thereon, is vested in Industry, and title to that portion of said industrial track extending from the southerly switch point thereof to survey station 1 + 43 thereon and that portion of said track extending from survey station 15 + 27 thereon to the northerly switch point thereof, is and shall remain vested in Railroad. Railroad shall have entire control of said track and the operation thereof, and may use the same as well for the business of third persons, not parties hereto, as for that of Industry; provided that such use of said portion of track owned by Industry for the benefit of third persons shall not unreasonably interfere with the business of Industry.

3.    Industry will, at the cost and expense of Industry, maintain the portion of said industrial track owned by Industry, as aforesaid, in good condition and repair and in all respects in accordance with the reasonable requirements of Railroad looking to the safe and convenient operation of engines and cars on said track; it being understood that Railroad will maintain the portion of said track owned by Railroad, as aforesaid. Upon request of Industry, Railroad will assist Industry in locating a qualified railroad contractor to perform, for the account of Industry, that portion of the maintenance work for which Industry is responsible under this paragraph; provided, that Railroad shall not be responsible for the performance of any such contractor to perform such maintenance work shall relieve Industry of Industry's primary obligation to maintain its portion of said track.

4.    Industry agrees, except as to the existing structures shown and depicted on said annexed print, to observe and be bound by the rules of Railroad for standard clearances; that is to say, Industry agrees to maintain and preserve an overhead space of 22 feet measured perpendicularly from the top of the rail (except that overhead clearance where wire lines extend over said track shall be such as may be prescribed by Railroad) and a space 20 feet in width, measured 10 feet on each side from the center line of said track (except that side clearances where platforms, and doorway for track entering building, are involved shall be such as may be prescribed by Railroad), provided, however, that all side clearances for said track must be increased one and one-half (1-1/2) inches for every degree of curvature therein, which space shall be kept clear of any obstruction whatever including, but not limited to, all structures, facilities or property of Industry which are or may be placed or erected above or parallel to said track; provided, however, that as to said existing structures where standard clearances do not obtain, the clearances for said track may be limited or restricted to the dimensions shown on said annexed print; provided, further that Industry shall place and maintain, at its cost and expense, warning signs, satisfactory to Railroad, at conspicuous places on each of said structures to the effect that such structures will not clear man on side or on top of car.

Notwithstanding any other provision of this agreement, Industry shall indemnify and save harmless Railroad, and any associated, controlled or affiliated corporation, from and against the consequences of any loss of life, personal injury or property loss or damage which may result from or be attributable to any limited or restricted clearances for said industrial track, whether or not negligence of Railroad may have caused or contributed to such loss, injury or damage.

5.    The liability of the parties to this agreement, as between themselves, for death, personal injury and property loss and damage, which occurs by reason of, or arises out of, or is incidental to, the construction, operation, maintenance, use, presence or removal of the track covered by this agreement and the right of way therefor, shall be determined in accordance with the following provisions:

(a)    Industry shall be solely responsible for, and shall bear all cost, expense and liability resulting from loss of or damage to property by fire;

(b)    Industry shall be solely responsible for, and shall bear all cost, expense and liability resulting from death, personal injury, and loss and damage to property, caused solely by the negligence of Industry, or of the agents or employees of Industry, or by the violation by Industry or its agents or employees of the terms of this agreement, or by the negligence of Industry concurring with the negligence of a third party;

(c)    Except as provided in subparagraph (a) above, Railroad shall be solely responsible for and shall bear all cost, expense and liability resulting from death, personal injury, and property loss and damage, caused

2883-228

~ 2 ~

solely by the negligence of Railroad, or of the agents or employees of Railroad, or by the negligence of Railroad concurring with the negligence of a third party;

(d)  Except as provided in subparagraph (a) above, Railroad and Industry shall be jointly responsible for and shall bear equally all cost, expense and liability resulting from death, personal injury, and property loss and damage, caused by their joint and concurring negligence;

(e)  Notwithstanding anything contained in this agreement, and irrespective of the sole, joint, or concurring negligence of Railroad, Industry shall assume sole responsibility for and shall indemnify and save harmless and defend Railroad from and against all claims, actions, or legal proceedings arising, in whole or in part, from the failure of Industry to comply with any clearance requirements set forth in this agreement.  In this connection it is specifically understood that knowledge on the part of Railroad of a violation of any such clearance requirements, whether such knowledge is actual or implied, shall not constitute a waiver and shall not relieve Industry of its obligations to indemnify Railroad for losses and claims resulting from any such violation;

(f)  Each of the parties hereto, for the liability imposed upon such party by this agreement, shall indemnify and hold entirely harmless the other party hereto;

(g)  Knowledge on the part of Railroad of a continuing violation of the terms of this agreement by Industry shall constitute neither negligence nor acquiescence on the part of Railroad, and shall in no event relieve Industry of any of the responsibilities imposed upon Industry hereunder; and

(h)  The term "Railroad", as used in this paragraph, shall include not only Railroad specifically named in the first sentence of this agreement, but also all of the corporate affiliates of Railroad so named.

6.  Cars shall not be moved to or from said industrial track except by Railroad.  Industry will provide and furnish, at its own cost and expense, and keep ready for use at all times in a convenient place, a metal sign (or signs) at least 12 inches by 15 inches, reading "STOP"—"Men at Work", the letters in the word "STOP" to be at least four (4) inches high, and the letters in the words "Men at Work" at least two (2) inches high, and the color of which shall be white with blue background, which said sign(s) shall be used (1) whenever work is being done or activity performed in or about any car or series of cars, either by men and/or equipment; (2) whenever any car or series of cars is being loaded or unloaded either by hand or by the use of any mechanical means or device without regard to whether said mechanical means or device is connected to said car or series of cars; (3) whenever any work is being done or activity performed on or about the tracks themselves by men and/or equipment without regard to whether any car or series of cars is located on the tracks at the time the work is being done or the activity is being performed; and (4) at any other time when Industry employees and/or Industry equipment are engaged in such activity that the movement of cars could cause injury or damage to employees and/or equipment.  If Industry loads or unloads to or from rail tank cars placed on said track by Railroad, said sign(s) shall be of the size and coloring specified herein, provided, however, that said sign(s) shall read "STOP"—"Tank Car Connected" and shall be maintained in place until the car is disconnected from any mechanical means or device used in connection with the loading or unloading thereof, including, but not limited to, any hose, pipe, conveyor belt or coupling of any type; it being understood and agreed that tank cars must not be left connected to any such mechanical means or device, as above defined, except when loading or unloading is going on and while a competent person is present and in charge.  If the commodity loaded or unloaded into or from said rail tank cars is defined as hazardous or flammable in the regulations of the United States Department of Transportation, it is further understood and agreed that (a) brakes must be set and wheels blocked on all cars being loaded or unloaded and (b) smoking is to be prohibited in loading or unloading areas and "No Smoking" sign(s), satisfactory to Railroad, are to be posted in conspicuous locations approved by Railroad in loading or unloading areas, said sign(s) to be provided at the cost and expense of Industry.  Industry agrees to keep the premises around and about said track clean

2883-228

and free of undergrowth and dead grass, and waste paper, trash or any other flammable or unsightly matter.

If any of the aforesaid situations are present necessitating the use of the aforesaid sign(s), the placement of which shall be solely the responsibility of Industry, said sign(s) shall be conspicuously displayed to give necessary warning as follows:

(a) On each end of the car involved or on the outermost end of the end car in a series of cars; or,

(b) Alternatively on the tracks beyond the end of the car involved or on the tracks beyond the outermost end of the end car in a series of cars; or,

(c) If no car or series of cars is involved on the tracks themselves at a location beyond the limits of any work being done or activity performed;

(d) Provided, that if the track involved is a "dead end" track sign(s) need only be deployed in the manner stated above to cover the direction from which train movement might occur.

7.   Notwithstanding any other provision of this agreement, Industry will, moreover, indemnify and save harmless Railroad, and any associated, controlled, or affiliated corporation, from and against any loss of or damage to any cars of Railroad or cars of other railroad companies in use by Railroad, while being moved by Industry upon said industrial track, and from and against any loss of life, personal injury and any property loss or damage which may occur during or which result from the movement of said cars by Industry, as aforementioned, whether or not negligence on the part of Railroad may have caused or contributed to such loss, damage, injury or death.

8.   All carload shipments consigned to Industry for delivery on said industrial track shall be deemed to have been fully and completely delivered as soon as the car containing such shipment shall have been placed on the industrial track and detached from the engine or train by which it was moved.  Railroad shall not be liable as common carrier, nor as bailee, for any property loaded into any car on said industrial track until said car is attached or coupled to the engine or train by which it is to be moved from said industrial track towards its destination, or until a bill of lading shall have been issued to Industry therefor, and until said car is so attached or coupled up, or a bill of lading is issued therefor, the said car and its contents shall be deemed and held to be in the possession of Industry so far as liability therefor is concerned.

9.   Notwithstanding any other provision hereof, Industry agrees to comply entirely at its own expense with all requirements imposed by any governmental agency, state, federal or local, with respect to clearances, walkways, specification and condition or maintenance of that part of the subject track which is owned or maintained by Industry.

10.   The provisions of this agreement shall inure to the benefit of, and shall be binding upon, any other railroad company now operating or which may hereafter operate over or upon the track covered by this agreement, and shall also be binding upon any third party who, as successor or assignee of Industry or with the consent of Industry, may use said track, or who may enter upon the premises served by said track; it being understood and agreed that Industry will promptly furnish to Railroad notice, in writing, of any such use or entry by any such third party.  Industry hereby guarantees the strict performance of the terms of this agreement by any such third party until the use of said track by such third party shall have been covered by the execution of an appropriate agreement with Railroad.  This contract is not assignable or transferable by Industry except with the written consent of Railroad, signed by an executive officer.

