## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| W. R. GRACE & CO., et al.,[1] | ) Case No. 01-01139 (AMC) |
| | ) (Jointly Administered) |
| Reorganized Debtor. | ) |
| | ) |
| | ) **Hearing Date:  May 1, 2023 at 10:00 a.m.** |
| | ) **Objection Deadline:  March 21, 2023 at 4:00 p.m.** |

### REORGANIZED DEBTOR'S MOTION TO APPROVE SETTLEMENT AGREEMENT RESOLVING STATE OF MONTANA'S REMAINING CLAIM 18496-1

### INTRODUCTION

The Reorganized Debtor requests the Court enter an order substantially in the form attached hereto as Exhibit 1 (the "Approval Order"),[2] and approve the settlement agreement (the "Settlement Agreement") attached thereto, thereby settling Claim No. 18496-1, in which the Montana Department of Environmental Quality ("MDEQ") has asserted claims concerning Operable Unit 3 ("OU3") of the Libby Asbestos Superfund Site.  The Approval Order would:

- Approve the Settlement Agreement as fair, adequate, reasonable, and consistent with the goals of the Comprehensive Environmental Response, Compensation and Liability Act, as amended, 42 U.S.C. § 9601 et seq. ("CERCLA") and the Montana Comprehensive Environmental Cleanup and Responsibility Act, Montana Code Annotated ("MCA") § 75-10-701 et seq.;

- Allow a single Claim (the "Allowed State Claim") consisting of (i) certain financial assurance for the maintenance and repair of the Kootenai Development Impoundment Dam (the "KDID") and its spillway, (ii) an Allowed contingent Claim for certain cost-sharing

---

[1]   W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc., or "Grace") is the sole remaining "Reorganized Debtor," and Case No. 01-1139 is the sole remaining open chapter 11 case.

[2]   Capitalized terms not defined herein shall have the meaning ascribed to them in, as the case may be, the Settlement Agreement or the *First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W. R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders as Modified Through December 23, 2010* [Docket No. 26368] (the "Plan").

and post-remedy operations and maintenance at OU3, and (iii) an Allowed natural resource damages Claim for $18.5 million;

- Dismiss as moot the Reorganized Debtor's Partial Allowance Motion, the MDEQ Response thereto, and the Reorganized Debtor's Reply in support thereof;[3]

- Authorize Reorganized Debtor to enter into and take all actions contemplated in the Settlement Agreement; and

- Complete the mediation scheduled by this Court's orders.

The Reorganized Debtor and the State of Montana (the "State") have agreed to the form of Approval Order.  Claim No. 18496-1 is the sole remaining unresolved claim in this proceeding.

In support of this Motion, the Reorganized Debtor respectfully states as follows:

## JURISDICTION

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.[4]  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409.

2.      The predicates for this Motion are section 105(a) of the Bankruptcy Code and Fed. R. Bankr. P. 9019.

---

[3]   The Request for Partial Allowance and Partial Disallowance of the Claim by the Montana Dept. Of Env. Quality ("MDEQ") for Environmental Remediation at Operable Unit 3 of the Libby Asbestos Superfund Site (Substantive Objection) [Docket No. 33099] is the "Partial Allowance Motion."  The Response and Reservation of Rights of the State of Montana to the Reorganized Debtor's Request for Partial Allowance and Partial Disallowance of the Claim by the Montana Dept. of Env. Quality for Environmental Remediation at Operable Unit 3 of the Libby Asbestos Superfund Site (Substantive Objection) [Docket No. 33102] is the "MDEQ Response".  The Reply In Support Of The Reorganized Debtor's Claim Objection Requesting Partial Allowance and Partial Disallowance Of MDEQ Prepetition Claim (Substantive Objection) [Docket No. 33110] is the "Reply".

[4]   The Reorganized Debtor and the State confirm their consent pursuant to Del. Bankr. L. R. 9013-1(f) to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

**BACKGROUND**

I.   **OPERABLE UNIT 3 OF THE LIBBY ASBESTOS SUPERFUND SITE**

A.   **Overview**

3.      In 1963, Grace acquired a business that owned land in Libby, Montana, where a vermiculite mine was located.  After decades of operations, the vermiculite mine ceased operation in or around 1990, and mine closure and environmental remediation efforts have been ongoing ever since.  The land at this property contains amphibole asbestos mineral impurities, often referred to as Libby Amphibole Asbestos, as well as other non-asbestos hazardous substances.  First Cole Declaration at § 4; Settlement Agreement, Exhibit E.[5]

B.   **Kootenai Development Impoundment Dam**

4.      As part of mining operations, beginning in the 1970s, Grace built an impoundment structure known as the Kootenai Development Impoundment Dam ("KDID").  Grace operates the KDID under operating permits issued by the Montana Department of Natural Resources and Conservation ("DNRC").  First Cole Declaration at § 5 [Docket No. 33099-4]; Settlement Agreement at Recitals.  Grace and the State recognize that the KDID itself will require certain "routine inspection, monitoring, operation, maintenance, repair, and other activities performed

---

[5]   The Declaration of Keith N. Cole in Support of the Reorganized Debtor's Request for Partial Allowance and Partial Disallowance of the Claim by the Montana Dept. of Env. Quality ("MDEQ") for Environmental Remediation at Operable Unit 3 of the Libby Asbestos Superfund Site (Substantive Objection) [Docket No. 33099-4], attached as Exhibit C to the Partial Allowance Motion, is the "First Cole Declaration".  The First Cole Declaration is incorporated herein by reference as if fully set forth herein.

