**Exhibit 1 to Motion**

**Form of Approval Order**

**THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| W. R. GRACE & CO., et al.,[1] | ) Case No. 01-01139 (AMC) |
| | ) (Jointly Administered) |
| Reorganized Debtor. | ) |
| | ) Re docket no. _____ |
| | ) Hearing Agenda item no. _____ |

**ORDER APPROVING SETTLEMENT AGREEMENT RESOLVING STATE OF
MONTANA'S CLAIM FOR OPERATING UNIT 3 OF THE LIBBY ASBESTOS
SUPERFUND SITE**

Upon consideration of the *Reorganized Debtor's Motion to Approve Settlement Agreement Resolving State of Montana's Claim for Operating Unit 3 of the Libby Asbestos Superfund Site* (the "Motion"); it appearing that the relief requested is in the best interests of the Reorganized Debtor, its estates, its creditors, and other parties-in-interest; the State of Montana having had a sufficient period of time to conduct a 30-day public comment period, and having provided any public comments received and responses to the Court; based upon information that the Reorganized Debtor and the State have provided, the Court having determined that the settlement is fair, adequate, reasonable, and consistent with the goals of the Comprehensive Environmental Response, Compensation and Liability Act, as amended, 42 U.S.C. § 9601 *et seq.* and the Montana Comprehensive Environmental Cleanup and Responsibility Act, Montana Code Annotated ("MCA") § 75-10-701 *et seq.*;  the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of

---

[1]    W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc., or "Grace") is the sole remaining Reorganized Debtor and Case No. 01-1139 is the sole remaining open chapter 11 case.

Reference from the United States District Court for the District of Delaware, dated February 29,

2012; consideration of the Motion and the relief requested therein being a core proceeding pursuant

to 28 U.S.C. § 157(b), and considering that this Court may enter an order consistent with Article

III of the United States Constitution; venue being proper before the Court pursuant to 28 U.S.C.

§§ 1408 and 1409; notice of the Motion having been adequate and appropriate under the

circumstances; and after due deliberation and sufficient cause appearing therefor, it is hereby

ORDERED that:[2]

1.     The Motion is granted in its entirety.

2.     The *Settlement Agreement*, a true and correct copy of which is attached as the <u>Exhibit</u> to

       this Order (the "<u>Settlement Agreement</u>"), is approved in its entirety.

3.     The Reorganized Debtor is authorized to enter into, and take all actions contemplated in,

       the Settlement Agreement on the terms and conditions set forth therein.

4.     The *Reorganized Debtor's Request for Partial Allowance and Partial Disallowance of the*

       *Claim by the Montana Dept. of Env. Quality ("<u>MDEQ</u>") for Environmental Remediation*

       *at Operable Unit 3 of the Libby Asbestos Superfund Site (Substantive Objection)*, the

       State's *Response and Reservation of Rights of the State of Montana to the Reorganized*

       *Debtor's Request for Partial Allowance and Partial Disallowance of the Claim by the*

       *Montana Dept. of Env. Quality for Environmental Remediation at Operable Unit 3 of the*

       *Libby Asbestos Superfund Site (Substantive Objection)* [Docket No. 33102], and the

       Reorganized Debtor's *Reply in Support of the Reorganized Debtor's Claim Objection*

---

[2]    Capitalized terms not defined in this order shall have the meaning ascribed to them in the Settlement Agreement.

*Requesting Partial Allowance and Partial Disallowance of MDEQ Prepetition Claim (Substantive Objection)* [Docket No. 33110] are dismissed as moot.

5.     The mediation scheduled in the *Stipulation and Agreed Order re Mediation of Contested Matter re Claim No. 18496-1* [Docket No. 33124], as supplemented by the *Joint Stipulation and Agreed Order Selecting Mediator in Contested Matter re Claim No. 18496-1* [Docket No. 33126], and as amended by the *Amendment to the Stipulation and Agreed Order re Mediation of Contested Matter re Claim No. 18496-1* [Docket No. 33144], has been completed.

6.     The Reorganized Debtor shall direct its claims agent Rust Consulting, Inc. to record: (i) the Allowed State Claim as an allowed, non-contingent, and liquidated claim on the terms and conditions set forth in the Settlement Agreement; and (ii) the State Claim (Claim No. 18496-1) as disallowed in all other respects and expunged.

7.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such motion and the requirements of Fed. R. Bankr. P. 6004(a) and the local rules of the Court are satisfied by such notice.

8.     The Court shall retain jurisdiction to hear and determine all matters arising from or relating to the implementation of this Order.

9.     This Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing and shall not be stayed under, as the case may be, Fed. R. Bankr. P. 7062, Fed. R. Bankr. P. 6004(h), Fed. R. Bankr. P. 9014, or otherwise.

DOCS_DE:241941.1 91100/001

10.     In the event of any conflict between the terms of this Order, the Motion, or the Settlement

Agreement, the Settlement Agreement shall govern.

Dated: _____, 2023

_____
Honorable Ashely M. Chan
United States Bankruptcy Judge

**E**XHIBIT TO **O**RDER

**Settlement Agreement with Attachments**

## SETTLEMENT AGREEMENT

This settlement agreement, including all attachments and exhibits ("Settlement Agreement"), is entered into as of _December 19_, 2022, by and among W.R. Grace & Co. ("Grace") and the State of Montana ("State").[1] Each of the foregoing are sometimes referred to herein collectively as the "Parties" and individually as a "Party."

## R E C I T A L S

**WHEREAS**, on or about April 2, 2001, Grace and its fellow Debtors (as that term is defined below) filed voluntary petitions with the U.S. Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101, *et seq.*, as amended (the "Bankruptcy Code");

**WHEREAS**, on November 14, 2007, MDEQ (as defined below) filed an amended proof of claim, designated No. 18496 (the "MDEQ 2007 Claim"), in W.R. Grace & Co.'s Chapter 11 Case (designated Case No. 01-1139-AMC) with respect to the Libby Asbestos Superfund Site (as defined below);

**WHEREAS**, the State of Montana and its departments, agencies, and programs filed a number of other proofs of claim, which are all listed in Exhibit H with their respective treatment under the Plan;

**WHEREAS**, by stipulation (the "MDEQ 2008 Stipulation" a copy of which is attached hereto in Exhibit G) dated May 20, 2008, the Debtors and MDEQ settled the MDEQ 2007 Claim for the entirety of the Libby Asbestos Superfund Site and all of its Operable Units, with the exception of Operable Unit 3 ("OU3"), as to which the State reserved claims;

**WHEREAS**, on July 21, 2008, the Bankruptcy Court entered its *Order Authorizing Stipulation Resolving Claims of Montana Department of Environmental Quality* [Docket No. 19110] (the "MDEQ 2008 Order", a copy of which is attached hereto in Exhibit G), approving the MDEQ 2008 Stipulation and disallowing and expunging all other remaining State Claims (as that term is defined below) filed by MDEQ in the Chapter 11 Cases that arose from or otherwise related to the Libby Asbestos Superfund Site;

**WHEREAS**, consistent with the MDEQ 2008 Order, the Debtors directed their claims agent to designate the remaining portion of the MDEQ 2007 Claim as Claim No. 18496-1, and no other Claims by the State of Montana remain pending against Reorganized Debtors in the Chapter 11 Cases;

**WHEREAS**, the Bankruptcy Court confirmed the Plan by orders dated January 31, 2011, and February 15, 2011. *See Memorandum Opinion Regarding Objections to Confirmation of First Amended Joint Plan of Reorganization and Recommended Supplemental Findings of Fact and*

---

[1]    Capitalized terms not defined herein shall have the meaning ascribed to them in the *First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W.R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders as Modified Through December 23, 2010* [Docket No. 26368].

**WHEREAS**, following the filing of the Partial Allowance Motion and the MDEQ Response, the Parties engaged in a Court-ordered mediation process, which resulted in a compromise resolution documented by this Settlement Agreement; and

**WHEREAS**, the Parties are entering into this Settlement Agreement to avoid the risk, expense, and burden of litigation, and to resolve their disputes according to the terms of this Settlement Agreement.

**NOW THEREFORE**, in consideration of the above recitals, the covenants, conditions, and promises exchanged between the Parties, the receipt of which is hereby acknowledged, and other good and valuable consideration including the benefits provided and to be provided by the Parties, as set out in this Settlement Agreement, including Sections 4, 5, 6, 7, and 8, the Parties agree as follows:

1.    **Recitals.**  The above recitals are incorporated herein for context and definitional purposes but do not constitute independent agreements between the Parties, and do not independently establish legal rights or obligations.

2.    **Definitions.**  Capitalized terms used but not otherwise defined in this Settlement Agreement shall have the meanings set forth below:

(a)    "Allowed Contingent OU3 State Share Claim" shall have the meaning set forth in Section 7 hereof.

(b)    "Allowed Financial Assurance" shall mean the financial assurance set forth in Sections 4, 5, and 6 hereof.

(c)    "Allowed Natural Resource Damages Claim" shall have the meaning set forth in Section 8(h) hereof.

(d)    "Allowed State Claim" shall mean: a) Allowed Financial Assurance; b) Allowed Contingent OU3 State Share Claim; and c) Allowed Natural Resource Damages Claim.

(e)    "Approval Order" shall mean the final and non-appealable order entered approving this Settlement Agreement pursuant to Fed. R. Bankr. P. 9019.

(f)    "CECRA" shall mean the Montana Comprehensive Environmental Cleanup and Responsibility Act, Montana Code Annotated ("MCA") § 75-10-701 *et seq.*

(g)    "CERCLA" shall mean the federal Comprehensive Environmental Response, Compensation, and Liability Act, as amended, 42 U.S.C. § 9601 *et seq.*

(h)    "Chapter 11 Cases" shall have the meaning set forth in the Plan, which for the avoidance of doubt, states:

"Chapter 11 Cases" shall mean the cases commenced by the Filing, on the Petition Date, by the Debtors of voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

3

Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, and H-G Coal Company.

(n)    "Distribution" or "Distributions" shall mean payment(s) by a trustee from a Financial Assurance Trust.

(o)    "DNRC" shall mean the Montana Department of Natural Resources and Conservation, the governmental department that has the statutory responsibility for implementing and/or administering the DNRC's Dam Safety Program.  In the event of a reorganization, name change, or other restructuring, DNRC shall mean the successor department headed by a cabinet level official appointed by the Governor with the foregoing statutory responsibility for implementing and/or administering DNRC's Dam Safety Program.

(p)    "DNRC's Dam Safety Program" shall mean the program, within the DNRC or its successor agency, with the legal authority to issue dam permits and regulate the construction, operation, and maintenance of Montana's dams to protect life and property from damages due to failure under the Montana Dam Safety Act, MCA § 85-15 as may be amended or superseded from time to time, and including any successor program to the DNRC's Dam Safety Program.

(q)    "DNRC Director" shall mean the Montana cabinet level official appointed by the Governor to direct the DNRC, or, in the event of a reorganization or other restructuring, such governmental department that has responsibility for implementing and/or administering the DNRC's Dam Safety Program, or its equivalent, pursuant to the Montana Dam Safety Act, MCA § 85-15-105, *et seq.*, as may be amended or superseded from time to time.

(r)    "EPA" shall mean the United States Environmental Protection Agency.

(s)    "Financial Assurance Trust," "Financial Assurance Trusts," "Trust," or "Trusts" shall mean the KDID O&M Performance Trust and the KDID Spillway Replacement Trust, individually or collectively as the case may be, and any accounts established within either Trust.

(t)    "*Force Majeure* Condition" shall mean a superior or irresistible force such as an Act of God, which is beyond the control of the Grace Parties and could not be avoided by the exercise of reasonable care.

(u)    "Grace" shall have the meaning set forth in the introductory paragraph of this Settlement Agreement, and its successors and lawful assigns.

(v)    "Grace Party" or "Grace Parties" shall mean Grace, KDC, and W.R. Grace & Co.-Conn., and their respective affiliates and successors with interests of any kind as to OU3, and

(ff)    "MDEQ" shall mean the Montana Department of Environmental Quality and successor agencies and programs.

(gg)    "MDEQ 2007 Claim" shall have the meaning set forth in the Recitals hereof.

(hh)    "MDEQ 2008 Order" shall have the meaning set forth in the Recitals hereof.

(ii)    "MDEQ Response" shall have the meaning set forth in the Recitals hereof.

(jj)    "MDEQ 2008 Stipulation" shall have the meaning set forth in the Recitals hereof.

(kk)    "Natural Resource Damages" or "NRD" shall mean any compensatory relief and/or other natural resources damages, including the reasonable costs of assessing such damages and other associated costs, that are recoverable pursuant to any State or Federal law, or amendments thereto, including but not limited to Section 107(a)(4)(C) of CERCLA, 42 U.S.C. § 9607(a)(4)(C), or Section 311(f) of the Clean Water Act, 33 U.S.C. § 1321(f), or MCA § 75-10-715(2)(b), or state or federal common law, by the State, for injury to, destruction of, loss of, or loss of use of Natural Resources or resource services resulting directly or indirectly from releases or threatened releases of hazardous or deleterious substances to, at, or from the Libby Asbestos Superfund Site. Natural Resource Damages include, without limitation: i) the costs of restoration, rehabilitation, replacement, or acquisition of the equivalent, of allegedly injured or lost Natural Resources or natural resource services; ii) assessment costs; iii) the costs of planning and monitoring such restoration activities; and iv) administrative, program, legal, technical, and all other related costs, and; (v) any other compensation for diminution in value or loss of use or non-use values.

(ll)    "Natural Resources" shall have the meaning provided in Section 101(16) of CERCLA, 42 U.S.C. § 9601(16), and MCA § 75-10-701(12).

(mm)    "Natural Resource Damage Program" or "NRDP" shall mean the Program that is administratively attached to the Montana Department of Justice and acts on behalf of the Governor in his capacity as the State's Natural Resource Damages Trustee with respect to Natural Resource Damages matters, and shall include successor agencies and programs.

(nn)    "Nonperformance Determination" shall have the meaning set forth in Section 5(d) hereof (Access to Trust Funds, State Access to Trust Funds).

(oo)    "NRD Funds" shall have the meaning set forth in Section 8(a) hereof.

(pp)    "Operable Unit 3" or "OU3" shall mean property in or around the Zonolite Mine owned by Grace or Grace-owned subsidiaries (excluding OU-2) and any area (including any structure, soil, air, water, sediment or receptor) impacted by the release and/or release and subsequent migration of hazardous substances and/or pollutants or contaminants from such property, including, but not limited to, the mine property, the Kootenai River and the sediments therein, Rainy Creek, Rainy Creek Road (sometimes referred to as Rainey Creek and Rainey Creek Road), and areas in which tree bark is contaminated with such hazardous substances and/or pollutants or contaminants.

7

liabilities, obligations, or causes of action by the State, of any kind or nature that it had, has or will have in the future for NRD at or related to OU3 or the Libby Asbestos Superfund Site; *provided, however*, that the State Claim does not include any State Reserved Rights, as defined below in Section (bbb). The "State Claim" does not include those claims set forth in Exhibit H.

(bbb)    "State Reserved Rights" shall mean the rights reserved in Sections 6(d)(ii) (State Consultative Role), 6(d)(iii) (CERCLA § 121), 6(g) (Effect of Financial Assurance), and 6(h) (Catastrophic Failure Reservation) hereof. In addition, the State Reserved Rights includes the State's rights to enforce this Settlement Agreement against any of the Grace Parties (including a right to any payment) or seek relief for a breach thereof, including under Section 8(i) (Stipulated Penalty for Failure to Make Section 8(a) Payments).

(ccc)    "10% Cost Share" shall have the meaning set forth in Section 7 hereof.

3.    **Settlement Agreement Approval Process and Effective Date.** This Settlement Agreement shall become effective after the process described in this Section 3 on the date the order approving this Settlement Agreement becomes final and non-appealable (the "Settlement Agreement Effective Date").

(a)    Upon execution of this Settlement Agreement by all Parties, the Parties shall confer regarding the motion in the Bankruptcy Court, pursuant to Fed. R. Bankr. P. 9019, § 75-10-701, *et seq.*, MCA, and 42 U.S.C. § 9607, which Grace shall file, seeking entry of the Approval Order. The Parties agree that the form of proposed Approval Order attached hereto as Exhibit I shall be attached to the motion seeking entry thereof. Within ten (10) days of the filing of the motion, the State shall publish notice and a brief description (as to which the Parties shall confer beforehand) in a newspaper of general circulation in Lincoln County, and provide a 30-day public comment period conducted by the State, which shall take place concurrent with the judicial approval process contemplated herein. The State reserves the right to withdraw or withhold its consent to the Settlement Agreement if the public comments received disclose facts or considerations that indicate the Settlement Agreement is inappropriate, improper, or inadequate. After the conclusion of the public comment period, the Parties shall confer regarding the State's response to the motion filed by Grace, and within thirty (30) days after the conclusion of the 30-day public comment period the State shall file its response and provide the Court with copies of all comments received and the State's responses thereto.

(b)    If public comments received do not disclose facts or considerations that indicate that this Settlement Agreement is inappropriate, improper, or inadequate, the State agrees to support prompt entry of the Approval Order by the Bankruptcy Court.

(c)    The Parties agree to take such other action as may be required to support prompt entry of the Approval Order by the Bankruptcy Court.

(d)    The Parties acknowledge and agree that the terms and conditions of this Settlement Agreement are conditioned, in all respects, on the approval of this Settlement Agreement by the Bankruptcy Court. If this Settlement Agreement is not approved by the Bankruptcy Court for any reason, it and any underlying agreements in principle, including any term sheet, will be immediately null and void and of no further force and effect.

(v)    As of December 31, 2042, if any funds are present in the Pre-2042 KDID O&M account, all such funds shall be transferred to or become part of (by virtue of the termination of the Pre-2042 KDID O&M account or otherwise) the KDID O&M Performance Trust for use Post-2042, and such amounts shall be in addition to the funding of the KDID O&M Performance Trust under Section 4(b).  No such transfer of funds from the Pre-2042 KDID O&M account to the Post-2042 KDID O&M Performance Trust shall affect the obligations described in Section 4(b).

(b)    Post-2042 KDID O&M Performance Trust.

(i)    *Establishment.*  Grace shall establish, within 90 days after the Settlement Agreement Effective Date, the KDID O&M Performance Trust, with the form of instrument substantially in the form attached to this Settlement Agreement as Exhibit C, to be managed by a reputable banking or financial institution.

(ii)    *Purpose and Access.*  Funds in the KDID O&M Performance Trust shall be used only for the restricted purpose of funding KDID O&M, and may be available only as provided under Section 5 (Access to Trust Funds).  Further, funds from the KDID O&M Performance Trust shall not be available before January 1, 2043 (except for any funds that may be deposited in the Pre-2042 KDID O&M account under Section 4(a), subject to the limitations in 4(a)(iv)).

(iii)    *Funding of the KDID O&M Performance Trust.*  Grace shall fund the KDID O&M Performance Trust in ten equal annual installments of $166,000, with the first installment required within 90 days of the Settlement Agreement Effective Date.  Each installment will be placed into the KDID O&M Performance Trust.

(iv)    *Duration and Final Distribution.*  The KDID O&M Performance Trust shall remain in full force and effect until its funds are depleted or the year 2122.  If funds remain in the KDID O&M Performance Trust in the year 2122, the funds shall be used and/or distributed pursuant to written agreement between the State and Grace, or in the absence of such an agreement, divided between Grace and the State equally on March 31, 2122.

(c)    KDID Spillway Replacement Trust.

(i)    *Establishment.*  Grace shall establish, within 90 days after the Settlement Agreement Effective Date, the KDID Spillway Replacement Trust with the form of instrument substantially in the form attached to this Settlement Agreement as Exhibit D, to be managed by a reputable banking or financial institution.

(ii)    *Purpose and Access.*  Funds in the KDID Spillway Replacement Trust shall be used only for the restricted purpose of funding KDID Spillway Work, including as the restricted purpose may be modified under Section 4(c)(iii), and may be available only as provided under Section 5 (Access to Trust Funds).  Further, funds from the KDID Spillway Replacement Trust shall not be available before January 1, 2126, except as provided under Section 4(c)(iii) or Section 5(e) (governing early access), below.

11

(ii)    For completed work that has already been paid for by the Party seeking Distribution, the invoices and receipts sufficient to demonstrate that work (or the relevant portion thereof) has been performed and payment has been made; and

(iii)    For Distribution directly to a contractor or vendor (without advance payment by the Party seeking Distribution), the contract between the contractor or vendor and the Party seeking Distribution for the performance of the work, accompanied by the relevant invoice(s) for payment due to the specified contractor or vendor.

(c)    *Grace Access to Trust Funds*.  Distributions from the Financial Assurance Trusts shall be made to Grace or KDC (or their contractors) upon request to the trustee consistent with the restricted purposes of the Financial Assurance Trusts, except that to prevent funding from the Trust for duplicative work, no Grace Party may request Distributions for specific work that has been fully performed by the State after a Nonperformance Determination.