11.   Upon the termination of this agreement Railroad may discontinue the operation of said industrial track and remove its property and fixtures therefrom; and Industry shall take up and remove from the right of way or property of Railroad the track materials in any portion of said track owned by Industry and located on Railroad right of way or property, the work of taking up said track materials to be done, if Railroad elects, by the forces

2883-228

– 4 –

of Railroad, but at the expense of Industry. Notwithstanding any other provision hereof, if Industry shall fail to comply with any of its covenants in this Agreement contained, Railroad shall have the right forthwith to discontinue operation of said industrial track, without liability to Industry, until Industry shall have complied with all of said covenants.

12. Industry will construct, maintain and renew, at its sole cost, said double swing gates across said track at the location indicated on said annexed print; said gates to be of such design and specification as may be prescribed by Railroad, to be equipped with Railroad's standard switch lock, so applied that said gates may be locked from the outside, and to be constructed in such manner as to provide, when opened, an unobstructed space on each side of the center line of said track of not less than ten feet and a total clearance of not less than twenty feet. Industry shall also provide a substantial device on each side of said track to which the wings of said gates may be fastened and made stationary parallel, or substantially parallel, with said track when railroad equipment is moving through the gateway; each of said devices to be so arranged that when the wings of said gates are fastened thereto the distance between the side of each wing and the center line of said track will not be less than ten feet in the clear.

Notwithstanding any other provisions of this agreement, Industry will assume full responsibility for the safe and proper maintenance and use of said gates, and, except for loss, damage or injury caused solely by the negligence of Railroad, Industry will indemnify and save harmless Railroad, and any associated, controlled or affiliated corporation, from and against the consequences of any property loss or damage, loss of life or personal injury whatever accruing from or by reason of the construction, maintenance or use of said gates or by reason of the presence of the same across said track, whether or not negligence of Railroad may have contributed to such loss, injury or damage.

13. Industry will construct, and maintain said Facility at all times during the life of this agreement, at its sole cost and expense, in strict accord with plans and specifications (if any) shown and noted on said annexed print and such other specifications as may be reasonably prescribed by Railroad, and, moreover, in all respects in accordance with the requirements of Railroad; it being understood that the work of constructing and maintaining said Facility shall, at all times during its progress, be subject to the inspection and supervision, and upon its completion to the approval, of the duly authorized representative of Railroad.

14. Industry will maintain said Facility at all times during the life of this agreement in such condition that said Facility or the use thereof by Industry shall not be or become an obstruction to, or interfere with, the safe and proper maintenance of said industrial track, or railroad operations upon said track, or endanger life or limb of employees of Railroad or other persons on or about said track.

15. Said Facility shall be maintained at the location indicated upon said annexed print, and shall not be relocated without the consent, in writing, of Railroad.

16. Industry proposes to construct, maintain and use said Facility with full cognizance of the risk of loss of life, personal injury and property loss or damage which may be caused by or result from railroad operations on said industrial track at the location of said Facility, or which may accrue from or by reason of the construction, installation, maintenance, presence or use of said Facility by Industry; and Industry covenants that said Facility shall be constructed, maintained and used solely at the risk of Industry and that neither Railroad, nor any associated, controlled or affiliated corporation, shall assume any responsibility in the premises; Industry hereby specifically agreeing, notwithstanding any other provision of this agreement, to indemnify and save harmless Railroad, and any associated, controlled or affiliated corporation, from and against the consequences of any and all such loss, injury or damage, whether or not negligence of Railroad may have caused or contributed to such loss, injury or damage.

2883-228

# EXHIBIT "B"

THIS AGREEMENT, made between
SOUTHERN RAILWAY COMPANY, a Virginia corporation,

hereinafter styled COMPANY; and
~~XXXXXXXXXXXXXXXXXXa Maryland corporation;~~    *Aug 14 71*
W. R. Grace & Co.,    a Connecticut Corporation,
hereinafter styled LICENSEE;

                    W I T N E S S E T H:

    THAT the PARTIES HERETO agree as follows:

    1.  COMPANY, in consideration of the covenants of Licensee, hereby grants unto
Licensee the right to occupy and use for the purpose or purposes hereinafter mentioned.

        A.    One        parcel(%) of the right of way or property of
        Company at     NATKA, South Carolina            ; having an
        area of  13,193   (square feet) (%%%%%%), more or less, the
        location and dimensions of which are substantially as shown
        in   blue      outline on print of Drawing No. TB-80-0185     ,
        dated      June 27, 1980     , ~~xxxxxxxxxxxxxxxxxxxxxx~~
        ~~xxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~, hereunto annexed and made a
        part hereof; TOGETHER with the right to maintain thereon, at
        Licensee's sole cost and expense, a portion of an existing
        warehouse building, with two appurtenant overhead canopies,
        a shed, and a cyclone fence with two double swing gates therein,
        all located substantially as shown on said annexed print; which said
        warehouse building, canopies, shed, fence and gates shall not become
        fixtures upon the realty but shall remain the property of Licensee
        and shall be removed from the premises upon termination of this
        agreement. Said canopies and said shed being hereinafter sometimes
        together referred to as "Facility".

        ~~B.  The _____ of Company, or use of~~
        ~~square feet, more or less, therein, at _____~~
        ~~_____, the location and dimensions of~~
        ~~said structure of Company or of the area therein to be~~
        ~~occupied by Licensee hereunder, being substantially as~~
        ~~shown in _____ outline on print of Drawing No. _____~~
        ~~_____, dated _____, revised~~
        ~~or last revised _____, hereunto~~
        ~~annexed and made a part hereof; TOGETHER with the right~~

Company reserves unto itself, and its permittees, the permanent right to maintain, operate,
renew or reconstruct upon, under or over said premises, any existing pipe, electric trans-
mission, telephone, telegraph, and signal lines, or any other facilities of like character,
Licensee hereby agreeing that this agreement is subject to any or all such rights and uses;
Company hereby further reserving unto itself the right to enter upon said premises at any
and all times for the purpose of operating, maintaining, reconstructing or relocating such
existing track or tracks as may be located on said premises.  The privilege herein granted
is subject also to such rights as the owners or users thereof may have to use any road or
highway, or portion thereof, which may be located upon or which may traverse said premises.

    2.  Licensee will use said premises for   mining and manufacturing plant
in connection with the   Kaolin manufacturing
_____ business of Licensee.

    3.  Licensee will pay unto Company the rent or sum of  ONE HUNDRED ---------------
----------------------- DOLLARS ($100.00 ) per annum, payable annually, in advance, beginning as

2883-227

of the effective date hereof. If Licensee shall default in the payment of rental hereunder for a period of 30 days after the same shall be due, a service charge in the amount of 1/2 of 1% of such rent for each month or portion thereof that the same shall remain unpaid shall be charged to Licensee. Licensee will pay such service charge together with rental due hereunder.

4. Licensee will use said premises for the purposes aforesaid and for no other purpose. This license is a personal privilege to Licensee and shall not be assigned without the written consent of Company; nor shall Licensee, except with such consent, permit said premises to be used for any purpose by any other person.

5. Licensee will pay all taxes, licenses or other charges assessed or levied upon the property or business conducted by Licensee upon said premises of Company, or against Company by reason of the location of such property or business of Licensee upon said premises.

6. Licensee will not construct or install upon said premises any buildings, structures or improvements unless specifically permitted hereby or by written consent of Company. Any buildings, structures or improvements erected by Licensee on said premises, if permitted hereby, shall be substantially constructed or installed, maintained and used in such manner as not to interfere with the operation and maintenance of the railroad of Company, shall be kept in good repair and presentable condition, shall be located as described herein or shown on the attached print, and shall not be relocated upon Company premises except with the written consent of Company. Buildings or structures of Licensee, if permitted hereunder, shall have roofs of metal or other non-combustible material to reduce fire risks. Licensee agrees to keep said premises in clean and sanitary condition, free of waste, trash, or unsanitary or inflammable matter, and to prevent the posting of advertising bills or signs upon said premises, except the usual business sign of Licensee.

7. Licensee will not permit smoking within any building of Company occupied by Licensee, and will post and maintain in a conspicuous place, or places, within said premises a sign or signs, reading "NO SMOKING ALLOWED", or words of similar import.

8. If the premises occupied hereunder by Licensee consists of a building or other structures of Company, or space therein, Licensee

    (a) accepts the premises in their present condition; it being agreed that all maintenance and repairs needed to keep the premises in as tenantable condition as at present shall be made by the Licensee at Licensee's sole cost and expense, the term "premises" as used in this subparagraph to include, without limitation, air conditioning, heating, sprinkler systems, plumbing, wiring facilities and other equipment or facilities which may be furnished by Company and employed in the use and occupancy of the premises; and that Company shall have no obligation to perform any maintenance or to make any repair or replacement with respect to the premises except those required to be made to the roofing, foundations, and outside walls (exclusive of windows, doors and facilities attached to or adjacent to the outside walls such as loading docks). It is further agreed that Licensee in fulfilling the obligations assumed by Licensee herein shall make provision for the immediate repair and maintenance of all doors, windows, or other facilities comprising the premises which serve to protect the premises from the elements, damage by vandalism or other causes, and that where any such repair or maintenance is not or is not considered by Licensee to be the responsibility of Licensee, Licensee shall notify Company immediately of the need for such repair and maintenance, Licensee failing in either respect, to be liable to Company for all damage resulting. Company shall have no obligation to furnish Licensee any water, heat, light or other public utilities for use by Licensee in Licensee's occupation and use of said premises, and all facilities for supplying light, water, heat and other public utilities required by Licensee in connection with Licensee's use of said premises shall be of character and design approved by Company and shall be installed and maintained therein at the expense of Licensee, and in accordance with the requirements of Company as to proper installation and construction; Licensee agreeing to pay all expenses and charges for such utilities and to install separate meters necessary in connection therewith.