3

periodically by KDC consistent with a dam safety operating permit."[6]  The Settlement Agreement defines these activities as "KDID O&M."  *Id*. at § 2(z).

5.      Grace is currently in the process of constructing, at its expense, an expanded spillway structure (the "KDID Spillway"), which has a design life of approximately 100 years.  *Id*. at 2(bb).

6.      Grace and the State recognize that the KDID Spillway may require repair or replacement and the Settlement Agreement defines certain repair and replacement as "KDID Spillway Work." *Id*. at § 2(dd).

7.      As discussed below in ¶¶ 24-27, the Settlement Agreement calls for Grace to fund the Allowed Financial Assurance to provide the State with financial assurance associated with Grace's performance of KDID Spillway Work and KDID O&M.  *Id*. at § 4.

**C.      Remedial Action at OU3**

8.      On October 24, 2002, the United States Environmental Protection Agency ("EPA") listed the Libby Asbestos Superfund Site on the National Priorities List pursuant to CERCLA.  *See* 367 FED. REG. 65,315 (Oct. 24, 2002).  One of the eight operable units designated by EPA was Operable Unit 3, also referred to as "OU3".  As then designated, OU3 included the property in or around the former vermiculite mine property owned by the then-Debtors (excluding the former screening plant) and any area impacted by the release and subsequent migration of hazardous

---

[6]    Kootenai Development Company ("KDC") is the current owner of the KDID and a wholly owned subsidiary of W. R. Grace & Co.-Conn., and was one of the Reorganized Debtors whose Chapter 11 Case is now closed.  *See infra* ¶ 18.

substances and/or pollutants or contaminants from the mine property, including the Kootenai River. *See* Settlement Agreement at § 2(pp) (definition of Operable Unit 3).

9.      As of the date hereof, Grace and its affiliates are performing a "Remedial Investigation and Feasibility Study" ("RI/FS") for OU3 pursuant to CERCLA under the EPA's oversight, in consultation and coordination with MDEQ and US Forest Service as support agencies under CERCLA.  Settlement Agreement at Recitals.  The RI/FS will provide the technical basis for EPA's selection of the remedial action for OU3.  42 U.S.C.S. § 9604; 40 C.F.R. § 300.430.

**D.      Potential State Contingent Claim**

10.     Section 104(c)(3) of CERCLA, 42 U.S.C. § 9604(c)(3), provides in relevant part that, if a potentially responsible person, such as Grace, were unavailable or declined to implement a remedial action at a CERCLA site and EPA were to decide to do so using federal Superfund money, then two conditions must be met before EPA proceeds: (1) the State must agree to pay 10% of the costs of the EPA selected remedial action costs (the "10% Cost Share"); and (2) the State must agree to pay 100% of the post-remedy operation and maintenance costs that are described in the EPA record of decision ("Post-Remedy O&M Costs").  Settlement Agreement at §§ 2(uu), 2(ccc), and 7.  The Parties agree that as of the date hereof, any claim for such costs remains contingent.  EPA has yet to select a remedial action at OU3, and EPA has not asked the State to agree to pay any portion of the State Share Cost.  Settlement Agreement at § 7(b).

11.     As discussed below in ¶¶ 28-31, the State and Grace have agreed to the allowance to the State of a contingent Claim for the 10% Cost Share and Post-Remedy O&M Costs.

**E.      Alleged Natural Resource Damages at OU3**

12.     During the process of resolving the State's claims arising from or relating to OU3, the State asserted that there are injured natural resources there.  Settlement Agreement at § 14 and

5

Exhibit E.  Grace has asserted "that there are minimal or no [natural resource damages] at or related to OU3." *Id*.

13.    As discussed below in ¶¶ 32-36, the State and Grace have agreed to the Allowance to the State of an Allowed Natural Resource Damages Claim.