(d)    *State Access to Trust Funds*.  Distributions from the Financial Assurance Trusts shall be made to the State (or its contractors if so directed by the State) upon State request to the trustee consistent with the restricted purposes of the Financial Assurance Trusts, but only in the event of an uncured Nonperformance Determination by the DNRC Director for KDID O&M or KDID Spillway Work, respectively, for performance of the work described in the final Nonperformance Determination.  The State shall also have access to the Financial Assurance Trusts if the events described under Section 6(e) (Cessation of Grace) were to occur.  This Settlement Agreement does not modify or amend in any way DNRC's authority and powers or regulatory process pursuant to the Montana Dam Safety Act or the DNRC's Dam Safety Program, as they may be amended or superseded from time to time.  The procedures in Section 5(d) and (e) solely lay out the process to be followed for the State to access funds in the Financial Assurance Trusts:

(i)    *Nonperformance Determination*.  A Nonperformance Determination means a final written determination by the DNRC Director that specifically: x) describes substantial and material nonperformance by KDC of KDID O&M or KDID Spillway Work; and y) establishes that the following conditions precedent have been met.  The DNRC Director is the only State official who may issue a Nonperformance Determination.  All Nonperformance Determination(s) are subject to the following conditions precedent, and substantive and procedural requirements.

(ii)    *Conditions Precedent to Nonperformance Determination*.    No Nonperformance Determination for KDID O&M or KDID Spillway Work may be issued without first providing to Grace or KDC:

(A)    Written actual notice by the DNRC Director or DNRC's Dam Safety Program that specifically: i) describes the work (either KDID O&M or KDID Spillway Work) allegedly not substantially and materially performed; and ii) identifies the provision(s) in the then-applicable operating permit or other such permit or license for dam operation under the DNRC's Dam Safety Program (and associated engineering reports, if any) requiring such work;

(B)    A reasonable opportunity to confer with the DNRC Director to attempt to resolve the matter in good faith; and

replacement is KDID Spillway Work that is reasonably necessary to perform before 2126; or

(ii)    *Emergency Response Distributions to the State.* The State may access the Spillway Replacement Trust for costs to respond to or address an emergency, consistent with the procedures and standards of the Dam Safety Act, MCA 85-15-215 or any superseding law. Notwithstanding Section 5(d), no Nonperformance Determination regarding the emergency response at the KDID Spillway is required as a prerequisite for Distributions under this Section 5(e)(ii) to the State specifically for and limited to an emergency consistent with MCA 85-15-215.

(f)    *Record Keeping and Periodic Accounting.* The Parties and KDC must maintain copies of records referenced in Section 5(b)-(d), including all requests for Distribution and Distributions from any Financial Assurance Trust and associated documentation, for a period of eight (8) years following such Distribution. Such records referenced in Section 5(b)-(d) shall be made available to either Party within sixty (60) days of written request. Grace shall arrange for an annual statement incorporating such information to be provided to each Party by the trustee on or before May 1 of the calendar year following the year covered by such statement.

6.    **Financial Assurance – General Terms**.

(a)    *Non-Duplication of Financial Assurance with EPA Requirements.* The Parties wish to avoid redundancy to the fullest extent possible, without defeating the purpose of the Allowed Financial Assurance contained herein or decreasing the scope and value of the Allowed Financial Assurance commitments. The Parties further recognize that EPA may request or require financial assurance from Grace or KDC as part of a draft or final EPA agreement, decree or order pertaining to the OU3 remedy, and that it is possible that financial assurance for KDID O&M and/or KDID Spillway Work could be a part of the financial assurance requested or required by EPA. Accordingly, the following terms apply.

(i)    Upon request of either Party to the other, the Parties shall cooperate in jointly expressing to EPA in writing that they have negotiated the Surety Bond and Financial Assurance Trusts regarding KDID O&M and/or KDID Spillway Work that adequately provide financial assurance regarding KDID O&M and/or KDID Spillway Work, with the intent that EPA accept as sufficient the financial assurance established in this agreement for purposes of KDID O&M and/or KDID Spillway Work.

(ii)    If and only if EPA so requests and requires, the Parties agree that EPA may be made the primary beneficiary of the Surety Bond or relevant Financial Assurance Trusts established by this Settlement Agreement and that, if so, the Parties will jointly request that the State be identified as a secondary beneficiary of the Surety Bond or relevant Financial Assurance Trust. The Parties will implement these beneficiary designations promptly when EPA agrees to them.

(iii)    To the extent that EPA declines the opportunity to become a primary beneficiary of the Surety Bond or Financial Assurance Trusts, and requests and requires, and a Grace Party provides, financial assurance for KDID O&M and/or

15

(ii) *State Consultative Role.* Nothing in this Settlement Agreement shall limit the State's participation in a consultative role with EPA regarding OU3 to the extent provided by law.

(iii) *CERCLA § 121.* The State preserves whatever rights it may have pursuant to Section 121 of CERCLA as in effect on the Settlement Agreement Effective Date, the exercise of which: y) shall have no bearing on the rights and obligations of the Parties, except as provided in Section 6(d); and z) shall not give rise to any claim or cause of action by the State against Grace Parties. Grace Parties reserve all of their rights and defenses.

(e) *Cessation of Grace.* If at any time after the Settlement Agreement Effective Date, Grace (and any merged or successor entity that assumes Grace's obligations to the State hereunder) ceases to exist or fails to continue to operate as a going concern, upon notice thereof, accompanied by documentation of the basis for the notice, to the trustee(s) and sureties of the Financial Assurance Trusts and/or Surety Bonds established hereunder, all such Trusts and Surety Bonds shall inure completely to the benefit of the State for use for the Trust purposes and may be accessed by the State consistent with Section 5 (Access to Trust Funds), but without a prerequisite for a Nonperformance Determination.

(f) *No Other Claims for Financial Assurance.* The State agrees that in consideration of the Allowed Financial Assurance provided herein, the State shall have no claims or causes of action at any time against a Grace Party for financial assurance in connection with KDID O&M or KDID Spillway Work.

(g) *Effect of Financial Assurance.* Neither the provision of the Allowed Financial Assurance, nor any termination thereof pursuant to Section 6(d)(i), shall expand, limit, or otherwise affect any obligations, rights, or remedies Grace Parties may or may not have with respect to OU3 now or in the future, except to establish by agreement the only financial assurance to the State for KDID O&M and KDID Spillway Work. Except as expressly provided in this Settlement Agreement, the provision of financial assurance herein shall not alter or limit the regulatory powers, rights, or remedies otherwise available to the State.

(h) *Catastrophic Failure Reservation.* The State reserves completely and without limitation whatsoever, and does not release in any way, any claims or causes of action of any kind that it may have arising out of or in connection with the occurrence of a future (post-Approval Order) catastrophic failure of the KDID or its integral components that results in a substantial or complete failure of the KDID structure and the downstream migration below the current location of the Mill Pond of a substantial portion of impounded tailings. The parties agree that such above-described catastrophic failure of the KDID or its integral components does not describe any conditions present as of the Settlement Agreement Effective Date.

(i) *Grace Reservation.* Grace reserves completely and without limitation whatsoever all of its rights, claims, counter-claims, and defenses as to any reserved State claim or cause of action.

7.    **Resolution of Montana Claim for Contingent CERCLA OU3 Costs.** The Parties acknowledge that under Section 104(c)(3) of CERCLA, 42 U.S.C. § 9604(c)(3), before

8.    **Natural Resource Damages.**

(a)    Grace shall provide a total of $18.5 million ("NRD Funds") in payments to the NRDP in a series of installments.  The first payment of $5 million will be paid within 180 days of the Settlement Agreement Effective Date, without interest being due.  The remaining balance of $13.5 million will bear interest at a rate of 4.19% per annum (beginning on the Settlement Agreement Effective Date), and shall be paid to NRDP in nine (9) annual installments of $1.5 million plus interest with the first installment paid within one (1) year of the Settlement Agreement Effective Date.  These payments constitute consideration for the State's agreement, as to the Grace Parties, to release its interests in NRD claims and fully and finally resolve NRD claims by the State as provided in Sections 9(a) and 9(b)(ii) herein.

(b)    *Payment Instructions.*  All payments made to the State pursuant to Section 8(a) of this Settlement Agreement, including interest, shall be made by electronic funds transfer in accordance with instructions in Exhibit F (State Wiring Instructions).  Grace shall contact the Chief Financial Officer of the Central Services Division of the Montana Department of Justice (dojaccountants@mt.gov) at least 48 hours prior to initiating a transfer to provide notice of the date, time, and amount of the expected transfer.  Grace must copy the NRDP at the e-mail addresses provided in Section 13 (Notice).  NRDP shall deposit the payments received, and any subsequent interest and earnings, into a State special revenue fund (non-budgeted) to be established in accordance with Section 17-2-102(1)(b)(i), MCA.

(i)    This account shall be operated and maintained by the NRDP as set forth in this Settlement Agreement.  No portion of the amounts deposited under this Settlement Agreement, or any interest or earnings thereon, is to be treated as State General Fund money, nor is any portion to be converted or transferred to the State General Fund or any other fund.  The monies paid to the State, and the interest and earnings thereon, shall be available only for the purposes described in this Settlement Agreement and for no other purpose.

(ii)    Any payments received by the State after 4:00 pm Mountain Standard Time shall be credited on the next business Day.

(c)    The funds in the above-described account and the interest and earnings thereon shall be used solely to restore, replace, rehabilitate, or acquire the equivalent of injured natural resources and services in or related to OU3 or the Lincoln County area, and support therefor, including costs for State restoration plan development and implementation, and administrative, program, legal, technical, and all other related costs, to the extent lawful under CERCLA or CECRA, which shall not be further recoverable from Grace Parties.

(d)    The report entitled *Alleged Injury and Examples of Restoration Options to Address Alleged State NRD at OU3* is attached as Exhibit E.  The Parties agree that the benefits from projects similar to the exemplary projects identified in the report are intended and anticipated to provide natural resource and other benefits in OU3 and elsewhere in the general vicinity.  Exhibit E describes the nature of the alleged injuries, types or examples of potential restoration projects, criteria for selecting projects, and the types of ecological values to be provided.  The restoration projects to be implemented with the NRD Funds should provide substantial aquatic, riparian, and

9.    **Settlement**.

(a)    In consideration of the actions performed and to be performed by the Parties and the funding provided and to be provided by Grace as described herein, the Parties agree that, upon the Settlement Agreement Effective Date:

      (i)    The State shall be deemed to have the Allowed State Claim under the Plan in full and complete satisfaction of the State Claim;

      (ii)    The Allowed State Claim is an Allowed Environmental Claim, as the Plan defines that term;

      (iii)    The State Claim is disallowed in all other respects;

      (iv)    The State has no remaining, and shall have no other, Claim in the Chapter 11 Cases; and

      (v)    The State Claim and any and all other Claims of the State (which for the avoidance of doubt are claims that were or could have been asserted in the Chapter 11 Cases) are discharged, barred, and enjoined pursuant to the Plan, the Confirmation Order, 11 U.S.C. § 524, and 11 U.S.C. § 1141 in exchange for the Allowed State Claim.

(b)    Covenants Not to Sue.

      (i)    State's Covenant Not to Sue.  Except as reserved in the State Reserved Rights, the State is forever barred, estopped, and enjoined from asserting any causes of action or relief against the Reorganized Debtors under CECRA, CERCLA, any other statute, common law, or any other theory of liability arising from or related to releases, threatened releases, or migration of hazardous or deleterious substances, pollutants, or contaminants at or from the Libby Asbestos Superfund Site.  The preceding sentence does not bar, estop, or enjoin State causes of action or relief:

            (x) for a release of a hazardous substance or solid waste resulting from Reorganized Debtors' operation of any portion of the Libby Asbestos Superfund Site or from their transportation, treatment, storage, or disposal, or the arrangement for the transportation, treatment, storage, or disposal, of a hazardous substance or a solid waste at or from the Libby Asbestos Superfund Site after the Settlement Agreement Effective Date (except for road, dam, or mine maintenance, forest management, or similar property management activities, each in compliance with regulatory requirements; or as provided by any EPA Record of Decision or other final EPA decision document; or in compliance with any administrative order, settlement agreement, directive, governmental permit, or government approval, respectively, by EPA or the State); or

a cumulative total of $1,500,000, and the State shall not submit invoices to Grace after the Settlement Agreement Effective Date. Upon payment by Grace of invoices submitted pursuant to the MOA on or before the Settlement Agreement Effective Date up to a maximum cumulative total under the MOA of $1,500,000 paid to the State, the MOA shall terminate.

11. **Cooperation in Implementation and Dispute Resolution**.

(a)  The Parties agree that each would benefit from a cooperative and collaborative working relationship and will endeavor to jointly determine ways that this might be accomplished in the future. The Parties agree that it may be reasonable and appropriate to schedule periodic meetings between the parties to discuss the implementation of this Settlement Agreement, which either Party may request.

(b)  The Parties agree that, except in unique or exigent circumstances that make it impracticable or impossible to do so, prior to filing a lawsuit or otherwise seeking judicial review of this Settlement Agreement, written notice shall be provided that identifies the dispute and requested resolution. Any dispute regarding this Settlement Agreement or its implementation shall in the first instance be the subject of informal negotiations between the Parties, including elevation to the management levels of the respective Parties. The Parties agree to consider at the time whether the dispute is amenable to resolution through mediation or other alternative dispute resolution mechanisms.

12. **Representations and Warranties**.

(a)  Each undersigned representative of a Party certifies that she or he is fully authorized to enter into the terms and conditions of this Settlement Agreement and to execute and legally bind such Party to this Settlement Agreement.

(b)  The State represents and warrants that i) it has full authority to enter into this Settlement Agreement; and ii) the State has not sold, transferred, or assigned the State Claim to any other person or entity.

(c)  Grace represents and warrants that i) it has full authority to enter into this Settlement Agreement; and ii) Grace has not sold, transferred, or assigned any rights or obligations established by the Settlement Agreement.

(d)  This Settlement Agreement is solely on behalf of the State and the Grace Parties.

13. **Notice.** Each notice and other communication required hereunder will be in writing and will be sent by email and either: delivered in person; sent by certified mail, return receipt requested; or delivered by a recognized delivery service with acknowledgement of receipt, and will be deemed to have been given on the date of its delivery, if mailed to each of the Parties

release of all of the State's NRD claims against Grace in or related to the Libby Asbestos Superfund Site. Both Parties acknowledge and agree that this Settlement Agreement is fair, reasonable, in the public interest, and consistent with CERCLA and CECRA. Nothing in this Settlement Agreement, nor entry into this Settlement Agreement, shall establish or be interpreted to establish any liability of any Grace Party, or be used as evidence of any such liability on the part of any Grace Party, in connection with any matters related to the Libby Asbestos Superfund Site or releases or threatened releases of hazardous or deleterious substances therefrom.

15. **Acceleration of Payments.** Notwithstanding anything to the contrary herein, Grace has the right to accelerate funding, without payment of unmatured interest, of any payments set forth in this Settlement Agreement, upon thirty (30) days written notice to the State

16. **Assignment.** Grace has the right to assign rights, obligations, and interests herein, upon thirty (30) days written notice to the State, to the maximum extent permissible by law, provided that such assignment does not materially impair fulfillment of the payment obligations imposed on Grace herein. In the event that an assignee fails to fulfill any obligations of this Settlement Agreement, any unfulfilled obligations remain an obligation of Grace that is enforceable under this Settlement Agreement.

17. **Parties Bound.** This agreement binds and inures to the benefit of the Parties and their successors and lawful assigns.

18. **Cure Period for Involuntary Delay in Payments.** An applicable deadline by which a payment obligation of Grace arises under this Settlement Agreement shall be suspended temporarily for a period of sixty (60) days if:

(a) Grace is precluded from making any such payment due to (a) a failure of electronic bank systems despite reasonable efforts of the Grace Parties under the circumstances, or (b) a *Force Majeure* Condition; and

(b) Grace promptly notifies the State within ten (10) days of such event pursuant to the notice provisions of this Settlement Agreement.

(c) Grace shall endeavor in good faith to make any such payment as soon as is practicable within the sixty (60) day period. If Grace is unable to make the payment within the sixty (60) day period, the Parties shall work together in good faith to resolve the payment issue as expeditiously as possible; *provided, however*, that in no event shall a failure of electronic bank systems or *Force Majeure* Condition excuse nonperformance for a period of greater than one-hundred twenty (120) days, absent written agreement between the Parties.

19. **Third Parties and Non-Affect**. This Settlement Agreement is solely on behalf of the State and the Grace Parties. The State is not representing any other entities in entering into this Settlement Agreement. The terms of this Settlement Agreement shall neither expand nor limit the legal rights or obligations of any person or entity other than the State and Grace Parties.

Agreement. Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Settlement Agreement for any purpose.

26.    **Modification.**    Any material or non-material modification of this Settlement Agreement shall be made only by written agreement of the Parties and shall take effect only upon court approval. The Parties' consent hereto is conditioned upon the approval of the Settlement Agreement in its entirety and without modification, addition, or deletion, except as agreed in writing by the Parties.

**IT IS HEREBY AGREED**

**FOR W.R. GRACE & CO.:**

KEITH N. COLE
Senior Vice President – Public Affairs & EHS
W. R. Grace & Co.
7500 Grace Dr.
Columbia, MD 21044

**FOR THE STATE OF MONTANA:**

THE HONORABLE GREG GIANFORTE
Governor of Montana
State Capitol
Helena, Montana 59620-0801

[signature page continues on
following page]

27

AUSTIN KNUDSEN
Attorney General
Office of the Attorney General
Justice Building, Third Floor
215 North Sanders
P.O. Box 201401
Helena, Montana 59620-1401

HARLEY R. HARRIS
Supervising Assistant Attorney General
Montana Natural Resource Damage Program
P.O. Box 201425
Helena, Montana 59620-1425

CHRISTOPHER DORRINGTON
Director
Montana Department of Environmental Quality
1520 E 6th Avenue
Helena, MT 59601

28

**Exhibits**

**Exhibit A - Surety Bond Form**

**Exhibit B – Surety Bond Amount Schedule**

**Exhibit C - KDID O&M Performance Trust**

**Exhibit D - KDID Spillway Replacement Trust**

**Exhibit E - Alleged Injury and Examples of Restoration Options to Address Alleged State NRD at OU3**

**Exhibit F – State Wiring Instructions**

**Exhibit G – MDEQ 2008 Order and MDEQ 2008 Stipulation**

**Exhibit H – List of Other State Proofs of Claim and their Treatment in the Plan**

**Exhibit I – Proposed Approval Order**

**Exhibit A - Surety Bond Form**

Bond No: _____

*DRAFT FORM OF DOCUMENT*

## PERFORMANCE BOND
### Pre-2042 KDID Operation and Maintenance Trust Funding

Date bond was executed: _____

Effective date: _____

Principal: _____

Surety Name & Address: _____

_____

**KNOW ALL MEN BY THESE PRESENTS**, that we, _____ (W.R. Grace & Co.)_ (hereinafter called the Principal), as Principal, and _____, a corporation duly organized under the laws of the State of _____ (hereinafter called the Surety) as Surety, are held and firmly bound unto _(The State of Montana)_, (hereinafter called the Obligees), as Obligees, in the initial amount of (Three Million Five Hundred Thousand Dollars and 00/100 Dollars--------- ($3,500,000.00) to be automatically adjusted January 1 of each calendar year to the following penal sum:

| Year | Maximum Penal Sum If Default in Given Year |
|------|---|
| January 1, 2023 | $ 3,500,000 |
| January 1, 2024 | $ 3,391,500 |
| January 1, 2025 | $ 3,277,260 |
| January 1, 2026 | $ 3,157,094 |
| January 1, 2027 | $ 3,030,810 |
| January 1, 2028 | $ 2,898,212 |
| January 1, 2029 | $ 2,759,098 |
| January 1, 2030 | $ 2,613,260 |
| January 1, 2031 | $ 2,460,485 |
| January 1, 2032 | $ 2,300,553 |
| January 1, 2033 | $ 2,133,240 |
| January 1, 2034 | $ 1,958,315 |
| January 1, 2035 | $ 1,775,539 |
| January 1, 2036 | $ 1,584,668 |
| January 1, 2037 | $ 1,385,453 |
| January 1, 2038 | $ 1,177,635 |
| January 1, 2039 | $ 960,950 |
| January 1, 2040 | $ 735,127 |
| January 1, 2031 | $ 499,886 |
| January 1, 2042 | $ 254,942 |
| January 1, 2043 | $ 0 |

6) Provided that the Obligees agree in writing, this bond may be replaced by alternative security including cash, or a letter of credit from a bank agreeable to the Obligees; otherwise, the alternative security shall be in the form of a surety bond consistent with the terms of the Settlement Agreement, including Section 4(a), from another surety which meets the bond issuer rating requirements set forth within Section 6(c)(i) of the Settlement Agreement.

7) In accordance with Section 6(a)(iii) or Section 6(d)(i) of the Settlement Agreement, respectively, and after 60 days written notice to the Obligees, this bond, and Principal's continuing obligation to provide the same, shall terminate:

    a.  to the extent the EPA declines the opportunity to become a primary beneficiary of the bond or financial assurance trusts and requests and requires, and Principal provides, financial assurance for the KDID O&M as part of an agreement, decree or order that exceeds the value and scope of the financial assurance provided for within the Settlement Agreement; or

    b.  in the event the KDID is required to be removed, substantially or completely.

Those persons whose signature appear below hereby certify that they are authorized to execute this surety bond on behalf of the Principal and Surety and that the surety is authorized to do business in the State of Montana.

Sealed with our seals and dated this ____ day of _____, 20__.