    (b) will not make any alterations in, additions to or improvements to said

2883-227

-- 2 --

premises, or the appurtenances thereof, of any kind whatsoever, without the written consent of Company being first obtained. All alterations of or additions to the electric light or power wires or fixtures upon said premises which may be made by Licensee with the consent of Company shall be made in strict accord with the requirements of the National Electrical Code and at the expense of Licensee; and

(c) will, while in possession hereunder, comply, and cause its agents and employees to comply, with all such reasonable rules and regulations as may be prescribed by Company looking to the prevention of fires and compliance with insurance contracts and policies. Licensee will promptly comply with any requirements of any insurance inspector of Company looking to the enforcement of said rules and regulations, and will use its best efforts at all times for the prevention of fires; the insurance inspector of Company to have the right at all reasonable times to enter said premises for the inspection thereof.

9.   At its own expense, Licensee shall maintain said premises in condition, and occupy and use the same in such manner as may be necessary, to meet all requirements of Federal, State, and local safety and health, environmental protection, and sanitation laws and regulations, and shall at its own expense make any and all corrections or additions to the leased premises that may be necessary to bring them into compliance with the aforesaid laws and regulations which may apply to the use and occupancy of said premises by Licensee.

10.   The liability of the parties to this agreement, as between themselves, for death, personal injury and property loss and damage, which occurs by reason of, or arises out of, or is incidental to, the use or occupancy by Licensee of the property covered by this agreement, shall be determined in accordance with the following provisions:

(a) Licensee shall be solely responsible for, and shall bear all cost, expense and liability resulting from loss of or damage to property by fire;

(b) Licensee shall be solely responsible for, and shall bear all cost, expense and liability resulting from death, personal injury, and loss and damage to property, caused solely by the negligence of Licensee, or of the agents or employees of Licensee, or by the violation by Licensee or its agents or employees of the terms of this agreement, or by the negligence of Licensee concurring with the negligence of a third party;

(c) Except as provided in subparagraph (a) above, Company shall be solely responsible for and shall bear all cost, expense and liability resulting from death, personal injury, and property loss and damage, caused solely by the negligence of Company, or of the agents or employees of Company, or by the negligence of Company concurring with the negligence of a third party;

(d) Except as provided in subparagraph (a) above, Company and Licensee shall be jointly responsible for and bear equally all cost, expense and liability resulting from death, personal injury and property loss and damage caused by their joint and concurring negligence;

(e) Each of the parties hereto, for the liability imposed upon such party by this agreement, shall indemnify and hold entirely harmless the other party hereto;

(f) Knowledge on the part of Company of a continuing violation of the terms of this agreement by Licensee shall constitute neither negligence nor acquiescence on the part of Company, and shall in no event relieve Licensee of any of the responsibilities imposed upon Licensee hereunder; and

(g) The term "Company", as used in this paragraph, shall include not only Company specifically named in the first sentence of this agreement, but also all of the corporate affiliates of Company so named.

11.   (a) In connection with the use of the premises covered by this agreement

2883-227                        - 3 -

Licensee agrees to observe and be bound by the rules of the Company with respect to standard clearances for all railroad tracks located on or adjacent to the premises covered by this agreement; that is to say, the Licensee agrees to maintain and preserve an overhead space of 22 feet measured perpendicularly from the top of the rail (except that overhead clearance where wire lines extend over said track shall be such as may be prescribed by the Company) and a space 20 feet in width, measured 10 feet on each side from the center line of said track; provided, however, that the side clearance of 10 feet must be increased one and one-half (1-1/2) inches for every degree of curvature, which space shall be kept clear of any obstruction whatever, including but not limited to all structures, facilities or property of the Licensee which are or may be placed or erected above or parallel to said track.

(b) Notwithstanding anything contained in this agreement, and irrespective of any joint or concurring negligence of Company, Licensee shall assume sole responsibility for and shall indemnify, save harmless and defend Company from and against all claims, actions, or legal proceedings arising, in whole or in part, from the failure of Licensee to comply with any clearance requirements set forth in this agreement. In this connection, it is specifically understood that knowledge on the part of Company of a violation of any such clearance requirements, whether such knowledge is actual or implied, shall not constitute a waiver and shall not relieve Licensee of its obligations to indemnify Company for losses and claims resulting from any such violation.

12.  In the event that the whole or any part of the premises occupied by Licensee hereunder shall be taken for any purpose under the power of eminent domain, Licensee shall not be entitled to share in any award resulting from any such taking, nor shall Licensee have any claim against the Company for any expense which may be incurred by Licensee as a result of such taking or as a result of termination of this agreement by reason of such taking, as hereinafter provided. In the event that the taking shall be of the whole of the property herein occupied by Licensee or, of such part as shall render said premises untenantable for the uses at such time made of the premises by the Licensee, then this agreement and all rights and interests acquired hereunder shall terminate as of the date of the vesting of title to the property in the condemning authority, and in no event shall Licensee have any claim for the value of any unexpired period of this agreement.

13.  Company may terminate this agreement at any time by 30 days' written notice to Licensee of election so to do, and if Licensee shall default in the payment of rentals, or violate any other covenants herein, Company may terminate this agreement by 10 days' written notice to Licensee of election so to do; service of such notice to be made either (a) by delivering a copy of the notice to Licensee, or (b) by mailing the same to or leaving it at the last known address of Licensee and posting in any conspicuous place upon said premises. Licensee may also terminate this agreement by 30 days' written notice to Company of election so to do. Upon the termination of this agreement, in any manner, Licensee will vacate said premises of Company, remove all property (including structures, if any) of Licensee therefrom, and surrender possession of said premises to Company in as good condition as they were in prior to construction or placing of said property thereupon, and, in default thereof, Company may, in addition to any other legal remedy it may have, at its election (a) remove the property of Licensee from and restore the condition of said premises of Company, at the expense of Licensee, or (b) subject to notice as hereinafter provided, take possession of any property left on said premises by Licensee and dispose of the same by sale or otherwise for the purpose of applying the proceeds thereof against unpaid rental or to other payments due pursuant to the terms of this agreement, or for other purposes as hereinafter mentioned; except that if said property so left on said premises by Licensee has no value, in the judgment of Company, or cannot be conveniently sold, the same may be disposed of in such manner as Company may determine to relieve itself of the burden of caring for such property; provided, however, that prior to the sale or other disposition of such property Company shall notify, or attempt to notify, Licensee of Company's intent so to sell or dispose of such property. If this agreement shall be terminated by Company it agrees, upon written

2883-227                    - 4 -

demand by Licensee, to refund the unearned portion of any rent paid in advance; provided, however, that Company's obligation to refund unearned rental shall be conditioned upon the fulfillment of all of the obligations of Licensee under the terms of this agreement. The terms and provisions of this paragraph shall survive the termination of this agreement.

14. This agreement shall take effect as of the ___1st___ day of ___June___ 19 _80_.

15. Licensee will maintain and renew, at its sole cost, the two double swing gates across the industrial track on said premises at the locations indicated on said annexed print; said gates to be of such design and specification as may be prescribed by Company, to be equipped outside, and to be constructed in such manner as to provide, when opened an unobstructed space on each side of the center line of said track of not less than ten feet and a total clearance of not less than twenty feet. Licensee shall also provide a substantial device on each side of said track to which the wings of said gates may be fastened and made stationary parallel, or substantially parallel, with said track when railroad equipment is moving through the gateways; each of said devices to be so arranged that when the wings of said gates are fastened thereto the distance between the side of each wing and the center line of said track will not be less than ten feet in the clear.

16. Notwithstanding any other provisions of this agreement, Licensee will assume full responsibility for the safe and proper maintenance and use of said gates, and, except for loss, damage or injury caused solely by the negligence of Company, Licensee will indemnify and save harmless Company, and any associated, controlled or affiliated corporation, from and against the consequences of any property loss or damage, loss of life or personal injury whatever accruing from or by reason of the construction, maintenance or use of said gates or by reason of the presence of the same across said track, whether or not negligence of Company may have contributed to such loss, injury or damage.

17. Licensee will construct, and maintain said Facility at all times during the life of this agreement, at its sole cost and expense, in strict accord with plans and specifications (if any) shown and noted on said annexed print and such other specifications as may be reasonably prescribed by Company, and, moreover, in all respects in accordance with requirements of Company; it being understood that the work of constructing and maintaining said Facility shall, at all times during its progress, be subject to the inspection and supervision, and upon its completion to the approval, of the duly authorized representative of Company.

18. Licensee will maintain said Facility at all times during the life of this agreement in such condition that said Facility or the use thereof by Licensee shall not be or become an obstruction to, or interfere with, the safe and proper maintenance of said industrial track, or railroad operations upon said track, or endanger life or limb of employees of Company or other persons on or about said track.