## II.    PROCEDURAL POSTURE

### A.    MDEQ Claims Resolved by MDEQ 2008 Stipulation

14.    The State filed a number of proofs of claim relating to OU3 during the Chapter 11 Cases, the last of which was filed on November 19, 2007.  The then-Debtors designated the State's proof of claim filed on November 19, 2007, as Claim No. 18496 (the "MDEQ 2007 Claim") in the amount of $55 million.  First Cole Declaration at ¶ 16 [Docket No 33099-4].  On May 20, 2008, MDEQ and the then-Debtors entered into the MDEQ 2008 Stipulation which allowed MDEQ a single claim (the "MDEQ 2008 Allowed Claim") for the entire Site other than OU3 in the amount of $5,167,000 in satisfaction of all the then-Debtors' obligations at the Libby Asbestos Superfund Site (other than at OU3).[7] *Id*.

15.    The MDEQ 2008 Stipulation provided that Montana DEQ was barred from asserting any:

> additional pre-petition or post-petition claims against the Debtors for past, present and future costs of investigation, remediation, monitoring and maintenance at the Libby Site (except for, Operable Unit 3) under the Montana Comprehensive Environmental Cleanup and Responsibility Act, §§ 75-10-701 *et seq*., MCA (CECRA) and

---

[7]    Exhibit G to the Settlement Agreement is the Order Authorizing Stipulation Resolving Claims of Montana Department of Environmental Quality [Docket No. 19110] (the "MDEQ 2008 Order") and the Stipulation Resolving Claims of Montana Department of Environmental Quality [Docket No. 19110-1] (the "MDEQ 2008 Stipulation").

the Comprehensive Environmental Response, Compensation and Liability Act, as amended, 42 USC § 9601 *et seq*. (CERCLA).

MDEQ 2008 Stipulation at § 6.

16.     The MDEQ 2008 Stipulation included a provision stating that:

Claims reserved for Operable Unit 3 include, without limitation, any liability of Debtors for injunctive relief; administrative order enforcement, cost recovery, and liability for damages for injury to, destruction of, or loss of natural resources under CERCLA or CECRA.

2008 MDEQ Stipulation at § 2.

17.     On July 21, 2008, the Court entered the MDEQ 2008 Order approving the MDEQ 2008 Stipulation, and Allowing the MDEQ 2008 Allowed Claim on the terms and conditions set forth therein.  Settlement Agreement at Exhibit G.  Consistent with the MDEQ 2008 Order, the then-Debtors directed their claims agent to designate MDEQ's remaining Claim as Claim No. 18496-1.  The Claim was listed as contingent, unliquidated, and disputed.

**B.     June 2019 Partial Allowance Motion, MDEQ Response, and Reorganized Debtor's Reply**

18.     On February 3, 2014, (the "Plan Effective Date") the Reorganized Debtors consummated their Plan.  Settlement Agreement at Recitals.[8]  The Reorganized Debtors paid the MDEQ 2008 Allowed Claim and one other State Allowed Claim shortly thereafter.  *Notice of Filing of Amended Undisputed Claims Exhibit*, dated January 31, 2014 [Docket No. 31681]; Settlement Agreement at Exhibit H.  Exhibit H to the Settlement Agreement describes the

---

[8]     See also Notice of Occurrence of the Effective Date of the First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W.R. Grace and Co., et al, the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders As Modified Through December 23, 2010, dated February 13, 2014 [Docket No. 31732].

treatment of all of the other Claims filed by the State other than Claim No. 18496-1. *Id*. at Recitals and Exhibit H.

19.     On June 7, 2019, the Reorganized Debtor filed its Partial Allowance Motion, which requested the Court enter an order Allowing MDEQ a single Claim for the 10% Cost Share and the Post-Remedy O&M Costs, and disallowing Claim No. 18496-1 in all other respects.  On July 22, 2019, MDEQ filed its MDEQ Response, which asserted that Claim No. 18496-1 encompassed and preserved a broader set of Claims than reflected in the Partial Allowance Motion.  On August 26, 2019, the Reorganized Debtor filed its Reply.  In lieu of litigating the complex set of claims, counter-claims, defenses, and reservations of rights asserted by the parties in these pleadings, the Reorganized Debtor and the State agreed to submit resolution of Claim No. 18496-1 to mediation.

### C.     Mediation

20.     On September 9, 2019, the Court entered its *Stipulation and Agreed Order re Mediation of Contested Matter re Claim No. 18496-1* [Docket No. 33124] (the "Mediation Order"), and on November 25, 2019, entered its *Amendment to the Stipulation and Agreed Order re Mediation of Contested Matter re Claim No. 18496-1* [Docket No. 33144] (the "Amended Mediation Order").

21.     Over the three years since then, with active leadership of the mediator, Grace and the State have engaged in a lengthy, confidential, mediation process addressing not only the unique factual issues relating to the Libby Asbestos Superfund Site, but also complex questions at the intersection of bankruptcy and environmental law, as well as other matters in dispute.