**Principal**

By:_____

Senior Director, Finance and Treasury
7500 Grace Drive, Columbia MD 21044
Attention: Asif Md Arshad

Address for Notification

**Surety**

By:_____

Attorney-in-Fact

_____

_____

Address for Notification

**Obligee**

By:_____

_____

_____

Address for Notification

**Exhibit B – Surety Bond Amount Schedule**

## Exhibit B - Surety Bond Amount Schedule

Summary of contingent future payout of the bond should payment by surety be required (referenced as "default" in below):

1) **Pre-2042 KDID O&M Performance Bond (Section 4.b)**

### KDID O&M Performance Bond Payout

| Year | Future Value of Expense | Maximum Sum of Bond Amount in Given Default Year |
|------|------|------|
| 2023 | $ 175,000 | $ 3,500,000 |
| 2024 | $ 178,500 | $ 3,391,500 |
| 2025 | $ 182,070 | $ 3,277,260 |
| 2026 | $ 185,711 | $ 3,157,094 |
| 2027 | $ 189,426 | $ 3,030,810 |
| 2028 | $ 193,214 | $ 2,898,212 |
| 2029 | $ 197,078 | $ 2,759,098 |
| 2030 | $ 201,020 | $ 2,613,260 |
| 2031 | $ 205,040 | $ 2,460,485 |
| 2032 | $ 209,141 | $ 2,300,553 |
| 2033 | $ 213,324 | $ 2,133,240 |
| 2034 | $ 217,591 | $ 1,958,315 |
| 2035 | $ 221,942 | $ 1,775,539 |
| 2036 | $ 226,381 | $ 1,584,668 |
| 2037 | $ 230,909 | $ 1,385,453 |
| 2038 | $ 235,527 | $ 1,177,635 |
| 2039 | $ 240,237 | $ 960,950 |
| 2040 | $ 245,042 | $ 735,127 |
| 2041 | $ 249,943 | $ 499,886 |
| 2042 | $ 254,942 | $ 254,942 |

**Exhibit C - KDID O&M Performance Trust Form**

EXHIBIT C

_____, 2023

## TRUST AGREEMENT

### KDID O&M Performance Trust

This Environmental Remediation Trust Agreement (the "Agreement") is made as of this _____ day of _____ 2023, by and among  W.R. Grace & Co. and Kootenai Development Company ("KDC") (collectively herein "Grace"), as settlor and beneficiary; the State of Montana on behalf of its agencies and departments named in the Settlement Agreement (the "State") as beneficiary, (each, individually, a "Party," and collectively, the "Parties"); and PNC Bank, National Association, not in its individual capacity, but solely as Trustee (the "Trustee").

## RECITALS

WHEREAS, Grace and the State have entered into a Settlement Agreement that provides for the formation of this trust, to be administered in the manner described herein.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants and agreements contained herein, and pursuant to the Settlement Agreement, the Parties and the Trustee hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1    Definitions. The following terms as used in this Agreement shall have the definitions given below:

1.1.1    "Account Statement" shall have the meaning given in Section 5.1.

1.1.2    "Agreement" shall be this Trust Agreement.

1.1.3    "Beneficiaries" means the State and Grace.

1.1.4    "Condition of Early Termination" shall mean each of the conditions of termination set out in Sections 6(a)(iii), 6(d)(i), or 6(e) of the Settlement Agreement.  The terms in the Settlement Agreement shall control whether a Condition of Early Termination exists, however, such conditions are summarized generally here for convenience:

(a)    Section 6(a)(iii): United States Environmental Protection Agency declines the opportunity to become a primary beneficiary of the Surety Bond or Financial Assurance Trusts, and requests and requires, and a Grace Party provides, financial assurance for KDID O&M and/or KDID Spillway Work as part of an agreement, decree, or order that exceeds the value and scope of the financial assurance provided in this Settlement Agreement for KDID O&M and/or KDID Spillway Work;

(including reasonable consulting and legal fees and expenses) associated with the Trustee's activities hereunder.

   1.1.16 "Nonperformance Determination" shall have the meaning set forth in the Settlement Agreement.

   1.1.17 "Parties" under this Agreement shall have the meaning given in the preamble.

   1.1.18 "Pre-2042 KDID Operation and Maintenance Performance Bond" or "Surety Bond" shall have the meaning set forth in the Settlement Agreement.

   1.1.19 "Pre-2042 KDID O&M Account" shall have the meaning set forth in Section 2.2.1 hereof.

   1.1.20 "Settlement Agreement" means the Settlement Agreement between W.R. Grace & Co. and the State, dated as of _____, 2022, negotiated and entered to settle the claim number 18496-1 in *In re W.R. Grace & Co., et al.*, before the United States Bankruptcy Court for the District of Delaware, under Case No. 01-011139 (AMC), as amended by W.R. Grace & Co. and the State hereafter, in accordance with the terms of the Settlement Agreement.

   1.1.21 "State" shall have the meaning given in the preamble.

   1.1.22 "Statement" shall have the meaning given in Section 3.2.1(a).

   1.1.23 "Surety" shall mean the surety acting as obligor for the Pre-2042 KDID Operation and Maintenance Performance Bond.

   1.1.24 "Trust" means the KDID O&M Performance Trust, and any sub-account therein, established pursuant to this Agreement.

   1.1.25 "Trust Assets" means the funds transferred to, or earned by, the Trust pursuant to this Agreement.

   1.1.26 "Trustee" means the trustee of the Trust. At any time that multiple trustees are acting, the term "Trustee" shall apply to each of the co-trustees.

  1.2 Other. To the extent a term in this Agreement is not defined above, to the extent practicable, such term shall have the meaning provided, if any, in the Settlement Agreement.

## ARTICLE II
## CREATION AND MANAGEMENT OF TRUST ASSETS

  2.1 Objectives and Purposes.

   2.1.1 General. The exclusive objectives and purposes of the Trust are to collect and disburse funds for KDID O&M Costs, as required under the Settlement Agreement, with no

in the Trust Account for the benefit of the Beneficiaries for the purposes described in Section 2.1, subject to the terms of this Agreement. The Trustee shall have no responsibility, and assumes no liability, to pursue collection of Trust Assets to be contributed under the Settlement Agreement from any source. Instead, all obligations with respect to the Settlement Agreement's requirements for funding of the Trust are to be solely exercised by Grace.

2.2.2   Ownership Trust Assets.  All legal rights and incidents of ownership of the Trust Assets shall be held solely by the Trustee. However, except and until otherwise provided in this Agreement, Grace shall be treated as the owner of the Trust Assets for federal income tax purposes pursuant to Treasury Regulations § 301.7701-4(e)(2).

2.2.3   Additional Contributions. The Trustee is authorized to accept contributions to the Trust from, and only from, the Parties or the Surety. The Trustee is not required to accept any contribution that the Trustee believes is not appropriate for administration as part of the Trust Assets.

2.3    Investment and Safekeeping of Trust Assets.

2.3.1   Segregation of Trust Assets.  The Trust Assets shall be held in trust and segregated from all, and shall not be comingled with any, other assets of Grace, the State or the Trustee.

2.3.2   Investment Requirements.  The Trustee shall have the authority to invest the Trust Assets in such a manner as the Trustee deems appropriate in the Trustee's discretion and in accordance with the guidelines applicable to the Trust Account set forth in this Section 2.3 (the "Investment Policy"), as may be amended in writing from time to time by Grace, the State and the Trustee. The Trustee shall consult initially and from time to time with Grace and the State regarding the nature and allocation of investments of the Trust Assets. All investment transactions effected for the Trust Account shall be deemed in compliance with the Investment Policy unless Grace or the State notifies Trustee in writing of its objection within sixty (60) days of its receipt of the most recent Account Statement pursuant to Section 5.1 of this Agreement. The compliance of an investment with the Investment Policy shall be determined on the date of purchase, based on the market value and asset class or type as of that date compared to the value of the Trust Account as of the most recent valuation date.

2.3.3   Investment Provisions.

(a)    Cash Sweep Vehicle. Grace authorizes the Trustee to automatically sweep uninvested cash balances in the Trust Account into (i) any money market mutual fund that (A) complies with the criteria set forth in (I) Securities and Exchange Commission Rule 2a-7 under the Investment Company Act of 1940, as amended, or (II) Securities and Exchange Commission Rule 3c-7 under the Investment Company Act of 1940, as amended, and (B) has portfolio assets of at least $5,000,000,000 or (ii) any bank deposit account offered by a commercial bank which has a combined capital and surplus and undivided profits of not less than $500,000,000, in each chosen by Trustee (referred to as "sweep vehicles"), which may include sweep vehicles advised by the Trustee and/or its affiliates or deposit accounts at the Trustee or an affiliated bank. Grace understands that Trustee will derive financial benefits from affiliated sweep vehicles (including

- 5 -

(e)     Special Disclosures for Fund Shares.  Grace understands that Funds and Other Securities available through the Trustee are not backed or guaranteed by the Trustee (or its affiliates), are not bank deposits and are not insured by, issued by, guaranteed by or obligations of the Federal Deposit Insurance Corporation, the Federal Reserve Board or any other government agency. Such Funds and Other Securities involve investment risks, including possible loss of value. There is no assurance that sweep vehicles will be able to maintain a stable net asset value of $1.00 per share.  For more complete information about Funds, including charges and expenses, Grace shall refer to the prospectus, private offering memorandum or other offering documents for the Funds.  Grace acknowledges (i) that it understands the information set forth in this Section 2.3.3 and (ii) receipt and review of the prospectus or summary prospectus, private offering memorandum or other offering documents for the selected Funds.

(f)     Trustee Selected Brokers.  Grace agrees that in cases where the Trustee selects brokers for trades, the Trustee may select brokers that are not affiliated with Trustee or brokers that are affiliated with Trustee.  Grace consents to transactions for the Trust Account being executed through brokers affiliated with the Trustee in accordance with this Agreement and the affiliated broker's execution policies. Grace may revoke the consent provided in this Section at any time by directions to the Trustee.  If the Trustee buys or sells securities for which an affiliated broker acts as a dealer or underwriter, the Trustee may buy those securities from, or sell those securities to, either the affiliated broker or a member of an underwriting syndicate of which an affiliated broker is a member.  Grace consents to brokers selected by the Trustee retaining commissions, including an affiliate of the Trustee.  Grace further agrees that, if execution is through an affiliated broker, the affiliated broker is entitled to receive and retain, without credit or offset, brokerage commissions, commission equivalents, mark-ups, mark-downs and dealer spreads on transactions effected for the Trust Account, in accordance with the affiliated broker's standard fee schedules.  Upon request, the Trustee will provide additional information to Grace concerning commissions, commission equivalents, mark-ups and mark-downs and other transaction costs. Grace understands and agrees that the Trustee has an indirect financial incentive to select an affiliated broker to execute transactions in the Trust Account, as it results in compensation to its affiliate.

(g)     Brokerage Fees and Pricing.  The Trustee will seek to obtain best execution in selection of brokers (both affiliated and unaffiliated, as applicable) for execution of securities trades for the Trust Account. When selecting brokers the Trustee may take into account the full range and quality of brokerage services including execution capability, trading expertise, accuracy of execution, commission rates, research, reputation and integrity, fairness in resolving disputes, financial responsibility, responsiveness, and any other relevant factors. The Trustee also may consider brokerage and research services provided by brokers even though the Trust Account may not benefit from such research. Broker commission rate is one component of price and a factor considered with other factors. The Trustee will not be obligated to seek the lowest commission rate in advance of a Trust Account transaction or to select brokers based on its purported commission rate. Accordingly, the Trustee shall not be deemed to have acted unlawfully solely for causing Grace to pay a higher commission for a securities trade than other brokers would have charged for the same transaction.

(h)     Aggregation of Trades.  The Trustee may, in its sole discretion, but is not required to, combine purchases and sales of securities held in the Trust Account with

for the notice, if Grace (or any merged or successor entity that assumes Grace's obligations to the State under the Settlement Agreement) ceases to exist or fails to continue to operate as a going concern, all rights and authorities of Grace under this Agreement shall automatically and without further action cease, and all Trust Assets shall inure completely to the benefit of the State only without any prerequisite Nonperformance Determination referenced in Section 3.1.3; provided, however, Grace shall have thirty (30) days after such notice to object to any assertion of Grace's cessation in a writing delivered to the Trustee and the State.

3.2    Process for Issuance of Distributions.  The Trustee shall make distributions for KDID O&M Costs under Section 3.1 to Grace or the State (under the conditions described in Section 3.1.3 or Section 3.1.4, which governs the State's contingent rights to distribution), as the case may be, in accordance with the following provisions.

3.2.1  Distribution Request. The Beneficiary seeking the distribution shall submit to the Trustee and the other Beneficiary:

(a)    A statement setting forth the exact amount of the distribution (the "Statement"), upon which the Trustee may conclusively rely;

(b)    A written certification that the distribution is for KDID O&M Costs within the restricted purposes of the Trust and the Settlement Agreement and, in the case of a distribution from the Pre-2042 KDID O&M Account, that such distribution does not decrease the balance of Trust Account, at any time during the year in which such distribution is to be made, below the "Maximum Sum of Bond Amount in Given Default Year" for the following year as reflected on the Surety Bond Amount Schedule attached to the Settlement Agreement as Exhibit B, which certification shall set forth the amounts necessary to demonstrate compliance with such requirement;

(c)    For completed KDID O&M that has already been paid for by the Beneficiary seeking distribution, the invoices and receipts sufficient to demonstrate that work (or the relevant portion thereof) has been performed and payment has been made (which the Trustee shall have no duty to review);

(d)    For distributions directly to a contractor or vendor (without advance payment by the Beneficiary seeking distribution), a copy of the contract for the performance of the work accompanied by the relevant invoice(s) for payment due to the specified contractor or vendor (which the Trustee shall have no duty to review) and

(e)    Trustee shall have no responsibility to confirm receipt of any or all required supporting documentation for each distribution or the completeness of any such supporting documentation provided with each distribution request other than to confirm a distribution request has been received from an authorized Beneficiary.

3.2.2  Distribution Payment.  Within three (3) business days after receipt of a distribution request submitted in accordance with Section 3.2.1, the Trustee shall issue such distribution in accordance with the Statement.

4.4    Powers. The Trustee shall have the following powers in administering the Trust.

4.4.1    Pennsylvania Law. Except as otherwise provided in this trust agreement, the Trustee shall have all powers granted to trustees under 20 Pa. C.S.§ 7780.5 and 20 Pa. C.S.§ 7780.6..

4.4.2    Additional Powers. Without limiting the Trustee's powers under 4.4.1 in any manner, the Trustee is further authorized to perform any and all acts necessary to accomplish the purposes of the Trust and facilitate the Parties' compliance with the Settlement Agreement, including the execution (including on behalf of the Trust) of agreements, instruments and other documents necessary to implement this Agreement, the Settlement Agreement, or any order of the Court or as may be necessary and proper to carry out the provisions of this Agreement, and, to the extent directed by the Beneficiaries in writing, the Settlement Agreement. Additionally, the Trustee may, among other things, invest the Trust Assets as provided in this Agreement and file documents in Court on behalf of itself and the Trust.

4.4.3    Limitations on the Trustee's Authority. The Trust and the Trustee shall not and are not authorized to engage in any trade or business with respect to the Trust Assets or any proceeds therefrom.  Without limiting the Trustee's right to payment of its fees, expenses and indemnities hereunder, the Trustee shall not make distributions for purposes other than as expressly set forth in Article III of this Agreement.  Notwithstanding anything to the contrary in this Agreement, the Settlement Agreement, 20 Pa. C.S.§ 7780.5, 20 Pa. C.S.§ 7780.6 or any other law, the Trustee shall not have the power to resolve any dispute between or among the Beneficiaries, the Parties and/or any other Person regarding the interpretation, application or enforcement of this Agreement or the Settlement Agreement and/or the administration of the Trust, including through mediation, arbitration or other alternative dispute resolution procedures.

4.5    Compensation. The Trustee shall be entitled to receive compensation from Grace for its services under this Agreement in accordance with the Schedule of Account Fees, a copy of which the Trustee delivered to the Beneficiaries with this Agreement. Additionally, brokerage fees and commissions may be charged to the Trust Account in connection with certain securities trades executed by the Trustee and subadvisors in accordance with this Agreement. In consideration for receiving commissions from the Trust Account, brokerage firms may provide Trustee with research, products and other services which may be used to assist Trustee in providing investment advice the Beneficiaries and other clients. Grace authorizes the Trustee to debit the Trust Account (or such other PNC Bank account owned by Grace as Grace may request) for the Trustee's compensation in accordance with the Schedule of Account Fees then in effect and all of the other costs and expenses described above. Within forty-five (45) days after receipt by Grace of a Statement from the Trustee setting forth (a) the amount of any compensation, fees or expenses due to the Trustee, or (b) any amount debited from the Trust Account during the Statement period, Grace shall transfer funds in the amount of such debit, compensations fees or expenses to the Trust to be added to and included as part of the Trust Assets in order to reimburse the Trust in full for any amounts debited from the Trust Account by the Trustee pursuant to this Section 4.5, Section 4.6, Section 4.7 or Article VI. Within one (1) day of the expiration of such forty-five (45) day period, Grace shall notify the State if Grace does not transfer such additional funds to the Trust in accordance with the immediately preceding sentence.

4.6    Limitation on Liability of Trustee.

- 11 -

(e)     The Trustee may act directly or through its agents, attorneys, custodians, servicers, managers, nominees or other skilled professionals, and the Trustee shall not be held responsible or liable for, or have any duty to supervise, any action, inaction, misconduct, or negligence of any such Persons selected by the Trustee with due care. Any expenses incurred by the Trustee in acting through agents, attorneys, custodians, services, managers or other skilled professionals shall be debited from the Trust Account in accordance with Section 4.5.

(f)     The Trustee shall not be responsible or liable for special, indirect, punitive, or consequential loss or damage of any kind whatsoever (including loss of profit) irrespective of whether the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(g)     The Trustee shall be entitled to rely conclusively, without investigation or other action on its part, on statements opinions, certificates, reports, directions, signatures, instruments, notices, advice, requests, waivers, consents, receipts, resolutions, bonds, calculations and other documents purported to be received from any Beneficiary, as contemplated by this Agreement, not only as to due execution, validity and effectiveness, but also as to the truth and accuracy of any information contained therein, and such reliance shall not constitute negligence (or gross negligence), bad faith or willful misconduct in connection with the Trustee's handling of funds or otherwise, and the Trustee shall not be liable or accountable to any Person by reason of such reliance. The Trustee shall not be responsible for the content or accuracy of any such documents provided to the Trustee, and shall not be required to recalculate, certify, or verify any information contained therein.

(h)     The Trustee may, at the expense of the Beneficiaries (i) request, rely on and act in accordance with officer's certificates of the Beneficiaries and opinions of counsel, and (ii) consult with, and request advice from, legal counsel selected by the Trustee as to any matters arising in connection with this Agreement, the interpretation and administration of any of the provisions of this Agreement or the Trustee's rights and obligations under this Agreement. The Trustee shall incur no liability and shall be fully protected in acting or refraining from acting in accordance with such officer's certificates and opinions of counsel and the written or oral advice of such legal counsel selected by the Trustee in good faith.

(i)     The Trustee shall incur no liability if, by reason of any provision of any present or future law or regulation thereunder, or by any force majeure event, including but not limited to any act of God, natural disaster, epidemic, pandemic, quarantine, shelter-in-place or similar directives, guidance, policy or other action by any governmental authority, accidents, labor disputes, disease, national emergency, loss or malfunction of utilities or computer software or hardware, the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility, acts of war, terrorism, insurrection, revolution or other circumstances beyond its reasonable control, the Trustee shall be prevented or forbidden from doing or performing any act or thing which the terms of this Agreement provide shall or may be done or performed, or by reason of any exercise of, or failure to exercise, any discretion provided for in this Agreement.

(j)     The Trustee shall not be required to take any action hereunder if it shall have reasonably determined, or shall have been advised by its counsel, that such action is

- 13 -

than to verify Grace's identity and/or the authority to open the Trust Account. Grace certifies that it is authorized to disclose the information provided in the Certification Regarding Beneficial Owners of Legal Entity Customers and, to the best of its knowledge, certifies that the information is complete and correct. Grace authorizes the Trustee to share the information provided in the Certification Regarding Beneficial Owners of Legal Entity Customers with any individual authorized to open or update the Trust Account.

(q)     The Trustee shall have no notice of, shall not be subject to, and shall not be required to comply with, any other agreement unless the Trustee in any capacity is a party thereto and has executed the same, even though reference thereto may be made herein.

(r)     Whenever the Trustee (a) receives any amounts, the application or disposition of which is not clearly addressed hereunder, (b) determines that it is uncertain about how to distribute any amounts which it has received, or (c) determines that there is any dispute among the Beneficiaries hereto about how such amounts should be distributed, the Trustee may choose to defer distribution of the amounts which are the subject of such uncertainty or dispute. If the Trustee in good faith believes that the uncertainty or dispute will not be promptly resolved, the Beneficiaries agree that the Trustee shall have the right, at its option, to deposit with, or commence an interpleader proceeding in respect of, such amounts in the Court for a determination by the Court as to the correct application of such amounts hereunder.