19. Said Facility shall be maintained at the location indicated upon said annexed print, and shall not be relocated without the consent, in writing, or Company.

20. Licensee proposes to construct, maintain and use said Facility with full cognizance of the risk of loss of life, personal injury and property loss or damage which may be caused by or result from railroad operations on said industrial track at the location of said Facility, or which may accrue from or by reason of the construction, installation, maintenance, presence of use of said Facility by Licensee; and Licensee covenants that said Facility shall be constructed, maintained and used solely at the risk of Licensee, and the neither Company nor any associated controlled or affiliated corporation, shall assume any responsibility in the premises; Licensee hereby specifically agreeing, notwithstanding any other provision of this agreement, to indemnify and save harmless Company and any associate, controlled or affiliated corporation, from and against the consequences of any and all such loss, injury or damage, whether or not negligence of Company may have caused or contributed to such loss, injury or damage.

21. Notwithstanding the provisions of Article 11 of this agreement, the clearances for said industrial track, as to the existing structures of Licensee shown and depicted on said annexed print, may be limited or restricted to the dimensions shown on said print, provided Licensee shall place and maintain, at its own cost and expense, warning signs, satisfactory to Company, at conspicuous places on each of said structures where

**2883-227**                                        -5-

standard clearances do not obtain to the effect that such structures will not clear man on side or on top of car.

Notwithstanding any other provisions of this agreement, Licensee shall indemnify and save harmless Company, and any associated, controlled or affiliated corporation, from and against the consequences of any loss of life, personal injury or property loss or damage which may result from or be attributable to any limited or restricted clearances for said industrial track, whether or not negligence of Company may have caused or contributed to such loss, injury or damage.

IN WITNESS WHEREOF the parties hereto have executed these presents in duplicate, each part being an original, this ___15th___ day of ___December___, 19 80 .

In presence of:

_____
As to Company.

In presence of:

_____
As to Licensee.

SOUTHERN RAILWAY COMPANY,
By

_____
Vice President.

W. R. GRACE & CO.,
By

_____
Vice-President.

-6-

DAG:jst
7-16-80
33458-1    2883-227

# EXHIBIT "C"

THIS SUPPLEMENTAL AGREEMENT, made between                2883-228

SOUTHERN RAILWAY COMPANY, a Virginia corporation, hereinafter called
Railroad; and

W. R. GRACE &    CO-CONN., a Connecticut corporation, hereinafter called    (formerly W. R. Grace & Co.)
Industry; and

W I T N E S S E T H: That

The parties hereto agree that, effective as of the ___17th___ day
of _SEPTEMBER_, 1990_____, the written agreement dated December 15,
1980, between Railroad and Industry concerning the operation and maintenance
of an industrial track 1678 feet in length at NATKA, South Carolina as
supplemented by agreement dated November 7, 1983 to provide for an additional
track 477 feet in length, (hereinafter together referred to as "Agreement") is
hereby modified in the following manner, but not otherwise, that is to say:

1. Railroad hereby grants unto Industry the right or license to
construct, maintain and use an overhead loading structure with retractable
loading spout, hereinafter called "Facility," across and over an industrial
track of Industry; the location of said Facility being substantially as shown
on print of Drawing No. AD-0102, dated June 14, 1990, annexed hereto and made
a part hereof.

2. Industry will construct and maintain said Facility at all times,
during the life of said Agreement, at its sole cost and expense, in strict
accord with plans and specifications (if any) shown and noted on said annexed
print and such other specifications as may be reasonably prescribed by
Railroad; and, moreover, in all respects in accordance with the requirements
of Railroad; it being understood that the work of constructing and maintaining
said Facility shall, at all times during its progress, be subject to the
inspection and supervision, and upon its completion to the approval, of the
duly authorized representative of Railroad.

3. Industry will maintain said Facility at all times during the
life of said Agreement in such condition that said Facility or the use thereof
by Industry shall not be or become an obstruction to, or interfere with, the
safe and proper maintenance of said industrial track, or railroad operations
upon said track, or endanger life or limb of employees of Railroad or other
persons on or about said track.

4. Said Facility shall be maintained at the location indicated upon
said annexed print, and shall not be relocated without the consent, in
writing, of Railroad.

5. Industry proposes to construct, maintain and use said Facility
with full cognizance of the risk of loss of life, personal injury or property
loss or damage which may be caused by or result from railroad operations on
said industrial track at the location of said Facility, or which may accrue
from or by reason of the construction, installation, maintenance, presence or
use of said Facility by Industry; and Industry covenants that said Facility
shall be constructed, maintained and used solely at the risk of Industry, and
that neither Railroad, nor any associated, controlled or affiliated
corporation, shall assume any responsibility in the premises; Industry hereby
specifically agreeing, notwithstanding any other provisions of said Agreement,
to indemnify and save harmless Railroad, and any associated, controlled or
affiliated corporation, from and against the consequences of any and all such
loss, injury or damage, whether or not negligence of Railroad may have caused
or contributed to such loss, injury or damage.

6. This agreement is supplemental to said Agreement and modifies
the same as herein provided, but not otherwise; and said Agreement, as herein
modified, shall continue in effect until terminated as therein provided.


RECEIVED
SEP 24 1990
AUGUSTA, GA. SALES

IN WITNESS WHEREOF, the parties hereto have executed this
supplemental agreement in duplicate, each part being an original, as of
the _3ᵈ_ day of _OCTOBER_, 19_90_.

In presence of:                          SOUTHERN RAILWAY COMPANY,
                                         By

_____                  _____
As to Railroad                           Vice President – Transportation

In presence of:                          W. R. GRACE & CO.,
                                         By

_____                  _____
As to Industry                           Emil Eichhorn
                                         Executive Vice President

LHG:prj
2327c
3345B
9-11-90

-2-

# EXHIBIT "D"

LAW OFFICES

**HALL, BLOCH, GARLAND & MEYER, LLP**

ELLSWORTH HALL, III
F. KENNEDY HALL
BENJAMIN M. GARLAND
J. PATRICK MEYER, JR.
J. STEVEN STEWART
JOHN BURTON WILKERSON, JR.
DUNCAN D. WALKER, III
MARK E. TOTH
JOHN FLANDERS KENNEDY
TODD C. BROOKS
J. ELLSWORTH HALL, IV

1500 CHARTER MEDICAL BUILDING
577 MULBERRY STREET
P.O. BOX 5088

**MACON, GEORGIA 31208-5088**

TELEPHONE 912-745-1625
FACSIMILE 912-741-8822

J. E. HALL
(1875-1945)
CHARLES J. BLOCH
(1893-1974)
ELLSWORTH HALL, JR.
(1903-1964)

MIDTOWN OFFICE
2452 VINEVILLE AVENUE
MACON, GEORGIA 31204
FACSIMILE 912-741-3544

September 15, 1999

<u>Via Certified Mail - Return Receipt Requested</u>

Mr. Harry Fishel
Plant Manager
W. R. Grace & Company
213 Kaolin Road
Aiken, SC 29801

FILE COPY

  RE: Lester F. Kirkland, Jr. vs. Norfolk Southern Railway Company;
    State Court of Bibb County, C/A No. 45273

Dear Mr. Fishel:

  This firm represents Norfolk Southern Railway Company and I am writing to you with reference to the above-identified lawsuit which has been filed by Plaintiff Lester Kirkland against Norfolk Southern, a copy of which is enclosed herewith for your ready reference.

  As you will note from Plaintiff's allegations of fact in the Complaint, he alleges that on two occasions he slipped from a slick and dangerous substance which covered the rail car on which he was working and he fell and injured his neck and back. At his deposition, Plaintiff testified that the cars he was working on were loaded with kaolin by Grace employees at the W. R. Grace plant. He testified that the cars were overloaded and the kaolin spilled out all over the cars, however, W. R. Grace & Company did not blow off the cars or otherwise clean them as they are supposed to do and, that the presence of the excess kaolin overspill caused him to slip.

  The agreement of December 15, 1980 between Southern Railway Company, Norfolk Southern's successor, and W. R. Grace & Company, provided in Section 10(b) that W. R. Grace & Company "shall be solely responsible, and shall bear all costs, expense and liability resulting from...personal injury...caused solely by the negligence of Licensee [W. R. Grace & Company]...or by a violation by licensee or its agents or employees of the terms of this agreement....".

  Section 18 of this agreement provides that "Licensee [W. R. Grace & Company] will maintain said Facility at all times during the life of this agreement in such condition that said Facility or the use thereof by licensee shall not be or become an obstruction to, or interference with, the safe and proper maintenance of said industrial track, or railroad operations upon said

LAW OFFICES
HALL, BLOCH, GARLAND & MEYER, LLP

Mr. Harry Fishel
Plant Manager
September 15, 1999
Page 2

track, or endanger life or limb of employees of Company or other persons on or about said track."

A full copy of the December 15, 1980 agreement is also enclosed herewith for your ready reference.

In view of the facts as alleged by Plaintiff in his Complaint and more fully developed upon his deposition, it seems clear that the proximate cause of Plaintiff's injury was the act of W. R. Grace & Company's employees in overfilling the kaolin cars and their failure to remove the overfill kaolin from the platform on the cars where the railroad employees have to walk.

I am therefore writing to request that W. R. Grace & Company assume the defense of this action and accept the responsibility for handling, settling or otherwise handling this lawsuit pursuant to the terms of the December 15, 1980 indemnity agreement.

If you or your counsel have additional questions with reference to this matter, please advise.