### III.   SUMMARY OF TERMS OF SETTLEMENT

22.     On December 19, 2022, Grace and the State (together, the "Parties," as defined in the Settlement Agreement) entered into the Settlement Agreement to "avoid the risk, expense, and burden of litigation, and to resolve their disputes according to the terms of … [the] Settlement

Agreement." Settlement Agreement at Recitals.   The Settlement Agreement calls for the

Allowance of a single Allowed Claim, known as the Allowed State Claim, consisting of the: "a)

Allowed Financial Assurance; b) Allowed Contingent OU3 State Share Claim; and c) Allowed

Natural Resource Damages Claim." *Id.* at § 2(d).  This Motion does not attempt to describe or

summarize all of the Settlement Agreement, which speaks for itself in all respects.   For

convenience, however, certain principal terms are summarized below.

23.    The Settlement Agreement is solely on behalf of the State and Grace, and does not

expand or limit the legal rights or obligations of any person or entity other than the State and Grace.

*Id.* at § 19.

**A.    Allowed Financial Assurance**

24.    The Allowed Financial Assurance relates to the long-term funding of work at the

KDID. *Id.* at §§ 4-6.   The Allowed Financial Assurance is to provide financial assurance to the

State for Grace's performance obligations in connection with OU3.   *Id.* at § 4.   In particular,

Settlement Agreement § 4 provides that Grace shall acquire a bond and establish two trusts, as

follows:

- A surety bond (defined therein as the "Pre-2042 KDID Operation and Maintenance Performance Bond") in the amount of $3.5 million within 90 days after the Settlement Agreement Effective Date (and renew it annually, in declining amounts, until 2042). *Id.* at § 4(a); and

- A trust (the "KDID O&M Performance Trust") for funding KDID O&M work after January 1, 2043.  Grace will fund this trust with ten annual installment payments of $166,000 each, with the first payment due 90 days after the Settlement Agreement Effective Date. *Id.* at § 4(b); and

- A trust (the "KDID Spillway Replacement Trust") for KDID Spillway Work, which Grace will fund in ten equal annual installments of $106,000 each.  The first payment will be due 90 days after the Settlement Agreement Effective Date, and the first funds will become available for disbursement from the trust in 2126 (subject to early access starting in 2072). The trust will terminate in 2132, at the latest.  *Id.* at § 4(c).

25.     The Settlement Agreement governs access to the Surety Bond and the Trusts.  *Id.* at § 5.  In general, Grace can access the Trusts for purposes of KDID O&M and KDID Spillway Work, and in the event of nonperformance by Grace, the State can access the Trusts. *Id.* at § 5.  It also provides certain other terms, including but not limited to:

- Treatment of the trust funds upon expiration or termination of the Trusts.  *Id.* at § 4(b)(iv) and (c)(v).

- Non-modification or amendment of DNRC authority and powers or regulatory process.  *Id.* at § 5(d);

- Terms for emergency access to certain trust funds by the State.  *Id.* at § 5(e)(ii);

- Non-duplication of financial assurance with EPA requirements.  *Id.* at § 6(a);

- Avoidance of double recovery.  *Id.* at § 6(b);

- Bond issuer ratings and funding matters.  *Id.* at § 6(c);

- Circumstances when Grace's Financial Assurance obligations could end.  *Id.* at § 6(d)(i);

- Treatment of the Financial Assurance mechanisms if Grace were to cease to exist.  *Id.* at § 6(e); and

- Non-effect of Financial Assurance to any obligations, rights, or remedies Grace Parties may have with respect to OU3.  *Id.* at § 6(g).

26.     The Settlement Agreement further provides in pertinent part that the State has certain "State Reserved Rights", which are "the rights reserved in Sections 6(d)(ii) (State Consultative Role), 6(d)(iii) (CERCLA § 121), 6(g) (Effect of Financial Assurance), and 6(h) (Catastrophic Failure Reservation)," as well as the State's rights to enforce this Settlement Agreement.  *Id.* at § 2(bbb).  The State Reserved Rights are not included within the scope of the definition of "State Claim," and thus are not discharged or released by the Settlement Agreement.  *Id.* at §§ 2(aaa) and 9(d).

27.     Finally, Settlement Agreement § 6(i) states that "Grace reserves completely and without limitation whatsoever all of its rights, claims, counter-claims, and defenses as to any reserved State claim or cause of action."

**B.     Allowed Contingent OU3 State Share Claim**

28.     The Settlement Agreement provides for an "Allowed Contingent OU3 State Share Claim" for the OU3 10% Cost Share and the Post-Remedy O&M Costs, "subject to any rights to challenge EPA's incurrence or imposition of any such costs, and any Grace Parties' rights, claims, counter-claims, and defenses." *Id*. at § 7(a)(i).

29.     The Settlement Agreement Allows the Allowed Contingent OU3 State Share Claim to be liquidated in the future, should the need ever arise.  Grace and the State have reserved their respective rights regarding any such potential future liquidation, including but not limited to Grace's reservation of the right to argue that the Allowed Contingent OU3 State Claim is capped at $50 million, which approximately equals the remaining amount claimed in the MDEQ 2007 Claim ($55 million) less the amount that was Allowed pursuant to the MDEQ 2008 Stipulation and MDEQ 2008 Order ($5,167,000). *Id*. at § 7(a)(ii).