(s)     Each of the Beneficiaries hereby agrees that (y) the Trustee (A) except as otherwise expressly set forth herein, has not provided nor will it provide in the future, any advice, counsel or opinion regarding this Agreement or the transactions contemplated hereby, including with respect to the tax, financial, investment, securities law or insurance implications and consequences of the consummation, funding and ongoing administration of this Agreement or the initial and ongoing selection and monitoring of financing arrangements, (B) has not made any investigation as to the accuracy or completeness of any representations, warranties or other obligations of any Person under this Agreement or any other document or instrument (other than the Trustee's representations and warranties, if any, expressly set forth in this Agreement) and shall not have any liability in connection therewith and (C) has not prepared or verified, nor shall it be responsible or liable for, any information, disclosure or other statement in any disclosure or offering document delivered in connection with this Agreement; and (z) it will make its own decisions regarding its rights and protections and will not rely on the Trustee regarding such decisions.

(t)     All written directions given by any Beneficiary to the Trustee relating to the Trust Assets must be in writing, signed by a representative of such Beneficiary identified on Appendix I hereto (an "Authorized Person") and delivered to the Trustee, as such Appendix I may be amended from time to time by a Beneficiary by notice to the Trustee delivered in accordance with this Agreement. Directions may be delivered to the Trustee in person or by U.S. Mail, overnight courier, facsimile or email. Email directions will be deemed authorized and signed by an Authorized Person if sent from an email address provided in Appendix I (Authorized Persons) attached to this Agreement, as the same may be updated from time to time by the Beneficiaries and delivered to the Trustee ("Authorized Persons List"), with visible electronic copies to all other Authorized Persons. The Trustee will have no liability under this Agreement for relying on and acting upon any form of directions which it believes to be genuine. If an

- 15 -

permitted assigns (each, an "Indemnified Person") from and against any and all fees, expenses, damages, losses, claims, liabilities, penalties, causes of action, demands, judgments, taxes (excluding any taxes of the Trustee on, or measured by, compensation received by the Trustee), suits or costs (in each case including reasonable attorneys' fees and expenses, court costs and costs of investigation) of any kind or nature whatsoever arising out of or in connection with this Agreement that may be imposed upon, incurred by or asserted against such Indemnified Person, including in connection with (i) the exercise or performance of any of the Trustee's rights, powers or duties hereunder, and (ii) any enforcement (including any dispute, action, claim or suit brought) by the Trustee of any indemnification or other obligation of Grace (each of the foregoing, a "Claim"); provided, that Grace shall not be required to indemnify an Indemnified Person for any Claim resulting from such Indemnified Person's actual fraud, gross negligence, bad faith or willful misconduct or material breach of this Agreement (in each case, as determined by a final, non-appealable order from a court of competent jurisdiction). Notwithstanding the foregoing, unless and until a final, non-appealable order of a court of competent jurisdiction determines that an Indemnified Person acted with gross negligence, bad faith or willful misconduct or materially breached this Agreement, Grace shall advance or reimburse, as reasonably determinable by the Trustee, any and all amounts due to such Indemnified Person pursuant to the foregoing indemnity.

4.8    Termination / Resignation of the Trustee. The duties, responsibilities, and powers of the Trustee will terminate on the date the Trust is terminated in accordance with this Agreement, or by an order of the Court. Further, the Trustee may resign at any time by giving at least thirty (30) days prior written notice thereof to the Beneficiaries and any Co-Trustee; and the resignation shall become effective upon the delivery of the Trust Assets to the successor Trustee appointed under 4.10. Sections 4.5 through 4.7 above shall survive the termination or assignment of this Agreement and the resignation or removal of the Trustee.

4.9    Replacement. The Trustee may be removed, with or without cause, and replaced upon thirty (30) days written notice by a joint written determination of the Beneficiaries. The removal shall become effective upon the delivery of the Trust Assets to the successor Trustee appointed under 4.10.

4.10    Appointment of Successor Trustee. If, at any time a successor Trustee is required for any reason, such successor shall be jointly appointed in writing by the Beneficiaries. Any successor Trustee appointed hereunder shall execute an instrument accepting such appointment hereunder and shall file such acceptance with the Parties. Thereupon, such successor Trustee shall, without any further act, become vested with all the properties, rights, powers, trusts, and duties of its predecessor in the Trust with like effect as if originally named herein; and a removed or resigning Trustee shall, when requested in writing by the successor Trustee, execute and deliver an instrument or instruments conveying and transferring to such successor Trustee under the Trust all the Trust Assets in the custody of such predecessor Trustee. A successor Trustee appointed under this 4.10 shall be a national banking association, or bank or trust company chartered under the laws of Pennsylvania, having a capital and surplus of at least $200,000,000. If no successor Trustee is timely appointed, and shall have timely accepted such appointment, then the Trustee may, at the sole expense of Grace (including with respect to attorney's fees and expenses), petition the Court for the appointment of a successor Trustee.

5.5     Tax Reporting.  To the extent directed in writing by the Beneficiaries, the Trustee shall also file (or cause to be filed) any other statements, returns, or disclosures, each in the form presented to the Trustee, for filing relating to the Trust that are required by any applicable governmental unit (which the Trustee shall have no duty to verify or confirm).

## ARTICLE VI
## MISCELLANEOUS PROVISIONS

6.1     Amendments and Waivers.  Any provision of this Agreement may be amended or waived only by mutual written consent of the Trustee, the State, and Grace.  Consent will not be unreasonably withheld for an amendment proposed by Grace  the sole effect of which is to further the Trust's qualification as an "environmental remediation trust," provided that such change does not affect the substantive rights or obligations of the Parties or the Trustee. All fees, costs and expenses (including reasonable attorneys' fees, costs and expenses) incurred by the Trustee in connection with any amendment or waiver shall be payable by Grace.

6.2     Tax Treatment.  The Trust created by this Agreement is intended by Grace to be treated as an Environmental Remediation Trust for federal income tax purposes and, to the extent provided by law, this Agreement shall be governed and construed in all respects consistent with such intent.

6.3     Cooperation.  The Trustee shall take such actions and execute such documents as are reasonably requested by the Beneficiaries in writing with respect to effectuating the Settlement Agreement and this Agreement and the transactions contemplated thereby. To the extent that the Beneficiaries request the Trustee to take such an action, the Trustee shall do so at the sole expense of Grace, who agree to separately fund and pay such expense(s).

6.4     Governing Law; Jurisdiction; Jury Trial.  The Trust Assets, the rights, duties, and obligations arising under this Trust Agreement shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth of Pennsylvania without giving effect to the principles of law thereof that would require the application of the laws of any other jurisdiction. Each of the signatories hereto irrevocably submits to the non-exclusive jurisdiction of any State or Federal court sitting in Allegheny County, Pennsylvania in respect of any action or proceeding pertaining solely to the construction of the Trust Agreement or the administration of the Trust. Each party to this agreement irrevocably waives, to the fullest extent permitted by applicable law, any objection or defense that it may now or hereafter have to the laying of venue of any such proceedings pertaining solely to the construction of the Trust Agreement or the administration of the Trust in any such court and any claim that any proceeding brought in any such court has been brought in an inconvenient forum. EACH PARTY HERETO HEREBY WAIVES THE RIGHT THAT IT MAY HAVE TO A TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION PERTAINING SOLELY TO THE CONSTRUCTION OF THE TRUST AGREEMENT OR THE ADMINISTRATION OF THE TRUST, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. EACH OF THE SIGNATORIES HERETO HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS, COMPLAINT AND OTHER PROCESS ISSUED IN ANY SUCH ACTION OR SUIT AND AGREES THAT SERVICE OF SUCH SUMMONS,

Attention: Libby Asbestos Superfund Site Settlement Agreement
nrdp@mt.gov
with a copy (which shall not constitute notice) to: khausrath@mt.gov,
HarleyHarris@mt.gov, and jessica.wilkerson@mt.gov.

As to Grace:

Senior Vice President, Government Relations and EHS
W. R. Grace & Co.
7500 Grace Drive
Columbia MD 21044
with a copy (which shall not constitute notice) to: Asif.Arshad@grace.com;
Tony.Penfold@grace.com; and Anthony.Yoo@grace.com

As to the Trustee:

PNC Bank, N.A.
116 Allegheny Center
Mailstop: P-YB35-02-Z
Pittsburgh, PA 15212

With a copy to:
Deputy General Counsel, Asset Management Group
300 Fifth Avenue
Pittsburgh, PA 15222

6.8     Headings.   The Section headings contained in this Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Agreement or any term or provision hereof.

6.9     Consistency of Agreements and Construction.   To the extent reasonably possible, the provisions of this Agreement shall be interpreted in a manner consistent with the Settlement Agreement. Where the provisions of this Agreement are irreconcilable with the provisions of the Settlement Agreement, the provisions of the Settlement Agreement shall prevail.

6.10    Counterparts.   This Agreement may be executed in multiple counterparts, each of which shall be deemed an original that is binding on the signatory thereto, but all of which together shall constitute one and the same instrument.   Signatures to this Agreement transmitted by facsimile, email, portable document format (or .pdf), or by any other electronic means intended to preserve the original graphic and pictorial appearance of this Agreement shall have the same effect as the physical delivery of the paper document bearing original signatures.

*The remainder of this page is left blank by intention.*

*Signatures are provided on the following page.*

KDW COMMENTS
10/1/22

## APPENDIX I

### AUTHORIZED PERSONS

The following named persons are officers, fiduciaries, agents, partners or other authorized persons duly elected or appointed and authorized to sign written directions on behalf of [State/Grace] under this Agreement. The directions of any one of the following persons is sufficient unless a greater number appears here: _____ **(insert number)**.

| Authorized Person Name | Title | Telephone Number | E-mail Address |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**Above information is <u>required</u> for all authorized individuals**

will contain the identifying information of at least one individual (under section (ii)), and up to five individuals (i.e., one individual under section (ii) and four 25 percent equity holders under section (i)).

You may also be asked to provide a copy of a driver's license or other identifying document for each beneficial owner and controlling party listed on this form.

**Note regarding updating information:** From time to time the information provided in this form may need to be updated due to changes in the ownership or controlling party of the legal entity Client or its beneficial owners. Further, from time to time PNC may be required to verify the continued accuracy of the information provided. .

## II. CLIENT CERTIFICATION FOR EXCLUDED LEGAL ENTITIES AND NON-PROFIT CORPORATIONS

**Excluded Legal Entity Certification.** Below is a list of Client entities that are **not** required to complete this form. Please review the list below carefully. If you determine that Client entity is an excluded legal entity, please complete the certification below.

**IF CLIENT CHECKS A BOX BELOW, STOP HERE. YOU DO NOT NEED TO COMPLETE THE REST OF THIS FORM.**

Client certifies, by checking the applicable box below, that it is:
- ☐ a trust created pursuant to a trust agreement or other contractual arrangement (i.e., the trust was not created by a filing with a Secretary of State or similar office - e.g., a statutory business trusts)
- ☐ a publicly held company traded on a U.S. stock exchange
- ☐ a majority-owned subsidiary of a publicly held company traded on a U.S. stock exchange
- ☐ registered with the Securities and Exchange Commission as a registered investment adviser
- ☐ registered with the Securities and Exchange Commission as a registered investment companies
- ☐ a U.S. government agency or instrumentality
- ☐ a public accounting firm registered under Section 102 of the Sarbanes-Oxley Act
- ☐ an entity established under the laws of the U.S. or any State, or of any political subdivision of any State or under an interstate compact
- ☐ opening an account for the purpose of participating in an employee benefit plan under the Employment Retirement Income Security Act of 1974
- ☐ a state-regulated insurance company
- ☐ a "U.S. financial institution" regulated by a federal functional regulator (i.e., federally regulated banks, brokers or dealers, futures commissions merchants and introducing brokers in commodities).
- ☐ a pooled investment vehicle operated or advised by a "U.S. financial institution" or an SEC registered investment adviser

**For U.S. Persons:** *Indicate if you are a U.S. Citizen, U.S. Resident Alien or Immigrant Refugee and provide Social Security Number (SSN)*
**For Non-U.S. Persons:** *Provide SSN, Individual Taxpayer Identification Number (ITIN), Passport or Other Acceptable ID Information*

| Name | % of Owner-ship | Date of Birth | Residential Street Address | For U.S. Persons: | For Non-U.S. Persons: |
|---|---|---|---|---|---|
| | | | | ☐ U.S. Citizen<br><br>☐ U.S. Resident Alien<br><br>☐ Immigrant Refugee<br><br><br>SSN #:<br><br>_____ | **Passport or Other Acceptable ID** Type:<br><br>_____<br><br>ID #:<br><br>_____<br><br>Country of Issuance:<br><br>_____<br><br>SSN / ITIN #:<br><br>_____ |
| | | | | ☐ U.S. Citizen<br><br>☐ U.S. Resident Alien<br><br>☐ Immigrant Refugee<br><br><br>SSN #:<br><br>_____ | **Passport or Other Acceptable ID** Type:_____<br><br>ID #:<br><br>_____<br><br>Country of Issuance:<br><br>_____<br><br>SSN / ITIN #:<br><br>_____ |
| | | | | ☐ U.S. Citizen<br><br>☐ U.S. Resident Alien<br><br>☐ Immigrant Refugee<br><br><br>SSN #:<br><br>_____ | **Passport or Other Acceptable ID** Type:_____<br><br>ID #:<br><br>_____<br><br>Country of Issuance:<br><br>_____<br><br>SSN / ITIN #: |

**Controlling Party:** The following information for <u>one individual</u> with significant responsibility for managing the legal entity listed above, such as:

- An executive officer or senior manager (e.g., Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, General Partner, Managing Member, President, Vice President, Treasurer); or
- Any other individual who regularly performs similar functions.
  (If appropriate, an individual listed under Section II(c) above may also be listed in this Section III(d)).

**For U.S. Persons:** *Indicate if you are a U.S. Citizen, U.S. Resident Alien or Immigrant Refugee and provide Social Security Number (SSN)*

**For Non-U.S. Persons:** *Provide SSN, Individual Taxpayer Identification Number (ITIN), Passport or Other Acceptable ID Information*

| Name | Title | Date of Birth | Residential Street Address | For U.S. Persons: | For Non-U.S. Persons: |
|---|---|---|---|---|---|
| | | | | ☐ U.S. Citizen<br><br>☐ U.S. Resident Alien<br><br>☐ Immigrant Refugee<br><br><br>SSN #:<br>_____ | **Passport or Other Acceptable ID** Type:_____<br><br>ID #:<br>_____<br><br>Country of Issuance:<br><br>_____<br>SSN / ITIN #:<br>_____ |

**Exhibit D - KDID Spillway Replacement Trust Form**

EXHIBIT D

_____, 2022

## TRUST AGREEMENT

### KDID Spillway Replacement Trust

This Environmental Remediation Trust Agreement (the "Agreement") is made as of this _____ day of _____ 2022, by and among W.R. Grace & Co. and Kootenai Development Company ("KDC") (collectively herein "Grace"), as settlor and beneficiary; the State of Montana on behalf of its agencies and departments named in the Settlement Agreement (the "State") as beneficiary, (each, individually, a "Party," and collectively, the "Parties"); and PNC Bank, National Association, not in its individual capacity, but solely as Trustee (the "Trustee").

## RECITALS

WHEREAS, Grace and the State have entered into a Settlement Agreement that provides for the formation of this trust, to be administered in the manner described herein.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants and agreements contained herein, and pursuant to the Settlement Agreement, the Parties and the Trustee hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1    Definitions. The following terms as used in this Agreement shall have the definitions given below:

1.1.1    "Account Statement" shall have the meaning given in Section 5.1.

1.1.2    "Agreement" shall be this Trust Agreement.

1.1.3    "Beneficiaries" means the State and Grace.

1.1.4    "Condition of Early Termination" shall mean each of the conditions of termination set out in Sections 6(a)(iii), 6(d)(i), or 6(e) of the Settlement Agreement. The terms in the Settlement Agreement shall control whether a Condition of Early Termination exists, however, such conditions are summarized generally here for convenience:

(a)    Section 6(a)(iii): United States Environmental Protection Agency declines the opportunity to become a primary beneficiary of the Surety Bond or Financial Assurance Trusts, and requests and requires, and a Grace Party provides, financial assurance for KDID O&M and/or KDID Spillway Work as part of an agreement, decree, or order that exceeds the value and scope of the financial assurance provided in this Settlement Agreement for KDID O&M and/or KDID Spillway Work;

1.1.15 "Nonperformance Determination" shall have the meaning set forth in the Settlement Agreement.

1.1.16 "Parties" under this Agreement shall have the meaning given in the preamble.

1.1.17 "Settlement Agreement" means the Settlement Agreement between W.R. Grace & Co. and the State, dated as of _____, 2022, negotiated and entered to settle the claim number 18496-1 in *In re W.R. Grace & Co., et al.*, before the United States Bankruptcy Court for the District of Delaware, under Case No. 01-011139 (AMC), as amended by W.R. Grace & Co. and the State hereafter, in accordance with the terms of the Settlement Agreement.

1.1.18 "State" shall have the meaning given in the preamble.

1.1.19 "Statement" shall have the meaning given in Section 3.2.1(a).

1.1.20 "Trust" means the KDID Spillway Replacement Trust established pursuant to this Agreement.

1.1.21 "Trust Assets" means the funds transferred to, or earned by, the Trust pursuant to this Agreement.

1.1.22 "Trustee" means the trustee of the Trust. At any time that multiple trustees are acting, the term "Trustee" shall apply to each of the co-trustees.

1.2    Other. To the extent a term in this Agreement is not defined above, to the extent practicable, such term shall have the meaning provided, if any, in the Settlement Agreement.

## ARTICLE II
## CREATION AND MANAGEMENT OF TRUST ASSETS

2.1    Objectives and Purposes.

2.1.1    General. The exclusive objectives and purposes of the Trust are to collect and disburse funds for KDID Spillway Work Costs, as required under the Settlement Agreement, with no objective or authority to engage in any trade or business. Subject to Section 3.3.1 of this Agreement, all payments and disbursements from the Trust by the Trustee shall be made and applied solely for these purposes, it being understood and agreed that any payments to the Trustee pursuant to this Agreement are in furtherance of such purposes; and at no time shall the Trust (or the Trustee on behalf of the Trust) conduct investment or business activities that compromise these purposes.

2.1.2    Tax Status. Initially, Grace intends, but is not required to ensure, that the Trust constitutes an "environmental remediation trust," as provided by Treasury Regulations §301.7701-4(e); and the Trust shall at all times be administered, and all provisions of this agreement shall be construed, in a manner that is consistent with such intent. At any time, however, , Grace may take such steps as are required to elect to treat the Trust as a "qualified settlement fund," as

2.3     Investment and Safekeeping of Trust Assets.

2.3.1    Segregation of Trust Assets.  The Trust Assets shall be held in trust and segregated from all, and shall not be comingled with any, other assets of Grace, the State or the Trustee.

2.3.2    Investment Requirements.  The Trustee shall have the authority to invest the Trust Assets in such a manner as the Trustee deems appropriate in the Trustee's discretion and in accordance with the guidelines applicable to the Trust Account set forth in this Section 2.3 (the "Investment Policy"), as may be amended in writing from time to time by Grace, the State and the Trustee. The Trustee shall consult initially and from time to time with Grace and the State regarding the nature and allocation of investments of the Trust Assets.  All investment transactions effected for the Trust Account shall be deemed in compliance with the Investment Policy unless Grace or the State notifies Trustee in writing of its objection within sixty (60) days of its receipt of the most recent Account Statement pursuant to Section 5.1 of this Agreement.   The compliance of an investment with the Investment Policy shall be determined on the date of purchase, based on the market value and asset class or type as of that date compared to the value of the Trust Account as of the most recent valuation date.

2.3.3    Investment Provisions.

(a)     Cash Sweep Vehicle. Grace authorizes the Trustee to automatically sweep uninvested cash balances in the Trust Account into (i) any money market mutual fund that (A) complies with the criteria set forth in (I) Securities and Exchange Commission Rule 2a-7 under the Investment Company Act of 1940, as amended, or (II) Securities and Exchange Commission Rule 3c-7 under the Investment Company Act of 1940, as amended, and (B) has portfolio assets of at least $5,000,000,000 or (ii) any bank deposit account offered by a commercial bank which has a combined capital and surplus and undivided profits of not less than $500,000,000, in each chosen by Trustee (referred to as "sweep vehicles"), which may include sweep vehicles advised by the Trustee and/or its affiliates or deposit accounts at the Trustee or an affiliated bank.  Grace understands that Trustee will derive financial benefits from affiliated sweep vehicles (including PNC Bank, National Association deposit sweep accounts), which benefits are in addition to the fees set forth in the Schedule of Account Fees described in Section 4.5 of this Agreement.