Thanking you, I am

Sincerely,

Hall, Bloch, Garland & Meyer

By:

Benjamin M. Garland

BMG/sj
Enclosures

cc:    M. S. Block
       R. A. Wells
       T. D. Barton
       J. D. Hollis
       KIRKLL012398HR

Case 01-01139-KJC   Doc 22975-4   Filed 08/26/09   Page 4 of 5

MAR 13 '01 10:36 FR PIEDMONT DIV SUPT   7 228 429   TO 79477415531 210529/31
(182612)

PERSONAL INJURY REPORT

REPORT DATE: 1-23-98       TRANSPORTATION DEPARTMEN
REPORT TIME: ( AM) or ( 2:40p PM)       Piedmont DIVISIO

Train No. (if applicable) P22P0   Is this incident related to a Train or Crossing Accident? [ ] Yes [✓] No

TO: Supervisory Officer MR. CHAPMAN   FROM: Injured Employee: C.E. KIRKLAND JR   Employee SS No.: 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

INCIDENT DATE: 1-23-98       INCIDENT TIME: ( AM) or ( 1:40p PM)

LOCATION: Select one: Line of Road ✓ Terminal ___ Shop or Office Building ___ Off Railroad Property ___
INCIDENT CITY: WARRENVILLE   STATE: S.C.   MILEPOST: (if applicable) R 179.7

WEATHER: Select one: Clear ___ Cloudy ___ Rain ✓ Fog ___ Sleet ___ Snow ___ Does Not Apply ___ (Injury Occurred Indoo
VISIBILITY: Select one: Dawn ___ Day ✓ Dusk ___ Dark ___ Indoors-Dark ___ Indoors-Dim ___ Indoors-Normal ___ Indoors-Other ___

TEMPERATURE: ( 58 PLUS) or ( MINUS)
HEIGHT: 5 FT. 9 IN. WEIGHT 150 LBS. OCCUPATION Conductor

REST DAYS: Select all that apply: Monday ___ Tuesday ___ Wednesday ___ Thursday ___ Friday ___ Saturday ✓ Sunday ✓ None ___

ASSIGNMENT: REGULAR ✓ RELIEF ___ EXTRA ___
ON DUTY: [✓] Yes [ ] No       HOURS ON DUTY AT TIME OF INCIDENT 6'45"

SAFETY ATTIRE WORN: Select all that apply: Head ___ Eye ✓ Hearing ✓ Respiratory ___ Foot ✓ Hand ✓ Other ___ None ___
WAS ANY TYPE OF EQUIPMENT INVOLVED? [✓] Yes [ ] No   STATIONARY ✓ MOVING ___
EQUIPMENT TYPE: Select one: Freight ✓ Passenger ___ Mixed ___ Work ___ Yard Switching ___ Light Locos ___ M/W Equipment ___ None ___

INITIAL AND NUMBER: _____

WITNESS NAMES                    ADDRESSES

DO YOU DESIRE MEDICAL ATTENTION AT THIS TIME? [ ] Yes [✓] No   While Releasing
DESCRIBE WHAT HAPPENED - GIVE SPECIFIC, DETAILED INFORMATION: Handbrake on Covered hopper loaded with clay, slipped on clay on hopper and fell to ground.

L.E. Kirkland Jr.
SIGNATURE OF EMPLOYEE

Distribution: Original to Supervisory Officer
Photocopy to Injured Employee



205

# PERSONAL INJURY REPORT

REPORT DATE: *1-26-98*          *TRANSPORTATION* DEPARTME

REPORT TIME ( _____ AM) or ( *100* PM)    *Piedmont* DIVISI

Train No. (If applicable) *P2PO*    Is this incident related to a Train or Crossing Accident?  [ ] Yes  [✓] No

TO: Supervisory    *TRAIN MASTER*    FROM: Injured    *L.E. KIRKLAND*    Employee *250-84*
Officer:    *MR. CHAPMAN*    Employee:    SS No.: *2831*

INCIDENT DATE: *1-26-98*    INCIDENT TIME: ( ____ AM) or ( *1210* PM)

LOCATION: Select one: Line of Road  *✓*  Terminal _____  Shop or Office Building _____  Off Railroad Property _____

INCIDENT CITY: *Aiken, S.C.*    STATE: *S.C.*    MILEPOST: (If applicable) *SA 57.3*

WEATHER: Select one: Clear *✓*  Cloudy ____ Rain ____ Fog ____ Sleet ____ Snow ____ Does Not Apply ____ (Injury Occurred Ind.

VISIBILITY: Select one: Dawn ____ Day *✓* Dusk ____ Dark ____ Indoors-Dark ____ Indoors-Dim ____ Indoors-Normal ____ Indoors-Other ____

TEMPERATURE: ( *45°* PLUS) or ( _____ MINUS)

HEIGHT: *5* FT. *8* IN. WEIGHT *150* LBS.    OCCUPATION *Conductor*

REST DAYS: Select all that apply: Monday ____ Tuesday ____ Wednesday ____ Thursday ____ Friday ____ Saturday *✓* Sunday *✓* None

ASSIGNMENT: REGULAR *✓*    RELIEF ____    EXTRA ____

ON DUTY:  [✓] Yes  [ ] No    HOURS ON DUTY AT TIME OF INCIDENT *5'10"*

SAFETY ATTIRE WORN: Select all that apply: Head ____ Eye *✓* Hearing *✓* Respiratory ____ Foot ____ Hand *✓* Other ____ None ____

WAS ANY TYPE OF EQUIPMENT INVOLVED? [✓] Yes  [ ] No    STATIONARY *✓*    MOVING ____

EQUIPMENT TYPE: Select one: Freight ____ Passenger ____ Mixed ____ Work ____ Yard Switching ____ Light Locos ____ M/W Equipment ____ None

INITIAL AND NUMBER: *NS 245061*

WITNESS NAMES    ADDRESSES *2905.*

*C. J. Sharpe*    *1224 Blackville Ct. Gaston, S.*

*T. W. Connelly*    *3384 Calhoun St. Branchville*
    *S.C. 29432*

? YOU DESIRE MEDICAL ATTENTION AT THIS TIME?  [✓] Yes  [ ] No

DESCRIBE WHAT HAPPENED - GIVE SPECIFIC, DETAILED INFORMATION: *Pulled 7 loads*
*from W.R. Grace Plant in Aiken, S.C. Brought*
*all 7 loads which were covered in clay back*
*to Aiken and ran around cars in house track*
*to take to Warrenville S.C. to be set off.*
*While applying handbrakes on cars conductor*
*slipped on NS 245061 and twisted or*
*tore or pulled something in lower back.*
*Brakeman C.J. Sharpe saw incident.*

Distribution:    Original to Supervisory Officer
    Photocopy to Injured Employee



*L.E. Kirkland Jr.*
SIGNATURE OF EMPLOYEE

*206*

# EXHIBIT "E"

PAC 658006v.1

1      Q    What was the condition of the loaded cars, as far as

2    clay on them?

3      A    Just covered in clay, just all over.

4      Q    How much?  Tell us what you mean when you say it's

5    covered in clay.

6      A    Well, on the top it might be six or eight inches, on

7    the grab irons and the platforms where we stand and stuff, it

8    might be an inch, inch -- you know, on the little grab irons,

9    that are real thin like this, you know, it won't pile up high,

10   it will fall off, but it will get up like that.  But then on

11   the inside of the car where there is a base for it to pile up,

12   it would pile up a foot high.

13     Q    Was this unusual to have this much clay on the cars?

14     A    It was -- that was a bad time, but it was like that

15   all the time.

16     Q    How long had it been going on like that?

17     A    Ever since I had been there in '91.

18     Q    Can you tell us a little bit -- you were the

19   conductor on the job, weren't you?

20     A    Yes, sir.

21     Q    Aren't you responsible for the job?

22     A    Yes, sir, I am.

23     Q    Well, did you consider this clay on the cars to be a

24   safety hazard?

25     A    Yes, sir, I did.

1      A      No, sir.

2      Q      So what did you do then?

3      A      Usually, the clay and stuff gets up in there and

4    gums it up, and so you can wiggle it and play with it, and try

5    to get it loosened.  You can turn it with your hand, you try

6    the quick release a couple of times, if it won't let the chain

7    down, which releases the brake, then you can try to turn the

8    wheel.  So I tried to pull the wheel off, and I couldn't move

9    it.  So then I tried to pull it back on, you know, wiggle it,

10   try to put some more on it, and I couldn't move it that way,

11   either, it was just stuck.

12     Q      You were trying to -- you thought if you could move

13   it back and forth that would get it free?

14     A      Right.  And break whatever was gummed up in there

15   loose.

16     Q      Is that something you have done before?

17     A      Yes, sir.

18     Q      Tell us what happened.

19     A      I couldn't get it either way.  I couldn't move it,

20   it was just like stuck.  And so I pulled the quick release

21   again, you know, couldn't get it to do anything, so I grabbed

22   the brake wheel, and I was pulling it toward me again, to see

23   if I could manually pull it off, and when I did I slipped off

24   the car.  I mean, just like that, I mean, my hand -- my foot

25   went that way, my hand went this way, and the next thing you

1     Q     Did you all get your train fixed?

2     A     Yes, sir, about -- probably took a couple of hours,

3     and shop truck got there and fixed the engine.

4     Q     When Mr. Chapman -- when you finally had him down

5     there at the plant, and you said, let's go down and see where

6     the problem is, and he said, I have seen enough, I mean, was

7     that anything new?

8     A     No, sir.

9     Q     When you got your engine fixed did you all go ahead

10    to W. R. Grace?