30.     Grace and the State have agreed in the Settlement Agreement that the Allowed Contingent OU3 State Share Claim could arise only if EPA itself were to implement the selected OU3 remedial action "using federal Superfund money and the State were to provide to EPA the requisite agreements under 42 U.S.C. § 9604(c)(3)." *Id*. at § 7(b).  Based on their involvement in the OU3 remediation process, the two Parties have further agreed that neither such event will have occurred as of the Settlement Agreement Effective Date. *Id*.

31.     Finally, the Agreement provides that "[n]o Grace Party shall be liable to pay, or indemnify, the State for any amount if the State has received or will receive payment from any other source for the State's Allowed Contingent State Share Claim." *Id*. at § 7(c).

## C.    Allowed Natural Resource Damages Claim

32.    The Settlement Agreement provides in relevant part that Grace shall pay a total of $18.5 million, with the first payment of $5 million paid within 180 days of the Settlement Agreement Effective Date, without interest being due, and the balance of $13.5 million paid in nine (9) annual installments of $1.5 million plus interest at 4.19% per annum.[9]  *Id*. at *§* 8(a).  The Allowed Natural Resource Damages Claim consists of these payments to the State (the "NRD Funds").  *Id*. at § 8(h).

33.    The State has agreed in the Settlement Agreement to certain terms regarding the use of NRD Funds.  *Id*. at §§ 8(b)(i), 8(c), 8(f), and 8(g).  In particular, the State has committed to prioritize the use of NRD Funds, subject to its required administrative decision-making processes, for projects located in Lincoln County, where the Libby Asbestos Superfund Site is located.  *Id*. at § 8(f).  Any restoration projects conducted in OU3 are subject to certain other restrictions as well, including but not limited to design and construction thereof not commencing until the EPA has "certified completion of all remedial action construction in OU3, except for projects that the State, EPA, and a Grace Party agree to integrate with remedial action."  *Id*. at § 8(g)(i)-(iv).  As to restoration work that is not in OU3, the Settlement Agreement does not limit whatever rights the State may have to conduct and/or implement such work.  *Id*. at § 8(g)(iv).

34.    The Parties believe, based on available information and data developed during the RI/FS, that payment of the NRD Funds:

---

[9]    The Settlement Agreement also provides that "Grace has the right to accelerate funding, without payment of unmatured interest, of any payments set forth in this Settlement Agreement, upon thirty (30) days written notice to the State."  Settlement Agreement at ¶ 15.

> [I]s sufficient to restore, replace, rehabilitate, and/or acquire the
> equivalent of injured natural resources under the State's trusteeship,
> and therefore will compensate the public for the State's claim for
> alleged injuries to natural resources resulting from the release of
> hazardous substances.  The Parties further stipulate that they believe
> that the settlement is a compromise and constitutes a final, fair, and
> reasonable resolution of all of the State's NRD claims, past, present,
> and future, against Grace, and is in the public interest and consistent
> with CERCLA and CECRA.

Settlement Agreement at § 8(e).  Exhibit E thereto contains analysis supporting that conclusion.

35.     The Parties have further concluded that the Settlement Agreement represents a compromise that compensates the State (as trustee) for the damages that it alleges in exchange for a release of all of the State's NRD claims against Grace in or related to the Libby Asbestos Superfund Site.  *Id.* at Exhibit E, p. 1, n. 1.

36.     If Grace were to breach its NRD Funds payment obligations set forth in § 8(a), Settlement Agreement § 8(i) provides for Grace to pay a stipulated penalty in the following amounts: $5,000 per day for the 1st through 14th day of such breach; $6,500 per day for the 15th through 30th day of such breach; and $8,500 per day for the 31st day of such breach and beyond for so long as payment of all amounts due under Section 8(a) and 8(i) are unpaid.  *Id.* at § 8(i). The State would also be entitled to reimbursement for all costs and expenses if it were to prevail in an action to enforce the Settlement Agreement "for breach of the of the payment obligations in Section 8(a) and 8(i)," and the § 8(i) stipulated penalty would "be in addition to any other remedies available to the State."  *Id.*

### D.     Termination of Memorandum of Agreement

37.     In connection with an April 2020 Memorandum of Agreement, whereby Grace has reimbursed the State for certain out-of-pocket mediation legal and related costs, the Settlement Agreement provides for a cap on such reimbursement, and termination of the MOA after payment, up to the cap, of covered invoices timely submitted.  *Id.* at § 10(a).