(b)     Investments in Other Securities.  Grace authorizes the Trustee to invest in: (i) direct obligations of, or obligations the principal of and interest on which are directly and fully guaranteed or insured by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America); (ii) investments in commercial paper having, at such date of acquisition, a credit rating of at least A-2 from S&P or P-2 from Moody's; (iii) repurchase agreements with a term of not more than 180 days for securities described in clause (i) of this sentence and entered into with a financial institution satisfying the criteria described in clause (ii) of Section 2.3.3(a); (iv) corporate debt obligations with a Moody's rating of at least A3 or an S&P rating of at least A-, or their equivalent; (v) shares or units issued by a company that is registered as an investment company under the Investment Company Act of 1940, as amended, that is traded on a national securities exchange and has a rating of at least four stars from Morningstar, Inc.; and (vi) any other security approved in writing by Grace and the State (collectively, "Other Securities").   "Moody's" means Moody's Investors

- 5 -

at any time by directions to the Trustee. If the Trustee buys or sells securities for which an affiliated broker acts as a dealer or underwriter, the Trustee may buy those securities from, or sell those securities to, either the affiliated broker or a member of an underwriting syndicate of which an affiliated broker is a member. Grace consents to brokers selected by the Trustee retaining commissions, including an affiliate of the Trustee. Grace further agrees that, if execution is through an affiliated broker, the affiliated broker is entitled to receive and retain, without credit or offset, brokerage commissions, commission equivalents, mark-ups, mark-downs and dealer spreads on transactions effected for the Trust Account, in accordance with the affiliated broker's standard fee schedules. Upon request, the Trustee will provide additional information to Grace concerning commissions, commission equivalents, mark-ups and mark-downs and other transaction costs. Grace understands and agrees that the Trustee has an indirect financial incentive to select an affiliated broker to execute transactions in the Trust Account, as it results in compensation to its affiliate.

(g) <u>Brokerage Fees and Pricing</u>. The Trustee will seek to obtain best execution in selection of brokers (both affiliated and unaffiliated, as applicable) for execution of securities trades for the Trust Account. When selecting brokers the Trustee may take into account the full range and quality of brokerage services including execution capability, trading expertise, accuracy of execution, commission rates, research, reputation and integrity, fairness in resolving disputes, financial responsibility, responsiveness, and any other relevant factors. The Trustee also may consider brokerage and research services provided by brokers even though the Trust Account may not benefit from such research. Broker commission rate is one component of price and a factor considered with other factors. The Trustee will not be obligated to seek the lowest commission rate in advance of a Trust Account transaction or to select brokers based on its purported commission rate. Accordingly, the Trustee shall not be deemed to have acted unlawfully solely for causing Grace to pay a higher commission for a securities trade than other brokers would have charged for the same transaction.

(h) <u>Aggregation of Trades</u>. The Trustee may, in its sole discretion, but is not required to, combine purchases and sales of securities held in the Trust Account with purchases and sales occurring on the same day of the same securities held in accounts of other clients of the Trustee (or its affiliates). When securities transactions are combined, the actual prices applicable to the combined transactions may be averaged, and the Trust Account and the other accounts may be deemed to have purchased or sold their proportionate shares of the securities involved at the average price then calculated. Grace understands that the Trustee may not be able to seek better pricing or lower costs on securities transactions by combining Trust Account securities transactions as described in this Section 2.3.3(h) and that combined securities transactions may or may not benefit the Trust Account.

2.3.4 <u>Construction of Investment Authority</u>. Nothing in this Section shall be construed as authorizing the Trustee to cause the Trust to carry on any business or to divide the gains therefrom, including the business of an investment company, or a company "controlled" by an "investment company," required to register as such under the Investment Company Act of 1940, as amended. The sole purpose of this Section 2.3 is to authorize the investment of the Trust Assets or any portions thereof as may be reasonably prudent pending use of the Trust Assets for the purposes of the Trust. Each of the Beneficiaries acknowledge and agree to the provisions of Section 2.3.

in Section 3.1.3 or Section 3.1.4, which governs the State's contingent rights to distribution), as the case may be, in accordance with the following provisions.

3.2.1    <u>Distribution Request</u>. The Beneficiary seeking the distribution shall submit to the Trustee and the other Beneficiary:

(a)    A statement setting forth the exact amount of the distribution (the "Statement"), upon which the Trustee may conclusively rely;

(b)    A written certification that the distribution is for KDID Spillway Work Costs within the restricted purposes of the Trust and the Settlement Agreement;

(c)    For completed work that has already been paid for by the Beneficiary seeking distribution, the invoices and receipts sufficient to demonstrate that work (or the relevant portion thereof) has been performed and payment has been made (which the Trustee shall have no duty to review);

(d)    For distributions directly to a contractor or vendor (without advance payment by the Beneficiary seeking distribution), a copy of the contract for the performance of the work accompanied by the relevant invoice(s) for payment due to the specified contractor or vendor (which the Trustee shall have no duty to review) and

(e)    Trustee shall have no responsibility to confirm receipt of any or all required supporting documentation for each distribution or the completeness of any such supporting documentation provided with each distribution request other than to confirm a distribution request has been received from an authorized Beneficiary.

3.2.2    <u>Distribution Payment</u>. Within three (3) business days after receipt of a distribution request submitted in accordance with Section 3.2.1, the Trustee shall issue such distribution in accordance with the Statement.

3.3    <u>Terminating Distributions</u>. Upon the conditions, and to the extent, provided in this Section 3.3, the remaining Trust Assets shall be distributed in accordance with this Section 3.3; and the Trust shall terminate.

3.3.1    <u>By Agreement</u>. At any time after the year 2072 but prior to the full termination of the Trust under Section 3.3.2 or Section 3.3.3, the Beneficiaries may agree, considering all of the relevant circumstances in existence at the time – including the value of the Trust versus the cost of a replacement KDID Spillway – that the Trust should be used for a reasonable and prudent purpose (other than replacement or significant repair of the KDID Spillway) related to the KDID Spillway or the KDID. In that event, the Trustee shall effectuate such terminating distributions as the Beneficiaries jointly direct in writing.

3.3.2    <u>Upon Expiration of Term</u>. Consistent with the terms of the Settlement Agreement, the Trust shall terminate on the date that is 110 years from the date of this Agreement. The Trustee shall not unduly prolong the duration of the Trust and shall, at the expiration of the period described in the immediately preceding sentence, endeavor to resolve, settle, or otherwise dispose of all claims against the Trust pursuant to written instructions from the Beneficiaries, and

extent directed by the Beneficiaries in writing, the Settlement Agreement. Additionally, the Trustee may, among other things, invest the Trust Assets as provided in this Agreement and file documents in Court on behalf of itself and the Trust.

4.4.3   Limitations on the Trustee's Authority. The Trust and the Trustee shall not and are not authorized to engage in any trade or business with respect to the Trust Assets or any proceeds therefrom. Without limiting the Trustee's right to payment of its fees, expenses and indemnities hereunder, the Trustee shall not make distributions for purposes other than as expressly set forth in Article III of this Agreement. Notwithstanding anything to the contrary in this Agreement, the Settlement Agreement, 20 Pa. C.S.§ 7780.5, 20 Pa. C.S.§ 7780.6 or any other law, the Trustee shall not have the power to resolve any dispute between or among the Beneficiaries, the Parties and/or any other Person regarding the interpretation, application or enforcement of this Agreement or the Settlement Agreement and/or the administration of the Trust, including through mediation, arbitration or other alternative dispute resolution procedures.

4.5   Compensation. The Trustee shall be entitled to receive compensation from Grace for its services under this Agreement in accordance with the Schedule of Account Fees, a copy of which the Trustee delivered to the Beneficiaries with this Agreement. Additionally, brokerage fees and commissions may be charged to the Trust Account in connection with certain securities trades executed by the Trustee and subadvisors in accordance with this Agreement. In consideration for receiving commissions from the Trust Account, brokerage firms may provide Trustee with research, products and other services which may be used to assist Trustee in providing investment advice the Beneficiaries and other clients. Grace authorizes the Trustee to debit the Trust Account (or such other PNC Bank account owned by Grace as Grace may request) for the Trustee's compensation in accordance with the Schedule of Account Fees then in effect and all of the other costs and expenses described above. Within forty-five (45) days after receipt by Grace of a Statement from the Trustee setting forth (a) the amount of any compensation, fees or expenses due to the Trustee, or (b) any amount debited from the Trust Account during the Statement period, Grace shall transfer funds in the amount of such debit, compensations fees or expenses to the Trust to be added to and included as part of the Trust Assets in order to reimburse the Trust in full for any amounts debited from the Trust Account by the Trustee pursuant to this Section 4.5, Section 4.6, Section 4.7 or Article VI. Within one (1) day of the expiration of such forty-five (45) day period, Grace shall notify the State if Grace does not transfer such additional funds to the Trust in accordance with the immediately preceding sentence.

4.6   Limitation on Liability of Trustee.

The following provisions shall govern the Trustee's rights, powers, obligations and duties under this Agreement, notwithstanding anything herein to the contrary:

(a)   Absent actual fraud, bad faith, willful misconduct, gross negligence or a material breach of its obligations under this Agreement as established by a final judgement of the Court no longer subject to appeal: (i) the Trustee shall incur no liability for any action taken or omitted to be taken in accordance with any instruction, direction or request of a Beneficiary that is not inconsistent with the terms of this Agreement, including with regard to distributions under Article III; and (ii) the Trustee shall not be liable for any loss to the Trust or any claim of inequality, partiality or unreasonableness resulting from any action taken in accordance with such direction.

- 11 -

irrespective of whether the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(g)     The Trustee shall be entitled to rely conclusively, without investigation or other action on its part, on statements opinions, certificates, reports, directions, signatures, instruments, notices, advice, requests, waivers, consents, receipts, resolutions, bonds, calculations and other documents purported to be received from any Beneficiary, as contemplated by this Agreement, not only as to due execution, validity and effectiveness, but also as to the truth and accuracy of any information contained therein, and such reliance shall not constitute negligence (or gross negligence), bad faith or willful misconduct in connection with the Trustee's handling of funds or otherwise, and the Trustee shall not be liable or accountable to any Person by reason of such reliance. The Trustee shall not be responsible for the content or accuracy of any such documents provided to the Trustee, and shall not be required to recalculate, certify, or verify any information contained therein.

(h)     The Trustee may, at the expense of the Beneficiaries (i) request, rely on and act in accordance with officer's certificates of the Beneficiaries and opinions of counsel, and (ii) consult with, and request advice from, legal counsel selected by the Trustee as to any matters arising in connection with this Agreement, the interpretation and administration of any of the provisions of this Agreement or the Trustee's rights and obligations under this Agreement. The Trustee shall incur no liability and shall be fully protected in acting or refraining from acting in accordance with such officer's certificates and opinions of counsel and the written or oral advice of such legal counsel selected by the Trustee in good faith.

(i)     The Trustee shall incur no liability if, by reason of any provision of any present or future law or regulation thereunder, or by any force majeure event, including but not limited to any act of God, natural disaster, epidemic, pandemic, quarantine, shelter-in-place or similar directives, guidance, policy or other action by any governmental authority, accidents, labor disputes, disease, national emergency, loss or malfunction of utilities or computer software or hardware, the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility, acts of war, terrorism, insurrection, revolution or other circumstances beyond its reasonable control, the Trustee shall be prevented or forbidden from doing or performing any act or thing which the terms of this Agreement provide shall or may be done or performed, or by reason of any exercise of, or failure to exercise, any discretion provided for in this Agreement.

(j)     The Trustee shall not be required to take any action hereunder if it shall have reasonably determined, or shall have been advised by its counsel, that such action is likely to result in liability on the part of the Trustee or is contrary to the terms hereof or is not in accordance with applicable laws.

(k)     Any permissive or discretionary act or privilege of, or right or power conferred upon, the Trustee enumerated in this Agreement shall not be deemed to be or otherwise construed as a duty or obligation, and the Trustee shall not be personally liable or accountable for the performance of any such act, privilege, right or power except as otherwise expressly provided herein.

- 13 -

(q)    The Trustee shall have no notice of, shall not be subject to, and shall not be required to comply with, any other agreement unless the Trustee in any capacity is a party thereto and has executed the same, even though reference thereto may be made herein.

(r)    Whenever the Trustee (a) receives any amounts, the application or disposition of which is not clearly addressed hereunder, (b) determines that it is uncertain about how to distribute any amounts which it has received, or (c) determines that there is any dispute among the Beneficiaries hereto about how such amounts should be distributed, the Trustee may choose to defer distribution of the amounts which are the subject of such uncertainty or dispute. If the Trustee in good faith believes that the uncertainty or dispute will not be promptly resolved, the Beneficiaries agree that the Trustee shall have the right, at its option, to deposit with, or commence an interpleader proceeding in respect of, such amounts in the Court for a determination by the Court as to the correct application of such amounts hereunder.

(s)    Each of the Beneficiaries hereby agrees that (y) the Trustee (A) except as otherwise expressly set forth herein, has not provided nor will it provide in the future, any advice, counsel or opinion regarding this Agreement or the transactions contemplated hereby, including with respect to the tax, financial, investment, securities law or insurance implications and consequences of the consummation, funding and ongoing administration of this Agreement or the initial and ongoing selection and monitoring of financing arrangements, (B) has not made any investigation as to the accuracy or completeness of any representations, warranties or other obligations of any Person under this Agreement or any other document or instrument (other than the Trustee's representations and warranties, if any, expressly set forth in this Agreement) and shall not have any liability in connection therewith and (C) has not prepared or verified, nor shall it be responsible or liable for, any information, disclosure or other statement in any disclosure or offering document delivered in connection with this Agreement; and (z) it will make its own decisions regarding its rights and protections and will not rely on the Trustee regarding such decisions.

(t)    All written directions given by any Beneficiary to the Trustee relating to the Trust Assets must be in writing, signed by a representative of such Beneficiary identified on Appendix I hereto (an "Authorized Person") and delivered to the Trustee, as such Appendix I may be amended from time to time by a Beneficiary by notice to the Trustee delivered in accordance with this Agreement. Directions may be delivered to the Trustee in person or by U.S. Mail, overnight courier, facsimile or email. Email directions will be deemed authorized and signed by an Authorized Person if sent from an email address provided in Appendix I (Authorized Persons) attached to this Agreement, as the same may be updated from time to time by the Beneficiaries and delivered to the Trustee ("Authorized Persons List"), with visible electronic copies to all other Authorized Persons. The Trustee will have no liability under this Agreement for relying on and acting upon any form of directions which it believes to be genuine. If an Authorized Person uses email to send directions to the Trustee, the applicable Beneficiary will cause all Authorized Persons to send emails from the email address provided in the Authorized Persons List. The Trustee will assume that all emails sent from a designated email address have been authorized and sent by an Authorized Person, until either Beneficiary notifies the Trustee by delivery of an updated Authorized Persons List that the email address is no longer valid. All emails sent by the Trustee to an Authorized Person's designated email address will be deemed delivered when sent by the Trustee; however, nothing in this Section shall reduce the Trustee's obligations

- 15 -

or duties hereunder, and (ii) any enforcement (including any dispute, action, claim or suit brought) by the Trustee of any indemnification or other obligation of Grace (each of the foregoing, a "Claim"); provided, that Grace shall not be required to indemnify an Indemnified Person for any Claim resulting from such Indemnified Person's actual fraud, gross negligence, bad faith or willful misconduct or material breach of this Agreement (in each case, as determined by a final, non-appealable order from a court of competent jurisdiction). Notwithstanding the foregoing, unless and until a final, non-appealable order of a court of competent jurisdiction determines that an Indemnified Person acted with gross negligence, bad faith or willful misconduct or materially breached this Agreement, Grace shall advance or reimburse, as reasonably determinable by the Trustee, any and all amounts due to such Indemnified Person pursuant to the foregoing indemnity.

4.8    Termination / Resignation of the Trustee. The duties, responsibilities, and powers of the Trustee will terminate on the date the Trust is terminated in accordance with this Agreement, or by an order of the Court. Further, the Trustee may resign at any time by giving at least thirty (30) days prior written notice thereof to the Beneficiaries and any Co-Trustee; and the resignation shall become effective upon the delivery of the Trust Assets to the successor Trustee appointed under 4.10. Sections 4.5 through 4.7 above shall survive the termination or assignment of this Agreement and the resignation or removal of the Trustee.

4.9    Replacement. The Trustee may be removed, with or without cause, and replaced upon thirty (30) days written notice by a joint written determination of the Beneficiaries. The removal shall become effective upon the delivery of the Trust Assets to the successor Trustee appointed under 4.10.

4.10    Appointment of Successor Trustee. If, at any time a successor Trustee is required for any reason, such successor shall be jointly appointed in writing by the Beneficiaries. Any successor Trustee appointed hereunder shall execute an instrument accepting such appointment hereunder and shall file such acceptance with the Parties. Thereupon, such successor Trustee shall, without any further act, become vested with all the properties, rights, powers, trusts, and duties of its predecessor in the Trust with like effect as if originally named herein; and a removed or resigning Trustee shall, when requested in writing by the successor Trustee, execute and deliver an instrument or instruments conveying and transferring to such successor Trustee under the Trust all the Trust Assets in the custody of such predecessor Trustee. A successor Trustee appointed under this 4.10 shall be a national banking association, or bank or trust company chartered under the laws of Pennsylvania, having a capital and surplus of at least $200,000,000. If no successor Trustee is timely appointed, and shall have timely accepted such appointment, then the Trustee may, at the sole expense of Grace (including with respect to attorney's fees and expenses), petition the Court for the appointment of a successor Trustee.

4.11    No Bond. Notwithstanding any state law to the contrary, the Trustee, including any successor Trustee, shall be exempt from giving any bond or other security in any jurisdiction.

## ARTICLE V
## TRUST RECORDS, TAX REPORTING

5.1    Accounting. The Trustee will provide quarterly statements to the Beneficiaries that include a listing of all transactions, receipts, and disbursements during the preceding quarter,

**ARTICLE VI**
**MISCELLANEOUS PROVISIONS**

6.1     Amendments and Waivers.  Any provision of this Agreement may be amended or waived only by mutual written consent of the Trustee, the State, and Grace.  Consent will not be unreasonably withheld for an amendment proposed by Grace  the sole effect of which is to further the Trust's qualification as an "environmental remediation trust," provided that such change does not affect the substantive rights or obligations of the Parties or the Trustee. All fees, costs and expenses (including reasonable attorneys' fees, costs and expenses) incurred by the Trustee in connection with any amendment or waiver shall be payable by Grace.

6.2     Tax Treatment.  The Trust created by this Agreement is intended by Grace to be treated as an Environmental Remediation Trust for federal income tax purposes and, to the extent provided by law, this Agreement shall be governed and construed in all respects consistent with such intent.

6.3     Cooperation.  The Trustee shall take such actions and execute such documents as are reasonably requested by the Beneficiaries in writing with respect to effectuating the Settlement Agreement and this Agreement and the transactions contemplated thereby. To the extent that the Beneficiaries request the Trustee to take such an action, the Trustee shall do so at the sole expense of Grace, who agree to separately fund and pay such expense(s).

6.4     Governing Law; Jurisdiction; Jury Trial.  The Trust Assets, the rights, duties, and obligations arising under this Trust Agreement shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth of Pennsylvania without giving effect to the principles of law thereof that would require the application of the laws of any other jurisdiction. Each of the signatories hereto irrevocably submits to the non-exclusive jurisdiction of any State or Federal court sitting in Allegheny County, Pennsylvania in respect of any action or proceeding pertaining solely to the construction of the Trust Agreement or the administration of the Trust. Each party to this agreement irrevocably waives, to the fullest extent permitted by applicable law, any objection or defense that it may now or hereafter have to the laying of venue of any such proceedings pertaining solely to the construction of the Trust Agreement or the administration of the Trust in any such court and any claim that any proceeding brought in any such court has been brought in an inconvenient forum. EACH PARTY HERETO HEREBY WAIVES THE RIGHT THAT IT MAY HAVE TO A TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION PERTAINING SOLELY TO THE CONSTRUCTION OF THE TRUST AGREEMENT OR THE ADMINISTRATION OF THE TRUST, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. EACH OF THE SIGNATORIES HERETO HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS, COMPLAINT AND OTHER PROCESS ISSUED IN ANY SUCH ACTION OR SUIT AND AGREES THAT SERVICE OF SUCH SUMMONS, COMPLAINT AND OTHER PROCESS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO IT AT ITS NOTICE ADDRESS AS PROVIDED HEREIN AND THAT SERVICE SO MADE SHALL BE DEEMED COMPLETED UPON SIGNATORY'S ACTUAL RECEIPT THEREOF. Nothing in this Paragraph 6.4 shall be construed to establish choice of law,

KDW COMMENTS
10/1/22

## APPENDIX I

### AUTHORIZED PERSONS

The following named persons are officers, fiduciaries, agents, partners or other authorized persons duly elected or appointed and authorized to sign written directions on behalf of [State/Grace] under this Agreement. The directions of any one of the following persons is sufficient unless a greater number appears here: _____ **(insert number)**.

| Authorized Person Name | Title | Telephone Number | E-mail Address |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**Above information is <u>required</u> for all authorized individuals**

will contain the identifying information of at least one individual (under section (ii)), and up to five individuals (i.e., one individual under section (ii) and four 25 percent equity holders under section (i)).

You may also be asked to provide a copy of a driver's license or other identifying document for each beneficial owner and controlling party listed on this form.

**Note regarding updating information:** From time to time the information provided in this form may need to be updated due to changes in the ownership or controlling party of the legal entity Client or its beneficial owners. Further, from time to time PNC may be required to verify the continued accuracy of the information provided. .

## II. CLIENT CERTIFICATION FOR EXCLUDED LEGAL ENTITIES AND NON-PROFIT CORPORATIONS

**Excluded Legal Entity Certification.** Below is a list of Client entities that are **not** required to complete this form. Please review the list below carefully. If you determine that Client entity is an excluded legal entity, please complete the certification below.