11    A     Yes, sir.  We went down to the plant and got ready

12    to start switching.  We put our empties out on the main line

13    like I always do, and then we started in with the engine.  And

14    when we started coupling these loads -- there were seven loads

15    to come out, and they were just covered.  I mean, they -- it

16    was just bad, covered.  And I stopped Chris, I said, hold up,

17    hold up, I said.  I told Tommy -- I said, just stop, Tommy.  I

18    said, take your break, Tommy.  I said, Tommy, call Trainmaster

19    Chapman on the radio and tell him to come back around here.

20    Well, he called two or three times and he couldn't get him.

21    He had gone to the depot, and I guess he was in the depot

22    making phone calls.  So I went in there and called on the

23    phone and got the dispatcher to call him on the phone at Aiken

24    depot and told him to come back around to Grace, that we had a

25    problem.

1   blow a couple of the grab irons off and a steel step where

2   they can get -- at least get up on the car. Chris looked at

3   Mr. Chapman, he said, what about all this clay piled up in

4   there that's a foot deep. He says, it's blows right off --

5   right on us, gets in our faces and everything, and then it

6   covers the grab irons again. So Mr. Wood says, well, you

7   know, I will look into it. So he walks off, goes back into

8   the plant. You want me to continue?

9       Q    Yes, sir.

10      A    Then I look at Mr. Chapman, and I said, well, what

11  do I do now, Mr. Chapman, I says, here's the cars, here's the

12  problem, I said, it's covered in clay. I said, best thing we

13  can do is just leave the cars sitting right here until they

14  clean them up. He said, this is a good customer, you are

15  going to switch this place. I said, you want me to switch

16  this place. He said, yes, you have got to switch them, got in

17  his car drove off. Me and Chris sat there going, what can you

18  do, I mean, what could I do.

19      Q    Did you switch them?

20      A    Yes, sir.

21      Q    Get them out of there okay?

22      A    Yes, sir.

23      Q    Where did you take them?

24      A    Went back to Aiken depot with them.

25      Q    And what did you do when you got to Aiken depot?

1      A    We were getting ready to take them down to

2  Warrenville, so we had to get our engine around them, so we

3  have to get down and tie some brakes. So Chris got down, I

4  got down, and then we got up and started mounting the cars.

5  And Chris got the first brake and I walked back there and got

6  the second brake, about that time Chris was coming back. I

7  mounted the car, got up on the platform, and was putting the

8  brake on and slipped again. My foot -- my right foot slipped

9  on that clay and pulled down and I almost fell off the car,

10  but I didn't. I grabbed myself and I was about to cry. And

11  Chris come walking up, and I said, Chris, I hurt myself bad, I

12  said, something ain't right. I said, something in my back is

13  not right. And I eased around, and he helped me down off the

14  car. And I told him, I said, get Tommy Connolly off the

15  engine and come on in the depot, and we will call Mr. Chapman

16  again.

17      Q    And did you all call him again?

18      A    Yes, sir.

19      Q    Did he come?

20      A    Yes, sir.

21      Q    And tell us what happened when he got there.

22      A    He walks in the depot and Tommy and Chris and I are

23  standing there, and he says, what now.

24      A    And I said, Mr. Chapman, I have hurt myself on this

25  second load out here. I said these cars are covered with

1    particular order, so you will have to explain them to me, to

2    us. Let me show you Exhibit Number 15, show us where the --

3         A    This is just a car, a hopper car, and it's supposed

4    to be clean, but the commodity -- the stuff is supposed to be

5    in the car, not on the car, and it gets all over the knuckles,

6    the couplers --

7         Q    That's all this white stuff?

8         A    All this white stuff, this is clay.  All this stuff

9    in here is clay, all this build up, like six or eight inches.

10   All this is clay, clay on these grab irons, that's where you

11   would come across from this side and step, this is where you

12   would step, covered in clay.  This is the type of clay that

13   was building up on the cars and blowing all over us, and all

14   in our faces and all over the stuff that we were climbing on.

15        Q    What we are seeing here, this is after you all have

16   pulled these cars for how far, how many miles?

17        A    Four miles, bouncing and pulling them with the wind

18   blowing, and that's what is left after four miles.

19        Q    Was it worse than this when you first picked them

20   up?

21        A    Yes, sir.

22        Q    Exhibit Number 18, again, is that a view of --

23        A    That's a different car, it's just pictures of the

24   seven cars, and it's all up in here, caked up in there, and it

25   blows off and it would get all in the walkway -- see all this

```
 1        A     Yes, sir, sometimes it would and sometimes it would

 2   not.

 3        Q     How many times you reckon you talked to Mr. Wood?

 4        A     A bunch.  I -- a lot.

 5        MR. GARLAND:     That is all I have.

 6                         REDIRECT EXAMINATION

 7   BY MR. WETTERMARK:

 8        Q     Mr. King, you don't know anything about running a

 9   kaolin loading facility, do you?

10        A     No, sir.

11        Q     And, I guess, the people at W. R. Grace, they don't

12   really know anything about what trainmen do on the trains

13   after they leave there?

14        A     No, sir.

15        Q     The responsibility for making sure that the trainmen

16   have safe coupler or safe grab irons and safe platforms to

17   stand on, that is the railroad's responsibility --

18        MR. GARLAND:     I object to him leading his own

19        witness, Your Honor.  Object to that.

20        THE COURT:       Rephrase your question.

21        Q     MR. WETTERMARK:     Who is responsible between --

22   who is responsible for making sure that trainmen have safe

23   equipment to work on?

24        A     Norfolk Southern Corporation.

25        Q     Sure.
```

1    slick into words, but can you describe for the members of the

2    Jury, just to the best of your ability, what it was like to

3    try to work on a car where the grab irons and the footholds

4    and walkways were coated with the kaolin?

5        A    It would be slick, like maybe pouring oil on them,

6    and trying to step on them.

7        Q    Is it slick even when it's dry?

8        A    Yes.

9        Q    How about when it's wet?

10       A    It's worse, more slick when it's wet.

11       Q    I asked you if you considered it a safety problem;

12   did you consider it a safety problem?

13       A    Yes.

14       Q    Did you try to get something done about it?

15       A    Yes.

16       Q    What?

17       A    Usually we would tell the agent, the local agent.

18       Q    Who was that?

19       A    That would have been Mr. Jimmy King.

20       Q    He was the agent at the Aiken depot?

21       A    Aiken depot, that's our local agent.

22       Q    Who else did you talk with?

23       A    Would talk with Trainmaster John Mass.

24       Q    He was the trainmaster at that time?

25       A    Right.

70

1    Q    Is he a company official?

2    A    Yes.

3    Q    Is he over you?

4    A    Yes.

5    Q    Anybody else that you can remember talking to?

6    A    And the supervisor at the plant.

7    Q    You actually talked to the people at Grace?

8    A    Yes.

9    Q    Was anything ever done about the clay being on the

10   cars?

11   A    Once in a while.

12   Q    Explain what you mean by that.

13   A    If you got on them and -- or told your boss to get

14   them to clean the cars off, they would clean them off, or try

15   to, as much as they could.

16   Q    For how long?

17   A    A day or two.

18   Q    And then what would happen?

19   A    Then it would go back to the same piling up, not

20   cleaning them off.

21   Q    Can you give us your best judgement, how often did

22   you personally talk with someone from the railroad about the

23   situation down there at Grace with the clay on the cars?

24   A    How often?

25   Q    Yes.  Were you doing it once a day, once a week,

1    look, they didn't blow that car good enough, do it again?  Did

2    you ever do that?

3         A    I didn't understand the question.

4         Q    Was it ever an occasion when you would go to Mr.

5    Woods and say they didn't blow these cars off at all, and he

6    would say, well, just leave them there a minute and let us get

7    somebody out there to do it?  Did that ever happen?

8         A    No.

9         Q    Would he not be there, or why wouldn't you report it

10   to him, if there was some clay left on the cars?

11        A    I would.

12        Q    Oh, you would.  But would he just say he wasn't

13   going to blow it anymore?

14        A    Right.

15        Q    Had it already gone through the little blower?

16        A    If at all.

17        Q    Has the blower always been there?

18        A    Not always.

19        Q    Do you remember when they installed the blowing

20   mechanism?

21        A    No, I don't.

22        Q    Did they have any way to blow it off before then, or

23   do you know?

24        A    They used to wash it off with water.

25        Q    Did they decide blowing was better?

# EXHIBIT "F"

PAC 658006v.1

MAR 13 '01 10:36 FR PIEDMONT DIV SUPT    7 228 4279 TO 7347974168822 216 P.29/31
SOUTHERN                                                                    (182612)

## PERSONAL INJURY REPORT

REPORT DATE: 1-23-98                    TRANSPORTATION DEPARTMEN

REPORT TIME (_____ AM) or ( 2:40p PM)        Piedmont DIVISIO

Train No. (If applicable) P22PO      Is this incident related to a Train or Crossing Accident?  [ ] Yes  [✓] No

TO: Supervisory MR. CHAPMAN    FROM: Injured  L.E. KIRKLAND Jr.  Employee SS No.: 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
    Officer                         Employee:

INCIDENT DATE: 1-23-98              INCIDENT TIME: (_____ AM)  or  ( 1:40p PM)

LOCATION: Select one: Line of Road ✓  Terminal ____ Shop or Office Building ____ Off Railroad Property ____

INCIDENT CITY: WARRENVILLE    STATE: S.C.  MILEPOST: (If applicable) R 179.7

WEATHER: Select one: Clear ____ Cloudy ____ Rain ✓ Fog ____ Sleet ____ Snow ____ Does Not Apply ____ (Injury Occurred Indoc

VISIBILITY: Select one: Dawn ____ Day ✓ Dusk ____ Dark ____ Indoors-Dark ____ Indoors-Dim ____ Indoors-Normal ____ Indoors-Other ____

TEMPERATURE: ( 58 PLUS) or ( _____ MINUS)      OCCUPATION  Conductor

HEIGHT: 5 FT. 9 IN. WEIGHT 150 LBS.