**E.      Discharge and Injunctive Provisions**

38.      Settlement Agreement § 9(a) provides:

In consideration of the actions performed and to be performed by the Parties and the funding provided and to be provided by Grace as described herein, the Parties agree that, upon the Settlement Agreement Effective Date:

(i) The State shall be deemed to have the Allowed State Claim under the Plan in full and complete satisfaction of the State Claim;

(ii) The Allowed State Claim is an Allowed Environmental Claim, as the Plan defines that term;

(iii) The State Claim is disallowed in all other respects;

(iv) The State has no remaining, and shall have no other, Claim in the Chapter 11 Cases; and

(v) The State Claim and any and all other Claims of the State (which for the avoidance of doubt are claims that were or could have been asserted in the Chapter 11 Cases) are discharged, barred, and enjoined pursuant to the Plan, the Confirmation Order, 11 U.S.C. § 524, and 11 U.S.C. § 1141 in exchange for the Allowed State Claim.

39.      Settlement Agreement § 9(b)(i) provides:

State's Covenant Not to Sue.   Except as reserved in the State Reserved Rights, the State is forever barred, estopped, and enjoined from asserting any causes of action or relief against the Reorganized Debtors under CECRA, CERCLA, any other statute, common law, or any other theory of liability arising from or related to releases, threatened releases, or migration of hazardous or deleterious substances, pollutants, or contaminants at or from the Libby Asbestos Superfund Site.   The preceding sentence does not bar, estop, or enjoin State causes of action or relief:

(x) for a release of a hazardous substance or solid waste resulting from Reorganized Debtors' operation of any portion of the Libby Asbestos Superfund Site or from their transportation, treatment, storage, or disposal, or the arrangement for the transportation, treatment, storage, or disposal, of a hazardous substance or a solid waste at or from the Libby Asbestos Superfund Site after the Settlement Agreement Effective Date (except for road, dam, or mine maintenance, forest management, or similar property management activities, each in compliance with regulatory requirements; or as provided by any EPA Record of Decision or other final EPA

14

decision document; or in compliance with any administrative order, settlement agreement, directive, governmental permit, or government approval, respectively, by EPA or the State); or

(y) arising from the disposal or release or threat of release of a hazardous substance, pollutant, or contaminant outside of the Libby Asbestos Superfund Site.

Settlement Agreement § 9(b)(ii) provides:

> <u>State's Covenant Not to Sue for NRD Claim.</u>  The State is forever barred, estopped, and enjoined from asserting any additional NRD claims, and will not pursue any other or additional NRD claims, against Grace Parties at or relating to the Libby Asbestos Superfund Site, except as reserved in Section 6(h)(Catastrophic Failure Reservation).

Settlement Agreement § 9(b)(iii) provides that, if Grace or another Reorganized Debtor were to sue the State:

> for any claim or liability arising from or related to releases, threatened releases, or migration of hazardous or deleterious substances, pollutants, or contaminants at or from the Libby Asbestos Superfund Site, then notwithstanding anything to the contrary in Section 9(b)(i), the State reserves completely and without limitation whatsoever all of its rights, claims, counter-claims, and defenses as to any such claim brought by Grace against the State.  Nothing in this Section 9(b)(iii) alters or affects the respective rights of the Parties to enforce the terms of this Settlement Agreement or with respect to the rights reserved in Section 6(h).

The Settlement Agreement further provides that the State's rights enumerated in § 9(b)(iii) thereof are neither discharged nor released by the Settlement Agreement and do not constitute a discharged Claim, as that term is defined in the Settlement Agreement.  *Id*. at § 9(d).

40.     The Settlement Agreement provides in relevant part that nothing therein "is intended to revive or modify the prior disallowance or expungement of certain State Claims, (*e.g.*, *see* MDEQ 2008 Order and MDEQ 2008 Stipulation), or eliminate or diminish the efficacy of the Reorganized Debtors' discharge injunction with respect thereto."  *Id*. at § 9(c).

41.     Prior to entering into the Settlement Agreement after having engaged in arms-length, complex negotiations with the State, the Reorganized Debtor determined in its business judgment that the terms of the Settlement Agreement describe a reasonable outcome that avoids Grace having to engage in extensive, complex, long, and likely very expensive litigation with the State, involving challenging issues of law and fact, to resolve Claim No. 18496-1.  Brown Declaration at ¶ 2.[10]

**F.     Agreed Procedure for Requesting this Court's Entry of the Approval Order**

42.     Consistent with the collaborative procedure established in the Settlement Agreement, the State and Grace have conferred about this Motion prior to its filing.  The Settlement Agreement provides that, within ten (10) days of the motion being filed, the State will "publish notice and a brief description (as to which the Parties shall confer beforehand) in a newspaper of general circulation in Lincoln County, and provide a 30-day public comment period conducted by the State."  *Id*. at § 3(a).  The Settlement Agreement also provides that, after the public comment period, "the Parties shall confer regarding the State's response to the motion filed by Grace, and within thirty (30) days after the conclusion of the 30-day public comment period the State shall file its response and provide the Court with copies of all comments received and the State's responses thereto."  *Id*.