**IF CLIENT CHECKS A BOX BELOW, STOP HERE. YOU DO NOT NEED TO COMPLETE THE REST OF THIS FORM.**

Client certifies, by checking the applicable box below, that it is:
- ☐ a trust created pursuant to a trust agreement or other contractual arrangement (i.e., the trust was not created by a filing with a Secretary of State or similar office - e.g., a statutory business trusts)
- ☐ a publicly held company traded on a U.S. stock exchange
- ☐ a majority-owned subsidiary of a publicly held company traded on a U.S. stock exchange
- ☐ registered with the Securities and Exchange Commission as a registered investment adviser
- ☐ registered with the Securities and Exchange Commission as a registered investment companies
- ☐ a U.S. government agency or instrumentality
- ☐ a public accounting firm registered under Section 102 of the Sarbanes-Oxley Act
- ☐ an entity established under the laws of the U.S. or any State, or of any political subdivision of any State or under an interstate compact
- ☐ opening an account for the purpose of participating in an employee benefit plan under the Employment Retirement Income Security Act of 1974
- ☐ a state-regulated insurance company
- ☐ a "U.S. financial institution" regulated by a federal functional regulator (i.e., federally regulated banks, brokers or dealers, futures commissions merchants and introducing brokers in commodities).
- ☐ a pooled investment vehicle operated or advised by a "U.S. financial institution" or an SEC registered investment adviser

**For U.S. Persons:** *Indicate if you are a U.S. Citizen, U.S. Resident Alien or Immigrant Refugee and provide Social Security Number (SSN)*
**For Non-U.S. Persons:** *Provide SSN, Individual Taxpayer Identification Number (ITIN), Passport or Other Acceptable ID Information*

| Name | % of Owner-ship | Date of Birth | Residential Street Address | For U.S. Persons: | For Non-U.S. Persons: |
|------|------|------|------|------|------|
|  |  |  |  | ☐ U.S. Citizen<br><br>☐ U.S. Resident Alien<br><br>☐ Immigrant Refugee<br><br><br>SSN #:<br><br>_____ | **Passport or Other Acceptable ID** Type:<br><br>_____<br><br>ID #:<br><br>_____<br><br>Country of Issuance:<br><br>_____<br><br>SSN / ITIN #:<br><br>_____ |
|  |  |  |  | ☐ U.S. Citizen<br><br>☐ U.S. Resident Alien<br><br>☐ Immigrant Refugee<br><br><br>SSN #:<br><br>_____ | **Passport or Other Acceptable ID** Type:_____<br>ID #:<br><br>_____<br><br>Country of Issuance:<br><br>_____<br><br>SSN / ITIN #:<br><br>_____ |
|  |  |  |  | ☐ U.S. Citizen<br><br>☐ U.S. Resident Alien<br><br>☐ Immigrant Refugee<br><br><br>SSN #:<br><br>_____ | **Passport or Other Acceptable ID** Type:_____<br>ID #:<br><br>_____<br><br>Country of Issuance:<br><br>_____<br><br>SSN / ITIN #:<br><br>_____ |

**Controlling Party:** The following information for <u>one individual</u> with significant responsibility for managing the legal entity listed above, such as:

- An executive officer or senior manager (e.g., Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, General Partner, Managing Member, President, Vice President, Treasurer); or
- Any other individual who regularly performs similar functions.
  (If appropriate, an individual listed under Section II(c) above may also be listed in this Section III(d)).

**For U.S. Persons:** *Indicate if you are a U.S. Citizen, U.S. Resident Alien or Immigrant Refugee and provide Social Security Number (SSN)*

**For Non-U.S. Persons:** *Provide SSN, Individual Taxpayer Identification Number (ITIN), Passport or Other Acceptable ID Information*

| Name | Title | Date of Birth | Residential Street Address | For U.S. Persons: | For Non-U.S. Persons: |
|---|---|---|---|---|---|
| | | | | ☐ U.S. Citizen<br><br>☐ U.S. Resident Alien<br><br>☐ Immigrant Refugee<br><br><br>SSN #:<br><br>_____ | **Passport or Other Acceptable ID** Type:_____<br><br>ID #:<br><br>_____<br><br>Country of Issuance:<br><br>_____<br><br>SSN / ITIN #:<br><br>_____ |

**Exhibit E -  Alleged Injury and Examples of Restoration Options to Address Alleged State NRD at OU3**

**Alleged Injury and Examples of Restoration Options
to Address Alleged State Natural Resource Damages at or Relating to
Operable Unit 3 of the Libby Asbestos Superfund Site**

This report provides information and analysis in support of the State of Montana (State) and
W.R. Grace & Co. (Grace)'s belief that a settlement payment of $18.5 million is sufficient to
restore, replace, rehabilitate, and/or acquire the equivalent of injured natural resources within the
State's trusteeship, and therefore will compensate the public for the State's claim for alleged
injuries to natural resources resulting from the release of hazardous substances in or related to
Operable Unit 3 (OU3) of the Libby Asbestos Superfund Site (Site).[1] This report includes an
overview of the nature of the alleged injuries and service losses, with references to related
studies and data; it is not an exhaustive summary of this information. This report also describes
the types of restoration projects that could be implemented to compensate for losses, the types of
ecological values that could be provided, and the anticipated criteria for selecting restoration
projects. The settlement reflects the judgment and experience of experts for Grace and the
Montana Natural Resource Damage Program ("NRDP").

The NRDP's mission is to act on behalf of the Governor of the State of Montana, the trustee, to
recover damages for natural resources injured by the release of hazardous substances and to
restore, rehabilitate, replace, or acquire the equivalent of the injured natural resources.

## I.    NATURE OF THE STATE'S ALLEGED INJURIES

Information collected at the Site under the oversight of the U.S. Environmental Protection
Agency (EPA) in consultation with the Montana Department of Environmental Quality (DEQ)
and other agencies pursuant to the Comprehensive Environmental Response, Compensation and
Liability Act, 42 U.S.C. §§ 9601 *et seq.* (CERCLA), as well as other information, has been used
by the State and Grace to evaluate the nature of potential natural resource injuries and potential
lost services in connection with the settlement agreement. Some of this information, including
relevant background information, is summarized below. The State has not conducted a formal
natural resource damage assessment (NRDA) at the Site under U.S. Department of Interior
(DOI) regulations promulgated under CERCLA, 43 C.F.R. Part 11, or under the Montana
Comprehensive Environmental Cleanup and Responsibility Act, 75-10-701, MCA, *et seq.*
(CECRA). This document does not include all of the information that would be in an NRDA and
is based on the information gathered to date.

---

[1] As indicated in the Settlement Agreement between the State and Grace, each Party denies the allegations of the
other. Grace asserts that there are no significant natural resource damages (NRD) at or related to OU3; the State
asserts that there are more significant NRD at or related to OU3. The Settlement Agreement represents a
compromise that compensates the State (as trustee) for the damages that it alleges in exchange for a release of all of
the State's NRD claims against Grace in or related to the Libby Asbestos Superfund Site. The Settlement
Agreement to which this report is attached is solely on behalf of the State and Grace, and does not expand or limit
the legal rights or obligations of any person or entity other than the State and Grace.

## A.    Site History and Assessment

OU3 of the Site consists of a former vermiculite mine and adjoining forested lands, located approximately 7 miles to the northeast of the town of Libby, Montana. The former mined area and immediately surrounding area are owned and managed by the Kootenai Development Company (KDC), a Grace subsidiary; other land within OU3 is managed by the U.S. Forest Service.

The former vermiculite mine was operated from the early 1920s to 1990, initially by the Zonolite Company, which sold the mine and processing facilities to a predecessor company to Grace in 1963. Historically, vermiculite from the former mine was used in insulation, feed additives, soil amendments, packaging, and construction materials. Vermiculite ore, excavated overburden (waste rock), mine tailings, and associated material from the former mine contain amphibole-type asbestos, a material in the geology in the mine area that is termed Libby amphibole asbestos (LA). Such materials also may contain non-asbestos hazardous substances.

Mining operations included blast and drag line mining and milling of ore, with ore processing taking place onsite during most of the time the mine was in operation. Both dry milling and wet milling were conducted at the mine site up to approximately 1974, after which the entire operation used wet processing (MWH 2016). In 1972, the State issued to Grace an operating permit under the Metal Mine Reclamation Act. Grace operated the mine under its permits, and performed reclamation of mined lands as they were taken out of operation (MWH 2016). Mining operations ceased completely by 1990, followed by further reclamation efforts that included demolition of mine facilities, re-contouring of the mined areas, and revegetation (MWH 2016).

In October 2002, EPA added the Libby Asbestos Superfund Site to the National Priorities List. EPA divided the site into multiple operable units. For OU3, a remedial investigation (RI) under CERCLA began in 2007. The RI was performed in phases, and included collection of more than 3,300 environmental samples for LA analysis and more than 500 samples for non-LA analysis (W.R. Grace & Co. et al. 2019). Surface water, sediment, sediment pore water, groundwater, soil, mine wastes, forest duff, tree bark, air, and fish and mammal tissue were sampled for analysis.

EPA conducted baseline ecological risk assessments (BERAs) as part of the RI. The objective of the risk assessments was to determine the potential for current or future unacceptable risk to ecological receptors (e.g., fish, aquatic invertebrates, terrestrial plants, terrestrial invertebrates, birds and mammals) within OU3. EPA published two BERAs that were the culmination of the ecological studies. The first evaluated ecological risks potentially associated with non-asbestos hazardous substances, such as inorganics (Non-Asbestos BERA) (USEPA 2013). The second examined ecological risk potentially associated with LA (Asbestos BERA) (USEPA 2014). A summary of the risk assessments is presented in the final RI report (MWH 2016). Grace and the State considered the data collected for the BERAs and RI, as well as additional information, in their respective evaluations of potential natural resource injuries and service losses in and relating to OU3. Some of the data and analyses are discussed in greater detail in subsequent

sections of this document. The State does not agree with all analyses and conclusions presented in these reports.

## B.    OU3 Habitats

OU3 provides a range of habitats for aquatic and upland species: creeks and their associated riparian zones, ponds, wetlands, and upland habitats.

### 1.    Aquatic Habitats

The primary surface waters in OU3 that are most likely to have received asbestos and other non-asbestos hazardous substances released as a result of mining activities are within the Rainy Creek watershed (~46.1 km$^2$) and include Rainy Creek, Fleetwood Creek, Carney Creek, portions of the Fine Tailings Impoundment (FTI), the Mill Pond, and potentially the Kootenai River. Rainy Creek is divided into Upper Rainy Creek (north of the mine area) and Lower Rainy Creek. Rainy Creek flows into the Kootenai River approximately 3.9 km south of the mine area.

Fleetwood Creek flows east to west on the northern border of the mine area and through a portion of the coarse tailings pile prior to discharging to the FTI. Carney Creek lies south of the mine area and flows along the toe of the West Waste Rock Pile before joining Lower Rainy Creek just downstream of the Mill Pond. Rainy Creek and portions of both tributary creeks are perennial (USEPA 2013) and provide habitat for fish and aquatic invertebrate communities (MWH 2016). Riparian areas occur along the creeks and provide ecological benefits such as channel stability, shade for the stream, erosion control, energy flow, nutrient cycling, water cycling, hydrological function, and plant and animal habitat (USDA 1996).

In addition to the creeks, there are ponded areas in OU3, including Carney Pond, Fleetwood Pond, and the Mill Pond. The FTI includes a ponded area that varies in size depending on precipitation. The FTI (~70 acres) was established in 1972 to receive and settle mine tailings, through construction of the Kootenai Development Impoundment Dam (KDID) across Rainy Creek. Water enters the FTI from Upper Rainy Creek, Fleetwood Creek, surface runoff, and groundwater. The Mill Pond, which is located in the Rainy Creek channel downstream (south) of the KDID and just north of the confluence of Carney Creek, was constructed to supply water for mining operations and discharges into Rainy Creek. Wetlands are present on and adjacent to the FTI and portions of the other waterways, and provide similar ecological benefits and services as those provided by riparian habitats.

In addition to the physical impacts of mining operations, physical alterations of the OU3 habitats have occurred over the years due to a variety of other activities, including timbering operations, channelization for road construction, and placement of culverts and impoundments (USDA 2000).

### 2.    Terrestrial Habitats

Upland habitats within OU3 consist primarily of the former mined area and surrounding forests.

The area disturbed by mining (including the former mined area and former tailings impoundment) covers approximately 1,100 acres of OU3 (MWH 2016). This area is characterized by native rock, soil, and vegetation, as well as waste rock and tailings resulting from past mining activities. During the period of mine operation, this area was largely unvegetated. Mining activities not only involve physical disturbance by heavy machinery and excavation, but also include removal of topsoil and placement of waste rock, which changes the physical conditions of the soil environment (e.g., Sheoran et al. 2010; Baig 1992).

Mined areas were reclaimed as mining in those areas was phased out. More extensive reclamation efforts at the former mine began in 1991 after mine closure. These efforts included hydroseeding and reforestation with pine and deciduous trees. Other reclamation efforts included regrading, trenching, and other physical measures to stabilize the mine surface.

At present, vegetative communities of the former mined area include forests, steppe shrub, and grassland habitat, with grassland and steppe shrub providing the predominant cover. Some bare soil areas exist, primarily on steeply sloped waste rock piles and other steep slopes.

Outside of the former mined area, the OU3 terrestrial habitats consist of temperate montane forests, portions of which have been historically logged. Douglas fir is the most common tree type, present at about 35% of the forested OU3 area, followed by lodgepole pine (17%) and spruce-fir (17%), with western larch forest on about 11% of the forested land area. The remaining area is populated with various deciduous species common in northwest Montana (MWH 2016). The OU3 forest outside of KDC/Grace ownership is part of the Kootenai National Forest.

### C.    Hazardous Substances Associated with Alleged Natural Resources Injuries

Due to proximity to the mine and associated access roads, the aquatic and terrestrial habitats of the Rainy Creek watershed have been exposed to LA and other non-asbestos constituents released from the mine area. Although some remediation has occurred, a final remedy has not been selected for OU3, and remediation of the entire forested watershed area within OU3 has not occurred and may not occur. Therefore, surface waters within the Rainy Creek Watershed in OU3 remain exposed to LA fibers and other non-asbestos contaminants. Depending on their concentrations and other circumstances, these constituents have the potential to adversely affect the aquatic, riparian, and terrestrial species that reside or forage in these habitats, and thereby result in natural resource injury. Natural resource injury caused by the release of a hazardous substance could be the source of natural resource damages, as defined under CERCLA, CECRA, and related guidance.

The Non-Asbestos BERA (USEPA 2013), Asbestos BERA (USEPA 2014), and RI report (MWH 2016) identified a number of hazardous substances released from the Site mining and milling activities and present within OU3 at concentrations that could pose risk to ecological receptors and/or exceed Circular DEQ-7 Montana Numeric Water Quality Standards (DEQ-7 Standards) or Residential Regional Screening Levels (RSLs). These substances include:

- Aluminum,
- Barium,
- Chromium,
- Cobalt,
- Copper,
- Iron,
- Lead,
- Manganese,
- Nickel,
- Selenium,
- Vanadium,
- Gross alpha, and
- LA.[2]

In addition, screening-level toxicity benchmarks were exceeded in one or more Site media (soil and sediment) for:

- Antimony,
- Benzo(b)fluoranthene,
- Benzo(k)fluoranthene,
- Cadmium,
- Fluoride,
- Mercury,
- Naphthalene,
- Nitrogen as nitrite,
- Thallium, and
- Asbestos.

Site investigations conducted as part of the RI and BERAs were used by EPA to assess the degree to which these constituents were present in OU3 and posed ecological risk. The RI and BERAs provide data with which to assess the range of possible natural resource damages in OU3. The data collected for these studies are referenced below in the context of potential types of natural resource injuries and service losses.

### D.    Per Se Injuries

Under the DOI NRDA regulations, natural resource injury is defined to exist when concentrations of hazardous substances are in excess of certain quality standards under the

---

[2] Regardless of whether there is a relevant standard for LA concentrations in the surface water, for purposes of this report, measured concentrations of LA in surface water are compared to DEQ-7 standards and maximum contaminant levels based on effects from exposure to chrysotile asbestos.  DEQ-7 does not provide an aquatic life standard.

circumstances specified in the regulations (see 43 C.F.R. § 11.62); this is sometimes referred to as "per se" injury.

A review of the available data collected as part of the RI demonstrates the potential per se injuries described below.

### 1.    Surface Water

As part of its screening analysis, the Non-Asbestos BERA identified the potential for risk to aquatic receptors from barium in surface water (USEPA 2013). In addition, concentrations above chronic DEQ-7 Standards for aquatic life for total lead and total iron were observed in surface water samples from Fleetwood Pond (MWH 2016). Dissolved aluminum was detected in one seep sample from the Site at a level of 110 ug/L. All other dissolved aluminum results were non-detects.[3]

Surface water was sampled in the Asbestos BERA (USEPA 2014) for LA. Results for water are typically expressed as million fibers per liter (MFL). Though there is no specific surface water quality standard for LA, for purposes of this report, the results were compared with EPA's maximum contaminant level (MCL) and the DEQ-7 Standard for surface water for asbestos fibers of 7 MFL.[4] All of the following results are from the RI (see, e.g., Table 5-17a):

- In Upper Rainy Creek, 48 samples were collected from three locations. LA was below the 7 MFL criterion in all samples, though LA was detected in two locations.
- In Fleetwood Creek and Fleetwood Pond, 46 surface water samples were collected at three stations; concentrations of LA >10 μm ranged from 0 MFL to 289 MFL.[5] Six samples were above 7 MFL in Fleetwood Creek and Fleetwood Pond (13% of the samples).
- In Carney Creek and Carney Pond, 72 surface water samples were collected at five stations; concentrations of LA >10 μm ranged from 0 MFL to 26 MFL.[6] Three samples were above 7 MFL in Carney Creek and none in Carney Pond (4% of the samples). An additional 21 samples were collected from seven seep locations near Carney Creek; concentrations of LA >10 μm ranged from 0 to 32 MFL.
- In Lower Rainy Creek, 263 samples were collected at 11 stations; concentrations of LA >10 μm ranged from 0 MFL to 66 MFL. Twenty-five samples were above 7 MFL in Lower Rainy Creek (10% of the samples).

The results tended to reflect seasonal variation. Concentrations were generally highest during high flows such as spring runoff.

---

[3] The reporting limit for dissolved aluminum in surface water was 90 μg/L, which is above the DEQ-7 aquatic life chronic standard for dissolved aluminum of 87 μg/L.

[4] The 7 MFL criterion applies only to fibers greater than 10 microns (10 μm) in length.

[5] The contractor reported that the sample result of 289 MFL in Fleetwood Pond (and duplicate sample result of 219 MFL) is suspect, as it is an order of magnitude higher than the next highest sample of 28 MFL at that location and was collected through a method that might have introduced higher sediment concentrations in the sample.

[6] Resampling following the 26 MFL result, at the same location about 6 weeks later, had a 0 MFL result. The next highest sample at that location was 7.5 MFL.

Some of the above conditions, if all criteria under the DOI regulations were met, would be defined as surface water injury. This report does not determine whether any of these conditions satisfy the DOI regulatory definition, but this information was used in evaluating the scope of potential injuries.

Concentrations of LA in reference ponds and creeks in and around OU3 tended to be below detection or very low. The Asbestos BERA reports that LA fibers in the Kootenai River were low and not different between samples from upstream and downstream of the confluence of Rainy Creek.

### 2.    Groundwater

LA was analyzed in groundwater samples as part of the RI (MWH 2016). Groundwater sampling was conducted in 8 shallow wells and 6 bedrock wells, with most wells sampled 2 to 3 times for a total of 20 shallow well samples and 14 bedrock samples. Two samples from the shallow groundwater wells showed LA concentrations above 7 MFL. The two results above 7 MFL may reflect sampling anomalies[7] and sampling issues and detections in equipment rinse blanks led to adjustment of the groundwater results (Appendix I to the RI [MWH 2016]); further samples were not collected.

Fewer samples were collected for non-asbestos contaminants. Samples for non-asbestos contaminants showed some elevated concentrations of site contaminants compared to screening levels established for assessment of potential drinking water exposures in people. Iron and manganese Residential RSLs for tap water (non-regulatory criteria) were exceeded in groundwater samples (USEPA 2013), and the DEQ-7 Standard and EPA MCL for gross alpha was exceeded in one groundwater sample from a bedrock well (USEPA 2013; MWH 2016).

Some of the above conditions, if all criteria under the DOI regulations were met, would be defined as groundwater injury. This report does not determine whether any of these conditions satisfy the DOI regulatory definition, but this information was used in evaluating the scope of potential injuries.

### 3.    Sediment Pore Water

LA was measured in instream sediment pore water at Lower Rainy Creek and reported in the RI (MWH 2016). LA concentrations up to 623 MFL were measured in pore water (fibers >10 μm).[8] On average, LA concentrations were greater in pore water samples than in surface water samples collected from the same locations in Lower Rainy Creek. The data indicate that biological

---

[7] "Elevated LAA levels are thought to be related to suspended sediment in the water at the time of sampling, given that the other samples collected from both piezometers had significantly lower LAA levels. In addition, sampling pump issues were noted during the April 2015 sampling..." (MWH 2016, Table 5-16b, p. 312)

[8] Pore water sample concentrations were variable across replicate samples and across samples collected during the sample durations (MWH 2016).

resources could be exposed to higher levels of hazardous substances in pore water compared to surface water.