REST DAYS: Select all that apply: Monday ____ Tuesday ____ Wednesday ____ Thursday ____ Friday ____ Saturday ✓ Sunday ✓ None ____

ASSIGNMENT: REGULAR ✓    RELIEF ____    EXTRA ____

ON DUTY: [✓] Yes  [ ] No      HOURS ON DUTY AT TIME OF INCIDENT 6'45"

SAFETY ATTIRE WORN: Select all that apply: Head ____ Eye [✓] Hearing ✓ Respiratory ____ Foot ✓ Hand ✓ Other ____ None ____

WAS ANY TYPE OF EQUIPMENT INVOLVED? [✓] Yes [ ] No   STATIONARY ✓   MOVING ____

EQUIPMENT TYPE: Select one: Freight ✓ Passenger ____ Mixed ____ Work ____ Yard Switching ____ Light Locos ____ M/W Equipment ____ None ____

INITIAL AND NUMBER: _____

WITNESS NAMES                                          ADDRESSES

_____          _____
_____          _____
_____          _____
_____          _____

DO YOU DESIRE MEDICAL ATTENTION AT THIS TIME?  [ ] Yes  [✓] No  While releasing

DESCRIBE WHAT HAPPENED - GIVE SPECIFIC, DETAILED INFORMATION:

Handbrake on covered hopper loaded
with clay, slipped on clay on
hopper and fell to ground

_____

_____

                                        L. E. Kirkland Jr.
                                        SIGNATURE OF EMPLOYEE

Distribution:  Original to Supervisory Officer
               Photocopy to Injured Employee


PLAINTIFF'S
EXHIBIT
28

205
1

# EXHIBIT "G"

PERSONAL INJURY REPORT                                    (182812)

REPORT DATE: *1-26-98*                    *TRANSPORTATION* DEPARTME

REPORT TIME (_____ AM) or (*1 00* PM)         *Piedmont* DIVISI

Train No. *(If applicable)* *P 22 P 0*    Is this incident related to a Train or Crossing Accident?  [ ] Yes  [✓] No

TO: Supervisory *TRAINMASTER*      FROM: Injured      Employee *250-84*
Officer: *MR. CHAPMAN*              Employee: *L.E. KIRKLAND*   SS No.: *2831*

INCIDENT DATE: *1-26-98*              INCIDENT TIME: (_____ AM) or (*1210P* PM)

LOCATION: Select one: Line of Road *✓*  Terminal _____  Shop or Office Building _____  Off Railroad Property _____

INCIDENT CITY: *Aiken, S.C.*    STATE: *S.C.*    MILEPOST: *(If applicable)* *SA 57.3*

WEATHER: Select one: Clear *✓*  Cloudy ____  Rain ____  Fog ____  Sleet ____  Snow ____  Does Not Apply ____  *(Injury Occurred Ind.*

VISIBILITY: Select one: Dawn ____  Day *✓* Dusk ____ Dark ____ Indoors-Dark ____ Indoors-Dim ____ Indoors-Normal ____ Indoors-Other ____

TEMPERATURE: (*45°* PLUS) or (_____ MINUS)

HEIGHT: *5* FT. *8* IN. WEIGHT *150* LBS.    OCCUPATION *Conductor*

REST DAYS: Select all that apply: Monday ____ Tuesday ____ Wednesday ____ Thursday ____ Friday ____ Saturday *✓* Sunday *✓* None ____

ASSIGNMENT: REGULAR *✓*    RELIEF ____    EXTRA ____

ON DUTY:  [✓] Yes   [ ] No       HOURS ON DUTY AT TIME OF INCIDENT *5'10"*

SAFETY ATTIRE WORN: Select all that apply: Head ____ Eye *✓* Hearing ____ Respiratory ____ Foot *✓* Hand *✓* Other ____ None ____

WAS ANY TYPE OF EQUIPMENT INVOLVED?  [✓] Yes  [ ] No      STATIONARY *✓*       MOVING ____

EQUIPMENT TYPE: Select one: Freight *✓* Passenger ____ Mixed ____ Work ____ Yard Switching ____ Light Locos ____ M/W Equipment ____ None ____

INITIAL AND NUMBER: *N.S 245061*

WITNESS NAMES                                    ADDRESSES  *2905.*

*C.J. Sharpe*                    *1224 Blackville Ct. Gaston, S.*

*T.W. Connelly*                  *3384 Calhoun St. Branchville*
                                 *S.C. 29432*

DO YOU DESIRE MEDICAL ATTENTION AT THIS TIME?  [✓] Yes  [ ] No

DESCRIBE WHAT HAPPENED - GIVE SPECIFIC, DETAILED INFORMATION: *Pulled 7 loads*
*from W.R. Grace plant in Aiken, S.C. Brought*
*all 7 loads which were covered in clay back*
*to Aiken and ran around cars in house track*
*to take to Warrenville S.C. to be set off.*
*While applying handbrakes on cars conductor*
*slipped on N.S 245061 and twisted or*
*poked or pulled something in lower back.*
*Brakeman C.J. Sharpe saw incident.*



*L.E. Kirkland Jr.*
SIGNATURE OF EMPLOYEE

Distribution:  Original to Supervisory Officer
Photocopy to Injured Employee

PLAINTIFF'S
EXHIBIT
20

206

# EXHIBIT "H"



191













PLAINTIFF'S
EXHIBIT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



PLAINTIFF'S EXHIBIT NO. 30

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



PLAINTIFF'S EXHIBIT NO. 31

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



PLAINTIFF'S EXHIBIT NO. 32

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



PLAINTIFF'S EXHIBIT NO. 33

210

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



PLAINTIFF'S EXHIBIT NO. 34

## EXHIBIT D

**Norfolk Southern Accident Report re January 23, 1998 Accident**

AIKEN, SC – JANUARY 23, 1998

MR DM KIMBROUGH;
GENERAL MANAGER

THE FOLLOWING NON-REPORTABLE INJURY IS BEING SUBMITTED:

| DATE | TIME | NAME | OCCUPATION | LOCATION |
|---|---|---|---|---|
| 1-23-98 | 1:40PM | LE KIRKLAND | CONDUCTOR | WARRENVILLE SC |

| SENIORITY DATE | PREVIOUS INJURIES | SUPERVISOR |
|---|---|---|
| 10-23-75 | 6 INJURIES<br>2 REPORTABLE<br>4 NON-REPORTABLE | JE CHAPMAN |

Mr. Kirkland suffered a bruised right palm and bruised left lower side/back injuries on January 23, 1998 at approximately 1:40 PM. Kirkland was performing service on the p22p023, Aiken, South Carolina and reporting for duty at 7:00 AM. Kirkland has been working this position for several years and is very familiar with his assignment. He was bom on May 9, 1955.

THE ACCIDENT?

This crew transported 26 cars from Aiken to Warrenville. These cars were destined to the siding at Warrenville for through train pick-up. These same cars had to be switched into classification order at Warrenville. Six cars were left on the main track at the south end. Two handbrakes were applied to the north two cars by Conductor Kirkland. After switching 20 cars these six cars had to be set on the south end of the siding. Brakeman Sharpe coupled unit 5172 to the six standing cars. After doing so, Sharpe was coupling air to the lead car and Kirkland was releasing the two handbrakes. Rear car Sou-99418 was the last brake to be released. This brake is a low end, vertical mounted with a quick release 26 inch lever. Kirkland stated he was in a four point stance when he lost his grip and footing. He states that the quick release did not work so he..grabbed the top of brake wheel with his right hand. When he attempted to pull the bryke wheel towards him in a counter clockwise motion, his_xlght slipped causing his left to slip and footing was lost.

Kirkland fell backward landing on his left lower back area. In the attempt to break his fall Kirkland bruised the palm area of his right hand. Kirkland attributes his loss of grip and footing, to product contamination on the car. Steady rain caused the clay residue to become slippery.

304

page 2

Bruising and injuries were caused by the mainline ballast.

TREATMENT:

Kirkland did not desire any medical attention.

ACCIDENT SCENE.:

This area consists of one main track and one storage track. The storage is use for set-off and pick-ups for the Aiken local. This area has good level walking conditions consisting of mainline ballast. Tracks are tangent and level. Employees had been operating in a steady, rain for several hours. The clay cars were contaminated with a wet clay coating. Clay was also found underneath these cars washed off by the rain showers. We could not find any indication of a fall in the area indicated by Mr. Kirkland. He stated that the fall took place 16 car lengths from the south switch at Warrenville.