43.     In addition, the State has reserved "the right to withdraw or withhold its consent to the Settlement Agreement if the public comments received disclose facts or considerations that

---

[10]    The Declaration of Michael Brown in Support of Reorganized Debtor's Motion to Approve Settlement Agreement Resolving State of Montana's Remaining Claim 18496-1, attached hereto as <u>Exhibit 2</u>, is the "<u>Brown Declaration.</u>"  The Brown Declaration is incorporated by reference as if fully set forth herein.

indicate the Settlement Agreement is inappropriate, improper, or inadequate." *Id*. But "[i]f public comments received do not disclose facts or considerations that indicate that this Settlement Agreement is inappropriate, improper, or inadequate, the State agrees to support prompt entry of the Approval Order by the Bankruptcy Court." *Id*. at § 3(b).

44.     By its terms, the Settlement Agreement will become effective on the Settlement Agreement Effective Date, which is "the date the order approving this Settlement Agreement becomes final and non-appealable." *Id*. at §§ 2(yy) and 3.

45.     The Parties have further acknowledged and agree that "the terms and conditions of this Settlement Agreement are conditioned, in all respects, on the approval of this Settlement Agreement by the Bankruptcy Court," and shall become immediately null and void if the Court does not enter the Approval Order. *Id*. at § 3(d).

## RELIEF REQUESTED

46.     The Reorganized Debtor respectfully requests that the Court approve the Settlement Agreement and enter the proposed Approval Order in substantially the form attached hereto.

## ANALYSIS

47.     Section 105(a) of the Bankruptcy Code provides in pertinent part that "(t)he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. 11 U.S.C. § 105(a). Fed. R. Bankr. P. 9019(a) further provides in pertinent part that "(o)n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."

48.     Courts generally favor minimizing litigation and expediting the administration of a bankruptcy case. *See Nebo Ventures, LLC v. Stanziale (In re Novapro Holdings, LLC)*, 2019 U.S. Dist. LEXIS 49047, at *10 (D. Del. Mar. 25, 2019), citing *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (quoting 9 COLLIER ON BANKRUPTCY § 9019.03[1] (15th ed. 1993)).

17

Settlements and compromises are "a normal part of the process of reorganization." *Protective*

*Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)

(quoting *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 130 (1939)); *In re Nutritional*

*Sourcing Corp.*, 398 B.R. 816, 832 (Bankr. D. Del. 2008) (Delaware courts continuing to apply

the same principles).  Indeed, compromises are favored in bankruptcy "to minimize litigation and

expedite the administration of a bankruptcy estate." *Martin*, 91 F.3d at 393 (citing COLLIER ON

BANKRUPTCY ¶ 9019.03[1] (15th ed. 1993)); *In re Nortel Networks, Inc.*, 522 B.R. 491, 509

(Bankr. D. Del. 2014) (same); *Griffin v. WMI Liquidating Tr. (In re Wash. Mut., Inc.)*, 2020 U.S.

Dist. LEXIS 49604, at *9 (D. Del. Mar. 23, 2020) (same).

49.    Before approving a settlement under Fed. R. Bankr. P. 9019(a), however, a court

must determine that the proposed settlement is in the best interests of the debtor's estate.  *See*

*Martin*, 91 F.3d at 394; *In re Tribune Co.*, 464 B.R. 126, 158 (Bankr. D. Del. 2011) ("[T]he

decision whether to approve a compromise under Rule 9019 is committed to the sound discretion

of the Court, which must determine if the compromise is fair, reasonable, and in the interest of the

estate") (internal citation omitted).  To reach this determination, the court must assess the value of

the claim that is being settled and balance it against the value to the estate of the approval of the

settlement.  *See Martin*, 91 F.3d at 393; *Tribune Co.*, 464 B.R. at 158 (same, quoting *Martin*).

50.    The standard by which courts should evaluate the reasonableness of a proposed

compromise and settlement is well established, and involves consideration of four factors:  "(1)

the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity

of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and

(4) the paramount interest of the creditors." *Martin*, 91 F.3d at 393; *see also Will v. Nw. Univ. (In*

*re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006) (quoting *Martin* in context of clam against

debtor and explaining derivation of *Martin* factors); *Tribune Co.*, 464 B.R. at 158 (quoting *Martin* in context of whether settlement in chapter 11 plan should be approved).

51.     It is also well-settled that a court need not conduct a "mini-trial" on the merits in analyzing a settlement or compromise under the *Martin* factors, but "rather should canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness." *In re W.R. Grace & Co.*, 475 B.R. 34, 78 (D. Del. 2012) (internal quotation marks and citations omitted).   "That is, the settlement need only be above 'the lowest point in the range of reasonableness'."  *In re Pervacio, Inc.*, 2021 Bankr. LEXIS 519, at *3 (Bankr. D. Del. Feb. 22, 2021) (quoting *In re Coram Healthcare Corp.*, 315 B.R. 321, 330 (Bankr. D. Del. 2004) (internal citation omitted)).   Therefore, "in evaluating the fairness of a settlement, the court does not have to be convinced that the settlement is the best possible compromise, but only that the settlement falls within a reasonable range of litigation possibilities." *Tribune Co.*, 464 B.R. at 158 (internal quotation marks and citations omitted).