Non-asbestos contaminants were not analyzed in sediment pore water, which the parties have considered.

### 4.    Sediment

In stream sediment, concentrations above screening level ecotoxicological benchmark values are not a per se injury, but indicate the potential for injury to the surface water in Montana as the State's water quality standards are based on measurements that include a fraction of suspended sediments. Sediment was analyzed in the Asbestos BERA by first sieving and grinding samples to reduce particle size to ≤250 µm and identifying LA fibers based on optical characteristics using polarized light microscopy. Visual area estimates are subjective, and results are considered semi-quantitative. Results are associated with bins of approximate ranges in percentages; Bin A represents non-detect samples, Bin B1 is <0.2% LA, B2 is 0.2% to <1% LA, and C is ≥1% LA.

Sediment samples from Lower Rainy Creek, Fleetwood Creek, Carney Creek, the FTI, and the Mill Pond contained LA fibers above detection (USEPA 2014). Sample results were highest in Carney Creek adjacent to the mine area and in Rainy Creek below the FTI. Most samples from Upper Rainy Creek were non-detect (Bin A). A total of 62 sediment samples collected in the above areas were in Bin C and ranged from 1% to 10% LA fibers.

Several non-asbestos analytes exceeded threshold effect concentrations (TECs) and/or sediment-based wildlife benchmarks in site sediments, as reported in the Non-Asbestos BERA (USEPA 2013) and summarized in Table 1, below. The TECs and other toxicity benchmark values are typically used in the screening stage of an ecological risk assessment to identify the potential for ecological risk.

A hazard quotient (HQ) is the ratio of the hazardous substance concentration in the exposed media compared to some toxicity benchmark or quality criterion. HQ values represent the maximum detected concentration divided by the toxicity benchmark, so a maximum HQ value greater than 1 indicates the maximum sediment concentration exceeded the toxicity benchmark. Calculated HQ values for OU3 sediment ranged from <1.0 to 54 for several non-asbestos analytes. Of the analytes with HQ values greater than 1, aluminum, barium, chromium, cobalt, copper, lead, manganese, nickel, vanadium, and zinc were also found to exceed sediment concentrations measured in reference samples.

*Table 1.    Hazard Quotient Values for Analytes that Exceeded Sediment Screening Values*

| Analyte | Maximum HQ for TEC-Based Benchmark | Maximum HQ for Sediment-Based Wildlife Benchmark |
|---------|-----------------------------------|--------------------------------------------------|
| Aluminum | 1.6 | NC |
| Arsenic | 0.72 | 5.1 |
| Barium | NC | 23 |
| Cadmium | 1.0 | 0.07 |

| Analyte | Maximum HQ for TEC-Based Benchmark | Maximum HQ for Sediment-Based Wildlife Benchmark |
|---|---|---|
| Chromium | 16 | 9.7 |
| Cobalt | NC | 1.8 |
| Copper | 5.5 | 54 |
| Lead | 2.8 | 3.3 |
| Manganese | 20 | 43 |
| Mercury | *0.56* | 1.6 |
| Nickel | 6.4 | 3.2 |
| Selenium | NC | 1.5 |
| Vanadium | NC | 46 |
| Zinc | *0.78* | 1.1 |
| Benzo(b)fluoranthene | 1.4 | *0.011* |
| Benzo(k)fluoranthene | 1.2 | *0.0094* |
| Naphthalene | 16 | *0.017* |

Notes: **BOLD** – sediment concentrations exceeded toxicity benchmark and were statistically greater than reference sediment concentrations; **BOLD** (no shading) – sediment concentrations exceeded toxicity benchmark but were statistically equal to or less than reference sediment concentrations; *Italics* – sediment concentrations did not exceed toxicity benchmark (HQ ≤ 1); HQ – hazard quotient; NC – not calculated, no screening value; TEC – threshold effect concentration; Data from Non-Asbestos BERA (USEPA 2013).

The Non-Asbestos BERA does not evaluate antimony in Site sediments, though antimony was detected in Site ponds and these data are reported in the OU3 RI. Antimony concentrations in two samples (one from Carney Creek Pond [4 mg/kg] and one from the FTI Pond [5 mg/kg]) exceeded the TEC (2 mg/kg) and the probable effect concentration (4 mg/kg).

Exposure to contaminated sediment can affect the growth and survival of invertebrates and limit the habitat available for colonization. In addition, biological resources higher in the food web potentially could be at risk from exposure to contaminants from eating contaminated invertebrates or from incidental ingestion of sediment while foraging. The studies in the EPA BERAs, noted below, evaluated such endpoints.

### E.    EPA Studies Performed to Evaluate Ecological Risk

The Asbestos BERA and Non-Asbestos BERA examined the potential risks to a variety of ecological receptors from LA and non-asbestos hazardous substance concentrations in soil. The following site-specific studies were conducted as part of the BERAs to evaluate the extent to which hazardous substances in surface water, sediment, and soil may pose risk to ecological receptors in OU3:

- Laboratory juvenile trout toxicity tests (non-asbestos contaminants)
- In situ juvenile trout toxicity tests
- In situ egg/alevin trout toxicity tests
- Resident trout lesion study
- Resident trout population study

- H. azteca (benthic invertebrate) sediment toxicity test
- C. tentans (benthic invertebrate) sediment toxicity test
- Resident benthic macroinvertebrate population study
- Laboratory tadpole sediment toxicity tests
- Resident frog lesion study
- Resident mouse lesion study
- Literature-based evaluation of sensitivity of birds to LA relative to small mammals

The results of these studies, along with EPA's habitat evaluations, weight of evidence evaluation, and analysis of uncertainties, are detailed in the BERAs.

### F.    Summary of Potential Natural Resource Injuries and Service Loss at or related to OU3

The data collected as part of the RI and BERA investigations indicate that natural resources within OU3 are exposed to LA and a subset of other non-LA hazardous substances. Past, present, and future injured OU3 resources could include:

- Small, large, and aquatic-dependent mammals
- Birds
- Fish
- Reptiles and amphibians
- Aquatic invertebrates
- Terrestrial invertebrates
- Terrestrial and aquatic plants
- Wetland and upland habitats.

To the extent that injury occurred, the following categories of resource services, among others, could theoretically have been reduced:

- Habitat services for biological resources, such as habitat for feeding and reproduction
- Fishing, particularly recreational fishing below the ordinary high-water mark per Montana stream access laws (§23-2-301, MCA, *et seq.*)
- Drinking water supply (to the extent relevant)
- Non-consumptive uses such as wildlife viewing and photography and other outdoor recreation activities below the ordinary high-water mark per Montana stream access laws (§23-2-301, MCA, *et seq.*)
- Primary and secondary contact recreational activities such as swimming and boating below the ordinary high-water mark per Montana stream access laws (§23-2-301, MCA, *et seq.*)
- Option and existence values.

## II.    TYPES OF RESTORATION PROJECTS AND RESULTANT SERVICES

The natural resource damages component of the Settlement between Grace and the State was negotiated and executed on a cash-out basis, with funds paid to the State over a period of 10 years. No particular project or projects are required by the Settlement, no particular project has been identified by the State at the time of this Report, and the projects ultimately implemented by the State may differ from the examples provided below, but the State must use settlement funds for restoration projects and support therefor, including costs for State restoration plan development and implementation, and administrative, program, legal, technical and all other related costs, to the extent lawful under CERCLA or CECRA. The State intends and anticipates using Settlement funds in connection with projects that provide natural resource and other benefits in and around OU3.

The following sections describe various types of exemplary restoration projects that may be constructed to benefit and improve aquatic and terrestrial natural resources and the services they provide. Additional types of restoration projects may also be considered. Other restoration actions selected to implement previous State NRD settlements at other sites can be found within the restoration plans for those sites, which are available on NRDP's website. Nothing in this report is intended to bind any party to a specific injured resource or particular type of project.

### A.    Aquatic Habitat Improvement Restoration Projects

Potentially injured resources identified at the Site include fish and other aquatic biota. A variety of restoration projects could be implemented to restore lost services. Below is a summary of types of aquatic habitat improvement projects that would restore aquatic ecological services.

In addition to the specific service benefits described below, the illustrative aquatic restoration activities all generally provide improved water quality, thereby providing favorable habitat to increase populations of in-stream biota. This should benefit upland predators that rely on stream food sources. Restoration of aquatic ecological resources ultimately benefits the entire ecosystem through increased biodiversity and results in enhanced recreational opportunities. Many of the restoration activities described below have been implemented in projects in the Kootenai and adjacent watersheds with significant success.

The selection of any specific creek restoration activities could be geographic (to prioritize a specific watershed or a specific creek segment to be identified, potentially including within OU3 once remediation has been completed) in accordance with the criteria outlined in Section III.

### 1.    Riparian Improvement

Riparian improvement projects include revegetation, reducing livestock access, removing/enhancing roads, streambank stabilization, floodplain restoration, reconstructing stream channel(s), constructing floodplain wetland cells, woody debris placement, microtopography creation, bank treatment, seeding and mulching, and planting. These types of projects can provide a host of services. Revegetation of the riparian area reduces contaminant mobility by providing filtration of overland flow and reduces sedimentation by providing soil

stabilization. Vegetation provides habitat cover for both upland and in-stream species, and limits surface water temperature fluctuations by providing shade. Floodplain restoration projects, including reconnecting the floodplain area and constructed wetlands, reduce erosion and subsequent sedimentation by reducing flow velocities, and provide opportunities for natural stream channel changes over time. Road removal and streambank stabilization projects, often supported by and conducted in conjunction with revegetation and floodplain restoration, reduce sedimentation (Yochum 2018) and can lead to an overall improvement in habitat conditions, thereby contributing to more robust and abundant populations of fish and wildlife. Engineered floodplains and riparian plantings also may improve groundwater quality by providing filtration of runoff and reducing overland flow, thereby encouraging groundwater recharge.

### 2. In-Stream Habitat Improvements and Channel Modifications

In-stream habitat improvement and channel modification activities can create habitat for biota by providing variable structures and improved channel flow. Modifying stream morphology by adding meanders and creating variable pool-riffle-run habitat directly improves habitat for fish (particularly trout) and invertebrates. Installing boulders, woody debris, and other large structures creates shelter and resting areas for fish that mimic natural features in streams and rivers. These features also create cover and reduce flow velocity to provide habitat for invertebrates (Wohl et al. 2015). These kinds of habitat improvements would advance and restore more natural hydraulic conditions and restore natural sediment transport processes, thereby improving water quality. The improvement and addition of habitat through stream channel modifications should result in increased fish and invertebrate populations, providing both ecological and recreational benefits.

### 3. Fish Passage

Conceptual fish passage projects include restoration activities such as removal of fish passage barriers in creeks and streams and addition of screens to reduce fish access to artificial diversions. These types of habitat improvements would benefit a variety of native and other fish species.

Removal of barriers and enhancement of passage structures such as culverts and fish ladders can directly benefit fish survival and spawning by enabling fish to regain access to diverse habitats and additional food sources. Restored access to spawning habitat should result in a direct increase in fish numbers, which would benefit imperiled species and increase recreational fishing opportunities by increasing fish populations and expanding accessible fishing areas. Limiting access to unsuitable habitat by placing screens on irrigation and power diversions can also encourage fish to instead utilize appropriate habitats for foraging and spawning. This should increase survival and reproduction rates for fish, especially trout (Yochum 2018).

### B. Terrestrial Habitat Improvement Restoration Projects

Activities can be implemented to improve upland terrestrial habitat and benefit ecological resources in the surrounding area. Example projects include selective removal of non-native plant species and/or planting of native trees and vegetation in OU3 and surrounding forest areas.

### 1.    Native Planting and Removal of Non-Native Species

Planting native trees and vegetation has direct benefits for not only the immediate area, but globally as well. Planting in burned, logged, or other denuded areas restores habitat for wildlife, giving birds, mammals, and reptiles improved nesting/burrowing, foraging, and hunting opportunities. Invertebrates will also benefit from increased access to food and shelter, as well as improved soil health. Trees also sequester carbon, reducing atmospheric carbon dioxide levels that contribute to global climate change (Dumroese et al. 2019).

Native planting and removal of non-native species activities in targeted areas would result in increased opportunities for multiple recreational uses in forested areas. Forest planting also improves surface water quality and has the potential to improve groundwater quality, through increased soil stabilization and filtration and reduction of evaporation from soil.

### C.    Recreational Fishing

A replacement recreational fishing project for potential lost recreational use could include acquisition of land and construction of a fishing access site or other recreational access site in Lincoln County in cooperation with Montana Fish Wildlife, and Parks or a local governmental entity. It would be constructed in accordance with then-current construction and design requirements for fishing access sites.

## III.    CRITERIA FOR SELECTING RESTORATION PROJECTS[9]

Prior to use of funds, a restoration plan would be developed and adopted by the Governor after adequate public notice and opportunity for hearing and consideration of all public comment. The DOI regulations, 43 C.F.R. § 11.82(a), provide that a reasonable number of possible alternatives for the restoration, rehabilitation, or replacement of the injured natural resources be developed and considered. The overall goal of the restoration plan is to identify actions that singly or in combination restore, rehabilitate, replace, or acquire the equivalent of injured natural resources or lost services such that they can provide the level of services available under baseline conditions. Restoration in areas where remedial action will be implemented typically follows implementation of the remedial action and is intended to provide restoration beyond that provided by the remedial actions. Additional data collection and analysis may be needed to evaluate the priority of the different restoration actions.

The Natural Resource Damage Program (NRDP), which acts on behalf of the Governor as trustee, typically develops a restoration plan in consultation with the Montana Department of

---

[9] The criteria described in this Section III are intended to provide a synopsis of the State's process for evaluating and selecting potential restoration projects. This Section does not, however, fully define that process or otherwise affect in any way the State or the Governor's authority and discretion established by law.

Fish, Wildlife and Parks, local government (e.g., Libby and Lincoln County, the local Water Quality Protection District), watershed groups and non-profits, other agencies, and the public. A recent example of this process is outlined in the *East Helena Asarco Smelter Final Restoration Plan and Environmental Assessment Checklist* (NRDP 2019), available at 11.04.2019-East-Helena-Restoration-Plan-Signed-by-Gov.pdf (dojmt.gov). NRDP would follow a similar process and gather restoration action ideas from all relevant entities from their planning documents, meetings, and a public solicitation for project ideas. The criteria outlined below are taken from the *East Helena Asarco Smelter Final Restoration Plan and Environmental Assessment Checklist.*

In developing possible alternatives for the restoration, replacement, rehabilitation, or acquiring the equivalent of the injured natural resources or services, NRDP anticipates evaluating the alternatives under the following criteria, which meet the requirements of CERCLA and CECRA, and the provisions of 43 C.F.R. § 11.82. In addition, NRDP also anticipates evaluating the additional "policy criteria" outlined at the end of this section. These criteria have been developed by the State to promote State of Montana goals.

**Technical Feasibility:** This criterion evaluates the degree to which a restoration action employs well-known and accepted technologies and the likelihood that the action will achieve its objectives. Actions that are technologically infeasible will be rejected. However, actions that are innovative or that have some element of uncertainty as to their results may be approved. Different actions will use different methodologies with varying degrees of feasibility. Accordingly, application of this criterion will focus on an evaluation of an action's relative technological feasibility.

**Relationship of Expected Costs to Expected Benefits:** This criterion examines whether the costs of an action to restore, rehabilitate, replace, and/or acquire equivalent resources are commensurate with the benefits provided. In doing so, the costs associated with a restoration action, including costs other than those needed simply to implement the action, and the benefits that would result from an action, will be determined. Application of this criterion is not a straight cost-benefit analysis, nor does it establish a cost-benefit ratio that is by definition unacceptable. Quantifying the benefits of a project will sometimes require collection of additional data or information and additional analysis.

**Cost-effectiveness:** This criterion evaluates whether a particular restoration action accomplishes its goal in the least costly way possible. As outlined in the natural resource damage regulations, cost-effectiveness means that when two or more activities provide the same or a similar level of benefits, the least costly activity providing that level of benefits will be selected (43 C.F.R. § 11.14(j)). To apply this criterion in a meaningful fashion, all of the benefits a restoration action would produce must be considered, not just cost; otherwise, the focus would be too narrow. Take the example of a restoration action that would fully restore a given resource in a short period of time compared to another restoration action that would restore the same resource at less cost but over a longer period of time. Considering only that the second action is less expensive than the first action ignores the benefits resulting from a relatively shorter recovery period. In this

example, since an accelerated recovery time is a benefit, it would need to be factored into a determination of cost-effectiveness.

**Results of Response Actions:** This criterion would consider the results or anticipated results of CERCLA response actions underway or planned in OU3 after selection of the final remedy by EPA. Evaluation of this criterion requires assessment of response actions at an adequate level of detail in order to make projections as to their effects on natural resources and services. For restoration alternatives within OU3, this criterion will include consideration of:

- What may be necessary in the way of restoration of resources and services in light of the ongoing and planned response actions.
- The degree of consistency between a restoration action and the response action(s).

**Adverse Environmental Impacts:** This criterion weighs whether, and to what degree, a restoration action will result in adverse human or physical environmental impacts. Specifically, NRDP will evaluate significant adverse impacts that could arise from the restoration action, short term or long term, direct or indirect, including those that involve resources that are not the focus of the project. To do so, the dynamics of a restoration action and how that action will interact with the environment must be understood.

**Recovery Period and Potential for Natural Recovery:** This criterion evaluates the merits of a restoration action in light of whether the resource is able to recover naturally (i.e., without human intervention) and, if a resource can recover naturally, how long that will take. Given that the final response action at OU3 has not been determined, the NRDP will consider the recovery period following response actions to evaluate potential restoration projects in OU3. (The term "recovery period" refers to a return to "baseline," as both of those terms are defined in 43 C.F.R. 11.14.)

**Human Health and Safety:** This criterion evaluates the potential for a restoration action to have adverse effects on human health and safety. Such a review will be undertaken not only to judge a particular action but also to determine if protective measures should be added to the restoration action to ensure safety.

**Federal, State, and Tribal Policies, Rules and Laws:** This criterion considers the degree to which a restoration action is consistent with applicable policies of the State of Montana and applicable policies of the federal government and Tribes (to the extent the State is aware of those policies and believes them to be applicable and meritorious). In addition, a restoration action must be implemented in compliance with applicable laws and rules.

**Policy Criteria**
In addition to the above legal criteria, NRDP applies the following policy criteria when considering prospective restoration projects.

**Normal Government Function:** This criterion evaluates whether a restoration action involves activities for which a governmental agency would normally be responsible or that would receive funding in the normal course of events and would be implemented if

recovered natural resource damages were not available. Settlement funds may be used to augment funds available to government agencies, if such cost sharing would result in the implementation of a restoration action that would not otherwise occur through normal government function. Based strictly on this criterion, a project involving activities that would fall within normal government responsibilities may be ranked lower than a restoration action that does not fall within this category.

**Price**: NRDP will evaluate whether the land, easements, water rights, or other property interests proposed to be acquired are being offered for sale at or below fair market value. Consideration of this criterion will likely require NRDP to conduct its own appraisal of the property. If the appraisal process for an acquisition was not subject to initial State review and approval, NRDP will, at a minimum, conduct a review appraisal and may conduct a full appraisal.

**Location**: Restoration actions are generally geographically restricted. In this case, the State has agreed to prioritize restoration actions within Lincoln County (in which OU3 is located), subject to NRDP's required administrative decision-making process.

**Environmental Review**
An environmental review of the implementation of the restoration plan is also required to evaluate impacts of proposed State action on the physical and human environment pursuant to the requirements of the Montana Environmental Policy Act, §§ 75-1-101, MCA, *et seq.* (MEPA). As part of its analysis of impacts to human health and safety, NRDP will determine if protective measures should be added to the restoration plan alternatives to ensure safety.

**Public Comment**
Upon a full evaluation of the information collected through the above process and an evaluation of the above criteria, including a comparative analysis, NRDP will identify a preferred alternative and put the draft restoration plan out for public comment. NRDP will consider all public comment before making a recommendation to the Governor for the final restoration plan. 42 U.S.C. § 9611 and § 75-10-713, MCA.

## IV.    RESOURCES

Baig, M.N. 1992. Natural revegetation of coal mine spoils in the Rocky Mountains of Alberta and its significance for species selection in land restoration. *Mountain Res. Develop.* 12(3):285-300.

Dumroese, R.K., N. Balloffet, J.W. Crockett, J. A. Stanturf, and L.E. Nave. 2019. A national approach to leverage the benefits of tree planting on public lands. *New Forests*, 50(1), 1–9.

MWH. 2016. Remedial investigation report, operable unit 3 study area: Libby asbestos superfund site, Libby, Montana. Final report - Revision 1. Prepared for W.R. Grace &

Co.-Conn and U.S. Environmental Protection Agency, Region 8, Denver, CO. MWH
Americas, Inc., Denver, CO. November. 1,934 pp.

NRDP (State of Montana Natural Resource Damage Program). 2019. East Helena ASARCO
Smelter Final Restoration Plan and Environmental Assessment Checklist.

Sheoran, V., A.S. Sheoran, and P. Poonia. 2010. Soil reclamation of abandoned mine land by
revegetation: A review. *Int. J. Soil Sed. Water*. 3(2):Article 13.