INCIDENT INVESTIGATION:

The incident was investigated by Officers Burgess, Gosnetl, Roberson, Chapman, and Marcum. The engine tape was pulled for future reference. Inspection of car, Sou 99418 revealed that the release mechanism did work properly... Kirkland stated that he released one handbrake on second from rear car and moved to the rear car. The handbrake on Sou 99148 was on the north end and this was the trailing car in a consist of six. He stated that the quick release did not work. He also stated in an attempt to release the handbrake with his right hand he lost his grip and footingy. His testimony, stated that the handbrake was never released but the brake was found to be released by the teajq*

Kirkland stated that after his fall he jumped up and checked himself out. Brakeman Sharpe radioed Kirkland to see if he was in the clear and the cars were moved. Kirkland positioned himself to protect the shove move on the siding. The team prpved that the handbrake had to be released but Kirkland stated that his attempt failed.

During the fall the engineer was located on the southeast short hood lead side of locomotive. Brakeman Sharpe was located on the northwest side of unit during, incident. Kirkland fell six car lengths from the locomotive on the northeast side of car Sou 99418.

A
9

Engineer McFarland and Brakeman Sharpe did not observe the incident.  Mr. Kirkland were wet and made of leather.  His boots are made by Wolverine, steel toed, defined heel with worn out, slick soles.  He was wearing safety, glasses and utilizing his ri(dio*~bolster.  The cars were shipped from J.M.Huber, North Aiken and released this same day.

TRAINING:

See his attached history.

PERSONAL HISTORY:

See his attached personal history.

EQUIPMENT:

Sou 99418 is a covered hopper type clay load with crushed clay. It is in clay service for Huber.  It is found to be in good working order with some residue contamination.  The brake wheel did not have contamination on during the teams inspection, However,, the crossover platform, ladders, and footholds were found to be contaminated.

CREW:

Engineer JB Me Farland
Conductor LE kirkland
Brakeman CJ Sharpe


, J. L. WAGNER

7-Joe-

<u>EXHIBIT E</u>

**Amended Norfolk Southern Accident Report re January 23, 1998 Accident**

January 29, 1998

UPDATE

Mr. D. M. Kimbrough, General Manager:

THE FOLLOWING REPORTABLE INJURY IS BEING UPDATED TO LOST TIME.

| DATE | TIME | NAME | OCCUPATION | LOCATION |
|------|------|------|-----------|----------|
| 1-23-98 | 1:40 PM | L. E. KIRKLAND, JR. | CONDUCTOR | WARRENVILLE, SC |

| SENIORITY DATE | NO. PREVIOUS INJURIES | SUPERVISOR |
|----------------|-----------------------|------------|
| 10-23-75 | 6 INJURIES | J. E. CHAPMAN |
| | 2 REPORTABLE | |
| | 4 NON-REPORTABLE | |

Mr. Kirkland suffered a bruised right palm and bruised left lower side/back injuries on January 23, 1998 at approximately 1:40 PM. Kirkland was performing service on the P22P023, Aiken, South Carolina and reported for duty at 7:00 AM. Kirkland has been working this position for several years and is very familiar with his assignment. He was born on May 9, 1955.


THE ACCIDENT:

This crew transported 26 cars from Aiken to Warrenville. These cars were destined to the siding at Warrenville for through train pick-up. These same cars had to be switched into classification order at Warrenville. Six cars were left on the main track at the south end. Two handbrakes were applied to the north two cars by Conductor Kirkland. After switching 20 cars, these six cars had to be set on the south end of the siding. Brakeman Sharpe coupled unit 5172 to the six standing cars. After doing so, Sharpe was coupling air to the lead car and Kirkland was releasing the two handbrakes. Rear car SOU 99418 was the last brake to be released. This brake is a low end, vertical mounted with a quick release 26 inch lever. Kirkland stated he was in a four point stance when he lost his grip and footing. He states that the quick release did not work so he grabbed the top of the brake wheel with his right hand. When he attempted to pull the brake wheel towards him in a counter clockwise motion, his right hand slipped causing his left to slip and footing was lost.

Kirkland fell backward landing on his left lower back area.

1



DEFENDANT'S EXHIBIT 10

309

MAR 13 '01 10:31 FR PIEDMONT DIV SUPT        7 228 4273 TO 714787410022-216 P.13/31

In the attempt to break his fall, Kirkland bruised the palm area of his right hand. Kirkland attributes his loss of grip and footing to product contamination on the car. Steady rain caused the clay residue to become slippery. Bruising and injuries were caused by the mainline ballast.


**TREATMENT:**

Kirkland did not desire any medical attention.


**ACCIDENT SCENE:**

This area consists of one main track and one storage track. The storage is used for set-offs and pick-ups for the Aiken local. This area has good level walking conditions consisting of mainline ballast. Tracks are tangent and level. Employees had been operating in a steady rain for several hours. The clay cars were contaminated with a wet clay coating. Clay was also found underneath these cars washed off by the rain showers. We could not find any indication of a fall in the area where Kirkland stated the fell. He stated that the fall took place 16 car lengths from the south switch at Warrenville.


**INCIDENT INVESTIGATION:**

The incident was investigated by Officers, Burgess, Gosnell, Roberson, Chapman and Marcum. The engine tape was pulled for future reference. Inspection of car, SOU 99418 revealed that the release mechanism did not work properly. Kirklnad stated that he released one handbrake on a second from rear car and moved to the rear car. The handbrake on SOU 99418 was on the north end and this was the trailing car in a consist of six. He stated that the quick release did not work. He also stated in an attempt to release the handbrake with his right hand he lost his grip and footing. He stated that the handbrake was never released but the brake was found to be released by the team.

Kirkland stated that after his fall, he jumped up and checked himself out. Brakeman Sharpe radioed Kirkland to see if he was in the clear and the cars were moved. Kirkland positioned himself to protect the shove move on the siding. The team proved that the handbrake had to be released, but Kirkland stated that his attempt failed.

During the fall the engineer was located on the southeast short hood lead side of the locomotive. Brakeman Sharpe was

2

10 310

located on the northwest side of the unit during the accident.
Kirkland fell six car lengths from the locomotive on the northeast
side of car SOU 99418. Engineer McFarland and Brakeman Sharpe did
not observe the incident. Mr. Kirkland's gloves were wet and made
of leather. His boots are made by Wolverine, steel toes, defined
heel with worn out slick soles. He was wearing safety glasses and
utilizing his radio holster. the cars were shipped from
J. M. Huber, North Aiken and released this same day.


## TRAINING:

See his attached history.


## PERSONAL HISTORY:

See his attached personal history.


## EQUIPMENT:

SOU 99418 is a covered hopper loaded with crushed clay and is
in clay service for Huber. It was found to be in good working
order with some residue contamination. The brake wheel was not
found to be contaminated during the team's inspection. However,
the crossover platform, ladders and footholds were found to be
contaminated.


## CREW:

Engineer J. B. McFarland
Conductor L. E. Kirkland, Jr.
Brakeman C. J. Sharpe


## UPDATE:

On Monday, January 26, 1998 at 7:00 AM, Trainmaster Chapman
spoke with Conductor Kirkland as he reported for work at the Aiken
Depot. Kirkland reported that after resting over the weekend his
back felt much better and he thought he would be okay.

At 11:45 AM, Kirkland requested that Trainmaster Chapman meet
him at the Aiken Depot. Conductor Kirkland reported the more he
worked the tighter his back became. Kirkland advised he could

10

3

finish the day, but was not sure how fit he would be for service if the pain persisted.

On Tuesday, January 27, 1998 at 7:00 AM, Kirkland reported for work at the Aiken Depot. Shortly after reporting for duty he contacted Superintendent of Terminals Roberson and requested to see a doctor.

At 10:30 AM, Kirkland and Superintendent of Terminals Roberson arrived at the office of Dr. C. Tucker Weston, 1410 Barnwell Street, Columbia, South Carolina. The examination revealed Conductor Kirkland had muscle spasms causing discomfort and tightness in his lower back with no apparent damage to bone structure. Dr. Weston advised Kirkland to take Ibuprofen for pain and a non-prescription analgesic applied locally to ease muscle spasms.

At 3:30 PM, Kirkland call Superintendent of Terminals Roberson and requested a second medical opinion. An attempt to schedule an appointment with the Midland Orthopedics, 320 Harbison Boulevard, Columbia, South Carolina, was unsuccessful.

On Wednesday, January 28, 1998 at 2:15 PM, Conductor Kirkland scheduled an appointment with Dr. Thomas R. Jackson, Aiken Medical Center, Suite 1510, 210 University Parkway, Aiken, South Carolina. During Dr. Jackson's examination, Kirkland explained his fall and pain in his lower back, tightness of the right thumb and subsequent headaches. Dr. Jackson recommended Ibuprofen for Kirkland's back spasms, prescribed Tylenol 3 for his headache and advised Kirkland to see Dr. Holford on February 3, 1998 if his thumb did not improve. Dr. Jackson told Kirkland to stay away from work and return to his office on February 4, 1998. The doctor advised a week of rest and Kirkland should be ready to return to work. No x-rays were taken.

Trainmaster Chapman met with Kirkland as he was departing Aiken Medical Center. Kirkland advised Trainmaster Chapman after his examination on Tuesday with Dr. Weston, UTU Local Chairman Coleman advised him to seek a second opinion. According to Kirkland, UTU Local Chairman Coleman described Orthopedic Surgeon C. Tucker Weston "as a Quack".

Mr. Kirkland reported he had been advised by UTU General Chairman Barbee and UTU Local Chairman Coleman not to return to work unless he was 100 percent. They justified this advice by saying "any injury or incident that might occur would be blamed on Mr. Kirkland."

4

Effective January 28, 1998, L. E. Kirkland is marked off injured. As of this date, Kirkland's injury status is upgraded to lost time.  Estimated time away from work is one week.


J. L. Wagner
Superintendent


5

10 313