52.     The Reorganized Debtor respectfully submits that this settlement more than satisfies the relevant *Martin* factors.[11]   As a threshold matter, this settlement resolves the last outstanding Disputed Claim in the Reorganized Debtor's Chapter 11 Case, and its resolution should enable its closure.  The settlement provides a mechanism for funding certain work at the KDID. The settlement will also enable the Reorganized Debtor to avoid protracted litigation that

---

[11]   The *Martin* factor "likely difficulties in collection" is not relevant here, because the Reorganized Debtor is not seeking collections from the State.  Similarly, the interests of creditors other than the State are not relevant here. All Allowed Claims were paid on the later of the Plan's Effective Date or the date on which the Claim was Allowed.  Moreover, the Plan provided for payment in full of Class 9 General Unsecured Claims, plus interest. Plan Art. 3.1.9 [Docket No. 26368].

would likely involve potentially novel issues at the intersection of environmental and bankruptcy law, as well as potentially complex factual disputes.  Indeed, any such litigation would likely involve a range of factual disputes over historic, current, and future environmental conditions at OU3.  Moreover, litigation would likely also involve factual issues concerning decades of operational history for which documents and witnesses may not be readily available, as well as many other facts over which the Parties disagree.

53.     Such complexity would likely create significant uncertainty as to the probability of the Reorganized Debtor's success in any such litigation.  Moreover, any such litigation would be expensive for both the Reorganized Debtor and the State.  Such expense would be in addition to the approximately $1.5 million of the State's mediation-related costs already reimbursed by the Reorganized Debtor, as well as the Reorganized Debtor's own mediation expenses.  Settlement Agreement at § 10.

54.     In the Settlement Agreement, the Reorganized Debtor and the State have stipulated "that they believe that the settlement is a compromise and constitutes a final, fair, and reasonable resolution of all of the State's NRD claims, past, present, and future, against Grace, and is in the public interest and consistent with CERCLA and CECRA."  *Id*. at § 8(e).  Exhibit E to the Settlement Agreement provides analysis in support of the foregoing stipulation.

55.     In this context the Reorganized Debtor has determined in its business judgment that the Allowed State Claim and the certainty of outcome provided by the Settlement Agreement would be of greater benefit to the Reorganized Debtor than the alternative of protracted, expensive litigation of uncertain outcome, which accords with the *Martin* factors.  Brown Declaration, paragraph 2, attached as Exhibit 2 to Motion; *see Martin*, 91 F.3d at 393; *see also Tribune Co.*, 464 B.R. at 158 (internal quotation marks and citations omitted).  The Reorganized Debtor

therefore respectfully submits that the Court should enter the Approval Order substantially in the form attached hereto, approving the Settlement Agreement and the Allowance of the Allowed State Claim, as described above and in the Settlement Agreement.

### NO PREVIOUS MOTION

56.     No previous motion for the relief sought herein has been made to this or any other court.

### NOTICE

57.     Notice of this Motion has been given to: (i) the Office of the United States Trustee; (ii) Counsel for the WRG Asbestos PI Trust; (iii) Counsel for the Asbestos PI Future Claimants Representative; (iv) Counsel for the Asbestos PD Future Claimants Representative; (v) Counsel for the WRG Asbestos PD Trust (7A); (vi) Counsel for the WRG Asbestos PD Trust (7B); (vii) Counsel for the CDN ZAI PD Claims Fund; (viii) those parties that requested service and notice of papers in accordance with Fed. R. Bankr. P. 2002; (ix) counsel for the State; and (x) counsel for EPA. In light of the nature of the relief requested, the Reorganized Debtors submit that no further notice is required.

**[remainder of this page is intentionally left blank]**

WHEREFORE, the Reorganized Debtor requests the Court enter the Order in substantially the form attached hereto as Exhibit 1: (i) approving the Settlement Agreement; (ii) Allowing the Allowed State Claim on the terms set forth in the Settlement Agreement; (iii) dismissing the Partial Allowance Motion and MDEQ Response as moot; (iv) completing the mediation; (v) authorizing Reorganized Debtor to enter into and take all actions contemplated in the Settlement Agreement; and (vi) granting such other relief as may be appropriate.

Dated:  January 10, 2023

THE LAW OFFICES OF ROGER HIGGINS, LLC
Roger J. Higgins
516 N. Ogden Ave.
Suite 136
Chicago, IL 60642
Telephone: (312) 480-1984

and

PACHULSKI STANG ZIEHL & JONES LLP


*/s/ James E. O'Neill*
Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

Co-Counsel for the Reorganized Debtor

**[remainder of this page is intentionally left blank]**