USDA. 1996. Riparian areas environmental uniqueness, function, and values. RCA Issue Brief
#11. Available at:
https://www.nrcs.usda.gov/wps/portal/nrcs/detail/national/technical/?cid=nrcs143_014199. U.S. Department of Agriculture, Natural Resources Conservation Service. August.

USDA. 2000. Alexander Forest health project environmental assessment, Kootenai National
Forest - Libby Ranger District, Lincoln County, Montana. U.S. Department of
Agriculture Forest Service, Libby, MT. May. 151 pp.

USEPA. 2013. Baseline ecological risk assessment for non-asbestos contaminants. Operable
unit 3, Libby asbestos superfund site, Libby, Montana. Final. Prepared for U.S.
Environmental Protection Agency, Region 8, Denver, CO. CDM Federal Programs
Corporation, Denver, CO, and SRC, Inc., Denver, CO. April.

USEPA. 2014. Site-wide baseline ecological risk assessment, Libby asbestos superfund site,
Libby, Montana. Prepared for U.S. Environmental Protection Agency, Region 8. SRC,
Inc., and CDM Federal Programs Corporation. December.

Wohl, E., S.N. Lane, and A.C. Wilcox. 2015. The science and practice of river restoration. *Water
Resources Research*, 51(8), 5974–5997.

W. R. Grace & Co. et al. 2019. Chapter 11, Case No. 01-01139 (AMC) (Jointly administered).
Exhibit C. Declaration of Keith N. Cole in reorganized debtor's request for partial
allowance and partial disallowance of the claim by the Montana Dept. of Env. Quality
("MDEQ") for environmental remediation at Operable Unit 3 of the Libby asbestos
Superfund site prepetition claim (substantive objection). U.S. Bankruptcy Court for the
District of Delaware. August 26. 100 pp.

Yochum, S. 2018. Guidance for Stream Restoration. 112.

**Exhibit F – State Wiring Instructions**

Date:   August 17, 2022

Re: Wiring instructions to send wires to the State of Montana:

| | |
|---|---|
| Bank Name: | US Bank, NA |
| Bank ABA # (routing): | 092900383 |
| Bank Swift (SIC) Code: | USBKUS44IMT |
| Bank Address: | 302 N. Last Chance Gulch<br>Helena, MT  59601 |
| Account Name: | State of Montana |
| Account Number: | 156041200221 |
| Federal ID Number: | 81-0302402 |
| State's Dunn #: | 096489542 |
| Third Party Information: | Business Unit of Receiving Agency (41100), Name of Receiving Agency (DOJ-NRDP), Name of Sender (W.R. Grace), Other information pertinent to the Receiving Agency. (Libby Asbestos Superfund Site OU3 NRD Settlement Agreement). |

NOTE:  The OBI field is an informational field available on a fed wire.  There are generally 75 to 100 spaces available.


NOTE:  Please utilize these wiring instructions only when a wire is necessary because the payment is time sensitive, or for a large amount of money.

**Exhibit G – MDEQ 2008 Order and MDEQ 2008 Stipulation**

THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-1139 (JKF) |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | Re: Docket No. 18931 & 19086 |
| | ) | July 21, 2008 Agenda # 5 |

## ORDER AUTHORIZING STIPULATION RESOLVING CLAIMS OF MONTANA DEPARTMENT OF ENVIRONMENTAL QUALITY

Upon consideration of the *Motion of Debtors for an Order Approving Stipulation With the Montana Department of Environmental Quality* (the "Motion"); and due and proper notice of the Motion having been given; and it appearing that the relief requested in the Motion is in the best interests of the Debtors,[2] their estates and creditors, it is hereby

ORDERED that the Motion is granted; and it is further

---

[1]    The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

[2]    Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion or the Stipulation.

1

DOCS_DE:138118.1

ORDERED that the Debtors are authorized to enter into the Stipulation; and it is further

ORDERED that the Debtors are authorized to perform their respective obligations under the Stipulation; and it is further

ORDERED that (i) MDEQ Proof of Claim No. 18496 shall be allowed as a general unsecured pre-petition claims in the amount of $5,167,000 and the remaining portion of Claim No. 18496 shall be resolved as provided in the Stipulation; and (ii) MDEQ Claim No. 15296 shall be disallowed and expunged; and it is further

ORDERED that the Debtors are authorized to take whatever other actions may be necessary to consummate the transactions contemplated by the Stipulation; and it is further

ORDERED that the Court shall retain jurisdiction to hear and determine all matters arising from or relating to the implementation of this Order; and it is further

ORDERED that this Order is effective immediately upon its entry.

Dated: July 21, 2008

_Judith K. Fitzgerald_
_____
Honorable Judith K. Fitzgerald    SAS
U. S. Bankruptcy Judge

2

# EXHIBIT A

## STIPULATION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:                                          )
                                                )
W. R. GRACE & CO., *et al.*[1]                  )        Chapter 11
                                                )
                    Debtors.                    )        Case No. 01-01139 (JKF)
                                                )        (Jointly Administered)

### STIPULATION RESOLVING CLAIMS OF
### MONTANA DEPARTMENT OF ENVIRONMENTAL QUALITY

This Stipulation is entered into this _20_th day of May 2008, between the above-

captioned debtors (collectively, the "Debtors") and the State of Montana Department of

Environmental Quality ("MDEQ").

WHEREAS, on April 2, 2001 the Debtors commenced their respective reorganization

cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

---

[1]   The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace &
Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc.
(f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex
Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five
Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a
Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester
New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary
Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace
H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn
International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated,
Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace
Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square
Corporation, Horace International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc.
(f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe
Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA,
Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental
Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc.,
Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West
Coal Company, H-G Coal Company.

WHEREAS, on April 22, 2002 this Court issued its Bar Date Order which established March 31, 2003 as the Bar Date for the filing of certain pre-petition (a) non-asbestos, (b) asbestos property damage, and (c) medical monitoring claims.

WHEREAS, MDEQ timely filed Proof of Claim No. 6100 against the Debtors with respect to the Libby Asbestos Site (or "Libby Site," as defined in Paragraph 1.a. herein) in Libby, MT.

WHEREAS, on May 20, 2003 MDEQ filed three virtually identical amended Proofs of Claim against the Debtors with respect to the Libby Site, described as follows:

| Claim No. | Amount | Priority | Basis |
|---|---|---|---|
| 15296 | $8,510,022.16 | Unsecured, Non-Priority | Clean-Up Costs |
| 15297 | $8,510,022.16 | Unsecured, Non-Priority | Clean-Up Costs |
| 15298 | $8,510,022.16 | Unsecured, Non-Priority | Clean-Up Costs |

WHEREAS, pursuant to an Order entered on May 24, 2004 [Docket No.5646] this Court expunged Proof of Claim No. 6100 as duplicated and superseded by Proofs of Claim Nos. 15296, 15297, and 15298.

WHEREAS, pursuant to an Order entered on April 17, 2007 [Docket No. 15218] this Court approved a stipulation between Debtors and MDEQ resolving certain claims. Specifically, claim numbers 15297 and 15298 were disallowed and expunged and claim number 15296 remained in the claims register as outlined in the stipulation attached to the order as Exhibit 1. The terms of the order and stipulation [Docket No. 15218] are incorporated herein.

WHEREAS, on November 14, 2007 MDEQ filed an amended Proof of Claim ("MDEQ's Claim") against the Debtors with respect to the Libby Site, described as follows:

2

| Claim No. | Amount | Priority | Basis |
|-----------|--------|----------|-------|
| 18496 | $55,010,022.16 | Unsecured, Non-Priority | Clean-Up Costs |

WHEREAS, the United States on behalf of the Environmental Protection Agency ("EPA") and Debtors have proposed a settlement of EPA's claims at the Site that would, among other things, allocate $11 million and the earnings on that amount towards operation and maintenance expenses at the Site, which covers some of the costs set forth in MDEQ's Proof of Claim.

WHEREAS, on January 13, 2005 the Debtors filed an Amended Joint Plan of Reorganization under which allowed general unsecured claims shall be paid in full, 85% in cash and 15% in stock of the Reorganized Debtors (the "Proposed Plan");

WHEREAS, the Debtors and MDEQ have agreed to settle MDEQ's Claim, with the exception of Operable Unit 3 as described below, on the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the terms and conditions contained herein, the Debtors and MDEQ hereby stipulate and agree as follows:

1. Whenever the terms listed below are used in this Stipulation, the following definitions shall apply:

    a.    "Libby Asbestos Site" or "Libby Site" shall mean the Zonolite Mine and all areas (including any structure, soil, air, water, sediment, or receptor) in and near Lincoln County, Montana, that have been contaminated by natural or human caused migration of hazardous substances and/or pollutants or contaminants from the Zonolite Mine. For purposes of this Stipulation, the Libby Site shall not include Operable Unit 3.

    b.    "Operable Unit 3" shall mean property in or around the Zonolite Mine owned by W. R. Grace or Grace-owned subsidiaries (excluding Operable Unit 2) and any area (including any structure, soil, air, water, sediment or receptor) impacted by the release and/or release and subsequent migration of hazardous substances and/or pollutants or contaminants from such property, including, but not limited to, the mine property, the

3

Kootenai River and the sediments therein, Rainey Creek, Rainey Creek Road, and areas in which tree bark is contaminated with such hazardous substances and/or pollutants or contaminants.

c.    "CECRA" shall mean the Montana Comprehensive Environmental Cleanup and Responsibility Act, §§ 75-10-701 et seq., MCA.

d.    "CERCLA" shall mean the Comprehensive Environmental Response, Compensation and Liability Act, as amended, 42 USC § 9601 et seq.

2.    MDEQ's Claim, Claim Number 18496, shall be allowed as an unsecured, pre-petition, non-priority claim against the chapter 11 estates of the Debtors in the amount of $5,167,000. Except as to claims relating to Operable Unit 3, which are specifically reserved herein, the remaining portions of MDEQ's Claim are resolved. Claims reserved for Operable Unit 3 include, without limitation, any liability of Debtors for injunctive relief, administrative order enforcement, cost recovery, and liability for damages for injury to, destruction of, or loss of natural resources under CERCLA or CECRA. MDEQ's Claim No. 15296 shall hereby be disallowed and expunged.

3.    MDEQ shall not be entitled to pre-petition or post-petition interest on MDEQ's Claim allowed herein with respect to any period prior to the effective date of a confirmed chapter 11 plan or plans with respect to the Debtors (the "Plan"). MDEQ's Claim shall be paid in the same manner as all other similarly situated general unsecured claims pursuant to the "Plan" except with respect to the payment of interest as described herein.

4.    Upon approval of this Stipulation by the Bankruptcy Court, the Debtors shall direct their Claims Agent, Rust Consulting, Inc. ("Claims Agent"), to mark the Claims Register to reflect that Claim No. 18496 shall be allowed as outlined herein.

5.    MDEQ will place and maintain any distributions received by MDEQ on account of its allowed claim set forth in Paragraph 2 in a State special revenue fund, as provided for in § 17-2-

4

102(1)(b)(i), MCA, to be known as the "Libby Asbestos Site State Cost Account." MDEQ shall use the funds in this account, together with all interest and earnings thereon, only for the State's CERCLA cost share requirements, including operation and maintenance expenses, or other costs related to asbestos at the Site.

6.  MDEQ agrees that it is forever barred, estopped, and enjoined from asserting any additional pre-petition or post-petition claims against the Debtors for past, present and future costs of investigation, remediation, monitoring, and maintenance at the Libby Site (except for Operable Unit 3) under the Montana Comprehensive Environmental Cleanup and Responsibility Act, §§ 75-10-701 et seq., MCA, (CECRA) and the Comprehensive Environmental Response, Compensation and Liability Act, as amended, 42 USC § 9601 et seq. (CERCLA).

7.  MDEQ and the State of Montana reserve, and this Stipulation is without prejudice to, all rights, claims, and causes of action they have or may in the future have against Debtors with respect to all matters not expressly included in the foregoing Paragraph 6.

8.  Debtors release and agree not to assert any claims or causes of action against the State of Montana, including any of its departments, agencies, instrumentalities, contractors or employees, with respect to the Libby Site, including but not limited to any claims for reimbursement, contribution, cost recovery or damages under CECRA, CERCLA, or any other provision of law.  This release does not cover and Debtors expressly reserve all claims relating to Operable Unit 3.

9.  In the event that this Stipulation becomes null and void for any reason, then the preceding Paragraphs shall not apply, and MDEQ's Claim shall be deemed fully reinstated, subject, however, to Debtor's defenses, counterclaims and offsets, if any, and credits for payments MDEQ has received, if any.  Neither this Stipulation nor its nullification pursuant to its

5

terms shall create a right that does not presently exist for MDEQ or any other party to file additional claims with respect to these matters, nor waive any defense that the Debtors may have against such claims.

10. The Debtors shall take whatever additional action, if any, is necessary to insure that MDEQ's Claim No. 18496 is allowed as outlined herein.

11. This Stipulation shall be subject to a thirty (30) day public comment period, which may take place concurrent with the judicial approval process described herein. MDEQ reserves the right to withdraw or withhold its consent to this Stipulation if the public comments received disclose facts or considerations that indicate that this Stipulation is inappropriate, improper, or inadequate. At the conclusion of the public comment period, the State will provide the Court with copies of any public comments and its responses thereto.

12. Entry into this Stipulation is contingent upon the Settlement Agreement between the United States, on behalf of the Environmental Protection Agency and other federal agencies, and Grace regarding the Libby Asbestos Site ("Libby Settlement Agreement")(which is attached as Exhibit A to Docket No. 18271 filed on March 12, 2008) being approved by the Bankruptcy Court and Grace complying with the payment obligations under the Libby Settlement Agreement. This Stipulation shall be null and void if the Bankruptcy Court does not approve the Libby Settlement Agreement or if Grace does not pay to the United States the sum specified in the Libby Settlement Agreement.

13. Notwithstanding the foregoing, this Stipulation and the Debtors' signature hereon shall not become effective and binding until the Bankruptcy Court has entered an Order approving it. The Debtors shall promptly seek approval of this Stipulation under Bankruptcy Rule 9019 or other applicable provisions of the Bankruptcy Code.

6

14. In the event this Stipulation does not become effective as outlined in Paragraphs 10, 11, and 12 above prior to December 31, 2008, this Stipulation shall be null and void unless otherwise mutually agreed by the parties.

Montana Department of Environmental Quality

By: _____
    Richard H. Opper
    Director

Date: _____May 20, 2008_____

W. R. Grace & Co., et al.
("Debtors")

By: _____
    William M. Corcoran
    Vice-President
    Public and Regulatory Affairs

Date: _____5/22/08_____

Approved for Legal Content:

By: _____
    William B. Kirley
    DEQ Counsel

Date: _____5-20-08_____

7

**Exhibit H – List of Other State Proofs of Claim and their Treatment in the Plan**

## Exhibit H – List of Other State Proofs of Claim and their Treatment in the Plan

Claim Numbers Compiled from *In Re: W.R. Grace & Co. et al.*, Case No. 01-01139-AMC, Doc 31847-1, page 1271, filed 3/12/2014, and Doc 31847-2, pages 846, 4584, and 4585, filed 03/12/2014.

| Claim # | Claimant Name | Claim Type | Claim Status |
|---|---|---|---|
| 6101 | State of Montana Risk Management & Tort Defense Div | Asbestos PI Claim | Channeled to and assumed by Asbestos PI Trust |
| 18543 | State of Montana Risk Management & Tort Defense Div | Asbestos PI Claim | Channeled to and assumed by Asbestos PI Trust |
| 18548 | State of Montana Risk Management & Tort Defense Div | Asbestos PI Claim | Channeled to and assumed by Asbestos PI Trust |
| 6098 | State of Montana – Dept of Public Health & Human Svcs | Asbestos PI Claim | Channeled to and assumed by Asbestos PI Trust |
| 6099 | State of Montana – Dept of Public Health & Human Svcs | Asbestos PI Claim | Channeled to and assumed by Asbestos PI Trust |
| 18524 | State of Montana – Dept of Public Health & Human Svcs | Asbestos PI Claim | Channeled to and assumed by Asbestos PI Trust |
| 18525 | State of Montana – Dept of Public Health & Human Svcs | Asbestos PI Claim | Channeled to and assumed by Asbestos PI Trust |
| 18567 | Montana Dept of Revenue | State Tax Claim | Allowed. Paid in 2014. Check cleared |
| Z14207 – Z14214 | Montana Department of Transportation | Asbestos PD Claim | Channeled to and assumed by the Asbestos PD Trust |
| Z17341- Z17349 | University of Montana | Asbestos PD Claim | Channeled to and assumed by the Asbestos PD Trust |

Asbestos PD Claims are US ZAI PD Claims (Class 7B ZAI) as the Plan defines that term

EXHIBIT I -  FORM OF APPROVAL ORDER

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| W. R. GRACE & CO., et al.,[1] | ) Case No. 01-01139 (AMC) |
| | ) (Jointly Administered) |
| Reorganized Debtor. | ) |
| | ) **Re docket no.** _____ |
| | ) **Hearing Agenda item no.** _____ |
| | ) |

## ORDER APPROVING SETTLEMENT AGREEMENT RESOLVING STATE OF MONTANA'S CLAIM FOR OPERATING UNIT 3 OF THE LIBBY ASBESTOS SUPERFUND SITE

Upon consideration of the Reorganized Debtor's Motion to Approve Settlement Agreement Resolving State of Montana's Claim for Operating Unit 3 of the Libby Asbestos Superfund Site (the "Motion"); it appearing that the relief requested is in the best interests of the Reorganized Debtor, its estates, its creditors, and other parties-in-interest; the State of Montana having had a sufficient period of time to conduct a 30-day public comment period, and having provided any public comments received and the responses to the Court; based upon information that the Reorganized Debtor and the State have provided, the Court having determined that the settlement is fair, adequate, reasonable, and consistent with the goals of the Comprehensive Environmental Response, Compensation and Liability Act, as amended, 42 U.S.C. § 9601 *et seq*. and the Montana Comprehensive Environmental Cleanup and Responsibility Act, Montana Code Annotated ("MCA") § 75-10-701 *et seq*.; the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated

---

[1] W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc., or "Grace") is the sole remaining Reorganized Debtor and Case No. 01-1139 is the sole remaining open chapter 11 case.

February 29, 2012; consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b), and considering that this Court may enter an order consistent with Article III of the United States Constitution; venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; notice of the Motion having been adequate and appropriate under the circumstances; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED that:[2]

1.    The Motion is granted in its entirety.

2.    The *Settlement Agreement*, a true and correct copy of which is attached as the <u>Exhibit</u> to this Order (the "<u>Settlement Agreement</u>"), is approved in its entirety.

3.    The Reorganized Debtor is authorized to enter into, and take all actions contemplated in, the Settlement Agreement on the terms and conditions set forth therein.

4.    The *Reorganized Debtor's Request for Partial Allowance and Partial Disallowance of the Claim by the Montana Dept. of Env. Quality ("<u>MDEQ</u>") for Environmental Remediation at Operable Unit 3 of the Libby Asbestos Superfund Site (Substantive Objection)*, the State's *Response and Reservation of Rights of the State of Montana to the Reorganized Debtor's Request for Partial Allowance and Partial Disallowance of the Claim by the Montana Dept. of Env. Quality for Environmental Remediation at Operable Unit 3 of the Libby Asbestos Superfund Site (Substantive Objection)* [Docket No. 33102], and the Reorganized Debtor's *Reply in Support of the Reorganized Debtor's Claim Objection Requesting Partial Allowance and Partial Disallowance of MDEQ Prepetition Claim (Substantive Objection)* [Docket No. 33110] are dismissed as moot.

---

[2]    Capitalized terms not defined in this order shall have the meaning ascribed to them in the Settlement Agreement.

5.      The mediation scheduled in the *Stipulation and Agreed Order re Mediation of Contested Matter re Claim No. 18496-1* [Docket No. 33124], as supplemented by the *Joint Stipulation and Agreed Order Selecting Mediator in Contested Matter re Claim No. 18496-1* [Docket No. 33126], and as amended by the *Amendment to the Stipulation and Agreed Order re Mediation of Contested Matter re Claim No. 18496-1* [Docket No. 33144], has been completed.

6.      The Reorganized Debtor shall direct its claims agent Rust Consulting, Inc. to record: (i) the Allowed State Claim as an allowed, non-contingent, and liquidated claim on the terms and conditions set forth in the Settlement Agreement; and (ii) the State Claim (Claim No. 18496-1) as disallowed in all other respects and expunged.

7.      Notice of the Motion as provided therein shall be deemed good and sufficient notice of such motion and the requirements of Fed. R. Bankr. P. 6004(a) and the local rules of the Court are satisfied by such notice.

8.      The Court shall retain jurisdiction to hear and determine all matters arising from or relating to the implementation of this Order.

9.      This Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing and shall not be stayed under, as the case may be, Fed. R. Bankr. P. 7062, Fed. R. Bankr. P. 6004(h), Fed. R. Bankr. P. 9014, or otherwise.

10.    In the event of any conflict between the terms of this Order, the Motion, or the Settlement

Agreement, the Settlement Agreement shall govern.

Dated: _____, 202_


_____

Honorable Ashely M. Chan
United States Bankruptcy Judge

## EXHIBIT TO ORDER

## Settlement Agreement